Stephan J. Schlegelmilch
David S. Mendel
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**KIK INTERACTIVE INC.**<br><br>**Defendant.** | **Case No.  19-cv-5244**<br><br>**Jury Trial Demanded** |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC") alleges as follows against Defendant Kik Interactive Inc. ("Kik"):

### SUMMARY

1.      From May to September 2017, Kik offered and sold one trillion digital tokens called "Kin."  More than 10,000 investors worldwide purchased Kin for approximately $100 million in U.S. dollars and digital assets – over half of this sum coming from investors located in the United States.  However, Kik's offer and sale of Kin was not registered with the SEC, and investors did not receive the disclosures required by the federal securities laws.

2.      Congress enacted the Securities Act of 1933 to regulate the offer and sale of securities. In contrast to ordinary commerce, which often operates under the principle of *caveat emptor*, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to

the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest. Such disclosure is ordinarily provided in a "registration statement," which provides public investors with financial and managerial information about the issuer of the securities, details about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

3. Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce. Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed or an exemption from registration applies. Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an exemption.

4. The definition of "security" includes a range of investment vehicles, including stocks, bonds, and "investment contracts." Investment contracts are transactions where an individual invests money in a common enterprise and reasonably expects profits to be derived from the entrepreneurial or managerial efforts of others. In a variety of circumstances, courts have found that investment vehicles other than stocks and bonds constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, airplanes, mobile phones, and enterprises existing only on the Internet. As the Supreme Court of the United States has noted, Congress defined security broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

5. Kik, a private Canadian company founded in 2009, owns and operates a mobile messaging application called Kik Messenger. Despite Kik Messenger's initial success and the

company's receipt of venture capital funding, Kik's costs have always far outpaced its revenues, and the company has never been profitable.

6.      In late 2016 and early 2017, Kik faced a crisis.  Fewer and fewer people were using Kik Messenger.  The company expected to run out of cash to fund its operations by the end of 2017, but its revenues were insignificant, and executives had no realistic plan to increase revenues through its existing operations.  In late 2016 and early 2017, Kik hired an investment bank to try to sell itself to a larger technology company, but no one was interested.

7.      Faced with a shrinking financial "runway," Kik decided to "pivot" to an entirely different business and attempt what a board member called a "hail Mary pass":  Kik would offer and sell one trillion digital tokens in return for cash to fund company operations and a speculative new venture.

8.      Starting in early 2017, Kik began to devise a plan to offer and sell digital tokens.  The plan became public on or about May 25, 2017, when Kik announced the Kin token offering by publishing a "white paper" and issuing press releases, and through a speech by Kik's Chief Executive Officer ("CEO") at a blockchain industry conference in Manhattan.  Through these and other outlets, Kik enthusiastically described the Kin offering and Kik's plans to create, develop, and support what Kik called the "Kin Ecosystem," in which, at an unspecified future date (if the project was successful), Kin could be used to buy goods and services.

9.      From the initial May 2017 announcement through September 2017, Kik relentlessly pitched Kin and the prospect that Kik's future efforts to develop the Kin Ecosystem would drive an increase in Kin's value.  Kik emphasized that only a finite number of tokens would be created and that rising demand for the tokens would cause their value to appreciate.  Kik promised that it would spur such demand by dedicating company expertise and resources – including proceeds from Kin sales – to specific, Ecosystem-enhancing projects, including:  the redesign of Kik Messenger to

incorporate Kin; the creation of what Kik called a "rewards engine" to compensate companies that fostered Kin transactions; and the implementation of a new, Kin-specific "transaction service" to address flaws in existing blockchain technology.  Kik also assured prospective buyers that, following distribution of the tokens, buyers would be able to trade Kin on secondary trading platforms, often described as "exchanges," enabling conversion of Kin to either a digital asset (*e.g.*, Bitcoin or Ether) or fiat currency (*e.g.*, U.S. dollars).

10.    Throughout its Kin promotional campaign, Kik also declared that the company would share with buyers a common interest in profiting from Kin's success:  in addition to selling one trillion tokens through its then-ongoing offering, Kik would create and allocate to itself three trillion Kin tokens over a two-and-a-half-year period.  Kik told potential buyers that, by allotting 30 percent of the outstanding supply of Kin to itself, the company would align its financial interests with those of other Kin investors, which would give the company an incentive to take entrepreneurial and managerial steps to increase the demand for the token.  And, Kik described Kin as an opportunity for both Kik and early Kin investors to "make a ton of money."

11.    Starting with the May 2017 announcement, Kik offered and sold the one trillion Kin tokens in a single offering aimed at both wealthy investors and the general public.

12.    From May to September 2017, Kik offered and sold tokens to professional investment funds and other select, wealthy investors using purchase agreements that Kik called "Simple Agreements for Future Tokens" or "SAFTs."  Kik's SAFTs entitled purchasers to the future delivery of the Kin that they purchased when they entered into the agreements.  Under the SAFTs, investors bought Kin at a discount to the price that the general public would pay, and Kik promised to deliver the tokens pursuant to a schedule, half at the time that it delivered tokens to the general public and half on the one-year anniversary of the first delivery.  Kik's sale of Kin through these purchase agreements was denominated in U.S. dollars, and Kik raised approximately $49 million.

13.     From May through September 2017, Kik also offered Kin to the general public and had public investors sign up for this public sale, even while the company was offering and selling discounted Kin to investment funds and other wealthy investors using its SAFTs.  Kik's September 2017 sale of Kin to the general public was denominated in Ether, and Kik received approximately $50 million worth of this digital asset.

14.     On September 26, 2017, Kik delivered to the public investors all of the Kin that they had purchased, and delivered to the investors who bought at a discount through SAFTs half of the tokens they had purchased, pursuant to the contracts' terms.

15.     Of the nearly $100 million in cash and Ether received by Kik, over $55 million was raised from United States-based investors.

16.     Throughout Kik's 2017 offering and sale of Kin, the decentralized economy that Kik had marketed did not exist.  In addition, when Kik distributed Kin on September 26, 2017, no one – not even Kik – offered goods or services in return for Kin.

17.     On July 25, 2017, approximately seven weeks before Kik started the public sale of Kin, the SEC issued what is often called the "DAO Report."  The DAO Report "advise[d] those who would use . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws," and found that digital assets at issue in that matter were securities.  Even prior to the DAO Report, however, Kik had been informed by one of its consultants that the Kin offering was, potentially, an offering of securities that needed to be registered with the SEC and that "unregistered public securities offerings are not legal in the U.S."

18.     Under the federal securities laws, Kik offered and sold securities from the initial May 2017 announcement of Kin through September 2017.  But, Kik has never filed with the SEC a registration statement for its offer and sale of securities.  By failing to prepare and file a registration

statement, Kik did not provide important information to investors regarding the investment opportunity promoted by Kik, such as information about Kik's current financial condition (including that the company's expenses far exceeded its revenue), future plans of operation and budget, the proposed use of investor proceeds, and detailed disclosure of material trends and the most significant factors that made the offering speculative and risky.  Kik thus failed to disclose information relevant for investors to evaluate Kik's promises about the investment potential of Kin and the Kin project.

19.    Kin is currently trading on unregulated trading platforms at about half of the value that public buyers paid in the offering, and, during the intervening period, it has often traded much lower.

20.    By engaging in the conduct set forth in this Complaint without a registration statement being in effect or filed, Kik has engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

21.    Unless Kik is permanently restrained and enjoined, it will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

22.    The SEC brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)].

23.    The SEC seeks a final judgment: (a) permanently enjoining Kik from engaging in acts, practices, and courses of business alleged herein; (b) ordering Kik to disgorge its ill-gotten gains and to pay prejudgment interest thereon; and (c) imposing civil money penalties on Kik pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)].

**JURISDICTION AND VENUE**

24.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)].

25.     Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

26.     Those transactions, acts, practices and courses of business include, but are not limited to: (a) Kik's office in this district from which Kik employees marketed the Kin offering and worked to create demand for Kin tokens: (b) Kik's announcement of the Kin offering at a blockchain conference held in this district; (c) Kik's employees' travel to and work in the United States to promote the Kin offering, including meetings with potential purchasers, including potential purchasers located within this district; (d) Kik's retention of consultants located in this district to work on and promote the Kin offering; and (e) Kik's offers and sales of Kin tokens to purchasers located within in the United States, including in this district.

27.     Kik has agreed to jurisdiction in the United States concerning disputes relating to Kin. When selling Kin to the general public, Kik required investors to agree that all disputes about the purchase and use of Kin would be heard by an arbitrator or court in the United States, specifically in the State of Delaware.

**DEFENDANT**

28.     **Kik Interactive Inc. ("Kik" or "Defendant")** is a privately-held Canadian corporation with headquarters in Waterloo, Ontario, and offices in New York City and Tel Aviv.

## BACKGROUND ON DIGITAL ASSETS

29.     An "Initial Coin Offering" or "ICO" is a fundraising event in which an entity offers participants a unique digital asset – often described as a "coin" or "token" – in exchange for consideration (most commonly Bitcoin, Ether, U.S. dollars, or other fiat currency).  The tokens are issued and distributed on a "blockchain" or cryptographically secured ledger.  Kik's offer and sale of Kin from May to September 2017, including the sales through SAFTs and to the general public, constituted an ICO.

30.     A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a network and records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks."  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain.  The system relies on cryptographic techniques for securely recording transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  Some blockchains can record what are called "smart contracts," which are, essentially, computer programs designed to execute the terms of a contract when certain triggering conditions are met.

31.     ICOs are typically announced and promoted online, although other marketing may be employed.  Issuers often release a "white paper" describing the project and promoting the ICO, often in highly technical terms and jargon.  To participate, investors are generally required to transfer consideration to the issuer's address, bank account, digital "wallet," or other account.  After the completion of the ICO, the issuer will distribute its tokens to the participants' unique address on the blockchain.  In marketing the Kin ICO, Kik often referred to the public sale and distribution of Kin as the "token distribution event" or the "network launch."

32.     Issuers and individuals increasingly have been using blockchain technology in connection with raising capital for businesses and projects.  And blockchain-enabled offerings are

often targeted at retail investors in the United States and globally. The overall size of the ICO market has grown exponentially. It is reported that more than $20 billion was raised between June 2017 and November 2018.

33.     After the initial sale by an issuer, tokens are sometimes transferred between users or listed on online trading platforms, which are sometimes colloquially referred to as "exchanges," whereon the tokens trade for other digital assets or fiat currencies.

### OTHER ENTITY DISCUSSED IN THIS COMPLAINT

34.     **Kin Ecosystem Foundation ("Foundation")** is a non-profit foundation that Kik announced to the public in May 2017 and created under Canadian law on September 12, 2017. The Foundation has had a two-member board of directors since its founding. Initially, the directors were Kik's CEO and Chief Financial Officer ("CFO"). Since May 2018, the directors have been Kik's CEO and a long-time Kik consultant. Because Kik's CEO has always been one of two board members, the Foundation has always needed the CEO's approval to conduct any business. As discussed further below, the Foundation was created so that it could receive six trillion Kin to distribute in such a way as to compensate – through the so-called "rewards engine" – companies that promote Kin transactions and, therefore, boost participation in the Kin Ecosystem and demand for Kin.

### FACTS

### I.     IN EARLY 2017, KIK FACED FINANCIAL CRISIS

35.     Since its founding in 2009 until its 2017 ICO, Kik raised at least $120 million from venture capital investors and a Chinese technology and entertainment conglomerate.

36.     Prior to the Kin project in 2017, Kik's only business line was Kik Messenger, a mobile software application or "app," which lets users communicate with each other using mobile devices.

The app had initial success, attracting millions of users around the world, with a significant concentration among teenagers and young adults in the United States.

37.     After several years, however, Kik's business faltered.  In 2016, Kik Messenger became less and less popular.  Daily average users dropped from more than 10 million in January 2016 to about 6 million in January 2017.  Monthly average users dropped from more than 28 million in January 2016 to about 20 million in January 2017.

38.     Kik Messenger had always been difficult for Kik to monetize, and Kik has never generated appreciable revenue and has never been profitable.  From mid-2015 to mid-2016, the company recorded $2.2 million in revenue but had total expenses of $29.2 million, and the company experienced a comprehensive loss, before adjustments for income taxes, of $29 million.  From mid-2016 to mid-2017, the company recorded $1.5 million in revenue but had $32.3 million in expenses, and the company experienced a comprehensive loss, before adjustments for income taxes, of $32.9 million.

39.     During its early years, Kik Messenger was a competitor of other messaging applications, such as Snapchat and WhatsApp, but the fates of these companies diverged.  In 2014, Facebook purchased WhatsApp for approximately $19.3 billion, and, in March 2017, Snapchat conducted an IPO.  Kik, however, failed to develop ways to generate revenue through Kik Messenger and failed to find a buyer.

40.     In or about October 2016, Kik hired an investment bank to identify companies that might buy Kik.  The investment bank contacted 35 parties and signed confidentiality agreements with seven companies that wanted additional information about Kik.  By February 1, 2017, however, all seven potential suitors had declined to buy or merge with Kik.

41.     By early 2017, Kik had spent most of its venture capital money and had remaining cash of about $26 million, expending about $3 million a month to support its operations.  In early

2017, Kik's executives repeatedly warned the company's directors about Kik's financial "runway" – the time by which Kik would run out of money to fund operations under then-current spending levels – and Kik predicted it would run out of cash sometime during the late fall of that year.

## II. HAVING NO OTHER OPTIONS, KIK "PIVOTED" TO DIGITAL TOKENS

42.     Facing steadily-declining cash reserves and no reasonable prospect of generating meaningful revenues from its current business, Kik's executives discussed the idea of "pivot[ing]" to digital tokens as "a way to raise capital."  By early 2017, Kik's senior management had concluded that an ICO was Kik's only option.  One member of Kik's board of directors, soon after discussions began, described the plan as a "hail Mary pass."

43.     From the outset, Kik saw investors and speculators as a crucial target audience for an ICO.  For example, in a meeting on February 16, 2017, Kik's executives and directors discussed the need to craft an offering that would appeal to "cryptoinvestors" and the growing market for "cryptoassets," highlighting a "50% three-year CAGR [compound annual growth rate]" for such investments.  At this meeting, Kik executives and directors anticipated that "Crowdfunders" "would invest in tradable digital tokens of a non-blockchain company if offered good risk-return potential."

44.     The timing of Kik's pivot coincided with a dramatic uptick in the number of ICOs generally.  CoinDesk (an online information service focusing on the blockchain industry) reports that in 2017 at least 343 ICOs occurred, up from only 43 the year prior.

45.     At the February 16, 2017 board meeting, facing a dearth of other options, Kik's board of directors instructed the executives to assume that Kik would conduct an ICO.

46.     Following the meeting, in an email to several employees dated February 28, 2017, Kik's CEO described Kik's new "crypto story," which would be "a new way" to raise capital.  He wrote that the company would "sell some [tokens] to crypto investors to raise money," and that

"[m]ore demand" for the token would mean "[v]alue goes up" and, therefore: "Buy today, sell tomorrow, profit."

47.    Similarly, in a March 24, 2017 email to employees, Kik's CEO described his "[v]ision" for an offering of tokens (then called "Kik Points").  He explained that Kik's creation of demand for the tokens in the future would mean that people could buy now at a low price and sell later at a higher price to "creat[e] a return":

> [I]f you buy some Kik Points today when the demand is low, then you will be able to sell them at a higher price tomorrow when the demand is higher, creating a return.  This potential return encourages investors to "buy in" at an ICO.  An ICO is where Kik takes a portion of its reserves from its Fort Knox (say 100 million of the 1 billion Kik Points that we initially created and put in our Fort Knox) and sells them in an auction. The value proposition to investors is that if they buy in today at the ICO, and then the demand for the currency goes up because of all the things we do to create demand for them, then they will be able to sell their points at a higher price in the future, and make a return.  The money taken in from investors for the ICO is used by Kik to fund development to create more and more demand by both growing the community, and by growing the demand for the currency within the community.

48.    During this same time period, Kik began to work with a consulting firm located in New York City to research the market for tokens and other digital assets and to design an ICO.

49.    The consultant's research confirmed for Kik that "serious cryptoinvestors globally as well as small VC funds and family offices that are pushing into the space" could, in fact, become interested in adding Kik's tokens to their existing portfolios of digital assets.  The consultant's research also indicated to Kik that the majority of people who would buy a potential token would do so for investment purposes, rather than to use the token to obtain goods or services.

50.    On or about April 10, 2017, in advance of a meeting of Kik directors later that same week, Kik's CEO sent to the directors his PowerPoint presentation for the meeting, entitled "Kik & Cryptocurrency," together with a report prepared by Kik's consultant.  The materials highlighted results from the consultant's "Cryptoinvestor Survey" and "Cryptoinvestor Expert Panel" and

included a "Funding perspectives" slide showing revenues from average historical token sales and predicted a capital raise of "$100 million easily" from the offering.  The materials set forth a "roadmap" for a token sale later that year and included steps for an "investor marketing plan" and an "exchange outreach."

51.     During this time, Kik decided to name the new tokens "Kin" and worked with its consultants to design plans for what would eventually be called the "Kin Ecosystem."  Kik also hired other companies in the United States and abroad to help it design and publicize the offering.

52.     In approximately April 2017, Kik and its New York-based consultants started to draft a "white paper" through which the company would announce the offering of Kin to the public and spur investment.

53.     In early May 2017, Kik's CEO told the company's board that he expected to announce the token offering later that month.  From at least this time period through the September 2017 public sale, Kik planned a single offering of one trillion tokens, which would raise for Kik about $100 million.

54.     On May 22, 2017, in advance of a telephonic board of directors meeting the next day, Kik's CEO sent the directors a PowerPoint presentation with details about the company's planned offering, which had been fleshed out during the drafting of the white paper.

55.     The presentation explained that Kik would create a total supply of 10 trillion Kin tokens and offer a "[f]loat" of 10 percent of that supply (*i.e.*, one trillion tokens), with a "Total Raise Target" of $100 million.  Kik would then use proceeds from the offering to build the "Kin Ecosystem" and fund company operations.  Kik planned to offer the one trillion tokens in multiple "tranches," with buyers in the earlier tranches committing funds well in advance of a sale of Kin to the general public in exchange for discounts from the final offering price.

56.    Kik had also decided to sell Kin in one or more of the early tranches by entering into SAFTs with investment funds and other wealthy investors.  As of May 22, 2017, Kik planned to raise up to $50 million through SAFTs, in what Kik called a "Pre-Sale," and between $50 million to $75 million more in what Kik called the "public tranche[s]."

57.    The May 22, 2017 presentation summarized Kik's anticipated sale of Kin as follows:

## Token Sale Structure (Soft Cap)

| | |
|---|---|
| Token Supply | 10T Tokens |
| Float Offered | 10% |
| $ Tranches Based Pricing Discounts | 35%; $0-25M SAFT<br>25%; $25-50M SAFT 2<br>20%; $50-75M (first public tranche)<br>10%; $75-100M (last chance for discounts)<br>0%; $100-125M (post soft cap) |
| Soft Cap | $100M (followed by a 24 hour countdown once reached) |
| Sale Time | 30 days maximum |
| Minimum | TBD |
| Distribution | Fixed 10% sold; Token Allocation calculated at end of sale based on proceeds raised and distributed per the example |
| Vesting | Time and Performance based for Founder and Foundation tokens only |

58.    The presentation also explained – and Kik's CEO reiterated during the telephonic call with Kik's board the next day – that 30 percent of the total number of tokens created (*i.e.*, three trillion) would be allocated to Kik under a future vesting schedule, while 60 percent of the total supply (*i.e.*, six trillion) would be allocated to a new "Kin Foundation" that Kik would establish.  By keeping three trillion Kin, Kik planned to profit from any future appreciation of Kin.

59.    Before the May 2017 public announcement, Kik drafted a single "communications strategy" that would run from the announcement until the "token distribution event" and encompass both the "Pre-sale" and "Public sale" phases.  Kik also planned a single "Investor Roadshow" that included events in New York City, San Francisco, and abroad.  The plan included

the public announcement at which Kik would "[d]rive interest and awareness of Kik token sale," meetings with venture capitalists, and the token sale itself (then scheduled for July 2017), at which Kik would "Drive participation in sale" by the "Crypto community."

60.     On or about May 23, 2017, Kik's board voted to approve the timeline, the allocation of the ten trillion Kin, the split between a "pre-sale and public sale," and the white paper.

61.     At this time, the Kin Ecosystem did not exist, and there were no services or products that could be purchased with Kin.  The Kin Ecosystem would only come to exist, if at all, after investors bought in and after Kik spent proceeds of the ICO in its efforts to build the Kin Ecosystem.

## III.    KIK PITCHED THE KIN OFFERING BY EMPHASIZING THE OPPORTUNITY TO PROFIT

62.     On May 25, 2017, Kik's CEO spoke in New York City at the Token Summit, a conference for people interested in digital assets, and publicly announced its offering of Kin tokens. Kik chose the Token Summit because, as a Kik executive observed, "the primary audience for the initial announcement really is an investor community," and such investors were expected to be in attendance.  The presentation was videotaped and posted by Kik on YouTube, making it accessible to anyone on the Internet.

63.     Also on May 25, 2017, in coordination with the Token Summit presentation, Kik's CEO appeared on CNBC, and Kik published on social media and other Internet sites various statements and documents that described the Kin offering, including, but not limited to, (a) Kik's white paper; (b) a post by Kik's CEO on Medium (an online publishing platform); (c) a press release entitled "Kik to Integrate Kin Tokens as First Mainstream Adoption of Cryptocurrency"; (d) another press release entitled "Announcing Kin, cryptocurrency for an open future"; and (e) a professionally produced video that Kik posted on YouTube.

64.   These public statements repeated and expanded upon Kik's Token Summit presentation.  Kik provided information on the amount of Kin to be sold and invited interested investors to sign up for alerts and information on Kik's website.

65.   The public statements – along with subsequent statements throughout the offering – highlighted Kik's vision that it would profit alongside other Kin investors, because the value of Kin held by both Kik and outside investors would increase as Kik helped increase demand for Kin.  For example, during his May 25, 2017 CNBC appearance, Kik's CEO stated:

> You are just bringing people together, creating a place where they can create value for each other transacting in a new cryptocurrency.  And that alone is enough to make a great financial return. . . . . .  How that makes money for Kik is that we create a new cryptocurrency such that there is only going to be so much of it.  We set some aside for us such that if more and more people transact in the cryptocurrency, the value of it grows such that the value of our holdings grow as well.

66.   Kik's CEO also touted the initial success of Kik Messenger and the company's experience when assuring viewers that Kik would take steps to stimulate demand for Kin and, therefore, increase its value.  For instance, Kik promised to start by integrating Kin into Kik Messenger "to really give it value."  One of Kik's press releases further explained that the company would create a "rewards engine" – which did not then exist – that would daily distribute Kin to developers to give them an incentive to create more Kin-related transactions, thereby making Kin more valuable:

> To maximize the chance of success, we're dedicated the majority of Kin to a rewards engine that will provide a financial incentive for developers.  Each day, using an algorithm that reflects each service's contribution, the Kin rewards Engine will divvy up a set amount of Kin among all the services in the ecosystem. . . .  In time, it can create a network effect:  as the daily reward increases in value, more developers will join, there will be more Kin transactions, Kin itself will become more valuable, and in turn the daily reward will be worth even more…

67.     Kik's May 25 Medium post made many of the same points, also stating that, because of increased demand that would result from Kik's efforts to build and support the ecosystem, "Kin itself will become more valuable, and in turn the daily reward will be worth even more."

68.     While touting the prior successes of Kik Messenger and outlining its future plans for Kin, Kik did not publicly disclose its financial statements, including the fact that its costs far exceeded revenues, or that the company anticipated running out of money absent a successful ICO, or other details about Kik and the offering that Kik would have been required to include in a registration statement filed with the SEC for the offering.

69.     In the weeks and months following the May 25 announcements, Kik promoted the Kin offering through numerous channels that resembled a traditional road show for an initial public offering of securities, where a series of presentations are made in various locations leading up to the offering.  Kik's promotion included a multi-city publicity tour, during which Kik executives gave both public presentations intended to raise awareness of the public sale and private meetings with potential investors.  This road show included an event in San Francisco on or about June 28, 2017, as well as stops in China, the United Kingdom, and Canada.

70.     In planning this road show, Kik executives and Kik's New York-based consultants identified events – often called "meetups" – that attracted "cryptoinvestors," and they tried to identify the "Top 3" investors in cities to which Kik's CEO travelled.  Several of Kik's road show events were videotaped and posted on YouTube.

71.     Concurrent with the publicity tour, Kik executives communicated and met with individual potential buyers by calling, emailing, and travelling to multiple United States cities, including to New York City and San Francisco.  Kik employees also continued the company's campaign to market Kin to the public by posting messages on social media, Medium, Twitter (an

online news and social networking service), Reddit (a social networking and news aggregation website), Slack (an online hub for communication and collaboration), and other online platforms.

72.     During this same time period, the overall demand for other digital tokens and assets significantly increased, and potential Kin investors were well aware that older digital assets (such as Bitcoin) had dramatically risen in value, generating monumental returns for early investors.  As the Kin offering's lead investor observed, "[t]he ICO market [was] white hot."  Kik repeatedly reminded potential Kin investors of the recent performance of older digital assets when pitching Kin as an investment opportunity.

73.     Kik and its agents also repeatedly primed potential purchasers' expectations that early Kin buyers would profit by invoking the "dot com" era as a prior example of the opportunity to make money in a quickly developing market.

74.     For example, at the June 28, 2017, San Francisco "Bitcoin Meet-up," Kik's CEO specifically cited the dot com era, predicting that "people are going to make a lot of money" with tokens and ICOs and directly comparing investors who would buy in Kik's token "crowd sale" to the venture capitalists who had earlier invested in Kik:

> So, I think – like, for me, I think is like the dot com, for better and for worse. So, you know, there is a lot of hype right now, and people are going to make a lot of money -- people have made a lot of money.  People are going to lose a lot of money here.  This is coming, right?  It's going to happen multiple times as we move through this innovation, but at the end of the day, Amazon and Google came out of the dot com.
>
> And so, this is how I view, like, tokens and ICOs.  I think 90% of them probably are going to go to zero, and people are going to lose a lot of money, and you know, the regulators are going to come in.  They're going to say, how do we make this (inaudible) for innovation, but still make it safe for consumers, and everybody's going to be trying to figure this out, and it's going to be crazy.
>
> It's going to be – I was in like, high school at the time, but I think like 2001 -- in 2000 or 2001, whatever year it was, it's going to be that all over again, and I think for us, it's – we believe that, you know, a few huge economic entities are going to come out of this space, and I think that actually a few huge economic entities have already come into this space.

And so, I think, you know, like everything, it's risk and reward, but I think, you know, we have a good story, and I think we're trying to do it in a fair, way, and I think our heart's in the right place, and we're going to do everything we can.

You know, what really scares me at the end of the day is disappointing people, and I think what scares me about doing a crowd sale is before, if Kik failed, I would disappoint a bunch of rich people. But now if Kik fails, I will disappoint a bunch of regular people, and that, like, really weighs on me. (Inaudible) we need – so, we're going to do everything we can to make it a win for everybody.

These comments were recorded, streamed live on the Internet, and posted on YouTube.

75.     In addition, Kik's CEO frequently pitched Kin by noting the similarities between it and venture capital investing, and touting the advantages of buying tokens. For example, speaking on the "Finance Magnates" podcast on August 1, 2017, which was streamed live on the Internet and posted on YouTube, Kik's CEO stated:

You know, I think compared to VC investing, for example, one, you can get in at basically any stage and in any amount, and two, you can get out at any stage, and in any amount, and I think that's really compelling, you know, this idea that I can get in early, identify something that could be big.

If I'm right, it can go up in value. I can sell maybe half of the crypto I hold and let the rest keep going. On the other side, I think that's also the challenge of crypto fundraising, which is, how do you sort of figure out which are the good ones, and which are not, and then how do you keep these teams sort of honest and executing on the vision that they laid out?

Because I think that's the hard thing now. There's a lot of projects right now. They're all raising lots of money. It's hard to know which are the good ones and which are not, and then once those projects get that money, it's hard – it's hard to see, you know, if when we were five people eight years ago, somebody had given us $100 million.

Like, that would've been runway forever, and there would've been no sense of urgency to figure out the next phase of the vision so that you could create the next version of the story so you could go out and raise more money, and keep the company alive.

Now, it's like, hey guys, like, you know, we could spend a million dollars a year for the next 100 years, and we still wouldn't have run out of money. So, I think that's going to be the challenge of crypto, is picking out which ones are the good ones versus the bad ones, and then creating that sense of urgency and accountability behind the teams.

76.     Various observers, including financial and technology news sources, that reported or publicly commented on Kik's offering of Kin either repeated the company's statements that Kin could appreciate or themselves analyzed Kin as a potential investment.  For example, a writer reporting on the June 2017 conference in China repeated statements by Kik's CEO about Kin's investment potential:

> While some people have made significant money off of bitcoin, others are skeptical as to whether volatile cryptocurrencies are a good investment. [Kik's CEO] can see it going either way.  "The way I think about ICOs is it's very similar to the dot-com era.  There was a bunch of excitement, people made a bunch of money, people lost a bunch of money but Amazon and Google came out of it."

77.     An article by a CNBC columnist dated July 11, 2017, discussed how Kik saw its ICO as a way for Kik itself to "exit" like an IPO, and calculated Kik's potential profit if Kin increased in value like other digital assets had done.

78.     Similarly, a September 4, 2017 article on an online blockchain news service described Kik's plan to use the proceeds from Kin sales to create the Kin Ecosystem, and analyzed the merits of buying Kin both "for flipping" and for its "long-term potential" as an investment, opining on the project's implied valuation and the risk that investors could sell rapidly on secondary trading markets.

## IV.    KIK ASSURED BUYERS THAT ANY KIN PURCHASED COULD BE EASILY RESOLD

79.     In the initial announcements of the Kin project and throughout the Kin offering, Kik told potential purchasers that they would be able to easily liquidate their Kin holdings and that Kin would trade on online trading platforms, which Kik referred to as "exchanges," soon after issuance.

80.     For example, in its May 2017 white paper, Kik stated that it expected Kin to trade on "exchanges" and that Kik's choice of the ERC-20 token protocol, a specific technical standard on the Ethereum blockchain, would make Kin easy to trade on trading venues operating on the Ethereum blockchain.

81.    Similarly, during a June 2017 conference in China, Kik's CEO stated that "the beautiful thing with these cryptocurrencies, is, you know, they're immediately tradable.  So on day one, Kin will go on to a bunch of exchanges where you can exchange it for other cryptocurrencies, or even other fiat currencies."

82.    On July 6, 2017, in response to an investor's inquiry about future tradability, a Kik executive responded that "once the token goes live (looking at end of summer).  It will be traded on a number of exchanges . . ."

83.    Kik also tweeted assurances regarding the future tradability of Kin, often using a Twitter account in the name of the Kin Foundation, which Kik had not yet created.  For example, on August 29, 2017, Kik wrote that "many" "exchanges" had indicated that they would list Kin:



And, similarly, on September 17, 2017, Kik stated:



84.     Kik intentionally promoted the future transferability of Kin, among other reasons, because the company understood that potential investors would want the ability to freely trade the Kin, like more traditional securities, and that liquidity would facilitate an increase in Kin's value.  Kik employees and other agents tracked platforms where Kik's token might trade and contacted at least one trading platform to inquire about listing Kin.

## V.     KIK'S SAFT REQUIRED KIK TO DISTRIBUTE KIN BEFORE KIK COULD CREATE AN ECOSYSTEM

85.     As Kik planned and then publicly announced its offering of Kin, the company remained acutely aware of its urgent need to raise cash, both to support continuing company operations and to advance the Kin project, including Kik's proposed Kin Ecosystem.  Indeed, on May 4, 2017, Kik's CEO advised Kik's board that the end of the company's cash runway was only six months away – October 9, 2017, with severance payments to fired employees, or November 1, 2017, without severance.

86.     Consequently, Kik chose an offering strategy designed to expedite the flow of cash to Kik:  it sold Kin at a discount to wealthy investors using SAFTs.  However, while the SAFT

temporarily solved Kik's cash problem, it created another.  The express terms of the SAFT created a hard-and-fast deadline for Kik to conduct the ICO and imposed dire consequences if it did not.

### A.    Kik's SAFT

87.    Under the SAFT used by Kik, the company sold Kin to certain professional investment funds and other wealthy investors, half of which would be delivered at the time that Kik delivered Kin to public buyers and half a year after that.  Such investors paid a sum certain at the time they entered into the SAFTs, but Kin would be delivered in an amount that reflected the discounted price – that is, they paid only 70 percent of the maximum price at which the Kin would be sold during the public sale.  Thus, the number of Kin received by the investor was contingent on pricing during the public sale.

88.    An investor who purchased Kin pursuant to a SAFT could not unilaterally cancel the contract and, after Kik launched Kin on the Ethereum blockchain, automatically would receive an allotment of Kin without needing to take further action.  The SAFT placed no restrictions on when or how the investor could sell the tokens, and once an investor received Kin, the token could be immediately sold.  All Kin – regardless of whether it was purchased pursuant to a SAFT, in the public sale, or on the open market – were unrestricted.

89.    Shortly before Kik's May 25, 2017 public announcements about Kin, Kik executives met in New York City with at least one hedge fund founder to discuss a possible investment in Kin. At the meeting, Kik described how it would use Kik Messenger to create interest in the tokens. That hedge fund later entered a SAFT and became the lead investor in the Kin offering.

90.    Following its May 2017 public announcement of Kin, Kik sent select potential investors non-binding term sheets that described Kik's plan to raise $50 million through SAFTs. Kik also provided a private placement memorandum ("PPM") that included, among other information, a company overview, biographies of Kik's directors and management, and a description

of the Kin project.  The PPM did not contain information about the company's financial history or failure to generate profits.  Investors who purchased in the later, undiscounted, public sale did not receive this or any other PPM.

91.     Although Kik's SAFT specifically stated that the SAFT was itself a security, it failed to state that the Kin to be delivered under the SAFT were securities sold pursuant to the SAFTs.  And although Kik's PPM claimed that the offer and sale of the SAFTs were subject to an exemption from registration under Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, among other United States laws, Kik did not claim any exemption for the offer and sale of Kin through the SAFT.  As such, Kik's offer and sale of the SAFTs and Kik's offer and sale of the Kin purchased under the SAFTs were not registered.

92.     By entering into the SAFTs, Kik locked itself into an aggressive schedule for issuing Kin that did not depend on whether or when Kin actually could be used to buy goods and services. The SAFTs created a September 30, 2017 deadline for the public sale (which the SAFT and PPM called the "network launch"), a deadline that Kik could extend only once by a maximum of 60 days, until November 30, 2017.  If the public sale did not occur by the deadline, the SAFTs required Kik to return 70 percent of the invested cash to these investors.

93.     Kik would go on to raise approximately $49.5 million pursuant to SAFTs.  Thus, if the public sale did not occur by the SAFT's deadline, Kik would have been obligated to return $35 million to these early investors, which would jeopardize the entire Kin project and Kik as a going concern.

94.     At least one major investor advised Kik that the investor would view any delay in issuing the tokens – even a delay to permit Kik to build out the Ecosystem or functionality of the token – as a reason to not invest.  As explained in a June 13, 2017 email that Kik's CEO received:

> We reached out to the lead investor on the pre-sale and talked about extending
> the time before the Company would conduct the [token distribution event]

and offered the reason why and much to our surprise, the proposed delay was viewed adversely and would impact the lead investor's decision to participate in the pre-sale.

95.     Similarly, Kik executives were worried that that the market for digital tokens might cool, or that other social media companies could offer digital assets before Kik and deprive it of significant first-mover advantages.

### B.     *Kik Was Well Aware That The Kin ICO Could Be A Securities Offering*

96.     Kik subjected itself to the SAFT's mandated schedule despite being aware, since at least February 2017, of a risk that United States and Canadian regulators would conclude that the offer and sale of Kin should be regulated as securities – specifically, as "investment contracts" – under the United States Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), or under analogous Canadian law.  A finding that Kik was selling securities would be significant, among other reasons, because it would trigger a requirement to register the offering of Kin with the SEC, absent an applicable exemption.

97.     For example, before Kik's public announcement of Kin, on or about April 3, 2017, the New York-based consultant that had been advising on the Kin offering warned Kik that the SEC would "potentially apply" the "*Howey* Test" to determine if sale of tokens would constitute an "investment contract."  The consultant also told a Kik executive, "You don't want your offering to be a securities offering, as that comes with a huge regulatory burden and expense (it's essentially like taking your company public).  On the other hand, unregistered public securities offerings are not legal in the U.S."  Several days later, on April 10, 2017, a series of PowerPoint slides provided to Kik's board of directors included the consultant's warning that a Kin offering that raised "millions" and "was highly marketed to users and the public at large . . . risk[ed] becoming a security in the eyes of the SEC very quickly."

98.    Also before the start of the Kin offering, on or about May 5, 2017, Kik's CEO sent the board of directors a series of PowerPoint slides that warned: "Risks. (1) Securities law."

99.    By committing to the deadlines that led to the September 2017 public sale, Kik prioritized its business need to raise capital over its obligation to comply with the United States securities law requirement that an offering or sale of securities be registered unless it qualifies for an exemption.

### C.    Kik Rushed To Create A "Minimum Viable Product" For Kin Owners

100.    By May 2017, Kik decided to hold the public Kin sale as soon as the company had created what it called a "Minimum Viable Product" for the token.

101.    By late June 2017, Kik told wealthy investors considering whether to buy tokens through SAFTs that Kik would sell Kin to the general public once it created the Minimum Viable Product. Kik's PPM described the Minimum Viable Product and stated that Kik would use proceeds from the sale of SAFTs to create the Minimum Viable Product and, as a second step, the broader Kin Ecosystem.

102.    Ultimately, Kik pursued the ICO without first achieving a decentralized economy for Kin, and without even ensuring that investors would be able to buy goods and services with the tokens upon their receipt. Instead, Kik pursued a superficial Minimum Viable Product in the form of digital, cartoon "stickers" that would be a supposed added benefit to Kik Messenger users who purchased Kin. The stickers would appear inside Kik Messenger and would be available only to Kin buyers who also had a Kik Messenger account. Upon buying Kin, an investor with a Kik Messenger account could access the cartoon stickers by opening a digital "wallet" inside Kik Messenger, unlocking digital stickers that were accessible in the wallet, and then sharing the stickers with other users within the application. The more Kin owned by a Kik Messenger user, the higher the user's "status" level and the more stickers the user could access.

103.   The stickers that Kik created for its purported Minimum Viable Product were small, emoji-like images, predominately a cartoon honey badger, such as the below:



104.   Kik did not design the cartoon sticker to encourage people to buy Kin for non-investment purposes, and, in any event, the stickers could not be purchased using Kin.  Rather, Kik developed the stickers based on an effort to create a hypothetical "use" for the tokens, which Kik believed was relevant to whether Kik's sales of Kin were securities transactions under the securities laws.  As one Kik executive wrote in a June 2017 email to other company executives about how the company had defined Minimum Viable Product:

> The definition was written with one purpose only: **COMPLIANCE**.  This is NOT an MVP [Minimum Viable Product] for product purposes, nor to satisfy any good user experience for crypto participants.  We discussed that once we integrate Kin into Kik we will rebuild the entire product bottom up and the MVP will not be used in any way.

(emphasis in original).  Similarly, in June 2017, a Kik employee admitted to another by email when discussing the lack of guidance they had received about the "crypto stickers":

> Basically it doesn't really matter.  The whole point is to make our legal department happy, not the users (who are actually investors and probably could care less that they got a sticker pack for their $10K investment into KIN).

105.   Kik did not mention the status-based stickers in any public announcements or otherwise discuss these cartoon stickers in marketing to potential public sale investors, before the

public sale.  Because public sale investors could not have known about the stickers before buying

Kin, the stickers could not have been a motivation for these purchases.

### D.  Prior To The Kin ICO, The SEC Issued The DAO Report, And The Ontario Securities Commission Told Kik That Kin Was A Security

106.   On July 25, 2017, two months prior to Kik's token distribution event and before all of

the sales to public investors, the SEC issued a Report of Investigation pursuant to Section 21(a) of

the Exchange Act (the "DAO Report") stating the SEC's view that digital assets may be securities,

and that the federal securities laws and registration requirements "apply to those who offer and sell

securities in the United States, regardless whether the issuing entity is a traditional company or a

decentralized autonomous organization, regardless whether those securities are purchased using U.S.

dollars or virtual currencies, and regardless whether they are distributed in certificated form or

through distributed ledger technology."  The DAO Report focused on the *Howey* test, the same legal

standard Kik had been discussing for months.

107.   Within days of the issuance of the DAO Report, Kik contacted the Ontario Securities

Commission ("OSC") regarding the legality of the Kin offering.  The OSC is a regulatory agency

which administers and enforces securities legislation in the Canadian province of Ontario, where Kik

is headquartered.

108.   From August to September 2017, including during a face-to-face meeting on August

14, 2017, Kik executives and outside counsel discussed the Kin offering with the OSC.  In the

discussions, OSC staff members raised concerns that the sale of Kin would violate Ontario securities

laws because Kin tokens were investment contracts and, thus, securities.  During these discussions,

the company and regulators specifically discussed the United States Supreme Court's decision in

*Howey.*

109. On or about September 5, 2017, as later confirmed in a November 2017 letter from Kik's outside counsel to the OSC, "OSC staff definitively communicated [to Kik's outside counsel] a position that the [sale to the public of Kin] constituted an offering of securities."

110. After learning of the OSC's position, Kik barred Canadians from purchasing Kin in the public sale.

111. Kik did not make a similar overture with the SEC. Kik did not register the offering and did not restrict United States-based investors from purchasing Kin. United States-based investors were deprived of the disclosures and protections to which they were entitled under the federal securities laws.

## VI.   THROUGHOUT THE KIN OFFERING, KIK EMPHASIZED ITS OWN IMPORTANCE TO KIN'S FUTURE SUCCESS AND THE ACTIONS IT WOULD TAKE TO SUPPORT KIN

112. In the initial public announcements of Kin and throughout the Kin offering, Kik emphasized the central role of its present and future efforts to make the project successful, as well as its financial incentive to do so, and the impact those efforts would have on the future value of Kin.

113. Kik repeatedly described specific, future actions the company itself would take to try to drive up Kin's value, which had no reasonable prospect for completion (and, in fact, were not completed) in advance of the planned 2017 public sale. Kik promised that it would create demand for Kin, thereby increasing its value, by building the Kin Ecosystem, integrating Kin into Kik Messenger, implementing a "transaction service" to supplement the Ethereum blockchain and seeking a long-term improvement of the blockchain, and creating a "Rewards Engine," as discussed below.

114. Because of Kik's numerous public statements before the public sale, including statements about the profitability and tradability of Kin, Kik's own importance to the Kin project, Kik's intent to profit from the appreciation of Kin, and Kik's planned future actions to support Kin,

investors who bought Kin reasonably would have expected future profits to be derived from the

entrepreneurial and managerial efforts of Kik and its agents.

### A.    *Kik Emphasized That Kik Itself Intended To Profit from Kin's Appreciation*

115.   Kik repeatedly told potential Kin investors that Kik intended to profit alongside all

other Kin investors from the future rise in Kin's value that the company itself would help generate.

For example, at a June 2017 conference in China, Kik's CEO highlighted the plan to award Kik 30

percent of the outstanding supply of Kin and said the company's "goal now is just to grow the value

of Kin":

> This – this is the beautiful thing for Kik: it's also fundamentally a new way to
> monetize.  So, for us, we're setting 30 percent of Kin aside for Kik, as a
> financial incentive for us basically to put this huge messenger into this
> ecosystem, and to get this whole ecosystem going.  And so (indiscernible) –
> you know, we – our goal now is just to grow the value of Kin.  The more we
> do that, the more the value of our 30 percent grows.  And we're now looking
> at that as the fundamental way that we monetize this, you know, eight and a
> half years of work, and $120 million invested.

116.   Similarly, at the June 28, 2017 San Francisco Bitcoin Meet-up, Kik's CEO explained

that setting aside Kin for the company at the beginning made sure that Kik was committed to

working to increase Kin's value:

> I think what we can guarantee is we are all in on this.  You know, this is – this
> is something we've been working to – towards for a long time, but this is
> something that is in our financial best interest, because of the 30%, but
> actually, like, just to be honest, like, this is something we have to do.  We
> cannot compete with Facebook.

117.   And again, at an August 18, 2017 conference in Canada – a video of which was made

available on the Internet by September 9, 2017 – Kik repeatedly assured potential buyers that the

company was going to do everything it could to make sure that early investors and Kik "make a ton

of money":

> But, now, with the cryptocurrency, it's in Kik's best interest to get people paid
> because that's what we're trying to do.  We're trying to build this economy . . .

Whether it's music, I create a great song.  I listen to your great song.  A game, I create a great level.  I play your great level where consumers are coming together, providing value to each other and facilitating that with the cryptocurrency.

The more you do that, the more valuable, the more demand for the cryptocurrency there will be.  And with sort of a, you know, cryptocurrency, you can guarantee a fixed supply, guaranteed scarcity.  So supply stays the same.  Demand goes up.  The price goes up such that if you set some aside for yourselves and you give other people the opportunity to participate and contribute, everybody can not only build this amazing new ecosystem and platform but also make a ton of money.

### B.    *Kik Emphasized Its Experience And Ability*

118.   Kik repeatedly promised to apply Kik's own expertise, experience, and resources – including the anticipated proceeds of the Kin offering – to establishing Kin's value and increasing Kin's future value.

119.   Kik touted its previous accomplishments and the popularity of Kik Messenger.  Kik's May 2017 white paper provided performance data for Kik Messenger, including the number of monthly average users and age of the active user base, and noted that 64% of the application's users live in the United States.  Kik asserted that "[t]he size of the [Kik Messenger] user base, demographics, and community ethos make Kik a unique venue where cryptocurrency may be introduced, adopted, and utilized by a large mainstream audience."  The "Kin project," Kik said, was "an opportunity to integrate chat with true digital commerce within an existing user base."

120.   Kik's white paper also touted Kik's management and included a four-page section describing the biographies, professional experience, and skills of seven Kik executives and identifying the names and titles of 13 other "Kin Core Team" members.  For example, Kik's white paper touted that the company's CFO had previously "spent more than 20 years leading finance, operations, and strategy for both established and startup companies" in various sectors.  And Kik's chief product officer, "br[ought] startup and academic research experience to Kik" and was "in the final stages of completing his PhD."  Kik did not provide a biography of any non-Kik personnel,

and, in the white paper's "Conclusion" section, Kik assured potential buyers that it would "pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Ecosystem to its millions of users."

121.   Similarly, in the May 25, 2017 video that Kik issued when announcing the Kin project, the company emphasized that "Kik has both the experience and the resources and the user base to really make this happen."

122.   Kik re-emphasized its experience and expertise throughout its marketing of the offering, both in public statements and in private meetings with potential investors.  In a Medium post on September 6, 2017, the day after the OSC "definitively communicated [to Kik's outside counsel] a position that the [sale to the public of Kin] constituted an offering of securities," Kik's CEO stated he was promoting Kin to "my friends and family" in part because:

> Kin has at least one participant who was all in: Kik.  With one strong digital service on board from day one, Kin can enjoy a good start regardless of whether or not other digital services adopt it right away.  Kik has 15 million monthly active users, many of whom are already accustomed to exchanging digital goods, such as stickers and emoji, through that.

### C.   Kik Promised It Would Create Demand For Kin By Building New Products, Services, And Systems For The "Kin Ecosystem"

123.   Among other specific, affirmative steps that Kik told potential investors it would take to increase demand for Kin – which, in turn, would drive up Kin's price – Kik promised that it would use funds from Kin investors to create and promote a decentralized economy, which it called the "Kin Ecosystem," in which Kin could be used to buy goods and services.  Kik's white paper stated:

> To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems.  Building a decentralized system is a complex process, and the transition to it must be done in a measured and responsible way over time.

124.   Kik's white paper also stated that Kik would be 'the ecosystem's champion and will showcase Kin to its millions of users," and, "[o]ver time, Kik will also promote other Kin digital services."  Kik made clear that "Kik must help to establish Kin's fundamental value" and that "Kik will build fundamental value."  In addition, Kik's May 25, 2017 Medium post said, "[o]nce we have established the new cryptocurrency, we will create demand for [Kin] by encouraging people to earn and spend Kin within Kik."

125.   Kik made clear that the sale of Kin would be used not only to "fund Kik operations[,]" but also to "finance the Kin roadmap."  Kik's CEO stated at the San Francisco conference in June 2017 that Kik would use sale proceeds to build systems "to . . . launch this whole broader ecosystem."

126.   Throughout the period in which Kik offered and sold Kin – including through Kik's last sale of Kin in the public sale that ended by September 26, 2017 – there was no Ecosystem as described in Kik's white paper and other marketing.  In addition, no company or person – not even Kik – had told the public about any good or service that it would sell in exchange for Kin.  There was, simply, nothing to purchase with Kin at the times Kik sold the tokens through September 26, 2017, or even when Kik distributed the tokens on that date.  And Kin did not have (and does not have) legal tender status in any jurisdiction.

127.   Kin investors reasonably would have expected that Kik's future efforts to create and promote the Ecosystem, by building new products, services, and systems, would increase the value of Kin if successful, and, therefore, that the investors and Kik would reap future profits from Kik's efforts.

### D.   *Kik Promised It Would Create Demand For Kin By Modifying Kik Messenger*

128.   Kik emphasized the importance of Kik Messenger and its numerous users to potential Kin investors.  Kik told potential investors that the company would revise Kik Messenger to permit

users to buy and sell goods and services using Kin.  Kik's white paper stated that Kik would "leverage its large existing user base to drive mass adoption" of Kin, and that "Kik will build fundamental value for the new currency by integrating Kin into its chat app.  Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem."

129.   Specifically, to achieve such integration, the white paper stated that, first, Kik would integrate digital wallets for each Kik Messenger user account so that users could engage in "common wallet interactions;" and that, thereafter, Kik would "work to integrate Kin into Kik's chat ecosystem for the benefit of users, platform developers and partners . . . by employing the same iterative process of research, experimentation, and fine-tuning that has made Kik successful."

130.   Kik's white paper identified hypothetical "use cases" that were possible ways that Kik might change Kik Messenger so that users could buy and sell goods and services using Kin.  One such use case, for example, consisted of charging a fee (paid in Kin) to app users wanting to attend chats with celebrities.

131.   Kik provided no date by which it would complete Kin's integration into Kik Messenger.  However, Kik made clear that its integration efforts would continue beyond any public sale of Kin.  A June 2017 online news article, for example, quoted a statement by Kik's CEO that the company would "add more and more ways to use [Kin] inside Kik . . . in the latter part of this year [2017] and into next year [2018]."   Kik controlled Kik Messenger.  Only Kik could modify Kik Messenger to incorporate Kin transactions.

132.   Kik further communicated to potential Kin investors that Kik would not complete its work on integrating Kin with Kik Messenger before the public sale, because, as its white paper explained, "[a] portion of the funds raised in the token distribution will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik."

133.   In fact, when Kik distributed Kin on September 26, 2017, none of the "use case" examples suggested by the white paper were available.  Those examples were purely hypothetical. Furthermore, at that time, there was no digital wallet within Kik Messenger that would enable users to hold or conduct transactions with Kin.  Other than providing investors who had Kik Messenger accounts with access to digital stickers (which investors did not learn of until after their purchase of Kin) and a report of how many Kin they owned, Kik Messenger had not been integrated with Kin.

134.   Potential Kin investors reasonably would have expected that Kik's promised future effort to integrate Kin with Kik Messenger would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

### E.   Kik Promised It Would Create Demand For Kin By Implementing New Technology To Allow For Scalable, Fast, And Cost-Effective Transactions

135.   Kik promised to maintain an active role in developing the technologies for the future use of Kin.

136.   Kik explained that Kin would initially operate on the pre-existing Ethereum blockchain, but this approach created known "[p]latform limitations" that were expected to impede the actual use of Kin to buy or sell goods or services.  Kik said that the Ethereum blockchain could handle only relatively small numbers of transactions, was too slow, and imposed a fee for each transaction.  Kik therefore recognized that the Ethereum blockchain was incapable of running consumer applications at sufficient volumes, or "scale," to make Kin successful.  Kik's white paper acknowledged a need for future "significant advances… in blockchain technology" to enable a "highly scalable, low latency, and cost effective decentralized systems."

137.   Even though Kik chose the Ethereum blockchain as Kin's platform, Kik could not use this blockchain for Kin transactions within Kik Messenger, let alone by numerous other companies, which Kik hoped to attract to the Kin Ecosystem, because of Ethereum's technological

limitations.  For example, Kik believed that giving only five Kin tokens to each Kik Messenger user would absorb 23 days of the computing capability of the entire Ethereum network.

138.  Kik's white paper stated that Kik would address these issues, and do so in at least two different ways.  First, Kik would implement its own "transaction service" that would allow Kin users to temporarily bypass the Ethereum blockchain – and avoid its logjams and expense – by conducting Kin transactions within Kik Messenger on a "centralized" ledger to be operated by Kik (or by an entity established by Kik).  Kik described this new service as "a semi-centralized hybrid on-chain and off-chain Transaction Service for scalable interactions with the Kin cryptocurrency."  Second, Kik stated that it would seek a "long term" solution by establishing a new entity, the "Kin Foundation," which would in turn "move to migrate [Kin's] transactional infrastructure to a fully decentralized system while retaining a low friction user experience."

139.  Kik promised to publish a "Kin Technical Whitepaper" that described this "managed solution for Kin tokens."  And, following its initial announcements, Kik continued to tell potential investors that it would seek long-term technological improvements that enabled Kin transactions on the blockchain.  For example, during a San Francisco conference, Kik's CEO said Kik was "looking for" a new "blockchain 3.0," which Kik itself might create by partnering with another blockchain or building its own bespoke blockchain.

140.  As the issues were described by Kik, a coordinated, centralized effort was required to implement solutions to the existing blockchain's "scalability" and speed issues.  A decentralized group of Kin investors could not perform these functions.  Indeed, Kik stated that it intended to use the proceeds of the token sale to finance this work by Kik employees and contractors, many of whom it identified by name in its white paper.

141.  By the time Kik sold Kin to the general public in September 2017, Kik had not enabled Kin transactions among users of Kik Messenger that would have relied on Kin's chosen

36

platform – the Ethereum blockchain – because doing so would have risked crashing the Ethereum network.  Also, by September 2017, it would have been impractical for Kik or any other commercial developer to engage in Kin transactions on the Ethereum blockchain, because of the slow speeds at which the blockchain would have processed those transactions, among other limitations.

142.   Kin investors reasonably would have expected that Kik's future effort to achieve "scalability" and speed would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

F.   *Kik Promised It Would Create Demand For Kin By Building A "Rewards Engine"*

143.   Kik also promised to create "the Kin Rewards Engine," an automated system that Kik would design and program to identify companies or individuals who helped to boost demand for Kin, and reward them with additional Kin.  Thus, the Rewards Engine would further develop the Ecosystem and increase the likelihood that Kik and other Kin investors would profit by incentivizing developers to make new products and services for Kin.

144.   Kik's white paper explained that "60 percent of the total supply of Kin will be secured in a smart contract, allocated to the Kin Rewards Engine, and introduced into circulation as periodic rewards."  Thus, Kik told potential Kin investors that, through its work designing the Rewards Engine, Kik would further grow the Ecosystem and drive appreciation in value.

145.   The white paper included a high-level overview of the Kin Rewards Engine's operations:

> Periodically, the Engine will unlock and distribute a specific amount of Kin to be shared among digital service providers in the Kin Ecosystem.  The rewards that each partner receives will be proportional to a measure of the utilization of Kin within that digital service.  Such value will be assessed by a well-defined process that ensures the rewards are distributed fairly using an objective, performance-based methodology.

But Kik's white paper did not provide additional details about this process – *e.g.*, how the Rewards Engine would "measure" the use of Kin in digital services, how it would "assess" the value of those uses, or how the "objective performance-based methodology" would be employed.

146.   Consequently, its white paper made clear that Kik would oversee additional, significant future work – to be performed by Kik employees – designing the Rewards Engine and providing computer code and technological support for the Rewards Engine, all of which was described as being essential to the profitability of the Kin project.

147.   Kik also expressly told investors that the Rewards Engine would not be created until after the public sale.  In a June 2017 interview, Kik's CEO stated that setting up the Rewards Engine "will be later this year [2017], or sometime next year [2018]."

148.   Furthermore, Kik communicated to potential Kin investors that Kik would not complete its work on the Rewards Engine before the public sale, when, at the June 2017 conference in San Francisco, Kik said it would "use the funds" from the public sale to build the Rewards Engine.

149.   In fact, on September 26, 2017, the Rewards Engine was not operational, and basic decisions about how the Rewards Engine would operate were still unresolved.

150.   Kin investors reasonably would have expected that Kik's future effort to build the Reward Engine would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

G.      *Kik Promised It Would Create And Support The Kin Foundation To Manage Kin*

151.   Kik's white paper emphasized that Kik would "establish the Kin Foundation to manage and encourage growth of the Kin Ecosystem."  Kik's white paper also promised that, "[o]ver time, Kik will work to structure and form the Kin Foundation, a nonprofit organization to oversee the fair and productive growth of the Kin Ecosystem."  The Foundation would "administer

38

the Kin supply and the Kin Rewards Engine" and "provide support and tools for digital services to operate more easily within the ecosystem," and, "[u]ltimately . . . [would] facilitate the entire ecosystem's transition to a fully decentralized and autonomous network."  And, Kik explained that the Foundation would receive six of the ten trillion Kin that Kik created.

152.   Despite statements about the eventual transfer of Kin Ecosystem responsibilities to the Foundation, Kik provided no concrete timetable for this transfer.  In addition, Kik assured prospective Kin investors that Kik would dominate and control the Foundation until an undefined point in the future.  For example, at a conference in China, Kik's CEO assured the audience that the Foundation would not be independent of Kik:

> Now, we [Kik] are going to have a lot of influence over that Kin foundation, at least initially, right?  We're not going to sit there and be like, "oh, no, no, it's totally independent." . . .  Like, honestly, we're going to have influence there.

153.   Kik did not complete paperwork for the creation of the Kin Foundation until September 12, 2017, after registration for the public sale of Kin had closed and on the day public sale buyers started to pay Ether for the tokens.  Upon creation of the Foundation and through distribution of the Kin on September 26, 2017, the Foundation was only a shell:  it had no operations independent of Kik, no employees, and no cash or other assets (except for the Kin it received on September 26, 2017) to fund operations.  After the Foundation was created, it had two directors, Kik's CEO and CFO, thereby giving Kik ultimate authority over all Foundation activities.

154.   In sum, Kik told investors that, between Kik and the Kin Foundation that Kik directed, Kik would effectively own and control nine trillion Kin – 90 percent of the outstanding supply of Kin.

155.   Kin investors reasonably would have expected that Kik's future effort to create and, for some period of time, direct the Kin Foundation would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

## VII.   KIK RAISED $100 MILLION FROM KIN INVESTORS

156.   From mid-July through September 2017, Kik raised a total of approximately $100 million through sales of Kin to investors.

### A.   *From July To September 11, 2017, Kik Sold Tokens To Wealthy Investors At A Discount*

157.   From early July 2017 to September 11, 2017, Kik sold Kin by entering into SAFTs with investment funds and other wealthy investors.  Kik received approximately $49.5 million from approximately 50 investors, including 21 located in the United States who paid Kik more than $39 million.  Ten of the 21 United States-based purchasers were from the State of New York, paying Kik about $9.5 million.

158.   On or about September 11, 2017, Kik filed a Form D with the SEC indicating that Kik had sold securities.  Under "Type(s) of Securities Offered," the Form D stated:  "Sale and issuance of rights to receive Kin tokens in the future via a Simple Agreement for Future Tokens (SAFTs)."

159.   Kik's Form D claimed that the offering was exempt from the requirement to be registered under the federal securities laws, pursuant to the exemption for sales to accredited investors under SEC Rule 506(c).  However, the offering did not qualify for the exemption, among other reasons, because the underlying assets being sold – the Kin tokens – were offered as part of one larger non-exempt offering of securities to the general public.  Furthermore, the sale of Kin through the use of the SAFTs and in the public sale should be treated as one offering, because Kik sold the Kin as part of a single plan of financing, for the same general purpose, at about the same time, without creating different classes of Kin, and for dollars or assets that were immediately convertible to dollars.

### B. Starting In August 2017, Kik Publicly Announced The Public Sale Process And Allowed Investors To Sign Up

160.   On or about August 29, 2017, Kik issued a press release announcing the dates for its "token distribution event" and the process by which the general public could purchase Kin.

161.   In its August 29 press release, Kik told the public that interested buyers were required to sign up online with Kik by 9:00 pm Eastern Time on September 9, 2017, and that sales of tokens would commence on September 12, 2017, at 9:00 am Eastern Time.  Kik also stated that it planned to "raise a total of $125 million through its token sale," including $50 million through the already-conducted "presale round" to "select investors" such as the large investment funds that Kik identified by name.  The August 29 press release repeated Kik's promise to "drive mainstream consumer adoption of Kin, potentially making it the most adopted and used cryptocurrency in the world."

162.   General public investors were not provided the PPM that was provided to investors who purchased Kin via Kik's SAFTs and were not provided the information that would be contained in a registration statement, which would include, among other information, financial and managerial information about the issuer of the securities (including a history of losses), details about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

163.   The PPM contained detailed descriptions of certain "Risk Factors" concerning Kik, Kin, and the Kin Ecosystem, but this information was not contained in disclosures to general public sale investors.  The PPM, for example, warned investors who purchased Kin via SAFTs that "Kik has experienced a declining usage of its messenger service over the last several years.  Such a lack of use or interest could negatively impact the development of the Kin Ecosystem and therefore the potential utility of Tokens."  Kik did not make a similar disclosure about the declining use of its app in written materials provided to general public sale investors on Kik's website.

164.   As Kik prepared for and rolled out the public sale of Kin, Kik and its agents continued to see investors as critical participants in the public sale's success.  Indeed, Kik's User Registration Guide, dated August 2017 and published to the public on Kik's website, stated that "[t]he Kin token offering presents a unique opportunity for crypto investors . . . ."

165.   Before and during the public sale, Kik executives worked to get investments from "whales" – investors willing to purchase large amounts of Kin.  As people registered, a Kik executive emailed and called potential investors who said they intended to buy more than $1 million in Kin, and Kik executives discussed by email how to limit individual purchases in a way that would not frustrate the "whales."  After the public sale commenced, Kik executives analyzed the amounts that buyers had purchased and considered ways to get "whales" to invest more.  In mid-September, Kik executives strategized how Kik's CEO could "network with and generate interest from high value crypto investors to participate in the Kin token sale."

166.   Investors who registered for the public sale were required to provide information proving their identity, including but not limited to, name, address, email, social security or passport number, a passport photo page scan, and, for some people, a photograph for face matching.  Kik used such information to verify the identity of each public sale investor, and referred to this process as a "know your customer" or "KYC" process.

167.   Kik relied on its KYC process to identify the citizenship, country of residence, and, where applicable, the state of residence of each public sale investor, and to decide which persons could purchase Kin and which could not.  Kik declined to sell Kin to investors from certain countries, including Canada, China, Cuba, and North Korea.  Kik also declined to sell Kin to general public investors from certain U.S. states, including New York and Washington State.

168.   Kik did not undertake, through its KYC process or otherwise, to determine whether these public sale investors qualified as "accredited investors," as that term is defined by federal securities regulations.

169.   Kik also did not undertake to determine whether investors bought Kin with the intent to profit from their purchase or to immediately resell and distribute Kin, nor did it take any steps to exclude such persons from investing.

170.   Kik continued to offer discounted Kin through SAFTs and to enter into SAFTs for the sale of Kin after announcing the date of the public sale on August 29, 2017, and after registration for the public sale closed on September 9, 2017.  For example, on or about September 11, 2017, Kik entered into a SAFT that covered $1.2 million worth of Kin.

### C.   *From September 12 To 26, 2017, Kik Sold Kin To The General Public*

171.   From September 12 to 26, 2017, Kik sold Kin to investors who were approved by Kik's KYC process.

172.   On September 12, 2017, Kik issued a press release that explained the token distribution event's sale process.  Pursuant to the process Kik outlined, investors, including investors located in the United States, sent the digital asset Ether to Kik and committed to purchasing Kin. Investors later received Kin in proportion to the Ether that they paid Kik.

173.   The sale included multiple rounds.  In each round, investors sent Ether to Kik to buy a proportional number of Kin.  In the first round, conducted over the first 24 hours starting on September 12, 2017, investors could send Kik up to $4,393 in Ether to buy a proportional number of Kin.  In the second round, which started on or about September 13, 2017, Kik removed the cap on purchase amounts, and investors could send unlimited amounts of Ether to buy Kin.

174.   In total, approximately 10,000 public investors sent 168,732 Ether (then worth about $49.2 million) to Kik.  Of the approximately 10,000 public investors, approximately 3,456 were from

the United States and sent about $16.8 million in Ether to Kik.  These United States-based investors

included (a) two purchasers who paid about $1.6 million and about $970,000 respectively; (b) 20

purchasers who paid about or more than $100,000; (d) 223 who paid about or more than $10,000;

and (d) 1,853 purchasers who paid about or more than $1,000.  Combined with those who bought

Kin via Kik's SAFT, Kik raised over $55 million from United States investors.

175.   At the time of all these sales, there was nothing to purchase using Kin, and critical

elements of the decentralized economy that Kik had marketed – including a blockchain capable of

processing transactions between buyers and sellers at the volume and speed necessary for running

consumer applications, and a functioning rewards engine – did not exist.

176.   On or about September 26, 2017, Kik issued a press release announcing that "the Kin

token distribution event (TDE) has successfully ended raising nearly US$100 million."

### D.      *Kik Delivered Kin To Itself, Investors, And The Foundation*

177.   On or about September 26, 2017, Kik created a smart contract that generated 10

trillion Kin.  Kik controlled who received those tokens.

178.   Kik received four trillion Kin, of which Kik kept three trilllion.  Kik then transferred

the other one trillion Kin to the approximately 10,000 general public investors and the

approximately 50 investors who purchased Kin using Kik's SAFT.  Pursuant to the terms of the

SAFTs, however, only half of the Kin purchased via SAFTs were delivered; the other half were to be

delivered on the one-year anniversary of the distribution.

179.   Kik also caused the Kin Foundation, which it had established only a few weeks earlier,

to receive six trillion Kin.

180.   The Kin that Kik kept and caused the Kin Foundation to receive are all identical and

fungible with the tokens that Kik sold and distributed (via SAFT or public sale).  Kin tokens each

provide their holders with the same rights.  Different classes of Kin do not exist, and no Kin tokens represent superior rights or special value or privileges over other Kin.

181.   Kik imposed no resale or use restriction on any of the Kin distributed on September 26, 2017.

182.   Following the token distribution event, investors who had purchased Kin at a discount through SAFTs began to liquidate their Kin holdings for a profit.

183.   If the value of Kin rises or falls, the change in value will affect the value of all of the Kin tokens, whether such tokens are held by Kik, the Foundation, or investors.

184.   Kin investors had no contractual or other obligation to help create, build, or support the Ecosystem or otherwise to create demand or increase the value of Kin.  Many Kin investors, including investors who bought Kin in the public sale, bought quantities of Kin that were not commensurate with an intent to use the tokens to buy goods and services.

185.   When Kik distributed Kin on September 26, 2017, the success and future value of Kin tokens depended on Kik's efforts.  If, after that date, Kik did not try to develop the Kin Ecosystem or stopped operating altogether, the promises Kik made when marketing the tokens could not, and would not, have been kept.

### E.   Kik Pooled The Proceeds Of The Sale Of Kin

186.   Kik pooled the proceeds of the sale of Kin into two Kik bank accounts – one in California and the other in Canada – and in the company's digital Ether "wallet."  Kik exchanged most, but not all, of that Ether for United States dollars, which Kik deposited in the California bank account.

187.   Kik did not distinguish between funds received through SAFTs, funds received from the general public, or funds the company previously had on hand from venture capital investment or company operations.

188.   Neither the Kin Foundation nor Kin investors had control over how the proceeds of the Kin sale were spent.  Kik possessed sole discretion.

189.   Accordingly, the fortunes of each Kin investor were tied to one another and to the success of the overall venture, including the development of a Kin Ecosystem, integration with Kik Messenger, creation of the Rewards Engine, and implementation of a new transaction service and/or bespoke blockchain.  Investors' profits were also tied to Kik's profits based on Kik's significant holdings of Kin.

## CONCLUSION

190.   Investors' purchases of Kin were an investment of money, in a common enterprise, with an expectation of profits for both Kik and the offerees, derived primarily from the future efforts of Kik and others to build the Kin Ecosystem and drive demand for Kin.  Consequently, Kik's offer and sale of Kin in 2017 was an offer and sale of securities

191.   Because Kik offered and sold securities, Kin investors were entitled to all of the protections and disclosures of the federal securities laws – protections and disclosures that were all the more important given the novel technology at issue here.

## CLAIM FOR RELIEF

### Violations of Section 5(a) and (c) of the Securities Act

192.   The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 191, inclusive, as if they were fully set forth herein.

193.   Federal securities laws require that companies disclose certain information through the registration with the SEC of the offer or sale of securities.  This information allows investors to make informed judgments about whether to purchase a company's securities.

194.   By engaging in the conduct described above, Kik offered and sold securities without a registration statement in effect and without an exemption from registration.

195.   From May to September 2017, Kik conducted an offering of securities, in the form of an offering of one trillion Kin tokens.  In connection with this offering, Kik sold a portion of the one trillion tokens at a discount to investment funds and other wealthy investors pursuant to SAFTs and sold another portion of the tokens through a process culminating in the September 2017 token distribution event.  The offering and component sales were required to be registered with the SEC unless an exemption applied.  However, neither the offering nor component sales were registered with the SEC, and no registration exemption applied to the offering or to any of these sales.

196.   Kik received a total of approximately $100 million as a result of its offering and related sales.

197.   Investors who bought Kin tokens through the offering and component sales made an investment of money in a common enterprise with Kik and with each other, and reasonably would have been led to expect profits derived from the entrepreneurial and managerial efforts of Kik and its agents.

198.   Kik filed a Form D with the SEC with respect to the Kin offered and sold via the SAFTs; however, those offers and sales were not exempt from registration under Regulation D, which was promulgated under the Securities Act.  The exemption does not apply because the offer and sale of Kin via Kik's SAFTs was part of a single offering of Kin to the general public that raised $100 million, or, in the alternative, was integrated with the offering of Kin whose sales began on September 12, 2017, and neither the totality of the offering nor the non-SAFT portion of it was limited to accredited investors.  In addition, Kik did not exercise reasonable care to assure that the purchasers of Kin via the SAFTs were not statutory underwriters of Kin within the meaning of Section 2(a)(11) of the Securities Act.

199.   As a result of the conduct described above, Kik violated Section 5(a) of the Securities Act, which states that unless a registration statement is in effect as to a security, it shall be unlawful

for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

200.   Also as a result of the conduct described above, Kik violated Section 5(c) of the Securities Act, which states that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

## I.

Permanently restraining and enjoining Defendant Kik Interactive Inc. from, directly or indirectly, violating Section 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a), § 77e(c)];

## II.

Ordering Defendant Kik Interactive Inc. to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

## III.

Ordering Defendant Kik Interactive Inc. to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and

## IV.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

Date:  June 4, 2019

Respectfully submitted,

*David Mendel*

Stephan J. Schlegelmilch
David S. Mendel
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov

Of Counsel
Robert A. Cohen
Reid A. Muoio
Brent S. Mitchell
Jeff Leasure
James F. Murtha
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549