UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

U.S. SECURITIES AND EXCHANGE
COMMISSION,

           Plaintiff,

   vs.

KIK INTERACTIVE INC.,

           Defendant.

------------------------------------ X

:
:
:
:
:
:
:

Civil Action No. 19-cv-5244 (AKH)

**ANSWER TO COMPLAINT**

**JURY TRIAL DEMANDED**

Kik Interactive Inc. ("Kik" or the "Company") hereby answers the Complaint of the Securities and Exchange Commission ("SEC" or the "Commission") as follows, and reserves its rights to request dismissal of the Complaint on any and all grounds. To the extent not expressly admitted, all allegations of the Complaint are denied.[1]

## I.    <u>INTRODUCTION</u>

If the Commission had strong evidence that Kik offered or promised TDE purchasers an opportunity to profit from Kik's efforts, as part of a common enterprise, the Commission would have simply outlined all the relevant facts and let those facts speak for themselves. Instead, the Commission's Complaint reflects a consistent effort to twist the facts by removing quotes from their context and misrepresenting the documents and testimony that the Commission gathered in its investigation. The result is a Complaint that badly mischaracterizes the totality of the facts and circumstances leading up to Kik's sale of Kin in 2017. These tactics may have gotten the Commission a decent news cycle, but they will not withstand meaningful scrutiny at summary judgment or trial.

The Commission repeatedly twists the facts throughout its Complaint. Here are just three examples.

---

[1] To the extent the headings in the Complaint are intended to constitute factual allegations, Defendant denies each and every such allegation.

*First*, the Complaint alleges that a Kik consultant warned that the "Kin offering" was, potentially, an offering of securities that needed to be registered with the Commission. The Complaint alleges that:

> "*Even prior to the DAO Report, however, Kik had been informed by one of its consultants that the Kin offering was, potentially, an offering of securities that needed to be registered with the SEC and that 'unregistered public securities offerings are not legal in the U.S.'*"

But the Commission omits the full quote from the consultant, in which the consultant distinguishes digital currencies, such as Kin, from securities:

> "*[U]nregistered public securities offerings are not legal in the U.S.* **In the case of a community currency, there is a good basis to argue that this is not a security. You're just selling units of property that you created that are used for a particular purpose in your app.**"

In other words, the consultant said the opposite of what the Commission claims he said in its Complaint.

*Second*, the Commission incorrectly claims that Kik promised to increase Kin's price through its efforts. For example, the Commission alleges:

> "*Similarly, at the June 28, 2017 San Francisco Bitcoin Meet-up, Kik's CEO explained that setting aside Kin for the company at the beginning made sure that Kik was committed to working to increase Kin's value: 'I think what we can guarantee is we are all in on this. You know, this is – this is something we've been working to – towards for a long time, but this is something that is in our financial best interest, because of the 30 percent, but actually, like, just to be honest, like, this is something we have to do. We cannot compete with Facebook.'*"

But the Commission omits what Mr. Livingston said immediately before the quoted language, which made clear that Kik could not guarantee Kin's value because its value would depend on basic economic principles of supply and demand. The full quote reads:

> "**So we can not guarantee value with Kin. I think once you create a cryptocurrency it sits on exchanges and the price of it is set by the market based on supply and demand. So you know supply is fixed and demand goes down the price is going to go down.** *But I*

> *think what we can guarantee is we're all in on this. You know this*
> *is something we've been working to – towards for a long time but*
> *this is something that is in our financial best interests because of the*
> *30 percent, but actually, like, just to be honest like this is something*
> *we have to do. We cannot compete with Facebook."*

In other words, in contrast to the Commission's misleading and selective quotation, Mr. Livingston's statement is wholly inconsistent with the Commission's claims.

*Third*, the Commission alleges that Kik continually emphasized its individual efforts to establish Kin's value and increase Kin's future value. The Complaint alleges:

> *"Similarly, in the May 25, 2017 video that Kik issued when*
> *announcing the Kin project, the company emphasized that 'Kik has*
> *both the experience and the resources and the user base to really*
> *make this happen.'"*

However, the Complaint fails to include the very next sentence of the video, which made clear that the success of the Kin economy depended on consumers and other developers, aside from Kik, to grow and build the economy as intended. The full statement says:

> "***I think we can make a better experience for consumers but also***
> ***a better future for society in general****. Kik has both the experience*
> *and the resources and the user base to really make this happen.* ***The***
> ***success of this project really comes down to how many other***
> ***people can we get excited to compete with us, to join us, to work***
> ***with us and to build this together****."*

These are just three examples of a pattern that appears repeatedly throughout the Commission's Complaint. Indeed, apparently recognizing the weakness of its claim, the Commission has rejected its higher governmental duty to first and foremost seek justice, and has instead employed a strategy to twist the facts, creating a highly selective and misleading depiction of the record as set forth below. When viewed fairly, and in context, the evidence in this case will paint a dramatically different picture of the facts and circumstances surrounding Kik's sale of Kin in 2017, which will make clear that Kik did not violate the federal securities laws.

## II.   ANSWER TO SPECIFIC ALLEGATIONS

1.   From May to September 2017, Kik offered and sold one trillion digital tokens called "Kin." More than 10,000 investors worldwide purchased Kin for approximately $100 million in

U.S. dollars and digital assets – over half of this sum coming from investors located in the United States.  However, Kik's offer and sale of Kin was not registered with the SEC, and investors did not receive the disclosures required by the federal securities laws.

**ANSWER**: Kik admits that it offered and sold one trillion Kin in 2017.  Kik denies the remaining allegations in this paragraph.  The Commission is wrong that Kik sold Kin in a single "offer and sale."  In reality, the distribution of Kin involved two entirely separate transactions: (1) a pre-sale of contractual rights, pursuant to SAFTs ("Simple Agreements for Future Tokens") and (2) the sale of Kin to the public (the "TDE"), pursuant to "Terms of Use."  Because of substantial differences between the pre-sale and the TDE, Kik decided to structure the pre-sale as a sale to accredited investors exempt from registration with the Commission under SEC Regulation D.

In the pre-sale, which occurred prior to the TDE, Kik sold the conditional right to receive Kin in the future at a discount, to accredited investors (the "pre-sale").  Pre-sale participants received private placement memoranda ("PPM"), and signed SAFT agreements.  Under the SAFTs, pre-sale participants would receive 50 percent of their Kin if and when a "Network Launch" (initial functionality of Kin within Kik) occurred and the remaining 50 percent of their Kin a year later.  If a Network Launch did not occur, pre-sale participants would forfeit 30 percent of the amount they contributed.  Kik capped the pre-sale at $50 million, all received in U.S. dollars, despite receiving millions more in interest, to ensure that the public would have an opportunity to purchase Kin in the TDE.  Kik also filed a Form D with the SEC in September 2017 to formalize the exemption.

 In the TDE, Kik sold around $50 million worth of Kin to around 10,000 public purchasers, more than two thirds of whom live outside of the United States.  As opposed to purchasing the right to receive Kin in the future, as memorialized in the SAFTs, TDE purchasers bought Kin tokens directly under the completely different "Terms of Use," and paid in Ether – not U.S. dollars.  Unlike in the pre-sale, within the first 24 hours of the TDE, purchasers could not buy more than $4,400 worth of Kin to "ensure all registered participants had a fair chance to purchase"

Kin.  Because Kik did not sell an "investment contract" or any other enumerated "security" in the TDE, Kik did not register the TDE with the SEC.

**2.**     Congress enacted the Securities Act of 1933 to regulate the offer and sale of securities.  In contrast to ordinary commerce, which often operates under the principle of caveat emptor, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.  Such disclosure is ordinarily provided in a "registration statement," which provides public investors with financial and managerial information about the issuer of the securities, details about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

**ANSWER**: Kik admits that Congress enacted the Securities Act of 1933 ("the Securities Act") to regulate the offer and sale of securities.  Kik further admits that the Securities Act and other federal regulation requires that the offer and sale of securities be accompanied by certain disclosures, such as a "registration statement," unless an exemption applies.  Kik admits that registration statements usually contain the information alleged in the third sentence of this paragraph.  However, Kik denies any suggestion that Kik "offered or sold securities" or violated the federal securities laws in any way for the reasons stated herein.

**3.**     Section 5(a) of the Securities Act [15 U.S.C. § 77e(a)] provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce.  Section 5(c) of the Securities Act [15 U.S.C. § 77e(c)] provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed or an exemption from registration applies.  Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce absent an exemption.

**ANSWER**: Kik admits that Section 5(a) of the Securities Act requires that the offer and sale of securities be accompanied by certain disclosures, such as a "registration statement" unless

an exemption applies.  Kik further admits that Section 5(c) of the Securities Act contains a similar prohibition.  However, Kik did not offer or sell any securities in the TDE, nor did it violate the federal securities laws.

4.      The definition of "security" includes a range of investment vehicles, including stocks, bonds, and "investment contracts."  Investment contracts are transactions where an individual invests money in a common enterprise and reasonably expects profits to be derived from the entrepreneurial or managerial efforts of others.  In a variety of circumstances, courts have found that investment vehicles other than stocks and bonds constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, airplanes, mobile phones, and enterprises existing only on the Internet.  As the Supreme Court of the United States has noted, Congress defined security broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

**ANSWER**:  Kik admits that the definition of a "security" includes stocks, bonds, and "investment contracts."  Kik further admits that some courts have found certain interests relating to non-traditional investment vehicles to be "investment contracts," in certain circumstances.  Kik further admits that the Supreme Court used the language quoted in the last sentence of this paragraph when describing the definition of an "investment contract" in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).  Kik denies the remaining allegations in this paragraph.  Tellingly, the Commission misstates the test established by the Supreme Court in *Howey* when it alleges that "[i]nvestment contracts are transactions where an individual invests money in a common enterprise and reasonably expects profits to be derived . . ."  In fact, the Supreme Court has defined an investment contract as "a transaction or scheme whereby a person invests his money in a common enterprise and ***is led to expect profits solely*** . . ."  And although the Supreme Court has stated that *Howey* embodies a "flexible" standard, it is far from limitless.  "Investment contract" was included in the definition of "security" for the "limited purpose of identifying unconventional instruments that ***have the essential properties of a debt or equity security***."  *Wals v. Fox Hills Dev. Corp.*, 24

F.3d 1016, 1018 (7th Cir. 1994) (emphasis added).  Courts, including the Supreme Court, have held in many cases that there is no "investment contract," and thus no "security," where one or more parts of the test articulated in *Howey* are not met.

**5.**      Kik, a private Canadian company founded in 2009, owns and operates a mobile messaging application called Kik Messenger.  Despite Kik Messenger's initial success and the company's receipt of venture capital funding, Kik's costs have always far outpaced its revenues, and the company has never been profitable.

**ANSWER**:  Kik admits that it is a private Canadian company, founded in 2009, that runs the successful Kik Messenger application.  Within two weeks of launching Kik Messenger in 2010, almost one million users downloaded the app, and by 2017, Kik Messenger was of the top 15 social media applications in the world, with 300 million registered users and millions of monthly active users.  Kik admits that it has received substantial venture capital funding, including an investment from technology conglomerate Tencent at a $1 billion valuation.  Kik admits that aside from fiscal 2018, its costs have exceeded its revenues.  Kik denies the remaining allegations in this paragraph.  Allegations about Kik's financial condition have nothing to do with whether Kik sold an "investment contract."   Instead, this paragraph is solely designed for misdirection, thereby prejudicing Kik and portraying it in a negative light.

Regardless, like many other technology companies, Kik's costs have historically exceeded revenues as a result of struggling to compete with larger social media companies, who have a dominant share of the market for advertising within mobile applications.   (*See* https://venturebeat.com/2017/09/24/your-chances-of-making-a-successful-mobile-app-are-almost-nil/.)  Similarly, Kik refused to sell user data to advertisers, which would have been antithetical to its core philosophy of protecting user data, unlike others in the space, despite the result of foreclosing another revenue stream.  Importantly, at all relevant times, Kik was transparent with the public about its monetization challenges as well as its slowing user growth.  Because of these challenges, Kik began to experiment with other projects and business models, ultimately deciding to adopt a cryptocurrency-based business model within a new digital economy.

6.      In late 2016 and early 2017, Kik faced a crisis.  Fewer and fewer people were using Kik Messenger.  The company expected to run out of cash to fund its operations by the end of 2017, but its revenues were insignificant, and executives had no realistic plan to increase revenues through its existing operations.  In late 2016 and early 2017, Kik hired an investment bank to try to sell itself to a larger technology company, but no one was interested.

**ANSWER**:  Kik admits that in late 2016, it hired an investment bank to evaluate a potential sale of the Company.  Kik denies the remaining allegations in this paragraph, which are both false and once again irrelevant.  This paragraph is simply wrong that Kik "faced a crisis."  In late 2016 and early 2017, although the Company faced challenges, which it publicly disclosed, the Company expected that it could sustain operations well past the date when the TDE eventually occurred.  Further, the Company believed that it could have obtained traditional financing or other potential strategic transactions if it wanted to.  And while some technology companies expressed significant interest in acquiring Kik, a deal did not materialize at that time, in large part, because Kik struggled to monetize its business in the traditional advertising model.  Kik also chose to decline a potential deal because the philosophy of the acquiring company was to collect and sell user data, contrary to Kik's core principles.  This same challenge prompted Kik to explore the possibility of creating a new digital economy centered around a digital currency.

7.      Faced with a shrinking financial "runway," Kik decided to "pivot" to an entirely different business and attempt what a board member called a "hail Mary pass": Kik would offer and sell one trillion digital tokens in return for cash to fund company operations and a speculative new venture.

**ANSWER**:  Kik admits that an email written by a member of Kik's Board contains the words "hail Mary pass," but Kik denies the remaining allegations in this paragraph.  The Commission took several hours of testimony from the Board member quoted, but did not bother to ask any questions about the email.  Now, the Commission cites the quoted language to characterize Kin as a desperate and final attempt to save a dying company, with little chance of success.  But that is not the case.  Kik's Board and Executive Team alike believed that Kin was a

bold idea that could solve the monetization challenges faced by all developers (not just Kik) in the existing advertising-based economy, by changing the way people buy and sell digital products and services. Consistent with the Board and Executive Team's view at the time, another Board member wrote:

> *The more I think about it, I think this is a great idea. People call it a hail Mary but to me that is a longshot and I really do not think it is a long shot.*

The Commission also asked Mr. Livingston directly whether "people consider[ed] the crypto project a Hail Mary on Kik's board," and he explained:

> I think when people first heard the idea, they, like almost everyone else I've ever introduced this idea to, thought it was crazy. But also, they -- like everyone else, as they spent more time with it, they heard more about it, they understood more about it, realized that like Jim realized here, *not only was this not a long shot, but it was a great shot.*

Indeed, many of Kik's competitors (such as Line, KaKao, Telegram, and Facebook) have since announced their own cryptocurrencies, thereby validating the ambitious vision that Kik conceived at a time when others were not bold enough to pursue it.

And while it is difficult to explain the Commission's apparent contempt for the idea that a company would sell a product to generate revenue, Kin was not simply a means to fund operations, nor was it necessary for Kik to stay in business. Kik believed that it could have received traditional financing if it had wanted to, as it had many times in the past, but realized that it would not address Kik's fundamental challenge to monetize within an advertising-based model. The Commission is also well aware that Kik was not facing imminent financial ruin: as Kik's then-CFO and member of the Board informed the Staff multiple times, "*it wasn't time to hit a panic button or anything*," and he did not think that Kik was in a "precarious position." And publicly, at the TechCrunch event that the Commission repeatedly references, Mr. Livingston squarely rejected the notion that it created Kin "because [it couldn't] get money from investors." Instead, Kik decided to create a new business model centered around a cryptocurrency to fuel a new digital economy that could allow smaller players to compete with large, dominant players.

Moreover, the Kin project was not a "speculative new venture." Rather, it is the product of years of research and testing. At least two years after Mr. Livingston began seriously studying cryptocurrencies, Kik first decided to explore the viability of a digital token in Kik Messenger in 2014, when it launched a digital currency called Kik Points to test and study users' interests. Much like Kin, users could spend Kik Points on digital content, including emojis or stickers, and could earn it by participating within the application. As part of this strategy, Kik sold Kik Points to advertisers, who – rather than siphoning user data and using it to run targeted advertisements – would offer them as rewards to users who interacted with advertisers' surveys or polls within Kik Messenger. Kik Points were very popular with Kik's user-base, proving that a digital currency had great potential for adoption within digital applications. In fact, transactions in Kik Points exceeded the transaction volume of Bitcoin, and during the two and a half years of Kik Points, users completed approximately 253 million earn experiences, and made 74 million purchases.

Kik Points proved that consumers would adopt and use a digital currency within applications. However, the Kik Points initiative was not a complete solution to Kik's monetization problem for a number of reasons. First, because Kik Points were centralized to Kik alone, there was nothing to prevent Kik from creating more Kik Points, and advertisers were hesitant to buy a token that could be unilaterally diluted or devalued. Second, because Kik Points could only be used within Kik Messenger, which could stop accepting Kik Points at any time, advertisers were concerned about Kik Points losing their value entirely. And third, Kik was unable to create enough spend experiences on its own to keep up with demand, which further limited interest from advertisers.

Against this backdrop, accounting for the strengths and limitations of Kik Points, as well as Kik's own market and technical research, Kik envisioned a decentralized, widely-adopted currency that would be used for earning and spending within a variety of digital services offered by developers.

**8.**     Starting in early 2017, Kik began to devise a plan to offer and sell digital tokens. The plan became public on or about May 25, 2017, when Kik announced the Kin token offering

by publishing a "white paper" and issuing press releases, and through a speech by Kik's Chief Executive Officer ("CEO") at a blockchain industry conference in Manhattan. Through these and other outlets, Kik enthusiastically described the Kin offering and Kik's plans to create, develop, and support what Kik called the "Kin Ecosystem," in which, at an unspecified future date (if the project was successful), Kin could be used to buy goods and services.

**ANSWER**: Kik admits that on May 25, 2017 it announced a plan to offer and sell Kin through publishing a white paper, issuing press releases, and Mr. Livingston's fireside chat at Token Summit. Kik denies the remaining allegations in this paragraph, which ignore years of study, research, and testing that resulted in the Kin project. (*See* Kik's Answer to ¶ 7.)

Given that Kik hoped to *avoid* the pitfalls of Kik Points, which suffered due to the fact that their value was too closely tied to Kik's efforts, it would make no sense for Kik to promise the public that Kik alone would "create, develop, and support" the Kin economy. From the time of its public announcement on May 25, 2017, through the TDE and today, in line with its vision, Kik has advertised Kin as both a currency for use in consumers' daily digital lives and as the basis for a new, fair, and open digital economy, one that would necessarily involve the efforts of users and content providers other than Kik. As Mr. Livingston emphasized at Token Summit,

> Within this community, within any individual community, it's a new way to get compensated for the value you provide. But it's also a new way to **spark the creation of an ecosystem of digital services**. And our ultimate vision, step four of our plan, which you'll see in our white paper, is to create the Kin Foundation, because at the end of the day, we want to use Kik to spark the creation of this new ecosystem. **But then over time, Kik is just one of hundreds, if not thousands of digital services in this ecosystem and Kik has no control over it**.

Later, at the San Francisco Bitcoin Meetup event, Livingston reiterated that "the ultimate dream is for Kik to launch Kin, to launch this broader ecosystem, **then for this broader ecosystem to not need Kik**." While Kik was involved in building the underlying infrastructure, it was unequivocal that Kik alone would not support the Kin economy – nor could it.

9.      From the initial May 2017 announcement through September 2017, Kik relentlessly pitched Kin and the prospect that Kik's future efforts to develop the Kin Ecosystem would drive an increase in Kin's value.  Kik emphasized that only a finite number of tokens would be created and that rising demand for the tokens would cause their value to appreciate.  Kik promised that it would spur such demand by dedicating company expertise and resources – including proceeds from Kin sales – to specific, Ecosystem-enhancing projects, including: the redesign of Kik Messenger to incorporate Kin; the creation of what Kik called a "rewards engine" to compensate companies that fostered Kin transactions; and the implementation of a new, Kin-specific "transaction service" to address flaws in existing blockchain technology.  Kik also assured prospective buyers that, following distribution of the tokens, buyers would be able to trade Kin on secondary trading platforms, often described as "exchanges," enabling conversion of Kin to either a digital asset (e.g., Bitcoin or Ether) or fiat currency (e.g., U.S. dollars).

**ANSWER:** Kik denies the allegations in this paragraph.  This paragraph is highly selective and misleading, as Kik did not "relentlessly pitch[ ] Kin and the prospect that Kik's future efforts to develop the Kin Ecosystem would drive an increase in Kin's value."  Tellingly, to show Kik's "relentless" marketing efforts, the Commission cites only a handful of Company statements from a body of over thousands of statements, made in hundreds of speaking engagements, conferences, interviews, blog posts, articles, and other public communications.  An even smaller subset of these statements even reference Kik's role in the Kin ecosystem, and none promise that Kik's efforts would generate profits.  At times, Kik spoke of how token prices could increase or decrease based on supply and demand, but those statements did not promise profits from Kik's efforts.  Instead, they simply described basic economic principles that apply to any asset, where an increase in demand without an increase in supply tends to lead to a higher price.  (*See* https://www.britannica.com/topic/supply-and-demand.)  The same principles apply to Bitcoin, which the Commission has conceded is not a security.  As Mr. Livingston articulated at the San Francisco Bitcoin Meetup, developers and other members of the Bitcoin ecosystem know there will only "ever be 21 million Bitcoins.  So the supply is fixed. . . . ***Economics 101 [says] supply***

*stays the same, demand goes up, the price is gonna go up*."  Regardless, during that same discussion, Mr. Livingston made clear that Kik could "not guarantee value with Kin."

Kik similarly did not "promise to "spur such demand by dedicating company expertise and resources . . . to specific, Ecosystem Enhancing Projects."  Rather, it stressed that "a movement this ambitious needs as many people as possible."  Kik wanted to "spark the creation of this ecosystem, but [ ] *want[ed] this ecosystem and Kin to go way beyond Kik.*"  In fact, on the day Kin was announced Mr. Livingston noted that Kik could not build a successful economy on its own: "we can't do this alone.  We can't do it alone from a technology perspective.  We can't do it alone from a digital service perspective.  *This really does have to be a community effort*."  Accordingly, as Kik had seen with Kik Points, if Kik was the only developer creating demand, the economy would fail.  Further, Kik did not "assure" prospective purchasers that Kin would be tradeable on exchanges.  For example, Kik responded to a Tweet, stating that that the decision to list Kin was "up to the exchanges."

10.    Throughout its Kin promotional campaign, Kik also declared that the company would share with buyers a common interest in profiting from Kin's success: in addition to selling one trillion tokens through its then-ongoing offering, Kik would create and allocate to itself three trillion Kin tokens over a two-and-a-half-year period.  Kik told potential buyers that, by allotting 30 percent of the outstanding supply of Kin to itself, the company would align its financial interests with those of other Kin investors, which would give the company an incentive to take entrepreneurial and managerial steps to increase the demand for the token.  And, Kik described Kin as an opportunity for both Kik and early Kin investors to "make a ton of money."

**ANSWER:**  Kik admits that it retained 30 percent of the Kin created.  Kik further admits that Mr. Livingston said the words "make a ton of money" at a conference in Canada.  Kik denies the remaining allegations in this paragraph.  Again, the Commission distorts and misstates Mr. Livingston's comments – he never promised that "investors" could "make a ton of money."  Rather, he explained that Kin allowed users and developers to be compensated fairly for

contributing valuable digital services in a new economy.  Mr. Livingston was also explaining basic economic principles that would apply to any asset.  The full quote reads:

> *We're trying to build this economy, whether it's around chat – you know, I host a great group chat that I join your great group chat; whether it's music – I create a great song, I listen to your great song; a game – I create at great level, I play your level; where consumers are coming together and providing value to each other and facilitating that with a cryptocurrency.  The more you do that, the more valuable the - the more demand for the cryptocurrency there will be. And with sort of a, you know, cryptocurrency, you can guarantee a fixed supply, guaranteed scarcity. So supply stays the same. Demand goes up, the price goes up. Such that if you set some aside for yourselves and you give other people the opportunity to participate and contribute, everybody can not only build this amazing new ecosystem and platform, but also* make a ton of money.

**11.**    Starting with the May 2017 announcement, Kik offered and sold the one trillion Kin tokens in a single offering aimed at both wealthy investors and the general public.

**ANSWER:** Kik categorically denies the allegations in this paragraph.  (*See* Kik's Answer to ¶ 1.)

**12.**    From May to September 2017, Kik offered and sold tokens to professional investment funds and other select, wealthy investors using purchase agreements that Kik called "Simple Agreements for Future Tokens" or "SAFTs."  Kik's SAFTs entitled participants to the future delivery of the Kin that they purchased when they entered into the agreements.  Under the SAFTs, investors bought Kin at a discount to the price that the general public would pay, and Kik promised to deliver the tokens pursuant to a schedule, half at the time that it delivered tokens to the general public and half on the one-year anniversary of the first delivery.  Kik's sale of Kin through these purchase agreements was denominated in U.S. dollars, and Kik raised approximately $49 million.

**ANSWER:** Kik admits that, from May through September 2017, Kik sold the right to receive Kin in the future, conditioned on a "Network Launch," to "accredited investors" as defined in SEC Regulation D.  Kik further admits that pre-sale participants purchased such rights pursuant

to SAFTs.  Kik further admits that if the "Network Launch" occurred, pre-sale participants would have the right to receive Kin at a discounted price.  Kik admits that these investors would be eligible to receive 50 percent of their allotted tokens upon Network Launch, and their remaining tokens the following year.  Kik further admits the Kik received approximately $49 million from the pre-sale.  Kik denies the remaining allegations of this paragraph.  (*See* Kik's Answer to ¶ 1.)

13.    From May through September 2017, Kik also offered Kin to the general public and had public investors sign up for this public sale, even while the company was offering and selling discounted Kin to investment funds and other wealthy investors using its SAFTs.  Kik's September 2017 sale of Kin to the general public was denominated in Ether, and Kik received approximately $50 million worth of this digital asset.

**ANSWER:**  Kik admits that it announced the TDE in May 2017.  Kik admits that the TDE was denominated in Ether and that Kik received Ether worth approximately $50 million as of the end of the TDE.  Kik denies the remaining allegations in this paragraph.  (*See* Kik's Answer to ¶ 1.)  The TDE did not commence until after the completion of the pre-sale.  Further, Kik required TDE purchasers to register for the TDE and undergo KYC, AML, and OFAC screening, to comply with federal laws and regulations.

14.    On September 26, 2017, Kik delivered to the public investors all of the Kin that they had purchased, and delivered to the investors who bought at a discount through SAFTs half of the tokens they had purchased, pursuant to the contracts' terms.

**ANSWER:**  Kik admits that it distributed Kin tokens to TDE purchasers on September 26, 2017.  Kik also admits that it distributed 50 percent of the Kin tokens that pre-sale participants were entitled to on September 26, 2017, pursuant to the SAFTs.  Kik denies the remaining allegations in this paragraph.  (*See* Kik's Answer to ¶ 1.)  Kik conducted two separate and distinct sales and Kin purchasers were not "investors."

15.    Of the nearly $100 million in cash and Ether received by Kik, over $55 million was raised from United States-based investors.

**ANSWER:** Kik denies the allegations of this paragraph.  This paragraph incorrectly suggests that the pre-sale and TDE were part of just one sale, despite the stark differences between the two transactions.  (*See* Kik's Answer to ¶ 1.)  This paragraph is also misleading.  Of the $55 million referenced in this paragraph, $40 million was received in the pre-sale, and therefore exempt from registration under SEC Regulation D.  Only approximately $16 million of the amount raised in the TDE, or less than one third of Ether received in the TDE, was from U.S. residents.  As for the majority of sales to non-U.S. purchasers, these transactions are not domestic and are therefore not subject to U.S. federal securities laws.  As a Canadian company, Kik's sales of Kin tokens to non-U.S. residents did not occur in the U.S. in any sense, thus precluding the application of U.S. securities laws to over $34 million worth of sales in the TDE.

16.     Throughout Kik's 2017 offering and sale of Kin, the decentralized economy that Kik had marketed did not exist.  In addition, when Kik distributed Kin on September 26, 2017, no one – not even Kik – offered goods or services in return for Kin.

**ANSWER:** Kik denies the allegations in this paragraph.  At the time of the September 2017 TDE, there was a decentralized Kin economy.  While Kin was not yet adopted at the scale it is today, Kin's fundamental utility as a digital currency existed on the day of the TDE in a number of ways: TDE purchasers could access premium content, link their digital wallets to their Kik accounts, and display their Kin balances, which was important to show status within the chat community.  Participants could use tokens to access tiered premium content, such as sticker packs, that were unlocked depending on the amount of Kin owned.  And Kin owners could use Kin for peer-to-peer transactions.  Third parties soon capitalized on these capabilities, for example, shortly after the TDE, a sunglass company accepted Kin as a form of payment.

17.     On July 25, 2017, approximately seven weeks before Kik started the public sale of Kin, the SEC issued what is often called the "DAO Report."  The DAO Report "advise[d] those who would use . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws," and found that digital assets at issue in that matter were securities.  Even prior to the DAO Report, however, Kik had

been informed by one of its consultants that the Kin offering was, potentially, an offering of securities that needed to be registered with the SEC and that "unregistered public securities offerings are not legal in the U.S."

**ANSWER:**  Kik admits that the SEC issued the DAO Report on July 25, 2017.  Kik denies the remaining allegations, including any suggestion that Kik did not "take appropriate steps to ensure compliance with the U.S. federal securities laws."  Given that the token at issue in the DAO Report was completely distinguishable from Kin, and without the benefit of *any* other SEC guidance at the time, the DAO Report actually provided reassurance to Kik.  In fact, in August 2017, Mr. Livingston publicly commented that it made "complete sense to [Kik] and [was] fully expected" that the SEC would determine that the DAO was a security because, among other things, the token at issue in the DAO Report entitled participants to vote and receive "rewards," which the DAO co-founder compared to "buying shares in a company and getting . . . dividends."  Further, the DAO expressly informed investors that it would fund projects in exchange for a return on investment.  In contrast, Mr. Livingston then observed that, at the time of Kik's 2017 sales of Kin, "when you look at the utility token side, ***there [was] no guidance given on that***."

In the midst of this uncertainty, Kik still made significant efforts to understand and comply with all applicable laws and regulations, and did its best to "anticipate where the rules will land and provide . . . the most thoughtful, buttoned up way to not only do a token distribution event but also to build one of these decentralized networks."  For example, Kik retained United States counsel; hired an experienced General Counsel; conducted robust KYC, AML, and OFAC screening; ensured that its product was functional and operational at the time of TDE; and hired a third-party auditor who confirmed that Kin was analogous to "inventory," and that Kik should therefore pay taxes on the revenue from the sale – something it would not have done if the TDE were a securities offering.

Further, this paragraph rips yet another quote from its proper context.  Specifically, the Commission dishonestly claims Kik's consultant "informed" Kik that "the Kin offering was, potentially, an offering of securities that needed to be registered with the SEC and that

"unregistered public securities offerings are not legal in the U.S."  The full quote from the consultant reads:

> You don't want your offering to be a securities offering, as that comes with a huge regulatory burden and expense (it's essentially like taking your company public).  On the other hand, unregistered public securities offerings are not legal in the US.
>
> ***In the case of a community currency, there is a good basis to argue that this is not a security. You're just selling units of property that you created that are used for a particular purpose in your app. Ultimately, this is the central question for decentralized crowdfunding, and the SEC has not given guidance or made any enforcement actions so far against these sales."***

18.     Under the federal securities laws, Kik offered and sold securities from the initial May 2017 announcement of Kin through September 2017.  But, Kik has never filed with the SEC a registration statement for its offer and sale of securities.  By failing to prepare and file a registration statement, Kik did not provide important information to investors regarding the investment opportunity promoted by Kik, such as information about Kik's current financial condition (including that the company's expenses far exceeded its revenue), future plans of operation and budget, the proposed use of investor proceeds, and detailed disclosure of material trends and the most significant factors that made the offering speculative and risky.  Kik thus failed to disclose information relevant for investors to evaluate Kik's promises about the investment potential of Kin and the Kin project.

**ANSWER:**  Kik denies the allegations in this paragraph.  In the pre-sale, Kik sold conditional contractual rights to accredited investors pursuant to SAFTs, in a sale that was exempt from registration requirements under SEC Regulation D.  (*See* Kik's Answer to ¶ 1.)  For the reasons stated herein, Kik's sale of Kin in the TDE was not an "investment contract" or otherwise a securities transaction.  Because Kik's sales did not fall under the purview of the federal securities laws, Kik was under no obligation to file a registration statement.  Nor was Kik, as a private

company, required to disclose information regarding its financial condition, budget, or use of proceeds.

19.     Kin is currently trading on unregulated trading platforms at about half of the value that public buyers paid in the offering, and, during the intervening period, it has often traded much lower.

**ANSWER:** Kik admits that at the time of the Complaint was filed, Kin's price, according to CoinMarketCap,[2] was about half of what it was at the time of the TDE.  Kik denies the remaining allegations of this paragraph.  Kin's price "during the intervening period" has at times exceeded its TDE price.  Regardless, this allegation has no relevance to whether Kik sold an "investment contract," but is instead designed to prejudice the Company.

20.     By engaging in the conduct set forth in this Complaint without a registration statement being in effect or filed, Kik has engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

**ANSWER:** Kik denies the allegations in this paragraph for the reasons stated herein.

21.     Unless Kik is permanently restrained and enjoined, it will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

**ANSWER:** Kik denies the allegations in this paragraph.  Notably, after investigating ongoing and future Kin transactions since September 2017, the Commission did not bring any claims regarding such transactions.

22.     The SEC brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)].

**ANSWER:** This allegation is a legal conclusion that does not require a response from Kik.

23.     The SEC seeks a final judgment: (a) permanently enjoining Kik from engaging in acts, practices, and courses of business alleged herein; (b) ordering Kik to disgorge its ill-gotten

---

[2] CoinMarketCap is a publicly available reference tool commonly used in the cryptocurrency industry to monitor token pricing and other data relating to cryptocurrency tokens.

gains and to pay prejudgment interest thereon; and (c) imposing civil money penalties on Kik pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)].

**ANSWER:** Kik admits that the SEC seeks the relief listed in this paragraph.  However, for the reasons stated herein, the Commission is not entitled to any of the relief listed in this paragraph. Further, U.S. securities laws do not extend to extraterritorial transactions between Kik, a Canadian company, and non-U.S. purchasers, and therefore the profits from such transactions are not subject to disgorgement.

### JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)].

**ANSWER:**  This paragraph relies on legal conclusions and does not require a response. However, Kik notes that it is a Canadian company, and less than one third of the TDE purchasers were United States residents.  U.S. securities laws do not extend to extraterritorial transactions between Kik, a Canadian company, and non-U.S. purchasers, and therefore such transactions are outside of the purview of this Court's jurisdiction.

25.     Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].  Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

**ANSWER:** This paragraph relies on legal conclusions and does not require a response. However, Kik notes that it is a Canadian company and less than one third of the TDE purchasers were United States residents.

26.     Those transactions, acts, practices and courses of business include, but are not limited to: (a) Kik's office in this district from which Kik employees marketed the Kin offering and worked to create demand for Kin tokens: (b) Kik's announcement of the Kin offering at a

blockchain conference held in this district; (c) Kik's employees' travel to and work in the United States to promote the Kin offering, including meetings with potential purchasers, including potential purchasers located within this district; (d) Kik's retention of consultants located in this district to work on and promote the Kin offering; and (e) Kik's offers and sales of Kin tokens to purchasers located within in the United States, including in this district.

**ANSWER**:  Kik admits that it had an office located in New York City in 2017.  Kik further admits that Mr. Livingston announced the sale of Kin at Token Summit in New York City on May 25, 2017.  Kik further admits that its employees traveled to the United States to market Kin as a medium of exchange for digital services to prospective TDE purchasers, and that it retained consultants located in New York in connection with the TDE.  Kik further admits that some of the TDE purchasers are purportedly New York residents.  Kik further admits that persons buying Kin were Kik purchasers, not "investors."  Kik denies the remaining allegations of this paragraph, which are misleading by omission.  First, although some activity connected with Kin occurred in the United States, Kik is a Canadian company.  Accordingly, most Kik employees, including much of the senior management team, was based in Canada during the relevant time period.  Second, the majority of TDE purchasers were located outside of the United States.

27.     Kik has agreed to jurisdiction in the United States concerning disputes relating to Kin.  When selling Kin to the general public, Kik required investors to agree that all disputes about the purchase and use of Kin would be heard by an arbitrator or court in the United States, specifically in the State of Delaware.

**ANSWER**:  Kik admits that its Terms of Use contain a provision stating that Delaware law would apply to users' "purchase and use of the Kin Tokens," and that any dispute between Kik and TDE purchasers "that is not subject to arbitration or cannot be heard in small claims court[] shall be resolved in the state or federal courts of the state of Delaware."  Kik denies the remaining allegations in this paragraph.  This provision has no bearing on whether the United States has jurisdiction over this lawsuit given that the SEC was not a party to the Terms of Use.

**DEFENDANT**

28.     **Kik Interactive Inc. ("Kik" or "Defendant")** is a privately-held Canadian corporation with headquarters in Waterloo, Ontario, and offices in New York City and Tel Aviv.

**ANSWER:** Kik admits that it is a privately-held Canadian corporation.  Kik further admits that it has an office in Tel Aviv.  Kik denies the remaining allegations.  Kik's headquarters are located in Kitchener, Ontario, and Kik currently does not have an office located in New York City.

**BACKGROUND ON DIGITAL ASSETS**

29.     An "Initial Coin Offering" or "ICO" is a fundraising event in which an entity offers participants a unique digital asset – often described as a "coin" or "token" – in exchange for consideration (most commonly Bitcoin, Ether, U.S. dollars, or other fiat currency).  The tokens are issued and distributed on a "blockchain" or cryptographically secured ledger.  Kik's offer and sale of Kin from May to September 2017, including the sales through SAFTs and to the general public, constituted an ICO.

**ANSWER:**  Kik admits that in 2017 it offered and sold digital tokens called Kin.  Kik denies the remaining allegations in this paragraph, and expresses no opinion on the nature of so-called "ICOs" or other token sales.  Generalizations about "ICOs" or other token sales have no bearing on Kik's sales of Kin, and have the potential to unfairly prejudice Kik.  And again, the Commission improperly conflates the pre-sale and the TDE as one "offer and sale."

30.     A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a network and records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks."  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain.  The system relies on cryptographic techniques for securely recording transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  Some blockchains can record what are called "smart contracts," which are, essentially, computer programs designed to execute the terms of a contract when certain triggering conditions are met.

**ANSWER:** Kik admits that this paragraph describes one characterization of blockchain technology.

31.     ICOs are typically announced and promoted online, although other marketing may be employed.  Issuers often release a "white paper" describing the project and promoting the ICO, often in highly technical terms and jargon.  To participate, investors are generally required to transfer consideration to the issuer's address, bank account, digital "wallet," or other account.  After the completion of the ICO, the issuer will distribute its tokens to the participants' unique address on the blockchain.  In marketing the Kin ICO, Kik often referred to the public sale and distribution of Kin as the "token distribution event" or the "network launch."

**ANSWER:** Kik admits that it has referred to the public sale of Kin as the "token distribution event" or the "network launch."  Kik denies the remaining allegations in this paragraph.  Not only is it improper to impute the Commission's generalized, selective, and unsubstantiated conclusions about token sales to Kik's sales of Kin, but it is also factually misleading because Kik's path toward adoption of a cryptocurrency began years before the vast majority of so-called "ICOs" had taken place.

32.     Issuers and individuals increasingly have been using blockchain technology in connection with raising capital for businesses and projects.  And blockchain-enabled offerings are often targeted at retail investors in the United States and globally.  The overall size of the ICO market has grown exponentially.  It is reported that more than $20 billion was raised between June 2017 and November 2018.

**ANSWER:** Kik has no basis to admit or deny the allegations in this paragraph, as they are outside of Kik's personal knowledge and, again, unrelated to the facts alleged in the Complaint.

33.     After the initial sale by an issuer, tokens are sometimes transferred between users or listed on online trading platforms, which are sometimes colloquially referred to as "exchanges," whereon the tokens trade for other digital assets or fiat currencies.

**ANSWER:** Kik admits that digital tokens such as Kin are often transferred between users or listed on exchanges.

## OTHER ENTITY DISCUSSED IN THIS COMPLAINT

34. **Kin Ecosystem Foundation ("Foundation")** is a non-profit foundation that Kik announced to the public in May 2017 and created under Canadian law on September 12, 2017. The Foundation has had a two-member board of directors since its founding. Initially, the directors were Kik's CEO and Chief Financial Officer ("CFO"). Since May 2018, the directors have been Kik's CEO and a long-time Kik consultant. Because Kik's CEO has always been one of two board members, the Foundation has always needed the CEO's approval to conduct any business. As discussed further below, the Foundation was created so that it could receive six trillion Kin to distribute in such a way as to compensate – through the so-called "rewards engine" – companies that promote Kin transactions and, therefore, boost participation in the Kin Ecosystem and demand for Kin.

**ANSWER:** Kik admits that the Kin Foundation was announced to the public in May 2017. Kik further admits that the Kin Foundation is a non-profit organization formed under Canadian law on September 12, 2017, that it received six trillion Kin, and that it is responsible for creating and administering the rewards engine. Kik also admits that initially, the Kin Foundation's Board of Directors consisted of Mr. Livingston and Kik's then-CFO, in their individual capacities. Today, the Kin Foundation's Board consists of Mr. Livingston in his individual capacity and William Mougayar, who is independent from Kik and a well-respected advisor in the blockchain and cryptocurrency space with years of experience advising startups. And while Mr. Livingston votes on Kin Foundation matters, Mr. Livingston cannot unilaterally approve any Kin Foundation action, unless Mr. Mougayar has a conflict of interest in the matter being voted on.

Kik denies the remaining allegations in this paragraph. This paragraph is misleading and, among other things, conflates Kik and the Kin Foundation. The Kin Foundation's sole purpose is to be "an independent, nonprofit, and democratic governance body for the members of this ecosystem," to encourage and foster growth of the Kin economy. Accordingly, as stated in Kik's

white paper, the "principal functions of the Kin Foundation [would] include the open governance of its resources together with other ecosystem partners, the support and advancement of the technology related to Kin's implementation, and all matters related to ecosystem membership, including the Kin Rewards Engine." Further, the Kin Foundation is a non-profit entity with its own outside counsel, its own wallet, its own bank account, and its own assets.

This paragraph is notable because the Commission investigated the Kin Foundation in connection with ongoing distributions of Kin, and ultimately decided not to bring claims against it.

FACTS

**I.**     **IN EARLY 2017, KIK FACED FINANCIAL CRISIS**

**35.**     Since its founding in 2009 until its 2017 ICO, Kik raised at least $120 million from venture capital investors and a Chinese technology and entertainment conglomerate.

**ANSWER:** Kik admits that it has received at least $120 million in financing from venture capital firms, including an investment in 2015 from technology conglomerate Tencent in which Kik was valued at $1 billion. Kik denies the remaining allegations in this paragraph.

**36.**     Prior to the Kin project in 2017, Kik's only business line was Kik Messenger, a mobile software application or "app," which lets users communicate with each other using mobile devices. The app had initial success, attracting millions of users around the world, with a significant concentration among teenagers and young adults in the United States.

**ANSWER:** Kik admits that it operates a chat application called Kik Messenger which was launched in 2010, and that it allows users to communicate with each other using mobile devices. As the Commission indicates, Kik Messenger was a viral success among users. (*See* Kik's Answer to ¶ 5.) Kik denies the remaining allegations in this paragraph. Within Kik Messenger, Kik operated numerous different business lines, including chat bots, advertising surveys and polls, digital stickers, premium emojis, Kik Points, and other digital content. Further, Kik's large user base is diverse and comprised of individuals from a wide age range, both within and outside the United States.

37.    After several years, however, Kik's business faltered.  In 2016, Kik Messenger became less and less popular.  Daily average users dropped from more than 10 million in January 2016 to about 6 million in January 2017.  Monthly average users dropped from more than 28 million in January 2016 to about 20 million in January 2017.

**ANSWER:** Kik admits that Kik monthly average user and daily active users decreased from January 2016 to January 2017.  Kik admits that, despite having hundreds of millions of users, and despite the fact that at this same time in 2017, Kik Messenger was ranked as one of the Top 15 social media applications in the world, it was struggling to monetize its business without compromising its core philosophies.  (*See* Kik's Answer to ¶ 5.)  Kin was created to solve these problems for Kik and the many other developers who faced the same challenges.  (*See* Kik's Answer to ¶ 8.)  Specifically, the Kin economy would allow innovative developers to compete on an even playing field with an alternative monetization strategy that did not rely on advertising revenue.  Kik denies the remaining allegations in this paragraph.

38.    Kik Messenger had always been difficult for Kik to monetize, and Kik has never generated appreciable revenue and has never been profitable.  From mid-2015 to mid-2016, the company recorded $2.2 million in revenue but had total expenses of $29.2 million, and the company experienced a comprehensive loss, before adjustments for income taxes, of $29 million.  From mid-2016 to mid-2017, the company recorded $1.5 million in revenue but had $32.3 million in expenses, and the company experienced a comprehensive loss, before adjustments for income taxes, of $32.9 million.

**ANSWER:** Kik admits that it recorded the revenue and expenses stated in this paragraph.  Kik further admits that it has historically not been profitable, and that its efforts to monetize its platform through other business lines have been largely insufficient to sustain its business.  Kik denies the remaining allegations in this paragraph.  Kik was profitable in fiscal year 2018.  And while Kik has attempted to monetize Kik Messenger through a variety of business lines, including Kik Points, paid chats, and other premium content which saw mixed results, Kik's continued

challenge to monetize while protecting user data prompted Kik to pursue a new sustainable business model centered on a digital currency to be used within digital applications.

39.     During its early years, Kik Messenger was a competitor of other messaging applications, such as Snapchat and WhatsApp, but the fates of these companies diverged.  In 2014, Facebook purchased WhatsApp for approximately $19.3 billion, and, in March 2017, Snap conducted an IPO.  Kik, however, failed to develop ways to generate revenue through Kik Messenger and failed to find a buyer.

**ANSWER:**  Kik has no basis to admit or deny facts outside of its personal knowledge. Kik admits that its competitors included Snapchat and WhatsApp.  However, upon information and belief, these companies have historically operated at a loss.  Kik denies the remaining allegations in this paragraph, which are both unfounded and irrelevant to the key issues in this case.  (*See* Kik's Answer to ¶ 6.)  Kik notes however, that most of Kik's competitors, including Facebook, are now pursuing cryptocurrencies, well after Kik's vision has come to fruition.

40.     In or about October 2016, Kik hired an investment bank to identify companies that might buy Kik.  The investment bank contacted 35 parties and signed confidentiality agreements with seven companies that wanted additional information about Kik.  By February 1, 2017, however, all seven potential suitors had declined to buy or merge with Kik.

**ANSWER:** Kik admits that in late 2016, it hired an investment bank to evaluate a potential sale of the Company.  Kik denies the remaining allegations in this paragraph.  (*See* Kik's Answer to ¶ 6.)  Notably, Kik began pursuing a cryptocurrency project before the "seven potential suitors had declined to buy or merge with Kik."

41.     By early 2017, Kik had spent most of its venture capital money and had remaining cash of about $26 million, expending about $3 million a month to support its operations.  In early 2017, Kik's executives repeatedly warned the company's directors about Kik's financial "runway" – the time by which Kik would run out of money to fund operations under then-current spending levels – and Kik predicted it would run out of cash sometime during the late fall of that year.

**ANSWER:** Kik admits that by early 2017, it had roughly $26 million in cash remaining and, at times, has spent around $3 million per month. Kik denies the remaining allegations in this paragraph, which again distract from the key issues in this case. As explained previously, Kik was not facing an imminent financial "crisis." (*See* Kik's Answer to ¶ 7.) And, rather than seeking yet another round of venture capital funding (which would temporarily extend its runway), Kik chose to address its monetization challenges head-on. Accordingly, Kik decided to go all in on a business model centered around a cryptocurrency.

## II. HAVING NO OTHER OPTIONS, KIK "PIVOTED" TO DIGITAL TOKENS

42. Facing steadily-declining cash reserves and no reasonable prospect of generating meaningful revenues from its current business, Kik's executives discussed the idea of "pivot[ing]" to digital tokens as "a way to raise capital." By early 2017, Kik's senior management had concluded that an ICO was Kik's only option. One member of Kik's board of directors, soon after discussions began, described the plan as a "hail Mary pass."

**ANSWER:** Kik admits that the quoted language appears in emails from Kik Board members and executives. Kik denies the remaining allegations, including the SEC's suggestion that the Kin project was a desperate attempt to keep the company alive. (*See* Kik's Answer to ¶ 7.) Kik's decision to launch Kin and adopt a cryptocurrency-based model was not necessarily a "pivot" and was not undertaken solely as a way to raise capital. (*See id.*) Kik had been methodically researching and vetting the idea of a digital currency since 2012, and had already successfully tested a digital currency with Kik Points in 2014. Further, as Kik's CFO testified, there remained other options for traditional financing, but none that solved Kik's concerns about the advertising-based monetization model. (*See* Kik's Answer to ¶ 7.) And still, the Commission persists in this story, even after having asked Mr. Livingston directly whether it sounded "entirely crazy to pivot to a crypto project" in 2012, in which Mr. Livingston replied:

> *[Kik] didn't pivot to a crypto project. It didn't sound entirely crazy that crypto could be our business model. . . . This was increasingly going all in on a fundamentally new business model that was powered by crypto.*

When asked again whether the Kin project would be "putting the company into this new business model," Mr. Livingston explained:

> I think it started as a side business, right? Like, with Kik Points, it was a side business. But as we got increasing conviction on the power of this option and increasing conviction on the futility of the other options, *it became increasingly clear to me that this was the best option.*

The Commission now ignores these sworn statements because they do not comport with its preferred story.

**43.**     From the outset, Kik saw investors and speculators as a crucial target audience for an ICO. For example, in a meeting on February 16, 2017, Kik's executives and directors discussed the need to craft an offering that would appeal to "cryptoinvestors" and the growing market for "cryptoassets," highlighting a "50% three-year CAGR [compound annual growth rate]" for such investments. At this meeting, Kik executives and directors anticipated that "Crowdfunders" "would invest in tradable digital tokens of a non-blockchain company if offered good risk-return potential."

**ANSWER:** Kik admits that the quoted language is from Kik's February 16, 2017 Board presentation. However, these phrases are taken out of context and twisted to take on an entirely different meaning. Kik denies the remaining allegations – especially the claim that Kik targeted "investors and speculators," which is demonstrably false. The Commission's characterization of Kik's February Board presentation is deceptive for two reasons. First, the Commission's characterization of the presentation is misleading and pulls these quotes from context. For example, while the presentation does make references to "cryptoinvestors," the $19 billion "total market capitalization of cryptoassets," and a "50% three-year CAGR," it is abundantly clear that these were presented as preliminary, generic statistics about the "market context" of cryptocurrency. Additionally, the Commission overlooks the fact that this data about "Crowdfunders" was from a generic "investor survey" conducted by Kik's consultant, and was not

a sampling of actual or prospective Kin purchasers – or even the public at large.[3]   In fact, the consultant was careful to caveat its results by stating that the "***survey maintained the anonymity of Kik Interactive*** . . . .  Had respondents known more about the brand involved, results may have varied."

What the Commission omits is even more telling.  Consistent with the vision of Kin ultimately offered to the public, the presentation actually observes that, in that market context, "mainstream user adoption [of cryptocurrency] [was] still missing," and that Kik could be "the first major consumer network to apply ***real use cases built off the blockchain***."  To make the pitch for Kin, this presentation includes pages of research and data explaining why a token designed for consumptive use could benefit Kik and other applications.  This included:

- A graph showing the transaction volume of Kik Points – which "had multiple days where the transaction volume was 4x Bitcoin's highest historical trading day;"

- Explanations of how "[c]ryptocurrency use cases perfected inside of Kik can also be ***utilized by many outside of Kik***," including "expressive content" and "unique interactive experiences;"

- Plans for Kik to conduct its own "[u]ser research" to "[u]nderstand fit with users (i.e., earn/redeem);"

And proving that Kik never targeted "speculators," the presentation notes that a "healthy and engaged audience base and ecosystem" of "users[,] content creators[,] advertisers/agencies[, and] developers" was a "[k]ey dependenc[y]" that would "need to be considered as [Kik thought] about execution" of a cryptocurrency project.  From the beginning, Kik realized that, if large

---

[3] This survey was directed at a "set of people who [were] knowledgeable and experienced in the issues surrounding blockchain-based decentralized crowdfunding," and the consultant acknowledged that "[s]ophistication bias" may have affected the results.  The survey was posted to various slack channels (including the consultant's) relating to large blockchain projects, sent to the consultant's mailing list, posted to the consultant's social media, and included in a weekly newsletter about Ethereum.  The survey received 223 responses from self-selected individuals; a statistically small sample size which would represent a mere ***0.7 percent*** of the Ethereum Subreddit's registered users.

numbers of passive speculators purchased Kin, the project would fail. But in any event, the data showed that Kik's audience would not likely be interested in speculative investments: *only 15 percent* of survey respondents listed the "[e]xpectation of speculative outsized returns" as a "[t]op reason for investing in a decentralized crowdfunding, and *only 10 percent* listed "large revenue potential of the business." In contrast, the same report found that a much higher percentage of respondents would "lean toward being users of the platform." In short, the Commission has completely misrepresented the content of this presentation.

44. The timing of Kik's pivot coincided with a dramatic uptick in the number of ICOs generally. CoinDesk (an online information service focusing on the blockchain industry) reports that in 2017 at least 343 ICOs occurred, up from only 43 the year prior.

**ANSWER:** Kik admits that an article by CoinDesk reported that "43 ICOs in 2016 raising an aggregate $256 million; that number jumped to 343 ICOs in 2017." Kik denies the remaining allegations in this paragraph, including the allegation that Kik's adoption of a cryptocurrency was a "pivot." (*See* Kik's Answer to ¶ 42.) More fundamentally, this paragraph misstates the timing of Kik's move toward cryptocurrency. While Mr. Livingston had personally been investigating the potential for a cryptocurrency-based business model since 2011, Kik had been working toward an in-app currency since it launched Kik Points in 2014. Kik's executives and advisors specifically began to discuss a cryptocurrency as early as 2016, and formally presented the idea to the Board in February 2017. At this time, the largest token offering to date had been the Ethereum crowdsale, which amounted to $18 million. Since then, many companies, within the digital services industry or otherwise, have adopted various cryptocurrency models.

45. At the February 16, 2017 board meeting, facing a dearth of other options, Kik's board of directors instructed the executives to assume that Kik would conduct an ICO.

**ANSWER:** This paragraph is inaccurate and prejudicial, as the alleged availability of "other options" at the time of the TDE has no bearing on whether the TDE constituted an "investment contract." In any event, Kik had other options, but opted to conduct a TDE to create new economy of users and developers that could sustain its business long term. (*See* Kik's

Answer to ¶¶ 41-42.)  As such, on February 16, 2017 the Board instructed the executive team to assume that Kik would conduct a token sale, while the Company was still "finishing [its] evaluation of the viability" of a cryptocurrency project."  Kik denies the remaining allegations in this paragraph.

46.    Following the meeting, in an email to several employees dated February 28, 2017, Kik's CEO described Kik's new "crypto story," which would be "a new way" to raise capital.  He wrote that the company would "sell some [tokens] to crypto investors to raise money," and that "[m]ore demand" for the token would mean "[v]alue goes up" and, therefore: "Buy today, sell tomorrow, profit."

**ANSWER**: Kik admits that Mr. Livingston sent an email with the subject line "Crypto story" to two – not several – Kik employees on February 28, 2017, and that this email included the phrase "new way to raise money," "sell some to crypto investors to raise money," "[m]ore demand," "value goes up," and "[b]uy today, sell tomorrow, profit."   Kik denies the remaining allegations of this paragraph, which distort the nature of these statements and ignore the six additional subjects Mr. Livingston covers in this same "story."  Mr. Livingston's "[c]rypto story" addressed the cryptocurrency industry as a whole, and how it could be integrated into Kik's existing platform.  Mr. Livingston also discussed the fact that cryptocurrency could give users "spending power," which would let them "earn or buy," and could give "developers a simple yet powerful monetization tool for their bots."   Only then does Mr. Livingston say that a cryptocurrency would "also . . . be a new way to raise money" by "also sell[ing] some to crypto investors to raise money."  This is consistent with Kik's eventual decision to conduct an exempt SEC Regulation D sale to accredited investors, who received a future right to receive Kin contingent on the "Network Launch," as defined in the SAFT.  Further, the mere reference to a potential increase in value is insufficient to establish an investment contract, particularly where such statements were incidental to Kik's promotion of Kin as a medium of exchange for digital services.  (*See* Kik's Answer to ¶ 9.)

47.     Similarly, in a March 24, 2017 email to employees, Kik's CEO described his "[v]ision" for an offering of tokens (then called "Kik Points").  He explained that Kik's creation of demand for the tokens in the future would mean that people could buy now at a low price and sell later at a higher price to "creat[e] a return":

> [I]f you buy some Kik Points today when the demand is low, then you will be able to sell them at a higher price tomorrow when the demand is higher, creating a return. This potential return encourages investors to "buy in" at an ICO. An ICO is where Kik takes a portion of its reserves from its Fort Knox (say 100 million of the 1 billion Kik Points that we initially created and put in our Fort Knox) and sells them in an auction. The value proposition to investors is that if they buy in today at the ICO, and then the demand for the currency goes up because of all the things we do to create demand for them, then they will be able to sell their points at a higher price in the future, and make a return.  The money taken in from investors for the ICO is used by Kik to fund development to create more and more demand by both growing the community, and by growing the demand for the currency within the community.

**ANSWER:** Kik admits that the quote cited in this paragraph was part of an email from Mr. Livingston to his executive leadership team on March 24, 2017 – months before the Kin economy was ever announced to the public (and months before the Commission issued the DAO Report). Kik denies the remaining allegations in this paragraph, none of which are relevant to whether the TDE was an investment contract.  As an initial matter, Mr. Livingston referred to the token as "Kik Points 2.0" as a placeholder, and acknowledged that Kik would "need to come up with a new name."  Further, this paragraph quotes an internal email from Mr. Livingston six months before the TDE, largely based on his impressions of other cryptocurrency projects.  However, as Kik continued to develop its vision, it narrowed its focus, and most importantly, its public messaging on Kin as a medium of exchange in a digital economy, that would serve as a new business model for developers.

But even then, the remaining three pages of Mr. Livingston's "vision" (which the Commission completely ignores) focus on the fact that Kin would be a "new way to monetize a

community."  He wrote that it would be a "way to unite the community to work together to build the best community possible," and that the "goal isn't revenue, but to increase the number of transactions," for example by rewarding those who "[p]rovide great moderation, or design a great sticker."  These ideas came to form the basis of the new Kin economy.

48.      During this same time period, Kik began to work with a consulting firm located in New York City to research the market for tokens and other digital assets and to design an ICO.

**ANSWER:** Kik admits that it engaged an advisory firm based in New York, which specialized in cryptocurrency and blockchain technology, to research the cryptocurrency market. Kik denies the remaining allegations in this paragraph.

49.      The consultant's research confirmed for Kik that "serious crypto investors globally as well as small VC funds and family offices that are pushing into the space" could, in fact, become interested in adding Kik's tokens to their existing portfolios of digital assets.  The consultant's research also indicated to Kik that the majority of people who would buy a potential token would do so for investment purposes, rather than to use the token to obtain goods or services.

**ANSWER:** Kik admits that the consultant's report contains the language quoted in this paragraph, but the Commission's characterization of the consultant's findings are otherwise false and misrepresent the nature of the consultant's report.   In February 2017, well before Kik announced Kin (and months before the Commission issued the DAO Report), the consultant conducted a generic survey to gauge interest in a new cryptocurrency.   However, the approximately 200-person survey population was not representative of prospective or actual Kin purchasers, nor did it account for the substantial measures Kik undertook to discourage speculation.  (*See* Kik's Answer to ¶ 43.)

The consultant's report did not show "that the majority of people who would buy a potential token would do so for investment purposes."  The report describes various demand drivers at length – none of which include "investment purposes."  Instead, it notes precisely the opposite: that "token demand" would be driven by the fact that "user[s] can ***use [the token] to purchase exclusive digital content*** (exclusive smileys, stickers, memes)," "access to a premium

bot," "premium bot features," or even "in-game currency within a bot application." The report also explains that demand will be driven by "[c]ontent creators" who would want to "spend coins to buy promotion of content that is used in messaging." In short, the survey does not support the Commission's conclusions in this paragraph.

50.     On or about April 10, 2017, in advance of a meeting of Kik directors later that same week, Kik's CEO sent to the directors his PowerPoint presentation for the meeting, entitled "Kik & Cryptocurrency," together with a report prepared by Kik's consultant. The materials highlighted results from the consultant's "Cryptoinvestor Survey" and "Cryptoinvestor Expert Panel" and included a "Funding perspectives" slide showing revenues from average historical token sales and predicted a capital raise of "$100 million easily" from the offering. The materials set forth a "roadmap" for a token sale later that year and included steps for an "investor marketing plan" and an "exchange outreach."

**ANSWER:** Kik admits that Mr. Livingston emailed a Board presentation called "Kik & Cryptocurrency" along with a report prepared by the consultant to the Kik Board on April 10, 2017. Kik also admits that the quoted language appears in the presentation. Kik denies the remaining allegations in this paragraph. Although the Board presentation references the results of the "Cryptoinvestor Survey" and "Cryptoinvestor Expert Panel," these are both referenced on just *one* slide of a fourteen-slide PowerPoint presentation – they were not "highlighted."[4] Rather, the presentation overwhelmingly focuses on the ways that cryptocurrency would "motivate[] behaviors that are beneficial for building a vibrant community chat" and focuses on the fact that "there is an appetite to *transact in the Kik community*," citing the success of Kik Points as a medium of exchange within a digital application.

---

[4] Contrary to the Commission's suggestion, the term "cryptoinvestor" simply referred to individuals in the cryptocurrency community, and it conveys nothing about motivations to purchase tokens. As Kik further developed its vision for the Kin economy, it stopped using the term "cryptoinvestors," as it gained a further understanding of economy participants. Regardless, as the Commission knows, terminology is not outcome determinative.

The Complaint omits that the survey showed that respondents believed that economy participants would use the currency as a medium of exchange within digital applications. Respondents believed that mobile gaming, social media, and messaging were the most promising "verticals" related to a cryptocurrency for digital application. And the "expert panel" opined that "the potential for mass adoption is great for all in blockchain and crypto," and that they were "most interested in learning if there's a real need for a token and how it is connected to the product's underlying mechanics."

Further, while this presentation contains a slide discussing "fundraising perspectives" showing generic statistics on other token sales, Kik denies that it "predicted a capital raise of '$100 million easily.'" This is quoted from a survey respondent who had opined that a *hypothetical* "well-known" company – not Kik – who conducted an offering "openly, smartly, and [with] a clear-cut use case" *could* raise $100 million. This individual was not speaking about Kik's sale of Kin. In reality, this presentation suggests that Kik expected far less than $100 million – as the highest potential "total" from the other token sales was around $30 million.

51. During this time, Kik decided to name the new tokens "Kin" and worked with its consultants to design plans for what would eventually be called the "Kin Ecosystem." Kik also hired other companies in the United States and abroad to help it design and publicize the offering.

**ANSWER:** Kik admits that in 2017, it offered and sold digital tokens called Kin. Kik further admits that it envisioned a decentralized economy of digital services centered around a digital currency, and that it discussed this vision with its consultants. Kik denies the remaining allegations in this paragraph. As stated herein, Kik's sale and distribution of Kin did not involve one "offering." (*See* Kik's Answer to ¶ 1.)

52. In approximately April 2017, Kik and its New York-based consultants started to draft a "white paper" through which the company would announce the offering of Kin to the public and spur investment.

**ANSWER:** Kik admits that it began drafting a white paper, with support from a consultant, in approximately April 2017. Kik denies the remaining allegations in this paragraph,

including the baseless claim that Kik's white paper was intended to "spur investment." The white paper was decidedly not **"**designed to spur investment" – nor did it once use the term "investment." The Commission disregards the white paper's plainly stated purpose: to "outline Kik's plan for launching an entirely new platform: the Kin Ecosystem." In fact, the white paper devotes over twenty pages to explaining the Kin economy, the Kin Foundation's role, and technical considerations relating to Kin. And the white paper noted that the TDE would only take place "***once Kik has completed the technology upgrade to integrate within Kin, and the cryptocurrency can be used functionally within Kik***." Accordingly, Kik did not market Kin as an "investment," but rather a token designed for consumptive use.

53.    In early May 2017, Kik's CEO told the company's board that he expected to announce the token offering later that month. From at least this time period through the September 2017 public sale, Kik planned a single offering of one trillion tokens, which would raise for Kik about $100 million.

**ANSWER:** Kik denies the allegations of this paragraph. (*See* Kik's Answer to ¶ 1.)

54.    On May 22, 2017, in advance of a telephonic Board of Directors meeting the next day, Kik's CEO sent the directors a PowerPoint presentation with details about the company's planned offering, which had been fleshed out during the drafting of the white paper.

**ANSWER:** Kik admits that Mr. Livingston sent the Kik board of Directors a presentation on May 22, 2017 in advance of its May 23, 2017 telephonic Board meeting. Kik further admits that this presentation contained details about the announcement of Kin, and that many of these details had been worked out in parallel with the Kin white paper. Kik denies the remaining allegations in this paragraph.

55.    The presentation explained that Kik would create a total supply of 10 trillion Kin tokens and offer a "[f]loat" of 10 percent of that supply (*i.e.*, one trillion tokens), with a "Total Raise Target" of $100 million. Kik would then use proceeds from the offering to build the "Kin Ecosystem" and fund company operations. Kik planned to offer the one trillion tokens in multiple

"tranches," with buyers in the earlier tranches committing funds well in advance of a sale of Kin to the general public in exchange for discounts from the final offering price.

**ANSWER:** Kik admits that the May 23, 2017 presentation references 10 trillion Kin tokens, offering a "[f]loat" of ten percent of the total supply, with a "Total Raise Target" of $100 million. Kik further admits that it planned to offer Kin in "tranche[s]." Kik denies the remaining allegations in this paragraph. Although Kik intended to participate in the Kin economy, it was not responsible for "build[ing] the 'Kin Ecosystem.'" At all relevant times, Kik made clear that the economy's success depended on consumers and developers, aside from Kik, adopting Kin as a medium of exchange in this new digital economy. (*See* Kik's Answer to ¶¶ 8, 9.) Indeed, as articulated in its white paper, Kik envisioned itself as a "participant, not a landlord."

56.     Kik had also decided to sell Kin in one or more of the early tranches by entering into SAFTs with investment funds and other wealthy investors. As of May 22, 2017, Kik planned to raise up to $50 million through SAFTs, in what Kik called a "Pre-Sale," and between $50 million to $75 million more in what Kik called the "public tranche[s]."

**ANSWER:** Kik admits that the quoted language in this paragraph appears in a May 22, 2017 Board presentation. Kik denies the remaining allegations in this paragraph. As the Commission is well aware, Kik conducted two separate and distinct sales: (1) the pre-sale of contractual rights to accredited investors pursuant to SAFTs, where such sale was exempt from the registration requirements under SEC Regulation D, and (2) a subsequent direct sale of Kin to the public through the TDE. (*See* Kik's Answer to ¶ 1.) In fact, the allegations in this paragraph and throughout the Complaint only highlight the stark differences between the pre-sale and TDE.

57.     The May 22, 2017 presentation summarized Kik's anticipated sale of Kin as follows:

## Token Sale Structure (Soft Cap)

| Token Supply | 1OT Tokens |
| --- | --- |
| Float Offered | 10% |
| $ Tranches Based Pricing Discounts | 35%; $0-25M SAFT<br>25%; $25-50M SAFT 2<br>20%; $50-75M (first public tranche)<br>10%; $75-100M (last chance for discounts)<br>0%; $100-125M (post soft cap) |
| Soft Cap | $100M (followed by a 24 hour countdown once reached) |
| Sale Time | 30 days maximum |
| Minimum | TBD |
| Distribution | Fixed 10% sold; Token Allocation calculated at end of sale based on proceeds raised and distributed per the example |
| Vesting | Time and Performance based for Founder and Foundation tokens only |

**ANSWER:** Kik admits that this chart appears in the May 22, 2017 Board presentation. Kik denies this paragraph as it incorrectly suggests that Kik conducted one "sale" of Kin. (*See* Kik's Answer to ¶ 1.).

58.     The presentation also explained – and Kik's CEO reiterated during the telephonic call with Kik's board the next day – that 30 percent of the total number of tokens created (*i.e.*, three trillion) would be allocated to Kik under a future vesting schedule, while 60 percent of the total supply (*i.e.*, six trillion) would be allocated to a new "Kin Foundation" that Kik would establish. By keeping three trillion Kin, Kik planned to profit from any future appreciation of Kin.

**ANSWER:** Kik admits that it retained thirty percent of the Kin in circulation pursuant to a vesting schedule, and that sixty percent was allocated to the Kin Foundation. Kik denies the remaining allegations in this paragraph. While Kik planned to retain an allocation of Kin, the purpose was not to "profit," but rather to "fund [Kik's] operations," as Kik employees have previously emphasized to Commission Staff. While Kik acknowledges that the price of Kin could increase or decrease based on principles of supply and demand, Kik's use or sale of Kin at any price has no bearing on whether Kik sold an "investment contract" in the TDE. Retaining tokens

is in line with the practice of many companies that retain products and commodities they create, not selling them all at once.

59.     Before the May 2017 public announcement, Kik drafted a single "communications strategy" that would run from the announcement until the "token distribution event" and encompass both the "Pre-sale" and "Public sale" phases.  Kik also planned a single "Investor Roadshow" that included events in New York City, San Francisco, and abroad.  The plan included the public announcement at which Kik would "[d]rive interest and awareness of Kik token sale," meetings with venture capitalists, and the token sale itself (then scheduled for July 2017), at which Kik would "Drive participation in sale" by the "Crypto community."

**ANSWER:** Kik admits that it drafted a "communications strategy" regarding the Kin project.  As part of that plan, Kik planned a public announcement that would "[d]rive interest and awareness of [the Kin] token sale" and crafted a communications strategy which included the phrase "[d]rive participation in sale" by the "Crypto community."  Kik also planned for Mr. Livingston to meet with potential pre-sale participants in a variety of countries, which a Kik employee referred to as an "investor roadshow."  Kik denies the remaining allegations in this paragraph.  This paragraph presents a misleading and highly selective view of the factual record. The reference to "investor roadshow" referred to meetings with "pre-sale," not TDE purchasers. In these meetings, Kik provided pre-sale participants with a PPM, offering conditional contractual rights to receive Kin in the future at a discount, where participants risked losing 30 percent of what they contributed.  On the other hand, Kik's TDE communication strategy was referred to as the "***Participant Roadshow***," which included events such as the developer conference, Botness, and a meetup at Spotify's office – something the Commission omits.  The fact that Kik spoke to the public about the TDE while separately discussing the pre-sale with accredited investors has no bearing on whether the pre-sale qualified for an exemption to the registration requirements under SEC Regulation D.

60.     On or about May 23, 2017, Kik's board voted to approve the timeline, the allocation of the ten trillion Kin, the split between a "pre-sale and public sale," and the white paper.

**ANSWER:** Kik admits that Kik's Board voted to approve the timeline, allocation of Kin, a separate and distinct pre-sale and TDE, and the white paper.

61.     At this time, the Kin Ecosystem did not exist, and there were no services or products that could be purchased with Kin.  The Kin Ecosystem would only come to exist, if at all, after investors bought in and after Kik spent proceeds of the ICO in its efforts to build the Kin Ecosystem.

**ANSWER:** Kik admits that in May 2017, the Kin economy did not exist, as Kin had not yet been minted, sold, or distributed.  For the same reason, there were no services or products that could be purchased with Kin at this time.  Kik denies the remaining allegations in this paragraph.  At the time of the TDE, the Kin economy existed.  However, the sustainability and further development of the economy depended on consumers and developers, other than Kik, adopting Kin as a medium of exchange within this new digital economy.  In other words, Kik did not promise to "build the Kin Ecosystem," nor would that be possible, as an ecosystem requires many diverse participants.  (*See* Kik's Answer to ¶¶ 8, 9, 55.)

### III.     KIK PITCHED THE KIN OFFERING BY EMPHASIZING THE OPPORTUNITY TO PROFIT

62.     On May 25, 2017, Kik's CEO spoke in New York City at the Token Summit, a conference for people interested in digital assets, and publicly announced its offering of Kin tokens.  Kik chose the Token Summit because, as a Kik executive observed, "the primary audience for the initial announcement really is an investor community," and such investors were expected to be in attendance.  The presentation was videotaped and posted by Kik on YouTube, making it accessible to anyone on the Internet.

**ANSWER:** Kik admits that Mr. Livingston announced Kin on May 25, 2017 at Token Summit in New York, and that the video was posted on YouTube.  Kik further admits that a former Kik executive sent an email on April 7, 2017 to Mr. Livingston containing the language quoted in this paragraph.  Kik denies the remaining allegations in this paragraph, which have been ripped from context and  unfairly suggest that Kik targeted passive "investors" to participate in the TDE.  In reality, when asked about this very email, the former Kik executive told the SEC

staff that, by "cryptoinvestor community," she simply meant "people who understood this base, who could help validate the project by being excited about it, who would participate in the ecosystem and who would help fund the project."  The point was never to encourage passive investors to purchase Kin, rather, the goal of the Token Summit announcement was to encourage broad participation, which would facilitate growth of the Kin economy.

63.     Also on May 25, 2017, in coordination with the Token Summit presentation, Kik's CEO appeared on CNBC, and Kik published on social media and other Internet sites various statements and documents that described the Kin offering, including, but not limited to, (a) Kik's white paper; (b) a post by Kik's CEO on Medium (an online publishing platform); (c) a press release entitled "Kik to Integrate Kin Tokens as First Mainstream Adoption of Cryptocurrency"; (d) another press release entitled "Announcing Kin, cryptocurrency for an open future"; and (e) a professionally produced video that Kik posted on YouTube.

**ANSWER:** Kik admits that on May 25, 2017, Kik released its white paper, Mr. Livingston appeared on CNBC, Kik and Mr. Livingston posted on social media and Medium, Kik released a produced video that was posted to YouTube, and that Kik released a press release entitled "Kik to Integrate Kin Tokens as First Mainstream Adoption of Cryptocurrency."  Kik denies the remaining allegations in this paragraph.  Contrary to the allegations in this paragraph, in all of these interviews, articles, and posts, Kik and Mr. Livingston announced the Kin economy – not the Kin "offering."  For example, in the video produced by Kik, Mr. Livingston began: "we're here today *to introduce a new project we've been working on called Kin*."  And Kik's press release stated that Kik was *"announc[ing] it is launching Kin*, a cryptocurrency that will serve as a foundation for a decentralized ecosystem of digital services."  Mr. Livingston's Medium post was entitled: "Announcing Kin, a Cryptocurrency for an Open Future," and he wrote: "[t]oday, we are *announcing Kin, a cryptocurrency built on top of the Ethereum blockchain*."

And in these public statements, both Kik and Mr. Livingston described Kin as a digital currency that would fuel a new digital economy, and unlock a new, revenue-generating business model for developers that had been struggling to monetize in an industry where a small number

of large companies earned a dominant share of advertising revenue.  For example, the Kin white paper explained that "users will be able to earn Kin by providing value to other[s]," and could "spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants."  Mr. Livingston's May 25, 2017 Medium post added that Kin would "allow[] people ***to participate in an economy based on buying and selling stickers, hosting and joining group chats, creating and using bots, and much more***."  Kik's public statements also emphasized its "ultimate vision is that [Kik] [would] be ***just one of thousands of services in the Kin ecosystem***," and that the economy could only succeed if other consumers and developers adopted and used the currency as well.  This was vital to Kik's vision, as Mr. Livingston told the public that "[t]he success of this project really comes down to ***how many other people can we get excited*** . . . ***to work with us and to build this together***."  To encourage other developers to join in this vision, Mr. Livingston explained that Kin had the potential to form the basis of a "fair and democratic" economy that would fairly reward developers for their contributions, and announced that a rewards system would be built to automatically reward developers for offering valuable services.

64.     These public statements repeated and expanded upon Kik's Token Summit presentation.  Kik provided information on the amount of Kin to be sold and invited interested investors to sign up for alerts and information on Kik's website.

 **ANSWER:**  Kik admits that statements listed in this paragraph contained information about Kin and the Kin economy.  Kik further admits that its white paper directed anyone interested in the Kin economy to sign up for an email distribution list to receive updates regarding the sale.  Kik denies the remaining allegations in this paragraph.  Specifically, Kik did not invite "interested investors," to sign up.  The website did not contain the term "investor," and the offer and sale of Kin was not positioned as an investment opportunity.

65.     The public statements – along with subsequent statements throughout the offering – highlighted Kik's vision that it would profit alongside other Kin investors, because the value of

Kin held by both Kik and outside investors would increase as Kik helped increase demand for Kin.

For example, during his May 25, 2017 CNBC appearance, Kik's CEO stated:

> You are just bringing people together, creating a place where they can create value for each other transacting in a new cryptocurrency. And that alone is enough to make a great financial return. . . . . . How that makes money for Kik is that we create a new cryptocurrency such that there is only going to be so much of it. We set some aside for us such that if more and more people transact in the cryptocurrency, the value of it grows such that the value of our holdings grow as well.

    **ANSWER:** Kik denies the allegations in this paragraph. The Commission not only affirmatively misquotes Mr. Livingston, but also omits significant details and context with the clear intention of editing Mr. Livingston's description of his vision for the Kin economy. Mr. Livingston actually told the interviewer:

> I think historically you'd build a community and use it to then sell people's attention to advertisers or try to sell them stuff that they either don't want or don't need. ***So now with a cryptocurrency it unlocks a fundamentally new way to monetize a community***. So instead you are just bringing people together creating a place where they can create value for each other transacting in a new cryptocurrency. And that alone is enough to make a great financial return.

    In context, it is clear that Mr. Livingston was speaking to the fact that developers can generate revenue by monetizing their existing communities in a new, unprecedented way – not suggesting that Kik or Kin purchasers could expect "financial returns" from Kin. Further, even more glaring, the Commission omits the fact that Mr. Livingston only discussed Kik's specific monetization strategy in response to a direct question from the interviewer about how "[Kik] make[s] money by people using Kin." As such, it is misleading for the Commission to use this doctored quote to suggest, falsely, that Kik "highlighted" its intent to profit from an increase in Kin's value.

    To this end, this paragraph omits Mr. Livingston's actual description of Kik's vision for the Kin economy. Contrary to the unfounded allegations in this paragraph, nowhere in the CNBC

interview did Mr. Livingston state that "the value of Kin held by both Kik and outside investors would increase as Kik helped increase demand for Kin." Instead, the totality of his statements made clear that the success of this new digital economy hinged on consumers and developers other than Kik adopting the currency as a medium of exchange within the economy. For example, during this same interview, Mr. Livingston heavily focused on how the Kin economy would serve as a new business model for developers who struggled to compete in an advertising-based model:

> I think the real challenge that ourselves as a Top 100 app and other developers it faces is getting increasingly difficult to compete with these huge centralized companies. You know, they're the only ones that have the necessary scale to monetize through advertising so they give everything else away for free. So as a developer you don't have the scale to monetize through advertising and you also live in this world where consumers expect everything for free. So this is also a new way to build a new ecosystem where we can use this cryptocurrency and create rewards engine to pull in other developers and build great services for consumers.

The Complaint disregards Kik's publicly articulated vision of Kin from the date of its public announcement through the TDE as the creation of this new digital economy for consumers and developers. Kik did acknowledge that the price of Kin could increase or decrease as a function of supply and demand, like in any economy, but that such a result would be secondary to the creation and sustainability of this new economy. If everyone just held Kin for a "financial gain," the economy would fail. The Complaint selectively quotes from a live interview of Mr. Livingston in a vacuum, while ignoring the totality of his public statements (including his other comments during the same appearance on CNBC), which speak to the Company's vision for Kin.

66. Kik's CEO also touted the initial success of Kik Messenger and the company's experience when assuring viewers that Kik would take steps to stimulate demand for Kin and, therefore, increase its value. For instance, Kik promised to start by integrating Kin into Kik Messenger "to really give it value." One of Kik's press releases further explained that the company would create a "rewards engine" – which did not then exist – that would daily distribute Kin to

developers to give them an incentive to create more Kin-related transactions, thereby making Kin more valuable:

> To maximize the chance of success, we're dedicated the majority of Kin to a rewards engine that will provide a financial incentive for developers. Each day, using an algorithm that reflects each service's contribution, the Kin rewards Engine will divvy up a set amount of Kin among all the services in the ecosystem. . . . In time, it can create a network effect: as the daily reward increases in value, more developers will join, there will be more Kin transactions, Kin itself will become more valuable, and in turn the daily reward will be worth even more…

**ANSWER:** Kik admits that Mr. Livingston said the words "to really give it value" at Token Summit on May 25, 2017, and that the additional language quoted in this paragraph appears in a Medium post by Mr. Livingston.  Kik denies the remaining allegations in this paragraph.  This paragraph misrepresents the circumstances surrounding the sale of Kin and, among other things, improperly suggests that Kik promised to "stimulate demand."  Contrary to the Commission's characterization, Mr. Livingston actually said:

> ***So that's step number two is taking Kin, integrating into one of the largest consumer apps in the world** to really give it value **and to make Kik better and monetize Kik in a new way.  But we didn't stop there.  We said, wait a second, if we give Kin value, could we use some of that value to spark the creation of a new ecosystem of digital services?  There's all these developers out there who have built these amazing things, but they can't make any money.  They don't have the scale to monetize through advertising.  And these huge companies who do have the scale are giving everything else away for free.  So you have all these developers who are trying to build these amazing things but they're just they're going broke.***

Kik believed that it was important for participants to start using Kin immediately and to show developers Kin's potential by first integrating it within Kik Messenger.  By this statement, Mr. Livingston reiterated the concept that was originally stated in the Kin white paper: that Kik would integrate Kin tokens upon launch in the hopes of "catalyzing a new, decentralized ecosystem of digital services . . . . [w]ith a new cryptocurrency at its center."  But for this new

-46-

economy to flourish, Kik has made clear that consumers and developers other than Kik must adopt and use Kin as a medium of exchange.

And while Kik employees worked on the Kin Rewards Engine, the white paper made clear that the Kin Rewards Engine would be initially administered by the Kin Foundation, and over time it would autonomously run on smart contract technology.  Although the Rewards Engine would provide compensation to incentivize developers to contribute to this new economy, the actual value generating properties of the economy depended on many developers and consumers, aside from Kik, adopting the currency as a medium of exchange within digital applications.

67.    Kik's May 25 Medium post made many of the same points, also stating that, because of increased demand that would result from Kik's efforts to build and support the economy, "Kin itself will become more valuable, and in turn the daily reward will be worth even more."

**ANSWER:** Kik admits that Mr. Livingston's May 25, 2017 Medium post contains the language quoted in this paragraph.  Kik denies the remaining allegations in this paragraph.  This paragraph misleadingly quotes from this Medium post, which does not state or even suggest that Kik's efforts to build and support the ecosystem would cause "Kin itself [to] become more valuable."  The full sentence, which the Commission selectively quotes from, actually states:

> To maximize the chances of success, ***we're dedicating the majority of Kin to a rewards system that will provide a financial incentive for developers. . . . We think this mechanism will provide a powerful way to compensate developers and creators without relying on advertising.  In time. It can create a network effect: as the daily reward increase[d] in value, more developers will join, there will be more Kin transactions,*** Kin itself will become more valuable, and in turn the daily reward will be worth more."

In other words, the ***Kin Rewards Engine***, which Kik employees worked on, but would be administered by the Kin Foundation, would encourage developers to join, which in turn would create a network effect that could potentially increase the value of the rewards offered by the rewards engine.  This cannot reasonably be construed as Kik promising that its efforts would

increase the value of Kin.  While Mr. Livingston acknowledged that, like any other asset or product, Kin's price could rise and fall as a result of supply and demand, such discussion was always incidental to Mr. Livingston's description of Kin as a medium of exchange within a new digital economy for earning and spending within digital services.  Even here, this paragraph omits that in the very next paragraph after the quoted language, Mr. Livingston writes:

> The foundation, which will be independent and not for profit, will operate the Kin Rewards Engine and manage the key operational aspects of the community, including transaction services and a decentralized user identity.  Its presence will provide assurance that people can participate in a Kin economy that is now-and can never be-monopolized by a giant company.  It's like Mozilla for the mobile era, but with payments built in.

> We believe this path leads to a future that is compelling for consumers, and open and fair for developers.  It's a path that provides an alternative to an otherwise inevitable future in which a tiny number of companies control all of the digital services that are most important in our lives.

> To all developers out there who are competing in a world increasingly controlled by giants, we invite you to check out Kin . . .

68.     While touting the prior successes of Kik Messenger and outlining its future plans for Kin, Kik did not publicly disclose its financial statements, including the fact that its costs far exceeded revenues, or that the company anticipated running out of money absent a successful ICO, or other details about Kik and the offering that Kik would have been required to include in a registration statement filed with the SEC for the offering.

**ANSWER:** Kik admits that it did not publicly disclose its financial statements, as it was under no obligation to do so.  Kik denies the remaining allegations in this paragraph.

69.     In the weeks and months following the May 25 announcements, Kik promoted the Kin offering through numerous channels that resembled a traditional road show for an initial public offering of securities, where a series of presentations are made in various locations leading up to the offering.  Kik's promotion included a multi-city publicity tour, during which Kik executives

gave both public presentations intended to raise awareness of the public sale and private meetings with potential investors. This road show included an event in San Francisco on or about June 28, 2017, as well as stops in China, the United Kingdom, and Canada.

**ANSWER:** Kik admits that it advertised the Kin economy following the announcement May 25, 2017 announcement, and that in doing so, its employees attended events in San Francisco, China, the United Kingdom and Canada. Kik denies the remaining allegations in this paragraph. Kik planned a "Participant Roadshow," as outlined in its Communications Strategy, which included stops in San Francisco, China, London, and Toronto and included events targeted at developers and other potential participants in the Kin economy, including the Tech Crunch conference in Shenzhen, China, the Botness conference in New York City, the Bitcoin Meetup in San Francisco, the Meetup at Spotify's office in New York, and a Meetup in London. Mr. Livingston's public statements during this "roadshow" centered on Kin's potential as the basis for a new digital economy. Kik also spoke directly to developers to explain that Kin offered a new business model to be compensated for content development, a model not dependent on advertising revenue.

70.     In planning this road show, Kik executives and Kik's New York-based consultants identified events – often called "meetups" – that attracted "cryptoinvestors," and they tried to identify the "Top 3" investors in cities to which Kik's CEO travelled. Several of Kik's road show events were videotaped and posted on YouTube.

**ANSWER:** Kik admits that its executives attended events in a number of cities to discuss the Kin economy, many of which were videotaped and posted on YouTube. Kik also admits that its *third party marketing consultant* wrote an email, asking consultants whether they had suggested meeting with "[c]ryptoinvestors," and if so, for their "list by city of the Top 3." Kik denies the remaining allegations in this paragraph. Many if not most of the "meetups" referenced, were aimed at developers, not "cryptoinvestors." This allegation again conflates the pre-sale and the TDE, ignoring the fact that Kik often spoke with accredited investors as prospective pre-sale participants.

71.     Concurrent with the publicity tour, Kik executives communicated and met with individual potential buyers by calling, emailing, and travelling to multiple United States cities, including to New York City and San Francisco.  Kik employees also continued the company's campaign to market Kin to the public by posting messages on social media, Medium, Twitter (an online news and social networking service), Reddit (a social networking and news aggregation website), Slack (an online hub for communication and collaboration), and other online platforms.

**ANSWER:** Kik admits that it posted to social media such as Medium, Twitter, Reddit, and Slack regarding the Kin project.  Kik denies the remaining allegations in this paragraph.  Kik's social media channels were primarily used to answer logistical questions from prospective participants to ensure a smooth KYC, AML, and registration process, as well as to explain the structure of the TDE, which was designed to deter speculation.

72.     During this same time period, the overall demand for other digital tokens and assets significantly increased, and potential Kin investors were well aware that older digital assets (such as Bitcoin) had dramatically risen in value, generating monumental returns for early investors.  As the Kin offering's lead investor observed, "[t]he ICO market [was] white hot."  Kik repeatedly reminded potential Kin investors of the recent performance of older digital assets when pitching Kin as an investment opportunity.

**ANSWER:**  Kik admits that the language quoted in this paragraph appears in an email written by a pre-sale participant.  Kik denies the remaining allegations in this paragraph.  This paragraph contends that Kik "repeatedly pitch[ed] Kin as an investment opportunity," without referencing a single quote from the Company or its employees.  Further, the pre-sale participant's statement is irrelevant to the Commission's claim as the pre-sale was exempt from registration under SEC Regulation D.  Nor does Kik pretend to know what each and every presale and TDE purchaser "were well aware" of at any point in time.  Kik could only control what it led purchasers to expect, not what purchasers may or may not have known.  And Kik led purchasers to expect a new digital economy centered around a digital currency, dependent on consumers and developers, aside from Kik, using Kin as a medium of exchange within digital applications, not a passive

investment opportunity.  But even if purchasers subjectively expected Kin's price to increase "because older digital assets (such as Bitcoin) had dramatically increased in value," such expectation would have been the result of market forces, not any effort undertaken by Kik. Similarly, the Commission's reference to Bitcoin is notable given that numerous high ranking SEC Staff, including Chairman Jay Clayton and the Director of the Division of Corporation Finance, William Hinman, have publicly stated that transactions in Bitcoin and Ether are not "investment contracts."

73.    Kik and its agents also repeatedly primed potential purchasers' expectations that early Kin buyers would profit by invoking the "dot com" era as a prior example of the opportunity to make money in a quickly developing market.

**ANSWER:**  Kik denies the allegations in this paragraph as it misconstrues what Kik conveyed to prospective Kin purchasers.  Analogies to the "dot com" era did not "prime[ ] potential purchasers' expectations that early Kin buyers would profit."  Instead, Kik referred to the "dot com" era to explain that while many cryptocurrency projects were developed, only a few would be sustainable.  Internal emails confirmed that Kik considered cryptocurrency to be analogous to the "dot com" era because "there are going to be successful companies, and there are going to be unsuccessful companies. . . .  As the first mainstream application of a cryptocurrency, we're trying to be one of the success stories and also stabilize transactions (*consumer usage as opposed to speculation like we see with bitcoin and others*)."

74.    For example, at the June 28, 2017, San Francisco "Bitcoin Meet-up," Kik's CEO specifically cited the dot com era, predicting that "people are going to make a lot of money" with tokens and ICOs and directly comparing investors who would buy in Kik's token "crowd sale" to the venture capitalists who had earlier invested in Kik:

> So, I think – like, for me, I think is like the dot com, for better and for worse. So, you know, there is a lot of hype right now, and people are going to make a lot of money -- people have made a lot of money. People are going to lose a lot of money here.  This is coming, right? It's going to happen multiple times as we move through this

innovation, but at the end of the day, Amazon and Google came out of the dot com.

And so, this is how I view, like, tokens and ICOs. I think 90% of them probably are going to go to zero, and people are going to lose a lot of money, and you know, the regulators are going to come in. They're going to say, how do we make this (inaudible) for innovation, but still make it safe for consumers, and everybody's going to be trying to figure this out, and it's going to be crazy.

It's going to be – I was in like, high school at the time, but I think like 2001 -- in 2000 or 2001, whatever year it was, it's going to be that all over again, and I think for us, it's – we believe that, you know, a few huge economic entities are going to come out of this space, and I think that actually a few huge economic entities have already come into this space.

And so, I think, you know, like everything, it's risk and reward, but I think, you know, we have a good story, and I think we're trying to do it in a fair, way, and I think our heart's in the right place, and we're going to do everything we can.

You know, what really scares me at the end of the day is disappointing people, and I think what scares me about doing a crowd sale is before, if Kik failed, I would disappoint a bunch of rich people. But now if Ki[n] fails, I will disappoint a bunch of regular people, and that, like, really weighs on me. (Inaudible) we need – so, we're going to do everything we can to make it a win for everybody.

These comments were recorded, streamed live on the Internet, and posted on YouTube.

**ANSWER:** Kik admits that Mr. Livingston stated the quoted language at the "Bitcoin Meetup" event in San Francisco.  Kik denies the remaining allegations in this paragraph.  The Commission incorrectly claims that Mr. Livingston suggested anyone would "make a lot of money" from "tokens and ICOs."  This is untrue.  Mr. Livingston's reference to the "dot com" era did not suggest that Kin holders could expect to make money, but rather that certain ideas may succeed and some may not.  (*See* Kik's Answer to ¶ 73.)  Further, the Commission's claim that Mr. Livingston ever analogized Kin purchasers to venture capitalists who had invested in Kik is entirely false.  Kin owners possess no governance rights or equity interest in the success or failure of Kik, whereas Kik shareholders do.

The Commission also ignores the fact that when the SEC Staff asked Mr. Livingston what he meant by "[b]ut now if Kik fails, I will disappoint a bunch of regular people . . . ." Mr. Livingston told the Staff that if *Kin* fails, or "this better way to compete with monopolies" fails, he would disappoint regular people.  But the Complaint misleadingly omits this clarification and the fact that, when asked about this specific statement during testimony, Mr. Livingston explained:

> [W]hat I meant by that is, you know, we're sparking a new ecosystem here, a new currency with a new vision and a new sort of go-to-market strategy. And for it to work, thousands of -- thousands, hundred thousands, millions, hundreds of millions of people, billions of people ultimately would have to contribute their time, effort, and money in many different ways if Kin was going to be successful.

75.     In addition, Kik's CEO frequently pitched Kin by noting the similarities between it and venture capital investing, and touting the advantages of buying tokens.  For example, speaking on the "Finance Magnates" podcast on August 1, 2017, which was streamed live on the Internet and posted on YouTube, Kik's CEO stated:

> You know, I think compared to VC investing, for example, one, you can get in at basically any stage and in any amount, and two, you can get out at any stage, and in any amount, and I think that's really compelling, you know, this idea that I can get in early, identify something that could be big.

> If I'm right, it can go up in value. I can sell maybe half of the crypto I hold and let the rest keep going. On the other side, I think that's also the challenge of crypto fundraising, which is, how do you sort of figure out which are the good ones, and which are not, and then how do you keep these teams sort of honest and executing on the vision that they laid out?

> Because I think that's the hard thing now. There's a lot of projects right now. They're all raising lots of money. It's hard to know which are the good ones and which are not, and then once those projects get that money, it's hard – it's hard to see, you know, if when we were five people eight years ago, somebody had given us $100 million.

> Like, that would've been runway forever, and there would've been no sense of urgency to figure out the next phase of the vision so that you could create the next version of the story so you could go out and raise more money, and keep the company alive.
>
> Now, it's like, hey guys, like, you know, we could spend a million dollars a year for the next 100 years, and we still wouldn't have run out of money. So, I think that's going to be the challenge of crypto, is picking out which ones are the good ones versus the bad ones, and then creating that sense of urgency and accountability behind the teams.

**ANSWER:** Kik admits that Mr. Livingston stated the quoted language on the "Finance Magnates" podcast on August 1, 2017, and that it was made available on the Internet.  Kik denies the remaining allegations in this paragraph.  The Complaint rips Mr. Livingston's statements from context, alleging that he "frequently pitched Kin by noting the similarities between it and venture capital investing."  This is a distortion of the facts: Mr. Livingston made the quoted comments in response to a direct question asking his "view[s] the ICO process versus the traditional funding process," which had previously sustained Kik's business.  Mr. Livingston never "pitched Kin" by "noting the similarities."  In fact, the Commission omits that Mr. Livingston first notes – before the quoted language – that the two are different: "***the really interesting thing about crypto is it's just sort of fundamentally new and fundamentally more powerful***."

In this very same interview, Mr. Livingston distinguished Kin from other token sales that resembled a "classic security," such as the DAO.  Mr. Livingston expressed support for the Commission electing to regulate "tokens that look like securities," such as the DAO tokens, because "DAO tokens were basically a fund [that was] pooling funds to invest in other projects, and then were then paying back out dividends to the people who held these tokens."  Mr. Livingston agreed that it "ma[de] complete sense to [Kik] and [was] fully expected" that the Commission would regulate the sale of DAO tokens as a security.  He then added:

> And so we're working with the top lawyers all over the world to make sure – not just that we follow the rules – obviously we do that, but also ***we're trying to anticipate where the rules will land and provide . . . the most thoughtful, buttoned up way to not only do a***

> *token distribution event but also to build one of these decentralized networks*.

**76.** Various observers, including financial and technology news sources, that reported or publicly commented on Kik's offering of Kin either repeated the company's statements that Kin could appreciate or themselves analyzed Kin as a potential investment.  For example, a writer reporting on the June 2017 conference in China repeated statements by Kik's CEO about Kin's investment potential:

> While some people have made significant money off of bitcoin, others are skeptical as to whether volatile cryptocurrencies are a good investment. [Kik's CEO] can see it going either way. 'The way I think about ICOs is it's very similar to the dot-com era. There was a bunch of excitement, people made a bunch of money, people lost a bunch of money but Amazon and Google came out of it.'

**ANSWER:** Kik has no basis to admit or deny facts outside of its personal knowledge, but it is aware that various news sources reported on Kin.  Kik is also aware that a journalist from TechCrunch reported on Mr. Livingston's appearance at the June 2017 Tech Crunch event in Shenzhen, China, and that her article contained the quoted language.  Kik denies the remaining allegations in this paragraph.   This paragraph is a distraction because statements made by third party journalists have nothing to do with whether the TDE was an "investment contract." Nonetheless, this paragraph is highly misleading because the quote attributed to Mr. Livingston is mischaracterized and Kik immediately contacted the reporter to correct it.  Specifically, Kik told the reporter:

> "[R]egarding the analogy [to] the dot-com era . . . the main point of this was that there are going to be successful companies, and there are going to be unsuccessful companies.  Like anything, it really depends on the project, the team and the implementation, which is no different than today.  As the first mainstream application of a cryptocurrency, we're trying to be one of the success stories and also stabilize transactions (consumer usage as opposed to speculation like what we see with bitcoin and others)."

**77.** An article by a CNBC columnist dated July 11, 2017, discussed how Kik saw its ICO as a way for Kik itself to "exit" like an IPO, and calculated Kik's potential profit if Kin increased in value like other digital assets had done.

**ANSWER:**  Kik admits that an article from a CNBC columnist was posted July 11, 2017 entitled: "Why a messaging start-up is making its own digital currency instead of going public." Kik denies the remaining allegations in this paragraph, which, again, unfairly suggest that Kik should be held accountable for statements by third parties.  (*See* Kik's Answer to ¶ 76.)  In any event, this article actually acknowledged that the vision of Kin centered around consumptive use, not passive investment: "Kin will be used as the currency on the Kik social network for things like emojis, stickers, hosting and participating in group chats, building apps like bots, etc. However, the ***stated goal is for Kin to also be used as currency outside of the Kik app***."

78.    Similarly, a September 4, 2017 article on an online blockchain news service described Kik's plan to use the proceeds from Kin sales to create the Kin Ecosystem, and analyzed the merits of buying Kin both "for flipping" and for its "long-term potential" as an investment, opining on the project's implied valuation and the risk that investors could sell rapidly on secondary trading markets.

**ANSWER:**  Kik admits that a website called "CrushCrypto" appears to have posted an article about Kin on our around September 4, 2017, and that the article contains the language quoted in this paragraph.  Kik denies the remaining allegations in this paragraph, which again rely on statements made by third parties over which Kik has no control.  (*See* Kik's Answer to ¶¶ 76, 77.)  Indeed, Kik did not speak to the journalist who wrote that article.  Nor does one journalist's subjective view, cherry-picked from hundreds, reflect what Kik led purchasers to expect.  If anything, this same article actually substantiates that Kik led purchasers to expect a new digital economy, not profits solely derived from its managerial or entrepreneurial efforts:

> Kik [would] integrate Kin into its chat app by using Kin as the platform's primary transaction currency.  In the future, users will be able to earn Kin by providing value to other members of the [Kin] ecosystem through curation, content creation, and commerce.  Kik users will be able to spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants.

The article then provides a number of "[s]ample use cases," validating Kin's marketing as a medium of exchange.

## IV.   KIK ASSURED BUYERS THAT ANY KIN PURCHASED COULD BE EASILY RESOLD

**79.**   In the initial announcements of the Kin project and throughout the Kin offering, Kik told potential purchasers that they would be able to easily liquidate their Kin holdings and that Kin would trade on online trading platforms, which Kik referred to as "exchanges," soon after issuance.

**ANSWER:**   Kik denies the allegations in this paragraph as they are inaccurate.   Kik repeatedly and unambiguously notified TDE purchasers that Kik would not operate any cryptocurrency exchange and could not guarantee Kin's liquidity.   In fact, the Terms of Use, the only agreement between Kik and TDE purchasers, made clear that Kin was sold "as is," where purchasers agreed to disclaim Kik of any express or implied warranties.   Further, the Terms of Use stated that:

> KIK DOES NOT GUARANTEE THAT KIK OR ANY KIK PARTY CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY KIN TOKENS.

The Complaint fails to identify a single statement in which that Kik or the Kin Foundation suggested they had ***control*** over whether Kin would be tradeable on exchanges.   Although the Kin Foundation tweeted that Kin would be available on exchanges after the sale, it was simply responding to questions about when Kin could be transferrable after the sale.   For exchanges, the Kin Foundation emphasized that listing Kin completely "depend[ed] on the exchanges themselves and who lists them."   Similarly, the Kin Foundation repeatedly reminded purchasers that "***it is up to the exchanges to list***" Kin.

**80.**   For example, in its May 2017 white paper, Kik stated that it expected Kin to trade on "exchanges" and that Kik's choice of the ERC-20 token protocol, a specific technical standard on the Ethereum blockchain, would make Kin easy to trade on trading venues operating on the Ethereum blockchain.

**ANSWER:** Kik admits that its white paper stated: "[l]ike other cryptocurrencies, units of kin are fungible and transferable, and they will be expected to trade on cryptocurrency exchanges." Kik further admits that its white paper states that Kin would be implemented on the "public Ethereum blockchain as an ERC20 token." Kik denies the remaining allegations in this paragraph. Kik created Kin as an ERC20 token because it believed that the Ethereum blockchain was the best initial support for the Kin economy as it offered substantial tools for developers, not because it would allow Kin to be "easy to trade." (*See* Kik's Answer to ¶ 79.)

81.    Similarly, during a June 2017 conference in China, Kik's CEO stated that "the beautiful thing with these cryptocurrencies, is, you know, they're immediately tradable. So on day one, Kin will go on to a bunch of exchanges where you can exchange it for other cryptocurrencies, or even other fiat currencies."

**ANSWER:** Kik admits that Mr. Livingston said the language quoted in this paragraph at the Tech Crunch event in June 2017 in Shenzhen. Kik denies the remaining allegations in this paragraph. Mr. Livingston made this statement based on an observation that exchanges have listed cryptocurrencies after their respective sales, and that he expected Kin to be no different. However, Mr. Livingston's statements did not promise or guarantee liquidity for Kin or that any exchange would ultimately list Kin. (*See* Kik's Answer to ¶ 79.)

82.    On July 6, 2017, in response to an investor's inquiry about future tradability, a Kik executive responded that "once the token goes live (looking at end of summer). It will be traded on a number of exchanges . . ."

**ANSWER:** Kik admits that an employee wrote a July 6, 2017 email to a pre-sale participant containing the quoted language. Kik denies the remaining allegations in this paragraph as it inappropriately suggests that Kik ensured tradeability of Kin on exchanges. This private statement to a pre-sale participant is irrelevant because the pre-sale was exempt from registration under SEC Regulation D. Further, this email reflects the employee's understanding that cryptocurrencies are typically listed on exchanges, not any efforts that Kik would undertake to guarantee liquidity. (*See* Kik's Answer to ¶¶ 79, 81.)

83.     Kik also tweeted assurances regarding the future tradability of Kin, often using a Twitter account in the name of the Kin Foundation, which Kik had not yet created.  For example, on August 29, 2017, Kik wrote that "many" "exchanges" had indicated that they would list Kin:



And, similarly, on September 17, 2017, Kik stated:



**ANSWER:** Kik admits that the Kin Foundation's Twitter account posted the language contained in this paragraph, and that the Kin Foundation was not formed as of the date of these posts.  Kik denies the remaining allegations in this paragraph.  These statements cannot reasonably be interpreted as "assurances" regarding Kin's liquidity, in light of numerous other tweets and public statements stating that exchange listings were "up to the exchange."  (*See* Kik's Answer to ¶ 79.)

84.    Kik intentionally promoted the future transferability of Kin, among other reasons, because the company understood that potential investors would want the ability to freely trade the Kin, like more traditional securities, and that liquidity would facilitate an increase in Kin's value. Kik employees and other agents tracked platforms where Kik's token might trade and contacted at least one trading platform to inquire about listing Kin.

**ANSWER:** Kik admits that it contacted at least one trading platform to inquire about listing Kin.  Kik denies the remaining allegations in this paragraph as they are false.  Prior to the TDE, the Kin Foundation tweeted it was "***not actively keeping track*** of exchanges that have expressed interest."  And, as a Kik executive directly told SEC Staff, "there was a discussion about potentially talking to exchanges prior to the token sale, ***and ultimately we decided not to do that***" because Kik instead focused on "structur[ing] the sale such that it would have broad participation so people could participate if they wanted to, also with the understanding that ***exchanges could list Kin if they wanted to, given it was an ERC-20 token, so not dedicating operational resources to do this***."  For similar reasons, Kik addressed Kin's potential liquidity publicly only in response to specific questions, and never "promoted the future transferability of Kin."  (*See* Kik's Answer to ¶ 79.)

In any event, the Commission is wrong that transferability of Kin is in any way analogous to "traditional securities."  Mr. Livingston has explained: "[***f]or Kin to work as a business model for developers, they would need to be able to sell Kin in some cases on exchanges for dollars to pay for their expenses.  That's what made it a fundamentally new business model***."  In other words, for developers to truly make a living in the Kin economy, consistent with any other form

of *currency*, Kin would need to be exchangeable for other forms of *currency* (at least until developers can pay salaries, rent, or other expenses in Kin).

## V.   KIK'S SAFT REQUIRED KIK TO DISTRIBUTE KIN BEFORE KIK COULD CREATE AN ECOSYSTEM

**85.**     As Kik planned and then publicly announced its offering of Kin, the company remained acutely aware of its urgent need to raise cash, both to support continuing company operations and to advance the Kin project, including Kik's proposed Kin Ecosystem.  Indeed, on May 4, 2017, Kik's CEO advised Kik's board that the end of the company's cash runway was only six months away – October 9, 2017, with severance payments to fired employees, or November 1, 2017, without severance.

**ANSWER:**  Kik denies the allegations in this paragraph.  There was no "acute" or "urgent need to raise cash," as the Commission is well aware.  (*See* Kik's Answer to ¶ 7.)

**86.**     Consequently, Kik chose an offering strategy designed to expedite the flow of cash to Kik: it sold Kin at a discount to wealthy investors using SAFTs.  However, while the SAFT temporarily solved Kik's cash problem, it created another.  The express terms of the SAFT created a hard-and-fast deadline for Kik to conduct the ICO and imposed dire consequences if it did not.

**ANSWER:**  Kik denies the allegations in this paragraph.  Contrary to the Commission's contention, Kik opted to conduct a pre-sale among participants who, as Kik's then-CFO testified, "would be supportive of the project and that would provide funding for us to develop out the ecosystem and build the product."  Mr. Livingston told the Commission Staff:

> [W]hat was compelling about doing a presale is you had people who deeply understood blockchains and sort of the crypto industry. And you had people who just understood blockchain and cryptocurrencies period and so could understand Kin as a business model for Kik and other developers.  And I also think there was an opportunity to get cash into the business quickly in a presale as well.

Further, the SAFT did not create a "hard-and-fast deadline" for Kik's TDE.  Kik retained the right to extend the TDE "deadline" by sixty days, and in fact delayed the TDE at least three

times to ensure that it carefully considered every component of the sale, including compliance with existing laws and regulations, such as the federal securities laws.  (*See* Kik's Answer to ¶¶ 1, 7, 12, 85.)

A.     **Kik's SAFT**

87.     Under the SAFT used by Kik, the company sold Kin to certain professional investment funds and other wealthy investors, half of which would be delivered at the time that Kik delivered Kin to public buyers and half a year after that.  Such investors paid a sum certain at the time they entered into the SAFTs, but Kin would be delivered in an amount that reflected the discounted price – that is, they paid only 70 percent of the maximum price at which the Kin would be sold during the public sale.  Thus, the number of Kin received by the investor was contingent on pricing during the public sale.

**ANSWER:** Kik admits that it sold conditional contractual rights to receive future Kin to accredited investors pursuant to SAFTs.  Kik further admits that upon "Network Launch," pre-sale participants would receive 50 percent of their Kin at that time, and the remaining 50 percent a year later.  Kik denies the remaining allegations in this paragraph.

88.     An investor who purchased Kin pursuant to a SAFT could not unilaterally cancel the contract and, after Kik launched Kin on the Ethereum blockchain, automatically would receive an allotment of Kin without needing to take further action.  The SAFT placed no restrictions on when or how the investor could sell the tokens, and once an investor received Kin, the token could be immediately sold.  All Kin – regardless of whether it was purchased pursuant to a SAFT, in the public sale, or on the open market – were unrestricted.

**ANSWER:** Kik admits that under the SAFT, pre-sale participants would receive 50 percent of their Kin without further action.  Kik further admits that the SAFT placed no resell restrictions on Kin once transferred to pre-sale participants.  Kik further admits that it did not place restrictions on the Kin distributed to TDE purchasers.  Kik denies the remaining allegations in this paragraph.  (*See* Kik's Answer to ¶¶ 1, 12.)

89.     Shortly before Kik's May 25, 2017 public announcements about Kin, Kik executives met in New York City with at least one hedge fund founder to discuss a possible investment in Kin.  At the meeting, Kik described how it would use Kik Messenger to create interest in the tokens.  That hedge fund later entered a SAFT and became the lead investor in the Kin offering.

**ANSWER:** Kik admits that, on May 24, 2017, Kik executives met in New York with the founder of the hedge fund referenced in this paragraph.  Kik denies the remaining allegations in this paragraph, as they are false.  At this meeting, Kik discussed the hedge fund's potential interest in signing a SAFT, not an "investment in Kin."  Further, Kik did not tell the hedge fund's founder that it would use Kik Messenger to create interest in the tokens.  In fact, the hedge fund's founder told the Commission – in response to the Commission staff's own questions – that his interest in the Kin economy was completely detached from Kik or Kik Messenger:

- "As long as [Kik] could have sponsored this interesting project, **which, actually, may well outlive Kik Messenger**, the company that would not have been a major factor."

- "The analogy here is that Satoshi Nakamoto incubated Bitcoin but it's **totally irrelevant to its current usage, and that's my opinion on Kik Messenger.  They were planning to incubate it, but it would quickly be able to take on a life of its own**.  And once they completed their auction, the foundation now has plenty of money to hire developers and do all those things."

- "I'm not focused on Kik the company. . . . Like, I'm not focused on what Satoshi Nakamoto is doing today. . . . [Satoshi] [i]s doing something different, and the project is wildly successful without him. **And I think Kin Ecosystem could be wildly successful without Kik."**

- "[M]y point here is . . . it is not Kik Messenger, Inc. or whatever the -- you know, company name -- full name is -- transforming into the Kin protocol token or project -- Kin project**, they're just incubating it, and they actually -- if they're not already**, **they will split and be separate entities.**"

For these reasons, the hedge fund's founder squarely rejected the notion that Kik's own financials would have influenced his decision to participate in the pre-sale because he "was not

investing in Kik Messenger," but rather a "completely separate ecosystem in the Kin social network that itself would probably never have revenue, as Bitcoin has no revenue."

90.     Following its May 2017 public announcement of Kin, Kik sent select potential investors non-binding term sheets that described Kik's plan to raise $50 million through SAFTs. Kik also provided a private placement memorandum ("PPM") that included, among other information, a company overview, biographies of Kik's directors and management, and a description of the Kin project.  The PPM did not contain information about the company's financial history or failure to generate profits.  Investors who purchased in the later, undiscounted, public sale did not receive this or any other PPM.

**ANSWER:** Kik admits that it conducted a separate pre-sale of contractual rights under the SEC Regulation D exemption, in which participants signed a SAFT.  Kik provided these participants with a PPM, including a "Company Overview," biographies of Kik's "Directors and Management," and a description of the Kin project, but did not contain information about Kik's financial history.  Because the TDE was wholly separate and distinct, TDE purchasers did not receive this PPM.  Kik denies the remaining allegations in this paragraph.

91.     Although Kik's SAFT specifically stated that the SAFT was itself a security, it failed to state that the Kin to be delivered under the SAFT were securities sold pursuant to the SAFTs.  And although Kik's PPM claimed that the offer and sale of the SAFTs were subject to an exemption from registration under Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, among other United States laws, Kik did not claim any exemption for the offer and sale of Kin through the SAFT.  As such, Kik's offer and sale of the SAFTs and Kik's offer and sale of the Kin purchased under the SAFTs were not registered.

**ANSWER:**  Kik admits that its offer and sale of SAFTs, encompassing the conditional contractual right to future Kin, was a security, exempt from registration under Section 4(a)(2) of the Securities Act and SEC Regulation D.  Kik denies the remaining allegations in this paragraph. The Commission alleges that "[a]lthough Kik's SAFT specifically stated that the SAFT was itself a security, it failed to state that the Kin to be delivered under the SAFT were securities . . ."   The

Kin tokens themselves were not (and are not) securities.  Indeed, in discussing blockchain based cryptocurrencies generally, the Commission itself has acknowledged that "***the token – or coin or whatever the digital information packet is called – all by itself is not a security*** . . . [t]he digital asset itself is simply code."  As such, "the offer and sale of the Kin purchased under the SAFTs," did not need to be registered as the underlying item was not a security, by the Commission's own admission.

92.     By entering into the SAFTs, Kik locked itself into an aggressive schedule for issuing Kin that did not depend on whether or when Kin actually could be used to buy goods and services.  The SAFTs created a September 30, 2017 deadline for the public sale (which the SAFT and PPM called the "network launch"), a deadline that Kik could extend only once by a maximum of 60 days, until November 30, 2017.  If the public sale did not occur by the deadline, the SAFTs required Kik to return 70 percent of the invested cash to these investors.

**ANSWER:** Kik admits that the SAFTs would expire if the network launch did not occur by September 30, 2017, and that Kik retained the right to extend that time frame by sixty days.  Kik denies the remaining allegations in this paragraph as Kik did not "lock[ ] itself into an aggressive schedule."  Instead, Kik carefully considered the timing of the TDE, delaying it no less than three times to ensure that every component of the sale was ready.

93.     Kik would go on to raise approximately $49.5 million pursuant to SAFTs.  Thus, if the public sale did not occur by the SAFT's deadline, Kik would have been obligated to return $35 million to these early investors, which would jeopardize the entire Kin project and Kik as a going concern.

**ANSWER:** Kik admits that it received approximately $49 million from approximately 50 participants pursuant to SAFTs in the pre-sale, ending on September 11, 2017.  Kik further admits that if the sale of Kin did not occur by November 30, 2017, it would have been obligated to return around $35 million to pre-sale participants.  Kik denies the remaining allegations in this paragraph.

**94.**     At least one major investor advised Kik that the investor would view any delay in issuing the tokens – even a delay to permit Kik to build out the Ecosystem or functionality of the token – as a reason to not invest.  As explained in a June 13, 2017 email that Kik's CEO received:

> We reached out to the lead investor on the pre-sale and talked about extending the time before the Company would conduct the [token distribution    event] and offered the reason why and much to our surprise, the proposed delay was viewed adversely and would impact the lead investor's decision to participate in the pre-sale.

**ANSWER:**  Kik admits that the language quoted in this paragraph appeared in a draft email from a Kik executive.  Kik denies the remaining allegations in this paragraph.  Notably, the Commission disregards testimony from this "investor" that the only reason that he did not favor delaying the TDE was that "everything they'd laid out was reasonable," and "if you wait, sometimes bad things happen."  And then, he unequivocally told the Staff: "if they said they were going to delay it, ***I don't think we would have done anything different.***"  A Kik Board member added that this pre-sale participant simply never threatened to back out of the pre-sale if Kik further delayed the TDE.

**95.**     Similarly, Kik executives were worried that that the market for digital tokens might cool, or that other social media companies could offer digital assets before Kik and deprive it of significant first-mover advantages.

**ANSWER:**  Kik admits that it wanted to be the first digital services application to launch a cryptocurrency, to ensure the widest possible adoption.  Kik denies the remaining allegations in this paragraph.

**B.     Kik Was Well Aware That The Kin ICO Could Be A Securities Offering**

**96.**     Kik subjected itself to the SAFT's mandated schedule despite being aware, since at least February 2017, of a risk that United States and Canadian regulators would conclude that the offer and sale of Kin should be regulated as securities – specifically, as "investment contracts" – under the United States Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), or under analogous Canadian law.  A finding that Kik was selling securities would be

significant, among other reasons, because it would trigger a requirement to register the offering of Kin with the SEC, absent an applicable exemption.

**ANSWER:** Kik denies the allegations in this paragraph.  For the reasons stated herein, Kik could not have expected that the Commission would classify its sale of Kin as an "investment contract."  In fact, as a result of the substantial efforts Kik undertook to ensure compliance with the federal securities laws, Kik was confident that its sale of a digital currency would not implicate the federal securities laws.

97.     For example, before Kik's public announcement of Kin, on or about April 3, 2017, the New York-based consultant that had been advising on the Kin offering warned Kik that the SEC would "potentially apply" the "*Howey* Test" to determine if sale of tokens would constitute an "investment contract."  The consultant also told a Kik executive, "You don't want your offering to be a securities offering, as that comes with a huge regulatory burden and expense (it's essentially like taking your company public).  On the other hand, unregistered public securities offerings are not legal in the U.S."  Several days later, on April 10, 2017, a series of PowerPoint slides provided to Kik's board of directors included the consultant's warning that a Kin offering that raised "millions" and "was highly marketed to users and the public at large . . . risk[ed] becoming a security in the eyes of the SEC very quickly."

**ANSWER:** Kik admits that the quoted language in this paragraph appears in these various sources.  However, Kik denies the remaining allegations in this paragraph, as each statement has been ripped from context and distorted to fit the Commission's story.  In each instance, the Commission has removed adjacent language that told the true story: that the Commission had yet to issue any comprehensive guidance – let alone any guidance suggesting that a token for consumptive use could fall within the purview of the federal securities laws.

Further, Kik's consultant did write in its report that the SEC "would potentially apply the Howey Test."  But the full quote is telling:  "*[t]he SEC has yet given no guidance that any particular token offering is a security, and this guidance is not expected in the near future.*  The SEC would potentially apply the Howey Test to determine if the sale of such tokens would

constitute an 'investment contract.'"  And notably, the consultant did not cite any guidance from the Commission – rather, it cited a private litigation involving a cryptocurrency in which the *plaintiffs* had claimed that the *Howey* test would apply.

And, as stated previously, Kik's consultant did acknowledge that "unregistered public securities offerings are not legal in the U.S.," but also told Kik that ***"[i]n the case of a community currency, there is a good basis to argue that this is not a security***.  You're just selling units of property that you created that are used for a particular purpose in your app."  Additionally, the consultant again reiterated that "the SEC ha[d] ***not given guidance or made any enforcement actions so far against these sales***."  (*See* Kik's Answer to ¶ 18.)

Moreover, this paragraph states that what the Commission misleadingly characterizes as a "warn[ing]" to Kik's Board came from Kik's consultant.  This is false.  This quote was taken from a third party who participated in a panel that Kik's consultant conducted among various industry experts.  The panelist did not even know that Kik was the focus of the research, let alone have any information about Kin, and the panel discussion took place long before Kik made any public statements about Kin.  (*See* Kik's Answer to ¶ 50.)  This quote was included in Kik's April 10, 2017 Board presentation as one "perspective" on the sale, but Kik's consultant issued no such "warning."  In short, Kik has not, at any point in time, believed that the TDE was an offer or sale of securities.

98.     Also before the start of the Kin offering, on or about May 5, 2017, Kik's CEO sent the board of directors a series of PowerPoint slides that warned: "Risks. (1) Securities law."

**ANSWER:** Kik admits that on or about May 5, 2017, Mr. Livingston sent the Kik Board of Directors a slide deck, in which one slide was titled, "Risks: (1) Securities law."  Kik denies the remaining allegations in this paragraph.

99.     By committing to the deadlines that led to the September 2017 public sale, Kik prioritized its business need to raise capital over its obligation to comply with the United States securities law requirement that an offering or sale of securities be registered unless it qualifies for an exemption.

**ANSWER:** Kik denies the allegations in this paragraph for the reasons stated herein.

**C.      Kik Rushed To Create A "Minimum Viable Product" For Kin Owners**

**100.**      By May 2017, Kik decided to hold the public Kin sale as soon as the company had created what it called a "Minimum Viable Product" for the token.

**ANSWER:** Kik admits that, unlike almost every other token sale during this time, Kik decided not to sell tokens to the public until Kin had initial functionality in a digital application. Kik denies the remaining allegations in this paragraph.  A "Minimum Viable Product" ("MVP") refers to a product that would demonstrate the functionality and benefits of the Kin token such that other developers and users could envision how Kin might be adopted and integrated in the future, while simultaneously allowing Kik to collect feedback and data about users' actual or desired use of Kin in practice.

**101.**      By late June 2017, Kik told wealthy investors considering whether to buy tokens through SAFTs that Kik would sell Kin to the general public once it created the Minimum Viable Product.  Kik's PPM described the Minimum Viable Product and stated that Kik would use proceeds from the sale of SAFTs to create the Minimum Viable Product and, as a second step, the broader Kin Ecosystem.

**ANSWER:** Kik admits that the PPM for the pre-sale stated:

> At the time of the public Token distribution event, the Kik messaging application will have the following functionality (the "***Minimum Viable Product***"):  a Kik user who owns Kin will be able to create a "wallet" inside the Kik app.  The wallet will be accessible via the settings menu within the Kik messaging application using a private key. Only by entering the private key, a Kik user will be able to see his or her wallet (including, the Kik user's Kin balance, send/receive premium stickers functionality and Kin status).  Each Kik user (who has a Kik wallet) will be categorized into one of five categories of status based on the number of Kin held by that Kik user.
>
> A Kik user (who has a wallet) will be eligible to use premium sticker packs based on his or her status. Premium sticker packs will be created by independent content creators (not brands).  A Kik user (who has a wallet) will be able to send any of his or her premium

stickers to any Kik user, however, a Kik user who does not have a wallet will only be able to receive premium stickers from a Kik user (who has a wallet).

Kik denies the remaining allegations in this paragraph.

**102.** Ultimately, Kik pursued the ICO without first achieving a decentralized economy for Kin, and without even ensuring that investors would be able to buy goods and services with the tokens upon their receipt. Instead, Kik pursued a superficial Minimum Viable Product in the form of digital, cartoon "stickers" that would be a supposed added benefit to Kik Messenger users who purchased Kin. The stickers would appear inside Kik Messenger and would be available only to Kin buyers who also had a Kik Messenger account. Upon buying Kin, an investor with a Kik Messenger account could access the cartoon stickers by opening a digital "wallet" inside Kik Messenger, unlocking digital stickers that were accessible in the wallet, and then sharing the stickers with other users within the application. The more Kin owned by a Kik Messenger user, the higher the user's "status" level and the more stickers the user could access.

**ANSWER:** Kik denies the allegations in this paragraph. *Howey* does not require that a decentralized economy be achieved. The Commission has made up this requirement out of whole cloth. Further, Kik was one of the only token sellers amongst hundreds (if not the only one) to offer a token with initial functionality at the time of the sale. To start, TDE purchasers could link their digital wallets to their Kik accounts and display their Kin balances, which was important to show status within the chat community. And to demonstrate Kin's potential, and to study initial user behavior, Kik launched a Minimum Viable Product ("MVP") that integrated Kin within Kik. The MVP allowed users to use Kin to access tiered premium content, such as sticker packs, that were unlocked depending on the amount of Kin owned. This use case was far from "superficial." Despite the Commission's skepticism, stickers are quite possibly a billion dollar industry. One messaging company, Line, earned over $250 million in a year, solely from digital stickers. And the public's response to Kik's MVP proved that it was not merely superficial: roughly 20 percent of the thousands of TDE purchasers linked their wallets to their Kik accounts, and participants applauded the Company for implementing Kin into Kik online. One social media poster said,

"Awesome! That's what happens when you have a real app already in place and devs ready to implement the new features!"   Another added, "12 hours an[d] we already see a product implemented in the app …"

Even given this initial functionality, these uses were always intended to be a stepping stone from which Kik and other developers could build informed user experiences – not the extent of Kin's utility.  As Mr. Livingston told the SEC Staff, Kik "wanted there to be ways to use Kin on day one," but acknowledged from the beginning that "then there would be ***many, many more ways to use Kin, obviously, over time***."

**103.**    The stickers that Kik created for its purported Minimum Viable Product were small, emoji-like images, predominately a cartoon honey badger, such as the below:



**ANSWER:** Kik admits that the image shown is one of the stickers created for the sticker packs that TDE purchasers could unlock after linking their Ethereum wallets to their Kik accounts. Sticker packs, including stickers and emojis such as this one, were created after rigorous design iterations, based on consumer research and experience analyzing what Kik users and Kin purchasers would want to use.  From the Kik Points project, for example, Kik learned that its users were interested and would spend digital currency to unlock digital stickers.  And the consultant's

report confirmed as much, finding that "token demand" would be driven by the fact that "user[s] can *use [the token] to purchase exclusive digital content* (exclusive smileys, stickers, memes)." Kik denies the remaining allegations in this paragraph.

104.    Kik did not design the cartoon sticker to encourage people to buy Kin for non-investment purposes, and, in any event, the stickers could not be purchased using Kin.  Rather, Kik developed the stickers based on an effort to create a hypothetical "use" for the tokens, which Kik believed was relevant to whether Kik's sales of Kin were securities transactions under the securities laws.  As one Kik executive wrote in a June 2017 email to other company executives about how the company had defined Minimum Viable Product:

> The definition was written with one purpose only: **COMPLIANCE**. This is NOT an MVP [Minimum Viable Product] for product purposes, nor to satisfy any good user experience for crypto participants. We discussed that once we integrate Kin into Kik we will rebuild the entire product bottom up and the MVP will not be used in any way.

(emphasis in original).  Similarly, in June 2017, a Kik employee admitted to another by email when discussing the lack of guidance they had received about the "crypto stickers":

> Basically it doesn't really matter. The whole point is to make our legal department happy, not the users (who are actually investors and probably could care less that they got a sticker pack for their $10K investment into KIN).

**ANSWER:** Kik admits that the text quoted in this paragraph appeared in emails from Kik employees.  Kik denies the remaining allegations in this paragraph.  As an initial matter, it is more than a little odd for the Commission to suggest that there is something nefarious about a company working for "compliance."  And yet again, this characterization of the facts is distorted: to make this claim, the Commission relies on an email by a Kik employee written three months before the TDE, which the employee described to the Commission as an expression of his "frustration" because he did not yet "understand enough about the legalities of the TDE."  But this same employee told the Commission that once he understood, he wanted to "take full advantage of the

situation," and made sure to establish criteria for the MVP that would allow Kik to "generate learnings that we can then evolve the product into."  (*See* Kik's Answer to ¶ 103.)

Additionally, the former Kik employee cited in the second block quote was a non-executive, based in Israel, who was not involved in developing the vision of Kin.  Any view he expressed was his view alone and not that of the Company's.  Further, the recipient of this email (who was actually the individual responsible for creating the stickers), disagreed with this sentiment.  In fact, this employee informed SEC Staff that he disagreed with the other individual's opinion that the content of the stickers did not matter – and insisted that he thought the stickers would be useful and of good quality.

105.    Kik did not mention the status-based stickers in any public announcements or otherwise discuss these cartoon stickers in marketing to potential public sale investors, before the public sale.  Because public sale investors could not have known about the stickers before buying Kin, the stickers could not have been a motivation for these purchases.

**ANSWER:** Kik admits that it did not specifically reference the status-based stickers in public announcements prior to the TDE.  Kik denies the remaining allegations in this paragraph, which pretend that stickers were to be Kin's only conceivable use.  While Kik did not specifically market the ability for Kin owners to unlock status-based stickers, Kik frequently described examples of potential Kin use cases in the months leading up to the TDE – many of which involved stickers.  (*See* Kik's Answer to ¶¶49, 63, 102, 103, 105.)  For example, Mr. Livingston's May 25 Medium post indicated that Kin would be used for "buying and selling stickers."  But more importantly, the MVP was only the beginning – as Kik and other developers integrated Kin, it would be used for more complex and valuable earn and spend transactions.  (*See id.*)

### D.    Prior To The Kin ICO, The SEC Issued The DAO Report, And The Ontario Securities Commission Told Kik That Kin Was A Security

106.    On July 25, 2017, two months prior to Kik's token distribution event and before all of the sales to public investors, the SEC issued a Report of Investigation pursuant to Section 21(a) of the Exchange Act (the "DAO Report") stating the SEC's view that digital assets may be

securities, and that the federal securities laws and registration requirements "apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology." The DAO Report focused on the *Howey* test, the same legal standard Kik had been discussing for months.

**ANSWER:** Kik admits that the SEC issued the DAO Report on July 25, 2017, and that it contains the quoted language. Kik denies the remaining allegations in this paragraph. The DAO Report did not provide adequate guidance for companies attempting to "take appropriate steps to ensure compliance with the U.S. federal securities laws," and was actually, in hindsight, affirmatively misleading to companies like Kik. At the time, Mr. Livingston said publicly that it made "complete sense to [Kik] and [was] fully expected" that the SEC would determine that the DAO was a security. (*See* Kik's Answer to ¶¶ 17, 75.) The token at issue in the DAO Report was entirely distinguishable from Kin. This was because, among other things, the token at issue in the DAO Report entitled participants to vote and receive "rewards," which the co-founder compared to "buying shares in a company and getting . . . dividends," and the company informed investors that it would fund projects in exchange for a return on investment. Neither Kin nor the Kin ecosystem possessed any of these qualities, and therefore Kik felt secure in its assessment that the TDE would not constitute an investment contract.

107.    Within days of the issuance of the DAO Report, Kik contacted the Ontario Securities Commission ("OSC") regarding the legality of the Kin offering. The OSC is a regulatory agency which administers and enforces securities legislation in the Canadian province of Ontario, where Kik is headquartered.

**ANSWER:** Kik admits that the OSC is a regulatory agency which administers and enforces Canadian securities laws in the Canadian province of Ontario, where Kik is headquartered. Kik further admits that it contacted the OSC regarding the legality of the TDE in Canada. Kik denies the remaining allegations in this paragraph.

108.    From August to September 2017, including during a face-to-face meeting on August 14, 2017, Kik executives and outside counsel discussed the Kin offering with the OSC.  In the discussions, OSC staff members raised concerns that the sale of Kin would violate Ontario securities laws because Kin tokens were investment contracts and, thus, securities.  During these discussions, the company and regulators specifically discussed the United States Supreme Court's decision in *Howey*.

**ANSWER:** Kik admits that from August to September 2017, Kik representatives met once with the OSC to discuss Kik's sale of Kin, but denies the remaining allegations in this paragraph.  Kik and the OSC staff did not merely "discuss[]" *Howey* – the OSC staff member actually indicated that she did not believe that *Howey* would even apply to token sales in Canada, given that the case was old.  As Kik's former CFO informed the Commission Staff:

> [T]here was one very perplexing comment from [the OSC staff member].  We said that we believed that we complied with -- we -- that we reviewed [] *Howey* and that we were not a security under the *Howey* test.  And her comment back to us was that was a ***very old framework and she didn't think it was applicable***, which was a bit of a shock to us.

And to Kik's knowledge, the OSC never reached a final conclusion regarding Kik's sale of Kin or whether it would consider its sale of Kin to be an offering of securities, under *Howey* or otherwise.  In fact, the OSC admitted to Kik that it had not reviewed all the material that Kik submitted to the OSC, which Kik believed would have demonstrated that Kik's sale of Kin was not a security.

In any event, unlike in the United States, in Canada, regulators are permitted to take action in the interest of public policy, even if there is no violation of existing securities law.  In other words, under Canadian law, the OSC could seek to regulate Kik's sale of Kin, even if the sale was not a securities offering under existing law.  This created significant regulatory uncertainty in Canada even if the sale did not involve an "investment contract" under *Howey*.  The Commission knows all of this, and in light of that fact, its allegations about Kik's interaction with the OSC are deeply misleading.

109.    On or about September 5, 2017, as later confirmed in a November 2017 letter from Kik's outside counsel to the OSC, "OSC staff definitively communicated [to Kik's outside counsel] a position that the [sale to the public of Kin] constituted an offering of securities."

**ANSWER:** Kik admits that its Canadian counsel wrote the language quoted in this paragraph in a letter.  Kik denies the remaining allegations in this paragraph.  As stated previously, the OSC never told Kik what regulatory framework it would apply – let alone whether it determined that the TDE would be an offering of securities – and had not yet reviewed the materials Kik submitted for their review.

110.    After learning of the OSC's position, Kik barred Canadians from purchasing Kin in the public sale.

**ANSWER:** Kik admits that it did not allow Canadian residents to purchase Kin in the TDE, based in part on its discussions with the OSC.  Kik denies the remaining allegations in this paragraph.  To be clear, Kik's discussions with the OSC had absolutely no bearing on whether Kik believed its sale of Kin to United States purchasers would qualify as a sale of securities under United States law.  In addition to the reasons set forth above, the securities laws statutes in each respective country are different, with different regulators, and different case law.  Whether or not the TDE would have been a securities violation in Canada is totally irrelevant to whether Kik violated Section 5 of the Securities Act.

111.    Kik did not make a similar overture with the SEC.  Kik did not register the offering and did not restrict United States-based investors from purchasing Kin.  United States-based investors were deprived of the disclosures and protections to which they were entitled under the federal securities laws.

**ANSWER:** Kik admits that it did not register the pre-sale or the TDE with the Commission, nor did it restrict United States purchasers from buying Kin.  Kik denies the remaining allegations in this paragraph.  Kik is not obligated to seek permission directly from the Commission before selling a non-security.  But notably, though the Commission has informed other companies that their token sale would constitute an investment contract in time for the

Company to change course, the Commission provided Kik no similar opportunity.  (*See* https://www.sec.gov/news/press-release/2017-227.)

## VI.   THROUGHOUT THE KIN OFFERING, KIK EMPHASIZED ITS OWN IMPORTANCE TO KIN'S FUTURE SUCCESS AND THE ACTIONS IT WOULD TAKE TO SUPPORT KIN

**112.**    In the initial public announcements of Kin and throughout the Kin offering, Kik emphasized the central role of its present and future efforts to make the project successful, as well as its financial incentive to do so, and the impact those efforts would have on the future value of Kin.

**ANSWER:** Kik denies the allegations in this paragraph.  From Kik's public announcement of Kin through the TDE and today, Kik has made clear that the Kin economy would not be successful unless there was broad participation from consumers and developers. (*See* Kik's Answer to ¶¶ 8-9.)  This was based on Kik's experience with Kik Points, as well as consumer research from Kik's consultant indicating that a high percentage of prospective purchasers "expressed concern about the risk of a centralized company stopping support for their token, creating failure risk," and "thought a centralized company would not be able to support fully decentralized products and/or implement them correctly."  It makes no sense that Kik's marketing strategy would "emphasize[]" Kik's "central role" in "mak[ing] the project successful," when Kik's research and experience told them that this would both hinder the project's development and drive away potential ecosystem participants.  As such, Kik's messaging throughout was clear that "we can't do this alone.  We can't do it alone from a technology perspective.  We can't do it alone from a digital service perspective. ***This really does have to be a community effort***."

**113.**    Kik repeatedly described specific, future actions the company itself would take to try to drive up Kin's value, which had no reasonable prospect for completion (and, in fact, were not completed) in advance of the planned 2017 public sale.  Kik promised that it would create demand for Kin, thereby increasing its value, by building the Kin Ecosystem, integrating Kin into

Kik Messenger, implementing a "transaction service" to supplement the Ethereum blockchain and seeking a long-term improvement of the blockchain, and creating a "Rewards Engine," as discussed below.

**ANSWER:** Kik denies the allegations in this paragraph.  It is telling that, despite making the claim that Kik "repeatedly described specific, future actions the company itself would take," this paragraph does not quote any of them.  Kik stated that it would serve as a participant in the economy like any other consumer or developer.  And, as stated previously, Kik made clear that the success on the economy was dependent on broad contributions from consumers and developers well beyond Kik.  (*See* Kik's Answer to ¶¶ 8-9, 112.)  Also, while Kik employees worked on the Rewards Engine, the Kin Foundation, a separate and distinct legal entity from Kik, was initially responsible for administering the Kin Rewards Engine and contributing to the further development of the Kin.  (*See* Kik's Answer to ¶ 67.)

114.    Because of Kik's numerous public statements before the public sale, including statements about the profitability and tradability of Kin, Kik's own importance to the Kin project, Kik's intent to profit from the appreciation of Kin, and Kik's planned future actions to support Kin, investors who bought Kin reasonably would have expected future profits to be derived from the entrepreneurial and managerial efforts of Kik and its agents.

**ANSWER:** For all of the reasons stated herein, Kik denies the allegations in this paragraph.  Kin purchasers were not led to expect profit based on the efforts of Kik, as part of a common enterprise.  Rather, the totality of Kik's promotional materials and statements emphasized Kin's utility as a medium of exchange, and the need for developers and users other than Kik to adopt and champion Kin for it to succeed.  (*See, e.g.*, Kik's Answer to ¶¶ 9, 10, 46, 58, 62, 63, 72, 73.)

### A.    Kik Emphasized That Kik Itself  Intended To Profit from Kin's Appreciation

115.    Kik repeatedly told potential Kin investors that Kik intended to profit alongside all other Kin investors from the future rise in Kin's value that the company itself would help generate.

For example, at a June 2017 conference in China, Kik's CEO highlighted the plan to award Kik 30 percent of the outstanding supply of Kin and said the company's "goal now is just to grow the value of Kin":

> This – this is the beautiful thing for Kik: it's also fundamentally a new way to monetize. So, for us, we're setting 30 percent of Kin aside for Kik, as a financial incentive for us basically to put this huge messenger into this ecosystem, and to get this whole ecosystem going. And so (indiscernible) – you know, we – our goal now is just to grow the value of Kin. The more we do that, the more the value of our 30 percent grows. And we're now looking at that as the fundamental way that we monetize this, you know, eight and a half years of work, and $120 million invested.

**ANSWER:** Kik admits that the block quote cited in this paragraph contains language that Mr. Livingston spoke at a June 2017 TechCrunch conference in China.  However, this paragraph removes these quotes from context and distorts Mr. Livingston's message, and Kik denies the remaining allegations on that basis.  Mr. Livingston's prevailing message at the TechCrunch conference was that Kin could fuel a new economy of digital services that offered developers a chance to compete with the dominant players.  In fact, immediately before the language the Commission chose to extract, Mr. Livingston stated:

> [T]here's a huge problem. Just like for Kik, it's very hard for [developers] to find a sustainable business model. It's very hard for them to do advertising, very hard for them to sell physical or virtual goods. ***So now with Kin and what we call the Kin Rewards Engine, they can say wait let's not do ads, let's not try to sell stuff, let's just bring people together and get them to provide value to each other using this cryptocurrency Kin***.

Then, Mr. Livingston gave the quoted statement in response to the host's question about how Kik "make[s] money . . . [w]ith all the Kin that [Kik is] sitting on at home."

116.    Similarly, at the June 28, 2017 San Francisco Bitcoin Meet-up, Kik's CEO explained that setting aside Kin for the company at the beginning made sure that Kik was committed to working to increase Kin's value:

> I think what we can guarantee is we are all in on this. You know, this is – this is something we've been working to – towards for a

> long time, but this is something that is in our financial best interest,
> because of the 30 percent, but actually, like, just to be honest, like,
> this is something we have to do. We cannot compete with Facebook.

**ANSWER:** Kik admits that the block quote cited in this paragraph contains language that Mr. Livingston spoke at a June 28, 2017 Bitcoin Meetup.  Kik denies the remaining allegations in this paragraph, which are misleading by omission.  Mr. Livingston was abundantly clear that Kik could not alone control Kin's value.  The un-doctored quote reads:

> ***So we can not guarantee value with Kin. I think once you create a
> cryptocurrency it sits on exchanges and the price of it is set by the
> market based on supply and demand.  So you know supply is fixed
> and demand goes down the price is going to go down.*** But I think
> what we can guarantee is we're all in on this. You know this is
> something we've been working to – towards for a long time but this
> is something that is in our financial best interests because of the
> thirty percent.  Actually, like just to be honest like this is something
> we have to do. We cannot compete with Facebook.

As with his many other public appearances, Mr. Livingston's overall message to attendees was that, unlike other cryptocurrencies that existed at the time, Kin would form the basis of a new economy that would allow seamless earning and spending within digital applications.  Specifically, he stated, "we're trying to create this . . . new open ecosystem where any developer can come in and innovate, as a consumer you can move between any of them, try them right away easily, bring your identity with you, start earning and spending in a frictionless but secure way wherever you go."

**117.**   And again, at an August 18, 2017 conference in Canada – a video of which was made available on the Internet by September 9, 2017 – Kik repeatedly assured potential buyers that the company was going to do everything it could to make sure that early investors and Kik "make a ton of money":

> But, now, with the cryptocurrency, it's in Kik's best interest to get
> people paid because that's what we're trying to do. We're trying to
> build this economy . . .
>
> Whether it's music, I create a great song. I listen to your great song.
> A game,  I create a great level. I play your great level where

consumers are coming together, providing value to each other and facilitating that with the cryptocurrency.

The more you do that, the more valuable, the more demand for the cryptocurrency there will be. And with sort of a, you know, cryptocurrency, you can guarantee a fixed supply, guaranteed scarcity. So supply stays the same. Demand goes up. The price goes up such that if you set some aside for yourselves and you give other people the opportunity to participate and contribute, everybody can not only build this amazing new ecosystem and platform but also make a ton of money.

**ANSWER:** Kik admits that the block quote cited in this paragraph contains language that Mr. Livingston spoke at a conference in Canada, which actually took place on August 14, 2017. Kik denies the remaining allegations in this paragraph. (*See* Kik's Answer to ¶ 10.) Mr. Livingston's statements focused overwhelmingly on Kin's utility as a medium of exchange, and, when read in context, made clear that the purpose of Kin was to create a new economy of digital services:

> *And so that's really the utility is like in Kik, for example, how would we use it in Kik? We want to bring consumers into Kik and we want to get them providing value to each other and using the cryptocurrency to facilitate it. You know, on Kik, if you host a great group chat, today you do that for free. You know, we do everything as consumers for free.* We never get paid. But now with a cryptocurrency, it's in Kik's best interests to get people paid because that's what we're trying to do. We're trying to build this economy, whether it's around chat. You know, I host a great group chat then I join your great group chat, *whether it's music. I create a great song, I listen to your great song. A game, I create at great level, I play your great level.*

**B.    Kik Emphasized Its Experience And Ability**

**118.**    Kik repeatedly promised to apply Kik's own expertise, experience, and resources – including the anticipated proceeds of the Kin offering – to establishing Kin's value and increasing Kin's future value.

**ANSWER:** Kik denies the allegations in this paragraph. Over and over again, Kik was clear that its own "expertise, experience, and resources" were insufficient on their own to support the Kin economy. (*See* Kik's Answer to ¶¶ 8, 9, 112.) And, although Kik acknowledged that

Kin's price could potentially increase as a function of supply and demand, as is the case in any economy (as well as goods, products, and other consumer items), the vision was to create a new and sustainable digital economy centered around Kin.  (*See* Kik's Answer to ¶¶ 9, 10, 46, 58, 62, 65, 72, 73.)

119.    Kik touted its previous accomplishments and the popularity of Kik Messenger. Kik's May 2017 white paper provided performance data for Kik Messenger, including the number of monthly average users and age of the active user base, and noted that 64% of the application's users live in the United States.  Kik asserted that "[t]he size of the [Kik Messenger] user base, demographics, and community ethos make Kik a unique venue where cryptocurrency may be introduced, adopted, and utilized by a large mainstream audience." The "Kin project," Kik said, was "an opportunity to integrate chat with true digital commerce within an existing user base."

**ANSWER:** Kik admits that the quoted language appears in Kik's May 2017 white paper, but the Commission is misleading in its characterization of the Kin white paper.  In the other 28 pages of the white paper, Kik stated that it intended to contribute to the economy as a "***one of many participants rather than a landlord***," and Kik made clear that the economy's success was dependent on consumers and developers using Kin as a medium of exchange, which went far beyond Kik.  And while Kik acknowledged that its "heritage has been built on chat," it also said that "it now hopes that its legacy will be in catalyzing a new, decentralized ecosystem of digital services for daily life."  (*See* Kik's Answer to ¶¶ 112, 118.)  No reasonable reader of this language would believe that Kik was offering TDE purchasers an opportunity to profit solely from Kik's efforts as part of a common enterprise.

120.    Kik's white paper also touted Kik's management and included a four-page section describing the biographies, professional experience, and skills of seven Kik executives and identifying the names and titles of 13 other "Kin Core Team" members.  For example, Kik's white paper touted that the company's CFO had previously "spent more than 20 years leading finance, operations, and strategy for both established and startup companies" in various sectors.  And Kik's chief product officer, "br[ought] startup and academic research experience to Kik" and was "in the

final stages of completing his PhD." Kik did not provide a biography of any non-Kik personnel, and, in the white paper's "Conclusion" section, Kik assured potential buyers that it would "pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Ecosystem to its millions of users."

      **ANSWER:** Kik admits that its white paper contained biographies of several Kik executives and employees, and that the allegations in this paragraph include certain incomplete quotes from Kik's white paper. Kik denies the remaining allegations in this paragraph, which again mischaracterize the white paper's primary message. As was customary in the cryptocurrency industry at the time, Kik included biographies of the team members that were working on aspects of the token sale. But Kik was beyond clear that although it intended to participate in the Kin economy, the economy's success was dependent on consumers and developers using the token as a medium of exchange. (*See* Kik's Answer to ¶¶ 119, 120.) The white paper did not lead readers to expect an investment opportunity, but instead the opportunity to participate in this new digital economy.

      **121.** Similarly, in the May 25, 2017 video that Kik issued when announcing the Kin project, the company emphasized that "Kik has both the experience and the resources and the user base to really make this happen."

      **ANSWER:** Kik admits that the video announcing Kik's vision of the Kin economy contained the quoted language. Kik denies the remaining allegations in this paragraph, which deprive this statement of context. Mr. Livingston's full statement reads:

> *I think we can make a better experience for consumers but also a better future for society in general.* Kik has both the experience and the resources and the user base to really make this happen. *The success of this project really comes down to how many other people can we get excited to compete with us, to join us, to work with us and to build this together.*

When read in context, Mr. Livingston's message simply echoes Kik's fundamental message: that it hoped to "spark the creation of this ecosystem," but "*want[ed] this ecosystem and Kin to go way beyond Kik*." (*See* Kik's Answer to ¶¶ 119, 122.)

122.    Kik re-emphasized its experience and expertise throughout its marketing of the offering, both in public statements and in private meetings with potential investors.  In a Medium post on September 6, 2017, the day after the OSC "definitively communicated [to Kik's outside counsel] a position that the [sale to the public of Kin] constituted an offering of securities," Kik's CEO stated he was promoting Kin to "my friends and family" in part because:

> Kin has at least one participant who was all in: Kik. With one strong digital service on board from day one, Kin can enjoy a good start regardless of whether or not other digital services adopt it right away. Kik has 15 million monthly active users, many of whom are already accustomed to exchanging digital goods, such as stickers and emoji, through that.

**ANSWER:** Kik admits that on September 7, 2017, Mr. Livingston posted an article that contained the language block quoted in this paragraph.  Kik denies the remaining allegations in this paragraph, which mischaracterize the nature of Kik's public statements.  Mr. Livingston stated Kik's intention to participate in the Kin economy, with the hope that its user base would participate as well.  In the same blog post, Mr. Livingston stated:

> This is about a movement.  A movement to build an ecosystem where people get fairly compensated for the value they provide to digital services.  A movement to build an ecosystem where smaller developers have a fair shot at making a living when they do what they love and build great things.  A movement where consumers get immersive and unique experiences catered to their interests and needs.
> ***A movement is only as strong as the people behind it, and a movement this ambitious needs as many people as possible.***

C.    **Kik Promised It Would Create Demand For Kin By Building New Products, Services, And Systems For The "Kin Ecosystem"**

123.    Among other specific, affirmative steps that Kik told potential investors it would take to increase demand for Kin – which, in turn, would drive up Kin's price – Kik promised that it would use funds from Kin investors to create and promote a decentralized economy, which it called the "Kin Ecosystem," in which Kin could be used to buy goods and services.  Kik's white paper stated:

> To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems. Building a decentralized system is a complex process, and the transition to it must be done in a measured and responsible way over time.

**ANSWER:** Kik admits that its white paper contained the language block quoted in this paragraph.  Kik denies the remaining allegations in this paragraph.  Although Kik articulated its intent to integrate Kin within Kik, including potential new use cases, Kik also repeatedly stated that the Kin economy depended on the participation of many other users and developers.  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

124.    Kik's white paper also stated that Kik would be 'the ecosystem's champion and will showcase Kin to its millions of users," and, "[o]ver time, Kik will also promote other Kin digital services." Kik made clear that "Kik must help to establish Kin's fundamental value" and that "Kik will build fundamental value." In addition, Kik's May 25, 2017 Medium post said, "[o]nce we have established the new cryptocurrency, we will create demand for [Kin] by encouraging people to earn and spend Kin within Kik."

**ANSWER:** Kik admits that its white paper and May 25, 2017 Medium post contain the incomplete statements quoted in this paragraph.  Kik denies the remaining allegations in this paragraph.  As stated herein, Kik intended to be, and was, the first to integrate Kin within its application – and in fact launched initial functionality within Kik at the time of the TDE.  Kik believed that it was important for participants to start using Kin immediately, and to demonstrate the viability of Kin working inside an application to show other developers how it could be integrated.  But it could not stop there – Kik knew that the project could only succeed if it garnered a wide base of users.  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

125.    Kik made clear that the sale of Kin would be used not only to "fund Kik operations[,]" but also to "finance the Kin roadmap." Kik's CEO stated at the San Francisco conference in June 2017 that Kik would use sale proceeds to build systems "to . . . launch this whole broader ecosystem."

**ANSWER:** Kik admits that the incomplete quotes in the first sentence of this paragraph appear in the Kin white paper.  Kik also admits that the quoted language was among Mr. Livingston's comments at the June 2017 Bitcoin Meetup in San Francisco.  Kik denies the remaining allegations in this paragraph.  Kik built the preliminary infrastructure underlying Kin, and hoped to "spark the creation of this ecosystem," but knew and consistently stated that many others would need to adopt Kin for it to succeed.  In fact, at the June 2017 conference that the Commission quotes from, Mr. Livingston stated that the economy needed "***thousands, and at some point tens of thousands, of developers to build that new and alternative ecosystem and digital services, an ecosystem that consumers own their identity, own their data . . . [and is a] fair and lucrative platform to build on***."

126.    Throughout the period in which Kik offered and sold Kin – including through Kik's last sale of Kin in the public sale that ended by September 26, 2017 – there was no Ecosystem as described in Kik's white paper and other marketing.  In addition, no company or person – not even Kik – had told the public about any good or service that it would sell in exchange for Kin.  There was, simply, nothing to purchase with Kin at the times Kik sold the tokens through September 26, 2017, or even when Kik distributed the tokens on that date.  And Kin did not have (and does not have) legal tender status in any jurisdiction.

**ANSWER:** Kik denies the allegations in this paragraph.  At the time of the September 2017 TDE, the decentralized Kin economy that Kik had marketed, did exist.  (*See* Kik's Answer to ¶16.)  Further, the Commission's reference to "legal tender" is wholly irrelevant as Kin falls under the general definition of a "currency," as well as such definition under the federal securities laws.

127.    Kin investors reasonably would have expected that Kik's future efforts to create and promote the Ecosystem, by building new products, services, and systems, would increase the value of Kin if successful, and, therefore, that the investors and Kik would reap future profits from Kik's efforts.

**ANSWER:** Kik denies the allegations in this paragraph.  Kik marketed the Kin economy as a means for consumers and developers to earn and spend within digital applications, not to passively invest, and simultaneously made clear that the success of the economy depended on substantially more than its participation.  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

> **D.     Kik Promised It Would Create Demand For Kin By Modifying Kik Messenger**

**128.**   Kik emphasized the importance of Kik Messenger and its numerous users to potential Kin investors.  Kik told potential investors that the company would revise Kik Messenger to permit users to buy and sell goods and services using Kin.  Kik's white paper stated that Kik would "leverage its large existing user base to drive mass adoption" of Kin, and that "Kik will build fundamental value for the new currency by integrating Kin into its chat app.  Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem."

**ANSWER:** Kik admits that the quoted language appears in Kik's white paper.  Kik denies the remaining allegations in this paragraph.  Kik built preliminary infrastructure underlying Kin, and hoped to "spark the creation of this ecosystem," but knew and consistently stated that many others would need to adopt Kin for it to succeed.  But emphasizing the "importance of Kik Messenger" would have been absurd, given Kik's first-hand knowledge from the Kik Points experiment that a currency which relies on one application would derail the project.  (*See* Kik's Answer to ¶ 112.)

**129.**   Specifically, to achieve such integration, the white paper stated that, first, Kik would integrate digital wallets for each Kik Messenger user account so that users could engage in "common wallet interactions;" and that, thereafter, Kik would "work to integrate Kin into Kik's chat ecosystem for the benefit of users, platform developers and partners . . . by employing the same iterative process of research, experimentation, and fine-tuning that has made Kik successful."

**ANSWER:** Kik admits that its white paper contains the quoted language in this paragraph, and that Kik believed it would be the first to integrate Kin into its application to spark the creation of a new ecosystem.  Kik denies the remaining allegations in this paragraph.

130.    Kik's white paper identified hypothetical "use cases" that were possible ways that Kik might change Kik Messenger so that users could buy and sell goods and services using Kin. One such use case, for example, consisted of charging a fee (paid in Kin) to app users wanting to attend chats with celebrities.

**ANSWER:** Kik admits that its white paper included "*example*" use cases for Kin, one of which was "VIP Groups" where users would pay Kin to chat with celebrities, other influencers, or to access premium content.  Kik denies the remaining allegations in this paragraph.  The white paper was intended to inform developers and users how Kin tokens might be used in the future. For obvious reasons, Kik provided examples from its own application.  This does not negate the litany of other statements indicating that Kik's integration alone would be insufficient to sustain an economy.  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

131.    Kik provided no date by which it would complete Kin's integration into Kik Messenger.  However, Kik made clear that its integration efforts would continue beyond any public sale of Kin.  A June 2017 online news article, for example, quoted a statement by Kik's CEO that the company would "add more and more ways to use [Kin] inside Kik . . . in the latter part of this year [2017] and into next year [2018]." Kik controlled Kik Messenger.  Only Kik could modify Kik Messenger to incorporate Kin transactions.

**ANSWER:** Kik admits that a June 2017 article included the quoted language contained in this paragraph, and that Kik alone controlled its application Kik Messenger.  Kik denies the remaining allegations in this paragraph.  While Kik would continue iterating on its application – as it has since Kik Messenger launched in 2009 – Kin's basic functionality existed on the day Kin was launched.  However, Kik and any other application that integrated Kin would not stop innovating and improving user experiences after integration – rather, in order to continue offering users unique and desirable experiences, applications would necessarily adapt to user feedback

and usage and improve applications of Kin.  Further, any developer, not just Kik, could integrate Kin within their respective applications.  But Kik was not obligated to do so, nor was any other developer, and this has no bearing on whether the TDE was an investment contract.

132.    In fact, when Kik distributed Kin on September 26, 2017, none of the "use case" examples suggested by the white paper were available.  Those examples were purely hypothetical. Furthermore, at that time, there was no digital wallet within Kik Messenger that would enable users to hold or conduct transactions with Kin.  Other than providing investors who had Kik Messenger accounts with access to digital stickers (which investors did not learn of until after their purchase of Kin) and a report of how many Kin they owned, Kik Messenger had not been integrated with Kin.

**ANSWER:** Kik denies the allegations in this paragraph.  The Commission omits a key word: "example."  Kik did not "suggest" that the "hypothetical" use cases in the white paper would be available at the time of the TDE – they were listed as "***example use cases***."  The white paper explained that these were "***several possible use cases demonstrating how Kin may be integrated into the Kik application***."  This allegation falsely suggests that Kik had suggested these uses would be available at the time of the TDE.  Nonetheless, at the time of the September 2017 TDE, Kin was integrated into Kik Messenger, and the Kin economy was functional.  (*See* Kik's Answer to ¶ 16.)

And although neither Kik nor the Commission can divine what each and every Kin purchasers had "learn[ed] of" prior to the TDE – Kik had stated many times that Kin would be integrated with the use of stickers.  (*See* Kik's Answer to ¶¶ 49, 63, 102, 103, 105.)

133.    Potential Kin investors reasonably would have expected that Kik's promised future effort to integrate Kin with Kik Messenger would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

**ANSWER:** Kik denies the allegations in this paragraph.  As stated herein, Kik did not lead purchasers to expect that Kik's efforts would increase the value of Kin, nor did it promise or suggest that Kin purchasers could earn profits.  Rather, Kik emphasized the Kin economy as a

means for consumers and developers to earn and spend within digital applications, not to passively invest, and it made clear that the success of the economy depended on substantially more than its participation.  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

### E. Kik Promised It Would Create Demand For Kin By Implementing New Technology To Allow For Scalable, Fast, And Cost-Effective Transactions

**134.**     Kik promised to maintain an active role in developing the technologies for the future use of Kin.

**ANSWER:** Kik denies the allegations in this paragraph.  Kik stated that it would be a participant in the Kin economy, but that the economy's success depended on participation from consumers and developers aside from Kik.  Further, Kik made clear that the Kin Foundation, a separate legal entity from Kik, would assist in the development of the economy, including through "open governance of its resources together with other ecosystem partners, the support and advancement of the technology related to Kin's implementation, and all matters related to ecosystem membership, including the Kin Rewards Engine."

**135.**     Kik explained that Kin would initially operate on the pre-existing Ethereum blockchain, but this approach created known "[p]latform limitations" that were expected to impede the actual use of Kin to buy or sell goods or services.  Kik said that the Ethereum blockchain could handle only relatively small numbers of transactions, was too slow, and imposed a fee for each transaction.  Kik therefore recognized that the Ethereum blockchain was incapable of running consumer applications at sufficient volumes, or "scale," to make Kin successful.  Kik's white paper acknowledged a need for future "significant advances… in blockchain technology" to enable a "highly scalable, low latency, and cost effective decentralized systems."

**ANSWER:** Kik admits that the language selectively quoted in this paragraph appears in the Kin white paper.  Kik denies the remaining allegations in this paragraph.  While Kik recognized the potential limitations of the Ethereum blockchain, the Kin white paper emphasized that Kik would welcome the opportunity to work with the "blockchain technology community"

implying that others would develop an alternative solution to Ethereum, which is consistent with its belief that Kin would quickly become decentralized.

136.    Even though Kik chose the Ethereum blockchain as Kin's platform, Kik could not use this blockchain for Kin transactions within Kik Messenger, let alone by numerous other companies, which Kik hoped to attract to the Kin Ecosystem, because of Ethereum's technological limitations.  For example, Kik believed that giving only five Kin tokens to each Kik Messenger user would absorb 23 days of the computing capability of the entire Ethereum network.

**ANSWER:**  Kik admits that, despite the revolutionary technology underlying the Ethereum blockchain, Kik realized that Ethereum contained technological limitations that could potentially cause issues with a digital token used for a high volume of transactions.  Kik denies the remaining allegations in this paragraph.  Specifically, this paragraph omits that the Kin white paper squarely addressed these potential scalability challenges, because "[b]ased on Kik's experience with Kik Points, the expected daily transaction rate could potentially surpass Ethereum's thoroughput capability and presents a risk of congesting the network."  In other words, judging by users' substantial use of Kik Points, Kik knew that there was potential for Kin to overburden the Ethereum network if it was used as intended.

137.    Kik's white paper stated that Kik would address these issues, and do so in at least two different ways.  First, Kik would implement its own "transaction service" that would allow Kin users to temporarily bypass the Ethereum blockchain – and avoid its logjams and expense – by conducting Kin transactions within Kik Messenger on a "centralized" ledger to be operated by Kik (or by an entity established by Kik).  Kik described this new service as "a semi-centralized hybrid on-chain and off-chain Transaction Service for scalable interactions with the Kin cryptocurrency." Second, Kik stated that it would seek a "long term" solution by establishing a new entity, the "Kin Foundation," which would in turn "move to migrate [Kin's] transactional infrastructure to a fully decentralized system while retaining a low friction user experience."

**ANSWER:**  Kik admits that its white paper contains the select language quoted in this paragraph, but denies the remaining allegations in this paragraph as they distort its meaning.  Kik

never stated that it alone would address the potential issues with Ethereum.  The Kin white paper stated that, much like Ethereum, it would "***welcome the opportunity to work with the blockchain technology community on accelerating the required advances and testing them in production***" thus implying that others would develop an alternative solution to Ethereum.  Further, the Kin Foundation is a separate and distinct entity, which is not controlled by Kik.  (*See* Kik's Answer to ¶ 34.)  As such, it is disingenuous to claim that the Kin Foundation's actions were one and the same as Kik's actions.

138.    Kik promised to publish a "Kin Technical White paper" that described this "managed solution for Kin tokens."  And, following its initial announcements, Kik continued to tell potential investors that it would seek long-term technological improvements that enabled Kin transactions on the blockchain.  For example, during a San Francisco conference, Kik's CEO said Kik was "looking for" a new "blockchain 3.0," which Kik itself might create by partnering with another blockchain or building its own bespoke blockchain.

**ANSWER:** Kik admits that its white paper contained a reference to a "Kin Technical White paper," and also contained the language "managed solution for Kin tokens."  However, Kik made many blog posts that were intended to serve as a substitute for the "Kin Technical White paper."  Kik further admits that Mr. Livingston said the quoted language at a San Francisco blockchain conference.  Kik denies the remaining allegations in this paragraph.  Although Kik did intend to be a participant in the Kin economy, including contributions to an alternative solution to Ethereum, Kik stated that ideally, the entire blockchain technology community would be involved in this effort.  (*See* Kik's Answer to ¶ 137.)  Moreover, Kik's initial support for the infrastructure of the blockchain is common and wholly consistent with a finding that there was no investment contract.  In fact, Ethereum – which the Commission has indicated is not a security – operates based on a very similar model.

139.    As the issues were described by Kik, a coordinated, centralized effort was required to implement solutions to the existing blockchain's "scalability" and speed issues.  A decentralized group of Kin investors could not perform these functions.  Indeed, Kik stated that it intended to

use the proceeds of the token sale to finance this work by Kik employees and contractors, many of whom it identified by name in its white paper.

      **ANSWER:** Kik denies the allegations in this paragraph.  As with every aspect of the Kin economy, a "centralized" effort would be insufficient.  Kik, the Kin Foundation, and all participants in the Kin economy at large were needed to solve scalability issues with Ethereum. (*See* Kik's Answer to ¶ 137.)

140.    By the time Kik sold Kin to the general public in September 2017, Kik had not enabled Kin transactions among users of Kik Messenger that would have relied on Kin's chosen platform – the Ethereum blockchain – because doing so would have risked crashing the Ethereum network.  Also, by September 2017, it would have been impractical for Kik or any other commercial developer to engage in Kin transactions on the Ethereum blockchain, because of the slow speeds at which the blockchain would have processed those transactions, among other limitations.

      **ANSWER:** Kik denies the allegations in this paragraph.  At the time of the TDE, Kin was integrated into Kik Messenger, and the Kin economy was functional, supported by the Ethereum blockchain.  (*See* Kik's Answer to ¶¶ 16, 61, 132.)  Further, shortly after the TDE, Kin purchasers could earn and spend Kin within Kik on the Ethereum blockchain.  Ethereum had this capability at the time of the TDE.  A software developer kit was also developed that would allow any app developer to integrate Kin within their applications, supported by the Ethereum blockchain. While the current Kin blockchain is more scalable and supports a higher transaction volume, that does not negate that at the time of the TDE, the Kin economy was functional.  These improvements since the TDE have only highlighted the economy's success.

141.    Kin investors reasonably would have expected that Kik's future effort to achieve "scalability" and speed would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

      **ANSWER:** Kik denies the allegations in this paragraph.  Not only did Kik emphasize the Kin economy as a means for consumers and developers to earn and spend within digital

applications, not to passively invest, but it made clear that the success of the economy depended on substantially more than its participation.  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

Further, Kik's efforts to foster increased scalability are, at most, infrastructure-building activities – which are not "managerial or entrepreneurial" efforts under governing law.

### F.     Kik Promised It Would Create Demand For Kin By Building A "Rewards Engine"

**142.**     Kik also promised to create "the Kin Rewards Engine," an automated system that Kik would design and program to identify companies or individuals who helped to boost demand for Kin, and reward them with additional Kin.  Thus, the Rewards Engine would further develop the Ecosystem and increase the likelihood that Kik and other Kin investors would profit by incentivizing developers to make new products and services for Kin.

**143.**     <u>**ANSWER:**</u> Kik denies the allegations in this paragraph.  The white paper made clear that the Kin Foundation would be initially responsible for administering the Rewards Engine:

> The Kin Foundation will oversee the reserve of uncirculated Kin with the mandate of promoting adoption and growth of the Kin Ecosystem. Sixty percent of the total supply of Kin will be secured in a smart contract, allocated to the Kin Rewards Engine, and introduced into circulation as periodic rewards. The rewards will be distributed among ecosystem partners and the Kin Foundation.

Further, the Commission misstates the purpose of the Rewards Engine.  The Rewards Engine would be a mechanism whereby developers would finally be compensated for their contributions irrespective of incumbent players' competitive advantages, allowing smaller industry players to bridge the gap and compete with dominant players in an advertising-based business model. Allowing developers to be compensated, and therefore incentivized to create content, would facilitate a sustainable economy centered around Kin.

**144.**     Kik's white paper explained that "60 percent of the total supply of Kin will be secured in a smart contract, allocated to the Kin Rewards Engine, and introduced into circulation as periodic rewards." Thus, Kik told potential Kin investors that, through its work designing the Rewards Engine, Kik would further grow the Ecosystem and drive appreciation in value.

**ANSWER:** Kik admits that its white paper contains the language quoted in this paragraph. Kik denies the remaining allegations in this paragraph. As stated herein, while Kik employees worked on the Kin Rewards Engine, the Kin Foundation would be initially responsible for administering the Kin Rewards Engine before it ultimately it became fully algorithmic and autonomous. (*See* Kik's Answer to ¶ 143.) Further, Kik made clear that the success of the economy depended on consumers and developers, aside from Kik, adopting Kin as a medium of exchange within this new digital economy. (*See* Kik's Answer to ¶¶ 8, 9, 112.) In any event, Kik denies the remaining allegations in this paragraph. Kik proposed the Kin economy as a means for consumers and developers to earn and spend within digital applications, not to passively invest, and simultaneously made clear that the success of the economy depended on substantially more than its participation. (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

145. The white paper included a high-level overview of the Kin Rewards Engine's operations:

> Periodically, the Engine will unlock and distribute a specific amount of Kin to be shared among digital service providers in the Kin Ecosystem. The rewards that each partner receives will be proportional to a measure of the utilization of Kin within that digital service. Such value will be assessed by a well-defined process that ensures the rewards are distributed fairly using an objective, performance-based methodology.

But Kik's white paper did not provide additional details about this process – *e.g.*, how the Rewards Engine would "measure" the use of Kin in digital services, how it would "assess" the value of those uses, or how the "objective performance-based methodology" would be employed.

**ANSWER:** Kik admits that the language block quoted in this paragraph appeared in the Kin white paper. Kik denies the remaining allegations in this paragraph. The white paper was a position paper that set forth the vision of the Kin economy. As such, it would not necessarily set forth every input of the algorithm that the Kin Rewards Engine would use. Further, the white paper explained that the Kin Foundation would be responsible for administering the Rewards Engine. (*See* Kik's Answer to ¶ 143.)

146.    Consequently, its white paper made clear that Kik would oversee additional, significant future work – to be performed by Kik employees – designing the Rewards Engine and providing computer code and technological support for the Rewards Engine, all of which was described as being essential to the profitability of the Kin project.

**ANSWER:** Kik denies the allegations in this paragraph.  As stated herein, while Kik employees worked on the Rewards Engine, Kik made clear that the Kin Foundation would be responsible for administering the Rewards Engine.  (*See* Kik's Answer to ¶ 143.)  Further, Kik emphasized that its efforts alone were insufficient for the economy to be successful.  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.)

147.    Kik also expressly told investors that the Rewards Engine would not be created until after the public sale.  In a June 2017 interview, Kik's CEO stated that setting up the Rewards Engine "will be later this year [2017], or sometime next year [2018]."

**ANSWER:** Kik admits that Mr. Livingston said the quoted language in this paragraph in an interview.  Kik denies the remaining allegations in this paragraph.

148.    Furthermore, Kik communicated to potential Kin investors that Kik would not complete its work on the Rewards Engine before the public sale, when, at the June 2017 conference in San Francisco, Kik said it would "use the funds" from the public sale to build the Rewards Engine.

**ANSWER:** Kik admits that Mr. Livingston said "use the funds" at the June 2017 conference.  Kik denies the remaining allegations in this paragraph.  But Mr. Livingston's full quote revealed that the funds would be used within Kik and to "launch this whole broader ecosystem" by building infrastructure:

> So we're going to use the ***funds to join the platform and essentially build it, the transaction service, the identity service, the reward engine. To build it in all use cases inside of Kik, to get a bunch of developers building use cases outside of Kik. Basically to like launch this whole broader ecosystem.***

These infrastructural elements all fall short of "managerial" or "entrepreneurial" efforts required by *Howey*. Further, although Kik employees worked on the Rewards Engine, the Kin Foundation, a separate legal entity, was responsible for administering the Rewards Engine. (*See* Kik's Answer to ¶ 143.)

149.    In fact, on September 26, 2017, the Rewards Engine was not operational, and basic decisions about how the Rewards Engine would operate were still unresolved.

**ANSWER:** Kik denies the allegations in this paragraph. Although the Rewards Engine was being worked on at the time of the TDE, an early iteration of the Rewards Engine was operational. Specifically, the Kin Foundation would manually administer the Rewards Engine.

150.    Kin investors reasonably would have expected that Kik's future effort to build the Reward Engine would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

**ANSWER:** Kik denies the allegations in this paragraph. Not only did Kik emphasize the Kin economy as a means for consumers and developers to earn and spend within digital applications, not to passively invest, but it made clear that the success of the economy depended on substantially more than its participation. (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122.) The infrastructure of the economy, such as the Rewards Engine, is not the same as the value-generating content that the soon to be over 60 application developers have provided to the economy.

Further, Kin purchasers were told from the time of Kin's announcement through the TDE that the Kin Rewards Engine would initially be administered by the Kin Foundation, but would ultimately "be a *decentralized system based on smart contract technology*."

G.    **Kik Promised It Would Create And Support The Kin Foundation To Manage Kin**

151.    Kik's white paper emphasized that Kik would "establish the Kin Foundation to manage and encourage growth of the Kin Ecosystem." Kik's white paper also promised that, "[o]ver time, Kik will work to structure and form the Kin Foundation, a nonprofit organization to

oversee the fair and productive growth of the Kin Ecosystem." The Foundation would "administer the Kin supply and the Kin Rewards Engine" and "provide support and tools for digital services to operate more easily within the ecosystem," and, "[u]ltimately . . . [would] facilitate the entire ecosystem's transition to a fully decentralized and autonomous network." And, Kik explained that the Foundation would receive six of the ten trillion Kin that Kik created.

**ANSWER:** Kik admits that the white paper contained the quoted language, and that the Kin Foundation was established as an independent, non-profit organization to oversee the fair and productive growth of the Kin economy.  Kik also admits that the Kin Foundation would initially administer the Kin supply and the Kin Rewards Engine, however, the white paper also stated that the Kin Rewards Engine would ultimately become automated and decentralized.  (*See* Kik's Answer to ¶ 150.)  Kik admits that the Foundation received six trillion Kin after the network launched.  Kik denies the remaining allegations of this paragraph.  Specifically, this paragraph pretends that Kik and the Kin Foundation are one and the same, when they are in fact entirely separate legal entities.  (*See* Kik's Answer to ¶ 34.)

152.    Despite statements about the eventual transfer of Kin Ecosystem responsibilities to the Foundation, Kik provided no concrete timetable for this transfer.  In addition, Kik assured prospective Kin investors that Kik would dominate and control the Foundation until an undefined point in the future.  For example, at a conference in China, Kik's CEO assured the audience that the Foundation would not be independent of Kik:

> Now, we [Kik] are going to have a lot of influence over that Kin foundation, at least initially, right?  We're not going to sit there and be like, "oh, no, no, it's totally independent." . . .  Like, honestly, we're going to have influence there.

**ANSWER:** Kik denies the allegations in this paragraph.  Mr. Livingston made these comments at the Bitcoin Meetup conference in San Francisco – not China.  At the conference in China, Mr. Livingston actually said:

> So we are setting up the Kin Foundation which is meant to be this not for profit independent group overseeing the growth of this

> ecosystem. And initially Kik will play a large part in getting that foundation going. But over time this foundation will become completely autonomous and completely decentralized such that it itself is just an entity that's running on the block chain. So that not only does Kik not control it but nobody controls it. It becomes almost like a new Internet.

Moreover, Kik did not "assure" any prospective TDE purchasers that it would "dominate and control the Foundation" for any amount of time – this is entirely false.  First, "influence" is not the same as domination or control.  While Mr. Livingston serves on the Foundation Board, he cannot single-handedly control anything that the Foundation does.  (*See also* Kik's Answer to ¶ 34.)  Second, the Commission selectively omitted portions of this statement that would have shown Mr. Livingston explaining exactly how and when the Kin Foundation would become completely independent.  The un-doctored quote actually reads:

> ***We're giving a bunch of that Kin to this independent not-for-profit foundation, the Kin Foundation.*** Now, we're going to have a lot of influence over that Kin Foundation, at least initially, right?  We're not going to sit there and oh like no, no, no, it's totally independent. Like obviously it's like Kik created Kin, Kik created the Kin Foundation, you know they put ten on the board because you know we thought it was really smart or whatever. Obviously we're going to have influence there. ***But our goal is to yes, we're going to start with employees to try to get this whole thing running. But . . . what we're going to do with the Kin Foundation is move to decentralize it and to make it completely autonomous as quickly as we can. Not right away because we don't want the DAO all over again. . . . But over time we'll move it to be - OK it works, the reward engine is working, it's not gameable, everything is running and it's working and nobody has hacked it yet or it's not being hacked. Everybody agrees that it's time to make it fully autonomous[.]***

As such, Kik was clear that as soon as the Kin Foundation would be fully decentralized as soon as it could be safely operated as a "fully autonomous" entity.

**153.**  Kik did not complete paperwork for the creation of the Kin Foundation until September 12, 2017, after registration for the public sale of Kin had closed and on the day public sale buyers started to pay Ether for the tokens.  Upon creation of the Foundation and through distribution of the Kin on September 26, 2017, the Foundation was only a shell: it had no

operations independent of Kik, no employees, and no cash or other assets (except for the Kin it received on September 26, 2017) to fund operations.  After the Foundation was created, it had two directors, Kik's CEO and CFO, thereby giving Kik ultimate authority over all Foundation activities.

**ANSWER:** Kik admits that the Kin Foundation was officially established on September 12, 2017, and that it initially had two directors, Mr. Livingston and Kik's then-CFO, in their individual capacities.  Kik denies the remaining allegations in this paragraph.  This paragraph mischaracterizes the nature of the Kin Foundation and its purpose.  The Kin Foundation was never a "shell," it was established to be "an independent, nonprofit, and democratic governance body for the members of this ecosystem."  The "principal functions of the Kin Foundation [would] include the open governance of its resources together with other ecosystem partners, the support and advancement of the technology related to Kin's implementation, and all matters related to ecosystem membership, including the Kin Rewards Engine."  None of these purposes became relevant until after Kin had been launched.  Moreover, Mr. Livingston and Kik's then-CFO were appointed as Board members in their individual capacity, and in this capacity they owed a fiduciary duty to make decisions that were in the best interests of the Foundation and its goals – not Kik's.

154.    In sum, Kik told investors that, between Kik and the Kin Foundation that Kik directed, Kik would effectively own and control nine trillion Kin – 90 percent of the outstanding supply of Kin.

**ANSWER:** Kik denies the allegations in this paragraph.  As stated herein, this paragraph misrepresents Kik's relationship to the Kin Foundation.  (*See* Kik's Answer to ¶¶ 34, 150-153.)  Kik and the Kin Foundation are unequivocally separate and distinct legal entities, where Kik has absolutely no legal or other rights to the 60 percent of the Kin in circulation, owned by the Kin Foundation.

155.    Kin investors reasonably would have expected that Kik's future effort to create and, for some period of time, direct the Kin Foundation would increase the value of Kin if successful, and, therefore, that investors and Kik would reap future profits from Kik's effort.

**ANSWER:** Kik denies the allegations in this paragraph.  Kik and the Kin Foundation are entirely separate legal entities.  (*See* Kik's Answer to ¶¶ 34, 150-153.)  But more importantly, neither were under any "direction" to "increase the value of Kin" to generate "profits."  This ignores Kik's repeated and consistent emphasis on the need for consumers and developers, aside from Kik, to adopt Kin as a medium of exchange within a new digital economy.

## VII.    KIK RAISED $100 MILLION FROM KIN INVESTORS

156.    From mid-July through September 2017, Kik raised a total of approximately $100 million through sales of Kin to investors.

**ANSWER:** Kik denies the allegations in this paragraph.  Specifically, this paragraph improperly suggests that Kik conducted one sale of Kin.  However, even the facts in the Complaint make clear the pre-sale and TDE were two distinct sales, encompassing different offers, terms, and rights, where the pre-sale was exempt from the registration requirements under SEC Regulation D.  (*See* Kik's Answer to ¶¶ 1, 12, 13, 15.)

### A.    From July To September 11, 2017, Kik Sold Tokens To Wealthy Investors At A Discount

157.    From early July 2017 to September 11, 2017, Kik sold Kin by entering into SAFTs with investment funds and other wealthy investors.  Kik received approximately $49.5 million from approximately 50 investors, including 21 located in the United States who paid Kik more than $39 million.  Ten of the 21 United States-based purchasers were from the State of New York, paying Kik about $9.5 million.

**ANSWER:**  Kik admits that it entered into SAFT agreements with approximately 50 participants, and that it received approximately $49.05 million – not $49.5 million.  (*See* Kik's Answer to ¶¶ 1, 12, 15.)  Kik further admits that approximately 21 of these participants resided or had an address in the United States, and that their purchases amounted to approximately $39.3

million.   Kik denies the remaining allegations in this paragraph.   The Commission has miscalculated the amount of funds received from pre-sale participants with New York addresses.

158.    On or about September 11, 2017, Kik filed a Form D with the SEC indicating that Kik had sold securities.  Under "Type(s) of Securities Offered," the Form D stated: "Sale and issuance of rights to receive Kin tokens in the future via a Simple Agreement for Future Tokens (SAFTs)."

**ANSWER:** Kik admits the allegations in this paragraph.

159.    Kik's Form D claimed that the offering was exempt from the requirement to be registered under the federal securities laws, pursuant to the exemption for sales to accredited investors under SEC Rule 506(c).  However, the offering did not qualify for the exemption, among other reasons, because the underlying assets being sold – the Kin tokens – were offered as part of one larger non-exempt offering of securities to the general public.  Furthermore, the sale of Kin through the use of the SAFTs and in the public sale should be treated as one offering, because Kik sold the Kin as part of a single plan of financing, for the same general purpose, at about the same time, without creating different classes of Kin, and for dollars or assets that were immediately convertible to dollars.

**ANSWER:**  Kik admits that it filed a Form D with the SEC, consistent with its position that the pre-sale was exempt pursuant to Rule 506(c).  Kik denies the remaining allegations in this paragraph.  Among other things, the theory set forth in this paragraph assumes, incorrectly, that Kin tokens in and of themselves are securities.  (*See* Kik's Answer to ¶ 91.)  Further, the TDE and the pre-sale were not "one offering."  As the Complaint illuminates, the pre-sale and TDE contained vast differences, making clear they were conducted as two separate and distinct sales.  (*See* Kik's Answer to ¶ 1.)

B.    **Starting In August 2017, Kik Publicly Announced The Public Sale Process And Allowed Investors To Sign Up**

160.    On or about August 29, 2017, Kik issued a press release announcing the dates for its "token distribution event" and the process by which the general public could purchase Kin.

**ANSWER:**  Kik admits the allegations in this paragraph.

161.    In its August 29 press release, Kik told the public that interested buyers were required to sign up online with Kik by 9:00 pm Eastern Time on September 9, 2017, and that sales of tokens would commence on September 12, 2017, at 9:00 am Eastern Time.  Kik also stated that it planned to "raise a total of $125 million through its token sale," including $50 million through the already- conducted "presale round" to "select investors" such as the large investment funds that Kik identified by name.  The August 29 press release repeated Kik's promise to "drive mainstream consumer adoption of Kin, potentially making it the most adopted and used cryptocurrency in the world."

**ANSWER:**  Kik admits that its August 29, 2017 press release informed the public that "[a]ll who want to participate in the TDE must register by Sept. 9, 9:00 a.m. ET," and that this same press release announced that Kik "ha[d] successfully closed a presale round of US $50 million to select accredited investors.  Kik will look to raise a total of US$125 million through its token sale."  Kik denies the remaining allegations in this paragraph.  This paragraph plainly misquotes the article by omitting the word "accredited" in the phrase "select *accredited* investors," which made it clear that the pre-sale was a distinct transaction conducted only with accredited investors.  Kik also never "promised" to "drive mainstream adoption," rather the press release stated: "Kik *hopes* to drive mainstream consumer adoption of Kin."  And further, this paragraph mischaracterizes the circumstances surrounding the sale of Kin.  Kik never indicated that it alone could generate sufficient user adoption, and in fact repeatedly reminded purchasers that although Kik hoped to "spark the creation of this ecosystem," it "*want[ed] this ecosystem and Kin to go way beyond Kik*."  (*See* Kik's Answer to ¶¶ 119, 122.)

162.    General public investors were not provided the PPM that was provided to investors who purchased Kin via Kik's SAFTs and were not provided the information that would be contained in a registration statement, which would include, among other information, financial and managerial information about the issuer of the securities (including a history of losses), details

about the terms of the securities offering, the proposed use of investor proceeds, and an analysis of the risks and material trends that would affect the enterprise.

**ANSWER:**  Kik admits that, given the vast differences between the TDE and the pre-sale, TDE purchasers did not receive the PPM that was provided to pre-sale participants.  However, the disclosures in the PPM had no relevance to TDE purchasers.  For example, the PPM describes the terms of the SAFT, which had no relevance to TDE purchasers.  Kik denies the remaining allegations in this paragraph.  The Commission persists in its false claim that TDE purchasers and pre-sale participants participated in the same sale.  (*See* Kik's Answer to ¶¶ 1, 12, 13, 15.)  As pre-sale participants were involved in an entirely separate transaction, they received different operative documents.  (*See* Kik's Answer to ¶ 90.)  Unlike SAFT participants, there was never any "enterprise" between or among Kik and the TDE purchasers, nor was Kik ever under any obligation to disclose Kik's financial or managerial information, proposed use of proceeds, or analysis of risks and trends to either pre-sale or TDE purchasers.  (*See* Kik's Answer to ¶¶ 18, 68, 69, 90.)

163.    The PPM contained detailed descriptions of certain "Risk Factors" concerning Kik, Kin, and the Kin Ecosystem, but this information was not contained in disclosures to general public sale investors.  The PPM, for example, warned investors who purchased Kin via SAFTs that "Kik has experienced a declining usage of its messenger service over the last several years.  Such a lack of use or interest could negatively impact the development of the Kin Ecosystem and therefore the potential utility of Tokens."  Kik did not make a similar disclosure about the declining use of its app in written materials provided to general public sale investors on Kik's website.

**ANSWER:**  Kik admits that TDE purchasers did not receive the PPM provided to pre-sale participants.  Kik admits that the PPM contains the quoted language.  (*See* Kik's Answer to ¶ 162.)  Kik denies the remaining allegations in this paragraph.

164.    As Kik prepared for and rolled out the public sale of Kin, Kik and its agents continued to see investors as critical participants in the public sale's success.  Indeed, Kik's User

Registration Guide, dated August 2017 and published to the public on Kik's website, stated that "[t]he Kin token offering presents a unique opportunity for crypto investors . . . ."

**ANSWER:** Kik admits that the Kin User Participation Guide for the TDE, dated August 2017, contained the quoted language.  Kik denies the remaining allegations in this paragraph.  The term "crypto investors" does not alter the meaning or circumstances surrounding Kik's sale of Kin, which do not amount to an investment contract.  (*See* Kik's Answer to ¶ 50, n. 4.)  The substance of this very sentence, in fact, reiterates the fact that Kin was being sold for consumptive use, not for passive investment, when read in full: "[t]he Kin token offering presents a unique opportunity for crypto investors, *as Kin will offer mainstream audiences a chance to instantly interact with a cryptocurrency*."

**165.**    Before and during the public sale, Kik executives worked to get investments from "whales" – investors willing to purchase large amounts of Kin.  As people registered, a Kik executive emailed and called potential investors who said they intended to buy more than $1 million in Kin, and Kik executives discussed by email how to limit individual purchases in a way that would not frustrate the "whales." After the public sale commenced, Kik executives analyzed the amounts that buyers had purchased and considered ways to get "whales" to invest more.  In mid-September, Kik executives strategized how Kik's CEO could "network with and generate interest from high value crypto investors to participate in the Kin token sale."

**ANSWER:**  Kik admits that Kik executives contacted a number of TDE purchasers who had indicated an interest in purchasing large amounts of Kin, to offer assistance in completing their transactions and establish a point of contact within Kik.  Kik's primary goal in the TDE, as explained to the SEC Staff, was to allow "as broad a participation as possible," including large and small purchasers.  Kik's intention was not to ensure that "whales" purchased larger amounts of Kin, but rather to structure the sale fairly so that large purchasers were *able* to purchase the amount of Kin they desired.  Given the larger amounts at issue, Kik employees opted to contact these purchasers to offer themselves, as one Kik executive told the Staff, "as a resource to ask further questions about the white paper or anything that they had questions about."

Further, it is wrong to insinuate that large "whale" purchasers necessarily possessed a different intention than a smaller purchaser.  Kik had no ability or obligation to determine the subjective intent of various purchasers, but the size of a purchase is not necessarily an indicator of intent to use the token.  For example, a developer might buy a large amount of Kin in the TDE to integrate Kin into its application, which often requires a large pool of Kin to jumpstart participation.  In contrast, a more casual user might buy a very small amount, sufficient to participate in applications he or she enjoyed.  Both participants intend to use Kin tokens.

Kik also admits that its Chief Marketing Officer wrote an email stating that they were considering having Mr. Livingston attend two conferences in Kiev and Hong Kong, with the goal being "for Ted to network with and generate interest from high value crypto investors to participate in the Kin token sale."  Kik denies the remaining allegations in this paragraph of the Complaint.  This paragraph takes the quoted language out of context and incorrectly suggests that Kik executives routinely "strategized" how to generate interest form "high value crypto investors."  This was not the case.  Here, Kik's executives were deciding whether to send Mr. Livingston to two conferences, and Kik's Chief Marketing Officer wrote this email to explain one purpose Mr. Livingston might have if he attended.  But Kik ultimately decided *against* sending Mr. Livingston to these conferences, so this hypothetical language is entirely irrelevant and misleading.

**166.**   Investors who registered for the public sale were required to provide information proving their identity, including but not limited to, name, address, email, social security or passport number, a passport photo page scan, and, for some people, a photograph for face matching.  Kik used such information to verify the identity of each public sale investor, and referred to this process as a "know your customer" or "KYC" process.

**ANSWER:**  Kik admits that purchasers were required to complete a robust KYC process in order to register for the TDE, and that this process required users to submit their name, address, email, and social security or passport number.  Kik admits that purchasers indicating an interest in purchasing over $100,000 of Kin would be required to submit a passport photo page scan and

a photograph for face matching.  Kik denies the remaining allegations in this paragraph.  In keeping with its substantial efforts to ensure compliance with all applicable laws, Kik actually hired a third party contractor to administer the KYC process – something other cryptocurrency issuers had not done at the time.  Further, the KYC process was not used merely to verify the purchasers' identities – Kik's third party vendor also screened each potential purchaser through various databases, to ensure that they were not subject to sanctions.  This process also allowed Kik to exclude purchasers who were identified as being from countries or states that were prohibited in order to remain compliant.

167.    Kik relied on its KYC process to identify the citizenship, country of residence, and, where applicable, the state of residence of each public sale investor, and to decide which persons could purchase Kin and which could not.  Kik declined to sell Kin to investors from certain countries, including Canada, China, Cuba, and North Korea.  Kik also declined to sell Kin to general public investors from certain U.S. states, including New York and Washington State.

**ANSWER:**  Kik admits the allegations of this paragraph, except for its incorrect and misleading reference of TDE purchasers as "investors."

168.    Kik did not undertake, through its KYC process or otherwise, to determine whether these public sale investors qualified as "accredited investors," as that term is defined by federal securities regulations.

**ANSWER:** Kik admits the allegations of this paragraph.  As the TDE did not involve any sale of securities, but rather the purchase of a digital currency on an "as is" basis, Kik was under no obligation to ensure that TDE purchasers were "accredited" or to comply with any exemption from registration.  (*See* Kik's Answer to ¶ 1.)

169.    Kik also did not undertake to determine whether investors bought Kin with the intent to profit from their purchase or to immediately resell and distribute Kin, nor did it take any steps to exclude such persons from investing.

**ANSWER:** Kik admits that it was impossible to have ascertained the subjective intents of over 10,000 purchasers who participated in the TDE.  Kik denies the remaining allegations in this

paragraph.  Kik can only be held responsible for actions within its own control, and the allegation that Kik did not take steps to exclude passive investors is false.  For the Kin economy to succeed, Kik knew that it was vital to ensure that Kin was distributed to those with actual intent to use the token.  To that end, Kik undertook substantial efforts to deter passive investors, which began with Kik's repeated marketing of Kin as an opportunity to participate in a new economy by earning and spending a digital token among a variety of applications.  (*See* Kik's Answer to ¶ 9.)  Kik also structured the TDE in a manner that would deter passive investors, for example, by refusing to impose a minimum purchase requirement.  This would allow anyone to purchase less than $1 worth of Kin if he or she wanted (certain purchasers did in fact buy less than $1 of Kin), which is entirely inconsistent with investment intent.  And on the flip side, Kik implemented a cap on purchases to ensure that every prospective purchaser would have a full and fair opportunity to purchase Kin, and to prevent a few large players from purchasing the majority of Kin only to re-sell it on the secondary market.  The facts show that these efforts were successful: over 50 percent of TDE purchasers bought less than $1,000 of Kin, and thousands of Ethereum wallets were linked to Kik accounts after the TDE, showing that purchasers bought with intent to use the tokens.

170.    Kik continued to offer discounted Kin through SAFTs and to enter into SAFTs for the sale of Kin after announcing the date of the public sale on August 29, 2017, and after registration for the public sale closed on September 9, 2017. For example, on or about September 11, 2017, Kik entered into a SAFT that covered $1.2 million worth of Kin.

**ANSWER:** Kik admits that it continued private discussions with pre-sale participants after the TDE was officially announced, and that it entered into a SAFT agreement in the amount of $1.2 million on September 11, 2017.  Kik denies the remaining allegations in this paragraph. Kik did not sell Kin tokens pursuant to the SAFT – it sold contractual rights to receive Kin in the future contingent on a "Network Launch."  (*See* Kik's Answer to ¶¶ 1, 12.)

**C.    From September 12 To 26, 2017, Kik Sold Kin To The General Public**

171.    From September 12 to 26, 2017, Kik sold Kin to investors who were approved by Kik's KYC process.

**ANSWER:** Kik admits that between September 12 and September 26, 2017, it sold Kin to purchasers who had been approved via the KYC process conducted by Kik's third party contractor. Kik denies the remaining allegations in this paragraph as Kin purchasers were not "investors."

172.    On September 12, 2017, Kik issued a press release that explained the token distribution event's sale process. Pursuant to the process Kik outlined, investors, including investors located in the United States, sent the digital asset Ether to Kik and committed to purchasing Kin. Investors later received Kin in proportion to the Ether that they paid Kik.

**ANSWER:** Kik admits that it issued a press release entitled "Kin token distribution event starts today" on September 12, 2017, that generally described the structure of the TDE. Kik admits that purchasers – including purchasers from the United States – paid Ether in exchange for Kin tokens, per an exchange rate Kik had established. Kik denies the remaining allegations in this paragraph, as they mischaracterize Kik's press release. Nowhere in this release does the word "investor" appear. This release explains that "***TDE participants*** will have 24 hours starting on September 12, 9:00 a.m. ET to participate up to US$4,393," and then explains the timing and structure for the rest of the sale. Further, the Commission's allegation misleadingly claims that purchasers "committed to purchasing Kin" pursuant to the procedure outlined in Kik's September 12 press release. This is false. Unlike the pre-sale participants, TDE purchasers purchased Kin directly through the TDE, beginning on September 12, 2017, and received Kin immediately once the sale completed.

173.    The sale included multiple rounds. In each round, investors sent Ether to Kik to buy a proportional number of Kin. In the first round, conducted over the first 24 hours starting on September 12, 2017, investors could send Kik up to $4,393 in Ether to buy a proportional number of Kin. In the second round, which started on or about September 13, 2017, Kik removed the cap on purchase amounts, and investors could send unlimited amounts of Ether to buy Kin.

**ANSWER:** Kik admits the allegations of this paragraph, except for its incorrect and misleading reference to TDE purchasers as "investors."

174.    In total, approximately 10,000 public investors sent 168,732 Ether (then worth about $49.2 million) to Kik.  Of the approximately 10,000 public investors, approximately 3,456 were from the United States and sent about $16.8 million in Ether to Kik.  These United States-based investors included (a) two purchasers who paid about $1.6 million and about $970,000 respectively; (b) 20 purchasers who paid about or more than $100,000; (d) 223 who paid about or more than $10,000; and (d) 1,853 purchasers who paid about or more than $1,000.  Combined with those who bought Kin via Kik's SAFT, Kik raised over $55 million from United States investors.

**ANSWER:** Kik admits that approximately 10,000 total purchasers bought Kin in the TDE in exchange for a total of 168,732 Ether, which was then worth approximately $49.2 million.  Kik admits that 3,456 of these purchasers were from the United States, and that these purchases accounted for approximately $16.8 million in Ether.  Kik denies the remaining allegations of this paragraph.  This paragraph mischaracterizes the separate and distinct pre-sale of contractual rights and the TDE sale of Kin as one offering.  (*See* Kik's Answer to ¶ 1.)  Of the nearly $50 million in Ether received by Kik in the TDE, over two thirds was received from non-United States residents.  As for the remaining approximately $34 million in sales from non-U.S. purchasers, such transactions were not domestic in nature and are therefore outside of the purview of U.S. securities laws.

175.    At the time of all these sales, there was nothing to purchase using Kin, and critical elements of the decentralized economy that Kik had marketed – including a blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications, and a functioning rewards engine – did not exist.

**ANSWER:** Kik denies the allegations the allegations in this paragraph.  This paragraph is misleading and presents a false account of the facts and circumstances surrounding Kik's offer and sale of Kin.  At the time of the TDE, the Kin economy did exist.  (*See* Kik's Answer to ¶ 16.)

176.    On or about September 26, 2017, Kik issued a press release announcing that "the Kin token distribution event (TDE) has successfully ended raising nearly US$100 million."

**ANSWER:** Kik admits that on September 26, 2017, it issued a press release entitled "Kik Raises Nearly US$100 Million in Kin Token Distribution Event" that stated: "the Kin token distribution event (TDE) has successfully ended, raising nearly US$100 million." But Kik also emphasized the fact that "[m]ore than 10,000 people from 117 countries participated," which was important because Kik "*wanted as many people as possible to participate*."

### D.    Kik Delivered Kin To Itself, Investors, And The Foundation

**177.**    On or about September 26, 2017, Kik created a smart contract that generated 10 trillion Kin. Kik controlled who received those tokens.

**ANSWER:** Kik denies the allegations in this paragraph. A third party contractor, hired by Kik, created the smart contract that generated and distributed Kin. Kik could not unilaterally control or decide who received Kin tokens, the amount was predetermined and programmed into the smart contract based on the contractual terms of the SAFT agreements and the TDE purchases.

**178.**    Kik received four trillion Kin, of which Kik kept three trillion. Kik then transferred the other one trillion Kin to the approximately 10,000 general public investors and the approximately 50 investors who purchased Kin using Kik's SAFT. Pursuant to the terms of the SAFTs, however, only half of the Kin purchased via SAFTs were delivered; the other half were to be delivered on the one-year anniversary of the distribution.

**ANSWER:** Kik admits the allegations in this paragraph, except for the misleading and incorrect use of "investor," as well as any suggestion that the pre-sale and TDE were one sale.

**179.**    Kik also caused the Kin Foundation, which it had established only a few weeks earlier, to receive six trillion Kin.

**ANSWER:** Kik denies the allegations in this paragraph. Kik caused a smart contract to be created, which distributed six trillion Kin to the Kin Foundation, and that the Kin Foundation was formally created on September 12, 2017.

**180.**    The Kin that Kik kept and caused the Kin Foundation to receive are all identical and fungible with the tokens that Kik sold and distributed (via SAFT or public sale). Kin tokens

each provide their holders with the same rights. Different classes of Kin do not exist, and no Kin tokens represent superior rights or special value or privileges over other Kin.

**ANSWER:** Kik admits that all Kin tokens are the same. Kik admits that both pre-sale investors and TDE purchasers eventually received Kin tokens. Kik denies the remaining allegations in this paragraph. This paragraph attempts to tack the pre-sale and TDE together for the simple reason that both ultimately received the same Kin – but this is irrelevant. For example, one transaction selling an interest in a condominium could be an investment contract, whereas another is not, all depending on the attendant facts and circumstances. Here, the facts and circumstances of the pre-sale and the TDE are entirely different, which means they are separate offerings. (*See* Kik's Answer to ¶¶ 1, 12, 13, 15.) Further, Kin tokens grant their owners ***no rights whatsoever***, aside from a property interest in Kin. Kin is a medium of exchange, it does not carry voting rights, nor does it grant owners any "special value or privileges" beyond the mere ownership of a token.

181. Kik imposed no resale or use restriction on any of the Kin distributed on September 26, 2017.

**ANSWER:** Kik admits the allegations in this paragraph. Kik had no ongoing contractual relationship with TDE purchasers or SAFT participants after Kin were distributed. Kik notes that 50 percent of SAFT participants' tokens did not get distributed to the smart contract until one year after the TDE.

182. Following the token distribution event, investors who had purchased Kin at a discount through SAFTs began to liquidate their Kin holdings for a profit.

**ANSWER:** Kik has no basis to admit or deny facts outside of its personal knowledge. Kik admits that, to its knowledge, some Kin owners sold Kin, and that some sold at a price that was higher than the Kin's value as of the time of the transaction.

183. If the value of Kin rises or falls, the change in value will affect the value of all of the Kin tokens, whether such tokens are held by Kik, the Foundation, or investors.

**ANSWER:** Kik admits that all Kin tokens are the same.  Because Kin is valued by principles of supply and demand in the market, Kik admits that presumably all Kin tokens are valued at the same price on any given day.  The same is true for anyone who holds U.S. dollars, or any other currency or commodity.  Kik denies the remaining allegations in this paragraph.

184.    Kin investors had no contractual or other obligation to help create, build, or support the Ecosystem or otherwise to create demand or increase the value of Kin.  Many Kin investors, including investors who bought Kin in the public sale, bought quantities of Kin that were not commensurate with an intent to use the tokens to buy goods and services.

**ANSWER:** Kik admits that Kin owners purchased Kin tokens "as is," and that no ongoing contractual relationship existed between Kin owners and either Kik or the Kin Foundation from either end.  Kik denies the remaining allegations.  Kin owners were not obligated to help "create, build, or support the Ecosystem;" rather, they were encouraged and incentivized to participate by spending and earning Kin due to the valuable goods and services being offered by third party developers and Kik itself.  Developers were incentivized to offer such valuable services by the Kin Rewards Engine, which rewarded desirable contributions.  But at a basic level, no quantity of Kin is necessarily inconsistent with an intent to use tokens.  (*See* Kik's Answer to ¶ 165.)

185.    When Kik distributed Kin on September 26, 2017, the success and future value of Kin tokens depended on Kik's efforts.  If, after that date, Kik did not try to develop the Kin Ecosystem or stopped operating altogether, the promises Kik made when marketing the tokens could not, and would not, have been kept.

**ANSWER:** Kik denies the allegations in this paragraph.  The success and future value of Kin tokens was solely a function of market forces.  Further, Kik owed no ongoing contractual obligation to Kin owners beyond delivering Kin tokens.  Kik's sole "promise" to Kin purchasers was the Terms of Use, which made no promises to develop or build the Kin economy.  Kik never even informally promised to develop the Kin economy; rather, it said the opposite.  Although Kik indicated that it would integrate Kin in its messaging application to jumpstart the Kin economy, it always reiterated that "we [Kik] ***can't do this alone***.  We can't do it alone from a technology

perspective.  We can't do it alone from a digital service perspective.  ***This really does have to be a community effort***."  (*See* Kik's Answer to ¶¶ 8, 9, 112, 119, 122, 124, 127, 133.)

### E.    Kik Pooled The Proceeds Of The Sale Of Kin

**186.**    Kik pooled the proceeds of the sale of Kin into two Kik bank accounts – one in California and the other in Canada – and in the company's digital Ether "wallet." Kik exchanged most, but not all, of that Ether for United States dollars, which Kik deposited in the California bank account.

**ANSWER:** Kik admits that it deposited the proceeds from the sale of Kin, which it treated as revenue and paid taxes on, into two Kik bank accounts and Kik's Ether wallet.  However, Kik denies the claim that it "pooled" proceeds, which would require that there is an ongoing relationship amongst purchasers or some common enterprise.

**187.**    Kik did not distinguish between funds received through SAFTs, funds received from the general public, or funds the company previously had on hand from venture capital investment or company operations.

**ANSWER:** Kik denies the allegations in this paragraph.

**188.**    Neither the Kin Foundation nor Kin investors had control over how the proceeds of the Kin sale were spent.  Kik possessed sole discretion.

**ANSWER:** Kik admits that it had control over the revenue it received from selling contractual rights in the pre-sale and Kin in the TDE.  Kik denies the remaining allegations in this paragraph.

**189.**    Accordingly, the fortunes of each Kin investor were tied to one another and to the success of the overall venture, including the development of a Kin Ecosystem, integration with Kik Messenger, creation of the Rewards Engine, and implementation of a new transaction service and/or bespoke blockchain.  Investors' profits were also tied to Kik's profits based on Kik's significant holdings of Kin.

**ANSWER:** For the reasons stated herein, Kik denies the allegations in this paragraph.

**CONCLUSION**

190.    Investors' purchases of Kin were an investment of money, in a common enterprise, with an expectation of profits for both Kik and the offerees, derived primarily from the future efforts of Kik and others to build the Kin Ecosystem and drive demand for Kin.  Consequently, Kik's offer and sale of Kin in 2017 was an offer and sale of securities.

**ANSWER:** Kik denies the allegations in this paragraph.  The Commission's claims rely on a fundamentally flawed factual and legal premise.  As Kik will show, the Commission has selectively edited the facts to carve out a story that it believes satisfies the relevant law.  In reality, Kik offered and sold the public a remarkable new idea: a frictionless, fair, and economically beneficial digital currency that would form the basis of a new economy.  This currency would allow developers to monetize users' authentic engagement with valuable digital services, including games, messaging services, video streaming, and social media, in an unprecedented way.  And it would allow users to quickly and seamlessly transact with their favorite applications, as well as fellow users who positively contributed to the Ecosystem.  On these facts, the Commission's claim cannot pass muster.  Kik's TDE was simply not an offer or sale of securities.

191.    Because Kik offered and sold securities, Kin investors were entitled to all of the protections and disclosures of the federal securities laws – protections and disclosures that were all the more important given the novel technology at issue here.

**ANSWER:** Kik denies the allegations in this paragraph.  Kik's pre-sale was exempt pursuant to SEC Regulation D, and the TDE did not constitute an offering of securities.

**CLAIM FOR RELIEF**

**Violations of Section 5(a) and (c) of the Securities Act**

192.    The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 191, inclusive, as if they were fully set forth herein.

**ANSWER:** Kik reincorporates its answers to Paragraphs 1 through 191 above.

193.    Federal securities laws require that companies disclose certain information through the registration with the SEC of the offer or sale of securities.  This information allows investors to make informed judgments about whether to purchase a company's securities.

ANSWER:  Kik admits the allegations in this paragraph.

194.    By engaging in the conduct described above, Kik offered and sold securities without a registration statement in effect and without an exemption from registration.

ANSWER:  For the reasons stated herein, Kik denies the allegations in this paragraph.

195.    From May to September 2017, Kik conducted an offering of securities, in the form of an offering of one trillion Kin tokens.  In connection with this offering, Kik sold a portion of the one trillion tokens at a discount to investment funds and other wealthy investors pursuant to SAFTs and sold another portion of the tokens through a process culminating in the September 2017 token distribution event.  The offering and component sales were required to be registered with the SEC unless an exemption applied.  However, neither the offering nor component sales were registered with the SEC, and no registration exemption applied to the offering or to any of these sales.

ANSWER:  Kik denies the allegations in this paragraph.  (*See* Kik's Answer to ¶ 1.)

196.    Kik received a total of approximately $100 million as a result of its offering and related sales.

ANSWER:  Kik admits that it received approximately $100 million between the pre-sale investments and the revenue from the TDE sale.  Kik denies the characterization of these separate sales as a single "offering."  (*See* Kik's Answer to ¶ 1.)  Moreover, over $34 million in sales in the TDE derived from non-U.S. transactions that are not subject to regulation by U.S. securities laws.

197.    Investors who bought Kin tokens through the offering and component sales made an investment of money in a common enterprise with Kik and with each other, and reasonably would have been led to expect profits derived from the entrepreneurial and managerial efforts of Kik and its agents.

**ANSWER:** Kik denies the allegations in this paragraph.

198.     Kik filed a Form D with the SEC with respect to the Kin offered and sold via the SAFTs; however, those offers and sales were not exempt from registration under SEC Regulation D, which was promulgated under the Securities Act.  The exemption does not apply because the offer and sale of Kin via Kik's SAFTs was part of a single offering of Kin to the general public that raised $100 million, or, in the alternative, was integrated with the offering of Kin whose sales began on September 12, 2017, and neither the totality of the offering nor the non-SAFT portion of it was limited to accredited investors.  In addition, Kik did not exercise reasonable care to assure that the purchasers of Kin via the SAFTs were not statutory underwriters of Kin within the meaning of Section 2(a)(11) of the Securities Act.

**ANSWER:** Kik admits that it filed a Form D with the SEC with respect to its pre-sale, which was conducted via SAFT agreements.  Kik denies the remaining allegations in this paragraph.  (*See* Kik's Answer to ¶¶ 1, 12, 13, 15.)

199.     As a result of the conduct described above, Kik violated Section 5(a) of the Securities Act, which states that unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

**ANSWER:**  Kik admits that this paragraph accurately reflects the requirements under Section 5(a), but denies the remaining allegations.

200.     Also as a result of the conduct described above, Kik violated Section 5(c) of the Securities Act, which states that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

**ANSWER:** Kik admits that this paragraph accurately reflects the requirements under Section 5(c), but denies the remaining allegations in this paragraph.

## III.   AFFIRMATIVE DEFENSES

Without assuming the burden of proof for such defenses that it would not otherwise have, Kik asserts the following affirmative defenses:

### FIRST DEFENSE

For the reasons set forth above, Kik did not violate Section 5 of the Securities Act because its offer and sale of Kin in 2017 did not amount to an "investment contract."  But if the phrase "investment contract" is defined in a way that applies to Kik's offer and sale of Kin in 2017, the phrase is unconstitutionally vague, and judgment should be entered for Kik.

The Due Process Clause of the United States Constitution requires that "laws be crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them.'"  *Gen. Media Comm., Inc v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997) (*quoting Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  As the Supreme Court has put it:

> Vague laws offend several important values.  First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  ***Vague laws may trap the innocent by not providing fair warning***.  Second, if arbitrary and discriminatory enforcement is to be prevented, ***laws must provide explicit standards for those who apply them***.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications (footnotes omitted).

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (emphasis added) (citation omitted); *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, (2012*)* ("[F]irst, . . . regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not

act in an arbitrary or discriminatory way."). Accordingly, a statute is unconstitutionally vague if either (1) it does not provide sufficient notice to those who are governed by it, **_or_** (2) it does not adequately cabin the discretion of those who apply it. *See Farid v. Ellen*, 593 F.3d 233, 243 (2d Cir. 2010). These considerations are especially important for statutes, such as Section 5, that purport to impose strict liability. *See Hoffman Estates*, 455 U.S. at 499. If applied to Kik's offer and sale of Kin in 2017, the definition of "investment contract" is unconstitutionally vague both because it did not provide sufficient notice to Kik and because it did not adequately cabin the SEC's discretion to apply it.

**_At the time of the TDE, Kik did not have adequate notice of whether its offer and sale of Kin would constitute an "investment contract."_** Kik announced the Kin project in May of 2017, eight years after the introduction of Bitcoin, and three years after the introduction of Ether. Each of Bitcoin and Ether was introduced as a medium of exchange for goods and services, but when first launched, neither Bitcoin nor Ether had any utility. Indeed, Ether tokens were not created or distributed until almost a year after the Ethereum project was funded and launched. For some period after the launch of Ethereum, the Ethereum Foundation maintained an active role in the Ethereum ecosystem, hiring employees, administering developer grants, holding a developer conference, and ensuring security for the Ethereum blockchain network. Once launched, both Bitcoin and Ether were bought and sold on secondary market exchanges, and some number of speculators bought and sold both cryptocurrencies in an effort to profit from changes in market prices.

Notwithstanding all that, by the time Kik announced the Kin project in May of 2017, no court or regulator had ever deemed the offer or sale of any cryptocurrency—not Bitcoin, not Ether—to be an "investment contract" under the federal securities laws. In 2015, the Commodity Futures Trading Commission announced its view that virtual currencies like Bitcoin and Ether are "commodities," and in 2014, the Internal Revenue Service announced its view that the receipt of cryptocurrencies is taxable income. But despite this attention from other regulators (whose positions were fully consistent with the treatment of digital assets as currencies), in the eight years

after Bitcoin was first introduced, the SEC remained virtually silent on the question of whether and how the federal securities laws might apply to offers and sales of cryptocurrencies. This remained true even as cryptocurrencies like Bitcoin and Ether gained widespread attention and use, and as dozens and then hundreds of market participants launched projects involving cryptocurrencies.

Indeed, the SEC issued no meaningful public comment on this issue until July of 2017, when it released a report concerning a cryptocurrency called the DAO token.  This report, called the DAO Report, expressed the Commission's view that the offer and sale of a cryptocurrency could be an "investment contract" under the test set forth by the Supreme Court in *Howey*.  But at least as to Kik's plan to sell Kin tokens, the DAO Report did not provide "'sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices,'" as required by the Due Process Clause.  *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008) (quoting *Arriaga* v. *Mukasey*, 521 F.3d 219, 224 (2d Cir. 2008)).  Among other things, the DAO Report stressed that, in the Commission's view, the application of the *Howey* test to the offer or sale of a cryptocurrency would depend on the specific "facts and circumstances" of the transaction.  (DAO Report of Investigation at 17-18 ("Whether or not a particular transaction involves the offer and sale of a security— regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction").)  This meant that a finding of an "investment contract" based on one set of "facts and circumstances" would provide little or no guidance about how the test would apply to different facts.  Moreover, nothing in the DAO Report suggested that a token (like Kin) that was designed and marketed as a digital currency for earning and spending could fall within the definition of an "investment contract" under the federal securities laws, as the Commission interpreted that phrase.

Indeed, as Kik noted publicly at the time of the DAO Report, the DAO token had several features that sharply distinguished it from Kin, and so nothing in the DAO Report suggested that the offer and sale of Kin would be deemed an investment contract under *Howey*.  Thus, after the DAO Report came out but before the TDE, Mr. Livingston publicly commented that the

Commission's analysis of the DAO token made "complete sense to [Kik] and [was] fully expected" because, among other things, the token at issue in the DAO Report entitled participants to vote and receive "rewards," which the co-founder compared to "buying shares in a company and getting . . . dividends," and the company informed investors that it would fund projects in exchange for a return on investment.  Mr. Livingston then observed that, at the time of Kik's 2017 sales of Kin "when you look at the utility token side, ***there [was] no guidance given on that***." Many industry observers expressed similar views, noting the particular "facts and circumstances" that informed the Commission's analysis of the DAO token, as well as the lack of any discussion in the DAO Report about tokens that were designed to be used as digital currencies or that would be integrated into digital applications.  No reasonable observer would have understood the DAO Report to suggest that the SEC would seek to apply the federal securities laws to nearly all of the many cryptocurrencies sold to the public at around that time, much less that it would seek to apply those laws to Kik's offer and sale of Kin.

In fact, by the time of the TDE in September of 2017, hundreds of different tokens had been offered and sold to the public, and ***not one seller had filed a registration statement with the Commission***.  These offers and sales of digital tokens, without filing registration statements, continued even after the DAO Report was issued in July of 2017.  Clearly, Kik was not alone in believing that its token was significantly different from the DAO token, and that the "facts and circumstances" of Kik's token sale (the TDE) should result in a different conclusion under the test set forth in *Howey*.  Among other things, unlike Kik's offer and sale of Kin, (1) the DAO project was marketed as solely an investment opportunity, (2) DAO tokens entitled holders to voting rights, where holders collectively selected which projects to fund, and therefore functioned as effectively a venture capital fund, (3) holders received pro rata dividend rights to the profits that each project generated, and (4) the token had no use aside from entitling the purchasers to the right to future profits from joint ventures.  These distinctions, coupled with the fact that the Commission had taken no action against either Bitcoin or Ether, strongly suggested that the Commission, at least, would not view the offer and sale of Kin to be an "investment contract."

In fact, Kin had far more in common with Bitcoin, for example, than with the DAO token. Much like Bitcoin, Kin was proposed as a decentralized digital currency. Moreover, unlike either Bitcoin (or Ether)—neither of which had been deemed a security at the time of the TDE—Kin had utility right away. A reasonable person, in Kik's position at the time of the TDE, would look to the lack of any Commission enforcement action against Bitcoin and Ether and would conclude that tokens with similar characteristics would also be outside the scope of the federal securities laws. In fact, Kik's consultant, who the Commission heavily cites in its Complaint, believed prior to the TDE that "*[i]n the case of a community currency, there is a good basis to argue that this is not a security. You're just selling units of property that you created that are used for a particular purpose in your app.*"

Indeed, when the Commission first approached Kik about the TDE in September of 2017, it did not take the position that the TDE involved the offer and sale of an "investment contract," even though the Commission was already aware of all the public statements that it now cites in its Complaint, nor did it make any attempt to stop the ongoing TDE, as it has done in other matters. Rather, the Commission asked Kik to produce certain materials voluntarily, and stressed that "the investigation does not mean that we have concluded that you or anyone else violated the law."

*Events since the TDE have also made clear that the term "investment contract" does not cabin the discretion of those who enforce it, including the Commission.* Since the TDE, the Commission has very slowly and fitfully issued a range of public statements about the application of the federal securities laws to cryptocurrencies. But far from clarifying the issue, the Commission's public statements since the TDE have created even more confusion, and have confirmed that, as applied to Kik's offer and sale of Kin in 2017, the definition of "investment contract" (as urged by the Commission) is hopelessly vague, and leaves the Commission free to engage in arbitrary and discriminatory enforcement in this space.

For example, Chairman Clayton has made numerous statements directly contradicting each other: in December 2017, he stated: "there are cryptocurrencies that *do not* appear to be securities." (Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017),

https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.)   Just two months later, on February 6, 2018, he told the Senate Banking Committee that "I believe **every** *ICO* I've seen is a security."   (Stan Higgins, *SEC Chief Clayton: 'Every ICO I've Seen is a Security*,' CoinDesk (Feb. 6, 2018), https://www.coindesk.com/sec-chief-clayton-every-ico-ive-seen-security.)   On April 5, 2018, Chairman Clayton suggested that the application of the federal securities laws to a given cryptocurrency could vary over time, noting that, "[j]ust because it's a security today doesn't mean it'll be a security tomorrow, and vice-versa."   (Nikhilesh De, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (April 5, 2018), https://www.coindesk.com/sec-chief-not-icos-bad.)   Just two months later, when asked to confirm this position, he appeared to back off, saying: "that is a question that is out there, and we'll be answering the specific facts and circumstances, but we've been doing this a long time and there's no need to change our fundamental approach."   (*SEC Chairman Jay Clayton*: *Cryptocurrencies Like Bitcoin Are Not Securities*, CNBC (June 6, 2018), https://www.youtube.com/watch?v=8YtZJRUak8E.)   Tellingly, Chairman Clayton himself has acknowledged that additional legislation is necessary to clarify the rules in the space, telling the U.S. Senate Committee on Banking, Housing and Urban Affairs in February that "[w]e may be back with our friends from the U.S. Treasury and the Fed to ask for additional legislation."   (Pete Rizzo & Stan Higgins, *New Regulation for Crypto? Senate Hearing Sees Debate*, CoinDesk (Feb. 6, 2018), https://www.coindesk.com/crypto-need-new-regulation-us-senate-re-opens-debate.)

Other senior SEC officials have further complicated this picture.  For example, in June 2018, Commission Director of Corporation Finance, William Hinman, echoed Chairman Clayton's earlier suggestion that token transactions can evolve from being a security to a non-security, using Bitcoin and Ether as examples.  (William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.)  However, Director Hinman provided no explanation as to where this line would be drawn, or even when or why Bitcoin and Ether first fell outside the purview of the federal securities laws.  Nor did he opine on whether their consumptive use is enough in and of itself for

transactions in each respective token to not be deemed "investment contracts." Instead, he listed numerous factors for token sellers to consider, suggesting that sellers should initially register their sales and would be able to deregister once the ecosystem was "sufficiently decentralized." But Director Hinman offered no guidance at all on what "sufficiently decentralized" meant. Apparently, it means whatever the Commission wants it to mean in a given case. This is precisely the type of vagueness that invites arbitrary and discriminatory enforcement.

The Commission's willingness to change the rules on the fly is reflected even in its Complaint against Kik. In his June 2018 speech, Director Hinman said that, in matters involving digital tokens, the existence of a security depends not on the nature of the token itself, but rather on the facts and circumstances of the offer and sale of the token. To that end, he said, "the token – or coin or whatever the digital information packet is called – all by itself is not a security." (*Id*.) But despite that clear statement from Director Hinman, the Commission's Complaint against Kik in this case alleges, with respect to Kik's pre-sale, "[a]lthough Kik's SAFT specifically stated that the SAFT was itself a security, it failed to state that the Kin to be delivered under the SAFT were securities sold pursuant to the SAFTs." (Complaint ¶ 91.) The Complaint apparently jettisoned Director Hinman's guidance in an attempt to support the Commission's (incorrect) claim that the pre-sale under the SAFT and the TDE under the Terms of use, amounted to a single transaction. (*See* Kik's Answer to ¶ 1.) Nonetheless, the Commission does not claim that Kin that is being used today is in and of itself a security. Nor does it claim that transactions in Kin are "investment contracts."

Notably, recognizing the confusion of her own colleagues' positions, Commissioner Hester Peirce has recently stated that, "[i]f you apply the reasoning that some of my colleagues at the SEC have used, there are lots of things that would [qualify as] securities," using Starbucks gift cards and Chuck E. Cheese tokens as examples. (Rey Mashayekhi, *U.S. Risks Falling Behind the World in Embracing Crypto, Warns 'Crypto Mom' SEC Commissioner*, Fortune (July 16, 2019), https://fortune.com/2019/07/16/u-s-risks-falling-behind-warns-crypto-mom-sec-commissioner/.)

Given such a statement by one of the Commission's five Commissioners, the Commission's discretion to enforce the term "investment contract," is clearly not "cabined."

Members of Congress have similarly expressed considerable frustration with the lack of clear guidance from the Commission.  On September 29, 2018, 15 Members wrote Chairman Clayton a letter expressing concern that they "believe[d] that the SEC could do more to clarify its position."  (Ltr. from Representative Ted Budd, et al., to Chairman Clayton (Sept. 28, 2018), https://budd.house.gov/uploadedfiles/budd_davidson_emmer_soto_sec_letter_final.pdf.)     They went on to write, "[we] believe that formal guidance may be an appropriate approach to clearing up legal uncertainties which are causing the environment for the development of innovative technologies in the United States to be unnecessarily fraught." (*Id.*)  The fact that Congress, which wrote the statute in question, felt the need to send a letter to the Commission expressing concern about the lack of regulatory clarity, is telling, and strongly supports a finding of vagueness as applied to Kik's sale of Kin in 2017.

But Congress is not the only entity expressing frustration and concern about the lack of clear guidance in this space.  Just a few days before Congress' letter to Chairman Clayton, over 50 private sector representatives from traditional finance and cryptocurrency industries gathered in Washington D.C. for an event hosted by Congressman Warren Davidson dubbed "Legislating Certainty for Cryptocurrencies."  (Kate Rooney, *Wall Street, venture capitalists and crypto companies descend on Capitol Hill to debate regulation*, CNBC (Sept. 25, 2018), https://www.cnbc.com/2018/09/24/lawmakers-venture-capitalists-and-crypto-companies-descend-on-on-capitol-hill-to-debate-regulation.html.)   These representatives, which included Nasdaq, Fidelity, Andreessen Horowitz, and Coinbase, voiced concern about the uncertain nature of US regulation of cryptocurrencies and the *Howey* test, and expressed fear that this innovation would have to move overseas.

Sadly, it appears that the lack of regulatory guidance from the Commission is no accident, but instead is designed to prevent industry participants from knowing, in advance, what conduct will be subject to regulation under the federal securities laws—which is precisely one of the

reasons why vague statutes and regulations offend Due Process.  At a blockchain conference in Washington D.C. on April 3, 2018, a very senior Commission Staff member stated: "I think if you were to start down the road of being very prescriptive and putting out specific releases about hypothetical situations, not only would you probably waste a lot of time, you would probably create a road map to get around it."  (Kirill Bryanov, *What Do We Know About Valerie Szczepanik, the First Crypto Czar*, Cointelegraph (June 12, 2018), https://cointelegraph.com/news/what-do-we-know-about-valerie-szczepanik-the-first-crypto-czar.)  In plain English:  the Commission does not want to issue "prescriptive" guidance because doing so would tell companies, in advance, how they could comply with the law and avoid regulation under the federal securities laws.  Simply put, for the Commission, the lack of comprehensive guidance telling people, in advance, how to comply with the law is a feature, not a bug.

Further muddying the waters, the Commission has foregone the typical formal rulemaking process wherein it seeks public comment and provides notice of its enforcement strategy.  (*See Rulemaking: How it Works*, https://www.sec.gov/fast-answers/answersrulemakinghtm.html (last modified April 6, 2011)).  This rulemaking process "involves several steps that are designed to give members of the public an opportunity to provide their opinions on whether the agency should reject, approve, or approve with modifications a rule proposal."  (*Id.*) Then, once the rule is approved by the Commission, the Commission specifies that "the date by which the public must come into compliance with a new or amended rule (the Compliance Date) *may be delayed or phased in to ensure the transition is a smooth one*."  (*Id.*)  This means that, even when the Commission goes through the proper channels and releases specific guidelines on how to comply with a new rule or interpretation of a prior rule, the Commission delays the compliance date to ensure that the public has time to conform its conduct to the new rule.  Not only was there no specific guidance or formal process – Kik was expected to retroactively comply with the vague guidance it did receive.

Evidencing this flawed approach to "guidance," the Commission has released a "framework" of thirty eight factors purporting to assess whether the sale of a token constitutes an

"investment contract."   But, by the Commission's own admission, the factors set forth in this framework "are not intended to be exhaustive in evaluating whether a digital asset is an investment contract or any other type of security, and no single factor is determinative . . . ."   No reasonable person would be able to balance 38 factors and have any clarity on whether his or her conduct would violate the federal securities laws.   In fact, Commissioner Pierce appears to agree, and has publicly stated:

> I worry that non-lawyers and lawyers not steeped in securities law and its attendant lore will not know what to make of the guidance. Pages worth of factors, many of which seemingly apply to all decentralized networks, might contribute to the feeling that navigating the securities laws in this area is perilous business. Rather than sorting through the factors or hiring an expensive lawyer to do so, a wary company may reasonably decide to forgo certain opportunities or to pursue them in a more crypto-friendly jurisdiction overseas.

(Hester M. Peirce, *How We Howey* (May 9, 2019), https://www.sec.gov/news/speech/peirce-how-we-howey-050919.)   Commissioner Pierce is exactly right, as journalists and the cryptocurrency and blockchain industry generally have continued to express frustration and confusion over time as to whether the federal securities laws apply to cryptocurrency transactions, and if so, which ones.

The Commission's efforts on the enforcement front have only added to the confusion.   In the DAO Report, the Commission purported to apply the test set forth by the Supreme Court in *Howey* to determine whether the offer and sale of the DAO Token gave rise to an investment contract.   (DAO Report of Investigation at 11.)   Among other things, that analysis included the question of whether there was a "common enterprise," an element of the *Howey* test that the Supreme Court has reiterated many times, and that every Circuit Court of Appeal in the country has recognized as a key part of the "investment contract" analysis.   In a series of consent orders crafted by the Commission's Division of Enforcement, however, the Commission has essentially read the "common enterprise" element out of the test, making no effort to show that any of the projects at issue in those enforcement matters involved the type of "common enterprise" that the

Supreme Court discussed in *Howey*. The Commission's efforts to modify *Howey*'s definition of "investment contract" further illustrates just how malleable that definition is in this context, and creates even more opportunities for arbitrary and selective enforcement by the SEC. As such, it further supports a finding that the term is impermissibly vague as applied to Kik.

\* \* \*

Given the foregoing, as applied to Kik's sale of Kin in 2017, the phrase "investment contract" is unconstitutionally vague because it did not give Kik notice that its conduct would be subject to Section 5, and because it did not adequately cabin the Commission's discretion in enforcing Section 5. Accordingly, even if the phrase "investment contract" is defined in a way that applies to Kik's offer and sale of Kin in 2017, the Commission's claim against Kik is barred by the Due Process Clause of the Fifth Amendment to the Constitution of the United States, and judgment should be entered for Kik.

**<u>SECOND DEFENSE</u>**

Under Rule 506 of SEC Regulation D, Kik's pre-sale of contractual rights pursuant to a SAFT is exempt from the registration requirement of Section 5. Accordingly, with respect to the pre-sale and the approximately $50 million that Kik received in the pre-sale, judgment should be entered in favor of Kik.

Under Rule 506 of SEC Regulation D, the sale of an instrument to an "accredited investor," is exempt from the registration requirements of the federal securities laws, subject to a number of conditions. These conditions include, among other things: taking reasonable steps to verify the status of accredited investors and filing Form D with the Commission. Notably, Chairman Clayton has recognized the Regulation D exemption's applicability to token sales:

> It is possible to conduct an ICO without triggering the SEC's registration requirements. For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an initial coin offering that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements.

(Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings* (December 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.)

Kik complied with the requirements of Rule 506.  Although the Commission disputes the exemption, it did not identify a single requirement of Rule 506 that Kik did not comply with. Indeed, Kik conducted diligence on each of the 50 pre-sale participants to ensure that they were "accredited," and included language in the SAFTs, required by Rule 506.  Further, on September 11, 2017, Kik filed a Form D with the Commission to formalize the exemption.

In its Complaint, the Commission appears to claim that the pre-sale is not an exempt sale because it is either (1) part of one "offering" with the TDE or (2) "integrated" with the TDE. Contrary to the Commission's assertion, however, the distribution of Kin in 2017 involved two entirely separate transactions: (1) a pre-sale of contractual rights pursuant to SAFTs, on the one hand, and (2) the sale of Kin to the public pursuant to "Terms of Use," on the other hand.  Because of significant differences between the pre-sale and the TDE, Kik decided to structure the pre-sale as a sale to accredited investors exempt from registration with the Commission under SEC Regulation D.  (*See* Kik's Answer to ¶¶ 1, 156.)

In the pre-sale, which occured before the TDE, Kik sold to accredited investors the conditional right to receive Kin in the future at a discount.  Pre-sale participants received private placement memoranda and signed SAFT agreements.  Under the SAFTs, pre-sale participants would receive 50 percent of their Kin if and when a "Network Launch" (initial functionality of Kin within Kik) occurred and the remaining 50 percent of their Kin a year later.  If a Network Launch did not occur, pre-sale participants would forfeit 30 percent of the amount they contributed.  Kik capped the pre-sale at $50 million, all received in U.S. dollars, despite receiving millions more in interest, to ensure that the public would have an opportunity to purchase Kin in the TDE.  Kik also filed a Form D with the SEC in September 2017 to formalize the exemption.

In the TDE, a separate and subsequent transaction, Kik sold around $50 million worth of Kin to around 10,000 public purchasers, more than two thirds of whom live outside of the United States.  Unlike the pre-sale participants, who purchased a conditional contractual right under the

SAFTS to receive Kin in the future, TDE purchasers bought Kin tokens directly under the completely different "Terms of Use," and paid in Ether – not U.S. dollars.  Furthermore, unlike in the pre-sale, the TDE imposed a time-limited cap on initial Kin purchases: during the first 24 hours of the TDE, purchasers could not buy more than $4,400 worth of Kin.  This was to "ensure all registered participants had a fair chance to purchase" Kin.  Because Kik did not sell an "investment contract" or any other enumerated "security" in the TDE, Kik did not register the TDE with the SEC.

The pre-sale was conducted pursuant to a valid exemption, which was not part of "one offering" or integrated with the TDE.

### THIRD DEFENSE

The Commission's claims are barred because Kik is not subject to general or specific personal jurisdiction in this Court.

## IV.   DEMAND FOR JURY TRIAL

Kik requests a trial by jury for all issues so triable.

***

Dated: August 6, 2019                    Respectfully submitted,


                                         By: /s/ *Patrick E. Gibbs*
                                         _____
                                              Patrick E. Gibbs (*Pro Hac Vice*)
                                              Luke T. Cadigan (*Pro Hac Vice*)
                                              Sarah M. Lightdale (4395661)
                                              Brett H. De Jarnette (*Pro Hac Vice*)

                                              Cooley LLP
                                              3175 Hanover Street
                                              Palo Alto, CA  94304-1130
                                              Phone: (650) 843-5000
                                              Fax:    (650) 849-7400
                                              Email: pgibbs@cooley.com;
                                              lcadigan@cooley.com;
                                              slightdale@cooley.com;
                                              bdejarnette@cooley.com

                                              Attorneys for Defendant
                                              KIK INTERACTIVE INC.


                                              Kenneth R. Lench (*Pro Hac Vice
                                              forthcoming*)

                                              Kirkland & Ellis LLP
                                              655 Fifteenth Street, N.W.
                                              Washington, D.C. 20005-5793
                                              Phone: (202) 879-5270
                                              kenneth.lench@kirkland.com

                                              Attorney for Defendant
                                              KIK INTERACTIVE INC.