UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,                        Case No.  19-cv-5244 (AKH)

         vs.

KIK INTERACTIVE INC.

                              Defendant.

MEMORANDUM OF LAW OF PLAINTIFF U.S. SECURTIES AND EXCHANGE
COMMISSION IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS
AS TO DEFENDANT KIK INTERACTIVE INC.'S FIRST DEFENSE

Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  STATEMENT OF FACTS .......................................................................................4

    A.   The Registration Provisions of the Securities Laws and the *Howey* Test .................4

    B.   The DAO Report and SEC Enforcement Actions Involving ICOs ..........................6

    C.   The SEC's Complaint Against Kik ......................................................................7

    D.   Kik's Answer to the Complaint ..........................................................................7

        1. Having Spent Most Of Its Venture Capital Money,
           Kik Publicly Announced Kin And Then Ran A Roadshow ................................8

        2. Kik Explicitly Considered The Application Of
           The *Howey* Test To The Offering and Sale ...............................................8

        3. Kik Told Prospective Kin Buyers About The Opportunity To Profit And Its Own
           Future Plans To Increase Demand For Kin and "To Spark The Creation Of This
           Ecosystem" ..............................................................................................9

        4. Kik Sold Kin and "Rights to Kin" And Made $100 Million ..............................10

        5. Kik And The Kin Foundation Controlled 90 Percent of Kin
           Distributed in September 2017 ..................................................................11

        6. Kik Did Not Register the Offering And Sale And Did Not Publicly
           Disclose Its Financial Statements ............................................................11

III. ARGUMENT .......................................................................................................12

    A.   The Standard Under Rule 12(c) …………………………...............................................12

    B.   The Standard for Unconstitutional Vagueness ...................................................13

    C.   "Investment Contract" Is Not Unconstitutionally Vague As Applied to Kik ...................14

        1.   Kik Had Constitutionally Fair Notice That It Was Offering and
            Selling Investment Contracts ...................................................................15

            a.   Kik's Admitted Conduct Created High Risk That Kik Was Offering
                And Selling Investment Contracts Under *Howey* .......................................16

b.   The DAO Report Provided Kik Additional Notice ................................................... 19

c.   Kik Understood Its Legal Risk And Did Not Seek Clarifying
Guidance From The SEC ............................................................................................ 20

2.   The Term "Investment Contract" Provides Explicit Standards................................... 21

a.   Kik's Offering and Sale Falls Within The Core Of
Section 5's Prohibition ............................................................................................... 22

b.   Section 5 and the *Howey* Test Do No Invite or Encourage
Arbitrary Enforcement ............................................................................................... 23

IV.   CONCLUSION.................................................................................................................... 25


Exhibit 1        Defendant Kik Interactive Inc.'s First Set of Requests for the Production of
Documents to Plaintiff U.S. Securities and Exchange Commission

Exhibit 2        Proposed Order

## TABLE OF AUTHORITIES

**Cases**

*Aldrich v. McCulloch Properties, Inc.,*
  627 F.2d 1036 (10th Cir. 1980) ................................................................................. 17

*Arriaga v. Mukasey,*
  521 F.3d 219 (2d Cir. 2008) ........................................................................................ 13

*Balestra v. ATBCOIN LLC,*
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........................................... 4, 17, 18, 19, 20

*Boyce Motor Lines, Inc. v. United States,*
  342 U.S. 337 (1952) ..................................................................................................... 16

*Bradley v. Fontaine Trailer Co.,*
  No. 06 Civ. 62 (WWE), 2009 WL 763548 (D. Conn. Mar. 20, 2009) ....................... 12

*Brodt v. Bache & Co., Inc.,*
  595 F.2d 459 (9th Cir.1978) ........................................................................................ 17

*Copeland v. Vance,*
  893 F.3d 101 (2d Cir. 2018) ......................................................... 13, 14, 21, 22, 24

*Davi v. Heckler,*
  No. 83 Civ. 2825, 1984 WL 62778 (E.D.N.Y. Nov. 21, 1984) .................................. 13

*Desiano v. Warner–Lambert & Co.,*
  467 F.3d 85 (2d Cir. 2006) .......................................................................................... 12

*Dickerson v. Napolitano,*
  604 F.3d 732 (2d Cir. 2010) ................................................................................. 13, 14

*Farrell v. Burke,*
  449 F.3d 470 (2d Cir. 2006) ............................................................................. 22, 23, 24

*General Media Comms v. Cohen,*
  131 F.3d 273 (2d Cir. 1997) ........................................................................................ 14

*Get Back Up, Inc. v. Detroit,*
  606 Fed. Appx. 792 (6th Cir. 2015) ............................................................................ 13

*Glen-Arden Commodities, Inc. v. Costantino,*
  493 F.2d 1027 (2d Cir. 1974) ................................................................................... 3, 15

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .................................................................................................... 24

*Hill v. Colorado,*
  530 U.S. 703 (2000) ..................................................................................................... 13

*In re Integrated Res. Real Estate Ltd. Partnerships Sec. Litig.,*
  850 F. Supp. 1105 (S.D.N.Y. 1993) ............................................................................ 13

*In re Matter of Munchee Inc.,*
  Exchange Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017) ........................ 6

*Juster Assocs. v. City of Rutland, Vt.,*
  901 F.2d 266 (2d Cir. 1990) ........................................................................................ 12

*L-7 Designs, Inc. v. Old Navy, LLC,*
  647 F.3d 419 (2d Cir. 2011) ........................................................................................ 12

*Lake Tahoe Watercraft Recreation Ass'n v. Tahoe Reg'l Planning Agency,*
  24 F. Supp. 2d 1062 (E.D. Cal. 1998) ........................................................................ 13

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) ............................................................. 5

*Lu v. Spencer,*
    No. 15 Civ. 30162 (MGM), 2016 WL 740407 (D. Mass. Feb. 24, 2016).................................. 13

*New Mexico Gas Co. v. Bernalillo County,*
    No. 14 Civ. 188 (WJ-KBM), 2014 WL 12783114 (D.N.M. Dec. 31, 2014).............................. 13

*Ortiz v. N.Y.S. Parole in Bronx, N.Y.,*
    586 F.3d 149 (2d Cir. 2009) ....................................................... 14

*Revak v. SEC Realty Corp.,*
    18 F.3d 81 (2d Cir. 1994)........................................................ 17

*SEC v. Aaron,*
    605 F.2d 612 (2d Cir. 1979) ....................................................... 5

*SEC v. Aqua-Sonic Products Corp.,*
    687 F.2d 577 (2d Cir. 1982) ................................................... 5, 15

*SEC v. AriseBank,*
    No. 18 Civ. 186 (BML) (N.D. Tex. Jan. 30, 2018) ...................................... 6

*SEC v. Blockvest,*
    No. 18 Civ. 2287-(GPB-BLM), 2019 WL 625163 (S.D. Cal. Feb. 14, 2019)............................ 4

*SEC v. Blockvest,*
    No. 18 Civ. 2287 (GPC-BLM) (S.D. Cal. Oct. 3, 2018) ................................... 6

*SEC v. Brigadoon Scotch Distributing Co.,*
    480 F.2d 1047 (2d Cir. 1973) ................................................... 3, 15

*SEC v. C.M. Joiner Leasing Corp.,*
    320 U.S. 344 (1943) ............................................................ 18

*SEC v. Cavanagh,*
    1 F. Supp. 2d 337 (S.D.N.Y. 1998) .................................................. 5

*SEC v. Edwards,*
    540 U.S. 389 (2004)......................................................... 5, 16, 17

*SEC v. Glenn W. Turner Ent., Inc.,*
    474 F.2d 476 (9th Cir. 1973)....................................................... 18

*SEC v. Howey,*
    328 U.S. 293 (1946) .......................................... 1, 5, 15, 16, 18

*SEC v. Koscot Interplanetary, Inc.,*
    497 F.2d 473 (5th Cir. 1974) ....................................................... 5

*SEC v. PlexCorps,*
    No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017) ...................................... 6

*SEC v. Ralston Purina Co.,*
    346 U.S. 119 (1953) ............................................................. 5

*SEC v. ReCoin Group Foundation, LLC,*
    No. 17 Civ. 5725 (RD) (E.D.N.Y. filed Sept. 29, 2017) ................................. 6

*SEC v. SG Ltd.,*
    265 F.3d 42 (1st Cir. 2001) ..................................................... 4, 5

*SEC v. Shavers,*
    No. 13 Civ. 416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014)............................. 16

*SEC v. Telegram Group Inc.,*
    No. 19 Civ. 9439 (PKC) (S.D.N.Y. Oct. 11, 2019) ..................................... 6

*SEC v. Zandford*,
   535 U.S. 813 (2002) ............................................................................................... 15
*Sellers v. M.C. Floor Crafters, Inc.*,
   842 F.2d 639 (2d Cir. 1988) .................................................................................. 12
*Solis v. Latium Network, Inc.*,
   No. 18 Civ. 10255 (SDW-SCM), 2018 WL 6445543 (D. N.J. Dec. 10, 2018) ........................ 4, 18
*State of New York v. United Parcel Service, Inc.*,
   160 F. Supp. 3d 629 (S.D.N.Y. 2016) .................................................................... 12
*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ........................................................................................... 5, 18
*United States v. Bowdoin*,
   770 F. Supp. 2d 142 (D.D.C. 2011) ...................................................................... 15
*United States v. Farhane*,
   634 F.3d 127 (2d Cir. 2011) ..................................................................... 21, 22, 23
*United States v. Farris*,
   614 F.2d 634 (9th Cir. 1979) ................................................................................ 15
*United States v. Kay*,
   513 F.3d 432 (5th Cir. 2007) ......................................................................... 16, 24
*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008) ...................................................................... 5, 15, 18
*United States v. Smith*,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) ............................................................ 13, 14
*United States v. Washam*,
   312 F.3d 926 (8th Cir. 2002) ............................................................................... 20
*United States v. Zaslavskiy*,
   No. 17 Cr. 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ............................... passim
*Uselton v. Commercial Lovelace Motor Freight, Inc.*,
   940 F.2d 564 (10th Cir. 1991) ............................................................................. 16
*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ................................................................................ 14, 21, 24

**Statutes**

15 U.S.C. § 77a ...................................................................................................... 4

15 U.S.C. § 77b ...................................................................................................... 5

15 U.S.C. § 77e ...................................................................................................... 4

15 U.S.C. § 78c ...................................................................................................... 5

**Other Authorities**

H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933) ....................................................... 5

Report of Investigation Pursuant to Section 21(a) of the
Securities Exchange Act of 1934: The DAO,
    Release No. 81207, 2017 WL 7184670 (July 25, 2017) ................................................................. passim

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................................................ 12

Fed. R. Civ. P. 12(c) ............................................................................................................................ 1, 12

Fed. R. Civ. P. 26(a)(1) ............................................................................................................................ 3

Pursuant to Fed. R. Civ. P. 12(c), Plaintiff U.S. Securities and Exchange Commission (the "Commission" or "SEC") respectfully submits this memorandum of law in support of its motion for judgment on the pleadings with respect to Defendant Kik Interactive Inc.'s ("Kik") First Affirmative Defense. This defense asserts that, notwithstanding 70-plus years of well-settled jurisprudence, the term "investment contract" in the securities laws is void for vagueness as applied to Kik's investment scheme. This claim is untenable and should be dismissed.

## I.     PRELIMINARY STATEMENT

The Commission seeks judgment on the pleadings so that Kik cannot use a baseless affirmative defense as a justification for irrelevant and burdensome discovery – for example, Kik's recent sweeping requests for production of all communications with third parties relating to, *inter alia*, every SEC investigation concerning a digital token, and effort to depose the Director of the Commission's Division of Corporation Finance and other senior SEC officials.   By deciding this purely legal issue at this early juncture, the Court will narrow the number of disputes that arise during discovery and facilitate the presentation of only relevant legal and factual issues at the summary judgment stage.

The Commission brought this action claiming that Kik violated Section 5 of the Securities Act of 1933 (the "Securities Act") by conducting an unregistered offering and sale of securities when, from May to September 2017, Kik offered and sold one trillion digital tokens called "Kin." Through this offering and sale (the "Offering and Sale"), Kik raised $100 million, over half of which came from investors in the United States. By failing to register the Offering and Sale, Kik deprived the thousands of people who bought Kin the protections and required disclosures under the Securities Act.

The Kin Offering and Sale was an offering and sale of securities under the Supreme Court's 70-year-old decision in *SEC v. Howey*, 328 U.S. 293 (1946). In *Howey*, the Court held that an "investment contract" – a specific type of security listed in the Securities Act – is "an investment of

money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301. Decades of court cases have explained and applied *Howey* to determine whether a multitude of investment schemes qualified as investment contracts. The Commission's complaint alleges all of the facts necessary for this *Howey* framework.

Although it strikes an indignant tone, Kik's answer to the complaint actually admits many key facts demonstrating that the *Howey* test was met, or – at a minimum – presenting an obvious risk that *Howey* would apply. Kik also concedes that it conducted the distribution of Kin in late September 2017 – two months *after* the SEC issued its Report of Investigation pursuant to Section 21(a) of the Exchange Act, known as the "DAO Report." *See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Release No. 81207, 2017 WL 7184670 (July 25, 2017). The DAO Report stated the SEC's view that digital assets like Kin may be securities, and that the federal securities laws and registration requirements "apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology." *Id.* at *14. In this regard, the DAO Report was wholly consistent with decades of *Howey* jurisprudence.

Kik further admits that "Risks" of "Securities law" were referenced in a presentation to its Board of Directors, and that *Howey* was at least mentioned when Kik met with regulators in Canada about the Offering and Sale. After this meeting, Kik decided to not to sell Kin to persons in Canada because of regulatory concerns, though it proceeded with the sale in the United States.

Despite longstanding judicial precedent, the DAO Report, and its numerous admissions regarding its contemporaneous awareness of the *Howey* issue, Kik contends that the phrase "investment contract" is "unconstitutionally vague." Answer at 118. Furthermore, Kik has relied on

its vagueness defense as the sole justification for seeking voluminous irrelevant discovery against the SEC.  Such discovery includes subpoenas to three high-ranking officials in the SEC's Division of Corporation Finance, a notice of deposition against the agency under Federal Rule of Civil Procedure 30(b)(6), and requests for the production of many thousands of documents concerning digital assets from throughout the agency, including other investigations and litigations, that are unrelated to the complaint's allegations.  *See, e.g.,* Kik's First Set of Requests for the Production of Documents to Plaintiff U.S. Securities and Exchange Commission (Exhibit 1).  By all appearances, Kik is trying to create an irrelevant sideshow about the SEC's regulation of digital assets that diverts attention from Kik's illegal conduct.[1]

Kik's first defense fails as a matter of law, and the Court should dismiss the defense, thereby streamlining the litigation by appropriately focusing discovery on the facts pertinent to whether or not Kik offered and sold securities in violation of Section 5.  This circuit's Court of Appeals found long ago that the "void for vagueness" defense, "[i]n light of the many Supreme Court decisions defining and applying the term [investment contract] . . . to be untenable."  *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973); *accord Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1029 (2d Cir. 1974) (rejecting as "untenable" the argument that the "term 'investment contract' in the statutory definition of the term 'security' in the federal securities laws was void for vagueness").  Citing *Brigadoon*, a court in the Eastern District of New York recently denied a criminal defendant's vagueness challenge to his indictment for securities violations involving digital assets, finding:

---

[1]     Notably, Kik did not serve any discovery requests until September 2019, over six weeks after the parties' July 19, 2019 case management conference at which defense counsel represented that he "expect[ed] . . . very limited written discovery" in the case – a statement totally at odds with what Kik then did.  Moreover, Kik did not state its intention to depose SEC employees until September 25, 2019, over six weeks after Kik served initial disclosures under Fed. R. Civ. P. 26(a)(1) that made no mention of SEC employees or the agency having "discoverable information that Kik may use to support its defenses."  Through such delay, Kik further exacerbated the burden and harassing nature of the requested discovery because of the already short (four and one-half month) fact discovery period set by the Court at Kik's request.

> [T]he test expounded in *Howey* has – for over 70 years – provided clear
> guidance to courts and litigants as to the definition of 'investment contract'
> under the securities laws. . . . [T]he abundance of caselaw interpreting and
> applying *Howey* at all levels of the judiciary, as well as related guidance issued
> by the SEC as to the scope of its regulatory authority and enforcement power,
> provide all the notice that is constitutionally required.

*United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018)

(Dearie, J.) (internal citations omitted).  Moreover, like the court in *Zaslavskiy*, other courts have ruled

favorably on allegations that offerings and sales of digital assets are offerings and sales of securities

under *Howey*.  *See, e.g.*, *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (denying

motion to dismiss); *SEC v. Blockvest*, No. 18 Civ. 2287 (GPB-BLM), 2019 WL 625163, at *9 (S.D. Cal.

Feb. 14, 2019) (granting preliminary injunction); *Solis v. Latium Network, Inc.*, No. 18 Civ. 10255 (SDW-

SCM), 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (denying motion to dismiss).

This Court should follow suit and reject Kik's vagueness claim.  For decades courts have

interpreted the term "investment contract" in a "'kaleidoscopic assortment of pecuniary arrangements

that defy categorization in conventional financial terms,'" *Zaslavskiy*, 2018 WL 4346339, at *9 (quoting

*SEC v. SG Ltd.*, 265 F.3d 42, 47 (1st Cir. 2001)).  These precedents, particularly in light of the DAO

Report and Kik's admissions in its answer, provided constitutionally sufficient notice to Kik that the

Offering and Sale might violate the Securities Act, and they demonstrate that the Act does not

authorize or encourage arbitrary and discriminatory enforcement.  Kik's answer raises no material

issue of fact, and the Court should grant the SEC judgment on the pleadings as to Kik's first defense.

## II.    STATEMENT OF FACTS

### A.    The Registration Provisions of the Securities Laws and the *Howey* Test

The registration regime imposed by the Securities Act, 15 U.S.C. §§ 77a, *et seq.*, requires the

offer or sale of "securities" to the public to be accompanied by "full and fair disclosure" afforded by

a registration statement filed with the SEC and the delivery of a statutory prospectus.  This regime

fulfills the statutory purpose to provide potential purchasers with the information essential to an

informed investment decision. *See, e.g.*, *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998); *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1952)), *vacated on other grounds*, 446 U.S. 680 (1980).  Sections 5(a) and 5(c) of the Securities Act, which was enacted in 1933, prohibit the unregistered offer or sale of "securities" in interstate commerce absent an exemption. 15 U.S.C. §§ 77e(a), (c); Compl. ¶ 3.

Under Section 2(a)(1) of the Securities Act, a security includes "an investment contract."  *See* 15 U.S.C. § 77b(a).[2]  The Supreme Court has interpreted "investment contract" to mean an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *Howey*, 328 U.S. at 301.  This so-called "*Howey* test" is designed to be "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299; *accord Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) (quoting *Howey*); *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847-48 (1975) (Congress "sought to define 'the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'") (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)).

Thus, courts have found the *Howey* test to be satisfied with regard to non-stock and non-debt interests in: orange groves in *Howey* itself; payphone leases, *see Edwards*, 540 U.S. at 389; licenses to sell dental products, *see SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir. 1982); films, *see United States v. Leonard*, 529 F.3d 83, 87-91 (2d Cir. 2008); and multi-level marketing, *see SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79 (5th Cir. 1974).  Notably, *Howey* has been satisfied where a promotor offered "virtual shares in an enterprise existing only in cyberspace." *SG Ltd.*, 265 F.3d at

---

[2]      Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange Act") also defines "security" to include "investment contract."  See 15 U.S.C. § 78c(a).

44-59. That it is a fact-specific inquiry does not mean that such an inquiry is vague or deprives regulated entities of notice of what is regulated. The Courts and the SEC have been applying the test successfully for decades, and regulated entities conform their conduct accordingly.

**B.** **The DAO Report and SEC Enforcement Actions Involving ICOs**

In July 2017, the SEC issued the DAO Report regarding an ICO for so-called "DAO Tokens." In the DAO Report, the SEC explained that issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption from registration applies. The DAO Report considered the offering and sale of DAO Tokens and concluded that they were securities based on long-standing legal principles, and that offers and sales of DAO Tokens were thus subject to the federal securities laws. The automation of certain functions through "smart contracts" or computer code or other technology, the Report concluded, does not remove conduct from the purview of the federal securities laws. Thus, the SEC's message to issuers and others in this space has been clear: those who would use distributed ledger or blockchain technology to raise capital or engage in securities transactions must take all appropriate steps to comply with the federal securities laws. *See Zaslavskiy*, 2018 WL 4346339, at *9 (relying on the DAO Report as part of the "guidance issued by the SEC as to the scope of its regulatory authority and enforcement power" that provides sufficient notice).

In addition to this action, the SEC has brought a number of enforcement actions concerning ICOs for alleged violations of the federal securities laws.[3]

---

[3]   *See, e.g., SEC v. Telegram Group Inc.*, No. 19 Civ. 9439 (PKC) (S.D.N.Y. Oct. 11, 2019) (emergency action to halt alleged unregistered offerings of digital assets); *SEC v. Blockvest*, No. 18 Civ. 2287 (GPC-BLM) (S.D. Cal. Oct. 3, 2018) (emergency action to halt allegedly fraudulent and unregistered offerings of digital assets); *SEC v. AriseBank*, No. 18 Civ. 186 (BML) (N.D. Tex. Jan. 30, 2018) (same); *In re Matter of Munchee Inc.*, Exchange Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017) (settled administrative proceeding against unregistered ICO); *SEC v. PlexCorps*, No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017) (emergency action to halt allegedly fraudulent and unregistered ICO); *SEC v. ReCoin Group Foundation, LLC*, No. 17 Civ. 5725 (RD) (E.D.N.Y. filed Sept. 29, 2017) (same). These and other matters are listed on the SEC's website. *See* https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

### C.     The SEC's Complaint Against Kik

On June 4, 2019, the Commission filed this action against Kik.  Kik, a private Canadian company founded in 2009, owned and operated a mobile messaging application called Kik Messenger. As alleged in the complaint, by early 2017, Kik had spent most of its venture capital money.  Unable to make a profit from Kik Messenger and facing rapidly dwindling reserves, Kik decided to raise – and did raise – significant new funds through the Offering and Sale.  But Kik did not register the Offering and Sale as required by Section 5 of the Securities Act, and the SEC's complaint provides detailed allegations demonstrating that the Offering and Sale was an offering and sale of investment contracts under each of the *Howey* elements.  Through this action, the SEC seeks an injunction against Kik restraining and enjoining it from, directly or indirectly, violating Section 5; disgorgement of all ill-gotten gains or unjust enrichment derived from the Offering and Sale; and an order that Kik pay a civil penalty.

### D.     Kik's Answer to the Complaint

On August 6, 2019, Kik filed a 130-page answer to the SEC's complaint including the affirmative defense that "if the phrase 'investment contract' is defined in a way that applies to Kik's offering and sale of Kin in 2017, the phrase is unconstitutionally vague."  Answer, First Defense, at 118.  However, Kik's lengthy response contains numerous factual admissions that Kik engaged in conduct that, under any objective analysis, met all of *Howey*'s elements for "investment contract" – or, at the barest minimum, presented an obvious risk that these elements would be satisfied.  These admissions alone render Kik's vagueness defense untenable.  The defense also is foreclosed by Kik's admissions that Kik had anticipated – and planned for – the possibility that government regulators would conclude that Kik offered and sold securities, thus showing that Kik was aware of the risk all along.

The following summary of events is based solely on the admissions in Kik's answer and demonstrates that relief under Rule 12(c) is appropriate at this juncture.  Kik was on notice that the Commission and U.S. courts could apply the Securities Act and decades of Supreme Court precedent to any large-scale offering to U.S. investors such as Kik's.[4]

1.      **Having Spent Most Of Its Venture Capital Money, Kik Publicly Announced Kin And Then Ran A Roadshow**

Although Kik received at least $120 million in financing from venture capital firms, Answer ¶ 35, by early 2017, the company had roughly $26 million in cash remaining, *id.* ¶ 41.  A May 2017 presentation to Kik's Board of Directors referenced a "Total Raise Target" of $100 million for the Offering and Sale.  *Id.* ¶¶ 54, 55, 57.  On May 25, 2017, Kik announced a plan to offer and sell Kin through publishing a "white paper," issuing press releases, and the CEO's "fireside chat" at a New York City conference, and also posted on social media and released a produced video that was posted to YouTube.  *Id.* ¶¶ 8, 13, 62, 63.  Additionally, "Kik planned a 'Participant Roadshow'" such that, after the May 25, 2017 announcements, Kik "advertised the Kin economy" by having "its employees attend[] events in San Francisco, China, the United Kingdom and Canada" – "[m]any" of which "were videotaped and posted on YouTube."  *Id.* ¶¶ 69-70.

2.      **Kik Explicitly Considered The Application Of The *Howey* Test To The Offering and Sale**

Even prior to the commencement of the Offering and Sale, Kik considered whether it would run afoul of the *Howey* test.  On or about April 3, 2017, Kik's consultant delivered a report stating: "[t]he SEC has yet given no guidance that any particular token offering is a security, and this guidance is not expected in the near future. The SEC would potentially apply the *Howey* Test to determine if the

---

[4]      The Commission does not concede that this summary based on Kik's answer includes all relevant facts, or that all of the stated facts are true.  The Commission reserves the right to show additional material facts about which there is no genuine dispute after discovery is completed, and to prove additional, relevant facts at trial.

sale of such tokens would constitute an 'investment contract.'" *Id.* ¶ 97.   "Kik's consultant did acknowledge that 'unregistered public securities offerings are not legal in the U.S.,'" *id.*, but, Kik explains, the consultant "also told Kik that '[i]n the case of a community currency, there is a good basis to argue that this is not a security.  You're just selling units of property that you created that are used for a particular purpose in your app.'" *Id.*  On April 10, 2017, PowerPoint slides provided to Kik's Board included the statement that a Kin offering that raised "millions" and "was highly marketed to users and the public at large . . . risk[ed] becoming a security in the eyes of the SEC very quickly." Answer ¶ 97; Compl. ¶ 97 (setting forth admitted quotations).

On or about May 5, 2017, Kik's CEO sent the Kik Board a slide deck, in which one slide was titled, "Risks: (1) Securities law."  Answer ¶ 98.  In August or September 2017, Kik representatives met with the Ontario Securities Commission ("OSC") to discuss Kik's sale of Kin, and at least one of the issues they discussed was *Howey*. *Id.* ¶ 108.  Kik's Canadian counsel later wrote a letter to the OSC stating, "OSC staff definitively communicated [to Kik's outside counsel] a position that the [sale to the public of Kin] constituted an offering of securities."  *Id.* ¶ 109.  Kik did not allow Canadian residents to purchase Kin in Kik's "Token Distribution Event" based in part on its discussions with the OSC.  *Id.* ¶ 110.

### 3. Kik Told Prospective Kin Buyers About The Opportunity To Profit And Its Own Future Plans To Increase Demand For Kin and "To Spark The Creation Of This Ecosystem"

In the months following the May 25, 2017 announcement, Kik made numerous public statements about Kin.  Through these and the May 25 public statements, Kik objectively communicated an opportunity to profit by:  comparing Kin to venture capital investing, *id.* ¶ 75; stating that it expected Kin to trade on secondary markets, and that Kin are fungible and transferable, *id.* ¶¶ 80, 81, 83; emphasizing its own financial interest in growing the value of Kin because of Kik's 30 percent stake in Kin, *id.* ¶¶ 115, 116, 117; stating that "[t]he Kin token offering presents a unique

opportunity for crypto investors . . . .," *id.* ¶ 164; and "acknowledge[ing] that the price of Kin could increase or decrease as a function of supply and demand, like in any economy," *id.* ¶ 65.

Kik's admitted public statements also described Kik's expertise, its future commitment to the Kin "economy," and the future steps that Kik would take to increase demand for Kin and "to spark the creation of this Ecosystem."  Kik provides these admissions at least in response to complaint paragraphs 121, 122, 123, 124, 125, 128, 129, 131, 136, 138, 139, 142, 144, 145, 147, 148, 151, 152, 153, and 161; *see also* Answer paragraphs 135, 137, 138, and 141.[5]

### 4.  Kik Sold Kin and "Rights to Kin" And Made $100 Million

On or about August 29, 2017, Kik publicly announced deadlines and procedures by which members of the public could participate in Kik's upcoming "token distribution event."  Answer ¶¶ 160-161; Compl. ¶¶ 160-161.  Between September 12 and September 26, 2017, Kik sold Kin to purchasers – including purchasers from the United States – who paid Ether in exchange for Kin tokens.  Answer ¶¶ 13, 171-172.

Approximately 10,000 total purchasers bought Kin in the token distribution event in exchange for a total of 168,732 Ether, which was then worth approximately $49.2 million.  *Id.* ¶ 172. Three thousand, four hundred, and fifty-six (3,456) of these purchasers were from the United States, and these purchasers accounted for approximately $16.8 million in Ether.  *Id.*  In addition, through September 11, 2017, Kik entered into Simple Agreements For Future Tokens ("SAFTs") with approximately 50 "participants," and received approximately $49 million in U.S. dollars, including approximately $40 million from "participants" in the United States. *Id.* ¶¶ 15, 93, 157.  On September

---

[5]     Because of a numbering error in Kik's answer, paragraphs 132 through 141 of Kik's answer correspond to paragraphs 133 through 142 of the SEC's complaint, respectively.  With respect to the paragraphs cited in the text, paragraph 136 of the complaint is answered by Kik's paragraph 135; complaint paragraph 138 is answered by Kik's paragraph 137; complaint paragraph 139 is answered by Kik's paragraph 138; and complaint paragraph 142 is answered by Kik's paragraph 141.  Kik failed to answer complaint paragraph 132.

26, 2017, Kik issued a press release entitled "Kik Raises Nearly US$100 Million in Kin Token Distribution Event" that stated: "the Kin token distribution event (TDE) has successfully ended, raising nearly US$100 million." *Id.* ¶ 176.

Kik deposited the proceeds from the sale of Kin into two bank accounts and Kik's Ether wallet, all of which Kik controlled. *Id.* ¶¶ 186, 188.

### 5. Kik And The Kin Foundation Controlled 90 Percent of Kin Distributed in September 2017

Kik arranged for the distribution of Kin that occurred on September 26, 2017. *Id.* ¶¶ 14, 177. Kik received four trillion Kin, of which Kik kept three trillion – 30 percent of the total Kin created. *Id.* ¶¶ 10, 178. Kik then transferred the other one trillion Kin to the approximately 10,000 general public purchasers and the approximately 50 "participants" who purchased Kin using Kik's SAFT. *Id.* ¶ 178.[6] In addition, six trillion Kin was distributed to the Kin Foundation. *Id.* ¶ 179.[7] All Kin tokens are the same. *Id.* ¶ 180.

### 6. Kik Did Not Register The Offering And Sale And Did Not Publicly Disclose Its Financial Statements

Kik did not register its sales of Kin via SAFTs or through its public sale with the Commission, nor did Kik restrict United States purchasers from buying Kin. *Id.* ¶ 111. Kik did not publicly disclose its financial statements. *Id.* ¶ 68.

---

[6]  Pursuant to the terms of the SAFTs, however, only half of the Kin purchased via SAFTs were delivered; the other half were to be delivered on the one-year anniversary of the distribution. Answer ¶¶ 14, 178.

[7]  Although Kik maintains that the Kin Foundation was "a separate legal entity," the Kin Foundation was not formed until September 12, 2017, and, "initially, the Kin Foundation's Board of Directors consisted of Kik CEO Livingston and Kik's then-CFO, in their individual capacities." Answer ¶¶ 34, 179.

# III.   ARGUMENT

## A.   The Standard Under Rule 12(c)

Federal Rule of Civil Procedure 12(c) ("Rule 12(c)") provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Courts review a Fed. R. Civ. P. 12(c) motion for judgment on the pleadings under the same standard used for analyzing a Fed. R. Civ. P. 12(b)(6) motion to dismiss. *Desiano v. Warner–Lambert & Co.*, 467 F.3d 85, 89 (2d Cir. 2006). "Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).  Under Rule 12(c), the movant bears the burden of establishing "that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990) (internal quotations and citations omitted).  On motion under Rule 12(c), the Court may consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation omitted).

A motion under Rule 12(c) may be brought by a plaintiff, as the SEC does here, seeking judgment as to some or all affirmative defenses.  *See Bradley v. Fontaine Trailer Co.*, No. 06 Civ. 62 (WWE), 2009 WL 763548 at *1-*3, *6 (D. Conn. Mar. 20, 2009) (granting judgment on the pleadings as to three affirmative defenses); *State of New York v. United Parcel Service, Inc.*, 160 F. Supp. 3d 629, 638 (S.D.N.Y. 2016) ("Although Rule 12(c) neither specifically authorizes nor prohibits motions for judgment on the pleadings directed to less than the entire complaint or answer . . . it is the practice of many judges to permit partial judgment on the pleadings (*e.g.* on the first claim for relief, or the third affirmative defense)" (internal quotation marks and citations omitted)), *vacated in part on other grounds*, 2016 WL 10672074 (S.D.N.Y. June 21, 2016).

Courts routinely grant Rule 12(c) motions against void for vagueness claims.[8]

### B.   The Standard for Unconstitutional Vagueness

Because Kik's vagueness challenge has no First Amendment implications and is otherwise unrelated to any assertion of constitutionally-protected rights, the challenge must be evaluated as the Securities Act is applied to Kik's particular circumstances.  *See Dickerson v. Napolitano*, 604 F.3d 732, 744 (2d Cir. 2010) (concluding that parties were "limited to an as-applied vagueness challenge under the Fourteenth Amendment" where neither First Amendment nor other fundamental rights were implicated); *Arriaga v. Mukasey,* 521 F.3d 219, 224-25 (2d Cir. 2008) ("Claims of facial invalidity are generally limited to statutes that threaten First Amendment interests.").

Where, as here, the challenge is vagueness as-applied, "[a] statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Arriaga*, 521 F.3d at 222-23 (same).

"Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well."  *United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (collecting Supreme Court and Second Circuit authority).  Whether by statute or judicial gloss, "a law need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Dickerson*, 604 F.3d at 747 (internal quotation marks omitted). "[T]he unavoidable ambiguities of language do not transform every circumstance in which judicial

---

[8]    *See, e.g., In re Integrated Res. Real Estate Ltd. Partnerships Sec. Litig.*, 850 F. Supp. 1105, 1114-16 (S.D.N.Y. 1993); *Davi v. Heckler*, No. 83 Civ. 2825, 1984 WL 62778, at *4 (E.D.N.Y. Nov. 21, 1984)); *Get Back Up, Inc. v. Detroit*, 606 Fed. Appx. 792, 797-98 (6th Cir. 2015); *Lake Tahoe Watercraft Recreation Ass'n v. Tahoe Reg'l Planning Agency*, 24 F. Supp. 2d 1062, 1073 (E.D. Cal. 1998); *New Mexico Gas Co. v. Bernalillo County*, No. 14 Civ. 188 (WJ-KBM), 2014 WL 12783114 (D.N.M. Dec. 31, 2014); *Lu v. Spencer*, No. 15 Civ. 30162 (MGM), 2016 WL 740407, at *1-3 (D. Mass. Feb. 24, 2016).

construction is necessary into a violation of the fair notice requirement." *Smith*, 985 F. Supp. 2d at

587-88 (quoting *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 159 (2d Cir. 2009)).

Furthermore, "[t]he degree of linguistic precision . . . varies with the nature—and in particular,

with the consequences of enforcement." *General Media Comms. v. Cohen*, 131 F.3d 273, 286 (2d Cir.

1997).  Not only do statutes implicating First Amendment and other constitutionally protected rights

receive "more stringent" analysis, *id.*, but, as the Supreme Court has explained,

> [E]conomic regulation is subject to a less strict vagueness test because its
> subject matter is often more narrow, and because businesses, which face
> economic demands to plan behavior carefully, can be expected to consult
> relevant legislation in advance of action. Indeed, the regulated enterprise may
> have the ability to clarify the meaning of the regulation by its own inquiry, or
> by resort to an administrative process.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (internal citations

omitted); *see also General Media*, 131 F.3d at 286 (noting lower "standards of certainty" for statutes

"depending primarily upon civil sanction for enforcement").   And, because the test for

unconstitutional vagueness is an "'objective' inquiry," the reviewing court need not determine

"'whether a particular plaintiff actually received a warning that alerted him or her to the danger of

being held to account for the behavior in question.'" *Copeland*, 893 F.3d at 113 (quoting *Dickerson*, 604

F.3d at 745–46).

### C.   "Investment Contract" Is Not Unconstitutionally Vague As Applied to Kik

Kik's defense that the term "investment contract" is unconstitutionally vague fails under this

doctrine.   The statute provided Kik "fair notice" and did not invite or encourage "arbitrary

enforcement" against it.

      1.        **Kik Had Constitutionally Fair Notice That It Was Offering and Selling Investment Contracts**

Kik cannot "demonstrate that a person of ordinary intelligence would not have sufficient notice that the charged conduct was proscribed." *Zaslavskiy*, 2018 WL 4346339, at *8.[9]  First, "courts are clear that the securities laws are meant to be interpreted 'flexibly to effectuate their remedial purpose.'" *Id.* at *9 (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002)).  Second, the *Howey* test itself was designed to be "flexible" and "capable of adaptation," and, for that reason, was specifically intended to be a test dependent on the facts and circumstances of each case.  *Howey*, 328 U.S. at 299; *see also Aqua-Sonic*, 687 F.2d at 584 (the inquiry "necessarily turn[s] on the totality of the circumstances"); *Leonard*, 529 F.3d at 87-91 (same).

Kik's claim in its answer that it lacked fair notice – precisely *because of Howey*'s flexibility – flies in the face of this Supreme Court guidance.  Here, as in *Zaslavskiy*, "the abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required."  *Zaslavskiy*, 2018 WL 4346339, at *9 (citing *Brigadoon*, 480 F.2d at 1052 n.6 and the DAO Report); *see also Glen-Arden*, 493 F.2d at 1029; *United States v. Farris*, 614 F.2d 634, 642 (9th Cir. 1979) ("It is too late in the day more than 32 years after the Supreme Court's decision in [*Howey*] to say that the term 'security' is impermissibly vague."); *United States v. Bowdoin*, 770 F. Supp. 2d 142, 148 (D.D.C. 2011) ("The lineage of the term [investment contract] is too long and well-recognized for Mr. Bowdoin's 2011 claim of unconstitutional vagueness to stand.").

---

[9]      The sale of digital assets at issue in *Zaslavskiy* concluded on September 11, 2017, two weeks *prior* to the conclusion of Kik's sale of Kin.  *See Zaslavskiy,* 2018 WL 4346339 at *2.

> **a.    Kik's Admitted Conduct Created High Risk That Kik Was Offering And Selling Investment Contracts Under *Howey***

Application of the *Howey* elements to the facts admitted by Kik in its answer demonstrates that Kik's vagueness defense is meritless.  By its own admissions, Kik engaged in conduct that amounted to an offering and sale of investment contracts under long-standing judicial precedents – or, at the very least, conduct for which Kik had sufficient notice that *Howey* could apply.  Kik had notice that Kin buyers (i) made an investment of money, (ii) in a common enterprise, (iii) with a reasonable expectation of profits, (iv) to be derived from the entrepreneurial or managerial efforts of others.  *See Edwards*, 540 U.S. at 393; *Howey*, 328 U.S. at 301.

It is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  *United States v. Kay*, 513 F.3d 432, 442 (5th Cir. 2007) (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952)).  Kik unquestionably took this risk.  The Court can grant the SEC's Rule 12(c) motion by concluding that a reasonable person in defendants' position would be aware of the risk of *Howey*'s application, without ultimately deciding whether Kik offered and sold "securities" under *Howey*.

First, "it is well established that cash is not the only form of contribution or investment that will create an investment contract," and that "the 'investment' may take the form of 'goods and services,' . . . or some other 'exchange of value.'"  *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991).  Thus, in *SEC v. Shavers*, No. 13 Civ. 416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014), the court was "easily able to determine that Bitcoin [tokens] . . . satisfie[d] the "investment of money" prong of the *Howey* test," *id.* at *5.  Here, Kik's acceptance of U.S. dollars or Ether for Kin similarly satisfies the "investment of money" prong.  Answer ¶¶ 13, 15, 93, 157, 172; *supra* Section II.D.4.

Second, the Second Circuit and other courts of appeals have long held that a showing of "horizontal commonality" suffices to meet *Howey*'s requirement of investment in a "common

enterprise." *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) ("A common enterprise within the meaning of *Howey* can be established by a showing of "horizontal commonality[.]"). "Horizontal commonality" involves the "tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets," such that "the fortunes of each investor depend upon the profitability of the enterprise as a whole." *Revak*, 18 F.3d at 87. Although pooling of assets is "usually combined with the pro-rata distribution of profits," *id.*, profit distribution is not required. *See Balestra*, 380 F. Supp. 3d at 354  (where plaintiff alleged sale of unregistered securities through initial coin offering of a digital asset, a "formalized profit-sharing mechanism is not required for a finding of horizontal commonality").

Here, the common enterprise element is met by Kik's admissions that the proceeds from its sales of Kin were deposited into two bank accounts, *see* Answer ¶ 186, that Kik controlled these proceeds, *see id.* ¶ 188, that Kik represented to investors that it would use the funds to build the "Kin Ecosystem," *see id.* ¶ 115, 122, 128, 148, and that all Kin were fungible or the same, *see id.* ¶ 80; *see generally supra* Sections II.D.3, II.D.4. Thus, the fortunes of all Kin buyers were tied together by Kik's pooling of the funds that the buyers paid Kik, and their fortunes jointly depended on Kik's ability to drive up demand for – and hence the price of – Kin.[10]

Third, Kik's admissions demonstrate that it led Kin investors reasonably to expect profits. "Profits" under *Howey* includes "capital appreciation resulting from the development of the initial investment," and does not require intervening profit distributions. *Edwards*, 540 U.S. at 395; *see also, e.g., Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) ("That the plaintiffs did

---

[10]      In addition, the Second Circuit has left open the question whether the common enterprise element may be met by a showing of "strict vertical commonality," which "requires that the fortunes of investors be tied to the *fortunes* of the promoter." *Revak*, 18 F.3d at 88 (emphasis in original) (citing *Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir.1978)). Kik's admissions plainly demonstrate strict vertical commonality, because any increase in the value of Kin would benefit Kik, which retained three trillion Kin, alongside the buyers who obtained Kin in the Offering and Sale.

not expect to realize any tangible gain until they sold their property does not preclude investment intent."). Whether a promoter such as Kik created an expectation of profits requires an evaluation of the promoter's various statements to investors. *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943). These include, in the ICO context, "advertising methods" and "public statements [that] stressed the limited supply of tokens," *Solis*, 2018 WL 6445543, at *3, and statements emphasizing the availability of secondary markets for the tokens, *see Balestra*, 380 F. Supp. 3d at 355 n.14 ("Purchasers' ability to resell ATB Coins on other exchanges also supports the conclusion that the coins are securities.").

Here, Kik led Kin buyers reasonably to expect profits by telling them that: Kin buyers could (compared to venture capitalists) "get in at basically any stage and in any amount, and . . . get out at any stage," Answer ¶ 75; Kik expected Kin to trade on "exchanges," *id.* ¶¶ 80-84; Kin's supply would be limited, *id.* ¶ 116; Kik itself had a financial interest in growing the value of Kin, *id.* ¶¶ 115-117; and – after the DAO Report and just weeks before the public sale – "[t]he Kin token offering presents a unique opportunity for crypto investors," *id.* ¶ 164; *see generally supra* Sections II.D.3.

Fourth, Kik's admissions demonstrate that that it led Kin investors reasonably to expect that profits that resulted from Kin's increase in value would be "derived from the entrepreneurial or managerial efforts of others," *United Hous. Found.*, 421 U.S. at 852. Courts routinely have declined to follow literally *Howey*'s statement that profits must come "solely from the efforts of the promoter or a third party," 328 U.S. at 298-299; *see, e.g., Leonard*, 529 F.3d at 88; *SEC v. Glenn W. Turner Ent., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). Courts in the Second Circuit instead "consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *Leonard*, 529 F.3d at 88.

18

Thus, in *Balestra*, the court concluded that this *Howey* element was met where a digital coin promoter had "conveyed to purchasers of ATB Coins that the anticipated return on their investment would be the result of [the promoter's] efforts to commercialize the ATB Blockchain and ATB Coins." 380 F. Supp.3d at 355.

Here, Kik led Kin investors reasonably to expect profits derived from the entrepreneurial or managerial efforts of others (*i.e.*, Kik) by publicly extolling Kik's experience, resources, and user base, Answer ¶ 121, and telling potential buyers in various communications that Kik hoped to "spark the creation of this ecosystem," *id.*; Kik "was all in" and, because of Kik, "Kin can enjoy a good start regardless of whether or not other digital services adopt it right away," *id.* ¶ 122; "Kik must create a series of new products, services, and systems," *id.* ¶ 123; "[o]nce we have established the new cryptocurrency, we will create demand for [Kin] by encouraging people to earn and spend Kin within Kik," *id.* ¶ 124; and Kik was "going to use the funds to join the platform and essentially build it, the transaction service, the identity service, the reward engine. . . . Basically, to like launch this whole broader ecosystem," *id.* ¶ 148; *see generally supra* Section II.D.3.

In sum, long-standing judicial precedent easily apply to Kik's admitted facts, which defeats Kik's claim that it lacked constitutionally sufficient notice as to what constitutes an "investment contract." Even if Kik were to ultimately prevail on summary judgment or at trial on its defense that the Offering and Sale did not involve a "security," that would not show that there is unconstitutional vagueness in determining whether the Offering and Sale was an offering and sale of an "investment contract," or lack of notice that *Howey* was an issue that Kik had to address in its Offering and Sale.

### b.    The DAO Report Provided Kik Additional Notice

The SEC's DAO Report issued on July 25, 2017, provided Kik additional notice of the risk that its conduct implicated the Securities Act and *Howey*. In the Report, the SEC "stress[ed] that the U.S. federal securities law may apply to various activities, including distributed ledger technology,

depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale." 2017 WL 7184670 at *7. The Report then analyzed how DAO tokens were investment contracts under *Howey* under the facts and circumstances in which those tokens were issued. The Report's broad warning that the *Howey* test would apply to digital assets like Kin dooms any claim of surprise by Kik.

As the *Zaslavskiy* court correctly found, the DAO Report constitutes relevant regulatory guidance, 2018 WL 4346339, at *9, and the Report further negates Kik's claim that the term "investment contract" is unconstitutionally vague as applied to Kin. *See also Balestra*, 380 F. Supp. 3d at 355 n.14 (citing with approval the DAO Report's finding that DAO Tokens issued through an ICO were securities).

### c.    Kik Understood Its Legal Risk And Did Not Seek Clarifying Guidance From The SEC

If there were any doubt that Kik had constitutionally sufficient notice that it might be offering and selling investment contracts, Kik's admissions that it considered – and actively planned for – the potential application of *Howey* to the Offering and Sale eviscerates this doubt. *Cf. United States v. Washam*, 312 F.3d 926, 930 (8th Cir. 2002) (finding "appeal" in the government's argument that "actual notice" by the defendant of the illegality of his actions defeated the argument about the statute's vagueness). Kik cannot escape the fact that, at least as early as April 3, 2017, Kik received explicit warnings in a report from Kik's consultant that regulators could find that the Offering and Sale is an offering and sale of securities under *Howey*, and that "Kik's consultant did acknowledge that unregistered public securities offerings are not legal in the U.S." Answer ¶ 97. Kik then flagged the "securities law" issue several days later in slides sent to Kik's Board as the number one "risk." *Id.* ¶ 98. Nor can Kik dispute that, in the following months, Kik considered this risk and decided to cancel the Offering and Sale in its home country of Canada but to proceed anyway in the United States. *See id.* ¶ 98, 108, 110; *supra* Section II.D.2. Although Kik clearly had "the ability to clarify the

meaning of the regulation by its own inquiry" with the SEC, *Village of Hoffman Estates*, 455 U.S. at 498-99, it deliberately chose not to do so, *see* Answer ¶ 111.  Any claim that Kik lacked fair notice is nonsense.

Perhaps most telling, Kik openly structured its Offer and Sale in a manner that plainly demonstrated its awareness that the securities law could and did apply to the Offering and Sale.  Kik received approximately $49 million – half of its proceeds – by entering into SAFTs which, in Kik's words, sold "the conditional right to receive Kin in the future at a discount, to accredited investors." *Id.* ¶ 1.[11]  Kik admits that its offer and sale of SAFTs "was a security," *id.* ¶ 91, and that it filed a Form D with the SEC in 2017 claiming an exemption for these instruments from the Securities Act's registration requirements, *id.* ¶ 1.  These public actions – including telling investors in the SAFT and the Form D that the SAFT *was* a security – further dooms Kik's claim that it lacked notice of the definition of "investment contract."

For all of the above reasons, the Securities Act gave Kik a "reasonable opportunity to understand what conduct it prohibits." *Copeland*, 893 F.3d at 114.

### 2.    The Term "Investment Contract" Provides Explicit Standards

Kik's vagueness defense fares no better under the second prong of that analysis, which asks whether statutory language "authorizes or even encourages arbitrary and discriminatory enforcement." A vagueness challenge can fail this second prong for either of two reasons.  First, "a statute certainly will not be deemed unconstitutionally vague if as a general matter, it provides sufficiently clear standards to eliminate such a risk" of arbitrary enforcement.  *United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011) (internal quotation marks omitted).  Second, "even in the absence of such standards,

---

[11]    Although the SEC contends that Kik sold Kin (not merely "rights" to receive Kin) through the SAFTs, and that these sales were part of and/or integrated with the Offering and Sale, *see* Compl. ¶¶ 159, 198, the Court need not resolve the parties' conflicting views on these issues for purposes of this motion; the relevant, undisputed fact here is that Kik's use of the SAFTs demonstrated its awareness of the potential applicability of the Securities Act and the term "investment contract."

a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farhane*, 634 F.3d. at 139-40 (internal quotation marks omitted); *see also Copeland*, 893 F.3d at 119-120 (same).

Kik's vagueness challenge fails for not just one but for both of these reasons. As the *Zaslavskiy* court found:

> *Howey* and its progeny set forth the standards needed to cabin Section 5's enforcement relative to investment contracts. Furthermore, the conduct charged "falls within the core of the statute's prohibition," and its enforcement in this case is "not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute."

2018 WL 4346339, at *9 (quoting *Farrell v. Burke*, 449 F.3d 470, 492-95 (2d Cir. 2006)). The reasoning from *Zaslavskiy* applies equally here. Although Kik loses if either condition is met, here they are both satisfied.

### a. Kik's Offering and Sale Falls Within The Core Of Section 5's Prohibition

Kik's admitted conduct plainly "falls within the core of the statute's prohibition," *Copeland*, 893 F.3d at 119 (quoting *Farrell*, 449 F.3d at 494), as the core purpose of the Securities Act is to ensure "full and fair disclosure" to investors afforded by registration. As of early 2017, Kik had spent over $96 million of the venture capital funding that it had received, and had only $26 million in cash remaining, with expenses reaching as high as $3 million per month. *See* Answer ¶¶ 35, 41; *supra* Section II.D.1. Facing these perilous financial circumstances, Kik proceeded to plan and run the Offering and Sale during which it conducted a Roadshow in multiple cities in the United States, Canada, and elsewhere, and made numerous public statements about itself and Kin through the white paper, press releases, articles, conferences, videos, tweets, and social media posts. Through these efforts, Kik took

$100 million from Kin buyers, including $55 million from over 3,400 buyers in the United States, all while retaining control of nine trillion (90 percent) of the Kin that it created, either directly or indirectly through the Kin Foundation for which Kik's CEO and CFO served as the sole directors.  *See supra* Sections II.D.I, II.D.4., II.D.5.  Yet Kik did not register the Offering and Sale and provide Kin buyers the Securities Act's protections, including disclosure of its financial statements and other information about Kik and Kin.  *See supra* Sections II.D.6.  Given this conduct, which Kik admits in its answer, "the enforcement of the statute against [Kik] was not arbitrary," *Farrell*, 449 F.3d at 494.

> **b.**     **Section 5 and the *Howey* Test Do No Invite or Encourage Arbitrary Enforcement**

Kik's challenge also separately fails because the Securities Act, "judicial interpretations thereof, as well as regulatory guidance, provided 'sufficiently clear standards to eliminate' risk of 'arbitrary enforcement' of the securities laws in this case." *Zaslavskiy*, 2018 WL 4346339, at *9 (quoting *Farhane*, 634 F.3d at 139).  For decades the multi-pronged *Howey* test has provided helpful and explicit standards by which courts, the SEC, and other government agencies have assessed whether conduct constitutes the offer and sale of investment contracts.  Neither the SEC's decisions to bring or not bring enforcement actions regarding other digital assets, nor statements by SEC officials in their personal capacities, Kik's CEO, industry groups, or members of Congress, as recited in Kik's answer, dictate otherwise.  *See* Answer at 122-27.

Kik attempts to compare Kin's circumstances to those of Bitcoin and Ether and contends that, by the time of Kin's distribution in September 2017, numerous other digital assets had been offered and sold to the public.  *See* Answer at 121-22.  But Bitcoin and Ether were introduced years before the SEC issued the DAO Report emphasizing "that the U.S. federal securities law may apply to . . . distributed ledger technology, depending on the particular facts and circumstances."  2017 WL 7184670 at *7.  Regardless, any such comparison would not suffice to show arbitrary enforcement by

the SEC.  Discretion to enforce a business regulation does not demonstrate arbitrary enforcement.

*See Village of Hoffman Estates*, 455 U.S. at 503; *Farrell*, 449 F.3d at 493-94.

In *Copeland*, addressing a claim of unconstitutional vagueness, the Second Circuit stated:

> [A] pattern of discriminatory enforcement, without more, would not show that the statute is unconstitutionally vague.  What makes a statute unconstitutionally vague is that the statute, as drafted by the legislature and interpreted by the courts, *invites* arbitrary enforcement. *See Kolender*, 461 U.S. at 360–61. The test is whether some element of the statute turns on the law enforcement officer's unguided and subjective judgment. Thus, the Supreme Court has invalidated ordinances whose elements included acting in an "annoying" manner, *Coates*, 402 U.S. at 611, 614–16, and remaining in place without an "apparent purpose," *Morales*, 527 U.S. at 60–64. Such terms are so devoid of objective content that any enforcement decision necessarily devolves upon an individual law enforcement officer's whim.

*Copeland*, 893 F.3d at 120; *see also Kay*, 513 F.3d at 442 (rejecting vagueness claim based on alleged similar misconduct by competitor companies; "multiple violations of a law do not make those violations legal or create vagueness in the law").  The same analysis applies here to Securities Act and the *Howey* test, and, for the same reasons, Kik's vagueness challenge fails.

Nor can Kik succeed on a theory of "selective enforcement," as that would be a claim under the Fifth Amendment's Equal Protection Clause and not a claim of unconstitutional vagueness.  *See Copeland*, 893 F.3d at 120 ("[B]ecause plaintiffs only advance a vagueness claim, we express no view on whether the defendants' enforcement priorities are consistent with the Equal Protection Clause."). Even were Kik to attempt such a claim, it would fail because Kik can offer no evidence that the SEC's efforts to enforce the Securities Act in the area of digital assets "target[s] certain classes of people over others."  *Id.*; *see generally Heckler v. Chaney*, 470 U.S. 821, 831 (1985) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion.").

Following the DAO Report, the Commission has brought numerous enforcement actions premised on the application of *Howey* to the offering and sale of digital assets, further undermining the claim that the standard invites "arbitrary enforcement." *See supra* Section II.B. And tellingly, the Court in *Zaslavskiy* rejected the defendant's vagueness challenge to the term "investment contract," even though the defendant completed his offering of digital assets in the month – September 2017 – that Kik completed its Offering and Sale. Similarly here, nothing in Kik's answer demonstrates unconstitutional vagueness.

\* \* \*

In sum, the parties' undisputed pleadings show that Kik was aware of: U.S. securities laws; the *Howey* test; the risk that, under the *Howey* test, the Offering and Sale was an offering and sale of an investment contract; and the risk that Kik was engaged in an unregistered offering. Irrespective who ultimately prevails on the Commission's claims, Kik's affirmative defense should be dismissed now because it is unsustainable in law and fact.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant plaintiff SEC judgment as a matter of law on defendant Kik's first defense of unconstitutional vagueness.

Dated:   October 24, 2019

/s/ David Mendel
Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on October 24, 2019, a copy of the foregoing document was served upon all counsel listed below via e-mail.

Patrick E. Gibbs
Brett H. De Jarnette
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
pgibbs@cooley.com
*Counsel for Defendant Kik Interactive Inc.*

*/s/ David Mendel*
David S. Mendel
*Counsel for Plaintiff*