# EXHIBIT A

**ANSWER:** Kik admits that this paragraph accurately reflects the requirements under Section 5(c), but denies the remaining allegations in this paragraph.

## III. AFFIRMATIVE DEFENSES

Without assuming the burden of proof for such defenses that it would not otherwise have, Kik asserts the following affirmative defenses:

### FIRST DEFENSE

For the reasons set forth above, Kik did not violate Section 5 of the Securities Act because its offer and sale of Kin in 2017 did not amount to an "investment contract." But if the phrase "investment contract" is defined in a way that applies to Kik's offer and sale of Kin in 2017, the phrase is unconstitutionally vague, and judgment should be entered for Kik.

The Due Process Clause of the United States Constitution requires that "laws be crafted with sufficient clarity to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited' and to 'provide explicit standards for those who apply them.'" *Gen. Media Comm., Inc v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997) (*quoting Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). As the Supreme Court has put it:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. ***Vague laws may trap the innocent by not providing fair warning***. Second, if arbitrary and discriminatory enforcement is to be prevented, ***laws must provide explicit standards for those who apply them***. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications (footnotes omitted).

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (emphasis added) (citation omitted); *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, (2012*)* ("[F]irst, . . . regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not

act in an arbitrary or discriminatory way."). Accordingly, a statute is unconstitutionally vague if either (1) it does not provide sufficient notice to those who are governed by it, **_or_** (2) it does not adequately cabin the discretion of those who apply it. *See Farid v. Ellen*, 593 F.3d 233, 243 (2d Cir. 2010). These considerations are especially important for statutes, such as Section 5, that purport to impose strict liability. *See Hoffman Estates*, 455 U.S. at 499. If applied to Kik's offer and sale of Kin in 2017, the definition of "investment contract" is unconstitutionally vague both because it did not provide sufficient notice to Kik and because it did not adequately cabin the SEC's discretion to apply it.

*** At the time of the TDE, Kik did not have adequate notice of whether its offer and sale of Kin would constitute an "investment contract."*** Kik announced the Kin project in May of 2017, eight years after the introduction of Bitcoin, and three years after the introduction of Ether. Each of Bitcoin and Ether was introduced as a medium of exchange for goods and services, but when first launched, neither Bitcoin nor Ether had any utility. Indeed, Ether tokens were not created or distributed until almost a year after the Ethereum project was funded and launched. For some period after the launch of Ethereum, the Ethereum Foundation maintained an active role in the Ethereum ecosystem, hiring employees, administering developer grants, holding a developer conference, and ensuring security for the Ethereum blockchain network. Once launched, both Bitcoin and Ether were bought and sold on secondary market exchanges, and some number of speculators bought and sold both cryptocurrencies in an effort to profit from changes in market prices.

Notwithstanding all that, by the time Kik announced the Kin project in May of 2017, no court or regulator had ever deemed the offer or sale of any cryptocurrency—not Bitcoin, not Ether—to be an "investment contract" under the federal securities laws. In 2015, the Commodity Futures Trading Commission announced its view that virtual currencies like Bitcoin and Ether are "commodities," and in 2014, the Internal Revenue Service announced its view that the receipt of cryptocurrencies is taxable income. But despite this attention from other regulators (whose positions were fully consistent with the treatment of digital assets as currencies), in the eight years

after Bitcoin was first introduced, the SEC remained virtually silent on the question of whether and how the federal securities laws might apply to offers and sales of cryptocurrencies. This remained true even as cryptocurrencies like Bitcoin and Ether gained widespread attention and use, and as dozens and then hundreds of market participants launched projects involving cryptocurrencies.

Indeed, the SEC issued no meaningful public comment on this issue until July of 2017, when it released a report concerning a cryptocurrency called the DAO token. This report, called the DAO Report, expressed the Commission's view that the offer and sale of a cryptocurrency could be an "investment contract" under the test set forth by the Supreme Court in *Howey*. But at least as to Kik's plan to sell Kin tokens, the DAO Report did not provide "'sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices,'" as required by the Due Process Clause. *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008) (quoting *Arriaga* v. *Mukasey*, 521 F.3d 219, 224 (2d Cir. 2008)). Among other things, the DAO Report stressed that, in the Commission's view, the application of the *Howey* test to the offer or sale of a cryptocurrency would depend on the specific "facts and circumstances" of the transaction. (DAO Report of Investigation at 17-18 ("Whether or not a particular transaction involves the offer and sale of a security— regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction").) This meant that a finding of an "investment contract" based on one set of "facts and circumstances" would provide little or no guidance about how the test would apply to different facts. Moreover, nothing in the DAO Report suggested that a token (like Kin) that was designed and marketed as a digital currency for earning and spending could fall within the definition of an "investment contract" under the federal securities laws, as the Commission interpreted that phrase.

Indeed, as Kik noted publicly at the time of the DAO Report, the DAO token had several features that sharply distinguished it from Kin, and so nothing in the DAO Report suggested that the offer and sale of Kin would be deemed an investment contract under *Howey*. Thus, after the DAO Report came out but before the TDE, Mr. Livingston publicly commented that the

Commission's analysis of the DAO token made "complete sense to [Kik] and [was] fully expected" because, among other things, the token at issue in the DAO Report entitled participants to vote and receive "rewards," which the co-founder compared to "buying shares in a company and getting . . . dividends," and the company informed investors that it would fund projects in exchange for a return on investment. Mr. Livingston then observed that, at the time of Kik's 2017 sales of Kin "when you look at the utility token side, *there [was] no guidance given on that*." Many industry observers expressed similar views, noting the particular "facts and circumstances" that informed the Commission's analysis of the DAO token, as well as the lack of any discussion in the DAO Report about tokens that were designed to be used as digital currencies or that would be integrated into digital applications. No reasonable observer would have understood the DAO Report to suggest that the SEC would seek to apply the federal securities laws to nearly all of the many cryptocurrencies sold to the public at around that time, much less that it would seek to apply those laws to Kik's offer and sale of Kin.

In fact, by the time of the TDE in September of 2017, hundreds of different tokens had been offered and sold to the public, and *not one seller had filed a registration statement with the Commission*. These offers and sales of digital tokens, without filing registration statements, continued even after the DAO Report was issued in July of 2017. Clearly, Kik was not alone in believing that its token was significantly different from the DAO token, and that the "facts and circumstances" of Kik's token sale (the TDE) should result in a different conclusion under the test set forth in *Howey*. Among other things, unlike Kik's offer and sale of Kin, (1) the DAO project was marketed as solely an investment opportunity, (2) DAO tokens entitled holders to voting rights, where holders collectively selected which projects to fund, and therefore functioned as effectively a venture capital fund, (3) holders received pro rata dividend rights to the profits that each project generated, and (4) the token had no use aside from entitling the purchasers to the right to future profits from joint ventures. These distinctions, coupled with the fact that the Commission had taken no action against either Bitcoin or Ether, strongly suggested that the Commission, at least, would not view the offer and sale of Kin to be an "investment contract."

In fact, Kin had far more in common with Bitcoin, for example, than with the DAO token. Much like Bitcoin, Kin was proposed as a decentralized digital currency. Moreover, unlike either Bitcoin (or Ether)—neither of which had been deemed a security at the time of the TDE—Kin had utility right away. A reasonable person, in Kik's position at the time of the TDE, would look to the lack of any Commission enforcement action against Bitcoin and Ether and would conclude that tokens with similar characteristics would also be outside the scope of the federal securities laws. In fact, Kik's consultant, who the Commission heavily cites in its Complaint, believed prior to the TDE that "*[i]n the case of a community currency, there is a good basis to argue that this is not a security. You're just selling units of property that you created that are used for a particular purpose in your app.*"

Indeed, when the Commission first approached Kik about the TDE in September of 2017, it did not take the position that the TDE involved the offer and sale of an "investment contract," even though the Commission was already aware of all the public statements that it now cites in its Complaint, nor did it make any attempt to stop the ongoing TDE, as it has done in other matters. Rather, the Commission asked Kik to produce certain materials voluntarily, and stressed that "the investigation does not mean that we have concluded that you or anyone else violated the law."

*Events since the TDE have also made clear that the term "investment contract" does not cabin the discretion of those who enforce it, including the Commission.* Since the TDE, the Commission has very slowly and fitfully issued a range of public statements about the application of the federal securities laws to cryptocurrencies. But far from clarifying the issue, the Commission's public statements since the TDE have created even more confusion, and have confirmed that, as applied to Kik's offer and sale of Kin in 2017, the definition of "investment contract" (as urged by the Commission) is hopelessly vague, and leaves the Commission free to engage in arbitrary and discriminatory enforcement in this space.

For example, Chairman Clayton has made numerous statements directly contradicting each other: in December 2017, he stated: "there are cryptocurrencies that *do not* appear to be securities." (Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017),

-122-

https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.)  Just two months later, on February 6, 2018, he told the Senate Banking Committee that "I believe **every ICO** I've seen is a security." (Stan Higgins, *SEC Chief Clayton: 'Every ICO I've Seen is a Security*,' CoinDesk (Feb. 6, 2018), https://www.coindesk.com/sec-chief-clayton-every-ico-ive-seen-security.)  On April 5, 2018, Chairman Clayton suggested that the application of the federal securities laws to a given cryptocurrency could vary over time, noting that, "[j]ust because it's a security today doesn't mean it'll be a security tomorrow, and vice-versa." (Nikhilesh De, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (April 5, 2018), https://www.coindesk.com/sec-chief-not-icos-bad.) Just two months later, when asked to confirm this position, he appeared to back off, saying: "that is a question that is out there, and we'll be answering the specific facts and circumstances, but we've been doing this a long time and there's no need to change our fundamental approach." (*SEC Chairman Jay Clayton*: *Cryptocurrencies Like Bitcoin Are Not Securities*, CNBC (June 6, 2018), https://www.youtube.com/watch?v=8YtZJRUak8E.)  Tellingly, Chairman Clayton himself has acknowledged that additional legislation is necessary to clarify the rules in the space, telling the U.S. Senate Committee on Banking, Housing and Urban Affairs in February that "[w]e may be back with our friends from the U.S. Treasury and the Fed to ask for additional legislation." (Pete Rizzo & Stan Higgins, *New Regulation for Crypto? Senate Hearing Sees Debate*, CoinDesk (Feb. 6, 2018), https://www.coindesk.com/crypto-need-new-regulation-us-senate-re-opens-debate.)

Other senior SEC officials have further complicated this picture. For example, in June 2018, Commission Director of Corporation Finance, William Hinman, echoed Chairman Clayton's earlier suggestion that token transactions can evolve from being a security to a non-security, using Bitcoin and Ether as examples. (William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.)  However, Director Hinman provided no explanation as to where this line would be drawn, or even when or why Bitcoin and Ether first fell outside the purview of the federal securities laws. Nor did he opine on whether their consumptive use is enough in and of itself for

transactions in each respective token to not be deemed "investment contracts." Instead, he listed numerous factors for token sellers to consider, suggesting that sellers should initially register their sales and would be able to deregister once the ecosystem was "sufficiently decentralized." But Director Hinman offered no guidance at all on what "sufficiently decentralized" meant. Apparently, it means whatever the Commission wants it to mean in a given case. This is precisely the type of vagueness that invites arbitrary and discriminatory enforcement.

The Commission's willingness to change the rules on the fly is reflected even in its Complaint against Kik. In his June 2018 speech, Director Hinman said that, in matters involving digital tokens, the existence of a security depends not on the nature of the token itself, but rather on the facts and circumstances of the offer and sale of the token. To that end, he said, "the token – or coin or whatever the digital information packet is called – all by itself is not a security." (*Id.*) But despite that clear statement from Director Hinman, the Commission's Complaint against Kik in this case alleges, with respect to Kik's pre-sale, "[a]lthough Kik's SAFT specifically stated that the SAFT was itself a security, it failed to state that the Kin to be delivered under the SAFT were securities sold pursuant to the SAFTs." (Complaint ¶ 91.) The Complaint apparently jettisoned Director Hinman's guidance in an attempt to support the Commission's (incorrect) claim that the pre-sale under the SAFT and the TDE under the Terms of use, amounted to a single transaction. (*See* Kik's Answer to ¶ 1.) Nonetheless, the Commission does not claim that Kin that is being used today is in and of itself a security. Nor does it claim that transactions in Kin are "investment contracts."

Notably, recognizing the confusion of her own colleagues' positions, Commissioner Hester Peirce has recently stated that, "[i]f you apply the reasoning that some of my colleagues at the SEC have used, there are lots of things that would [qualify as] securities," using Starbucks gift cards and Chuck E. Cheese tokens as examples. (Rey Mashayekhi, *U.S. Risks Falling Behind the World in Embracing Crypto, Warns 'Crypto Mom' SEC Commissioner*, Fortune (July 16, 2019), https://fortune.com/2019/07/16/u-s-risks-falling-behind-warns-crypto-mom-sec-commissioner/.)

Given such a statement by one of the Commission's five Commissioners, the Commission's discretion to enforce the term "investment contract," is clearly not "cabined."

Members of Congress have similarly expressed considerable frustration with the lack of clear guidance from the Commission. On September 29, 2018, 15 Members wrote Chairman Clayton a letter expressing concern that they "believe[d] that the SEC could do more to clarify its position." (Ltr. from Representative Ted Budd, et al., to Chairman Clayton (Sept. 28, 2018), https://budd.house.gov/uploadedfiles/budd_davidson_emmer_soto_sec_letter_final.pdf.) They went on to write, "[we] believe that formal guidance may be an appropriate approach to clearing up legal uncertainties which are causing the environment for the development of innovative technologies in the United States to be unnecessarily fraught." (*Id.*) The fact that Congress, which wrote the statute in question, felt the need to send a letter to the Commission expressing concern about the lack of regulatory clarity, is telling, and strongly supports a finding of vagueness as applied to Kik's sale of Kin in 2017.

But Congress is not the only entity expressing frustration and concern about the lack of clear guidance in this space. Just a few days before Congress' letter to Chairman Clayton, over 50 private sector representatives from traditional finance and cryptocurrency industries gathered in Washington D.C. for an event hosted by Congressman Warren Davidson dubbed "Legislating Certainty for Cryptocurrencies." (Kate Rooney, *Wall Street, venture capitalists and crypto companies descend on Capitol Hill to debate regulation*, CNBC (Sept. 25, 2018), https://www.cnbc.com/2018/09/24/lawmakers-venture-capitalists-and-crypto-companies-descend-on-on-capitol-hill-to-debate-regulation.html.) These representatives, which included Nasdaq, Fidelity, Andreessen Horowitz, and Coinbase, voiced concern about the uncertain nature of US regulation of cryptocurrencies and the *Howey* test, and expressed fear that this innovation would have to move overseas.

Sadly, it appears that the lack of regulatory guidance from the Commission is no accident, but instead is designed to prevent industry participants from knowing, in advance, what conduct will be subject to regulation under the federal securities laws—which is precisely one of the

reasons why vague statutes and regulations offend Due Process.  At a blockchain conference in Washington D.C. on April 3, 2018, a very senior Commission Staff member stated: "I think if you were to start down the road of being very prescriptive and putting out specific releases about hypothetical situations, not only would you probably waste a lot of time, you would probably create a road map to get around it." (Kirill Bryanov, *What Do We Know About Valerie Szczepanik, the First Crypto Czar*, Cointelegraph (June 12, 2018), https://cointelegraph.com/news/what-do-we-know-about-valerie-szczepanik-the-first-crypto-czar.)  In plain English:  the Commission does not want to issue "prescriptive" guidance because doing so would tell companies, in advance, how they could comply with the law and avoid regulation under the federal securities laws.  Simply put, for the Commission, the lack of comprehensive guidance telling people, in advance, how to comply with the law is a feature, not a bug.

Further muddying the waters, the Commission has foregone the typical formal rulemaking process wherein it seeks public comment and provides notice of its enforcement strategy.  (*See Rulemaking: How it Works*, https://www.sec.gov/fast-answers/answersrulemakinghtm.html (last modified April 6, 2011)).  This rulemaking process "involves several steps that are designed to give members of the public an opportunity to provide their opinions on whether the agency should reject, approve, or approve with modifications a rule proposal."  (*Id.*)  Then, once the rule is approved by the Commission, the Commission specifies that "the date by which the public must come into compliance with a new or amended rule (the Compliance Date) ***may be delayed or phased in to ensure the transition is a smooth one***."  (*Id.*)  This means that, even when the Commission goes through the proper channels and releases specific guidelines on how to comply with a new rule or interpretation of a prior rule, the Commission delays the compliance date to ensure that the public has time to conform its conduct to the new rule.  Not only was there no specific guidance or formal process – Kik was expected to retroactively comply with the vague guidance it did receive.

Evidencing this flawed approach to "guidance," the Commission has released a "framework" of thirty eight factors purporting to assess whether the sale of a token constitutes an

"investment contract." But, by the Commission's own admission, the factors set forth in this framework "are not intended to be exhaustive in evaluating whether a digital asset is an investment contract or any other type of security, and no single factor is determinative . . . ." No reasonable person would be able to balance 38 factors and have any clarity on whether his or her conduct would violate the federal securities laws. In fact, Commissioner Pierce appears to agree, and has publicly stated:

> I worry that non-lawyers and lawyers not steeped in securities law and its attendant lore will not know what to make of the guidance. Pages worth of factors, many of which seemingly apply to all decentralized networks, might contribute to the feeling that navigating the securities laws in this area is perilous business. Rather than sorting through the factors or hiring an expensive lawyer to do so, a wary company may reasonably decide to forgo certain opportunities or to pursue them in a more crypto-friendly jurisdiction overseas.

(Hester M. Peirce, *How We Howey* (May 9, 2019), https://www.sec.gov/news/speech/peirce-how-we-howey-050919.) Commissioner Pierce is exactly right, as journalists and the cryptocurrency and blockchain industry generally have continued to express frustration and confusion over time as to whether the federal securities laws apply to cryptocurrency transactions, and if so, which ones.

The Commission's efforts on the enforcement front have only added to the confusion. In the DAO Report, the Commission purported to apply the test set forth by the Supreme Court in *Howey* to determine whether the offer and sale of the DAO Token gave rise to an investment contract. (DAO Report of Investigation at 11.) Among other things, that analysis included the question of whether there was a "common enterprise," an element of the *Howey* test that the Supreme Court has reiterated many times, and that every Circuit Court of Appeal in the country has recognized as a key part of the "investment contract" analysis. In a series of consent orders crafted by the Commission's Division of Enforcement, however, the Commission has essentially read the "common enterprise" element out of the test, making no effort to show that any of the projects at issue in those enforcement matters involved the type of "common enterprise" that the

Supreme Court discussed in *Howey*. The Commission's efforts to modify *Howey*'s definition of "investment contract" further illustrates just how malleable that definition is in this context, and creates even more opportunities for arbitrary and selective enforcement by the SEC. As such, it further supports a finding that the term is impermissibly vague as applied to Kik.

\* \* \*

Given the foregoing, as applied to Kik's sale of Kin in 2017, the phrase "investment contract" is unconstitutionally vague because it did not give Kik notice that its conduct would be subject to Section 5, and because it did not adequately cabin the Commission's discretion in enforcing Section 5. Accordingly, even if the phrase "investment contract" is defined in a way that applies to Kik's offer and sale of Kin in 2017, the Commission's claim against Kik is barred by the Due Process Clause of the Fifth Amendment to the Constitution of the United States, and judgment should be entered for Kik.

## SECOND DEFENSE

Under Rule 506 of SEC Regulation D, Kik's pre-sale of contractual rights pursuant to a SAFT is exempt from the registration requirement of Section 5. Accordingly, with respect to the pre-sale and the approximately $50 million that Kik received in the pre-sale, judgment should be entered in favor of Kik.

Under Rule 506 of SEC Regulation D, the sale of an instrument to an "accredited investor," is exempt from the registration requirements of the federal securities laws, subject to a number of conditions. These conditions include, among other things: taking reasonable steps to verify the status of accredited investors and filing Form D with the Commission. Notably, Chairman Clayton has recognized the Regulation D exemption's applicability to token sales:

> It is possible to conduct an ICO without triggering the SEC's registration requirements. For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an initial coin offering that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements.