## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>       **vs.**<br><br>**KIK INTERACTIVE INC.**<br><br>                              **Defendant.** | **Case No.  19-cv-5244 (AKH)** |

## MEMORANDUM OF LAW OF PLAINTIFF U.S. SECURTIES AND EXCHANGE COMMISSION IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT .......................................................................................1

II.  BACKGROUND .......................................................................................................... 6

    A.   The Registration Provisions of the Securities Laws and the *Howey* Test ...................6

    B.   The DAO Report and SEC Enforcement Actions Involving ICOs...........................7

    C.   Statement of Facts: Kik's Offer And Sale ................................................................8

        1. Going Into 2017, There Was A "fear within Kik that Kik could die" ...............8

        2. Kik's "Pivot" To A Single "Token Sale Structure" ........................................9

        3. Kik's Public Announcement And Roadshow ...................................................12

        4. Kik Publicly Stated That It Would Make Future Efforts To Increase Kin's Value .........13

        5. Kik Sold Kin Through SAFTs As Part of The Offering......................................14

        6. Kik Conducted A Public Sale As Part Of The Offering
          And Announced Total Offering Proceeds of $100 Million ................................15

        7. Kik And The Kin Foundation Control 90 Percent of Kin
          Distributed In September 2017 .......................................................................16

        8. Kik Knew That Its Offer and Sale Could Be Considered An
          Offer And Sale of Securities...........................................................................17

        9. Kik Did Not Register The Offer And Sale And Did Not Publicly
          Disclose Its Financial Statements....................................................................17

III. STANDARD OF REVIEW ..........................................................................................17

IV.  ARGUMENT ..............................................................................................................19

    A.   Kik Made Unregistered Offer And Sales Of Securities............................................18

        1. Kik Obtained An Investment Of Money.............................................................21

        2. Purchasers In The Offering Invested In A Common Enterprise ........................21

        3. Kin Investors Reasonably Expected Profits Derived From Kik's
          Entrepreneurial And Managerial Efforts ........................................................25

    B.   Kik Engaged In A Public Distribution In Violation of Section 5 ...........................37

i

1. Kik Engaged In A Single Distribution ..................................................................38

2. Even If Kik Engaged In Two Separate Offerings, They Should
   Be Integrated Into A Single Non-Exempt Offering ............................................43

3. Even If Kik Engaged In Two Non-Integrated Offerings, No Exemption
   Is Available Under Section 506(c) .....................................................................48

C.   The Term "Investment Contract" Is Not Unconstitutionally Vague
     As Applied to Kik...........................................................................................   56

1. Standard For Unconstitutional Vagueness ..........................................................57

2. The Second Circuit And Other Federal Courts Have Uniformly
   Rejected Vagueness Challenges To The Statutory Term "Investment Contract"...........58

3. Kik Had Constitutionally Fair Notice That It Was Offering And
   Selling Investment Contracts ...........................................................................   59

4. The Securities Act Does Not Invite Arbitrary Enforcement................................61

D.   The Court Should Exercise Personal Jurisdiction Over Kik..................................64

V.   CONCLUSION ......................................................................................................65

## **TABLE OF AUTHORITIES**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012) .......................................................................................... 53

*Ackerberg v. Johnson,*
  892 F.2d 1328 (8th Cir. 1989) ..................................................................................... 50

*Aldrich v. McCulloch Properties, Inc.,*
  627 F.2d 1036 (10th Cir. 1980) ................................................................................... 26

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ......................................................................................................17

*Argentinian Recovery Company LLC v. Board of Directors of Multicanal S.A.,*
  331 B.R. 537 (S.D.N.Y. 2005) ............................................................................... 45, 48

*Arriaga v. Mukasey,*
  521 F.3d 219 (2d Cir. 2008) ........................................................................................ 57

*Balestra v. ATBCOIN LLC,*
  380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........................................ 21, 22, 25, 26, 28, 36, 60

*Barkate v. SEC,*
  125 F. App'x 892 (9th Cir. 2005) ................................................................................ 22

*Beranger v. Harris,*
  No. 18 Civ. 05054 (CAP), 2019 WL 5485128 (N.D. Ga. Apr. 24, 2019) ................ 21, 29

*Berckeley Inv. Group, Ltd. v. Colkitt,*
  455 F.3d 195 (3d Cir. 2006) .................................................................................. 37, 50

*Boyce Motor Lines, Inc. v. United States,*
  342 U.S. 337 (1952) ..................................................................................................... 57

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) ..................................................................................................... 64

*Copeland v. Vance,*
  893 F.3d 101 (2d Cir. 2018) .............................................................. 5, 57, 58, 61, 62, 63, 64

*Delaney v. Bank of Am. Corp.,*
  766 F.3d 163 (2d Cir. 2014) ........................................................................................ 18

*Dependable Sales & Service, Inc. v. TruCar, Inc.,*
  377 F. Supp. 3d 337 (S.D.N.Y. 2019) ......................................................................... 18

*Dickerson v. Napolitano,*
  604 F.3d 732 (2d Cir. 2010) .................................................................................. 57, 58

*Farrell v. Burke,*
   449 F.3d 470 (2d Cir. 2006) .................................................................................. 63, 64

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   756 F.2d 230 (2d Cir. 1985) ......................................................................................... 28

*Geiger v. SEC,*
   363 F.3d 481 (D.C. Cir. 2004) ..................................................................................... 50

*General Media Comms. v. Cohen,*
   131 F.3d 273 (2d Cir. 1997) ............................................................................ 57, 58, 60

*Gilligan, Will & Co. v. SEC,*
   267 F.2d 461 (2d Cir. 1959) .................................................................................. 37, 50

*Glen-Arden Commodities, Inc. v. Costantino,*
   493 F.2d 1027 (2d Cir. 1974) ............................................................................... 20, 58

*Hill v. Colorado,*
   530 U.S. 703 (2000) ..................................................................................................... 57

*In re J.P. Jeanneret Assocs., Inc.,*
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................................................................... 23

*In re Barkate,*
   Release No. 49542, 82 SEC Docket 2130, 2004 WL 762434, (Apr. 8, 2004) ............... 22

*In re Matter of Munchee Inc.,*
   Exchange Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017) ........................... 8

*Jaramillo v. Weyerhaeuser Co.,*
   536 F.3d 140 (2d Cir. 2008) ......................................................................................... 18

*Lorenzo v. SEC,*
   139 S. Ct. 1094 (2019) ................................................................................................... 7

*Miller v. Central Chinchilla Group, Inc.,*
   494 F.2d 414 (8th Cir. 1974) ................................................................................... 7, 36

*Ortiz v. N.Y.S. Parole in Bronx, N.Y.,*
   586 F.3d 149 (2d Cir. 2009) ......................................................................................... 57

*Powell v. Nat'l Bd. of Med. Exam'rs,*
   364 F.3d 79 (2d Cir. 2004) ........................................................................................... 18

*R.A. Holman & Co. v. SEC,*
   366 F.2d 446 (2d Cir. 1966) ......................................................................................... 50

*Radiation Dynamics, Inc. v. Goldmuntz,*
   464 F.2d 876 (2d Cir. 1972) ......................................................................................... 52

*Revak v. SEC Realty Corp.,*

18 F.3d 81 (2d Cir. 1994) ...................................................................................................... 22, 23

*Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings, LLC,*
230 F. Supp. 3d 159 (S.D.N.Y. 2017) ..................................................................... 23, 25

*SEC v. Aaron,*
605 F.2d 612 (2d Cir. 1979) ...................................................................................................... 6

*SEC v. Aqua-Sonic Products Corp.,*
687 F.2d 577 (2d Cir. 1982) ............................................................... 7, 20, 26, 29, 35, 36

*SEC v. Blockvest, LLC,*
No. 18 Civ. 2287 (GPB-BLM), 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ...................... 8, 20, 21

*SEC v. Brigadoon Scotch Distrib. Co.,*
480 F.2d 1047 (2d Cir. 1973) ...................................................................................................58

*SEC v. C.M. Joiner Leasing Corp.,*
320 U.S. 344 (1943) ............................................................................................... 3, 7, 20, 26

*SEC v. Cavanagh,*
1 F. Supp. 2d 337 (S.D.N.Y. 1998) ..........................................................................................6

*SEC v. Cavanagh,*
445 F.3d 105 (2d Cir. 2006) ............................................................................ 1, 19, 37, 42, 56

*SEC v. Chinese Consol. Benev. Ass'n,*
120 F.2d 738 (1941)................................................................................................................. 49

*SEC v. Edwards,*
540 U.S. 389 (2004) ........................................................................................ 1, 6, 7, 20, 26, 32

*SEC v. Feng,*
935 F.3d 721 (9th Cir. 2019) ...................................................................................................... 7

*SEC v. Glenn W. Turner Ent., Inc.,*
474 F.2d 476 (9th Cir. 1973) ................................................................................................... 20

*SEC v. Infinity Grp. Co.,*
212 F.3d 180 (3d Cir. 2000) ................................................................................... 22, 24, 29

*SEC v. Kern,*
425 F.3d 143 (2d Cir. 2005) ............................................................................................... 1, 50

*SEC v. Koscot Interplanetary, Inc.,*
497 F.2d 473 (5th Cir. 1974) ..................................................................................................... 7

*SEC v. M & A West, Inc.,*
538 F.3d 1043 (9th Cir. 2008) .................................................................................................. 1

*SEC v. Manor Nursing Ctrs., Inc.,*
458 F.2d 1082 (2d Cir.1972) ..................................................................................................... 6

*SEC v. Mattera*
   No. 11 Civ. 8323 (PKC), 2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) .......................... 4, 19, 44, 45

*SEC v. Murphy*,
   626 F.2d 633 (9th Cir. 1980) ...................................................................................... 18, 45

*SEC v. Ralston Purina Co.*,
   346 U.S. 119 (1952) ...................................................................... 6, 19, 37, 38, 56

*SEC v. Schooler*,
   106 F. Supp. 3d 1157 (S.D. Cal. 2015) ...................................................................... 18, 37

*SEC v. Scoville*,
   913 F.3d 1204 (10th Cir. 2019) ............................................................................................ 7

*SEC v. SG Ltd.*,
   265 F.3d 42 (1st Cir. 2001) ...................................................................................... 7, 22, 24

*SEC v. Shavers*,
   No. 13 Civ. 416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014) .................................... 21

*SEC v. Shields*,
   744 F.3d 633 (10th Cir. 2014) ...................................................................................... 20

*SEC v. Softpoint, Inc.*,
   958 F. Supp. 846 (S.D.N.Y. 1997) .............................................................................. 19, 37

*SEC v. Tourre*,
   No. 10 Civ. 3229 (KBF), 2013 WL 2407172 (S.D.N.Y. June 4, 2013) ............................ 19

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................................ 1, 6, 7, 20, 22, 24, 34, 59, 63

*Solis v. Latium Network, Inc.*,
   No. 18 Civ. 10255 (SDW-SCM), 2018 WL 6445543 (D.N.J. Dec. 10, 2018) .......................... 21, 26

*Steed Finance LDC v. Nomura Securities Intern., Inc.*,
   Fed. Sec. L. Rep. (CCH) ¶ 91552, 2001 WL 1111508 (S.D.N.Y. 2001) .......................... 45

*Tcherpnin v Knight*,
   389 U.S. 332 (1967) ...................................................................................... 20, 36

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ...................................................................................... 7, 20, 35

*United States v Bowdoin*,
   770 F. Supp. 2d 142 (D.D.C. 2011) .............................................................................. 59

*United States v. Farhane*,
   634 F.3d 127 (2d Cir. 2011) .............................................................................. 62

*United States v. Farris*
  614 F.2d 634 (9th Cir. 1979) ........................................................................................ 59

*United States v. Kay,*
  513 F.3d 432 (5th Cir. 2007) ................................................................................... 57, 64

*United States v. Leonard,*
  529 F.3d 83 (2d Cir. 2008) ............................................................................... 7, 20, 63

*United States v. Smith,*
  985 F. Supp. 2d 547 (S.D.N.Y. 2014) ....................................................................... 57

*United States v. Zaslavskiy,*
  No. 17 Cr. 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ........ 8, 21, 24, 59, 60, 62, 63

*Uselton v. Commercial Lovelace Motor Freight, Inc.,*
  940 F.2d 564 (10th Cir. 1991) ................................................................................... 21

*Vacold LLC v. Cerami,*
  545 F.3d 114 (2d Cir. 2008) ................................................................................. 52, 53

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982) ......................................................................................... 58, 61, 64

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.,*
  373 F.3d 241 (2d Cir. 2004) ..................................................................................... 18

*Warfield v. Alaniz,*
  569 F.3d 1015 (9th Cir. 2009) ................................................................................... 31

*Weinstock v. Columbia Univ.,*
  224 F.3d 33 (2d Cir. 2000) ........................................................................................ 17

*Yoder v. Orthomolecular Nutrition Inst.,*
  751 F.2d 555 (2d Cir. 1985) ..................................................................................... 52

## Statutes

15 U.S.C. § 77 ......................................................................... 6, 13, 18, 48, 49, 52, 58

17 C.F.R. § 230.502 ....................................................................... 43, 44, 49, 51

17 C.F.R. § 230.506 .................................................................... 38, 43, 44, 49, 50

## Other Authorities

*ICO Gold Rush: It's a Scam, It's a Bubble, It's a Super Challenge for Regulators,*
  60 Harv. Int'l L. J. 267 (2019) ................................................................................. 36

*Non- Public Offering Exemption,*
  1933 Act Release No. 33-4552, 27 Fed. Reg. 11316, 1962 WL 69540 (Nov. 6, 1962) ........... 4, 44

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act Of 1934: The DAO*,
    Release No. 81207 (S.E.C. Release No.), Release No. 34-81207,
    117 S.E.C. Docket 745, 2017 WL 7184670 (July 25, 2017) ............................................................ 7

*Section 3(a)(11) Exemptions for Local Offerings*,
    1933 Act Release No. 33-4434, 26 Fed. Reg. 11896, 1961 WL 61651 (Dec. 6, 1961) .................. 44

Plaintiff U.S. Securities and Exchange Commission ("SEC") respectfully submits this memorandum in support of its motion for summary judgment against defendant Kik Interactive Inc. ("Kik").  For the reasons set forth below, the Court should grant the SEC's motion.

## I.   PRELIMINARY STATEMENT

Kik violated Section 5 of the Securities Act of 1933 ("Securities Act" or "Act") by conducting a public offering of securities – in the form of digital tokens called "Kin" – without filing a registration statement or having an exemption from registration available.  Facing dwindling cash and no reasonable prospect of revenue, Kik sought to reinvent itself with proceeds from the sale of Kin. From May to September 2017, Kik offered and sold one trillion Kin and received $100 million from thousands of investors worldwide, with over half coming from investors located in the United States. By failing to register the offer and sale of Kin, Kik deprived thousands of investors the protections and required disclosures under the federal securities laws.

Aside from the industry-specific jargon surrounding the security at issue, this is a straightforward case in which Kik's investment scheme and violation of Section 5 are easily identified. Courts routinely grant summary judgment in such circumstances.  *See, e.g.*, *SEC v. Cavanagh*, 445 F.3d 105, 107-116 (2d Cir. 2006) (affirming summary judgment on Section 5 claims); *SEC v. Kern*, 425 F.3d 143, 147-53 (2d Cir. 2005) (same); *SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 328-30 (6th Cir. 2013) (same); *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1050-54 (9th Cir. 2008) (same).

**A.**   The Supreme Court held 70 years ago in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and has continuously re-confirmed in subsequent cases, that an "investment contract" – a specific type of security listed in the Securities Act – is an "investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (internal quotation omitted).  The undisputed

evidence shows that Kik's offer and sale of Kin was an offer and sale of investment contracts under this test.

Kik sought and obtained investment capital through a well-orchestrated public offering. Beginning with the announcement of Kin in May 2017, Kik kicked off a four-month marketing campaign and multi-city "roadshow."  Kik promised to create a "Kin Ecosystem" of computer programs and applications in which investors would be able to use and spend Kin.  In order to attract investors, Kik repeatedly described numerous actions that Kik would take – using sale proceeds – to develop, improve, and create value in the new Ecosystem, and to increase the market value of Kin. Kik promised that it would:  "integrate" Kin into its well-known instant messaging application, Kik Messenger; build new products, services and systems for the Ecosystem, including a "Rewards Engine" that would incentivize developers;  improve the blockchain on which Kin would run; and create and guide a new "Foundation" dedicated to boosting the Ecosystem.  When marketing Kin to investors, Kik also repeatedly touted its entrepreneurial and technological experience, its managerial expertise and capability, and Messenger's large user base.  Kik also said it had an incentive to make the ecosystem successful because of the huge stake in Kin that Kik was retaining for itself.  Kik's CEO described Kin as an opportunity for both Kik and early Kin investors to "*make a lot of money.*" SEC's Statement of Material Facts On Motion For Summary Judgment Under Local Civil Rule 56.1, submitted herewith ("56.1") ¶ 104 (emphasis added).  Thus, when investors bought Kin in 2017 using U.S. dollars or digital assets convertible to U.S. dollars, they were investing in a common venture, and they reasonably expected profits derived from the entrepreneurial or managerial efforts of others, namely Kik.

Kik does not – and cannot – dispute the content of its many public statements about Kin, including the "white paper," public speeches, press releases, and social media posts that Kik issued during its marketing campaign.  These materials are dispositive of Kik's violation.  Kik now contends

that Kin's success depended on participation throughout the Ecosystem, not on Kik's efforts.  But Kik cannot escape the vast record of what it repeatedly told prospective Kin investors and the reality that Kik's future efforts were essential to achieving the benefits that it advertised.  The Supreme Court made clear even before *Howey* that, in a case such as this one, "it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943).  Kik alleges that it was not the "landlord" of its so-called Kin Ecosystem, but Kik was clearly the architect, developer, builder, selling agent, and, critically, caretaker and far largest anchor tenant – without which purchasers could not reasonably have hoped for the venture's success.

**B.**     Furthermore, there is no genuine dispute that Kik violated Section 5 through its *entire* offer and sale, including the portion directed toward wealthy purchasers who entered special contracts with Kik and received Kin at a discounted price.  Kik contends that these transactions – through which Kik obtained about half of the $100 million that it raised in the offering – were exempt from the Act's registration requirement under an SEC rule designed exclusively for sales of securities to "accredited investors" as the end-recipients.  Kik's claimed Rule 506(c) exemption fails for three independent reasons.

First, Kik did *not* limit its sales to accredited investors.  Kik's offer and sale to the wealthy purchasers cannot be separated from its offer and sale to the public, which indisputably included non-accredited investors.  Answer ¶ 1.  Kik conducted one marketing campaign and publicly referred to only one "sale." Furthermore, the amount of Kin that Kik sold to the wealthy purchasers – and the price at which Kik sold it – were contingent on the public also buying Kin in the offering.  Thus, the portion of Kik's offering sold through these contracts did not constitute a private exempt offering but, rather, was part of a public offering for which registration was required.

Second, even if Kik's offering were to be treated as two separate offerings, Kik cannot demonstrate that the alleged "two" sets of transactions should not be *integrated* and considered one

offering under SEC rules.  "A person may not separate parts of a series of related transactions, the sum total of which is really one offering, and claim that a particular part is a nonpublic transaction." *Nonpublic Offering Exemption*, 1933 Act Release No. 33-4552, 27 Fed. Reg. 11316, 1962 WL 69540, at *4 (Nov. 6, 1962); *SEC v. Mattera*, No. 11 Civ. 8323 (PKC), 2013 WL 6485949, at *12 (S.D.N.Y. Dec. 9, 2013).  Kik's alleged "two" offerings involving Kin must be considered integrated under the factors that are normally considered in such an analysis:  they were part of a single plan of financing, involved issuance of the same class of securities (*i.e.*, identical and fungible Kin), were made at or about the same time, involved functionally similar consideration, and were for the same general purpose.  For these reasons also, Kik cannot qualify for the exemption limited to accredited investors.

And, third, even were the sales to the wealthy purchasers under the special contracts a separate offering, that too fails the Rule 506(c) exemption because Kik did not take any steps to restrict the purchasers from immediately reselling to the public.  The wealthy purchasers who obtained large quantities of Kin at a significant discount were but a first step to a broader distribution to the public – in which purchasers planned to and did participate.  The terms of sale at a steep discount virtually guaranteed that purchasers using the contracts would acquire Kin not with any intent to hold and use Kin in a future ecosystem, but with an intent to resell to lock in their anticipated profit.  All purchasers of Kin – those who bought Kin directly from Kik and those who bought in the secondary market – were deprived of the important disclosures that a registration statement and SEC reporting would have provided regarding their investments.  Kik's claim that it structured an "exempt private offering" invites this Court to ignore reality:  the Kin were not intended to come to rest with the wealthy purchasers.  Having failed to include any resale restrictions when it sold Kin to those purchasers, Kik engaged in an unregistered distribution of securities for which no exemption is available.

C.     Kik cannot prevail on its affirmative defense that the Act's term "investment contract" is void for vagueness as applied to Kik's investment scheme.  Through this defense, Kik improperly

tries to refocus attention on the SEC's reasons for bringing this case, and away from its own illegal conduct. However, as the Court has already correctly found, the question whether the Act is confusing or invites arbitrary enforcement should be decided objectively, ECF Nos. 30 and 36, and Kik's claim of constitutional defect is without merit. Decades of court cases have explained and applied *Howey* to determine whether a multitude of novel investment schemes qualified as investment contracts. Furthermore, in July 2017, two months before Kik conducted its public sale of Kin, the SEC issued its "DAO Report," which "advise[d] those who would use . . . distributed ledger or blockchain-enable means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities law," and found that the digital assets at issue in that matter were investment contracts, and therefore securities. 56.1 ¶ 225, SEC88 at 2. Kik, therefore, had fair notice that regulators and courts could determine that Kik was offering and selling investment contracts, and it cannot demonstrate that the Act "invites arbitrary enforcement." *Copeland v. Vance*, 893 F.3d 101, 120 (2d Cir. 2018). The fact that Kik was aware of the regulatory risk it was taking on – going so far as to cancel the sale of Kin in Canada due to warnings from regulators that had applied *Howey* to the offering, while increasing its insurance coverage of defense costs "if the SEC determines that Kin is in fact a security" (56.1 ¶ 223) – further defeats its constitutional challenge.

**D.** Finally, because Kik told the SEC that it intends abandon its defense that the Court lacks personal jurisdiction over it, the Court should disregard this defense. In any event, the defense is without merit, because Kik had sufficient minimum contacts with the United States and the Court's exercise of jurisdiction over Kik in this case is not unreasonable under the Due Process Clause.

*         *         *         *

Kik's 2017 offer and sale of Kin was an offer and sale of investment contracts to the public, which was not registered with the SEC, and for which there was no exemption from registration under

5

the Act.  And Kik has no cognizable defense to the SEC's claim that it violated Section 5.  Accordingly, the Court should grant the SEC's motion for summary judgment.

## II.      BACKGROUND

### A.      The Registration Provisions of the Securities Laws and the *Howey* Test

The registration regime imposed by the Securities Act, 15 U.S.C. §§ 77a, *et seq.*, requires the offer or sale of "securities" to the public to be accompanied by "full and fair disclosure" afforded by a registration statement filed with the SEC and the delivery of a statutory prospectus.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1952).  This regime fulfills the statutory purpose of providing potential purchasers with the information essential to an informed investment decision.  *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998); *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979)), *vacated on other grounds*, 446 U.S. 680 (1980).  Registration entails disclosure of detailed information bearing on the value of publicly-traded securities, including the identity and background of management, the issuer's financial condition, and investment risks.  *See* 15 U.S.C. §§ 77g, 77aa; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1098 (2d Cir.1972).  The registration statement is "central to the Act's comprehensive scheme for protecting public investors."  *Aaron*, 605 F.2d at 618.  Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of "securities" in interstate commerce absent an exemption. 15 U.S.C. §§ 77e(a), (c).

Under Section 2(a)(1) of the Securities Act, a security includes "an investment contract."  *See* 15 U.S.C. § 77b(a).  The Supreme Court interprets "investment contract" to mean an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *See Howey*, 328 U.S. at 301; *Edwards*, 540 U.S. at 393. This "*Howey* test" is designed to be "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299; *accord Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019) (recently quoting *Howey*); *see*

6

*also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847-48 (1975) (Congress "sought to define 'the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'") (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)); *Joiner*, 320 U.S. at 351 ("[T]he reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security.'").

Thus, courts have found the *Howey* test to be satisfied with regard to non-stock and non-debt interests in: orange groves in *Howey* itself; payphone leases, *see Edwards*, 540 U.S. at 389; investment packages to secure EB-5 visas, *see SEC v. Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019); online ad services, *see SEC v. Scoville*, 913 F.3d 1204, 1219-22 (10th Cir. 2019); licenses to sell dental products, *see SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir. 1982); films, *see United States v. Leonard*, 529 F.3d 83, 87-91 (2d Cir. 2008); multi-level marketing, *see SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 478-79 (5th Cir. 1974); and chinchillas, *see Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414, 416-18 (8th Cir. 1974). Notably, *Howey* has been satisfied where a promotor offered "virtual shares in an enterprise existing only in cyberspace." *SEC v. SG Ltd.*, 265 F.3d 42, 44-59, 51 (1st Cir. 2001).

## B.    The DAO Report and SEC Enforcement Actions Involving ICOs

In July 2017, the SEC issued the DAO Report regarding an "Initial Coin Offering" ("ICO") for so-called "DAO Tokens." 56.1 ¶ 225, SEC88. An ICO is a fundraising event in which an entity offers participants a unique digital asset – often described as a "coin" or "token" – in exchange for consideration, most commonly U.S. dollars, or other digital assets such as Bitcoin or Ether. In the DAO Report, the SEC explained that issuers of distributed ledger or blockchain technology-based

7

securities must register offers and sales of such securities under the Securities Act unless a valid exemption from registration applies. The DAO Report considered the offer and sale of DAO Tokens and concluded that they were investment contracts, and therefore securities based on long-standing legal principles, and that offers and sales of DAO Tokens were thus subject to the federal securities laws.  The automation of certain functions through "smart contracts" or computer code or other technology, the Report concluded, does not remove conduct from the purview of those laws.  Thus, the SEC's message to issuers and others in this space has been clear:  those who would use distributed ledger or blockchain technology to raise capital or engage in securities transactions must take all appropriate steps to comply with the federal securities laws.  *See United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018) (relying on the DAO Report as part of the "guidance issued by the SEC as to the scope of its regulatory authority and enforcement power" that provides notice).

In addition to this action, the SEC has brought a number of enforcement actions concerning ICOs for alleged violations of the federal securities laws.[1]

### C.  Statement of Facts:  Kik's Offer And Sale

#### 1.  Going Into 2017, There Was A "fear within Kik that Kik could die"

Kik is a privately-held Canadian corporation, which, during the relevant time period, had its headquarters in Waterloo, Ontario, and offices in New York City and Tel Aviv.  56.1 ¶¶ 1-2.  From

---

[1]      *See, e.g., SEC v. Telegram Group Inc.*, No. 19 Civ. 9439 (PKC) (S.D.N.Y. Oct. 11, 2019) (emergency action to halt alleged unregistered offerings of digital assets); *SEC v. Blockvest*, No. 18 Civ. 2287 (GPC-BLM) (S.D. Cal. Oct. 3, 2018) (emergency action to halt allegedly fraudulent and unregistered offerings of digital assets); *SEC v. AriseBank*, No. 18 Civ. 186 (BML) (N.D. Tex. Jan. 30, 2018) (same); *In re Matter of Munchee Inc.*, Exchange Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017)  (settled administrative proceeding against unregistered ICO); *SEC v. PlexCorps*, No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017) (emergency action to halt allegedly fraudulent and unregistered ICO); *SEC v. ReCoin Group Foundation, LLC*, No. 17 Civ. 5725 (RD) (E.D.N.Y. filed Sept. 29, 2017) (same).   These and other matters are listed on the SEC's website.   *See* https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

2010 until 2019, Kik operated a chat application called Kik Messenger, which allowed users to communicate with each other using mobile devices. *Id.* ¶ 7. Although Kik Messenger has had hundreds of millions of users, historically Kik has not been profitable. *Id.* ¶¶ 8-9. From mid-2015 to mid-2017, Kik lost tens of millions of dollars per year. *Id.* ¶ 11. In late 2016 and early 2017, Kik hired an investment bank to help Kik find a purchaser of its business, but the bank did not find a buyer. *Id.* ¶ 12.

By early 2017, Kik had only $26 million in cash remaining from the $120 million in financing that it had received from venture capital firms. *Id.* ¶¶ 6, 15. A January 2017 presentation to the board of directors reported "$3.1M current burn" per month and "Runway to September 5, 2017." *Id.* ¶ 17. "Runway" meant the time by which Kik would run out of money to fund operations at then-current spending levels. *Id.* ¶ 17. As Kik's CEO later testified, "the answer of Kik will 'figure out how to make money later' was no longer an option with [Kik's] investors," and, going into 2017, there was "a fear within Kik that Kik could die." *Id.* ¶ 14.

### 2.     Kik's "Pivot" To A Single "Token Sale Structure"

On February 1, 2017, Kik's board of directors discussed offering and selling a new digital token through an ICO, which, according to management's PowerPoint slide presentation for the meeting, was "a new way to raise funds that is in vogue" and would be a "[l]arge pivot in business model." 56.1 ¶¶ 18-19. Later that month, Kik's management delivered a presentation to the directors on "[t]he potential for an ICO," and the board instructed the executive team to assume that Kik would conduct a token sale. *Id.* ¶¶ 24, 26. By early 2017, Kik's senior management had concluded that the offer and sale of digital tokens was Kik's "only option." *Id.* ¶ 20.

In the following months, Kik's management continued to update the board on the potential ICO by providing assessments of the potential interest of "cryptoinvestors" and "crowdfunders." *Id.* ¶ 24. In addition, Kik's CEO explained to other employees his thesis for how cryptoinvestors could

profit from Kik's anticipated ICO.  In a March 24, 2017 email to Kik's "Leadership Team," the CEO explained that Kik's steps to boost the demand for the tokens in the future would mean that people could buy now at a low price and sell later at a higher price to "creat[e] a return":

> [I]f you buy some Kik Points today when the demand is low, then you will be able to sell them at a higher price tomorrow when the demand is higher, creating a return.  This potential return encourages investors to "buy in" at an ICO.  An ICO is where Kik takes a portion of its reserves from its Fort Knox (say 100 million of the 1 billion Kik Points that we initially created and put in our Fort Knox) and sells them in an auction.  The value proposition to investors is that if they buy in today at the ICO, and then the demand for the currency goes up *because of all the things we do to create demand for them*, then they will be able to sell their points at a higher price in the future, and make a return.  The money taken in from investors for the ICO is used by Kik to fund development to create more and more demand by both growing the community, and by growing the demand for the currency within the community.

*Id.* ¶ 28 (emphasis added).  During this time period, Kik hired a New York City-based consulting firm, which researched the market for tokens and other digital assets and helped plan Kik's ICO.  *Id.* ¶ 29.  The consultant advised Kik that the "investment space" for digital tokens "[wa]s extremely hot," with recent token sales notching an "*average return multiple of 15x.*"  *Id.* ¶ 30.

In a late April 2017 email, a Kik board member described Kik's plan to offer and sell a digital token as "a hail Mary pass that involves crypto."  *Id.* ¶ 32.  An early May 2017 PowerPoint slide presentation to the board stated that the end of the company's cash runway was then only six or seven months away, depending on whether Kik paid severance to laid-off employees.  *Id.* ¶ 34.

Kik established a plan to create ten trillion digital tokens called "Kin" and to sell one trillion of this supply (10 percent) in 2017.  (Later, when publicly discussing the plan, Kik would always refer to the sale as "one" sale of one trillion tokens, and not multiple sales.  *See infra* Section IV.B.1).  A slide presentation circulated to the board on May 22, 2017, projected Kik's goal of a "Total Raise of $100 million."  *Id.* ¶ 37.  This would occur through a "Pre-Sale" phase and a "Token Distribution Event."  *Id.* ¶ 37.  One of the slides, entitled "Token Sale Structure (Soft Cap)," summarized Kik's

plan to offer the one trillion tokens in multiple "tranches," with investors in the earlier tranches – *i.e.,* during the "Pre-Sale" – committing funds in advance of a sale of Kin to the general public in exchange for discounts from the final offering price.  *Id.* ¶ 38.  Some of the Kin sales in the Pre-Sale would be accomplished through contracts called Simple Agreements for Future Tokens ("SAFTs").  *Id.* ¶ 39.  Kik planned to raise up to $125 million – $50 million through the SAFTs, and between $50 million to $75 million more in what Kik called the "public tranche[s]."  *Id.* ¶¶ 39-40.  Here is Kik's slide describing its plan of distribution to Kin investors:

## Token Sale Structure (Soft Cap)

| | |
|---|---|
| Token Supply | 10T Tokens |
| Float Offered | 10% |
| $ Tranches Based Pricing Discounts | 35%; $0-25M SAFT<br>25%; $25-50M SAFT 2<br>20%; $50-75M (first public tranche)<br>10%; $75-100M (last chance for discounts)<br>0%; $100-125M (post soft cap) |
| Soft Cap | $100M (followed by a 24 hour countdown once reached) |
| Sale Time | 30 days maximum |
| Minimum | TBD |
| Distribution | Fixed 10% sold; Token Allocation calculated at end of sale based on proceeds raised and distributed per the example |
| Vesting | Time and Performance based for Founder and Foundation tokens only |

*Id.* ¶ 40.

Kik prepared a single "communications strategy" that would run from the public announcement of Kin until the "Token Sale" and encompass "pre-sales."  *Id.* ¶ 43.  Kik also planned a multi-city "Roadshow," *id.* ¶¶ 43-45, and drafted a "white paper" that Kik would direct to both the accredited, pre-sale investors and the general public simultaneously, *id.* ¶ 47.

### 3.   Kik's Public Announcement And Roadshow

On May 25, 2017, Kik publicly announced Kin to an over-capacity audience of around 700 individuals at the New York City "Token Summit," while also releasing a professionally prepared promotional video, giving an interview on CNBC, and publicly issuing its white paper and multiple other written statements.  56.1 ¶¶ 49-50, 56.  A video of the Token Summit announcement was posted on YouTube, and Kik posted the white paper on its website, making the document freely accessible on the Internet.  *Id.* ¶¶ 52-53.  Kik then embarked on the Roadshow in which Kik's CEO delivered speeches and interviews that were streamed live or later posted on the Internet.  Between June 20, 2017 and September 7, 2017, Kik's CEO spoke at conferences, "fireside chats," or "meet-ups" in Shenzhen, China; San Francisco, California; Toronto, Canada; and New York City (a second time), and he appeared on a video podcast.  *Id.* ¶¶ 57, 68.  Interspersed with these live presentations were additional public Internet posts, blogs, and tweets.  *Id.* ¶ 63.  While visiting other cities during the Roadshow, Kik also met privately with potential Kin investors.  *Id.* ¶ 62.

Kik's white paper sets forth Kik's "Vision" for Kin and the "Kin Ecosystem."  *Id.* ¶ 54.  Kin would be implemented on the "public Ethereum blockchain as an ERC-20 token."  *Id.* ¶ 124.[2]  The white paper also stated:  "In order to finance the Kin roadmap, Kik will conduct a token distribution event that will offer for sale one trillion units out of a 10 trillion unit total supply of Kin."  *Id.* ¶ 55.  It also explained that three trillion Kin (30 percent) would be allocated to Kik under a future vesting schedule, and six trillion (60 percent) would be allocated to a new "Kin Foundation" that Kik would establish.  *Id.* ¶ 55.

Accordingly, it was Kik's plan all along to embark on a public distribution of securities to raise the capital required to implement its aggressive plan to reinvent itself.

---

[2] Ethereum is one of the more widely used blockchain networks.  ERC-20 is a standardized format for the creation, issuance, and management of fungible tokens on the Ethereum blockchain.

4.    **Kik Publicly Stated That It Would Make Future Efforts To Increase Kin's Value**

In its public statements, Kik repeatedly described how Kik would "build fundamental value" for Kin and how Kik would make entrepreneurial and managerial efforts to increase the value of Kin. Kik repeatedly explained to the public the same "value proposition" that Kik's CEO had articulated for his leadership team a few months earlier: Kik was creating a limited supply of Kin, and its efforts to increase the demand for the token would lead to increased value. 56.1 ¶¶ 95, 97-101, 103-104. Kik compared buying Kin to venture capital investing and asserted that, like in the dot.com era, "there is a lot of hype right now, and people are going to make a lot of money." *Id.* ¶¶ 117-120. Kik assured Kin investors that any Kin purchased could be easily resold on online trading platforms, which Kik referred to as "exchanges," soon after issuance.[3] *Id.* ¶¶ 121-130. Kik thereby primed investor expectations of liquidity and resales of the token. *Id.*; *see also infra* Section IV.A.3.a. And indeed, within months after receipt, initial Kin investors resold billions of Kin into secondary markets. 56.1 ¶¶ 195, 197. These resales show that the Kin were not purchased for use within the Ecosystem and not in amounts commensurate with such use.

Kik's public statements also repeatedly described Kik's managerial and entrepreneurial expertise, its future commitment to the Kin "economy," and the many future steps that Kik would take to drive up demand for Kin and, hence, Kin's value. These steps included: integrating Kin into Kik's existing product, Kik Messenger; building new products, services, and systems for the Kin Ecosystem; creating a Rewards Engine that would incentivize developers to join the Ecosystem; supplementing and improving the Ethereum blockchain; and creating and guiding a new "Kin Foundation" that Kik would direct and control. *Id.* ¶¶ 131-183. Kik also repeatedly emphasized its

---

[3] Although Kik and others may refer to secondary trading of Kin on "exchanges," such trading platforms are not registered with the Commission as national securities exchanges, and are not exempt from the registration requirements applicable to national securities exchanges. *See* 15 U.S.C. §§ 78e, 78f.

13

own financial interest in growing the value of Kin, because Kik would retain ownership of 30 percent of the outstanding supply of Kin.  *Id.* ¶¶ 105-112.  Kik's CEO declared that Kik "will be able to sell it on to the exchanges like anybody else."  *Id.* ¶ 125.  *See infra* Section IV.A.3.b.

### 5.      Kik Sold Kin Through SAFTs As Part Of The Offering

From May through September 2017, Kik offered and sold what Kik called "the right to certain units of Kin" to wealthy investors through contracts called SAFTs.  56.1 ¶ 72.[4]  Under the SAFT, an investor ("SAFT participant") paid Kik an agreed-upon sum of U.S. dollars, and Kik would deliver Kin to the participants at a 30 percent discount from the maximum price at which the tokens would be sold to the public during a "Network Launch."  *Id.* ¶ 78.  The Network Launch was defined as the sale of "Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain" – *i.e.*, the "tranches" of Kin that Kik planned to distribute to the general investing public.  *Id.* ¶ 77.  SAFT participants would receive 50 percent of their allotted tokens upon Network Launch, and their remaining tokens the following year.  *Id.* ¶ 72.  There were no resale restrictions on the Kin delivered to SAFT participants.  *Id.* ¶¶ 79, 83.

The SAFT stated that it was a "security instrument," and Kik provided SAFT participants with private placement memoranda ("PPM") which included a "Company Overview," biographies of Kik's "Directors and Management," and a description of the Kin project.  *Id.* ¶ 83, 88.[5]  Kik started to enter into SAFTs with participants in early July 2017 and continued to do so through September 11, 2017.  *Id.* ¶ 234.

---

[4] As explained below, *infra* Section IV.B.3.a, Kik sold Kin and not just "the right to" Kin through the SAFTs.

[5] The PPM also contained detailed descriptions of certain "Risk Factors" concerning Kik, Kin, and the Kin Ecosystem.  For example, it warned investors who purchased Kin via SAFTs that "Kik has experienced a declining usage of its messenger service over the last several years. Such a lack of use or interest could negatively impact the development of the Kin Ecosystem and therefore the potential utility of Tokens."  56.1 ¶ 247.

###### 6. Kik Conducted A Public Sale As Part Of The Offering And Announced Total Offering Proceeds Of $100 Million

From May through September 2017, Kik offered and sold Kin to the public.  On or about August 29, 2017, Kik publicly announced deadlines and procedures by which all members of the public ("public investors") could participate in Kik's upcoming "token distribution event."  56.1 ¶¶ 244-245.  The deadline for public investors to register for this portion of the offering was September 9, 2017.  *Id.* ¶ 245.  Then, between September 12 and September 26, 2017, Kik sold Kin to registered public investors who used Ether to pay for the tokens.  *Id.* ¶¶ 255-258.

Kik's marketing paid off.  Approximately 10,000 public investors bought Kin in exchange for a total of 168,732 Ether, which was then worth approximately $49.2 million. *Id.* ¶ 260.[6]  Over three thousand (3,456) of these investors were from the United States and accounted for approximately $16.8 million in Ether.  *Id.* ¶ 260.  Kik did not provide the PPM to persons who bought Kin only through the public sale.  *Id.* ¶ 247.

Meanwhile, from early July through September 11, 2017 – two days after investor registration for the public portion of the offering closed – Kik entered into SAFTs with approximately 50 SAFT participants who paid Kik approximately $49 million in U.S. dollars for Kin tokens.  *Id.* ¶ 234.  Of this amount, approximately $40 million came from SAFT participants in the United States.  *Id.* ¶ 234.

On September 26, 2017, Kik issued a press release entitled "Kik Raises Nearly US$100 Million in Kin Token Distribution Event" that stated: "the Kin token distribution event (TDE) has successfully ended, raising nearly US$100 million."  *Id.* ¶ 270.  Kik deposited the proceeds from the Kin sales into two bank accounts and Kik's Ether wallet,[7] all of which Kik controlled.  *Id.* ¶¶ 294-296.

---

[6] Kik ultimately realized approximately $59 million from its sale of Ether, because it converted its Ether to dollars during a rise in the price for the asset.  56.1 ¶ 295.

[7] An Ether "wallet" is a computer application used to receive, send, and hold Ether.

Soon after Kik distributed the tokens, Kik began to convert to cash the Ether it received during the sale. *Id.* ¶ 295; SEC93 at ¶¶ 8.c-8f.

### 7. Kik And The Kin Foundation Control 90 Percent of Kin Distributed In September 2017

Kik allocated the distribution of Kin that occurred on September 26, 2017. 56.1 ¶¶ 287-289. Kik received four trillion Kin, of which Kik kept three trillion – 30 percent of the total Kin created. *Id.* ¶ 288. Kik then transferred the other one trillion Kin to investors in the offering – the approximately 10,000 public investors and the approximately 50 SAFT participants. *Id.* ¶ 288.[8] Kik also distributed six trillion Kin to the Kin Foundation that Kik had created just a few weeks earlier. *Id.* ¶ 289. Between Kik and the Kin Foundation that Kik created and controlled, Kik controlled 90 percent of the available supply of Kin.

At no time during the offering and through the distribution of Kin on September 26, 2017, did Kik identify *any* good or service that could be purchased with Kin. *Id.* ¶ 210; *see also id.* ¶ 211 ("Q. On the day you purchased or received your Kin, were you able to purchase anything? A. No, I don't think so."). Furthermore, during this same time period, it was impossible to buy *any* good or service within Kik Messenger using Kin. *Id.* ¶ 210; SEC8, Livingston Inv. Tr. 475:20-22 ("If you're saying in terms of actually spending them where Kik would take your tokens in return for something, no.").

### 8. Kik Knew That Its Offer And Sale Could Be Considered An Offer And Sale of Securities

Starting at least as early as February 2017, Kik was aware that regulators and courts could decide that the offer and sale of Kin was an offer and sale of securities under *Howey*. 56.1 ¶ 217. One of Kik's consultants specifically warned Kik of the risk, and the Kik board discussed it. *Id.* ¶¶ 218-221. Kik then took steps to try to address the risk, for example, by creating a so-called "Minimum

---

[8] Pursuant to the terms of the SAFTs, however, only half of the Kin purchased via SAFTs were delivered; the other half were to be delivered on the one-year anniversary of the distribution. 56.1 ¶ 288.

Viable Product" that allegedly would allow Kik to claim that Kin had functionality when first issued and put Kik "in a better position to defend a regulatory challenge." *Id.* ¶¶ 201-207. After a Canadian regulator (the Ontario Securities Commission) "definitively" told Kik that it believed that Kik was offering and selling securities under *Howey* and Canadian law, Kik canceled the offer and sale in Canada but proceeded in the United States. *Id.* ¶¶ 227-230. Kik increased its insurance coverage for the company's officers and directors for the purpose of preparing for a possible SEC investigation and litigation. *Id.* ¶¶ 222-224.

### 9. Kik Did Not Register The Offer And Sale And Did Not Publicly Disclose Its Financial Statements

Kik did not register with the SEC its sales via SAFTs or to public investors in the offering, nor did Kik prohibit United States purchasers from buying Kin. 56.1 ¶ 276. Kik did not publicly disclose its financial statements during the offer and sale. *Id.* ¶ 277.

## III.   STANDARD OF REVIEW

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014). *See generally Dependable Sales & Service, Inc. v. TruCar, Inc.*, 377 F. Supp. 3d 337, 345-46 (S.D.N.Y. 2019).

It is the initial burden of the movant to come forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241,

244 (2d Cir. 2004).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Id.* In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993)).  *See generally Dependable Sales*, 377 F. Supp. 3d at 345-46.

 Furthermore, "[i]n an SEC enforcement action, once the SEC has made out a prima facie case of the sale of unregistered securities, the burden shifts to the defendant to introduce evidence supporting its affirmative defense."  *SEC v. Schooler*, 106 F. Supp. 3d 1157, 1161 (S.D. Cal. 2015), *aff'd in relevant part*, 905 F.3d 1107 (9th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir.1980)).

## IV.    ARGUMENT

### A.    Kik Made An Unregistered Offer And Sale Of Securities

Sections 5(a) and (c) of the Securities Act make it "unlawful for any person, directly or indirectly" to "sell," "offer to sell" or "offer to buy," a "security" unless a registration statement is in effect or has been filed as to such security.  15 U.S.C. §§ 77e(a), (c).  To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly sold or offered to sell the securities (3) through interstate commerce.  *Cavanagh*, 445 F.3d at 111 n.13.  "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption."  *Id.* (citing *Ralston Purina*,

346 U.S. at 126); *see also SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859 (S.D.N.Y. 1997) ("If a registration exemption is claimed, the claimant bears the burden of proving the exemption.").

Kik does not dispute that it sold or offered to sell Kin, or that it has never had a registration statement filed or in effect.  *See* Answer ¶¶ 1, 18, 111; 56.1 ¶ 276.  Additionally, Kik cannot dispute that the offer and sale occurred through interstate commerce.  Among other things, Kik used the Internet, including websites and email, to provide offering materials and information about the buying process to potential Kin investors in the United States, and then delivered Kin to United States buyers over the Internet.  56.1 ¶¶ 305-306.  Kik also spoke by telephone with Kin buyers in the United States to promote the offer and sale, and used several United States-based social media on the Internet.  *Id.* ¶¶ 307-308; *see Mattera*, 2013 WL 6485949, at *10) (finding interstate communication was used in the offer or sale where defendant "solicited investments through email"); *SEC v. Tourre*, No. 10 Civ. 3229 (KBF), 2013 WL 2407172, at *11 (S.D.N.Y. June 4, 2013) (granting summary judgment to SEC on interstate commerce element where it was undisputed that alleged misconduct occurred "via phone and e-mail").  Accordingly, this case turns on whether Kik offered or sold "securities" in the form of "investment contracts" under the Act.

Under *Howey*, an investment contract involves: an investment of money, in a common enterprise, with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  *See Howey*, 328 U.S. at 301; *Edwards*, 540 U.S. at 393-95; *United Housing Found.*, 421 U.S. at 852.  The test aims to answer a fundamental question: whether the transaction involves "all the elements of a profit-seeking business venture."  *Howey*, 328 U.S. at 300; *see also Forman*, 421 U.S. at 849 (focus is "on the capital market of the enterprise system"); *supra* Section II.A (collecting cases applying *Howey* to various and novel circumstances).  The Second Circuit has explained that the *Howey* test is an analysis of "'whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their

money and the promoter's contribution in a meaningful way." *Leonard*, 529 F.3d at 88 (quoting *Aqua-Sonic*, 687 F.2d at 583).[9]   In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction," *Forman*, 421 U.S. at 849.

"Consistent with *Howey*'s focus on substance over form, [courts] look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) (quoting *SEC v. Merchant Cap.*, LLC, 483 F.3d 747, 756-57 (11th Cir. 2007)).   "[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'" *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1029, 1034 (2d Cir. 1974) (quoting *Joiner*, 320 U.S. at 352-353); *see also Aqua-Sonic*, 687 F.2d at 583 (same); *SEC v. Blockvest, LLC*, No. 18 Civ. 2287 (GPB-BLM), 2019 WL 625163, at *6 (S.D. Cal. Feb. 14, 2019) (same).

Courts applying these standards have ruled favorably on allegations that offerings and sales of digital assets are offerings and sales of securities. *See, e.g.*, *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (denying motion to dismiss complaint); *Beranger v. Harris*, No. 18 Civ. 05054 (CAP), 2019 WL 5485128, at *4 (N.D. Ga. Apr. 24, 2019) (denying motion to dismiss claim that digital tokens were securities); *Blockvest*, 2019 WL 625163, at *9 (granting motion for preliminary injunction); *Solis v. Latium Network, Inc.*, No. 18 Civ. 10255 (SDW-SCM), 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (denying motion to dismiss complaint); *Zaslavskiy*, 2018 WL 4346339 at *8 (denying motion to dismiss indictment).

---

[9] In *Howey*, the Court stated that "[t]he test" for an investment contract is "whether the scheme involves an investment of money . . . with profits to come solely from the efforts of others."  328 U.S. at 301.  Courts in the Second Circuit and elsewhere have declined to follow literally the word "solely."  *See Leonard*, 529 F.3d at 88; *SEC v. Glenn W. Turner Ent., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973).

Here, the undisputed facts show that the offer and sale meets the *Howey* test as a matter of law, and Kik engaged in an unregistered public offering in violation of Section 5.

### 1.   Kik Obtained An Investment Of Money

There can be no genuine dispute that all Kin purchasers made an "investment of money." Investors paid Kik in U.S. dollars ($49 million from SAFT participants, 56.1 ¶ 234), or in Ether ($49.2 million worth from public investors, 56.1 ¶ 260).[10]  Kik's acceptance of U.S. dollars or Ether for Kin easily constitutes an "investment of money."

Paying U.S. dollars is an investment of money, and "it is well established that cash is not the only form of contribution or investment that will create an investment contract"; "the 'investment' may take the form of 'goods and services,' . . . or some other 'exchange of value.'" *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991).  Thus, in *SEC v. Shavers*, No. 13 Civ. 416, 2014 WL 12622292 (E.D. Tex. Aug. 26, 2014), the court was "easily able to determine that Bitcoin . . . satisfie[d] the "investment of money" prong of the *Howey* test," *id.* at *5.  *See also Beranger*, 2019 WL 5485128, at *2 (collecting cases holding that payments of Bitcoin or Ether satisfied "investment of money" prong of *Howey*).

### 2.   Purchasers In The Offering Invested In A Common Enterprise

There also can be no genuine dispute that all purchasers in the offering – SAFT participants and public investors alike (collectively the "Kin investors") – invested "in a common enterprise." *Howey*, 328 U.S. at 301.[11]  In the Second Circuit, a common enterprise can be established by showing "horizontal commonality":  the "tying of each individual investor's fortunes to the fortunes of the

---

[10] Kik sold the Ether for U.S. dollars, which it deposited into a U.S. bank account.  56.1 ¶ 295.

[11] The Commission does not require commonality *per se* or view a "common enterprise" as a distinct element of the term "investment contract."  In its *In re Barkate* opinion, the Commission stated that a "common enterprise" is not a distinct requirement for an "investment contract" under *Howey*.  Release No. 49542, 82 SEC Docket 2130, 2004 WL 762434, *3 n.13 (Apr. 8, 2004), *aff'd sub nom. Barkate v. SEC*, 125 F. App'x 892 (9th Cir. 2005).  In any event, as explained further herein, the record shows the undisputed existence of commonality.

other investors by the pooling of assets," such that "the fortunes of each investor depend upon the profitability of the enterprise as a whole." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). To establish horizontal commonality, it is sufficient to show that "each investor was entitled to receive returns directly proportionate to his or her investment stake," including as an "increase in the value of the investment." *SG Ltd.*, 265 F.3d at 46-47, 51 (finding horizontal commonality); *accord SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000).   Although pooling of assets is "usually combined with the pro-rata distribution of profits," *id.*, profit distribution is not required.  *See Balestra*, 380 F. Supp. 3d at 354  (where plaintiff alleged sale of unregistered securities through initial coin offering of a digital asset, a "formalized profit-sharing mechanism is not required for a finding of horizontal commonality").

The Second Circuit has not yet decided whether a common enterprise can alternatively be established by showing "strict vertical commonality;" however, many courts in this District have concluded that it can.  *See Revak*, 18 F.3d at 88 (concluding that "broad vertical commonality" does not satisfy the common enterprise prong but declining to decide whether "strict vertical commonality" does); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) ("[C]ourts in this district have held that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*.") (collecting cases).  "'Strict vertical commonality' requires that the fortunes of investors be tied to the fortunes of the promoter." *Revak*, 18 F.3d at 88 (emphasis and citation omitted).  This can be established if there is "a direct relationship between the fortunes of the investor and . . . promoter of the investment such that 'their fortunes rise and fall together.'" *Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings, LLC*, 230 F. Supp. 3d 159, 165 (S.D.N.Y. 2017) (citation omitted).

Although either horizontal or strict vertical commonality suffices, the Kin investors invested in a common enterprise that satisfies both types of commonality.  With respect to horizontal

commonality, the fortunes of all Kin investors were tied together by Kik's pooling of the funds that

the investors paid Kik.  Kik told the Kin investors that it would use their pooled investments to

execute upon the very steps that were designed to increase Kin's value.  Kik's white paper stated,

"[t]he proceeds of the token distribution event will be used to fund Kik operations and to deploy the

Kin Foundation," and that a "portion" of these funds "will be used to execute upon the roadmap of

additional feature development planned for the Kin integration into Kik."  56.1 ¶ 142.  Kik's CEO

told his San Francisco audience:

> So, we're going to use the funds to build a new platform.  So, to build a new
> transaction service, the identity service, the reward engine, to build out all these
> cases inside of Kik, to get a bunch of developers building use cases outside of
> Kik basically to, like, launch this whole broader ecosystem.

56.1 ¶ 143.  And Kik specifically informed SAFT participants:

> A significant portion of the amount raised under the SAFTs will be used to
> fund the Company's build-out of a semi-centralized blockchain-based
> computer network (the "*Kin Ecosystem*") that enables economic
> transactions and a reward system for digital service providers as well as to
> develop an application to make the network accessible via the Kik messaging
> platform.

*Id.* ¶ 144 (emphasis in original).

Consistent with these representations, after completing its Kin sales and receiving the

investors' funds, Kik pooled the funds.  Kik deposited the U.S. dollars it received from SAFT

participants in a single account owned by Kik at a Canadian bank.  *Id.* ¶ 294.  Kik housed the Ether it

received from public investors in a digital wallet, and then promptly started to exchange the Ether for

U.S. dollars which Kik put into a single California bank acccount.  *Id.* ¶ 295.  Kik converted the vast

majority of its Ether from the public sale to U.S. dollars within eight months.  *Id.* ¶ 295.

Once the funds were in Kik's bank accounts, they were "pooled" and became subject to the

company's budgeting process.  *Id.* ¶¶ 296-298.  Kik has used the funds as working capital to fund Kik's

business operations, *id.* ¶ 297, to develop the Ecosystem, and to try to "execute on the plan that we

produced in the white paper," *id.* ¶ 299.  Kik has also tried to cause an increase in "the amount that

the currency trades," or what Kik's former CEO called Kin's "velocity," which would "[e]ffectively

over time . . . increase the value of the token."  *Id.* ¶ 300.

      Furthermore, because all Kin are fungible or the same, the value of any one holder's Kin is

proportionate to the number of Kin held.  *Id.* ¶¶ 76, 290.  This undisputed fact establishes horizontal

commonality under the applicable caselaw.  *See Howey*, 328 U.S. at 301 (investors "respective shares in

th[e] enterprise" served as a "convenient method of determining [their] allocable shares of the

profits"); *SG Ltd.*, 265 F.3d at 51 (horizontal commonality established where investors received

"capital units . . . directly proportional to the size of [their] investment[s]" and "expected profits were

a function of the number of 'capital units' held"); *Infinity Group*, 212 F.3d at 188 (finding horizontal

commonality where the "return on investment was . . . directly proportional to the amount of that

investment"); *Zaslavskiy*, 2018 WL 4346339, at *6 (finding horizontal commonality for digital asset

where "profits would be distributed to investors pro-rata—given that investors were promised

'tokens' or 'coins' in exchange for, and proportionate to, their investment interests in the schemes.");

*Balestra*, 380 F. Supp. 3d at 353-54 (same, another digital asset).

      With respect to vertical commonality, Kin investors understood that their fortunes would rise

and fall with those of Kik because of Kik's large stake in Kin.  As a matter of economic reality, if the

price of Kin rose or fell, it would rise and fall for all Kin holders – purchasers and Kik alike.  Kik

stated in the white paper that it would receive three trillion Kin, amounting to 30 percent of all Kin

created.  Then, during the Roadshow, Kik routinely touted this fact and reminded would-be investors

that "their fortunes rise and fall together," *Rocky Aspen*, 230 F. Supp. 3d at 165.  In San Francisco, for

example, Kik's CEO declared:

> I think what we can guarantee is we are all in on this.  You know, this is – this
> is something we've been working to – towards for a long time, but this is
> something that is in our financial best interest, because of the 30%, but
> actually, like, just to be honest, like, this is something we have to do.

56.1 ¶ 100.  And again, in New York City in September 2017 (among other occasions), Kik's CEO

explained:

> We're putting aside 3 trillion for Kik, vesting in at 10 percent a quarter for 10
> quarters.  So over two and a half years – that's Kik's incentive for being the
> first killer app on this platform, how we convinced our investors to do this.

*Id.* ¶ 112.  And he explained that Kik is able to sell its retained Kin "on to the exchanges like anybody

else."  *Id.* ¶ 125.

In sum, as Kik's numerous statements touting its own stake and fortunes emphasized, Kik

would have a strong economic incentive to try to increase the value of Kin.  Kik would try to do this

for Kik's and the investors' benefit alike.   Accordingly, the undisputed facts meet the vertical

commonality test and satisfy *Howey*'s "common enterprise" element.

### 3.    Kin Investors Reasonably Expected Profits Derived From Kik's Entrepreneurial And Managerial Efforts

Additionally, there can be no genuine dispute that Kin investors had "a reasonable expectation

of profits to be derived from the entrepreneurial or managerial efforts of others."  *Edwards*, 540 U.S.

at 395.

### a.    Kin Investors Reasonably Expected Profits

"Profits" under *Howey* include "capital appreciation resulting from the development of the

initial investment," and does not require intervening profit distributions.  *Edwards*, 540 U.S. at 395; *see*

*also Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) ("That the plaintiffs did

not expect to realize any tangible gain until they sold their property does not preclude investment

intent.").  In general, courts examine the "terms of the offer, the plan of distribution, and the economic

inducements held out to the prospect," *Joiner*, 320 U.S. at 352-353, 355, including promotional

materials, in order to determine if *Howey*'s "expectation of profits" prong is satisfied.  *See Aqua-Sonic*,

687 F.2d at 583 (following *Joiner*).  In the ICO context, the analysis must include, among other things,

the promoter's "advertising methods" and "public statements [that] stressed the limited supply of

tokens," *Solis*, 2018 WL 6445543, at *3, and statements emphasizing the availability of secondary markets for the tokens, *see Balestra*, 380 F. Supp. 3d at 355 n.14 ("Purchasers' ability to resell ATB Coins on other exchanges also supports the conclusion that the coins are securities.").

Kik's public marketing campaign pervasively touted Kik's plans to increase Kin's value through a variety of efforts, described in the next subsection.  Here, an initial matter, there can be no genuine dispute that Kin investors reasonably expected profits.

*First*, there is no doubt that Kik repeatedly and in many public venues promised that investors "*could make a lot of money*" from Kin.  56.1 ¶ 104 (NYC Ethereum event) (emphasis added); *id.* ¶ 117 (San Francisco event); *id.* ¶ 103 (statement at event in Canada that, with increased demand, "everybody can . . . make a ton of money").  Kik's CEO specifically cited the dot.com era, predicting that "people are going to make a lot of money" with tokens and ICOs and directly comparing investors who would buy in Kik's token "crowd sale" to the venture capitalists who were investing in Kik.  *Id.* ¶ 117.  Kik's CEO also repeatedly likened Kin's profitability to that of other digital assets that were experiencing a market fervor, saying that "*if Kin were as popular as Ether is today, that 30% would be worth $9 billion.*" *Id.* ¶ 114; *see also id.* ¶ 115 (similar statement from Kik's CEO to another audience).  He also marketed Kin by explaining the similarities between investing in Kin and "venture capital investing," and touting the advantages of buying tokens:

> You know, I think compared to VC investing, for example, one, you can get in at basically any stage and in any amount, and two, you can get out at any stage, and in any amount, and I think that's really compelling, you know, this idea that I can get in early, identify something that could be big.

*Id.* ¶ 120.  On numerous occasions and through a variety of channels, Kik touted Kin's potential to gain or increase in "value" or become "more valuable" as a result of Kik's efforts to drive demand for Kin.  *See id.* ¶ 54 (white paper); *id.* ¶ 97 (Token Summit); *id.* ¶ 98 (May 25, 2017 press release); *id.* ¶ 103 (August 14, 2017 conference in Canada).  And, in an August 2017 press release, Kik encouraged prospective investors to participate in Kik's upcoming public sale by providing the names of large,

professional investment firms – Blockchain Capital, Pantera Capital, and Polychain Capital – who, as "accredited investors," had already purchased Kin during the "presale round."  *Id.*  ¶ 246.[12]

*Second*, Kik repeatedly told investors in its white paper, tweets, and Roadshow, that Kin would be tradable – or that Kik expected Kin to be tradable – on secondary trading platforms (what it called "exchanges"), thereby priming expectations that investors would be able to easily resell Kin at a profit. *Id.* ¶¶ 121-127.  As Kik's CEO told one audience, "the beautiful thing with these cryptocurrencies, is, you know, they're immediately tradable.  So on day one, Kin will go on to a bunch of exchanges where you can exchange it for other cryptocurrencies, or even other fiat currencies."  *Id.* ¶ 125.  "[R]esale in the secondary market" is "crucial to the investor" for "realizing profits from capital appreciation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985); *see also Balestra*, 380 F. Supp. 3d at 356 n.14 ("Purchasers' ability to resell [tokens] on other exchanges also supports the conclusion that the coins are securities.").

Indeed, public investors considered and reasonably relied on these statements when making their purchase decisions, and SAFT participants similarly planned or hoped to realize profits by selling on secondary exchanges.  *Id.* ¶ 129.  As one public investor testified:

> The only way we can make money is if there's liquidity and also I mean, the market at that time was essentially if your token had partnerships/use cases and was on exchanges for liquidity the prices were skyrocketing.

---

[12] Kik's User Registration Guide, made available to public investors in advance of the public sale, further embraced their roles as investors, stating:  "We are excited to take the next steps in bringing Kin to life.  The Kin offering presents a unique opportunity for crypto investors, as Kin will offer mainstream audiences a chance to instantly interact with a cryptocurrency."  56.1 ¶ 248.  Meanwhile, Kik obviously understood that its marketing was having the desired effect of generating investor interest.  After the August 14, 2017 conference in Canada, a prospective investor sent an email to the Kik consultant who conducted the live interview of Kik's CEO at the event, stating "I just wanted to let you know that I was very excited to watch your fireside chat with Ted and also to find out that you're an investor.  I was planning to invest in Kin and that video made me even more confident!"  56.1 ¶ 192.  The consultant forwarded the email to Kik's CEO, who responded "Great :)."  *Id.*

*Id.* ¶ 129 (Wang).[13]

*Third*, Kik targeted the larger investing public and deliberately chose audiences that it knew would want to take advantage of increasing prices. Kik executives considered the Token Summit in New York City an "ideal" venue for the public announcement of Kin, because "the primary audience for the initial announcement really is an investor community." *Id.* ¶ 49. Kik was told to expect attendees that would include "investors/VCs, wall street types." *Id.* ¶ 50. When planning the offering, Kik obtained information regarding the potential interest of "cryptoinvestors" and "crowdfunders" in purchasing a digital token issued by Kik. *Id.* ¶ 24. *See generally Aqua-Sonic*, 687 F.2d at 583-84 (considering promoter's "plan of distribution" including the potential investors who were targeted).

*Fourth*, Kik did not identify any specific use for Kin as a proposed medium of exchange, thereby further heightening the emphasis on Kin's future "value" and its attractiveness as an investment. *Id.* ¶ 210. *See Infinity Group*, 212 F.3d at 187, 189 (focusing under *Howey* "[on] whether the purchaser [is] attracted to the investment by the prospect of a profit on the investment rather than a desire to use or consume the item purchased" (internal quotation omitted)). Although Kik evangelized a future Kin "economy," it did not state when this economy would materialize, and Kik did not identify *any* specific good or service that could be bought with Kin upon distribution of the token. *Id.* ¶¶ 210-211.

The so-called Minimum Viable Product ("MVP") that Kik scrambled to create for Kin was for "COMPLIANCE" purposes and was not a product that could be bought or sold with Kin. *Id.* ¶¶

---

[13] According to a study of 4,003 executed and planned ICOs – nearly all ICOs from January 2017 until the completion of the study in May 2018 – the ICOs that led to listings of tokens on exchanges generated for the ICO investors average returns of 179% from the ICO price to the first day's opening market price, over a holding period that averaged only 16 days. ICOs that did not list their tokens within 60 days generated 82% returns after adjustments. After trading on exchanges began for tokens, they continued to appreciate in price, generating average buy-and hold abnormal returns of 48% in the first 30 trading days. Benedetti, Hugo and Kostovetsky, Leonard, *Digital Tulips? Returns to Investors in Initial Coin Offerings* (May 2018), *available at* SSRN: https://ssrn.com/abstract=3182169.

203, 205-207.  Kik's MVP for Kin consisted of honey badger "stickers" that could be "unlocked" by Kin investors inside Kik Messenger.  *Id.*  ¶¶ 202, 204; ECF No. 1 ¶ 202 (reproducing the sticker).  The stickers were unavailable to public investors who did not also have a Messenger account.  56.1 ¶ 202.  Moreover, Kik did not market the stickers to public investors, and so they could not have been a reason for any of their Kin purchases anyway.  Kik did not mention the status-based stickers in any public announcements or otherwise discuss these cartoon stickers in marketing to potential public sale investors, before the public sale.  *Id.* ¶ 208.  *See also id.* ¶ 209; SEC 74, Neil Dep. Tr. 117:10-118:2 ("It was my understanding they had no product at the time."); SEC73, Wang Tr. 17:7-18:10 ("Q.  Did you buy Kin in order to gain access to digital stickers?  A. No."); SEC75, Furo Tr. 15:5-20 ("I could not care less about these stickers.").  *See Beranger*, 2019 WL 5485128, at *3-4 (*Howey* test met where promoter led buyers "to believe they could expect a profit from buying the tokens," even though "tokens had additional functionality").

*Fifth*, investors bought Kin in such large quantities that their purchases only can only be logically explained by an expectation of profits, and not by a desire to use or consume.  Of the approximate total of $98.3 million that all investors paid Kik for Kin, over $65 million was spent by investors who invested more than $100,000, and less than two percent (2%) of the entire amount raised in the Kin offering was spent by investors who paid less than $1,000.  *Id.* ¶¶ 270-71.  Looking only at sales to *public* investors – who bought approximately $49 million of Kin – there is a similar pattern:  $16.2 million was spent by investors who invested more than $100,000 (one investor alone paid $1.6 million, another paid $970,000), and only 4 percent (4%) of the sum raised during the public portion of the sale was from investors who spent less than $1,000.  *Id.* ¶¶ 267-268; *see generally id.* ¶¶

260-272 (providing additional statistics).  The economic reality was that investors did not buy Kin primarily to use in an ecosystem that had no identified goods or services.[14]

*Sixth*, SAFT participants had a profit incentive.  SAFT participants bought Kin at a 30 percent discount from the public sale price of Kin, which gave the SAFT participants an obvious profit opportunity.  *Id.* ¶¶ 72, 78.  Moreover, the SAFT participants included managers of large investment funds with hundreds of millions or billions of dollars under management and whose business purpose was to make investment returns, not develop or use software applications or digital asset ecosystems or accumulate stickers.  *Id.* ¶ 193.  SAFT participants testified that they bought Kin to profit from its expected appreciation in value.  *Id.* ¶¶ 193-197.

*Seventh*, public investors testified that they bought Kin to profit.  While the "focus" of the investment contract inquiry is "on what the purchasers were offered or promised," nevertheless "the subjective intent of the purchasers may have some bearing on the issue."  *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009).  Here, testimony confirms that multiple Kin investors bought to profit. For example:

> Q.   And then did you then choose to buy in the project, in the ICO because you thought if that worked the coins would be more valuable in the future?
>
> A.   That's correct.

---

[14] In its Answer, Kik has raised the possibility that application developers may have purchased large amounts of tokens for use in to-be-developed products.  *See* Answer ¶ 165.  Tellingly, however, Kik did not distribute the blockchain's public code in the form of a Software Developer Kit (called a "SDK") to developers until after the distribution of the token.  56.1 ¶ 214.  Indeed, as of October 15, 2017, several weeks after Kik distributed Kin, there were no developers on the "Kin platform;" the Kin Rewards Engine had not made any payouts; and it was the case that "multiple digital services building experiences for users" did not then exist.  *Id.* ¶ 214.

> Q.   So if I were to say you bought Kin because looking at the project you thought you would be able or more likely to make a profit; would that be correct?
>
> A.   Yes.

*Id.* ¶ 188 (Rousmaniere).  Other public investors testified similarly.  *Id.* ¶ 190, SEC74, Neil Dep. Tr. 113:1-114:18 (Q. When you made your purchase of Kin, did you purchase the Kin with the expectation of making a profit?  A. Yes.); *id.* ¶ 189, SEC73, Wang Inv. Tr. 18:11-13, 19:3-9 ("Q.  Did you invest in Kin because you wanted to make a profit?  A. Yes.")

*Finally*, Kik's statements that Kik had a significant hoard of Kin and thus an interest in increasing Kin's value fed all investors' expectations that Kin would be profitable.  Kik continually reminded potential investors that Kik was allocating itself three trillion Kin and, therefore, had gigantic incentives to make this happen.  Kik "guarantee[d]" at the San Francisco conference that "we are all in on this," because "this is something that is in our financial best interest."  *Id.* ¶ 100.  At the June 2017 conference in China, Kik's CEO described the plan to award Kik 30 percent of the outstanding supply of Kin and said the company's "***goal now is just to grow the value of Kin***."  *Id.* ¶ 110.

### b.   Kin Investors Reasonably Expected Entrepreneurial  Or Managerial Efforts From Kik

Additionally, there is no genuine dispute that Kin investors reasonably expected that the profits that resulted from Kin's increase in value would be "derived from the entrepreneurial or managerial efforts of others." *Edwards*, 540 U.S. at 395.  Kik's four-month marketing campaign overwhelmingly and repeatedly conveyed not only that "efforts of others" would be required to grow the value of Kin, but also that Kik would undertake the most important of those efforts.  Unlike a commodity such as gold – or even *Howey*'s oranges – Kin had no inherent value or even historical existence.  Kin only existed and could only gain value through efforts to develop the ecosystem and drive up demand for the token, and that is exactly Kik what promised to do.  Throughout its marketing campaign, Kik promoted its own history and accomplishments and the strength of its user base going

forward as a way for Kin to gain momentum, and promised to take numerous value-enhancing actions for Kin after it distributed the token.

1.     *Kik repeatedly vowed to integrate Kin into Kik Messenger.*  Kik's white paper stated that Kik would "leverage its large existing user base to drive mass adoption" of Kin, that "Kik will build fundamental value for the new currency by integrating Kin into its chat app," and that "Kik will be the first service to join the Kin Ecosystem." 56.1 ¶ 148.  Kik's May 25, 2017 Medium post stated that Kik "will create demand for it by encouraging people to earn and spend Kin within Kik, which is used by millions."  *Id.* ¶ 149.  Such integration would occur "[o]ver time," *id.* ¶ 146, and "[o]nce we have established the new cryptocurrency," *id.* ¶ 147.  Kik's CEO subsequently stated in a published interview that Kik would "add more and more ways to use [Kin] inside Kik" in late 2017 and 2018.  *Id.* ¶ 153.  *See also id.* ¶ 150 (additional white paper statement); *id.* ¶ 151 (white paper "use cases"); *id.* ¶ 152 (telling TechCrunch conference that integrating Kin into Kik "on day one will make Kin the most used cryptocurrency – one of, if not the most used cryptocurrencies in the world.  And that's going to make Kin very valuable").

2.     *Kik repeatedly promised to build new products, programs, and systems.*  Kik repeatedly promised to develop the Kik "ecosystem" that would increase the value of Kin.  Kik's white paper stated:  "To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems." 56.1 ¶ 54.  Kik's white paper further stated that Kik would "finance the Kin roadmap" by selling one trillion Kin, that "[t]he proceeds of the token distribution event will be used to fund Kik operations and to deploy the Kin Foundation," and that "[a] portion of the funds raised in the token distribution will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik."  *Id.* ¶¶ 55, 142.  Kik's CEO told his San Francisco audience and Internet viewers of the video that Kik would use sale proceeds to build systems "to . . . launch this whole

broader ecosystem." *Id.* ¶ 143.  *See supra* Section IV.A.2.  These promises were repeated to the SAFT participants in the SAFT and the PPM.  56.1 ¶ 144.

Kik's white paper also stated that, apart from the one trillion tokens that Kik was selling through the offering, an additional six trillion Kin would be "secured in a smart contract" that was "allocated to the Kin Rewards Engine" and "introduced into circulation as periodic rewards."  *Id.* ¶ 170.  Kik simultaneously explained at the New York City Token Summit – and then repeated during the Roadshow – that the Rewards Engine, would be instrumental in attracting developers to the ecosystem, thereby increasing the utility of Kin, which would spur greater numbers of transactions, and make Kin more valuable.  *Id.* ¶¶ 174-176.  Kik stated that it was *"the company"* that would create the Rewards Engine, and that it would do so "later this year [2017], or sometime next year [2018]." *Id.* ¶¶ 171, 175 (emphasis added).  *See also* 56.1 ¶ 178 (September NYC Ethereum event).  Kin investors are wholly dependent on Kik management to make this rewards engine a success, which involves decision-making beyond what any Kin holder could be reasonably expected to accomplish on their own.

3.   ***Kik promised steps to supplement and improve the current blockchain***.  Kik's white paper explained that the Ethereum blockchain that would initially host Kin had insufficient scale and speed and was expensive to users.  Kik therefore promised a two-step solution:  (i) Kik would create an in-house "transaction service" for Kik Messenger users that temporarily bypassed Ethereum, and (ii) Kik, through the Kin Foundation, would pursue a longer-term migration of Kin's "transactional infrastructure."  56.1 ¶ 158.  Kik's CEO repeated these promises to Roadshow audiences, stating that Kik was would look to transition Kin to an improved blockchain "whether it's on Ethereum, [or] our own sort of blockchain 3.0 project, or somebody else's blockchain 3.0."  *Id.* ¶ 161.  *See also id.* ¶ 160; SEC46-B, An Evening Tr. 22:11-23:3 (stating Kik was "looking for" a new

"blockchain 3.0," which Kik itself might create by partnering with another blockchain or building its own).

4.    *Kik repeatedly touted its entrepreneurial experience and management expertise*.  Kik's white paper declared that "Kik has been a leading innovator in the chat space since the first million people signed up for the chat application in 2010," and described the backgrounds of Kik's executives and identified other "Kin Core Team" members.  56.1 ¶¶ 132-134.[15]  Kik's prepared video told viewers, "Kik has both the experience and the resources, and the user base to really make this happen." *Id.* ¶ 137.  On September 6, 2017, six days before it started the public sale, Kik posted: "Kin has at least one participant who was all in: Kik.  With one strong digital service on board from day one, Kin can enjoy a good start regardless of whether or not other digital services adopt it right away."  *Id.* ¶ 140; *see also id.* ¶ 133 (white paper); *id.* ¶ 139 (Kik press release); *id.* ¶ 141 (NYC Ethereum event).  It was clear to investors that Kik would "manage, control and operate the enterprise."  *Howey*, 328 U.S. at 300.

5.    *Kik promised to create and "influence" the Kin Foundation to promote demand for Kin.*  Kik's white paper stated that, "[o]ver time, Kik will work to structure and form the Kin Foundation, a nonprofit organization to oversee the fair and productive growth of the Kin Ecosystem," including "adminis[tration of] the Kin supply and the Kin Rewards Engine."  56.1 ¶ 180.  But Kik provided no concrete timetable for this transfer and told audiences in San Francisco and New York that Kik would "have influence" over the Foundation.  *Id.* ¶¶ 181-182.  Kik did not officially create the Foundation until September 12, 2017, after registration for the public sale of Kin had closed and on the day public investors started to pay Ether for the tokens.  *Id.* ¶ 278.

---

[15] Tellingly, Kik did not provide the biography of a single non-Kik person.  56.1 ¶ 135.

The Foundation had no existence independent from Kik.  From its creation on September 12, 2017, through Kik's distribution of Kin on September 26, 2017, Kik's chief executive officer and chief financial officer served as the Foundation's only two directors, and the Foundation had no separate operations, employees, or assets (other than the Kin it received on September 26, 2017) to fund operations.  *Id.* ¶¶ 278-280.  Kik's CEO and CFO remained the two directors of the Foundation until May 2018, at which time the CFO was replaced by a long-time Kik consultant who continued to receive monthly compensation from Kik.  *Id.* ¶¶ 281-282.[16]  The Foundation, as marketed by Kik and as it actually operated, was clearly another aspect of "the promoter's contribution" to the investment contract.  *Aqua-Sonic*, 687 F.2d at 582.  The Foundation's activities constituted "efforts of others" encompassed by *Howey*.  *See Forman*, 421 U.S. at 854 (efforts of others can include the efforts of "promoters or third parties").

*     *     *     *

This record leaves no doubt that Kik promoted Kin "primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way."  *Aqua-Sonic*, 687 F.2d at 582.  No single Kin investor could have been expected to develop the necessary technology or to stimulate demand that was sufficient to establish and build Kin's "value."  Those tasks fell to Kik, and Kik promoted as much to the investors.  The "economic reality" was that Kik's marketing of Kin created an investment contract based on Kin.  *See, e.g.*, *Tcherpnin*, 389 U.S. at 338 (finding withdrawable capital shares were investment contracts where investors' profits depended on skill and honesty of company's managers); *Aqua-Sonic*, 687 F.2d at 582-83 (finding dental product licenses were investment contracts where investors "could not reasonably

---

[16] Thus, even after the September 26, 2017, the Foundation's dependence on Kik persisted.  The Foundation did not hire its own employees, but, rather, relied on Kik employees to perform its functions.  56.1 ¶¶ 284-285.

be believed to be desirous and capable" of performing future steps necessary to achieve profits); *Miller*, 494 F.2d at 417 (finding *Howey* satisfied even though contract required investors to raise chinchillas because those efforts were not "the undeniably significant ones;" "what the plaintiffs really purchased was the defendants' skill at persuading other to become chinchilla raisers"); *Balestra*, 380 F. Supp. 3d at 355 (finding *Howey* satisfied where a digital coin promoter "conveyed to purchasers of ATB Coins that the anticipated return on their investment would be the result of [the promoter's] efforts to commercialize the ATB Blockchain and ATB Coins"). Accordingly, passive investors in Kin awaited returns (or suffered losses) based on Kik's managerial and entrepreneurial acumen in deploying the capital those investors provided to develop those products, programs, and systems.

Testimony from Kin investors confirms that, based on what they saw and heard from Kik during the offering, they reasonably expected that Kik would play the essential role in Kin's future success:

- For one public investor, it "seems obvious" that Kik's going out of business would put the value of Kin at risk. He understood at the time of his investment that, "even if other developers were to build applications around using the Kin token and around their chat application, their – the core of it would be their [Kik's] system and their [Kik's] software. So if that disappears, it's likely the whole thing would disappear." Thus he believed that the value of his investment was tied to Kik's ability to perform future tasks. 56.1 ¶ 188 (Rousmaniere).

- A second public investor testified that, if Kik conducted the ICO and then did nothing, the value of his Kin would dramatically decrease "because all the investors would sell off." *Id.* ¶ 189 (Wang).

- A third public investor, recalling Kik's statements that "because it's a finite supply, as more people use it, it will be worth more money, which implies profit," explained:

This "wouldn't magically happen. Kik and Kin would have to push it to make it happen." *Id.* ¶ 190 (Neil).

## B.     Kik Engaged In A Public Distribution In Violation Of Section 5

Kik claims under its second affirmative defense that "Kik's pre-sale of contractual rights pursuant to a SAFT is exempt from the registration requirement . . . [u]nder Rule 506 of Regulation D." Answer at 128.  Additionally, Kik filed a Form D that claimed the Rule 506(c) exemption.  56.1 ¶¶ 241-242.  "The burden of proving entitlement to an exemption rests with the party claiming the entitlement." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 213 (3d Cir. 2006) (citing *Ralston Purina*, 346 U.S. at 126); *see also Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959); *Softpoint,* 958 F. Supp. at 859 ("If a registration exemption is claimed, the claimant bears the burden of proving the exemption.").  Furthermore, "[r]egistration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *Cavanagh*, 445 F.3d at 115; *see also Schooler*, 106 F. Supp. 3d at 1162 ("Registration exemptions are construed narrowly in order to further the purpose of the Act" (internal quotation omitted)).

Kik cannot carry its burden here.  It is undisputed that Kik offered and sold $100 million worth of Kin to investors all over the globe and that such sales were not accompanied by a prospectus or registration statement.  Rule 506(c) exempts from registration offerings involving general solicitation so long as sales are made only to accredited investors.  Accredited investors are presumed to fend for themselves and have the ability to demand access to information otherwise required by a registration statement. *Ralston Purina*, 346 U.S. at 125 ("An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'").  As Kik itself consistently indicated to all Kin investors, from the beginning of the sale in May 2017 until its end in September 2017, Kik ran only a single offering of one trillion tokens, which included both SAFT

participants and non-accredited public investors.  Kik's sales to non-accredited investors defeat any reliance on the Rule 506(c) exemption.  Those investors were not even provided with the information provided to the "pre-sale" purchasers, let alone the information they were entitled to receive in a registration statement.  *See Ralston Purina*, 346 U.S. at 127.

Furthermore, even assuming Kik made "two" offerings – one to SAFT participants and a second to public investors – Kik cannot show that the "separate" offerings should not be integrated as one offering, which would prevent reliance on that exemption.

Finally, even if Kik engaged in two separate offerings, its offering via SAFTs would not qualify for the Rule 506(c) exemption.[17]  Rule 506(c)'s requirements were unsatisfied, because Kik failed to impose any restrictions on the Kin to preclude immediate resale to uninformed public investors.

### 1.    Kik Engaged In A Single Distribution

Kik did not comply with Rule 506(c) because Kik engaged in a single distribution that Kik did not limit to accredited investors.  Rule 506(c)(2) imposes the following "specific condition[]" for an offering to qualify for an exemption from registration under the rule:  "[a]ll purchasers of securities . . . are accredited investors."  17 C.F.R. § 230.506(c)(2)(i).  Here, however, Kik conducted a single offering of Kin to accredited and non-accredited investors, which defeats reliance on Rule 506(c).

Kik's argument that its sale of Kin through the SAFTs and its public sale of Kin were two different offerings is incorrect.  *First*, Kik ran a single offering, because that is what it told investors. Kik repeatedly told the public and individuals alike that it was conducting one "sale" and seeking to raise one "total" amount of money:

---

[17] While Kik does not try to claim an exemption for its sales of Kin sales to public investors, obviously no Rule 506(c) exemption is available for those sales to non-accredited investors either.

- The white paper stated that Kik "*will conduct a token distribution event that will offer for sale one trillion units* out of a 10 trillion total supply of Kin." 56.1 ¶ 55. (emphasis added).

- In its August 29, 2017 press release, Kik announced that it had "successfully closed a presale round of US$50 million . . . [and] will look to raise a *total of US$125 million through its token sale*." *Id.* ¶ 245 (emphasis added);

- On or about August 30, 2017, Kik sent emails providing SAFT participants providing the following "Sale Metrics":

  - *Total cap*: $125mm
    - Pre-sale:  $50mm (30% discount)
    - Public: $75mm

  *Id.* ¶ 239 (emphasis added).

- In its September 12, 2017 press release, Kik announced the commencement of its "Kin token distribution event . . . in which Kik will look to raise *a total of US$125 million*." *Id.* ¶ 257 (emphasis added).

- In its September 26, 2017 press release, Kik "announced the Kin token distribution event (TDE) has successfully ended raising nearly *US$100 million*. More than 10,000 people from 117 countries participated in *the token sale* . . ." *Id.* ¶ 273 (emphasis added).

- On September 26, 2017, Kik sent an email to SAFT participants reporting a *"$98.76M total raise* (inclusive of pre-sale and public sale)"; and that, "*The hard cap for the sale was $125M*. In order to maintain the 1T supply, the remaining allocation in the sale is being redistributed proportionally to all sale participants, while also maintaining the 30% discount to pre-sale participants." *Id.* ¶ 274.

Thus, Kik's own contemporaneous communications belie its contention that it conducted separate offerings and reconfirm that Kik conducted only one offer and sale of Kin in 2017.

*Second*, Kik used the same marketing and logistics for the two stages of the offering. Crucially, Kik directed its white paper at both SAFT participants and public investors. *Id.* ¶ 47 Kik also created a single communications strategy directed at both groups, and ran the Roadshow during which it gave public presentations that were open to both groups and met privately with the SAFT participants. The communications strategy demonstrated that the Roadshow would address all of these audiences:

### Roadshow

**Media Strategy:** Setup in-person interviews with friendlies and analysts; setup in-person meetings with crypto investors reporters

**Tactics:**
- Media dinner in Toronto
- In-person meetings in SF and NY
- 1-2 Meetups w/ Ted in SF, NY, Toronto, London
- Leverage Fred Wilson and other advisors to validate this strategy with media and analysts
- Speak at TechCrunch Shenzen and Cryptofinancing (London)

*Key Topics:*
- *Kik is converting its network into crypto users*
- *Why chat + crypto makes sense*
- *How chat's ecosystem (bots, expression, etc.) will drive*
- *Potential alliance to trump Facebook's network effects*
- *General industry/Kik decline (if this is part of the narrative, this needs to be addressed head-on)*
- *Why Kik will be the first one to make this successful*




*Id.* ¶ 43. The "Presale Timeline" that Kik's management provided the board for its May 23, 2017 meeting also demonstrates that Kik would conduct its public marketing of Kin in tandem with meetings with potential SAFT participants:

*Id.* ¶ 46.  As the slide shows, Kik would conduct its "Pre-sale" marketing at the same time that Kik's

CEO delivered public presentations to audiences in San Francisco and Shenzen, China, among other

places.

Kik even used the same mechanics for sales to the two groups.  For example, some SAFT

participants used the same Internet portal that public investors used to provide their Ether addresses

and requested know-your-customer information to Kik.  *Id.* ¶ 240.  And, the same "smart contract"

delivered the same, fungible tokens to both sets of purchasers at precisely the same time.  *Id.* ¶¶ 287,

290.

*Third*, Kik ran a single offering, because the delivery of Kin to SAFT participants and the price

at which the participants bought the Kin were both conditioned on the public phase of the offering.

As the SAFT itself made clear, there would be a distribution of Kin to the SAFT participants only "[i]f

there is a Network Launch before the expiration or termination of this instrument."  56.1 ¶ 77, SEC51,

SAFT ¶ 1(a), Dep. Ex. 52 at KIK000067.  A "Network Launch" consisted of the transactions through

"which the Company will sell Kin to the general public."  56.1 ¶ 77, SEC51, SAFT ¶ 2, Dep. Ex. 52

at KIK000068. If Kik did not conduct the public sale by the SAFT's deadline date, the SAFT would terminate and SAFT participants would not receive any Kin. 56.1 ¶ 81, SEC 51, SAFT ¶ 1(c), Dep. Ex. 52 at KIK000068. And because the SAFT participants paid a discounted price for the Kin based on the public sale price, the number of Kin that the participants received were contingent on the public sale pricing of Kin. 56.1 ¶ 78. Thus, the economic reality is that Kik's offer and sale of Kin under the SAFTs was inextricably bound to Kik's public sale and constituted a single distribution.

*Finally*, Second Circuit caselaw supports this result. In *Cavanagh*, the court of appeals rejected the defendants' formalistic arguments that they were exempt from Section 5 by virtue of "multiple transactions" that allegedly skirted registration requirements. *Id.* at 445 F.3d at 114. The defendants had claimed that transactions through which they merged two companies were separate from later transactions through which the companies' securities were sold, thereby precluding a finding that the defendants were required as company affiliates to register the latter sales. *See id.* at 111. The court intead found that defendants had engaged in "a *single* transaction with multiple stages." *Id.* at 114 (emphasis in original). In so holding, the court emphasized that "[r]egistration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *Id.* at 115. The court reasoned that defendants with superior access to non-public information about the issuer could not simply "escape liability" by conducting separate transactions at a later time when they had resigned their affiliate status. *See id.*

The court here should similarly disregard Kik's formalistic charade. By conducting simultaneous and inter-dependent processes to sell an aggregate quantity of Kin at a uniform per-unit price for a single fundraising goal, Kik conducted a single offering in the form of a public distribution. Meanwhile, Kik improperly advantaged the SAFT participants, at the expense of the undiscounted public investors, by providing the SAFT participants with additional information about the offering

through the PPM.  56.1 ¶¶ 83, 247.[18]  Kik even invoked the names of large investment houses that

purchased Kin via SAFTs to hype the public sale.  *Id.* ¶ 257.  It would be unfair and would "frustrate

the broad remedial goals of the securities laws," *id.* at 115, to allow Kik to escape liability under Section

5 for any stage of its 2017 Kin sales.

> **2.      Even If Kik Engaged In Two Separate Offerings, They Should
> Be Integrated Into A Single Non-Exempt Offering.**

Even assuming, *arguendo*, that the Court finds that Kik conducted two separate offerings of

Kin, Kik still does not qualify for the Rule 506(c) exemption.  That is because it cannot demonstrate

that its "two" offerings should not be integrated and therefore considered as one offering under

Commission rules.  Application of the prescribed factors for this analysis plainly show that the two

offerings were inseparable (because they were, in fact, one offering) and, therefore, both are ineligible

for Kik's claimed exemption.

Qualification for the Rule 506(c) exemption requires, among other things, "satisfy[ing] all the

terms and conditions of Rules . . . 502(a) and (d)."  17 C.F.R. § 230.506(c)(1).  Rule 502(a) provides:

"(a) *Integration*.  All sales that are part of the same Regulation D offering must meet all of the terms

and conditions of Regulation D."  17 C.F.R. § 230.502(a).  Whether sales are "part of the same

Regulation D offering" depends on the facts and circumstances as set forth in long-standing SEC

guidance.  As one court in this district has summarized:

> The term "offering" is not defined in the Securities Act. 17 C.F.R. § 230.502(a).
> "[T]he determination as to whether separate sales of securities are part of the
> same offering (*i.e.*, are considered *integrated* ) depends on the particular facts
> and circumstances."  *Id.* (emphasis in original). "*A person may not separate
> parts of a series of related transactions, the sum total of which is really
> one offering, and claim that a particular part is a nonpublic transaction*."

---

[18] For example, Kik advised SAFT participants in the PPM that "Kik has experienced a declining usage of its
messenger service over the last several years.  Such a lack of use or interest could negatively impact the
development of the Kin Ecosystem and therefore the potential utility of Tokens."  56.1 ¶ 247.

> *Nonpublic Offering* Exemption[, 1933 Act Release No. 33-4552, 27 Fed. Reg.
> 11316, 1962 WL 69540 (Nov. 6, 1962)].

*Mattera*, 2013 WL 6485949, at *12 (emphasis in boldface italics added).

Under the integration rule, if a purported "private" offering is part of another offering that is public and extended to non-accredited investors, none of the offering qualifies for the Rule 506(c) exemption. *See* Rule 506(c)(2)(i), 17 C.F.R. § 230.506(c)(2)(i) (exemption requires accredited investor status for "[a]ll purchasers of securities sold in any offering"). In determining whether offers and sales should be integrated for purposes of the exemptions under Regulation D, the following five factors should be considered:

> (i)   whether the sales are part of a single plan of financing;
>
> (ii)  whether the sales involve issuance of the same class of securities;
>
> (iii) whether the sales have been made at or about the same time;
>
> (iv)  whether the same type of consideration is being received; and
>
> (v)   whether the sales are made for the same general purpose

*Nonpublic Offering Exemption*, 1962 WL 69540, at *3; 17 C.F.R. § 230.502(a) Note.[19] "Any one or more [of these] factors may be determinative of the question of integration." *Section 3(a)(11) Exemptions for Local Offerings*, 1933 Act Release No. 33-4434, 26 Fed. Reg. 11896, 1961 WL 61651 (Dec. 6, 1961) (providing same five-factor test).

Applying these factors, the court in *Mattera* found that a Regulation D exemption was unavailable for a securities offering to accredited investors that was found to be integrated with an offering to other investors who likely were not "sophisticated investors who would qualify as

---

[19] Rule 502(a) allows a "safe harbor" for avoiding integration by providing that offers and sales made more than six months before the start of, or six months after the completion of, the Regulation D offering will not be integrated. *See* 17 C.F.R. § 230.502(a). Kik cannot avail itself of this safe harbor because it offered and sold Kin to SAFT participants and to public investors simultaneously.

accredited investors." *Id.* at 2013 WL 6485949, at *12. Other courts have similarly found Regulation D to be unavailable after applying these integration factors. *See SEC v. Schooler*, 905 F. 3d 1107, 1163-64 (9th Cir. 2018) (finding integration and Regulation D exemption unavailable where four out of five factors were satisfied); *SEC v. Murphy*, 626 F.2d 633, 645-46 (9th Cir. 1980) (same); *Steed Finance LDC v. Nomura Securities Intern., Inc.,* Fed. Sec. L. Rep. (CCH) ¶ 91552, 2001 WL 1111508 (S.D.N.Y. 2001) (applying integration doctrine to purported private offering involving too many unqualified investors); 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 4:120 n.2 (2019) (collecting cases).

And in *Argentinian Recovery Company LLC v. Board of Directors of Multicanal S.A.*, 331 B.R. 537 (S.D.N.Y. 2005) (Hellerstein, J.), this court found that a statutory exemption from registration was unavailable for a securities offering to a group of buyers, because the offering was integrated with an earlier offering to a different group of buyers that did not meet all the criteria for the exemption. *See* 331 B.R. at 540-41, 543-48. This court emphasized that the later offering "necessarily followed, and was dependent on," the earlier offering. *Id.* at 547-48 (citing authority that integration was appropriate when one offering "would not have happened without the other").

Here, Kik's offer and sale to SAFT participants should be integrated with Kik's offer and sale to the general public under the traditional five-factor test. Foremost, the two sets of transactions constituted a single plan of financing (factor one) and served the same general purpose (factor five). *See Mattera*, 2013 WL 6485949 at *13 ("[I]n general, the first and fifth factors are often given greater weight.") Before publicly announcing Kin, Kik planned a single offering of one trillion tokens that would raise $100 million in multiple "tranches" that included "SAFT" tranches. *Supra* Section II.C.2. Kik then consolidated (and re-named) these "tranches" into the so-called "private sale" and "token distribution event" that constituted the public sale. As planned, Kik offered and sold one trillion Kin and raised a total of $100 million, and, in so doing, repeatedly told Kin buyers it was one "sale" and that Kik raised one "total." Rule 56.1 ¶¶ 55, 239, 245, 257, 274; *supra* Section IV.B.1. Furthermore,

Kik clearly told both the SAFT participants and the public investors that Kik would use the sale proceeds "to fund Kik operations" and "basically to, like, launch this whole broader ecosystem."  *Id.* ¶¶ 142-143.

Additionally, Kik conducted all relevant activity "at or about the same time" (third factor). From May 25, 2017 through September 11, 2017, Kik offered and sold Kin to the SAFT participants while, from May 25, 2017 through September 26, 2017, Kik offered and sold Kin to the public investors.  *Id.* ¶¶ 72, 73.  Further demonstrating that the activity was synchronized:

- Kik marketed Kin to the two groups at the same time, while on the same Roadshow, under one communications strategy, and using the same white paper.  *Supra* Section IV.B.1.  To take just one example, on May 24, 2017, the day before Kik publicly announced Kin, Kik executives met with a prospective SAFT participant in New York City about the investment opportunity, and during the same trip met with at least one other SAFT participant.  Rule 56.1 ¶¶ 62, 84-85.

- Kik entered into SAFTs starting in early July 2017.  The last day on which it entered SAFTs, September 11, 2017, was two weeks *after* Kik publicly announced how to sign up for the public sale, two days *after* the deadline for the public to sign up for the sale, and only one day before it started the sale.  *Id.* ¶¶ 234-235, 238, 254.

- Kik distributed 50 percent of the Kin owed to SAFT participants on the same day, September 26, 2017, that Kik distributed the Kin to the public investors.  *Id.* ¶¶ 287-289.

The following chart summarizes the timing of Kik's activities involving SAFT participants and public investors:

Additionally, Kik did did not create different classes of Kin (second factor). All of the Kin that Kik sold were identical and fungible and provided their holders with the same rights. *Id.* ¶¶ 76, 123, 290. If the value of Kin rises or falls, the change in value will affect the value of all of the Kin tokens, whether such tokens are held by Kik, the Foundation, or investors. 56.1 ¶ 293. Indeed, this was a fact Kik repeatedly touted when citing its own Kin holdings and promising that it was "all in" on Kin's success. *Id.* ¶ 100.

Furthermore, all of Kik's sales of Kin were for U.S. dollars or assets that were immediately convertible to U.S. dollars (fourth factor). Indeed, starting almost immediately after the distribution of the tokens, Kik began to convert the Ether received from the public into tens of millions of U.S. dollars in cash. *Id.* ¶ 295; SEC93 at ¶ 8.c-e (observing that Kik liquidated over $11 million of Ether within three days, $50 million within about three months, and $59 million within about six months).

Finally, all the facts demonstrating that Kik conducted a single offer and sale, set forth above, *supra* Section IV.B.1, similarly demonstrate that all of Kik's 2017 Kin offerings should be integrated. Just as this court concluded in *Argentinian Recovery* that two offerings were integrated where one "would

not have happened without the other," so too should it find that the offer and sale to SAFT participants was integrated with Kik's offer and sale to public investors, as the former was "dependent on" the latter – the per-Kin price paid by SAFT participants depended on the public sale price, and delivery of Kin to SAFT participants depended on the Network Launch. *Id.*, 331 B.R. at 547-48. For all of these reasons, Kik cannot demonstrate that the offerings should not be integrated, and, therefore, Kik cannot show that it was exempted from the registration requirements of the Act pursuant to Rule 506(c) of Regulation D.

3.   **Even If Kik Engaged In Two Non-Integrated Offerings, No Exemption Is Available Under Section 506(c)**

Even were this Court to treat Kik's offering as two distinct offerings, Kik's offering via SAFTs is not exempt under Rule 506(c). Rule 506(c) required Kik to comply with Rule 502(d), which required Kik to assure that purchasers were not underwriters. Because Kik's sales to the SAFT participants were but an intermediate step towards its ultimate indisputable goal – the public distribution of Kin – no exemption is available.

Pursuant to Sections 4 and 5 of the Securities Act, issuer offerings to the public must be accompanied by all of the disclosure required by registration to afford investors important information about the offering and the issuer prior to their investment. In exempting certain transactions from Section 5's requirements, Congress distinguished between transactions through which securities are distributed to the public in an offering from the issuer (which must be registered), and ordinary trading once the securities have come to rest with investors (which are typically exempt under Section 4(a)(1) of the Act). *SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (1941) (Section 4(1) "was intended to exempt only trading transactions between individual investors with relation to securities already issued and not exempt distributions by issuers."). Congress required registration not just where an issuer sells securities directly to the public, but also through intermediaries who either buy the security from the issuer "with a view" to distribution, or sell "for the issuer," *i.e.*, "underwriters." 15 U.S.C. §

77b(a)(11).  The Securities Act covers intermediaries' transactions in order to prevent evasion of the registration requirements through their use.  The presence of those intermediaries – underwriters – indicates a "distribution" or "public offering" for which neither the Act – nor the rules issued thereunder – provide a registration exemption.

Rule 506(c) is consistent with Section 4(a)(1).  To rely on Rule 506(c), Kik not only had to sell to accredited investors, it also had to comply with Rule 502(d).  *See* Rule 506(c)(1) (requiring "satisf[action of] all the terms and conditions of Rule[] [502(d)])."  17 C.F.R. § 230.506(c)(1).  Rule 502(d) requires the issuer to "exercise reasonable care" to assure that the purchasers are not underwriters within the meaning of Section 2(a)(11) of the Act.  17 C.F.R. § 230.502(d); 15 U.S.C. § 77b(a)(11) (transactions involving underwriters are not exempt from registration).

Kik cannot show that it exercised reasonable care to assure that the SAFT participants to whom it directly sold Kin were not conduits of Kin to the broader public, *i.e.*, statutory underwriters who could promptly resell the investment contracts to the public.  That the SAFT participants functioned as underwriters – namely, conduits through which the securities passed before coming to rest in the hands of the public – plainly defeats any claim of exemption by Kik or reliance on Rule 506(c).

Section 2(a)(11) of the Securities Act defines "underwriter" to mean, in relevant part, "any person who has purchased from an issuer with a view to . . . the distribution of any security, or participates or has a direct or indirect participation in any such undertaking."  15 U.S.C. § 77b(a)(11).  "The legislative history of the term 'underwriter' reveals 'that the congressional intent was to include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public.'"  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 214 (3d Cir. 2006) (quoting 1 Thomas Lee Hazen, *The Law of Securities Regulation* 476 (5th ed. 2005)).  "As a result, the focus of the

49

term 'underwriter' is on the concept of "distribution.'" *Berckeley*, 455 F.3d at 215 (citing *Ackerberg v. Johnson*, 892 F.2d 1328, 1337 (8th Cir. 1989)).

"[T]he term 'distribution' in § 2(a)(11) is synonymous with 'public offering.'" *Berckeley*, 455 F.3d at 215 (collecting cases); *see also Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959). Put another way, "'[d]istribution' comprises the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (internal quotation omitted); *see also Kern*, 425 F.3d at 153 (same); *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (same). Courts look at a transaction's economic inducements to determine whether the security was intended to "come to rest" with a private purchaser or with public investors at large. *Geiger*, 363 F.3d at 488 (D.C. Cir. 2004) (sale of securities at deep discount shows that securities "were never meant to 'come to rest . . .'" with initial purchasers).

Rule 506(c) does not exempt what is already prohibited by the Act, and it explicitly requires issuers to take steps to assure purchasers are not underwriters. Under Rule 506(c), "sales must satisfy all the terms and conditions Rules . . . 502(a) and (d)." Rule 506(c)(1), 17 C.F.R. § 230.506(c)(1). Rule 502(d) states:

> *Limitations on resale.* Except as provided in § 230.504(b)(1), securities acquired in a transaction under Regulation D shall have the status of securities acquired in a transaction under section 4(a)(2) of the Act and cannot be resold without registration under the Act or an exemption therefrom. *The issuer shall exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(a)(11) of the Act*, which reasonable care may be demonstrated by the following:
>
> (1) Reasonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons;
>
> (2) *Written disclosure to each purchaser prior to sale that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available*; and

> (3) ***Placement of a legend on the certificate or other document*** that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities.
>
> While taking these actions will establish the requisite reasonable care, it is not the exclusive method to demonstrate such care. Other actions by the issuer may satisfy this provision. In addition, § 230.502(b)(2)(vii) requires the delivery of written disclosure of the limitations on resale to investors in certain instances.

17 C.F.R. § 230.502(d) (emphasis added).  Thus, Rule 502(d) makes clear that it provides a safe harbor only for the sale from the issuer to the initial purchaser, and those securities cannot be resold unless that later transaction is registered or qualifies for an exemption from registration.  *See SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998) (registration is "transaction-specific" and the requirement of registration applies to each act of offer or sale).  Also, critically, Rule 502(d) requires the issuer to exercise reasonable care to assure that the purchasers are not statutory underwriters who purchase only to sell on to public investors.  Issuers availing themselves of this Rule take steps like disclosing in writing to the purchaser that the securities cannot be resold unless they are registered under the Act or an exemption from registration is available, and placing restrictive legends on the securities.  *See id.*  Those steps are designed to ensure securities are coming to rest with the purchasers and that such purchasers are not acting as conduits for further distribution.

Here, the economic inducement that Kik built into the price of Kin that it sold to SAFT purchasers confirms that Kin were not meant to come to rest in the hands of the SAFT purchasers, but were designed to be broadly disbursed and land in the hands of the ultimate investing public.  Kik took *no* steps to assure that Kin sold to SAFT purchasers would be restricted in their hands and would not be immediately sold to the public.  Kik cannot meet its burden of showing that any "separate" offering of Kin via SAFTs complied with Rules 506(c) and 502(d).

### a.      Kik Sold Kin Through SAFTs

Kik cannot rely on Rule 506(c) on the theory that it sold only "the conditional right to receive Kin in the future at a discount" – but did not sell Kin – through the SAFTs.  Answer ¶ 1.  The SAFT states that Kik "issues to the Purchaser the right (the ***"Right"***) to certain units of Kin."  56.1 ¶ 72 (emphasis in original).  Kik apparently argues that, by selling this right to Kin, Kik did not actually sell Kin to the SAFT participants.  Kik is mistaken.  Kik offered and sold Kin via the SAFTs.

Kik's sales of Kin to the SAFT participants occurred when Kik and the participants signed the SAFTs and thus obligated themselves to perform under the instrument – regardless of the times at which Kik promised to deliver the Kin, and regardless that delivery was contingent on a condition outside of the investors' control, namely the Network Launch.  The definition of "sale" in the Securities Act broadly includes "every contract of sale or disposition of a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3).  In *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890-91 (2d Cir. 1972), the Second Circuit held that a "sale" under this definition occurs "when the parties to the transaction are committed to one another;" and rejected appellant's argument that the time of sale was when "the securities are transferred and paid for."  *Id.*; *see also id.* at 891 (sale is at "the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time").  Furthermore, this standard for determining the point of sale "holds even if the later exchange of money and securities is contingent upon the occurrence of future events, such as the satisfaction of a financing condition, at least when the contingency is not so unlikely that it renders the stock transaction extremely speculative."  *Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008); *see also Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555, 559 (2d Cir. 1985) ("[A] contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed."); *Absolute Activist Value Master*

*Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) ("the point at which the parties become irrevocably bound is used to determine the timing of a purchase and sale").

Accordingly, Kik sold Kin to the SAFT participants when the parties entered into the SAFTs. Once the SAFT participants entered the SAFTs, they were unconditionally obligated to pay for the Kin and contractually bound to accept them. 56.1 ¶¶ 77-79, SEC51. The SAFT made no provision for a participant to cancel the agreement and obtain a refund, absent a condition set forth in the SAFT that was entirely outside the participant's control. 56.1 ¶ 81 (reciting "Dissolution Event" and "Termination" provisions of SAFT); *id.* ¶ 82. Similarly, Kik bound itself to deliver Kin upon conducting the Network Launch. Although the SAFT's "Termination Clause" provided for the unwinding of the transaction if the Network Launch did not occur by a stated deadline, this did not render performance "so unlikely" as to render the transaction "extremely speculative" or otherwise relieve Kik of its unequivocal obligation to deliver Kin. *Cerami*, 545 F.3d at 122.

Notably, the public investors also made their payments (of Ether) to Kik in advance of receiving their distributions of Kin; the public investors started making these payments on September 12, 2017, *see* 56.1 ¶¶ 255-256, yet Kik did not distribute Kin until September 26, 2017. Kik does not contend that sales of Kin were not made to public investors at the time the buyers sent their funds, and the same holds true for the SAFT participants: they purchased Kin when they entered into the SAFTs.

Kik's own statements further support this conclusion. Kik's white paper stated that Kik "***will offer for sale one trillion units*** out of a 10 trillion total supply of Kin." *Id.* ¶ 55. The white paper does not reference the offer of "rights" to Kin. Moreover, Kik's answer to the complaint asserts "***that it offered and sold one trillion Kin in 2017.***" Answer ¶ 1 (emphasis added). Kik admits this even though it had not completed delivery of Kin to SAFT participants in 2017. Thus, Kik admits, albeit obliquely, that it sold Kin – and not just "rights" to Kin – to SAFT participants via the SAFTs.

      **b.**     **Kik Did Not Take Any Steps To Assure SAFT Participants Were Not Underwriters**

Far from exercising reasonable care to assure that SAFT participants were not statutory underwriters, Kik incentivized the participants to play that role. The SAFT participants bought their Kin at a 30 percent discount from the public sale price. To the extent Kin was immediately tradable in secondary markets, SAFT participants stood to make a fast and sigificant profit on their Kin. The SAFT's discount structure provided the SAFT participants with an obvious economic incentive to promptly resell their Kin, and they did. Furthermore, Kik indisputably did not advise the SAFT participants – in the SAFT or any other document – that they were prohibited from reselling Kin unless the offer and sale of Kin were registered under the Act or an exemption from registration applied. The SAFT participants received 50 percent of the Kin they were owed on September 26, 2017, when Kik also distributed all of the Kin owed to the public investors. The SAFT stated only that "the Right created by this instrument . . . cannot be resold except in compliance with the applicable country's laws." 56.1 ¶ 79, SEC 51, Dep. Ex. 52 at KIK000069 (SAFT ¶ 4(b)). This language purported to restrict resale of the SAFT instrument itself, but it did not purport to restrict the resale of Kin once delivered to those purchasers. *See also* 56.1 ¶ 83 ("The *SAFTs* describe in this [PPM] are subject to restrictions on transferability and resale and may not be transferred or resold.") (emphasis added). Thus, Kik took no steps to prevent SAFT participants from immediately reselling Kin as soon as they received them.

Rule 502(d) provides several non-exclusive ways for issuers to assure themselves that they are not selling to underwriters. For example, the issuer can place "a legend" on any "document that evidences the securities stating that the securities have not been registered under the Act and setting forth or referring to the restrictions on transferability and sale of the securities." Rule 502(d)(3). Although technically feasible, Kik did not design the token with any prophylactic device analogous to the restrictive legend that gets placed on securities certificates indicating restrictions on resale –

restrictions that serve as notice to anyone seeking to purchase from the original purchaser that resales must be registered or otherwise exempt.

In short, Kik did not follow **any** of the examples set forth in Rule 502(d) for demonstrating reasonable care that it was not selling Kin to underwriters. Unsurprisingly given this total lack of any resale restrictions or impediments, SAFT participants could reasonably anticipate at the time of their purchase they were free to quickly resell the Kin upon delivery. And participants did just that, by pumping billions of Kin into secondary markets within months of the September 2017 distribution. One SAFT participant, PB Digital, was an investment firm that paid $2 million for an allocation of approximately 19.5 billion Kin. 56.1 ¶ 193. A representative of PB Digital opined in a June 2017 email that, "[c]ompared to other ICOs, Kik has a real product/user base/VC investor base etc., which should generate hype around the ICO **and make it fairly easy to flip**." 56.1 ¶ 193 (emphasis added). As the representative later testified, he thought at the time of the offering "[t]hat there would be a lot of people that would want to buy these assets once they were, you know, created and out there liquid in the market," and that the firm could exit its position at a profit. *Id.* ¶ 194. Within 10 months of the September 2017 distribution, PB Digital sold all of the approximately 9.75 billion Kin that it had received by that point for which it obtained proceeds substantially exceeding its entire $2 million investment. *Id.* ¶ 195.

Similarly, Kik's lead investor in Kin, Pantera, was a fund manager and registered investment advisor that paid Kik $20 million – approximately one-fifth of the entire offering – and received an allocation of approximately 146 billion Kin. *Id.* ¶ 196. In a June 2017 email chain, Pantera's founder noted the 30 percent discount and wrote, "I think it is likely to [sic] up more than 2x **so can lock in gain**." *Id.* ¶ 196 (emphasis added). Pantera began selling its Kin within six months of the September 2017 distribution and sold approximately 10 percent of its allocated Kin within a year after delivery,

obtaining proceeds that represented approximately 25 percent (or $5 million) of the participant's original investment. *Id.* ¶ 197.

This overwhelming evidence demonstrating that SAFT participants *were*, in fact, underwriters in the Kin offering demonstrates that Kik's reliance on Rule 506(c) is untenable. The above-described time frames in which PB Digital and Pantera sold their Kin shows that they were underwriters for Kik's distribution of the Kin. *See Cavanagh*, 445 F.3d at 115-116 (approving district court's conclusion that third parties that purchased shares from affiliates of issuer with plans to resell them were underwriters). The asbsence of any registration statement for Kin meant that public investors who purchased from the SAFT participants did not have access to the information found in registration statements. *Cf. Ralston Purina*, 346 U.S. at 124 (in assessing whether sales of securities are a private or public distribution, courts look at the sophistication of the ultimate offerees and their ability to obtain the information normally afforded in a registration statement).

Because Kik sold Kin through the SAFTs, and because Kik cannot carry its burden of showing that it acted reasonably to assure that the SAFT participants were not statutory underwriters of investment contracts that included Kin, Kik cannot show that it qualified for the Rule 506(c) exemption. Kik's total failure to assure that the SAFT participants were not underwriters forecloses Kik's reliance on Rule 506(c).

### C.   The Term "Investment Contract" Is Not Unconstitutionally Vague As Applied to Kik

Kik's first affirmative defense – that "if the phrase 'investment contract' is defined in a way that applies to Kik's offer and sale of Kin in 2017, the phrase is unconstitutionally vague" (Answer at 118) – is also without merit. It is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *United States v. Kay*, 513 F.3d 432, 442 (5th Cir. 2007) (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952)). Kik unquestionably took this risk. It cannot now evade responsibility by blaming the SEC.

1.     **Standard For Unconstitutional Vagueness**

Kik asserts only an "as-applied" constitutional challenge. *See* ECF No. 34 at 4 ("To be clear, Kik is not asserting a 'facial' challenge to the law.")[20]   Under this type of challenge, "[a] statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland*, 893 F.3d at 114 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).

"Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well." *United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (collecting Supreme Court and Second Circuit authority).  Whether by statute or judicial gloss, "a law need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Dickerson v. Napolitano*, 604 F.3d 732, 747 (2d Cir. 2010) (internal quotation marks omitted).   "[T]he unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement." *Smith*, 985 F. Supp. 2d at 587-88 (quoting *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 159 (2d Cir. 2009)).

Furthermore, "[t]he degree of linguistic precision . . . varies with the nature—and in particular, with the consequences of enforcement." *General Media Comms. v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997).  Laws implicating First Amendment and other constitutionally protected rights receive "more stringent" analysis. *Id.*  By contrast, as the Supreme Court has explained,

---

[20] Kik could not have brought a "facial challenge" because it cannot assert any First Amendment implications and or other constitutionally-protected rights. *See Dickerson v. Napolitano*, 604 F.3d 732, 744 (2d Cir. 2010) (concluding that parties were "limited to an as-applied vagueness challenge under the Fourteenth Amendment" where neither First Amendment nor other fundamental rights were implicated); *Arriaga v. Mukasey*, 521 F.3d 219, 224-25 (2d Cir. 2008) ("Claims of facial invalidity are generally limited to statutes that threaten First Amendment interests.").

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (internal citations omitted); *see also Gen. Media*, 131 F.3d at 286 (noting lower "standards of certainty" for statutes "depending primarily upon civil sanction for enforcement").   And, because the test for unconstitutional vagueness is an "'objective' inquiry," the reviewing court need not determine "'whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.'"  *Copeland*, 893 F.3d at 113 (quoting *Dickerson*, 604 F.3d at 745-46).

### 2.    The Second Circuit And Other Federal Courts Have Uniformly Rejected Vagueness Challenges To The Statutory Term "Investment Contract"

No federal court has ever accepted Kik's argument that the term "investment contract" as used in the Securities Act, 15 U.S.C. § 77b(a)(1), or as construed by the Supreme Court in *Howey*, is unconstitutionally vague in any context.  Rather, the Second Circuit has twice rejected vagueness challenges to the statute.  In *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973), the Court found "untenable" any claim that the term "investment contract" was void for vagueness "in light of the many Supreme Court decisions defining and applying the term."  The Court reached that conclusion despite the defendant's claims that it was merely selling interests in a usable physical commodity (whisky caskets) and that the SEC had issued conflicting guidance as to the applicability of the securities laws to such instruments. *Id.* at 1052 n.3.  The Second Circuit reiterated that conclusion in *Glen-Arden*, 493 F.2d 1027 at 1033-35, affirming a preliminary injunction enjoining the sale of certain contractual instruments that the defendants contended were not investment contracts on the ground that they were contracts for the future delivery of a product.

The Ninth Circuit has reached the same conclusion in a criminal proceeding. Relying on *Brigadoon Scotch*, in *United States v. Farris*, 614 F.2d 634, 642 (9th Cir. 1979), it rejected the vagueness challenge and explained that "[t]here are numerous authorities on the definition of a 'security', enough to give [the defendant] 'a reasonable opportunity to know' the bounds of the federal offense," and that it was "too late in the day more than 32 years after the Supreme Court's decision in [*Howey*] to say that the term 'security' is impermissibly vague." *Id.*

More recently, two district courts also rejected similar challenges, including one in the Second Circuit in a case involving digital assets. In *Zaslavskiy*, the court, relying partly on *Brigadoon Scotch*, rejected the argument that "the United States securities laws are unconstitutionally vague ('void for vagueness') as applied to cryptocurrencies." 2018 WL 4346339 at *8. The court explained: "[T]he abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required." *Id.* at *9. The court in *United States v. Bowdoin* reached a similar conclusion, even though the defendant's failure to abide by the law allegedly "'resulted from a bona fide mistake as to the law.'" 770 F. Supp. 2d 142, 147-48 (D.D.C. 2011). The *Bowdoin* court rejected the argument that it was "far from clear how to uniformly apply the *Howey* test to novel fact patterns." *Id.* (citing *Howey*, 328 U.S. at 300).

### 3. Kik Had Constitutionally Fair Notice That It Was Offering And Selling Investment Contracts

The precedents rejecting vagueness challenges to the Act, described above, demonstrate the legal insufficiency of Kik's defense. Yet even if the Court were to set aside these cases and write on a clean slate, Kik had constitutionally sufficient notice from the statute, *Howey* and the decisions applying it, and regulatory guidance.

*First*, *Howey* and its progeny provide a clear, explicit standard. Courts have had no difficulty applying the standard to new and even unconventional investment instruments. *See supra* Section II.A

59

(listing examples); *see generally Gen. Media*, 131 F.3d at 287 (rejecting vagueness challenge in part because "[m]any of the terms employed in the [challenged statute], read in light of the explanatory directive implementing it, have been found by the courts to be sufficiently clear for constitutional purposes"). Thus, that *Howey* calls for a fact-specific inquiry does not mean that such an inquiry is vague or deprives regulated entities of notice of what is regulated. The Courts and the SEC have been applying the test successfully for decades, and regulated entities conform their conduct accordingly. Here, a "person of ordinary intelligence would have sufficient notice that the charged conduct was proscribed." *Zaslavskiy*, 2018 WL 4346339, at *8.

*Second*, the SEC's DAO Report, issued on July 25, 2017, provided Kik additional notice weeks before the conclusion of the offering. In the Report, the SEC "stress[ed] that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale." 56.1 ¶ 225, SEC88 at 10; 2017 WL 7184670 at *7. The Report then analyzed how DAO Tokens were investment contracts under *Howey* under the facts and circumstances in which those tokens were issued. Kik's CEO was aware of the DAO Report within days of its issuance. 56.1 ¶ 226. As the *Zaslavskiy* court correctly found, the DAO Report constitutes relevant regulatory guidance. *See* 2018 WL 4346339, at *9; *Balestra*, 380 F. Supp. 3d at 355 n.14 (citing with approval the DAO Report's finding that DAO Tokens issued through an ICO were securities).

*Third*, if there were any doubt that Kik had constitutionally sufficient notice that it might be offering and selling investment contracts, the overwhelming evidence that Kik for months considered – and actively planned for – the potential application of *Howey* to the Kin offering and sale eviscerates this doubt. At least as early as April 3, 2017, Kik received explicit warnings in a report from its consultant that regulators could find that the offer and sale of Kin would be an offer and sale of

securities under *Howey*.  56.1 ¶¶ 218-219.  Kik then flagged the "securities law" issue in slides sent to

Kik's Board as the number one "risk."  *Id.* ¶¶ 220-221.

In June 2017, Kik discussed with its insurance broker this very risk: whether Kik was

[c]omplying with the Howey test" and could obtain $10 million in additional insurance for officers

and directors for "defense costs."  *Id.* ¶ 222-223.  A July 2017 email that Kik received from the broker

stated:

> ***With the advent of Kin we now have the potential for regulatory issues***
> ***to develop if the SEC determines that Kin is in fact a security*** and not a
> product.  An SEC investigation would trigger defense costs, fines and penalties
> as well as a likely investor suit should there be any direct impact on the value
> of their investment.

*Id.* ¶ 223 (emphasis added).  Kik ultimately obtained the $10 million in additional insurance coverage.

*Id.* ¶ 224.

*Finally*, Kik decided to cancel the offering and sale in its home country because of regulatory

concerns but to proceed anyway in the United States.  *Id.* ¶¶ 227-230.  The Ontario Securities

Commission ("OSC") questioned whether Kik should contact the SEC in light of the OSC's

conclusions on the subject, including its conclusions regarding the scope of *Howey*.  *Id.* ¶ 230.  Although

Kik clearly had "the ability to clarify the meaning of the regulation by its own inquiry" with the SEC,

*Village of Hoffman Estates*, 455 U.S. at 498-99, it deliberately chose not to do so.  56.1 ¶ 230.

The law and the facts defeat Kik's claim that it lacked fair notice.  For all of the above reasons,

the Securities Act gave Kik a "reasonable opportunity to understand what conduct it prohibits."

*Copeland*, 893 F.3d at 114.

### 4.    The Securities Act Does Not Invite Arbitrary Enforcement

Kik's vagueness defense fares no better under the second prong of that analysis, which asks

whether statutory language "authorizes or even encourages arbitrary and discriminatory enforcement."

A vagueness challenge can fail this second prong for either of two reasons.  First, "a statute certainly

61

will not be deemed unconstitutionally vague if as a general matter, it provides sufficiently clear standards to eliminate such a risk" of arbitrary enforcement. *United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011) (internal quotation marks omitted). Second, "even in the absence of such standards, a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *Farhane*, 634 F.3d. at 139-40 (internal quotation marks omitted); *see also Copeland*, 893 F.3d at 119-120 (same).

Kik loses its vagueness defense if it fails only one of these two tests, but it fails both. *First*, as the *Zaslavskiy* court found, "*Howey* and its progeny set forth the standards needed to cabin [Section 5's] enforcement relative to investment contracts." 2018 WL 4346339, at *9. The multi-pronged *Howey* test has long provided helpful and explicit standards by which courts, the SEC, and other government agencies have assessed whether conduct constitutes the offer and sale of investment contracts. Kik seeks to flip the inquiry by focusing on the reasons why the SEC brought this lawsuit, as opposed to whether Kik's conduct violated the Securities Act. But, as this Court already correctly ruled, "the deliberations within an agency shed no light on the application of the statute or regulation or issue;" rather, the inquiry is whether "the law is vague, or confusing, or arbitrary . . . objectively." ECF No. 36. Similarly, neither the SEC's decisions to bring or not bring enforcement actions regarding other digital assets, nor statements by SEC officials in their personal capacities, Kik's CEO, industry groups, or members of Congress, as recited in Kik's answer (Answer at 122-27), inform whether the Securities Act is unconstitutionally vague. The term "investment contracts" is sufficiently clear to eliminate the risk of arbitrary enforcement.

*Second*, Kik's admitted conduct plainly "falls within the core of the statute's prohibition," *Copeland*, 893 F.3d at 119 (quoting *Farrell v. Burke*, 449 F.3d 470, 494 (2d Cir. 2006)), as the core purpose

of the Securities Act is to ensure "full and fair disclosure" to investors through registration.  As of early 2017, Kik had spent over $96 million of the venture capital funding that it had received, and had only $26 million in cash remaining, with expenses reaching as high as $3 million per month.  56.1 ¶¶ 15, 17.  Facing these perilous financial circumstances and existential uncertainty, Kik proceeded to plan and run the Kin offering and took $100 million from Kin buyers, including $55 million from over 3,400 investors in the United States.  *Id.* ¶¶ 234, 260.  "Stripped of the 21st-century jargon," Kik engaged in a straightforward fund raise "replete with the common characteristics" of other such endeavors.  *Zaslavskiy*, 2018 WL 4346339, at *3.  Yet Kik did not register the offer and sale and provide Kin investors the Securities Act's protections, including disclosure of its financial statements and other information about Kik and Kin.  *Id.* ¶¶ 276-277.  To the contrary, Kik strategized on how to avoid such a requirement, bulked up its liability insurance, and avoided calling the SEC after another securities regulator "definitively" informed the company that its offering violated the securities laws. *Id.* ¶¶ 205-207, 222-224, 227-230.

Kik's Answer seems to contend that the Act permits arbitrary enforcement by attempting to compare Kin to Bitcoin and Ether (the issuance of which years earlier, prior to the SEC's public issuance of the DAO Report, did not trigger SEC enforcement actions) and by pointing to other digital assets that existed by the time of Kik's public sale.  *See* Answer at 121-22.  But, as the *Zaslavskiy* court explained, "[w]hether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry." 2018 WL 4346339, at *4 (citing *Howey*, 328 U.S. at 293).  "This is especially true in the context of 'relatively new, hybrid vehicle[s],' which require 'case-by-case analysis into the economic realities of the underlying transaction[s].'"  *Id.* (quoting *Leonard*, 529 F.3d at 88-89).  Simply incanting "Bitcoin" and "Ether" does not answer the ultimate question of whether Kin are investment contracts.  Regardless, such comparison does not show arbitrary enforcement because discretion to enforce a business regulation is not the same as inviting arbitrary enforcement.  *See Village of Hoffman*

*Estates*, 455 U.S. at 503; *Farrell*, 449 F.3d at 493-94.  As the Second Circuit explained in *Copeland* rejecting a claim of unconstitutional vagueness, even a "pattern of discriminatory enforcement, without more, would not show that the statute is unconstitutionally vague.  What [is needed] is that the statute, as drafted by the legislature and interpreted by the courts, *invites* arbitrary enforcement . . . by turn[ing] on the law enforcement officer's unguided and subjective judgment."  893 F.3d at 120 (emphasis added); *see also Kay*, 513 F.3d at 442 (rejecting vagueness claim based on alleged similar misconduct by competitor companies noting that "multiple violations of a law do not . . . create vagueness in the law").

In sum, Kik cannot show that the Securities Act and *Howey* are constitutionally defective as applied to its circumstances, and there is no genuine dispute that its first affirmative defense should be rejected.

### D.      The Court Should Exercise Personal Jurisdiction Over Kik

Kik claims under its third affirmative defense that "Kik is not subject to general or specific personal jurisdiction in this Court."  Answer at 130.  Kik has since represented to the SEC that it intends to abandon this defense, and, therefore, the Court should disregard it and grant judgment to the SEC on all of Kik's defenses.  Any claim that this Court should not exercise personal jurisdiction over Kik would, in any event, be without merit.  Kik undoubtedly has sufficient minimum contacts with the United States under the Due Process Clause, because Kik "purposefully directed" its activities at residents of the United States, and this litigation results from injuries "aris[ing] out of or relat[ing] to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).  *See* 56.1 ¶¶ 2-3, 49, 64, 305-306 (describing contacts).  In the event Kik attempts to revive this meritless defense, the SEC respectfully seeks leave to submit additional briefing as appropriate.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant plaintiff SEC summary judgment.


Dated:   March 20, 2020

*David Mendel*
Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov


*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on March 20, 2020, I caused the foregoing to be filed using the Court's CM/ECF

system, which will send a notification of such filing to each counsel of record.


_/s/ David Mendel_

David S. Mendel
*One of Plaintiff's Attorneys*