| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Case No. 19-cv-5244 (AKH)** |
| **vs.** | |
| **KIK INTERACTIVE INC.** | |
| **Defendant.** | |

**PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF MATERIAL FACTS ON MOTION FOR SUMMARY JUDGMENT UNDER LOCAL CIVIL RULE 56.1**

Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

# TABLE OF CONTENTS

A. BACKGROUND ON KIK ................................................................................1

B. BY EARLY 2017, KIK WAS RUNNING OUT OF MONEY ............................................3

C. KIK PLANNED A SINGLE OFFERING OF ONE TRILLION DIGITAL TOKENS CALLED "KIN" ......................................................................4

D. KIK PUBLICLY ANNOUNCED THE OFFERING OF ONE TRILLION KIN TOKENS ...............................................................................13

E. BETWEEN MAY AND SEPTEMBER 2017, KIK PROMOTED THE SALE OF ONE TRILLION KIN THROUGH A "WHITE PAPER," SEVERAL VIDEOS, SOCIAL MEDIA, AND A MULTI-CITY "ROADSHOW" ........................................ 15

F. KIK OFFERED AND SOLD THE ONE TRILLION KIN THROUGH CONTRACTS CALLED "SAFTS" AND THROUGH A "PUBLIC SALE" ................ 19

    i. Kik Conducted One Offering of Kin In Two Phases, One That Included A SAFT And One That Did Not. ................................................ 19

    ii. By Entering Into The SAFTs, Kik Gave Itself A Deadline To Complete The Public Sale ...................................................... 21

G. KIK MARKETED THE KIN OFFERING BY EMPHASIZING THE OPPORTUNITY TO PROFIT ...................................................................26

    i. Kik's Publicly Described How Kin's Price Could Increase. ...................................26

    ii. When Pitching Kin, Kik Emphasized That Kik's Ownership of Three Trillion Kin Gave Kik a Financial Incentive to Increase the Value of Kin............................30

    iii. Kik Promoted Kin Against A Backdrop of Rapidly Increasing Prices For Digital Assets....................................................................................33

    iv. Kik Compared Market Conditions To The "Dot Com" Era............................34

    v. Kik Compared Buying Kin to Venture Capital Investing.......................................36

H. THROUGHOUT THE KIN OFFERING, KIK EMPHASIZED ITS OWN IMPORTANCE TO KIN'S FUTURE SUCCESS AND THE ACTIONS IT WOULD TAKE TO SUPPORT KIN AND INCREASE DEMAND FOR KIN .........................40

    i. Kik Touted Its Experience, Its Expertise, And The Value Of Kik Messenger......40

ii.      **Kik Stated That It Would Spend Proceeds From Kin Sales On Tasks To Increase Demand for Kin**……………………………………………………………………..44

iii.     **Kik Promised It Would Create Demand For Kin By Building New Products, Services, And Systems For the "Kin Ecosystem"**…………………………………45

iv.     **Kik Promised It Would Create Demand For Kin By Integrating Kin Into Kik's Messaging App**……………………………………………………………………..46

v.     **Kik Promised It Would Create Demand For Kin By Implementing New Technology To Allow For Scalable, Fast, And Cost-Effective Transactions – i.e., Kik Stated That It Would Develop A Blockchain For The Future Kin Network**……………………………………………………………………………48

vi.    **Kik Told Investors It Would Work To Attract People To The Kin Network, Which Would Increase The Price Of Kin In The Future** .......................................51

vii.   **Kik Said That It Would Create A "Kin Rewards Engine" That Would "Further Grow The Ecosystem."**........................................................52

viii.   **Kik Promised It Would Create And Control A "Kin Foundation" To Manage And Promote Demand For Kin.**..............................................55

I.     **THE MARKET UNDERSTOOD FROM KIK'S MARKETING OF THE OFFERING THAT THEY COULD PROFIT FROM KIK'S ANTICIPATED FUTURE EFFORTS TO PROMOTE AND SUPPORT KIN** .........................................................................56

J.     **AT THE TIME OF THE KIN OFFERING, KIN HAD NO UTILITY** .......................63

i.     **Kik Did Not Market Any Specific Use For Kin To Public Buyers**..........................63

ii.     **Kik Rushed To Create A "Minimum Viable Product" That Kik Described Only To SAFT Participants** .............................................................................64

iii.    **Up To And Including The Time Of Kik's Distribution Of Kin On September 26, 2017, There Was No Good Or Service To Purchase With Kin**……………………..66

K.    **KIK KNEW THAT ITS OFFERING AND SALE OF KIN COULD BE CONSIDERED AN OFFERING AND SALE OF SECURITIES**................................69

L.    **KIK ATTEMPTED TO TAILOR ITS MESSAGING TO MITIGATE LEGAL RISK** ............................................................................. 73

M.   **KIK RAISED APPROXIMATELY $100 MILLION FROM KIN INVESTORS WITHOUT FILING A REGISTRATION STATEMENT** ...........................................74

i.      From July To September 11, 2017, Kik Sold Discounted Kin To Wealthy Investors Through SAFTS. ...................................................................................................74

ii.      Starting In August 2017, Kik Publicly Announced The Public Sale Process And Allowed Investors To Sign Up. .......................................................................76

iii.      From September 12 To 26, 2017, Kik Sold Kin To The General Public..................79

iv.      Kik Never Filed A Registration Statement.............................................................83

N.    AS PROMISED, KIK CREATED THE KIN FOUNDATION ON SEPTEMBER 12, 2017.....................................................................................................83

O.    ON SEPTEMBER 26, 2017, KIK DELIVERED THREE TRILLION KIN TO ITSELF, ONE TRILLION KIN TO INVESTORS, AND SIX TRILLION KIN THE FOUNDATION ...........................................................................................................85

P.     KIK POOLED THE PROCEEDS OF THE SALE OF KIN AND USED THE PROCEEDS TO FUND ITS OPERATIONS AND "INCREASE THE VELOCITY" OF KIN ........................................................................................................................86

Q.    WHEN OFFERING AND SELLING KIN, KIK MADE USE OF THE MEANS AND INSTRUMENTS OF INTERSTATE COMMERCE ................................................... 87

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1, Plaintiff U.S. Securities and Exchange Commission ("SEC") respectfully submits this statement of material facts as to which there is no genuine issue to be tried, together with the Declaration of Laura D'Allaird and the exhibits thereto, and Plaintiff's memorandum of law, in support of its motion for summary judgment.

## A. BACKGROUND ON KIK

1. Defendant Kik Interactive Inc. ("Kik") is a privately-held Canadian corporation founded in 2009. (Kik's Answer to Complaint ("Answer")[1] ¶ 5; SEC1,[2] Kik's September 17, 2018 Response to the SEC's Investigative Requests for Admission ("Inv. RFA") No. 36; SEC2, Kik's October 7, 2019 Response to the SEC's Rule 36 Requests for Admission ("Lit. RFA") No. 1).

2. Between February 22, 2017 and September 17, 2018, Kik had its headquarters in Waterloo, Ontario, and offices in New York City and Tel Aviv. (Answer ¶ 28; SEC1, Inv. RFA, at No. 1; SEC2, Lit. RFA, at No. 36).

3. Kik's New York City office was located in Manhattan, on the Lower East Side, and employed ten people, including its chief marketing officer. (SEC3, Investigative Testimony of Erin Clift ("Clift Inv. Tr."), at 11:19-21, 26:24-27:12; SEC4, Deposition of Peter Heinke ("Heinke Dep. Tr."), at 41:6-25).

4. From mid-2017 through the date of this filing, Kik's general counsel lived and worked in California. (SEC5, Investigative Testimony of Eileen Lyon ("Lyon Inv. Tr."), at 14:16-22, 30:17-22; SEC6, Rule 30(b)(6) Deposition of Kik Interactive ("Kik 30(b)(6) Dep. Tr."), at 13:5-14:22).

---

[1] *See* ECF No. 22. Consistent with this Court's instruction that "[p]arties shall refer to exhibits already filed and not duplicate them," Individual Rule 2(C)(i)(III), the SEC has not re-filed Kik's Answer because it is available on the Court's electronic filing system.
[2] Exhibits cited herein are attached to the Declaration of Laura D'Allaird, filed concurrently by Plaintiff, and are designated herein as "SEC" followed by the exhibit number (*e.g.*, "SEC1").

5. At present, Kik is headquartered in Kitchener, Ontario, and has several employees in the United States, including at least one in Manhattan. (Answer ¶ 28; SEC6, Kik 30(b)(6) Dep. Tr., at 13:5-14:20, 24:8-25:7).

6. Before 2017, Kik received at least $120 million in financing from venture capital firms, including an investment in 2015 from technology conglomerate Tencent. (Answer ¶ 35).

7. Until September 2019, Kik operated a chat application called Kik Messenger, which was launched in 2010 and allowed users to communicate with each other using mobile devices. (Answer ¶ 36). Kik sold Kik Messenger in September 2019, and it has since then focused on developing a new product, a digital "wallet," that will "send and receive and store Kin." (SEC6, Kik 30(b)(6) Dep. Tr., at 28:10-31:24; SEC7, Deposition Exhibit ("Dep. Ex.") 264).

8. Kik Messenger has had hundreds of millions of users (Answer ¶ 37), with a significant concentration among "teenagers and 20-somethings" in the United States (SEC8, Investigative Testimony of Edward Livingston ("Livingston Inv. Tr."), at 38:12-20).

9. Kik has had challenges in making money from Kik Messenger. (SEC4, Heinke Dep. Tr., at 43:5-8). Historically, Kik has not been profitable, and its efforts to monetize its platform through other business lines have been largely insufficient to sustain its business. (Answer ¶ 38). In 2017, Kik was struggling to monetize its business without resorting to the sale of user data to advertisers. (Answer ¶¶ 5, 37).

10. Before fiscal year 2018, Kik's costs exceeded its revenue (Answer ¶ 5), and Kik did not generate appreciable revenue. (SEC9, Investigative Testimony of Paul Holland ("Holland Inv. Tr.") 30:14-33:7; SEC10, Investigative Testimony of Peter Heinke ("Heinke Inv. Tr."), 43:24-46:2; 48:16-50:2, 53:15-55:6).

11. From mid-2015 to mid-2016, the company recorded $2.2 million in revenue but had total expenses of $29.2 million, and the company experienced a comprehensive loss, before

adjustments for income taxes, of $29 million. From mid-2016 to mid-2017, the company recorded $1.5 million in revenue but had $32.3 million in expenses, and the company experienced a comprehensive loss, before adjustments for income taxes, of $32.9 million. (Answer ¶ 38; SEC11, Dep. Ex. 26; SEC12, Dep. Ex. 27; *see also* SEC2, Lit. RFA, Nos. 48-49; SEC4, Heinke Dep. Tr., at 43:20-45:17; SEC10, Heinke Inv. Tr., 50:7-52:6).

12.     In late 2016, Kik hired an investment bank to evaluate a potential sale of the Company. (Answer ¶ 40). On or about February 1, 2017, Kik's CEO sent an email to Kik's Board of Directors attaching an update from the investment bank. The update stated that the investment bank had contacted 35 parties and signed confidentiality agreements with seven of them, and that all seven declined to buy or merge with Kik after attending presentations. (SEC13, KIK_FOUNDATION_CAP_001299). The investment bank did not find a buyer for Kik. (SEC4, Heinke Dep. Tr., at 46:22-47:10; SEC14, Investigative Testimony of Tanner Philp ("Philp Inv. Tr."), at 36:14-40:11).

13.     "With no bids coming out of the [investment bank's] process, and a continued decline in [Kik Messenger's] metrics, [Kik was] in a precarious position, to say the least." (SEC15, Dep. Ex. 28).

14.     At the same time, "the answer of Kik will 'figure out how to make money later' was no longer an option with [Kik's] investors." (SEC8, Livingston Inv. Tr., 42:10-43:4) And, going into 2017, there was "a fear within Kik that Kik could die." (*Id.* at 46:19-22).

## B.     BY EARLY 2017, KIK WAS RUNNING OUT OF MONEY

15.     By early 2017, Kik had had roughly $26 million in cash remaining and, at times, spent around $3 million per month. (Answer ¶ 41).

16.     On January 27, 2017, Kik's CEO sent an email to Kik's Board that referenced an upcoming meeting and attached a slide deck. The slide deck showed that daily average users dropped

from more than 10 million in January 2016 to about 6 million in January 2017, and that monthly average users dropped from more than 28 million in January 2016 to about 20 million in January 2017. (SEC15, Dep. Ex. 28, at KIK_FOUNDATION_CAP_005718-719; SEC4, Heinke Dep. Tr., at 50:16-52:5; *see also* Answer ¶ 37).

17.     The January 27, 2017 slide deck also stated that the "Current Situation" was "$3.1M current burn" and "Runway to September 5, 2017." (SEC15, Dep. Ex. 28, at KIK_FOUNDATION_CAP_005718-719, 740; SEC4, Heinke Dep. Tr., at 53:22-54:6). "Runway" meant the time by which Kik would run out of money to fund operations under then-current spending levels. (SEC4, Heinke Dep. Tr., at 52:6-20). "Current burn" meant the amount of money Kik spent every month to operate. (*Id.* at 55:3-6).

## C.     KIK PLANNED A SINGLE OFFERING OF ONE TRILLION DIGITAL TOKENS CALLED "KIN"

18.     The January 27, 2017 slide deck included slides stating that a sale of a "cryptocurrency" may be a way for Kik to "finance the business" and thereby "[e]xtend[] [r]unway." (SEC15, Dep. Ex. 28, at KIK_FOUNDATION_CAP_005739, 005747, and 005752). The slides also stated that "launching a new cryptocurrency" was a "new way to raise funds that is in vogue," and they noted that such a launch would be a "[l]arge pivot in business model." (*Id.* at KIK_FOUNDATION_CAP_005752).

19.     During its meeting on or about February 1, 2017, Kik's Board discussed the slides circulated on January 27. (SEC4, Heinke Dep. Tr., at 57:11-59:1).

20.     By early 2017, Kik's senior management had concluded that sale of digital tokens was Kik's "only option." (SEC8, Livingston Inv. Tr., at 79:14-80:5, 158:12-161:10).

21.     The new cryptocurrency considered by the Board would be issued on a blockchain. A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a network and

records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Some blockchains can record what are called "smart contracts," which are, essentially, computer programs designed to execute the terms of a contract when certain triggering conditions are met. (Answer ¶ 30).

22. Kik's Board members often referred to the potential issuance of a cryptocurrency as an "ICO," which is shorthand for Initial Coin Offering. (*See, e.g.*, SEC16, Investigative Testimony Exhibit ("Inv. Ex.") 150; SEC17, Investigative Testimony of Fred Wilson ("Wilson Inv. Tr."), at 132:8-133:3; SEC9, Holland Inv. Tr., at 64:4-65:9).

23. From February through May 2017, Kik's executives continued to provide updates to the company's directors about Kik's financial "runway," and Kik predicted it would run out of cash sometime during the late fall of that year. (*See, e.g.*, SEC18, Dep. Ex. 4 at KIK_00026538; SEC19, Dep. Ex. 36 at KIK_00106791; SEC4, Heinke Dep. Tr., 86:7-18, 87:21-88:8; SEC3, Clift Inv. Tr., 52:16-54:6; SEC9, Holland Inv. Tr., 48:21-51:19; 106:2-107:21; SEC14, Philp Inv. Tr. at 32:16-33:14; SEC17, Wilson Inv. Tr. 37:4-39:4).

24. On February 16, 2017, Kik's CEO emailed the board a PowerPoint slide deck that included "The Potential for an ICO" in the agenda and a section entitled "Kik & the Blockchain" (SEC18, Dep. Ex. 4 at KIK_00026455), which included, *inter alia*, the following statements regarding the potential interest of "cryptoinvestors" and "crowdfunders" in purchasing a digital token issued by Kik:

- "Cryptoinvestors" were "largely funding three areas" that included blockchain platforms, infrastructure projects, and decentralized applications;

- "We believe that the scale of our network alone will drive strong interest from the cryptoinvestor community;" and

- 68% of "Crowdfunders" "[w]ould invest in tradable digital tokens of a blockchain company if offered good risk-return potential."

(*Id.* at KIK_00026455, 57-58, 61, and 63; *see also* SEC3, Clift Inv. Tr. at 98:19-99:9, 99:13-103:13).

25.     Kik's "pivot" to cryptocurrency coincided with a dramatic increase in both the number of digital token offerings and the amounts raised therein – "a sort of market frenzy that typifies a bubble." (SEC20, Dirk A. Zetzsche, Ross P. Buckley, Douglas W. Arner, & Linus Föhr, *The ICO Gold Rush: It's a Scam, It's a Bubble, It's a Super Challenge for Regulators*, 60 Harv. Int'l L. J. 267, 288 (2019) (analyzing 1,000 ICO "whitepapers" issued between 2016 and 2019)).   During a February 2017 conference, a market observer – whom Kik later hired as a consultant – predicted "strong growth of ICO markets in 2017" with 34 ICOs in the first half of the first quarter and, by year end, "300 ICOs raising $600m."   (SEC21, Dep. Ex. 133 at MMLWM-00000151; SEC22, Deposition of William Mougayar ("Mougayar Dep. Tr."), at 71:14-72:10).   According to an article by CoinDesk, "43 ICOs in 2016 raising an aggregate $256 million; that number jumped to 343 ICOs in 2017."   (Answer ¶ 44).   And, according to the founder of a hedge fund that would become the top Kin purchaser, "[t]he ICO market [was] white hot" in 2017.   (Answer ¶ 72; SEC23, Investigative Testimony of Daniel Morehead ("Morehead Inv. Tr."), at 57:17-25; SEC24, Inv. Ex. 180).

26.     At the February 16, 2017 meeting, Kik's Board instructed the executive team to assume that Kik would conduct a token sale, while the company was "finishing [its] evaluation of the viability' of a cryptocurrency project." (Answer ¶ 45).

27.     In an email to Kik's chief marketing officer and another marketing employee dated February 28, 2017, Kik's CEO described Kik's new "crypto story," which would be "a new way" to raise capital.   He wrote, *inter alia*, that Kik would "sell some [tokens] to crypto investors to raise

money," and that "[m]ore demand" for the token would mean "[v]alue goes up," and, therefore: "Buy today, sell tomorrow, profit." (SEC25, KIK_00026563; Answer ¶ 46).

28.     Similarly, in a March 24, 2017 email to Kik's Leadership Team, Kik's CEO described his "[v]ision" for an offering of tokens (then called "Kik Points") and the "value proposition to investors." He explained that, "because of all the things [Kik will] do to create demand for [the tokens]," people could buy now at a low price and sell later at a higher price to "creat[e] a return":

> [I]f you buy some Kik Points today when the demand is low, then you will be able to sell them at a higher price tomorrow when the demand is higher, creating a return. This potential return encourages investors to "buy in" at an ICO. An ICO is where Kik takes a portion of its reserves from its Fort Knox (say 100 million of the 1 billion Kik Points that we initially created and put in our Fort Knox) and sells them in an auction. The value proposition to investors is that if they buy in today at the ICO, and then the demand for the currency goes up because of all the things we do to create demand for them, then they will be able to sell their points at a higher price in the future, and make a return. The money taken in from investors for the ICO is used by Kik to fund development to create more and more demand by both growing the community, and by growing the demand for the currency within the community.

(Answer ¶ 47; SEC26, Inv. Ex. 107 at KIK_00026625; SEC8, Livingston Inv. Tr., at 208:19-210:13).

29.     During this same time period, Kik began to work with a consulting firm located in New York City to research the market for tokens and other digital assets and to design Kik's ICO. (SEC10, Heinke Inv. Tr., at 80:22-86:25; SEC9, Holland Inv. Tr. 98:4-9; SEC14, Philp Inv. Tr., at 56:13-19).

30.     The consultant's research confirmed for Kik that "serious cryptoinvestors globally as well as small VC funds and family offices that are pushing into the space" could, in fact, become interested in adding Kik's tokens to their existing portfolios of digital assets. (Answer ¶ 49). The consultant again advised Kik that the "investment space" for digital tokens "[wa]s extremely hot" and reported for recent token sales that "[t]he average return multiple is 15x." (SEC27, Dep. Ex. 6 at COINFUND007697 (emphasis in original); SEC10, Heinke Inv. Tr., at 127:20-128:10).

31.     On April 10, 2017, in advance of a meeting of Kik directors later that same week, Kik's CEO sent to the directors his PowerPoint presentation for the meeting, entitled "Kik & Cryptocurrency," together with a report prepared by Kik's consultant. (Answer ¶ 50; SEC28, Dep. Ex. 35). The materials included results from the consultant's "Cryptoinvestor Survey" and "Cryptoinvestor Expert Panel" and contained a "Funding perspectives" slide showing revenues from average historical token sales and predicted a capital raise of "$100 million easily" from the offering. (Answer ¶ 50). The materials set forth a "roadmap" for a token sale later that year and included steps for an "investor marketing plan" and an "exchange outreach." (*Id.*).

32.     Despite the consultant's optimism, in a late April 2017 email, a Kik Board member described Kik's plan to offer and sell a digital token as "a hail Mary pass that involves crypto." (SEC29, USV0015937; Answer ¶ 7).

33.     In April 2017, Kik and its New York-based consultants started to draft a "white paper," through which the company would announce the offering of the digital token – by this time called "Kin" – to the public. (Answer ¶ 52).

34.     On May 4, 2017, Kik's CEO emailed Kik's Board a PowerPoint slide deck stating that the end of the company's cash runway was six months away – October 9, 2017, if the company made severance payments to fired employees, or November 1, 2017, if it did not. (SEC19, Dep. Ex. 36, at KIK_00106791; SEC4, Heinke Dep. Tr., at 85:22-86:18).

35.     The PowerPoint Slides attached to Kik's CEO's May 4, 2017 email described Kik's intended sale of one trillion tokens, which would be "sold on day 1" to "Investors." (SEC19, Dep. Ex. 36, at KIK_00106802; *see also id.* at KIK_00106815).

36.     On May 22, 2017, in advance of a telephonic Board meeting the next day, Kik's CEO sent the directors a PowerPoint presentation with details about the company's planned offering, which had been fleshed out during the drafting of the white paper. (Answer ¶ 54; SEC30, Dep. Ex. 7).

37.    The presentation reiterated that Kik would create a total supply of 10 trillion Kin tokens and offer a "[f]loat" of 10 percent of that supply (*i.e.*, one trillion tokens), with a "Total Raise Target" of $100 million.  (Answer ¶ 55; SEC30, Dep. Ex. 7).  The "Total Raise" would occur though a "Pre-Sale" phase and a "Token Distribution Event."  (SEC 30, Dep. Ex. 7, at KIK_00106892).

38.    The presentation also described the sale of the one trillion tokens in multiple "tranches," with buyers in the earlier tranches – *i.e.*, what Kik called a "Pre-Sale" – committing funds in advance of a sale of Kin to the general public in exchange for discounts from the final offering price.  (Answer ¶ 55; SEC30, Dep. Ex. 7).

39.    Kik had also decided to sell Kin in one or more of the early tranches by entering into Simple Agreements for Future Tokens ("SAFTs") with investment funds and other wealthy investors.  As of May 22, 2017, Kik planned to raise up to $50 million through SAFTs, during the "Pre-Sale," and between $50 million to $75 million more in what Kik called the "public tranche[s]."  (Answer ¶ 56; SEC30, Dep. Ex. 7; SEC10, Heinke Inv. Tr., at 207:10-23).

40. The May 22, 2017 presentation summarized a single sale of the one trillion Kin "float" as follows:

**Token Sale Structure (Soft Cap)**

| | |
|---|---|
| Token Supply | 10T Tokens |
| Float Offered | 10% |
| $ Tranches Based Pricing Discounts | 35%; $0-25M SAFT<br>25%; $25-50M SAFT 2<br>20%; $50-75M (first public tranche)<br>10%; $75-100M (last chance for discounts)<br>0%; $100-125M (post soft cap) |
| Soft Cap | $100M (followed by a 24 hour countdown once reached) |
| Sale Time | 30 days maximum |
| Minimum | TBD |
| Distribution | Fixed 10% sold; Token Allocation calculated at end of sale based on proceeds raised and distributed per the example |
| Vesting | Time and Performance based for Founder and Foundation tokens only |

(Answer ¶ 57; SEC30, Dep. Ex. 7, at KIK_00106893).

41. The presentation also explained that 30 percent of the total number of tokens created (*i.e.*, three trillion) would be allocated to Kik under a future vesting schedule, while 60 percent of the total supply (*i.e.*, six trillion) would be allocated to a new "Kin Foundation" that Kik would establish. (Answer ¶ 58).

42. By planning to keep three trillion Kin, Kik intended to compensate itself for "provid[ing] start up resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand." (SEC31, Dep. Ex. 12, at KIK000021).[3]  And, in so doing, Kik planned to profit from

---

[3] SEC31, Dep. Ex. 12, is the Kin white paper, which Kik published on May 25, 2017.  The white paper was Kik's primary marketing document for the entire, one trillion Kin token sale.  (SEC4, Heinke Dep. Tr., at 99:16-25).

any future appreciation of Kin, so that the more success Kik had with respect to its "goal . . . to grow the value of Kin . . . the more the value of [Kik's] 30 percent grows."  (Answer ¶ 115).

43.    Before the May 2017 public announcement, Kik drafted a single "communications strategy" that would run from the announcement until the "token distribution event" and encompass both the "Pre-sale" and "Public sale" phases.  (Answer ¶ 59; SEC32, Inv. Ex. 56)  Kik also planned a single "Investor Roadshow" that included events in New York City, San Francisco, and abroad.  The plan included the public announcement at which Kik would "[d]rive interest and awareness of Kik token sale," meetings with venture capitalists, and the token sale itself (then scheduled for July 2017), at which Kik would "Drive participation in sale" by the "Crypto community."  (Answer ¶ 59; SEC32, Inv. Ex. 56).

44.    The "communications strategy" summarized how the Investor Roadshow would be directed at both SAFT participants and public buyers as follows:

## Roadshow

**Media Strategy:** Setup in-person interviews with friendlies and analysts; setup in-person meetings with crypto investors reporters

**Tactics:**
- Media dinner in Toronto
- In-person meetings in SF and NY
- 1-2 Meetups w/ Ted in SF, NY, Toronto, London
- Leverage Fred Wilson and other advisors to validate this strategy with media and analysts
- Speak at TechCrunch Shenzen and Cryptofinancing (London)

**Key Topics:**
- *Kik is converting its network into crypto users*
- *Why chat + crypto makes sense*
- *How chat's ecosystem (bots, expression, etc.) will drive*
- *Potential alliance to trump Facebook's network effects*
- *General industry/Kik decline (if this is part of the narrative, this needs to be addressed head-on)*
- *Why Kik will be the first one to make this successful*




(SEC32, Inv. Ex. 56, at COINFUND006085).

45.     Pursuant to its communications strategy, Kik planned to speak to the public about the "Public sale" phase at the same time it would discuss the "Pre-sale" phase with accredited investors. (Answer ¶ 59).

46.     The May 22, 2017 Board presentation included the following "Presale Timeline," which illustrates Kik's plan to simultaneously market Kin to both the general public and potential SAFT participants:



**Presale Timeline**

| June 1 | Mid-June | End of June | Mid-July |
|---|---|---|---|
| **Target Raise Amount (Cumulative)** | | | |
| $5mm | $20mm | $40mm | $50mm |
| **Target Markets** | | | |
| - Conference Attendees<br>- First Degree Connections | - US - East Coast<br>- Canada | - US - West Coast<br>- Asia | - EU |
| **Key Actions** | | | |
| - Qualify prospective buyers<br>- Advisor warm intros | - NY & Toronto Roadshow<br>- Media Dinners | - TechCrunch: Shenzen<br>- China & Japan Roadshow<br>- SF Roadshow | - London: Cryptofinancing<br>- EU Roadshow |
| **Materials** | | | |
| - Executive Summary<br>- Term Sheet | - Management Presentation<br>- SAFT | - Management Presentation<br>- SAFT | - Management Presentation<br>- SAFT |

(SEC, Dep. Ex. 7, at KIK_00106886).

47.     Kik's white paper (SEC31, Dep. Ex. 12) was directed to both the general public and accredited, pre-sale investors simultaneously.  (SEC10, Heinke Inv. Tr., at 243:24-244:23).

48.     On May 23, 2017, Kik's board voted to approve the timeline, the allocation of the ten trillion Kin, the split between a "pre-sale and public sale," and the white paper.  (Answer ¶ 60).

## D. KIK PUBLICLY ANNOUNCED THE OFFERING OF ONE TRILLION KIN TOKENS

49.     On May 25, 2017, Kik announced a plan to offer and sell one trillion Kin through publishing a white paper, issuing press releases, and statements by Kik's CEO during a "fireside chat" at an event in New York City called the "Token Summit." (Answer ¶ 8; SEC22, Mougayar Dep. Tr., at 96:13-20; SEC31, Dep. Ex. 12) Before the announcement, Kik's chief marketing officer emailed Kik's CEO that "the primary audience for the initial announcement really is an investor community" and "the Token Summit is ideal." (Answer ¶ 62; SEC33, Inv. Ex. 84).

50.     The Token Summit was created and organized by one of Kik's consultants. (SEC22, Mougayar Dep. Tr., at 36:13-38:14). Before the announcement, the consultant emailed Kik's chief marketing officer that "we expect 350-400 attendees, a mix of crypto-token crowd, entrepreneurs, business managers, investors/VCs, wall street types, regulators and media." (SEC34, Dep. Ex. 135; SEC22, Mougayar Dep. Tr., at 88:17-89:5). The actual number of attendees was close to 700, requiring building security to shut a number of people out because of fire regulations. (SEC22, Mougayar Dep. Tr., at 90:15-16; SEC4, Heinke Dep. Tr., at 134:16-135:1).

51.     At the time he spoke at Token Summit, as well as when he subsequently appeared on CNBC and spoke at other events relating to Kin, Kik's CEO had authority to speak on behalf of Kik regarding the Kin project. (SEC35, November 12, 2019 Stipulation, at ¶¶ 14-41).

52.     A video of the Token Summit fireside chat was posted on YouTube. (Answer ¶ 62; SEC36-A, May 25, 2017 Token Summit ("Token Summit") (video), SEC36-B, Token Summit (transcript)).

53.     Kik posted the white paper on its website, making the document freely accessible on the Internet. (SEC4, Heinke Dep. Tr., at 127:5-25). The white paper was Kik's primary marketing document for the entire, one trillion Kin token sale. (*Id.* at 99:16-25).

54.     The whitepaper described as follows Kik's plan to sell Kin and to "driv[e] demand [for] and fundamental value" of the token:

## 1.     Kik's Vision

As a company, Kik has been searching for a sustainable monetization model that does not compromise user experience or privacy. Rather than opt for mass display advertising or the selling of consumer data, Kik has decided to adopt a decentralized organizational model. Its goal is to encourage the development of a digital services ecosystem that is fair and open. Kik prefers to be a participant rather than a landlord in this user-first economy.

To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems. Building a decentralized system is a complex process, and the transition to it must be done in a measured and responsible way over time. The following subsections outline Kik's plan for launching an entirely new platform: the Kin Ecosystem.

### A new digital currency

The first step is to create a new cryptocurrency: Kin. Related to the word "kinship," and conveying a feeling of being connected to community, the Kin identity and currency is designed specifically to bring people together in a new shared economy.

But simply creating a digital currency is not enough. For a cryptocurrency to be viable, it must also be useful and valuable. To establish an economy around the new currency, Kik must help to establish Kin's fundamental value.

### Building fundamental value

Kik has been experimenting with forms of in-app currency since 2014, when it launched Kik Points. In launching Kik Points, the company wanted to see if users of its chat app would be eager to earn and spend a centralized digital currency. Key to this innovation was the notion that users would not have to purchase Kik Points but could instead earn them within the app. Millions of Kik users participated, resulting in an average monthly transaction volume nearly three times higher than the global transaction volume of Bitcoin.

Today, Kik is one of the world's most used chat apps and the fifth most-searched term in the iOS App Store. The millions of people who use Kik each month are in a unique position to demonstrate how cryptocurrency economies might form and function in the context of a large, mainstream user base.

Kik will build fundamental value for the new currency by integrating Kin into its chat app. Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem. In the future, users will be

able to earn Kin by providing value to other members of the Kik digital community through curation, content creation, and commerce. Kik users will be able to spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants.

Kin will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency. Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem.

(SEC31, Dep. Ex. 12, at 5-6).

55. The white paper further stated that, "[i]n order to finance the Kin roadmap, Kik will conduct a token distribution event that will offer for sale one trillion units out of a 10 trillion unit total supply of Kin" (*id.* at 21), and that, "[t]o be notified of updates regarding the token distribution event, participants are invited to provide their email address at http://kin.kin.com" (*id.* at 23; Answer ¶ 64). The white paper did not identify a date on which the token distribution event would occur. Consistent with Kik's prior plans, the white paper also explained that three trillion Kin (30%) would be allocated to Kik under a future vesting schedule, and six trillion Kin (60%) would be allocated to a new "Kin Foundation." (SEC31, Dep. Ex. 12, at 21).

56. Also on May 25, 2017, Kik's CEO appeared on CNBC; Kik and Kik's CEO posted online on social media and Medium; Kik released a professionally prepared promotional video that was uploaded to YouTube; and Kik issued a press release entitled "Kik to Integrate Kin Tokens as First Mainstream Adoption of Cryptocurrency." (Answer ¶ 63; SEC37, Inv. Ex. 200; SEC38, Inv. Ex. 88).

**E. BETWEEN MAY AND SEPTEMBER 2017, KIK PROMOTED THE SALE OF ONE TRILLION KIN THROUGH A "WHITE PAPER," SEVERAL VIDEOS, SOCIAL MEDIA, AND A MULTI-CITY "ROADSHOW"**

57. Following the May 25, 2017 announcement, Kik advertised the "Kin economy," and, in doing so, its employees attended events in San Francisco, China, the United Kingdom and Canada. Kik planned a "Participant Roadshow," as outlined in its Communications Strategy, which included

stops in San Francisco, China, London, and Toronto, and included events targeted at developers and other potential participants in the Kin economy, including the "TechCrunch" conference in Shenzhen, China, the "Botness" conference in New York City, the "Bitcoin Meetup" in San Francisco, the "Meetup" at Spotify's office in New York, and a "Meetup" in London. Kik's CEO made public statements during this "roadshow," including by speaking on panels at conferences and in "fireside chats" with local media (Answer ¶ 69; SEC14, Philp Inv. Tr., at 332:18-23; SEC39, Inv. Ex. 202; SEC35, November 12, 2019 Stipulation, at ¶¶ 14-41).

58. The "Participant Roadshow," as outlined in the Communications Strategy, was not specifically targeted at developers and other potential participants in the Kin economy, but was instead directed at accredited investors, several of whom would ultimately purchase Kin via SAFT (*e.g.*, Pantera Capital and Polychain Capital):



### Participant Roadshow

**Goal: Ted to meet with top 2-3 crypto participants in each market**

**Toronto (June 7-8):**
- Anthony Di Iorio, Decentral
- Trevor Koverko, The Website Buyer

**New York (June 12-14):**
- Barry Silbert, digital currency group
- Winklevoss Capital
- Digital Currency Group
- Future perfect VC
- RRE ventures

**China *and Japan?* (June 19-22):**
- fenbushi.vc (Shanghai)
- Shuoji Zhou: https://www.linkedin.com/in/shuojizhou/ (Beijing)
- Wanxiang Holdings
- *Roger Ver*
- *Jeremy Wood, iOHK*

**San Francisco (June 26-28):**
- Chris Dixon Andreessen Horowitz
- Pantera Capital
- Tim Draper
- Polychain Capital
- Brock Pierce (LA)
- Naval Ravikant

**London (July 6-7):**
- Parnir Gelenbe, Hummingbird
- Briktothefuture
- Eric Benz, Credits

(SEC39, Inv. Ex. 202, at KIK_00107750; *see also* SEC8, Livingston Inv. Tr., at 400:9-401:18).

59.     At least one Kik executive expected that persons who would be interested in participating in Kik's public sale would include "speculators" who "are there to make a profit. And that is it. They couldn't care less about anything else." (SEC40, Deposition of Eran Ben-Ari ("Ben-Ari Dep. Tr."), at 69:15-70:3; SEC41, Investigative Testimony of Eran Ben-Ari, ("Ben-Ari Inv. Tr."), at 138:14-20.) He formed this view based on "internal discussions with people within the company" including Kik's CEO and CFO, and based on discussions with Kik's consultants during an "offsite . . . to better understand who usually participates in these TDEs [token distribution events]." (SEC41, Ben-Ari Inv. Tr., at 140:9-22).

60.     Kik personnel attended events in various cities to tell people about the Kin project and the idea of buying Kin tokens (SEC14, Philp Inv. Tr., at 334:7-11), and to raise awareness of the ecosystem as a whole and Kik's planned token distribution event (*Id.* at 394:2-11; *see also* SEC35, November 12, 2019 Stipulation, at ¶¶ 8-13).

61.     Many of Kik's Roadshow events were videotaped and posted on YouTube. (Answer ¶¶ 7, 70).

62.     During the same Roadshow in which Kik made public statements about Kin, Kik also met privately with individuals to discuss Kin. These individuals included accredited investors who were interested in participating in sales of digital tokens. (SEC14, Philp Inv. Tr., at 332:18-23, 336:7-13, 338:12-23). For example, while Kik was in New York City during the week of the Token Summit, Kik met with the investors Pantera Capital and Maple Ventures. (SEC10, Heinke Inv. Tr., at 132:20-12; SEC14, Philp Inv. Tr., at 338:25-339:4; SEC23, Morehead Inv. Tr., at 26:6-28:9). In addition, while in San Francisco, Kik met with representatives of Fortress Investment Group. (SEC14, Philp Inv. Tr., at 337:14-338:3; SEC42, Investigative Testimony of Michael Hourigan ("Hourigan Inv. Tr."), at 38:11-42:12, 43:20-46:1). Kik's written Communications Strategy stated with respect to the

Roadshow, "Goal: [Kik's CEO] to meet with top 2-3 crypto participants in each market." (SEC39, Inv. Ex. 202 at KIK_00107750).

63.     In addition to traveling to multiple cities, Kik posted to on-line social media such as Medium, Twitter, Reddit, and Slack regarding the Kin project. (Answer ¶ 71).

64.     By June 1, 2017, Kik was sending emails to persons who had signed up to receive updates about Kin, stating that Kik would "be back in touch over the coming weeks with more details on the product, the registration process and token event." (*See, e.g.*, SEC43, COINFUND012819; SEC44, PANT-000000051).

65.     Between June 14, 2017 and June 16, 2017, Kik's CEO traveled to New York City in connection with Kik's sale of Kin. (SEC35, November 12, 2019 Stipulation, at ¶ 9).

66.     Between June 18, 2017 and June 22, 2017, Kik's CEO traveled to Shenzhen, China, where, on June 20, 2017, he spoke at an event entitled "TechCrunch Shenzhen." (*Id.* at ¶ 23). Kik's CEO's statements at TechCrunch Shenzhen were recorded on video. (*Id.* at ¶¶23-26; SEC45-A, June 20, 2017 TechCrunch Shenzhen ("TechCrunch") (video); SEC45-B, TechCrunch (transcript)).

67.     Between June 27, 2017 and June 28, 2017, Kik's CEO traveled to San Francisco, California, where, on June 27, 2017, he spoke at an event entitled "An Evening with Ted Livingston." (SEC35, November 12, 2019 Stipulation, at ¶ 27). Kik's CEO's statements at "An Evening with Ted Livingston" were streamed on-line live and recorded on video. (*Id.* at ¶¶ 27-30; SEC46-A, June 27, 2017 An Evening with Ted Livingston ("An Evening") (video); SEC46-B, An Evening (transcript); SEC46-C, An Evening (screen capture)).

68.     Between July 4, 2017 and July 7, 2017, Kik's CEO traveled to London in connection with Kik's sale of Kin. (SEC35, November 12, 2019 Stipulation, at ¶ 12). And, on August 1, 2017, Kik's CEO appeared on "Finance Magnates' Blockchain Podcast," a video podcast that was and is available on the Internet. (*Id.* at ¶¶ 31-33; SEC47-A, August 1, 2017 Finance Magnates' Blockchain

Podcast ("Finance Magnates") (video); SEC47-B, Finance Magnates (transcript); SEC47-C, Finance Magnates (screen capture)).

69.     On August 14, 2017, Kik's CEO spoke at an event in Toronto, Canada entitled "Fintech Canada: Bitcoin and Ethereum Summit." (SEC35, November 12, 2019 Stipulation, ¶¶ 34-37). Registration for the event was open to the public. (SEC22, Mougayar Dep. Tr. 162:18-21). The talk was recorded on video and posted on the Internet. (SEC35, November 12, 2019 Stipulation, ¶¶ 34-37; SEC48-A, August 14, 2017 Fintech Canada: Bitcoin and Ethereum Summit ("Fintech Canada") (video); SEC48-B, Fintech Canada (transcript); SEC48-C, Fintech Canada (screen capture); SEC22, Mougayar Dep. Tr., at 167:23-170:8).

70.     Between September 6, 2017 and September 8, 2017, Kik's CEO traveled to New York City (again), where, on September 7, 2017, he spoke at an event entitled "New York City Ethereum." (SEC35, November 12, 2019 Stipulation, ¶¶ 38-41). The talk was recorded on video and posted on the Internet. (*Id.*; SEC49-A, September 7, 2017 New York City Ethereum ("NYC Ethereum") (video); SEC49-B, NYC Ethereum (transcript); SEC49-C, NYC Ethereum (screen capture)).

71.     At least one purchaser of Kin viewed some or all of these public appearances on YouTube before making his purchases. (*See, e.g.*, SEC50, Deposition of Harrison Wang ("Wang Dep. Tr."), at 43:5-14, 122:4-13).

## F.     KIK OFFERED AND SOLD THE ONE TRILLION KIN THROUGH CONTRACTS CALLED "SAFTS" AND THROUGH A "PUBLIC SALE"

### i.     *Kik Conducted One Offering of Kin In Two Phases, One That Included A SAFT And One That Did Not.*

72.     From May 25, 2017 through September 11, 2017, Kik offered and sold the right to receive Kin in the future, conditioned on a "Network Launch," to "accredited investors" as defined in SEC Regulation D. Kik sold such rights to investors pursuant to contracts called Simple Agreements For Future Tokens ("SAFTs"). The SAFT stated that Kik "hereby issues to the Purchaser

the right ("***the Right***") to certain units of Kin (the "***Token***" or "***Kin***"), subject to the terms" of the SAFT. If the "Network Launch" occurred, the investors who entered into a SAFT with Kik would receive Kin at a discounted price. These SAFT investors would receive 50 percent of their allotted tokens upon Network Launch, and their remaining tokens the following year (SEC51, Dep. Ex. 52; Answer ¶ 1).[4]

73.    From May 25, 2017 through September 26, 2017, Kik offered and sold Kin to the general public through a process that culminated in the Network Launch, which Kik also referred to as a "public sale" or "token distribution event." (Answer ¶ 31).

74.    As Kik's CEO explained to an audience in San Francisco, Kik sold Kin through SAFTs and to the public as part of a single sale of 10% of the total number of Kin that Kik planned to create:

> So, maybe this is, like – the allocation is, we're selling 10%. So, we're creating 10 trillion Kin tokens. You know, why a trillion? Because consumers, when they post in our group chat, they don't want to earn .0002 Bit coin, they'd rather have two Kin. So you know, we just always look at this group (inaudible) so that's why so many. We're going to take 1 trillion of those tokens and then sell it in a token distribution event, and we're going to do half presale through institutional investors, which is already completely spoken for (inaudible) and then half through a public distribution event, and that distributor event. . . .

(SEC44-B, An Evening (transcript), at 55:24-56:20).

75.    Similarly, Kik's CEO described the structure of the Kin sale to an audience in China as follows:

> There'll be three blocks of Kin. One block will be the 10 percent we're selling this summer, one block will be the 30 percent set aside for Kik, and that will vest 10 percent per quarter for 10 quarters. And then the third block will be the 60 percent set aside for this not-for-profit Kin Foundation. So, for that 30 for Kik, as it vests into the market, we will be able to sell it on to the exchanges like anybody else, to fund operations, to provide a financial exit for employees and investors, really to do with whatever we want.

(SEC43-B, TechCrunch (transcript), at 21:4-14).

---

[4] SEC51, Dep. Ex. 52, is a sample of Kik's form SAFT.

76.     Consistent with Kik's CEO's statements, Kik did not create different classes of Kin. All of the one trillion Kin that Kik sold were identical and fungible.  (Answer ¶ 180).

**ii.     By Entering Into The SAFTs, Kik Gave Itself A Deadline To Complete The Public Sale.**

77.     Kik's SAFT (*see, e.g.*, SEC51, Dep. Ex. 52) provided that purchasers who contracted with Kik would receive half of their allotment of tokens upon the completion of the public portion of the sale, which the SAFT called the "Network Launch", and half the following year:

> **1.     Events**
>
> **(a)     Network Launch**. If there is a Network Launch before the expiration or termination of this instrument, the Company will issue to the Purchaser a number of units of the Token equal to the Purchase Amount divided by the Discount Price pursuant to the following schedule:
>
> **(i)**     Fifty percent (50%) shall be issued as soon as practicable after the Network Launch provided that such issuance shall be no later than the date on which such units of Token are distributed to the public; and(ii) Fifty percent (50%) shall be issued on the one-year anniversary of the Network Launch.
>
> In connection with and prior to the issuance of Tokens by the Company to the Purchaser pursuant to this Section 1(a):
>
> **(ii)**     The Purchaser will execute and deliver to the Company any and all other transaction documents related to this SAFT, including verification of accredited investor status or non-U.S. person status under the applicable securities laws; and
>
> **(iii)**     The Purchaser will provide to the Company a network address for the allocation of Purchaser's Tokens after the Network Launch.

(SEC51, Dep. Ex. 52; Answer ¶ 1). The "Network Launch" was defined as "a *bona fide* transaction or series of transactions, pursuant to which the Company will sell Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain" – *i.e.*, the "tranches" of Kin that Kik planned to sell the general public.  (SEC51, Dep. Ex. 52).

78.     Purchasers who bought Kin via SAFT (who Kik sometimes referred to as "SAFT participants") paid a sum certain at the time they entered into the SAFTs, but Kin would ultimately be delivered in an amount that reflected the discounted price – that is, they paid only 70 percent of the price at which the Kin would be sold to the public during the public portion of the sale.  Thus, the number of Kin received by the SAFT investor and the per-Kin price for the Kin received were

contingent on the pricing of Kin during the public portion of the sale. Specifically, the SAFT stated in relevant part, under Section 2:

> "**Discount Price**" means the maximum price per Token sold by the Company to the public during the Network Launch multiplied by the Discount Rate.
>
> "**Discount Rate**" is 70%.

(SEC51, Dep. Ex. 52; *see also* SEC52, Dep. Ex. 16).[5] Stated another way, because SAFT participants paid a discounted price for the Kin based on the public sale price, the number of Kin that SAFT participants would ultimately receive was contingent on the public sale pricing of Kin. (SEC51, Dep. Ex. 52, at KIK000068; SEC4, Heinke Dep. Tr. 170:2-21).

79. SAFT participants would receive 50% of their Kin upon the completion of the "Network Launch" and 50% a year later, both without further action on the part of the purchaser. The SAFT stated that "the Right created by this instrument . . . cannot be resold except in compliance with the applicable country's laws." (SEC51, Dep. Ex. 52, at KIK000069). The SAFT placed no resell restrictions on Kin once transferred to SAFT participants. Kik also did not place restrictions on the Kin distributed to persons who bought during the public sale. (Answer ¶¶ 1, 12, 88).

80. The SAFTs would expire if the "Network Launch" (*i.e.*, the completion of the sale to the public) did not occur by September 30, 2017. Kik retained the right to extend that time frame by sixty days, until November 30, 2017. (Answer ¶ 92).

---

[5] SEC52, Dep. Ex. 16, is an example of Kik's private placement memorandum ("PPM") that Kik provided to accredited SAFT participants but not to general public purchasers. (Answer ¶ 90).

81. If the Network Launch did not occur by the deadline, Kik's SAFT would "terminate," meaning that SAFT participants would not receive Kin, and Kik would be required to return 70% of the invested cash to each purchaser:

> **(b)** **Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount multiplied by the Discount Rate (the "**Discounted Purchase Amount**"), due and payable to the Purchaser immediately prior to, or concurrent with, the consummation of the Dissolution Event. If immediately prior to the consummation of the Dissolution Event, the assets of the Company that remain legally available for distribution to the Purchaser and all holders of all other SAFTs (the "**Dissolving Purchasers**"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Purchasers of their respective Discounted Purchase Amounts, then the remaining assets of the Company legally available for

> distribution, will be distributed with equal priority and pro rata among the Dissolving Purchasers in proportion to the Discounted Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(b). Any distributed amounts shall be in U.S. Dollars.

> **(c)** **Termination**. This instrument will expire and terminate upon the earlier of (i) upon the Network Launch; (ii) the payment, or setting aside for payment, of amounts due the Purchaser pursuant to Section 1(b); (iii) September 30, 2017 (the "**Deadline Date**"), if the Network Launch has not occurred as of such date; provided that, the Company shall have the right to extend the Deadline Date by sixty (60) days, in its sole discretion; and (iv) the failure to obtain net proceeds of more than $25,000,000 from the sale of all rights pursuant to the SAFTs; *provided*, that in the case of (iv), the Company shall have the obligation to repay to the Purchasers the aggregate amount of all Purchase Amounts.

(SEC51, Dep. Ex. 52; *see also* Answer ¶ 1; SEC10, Heinke Inv. Tr., at 392:20-295:19).

82. The SAFT made no provision for a purchaser to cancel the agreement and obtain a refund, absent a condition set forth in the SAFT. (SEC51, Dep. Ex. 52).

83. Kik provided potential SAFT participants with a private placement memorandum ("PPM") (SEC52, Dep. Ex. 16), but it did not provide this information to general public purchasers. (Answer ¶ 90). The PPM included a "Company Overview" about Kik, biographies of Kik's "Directors and Management," and a description of the Kin project, but did not contain information about Kik's financial history. (SEC52, Dep. Ex. 16). The PPM provided that "[t]he SAFTs described in this Memorandum are subject to restrictions on transferability and resale and may not be transferred or resold" (*id.* at KIK000038), but it did not place any restrictions on the resale or transferability of the Kin purchased pursuant to the SAFT. (Answer ¶ 88).

84. On May 24, 2017, the day before Kik publicly announced about Kin, Kik executives met in New York City with the founder of a hedge fund, Pantera Capital, and discussed the hedge fund's potential interest in signing a SAFT. (Answer ¶ 89).

85. At its May 24, 2017 meeting with Pantera's founder, Kik described how it would use Kik Messenger to create interest in the tokens. (SEC23, Morehead Inv. Tr., at 26:4-31:5). That hedge fund later entered a SAFT and paid Kik $15 million, the highest amount by any Kin buyer in 2017. (SEC53, Dep. Ex. 40; SEC10, Heinke Inv. Tr., at 362:4-7).

86. During the same New York City trip, Kik executives also met with representatives of another potential SAFT participant, which later entered into a SAFT with Kik. (SEC4, Heinke Dep. Tr., at 132:20-133:12).

87. Following its May 2017 public announcement of Kin, Kik sent select potential SAFT participants term sheets that described Kik's plan to raise $50 million through SAFTs. (*See, e.g.*, SEC54, KIK_00017702; SEC55, KIK_00017698).

88. Kik advised Kin purchasers who purchased pursuant to the SAFT that the SAFT was a security:

> THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED, OR HYPOTECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

(Answer ¶ 91; SEC51, Dep. Ex. 52).

89. On June 14, 2017, Kik's outside counsel sent an email to Kik's CFO with the subject line "Draft email," and which stated in the body of the email:

> At the last Board meeting, before Fred and Jim had to drop off the call, the proposed course of action suggested, to ensure minimum risk to the Company

and the Board (in recognition of the frothiness of the cryptocurrency markets generally at this time), was to conduct a $100MM pre-sale and eliminate the "public" token distribution event (TDE). The conversion of the SAFT rights into Kin would occur at the time the Kin ecosystem was fully functional versus at the time there was a minimal viable product.

During the remainder of the Board call (after Fred and Jim's departure), the discussion centered on an option whereby the Company would conduct a $75MM pre-sale, and a $25MM public TDE at the time the Kin ecosystem was fully functional (which would be beyond the anticipated summer 2017 event).

After the Board meeting, management had an opportunity to consider 2 things – whether a TDE at $25MM (total raise of $100MM including the pre-sales) would maintain the integrity of the discounts communicated to pre-sale investors and whether investors contacted already for the pre-sale would view negatively a delay in the TDE to allow the Company to develop a fully functional Kin ecosystem.

. . . .

We reached out to the lead investor on the pre-sale [Pantera Capital] and talked about extending the time before the Company would conduct the [token distribution event] and offered the reason why and much to our surprise, the proposed delay was viewed adversely and would impact the lead investor's decision to participate in the pre-sale.

(SEC56, Inv. Ex. 181).

90. Kik wanted to be the first digital services application to launch a cryptocurrency. (Answer ¶ 95).

91. Kik executives were worried that the market for digital tokens might cool, or that other social media companies could offer digital assets before Kik and deprive it of significant first-mover advantages. (SEC9, Holland Inv. Tr., at 231:5-233:11; SEC10, Heinke Inv. Tr., at 406:1-411:7).

92. Kik entered into SAFTs with various participants from July 2017 until September 11, 2017, when it entered into the final 10 SAFT agreements. (SEC57, Inv. Ex. 133).

93. In total, Kik received approximately $49 million from approximately 50 participants pursuant to the SAFTs. (Answer ¶¶ 1, 12, 93). As a result of the deadline contained in the SAFT, if

the Network Launch did not occur by November 30, 2017, Kik would have been obligated to return around $35 million to Kin purchasers who bought pursuant to a SAFT purchasers.  (Answer ¶ 93).

## G.   KIK MARKETED THE KIN OFFERING BY EMPHASIZING THE OPPORTUNITY TO PROFIT.

### i.   *Kik's Publicly Described How Kin's Price Could Increase.*

94.     Kik could control what it led purchasers of Kin to expect.  (Answer ¶ 72).  And in its public statements about Kin between May 25, 2017 and September 26, 2017, Kik described how the value and prices of Kin could increase in the future.

95.     For example, Kik's white paper made clear that the Kin that Kik planned to both sell to the public and retain in its treasury was at the core of Kik's "monetization model" as a for-profit entity, and it included the following discussion:

> Kin will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency. Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem.
>
> The Kin Rewards Engine will use economic incentives to bring other digital services and applications into the decentralized Kin Ecosystem. Inspired by previous systems like Bitcoin's block rewards and Steemit's posting rewards, the Rewards Engine will create natural incentives for digital service providers to adopt Kin and become partners in the ecosystem. The ecosystem will not impose any unnecessary restrictions or tolls on monetization strategies, beyond ensuring common ethics and legality of content and transactions. As more partners join, the network effect of the Kin Ecosystem will grow, building the value of the currency, and in turn encouraging new partners to join this initiative.
> . . .
>
> Through a series of economic and technological transitions, and based on a new cryptocurrency called Kin, Kik will work toward creating the first open and sustainable alternative ecosystem of digital services for our daily lives. Economic incentives at the core of this ecosystem will ensure that all participants – users, founders, and digital service partners – will ultimately benefit from this work.

(SEC31, Dep. Ex. 12, at 5, 6, 7).

96.     As one Kik witness testified, the "entire vision is that as the ecosystem evolves and more demand, the value of the underlying token would increase." (SEC14, Philp Inv. Tr., at 408:5-408:7).

97.     Similarly, at the May 25, 2017 Token Summit in New York City, Kik's CEO stressed Kin's role in "monetization":

> So that's step number two is taking Kin, integrating into one of the largest consumer apps in the world to really give it value and to make Kik better and monetize Kik in a new way. But we didn't stop there. We said, wait a second, if we give Kin value, could we use some of that value to spark the creation of a new ecosystem of digital services? There's all these developers out there who have built these amazing things, but they can't make any money. They don't have the scale to monetize through advertising. And these huge companies who do have the scale are giving everything else away for free. So you have all these developers who are trying to build these amazing things but they're just they're going broke.

(Answer ¶ 66; SEC36-B, Token Summit (transcript), at 5:13-6:2).

98.     In its May 25, 2017 press release, Kik stated that it "will drive mainstream consumer adoption of Kin, establishing demand and fundamental value for the cryptocurrency." (SEC38, Inv. Ex. 88).

99.     And, in its May 25, 2017 Medium post, Kik described a future "system" under which "Kin itself will become more valuable":

> To maximize the chance of success, we're dedicated the majority of Kin to a rewards system that will provide a financial incentive for developers. Each day, using an algorithm that reflects each service's contribution, the Kin Rewards Engine will divvy up a set amount of Kin among all the services in the ecosystem. . . . In time, it can create a network effect: as the daily reward increases in value, more developers will join, there will be more Kin transactions, Kin itself will become more valuable, and in turn the daily reward will be worth even more…

(Answer ¶ 66; SEC37, Inv. Ex. 200).

100.    Kik repeatedly discussed the potential to profit from a purchase of Kin by citing the concepts of "supply and demand" and reminding potential purchasers that the supply of Kin was

fixed (*e.g.*, SEC31, Dep. Ex. 12, at 8), and Kik was "all in" on creating demand for the token. For example, at the June 27, 2017 conference in San Francisco, Kik's CEO put it as follows during a question-and-answer session with the audience:

> [KIK'S CEO]: So, that's the beautiful thing with the blockchain, right? We know with Bitcoin for example, there's only going to ever be 22 million Bitcoins, or whatever it is --
>
> AUDIENCE MEMBER: 21 million.
>
> [KIK'S CEO]: 21 million, thank you, I appreciate that. (Laughter.)
>
> [KIK'S CEO]: Sorry, I was off by so much. (Laughter.)
>
> [KIK'S CEO]: And with that -- so, that's the beautiful thing, is like, as a developer, as anybody in the US, you can look at Bitcoin and say, so, there's only going to ever be 21 million Bitcoins. So, the supply is fixed, so the demand for Bitcoin goes up, economics 101, supply stays the same, demand goes up, price is going to go up. And therefore, if I buy some today, if I think the demand is low, because I think tomorrow the demand will be higher, I will be able to sell at a higher price, and that's the thing that was just never possible. . . .
>
> AUDIENCE MEMBER: All right, that's all well and good. My second question for you is, what will Kik do in order to guarantee the value of Kin going forward?
>
> [KIK'S CEO]: So, we cannot guarantee the value of Kin. You know, I think once you create a cryptocurrency, it's on the exchanges, and the price of it is set by market based on supply and demand. And so, you know, even though the supply is fixed, as the demand goes down, the price is going to go down, but I think what we can guarantee is we are all in on this. You know, this is -- this is something we've been working to -- towards for a long time, but this is something that is in our financial best interest, because of the 30%, but actually, like, just to be honest, like, this is something we have to do. We cannot compete with Facebook.

(SEC46-B, An Evening (transcript), at 34:11-35:6, 35:17-36:7; Answer ¶ 9).

101.    In the professionally produced video that Kik released around the time of the Token Summit, Kik's CEO described how Kik would recruit developers to join the Kin Ecosystem and the benefits that would follow: "So you get all these developers coming in, and that creates more transactions. The more transactions, the more demand for the currency. The more demand for the

currency, the more valuable the currency." (SEC58-A, May 25, 2017 Promotional Video ("Promo Video") (video); SEC58-B, Promo Video (transcript), at 4:10-13; *see also* SEC35, November 12, 2019 Stipulation, at ¶20-22).

102.    Kik's white paper, meanwhile, stated, "In character, Kin is a pure cryptocurrency of fixed supply." (SEC31, Dep. Ex. 12, at 8).

103.    And, at the August 14, 2017 conference in Canada, Kik's CEO described how increased demand for Kin could lead to "everybody . . . mak[ing] a ton of money":

> But, now, with the cryptocurrency, it's in Kik's best interest to get people paid because that's what we're trying to do. We're trying to build this economy, whether it's around chat – you know, I host a great group chat that I join your great group chat; whether it's music – I create a great song, I listen to your great song; a game – I create at great level, I play your level; where consumers are coming together and providing value to each other and facilitating that with a cryptocurrency. The more you do that, the more valuable the - the more demand for the cryptocurrency there will be. And with sort of a, you know, cryptocurrency, you can guarantee a fixed supply, guaranteed scarcity. So supply stays the same. Demand goes up, the price goes up. Such that if you set some aside for yourselves and you give other people the opportunity to participate and contribute, everybody can not only build this amazing new ecosystem and platform, but also make a ton of money.

(Answer ¶¶ 10, 117; SEC48-B, Fintech Canada (transcript), at 10:10-11:3).

104.    Kik's CEO made similar statements at an early September event in New York City:

> And this is where we really got excited about bitcoin back in 2011 where it was like, bitcoin for the first time ever could provide a solution to this problem; where now for the first time ever with blockchain, you could actually guarantee the scarcity of a digital asset. So once you create a cryptocurrency on the blockchain, you can guarantee for the first time ever that there will never be more. So, you know, there's going to be 21 million bitcoins. For the first time ever we can say, there will never be more. You know, whereas before with airline miles, or any other sort of digital asset, somebody could always print more. And so what that meant is guaranteed scarcity -- if you could create a new cryptocurrency, there's only ever going to be so much of it, guaranteed scarcity, guaranteed supply. If you could grow the demand for it, then the price -- the value of that cryptocurrency would go up, such that if you set some aside for yourself at the beginning, you could make a lot of money. And so this was the exciting insight for us. It was like, for the first time ever, you could have open and valuable.

. . .

And so that's what you're doing. You're building an economy around some way that consumers can provide value to other consumers where there's sort of like, built-in scarcity. You know, I can only have so many people in my fan club. I'd love to give it to you all for free, but I can't. So who will pay me the most, and let's facilitate that with a cryptocurrency. The really cool thing about this is now as a digital service provider as Twitter, your number one metric is how well can you get consumers compensated, okay? Before it was how well can we extract value from consumers. Now, it's how well can we give value to consumers. And the more you do that, the more valuable the cryptocurrency will be.

(SEC49-B, NYC Ethereum (transcript), at 35:15-36:13, 73:23-74:14).

> ### ii. When Pitching Kin, Kik Emphasized That Kik's Ownership of Three Trillion Kin Gave Kik a Financial Incentive to Increase the Value of Kin.

105.    In its public statements about Kin between May 25, 2017 and September 26, 2017, Kik said it intended to profit from its own stake in Kin. Kik also stated that, because of its desire to profit, Kik was committed to trying to grow the demand for the token.

106.    Kik retained 30% of the Kin created. (Answer ¶ 10).

107.    On May 25, 2017, Kik's CEO stated on CNBC that Kik could make a "great financial return" if "more and more people" transact using Kin:

> KIK CEO: Digital currency allows us to create a fundamentally new way to monetize. I think, historically, you build a community and use it to then sell people's attention to advertisers or try to sell them stuff that they either don't want or don't need. So now with the cryptocurrency, it unlocks a fundamentally new way to monetize the community. So instead you're just bringing people together, creating a place where they can create value for each other transacting in a new cryptocurrency, and that alone is enough to make a great financial return.
>
> INTERVIEWER: What exactly are they transacting? And how do you make money by people using Kin.
>
> KIK CEO: So this is something we've been experimenting with, actually, since 2014 when we launched Kik Points. And so there's a bunch of ways to earn it. You could watch ads, you could host a great group chat, create a great sticker, build a great bot. And so there's all these different ways as a consumer you can come in and build spend value. And how that makes money for Kik is we create (inaudible) set some of that aside for us such that if more and more

people transact in this cryptocurrency, the value of it grows such that the value of our holdings grow as well.

(Answer ¶ 65; SEC59-A, May 25, 2017 CNBC Interview ("CNBC") (video); SEC59-B, CNBC

(transcript), at 2:1-3:1).

108.    At the May 25, 2017 Token Summit announcement, Kik's CEO reiterated that Kin

presented a "fundamentally new way to monetize a community":

> So, historically, you build a community.  Kik has 15 million people that show up every month -- over 15 million people.  And so, historically, what you want to do is you sell their attention to advertisers, or you try to sell them stuff that maybe they don't need or don't want.
>
> But now with the block chain, and with a cryptocurrency, you could change that, and instead what you could do is, hey, what if we just brought people together?  Brought people together in this community, and created an economy where people are providing value to the community, and taking value from the community on this -- on a cryptocurrency?  If you could do that, and do that alone, and by owning a chunk of that cryptocurrency, if could be a fundamentally new way to monetize a community.

(SEC36-B, Token Summit (transcript), at 3:15-4:5).

109.    At the June 27, 2017 presentation in San Francisco, Kik's CEO explained that, because

Kik set aside Kin for the itself at the beginning, Kik was committed to working to increase Kin's value:

> So, like, the coolest thing about it is like we would become completely aligned with everybody in our ecosystem. They'd be like -- users would be, like, hey, the more places I can earn value, the better it is for me. The more places I can spend value, the better it is for me. The developers would say, hey, the more places (inaudible) can spend -- the (inaudible) that I have -- cryptocurrency that I have becomes more valuable.  And for Kik, you know, we're setting, again, 30% aside for ourselves. The beginning, hey, the more valuable this becomes, the more it gets used -- even if it's not even in Kik over time.
>
> . . .
>
> So, we cannot guarantee value with Kin. I think once you create a cryptocurrency, it sits on exchanges and the price of it is set by the market based on supply and demand.  So you know supply is fixed and demand goes down the price is going to go down. But I think what we can guarantee is we are all in on this.  You know, this is – this is something we've been working to – towards for a long time, but this is something that is in our financial best

interest, because of the 30%, but actually, like, just to be honest, like, this is something we have to do.  We cannot compete with Facebook.

(Answer ¶ 116; SEC46-B, An Evening (transcript), at 15:3-14, 35:20-36:7).

110.    At the June 2017 conference in China, Kik's CEO described the plan to award Kik 30% of the outstanding supply of Kin, and he explained that, as a result, the company's "goal now is just to grow the value of Kin":

> This – this is the beautiful thing for Kik: it's also fundamentally a new way to monetize.  So, for us, we're setting 30 percent of Kin aside for Kik, as a financial incentive for us basically to put this huge messenger into this ecosystem, and to get this whole ecosystem going.  And so (indiscernible) – you know, we – our goal now is just to grow the value of Kin.  The more we do that, the more the value of our 30 percent grows.  And we're now looking at that as the fundamental way that we monetize this, you know, eight and a half years of work, and $120 million invested.

(Answer ¶ 115; SEC45-B, TechCrunch (transcript), at 20:1-12).

111.    At the August 14, 2017 conference in Canada (quoted above at ¶ 103), Kik stated that "its's in Kik's best interest to get people paid."  (Answer ¶ 117).

112.    And Kik's CEO repeated these sentiments at the early September 2017 conference in New York City:

> We're putting aside 3 trillion for Kik, vesting in at 10 percent a quarter for 10 quarters. So over two and a half years – that's Kik's incentive for being the first killer app on this platform, how we convinced our investors to do this.
>
> . . .
>
> This is the thing I love about cryptocurrencies, it's so many times, like, why would we open source Kik for the users?  Because we'll make more money. Because the more we grow the usage of this asset, the ecosystem around it, the more valuable the currency, the more valuable our 30 percent. If people perceive that, hey, this Kin foundation, they're favoring Kik as one of these participants in the system, nobody will adopt it, and Kin won't be worth anything. And so it's just in our economic best interest, which is always the best test. If it's in somebody's economic best interest, they're probably going to do it. And so that's how we tried to set it up here.

(SEC49-B, NYC Ethereum (transcript), at 56:3-8, 57:7-21).

### iii.    Kik Promoted Kin Against A Backdrop Of Rapidly Increasing Prices For Digital Assets.

113.    During this same time period, the overall demand for other digital tokens and assets significantly increased, and potential Kin investors were well aware that older digital assets (such as Bitcoin) had dramatically risen in value, generating large returns for early investors. Again, as the Kin offering's lead investor observed, "[t]he ICO market [was] white hot." (Answer ¶ 72).

114.    Kik repeatedly reminded potential Kin investors of the recent performance of older digital assets when pitching Kin. For example, at the June 2017 conference in San Francisco, Kik's CEO invoked the increase in price of Ether when explaining why Tencent and Kik's other venture capital investors made the economic decision to permit Kik to pivot to Kin:

> So, one thing -- but in terms of, like, funding, you know, we have raised $120 million from traditional investors, and the most recent investment we took is from [Tencent], you know, one of the most advanced messengers in the world. They invested $50 million to privately fund the company. Those guys want a return, you know? We invested all this money, so you're just going to give this all away? And so, I think this is what is cool about cryptocurrency is like, you can say, no, no, no, we're not -- yes, we want to give it all away, we want to open everything up. We want to give up control, and build this open, decentralized ecosystem, but in doing so, we give Kin a better shot at succeeding, and by setting 30% aside for ourselves, like, you know, if Kin were as popular as Ether is today, that 30% would be worth $9 billion. That'd be pretty awesome. You know, we'd give some back to you guys [Tencent]. You know, you invest 50 million, we'll give you 500 million out of that $9 billion. So, that's why it took some time -- it took some time, but you know, we said, listen, we need a new way to compete, we need a new way to monetize, and this is the best way, and we can make some money too if it works.

(SEC46-B, An Evening (transcript), at 37:24-38:22).

115.    Similarly, at the June 2017 conference in China, Kik's CEO participated in the following on-stage dialogue with the moderator:

> KIK CEO: You know, the thing about a cryptocurrency is, once it's created, there will never be more. And so Kik will never have more than that 3 trillion tokens of Kin. And as we sell them into the market, we will -- the only way to get them back is to buy them back. And that's what makes cryptocurrencies really special. But the – the value of these cryptocurrencies can grow very quickly. And so our bet is, the more -- you know, we sell a little bit into the

market, that gives us funding. We can build some more around that – we can create value faster than we're selling the Kin into the market. So, for example, if, you know, we owned 30 percent of Ethereum today, that would be worth $10 billion.

INTERVIEWER: That's quite a lot of money.

KIK CEO: That's quite a lot of money. That would be a good exit.

(SEC45-B, TechCrunch (transcript), at 21:23-22:15).

### iv. *Kik Compared Market Conditions To The "Dot Com" Era.*

116.    During its Roadshow, Kik invoked the "dot com" era as a prior example of the opportunity to make money in a quickly developing market.

117.    For example, at the June 28, 2017 conference in San Francisco, Kik's CEO specifically cited the "dot com" era, predicting that "people are going to make a lot of money" with tokens and ICOs and directly comparing investors who would buy in Kik's token "crowd sale" to the venture capitalists who had earlier invested in Kik:

> So, I think – like, for me, I think is like the dot com, for better and for worse. So, you know, there is a lot of hype right now, and people are going to make a lot of money -- people have made a lot of money. People are going to lose a lot of money here. This is coming, right? It's going to happen multiple times as we move through this innovation, but at the end of the day, Amazon and Google came out of the dot com.

> And so, this is how I view, like, tokens and ICOs. I think 90% of them probably are going to go to zero, and people are going to lose a lot of money, and you know, the regulators are going to come in. They're going to say, how do we make this (inaudible) for innovation, but still make it safe for consumers, and everybody's going to be trying to figure this out, and it's going to be crazy.

> It's going to be – I was in like, high school at the time, but I think like 2001 -- in 2000 or 2001, whatever year it was, it's going to be that all over again, and I think for us, it's – we believe that, you know, a few huge economic entities are going to come out of this space, and I think that actually a few huge economic entities have already come into this space.

> And so, I think, you know, like everything, it's risk and reward, but I think, you know, we have a good story, and I think we're trying to do it in a fair, way, and I think our heart's in the right place, and we're going to do everything we can.

You know, what really scares me at the end of the day is disappointing people, and I think what scares me about doing a crowd sale is before, if Kik failed, I would disappoint a bunch of rich people. But now if Kik fails, I will disappoint a bunch of regular people, and that, like, really weighs on me. (Inaudible) we need – so, we're going to do everything we can to make it a win for everybody.

(Answer ¶ 74; SEC46-B, An Evening (transcript), at 61:9-62:15).

118.    Similarly, at the September 7, 2017 conference in New York City, Kik's CEO stated:

I think like, the right analogy for this, too, is just like, this is the dot.com. Right, when the Internet came out, it was this new innovation, very disruptive at the time, and on one side it created all these opportunities, but on the other side, it created all these challenges. And you know, regulators have a choice, like, oh, look at all the sex on the Internet. Like, shut it down. But if they did that, they would miss out on this decade's biggest opportunity of innovation and economic wealth generation. And so just like with the dot.com, I think, you know, crypto today is very similar. There's a lot of excitement. There's going to be a lot of money made. There's going to be a lot of money lost. But that the end of the day, something the size of Amazon and Google will come out of it.

(SEC49-B, NYC Ethereum (transcript), at 69:24-70:17).

119.    Kik's CEO later explained that he used the "dot com" analogy because he wanted to express to potential purchasers his belief that Kin would be "massive":

Q.    In promoting or discussing Kin prior to the public sale, did you ever compare the crypto space in 2017 to the dot-com area?

A.    I did.

Q.    Why did you do that?

A.    I think I wanted to -- I don't recall specifically, let me say that. But if I were to speculate, I wanted to make it clear that what I was trying to do, I believe, is -- dot-com, there was a lot of -- a lot of excitement at the time. Ultimately, a lot of the things that people were excited about turned out to be failures. And yet, a few of the things that people were excited about or even not excited about at the time turned out to be massive. And I think I was just simply drawing the comparison that I felt the same way and do feel the same way about cryptocurrencies today, that most of them will be failures, but some of them will change the world.

Q.    And you think Kin could be one that becomes massive and changes the world?

> A.     I absolutely believe that, yes.

> Q.     Okay. And was that part of how you described or encouraged people to participate in the Kin sale?

> A.     I think that's how I described my belief in the vision.

> Q.     In advance of the Kin sale?

> A.     Yes. Absolutely.

(SEC8, Livingston Inv. Tr., at 426:2-427:5).

### v.     *Kik Compared Buying Kin to Venture Capital Investing*

120.     Kik's CEO marketed Kin by noting the similarities between it and venture capital investing, and touting the advantages of buying tokens. For example, speaking on the "Finance Magnates" video podcast on August 1, 2017, Kik's CEO stated:

> You know, I think compared to VC investing, for example, one, you can get in at basically any stage and in any amount, and two, you can get out at any stage, and in any amount, and I think that's really compelling, you know, this idea that I can get in early, identify something that could be big.

> If I'm right, it can go up in value. I can sell maybe half of the crypto I hold and let the rest keep going. On the other side, I think that's also the challenge of crypto fundraising, which is, how do you sort of figure out which are the good ones, and which are not, and then how do you keep these teams sort of honest and executing on the vision that they laid out?

> Because I think that's the hard thing now. There's a lot of projects right now. They're all raising lots of money. It's hard to know which are the good ones and which are not, and then once those projects get that money, it's hard – it's hard to see, you know, if when we were five people eight years ago, somebody had given us $100 million.

> Like, that would've been runway forever, and there would've been no sense of urgency to figure out the next phase of the vision so that you could create the next version of the story so you could go out and raise more money, and keep the company alive.

> Now, it's like, hey guys, like, you know, we could spend a million dollars a year for the next 100 years, and we still wouldn't have run out of money. So, I think that's going to be the challenge of crypto, is picking out which ones are the good ones versus the bad ones, and then creating that sense of urgency and accountability behind the teams.

(Answer ¶ 75; SEC47-B, Finance Magnates (transcript), at 14:8-15:14).

### vi.   *Kik Told Buyers That There Would Be Platforms For Reselling Kin*

121.   After the initial sale by an issuer, digital tokens are sometimes transferred between users or listed on online trading platforms, which are sometimes colloquially referred to as "exchanges," whereon the tokens trade for other digital assets or fiat currencies.  (Answer ¶ 33).

122.   In the initial announcements of the Kin project and throughout the Kin offering, Kik told potential purchasers that they would be able to liquidate their Kin holdings and that Kin would trade on online trading platforms, which Kik referred to as "exchanges," soon after issuance.

123.   Kik's white paper stated:  "[l]ike other cryptocurrencies, units of kin are fungible and transferable, and they will be expected to trade on cryptocurrency exchanges."  (Answer ¶ 80; SEC31, Dep. Ex. 12, at 8).

124.   Kik's white paper stated that Kin would be implemented on the "public Ethereum blockchain as an ERC20 token."  (Answer ¶ 80; SEC31, Dep. Ex. 12, at 8).  Kik's choice of the ERC-20 token protocol, a specific technical standard on the Ethereum blockchain, would make Kin easy to trade on trading venues operating on the Ethereum blockchain.  In February 2017, regarding the ERC-20 standard, a Kik board member observed in an email to Kik's CEO that a particular platform operator "is going to support all tokens built on this standard in their exchange and consumer product," and predicted, "if we build on that it will make it easier for all of the exchanges to support our token."  (SEC60, KIK_00024739).

125.   During the June 2017 conference in China, Kik's CEO stated that "the beautiful thing with these cryptocurrencies, is, you know, they're immediately tradable.  So on day one, Kin will go on to a bunch of exchanges where you can exchange it for other cryptocurrencies, or even other fiat currencies."  (Answer ¶ 81; SEC45-B, TechCrunch (transcript), at 20:18-22).  Indeed, during the same talk, Kik's CEO stated that Kik intended to utilize such exchanges for its own holdings: "So, for that

30[%] for Kik, as it vests into the market, we will be able to sell it on to the exchanges like anybody else, to fund operations, to provide a financial exit for employees and investors, really to do with whatever we want." (SEC45-B, TechCrunch (transcript), at 21:10-14).

126. On July 6, 2017, in response to an investor's inquiry about future tradability, a Kik executive responded that "once the token goes live (looking at end of summer). It will be traded on a number of exchanges," and provided the name of "one of the more popular ones." (Answer ¶ 82; SEC61, DBP-SEC-KIN_0000070).

127. Kik also tweeted statements regarding the future tradability of Kin, often using a Twitter account in the name of the Kin Foundation, which Kik had not yet created. (Answer ¶ 83). For example, on August 29, 2017, Kik wrote that "many" "exchanges" had indicated that they would list Kin:



And, similarly, on September 17, 2017, Kik stated:



(Answer ¶ 83; SEC62, KIK_00006919; SEC63, KIK_00004467; SEC64, October 20, 2017 Letter, at page 6).

128.    Kik contacted at least one trading platform to inquire about listing Kin.  (Answer ¶ 84).

129.    Following the distribution of Kin in September 2017, Kik communicated with purchasers who wanted to know when the token would be listed on trading platforms.  (*See, e.g.*, SEC65, Dep. Ex. 230; SEC50, Wang. Dep. Tr., at 220:12-222:4).  At least one purchaser, based on Kik's tweets and other communication, understood Kik to have represented that Kik would cause Kin to be listed on trading platforms.  (SEC50, Wang Dep. Tr., at 21:13-22:7, 174:13-24, 177:13-22, 220:25-221:9).  This purchaser believed that such listing was critical to making a profit from the appreciation of Kin:

> Q.    One other question that I want to ask you is why did you want Kin to be listed on exchanges?
>
> A.    The only way we can make money is if there's liquidity and also I mean, the market at that time was essentially if your token had

> partnerships/use cases and was on exchanges for liquidity the prices
> were skyrocketing.

(*Id.* at 226:23-227:4). SAFT participants similarly planned or hoped to realize profits by selling on secondary exchanges. (*See, e.g.*, SEC23, Morehead Inv. Tr., 68:20-69:11; SEC42, Hourigan Inv. Tr., at 42:21-43:19).

130.    On or about December 17, 2017, in a post on the social media platform Reddit, a Kik employee wrote: "1. Liquidity. We are fully aware there needs to be liquidity for Kin on major exchanges, and this is essential for the token and the Kin ecosystem to work: This is absolutely understood by the company, and most importantly - its management. We were aware of this since the project was conceived." (SEC66, KIK_00045074).

## H. THROUGHOUT THE KIN OFFERING, KIK EMPHASIZED ITS OWN IMPORTANCE TO KIN'S FUTURE SUCCESS AND THE ACTIONS IT WOULD TAKE TO SUPPORT KIN AND INCREASE DEMAND FOR KIN

131.    In the initial public announcements of Kin and at numerous other times during the Kin offering, Kik described actions it was then taking, and actions it would take in the future, to make the project successful. Kik stated that the actions it was taking, and intended to take in the future, were intended to drive up demand for Kin and, hence, Kin's value. Many of the actions that Kik said it would take had no reasonable prospect for completion, and, in fact, were not completed, in advance of the planned 2017 public sale.

### i.    *Kik Touted Its Experience, Its Expertise, And The Value Of Kik Messenger.*

132.    Kik touted its previous accomplishments and the popularity of Kik Messenger. Kik's May 2017 white paper stated that "Kik has been a leading innovator in the chat space since the first million people signed up for the chat application in 2010." (SEC31, Dep. Ex. 12, at 5). The white paper provided performance data for Kik Messenger, including the number of monthly average users and age of the active user base, and noted that 64% of the application's users live in the United States.

Kik asserted that "[t]he size of the [Kik Messenger] user base, demographics, and community ethos make Kik a unique venue where cryptocurrency may be introduced, adopted, and utilized by a large mainstream audience." (Answer ¶ 119; SEC31, Dep. Ex. 12, at 9). The "Kin project," Kik said, was "an opportunity to integrate chat with true digital commerce within an existing user base." (Answer ¶ 119; SEC31, Dep. Ex. 12, at 11).

133. As Kik's then-chief marketing officer testified, Kik included information about the performance of Kik Messenger in the white paper because "[i]t was about our ability to grow an audience and maintain an ecosystem." (SEC3, Clift Inv. Tr., at 148:23-149:15). Kik's white paper stated: "Kik's team has a proven track record of developing products for the mass market, and Kik looks forward to introducing cryptocurrency into the product process." (SEC31, Dep. Ex. 12, at 11).

134. Kik's white paper touted Kik's management and included a four-page section describing the biographies, professional experience, and skills of seven Kik executives and identifying the names and titles of 13 other "Kin Core Team" members. (*Id.* at 24-27). For example, Kik's white paper touted that the company's CFO had previously "spent more than 20 years leading finance, operations, and strategy for both established and startup companies" in various sectors. And Kik's chief product officer, "br[ought] startup and academic research experience to Kik" and was "in the final stages of completing his PhD." (*Id.* at 24-25).

135. Kik did not provide a biography of any non-Kik personnel, and, in the white paper's "Conclusion" section, Kik assured potential buyers that it would "pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Ecosystem to its millions of users." (*Id.* at 23-27; Answer ¶ 120).

136. Kik's former CFO explained that a similar description of Kik's leadership team was included in the PPM because "people that would be investing in this company, Kik, at the presale level would want to know who's managing the company." (SEC10, Heinke Inv. Tr. 390:13-391:3).

137.     In the May 25, 2017 video that Kik issued when announcing the Kin project, the

company stated:

> [B]y banding together, and using this cryptocurrency, Kin, as a way to align us
> all together, I think we can make a better experience for consumers but also a
> better future for society in general.   Kik has both the experience and the
> resources, and the user base to really make this happen.   The success of this
> project really comes down to how many other people can we get excited to
> compete with us, to join us, to work with us and to build this together.

(SEC58-B, Promo Video (transcript), at 5:6-15).

138.     Kik's public statements reflected the CEO's belief that the role of Kik, as an

established company with a long history of market achievements, distinguished the Kin token from

other projects being sold at the time:

> Every cryptocurrency to date had been launched by small groups of people
> who were working together but were new and unestablished, and yet, here was
> an established company creating a cryptocurrency.  . .
>
> [And] I would say we have a long history of Kik being first. So maybe -- like,
> we're the first chat app to go viral, the first chat app to launch platforms, the
> first chat app in the western world to launch bots, and the first VC-backed
> company, to my knowledge, in the world to launch cryptocurrency. So I guess
> that's what distinguishes us broadly.

(SEC8, Livingston Inv. Tr., at 420:18-21, 421:6-12).

139.     Kik re-emphasized its experience and expertise at other times during its marketing of

the offering.    In an August 2017 press release relating to the then-upcoming public portion of the

sale, Kik quoted a hedge fund partner's statement that:

> Kik is by far the largest consumer company to enter the cryptocurrency space,
> and this is a seminal moment for the industry…We have been impressed with
> Kik's thoughtful approach to the creation and distribution of Kin, and have
> confidence that the team will execute their vision of creating a decentralized
> ecosystem of digital services through Kin."

(SEC67, Inv. Ex. 93).

140.     In a Medium post on September 6, 2017, Kik's CEO stated he was promoting Kin to

his "friends and family" in part because:

> Kin has at least one participant who was all in: Kik.  With one strong digital
> service on board from day one, Kin can enjoy a good start regardless of
> whether or not other digital services adopt it right away.  Kik has 15 million
> monthly active users, many of whom are already accustomed to exchanging
> digital goods, such as stickers and emoji, through that.

(SEC68, Dep. Ex. 227; Answer ¶ 122).

141.     And Kik's CEO repeated these sentiments at the conference in New York City in early

September 2017:

> And that's where we said, okay, it shouldn't be Kik points. It should be
> something more broad, bigger, and that's where we came up with the name
> Kin and family. It's, yes, we'll use Kik to launch Kin. That will give it its value.
> But then we'll use the cryptocurrency as a tool to economically incentivize the
> creation of hundreds, thousands, tens of thousands of other places where
> consumers can go to earn and spend Kin.
>
> . . .
>
> Like, the way I think of it is, number one, imagine somebody -- some new
> project created Kin.  Hey, we're going to create this new ecosystem of digital
> services for consumers so you can go to all these different places, all these
> great services. But everybody would be like, well, who is going to adopt that?
> So now we're saying, well, actually we signed up the first digital service, and it's
> this company called Kik -- this app called Kik. It has 15 million monthly active
> users. It's a top 100 app in the U.S., and it's actually the number five most-
> searched for term in the App Store because everybody uses it to connect across
> communities. Everybody would be like, wow, Kin, that sounds amazing. And
> you've already signed up Kik -- this top 100 app? Like, that's a really exciting
> project. And so that we think is like, the killer innovation is not only have we
> built the platform and the ecosystem with Kin, but we've also found that first
> killer app. And, you know, if you look at the history of platforms, that's always
> how they evolve. You know, like, Nintendo had Super Mario Brothers.
> Windows had Excel. Even the iPhone had the iPod. So we think we have both
> the platform and the killer app to start this whole thing.

(SEC49-B, NYC Ethereum (transcript), at 42:15-2345:3-46:3).

### ii. Kik Stated That It Would Spend Proceeds From Kin Sales On Tasks To Increase Demand For Kin.

142. Kik's white paper stated:

> In order to finance the Kin roadmap, Kik will conduct a token distribution event that will offer one trillion out of a 10 trillion unit total supply of Kin. The proceeds of the token distribution event will be used to fund Kik operations and to deploy the Kin Foundation. A portion of the funds raised in the token distribution will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik.
>
> . . . .
>
> [And i]n exchange [for its receipt of three trillion Kin], Kik will provide startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand.

(SEC31, Dep. Ex. 12, at 21; Answer ¶ 125).

143. Kik's CEO stated at the San Francisco conference in June 2017 that Kik would use sale proceeds to build systems "to . . . launch this whole broader ecosystem":

> AUDIENCE MEMBER: So, my question is regarding the ICO. Let's say it's successful as some of these recent ICOs, and you raise $50 million worth of Ether. What will you guys do with that Ether?
>
> [KIK'S CEO]: So, we will convert it to US dollars. So -- is that what your question is?
>
> AUDIENCE MEMBER: Or how are you going to use the funds? Well, how are you going to use the funds? Because, like, most other ICOs are using those funds to build another platform.
>
> [KIK'S CEO]: Yeah.
>
> AUDIENCE MEMBER: You guys already have a platform.
>
> [KIK'S CEO]: So, we're going to use the funds to build a new platform. So, to build a new transaction service, the identity service, the reward engine, to build out all these cases inside of Kik, to get a bunch of developers building use cases outside of Kik basically to, like, launch this whole broader ecosystem.

(SEC46-B, An Evening (transcript), at 55:10-23; Answer ¶ 125).

144.     The SAFT stated:

> A significant portion of the amount raised under the SAFTs will be used to fund the Company's build-out of a semi-centralized blockchain-based computer network (the "***Kin Ecosystem***") that enables economic transactions and a reward system for digital service providers as well as to develop an application to make the network accessible via the Kik messaging platform.

(SEC51, Dep. Ex. 52, at KIK000068 (emphasis in original)).  Similarly, the PPM stated:

> A significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to buildout a semi-centralized blockchain-based computer network that enables economic transactions and a reward system for digital service providers as well as to develop an application to make the network accessible via the Kik messaging platform (the "Kin Ecosystem")

(SEC52, Dep. Ex. 16, at KIK000048).

### iii.     *Kik Promised It Would Create Demand For Kin By Building New Products, Services, And Systems For The "Kin Ecosystem."*

145.     Kik's white paper stated:

> To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems.  Building a decentralized system is a complex process, and the transition to it must be done in a measured and responsible way over time.

(SEC31, Dep. Ex. 12, at 5; Answer ¶ 123).

146.     Kik's white paper also stated that Kik would be 'the ecosystem's champion and will showcase Kin to its millions of users," and, "[o]ver time, Kik will also promote other Kin digital services."  Kik made clear that "Kik must help to establish Kin's fundamental value" and that "Kik will build fundamental value."  (SEC31, Dep. Ex. 12, at 5, 6; Answer ¶ 124).

147.     Kik's May 25, 2017 Medium post said, "[o]nce we have established the new cryptocurrency, we will create demand for [Kin] by encouraging people to earn and spend Kin within Kik."  (Answer ¶ 124).

### iv. *Kik Promised It Would Create Demand For Kin By Integrating Kin Into Kik's Messaging App.*

148.    Kik told potential investors that the company would revise Kik Messenger to permit users to buy and sell goods and services using Kin. Kik's white paper stated that Kik would "leverage its large existing user base to drive mass adoption" of Kin, and that "Kik will build fundamental value for the new currency by integrating Kin into its chat app. Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem." (SEC31, Dep. Ex. 12, at 5; Answer ¶ 128). The white paper also stated, "Kik users will be able to spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants." (SEC31, Dep. Ex. 12, at 6).

149.    Kik's May 25, 2017 Medium post stated: "Once we have established the new cryptocurrency, we will create demand for it by encouraging people to earn and spend Kin within Kik which is used by millions of people every day." (SEC37, Inv. Ex. 200; *see also* SEC8, Livingston Inv. Tr., at 350:21-351:7).

150.    Specifically, to achieve such integration, the white paper stated that, first, Kik would integrate digital wallets for each Kik Messenger user account so that users could engage in "common wallet interactions;" and that, thereafter, "[o]ver time, Kik will work to integrate Kin into Kik's chat ecosystem for the benefit of users, platform developers and partners . . . by employing the same iterative process of research, experimentation, and fine-tuning that has made Kik successful." (SEC31, Dep. Ex. 12, at 11; Answer ¶ 128).

151.    Kik's white paper identified "example" or "prospective use cases" that were possible ways that Kik might change Kik Messenger so that users could buy and sell goods and services using Kin. One such use case, for example, consisted of charging a fee (paid in Kin) to app users wanting to attend chats with celebrities. (SEC31, Dep. Ex. 12, at 12-15; Answer ¶ 129).

152. At the June 2017 conference in China, Kik's CEO stated that Kik would "integrate" Kin into Kik Messenger:

> So, there's a couple phases to rolling out Kin, this new cryptocurrency. So, the first phase is to create the cryptocurrency, and to integrate it into Kik. And that on day one will make Kin the most used cryptocurrency -- one of, if not the most used cryptocurrencies in the world. And that's going to make Kin very valuable.

(SEC45-B, TechCrunch (transcript), at 18:3-22:15).

153. Kik provided no date by which it would complete Kin's integration into Kik Messenger. However, Kik made clear that its integration efforts would continue beyond any public sale of Kin. (SEC31, Dep. Ex. 12 at 11 ("Over time, Kik will work to integrate. . .")). A June 2017 online news article that Kik promoted on the Kin Foundation's Twitter feed, for example, quoted a statement by Kik's CEO that the company would "add more and more ways to use [Kin] inside Kik . . . in the latter part of this year [2017] and into next year [2018]." (Answer ¶ 131; SEC69, KIK_00007074, at KIK_00007090).

154. Kik alone controlled Kik Messenger, and only Kik could modify Kik Messenger to incorporate Kin transactions. (Answer ¶ 131).

155. Kik further communicated to potential Kin investors that Kik would not complete its work on integrating Kin with Kik Messenger before the public sale, because, as its white paper explained, "[a] portion of the funds raised in the token distribution will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik." (Complaint ¶ 132;[6] SEC31, Dep. Ex. 12, at 21).

---

[6] ECF No. 1. Kik's Answer did not address this paragraph of the Complaint, so it is admitted. Each paragraph of Kik's Answer after ¶ 131 is mis-numbered by one paragraph – *e.g.*, Answer ¶ 132 responds to Complaint ¶ 133, and so on.

***v.*** ***Kik Promised It Would Create Demand For Kin By Implementing New Technology To Allow For Scalable, Fast, And Cost-Effective Transactions – i.e., Kik Stated That It Would Develop A Blockchain For The Future Kin Network.***

156. Kik's white paper stated that Kin would initially operate on the pre-existing Ethereum blockchain, but Kik acknowledged that this approach created known "[p]latform limitations" that were expected to impede the actual use of Kin to buy or sell goods or services. Kik said that the Ethereum blockchain could handle only relatively small numbers of transactions, was too slow, and imposed a fee for each transaction. Kik therefore recognized that the Ethereum blockchain was incapable of running consumer applications at sufficient volumes, or "scale," to make Kin successful. Kik's white paper acknowledged a need for future "significant advances… in blockchain technology" to enable a "highly scalable, low latency, and cost effective decentralized systems." (SEC31, Dep. Ex. 12, at 18-19; Answer ¶ 135). Kik realized that Ethereum contained technological limitations that could potentially cause issues with a digital token used for a high volume of transactions. (Answer ¶ 136).

157. Accordingly, even though Kik chose the Ethereum blockchain as Kin's platform, Kik could not use this blockchain for Kin transactions within Kik Messenger, let alone by numerous other companies, which Kik hoped to attract to the Kin Ecosystem, because of Ethereum's technological limitations. At the June 2017 presentation in San Francisco, Kik's CEO told the audience that giving only five Kin tokens to each Kik Messenger user would absorb 23 days of the computing capability of the entire Ethereum network. (SEC46-B, An Evening (transcript), at 21:2-23:3).

158. Kik's white paper informed potential purchasers that Kik would address these issues, and do so in at least two different ways. First, Kik would implement its own "transaction service" that would allow Kin users to temporarily bypass the Ethereum blockchain – and avoid its logjams and expense – by conducting Kin transactions within Kik Messenger on a "centralized" ledger to be operated by Kik (or by an entity established by Kik). Kik described this new service as "a semi-centralized hybrid on-chain and off-chain Transaction Service for scalable interactions with the Kin

cryptocurrency." Second, Kik stated that it would seek a "long term" solution by establishing a new entity, the "Kin Foundation," which would in turn "move to migrate [Kin's] transactional infrastructure to a fully decentralized system while retaining a low friction user experience." (SEC31, Dep. Ex. 12, at 19; Answer ¶ 137).

159. Kik promised to publish a "Kin Technical Whitepaper" that described Kik's proposed "managed solution for Kin tokens." (SEC31, Dep. Ex. 12, at 19; Answer ¶ 138).

160. Following its initial announcements, Kik continued to tell potential investors that it would seek long-term technological improvements that enabled Kin transactions on the blockchain. For example, during the June 2017 San Francisco conference, Kik's CEO said Kik was "looking for" a new "blockchain 3.0," which Kik itself might create by partnering with another blockchain or building its own bespoke blockchain. (SEC46-B, An Evening (transcript), at 22:11-23:3; Answer ¶ 138). Regardless, Kik promised to "spend a lot of time on that as well." (*Id.* at 23:2-3).

161. Similarly, at the September 7 New York City event, Kik's CEO stated:

> Scalability is a real issue. You know, if we wanted to go in and just give one Kin to each of our users, we'd tie up the Ethereum network for something like 30 days. Take 30 days, like, you get one Kin. You get one Kin. Come back 30 days later, and you get one Kin. And it would take down the whole network. And so I think, you know, getting that scalability, it's a big challenge. How we're going to do it is we want everything to be on chain from day one because we're going to do sort of like, a Gmail-style rollout inside of Kik. So we're going to start with just a thousand users. And then from there, as we figure out the scalability, we increase the scalability of the blockchain -- whether it's on Ethereum, whether it's on our own sort of blockchain 3.0 project, or somebody else's blockchain 3.0, I call it, as we can increase the scalability, we'll increase the size of the consumer bases again.

(SEC49-B, NYC Ethereum (transcript), at 48:7-49:1).

162. By September 2017, it would have been impractical for Kik or any other commercial developer to engage in Kin transactions on the Ethereum blockchain, because of the slow speeds at

which the blockchain would have processed those transactions, among other limitations.  As a Kik

executive testified in August 2018, almost a year after Kik's token distribution event:

> Q.      Can a commercial developer like Kik just run on the -- run transactions
>         on the Ethereum app?  On the Ethereum blockchain?
>
> A.      They could.  It would be slow.
>
> Q.      I mean, do you think it's actually, like, that it's a practical way to run a
>         business?
>
> A.      Today?
>
> Q.      Yeah.
>
> A.      I do not think it's practical for a consumer application to run all their
>         products on Ethereum.  I think over time Ethereum will become more
>         scalable and that is up to all the people contributing to the Ethereum
>         blockchain.

(SEC14, Philp Inv. Tr., at 575:12-575:24).

> 163.    As the issues were described by Kik, a coordinated, centralized effort was required to

implement solutions to the existing blockchain's "scalability" and speed issues.  A decentralized group

of Kin investors could not perform these functions.  Indeed, Kik stated that it intended to use the

proceeds of the token sale to finance this work by Kik employees and contractors, many of whom it

identified by name in its white paper.  As Kik's New York City-based consultant testified:

> Q.      . . . [S]o when Kin was offered to the public, again, I'll represent to
>         you was September of 2017, what blockchain was it on?
>
> A.      So I believe Kin was anticipating being an ERC20 token on the
>         Ethereum blockchain.
>
> Q.      Got it. . . .
>
> [Q].    Could the decentralized community have gotten together and just
>         moved Kik -- the Kin tokens off the Ethereum blockchain?
>
> [A].    That has never happened -- well, it kind of depends on what you
>         mean, I suppose.  Would the holders of Kin tokens be able to, you
>         know -- you know, as a group, unilaterally make such a decision?  No.

(SEC70, Investigative Testimony of Jake Bruhkman ("Brukhman Inv. Tr."), at 90:10-91:1).

164.     By the time Kik sold Kin to the general public in September 2017, Kik had not enabled

Kin transactions among users of Kik Messenger that would have relied on Kin's chosen platform –

the Ethereum blockchain – because doing so would have risked crashing the Ethereum network:

> Q.      Could -- again, I bought Kik – let's say I bought Kin on day
> one of the public sale.   Could I engage in peer-to-peer
> transactions inside the Kik messaging app with my Kin?
>
> A.      You could not.   Not to my knowledge.
>
> Q.      Why not?
>
> A.      Why not?   The reason for that was the blockchain technology
> was very new and immature.   And so I think our concern was
> with the current state of blockchain technology, if we enabled
> that, there's a potential that we could crash the Ethereum
> network, which would not just hurt all Kin users inside of Kik,
> obviously, but would hurt all users of Ethereum broadly.   And
> we didn't want to do that.

(SEC8, Livingston Inv. Tr., at 470:2-470:15).

165.     Ultimately, such work to improve the scalability of the blockchain was undertaken by

Kik.   (SEC14, Philp Inv. Tr., at 563:12-565:9).

### vi.     *Kik Told Investors It Would Work To Attract People To The Kin Network, Which Would Increase The Price Of Kin In The Future.*

166.      Kik publicly stated that it would wait until after the planned token distribution event

to invite developers to join the ecosystem.   At the May 25, 2017 Token Summit, Kik's CEO stated:

> So, the timeline for this is we're publishing our white paper today.   We'll start
> integrating Kin into Kik in a way very similar to what we did with Kik coins,
> and then we'll announce a token distribution event later this summer, and
> from there, later this year or early next year, that's where we'll -- where we
> will start to open up the platform for other developers to join the ecosystem.

(SEC36-B, Token Summit (transcript), at 11:9-11:16).

167.     Similarly, the white paper promised that "Kik will be the [Kin] ecosystem's champion

and will showcase Kin to its millions of users."   (SEC31, Dep. Ex. 12, at 6).

168.    And, Kik previewed for investors its post-launch pitch at the September 7 conference in New York City:

> And so the question everybody is going to ask themselves is, why would I adopt Kin when I could launch my own cryptocurrency and do my own token distribution event? And so the answer we want to give to that is because you will make more money. And so that's really how we thought about Kin is how can we set it up such that as a developer, who has a digital service like, I could do my own cryptocurrency, but if I adopt Kin, I'll just make more money.

(SEC49-B, NYC Ethereum (transcript), at 62:19-63:3).

### vii.    Kik Said That It Would Create A "Kin Rewards Engine" That Would "Further Grow The Ecosystem."

169.    Kik also promoted the creation of "the Kin Rewards Engine," an automated system that would identify companies or individuals who helped to boost demand for Kin, and reward them with additional Kin.  Thus, the Rewards Engine would further develop the Ecosystem.   Kik's white paper stated:

> Kin will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency.  Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem.

(SEC31, Dep. Ex. 12, at 5).

170.    Kik's white paper explained that "60 percent of the total supply of Kin will be secured in a smart contract, allocated to the Kin Rewards Engine, and introduced into circulation as periodic rewards."  (*Id.* at 19; Answer ¶ 144)

171.    Kik's white paper stated that "the company [*i.e.*, Kik] . . . will create the Kin Rewards Engine to incentivize developers and creators to make new products and services."  (SEC31, Dep. Ex. 12, at 23).

172.    Kik employees worked on the Kin Rewards Engine.  (Answer ¶ 95).

173.    Kik's white paper included a high-level overview of the Kin Rewards Engine's operations:

> Periodically, the Engine will unlock and distribute a specific amount of Kin to be shared among digital service providers in the Kin Ecosystem. The rewards that each partner receives will be proportional to a measure of the utilization of Kin within that digital service. Such value will be assessed by a well-defined process that ensures the rewards are distributed fairly using an objective, performance-based methodology.

(SEC31, Dep. Ex. 12, at 6). But Kik's white paper did not provide additional details about this process – *e.g.*, how the Rewards Engine would "measure" the use of Kin in digital services, how it would "assess" the value of those uses, or how the "objective performance-based methodology" would be employed – it necessarily required further work by Kik. As Kik's Answer confirms, the white paper "would not necessarily set forth every input of the algorithm that the Kin Rewards Engine would use." (Answer ¶ 145).

174.    At the May 25 Token Summit, Kik's CEO was asked a series of questions by the organizer of the summit who at that time also served as a paid Kik consultant. The two discussed on stage the Kin Rewards Engine as follows:

> CONSULTANT: It's almost like a profit sharing kind of coop type model?
>
> KIK'S CEO: Yeah. It economically incentivizes everybody to work together, and the really nice thing about it is, it creates this great network effect, where the more developers that come into this ecosystem, the more transactions they create -- the more transactions they create, the more valuable Kin overall becomes, the more valuable Kin overall becomes, the more valuable the daily reward becomes. And so, we see this daily reward starting at about $100,000 a day, but could quickly grow to half a million, million dollars a day, if not more.

(SEC36-B, Token Summit (transcript), at 6:22-7:9; *see also* SEC22, Mougayar Dep. Tr., at 107:18-19).

175.    Kik publicly stated that the Rewards Engine would not be created until after the public sale. In a June 2017 interview, Kik's CEO stated that setting up the Rewards Engine "will be later this year [2017], or sometime next year [2018]." (Answer ¶ 147).

176.     Kik communicated to potential Kin buyers that Kik would "use the funds" from the

public sale to build the Rewards Engine, among other tasks:

> So we're going to use the funds to join the platform and essentially build it, the transaction service, the identity service, the reward engine.  To build it in all use cases inside of Kik, to get a bunch of developers building use cases outside of Kik.  Basically to like launch this whole broader ecosystem

(SEC46-B, An Evening (transcript), at 55:10-23; Answer ¶ 148).

177.     At the time of the May 25, 2017 announcement and throughout the rest of the offering,

Kik did not intend to complete the Kin Rewards Engine before the planned token distribution event.

(SEC4, Heinke Dep. Tr., at 94:5-12, 96:20-97:18, 104:19-106:20).   By July 2017, Kik executives

understood that creating a Rewards Engine "would be really difficult" and could take a significant

amount of time.  (SEC10, Heinke Inv. Tr., at 406:18-409:9; SEC71, Inv. Ex. 184).  Before distributing

Kin, Kik hired an additional consultant to work with Kik employees to design the Rewards Engine.

(SEC10, Heinke Inv. Tr., at 410:12-411:7).

178.     At the September 2017 New York City event, Kik's CEO stated that Kik was not ready

to release the algorithm for the Kin Rewards Engine, and that the company was still trying to develop

an algorithm that could not be "gamed":

> Now, the thing we haven't released yet – and we will but not yet -- is -- the obvious question is, but isn't that really gameable?
>
> Like, what if, you know, Jesse at Spotify is a little bit evil, and he says, instead of like, creating real transactions, what if I just great a bunch of bots to send Kin back and forth with each other, and I'll drive up this transaction volume, and, you know, who is real?  Who is a bot?  You can't know.
>
> I think the secret sauce to the algorithm is how we solve for that problem, how we solve for game ability.  We're not releasing that yet.  We're very excited about that, but that's really how the Kin – that wasn't 60 seconds, but that's how the Kin rewards engine works is if the Kin economy like, is worth this much without you, and this much with you, we're going to find a way -- a fair, programmable, and ultimately decentralized way to get that value to you, such that it's in your best economic interest to adopt Kin versus build your own cryptocurrency.

(SEC49-B, NYC Ethereum (transcript), at 64:2-64:21).

179.     On September 26, 2017, the automated functions of the Rewards Engine were not operational.  The Kin Rewards Engine was being worked on at the time of the September 2017 distribution.  (Answer ¶ 149).

### viii.     Kik Promised It Would Create And Control A "Kin Foundation" To Manage And Promote Demand For Kin.

180.     Kik's white paper stated that Kik would "establish the Kin Foundation to manage and encourage growth of the Kin Ecosystem," and that, "[o]ver time, Kik will work to structure and form the Kin Foundation, a nonprofit organization to oversee the fair and productive growth of the Kin Ecosystem."  The Foundation would "administer the Kin supply and the Kin Rewards Engine" and "provide support and tools for digital services to operate more easily within the ecosystem," and, "[u]ltimately . . . [would] facilitate the entire ecosystem's transition to a fully decentralized and autonomous network."  And, Kik explained that the Foundation would receive six of the ten trillion Kin that Kik created.  (SEC31, Dep. Ex. 12, at 6, 21; Answer ¶ 98).

181.     Despite statements about the eventual transfer of Kin Ecosystem responsibilities to the Foundation, Kik provided no concrete timetable for this transfer, and Kik's CEO told audiences that, for an unspecified period, Kik would "have a lot of influence over that Kin Foundation" and that the Foundation would not be "totally independent" from Kik:

> [Y]es, Kik is a centralized app run by a centralized company, but we are using Kik to boost up the value of Kin, and you know, we're giving a bunch of that Kin to this independent not-for-profit foundation, the Kin Foundation. Now, we're going to have a lot of influence over that Kin Foundation, at least initially, right?  We're not going to sit there and oh like no, no, no, it's totally independent.  Like obviously it's like Kik created Kin, Kik created the Kin Foundation, you know they put ten on the board because you know you thought it was really smart or whatever.  Obviously we're going to have influence there.  But our goal is to yes, we're going to start with employees to try to get this whole thing running.  But . . . what we're going to do with the Kin Foundation is move to decentralize it and to make it completely autonomous as quickly as we can. Not right away because we don't want the DAO all over again. But over time we'll move it to be - okay it works, the

reward engine is working, it's not gameable, everything is running and it's working, no one's hacked it yet or it's not being hacked. Everybody agrees, like, now is the time for the autonomous use, we'll decentralize[.]

(SEC46-B, An Evening (transcript), at 43:17-44:24; Answer ¶ 152).

182.     At the September 2017 New York City event, Kik's CEO stated that Kik "has influence" on both the company and the foundation:

> So in terms of separating, like, the private entity of Kik and the foundation, the Kin rewards engine, today, you know, obviously Kik has influence on both. And that's what we need to do to get it going.  But over time, the idea is Kik becomes just another participant in this much broader ecosystem.

(SEC49-B, NYC Ethereum (transcript), at 56:17-22).

183.     According to Kik's public statements throughout the offering, Kik and the Kin Foundation (which, again, Kik planned to "have a lot of influence over") would collectively own and control nine trillion Kin – 90% of all the Kin that would ever exist.   (SEC45-B, TechCrunch (transcript), at 12:4-14).

## I.     THE MARKET UNDERSTOOD FROM KIK'S MARKETING OF THE OFFERING THAT THEY COULD PROFIT FROM KIK'S ANTICIPATED FUTURE EFFORTS TO PROMOTE AND SUPPORT KIN.

184.     Various observers, including financial and technology news sources, that reported or publicly commented on Kik's offering of Kin either repeated the company's statements that Kin could appreciate or stated that they understood Kik to be offering an investment vehicle.  For example, a writer reporting on the June 2017 conference in China reported as follows:

> While some people have made significant money off of bitcoin, others are skeptical as to whether volatile cryptocurrencies are a good investment. [Kik's CEO] can see it going either way.  "The way I think about ICOs is it's very similar to the dot-com era.  There was a bunch of excitement, people made a bunch of money, people lost a bunch of money but Amazon and Google came out of it. "

(Answer ¶ 76).

185.     In a July 11, 2017 article by a CNBC columnist titled "Why a messaging start-up is making its own digital currency instead of going public," the reporter summarized an interview with Kik's CEO as follows: "he thought, if Kik could develop a cryptocurrency that became a self-sustaining economy – and Kik owned a big chunk of that supply limited currency – the value of that stake in Kin could end up being more valuable than the potential exit valuation for Kik as an ad-based business in an IPO or through an acquisition." The article also calculated Kik's potential profit if Kin increased in value like other digital assets had done. (Answer ¶ 77).

186.     A September 4, 2017 article on an online blockchain news service described Kik's plan to use the proceeds from Kin sales to create the Kin Ecosystem, and analyzed the merits of buying Kin both "for flipping" and for its "long-term potential" as an investment, opining on the project's implied valuation and the risk that investors could sell rapidly on secondary trading markets. (Answer ¶ 78).

187.     Similarly, investors who purchased Kin understood from Kik's marketing of the token that investing in Kin provided an opportunity to profit, and that Kik would take steps to increase demand for the token, thereby increasing its price.

188.     For example, one investor who purchased Kin during the portion of the sale open to the public stated that, after reading Kik's whitepaper, he purchased Kin in order to make a profit on the token's appreciation, and he understood that Kin's appreciation, if any, was tied to Kik's ability to execute on the assurances it had made when marketing the token:

> Q.     You thought that the fact that Kik was an existing company with a messaging base meant that they could have, not with certainty, but a chance of building out a project with real value?
>
> A.     That's correct.
>
> Q.     And then did you then choose to buy in the project, in the ICO because you thought if that worked the coins would be more valuable in the future?

A.  That's correct.

Q.  So if I were to say you bought Kin because looking at the project you thought you would be able or more likely to make a profit; would that be correct?

A.  Yes.

. . . .

Q.  Let's say, God forbid, that the day after the public sale of Kin tokens Kik went out of business. It stopped. It couldn't afford the ecosystem. Do you think that would put the value of Kin at risk?

A.  Yes.

Q.  Is that obvious that it would?

A.  It seems obvious to me, yes.

Q.  Why is that? Spell it out for me.

A.  Because -- because it's -- even if other developers were to build applications around using the Kin token and around their chat application, their -- the core of it would be their system and their software. So if that disappears, it's likely the whole thing would disappear.

Q.  And is that something you understood at the time?

A.  Yes.

Q.  Just curious. So is it fair to say that the value of your investment in Kin was tied to Kik's ability to perform future tasks?

A.  Yes.

(SEC72, Investigative Testimony of Alexander Rousmaniere ("Rousmaniere Inv. Tr."), at 16:23-17:10, 20:8-21:4).

189.    Likewise, another investor, after reading the white paper, purchased Kin in the hopes that it would rise in value, and that he could thereby make a profit (SEC73, Investigative Testimony of Harrison Wang ("Wang Inv. Tr."), at 18:11-13, 19:3-9 ("Q.  Did you invest in Kin because you

wanted to make a profit?  A.  Yes.")); he also understood from Kik's statements that such appreciation

was tied to the fortunes of Kik:

> Q. What if Kik conducted the ICO and then did nothing; would Kin appreciate in value, in your opinion?
>
> A. No.
>
> Q. What would happen to it?
>
> A. I mean, it would just -- everyone would jump ship, I think, because all the investors would sell off.
>
> Q. It's fair to say that the value of your Kin would dramatically decrease?
>
> A. Yes.

(*Id.* at 20:15-23; *see also* SEC50, Wang Dep. Tr., at 42:3-25).

190. Another investor who purchased Kin during the sale to the public testified that Kik's

touting of Kik's receipt of funding from well-known venture capital firms was evidence that Kik would

cause Kin to increase the price of Kin and that he would, as a result, make a profit:

> Q. When you made your purchase of Kin, did you purchase the Kin with the expectation of making a profit?
>
> A. Yes.
>
> Q. And why did you think that?
>
> A. Same reason the venture people who invested in Kik did.  I mean, I just -- I trusted that. I mean, that's more than anything the reason why I clicked Send, was -- was following those investors and their belief and their diligence they had done, so that's the primary reason.
>
> Q. Do you recall any specific statements made by Kik itself telling you that you could expect a profit?
>
> A. Well, I mean, in the whitepaper, there's that sentence that I alluded to earlier that said, you know, because it's a finite supply, as more people use it, it will be worth more money, which implies profit.
>
> . . .

Q. But your understanding was that the – that the -- the company had made statements, in effect, that as more people used the token, its value would rise?

A. Correct.

Q. Okay. And was it your understanding that that -- that use required participation by developers, service providers, and participants in the network?

[A]. Right, and it wouldn't magically happen. Kik and Kin would have to push it to make it happen.

(SEC74, Deposition of Jack Neil ("Neil Dep. Tr."), at 113:1-114:18 (objection omitted)).

191. Another public sale investor explained that in making his purchase decision he considered:

[A]. Well, in ICO land, you have people raising tens of millions of dollars to make things that don't already exist sometimes in any form. Kik was a different case because it was an existing company that had done successful VC raises and had a large or at least significant and material user base. Therefore, it seems, given their track record of success here, where success means doing anything, they would be able to do more anythings with tens of millions of dollars from the offering.

[Q]. They would be able to do those things after the offering?

[A]. I think that -- yes, they need money to do the things.

(SEC75, Investigative Testimony of Garrette Furo ("Furo Inv. Tr."), at 13:12-13:25).

192. After the August 14, 2017 conference in Canada, a prospective Kin buyer sent an email to the Kik consultant who conducted the live interview of Kik's CEO at the conference, stating: "I just wanted to let you know that I was very excited to watch your fireside chat with Ted and also to find out that you're an investor. I was planning to invest in Kin and that video made me even more confident!" The consultant forwarded the email to Kik's CEO, who responded "Great :)" (SEC76, Dep. Ex. 146; SEC22, Mougayar Dep. Tr. 173:2-14).

193. The accredited investors who purchased Kin through the SAFT included managers of large investment funds with hundreds of millions or billions of dollars under management, and whose

business purpose was to make investment returns not develop or use software applications or digital asset ecosystems or accumulate stickers. (*See, e.g.*, SEC23, Morehead Inv. Tr., at 9:24-12:1; 24:12-15 (re Pantera Capital); SEC42, Hourigan Inv. Tr., at 8:11-14:23, 34:1-12 (re PB Digital/Fortress Investment Group). They also understood that Kik was selling an investment, and they purchased Kin with the intent to make a profit, specifically through Kin's appreciation resulting from Kik's promised efforts. For instance, a representative for a SAFT participant which paid $2 million for approximately 19.5 billion Kin (*see* SEC53, Dep. Ex. 40), explained in a June 2017 email that "[c]ompared to other ICOs, Kik has a real product/user base/VC investor base etc., which should generate hype around the ICO and make it fairly easy to flip." (SEC77, Inv. Ex. 75).

194. The representative later testified:

> Q. Having now had a chance to look at your e-mail again, is it fair to say that your sort of overall view of this was that Kik's prospects as a company weren't great long-term, but that because it had a real product, a user base and a VC investor base, that it should go up in the near term and that you could exit your [Kin] position at a profit?
>
> A. I would say that it should go up in the near term based on its potential to actually work. I mean despite the, you know, negatives which we just discussed in terms of their user base and kind of how it was trending, they did have or I think they still do have, you know, hundreds of millions of people on a -- on a chat platform and a lot of activity; and so trying to, you know, create a digital asset to be used in that has a lot of potential compared to creating a digital asset that has no user base to sort of be integrated into. So it was one part the signaling of this, you know, VC funding they raised and the kind of foundation they have, but the other part of it was that they actually do have that user base and that technology already built out, that, you know, could be an attractive thing to try to integrate this into.
>
> Q. You wrote that it should be fairly ease to flip. What did you mean by that?
>
> A. That there would be a lot of people that would want to buy these assets once they were, you know, created and out there liquid in the market.
>
> Q. So again, so that Fortress or you could be -- you could exit your position at a profit.

A. Correct.

(SEC42, Hourigan Inv. Tr., at 50:21-52:4). This investor also confirmed that he understood that if Kik were to stop its involvement with Kin following the tokens' distribution, it "would have been a big negative" based on the investor's "investment thesis." (*Id.* at 46:2-10).

195. Within 10 months of the September 2017 distribution of Kin, this SAFT participant had sold all of the approximately 9.75 billion Kin that it had received by that point, and for which it obtained proceeds substantially exceeding its entire $2 million investment. (*Id.* at 20:4-21:17; 56:4-8).

196. Another SAFT participant, Pantera Capital, paid Kik $20 million – nearly one fifth of the entire amount Kik received – for an allocation of approximately 146 billion Kin. (SEC53, Dep. Ex. 40). In a June 2017 email, this participant's founder noted the 30% discount that it would receive under the SAFT and wrote, "I think it is likely to [sic] up more than 2x so can lock in gain." (SEC77, Inv. Ex. 75).

197. Pantera Capital also began selling its Kin within six months of the September 2017 distribution and sold approximately 10 percent of its allocated Kin within a year of the distribution, obtaining proceeds that represented approximately 25 percent (or $5 million) of the participant's original investment. (SEC23, Morehead Inv. Tr., at 133:7-135:24; 148:21-149:5). The founder of this purchaser later testified:

> Q. Did you buy Kin tokens to use them, to spend them within the Kik app or within any ecosystem they might create?
>
> A. I imagine that we would have used a small percentage of them, but we principally bought it for capital appreciation.
>
> Q. So is all the Kin that you bought in the ICO fund?
>
> A. Yes.
>
> Q. And so you would have used the Kin tokens that reside in the ICO fund to purchase things within the Kin Ecosystem?

> A.     I -- only for kind of experimental reasons to decide if it's a good investment. It would be an immaterial amount.
>
> Q.     Is that something you would have to clear with the fund investors before doing or you can just unilaterally do that?
>
> A.     We do have the ability to use tokens for staking and other purposes to test systems, but it would -- again, it would be a very immaterial amount.
>
> Q.     So, I mean, the primary purpose for your investing in Kin was to profit, to make money for your investors?
>
> A.     Yes. We were principally seeking capital. Appreciation on the tokens.

(*Id.* at 73:9-74:9).

198.     Another investor who purchased $100,000 in Kin using a SAFT (and who was compensated as a Kik consultant and later became a director of the Foundation), believed during the offering that Kik would be responsible for opening up Kin to developers after the token distribution event, because Kik "had the resources." (SEC22, Mougayar Dep. Tr., at 122:25-123:14). At the time of the offering, the investor expected Kik to be involved in developing Kin at least through 2017 and likely into 2018 because "that was the only way." (*Id.* at 125:10-16:17). One of the reasons the investor bought Kin was to profit from an appreciation in the value of Kin "if they are successful." (*Id.* at 133:1-7).

## J.   AT THE TIME OF THE KIN OFFERING, KIN HAD NO UTILITY

### i.     *Kik Did Not Market Any Specific Use For Kin To Public Buyers*

199.     In marketing the Kin offering, Kik's white paper had described a number of "example[s]" or "prospective use cases . . . demonstrating how Kin may be integrated into the Kik application." (SEC31, Dep. Ex. 12, at 12-15).

200.     When Kik distributed Kin on September 26, 2017, none of the "use case" examples suggested by the white paper were available:

> Q.     At the time of the token distribution event, could people go into the Kik app and use their Kin tokens to do any of the things that are described here [in the white paper]?
>
> A.     No.

(SEC10, Heinke Test. Tr., at 246:14-247:7; *see also* SEC4, Heinke Dep. Tr., at 130:7-131:25; SEC14, Philp Test. Tr. 404:19-405:4).

### ii.     Kik Rushed To Create A "Minimum Viable Product" That Kik Described Only To SAFT Participants

201.     By June 2017, Kik decided to hold the public Kin sale as soon as the company had created what it called a "Minimum Viable Product" or "MVP" for the token.  (SEC78, Inv. Ex. 49).

202.     The Minimum Viable Product that Kik pursued was a series of digital, cartoon "stickers" that would be available to Kik Messenger users who purchased Kin.  The stickers would appear inside Kik Messenger and would not be available to Kin buyers who did not have a Kik Messenger account.  (SEC40, Ben-Ari Dep. Tr., at 107:3-10 ("You had to have a Kik Messenger in order to access the stickers.")).  Upon buying Kin, an investor with a Kik Messenger account could access the cartoon stickers by opening a digital "wallet" inside Kik Messenger, unlocking digital stickers that were accessible in the wallet, and then sharing the stickers with other users within the application.  The more Kin owned by a Kik Messenger user, the higher the user's "status" level and the more stickers the user could access.  (SEC10, Heinke Inv. Tr., at 193:10-14).

203.     The stickers could not be purchased using Kin.  (SEC14, Philp Inv. Tr., at 228:10-13; SEC64, October 20, 2017 Letter).

204. The stickers that Kik created for its purported Minimum Viable Product were small, emoji-like images, predominately a cartoon honey badger, such as the below:



(Answer ¶ 103).

205. Kik developed the stickers based on its belief that they were relevant to whether Kik's sales of Kin were securities transactions under the securities laws. (SEC14, Philp Inv. Tr.,. 265:19-266:5, 272:23-273:12; SEC41, Ben-Ari Inv. Tr., at 71:20-74:13). As one Kik executive wrote in a June 2017 email to other company executives about how the company had defined Minimum Viable Product:

> The definition was written with one purpose only: **COMPLIANCE**. This is NOT an MVP [Minimum Viable Product] for product purposes, nor to satisfy any good user experience for crypto participants. We discussed that once we integrate Kin into Kik we will rebuild the entire product bottom up and the MVP will not be used in any way.

(SEC79, Inv. Ex. 194; SEC41, Ben-Ari Inv. Tr., 71:20-74:13).

206. Similarly, in June 2017, a Kik employee described the "crypto stickers" as follows:

> Basically it doesn't really matter. The whole point is to make our legal department happy, not the users (who are actually investors and probably could care less that they got a sticker pack for their $10K investment into KIN).

(SEC80, Dep. Ex. 76).

207. Minutes from a Kik Board meeting on August 3, 2017 reported that Kik's CEO discussed with the board "the proposed cap on the [Token Distribution Event] . . . indicating that

since the TDE has been delayed to further develop the minimum viable product (or initial product) so it should be in a better position to defend a regulatory challenge than others which have raised far greater amounts with either no or little utility." (SEC81, Inv. Ex. 29).

208. Kik did not mention the status-based stickers in any public announcements or otherwise discuss these cartoon stickers in marketing to potential public sale investors, before the public sale. (SEC3, Clift Inv. Tr., at 180:14-18; SEC40, Ben-Ari Dep. Tr., at 154:15-155:13). Because public sale investors could not have known about the stickers before buying Kin, the stickers could not have been a motivation for these purchases.

209. Some of the largest Kin purchasers during the portion of the sale open to the public have testified that they did not purchase Kin in order to access the stickers. (SEC72, Rousmaniere Inv. Tr., at 17:12-22; SEC73, Wang Inv. Tr., at 17:7-18:10 ("Q. Did you buy Kin in order to gain access to digital stickers? A. No."); SEC75, Furo Inv. Tr., at 15:5-20 ("I could not care less about these stickers."); SEC74, Neil Dep. Tr., at 117:10-118:2 ("It was my understanding they had no product at the time.")).

### iii. Up To And Including The Time Of Kik's Distribution Of Kin On September 26, 2017, There Was No Good Or Service To Purchase With Kin.

210. At no time prior to September 26, 2017 did Kik identify any specific good or service that could be purchased with Kin. (SEC14, Philp Inv. Tr., at 233:22-235:7, 241:11-21; SEC8, Livingston Inv. Tr., at 457:24-458:6). And, throughout the period in which Kik offered and sold Kin, up to and including September 26, 2017, there was nothing to purchase using Kin:

> Q. Okay. Rolling back the clock. It's September of 2017. Which developers or apps accepted Kin?
>
> A. Just Kik.
>
> Q. That's it? You were unaware of any others?
>
> A. Correct.

Q.      Okay.

[Q].    What did Kik accept them for?

[A].    Kik allowed you to unlock stickers based on your balance.

[Q].    So did Kik -- did Kik provide any goods and services to people in return for Kin tokens?

[A].    If you're saying in terms of actually spending them where Kik would take your tokens in return for something, no.

(SEC8, Livingston Inv. Tr., at 475:6-22; *see also* SEC41, Ben-Ari Inv. Tr., at 132:1-22 ("If you're referring to spend Kin within Kik, that was, at that point in time, at the point of the TDE, was not possible."); SEC64, October 20, 2017 Letter).

211.    One investor who bought Kin in the public sale confirmed that, at the time he received his Kin, "[t]here wasn't anything available then.  They had the whole infrastructure to build out."  And the investor confirmed that he understood that it was Kik who would build that "infrastructure." (SEC75, Furo Inv. Tr., at 16:19-25).  Another public sale purchaser testified similarly:

Q.      On the day you purchased or received your Kin, were you able to purchase anything?

A.      No, I don't think so.

Q.      Were you relying on Kik to build the ecosystem in order for you to be able to access the ecosystem you referenced?

A.      Yeah.

 (SEC73, Wang Inv. Tr., at 16:17-23).

212.    A blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications, and a functioning rewards engine also did not exist on September 26, 2017.  (SEC8, Livingston Inv. Tr., at 115:15-117:16; SEC14, Philp Inv. Tr., at 564:3-565:9 ("The transaction throughput on Ethereum is too slow and too expensive to run consumer applications at scale.")).

213.     As of late 2018, a functional Rewards Engine did not exist:

> Q.     Okay. And, again, we're on day one. I bought -- say I bought in the Kin sale in September 2017. Could I, at that time, earn Kin via the Kin Rewards Engine?
>
> A.     As a developer?
>
> Q.     As anyone?
>
> A.     So the Reward Engine is for developers.
>
> Q.     Okay.
>
> A.     The Reward Engine was not running then and is not running today.
>
> Q.     That's what I was going to ask you. It's not running today [in 2018]?
>
> A.     Correct.

(SEC8, Livingston Inv. Tr., at 471:10-471:22).

214.     Kik did not distribute the blockchain's public code in the form of a Software Developer Kit (called a "SDK") to developers until after the distribution of the token. (SEC8, Livingston Inv. Tr., at 586:6-586:19; SEC22, Mougayar Dep. Tr., at 233:7-18; SEC14, Philp Inv. Tr., at 564:21-566:9). Indeed, as of October 15, 2017, several weeks after Kik distributed Kin, there were no developers on the "Kin platform;" the Kin Rewards Engine had not made any payouts; and it was the case that "multiple digital services building experiences for users" did not then exist. (SEC22, Mougayar Dep. Tr., at 211:5-20, 212:18-213:25; SEC82, Dep. Ex. 150; SEC64, October 20, 2017 Letter).

215.     As of late 2019, there were (and had been) no "tangible real world products that could be purchased with Kin." (SEC22, Mougayar Dep. Tr., at 214:11-215:12).

216.     Kin is not "currency" as that term is defined in the federal regulations, and it has never had legal tender status in any jurisdiction. Federal regulations define "currency" as "[t]he coin and paper money of the United States or of any other country that is designated as legal tender and that

circulates and is customarily used and accepted as a medium of exchange in the country of issuance."

31 C.F.R. § 1010.100(m). The Treasury Department's Financial Crimes Enforcement Network

("FinCEN") has noted that virtual currency is not legal tender: "In contrast to real currency, 'virtual'

currency is a medium of exchange that operates like a currency in some environments, but does not

have all the attributes of real currency. In particular, virtual currency does not have legal tender status

in any jurisdiction." *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or*

*Using Virtual Currencies* (March 18, 2013) (discussing 31 C.F.R. § 1010.100(m)).[7] The CFTC and IRS

have reached the same conclusion. *See In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, *1 n.2

(Sept. 17, 2015); *IRS Virtual Currency Guidance*, I.R.S. Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL

1224474 (Apr. 14, 2014).

## K. KIK KNEW THAT ITS OFFERING AND SALE OF KIN COULD BE CONSIDERED AN OFFERING AND SALE OF SECURITIES

217. Starting at least as early as February 2017, Kik was aware that regulators could decide

that the offering and sale of Kin was an offering and sale of securities under *Howey*. On multiple

occasions between February 2017 and Kik's distribution of Kin in September 2017, Kik executives

and board members specifically discussed the risk that United States and Canadian securities regulators

would conclude that the offer and sale of Kin should be regulated as a security – specifically, as an

"investment contract" under the United States Supreme Court's decision in *SEC v. W.J. Howey Co.*,

328 U.S. 293 (1946), or analogous Canadian law.

---

[7] Available at https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf (last visited March 17, 2020).

218. For example, before Kik's public announcement of Kin, on or about April 3, 2017, the New York-based consultant that had been advising Kik specifically warned Kik about the SEC's potential regulation of the Kin offering:

2. **SEC**

    a. The SEC has yet given no guidance that any particular token offering is a security, and this guidance is not expected in the near future.

    b. The SEC would potentially apply the Howey Test[3] to determine if the sale of such tokens would constitute an "investment contract".

(SEC83, Dep. Ex. 33, at COINFUND019857; Answer ¶ 97).

219. In an email the next day, on April 4, 2017, the same consultant told a Kik executive, "You don't want your offering to be a securities offering, as that comes with a huge regulatory burden and expense (it's essentially like taking your company public). On the other hand, unregistered public securities offerings are not legal in the U.S." (Answer ¶ 97; SEC84, COINFUND000369). The consultant further suggested that Kik consider blocking sales in the United States to mitigate the risk of SEC enforcement. (SEC84, COINFUND000369). By the time Kik received these communications, Kik personnel were aware that the *Howey* test could be used to determine that the sale of a digital token constituted the sale of an investment contract. (SEC14, Philp Inv. Tr., at 197:9-198:19; SEC10, Heinke Inv. Tr., 94:24-95:6).

220. On April 10, 2017, a series of PowerPoint slides provided to Kik's Board included the statement that a Kin offering that raised "millions" and "was highly marketed to users and the public at large . . . risk[ed] becoming a security in the eyes of the SEC very quickly." (Answer ¶ 97).

221.    On or about May 5, 2017, Kik's CEO also sent the board of directors a series of PowerPoint slides that warned that "Securities law" was the first-listed "[r]isk" associated with the company's sale of Kin:



# Risks

**1 Securities law**

**2 Accepting funds through token sale**

**3 Money transmission law**

(SEC19, Dep. Ex. 36 at KIK_00106806; Answer ¶ 98).

222.    During the summer of 2017, as Kik's officers and directors reassessed Kik's insurance, they specifically discussed obtaining $10 million in additional insurance for "defense costs" associated with, *inter alia*, disputes regarding whether Kik had "compl[ied] with the Howey test" or "if the SEC determines that Kin is, in fact, a security and not a product." (SEC4, Heinke Dep. Tr., at 146:7-155:10; SEC85, Dep. Ex. 53; SEC86, Dep. Ex. 67).

223.    On July 18, 2017 Kik's CFO received an email from Kik's insurance broker which stated:

Investor issues will generally come from two areas:

- Any failure of Kik to perform as the investors expect. As you march towards commercialization and greater success these issues will continue to grow with the increased investor expectations.
- With the advent of Kin we now have the potential for regulatory issues to develop if the SEC determines that Kin is in fact a security and not a product. An SEC investigation would trigger defense costs, fines and penalties as well as a likely investor suit should there be any direct impact on the value of their investment.

(SEC86, Dep. Ex. 67; SEC4, Heinke Dep. Tr., at 152:20-153:5).

224.     Kik ultimately obtained $10 million in additional insurance coverage (SEC4, Heike Dep. Tr., at 160:19-162:8), and this insurance is presently financing Kik's defense in this litigation. (SEC87, Kik's Second Amended Initial Disclosures).

225.     On July 25, 2017, the SEC issued a Report of Investigation pursuant to Section 21(a) of the Exchange Act (the "DAO Report").   The DAO Report specifically discussed the so-called "*Howey* test" and stated, *inter alia*, as follows:

> Whether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction. Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission or to qualify for an exemption from the registration requirements of the federal securities laws. The registration requirements are designed to provide investors with procedural protections and material information necessary to make informed investment decisions. These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology.

(SEC88, The DAO Report at 17-18; Answer ¶ 106).

226.     Kik's CEO was aware of and reviewed the DAO Report within days of its issuance. (SEC2, Lit. RFA, No. 130).

227.     On the same day the SEC issued the DAO Report, Kik contacted the Ontario Securities Commission ("OSC") regarding the legality of the Kin offering.  The OSC is a regulatory agency which administers and enforces securities legislation in the Canadian province of Ontario, where Kik is headquartered.   (Answer ¶ 107; SEC89, Deposition of Pat Chaukos ("Chaukos Dep. Tr."), at 47:18-50:12).

228.     From August to September 2017, including during a face-to-face meeting on August 14, 2017, Kik executives and Kik's Canadian and American counsel discussed the Kin offering with

the OSC. In the discussions, OSC staff members raised concerns that the sale of Kin would violate both Ontario and U.S. securities laws, because Kin tokens were investment contracts and, thus, securities. During these discussions, the company, its Canadian and American lawyers, and regulators specifically discussed the United States Supreme Court's decision in *Howey*, to which the Canadian regulator looked for guidance as to whether the offering of Kin was, in fact, a securities offering. (SEC89, Chaukos Dep. Tr. 73:22-75:4, 77:18-21, 82:21-83:8, 85:8-17, 169:22-171:16).

229.    By at least September 5, 2017, the OSC informed Kik that the "OSC staff definitively communicated a position that the [sale to the public of Kin] constituted an offering of securities" based on the *Howey* test and other Canadian law. (Answer ¶ 109; SEC89, Chaukos Dep. Tr., at 169:22-171:16, 181:14-183:15; SEC90, Deposition of Ross McKee ("McKee Dep. Tr."), at 171:23-172:13, 177:22-178:6).

230.    After learning of the OSC's position, Kik barred Canadians from purchasing Kin in the public sale. (Answer ¶ 110). Kik did not contact the SEC regarding the legality of the Kin offering, even though the OSC questioned whether Kik should do so in light of the OSC's conclusions on the subject. (SEC89, Chaukos Dep. Tr., at 185:10-185:20; Answer ¶ 111).

## L.    KIK ATTEMPTED TO TAILOR ITS MESSAGING TO MITIGATE LEGAL RISK

231.    Kik personnel tasked with speaking publicly about Kik's offering of Kin were provided with guidance about "not talking about Kin publicly as an investment . . . [f]or compliance reasons." (SEC14, Philp. Inv. Tr., at 399:9-400:8; SEC91, Inv. Ex. 120; *see also, e.g.*, SEC14, Philp Inv. Tr., at 368:19-371-17).

232.    Kin purchasers, however, understood that Kik's avoidance of certain buzz-words did not impact the value proposition of the investment Kik offered:

> Q.    Did you have the idea when you bought Kin that you might profit from that purchase?
>
> A.    Yes.

Q.    Why did you think that?

A.    I think you already asked that.  But to go over it again, I thought that the value of the Kik could increase because I thought that the usage -- that the overall proposal that a cryptocurrency could be used in a chat application successfully was a good idea, a good proposal and I thought that could work at some point and Kin was well positioned to be that application -- Kin was looked to be that currency because Kik already had an application and user base.

. . . .

Q.    Do you recall -- I know that you mentioned you had only -- you remember anything specific about the white paper but you believe it was likely that you had reviewed it.  Do you remember anything in the white p[aper] or otherwise where Kik told you to expect that you could profit?

A.    No, I don't remember.

Q.    Do you have any reason to believe that they did make any such statement?

[A].    I don't have any reason to believe and that would be a pretty amateur move.  So I doubt they would make such statement.

(SEC92, Deposition of Alexander Rousmaniere ("Rousmaniere Dep. Tr."), at 94:8-21, 95:9-21

(objection omitted)).

## M.    KIK RAISED APPROXIMATELY $100 MILLION FROM KIN INVESTORS WITHOUT FILING A REGISTRATION STATEMENT

233.    Kik offered and sold one trillion Kin in 2017.  (Answer ¶ 1).  From mid-July through

September 2017, Kik raised a total of approximately $100 million in U.S. dollars and Ether through

sales of Kin.  (SEC1, Inv. RFA, No. 32).  Over $55 million of this sum was raised from United States-

based purchasers.  (Answer ¶ 15).

### i.    *From July To September 11, 2017, Kik Sold Discounted Kin To Wealthy Investors Through SAFTS.*

234.    From early July 2017 to September 11, 2017, Kik sold Kin by entering into SAFTs

with investment funds and other wealthy investors.  Kik received approximately $49.05 million from

approximately 50 investors, including 21 located in the United States who paid Kik more than $39.3 million. (Answer ¶ 157).

235.    Pursuant to the SAFTs Kik entered into between July 2017 and September 11, 2017, purchasers bought Kin in amounts that ranged from $10,000 to $15 million. (SEC93, Declaration of Brent Mitchell ("Mitchell Dec."), at ¶ 4(b)).

236.    The six largest SAFT purchasers all have postal addresses suggesting that they reside in the United States, and two of the largest SAFT participants have addresses in New York City. (*Id.* at ¶ 4(c)).

237.    In addition, the SAFT participants included: (i) 11 purchasers who purchased Kin for amounts ranging from $501,000 to $1.999 million, (ii) 21 purchasers who purchased Kin for amounts ranging from $100,000 to $500,000, and (iii) 13 purchasers who purchased Kin for amounts ranging from $10,000 to $99,999. (*Id.* at ¶ 4(d)).

238.    On September 11, 2017, Kik entered into SAFT agreements with the last 10 purchasers, including a $1.2 million agreement with a purchaser located in Illinois. (*Id.* at ¶ 4(e)).

239.    Kik provided email updates to SAFT participants that included plans for the token distribution event and "Sale Metrics" for all the Kin that Kik hoped to sell in both portions of the offering. For example, on or about August 30, 2017, Kik sent SAFT participants an email stating:

## Sale Metrics

- Total cap: $125mm
  - Pre-sale: $50mm (30% discount)
  - Public: $75mm

(SEC94, Dep. Ex. 141; SEC22, Mougayar Dep. Tr., at 141:2-8; SEC95, KIK_00019210 - KIK_00019475).

240. In order to collect Ether addresses and know-your-customer information from certain Kin purchasers who bought via SAFT, Kik asked those investors to use the same internet portal that the general public used. (SEC94, Dep. Ex. 141; SEC22, Mougayar Dep. Tr., at 142:2-14).

241. On or about September 11, 2017, Kik filed a Form D with the SEC indicating that Kik had sold securities. Under "Type(s) of Securities Offered," the Form D stated: "Sale and issuance of rights to receive Kin tokens in the future via a Simple Agreement for Future Tokens (SAFTs)." (Answer ¶ 158).

242. Kik's Form D claimed that its offering using SAFTs was exempt from the requirement to be registered under the federal securities laws, pursuant to the exemption for sales to accredited investors under SEC Rule 506(c). (Answer ¶ 159).

243. The Kin that were ultimately delivered to the wealthy investors who purchased through Kik's SAFT were identical to those delivered to investors who purchased during the public sale portion of the offering. (Answer ¶ 180).

### ii. Starting In August 2017, Kik Publicly Announced The Public Sale Process And Allowed Investors To Sign Up.

244. On or about August 29, 2017, Kik issued a press release announcing the dates for its "token distribution event" and the process by which the general public could purchase Kin. (Answer ¶ 160; SEC96, Dep. Ex. 55).

245. In its August 29 press release, Kik informed the public that "[a]ll who want to participate in the TDE [public sale] must register by Sept. 9, 9:00 ET." This same press release announced that Kik "ha[d] successfully closed a presale round of US $50 million to select accredited investors." And that "Kik will look to raise a total of US$125 million through its token sale." (Answer ¶ 161; SEC96, Dep. Ex. 55). The August 29 press release also stated that "[w]ith millions of users, Kik hopes to drive mainstream consumer adoption of Kin, potentially making it the most adopted and used cryptocurrency in the world." (Answer ¶ 161; SEC96, Dep. Ex. 55).

246. Kik's August 29 press release also included the following quote attributed to one of the "select accredited investors" identified earlier in the press release:

> "Kik is by far the largest consumer company to enter the cryptocurrency space, and this is a seminal moment for the industry," said Ryan Zurrer, principal and venture partner at leading cryptocurrency hedge fund Polychain Capital. "We have been impressed with Kik's thoughtful approach to the creation and distribution of Kin, and have confidence that the team will execute their vision of creating a decentralized ecosystem of digital services through Kin."

(SEC96, Dep. Ex. 55).

247. General public investors were not provided the PPM that was provided to the wealthy investors who purchased Kin at a discount pursuant to via Kik's SAFT. (Answer ¶ 162). The PPM contained detailed descriptions of certain "Risk Factors" concerning Kik, Kin, and the Ecosystem. For example, it warned investors who purchased Kin via SAFT that "Kik has experienced a declining usage of its messenger service over the last several years. Such a lack of use or interest could negatively impact the development of the Kin Ecosystem and therefore the potential utility of Tokens." (Answer ¶ 163; SEC52, Dep. Ex. 16).

248. Kik's User Registration Guide, dated August 2017 and published to the public on Kik's website, stated: "We are excited to take the next steps in bringing Kin to life. The Kin token offering presents a unique opportunity for crypto investors, as Kin will offer mainstream audiences a chance to instantly interact with a cryptocurrency." (SEC97, Inv. Ex. 9; Answer ¶ 164). Kik executives contacted a number of public sale purchasers who had indicated an interest in purchasing large amounts of Kin, to offer assistance in completing their transactions and establish a point of contact within Kik. (Answer ¶ 165). Kik executives referred to these large purchasers as "whales." (*See, e.g.,* SEC98, Inv. Ex. 185). Kik's intention was to structure the sale so that whales were able to purchase the amount of Kin they desired. Given the larger amounts at issue, Kik employees opted to contact

these purchasers to offer themselves "as a resource to ask further questions about the white paper or anything that they had questions about." (Answer ¶ 165).

249. In mid-September, Kik's chief marketing officer wrote an email suggesting that Mr. Livingston attend two conferences in Kiev and Hong Kong, with the goal being "for Ted to network with and generate interest from high value crypto investors to participate in the Kin token sale." (Answer ¶ 165).

250. Would-be purchasers who registered for the public sale were required to complete a "know-your-customer" or "KYC" process, which required users to submit their name, address, email, and social security or passport number. Purchasers indicating an interest in purchasing over $100,000 of Kin would be required to submit a passport photo page scan and a photograph for face matching. (Answer ¶ 166).

251. Kik relied on its KYC process to identify the citizenship, country of residence, and, where applicable, the state of residence of each public sale purchaser, and to decide which persons could purchase Kin and which could not. Kik declined to sell Kin to purchasers from certain countries, including Canada, China, Cuba, and North Korea. Kik also declined to sell Kin to general public purchasers from certain U.S. states, including New York and Washington State. (Answer ¶ 167).

252. Kik did not undertake, through its KYC process or otherwise, to determine whether these public sale investors qualified as "accredited investors," as that term is defined by federal securities regulations. (Answer ¶ 168).

253. Kik did not undertake to determine whether investors bought Kin with the intent to profit from their purchase or to immediately resell and distribute Kin. (Answer ¶ 169).

254. Kik continued private discussions with accredited investors after the public portion of the sale was officially announced, and it entered into 10 SAFTs, including one in the amount of $1.2

million, on September 11, 2017, two days after the registration deadline for potential purchasers in the public sale. (Answer ¶ 170; SEC93, Mitchell Decl., at ¶ 4(e)).

### iii. From September 12 To 26, 2017, Kik Sold Kin To The General Public.

255. From September 12 to 26, 2017, Kik sold Kin to investors who were approved by Kik's KYC process. (Answer ¶ 171).

256. On September 12, 2017, Kik issued a press release entitled "Kin token distribution event starts today," which explained the process for registered purchasers to buy Kin. (Answer ¶ 172)

257. The September 12 press release provided:

WATERLOO, Ontario – Sept. 12, 2017 – Kik Interactive, the creator of the popular chat platform Kik, today announced the Kin token distribution event (TDE) will commence on Sept. 12, 9:00 a.m. ET. To date, 17,075 individuals from 139 countries have registered to participate in the token sale, in which Kik will look to raise a total of US$125 million.

TDE participants will have 24 hours starting on Sept. 12, 9:00 a.m. ET to participate up to US$4,393. This individual cap was determined by dividing the available US$75 million by the total number of registrants. In doing this, we are guaranteeing that not all of the US$75 million will be sold — registered participants who later decide not to participate at all or at the or maximum participation cap will result in unsold tokens. On Sept. 13, 9:00 a.m. ET, these unsold tokens will be sold in a subsequent sale for registered participants who would like to buy more. The maximum participation cap will be incrementally raised over the first hour and then be removed until all tokens are sold.

Kik has already raised US$50 million in a presale round, leaving 512 billion Kin tokens valued at US$75 million available for the public token sale. Notable participants of the pre-sale included Blockchain Capital, P Polychain Capital.

Only those who completed registration before Sept. 9 can which will only take place on kin.kik.com.

(SEC99, Inv. Ex. 94). A large public sale purchaser found Kik's touting of venture capital participants important to his decision to invest. (SEC73, Wang Inv. Tr., at 14:19-16:3).

258. Kik's September 2017 sale of Kin to the general public was denominated in Ether, which Kik planned to quickly convert to dollars. (SEC46-B, An Evening (transcript), at 55:10-23).

259.    The sale included multiple rounds.  In each round, purchasers sent Ether to Kik to buy a proportional number of Kin.  In the first round, conducted over the first 24 hours starting on September 12, 2017, purchasers could send Kik Ether worth up to $4,393 to buy a proportional number of Kin.  In the second round, which started on or about September 13, 2017, Kik removed the cap on purchase amounts, and purchasers could send unlimited amounts of Ether to buy Kin.  (Answer ¶ 173).

260.    Approximately 10,000 total purchasers bought Kin in the public sale in exchange for a total of 168,732 Ether, which was then worth approximately $49.2 million.  Approximately 3,456 of these purchasers were from the United States, and these purchases accounted for approximately $16.8 million in Ether.  (Answer ¶ 174).

261.    In addition, the United States public sale buyers included: (i) 15 purchasers who paid for Kin in amounts ranging from $100,000 to $500,000, (ii) 207 purchasers who paid for Kin in amounts ranging from $10,000 to $99,999, and (iii) 1664 purchasers who paid for Kin in amounts ranging from $1,000 to $9,999.  (SEC93, Mitchell Decl., at ¶ 6(i)).

262.    Of the money spent on Kin by United States buyers in the public sale, a total amount of about $2,254,097 was spent by buyers who paid at least $500,000; a total amount of about $5,168,031 was spent by buyers who paid at least $100,000; a total amount of about $10,525,772 was spent by buyers who paid at least $10,000; and a total amount of about $16,219,917 was spent by buyers who paid at least $1,000.  (*Id.* at ¶ 6(j)).

263.    Of the money spent on Kin in the public sale by United States-based buyers, a total amount of about $677,612 – or about 4.01% of all purchases made by United States-based buyers – was spent by United States-based buyers who paid less than $1,000.  (*Id.* at ¶ 6(k)).

264.    Of the money spent on Kin by buyers from the United States, more than 50% of the Kin was purchased by buyers who paid more than $24,000.  (*Id.* at ¶ 6(l)).

265. The eight largest public sale purchasers paid about $1.553 million, $1.462 million, $1.160 million, $970,231, $871,393, $686,144, $640,424 and $593,705, respectively. (*Id.* at ¶ 6(b)).

266. The purchasers in the public portion of the sale also included (i) 48 purchasers who paid for Kin in amounts ranging from $100,000 to $500,000, (ii) 544 purchasers who paid for Kin in amounts ranging from $10,000 to $99,999, and (iii) 4584 purchasers who paid for Kin in amounts ranging from $1,000 to $9,999. (*Id.* at ¶ 6(c)).

267. Of the money spent on Kin by all buyers in the public portion of the sale, a total amount of about $7,938,264 was spent by buyers who paid at least $500,000; a total amount of about $16,298,405 was spent by buyers who paid at least $100,000; a total amount of about $31,369,147 was spent by buyers who paid at least $10,000; and a total amount of about $46,837,457 was spent by buyers who paid at least $1,000. (*Id.* at ¶ 6(d)).

268. Of the money spent on Kin by all buyers in the public portion of the sale, a total amount of about $1,926,056 – or about 3.95% of the total sum raised during the public portion of the sale – was spent by buyers who paid less than $1,000. (*Id.* at ¶ 6(e)).

269. Of the Kin bought by all buyers in the public portion of the sale, more than 50% of the Kin was purchased by buyers who paid more than $32,000. (*Id.* at ¶ 6(f)).

270. Of the money spent on Kin by all buyers, including both those who purchased pursuant to SAFT and those who did not, a total amount of about $54,403,264 was spent by buyers who paid at least $500,000; a total amount of about $65,413,405 was spent by buyers who paid at least $100,000; a total amount of about $80,960,647 was spent by buyers who paid at least $10,000; and a total amount of about $96,428,957 was spent by buyers who paid at least $1,000. (*Id.* at ¶ 8(b)).

271. Of the money spent on Kin by all buyers, including both those who purchased pursuant to SAFT and those who did not, a total amount of about $1,926,056 – or about 1.96% of

the entire amount raised in Kin offering – was spent by buyers who paid less than $1,000. (*Id.* at ¶ 8(c)).

272. Of the money spent on Kin by all buyers, including both those who purchased pursuant to SAFT and those who did not, more than 50% of the Kin was purchased by buyers who paid more than $500,000. (*Id.* at ¶ 8(d)).

273. On or about September 26, 2017, Kik issued a press release announcing that "the Kin token distribution event (TDE) has successfully ended raising nearly US$100 million":

> **WATERLOO, Ontario – Sep. 26, 2017-** Kik Interactive, the creator of the popular chat platform Kik, has announced the Kin token distribution event (TDE) has successfully ended raising nearly US$100 million. More than 10,000 people from 117 countries participated in the token sale, immediately making Kin one of the most widely held cryptocurrencies in the world.

(Answer ¶ 176; SEC100, Inv. Ex. 95).

274. Following its distribution of Kin, Kik sent external communications regarding its sales of Kin and referring to the transactions as one "sale." For example, on September 26, 2017, a Kik executive sent the following email to a purchaser who bought via SAFT:

> The token distribution event closed this morning. Here's a quick look at the results:
>
> - $98.76M total raise (inclusive of pre-sale and public sale)
> - Over 10,000 total participants from 117 countries
>
> The hard cap for the sale was $125M. In order to maintain the 1T supply, the remaining allocation in the sale is being redistributed proportionally to all sale participants, while also maintaining the 30% discount to pre-sale participants. As such, the split of the 1trillion tokens netted out to:
>
> - **59.43%** pre-sale
> - **40.57%** public sale
>
> The distribution of tokens is coming through in two instalments. The first, which you should see in your wallet now, is your proportional allocation of tokens of the initial 488B tokens allocated to the pre-sale cohort under the assumption of a full $125M sale. The second instalment is the redistribution of unsold tokens and you will see that in the next 48-72 hours.

(SEC101, Dep. Ex. 149; SEC22, Mougayar Dep. Tr., at 182:16-183:10). Similar emails were sent to other SAFT participants. (SEC102, KIK_00020141 - KIK_00020150).

275. The following timeline illustrates Kik's offering and sale of Kin:

## Kik's Offer and Sale of Kin

**MAY 2017**

**MAY 25** — Sale of 1 Trillion Kin announced (a), and white paper issued (b)

**JULY 2017**

**JULY 3** — First sale via SAFT (c)
**JULY 25** — SEC issues DAO Report (d)

**AUG 2017**

**AUG 29** — Kik publishes Instructions for public portion of sale (e)

**SEPT 2017**

**SEPT 5** — OSC "definitively communicate[s]" that sale of Kin is securities offering (f)
**SEPT 9** — Deadline for buyers to register for public portion of sale (g)
**SEPT 11** — Last sales via SAFT (h)
**SEPT 12** — Purchasers who timely registered pay Ether to buy Kin (i)
**SEPT 26** — Sale concludes and Kik announces that it has raised "US$100 million" (j)
1 Trillion Kin distributed (k)

((a) SEC38, Inv. Ex. 88; (b) Answer ¶ 8; SEC31, Dep. Ex. 12; (c) SEC53, Dep. Ex. 40; (d) Answer ¶ 17; (e) Answer ¶ 160; SEC96, Dep. Ex. 55; (f) Answer ¶ 109; SEC89, Chaukos Dep. Tr., at 169:22-171:16, 181:14-183:15; (g) Answer ¶ 161; (h) SEC53, Dep. Ex. 40; (i) Answer ¶¶ 171, 173; (j) Answer ¶ 176; (k) Answer ¶ 177).

### iv. Kik Never Filed A Registration Statement.

276. Kik has never filed with the SEC a registration statement for its offer and sale of Kin. (Answer ¶ 111; SEC1, Inv. RFA, No. 40).

277. Kik did not otherwise publicly disclose its financial statements. (Answer ¶ 68).

## N. AS PROMISED, KIK CREATED THE KIN FOUNDATION ON SEPTEMBER 12, 2017

278. The Kin Foundation was officially established on September 12, 2017, after registration for the public sale of Kin had closed and on the day public sale buyers started to pay Ether

for the tokens.  Initially the Foundation had two directors, Kik's CEO and Kik's then-CFO.  (Answer ¶ 153; SEC1, Inv. RFA, No. 38; SEC103, Dep. Ex. 62; SEC4, Heinke Dep. Tr., at 186:21-187:11).

279.    Upon creation of the Foundation and through distribution of the Kin on September 26, 2017, the Foundation had no operations independent of Kik, no employees, and no cash or other assets (except for the Kin it received on September 26, 2017) to fund operations.  (SEC4, Heinke Dep. Tr., at 189:9-20; SEC1, Inv. RFA, No. 44; SEC10, Heinke Inv. Tr., at 462:11-469:4).

280.    At the time of the public sale, the Foundation was not independent from Kik, and Kik had not made any specific decisions about how the Foundation would operate in the future.  (SEC10, Heinke Inv. Tr., at 456:2-22).

281.    Kik's CEO and CFO served as the Foundation's sole directors until May 2018.  (SEC1, Inv. RFA, No. 42).  Since May 2018, the Foundation's directors have been Kik's CEO and a long-time Kik consultant, William Mougayar.  (SEC22, Mougayar Dep. Tr., at 197:6-15).  From approximately April 2017 through May 2018, Mr. Mougayar served as a compensated consultant to Kik.  (Answer ¶ 34; SEC22, Mougayar Dep. Tr., at 53:4-18; 56:18-57:9; 187:17-21).

282.    Because Kik's CEO has always been one of two board members, the Foundation has always needed the CEO's approval to conduct any business.  Kik's CEO cannot unilaterally approve any Foundation action, unless Mr. Mougayar has a conflict of interest in the matter being voted on.  (Answer ¶ 34; SEC8, Livingston Inv. Tr., at 424:24-425:21; SEC22, Mougayar Dep. Tr., at 198:9-199:1).

283.    The Foundation was created so that it could receive six trillion Kin to distribute in such a way as to compensate – through the Rewards Engine – companies that promote Kin transactions and, therefore, boost demand for Kin.  (SEC31, Dep. Ex. 12 at 21).

284.    At present, all Foundation activities are conducted by Kik employees at Kik's cost.  (SEC6, Kik 30(b)(6) Dep. Tr., at 75:3-78:3).  The Foundation continues to have no employees and no

assets of its own, other than the Kin it received on September 26, 2017. (*Id.* at 41:22-42:22; SEC22, Mougayar Dep. Tr., 234:17-235:16). Certain Kik employees are "very critical" to the Foundation's functions. (SEC22, Mougayar Dep. Tr., at 236:3-238:19).

285. Kik's general counsel serves as the Foundation's secretary, although the Foundation does not pay her. (*Id.* at 237:6-238:20).

286. The Foundation did not enter into any contracts with developers who agreed to integrate Kin into their applications until 2018. (*Id.* at 233:7-11).

## O. ON SEPTEMBER 26, 2017, KIK DELIVERED THREE TRILLION KIN TO ITSELF, ONE TRILLION KIN TO INVESTORS, AND SIX TRILLION KIN THE FOUNDATION

287. On or about September 26, 2017, a third-party contractor hired by Kik created a smart contract that generated 10 trillion Kin. (Answer ¶ 177).

288. Kik received four trillion Kin, of which Kik kept three trilllion. Kik then transferred the other one trillion Kin to the approximately 10,000 general public purchasers and the approximately 50 purchasers who bought Kin using Kik's SAFT. Pursuant to the terms of the SAFTs, however, only half of the Kin purchased via SAFTs were delivered; the other half were to be delivered on the one-year anniversary of the distribution. (Answer ¶ 178).

289. The smart contract also distributed six trillion Kin to the Kin Foundation. (Answer ¶ 179).

290. The Kin that Kik kept and caused the Kin Foundation to receive are all identical and fungible with the tokens that Kik sold and distributed (via SAFT or public sale). (Answer ¶ 180).

291. Kik imposed no resale or use restriction on any of the Kin distributed on September 26, 2017. (Answer ¶ 181).

292. Within months after the token distribution event, investors who had purchased Kin at a discount through SAFTs began to liquidate their Kin holdings for a profit, sending billions of Kin

into the secondary market.  (SEC23, Morehead Inv. Tr., at 133:2-135:25; SEC42, Hourigan Inv. Tr., at 20:4-21:17; 56:4-8; Answer ¶ 182).

293.    Because all Kin tokens are the same, all Kin tokens are valued at the same price on any given day.  (Answer ¶ 183).  If the value of Kin rises or falls, the change in value will affect the value of all Kin, whether such tokens are held by Kik, the Foundation, or investors.  (*Id.*).

## P.    KIK POOLED THE PROCEEDS OF THE SALE OF KIN AND USED THE PROCEEDS TO FUND ITS OPERATIONS AND "INCREASE THE VELOCITY" OF KIN

294.    Kik deposited funds received from the SAFT participants in U.S. dollars in a single account owned by Kik at a Canadian bank.  (Answer ¶ 186; SEC2, Lit. RFA, No. 70; SEC10, Heinke Inv. Tr., at 473:6-474:11).

295.    Kik stored in a "digital wallet" the Ether it had received during the public portion of the sale.  Between September 27, 2017 and March 28, 2018, Kik exchanged Ether it had received during the public portion of the sale for U.S. dollars and put those dollars into a single account owned by Kik at a California bank.  (SEC10, Heinke Inv. Tr., at 474:22-475:14, 477:7-478:4; SEC6, Kik 30(b)(6) Dep. Tr., at 33:19-34:24; SEC93, Mitchell Decl., at ¶¶ 10(b)-(e)).  Because of an increase in the price of Ether after September 26, 2017, Kik ultimately realized approximately $59 million from its exchange of Ether to U.S. dollars.  (SEC93, Mitchell Decl., at ¶ 10(e)).

296.    Kik thus owned all the proceeds from the sales and controlled the proceeds through the company's budgeting process.  (SEC10, Heinke Inv. Tr., at 473:24-474:4; 474:12-21; 477:7-478:4; SEC6, Kik 30(b)(6) Dep. Tr., at 33:19-34:24).

297.    Kik has used proceeds received from both portions of its sale of Kin as working capital to fund Kik's business operations.  (SEC6, Kik 30(b)(6) Dep. Tr., at 33:19-34:24; SEC2, Lit. RFA, No. 71; SEC64, October 20, 2017 Letter).

298. Funds received from both portions of the sale were "pooled" and transferred to and from various Kik-controlled accounts to finance Kik's operations, and Kik controlled the transfer of all such funds. (SEC10, Heinke Inv. Tr., at 477:24-479:24; SEC14, Philp Inv. Tr., at 448:16-451:19; SEC6, Kik 30(b)(6) Dep. Tr., at 33:1-34:14).

299. Kik has also spent the proceeds "to develop the Kin Ecosystem" and to try to "execute on the plan that we produced in the white paper." (SEC10, Heinke Inv. Tr., at 479:25-480:18; *see also* SEC64, October 20, 2017 Letter).

300. After the public sale, Kik "tr[ied] to attract people to use Kin tokens," including by "get[ting] brands to build and developers to build on the ecosystem." (SEC10, Heinke Inv. Tr., at 480:22-481:4). Specifically, Kik tried to "increase the velocity" in Kin, which meant "the amount that the currency trades." Causing an increase in the "velocity" of Kin would "[e]ffectively over time . . . increase the value of the token." (Id. at 481:7-20).

301. Kik used funds from Kik's Canadian bank account "to further its efforts as a participant in the Kin Ecosystem." (SEC2, Lit. RFA, No. 75).

302. Kik used funds that were first deposited in Kik's California bank account "to further its efforts as a participant in the Kin Ecosystem." (*Id.* at No. 72).

303. Kik does not distinguish between funds received through SAFTs, funds received from the general public, or funds the company previously had on hand from venture capital investment or company operations. (SEC6, Kik 30(b)(6) Dep. Tr., at 32:1-35:15).

304. Neither the Kin Foundation nor Kin investors had control over how the proceeds of the Kin sale were spent. Kik possessed sole discretion. (Answer ¶ 188).

## Q.   WHEN OFFERING AND SELLING KIN, KIK MADE USE OF THE MEANS AND INSTRUMENTS OF INTERSTATE COMMERCE.

305. Kik used the Internet, including websites and email, to provide offering materials to potential purchasers of the Kin token. Specifically, Kik posted the white paper on its website, making

the document freely accessible on the Internet. (SEC4, Heinke Dep. Tr., at 127:5-25). Kik also emailed the white paper and URL addresses for the white paper to potential and actual Kin investors in the United States. (*See, e.g.*, SEC74, Neil Dep. Tr., at 25:23-26:10, 152:24-153:12).

306. Kik also sent emails to potential and actual investors in the United States to communicate regarding Kik's offer and sale of Kin. (*See, e.g.,* SEC74, Neil Dep. Tr., at 152:3-19, 153:16-155:6, 155:12-156:1, 156:22-157:12; SEC2, Lit. RFA, Nos. 64, 67; SEC44, PANT-000000051).

307. Kik also spoke by telephone with prospective and actual investors in the United States to discuss and promote Kik's offering of Kin. (SEC14, Philp Inv. Tr., at 426:4-19, 429:6-11; SEC73, Wang Inv. Tr., at 24:19-25:4; SEC50, Wang Dep. Tr., at 40:17-41:4).

308. Kik also used multiple United States-based social media outlets on the Internet, including Medium, Twitter, Reddit, and Slack, to post about the Kin project. (Answer ¶ 71). And at least one investor viewed on-line the video recordings of Kik's CEO's various public talks before making his investment decision. (*See, e.g.*, SEC50, Wang Dep. Tr., at 43:5-14, 122:4-13).

*   *   *   *

Dated: March 20, 2020

/s/ Stephan J. Schlegelmilch
Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on March 20, 2020, I caused the foregoing to be filed using the Court's CM/ECF system, which will send notification of such filing to each counsel of record.

/s/ Stephan J. Schlegelmilch
One of Plaintiff's Attorneys