SEC4

```
 1          UNITED STATES DISTRICT COURT
 2         SOUTHERN DISTRICT OF NEW YORK
 3
 4  U.S. SECURITIES AND EXCHANGE    )
    COMMISSION,              )
 5                          )
           Plaintiff,    ) Case No.
 6                      ) 19-cv-5244(AKH)
    v.                   )
 7                      )
    KIK INTERACTIVE INC.        )
 8                      )
           Defendant.    )
10  _____)
11
12     VIDEOTAPED DEPOSITION OF PETER HEINKE
13      (Volume 1, pages 1 - 212 inclusive)
14         Friday, November 22, 2019
15              8:57 a.m.
16              Taken at:
17    U.S. Securities & Exchange Commission
           100 F Street, Northeast
18         Washington, D.C.  20549
19
20
21
22
23
    Reported by:
24  Michele E. Eddy
    (RPR, CRR, CRI, Participating Member of NCRA)
25  JOB No. 191122ERS
```

1

```
 1              A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF:
 3    U.S. SECURITIES AND EXCHANGE COMMISSION
 4      100 F Street NE
        Washington, DC  20549-5977
 5
        Telephone:  (202) 551 4418 (Mendel)
 6
      BY:  MR. DAVID S. MENDEL, Esq.
 7        MR. STEPHAN J. SCHLEGELMILCH, Esq.
        mendeld@sec.gov
 8        schlegelmilchs@sec.gov
 9
10  On behalf of Defendant:
11    COOLEY LLP
12      500 Boylston Street
        Boston, MA  02116-3736
13
        Telephone:  (617) 937 2480 (Cadigan)
14      Facsimile:  (617) 937 2400 (Cadigan)
15    BY:  MR. LUKE T. CADIGAN, Esq.
        MR. MICHAEL E. WELSH, Esq.
16
      lcadigan@cooley.com
17      mwelsh@cooley.com
18      AND
19    COOLEY LLP
20      55 Hudson Yards
        New York, NY  10001-2157
21      Telephone:  (212) 479-6784
22    BY:  MR. DANIEL P. ROY, III, Esq.
23      droy@cooley.com
24
25  ALSO PRESENT:  Gene Aronoff, Videographer
```

2

```
 1                  INDEX
 2  Witness:                    Page
 3  Peter Heinke (Volume 1)
 4  Examination by Mr. Mendel            16
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
 1              EXHIBIT INDEX
 2   No.      Description            Page
 3  SEC Exhibit 4   Email dated 2-16-17 from Ted     62
 4        Livingston to Kik Board and
 5        Derek Lebert, with attachment;
 6        KIK_00026450 - 6494
 7  SEC Exhibit 6   CoinFund document titled,     70
 8        "Token Integration Research
 9        and Proposed Economics," dated
10        3-21-17;
11        COINFUND007691 - 7747
12  SEC Exhibit 7   Board Call dated 5-23-17;     94
13        KIK_00106868 - 6898
14  SEC Exhibit 10  Email dated 5-18-17 from Eran    15
15        Ben Ari to Ted Livingston,
16        Nancy Wojtas, and the
17        Leadership Team;
18        KIK_00103093 - 3097
19  SEC Exhibit 12  Kin position paper titled,     126
20        "Kin:  a decentralized
21        ecosystem of digital services
22        for daily life," dated May
23        2017; KIK000001 - 28
24
25
```

4

1          EXHIBIT INDEX CONTINUED
2
3    No.     Description              Page
4  SEC Exhibit 16  Kik Interactive Inc.      164
5             Confidential
6             Private Placement Offering
7             Memorandum, Purchase Rights
8             for Tokens pursuant to Simple
9             Agreement for Future Tokens;
10            KIK000037 - 65
11 SEC Exhibit 19  Subpoena to Testify for Peter   19
12            Heinke
13 SEC Exhibit 20  Securities and Exchange    20
14            Commission Supplemental
15            Information for Persons
16            Requested to Supply
17            Information Voluntarily
18            or Directed to Supply
19            Information Pursuant to a
20            Commission Subpoena
21 SEC Exhibit 21  Transcript dated 9-20-18 of   24
22            Peter Heinke
23 SEC Exhibit 22  Transcript dated 9-21-18 of   24
24            Peter Heinke
25

                        5

1          EXHIBIT INDEX CONTINUED
2
3    No.     Description              Page
4  SEC Exhibit 29  Email dated 2-3-17 from Peter    60
5             Heinke to Ted Livingston;
6             KIK_00021266 - 1267
7  SEC Exhibit 30  Review of CoinFund Deliverable   70
8             dated 3-22-17;
9             KIK_00044719 - 4725
10 SEC Exhibit 31  Crypto Survey Feedback;      15
11            KIK_00044727 - 4733
12 SEC Exhibit 32  Email dated 3-24-17 from Peter   15
13            Heinke to Jake@coinfund.io;
14            COINFUND009764 - 9765
15 SEC Exhibit 33  Email dated 4-3-17 from Jake    75
16            Brukhman to Peter Heinke, with
17            attachment;
18            COINFUND020091 - 884
19 SEC Exhibit 34  Email dated 4-28-17 from Peter   15
20            Heinke to jake@coinfund.io, with
21            attachment; COINFUND010140 - 159
22 SEC Exhibit 35  Email dated 4-10-17 from Ted    84
23            Livingston to Kik Board, with
24            attachment; KIK_00106656 - 6714
25

                        7

1          EXHIBIT INDEX CONTINUED
2
3    No.     Description              Page
4  SEC Exhibit 23  Letter dated 6-13-18 from     15
5             Brent Mitchell to Peter
6             Heinke, with attachment
7  SEC Exhibit 24  Background Questionnaire for   15
8             Peter Albert Heinke
9  SEC Exhibit 25  Kik Interactive Inc. Consultant  195
10            Agreement dated July 1, 2018
11            between Kik Interactive Inc.
12            and Peter Heinke;
13            KIK_00147219 - 7227
14 SEC Exhibit 26  Consolidated Financial      44
15            Statements of Kik Interactive
16            Inc. year ended
17            6-30-16; KIK_00007193 - 7229
18 SEC Exhibit 27  Consolidated Financial      44
19            Statements of Kik Interactive
20            Inc. year ended
21            6-30-17; KIK_00007243 - 7279
22 SEC Exhibit 28  Email dated 1-27-17 from Ted   47
23            Livingston to Kik Board and
24            Derek Lebert, with attachment;
25            KIK_FOUNDATION_CAP_005705 - 5771

                        6

1          EXHIBIT INDEX CONTINUED
2
3    No.     Description              Page
4  SEC Exhibit 36  Email dated 5-4-17 from Ted    85
5             Livingston to Kik Board, with
6             attachment; KIK_00106784 - 6835
7  SEC Exhibit 37  Email dated 6-8-17 from Tanner   15
8             Philp to Jesse Clayburgh, Alex
9             Felix, Peter Heinke, and Juan
10            Benet, with attachment;
11            PL 000062 - 66
12 SEC Exhibit 38  Email dated 6-2-17 from Tanner   15
13            Philp to Peter Heinke, with
14            attachment; KIK_00017719 - 7741
15 SEC Exhibit 39  Kik Interactive, Inc. Pre-Sale   15
16            Participant Name list;
17            KIK000283
18 SEC Exhibit 40  Kik Interactive Inc. - SAFTS -  170
19            Participant Name list
20 SEC Exhibit 41  Email dated 5-16-17 from Tanner  15
21            Philp to Peter Heinke and
22            Jairaj@kik.com;
23            KIK_00092469 - 70
24
25

                        8

```
 1              EXHIBIT INDEX CONTINUED
 2
 3   No.     Description              Page
 4   SEC Exhibit 42  Email chain; most recent email  113
 5           dated 5-17-17 from Eran Ben Ari
 6           to Tanner Philp, etc.;
 7           KIK_00100121 - 122
 8   SEC Exhibit 43  Email chain; most recent email  15
 9           dated 5-21-17 from Tanner Philp
10           to Peter Heinke, with attachment;
11           KIK_00017627 - 7642
12   SEC Exhibit 44  Email chain; most recent email  15
13           dated 6-10-17 from Eran Ben Ari
14           to Marth Funston, Erin Clift,
15           Peter Heinke, and Ted Livingston;
16           KIK_00103267
17   SEC Exhibit 45  Email chain; most recent email  135
18           dated 6-12-17 from Peter Heinke
19           to Paul Holland, Michelle Dent,
20           Kik Board, Katie Tonin, Derek
21           Lebert, Angela Baiamonte, and
22           Sam Spadafora;
23           KIK_00001840 - 1842
24
25
```

9

```
 1              EXHIBIT INDEX CONTINUED
 2
 3   No.     Description              Page
 4   SEC Exhibit 53  Initial Kin Insurance Meeting  146
 5           Notes dated 6-13-17;
 6           KIK_00118242 - 8245
 7   SEC Exhibit 54  Email dated 7-10-17 from Google  15
 8           Calendar to Tanner Philp, etc.;
 9           KIK_00002106 - 2107
10   SEC Exhibit 55  Document titled "Kik announces  184
11           highly anticipated token
12           distribution event"
13   SEC Exhibit 56  Email chain; most recent email  15
14           dated 9-8-17 from Erin Clift to
15           Jairaj@kik.com, etc.;
16           KIK_00025985 - 989
17   SEC Exhibit 57  United States Securities and  15
18           Exchange Commission - Form D;
19           KIK000073 - 78
20   SEC Exhibit 58  Letter dated 11-2-17 from Ross  176
21           McKee at Blakes (Blake, Cassels &
22           Graydon LLP); SEC-OSC-E-0000005
23   SEC Exhibit 59  Kin blog titled, "Canadian  181
24           Residents Excluded from Next
25           Week's Kin TDE," by Ted Livingston
```

11

```
 1                  EXHIBIT INDEX
 2   No.     Description              Page
 3   SEC Exhibit 46  Minutes of a Meeting of the  15
 4           Board of Directors of Kik
 5           Interactive Inc.;
 6           KIK_00078790 - 8791
 7   SEC Exhibit 47  Email chain; most recent email  138
 8           dated 6-15-17 from Peter Heinke
 9           to Ted Livingston; KIK_00100298
10   SEC Exhibit 48  Email chain; most recent email  15
11           dated 6-17-17 from Tanner Philp
12           to Dan Morehead, etc.;
13           PANT-000000459 - 461
14   SEC Exhibit 49  Email dated 6-14-17 from Nancy  143
15           Wojtas to Peter Heinke;
16           KIK_00113490 - 3493
17   SEC Exhibit 50  Email dated 6-26-17 from Nancy  15
18           Wojtas to Ted Livingston, with
19           attachment; KIK_00103324 - 3327
20   SEC Exhibit 51  Email chain; most email dated  15
21           6-28-17 from Peter Heinke to
22           Michelle Dent, with attachment;
23           KIK_00117728 - 7730
24   SEC Exhibit 52  Notice to Residents of the  166
25           United States; KIK000066 - 72
```

10

```
 1              EXHIBIT INDEX CONTINUED
 2
 3   No.     Description              Page
 4   SEC Exhibit 60  Document titled, "Kin token  185
 5           distribution event starts today,"
 6           dated 9-12-17
 7   SEC Exhibit 61  Document titled, "Kik raises  185
 8           nearly US $100 million in Kin
 9           token distribution event,"
10           dated 9-26-17
11   SEC Exhibit 62  Certificate of Incorporation  186
12           for Kin Ecosystem Foundation;
13           KIK001071 - 1076
14   SEC Exhibit 63  Email dated 1-9-18 from Peter  15
15           Heinke to William J. Raduchel;
16           WR-Kik-00000282 - 287
17   SEC Exhibit 64  Services Agreement between Kik  15
18           Interactive Inc. and Kin Ecosystem
19           Foundation; KIK_00147202 - 7210
20   SEC Exhibit 65  Agency Agreement between Kin  15
21           Ecosystem Foundation and Kik
22           Interactive Inc.;
23           KIK_00147211 - 7218
24
25
```

12

```
 1              EXHIBIT INDEX CONTINUED
 2
 3   No.     Description                    Page
 4   SEC Exhibit 66  Document titled "Deposition of    29
 5              Peter Heinke on November 22,
 6              2019, Index of Exhibits
 7              Previously Marked in
 8              Investigative Testimony"
 9   SEC Exhibit 67  Email dated 7-18-17 from Angela   151
10              Watkins to Peter Heinke;
11              KIK_00115681 - 5686
12   SEC Exhibit 68  Email chain; most recent email    155
13              dated 8-3-17 from Katie Tonin to
14              Kik Board, Angela Baiamonte,
15              Annemarie Palmer, Cherie Bauman,
16              Christie Locke, Gillian Arca,
17              Sam, Teresa Pecce, Nancy Wojtas,
18              and Ted Livingston; attached
19              PowerPoint; USV0016091 - 6118
20   SEC Exhibit 69  Email chain; most recent email    156
21              dated 9-17-17 from Chris Cameron
22              to Peter Heinke;
23              KIK_00116494 - 6498
24
25
```

                          13

```
 1              EXHIBIT INDEX CONTINUED
 2
 3   No.     Description                    Page
 4   SEC Exhibit 70  Email dated 10-30-17 from    160
 5              Brandon Brunet to Kik Board;
 6              USV0015214;
 7              with attachment
 8              Bates 15221 - 5249
 9   SEC Exhibit 71  Email chain; most recent email    192
10              dated 12-14-17 from Chris Cameron
11              to William Raduchel and Peter
12              Heinke; WR-Kik-00000229 - 230
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                          14

```
 1          (Plaintiff's Exhibits 4, 6, 7, 10, 12, 16,
 2   and 23 through 65 were previously marked before
 3   going on the record.)
 4          (On the record at 8:57 a.m.)
 5          THE VIDEOGRAPHER:  Good morning.  This
 6   is video number 1 of the video deposition of Peter
 7   Heinke taken by plaintiff in the matter of United
 8   States Securities and Exchange Commission versus
 9   Kik Interactive, pending before the United States
10   District Court for the Southern District of New
11   York, Case Number 1:19-cv-05244.
12          This deposition is being held at the
13   United States Securities and Exchange Commission
14   on November 22nd, 2019.  The time on the video
15   screen is 8:58 a.m.
16          My name is Gene Aronoff, and I am the
17   legal video specialist from the firm of Gradillas
18   Court Reporters, Inc.  The court reporter today is
19   Michele Eddy, in association with Gradillas Court
20   Reporters, Inc., located at 400 North Brand
21   Boulevard, Suite 950, Glendale, California.
22          For the record, will counsel now please
23   introduce themselves and whom they represent.
24          MR. MENDEL:  David Mendel for plaintiff,
25   United States Securities and Exchange Commission.
```

                          15

```
 1          MR. SCHLEGELMILCH:  Stephan
 2   Schlegelmilch for the Commission.
 3          MR. CADIGAN:  Luke Cadigan for the
 4   defendant Kik Interactive.
 5          MR. WELSH:  Michael Welsh for Kik
 6   Interactive.
 7          MR. ROY:  Daniel Roy for Kik
 8   Interactive.
 9          THE VIDEOGRAPHER:  Will the court
10   reporter please administer the oath.
11               - - -
12          PETER HEINKE,
13   having been duly sworn, testified as follows:
14               EXAMINATION
15   BY MR. MENDEL:
16      Q   Good morning.
17      A   Good morning.
18      Q   Could you please state your full name
19   and spell it.
20      A   Peter Heinke, H-E-I-N-K-E.
21      Q   And my name, as I mentioned, is David
22   Mendel.  I represent the SEC in a lawsuit against
23   Kik Interactive, Inc., and this is a deposition
24   pursuant to the Federal Rules of Civil Procedure
25   in that action.
```

                          16



**17**

1    Can you state your home address, please.
2    A   Yes.  It's ███████████████████
3    ███████████████████████.
4    Q   Do you have any other personal
5 addresses?
6    A   No.  There's a box office address for
7 the local mailing, which is ████████████
8 ████████████████████
9    Q   Just to clarify, that's in Canada,
10 correct?
11    A   Yes, sorry.
12    Q   You don't have any personal addresses in
13 the United States?
14    A   No.
15    MR. MENDEL:  Could I also clarify for
16 the record, is counsel here today --
17    MR. CADIGAN:  Oh, I'm sorry.  Yes, we
18 are representing Mr. Heinke today as well.
19    MR. MENDEL:  Thank you.
20 BY MR. MENDEL:
21    Q   So I would like to go over some
22 procedures that we typically follow for
23 depositions.
24    A   Okay.
25    Q   You probably heard them before, but I'll

**18**

1 just repeat them.  As you know, we have a court
2 reporter who's transcribing the deposition.  And
3 so it will be a much better transcript if we don't
4 talk over each other.  So please let me finish my
5 question before you start your answer.  I know
6 sometimes it's tempting to jump in, but try to let
7 me get my question out first.
8    Please give audible responses instead of
9 just a body gesture or a nod of the head.  If you
10 don't understand a question, by all means, let me
11 know and I'll try to rephrase it so that it's more
12 understandable.
13    We'll take some periodic breaks.  We'll
14 take one midmorning, I imagine, but if you need a
15 break for any other reason, just feel free to let
16 your counsel know or let me know, and you might
17 want to request an escort because we try to finish
18 answering the question that's pending before we
19 move to a break.
20    A   Okay, yes.
21    Q   You understand that you're under oath?
22    A   Yes.
23    Q   And are you taking any medication today
24 that could affect your memory?
25    A   No.

**19**

1    Q   Is there any reason you can't give full
2 and complete testimony today?
3    A   No.
4    (Plaintiff's Exhibit 19 was marked for
5    identification.)
6 BY MR. MENDEL:
7    Q   Mr. Heinke, I've given you what's been
8 marked Deposition Exhibit 19.  Have you seen this
9 before?
10    A   Not that I recall.
11    Q   Okay.
12    Do you understand that you're appearing
13 today in the deposition pursuant to a subpoena?
14    A   Yes.
15    Q   Okay.  I'll take that back.
16    Well, one more question.  Does
17 Exhibit 19 look like a subpoena to you?
18    A   Yes, it does.
19    Q   And it has your name on it, right?
20    A   Yes, it does.
21    Q   Very good.  Thank you.
22    A   I'm sorry, where is --
23    Q   Do you want to look at it some more?
24    A   I just want to look where my name is.
25    Q   It says at the top "Subpoena to Testify

**20**

1 at a Deposition in a Civil Action," below that,
2 "Peter Heinke."
3    A   Oh, right, sorry, I didn't see it there.
4    Q   No problem.
5    A   Thank you.
6    Q   Mr. Heinke, do you recall giving sworn
7 testimony to the SEC during its investigation that
8 led to this lawsuit?
9    A   Yes, I do.
10    Q   That testimony took place on September
11 20th and 21st in 2018.  Does that sound right?
12    A   Yes, that does.
13    (Plaintiff's Exhibit 20 was marked for
14    identification.)
15 BY MR. MENDEL:
16    Q   I've provided you, Mr. Heinke, with
17 what's been marked as Deposition Exhibit 20.
18    Just before the start of your testimony
19 last September in 2018, on the first morning, do
20 you recall being provided with a copy of what's
21 now been marked Deposition Exhibit 20?
22    A   Yes.
23    Q   You took the time to read it, right?
24    A   At that time?
25    Q   At that time.

1     **A**   Yes.
2     **Q**   This is what we call a Form 1662.
3  That's in the lower left-hand corner of the
4  document.  Do you see SEC 1662 on it?
5     **A**   In the corner, yes.
6     **Q**   Then going up to the first section at
7  the top of the first page, "False Statements and
8  Documents," this form provides warnings about not
9  being truthful during your testimony to the SEC,
10  right?
11     **A**   Yes.
12     **Q**   I'll take that back.
13        At the start of your investigative
14  testimony back in September 2018, you swore an
15  oath, correct?
16     **A**   Yes.
17     **Q**   What did you understand the oath to
18  require you to do?
19     **A**   To tell the truth.
20     **Q**   That's what you did, right?
21     **A**   Yes, I did.
22     **Q**   The SEC proceeded to ask you questions
23  during the testimony?
24     **A**   Yes, they did.
25     **Q**   And when you answered the SEC's

                    21

1  questions, you told the truth?
2     **A**   Yes, I did.
3     **Q**   On September 20th and 21st, 2018, did
4  you tell the entire truth?
5     **A**   Yes, I did.
6     **Q**   Was there ever a moment during your
7  testimony when you thought that you were not
8  telling the truth?
9     **A**   No.  As far as my recollection was at
10  the time, I was telling the truth.
11     **Q**   Very good.
12        On September 20th and 21st, 2018, were
13  you under the influence of drugs or alcohol?
14     **A**   No, I wasn't.
15     **Q**   And there was a court reporter present,
16  right, just like today?
17     **A**   Yes, there was.
18     **Q**   And your testimony was videotaped, just
19  like today, correct?
20     **A**   Yes, it was.
21     **Q**   That testimony in September of 2018,
22  that was also attended by attorneys for Kik
23  Interactive, Inc., right?
24     **A**   Yes, it was.
25     **Q**   And that's the defendant in this case.

                    22

1     **A**   Yes, it was.
2     **Q**   And those attorneys representing Kik, at
3  the time they also represented you personally; is
4  that right?
5     **A**   That's correct.
6     **Q**   Did the attorneys representing Kik
7  attend all of your testimony on those days?
8     **A**   Yes, they did.
9     **Q**   During the testimony the attorneys for
10  Kik gave you advice with regard to questions that
11  potentially involved the attorney-client
12  privilege, right?
13     **A**   Yes, they did.
14     **Q**   And you followed that advice?
15     **A**   Yes, I did.
16     **Q**   Do you remember, at the end of the
17  second day of testimony, being asked whether you
18  would like to clarify or add to any of your
19  answers?
20     **A**   I believe so, yes.
21     **Q**   You answered that you didn't have
22  anything, right?
23     **A**   That's correct.
24     **Q**   Similarly, do you remember, at the end
25  of the second day of testimony, that Kik's lawyers

                    23

1  were asked whether they had any questions for you
2  at the time, right?
3     **A**   Yes.
4     **Q**   Kik's lawyers responded that they did
5  not?
6     **A**   That's what I recall, yes.
7     **Q**   Have you read any of the transcripts
8  from your investigative testimony?
9     **A**   Yes, I went over them.
10     **Q**   When did you read them?
11     **A**   In the last week.
12     **Q**   Did you read all of them?
13     **A**   I went through most of the pages, yes.
14        (Plaintiff's Exhibit 21 and Plaintiff's
15        Exhibit 22 were marked for
16        identification.)
17        MR. CADIGAN:  Dave, we're still
18  continuing to stipulate that all objections other
19  than as to form are reserved, right?
20        MR. MENDEL:  Yes.
21        MR. CADIGAN:  Okay.
22        Just, actually, for the record, that
23  will pertain to all depositions going forward in
24  this matter; is that right?
25        MR. MENDEL:  Sure.

                    24

1       MR. CADIGAN:  So we don't have to keep
2  putting it on the record.
3       MR. MENDEL:  Unless we say otherwise.
4       MR. CADIGAN:  Yes, right, right, right.
5       MR. MENDEL:  Sounds good to me.
6  BY MR. MENDEL:
7    Q   So I've provided you, Mr. Heinke, with
8  what's been marked as Exhibit 21 and 22.  Exhibit
9  21 indicates that it's a transcript of you on
10 September 20th, 2018, and Exhibit 22 reflects that
11 it's a transcript from your testimony from
12 September 21st, 2018.
13      Does that look right to you?
14   A   Yes, it does.
15   Q   Do you recognize Exhibits 21 and 22 as
16 transcripts that you reviewed in preparation for
17 your testimony today?
18   A   Yes, I do.
19   Q   I'm sorry if I asked you this.  How long
20 did you spend reviewing?
21   A   I can't really recall.  Probably about
22 five, six hours.
23   Q   When you reviewed the transcripts, did
24 you notice anything in them that seemed incorrect?
25   A   No.  In general, they were pretty

                            25

1  reflective of what the facts were.
2    Q   Did you notice any errors in the
3  transcription?
4    A   Not -- no.
5    Q   Did you notice any errors in what was
6  actually said during the testimony by you or
7  anyone else?
8    A   Not that I can recall.
9    Q   Nothing significant?
10   A   Nothing significant.
11   Q   Can you recall anything now from your
12 testimony that you think is incorrect?
13   A   No, I can't recall any.
14   Q   And you're not aware of any mistakes in
15 the transcripts now?
16   A   Not upon reading it.
17   Q   So there's nothing you would like to
18 correct at this point?
19   A   No.
20   Q   If I were to ask the same questions
21 today that I asked you on September 20th and 21st,
22 2018, would you give the same answers?
23      MR. CADIGAN:  Objection.  You can
24 answer.
25   A   Pardon?

                            26

1    Q   If I were to ask you the same questions
2  today that I asked you on September 20th -- I'll
3  break that down.
4       If I were to ask you the same questions
5  today that I asked you on September 20th, 2018,
6  would you give the same answers?
7       MR. CADIGAN:  Objection.
8    A   Just as far as I could recall.  I mean,
9  it's been over a year ago so, I mean, there may be
10 some nuances or changes to them, but in general,
11 yes.
12   Q   Based on what you reviewed before your
13 testimony, correct?
14   A   Right.
15   Q   And based on what you can remember now?
16   A   Yes.
17   Q   Very well.
18      The same question for the second day.
19 If I were to ask you the same questions today that
20 I asked you on September 21st, 2018, your second
21 day of testimony, would you give the same answers?
22      MR. CADIGAN:  Objection.
23   A   Just as far as I can recall.
24   Q   Okay.  Will you agree to treat your
25 transcript marked as Exhibit 21, right before you,

                            27

1  reflecting your testimony on September 20th, 2018,
2  as part of your sworn testimony today?
3       MR. CADIGAN:  Objection.
4    A   Yes, I will.
5    Q   You have no reason to think it's
6  inaccurate, correct?
7    A   No, I don't.
8    Q   Will you agree to treat your testimony
9  transcript marked as Exhibit 22, reflecting your
10 testimony on September 21st, 2018, as part of your
11 sworn testimony today?
12      MR. CADIGAN:  Objection.
13   A   Yes, I will.
14   Q   And there's nothing inaccurate that you
15 can think of, correct?
16   A   Not that I can recall.
17   Q   Will you agree to treat your videotaped
18 statements on September 20th and 21st, 2018,
19 during your testimony as part of your sworn
20 testimony today?
21      MR. CADIGAN:  Objection.
22   A   Yes, I will.
23      MR. MENDEL:  Can we go off the record,
24 please?
25      MR. CADIGAN:  Sure.

                            28

1      THE VIDEOGRAPHER:  We're going off the
2  record.  The time is 9:11 a.m.
3           (A brief recess was taken.)
4      (Plaintiff's Exhibit 66 was marked for
5      identification.)
6      THE VIDEOGRAPHER:  Going back on the
7  record.  The time is 9:44 a.m.
8  BY MR. MENDEL:
9      Q   Mr. Heinke, we just took a break, and
10  you met with your attorneys in a different room,
11  right?
12          During the break, I provided you with a
13  number of documents that were premarked as
14  deposition exhibits, correct?
15     A   Correct.
16     Q   The documents I gave you were marked,
17  and they're sitting right before you in the two
18  files that I gave you.  The documents were marked
19  Deposition Exhibits 4, 6, 7, 10, 12, 16, and 23
20  through 65.  Is that right?  If you like, you can
21  look at them right now.
22          Do you want me to repeat the numbers?
23     A   Yes, what was it?  Yes, please.
24     Q   Sure.  4, 6, 7, 10, 12, 16, and then 23
25  through 65.

29

1      A   Correct.
2      Q   And I also gave you a document in the
3  form of a list that's been premarked as Deposition
4  Exhibit 66.  Do you have that right before you?
5      A   Yes, I do.
6      Q   It's a two-page list, correct?
7      A   Correct.
8      Q   Is this a list of all the numbers of the
9  deposition exhibits that you were provided during
10  the break?
11     A   Yes, it is.
12     Q   And the deposition exhibits on that
13  two-page list, those are also -- you can read with
14  me -- 4, 6, 7, 10, 12, 6 and 23 through 65?
15         MR. CADIGAN:  Wait a second.  I think
16  you said that wrong.
17     A   Yes, you said that wrong.
18     Q   I did?
19     A   Yes.
20     Q   What did I say incorrectly?
21     A   You said 12, 6.  It's 12, 16.
22     Q   Let me repeat it.  Thank you.
23         Deposition Exhibits 4, 6, 7, 10, 12, 16,
24  and 23 through 65.  Did I get that right?
25     A   That's correct.  Yes.

30

1      Q   And my question is, to the best of your
2  knowledge, were you shown all of the deposition
3  exhibits listed on Deposition Exhibit 66 during
4  your investigative testimony on September 20th and
5  21st, 2018?
6      A   Yes.  Sorry, can you repeat the
7  question?
8      Q   To the best of your knowledge, were you
9  shown all of the deposition exhibits listed on
10  Deposition Exhibit 66, which you have right before
11  you, during your investigative testimony in 2018?
12     A   I could recall some of them, but I
13  couldn't recall all of them.  Was that --
14         MR. CADIGAN:  You've answered -- just
15  answer the question.
16     A   Yes.
17         MR. CADIGAN:  Wait, wait, wait.
18     A   No.  Sorry, I didn't recall all of them,
19  no.  Is that what you're asking?
20     Q   Were you shown all those exhibits,
21  correct, during your investigative testimony?
22  That's my question.
23     A   I couldn't recall all of them, no.
24     Q   Did you recall some of them?
25     A   I recalled some of them.

31

1      Q   Did you think that you were not shown
2  any of them?
3      A   I don't believe so, but I don't recall
4  them.  It's over a year ago.
5      Q   Okay.  If we look at Deposition Exhibit
6  66, next --
7          MR. CADIGAN:  Actually, David, just at
8  this point I just want to make it clear, because
9  we said -- you know, we're willing to stipulate
10  that, again, subject to your representations and,
11  you know, production of a certified copy of his
12  investigative testimony, that he made the
13  statements that are reflected in whatever
14  certified transcript you were able to get and was
15  shown the exhibits that would be attached to
16  whatever certified copy of the investigative
17  testimony you have, subject to, I'm sure, typos or
18  whatever.
19         MR. MENDEL:  Fair enough.  Thank you.
20  And I can represent that the exhibits that I
21  provided him that I just went through, in terms of
22  the numbers, were copies of the exhibits shown to
23  him during his testimony, and we'll endeavor to
24  get an additional certified copy.
25         MR. CADIGAN:  Yes.

32

BY MR. MENDEL:
Q   I'll just have a few more questions on this subject and then we can move on --
A   Okay.
Q   -- just to complete the record as best we can do it based on your memory of your testimony, okay?
A   Okay.
Q   So I just want to go back to Exhibit 66. That's the list.  Just for the record, if we look at Exhibit 66, so on the first column it's "Deposition Exhibit Number," right?
A   Yes.
Q   And we just listed -- I just went over what was included there.
The second column immediately adjacent is captioned "Investigation Exhibit Number"?
A   Yes.
Q   Do you see that?
A   Yes.
Q   And is each deposition exhibit number also identified by an investigation exhibit number?
A   Yes.
Q   During your testimony, was each

33

deposition exhibit listed on Exhibit 66 identified by the investigative exhibit number in the adjacent column?
A   Sorry, can you just repeat that?  Was every --
Q   Was every document -- during your investigative testimony, was every document that's now identified by an exhibit number --
A   Right.
Q   -- was it also identified by the corresponding investigation exhibit number, to the extent you can remember?
A   To the extent I can remember.
MR. CADIGAN:  Wait, wait, wait.  I'm sorry.
A   Are you saying, like, in section --
MR. CADIGAN:  Are you saying that the set you just provided him indicates both the deposition number and the investigative testimony number?  Or are you saying a year ago when he was provided -- because clearly a year ago he wasn't provided documents that had deposition numbers on them.
MR. MENDEL:  Maybe it would be easier if I go --

34

MR. CADIGAN:  Can we -- just for the record, you're representing that the deposition numbers that are reflected on the document Exhibit 66 that you provided us correspond to the investigative exhibits that he was shown reflected in column 2.
MR. MENDEL:  I am.  That's my representation.
MR. CADIGAN:  That's your representation.
MR. MENDEL:  Yes.
MR. CADIGAN:  I don't know.  I mean, you can obviously, you know, feel free to inquire as to -- I mean, I think he's already indicated he didn't recall all of the deposition exhibits being shown to him during his investigative testimony. I'm not saying that he wasn't.  He just doesn't recall it as he sits here today.
BY MR. MENDEL:
Q   All the exhibits that you were shown in your investigative testimony, they had exhibit numbers on them, correct?  They were labeled by numbers.
A   When I was -- a year ago?
Q   Yes, correct, a year ago.

35

A   That's correct.
Q   Okay.
Looking at Exhibit 66 now, and based on the review you just performed of the exhibits before you, are you aware of any errors in Exhibit 66?
MR. CADIGAN:  Objection.
A   I don't know how I can comment on that in that short a time, like to go through and -- are you saying, Dave, that I would reference each one of these to the exhibit number?
Q   I'm just asking if you noticed any errors when you looked at it just now.
MR. CADIGAN:  Objection.
A   I don't know how I can --
Q   Did you see any mistakes?
A   Well, I don't know if it was correct or right or wrong.  I can't recall, like, each one of these things here.  I think that's -- I don't know --
Q   I understood you didn't -- understanding that you didn't remember each document, did you notice any mistakes on Exhibit 66?
MR. CADIGAN:  Objection.
A   I didn't notice any mistakes, but I

36

1 didn't know if they were all correct either, so
2 that's --
3    Q    Okay, that's fine.
4    A    Is that fine?
5    Q    Sure.
6        So at this point let me take back this
7 group of exhibits.
8    A    And this?
9    Q    Sure, I'll take that back.
10        MR. CADIGAN:  Do you want this here?
11        MR. MENDEL:  Yes, you can leave that
12 there.
13 BY MR. MENDEL:
14    Q    Mr. Heinke, when did you first start
15 working at Kik?
16    A    Full time or -- because I started as a
17 consultant or advisory in 2009.  Roughly, I met
18 Ted the first time, I believe it was in March
19 2009.  And I worked with him for about a year and
20 a half in that capacity and then took a full-time
21 position around November of 2010 -- November,
22 December 2010.
23    Q    Before that were you working in the
24 healthcare sector?
25    A    Yes, I was.

37

1    Q    When you first started to work in a
2 full-time capacity for Kik, what kind of company
3 was Kik?
4    A    What do you mean, what kind of company?
5    Q    What was its main product?
6    A    It was a messaging product with -- it
7 would distribute music through a messenger.
8    Q    Did that product evolve at all through
9 2016?
10    A    Through 2016.  Sorry.
11    Q    You said it was a messenger product
12 linked to music.  Was that the product as it
13 existed through 2016, or did it evolve?
14    A    Oh, through 2016.  No, it evolved.
15    Q    But it was still essentially a messenger
16 service or application?
17    A    Yes.  Yes, it was.
18    Q    When was Kik Messenger launched?
19    A    It was launched in a beta form in, I
20 believe, April of 2010 and then it launched in a
21 full production version in October, roughly, of
22 2010.
23    Q    By "beta," do you mean sort of a pilot
24 status?
25    A    Correct.

38

1    Q    In 2010, did you take the title of both
2 chief financial officer and chief operating
3 officer?
4    A    Yes, I did.
5    Q    For how long did you retain your chief
6 financial officer role?
7    A    Right through until I left in June of
8 2018.
9    Q    How long did you retain your chief
10 operating officer role?
11    A    I maintained that till -- I believe it
12 was around April, May of 2018, if I recall
13 correctly.
14    Q    That's how long you kept your COO role?
15    A    Until then.
16    Q    In 2018?
17    A    Sorry, 2017.
18    Q    April or May 2017, correct?
19    A    I believe so.  I'm just trying to think.
20 Yes.
21    Q    If you take Exhibit 21 and look at page
22 20, line -- it's page 20 on --
23    A    Sorry, okay.
24    Q    -- the small square in the page.  Let me
25 know after you've looked at page 20.

39

1    A    Yes, April 2017, yes, that's correct.
2    Q    Okay.  You can put that down.
3        I'll just refer to them as CFO and COO.
4    A    Okay.
5    Q    In these roles, to whom did you report?
6    A    To Ted Livingston.
7    Q    Who was Mr. Livingston?
8    A    Mr. Livingston was the CEO.
9    Q    Of Kik?
10    A    Yes, he was.
11    Q    As CFO, did you supervise Kik's
12 accounting and finance functions?
13    A    Yes, I did.
14    Q    During your time at Kik, did the company
15 establish facilities in Waterloo in Ontario,
16 Canada?
17    A    Yes, it did.
18    Q    When did it do that?
19    A    Ted, when I met him, was in Toronto.  I
20 believe he moved down to Waterloo in September
21 of -- around 2009 in the fall -- summer or fall of
22 that year.
23    Q    Did Kik establish offices in other
24 cities?
25    A    Yes, it did.

40

1    **Q**   Which cities?
2    **A**   It established an office in Toronto and
3    in New York and in eventually Tel Aviv, and then
4    we had personnel working in San Francisco, in
5    L.A. -- or L.A., sorry.  Not San Francisco.
6    **Q**   When did Kik establish the New York
7    office?
8    **A**   I can't really recall.  It would have
9    been --
10   **Q**   Was it before 2015?
11   **A**   It may have been.  I can't really recall
12   exactly when that office started.  We started in a
13   WeWork facility, and then we established a
14   full-time office, but I can't really recall what
15   those years were.
16   **Q**   Was it in operation in 2017?
17   **A**   Yes, it was.
18   **Q**   For how many months in 2017?
19   **A**   I think it would have been the full year
20   in 2017.
21   **Q**   Approximately how many employees were in
22   the New York office?
23   **A**   It varied but --
24   **Q**   In 2017.
25   **A**   In 2017.  Probably around ten.

41

1    **Q**   Did you also serve on Kik's Board of
2    Directors?
3    **A**   Yes, I did.
4    **Q**   When did you become a board member?
5    **A**   When the A round was done, which would
6    have been around -- that would have been December
7    of 2010.
8    **Q**   When you say "A round," is that a form
9    of financing?
10   **A**   Yes.
11   **Q**   That's a sale of stock to investors?
12   **A**   Yes, it is.
13   **Q**   While at Kik, did you own Kik stock?
14   **A**   Yes, I did -- yes, I did.
15   **Q**   As of the end of 2016, approximately how
16   many shares did you own?
17   **A**   I don't know the number of shares.  It
18   would have been around anywhere from 3 to
19   4 percent of the company.  I think -- sorry, I'll
20   take that back.  It was probably about a million
21   shares.
22   **Q**   That was 3 or 4 percent of the company?
23   **A**   Yes.
24   **Q**   Is it fair to say that Kik had some
25   success with Kik Messenger?

42

1    **A**   Yes, it did.
2    **Q**   Did Kik Messenger have millions of
3    users?
4    **A**   Yes, it did.
5    **Q**   Is it also fair to say that at least
6    before the middle of 2017, Kik had challenges in
7    making money from Kik Messenger?
8    **A**   Yes, it did.
9    **Q**   Kik tried to make money off of Messenger
10   by working with something called points.  Do I
11   have that right?
12   **A**   That's correct.
13   **Q**   And Kik tried to make money by working
14   with something called Promoted Chats?
15   **A**   Yes, it did.
16   **Q**   As a result of these efforts, did Kik
17   make significant revenue compared to expenses
18   before 2017?
19   **A**   No, it didn't.
20   **Q**   Is it correct that for the fiscal year
21   ended June 30th, 2016, Kik's audited financial
22   statements showed a comprehensive loss of
23   approximately $29 million?
24   **A**   I would say approximately, yes.
25   **Q**   Is it correct that for the fiscal year

43

1    ended June 30th, 2017, Kik's audited financial
2    statements show a comprehensive loss, after a tax
3    recovery, of approximately $16.9 million?
4    **A**   That's probably correct.
5    **Q**   Is it correct that for the fiscal year
6    ended June 30th, 2017, before the tax recovery is
7    factored in, the statements show that Kik lost
8    approximately $32.8 million?
9    **A**   I would have to see the statement for
10   the exact number if you've got it there, but I
11   think that's probably roughly correct.
12            (Plaintiff's Exhibit 26 and Plaintiff's
13            Exhibit 27 were marked for
14            identification.)
15   BY MR. MENDEL:
16   **Q**   I'm showing you what's been previously
17   marked as 26 and 27.  Those are Deposition
18   Exhibits 26 and 27.
19            MR. SCHLEGELMILCH:  Actually they're in
20   the binders.
21            MR. MENDEL:  They're in the binders, and
22   counsel should all have copies.
23            MR. SCHLEGELMILCH:  Yes, they do.
24   **A**   So to your question in 2017 of a loss
25   before tax recovery, there was a loss of

44

1   $32,887,544.
2       Q   What exhibit are you looking at?
3       A   I'm looking at Exhibit 27.
4       Q   Does Exhibit 27 appear to be the audited
5   financial statement for Kik for the fiscal year
6   ending June 30th, 2017?
7       A   Yes, it does.
8       Q   Same question for Exhibit 26.  Is that
9   Kik's audited financial statement for the fiscal
10  year ended June 30th, 2016?
11      A   Yes, it is.
12      Q   Kik does business in U.S. dollars?
13      A   Yes, it does.
14      Q   Did both audited financial statements
15  for the years 2016 and 2017 fairly reflect Kik's
16  financial results for those years?
17      A   Yes, they did.
18      Q   I'll take 26 and 27 back, please.
19          In late 2016, early 2017, was Kik
20  struggling with growing the numbers of its users
21  of Kik Messenger?
22      A   Yes.  They were not increasing.  They
23  were declining.
24      Q   This was recognized within the company,
25  correct?

45

1       Q   Which investment bank was that?
2       A   Credit Suisse.
3       Q   And did Credit Suisse contact a number
4   of other businesses to see if they had an
5   interest?
6       A   Yes, they did.
7       Q   Of the businesses contacted, none of
8   them were interested in buying Kik at that time,
9   correct?
10      A   At that time, no.
11      Q   And Kik decided to take a break from
12  that process to look at other options for its
13  business plan; is that right?
14      A   Yes, it did.
15      Q   Around this time at the end of 2016,
16  early 2017, after the Credit Suisse process -- the
17  Credit Suisse process had been implemented and
18  tried, did Mr. Livingston, Kik's CEO, did he start
19  to raise internally the possibility of issuing a
20  cryptocurrency?
21      A   Yes, he did.
22          (Plaintiff's Exhibit 28 was marked
23          for identification.)
24  BY MR. MENDEL:
25      Q   I'm showing you what's been marked

47

1       A   Yes, it was.
2       Q   In late 2016 and early 2017, was Kik
3   struggling to find a way to monetize Kik
4   Messenger?
5       A   We were looking at different options to
6   monetize the Messenger.
7       Q   Would you state that you were
8   struggling -- not you personally, but was Kik, the
9   company, struggling to find a way to monetize Kik
10  Messenger?
11      A   I don't know if I would use the word
12  "struggling."  Every start-up looks to different
13  models to monetize, and so we were trying to
14  evaluate which the best one would be.
15      Q   Was there any significant revenue to
16  speak of?
17      A   No, there wasn't.
18      Q   Had any of the strategies up until then
19  for monetizing Kik Messenger, had they proved
20  successful?
21      A   No, they hadn't.
22      Q   In 2016, did Kik engage an investment
23  bank to look to see if there were other businesses
24  that were interested in buying Kik?
25      A   Yes, they did.

46

1   Deposition Exhibit 28.
2           MR. MENDEL:  Luke, I have one more
3   binder.  Do you want one?
4           MR. CADIGAN:  That's fine.  Thank you.
5   BY MR. MENDEL:
6       Q   Mr. Heinke, do you recognize Deposition
7   Exhibit 28?
8       A   Yes, I do.
9       Q   For the record, this was marked
10  previously as an Exhibit 12B.  That's on the first
11  page.  Do you see that?
12      A   Yes, I do.
13      Q   What is Exhibit 28?
14      A   It's the deck for the board meeting.
15      Q   Which board meeting?
16      A   Of -- I think there's a date here, is
17  there not?
18      Q   Let's -- go ahead.
19      A   It says February 1st, 2017.
20      Q   There's a cover page, right?  The first
21  page of Exhibit 28 is an email from Mr. Livingston
22  to Kik Board, correct?
23      A   That's correct.
24      Q   You were a member of the Board at the
25  time, right?

48

1      A    Yes, I was.
2      Q    So you received this?
3      A    Yes, I did.
4      Q    And Mr. Livingston writes in his email,
5  attaching the board presentation -- I'll read it
6  out loud -- "With no bids coming out of the
7  process and a continued decline in our metrics, we
8  are in a precarious position to say the least.
9  Therefore, I would like to spend the majority of
10  the meeting discussing the options to extend our
11  runway."
12          Did I read that correctly?
13      A    That's correct.
14      Q    He sent that to the Board?
15      A    Yes, he did.
16      Q    Was it common practice to circulate a
17  set of slides to the Board of Directors before
18  board meetings?
19      A    Yes, it was.
20      Q    Were you typically responsible for
21  portions of these board decks?
22      A    Yes, I was.
23      Q    Did you take care of the financial and
24  administrative elements of the board decks?
25      A    Yes, I did.

49

1      Q    Did Mr. Livingston typically review the
2  entire decks before they were circulated?
3      A    Yes, he did.
4      Q    Would the chairman of the Board
5  sometimes also review them as well?
6      A    Yes, he would.
7      Q    Was that Sam Spadafora?
8      A    Yes, that is.
9      Q    Within Exhibit 28, if you could, do you
10  see the small numbers on the lower right-hand
11  corner ending in -- well, it says
12  KIK_FOUNDATION_CAP_, and then there's a string of
13  numbers. Do you see that?
14      A    Yes.
15      Q    I might refer to those as Bates numbers.
16          Can you turn to the pages -- turn to the
17  page ending in 5717.
18          Are you there?
19      A    Yes.
20      Q    That page is just an introductory slide
21  that says, "Our metrics continue to decline,"
22  correct?
23      A    Correct.
24      Q    This is the deck for the board meeting
25  on February 1st, 2017?

50

1      A    Yes, it is.
2      Q    And then the following pages ending in
3  numbers 5718, 5719, 5720, 5721, and 5722, those
4  all show different metrics declining?
5      A    Yes, they do.
6      Q    The first one is "Daily average users
7  continues to decline," and there's a chart showing
8  a downward trend?
9      A    Yes, it does.
10      Q    The next page is "Monthly average users
11  continues to decline"; is that right?
12      A    Yes.
13      Q    Then the next page is -- I'm on 5720 --
14  DAU/MAU continues to decline." Is that a
15  composite metric?
16      A    Yes.
17      Q    DAU is daily average users, and MAU is
18  monthly average users, correct?
19      A    That is correct.
20      Q    5721, "Activation continues to decline,"
21  correct?
22      A    Correct.
23      Q    The last one is "Retention continues to
24  decline," correct?
25      A    Yes.

51

1      Q    These metrics came from Kik's data team;
2  is that right?
3      A    That is correct.
4      Q    You believe them to be correct?
5      A    I do believe them to be correct.
6      Q    Can you turn to page 5739.
7      A    Okay.
8      Q    This is an introductory slide saying
9  "extending runway" -- "extending runway," correct?
10      A    Correct.
11      Q    What is runway?
12      A    A Runway is the length of time a company
13  normally has cash flow to operate.
14      Q    Is it cash flow or the amount of cash,
15  sort of, it has to operate?
16      A    It can be -- it would be cash it has and
17  then cash -- any cash it generates during the
18  period.
19      Q    Basically, it's a projected life span.
20      A    Exactly. You could say that.
21      Q    It's true, is it not, that the board
22  members consistently requested that you provide
23  runway information in your presentations in 2017?
24      A    It's a fairly standard piece of
25  information that every start-up normally asks for

52

1  for the Board.
2      Q   And did Kik still consider itself a
3  start-up?
4      A   Yes.
5      Q   One board member in particular was
6  concerned about cutting back expenses; is that
7  right?
8      A   That's correct.
9          MR. CADIGAN:  Objection.
10     Q   You can answer.
11     A   Paul Holland.
12     Q   He was focused on cutting expenses?
13     A   Yes, he was.
14     Q   He was particularly interested in the
15  runway slides?
16     A   Yes.
17     Q   But it's fair to say that the runway was
18  important to the entire Board, correct?
19     A   Correct.
20     Q   And it was important to you.
21     A   Yes, it was.
22     Q   Can you turn to page ending in 5740.
23  This is another slide.
24         It says at the top "Where are we now,"
25  correct?

53

1      A   That's correct.
2      Q   And then I'm going to read from the
3  slide.  Under that caption it says, "Current
4  Situation," bullet, "26 million in cash," bullet,
5  "3.1 million current burn," and then third bullet,
6  "Runway to September 5th, 2017."
7          Did this accurately reflect Kik's
8  financial situation at the time?
9      A   I'm not really sure because I saw in
10  some documents we had at that time that I think we
11  extended runway until the end of November.
12     Q   Okay.
13     A   So ...
14     Q   But as of February 1st, do you have any
15  reason to think this wasn't Kik's financial
16  situation?
17     A   No, that's probably around accurate,
18  within a month or two.
19     Q   It wouldn't have been your practice to
20  include incorrect information to the Board, would
21  it?
22     A   No, we would show conservative
23  information, though.
24     Q   What do you mean by "conservative"?
25     A   That we would be more aggressive in

54

1  terms of reducing the amount of runway than having
2  it extend out farther.
3      Q   Fair enough.
4          3.1 million current burn, is that a
5  monthly burn rate?
6      A   Yes.
7      Q   Looking at Exhibit 28 now, do you have
8  any memory of looking at this same document during
9  your investigative testimony last year in 2018?
10     A   I don't recall offhand, but I assume it
11  was there, presented.
12     Q   At the February 1 meeting of the Board,
13  did the Board discuss existing runway?
14     A   Yes, it did.
15     Q   During this discussion, did the Board
16  debate whether to cut expenses as a way to extend
17  runway?
18     A   I would say we discussed it.
19     Q   Cutting expenses would have meant laying
20  off employees?
21     A   Yes, it would include laying off.  It
22  wouldn't be the only thing we would look at.
23     Q   You would consider a range of options,
24  right?
25     A   Yes.

55

1      Q   Can you turn to the page ending in 5741.
2  It says, "What are our options?"  I think you just
3  went right by it.  5741.
4      A   This one?  Yes.
5      Q   Okay.  And then that introduces the next
6  section of this presentation?
7      A   That's correct.
8      Q   And then if we skip ahead -- these pages
9  discuss what the Board was considering, the
10  different types of things, steps it could take,
11  correct?
12     A   Yes, it is.
13     Q   All right.  So, can you flip to 5747.
14  At the top of the page there it says, "Investment
15  Alternatives," right?
16     A   Yes.
17     Q   And these are different investment
18  options that Kik was considering?
19     A   Yes, it is.
20     Q   These would be investments into the
21  company, correct?
22     A   I don't think they would -- they would
23  be investments in the company.  I think
24  cryptocurrency was discussed at that time as being
25  more a business model aspect, not necessarily an

56

**Page 57**

1  investment.
2  **Q**  But it's listed under "Investment" --
3  **A**  Yes.
4  **Q**  -- "alternatives" here, correct?
5  **A**  Correct.
6  **Q**  All right.  And that's -- you just
7  mentioned cryptocurrency.  That's the fifth bullet
8  down.  There's five bullets, and cryptocurrency is
9  the fifth one, right?
10  **A**  That's correct.
11  **Q**  Let's go to page 5752.
12     Here is a page with "Cryptocurrency" at
13  the top, correct?
14  **A**  That's correct.
15  **Q**  This is just discussing the
16  cryptocurrency option?
17  **A**  Yes.
18  **Q**  And you have "Current Status."  It says,
19  "Consider launching a new cryptocurrency called
20  'Kik Coins.'"
21     Was that the option being considered?
22  **A**  Yes.
23  **Q**  And then below there's a couple
24  additional bullets, and then it says, "Key
25  Considerations," and there's a "Pros" column and a

**Page 58**

1  "Cons" column.  Under the "Pros" column, there is
2  another bullet that says, "New way to raise funds
3  that is in vogue"; is that right"?
4  **A**  Correct.
5  **Q**  And in the "Cons" column it says, "Large
6  pivot in business model"; is that right?
7  **A**  Yes.
8  **Q**  The Board at this meeting discussed
9  cryptocurrency as a new way to raise funds; isn't
10  that right?
11  **A**  I think that was one aspect of it.  If
12  you look at the second point under "Pros" that you
13  didn't mention, was that it's an "Immediate value
14  exchange on Kik to power transactions."
15  **Q**  Okay.  So is both of them including a
16  way to raise funds, correct?
17  **A**  No.  One is a business model aspect, and
18  one is -- when you say "raise funds," I mean, my
19  looking at Kik Points, and as reflected in our
20  financial statements, it was a sale of a product.
21  So that's a way of getting funds into the
22  business.  If you want to -- that's how I look at
23  it.
24  **Q**  Cryptocurrency was an option for
25  extending Kik's runway, was it not?

**Page 59**

1  **A**  Yes, it was.
2  **Q**  And cryptocurrency was also a -- it
3  would have been a large pivot in Kik's business
4  model; isn't that right?
5  **A**  He has it defined as that.  I wouldn't
6  state that, looking in retrospect now, because
7  what we did was we had Kik Points and we had an
8  ecosystem formed.  And all we were doing was
9  replacing the Kik Points with the cryptocurrency,
10  which had, you know, broader ability to have usage
11  outside of what we were using Kik Points for.
12  **Q**  You said "he."  Did someone else write
13  these words "Large pivot in business model"?
14  **A**  I think those -- I don't recall who
15  prepared these slides, but it would have been -- I
16  don't know -- it could have been either Derek,
17  Tanner, Ted, or myself.
18  **Q**  Mr. Livingston would have reviewed this
19  before it went to the Board, correct?
20  **A**  Yes.
21  **Q**  Was this meeting the first time that the
22  Board substantively discussed starting a new
23  cryptocurrency?
24  **A**  I think it's the first time the Board
25  probably looked at cryptocurrency, but Ted had

**Page 60**

1  been involved in looking at Bitcoin and other
2  currencies since, I think, 2011.
3  **Q**  Right.  But this is the first time that
4  the Board was sitting down and thinking about it
5  in sort of a sustained way?
6  **A**  Yes.
7  **Q**  What happened as a result of this
8  meeting with respect to cryptocurrency -- the
9  cryptocurrency idea?
10  **A**  I believe at this meeting it was
11  discussed that we should continue and investigate
12  it as an option for a business model.
13  **Q**  Did Kik's management receive approval to
14  look further at the option of cryptocurrency?
15  **A**  Yes.
16  **Q**  Were they instructed to go and consider
17  the option in a more sustained way?
18  **A**  Yes, they were.
19  **Q**  I'll take that exhibit back from you.
20     (Plaintiff's Exhibit 29 was marked for
21     identification.)
22  BY MR. MENDEL:
23  **Q**  Mr. Heinke, I'm giving you what's been
24  marked Deposition Exhibit 29.  Take a moment to
25  look at it.

1    So 29 is an email chain, correct?
2    A   Yes.
3    Q   At the top it's -- the most recent
4 email, it's from you, Peter Heinke, to Ted
5 Livingston on February 3rd, 2017?
6    A   Yes.
7    Q   So this is a few days after the board
8 meeting that we just talked about, right?
9    A   Yes.
10   Q   You're responding to an email from
11 Mr. Livingston, right?
12   A   Yes.
13   Q   And Mr. Livingston is forwarding an
14 email written to him from Jim Estill.  Is that a
15 board member?
16   A   Yes, it is.
17   Q   So Mr. Estill had written his email on
18 February 2nd, the day before 2017.
19   A   Yes.
20   Q   And one of his ideas was to prepare four
21 to five slides on the cryptocurrency idea for the
22 rest of the Board, right?
23   A   Yes.
24   Q   And Mr. Livingston forwarded it to you
25 on February 3rd, and then you responded on

61

1 February 3rd, "I agree, why I am having Tanner
2 make up the slides that if you looked at this as
3 an investment - will provide the framework,"
4 right?  That's what he wrote?
5    A   I see that written, yes.
6    Q   Then you wrote, "There are nuances here
7 that you have to consider also from a securities
8 law standpoint," right?
9    A   Yes.
10   Q   This reflected your view that creating a
11 cryptocurrency could raise securities law issues,
12 correct?
13   A   When you say my view, I would -- like
14 anything, I would look at this as to what the
15 different implications were from a regulatory
16 standpoint, whether it would be for security or
17 for -- because we looked a lot also at Kik cash.
18 So there were all sorts of rules to consider at
19 that point in time.
20   Q   And securities laws were among the rules
21 you were all looking at.
22   A   Yes.
23   Q   I'll take that back.
24       Can you look in your -- I have it.
25 Never mind.

62

1       (Plaintiff's Exhibit 4 was marked for
2       identification.)
3 BY MR. MENDEL:
4    Q   I'm giving you what's being marked
5 Deposition Exhibit 4.  For the record, the
6 Investigation Exhibit 14A.
7       Exhibit 14A -- I'm sorry, Exhibit 4,
8 this is another deck presentation for a board
9 meeting, right?
10   A   Yes, it is.
11   Q   This meeting is on February 16th, 2017?
12   A   Yes, it is.
13   Q   This was about three weeks after the
14 prior board meeting when the idea of the
15 cryptocurrency was first substantively discussed?
16   A   Yes, it is.
17   Q   Mr. Livingston and other executives are
18 providing the Board a follow-up to the issues you
19 had discussed, right?
20   A   Yes, it is.
21   Q   On cryptocurrency.
22       If you turn to page ending in 6542.
23 This says, "Agenda," right?  Are you there?
24   A   These numbers are pretty small.
25   Q   They are pretty small.

63

1    A   36?
2    Q   Slide 2.  Maybe that's it.  Just turn
3 the page.
4    A   This one?  I'm sorry.
5    Q   Do you see that?
6    A   Yes.
7    Q   Slide 2, "Agenda"?
8    A   Yes, I do.
9    Q   It's just three enumerated items,
10 "Process update, Ted"; "The potential for an ICO,
11 Erin"; and, 3, "The potential for growth, Eran."
12       Ted, that's Ted Livingston.  Erin is
13 Erin Clift?
14   A   Correct.
15   Q   And she was the chief marketing officer?
16   A   Correct.
17   Q   And Eran was Eran Ben-Ari, right?
18   A   Correct.
19   Q   Chief product officer?
20   A   Yes.
21   Q   And you all reported to Ted Livingston,
22 the CEO, right?
23   A   That's correct.
24   Q   Then go to 6455.
25       Again, kind of hard to read, but it

64

1  says, "Kik in the blockchain."  Are you there?
2      A   Yes, okay.
3      Q   You're at that slide.  This starts a
4  discussion of the cryptocurrency, right?
5      A   Right.
6      Q   Okay.  And then, slide 11, ending in
7  461, let me know if you're there.
8      A   Yes.
9      Q   This is a slide with a blockchain
10  insignia or a circle in the middle of the page,
11  right?
12      A   Correct.
13      Q   And below, it says, "We believe that the
14  scale of our network alone will drive strong
15  interest from the cryptoinvestor community,"
16  correct?
17      A   Correct.
18      Q   Was this Ms. Clift's portion of the
19  presentation?
20      A   I can't recall that.
21      Q   Was it yours?
22      A   No, I don't think I presented -- if you
23  looked at the beginning, the agenda suggested that
24  I wasn't.  It was Ted --
25      Q   It was Mr. Livingston --

65

1      A   -- Eran and/or Erin.
2      Q   Erin.  Do you think Erin or Eran would
3  have done this?
4      A   Probably.
5      Q   Did the Board discuss this statement?
6      A   Yes.
7      Q   Then if you turn to page 46 -- ending in
8  463.  That states at the top, "Crowdfunders have
9  strong appetites for exploration," right?
10      A   Correct.
11      Q   And below -- right below that, on the
12  left side, there is a large circle.  It says,
13  "68 percent," and then next to it, "Would invest
14  in a tradeable -- tradeable digital tokens of a
15  non-blockchain company if offered good risk-reward
16  potential."
17          Is that what it says?
18      A   Yes.
19      Q   And Kik considered itself a
20  non-blockchain company at the time?
21      A   I believe so, yes.
22      Q   Did this observation come from another
23  company called CoinFund?
24      A   Yes.
25      Q   How do you know that?

66

1      A   I believe CoinFund was one of the
2  companies at that time -- I'm just trying to think
3  of timing-wise -- that we had engaged to
4  understand the whole blockchain environment
5  better.
6      Q   Can you turn to page ending in 471.
7          This is under the section "Next Steps."
8  It was the prior page, right?
9      A   This is -- this one?
10      Q   Correct.  You're on the right page.  If
11  you flip back a page, it's under the section "Next
12  Steps."
13      A   Got it.
14      Q   Okay.
15          This says, "Three weeks to gauge
16  preliminary investor interest," right?
17      A   Correct.
18      Q   And this is still talking about
19  cryptocurrency?
20      A   It is.
21      Q   And there's four steps listed
22  immediately below, and next to those four steps it
23  says, "CoinFund"?
24      A   Yes.
25      Q   Under each -- next to each of the four

67

1  steps, it says either one or two weeks?
2      A   Yes.
3      Q   These were all tasks assigned to
4  CoinFund for going forward?
5      A   I believe so, yes.
6      Q   And the second step, the description is
7  "Market fit between Kik and cryptoinvestors,"
8  right?
9      A   Correct.
10      Q   Did Kik go ahead and take some
11  additional weeks to gauge preliminary investor
12  interest?
13      A   Take additional weeks?  I believe so.
14  This is a period of time when we were still
15  integrating Rounds of Israel.  So I was heavily
16  involved with Rounds and still doing the
17  acquisition there so the marketing research and
18  all this sort of stuff was handled by Erin and her
19  team during this time.
20      Q   Just so we understand, Rounds was an
21  acquisition Kik was involved in?
22      A   Yes.  We had in December of 2016
23  purchased Rounds, which was a video-based
24  messaging company in Tel Aviv.  So we acquired it
25  for both the technology and for the people that

68

1    were in that company.
2    Q    Going back to this slide in the exhibit,
3    where it says, "Three weeks to gauge preliminary
4    investor interest," that was sort of on a
5    going-forward basis for next steps, right?
6    A    I would assume so.
7    Q    You would assume so because it's in the
8    "Next Steps" section?
9    A    Yes.
10   Q    Is it fair to say at this stage that not
11   all the board members were enthusiastic about the
12   crypto idea?
13       MR. CADIGAN:  Objection.
14   A    I can't conjecture that.  I mean,
15   Paul's -- as you identified earlier, Paul's
16   objections were more about reducing cash flow, and
17   a lot of them, it was new to them also.  I
18   wouldn't say there was -- I can't recall there was
19   a major negative reaction to it.
20   Q    Mr. Holland was concerned about
21   expenses?
22   A    He was --
23       MR. CADIGAN:  Objection.  I'm sorry.
24   Q    Your understanding.
25   A    It was --

69

1    Q    That was your understanding?
2    A    My understanding was he was more
3    concerned about expenses, yes.
4    Q    Was it your understanding that he was
5    proposing to cut down -- cut Kik to about 50 to 60
6    employees?
7    A    That is what he suggested, yes.
8    Q    I'll take that back.
9        Did Kik hire CoinFund to help the
10   company assess the idea of a digital token?
11   A    I don't know if that was a specific
12   thing -- we didn't have a -- we did to hire them
13   to help us out with that.
14   Q    And they were hired to help with the
15   four steps we just read about?
16   A    Yes, I believe so.
17   Q    Did you have responsibility for
18   negotiating the arrangement with CoinFund?
19   A    I did -- I did, yes.
20   Q    You did, okay.
21       (Plaintiff's Exhibit 6 and Plaintiff's
22       Exhibit 30 were marked for
23       identification.)
24   BY MR. MENDEL:
25   Q    So I've given you what's been marked

70

1    Deposition Exhibits 6 and 30.
2    A    Uh-hmm.
3    Q    Just for the record, the one that says
4    6, that also has the Investigation Exhibit No. 39
5    on it, right?
6    A    Correct.
7    Q    And the one that says Deposition Exhibit
8    30, that says Investigative Exhibit 170?
9    A    Yes.
10   Q    Great.
11       So going to, first, the one that says 6,
12   is this a report that CoinFund delivered to Kik?
13   A    Yes, it is.
14   Q    It has a date of March 21st, 2017?
15   That's when they delivered it?
16   A    That's correct.
17   Q    You received the report, right?
18   A    Yes, I did.
19   Q    You reviewed it?
20   A    At the time, yes.
21   Q    Did this report provide information that
22   Kik had asked for about a cryptocurrency?
23   A    Yes, it did.
24   Q    If you look at Exhibit 30 for a second,
25   please.  At the top it says, "Review of CoinFund

71

1    Deliverable."
2        This is an internal Kik document, right?
3    A    Yes, it is.
4    Q    A summary of notes?
5    A    Yes.
6    Q    It's dated March 22nd, 2017, right?
7    A    Correct.
8    Q    What is this?
9    A    It's a review of CoinFund deliverable.
10   So it was to the management team, it looks like.
11   Q    You're listed as an attendee, right?
12   A    That's correct.
13   Q    Erin Clift is listed here, too, right?
14   A    Yes, she is.
15   Q    And so is Mr. Ben-Ari?
16   A    That's correct.
17   Q    So going back to 6 -- Exhibit 6, excuse
18   me.  And can you go to page 9 of Exhibit 6.
19       Are you there?
20   A    Yes.
21   Q    This is identified by the Bates number
22   as 7699 in the lower right corner.  So on this
23   page what we see are examples of tokens -- digital
24   tokens that were in the market at the time; is
25   that right?

72

1    **A**   Correct.
2    **Q**   That's what your understanding was?
3    **A**   That's correct.
4    **Q**   And at the bottom of the page, it
5    says -- this is CoinFund speaking -- actually, if
6    you could, go back a page, to page 7.  It says --
7    it starts the section called "Notable Token
8    Sales."  Then at the bottom of the page, "The
9    following outlines some observations about the
10   token sales space."
11       Are you with me?
12   **A**   Yes.
13   **Q**   It says, "The investment space is
14   extremely hot," right?
15   **A**   Yes.
16   **Q**   And "All of the tokens mentioned here
17   have generated returns at the time of the writing,
18   as measured on a U.S. dollars basis," right?
19   **A**   Yes.
20   **Q**   And the average return multiple is 15
21   times --
22   **A**   Yes.
23   **Q**   -- or 15X.  They say that and underline
24   it?
25   **A**   That's correct.

73

1    **Q**   This is all from CoinFund, right?
2    **A**   Yes.
3    **Q**   Could you go to page 19.
4        It says at the top, "CoinFund
5    Cryptoinvestor Survey," right?
6    **A**   That's correct.
7    **Q**   And then "Methodology."  I'm just going
8    to read from it.  "Working together with the Kik
9    team, CoinFund conducted a public and an open
10   source survey in the blockchain research and
11   investment community, targeting the set of people
12   who are knowledgeable and experienced in issues
13   surrounding blockchain-based decentralized
14   crowdfunding and known as 'cryptoinvestors.'"
15       You understood that -- I'll stop there,
16   reading there.  You understood CoinFund was
17   conducting a survey?
18   **A**   Yes, based on this report.
19   **Q**   If you could, go to page 25 of the
20   CoinFund report.
21       Ending in Bates number 7715, it says --
22   there's a section called "User vs. Investor
23   Interest."
24       Do you see that?
25   **A**   Yes.

74

1    **Q**   And then there's three -- three findings
2    below that, and it says, number 1, "19.3 percent
3    would forego participation"?
4    **A**   Yes.
5    **Q**   And the second one says, "48.4 percent
6    lean toward being investors only (with
7    21.5 percent being speculators)," right?
8    **A**   Yes.
9    **Q**   These were findings that CoinFund
10   reported to Kik?
11   **A**   Yes.
12   **Q**   I'll take back Exhibit 6, please, and
13   I'll take back the other one, too.  Thank you.
14       (Plaintiff's Exhibit 33 was marked for
15       identification.)
16   BY MR. MENDEL:
17   **Q**   I'm giving you what's been marked
18   Exhibit 33.
19   **A**   Okay.
20   **Q**   For the record, this was marked
21   previously as Exhibit 54 in the investigation,
22   right?
23   **A**   Yes.
24   **Q**   And this is an email from Jake Brukhman
25   to you on April 3rd, 2017?

75

1    **A**   Correct.
2    **Q**   Who is Mr. Brukhman?
3    **A**   He was the principal of CoinFund.  I
4    believe he was -- I think they're a partnership so
5    I think he was one of the partners.
6    **Q**   The email is to you, Hayeon Kim -- she's
7    at Kik, right?
8    **A**   Yes.
9    **Q**   -- Erin Clift, and then there's an email
10   address that says, "Core Team," right?
11   **A**   Yes.
12   **Q**   Does exhibit -- well, I should say,
13   behind the email there's an attachment, right?
14   And it's "CoinFund Additional Research"?
15   **A**   Yes.
16   **Q**   So this is a supplemental report from
17   CoinFund?
18   **A**   Yes.
19   **Q**   Dated April 3rd, 2017, right?
20   **A**   Yes.
21   **Q**   Does this respond to questions that you
22   had raised?
23   **A**   I take it from this, yes.
24   **Q**   Why do you say that?
25   **A**   Because it says, "Questions from Peter."

76

1    Q   3-23, March -- it's fair to say those
2    were March 23rd questions from you?
3    A   Yes.
4    Q   What generated your questions?
5    A   What generated my questions?
6    Q   Yes.
7    A   I was learning -- trying to learn more
8    about cryptocurrency and what was involved in it.
9    So it was -- as I said, like, I just became aware
10   more about it at the board meeting.  I didn't
11   understand a lot about cryptocurrency at that
12   time.  So this is more still education for me at
13   that time.
14   Q   Were some of the questions generated --
15   or did they occur to you from reviewing the prior
16   report?
17   A   The prior report and just outside
18   industry information, what I was reading about.
19   Q   If you look at page 855 -- I think
20   you're already on it.  Actually, if you go back.
21   A   Yes.
22   Q   There's a diagram with the title "Token
23   Sale Participants" at the top there.
24       Do you see that?
25   A   Yes.

77

1    Q   There's a reference to -- in the diagram
2    itself, you have, "private investor" and to the
3    right, "cryptoinvestor."
4    A   Yes.
5    Q   You understood "cryptoinvestor" to refer
6    to people who would buy tokens through a public
7    sale; is that right?
8    A   No, I didn't understand that at that
9    time.
10   Q   What did you understand cryptoinvestors
11   to refer to?
12   A   We -- well, I can't really recall going
13   over -- but this was very early in the process,
14   and I can't recall when exactly we started
15   splitting out those people that we referred to as
16   capitalists in the white paper or participants,
17   and I'm not sure exactly what the timing was of
18   that.
19   Q   The next page, if you just go to the
20   next page at the top --
21   A   Yes.
22   Q   -- it states, "Cryptoinvestors," in
23   quotes, "include regular participants of token
24   sales as well as Kik users who are participating
25   in the sale by way of cryptocurrency."

78

1        That's a definition that CoinFund
2    provided, right?
3    A   That's correct.
4    Q   That didn't match your understanding at
5    the time?
6    A   I can't recall at the time.  We ended up
7    splitting them up between those people that we
8    reviewed more as sort of like what, I guess, he
9    would define as cryptoinvestors and those people
10   that we defined as participants in the ecosystem.
11       The nomenclature evolved over -- this is
12   going back -- this is very early in the process.
13   This is back in March.
14   Q   At this point in time, is it fair to say
15   that Kik was considering a sale that would include
16   all of those groups?
17   A   I can't recall when exactly at this
18   point in time, whether we were doing it as one
19   complete sale or two sales.
20   Q   Can you go to page 857?
21   A   Yes.
22   Q   It says, "Regulatory Bodies" at the top?
23   A   That's correct.
24   Q   This is still CoinFund responding to
25   your questions; is that right?

79

1    A   That's correct.
2    Q   There's a section that says, "FinCEN,
3    Department of Treasury."  Do you see that?
4    A   That's correct.
5    Q   Below that it says, "SEC," right?
6    A   That's correct.
7    Q   This is CoinFund responding to your
8    questions about SEC?
9    A   Yes.
10   Q   They say, first, under little a., "The
11   SEC has yet given no guidance that any particular
12   token offering is a security, and this guidance is
13   not expected in the near future," correct?
14   A   That's correct.
15   Q   And then b., "The SEC would potentially
16   apply the Howey test to determine if the sale of
17   such tokens would constitute an investment
18   contract," right?
19   A   Correct.
20   Q   And then it also says, "Some companies,
21   in an effort to defensibly avoid this
22   classification altogether, have structured their
23   offering outside of the U.S. and block U.S.
24   users," right?
25   A   That's correct.

80

1    Q    Did Kik later do this step when it
2  issued a Kin tokens?
3    A    I think we changed path quite a lot from
4  whether -- like, as I said, we viewed this fairly
5  early on as being a currency.  We were taking Kik
6  Points and replacing it with Kin.
7         So, as such, my concern was more with
8  relationship to viewing it as a currency, so
9  things like FinCEN, which we registered for at the
10 time, and we then also considered -- well, the
11 things that he talks about further here, about the
12 IRS, what are the tax implications, because we
13 viewed this as a taxable event.
14        I think it was also around this time
15 that we took the step of -- I can't really recall
16 time exactly, but we employed KPMG to take a look
17 at it from a financial reporting and tax
18 standpoint.  And relating to our previous, you
19 know, assessments of Kik currency, when we looked
20 at the card, we looked at that also.
21   Q    CoinFund had written in c., like I just
22 said, that "Some companies, in an effort to avoid
23 this classification altogether, have structured
24 their offering outside of the U.S. and block U.S.
25 users."

81

1         Did Kik do that?
2    A    No, we didn't.  Sorry, can I correct on
3  that?
4    Q    Sure.
5    A    We did eventually in certain areas
6  where, I think it was New York, that you needed a
7  BitLicense.  So we did block users from New York.
8    Q    Okay.  But it didn't block U.S.
9  generally?
10   A    No.
11   Q    Just to be clear, CoinFund did advise
12 you that issuing a cryptocurrency had SEC
13 implications, correct?
14   A    As they said at the top there, "The
15 following should not be construed as legal advice
16 and is provided for informational purposes only."
17 So they just made us aware it's possible that the
18 following regulators could come into play.
19   Q    Understood.  They're not lawyers, right?
20   A    That's right.
21   Q    But they were raising these --
22   A    Yes.
23   Q    They were responding and discussing
24 these issues with you.
25   A    That's correct.

82

1    Q    And CoinFund advised you, again, not in
2  the legal way, but that the SEC could employ the
3  Howey test, right?
4    A    That's what they said, yes, in this
5  document.
6    Q    By this time had Kik hired a general
7  counsel?
8    A    Yes, we had general counsel.
9    Q    Was she working from her home in Los
10 Angeles?
11   A    Sorry, no, when you say "general
12 counsel," we didn't hire general counsel until I
13 believe it was July or August.
14   Q    Okay.  That was Eileen Lyon?
15   A    That's correct.
16        MR. MENDEL:  Why don't we take a break.
17 Off the record.
18        THE WITNESS:  Okay.
19        THE VIDEOGRAPHER:  We are going off the
20 record.  This is the end of media unit number 1.
21 The time is 10:45 a.m.
22        (A brief recess was taken.)
23        THE VIDEOGRAPHER:  We're back on the
24 record.  This is the beginning of media unit
25 number 2.  The time is 10:57 a.m.

83

1  BY MR. MENDEL:
2    Q    Mr. Heinke, what's before you right now?
3    A    Exhibit 33.
4    Q    I'll take that back.
5         (Plaintiff's Exhibit 35 was marked for
6         identification.)
7    Q    I'm giving you, Mr. Heinke, what's been
8  marked Exhibit 35.
9         What is Exhibit 35?
10   A    It's an introduction email to the board
11 deck from April 2017.
12   Q    That's from Mr. Livingston to the Board?
13   A    That's correct.
14   Q    And does Mr. Livingston's email also
15 include the CoinFund report?  Actually, yes, go
16 ahead.
17   A    I'm not sure.
18   Q    Let's go back to the first page.
19   A    Got it, okay.
20   Q    In the second paragraph -- this is
21 Mr. Livingston's email -- introductory email, "For
22 those interested in doing some prereading" --
23   A    Sorry.  Okay.
24   Q    Do you see that?
25        -- "I have attached a deck that

84

1 summarizes how crypto fits into our chat community
2 strategy.  I have also added CoinFund's research
3 deliverable."
4        Then if you go to, flipping through,
5 KIK_, ending in 6657.
6    A   Got it, yes.
7    Q   Got it?  So that's Mr. Livingston
8 sending the March 21st CoinFund report to the
9 Board, right?
10    A   That's correct.
11    Q   Great.
12        For the record, that was Investi-- --
13 excuse me, Investigation Exhibit 16A?  It's on the
14 front.
15    A   Oh, yes.
16    Q   And Deposition Exhibit 35, right?
17    A   Correct.
18    Q   I'll take that back.  Thank you.
19        (Plaintiff's Exhibit 36 was marked for
20        identification.)
21 BY MR. MENDEL:
22    Q   Here is Deposition Exhibit 36.  This is
23 a one-page email on the front from Mr. Livingston
24 to Kik Board on May 4th, 2017, right?
25    A   Correct.

85

1 right?
2    A   No.  It's actually --
3    Q   Under the "Revised Forecast," it says,
4 "Last presented by November 7th," right?
5    A   Right.  But the document you showed me
6 earlier, we discussed it said "Runway to September
7 2017."  So it's not shaving it.  It's actually
8 extending from what that document was.
9    Q   We agree.  I mis- --
10    A   That's okay.
11    Q   I didn't make my question precise
12 enough.
13    A   Okay.
14    Q   The runway was extended from the
15 September 2017 cutoff --
16    A   Right.
17    Q   -- that had been projected in February.
18 Now it's in November.
19    A   That's correct.
20    Q   Fair enough.
21        And then it says, "Revised Forecast with
22 Severance, October 9th, 2017."
23    A   Correct.
24    Q   Severance means that's if it provide --
25 Kik would provide some sort of severance payment

87

1    Q   And that's attaching a board deck for
2 board meeting May 5th, 2017, right?
3    A   Correct.
4    Q   If we go to a section of the board deck
5 that ends in 6791 -- let me know if you're there.
6    A   Correct.
7    Q   All right.  This is captioned "Runway
8 Budget Versus Revised Forecast," right?
9    A   Correct.
10    Q   This has a revised runway forecast of
11 November 1st, 2017.
12    A   Correct.
13    Q   It's revised down from November 7th,
14 2017, right?
15    A   Correct.
16    Q   Is this what you were remembering before
17 about the runway going out further?
18    A   That's correct.
19    Q   Okay.  The earlier runway was back in
20 February and so now we're in May.
21    A   That's correct.  So the earlier one
22 ended -- the runway lasted per the projections
23 into September.  Now it's lasting in this one to
24 November.
25    Q   Okay.  But this is shaving it by a week,

86

1 to its employees if it were to shut down?
2    A   Correct.
3    Q   This slide reflects the runway that you
4 understood to exist in May, correct?
5    A   Correct.
6    Q   You presented this to the Board; is that
7 right?
8    A   Correct.
9    Q   Then let's go to 6799.  This begins a
10 section called "Cryptocurrency," correct?
11    A   Correct.
12    Q   And then let's go to page 7802.  It's
13 two pages forward.
14        MR. SCHLEGELMILCH:  6802.
15    Q   6802.  6802.
16    A   6802, yes.
17    Q   It says, "Step 1, create a new
18 cryptocurrency with 10 trillion tokens"?
19    A   Correct.
20    Q   That's what Kik was planning to do at
21 this step?
22    A   Correct.
23    Q   Below it lists different percentages
24 going to different types of groups.  And it says,
25 "30 percent to investors"; is that right?

88

1     A   That's correct, in this document, yes.
2     Q   Yes, in this document, on May 5th.  For
3  the May 5th board meeting it says, "30 percent to
4  investors," correct?
5     A   Correct.
6     Q   It says under that -- under "Investors,"
7  it says, "10 percent sold on day 1," correct?
8     A   Correct.
9     Q   In fact, that's what Kik eventually did
10  with Kin, it sold 10 percent of its float on day
11  1, right?
12     A   That's correct.
13     Q   That was 1 trillion Kin?
14     A   That's correct.  So just to take -- I
15  just want to go back because this isn't --
16  "community builder" so -- because we had
17  60 percent, we gave -- so this must have -- so
18  this has changed then afterwards, I guess.
19     Q   Okay.  This was just the plan as of
20  May 5th, 2017, right?
21     A   It was initial outline, yes.
22     Q   Okay.
23         Can we go to page 7806 -- 6806.  I'm
24  sorry, I misspoke.
25         Please go to page ending in 6806.

89

1     A   That's correct.
2     Q   Here we have a page -- a slide that just
3  says "Risks," correct?
4     A   Correct.
5     Q   And there's three risks listed.  The
6  first risk listed just says "Securities law,"
7  correct?
8     A   Correct.
9     Q   This was the risk that selling of Kin
10  tokens could be seen as the selling of a security;
11  isn't that right?
12     A   That gets into attorney-client privilege
13  because everything related to that is redacted
14  so ...
15     Q   But you -- I mean, it's fair to say,
16  independent -- and, please, counsel, jump in if
17  this is going on privilege -- but the topic being
18  discussed was whether the selling of Kin tokens
19  would be seen as the selling of a security.  Isn't
20  that what was encompassed by a securities law --
21     A   Correct.
22     Q   -- risk?
23         Okay.
24         And the Board discussed this during your
25  meeting?

90

1     A   Yes, it was discussed with counsel
2  present.
3     Q   Great.
4         Can you go to page 6810.  Are you there?
5  It says, "Timeline"?
6     A   Yes.
7     Q   I'm just going to walk through some of
8  the number -- the items here.  It's a graphic, is
9  it not?
10     A   That's correct.
11     Q   May 24th, it says, "Token Summit
12  Announcement."
13     A   Correct.
14     Q   Then for June, further on the timeline
15  it says, "Presale roadshow," right?
16     A   Correct.
17     Q   Then the next dot on the timeline is "To
18  be determined early July token distribution
19  event."
20     A   Correct.
21     Q   Then the last bullet on the timeline is
22  "To be determined full product launch," right?
23     A   Correct.
24     Q   So full product launch was planned at
25  this point for after the token distribution event?

91

1     A   At this time, yes.
2     Q   And then, who was the counsel with you
3  at the meeting where you discussed the securities
4  law issue?
5     A   Nancy Wojtas.
6     Q   Anybody else?
7     A   Not that I can recall.
8     Q   Was she there in person or on the phone?
9     A   I can't recall if this was a sit-down
10  meeting or a call-in meeting.  Does it -- it would
11  normally say at the beginning of the board
12  minutes.
13     Q   Let's go back.  This is just the board
14  deck, right?
15     A   Yes, it says, "Board meeting."  Yes, so
16  it would have been a call-in meeting.
17     Q   You see that from --
18     A   Look at reference 786.
19     Q   I'm there.
20     A   It says, "Board meeting."  So it says,
21  "Join call."
22     Q   And where -- where is -- Ms. Wojtas is
23  outside counsel, right?
24     A   Yes.
25     Q   What firm is she at?

92

1    A   Cooley's.
2    Q   Let's go to page ending in 815.
3        And we're back in the "Cryptocurrency"
4   section, right?
5    A   Yes.
6    Q   This says, "Sales Structure."  What is
7   this chart?
8    A   This shows the allocation, I guess, for
9   the tokens.
10   Q   Okay.  And the plan then was to sell 10
11  trillion tokens, right?
12   A   Correct.
13   Q   The float offered was 10 percent.  So
14  Kik would be offering, then, 1 trillion, or
15  10 percent, of the total token supply.  Do I have
16  that right?
17   A   Right.
18   Q   And then below, "Tiered Pricing
19  Discounts," there is a plan to offer some of
20  the -- part of the 10 percent, or 1 trillion
21  tokens, in tranches.  Do I have that right?
22   A   Right.
23   Q   And they vary in the level of discount.
24   A   Correct.
25   Q   Okay.  I'll take that back.

93

1    Q   -- 7?
2    A   Yes, the agenda item on 870.
3    Q   So based on 870, would you say that it
4   was voted on at this board meeting?
5    A   There's -- I don't have the resolutions
6   here in front of me so that's obviously an agenda
7   item, but I don't see the actual resolutions that
8   we were asking for in this.  If we go through the
9   document -- so it says here, if we go to slide
10  885 --
11   Q   885, yes.
12   A   -- "Kin roadmap:  Allocation schedule
13  approval; Announcement at Token Summit.  Approval:
14  Kin Whitepaper; Distribution of whitepaper post
15  announcement.  Kin Whitepaper Advisors."
16   Q   Did the Board approve all these things
17  at the May 23rd meeting?
18   A   There would have been a resolution, so
19  I'm not sure if there's a -- there would have been
20  a signed resolution, probably, or minutes
21  identifying that the approval was done.
22   Q   Is it fair to say the approval was given
23  before the public announcement?
24   A   Yes.
25   Q   Was the Board in -- unanimous about the

95

1        Thank you.
2        (Plaintiff's Exhibit 7 was marked for
3        identification.)
4   BY MR. MENDEL:
5    Q   I'm giving you what's been marked
6   Deposition Exhibit 7.  In the investigation it was
7   Exhibit 18A, as requested on the front.
8        One question.  At a certain point, the
9   Kik Board authorized the issuance of the
10  cryptocurrency or at least the offer of the
11  cryptocurrency, right?
12   A   Correct.
13   Q   Which board meeting did that
14  authorization take place?
15   A   I can't recall exactly which meeting it
16  was.
17   Q   Was it in May?
18   A   May have been.  As I said, I can't
19  recall.  I don't know if there's approvals in here
20  or resolutions proposed.
21   Q   Okay.
22   A   It says May.  It says second point is
23  "Approvals requested."
24   Q   You're looking at --
25   A   Looking at --

94

1   proposal to make the announcement of Kin?
2    A   Yes, it was.
3    Q   Did Mr. Holland vote in favor of that?
4    A   Yes, he did.
5    Q   In Exhibit 7, let's go to -- just to --
6   just to highlight the date here, this is May 23rd,
7   2017 --
8    A   Correct.
9    Q   -- and the public announcement was a
10  couple days later on May 25th, 2017?
11       Do I have that right?
12   A   I believe so.  I can't recall the exact
13  date.
14   Q   It was in May.
15   A   Yes.
16   Q   So this is just a few days before the
17  public announcement.
18   A   Right.
19   Q   Okay.
20       Let's go to the page ending in 871.
21       It says, "Update on crypto, sit-down
22  May 18th, 2017," right?
23   A   Yes.
24   Q   Is this, then, an excerpt of an internal
25  presentation at Kik that's included in the board

96

1  deck?
2      A    Correct.
3      Q    Below, it says -- below the slide it
4  says, "Thanks, Eran and team." So that's sort of
5  a reference to an internal effort at Kik, right?
6      A    Correct.
7      Q    At the sit-down, did you go? Did you
8  attend the sit-down?
9      A    I believe I did, but I can't recall
10  exactly.
11      Q    Did all offices attend by video?
12      A    Sorry?
13      Q    At the sit-down on May 18th, 2017, did
14  all of Kik's offices attend?
15      A    I believe so because we -- Tel Aviv
16  would have been the -- from a timing standpoint,
17  and I think they would have been -- they were on
18  this call.
19      Q    If it's a sit-down, it's usually an
20  all-employee-type meeting, right?
21      A    Yes.
22      Q    Let's go to 872, which is the next page.
23      A    The only reason I'm saying that --
24      Q    Yes.
25      A    -- is there have been meetings where we

97

1  have done a sit-down for North America, and then
2  we did another one, I believe, for Tel Aviv just
3  because of time differences sometimes.
4          I think this done was all, but I can't
5  really recall exactly.
6      Q    Okay. Fair enough.
7          Looking at page 6872, which is right
8  after the Update on Crypto slide. You see we were
9  close to it before.
10      A    Yes.
11      Q    You're there?
12          It says, there's a slide -- the slide
13  says, "Where we are," on the left-hand side,
14  "Token Summit NYC." There's a graphic that says,
15  "White Paper," and then on the right side, "Token
16  sale." It's sort of a two-event timeline. Then
17  below, there's language. And below the slide,
18  that's what would have been spoken at the meeting,
19  correct?
20      A    Correct.
21      Q    It says, "We are one week away from
22  announcing our intention to fundraise." Is this
23  what -- was this from Mr. Livingston, or was
24  somebody else talking here?
25      A    This would have been probably

98

1  Mr. Livingston.
2      Q    Okay. He says, "I'm doing a fireside
3  chat at Token Summit at NYC, and then we're going
4  to move pretty quickly into a roadshow followed by
5  the actual token sale likely in July."
6      A    Correct.
7      Q    That also was spoken by Mr. Livingston,
8  right?
9      A    Correct.
10      Q    Because Mr. Livingston was the one who
11  did the Token Summit.
12      A    Yes.
13      Q    This reflected Kik's plans at the time,
14  correct?
15      A    Correct.
16      Q    And it says then, "Next Thursday, after
17  we announce, we will be propping up a landing page
18  which will house the main marketing document for
19  our fundraise, the white paper."
20      A    Correct.
21      Q    And the white paper was Kik's main
22  marketing document for the offering; is that
23  right?
24      A    Correct. Well, you say offer. Yes, for
25  the token sale.

99

1      Q    By "propping up a landing page," what
2  does that mean?
3      A    I don't know, really, what that means,
4  quite frankly.
5      Q    Was that a landing page on a website?
6      A    I imagine so.
7      Q    Would that web page have been freely
8  accessible to people on the Internet?
9      A    I don't know if we had any sort of
10  restrictions on that one. I can't recall.
11      Q    You can't remember any restrictions on
12  access to the white paper, can you?
13      A    I can't recall either way.
14      Q    Let's go to page 878.
15          It says, "Division." Are you there?
16      A    Correct, yes.
17      Q    The slide says, "A decentralized
18  ecosystem of digital services for daily life,"
19  right?
20      A    Correct.
21      Q    And then in the presentation part -- or
22  the notes below, it says, "I'm going to take you
23  through four steps to realizing this vision."
24      A    Correct.
25      Q    This is still Mr. Livingston speaking?

100

1    **A**   I would imagine so, yes.
2    **Q**   Then the next page, 879, its says, "Step
3  1, create a new cryptocurrency."  Let me -- and
4  then it says below that, "Kin."
5        Was this the first time that employees
6  generally at Kik saw the term "Kin"?
7    **A**   You know what, I can't really recall if
8  this would have been the first time.  I'm not sure
9  of the timing as to when we finalized the name and
10  when it was presented, but it would have --
11    **Q**   Take Exhibit 21, which is your
12  transcript.  I'm going to refer you to page 223.
13  Again, it's the small square on the page.
14        Look at line 8 starting -- look at the
15  testimony starting on line 8 on page 223.
16    **A**   Okay.
17    **Q**   Then read up to the top of page 224.  Do
18  you see that?
19    **A**   (Document review.)
20        Yes.
21    **Q**   Does that refresh your memory?
22    **A**   Yes.
23    **Q**   Okay.  You can put the transcript down.
24        So do you think that this meeting was
25  the first instance in which Kik employees

101

1  generally saw the term "Kin"?
2    **A**   Yes, I said there, too, I think this is
3  the first time.
4    **Q**   Then going to page 880 -- this is the
5  next slide in the deck -- it says, "Step 2, give
6  value to Kin."
7        Did Mr. Livingston tell employees during
8  the sit-down that the second step was to give
9  value to Kin and this would be accomplished by
10  integrating Kin into Kik?
11    **A**   Yes.
12    **Q**   Did he tell the same thing to the Kik
13  Board?
14    **A**   Yes, he would have.
15    **Q**   Did Mr. Livingston tell Kik employees
16  that "increased usage means increased demand which
17  means increased value"?
18    **A**   Yes.
19    **Q**   Was that Kik's goal, to have increased
20  usage, which would mean increased demand?
21    **A**   With the increased usage, I think as I
22  describe back then, was the economy's success is
23  based on velocity, how many transactions occur,
24  and that's driven by increased demand and usage.
25    **Q**   The thought was that an increase in

102

1  demand would lead to an increase in the value of
2  the token; is that right?
3    **A**   Yes.  Over a period of time, yes.
4    **Q**   In your view, the best way for this to
5  happen was to have a system where the value would
6  increase steadily, right, not through like a spike
7  or a drop?  You wanted sort of an even increase in
8  the value of Kin.
9    **A**   Exactly.  Stability to it so it's not
10  highly volatile.
11    **Q**   But the ultimate objective was to go up
12  in value, correct?
13    **A**   Yes, eventually, yes.
14    **Q**   And you hired a consultant to work on
15  that with you, or no?
16    **A**   We hired a couple consultants.  We
17  hired -- CoinFund had an economist to help sort of
18  take a look at what was required in the economy,
19  and then we also hired McKenzie to help with that
20  part of it.
21    **Q**   Go to the next page, 881.
22    **A**   Sorry, there was also a third person.
23  It was Bill Raduchel, who was a foundation member.
24  He was a Ph.D. in economics from Harvard.  And
25  that was a lot of his background, too.  That's why

103

1  we had him on the Foundation -- a proposed
2  designee on the Foundation.
3    **Q**   When you said "foundation member," what
4  do you mean by that?
5    **A**   He was a proposed board director member
6  of the Foundation.
7    **Q**   But he -- did he ever become a director?
8    **A**   No.  He -- he was supposed to become,
9  and then when the SEC thing came out right away
10  after the token distribution event, he held off,
11  but we did still treat him as though he was a
12  foundation board member.
13    **Q**   He never had any voting authority for
14  the Foundation, did he?
15    **A**   No.
16    **Q**   And he never had any managerial
17  responsibility at Kik, correct?
18    **A**   No.
19    **Q**   Going to page 881, where it says, "Step
20  3, the Kin Rewards Engine."
21    **A**   Yes.
22    **Q**   So, going down below, where it says, "On
23  a high level, here is how this will work," this is
24  describing the Kin reward engine, right?
25    **A**   Correct.

104

1    Q   So I'll just read the three bullets
2  here.  Bullet number 1 says, "60 percent of the
3  total supply of Kin will be allocated to the
4  operation of a Kin Rewards Engine."
5        That's how it was conceived at the time,
6  right?
7    A   Yes.
8    Q   Then the second bullet, "Periodically,
9  KRE" -- meaning Kin Rewards Engine -- "will unlock
10 and distribute a specific amount of Kin to be
11 shared among all of the digital services that make
12 up the Kin ecosystem," right?
13   A   Correct.
14   Q   And then finally, the third bullet, "The
15 amount of reward received by each digital service
16 will be calculated by considering the volume of
17 Kin transactions originated from that digital
18 service," right?
19   A   Yes.
20   Q   These talking points accurately describe
21 Kik's plans for the reward engine, correct?
22   A   Correct.
23   Q   At the time of this meeting, Kik did not
24 know how the Kin Rewards Engine would run, though,
25 right?

105

1    A   No.
2    Q   And Kik had not created the algorithms
3  necessary to run the rewards engine; is that
4  right?
5    A   That's right.
6    Q   And the details of the reward engine
7  were not complete at the time of the token
8  distribution event; is that right?
9    A   No, they weren't intended to be complete
10 at the time of the token distribution event.
11   Q   And they are not complete.
12   A   No.
13   Q   It was never imagined that they would be
14 complete at the time of the token event?
15   A   No.
16   Q   And Kik knew that, right?
17   A   Yes.
18   Q   At this point, the Kin Rewards Engine,
19 it's just a hypothetical, right?
20   A   Yes.
21   Q   Page 883.  Well, let me just --
22   A   Can I just take a step back?  When you
23 say it was hypothetical, the Kik Rewards Engine,
24 there was still going to be Kin rewards issued but
25 just not through algorithms and that.

106

1    Q   What do you mean by "Kin rewards issued
2  but not through algorithms"?
3    A   I think if you go back to my testimony,
4  I think I talked about it last time, too, is that
5  one of the advisors was William Mougayar, and we
6  had talked about an automated algorithmic rewards
7  engine.  And he advised against it initially
8  because he said you don't understand the ecosystem
9  yet at that point in time.
10       But I think he -- it's in the -- I
11 recall reading it in the testimony I gave last
12 time.
13   Q   Ah, okay.
14       So functionally, then, would the
15 issuances be done?
16   A   How functionally?  It was --
17   Q   If you're saying it's not -- the Kin
18 Rewards Engine was conceived as an algorithm,
19 right?
20   A   Right.
21   Q   Okay.  So is your testimony that the
22 rewards operation would go manually?
23   A   Yes, I think there was some -- there was
24 an idea that -- I know there were discussions with
25 various potential consortium players, and that was

107

1  the intent, was that we would look at the
2  Foundation being independent and would award them
3  at somewhat a discretionary level to start, just
4  to incentivize people to build on the ecosystem.
5    Q   Are you aware of this being done, of
6  manual issuances?
7    A   I believe they are -- they were done --
8  I can't recall if they were done at that time.  I
9  know they are being done.
10   Q   Well, you became a foundation director,
11 right?
12   A   Right.
13   Q   This is skipping ahead.  Do you remember
14 any manual issuances being done by the Foundation
15 while you were director?
16   A   I don't recall any.
17   Q   And you were thinking about it, because
18 your testimony is that there was -- one of your
19 consultants was cautioning Kik against the
20 algorithm at first?  Is that what you're saying?
21   A   That's correct.
22   Q   Mr. Mougayar?
23   A   Yes.
24   Q   Was it envisioned, then, that the
25 issuances would be done by Kik employees?

108

1    **A**   No.  It would have been -- the envision
2   would have been done -- it would have been done by
3   the Foundation.
4    **Q**   Did the Foundation ever have any
5   employees while you were there?
6    **A**   No.
7    **Q**   Going to page 882, it says, "Step 4 of
8   the Foundation," right?
9    **A**   Yes.
10    **Q**   That refers to the Foundation that Kik
11   would set up?
12    **A**   Yes.
13    **Q**   Then page 883, the next page, it says,
14   "What this means for Kik," and there's four items
15   listed.  The first one is, under Kik, "Create
16   Kin."  That's the first thing listed.  And it
17   says, "Raise money, better terms," correct?
18    **A**   Correct.
19    **Q**   I'll take that one back.
20       Was that true, raise money, better
21   terms?
22    **A**   It was with --
23       MR. CADIGAN:  Objection.  Go ahead.
24    **A**   It was with the presale investors.
25    **Q**   The presale investors were who?

109

1    **A**   The presale investors were the
2   sophisticated, accredited investors that we had.
3    **Q**   Had those investors been identified by
4   the time of this board meeting on May 23rd, 2017?
5    **A**   I can't recall if they had been
6   identified at this time.
7    **Q**   But at this point you were thinking
8   about selling to accredited investors?
9    **A**   Yes.
10    **Q**   I took this away too quickly.  Here, I'm
11   going to give it back to you.
12    **A**   Okay.
13    **Q**   Let's go to page 889.
14       You're there, right?  It says,
15   "Proposed" -- this is another slide.  It says,
16   "Proposed product MVP."
17    **A**   Correct.
18    **Q**   What does MVP stand for?
19    **A**   Minimum viable product.
20    **Q**   And the plan was at this point to sell
21   the tokens to the public once Kik had created an
22   MVP; is that right?
23    **A**   That's correct.
24    **Q**   This is now part of the plan that was in
25   the board report?

110

1    **A**   Yes.
2    **Q**   It says under C, "All token users will
3   be eligible to receive -- to a" -- there's a word
4   missing.  "All token users will be eligible to a
5   premium sticker pack based on their status,
6   bronze, silver, gold," right?
7    **A**   Yes.
8    **Q**   It should say, "eligible to receive a
9   premium sticker pack," right?
10    **A**   Correct.
11    **Q**   When was the decision made to include an
12   MVP?
13    **A**   I can't recall.
14    **Q**   Was it before the May 23rd board
15   meeting?
16    **A**   I would imagine so because it's being
17   proposed here.
18    **Q**   Was it after the -- was it between the
19   May 4th board meeting that we talked about and
20   this board meeting?
21    **A**   I can't recall that.
22    **Q**   But it had been worked on before this
23   point, right?  Fair to say?
24    **A**   Before this point?
25    **Q**   Yes.

111

1    **A**   Yes.
2    **Q**   Who at Kik made a decision to include an
3   MVP?
4    **A**   I can't really recall.  It would have
5   been likely in consultation with counsel so -- but
6   I can't recall who exactly at that time.  At this
7   time I was also heavily starting to get involved
8   with purchasing a company called CoinTree.
9    **Q**   Yes.
10    **A**   So that was around this time also.  So I
11   wasn't as involved in sort of some of these things
12   as I was in some of the other transactions.
13    **Q**   You were not heavily involved in
14   determining the MVP?
15    **A**   No.  That was product people.
16    **Q**   Like Mr. Ben-Ari?
17    **A**   Yes.
18    **Q**   People under his supervision?
19    **A**   Yes, and then with -- in conjunction
20   with Ted and marketing people, I gather.
21    **Q**   Mr. Livingston was involved in that,
22   right?
23    **A**   Yes, I believe so.
24    **Q**   Was one reason for the MVP to satisfy
25   compliance concerns?

112

1    **A**   I guess that would have been one of the
2  reasons.
3    **Q**   You guess?  Are you sure?
4    **A**   Yes, one of the reasons.
5    **Q**   It was believed that by having -- let's
6  go back to the term "minimum viable product."
7  Does that suggest some level of functionality?  Is
8  that what the idea is?
9    **A**   That's correct.
10   **Q**   Was it believed that by having some
11 level of functionality, that it called an MVP,
12 that Kik would be better able to achieve legal
13 compliance?
14   **A**   That would be one.
15       (Plaintiff's Exhibit 42 was marked for
16       identification.)
17 BY MR. MENDEL:
18   **Q**   I'm presenting you with what's been
19 marked Deposition Exhibit 42.
20       This is an email from Mr. Ben-Ari on
21 May 17th, 2017, to Tanner Philp.  He's at Kik,
22 right?
23   **A**   Right.
24   **Q**   You're listed on the cc line, right?
25   **A**   Yes.

113

1    **Q**   So you received this?
2    **A**   Yes.
3    **Q**   Mr. Ben-Ari says in the second
4  paragraph, "The MVP has an objective to satisfy
5  compliance requirements," correct?
6    **A**   Yes.
7    **Q**   That was the comment that was the
8  consensus at Kik, right?
9        MR. CADIGAN:  Objection.
10   **Q**   That's what you understood one of the
11 objectives to be?
12   **A**   That was one of the objectives.
13   **Q**   Another objective of the MVP, as Kik
14 designed it, was to allow Kik to be first to get
15 to market, right?
16   **A**   That's correct.
17   **Q**   Why was it important to get to market
18 quickly?
19   **A**   From a business standpoint, it's -- you
20 always want to be first to market with a product.
21   **Q**   So Kik wanted to design something that
22 would facilitate that, right?
23   **A**   Yes.
24   **Q**   Meaning you should develop a product --
25 you wanted a product that could be developed

114

1  quickly.
2    **A**   Wanted a product that could be developed
3  quickly that would satisfy, as we point out here,
4  compliance, be first to market, and then also
5  establish that it was technically feasible.
6    **Q**   Did Kik choose a theme for the MVP?
7    **A**   Sorry, what do you mean by "theme"?
8    **Q**   Well, chose -- the MVP included
9  accessing sticker packs, right?
10   **A**   Correct.
11   **Q**   That was the central idea?
12   **A**   That was one, and then the ability to
13 see your wallet and hold Kik coin and have that
14 integrated with the messenger.
15   **Q**   So it would be sort of reading your
16 balance.
17   **A**   Correct.
18   **Q**   And then showing other people that you
19 had a particular balance.
20   **A**   Yes.
21   **Q**   Almost like sending them a screenshot of
22 your -- of how many Kin that you had; is that
23 right?
24   **A**   No, you wouldn't show how many Kin you
25 specifically had.

115

1    **Q**   You would show a sticker instead.
2    **A**   Yeah, you would have a status, and that
3  would sort of give you sort of status in the
4  ecosystem.
5    **Q**   Status was the number of Kin you held.
6    **A**   Exactly.
7    **Q**   It's kind of like showing your bank
8  account, isn't it?
9    **A**   Yes, I guess so.
10   **Q**   And what was the theme of the sticker?
11   **A**   The theme?
12   **Q**   Was there like some sort of common
13 thread to the sticker packs that Kik developed?
14 Honey badgers?
15   **A**   Yeah, I can't recall the characters
16 exactly.  You're talking about the characters when
17 you're talking about themes?
18   **Q**   Yes.  That's all I'm asking.
19   **A**   Yes.
20   **Q**   Okay.
21       Being first to market was important
22 because that would give Kik more publicity; isn't
23 that right?
24   **A**   That's correct.
25   **Q**   And other MVP options could have taken

116

1 longer?
2    **A**   Yes, likely.  So when you say the
3 objective of getting publicity, objective of
4 getting publicity is to attract other users and
5 developers to the ecosystem.
6    **Q**   You thought the MVP was limited; isn't
7 that right?
8       MR. CADIGAN:  Objection.
9    **A**   I don't know.  Where do I say that?
10    **Q**   Well, I'm just asking for your
11 impressions now.  Don't you think that the MVP was
12 limited?
13       MR. CADIGAN:  Objection.
14    **A**   No, not necessarily.  I mean, the MVP --
15 the purpose of the MVP was threefold.  The fact
16 that we were able to do and build a cryptocurrency
17 in a transactional environment was a big step.  No
18 one had done that yet at that stage.  So that was
19 really important for us.
20    **Q**   You were not a big sticker user, right?
21    **A**   No, not at my age, no.
22    **Q**   So you didn't have a lot of firsthand
23 knowledge of what the MVP would mean for users,
24 right?
25    **A**   No, because -- no, exactly.

117

1    **Q**   And you can't comment on whether the
2 MVP, as a product matter, was a good product,
3 right --
4    **A**   No.
5    **Q**   -- because you don't have the experience
6 for that.
7    **A**   That's correct.
8    **Q**   A decision -- you referred to presale
9 investors, right?  So a decision was made to offer
10 digital tokens through something called Simple
11 Agreements for Future Tokens, or SAFTs?
12    **A**   Correct.
13    **Q**   Can you just describe what a SAFT was?
14    **A**   SAFT is a security agreement for
15 receiving tokens at a later date.
16    **Q**   Let's go to -- let me just ask you.  As
17 part of that agreement that you just described,
18 investors entering into a SAFT would buy the Kin
19 at a discount; is that right?
20       MR. CADIGAN:  Objection.
21    **Q**   Was there a discount involved?
22       MR. CADIGAN:  Objection.
23    **A**   There was a discount involved, yes.  And
24 there were other terms that were vesting terms
25 with it.

118

1    **Q**   A price that a person paid, an
2 accredited investor, the thought was that the
3 price that the accredited investor paid to enter
4 into a SAFT, allowing for the receipt of Kin,
5 would be lower than the price that somebody who
6 bought in the public sale would pay, correct?
7       MR. CADIGAN:  Objection.
8    **A**   Yes.
9    **Q**   Let's go to -- still on Exhibit 7, page
10 892.
11    **A**   Do you want 42 back or no?
12    **Q**   Yes, please, thank you.
13    **A**   Sorry, which page?
14    **Q**   Bates number ending in 892.
15       It says "Sales Process," correct?
16    **A**   Correct.
17    **Q**   And "Total Raise, Target, 100 million."
18    **A**   Correct.
19    **Q**   And then it's broken down.  "Presale, up
20 to 50 million."  Is that what it says?
21    **A**   Correct.
22    **Q**   And then "Token Distribution Event, 50
23 to 75 million," right?
24    **A**   Correct.
25    **Q**   Those breakdowns appear on the same

119

1 slide, right?
2    **A**   Correct.
3    **Q**   The presale, that was to the accredited
4 investors, right?
5    **A**   That's correct.
6    **Q**   So at this point in time, as you've just
7 said, Kik's plan was to sell the tokens through a
8 presale stage and through a token distribution
9 event.
10    **A**   Correct.
11    **Q**   Was the token distribution event to the
12 general public?
13    **A**   Yes.
14    **Q**   Let's go to the next page.  Yes?
15    **A**   Sorry, when you say "general public,"
16 like, they had to register, so -- but, yes.
17    **Q**   The token distribution event
18 participants had to preregister for the event.
19    **A**   That's correct.  They had pre KYC,
20 right.
21    **Q**   And they had to go through steps and
22 processes.
23    **A**   Exactly.
24    **Q**   But it was at least for -- the
25 preregistration process was basically open to

120

1  anybody.
2      **A**   No.
3      **Q**   Subject to geographic --
4      **A**   Correct.
5      **Q**   -- carve-outs.
6      **A**   Correct.  Yes.
7      **Q**   Okay.  I got that right.
8      **A**   Yes.
9      **Q**   But there was one plan to raise
10 $100 million, right?  There weren't several plans
11 to raise $100 million, just one plan to raise
12 $100 million.
13     **A**   Well, yes, I guess you could say there
14 were one plan.  There were two sections to it.
15     **Q**   Let's go to page 893.  This is a slide
16 that says "Token sales structure soft cap."  This
17 is -- we've seen something like this in a prior
18 board deck, right?
19     **A**   Uh-hmm.  Yes.
20     **Q**   And this has been revised.  The token
21 supply is $10 trillion tokens, right?
22     **A**   Yes.
23     **Q**   And the float offered is still
24 10 percent?
25     **A**   Correct.

121

1      **Q**   And then it has different discounts
2  listed below that, under "Tranches," right?
3      **A**   Correct.
4      **Q**   And, now, some of the tranches have
5  "SAFT" listed next to them, correct?
6      **A**   Correct.
7      **Q**   But not all the tranches, right?
8      **A**   Correct.
9      **Q**   All right.  It says -- there's two
10 tranches that have SAFT, one SAFT, and then the
11 other SAFT, two, right?
12     **A**   Correct.
13     **Q**   Then it says, "First public tranche,
14 20 percent."
15     **A**   Correct.
16     **Q**   Okay.  And then "10 percent, 75 to 100
17 million, last chance for discounts," right?
18     **A**   Correct.
19     **Q**   And then zero percent, the 100 to 125
20 million, there would be no discount?
21     **A**   Correct.
22     **Q**   So as envisioned in this document, then,
23 discounts weren't necessarily limited to people
24 who entered into SAFTs.
25     **A**   Correct.

122

1      **Q**   Flip back to page 886.
2          It says, "Presale timeline," correct?
3      **A**   Correct.
4      **Q**   And this is the plan for selling to
5  accredited investors?
6      **A**   Correct.
7      **Q**   Does it reflect a roadshow?  Under "Key
8  Actions," so if you go down several lines, you'll
9  see "Key Actions," and then under "Mid June, New
10 York and Toronto roadshow."
11     **A**   Yes, I'm not sure, like -- I describe it
12 as a roadshow.  We had meetings set up, but there
13 was no, like -- outside of an event where Ted --
14 like where he launched the thing originally.  Most
15 of these were just meetings set up.
16     **Q**   But the slide says "roadshow."
17     **A**   Yes, that's correct.
18     **Q**   And then it says -- and then under "End
19 of June" it says, "TechCrunch:  Shenzen," correct?
20     **A**   Yes.
21     **Q**   "China and Japan roadshow," right?
22     **A**   Correct.
23     **Q**   "San Francisco roadshow"?
24     **A**   Yes.
25     **Q**   Were those events where Ted spoke

123

1  publicly?
2      **A**   I can't recall if he did or not, like I
3  wasn't on those, Shenzen and Japan.  I think he
4  was going over for a conference, but I can't
5  recall if he spoke.
6      **Q**   But these are describing also the
7  presale efforts, correct?
8      **A**   Correct.
9      **Q**   So they were happening -- well, okay.
10 Fine.
11         Once a SAFT participant received Kin,
12 was there any restriction on what the participant
13 could do with the Kin?
14     **A**   Restriction in the sense of?
15     **Q**   Were there resale restrictions?
16         MR. CADIGAN:  Objection.
17     **A**   I can't recall offhand.
18     **Q**   You can't remember, sitting here, that
19 there were any resale restrictions on Kin, right?
20     **A**   No, I can't recall.
21     **Q**   Why don't you turn to page 214 of
22 Exhibit 21.
23         Start on line 7.  Just let me know after
24 you've read to -- pick line 12, just 7 to 12.
25         Does that refresh your memory?

124

1    **A**   Yes.
2    **Q**   What's your memory now as to whether
3   there were restrictions on holding Kin?
4    **A**   It says here that there was no
5   restrictions on them, and we had vesting on all of
6   the presale investors in order to prevent that
7   sort of scenario happening, which I assume was to
8   avoid having everybody sell everything right at
9   the start.
10    **Q**   Well, when you say "vesting," though --
11    **A**   They couldn't sell any -- half of their
12   holdings, what they bought, they couldn't sell
13   them for a year, or they --
14    **Q**   Because they didn't receive them.
15    **A**   Yes, at that rate, correct.
16    **Q**   But what about the Kin they did receive?
17   They received half the Kin right away.
18    **A**   They could sell those, that's correct.
19    **Q**   Right away.
20    **A**   Yes.
21    **Q**   I'll take 36 back.  I'm sorry to see --
22   I'm sure you're sorry to see it go but ...
23        That was -- I'm sorry, I just took
24   Exhibit 7 back from you.  Then what's the other --
25   you have no other exhibits in front of you.

125

1    **A**   No, these are transcripts.
2    **Q**   Kik made its announcement of Kin in late
3   May 2017, correct?
4    **A**   Correct.
5    **Q**   At the Token Summit in New York City?
6    **A**   Correct.
7    **Q**   Were you in New York at the time of the
8   announcement?
9    **A**   Yes.
10    **Q**   Did you attend the Token Summit where it
11   was announced?
12    **A**   I was hoping to, but I didn't.
13    **Q**   Kik published the white paper at the
14   same time?
15    **A**   I believe so, yes.
16        (Plaintiff's Exhibit 12 was marked for
17        identification.)
18   BY MR. MENDEL:
19    **Q**   I'm providing you what's been marked
20   Deposition Exhibit 12, marked Investigation
21   Exhibit No. 2.
22        Is this the white paper?
23    **A**   Correct.
24    **Q**   Take a minute and look at it if you need
25   to.

126

1    **A**   Yes.
2    **Q**   You read drafts of that before it was
3   issued, right?
4    **A**   Yes.
5    **Q**   And that's the final one?
6    **A**   Okay.
7    **Q**   You agree that's the final one?
8    **A**   Yes.
9    **Q**   Okay.  And this was published on Kik's
10   website?
11    **A**   I believe so.
12    **Q**   Kik's website was freely accessible on
13   the Internet, correct?  You didn't need to
14   register to get on Kik's website, did you?
15    **A**   I can't recall that, actually.
16    **Q**   Look at page 239 of your transcript at
17   Exhibit 21.
18    **A**   Yes.
19    **Q**   Then look at line 22 through 24, and
20   then keep reading to the top of page 240.  Let me
21   know if that refreshes your memory.
22    **A**   Yes.
23    **Q**   So Kik's website was freely accessible,
24   right?
25    **A**   Yes.

127

1    **Q**   Okay, great.  Thanks.  You can put that
2   down.
3        Who was the white paper's intended
4   audience?
5        MR. CADIGAN:  Objection.
6    **A**   I can't really recall who.
7    **Q**   Was the white paper directed toward the
8   general public?
9    **A**   I can't remember how we marketed it, if
10   we marketed it at all at that time.  As I said, I
11   wasn't involved in the marketing side of the
12   equation at this time.
13    **Q**   Understood.  And it's been another year
14   since you testified, right?
15    **A**   Yes, two years since -- two and a half
16   years, actually.
17    **Q**   Okay.  So, here, let's go back to the
18   transcript, page 244.
19    **A**   Yes.
20    **Q**   You remembered the events more
21   accurately or better last year, right, during your
22   testimony?
23    **A**   Yes, correct.
24    **Q**   And so let's go to page 244, line 12.
25   Are you there?

128

1    **A**   Yes.
2    **Q**   Just read the page -- line 23.
3    **A**   Yes.
4    **Q**   So, would you agree, based on your prior
5  testimony, that the white paper's intended
6  audience included the general public --
7       MR. CADIGAN:  Objection.
8    **Q**   -- as you understood it?
9       Let me just ask the question again.  As
10 you understood the efforts of the marketing team
11 at Kik, did you understand the white paper's
12 intended audience to include the general public?
13   **A**   When you say "general public," like our
14 users or --
15   **Q**   The public generally.
16   **A**   I guess so.
17   **Q**   And was another target people who would
18 participate via the SAFT?
19   **A**   Yes, presale investors.
20   **Q**   Together.  They were all included,
21 right?
22   **A**   Yes.
23   **Q**   Then let's go to pages 11 to 15 of the
24 white paper.
25       It says on page 11, Kik integration in

129

1  Kin.  I'm sorry, I misspoke.  "Kin integration in
2  Kik."
3    **A**   Yes.
4    **Q**   We have on page 11, "An earnable
5  currency."  That's a subtitle, right?
6    **A**   Yes.
7    **Q**   And then in the next pages we have use
8  cases, right, or proposed use cases?
9    **A**   Proposed use cases, yes.
10   **Q**   These weren't actually implemented at
11 the time, right?
12   **A**   No, they say, like, "example."
13   **Q**   Yes, of what could happen or --
14   **A**   Exactly.
15   **Q**   "Kin wallet," "Ethereum settlement
16 layer," "Kin economy and prospective use cases."
17 That was on page 12.  Those were subheadings.  And
18 then, where it says "prospective use cases," we
19 have a number of examples on pages 13 through 15,
20 correct?
21   **A**   Correct.
22   **Q**   All right.
23       So looking at these pages, at the time
24 of the token distribution event -- and just going
25 ahead, that was in September, right?

130

1    **A**   Correct.
2    **Q**   Of 2017, right?
3    **A**   Yes.
4    **Q**   Could people go into the Kik Messenger
5  app and use their Kin tokens to do any of the
6  things that are described in these pages that we
7  just looked at?
8    **A**   Well, you could have -- I know that
9  somebody had actually been selling, like, not in
10 the digital side, but had been selling sunglasses,
11 as an example, using KikCoin -- Kin Coin, but I
12 don't think -- none of these examples were there
13 at the time.
14   **Q**   At the time, okay.  And nothing in the
15 white paper.  Kik app users couldn't do any of the
16 things described in the white paper at the time of
17 the token distribution --
18   **A**   No.
19   **Q**   -- event?
20       MR. CADIGAN:  Objection.
21   **Q**   Is that a no?
22   **A**   Not that I'm aware of.
23   **Q**   And the sunglass example, the sunglass
24 example isn't in the white paper, is it?
25   **A**   No.

131

1    **Q**   And, to your knowledge, when could
2  people buy sunglasses using Kin?
3    **A**   I can't recall the exact date, but I
4  know people in Tel Aviv actually made purchases of
5  those sunglasses.
6    **Q**   After the distribution event.
7    **A**   Yes.
8    **Q**   Through Kik Messenger or outside on the
9  general market?
10   **A**   Outside.
11   **Q**   Outside the Kik Messenger?
12   **A**   Exactly.
13   **Q**   Did the white paper include the
14 description of the MVP that we saw earlier in the
15 board presentation?
16   **A**   I don't believe so.  Can you just give
17 me a second?
18   **Q**   Take your time.
19   **A**   No, it didn't.
20   **Q**   On the same trip to New York for the
21 public announcement, did you have private meetings
22 with others about Kin?
23   **A**   Yes.
24   **Q**   These were prospective participants in
25 the private sale, right?

132

1    A   Correct.
2    Q   Did you meet with Dan Morehead --
3    A   We did.
4    Q   -- of Pantera?
5    A   We did.
6    Q   That was at Kik's New York offices?
7    A   We did.
8    Q   And did you meet with a group called
9  Maple at a Manhattan Starbucks?
10   A   Yes.
11   Q   That was the same trip, right?
12   A   Yes.
13   Q   Following the announcement, Kik went
14 ahead and did a roadshow; isn't that right?
15   A   We met -- we had other meetings. I
16 mean, how do you -- how do you describe a
17 roadshow?
18   Q   I'm using Kik's words.
19   A   Okay.  Yeah.
20   Q   It says, "from roadshow."
21   A   I think it's an improper term, but we
22 had meetings for -- with presale investors.
23   Q   Did you -- was there -- were there
24 presentations at conferences to people other than
25 accredited investors?

133

1    A   I don't know.  I didn't attend any of
2  those presentations or conferences.  I didn't even
3  get into May one so ...
4    Q   You participated in some of the meetings
5  on the road.
6    A   I was -- the meeting that you -- two
7  meetings you just described, I participated in
8  with Dan Morehead, which was in the Toronto
9  office -- New York office.  And the meeting with
10 Maple that I was in was sort of an ad hoc
11 introduction and we met with them at the
12 Starbucks.  We didn't get into the conference so
13 we went over to the Starbucks, and we were sitting
14 there, and someone came along and introduced us to
15 Maple.
16   Q   How did the CFO not get into the
17 conference?
18   A   It was a pretty -- William Mougayar was
19 pretty embarrassed, but what happened was they had
20 more people coming in than what the fire
21 regulations allowed.  So the building security
22 themselves shut a number of people out.  It was
23 not a pretty scene.
24   Q   It was a widely attended event.
25   A   Well, because people came from, yes, all

134

1  over the world for that event.
2    Q   I'll take back 12.
3        As Kik -- as the Kin project moved
4  forward, was it your job to keep the Board updated
5  on certain aspects of the project?
6    A   Yes, in the capacity as the CFO.
7        (Plaintiff's Exhibit 45 was marked for
8        identification.)
9  BY MR. MENDEL:
10   Q   I have given you what's been marked
11 Deposition Exhibit -- I'll take that back.
12       I'm good.  Okay, here is 45 back.
13 Sorry.
14   A   That's okay.
15   Q   So this was previously marked
16 Investigation Exhibit 156.  And it's a three-page
17 email chain, right?
18   A   Uh-hmm.
19   Q   Okay.  And the lead, the top email, most
20 recent, on June 12th, 2017, is from you to the Kik
21 Board, including Paul Holland, right?
22   A   Uh-hmm.  Yes.
23   Q   And it says, "Board meeting materials"?
24   A   Yes.
25   Q   So these were sent in advance of the

135

1  meeting, right?
2    A   Correct.
3    Q   This was an example of you keeping the
4  Board updated?
5    A   Yes.
6    Q   And then down below, there's embedded --
7  same day, June 12th, 2017, there's an email from
8  Michelle Dent to the Kik Board.  Is Ms. Dent an
9  assistant?
10   A   Yes.
11   Q   She's sending it on your behalf, right?
12   A   Yes.
13   Q   And the message is "Gentlemen, the main
14 purpose for this meeting is to provide you more
15 insight into the proposed Kin offering and the
16 regulatory hurdles we are navigating," right?
17   A   Correct.
18   Q   You wrote that, right?
19   A   Yes.
20   Q   "At this time we have approximately
21 30 million in purchases, i.e., rights to acquire
22 Kin in the public offering committed in executed
23 term sheets and another 13 million in email
24 commitments.  So the presale is moving quite
25 quickly, and we would like the Board approvals

136

1  necessary to be able to close on the presales
2  quickly."
3       That reflected the status at the time?
4  **A**   Yes.
5  **Q**   And that's what you asked the Board for?
6  **A**   Correct.
7  **Q**   And then also there's -- under -- just
8  skipping, down below, "The following documents are
9  attached and will help guide the Board on its
10 approvals. 1, Kin legal risk assessment
11 memorandum that Cooley has provided for your
12 review."
13      Did I read that correct?
14 **A**   Correct.
15 **Q**   Was there a legal risk memo that you
16 sent?
17 **A**   Yes.
18 **Q**   Along with a form of the SAFT, right?
19 **A**   Yes.
20 **Q**   And a draft of the private placement
21 memorandum.
22 **A**   Correct.
23 **Q**   Those hadn't been finalized.
24 **A**   No, because it was a draft form.
25 **Q**   Okay. So no one had signed on to the

137

1  SAFT yet?
2  **A**   I gather not by this.
3  **Q**   But you had the commitments.
4  **A**   Yes.
5  **Q**   You also had discussions in June about
6  when to hold the token distribution event,
7  correct?
8  **A**   Where does it say that?
9  **Q**   Not in that one. I'll take it back.
10 Sorry. Didn't mean to --
11 **A**   Okay.
12 **Q**   -- trick you there.
13      Just in general, from your memory, in
14 June -- let me ask it again. In June 2017, did
15 the Board also have discussions about when to hold
16 the token distribution event?
17 **A**   I would imagine it was discussed as to
18 when it would occur, but as far as a specific
19 date, I'm not sure if that was defined at that
20 meeting.
21      (Plaintiff's Exhibit 47 was marked for
22      identification.)
23 BY MR. MENDEL:
24 **Q**   I'm giving you what's been marked
25 Deposition Exhibit 47.

138

1  **A**   Correct.
2  **Q**   And this is a June 15th email from you
3  to Mr. Livingston, correct?
4  **A**   Correct.
5  **Q**   And it's forwarding an email from Dan
6  Morehead to you and Tanner Philp same day,
7  June 15th, 2017. And Mr. Morehead, just to remind
8  us, is -- he's with Pantera, right?
9  **A**   Correct.
10 **Q**   Was Pantera the lead accredited
11 investor?
12 **A**   They were the largest, yes.
13 **Q**   Did they buy the most?
14 **A**   Yes.
15 **Q**   I'm skipping down below to a section of
16 the email written from Mr. Morehead to you. It
17 says, "ICO as planned rather than Q1."
18 **A**   Correct.
19 **Q**   So there was discussion, then, about
20 postponing the ICO.
21 **A**   Right.
22 **Q**   And ICO is the Initial Coin Offering,
23 right?
24 **A**   Well, we referred to it as TDE.
25 **Q**   TDE meaning what?

139

1  **A**   Token distribution event.
2  **Q**   And Mr. Morehead refers to it as an ICO?
3  **A**   Correct.
4  **Q**   That's short for Initial Coin Offering?
5  **A**   Yes.
6  **Q**   Were they used interchangeably?
7       MR. CADIGAN: Objection.
8  **A**   Not by us.
9  **Q**   Not by you.
10      Did others -- did accredited investors
11 use the term "ICO"?
12 **A**   I can't recall other than looking at
13 this.
14 **Q**   Does this email reflect an earlier
15 discussion with Mr. Morehead?
16 **A**   Yes.
17 **Q**   You had asked for his input on delaying
18 the token distribution event to build more
19 functionality into the token; isn't that right?
20 **A**   I don't recall if that was the delay or
21 the purpose of the call, whether it was to build
22 more or -- I can't really recall where we were on
23 the MVP at that point in time.
24 **Q**   Can you take out -- we're now on
25 Exhibit 22.

140

1    A   22, okay.
2    Q   This is your -- day 2 of your
3  transcript, right?  Can you look at page 342 in
4  Exhibit 22, line 8.
5        Can you read for me, to yourself,
6  lines 8 to 15?
7    A   Yes.
8    Q   Does this refresh your memory of what --
9    A   Yes.
10   Q   Okay.  So is it the case, then, that you
11  were --
12   A   Can I just finish reading the rest of
13  the --
14   Q   Absolutely, please.
15   A   (Document review.)
16       Okay.
17   Q   So, then, you were discussing with
18  Mr. Morehead about his input on -- for his input
19  on delaying the TDE to build more functionality
20  into the token, right?
21   A   Correct.
22   Q   And Mr. Morehead responded, "Who is the
23  second African-American to play MLB," right?
24   A   Yes.
25   Q   And you understood from Mr. Morehead

141

1  that he did not want to be -- that was a
2  rhetorical question.
3    A   Right.
4    Q   Right?
5        You understood from Mr. Morehead that he
6  did not want Kik to postpone its TDE, right?
7    A   That's correct.
8    Q   Because he wanted the name -- the name
9  recognition of being first.
10   A   Correct.
11   Q   And you understood that Mr. Morehead
12  thought being first to market was really critical
13  to the success of the token, right?
14   A   Correct.  And that's as we discussed
15  earlier, that being first to market was really
16  important.
17   Q   He wrote also in this same email, "The
18  ICO market is white-hot.  There's also a chance
19  that the ICO window closes adverse SEC reaction."
20  Correct?
21   A   Correct, that's what he said.
22   Q   And around this time there was talk in
23  the marketplace that the SEC was going to be
24  issuing guidance, correct?
25       MR. CADIGAN:  Objection.

142

1    A   Yeah.
2    Q   Weren't you aware of discussion in the
3  marketplace about the SEC coming out with
4  guidance -- with some sort of statement about
5  cryptocurrencies?
6    A   There was sort of some discussion, yes.
7    Q   You were anticipating that, weren't you?
8    A   I was anticipating that was through
9  attorney discussions.
10   Q   Okay.  It appears that Mr. Morehead was
11  also referencing that; is that right?
12   A   Yes.
13   Q   I'll take that back.
14       (Plaintiff's Exhibit 49 was marked for
15       identification.)
16  BY MR. MENDEL:
17   Q   I'm giving you what's been marked
18  Deposition Exhibit 49.  That's Investigation
19  Exhibit 181.
20       And 49 is an email from Nancy Wojtas to
21  you, just to you, on June 14th, 2017.
22       She's the lawyer at Cooley, correct?
23   A   Correct.
24   Q   She's outside counsel?
25   A   Correct.

143

1    Q   And she's sending you -- it says,
2  "Peter, here is the draft, copied below, on the
3  attached org document."
4        So she's sending you a draft email.
5    A   Uh-hmm.
6    Q   And this is -- at the top she states, or
7  in the draft email -- "At the last board meeting,
8  before Fred and Jim had to drop off the call, the
9  proposed course of action suggested to ensure
10  minimum risk to the company and the Board, in
11  recognition of the frothiness of the
12  cryptocurrency markets generally at this time, was
13  to conduct 100 million presale and eliminate the
14  public token distribution event.  The conversion
15  of the SAFT rates into Kin would occur at the time
16  Kin Ecosystem was fully functional versus at the
17  time there was a minimum viable product."
18  Correct?
19   A   Correct.
20   Q   She wrote that?
21       So, according to this email, the Board
22  considered just selling to accredited investors
23  until the Kin Ecosystem was "fully functional"; is
24  that right?
25   A   Correct.

144

1     Q    You have no reason to doubt that the
2  Board consider this proposal, right?
3     A    Right.
4     Q    In fact, it's likely the Board did
5  consider this proposal.
6     A    They did.
7     Q    That's not the option the Board adopted,
8  right?
9     A    That's right.
10     Q    It decided -- the Board proceeded with
11  the token distribution event before the Kin
12  Ecosystem was fully functional, right?
13     A    Well, it depends what you're defining as
14  fully functional.  I can't recall what we were
15  describing as fully functional versus what the
16  minimum viable product was.
17     Q    Well, it decided to proceed with the TDE
18  before what you considered full functionality was,
19  right?
20     A    I can't recall what we discussed in
21  terms of full functionality versus minimum viable
22  product.
23     Q    The Board thought the MVP was
24  sufficient?
25     A    I thought it was sufficient for what we

145

needed it for, which are the things that we
described before.
3     Q    I'll take that back.
4          (Plaintiff's Exhibit 53 was marked for
5          identification.)
6  BY MR. MENDEL:
7     Q    I'm providing you, Mr. Heinke, with
8  what's been marked Deposition Exhibit 53,
9  previously in the investigation marked as 183.
10          This is a document that says at the top,
11  "6-13-17, Andy Sloan, Magnes, Inc., Re:  Initial
12  Kin Insurance Meeting Notes," right?
13     A    Correct.
14     Q    What's your understanding of what this
15  document is?
16     A    This was a discussion of what sort of
17  insurances we should probably take a look at
18  having.
19     Q    Who is Andy Sloan?
20     A    He's the principal of the brokerage --
21  insurance broker Magnes.  They have been our
22  insurance company since pretty much day one -- or
23  broker.
24     Q    That's who you continue to work with?
25     A    That's correct.

146

1     Q    Who created this document?
2     A    I honestly can't remember if I did or
3  someone else in the meeting did.
4     Q    Is it memorializing what was discussed
5  in a meeting?
6     A    Yes.
7     Q    There's a bubble comment to the right
8  that says, "Assigned to Peter Heinke," right?
9     A    Yes.
10     Q    So you were in this meeting, correct?
11     A    Correct.  I think I was in the meeting.
12     Q    You later reviewed the document -- if
13  you didn't write it, you definitely reviewed the
14  document.
15     A    Yes, I did.
16     Q    So that summer, the summer of 2017, you
17  worked to increase coverage for Kik's officers and
18  directors?
19     A    Correct.
20     Q    And then under "Topics of Discussion" in
21  Exhibit 53, there's a number of bullets.  The
22  first bullet is "Compliance is our biggest
23  concern."
24     A    Correct.
25     Q    The third bullet says, "View the raise

147

as a security."  And then the fourth bullet down
2  states, "Complying with Howey test (viewed as a
3  security)," right?
4     A    Correct.
5     Q    And then the third bullet that said
6  "View the raise as a security," there's a dotted
7  line to the bubble "Commented [1]," and the bubble
8  comment says, "The SAFT is a security, however,
9  the tokens are not a security.  Peter@kik.com can
10  you confirm?"
11          And this was assigned to you?
12     A    Yes.
13     Q    So this was an issue that you worked on.
14     A    Yes.
15     Q    And then there's a comment at -- there's
16  another comment -- bubble comment directly below,
17  and this corresponds to the fourth bullet in the
18  document, "Complying with Howey test (viewed as a
19  security)."
20          It says, "Yes, we used the Howey test."
21  That was you responding?
22     A    I believe so, yes.
23     Q    And you discuss with Andy Sloan of
24  Magnes whether Kik was complying with the Howey
25  test, right?

148

1    **A**   I believe so.
2    **Q**   And what did you tell Mr. Sloan in that
3  regard?
4    **A**   I can't recall exactly what I said at
5  the time.  I mean, if you go further down, our
6  bigger risk that we defined at the time was the
7  money laundering and AML.
8    **Q**   Which appears first, "view the raise as
9  a security" or the money-laundering concerns?
10   **A**   Howey appears first, but if you look at
11  it, the other one that's identified is the
12  high-risk issue.
13   **Q**   Where does it say high-risk?
14   **A**   "High-risk issues - Money laundering.
15  AML risk.  Policies in place to mitigate risk."
16   **Q**   That's the seventh bullet down, right?
17   **A**   Yes.  I don't think there was any
18  priority with respect to where the dot existed in
19  that discussion.
20   **Q**   This was dated in June?
21   **A**   Correct.
22   **Q**   Down below, under "Actions to be
23  Taken" --
24   **A**   Yes.
25   **Q**   -- "Reassess D&O insurance.  Penalties

149

1  are not insurable.  (Jail time, etc.)"
2         Then the second bullet, "Add defense
3  costs.  10 million to expect to defend.  (Fines
4  are not insurable.)"
5         Is that correct?
6    **A**   Correct.
7    **Q**   Then go to the next page, please.
8  Actually, go to the third page.
9    **A**   This is 8244?
10   **Q**   You got it.  Summary of current
11  policies, limits -- "Summary of current policies,
12  limits, new limits suggested."  And there's a
13  chart that seems to be cut and pasted showing
14  coverage summary, current coverage, suggested
15  coverage to extend, and notations, right?
16   **A**   Uh-hmm.
17   **Q**   Did Kik move from a $15 million D&O
18  policy to a $25 million policy?
19   **A**   I believe so.
20        MR. MENDEL:  I'll take that exhibit
21  back.
22        How are you doing?  Can we go a little
23  while longer?
24        THE WITNESS:  How long do you think this
25  will ...

150

1        MR. MENDEL:  Probably like 15 minutes.
2        THE WITNESS:  Oh, yes, that's fine.
3        MR. MENDEL:  Does that work?
4        MR. CADIGAN:  Yes.
5        THE WITNESS:  Yes.
6        MR. CADIGAN:  By "15 minutes," you mean
7  15 minutes left in the depo or 15 minutes until
8  the break?
9        MR. MENDEL:  I was thinking 15 minutes
10  until lunch, and then we can talk at lunch about
11  how much longer I have.
12        MR. CADIGAN:  Okay.
13        (Plaintiff's Exhibit 67 was marked for
14  identification.)
15  BY MR. MENDEL:
16   **Q**   I'm handing you, Mr. Heinke, what's been
17  marked as Exhibit 67.
18   **A**   Correct.
19   **Q**   This is a newly marked exhibit.  It's an
20  email chain.  At the top it says from Angela
21  Watkins to you, Peter Heinke, Tuesday, July 18th,
22  2017.  It's forwarding -- she says, "Forwarding
23  this Insurance overview from Chris," Chris Cameron
24  at Magnes Group.
25        Who is Angela Watkins?

151

1    **A**   She was our sort of office manager or
2  head of administration.
3    **Q**   Who is Chris Cameron?
4    **A**   He is from the brokerage firm, Magnes.
5    **Q**   He worked with Andy Sloan?
6    **A**   Correct.
7    **Q**   I'm just going to skip down to the email
8  that's going to Angela from Mr. Cameron.  He
9  writes in part, after the first paragraph, "In
10  broad terms, we see the potential for a loss
11  coming from two main areas, the investor side and
12  the operational side."  Then he says, "Investor
13  issues will generally come from two areas," and he
14  lists two bullets.  And I'll read from the second
15  bullet.
16        Well, the first bullet says, to start,
17  "Any failure of Kik to perform as the investors
18  expect," right?
19   **A**   Correct.
20   **Q**   Then the second bullet states -- I'll
21  just read it in full -- "With the advent of Kin,
22  we now have the potential for regulatory issues to
23  develop if the SEC determines that Kin is, in
24  fact, a security and not a product.  An SEC
25  investigation would trigger defense costs, fines,

152

1 and penalties, as well as a likely investor suit
2 should there be any direct impact on the value of
3 their investment."
4        Did you read this when you got it?
5    A  Yes.
6    Q  Was this consistent with your prior
7 concerns?
8        MR. CADIGAN:  Objection.
9    Q  Was this consistent with your prior
10 concerns about the securities law issue that you
11 had previously flagged for the Board?
12       MR. CADIGAN:  Objection.  Just, again,
13 to the extent that any prior concerns are informed
14 by discussion with counsel, I'll ask you not to --
15   A  Yes, they are.  They are informed by
16 discussions with counsel.
17   Q  Okay.  Just the part of my question that
18 asked if this was consistent with your concerns,
19 you can't answer that without getting into
20 discussions with counsel, correct?
21   A  Right.  Correct.
22       MR. MENDEL:  And so are you instructing
23 Mr. Heinke not to answer the question?
24       MR. CADIGAN:  Yes.
25

153

1 BY MR. MENDEL:
2    Q  Did you disagree with this statement?
3    A  Did I disagree with the statement?
4    Q  The second bullet that I read out loud,
5 did you disagree with Mr. Cameron's assessment?
6 Again, can you answer that question without --
7    A  No.  It relates to the discussions I had
8 with counsel.
9        MR. MENDEL:  Mr. Cadigan, do you
10 instruct the witness not to answer?
11       MR. CADIGAN:  Again, to the extent that
12 it reflects discussions with counsel, I definitely
13 instruct him not to answer.
14 BY MR. MENDEL:
15   Q  And you can't answer that question
16 without getting into discussions with counsel?
17   A  That's right, yes.
18   Q  What did you do with the information in
19 the email that you received from Chris Cameron via
20 Angela Watkins?
21   A  What did I do with it?
22   Q  Yes.
23       Did you forward it?
24   A  I'm not sure if I forwarded it or not.
25   Q  Mr. Cameron had also written, "These

154

1 types of claims would fall under the D&O space.
2 We have a D&O policy in place already and are
3 working to replace our primary insurer because
4 they cannot accommodate anything FI related."
5        Did you understand that's what he was
6 doing?
7    A  Yes, because we would have -- this would
8 have been an instruction from the Board to likely
9 look at the insurance, and we would always update
10 the Board with where the insurance was.
11   Q  What does "FI related" mean?
12   A  I'm not sure.  I think it's financial
13 instruments, but I can't -- it's conjecture on my
14 behalf.
15   Q  I'll take that one back.
16       (Plaintiff's Exhibit 68 was marked for
17 identification.)
18 BY MR. MENDEL:
19   Q  I've handed you what's been marked
20 Deposition Exhibit 68, formerly Exhibit 19C in the
21 investigation.  It's an email dated August 3rd,
22 2017 from Katie Tonin to the Kik Board, and there
23 are others listed on the cc line, including
24 Mr. Livingston and Nancy Wojtas.
25       Do you see that?

155

1    A  Yes.
2    Q  But you received this as a Kik board
3 member, right?
4    A  Correct.
5    Q  This is a board deck for the August 3rd
6 board meeting, correct?
7    A  Correct.
8    Q  If you go to page 6109, it says,
9 "Insurance Admin Update," right?
10   A  Correct.
11   Q  Was this your update?
12   A  Yes.
13   Q  It says, "D&O insurance.  Kik currently
14 evaluating D&O policies.  Received quotes from two
15 of the 20 applications.  Limit of 25 million,
16 deductible 25,000, for cost of 55,000 per year."
17       That's right?
18   A  Correct.
19   Q  Is this an accurate summary?
20   A  I believe so.
21   Q  Is this you following up on information
22 you had received from The Magnes Group?
23   A  Yes, I would assume so.
24   Q  That's all I have for that one.  I'll
25 take it back.  Thank you.

156

1    (Plaintiff's Exhibit 69 was marked for
2    identification.)
3  BY MR. MENDEL:
4    Q   Mr. Heinke, I've provided you with
5  what's been marked as Deposition Exhibit 69.  This
6  is an email from Chris Cameron at Magnes to you
7  directly, dated September 17th, 2017.  Do you see
8  that?
9    A   Yes.
10   Q   He says in his email to you, "Hi, Peter.
11  Per our call Friday, here is a short summary.  Be
12  prepared."  And then it's forwarding another email
13  that he had sent that's dated July 18th, right?
14  And it's sent to Angela Watkins?  Do you see that?
15   A   Yes.
16   Q   I'm handing you back Deposition Exhibit
17  67 so you can read 67 and 69 together.
18       So going back to 67, the embedded email
19  from Angela to Chris Cameron -- I'm sorry, the
20  embedded email from Chris Cameron to Angela in
21  Exhibit 67 that I read from, it's very similar to
22  the email by the same date, July 18th, in the new
23  Exhibit 69, correct?
24   A   Yes.  Sorry, the --
25   Q   So my question is this.  There's two

157

1  embedded -- in each -- each exhibit has an
2  embedded email from Angela Watkins to Chris
3  Cameron dated July 18th, right?
4    A   Correct.
5    Q   And Exhibit 69, which is the separate
6  September 17th email from Chris Cameron to you, he
7  presents this as a short summary, does he not?
8    A   Yes.
9    Q   And the first -- the bullet that I read,
10  starting, "With the advent of Kin," that appears
11  exactly the same in both exhibits, right?
12   A   Correct.
13   Q   It's part of his summary to you on
14  September 17th, 2017.
15   A   Correct.
16   Q   The next language seems to have changed
17  a little bit.  It states, "These types of claims
18  would fall under the D&O space.  We have replaced
19  our D&O markets to use insurers who are
20  comfortable with the FI space and have increased
21  our total limit to 25 million to more adequately
22  guard against the increased exposure."
23       Did I read that correctly?
24   A   Correct.
25   Q   So this is an update since the email

158

1  that you had received that's reflected in Exhibit
2  67.  Again, comparing the two emails, this is a
3  little bit different than what you had heard in
4  July, right?
5    A   Yes.
6    Q   Now, the D&O markets have been replaced
7  by Magnes; is that right?
8    A   Sorry?
9    Q   The -- Mr. Magnes says, "We have
10  replaced our D&O markets," and that's --
11   A   No, it's Mr. Cameron.  Magnes is the
12  company.
13   Q   I apologize.
14   A   That's okay.
15   Q   Mr. Cameron has --
16   A   Yes.
17   Q   Mr. Cameron is saying he replaced the
18  D&O markets, right?
19   A   Right.
20   Q   Are those like secondary insurers?
21   A   I'm not sure, when you say "secondary."
22   Q   When he says "replaced our D&O markets,"
23  what does that mean?
24   A   I think he has different insurers that
25  he goes out to, and he brokers the insurance.  So

159

1  he's probably -- in this case he's gone out and
2  he's got other insurers that are -- it says here,
3  "who are more comfortable with the FI space."
4        So it's probably just an insurance
5  company that he's replaced.
6    Q   Very well.
7    A   I don't know about secondary or ...
8    Q   That was my wording, right?
9    A   Yes.
10   Q   You just understood that he had replaced
11  the pool of insurance companies that they were
12  pursuing policies from?
13   A   Correct.
14   Q   I'll take 69 and the other one back from
15  you.
16       (Plaintiff's Exhibit 70 was marked for
17       identification.)
18  BY MR. MENDEL:
19   Q   I'm now giving you what's been marked
20  Exhibit 70, and this was Exhibit 22C in the
21  investigation.  But this is newly marked and was
22  not in your prior investigative testimony as far
23  as I know.
24   A   Okay.
25   Q   So this is from Brandon Brunet to Kik

160

1  Board; cc to Ted@kik.com and you, Peter Heinke,
2  October 30th, 2017.
3        Do you recognize this?
4        A   Do I recognize it?  No, not offhand, but
5  it's obviously something that was sent.
6        Q   These are a list of approvals sought for
7  the board meeting?
8        A   Okay.
9        Q   Is that right?
10       A   Correct.
11       Q   Then let's look at the page ending in
12  242.
13       A   "Budget versus actual."  Oh, that's 243.
14  Okay.
15       Q   This says, "Insurance Update"?
16       A   Yes.
17       Q   So this is in October, October 2017.
18  We're beyond the token distribution event, right?
19       A   Yes.
20       Q   Are you a director of the Foundation by
21  this point?
22       A   Yes.
23       Q   And you're still on the Kik Board,
24  right?
25       A   Yes.

161

1        A   Yes.
2        Q   Did Kik's D&O insurance coverage cover
3  the foundation directors?
4        A   No.  That's what we had a separate
5  insurance policy.
6        Q   But it says, "D&O covers all Kik
7  umbrella entities, including proposed directors of
8  the Kin Ecosystem Foundation."
9        A   I'm not sure if that's correct.  I would
10  have to go back.  I know there was a lot of
11  discussion even right from the start about having
12  the Foundation insured separately.
13       Q   Right.  It says below, "Foundation" --
14       A   Right.
15       Q   -- "will require separate insurance
16  policy."
17       But this suggests that the directors
18  were covered by Kik's D&O policy.
19       A   Yes, that is what this is saying.
20       Q   Do you have any reason to think that
21  didn't happen?
22       A   I remember there was a lot of discussion
23  going on.  I can't recall whether we -- this is
24  saying that we did, but I don't see -- do you have
25  any -- is there any document from Chris Cameron

163

1        Q   This insurance update says, "Increased
2  Director's and Officer's (D&O) insurance by
3  10 million (25 million in total)."
4        So the increase had occurred?
5        A   Yes.
6        Q   This is just an update, right?  They had
7  approved it already and it's been updated.
8        A   Correct.
9        Q   Then it says, "D&O covers all Kik
10  umbrella entities, including proposed directors of
11  the Kin Ecosystem Foundation."
12       What does "umbrella entities" mean?
13       A   I would assume that means all the
14  subsidiary companies.
15       Q   Okay.  But directors of the Kin
16  Ecosystem Foundation were considered umbrella
17  entities?
18       A   No, that's why I think he's put it
19  separately, "including proposed directors of the
20  Kin Ecosystem Foundation."
21       Q   What's an example of what an umbrella
22  entity was?
23       A   An umbrella entity would be like the
24  U.S. company, subsidiary.
25       Q   Of Kik.

162

1  where he talks about the Foundation?
2        Q   I don't have anything with me here.
3        A   Okay.  So I would have to -- I would
4  have to go back and take a look at something to
5  ensure that was the case.
6        Q   Wouldn't you have been careful when you
7  wrote the update, though, to be accurate?
8        A   I don't know if I wrote this or if
9  Brandon did.
10       Q   In any event, the D&O insurance had been
11  raised by 10 million to 25 million, right --
12       A   Correct.
13       Q   -- for Kik?
14       Very well.
15       MR. MENDEL:  Off the record.
16       THE VIDEOGRAPHER:  We're going off the
17  record.  This is the end of media unit number 2.
18  The time is 12:29 p.m.
19       (A brief recess was taken.)
20       THE VIDEOGRAPHER:  We're back on the
21  record.  This is the beginning of media unit
22  number 3.  The time is 1:34 p.m.
23  BY MR. MENDEL:
24       Q   Good afternoon, Mr. Heinke.
25       A   Good afternoon.

164

1    (Plaintiff's Exhibit 16 was marked for
2    identification.)
3  BY MR. MENDEL:
4    Q    So we're continuing.  I wanted to refer
5  you to what's been marked as Deposition 16.  It's
6  been placed in front of you.
7    A    Yes.
8    Q    This in the investigation was Exhibit 4.
9        Do you recognize Exhibit 16?
10   A    Yes, I do.
11   Q    This is the private placement memorandum
12 in final form?
13   A    Correct.
14   Q    If you could turn to page 43 and the
15 Bates stamp -- or page 3 of the PPM.  It states at
16 the top, "The Development of the Kin Ecosystem"
17 and, at the bottom of the first paragraph, "The
18 development of the Kin Ecosystem will follow four
19 key milestone phases."
20       Do you see that?
21   A    Yes.
22   Q    That was true?
23   A    Yes.
24   Q    Also on page 3, at the bottom, "Initial
25 Launch of Kin and Kin Ecosystem," there is a

165

1 section about minimum viable product.  Do you see
2 that?
3    A    Yes.
4    Q    Okay.
5        You thought it was important for the
6  participants, via SAFTs, to have information about
7  the MVP, correct?
8    A    Correct -- well, yes, I would say
9  correct.
10   Q    You thought that was important, right?
11   A    Yes.
12   Q    Because it described what people would
13 be able to do with Kin when they first bought it,
14 right?
15   A    Yes.
16   Q    The MVP was not described in the white
17 paper, though, correct?
18   A    That's correct.
19   Q    I'll take that one back.
20       Here's number 52.
21       (Plaintiff's Exhibit 52 was marked for
22       identification.)
23 BY MR. MENDEL:
24   Q    I've given you what's been marked as
25 Deposition Exhibit 52, previously marked in the

166

1 investigation as 5, correct?
2    A    Yes.
3    Q    Is this the form of the SAFT used for
4  accredited investors?
5    A    Yes.
6    Q    This is the final one, correct?
7    A    I believe so, yes.
8    Q    The first page states, under "Notice to
9  Residents of the United States," "The offer and
10 sale of this security instrument has not been
11 registered under the U.S. Securities Act of 1933
12 as amended," right?
13   A    Correct.
14   Q    So it referred to the SAFT.  Simple --
15 what we're looking at is the Simple Agreement for
16 Future Tokens?
17   A    Yes.
18   Q    And the short form for that is SAFT,
19 S-A-F-T.
20   A    Correct.
21   Q    And the first page identified it as a
22 security instrument, in what I just read, the
23 first page.
24   A    Not -- oh, yes, as a security
25 instrument.  It has not been registered, though,

167

1 yes, that's correct.
2    Q    Are you aware of any terms of the SAFT
3  changing from investor to investor?
4    A    No.
5    Q    Can you turn to "Definitions" on page 2.
6  I'm looking at the sections called "Discount
7  Price" and "Discount Rate."  "Discount price means
8  the maximum price per token sold by the company to
9  the public during the network launch, multiplied
10 by the discount rate."
11   A    Correct.
12   Q    Can you explain what all this means?
13       MR. CADIGAN:  Objection.
14   Q    Sure.  Let me be more specific.  What
15 was the network launch, as referred to in the
16 SAFT?
17   A    (Document review.)
18       That would be the TDE, I believe.
19   Q    The token distribution event?
20   A    Yes.
21   Q    Okay.  And when the discount price is
22 defined as "the maximum price per token sold by
23 the company to public during the network launch,
24 multiplied by the discount rate" --
25   A    Right.

168

1    Q   -- was that a linkage between the price
2  paid by the SAFT participant with the price of the
3  token in the token distribution event?
4          MR. CADIGAN:  Objection.
5    A   Sorry, can you -- can you just go
6  through that again?
7    Q   Sure.
8          Was the discount price paid, was that
9  the price paid by a SAFT participant?
10    A   Yes.
11    Q   Can you describe the linkage between the
12  discount price and the price paid in the token
13  distribution event?
14          MR. CADIGAN:  Objection.
15    A   What do you mean by "linkage"?
16    Q   Well -- it means, it states here that
17  "the maximum price per token sold by the company
18  to the public during the network launch,
19  multiplied by the discount rate."
20    A   Right.
21    Q   And the discount rate is defined in the
22  SAFT, right?
23    A   Okay.
24    Q   At 70 percent?
25    A   That's what you're defining as linkage,

169

1  okay.
2    Q   And so, was the price paid by the SAFT
3  participant discounted from the token distribution
4  event price?
5    A   Yes.
6    Q   And, according to this final SAFT, it
7  was discounted 70 percent.
8    A   That's correct.
9    Q   So by the terms of the SAFT, did the
10  price paid by the SAFT participant depend on the
11  price paid in the token distribution event?
12    A   Yes.
13          MR. CADIGAN:  Objection.
14    Q   You can answer that.  Yes?
15    A   Yes.
16    Q   If the price in the token distribution
17  event changed, so too did the price paid by the
18  SAFT participant for one token, correct?
19          MR. CADIGAN:  Objection.
20    Q   You can answer.
21    A   Yes.
22          (Plaintiff's Exhibit 40 was marked for
23          identification.)
24  BY MR. MENDEL:
25    Q   I've given you what's been marked

170

1  Exhibit 40.  And that's Deposition Exhibit 40,
2  Investigation Exhibit 133.
3          This is a list of the participants via
4  SAFT, correct?
5    A   Correct.
6    Q   And as reflected on -- it's a one-page
7  list, and it lists "Participant Name," "Amount,"
8  and "Date of SAFT" on the right.  Do you see that?
9    A   Yes.
10    Q   And, as reflected on the column on the
11  right, "Date of SAFT," there are a number of SAFTs
12  that were executed on September 11th, 2017; is
13  that right?
14    A   Correct.
15    Q   And you have -- sitting here today, you
16  have an independent memory that this occurred,
17  right, that certain SAFT participants signed their
18  paperwork on September 11th, 2017, right?
19    A   Yes.
20    Q   On the Exhibit 133, further, you see
21  about two thirds of the way down, "Maple Ventures,
22  LLC."  Do you see that?
23    A   Yes.
24    Q   They bought for $4,500,000?
25    A   Correct.

171

1    Q   And you met them in New York on or
2  around May 25th during the announcement of Kin,
3  correct?
4    A   Correct.
5    Q   And you see Pantera Capital Management
6  is listed for $15 million?
7    A   Correct.
8    Q   You also met them in New York that same
9  time, correct?
10    A   Yes.
11    Q   Great.
12          I'll take that one back, please.
13          During the summer of 2017, it was
14  decided within Kik to approach the Ontario
15  Securities Commission about Kik's plans to issue
16  Kin, correct?
17    A   Correct.
18    Q   And Ontario Securities Commission, the
19  acronym for that is OSC?
20    A   Correct.
21    Q   You have heard that at least particular
22  people at the OSC were upset; isn't that right?
23    A   I'm not sure what the --
24          MR. CADIGAN:  Objection.  I just caution
25  you, to the extent that any of the bases is based

172

1  upon communications, conversations with counsel, I
2  instruct you not to answer.
3      THE WITNESS:  Okay.
4      MR. CADIGAN:  But to the extent it
5  wasn't, go for it.
6      **A**   No, that's -- I don't know if I would
7  use the term "upset," but they wanted to -- they
8  heard about our -- what we were doing with Kin,
9  and they wanted to know -- they didn't have any
10  knowledge about it.
11      **Q**   Well, let's take a look at your
12  transcript.  Can you go to page 431 of your
13  transcript.
14      **A**   (Document review.)
15      **Q**   Look at line 1618.
16      I'll read -- this is your answer to a
17  prior question.  "So on that basis we said sure,
18  and we set up a meeting with them, and someone
19  said they were a little upset."
20      Does that refresh your memory?
21      **A**   I guess so.  I didn't recall using that
22  term, but that's fine, I guess, here.
23      Yes, we didn't understand why they were
24  upset, that's correct.
25      **Q**   But you believed it came down to the

173

1  view of whether Kin was a security or not,
2  right --
3      **A**   No.
4      **Q**   -- in terms of what their -- what the
5  reason for the discord could be?
6      **A**   I think it was that they -- whether it
7  was a security or not, but they knew we were --
8  they had heard about it through other people, and
9  they wanted to -- they didn't know anything about
10  it.
11      So I think at the time William Mougayar
12  was informing us about that, and I think I
13  mentioned that, yes, he was our advisor.
14      So he had heard the OSC, I would say,
15  someone was questioning like what were we doing
16  because we were getting questions about our
17  offering.
18      **Q**   Can you read to yourself your answer on
19  lines 19 to 22.
20      **A**   "And someone said they were a little
21  upset, and we said we don't understand why they
22  were upset.  And, again, it came down to the view
23  whether this was a security or not.  And we felt
24  it wasn't, and so we went in there to have a
25  discussion with them."

174

1      **Q**   Okay.  But this was the issue, wasn't
2  it, whether Kin was a security or not?
3      **A**   Yes.
4      **Q**   You had the meeting, right?
5      **A**   Correct.
6      **Q**   You attended?
7      **A**   Yes, I did.
8      **Q**   Mr. Livingston and Mr. Philp attended?
9      **A**   Correct.
10      **Q**   Kik's counsel, Ross McKee, attended?
11      **A**   Correct.
12      **Q**   Kik's counsel from Cooley, Nancy Wojtas,
13  attended by phone?
14      **A**   Correct.
15      **Q**   Anybody else?
16      **A**   I'm not sure whether Eileen was with us
17  at that point in time yet or not, so I can't
18  recall if she was on the call or not.
19      **Q**   Mr. Ross McKee, he's from a law firm
20  known as Blakes?
21      **A**   That's correct.
22      **Q**   During the meeting, Mr. McKee discussed
23  whether Howey would apply to Kik's issuance of
24  Kin; isn't that right?
25      **A**   That's correct.

175

1      (Plaintiff's Exhibit 58 was marked for
2      identification.)
3  BY MR. MENDEL:
4      **Q**   I'm showing you what's been marked as
5  Exhibit 58.
6      **A**   Correct.
7      **Q**   This is a letter from -- on Blakes
8  letterhead dated November 2nd, 2017, again,
9  Deposition Exhibit 58.  This was Deposition -- I'm
10  sorry, this was Exhibit 186 in the investigation.
11      Do you recognize this?
12      **A**   Yes.
13      **Q**   I'm reading in the middle of the first
14  page.  "The meeting on August 14th was in fact
15  inconclusive.  Notes indicate that the closest the
16  OSC staff present came to expressing a position
17  was for Pat Chaukos to say, 'I'm not sure we're
18  where you are.'"
19      This is Mr. McKee writing in the letter,
20  correct?
21      **A**   Yes.
22      **Q**   And so the meeting took place on
23  August 14th?
24      **A**   That's correct.
25      **Q**   You'll recall a board meeting that we

176

1 looked at this morning on or about August 3rd,
2 right, when you -- in which you had discussed
3 raising D&O coverage; is that right?
4     A   Correct.
5     Q   So this is 11 days after that meeting
6 about raising D&O coverage?
7     A   Correct.
8     Q   Then two paragraphs down in this letter
9 on Exhibit 58, "In fact, the first time that the
10 OSC staff definitively communicated a position
11 that the ITD constituted an offering of securities
12 was in the telephone call to me from Ms. Chaukos
13 on September 5, shortly before the scheduled
14 launch date."
15         Did I read that correctly?
16     A   That's correct.
17     Q   By "ITD," McKee is referring to the
18 token distribution event?
19     A   Correct.
20     Q   Within a few days of September 5th, did
21 Kik make a decision about selling Kin tokens to
22 people in Canada?
23     A   I'm not sure exactly the date of when we
24 decided not to sell Kik tokens in Canada.  I know
25 that during the meeting it became clear that the

177

1 OSC hadn't had a position and they hadn't had
2 decided on what sort of framework they would use
3 to value whether something -- evaluate whether
4 something was a security or not.
5         Specifically, when Ross raised the issue
6 of the Howey test, Ms. Chaukos' response was that
7 she looked at it as an old framework or something
8 to that extent.
9     Q   You remember that, sitting here today?
10     A   Yes, I do, because that was the basis of
11 that we didn't -- they didn't know on what basis,
12 how they were going to review it or against what
13 test.  And I think -- my understanding is, I
14 believe, since then they haven't even -- they're
15 not using the Howey test, but I can't recall that.
16     Q   So then why did you decide not to
17 proceed with the sale in Canada?
18     A   Because we didn't know on what basis
19 they were reviewing it, how they were establishing
20 whether it was a security or not.
21     Q   Was it in an abundance of caution?
22     A   Pardon?
23     Q   Were you being cautious?
24     A   Yes.
25     Q   You were concerned, were you not, that

178

1 the OSC could find that the token distribution
2 event constituted an offering of securities?
3     A   I think that's speculative.  I mean, we
4 didn't know what framework they were using.  So
5 until they came up with a framework, we were -- it
6 was a guess as to what they were going to -- how
7 they were going to evaluate it.
8     Q   I guess, my question was what -- you
9 were concerned that they could find that it was an
10 offering.
11     A   They could, yes.
12     Q   And that factored into your decision,
13 correct?
14     A   It was part of it because they had also
15 told us about the Quebec Securities Commission.
16 So -- I think I spoke about it in my testimony,
17 but in Canada each provincial securities
18 commission is regulated independently, and they
19 have this overriding Canadian Securities
20 Association, and each province takes a turn at
21 running that overall, and Quebec was running it at
22 the time so someone said we should also talk to
23 Quebec.
24         We had a discussion with him, and in
25 that discussion we raised the fact that from

179

1 discussion with our tax and audit advisors, that
2 they would view this as a sale of a product and
3 that it would be taxable.  So he said those were
4 pretty good arguments for it not being a security.
5 And then he asked me to send him the letter, which
6 I did, and then I didn't hear anything back from
7 him.
8     Q   When you say "he," who are you talking
9 about?
10     A   The fellow at the -- I forget what his
11 name is, but the Quebec -- I think there's
12 somewhere in the documents, there's whoever was
13 head of the -- I don't think it was head, but head
14 of regulatory or something.  There were two people
15 on the phone.  There was a gentleman and a lady at
16 the Quebec Securities Commission.
17     Q   When was this phone call?
18     A   It was probably around the time just
19 shortly after our initial meeting with the OSC.
20     Q   Who was on that call?
21     A   It was Ted, I think myself, Tanner, and
22 the two people from the Commission.
23     Q   So is it fair to say that Kik was
24 concerned that either the OSC or the Quebec
25 Securities Commission could find that an offering

180

1  of Kin was an offering of securities?
2      A    Yes.  That would be speculative, but,
3  yes, I would agree.
4      Q    Well, you didn't know what they were
5  going to decide.
6      A    No.
7      Q    That was your testimony, right?
8      A    Yes.
9      Q    But Kik was concerned about what they
10  could decide.
11      A    Right.  We didn't want -- we wanted to
12  comply, and so we didn't want to do something that
13  would breach that, and they hadn't made a decision
14  about what framework they were using to evaluate
15  it.
16      Q    And on that basis you decided not to
17  offer the Kins in Canada, correct?
18      A    Correct.
19      Q    I'll take back 58.
20      A    58 and -- do you want both of these?
21  You have 52 there also.
22      Q    That's fine.
23          (Plaintiff's Exhibit 59 was marked for
24          identification.)
25

181

1  BY MR. MENDEL:
2      Q    I'm showing you what's been marked
3  Deposition Exhibit 59, which was in the
4  Investigation Exhibit 187.  It says at the top,
5  "Canadian Residents Excluded from Next Week's Kin
6  TDE."  It's dated September 7, 2017.
7          Do you recognize this?
8      A    Yes.
9      Q    This was a Medium post by
10  Mr. Livingston, correct?
11      A    Correct.
12      Q    Announcing that Kin wouldn't be sold to
13  Canadians?
14      A    Correct.
15      Q    This was the announcement on
16  September 7th?
17      A    Correct.
18      Q    This is two days after the Blakes
19  letter?
20      A    Yes.  Sorry.  What was the date of the
21  Blakes letter?
22      Q    It's referred to in Exhibit -- let me
23  just hand you back 58 briefly.  In the paragraph
24  it discussed a letter from Ms. Chaukos on the 5th.
25      A    Okay.

182

1      Q    Do I have that right?
2      A    Yes.
3      Q    So, I said -- so in the November 2nd
4  Blakes letter, where it refers to --
5      A    Sorry, it says -- it wasn't a letter
6  from Chaukos.  It was a telephone phone call with
7  Chaukos.
8      Q    Thank you for clarifying.
9      A    Okay.
10      Q    I spoke incorrectly.
11      A    Yes.
12      Q    So just to make the record clear, the
13  Blakes letter in Exhibit 58 states that "In a
14  telephone call from Ms. Chaukos on September 5th,
15  the OSC staff definitively communicated a position
16  that the ITD constituted an offering of
17  securities," right?
18      A    Right.
19      Q    Okay.  So two days after that phone call
20  on September 5th, on September 7th the
21  announcement came out from Mr. Livingston that
22  Canadians were excluded, correct?
23      A    Correct.
24      Q    Thank you.
25          In late August, Kik announced the

183

1  schedule for its token distribution event?
2      A    I believe so.
3      Q    Is it your recollection Kik issued a
4  press release on August 29th, 2017, announcing
5  that the event would start September 12th?
6      A    I don't recall the press release, but do
7  you have it there?
8          (Plaintiff's Exhibit 55 was marked for
9          identification.)
10  BY MR. MENDEL:
11      Q    I'm handing you what's been marked
12  Deposition Exhibit 55.
13      A    Yes, that's August 29th.
14      Q    And this was Exhibit 93 in the
15  investigation, so, yes, this -- this is the
16  August 29th press release issued by Kik, right?
17      A    Yes.
18      Q    It announced that the event would start
19  September 12th?
20      A    Yes.
21      Q    It says, "Kik also announced that" -- in
22  the first paragraph -- "it has successfully closed
23  a presale round of U.S. 50 million to select
24  accredited investors, including Blockchain
25  Capital, Pantera Capital, and Polychain Capital,

184

1  right?
2      A    Yes.
3      Q    But as we discussed previously, certain
4  SAFTs were entered into after this date, on
5  September 11th, right?
6      A    Right.
7      Q    And then at the bottom it says, "To
8  learn more about Kin and to register for the TDE,
9  please visit kin.kik.com.  All who want to
10 participate in the TDE must register by
11 September 9th."  Right?
12     A    Correct.
13     Q    I'll take that back.  Actually, just
14 keep it for the moment.
15          (Plaintiff's Exhibit 60 was marked for
16          identification.)
17 BY MR. MENDEL:
18     Q    I'm providing you what's been marked
19 Deposition Exhibit 60.  This was Exhibit 93 in the
20 investigation.  And this is the September 12th
21 press release by Kik that the token distribution
22 event was commencing, correct?
23     A    Correct.
24     Q    And it gives information about the
25 results of what it called the presale, right?

185

1      A    Correct.
2          (Plaintiff's Exhibit 61 was marked for
3          identification.)
4  BY MR. MENDEL:
5      Q    I handed you what's been marked
6  Deposition Exhibit 61, right, that was Exhibit 95
7  in the investigation?
8      A    Yes.
9      Q    And this was the announcement that the
10 token distribution event had successfully ended,
11 right?
12     A    Yes.
13     Q    And it states in the first sentence that
14 "The token distribution event has successfully
15 ended, raising nearly U.S. 100 million," correct?
16     A    Correct.
17     Q    I'll take all three of those back.
18          (Plaintiff's Exhibit 62 was marked for
19          identification.)
20 BY MR. MENDEL:
21     Q    I've given you Deposition Exhibit 62,
22 which was Exhibit 188 in the investigation.
23          Do you recognize this as the Certificate
24 of Incorporation for the Kin Ecosystem Foundation?
25     A    Yes.

186

1      Q    The Foundation was formed on
2  September 12th, 2017, right?
3      A    Correct.
4      Q    The Foundation had no operations between
5  the date of its formation on September 12th, 2017,
6  and the token distribution event, right?
7      A    Right.
8      Q    Directors were announced -- when the
9  Foundation was formed, the directors were you and
10 Mr. Livingston, right?
11     A    Correct.
12     Q    When formed, the Foundation was not
13 independent of Kik, right?
14     A    I'm not sure how -- I'm not sure what
15 the structure was of the foundation offhand
16 because it's a trustee organization so it doesn't
17 have a share structure, per se.
18     Q    Right.
19          Can you look at your transcript, please,
20 on page 455.
21     A    Yes.  (Document review.)
22          Okay.
23     Q    The question at -- well, the sequence
24 starts on the bottom of page 455, line 21.
25     A    Okay.

187

1      Q    "Okay."  And this is a question.  "Okay.
2  So, at the time, at the token distribution event,
3  had people decided, well, let me -- sorry, when it
4  was formed, who were the directors?"
5          Answer, "Directors at that time would
6  have been Ted Livingston and myself."
7          Question --
8      A    Right.
9      Q    Question, "So at the time it was formed,
10 was this entity independent of Kik?"
11          Answer, "No."
12     A    Well, it depends on how you define
13 independence because it was set up as a trust to
14 hold the shares so it's not, like, owned by Kik.
15 You would -- you could -- so whether it was
16 independent or not, it's -- I mean, it's a
17 difficult question because the structure of this,
18 from what I understand, is a trust.
19     Q    Well, if you're just looking at the
20 identity of the directors, was it independent?
21     A    Based on that, no.
22     Q    Because you and Mr. Livingston were both
23 directors of --
24     A    Yes.
25     Q    -- of Kik Interactive, right?

188

1    A   Yes.
2    Q   Okay.
3    A   However, that was not the intent at the
4  time because both William Mougayar and Bill
5  Raduchel were as designee directors.
6    Q   But as designee directors, they didn't
7  have a vote, correct?
8    A   No.
9    Q   At the time of the token distribution
10  event, had the Foundation done anything?
11    A   No.
12    Q   Had it taken any actions?
13    A   Not that I believe.
14    Q   Not that you can remember, right?
15    A   No.
16    Q   From the time of the token distribution
17  event in September of 2017 to the end of that year
18  2017, the Kin Foundation was not independent of
19  Kik, as identified by their directors, correct?
20    A   Correct.
21    Q   And by the end of 2017, the Kin
22  Ecosystem Foundation was not operating, right?
23    A   It wasn't operating, but we did have
24  meetings as though it was operating.  So we had, I
25  believe, two meetings with William Mougayar and

189

1  Bill Raduchel, with whom we discussed actions of
2  the Foundation, like, i.e., we engaged McKenzie at
3  the time, and there was one other discussion, but
4  I can't remember what it was offhand.
5    Q   These were meetings with you -- how do
6  you say his name, Mougayar?
7    A   Mougayar.
8    Q   Mougayar.
9    A   Yes.
10        Bill Raduchel and Ted and myself.  And I
11  can't recall whether anybody else was on the call.
12    Q   There were two meetings?
13    A   Yes.
14    Q   Was McKenzie retained?
15    A   Yes.
16    Q   When?
17    A   I can't recall.  Like, it was in the
18  fall, but I can't recall when.
19    Q   Did Kik pay for McKinsey's retention?
20    A   I can't recall the distribution of funds
21  at the time.
22    Q   Did the Foundation have any assets to
23  pay other than the Kin that it owned?
24    A   We had loaned over $100,000 to the
25  Foundation.  I recall that.

190

1    Q   Who is "we"?
2    A   Kik did.
3    Q   Kik had loaned the Foundation $100,000.
4    A   Correct.
5    Q   Did the Foundation have any other cash?
6    A   No.
7    Q   You served on the Foundation Board until
8  May 2018?
9    A   Correct.
10    Q   During the time you served on the
11  Foundation Board, the Foundation had no other
12  directors who could vote and no employees; is that
13  right?
14    A   That's correct.
15    Q   During the time you served on the Board
16  of the Foundation, the Foundation had no
17  operations other than meetings between yourself
18  and the other -- and Mr. Livingston and
19  Mr. Mougayar and Mr. Raduchel, correct?
20    A   Correct.
21    Q   And the Foundation did receive Kin
22  during the token distribution event, right?
23    A   Yes, I believe so.
24    Q   Your testimony is the Foundation
25  obtained separate D&O insurance?

191

1    A   Correct.
2    Q   It was Kik that funded the Foundation's
3  directors and officers insurance, isn't it?
4    A   Correct.
5    Q   And they funded it through the $100,000
6  that was put into the foundation bank account.
7    A   Yes.
8    Q   That money was only spent on insurance.
9  It wasn't spent on anything else, right?
10    A   I don't recall if there was anything
11  else.
12        (Plaintiff's Exhibit 71 was marked for
13        identification.)
14  BY MR. MENDEL:
15    Q   I've handed you what's been marked
16  Deposition Exhibit 71.  I don't believe you were
17  shown this in your investigative testimony.
18    A   No.
19    Q   It's an email chain from December 2017.
20  At the bottom of the chain, it's an email from
21  Chris Cameron from The Magnes Group to William
22  Raduchel and Mr. Mougayar and a cc to you,
23  Mr. Heinke.  It says, "Hi, everyone.  Thanks very
24  much for your patience.  Attached is the summary
25  for the D&O quotes we've obtained to build a

192

1  $20 million tower."  And it provides some other
2  details.
3        Do you know what Mr. Cameron is saying
4  about the $20 million tower?
5     A   I'm not sure what he means by "tower,"
6  but it's a $20 million coverage is what I assume
7  it means.
8     Q   Is that what the Foundation got?
9     A   I can't recall.  I believe so, based on
10 what's said here.
11    Q   What was your role in arranging the
12 coverage?
13    A   Basically just to direct Chris Cameron
14 to look at foundation insurance, and then it says
15 here, "Report to Bill and William."
16    Q   Had they requested $20 million coverage?
17    A   I can't recall what the request was or
18 whether that was what seemed -- what his
19 assessment was what would be necessary.
20       It says here -- if you look here, it
21 says, "Can you please confirm that you're okay to
22 proceed and bind the coverage.  This reflects the
23 increase that you requested to 20 million."
24    Q   Yes.
25    A   So it would be requested by them, based

193

1  on the email string.
2     Q   Did you essentially act as a go-between
3  to arrange the coverage?
4     A   I made the contact with Chris Cameron
5  because he was our -- he was Kik's insurance
6  agent.
7     Q   Was the insurance that the Foundation
8  obtained through the same agent, Magnes?
9     A   Yes.
10    Q   I'll take that back.
11    A   Do you want this, too?
12    Q   Yes.  Thank you.
13       You mentioned Mr. Mougayar's role with
14 the Foundation.
15       Kik had already hired Mr. Mougayar as a
16 consultant to help with the Kin project, right?
17    A   That's correct.
18    Q   He was paid $5,000 a month?
19    A   Correct.
20    Q   That was from the March time period of
21 2017?
22    A   Correct.
23    Q   And while you were a director of the
24 foundation, Mr. Mougayar --
25    A   Mougayar.

194

1     Q   Mougayar, thank you.
2        He did not also hold the title of
3  director, correct?
4     A   No.
5     Q   And he didn't vote?
6     A   No.
7     Q   The other person you said you consulted
8  with was Bill Raduchel?
9     A   Correct.
10    Q   While you were a director of the
11 Foundation, the Foundation didn't pay
12 Mr. Raduchel, did it?
13    A   No.
14    Q   Did Kik pay Mr. Raduchel?
15    A   I don't believe so, no.
16    Q   He didn't hold the title of director
17 while you held it, correct?
18    A   No.
19    Q   Did he ever hold the title of director?
20    A   No, he was just a designee.
21    Q   He never became a director at all.
22    A   No.
23       (Plaintiff's Exhibit 25 was marked for
24       identification.)
25

195

1  BY MR. MENDEL:
2     Q   I have handed you what's been marked
3  Deposition Exhibit 25.
4     A   Yes.
5     Q   This was Investigatory Exhibit 167.
6     A   Correct.
7     Q   Let me ask you, before we get to the
8  details of that, do you have any current position
9  with Kik?
10    A   No, other than as a shareholder.
11    Q   Okay.
12       Have you sold any shares of Kik since
13 the 1 million that you mentioned?
14    A   No.
15    Q   Did that position increase?
16    A   No.  I did -- we did, back when -- I
17 don't know what year it was.  We all gave
18 5 percent of our equity holdings to other
19 employees through another -- through a company,
20 but I can't recall the structure of how it was set
21 up.
22    Q   What year was that?
23    A   Probably around 2014 or '15.  It was
24 when we did the B round.
25    Q   Okay.

196

1    You stopped being an employee of Kik on
2 June 30th, 2018; is that right?
3    A    Correct.
4    Q    And then you worked for Kik as a
5 consultant.
6    A    Correct.
7    Q    And what I have given you as Exhibit 25,
8 this is your consulting agreement?
9    A    Correct.
10    Q    Looking at the first page, ending in
11 219, it says this was entered into on the first
12 day of July 2018.
13    A    Correct.
14    Q    Is that when it was entered into?
15    A    Yes.
16    Q    If you go to page 3, ending in numbers
17 221 on the lower right corner --
18    A    Correct.
19    Q    -- those are the signatures of
20 Mr. Livingston for Kik and then signed by you
21 below, right?
22    A    Correct.
23    Q    Going back to the first page, under
24 "Term," it states in the middle of the paragraph
25 there, "This agreement shall have a term of 12

197

1 months after which this agreement may be renewed
2 on a month-to-month basis by further agreement of
3 the parties hereto," correct?
4    A    Yes.
5    Q    Was this agreement renewed?
6    A    No.
7    Q    Did you enter into a new agreement with
8 Kik after that?
9    A    How do you define agreement?
10    Q    Did you enter into any kind of
11 consultant agreement with Kik?
12    A    No.
13    Q    Was -- looking at page 2, there's a
14 termination clause 6.  Was the agreement
15 terminated under this clause?
16    A    No.
17    Q    So the agreement went to completion,
18 right, 12 months?
19    A    Correct.
20    Q    Let's go to Schedule A, which has the
21 numbers 222 on the lower right corner.  Do you see
22 that?
23    A    Yes.
24    Q    So, this Schedule A includes a statement
25 of work, and it includes a section on fees.  And

198

1 looking at the "Fees" section, it states,
2 "Consultant shall receive 51,600 Canadian dollars
3 a month for 12 months, payable in advance in two
4 equal installments."
5    Did you receive those two installments?
6    A    Yes, I did.
7    Q    Those were on July 1st, 2019, and
8 January -- I'm sorry, those were on July 1st,
9 2018, correct?
10    A    Yes.
11    Q    And January 1st, 2019.
12    A    That's correct.
13    Q    So the second installment came after
14 your investigative testimony in September of 2018,
15 right?
16    A    Correct.
17    Q    It says, directly above "Fees,"
18 "Consultant will be required to provide
19 approximately 15 hours of advisory services per
20 month"?
21    A    Correct.
22    Q    So this -- if you average out 51,600
23 Canadian dollars over 15 hours, that's about 3,440
24 Canadian dollars per hour; is that right?
25    A    Correct.

199

1    Q    Did you exceed this 15-hour requirement
2 in any month of your consultancy?
3    A    No.  Well, I would say that I was --
4 down here, there would have been, like, two
5 days -- two full days just in that.  So there
6 would have been work, but I say over the course of
7 the year, when you average out the 15,000, it
8 didn't exceed -- or 15 hours.
9    Q    When you're talking about "down here,"
10 you mean for your investigative testimony.
11    A    Exactly.
12    Q    Okay.
13    So Kik never paid you -- during the term
14 of your agreement, Kik never paid you extra in
15 addition to what you were ob- -- due under this
16 agreement, correct?
17    A    No, they didn't.
18    Q    In your view, was the time you spent
19 as -- testifying with the SEC, was that pursuant
20 to this agreement?
21    A    Yes, because it says, "Continued support
22 with respect to regulatory issues such as the
23 SEC."
24    Q    Okay.  So the testimony fell into that
25 bucket, bucket number 1 under --

200

1    **A**   I mean, I would --
2    **Q**   -- Schedule A?
3    **A**   Yes, I would assume -- yes.  It wasn't a
4  direct correlation.
5    **Q**   But you counted it?
6    **A**   I didn't really count it.  I just had --
7  I didn't keep a set time record if that's what
8  you're asking.
9    **Q**   No, I mean, I'm not asking that.  I'm
10  just asking if you considered your testimony
11  before the SEC in September to be doing work under
12  your consulting agreement, specifically statement
13  of work 1.
14    **A**   I didn't -- I wouldn't say I considered
15  it beforehand, before you just raising it right
16  now.  I mean, it was something I did, but it was
17  sort of -- I just looked at it as a bucket here of
18  a number of different things.
19    **Q**   So you just did it.
20    **A**   Yes.
21    **Q**   Did you think it was under your
22  consulting agreement?
23    **A**   I guess you could say that, but I don't
24  know -- I'm not sure about the exact testimony.
25  It was just ongoing support, it says there.

1    **Q**   Did you perform any other tasks under
2  this item, number 1?
3    **A**   I can't recall.  It's over a year ago.
4    **Q**   You could have, you just don't know?
5    **A**   I just don't know.
6    **Q**   Would you say -- well, for your
7  investigative testimony, did you prepare for it?
8    **A**   Yes.
9    **Q**   Where did you prepare?
10    **A**   I prepared in Palo Alto.
11    **Q**   How many days did you prepare?
12    **A**   I think it was one to two days.
13    **Q**   Was that preparation with Cooley's
14  lawyers?
15    **A**   Yes.  Sorry, and then another day here
16  just prior to.
17    **Q**   Did you receive compensation, apart from
18  your consulting agreement, for your preparation
19  for those sessions?
20    MR. CADIGAN:  Objection.  Go ahead.
21    **A**   I was paid the expenses for flights, or
22  they paid them directly.
23    **Q**   Did you receive any other payments for
24  your time spent preparing for your investigative
25  testimony in 2018?

1    **A**   No, I didn't.
2    **Q**   Have you paid any legal bills related to
3  the SEC's investigation or this lawsuit?
4    **A**   No, he haven't.
5    **Q**   Do you have an understanding who's
6  covering the bills for your attorneys sitting
7  here?
8    **A**   Can I just take a step back?
9    **Q**   Yes.
10    **A**   I had one -- I had a call with, just
11  recent- -- well, before this happened, I did have
12  one call with a Canadian counsel who I just went
13  through, and then that was it.  And I don't think
14  he's even billed me for the time.
15    **Q**   When you say "this," are you talking
16  about this deposition?
17    **A**   Yes.
18    **Q**   So you called a Canadian counsel, not
19  Cooley --
20    **A**   Yes.
21    **Q**   -- about this.
22    **A**   Yes.
23    **Q**   And you may get a bill for that.
24    **A**   Right.
25    **Q**   Do you know who's going to pay for that?

1    MR. CADIGAN:  Objection.
2    **A**   I haven't presented it yet, but ...
3    **Q**   Presented it to Kik, you mean?
4    **A**   Yes, because I haven't gotten a bill.
5    **Q**   Do you plan to?
6    MR. CADIGAN:  Objection.  You're talking
7  about something he hasn't received.
8    **A**   I haven't received it yet so I'll take a
9  look what it is.  He might not even charge me
10  so --
11    **Q**   Okay.  So you'll address that.  You may
12  submit it to Kik after you receive it.
13    **A**   May or may not.  I'm not sure.
14    MR. CADIGAN:  Objection.
15    **Q**   I'm just saying what your future plans
16  are.  I think you can say what your future plans
17  are.
18    MR. CADIGAN:  Speculation.  Objection.
19  Go ahead, answer.
20    **A**   I may or may not.  I'm not sure what I
21  will do yet.
22    **Q**   Has anybody at all made any payments to
23  you for appearing for this deposition today?
24    **A**   No.  Just taking, considering, like,
25  the -- I paid for the hotel this morning, and the

1  flights were booked through Kik.
2      **Q**   Has anybody made any payments to you for
3  appearing -- for preparing for this deposition?
4      **A**   No.
5      **Q**   Do you have any kind of understanding,
6  like, broadly speaking, for payments that might
7  come to you for appearing in this deposition
8  today?
9      **A**   No.
10     **Q**   Do you have any understanding of
11 payments that come to you for preparing for
12 the deposition today?
13     **A**   Only for the expenses, flights and
14 hotel.
15     **Q**   Flights and hotel.
16         You don't have an understanding that
17 you'll be paid for your time today or for
18 preparing?
19     **A**   No.
20     **Q**   Did you ever have emails with anybody
21 about the possibility of being paid for your time?
22     **A**   No.
23     **Q**   Are you doing any work at all for Kik
24 right now?
25     **A**   No.

205

1      **Q**   Have you done any work at all for Kik in
2  2019?
3      **A**   In 2019. I don't -- I can't recall any.
4  Like, they might have gotten some calls about
5  something for clarifications, but I have done no
6  specific work for Kik.
7      **Q**   Are you still in touch with
8  Mr. Livingston?
9      **A**   I have spoken to him twice, probably,
10 since I've left.
11     **Q**   What about Fred Wilson?
12     **A**   No, I haven't spoken to Fred.
13     **Q**   Paul Holland?
14     **A**   No.
15     **Q**   After leaving Kik back in 2018 --
16     **A**   Yes.
17     **Q**   -- what have you been doing
18 professionally?
19     **A**   Well, I took time off. I took a course
20 from Oxford on blockchain. And then I worked for
21 a company that put a major retailer's freight
22 management system on blockchain. And I've advised
23 an educational company on strategy and sale. And
24 then I've also just recently picked up a contract
25 with a tech company for doing -- basically, they

206

1  have a technology for converting WiFi in your home
2  to motion detection.
3         And that's just been recently.
4      **Q**   Do you own Kin?
5      **A**   Yes.
6      **Q**   Since when?
7      **A**   Since the TDE.
8      **Q**   Have you sold any of it?
9      **A**   No.
10     **Q**   And you -- as we discussed, you
11 currently live in Canada at the address you
12 provided?
13     **A**   Yes.
14     **Q**   Did you meet with lawyers to prepare for
15 today's deposition?
16     **A**   Yes, I did.
17     **Q**   When?
18     **A**   Yesterday.
19     **Q**   Where?
20     **A**   Cooley's office here in Washington.
21     **Q**   How long did you meet?
22     **A**   Four hours, five hours.
23     **Q**   In addition to that, you reviewed the
24 transcripts, right?
25     **A**   That's correct.

207

1      **Q**   Did you review documents?
2      **A**   Did I review documents?
3      **Q**   Yesterday during your preparation.
4      **A**   Yes.
5      **Q**   Ballpark, how many did you look at?
6      **A**   I can't really say. Maybe 10 to 15.
7  Probably similar to what I looked at here.
8      **Q**   And they refreshed your recollection?
9      **A**   In some of the cases, yes.
10         MR. MENDEL: Can we go off the record,
11 please.
12         THE WITNESS: Sure.
13         MR. CADIGAN: Yes.
14         THE VIDEOGRAPHER: We're going off the
15 record. The time is 2:23 p.m.
16         (A brief recess was taken.)
17         THE VIDEOGRAPHER: We're back on the
18 record. The time is 2:30 p.m.
19         MR. MENDEL: The SEC passes the witness.
20         MR. CADIGAN: We have no questions.
21         MR. MENDEL: Thank you, Mr. Heinke.
22         THE WITNESS: Thank you.
23         MR. MENDEL: Okay. We're done.
24         (Discussion off the record.)
25         THE VIDEOGRAPHER: We're off the record

208

1 at 2:30 p.m., and this concludes today's
2 deposition given by Peter Heinke.
3          (The deposition was concluded at 2:30 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

209

ERRATA SHEET
Deposition of Peter Heinke, Vol. 1
Date taken: November 22, 2019
Case:  SEC vs. Kik Interactive, Inc.
PAGE LINE
4  _____ _____   CHANGE: _____
   _____ _____   REASON: _____
5
6  _____ _____   CHANGE: _____
   _____ _____   REASON: _____
7  _____ _____   CHANGE: _____
   _____ _____   REASON: _____
8
9  _____ _____   CHANGE: _____
10 _____ _____   REASON: _____
11 _____ _____   CHANGE: _____
12 _____ _____   REASON: _____
   _____ _____   CHANGE: _____
13 _____ _____   REASON: _____
14 _____ _____   CHANGE: _____
15 _____ _____   REASON: _____
   _____ _____   CHANGE: _____
16 _____ _____   REASON: _____
17 _____ _____   CHANGE: _____
18 _____ _____   REASON: _____
   _____ _____   CHANGE: _____
19 _____ _____   REASON: _____
20 _____ _____   CHANGE: _____
21 _____ _____   REASON: _____
   _____ _____   CHANGE: _____
22 _____ _____   REASON: _____
23 _____ _____   CHANGE: _____
   _____ _____   REASON: _____
24 Signed _____
25 Dated _____

211

CERTIFICATE OF WITNESS

I, PETER HEINKE, declare that I have read the entire
transcript of Volume 1 of my deposition testimony, or
the same has been read to me, and certify that it is a
true, correct and complete transcript of my testimony
given on Friday, November 22, 2019, save and except
for changes and/or corrections, if any, as indicated
by me on the attached Errata Sheet, with the
understanding that I offer these changes and/or
corrections as if still under oath.
_____ I have made corrections to my deposition.
_____ I have NOT made any changes to my deposition.

Signed _____
       PETER HEINKE (Volume 1)

Dated this _____ day of _____ , _____

210

REPORTER CERTIFICATED

I, Michele E. Eddy, Registered Professional Reporter
and Certified Realtime Reporter, Participating Member
of NCRA, do hereby certify that:  Peter Heinke
appeared before me on Friday, November 22, 2019, was
sworn by me, and was thereupon examined by counsel;
that the foregoing is true and accurate to the best of
my knowledge, skill and ability; that the testimony of
said witness was taken and reduced to stenotype
writing before me; that the said transcript is a true
and accurate record of the testimony given by said
witness; that I am neither counsel for, related to,
nor employed by any of the parties to the action in
which this deposition was taken; and further, that I
am not a relative or employee of any attorney or
counsel employed by the parties thereto; nor
financially or otherwise interested in the outcome of
the action.
     IN WITNESS WHEREOF, I have hereunto set my hand
this 2nd day of December, 2019.

_____

Michele E. Eddy, RPR, CRR, CRI
Notary Public in and for the District of Columbia
My Commission expires July 14, 2022

212