SEC5

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:     )

                      )   File No. HO-13388-A

                      )

KIK INTERACTIVE      )


WITNESS:  Eileen Lyon

PAGES:    1 through 161

PLACE:    U.S. Securities and Exchange Commission

          100 F Street, N.E.

          Washington, D.C. 20549

DATE:     Thursday, August 30, 2018


     The above-entitled matter came on for hearing,

pursuant to notice, at 9:45 a.m.


Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

1   APPEARANCES:
2   On behalf of the Securities and Exchange Commission:
3       BRENT MITCHELL, ESQ.
4       JAMES MURTHA, ESQ.
5       JEFF LEASURE, ESQ.
6       STEPHAN SCHLEGELMILCH, ESQ.
7       DAVID MENDEL, ESQ.
8       Securities and Exchange Commission
9       100 F Street, N.E.
10      Washington, D.C. 20549
11      (202)551-4683
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1               C O N T E N T S
2   WITNESS:                    EXAMINATION
3   Eileen Lyon                     5
4
5   EXHIBITS     DESCRIPTION          IDENTIFIED
6   130      Subpoena              7
7   131      Resume               10
8   132      Charts               40
9   133      Charts               41
10  134      Memorandum           64
11  135      Chart                67
12  136      Spreadsheet          70
13  137      E-mail Chain         90
14  138      Letter               95
15  139      Attachment           96
16  140      E-mail Chain         99
17  141      E-mail Chain        108
18  142      E-mail Chain        110
19  143      E-mail Chain        115
20  144      E-mail Chain        119
21
22
23
24
25

Page 3

1       APPEARANCES(CONT.)
2
3   On behalf of the Witness:
4       LUKE CADIGAN, ESQ.
5       BRETT DEJARNETTE, ESQ.
6       PATRICK GIBBS, ESQ.
7       Cooley LLP
8       500 Boylston Street
9       Boston, Massachusetts 02116
10      617.937.2480
11      KENNETH LENCH, ESQ.
12      Kirkland & Ellis
13      655 Fifteenth Street, N.W.
14      Washington, D.C. 20005
15      202.879.5270
16
17  Also Present:
18      Steven Jones, Videographer
19      Ryan Walker, SEC Intern
20
21
22
23
24
25

Page 5

1           P R O C E E D I N G S
2       THE VIDEOGRAPHER:  Good morning this begins
3   disc number one.  We are on the record at 9:45 a.m.
4       MR. MITCHELL:  Ms. Lyon, could you put up
5   your right hand?  Do you swear or affirm to tell the
6   truth, the whole truth, and nothing but the truth?
7       THE WITNESS:  I do.
8   Whereupon,
9           EILEEN LYON
10  was called as a witness and, having been first duly sworn,
11  was examined and testified as follows:
12          EXAMINATION
13  BY MR. MITCHELL:
14      Q   Okay.  Can you please state and spell your
15  name for the record?
16      A   It's Eileen, E-i-l-e-e-n, Lyon, L-y-o-n.
17      Q   Perfect.  My name is Brent Mitchell.  With
18  me today are Jeff Leasure, James Murtha, David Mendel,
19  and Stephan Schlegelmilch.  We are all officers of the
20  Commission for purposes of this proceeding.  Also with
21  us today is an SEC intern named Ryan Walker.
22      MR. MITCHELL:  Do you have any objection to
23  Ryan being here?
24      MR. CADIGAN:  No.
25      BY MR. MITCHELL:

## Page 6

1     **Q  This is an investigation by the United**
2 **States Securities and Exchange Commission in the matter**
3 **of Kik Interactive to determine whether there have been**
4 **violations of certain provisions of the federal**
5 **securities laws. However, the facts developed in this**
6 **investigation might constitute violations in other**
7 **federal or state, civil or criminal laws.**
8     **Prior to the opening of the record, I gave**
9 **you a copy of the formal order of investigation in this**
10 **matter, and it's stapled with the two supplements. It**
11 **will be on the -- we'll just leave it on the table.**
12 **It's available to use during the course of the**
13 **proceeding.**
14     **Ms. Lyon, have you had an opportunity to**
15 **review the formal order?**
16     **A  Yes.**
17     **Q  Also, before that, I gave you what has been**
18 **marked as Exhibit 1. That is the -- it's actually this**
19 **document right -- it's the Form 1662, the Commission**
20 **supplemental information form.**
21     **Have you had an opportunity to read**
22 **Exhibit 1?**
23     **A  Yes.**
24     **Q  Do you have any questions about it?**
25     **A  No.**

## Page 7

1     **Q  Are you represented today by counsel?**
2     A  Yes, I am.
3     MR. MITCHELL: Could your counsel identify
4 themselves or in groups or however you want to do it?
5     MR. CADIGAN: Luke Cadigan of Cooley, LLP
6 for the witness, Ms. Lyon and Kik.
7     MR. GIBBS: Patrick Gibbs from Cooley, also
8 for the witness and then Kik.
9     MR. LENCH: Kenneth Lench, Kirkland &
10 Ellis, LLP, representing the witness today.
11     MR. DEJARNETTE: Brett DeJarnette from
12 Cooley on behalf of the witness and Kik.
13     MR. MITCHELL: Okay. Can you -- Cooley
14 also represents some other people.
15     Can we just put that on the record?
16     MR. DEJARNETTE: So Cooley and Kirkland
17 collectively represent Kik, Ted Livingston, Peter
18 Heinke, Tanner Philp, and Phil Yang. Cooley represents
19 Erin Clift, Eran Ben-Ari, Fred Wilson, and Union Square
20 Ventures.
21     BY MR. MITCHELL:
22     **Q  Okay. Before we went on the record, we**
23 **also marked as Exhibit 130.**
24     **(SEC Exhibit No. 130 was marked for**
25     **identification.)**

## Page 8

1     BY MR. MITCHELL:
2     **Q  A document there that is a --**
3     MR. CADIGAN: Wait. Before we get started,
4 can we -- I just make a comment, actually.
5     MR. MITCHELL: Oh, yeah.
6     MR. CADIGAN: And as we've discussed in our
7 call yesterday, the -- obviously, the active
8 subpoenaing in-house attorney is somewhat irregular but
9 the company, never to be uncooperative, has presented
10 Ms. Lyon today. In looking and anticipating potential
11 questions, obviously, there are a lot of potential
12 privilege issues. Almost all of Ms. Lyons' knowledge
13 comes based upon her communications with outside
14 counsel or in her role as in-house counsel,
15 communications with Kik employees. All of that would
16 be privileged.
17     But in addition, any questions that might
18 be reserved for other witnesses or might be appropriate
19 for other witnesses, they get into her mental
20 impressions, her motivations, her understandings, why
21 she did something, would she have thought of something
22 of the like would also be off limits.
23     And as we discussed yesterday with that, I
24 think any, you know, well-crafted questions hopefully
25 would -- you know, we're, obviously, presenting her to

## Page 9

1 be able to allow you to ask questions and get around it
2 and not get into those issues.
3     To the extent she's here today, obviously,
4 you know, she has no intention, as we discussed
5 yesterday, of making any waiver of the attorney-client
6 privilege. Any discussion there that we get into, that
7 would be inadvertent. She actually has no authority on
8 behalf of the company to waive, and I believe that
9 we've discussed that you're not intending to use
10 anything that she says here to be a broader waiver or
11 broad waiver of any attorney-client privilege or any
12 waiver of the attorney-client privilege.
13     MR. MITCHELL: Right. In terms of the
14 issue of authority, we have -- we -- I think we agree.
15 We understand that she doesn't have the authority.
16 We're going to talk to her today, and, likely, the
17 questions and answers we do today will just be what
18 they are.
19     MR. CADIGAN: Okay.
20     MR. MITCHELL: On the issue of the rest of
21 it, we'll just -- my suggestion is we'll just do it
22 question by question and see how things go.
23     MR. CADIGAN: Yeah. Okay.
24     MR. MITCHELL: Good?
25     MR. CADIGAN: That's good.

Page 10

BY MR. MITCHELL:
**Q   Okay.  Ms. Lyon, is Exhibit 130 a copy of**
**the subpoena you are appearing pursuant to here today?**
A   It appears to be.
**Q   Okay.  So what I'm going to do is just**
**clean these up, and I'll leave them on the counter -- I**
**mean, leave them on the table here in case you want to**
**see them later.**
A   Okay.
**Q   So I'm going to ask you to sort of just to**
**run through at a resume level your education and jobs**
**after high school.  And to make that more efficient, I**
**have marked Exhibit 131.**
        (SEC Exhibit No. 131 was marked for
identification.)
BY MR. MITCHELL:
**Q   Which I think is a copy of your resume.  It**
**is a double-paged document with the Bates number**
**KIK_foundation_cap_003440 to 401.**
A   Okay.
**Q   Have you had a chance to look at it?**
A   Yes.
**Q   What is it?**
A   This appears to be my resume as a lawyer.
It doesn't actually cover everything since high school.

Page 11

**Q   Sure.**
A   But what would you like to know?
**Q   Well, I guess, if you -- could you just**
**sort of --**
A   Start at the beginning?
**Q   Well, yeah.**
A   Okay.
**Q   Start with college and what you did and --**
A   I went to college at UCLA and studied
history.  And then I worked as a paralegal for a year
in a small law firm in Los Angeles during which time I
applied to law school and attended the University of
Southern California.  From there I went to Manatt,
Phelps, & Phillips, which is a national law firm, and I
was in their corporate department for 13 years rising
to the level of partner.
        In 2000, I left the firm and joined
Hawthorne Savings and its parent company, Hawthorne
Financial Corporation, as senior vice president general
counsel and corporate secretary.  I was responsible for
not only the legal affairs, but I also chaired the
compliance committee there.
        After that, I -- the company was merged
with another company.  So I left there and had a few
months off until I took a position with Far East

Page 12

National Bank.  And I was their chief legal officer,
also had responsibility for compliance as well as the
Bank Secrecy Act and anti-money laundering program.
        And then when I left that firm in 2012, I
went to a small law firm in Los Angeles that did a lot
of merger and acquisition activity involving community
banks.  And at that time, I met the people from Kik --
actually, the CFO briefly through an introduction from
the Cooley firm.  And I didn't really do much work for
them at that time.  But after I was at King Holmes, I
was hired to be general counsel at Citizens Business
Bank and its parent company, CVB Financial, and I was
there for about a year when I left.
        And after that period of time, I was
thinking about what I would want to do next.  So I
spoke with my colleague at Cooley.  And she mentioned
that Kik might want to have somebody with my background
be their general counsel.  But I was committed to
working on a merger transaction with -- oh, I can't
even remember the bank.  It was a friend of mine, but
they were being acquired by PacWestern and they needed
to close the deal.
        So I committed to work for her for a few
months part time.  And so I started with Kik on a
part-time basis until October.  And in October, I

Page 13

started working with Kik full time as their general
counsel and chief compliance officer.
**Q   Okay.**
        MR. SCHLEGELMILCH:  And that's
October 2017?
        THE WITNESS:  Yes.
        BY MR. MITCHELL:
**Q   Sure.  I think you said it, but at**
**Hawthorne, you chaired a compliance committee?**
A   Uh-huh.
**Q   What does that mean?  What did that entail?**
A   Well, banks are subject to a wide range of
regulatory compliance matters, and we had a compliance
group.  But we determined that it was more efficient
and effective as a compliance function to outsource it
to a consulting firm.  And I'm trying -- I think we
used Protiviti for that, and they actually conducted
the compliance audits.  But the compliance committee
established what the program would be.  And I was the
chair of that -- of that committee.
        So it covered the full range of regulatory
compliance matters that banks are subject to.
**Q   Okay.  And at Far East it also -- I think**
**your resume also said you restructured the**
**reorganization of the broker-dealer affiliate?**

Page 14

1    A   Correct. Gosh, I had forgotten about that.
2    They had a broker-dealer affiliate, and it wasn't
3    really very active.  And so my recollection is we took
4    it into a nondeposit investment products affiliate.  So
5    taking it from an actual subsidiary to an affiliate
6    that wasn't a registered broker-dealer that did --
7    because, again, we outsourced the broker-dealer
8    function to -- I can't even remember who that was -- to
9    a, you know, registered broker-dealer.
10       It's common practice among smaller
11   institutions to use a third-party broker-dealer to sell
12   investment products to their clientele.
13       Q   But you led that effort to do that kind of
14   restructure?
15       A   Yes.
16       Q   Okay.  So when did you first start working
17   for Kik?
18       A   I started working for them, I think, it was
19   in mid-July or early August.  Actually, for some
20   reason, the date August 8th comes to mind, but it might
21   have been early July.  I know I started talking to them
22   in mid-July.
23       Q   Okay.  And when you started, you said you
24   were working part time for them and part time for
25   somebody else?

Page 15

1    A   Yes.
2    Q   Were you affiliated --
3    A   CU Bancorp.
4    Q   I'm sorry.  What was the name of the bank?
5    A   CU Bancorp.
6    Q   Okay.  And when you were working part time,
7    were you -- what was your, I guess, sort of -- what did
8    you work on?  What was the scope of your
9    responsibilities?
10       A   Well, they were in the middle of conducting
11   a token distribution event, getting ready for that, and
12   so I spent a lot of time getting up to speed on the
13   work that had been done.  I also focused most of my
14   energy on the issue of whether or not Kik was required
15   to be a money services business licensed with the
16   states and registered with FinCEN.  And then just
17   whatever other work came my way because they hadn't had
18   a general counsel or in-house counsel for a while.  So,
19   you know, what happens is everybody gets wind of that
20   and starts sending you contracts to review.
21       Q   Sure.  And when you went full time, did the
22   scope of your job change?
23       A   Not really.  I just had more time to devote
24   to the tasks.
25       Q   Okay.  And when you -- again, I'm just

Page 16

1    making sure I understand between the part time and the
2    full time.
3        When you first started working for them in
4    the summer, who did you report to?
5        A   Ted Livingston.
6        Q   And has that changed?
7        A   No.
8        Q   And so during the time -- again, what's the
9    scope of your responsibilities at Kik?
10       A   Really all legal matters.  And that
11   includes all matters relating to compliance such as it
12   applies to a nonfinancial institution.  They do have
13   privacy obligations.  GDPR came under my role.
14       Mostly thinking about the consequences of
15   engaging in a token distribution offering and the
16   furthering of the build out of the ecosystem and at
17   every turn because this is very new and it doesn't fall
18   into the established guidelines, you know, really
19   spending time thinking about what the efforts might be
20   and whether or not that would require a licensing as a
21   money transmitter.
22       I also took on in January a role to oversee
23   what we call our trust and safety group.  And they do
24   content moderation looking for child sexual abuse
25   material and other abusive material in violations of

Page 17

1    our terms of service.  And I helped -- the idea was
2    that we were going to outsource some of that content
3    moderation.  We haven't done that yet.  And, in fact,
4    I've -- my role has shifted, and I'm not really
5    responsible for that anymore.
6        Q   Okay.  You're also Kik's chief compliance
7    officer?
8        A   That's the title, but it really is the same
9    as just being general counsel because there really
10   aren't the same kind of compliance obligations that one
11   would have in a financial institution.
12       So as chief compliance officer at a bank,
13   you would necessarily have to work with outside
14   auditors or inside auditors to audit the various --
15   compliance with various regulations.  That's not the
16   sort of thing that happens in the -- in Kik.  We just,
17   you know, need to be compliant with privacy regulations
18   and GDPR and responsibility for responding to legal
19   process when that's served in connection with -- you
20   know, about reports about CSAM.
21       Q   I apologize.  What's CSAM?
22       A   It's child sexual abuse material.
23       Q   That's what I think of -- it's like a --
24   it's when a police agency's number contacts Kik and
25   wants documents or things like that?

## Page 18

```
 1      A  Yeah.  Right.
 2      Q  Okay.  And I apologize.  I don't know what
 3   GDPR is.
 4      A  General -- Gosh, I don't know what the
 5   actual title is.  It's the European regulation on
 6   privacy protection that was effective May 25th of this
 7   year and has probably been the reason you've been
 8   getting all those new privacy notices.
 9      Q  Yeah.  Got it.
10         So are you sort of -- or other than -- part
11   of your job is giving people legal advice?
12      A  Yeah.
13      Q  All right.  Separate from that, do you have
14   any roles where you are responsible for, you know,
15   running any compliance programs or any doing anything
16   sort of separate from giving legal advice?
17      A  As I mentioned, I was responsible for
18   running the trust and safety program.
19      Q  Right.
20      A  And I also -- I have one staff.  I have a
21   paralegal who reports to me.  She spends a lot of her
22   time working on IP matters.  And we had some
23   litigation, so I oversaw litigation.  You know, it's
24   really just the general legal brief that comes to an
25   in-house counsel.
```

## Page 19

```
 1      Q  Do you deal with government agencies when
 2   they contact Kik?
 3      A  If they do contact Kik.  Usually -- very
 4   rarely.  I've only seen one or two instances, and that
 5   was mostly in connection with the legal process.  So
 6   the Royal Canadian Mounted Police or Canadian company,
 7   they will frequently contact -- be in contact with our
 8   trust and safety team.  They usually handle those
 9   directly.
10         But, once in a while, something will arise to
11   a level where I have to respond to it or, you know,
12   advise about the response to that request.
13      Q  And do you, like, negotiate for Kik with
14   other companies?
15      A  On occasion.  Not generally directly.  In
16   connection with our partnerships team, you know,
17   they -- there have been some negotiations with partners
18   regarding how they might work with the -- within the
19   ecosystem.  But our partnerships team have primarily
20   handled those negotiations.  I'm in the background,
21   handle the contracts, and work generally with the
22   business people.  Generally, I work with the business
23   people, and they negotiate the contacts directly.
24      Q  Were there any potential partners who you
25   dealt with directly?
```

## Page 20

```
 1      A  There was one partner -- I can't think of
 2   who it was, and I don't know if they actually became a
 3   partner -- where I spoke with in a group.  I -- they
 4   called and asked about some issues regarding the Kin
 5   tokens.
 6      Q  Okay.  Who's that?
 7      A  I don't remember.
 8      Q  What issues did they want to talk about?
 9      A  Whether we thought the Kin token was a
10   security or not.
11      Q  So who was there on the Kik side?
12      A  Tanner Philp.
13      Q  Anybody else?
14      A  I don't think so.  Just Tanner and I.
15      Q  But you were on the phone?
16      A  Yes.
17      Q  What do remember?
18         I understand you don't remember the name of
19   the company.  What do you remember about who was on the
20   other side?
21      A  It was the either the CFO or the CEO of
22   that company.
23      Q  Okay.  And what did they ask?
24      A  You know, we're interested in pursuing a
25   partnership with your, you know, company regarding
```

## Page 21

```
 1   integrating the Kin token into our platform, but,
 2   obviously, we've heard all of the news about
 3   cryptocurrency and we just want to know what your view
 4   is on whether or not it constitutes a security.
 5      Q  And what did you and Mr. Philp tell them?
 6      A  That we were of the view that it did not
 7   constitute a security, and that was a view that was
 8   based on our consultation with outside counsel.
 9      Q  Okay.  Did you talk to them about the --
10   your reasoning?
11      A  No.
12      Q  Then what happened?
13      A  They -- the call ended, and I don't know if
14   we ever resumed.  I actually don't know what happened
15   with that particular -- because I can't remember which
16   partner it was.  I don't know if it ever went any
17   further.
18      Q  Were there any sort of people outside
19   of Kik who you've dealt in connection with the Kin
20   token offering?
21      A  How do you mean?  I'm not sure I'm
22   following.
23      Q  You said that in terms of partners -- so
24   you had talked to this one possible partner.
25         Were there any other possible partners who
```

Page 22

1  you've talked to?
2      A   Not that I've talked to, no.
3      Q   Okay.  Beyond partners, is there anyone
4  else, are there any other companies outside of Kik that
5  you've talked to about the Kin token or the Kin token
6  offering?
7      A   I've talked to some representatives of
8  Bittrex which is a token exchange.
9      Q   Anybody else?
10     A   I have talked to -- not about the Kin
11  token, no.  I've talked to Peter Van Valkenburgh and
12  Jerry Brito of Coin Center just generally about
13  cryptocurrency.
14     Q   I don't know who they are.
15         Who are they?
16     A   Coin Center is an independent research and
17  advocacy organization.
18     Q   And how did you come to talk to them?
19     A   We met up in New York during the consensus
20  conference.
21     Q   And what?  Did they want to talk to you?
22     A   No.  We just agreed to meet because I
23  liked -- we were supporting their organization.  We had
24  purchased a table at their dinner, and we wanted to
25  meet up with them just to, you know, make an

Page 23

1  introduction and see how -- you know, what was new in
2  the world of government relations regarding
3  cryptocurrencies.
4      Q   And what did you talk about -- strike.
5          Did you end up having a talk with them?
6      A   We talked generally, yes.  And they told us
7  what was happening on the hill and what research they
8  were doing and how we could support them.
9      Q   Okay.  Anything else?
10     A   Not that I can remember.
11     Q   Did you talk about the Kin token
12  specifically, the kin token itself?
13     A   No, I don't think we did.
14     Q   Okay.  So I think we've talked about three
15  things the possible partner, Bittrex, and Coin Center.
16         Anyone else?
17     A   There may have been.  I just can't --
18  nothing comes to mind at the moment.
19     Q   Okay.  I know when you started at Kik you
20  also had another client, the bank whose name I've lost.
21     A   CU Bancorp.
22     Q   Great.  Other than that bank, have you had
23  any other clients since you started working for Kik?
24     A   No.
25     Q   Have you ever done work for the Kin

Page 24

1  Ecosystem Foundation?
2      A   Oh, yes, I have been helping with the Kin
3  Ecosystem Foundation formalizing the organization of
4  that and working with their outside counsel, which is
5  Borden Ladner and Gervais, a Canadian firm that -- it's
6  like one of the Seven Sisters Canadian firms.
7      Q   And you said you've been working to
8  formalize what?
9      A   The organization of the foundation.
10  Because when the TDE occurred, the foundation had been
11  incorporated, but it hadn't been organized.  So
12  incorporation is filing the articles of incorporation.
13  And organization is completing the steps that need to
14  be taken for a corporation to operate fully such as
15  adopting bylaws, organizational resolutions that
16  appoint, you know, corporate secretary, president, that
17  sort of thing.
18     Q   Are you in the works -- sorry.  The work
19  that you're -- in the work on the organizing, are
20  you -- who's your client?
21     A   My -- I work for Kik.  I'm Kik's lawyer.
22  I'm just facilitating the formation of the foundation
23  because it doesn't have its own employees, and Kik
24  performs a lot of services for the foundation under its
25  services agreement.

Page 25

1      Q   What time period have you done that, this
2  organizational work?
3      A   Pretty much just since January until --
4  it's really only taken off in the last, kind of, two or
5  three months.
6      Q   And Kik bills the foundation for your time?
7      A   We have a -- yes, essentially.  The
8  services agreement is a cost-plus.  So similar to --
9  well, I should say there is a fee that's paid for the
10  services plus a percentage that reflects, kind of, the
11  market -- the market value of services.  Because
12  obviously, my services to Kik are lower than these
13  gentlemen charge us for their services.  But rather
14  than do, you know, something similar, it's -- there's
15  an add-on of, I think, 8 to 10 percent, depending on
16  the services.  And that was -- we were told to do that
17  by KPMG, which is the auditors for the foundation.
18     Q   8 to 10 percent on top of what?
19     A   On top of the cost of services.  So there's
20  like a time and costs evaluation done generally.  It's
21  similar to what, I guess, they do in transfer pricing.
22  I really didn't handle any of that.
23     Q   That's fine.  I really -- just as a
24  practical manner.  Do you -- you didn't have to keep
25  your time again like you did at a firm?

Page 26

1    A   No.  I haven't been doing that.  I'll
2   probably just estimate what it is.
3    Q   Okay.
4    A   Like in terms of a percentage of my time.
5    **Q   And then it's -- and then there's a -- that**
6   **comes up with an hour and then there's a rate that's**
7   **charged?**
8    A   Right.
9    Q   Okay.
10   A   And then a percentage on top of that to
11  account for the general overhead and other things I
12  suppose.
13   **Q   And has Kik billed the foundation for that**
14  **yet?**
15   A   I don't know.  It would be something that
16  the accounting department would know.
17   **Q   But have you submitted any estimates yet**
18  **for the time that you've spent since January on it?**
19   A   No, I haven't.
20       MR. MURTHA:  Is the foundation a
21  corporation or a not-for-profit?
22       THE WITNESS:  It's a corporation that is a
23  not-for-profit corporation.
24       MR. SCHLEGELMILCH:  Do you know whether the
25  foundation has any assets other than Kin?

Page 27

1       THE WITNESS:  I don't believe it has any
2   assets other than Kin.
3       MR. SCHLEGELMILCH:  How -- do you have an
4   understanding of how the corporation will compensate
5   Kik under the services agreement?
6       THE WITNESS:  There are -- the board of the
7   foundation, I understand, is considering a few
8   alternatives, including the sale of some Kin or the
9   issuing of some securities backed by the Kin, maybe a
10  note or some sort of a debt instrument to unaffiliated
11  parties.  Currently, Kin made a loan -- or Kik made a
12  loan to Kin, and that's supported by a note that bears
13  interest.  And so that's currently funding its
14  operation.
15       MR. CADIGAN:  I don't want to delay this
16  matter long, but, I mean, I do caution that if there
17  are other witnesses that can answer questions regarding
18  factual matters, you better to get into it, rather than
19  going through her understanding, which, obviously,
20  implicates her mental impressions regarding this.  And
21  we'd have to step out each time you ask a question
22  about her understanding as to whether or not, you know,
23  how she received it and what the basis was and whether
24  or not -- and I understand they're basic questions, but
25  there will be a lot of witnesses that might be able to

Page 28

1   get at that without implicating these issues.
2       MR. SCHLEGELMILCH:  We're currently just
3   asking factual questions.
4       MR. CADIGAN:  But you're asking those
5   factual questions including the understanding with
6   in-house counsel.  And, again, that's Supreme Court
7   case law, very clear --
8       MR. SCHLEGELMILCH:  Yes.  I read --
9       (Simultaneous speakers.)
10       MR. SCHLEGELMILCH:  -- yesterday.  The
11  underlying facts aren't privileged.
12       MR. CADIGAN:  The underlying facts aren't
13  privileged.  But her understanding of that is.  And so
14  the -- if you want to get at the facts, you don't need
15  her.
16       MR. SCHLEGELMILCH:  You are welcome to
17  instruct not to answer any question you think steps
18  over the line.
19       MR. CADIGAN:  Okay.  And, again, I want to
20  avoid that.  And I also want to avoid having her step
21  out because we want to make sure that she's here to --
22  but when we get into that understanding, you know, it
23  implicates that.
24       And you will have a variety of a number of
25  witnesses.  You'll have Mr. Livingston.  You'll have a

Page 29

1   number of other people.  You can ask them all the
2   questions you want to get at the facts.
3       As you've read -- John, I'm sure you've
4   read Sheldon and others -- she's not necessary to get
5   into that.  And so there are other ways you can get at
6   the factual issues without getting into the mind of
7   in-house counsel.
8       MR. SCHLEGELMILCH:  Okay.
9       BY MR. MITCHELL:
10   **Q   Who at Kik handles its relationship with**
11  **the foundation?**
12   A   Tanner has been very involved in the
13  relationship.  Ted Livingston, who is on the board of
14  the foundation, and then myself.
15   **Q   Okay.**
16   A   And Brandon Brunet, he is our controller.
17  So probably Neil Brown as well, who is our assistant
18  controller.
19   **Q   Have you been involved in discussions with**
20  **people at the Kin -- at the foundation about the**
21  **foundation's -- you were describing an idea of issuing,**
22  **like, a debt instrument or something?**
23   A   Right.  That was something that was what
24  the attorneys for the foundation mentioned to me, and I
25  haven't really mentioned it to anybody else.  I just

<table>
<tr><td>

Page 30

1  recall they threw it out there.
2      Q   And the loan that you were describing
3  earlier from -- it was a loan from Kik to the
4  foundation?
5      A   Yes.
6      Q   Of -- sorry.  Of dollars?
7      A   Of Canadian dollars, I think.
8      Q   Canadian, okay.
9          And how many?  What's the size?
10     A   It's about 300,000.  I don't know
11  specifically.  I recall that the note specified
12  $269,000.  And I believe that there has been some
13  additional amounts advanced, but I could be wrong about
14  that.
15     Q   Do you work in Toronto or in Waterloo?
16     A   No.
17     Q   Where do you work?
18     A   I live in Los Angeles, and I work from my
19  home office.
20     Q   And that's been until -- and that's been
21  true the whole time you were working at Kik?
22     A   Yes.
23     Q   Do you visit Kik's offices?
24     A   Yes.  Yes, I travel there about every six
25  weeks.

</td><td>

Page 32

1  means that it's a digital representation of value.
2      Q   Okay.  And how did you educate yourself
3  about the token when you came up?
4      A   I read a number of things that had been
5  published, the white paper, some instructions to token
6  purchasers.  I actually purchased some tokens.  I
7  registered myself so I could understand the process,
8  not very much money.
9      Q   In the September --
10     A   Yeah.  In the event.  Let's see.  I read
11  advice from counsel and a lot of e-mail traffic that
12  had gone back and forth with counsel regarding the
13  token, did my research.
14     Q   So when you arrived at Kik, where was the
15  company sort of in the process of getting to that
16  event?
17     A   It was very close to the token event.
18     Q   But had there been --
19     A   Like, within a month after I got there, it
20  was launched.
21     Q   After you got there full time?
22     A   No, after I got there part time.  I got
23  there part time in -- I think, it was the first part of
24  August.  And, you know, by September 12th, the
25  registration was open and -- no.  Registration had been

</td></tr>
<tr><td>

Page 31

1      Q   And that's the Waterloo office?
2      A   Waterloo.
3      Q   And have you traveled to their office in
4  New York?
5      A   Yes.
6      Q   For what?
7      A   Executive meetings.  We had a Kin
8  ambassador event.  I went to consensus, which is a
9  cryptocurrency conference, a big conference in New
10  York.  And during that time period, I visited the
11  office.
12     Q   I think earlier -- I appreciate all this
13  background, but we're going to sort of move to the Kin
14  token.  I think you said earlier that when -- one of
15  the things you did when you came on board was sort of
16  educate yourself about what -- about the token and what
17  was going on with it at the time; is that right?
18     A   Sure.
19     Q   So with -- just with everybody, we're just
20  sort of getting the basics.
21         What is the Kin token?
22     A   What is the Kin token.  The Kin token is a
23  cryptocurrency that was based on Ethereum.  It's an
24  ERC-20 token created by Kik, and ten trillion Kin were
25  minted in September of 2017.  As I understand it, that

</td><td>

Page 33

1  open for a month prior to that.  And then once the
2  token event had been open then, you know, it was open
3  for two weeks and people would commit to what amount
4  they wanted to purchase.
5      Q   Sorry.  I just want to make sure I
6  understand.  September 12th is the start of the event?
7      A   I believe so.  I think that's how it worked
8  is that you preregistered so that you could purchase in
9  the event on the day the event opened.  You had two
10  weeks to say, I want to buy -- you know, I was
11  preregistered for a thousand dollars worth and I am
12  going to buy -- you know, okay, I can buy up to $1,000
13  worth or whatever.
14         Actually, depending on what people -- how
15  many people had registered, there was an amount that
16  was -- it was limited to the number of people divided
17  by the 125 million that was being offered for sale.
18  And so you could register for as much as you wanted,
19  but you were only permitted to purchase a certain
20  amount.
21     Q   In that first stage?
22     A   In that first stage.
23     Q   Got it.  But in that -- September 12th,
24  that's the point at which people can say, this is what
25  I really want to buy?

</td></tr>
</table>

Page 34

1     A  I think that's right, yes.
2     Q  Okay.
3     A  And my recollection is -- I think that's
4  how that worked.
5     Q  And then -- and that's also the stage where
6  they would provide -- had to provide the company
7  with ether?
8     A  Ether.
9     Q  Okay.  And they did that in that stage?
10    A  Yes.
11    Q  Okay.
12    A  Well, yeah.  And, technically, I don't know
13  how -- when you provide the company with ether, I don't
14  think that any of the ether actually went to the
15  company until the -- September 26th.  it was, because
16  of the smart contract, it was a process that it would
17  be held until that time and then it would be issued.  I
18  frankly don't know what the technology on that is.
19  It's not like an escrow, you know, in a home purchase
20  or something.
21    Q  Sorry.  In what way?  What do you mean?
22    A  Well, the whole -- you know, you actually
23  wire your money to the escrow company and it sits there
24  in that escrow company account until the house
25  transaction closes.  I don't think that that kind of

Page 35

1  thing happens in a cryptocurrency offer, but I don't --
2  I shouldn't speculate.
3     Q  Just in a room of lawyers --
4     A  Yeah.
5     Q  All right.  Do you know -- and, again,
6  we've been talking about this.  I appreciate you
7  talking about it.  But do you know how that technical
8  system worked?
9     A  I generally understand but not sufficient
10  to explain it to you all.
11    Q  That's not -- that wasn't actually where I
12  was intending to go, so I appreciate it.
13    A  Okay.
14    Q  Okay.  There had been part of -- there had
15  been sort of events in the -- about tokens before
16  this -- sorry.  Let me start over because I'm using the
17  word event.
18       We were just talking about the token
19  distribution event in September.
20    A  Yes.
21    Q  There had been an earlier stage of Kik
22  selling things to other people; is that right?
23    A  No.
24    Q  Okay.  Did Kik sell --
25    A  Oh, oh, the SAFT, yes.  Kik sold the right

Page 36

1  to acquire tokens to accredited investors in a prior --
2  up to -- I think it was $50 million that they had sold
3  to a certain number of accredited investors.  I wasn't
4  involved in any of that.
5     Q  That was completed by --
6     A  Yeah.
7     Q  Okay.
8     A  It was all over and done with by the time I
9  got there.
10    Q  Okay.  So I think you said you reported to
11  Ted Livingston your entire time at Kik?
12    A  Yes.
13    Q  Are you on the board of directors?
14    A  No.
15    Q  Who else sort of do you -- what other
16  people at Kik do you interact with on sort a --
17  repeatedly?
18    A  I have interacted with Peter Heinke who was
19  the chief financial officer until about two months ago.
20  I probably interacted with him as much or more than I
21  interacted with Ted.  I interact with my assistant,
22  Michelle Dent.  I interact with the head of trust and
23  safety, Gina Serpa.  I interact with other executives,
24  Dany Fishel.
25       Jody -- Gosh, you know, we don't use last

Page 37

1  names, so I'm having trouble remembering Jody's last
2  name.  Jody is head of HR.  I interact with Alex
3  Frenkal who is the head of our Tel Aviv office.  And I
4  interact with Rod McLeod who is our comms director in
5  New York.  And then just whoever reaches out to me.  I
6  mean, basically, I've had the opportunity to talk to
7  just about everybody in the company at some point or
8  another.
9     Q  What -- when Mr. Heinke worked at the
10  company, what was his --
11    A  He was the chief financial officer.
12    Q  Was he also the chief operating officer?
13    A  He might have been.  I actually couldn't
14  say.  He might have acted like the chief operating
15  officer.
16    Q  Okay.  And sorry.  There was a woman whose
17  name -- Jenna?
18    A  Jody.
19    Q  Jody was HR?
20    A  Jody was HR.
21    Q  Got it.  There was also a woman named
22  Jenna who I think you said was --
23    A  Oh, Gina.
24    Q  Gina.  Sorry.
25    A  Gina Serpa.

Page 38

1    Q   Yep.
2    A   And she is the head of trust and safety.
3    Q   Okay.  And that's the team you described
4  earlier that monitors --
5    A   Yes, it does content moderation and law
6  enforcement.
7    Q   Okay.  I'm sorry.  Michelle Dent is your
8  assistant?
9    A   She's a paralegal.
10   Q   A paralegal.
11       Where does she work?
12   A   She works in Waterloo.
13   Q   Okay.  And Dany Fishel, what does he do for
14  the company?
15   A   Dany is -- he was the president of Rounds,
16  which we acquired about a year and a half ago, and
17  that's the Tel Aviv office.  So he ran the Tel Aviv
18  office.  He moved to Houston in the early part of this
19  year.  So he travels a lot.
20   Q   The company has an office in Houston?
21   A   No.
22   Q   Oh, he just --
23   A   He just lives in Houston.  So he works out
24  of his house.
25   Q   What does he do now for the company?

Page 39

1    A   He heads the partnerships team.
2    Q   Alex Frenkal, what does he do?
3    A   He runs the Tel Aviv office now.  He's the
4  product manager, product -- the product head.
5    Q   Did he replace Eran Ben-Ari?
6    A   There was some overlap, but I think, in
7  essence, he's, you know, taken over all of Eran's
8  functions.
9    Q   Okay, okay.
10   A   I did work with Eran when he was at Kik.
11   Q   Sure.  And did you work with Erin Clift
12  when she worked at Kik?
13   A   Not really.  I met -- I never met her in
14  person, and I was on a few phone calls where she was on
15  the phone as well.
16   Q   Okay.
17       MR. SCHLEGELMILCH:  What's the approximate
18  head count at Kik right now?
19       THE WITNESS:  I want to say about 150,
20  maybe 170.
21       MR. SCHLEGELMILCH:  Okay.  Thank you.
22       MR. MITCHELL:  So we're going to go off the
23  record.
24       THE VIDEOGRAPHER:  Going off the record.
25  The time on the video monitor is 10:26 a.m.

Page 40

1        (A brief recess was taken.)
2        THE VIDEOGRAPHER:  We are back on the
3  record.  The time on the video monitor is 10:40 a.m.
4        BY MR. MITCHELL:
5    Q   Ms. Lyon, during the break, did you have
6  any substantive conversations about the case with the
7  staff?
8    A   No.
9    Q   All right.  Earlier you had said that you
10  did not have a role with the sale of SAFT.  Well, I
11  do -- I just want to follow up on that.
12       To -- just so to -- did you have -- while
13  you worked at Kik, have you had any role in sort of
14  compliance around the -- around those sales or
15  gathering information about those sales?
16   A   How do you mean?
17   Q   Let me just -- let me go -- let me see
18  here.  Let me just mark this.  I'm going to mark two
19  documents.  They're just charts.  These are both
20  charts, and I can just tell you I understand it to be
21  the lists of the people who bought in SAFT sales.  I'm
22  going to hand you Exhibit 132, which has a Bates number
23  on it.
24       (SEC Exhibit No. 132 was marked for
25       identification.)

Page 41

1        BY MR. MITCHELL:
2    Q   Kik 000283.  That's 132.  And I'm going to
3  give you what has been -- what -- it doesn't have a
4  Bates number on it but I printed from Kik 001187.
5        (SEC Exhibit No. 133 was marked for
6        identification.)
7        BY MR. MITCHELL:
8    Q   So Exhibit 133 is a -- this is a -- that
9  physical piece of paper doesn't have a page -- doesn't
10  have a Bates number, but it is the document that has a
11  Bates number KIK 001187.
12       So can you look at Exhibits 132 and 133?
13   A   Okay.
14   Q   And, again, my first question is going to
15  be:  Do you recognize these?
16   A   I may have seen these, but they're not --
17  I'm not familiar with them.  I wouldn't say I'm
18  familiar with them.
19   Q   Okay.  Were you -- well, I guess, right.
20       Were you involved in creating these?
21   A   I don't think so.
22   Q   Okay.  Do you know who at Kik was involved
23  with collecting information about the people who bought
24  SAFTs?
25   A   I don't know.  I would say it was Tanner,

Page 42

1    but I don't know.
2         MR. LEASURE:  Do you have any reason to
3    believe these are -- this is an inaccurate list?
4         THE WITNESS:  I have no idea whether it's
5    accurate or inaccurate.  I see some names that I'm
6    familiar with, but I don't know.
7         MR. LEASURE:  Okay.
8         MR. MURTHA:  Have you ever met with anybody
9    on this list?
10        THE WITNESS:  I'm sorry?
11        MR. MURTHA:  Have you ever met with anybody
12   on this list?
13        THE WITNESS:  Yes, Daniel Peled.
14        BY MR. MITCHELL:
15     Q    He works for Coin Tree?
16     A    Does he?
17     Q    Sorry.  That was a question.
18     A    I know he works for Orbs.
19     Q    Orbs?
20     A    Yes.  Tal Cole.  Uriel Peled.  William
21   McGuire.  Michael Arrington, that name sounds familiar,
22   but I don't -- I can't place where I might have met
23   him.
24     Q    Did he have a previous relationship with
25   TechCrunch?

Page 43

1     A    Maybe.  I don't think I met with him.
2    Okay.
3         MR. LEASURE:  Any of the entities listed on
4    here, have you ever met with any of the representatives
5    for them?
6         THE WITNESS:  I think I had a phone call
7    with somebody, Paul Veradittakit from Pantera.  I don't
8    know if that's how you say it or spell his name.
9         MR. LEASURE:  Have you ever visited any of
10   the addresses listed on Exhibit 132?
11        THE WITNESS:  Ever?  I might have visited
12   588 Sutter Street once in my life, but I couldn't tell
13   you when.
14        MR. LEASURE:  It wasn't to meet with Brundy
15   LLC?
16        THE WITNESS:  No, it was not.  And I've
17   been to New York and California and Israel.
18        BY MR. MITCHELL:
19     Q    Because there are entries that just say New
20   York?
21     A    Exactly.  Yeah.  I -- other than those, I
22   don't think I've been to any.  Like where is Daniels --
23   yeah.  It just says Israel.
24        MR. LEASURE:  You referenced a conversation
25   with somebody at --

Page 44

1         THE WITNESS:  Pantera?
2         MR. LEASURE:  Yes.
3         THE WITNESS:  Paul Veradittakit or
4    something.
5         MR. LEASURE:  We'll go with Paul.
6         THE WITNESS:  Paul, Paul V.  You can say
7    Paul V.
8         MR. LEASURE:  Paul V.  Tell me about that
9    conversation.
10        THE WITNESS:  Tanner and I talked to Paul
11   V. at a time when we were talking about filing an
12   application with Bittrex, and we asked for -- it was
13   our understanding -- I'm not sure where this came
14   from but -- that companies that had issued tokens
15   didn't apply directly to the exchange, that they had to
16   be listed by holders or the request had to be made by
17   holders.  So they were a holder so -- and they had
18   a relationship.  So the idea was they were going to
19   submit the application for us, which he did.
20        BY MR. MITCHELL:
21     Q    I can just take those back so we don't use
22   them.
23          Are you familiar with the contract that is
24   sometimes called the SAFT?
25     A    I'm familiar with the contract that's

Page 45

1    sometimes called -- yes, I know.  Simple agreement for
2    future tokens.
3      Q    All right.  And so how did the mechanics of
4    the -- that -- the sale that used the SAFT work in
5    terms of what people paid, what they got?
6         THE WITNESS:  Is that something I should be
7    answering?
8         MR. CADIGAN:  Wait a minute.  Was that
9    something that occurred before you got there?
10        THE WITNESS:  Yeah.  The transactions all
11   occurred before I got there.  I haven't had any
12   occasion to enforce them or, you know, do anything with
13   them.  So I may have read them.  I don't know that I
14   want to talk about my understanding of how they work.
15        I mean, is that a thought process?
16        MR. CADIGAN:  I mean, we -- actually, if
17   you want to ask the question, we might need to step out
18   to get into it.  I mean, you can't give them the SAFT
19   that occurred before you got there.  I mean, with
20   everything that you might just discuss --
21        THE WITNESS:  Yeah.  I mean, I generally
22   understand what they are.
23        MR. CADIGAN:  Through what?  How?  Through
24   conversations with Kik employees?
25        THE WITNESS:  No.  Just reading about the

12 (Pages 42 to 45)

Page 46

1    SAFT instruments as part of my background research.
2         BY MR. MITCHELL:
3         Q   Have you read the document?
4         A   I have looked over the Kik form of SAFT.
5         Q   Okay.  So the question I had before was
6    sort of how did the transaction work?
7             What did -- had -- what did one side --
8    what did the other side give to Kik and what did Kik
9    give to them?
10            MR. CADIGAN:  Is it -- so you're asking her
11   understanding of how the transaction worked?
12            MR. MITCHELL:  Or the -- yeah.  My
13   understanding is that the document runs the
14   transaction.  I'm not --
15            MR. CADIGAN:  Right.  So you have the
16   document, right?  I mean, do you really need her
17   understanding to describe the document?
18            BY MR. MITCHELL:
19        Q   Well, I'll give you what we already marked
20   as Exhibit 5.  It's just a copy of the SAFT.
21            Yeah.  So my question is -- yeah.  I just
22   want to understand how I can read -- I can read the
23   document.
24            MR. CADIGAN:  Right.
25            MR. MITCHELL:  But I'm not going to

Page 47

1    testify, so I'm trying understand.  I'm just trying to
2    make sure that I --
3             MR. CADIGAN:  Get her understanding of this
4    document?
5             MR. MITCHELL:  Yeah.  Because she said
6    she's read it and --
7             MR. CADIGAN:  Yes, she did.  I'm just
8    trying to ascertain because she is an attorney.  She is
9    in-house counsel, and you're trying to get her
10   understanding, her mental impressions on this document.
11   So we're just going to need to step out to get into
12   that.
13            MR. MITCHELL:  Okay.  Sure.  We'll go off
14   the record.
15            THE VIDEOGRAPHER:  Going off the record.
16   The time on the monitor is 10:49 a.m.
17            (Discussion off the record.)
18            THE VIDEOGRAPHER:  We are back on the
19   record.  The time on the video monitor is 10:58 a.m.
20            BY MR. MITCHELL:
21        Q   Ms. Lyon, during the break, did you have
22   any substantive conversations about the case with the
23   staff?
24        A   No.
25        Q   So we had -- while you were out of the

Page 48

1    room, we had a conversation with your attorney, and I'm
2    just going to withdrawal the question and move on.
3        A   Okay.
4        Q   At some point, we discussed earlier that
5    the Kin Ecosystem Foundation was created at some point
6    before the -- the one in September; is that right?
7        A   I think it was September 12th.
8        Q   Okay.  Did you have any role in that?
9        A   No.
10       Q   Okay.  Did you ever deal with a person
11   named -- it's probably French, and I'm going to
12   mispronounce it.  Virginia Ethier, V-i-r-g-i-n-i-a
13   E-t-h-i-e-r?
14       A   I have not met her.
15       Q   Okay.  Before -- so the -- September 26th
16   was the day that Kik distributed the Kin token to
17   people?
18       A   That's my understanding, yes.
19       Q   At any time before then, did you have
20   conversations with anyone who wanted to buy tokens or
21   was considering buying tokens?
22       A   Maybe people at the company.
23       Q   Sure.  Leaving aside people at the company?
24       A   Or -- I don't think so.  There was one
25   person that wanted to participate and was denied

Page 49

1    participation because of an OFAC screen, and it was
2    often you get false positives.  His was apparently a
3    false-positive case.  But by the time it was cleared,
4    it was too late for him to be registered or something
5    like that.  And I only had e-mail communications with
6    the person.  And I told him sorry but, you know, can
7    can't accommodate.
8        Q   Okay.  Got it.  And so your interaction
9    with him was just over the question of whether he was
10   allowed to register?
11       A   Correct.
12       Q   Was there a know-your-customer process for
13   the sale to the public?
14       A   Yes.
15       Q   Okay.  Were you -- did you have any role in
16   that?
17       A   Yes.
18       Q   What was your role?
19       A   During registration or -- during
20   registration as individuals were being vetted through
21   IdentityMind, which was the vendor that was doing this
22   for us, there would be false positives from time to
23   time that were -- that would come up or there would be
24   questions about particular anomalies in the
25   registration process.  And so from time to time, I

Page 50

1  would weigh in on whether or not we could accept that
2  person or not accept that person.
3      Q.  Okay.  IdentityMind was a company that Kik
4  hired to do that work?
5      A.  Yes.
6      Q.  Okay.  Were you involved in hiring
7  IdentityMind or in the work of deciding what would --
8  what information IdentityMind would collect or had they
9  collected?
10     A.  No.  That was set up before I got there.
11     Q.  Okay.  Do you know who set that up?
12     A.  I don't know, but I believe it would have
13  been Scott Benson.
14     Q.  Okay.  And did Kik use the information that
15  IdentityMind collected to decide who it could sell
16  to -- or who -- who could register and who couldn't
17  register?
18     A.  Yes.
19     Q.  Okay.  How?  Like, what kind of -- what
20  were they doing?
21     A.  It collected information about a person,
22  where they were from, their birth date or social
23  security number or passport identification in the event
24  that they had more than -- you know, they're
25  registering to purchase more than $100,000 in the U.S.

Page 51

1  or outside of the U.S.
2      And after running those through a screening
3  process, the determination that was made that, first of
4  all, we wouldn't -- we weren't going to be selling to
5  people who lived in New York because of the requirement
6  of having a BitLicense.  We didn't have a BitLicense.
7  So we felt that there was too much risk there.
8      And Washington state, I believe, was
9  excluded.  And then, ultimately, Canada was excluded
10 and China was excluded.  And there are maybe others,
11 countries that were excluded.  So if a person was from
12 those countries, they were excluded.  Or if they didn't
13 pass the OFAC screening or whatever sanctions
14 screening -- it wasn't just OFAC -- we would exclude
15 them.
16     Q.  And that was based on the information that
17 IdentityMind had gathered?
18     A.  It was information gathered through -- as I
19 understand it, they're a portal.  And so the
20 individuals would sign up and provide that information
21 to IdentityMind.  So they would collect it.
22     Q.  And that IdentityMind provided to Kik?
23     A.  They didn't provide -- we had access to the
24 information, but they maintained the information.
25     Q.  I think you were describing earlier sort of

Page 52

1      decisions on what -- whether a person was eligible or
2      not?
3      A.  Yeah.
4      Q.  Did IdentityMind employees make that call?
5      A.  I don't know.  I -- ultimately, there may
6  have been, like, a level where they made a decision and
7  then we made a decision if it was, you know, no.  So we
8  might override that, but I couldn't tell you really.
9      Q.  Okay.  But --
10     A.  I do know that from time to time, a
11 question was elevated to me, and I made the final call.
12     Q.  And I'm -- and -- sorry.  You were making
13     final calls about things like based on their birth date
14     or based on where they were from or their passport?
15     A.  Probably the -- I don't recall specifically
16 an instance.  But it would have been, you know, an
17 inconsistency in something, you know, whether we could
18 accept that inconsistency or not.
19     Q.  Okay.  And it's an inconsistency in the
20     data that --
21     A.  Yeah.
22     Q.  -- that IdentityMind had?
23     A.  Right.
24     Q.  Okay.  Sorry.  What's a BitLicense?
25     A.  New York state has a regime for

Page 53

1  cryptocurrency that they call the BitLicense and you --
2  it's a money transmission license.  But it's so broadly
3  written that it could encompass things that we might be
4  doing, selling cryptocurrency to residents.
5      Q.  And so if Kik thought someone was from New
6  York, it just -- they couldn't register?
7      A.  Right.
8      Q.  Okay.  And the same thing for Washington
9  state?
10     A.  Yes.
11     Q.  And what was the issue with Washington
12 state?
13     A.  I didn't do that analysis.  I only know
14 from talking to outside counsel that they had
15 previously concluded that.
16     Q.  That sounds fine.  Sorry.
17     And then China and Canada as well?
18     A.  Correct.
19     Q.  And if a person said they were from those
20     places then they could not participate, they couldn't
21     register?
22     A.  Well, they might have registered initially,
23 but they couldn't purchase.
24     MR. MURTHA:  Under the New York BitLicense
25 regime, do you -- how come New Yorkers were allowed to

Page 54

1   participate in a private sale but not the public sale?
2       THE WITNESS:  I don't know.
3       MR. MURTHA:  Neither do I.
4       BY MR. MITCHELL:
5       Q   I apologize.  I'm just looking at something
6   to see if I've already got an answer, then I don't need
7   to even ask it.
8           So at the end of the -- so it was -- there
9   was a process where people registered for the sale, and
10  then they would either be approved or not approved; is
11  that right?
12      A   That's correct.
13      Q   Okay.  And then there was a second process
14  in the token distribution event where people basically
15  said -- actually sort of said I want to have this -- I
16  would like to buy this much Kin, and there were limits
17  and different stages; is that right, as well?
18      A   Right.
19      Q   And then after that point -- there was a
20  point at which that closed?
21      A   Yes, I think it was the first 24 hours.
22      Q   That's the -- the first stage closed?
23      A   The first stage was 24 hours, where there
24  was a limit.
25      Q   Okay.  And then there was a later stage

Page 55

1   where there was no limit?
2       A   Which is just the -- until the full amount
3   of tokens had been sold or I think we ended up cutting
4   it off at some point.
5       Q   So at some point there was a -- at some
6   point that whole process ended?
7       A   Yes.
8       Q   And then after that, did Kik distribute the
9   Kin to people who had purchased it?
10      A   Yes.
11      Q   Okay.  And at the same time, did Kik
12  distribute Kin to the people who had purchased SAFT
13  previously?
14      A   Yes.
15      Q   Okay.  And so was there someone at the
16  company who sort of made the decision about, okay, now
17  we're ready to distribute?
18      A   I don't know.
19      Q   Okay.  Do you know how -- well, was there
20  some process that Kik went through to say, okay, yes,
21  we've completed the launch and it's time for us to
22  distribute to people who had purchased in the SAFT?
23      A   There was -- yeah.  There was a process
24  where that decision was made.  I don't know who made
25  it.  I don't know how it was made.  I just recall that

Page 56

1   it was made.
2       Q   Okay.
3       A   And it ended and we sold the tokens.
4       Q   You mean you distributed the tokens out?
5       A   Distributed the tokens.
6       Q   Okay.  And at that point, did Kik reach out
7   to the people who had purchased SAFTs and asked, you
8   know, how many tokens do you want?
9       A   I don't think so.
10      Q   Why not?
11      A   My understanding is that they were already
12  committed to the amount.
13      Q   The buyers were already committed?
14      A   Uh-huh.
15      Q   Okay.  And Kik was committed to -- whatever
16  they had said they purchased, Kik would deliver them
17  half of them at that time?
18      A   Uh-huh.
19      Q   Sorry.  I apologize.
20      A   It's programmed into a smart contract.
21      Q   I appreciate it.  It's actually when I
22  asked you a question and you answered with an uh-huh --
23      A   Uh-huh.
24      Q   I just want to make sure -- just for the
25  record, it's easier for her if she gets a yes or no.

Page 57

1           So at that point, the people from the --
2   the people who owned the SAFTs were -- had -- they were
3   committed to provide the money they promised; is that
4   right?
5       A   That's my understanding.
6       Q   And at the same time, Kik was committed to
7   providing the tokens that had been promised in the
8   SAFT?
9       A   Yes.
10      Q   Couple super practical questions.
11          Do each Kin tokens have an equal value to
12  each other?
13      A   They're fungible.
14      Q   Okay.
15      A   Each one is fungible with every other one.
16      Q   That's the same as each other?
17      A   Yes.
18      Q   All right.  So does any Kin token have a
19  greater right or value than any other Kin token?
20      A   Not to my knowledge.  They're completely
21  fungible.
22      Q   And so the tokens that Kik has received are
23  fungible with the tokens that other people have
24  received?
25      A   Yes.

Page 58

```
1        MR. SCHLEGELMILCH:  And the same is true
2   with the tokens that the foundation received; is that
3   correct?
4        THE WITNESS:  Yes.
5   BY MR. MITCHELL:
6    Q   At some -- at any point while you were
7   working at Kik, did you talk to banks about the Kin
8   token offering?
9    A   Yes.
10    Q   Why?
11    A   Because we wanted to open a bank account to
12   hold proceeds from the token offering.
13    Q   So tell me about that.  What was your role
14   in that?
15    A   I spoke to the compliance officer and the
16   chief operating officer at Silvergate Bank regarding
17   the structure of the offering and the KYC process
18   primarily that we had done.
19    Q   At the time you talked to Silvergate, did
20   the -- did Kik already have an account at Silvergate?
21    A   No.
22    Q   Did you talk to any banks other than
23   Silvergate?
24    A   I might have been on a call where we talked
25   to the Bank of Montreal, BMO.  I should call it BMO.
```

Page 59

```
1   But I can't say for certain.
2    Q   Okay.  Let me take the Silvergate then.
3        Did you have one conversation with them,
4   multiple conversations with them?  What do you
5   remember?
6    A   Prior to the offering, I think I only had
7   one conversation.
8    Q   Okay.  And what did they -- well, sorry.
9        They were asking questions or?
10    A   They were asking questions.
11    Q   So what did they ask?
12    A   To my recollection, they were very
13   interested in the KYC process.
14    Q   What did you tell them about the KYC
15   process?
16    A   I told them what I knew about the KYC
17   process, which I've already told you about.
18    Q   Right.  This is the process with --
19   sorry -- the contractor, IdentityMind?
20    A   Correct.
21    Q   Okay.  Did anyone from Silvergate raise any
22   questions about whether Kin tokens were a security?
23    A   They may have, but I don't recall.
24    Q   I think you said that you had one
25   conversation with them before the token, that was
```

Page 60

```
1   before the token distribution event?
2    A   Correct.
3    Q   And then out of -- after your conversation,
4   did Silvergate open an account for Kik?
5    A   Yes.
6    Q   Before the token distribution event?
7    A   I don't know.
8    Q   All right.  Have you had conversations with
9   them since the token distribution event?
10    A   Yes.
11    Q   Like in what context?
12    A   The compliance officer contacted me
13   regarding some of the participants, some of the
14   purchasers, and asked if we could confirm that we did
15   KYC on them and if we had any other information about
16   them, about those particular purchasers.
17    Q   How did Silvergate know the names of the
18   purchasers?
19    A   They didn't know the names.  They knew the
20   public addresses.
21    Q   On the Ethereum blockchain?
22    A   Uh-huh.
23    Q   So they flagged some set of Ethereum
24   blockchain addresses for you?
25    A   Uh-huh.
```

Page 61

```
1    Q   And so then what did you do?
2    A   So we compared them to our list of token
3   distribution event purchasers to see who they were, and
4   we didn't want to share the personal information.  So
5   we had a little bit of back-and-forth as to how we
6   could vouch for them.  I mean, we weren't really
7   vouching for them, but we were saying that we had
8   completed a KYC process on them.
9    Q   Okay.
10    A   And none of them had turned up in a
11   sanction screening.  So that seemed to satisfy them.
12    Q   So you provided the information, was that
13   the end of the dealings?
14    A   I believe they also asked us about any
15   regulatory issues that we might have had subsequent to
16   the TDE.
17    Q   What did you tell them?
18    A   We told them that we were in discussions
19   with the SEC regarding a potential Section 5 violation.
20   I'm not sure exactly how much information we gave them.
21    Q   Okay.  What happened next?
22    A   Nothing.
23    Q   Okay.  Thank you.  Other than those
24   conversations with Silvergate, have you had any other
25   conversations with people at Silvergate?
```

Page 62

1    A  I don't think so.
2    Q  Okay.  Let's move to -- let me -- let's
3    talk about Bank of Montreal.
4    A  Uh-huh.
5    Q  What was your dealings with the Bank of
6    Montreal?
7    A  It would have just been to sit on a phone
8    call with our chief financial officer when he was
9    talking with them about potentially opening an account
10   with their U.S. affiliate.
11   Q  And this is, again, Mr. Heinke?
12   A  Heinke.
13   Q  Heinke.  Was it one -- like, one phone call
14   you remember or multiple phone calls?
15   A  I don't remember.
16   Q  What -- did Bank of Montreal have questions
17   like Silvergate did?
18   A  Very similar.
19   Q  So what were -- what were its questions?
20   A  They wanted to understand how the token
21   offering was being conducted.  You know, how we
22   approached the KYC process.
23   Q  Anything else?
24   A  Nothing that I can recall.
25   Q  Were you on calls with Bank of Montreal

Page 63

1    with Mr. Tanner Philp?
2    A  I can't recall if he was on those phone
3    calls.
4    Q  Do you recall whether the Bank of Montreal
5    asked about whether the Kin tokens were securities?
6    A  I don't recall.
7    Q  You don't remember one way or the other?
8    A  I don't remember one way or the other.
9    Q  Okay.  Did anyone from Kik, in the
10   conversations you were in, talk to anyone at the Bank
11   of Montreal about an analysis of whether the tokens
12   were securities?
13   A  I don't recall.
14   Q  You don't recall anyone doing that?
15   A  I don't recall anyone talking about that.
16   Q  Okay.  What about TD Bank?  Have you dealt
17   with anyone from TD Bank?
18   A  I don't think so, but TD Bank is our
19   current bank.
20   Q  Do you deal with them regularly?
21   A  No.
22   Q  Did you draft any documents for TD Bank?
23   A  I don't recall, but it looks like you have
24   something there.
25   Q  Yeah.  I will try and do what we would call

Page 64

1    refreshing your recollection.  Let me give you what has
2    been marked as Exhibit 134.
3         (SEC Exhibit No. 134 was marked for
4         identification.)
5    BY MR. MITCHELL:
6    Q  134.  Do you -- sorry.  Exhibit 134 is a
7    multi-page document with the Bates number Kik_00045379
8    to 382.
9    A  Okay.
10   Q  Do you recognize this Exhibit 134?
11   A  Yes, I do.
12   Q  What is this?
13   A  This is a memorandum being provided to
14   Toronto Dominion Bank.
15   Q  So have I successfully refreshed your
16   recollection?
17   A  A little bit.  I am vaguely recalling
18   putting this together, but I don't remember the context
19   specifically, other than there was some question about
20   whether they wanted to continue to be our bank in the
21   light of our doing a cryptocurrency offering.
22   Q  And is the -- thinking of it -- was that
23   before or after the actual token distribution happened?
24   A  I can't remember.
25   Q  Okay.  Did someone send this to TD Bank?

Page 65

1    A  I -- probably, yes.
2    Q  Do you know who did?
3    A  It might have been Peter Heinke.
4    Q  Okay.  Let me back up a little.  Who was
5    the person dealing with TD Bank on that, on the issue
6    you just mentioned?
7    A  On the issue of the -- talking to the --
8    Q  Right.  Yeah.  Whether they wanted --
9    A  Peter, our CFO, was talking with TD Bank
10   about continuing our banking relationship with them.
11   Q  Okay.  If you could just sort of look
12   through it, I -- is this --- do you -- I mean, sitting
13   here now, do you now remember drafting this?
14   A  I remember it.  As far as drafting, I'm not
15   sure I would -- it was probably a cut-and-paste job
16   that I took from something else for the white part.  I
17   know that this -- examples from the white paper, I
18   didn't write those out of my brain.  I think -- the
19   presale section and the token launch, I think those
20   are -- I think those are crypt from something that our
21   Canadian lawyers wrote.  I probably wrote the part
22   about the money services businesses.
23   Q  Okay.  Was this information --
24   A  I know I created this little graphic at the
25   back because I was trying to figure it all out for

Page 66

```
 1   myself so I threw that in there.
 2        Q   Okay.  The graphic that's on the page that
 3   ends 82?
 4        A   Yes.
 5        Q   What is that?
 6        A   It's a graphic that shows what had been
 7   originally the structure of the token distribution that
 8   Kik would enter into a distribution agreement with KDS,
 9   which is a subsidiary of Kin -- of Kik.  We didn't end
10   up doing that.  So that, you know, you can just ignore
11   it.
12        Q   Okay.  And what -- when you put this
13   together, it was -- was this correct as you -- as far
14   as --
15        A   As far as I knew, it was the proposed
16   structure.
17        Q   Do you remember anything else?  Have I
18   refreshed your recollection at all about any other
19   interactions with TD Bank?
20        A   No.
21        Q   Have you dealt with TD Bank since the token
22   distribution event?
23        A   I don't believe I have.
24        Q   Okay.  I'm just going to -- with
25   everything -- change a couple subjects.
```

Page 67

```
 1        A   Sure.
 2        Q   I'm going to mark as Exhibit 135 a
 3   document, a multi-page document with a Bates number
 4   Kik_00045676 to 678.
 5            (SEC Exhibit No. 135 was marked for
 6            identification.)
 7        THE WITNESS:  Yep.
 8        BY MR. MITCHELL:
 9        Q   I'm literally asking you this because I
10   think this -- let's see where I found it.  The meta --
11   so in the document production in the metadata --
12        A   Uh-huh.
13        Q   The metadata says created by you, that's
14   why I was just asking about it.
15        A   Yep.
16        Q   What is -- do you recognize Exhibit 135?
17        A   Yes.
18        Q   What is it?
19        A   It's a chart generalizing the -- generally
20   describing how the token sale was structured and
21   planned to occur.  And my recollection is this was
22   something we used to talk to Silvergate.  I don't know
23   if it was used for the other banks, but I'm pretty sure
24   I gave this to Silvergate or someone gave this to
25   Silvergate.
```

Page 68

```
 1        Q   All right.  And same kind of question.
 2            When you wrote it, to the best of your
 3   knowledge, it was correct?
 4        A   Yes.
 5        Q   All right.  Anything that you're looking at
 6   it now that didn't -- is this the way it actually went
 7   or is there a part in here that didn't turn out that
 8   way?
 9        A   Well, there are parts of this that were --
10   we don't refer to them in the same way, and so I'm not
11   clear in my mind that it did, in fact, happen.  So, for
12   example, under the Kin ecosystem, Kik users, it's
13   referring to reward Kin allocated to a master wallet to
14   back up the status reward Kin.  We don't refer to it
15   that way.  So I'm not sure if that's exactly what
16   happened.  Derek isn't our controller anymore.
17        Q   Sorry.  Literally the contact list, the --
18   Mr. Heinke and Mr. Lebert --
19        A   Yep.  Lebert.
20        Q   Lebert.
21        A   He's not our controller anymore, but, you
22   know, generally, it's correct.  It was -- I believe it
23   was correct at the time it was written.
24        Q   Sounds okay.  Literally just reading it, it
25   looks to me like the token distribution event hasn't
```

Page 69

```
 1   happened yet at the time you're writing this, though?
 2        A   I presume that I wrote this prior to the
 3   event happening.
 4        Q   Okay.
 5        MR. LEASURE:  There's a reference in
 6   Exhibit 135 on the second page, in the box, "key
 7   considerations"?
 8        THE WITNESS:  Yep.
 9        MR. LEASURE:  "Kin not a security"?
10        THE WITNESS:  Yep.
11        MR. LEASURE:  Did you discuss that topic
12   with anyone at Silvergate?
13        THE WITNESS:  I don't recall if I did or
14   not.
15        MR. LEASURE:  Okay.  I was seeing if this
16   maybe jogged any recollection or anything.
17            How about at any other bank that we
18   discussed so far?
19        THE WITNESS:  I don't recall if I did or
20   not.
21        BY MR. MITCHELL:
22        Q   One other document that I just really want
23   to ask is the metadata has that it's e-mailed from you.
24        A   Okay.
25        Q   So I'm going to give you what I'm going to
```

Page 70

1    mark as Exhibit 136.
2        (SEC Exhibit No. 136 was marked for
3        identification.)
4    BY MR. MITCHELL:
5    Q   Exhibit 136 has a Bates number Kik 99989
6   and runs through Kik_00100001.
7    A   Okay.
8    Q   All right.  Do you recognize the -- take as
9   much time as you want.
10   A   No.  I recognize the document.
11   Q   What is it?
12   A   It is a spreadsheet that I prepared in
13  which I attempted to go through the white paper to
14  capture what we said we would do as -- in the offering,
15  and then was intended to look and see, well, who was
16  going to do it and whether we had done it.  And my
17  intention at the time was to keep this up to date, but
18  I don't think I ever looked at it again.
19   Q   Okay.
20   A   But I wanted to be sure that we were
21  focused on, you know, what the white paper said and
22  making sure that we did it.
23   Q   Why?
24   A   Because of -- I think that when -- well, if
25  your website says you're going to do something, I think

Page 71

1   you should do it.
2    Q   And the -- just -- it has sort of a bunch
3   of -- it has a bunch of lines?
4    A   Uh-huh.
5    Q   And then some of them are just -- like, I'm
6   just trying to pick one.  22.  All right.
7       If you look on the page that ends in 991 --
8    A   Uh-huh.
9    Q   -- 22 says, "As the founding member of the
10  Kin foundation, Kik will be the ecosystem's champion
11  and will showcase Kin to its millions of users."
12       So this is the -- that's the kind of thing
13  that you're talking about that you were going to try to
14  keep track of?
15   A   Well, it's on there, yeah.
16   Q   Okay.  All right.  I have a lot of
17  spreadsheets like that, too, that were started with the
18  best of intentions.  Okay.  So let me take you to the
19  time after the token distribution event.
20   A   All right.
21   Q   What kind of role have you had with Kin
22  tokens since then?  Sorry.  I know you already talked
23  about for part of the time -- well, probably not the
24  Kin tokens.
25       What role you have had with the Kin tokens

Page 72

1   or the -- since the token distribution event?
2    A   Well, I've been dealing with you all.
3    Q   Yes.  I would appreciate that.
4    A   I have been present during meetings of the
5   management team and executive team in which the
6   continued build out of the Kin Ecosystem was discussed.
7    Q   Okay.
8    A   And for which I provided legal and
9   compliance advice.
10   Q   Okay.  I'm going to focus on the compliance
11  side.  Is there some compliance work that you've done
12  that's sort of separate from providing legal advice?
13   A   I kind of think of compliance as being the
14  money transmission side of things as opposed to, you
15  know, other legal issues, but they're really all legal
16  regulatory issues, complying with federal and state
17  regulations and other countries' regulations.
18   Q   Okay.  So I'm going to keep away -- I'm
19  going to try to keep away from sort of your
20  conversations with people inside Kik.
21       Have you worked with people or dealt with
22  people outside of Kik on any parts of the Kin project
23  since the token distribution event?
24   A   Yes.  I have spoken, as I mentioned before,
25  with Bittrex.

Page 73

1    Q   Bittrex, yeah.
2    A   And exchanged.  I've prepared for filing
3   other applications to other exchanges, including
4   Binance and Huobi.  I have talked with William McGuire
5   who is one of the directors of the foundation and Juan
6   Llanos who is a consultant to the foundation.  Kin
7   tokens.  Outside of the company.
8    Q   Have you dealt with anyone at Stellar?
9    A   Yes.  I've spoken with some people at
10  Stellar when we were making the decision to migrate.
11  And, initially, we thought we were going to migrate the
12  token from the Ethereum token to the Stellar token,
13  and, ultimately, decided that there would be a, you
14  know, dual sort of role for the token.
15       So it operates on a theory, and that is the
16  token that was issued.  But there was also a
17  blockchain, a Stellar blockchain, and I believe, it
18  was operating on their test net.  But in any case, you
19  know, we call it the Kin blockchain, and it's both of
20  them.
21       So I'm not sure how it's going to work or
22  how it does work or whether it even does work
23  currently.  But we talked about the issues with the
24  migration, technically how that might happen.  Because
25  in order to analyze the money transmission issues, we

Page 74

1  need to understand specifically what happens and
2  whether Kik -- I'm sorry.  Yeah.  Whether Kik or the
3  Kin Foundation -- although, at this time I think it was
4  just Kik -- had control over anybody's assets because
5  if you have control you are, you know, a money
6  transmitter and you must be licensed.
7      Q   Okay.  So what was the issue that the --
8  that this work with Stellar was trying to address?
9      A   The swap of the tokens.  So it was
10 really -- it was really a technical discussion, and I
11 was listening in.
12     Q   Sure.  But --
13     A   Trying to keep up.
14     Q   So what was the issue that this solution
15 was trying to address?
16     A   Why we were looking at Stellar?
17     Q   Yes.
18     A   The Ethereum blockchain is slow and
19 expensive, and Stellar is fast and the fees were much
20 lower.  And for a consumer blockchain, Kik thought that
21 we needed to have the speed and the lower fees.  We
22 ultimately forked it because the decision was made that
23 the -- if we created our own version of Stellar, that
24 we didn't have to charge any fees, and so that would
25 facilitate the development of the ecosystem.

Page 75

1      Q   Okay.  And who at Kik was handling sort of
2  the substantive discussion that you were listening to
3  about the technical things, how to do it?
4      A   I believe Gadi, G-a-d-i, Sbrenik
5  S-b-r-e-n-i-k, and he heads our blockchain team in Tel
6  Aviv, would have been on that call.  Tanner Philp would
7  have been on that call.  Tal Cole might have been on
8  that call, but I don't think he -- and he's not with
9  the company anymore.
10     Q   And was Stellar the only way to solve this
11 problem that the Ethereum blockchain was slow and
12 extensive?
13     A   I don't know if it was the only other
14 option.  We were also in discussion with Orbs.
15     Q   That's the company that had been CoinTree
16 and became Orbs?
17     A   Well, I don't know if it became Orbs.
18     Q   The same group of people?
19     A   It's the same group of people, right.
20     Q   Okay.
21     A   We had been talking with Orbs for quite a
22 long time.
23     Q   About the same issue?
24     A   About -- they were -- they would be
25 providing a blockchain solution for consumer use of

Page 76

1  cryptocurrency that would address the latency issues
2  with Stellar.
3      Q   Stellar?
4      A   I mean with Ethereum.
5      Q   With Ethereum, okay.
6          So Stellar and Orbs were both possible
7  solutions?
8      A   Possible solutions.
9      Q   Okay.  And -- but a decision was made to go
10 with Stellar?
11     A   Well, Orbs, I don't believe they had a
12 solution ready at the time that we were working with
13 Stellar.
14     Q   Okay.  Is Kik still working with Orbs on
15 that?
16     A   No.
17     Q   So at some point some people made a
18 decision to go with Stellar instead of Orbs?
19     A   Right.
20     Q   And who made that decision?
21     A   It would have been the blockchain team and
22 Ted.
23     Q   Ted Livingston?
24     A   Ted Livingston.
25     Q   And the blockchain team are Kik employees?

Page 77

1      A   Yes.
2      Q   Okay.  And then earlier you said -- so --
3  sorry.  It sounds like -- am I right that after the
4  decision was made to go with Stellar then there was
5  another decision to fork something?
6      A   Fork Stellar.  So Stellar's blockchain is
7  open-source software, and anyone at any time can copy
8  it and do what they want with it.  And that's what they
9  did.
10     Q   Who is the "they"?
11     A   The blockchain team.
12     Q   At Kik?
13     A   At Kik.
14     Q   Okay.  So forking it is copying it and?
15     A   Adjusting it and using it for a different
16 purpose.  I mean, that's a common thing in blockchain,
17 to fork technology.
18     Q   And so is -- who is -- sorry.
19         Is there now a forked --
20     A   A forked version of Stellar that we call
21 the Kin blockchain.
22     Q   The Kin blockchain?
23     A   Yes.
24     Q   Okay.  And is that also open source?
25     A   I think it is, yes.

Page 78

1     Q   Okay.  And who is -- is someone sort of
2   overseeing the Kin blockchain today?
3     A   Yes.  Gadi Neteanel, N-e-t-e-a-n-e-l, Lev
4   L-e-v.
5     Q   Yeah.
6     A   Also in our Tel Aviv office.
7     Q   So Kik employees are overseeing this Kin
8   blockchain?
9     A   Right.
10    Q   And have -- is the Kin -- you have to tell
11  me if I'm using the right kind of term.
12        Is the Kin blockchain operational?  Like,
13  does it -- are people using it?
14    A   Yes.
15    Q   Or how does it get used today?
16    A   The Kinit app.  Have you heard of the Kinit
17  app?
18    Q   I did, actually.
19    A   Yes.  Have you earned some Kin yet?
20    Q   I have not.
21    A   You should because you can use it to buy
22  things.
23    Q   I am actually not allowed to own it.
24    A   Oh, okay.  It's quite interesting.  So one
25  can download the app now on IOs, on Apple, as well as

Page 79

1   in the Google store, Google play store and you can --
2   one can -- I have answered polls and received tokens as
3   a result.  So I have a little build up of tokens.  I
4   have almost 600 tokens, and I can use them to buy a
5   $5.00 Amazon gift card if I want.  But I'm saving it
6   because I might want to use it to buy something else.
7     Q   Okay.  And the -- and that app --
8     A   Operates on the Kin blockchain.
9     Q   The Kin blockchain, okay.  And that app is
10  run -- it's also -- that's a Kik -- Kik employees run
11  that app?
12    A   Kik employees developed that app, correct.
13    Q   And I'm sorry.  Does Kik own the app?
14    A   Yeah.
15        MR. LEASURE:  It's free?
16        THE WITNESS:  It's free.  See what you're
17  missing out on?  Check it out.
18        BY MR. MITCHELL:
19    Q   I'm just -- I'm looking at a document.  I
20  don't think I need to show it to you.
21        At some point prior to the plan that led to
22  the Kin blockchain, there had been a different idea of
23  possibly having people exchange their Kin tokens on the
24  Ethereum blockchain for ones on the Stellar blockchain?
25    A   That was floated, but it was never resolved

Page 80

1   because there were issues associated with that.  The
2   exchanged value for value was a problem, you know,
3   being unlicensed, not a money transmitter.  How would
4   that occur?  We just -- it didn't go very far.
5     Q   All right.  It was an option people --
6     A   Plus, people felt that the Stellar
7   blockchain is limited in that it doesn't provide any
8   liquidity for anyone that wanted to move out of Kin
9   into fiat currency.
10    Q   Why doesn't it?
11    A   I'm not sure, but that's what I understand.
12    Q   All right.  Okay.  It's - so your
13  understanding is it's not possible to move -- to --
14    A   It's not possible or it's not easy.  It's
15  not, you know, fluid enough.  So the best of both
16  worlds is how Ted describes it.  And I think that's
17  probably accurate is that, you know, using both
18  blockchains allows people who want the security and
19  the -- I think what he says is the security and the
20  liquidity of the Ethereum blockchain can use that and
21  then that was what the tokens were issued on.  But if
22  they want to use it in the ecosystem, the Stellar
23  blockchain provides that, the speed and the low fees.
24    Q   And, as a practical matter, do people
25  actually give up their token on the Ethereum blockchain

Page 81

1   in order to get the token on the Stellar blockchain?
2     A   Not currently.  It's -- they're kind of
3   operating -- the Stellar blockchain currently, as I
4   understand it, is operating almost as the Kik points
5   were operating, and they're not swappable at the
6   moment.
7     Q   But is that the long-term goal was to --
8     A   Oh, yeah.  It's actually not that long of a
9   term goal.  We have to have that functional.  But there
10  were technical issues with it as well as legal
11  regulatory issues associated with it.  So figuring that
12  out has kind of occupied quite a lot of people's times.
13    Q   And the legal writing term are in the money
14  transfer kind of fund?
15    A   Yes, in my -- yeah.  Money transfer.
16    Q   Okay.  So can I -- I think you mentioned
17  some exchanges.
18    A   Okay.
19    Q   Tell -- you said your -- I think you said
20  you had prepared things for Binance?
21    A   Binance.
22    Q   And somebody else called?
23    A   Huobi, H-u-o-b-i.
24    Q   H-u-o-b-i.  So let me take them one at a
25  time.

Page 82

1     A   Sure.
2     Q   What's Binance?
3     A   Binance is a cryptocurrency exchange.
4     Q   And how did you come -- did you actually
5   deal with people at Binance directly?
6     A   I probably looked them up on the Internet
7   and downloaded their application form, which was a
8   Google doc.
9     Q   Okay.
10    A   Very likely.
11    Q   And what did you do?
12    A   Filled it out.
13    Q   And then what did you do once you filled it
14  out?
15    A   E-mailed it to them or pushed send.
16    Q   And when was this?
17    A   Probably in February.
18    Q   Okay.
19        MR. LEASURE:  Of 2018?
20        THE WITNESS:  Yes.
21        BY MR. MITCHELL:
22    Q   And was that just your idea to do?
23    A   No.
24    Q   So how did this -- how did you -- were you
25  tasked with doing that?

Page 83

1     A   Yes.
2     Q   So how did you get tasked with doing that?
3     A   During an executive meeting or a planning
4   meeting, members of the team expressed that liquidity
5   was going to be very important for developers and that
6   we already were included on a couple of exchanges, but
7   they had low liquidity.  And so having one of the
8   larger exchanges list the token was advisable or
9   preferable.  And so, you know, we picked the top then
10  exchanges by volume and started going down the list.
11    Q   Okay.  Why was it preferable?
12    A   Because if there is more liquidity.  If
13  there are more tokens, if they can handle more tokens,
14  then it would, you know, make the easiest, you know,
15  transactions.  You know, I guess, similar thinking to
16  why would you list on the New York Stock Exchange
17  versus the Pacific Stock Exchange.
18    Q   Okay.  But how is that connected to
19  developers?  I think you --
20    A   Developers who receive grants through the
21  partnership program or, ultimately, through the Kin
22  rewards engine may want to redeploy that into their
23  ecosystems and give opportunities to their users to
24  earn or spend.  But they also might need to spend it
25  on, you know, the day-to-day necessities of running a

Page 84

1   corporation such as paying their employees or paying
2   their rent, and those people might not be willing to
3   accept Kin.  So you'd want to transfer it into fiat in
4   order to pay all the -- pay those bills and such.
5     Q   And so the added liquidity would make the
6   participating in the Kin ecosystem more attractive to
7   the developers?
8     A   Exactly.
9     Q   Okay.  I'm sorry.  So it sounds like the
10  group decided to target the top ten?
11    A   Yes.
12    Q   And so you just got a few of the top ten?
13    A   Well, I have a list of the whole top ten,
14  and it changes every day.
15    Q   But you only, though, reached out to
16  Binance and --
17    A   Huobi.
18    Q   -- Huobi?  You reached out to --
19    A   Actually, I don't know if that's how it's
20  pronounced, but that's how I pronounce it.
21    Q   For today it will be.
22        Did other people -- were other people
23  tasked with approaching other exchanges?
24    A   No, no.  I was supposed to do all of them,
25  but, you know, bandwidth was limited.

Page 85

1     Q   So Binance, you submitted an application?
2     A   I believe we did submit an application to
3   Binance.
4     Q   And then what happened next?
5     A   I haven't heard anything from them since.
6     Q   Okay.  And then -- what about -- what did
7   you do in terms of Huobi?
8     A   The same.  They had an application form.
9   It was very similar to the Binance form, and I think
10  they probably just copied it.  And so I filled that
11  out.  Actually, I had my paralegal fill it out.  I
12  reviewed it, and then we provided it.  And I don't
13  think we heard anything back from them either.
14        MR. LEASURE:  Where are they based?
15        THE WITNESS:  I think they're Korean
16  exchange.
17        MR. LEASURE:  We talked a few minutes ago
18  about the desire to have Kin listed on exchanges or
19  more liquid exchanges, correct?
20        THE WITNESS:  Yes.
21        MR. LEASURE:  Have you ever directly or
22  indirectly received complaints from purchasers in the
23  token distribution event that Kin wasn't being listed
24  on major exchanges?
25        THE WITNESS:  I personally didn't receive

Page 86

1  any, but I'm aware that there were comments made in
2  Reddit channels about that.
3      MR. LEASURE: Okay. And they weren't
4  directly to you, I take it?
5      THE WITNESS: No.
6      MR. LEASURE: Right. Of course not.
7      But did you -- you came to hear about those
8  comments?
9      THE WITNESS: Yes, I did.
10     MR. LEASURE: Who did you hear about those
11 from?
12     THE WITNESS: From our communications team.
13     MR. LEASURE: Okay.
14     THE WITNESS: Because they look at those
15 channels and they monitor them.
16     MR. LEASURE: Okay. Were they -- I just
17 want to make sure I'm not stepping on anything.
18     Were your communications team seeking legal
19 advice from you in connection to those complaints on
20 Reddit?
21     I just want to make sure I'm not --
22     THE WITNESS: I don't know that they --
23 they wanted an appropriate response.
24     MR. LEASURE: Okay.
25     THE WITNESS: And so in that regard it was

Page 87

1  a legal request.
2      MR. LEASURE: Okay. So I don't want you to
3  tell me about what you told the communications team.
4      What were people on Reddit, at least as far
5  as you could see -- was it fair to say they were
6  complaining about a lack of liquidity for Kin at the
7  time?
8      THE WITNESS: Yes.
9      MR. LEASURE: Okay. Do you know why? Why
10 would they care?
11     THE WITNESS: I don't know why they would
12 care. I can conjecture, but I wouldn't have any
13 insight into their thought process.
14     MR. LEASURE: Would you -- was it your
15 impression that they were --- that the people on Reddit
16 who were complaining were only developers?
17     THE WITNESS: I don't think any of them
18 were developers. They were just people who were
19 holders.
20     MR. LEASURE: Okay. So would you agree --
21 well, based on that, is -- I want to be mindful of
22 privilege.
23     Is it accurate then that there was concern
24 about getting access to liquid exchanges that was
25 expressed by developers and people who purchased in the

Page 88

1  token distribution event?
2      THE WITNESS: Some people expressed concern
3  about that.
4      MR. LEASURE: Sure.
5      THE WITNESS: I don't know if they were
6  developers or whether they were holders or whether they
7  were just interested bystanders.
8      MR. LEASURE: Absolutely. Right. Okay.
9  BY MR. MITCHELL:
10 Q   And the last one is Bittrex?
11 A   Yes.
12 Q   So how did you start dealing with Bittrex?
13     What was the first step for you?
14 A   I believe we contacted Bill Shihara, who's
15 their CEO or somebody, you know, in the management team
16 at Bittrex to talk about potentially listing Kin on the
17 exchange. They then provided us with an application
18 form that we completed. And then I've had some
19 follow-up conversations with their in-house counsel,
20 and their outside counsel, O'Melveny & Myers.
21 Q   Okay. Did Kik ask Pantera to submit a
22 listing application for the Kin token?
23 A   Yes.
24 Q   Tell me about that.
25 A   It was our understanding at that time that

Page 89

1  token issuers didn't apply directly, that a request had
2  to be made by someone who was a holder, and we
3  understood Pantera to be a holder through the SAFTs
4  process and that they also had a relationship with
5  Bittrex. So we asked Pantera to submit the application
6  on our behalf.
7  Q   Did someone draft an application?
8  A   The application that was submitted, yes,
9  was drafted by Tanner and me.
10 Q   Okay. And then you provided it to Pantera?
11 A   And we provided it to Pantera to provide to
12 Bittrex.
13 Q   Okay. And did Pantera provide it to
14 Bittrex?
15 A   I assume so. They had the application.
16 They contacted me about it.
17 Q   Okay.
18     MR. SCHLEGELMILCH: When did this happen?
19     THE WITNESS: I believe it was in October
20 or November of 2017.
21     MR. SCHLEGELMILCH: Thank you.
22     BY MR. MITCHELL:
23 Q   At a subsequent point, did you submit a
24 second application to Bittrex?
25 A   I don't think I submitted a second

## Page 90

1  application.  I may have done -- I don't think so,
2  though.  It would have been substantially the same
3  application.
4     Q   Did you submit it -- but did you --
5     A   Personally --
6     Q   Did you go in -- did you go back into
7  Bittrex's system and put in a new document to them?
8     A   It sounds familiar, but I -- I might have
9  done that, yeah.
10    Q   Let me just give you what is a two-page
11  e-mail.
12    A   Okay.
13    Q   Real quick.
14    A   Yeah.
15    Q   This is marked Exhibit 137.
16       (SEC Exhibit No. 137 was marked for
17       identification.)
18    THE WITNESS:  Okay.
19    BY MR. MITCHELL:
20    Q   Bates number PANT-000002107 to 2108.  And
21  on the top of the e-mail chain it has a date of
22  11/21/2017.
23    A   Okay.
24    Q   Do you see that?
25    A   Yes.

## Page 91

1     Q   Take your time.  My first question is going
2  to be:  Do you recognize the document?
3     A   I recognize the top part.  I don't know
4  that I -- yeah.  I guess I saw the last part.  This --
5  this business here doesn't -- this doesn't look
6  familiar to me, but everything else looks like I've
7  seen it.
8     Q   All right.  Sorry.  The part that sort of
9  is a -- looks like maybe --
10    A   A graphic?
11    Q   -- it's an image with account information
12  on the second page?
13    A   Yeah, yeah, yeah.  I don't remember seeing
14  that before.
15    Q   Okay.  Again, this was sort of
16  approached -- started doing this to discuss the dates.
17    A   Okay.
18    Q   So do you know who Matt Gorham,
19  G-o-r-h-a-m, is?
20    A   Well, I see from this that he's the chief
21  operating officer for Pantera, but, other than that, I
22  don't know who he is.
23    Q   Okay.
24    A   I have never talked to him that I recall.
25    Q   And then at the top of the page, do you see

## Page 92

1  there is an e-mail from someone named Katie Harrison?
2     A   Yes.
3     Q   And it includes you in the CC order?
4     A   Yes.
5     Q   Who is Katie Harrison?
6     A   She's the general counsel at Bittrex.
7     Q   Okay.  And so what -- I guess what I'm
8  trying to figure out is at this point did she ask you
9  or did she say that someone from Kik needs to submit an
10  application?
11    A   That's what I understood this to mean.
12    Q   Okay.  And so -- sorry.
13       Did you do at that some point?
14    A   I believe so.
15    Q   Okay.  You see in her -- in Ms. Harrison's
16  e-mail in the detailed paragraph that starts "attached
17  is our listing application"?
18    A   Yes.
19    Q   And then it -- I'll just read it.  It says,
20  "You'll notice that there is a document request list at
21  the end that tells you what else we need to do our
22  review.  This includes a memo showing the analysis on
23  how the token is not a security using the Howey Test."
24    A   Yes.
25    Q   Okay.  So did you understand that she was

## Page 93

1  asking that Bittrex was measuring whether a token was a
2  security based on the Howey Test?
3     A   That's what -- that's what this -- it
4  requires a memo.
5     Q   Okay.  And did you provide one?
6     A   I did not provide a memo.  I provided, to
7  my knowledge, a copy of a letter that our counsel at
8  Blakes had written to the Ontario Securities Commission
9  because all of the memos that we have regarding our
10  analysis were privileged, and we didn't want to
11  inadvertently waive that privilege.
12    MR. LEASURE:  Can I ask please -- Bittrex,
13  the only exchange you're aware of in connection with
14  Kin Applications was to ask for a memo showing a Howey
15  analysis?
16    THE WITNESS:  I believe Binance and Huobi
17  also have some requirement to provide some kind of
18  analysis.
19    MR. LEASURE:  Did -- was one provided to
20  them?
21    THE WITNESS:  I would have provided the
22  same letter that -- if I provided it, it would have
23  been the same letter that I provided to Bittrex.
24    MR. LEASURE:  Of Blakes letter, right?
25    THE WITNESS:  The Blakes letter, yeah.

Page 94

1    MR. LEASURE:  Okay.  Did Kik ever provide
2  any other memorandum or analysis to any exchange in
3  connection with an exchange application?
4    THE WITNESS:  Well, I -- they -- after they
5  had their outside attorneys look at it, O'Melveny asked
6  me to update the memorandum or the letter to take
7  account of recent enforcement actions and statements by
8  the chairman.
9    MR. LEASURE:  Someone at the SEC.  And
10  we'll turn to that in a minute.
11    THE WITNESS:  Okay.
12    MR. LEASURE:  Just to make sure we're not
13  missing anything else.
14    THE WITNESS:  No.  That's my only -- that's
15  the other thing that I have been asked for.
16    MR. LEASURE:  In your work dealing with
17  exchanges, did you ever get an impression of why
18  exchanges wanted that information?
19    THE WITNESS:  I -- it was my understanding
20  that they did not want to list a token that was
21  considered to be a security.
22    MR. LEASURE:  Got it.  So right.  That's --
23  they just want to have something that -- something to
24  make a call --
25    THE WITNESS:  Yeah.  It was their due

Page 95

1  diligence process.
2    MR. LEASURE:  Thank you.  Understood.
3    BY MR. MITCHELL:
4    Q  I'm going to just mark as Exhibit 138 a
5  letter that's ongoing --
6    A  Okay.
7    (SEC Exhibit No. 138 was marked for
8    identification.)
9    BY MR. MITCHELL:
10    Q  138 is -- has a Bates number SEC-Bittrex,
11  B-i-t-t-r-e-x, dash E-0000012 to 17.
12    A  Okay.
13    Q  Do you recognize this?
14    A  I do.
15    Q  What is this?
16    A  This is a letter that Ross McKee from
17  Blakes wrote to Pat Chaukos at the OSC, Ontario
18  Securities Commission in response to an outreach from
19  the OSC to Kik regarding our token distribution event.
20    Q  And was it the Blakes letter that you were
21  discussing earlier?
22    A  This is the one that I provided to Bittrex.
23    Q  I'm going to mark as Exhibit 139 --
24    MR. LEASURE:  Can I ask about Exhibit 138?
25  Who decided to provide this Blakes letter

Page 96

1  as opposed to other internal memoranda that might exist
2  regarding the Howey analysis?
3    THE WITNESS:  I discussed it with outside
4  counsel both at Blakes and at Cooley was advised not
5  to --
6    MR. LEASURE:  That's where we stop you.
7  Apologies.  So you decided?
8    THE WITNESS:  I decided.
9    MR. LEASURE:  Got it.
10    BY MR. MITCHELL:
11    Q  I'm going to mark -- I just marked as
12  Exhibit 139.
13    (SEC Exhibit No. 139 was marked for
14    identification.)
15    BY MR. MITCHELL:
16    Q  It's a document with a Bates number
17  KIK_00112748 to 2750 -- oh, no.  2752.
18    A  Yep.
19    Q  On the top it says, "Attachment B 1 to
20  Bittrex token application and listing agreement"?
21    A  Yes.
22    Q  Do you recognize this document?
23    A  Yes, I do.
24    Q  What is this?
25    A  It's an attachment to the Bittrex token

Page 97

1  application and listing agreement.
2    Q  This is an -- did you submit this
3  attachment as part of your application?
4    A  Yes.
5    Q  And was it -- you know, were the things you
6  wrote in here at the time that you wrote it?
7    Or I'm sorry.  Did you draft this?
8    A  I did draft it.  It was, as with some of
9  the other things I've submitted, cribbed a lot from
10  other documents that were prepared by others, but I
11  believed them to be accurate when I submitted it.  It
12  looks incomplete.
13    Q  What do you mean incomplete?
14    A  "The status of the work on the platform are
15  as follows," and it's -- there's nothing there.  And,
16  also, I see that there was a triple X here on the last
17  page.
18    Q  So this is -- this is a draft?
19    A  So it -- I think it was actually submitted,
20  but, you know, we didn't do such a great job of
21  finalizing it.
22    Q  Okay.  So I think you've already started to
23  tell some of the story.  But what -- after you made the
24  submission, what happened next?
25    A  The operations person, Julian Yap, reached

Page 98

1    out and said he was setting up a slack channel for us
2    and that that was how we should communicate with them
3    going forward. And I asked, does that mean that you've
4    agreed to list us? And he said, no, it's under
5    consideration.
6            And I think I spoke to Katie, also, and she
7    said that part of the process was that their outside
8    lawyer had to review the application and make a
9    determination for them on the security issue and that,
10   you know, they would reach out.
11           And so, thereafter, I heard from first a
12   lawyer at Perkins Coie and then he told me that he was
13   passing it on to a lawyer at O'Melveny. And so then I
14   spoke with the lawyer at O'Melveny and he asked me to
15   submit an updated -- update the Blakes letter based on
16   recent developments at the Commission. And so I
17   submitted a letter or a memo outlining why I thought
18   that the token is not a security.
19   **Q    Okay.**
20       A    And that the Munchee decision and the
21   chairman statement didn't change anything.
22       MR. MITCHELL: Well, he's actually just
23   running out of tape. So let me -- I'm just going to
24   ask a -- try to ask a simple question.
25           Actually, we're going to -- can we go off

Page 99

1    the record?
2        THE VIDEOGRAPHER: This ends disc number
3    one. Going off the record. The time is now 12:04 p.m.
4        (A brief recess was taken.)
5        THE VIDEOGRAPHER: This begins disc number
6    two. We are back on the record.
7        The time on the monitor is 12:16 p.m.
8        BY MR. MITCHELL:
9    **Q    During the break, did you have any**
10   **substantive conversations about the case with the**
11   **staff?**
12       A    No.
13   **Q    All right. I'm going to mark as**
14   **Exhibit 140 a two-page document.**
15           (SEC Exhibit No. 140 was marked for
16           identification.)
17       THE WITNESS: Okay.
18       BY MR. MITCHELL:
19   **Q    It's Bates number SEC KIN 00 -- or no. Let**
20   **me start over. It's Bates number is**
21   **SEC-Bittrex-E-0000096. It has another Bates -- another**
22   **number that might be a Bates number up top, but I don't**
23   **know what that is.**
24           So we've got Exhibit 140. Again, it's a
25   **two-page document with that Bates number that ends in**

Page 100

1    96 to 97. And it has on the face it looks like an
2    e-mail chain and at the top it has an e-mail, the top
3    e-mail is dated January 8th, 2018.
4        A    Okay.
5    **Q    Do you recognize this document?**
6        A    I do.
7    **Q    What is it?**
8        A    It's an e-mail chain between me and certain
9    people at Bittrex regarding the status of the
10   application.
11   **Q    Okay. So you asked what's the status of**
12   **the application to Bittrex?**
13       A    Yes.
14   **Q    And then in the middle is there -- there's**
15   **a January 8th, 2018, e-mail where Ms. Harrison asks did**
16   **you send us your U.S. Securities analysis memo; do you**
17   **see that?**
18       A    Yes, uh-huh.
19   **Q    And then above that, did you write back to**
20   **her that, yes -- I'll just read it.**
21           **"Yes, it was attached as Exhibit 5, a**
22   **letter from our Canadian counsel at Blakes to the**
23   **Ontario Securities Commission, which analyzes the**
24   **securities issues."**
25       A    Yes.

Page 101

1    **Q    Okay. And is that Exhibit 138 that we**
2    **talked about before?**
3        A    Yes.
4        MR. LEASURE: Is Exhibit 138 a U.S.
5    Security analysis memo responsive to Bittrex's request?
6        THE WITNESS: Well, it doesn't analyze U.S.
7    Securities laws, as you can see, but I felt that it was
8    responsive to Bittrex's request.
9        MR. LEASURE: Can you explain why?
10       THE WITNESS: No. That would be my
11   impressions and thoughts, and I'm going to invoke a
12   privilege on that.
13       MR. LEASURE: Okay. Were you involved in
14   the 2017 discussions with the Ontario Securities
15   regulators?
16       THE WITNESS: I did not have any
17   conversations with the securities regulars. I only had
18   conversations with counsel.
19       MR. LEASURE: So you didn't meet them?
20       THE WITNESS: I did not meet with the
21   Ontario Securities Commission or talk to them on the
22   telephone.
23       MR. LEASURE: And the -- Kin was ultimately
24   not sold in Canada, correct?
25       THE WITNESS: That's correct.

Page 102

1    MR. LEASURE:  And was that as a result of
2  negative feedback from the OSC?
3    MR. CADIGAN:  Can you answer that question
4  without getting into discussions with counsel?
5    THE WITNESS:  Yeah.  I really can't answer
6  that without getting into discussions with counsel.
7    MR. SCHLEGELMILCH:  So the Blakes letter,
8  Exhibit 138, was submitted to the Ontario Securities
9  Commission in connection with the Kin offering; is that
10  correct?
11    THE WITNESS:  Correct.
12    MR. SCHLEGELMILCH:  And the OSC, the
13  Ontario Securities Commission, provided feedback based
14  on the Blakes letter, correct?
15    THE WITNESS:  They had further discussions
16  with our counsel at Blakes.
17    MR. SCHLEGELMILCH:  And you can't tell us
18  what those conversations were, what OSC told Blakes; is
19  that your testimony?
20    THE WITNESS:  My only knowledge of those is
21  through conversations that I had with Blakes.
22    MR. SCHLEGELMILCH:  Okay.  So the answer to
23  my question is:  Sitting here today, you can't tell us
24  what --
25    THE WITNESS:  I won't tell you because of

Page 103

1  the attorney-client privilege.
2    MR. SCHLEGELMILCH:  Hang on.  I just want
3  to make sure the record's clear.
4    THE WITNESS:  Okay.  Yeah.  That's fine.
5    MR. GIBBS:  Yes, it.  So let me throw in
6  $0.02.  I think what she's saying is she can't tell you
7  what the Canadian regulators said because she wasn't
8  there.  All she can tell you is what her lawyers told
9  her about that meeting.
10    MR. SCHLEGELMILCH:  That's -- I understood
11  that.
12    MR. GIBBS:  Okay.  I just -- I wanted to
13  make sure it's clear.  I didn't think it yet.
14    MR. SCHLEGELMILCH:  It may not be clear,
15  but I understood it.
16    MR. GIBBS:  Okay.
17    THE WITNESS:  Okay.
18    MR. SCHLEGELMILCH:  Okay.  So now that I
19  understand the situation -- and, ultimately, Kin was
20  not offered to Canadian residents?
21    THE WITNESS:  Correct.
22    MR. SCHLEGELMILCH:  Okay.  Can you tell me
23  whether there is a causal connection between the
24  feedback provided from the OSC and Kin not being
25  offered to Canadian residents?

Page 104

1    MR. CADIGAN:  Can you answer that question
2  without getting into discussions with outside counsel
3  or --
4    THE WITNESS:  No.  I can't answer that
5  question without resorting to conversations with
6  counsel.
7    MR. SCHLEGELMILCH:  Okay.  And you provided
8  Exhibit 138, the Blakes letter, to Bittrex prior to
9  January 8th, 2018, correct?
10    THE WITNESS:  Correct.
11    MR. SCHLEGELMILCH:  Did you -- was -- did
12  you tell Bittrex that Kin was not offered in Canada?
13    THE WITNESS:  I don't know whether I did or
14  not.  I don't think I did.
15    MR. SCHLEGELMILCH:  Okay.  Do you have a --
16  I -- let me drill down.  Do you have a memory of
17  providing that information to Bittrex?
18    THE WITNESS:  I don't have any memory of
19  providing that information to Bittrex.
20    MR. SCHLEGELMILCH:  Okay.  Do you have a
21  memory of choosing not to provide it to Bittrex?
22    THE WITNESS:  I -- if I didn't provide the
23  information, it's because they didn't ask me.
24    MR. LEASURE:  Okay.  And Kin was also not
25  offered to Chinese purchasers; is that correct?

Page 105

1    THE WITNESS:  That's right.
2    MR. LEASURE:  Do you know why that is?
3    THE WITNESS:  Yes.
4    MR. LEASURE:  Why is that?
5    THE WITNESS:  It was a --
6    MR. CADIGAN:  Is that information -- I just
7  want to make it clear --
8    THE WITNESS:  Yeah.  No.  It's information
9  that's in my knowledge as a result of conversations
10  with counsel.  I mean, I can say generally that it was
11  because of recent regulatory or government action in
12  China immediately prior to the TDE in which they --
13  reports were that they declared cryptocurrency illegal.
14    MR. SCHLEGELMILCH:  So Kin was not offered
15  to -- in the -- well, in the September time period, was
16  not offered to New York residents that you know of,
17  correct?
18    THE WITNESS:  Yes.
19    MR. SCHLEGELMILCH:  It was not offered to
20  residents of the state of Washington?
21    THE WITNESS:  Yes.
22    MR. SCHLEGELMILCH:  It was not offered to
23  Canadian citizens?
24    THE WITNESS:  Right.
25    MR. SCHLEGELMILCH:  And it wasn't offered

Page 106

1    to Chinese citizens; is that correct?
2         THE WITNESS:  Residents.
3         MR. SCHLEGELMILCH:  Residents.
4         THE WITNESS:  Uh-huh.
5         MR. SCHLEGELMILCH:  Was is -- let me make
6    the same distinction then with Canadians.
7         Was it offered to Canadian residents?
8         THE WITNESS:  It was not offered to
9    Canadian residents.
10        MR. SCHLEGELMILCH:  Okay.
11        THE WITNESS:  Other than, there were some
12   employees who were Canadian.
13        MR. SCHLEGELMILCH:  And they were permitted
14   to buy?
15        THE WITNESS:  They were permitted to
16   participate.
17        MR. SCHLEGELMILCH:  Okay.  Are there any
18   other jurisdictions to which -- that you're aware of
19   that Kik decided to not sell Kin into, other than the
20   four we've identified?
21        THE WITNESS:  Well, I think we didn't
22   permit any registrations in Iran and other sanctioned
23   countries.
24        MR. SCHLEGELMILCH:  Okay.  So other than
25   Iran, can you --

Page 107

1         THE WITNESS:  I don't know even -- I mean,
2    if anybody even tried to register from there, but we
3    would not have permitted them.
4         MR. SCHLEGELMILCH:  Okay.
5         THE WITNESS:  And I don't know of any other
6    countries.
7         MR. SCHLEGELMILCH:  Thank you.
8         BY MR. MITCHELL:
9     Q    So I think in the Bittrex you had -- you
10   were communicating with Ms. Harrison and told her, yes,
11   we've provided the U.S. --
12    A    Memo.
13    Q    What happened next?  Like, what did you --
14   what was the -- what happened after that, in terms of
15   Bittrex?
16    A    I had a phone call with a lawyer of theirs,
17   outside counsel from Perkins Coie, and then I had an
18   e-mail from him indicating that he was passing the
19   matter on to a lawyer at O'Melveny & Myers.
20    Q    Okay.
21    A    And that I should continue to discuss it
22   with him.
23    Q    Great.  And is that Fredrick?
24    A    Fedynshyn or something like that?
25    Q    Yeah.

Page 108

1     A    Yeah.
2     Q    And let me just -- and did he ask for some
3    additional analysis?
4     A    He may have done -- if he did, it's
5    probably in that e-mail you're about to hand me.
6     Q    Yeah.  And the spelling of his name is
7    there, too.
8     A    Okay.
9     Q    I'll give you what has been marked as
10   Exhibit 141 which is a multi-page document with the
11   Bates number KIK_00112557 through 559.
12        (SEC Exhibit No. 141 was marked for
13        identification.)
14        BY MR. MITCHELL:
15    Q    And, again, on it's face it's an e-mail
16   chain that seems to include a lawyer at Perkins Coie
17   named Fredrick Fedynyshyn.  I'm sure that's not how
18   it's pronounced, but his last name is spelled
19   F-e-d-y-n-y-s-h-y-n.
20        Is that the Perkins Coie lawyer you were
21   thinking of?
22    A    Yes.
23    Q    Okay.  So you had a conversation with him
24   and then got an e-mail from him?
25    A    I think I talked to him on the telephone.

Page 109

1     Q    Okay.  What -- did he call -- what -- did
2    he call to ask questions?
3     A    Might have just been an introductory call.
4    I don't recall the substance of it, but what's covered
5    in this e-mail from January 11th is substantially the
6    gist of any conversation I had with him.
7     Q    So in this e-mail he asks for an update --
8    you to update -- I'm reading at the bottom of the first
9    page.
10    A    Yeah.
11    Q    "We would, therefore, appreciate it if you
12   would update the analysis in the letter to address
13   these and all of the relevant developments that may
14   affect whether the Kin token may be found to qualify as
15   an investment contract subject to regulation under U.S.
16   securities laws."
17    A    Yes.
18    Q    That was what he was asking for?
19    A    Yes.
20    Q    Okay.  And then he provides some specifics
21   on the second page?
22    A    Uh-huh.
23    Q    So then what happened next?
24    A    I responded that we would work to get
25   something back to him.

Page 110

1    Q   As a practical matter, by the time you got
2  back to him, Bittrex had moved from the Perkins lawyer
3  to an O'Melveny lawyer?
4    A   Correct.
5    Q   And did you provide that to him?
6    A   Yes.
7    Q   Okay.  I'm going to mark a document, which
8  is Exhibit 142.
9        (SEC Exhibit No. 142 was marked for
10       identification.)
11  BY MR. MITCHELL:
12   Q   It has the Bates number -- long Bates
13  number Bittrex_SUPP_production_07.05.2018_001 through
14  009.
15   A   Actually ten.
16   Q   Ten?  It goes all the way to ten but ten is
17  blank.
18   A   Uh-huh.
19   Q   Again, take all the time you need.  But
20  first question is just going to be:  Do you recognize
21  this?
22   A   Yes, I recognize this.
23   Q   What is -- what -- tell me -- start with
24  the e-mail on the first page.
25   A   Okay.

Page 111

1    Q   What is that e-mail?
2    A   So the e-mail on the first page is me
3  reaching out to Katie and Julian Yap regarding the
4  status of our application and indicating that we had
5  submitted a further analysis as requested by counsel
6  and Katie asking if I had submitted a memo to O'Melveny
7  and me reiterating that, yes, I had done that.
8    Q   Okay.
9    A   And another copy is attached.
10   Q   Right.  So you actually attached a prior
11  e-mail that you'd sent to a lawyer at O'Melveny &
12  Myers?
13   A   Correct.
14   Q   Okay.  So is the attachment -- this
15  attachment is an e-mail you sent to O'Melveny & Myers
16  in response to the questions raised by the Perkins Coie
17  lawyer?
18   A   Yes.
19   Q   So, I guess, at this point we're in the
20  middle part of February of 2018.
21       What happened next, in terms of Bittrex?
22   A   So I sent a letter to -- or a memo.  It was
23  an e-mail.  It was in the form of a letter, not an
24  opinion, analyzing developments in the U.S. law,
25  specifically Munchee and statements made by chairman

Page 112

1  Clayton that they asked us to consider and asked if
2  we -- if that changed in any way, our analysis
3  regarding the Kin token.
4    Q   And that -- the they was Bittrex asked for
5  it?
6    A   Well, through their counsel.
7    Q   Okay.  And sorry.  You just said it's in a
8  letter not in an opinion?
9    A   Yes.
10   Q   What did you mean?
11   A   Well, an opinion of counsel is a specific
12  sort of thing, and I disclaim it being an opinion.  It
13  was simply an analysis of -- you know, my analysis.  I
14  was not of the opinion as one does in legal matters,
15  rendering a legal opinion as such.
16   Q   Okay.  This just may not be an area that I
17  practice a lot in.  Are there other parts in your
18  practice where you have actually given something called
19  a legal opinion?
20   A   Uh-huh.
21   Q   And so what kind context does that come up?
22   A   Usually in a financing kind of matter in
23  which you -- well, also securities filings where you
24  opine that the securities that you're registering are,
25  you know, valid -- what are the three things -- validly

Page 113

1  issued, fully paid, and non-accessible.  In financing
2  that -- the enforceability of the financing documents
3  has against the debtor.  In connection with a
4  change-of-transfer agent, I've given opinions regarding
5  the outstanding common stock being all of the common
6  stock that there was.
7        And in all of those cases, there's a very
8  precise meaning for each of the opinions that is given,
9  and, you know, one follows a certain form of due
10  diligence.  And it's not the same as simply writing a
11  memo that is an analysis.
12       MR. LEASURE:  Right.  That does -- I'm
13  flashing back to my early days at the law firm.  It's
14  a -- an opinion letter is a kind of -- a formal thing
15  used in various business context, right?
16       THE WITNESS:  Exactly.
17       MR. LEASURE:  Okay.  As an aside -- and
18  we'll turn back to this document -- were efforts ever
19  made to get -- to find an outside law firm that would
20  prepare an opinion letter to exchanges?
21       THE WITNESS:  No.  I should correct that.
22  We did ask Cooley if they --
23       MR. CADIGAN:  Are you going to get into
24  conversations with Cooley?
25       THE WITNESS:  I was just going to say what

Page 114

1 we had asked them to provide, and they did not agree to
2 provide an opinion.
3        MR. CADIGAN:  I would instruct you not to
4 state what you just did.
5        THE WITNESS:  Okay.  Strike that.
6        MR. LEASURE:  Did any purchaser of Kin
7 offer to help find a law firm to provide an opinion?
8        THE WITNESS:  A purchaser of Kin?
9        MR. LEASURE:  Yes.
10        THE WITNESS:  Not that I'm aware of.  And
11 if -- not one that I would have accepted.
12        MR. LEASURE:  Got it.
13        BY MR. MITCHELL:
14        Q   Okay.  So I may come back to the
15 attachment, but the -- I apologize.
16            What's the date at the top of --
17        A   February 13th.
18        Q   Great.  Exhibit 142.  So then -- I'm just
19 trying to kind of move this story ahead.
20            What happened after that?  Did Bittrex get
21 back with an answer?  What happened?
22        A   Well, as I mentioned before, we met up with
23 Katie Harrison at consensus, which I thought was in
24 January but I think it was after this was submitted.
25 So I may be wrong on those dates.  But, you know, we

Page 115

1 just talked generally about the application and did
2 they need any other information from us.  And the
3 indication was no.
4            I know that I also reached out to Bill
5 Shihara, who is the CEO, and asked if there were any
6 questions and if he could arrange a phone call with Ted
7 Livingston, our CEO, and I believe that did happen.
8        Q   Why did you reach out to him?
9        A   Because there had been no action taken on
10 our application.
11        Q   All right.  And that made this -- I'm going
12 to give you Exhibit 143.  Just one page.
13            (SEC Exhibit No. 143 was marked for
14                identification.)
15        BY MR. MITCHELL:
16        Q   And down at the bottom it says
17 SEC-Bittrex-E-0000029.
18        A   Okay.
19        Q   Do you see that?
20        A   Yes.
21        Q   Again, take your time and then just tell me
22 do you recognize this document?
23        A   Okay.
24        Q   What -- do you recognize it?
25        A   Yes.

Page 116

1        Q   What is it?
2        A   It's a letter -- an e-mail I wrote to Bill
3 Shihara just following up on the application,
4 reiterating that we had provided everything that they
5 had been -- that they requested and spoken with their
6 attorneys and hoping to discuss the project with a view
7 to getting the token listed on Bittrex.
8        Q   Okay.  And, again, I've asked this kind of
9 question before, but when you wrote this e-mail to
10 Mr. Shihara, was everything true as far as you
11 understood at the time?
12        A   Yes.
13        Q   And there is a -- in the bottom of the
14 first para -- first full paragraph in your e-mail,
15 there's a line that says, "We also had conversations
16 this week with Eric Sibbit, S-i-b-b-i-t, at O'Melveny
17 to discuss our legal analysis and to provide an
18 overview of the status of the project."
19        A   Uh-huh.
20        Q   Did you have conversations with Mr. Sibbit
21 at O'Melveny?
22        A   I do recall having a conversation with Eric
23 Sibbit, and I presume it was that week since I said it
24 was.
25        Q   Who was on -- do you remember who was on

Page 117

1 the call other than you and Mr. Sibbit?
2        A   There's a possibility he had an associate
3 or another O'Melveny partner present.
4        Q   Sure.  Anybody on your side?
5        A   I don't recall.
6        Q   And what did you -- what did you discuss
7 with him about your legal analysis?
8        A   I don't recall specifically.  It probably
9 would have been a reiteration of the letter I sent to
10 Fred at Perkins Coie.  No, no -- is that the one?
11 Yeah.  No.  The earlier.
12        Q   Yeah.
13        A   It probably just would have been the
14 February 1 letter addressed to Eric just to ask if he
15 had any questions or if he had any clarifying.
16        Q   Did you discuss legal analysis beyond what
17 was in that e-mail to the O'Melveny --
18        A   Not that I recall.
19        Q   And then the second paragraph starts, "We
20 very much appreciate the rigor with which Bittrex
21 approaches token offerings and for that reason, view
22 being listed on Bittrex is a corporate imperative."
23            Do you see?
24        A   Uh-huh.
25        Q   Why?

Page 118

1    A   Other than what it says, I don't really
2    have any comment about it.
3        Q   Well, what -- why was it a corporate
4    imperative?
5        A   Kik viewed Bittrex as one of the exchanges
6    that was one of the top ten exchanges and had a good
7    reputation.
8        Q   Sorry.  How did that make it a Kik
9    corporate imperative?
10       A   Well, because, as I mentioned earlier,
11   providing liquidity to our developers by being listed
12   on a more active exchange was a corporate imperative.
13   And so it could have been a disreputable exchange.
14   There were plenty that would take your ether and list
15   you, but that wasn't what we were hoping to achieve.
16       Q   Why?
17       A   Because, you know, we're a -- we're a
18   project that views our reputation and our compliance
19   with all applicable regulations as being very
20   important.
21       Q   So that made Bittrex --
22       A   And so we wanted to do business with people
23   who also feel that way.
24       MR. LEASURE:  I'm going to point you back
25   to Exhibit 142.  And that's the -- that looks like the

Page 119

1    substantive letter, correct --
2        THE WITNESS:  Sure.
3        MR. LEASURE:  -- you wrote to Mr. Sibbit at
4    O'Melveny.  Actually, let Brent proceed.  I think I cut
5    off his flow.
6        BY MR. MITCHELL:
7        Q   There is just another similar e-mail that I
8    just wanted to ask about.  It's Exhibit 144 now, a
9    single page document SEC-Bittrex-E-0000057.
10       A   Uh-huh.
11       (SEC Exhibit No. 144 was marked for
12       identification.)
13       BY MR. MITCHELL:
14       Q   And I'm going to hand it to your lawyer and
15   give everybody a chance to read it.
16       A   Okay.
17       Q   Again, do you recognize the document?
18       A   Yes.
19       Q   What is it?
20       A   It's an e-mail from me to Katie Harrison
21   and Julian Yap at Bittrex asking about the status of
22   the listing application.
23       Q   So by this, they still had not gotten back?
24       A   Correct.
25       Q   Okay.  And, again, this one -- there's a --

Page 120

1    the second sentence says -- sorry.
2        Again, was this true -- to the best of your
3    knowledge, was it true when you wrote it?
4        A   Yes.
5        Q   So the second sentence says, "We have
6    several business" -- I'm sorry.  It says, "Can we
7    please get an update on where Bittrex is with respect
8    to our listing application?  We have several business
9    initiatives that may be impacted by this and would like
10   to know where things stand and what alternative paths
11   we might need to take."
12       So I guess, what business initiatives?
13       A   As we sit here today, I actually don't
14   recall.
15       Q   Okay.  And did you at -- did this e-mail
16   spark any conversation with them about what -- about
17   where things stand or alternative paths?
18       A   I did not discuss with Bittrex any
19   alternative paths that we might take.  I do know that
20   Bill Shihara and Ted Livingston did have a
21   conversation.  I don't know when it was relative to
22   this letter.  I wasn't present for that conversation.
23   He told me about it afterward.
24       Q   Okay.  And did he just -- was he just
25   telling you sort of so you knew the facts or was he

Page 121

1    telling you seeking some type of legal advice?
2        A   I don't think there was any legal advice
3    sought in that conversation.  It was just repeating
4    what he had discussed with Bill.
5        Q   So can you tell us what he said?
6        A   So he -- my recollection is that Bill was
7    supportive and believed that there was no reason why
8    Bittrex couldn't or wouldn't list the token and said
9    that he would contact his business people.
10       I may be reading more into it than actually
11   occurred, but that was my impression.  But I do recall
12   the comment being made relayed to me through Ted that
13   the Kin project certainly met their standards.
14       Q   Okay.  So then take me from this point sort
15   of after this did you hear from Bittrex about the
16   listing?
17       A   No.
18       Q   And have you heard anything since then?
19       A   We've tried reaching out, and it's pretty
20   much been radio silence.
21       MR. MITCHELL:  Okay.
22       MR. LEASURE:  Do you know why Bittrex
23   hasn't spoken?
24       THE WITNESS:  I can only assume that
25   they're getting some heat business from regulatory

Page 122

1   agencies that are preventing them from taking business
2   actions that they otherwise would be taking.
3          MR. LEASURE:  The SEC?
4          THE WITNESS:  You tell me.
5          MR. LEASURE:  Well, what's your assumption
6   based on?
7          THE WITNESS:  Public sentiments.
8          BY MR. MITCHELL:
9      Q   Can I take you back to Exhibit 142?
10  It's --
11     A   Yes.
12     Q   The front of it is the e-mail --
13     A   Of course.
14     Q   -- in between you and Ms. Harrison, but
15  then the attachment was the e-mail from you to
16  Mr. Sibbit.
17     A   Okay.
18     Q   I may have already asked this.  I apologize
19  if I did.
20         But when you wrote this e-mail to
21  Mr. Sibbit, was this all true as far as you understood
22  at the time?
23     A   As far as I understood at the time.
24     Q   Okay.  I just want to go through a couple
25  sections of it.  In the second paragraph -- I'm looking

Page 123

1   at the February 2nd -- the date on the top of it says
2   February 1st, but it looks like it's an e-mail sent
3   February 2nd.
4      A   Okay.
5      Q   Do you see where I see that?
6      A   Uh-huh, yes.
7      Q   In the second paragraph it says, "As you
8   are aware, Kik filed an application to list Kin tokens
9   on the Bittrex exchange.  In connection with that
10  application, we provided a letter from our Canadian
11  counsel."  And then it goes on.
12         Do you see that?
13     A   Uh-huh.
14     Q   Was that -- were you referring to the
15  Blakes letter that we've already discussed that we
16  marked?
17     A   Yes.
18     Q   Okay.  And then there is a description of
19  an SEC cease and desist proceeding with a company
20  called Munchee, Inc.  And I'm sorry.  I'm looking for
21  the language.  I apologize.  I'm literally just looking
22  for a line.  I was trying to find it so I can point you
23  to it.
24         All right.  Well, in preparation for
25  writing this, do you remember what you reviewed about

Page 124

1   the Munchee offering?
2      A   I reviewed the Munchee order.  I reviewed
3   the Clayton statement that was published on the SEC
4   website, and I reviewed, to the extent I could obtain
5   it, copies of the Munchee white paper and other
6   publicly available information.
7      Q   Great.  And I apologize.  I was actually
8   going -- I intended to point you at the bottom of the
9   fourth paragraph.
10     A   Uh-huh.
11     Q   Do you see there's a sentence that says,
12  "However, having reviewed the order and the Munchee
13  white paper along with the other available materials"?
14     A   Uh-huh.
15     Q   Okay.  So that was -- what I meant to ask
16  is -- so you just mentioned you've reviewed other
17  things.
18         What other things other than the order and
19  the white paper?
20     A   I can't recall what there might have been.
21  Maybe a listing or a registration, press releases.  I
22  think they had some comments in like medium channels or
23  some public statements that were made.
24     Q   And that continues.  It says, "However,
25  having reviewed the order and the Munchee white paper

Page 125

1   along with the other available materials, we continue
2   to believe that Kin is not a security and the Kin TD
3   was not subject to registration under the Securities
4   Act."
5          Do you see where I read that?
6      A   I do.
7      Q   And then is -- the discussion that sort of
8   follows this in the e-mail, is that an explanation of
9   why Kik believes that the Kin TD was not subject to
10  registration under the Securities Act?
11     A   Well, it speaks for itself.  I mean, it
12  says what it says.  It was an argument distinguishing
13  Kin tokens from the MUN tokens.
14     Q   That's sort of -- that's what the remainder
15  of the e-mail is?
16     A   Yeah, I think so.
17     Q   In fact, the top of the second page,
18  there's a line that says, "We believe that Kin tokens
19  are distinguishable from MUN tokens for several
20  reasons."
21     A   Uh-huh.
22     Q   Do you see where I read that?
23     A   Yes.
24     Q   And was that true at the time when you
25  wrote it?

Page 126

1      A   Yeah, I think it was true.
2      Q   Okay.  And then did you write out those
3  reasons in the -- did you write out some of those
4  reasons in the remainder of the e-mail?
5      A   I wrote the e-mail.
6      Q   Is this -- is the remainder of the
7  subsequent part of that e-mail after that line some of
8  the reasons or the reasons why you believe that the Kin
9  tokens were distinguishable from MUN tokens?
10     A   Yes.
11     Q   Okay.  So then right after that it says,
12  "In particular, the MUN tokens had no current utility
13  at the time of offering.  Although MUN would
14  theoretically reflect some utility in its proposed
15  ecosystem for earning and using the tokens, no investor
16  could use the tokens immediately after purchasing them
17  as the features had not yet been developed.  Munchee
18  had not signed up a single restaurant that might have
19  been reviewed in the proposed application."
20     Do you see where I read that?
21     A   Yes.
22     Q   So I guess, why is this here?
23     A   I'm not going to answer that because it
24  gets into my thought process about the analysis, the
25  legal analysis.

Page 127

1      Q   Okay.  Well, was a concept of the utility
2  part of your analysis under the Howey Test?
3      A   I'm not going to talk to you about my
4  thought process regarding the analysis with the Howey
5  Test.
6      Q   Okay.
7      MR. SCHLEGELMILCH:  Was this letter
8  prepared in anticipation of litigation?  Did you write
9  this with litigation in mind?
10     THE WITNESS:  I wrote this at a time when
11  the company was under investigation by the SEC.  So I
12  certainly was mindful of litigation.
13     MR. SCHLEGELMILCH:  Okay.
14     THE WITNESS:  Not for the specific purpose
15  perhaps.
16     BY MR. MITCHELL:
17     Q   The MUN tokens that you're just -- that are
18  described here, those were tokens that Munchee Company
19  had sort of prepared to sell?
20     A   As I understand it from the enforcement
21  release.
22     Q   And if they had been sold, sorry.  I'll
23  just state for the record Munchee never sold anything.
24  They shut down.
25     A   Right.

Page 128

1      Q   If they had been sold, was it your opinion
2  that the MUN tokens had no utility -- would have had no
3  utility?
4      A   I'm not going to answer that.
5      MR. GIBBS:  Are we going to have a legal
6  debate with the witness --
7      MR. MITCHELL:  I was just trying to
8  understand --
9      (Simultaneous speakers.)
10     MR. CADIGAN:  What she wrote is here, and
11  you're entitled to that.  But what goes into the
12  thought process which was, you know, written with, you
13  know, advice of counsel and her thought process on
14  that, we are going to instruct her not to answer.
15     MR. MITCHELL:  That sounds fine.  We got
16  hours here on the record of me trying to be --
17     (Simultaneous speakers.)
18     MR. CADIGAN:  And you've been very good
19  about that.  I appreciate that.
20     MR. MITCHELL:  I'm trying to word a
21  question that she can answer.  And if you're going to
22  instruct her, that's fine.
23     BY MR. MITCHELL:
24     Q   When you wrote the letter, was it your
25  understanding that MUN tokens would have been issued on

Page 129

1  the Ethereum blockchain?
2      A   I don't know if they were going to be
3  issued on the Ethereum blockchain frankly.
4      Q   At the time what was your understanding of
5  how they would be issued?
6      MR. CADIGAN:  Again, the idea is that
7  you want to get the facts.  You want to ask her the
8  factual question -- to get her understanding of these
9  things I think is a little different.  So I mean, I'm
10  going to instruct her not to answer questions with
11  respect to her understanding regarding her reading of
12  the Munchee order and those materials.
13     MR. SCHLEGELMILCH:  What was the Kin tokens
14  utility at the time of offering?
15     THE WITNESS:  It could be used by anyone
16  that owned it to purchase any kinds of goods and
17  services from anyone that would accept it.
18     MR. SCHLEGELMILCH:  At the time of
19  offering?
20     THE WITNESS:  At the time of offering,
21  sure.  And it was able to provide for people who were
22  participants in the Kik platform could obtain a certain
23  level of status and obtain certain premium content.
24     MR. SCHLEGELMILCH:  At the time of the
25  offering, how many users accepted Kin tokens?

Page 130

1      You said that it could be used to -- in
2   exchange for goods or services. How many goods or
3   services were available at the time of offering?
4      THE WITNESS: I have no idea how many
5   because it's a decentralized ecosystem. Anyone could
6   have accepted it, and I wouldn't necessarily know.
7      There were transactions on the blockchain
8   fairly soon after the token offering was completed, and
9   I, don't have any way of knowing whether those were you
10  know person to person, person to business. I don't --
11  there's really no way for me to have insight into that.
12     MR. SCHLEGELMILCH: Are you aware of -- I'm
13  asking your personal awareness. Are you aware of any
14  user that accepted Kin tokens at the time of the
15  offering, any specific user?
16     THE WITNESS: I am aware of businesses that
17  accepted Kin tokens subsequent to the offering.
18     MR. SCHLEGELMILCH: Okay. At the time of
19  the offering?
20     THE WITNESS: At the time of the offering,
21  there was no -- you know, until the offering occurred,
22  there was no currency to accept so --
23     MR. SCHLEGELMILCH: Offering plus one
24  second?
25     MR. CADIGAN: Do you know?

Page 131

1      THE WITNESS: I don't know.
2      MR. SCHLEGELMILCH: Thank you.
3      BY MR. MITCHELL:
4      Q   Are you aware of anyone who, say, in the
5   first month after the offering accepted Kin tokens for
6   goods and services?
7      A   I don't know what the time frame is, but I
8   do know that somebody accepted Kin tokens for the
9   purchase of glasses, and I know that some of those
10  glasses were, in fact, purchased using Kin tokens.
11     I also am aware of an automobile dealership
12  that accepted Kin tokens, but I don't know if there
13  were any purchases made.
14     Q   What year was the glasses sale?
15     A   I don't know.
16     Q   Do you think it was 2017?
17     A   I don't know. It was between then and now.
18     Q   Sure. But sometime between September of
19  2017 and today?
20     A   Yes.
21     Q   But you don't know when?
22     A   I don't. It was -- I'm going to say it was
23  before consensus, which whenever that occurred because
24  when I was at the New York office, there was a pair of
25  those sunglasses sitting there.

Page 132

1      Q   Okay. And that's in 2018?
2      A   I think so.
3      Q   And at the time of the offering, had either
4   the sunglasses company -- at the time of the token
5   distribution event, had the sunglasses company told the
6   public or told anyone that they were going to accept
7   Kin for sunglasses?
8      A   I have no idea. We weren't aware of it.
9      Q   Okay. What about the car dealer, were you
10  aware --
11     A   The same. I don't know if they did or not,
12  but we weren't aware of it. I wasn't aware of it.
13     Q   And the MUN tokens that Munchee proposed,
14  could those have been used to buy goods or services
15  from someone who would have accepted MUN tokens?
16     A   I don't know. My understanding is that
17  they were never actually issued. So whether they were
18  usable or not is --
19     Q   But if there was a token -- if there was
20  just a token on a blockchain, couldn't they be used to
21  buy or sell goods or services or at least to buy goods
22  or services if someone is willing to accept it?
23     A   Well, I suppose that's possible.
24     Q   So is --
25     A   But I don't know. It's not a token that I

Page 133

1   have any interaction with. So I don't know -- I mean,
2   you guys were the ones that wrote that it had no
3   utility in your enforcement order so --
4      Q   Oh, is this -- is that this sentence in
5   particular, "The MUN tokens had no current utility at
6   the time of the offering," that's based on the SEC
7   order?
8      A   I believe so.
9      Q   Anything else?
10     A   I wouldn't have any independent knowledge.
11  I was just distinguishing the order and the enforcement
12  action from the situation that we were in.
13     Q   So you were using the term "no current
14  utility" to mean what the Commission meant it meant in
15  the order?
16     A   I don't know what I meant. I've got to --
17  I've got to say -- I mean, it says what it says. And I
18  know about the characteristics of the MUN token from
19  what I read in the enforcement order and what I read in
20  the white paper.
21     Q   Anything else?
22     A   I don't have any personal knowledge of the
23  MUN token otherwise.
24     Q   Did you --
25     A   I don't think I expressed that I had any

Page 134

1    personal knowledge of the MUN token other than from
2    what I read in those documents.
3        Q   Did you have any reason to think at the
4    time you wrote this that MUN tokens couldn't be
5    exchanged between people?
6        A   I don't have any recollection of what I
7    thought about MUN tokens other than what I've written
8    there.
9        Q   So -- but at the time that you wrote this,
10   did you have any reason to think that MUN tokens were
11   restricted in some way that people couldn't exchange
12   them on the blockchain?
13       A   As I said, at the time I wrote this, I was
14   aware that MUN tokens had been -- that the token
15   offering had been withdrawn and there were no MUN
16   tokens actually issued.  So whether or not they were
17   usable on the blockchain is speculative and I can't
18   answer that.
19       Q   Okay.  But, again, at the time, did you
20   have any reason to believe that MUN tokens were
21   restricted -- couldn't be exchanged between two people
22   when you wrote this?
23       A   I think I answered that question already.
24       Q   Please.  I didn't understand it then.  If
25   you could just --

Page 135

1        A   Could you read it back, please?
2            MR. MITCHELL:  Please read it back.
3            (Record read.)
4            THE WITNESS:  Prior to that, I made a
5    statement.  Can you please read that back?
6        BY MR. MITCHELL:
7        Q   Actually, what I'd like you to do is just
8    answer.  She's read you back the question.  Please just
9    answer the question.
10       A   I did answer the question, and I want to
11   make sure that I don't answer it inconsistently with
12   what I already answered.  If there's something I can
13   add, I'll try and add it.
14           (Record read.)
15       BY MR. MITCHELL:
16       Q   But I'm just asking you a yes-or-no
17   question.
18           Did you have any reason to think that the
19   MUN tokens that you describe in this letter to
20   O'Melveny & Myers were not -- couldn't -- were somehow
21   restricted and could not be exchanged between two
22   people on the blockchain?
23       A   I think that that was what I had previously
24   answered which is that they were never, in fact,
25   deployed and so I don't have any idea whether there was

Page 136

1    a restriction on them or not.
2            All I know about the MUN tokens is what I
3    read about them in the enforcement action in the
4    statement of facts that the SEC provided and what I
5    read about them in the white paper in which they were
6    described.
7            I have no personal knowledge of the MUN
8    tokens and any restrictions about them.  I didn't look
9    at their smart contract.  I don't know if they were
10   issued on the Ethereum blockchain or not.
11           MR. MURTHA:  Oh, you used the term premium
12   content earlier.
13           What premium content were you referring to?
14           THE WITNESS:  Special digital content in
15   the form of stickers.  Stickers are a thing that many
16   people use in digital communications to express their
17   emotions.  And so there were special stickers and
18   other -- well, I guess it was just stickers at the time
19   that were available.
20       BY MR. MITCHELL:
21       Q   If I can take you to the second paragraph
22   on the page that ends in 004.
23       A   Yeah.
24       Q   The first part of that paragraph reads,
25   "Unlike Munchee, whose restaurant review application

Page 137

1    didn't even exist, at the time of the Kin TDE, Kik was
2    one of the world's most popular messaging platforms
3    with 300 million registered users and 15 million
4    monthly active users."
5            Do you see where I read that?
6        A   Yes.
7        Q   So was it true at the time that Kik was --
8    the Kik messaging app was one of the world's most
9    popular messaging platforms?
10       A   That is my understanding from discussions
11   with our product people and marketing people.  That
12   is -- I didn't independently verify that.
13       Q   And was it true that Munchee's restaurant
14   review application didn't even exist?
15       A   That was what I read in the enforcement
16   action.
17       Q   Did you do anything to check that?
18       A   No.
19       Q   So you're just relying on the order?
20       A   Yes.
21       Q   And if the order said something different?
22       A   Well, if it said something different, then
23   maybe I was mistaken.
24       Q   Okay.  The bottom of that same paragraph.
25       A   Uh-huh.

Page 138

1    Q   Actually, you've already answered that
2  question.  I don't need to ask that.  There's a -- I'm
3  going to take you down to the part that says,
4  "Munchee's marketing focused on" at the bottom.
5          Do you see the last paragraph on that same
6  page?
7    A   Yes.
8    Q   "Munchee marketing focused on the
9  appreciation of tokens."
10   A   Yes.
11   Q   And then there is text and then at the
12 bottom -- not on the bottom.  It says -- actually, on
13 the next page it starts off, "Kik, on the other hand,
14 made no statements of this nature."
15         Do you see where I read that?
16   A   Uh-huh.
17   Q   What's the nature that you're talking
18 about, that Kik, on the other hand, made no statements
19 of this nature?
20   A   Statements that discuss potential price
21 appreciation of the tokens over time as the proposed
22 money ecosystem would include opportunities for earning
23 tokens and spending tokens and create value as more
24 users adopted the platform.  And I believe that there
25 were statements that were made in the offering

Page 139

1  marketing materials about a 199 percent return for
2  early investors.
3    Q   That's in the Munchee market?
4    A   Right.  We didn't make statements like
5  that.
6    Q   So Kik didn't make statements about ways
7  that the Kin token would appreciate in value?
8    A   I would have to refer to the white paper
9  and other statements.  The statements were made before
10 I got there.  So I'm not sure what the context was
11 frankly.
12   Q   What?
13   A   I'm not trying to be cute.  I just -- I
14 don't want to speak on behalf of somebody else who made
15 those statements.
16   Q   What statements are you thinking about?
17   A   Any statements that related to the value
18 proposition of the Kik -- of the Kin tokens.
19   Q   So -- sorry.  People at Kik did make
20 statements about the value proposition?
21   A   I know there were statements made in the
22 white paper that relate to the scarcity of the token
23 and that over time, the value of the tokens was
24 expected to increase as a result of the use of the
25 token in the ecosystem.

Page 140

1    Q   Do you mention that in here, in the
2  Exhibit 142?
3    A   Do I?  I don't know.  I don't see it.
4  Look, this was my analysis given to O'Melveny for the
5  purpose of listing the token to try and distinguish our
6  token from Kin, our token from MUN.  And they could
7  accept it or not accept it.  They could have poked
8  holes in it.
9          I'm not the judge that gets to decide this,
10 but this was my reasoned analysis and if it's crap,
11 it's crap.  But, you know, this is what I wrote.
12   Q   That's great.  I'm just asking a question.
13 I'm trying to understand it.  I'm not -- I completely
14 understand --
15   A   Well, what you're trying to understand are
16 thoughts in my head.
17         MR. GIBBS:  You're arguing with
18 the witness.
19         (Simultaneous speakers.)
20         THE WITNESS:  You can read it and tell me
21 what you think.  But you can't ask what was in my mind
22 when I wrote it.
23         BY MR. MITCHELL:
24   Q   I didn't.  I asked if you had mentioned --
25 we discussed something and --

Page 141

1    A   Well, then you can read it and see if it's
2  there.
3    Q   I agree.
4    A   Okay.
5    Q   I'm asking you:  Is it here?
6    A   Well, I'd have to sit here and reread it.
7  So let me do that.
8    Q   Okay.
9    A   If you think that's worth everyone's time.
10         MR. GIBBS:  I certainly don't because
11 you're asking her --
12         (Simultaneous speakers.)
13         MR. MURTHA:  Hang on a second.  Can you
14 please take your mic off and leave the room for a
15 second.
16         (Whereupon, the witness was excused.)
17         MR. MURTHA:  So if you're going to say
18 anything other than objections on the basis of some
19 sort of privilege, we're going to excuse the witness
20 every single time.
21         You're interrupting Brent's ability to ask
22 questions.  He's asking reasonable questions.  And what
23 you're doing is inappropriate.
24         MR. GIBBS:  I disagree that they're
25 reasonable questions.  You've asked her now probably a

Page 142

1 dozen questions that you know the answer to, right?
2 All you're doing is a little, like, mock
3 cross-examination of her and arguing with her about her
4 legal distinctions.
5         I presented to you guys in this room a deck
6 drawing a lot of the same distinctions between Munchee
7 and this case. Am I going to get a subpoena? Are you
8 going to cross-examine me about my legal analysis of
9 the Munchee order?
10        MR. MITCHELL: She's here because she
11 submitted the application to Bittrex, and we're trying
12 to understand the application.
13        MR. GIBBS: You're not trying to understand
14 it. You know what it says. I understand the arguments
15 you're laying out with your questions, but this isn't
16 investigative. You're not asking her for information
17 you don't know. Okay? You're arguing with her.
18        MR. LEASURE: I think we can have a
19 counsel-to-counsel discussion outside of the presence
20 of the witness about the merits of investigative steps
21 we're taking. I think our only point here is that
22 during the course of an examination, these may
23 appear -- at least they don't appear to us to be
24 appropriate objections during the examination of the
25 witness.

Page 143

1        MR. GIBBS: Then we're not during the
2 examination anymore.
3        MR. MURTHA: That's why I asked her to
4 leave.
5        MR. GIBBS: That's fine. I didn't object
6 to you guys asking her to leave. That's fine.
7        MR. LEASURE: If you have objections to the
8 form of the examination questions that we're doing
9 here, you know, obviously, we want to respect the
10 privilege.
11        But other than that, we have some concerns
12 about objections during the course of the examination.
13        MR. GIBBS: You've said it. That's fine.
14        MR. LENCH: Can we go off the record now?
15 I think -- let's take a break.
16        MR. MITCHELL: All right. Sure.
17        THE VIDEOGRAPHER: Going off the record.
18 The time on the video monitor is 1:13 p.m.
19        (A brief recess was taken.)
20        THE VIDEOGRAPHER: We are back on the
21 record. The time on the video monitor is 1:24 p.m.
22        BY MR. MITCHELL:
23        Q. During the break, did you have any
24 substantive conversations with the staff about the
25 case?

Page 144

1        A. No.
2        Q. Okay. Two more questions about this
3 document. On the top of the page that has a 5, Bates
4 number 5.
5        A. Okay.
6        Q. We were reading the first sentence before.
7 The second sentence says, "Kin was marketed as a
8 product with utility."
9        I guess what was the marketing -- how was
10 Kin marketed as a product with utility?
11        A. I believe that in the Kin white paper it
12 discussed how Kin tokens would be used in an ecosystem
13 for digital services.
14        Q. Are those the use cases in the white paper?
15        A. There were some use cases in the white
16 paper.
17        Q. So that's the utility in the marketing?
18        A. That's utility that was, I guess, marketing
19 the white paper, so -- but I'm not saying that that was
20 the only utility.
21        Q. Was there any other utility that was
22 marketed -- that was marketed that Kin would have this
23 utility?
24        A. I did not write the white paper and I'm not
25 on the product development or technical side, so I

Page 145

1 really don't have an answer for that question as to
2 what else there might be.
3        Q. Oh, sorry. But I meant more on the
4 marketing.
5        If Kin was marketed as a product with
6 utility, was there -- did Kik do marketing or did
7 anyone do marketing for Kin for utility other than
8 those use cases in the white paper?
9        A. Not that I'm aware of.
10        MR. LEASURE: How was this document
11 prepared?
12        THE WITNESS: How was this document
13 prepared?
14        MR. LEASURE: Let me ask that in English
15 this time around. Who wrote this?
16        THE WITNESS: I probably wrote this.
17        MR. LEASURE: Did anyone help you?
18        THE WITNESS: I consulted with outside
19 counsel.
20        MR. LEASURE: Which outside counsel?
21        THE WITNESS: Cooley.
22        MR. LEASURE: Anyone else?
23        THE WITNESS: Some of the language in here
24 I believe I captured from some information about the
25 Kin rewards engine that I did not write. But I don't

Page 146

1  know who wrote that.
2        MR. LEASURE:  And that's what I was going
3  to ask.
4        Did you consult with any business people
5  who wrote the white paper or other documents?
6        THE WITNESS:  I didn't consult with them.
7  I just looked at what they wrote and used that.
8        MR. LEASURE:  Sure.
9        MR. MENDEL:  Different subject slightly.  I
10  want to go back to the token distribution event in
11  September.
12        THE WITNESS:  Okay.
13        MR. MENDEL:  And I really just want to walk
14  through the mechanics of it.
15        Were you yourself familiar with how
16  purchasers could sign up and get Kin through public
17  sale?
18        THE WITNESS:  I am familiar because I did
19  it myself.
20        MR. MENDEL:  Were you familiar for any
21  other reasons?
22        THE WITNESS:  I am not sure I understand
23  your question.
24        MR. MENDEL:  Did you help set up the
25  process?

Page 147

1        THE WITNESS:  I did not.
2        MR. MENDEL:  Okay.  So your knowledge is
3  based on what you went through as a user?
4        THE WITNESS:  Yes.
5        MR. MENDEL:  And can you just at a high
6  level kind of walk through what you needed to do to buy
7  the Kin in terms of going on the website and just going
8  through the process?
9        THE WITNESS:  My recollection is that I had
10  to fill out a registration form, provide some
11  information about myself, probably my social security
12  number.  The amount that I bought was small, so I don't
13  believe I had to provide a passport, but I might have.
14        And then on -- I read -- I read the user
15  registration form.
16        I followed the instructions about
17  how to acquire ether.  So I set up an account with
18  something, but I don't know.  It was one of the coins,
19  coin this or that.  It's coin -- coin base, something.
20        And I sent money from my Chase bank account
21  to that account to purchase ether.  And then when the
22  date of the sale came around, there was some
23  instructions about how to set it up so that the
24  ether -- so that I committed to purchase a certain
25  amount of Kin and the ether would be sent minus some

Page 148

1  gas, which is the fee payable to ether.
2        And then I just waited until the Kin was
3  returned to me via the blockchain into a private --
4  into my public address.  And then I believe I moved
5  that from the public address into a private account so
6  that it was off chain.  I didn't want it -- I moved it
7  to a cold wallet.  I didn't want it to be in a hot
8  wallet.  My little amount of money I didn't want to
9  lose.
10        MR. MENDEL:  I'm providing you what has
11  been previously marked as Exhibits 8 and 9.
12        THE WITNESS:  Okay.
13        MR. MITCHELL:  Eight is the terms of use
14  agreement.
15        It says that on its face.  And 9 on its
16  face user registration guide.
17        MR. MENDEL:  I just want to wind back up
18  and start from when you accessed the website in order
19  to register.
20        Did you -- were you presented with
21  Exhibit 8 or Exhibit 9 first?
22        THE WITNESS:  I couldn't tell you.
23        MR. MENDEL:  One other question.  You
24  encountered both of these documents during the
25  registration process?

Page 149

1        THE WITNESS:  I don't recall.
2        MR. MENDEL:  Did you help draft either of
3  these documents?
4        THE WITNESS:  I did not draft the user
5  registration guide, and I did not review the user
6  registration guide.
7        The terms of use agreement was prepared by
8  outside counsel, and I was asked to review it which I
9  did.
10        But I frankly didn't have much to say about it
11  because it's not something that I have worked with in
12  my past career.
13        So this was a new kind of thing.  In
14  terms of use agreements, I didn't really know what they
15  looked like, so I didn't have much to contribute.
16        MR. MENDEL:  Did you come across the terms
17  of use agreement during the initial registration phase?
18        THE WITNESS:  I don't recall specifically.
19  I imagine I would have because I've never accessed a
20  website in my life that didn't have an accept terms of
21  use.
22        MR. MENDEL:  And the terms of use agreement
23  that you came across when you registered had a link to
24  the white paper which is reflected on the first page of
25  Exhibit 8?

Page 150

1  THE WITNESS:  As I said, I don't recall
2  specifically coming across this.  I presume I did.  I
3  can see that there's what appears to be a link, but I
4  can't say for certain if that is a link.
5  I know that I have gone to the website and
6  linked to the white paper, but whether that was
7  something I had done in my personal purchase of Kin, I
8  don't know.  I can't say.
9  MR. MENDEL:  Do you have any reason to
10  think that the white paper wasn't available by link at
11  the time that you registered?
12  THE WITNESS:  No, I have no reason to
13  believe it was not available.
14  MR. MENDEL:  And do you think that you went
15  through the user registration guide at the time that
16  you registered that's reflected in Exhibit 8 -- I'm
17  sorry -- Exhibit 9?
18  THE WITNESS:  I'm pretty sure I read this
19  very carefully because otherwise I wouldn't have
20  figured out how to do it.
21  MR. MENDEL:  And besides Exhibit 8 and
22  Exhibit 9, do you recall any other steps that you were
23  required to take during the registration phase?
24  THE WITNESS:  Well, as I mentioned, I had
25  to arrange with my bank to send money to somebody to

Page 151

1  purchase ether.
2  I don't think I did anything else.  I
3  did purchase a cold storage wallet from Amazon.
4  MR. MENDEL:  You don't recall any other
5  documents that you were asked to agree to as part of
6  the process?
7  THE WITNESS:  I don't recall even agreeing
8  to this as part of the process but --
9  MR. MENDEL:  So there was nothing else?
10  THE WITNESS:  I don't know.  I can't
11  recall.
12  MR. MENDEL:  Do you recall any other
13  disclosures that were provided by Kik as part of the
14  registration process?
15  THE WITNESS:  I do know that there were
16  different terms of use agreements that were prepared
17  for various different things.  So Kik had a terms of
18  use.
19  The Kin website had a terms of use.  There was
20  something for Kin Digital Services that had terms of
21  use.  But I can't say for certain how they were
22  relating to one another.
23  I do recall that just before the token
24  distribution event occurred that one of the terms of
25  use had to be updated and that was what I reviewed that

Page 152

1  was prepared by outside counsel.  But there were others
2  that had been prepared prior to my getting there that I
3  didn't really have any involvement in.
4  MR. MENDEL:  You mentioned the Kik site,
5  the Kin site, and the Kin Digital Services site?
6  THE WITNESS:  I don't actually know if Kin
7  Digital Services had a site, but I know that I've seen
8  terms of service that referred to Kin Digital Services.
9  MR. MENDEL:  Did you have to go to the Kik
10  site and the Kin site in order to register?
11  THE WITNESS:  I don't remember.  I probably
12  went to this Kin.Kik.com.
13  MR. MENDEL:  Do you recall any other steps
14  that you took that you haven't discussed?
15  THE WITNESS:  I don't recall any other
16  steps.
17  MR. LEASURE:  We saw earlier in one of
18  those exhibits that in response to a request from an
19  exchange you provided the Blakes letter, Kik's
20  communication to the Ontario regulators, right?
21  THE WITNESS:  Correct.
22  MR. MENDEL:  And that was -- in that
23  instance Kik did not provide a memo or other advice
24  that Kik may have received from Cooley or another law
25  firm?

Page 153

1  THE WITNESS:  We did not provide that
2  advice to an exchange.
3  MR. LEASURE:  So that's what I'm going --
4  you're anticipating what I'm going to ask you.
5  THE WITNESS:  No, I don't know what you're
6  going to ask.
7  MR. LEASURE:  Did Kik ever -- did Kik ever
8  provide to any exchange memoranda containing legal
9  advice provided by Cooley to Kik?
10  THE WITNESS:  I hope not because we were
11  advised not to do that.
12  MR. LEASURE:  Did Kik ever provide to any
13  third party, leaving aside even more than just
14  exchanges, anyone outside of Kik, did Kik ever provide
15  memoranda or legal analysis prepared by Cooley?
16  THE WITNESS:  I don't know if we did.  I
17  hope we didn't.
18  MR. LEASURE:  You have not?
19  THE WITNESS:  I don't believe I have.
20  MR. LEASURE:  Have you ever told any third
21  party outside of Kik the -- what legal advice Kik may
22  have received in advance of the token distribution
23  event?
24  THE WITNESS:  I believe in general terms.
25  MR. LEASURE:  What can you tell me about

Page 154

1  that?
2       THE WITNESS:  Just the conclusion that Kin
3  was not a security.
4       MR. LEASURE:  Anything beyond that?
5       THE WITNESS:  Nothing specific that I can
6  remember.
7       MR. LEASURE:  Do you know who?
8       THE WITNESS:  No, I don't know who.
9       MR. LEASURE:  I'm -- let me ask that in a
10  better way.
11       THE WITNESS:  Yeah.
12       MR. LEASURE:  What third parties that might
13  have been communicated through?
14       THE WITNESS:  As I mentioned, the exchanges
15  that were, you know, interested in that issue.
16  Silvergate was interested in that issue, you know, as
17  was the other bank in Canada, other counsel, counsel
18  for the foundation.
19       MR. LEASURE:  Okay.  So to make sure I
20  understand, for the exchanges and other -- and banks
21  who might have been interested, you told them that --
22  at the top line that Cooley had provided legal advice,
23  correct?
24       THE WITNESS:  We had sought legal advice
25  from a number of advisors --

Page 155

1       MR. LEASURE:  And you told --
2       THE WITNESS:  -- and our conclusion was
3  that Kin was not a security under applicable law.
4       MR. LEASURE:  But the underlying
5  analysis --
6       THE WITNESS:  Was not provided.
7       MR. LEASURE:  To any of those parties?
8       THE WITNESS:  Not to my knowledge.
9       MR. LEASURE:  Okay.  Shifting gears.
10       THE WITNESS:  Okay.
11       MR. LEASURE:  Is Kik considering
12  withdrawing the Kin project from the United States?
13       THE WITNESS:  I've heard that's a
14  possibility.  I don't think it's a real possibility,
15  but, you know, I'm not the decider of that.
16       MR. LEASURE:  I want to obviously because
17  of your -- because you're a lawyer working for Kik, I
18  want to be careful.
19       In what context did you hear about that?
20       THE WITNESS:  Just kind of general
21  conversations with the executive team or the board.
22       MR. LEASURE:  Were you being asked for
23  legal advice on the topic of whether Kik should
24  withdraw the Kin project from the United States?
25       THE WITNESS:  It wasn't -- no, I wasn't

Page 156

1  specifically asked for my advice on that topic.
2       MR. LEASURE:  Okay.  Is that a -- from your
3  knowledge is that a serious proposal or just something
4  being discussed or considered?
5       THE WITNESS:  I don't know whether it was
6  serious or not.
7       MR. LEASURE:  I think you may have
8  anticipated this, but is there a way to do that?
9       THE WITNESS:  I don't know.
10       MR. LEASURE:  That's fair.
11       MR. MENDEL:  Just a quick followup on the
12  line of questions I was asking.
13       I think you said you didn't really have a
14  direct role in organizing the website for registration;
15  is that right?
16       THE WITNESS:  Right.
17       MR. MENDEL:  Who at Kik did?
18       THE WITNESS:  You know, I don't know who
19  sets up the website.  I'm -- I imagine -- I don't know.
20  There's a lot of people who work on different aspects.
21  For some reason I think that our communications group
22  in New York had something to do with the website.
23       MR. MENDEL:  Did you have a point of
24  contact for this project in terms of them sending you
25  things to look at?

Page 157

1       THE WITNESS:  I know that I was in contact
2  with Ronaldo Clifton.
3       MR. MENDEL:  Anybody else?
4       THE WITNESS:  Maybe Rod McLeod.
5       MR. MENDEL:  Are they both in New York?
6       THE WITNESS:  Ronalda is no longer with the
7  company, but Rod is in New York.
8       MR. MENDEL:  And was Ronaldo Clifton -- do
9  I have that right?
10       THE WITNESS:  Ronalda.
11       MR. MENDEL:  Ronalda, was she in New York?
12       THE WITNESS:  She was in New York, uh-huh.
13       MR. MENDEL:  And were they both in the
14  communications group?
15       THE WITNESS:  Rod is.  He's kind of our
16  communications director.  And I don't know what
17  Ronalda's role was.  She might have been -- I don't
18  know what her role was.
19       BY MR. MITCHELL:
20       Q   Was her role within the broader marketing
21  group?
22       A   I don't even know that frankly.  I don't
23  even know who she reported to.  I was really new, and I
24  was still trying to sort people out.
25       MR. MENDEL:  I think you said that you

## Page 158

1    refer -- you reviewed at least one version of the terms
2    of use agreement?
3            THE WITNESS:  I did.
4            MR. MENDEL:  Who sent you that to review?
5            THE WITNESS:  A lawyer at Cooley, Diane
6    Savage.
7            Is there a Diane Savage?  Yes.  Brett is
8    saying yes.  I think she was the one that sent it to
9    me.
10           MR. MENDEL:  Did you interact with anyone
11   at Kik about the terms of use agreement?
12           THE WITNESS:  I interacted with Michelle
13   Dent, my paralegal, and Ronalda Clifton about that.
14           MR. MENDEL:  Thank you.
15           THE WITNESS:  Tanner Philp also.
16           MR. MENDEL:  Anybody else?
17           THE WITNESS:  Not that I can think of.
18           MR. MITCHELL:  Thank you for coming.  We
19   don't have any more questions for you today.  We really
20   do appreciate it.
21           It is actually really helpful to us.
22   If we have any other questions in the future, we'll
23   talk to Cooley and Kirkland and get back to you.
24           At the end of these, we always give the
25   witness an opportunity if there was anything that you

## Page 159

1    wanted to correct or amend or supplement.
2            Is there anything that we asked that you
3    want to amend or correct or supplement your answers to?
4            THE WITNESS:  I don't think of anything
5    that I am not comfortable with, but --
6            MR. MITCHELL:  Sounds good.  And we also --
7            MR. CADIGAN:  No questions.  Nothing
8    further.
9            MR. MITCHELL:  Then we will go off the
10   record.
11           THE VIDEOGRAPHER:  This concludes today's
12   video deposition.  This is disc two of two.  Going off
13   the record.  The time is now 1:43 p.m.
14           (Whereupon, at 1:43 p.m., the examination
15   was concluded.)
16                   * * * * *
17
18
19
20
21
22
23
24
25

## Page 160

1               PROOFREADER'S CERTIFICATE
2
3    In the Matter of:  KIK INTERACTIVE
4    Witness:        Eileen Lyon
5    File Number:    HO-13388-A
6    Date:           Thursday, August 30, 2018
7    Location:       Washington, D.C.
8
9            This is to certify that I, Christine Boyce,
10   (the undersigned) do hereby swear and affirm that the
11   attached proceedings before the U.S. Securities and
12   Exchange Commission were held according to the record,
13   and that this is the original, complete, true and
14   accurate transcript, which has been compared with the
15   reporting or recording accomplished at the hearing.
16
17
18   _____  _____
19   (Proofreader's Name)        (Date)
20
21
22
23
24
25

## Page 161

1               REPORTER'S CERTIFICATE
2
3            I, Melinda Johnson, CSR, reporter, hereby
4    certify that the foregoing transcript of 159 pages is a
5    complete, true and accurate transcript of the testimony
6    indicated, held on Thursday, August 30, 2018, at
7    Washington, D.C. in the matter of:  Kik Interactive.
8
9            I further certify that this proceeding was
10   recorded by me, and that the foregoing transcript has
11   been prepared under my direction.
12
13           Date:_____
14   Official Reporter:_____
15   Diversified Reporting Services, Inc.
16
17
18
19
20
21
22
23
24
25