SEC6

1          UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF NEW YORK
3
4   UNITED STATES SECURITIES AND )
    EXCHANGE COMMISSION,        )
5                               )
         Plaintiff,      )
6                   ) Case No.
    vs.               ) 19-cv-5244(AKH)
7                               )
    KIK INTERACTIVE INC.,       )
8                               )
         Defendant.     )
9   _____)
10
11
12
13
14
15     30(B)(6) DEPOSITION OF KIK INTERACTIVE INC.
16           DESIGNEE:  TANNER PHILP
17              Palo Alto, California
18           Wednesday, February 5, 2020
19
20
21
22  Reported by:
23  JANIS JENNINGS
24  CSR No. 3942, CLR, CCRR
25  Job No. 200205JJE

1

1
2
3
4
5
6
7        VIDEOTAPED DEPOSITION OF TANNER PHILP, taken
8   on behalf of the Plaintiff, at Cooley LLP, 3175 Hanover
9   Street, Palo Alto, California, beginning at 9:13 a.m.
10  on Wednesday, February 5, 2020, before Janis Jennings,
11  Certified Shorthand Reporter No. 3942, CLR, CCRR.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2

1   APPEARANCES:
2
3     For Plaintiff:
4        U.S. SECURITIES  AND EXCHANGE COMMISSION
5        DIVISION OF ENFORCEMENT
6        100 F Street N.E.
7        Washington, DC  20549
8        202.551.4418
9        BY:  STEPHAN J. SCHLEGELMILCH, ESQ.
10           DAVID S. MENDEL, ESQ.
11           LAURA D'ALLAIRD, ESQ.
12
13     For Defendant:
14        COOLEY LLP
15        3175 Hanover Street
16        Palo Alto, California  94304
17        650.843.5535
18        BY:  PATRICK E. GIBBS, ESQ.
19           JENNA BAILEY, ESQ.
20           BRETT DE JARNETTE, ESQ.
21
22     Also Present:
23        FRANK QUIRARTE, Videographer
24
25

3

1                I N D E X
2
3   WITNESS                    EXAMINATION
4   30(b)(6) Kik Interactive Inc.
5   Designee:  Tanner Philp
6
7
8
9        BY MR. SCHLEGELMILCH        7
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

**Page 5**

```
 1            E X H I B I T S
 2
 3  EXHIBIT      DESCRIPTION              PAGE
 4  Exhibit 260  Summary of provincial information -  17
 5             provincial income tax payable;
 6             KIK_00147721
 7  Exhibit 261  Five-Year Comparative Study;       21
 8             KIK_00147723
 9  Exhibit 262  Federal Corporation Information for  27
10             Code Inc.; 3 pages
11  Exhibit 263  Statement Summary as of 9/29/17;     35
12             SEC-SILVERGATE-E-0000217 - 303
13  Exhibit 264  Moving Forward Boldly with Kin -     54
14             Ted Livingston - Medium; 3 pages
15  Exhibit 265  Services Agreement;                 59
16             KIK_00147202 - 210
17  Exhibit 266  Agency Agreement;                   61
18             KIK_00147211 - 147218
19  Exhibit 267  GitHut webpage Kin Improvement       70
20             Proposal - KRE V2.0
21  Exhibit 268  Services Agreement                  74
22             (with signatures)
23  Exhibit 269  Agency Agreement;                   78
24             (with signatures)
25
```

**Page 6**

```
 1  PALO ALTO, CALIFORNIA; WEDNESDAY, FEBRUARY 5, 2020
 2            9:13 A.M.
 3
 4       THE VIDEOGRAPHER:  Good morning, ladies and
 5  gentlemen.  This begins Volume I, media number 1 in
 6  the deposition of Tanner Philp.  It's in the matter
 7  of the United States Securities and Exchange
 8  Commission versus Kik Interactive Inc.  It's being
 9  held in the United States District Court for the
10  Southern District of New York, case number
11  19-CV-5244.
12       Today's date is February 5th, 2020.  The
13  time on the record is approximately 9:13 a.m.  My
14  name is Frank Quirarte.  I'm your legal video
15  operator today, contracted by Gradillas Court
16  Reporters.  This video deposition is taking place at
17  3175 Hanover Street in Palo Alto, California and was
18  noticed by the defendant.
19       At this time will counsel and all present
20  please identify yourself for the record.
21       MR. SCHLEGELMILCH:  Sure.
22  Stephan Schlegelmilch for the SEC.
23       MR. MENDEL:  David Mendel for the SEC.
24       MS. D'ALLAIRD:  Laura D'Allaird for the
25  SEC.
```

**Page 7**

```
 1       MR. GIBBS:  Patrick Gibbs from Cooley on
 2  behalf of Kik and the witness.
 3       MS. BAILEY:  Jenna Bailey from Cooley on
 4  behalf of Kik and the witness.
 5       MR. DE JARNETTE:  Brett De Jarnette from
 6  Cooley on behalf of Kik and the witness.
 7       THE VIDEOGRAPHER:  Madam Court Reporter,
 8  will you please swear in the witness.
 9
10            TANNER PHILP,
11       the witness herein, was sworn and
12       testified as follows:
13
14       MR. SCHLEGELMILCH:  During the read-in I
15  think the court reporter mentioned that it was
16  noticed by the defendant.  This is a deposition that
17  was noticed by the plaintiff, if it matters, just to
18  make sure that's accurate.
19
20            EXAMINATION
21  BY MR. SCHLEGELMILCH:
22    Q.  Good morning, Mr. Philp.  My
23  understanding -- and I'm just going to ask that you
24  confirm this for the record -- is that Kik
25  Interactive has selected you to be its designee
```

**Page 8**

```
 1  during this deposition of Kik Interactive, which the
 2  SEC is conducting pursuant to Federal Civil Rule
 3  30(b)(6); is that correct?
 4    A.  That's correct.
 5    Q.  I suspect you know all this, but I'll just
 6  run through some of the ground rules for this
 7  deposition.  The first is that you need to answer
 8  orally.  Is that okay?
 9    A.  Yep.
10    Q.  Good -- good job right there.  You and I
11  need to take pains to not talk over each other.
12    A.  Yep.
13    Q.  And that's good.  Wait a couple seconds to
14  make sure I'm done, and I'll try to do the same for
15  you.
16    A.  Yep.
17    Q.  And you need to let me know if I ask you a
18  question that doesn't make any sense or uses jargon
19  in a way that's -- that's inaccurate or you don't
20  understand, because that's the only way I can fix it
21  is if you let me know.  Is that okay?
22    A.  Sounds good.
23    Q.  Okay.  None of my questions this morning are
24  intended to reach conversations you've had with
25  counsel, and so if you think I've asked something
```

1 that goes over the line, just let me know, and we'll
2 see if I can fix it.
3    **A.** Great.
4    **Q.** I typically take a break every hour. If you
5 would like to take a break more frequently than
6 that, it's fine by me. I would just ask that we not
7 do it when a question is pending. Sound okay?
8    **A.** Sounds great.
9    **Q.** Great.
10       How many employees does Kik have at the
11 moment?
12    **A.** 18.
13    **Q.** And how many did it have on January 1st of
14 this year?
15    **A.** 2020?
16    **Q.** Yes, sir.
17    **A.** 18.
18    **Q.** Okay. Same number; right? It's only been a
19 month. What about January 1st, 2019?
20    **A.** 155.
21    **Q.** Okay. Are you a Kik employee?
22    **A.** I am.
23    **Q.** Are you an employee of any other entity?
24    **A.** No.
25    **Q.** Are any of the 18 Kik employees also

9

1 employees of other entities -- for example, the Kin
2 Foundation?
3    **A.** They are not.
4    **Q.** Is Mr. Livingston still the CEO of Kik?
5    **A.** He is.
6    **Q.** And he's also a director of the Kin
7 Foundation?
8    **A.** He is.
9    **Q.** Does Kik have any officers?
10    **A.** Yes.
11    **Q.** Okay. Who is Kik's CFO?
12    **A.** Kik does not have a CFO.
13    **Q.** Okay. Why don't we do this another way.
14 Why don't you tell me what officers Kik has.
15    **A.** Ted Livingston, Chief Executive Officer.
16    **Q.** Okay.
17    **A.** Eileen Lyon, Chief Compliance Officer; and
18 Mike Roberts, Chief Technology Officer.
19    **Q.** Okay. So Kik does not currently have a CFO?
20    **A.** No.
21    **Q.** It doesn't have a COO?
22    **A.** It does not.
23    **Q.** And does it have a general counsel, or is
24 that Ms. Lyon as well?
25    **A.** She is Chief Compliance Officer and General

10

1 Counsel.
2    **Q.** I see.
3       Is Ms. Lyon -- is it "Lyons" or "Lyon"?
4    **A.** Lyon.
5    **Q.** Okay. Singular?
6    **A.** Singular; no "s."
7    **Q.** Is Ms. Lyon also the general counsel of the
8 Kin Foundation?
9    **A.** No.
10    **Q.** Had she been?
11    **A.** No.
12    **Q.** Okay. Was she the secretary of the Kin
13 Foundation?
14    **A.** My understanding is that she's the
15 secretary.
16    **Q.** Currently?
17    **A.** Yes.
18    **Q.** Okay.
19       MR. GIBBS: Just -- just -- I won't do this
20 unnecessarily, but as a general matter, in our view,
21 questions about the internal structure and workings
22 of the Kin Foundation are not within the scope of
23 what the Court ordered. I'm perfectly happy to have
24 Mr. Philp answer to the best of his own knowledge,
25 but I don't think that's within the scope of what

11

1 the Court has ordered Kik to produce a witness for.
2       MR. SCHLEGELMILCH: Okay. I'm inquiring
3 about whether there are -- whether Kik employees
4 have other responsibilities, and so I view that as
5 within bounds, but we can agree to disagree about
6 that. And if you're willing to let the witness
7 answer, then we can table this -- this dispute for
8 another time.
9       MR. GIBBS: I agree. And, more generally --
10 I forgot to do this at the outset -- but before we
11 went on the record, you and I had a discussion about
12 scope objections, and I believe we agreed that
13 objections about whether or not certain questions
14 are within the scope of what the Court ordered will
15 be reserved.
16       So I don't need to make them here on the
17 record. We can assert them later if and when
18 there's a question about whether a question and an
19 answer is within the scope and properly deemed
20 corporate testimony.
21       MR. SCHLEGELMILCH: Agreed.
22       MR. GIBBS: Okay. I just thought I would
23 convey to you our position about the distinction
24 between the Foundation and the company, but with
25 that...

12

1     MR. SCHLEGELMILCH: I understand your
2  position.
3     MR. GIBBS: Okay.
4  BY MR. SCHLEGELMILCH:
5     **Q.** At present do any of Kik's employees work in
6  the United States?
7     **A.** Yes.
8     **Q.** Who?
9     **A.** Eileen Lyon.
10    **Q.** She's a -- I'm sorry.
11    **A.** Sorry.
12    **Q.** I'm going to not cut you off.
13    **A.** No, no. You have a clarifying question. Go
14  for it.
15    **Q.** I -- I don't. So Ms. Lyon works in the
16  United States?
17    **A.** Yes.
18    **Q.** Who else?
19    **A.** Matthew Hibberd.
20    **Q.** And that's H-i-b-b-e-r-t?
21    **A.** -e-r-d.
22    **Q.** -e-r-d. Thank you.
23    **A.** Kevin Ricoy, R-i-c-o-y.
24    **Q.** Yep.
25    **A.** Jack Roberts and Chase Barker.

13

1     **Q.** And these are all Kik employees?
2     **A.** They are.
3     **Q.** Okay. Ms. Lyon, she resides in -- or she
4  works outs of California, does she not?
5     **A.** Los Angeles.
6     **Q.** What about Mr. Hibberd?
7     **A.** San Francisco.
8     **Q.** Mr. Ricoy?
9     **A.** Washington, D.C.
10    **Q.** Okay. Mr. Roberts?
11    **A.** New York City.
12    **Q.** Do you know which borough?
13    **A.** He is in Manhattan.
14    **Q.** Thank you.
15       And Mr. Barker?
16    **A.** He works out of Charleston.
17    **Q.** South Carolina?
18    **A.** Yes.
19    **Q.** It could be West Virginia.
20    **A.** Yeah.
21    **Q.** What is Mr. Ricoy's title at Kik?
22    **A.** Communications manager.
23    **Q.** Okay. Are you familiar with somebody
24  named -- and forgive me if I mispronounce this --
25  Ulyoel Rivlas?

14

1     **A.** Yes.
2     **Q.** Is that a former Kik employee?
3     **A.** Yes.
4     **Q.** Was that -- is that a man or woman?
5     **A.** A man.
6     **Q.** Was he a Kik employee in 2019?
7     **A.** I do not believe so.
8     **Q.** Okay. When was the last --
9     **A.** My recollection was it was towards the end
10  of 2018 that he left.
11    **Q.** What about Hadar Landau?
12    **A.** She was a former Kik employee.
13    **Q.** Okay. Was she a Kik employee in 2019?
14    **A.** She was.
15    **Q.** Osnat Lidor?
16    **A.** Yes.
17    **Q.** Is that -- that's a she, is it not?
18    **A.** Yes. It's a woman.
19    **Q.** And she is no longer a Kik employee?
20    **A.** Correct.
21    **Q.** But she was in 2019?
22    **A.** She was.
23    **Q.** Okay. She had a role in marketing or --
24    **A.** Correct.
25    **Q.** Okay. Alex Cohen?

15

1     **A.** Yes.
2     **Q.** Is that a former Kik employee or a current
3  Kik employee?
4     **A.** Former Kik employee.
5     **Q.** Okay. Where was he located?
6     **A.** Israel, Tel Aviv.
7     **Q.** Okay. And he was a Kik employee in 2019?
8     **A.** Yes.
9     **Q.** Okay. Does Kik have any business units or
10  divisions?
11    **A.** Kik has multiple subsidiaries.
12    **Q.** Okay.
13    **A.** There's Kik Interactive, which is where all
14  Canadian employees are employed out of. There is
15  Kik U.S. All of the U.S. employees which I
16  mentioned previously are through Kik U.S.
17    **Q.** Okay.
18    **A.** There's a subsidiary Kik Israel. There are
19  no longer any employees under Kik Israel. And there
20  is another subsidiary that was recently set up, Code
21  Inc.
22    **Q.** Okay. And that is a subsidiary?
23    **A.** Yes.
24    **Q.** Does Code Inc. have any employees?
25    **A.** No.

16

1    MR. SCHLEGELMILCH:  Okay.  Let me hand you
2  what we will mark as Exhibit 260.
3    (Exhibit 260 marked for identification.)
4    THE WITNESS:  It's a wide table.  You can
5  throw it.
6    MR. GIBBS:  He doesn't want to do that on
7  videotape.  It doesn't look good.
8    THE WITNESS:  If it goes wide, yeah.
9    MR. SCHLEGELMILCH:  I can give it to
10  Patrick, though.
11  BY MR. SCHLEGELMILCH:
12    Q.  Okay.  What I just handed you is an excerpt
13  of a -- what appears to me, and I'm not a Canadian
14  tax expert by any means -- but it looks like a
15  portion of Kik's 2018 tax return?
16    A.  Yep.
17    Q.  And, just for the record, it is
18  Bates-labeled KIK_00147721.  And, again, this is
19  just one page of a very lengthy tax return document.
20    My -- my question --
21    MR. MENDEL:  Did we say on the record what
22  the exhibit label number is?
23    MR. SCHLEGELMILCH:  I did.  It's -- it's
24  260.
25    MR. MENDEL:  Thank you.

17

1    MR. SCHLEGELMILCH:  It's Exhibit 260.
2    MR. MENDEL:  Sorry if I --
3    MR. SCHLEGELMILCH:  No, no.  It's fine.
4    THE WITNESS:  I heard it too.
5    MR. SCHLEGELMILCH:  See?
6  BY MR. SCHLEGELMILCH:
7    Q.  If you look down at the -- at the bottom of
8  this page --
9    A.  Yep.
10    Q.  -- there are what appear to me to be a list
11  of entities --
12    A.  Yes.
13    Q.  -- Kik Interactive, Endemic Mobile Inc.  My
14  question is -- is can we just -- some of these we've
15  already discussed.
16    A.  Yes.
17    Q.  We've already explained what they are.  And
18  the ones that we haven't, I would just like --
19    DEPOSITION REPORTER:  Excuse me.  Can you
20  let him finish the question before responding.
21    THE WITNESS:  Oh, sorry.
22    MR. SCHLEGELMILCH:  And I'm probably talking
23  too quickly anyway.
24    DEPOSITION REPORTER:  Thank you.
25    THE WITNESS:  Sorry.  I'll be less

18

1  conversational.
2    MR. SCHLEGELMILCH:  I think that would
3  probably make Patrick happy too.
4  BY MR. SCHLEGELMILCH:
5    Q.  Some of these entities we've talked about;
6  some of them we haven't.  And I just wanted to run
7  through them quickly.
8    So Kik Interactive we've talked about;
9  correct?
10    A.  Yes.
11    Q.  That's Kik's Canadian operation?
12    A.  Correct.
13    Q.  What is Endemic Mobile Inc.?
14    A.  That was a previous subsidiary that was
15  consolidated.
16    Q.  So it no longer exists?
17    A.  Correct.
18    Q.  Okay.  What about 9108041 Canada Inc.?
19    A.  That is a -- there are three numbered
20  companies on here.
21    Q.  Yes.
22    A.  One of those -- and I can't recall which
23  one, because they're all numbered companies -- is a
24  holding company for employee shares, and I'm not
25  sure which one of them it is, so it could be that

19

1  one.
2    Q.  Okay.  And there -- you said there were
3  three -- there are on the exhibit --
4    A.  Yes.
5    Q.  -- three numbered entities.  Do they all do
6  the same thing?
7    A.  Only one of them exists today.  The other
8  two have been consolidated.
9    Q.  Okay.  Do the numbers have meaning?
10    A.  In Ontario when you first incorporate you'll
11  be assigned a numbered company, and then you can
12  choose to submit a new name.  So these were not
13  renamed.
14    Q.  Terrific.  Thank you.
15    Kik U.S. we've talked about.  That's Kik's
16  U.S. operation?
17    A.  Yes.
18    Q.  Snowball Labs Inc.?
19    A.  That was another subsidiary that didn't have
20  any operations or assets and was consolidated.
21    Q.  Okay.  Kik Interactive Inc.?
22    A.  Likewise, was another subsidiary, didn't
23  have any assets or operations and was consolidated.
24    Q.  Okay.  And Kik Interactive Israel, we talked
25  about that was its Israeli operation?

20

1    **A.**  Yes.
2    **Q.**  And that has been shut down?
3    **A.**  There are no longer any employees.  It is
4  still an active subsidiary.
5    **Q.**  I see.  Thank you.
6        MR. SCHLEGELMILCH:  Let me hand you what
7  we'll mark as Exhibit 261.
8        (Exhibit 261 marked for identification.)
9        MR. SCHLEGELMILCH:  See?  That's why I
10  should have handed it to the court reporter.
11  BY MR. SCHLEGELMILCH:
12    **Q.**  This is another page of Kik's 2018 tax
13  return, and what -- there's just one line that I'd
14  like to ask you about, the net income line.
15    **A.**  Yep.
16    **Q.**  So just so that I understand, Kik lost
17  $1.8 million for the fiscal year ending 2014 --
18  August 26, 2014; is that correct?
19    **A.**  Correct.
20    **Q.**  The next year it lost $14 million in the
21  year ending June 30, 2015?
22    **A.**  Correct.
23    **Q.**  The following year, on June 30, 2016, it
24  lost $25 million?
25    **A.**  Yes.

21

1    **Q.**  In 2017, on June 30th of 2017, it was -- it
2  was negative.  It lost $35 million?
3    **A.**  Correct.
4    **Q.**  But in 2018, on June 30, 2018, it had a net
5  income of $93 and a half million?
6    **A.**  Correct.
7    **Q.**  And that is due, is it not, to the sale of
8  the Kin token?
9    **A.**  It is the sale of SAFTs --
10    **Q.**  Okay.
11    **A.**  -- under the presale for the Kin token, and
12  it is the sale of ether that Kin -- that Kik took in
13  through the public sale of Kin tokens.
14    **Q.**  Okay.  I see.
15        And these are reported in Canadian dollars?
16  I don't know that it -- that it says.  I'm just --
17    **A.**  I believe it is U.S. dollars.
18    **Q.**  Okay.  Thank you.
19        In the year that ended June 30, 2019, did
20  Kik make a -- have a positive net profit or net
21  income -- because we are talking about net income
22  here -- or negative net income?
23    **A.**  Fiscal year ending June 2019?
24    **Q.**  Yes, sir.
25    **A.**  It did not.

22

1    **Q.**  It did not what?
2    **A.**  Have a positive net income.
3    **Q.**  Okay.  What was the amount of the negative
4  net income?
5    **A.**  The -- I don't recall the specific number.
6  I believe it was close to the 2017 number of
7  negative 35 million.
8    **Q.**  Does Kik have any revenue at present?
9    **A.**  It has some revenue through the sale to
10  MediaLab.
11    **Q.**  The sale of the Messenger app?
12    **A.**  Yes.
13    **Q.**  Outside of the sale of the -- well, I don't
14  know whether this is a document that you brought
15  with or are willing to mark, but does the sale of
16  the Messenger app to MediaLab allow -- does it --
17  does it require MediaLab to remit funds to Kik on a
18  sort of ongoing basis, or was it a lump sum?
19    **A.**  It was not a lump sum.  It was structured as
20  a nonexclusive license for IP, and there was a
21  $1 million payment made on October -- in
22  October 2019 and then ten subsequent payments of
23  $450,000 per month.
24    **Q.**  So in August of 2020 those payments will
25  stop?

23

1    **A.**  Correct.
2    **Q.**  Other than the revenue from MediaLab, does
3  Kik have any other revenue?
4    **A.**  At present, no.
5    **Q.**  Okay.  Forgive me if I asked this already,
6  but is Kik still a private Canadian corporation?
7    **A.**  It is.
8    **Q.**  And at present are all of Kik's operations
9  in one -- let me ask a better question.  Outside of
10  the office in Waterloo, does Kik have any other
11  office space?
12    **A.**  Kik has a small office space in Toronto as
13  well.
14    **Q.**  Okay.  And can you provide me with -- well,
15  let me ask it this way.  What is Kik's current
16  office space address in Waterloo?
17    **A.**  151 Charles Street East.  It's actually in
18  Kitchener now.  We've moved.
19    **Q.**  Okay.  Is that near Waterloo?
20    **A.**  Yeah.  It's right next to it.
21    **Q.**  Okay.  But it has no office space in the
22  United States?
23    **A.**  No.  All of the U.S. employees are remote
24  workers.
25    **Q.**  They work from their personal homes?

24

1    **A.**   Correct.
2    **Q.**   How many -- how many employees are in
3 Toronto?
4    **A.**   There are five employees in Toronto.
5    **Q.**   Okay.  And about how many employees are in
6 Waterloo -- or Kitchener?
7    **A.**   Six employees in Kitchener.
8    **Q.**   Okay.  Who or what are Kik's shareholders at
9 present?  And -- and let me -- let me just qualify
10 this.  My expectation is that there are a number of
11 employee benefit plans that include either options
12 or equity to sharehold- -- to employees.
13    **A.**   Uh-huh.
14    **Q.**   I'm not interested in those.  What I'm
15 looking for are the larger -- larger shareholders,
16 the nonemployee shareholders.
17    **A.**   Perfect.  I can give you a summary of anyone
18 who has above 1 percent ownership stake if it would
19 be helpful.
20    **Q.**   That would be terrific.
21    **A.**   Great.
22    **Q.**   Thank you.  That's exactly what I'm looking
23 for.
24    **A.**   Perfect.  So the employee pool, just to
25 qualify that, accounts for 10 percent, so those

25

1 Kik's board of directors?
2    **A.**   At present Ted Livingston, Fred Wilson, and
3 Jim Estill.
4    **Q.**   Mr. Holland is no longer a member of the
5 board?
6    **A.**   He's not.
7         MR. SCHLEGELMILCH:  Oh, yeah.  Thank you,
8 David.
9 BY MR. SCHLEGELMILCH:
10    **Q.**   You mentioned Yuriy and Andre?
11    **A.**   Yes.
12    **Q.**   What -- what percentage do they own?  I
13 know -- I know that you said that it was more than 1
14 percent, but I don't know if you -- if you have a
15 specific percentage.
16    **A.**   I believe Yuriy is 2 to 2.5 percent, in that
17 range; and Andre, I believe, is around 1.5 percent.
18         MR. SCHLEGELMILCH:  Thank you.
19         I will hand you what we'll mark as 262.
20         (Exhibit 262 marked for identification.)
21         THE WITNESS:  Nice.
22         MR. SCHLEGELMILCH:  I'm getting better.
23 BY MR. SCHLEGELMILCH:
24    **Q.**   This purports to be an incorporation
25 document for Code Inc.; is that correct?

27

1 would be all the employees that have options.  And
2 then moving up from that, there are a few early
3 employees who have above 1 percent.  One would be
4 Yuriy Blokhin.  Another one would be Andre.  His
5 last name is complicated, but it's --
6    **Q.**   I have a complicated last name.
7    **A.**   Yours is actually easier to pronounce.
8         Chris Best, who is Ted's co-founder, has
9 roughly 3 and a half percent.  Peter Heinke has
10 about 3 and a half percent ownership.
11 Ted Livingston has 31 percent.  And then in terms of
12 the entities that are shareholders, Union Square
13 Ventures, Spark Capital and Tencent all have
14 4.68 percent ownership.
15    **Q.**   Okay.
16    **A.**   RRE Ventures has roughly 7.5 percent
17 ownership.  Foundation Capital and Valiant Capital
18 both have roughly 3.5 percent ownership.  And then
19 Rounds has roughly 2.5 percent ownership.  That came
20 through the acquisition of Rounds, which was the
21 Israeli company that we bought in 2016.
22    **Q.**   Is there anyone else?
23    **A.**   Those would be the major shareholders.
24    **Q.**   That's perfect.  Thank you very much.
25         Who -- at present who are the members of

26

1    **A.**   Yes.
2    **Q.**   Have you ever seen this document before?
3    **A.**   Yes.
4    **Q.**   Okay.  And I believe you said that Code Inc.
5 was incorporated -- well, I don't know if you did
6 say when Code Inc. was incorporated.  Can you tell
7 me when Code Inc. was incorporated?
8    **A.**   October 17, 2019, according to this
9 document.
10    **Q.**   Okay.  What was the purpose of incorporating
11 Code Inc.?
12    **A.**   After the sale of Kik Messenger, Kik Inc.
13 has begun work on a new application.  And at some
14 point it will need to have a new name, because it
15 would not make sense to be called "Kik," the
16 company, because Kik Messenger is now owned by
17 MediaLab, so we set up "Code Inc." as a potential
18 name for the company.  It is generic enough that it
19 has some flexibility.
20    **Q.**   Okay.  What is the new app that Kik is
21 working on?
22    **A.**   Kik is working on a wallet app for Kin.
23    **Q.**   What would that -- what would the Wallet app
24 do?  Like, I know that wallet apps are ubiquitous.
25 There are a lot of them.

28

1    **A.**  Uh-huh.
2    **Q.**  What -- what would differentiate Kik's
3   Wallet app from other wallet apps?
4    **A.**  Very simply the Wallet app will send -- be
5   able to send and receive and store Kin.  What it's
6   used for remains to be seen.  There are a number of
7   different opportunities for go-to-market, but it
8   would be used within the Kin ecosystem broadly.
9    **Q.**  Okay.  And I think you said this earlier.
10  Forgive me if I -- if I'm making you say it again.
11  Code Inc. doesn't have any employees currently?
12   **A.**  No.
13   **Q.**  Have any of Kik's assets been transferred to
14  the subsidiary?
15   **A.**  No.
16   **Q.**  Other than the app that you described, does
17  Code Inc. do anything else?
18   **A.**  No.
19   **Q.**  Does it have office space?
20   **A.**  No.
21   **Q.**  Okay.  Turning back to Kik's sale of the
22  Messenger app to MediaLab, can you just remind me
23  again.  That was in October of 2019?
24   **A.**  Yes.
25   **Q.**  And is MediaLab currently operating the

29

1   start at any specific point?
2    **A.**  There is not a specific start date.
3    **Q.**  Do you know why they've not started?
4    **A.**  My understanding is that they are still
5   working through logistics of that as well as have
6   some questions around how to do that effectively
7   from a legal front.
8    **Q.**  Okay.  Did the consideration from a sale of
9   the app get deposited into Kik's general ledger,
10  its -- its...
11   **A.**  Yes.
12   **Q.**  Other than the app, which you've talked
13  about, does Kik have any other products or services
14  that it offers?
15   **A.**  Kik Inc.?
16   **Q.**  Yes, sir.
17   **A.**  No.
18   **Q.**  Does it have anything in the works, anything
19  that it's working on other than the app?
20   **A.**  It's working on a wallet app, as I mentioned
21  previously.
22   **Q.**  In addition to the wallet app, is there
23  anything?
24   **A.**  No.
25   **Q.**  Okay.  Thank you.

31

1   Messenger app?
2    **A.**  Yes.
3    **Q.**  And the consideration that was paid to Kik
4   pursuant to the agreement, just to make sure I have
5   it right, was a million-dollar lump sum plus 4 --
6   $400,000 per month for ten months?
7    **A.**  $450,000 per month for ten months --
8    **Q.**  Thank you.
9    **A.**  -- for a total of 5.5 million U.S. dollars.
10   **Q.**  That was my next question.
11       Did the sale of the app include any Kik
12  employees that went with the app?
13   **A.**  No.
14   **Q.**  Did the terms of the agreement include
15  anything regarding Kin?
16   **A.**  There was a side letter outside of the asset
17  purchase agreement.
18   **Q.**  What was in the side letter?
19   **A.**  The side letter stated that MediaLab would
20  purchase $100,000 worth of Kin for 15 months -- so
21  for a total of $1.5 million worth of Kin -- from the
22  open market, not from Kik.
23   **Q.**  Is MediaLab doing that?
24   **A.**  They have not started purchasing Kin.
25   **Q.**  When -- does the side letter require them to

30

1       Is it fair to say that the cash that Kik is
2   spending today includes the cash that Kik received
3   in the 2017 token sale?
4    **A.**  Yes.
5    **Q.**  And so Kik is using the cash it received
6   from the token sale to pay salaries and otherwise
7   fund its operations?
8    **A.**  Yes.
9    **Q.**  How much cash on hand does Kik have at
10  present?
11   **A.**  $16,100,000.
12   **Q.**  And that includes all -- any cash held by
13  any subsidiary?
14   **A.**  Correct.
15   **Q.**  We understand from prior testimony that Kik
16  received ETH during the token offering.  That's
17  correct; right?
18   **A.**  Correct.
19   **Q.**  And we also understand that Kik began to
20  liquidate its holdings of ETH?
21   **A.**  Yes.
22   **Q.**  Is that liquidation complete?
23   **A.**  No.
24   **Q.**  Okay.  How much ETH does Kik still hold?
25   **A.**  1800 ETH.

32

1    Q.  When Kik converted some of the ether to fiat
2  currency, it was to U.S. dollars?
3    A.  Yes.
4    Q.  And the U.S. dollars that Kik received in
5  exchange for ether, those were held in the same
6  accounts as the cash that Kik received for the 2017
7  token sale; correct?
8    A.  Can you define the 2017 token sale, just so
9  we're --
10    Q.  Sure.  Of course.
11        So we -- my understanding -- and you should
12  tell me if I get it wrong -- my understanding is
13  that Kik sold tokens pursuant to the SAFT agreement
14  for cash.
15    A.  Yes.
16    Q.  And so my question is -- and it sold tokens
17  to the general public for ether; right?
18    A.  Yes.
19    Q.  My question is:  Is the ether that Kik
20  received for the general public sales -- some of it
21  has been converted to cash?
22    A.  Yes.
23    Q.  Has that cash, that converted cash, been
24  sort of held in the same accounts that Kik held --
25  holds the cash it received from the token offering?

33

1    A.  The proceeds from the sale of SAFT?
2    Q.  Yes, sir.
3    A.  Those were deposited into a TD account --
4    Q.  Okay.
5    A.  -- Toronto-Dominion Bank, and the cash
6  received from the conversion of ETH to U.S. dollars
7  was held in a Silvergate Bank account.
8    Q.  And we can look at it, but a number of
9  transfers from the Silvergate account to other Kik
10  entities occurred; correct?
11    A.  Correct.
12    Q.  So Kik has used the money held in Silvergate
13  to fund its operations?
14    A.  Yes.
15    Q.  In total in U.S. dollars, how much did Kik
16  receive in exchange for the ETH it received in the
17  token sale?
18    A.  59 million U.S. dollars.
19    Q.  And that does not include or does it include
20  the 1800 ETH that Kik still holds?
21    A.  It does not include that.
22    Q.  Okay.  So it's 59 million U.S. dollars plus
23  1800 ETH?
24    A.  Correct.
25    Q.  What bank accounts does Kik own at present?

34

1    A.  A TD account, as well as a small bank
2  account with Your Neighborhood Credit Union was
3  recently set up.
4    Q.  Is that a Canadian credit union?
5    A.  Yes.
6    Q.  Does Kik no longer own the Silvergate
7  account?
8    A.  It does not.
9    Q.  Okay.  And so it's just those two, TD and
10  Your Neighborhood Credit Union?
11    A.  Yes.
12    Q.  And so the sum that you indicated earlier,
13  the 16.1 million, that includes all moneys held at
14  both accounts?
15    A.  Yes.
16    Q.  How many payments -- just to back up, how
17  many payments of 450,000 has MediaLab already made
18  to Kik?
19    A.  Three.
20        MR. SCHLEGELMILCH:  Let me hand you what
21  we'll mark as 263.  Let me mark it first.
22        (Exhibit 263 marked for identification.)
23  BY MR. SCHLEGELMILCH:
24    Q.  These purport to be Silvergate bank records
25  for Kik Interactive Inc.  They are Bates-stamped

35

1  SEC-SILVERGATE-E-0000217 through 303.
2        Have you ever seen these documents before?
3    A.  Yes.
4    Q.  Okay.  Great.
5        Are these, in fact, statements for Kik's
6  account at Silvergate?
7    A.  Yes.
8    Q.  And this was an account that Kik owned and
9  controlled; correct?
10    A.  Yes.
11    Q.  And it was not an account owned or
12  controlled by the Kin Foundation?
13    A.  Correct.
14    Q.  Can you take a look at the page -- the Bates
15  stamps, it's 283.  And, again, your copy is
16  double-sided --
17    A.  Okay.
18    Q.  -- so I can't tell you which side of the
19  page it's going to be on.
20    A.  Got it.
21    Q.  Okay.  About the middle of the page on May
22  the 13th of 2019, there's a payment to
23  James Weatherman.  Do you see that?
24    A.  Yes.
25    Q.  Mr. Weatherman is an app developer who won

36

1  an award from the Kin Foundation for integrating Kin
2  into his app; correct?
3      **A.**  Correct.
4      **Q.**  Did the Kin Foundation -- if you know, did
5  the Kin Foundation repay Kik for paying
6  Mr. Weatherman $5,000?
7      **A.**  This is accrued in a promissory note as a
8  loan to the foundation.  That loan has not been
9  repaid.
10     **Q.**  Okay.  On that same page directly above
11 Mr. Weatherman is a -- is another payment on the
12 same date for the same amount to Ryan Steubs.  Is he
13 an app developer?
14     **A.**  I believe so.
15     **Q.**  And I don't at all know how to pronounce his
16 app, but it's SXLVE; is that right?
17     **A.**  I believe so, yes.
18     **Q.**  And he also won an award from the Kin
19 Foundation?
20     **A.**  Yes.
21     **Q.**  On that same page on the 17th,
22 Simon Partridge, is he an app developer?
23     **A.**  Yes.
24     **Q.**  And both Mr. Steubs and Mr. Partridge, those
25 payments to them from Kik -- let me ask a better

37

1  question.
2        The payments from Kik to Mr. Steubs and
3  Mr. Partridge, were those also included in the
4  promissory note from the foundation?
5      **A.**  Yes.
6      **Q.**  If you look on the next page, there are
7  $5,000 payments to Jonathan Garsman and
8  Simon Howard --
9      **A.**  Yes.
10     **Q.**  -- on May the 30th.  Are those also app
11 developers?
12     **A.**  Yes.
13     **Q.**  And those are also included in the
14 promissory note?
15     **A.**  Yes.
16     **Q.**  Is there a running total of how much the Kin
17 Foundation owes Kik Interactive?
18     **A.**  Yes.
19     **Q.**  If you turn to page 287.
20     **A.**  I'm here.
21     **Q.**  On June the 14th there's a payment of $5,000
22 to Simon Howard.
23     **A.**  Yes.
24     **Q.**  Is Mr. Howard a app developer?
25     **A.**  Yes.

38

1      **Q.**  And if you look on the next page, 288, there
2  are $5,000 payments to Tinashe Khumbula --
3      **A.**  Yes.
4      **Q.**  -- Jim Ramia, and Kierian Technologies
5  Limited?
6      **A.**  Yes.
7      **Q.**  Are those all app developers?
8      **A.**  Yes.
9      **Q.**  And those are all included in the promissory
10 note?
11     **A.**  Correct.
12     **Q.**  If you go -- it's earlier in this document.
13 If you go to page 253.
14     **A.**  I'm here.
15     **Q.**  There is an October 15, 2018 payment to
16 Perfect365 Inc.?
17     **A.**  Yes.
18     **Q.**  That's an app developer, is it not?
19     **A.**  Yes.
20     **Q.**  Is this included in the note from Kik -- the
21 Kin Foundation to Kik?
22     **A.**  Yes.
23     **Q.**  And if you turn to page 256.
24     **A.**  I'm here.
25     **Q.**  There's -- on November the 1st, 2018,

39

1  there's a payment of $15,000 to Kinny Co Limited.
2  Kinny is another app, is it not?
3      **A.**  It is.
4      **Q.**  And is this also included in the debt that
5  Kin Foundation owns -- owes to Kik?
6      **A.**  Yes.
7      **Q.**  If you turn to the next page, 257.
8      **A.**  Yep.
9      **Q.**  There's a payment of $15,000 to
10 Oroboros LLC?
11     **A.**  Yes.
12     **Q.**  That's an app developer, is it not?
13     **A.**  It is.
14     **Q.**  That's Sam Dowd?
15     **A.**  Yes.
16     **Q.**  And also payments to This That Limited?
17     **A.**  Yes.
18     **Q.**  Is that an app developer?
19     **A.**  It is.
20     **Q.**  And Life Slice Limited?
21     **A.**  Yes.  Also a developer.
22     **Q.**  Seeing Digital?
23     **A.**  Also a developer.
24     **Q.**  AJ Enterprises?
25     **A.**  Also a developer.

40

1   Q.   Third Rock BVA -- BVBA?
2   A.   Also a developer.
3   Q.   Matthew Valenty?
4   A.   Also a developer.
5   Q.   Appwise?
6   A.   Also a developer.
7   Q.   Smil3 Inc., with a "3" instead of an "e"?
8   A.   Also a developer.
9   Q.   And those are all included in the debt that
10  the Kin Foundation owes to Kik?
11  A.   Yes.
12  Q.   And I just have one more of these.  It's at
13  the end.  It's in the same month on 1126, so it's
14  just a few pages away.
15  A.   Yes.
16  Q.   Perfect365, we already established that was
17  a developer; correct?
18  A.   Yes.
19  Q.   Okay.  And that is part of the debt that the
20  Kin Foundation owes to Kik; is that correct?
21  A.   Correct.
22  Q.   What is the present amount of the debt that
23  Kin Foundation owes to Kik?
24  A.   There are two promissory notes, one for
25  $268,000 and one for $175,000.

41

1   Q.   And do they sort of grow monthly the debt?
2   A.   Those two promissory notes are their own,
3   and then there has been additional receivables from
4   the foundation, but it's not been memorialized in a
5   promissory note.
6   Q.   Okay.  Are these notes secured in any way?
7   A.   No.
8   Q.   And I think you said that there have been --
9   well, you said that there had been -- let me ask --
10  let me just ask the question.
11      Have any payments been made on either of
12  these notes?
13  A.   No.
14  Q.   Does Kik expect to receive any payments on
15  either of these notes?
16  A.   At some point, yes.
17  Q.   What would be the point where that would
18  happen?
19  A.   At the time when it was deemed necessary for
20  Kik to call in those notes.
21  Q.   But does the Kin Foundation have any cash?
22  A.   Not at present, to my knowledge.
23  Q.   Thank you.
24      Are -- we've talked about a series of
25  payments from Kik to app developers.

42

1   A.   Yes.
2   Q.   Are similar payments being made, or were --
3   let me ask a better question.
4       Were similar payments made from the TD
5   account?
6   A.   Not to my knowledge.
7   Q.   Okay.  And are payments being made from the
8   Your Neighborhood Credit Union account?
9   A.   No.
10  Q.   Does Kik hold any -- does Kik own any assets
11  in the United States?
12  A.   No.
13  Q.   At present, what are Kik's monthly expenses?
14  A.   In this present month, February, we would
15  expect the total expenses to be approximately
16  $900,000.  Going forward, that will be roughly
17  $650,000 in perpetuity.
18  Q.   What -- what accounts for the -- the delta?
19  A.   There are some remaining severance
20  obligations based on a consolidation and
21  restructure.
22  Q.   Okay.  Are there any sort of large upcoming
23  expenses that Kik anticipates having?
24  A.   No.
25  Q.   Does Kik anticipate any cash infusions or

43

1   any capital-raising events?
2   A.   No.
3   Q.   Is Kik trying to raise money?
4   A.   No, not at present.
5   Q.   Given Kik's current cash position and
6   expenses, what is Kik's current financial runway?
7   A.   Kik has 18 months of runway through
8   June 2021 at current burn rate in cash.
9   Q.   Does Kik own any real estate?
10  A.   No.
11  Q.   Does Kik own any intellectual property?
12  A.   Yes.
13  Q.   At a high level, what does Kik own?  Well,
14  let me -- let me break it down.
15      Does Kik own any patents?
16  A.   Yes.
17  Q.   About how many?
18  A.   38, to be specific.
19  Q.   Okay.  That's very specific.
20      Are those Canadian patents?
21  A.   Canadian and U.S. patents.
22  Q.   Okay.  Does it own other intellectual
23  property?
24  A.   Yes.
25  Q.   What is that?

44

1    A.  It's intellectual property related to the
2  Kik Messenger app.
3    Q.  Okay.  Which it sold?
4    A.  It sold a nonexclusive license for the IP,
5  but it still owns the IP.
6    Q.  I see.
7       Other than the ether that we talked about,
8  does Kik own any other, for lack of a better word,
9  cryptocurrency or digital currency?
10   A.  Kik owns 3 trillion Kin.
11   Q.  Okay.  But no other tokens?
12   A.  No.
13   Q.  Does Kik have any large accounts receivable?
14   A.  The two items in the accounts receivable
15 would be the outstanding payments from MediaLab, the
16 seven payments of $450,000, as well as the two
17 promissory notes from the Kin Foundation.
18   Q.  Are you able to provide a net worth of Kik
19 today?
20   A.  Its most recent valuation?
21   Q.  Yes, sir.
22   A.  Yes.  $408 million.  And that was as of
23 October 2018.
24   Q.  2018?
25   A.  That was the last time the val- --

45

1    Q.  I see.
2    A.  -- the 409A was completed.
3    Q.  Thank you.
4       So that is the most current --
5    A.  Valuation.
6    Q.  -- valuation?
7    A.  Yes.
8    Q.  Thank you.  That's helpful.
9       At a high level, what are Kik's liabilities
10 at present?
11   A.  Kik has very few liabilities.  The current
12 liabilities would be any outstanding invoices, which
13 are typically cleared within a month.  That would be
14 approximately $2 million.
15   Q.  Okay.  Does Kik have any debt?
16   A.  No.
17      MR. SCHLEGELMILCH:  Okay.  We have been
18 going for about an hour.  We've actually been making
19 great progress.  Would anyone mind if we took a
20 short break, a five-minute break, to use the rest
21 room?
22      THE WITNESS:  Up to you.
23      MR. GIBBS:  That's fine with us.
24      THE WITNESS:  Great.
25      MR. SCHLEGELMILCH:  Can we go off the

46

1       record.
2       THE VIDEOGRAPHER:  We're going off the
3  record.  The time is 10:04 a.m.  This marks the end
4  of media number 1.
5       (Off the record.)
6       THE VIDEOGRAPHER:  We're back on the record.
7  The time is 10:20 a.m.  This marks the beginning of
8  media number 2.
9       MR. SCHLEGELMILCH:  Great.
10 BY MR. SCHLEGELMILCH:
11   Q.  Welcome back, Mr. Philp.  I just have a
12 couple followup questions on what we covered in the
13 morning session, or the first session --
14   A.  Before we begin, could I just make one
15 clarifying point?
16   Q.  Please do.
17   A.  Previously when I talked about the tax
18 return, I mentioned that those were denoted in U.S.
19 dollars.  It's actually Canadian dollars.
20   Q.  Thank you.
21   A.  I just wanted to clarify that.
22   Q.  Thank you very much.  That's -- I appreciate
23 that.  Great.
24      You mentioned that one of the items of
25 intellectual property that Kik owns is the

47

1  intellectual property associated with the messaging
2  app?
3    A.  Correct.
4    Q.  Do you -- does Kik have any plans to restart
5  operations of the messaging app?
6    A.  At present, no.
7    Q.  Okay.  Does it have plans to -- to create
8  another Messenger app?
9    A.  At present, no.
10   Q.  Okay.  And on the notes, the Kin Foundation
11 notes that we talked about earlier today --
12   A.  The promissory notes?
13   Q.  Yes, sir.
14      -- is there a maturity date on those notes?
15   A.  No.
16   Q.  So there's no -- there's no due date?
17   A.  No.
18   Q.  Is there an interest rate?
19   A.  There's a 5 percent annual interest rate.
20   Q.  Okay.  You also mentioned earlier today that
21 Kik owns 3 trillion Kin tokens; is that correct?
22   A.  That is correct.
23   Q.  And it received those Kin tokens in
24 September 2017 --
25   A.  Correct.

48

1    **Q.**   -- at the time of the token distribution
2 event?
3    **A.**   That is correct.
4    **Q.**   And of the 3 trillion tokens that Kik issued
5 to itself, did Kik receive them all at once or
6 pursuant to a schedule?
7    **A.**   The tokens were issued through a smart
8 contract, and the smart contract had a vesting
9 schedule, 10 periods, each vesting per quarter.
10    **Q.**   Have all of the Kin vested?
11    **A.**   No.
12    **Q.**   How many -- how much Kin has not yet vested?
13    **A.**   There is one more vesting period.
14    **Q.**   Okay.  And how much will be vested at that
15 last vesting period?
16    **A.**   Three hundred billion Kin.  All vesting
17 periods were equal amounts.
18    **Q.**   Okay.  And is that vesting period -- will
19 that come at the end of this quarter, so the end of
20 March?
21    **A.**   Yes.
22    **Q.**   Okay.  So by the end of March 2020, Kik
23 will -- all of the Kin that Kik received in the
24 token distribution event will be vested?
25    **A.**   Yes.

49

1    **A.**   Yes.
2    **Q.**   Has Kik sold any of its tokens?
3    **A.**   No.
4    **Q.**   Let me ask a better question so the record's
5 clear.  Has Kik sold any of its Kin tokens?
6    **A.**   No.
7    **Q.**   Has Kik ever used them to collateralize any
8 debt?
9    **A.**   No.
10    **Q.**   Has Kik sold any interest in its tokens?
11    **A.**   No.
12    **Q.**   Are the tokens stored in a single wallet?
13    **A.**   Yes.
14    **Q.**   Okay.  What's the name of the service that
15 holds the tokens?
16    **A.**   It is a owned wallet by Kik Inc.
17    **Q.**   Okay.
18    **A.**   A hard -- sorry -- a cold storage wallet.
19    **Q.**   What is -- I'm a lawyer.  I don't know
20 anything.  What is a cold storage wallet?
21    **A.**   It means that it is not active on an
22 exchange or readily available through a single
23 signer private key.  So there is a multi-sig wallet,
24 and it is not stored on the Internet.
25        (Clarification requested by Reporter.)

51

1    **Q.**   Okay.  The tokens that Kik currently holds,
2 are they ERC20 tokens?
3    **A.**   No.
4    **Q.**   What are they?
5    **A.**   They are Kin tokens that run on the Kin
6 blockchain.
7    **Q.**   And that's a bespoke blockchain; correct?
8    **A.**   It is a fork of Stellar.
9    **Q.**   I see.
10        When did Kik -- or let me ask it better.
11        Did Kik exchange -- Kik did, though, receive
12 ERC20 tokens in the token distribution event;
13 correct?
14    **A.**   Kik received ERC20 Kin through that smart
15 contract, yes.
16    **Q.**   Okay.  When did Kik exchange the ERC20 Kin
17 for the Stellar fork Kin?
18    **A.**   Kik has exchanged the vested Kin for the Kin
19 tokens on the Kin blockchain as of -- I believe it
20 was July of 2019.  And, just to clarify, the ERC20
21 tokens still do vest to Kik, and then they are
22 converted at the time of the vesting.
23    **Q.**   That was my next question.  And the exchange
24 of ERC20 tokens to Kin blockchain tokens, was that
25 on a one-for-one basis?

50

1        THE WITNESS:  "Sig," short for "signature."
2 BY MR. SCHLEGELMILCH:
3    **Q.**   Between January 1st, 2018 and the present,
4 has Kik purchased any Kin tokens?
5    **A.**   Yes.
6    **Q.**   When?
7    **A.**   Kik began purchasing Kin tokens in November
8 of 2019 and has done that as part of an employee
9 compensation program that was announced publicly.
10    **Q.**   Okay.  How many Kin tokens has Kik purchased
11 through that program that you just described?
12    **A.**   Kik purchases approximately 20,000 U.S.
13 dollars' worth of Kin tokens per month starting in
14 November, so that's happened three times now, so
15 approximately $60,000 of U.S. dollars' worth of Kin
16 tokens and then based on the price of Kin at that
17 time.  So I think that would be a hundred billion,
18 if I was to do quick math.
19    **Q.**   Okay.  Does Kik expect to continue to
20 purchase $20,000 U.S. worth of Kin tokens in the
21 future every month?
22    **A.**   Yes.
23    **Q.**   For -- until when?
24    **A.**   That is in perpetuity.  It's part of the
25 employee compensation program.

52

1    Q.   Okay.  Is there anyone working at Kik's
2  direction that purchased -- that has purchased Kin
3  tokens?
4    A.   Can you define what you mean by "at Kik's
5  direction"?
6    Q.   Sure.  Has Kik asked anyone or any entity to
7  purchase Kin tokens?
8    A.   No.
9    Q.   Between January 1st, 2018 and the present,
10  has Kik sold any Kin tokens?
11    A.   No.
12    Q.   The tokens -- the Kin tokens that Kik
13  purchases for the employee benefit plan --
14    A.   Yes.
15    Q.   -- what does Kik do with the Kin tokens
16  after it purchases them?
17    A.   Kik purchases the tokens and distributes
18  them to employees based on the compensation package.
19    Q.   So directly into the employees' wallets?
20    A.   Yes.
21    Q.   What is Kik's plan for the Kin tokens it now
22  controls?
23    A.   Kik does not have an explicit plan for the
24  Kin tokens.  It would plan to monetize them, which
25  has been the Kin business model since the time Kin

53

1  was launched.
2    Q.   What do you mean by "monetize"?
3    A.   Monetize the Kin tokens would be selling Kin
4  to fund operations.  But the way in which those are
5  sold or to whom they are sold is to be determined.
6    Q.   Okay.  So it has no -- if I get this wrong,
7  just let me know.  It has no specific plan, but
8  it -- generally speaking, it plans to monetize the
9  tokens by selling them to fund operations?
10    A.   Yes.
11        MR. SCHLEGELMILCH:  Let me hand you what we
12  will mark as 264.
13        (Exhibit 264 marked for identification.)
14  BY MR. SCHLEGELMILCH:
15    Q.   Have you seen this document before?
16    A.   Yes.
17    Q.   This is a Medium post that Mr. Livingston,
18  Kik's CEO, posted on September 23rd, 2019; is that
19  correct?
20    A.   That's correct.
21    Q.   Okay.  And Mr. Livingston used this Medium
22  post to announce the shutdown of Kik's Messenger
23  app; is that right?
24    A.   That's correct.
25    Q.   And it turns out a couple weeks later Kik

54

1  was able to sell it; right?
2    A.   That's correct.
3    Q.   But at this time in September of 2019, Kik
4  had just planned to close it?
5    A.   Yes.
6    Q.   Did you read this before Mr. Livingston --
7  you personally -- did you personally read this
8  before Mr. Livingston published it?
9    A.   Yes.
10    Q.   Okay.  If you look in the fourth paragraph,
11  "While we are ready" --
12    A.   Yes.
13    Q.   -- the "we" in that sentence, that's Kik, is
14  it not?
15    A.   Let me just read to get the full context on
16  this.
17    Q.   Of course.
18    A.   Thanks.
19        Yes, I believe the "we" is referring to Kik
20  Inc.
21    Q.   Okay.  Because, again, this is an
22  announcement that the Messenger app was closing?
23    A.   Correct.
24    Q.   Which Kik Inc. owns --
25    A.   Yes.

55

1    Q.   -- correct?
2        And Mr. Livingston announced three things.
3  He announced that they were going to -- that Kik was
4  going to shut down the app; right?
5    A.   Yes.
6    Q.   Kik was going to reduce its headcount to
7  19 people?
8    A.   Yes.
9    Q.   And that Kik was going to focus on
10  converting -- on one thing, converting Kin users to
11  Kin buyers?
12    A.   Yes.
13    Q.   If you look on the next page, at the bottom
14  of the second paragraph -- the second paragraph
15  that -- well, the paragraph that begins, "But no
16  matter what happens to Kik" --
17    A.   Yes.
18    Q.   -- there is a line at the end that reads:
19        "And the Ecosystem is close to adding a
20        lot more firepower."
21        Do you see that?
22    A.   Yes.
23    Q.   What is that a reference to?
24    A.   I can't speak to the specifics because it is
25  relatively broad.  My understanding, not as the

56

1 author of this, would be that it is talking about
2 the fact that more users are continuing to come into
3 the ecosystem over time, as we had seen the number
4 of users earning and spending Kin had continued to
5 increase and has increased since this blog post was
6 published.
7      **Q.** Okay. On that same page Mr. Livingston lays
8 out for Kik a three-part strategy; is that correct?
9      **A.** Yes.
10     **Q.** And that Kik would be involved in moving the
11 Kin blockchain forward to support a billion
12 consumers making a dozen transactions a day with
13 under one-second confirmation times?
14     **A.** Yes.
15     **Q.** That Kik would take steps to accelerate the
16 adoption, growth and success of all developers on
17 the Kin ecosystem?
18     MR. GIBBS: Objection to form.
19     You can answer if you can.
20     THE WITNESS: You're asking that these are
21 what's on the page? Sorry.
22 BY MR. SCHLEGELMILCH:
23     **Q.** Yes, sir. This is what Mr. Livingston laid
24 out as a three-part strategy for Kik?
25     **A.** Yes. So I'm confirming what we're both

57

1 (Exhibit 265 marked for identification.)
2     THE WITNESS: You're getting better at that.
3     MR. SCHLEGELMILCH: Just -- just a little.
4 BY MR. SCHLEGELMILCH:
5     **Q.** So as you can see, this is not the executed
6 version. We don't have the executed version. We
7 asked for the executed version in discovery, but
8 this is what we have.
9     **A.** Okay.
10     **Q.** So have you seen a document that looks like
11 this?
12     **A.** Yes.
13     **Q.** Great. And it is titled "Services
14 Agreement"?
15     **A.** Yes.
16     **Q.** Okay. What does the Services Agreement do?
17     **A.** The Services Agreement speaks to the
18 services that Kik Inc. would perform on behalf of
19 the Kin Foundation.
20     **Q.** Okay. And if you look on this exhibit,
21 there's a Schedule A.
22     **A.** Yes.
23     **Q.** And, again, this is a -- this is a draft
24 agreement. I don't have the -- the signed one. Are
25 these the services -- and you can take a minute to

59

1 reading on the page.
2     **Q.** Great.
3     MR. GIBBS: Glad we've all convened to do
4 that.
5 BY MR. SCHLEGELMILCH:
6     **Q.** Does -- other than the debt that we've
7 talked about, does Kik have any contracts or other
8 agree- -- written contracts -- does Kik have any
9 written agreements with the Kin Foundation?
10     **A.** Just to confirm, we are not talking about
11 this document anymore; right?
12     **Q.** We are not.
13     **A.** Okay. So the question was do we -- is --
14 does Kik Inc. have any contractual relationship with
15 the Kin Foundation?
16     **Q.** Correct.
17     **A.** There is a services agreement between Kik
18 Inc. and the Kin Foundation.
19     **Q.** Okay. Is there an agency agreement?
20     **A.** I'm only aware of the services agreement.
21     **Q.** Sure. Let me see if I can help.
22     So I will hand you what was marked during
23 testimony as Exhibit 190.
24     MR. SCHLEGELMILCH: And we will mark it here
25 as 265.

58

1 read them over. Are these the services that Kik
2 today provides to the Kin Foundation?
3     **A.** Kik provides ser- -- many of the services
4 that are listed here in Schedule A.
5     **Q.** Okay. Does any other entity, to Kik's
6 knowledge, provide services to the Kin Foundation?
7     **A.** Kik and myself are unaware of any other
8 services agreements that the Foundation has, but I
9 can't speak to any other contractual obligations we
10 would have.
11     **Q.** Great.
12     Has the Kin Foundation ever made a payment
13 to Kik for services provided pursuant to the
14 Services Agreement?
15     **A.** No.
16     **Q.** In the draft the Services Agreement has a
17 term --
18     **A.** Which page are we looking at?
19     **Q.** Sure. It's page 2.
20     **A.** Okay.
21     **Q.** In the draft the agreement lasts until
22 September 30, 2022. Is that the term of the
23 Services Agreement that was ultimately entered
24 between Kik and the Kin Foundation?
25     **A.** I do not know for sure if that is the date

60

1  that is in the executed version.
2      Q.  Okay.
3      A.  But we can follow up on that.
4          MR. SCHLEGELMILCH:  Thank you.
5      I will now hand you what we will mark as
6  Exhibit 266 that was marked during the investigation
7  as Exhibit 191.
8          (Exhibit 266 marked for identification.)
9  BY MR. SCHLEGELMILCH:
10     Q.  Again, this is a draft.  We do not have
11 the -- an executed version of this.
12         Have you ever seen a document like this
13 before?
14     A.  No.
15     Q.  Do you know whether or not Kik executed an
16 agency agreement with the Kin Foundation?
17     A.  I do not know.
18     Q.  Okay.  If you don't know anything about it,
19 I don't have any questions about it.
20         Can you look back at the Services Agreement.
21     A.  Exhibit 265?
22     Q.  Yes, please.
23         You -- and, again, I'm not trying to
24 misquote you.  I'm just trying to bring you back to
25 your prior testimony.  I think you said that Kik --

61

1  that Kik provides many of these services to the Kin
2  Foundation?
3      A.  Yes.
4      Q.  Are there -- and this may be the easiest way
5  to do it.  Are there services that Kik does not
6  provide to the Kin Foundation?
7      A.  There are a couple of terms in here that are
8  vague, so I would not be able to speak to that
9  specifically, like "Senior management oversight."
10     Q.  Okay.
11     A.  There's also no facilities for the Kin
12 Foundation, so Kik does not do any leasehold issues,
13 telephone support, or mailroom functions.
14     Q.  Okay.  If you write a -- well, never mind.
15         Well, let me ask it this way.  If I wanted
16 to write a letter to the Kin Foundation, would I
17 address it to Kik?
18     A.  I believe it goes to the Kin Foundation's
19 lawyers, external counsel, which is BLG.
20     Q.  Okay.
21     A.  I can't say for certain because I haven't
22 sent a letter there, but I believe that's where the
23 mail goes.
24     Q.  So you've identified "senior management
25 oversight" as being sort of vague, and so you're not

62

1  sure what that means.  And then under
2  "Administration/Facilities," you explained why Kik
3  does not do that for Kin -- or for the Kin
4  Foundation.  Are there other things that you can
5  say --
6      A.  Are there specific things in here that you'd
7  like to ask about?
8      Q.  Yeah.  The question is that Kik definitely
9  does not do for the Kin Foundation.  I suspect
10 facility services are -- would be included in that
11 list.
12     A.  I would also include, yes, facility
13 services, space cleaning.  There's been no
14 collections, that I'm aware of.  And then some of
15 these, again, are a little bit vague.  So "decision
16 support," as an example, I'm not sure how that would
17 be defined so I can't speak to that specifically.
18     Q.  Got you.  Thank you.
19         Are you familiar with Mr. Mougayar?
20     A.  Yes.
21     Q.  Does Kik pay Mr. Mougayar?
22     A.  The Kin Foundation pays Mr. Mougayar, but
23 Kik administers that payment under the Services
24 Agreement.
25     Q.  Does Kik write Mr. Mougayar a check or wire

63

1  him money?
2      A.  The money comes from Kik's bank account but
3  is pursuant to the promissory note and the loan from
4  the Kin Foundation.
5      Q.  I see.  So Kik pays him, and it gets sort of
6  added to the -- the debt obligation that the Kin
7  Foundation has to Kik?
8      A.  Yes.
9      Q.  So is Kik currently paying Mr. Mougayar
10 $5,000 a month?
11     A.  I believe the Kin Foundation is paying
12 Mr. Mougayar $5,000 a month, administered by Kik.
13     Q.  Now I understand.  Thank you.
14         And he had previously received $10,000 a
15 month; is that correct?
16     A.  I believe so.
17     Q.  And is that -- is that denominated in
18 Canadian or U.S. dollars?
19     A.  I am not certain which denomination that is,
20 but we can follow up.
21     Q.  What work -- well, never mind.
22         And Kik employees routinely attend Kin
23 Foundation board meetings; correct?
24     A.  Some Kik employees have attended the Kin
25 Foundation board meetings in the past, yes.

64

1  Q.  Well, you personally, you attend Kin
2  Foundation board meetings; correct?
3     A.  Yes.
4     Q.  Mr. Livingston does?
5     A.  Mr. Livingston attends the foundation board
6  meetings in his capacity as a foundation board
7  member.
8     Q.  Okay.  What capacity do you attend in?
9     A.  I attend the foundation board meetings under
10  the Services Agreement because Kik is performing
11  services, so I will typically be there at the
12  request of the Kin Foundation.
13     Q.  Okay.  And Ms. Lyon attends as secretary?
14     A.  Yes.
15     Q.  Is there an agreement to compensate Ms. Lyon
16  for her work as secretary of the Kin Foundation?
17     A.  No.
18     Q.  Do you know the name Juan Llanos?  I may
19  be -- I'm probably mispronouncing it.
20     A.  Very close.
21     Q.  "Llanos?"
22     A.  "Llanos."
23     Q.  "Llanos"?
24     A.  Yes.  L-l-a-o- --
25     Q.  Yeah, that's what I was --

65

1     A.  -- -n-o-s.
2        (Clarification requested by Reporter.)
3        THE WITNESS:  I actually -- I don't even
4  know.  L-l-a-n-o-s.
5  BY MR. SCHLEGELMILCH:
6     Q.  Okay.  Who's Mr. Llanos?
7     A.  He was contracted by the Kin Foundation.
8     Q.  Okay.  To do what, if you know?
9     A.  He was contracted to facilitate
10  relationships with exchanges.
11     Q.  Okay.  And he was compensated for his work
12  through Kik's bank account; correct?
13     A.  Mr. Llanos was compensated by the
14  foundation, and it was administered by Kik, and the
15  money came from Kik's bank account.  He was also
16  compensated in Kin, which came from the foundation.
17     Q.  Okay.  And that was from the Silvergate
18  account; correct?
19     A.  Yes.
20     Q.  Does Kik currently host a node for the Kin
21  blockchain?
22     A.  Yes.
23     Q.  Does it host more than one?
24     A.  Yes.
25     Q.  How many -- how many nodes does Kin -- does

66

1  Kik host?
2     A.  Two.
3     Q.  Two.
4        Do they have a geographical location?
5     A.  They are both Amazon Web Services cloud
6  instances.
7     Q.  Okay.  How many nodes are there total?
8     A.  11 nodes that confirm transactions.  There's
9  also one or two observer nodes that we are aware of.
10     Q.  Okay.  Of the nodes that Kik hosts, are
11  those -- are those nodes that confirm transactions,
12  or are they observer nodes?
13     A.  They are both part of the quorum that
14  confirms transactions.
15     Q.  Okay.  How much does it cost Kik to host a
16  Kin blockchain node?
17     A.  It's approximately 1500 U.S. dollars per
18  month per node.
19     Q.  And just at a high level, what does a node
20  do?
21     A.  A node stores data from the blockchain and
22  confirms transactions that come through at regular
23  intervals through blocks.
24     Q.  Does the foundation -- is it -- is Kik's
25  payment of the cost of operating the node part of

67

1  the Kin Foundation's obligation to repay?
2        That's a lousy question, but what I'm
3  getting at is does this sort of -- is this sort of a
4  debt that accrues to the Foundation, that -- the
5  expenses that Kin -- that Kik is incurring to host
6  the node?
7     A.  Your question is if the monthly costs
8  associated with Kik's two nodes are encompassed in
9  the promissory note?
10     Q.  That is a much better way to ask what I
11  should have asked.
12     A.  No.
13     Q.  Okay.  We talked earlier today about the
14  migration of the ERC20 token to the Kin blockchain;
15  correct?
16     A.  Yes.
17     Q.  When did that occur?
18     A.  That process kicked off in May of 2019, I
19  believe.
20     Q.  And it's ongoing?
21     A.  Yes.
22     Q.  Is there an end date?
23     A.  There's no way to confirm an end date.
24  Anyone that owns ERC20 Kin can choose to move to the
25  new block chain or can continue on the Ethereum

68

1 blockchain, so it is -- no one can say for certain
2 when that migration would finish.
3    **Q.** Is there going to be a point in time where
4 Kik or Kin or somebody will stop supporting the
5 ERC20 token?
6    **A.** No, that would be impossible.
7    **Q.** Okay.
8    **A.** It's an ERC20 token, so as long as the
9 Ethereum blockchain continues to operate, that token
10 will continue to operate.
11    **Q.** Okay. What role, if any, did Kik have in
12 the creation of the Kik blockchain?
13    **A.** Kik was one of the leading developers that
14 created the Kin blockchain in collaboration with the
15 Stellar Foundation, who wrote most of the source
16 code that was used for the Kin blockchain.
17    **Q.** Did Stellar participate in this effort at
18 the same time that Kik did?
19    **A.** Yes, there was collaboration.
20    **Q.** Okay.
21    **A.** There were also employees of another company
22 in Israel called "Orbs" that contributed too.
23    **Q.** So it was Kik, Orbs and Stellar?
24    **A.** Yes.
25    **Q.** How many -- approximately how many Kik

69

1 employees were -- were working on -- on the
2 development of the Stellar blockchain?
3    **A.** There were approximately 15 employees of Kik
4 that were working on the development of the Stellar
5 fork.
6    **Q.** And were these Kik employees located in
7 Israel?
8    **A.** Yes.
9    **Q.** All of them?
10    **A.** Yes.
11       MR. SCHLEGELMILCH: I will hand you what
12 we'll mark as 267.
13       (Exhibit 267 marked for identification.)
14       THE WITNESS: Thank you.
15 BY MR. SCHLEGELMILCH:
16    **Q.** Have you ever seen this before?
17    **A.** Yes.
18    **Q.** What is this?
19    **A.** This is the public GitHub repository for the
20 Kin Rewards Engine.
21    **Q.** Okay. What is the public GitHub repository?
22    **A.** The public GitHub repository is a repository
23 of open source code, some of which pertains to SDKs
24 and the blockchain. And this is another branch of
25 that public GitHub that talks about the Kin Rewards

70

1 Engine that is run by the Kin Foundation.
2    **Q.** Okay. And, specifically, this document was
3 a -- a proposed change to the Kin Reward Engine that
4 Kik Interactive submitted --
5    **A.** Yes.
6    **Q.** -- is that correct?
7       Okay. Did any -- do you know whether or not
8 anyone else submitted any proposals to the Kin
9 Reward Engine?
10    **A.** Yes, there have been.
11    **Q.** What about during this -- my
12 understanding is that there was a recent upgrade or
13 update to the Kin Reward Engine that, I think, went
14 live January 1st, 2020; is that correct?
15    **A.** Yes. There's been two updates to the Kin
16 Rewards Engine. One went live in December. I
17 believe it was December 18th.
18    **Q.** Okay.
19    **A.** That was based on the proposal KRE v1.1.
20 And then KRE 2.0 was the second proposal that was
21 adopted in -- January 1st, 2020.
22    **Q.** Okay. Is Kik Interactive's proposal the one
23 that was adopted most recently?
24    **A.** The proposal that was adopted was initially
25 put forth by Kik Interactive. There was a number of

71

1 comments and, I'll call it, sub-proposals from other
2 people in the community for improvements to this,
3 which was then iterated on and then went forward.
4 So, yes, Kik Interactive is the proposer here, but
5 it had input from a lot of other people that are not
6 employed by Kik Interactive Inc.
7    **Q.** Great.
8    **A.** There's also been a subsequent proposal that
9 has came through, not yet adopted, from someone in
10 the Kin community that is not employed by Kik
11 Interactive Inc. I just wanted to say --
12 BY MR. SCHLEGELMILCH:
13    **Q.** Do you know who that person is?
14    **A.** I know what their GitHub handle is. I don't
15 know who that person is individually.
16    **Q.** What is their GitHub handle?
17    **A.** It is --
18    **Q.** You offered.
19    **A.** I know. I'm trying to remember the spelling
20 now. You can go on the GitHub repository and find
21 it. But it is A-s-p-a-r-g-u-s-m, I believe.
22    **Q.** Of course it is.
23    **A.** I know. It's well-written; the proposal,
24 not the user name.
25    **Q.** All right.

72

1    A.  I'd recommend checking it out.
2    Q.  I shall.
3         MR. SCHLEGELMILCH:  Here's the thing.  If we
4  are able to go off the record...
5         THE VIDEOGRAPHER:  We are going off the
6  record.  The time is 10:56 a.m.  This marks the end
7  of media number 2.
8         (Off the record.)
9         THE VIDEOGRAPHER:  We are back on the
10  record.  The time is 11:31 a.m.  This marks the
11  beginning of media number 3.
12         MR. SCHLEGELMILCH:  Great.
13  BY MR. SCHLEGELMILCH:
14    Q.  One followup question from this morning's
15  discussion about the Wallet app that Kik is working
16  on.
17    A.  Yes.
18    Q.  Would that app generate revenue to Kik?  Is
19  it anticipated that that app would be a
20  revenue-generator?
21    A.  At present there's no specific plans for
22  revenue generation within the app.
23    Q.  Okay.  Does Kik otherwise have plans to earn
24  revenue in the future?
25    A.  There's no specific revenue plans for Kik --

73

1    Q.  Okay.
2    A.  -- aside from monetization of the Kin that
3  it owns.
4         MR. SCHLEGELMILCH:  Okay.  During the break,
5  counsel handed me the final executed version of both
6  the Services Agreement and the Agency Agreement,
7  which I'll mark, and we can talk about them.
8         And thank you, Counsel.
9         MR. GIBBS:  While you're doing that, I -- it
10  probably makes sense for us to ultimately produce to
11  you Bates-labeled copies.  These will be marked for
12  now, obviously, but we might as well have a
13  Bates-labeled version copy --
14         MR. SCHLEGELMILCH:  Please do.
15         MR. GIBBS:  -- in a day or two.
16         (Exhibit 268 marked for identification.)
17  BY MR. SCHLEGELMILCH:
18    Q.  Let me hand you Exhibit 268, the Services
19  Agreement.  Somehow we lost one, but...
20         MR. MENDEL:  Do you have one?
21         MR. SCHLEGELMILCH:  I have one.  I have one.
22  Okay.  No, I have one.
23         MR. MENDEL:  Okay.
24  BY MR. SCHLEGELMILCH:
25    Q.  Okay.  What did I do with it?  Oh.  268.

74

1         Have you seen this document before?
2    A.  Yes.
3    Q.  What is this document?
4    A.  This is a Services Agreement between the Kin
5  Foundation and Kik Interactive Inc.
6    Q.  Great.  And if you look on -- it is not
7  paginated, but if you -- there is a signature page
8  close to the end.
9    A.  Yes.  Page 7, if we were to have a page.
10    Q.  And Mr. Livingston signed for the Ecosystem,
11  the --
12    A.  Yes.
13    Q.  -- Kin Foundation.
14         And Mr. Brunet signed for Kik Interactive?
15    A.  Yes.
16    Q.  And he -- it says that he's the Controller.
17  Is that -- is that accurate?
18    A.  His title now is Head of Finance, but at the
19  time it was Controller.
20    Q.  Okay.  And he's still with the company?
21    A.  Yes.
22    Q.  If you look on the first page of the
23  agreement, it says that it's dated the 18th of
24  September, 2018.  Do you see that?
25    A.  Yes.

75

1    Q.  Did Kik provide services to the Kin
2  Foundation prior to September 18th, 2018?
3    A.  Kik provided services to the Kin Foundation
4  starting September 12th, 2017, which is also noted
5  on this document as the legal effect from this
6  date -- from this document.
7    Q.  Okay.  So what is -- is there a significance
8  of September 12th, 2017?  What happened on that
9  date?
10    A.  That is the time -- that is date that Kin
11  was created in the smart contract.
12    Q.  Okay.  Is that -- and maybe -- maybe I'm
13  wrong.  Is that the date that the Kin Foundation was
14  incorporated?
15    A.  I believe the Kin Foundation was
16  incorporated on September 11th, 2017.
17    Q.  Okay.  If you look still on the first page
18  under "Service Fees," 2.2.
19    A.  Yes.
20    Q.  It indicates that "...the foundation shall
21  pay Kik such fees as invoiced by Kik from time to
22  time."  Do you see that?
23    A.  Yes.
24    Q.  Has Kik ever invoiced the foundation?
25    A.  The -- Kik has only executed the two

76

1 promissory notes with the Kin Foundation, so outside
2 of those, there's been no invoices.
3    Q.   Okay.  And as I understand from your prior
4 testimony, the promissory notes were for money that
5 Kik sent to app developers and -- and other
6 individuals --
7    A.   Cash expenses.
8    Q.   Cash expenses.
9    A.   Yes.
10    Q.   So for services is it fair to say that Kik
11 has never invoiced the foundation?
12    A.   That's fair.
13    Q.   And if you look at Exhibit -- Schedule A,
14 which is right after the signature page.
15    A.   Yes.
16    Q.   And just take a minute to con- -- confirm.
17 These are the services that Kik will provide to the
18 Kin Foundation pursuant to the Services Agreement;
19 is that correct?
20    A.   Yes.  These are all the services
21 contemplated in the Services Agreement.  Per my
22 comment previously on the other document, there are
23 some that Kik has not been providing.
24    Q.   They just don't make sense --
25    A.   Yes.

77

1    Q.   -- because the Kin Foundation doesn't have
2 a --
3    A.   Facilities.
4    Q.   Right.  Okay.
5         MR. SCHLEGELMILCH:  Let me hand you what
6 we'll mark as 269.
7         Sorry.
8         (Exhibit 269 marked for identification.)
9 BY MR. SCHLEGELMILCH:
10    Q.   And you have seen this document before?
11    A.   Yes.
12    Q.   What is it?
13    A.   This is an agency agreement between the Kin
14 Foundation and Kik Interactive Inc.
15    Q.   Okay.  And it's dated October 10th of 2018?
16    A.   That's correct.
17    Q.   But as with the other agreement, it's --
18 it's intended to be retroactive to September 12th,
19 2017?
20    A.   Correct.
21    Q.   Okay.  What happened, if anything, in
22 September or October 2018 or previously that sort of
23 caused Kin -- the Kin Foundation and Kik to want to
24 memorialize these -- these agreements?
25    A.   There had been discussions ongoing about

78

1 memorializing the activities that were happening
2 under what's contemplated in the Services Agreement
3 and the Agency Agreement.  Those were ultimately
4 executed at this time.  It was mostly a -- an
5 operational thing of going through drafts.
6         One thing I will note is this Agency
7 Agreement was ultimately cancelled approximately one
8 month later because it was felt that it was
9 redundant with the Services Agreement because
10 everything was captured in the Services Agreement.
11    Q.   Okay.  Okay.  So -- okay.  Just for the
12 record, this Agency Agreement, if you look there, it
13 was signed; right?
14    A.   Yes.
15    Q.   This version of it was signed by
16 Mr. Livingston for the Foundation and Mr. Brunet,
17 again, for Kik Interactive?
18    A.   Yes.
19    Q.   Okay.  And it's your testimony that this was
20 cancelled a month later?
21    A.   Yes.
22    Q.   So my last question was going to be -- if
23 you look on page 3 --
24    A.   Yes.
25    Q.   -- Section 7.1 --

79

1    A.   Yes.
2    Q.   -- my question was -- this -- this indicates
3 that the principal, the Foundation, shall pay the
4 agent, Kik, an annual agency fee equal to $100,000
5 U.S. dollars.  And my question was:  Has -- has that
6 ever been paid?
7    A.   No.
8    Q.   And the reason being?
9    A.   That this document was cancelled a month
10 later.
11    Q.   That's what I thought.
12         But the Services Agreement is still in
13 effect?
14    A.   Yes.
15         MR. SCHLEGELMILCH:  Okay.  That's all I got.
16 I pass the witness.
17         MR. GIBBS:  No questions.
18         MR. SCHLEGELMILCH:  We can go off the
19 record.
20         THE VIDEOGRAPHER:  This concludes today's
21 deposition of Tanner Philp.  The master media of
22 today's deposition will remain in the custody of
23 Gradillas Court Reporters.  The time is 11:39 a.m.
24 We are now off the record.
25         (Ending time:  11:39 a.m.)

80

```
 1        I, JANIS JENNINGS, CSR No. 3942, Certified
 2    Shorthand Reporter, certify:
 3        That the foregoing proceedings were taken
 4    before me at the time and place therein set forth, at
 5    which time the witness was duly sworn by me;
 6        That the testimony of the witness, the
 7    questions propounded, and all objections and statements
 8    made at the time of the examination were recorded
 9    stenographically by me and were thereafter transcribed;
10        That the foregoing pages contain a full, true
11    and accurate record of all proceedings and testimony.
12        Pursuant to F.R.C.P. 30(e)(2) before
13    completion of the proceedings, review of the transcript
14    [ ] was [X] was not requested.
15        I further certify that I am not a relative or
16    employee of any attorney of the parties, nor financially
17    interested in the action.
18        I declare under penalty of perjury under the
19    laws of California that the foregoing is true and
20    correct.
21        Dated this 11th day of February 2020.
22
23
24        JANIS JENNINGS, CSR NO. 3942
25        CLR, CCRR

                        81
```

```
 1                    ERRATA SHEET
 2    Deposition of:  TANNER PHILP
      Date taken:  February 5, 2020
 3    Case:  SEC vs. KIK INTERACTIVE INC.
      PAGE LINE
 4    ____ ____  CHANGE: _____
 5                  REASON: _____
                    CHANGE: _____
 6    ____ ____  REASON: _____
 7    ____ ____  CHANGE: _____
 8                  REASON: _____
                    CHANGE: _____
 9    ____ ____  REASON: _____
10    ____ ____  CHANGE: _____
11                  REASON: _____
                    CHANGE: _____
12    ____ ____  REASON: _____
13    ____ ____  CHANGE: _____
14                  REASON: _____
                    CHANGE: _____
15    ____ ____  REASON: _____
16    ____ ____  CHANGE: _____
17                  REASON: _____
                    CHANGE: _____
18    ____ ____  REASON: _____
19    ____ ____  CHANGE: _____
20                  REASON: _____
                    CHANGE: _____
21    ____ ____  REASON: _____
22    ____ ____  CHANGE: _____
                    REASON: _____
23
24    Signed _____
25    Dated _____

                        83
```

```
 1    WITNESS DECLARATION AND ERRATA SHEET
 2
 3
 4    Gradillas Court Reporters Assignment No. 200205JJE
 5    Case Caption:  Securities & Exchange Commission vs.
 6            Kik Interactive, Inc.
 7
 8
 9        DECLARATION UNDER PENALTY OF PERJURY
10        I declare under penalty of perjury
11    that I have read the entire transcript of my
12    Deposition taken in the captioned matter or the
13    same has been read to me, and the same is true
14    and accurate, save and except for changes and/or
15    corrections, if any, as indicated by me on the
16    DEPOSITION ERRATA SHEET hereof, with the
17    understanding that I offer these changes as if
18    still under oath.
19
20    Signed on the _____ day of _____, 20___.
21
22    _____
23    TANNER PHILP
24
25

                        82
```