SEC17

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:      )

                       )   File No. HO-13388-A

KIK INTERACTIVE      )   AMENDED 12-5-2018


WITNESS:  Fred Wilson

PAGES:    1 through 222

PLACE:    U.S. Securities and Exchange Commission

          100 F Street, N.E.

          Washington, D.C. 20549

DATE:     Wednesday, September 5, 2018


      The above-entitled matter came on for hearing,

pursuant to notice, at 9:31 a.m.


Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

```
1   APPEARANCES:
2
3   On behalf of the Securities and Exchange Commission:
4      BRENT MITCHELL, ESQ.
5      JAMES MURTHA, ESQ.
6      JEFF LEASURE, ESQ.
7      STEPHAN SCHLEGELMILCH, ESQ.
8      DAVID MENDEL, ESQ.
9      Securities and Exchange Commission
10     100 F Street, N.E.
11     Washington, D.C. 20549
12     (202)551-4683
13     mitchellb@sec.gov
14
15  On behalf of the Witness:
16     LUKE CADIGAN, ESQ.
17     JULIANNE LANDSVIK, ESQ.
18     Cooley LLP
19     500 Boylston Street
20     Boston, Massachusetts 02116
21     (617)937-2480
22     lcadigan@cooley.com
23  Also Present:
24     Steven Jones, Videographer
25
```

Page 3

C O N T E N T S

```
1          C O N T E N T S
2   WITNESS:            EXAMINATION
3   Fred Wilson              4
4
```

| EXHIBITS | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 145 | Subpoena | 7 |
| 146 | E-mail Chain | 65 |
| 147 | E-mail Chain | 76 |
| 148 | E-mail Chain | 87 |
| 149 | E-mail Chain | 128 |
| 150 | E-mail Chain | 132 |
| 151 | E-mail Chain | 139 |
| 152 | E-mail Chain | 149 |
| 153 | E-mail Chain | 157 |
| 154 | E-mail Chain | 173 |
| 155 | E-mail Chain | 188 |
| 156 | E-mail Chain | 191 |
| 157 | E-mail Chain | 194 |
| 158 | E-mail Chain | 198 |
| 159 | E-mail Chain | 202 |
| 160 | E-mail Chain | 210 |

Page 4

P R O C E E D I N G S

```
1          P R O C E E D I N G S
2       THE VIDEOGRAPHER:  This begins disc number
3   one.  We are now on the record.  The time on the video
4   monitor is 9:31 a.m.
5       MR. SCHLEGELMILCH:  We are on the record at
6   9:31 a.m. on September the 5th, 2018, at the SEC's
7   Washington DC office.
8       Mr. Wilson, would you raise your right
9   hand?
10      MR. SCHLEGELMILCH:  Do you swear or affirm
11  to tell the truth, the whole truth, and nothing but the
12  truth?
13      THE WITNESS:  I do.
14  Whereupon,
15              FRED WILSON
16  was called as a witness and, having been first duly sworn,
17  was examined and testified as follows:
18              EXAMINATION
19      BY MR. SCHLEGELMILCH:
20      Q   Okay.  Would you -- you can put down your
21  hand.  Would you mind stating and spelling your full
22  name for the record?
23      A   Yes.  My name is Fredrick, F-R-E-D-R-I-C-K,
24  R. Wilson.
25      Q   Okay.  And it's W-I-L-S-O-N?
```

Page 5

```
1       A   Correct.
2       Q   Okay.  Good morning, Mr. Wilson.  My name
3   is Steven Schlegelmilch, and to my right is Jeff
4   Leasure, James Murtha, David Mendel, and Brent
5   Mitchell.
6       We are members of the staff of the
7   Enforcement Division, and, for purposes of this
8   proceeding, we're officers of the United States
9   Securities and Exchange Commission.
10      This is an investigation by the United
11  States Securities and Exchange Commission in the matter
12  of Kik Interactive, file number HO-13388 to determine
13  whether there have been violations of certain
14  provisions of the federal securities laws.  However,
15  the facts developed in this investigation might
16  constitute violations of other federal or state civil
17  or criminal laws.
18      Prior to the opening of the record, you
19  were provided a copy of the formal order of
20  investigation of this matter, which is actually right
21  in front of you right on top, and it has been
22  supplemented several times and it's available if you
23  want to look through it at any point today.  What that
24  formal order does is the Commission is the entity
25  that's authorized by the statute to take testimony to
```

Page 6

1    investigate what happened, to issue subpoenas, to swear
2    in witnesses, things like that.
3         But the Commission has delegated to its
4    officers the ability to do so that the four people on
5    the 10th floor don't have to.  So for purposes of this
6    proceeding the five of us have been variously
7    designated as officers of the Commission, and that's
8    what the formal order does.
9         If you would like to look at it, I think
10   you would be the first one, but it's right there in
11   front of you.
12   A   Thank you.
13   Q   Prior to the opening of the record, also in
14   front of you is a copy of the Commission Supplemental
15   Information Form 1662 which we provided to your counsel
16   when we issued the subpoena.  So that's been previously
17   marked as Exhibit 1.
18        And have you had an opportunity to look at
19   it or to talk to your counsel about it, this Form 1662
20   which is the second document?
21   A   Yeah.  I've seen this.
22   Q   Do you have any questions or concerns
23   regarding the Form 1662?
24   A   I do not.
25   Q   Okay.  And you're represented by counsel

Page 7

1    here today?
2    A   I am.
3    Q   Would counsel mind introducing themselves?
4        MR. CADIGAN:  Yes.  Luke Cadigan of Cooley,
5    LLP.
6        MS. LANDSVIK:  Julianne Landsvik of Cooley,
7    LLP.
8        MR. SCHLEGELMILCH:  Okay.  And do you
9    represent Mr. Wilson today?
10       MR. CADIGAN:  Yes, we represent Mr. Wilson.
11   And then I know you've asked that we indicate the other
12   parties that we're representing.
13   Julie, do you have that?
14       MS. LANDSVIK:  Yes.  Cooley represents Fred
15   Wilson, Union Square Ventures, Kik Interactive, Ted
16   Livingston, Peter Heinke, Tanner Philp, Phil Yang,
17   Eileen Lyon, Erin Clift, and Eran Ben-Ari.
18       BY MR. SCHLEGELMILCH:
19   Q   Let me hand you what will be marked as
20   Exhibit 145, which is a copy of the subpoena.
21       (SEC Exhibit No. 145 was marked for
22       identification.)
23       BY MR. SCHLEGELMILCH:
24   Q   Have you had a chance to see this before,
25   Mr. Wilson?

Page 8

1    A   Yes, I have.
2    Q   Okay.  And this is the subpoena pursuant to
3    which you're appearing here today?
4    A   Yes, it is.
5    Q   Okay.  So let me go over just a few of the
6    ground rules for testimony, which are similar to the
7    rules for a deposition.  Have you ever had your
8    deposition taken before?
9    A   Yes, I have.
10   Q   Okay.  About how many times?
11   A   I think twice.
12   Q   Okay.  When did that happen?
13   A   I don't think I've done one in over ten
14   years.  So I'd say -- I think I did a couple in the
15   late '90s and early '00s.
16   Q   Okay.  What was the context of those
17   depositions?
18   A   Well, the one that I recall most vividly
19   was a litigation between some former employees and a
20   company I was on the board of.
21   Q   Okay.  Were you a named party to that
22   litigation?
23   A   I don't recall.
24   Q   Okay.  The big rule for today is that you
25   and I can't speak over each other.  So I need to let

Page 9

1    you finish your answer before I ask you another
2    question, and you need to let me finish my question
3    before you provide an answer.
4    A   Okay.
5    Q   And, like I said, we'll take a break every
6    hour or so.  I suspect your counsel has told you what
7    to expect, but do you have any questions about how
8    today will proceed?
9    A   I do not.
10   Q   Okay.  Just to get started, I'd like to get
11   a sense for your background.
12        Would you mind providing me sort of a
13   resume-level 30,000-foot-overview of your career sort
14   of starting at college and then working forward to
15   today?
16   A   Okay.  I attended MIT from 1979 to 1983
17   graduating with a degree in mechanical engineering.  I
18   worked as a software engineer for two years.  From '83
19   to '85, I attended University of Pennsylvania's Wharton
20   School of Business.  From '85 to '87, I started working
21   for a venture capital firm called Euclid Partners while
22   I was in business school at Wharton.  I started there
23   in the summer of 1986.  I worked there for ten years,
24   from 1986 to 1996, first as an associate then as a
25   junior partner then a full partner.

Page 10

1    I left in the summer of 1996 to start a
2    venture capital firm called Flatiron Partners, which
3    still exists in some form today, but we stopped
4    investing actively out of that vehicle in 2000.
5         Q   Okay.
6         A   And I spent 2001, 2002 and part of 2003
7    winding down the affairs of that business.  And in the
8    summer of 2003, I cofounded Union Square Ventures and I
9    have a partner at Union Square Ventures ever
10   since.
11        Q   Where is Union Square Ventures located?
12        A   New York City.
13        Q   Okay.  Is that where you're located?
14            Is that where your office is?
15        A   The offices of Union Square Ventures.
16        Q   Is in New York city.
17            Where do you work?
18        A   I work in the offices of Union Square
19   Ventures when I'm in New York City.
20        Q   Okay.
21        A   And when I'm not in New York City, I work
22   in my home offices.
23        Q   Okay.  And where is that?  I don't need to
24   have your address, but where is your home office?
25        A   I have a home office in Venice Beach,

Page 11

1    California.  I have a home office in Park City, Utah.
2    I have home office in Amagansett, New York.
3         Q   Okay.  Is Union Square Ventures -- is their
4    office in Manhattan?
5         A   Yes, it is.
6         Q   Okay.  How many partners -- or -- well, let
7    me step back.
8             What is Union Square Ventures?  What kind
9    of -- what is Union Square Ventures?
10        A   Union Square Ventures is an early-stage
11   venture capital firm.
12        Q   Okay.  How is it organized?  Is it an LLC,
13   a partnership, a corporation?  What is it?
14        A   Union Square Ventures Management Company is
15   an LLC, and then there are seven main found entities
16   that have been formed over the past 15 years that are
17   limited partnerships.  We also have a number of other
18   limited partnerships, side car vehicles and so on and
19   so forth.  The main fund is a 3 (c)(7) fund, but we
20   also operate 3(c)(1) funds for investors who are less
21   wealthy.  And so that means that we have these side
22   vehicles.
23            So I think maybe we have a total of 13 or
24   14 organized investing entities, but there's seven main
25   unit partnerships where the vast majority of our

Page 12

1    capital resides.
2         Q   Okay.  What's your role at Union Square
3    Ventures?
4         A   I am a general partner.
5         Q   How many general partners are there?
6         A   There are six general partners right now.
7         Q   Okay.  Can you -- would you mind naming
8    them for me?
9         A   Sure.
10        Q   And just part of it is we're going to see a
11   lot of e-mails today and I want -- I'm trying to get
12   a -- sort of a cast of characters.
13        A   Right.  So myself, Fred Wilson, my
14   cofounder, Brad Burnham, Albert Wenger; that's spelled
15   W-e-n-g-e-r.
16        Q   Okay.
17        A   John Buttrick, Andrew Weissman, Rebecca
18   Kaden.  Kaden, K-a-d-e-n.
19        Q   And Buttrick, B-u- --
20        A   B-u-t-t-r-i-c-k.
21        Q   Thank you.  And about how many other
22   employees does Union Square Ventures have?
23        A   I think we have about 16 employees right
24   now of which six are the people I just named.  So we
25   have ten other people who work at Union Square

Page 13

1    Ventures.
2         Q   Thank you.  Can you give me sort of an
3    order of magnitude for sort of the amount of assets
4    under management for Union Square Ventures?
5         A   Well, that -- that requires some
6    definition.  We have raised, over the life of Union
7    Square Ventures, seven primary investing vehicles and
8    these other vehicles that go side-by-side with some of
9    these other vehicles.  And if you add all of those up,
10   I would say that it adds up to -- it adds up to about a
11   billion dollars --
12        Q   Okay.
13        A   -- across those -- all of those vehicles.
14            But the 2004 fund, the first fund I raised
15   is largely liquidated.  There's two very small
16   positions that remain.  So I'm not sure I would
17   consider that under active management anymore.
18        Q   Okay.  That's helpful.  Thank you.
19        A   And we don't take the income on the 2004
20   fund.  And we take a nominal amount of fee income on
21   the 2008 fund and the 2000 -- and the Union Square
22   Ventures opportunity fund, which are our three oldest
23   funds.  So, you know, again, you know, it sort of begs
24   the question of what you mean by under management.
25        Q   Actually, what you provided is very

Page 14

1  helpful.
2      A   Okay.
3      Q   You are obviously familiar with a company
4  called Kik Interactive; is that right?
5      A   Yes.  I'm on the board of Kik interactive.
6      Q   Okay.  Well, that's a question I don't have
7  to ask now.
8          When did you first hear about Kik
9  Interactive?
10     A   I believe that we first heard about Kik
11 Interactive in the summer of 2011.
12     Q   And when did you -- or, I guess, more
13 specifically, your firm first invest in Kik?
14     A   I believe it -- I think it was in 2011.
15 I'm not entirely sure, but it's either 2011 or 2012.
16         MR. MURTHA:  Under what circumstances did
17 you come to learn about Kik Interactive?
18         THE WITNESS:  They had a fast-growing
19 mobile messaging app that just sort of caught fire,
20 people started using it, and, you know, that's what we
21 pay attention to.  You know, we saw press around it and
22 that kind of thing.
23         BY MR. SCHLEGELMILCH:
24     Q   That's another sort of unique thing about
25 testimony today is that any of the people on this side

Page 15

1  of the table will ask questions, and we'll try not to
2  step on each other.  But thank you.
3      A   It's okay.
4      Q   What was the size of Union Square Ventures'
5  initial investment in Kik?
6      A   2.5 million.
7      Q   Okay.  And how did it -- what was the --
8  what form did that investment take?  And what I mean by
9  that is was it in the form of a purchase of equity or
10 debt or --
11     A   We purchased a Series A preferred equity.
12     Q   And has that position in Kik grown or
13 diminished over time?
14     A   The cost basis of it?
15     Q   Let's start with:  Have you invested more?
16     A   Yes.
17     Q   Okay.  Can you walk me through sort of the
18 progression of the -- Union Square Ventures' investment
19 in Kik?
20     A   Yeah, yeah.  We brought some Series B
21 preferred maybe a year or two later, and we bought some
22 Series C preferred maybe a year or two later.  The
23 total position that we have in Kik as of now is
24 worth -- is at cost approximately 5.5 million.
25     Q   Okay.  And cost meaning that's what Union

Page 16

1  Square Ventures actually paid?
2      A   Union Square Ventures 2008, specifically,
3  is the only vehicle that we manage that's an investor
4  in Kik.
5      Q   Of the seven primary investment vehicles?
6      A   Only one which is Union Square Ventures
7  2008, LP --
8      Q   Okay.
9      A   -- the only entity that owns equity in Kik.
10     Q   And its cost basis for that investment is
11 5.5 million?
12     A   Correct.
13     Q   Okay.  And it's all in the form of equity?
14     A   Correct.
15         MR. LEASURE:  Can you explain what Series
16 A, Series B, Series C means in this case?
17         THE WITNESS:  They are rounds of financing
18 that companies do, you know.  So they're named that way
19 just to sort of recognize that they were raised at
20 different times.  They can be sometimes very similar to
21 each other in terms of liquidation preference and price
22 per share, but they could be very different from each
23 other as well.
24         Things that could change other than price
25 per share is whether or not they're pari-passuing

Page 17

1  liquidation versus senior in liquidation, and sometimes
2  you know securities can carry -- pay a dividend, pay it
3  in kind dividend, typically not a cash paying dividend.
4          So, you know, they can differ from time to
5  time, but everybody who buys the Series A preferred
6  buys the exact same piece of paper.  And everybody who
7  buys a Series B preferred buys the exact same piece of
8  paper.
9          MR. LEASURE:  Got it.
10         MR. MURTHA:  Is the 2008 fund one of the
11 funds which you had mentioned earlier as one of the
12 ones that Union Square Ventures is not taking income
13 from?
14         THE WITNESS:  I believe that we are now
15 taking a million dollars a year of management fee
16 income, which is fairly nominal for a fund that's
17 $159 million of committed capital.  The fees typically
18 for a fund like that would be on the order of two to
19 two and a half percent, so somewhere between 3 and
20 $4 million a year, but we've reduced the fees we're
21 taking on that fund.
22         What happens is a fund has a tenure life.
23 That fund is either past its tenure life or is coming
24 up on its tenure life.  We will extend the
25 investment -- we will extend the life of the fund until

Page 18

1 we can fully liquidate it. And during those
2 extensions, we ratchet down the management fees pretty
3 dramatically just to recognize the fact that we're not
4 providing as much management to the fund as we might
5 have been in the past.
6        Although, this fund still has something
7 like -- I don't know -- something like 15 active
8 investments in it. So it's a pretty actively managed
9 fund given the age of it.
10       MR. LEASURE: And of the investments in
11 this fund, can you give me a rough percentage on a cost
12 basis of the value of the Kik Investments versus --
13       THE WITNESS: We made something like 23 or
14 24 investments in the fund.
15       MR. LEASURE: Okay.
16       THE WITNESS: It's a $159 million fund. So
17 if you just do the averages, which is not going to be
18 accurate, but on average we would have put maybe
19 something like 6 or $7 million on average into a
20 company. I think that the spread probably is more like
21 2 million-ish on the low end up to maybe 10 to 12
22 million-ish on the high end. So it's probably right
23 down the middle in terms of size.
24       BY MR. SCHLEGELMILCH:
25   Q   So the investment in Kik that this fund

Page 19

1 made is sort of an average-size investment for the
2 fund?
3    A   Correct.
4    Q   Okay.
5        MR. LEASURE: What other types of -- just
6 taking this fund in particular as an example, what
7 other types of investments did this fund make similar
8 to tech companies like Kik --
9        THE WITNESS: Yeah. So our specialty, if
10 you will, Union Square Ventures, is Internet-based
11 businesses. That means web and mobile, and
12 increasingly now blockchain. And so we don't -- and
13 they all, essentially, are software-based businesses.
14       So, you know, an easy way to think about it
15 is somewhere around half to two-thirds of the employees
16 are software engineers who make the product. That's
17 the way to kind of think about the kind of companies we
18 invest in.
19       And this fund, the 2008 fund, was raised
20 right as the iPhone and the iOS and Android operating
21 systems were coming to market. So you see a lot of
22 companies in that portfolio that were coming to market
23 with mobile applications, native mobile applications
24 like what Kik does. That isn't necessarily what you
25 would see of a current portfolio of ours because that

Page 20

1 sort of opportunity wave has sort of come now and --
2 well, there's obviously lots of big and valuable
3 companies. The ability to start a company around a
4 mobile app has sort of come and gone. So we don't do
5 that much of that kind of investing now, but in that
6 fund there was a lot of that.
7        MR. MENDEL: What was your total return on
8 the fund?
9        THE WITNESS: Fund is still actively
10 managed. So we don't know, but what I can tell you is
11 we raised $159 million committed capital. We called
12 about 150 of that. So we don't necessarily fully call
13 our funds. We would try to, but, you know, we don't
14 always call every dime of capital.
15       And we have distributed in cash and
16 marketable stock to the investors of that fund about
17 $400 million. That's an estimate. It could be, you
18 know, 50 million more or less, but about 400 million
19 distributed cash and liquid stock. And then we
20 probably have another 100 million-ish, maybe a little
21 bit more of residual value in that fund.
22       So the cash on cash -- when I say cash, I
23 mean cash plus liquid stock returns to the limited
24 partners of that fund -- as of June 30th is probably --
25 and that's net to the limited partners, so that's after

Page 21

1 our carrying fees -- is about 3.25. And, you know,
2 that number could grow some, you know, because we do
3 have a pretty significant unrealized portfolio.
4        MR. MENDEL: 3.25 what?
5        THE WITNESS: Cash-on-cash return. So if
6 you take the amount of value, including what we've
7 distributed and what remains undistributed, and divide
8 that by what people put in, you get to 3.25.
9        MR. MENDEL: And what did you mean by the
10 calling? You said calling --
11       THE WITNESS: All right. So if we have
12 $159 million of committed capital, we call that capital
13 over the life of the fund, and we call it in like 5
14 million, 10 million increments so that our limited
15 partners hold onto that money until we find a place to
16 invest it. And then -- so, you know, we don't take the
17 $159 million when we close and put it in the bank. So
18 that's why sometimes we don't call the entire fund.
19 You know, we try to call the entire fund.
20       But our investment period is four years.
21 So we don't add any new names to the fund after four
22 years, and then we have follow-on investments we make.
23 So, you know, it's impossible to precisely call exactly
24 the amount of committed capital.
25       And we do also recycle, meaning we take

6 (Pages 18 to 21)

1 some investments as they get realized and we reinvest
2 them.  We can do up to about 20 percent of our
3 committed capital that way.  So that's why, you know,
4 these numbers are a little imprecise.
5         MR. MENDEL:  Thank you.
6         BY MR. SCHLEGELMILCH:
7     Q   To date, has the 2008 fund received any
8 return on its investment in Kik?
9     A   No, it has not.
10    Q   Other than Union Square Ventures, are there
11 other investors in these series of preferred's?
12    A   Yes, there are.
13    Q   Okay.  Do you know who they are or are
14 they --
15    A   Well, I do know who they are.  I'm -- I'll
16 try to do it from memory.
17    Q   Okay.
18    A   In the initial Series A offering, there
19 were two other venture capital firms, a firm called
20 RRE, which is based in New York City, and a firm called
21 Spark Capital based in Boston and also the Bay Area.
22        The Series B was those three firms, plus a
23 wealthy family, a wealthy Canadian family whose name
24 escapes me, plus a venture capital firm.  Oh wait, I
25 may be getting this wrong.  They may have done the

1 Series C.  I think maybe that was the Series B.
2         And then Series C was those three firms and
3 maybe the wealthy Canadian family, and a firm called
4 Foundation Capital.  And then there was also a Series
5 D, which was done by a Chinese mobile Internet company
6 called Tencent which owns the WeChat mobile messenger
7 which is the most popular mobile messenger in China.
8     Q   And what was the sort of order of magnitude
9 of the Series D?
10    A   I think it was 50 million, 5-0.
11    Q   Okay.  That's very helpful.  And sort of --
12 if it's easier to take them sort of series by series,
13 let's do that.  But what I'm trying to determine is
14 like sort of the -- compare the size of USV's or --
15 I'm using USV as sort of a shorthand for the 2008
16 fund -- but USV's investment versus these other
17 investors in the different series.  I'm trying to
18 figure out what -- like how Union Square Ventures'
19 investment compares to the other ones?
20    A   So in the Series A, I believe, it was
21 two-and-a-half million from all three of us.  I believe
22 it was a -- roughly seven-and-a-half million dollars
23 round.
24    Q   Okay.  So it's about approximately
25 33 percent of the Series A?  The Series A belongs to

1 USV?
2     A   Correct.  And then in the Series B, I think
3 that -- I think we did something like 2 million in the
4 Series B.  And I think that RRE and Spark did a similar
5 amount and then this wealthy Canadian family.  And
6 there may have -- there may have been some other
7 investors, but I think that round in total was maybe in
8 the 12 to $15 million range.  So maybe we did 15
9 percent of it.
10        And then the Series C -- I can't remember
11 exactly how big it was, but I think Foundation put 15
12 or $20 million into the company.  And I think we put
13 maybe $1.5 million in.  And I don't remember whether
14 Spark and RRE participated, but I suspect they did.  My
15 guess is maybe that was a $20 million round in total,
16 and so maybe we did seven or eight percent of it.  And
17 we did zero percent of the Series D.  And that's pretty
18 typical of how we would make an investment.
19        So, you know, if you think about the way we
20 would do -- we're an early-stage venture capital firm.
21 So we typically would invest in the C round.  Our entry
22 point in a company would either be in the C round or
23 the Series A round, and we would be taking a meaningful
24 piece of those rounds.  Maybe as much as half or
25 two-thirds sometimes.  It could low as a third, you

1 know, but some meaningful piece of it, right.
2         And then as the follow-on rounds are done,
3 the rounds get bigger, and our participation remains
4 the same or maybe decreases over time.  And so, you
5 know, we build our position early at a relatively low
6 price and we continue to participate for a period of
7 time.  And then at some point we no longer have the
8 capacity to continue to participate in these rounds of
9 financing.  We manage, as I mentioned, relatively small
10 fund sizes.  And if our average investment is something
11 like that 7 or 8 or $9 million, you know, we can't --
12 we can't be taking 20 percent of a Series D of
13 $50 million.  That's larger than the entire position at
14 most of portfolio company.  So that's how we operate,
15 and that's how most early-stage venture capital firms
16 operate.
17    Q   Okay.  That makes -- that makes a lot of
18 sense, and it's very helpful.  Thank you.  I'd like to
19 take you back to sort of the late 2016 time period.
20        What was your view in that time period of
21 the investment in Kik?
22    A   So starting in about 2014, Kik started to
23 run into a number of challenges, and we saw sort of
24 stagnating usage.  We saw companies like Facebook both
25 acquire and also build very large messaging

Page 26

1  applications. We saw the emergence of iMessage,
2  Apple's native messaging platform of the iPhone really
3  start to become dominant.
4       And we also were really struggling with
5  trying to generate revenue for the business because our
6  competitors like, you know, iMessage, and others,
7  didn't contain any advertising. So, you know, we
8  couldn't just load up our app with advertising because
9  it would just make the experience less attractive
10  relative to our competitors. And a lot of our
11  competing -- a lot of our competitors were owned by
12  very large companies who could afford to spend 50 or
13  $100 million a year, you know, managing a very large
14  mobile messaging application without generating any
15  revenue because it was strategic to their overall
16  portfolio of products. We didn't have that advantage.
17       So the company really, I would say, had
18  been going through a very difficult period, and, you
19  know, we -- it was maybe into its third year of that.
20  You know, the Tencent investment was sort of premised
21  upon a big strategic partnership between Kik in the
22  U.S. and WeChat in Asia that never really materialized.
23  So, you know, we sort of came up empty on that.
24       And so we decided to see if there was, you
25  know, a big company in the United States, a big

Page 27

1  Internet company in the United States that didn't have
2  a mobile messenger that wanted to have a mobile
3  messenger or didn't have a popular mobile messenger
4  that wanted to have a mobile messenger.
5       We hired Credit Suisse. We went around and
6  talked to everybody, and, you know, we, essentially,
7  came up empty. And that, you know, is kind of where we
8  were at the end of 2016.
9       Q  Okay. So just -- to make sure I understand
10  your testimony, so is it fair to say that Kik has never
11  really had a significant source of revenue?
12       A  We've tried a lot of things. We've tried
13  being a developer platform, bot platform. We've tried
14  using, you know, various sort of in-app promotional
15  things, not ads per se, but, you know, get coupons and
16  things like that, and we've never been able to really
17  generate any meaningful revenue out of any of that.
18       Q  Okay. So going into -- or coming out of
19  2016 and going into 2017, the idea was to hire Credit
20  Suisse and to find out the buyer for Kik?
21       A  I think we hired Credit Suisse earlier than
22  that. I don't -- I mean --
23       Q  Tell me what you recall about that.
24       A  Well, I don't have a precise recollection
25  of it, but I feel like the Credit Suisse process kicked

Page 28

1  off in the summer or fall of 2016. And I don't really
2  remember, but I think by the end of '16 it was already
3  pretty clear that that process wasn't going very well.
4  And I think we halted it, you know, in the spring of
5  2017. And I think that was a six-to-nine-month
6  process.
7       Q  Okay. So by the time it was halted in late
8  '16, early '17, has it been -- Credit Suisse had been
9  working for about six to nine months?
10       A  I think so.
11       Q  So what was sort of Kik's financial
12  position going into 2017?
13       A  You know, I think we probably went into --
14  I think if you looked at the December 31st balance
15  sheet, you know, maybe we had 30 or 35 million in cash,
16  burning two-and-a-half to $3 million a month. And the
17  thing you have to understand about Kik is even though,
18  you know, by then maybe we only had 20 or 25 million
19  monthly active users, it was a -- it -- that's still a
20  lot of people using it, right.
21       You know, relative to a WeChat or a
22  WhatsApp or a Facebook messenger or an iMessage, it's a
23  10th of the size of those user bases. So, you know, it
24  doesn't look like, you know, a particularly successful
25  application, but, nevertheless, to run a mobile

Page 29

1  messaging app that, you know, 20 or 25 million people
2  are using is an expensive proposition. You've got
3  servers, you've got bandwidth, you've got engineers.
4  You know, you got to keep this thing up and running,
5  and people are -- expect those messages to go through
6  and to go through instantly.
7       Q  The overhead's very high?
8       A  Correct. I mean, regardless of whether you
9  have revenue or not, you've got a cost structure to
10  maintain that. And so, you know, we were spending, you
11  know, a fair bit of money against basically no revenue
12  maintaining the Kik mobile messaging app.
13       Q  Okay. So I think we -- I mean, you're not
14  the first witness to come in here and to help us
15  understand what happened, but I think our understanding
16  is that sort of at the -- going into 2017 that the sort
17  of at the then present rate of consumption Kik was
18  projected to run out of money in the fall of 2017?
19       A  Correct.
20       Q  And have you heard that described as Kik's
21  runway?
22       A  Yeah. That's a -- just a very common term
23  used in the world of startup is cash runway, runway,
24  cash-out date. You know, all companies -- I mean, you
25  know, the startup business is -- I mean, think about

Page 30

1  the startup business.  What is the startup business?  A
2  startup business is you put money into a money-losing
3  business, and the team and the board and the investor
4  group basically work over the course of, you know, some
5  period of time which is 3, 5, 7 years to build that
6  business to get a revenue or a monetization model and
7  then to ultimately get that business profitable.  And
8  these companies face multiple cash-out dates along the
9  way.
10       And so you -- you know, you hope that you
11  can generate enough progress that you can get another
12  round of financing done.  So that's why you have Series
13  A, Series B, Series C, Series D, right.  And so it's a
14  pretty common thing that you'd have a money-losing
15  business that would be running out of money.
16       And then the other things to think about
17  are can you bring in revenue, and how quickly can that
18  revenue start to cover your cost base?  Can you reduce
19  your cost base to extend your runway?  Can you bring in
20  outside capital or potentially can you find a strategic
21  buyer for the business?
22       And so those are -- you know, think about
23  you're like a juggler and you've got all those balls in
24  the air.  And so it's just not one of those; it's all
25  of those, right.  And you're constantly trying to

Page 31

1  manage that, manage your cash-out date, manage your
2  revenue line item, manage your cost structure, managing
3  your financing prospects, managing your strategic value
4  to others.  And then -- and that's what we were doing.
5       Q  So just to make sure that I sort of
6  understand where we're at, so going into 2017, Kik had
7  tried to find a strategic buyer unsuccessful?
8       A  Right.
9       Q  Kik had about 30 to $35 million in the bank
10  to fund its operation?
11       A  Right.
12       Q  Kik was burning about $2.5 million a month;
13  is that correct?
14       A  I think more.  I think it was north of
15  three, and then in the February-March-April time frame,
16  we did a head count reduction and it took it down to
17  about two and a half.
18       Q  I see.  So Kik is -- the runway for Kik,
19  the financial runway for Kik ends in the fall of 2017
20  unless significant reductions in costs are made to
21  extend the runway?
22       A  Yeah.  Right.  But there's a limit to how
23  far we can take down costs.  I mean, we could have
24  potentially cut our headcount maybe in half, but
25  headcount wasn't maybe more than half of all those

Page 32

1  costs.  We had very large infrastructure costs to just
2  maintain the network, the Kik network, right.
3       So even if we would've cut the headcount in
4  half, which we didn't do, I don't think we could have
5  necessarily cut the burn rate.  I don't think there was
6  any scenario in which we could've cut the burn rate
7  below $2 million a month.
8       Q  Okay.  And that was actually my next
9  question that because of the cost of running a
10  messenger app, there should -- the overhead can only go
11  so low and have the messenger apps work?
12       A  Right.  Exactly.
13       Q  Okay.  And is it also fair to say that you
14  and other members of the board were growing sort of
15  increasingly frustrated with Mr. Livingston's performance
16  as a CEO during this time period?
17       A  That is true.
18       Q  Okay.  What was -- and Mr. Livingston, it's
19  Ted Livingston; is that correct?
20       A  Correct.
21       Q  And what was it that frustrated -- I'm
22  talking about you.  I don't -- you don't need to speak
23  for the other members of the board.
24       What was it during this time period that
25  frustrated you about Mr. Livingston's performance as

Page 33

1  CEO?
2       A  Well, Ted's an optimist, you know.  And
3  he's always seeing the bright side of things.  And, you
4  know, the business was not doing well, you know.  And I
5  think that, you know, his mode of operation is always
6  to try something new, you know, try something new.
7  We're going to get -- we're going to do this thing and
8  it's going to work, right.  And, you know, I just think
9  everybody around the company was starting to, you know,
10  lose a little bit of faith in that.
11       Q  Okay.  What was your -- in the same time
12  period, the early 2017 or sort of going into 2017, what
13  was your outlook on the -- on your firm's investment in
14  Kik?
15       A  You know, we were not -- we were not that
16  positive about, you know, the potential value creation
17  of our equity investment in Kik.
18       Q  Now, in sort of other --
19       A  Well, you know, let me just say something.
20       Q  Please.
21       A  I never want to give up on a company.  I
22  never want to give up on a founder.  I never want to
23  give up on a team.  I never want to give up on the
24  users.  You know, there's a lot of people in the
25  venture capital business who would've turned around and

Page 34

1    run the other way from that company by then, and I'm
2    not that kind of investor.
3           I'm going to stick with a company until the
4    bitter end. And I'm going to try like hell to figure
5    out how to make something go of it because that's what,
6    you know, I, as an investor and board member, feel like
7    I owe the founders that we invested in, the companies
8    we invested in, the employees who work at those
9    companies, and the users of those products.
10   Q   That actually sort of anticipates what my
11   next question was. Because we -- you know, in this job
12   I've had the opportunity to talk to a lot of venture
13   capital investors, and there seems to be a general
14   consensus that you want a company to fail fast.
15          And it seems like that is not an investment
16   philosophy that you have; is that correct?
17   A   No. I actually -- you know, if you look at
18   me as just a rational investor, that is absolutely
19   true. It would be way better for Union Square Ventures
20   and me personally for the things that fail to fail
21   quickly and the things to succeed to succeed quickly
22   because that would allow us to invest most of our
23   capital and most of our time in things that are working
24   and not in things that are not working.
25          But I also believe that it's a very

Page 35

1    competitive business, the venture capital business, and
2    you compete every day to get an entrepreneur to take
3    money from you versus somebody else. It's not like the
4    public markets where if you want to buy Amazon, you can
5    buy Amazon. If you want to buy an investment in Kik,
6    you're going to go through a beauty contest, and the
7    entrepreneur's going to pick one or two or three firms
8    and let you do that, right.
9           So you're -- so you have to differentiate
10   yourself in the hearts and minds of entrepreneurs. And
11   I think the only way you can really do that is by what
12   you do after you make your investment, rolling up your
13   sleeves and helping the company. And that is what we
14   do at Union Square Ventures, that. And if you surveyed
15   the market what you would find -- a brand, the brand of
16   me and the brand of all the partners in Union Square
17   Ventures. That is what you would hear. We are
18   supportive investors. We are committed investors. And
19   we stick with our companies.
20          And so it is not rational on, you know, a
21   marginal dollar basis to behave that way, but I think
22   it is actually rational if you're thinking about the
23   lifetime value of a venture capital firm to behave that
24   way.
25   Q   I understand. That's very helpful. Thank

Page 36

1    you.
2           Sort of building on that, how much of your
3    time personally was spent on Kik in this sort of early
4    2017 -- and if you want to talk about it on a monthly
5    or a weekly or a daily basis, whatever basis sort of
6    makes sense.
7           But what you're describing sounds like a --
8    far more than just making a financial investment and
9    saying I really hope it works out?
10   A   You know, they come and -- these things
11   come and go. You know, there are periods of time when
12   you're spending maybe as much as 20 or 30 percent of
13   your time on a specific company. It could even be 50
14   or 60 percent of your time, and then there's times when
15   you're spending like literally one to two percent of
16   your time on a company.
17          It's just these companies need help in
18   waves. And so with that, I would say that while the
19   Credit Suisse process was going on I was not that
20   involved. I was somewhat involved, but not that
21   involved. Once it became apparent that the Credit
22   Suisse process wasn't -- became apparent to me that the
23   Credit Suisse process was not going to succeed, I
24   started thinking a lot about whoa, what are we going to
25   do.

Page 37

1    Q   Okay. And it began to take up a lot more
2    of your time?
3    A   Uh-huh.
4           MR. LEASURE: Why do you think Kik -- you
5    know, the Credit Suisse process didn't work for Kik?
6           THE WITNESS: You know, by 2016, most
7    companies that wanted a mobile messenger had bought a
8    mobile messenger or built one, and the companies that
9    you would think would want one that didn't have one
10   like Amazon, Twitter -- you could argue that Twitter
11   direct messaging is a mobile messenger, but I really
12   don't think that's true. And I just think that, you
13   know, we kind of missed the window where we -- where
14   our strategic value was highest and, you know, we,
15   frankly, waited too long.
16          MR. LEASURE: Got it. So if I can ask you
17   to do an alternative history, and I'm asking you to
18   speculate. Kik in real history raised money through a
19   token offering in 2017, right?
20          THE WITNESS: In 2017?
21          MR. LEASURE: Yeah.
22          THE WITNESS: Right.
23          MR. LEASURE: Let's say it didn't. And the
24   runway, you know, money was still spent and all of
25   that, what would have happened to Kik?

Page 38

1    THE WITNESS: I think it was bought, but it
2  would have been bought in a more challenged type of
3  transaction, you know, maybe a more distressed type of
4  transaction.
5    MR. LEASURE: At a lower valuation than say
6  the earlier rounds of funding that Kik had received?
7    THE WITNESS: Yes. But also, you know,
8  maybe, you know, we would have, you know, slashed the
9  headcount costs. I mean, it would have been, you know,
10  a much more -- I think it would have been kind of a --
11  you know, kind of a challenging type of sale process.
12    BY MR. SCHLEGELMILCH:
13    Q   Fire sale?
14    A   You could use that term.
15    MR. LEASURE: And was that in people's --
16  sorry.
17    Was that in -- was it your sense that that
18  was a prospect that was in Kik's management mind as a
19  possibility in early 2017?
20    THE WITNESS: I can't really speculate what
21  was on Kik management's mind. I can tell you what I
22  thought --
23    MR. LEASURE: Yes.
24    THE WITNESS: -- but I can't tell you what
25  they thought.

Page 39

1    MR. LEASURE: Was that what you were
2  thinking?
3    THE WITNESS: Yeah. I thought that was a
4  distinct possibility.
5    MR. LEASURE: And you -- it sounds like
6  you've been -- you've for a while worked as an early
7  stage -- an early-stage investor in the space for a
8  while?
9    THE WITNESS: Uh-huh.
10    MR. LEASURE: You've seen companies go down
11  that ground before?
12    THE WITNESS: Right. Absolutely.
13    MR. LEASURE: Okay. And I take it that's
14  not -- I mean, I can appreciate from what you're saying
15  there from your perspective and from the founders'
16  perspectives running a business is not just set on the
17  marginal dollar expense, it's also an emotional --
18    THE WITNESS: Right.
19    MR. LEASURE: You know, that is an
20  emotionally unpleasant road to go down.
21    THE WITNESS: Right.
22    MR. LEASURE: The distressed or fire sale
23  process.
24    THE WITNESS: Uh-huh.
25    MR. LEASURE: I take it for the founders

Page 40

1  and the people involved?
2    THE WITNESS: Yeah. Absolutely. I mean,
3  that's not a happy outcome, but it's also not an
4  unusual outcome. I mean, if you think about a venture
5  capital portfolio -- and this is true, I think,
6  probably of every early-stage venture capital -- when I
7  say early-stage, I'm talking about people who invested
8  seed in Series A, but not -- this would not be true of
9  people who typically invest later on.
10    You know, you're going to see at least a
11  third of the portfolio end up being completely
12  worthless. You're going to see another third of the
13  portfolio end up not being worth, you know, a
14  meaningful amount of money, and then you're going to
15  see pretty much 80 to 90 percent of all the value
16  distributed out to the investors coming out of that
17  final third. And it can often be one or two companies
18  that make up, you know, 60, 70 percent, you know.
19    So it is -- and that is true of all venture
20  capital portfolios that I've ever been involved with.
21  It's just -- it's the sort of the plutonium physics of
22  it, the venture capital. It's just -- it's true.
23    So, you know, by, you know, the end of
24  2016, that's where this company was in our portfolio.
25  I mean, you know, I don't know that you subpoenaed our

Page 41

1  schedule of investments, you know, for 2008 fund, but
2  if you did, you know, I don't know where we were
3  carrying at year-end 2016. But it wouldn't surprise me
4  if we'd written it to zero or at least written it down
5  below our costs by then, you know.
6    So, you know, we certainly had it either in
7  that third that's going to not work or headed to that
8  third that's not going to work. And, you know, we're
9  pretty aggressive at taking our write-downs. So, you
10  know, we sort of had made peace with that.
11    MR. LEASURE: I meant to ask this, and I
12  apologize. How often did this fund do evaluation of
13  its Kik holder?
14    THE WITNESS: Every quarter.
15    MR. LEASURE: Every quarter.
16    THE WITNESS: Every company in all of our
17  funds are evaluated every quarter.
18    MR. LEASURE: Okay. But what was Kik, if
19  you remember? It sounds like your estimate in late '16
20  with Kik was at near zero in terms of USV's internal
21  evaluation?
22    THE WITNESS: Yeah, yeah. I don't remember
23  if we -- I know we took the value down below our cost.
24  I don't know if we wrote it to zero, but, you know, we
25  certainly acknowledged that it was, you know, an

1  underperforming investment on our books.
2      Now, we have taken it back to cost.
3      MR. LEASURE:  Is that where it currently
4  is?
5      THE WITNESS:  It is currently at cost.
6      MR. LEASURE:  Okay.  So it's increased from
7  late '16, but it hasn't gone to one of the -- you know,
8  when you say you value that cost, I take it hasn't gone
9  to one of the one third of the portfolio that provides all
10  the return?
11     THE WITNESS:  No.  It's still, you know, a
12  relatively de minimus part of the overall value of that
13  fund.  Whether it's a cost -- you know, some of this is
14  just signalling to our investors, you know.  You know,
15  we also write, you know -- you know, we write something
16  about our companies.  But some of our investors just
17  like to look at the numbers, and they can just kind of
18  tell by looking at the numbers and how things are
19  changing.  Like that in some ways to them is a more
20  efficient way for them to understand what's going on in
21  the portfolio.
22     So we do like to use value.  We're required
23  by GAAP, by the way, to value.  We get audited once a
24  year, right.  So we're not -- we don't have to value on
25  a GAAP basis quarterly, but we typically use the same

1  methodology which is that you should be carrying your
2  investments at what their fair market value is.  That's
3  what GAAP is.
4      BY MR. SCHLEGELMILCH:
5      Q   And it's your memory that in early 2017
6  that USV was carrying it at -- below its cost?
7      A   When?
8      Q   Early 2017.  I don't know what I said, but
9  that's what I meant to say.
10     A   Yeah.  I think that's right.
11     MR. MENDEL:  Do you remember the quarter
12  when you elevated the value of it to cost?
13     THE WITNESS:  I think that after the
14  company completed its ICO we took it back to cost.
15     BY MR. SCHLEGELMILCH:
16     Q   And do you recall during the Tencent
17  investment in the Series D that Kik had been valued at
18  a billion dollars?
19     A   That is correct.
20     Q   Okay.  In late 2016, early 2017 did you
21  think that that was an accurate valuation for the
22  company?
23     A   So we never wrote our investment up to that
24  valuation.
25     Q   So, in other words, you didn't think a

1  billion dollars was accurate for purposes of USV's
2  book?
3      A   We never -- we never valued our investment
4  in -- the equity value of our investment at Kik
5  anywhere near that number.
6      MR. MITCHELL:  Why not?
7      THE WITNESS:  We generally don't -- I don't
8  believe that finance evaluations are indicative of what
9  companies would typically trade at.  And we want to
10  value our investments that -- where companies would
11  trade at because we don't want to have an investment in
12  a company that we're carrying at a billion dollars and
13  then have it sell for $250 million.  That would look
14  very bad, I think, in terms of our, you know, ability,
15  to manage capital for others.
16     MR. LEASURE:  Can you outline for me -- and
17  I don't need specific names.  Can you outline for me
18  the investor base of this particular 2008 fund?
19     THE WITNESS:  It's in the response that we
20  gave you, every single limited partner.
21     MR. LEASURE:  Oh, apologies.
22     THE WITNESS:  But what I would tell you is
23  that about 20 institutions make up about 80 percent of
24  the capital, and then about 100 to 150 individuals make
25  up about 20 percent of the capital.  And the

1  institutions are, you know, what you would expect; it's
2  public pension funds; it's college endowments; it's
3  that kind of thing.
4      MR. LEASURE:  Got it.  But that anticipates
5  my last question on that that it's not an unusual
6  investor base in this space?  This particular fund,
7  would you say it's a typical investor base?
8      THE WITNESS:  I think it's very -- our
9  investor base is very typical.
10     BY MR. SCHLEGELMILCH:
11     Q   And I think you said earlier that you serve
12  on Kik's board?
13     A   That is correct.
14     Q   Okay.  How long have you served on the
15  board?
16     A   Since we made our investments in Kik.  So
17  whenever that was.  It was either 2011 or 2012.  We
18  could actually probably figure that out.  I mean, we
19  probably have it somewhere, but it's since then.
20     Q   And, again, this is just for sort of
21  purposes of cast of characters, in this late 2016,
22  early 2017 time period, who else served on the board
23  with you?
24     A   Paul Holland from Foundation.
25     Q   Okay.

1    A  Jim Estill who is an entrepreneur and Angel
2  Investor in the Waterloo/Toronto region, Ted
3  Livingston, Peter Heinke, and Sam Spadafora who's the
4  chairman of the company who's a Silicon Valley
5  entrepreneur.
6    Q  Okay.
7    A  And I think that's it.  I could be missing
8  somebody, but I think that's it.
9    Q  And Mr. Livingston is the -- was the CEO or
10  is the CEO of Kik?
11    A  He is.
12    Q  And Mr. Heinke?
13    A  Yes.
14    Q  And what -- did he -- he was an employee of
15  Kik, correct?
16    A  CFO.
17    Q  CFO.  I'm going to change gears.  So this
18  is a fine time for a short five-minute break.
19    So why don't we go off the record.
20    THE VIDEOGRAPHER:  Going off the record.
21  The time on the video monitor is 10:25 a.m.
22    (A brief recess was taken.)
23    THE VIDEOGRAPHER:  We are back on the
24  record.
25    The time on the video monitor is 10:36 a.m.

1    BY MR. SCHLEGELMILCH:
2    Q  Welcome back, Mr. Wilson.  You're still
3  under oath.  I'm going to ask you a question that seems
4  ridiculous, and there's a whole sort of apocryphal
5  history about why I have to ask it.  But I have to ask
6  it.
7    And it's:  Did you or any member of the
8  staff -- and by the staff I mean all the people on this
9  side of the table -- have any substantive conversations
10  during the break?
11    A  No.
12    Q  Okay.  Your counsel shouldn't be interested
13  but can tell you the -- sort of the apocryphal history
14  of why that question is asked, but there you go.  Yeah.
15  That's pretty much what I expected.
16    You mentioned prior to the break that you
17  served on the board of Kik.  What are your sort of
18  roles and responsibilities on the board sort of
19  understanding that every board is different and every
20  board member is different?  What do you do for Kik on
21  the board?  What's your role?
22    A  Are you asking what the board's role is or
23  are you asking what my role is?
24    Q  The latter.  But if you need to answer the
25  former to answer the latter, that's fine, too.

1    A  I would say that over the history of the
2  company I probably have been the closest to the product
3  and the strategy and the business model issues.  I
4  think that, other than Ted, of course, and Peter, I
5  have been the director who is probably the most fluent
6  in the market segments that they operate in and
7  provided a lot of counsel over the years to Ted and the
8  management team around those issues.
9    Q  In addition to that sort of informal role,
10  do you serve on any committees of the board or are --
11  does the board have committees?
12    A  The board does have the committees.  I'm
13  not on the comp committee, and I may be on the audit
14  committee.  I think I am on the audit committee.
15    MR. LEASURE:  Can I ask one follow-up?
16    You said -- correct me if I'm wrong -- that
17  you are familiar with the segments that Kik operates
18  in; what did you mean by that?
19    THE WITNESS:  You know, mobile
20  applications, mobile messaging applications,
21  monetization around those sectors, competitive dynamics
22  around those sectors, things like that.
23    MR. LEASURE:  Got it.  Kik runs a messaging
24  app, correct?
25    THE WITNESS:  Correct.

1    MR. LEASURE:  And does it -- does that
2  messaging app from your sense have a particular user
3  base or focus on a particular group or groups?
4    THE WITNESS:  Yeah.  It's mostly young
5  people.  And, you know, it -- it's not so much a
6  utility in the way that maybe iMessage is a utility.
7  People use it more socially than that, which is part of
8  the reason it appeals to the younger audience.
9    MR. LEASURE:  And everyone's younger me.
10    BY MR. SCHLEGELMILCH:
11    Q  Yeah.  I was going to ask the same
12  question.
13    As a 45-year old, what do you mean by
14  young?
15    A  From the minute you get your first phone
16  until you get a real job.
17    Q  All right.  Just to sort of change gears a
18  little bit.  In September of 2017, Kik launched a
19  digital token called Kin, correct?
20    A  Give me the date again, please.
21    Q  Certainly.  The month of September 2017.
22  During that month?
23    A  When you say launched, what do you mean by
24  launched?
25    Q  They had a -- the token distribution event?

1    A   Yeah, that's correct.
2    Q   It sort of went live, the tokens were
3  distributed?
4    A   Right.
5    Q   There was a lot of lead-up to that event?
6    A   Uh-huh, right.
7    Q   And we'll talk about that probably for the
8  balance of the day.
9    A   Right.
10    Q   But the event was in 20 -- was in
11  September 2017?
12    A   Correct.
13    Q   Okay.  Where did the idea of launching a
14  digital token come from?
15    A   Are you asking within the Kik management
16  team where did that come from? I mean, because that
17  idea is out there, you know, broadly in the world.  You
18  know, there's literally, you know, thousands of people
19  who've done something like that now, right.  So you're
20  not asking me like who came up with the idea of doing
21  something like that, are you?
22    Q   I am not asking about who came up with
23  blockchain or the idea of using blockchain.
24    A   Uh-huh.
25    Q   That's been around since -- I don't know --

1  2008, 2009, whenever Bitcoin went live.
2    A   Well, the idea's been around for a lot
3  longer than that.  I mean, the idea's probably been
4  around since the late 90s.
5    Q   Okay.  My specific question -- and I
6  appreciate the clarification for the record.
7        My specific question is:  When did Kik --
8  the management team of Kik begin to think, hey, maybe
9  this is something we should do?
10    A   Ted and I have had conversations about this
11  idea on and off since the early days of Kik.  But, you
12  know, neither of us ever really felt like the time was
13  right until late '16, early '17 when I really started
14  pushing on it as what I thought that in a world where,
15  you know, the large incumbent tech companies have, you
16  know, essentially taken control of the messaging
17  market, we need a disruptive business model here.  We
18  need a way to compete with them on a dimension that
19  they won't compete on.  And we need a revenue model
20  that's fundamentally different than the revenue models
21  that they use.
22        And, you know, I felt that a crypto token
23  could be that.  And we already had, essentially, you
24  know, an MVP of a crypto token with our Kik Points
25  product which was quite popular.  And so, you know, I

1  just felt like, you know, the time had come for us to
2  do it.
3    Q   And why this time -- and I think the time
4  period you're referring to is like late 2016, early
5  '17, why then?
6    A   Look, if we're going to sell the company,
7  we don't need to do it, right.  You know, then whoever
8  buys the company is going to do what they want to do
9  with the business.  And so it made no sense to pivot to
10  an entirely new business model when the plan was to
11  sell the company.
12        But once that was off the table and there
13  really wasn't a strategic buyer who was going to step
14  up and do it, it seemed to me that, you know, we'd
15  tried all the obvious things and, you know, they hadn't
16  worked.  And, on top of that, you know, we were
17  increasingly seeing success stories out there in the
18  crypto market of people, you know, building and
19  launching crypto tokens and people using them to build
20  things.
21        And so it just seemed to me that, you know,
22  we could do it and be the first mobile messenger to do
23  it and that we should do it.  And just, you know, I --
24  it -- you know, all of the reasons that had gotten in
25  the way of us doing it in the past, in my view, had

1  essentially come and gone, and there was no reason not
2  to do it at this point.
3    Q   What were the reasons that had sort of
4  stopped you from doing it in the past or stopped Kik
5  from doing it in the past?
6    A   You know, I mean, probably the first and
7  foremost is that we didn't really have any crypto
8  engineers.  We didn't really have any expertise in
9  building a crypto token and building a blockchain.
10  We -- you know, it was a very material pivot of the
11  business, you know, and there was a lot of risk
12  involved in doing that, right.
13        You know, you stop doing the things that
14  you've been good at and you start doing things that you
15  don't really have any experience doing, and you might
16  just completely fall flat on your face.  And, as I
17  said, you know, if we thought that the likely outcome
18  was that we would get bought, you know, that might
19  become very unappealing to a strategic buyer if all of
20  a sudden, you know, we encumbered the business with a
21  crypto token and a crypto business model.
22        So there was a whole bunch of reasons not
23  do it, but I think most of them, as I said, had sort of
24  come and gone.
25    Q   So it sounds to me, based on your

Page 54

1   **testimony, that you and Mr. Livingston had a series of**
2   **conversations about this; is that correct?**
3       A   Going back to at least 3 or 4 years
4   earlier.
5       Q   Were other people either at Kik or on the
6   **board involved in these conversations?**
7       A   Yeah.  I think that we may have talked
8   about it very briefly at a few board meetings over
9   time, but never very seriously.  And I'm sure that
10  Peter was involved in some of those conversations and
11  probably other members of the Kik management team at
12  one time or another may have been involved in those
13  conversations.
14      Q   How would the issuance or the creation of a
15  **crypto token, as you call it -- how would that help**
16  **Kik?**
17      A   Well, it just creates an entirely new
18  business model.  See, so Kik Points -- we often thought
19  that we could build a business model around Kik Points,
20  that we could get developers to come and build
21  applications or bots inside of the messaging platform,
22  and we could incentivize them with Kik Points and they
23  could earn Kik Points and then they could monetize
24  those Kik Points and that we could also share in that
25  value creation.

Page 55

1           But we never came up with a way to make Kik
2   Points worth anything to anybody because they didn't
3   have any intrinsic value outside of Kik.  And the idea
4   of making them a crypto token that could trade on an
5   exchange and be exchanged for other cryptoassets like
6   Bitcoin or Ethereum or even for fiat currencies would
7   establish a value of what a Kik point was worth.
8           And then developers would be interested in
9   coming and building games or other digital assets
10  inside of Kik and earning those.  And, also, we could
11  earn those.  And we could be in partnership in a way in
12  sort of like a marketplace business model with those
13  developers around that, and that could turn into a
14  meaningful amount of money every month for us that we
15  could use to sustain the cost operating of the
16  platform, which is really -- the fundamental problem we
17  have is that we couldn't pay for the day-to-day cost of
18  operating this messaging platform.  We needed to come
19  up with a way to do that.
20          So for me it was -- it's a business model.
21  And, you know, that's what interests me about this
22  whole sector.  And when I say whole sector, I'm talking
23  about the crypto sector.  In fact, I think it's the
24  next big business model, you know, after banner ads and
25  search advertising and social and in-app purchases.  I

Page 56

1   think the next big business model for the Internet and
2   mobile is crypto tokens, and I was a believer.  And I
3   thought we could be the first messaging app to do it.
4       Q   And is it also fair to say that the
5   **issuance of these -- of a crypto token would also bring**
6   **in either fiat currency or another digital currency in**
7   **the -- when the tokens were sold?**
8       A   That's part of the business model is that
9   you sell the crypto tokens in a Genesis Block sale or a
10  token distribution event or whatever you want to call
11  it.  You raise the capital to get the flywheel going,
12  to fund the business until the flywheel can go.  You
13  also bring a community of buyers to the table, some of
14  those might be developers who build applications, some
15  of those might be users who are incentive to come and
16  earn and spend those things.
17          If you look at Bitcoin, if you look at
18  Ethereum, if you look at the successful crypto tokens
19  that have been merged, there's a -- you know, there's
20  a community buy-in, you know, that goes on, and that's
21  what these token distribution events are all about.
22  And it's putting skin in the game.  It's, you know,
23  getting in.
24          You know, imagine if the first users of
25  Facebook got shares in Facebook.  Imagine how wealthy

Page 57

1   they would be, but they didn't make a dime on Facebook
2   because Mark Zuckerberg and the investors in Facebook
3   and the employees of Facebook got all of that money,
4   and all of the people who made Facebook what it is,
5   which is a social network, didn't make a fucking dime.
6   And that's what crypto token is going to change.
7           The first people in the game are going to
8   make the most money.  That's why Bitcoin, the first
9   minors got the most Bitcoin.  And that's the crypto
10  token business model.  And that's very appealing to me
11  and I wanted to see Kik do it.  And they're not the
12  only mobile messaging app that's doing it now.
13  Telegram is doing it.  Line is doing it.  Even Facebook
14  is doing it, right.
15          So all of the other mobile messaging apps
16  are copying us, but we were the first ones to do it.
17  We wrote the first white paper.  We got there first.
18  We did the first token distribution event.  Now, we're
19  going to have to execute and beat everybody in terms of
20  actually delivering it, which we're working hard on
21  doing but we were the first.
22      Q   Okay.  And so part of the change in
23  **business model is that however much money or fiat**
24  **currency, or either or whatever it is, that is sort of**
25  **taken in in this distribution event is used by Kik in**

Page 58

1   **this instance to sort of fund its -- to keep the lights**
2   **on, to keep the servers humming, and to --**
3       A   And to build out the blockchain and, you
4   know, to build all the security and all the other
5   things that you need to do to do this business model.
6       **Q   And the reason why somebody would get in at**
7   **the ground floor, would get in at this token**
8   **distribution event level is to use the idea that you**
9   **said about Facebook is to sort of get in on the ground**
10  **floor and when it -- to make money.**
11          **When it goes up, everyone goes up?**
12      A   The problem we have in the startup economy
13  is the only people who are allowed to invest in
14  startups are accredited investors and institutional
15  investors, and, yet, the people who are using these
16  products whether it's Facebook or Twitter or Amazon or
17  eBay or Uber or Airbnb or whatever, they can't even
18  invest in these companies.  They're not allowed to.
19  It's wrong.  You guys got to change the rules.
20      **Q   No rules are made on the first floor of**
21  **this building.**
22      A   I understand, but I'm just saying this is a
23  problem.  It's a real problem, and crypto tokens is
24  going to solve this.  That's why we've got to get
25  excited about crypto tokens.  You've got to stop

Page 60

1   advantage.  We want to do the next big thing, and, yet,
2   we don't know how to do it in a compliant way.  There's
3   no rules.  It's a real problem.
4       **Q   So just to sort of dial this back a couple**
5   **minutes.  The idea, as you understood it, was that Kik**
6   **could issue a token, a digital token, and people would**
7   **purchase the digital token and it would be sort of akin**
8   **to getting in on the ground floor of Facebook?**
9       A   Yeah.  But you could also earn it.  You
10  don't have to just purchase it.  You could also earn
11  it.  You could just, you know, use your Kin app, and
12  you could earn it and you could spend it and you could
13  do it that way, too.
14          I mean, this is -- there's -- the beauty of
15  it is you don't have to just buy it.  You can also earn
16  it, right.  But, yes, you can buy it, if you want to do
17  that.
18      **Q   Okay.**
19      A   Not everybody wants to mine Bitcoin, right?
20  Some people just want to buy Bitcoin.
21      **Q   And the idea is that there's a -- there**
22  **would be a finite amount of what became known as Kin?**
23      A   That's a big part of the crypto token
24  business model is that there's a finite amount of it,
25  and no more of that will ever be created so that people

Page 59

1   fighting it, and you've got to start supporting it.
2   Give us guidance.  Give the boards of these companies
3   guidance on how to do a crypto token offering in a
4   proper way.
5           But not just the offering.  What happens
6   afterwards, when they're traded?  But we, the boards of
7   these companies and management companies, are operating
8   without any guidance.  All we can see is Bitcoin did
9   this, Ethereum did this, Tezos did this, BioCoin did
10  this, okay.  That was all cool.  Nobody stopped any of
11  that.  Precedence set.  We're going to follow those
12  best practices and all will be cool.  That's what --
13  that's the only thing we've got.
14          It's not enough.  Guidance.  Give us
15  guidance.  Tell us how to do it.  We'll do it.
16      **Q   Well, I have no guidance for you here**
17  **today.  If -- you're going to be disappointed by a lot**
18  **of things that happen today, but let me get that out of**
19  **the way to start with.  I have no guidance to offer.**
20      A   All right.  Well, in the absence of
21  guidance, we're just stumbling in the dark, and that's
22  really, really bad.  You know, as a board, it's a
23  really, really bad place to be.  We want to execute a
24  crypto token business model.  We want to be able to
25  compete with these incumbents so we have a competitive

Page 61

1   know that the company can't just keep issuing it,
2   right, that there's no -- and that's -- I mean, that's
3   built into -- that's locked and loaded in the
4   technology.  It cannot be changed.
5       **Q   It's sort of infinitely divisible, but it**
6   **cannot be -- more cannot be --**
7       A   Right.  The most famous one is there's 20
8   million Bitcoin, and that's it.
9       **Q   Right.**
10      A   There will never be more than that.
11      **Q   And the idea sort of -- let's say starting**
12  **in like May of 2017 sort of once the idea begins to**
13  **crystallize, the idea is that there would only be --**
14  **what is it -- ten trillion --**
15      A   Correct.
16      **Q   -- Kin?**
17      A   Correct.
18      **Q   And I think it's one trillion Kin would be**
19  **sold in the token distribution event?**
20      A   Correct.
21      **Q   Thirty trillion Kin -- not 30.**
22      A   Three.
23      **Q   Three trillion Kin would go to Kik?**
24      A   Uh-huh.
25      **Q   And -- is that a yes?**

Page 62

1       A   That's correct.
2       Q   And it would be sort of, I think, doled out
3   quarterly for ten quarters?
4       A   Vested.
5       Q   I see.  So it's -- they would get it -- Kik
6   would receive it at the moment of the distribution
7   event, but it would vest quarterly.
8       It would vest quarterly?
9       A   I believe that's -- I mean, I think that's
10  how the smart contract works.  This is encoded in an
11  Ethereum smart contract.
12      Q   Okay.  And then the Kin Foundation -- which
13  we'll spend some more time talking about today.  The
14  Kin Foundation would receive six trillion Kin, correct?
15      A   For the Kin Rewards Engine.
16      MR. MITCHELL:  Earlier I think you had said
17  that after -- sort of after the sale -- after the sale
18  of the Kin tokens, you said, I think, something like
19  we'd still need to deliver.
20      Do I have that right?
21      THE WITNESS:  Right.  Absolutely.
22      MR. MITCHELL:  What do you mean by that?
23      THE WITNESS:  We need to come up with
24  scalable blockchain technology so that thousands, tens
25  of thousands, possibly millions of Kin transactions

Page 63

1   could happen in any given day.  We need to make sure
2   it's secure so that the people who own Kin can securely
3   hold that Kin and know that it's there.  We need to get
4   third party developers on the Kin platform integrating
5   Kin into their applications.
6       We need to get new developers building
7   applications on top of Kin, and we need to get Kin
8   working inside of Kik.  And we need to get, you know,
9   all of the users of Kik earning and spending Kin inside
10  of Kik.  And we're on a road map to do that.
11      We had to build our own blockchain.
12  Ethereum just isn't scaling quickly enough for us to do
13  this on Ethereum.  So we took a blockchain called
14  Stellar, we forked it.  And we're running Kin on that
15  blockchain now.  And we have third party developers now
16  who are integrating Kin into their applications.  So,
17  you know, we're executing on that road map.
18      And I think that we -- we were the first
19  messenger to have a crypto token live in the
20  application.  I think we're going to be the first
21  crypto token to be adopted by multiple mobile
22  applications, and, you know, we've just -- you know,
23  we've got to keep doing that.
24      We've got, you know, a team of engineers in
25  Tel Aviv that's doing all the crypto engineering.

Page 64

1   We've got a team of engineers in Waterloo who are doing
2   most of the work on the Kik side.  And so, you know,
3   we're spending some of the proceeds of the token
4   distribution event on doing that.
5       MR. MITCHELL:  And the people in Tel Aviv,
6   those work for Kik?
7       THE WITNESS:  Correct.
8       BY MR. SCHLEGELMILCH:
9       Q   And let me just -- so you said "we" a lot
10  in that answer.
11      A   Right.
12      Q   By "we," you mean Kik?
13      A   Correct.
14      MR. MITCHELL:  Why do you feel like Kik
15  needs to do those things?
16      THE WITNESS:  Well, we committed to do
17  them, right.  You know, when we -- when we, you know,
18  went to the world with the Kin business plan, that's
19  what we said we were going to do, but that's also what
20  we have to do to make Kin valuable and to make Kin
21  something that can really be a viable business model
22  for us.
23      BY MR. SCHLEGELMILCH:
24      Q   I'm going to mark an exhibit.  We'll mark
25  this as 146.

Page 65

1       (SEC Exhibit No. 146 was marked for
2           identification.)
3       BY MR. SCHLEGELMILCH:
4       Q   I apologize for the copy.  I might kill a
5   million trees today.  I also apologize for the quality
6   of the copies, but I'm going to blame that on Kik.  I'm
7   sure this is Kik's fault.  And it had nothing to do
8   with SEC's technology.
9       So I'm going to -- all I'm -- I'm going
10  to -- I'm going to get very difficult to do -- what I'm
11  going to ask you to do.  But take a minute just to look
12  at this, and I'll read -- I'll sort of describe it for
13  the record.
14      This is an e-mail from Mr. Livingston to
15  William Mougayar -- I'm positive I'm mispronouncing --
16  carbon copied to you dated June 21, 2016 at 9:29 a.m.
17  The Bates number is Kik_00028449.  448 -- no. 449.
18  I'm sorry.  Okay.
19      This is an -- it's an e-mail chain.  So
20  they work the way all e-mail chains -- the list -- the
21  earliest is at the bottom, the latest is at the top.
22      A   Although, I would point out that that's not
23  the case here.  For some reason, my e-mail to William
24  is time-stamped 9:31, and the e-mail at the top is
25  time-stamped 9:29.  That's always puzzled me about this

Page 66

1   one.
2       Q   This is rank speculation, but it may have
3   to do with the fact that some computers are -- what is
4   it -- what's the universal time --
5       A   Right.
6       Q   -- UTC and some computers are local time
7   zone.
8       MR. MITCHELL:  Just another -- are there
9   times you worked in California?
10      THE WITNESS:  Yeah, absolutely.  But not in
11  June.
12      MR. LEASURE:  Take a look at the substance
13  of the text and see if you can come up with a view on
14  the chronology of the e-mails within.
15      THE WITNESS:  I mean, this is an odd one,
16  right, because it starts out with an e-mail between me
17  and William, and the next thing you know, William is
18  talking to somebody and it's not clear exactly who he's
19  talking to.  And then the next thing you know Ted is
20  responding to it.  So I, honestly -- I don't know.  I
21  mean, I vaguely remember this conversation, right.
22      So -- and it's -- clearly, this
23  conversation happened.  I'm not suggesting it didn't,
24  but I'm not entirely sure how this ended up looking
25  like this.

Page 67

1       BY MR. SCHLEGELMILCH:
2       Q   Fair enough.  It is what -- well, we are
3   presented with what we are presented with.  And so let
4   me see if I can ask some questions and we can --
5       A   Okay.
6       Q   -- figure out what you recall about this
7   conversation.
8           First of all, who -- and I know I'm going
9   to mispronounce it, but, miraculously, it'll appear
10  correct on the written transcript -- William Mougayar,
11  how do you pronounce that and who is that?
12      A   I think that's how you say his name, and he
13  is an entrepreneur.  He's an Angel Investor.  He's an
14  author.  He runs a conference called the Token Summit.
15  He's been an advisor to Kik, and he is now a board
16  member of the Kin Foundation.
17      Q   Since when?
18      A   Recently.
19      Q   Like days, weeks, months?
20      A   I would say in the last month-ish.
21      Q   Okay.  Who else is a member of the Kin
22  Foundation board?
23      A   Ted.
24      Q   Okay.  So just Mr. Mougayar and
25  Mr. Livingston?

Page 68

1       A   Correct.
2       MR. MITCHELL:  Who picked Mr. Mougayar?
3       THE WITNESS:  Why did the Kin Foundation
4   pick him versus anybody else?
5       MR. MITCHELL:  No.  Who?
6       THE WITNESS:  Who picked him?  That's a
7   great question.  I'm not entirely sure, actually.
8       MR. MITCHELL:  Do you know anyone who was
9   involved in making the decision?
10      THE WITNESS:  Well, I mean, this was a
11  decision that has been going on for a long time about
12  who would be a good board member for the Kin
13  Foundation, but I don't know the answer to technically
14  who appointed him to it.  I don't know the answer to
15  that.
16      BY MR. SCHLEGELMILCH:
17      Q   And the discussion, is that discussion of
18  Kik personnel and board members, is that discussion
19  among --
20      A   Yeah.  And management team members and
21  other investors in Kin, people in the Kin community.
22  You know, it's a broader group of people than that.
23      Q   Okay.  Putting aside the -- sort of the
24  discontinuity in time in this document, do you recall
25  reaching out in approximately June 2016 to Mr. Mougayar

Page 69

1   and sort of relaying to him that Mr. Livingston is
2   thinking about a Genesis block sale of Kik Points?
3       A   I do.  And the reason I reached out to
4   William was that William was an early advisor to
5   Vitalik Buterin, and the Ethereum Foundation and was
6   very familiar with how Ethereum did their Genesis block
7   sale.  And this was one of those moments where Ted and
8   I were kind of talking about, you know, could we turn
9   Kik Points into a crypto token.  And I wanted to get
10  William's take on that.
11      Q   Okay.  And did -- we'll see -- we see it
12  here and we'll see it a couple other places.
13          What is a Genesis block sale?
14      A   It's the first -- it's like saying okay,
15  we're going to get a token live and we're going to --
16  the way we're going to do it is we're going to sell --
17  like we're going to sell some tokens to a group of
18  people, and then once those people have it, they can
19  start trading and the token will be a thing.  Like it's
20  kind of the bootstrap mechanism.
21      Q   The moment?
22      A   Right.
23      Q   Okay.  The moment where it becomes a thing?
24      A   Right.
25      Q   Okay.  And Mr. Mougayar responds to you and

1 maybe to Mr. Livingston.  And he asks, "Why do you want
2 to do this?  What is your understanding of the
3 benefits," among other things.
4       Do you recall -- and then Mr. Livingston in
5 the top e-mail writes that it's a way to raise capital;
6 do you see that?
7       A  I do.
8       Q  And do you recall that being consistent
9 with sort of the rationale during this time period of
10 why Kik would issue a crypto token?
11      A  I mean, clearly, that's what Ted wrote.
12 And so I'm not going to, you know, try to, you know,
13 get inside his mind about, you know, what he saw the
14 benefits of it were, but I don't think that that was
15 the only benefit to doing something like this.  And nor
16 do I think Ted thought so either.
17      Q  Okay.  But it was a benefit?
18      A  Absolutely.
19      Q  What were the other -- and during this time
20 period -- because I suspect that you're sort of
21 thinking on it --
22      A  Right.
23      Q  -- has sort of crystallized over time.
24       In the June 2016 time period, what were --
25 what was in your mind of being a benefit of doing a

1 crypto offering?
2       A  To get Kik Points to have real value to
3 developers and users and not just sort of phantom
4 value.
5       Q  And why is that a benefit to Kik?
6       A  Because then Kik Points could become our
7 business model that we could then operate a business, a
8 marketplace, if you will, and we could, you know, tax
9 it, you know.  And if you think about like businesses,
10 eBay, Etsy, Uber, Airbnb, you know what people are
11 basically doing in a -- probably, you know, the most
12 fundamental Internet business model -- is create a
13 marketplace and you as the operator of the marketplace
14 tax it, and that's your business.
15      Q  And by tax it, you mean impose some sort
16 of --
17      A  A take rate.
18      Q  Or a transaction cost or whatever you want
19 to call it?
20      A  Right, exactly, exactly.
21      Q  Okay.  And that was sort of -- I'm just
22 trying to make sure I understand how what you just said
23 relates to this document.  That's your understanding of
24 one of the ways the business model works is that you
25 raise capital through the initial offering or the

1 Genesis sale --
2       A  Right.
3       Q  -- and then also Kik would have a -- I
4 think you said a take rate --
5       A  Yes.
6       Q  -- on each transaction?
7       A  Correct.  And that's really -- you know,
8 how do we get Kik Points to be a business model?
9 Step 1 is make Kik Points with something.  Step 2 is
10 get people developing third party applications where
11 users can earn and spend Kik Points.  Step 3 is take a
12 take rate on that.  Step 4 is build this massive
13 economy inside of Kik.  Step 5 is become profitable.
14      Q  And all of those steps require sort of the
15 raising of capital through the Genesis offering?
16      A  Well, it requires the establishment of a
17 market value, and there is no way to get a market value
18 unless there are buyers and sellers of it in an
19 exchange environment.  And the only way -- the best way
20 to do that is to do a Genesis block sale and to
21 bootstrap that.
22      Q  What do you mean by bootstrap that?
23      A  You need some way for Kik Points -- in this
24 case we'll just call it Kik Points or we can call it
25 Kin, it doesn't really matter -- to have some market

1 value to be worth $0.10 or a dollar or $50 or whatever.
2       I mean, we can't just say that.  I mean,
3 you can't just say well, now we believe that Kik Points
4 is worth $0.10.  You need the market to establish that,
5 and the only way to do that is to sell some and then to
6 have exchanges operating where those things are traded.
7 And people can look at that and say oh, Kik Points is
8 trading today at $0.10.  They must be worth $0.10.  I'm
9 happy to earn Kik Points because I now know that I
10 could sell them for $0.10.
11      Q  And by exchanges, you mean places where you
12 can exchange Kin for another -- for Ether or Bitcoin or
13 fiat currency?
14      A  Exactly.
15      Q  Okay.  And so it's -- sort of the idea of
16 an exchange is -- or not the idea -- the existence of
17 an exchange is sort of a necessary precondition to all
18 this working?
19      A  Absolutely.  And that's the amazing thing
20 about what's happened, right.  You know what has
21 happened is Bitcoin has come along and exchanges got
22 built up where people could exchange with my Bitcoin
23 and then they could exchange Bitcoin for dollars or yen
24 or euros.  And then Ethereum came along and the same
25 thing happened.  And now we have thousands of

Page 74

1  cryptoassets out there that have come along that can
2  get exchanged.
3       So now we have this economy, this crypto
4  economy that exists that allows people to execute this
5  business model.  That's the greatest thing that's
6  happened in the tech sector in -- since the invention
7  of the Internet.
8       Q   And returning to Kin, we talked about the
9  ten trillion Kin that exists, the finite number of Kin.
10  And the idea is -- I think to build on what you just
11  said, the idea is that each of those Kin are fungible.
12  And what I mean by that is there are no preferred Kin?
13       A   A Kin is a Kin is a Kin.
14       Q   And the Kin that, for example, Kik owns,
15  the three trillion Kik -- the three trillion Kin that
16  Kik owns, that Kin is worth exactly the same as the Kin
17  that Mr. Mitchell, you know, gets by answering a
18  Dunkin' Donuts survey?
19       A   Correct.
20       Q   Okay.  Now, this e-mail is dated June 2016.
21  I think your testimony was that you recalled some
22  generalized discussion about a cryptoasset prior to
23  this time period?
24       A   As I said, there was an on-again, off-again
25  conversation about could we do something like this

Page 75

1  going back to maybe as early as 2012, 2013, you know.
2  And, you know, Ted and I always thought that like it
3  would be a great thing to do, but then we were always
4  daunted by how hard it was.  And you know, what
5  happened is it got easier and easier.
6       The big thing that happened was that a
7  standard was built on top of Ethereum called ERC-20
8  that allowed you to build a token, a crypto token on
9  top of Ethereum.  And I don't know when that emerged
10  but it emerged sometime in 2016.  And that really
11  fuelled the creation of new crypto tokens and the sale
12  of these crypto tokens and the trading of these crypto
13  token.  And we all know that and you can just look at
14  it and see it.  Boom.  That -- that, you know, was such
15  a -- I mean, all it was was just a speck, you know, 50
16  lines of code, 100 lines of code and, yet, what it's
17  unleashed is just unbelievable.
18       Q   So what happened -- to the extent you
19  recall, what happened after this June 2016 e-mail?
20       A   Nothing because we were doing a sale
21  process.
22       Q   And by that you mean through Credit Suisse?
23       A   Yeah.  Just was not -- this never got any
24  real, you know, mindshare inside the company.
25       Q   Okay.  Let me -- let's mark another

Page 76

1  exhibit.  This will be 147.
2       (SEC Exhibit No. 147 was marked for
3       identification.)
4  BY MR. SCHLEGELMILCH:
5       Q   And while you're reading, I'll just read it
6  into the record.  This is an e-mail from you to
7  investment team dated January 15th, 2017, at 7:09 a.m.
8  And it is forwarding an e-mail that you sent to
9  Mr. Livingston earlier in the day, just five minutes
10  earlier, six minutes earlier.  And it's -- the Bates
11  number on it is USV 0008290 and 91.
12       Have you had a minute to look at it?
13       A   Yeah.
14       Q   Oh, great.  You looked like you were lost
15  in thought.
16       A   No, no, no, no.  Just pondering who Bates
17  was.
18       Q   Bates is a machine that in the olden days
19  were used to -- it was the machine that stamped --
20  physically stamped documents.  So now any number -- any
21  sequentially numbered thing at the bottom of the
22  document is called a Bates number.
23       A   Presumably, Bates was the man or woman who
24  invented the machine?
25       Q   Or the company that made -- that sold the

Page 77

1  machine, but it was like a physical stamp.
2       A   Got it.
3       Q   That's basically what I learned working at
4  a law firm.
5       So I think that this e-mail sort of picks
6  up nicely where you left off in the story that after
7  the -- after your June exchange with Mr. Mougayar and
8  Mr. Livingston sort of nothing happened until --
9  because the Credit Suisse process was going on; is that
10  correct?
11       A   Yes.
12       Q   And in your e-mail to investment team --
13  and just a little -- to pause there.
14       What is the investment -- it says, "to
15  investment team."
16       What is that?  Is that an e-mail group?
17       A   Yeah.  It's the subset of the team at USV
18  that actively works on investing that would be as
19  opposed to the finance team or the admin team.
20       Q   Okay.  And do you recall who was a member
21  of that group, like the names of the people that --
22       A   Well, it changes because, obviously, people
23  come and go.  But in January of 2017, it would have
24  been the five partners we had then.  Rebecca Kaden
25  joined us in roughly October, November of '17.

Page 78

1    So the five partners being myself, Brad
2  Burnham, Albert Wenger, John Buttrick, Andy Weissman;
3  plus, Carrie Rachlin, who runs our finance team;
4  Bethany, who runs our portfolio network; Lauren, who
5  works with Bethany on our portfolio network; and then
6  our analysts who -- and Nick Grossman, who does a lot
7  of things for us, sort of a utility infielder type of
8  role; and then our analyst team who is -- at the time
9  was Joel Monegro, Jacqueline Garavente, and Jennifer
10  Campbell.
11    MR. LEASURE:  Do all of the individuals
12  you've mentioned, the partners, the analysts, I think
13  the finance team you might have mentioned, too -- at
14  the time, did all of them work on Kik and the Kik
15  investments?
16    THE WITNESS:  No, no.  But, you know, our
17  culture is that we share information with each other.
18  We support each other on our investments.  So, you
19  know, my job as a board member is enhanced by input
20  from the investment team, largely from the partners,
21  probably an 80/20 thing but to some extent the other
22  people on the investment team.
23    MR. LEASURE:  So is it fair to say that
24  within USV, you were the point person for the Kik
25  investment?

Page 79

1    THE WITNESS:  Absolutely.
2    MR. LEASURE:  Okay.  And I take it some of
3  the other partners were point people for other --
4    THE WITNESS:  Every investor has a point
5  person.
6    MR. LEASURE:  And so they, in turn -- I'm
7  making up a company that has a point person, right?
8    THE WITNESS:  Right.
9    MR. LEASURE:  One of the other partners
10  might be the point person for ABC company?
11    THE WITNESS:  Right.
12    MR. LEASURE:  They would forward you an
13  e-mail about ABC company?
14    THE WITNESS:  All the time.
15    MR. LEASURE:  And it wouldn't be to get
16  your advice or input on ABC necessarily --
17    THE WITNESS:  No.  It might be though.
18    MR. LEASURE:  Okay.  But it also could be
19  just so you see what's happening generally in the world
20  or --
21    THE WITNESS:  Yeah.  You might say it
22  serves a lot of purposes, but the primary purposes are
23  information sharing throughout the firm and
24  solicitation of advice and counsel from the investment
25  team, largely the partners, sometimes others.

Page 80

1    MR. LEASURE:  So any time we see someone at
2  USV forwarding something to the other partners and the
3  investment team, it could be on an FYI basis, it could
4  be to seek advice?
5    THE WITNESS:  I would say that -- yes.  It
6  serves both functions.
7    MR. LEASURE:  Okay.  It just depends on the
8  context of the e-mail?
9    THE WITNESS:  Right.
10    BY MR. SCHLEGELMILCH:
11    **Q  Returning to the text of your e-mail, you**
12  **write at the very top, "I participated in a call with**
13  **Credit Suisse on Friday in which we learned that the**
14  **Kik sale process is doing poorly with most of the**
15  **target buyers having passed in the last two weeks**
16  **setting a number of things including declining user**
17  **numbers, a large team with no revenues, heavy losses to**
18  **absorb, and messaging not being strategic or they**
19  **already have one."**
20    **What I -- my first question -- I think you**
21  **talked about it quite a bit already this morning --**
22  **but -- is:  Who do you recall Credit Suisse reaching**
23  **out to during this process or which companies or**
24  **potential buyers?**
25    A  We talked to all the usual suspects.  I

Page 81

1  mean, the big Internet companies, Facebook, Apple,
2  Google, Amazon.  We talked to Twitter.  We talked to
3  some of the other messaging apps like Vine, and
4  Tencent, WeChat who was already an investor in the
5  company.  More than that for sure.  Maybe we talked to
6  some of the big tech companies like Microsoft and IBM.
7    I mean, I don't have the exact list in
8  front of me, but, you know, it was more than ten,
9  probably less than 25.
10    **Q  Okay.  And you recall that the process, it**
11  **went poorly?  Everyone sort of passed?**
12    A  Right.
13    **Q  One of the things I don't think we've**
14  **talked about today is declining user numbers.**
15    **Do you recall what the situation was with**
16  **user numbers with Kik?**
17    A  Yeah.  I mean, we peaked in terms of our
18  monthly user count in probably 2014 or 2015 at maybe 40
19  or 50 million monthly users, and by this time maybe we
20  were at 25 million-ish.  So it'd come down a fair bit.
21    **Q  Okay.  And it was continuing to trend --**
22  **plateau or trend down?**
23    A  Correct, correct.
24    **Q  Okay.  You next write, "Ted and his team**
25  **are going to figure out how to restructure the business**

Page 82

1 in light of that. At this time, we have enough cash to
2 get the company through the summer."
3     I think we've already talked about the cash
4 situation and the burn rate and sort of there wasn't
5 much to do about the burn rate because of the cost of
6 operating the business; is that right?
7     A  Correct.
8     Q  What do you recall Ted and his team trying
9 to figure out about how to restructure the business
10 during this time period January 2017?
11    A  I mean, we were obviously looking at
12 headcount reductions, and, you know, what we could
13 actually part with and what we absolutely needed to
14 have. There was also a conversation about getting off
15 of our own infrastructure. We were still running at
16 the time -- were still running Kik on our own server
17 infrastructure. That's no longer the case. We now got
18 in the cloud at, I think, Amazon, but I'm not sure. I
19 mean, it could be at Google or Microsoft, but I think
20 it's at Amazon now.
21        And that had long-term potential to save
22 some real money, but actually in the short run was
23 going to cost us money. And, you know, there may have
24 been some other -- other things that we could do, but
25 we were just looking at everything and asking can we

Page 83

1 run this less expensively.
2     Q  Okay. And it looks like your response to
3 this was to send an e-mail to Mr. Livingston earlier in
4 the day and advocating for sort of a pivot to the
5 issuance of a crypto token; is that right?
6     A  Yep. I mean, that's what I wrote to my
7 partners. "I sent the e-mail to Ted this morning.
8 I've been advocating for this monetization strategy for
9 a while now, but I'm going to push harder for it."
10    Q  And I think a lot of this we talked about.
11 Some question -- there's some things I'm not sure I
12 understand.
13        If you look on the second page, you have a
14 number of bullets. I think it's 1 through 8. And I
15 have some questions about some of these, specifically
16 number six.
17        "Get an exchange like Poloniex to create a
18 market in BTC" -- which I think is Bitcoin -- "slash
19 Kin token so that Kik token becomes a traded asset and
20 establishes a market value."
21        What is Poloniex?
22    A  It was one of the popular exchanges at the
23 time.
24    Q  Okay. So where did -- what are you
25 suggesting needs to happen here?

Page 84

1     A  Just we got to get it all in exchange, and
2 I think we talked about this. And I think that's
3 fundamental because unless Kik Points had a valid
4 third-party established market value nobody was going
5 to want to, you know, earn it. Like it just -- you
6 know, earning fake money wasn't appealing to people,
7 but earning real money is appealing to people.
8     Q  In Kik -- I mean, I don't mean to be
9 pejorative, but Kik Points were in a way sort of fake
10 money?
11    A  Correct, correct. I mean, it's true of
12 video games, right. You play video games and you earn
13 virtual goods, but those virtual goods are not worth
14 anything outside the video game. So there's --
15    Q  Unless you're a 12-year-old boy.
16    A  Right. But imagine a world in which those
17 virtual goods are going to be valuable outside of video
18 gaming. That's where this is going. And I think
19 that's just going to -- I just think it's going to 10X
20 the potential value of the video game business.
21        When you can earn something in Fortnite or
22 something and then you can take it to -- when you're
23 done playing, you've spent your 10,000 hours of
24 obsession and you just go and you take your entire, you
25 know, set of assets that you've earned and sell them.

Page 85

1        It's going be -- I think it's going to
2 really -- it's going to be like a huge next up leg in
3 the video game business.
4     Q  I have a 12-year-old boy, and this is like
5 music to his ears.
6        In 8, you write, "Launch a token offering
7 in which Kik sells a certain number of these Kik tokens
8 to investors for USD" -- which, I think, is U.S.
9 dollars -- "to fund the business."
10    A  Right.
11    Q  And I think we talked about this a little
12 bit earlier, and that the idea is that whatever token
13 gets issued has to be finite. There has to be a
14 certain number of them?
15    A  Uh-huh.
16    Q  Is that correct?
17    A  Yes.
18    Q  The other rule I should've mentioned at the
19 beginning, which I'll blame your counsel for not
20 prepping you on, you have to answer orally. So it's
21 not like a regular conversation.
22    A  Okay. Gotcha.
23    Q  And so I'll be rude and I'll say --
24    A  Okay.
25    Q  -- you mean yes, but that's -- anyway.

1          So the idea is that whatever cryptoasset
2    Kik issues has to be finite; is that correct?
3          A   That is correct.
4          Q   Okay.  And that -- that's -- the revenue
5    receipt from the sale of these assets would be used to
6    fund the business to extend the runway for Kik?
7          A   Right.  It's interesting you say that.
8    That is exactly how Kik accounted for these dollars.
9    We -- it was accounted for as revenue.  Not as -- like
10   when you do a venture capital financing and you sell
11   you know ten percent of your company and you bring in
12   $20 million, you don't book it as revenue on your
13   financial statements.  You book it against your capital
14   account and your balance sheet.
15         But when Kik did this $100 million, we
16   booked it as revenue because it was a sale of assets,
17   not a sale of equity.  And that's -- and we paid taxes
18   on it.  You know, it's a taxable event.  You know, we
19   have net operating losses.
20         So what we really did was we burned through
21   all of our net operating losses, but that's the
22   accounting treatment.  It's a sale of assets, not a
23   sale of equity.
24         Q   Okay.  Let me hand you what we'll mark as
25   148.

1          (SEC Exhibit No. 148 was marked for
2          identification.)
3    BY MR. SCHLEGELMILCH:
4          Q   And this is an e-mail string.  The Bates
5    number is Kik_00026346 through 48, and the top e-mail
6    is an e-mail from Mr. Livingston to Mr. Wilson and Jim
7    Estill dated January 17th, 2017 at 9:44 a.m.
8          Take a minute to read this over.  Okay.
9    The bottom portion of the e-mail is your sort of bullet
10   points to Mr. Livingston that we looked at in the
11   earlier exhibit?
12         A   Right.
13         Q   And Mr. Livingston responds and you have
14   a -- sort of an e-mail exchange about this idea.  And
15   in the e-mail, dated January 17th, 2017 at 6:55 a.m.,
16   you suggest that Mr. Livingston contact Jake Brukhman
17   in New York City?
18         A   Yep.
19         Q   Who is Mr. Brukhman?
20         A   He is a principal of a firm called
21   CoinFund.  I'm not sure that CoinFund was a thing back
22   in January of '17.  I'm not entirely sure if that had
23   been established, but he was introduced to me by an
24   analyst who worked for us at the time named Joel
25   Monegro.  And Joel thought that Jake would be a good

1    consultant for Ted to hire to help him execute this
2    eight-part strategy that I had laid out.
3          Q   Okay.  And you provided Mr. Livingston with
4    something that Mr. Brukhman had written; is that
5    correct?
6          A   Correct.
7          Q   Where is that from?
8          A   I don't recall.  But it was a
9    cut-and-paste.
10         Q   It looks like a cut-and-paste.
11         A   Right.
12         Q   Why did you provide this to Mr. Livingston?
13         What was it about this cut-and-paste that
14   you thought he needed to read?
15         A   I think what this is about is -- the
16   about -- the about -- moving away from
17   centrally-controlled companies like Facebook and Google
18   into more community-owned-and-operated networks, and,
19   you know, that's, you know, something -- I mean, you've
20   heard me talk about this a little earlier.  It's a
21   powerful idea, one whose time has come.  And, I mean, I
22   wanted Ted to see that other people were thinking about
23   this and I thought the way that Jake had described it
24   was quite good.
25         Q   Okay.  And it's this idea of a

1    decentralized ownership model, I guess, is the way he
2    put it?
3          A   Correct, correct.
4          Q   Okay.  So then Mr. Livingston responds to
5    your e-mail on January 17th, 2017, at 9:44 a.m., and,
6    essentially, he lays out what he sees Kik's options are
7    at this point.  There's of the cryptoasset idea
8    that your -- that you've proposed, and then three other
9    options.
10         A   Uh-huh.
11         Q   Cost reductions, revenue, or, essentially,
12   sell the assets or sell the company.
13         A   Uh-huh.
14         Q   So those are the four options that Kik
15   really has in front of it; is that correct?
16         A   Yeah.  I mean, I'm not sure that they are
17   mutually exclusive.  You know, I mean, we could do some
18   cost reductions.  We could do some revenue, and we
19   could get some investment, right.  And that might --
20   that group of things together might be the answer,
21   right.
22         So I just -- I'm trying to kind of make a
23   point that he may have laid it out like we can either
24   do cost reductions or revenue or invest and sell, but
25   the answer probably was some combination of all of

Page 90

1   that.
2       Q   I see. Was it your view during this time
3   period of January 2017 or even after that the issuance
4   of a digital token by Kik was sort of a Hail Mary to
5   save the company?
6       A   I'm not sure that I would say to save the
7   company, but at this time in January of 2017, I did not
8   anticipate the market for crypto tokens to explode the
9   way it did. And so I definitely felt that it was a
10  long shot in January of 2017.
11      Q   I see. Okay.
12          MR. LEASURE: The market exploded later on
13  in the year, from your perspective?
14          THE WITNESS: Yeah. I mean, we can go look
15  at the data, but if you look at the amount of money
16  that was raised in token sales each month over the
17  course of '17, you know, it kind of went like this
18  (indicating).
19          MR. LEASURE: Right.
20          THE WITNESS: Right.
21          MR. LEASURE: Upward curve. So giving it
22  an upward curve?
23          THE WITNESS: Correct.
24          MR. LEASURE: I take it as -- moving the
25  camera forward slightly, I take it as you saw that, did

Page 91

1   that give you more confidence in the prospects for a
2   token project for Kin?
3           THE WITNESS: I -- look, I mean, to be
4   clear, I wanted Kik to convert to a crypto-token-based
5   business model, first and foremost. The sale of crypto
6   tokens is essential to executing that business model.
7   The amount of money you raise in the sale of crypto
8   tokens is not that essential, right.
9           So you have -- you know, we talked about
10  this a bunch. You have -- it's a piece of what it
11  takes. You've got to get a market established for the
12  crypto tokens. Best way to do that is to do a Genesis
13  block sale. I think Ethereum raised somewhere between
14  10 and $20 million in their Genesis block sale. I
15  don't think it was a lot of money, and Ethereum is now
16  worth 20 billion or 30 billion or something like that.
17          So I never thought that you have to raise a
18  lot of money in that, and I didn't think, you know, at
19  the time I wrote this that we could raise a lot of
20  money in doing that.
21          What I did think was that if we could get
22  Kik Points to have real value as opposed to in-game
23  value or in-app value that that could unlock a real and
24  sustainable business model that could keep the Kik
25  messenger as a real, live, profitable business and that

Page 92

1   short of that -- I mean, I didn't think that there was
2   -- anything else was going to get us there. And I was
3   really advocating for that path. And the board and the
4   management team were thinking about it as one of our
5   options, but I was really pushing on it hard.
6           MR. LEASURE: So I think I understand your
7   testimony. I want to make sure I do. It sounds like
8   you wanted -- you wanted and pushed for Kik to move to
9   a token model for its business?
10          THE WITNESS: Correct.
11          MR. LEASURE: And you wanted that
12  regardless of whether it would raise a little or a lot
13  of money in a Genesis or a token distribution of that?
14          THE WITNESS: Absolutely.
15          MR. LEASURE: Okay. But the amount of
16  money -- I want to go back to some earlier parts of
17  your testimony.
18          The amount of money Kik raised wasn't
19  wholly immaterial, if I understand right?
20          THE WITNESS: Yeah. I mean, it's -- it's
21  a -- it's an exercise in how much money it actually
22  costs to run the business, how quickly can we get a
23  token economy operating inside of Kik, how highly we
24  can tax that to actually book our own revenue, and will
25  that cover whatever the cost structure is we think we

Page 93

1   need to manage the business and how long is that going
2   to take.
3           MR. LEASURE: Right.
4           THE WITNESS: And how much cash do we have
5   now and how much incremental capital might we need to
6   execute that, right.
7           MR. LEASURE: Right.
8           THE WITNESS: That's a spreadsheet. You
9   know, we can sit there and make that spreadsheet. And
10  depending on what your assumptions are, you know, that
11  number could be 10 million, that number could be 50
12  million, right. It all depends on a whole bunch of
13  variables in terms of how optimistic you are and how
14  quickly you think you can do it, all that kind of
15  stuff.
16          MR. LEASURE: Got it.
17          BY MR. SCHLEGELMILCH:
18      Q   So like Goldilocks, it has to be just
19  right?
20      A   I don't get that analogy.
21      Q   Well, you can't be too hot. You can't be
22  too cold. It has to be just right?
23          MR. LEASURE: To be clear, transforming Kik
24  as a messaging app business in early '17 into a
25  decentralized token-based business, that doesn't happen

Page 94

1  overnight, correct?
2       THE WITNESS: Correct.
3       MR. LEASURE: And it doesn't happen for
4  free?
5       THE WITNESS: Correct.
6       MR. LEASURE: You can't snap your fingers?
7       THE WITNESS: Correct.
8       MR. LEASURE: And it didn't happen at the
9  time, in fact, of the token distribution event, right?
10      At the time of the token distribution
11  event, would you agree that Kik wasn't a fully
12  decentralized token-based business?
13      THE WITNESS: It's not that even now.
14      MR. LEASURE: Right.
15      THE WITNESS: I mean, we have a road map to
16  get it there, but it will take time. I mean, you know,
17  there's two ways to do this. There are the projects
18  that start out day one decentralized, like Ethereum,
19  and then there's the projects like Kik and Telegram and
20  others that start out mostly centralized and have a
21  path to get decentralized. I don't think we yet know
22  which of those two pathways is going to be the better
23  path way, but I think both are viable.
24      MR. LEASURE: I can see that. And then
25  closing the loop here then in terms of understanding

Page 95

1  the importance of the -- importance or the unimportance
2  you would place on the amount of money Kik could happen
3  to raise in a token distribution, the money it could
4  raise would enable it to have funds, resources, and
5  time to transform the business into a decentralized
6  token-based business, right?
7       THE WITNESS: Correct.
8       MR. LEASURE: Got it.
9       BY MR. SCHLEGELMILCH:
10      Q  We've been going for another hour. Unless
11  you'd like a break, my preference would be to do
12  another 20 or 30 minutes and to break for lunch.
13      But if you would like a break or your
14  counsel would like a break?
15      MR. CADIGAN: That's fine. 20, 30 minutes?
16      MR. SCHLEGELMILCH: This will be an actual
17  20, 30 minutes, not like a just --
18      THE VIDEOGRAPHER: Actually, if could do
19  just a quick tape change?
20      MR. SCHLEGELMILCH: Oh, then, why don't we
21  go off the record. We'll change the tape.
22      THE VIDEOGRAPHER: Going off the record.
23  The time is now 11:39 a.m.
24      (A brief recess was taken.)
25      THE VIDEOGRAPHER: This begins disc number

Page 96

1  two. We are back on the record. The time on the video
2  monitor is 11:41 a.m.
3       BY MR. SCHLEGELMILCH:
4       Q  I'd like to go back to CoinFund.
5       Did Kik eventually hire CoinFund?
6       A  Yes, they did.
7       Q  Okay. What did CoinFund do for Kik?
8       A  I would say they were a consultant. They
9  helped the -- so one of the issues we had at Kik that,
10  you know, prevented us from jumping on this idea
11  sooner, say, in '14 or '15 or '16 is that we really
12  didn't have a lot of crypto-domain expertise in the
13  company. And so CoinFund really helped supplement the
14  management team in their knowledge of the market, how
15  one would build a crypto token, how to think about, you
16  know, what blockchain to use, how to secure it, how to
17  implement it, you know, how to think about how much of
18  the token to sell, how much of the token to retain, how
19  much of the token to reserve for the community.
20      You know, just the whole litany of issues
21  that the company needed help -- and we needed to move
22  quickly or we weren't -- we didn't have a year to
23  figure out all this stuff. We had to figure it out in
24  the span of a couple months. So they were really quite
25  helpful in doing that.

Page 97

1       Q  Okay. And one of the things, I think, you
2  said is that CoinFund did a market survey; is that
3  correct?
4       A  They did do a market survey.
5       Q  Okay. Did you see that?
6       A  I'm sure that it was circulated to the
7  board.
8       Q  Okay. And do you recall thinking to
9  yourself like that the survey was flawed or didn't make
10  any sense or did you find it helpful?
11      A  You know, I did -- you know, I did not
12  spend a lot of time on it, to be honest. I think it
13  was very helpful for some of the other board members
14  who weren't as familiar with this market as I was, but
15  I don't remember spending a lot of time with it.
16      Q  With the market survey portion of what
17  CoinFund did?
18      A  Right.
19      Q  I see. But you think that other board
20  members probably did because they were less familiar
21  with the space?
22      A  Yeah. I mean, we had a bunch of people on
23  our board who had never been involved with a crypto
24  company, crypto project or anything. I mean, they had
25  never -- this was all new to them.

Page 98

1    Q   Like for instance, Mister -- I'm going to
2   mispronounce his name -- Mr. Spadafora?
3    A   Uh-huh.
4    Q   How do you pronounce that?
5    A   I'm not sure.
6    Q   Okay.
7    A   Sam.  I call him Sam.
8    Q   Thank you.  Did he -- is he one of the
9   people you're referring to?
10   A   Yes.  And Paul, too.
11   Q   Mr. Holland?
12   A   Yep.
13   Q   Okay.  And Mr. Heinke, the CFO?
14   A   Peter definitely needed some hand-holding,
15  you know, from CoinFund, more operationally I would say
16  than his role as a board member.  But he had a lot of
17  questions about how to -- how are we going to do this,
18  you know, what -- you know, how do we -- going to
19  execute it operationally, you know, all of that kind of
20  stuff.
21   Q   And CoinFund also provided expertise on
22  sort of who would buy Kin in this token distribution
23  event, correct?
24   A   I believe so.
25   Q   Okay.  And Kik -- the board of Kik and the

Page 99

1   management of Kik used CoinFund's work with marketing
2   and with this market survey in order to sort of make
3   decisions on how to do the Kin offering correct?
4    A   Yeah, I believe so.
5    Q   The fact that I'm skipping exhibits would
6   be -- it means that's a good thing.
7        Do you recall during this time period --
8   and by time period I mean like spring, so like January,
9   February, April -- or March and April, do you recall
10  approaching Zynga, the sort of game manufacturer?
11       Am I pronouncing that right?
12   A   So, yes, I do recall approaching Zynga.  I
13  am not sure that that's when those conversations were
14  going on but -- I mean, I can't tell you exactly when
15  but I definitely did.  It wasn't the first time,
16  though.  I mean, Zynga had had conversations with Kik
17  going back as far as late 2014 or 2015.
18   Q   And just for the record, Zynga makes?
19   A   Mobile games.
20   Q   Mobile games.  Okay.  And those went
21  nowhere, the conversations?
22   A   Well, not -- I mean, I wouldn't say they
23  went nowhere.  You know, a transaction was not
24  concluded.
25   Q   I see.  Okay.  Sort of between -- I think

Page 100

1   the last e-mail we looked at was dated January 17th.
2        Between that and May 2017, what was
3   happening at the company with respect to the creation
4   of a digital token?
5    A   It got more and more real as Ted and the
6   management team started to believe that this was the
7   best path forward for the company, and, you know, we
8   had advisors like CoinFund who really helped the
9   company get up the learning curve.  The team in Tel
10  Aviv was supplemented with some additional people who
11  helped that team.
12   Q   Was it Coin Tree?
13   A   It was -- there was a consultant called
14  Coin Tree who was more of a technical consultant and
15  really helped supplement the engineering team that we
16  had in Tel Aviv and helped them get up the crypto
17  learning curve.  None of those people, I believe, are
18  still employed by the company and some of them never
19  were.
20       But they were very helpful in converting
21  that engineering team that we had in Tel Aviv to really
22  be, I think, a very good crypto engineering team, which
23  they were not at the beginning of '17 and, you know,
24  18, 21 months later they really are.
25   Q   Okay.  What was your view in sort of the

Page 101

1   spring 2017 time period of Mr. Livingston's performance
2   as CEO?
3    A   You know, that's a -- it's hard for me to
4   answer that question at moment in time.
5    Q   Sure.
6    A   I have felt for a long time that Ted has
7   great strengths and great weaknesses.  He is a great
8   evangelist.  He is a real visionary.  He's great at
9   taking an idea and, you know, just kind of crafting it
10  into something that's actionable and getting buy in
11  from a group of people around him to go execute against
12  that.  So those are, I think, some of his great
13  strengths.
14       He is challenged as an operator.  He's
15  challenged as a leader and a manager, and he's an
16  optimist, as I mentioned earlier in this testimony.
17  And he, you know, is constantly, you know, kind of
18  moving on to the next thing, this is going to be the
19  thing, this is going to be -- this is going to be the
20  thing.  So, you know, that wears on you after a while.
21   Q   Well, that sort of anticipates my next
22  question.  How was he, as a leader of a company that
23  was making what, by all accounts, seems to be a
24  significant pivot in its entire business model?
25   A   He's brilliant.  I mean, just amazing.  I

1    mean, I can't -- I can't imagine that the CEOs of many
2    of our portfolio companies could pull off what he
3    pulled off.  It's what he's good at.
4        Q    Okay.
5        MR. LEASURE:  Did he drive the project
6    in --
7        THE WITNESS:  Absolutely, absolutely.
8        BY MR. SCHLEGELMILCH:
9        Q    And he was -- I think to use your word --
10   an evangelist for the product?
11       A    Absolutely.
12       Q    Or the project I guess?
13       A    Yep.
14       Q    Do you recall that Kik issued a white paper
15   or made available online, a white paper?
16       A    I do.
17       Q    Did you have any role in the creation of
18   the white paper?
19       A    Well, I read it.  And I gave comments on
20   it.  But I wouldn't say that I was on the team that put
21   it out.
22       Q    Who was on the team that put it out?
23       A    It was mostly the Kik management team; Ted,
24   Peter, Tanner, Erin, and then absolutely complimented
25   by the CoinFund folks.  I think the Coin Tree folks had

1    some involvement in it as well, and other advisors that
2    we had to the company.  You know, so it was -- you
3    know, like anything of this ilk, it was a group
4    project.
5        Q    But you recall reading it before it was
6    made available to the public?
7        A    Yes, I do.
8        Q    Okay.  And commenting on it?
9        A    I do.
10       Q    Do you -- and I have a copy of it if it
11   will be helpful for your answer.
12           Do you recall focusing on specific portions
13   of it?
14       A    You know, without looking at my specific
15   comments, I think I have a hard time really
16   recollecting the substance of what my comments were.
17       Q    Well, I brought the copies.  We might as
18   well -- this is -- I'm going to hand you what has been
19   previously marked as Exhibit 2.
20           And Exhibit 2 is a copy of the white paper
21   and it starts on Kik_000001.  And it was -- just for
22   sort of purposes of the timeline, it was issued by the
23   company in May 2017?
24       A    Yes.
25       Q    Okay.  And if you look on page 04, there's

1    a table of contents.  And just -- if you want to take a
2    minute to look through this.  And if this sort of
3    refreshes your memory of specific sections that you
4    worked on or had a role in or had specific comments on
5    that would be very helpful.
6        A    You know, as a general matter, I don't
7    recall specifically what my comments were.  However, I
8    would say that I focused a lot on the first several
9    pages because I felt that the vision and the
10   positioning of what Kin was was super important.  I'm
11   sure I had some comments on the implementation details
12   and some of the other things, but I do recall being
13   quite focused on those first three pages.
14       Q    Okay.  Now, the purpose of the white paper
15   was essentially to mark it as the digital token,
16   correct?
17       A    I'm not sure that that's correct.  I think
18   that -- the purpose of a white paper is to lay out the
19   vision of what the project is and to get people excited
20   about both developing for this platform, using this
21   platform, and also investing in the platform.  But I --
22   it -- there are multiple audiences for a white paper.
23   It's not just the investor community.
24       Q    Now, in addition to the white paper, what
25   else did Kik do to -- I'll limit it to marketing the

1    offering.
2            What else did Kik do to market the
3    offering?
4            Now, I know that you said the white paper
5    does multiple things, but I want to focus on marketing
6    the offering.
7        A    Well, I'm not -- I didn't participate in
8    any of the meetings or anything like that.  So I'm not
9    100 percent sure what the substance of those meetings
10   was like.  I know there was a video made, and there may
11   have been other marketing materials.  I'm not
12   100 percent sure.
13       Q    Okay.  Did you see the video before it was
14   made available to the public?
15       A    I'm not sure.
16       Q    Okay.  Did Mr. Livingston speak publicly on
17   the Kin idea?
18       A    Oh, yeah.  I mean, he effectively announced
19   it at Token Summit, and there may have been other
20   public appearances as well.
21       Q    Okay.  And where does Token Summit take
22   place?
23       A    The first one took place in New York at
24   NYU, which is where I think Ted announced Kin.  But
25   it's also taken place in San Francisco and maybe

Page 106

1  elsewhere.
2       Q   Okay.  But the one where Kik was -- or
3  excuse me.
4            The one where Kin was announced by
5  Mr. Livingston was at NYU?
6       A   Yeah, at the Stern School of Business.
7       Q   Okay.  And that's in Manhattan?
8       A   Correct.
9            MR. MITCHELL:  I want to ask you a question
10  about the video.
11           The video that you were describing, was
12  that published about the same time as the white paper?
13           THE WITNESS:  I don't know, honestly.
14           MR. MITCHELL:  Did you link -- do you do a
15  personal blog?
16           THE WITNESS:  I do.
17           MR. MITCHELL:  Did you link your blog to
18  that video that Kik created?
19           THE WITNESS:  I believe so, yes.
20           MR. MITCHELL:  Why?
21           THE WITNESS:  I wanted to, you know, share,
22  you know, with my readership, you know, this vision,
23  you know, of a crypto token running inside of an
24  existing mobile application, and that this is a, at the
25  time, I think quite a novel idea.  Like I said, other

Page 107

1  people have copied it now, but it was the first that I
2  had ever seen.
3            MR. MITCHELL:  So you thought it was
4  important that it was operating inside an existing
5  mobile application?
6            THE WITNESS:  That, at the time, was a
7  pretty unique idea that, you know, an existing mobile
8  application could adopt a crypto token business model.
9            MR. MITCHELL:  Did that seem valuable to
10  you?
11           THE WITNESS:  Yeah.  Because I think at the
12  time everybody's thinking oh, you know, I've got to go
13  do an Ethereum or I've got to do a Bitcoin.  You know,
14  that's the way you could do something like this, and,
15  you know, the fact of the matter was that Kik was
16  showing another way.
17           MR. MITCHELL:  And the other way was using
18  the existing messaging?
19           THE WITNESS:  Right.  Something that's
20  already used by tens of millions of people, right.  I
21  mean, that's the move, right, is -- if you're starting
22  Ethereum, right, the day you start Ethereum, there's
23  nobody using Ethereum.
24           If you have an application that's being
25  used by tens of millions of people and you launch a

Page 108

1  crypto token, in theory -- now, it turns out to be more
2  complicated than that, as we've found.  But in theory,
3  you can introduce that crypto token to tens of millions
4  of people like that, and that, I thought, was a
5  powerful idea.
6            MR. MITCHELL:  Powerful in that it leads to
7  adoption of that token?
8            THE WITNESS:  Correct, correct.  And that
9  developers could use that token, build new
10  applications, you know, just create an ecosystem around
11  that, you know, and do it that way versus, you know,
12  the way that every crypto project up until then had
13  kind of come to market.
14           BY MR. SCHLEGELMILCH:
15       Q   So I think you said that Mr. Livingston
16  spoke at Token Summit?
17       A   Yes.
18       Q   Are you aware of any other public speaking
19  that Mr. Livingston did regarding the digital token?
20       A   Vaguely but not specifically.  Like I just
21  have this recollection that there was more than that,
22  but I can't tell you where.
23       Q   Did -- were you -- did you know what
24  specifically Mr. Livingston was going to say at Token
25  Summit before he said it?

Page 109

1       A   Did I review his presentation?  Is that
2  what you're asking?
3       Q   Yes, sir.
4       A   Possibly.
5       Q   Okay.  Did you review any other
6  presentation that Mr. Livingston made regarding the
7  digital token?
8       A   Maybe.  But I'm not sure.
9       Q   Okay.  Do you know whether other members of
10  the Kik board reviewed Mr. Livingston's statement at
11  the Token Summit or any other statement?
12       A   I can't say.
13       Q   Okay.  I guess the question I'm asking is:
14  Is this something that you were doing as sort of an
15  advisor to Kik or something that you were doing as a
16  board member?
17       A   I don't know.  I'm not sure that I'd make
18  that distinction.
19       Q   Okay.  Fair enough.  Did you make any
20  public statements or give any public talks about the
21  digital token?
22       A   Other than what was written on my blog, I'm
23  not aware of any public statements or publicity that
24  I -- and my participation in the video.
25       Q   Can you describe for me your participation

28 (Pages 106 to 109)

Page 110

1   in the video?
2       A   They came in and they recorded me.
3       Q   Okay.  And do you write your own blog?
4       A   I do.
5       Q   Okay.  I didn't know if it was
6   ghostwritten.
7       A   No, it's not ghostwritten.
8       Q   And who's the audience for your blog?
9       A   It is a collection of tech entrepreneurs,
10  tech investors, employees at tech companies, and other
11  people who are interested in tech startups and venture
12  capital.
13      Q   Who are the -- who's sort of the audience
14  of Token Summit?
15      A   I would say that is the crypto community,
16  that is crypto entrepreneurs and -- largely crypto
17  entrepreneurs, people who are trying to start companies
18  in the crypto sector, I'd say probably are the vast
19  majority of the attendees there.
20      Q   Crypto investors?
21      A   Maybe.  But that's often one in the same
22  thing, right.  You know, a lot of the largest investors
23  in crypto projects are also founders of crypto projects
24  themselves.
25      MR. MITCHELL:  Does the conference audience

Page 111

1   include a significant number of people who own
2   messaging apps?
3       THE WITNESS:  People on messaging apps?
4       MR. MITCHELL:  Who own messaging apps?
5       THE WITNESS:  I don't know.  I don't know
6   if anybody from the other messaging apps came to it.
7   It wouldn't surprise me, though.
8       MR. SCHLEGELMILCH:  Why don't we break for
9   lunch?
10      THE WITNESS:  Okay.
11      MR. SCHLEGELMILCH:  As promised on
12  schedule.
13      Can we go off the record?
14      THE VIDEOGRAPHER:  Going off the record.
15      The time on the monitor at 12:03 p.m.
16      (Recess.)
17      THE VIDEOGRAPHER:  We are back on the video
18  record.  The time is 1:11 p.m.
19      BY MR. SCHLEGELMILCH:
20      Q   Great.  Thank you.  And welcome back,
21  Mr. Wilson.
22      You understand that you're still under
23  oath?
24      A   I do.
25      Q   Great.  And during the lunch break you

Page 112

1   didn't have any conversations with the staff, the folks
2   on this side of the table about the case?
3       A   I did not.
4       Q   Great.  I think -- before I ask any more
5   questions, I think Mr. Mitchell is going to ask a few.
6       MR. MITCHELL:  Sure.  Before the break we
7   were sort of talking about the time period when the
8   white paper came out.
9       THE WITNESS:  Uh-huh.
10      MR. MITCHELL:  At that point -- in the
11  second half of May, at that point did Kik have a plan
12  to sell a trillion Kin token?
13      THE WITNESS:  I don't recall.
14      MR. MITCHELL:  Okay.  So then let me pass
15  that down.  I'm going to give you what we've already
16  marked as Exhibit 18 A.  Take all the time you want to
17  look at it.
18      The first question is going to be:  Do you
19  recognize the document?
20      THE WITNESS:  Yes, I do.
21      MR. MITCHELL:  What is it?
22      THE WITNESS:  It's the deck for a board
23  call.
24      MR. MITCHELL:  Okay.  So what I'm -- the
25  reason I wanted to give it to you to start off at least

Page 113

1   is do what lawyers call refresh your recollection.
2       THE WITNESS:  Right.
3       MR. MITCHELL:  Is this the deck for a board
4   call on May 23rd, 2017?
5       THE WITNESS:  Yes, it is.
6       MR. MITCHELL:  And if I could just take
7   you, again, to the Bates number.  This document has a
8   Bates number of Kik_00106868 through 689, but if you
9   could turn to the page that ends in 6890 and look at
10  90, 91, 92, going on from there to maybe 96.
11      MR. SCHLEGELMILCH:  Looks like the slides
12  are also numbered 23.
13      MR. MITCHELL:  Yeah.  The slides have
14  numbers, too.
15      Again, if you want, I can take you to the
16  page that ends in 93.
17      THE WITNESS:  Yep.
18      MR. MITCHELL:  Does this refresh your
19  recollection about what Kik planned to offer to the
20  public or offer in general?
21      THE WITNESS:  Yes.
22      MR. MITCHELL:  And was it one trillion
23  tokens?
24      THE WITNESS:  Ten trillion, I think.
25      MR. MITCHELL:  Okay.  So you're looking at

Page 114

1   the page that ends in 93?
2       THE WITNESS: Yes.
3       MR. MITCHELL: There is a number ten T
4   tokens, that's the ten trillion?
5       THE WITNESS: I believe so, yes.
6       MR. MITCHELL: Okay. And was that the full
7   supply or was that what was taken -- going to sell to
8   the public?
9       THE WITNESS: I think -- I mean, I
10  interpret as the total supply.
11      MR. MITCHELL: Okay. And then do you
12  remember what percentage of the total supply Kik
13  intended to sell?
14      THE WITNESS: Ten percent.
15      MR. MITCHELL: So at that time, was there a
16  plan to sell them to anyone in particular, any type of
17  person in particular? What was the plan at that point?
18      THE WITNESS: It looks like the plan was
19  laid out on the page before.
20      MR. MITCHELL: The page that ends in 892?
21      THE WITNESS: Right. Where up to 50
22  million would be sold to accredited investors, and then
23  the balance would be sold in the token distribution
24  event.
25      MR. MITCHELL: And this -- this was all --

Page 115

1   these are just two parts of the ten of the one trillion
2   tokens?
3       THE WITNESS: I believe so, yes.
4       MR. MITCHELL: And the -- that first part,
5   the up to $50 million part, was that -- was it Kik's
6   plan at that point to offer that just to accredited
7   investors?
8       THE WITNESS: Yes.
9       MR. MITCHELL: And then the second
10  whatever -- the second part would be -- would go to the
11  public?
12      THE WITNESS: To anybody who wanted to buy.
13      MR. MITCHELL: Did that plan, that plan for
14  the offering change between the time of May and the
15  time of September when the token distribution event
16  happened?
17      THE WITNESS: I'm sure it changed in some
18  respects but not materially.
19      MR. MITCHELL: Did it change in any
20  respects in terms of the number of tokens Kik planned
21  to sell?
22      THE WITNESS: You know, there was some back
23  and forth around the smart contract that we used at the
24  token distribution event as it related to 50 versus 75
25  million that I remember we had to work on as we got

Page 116

1   really close to the token distribution event, but,
2   absent that, no, I don't think so.
3       MR. MITCHELL: The event that you were --
4   the events that you were just thinking of right now
5   were those -- those were happening during the time that
6   people were actually putting up their Ether to buy Kin?
7       THE WITNESS: Yes.
8       MR. MITCHELL: And was that around sort of
9   the idea whether Kik had to burn -- had to choose
10  whether it would burn some or distribute them?
11      THE WITNESS: Yes. I don't remember
12  exactly how we resolved it, but it was resolved.
13      MR. MITCHELL: Was there any point during
14  this process that Kik had a plan to just sell the piece
15  to accredited investors and then, you know, just sort
16  of go on with its business?
17      THE WITNESS: Well, look, we certainly
18  discussed a number of scenarios, and I have to believe
19  that that was one of the scenarios we discussed. But
20  that's certainly not what we ultimately ended up doing.
21      MR. MITCHELL: This -- to the best of your
22  memory, the slides in this board deck, they accurately
23  reflect the plan as of the time of this board call?
24      THE WITNESS: I think they do.
25      MR. MITCHELL: Thank you.

Page 117

1       BY MR. SCHLEGELMILCH:
2   Q   So the sale of a hundred -- of one trillion
3   tokens was sort of divided into these two halves, the
4   presale and then the token distribution event, the
5   A   Right.
6   Q   How was the presale going to work?
7   A   I'm not clear what you mean by that.
8   Q   Sure that's fair. It was a lousy question.
9       Who was going to be permitted to buy?
10  A   Accredited investors were going to be
11  permitted to buy.
12  Q   Okay. What does that mean?
13  A   Well, it's a definition that is in the
14  securities regulations.
15  Q   Okay. And was there a document or a
16  contract that was used to effectuate this sort of
17  presale purchases?
18  A   Yeah. I think we used something called the
19  Simple Agreement For Future Tokens, a SAFT.
20  Q   Okay. And where did document come from?
21  A   I'm not sure who prepared it, but I suspect
22  we got it from our law firm.
23  Q   Now, were the tokens purchased through the
24  SAFT, were they purchased at a discount?
25  A   I believe so.

```
 1        Q  Do you recall what the discount was?
 2        A  No.  Not really.
 3        Q  Okay.  And accredited investors, that
 4   implies that you have certain levels of sort of assets
 5   or wealth at your disposal; is that correct?
 6        A  That is correct.
 7        Q  Okay.  Do you recall how many purchasers
 8   actually purchased in the presale portion?
 9        A  I do not.
10        Q  Okay.  What about an order of magnitude for
11   the number of purchasers?
12        A  I'd be guessing.
13        Q  Okay.  What about during the token
14   distribution event or what's, I think, sometimes called
15   the public sale?
16           Is that a term that you're familiar with,
17   the token sale?
18        A  Yes, yes.
19        Q  Okay.  How was that going to work?  And
20   what I mean by that is -- let me ask -- let me --
21   strike that.  Let me ask one other question.
22           What currency was the presale denominated
23   in?
24        A  I believe we sold the SAFT for dollars.
25        Q  U.S. dollars?
```

```
 1        A  I believe so.
 2        Q  Okay.  And do you recall how much money was
 3   raised?
 4        A  50 million U.S. dollars.
 5        Q  Okay.  And was that the cap for the
 6   presale?
 7        A  I think so.  I mean, I think we could have
 8   sold more, but we didn't.
 9        Q  Okay.  That's, I think, what I was actually
10   getting at was $50 million the target or the cap or was
11   it just that's where it ended, that's where the
12   interest stopped?
13        A  I think it was a target and a cap.
14        Q  Okay.  Do you recall the name of any
15   investor during the presale?
16        A  Sure.
17        Q  Who do you recall?
18        A  I know that Pantera bought in the presale,
19   and I know that Polychain bought in the presale.
20        Q  Okay.  What is Polychain?
21        A  Polychain is a token fund.
22        Q  And just forgive me.
23           What does that mean?
24        A  It is a partnership, like a venture capital
25   fund, but it buys crypto tokens.  It's based in San
```

```
 1   Francisco.  The principal is a gentleman named Olaf
 2   Carlson-Wee.  Union Square Ventures is an investor in
 3   Polychain.  We own a piece of the general partner of
 4   Polychain.
 5        Q  Okay.
 6           MR. MITCHELL:  Do you own that through one
 7   of the funds that you've raised?
 8           THE WITNESS:  We own it through the Union
 9   Square Ventures 2016 fund.
10           BY MR. SCHLEGELMILCH:
11        Q  And I think you mentioned Pantera?
12        A  Pantera is another token fund.
13        Q  Okay.  Can you tell me -- what do you know
14   about --
15        A  I don't know a lot about Pantera, but I
16   know a few things.  There's a principal there named Dan
17   Morehead, and they are also an investor in the general
18   partner of Polychain.
19        Q  Okay.
20        A  And they are a token fund like Polychain.
21        Q  Were -- was USV, the 2016 fund an investor
22   in Polychain at the time they invested in the Kin
23   presale?
24        A  I believe so, but I can't say definitively
25   that that is so.
```

```
 1        Q  Okay.
 2        A  Because it's really a timing question.  You
 3   know, I don't know exactly when the presale was done,
 4   and I don't know exactly when we became an investor.
 5   But it was very likely that we were.
 6        Q  Okay.  I guess what I'm trying to get at is
 7   does USV, albeit, perhaps indirectly have a financial
 8   interest in Kin or a position in Kin?
 9        A  I believe that we did at one time through
10   Polychain, but I don't think we do anymore.
11        Q  Okay.  You think that Polychain has
12   liquidated its position?
13        A  I believe so, but I don't know for sure.
14        Q  Okay.  Did investors in the presale -- did
15   they receive the Kin that they had purchased through
16   the SAFT in increments like two halves?
17        A  I'm not entirely sure if there was any
18   vesting provisions or lockup provisions.  I'm not
19   entirely sure how that was done, to be honest.
20        Q  USV did not directly purchase Kin through
21   the presale; is that correct?
22        A  We did not.
23        Q  And you didn't -- and USV also did not
24   invest in Kin in the public sale?
25        A  We did not.
```

Page 122

1    Q  Okay.
2    MR. LEASURE:  Why not?
3    THE WITNESS:  We own about five and a half
4  percent of Kik.  Kik owns about 30 percent of Kin.  So
5  our five percent of Kik would give us an underlying
6  interest in about one and a half percent of the entire
7  token supply, and at that price of the sale, if 100
8  million is buying ten percent of Kin, then one and a
9  half percent of Kin would be worth something like
10  $15 million which would be by far and away the largest
11  token position by like several multiples of what we
12  have in our funds.
13    So we felt that, if anything, we were
14  overexposed and just didn't feel like it was
15  appropriate to extend our exposure beyond that.
16  BY MR. SCHLEGELMILCH:
17    Q  Do you know how many purchasers
18  participated in the public portion?
19    A  I don't know the exact number, but I do
20  know that we KYCed everybody, and I remember Ted
21  telling me that we received over 10,000 passports that
22  we had to go through.
23    Now, I don't know if all of those people
24  that we KYCed bought, but I suspect that the number of
25  people who bought was, you know, in the thousands and

Page 123

1  maybe as much as 10,000.  I mean, it was a large
2  number.  I really don't know how many, but it was a
3  large number of people.
4    Q  Okay.  And the public sale portion or the
5  token distribution event, that was denominated in
6  Ether, correct?
7    A  Correct, yes.
8    Q  Why do it in this way?
9    Why do it in two steps?
10    A  Well, we had a lot of institutional
11  interest in Kin, and we felt that we could issue Kin --
12  we could sell Kin to institutional and accredited
13  investors through a SAFT structure prior to the token
14  being live and the network being up and running.  And
15  so we felt that the prudent thing to do would be to do
16  that, go ahead and do that via the SAFT structure, and
17  then once the network was live and the token was live
18  we could then offer the token to the community, the
19  broader community.
20    Q  Okay.  Is that what ultimately happened?
21    A  More or less, yes, that's what ultimately
22  happened.
23    Q  Did you personally speak with any
24  purchasers in the private sale, the presale portion?
25    A  I don't think that I had any conversations

Page 124

1  with presale buyers about Kin or anything like that.  I
2  do recall a number of people reaching out to me saying
3  that they had an interest in Kin, and I connected them
4  to the company in some cases, not in all cases.  But I
5  don't think I was involved in any due diligence or any
6  of the marketing activity of it.
7    Q  Okay.  You said that people had reached out
8  to you and that you connected them to Kik?
9    A  Uh-huh.
10    Q  And I don't -- I'm not trying to misquote
11  you.  I'm just trying to reorient you.
12    Do you recall who reached out to you?
13    A  Well, I know that the folks at IBG, which
14  is a big Asian investor, got connected to me through
15  somebody and was interested, and I think I connected
16  them to the folks at Kik.
17    Q  Okay.
18    A  I remember that, and I think it may have --
19  I think, you know, others may have done the same.
20    Q  Okay.  Do you recall anyone other than the
21  folks at IBG?
22    A  Not -- I mean, not specifically.
23    Q  Okay.  Did the folks at IBG tell you why
24  they were interested in the Kin offering?
25    A  No.

Page 125

1    Q  What about Mr. Morehead at Pantera?
2    Did you speak with Mr. Morehead at Pantera
3  about the Kin offering?
4    A  I don't think I spoke to him about the Kin
5  offering.  I certainly don't recall speaking to him
6  about the Kin offering.
7    Q  Okay.  Did you speak with anyone that
8  participated in the public sale regarding the Kin
9  offering?
10    A  I don't think so.
11    Q  Okay.
12    A  Certainly not before the offering.  There
13  was a conference that Kik did in -- I don't really
14  remember, but I think maybe the late fall or early
15  winter of last year where they invited Kin developers
16  and Kin community members to come to New York and I
17  spoke at that.  And I'm sure that some of the people
18  who were at that conference were people who bought Kin,
19  but that was well after the event.
20    Q  Okay.  What was -- do you recall what the
21  name of that conference was or did it have a name?
22    A  It definitely had a name, but I don't
23  remember what the name was.
24    Q  Okay.  And what did you speak on?
25    A  I think they wanted me to speak broadly

Page 126

1  about the cryptocurrency market, not so much about Kin
2  but just my views of what was going on in the
3  cryptocurrency market at the time.
4      Q   Okay.  Just returning sort of to this what
5  I'll call summer and fall 2017, what was the state of
6  the crypto market or the market for digital tokens like
7  Kin?
8      A   At what time?
9      Q   Let's start with like May.  We just talked
10  about the white paper which was in May of 2017.  Let's
11  talk about sort of May leading up to the token
12  distribution event in September.
13      A   I think in May the market for crypto tokens
14  was starting to become very interesting to lots of
15  people, and Ethereum was starting to increase in value
16  significantly.  And people were then thinking okay,
17  what's the next Ethereum, want to get in the ground
18  floor of the next Ethereum and that -- so that what was
19  kind of going on in the May time frame.
20      Q   Okay.  And I think you said earlier in
21  response to a question that Mr. Leasure posed that it
22  sort of -- it had really ramped up significantly?
23      A   Yes.
24      Q   Okay.  And that just there was far more
25  demand for digital tokens than there had ever been

Page 127

1  previously?
2      A   Yeah.  Well, you know, I think part of what
3  was going on was that people had participated in the
4  Ethereum project and that had increased in value
5  significantly.  And a lot of these offerings were done
6  for Ethereum.
7          So, you know, one thing you could think
8  about was that people were taking some percentage of
9  their Ethereum that had appreciated significantly and
10  diversifying their cryptoasset portfolio by taking some
11  of their appreciated Ethereum and turning around and
12  buying other cryptoassets and then creating more of a
13  diverse portfolio.
14          I mean, I think was fuelled by the rapid
15  rise of Ethereum.  So all of a sudden people who maybe
16  had $10,000 of Ethereum all of a sudden had a $100,000
17  of Ethereum and they're like, well, let me take 20 or
18  30,000 of that and put it into five or six other
19  things, get a diverse portfolio, and possibly get on
20  the ground floor of the next one.
21          So I think that was a big part of what
22  happened in 2017.
23      Q   Okay.  And that's part of what happened
24  with the interest in Kin, correct?  It was -- some
25  people were diversifying their portfolios from Ether?

Page 128

1      A   I believe that's -- I think that's what was
2  going on in the broader market, not just the Kin.
3      Q   But including Kin?
4      A   Certainly.
5      Q   Okay.  Let me hand you what will soon be
6  marked as Exhibit 149.
7          (SEC Exhibit No. 149 was marked for
8          identification.)
9      BY MR. SCHLEGELMILCH:
10      Q   As you're reading, this is an e-mail chain.
11  The top e-mail on the chain is from Erin Clift to
12  Mr. Wilson dated June 3rd, 2017, and the Bates number
13  is Kik_00022109 and 110.  And just let me know when
14  you've had a chance to read it.
15      A   Okay.
16      Q   I'd like to focus on the e-mail at the
17  bottom from Mr. Grossman to you, carbon copied to
18  Mr. Wenger.
19      A   Yep.
20      Q   Am I pronouncing that right?
21      A   Uh-huh.
22      Q   And Mr. Weissman and -- dated May the 31st,
23  2017.  And Mr. Grossman is a partner at USV?
24      A   Not a partner.  He is on the investment
25  team but not a partner.

Page 129

1      Q   Thank you.  But Mr. Wenger and Mr. Weissman
2  are partners?
3      A   Yes, correct.
4      Q   Okay.  What is it that Mr. Grossman is
5  proposing to you?  How did you understand
6  Mr. Grossman's proposal or his e-mail to you?
7          What was he trying to communicate to you?
8      A   The plan, which is still the plan, for Kin
9  is to get multiple applications to adopt it as an
10  engagement and monetization mechanism.  And he was
11  proposing that we had a bunch of companies in our
12  portfolio who could be candidates for doing that.
13          And he was also suggesting that Kin could
14  take some of the 30 percent that was being allocated to
15  Kik and sharing that with other partners to get them to
16  commit to being early platform partners.
17      Q   Okay.  And Mr. Grossman lists a number of
18  what he calls USV companies and this is a list of
19  companies in which USV had an ownership interest or
20  some investment in?
21      A   That's correct.
22      Q   Let me ask you this:  Does USV -- does it
23  only take equity stakes in the companies in which it
24  invests?
25      A   Versus what?

Page 130

1     **Q**  **Debt.**
2     A  Yes. We're equity investors.
3     **Q**  **Okay. So I'm not going to go through all**
4 **of them, but YouNow -- mr. Grossman writes obv,**
5 **which I read as obvious?**
6     A  Uh-huh.
7     **Q**  **What is YouNow?**
8     A  YouNow is a mobile video messaging app.
9 It's very similar to Kik except it's focused on video
10 as opposed to text.
11     **Q**  **Okay. And he writes that it was an obvious**
12 **participant?**
13     A  Same issues have played that company that
14 have played Kik over the years.
15     **Q**  **Okay. And he lists a number of other**
16 **companies maybe 9 or 10 in all. Are any -- at the**
17 **moment of the token distribution event in September of**
18 **2017, did any of these USV companies accept Kin?**
19     A  No.
20     **Q**  **Okay. Okay. Do any of them currently?**
21     A  No. There are conversations going on
22 between YouNow and Four Square and maybe 1 or 2 others.
23 I'm not totally up to date on where all of our
24 partnership discussions are, but nothing has concluded
25 with any of them at this time.

Page 131

1     **Q**  **Okay.**
2     MR. MITCHELL: Those are conversations
3 between Kik and those companies?
4     THE WITNESS: Yes, that's correct.
5     MR. MITCHELL: And Kik is trying to sort of
6 recruit them to join the Kin Ecosystem?
7     THE WITNESS: Correct, exactly.
8     BY MR. SCHLEGELMILCH:
9     **Q**  **Other than the companies that are listed**
10 **here under USV, are you aware of any other company at**
11 **the time of the token distribution event in**
12 **September of 2017 that had agreed to accept Kin?**
13     A  In return for?
14     **Q**  **Anything. Any service or product.**
15     A  Yeah. I think that -- well, I don't
16 exactly remember how we concluded the CoinFund and Coin
17 Tree deals. So I don't know if we ultimately paid
18 their advisory services in cash or Kin or both, but,
19 certainly, it was contemplated at the time that we
20 might pay for their services in Kin.
21     **Q**  **But you don't know whether that happened?**
22     A  I don't.
23     **Q**  **Okay.**
24     A  I mean, no. Because I think it moved
25 around a bit between the initial conversations and what

Page 132

1 ultimately happened.
2     **Q**  **Okay. Putting aside -- now, this is very**
3 **helpful. Putting aside Coin Tree and CoinFund, at the**
4 **time of the token distribution event, were there any**
5 **other companies or service providers that accepted Kin**
6 **as a medium of exchange?**
7     A  Not to my knowledge.
8     MR. SCHLEGELMILCH: Okay. This is 150,
9 please.
10     (SEC Exhibit No. 150 was marked for
11     identification.)
12     BY MR. SCHLEGELMILCH:
13     **Q**  **This is an e-mail from you to investment**
14 **team dated June the 8th, 2017. And the Bates number is**
15 **USV 0003712. Just take as much time as you need. I'll**
16 **just ask you a few questions.**
17     A  Okay.
18     **Q**  **Can you walk me through what this e-mail is**
19 **attempting to convey?**
20     A  Yeah. This is -- this e-mail is a
21 discussion inside of our firm about the conversation we
22 had a little bit earlier about why we chose not to buy
23 in the presale. This was sort of a back of the
24 envelope approach to figuring out what our underlying
25 interest in Kin would ultimately be vis-a-vis the

Page 133

1 equity we had in Kik. And, I mean, we can go through
2 it if you'd like, but, ultimately, I concluded that we
3 should sit on the sidelines.
4     **Q**  **Okay. And just -- I think it may make**
5 **sense to go through it in some amount of detail, but**
6 **the idea -- I'm looking specifically at your bullet**
7 **number one -- is that Kik was going to receive**
8 **30 percent of the offering?**
9     A  Uh-huh.
10     **Q**  **Is that correct?**
11     A  That's correct.
12     **Q**  **And that it would be permitted to sell**
13 **portions of its Kin allotment into quarterly increments**
14 **to finance its burn, which I think you said is about**
15 **$2.5 million?**
16     A  Uh-huh.
17     **Q**  **Do I have that correct?**
18     A  That's correct.
19     **Q**  **Is that currently what's happening?**
20     A  No, that is not happening.
21     **Q**  **Okay. Well, why is that?**
22     A  Because Kin is currently using the proceeds
23 of the token offering to manage the business.
24     **Q**  **The $100 million?**
25     A  Correct.

1      Q   Okay.  But it's not liquidating sort of in
2   regular increments its allocation of Kin?
3      A   It has not liquidated any Kin to my
4   knowledge.
5      Q   Okay.  You write in bullet four, "The Kin
6   Rewards Engine will pay out something like 12 percent
7   in year one.  So if Kin stays at 1 billion, that's
8   $128 million, and Kik will stand to get much of that."
9   Can you explain to me what that means?
10     A   Yeah.  First of all, I'm not sure that this
11  is still what we are contemplating.  So I think our
12  plans here have changed, but at the time that I wrote
13  this e-mail my understanding was that any application
14  that was using Kin would participate in a Kin Rewards
15  Engine.  And that -- I thought Kik would be the largest
16  application in the Kin Ecosystem and would get a lot of
17  the Kin Rewards Engine.
18         I think what we ultimately decided to do at
19  some point post me writing this e-mail is to say that
20  Kik would not participate in the rewards engine for
21  some period of time to give all the developers
22  confidence that they wouldn't be crowded out of the
23  rewards engine.
24         So that's why I say I don't think that
25  bullet point four is really accurate anymore, but at

1   the time I wrote the e-mail that's what I thinking.
2      Q   No, no.  I understand.  Thank you.  That's
3   very helpful.
4         And just for the record, you wrote this
5   e-mail in June 2017?
6      A   Correct.
7      Q   And we're now over a year later?
8      A   Right.
9         MR. MITCHELL:  The change that you were
10  just alluding to, do you remember whether that happened
11  before or after the token distribution event?
12         THE WITNESS:  Well, I think that this has
13  been a little bit of a moving target over the past
14  year.  I think that there was a commitment not to have
15  Kik participate in the rewards engine for some period
16  of time before we did the token distribution event, but
17  I think we may have even moved further on that since
18  then.
19         MR. MITCHELL:  So the ideas you were
20  talking about, they're all made to be integrated into
21  the Kin Rewards Engine; is that right?
22         THE WITNESS:  The Kin Rewards Engine is a
23  smart contract that, you know, will start paying out
24  Kin, but I think that Kik has the ability to defer
25  taking Kin out of the rewards engine if we want.  And I

1   think we have felt that that's something the developers
2   will want to see us do in order to get on board.
3         MR. MITCHELL:  Did that smart contract
4   exist here?
5         THE WITNESS:  Yeah, that's is great
6   question that I -- I don't know the answer to that.
7         BY MR. SCHLEGELMILCH:
8      Q   Well, let me ask a more basic question
9   then.
10        Does the Kin Rewards Engine -- is it
11  operational?
12     A   Not at this time.  It is not paying any --
13  I believe that the foundation still holds all of its
14  Kin, and it is not paying out any on the rewards
15  engine.
16     Q   Okay.  In the paragraph right under four
17  you write, "So if Kin is successful, meaning that
18  investors who buy in the presale and the ICO make
19  money, then it looks to me that Kik would end up owning
20  a lot of Kin and would likely dividend it out at some
21  point to its shareholders, and we would get some of it
22  from that."
23        You -- the first part, if Kin is
24  successful, meaning that investors who buy in the
25  presale and ICO make money, in June of 2017, is that

1   sort of how you envisioned success looking like or is
2   that what you thought success looked like?
3      A   No.  I think what I was writing -- you
4   know, I was really trying to do an economic analysis
5   here.  So what I was thinking about as I wrote that is
6   how investors who bought in the presale would think
7   about Kik being -- Kin being successful.
8         I don't know that that's, for me, the
9   totality of what a definition of success would be, but
10  I was trying to just take a stab at should we buy in
11  the offering.  And so then looking at if the offering
12  is successful, we would make money buying in the
13  offering.  But if the offering is a success, then we
14  would also stand to benefit a lot from our underlying
15  ownership.  So that's really the context of which I
16  wrote this e-mail.
17     Q   Okay.  But from your point of view, like a
18  purchaser in either the presale or in the token
19  distribution event, their view of whether the offering
20  was successful or not had to do with whether --
21     A   They made money or not.
22     Q   Okay.  Thank you.  This also speaks of
23  using Kin as a dividend to Kik shareholders?
24     A   Uh-huh.
25     Q   Is that correct?

Page 138

1    A   Yes.
2    Q   Did that happen or is that contemplated?
3    A   It has not happened, and I'm not sure that
4    that's the right way to ultimately align the interests
5    of the Kik shareholders and the Kin holders. I think a
6    better approach might be to do some sort of exchange.
7    Q   And that prompts sort of a lot of questions
8    in my mind.
9        What sort of exchange are you talking
10   about?
11   A   One could imagine 3, 5, 10 years from now,
12   if Kin has a market cap of billions of dollars and Kik
13   owns a meaningful piece of that that Kik's Kin position
14   could be in the hundreds of millions or maybe even more
15   than that and that what we could do at that time is to
16   say to our shareholders in Kik, exchange your stock in
17   Kik for some of our underlying Kin, you know, like a
18   redemption or, you know, some sort of buyback, if you
19   will.
20   Q   Okay. So the stock could be bought back or
21   bought out using Kin as the currency?
22   A   Yes.
23   Q   Or the medium -- whatever you want to call
24   it, the medium of exchange?
25   A   Yeah. I think that's a better approach for

Page 139

1    a bunch of reasons than doing a dividend.
2    Q   Okay. And I think you had mentioned
3    earlier -- and I'm not trying to misquote you, I'm just
4    trying to bring us back -- that you felt that to use
5    Kin as a dividend misaligned interest -- and here's
6    where I'm -- I'm not trying to misquote you, but I
7    think you --
8    A   No, no, no, no, no. That's not what I was
9    saying.
10   Q   Thank you. What were you saying?
11   A   Well, you know, if one group of investors
12   are shareholders in a corporate entity and one group of
13   investors are token holders and the business really
14   moves to a decentralized platform, it may be the case
15   that the best alignment would be for everybody to just
16   be Kin holders and we would all be interested in making
17   Kin worth the most and not have any equity value
18   necessarily outside of the value of Kik's holding in
19   Kin, that that might be the best way to assign
20   everybody's interest.
21   Q   I understand now. Thank you.
22       We'll mark this as 151.
23       (SEC Exhibit No. 151 was marked for
24       identification.)
25       BY MR. SCHLEGELMILCH:

Page 140

1    Q   This is an e-mail chain. The e-mail at the
2    very top is an e-mail from you to a lot of people, Miss
3    Wochtas -- probably mispronouncing that -- Spadafora,
4    Mr. Holland, and Mr. Estill dated June the 13th, 2017,
5    at 6:53 a.m. And the Bates number is
6    Kik_foundation_cap_002701 and 02.
7    A   Okay. I've read it.
8    Q   Thank you. Referring to the e-mail that is
9    at the bottom of the first page on 2701, an e-mail from
10   you to Mr. Heinke and mister -- with a carbon to
11   Mr. Livingston, you write, "Just so you both know, I am
12   increasingly nervous about the speculative fever in the
13   token sale world."
14       Can you explain what you were thinking
15   about in this time period when you wrote that?
16   A   You know, I'm a conservative person, and it
17   just felt to me that, you know, things were getting a
18   little out of hand.
19   Q   And what do you mean by a little out of
20   hand?
21   A   You know, projects -- and I'm not speaking
22   about Kin here.
23   Q   Understood.
24   A   Projects with very little, other than, you
25   know, an idea presented on a white paper or raising 50,

Page 141

1    100, a million even more. You know, I've been in the
2    venture capital business for 30 years, and, you know,
3    when someone writes their ideas on a business plan, you
4    know, maybe they can raise a million or 2 million of
5    seed capital. But then they got to go out and, you
6    know, actually build something in order to get another
7    round done. And it just felt to me like there was
8    something sort of -- you know, it just didn't -- it
9    didn't -- wasn't making a lot of sense to me.
10   Q   Okay. And, again, we talked about how the
11   demand for these digital tokens had just skyrocketed?
12   A   Right.
13   Q   And we -- you write, "Specifically, one, we
14   should cap our SAFT at $50 million" -- which I think
15   we've talked about previously -- "and sell it only to
16   institutions that can do the required due diligence and
17   can afford to take a loss on the investment."
18       And then, two, you write, "We should not
19   sell Kin tokens to the crowd until we have implemented
20   Kin inside Kik and can show it working just like Kik
21   Points. We should show that we can settle off-chain
22   and on-chain before offering Kin to the crowd."
23       And I'd like to just break that down. When
24   you say we should not sell Kin tokens to the crowd
25   until we've implemented Kin inside Kik and can show it

Page 142

1    working just like Kik Points, what did you mean by
2    that?
3        A    I wanted Kin to be functional inside of the
4    Kik app.
5        Q    And just -- what does functional inside the
6    Kik app mean?
7        A    There would be a wallet there.  You could
8    see it.  You know, you could do something with it.
9    Like it would be -- I could actually open up my Kik,
10   see the Kin there.  I could earn some Kin.  I could
11   spend some Kin.  You know, just, you know, that it's
12   working.
13       Q    Okay.  What did it mean when we could show
14   that we can settle off-chain and on-chain before
15   offering Kin to the crowd?
16       A    That Kin could move from one wallet to
17   another, one Kin wallet to another that -- on a
18   blockchain.
19       Q    Okay.  Is that what off-chain means?
20       A    Off-chain would mean that if it was
21   happening from one Kin wallet inside of Kik to another
22   Kin wallet inside of Kik, we could settle those
23   off-chain, and those transactions could be like batch
24   processed onto the Ethereum blockchain at some later
25   date, which would give us the ability to do higher

Page 143

1    throughput transactions.
2        Q    Okay.  Because the Ethereum blockchain can
3    just only handle so many transactions?
4        A    Correct.
5        Q    And are you familiar -- you probably are
6    far more familiar than I am with the Cyber Kitty?
7        A    Crypto Kitty.
8        Q    Crypto Kitty.  See, like I said, you're
9    more familiar with it than I am.
10       A    I'm an investor in Crypto Kitty.
11       Q    That was a smart thing to do.
12       A    Maybe.  We'll see in years.
13       Q    But that -- the Crypto Kitty sort of idea
14   swamped and basically shut down the Ethereum
15   blockchain, correct?
16       A    Correct.
17       Q    And so the concern was -- is that can the
18   Ethereum blockchain handle all these Kik -- Kin
19   transactions?
20       A    Right, right.  And at the time our idea to
21   solve that problem would be to settle transactions
22   inside of -- from one Kik user to another Kik user
23   off-chain or sidechain is another term people use.
24           Ultimately, we decided to move off of the
25   Ethereum blockchain entirely and do this fork of

Page 144

1    Stellar, which I think is going to be a better
2    solution.  But I was aware of that and -- which is why
3    I wrote on and off-chain.  Because if I had wrote just
4    on-chain, I think the management team would come back
5    and say that's never going to work.  So that's why I
6    wrote off-chain and on-chain.
7        Q    Okay.  And why was it important to have Kin
8    implemented inside of Kik and to show it working just
9    like Kik Points?  Why was that important to do it
10   pre-crowd scale?
11       A    There's a whole bunch of reasons why that's
12   the case, some which are sort of, you know, I would say
13   best practices and some that I just think, you know,
14   were the right thing to do.  I think that before, you
15   know, we sold Kik to, you know, the community we had to
16   demonstrate that it was working.  And I just think
17   that's like -- I mean, it just makes sense that you --
18   because, otherwise, it's just, you know, you're selling
19   a dream.  And that's, I don't think, the way to do
20   things.
21       Q    Okay.  Were you able to -- if you -- if you
22   owned Kin at the time of the token distribution event,
23   were you able to send Kin from one Kik user's wallet to
24   another Kik user's wallet at the time of the
25   distribution event?

Page 145

1        A    No.  Because we decided to not allow
2    peer-to-peer payments functionality inside of Kik for,
3    you know -- I would say trust and safety reasons.  And
4    so you could earn it; you could spend it; but you
5    couldn't do peer-to-peer payments.
6        Q    At the time of the token distribution
7    event, how could you earn it?  How could you earn Kin?
8        A    I think you just earned it by sort of
9    opting into it.  You'd get, I think, 400,000 Kin by
10   just kind of opting into it.
11       Q    Okay.  And how could you spend it?
12       A    You could buy stickers and things like
13   that.
14       Q    At the time of the token distribution
15   event?
16       A    I believe so.
17       Q    Okay.
18           MR. LEASURE:  From who?
19           THE WITNESS:  From Kik, I guess.
20           MR. LEASURE:  Anyone else?
21           THE WITNESS:  Not aware of anybody else.
22           MR. LEASURE:  So would you say the
23   limitations you proposed on this item 2 limiting what
24   should be in place before a crowd sale took place,
25   would you say that those limitations were in the event

1    followed?
2         THE WITNESS: I certainly think that --
3    well, here's what I would say.
4         MR. LEASURE: Yeah.
5         THE WITNESS: The management team got me
6    and the board comfortable, that we had satisfied
7    certainly the spirit of bullet number two before we did
8    the token distribution event.
9    BY MR. SCHLEGELMILCH:
10   **Q   How did they do that?**
11        A    There was a subsequent board meeting where
12   we discussed this. And the specifics of what would be
13   live inside of the Kik app and what would not were
14   discussed and we signed off on it.
15       **Q   And do you recall what was told to you**
16   **about what would be live inside the Kik app?**
17        A    I could recall it, if I was aided by, you
18   know, some of the board materials. I mean, I remember
19   the board meeting and I remember the conversation, but
20   I don't want to try to just do it on memory.
21       **Q   Okay.**
22        MR. LEASURE: Was it -- this e-mail on top
23   of the other things, seems to be setting up an upcoming
24   board meeting?
25        THE WITNESS: Yeah. I don't know whether

1    it was at that board meeting or another board meeting
2    where we locked into the specifics. It may have been
3    that board meeting, but, you know, ultimately, we
4    didn't do the token distribution event for almost two
5    months. So I don't know if things changed between then
6    and when we ultimately did it.
7         MR. LEASURE: Okay. Do you remember a
8    board meeting in mid-June that you -- it looks like you
9    called into for the first 30 minutes?
10        THE WITNESS: Yeah.
11        MR. LEASURE: Tell me about that board
12   meeting.
13        THE WITNESS: What do you want to know
14   about the board meeting?
15        MR. LEASURE: What did you say? What did
16   other people say? What was discussed?
17        THE WITNESS: I think we were talking about
18   the logistics of both the SAFT and the crowd sale, and,
19   you know, how we were going to go about doing these
20   thing and so on and so forth.
21        MR. LEASURE: The items that we spent some
22   time walking through where you wanted to put some --
23   it's fair to say -- guardrails or limitations on when
24   to do the public crowd sale, was that discussed at that
25   board meeting?

1         THE WITNESS: That -- yes. That was
2    definitely discussed at that board meeting.
3         MR. LEASURE: Can you tell me anything
4    about that particular discussion?
5         THE WITNESS: What do you want to know? I
6    mean, it's -- the problem is that I don't have a
7    perfect recollection. I was only on for 30 minutes.
8    So it's kind of tough to just answer questions like
9    that.
10        MR. LEASURE: No, no. Okay. So
11   reaction-wise, did people discuss what you were
12   proposing sort of a -- things to be in place before the
13   public crowd sale?
14        THE WITNESS: Yeah.
15        MR. LEASURE: And what was their reaction?
16        THE WITNESS: I think, generally speaking,
17   the board agreed that this was a good framework.
18        MR. LEASURE: And do I have it right that
19   there was a -- was this the meeting where management
20   presented and made people comfortable that they had
21   a --
22        THE WITNESS: See, that's what I don't
23   remember.
24        MR. LEASURE: That's okay.
25        THE WITNESS: I mean, it may have been

1    another call or meeting that we had between this and
2    September. You know, we were evolving things as we
3    went through the spring and summer, and so I don't know
4    whether we locked and loaded on it at this meeting or
5    another meeting.
6    BY MR. SCHLEGELMILCH:
7         **Q   Let me mark one more exhibit, which I think**
8    **may --**
9         A    Okay.
10        **Q   -- shed a little bit of clarity on this**
11   **meeting versus another one.**
12        **So we'll mark this 152.**
13            (SEC Exhibit No. 152 was marked for
14            identification.)
15   BY MR. SCHLEGELMILCH:
16        **Q   And just for the record, this is an e-mail**
17   **from you to investment team dated June 14, 2017. The**
18   **Bates number is USV 0011717.**
19        A    All right. Great.
20        **Q   Does this do anything to refresh your**
21   **memory about what was discussed at the board meeting?**
22        A    Yeah. But -- except for the fact I don't
23   know if -- I mean, this is certainly the plan of action
24   that we agreed to at that board meeting, but what I
25   don't know is whether that plan of action changed

Page 150

1    between that board meeting and the ultimate token
2    distribution event.
3        Q   Fair enough.  So let's -- and it may help
4    to sort of break it down and we can sort of do it item
5    by item because what you do in your e-mail is you list
6    sort of five bullet points and then have a --
7        A   You noticed my tendency to do that?
8        Q   It's very convenient.  I appreciate that.
9        So the first -- the very first sentence,
10   writes -- you write, "We had a board meeting yesterday
11   to make some decisions on our SAFT."
12       And is that something that you would do
13   following a board meeting with Kik?  You'd send it to
14   the investment team?
15       A   Certainly.
16       Q   Okay.  And why would you do that?
17       A   To keep everybody informed, get advice,
18   counsel.
19       Q   Okay.  You wrote, "There is north of
20   $50 million of soft-circle demand for the Kin SAFT.
21   Apparently, Olaf has indicated some interest from
22   Polychain.  I will circle back with him."
23       What does soft-circle demand mean?
24       A   That is a term of art which says that
25   these, you know, people are, you know, putting in

Page 151

1    indications of interest or sizing up their perspective
2    interest in an offering.
3        Q   But no one has committed to anything,
4    nothing is irreversible?
5        A   Correct.
6        Q   Okay.  And Olaf, that's the -- I don't know
7    what his title is.
8        A   Founder of Polychain.
9        Q   Founder of Polychain.  Okay.
10       You wrote, "Vaguely, they can raise and
11   close on 75 million in the next week to ten days"?
12       Who is the they?
13       A   The management team.
14       Q   Of Kik?
15       A   Yeah.
16       Q   Okay.  And then, "We decided the following:
17   We will hard cap the entire offering presale and ICO to
18   $100 million."
19       A   Uh-huh.
20       Q   Do you recall that being discussed?
21       A   I do.
22       Q   And that's what ultimately happened,
23   correct?
24       A   No, actually.  There was a time when we
25   thought about raising 125.

Page 152

1        Q   I see.  But at the -- at the end of the
2    day --
3        A   We ended up raising 100.
4        Q   Okay.  And is that because it was capped or
5    just because that's where the -- sort of the interest
6    ran out?
7        A   Well, we -- you know, we held the SAFT to
8    $50 million.  And then when we did the crowd sale we
9    raised 50 but not 75.  So it ended up being 100.  So
10   it's a little above.
11       Q   Was the cap at 75?
12       A   On the crowd sale?
13       Q   Yes, sir?
14       A   Yes.
15       Q   Okay.  You talk about doing AML and KYC,
16   which is anti-money laundering and know your client?
17       A   Uh-huh.
18       Q   Is that what those stand for?
19       A   Uh-huh.
20       Q   And then you write, "We will only draw down
21   on 20 percent of the SAFT until the ICO is completed."
22       What does that mean?
23       A   That means that the company would not get
24   access to the entire 50 million.  We would only get
25   access to 20 percent of it.

Page 153

1        Q   Okay.  And do you recall whether that
2    actually -- was that how it actually worked?
3        A   I believe that is how it actually worked.
4        Q   Okay.  And what was -- why?  Why do it that
5    way?
6        A   It just felt like it was a conservative
7    thing to do, to not take 50 million from a bunch of
8    investors and spend it and never actually execute on
9    the token distribution event.  It just seemed to
10   protect them and, also, you know, incentivize us to
11   deliver on what we were supposed to deliver on, which
12   is to get the crypto token live and get it working
13   inside of Kik and demonstrate that we could do all of
14   that.
15       Q   Okay.  And then you write, "We will not ICO
16   until Kin is working inside of Kik and we can settle
17   Kin off-chain and on-chain."
18       And I think we talked about that.
19       Looking at the rest of your e-mail which
20   reads, "What this all means is that Kik is raising this
21   money from sophisticated investors and is a security
22   offering for now.  It also means that Kik will have
23   access to roughly $15 million of the SAFT proceeds,
24   which when combined with the $15 million they have in
25   the bank will fund the business for 12 months which

Page 154

1  **gives them plenty of time to properly implement Kin**
2  **inside of Kik and the scaleup before they can be ICO."**
3      **When did you understand they were going to**
4  **do the ICO?**
5      A   When we could get Kin working inside of
6  Kik.  I mean, to me, it wasn't clear when that would
7  happen.
8      **Q   Okay.  And why was it not clear to you?**
9      A   Because we to had to build the software.
10  We had to actually, you know, make it work.
11     **Q   When did you understand or when did you**
12  **come to learn that they were actually going to do the**
13  **token distribution event or the ICO, whatever you want**
14  **to call it in September, which was, you know, only a**
15  **few months after this?**
16     A   I don't know, to be honest.  I mean, I
17  can't recall when that became crystal clear to me, but
18  you know, I just wanted -- what you're seeing in this
19  e-mail is me communicating to my partners that the SAFT
20  bought us time to do it properly and that the company
21  would do it properly and that I had a commitment from
22  the company to do it properly.
23     **Q   Okay.  And what did do it properly mean?**
24     A   Make sure that it was working, that we
25  were -- that we had a live crypto token working inside

Page 155

1  of Kik before offering crypto tokens to the community.
2      **Q   And is it your view that that's what**
3  **ultimately happened?**
4      A   It is my view that that's what ultimately
5  happened.
6      **Q   Okay.  Were you surprised to learn at some**
7  **point during the summer of 2017 that Kik only needed**
8  **until mid-September to have a -- to have it work inside**
9  **of Kik?**
10     A   I wasn't surprised.  No.  But, you know, I
11  think that the engineering team in Tel Aviv is much
12  stronger than the engineering team we had prior to
13  acquiring that group.  And they really -- they did a
14  lot that summer.  They -- it was, I would say -- I
15  don't know if surprising is the right word, but I would
16  say I was certainly pleased that our team was as good
17  at doing this as they ended up being.
18     **Q   Okay.  You write in the last sentence of**
19  **your e-mail, "This is still a lot of money, and it**
20  **makes me nervous.  But I do feel that this plan is**
21  **appropriately cautious and certainly much less**
22  **aggressive than some of the things that are getting**
23  **done out there right now."**
24     **Why did it make you nervous?**
25     A   You know -- I just -- you know, I felt --

Page 156

1  look, I mean -- I mean, I lived through the first
2  Internet bubble, you know, when, you know, things just
3  went crazy and all of a sudden people were raising
4  hundreds of millions dollars, you know, on a napkin,
5  and, you know, that ended badly.  And I felt, you know,
6  a lot of, you know, muscle memory from that period and,
7  you know, I just -- I have a natural instinct to be --
8  you know, when everybody wants to buy, you know, I want
9  to sell, you know.
10     It's like I've got a contrarian mindset.
11  Like when everybody is jumping into this thing -- you
12  know, we have been in this market since 2011.  You
13  know, we've been investing in the crypto market for
14  now, you know, six years and all of a sudden everybody
15  wants to get in.  You know, I want to get out, you
16  know.  So that's what you -- you know, I'm a
17  conservative contrarian person.
18     **Q   Okay.  That's very helpful.  We've been**
19  **going for another hour.**
20     A   Okay.
21     **Q   Any objections to a short break?  Great.**
22  **All right.**
23     **Can we go off the record, please?**
24     THE VIDEOGRAPHER:  This ends disc number
25  two.  Going off the record.  The time is now 2:13 p.m.

Page 157

1      (A brief recess was taken.)
2      THE VIDEOGRAPHER:  This begins disc number
3  three.  We are back on the record.  The time on the
4  video monitor is 2:27 p.m.
5      BY MR. SCHLEGELMILCH:
6      **Q   Welcome back, Mr. Wilson.**
7      **During the break you didn't have any**
8  **substantive conversations with the staff?**
9      A   I did not.
10     **Q   I think we overheard a conversation about**
11  **the New York Knicks, but I think that was about it.**
12     A   Does that count as substantive?
13     **Q   It depends on your affiliations.  Let me**
14  **mark another, and I made all these copies.  I might as**
15  **well mark them.  And this has been marked as**
16  **Exhibit 153.**
17     (SEC Exhibit No. 153 was marked for
18     identification.)
19     BY MR. SCHLEGELMILCH:
20     **Q   And it's an e-mail from you to -- it's an**
21  **e-mail chain, but the one at the top is an e-mail from**
22  **you to Mr. Wenger, Burnham, and investment team dated**
23  **June the 15th, 2017 at 10:44 a.m.  And it's USV 0011600**
24  **to 601.  And just let me know when you've had a chance**
25  **to read it.**

Page 158

1     A   Okay.
2     Q   Perfect.  What I'd like you to do is to
3  turn to the second page which begins -- the e-mail
4  chain looks like it begins with an e-mail from Olaf
5  Carlson-Wee to you dated June the 14th, 2017?
6     A   Yep.
7     Q   And Mr. Carlson-Wee is the founder of
8  Polychain?
9     A   Correct.
10    Q   And it looks like Mr. Carlson-Wee has read
11 the Kik white paper and has heard Mr. Livingston speak
12 about the Kin offering in some form whether on video or
13 live or something like that?
14    A   Uh-huh.
15    Q   And he e-mails you about his interest in
16 the Kin offering?
17    A   Yep.
18    Q   Okay.  I just want to make sure -- I'm just
19 trying to lay a little bit of context here.
20       It looks like you forward Mr. Carlson-Wee's
21 e-mail to somebody.  It doesn't say who.
22       And you write, "Olaf is bullish on Kin.  I
23 will dialog more with him on this to make sure he
24 understands the risks here.  I want to strike a
25 balance."

Page 159

1        When you wrote that you want to make sure
2  he understands the risks, what risks were you referring
3  to?
4     A   You know, whether we could get to a token
5  distribution event, which would then convert the SAFT
6  into a token that he could own.  I mean, it's a token
7  fund, right.  So he's not really in the business of
8  owning illiquid assets.  And, you know, just, you know,
9  the challenges of taking a centralized system like Kik
10 and decentralizing it with a crypto token, which I
11 don't think is -- even though that was our game plan,
12 you know, there's some challenges around doing that,
13 scalability being one that we discussed in this e-mail.
14    Q   Okay.  I just want to make sure I
15 understand your answer.  You said that Polychain was
16 not in the business of holding illiquid assets.
17       Is it -- is what you meant by that -- and
18 first of all, I'm not trying to misquote you in any
19 way, if I get it wrong, just say, no, that's not what I
20 said.
21       But is it -- your testimony is that in your
22 mind Polychain was in the business of owning crypto
23 tokens or blockchain tokens that it could sell easily
24 if the -- if it needed to match it's investment
25 interest?

Page 160

1     A   I mean, that is what -- I mean, that is
2  what makes Polychain different than Union Square
3  Ventures.  You know, we own illiquid securities, and
4  they own largely liquid securities.  So, yes, that is
5  what I mean.
6        Now, the truth is they probably hold more
7  illiquid securities than one might imagine because they
8  bought a lot of these SAFTs over the years.  So
9  maybe -- I don't know -- some percentage, 20,
10 30 percent of their fund might actually be in illiquid
11 securities, but that's what I meant by what I said.
12    Q   Okay.  And when you wrote this e-mail on
13 June 15th, was there, in your mind, some risk that Kik
14 would do the SAFT, that they would do this presale and
15 not do the ICO?
16    A   Not so much that they wouldn't ultimately
17 do the token distribution event but that it might take
18 a while to get there, you know.
19    Q   And that the tokens that Mr. Carlson-Wee
20 would purchase on behalf of Polychain would be sort of
21 waiting for the token distribution event to be issued?
22    A   Right.
23    Q   The ones that he purchased through the
24 SAFT?
25    A   That's one of the risks.

Page 161

1     Q   And that it might be an indefinite period
2  of time?
3     A   It could've been a longer period of time
4  than he was counting on.
5     Q   Okay.  And so is it fair to say in June of
6  2015 that you -- or let me ask it a better way.
7        Did you know in June 2017 when the token
8  distribution event was going to occur?
9     A   No, I did not.
10    Q   Okay.  And it looks to me, based on my
11 career of reading other peoples e-mails, that you
12 forwarded this e-mail to Mr. Burnham at USV?
13    A   I think I probably forwarded it to either
14 the investment team or another group, which would have
15 been the partners at USV.  I'm pretty certain I didn't
16 just -- just the way that Brad replies to it, it looks
17 to me like there were other people on this than just
18 Brad.
19    Q   I see.  Can you -- what did you understand
20 Mr. Burnham to be writing in response to your e-mail
21 about Mr. Carlson-Wee?
22    A   Well, he started out by saying Olaf has
23 this exactly right.  Brad, you know -- it's a little
24 bit like you have -- you know, you've got to understand
25 our partnership to truly understand this e-mail, but

1  Brad is the sort of -- he's the sort of big-picture
2  macro thinker, you know, and he -- Albert's the
3  technician, the one thinks who about how you actually
4  implement something and whether it will scale and the
5  computer scientist, and Brad is much more sort of
6  market strategist and macro thinkers.
7       So, I mean, this is classic, actually,
8  reading this e-mail how our partnership behaves, but
9  what Brad was basically saying is that, you know, we
10 should not implement Kin in some sort of -- you know,
11 there was this conflict of, like, private blockchains
12 and, you know, fake blockchains.  And, you know, I
13 think Brad was saying, you know, we put it on Ethereum
14 and make it work on Ethereum, and that's going to be a
15 better solution.
16      Q   Okay.  And then you respond it looks like
17 to Mr. Burnham's e-mail at 9:45 a.m. and you write,
18 "Your idea limited utility day one is exactly what Ted
19 is pushing me on.  Should I cave?  And say yes to
20 that."
21      What does that mean?  What are you
22 referring to when you wrote that?
23      A   Well, because the Ethereum blockchain could
24 not really process many transactions, if Kin was going
25 to be alive on the Ethereum blockchain, we would have

1  to really minimize what transacting could be done with
2  it.  It would have to be very sort of minimally viable,
3  which is what Brad was basically arguing for is put it
4  on a public blockchain, make it a real blockchain, and
5  just, you know, start with a very, very, very thin
6  amount of utility versus putting it on a private chain
7  that we could then let people do all sorts of things
8  with it.
9       Q   And when you wrote that Ted is pushing you
10 on -- well, let me ask it in a better question.
11      What was Ted pushing you on?
12      A   Ted wanted to put it on Ethereum and, you
13 know, really release a minimally viable implementation
14 of Kin inside of Kik, one that Ethereum could support
15 but would not -- you wouldn't be able to do much with
16 it.
17      Q   Okay.  And what -- in the version that --
18 during this time period that Mr. Livingston was pushing
19 you on, what was the minimum?
20      A   That's the part that's a little, you know,
21 hard for me, you know, to, you know, reconstruct what
22 that looked like on June 15th versus what that looked
23 like on July 15th versus that what looked like on the
24 day of the token distribution event.  You know, this
25 is -- this was an ongoing conversation.

1       Q   Okay.
2       A   But, you know, I mean, I wanted to make
3  sure that we had a working implementation of Kin inside
4  of Kik.  That's what I kept sort of hammering on.
5       Q   And what is it -- am I reading this
6  correctly when you say should I cave and say yes to
7  that, it should -- and I'm speaking as you -- should I
8  say yes to this sort of minimum whatever, this minimum
9  thing that Ted is pushing you on?
10      A   Yes.
11      Q   Okay.
12      A   And Brad came back and said, you know, if
13 the limited utility is clearly defining a path towards
14 an open decentralized protocol, then I don't see why
15 not.  His point was, you know, it can be minimally
16 viable day one, and then you can make it more and more
17 and more viable every single day and deliver what you
18 want to see thread over some period of time as opposed
19 to having it all there day one.  That was what he was
20 saying.
21      Q   Okay.  But your preference was to have it
22 all sort of there on day one?
23      A   I wanted my cake and eat it, too.  Don't we
24 all?
25      Q   And so you respond to Mr. Burnham's e-mail,

1  "I feel like the bling is leading the blind"?
2       A   That's a typo.  That's the blind.
3       Q   Okay.  So what you meant to write was I
4  feel like the blind is leading the blind here?
5       A   Yes.
6       Q   And what did you mean by that?
7       A   You know, we're stumbling in the dark.  We
8  don't really know, you know.  We're trying to figure
9  out what, you know, the right thing to do here is, and
10 there's not a lot of guidance being given by anybody,
11 you know.
12      And we're going to -- you know, we're
13 setting a precedent for how a large centralized network
14 decentralizes.  And, you know, Ted's relying on me and
15 I don't have a lot of experience in this.  And, you
16 know, I'm reaching out to my partners to help, you
17 know.  Help me.  Help me help Ted.  Help me help the
18 company.
19      Q   Okay.  And then looking at the top
20 e-mail --
21      A   Right.
22      Q   What you wrote was, "What Ted wants to do
23 is on-chain but not a truly transactional service day
24 one.  You would be able to have Kin and display them on
25 your profile but not send them around.  I think that is

Page 166

1    what Brad meant 'status' and not a lot more."
2        What do you recall about this, what Ted
3    wants to do being on-chain but not a truly
4    transactional service --
5        A    This is -- you know, I mentioned this
6    before.  They did not want to allow peer-to-peer
7    transactions between Kik users -- me sending you Kin --
8    inside Kik, day one.  They didn't think that they could
9    support that from a scaling perspective, and there was
10   also trust and safety issues around that, too.
11       Q    When you say trust and safety issues, what
12   do you mean by that?
13       A    You know, we -- you know -- you just -- you
14   know, you can have some bad person doing some bad
15   thing, right.  We've got to make sure that, you know,
16   we're not, you know, facilitating, you know, people
17   doing things -- you need to be -- if you're going to
18   implement something like, you know, a peer-to-peer
19   payment system, you've got to have it instrumented so
20   you can kind of watch the stuff go around and make sure
21   that there's not sketchy stuff going on.
22       Q    Okay.  And you write, "You would be able to
23   have Kin and display them on your profile."
24       What does that mean?
25       A    You know, like say like I've got 400,000

Page 167

1    Kin or I've got 300,000 Kin or I've got 500,000 Kin.
2        Q    And I think that -- I think you write this
3    in the next sentence that you would be able to -- that
4    your status or the amount of Kin that you own --
5        A    Uh-huh.
6        Q    -- would be displayable or known?
7        A    Right.
8        Q    Is that how -- at the time of the token
9    distribution event, is that the -- is that what you
10   could do with Kin?
11       A    No, no, no.  Because I think that we
12   ultimately added the ability to earn and spend by
13   buying stickers.
14       Q    Okay.  At the time of the token
15   distribution event?
16       A    Yes, yeah.
17       Q    Okay.
18       MR. MURTHA:  If you hadn't had the ability
19   to buy and spend, do you think that this was a -- have
20   minimum liability?
21       THE WITNESS:  I mean, look, this is all an
22   unknowable answer, right.  Like, we don't -- there --
23   there's no -- there's no guidance on that.  We -- I
24   don't know, you know.  That's why, you know, I feel
25   like the blind's leading the blind here, you know.

Page 168

1    There's no bright line test of that.  You know, it's
2    just an excruciating part of trying to be a responsible
3    board member and do the right thing without any
4    guidance.
5        MR. LEASURE:  Just because we talked about
6    guidance earlier in the day, and I think you were
7    connecting guidance to securities law guidance.  When
8    you're talking in this context, are you talking about
9    just business cases went up from a business
10   perspective?
11       THE WITNESS:  No.  Not -- I mean, it would
12   be helpful to know when something is a utility token.
13       MR. LEASURE:  Under -- okay.  And I'm
14   asking in these -- we see these e-mails in mid-June --
15       THE WITNESS:  Uh-huh.
16       MR. LEASURE:  Is that -- and we see the
17   word utility in there.
18       THE WITNESS:  Uh-huh.
19       MR. LEASURE:  And are you talking -- are
20   these discussions in part concerns about securities
21   laws or are they concerned about just business case,
22   what's responsible -- I'm trying to get context of what
23   your concerns are at this time in June.
24       THE WITNESS:  It is my belief that you
25   cannot have a functioning crypto token economy where

Page 169

1    every crypto token is a security.  We're never going to
2    get there, okay.  So we have to have a bright line test
3    about when something is no longer security and it is a
4    utility.  Okay.  That's what we need.  And no one's
5    given it to us.  So we're making it up.
6        MR. LEASURE:  Well, I'm asking a slightly
7    different thing.
8        THE WITNESS:  Okay.
9        MR. LEASURE:  And I just want to be clear.
10   These discussions in June where it looks like you and
11   Ted are having a back and forth about what, you know,
12   should be implemented in Kin on day -- at Kik on day
13   one --
14       THE WITNESS:  Uh-huh.
15       MR. LEASURE:  I'm trying to understand if
16   those are business discussions or if those are
17   discussions about securities laws, something else --
18       THE WITNESS:  Everything, everything.
19       MR. LEASURE:  All of it altogether?
20       Because it's not just about securities
21   laws, it's about, you know, users are going to be
22   earning Kin, right.  We want that Kin to be something
23   that they can spend, that they can exchange, right.
24   You know, so it's got to be utility.  It's got to be
25   something like a currency.  It's got to be something

Page 170

1  like a euro or a yen, right.
2         And so it's about securities laws.  It's
3  about tax laws.  It's about, you know, a lot of things.
4  It's not just about securities laws in my mind.
5         BY MR. SCHLEGELMILCH:
6         Q   You talked about guidance regarding the
7  securities issues.
8             Do you know whether or not Kik sought
9  guidance from the Ontario Securities Commission?
10        A   I'm not sure why they went and talked to
11  the Ontario Securities Commission, but they did.
12        Q   Okay.  Do you have an understanding of what
13  guidance the Ontario Securities Commission -- well, let
14  me step back and -- that's sort of preliminary
15  question.
16            Do you know what Kik asked the Ontario
17  Securities Commission about?
18        MR. CADIGAN:  Well, actually, I just want
19  to -- I mean, if we step out, I just want to make sure
20  you agree that your knowledge is based upon
21  communication with counsel.  I instruct you not to
22  answer that.  If we need to step out to discuss that.
23        THE WITNESS:  I don't really know,
24  honestly.  I don't really know why we went and talked
25  to the Ontario Securities Commission.  I know we did.

Page 171

1         BY MR. SCHLEGELMILCH:
2         Q   Okay.  And do you know that -- and with
3  your counsel's sort of concerns sort of baked into my
4  question, do you know what they asked about of the
5  Ontario Securities Commission?
6         A   I do not.  I do not.
7         Q   Okay.  Do you know -- and, again, with your
8  counsel's concern sort of baked into this question, do
9  you know what Kik was told in response to their quarry
10  to the Ontario Securities Commission?
11        A   I do not.  But I do know that all Canadian
12  passports that we received in our KYC effort were
13  removed from the offering.
14        Q   Meaning that Canadian citizens, people who
15  had a Canadian passport were not participating -- were
16  not permitted to participate in the token distribution
17  event?
18        A   That is what resulted from that meeting,
19  and I don't know what we asked them for and I don't
20  know what they told us.  But I know that was what the
21  result was.
22        MR. LEASURE:  With your counsel's
23  admonitions, again, going through these series of
24  questions -- the Ontario securities regulators, do you
25  know if they ever reached out to the U.S. securities

Page 172

1  regulators prior to token distribution event?
2         THE WITNESS:  I do not.
3         MR. LEASURE:  But was there discussion
4  about doing so?
5         THE WITNESS:  There may have been, but I
6  don't know.
7         MR. LEASURE:  You weren't involved in it?
8         THE WITNESS:  Maybe I was.  Maybe I wasn't.
9  I don't recall.
10        MR. LEASURE:  You don't recall.  Okay.
11        BY MR. SCHLEGELMILCH:
12        Q   And I should have made this clear at the
13  beginning of the day and I didn't, but I'm not trying
14  to get into your conversations with counsel.  Those
15  are -- the company has not waived it's privilege.  I
16  have no interest in making you waive on their behalf.
17  I just -- I'm not trying to invade that at all.
18        A   Okay.
19        Q   So if there's a -- if I ask you any
20  question where the answer to it depends or turns or
21  includes conversations that you had with counsel, we
22  can call a time out and we can figure out how to
23  resolve it.
24        A   Okay.
25        Q   Is that fair, counsel?

Page 173

1         MR. CADIGAN:  Yes, yes.  Thanks.
2         BY MR. SCHLEGELMILCH:
3         Q   Let me hand you what will be marked as 154.
4             (SEC Exhibit No. 154 was marked for
5             identification.)
6         BY MR. SCHLEGELMILCH:
7         Q   And just for the record, this is an
8  e-mail -- it's an e-mail string.  The top of the string
9  is from you to Mr. Burnham and carbon copied to
10  investment team dated June 16, 2017, at 4:45 a.m.  I
11  can only hope that you were on the west coast when this
12  went through, and it's USV 0011569 through 573.
13        A   By the way, I believe that this entire --
14  not that this is material in any way -- this entire
15  chain of e-mails starting on June 3rd and going to this
16  one sent by me when I was in Europe.  I was in
17  Europe for the entire month of June in 2017.
18        Q   Okay.
19        A   So that may explain some of the time stamp
20  issues.
21        Q   Well, I would have also accepted I'm an
22  early riser.
23        A   I am, but I think that's what was going on.
24        Q   Okay.  Oh, you're ready.  I'm sorry.  I
25  didn't want to rush you.

Page 174

```
 1         What this looks like, if you look on page 2
 2   of the exhibit, is a lengthy e-mail from Mr. Morehead
 3   at Pantera Capital to someone named Sunil?
 4      A   Uh-huh.
 5      Q   Do you know Sunil Shah?
 6      A   I do.
 7      Q   Okay.  Who is Sunil Shah?
 8      A   He's a venture capitalist on the west
 9   coast.
10      Q   Okay.  So and he writes a lengthy e-mail to
11   Mr. Shah regarding among other things Kin; is that
12   correct?
13      A   Yes.
14      Q   Okay.  I'm not going to spend a ton of time
15   on Mr. Morehead's e-mail.  I don't know that it makes a
16   ton of sense to talk with you about it, but Mr. Shah
17   takes Mr. Morehead's e-mail and forwards it to
18   Mr. Monegro who works for Union Square?
19      A   Not at the time.  He was gone by the time
20   this happened.  He now works for a fund called
21   Placeholder.
22      Q   Okay.  So at the time of this e-mail,
23   Mr. Monegro worked for Placeholder?
24      A   Correct.
25      Q   Mr. Monegro forwards it to Mr. Burnham
```

Page 175

```
 1   with a carbon to Mr. Burniske?
 2      A   Who is his partner at Placeholder.
 3      Q   I see.  But Mr. Burnham works at USV.
 4   Okay.  So that is the route that this e-mail took
 5   through the ether, not capitalized.  And then
 6   Mr. Burnham responds, and it looks like he forwards it
 7   on talking about he finds it wild that someone is using
 8   Kik's white paper.  And then we get to your e-mail
 9   which appears to be a response to Mr. Burnham's.  Okay.
10   That's where we're at.  It was a long walk for a short
11   drink, but that's where we're at.
12         You write, "Dan at Pantera is my problem
13   right now in managing Ted.  Dan is pushing Ted to
14   optimize for market cap not token utility.  He's
15   arguing that the first token to hit CoinMarketCap that
16   is about decentralizing an existing centralized app
17   will go right to the top of the charts and the next one
18   will hardly register."  Just stopping right there.
19         How was Dan at Pantera your problem right
20   now in managing Ted?
21      A   He was giving Ted a different set of advice
22   than I was.
23      Q   What's your understanding of what mister --
24   what Dan at Pantera was telling Ted?
25      A   So I never talked to Dan.
```

Page 176

```
 1      Q   Okay.
 2      A   Everything that I wrote here I heard
 3   thirdhand through Ted.
 4      Q   What did Mr. Livingston tell you he was
 5   getting from Mr. Morehead at Pantera?
 6      A   He was saying got to get the token
 7   distribution event done ASAP.
 8      Q   And why?
 9      A   Because the first centralized -- again, Dan
10   never said this to me.  What I heard third party from
11   Ted was that Dan's argument was the first centralized
12   app to have a live token would be wildly successful and
13   the second one would barely register.
14      Q   And the analogy that you understood from
15   Ted was -- looking -- I think you're right.
16         "He literally told Ted do you know who the
17   second black baseball player is," meaning that -- the
18   baseball player that came after Jackie Robinson?
19      A   That's what Ted told me he said.
20      Q   Okay.  And just for the record, it's Larry
21   Doby, and he played for the Cleveland Indians.  And
22   he's the first American league professional -- African
23   American professional baseball player.  I grew up in
24   Cleveland.  There's a statue of Larry Doby.  He's a big
25   deal.  And I promised, specifically Mr. Murtha, I would
```

Page 177

```
 1   get this on the record.
 2      A   I think it's important that it be on the
 3   record, and I didn't know the answer to that.  And I
 4   would -- if Dan ever asked me who the second black
 5   baseball player is, now I know.
 6      Q   It's Larry Doby.
 7      A   How do you spell it?  D-o-b-e?
 8      Q   D-o-b-y.
 9      A   D-o-b-y.  Okay.
10      Q   You write next, "I've been arguing that we
11   should do the token distribution event when Kin is live
12   and working in Kik then we can settle on and off-chain.
13   Anything short of that seems janky to me."
14         What did you mean by anything short of that
15   seems janky to me?
16      A   Well, we've discussed this, you know, for
17   the past half hour.  So I just wanted real utility.
18      Q   And you understood through Ted -- I
19   understand this was through Mr. Livingston -- that
20   Mr. Morehead at Pantera was pushing for speed over
21   utility?
22      A   Yes.  That's what I heard from Ted.
23      Q   "Dan is arguing we should rig something up
24   that is gimmicky but passes the Howey Test and do the
25   token distribution event ASAP."
```

Page 178

1      **What did you mean by rig something up that**
2  **is gimmicky that passes the Howey Test?**
3      A   I don't know.  I mean, I don't know whether
4  those were Ted's words or Dan's words or that I wrote
5  them.  I really don't know.  But I mean, I -- you know,
6  something less than what I wanted.
7      **Q   Okay.  What is the Howey Test?**
8      A   The Howey Test is one of the tests to know
9  whether something's a security or not.
10     **Q   Okay.  And you understood through Ted that,**
11 **again, Mr. Morehead was pushing for speed and was**
12 **willing to do something gimmicky to pass the Howey**
13 **Test?**
14     A   I think he was arguing that Kik should be
15 willing to do that.
16     **Q   Okay.  Understood.**
17         MR. LEASURE:  Why would Ted care what Dan
18 Morehead wants?
19         THE WITNESS:  You know, Ted -- you know,
20 Ted's a -- you know, Ted's a -- you know, he's -- he
21 takes counsel from lots of people.  And, you know, in
22 the -- my relationship with him, going back to the
23 earliest days, you know, he'd call me up and say so and
24 so thinks we should do this, what do you think.  It's
25 just one more example of that.

Page 179

1          MR. LEASURE:  All right.  So just because
2  Dan Morehead -- any other reason than that?
3          THE WITNESS:  I don't know.  I mean, I
4  wasn't involved in that conversation.  I really don't
5  want to speculate.  But, you know, this was not
6  atypical of my relationship with Ted where he would run
7  a conversation he had with somebody else by me.
8          BY MR. SCHLEGELMILCH:
9      **Q   Pantera ultimately was one of the larger**
10 **purchases during the presale, correct?**
11     A   Correct.
12         MR. LEASURE:  But at this time Pantera -- I
13 think I have this right.
14         Pantera still had the option of walking
15 away from the presale?
16         THE WITNESS:  I don't know.  I mean,
17 when -- I don't know when, you know, they committed to
18 it.  I don't know when they funded it.  I really don't
19 know.
20         MR. LEASURE:  Is it -- well, never mind.
21         MR. MURTHA:  Did you ever come to
22 understand that Pantera might be willing to walk away
23 from investing in the Kin ICO if Kik didn't
24 acquiesce --
25         THE WITNESS:  No. I don't think -- I don't

Page 180

1  think that's -- I don't really think that was what the
2  tone intended or the conversation was.  I think Dan was
3  very bullish on Kin.  He wanted to see us move it very
4  quickly to move on what he saw was a first move or
5  advantage.  And he was just putting a lot of pressure
6  on Ted to move more quickly.  And that's -- I think is
7  the extent of it.
8          MR. MURTHA:  But you're just speculating
9  that?  You never came to actually --
10         THE WITNESS:  I never talked to Dan, but I
11 don't think -- I don't know because I never talked to
12 Dan.  But I don't think that there was some you got to
13 do it this way or we won't put money in this out there.
14 I really don't think that that's what was going on.  I
15 think it was more like I'm really excited about this,
16 can we go faster.  It was -- I think it was that kind
17 of conversation.
18         MR. MURTHA:  At the time you wrote this
19 e-mail on June 16th, did you have any kind of
20 expectation how long it would take until the Kin was
21 live and working on Kik, even if it was like a range of
22 time?
23         THE WITNESS:  I mean, no.  I mean, I
24 thought we could do it, you know, in -- certainly by
25 year-end, you know.  I mean, I thought we could get it

Page 181

1  done in '17.  But I -- you know, I didn't know the way
2  that we could get it done in a month, two months, three
3  months, four months, five months.  I just didn't have a
4  good sense of that.
5          BY MR. SCHLEGELMILCH:
6      **Q   Let me hand you what's been previously**
7  **marked as Exhibit 48.**
8          **What is Exhibit 48?**
9          **Let me ask you a better question than that:**
10 **Have you ever seen Exhibit 48 before?**
11     A   Yes.
12     **Q   Okay.  What is it?**
13     A   It's the board resolutions that we passed
14 that authorized the company to do the SAFT.  And I
15 guess -- and maybe aspects of the token distribution
16 event as well.  I'm not entirely clear whether this was
17 the entirety of the resolutions that were required for
18 the token distribution event, but, certainly, this was
19 the board resolution that gave the company the
20 authority to do the SAFT.
21     **Q   Well, let's look at the whereas clause.  If**
22 **you look at the first whereas clause, it reads,**
23 **"Whereas the company has been developing a strategy to**
24 **build out a semi-centralized blockchain-based computer**
25 **network called the Kin Ecosystem that enables economic**

Page 182

1    transactions and a reward system for digital service
2    providers as well as an application to make it's
3    network accessible via the Kik messaging platform,
4    defined as the network application.
5         "Whereas the corporation proposes to offer
6    for sale to the public an appcoin called Kin at such
7    time as the Kin Ecosystem is functional.
8         "Whereas the corporation requires
9    additional funds to finance the development of the Kin
10   Ecosystem and the network application before such
11   rollout of the Kin Ecosystem and development of the
12   network application."
13        So what did you -- when you -- if you look
14   at the last page of this, you signed this?
15        A  Uh-huh.
16        Q  You DocuSigned it?
17        A  I did.
18        Q  What was your understanding of what you
19   were DocuSigning with respect to these, these two
20   whereas clauses or these three whereas clauses?
21        A  Well, like I said, I was certainly
22   consenting to the SAFT offering and possibly also
23   pieces of the token distribution event.
24        Q  Well, yeah.  And the next whereas clause
25   discusses the SAFT.

Page 183

1        A  Right.
2        Q  And then the whereas after that was,
3    "Whereas the corporation proposes to raise up to 50
4    million in presales pursuant to the SAFT, which a
5    significant portion of that amount raised under the
6    SAFT will be used to fund the corporation's build out
7    of the Kin Ecosystem and network application."
8         And then, "Whereas the corporation proposes
9    to raise an additional 50 million in a public token
10   distribution event once the Kin Ecosystem is billed
11   out," meaning the -- token distribution event.
12        Again in -- this is dated January -- or I'm
13   sorry -- June 26, 2017.  When was your understanding of
14   when that token distribution event was going to happen
15   or what needed to happen before it could happen?
16        A  Those are two separate questions.
17        Q  Well, then I'll break it -- I'll -- what
18   needed to happen before this token distribution event
19   could occur?
20        A  We needed to get Kin working inside of Kik.
21        Q  Okay.  And, again, at the end of June, do
22   you recall what your understanding was of when that was
23   likely to happen?
24        A  For the, at least, 5th time, no.
25        MR. LEASURE:  So just to -- when this is --

Page 184

1    once the Kin Ecosystem is built out, does that mean to
2    have Kin working within Kik?
3         THE WITNESS:  I think what we wanted to do
4    was demonstrate real functional utility of a Kin token,
5    and the place we wanted to do that was inside of the
6    Kik app.
7         MR. LEASURE:  And that's what's meant by
8    the Kin Ecosystem is built out?
9         THE WITNESS:  I think the Kin Ecosystem
10   actually in that resolution refers to Kin running on a
11   public blockchain.  And running inside of Kik in that
12   resolution is the network application, I think, is what
13   the definition is.  So, you know, I think this
14   resolution may be a -- you know, this is written like a
15   board resolution, and that's what it is.
16        BY MR. SCHLEGELMILCH:
17        Q  Okay.  Let me hand you what's been
18   previously marked as Exhibit 49.
19        Have you ever seen this document before?
20        A  This looks like the same resolution.
21        Q  But that's -- and I understand you're --
22   you acted like you were kind of frustrated with my last
23   round of questions, which is fair.  There's a long line
24   of people who are frustrated with me.
25        But it's dated two days later.  It's dated

Page 185

1    June the 28th, right?
2         A  Yeah.
3         Q  The last one we looked at was dated June
4    the 26th.  It appears to cover the same topic, and by
5    topic I mean the SAFT.  And the -- but it does it in a
6    different way.
7         And your DocuSign appears on both of them
8    two days apart, correct?
9         A  Yes.
10        Q  And my question is:  Why was there two days
11   later another board resolution on exactly the same
12   topic?
13        A  I don't know.  Honestly, I mean, I'm sure
14   there's a reason, but I can't recall why that happened.
15        Q  You don't recall any like conversation
16   about hey we need to redo the board resolution or hey?
17        A  No, I don't recall, but I'm sure it
18   happened.
19        Q  Okay.  If you look at the second whereas on
20   the June 28th board resolution, it talks about -- it
21   reads, "Whereas the corporation proposes to offer for
22   sale to the public an app coin called Kin at such time
23   as the corporation can introduce the MVP," which is
24   defined on the next page.
25        Do you see that?

1    A   Yep.

2    Q   What does that mean?

3    A   Well, it looks like, you know, we're more

4  tightly defining when we can do a sale to the public by

5  introducing the concept of an MVP, which is then

6  described in some detail at the end of the resolution.

7    Q   Okay.  And do you recall why that happened?

8    A   I do not recall why that happened.

9    Q   Okay.  What is your recollection of what an

10  MVP meant in the context of this board resolution?

11    A   Well, in the context of this board

12  resolution what it says right here at end of

13  the signatures.

14    Q   Sure.  My question, though, is slightly

15  different.  I'm just asking what you -- what, if

16  anything, you recall about the discussion of the MVP

17  during this time period?

18    A   And I really don't recall why there's two

19  resolutions here.  And, you know, I'm not trying to be

20  difficult here, but I just don't really remember this.

21    Q   Okay.

22    MR. LEASURE:  And was the Kin Ecosystem

23  functional at the time of the token distribution event?

24    THE WITNESS:  As defined by the definition

25  in this first resolution?

1    MR. LEASURE:  Yes.  Exhibit 48.

2    THE WITNESS:  Yes.  I would say that the

3  company had built out a semi-centralized

4  blockchain-based computer network.  Yes, I would say

5  that that was functional.

6    BY MR. SCHLEGELMILCH:

7    Q   Was the MVP, as defined in Exhibit 49, was

8  that functional at the time of the token distribution

9  event?

10    A   I don't know whether -- I mean, what I

11  would say is that most of this functionality was live

12  at the time of the token distribution event, but I

13  can't say definitively that all of it was.  For

14  example, I don't know that a Kik user who has a wallet

15  will be able to send any of his or her premium stickers

16  to any Kik user.  I don't know.  I don't know if that

17  actually was implemented.

18    Q   Okay.  Well -- and, again, if you don't

19  recall, that's fine.

20    What do you recall being functional?

21    A   The wallet and the ability to use the Kin

22  to acquire stickers.

23    Q   Which were awarded based on how much Kin

24  you had?

25    A   No.  I think you had to actually spend the

1  Kin to get the stickers.

2    Q   Okay.  That's your memory?

3    A   That's my memory.

4    Q   Okay.  Let me hand you what we'll mark as

5  155.

6    (SEC Exhibit No. 155 was marked for

7    identification.)

8    BY MR. SCHLEGELMILCH:

9    Q   And this is an e-mail from you to Alexander

10  Ljung?

11    A   Yeah.

12    Q   Did I get that right?

13    A   Yep.

14    Q   Pronunciation-wise that's right?

15    A   Uh-huh.

16    Q   And Eric Wahlforss and Christophe Maire

17  dated July the 16th, 2017.  And it is USV 0011165

18  through 167.  And my questions are only going to focus

19  on your e-mail.

20    A   Uh-huh.

21    Q   And, first of all, who is Alexander Ljung?

22    A   He's the former CEO of SoundCloud.

23    Q   Okay.  And Mr. Wahlforss?

24    A   Alex's cofounder and currently the chief

25  product officer at SoundCloud.

1    Q   And Mr. Maire?

2    A   He is a board former -- well, former board

3  member and investor in SoundCloud.

4    Q   Okay.  You write -- and this is, again, in

5  July -- July 16, 2017, "It took Kik about six months to

6  get to the point where they could do a presale of their

7  token, which is going on now, and will take another six

8  to 12 months before they can release Kin token inside

9  of Kik."

10    Do you see that?

11    A   I do.

12    Q   Is that an accurate statement or was it an

13  accurate statement in July of 2017 of when you

14  understood Kik could release the Kin token inside of

15  Kik?

16    A   Not -- I mean, well, in hindsight,

17  certainly not an accurate statement.  They got it done

18  much more quickly than that.

19    Q   Okay.

20    A   But it does, I think, point out that it was

21  unclear to me at the time that I wrote this how quickly

22  they could ultimately do that.

23    Q   Okay.  And, again, you were at the -- you

24  understood that the big problem was the number of

25  transactions on the Ethereum network?

1    A   Right.
2    Q   And even as you sit here that problem
3  hasn't been solved yet; is that correct?
4    A   It's getting better but not quickly enough.
5    Q   You know, here's the thing.
6        Can we go off the record?
7        THE VIDEOGRAPHER:  Going off the record.
8  The time on the video monitor is 3:14 p.m.
9        (A brief recess was taken.)
10       THE VIDEOGRAPHER:  We are back on the
11  record.  The time is now 3:34 p.m.
12  BY MR. SCHLEGELMILCH:
13   Q   Great.  Welcome back, Mr. Wilson.
14       During the break, Mr. Wilson, did you and
15  any member of the staff have any substantive
16  conversations?
17   A   Nope.
18   Q   Great.  You mentioned earlier that you have
19  a blog; is that correct?
20   A   That is correct.
21   Q   How frequently do you post on the blog?
22   A   Every day.
23   Q   That is impressive.
24   A   Thank you.
25   Q   What is the name of your blog?

1    A   AVC.com.
2    Q   Okay.  Right.  Let me mark -- this is 156.
3        (SEC Exhibit No. 156 was marked for
4        identification.)
5        BY MR. SCHLEGELMILCH:
6    Q   This is an e-mail from Peter Heinke dated
7  June the 12th 2017 to Paul Holland, Michelle Dent, and
8  Kik board with carbons to some other folks.
9        Do you see that?
10       Well, let me give you a chance to read it.
11   A   Okay.  Okay.
12   Q   My question really just concerns the e-mail
13  from Michelle Dent to Kik board on Monday, June
14  the 12th, 2017.
15       Do you see that?
16   A   I do.
17   Q   Okay.  Are you a member of the Kik board
18  e-mail group?
19   A   I am.
20   Q   Okay.  And it's not on this exhibit, but
21  did you forward this e-mail from Michelle Dent to Kik
22  board to investment team?
23   A   I may have.
24   Q   Okay.  Do you recall doing that?
25   A   Honestly, I don't recall doing it, but I

1  believe I did.
2    Q   Okay.  And it's your practice to do that?
3    A   Generally speaking, I would do that.
4    Q   Okay.  And that's actually all I have on
5  this one.
6        MR. LEASURE:  Why would you do that?
7        THE WITNESS:  So we have a practice at USV
8  of sharing all board decks internally.
9        MR. LEASURE:  So there wasn't a particular
10  thing about that board deck that would have led you to
11  do so?
12       THE WITNESS:  Not necessarily.  I mean, we
13  don't always 100 percent do it, but it's like a
14  95 percent thing.  Like, we want to do that.  That's
15  our practice.
16       MR. LEASURE:  Yeah.  And I'm asking was
17  there something in particular about that board deck and
18  the content of it that led you to forward it to the
19  investment team?
20       THE WITNESS:  I don't think so.
21       MR. LEASURE:  Okay.  And did you expect any
22  particular feedback on that board deck in particular?
23       THE WITNESS:  I didn't expect it, but it
24  would have been great to get it.
25       MR. LEASURE:  Sure.  You won't mind it?

1        THE WITNESS:  Right.
2        MR. LEASURE:  But there wasn't a demand or
3  an expectation about that particular board deck that
4  you get some particular important feedback?
5        THE WITNESS:  There might have been, but I
6  don't recall that to be the case.
7        MR. LEASURE:  That's fine.
8        MR. MITCHELL:  And why do you like this --
9  why do the folks at USV like to share these board
10  decks?
11       THE WITNESS:  It's just a great way for all
12  of us to stay up to speed on all of our portfolio
13  companies and the issues that they all are facing.
14  And, you know, we invest in a lot of companies that are
15  similar.  So it's shared learning and just sort of what
16  our practice is.
17       MR. MITCHELL:  And I have a couple follow
18  ups on that.  I had gotten a letter before with some
19  names of companies.  I just want to make sure I
20  understand it right.
21       The entity that owns the Kik share is Union
22  Square Ventures 2008, LP?
23       That's correct.
24       MR. MITCHELL:  And there's another entity
25  Union Square Ventures, LLP?

Page 194

1    THE WITNESS: That's our management
2 company.
3    MR. MITCHELL: And that also provides
4 investment advisor services into funds like Union
5 Square Ventures 2008, LLP?
6    THE WITNESS: Yes.
7    MR. MITCHELL: And Union Square Ventures,
8 LLP advises.
9    Does it provide advice to Kik?
10    THE WITNESS: Not formally, no.
11    MR. MITCHELL: Did -- well, did Union
12 Square Ventures 2008, LP have any role in planning or
13 conducting the Kin token offering sale?
14    THE WITNESS: Union Square Ventures 2008?
15    MR. MITCHELL: Yeah.
16    THE WITNESS: No.
17    MR. MITCHELL: Okay. Did Union Square
18 Ventures, LLP, have any role in the Kin token offering?
19    THE WITNESS: Other than the fact that I'm
20 a board member of Kik, no.
21    BY MR. SCHLEGELMILCH:
22    Q   Moving right along. Look at all this
23 progress we're making. Let's mark this as 157.
24    (SEC Exhibit No. 157 was marked for
25    identification.)

Page 195

1    BY MR. SCHLEGELMILCH:
2    Q   In Exhibit 157 is an e-mail string at the
3 top of the string is an e-mail from you to
4 Mr. Livingston. The e-mail at the very top is dated
5 May 20, 2017, at 9:03 a.m. The Bates stamp is
6 Kik_00025016 through 17. This looks like it should be
7 a pretty quick read.
8    In the e-mail that appears in the middle of
9 the page, the middle of the first page, you write to
10 Peter, who I suspect is Mr. Heinke, and Ted who is Ted
11 Livingston, "I woke up this morning feeling very
12 uncomfortable with the idea of being on the Kik
13 Foundation board. Is there anyone else, maybe Jim, who
14 would be willing to do it?"
15    And then you have a continued dialogue with
16 Mr. Livingston about this. You state that you don't
17 like the personal risk of appearing on the Kin
18 Foundation board and that you don't love the idea of
19 staking your reputation and responsibility on something
20 I don't feel totally comfortable with.
21    What made you feel uncomfortable about the
22 Kin Foundation board?
23    A   I'd never done something like that in my
24 career. You know, I take board seats in privately held
25 companies on a regular basis, and I know what that is.

Page 196

1 And I know what the risks are on that. And, you know,
2 I can make a -- you know, an informed decision about
3 whether or not I want to do that.
4    And here I just -- you know, I don't -- I
5 mean, this is -- you know, a relatively new concept of
6 a crypto economy, you know, decentralized with a
7 foundation, you know, at the center of it and what the
8 boards responsibilities are and so on and so forth. It
9 just was something that I just couldn't wrap my head
10 around.
11    Q   Okay. When you wrote I don't like the
12 personal risk, what were you referring to?
13    A   Just, you know, I think that sitting on
14 boards is a -- you know, is a, you know -- you're
15 staking your reputation and possibly more on your
16 ability to live up to your obligations as a director.
17 And, you know, I just wasn't comfortable with, you
18 know, what that was here.
19    Q   Okay. Prior to the token distribution
20 event, did Kik increase the amount of directors and
21 officers liability insurance it carries?
22    A   For the company?
23    Q   Yes, sir.
24    A   I think so.
25    Q   And do you recall what it was and what it

Page 197

1 sort of increased to?
2    A   I do not.
3    Q   Do you recall why that was increased?
4    A   I think the board felt like there was an
5 increased possibility of litigation against the
6 directors and officers of the company and that it
7 warranted getting more insurance.
8    Q   Litigation regarding what?
9    A   Just the new business model and all of the
10 new stakeholders in that business model and you know,
11 just seemed like a prudent thing to take some more
12 insurance.
13    Q   And litigation by whom?
14    A   I don't know. I don't know that we went
15 that far, you know. I think we just looked at it and
16 said, you know, we're entering, you know, an uncertain
17 and unknown world here. Let's make sure that we, you
18 know, are properly, you know, protected by, you know,
19 insurance to the extent that insurance can protect us.
20    Q   Do you recall whose idea that was or who
21 brought that to the table?
22    A   I don't know. It could have been me. It
23 could have been Peter. It could have been Paul. It
24 could have been Sam. I don't really know.
25    Q   Okay. And other than what you've already

Page 198

1 shared, do you recall any of the conversations at the
2 board level surrounding that issue?
3     A   I do not.
4     Q   Let me hand you what will be marked as
5 Exhibit 158.
6         (SEC Exhibit No. 158 was marked for
7         identification.)
8 BY MR. SCHLEGELMILCH:
9     Q   And this should take you about two seconds
10 to read.  It's a very short e-mail from you to William
11 Redashell?
12    A   Yep.
13    Q   On December the 11th, 2017?
14    A   Uh-huh.
15    Q   I'll wait until you finish.
16    A   I'm finished.
17    Q   Okay.  Who is William Redashell?
18    A   He's somebody that has been close to the
19 company for a long time, not on the board, an advisor
20 to Ted, a tech entrepreneur, and now probably in his
21 60s or 70s.  I'm not entirely sure.  Semi retired.  And
22 he was somebody that we had thought about possibly
23 asking to be on the Kin Foundation board.
24    Q   Okay.  You write that he made a ton of
25 sense on this call.

Page 199

1         What call are you referring to?
2     A   We had a call, Ted for sure, me.  I don't
3 know if Peter was on the call or not.  And maybe there
4 were a few others.  I don't know.  And I'm not even
5 sure what the agenda was for that call, you know.  I
6 can't totally remember.
7         But I just remember him raising a bunch of
8 issues about the Kin road map, the Kin Ecosystem that,
9 you know, I thought were, you know, really well said
10 and I wanted to flush it out in more detail with him.
11    Q   Okay.  And do you recall specifically what
12 he said that made a ton of sense to you?
13    A   Yeah.  I mean, there was a bunch of
14 questions that he had around price of ability, stable
15 coins, and, you know, whether or not we needed to, you
16 know, think about that for Kin if we wanted it to be,
17 you know, really a transactional type of
18 cryptocurrency.  And so, you know, I thought those were
19 really interesting questions.  And I thought, you know,
20 it would be worth exploring in more detail with him.
21    Q   Did he raise concerns about the Kin
22 Foundation?
23    A   I don't know that he did, but those weren't
24 the issues that I was interested in talking to him
25 about.

Page 200

1     Q   Okay.  You write that you'd like to have a
2 one-on-one convo at a time that was convenient to him.
3         Did you have a follow-up call with him?
4     A   I think I did, yeah.
5     Q   Do you recall what you talked about in that
6 follow-up call?
7     A   A lot of these issues around price
8 stability and how one could get price stability to do
9 a crypto token and whether or not we needed to do that.
10 That was a big part of what the conversation was.
11    Q   Okay.  What do you recall Mr. Redashell
12 saying regarding that topic, specifically price
13 stability?
14    A   Well, he felt that people were not going to
15 transact in a crypto token unless they could be
16 confident that it wasn't going to rise or fall
17 meaningfully and that, you know, price stability was
18 really important.
19    Q   Okay.  And what was it about that that you
20 found, you know, very interesting or worth following up
21 on?
22    A   Well, we didn't have any plans at the time,
23 and even today I think there aren't, you know, any
24 well-designed ideas around that for Kin.  And so I --
25 you know, it just got my attention that he felt

Page 201

1 strongly about that.
2     Q   Okay.  Does the Kin Foundation currently
3 have any employees?
4     A   No, it does not.
5     Q   Okay.  Does it have any operations?
6     A   What do you mean by operations?
7     Q   Does it do anything other than hold Kin?
8     A   I think there's some minimal operations.
9     Q   And who are those minimal operations being
10 done by?
11    A   Ted and William.
12    Q   Okay.  And I forgot William's last name?
13    A   Mougayar.  I'm not entirely sure how to say
14 it actually.
15    Q   Okay.  Thank you.
16        Does the Kin Foundation have an agreement
17 with Kik to provide -- that -- where Kik will provide
18 services to the Kin Foundation?
19    A   I'm not sure if there's a written agreement
20 in place or not.
21    Q   Okay.  Do you know whether Kik has loaned
22 money to the Kin Foundation?
23    A   It's possible, but I don't know.
24    Q   Okay.  I think you mentioned earlier today
25 that Kin has moved from one blockchain to another?

1     A   Uh-huh.
2     Q   And it moved from Ether -- the ER -- the --
3   what is it, not the ER 20, but the --
4     A   ERC-20.
5     Q   ERC-20.   Thank you.
6         To a version of Stellar or a forked version
7   of Stellar?
8     A   Correct.
9     Q   That decision to move from one blockchain
10  to another, that was a decision that was made by Kik?
11    A   Correct.
12    Q   And the fork of Stellar, that fork was
13  accomplished by Kik engineers?
14    A   That's correct.
15    Q   Okay.   So even now, even after the token's
16  been issued for almost a year, Kik is still making
17  these sort of technological decisions about how the
18  token will function?
19    A   That's true.
20    Q   Let me hand you what will be marked
21  Exhibit 159.
22        (SEC Exhibit No. 159 was marked for
23        identification.)
24    BY MR. SCHLEGELMILCH:
25    Q   This is another e-mail that'll not take you

1   too long to read.  It's an e-mail from you to
2   Mr. Holland dated November the 22nd, 2017.  It's at
3   2:41 p.m. And the subject line is a grand plan for Kik
4   Kin.
5     A   Yep.
6     Q   You wrote, "I think I just came up with a
7   plan that can solve all our problems."
8         And then you write, "I realize we're on the
9   cusp of a four-day holiday, but if you want to hear it
10  I can give you a call this afternoon."
11        What were all our problems that you were
12  referring to in this e-mail?
13    A   We have management issues, we have -- had
14  really because I think a lot of them have been
15  resolved -- had management issues.  We had some real,
16  you know, tension between the Waterloo team and the Tel
17  Aviv team, legacy Kik versus Kin, if you will.  Ted was
18  about to have a baby and was sort of checked out.
19        And, you know, there's this question about,
20  you know, how do the Kik shareholders participate in
21  Kin.  And, you know, all of those were sort of weighing
22  on me and Paul and some of the other board members as
23  well.
24    Q   Let's sort of break that down.  I'm not
25  sure I need to hear more about Mr. Livingston's baby,

1   but what were the management issues that you were
2   referring to?
3     A   You know, Ted's a great visionary, really,
4   really good at kind of taking an idea and jumping on
5   it, but in terms of a day-to-day operator, you know,
6   he's -- he's not, you know, the kind of person that,
7   you know, is at his best in a very sort of static kind
8   of mode and we were starting to get to that point.
9         And while you, you know, might not be
10  interested in hearing more about his baby, I think that
11  was a huge issue because he was checked out and not
12  really hands on in the business which was exacerbating,
13  you know, some of those issues.
14    Q   Okay.  Fair enough.  Now, I'm interested.
15        So like when was the time period when this
16  was going on, this period of being checked out and
17  having it --
18    A   I know that it was starting in early
19  November.  I forget when the baby actually came, maybe
20  early January.  But, you know, he was already starting
21  to like, you know, come to me and others and say I'm
22  not sure I can do this.  You know, we may need to come
23  up with a different leadership model.  You know, so
24  that was a real issue.
25    Q   Was this Mr. Livingston's -- I mean, if you

1   know, was this Mr. Livingston's first child?
2     A   Yes.
3     Q   Okay.  You also mentioned tension between
4   the Waterloo operations and the Tel Aviv operations?
5     A   Yeah.
6     Q   What do you recall about that?
7     A   Well, you know, I mean, the Waterloo team
8   was seven years old, you know, was managing an
9   application that had been inclined for two or
10  three years, and there's this shiny new thing called
11  Kin and that's being built and designed, and, you know,
12  all of the engineering is in Tel Aviv.
13        And so you kind of had like, you know, two
14  very different vibes inside the company.  And people
15  weren't getting along, and, you know, there's also -- I
16  mean, I don't know how well you know Israelis and how
17  well you know Canadians, but you really couldn't create
18  two different kinds of personality types.  So that was
19  also a factor.
20    Q   Okay.  Was there thought of replacing
21  Mr. Livingston as CEO during this time period?
22    A   Absolutely.  I mean, it was driven by him.
23  It wasn't like the board was trying to get rid of Ted.
24  Ted was basically saying I'm not sure I can do this.
25    Q   Okay.

Page 206

```
1        MR. LEASURE:  Was there thought on hiring a
2   separate CEO just for the Kin project?
3        THE WITNESS:  Yes.  I mean, so that's the
4   grand plan, right.  So the grand plan was break Kin and
5   Kik up into two things, have Ted stay with Kik,
6   something that he was comfortable with and, you know,
7   had been running for a long time, bring in new
8   leadership for Kin, and possibly, you know, spin, you
9   know, legacy Kik out and make the company really all
10  about Kin.  And, you know, there was also, as we talked
11  before, an idea about possibly putting in some sort of
12  exchange mechanism so that at some point in the future
13  Kin shareholders could -- Kik shareholders could
14  exchange for Kin.
15        So this was sort of all part of this sort
16  of grand plan.  It turns out we didn't do any of it,
17  you know, because we couldn't find somebody, frankly,
18  to come in and take over the company.  This
19  investigation really, honestly put the kibosh on that.
20        And so Ted had the baby and came back and,
21  you know, figured out, you know, how to fix a lot of
22  the dysfunction issues between Waterloo and Tel Aviv
23  and started making good progress on the Kin road map.
24  And the folks at Kik started feeling better about all
25  of that.
```

Page 207

```
1        And so we didn't do any of that.  But that's
2   what we were discussing at that time.
3        BY MR. SCHLEGELMILCH:
4        Q.  Okay.
5            You talked about the grand plan to
6   break Kik and Kin into two things; that -- as of today,
7   that hasn't happened?
8        A.  Yeah.  And I'm not sure that it will, you
9   know.  I think a lot of the problems was we were
10  having -- figuring out how to run it as one company,
11  you know, have mitigated.  I'm not saying that they
12  won't crop back up, but right now things are working
13  pretty well.
14        Q.  The last thing that you talked about as
15  being one of the problems that you were talking about
16  with Mr. Holland was that -- what to do with the Kik
17  shareholders?
18        A.  Right.
19        Q.  And I don't want to plow ground that we've
20  already plowed.  This -- this idea where should a
21  dividend be paid to the Kik shareholders or should Kik
22  shareholders be bought out with Kin.  Is that -- we've
23  talked about it already.
24        A.  Yeah.
25        Q.  Is there something more than what we've
```

Page 208

```
1   already talked about?
2        A.  No.  It's just that, you know, the people
3   who are invested in Kin and the people who are invested
4   in Kik are aligned around this Kin vision but not
5   completely, right, like their equity in Kik is
6   different than owning the Kin token.  And there's no
7   current strategies -- I mean, there's is lots of
8   conversations about how to ultimately link them, but we
9   haven't implemented any of that.
10       Q.  Okay.
11       A.  And it also plays out with the employee
12  base, right.
13       So the employees all have stock options
14  in Kik equity, and, yet, you know, they're being told
15  you're working on this Kin thing and that's the future.
16  And they're like yeah but I don't own any Kin.  I --
17  and so that's just an example of where, you know,
18  that's a challenge.
19       We are going to have to fix that at some
20  point.  We can't even think about it as long as this
21  investigation goes on.  So no point in talking about it
22  until this gets resolved one way or another.
23       Q.  You said to Mr. Holland or you wrote to
24  Mr. Holland that you came up with a plan.
25           What was the plan?
```

Page 209

```
1        A.  Basically what I said.
2        Q.  Okay.
3        A.  Split Kin and Kik into two things and bring
4   in a new leader for Kin, leave Ted in charge of legacy
5   Kik, and come up with some mechanism for, you know, Kik
6   shareholders to ultimately become Kin token holders
7   over some period of time.
8        Q.  Okay.  I think the last question I have is
9   you've talked a couple times today about the Kin road
10  map.  And I just want to make sure that we're
11  talking -- well, let me ask you this.
12           Is the Kin road map a document or like an
13  idea?
14       A.  It's an idea.  It's like what we're going
15  to do and when we're going to do it.  It's an evolving,
16  living thing.
17       You know, it changes over time.  But
18  it's like -- it's the technical road map.  They got a
19  market road map, you know, what we're going to do with
20  the 60 percent of Kin, how we're going to ultimately
21  implement the rewards engine.  It's like that whole
22  thing.
23       Q.  Okay.
24           Let me hand you what will be marked
25  as Exhibit 160.
```

Page 210

1        (SEC Exhibit No. 160 was marked for
2    identification.)
3        BY MR. SCHLEGELMILCH:
4        Q   And then I am not asking you to review the
5    whole thing.
6        Although, you are welcome to do that if
7    you think you need to to answer my question.
8        My question is just simply attached to
9    this -- attached to this e-mail are a series of Word
10   documents which we've printed out and attached
11   physically to the e-mail which has been marked as 160
12   which is an e-mail from Mr. Heinke to Mr. Redashell,
13   Mr. Mougayer, Mr. Livingston, you, and carboned to Ms.
14   -- it's an e-mail dated December the 11th, 2017, and
15   it's USV 0014922 through 960.
16       A   By the way, I think this is the call that
17   we had that I then sent Bill the e-mail that you
18   referred to two e-mails ago.
19       Q   I see.
20       So this -- the first page of this
21   exhibit is the topics that you talked with
22   Mr. Redashell where you thought he made a lot of sense?
23       A   It was this call where -- you know, because
24   he wasn't on the Kik board, right.  So I'd never really
25   heard his point of view about Kin directly until he

Page 211

1    participated on this call.
2        Q   Okay.
3        A   And he made, I thought, some really good
4    points.  And I wanted to sort of dig deep er than we
5    were able to do on this call.  And I wanted to talk to
6    him one on one.
7        Q   Okay.
8        And we talked about that call and we
9    don't need to rehash that.
10       A   Right, right.  Okay.
11       Q   Although, I work here.  I can talk for
12   another couple of hours.
13       My question is:  Is the attachments to this
14   e-mail -- is this a copy of the then current -- which I
15   understand you said it was a work in progress.
16       Is it a copy of the then current Kin
17   product road map?
18       A   More than product road map.  I'd say that
19   this is -- this is a little bit more than a product
20   road map.
21       I think there's still some vision in here
22   and I think -- yeah.  I mean, I think that this is
23   definitely a road map document.
24       Q   Okay.
25       The reason why I drew that

Page 212

1    conclusion is that starting on USV 0014924 --
2        A   Uh-huh.
3        Q   -- there's a footer that says Kin road map.
4    And using my lawyers powers of deduction I concluded
5    that it was the Kin road map.
6        A   Right.  But, like, the point is, like, this
7    is no longer, you know, the definitive Kin road map.
8    So, for example, you see this daily airdrop module?
9        Q   On -- which page are you referring to, sir?
10       A   Eight.
11       Q   Thank you.
12       A   I don't think we're currently working on
13   that.
14       I don't know if we've just tabled it, you know,
15   to a later date or whether we've decided that's not
16   interesting anymore.
17       So the current Kin road map
18   document would look somewhat different than this.
19       Q   Okay.  That's -- I guess that's what I was
20   trying to get to.
21       So as of the day of this e-mail,
22   December 11th, 2017, do you know if that is the sort of
23   then current version of the road map?
24       A   I think so now, yes.
25       Q   Okay.

Page 213

1        But that -- it is sort of a living
2    document.
3        It's a work in progress, and it sort of
4    changes -- it's an interim process?
5        A   Absolutely.
6        Q   Okay.
7        And it is now likely different than
8    this in some way?
9        A   Definitely different than this.  There's
10   some things that are absolutely still a part of the
11   plan, and there's some things that are not as much a
12   part of the plan.
13       Q   Okay.  Just -- and a couple of points.  In
14   your testimony today, you talked about the Kin road map
15   but --
16       A   Yeah.  I don't mean this document.
17       Q   Thank you.
18       A   I mean, where we're going.
19       Q   Okay.
20       Thank you.  That's very helpful.  I
21   think it may make sense for like just a short confab on
22   this side of the table, but I think we're pretty darn
23   close.
24       THE WITNESS:  Okay.
25       MR. SCHLEGELMILCH:  Can we go off the

Page 214

1    record?
2        THE VIDEOGRAPHER:  Going off the record.
3    The time is 4:06 p.m.
4        (Discussion off the record.)
5        THE VIDEOGRAPHER:  We are back on the
6    record.  The time is now 4:12 p.m.
7        MR. MITCHELL:  During the break,
8    Mr. Wilson, did you have any conversations with the
9    staff about the case?
10       THE WITNESS:  Did not.
11       MR. MITCHELL:  Okay.  I really just have a
12   couple, you know, clean up things, then we'll be done.
13       Does Kik have a controlling shareholder or
14   major shareholders like beyond USV and the funds that
15   we were just talking about?
16       THE WITNESS:  No, it does not.
17       MR. MITCHELL:  Does Mr. Livingston own a
18   significant amount of Kik?
19       THE WITNESS:  He does, but not a
20   controlling interest.
21       MR. MITCHELL:  Okay.  But do you know what
22   he owns?
23       THE WITNESS:  Somewhere between 30 and 40
24   percent.
25       MR. MITCHELL:  Is he the largest

Page 215

1    shareholder?
2        THE WITNESS:  Yes, he is.
3        MR. MITCHELL:  Do you -- have you ever
4    discussed with Mr. Livingston his -- sort of how that
5    fits into his overall portfolio?
6        THE WITNESS:  Meaning his -- the majority
7    of his net worth in Kik?
8        MR. MITCHELL:  Yeah, that's what I -- yeah.
9    I mean, or anything on that --
10       THE WITNESS:  I mean, I'm not sure that
11   I've ever discussed that with him, but that is
12   absolutely the case.
13       MR. MITCHELL:  I'm sorry.  If you haven't
14   discussed it with him, how do you know?
15       THE WITNESS:  Well, I mean, I've seen how
16   he lives.  I mean, you know, he's not a wealthy person.
17       MR. MITCHELL:  Okay.  So Cooley represents
18   you as being in connection with this investigation.
19       Did Cooley represent USV on other issues
20   before this investigation?
21       THE WITNESS:  Well, I don't actually know
22   the answer.  I think the answer is certainly Cooley has
23   represented USV on some financings that we've done over
24   the years, but I'm not sure that we've ever been
25   involved in, you know, a matter like this with them.

Page 216

1        MR. MITCHELL:  Sounds good.  Earlier we had
2    discussed sort of the issue that -- the issue with the
3    Ethereum blockchain and whether it was capable of
4    handling large enough volumes of transactions for Kin
5    tokens to be widely used.
6        Do you remember that from earlier?
7        THE WITNESS:  Yes, I do.
8        MR. MITCHELL:  At any point did Kik
9    consider just sort of sitting back and letting somebody
10   else solve that problem?
11       THE WITNESS:  No.
12       MR. MITCHELL:  Why not?
13       THE WITNESS:  Because I think we felt like
14   we had this idea and we wanted to do it.  And we wanted
15   to be the first company to do it and that if we waited
16   somebody else was going to come in and do it instead of
17   us.
18       MR. MITCHELL:  You mean, with the Kin token
19   or with a different token?
20       THE WITNESS:  With a different token.
21       MR. MITCHELL:  But did Kik ever consider
22   just waiting back and letting somebody else solve it
23   for the Kin token?
24       THE WITNESS:  No.
25       MR. MITCHELL:  Why not?

Page 217

1        THE WITNESS:  Because then we couldn't --
2    we couldn't do -- I mean, it was -- I'm not really
3    understanding very well what you're trying to ask, but
4    I don't think that there was a viable strategy to do
5    Kin that involved just sitting back and waiting for a
6    blockchain to get to a level of scalability.  I think
7    we had to, you know, figure out how to solve that
8    problem ourselves.
9        MR. MITCHELL:  In a similar vein, we've
10   talked about Kik making efforts to recruit other
11   companies to conduct transactions or to allow their app
12   users to conduct transactions.
13       Has Kik ever considered just sort of
14   stepping back and letting someone else recruit partners
15   to the Kin Ecosystem?
16       THE WITNESS:  I don't know who would do
17   that.
18       MR. MITCHELL:  Okay.  And sort of a similar
19   question.  Has Kik ever considered stepping back and
20   letting somebody else integrate the Kin token into the
21   Kik app?
22       THE WITNESS:  No.
23       MR. MITCHELL:  And why not?
24       THE WITNESS:  I don't know that anybody
25   else could do that.

Page 218

1          MR. LEASURE:  In 2018, did Kik ever
2     consider withdrawing the Kin project in some way from
3     the United States?
4          THE WITNESS:  In 2018, this year?
5          MR. LEASURE:  Yes, this year.
6          THE WITNESS:  What would that look like?
7     Like, how would one do that?
8          MR. LEASURE:  You just made my next
9     question.  Let me ask first, is that something that
10    you've heard about people considering in some way?
11         THE WITNESS:  I mean, people have
12    definitely considered doing a token project outside of
13    the U.S. and not inviting any U.S. citizens to buy the
14    token or earn the token.
15         And, therefore, not exposing
16    themselves to U.S. securities laws.  That is a definite
17    thing, but I don't know that -- well, we didn't -- I
18    don't remember talking about it in 2017, and once we
19    did our token distribution event I'm not sure how we
20    could unwind that.
21         MR. LEASURE:  You don't think that's a
22    viable idea?
23         THE WITNESS:  Not for us, no.  I think
24    there are companies who are doing or token projects
25    that are doing it, and I think it is a viable strategy.

Page 219

1     But it's -- I think, you know, that train's left the
2     station with Kik and Kin.
3          MR. LEASURE:  Are you aware of anyone from
4     Kik making public statements in 2018 saying Kik was
5     considering withdrawing the project in some way from
6     the U.S.?
7          THE WITNESS:  I'm not aware of anybody
8     making that statement, but, I mean, I can't tell you
9     that nobody said that.
10         MR. LEASURE:  That's fine.  But you never
11    made that statement, and you wouldn't make that
12    statement?
13         THE WITNESS:  I don't know how we would do
14    that.
15         MR. LEASURE:  Sure.  Okay.
16         MR. SCHLEGELMILCH  I think we're good.
17         THE WITNESS:  Great.
18         MR. SCHLEGELMILCH:  Could we go off the
19    record, please?
20         Oh, let's not go off the record.
21         What we normally do at the end these days
22    is we give the witness an opportunity if there's
23    anything you said or didn't say that you think you need
24    to to clarify the record.  This is an opportunity for
25    you to do that.

Page 220

1     Is there anything you'd like to add or
2     clarify?
3          THE WITNESS:  I don't think so.
4          MR. SCHLEGELMILCH:  Okay.  And I normally
5     give counsel the same opportunity.
6          MR. CADIGAN:  Yeah.  No further questions.
7     Thanks.
8          MR. SCHLEGELMILCH:  Okay.  Then with that,
9     we're going to go off the record.
10         THE VIDEOGRAPHER:  This concludes the video
11    deposition.  This is disc three of three.  Going off
12    the record.  The time is now 4:19 p.m.
13         (Whereupon, at 4:19 p.m., the examination
14    was concluded.)
15                  * * * * *
16
17
18
19
20
21
22
23
24
25

Page 221

1          PROOFREADER'S CERTIFICATE
2
3     In the Matter of:  KIK INTERACTIVE
4     Witness:       Fred Wilson
5     File Number:      HO-13388-A
6     Date:      Wednesday, September 5, 2018
7     Location:      Washington, D.C.
8
9          This is to certify that I, Christine Boyce,
10    (the undersigned) do hereby swear and affirm that the
11    attached proceedings before the U.S. Securities and
12    Exchange Commission were held according to the record,
13    and that this is the original, complete, true and
14    accurate transcript, which has been compared with the
15    reporting or recording accomplished at the hearing.
16
17
18    _____    _____
19    (Proofreader's Name)            (Date)
20
21
22
23
24
25

Page 222

```
 1              REPORTER'S CERTIFICATE
 2
 3         I, Melinda Johnson, CSR, reporter, hereby
 4    certify that the foregoing transcript of 220 pages is a
 5    complete, true and accurate transcript of the testimony
 6    indicated, held on Wednesday, September 5, 2018, at
 7    Washington, D.C. in the matter of:  Kik Interactive.
 8
 9         I further certify that this proceeding was
10    recorded by me, and that the foregoing transcript has
11    been prepared under my direction.
12
13              Date:_____
14    Official Reporter:_____
15    Diversified Reporting Services, Inc.
16
17
18
19
20
21
22
23
24
25
```