# SEC22

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2      FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4   UNITED STATES SECURITIES  )
     AND EXCHANGE COMMISSION,  )
 5                             )
           Plaintiff,     ) Case No.
 6                        ) 1:19-cv-05244
         v.               )
 7                        )
     KIK INTERACTIVE INC.,    )
 8                        )
           Defendant.    )
 9   _____)
10
11
12
13   CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
14         VIDEO DEPOSITION OF
15          WILLIAM MOUGAYAR
16        Friday, December 6, 2019
17          Washington, D.C.
18
19
20
21
22
23   Reported by:
     Lori J. Goodin, RPR, CLR, CRR, RSA
24   California CSR #13959
25   JOB No. 191206LJG
```

**Page 2**

```
 1          UNITED STATES DISTRICT COURT
 2      FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4   UNITED STATES SECURITIES  )
     AND EXCHANGE COMMISSION,  )
 5                             )
           Plaintiff,     ) Case No.
 6                        ) 1:19-cv-05244
         v.               )
 7                        )
     KIK INTERACTIVE INC.,    )
 8                        )
           Defendant.    )
 9   _____)
10
11
12
13       Deposition of WILLIAM MOUGAYAR, taken
14   on behalf of Plaintiff, at 100 F Street,
15   Northeast, Washington, D.C. 20549, beginning
16   at 10:10 a.m. and ending at 5:20 p.m., on
17   Friday, December 6, 2019, before LORI GOODIN,
18   Certified Shorthand Reporter No. 13959.
19
20
21
22
23
24
25
```

**Page 3**

```
 1                 APPEARANCES
 2   For Plaintiff:
 3
         SECURITIES & EXCHANGE COMMISSION
 4   BY:  DAVID S. MENDEL
          mendeld@sec.gov
 5        LAURA K. D'ALLAIRD
          dallairdl@sec.gov
 6        Attorneys at Law
          100 F. Street, Northeast
 7        Washington, DC 20549
          202-551-4418
 8
 9   For Defendant:
10       COOLEY LLP
         BY:  LUKE T. CADIGAN
11            lcadigan@cooley.com
              500 Boylston Street
12            14 h Floor
              Boston, MA 02116
13            617-937-2480
14
     For the Witness:
15
         MURPHY & MCGONIGLE
16       BY:  STEPHEN J. CRIMMINS
              scrimmins@mmlawus.com
17            Attorney at Law
              1001 G Street, Northwest
18            7th Floor
              Washington, DC  20001
19            202-661-7031
20
     VIDEOGRAPHER:
21
         JEFFREY ELAM
22       GRADILLAS COURT REPORTERS
         400 N. Brand Boulevard, Suite 950
23       Glendale, California  91203
         424-239-2800
24
25
```

**Page 4**

```
 1                 INDEX
     WITNESS:       EXAMINATION       PAGE
 2   WILLIAM MOUGAYAR
              BY MR. MENDEL      12
 3
 4             EXHIBITS
 5   EXHIBIT NO.  PAGE   DESCRIPTION
 6   Exhibit 126   15   Subpoena to testify
 7   Exhibit 127   17   Title page of Mr. Mougayar's
 8                      book, The Business
 9                      Blockchain, 2016
10   Exhibit 128   42   E-mail chain, Mougayar to
11                      Heinke, 4/28/2017
12   Exhibit 129   46   E-Mail chain, Mougayar and
13                      Heinke, 6/28/2017
14                      MMLWM-00000555
15   Exhibit 130   50   E-mail chain, Mougayar and
16                      Heinke, about SAFT,
17                      7/17/2017
18                      MMLWM-00000598
19   Exhibit 131   51   Text exchange, Mougayar and
20                      Heinke, 7/21
21                      MMLWM-00000728
22   Exhibit 132   54   E-mail chain, Mougayar and
23                      Heinke, Your voice mail,
24                      8/10/2017
25                      MMLWM-00000731
```

**CONFIDENTIAL**

William Mougayar,
12/6/2019

| 1 | EXHIBITS CONTINUED |
|---|---|
| 2 | |
| 3 | EXHIBIT NO.  PAGE    DESCRIPTION |
| 4 | Exhibit 133    66   E-mail, Miroshnik of Argon |
| 5 | Group to Heinke, others |
| 6 | Intro to Argon, 4/14/2017 |
| 7 | MMLWM-00000145 |
| 8 | Exhibit 134    76   E-mail, Miroshnik to Heinke, |
| 9 | others, Kik-Argon follow up |
| 10 | 4/21/2017 |
| 11 | MMLWM-00000200 |
| 12 | Exhibit 135    87   E-mail, Mougayar to Clift |
| 13 | Token Summit, 4/8/2017 |
| 14 | MMLWM-00000020 |
| 15 | Exhibit 136    90   E-mail, Clift to Mougayar |
| 16 | Summary of Kik announcement |
| 17 | 5/18/2017 |
| 18 | MMLWM-00000361 |
| 19 | Exhibit 137    93   E-mail chain, McLeod to |
| 20 | Mougayar, Kik follow up and |
| 21 | Token summit, 5/23/2017 |
| 22 | MMLWM-00000382 |
| 23 | Exhibit 138    97   Transcript of video |
| 24 | conversation, Mougayar and |
| 25 | Livingston, 5/25/2017 |

5

| 1 | EXHIBITS CONTINUED |
|---|---|
| 2 | |
| 3 | EXHIBIT NO.  PAGE    DESCRIPTION |
| 4 | Exhibit 145    170   Transcription of NYC |
| 5 | Ethereum Crypto-currency |
| 6 | Consumer Media, 9/7/2017 |
| 7 | Exhibit 146    172   E-mail chain, Livingston to |
| 8 | Heinke, Kin, 9/7/2017 |
| 9 | MMLWM-00000888 |
| 10 | Exhibit 147    178   E-mail, Kin by Kik |
| 11 | Confirmation of |
| 12 | Preregistration, 6/2/2017 |
| 13 | MMLWM-00000487 |
| 14 | Exhibit 148    179   Collection of various |
| 15 | e-mails to Mougayar from |
| 16 | August and September 2017 |
| 17 | MMLWM-00000808 |
| 18 | Exhibit 149    182   E-mail from Philp to |
| 19 | Mougayar, Token distribution |
| 20 | 9/26/2017 |
| 21 | MMLWM-00001027 |
| 22 | Exhibit 150    207   E-mail, Heinke to Mougayar |
| 23 | Foundation overview, |
| 24 | 10/15/2017 |
| 25 | MMLWM-00002606 |

7

| 1 | EXHIBITS CONTINUED |
|---|---|
| 2 | |
| 3 | EXHIBIT NO.  PAGE    DESCRIPTION |
| 4 | Exhibit 139    118   E-mail chain, Livingston to |
| 5 | Mougayar, On-chain Private |
| 6 | Eth Implementation, |
| 7 | MMLWM-00000645 |
| 8 | Exhibit 140    131   Notice to Certain Residents |
| 9 | of U.S., Canada, China, U.K. |
| 10 | in relation to SAFT, 8/21/17 |
| 11 | KPMGC-KIK-0003163 |
| 12 | Exhibit 141    139   E-mail chain, Philp, |
| 13 | Mougayar, Kin update, 9/6/17 |
| 14 | MMLWM-00000877 |
| 15 | Exhibit 142    150   E-mail chain, McKee, |
| 16 | Mougayar, Heinke, 7/7/2017 |
| 17 | OSC comment |
| 18 | MMLWM-00001215 |
| 19 | Exhibit 143    158   E-mail chain, Mougayar to |
| 20 | Heinke, OSC approved |
| 21 | 8/11/2017 |
| 22 | MMLWM-00000736 |
| 23 | Exhibit 144    167   SEC compilation of websites |
| 24 | SEC-KIK-LIT-E 0000274 |
| 25 | |

6

| 1 | EXHIBITS CONTINUED |
|---|---|
| 2 | EXHIBIT NO.  PAGE    DESCRIPTION |
| 3 | Exhibit 151    207   E-mail, Mougayar to Heinke |
| 4 | Foundation overview, |
| 5 | 10/15/2017 |
| 6 | MMLWM-00002604 |
| 7 | Exhibit 152    215   E-mail, Heinke to Mougayar, |
| 8 | others, Tomorrow discussion |
| 9 | 11/9/2017 |
| 10 | MMLWM-00003759 |
| 11 | Exhibit 153    216   E-mail, Heinke to Raduchel |
| 12 | Economic Model Workplan |
| 13 | 11/26/2017 |
| 14 | MMLWM-00002524 |
| 15 | Exhibit 154    224   E-mail, Cameron to Raduchel, |
| 16 | Mougayar, D&O insurance, |
| 17 | 11/28/2017 |
| 18 | MMLWM-00003082 |
| 19 | Exhibit 155    226   E-mail, Cameron to Raduchel, |
| 20 | Mougayar, Heinke, D&O quote |
| 21 | 12/11/2017 |
| 22 | MMLWM-00003255 |
| 23 | Exhibit 156    229   E-mail, Heinke, Raduchel, |
| 24 | Mougayar, D&O quote, 1/26/18 |
| 25 | MMLWM-00003246 |

8

CONFIDENTIAL

William Mougayar,
12/6/2019

---

**Page 9**

```
 1                 EXHIBITS CONTINUED
 2   EXHIBIT NO.  PAGE   DESCRIPTION
 3   Exhibit 157  230   E-mail, Heinke to Livingston
 4                      Mougayar, Kin Ecosystem
 5                      Foundation, D&O Policies
 6                      6/18/2018, MMLWM-00003153
 7   Exhibit 158  235   E-mail chain, Tonin, Lyon,
 8                      Mougayar, Quarterly Meetings
 9                      7/20/2018
10                      MMLWM-00002252
11   Exhibit 159  238   E-mail, Mougayar to
12                      Livingston, Kin Foundation
13                      Matter, 7/15/2018
14                      MMLWM-00002175
15   Exhibit 160  242   E-mail, Mougayar to DiPietro
16                      Introduction, 7/13/2018
17                      MMLWM-00001863
18   Exhibit 161  246   Google Calendar invites,
19                      7/23/2018-12/20/2018
20                      MMLWM-00001644
21   Exhibit 162  249   E-mail, Hibbard to Llanos,
22                      others, Kin Liquidity
23                      Project Update, 9/13/2018
24                      MMLWM-00001857
25
```

---

**Page 10**

```
 1                 EXHIBITS CONTINUED
 2
 3   EXHIBIT NO.  PAGE   DESCRIPTION
 4   Exhibit 163  253   Draft of Kin Ecosystem
 5                      Foundation Minutes of Board
 6                      Meeting, 10/11/2018
 7   Exhibit 164  256   Slide presentation
 8                      MMLWM-00001540
 9
10       (Original Exhibits attached to the
11   original transcript.)
12
13             PRIOR MARKED EXHIBIT
14              FIRST REFERRAL
15             EXHIBIT     PAGE
16               16     137
17
18       INSTRUCTION NOT TO ANSWER
19             PAGE      LINE
20             150        2
21             152        17
22             154        13
23             156        5
24             159        15
25                * * *
```

---

**Page 11**

```
 1                 PROCEEDINGS
 2                   * * *
 3
 4       THE VIDEOGRAPHER:  This is the video
 5   download of the video deposition of William
 6   Mougayar taken by plaintiff in the matter of
 7   Security Exchange Commission versus Kik
 8   Interactive, Incorporated, pending before the
 9   court, the United States District Court for
10   the Southern District of New York.
11     Case Number 1:19-CV-05244.
12       This deposition is being held at
13   Security and Exchange Commission, 100 F Street
14   Northeast, Washington, D.C., 20549, on
15   December 6, 2019.  The time on the video screen
16   is 10:10 a.m.
17       My name is Jeffrey Elam and I am the
18   videographer specialist from the firm Gradillas
19   Court Reporting Incorporated.
20       The court reporter today is Lori
21   Goodin in association with Gradillas Court
22   Reporting Incorporated, located at 400 North
23   Brand Boulevard, Suite 950, Glendale,
24   California 91203.
25       For the record will counsel now
```

---

**Page 12**

```
 1   please introduce themselves and who they
 2   represent.
 3       MR. MENDEL:  I am David Mendel, for
 4   the U.S. Securities and Exchange Commission.
 5       MS. D'ALLAIRD:  I am Laura D'Allaird
 6   for the U.S. Securities and Exchange
 7   Commission.
 8       MR. CADIGAN:  Luke Cadigan, for Kik
 9   Interactive, Cooley LLP.
10       MR. CRIMMINS:  My name is Steve
11   Crimmins from the firm of Murphy and
12   McGonigle, and I am counsel for the witness
13   Mr. William Mougayar.
14       THE VIDEOGRAPHER:  Will the court
15   reporter please administer the oath.
16                   * * *
17          WILLIAM MOUGAYAR,
18   a witness called for examination, having been
19   first duly sworn, testified as follows:
20                   * * *
21       THE VIDEOGRAPHER:  Thank you.
22          EXAMINATION
23   BY MR. MENDEL:
24   Q.   Good morning.
25   A.   Good morning.
```

1    Q.   Can you please restate and spell
2  your full name?
3    A.   Yes, William Mougayar.
4    Q.   And can you spell that please, for
5  the record?
6    A.   M-O-U-G-A-Y-A-R.
7    Q.   Thank you.  And can you state your
8  home address, please?
9    A.   My address is ▇▇▇▇▇▇
10  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.
11    Q.   Can you spell the street name again?
12    A.   ▇▇▇▇▇▇▇▇▇▇▇▇▇
13  ▇▇▇▇▇▇.
14    Q.   Is that near Toronto?
15    A.   It is just outside Toronto, yes.
16    Q.   Do you have any other personal
17  addresses?
18    A.   No, I don't.
19    Q.   Do you have any addresses or offices
20  in the United States?
21    A.   No, I don't.
22    Q.   As I mentioned, my name is David
23  Mendel.  I represent the plaintiff in this
24  lawsuit, the U.S. Securities and Exchange
25  Commission in its lawsuit against Kik

13

1  Interactive.
2        I just want to go over some general
3  procedures for conducting the deposition before
4  we get started on substance.
5        As you know we have a court reporter
6  who is transcribing what we say.  And so it is
7  good to bear in mind that we would like to create
8  a clean transcript.  It is good if you let me
9  finish my question first before starting to
10  answer.  Even though you think you know what I'm
11  going to say, just let me finish my question
12  first to get a clean transcript.
13        Please give audible responses,
14  instead of a body gesture or a shake of the head
15  or a nod of the head.
16        And if you don't understand any
17  question, please let me know and I will try to
18  rephrase it and make it more understandable.
19        You understand that you are under
20  oath today?
21    A.   Yes.
22    Q.   And are you taking any medication
23  today that can affect your memory?
24    A.   No.
25    Q.   Is there any other reason that it

14

1  might be difficult for you to give full and
2  complete testimony today?
3    A.   No.
4    Q.   I'm going to give you what has been
5  marked as Deposition Exhibit 126.  And you can
6  take a look at it.
7        (Whereupon, Exhibit 126
8         waswas marked for identification.)
9  BY MR. MENDEL:
10    Q.   It says Subpoena to Testify at a
11  Deposition in a Civil Action on the first page.
12    A.   Yes.
13    Q.   And it has the case caption.  Have
14  you seen this before?
15    A.   Not in this form.
16        MR. CRIMMINS:  We will stipulate
17  that this is the subpoena which we have
18  accepted on Mr. Mougayar's behalf and that he
19  is appearing today pursuant to this subpoena.
20        MR. MENDEL:  Thank you.  If you can
21  give that back to me.
22        THE WITNESS:  Yes.
23  BY MR. MENDEL:
24    Q.   Actually, we will do this.  What
25  year were you born?

15

1    A.   1959.
2    Q.   And where were you born?
3    A.   In Beirut, Lebanon.
4    Q.   Where did you grow up?
5    A.   Up until the age of 17 I grew up in
6  Lebanon and then I moved to Canada.
7    Q.   Did you go to a college or
8  university?
9    A.   Yes, I went to the University of
10  Washington in Seattle.
11        And then I also went to the
12  University of British Columbia in Vancouver, and
13  I have a Management Degree from the University of
14  Western Ontario in London, Ontario.
15    Q.   What do you study at the University
16  of Seattle?
17    A.   Electrical Engineering.
18    Q.   I'm sorry, the University of
19  Washington, yes.
20    A.   Electrical Engineering.  I received
21  a bachelor's degree.
22    Q.   And when did you receive your
23  degree?
24    A.   1980.
25    Q.   And what about your other degrees,

16

1  when did you receive those?
2      A.   The UBC was a graduate, I did not
3  get a degree.  I attended graduate commerce
4  courses.  But it was not a degree.
5          And in London it was a Marketing
6  Management Degree.
7              (Whereupon, Exhibit 127
8              was marked for identification.)
9  BY MR. MENDEL:
10     Q.   I am providing you what has been
11  marked Deposition Exhibit 127.
12     A.   Yes.
13     Q.   And do you recognize this?
14     A.   Yes.
15     Q.   Take a look at it.
16     A.   Okay.
17     Q.   It says, it is a title page, The
18  Business Blockchain.  It is the title of your
19  book, correct from 2016?
20     A.   Yes.
21     Q.   And then there is a personal
22  preface.  Do you see that?
23     A.   Yes.
24     Q.   Okay.  And you drafted this, right?
25     A.   Correct, I did.

17

1      A.   That's correct.
2      Q.   What were the dates of those?
3      A.   From '82 until '95.
4      Q.   Okay.  And then you were an
5  independent consultant.  Is that right?
6      A.   That's correct.
7      Q.   Okay.  What are some of the
8  companies you were an independent consultant for?
9      A.   During which period?  During the
10  period of --
11     Q.   Well, it says --
12     A.   '95 to 2005?
13     Q.   Yes.  The next period of time from
14  '95 to 2005?
15     A.   From memory I can name a few.  Many
16  of them were large companies, Fortune 500
17  companies in North America, in Europe,
18  internationally, including CIBC, IBM, Oracle,
19  Microsoft, First Union Bank.  This goes back a
20  long time.
21          So, a number of technology
22  companies, some of the ones I just mentioned,
23  Hewlett Packard, specifically.  Motorola in
24  Chicago.  These are some of the ones that come to
25  my mind at this point.

19

1      Q.   Is it right that starting in 2014
2  you got to know the principal inventor or founder
3  of the theory of blockchain?
4      A.   That's correct.
5      Q.   That was Mr. Vitalik Buterin?
6      A.   That's correct.
7      Q.   And did you develop a close working
8  relationship with Mr. Buterin?
9      A.   Yes, I have.
10     Q.   During the course of that
11  relationship, did you learn a lot about Ethereum?
12     A.   That's correct.
13     Q.   If you go to the following page, it
14  starts on, actually it is the same, it is just
15  the page of your book, small Roman Numeral xvii?
16     A.   Do I have it?
17     Q.   You have it.  It is this page.
18     A.   Oh, okay.  Yes.
19     Q.   Starting on that page you start to,
20  you summarize your professional background.
21     A.   Yes.
22     Q.   Is this summary accurate?
23     A.   Yes.
24     Q.   And it mentions that you spent
25  14 years at Hewlett Packard; is that right?

18

1      Q.   What generally, I mean, at a very
2  high level, what was the nature of your
3  consulting relationships?
4      A.   It was mostly related to business
5  strategies, internet related business strategies.
6          The internet was new at the time and
7  companies required my expertise to learn about
8  e-commerce.
9      Q.   Okay.
10     A.   And the impact of the internet on
11  their businesses.  That is really the extent of
12  it.  And most of the interactions were at the
13  executive levels with the senior, senior managers
14  or executives of these companies.
15     Q.   In 2016 you published a book,
16  correct?
17     A.   Yes.
18     Q.   Or you had a book published.
19     A.   Yes.
20     Q.   Did you work on that from 2013 to
21  2016?
22     A.   Roughly.  I mean as I mentioned in
23  the book, some of the work started via the blogs,
24  the blogging, the writing, the research, the
25  period that you named is pretty accurate in terms

20

CONFIDENTIAL

William Mougayar,
12/6/2019

1  of the time.  Yes.
2      Q.    And then during that period of time,
3  2013 to 2016 what other activities were you
4  engaged in?
5      A.    I was in, back to being an
6  independent professional, self-employed, and I
7  was doing a lot of writing and then learning
8  about the space, basically, and I think I had
9  some small engagements with companies in Canada,
10  advisory engagements and technology.  And I began
11  to invest in the space as well.  As investment in
12  technology startups both in the U.S. and in
13  Canada.
14      Q.    You started to invest during this
15  time period, 2013 to 2016?
16      A.    Approximately, yes, '13, '14, I
17  think.
18      Q.    Since 2016, other than Kik or Kin,
19  what professional activities have you been
20  engaged in?
21      A.    A lot of speaking engagements and
22  some sitting on some boards and some advisory
23  activities.
24          Again both in the U.S. and in Canada
25  and in Europe.

21

1      Q.    What boards have you sat on since
2  2013?
3      A.    The Kin Foundation board, the
4  OpenBazaar.
5      Q.    Did you say OpenBazaar?
6      A.    The OpenBazaar Company, I am
7  currently sitting on their board.
8      Q.    What is that?
9      A.    It is a peer-to-peer commerce
10  startup in the blockchain space.
11      Q.    Okay.
12      A.    I was also on the advisory -- do
13  advisory boards count?
14      Q.    Sure.  Yes.
15      A.    The advisory board of the Ethereum
16  Foundation, based in Switzerland.  Advisory board
17  of Coin Center, based in Washington, D.C.
18          I was on the board of directors of
19  Stratum Company based in Paris, France, and there
20  may be one more, I can't remember.
21      Q.    Okay.
22      A.    But just a variety, that is like a
23  handful, four or five, the ones I mentioned.
24      Q.    Did you do consulting as well?
25  Again, other than for Kik?

22

1      A.    On a limited basis, yes, I consulted
2  to CIBC, the bank.  I did a small speaking
3  engagement with some interactions to the Federal
4  Reserve Bank in Chicago.  That was about 2016,
5  perhaps.  If I recall, or '17, maybe.  Another
6  firm in Chicago as well they were in the trading
7  business, on a limited basis.  Yes.
8      Q.    Anybody else besides CIBC, the
9  Federal Reserve Bank or this other Chicago firm?
10      A.    No.
11      Q.    Okay.  I will take that exhibit back
12  from you.
13      A.    Sure.
14      Q.    Going back, you mentioned
15  investments that you started to make --
16      A.    Yes.
17      Q.    -- in this area.  Have you purchased
18  any digital assets or cryptocurrencies?
19      A.    In what period?
20      Q.    Starting -- well, ever, really?
21      A.    Yes, I have.
22      Q.    Okay.  And when was the first one
23  that you bought?
24      A.    Probably in '14 I want to say.  Yes.
25      Q.    Which one was that?

23

1      A.    Bitcoin.
2      Q.    And, what other -- well first let me
3  try to get my terminology straight.
4          Do digital assets and
5  cryptocurrencies, are they the same thing to you?
6      A.    Yes, we can say, yes, they are the
7  same, yes.
8      Q.    So, if I say digital assets, you
9  will include cryptocurrencies, is that okay?
10      A.    Sure, sure.
11      Q.    Okay.  What other digital assets
12  have you purchased?
13      A.    Since then a variety.  Kin is one of
14  them.  Civic, Block Stack, excuse me.  File Coin.
15  I am trying to remember now.  StorJ, S-T-O-R-J.
16  There is another one with a coin in it, I forgot
17  the name of it.
18          Are you asking me the ones that I am
19  still, that I may have, that I may not have them
20  currently.
21      Q.    I will ask follow up questions.  I
22  just asked for all.
23      A.    I have dabbled into them for sure if
24  that is what you are trying to get at.
25      Q.    What about Block Deck or Block

24

CONFIDENTIAL

William Mougayar,
12/6/2019

1 Collider?
2    A.   Oh, yes, Block Collider for sure I
3 participated in.  And there is another one,
4 Foam.Space, Foam.Space.  And, let me see for a
5 second here.
6    Q.   That is good for now.
7    A.   Yes, I may have missed a couple.
8 But, that gives you a --
9    Q.   That gives a good picture?
10   A.   I don't think, exactly, yes.
11   Q.   So, generally speaking, why did you
12 make these purchases?  And put aside Kin for now.
13 All of the others, why did you buy those?
14   A.   Generally speaking, because I
15 believed in the projects that they represented.
16 And in most cases, if not all, I knew the
17 principals and I trusted them that they would
18 deliver on their vision.  And I wanted to support
19 them and I believed in what they were working on.
20   Q.   Was your belief or trust in the
21 principals an important factor in your decision
22 to buy?
23   A.   I would say yes.  It is.
24   Q.   Why is that?
25   A.   To be informed.  The reason is to be

25

1 informed about investments.  Is that I viewed my
2 investments as informed investments.
3        And part of the diligence is to get
4 to know who was behind them, basically.
5    Q.   And again putting aside Kin, what
6 were your -- do you think you can recall your
7 biggest three purchases measured by dollar value
8 at the time you bought them?
9    A.   Well there is one I forgot --
10 actually, no.  The biggest one I think maybe
11 Block Stack.  Block Stack was a big one.
12 File Coin was also significant.  Civic, about the
13 same as File Coin I would say.
14   Q.   Okay.  And, do you recall
15 approximately how much you purchased for each of
16 those starting with Block Stack?
17   A.   Block Stack about I think $120,000.
18      MR. MENDEL:  Can we just pause off
19 the record for a moment.
20      THE VIDEOGRAPHER:  We are going off
21 the record.  The time is 10:29 a.m.
22      (Whereupon, a discussion off the
23 record took place.)
24      THE VIDEOGRAPHER:  We are back on
25 the record.  The time is 10:30 a.m.

26

1 BY MR. MENDEL:
2    Q.   We were talking about your
3 investments in the digital assets specifically,
4 Block Stack, File Coin and Civic.  And I asked
5 you approximately how much in dollar value did
6 you invest?
7    A.   Yes, so Block Stack was 120,000.
8 Civic was, if I recall 35,000 and the same for
9 File Coin, yes, about that, it was 35,000.  That
10 is what I remember.
11   Q.   And so you had bought last Bitcoin?
12   A.   Bitcoin, I didn't have a lot of
13 Bitcoin.  But it varied.  Sometimes I had more
14 sometimes I had less.
15   Q.   Okay.  And when did you buy each of
16 these Block Stack, approximately?
17   A.   February of 2000 and, January and
18 February of 2018, I believe.
19      File Coin, I'm trying to remember.
20 I think it is whenever they were doing their,
21 when they did their offering.
22   Q.   Okay.
23   A.   I want to say '17, end of '17,
24 somewhere in there.
25   Q.   Okay.  What about Civic?

27

1    A.   Or in the middle of '17.  Same with,
2 Civic was before.  In chronology, what I remember
3 is chronology.  I think Civic came first and then
4 File Coin and then Block Stack in the '17 to
5 early '18 time frame.
6    Q.   Okay.  Fair enough, thank you.
7    A.   Yes.
8    Q.   And did you buy, of the three that
9 you mentioned, did you buy any of them at a
10 discount?
11   A.   I recall Civic had a small discount.
12 I mean these were the terms; these were the
13 standard terms.  Yes.  Civic had a bit of a
14 discount.  I don't know if they called it a
15 discount.  It was the offering, so, it was
16 whatever was offered.
17      Discount is relative, what is
18 discount, relative to what?
19   Q.   I guess I should first ask, did you
20 buy any of the three tokens that you just
21 mentioned, did you buy them in the, a sale that
22 was generally available to the public?  Or did
23 you do a different process?
24   A.   If I recall the Civic, I think they
25 were like available to the accredited public, to

28

CONFIDENTIAL

William Mougayar,
12/6/2019

1 the accredited investors.
2          Civic was an accredited process.  So
3 was File Coin.  And so was Block Stack.
4      Q.   And so when I mentioned discount,
5 what I was referring to was did you buy them at
6 any kind of discount from what the coin was
7 offered to other people?
8      A.   I don't think it is fair to call it,
9 I don't think I viewed it as a discount.  It was
10 the price at the time.
11         If the price was different later, it
12 was not because it was a discount.  It was just
13 because it may have appreciated.
14         So it was the price that was offered
15 at.  I didn't view it as a discount.
16     Q.   Uh-huh.  For any of the digital
17 assets that you have purchased, not just these
18 three but any others, have you ever used any of
19 those assets to buy any good or service?
20     A.   You mean if I, to clarify the
21 question, have I used like the Civic coin to buy
22 an asset?
23     Q.   To buy something, yes, other than to
24 sell it for some sort of monetary exchange.
25         Did you use it to buy something?

29

1      A.   No, I have not used it to buy
2 something in the real world, if that is what you
3 are --
4      Q.   Yes, or even on-line, any sort of
5 item, did you spend it in any sort of fashion
6 on-line?
7      A.   I have spent cryptocurrency on
8 mundane goods like sometimes a ticket would be
9 offered in cryptocurrency if that is what you are
10 asking.
11     Q.   Yes.
12     A.   I have dabbled in buying goods,
13 small goods and services.  Not goods, many
14 services, like an event might be offered like a
15 dinner.  I think the Coin Center one time they
16 had a dinner and you could pay in Bitcoin.  So I
17 think I paid them in Bitcoin --
18     Q.   I see.
19     A.   -- to attend.  There was a donation,
20 like a dinner, like a gala dinner, something like
21 that.  It is minor stuff.
22     Q.   Okay.  What about Kin?  Did you ever
23 use Kin to buy any good or service, like what you
24 have just described?
25     A.   I have used a Kin application, some

30

1 of the Kin apps to, in the, some of them that had
2 Kin in them, to conduct services to play around
3 with it basically.
4      Q.   When did you do that?
5      A.   I started doing that when they
6 started to test it in '17, I would say.
7      Q.   Do you recall the month?
8      A.   I don't recall the month.  It is
9 probably in the latter part, in the end of '17.
10     Q.   How about since then?  Have you used
11 Kin to buy any good or service?
12     A.   I used some of the, yes, there are
13 some apps that I have on my iPhone that use Kin
14 and I go in and I interact with them on an
15 occasional basis, so I can stay up to date with
16 the ecosystem.
17     Q.   And what are the apps that you have
18 used on your phone with Kin?
19     A.   If I had my iPhone I would tell you,
20 but I think Mad Libs and Tap Tap See.  I mean it
21 is that I dabbled in them, I don't depend on them
22 on a daily basis.
23     Q.   Is it fair to say that your use is
24 infrequent?
25     A.   Correct, yes, correct.

31

1      Q.   Was it more in the way of
2 experimenting?
3      A.   You could say it is part of it,
4 experimenting and being in the know about what
5 the capabilities are.
6      Q.   Have you ever, for any of the
7 digital assets that you have purchased, have you
8 ever sold, sold anything, like any good or
9 service from you in exchange for a token?
10     A.   No, I have not.
11     Q.   Did you buy the digital assets that
12 you mentioned in the hope that they would
13 increase in value?
14     A.   I wouldn't say that would be the
15 only reason.  It would be one of the reasons,
16 that eventually, yes, the value would increase if
17 the projects were successful.
18     Q.   That was true for each of the tokens
19 that, or the digital assets that you have
20 purchased, that was one of your objectives?
21     A.   One of the objectives, generally
22 speaking, yes.
23     Q.   For any of the digital assets that
24 you have mentioned, was that the only objective?
25     A.   No.  It was never the only

32

1  objective.  I mean, part of it is you become
2  close, you get closely associated with the
3  project and then you learn.  I mean part of my
4  work is to be in the know and to be knowledgeable
5  and to be a bit ahead of others.
6          And part of it is you get closer to
7  the entrepreneurs and you start to understand
8  what is going on, and you support them.
9          So, if appreciation comes later then
10 I would say it is a good thing, but it is one of
11 the things.  Because not all of them typically
12 appreciate.
13          Part of the investment portfolio is
14 to have a portfolio which means some of them will
15 do well, some of them will not do well.
16          So, I don't -- I never expect that,
17 all of them to appreciate.
18      Q.    But your hope was that at least some
19 of them would appreciate; is that right?
20      A.    I would say generally, I want to be
21 positive about things, yes.
22      Q.    For the Block Stack digital asset,
23 did you think that -- who issued Block Stack?
24      A.    You mean who did they work with?  I
25 think CoinList.  You mean who was the issuer?  I

33

1  think it went through CoinList.  CoinList was
2  the, it is a service.  Are you familiar with
3  CoinList?  Anyways, it is a service, CoinList was
4  the --
5      Q.    Were they the inventors of the
6  token?
7      A.    Block Stack was.
8      Q.    Did you know the management of
9  Block Stack?
10     A.    Yes, I did.
11     Q.    Did you think that the efforts of
12 Block Stack would matter to the future value of
13 the Block Stack token?
14     A.    Yes, but not only theirs, but theirs
15 and the ecosystem that they were kind of leading
16 to create.
17     Q.    Why would the efforts of Block Stack
18 have mattered to the future value of the
19 Block Stack token?
20     A.    Because they were developing the
21 core technology behind it.  And other developers
22 would be adopting that technology and
23 incorporating it into their specific
24 applications.
25     Q.    Did you think that the efforts of

34

1  Block Stack would matter to the value of their
2  token even after they issued the token?
3      A.    To a degree.  They have to be
4  adopted, so, it is just their efforts and the
5  efforts of others.  Not just their efforts.
6      Q.    And did you think that the quality
7  of Block Stack's management mattered to the
8  future value of the Block Stack Kin?
9      A.    Yes, I did.
10     Q.    Is that also true of File Coin and
11 Civic?
12     A.    Yes.
13     Q.    The management of those companies
14 was important to the future value of those
15 tokens?
16     A.    That is correct.
17     Q.    And, the future efforts of those
18 issuers of File Coin and Civic, those future
19 efforts were important to the value of those
20 tokens, correct?
21     A.    Their efforts and the efforts of
22 others.  Not just their efforts, I would say.
23     Q.    Have you sold any of the tokens that
24 you have purchased?
25     A.    Of the ones we have just named?

35

1      Q.    Yes.
2      A.    If I recall --
3      Q.    Do you need a break?
4      A.    No, I should be okay.  I've got a
5  bleeding.  I don't know if it is too dry, it
6  should be okay.
7          I think I sold Civic.  I have yes, I
8  sold Civic, I think, but not the others.
9      Q.    Did you make a profit on Civic?
10     A.    I think it was a small profit.  It
11 wasn't -- yeah, a small profit, nothing
12 spectacular, yes.
13     Q.    You are familiar with the Token
14 Summit?
15     A.    Yes, I am the creator of the Token
16 Summit, yes, I am.
17     Q.    You created it?
18     A.    Yes, I have.
19     Q.    And when did you create it?
20     A.    I think I announced it at the end of
21 '16 and we had the first such event in May
22 of '17, in New York, at the NYU, at the
23 university.
24     Q.    The event, it was -- the May 2017
25 event in New York, was that the first one?

36

1    A.   It was the first one, yes.
2    Q.   Do you consider it the premier
3  conference on the token economy?
4    A.   I think, at the time I thought it
5  was.  I mean it still has a very good
6  representation.  Since then others have come into
7  the space and there are so many conferences now.
8        But, I think we were the first.  I
9  was the first to foresee that phenomenon early
10  on.  One of the first I would say.
11   Q.   How often are you running Token
12  Summits now?
13   A.   Now, we did two in '17.  One in New
14  York, one in San Francisco.
15        Then later we did another one in New
16  York in '18 and we did the fourth one in '19,
17  this year in May.  So far it is once a year.
18   Q.   Where, when was the San Francisco
19  Token Summit in 2017?
20   A.   In December, first week of
21  December, '17.
22   Q.   Why have you chosen New York City as
23  a location for these summits?
24   A.   There was a, another event there
25  called Consensus, and New York became a good

37

1  location for, like a good meeting location for a
2  lot of blockchain activity.
3        So, that became the, what is then
4  called Blockchain Week.
5        So, the Monday and Tuesday of that
6  week thousands of people came to New York for the
7  Consensus event.
8        And I decided to organize the Token
9  Summit on Thursday of that week because already a
10  lot of people were already in New York and at the
11  time in '17 there were only like two or three
12  events, but we called it Blockchain Week and now
13  it is an official thing.  Blockchain Week, there
14  are dozens that take place.  Not uncommon to what
15  other cities do in the world.
16        Berlin has a Blockchain Week, San
17  Francisco has a Blockchain Week.  Places
18  around -- we kind of pioneered that model and
19  other cities followed that Blockchain Week.
20        Maybe, typically there is one or two
21  anchor events and many others organize events
22  around Blockchain Week.
23   Q.   Is there anything similar in Canada?
24   A.   Yes, they did a Blockchain Week.
25  Not me, I wasn't involved with it.  Some other

38

1  group did the Blockchain Week.  I'm not sure if
2  it was in August.  I wasn't directly involved.
3    Q.   Did you think New York was a better
4  locale than Canada for the summit?
5    A.   Did I think that New York was a
6  better?
7    Q.   Yes.
8    A.   Yes, because my mindset was more
9  international.
10   Q.   How did you get involved with Kik?
11   A.   I knew Ted, the CEO from maybe
12  2012/13.  I knew him casually because I was part
13  of the tech ecosystem of Toronto.  Waterloo, it
14  is kind of a corridor or it is a region.
15        And.  And that is kind of what
16  started the relationship.  But, I didn't know him
17  very well back in '12 or '13.  I would say I knew
18  him casually.
19   Q.   Did you become a consultant to Kik?
20   A.   I became a consultant to Kik in,
21  yes, I became it later, later on.
22   Q.   Can you explain how that happened?
23   A.   I think that the events that led to
24  it probably started in '16.  I think Fred Wilson
25  and I, Fred Wilson is an investor and a board

39

1  member of Kik.  We started to discuss if there
2  was applicability of the blockchain for Kik in
3  '16 more or less.  And I think I had lunch with
4  Ted at, I can't remember if it was '16 or '17,
5  one time.
6        And he had been thinking about the
7  blockchain and cryptocurrency for a while.  And
8  my expertise would be beneficial, I thought that
9  my expertise would be beneficial to them and vice
10  versa.
11        So, one thing led to another, I
12  think, and then they retained my services in,
13  trying to think, it was in the middle of '17.
14   Q.   Did you enter into a formal contract
15  with Kik for your consulting services?
16   A.   It was quite informal to, I don't
17  remember if I signed an agreement, consulting
18  agreement with them.
19        We had agreed on a monthly, on a
20  monthly compensation and the date of the starting
21  point.
22   Q.   I can tell you that --
23   A.   It was in an e-mail, I think.
24   Q.   I can tell you that the SEC received
25  a production of documents about this case from

40

CONFIDENTIAL

William Mougayar,
12/6/2019

1   you and we didn't see a formal agreement.  So I'm
2   just wondering if you are aware?
3       **A.**   No there was e-mails.
4       **Q.**   Just to restate, I'm just wondering,
5   if you, Mr. Mougayar, are you aware of any
6   contract that you entered into with Kik in 2017
7   for your consulting services?
8       **A.**   I wasn't aware, no.  I think it was
9   done via an e-mail in an understanding of like an
10  e-mail.
11      **Q.**   Okay.  What did you do as a
12  consultant for Kik in 2017?
13      **A.**   So, a variety of things.  Obviously
14  my expertise is in the token economics aspects,
15  and in the role of tokens.  And, how tokens can
16  create economies.  How users can earn and spend
17  tokens, specifically.
18          The business models behind tokens.
19          And I had some relationships with
20  some companies in the space.
21          So, I introduced them to companies
22  and people in the space that could be helping
23  them.
24          I don't know if I need to be more
25  specific or if you want me to name ...

41

1       **Q.**   No, that is okay.
2       **A.**   I have already mentioned.
3       **Q.**   My question was more general.
4       **A.**   Okay.
5       **Q.**   And do you have anything else to add
6   to that?  Just generally, the scope of your
7   responsibilities?
8       **A.**   I was available to them.  I was very
9   available to them at any time.
10          They could call me or I was there
11  for them, basically.
12      **Q.**   Do you have an account on Kik
13  Messenger?
14      **A.**   Yes.
15      **Q.**   Since when?
16      **A.**   Probably '12, '13, or even '11.
17  2011 or so.
18      **Q.**   Are you a user of it today?
19      **A.**   Yes, I am.
20      **Q.**   Would you say you use it frequently?
21      **A.**   I use it regularly, but with a very
22  limited set of users.
23      **Q.**   Thank you.
24          (Whereupon, Exhibit 128
25          was marked for identification.)

42

1           THE WITNESS:  Thank you.
2   BY MR. MENDEL:
3       **Q.**   I have given you what has been
4   marked Deposition Exhibit 128.
5       **A.**   Uh-huh.
6       **Q.**   And this appears to be an e-mail
7   from you.  It is an e-mail chain, I should say,
8   and the top e-mail is an e-mail from you,
9   Mr. Mougayar, to Peter Heinke on April 28, 2017.
10          Feel free to take a minute to look
11  throughout the e-mail chain to see what it is.
12      **A.**   Sure.
13      **Q.**   I actually want to, my only
14  questions are about the paragraph on the page,
15  the first page?
16      **A.**   Yes.
17      **Q.**   And do you recognize this e-mail?
18      **A.**   Yes.
19      **Q.**   And you write in the top e-mail, in
20  part, well your e-mail is to Mr. Heinke, but you
21  say, "By the way, I sent this to Ted yesterday
22  and he said I should share it with you."  And
23  then a smiley face.  And then you write, "Hi Ted,
24  I wanted to see if you have thoughts on how to
25  structure our arrangements for reference.  I

43

1   received about 20,000 from Ethereum Foundation
2   three years ago at ICO prices and 200,000 from
3   Steemit last year for somewhat similar
4   arrangements.
5           "I suggest we peg to U.S. 60,000
6   worth of tokens at the lowest issued presale
7   price.
8           Okay to lock part of it for six
9   months or one year.  But total vesting is two
10  years max.  Thoughts?"
11      **A.**   Uh-huh.
12      **Q.**   "And I continue on going with you
13  and be part of advisory oversight board or team
14  for two years."
15          Did I read that correctly?
16      **A.**   Yes.
17      **Q.**   Okay.  And was this your discussion
18  with Kik about your consulting arrangements?
19      **A.**   This was in April.  I think it would
20  lead, I mean we were negotiating, basically.  I
21  was negotiating.
22      **Q.**   This wasn't the file deal, this was
23  just --
24      **A.**   Negotiation.
25      **Q.**   Your proposal?

44

1     A.   Yes, I was negotiating.
2     Q.   Okay.  And you were interested in
3  getting paid in whatever token Kik would issue.
4  Is that right?
5     A.   I think this says it would be a
6  combination, I think.  Did it not?  I suggest we
7  peg it to 60K worth of tokens ---oh, yes, here it
8  is tokens, we didn't discuss dollars at the time.
9     Q.   Okay.
10    A.   That is correct.  I didn't know how
11 it was going to develop, to unravel, let's put it
12 that way.
13         And I had suggested tokens at the
14 time.
15    Q.   You are referring to other
16 consulting arrangements that you had in the
17 e-mail?
18    A.   Yes.
19    Q.   And one of them was with Ethereum
20 Foundation?
21    A.   Yes.
22    Q.   And you received $20,000 worth of
23 Ethereum in 2014?
24    A.   '14 or '15, yes, '14 I would say.
25 Yes.  Correct.

45

1     Q.   Okay.  Do you remember if that was
2  U.S. dollars or Canadian dollars?
3     A.   Good question.  U.S. dollars.
4     Q.   What did you do with the Ether that
5  you received from that contract?
6     A.   I think I ended up disposing of it
7  later on.
8     Q.   Did you make a profit?
9     A.   Not a lot.  I sold them at low
10 prices.
11    Q.   What about the 200,000 that you
12 received in tokens from Steemit?  What did you do
13 with those tokens?
14    A.   Over the years I disposed of them as
15 well.
16    Q.   Okay.  I will take that one back.
17    A.   Thank you.
18         (Whereupon, Exhibit 129
19         was marked for identification.)
20 BY MR. MENDEL:
21    Q.   I have given you, Mr. Mougayar, what
22 has been marked as Deposition Exhibit 129.
23    A.   Yes.
24    Q.   This is another e-mail chain.  This
25 one is dated at the top June 28, 2017.

46

1     A.   Uh-huh.
2     Q.   Do you recognize this e-mail chain?
3     A.   Yes.
4     Q.   I just want to refer you to, it is
5  Page 4 of the exhibit.  If you look in the lower
6  right-hand corner, there are these small numbers
7  that us lawyers refer to as Bates numbers.  Do
8  you see those, and it says MMLWM and then there
9  is a long string of numbers?
10    A.   Here?
11    Q.   Yes.  Exactly.  And so can you turn
12 to the page that has five, ends in 558?
13    A.   Yes.
14    Q.   Are you there?
15    A.   Yes.
16    Q.   Okay.  And if you look all of the
17 way to the top of the page, it is actually an
18 e-mail from June 23, 2017.
19    A.   Yes.
20    Q.   Do you see that?
21    A.   Yes.
22    Q.   Okay.  And you write, "I would like
23 to close the loop on our agreement terms, too.
24 Given that your round is much higher, I would
25 like to propose a higher figure than the original

47

1  75,000."
2     A.   Uh-huh.
3     Q.   Did your fee proposal increase from
4  the 60,000 that you saw in the prior e-mail?
5     A.   It seems to be that way.  I mean I
6  was negotiating still.
7     Q.   Okay.  And, do you know what you
8  meant by your round is much higher?  What were
9  you referring to there?
10    A.   Well, I didn't know at the time,
11 maybe I think it wasn't clear how much they were,
12 wanted to raise.  Whether it was 50 million, I
13 kind of vaguely recall maybe the figure was lower
14 than 100 and it is, I think, later it was
15 hovering towards the 100.  So, it was higher than
16 I originally thought.
17         So, probably that is what led to it,
18 to me saying that.
19    Q.   You also write, "Also, I would like
20 to personally participate in your presale for
21 $100,000, if you can squeeze me in."
22    A.   Yes.
23    Q.   This is, this reflects your interest
24 in investing in Kin?
25    A.   Yes.

48

1     Q.    And is this the first time that you
2  raised the possibility of such an investment with
3  Kik?
4     A.    I think so.  Let me see the date.
5  Yes, I think so, yes.
6     Q.    Okay.  And, this is in June, late
7  June, 2017, right?  This is a month after the
8  public announcement of Kin.  Does that sound
9  right to you?
10    A.    More or less, yes.
11    Q.    Because the public announcement was
12 at your token summit in late May of 2017?
13    A.    Maybe middle May of '17 or something
14 like that, pretty close.
15    Q.    My question is why did you wait
16 until late June to raise the possibility of you
17 investing in Kin?
18    A.    I don't remember.  I mean there was
19 no particular reason.  It is not something I
20 planned.  I didn't think I am going to wait a
21 month.
22          I think, I don't know, I mean the
23 terms were not maybe, there is nothing to read
24 into it.  It just happened, maybe I felt it was
25 ready at the time, I don't remember.

49

1     Q.    Okay.  Fair enough.
2     A.    Nothing really.
3          (Whereupon, Exhibit 130
4          was marked for identification.)
5  BY MR. MENDEL:
6     Q.    I provided you what has been marked
7  as Deposition Exhibit 130.
8     A.    Yes.
9     Q.    This is an e-mail chain?
10         Again, and the e-mail date at the
11 top of the first page is July 7th, 2017.
12    A.    Yes.
13    Q.    And, you state here again -- strike
14 that.
15         You say in your July 7th, 2017,
16 e-mail to Peter Heinke, "Any chance you can give
17 me an update on the advisor agreement terms you
18 are thinking about?  Ted told me that is with
19 you."
20    A.    Yes.
21    Q.    So, this is still the issue of your
22 agreement to act as a consultant with Kik, right?
23    A.    Yes.
24    Q.    And as of July 7, 2017 it hadn't
25 been formalized, correct?

50

1     A.    Yes, I would say that is fair.
2     Q.    Okay.  In fact you hadn't come to
3  terms yet on your agreement?
4     A.    Yes, that would be more accurate to
5  say that, yes.
6     Q.    Okay.  That is all I have for that
7  one.
8     A.    Yes.
9          (Whereupon, Exhibit 131
10         was marked for identification.)
11 BY MR. MENDEL:
12    Q.    And I have given you what has been
13 marked as Deposition Exhibit 131.
14    A.    Okay.
15    Q.    And this is a, it looks to be a text
16 exchange between you and Mr. Heinke.  Is that
17 right?
18    A.    Yes.
19    Q.    And he writes the date, this date
20 seems to be July 21st.
21    A.    What year is this, do you know?
22    Q.    I don't know.  I was going to ask
23 you that.
24         Did you -- well, the --
25    A.    I think it is a --

51

1     Q.    Go ahead.  What is your --
2     A.    I want to say it is '17.
3     Q.    Okay.  What makes you say that?
4     A.    My wire is sent, is that from me.
5  Is this just Peter?  Or was it me, or --
6     Q.    I need to ask your help for this.
7  Because all I have is this one page.
8          And so what I see at the top is
9  "Also we will owe you about 15 to 20 thousand."
10 That seems to be Mr. Heinke writing, correct?
11    A.    It says Peter H.  So, I would -- I
12 don't remember.
13    Q.    I mean you don't remember owing
14 anybody 15 to 20 thousand, do you?
15    A.    Well, no, this may not be me.  I'm
16 sorry, I jumped to a conclusion here.
17         I thought you were showing me a
18 conversation with Peter.  But, I--
19    Q.    I believe you produced this
20 document.
21    A.    Let me think.  I believe we started
22 early April which is when I came to see.  Yes,
23 that sounds to me.
24    Q.    Okay.
25    A.    "But I prefer to keep them in your

52

1  bank as tokens if that is possible."
2      I mean, I don't remember this.  But,
3  okay.
4      Q.   Okay.  Just to clarify for the
5  record, so, is it your understanding that this is
6  a text exchange between you and Mr. Heinke around
7  July 21st, 2017?
8      A.   Yes, it sounds correct.
9      Q.   Okay.  And, are you writing then
10 that Kik owes you for about four months of
11 consulting work?
12     A.   I think that was the reference.  So,
13 they were saying, I mean, this would be, that was
14 the assumption that if we had, if we had started
15 the clock on April, yes, that is what it assumed.
16     Q.   You are come to an agreement in July
17 that you would count your effort from April?
18     A.   Yes, it is normal.
19     Q.   Okay?
20     A.   It was like applying some
21 retroactivity to it, I would say.
22     Q.   It was a retroactive agreement?
23     A.   It seemed that way, I mean that was
24 part of the negotiations, yes.
25     Q.   Very well.

53

1      A.   That's correct.
2          (Whereupon, Exhibit 132
3          was marked for identification.)
4  BY MR. MENDEL:
5      Q.   And so now I have given you what has
6  been marked as Deposition Exhibit 132.  And this
7  is an e-mail chain between you and Mr. Heinke.
8  And the first one at the top of the first page is
9  dated August 10th, 2017.  Correct?
10     A.   Yes.
11     Q.   Do you recognize this document?
12     A.   Yes, I do.
13     Q.   Okay.  And, if you look down the
14 first page, it says on August 10th, 2017, Peter
15 Heinke wrote and I'm skipping down, "Starting in
16 April is fine on the fees.  Are you going to send
17 us an invoice for the advisory fees?"
18     A.   Yes.
19     Q.   And that is again referring to your
20 consulting agreement.  Correct?
21     A.   Yes.
22     Q.   And it is Mr. Heinke stating that
23 they agreed to pay you from starting in April?
24     A.   Yes.
25     Q.   And then he also writes, "At this

54

1  point, unless Ted changes his mind, it will have
2  to be in the form of the old-fashioned monetary
3  exchange method called a check or a wire transfer
4  but unfortunately not in Kin."  Right?
5      A.   Yes.
6      Q.   He wrote that.  And in response to
7  your earlier inquiry whether you could be paid in
8  tokens?
9      A.   Correct.
10     Q.   Okay.  And you responded on
11 August 10th, it is on the first page.  It is on
12 the top e-mail.
13     A.   Yes.
14     Q.   It is the most recent e-mail first.
15     A.   Yes.
16     Q.   And, you write in part, "Re:  Cash v
17 Kin, is that a board decision or Ted has leeway
18 in deciding?"  You are following up --
19     A.   I am still negotiating somehow, yes.
20     Q.   Why were you still interested in
21 receiving Kin rather than cash?
22     A.   I don't -- I think -- I can't
23 remember.  I mean, I thought it would be easier
24 on them.  I --
25     Q.   Because you had asked several times

55

1  and they kept saying no, we would have to pay you
2  cash.
3      A.   This is how some of the other
4  arrangements that I had with other companies.
5      Q.   Does that reflect a preference by
6  you for Kin?
7      A.   Not really.  I mean, it was, I
8  wasn't really, no, it wasn't -- I was just
9  negotiating, I think.
10         Either one would have been fine.
11 Again, it was based on some of my previous
12 arrangements, and I thought that they wanted to
13 preserve cash or they didn't want -- every
14 company is different, so.
15         At the end of the day it is whatever
16 they decide, not what I want, so ...
17     Q.   Okay.  You can put that one down.
18         When did your, how long did your
19 consulting arrangement with Kik last?
20     A.   I think it lasted at least a year if
21 not more.  And if I recall, we converted it to a,
22 to my position in the, on the Kin Foundation
23 Board.
24         So, maybe I'm going ahead here.  It
25 is kind of related, so I might as well tell you.

56

1       So, did you ask when did it
2  terminate, or what was the question again?
3       **Q.**   I was essentially asking how long
4  did your arrangement go for?  Yes.
5       **A.**   It went on, maybe I think more than
6  a year, maybe a year and a few months.
7       Again, until it converted to a, when
8  they made it official that I was a board member
9  of the Kin Foundation.
10       **Q.**   Okay.  And, was there a set monthly
11  amount that you were getting?
12       **A.**   Yes.  Yes.  It was.  I can't
13  remember if it was 5 or 10 thousand dollars.  In
14  that neighborhood.
15       **Q.**   Could you just speak a little
16  louder?  Can you say how much money it was?
17       **A.**   I'm sorry, it was about 5 or 10
18  thousand dollars, I think that maybe.
19       **Q.**   A month?
20       **A.**   Yes, it may have been 10,000 at some
21  point.  And then five later.  I can't remember
22  exactly.  But that is kind of the, what I
23  remember, yes.
24       Probably 5,000 is my recollection,
25  if I'm not mistaken.

                                        57

1       **Q.**   If you go back to the text exchange,
2  and we are looking at Deposition Exhibit 131.
3       **A.**   Yes.
4       **Q.**   Mr. Heinke wrote, "We will owe you
5  about 15 to 20 thousand."
6       **A.**   Yes.
7       **Q.**   Does that reflect 5,000 a month?
8       **A.**   Correct, so, April, May, June, that
9  is correct.
10       **Q.**   Very good.  Thank you.  And do you
11  think you continued to get paid 5,000 a month
12  through a year and a few months into 2018; is
13  that right?
14       **A.**   I think so, I think so, that was --
15  yes, that is correct.
16       **Q.**   From April of 2017 through the token
17  distribution event, when, do you recall when that
18  was?
19       **A.**   I think September.
20       **Q.**   September 2017?
21       **A.**   Yes.
22       **Q.**   Okay.  From, during those months,
23  so, from April through September 2017, how much
24  of your time did you spend on Kik-related
25  matters?

                                        58

1       **A.**   Like in terms of hours or days,
2  or -- I mean -- how much of a percentage of my
3  time.
4       **Q.**   Yes, a percentage of your time.
5       **A.**   I can give you a percentage.  I had
6  other activities.  So, maybe just guessing here,
7  maybe 5 to 10 percent would be fair.
8       **Q.**   Okay.  Okay.  5 to 10 percent of
9  your business time?
10       **A.**   Yes.  More or less, yes.
11       **Q.**   Did you keep an office at Kik?
12       **A.**   Never.
13       **Q.**   Did you make decisions on Kik's
14  behalf?
15       **A.**   No, I have not.
16       **Q.**   Did you seek Kik's approval of your
17  actions?
18       **A.**   What actions?  What do you mean by
19  that?
20       **Q.**   If you were to start a certain
21  activity, per your consulting arrangement, would
22  you ask Kik whether you should do it first?
23       **A.**   It is not fair to say that, because
24  I was not acting on behalf of Kik in any
25  capacity.

                                        59

1       So, I, that question, I mean I'm
2  sorry it is not relevant to me because I was not
3  acting on their behalf.  I was consulting to them.
4       **Q.**   Was there a certain job at Kik for
5  which you had primary responsibility?
6       **A.**   A job, no.
7       **Q.**   Did you ever think you were
8  performing the responsibilities of a Kik
9  employee?
10       **A.**   No.
11       **Q.**   Did you tell other people during
12  this time period, again I'm referring to the
13  April to September 2017 period, did you ever tell
14  other people that you were working for Kik?
15       **A.**   I don't recall that I did.  I don't
16  recall that I did.  No.
17       **Q.**   Okay.
18       **A.**   I wasn't bragging about it if that
19  is what you are implying, no.
20       **Q.**   No.  I was just saying factually.  I
21  wasn't trying to impute a certain puffery to it
22  or anything.
23       I was just asking you whether you
24  factually, whether you ever told people that you
25  were working for Kik.

                                        60

1      A.   I may have mentioned that I may be
2   advising them.  Or, I mean the terms were not
3   final.  So, I was still not definite, you know,
4   because as you can, as you saw, I mean we are
5   still back and forth.
6           So, I may have mentioned it to
7   somebody.  But, nothing, like I wasn't
8   broadcasting it, I would say.  So it was -- no, I
9   didn't, I wasn't very overt in saying that.
10      Q.   Did you tell other people that you
11   could make decisions for Kik?
12      A.   No.  I never did.
13      Q.   Did you seek legal advice from Kik's
14   lawyers to guide your work for Kik?
15           MR. CADIGAN:  Objection.  You can
16   answer.
17           THE WITNESS:  You said something.
18           MR. CADIGAN:  You can answer.
19           MR. CRIMMINS:  He has to sustain an
20   objection for the record to preserve it for
21   trial.
22           MR. CADIGAN:  You can answer the
23   question.
24           MR. CRIMMINS:  Sometimes he will
25   state an objection and it will be privilege

61

and we will have to instruct you not to
2   answer, but other times we will just state an
3   objection for technical reasons and you can
4   still answer.  This is one of those times you
5   can still answer.  Would you like the
6   question repeated?
7           THE WITNESS:  Would you like to
8   restate the question, please?
9   BY MR. MENDEL:
10      Q.   I will.
11           Did you, Mr. Mougayar, seek legal
12   advice from Kik's lawyers to guide your work for
13   Kik between April 2017 and September 2017?
14           MR. CADIGAN:  Objection.
15           MR. CRIMMINS:  Do you understand it?
16           THE WITNESS:  I mean, what kind of
17   legal advice?  What did I -- what did I
18   mean by that?
19           MR. CRIMMINS:  The question is to
20   guide your work.
21           THE WITNESS:  To guide my work.
22           MR. CRIMMINS:  To guide your work,
23   did you go to Kik's lawyers and ask for
24   guidance?
25           THE WITNESS:  No, I have not, no.

62

1   BY MR. MENDEL:
2      Q.   You are not still consulting for Kik
3   today, correct?
4      A.   I'm on the board of the Kin
5   Foundation.  So I'm not consulting for them.
6           But, my duties are to advise them.
7           If you want to equate advising to
8   consulting, then it is part of my duties.
9      Q.   As a board foundation member, part
10   of your responsibility then is advising the
11   company Kik Interactive?
12      A.   Correct.  No, sorry, now -- let me
13   rephrase.
14           My, the scope of my activities are
15   for the Foundation, not Kik.  So, I should,
16   everything I said is really about the, my
17   involvement is with the Kin, like recently now
18   there is Kin Foundation, yes, correct.
19   Currently.
20      Q.   What about -- okay.  But, previously
21   you stated that your consulting arrangement with
22   Kik Interactive, the company, went a year and a
23   few months.  Correct?  Is that not right?
24      A.   Yes.  Yes, that is correct.
25      Q.   That is correct.

63

1      A.   Yes.
2      Q.   And then so are you saying basically
3   in May or June of 2018 your consulting
4   arrangement with Kik ended.  Is that what you are
5   saying?
6      A.   I'm trying to think.  I would say
7   roughly, yes, yes.
8           But, a lot of, just to be clear, I
9   don't know what you are implying here.
10           There was a lot of act -- I mean, my
11   involvement was related to the Kin Foundation, to
12   the, to matters relating to the ecosystem, to the
13   Kin cryptocurrency.
14           It is really very much Kin-related
15   not so much Kik.
16      Q.   Okay.  Those were your
17   responsibilities?
18      A.   Yes.  Yes.
19      Q.   Okay.  While even, so, that, those
20   responsibilities began before May/June 2018?
21      A.   There was an expectation to have a
22   Kin Foundation from the beginning.  So, my, the
23   scope of my work was related to Kin as a
24   currency, as a cryptocurrency.
25           And the eventual, and the evolution

64

1  of the Foundation.
2      Q.   Did you introduce -- let me go back
3  to the period before the announcement of Kin, so
4  I'm talking about the April time period.
5      A.   Okay.
6      Q.   In the months leading up to the
7  announcement, did you introduce Kik to investment
8  banks?
9      A.   I introduced Kik to, I don't know
10 that it is accurate to call them investment
11 banks.
12          They were service providers.  One of
13 them was Argon Group.  There was another one, I
14 forgot the name.  It was the principal, one of
15 the principals from Argon that had left and did
16 his own thing.
17          So, I introduced them to a couple.
18 I don't know the timing, though.
19          It may have been after May.  So,
20 between April and May, I don't -- I think that
21 happened after May, though.  I can't remember
22 exactly.  But, I'm pretty sure it was after May.
23          MR. CRIMMINS:  2017?
24          THE WITNESS:  '17, yes.  We can go
25 through the record.  I mean it would be the

65

1  Argon e-mails.  I, I think it was after May,
2  but I'm not sure.
3  BY MR. MENDEL:
4      Q.   I'm going to give you one.
5      A.   You probably have it, yes.
6          Oh, yes, it was before, I guess,
7  yes, Stan.  Argon Group, yes.  Yes, it was
8  before.  Correct.
9          (Whereupon, Exhibit 133
10          was marked for identification.)
11 BY MR. MENDEL:
12     Q.   Okay, so, Mr. Mougayar, just for the
13 record, I have given you what has been marked as
14 Deposition Exhibit 133 and this is an e-mail from
15 somebody named Stan Miroshnik, M-I-R-O-S-H-N-I-K.
16     A.   Yes.
17     Q.   Dated April 14th, 2017.
18     A.   Yes.
19     Q.   To Peter Heinke.  And you are on the
20 cc: line.  Right?
21     A.   Yes.
22     Q.   Okay.  And, so, this is
23 Mr. Miroshnik e-mailing about potential, would
24 you call them investment bank services?
25     A.   Well, they, I mean they provide the

66

1  equivalent of investment banks but in the
2  cryptocurrency space.
3          They are a service provider, I mean
4  I think we call them, they are one of the service
5  providers.
6      Q.   When you say they are the equivalent
7  of an investment bank.  Why do you say that?
8      A.   Maybe, I mean, I think that is how
9  they portrayed themselves.  So, I don't take it
10 as something that I, it is not a label that I
11 should -- I mean, that is my understanding, that
12 is how they viewed themselves, I think.
13     Q.   And, did you make the introduction?
14     A.   I think I have, yes.  According to
15 this e-mail.  It looks like, it seems like I
16 have, yes, I have.
17     Q.   Okay.  And then you see the document
18 attached to the e-mail, right?  It starts on page
19 number ending in 147?
20     A.   Yes.
21     Q.   Again looking at the small ones on
22 the lower right side.
23     A.   Yes.
24     Q.   Okay.  Was this a document prepared
25 by Argon sent to Kik?

67

1      A.   Yes.
2      Q.   You didn't prepare it, right?
3      A.   No.
4      Q.   Okay.  And just for the record this
5  is an attachment to the e-mail and the last page
6  number ends in 162, right?
7      A.   Yes.
8      Q.   Okay.  Good, can you go to Page 150.
9      A.   Uh-huh.
10     Q.   Let me know when you are there.
11     A.   One second.  150, yes, I am there.
12     Q.   Okay.  And there is a, at the very
13 top there is the Argon Group insignia to the
14 left.  And then it says, "A brand new capital
15 market.  Recent ICOs volume is growing rapidly.
16 The regulators will notice."
17          Did you agree that ICOs were a brand
18 new capital market?
19     A.   Did I agree that ICOs were a brand
20 new market.
21     Q.   A brand new capital market.  Did you
22 agree with that?
23          MR. CRIMMINS:  Do you understand the
24 term?
25          THE WITNESS:  Can you elaborate

68

CONFIDENTIAL

William Mougayar,
12/6/2019

1    maybe?
2  BY MR. MENDEL:
3        **Q.**   Well, I'm really just going with
4  what is in the document and Argon in their
5  brochure says, "A brand new capital market."
6        And then it has got some charts
7  below that.
8        One caption is "Major ICOs in 2016."
9  But the header says a brand new capital market.
10       What do you understand the capital
11  market to be?  Aside from this document?
12       MR. CRIMMINS:  Yes, you mean as
13    Argon as using it or as he understands it.
14  BY MR. MENDEL:
15       **Q.**   Well, as Mr. Mougayar understands
16  it.
17       So, aside from the document, what do
18  you understand the capital market to be?
19       MR. CRIMMINS:  If you have an
20    understanding.
21       THE WITNESS:  My understanding is
22    that there is economic, economic value that
23    could be derived from the activity underlying
24    the market.
25       So, they wrote this, I didn't.  So

                           69

1    I'm not sure where, what you are implying,
2    did I understand it, do I believe it was a
3    brand new capital market.
4        Yes, I believe cryptocurrencies,
5    there is a lot of novelty around
6    cryptocurrencies.
7        So, I agree with that
8    characterization.  I would agree with it.  I
9    mean there is nothing wrong with agreeing
10    with that one, yes.
11  BY MR. MENDEL:
12       **Q.**   And, do the charts below, where it
13  says Major ICOs in 2016, do those look roughly
14  accurate to you?
15       MR. CADIGAN:  Objection.
16  BY MR. MENDEL:
17       **Q.**   To the extent that you know.  Yes,
18  that is a bad question.  Let me say it again.
19       Do the charts listed on Page 150 of
20  this exhibit, underneath the caption Major ICOs
21  in 2016, do you have any reason to doubt their
22  accuracy?
23       MR. CADIGAN:  Objection.
24       MR. CRIMMINS:  Join.  Do you know
25    the number of ICOs during the period

                           70

1    referenced, 2016?
2        THE WITNESS:  Not offhand.  I mean,
3    it seems to be kind of in the ballpark I
4    would say.
5  BY MR. MENDEL:
6        **Q.**   I will take that.  That is fine.
7        **A.**   It was numbers, it was in the
8  ballpark.
9        **Q.**   Can you turn to Page 151?
10       **A.**   Okay.
11       **Q.**   And, at the top it says ICO Market
12  Update.
13       **A.**   Okay.
14       **Q.**   And on the left column there is a
15  bullet, the third bullet down, it states,
16  "Expectation for a strong growth of ICO market in
17  2017, e.g., William Mougayar at EDCON."
18       **A.**   Yes.
19       **Q.**   Right.  First, what is EDCON?
20       **A.**   EDCON.  It is a conference, an
21  Ethereum, Ethereum education.  So, the ED stands
22  for education, conference.
23       **Q.**   Okay.  And are these subbullets
24  starting with "80 percent of ICO on Ethereum,"
25  are these numbers that you came up with as part

                           71

1    of your EDCON?
2        **A.**   Yes.  That was in February of '17 in
3  Paris.  I made a presentation.  It was the early
4  days of the ICO, yes.  I made some, I made some
5  predictions.  Correct.
6        **Q.**   So, would you agree with the bullet,
7  "Expectation for a strong growth of ICO market in
8  2017."
9        Did you believe that at the time?
10       **A.**   That's correct, yes.
11       **Q.**   Can you turn to Page 154?
12       **A.**   I didn't know, by the way, they had
13  used my notes in this presentation.
14       When I saw it, it was the first
15  time.  So, I'm not the one that told them to put
16  this bullet.
17       **Q.**   When you saw it for the first time
18  right now in this deposition?
19       **A.**   No, no.  When I saw their proposal,
20  and I saw they had used my references, my bullets
21  in this proposal, it was the first time I had
22  seen it.
23       So, I'm not the one that told Argon
24  to put my bullets in the Kik proposal.
25       **Q.**   Understood.  But you agree with what

                           72

CONFIDENTIAL

William Mougayar,
12/6/2019

1  the bullet says?
2      **A.**  It was my bullets, yes, so I agreed
3  with the bullets.
4      **Q.**  Okay.
5      **A.**  The context in which they are used
6  is another story.  I mean, but it is my bullets.
7  People can, people always, can misquote me or
8  misuse numbers.
9          So, all I'm saying is that these are
10 my bullets.  How they use them is up to them not
11 up to me.
12     **Q.**  When you received this on, in April
13 of 2017, did you read it?
14     **A.**  Yes.
15     **Q.**  You read the Argon brochure,
16 correct?
17     **A.**  Yes.
18     **Q.**  Okay.  Let's go to Page 154.  It
19 says ICO Offering Structure.  Do you see that?
20     **A.**  Uh-huh.
21     **Q.**  And then there is two columns.  One
22 that says Feature and the other that says
23 Description.
24         And if you look down there is -- are
25 you with me?

73

1      **A.**  Yes.
2      **Q.**  Okay.  And, the fourth feature says
3  Discount For Early Participation.
4          Do you see that?
5      **A.**  Uh-huh.
6      **Q.**  Was this a common feature of ICOs
7  offering structures in 2017?
8      **A.**  I would say it varied.  There were
9  no common features I would say.  It varied all
10 over the map.
11     **Q.**  And can we go back to Page 150?  We
12 were on it previously.
13     **A.**  Yes.
14     **Q.**  Where it says the regulators will
15 notice.
16     **A.**  Uh-huh.
17     **Q.**  Did you agree with that statement?
18         MR. CADIGAN:  Objection.
19         MR. CRIMMINS:  Join.  Do you know
20     what it means?
21         THE WITNESS:  The regulators will
22     notice.  What does it mean.
23         MR. CRIMMINS:  Were those your words
24     or Argon's words?  And if they are Argon's
25     words, do you --

74

1          THE WITNESS:  They are Argon's
2      words.
3  BY MR. MENDEL:
4      **Q.**  Understanding that they are Argon's
5  words and this was a document that was prepared
6  by them and you received and read, when you read
7  it did you agree with them the regulators will
8  notice.
9          MR. CRIMMINS:  Objection, did you
10     understand it?  And if you understood it,
11     then did you agree.
12         THE WITNESS:  I didn't really
13     understand it, to be honest.  It is a very
14     vague statement.  It could be taken
15     positively, it could be taken negatively, it
16     could be taken truthfully.
17         So, my agreement or disagreement
18     with it, I don't think is here or there.  I
19     would have to write the dissertation to
20     answer your question accurately to be honest.
21         Because it is a very vague statement
22     will notice, notice.
23 BY MR. MENDEL:
24     **Q.**  We will move on.
25     **A.**  So, that is it.

75

1          (Whereupon, Exhibit 134
2          was marked for identification.)
3  BY MR. MENDEL:
4      **Q.**  134?
5      **A.**  Yes.
6      **Q.**  So, I have given you Deposition
7  Exhibit 134.  And this is another e-mail from
8  Stan Miroshnik.
9      **A.**  Yes.
10     **Q.**  And this one is dated April 21st,
11 2017, to Peter Heinke and on the cc: line are Ted
12 Livingston, he is the CEO of Kik, correct?
13     **A.**  Yes.
14     **Q.**  And you, William Mougayar.
15     **A.**  Yes.
16     **Q.**  So, take a minute and refresh your
17 memory about this one.
18     **A.**  Sure, yes.  Yes.
19     **Q.**  And this is an e-mail from
20 Mr. Miroshnik following up on earlier contact
21 with Kik, correct?
22     **A.**  Yes.
23     **Q.**  Why are you copied on this e-mail?
24     **A.**  I believe because I made the
25 introduction.

76

1    Q.    And then, going down to the second
2    paragraph after the introductory word Peter, it
3    says it makes a reference to, well first he says,
4    "We are a full service investment bank."
5    A.    Yes.
6    Q.    "And would deliver a fully staffed
7    team to run the process with myself at the helm,
8    timeline, weekly calls, communication with
9    stakeholders, investors, external advisors,
10   regulators if needed, marketing, tech team,
11   audit, et cetera.
12        "This is basically IPO level
13   workload."
14   A.    Yes.
15   Q.    So, this is Mr. Miroshnik stating
16   that he is providing the services of an
17   investment bank.  Correct?
18   A.    Yes.
19   Q.    And, do you know what he, do you
20   understand what he meant by IPO?
21   A.    Yes.
22   Q.    What is that?
23   A.    Like the public market initial.
24   Q.    Initial public offering?
25   A.    Public offering in the public

77

1    if he could just answer the question.
2        MR. CRIMMINS:  No, because --
3        MR. MENDEL:  I appreciate you are
4    not testifying for the witness.
5        MR. CRIMMINS:  Well, I have to state
6    an objection.
7        MR. MENDEL:  The just state your
8    objection, please.
9        MR. CRIMMINS:  My problem is you are
10   asking something and you haven't established
11   a foundation that you cannot establish.
12        He knows what an IPO is.  He has no
13   clue, I would hazard to guess, what it takes
14   to do an IPO.  I don't think he has ever done
15   one.  He has never worked in public finance.
16        MR. MENDEL:  Then, he can say he
17   doesn't know.
18        MR. CRIMMINS:  You are asking him to
19   do an assumption based on the fact that he
20   has, and he hasn't.  And if you want to probe
21   it, go ahead.
22        THE WITNESS:  To the extent ...
23        MR. CADIGAN:  Objection.  You may
24   answer.
25        THE WITNESS:  I'm not an expert in

79

1    markets, yes.
2    Q.    Okay.  And then do you know what he
3    meant by this is basically IPO level workload?
4        MR. CADIGAN:  Objection.
5        THE WITNESS:  That is his words not
6    mine.
7    BY MR. MENDEL:
8    Q.    Understood.  But, did you understand
9    what he meant by it?
10   A.    At the high levels.  They are
11   selling themselves.
12        So, you take that with a grain of
13   salt, if that is what you want to say.
14        They are selling it, their services,
15   so they can say whatever they would like.
16   Q.    Did you, do you agree that the
17   workload that they are describing for issuing Kin
18   would be would be similar to the workload for an
19   IPO?
20        MR. CRIMMINS:  Do you have an
21   understanding of what an IPO workload is.  I
22   object.
23        MR. MENDEL:  We have established, we
24   have established, I asked him whether he
25   understands an IPO, so I would appreciate it

78

1    IPOs, so, if that --
2        MR. CRIMMINS:  Why don't you lay it
3    out for counsel what you know and what you
4    don't know.
5        THE WITNESS:  Yes, I mean I know the
6    high levels of process.  But, I'm not an
7    expert in IPOs.
8        So, it is not my, I mean this memo
9    is from, between Argon Group and Kik.  I was
10   not part of that decision or any discussion
11   following their proposals.
12        So, it is between them, the two of
13   them.  I only made the introduction and that
14   is it, basically.  There is nothing to read
15   into this.  Yes, so, again I'm not an expert
16   in the IPO process.
17   BY MR. MENDEL:
18   Q.    If you go down to Number 9, it says,
19   "Run the book building process with early and
20   anchor investors, presale, 'retail' and other
21   participants in a way that delivers
22   oversubscription tension in the book and positive
23   aftermarket performance."
24   A.    Correct.
25   Q.    Do you understand what Mr. Miroshnik

80

**CONFIDENTIAL**

William Mougayar,
12/6/2019

1   was saying here?
2      **A.**   At the high levels.  What they are
3   saying is that they will provide, they will find
4   the buyers, that is what it says.  That is my
5   understanding.
6      **Q.**   Do you know what he means when he
7   says delivers oversubscription?
8      **A.**   It means that there are more people
9   that are interested in it than there is space for
10  it.  That is my understanding.
11     **Q.**   Okay.
12     **A.**   I don't understand all of it.  I
13  don't understand what tension in the book means.
14     **Q.**   What about positive aftermarket
15  performance?
16     **A.**   I think it is a vague statement, so
17  I don't fully understand it either.
18     **Q.**   Does that refer to the price of the
19  token going up in value?
20     MR. CRIMMINS:  Objection.
21  BY MR. MENDEL:
22     **Q.**   Is that how you understand it?
23     **A.**   Potentially.  But there are many
24  factors that I don't know exactly.  It is
25  possible, but there are many factors involved, so

81

1   it is not a definite.
2      **Q.**   Thank you.
3         Were you aware of Kik's work with a
4   consultant in CoinFund?
5      **A.**   I was aware that they had contracted
6   them or they were involved, but I was not aware
7   of the details of their arrangements.
8      **Q.**   Did you ever talk to CoinFund?
9      **A.**   Yes, I have talked to them.
10     MR. CADIGAN:  When we move to a new
11  topic, can we just take a break.
12     MR. MENDEL:  This is not going to
13  take more than a minute, and then we will
14  take a break.
15     MR. CADIGAN:  That is fine.
16     THE WITNESS:  But, I don't recall
17  talking to them in connection with Kik
18  specifically.
19     I knew CoinFund from before.
20  BY MR. MENDEL:
21     **Q.**   Very well.
22     MR. MENDEL:  I think this is a good
23  time for a break.  Off the record.
24     Thank you, Mr. Mougayar.
25     THE WITNESS:  Thank you.

82

1      THE VIDEOGRAPHER:  We are going off
2   the record.  This is the end of Media Unit
3   Number 1.  The time is 11:38 a.m.
4      (Recess taken -- 11:38 a.m.)
5      (After recess -- 11:53 a.m.)
6      THE VIDEOGRAPHER:  We are back on
7   the record.  This is the beginning of Media
8   Unit Number 2.  The time is 11:53 a.m.
9   BY MR. MENDEL:
10     **Q.**   Mr. Mougayar, we just had a break.
11  And you consulted with your --
12     THE VIDEOGRAPHER:  Please stand by.
13  Sorry, let's do that again, I had the mics
14  turned down.
15     MR. MENDEL:  Okay.
16     THE VIDEOGRAPHER:  We are back on
17  the record.  This is the beginning of Media
18  Unit Number 2.  The time is 11:54 a.m.
19  BY MR. MENDEL:
20     **Q.**   Mr. Mougayar, we just had a break,
21  right?  And you met separately with your
22  attorneys, right?
23     For the record, I should just, in
24  case this hasn't already been clarified, you are
25  here today with Mr. Crimmins who is representing

83

1   you, correct, personally?
2      **A.**   Yes.
3      MR. CRIMMINS:  Correct.
4   BY MR. MENDEL:
5      **Q.**   And we also have Luke Cadigan here,
6   who is from Cooley here representing Kik,
7   correct?
8      **A.**   Yes.
9      **Q.**   Mr. Cadigan doesn't represent you,
10  right?
11     **A.**   That's correct.
12     MR. CADIGAN:  I don't represent him
13  personally, no.
14  BY MR. MENDEL:
15     **Q.**   Nor does the firm Cooley represent
16  you.
17     **A.**   Personally, no.
18     MR. CADIGAN:  We do represent the
19  Foundation.
20  BY MR. MENDEL:
21     **Q.**   You wish to clarify the prior answer
22  that you made in the deposition?
23     **A.**   Yes, with respect to whether I had
24  consulted with Cooley, and my clarification is
25  that I did not consult with Cooley pertaining to

84

1   my consulting agreement with Kik.
2         But, I have consulted with Cooley in
3   relation to matters relating to Kin, the
4   Foundation specifically.  So that is the
5   separation I wish to clarify.
6         Q.   Okay.  That goes to my question of
7   whether you consulted with, or whether you sought
8   legal advice from Kik's lawyers to guide your
9   work for Kik.  Correct?  Is that the question
10  that you are --
11        A.   To guide.
12        Q.   -- clarifying?
13        A.   My, pertaining to Kik.  Not to my
14  advisory agreement with Kik.  But, to the work.
15  To the Kins work.
16        Q.   So, your testimony is that you
17  sought legal advice from to Kik's lawyers to
18  guide your work for Kik?
19        A.   Not to guide my, what did you mean
20  by that?  To guide my work?  To guide my work
21  pertaining to Kin, not to guide my advisory
22  agreement with Kik.  More the work itself.
23        Q.   Your work regarding Kin?
24        A.   Regarding Kin, correct.
25        Q.   And, Kik's lawyers that you

85

1   consulted with were Cooley?
2         A.   Correct, yes.
3         Q.   And, do you know when you started
4   consulting, or, when you consulted with Cooley
5   about your work regarding Kin?
6         A.   If I recall, I knew them before.  I
7   knew Nancy.  So I don't recall exactly when it
8   started, but it would have been in that time
9   frame.
10        Q.   Which time frame.  Can you --
11        A.   In the April/May time frame of 2017.
12        Q.   Okay.  And what made, what made you
13  your memory that you consulted with Cooley about
14  your work for Kin?
15             I'm not asking you to tell me
16  anything privileged that you discussed with your
17  counsel.  I'm just asking you whether there was
18  anything that refreshed your memory about this is
19  what you did?
20             MR. CRIMMINS:  Objection, he didn't
21  say his memory was refreshed; he said he was
22  clarifying.
23             THE WITNESS:  Yes, I, that is
24  correct.  I mean, I -- it would be too far to
25  be able to answer that question, specifically.

86

1   BY MR. MENDEL:
2         Q.   Okay.  But, just for the record this
3   clarification came after the break.  Correct?
4         A.   Yes.
5         Q.   Okay.  Kik made the decision to
6   announce its offering of Kin at your Token
7   Summit, correct?
8         A.   Yes.
9         Q.   And that was in May of 2017?
10        A.   Yes.
11        Q.   Do you know how it was decided to
12  announce Kin at the Token Summit?
13        A.   I don't remember exactly how it was
14  decided.  No, I don't remember it.  No.
15        Q.   The decision was made?
16        A.   Yes, I had conversations or --
17        Q.   Okay.
18             (Whereupon, Exhibit 135
19             was marked for identification.)
20  BY MR. MENDEL:
21        Q.   I have given you what has been
22  marked as Deposition Exhibit Number 135.  And
23  this is, appears to be an e-mail from you to Erin
24  Clift with a cc: to Ted Livingston on April 8,
25  2017.

87

1             Do you recognize this document?
2         A.   From that time, yes.
3         Q.   Who is Ms. Clift?
4         A.   She works for Kik.  I, it seems that
5   she is in marketing at Kik or --
6         Q.   Do you remember that?  Do you
7   remember that she was in marketing at Kik?
8         A.   I remember her name.  I don't think
9   I met her.  But it was communications.
10        Q.   Do you know why you are e-mailing
11  her?
12             Well, let me read the first part of
13  the e-mail.  It says, the subject line is Token
14  Summit.  So you are talking about the Token
15  Summit, right?
16        A.   Uh-huh.
17        Q.   And then you say, "Hi Erin, yes, we
18  can talk next week.  We expect 350 to 400
19  attendees, a mix of crypto token crowd
20  entrepreneurs, business managers, investors/VCs,
21  Wall Street-types, regulators and media."
22  Correct?
23        A.   Yes.
24        Q.   And, what did you mean by VCs?
25        A.   Venture capitalists.

88

**CONFIDENTIAL**

William Mougayar,
12/6/2019

1    Q.   And is this how you would, how you
2 described your expected attendees at the Token
3 Summit?
4    A.   That the mix of is what I expected,
5 yes.
6    Q.   Right.  This e-mail is you
7 describing what you thought the attendees would
8 be?
9    A.   To correct something you said
10 earlier.  The prior e-mail, I did not initiate
11 this e-mail to Erin.  I was responding.  I think
12 Ted had looped in Erin from his side and that was
13 my first interaction with Erin.  So I was
14 responding, right.  The top is in response to the
15 bottom.
16    Q.   Yes, thank you.
17    A.   So, I did not initiate the e-mail to
18 Erin.  I was responding.
19    Q.   Understood.  So, yes, for the record
20 the first e-mail in the chain is Erin Clift
21 writing.
22         It appears to be an e-mail to Ted.
23 And then it is just on the first page.  And then
24 on April 7th, Ted responds and then also on
25 April 7th Erin writes, it is hard to know who she

89

1 wrote to, but she wrote an e-mail saying thanks
2 Ted.  And then apparently you were looped in.
3 And you responded to Erin, correct?
4    A.   She was asking Ted to connect him
5 with me.  So, she works for Ted.
6    Q.   Correct.  Okay.  And, going back to
7 the, your response to Erin, and your description
8 of who you thought the attendees would be.
9         Did you, did your prediction of who
10 the attendees would be, did that turn out to be
11 true?
12    A.   Roughly speaking.  I don't have the
13 stats.  It was a mix.  We ended up getting more
14 than that number.  But --
15    Q.   Do you know how many attendees came?
16    A.   Close to 700.
17    Q.   Okay.  We are done.
18         (Whereupon, Exhibit 136
19         was marked for identification.)
20 BY MR. MENDEL:
21    Q.   I have given you what has been
22 marked Deposition Exhibit 136.
23    A.   Okay.
24    Q.   And, it appears to be an e-mail from
25 Erin Clift to you.

90

1    A.   Yes.
2    Q.   On May 18th, 2017, and there was an
3 attachment to the e-mail starting on the next
4 page with the small number 362, the e-mail is
5 Page 361.  The attachment starts to 362.
6         Do you recognize this document that
7 I have given you?
8    A.   Yes.
9    Q.   What is it?
10    A.   It says Kin: A Decentralized
11 Ecosystem For Digital Services For Daily Life.
12    Q.   The first page is, do you remember,
13 it is an e-mail from Miss Clift to you?
14         Do you remember receiving this
15 e-mail?
16    A.   Yes.  At the time, yes.
17    Q.   Okay.  And, did you understand the
18 attachment to be a draft excerpt of the white
19 paper?
20    A.   That is what it says, yes.
21    Q.   And, going through this, did you
22 read it when you received it?
23    A.   Yes, I did.
24    Q.   Going through it, starting on
25 Page 365, well let's start at Page 364, actually.

91

1         There is a caption that says Kik's
2 Vision, right?  Do you see that?
3    A.   365.
4    Q.   I'm sorry, Page 364.
5    A.   64, yes, yes.
6    MR. CRIMMINS:  There it is.
7    THE WITNESS:  Yes.
8 BY MR. MENDEL:
9    Q.   And then on the next page, 365, it
10 is an outline of Kik's vision.  Correct?  And it
11 says, "Step 1, A New Digital Currency."
12    A.   Yes.
13    Q.   And then Step 2, also in that same
14 page "Building Fundamental Value."  Correct?
15    A.   Yes.
16    Q.   And then to the next Page 366 says,
17 "Step 3, Building an Ecosystem."
18    A.   Yes.
19    Q.   And then finally "Step 4, A
20 Foundation For Open Governance."
21         Do you see that?
22    A.   Yes.
23    Q.   Okay.  And did you, was this
24 consistent with your understanding of what Kik's
25 plans were?

92

CONFIDENTIAL

William Mougayar,
12/6/2019

1    A.   Yes, this was a background for me to
2    prepare for the interview I was going to conduct
3    with Ted.
4        Q.   Okay.  You can put that down.
5            (Whereupon, Exhibit 137
6            was marked for identification.)
7    BY MR. MENDEL:
8        Q.   I have given you what has been
9    marked Deposition Exhibit 137.
10       A.   Uh-huh.
11       Q.   And this is an e-mail chain with an
12   e-mail at the top from somebody named Rod McLeod.
13   I'm not sure if I pronounced that properly.
14   M-C-L-E-O-D --
15       A.   Yes.
16       Q.   -- to you, on May 23rd, 2017, with a
17   cc: to Erin Clift, correct?
18       A.   Yes.
19       Q.   Do you recognize this e-mail chain?
20       A.   Now that you have put it in front of
21   me I recognize it, yes.
22       Q.   Okay.  So, please take a moment and
23   take a look at it.
24       A.   Okay.
25       Q.   Okay.  So, on the first page it

93

1    looks like on May 15th Rod McLeod had e-mailed
2    you about the upcoming Token Summit, right, and
3    asked whether Ted was speaking on May 24th or
4    25th.  He wanted clarification of the date.  And
5    you responded in your e-mail on May 15th that Ted
6    was currently planning to do the Fireside Chat on
7    May 25th.  Right?
8        A.   Uh-huh.
9        Q.   Okay.  And, then you list four items
10   that you had planned to talk to Mr. Livingston
11   about.  Do you see that?
12       A.   Yes.
13       Q.   And, Number 4 was where is this
14   going to take you, what is the vision two to
15   three years from now.
16           Did you plan on asking
17   Mr. Livingston about this two to three-year plan?
18       A.   That is what it seemed like.  That I
19   was trying to structure the interview.  And these
20   were suggested questions.  This is something I do
21   with anybody that I end up interviewing.
22       Q.   Okay.  Did you think it was
23   pertinent to Mr. Livingston's presentation at the
24   Token Summit, his plans for two to three years?
25       A.   Yes.

94

1        Q.   When you say where is this going to
2    take you, who did you mean by you?
3        A.   It could be the company, it could be
4    Kin, it could be the project.  The vision,
5    basically.  Where is this going.  These are
6    generic.  These questions could be asked to
7    anyone.
8        Q.   Okay.
9        A.   It is not very, yeah, it is broad
10   direction.
11       Q.   Standard questions.
12       A.   Lots of similarities with other
13   questions I would ask.
14       Q.   So, I introduced Mr. Livingston at
15   the Token Summit, right?
16       A.   Yes.
17       Q.   Okay.  And it was a Fireside Chat;
18   is that right?
19       A.   Correct.
20       Q.   And at the conference, did you, what
21   was your understanding of why Mr. Livingston was
22   appearing there?  Like why did he come to the
23   Token Summit?
24       A.   So, my role as an organizer is to
25   put content in front of an audience.

95

1            And, he was one of the content that
2    would be relevant to the audience.
3            And, he was going to announce the
4    project and give some details about what they
5    were planning to do with the cryptocurrency Kin
6    that they were planning to launch.
7        Q.   The project that you are referring
8    to is the project with Kin, correct?
9        A.   Yes.
10       Q.   And, it was Kik that was announcing
11   the issuance of, or the project for Kin, correct?
12       A.   That's correct.
13       Q.   Did you understand that
14   Mr. Livingston was representing Kik at this
15   conference?
16       A.   Yes.
17       Q.   Did you understand Mr. Livingston to
18   be speaking on behalf of Kik at the conference at
19   the Fireside Chat?
20       A.   Yes.
21       Q.   Have you watched any video of the
22   Token Summit of the Fireside Chat between you and
23   Mr. Livingston since you did it in 2017?
24       A.   I did, when do you mean, when did
25   I -- when?

96

1     Q.   At any time after you had the chat
2  with Mr. Livingston at the summit, did you watch
3  any video of it?
4     A.   Yes, I replayed it later.  Yes.
5     Q.   When did you replay it?
6     A.   That year.  I think probably a month
7  or two after, I replayed it.
8     Q.   Have you watched it recently?
9     A.   No, I have not watched it recently.
10    Q.   Have you read any transcripts of the
11 chat that you had with Mr. Livingston?
12    A.   No.  I have not.
13    Q.   Okay.
14        (Whereupon, Exhibit 138
15        was marked for identification.)
16 BY MR. MENDEL:
17    Q.   So, I can represent to you,
18 Mr. Mougayar, that the SEC obtained a copy of
19 what we believed to be the video of the Token
20 Summit --
21    A.   Okay.
22    Q.   -- and the conference between -- and
23 the conversation between you and Mr. Livingston
24 and we had a transcript made of it.
25        And, what I'm giving you as

97

1     A.   Yes.
2        MR. CADIGAN:  Before you start, what
3  is the date on this?
4  BY MR. MENDEL:
5     Q.   What is the date of what?
6        MR. CADIGAN:  Of the presentation
7  that is referenced in this transcript.
8  BY MR. MENDEL:
9     Q.   Okay.  So, do you remember the date
10 on which Mr. Livingston made his announcement at
11 the Token Summit?
12    A.   It was the day of the Token Summit.
13 I believe it was May 25th, 2017.
14    Q.   Right.
15    A.   If I'm not mistaken.  Yes, May 25th
16 all right.
17    Q.   That is my understanding.  I think
18 that is pretty clear on the record?
19    A.   It is a public date, yes.
20    Q.   He so, to answer Mr. Cadigan's
21 question, this was a transcript of the video from
22 the 25th.
23        MR. CADIGAN:  Okay.
24 BY MR. MENDEL:
25    Q.   So, going back to Page 2.

99

1  Deposition Exhibit 138 is a copy of the written
2  transcript the SEC had made.
3     A.   Okay.
4     Q.   But, you had never seen this before,
5  correct?
6     A.   No.
7     Q.   Okay.  So I just wanted to go
8  through some sections of the transcript with you
9  and ask you some questions about the
10 conversation.
11    A.   Okay.
12    Q.   You will see on, so, if I refer to a
13 page number, what I am referring to is the
14 little, one of the little square boxes on one
15 page.
16    A.   Yes.
17    Q.   It is pages, so, the, you will see
18 Pages 2, 3, 4, 5 on one page.  Do you see that?
19    A.   Yes.  Sure.
20    Q.   Okay.  So, do you want another
21 minute to look at it or can I ask you some
22 questions?
23    A.   You can go ahead, that is fine.
24    Q.   Okay.  So, let's just start with
25 Page 2.

98

1     A.   Uh-huh.
2     Q.   You see it says Male Speaker at the
3  very top?
4     A.   Yes.
5     Q.   Is that you?
6     A.   Yes, that's correct.
7     Q.   Okay.  If at any point in this
8  document you see male speaker and you don't think
9  it is you, please let me know, but I have every
10 reason to think that you are the male speaker.
11    A.   Yes, I mean this if this was an
12 ongoing transcription of the video, I was the one
13 with that, yes.
14    Q.   Okay, great.  And so, let me walk
15 you through some parts.
16        I'm looking on Page 4.
17    A.   Uh-huh.
18    Q.   And if you look on Page 4, do you
19 see the numbers running down the left-hand side?
20    A.   Yes.
21    Q.   If you go to 17.  And it states
22 starting on Line 17 of Page 4, "But in that white
23 paper you will see we outlined four steps to what
24 we are trying to do.
25        "So, the first step, very simply, is

100

1  we are going to create Kin, a new cryptocurrency
2  on the Ethereum blockchain.  So it will be an
3  ERC-20 token."
4      A.    Yes.
5      Q.    As far as you can remember this
6  seems like an accurate transcription?
7            I'm not asking you to verify it.
8  I'm just saying as far as you can remember, this
9  looks to be accurate, correct?
10     A.    Yes.  Seems that way.
11     Q.    And the opening phrase is "But in
12  that white paper," what was the white paper, just
13  so we have a basis for talking about this?
14     A.    I think he published the white paper
15  that same day.
16     Q.    Okay.  And what generally is the
17  white paper?
18     A.    Similar to that draft you just
19  showed me, it was outlining the vision and what
20  they were doing.
21     Q.    And you are referring to?
22     A.    You may have brought in a draft of
23  it.
24     Q.    Deposition Exhibit 136, right?
25     A.    Yes, I think.  That was the draft of

101

1            Did I read that correctly?
2      A.    So, are we on Page 5 here?
3      Q.    Yes.
4      A.    What line?
5      Q.    Oh, let me, I started on Line 13.
6  13 to 16.
7      A.    Okay.  Okay.
8      Q.    And, does this seem like an accurate
9  transcription as far as you can remember?
10     A.    Yes.
11     Q.    And was this consistent with the
12  vision statement that you saw as the draft white
13  paper?
14     A.    Yes.
15     Q.    Did you understand what
16  Mr. Livingston meant by integrating Kin into Kik?
17     A.    Yes.
18     Q.    What was your understanding of what
19  he meant?
20     A.    To make Kin as a currency,
21  cryptocurrency available to Kik users.  That is
22  what my understanding was.
23     Q.    Did you think he meant spending Kin
24  inside the Kik Messenger?
25     A.    Yes, that would be one of his cases,

103

1  what later became a bit more elaborate white
2  paper.  That is my recollection.
3      Q.    Okay, fine.  And they issued that on
4  May 25th, the same day as the Token Summit?
5      A.    I think so.  I think it was
6  orchestrated that way, yes.
7      Q.    Okay.  And was this Step 1 that I
8  just read to you on Page 4 of Exhibit 138 that
9  was consistent with what you had read in the
10  draft white paper, right?  The first step was to
11  create Kin, right?
12     A.    Sure.
13     Q.    Okay.  Fair enough.
14            And then let's go down just to
15  Line 24.  It says, "The second step is
16  integrating Kin into Kik, this huge messenger to
17  give Kin value."
18            Do you see where I just read that?
19     A.    Yes.  Yes.
20     Q.    And then further below, on Page 5,
21  skipping ahead, on Line 13 it says, "So that Step
22  Number 2 is taking Kin and integrating it into
23  one of the largest consumer apps in the world to
24  really give it value and to make Kik better and
25  monetize Kik in a new way."

102

1  yes.
2      Q.    Did you think he meant earning Kin
3  within Kik Messenger?
4      A.    Potentially.  It is about earning
5  and spending, yes.
6      Q.    Did you think that integration of
7  Kin into Kik Messenger would be accomplished by
8  the time of the token distribution event?
9      A.    I did not think either way.  I
10  wasn't thinking of that.  I had no -- can you
11  rephrase the question?  Did I think ...
12     Q.    I can re-ask it.
13            At the time of the Token Summit, at
14  the time that Kik issued its white paper, and
15  Mr., at the summit when Mr. Livingston said
16  Step 2 was integrating Kin into Kik, did you have
17  a view as to whether that would be accomplished
18  by the time of Kik's token distribution event for
19  Kin?
20     A.    I don't remember the timing aspect.
21  So I wouldn't be able to answer it accurately in
22  saying to you yes or no.  So, I don't remember
23  now, what the timing expectations were.
24     Q.    And, do you know what I meant by
25  token distribution event?

104

CONFIDENTIAL

William Mougayar,
12/6/2019

1    A.   Yes.
2    Q.   What is your understanding about
3  token distribution event?
4    A.   The availability of the token for,
5  to make it, to make it available to the public,
6  basically, to be bought, to be purchased, that
7  was my understanding.
8    Q.   The issuance of the token?
9    A.   Yes.
10   Q.   And that occurred in September of
11 2017?
12   A.   I believe so, yes.
13   Q.   When Mr. Livingston made that
14 statement at the Token Summit, did you have any
15 view at all as to how long it would take to
16 integrate Kin into Kik?
17   A.   No, because it wasn't -- I mean my
18 role there was as an interviewer.  So, I was a
19 neutral party there.
20        I was, I didn't have any views.  I
21 was just interviewing Ted, basically asking him
22 questions.
23   Q.   Did you understand what he meant by
24 monetizing Kik in a new way?
25   A.   It is a vague statement, I would

105

1  say.  Do I understand it?  At the time?
2    Q.   At the time, correct.
3    A.   I understood it in the way that it
4  would be a cryptocurrency that would enable an
5  economic activity within the ecosystem in terms
6  of spending and earning of it.
7        So, I understood in the context of a
8  cryptocurrency that is being used by users.
9    Q.   But how would that be -- well, did
10 you have an understanding of what monetizing Kik
11 in a new way meant?
12   A.   At the time, I think, I'm not sure
13 if Kik can, I mean if Ted discusses this later
14 on.
15        I don't remember exactly.  I mean,
16 in my understanding, the monetization is part of
17 the economic activity of the buying and selling.
18        So, beyond that, I think that is
19 Ted's, you have to ask Ted, I think.
20   Q.   Going, continuing on Page 5,
21 Line 17, he says, "But we didn't stop there.  We
22 said wait a second, if we give Kin value, could
23 we use some of that value to spark the creation
24 of a new Kin, of a new ecosystem of digital
25 services."  Correct?

106

1    A.   Yes.
2    Q.   And, I'm going to skip ahead also to
3  Page 6, Line 2.
4    A.   Yes.
5    Q.   He says, "What if we took a big
6  chunk of Kin and used it to create what we called
7  the Kin rewards engine."  Do you see that?
8    A.   Yes.
9    Q.   Does that seem like that is an
10 accurate transcription, correct?
11   A.   Yes.
12   Q.   And it is consistent with the vision
13 statement that you read?
14   A.   Yes.
15   Q.   You asked a question further below
16 starting on Line 22.
17   A.   Uh-huh.
18   Q.   "It is almost like a profit sharing
19 kind of co-op type model.  Right?"
20        Do you see that?
21   A.   Uh-huh.
22   Q.   And Mr. Livingston responds, "Yeah,
23 it economically incentivizes everybody to work
24 together.  And the really nice thing about it is
25 it creates this great network effect where the

107

1  more developers that come into this ecosystem,
2  the more transactions they create.  The more
3  transactions they create, the more valuable Kin
4  overall becomes.  And the more valuable Kin
5  overall becomes, the more valuable the daily
6  reward becomes."
7    A.   Yes.
8    Q.   "And so we see this, daily rewards
9  starting at about $100,000 a day, but could
10 quickly grow to a half a million dollars a day if
11 not more."  Right?  So, I will stop there.
12        Did you have an understanding of
13 what Mr. Livingston was describing here?
14   A.   Roughly.  I mean, these are, these
15 were, this is part of his vision.
16        So, I wasn't the one to judge his
17 vision.  He is the entrepreneur.  So, that was
18 his vision.  And I just let him communicate it,
19 basically.  I did not have a judgment on it.
20   Q.   Did you understand Mr. Livingston to
21 say that the rewards engine would help Kin to
22 become more valuable?
23   A.   Inasmuch as it created an economic
24 activity by the usage of the cryptocurrency, that
25 was my understanding of it.  That it was going to

108

1  be a cryptocurrency to be used for digital
2  services within the Kin ecosystem.  So that was
3  my understanding.
4      Q.   And, by developing economic activity
5  or usage of a Kin, it would go up in price,
6  correct?
7      A.   That wasn't my conclusion.  I mean
8  that is what you are saying, so, I'm not --
9      Q.   Did you understand that from Ted's
10 comments?  That by stirring economic activity and
11 through the rewards engine, Kik would help Kin go
12 up in price?
13     A.   Are you saying that he is implying
14 it.  Or is he -- I'm not sure.
15     Q.   I'm asking you if that is your
16 understanding of what he was saying here.
17     A.   It wasn't the first thing that, it
18 wasn't the first, I mean understanding is a
19 multi, in my opinion, understanding is a
20 multi-layered kind of thing.  You can understand
21 one aspect of something or ten aspects of it.
22          I was focused more on the
23 cryptocurrency usage of Kin as a currency.  And,
24 what happened after was, I think, it is not
25 something that I was necessarily predicting.

109

1      Q.   When he says the daily reward could
2  start at $100,000 a day, and quickly grow to half
3  a million or a million dollars a day.
4      A.   Uh-huh.
5      Q.   Do you understand that to reflect an
6  increase in the price of Kin?
7      A.   Not necessarily.  No.  I don't think
8  they are related.  That is not my understanding
9  at least.
10     Q.   If Kin did not go up in price, how
11 else could the daily reward go up from $100,000
12 to a million dollars a day?
13     A.   I'm not sure.  I mean maybe I didn't
14 understand it.  But again this was a vision,
15 Ted's vision.  So, he said it.  So, I just, I
16 was, I did not totally understand it to be
17 honest.
18     Q.   Going ahead to Page 10?
19     A.   Yes.
20     Q.   Let me know if you are there.
21     A.   Yes.  Okay.  Yes.
22     Q.   Looking at Page 10, Line 11, are you
23 there?
24     A.   Yes.
25     Q.   It says, "Our ultimate vision,

110

1  Step 4 of our plan, which you will see in our
2  white paper, is to create the Kin Foundation."
3      A.   Uh-huh.
4      Q.   And then further down below on
5  Page 11, Line 3.
6      A.   Yes.
7      Q.   Male speaker, that is you?
8      A.   Yes.
9      Q.   And you say, "So, this is kind of,
10 it gets to into governance territory because now
11 you have a responsibility for billions, millions
12 or maybe billions of dollars in cryptocurrency.
13 So, how will you set up the governance structure?
14 Is it going to be a separate structure from Kik,
15 Inc.?"
16     A.   Yes.
17     Q.   Why did you ask whether the
18 Foundation would be separate?
19     A.   Because that is how I had seen other
20 foundations operate, as a separate structure.
21     Q.   Did you think the separation was
22 important?  Did you think it was an important
23 aspect of the vision that listeners would want to
24 know?
25     A.   Yes.  I would say so.

111

1      Q.   And why is that?
2      A.   Because of the governance for trust
3  issues, for, it is really a trust, a matter of
4  trust.  So that again as I was saying here, there
5  would be some value in, the Foundation is like
6  the keeper of the value.
7          So, yes, there would be important
8  that the Foundation be independent or separate.
9  Yes.
10     Q.   The transcript continues on Line 9
11 of Page 11, Mr. Livingston responds, "Yes, so,
12 the timeline for this is we are publishing our
13 white paper today.  We will start integrating Kin
14 into Kik in a way very similar to what we did
15 with Kik coins and then we will announce a token
16 distribution event later this summer.
17          "And from there later this year or
18 early next year that is where we will, where we
19 will start to open up the platform for other
20 developers to join the ecosystem.
21          "At that point, that is where we
22 will create the Kin Foundation and that is really
23 why we want to publish the white paper is figure
24 out who are the best people to run this."  Okay?
25     A.   Okay.

112

1    **Q.**   Stopping there, did you understand
2  when Mr. Livingston was saying that Kin
3  Foundation would be established from his
4  description here?
5    **A.**   It seemed that it would be
6  established after the, as he said, after the
7  distribution event.  Towards the latter part of
8  the year.  That is what it seems that he said.
9         So, now that you are putting this in
10  front of me, I'm refreshing my mind.  That seems
11  that is what he said.  Yes.  At that point we
12  will create the Foundation.  That is what he is
13  saying.  Yes.
14    **Q.**   Did you understand that the
15  Foundation would operate independently from Kik
16  right away?
17    **A.**   I didn't have a prejudgment on that.
18  When you say right away, no.  Not right away.
19  Nothing.  I wouldn't say right away.  It would be
20  gradual, I saw it as a gradual development.
21    **Q.**   When you say gradual, over the
22  course of weeks, months, a year?
23    **A.**   Probably months.  Many months.
24    **Q.**   Could it be as long as a year?
25    **A.**   Could be, possibly.

113

1    **Q.**   There wasn't a set time frame on it
2  at this point, correct?
3    **A.**   Not according to what I had heard
4  Ted.
5    **Q.**   Not according to what Ted said at
6  the Token Summit?
7    **A.**   Correct, correct.
8    **Q.**   Okay.  You can put that down.
9    **A.**   Sure.
10    **Q.**   And did you, do you remember the
11  white paper being issued, correct?
12    **A.**   Yes.
13    **Q.**   Did you read it when it was issued?
14    **A.**   Yes.
15    **Q.**   Okay.  You read it in detail?
16    **A.**   Yes.
17         MR. MENDEL:  Why don't we try to go
18  a little bit longer and then we will break
19  for lunch?  Does that work for everybody?
20         THE WITNESS:  Yes, that works.
21  BY MR. MENDEL:
22    **Q.**   Okay.  Following that announcement
23  at the Token Summit, did you continue to consult
24  for Kik?
25    **A.**   I believe so, yes.  Yes.

114

1    **Q.**   And what sorts of activities did you
2  focus on following the announcement at the Token
3  Summit?
4    **A.**   It was varied.  I mean, some of them
5  pertain to the rollout of the distribution event,
6  I think.  I can't remember if, I may have
7  introduced them to a law firm in Switzerland.
8  MME, they had experience in token distribution
9  events.
10         And I was there more to respond to
11  their inquiry.
12         So, I wasn't necessarily initiating,
13  initiating things myself.  I was responding to
14  their inquiries.
15         So, whatever they wanted me to
16  respond to.
17    **Q.**   Did you consult with Kik about its
18  rewards engine?
19    **A.**   Yes, we were, there were some models
20  and some, I recall there were some discussions
21  about the Kin's rewards engine.
22    **Q.**   What do you remember about the
23  discussions, and I am talking about the months
24  between the announcement and the distribution
25  event.

115

1    **A.**   I don't remember exactly right now.
2  I mean it would be documented in the e-mails.
3         It would be about the, I mean how it
4  was going to work.  The different relationships
5  between the currency usage and how it would
6  translate to the rewards.
7         There was some formula, I think Ted
8  wanted to have a formula of some sort.  And we
9  were iterating on what it could be.  That is what
10  I kind of vaguely remember.
11    **Q.**   Did you, do you remember any
12  conversations about automating the Kin rewards
13  engine?  Creating an algorithm for it?
14    **A.**   There was discussion about it, yes.
15  I mean I said equation, algorithm, it was going
16  to be, to make it fair, it was an algorithmic
17  kind of thing.  It wasn't an objective.
18    **Q.**   Do you remember advising Kik to
19  automate the rewards engine slowly, to not go too
20  fast?
21    **A.**   I don't remember that specifically.
22  From memory I don't remember.  But if it is in
23  e-mails then you have to refresh my memory to it.
24    **Q.**   As Mr. Livingston indicated at the
25  Token Summit the plan was to put Kin on the

116

1  Ethereum blockchain; is that right?
2      A.   Yes.
3      Q.   Through an ERC-20 token, do I have
4  that right?
5      A.   Yes.
6      Q.   And did you have discussions with
7  Kik about this decision, about putting Kin on the
8  Ethereum blockchain?
9      A.   Yes.
10      Q.   When did those discussions take
11  place?
12      A.   Over the, what period?  I can't --
13      Q.   In the months actually, before, as,
14  in the months leading up to his decision to put
15  Kin on the block, on the Ethereum blockchain, you
16  had discussions with Kik about that?
17      A.   Prior to or after?
18      Q.   Before.  Before.
19      A.   I wasn't part of the -- I mean
20  ERC-20 was like, was the most popular way of
21  doing, of creating currency.
22          So, it was a given.  It wasn't a big
23  decision.  I mean it wasn't -- it was a very
24  mundane decision basically, the ERC-20.
25      Q.   So, after the decision was made, did

117

1  you have a view as to the technological
2  limitations of the Ethereum blockchain?
3      A.   Can you rephrase the question?  What
4  is --
5      Q.   In -- after the token
6  announcement --
7      A.   Uh-huh.
8      Q.   -- during the summer of 2017, did
9  you have a view as to the relative effectiveness
10  of the Ethereum blockchain?
11      A.   I had knowledge about the Ethereum
12  blockchain.  And, I was helping them in, I was
13  connecting them with the right people at the
14  Ethereum, on the Ethereum side so they can
15  evaluate the technology.  The Ethereum
16  technology.  So --
17          (Whereupon, Exhibit 139
18          was marked for identification.)
19          THE WITNESS:  Yes, yes.  Yes.
20  BY MR. MENDEL:
21      Q.   I have given you what has been
22  marked Deposition Exhibit 139.
23      A.   Correct.
24      Q.   And so this is an e-mail chain
25  dated, at the top, as the first, as the most

118

1  recent e-mail July 20th, 2017.  This one is from
2  Mr. Livingston to you.  Do you see that?
3      A.   Yes.
4      Q.   Do you remember this e-mail?
5      A.   Now I remember, yes.
6      Q.   Okay.  Okay.  What is this e-mail
7  thread about?
8      A.   It is about the applicability of the
9  Ethereum blockchain for the deployment of Kin.
10  Yes.
11      Q.   You write on July 19th, 2017, and
12  this is also close to the top of the first page,
13  "Eventually it is my belief that you will need to
14  run your own blockchain as it is a proprietary
15  edge that you have."
16          What did you mean by that?  By --
17      A.   I was suggesting as one of the
18  options they could have is to have, to run what
19  is called a private blockchain.
20      Q.   And why did you think that might be
21  a good course of action?
22      A.   Because at the time the transaction
23  speed of the Ethereum public blockchain had some
24  limitations.
25      Q.   What were the limitations?

119

1      A.   The transactions per seconds, the
2  speed, the speed limitations.
3      Q.   Is that a latency or a scalability
4  issue?
5      A.   It is a scalability factor.  Not an
6  issue, but it is a factor.  It was a known
7  factor.
8      Q.   Further below in this e-mail,
9  "Ethereum main net cannot process the transaction
10  throughput you want, but with AM.IS, you have
11  continuity with private public which is what you
12  want eventually."
13          Did Kik eventually work with AM.IS?
14      A.   Not to my knowledge.
15      Q.   Do you know why not?
16      A.   I wasn't involved in -- no, I don't
17  know why.
18      Q.   Okay.
19      A.   I think they were evaluating many of
20  the options.  It was one of the options.
21          So, they were evaluating many, many
22  options in terms of their implementations and
23  this is one of them.
24      Q.   Okay.  I will take that back.
25      A.   I have two copies of the same.  So,

120

1  I don't know if you want to keep that one.
2      Q.   Thank you.  Around the time of the
3  public announcement, again in May, 2015, in 2017,
4  did you have an expectation of what Kin's
5  functionality was be at the time of the token
6  distribution event?
7      A.   Did I have an expectation of what it
8  would be at, in May?
9      Q.   So, I'm asking you, at the time in
10  May, right, did you have an expectation of what
11  kind of functionality Kin would have at the time
12  of its issuance?
13     A.   That, I'm trying to remember now.
14  At the time, what did I expect.
15     Q.   Correct.
16     A.   I think I would have, I was
17  expecting it to have some functionality.
18     Q.   At the time of its issuance?
19     A.   Or thereabouts.
20     Q.   Uh-huh.
21     A.   I don't think it was, in my opinion,
22  it wasn't critical to know exactly what the
23  functionality was potentially.  But at least some
24  functionality, yes.
25         But, I wasn't privy to their, to

121

1  their actual developments.
2      Q.   Did you have any views specifically
3  about, or expectations about functions it would
4  have?
5      A.   I don't remember specifically.  If
6  it was, what it would be.
7      Q.   How did you think the functionality
8  would be obtained?  Who did you think was going
9  to do the work?
10         MR. CADIGAN:  You are talking in
11     May.
12  BY MR. MENDEL:
13     Q.   In May.
14     A.   It depends.  Because as Kin was
15  saying, Kin was going to be integrated within
16  Kik.
17         And then later it was going to be
18  integrated with other similar types of
19  applications.
20         And he said that they will open it
21  up to developers after the TDE.
22         So, the expectation was that it
23  would be first on Kik, the Messenger and then
24  later on the other ones.
25     Q.   Did you, who did you think would be

122

1  responsible for opening up Kin later on after the
2  token distribution event?
3      A.   Can you say that again?  Who would
4  be responsible for opening up --
5      Q.   I was trying to use your words.  Who
6  did you think was going to be involved in adding
7  functionality for Kin after the token distribution
8  event?
9      A.   Kik was doing that.
10     Q.   And why do you say that?
11     A.   They had the resources.
12     Q.   And that was true, this is what you
13  believed in May of 2017, correct?
14     A.   Yes.
15     Q.   You will recall a prior e-mail that
16  we looked at where, it was from the June time
17  frame where you basically asked whether you could
18  be included in the presale, right, for the
19  $100,000?
20     A.   Uh-huh.
21     Q.   So, you had decided at that point
22  that you would like to invest in Kin, correct?
23         MR. CRIMMINS:  Objection.
24         THE WITNESS:  What month was that?
25  BY MR. MENDEL:

123

1      Q.   Let me see if I can find it.  This
2  is Exhibit 129.  You can look at it.
3      A.   Yes, June.  End of June.
4      Q.   Was the involvement of Kik's
5  management team in Kin a factor in your decision
6  to buy Kin?
7      A.   What did you mean by buy, did they
8  influence me?  Is that what you mean?
9      Q.   Was the make up of Kik's management
10  team, was that a factor in your decision to buy
11  Kin?
12     A.   Oh, I see.  The quality you mean?
13     Q.   Yes.
14     A.   The quality of the management?
15     Q.   Yes.
16     A.   Yes.  The quality.
17     Q.   Why was that a factor?
18     A.   Because it is important to have
19  quality people to deliver on what the promises
20  are.
21         So, I had faith in their
22  capabilities.
23     Q.   Did you think Kin could be
24  successful without involvement of Kik long-term?
25     A.   Did I think that Kin could be

124

1  successful without Kik in the long-term?
2      Q.   Correct.
3      A.   Yes, potentially it would be, because
4  that was the vision.  The vision is to make the
5  ecosystem decentralized without the sole reliance
6  on one party.
7          So, yes, I believe that in the
8  long-term the success of the ecosystem would be
9  related to not just Kik but others as well.
10     Q.   How long did you think it would take
11  until the ecosystem was decentralized?
12     A.   It was too early to speculate on
13  that question.  On that answer.  I would say, I
14  could not answer it.
15     Q.   Did you think that Kik's involvement
16  for at least a year was important to the success
17  of Kin?
18     A.   I would say it would be fine if that
19  was the case.  It wasn't out of the ordinary if
20  Kik had to be involved for at least a year if not
21  more.
22          And there would be a gradual thing.
23  What I had to envision is that initially maybe
24  Kik would be a big part, and then gradually, they
25  would be a smaller part of a bigger ecosystem.

125

1      Q.   You thought it was important,
2  though.  I mean, for Kik to be involved for some
3  period of time, correct?
4      A.   Yes, that was the only way.
5      Q.   And that period had to extend at
6  least through 2017.
7      A.   It started in '17.  What do you
8  mean?
9      Q.   Well, the issuance was in September,
10  right?
11     A.   Yes.
12     Q.   But at the time you would have
13  expected Kik to be involved at least through
14  developing Kin at least through 2017, correct?
15     A.   At least, yes.
16     Q.   And likely into 2018, correct?
17     A.   Correct, yes.
18     Q.   Possibly even into 2019?
19     A.   It was too early to speculate,
20  project, projecting too far out.
21          Like the circumstances can change
22  your predictions so, at the time it wasn't
23  inconceivable to see them involved until the
24  ecosystem would be able to stand on its own feet.
25     Q.   Were you aware of Kik's, something

126

1  called a minimum viable product?
2      A.   I'm aware of the term used in the
3  industry as a general term.  Yes.
4      Q.   Were you aware of any, it is called
5  an MVP?
6      A.   Yes.
7      Q.   What is your understanding of what
8  an MVP is?
9      A.   Minimum functionality that would be
10  the most rated and used by users.
11     Q.   Minimum functionality for what?
12     A.   Any usage.  I'm talking generically
13  speaking.
14     Q.   Were you aware of an MVP plan for
15  Kin?  I'm sorry, yes, were you aware of an MVP
16  plan for Kin?
17     A.   I had heard of it, yes.
18     Q.   And what did you hear of it?
19     A.   That there would be some
20  functionality that, in relation to the Kik
21  points.
22          So, a lot of, there was a lot of Kik
23  points legacy there that was going to be
24  transferred to Kin as a currency.
25     Q.   Do you know if, in fact, it was

127

1  transferred?
2      A.   Yes.  That is what they told me that
3  they were.
4      Q.   They told --
5      A.   That is the general -- I mean, they
6  have had a history, a known history of using Kik
7  points.  So, Kik points was like a similar to a
8  currency and it was up, they extended that into
9  Kin.
10     Q.   What functionality from Kik points
11  did you think was going to carryover to Kin?
12     A.   That I don't remember exactly.
13          I am not sure I can answer that.  I
14  knew the there was a variety of use cases.  I
15  think watching videos or maybe stickers,
16  something with stickers, and the like, there was
17  some variety of activities.
18     Q.   You don't know specifically what
19  Kik's MVP was, do you?
20          MR. CRIMMINS:  Objection.
21  BY MR. MENDEL:
22     Q.   Do you know specifically what MVP
23  Kik had planned for Kin for its token
24  distribution event?
25          MR. CADIGAN:  As of what time?

128

BY MR. MENDEL:
1
2    Q.    At any time, did you know what the
3 MVP was?
4    A.    What I knew is that there would be
5 some functionality that could be demonstrated.
6 And that is the extent of it.
7          An MVP is a general term again.  It
8 is, it could describe a minimal usage.  I mean, a
9 demonstrable usage.  It could have been
10 something that was being iterated upon.
11         So, my understanding of it in May
12 could be different in how it evolved later.
13    Q.    But you didn't have any
14 understanding of specifically what they chose for
15 the MVP, do you?
16    A.    I did not see a document that
17 described it.  Let's put it that way.  So, I did
18 not have detailed knowledge of it.
19    Q.    Did you make any recommendations to
20 Kik about what minimum functionality it should
21 have?  Before the TDE?
22    A.    Not the specific, to the specificity
23 of it.  I would, if I recall I may have said it
24 would be good to have some functionality.  And
25 that was it.  That was the extent of what I said

129

1 perhaps.
2    Q.    Do you recall an MVP based around
3 digital stickers?
4    A.    I remember, as I mentioned, stickers
5 as one of the use cases.
6    Q.    Did you buy Kin, did you, was your
7 interest in buying Kin, you will recall the
8 interest in spending $100,000.  Was that in any
9 way tied to what Kik had decided for its MVP?
10    A.    Tied?  What do you mean by tied?
11    Q.    Was your decision to invest $100,000
12 in Kin informed at all by the MVP that Kik had
13 picked for Kin?
14    A.    Not necessarily.  That wouldn't
15 be -- my decision was based upon the quality of
16 the project.  The quality of the people behind
17 it.  And, the ability to deliver on it.
18         The MVP is one of many other
19 factors.
20         MR. MENDEL:  I think we can go off
21 the record.
22         MR. CADIGAN:  Okay.
23         THE VIDEOGRAPHER:  We are going off
24 the record.  The time is 12:54 p.m.
25         (Recess taken -- 12:54 p.m.)

130

1         (After recess -- 2:01 p.m.)
2         THE VIDEOGRAPHER:  We are back on
3 the record.  The time is 2:01 p.m.
4 BY MR. MENDEL:
5    Q.    Good afternoon, Mr. Mougayar.
6 During the break just now, I handed you what has
7 been marked exhibit, Deposition Exhibit 140.  Do
8 you see that?
9         (Whereupon, Exhibit 140
10         was marked for identification.)
11         THE WITNESS:  Yes.
12 BY MR. MENDEL:
13    Q.    And do you recognize it?
14    A.    Yes.
15    Q.    What is it?
16    A.    It is a notice to certain residents
17 of the U.S., Canada, China.
18    Q.    That is what it says on the first
19 page, right?
20    A.    Yes.
21    Q.    Okay.
22    A.    It is in relation to the SAFT, the
23 Kik SAFT.
24    Q.    Is this the, what does a SAFT stand
25 for?

131

1    A.    Simple Agreement For Future Tokens.
2    Q.    And is this a SAFT that you entered
3 into?
4    A.    That's correct.
5    Q.    That is looking at it, that is your
6 signature that is on the last page, 3169?
7    A.    Yes.
8    Q.    And, Ted Livingston's signature is
9 also on that page, correct?
10    A.    Yes.
11    Q.    Looking on Page 2 of the SAFT with
12 Bates Numbers KPMGC-KIK-0003164.
13    A.    Yes.
14    Q.    This was entered into on or about
15 August 21st, 2017?
16    A.    Yes.
17    Q.    Okay.  What are all of the different
18 reasons that you decided to enter into this SAFT?
19    A.    That I supported the project, and I
20 believed it was a quality project that I was
21 supportive of.
22    Q.    And which project are you referring
23 to?
24    A.    The Kin project.  The Kin.  The Kin,
25 cryptocurrency.

132

**CONFIDENTIAL**                                    William Mougayar,
12/6/2019

1      Q.   And is it fair to say that one of
2  the reasons that you entered into this SAFT was
3  that you hoped to profit from an appreciation in
4  the value of Kin?
5      A.   That is one of the reasons,
6  potentially, if they are successful.  Only if
7  they are successful.
8      Q.   And was it your understanding that
9  you were, through the SAFT you were buying the
10 Kin at a discounted price?
11     A.   Now that you have put in front of me
12 I am seeing here a discounted.  Yes, that's
13 correct.
14     Q.   What are you looking at that is
15 telling you the discount?
16     A.   It says discount rate of 70 percent.
17     Q.   That is on Page 3 of the SAFT?
18     A.   Page 3.
19     Q.   Okay.  So, essentially you are
20 getting 30 percent off the price in the public
21 offering, correct?
22     A.   That is what it says, yes.
23     Q.   Or the public sale.  Is that -- it
24 says, "Discount under discount price means the
25 maximum price per token sold by the company to

133

1  the public during the network launch multiplied
2  by the discount rate."
3      A.   Yes.
4      Q.   And what did you think the network
5  launch was?
6      A.   Where is the reference to the
7  network launch?
8      Q.   In the description of discount price
9  that I just read.
10     A.   So, by the company -- the network
11 launch is the TDE, isn't it?  It is the TDE.
12     Q.   Is that your understanding, it is
13 the TDE?
14     A.   Yes.
15     Q.   Okay.  Did the discount reflect a
16 profit opportunity for you?
17     A.   No.
18     Q.   By buying at a discount, were you
19 hoping that after the TDE, your Kin would be
20 valued higher than what you paid?
21     A.   I didn't have real expectations of
22 that to be honest.
23          Again, I was supportive of the
24 project and I took a long-term view to my
25 investment.  I was not looking to make a quick

134

1  profit on it.
2      Q.   Were you looking to make a profit
3  eventually, long-term if not short term?
4      A.   Certainly not short term.
5  Potentially long-term if they were successful.
6      Q.   When you entered into the SAFT, did
7  you think that the SAFT entitled you to receive
8  Kin during the token distribution event?
9      A.   What do you mean during, during the
10 public sale?
11     Q.   Correct.  Did you think that by
12 entering into the SAFT, which you have here as
13 Exhibit 140 -- can we just clarify for the
14 record, we are looking at the SAFT has been
15 marked as Exhibit 140, correct?
16     A.   Yes.
17     Q.   Make sure I have that right.  Thank
18 you.  Was it your understanding that by entering
19 into the SAFT you were entitled to receive Kin at
20 the time of the token distribution event?
21     A.   I think there is two parts to your
22 question.  My position was to receive it.  As to
23 the timing, I do not -- I don't recall there was
24 a timing as to when I would receive it.  If it
25 was before or after.

135

1          I don't recall the exact timing of
2  when I would receive it.
3          I remember that I would receive it
4  shortly after I signed this.
5      Q.   If you look on Page 2, Bates
6  Number 3164.
7      A.   Yes.
8      Q.   And you look under 1, Events.
9      A.   Yes.
10     Q.   And it says under A, Network Launch,
11 "If there is a network launch before the
12 expiration or termination of this instrument, the
13 company will issue to the purchaser a number of
14 units of the token equal to the purchase amount
15 divided by the discount price pursuant to the
16 following schedule."
17     A.   Okay.
18     Q.   And then "50 percent shall be issued
19 as soon as practicable after the network launch."
20     A.   Yes, after, yes.  That's correct.
21     Q.   "Provided that such issuance shall
22 be no later than the date on which such units of
23 token are distributed to the public and
24 50 percent shall be issued on a one year
25 anniversary of the network launch."  Correct?

136

1    A.    That's correct.
2    Q.    What was your understanding of
3  the -- so, let me restart.
4          When you entered into the SAFT, what
5  did you think had to happen in order to receive
6  the Kin?
7    A.    That they would launch the --
8          That they would do the network
9  launch as it states there.
10   Q.    Anything else?
11   A.    According to this agreement that I
12 signed that is what it states.
13   Q.    You are not aware of any other
14 conditions sitting here, right?
15   A.    No.
16   Q.    And I have placed before you what
17 has been marked as Deposition Exhibit 16,
18 correct?
19         (Previously marked Exhibit
20         Number 16, first referral.)
21         THE WITNESS:  Yes.
22 BY MR. MENDEL:
23   Q.    Do you recognize Exhibit 16?
24   A.    Yes.
25   Q.    What is that?

137

1    A.    It is a Placement Memorandum,
2  Placement Offering Memorandum.
3    Q.    Did you receive this before you
4  signed this SAFT?
5    A.    Yes.
6    Q.    Did you read it?
7    A.    Yes.
8    Q.    If you turn to Page 43.
9    A.    Yes.
10   Q.    There is a section on the bottom
11 called Initial Launch of Kin and Kin Ecosystem.
12   A.    Uh-huh.
13   Q.    And, can you read the description to
14 yourself there?
15   A.    The first paragraph you mean?  At
16 the time of.
17   Q.    You don't need to read it out loud.
18 Read it to yourself and let me know when you have
19 read the first paragraph.
20   A.    Okay.
21   Q.    Does this refresh your memory as to
22 what the minimum viable product was that Kik
23 chose?
24   A.    As described here, yes.
25   Q.    Okay.  And what, as described here,

138

1  what essentially was it?
2    A.    That the users would be able to
3  create a wallet.  And that they would see the
4  balance and receive or send or receive stickers.
5    Q.    Did you access stickers?
6    A.    I don't remember if I personally did
7  that.  I don't remember if I did that.
8    Q.    You didn't buy Kin to invest in, or
9  to access the stickers, did you?
10   A.    No.
11   Q.    Okay.  We can urn that one over.
12         (Whereupon, Exhibit 141
13         was marked for identification.)
14 BY MR. MENDEL:
15   Q.    I have given you what has been
16 marked as Deposition Exhibit 141.
17   A.    Uh-huh.
18   Q.    This is an e-mail chain.  At the top
19 it is an e-mail exchange between Tanner Philp,
20 and you.  He wrote to you on September 6, 2017.
21 Is that right?
22   A.    Yes.
23   Q.    If you want to take a minute and
24 look at this.
25   A.    Okay.  Okay.

139

1    Q.    So, I want to start on the page
2  marked 878.
3    A.    Okay.
4    Q.    And this is a, an e-mail that seems
5  to have been written by Tanner Philp to you.  Do
6  you see that on August 30th?
7    A.    Hey William, yes.
8    Q.    Yes, and this basically asked you
9  for your Canadian address, right, for his
10 paperwork; is that right?
11   A.    Yes.
12   Q.    He writes at the end of that
13 paragraph --
14   A.    Yes, yes, sure.
15   Q.    Okay.  And he says, "Additionally
16 here is the e-mail on next steps I have been
17 sending to all of the presale investors.  There
18 are a couple of action items here, in there.  If
19 you are able to execute by September 5th, that
20 would be great."
21   A.    Okay.
22   Q.    Do you follow?
23   A.    Yes.
24   Q.    And then below that he includes
25 something called Sale Metrics.  Do you see that?

140

1    A.   Yes.
2    Q.   And it says total cap at 125 million
3  with presale amount and a public sale amount.
4    A.   Yes.
5    Q.   And this is consistent with your
6  understanding of how the sale would operate,
7  correct?
8    A.   Yes.
9    Q.   If you keep looking, this same
10  e-mail has a Notice of a Preregistration Now
11  Open.  Do you see that?
12    A.   Under Structure?
13    Q.   Yes, under Structure.
14    A.   Yes.
15    Q.   Do you know what the preregistration
16  was?
17    A.   My understanding is that it is like
18  putting your name down for something.
19    Q.   For participation in?
20    A.   In the, in the public sale.
21    Q.   Did you preregister?
22    A.   No, I think this is relating to the
23  public sale, it is not, that is my understanding.
24         My involvement was doing the SAFT.
25  I was part of the SAFT.  Not, I did not

141

1  participate in the public sale.
2    Q.   If you turn back to Page 877, this
3  is the first page.  You have responded at the
4  bottom of the page and this is on August 30th,
5  2017, you wrote, "The form that you link to is
6  the public sale form.  That is the one to use for
7  presales, too."  Were you -- is it, is that what
8  you wrote?
9    A.   Yes, I was seeking clarification,
10  yes.
11    Q.   Were you confused by why he was
12  sending this to you?  Why Mr. Philp was sending
13  it to you?
14         As you just said, you were a
15  participant in the presale and he was sending you
16  a form for the public sale?
17    A.   Not confused, I was inquiring.
18    Q.   Okay.  You were just asking why he
19  was sending it to you.
20    A.   Clarification.
21    Q.   And then he wrote to you, or
22  responded to you, also on August 30th, in part
23  "There are only a couple of pre-sale
24  participants, as individuals, so we are just
25  getting you guys to register in the same portal

142

1  to collect the ETH address and info for KYC.
2         "Don't worry about the amount field,
3  you can put 100,000."  Right?
4    A.   Oh, I see.  Okay.  Okay.
5    Q.   So, did you understand that you were
6  using the same portal for the public sale, even
7  though you were a private sale participant?
8    A.   Now that you are refreshing my
9  memory, it sounds right.
10    Q.   Okay.  And then you responded on
11  September 5th.  "I just submitted the Kin form
12  and received the e-mail confirmation back."
13  Right?
14    A.   Yes.  Yes.
15    Q.   Okay.
16    A.   Yes, that is correct.  I just said
17  the wallet address, correct.
18    Q.   That is all we have for that.  Thank
19  you.  Are you familiar with the Ontario
20  Securities Commission?
21    A.   Yes.
22    Q.   It is the OSC?
23    A.   Yes.
24    Q.   In 2017 did you know people at the
25  OSC?

143

1    A.   I knew them not -- yes, I knew some
2  of them.
3    Q.   How did you know them?
4    A.   At one point I was making a lecture
5  at an event in Cambridge, Ontario, and Pat, Pat
6  Chaukos from the OSC was there.  I was introduced
7  to her.  Another time I was introduced to
8  Maureen, I'm sorry her last name escapes me now.
9  She is the chair of the OSC.
10         And then I attended an event they
11  had organized, a fin-tech event.  I was a
12  participant.  I was in the audience; I wasn't
13  presenting.  And the number of them were there.
14         And at one point I sent three copies
15  of my book to Maureen and her staff as a gesture.
16    Q.   When was it that you saw Maureen,
17  when was the event at which you saw her?
18    A.   That was their fin-tech event.  I'm
19  trying to think now.  I'm trying to think.  I
20  don't remember.  I think it was in '17.  They put
21  together an event.
22    Q.   You are not really sure?
23    A.   I'm not sure when exactly.
24    Q.   What about Pat Chaukos, when did you
25  see her?

144

1   A.   Well, January '17, that is when I
2   did my -- January or February of '17, that is
3   when I was talking to a group of some kind of
4   small conference somewhere in Cambridge.
5        So, it was January or February.  I
6   think they ran their event probably around April
7   or May.  April, maybe, yes, April of '17.  It was
8   around the time where they announced the fin-tech
9   hub.
10   Q.   And when you say they, are you --
11   A.   OSC, OSC.
12   Q.   How many times did you meet Pat
13   Chaukos?
14   A.   I didn't really meet her.  I mean
15   she was at the event that I was at, the second
16   time.  So, counting the first time and second
17   time, twice I was in the same vicinity as she
18   was.
19   Q.   The second time, the second time
20   being the fin-tech event?
21   A.   Correct.
22   Q.   And that was in approximately --
23   A.   I think March or April of '17.
24   Q.   Did you --
25        Have you ever seen Pat Chaukos after

145

1   that?
2   A.   No.
3   Q.   In the summer of 2017 did you obtain
4   information that the OSC was aware of Kik's plans
5   for Kin?
6   A.   That is correct.  Yes.
7   Q.   How did you get that information?
8   A.   Via a discussion with someone I knew
9   that had passed on that information to me.
10   Q.   Who was that?
11   A.   His name is Alan Munsche,
12   M-U-N-S-C-H-E.
13   Q.   When was that conversation?
14   A.   Probably in the, I want to say
15   June/July time frame.
16   Q.   Where were you when you had this
17   conversation?
18   A.   I don't remember where I was.  But I
19   remember it would have been on the phone.  It
20   would have been on the phone.  I was probably in
21   Toronto.
22   Q.   What does Mr. Munsche do?
23   A.   He runs a project called Token
24   Market, Token Funder, sorry.  Token Funder.  And
25   he was in discussions with the OSC to get some

146

1   kinds of approvals.  And it was my understanding
2   he was close to Pat.
3   Q.   Just to clarify, Mr. Munsche was
4   seeking approvals for a project different than
5   Kin, correct?
6   A.   Correct.
7   Q.   And so what did Mr. Munsche say to
8   you about the OSC and Kin?
9   A.   Mr. Munsche wanted me to become an
10   advisor to his project.  And over some
11   discussions he told me, he knew that I was
12   involved with Kin, and he told me that the OSC is
13   not fully aware of what Kin is doing and they
14   feel they are in the dark about it.
15        And that they may not be happy about
16   what Kin is doing.  And that is the extent of it.
17   Q.   He, Mr. Munsche said that he
18   believed that the OSC felt it was in the dark.
19   Is that what he was saying?
20   A.   Yes.
21   Q.   And how did Mr. Munsche come about
22   that information that he passed on to you?
23   A.   He didn't tell me.  He didn't tell
24   me.  It was, he was giving me feedback basically.
25   Q.   But it is your understanding that he

147

1   had been in communication with the OSC about his
2   project?
3   A.   Yes.
4   Q.   And it was Mr. Munsche who told you
5   that it was his understanding that the OSC was
6   not very happy about Kin?
7   A.   Those were his words, yes.
8   Q.   And then, was that the only
9   conversation with Mr. Munsche you had about the
10   OSC and Kin?
11   A.   That's correct, yes.
12   Q.   And after you got that information
13   from Mr. Munsche, what did you do with it?
14   A.   I relayed to Kik.
15   Q.   Who at Kik did you relay it to?
16   A.   I think it was in an e-mail.
17   Probably Ted for sure, Ted and maybe Tanner, I'm
18   not sure.  But there was an e-mail there where I
19   have told him.
20   Q.   Did you recommend any additional
21   steps that Kik should take with respect to the
22   OSC?
23   A.   If I recall, I kind of was asking
24   them would it make sense for you to go and tell
25   them what you are doing and that started the

148

1  conversation.
2      Q.   Did you have additional
3  conversations with Kik about that issue about
4  whether to approach the OSC?
5      A.   I don't recall. I think at that
6  time they took it themselves and they talked with
7  counsel, their counsel to kind of take it
8  forward.
9           I was not in the loop at that time,
10  after that.
11     Q.   Did you offer any advice about what
12  Kik should say to the OSC?
13     A.   I reviewed the draft of the letter
14  they were going to send to the OSC in
15  anticipation to meeting them.
16     Q.   And what did you do after you
17  reviewed the letter?
18     A.   I think there was an e-mail where I
19  made comments and that was the end of it.
20     Q.   And who was that letter, who was
21  that e-mail to? Did you write?
22     A.   I don't remember. It was, I'm not
23  sure if -- where it came from. If it came from
24  Ted or from counsel. It may have come from --
25  I'm not sure. But there was an e-mail. There

                        149

1  was an e-mail about.
2      Q.   What did you say in the e-mail?
3           MR. CADIGAN: Objection. I will
4  instruct you not to answer in any
5  communication that you had with Kik counsel.
6           THE WITNESS: Yes, it may have been
7  privileged, too.
8           MR. CADIGAN: I mean to the extent
9  that you know that it wasn't to Kik counsel,
10  feel free to answer.
11          THE WITNESS: No, Kik counsel was
12  quite involved in that letter.
13          MR. CADIGAN: Then I instruct you
14  not to answer.
15          THE WITNESS: 100 percent.
16  BY MR. MENDEL:
17     Q.   Are you going to follow the
18  instruction of Kik's counsel?
19     A.   That's correct, yes.
20     Q.   Did you talk to anyone directly at
21  the OSC about Kik or Kin?
22     A.   No.
23          (Whereupon, Exhibit 142
24           was marked for identification.)
25  BY MR. MENDEL:

                        150

1      Q.   Mr. Mougayar, I have provided you
2  with what has been marked as Deposition
3  Exhibit 142.
4      A.   Uh-huh.
5      Q.   This is an e-mail chain. And the
6  top e-mail on the first page is from you to Peter
7  Heinke on July 7th, 2017. Is that right?
8      A.   Yes.
9      Q.   Now as of this date July 7, 2017,
10  you still have not come to any agreement on your
11  consulting engagement with Kik. Is that right?
12     A.   Not -- to be accurate, formal
13  agreement, yes, correct.
14     Q.   You hadn't agreed on how much you
15  would be paid or in what form, correct?
16     A.   It sounds about right if -- yes.
17     Q.   I mean based on the e-mails we have
18  reviewed this morning, correct?
19     A.   The chronology is in the e-mail so
20  that is clear. It seems like we were still back
21  and forth, yes.
22     Q.   Okay. And then if we flip to the
23  back of this exhibit, Exhibit 142, I'm just
24  looking at this first e-mail in the chain. It
25  says there is an e-mail written on Thursday

                        151

1  July 6, 2017.
2      A.   What page, sorry, are you looking
3  at?
4      Q.   It is on page ending in 1219.
5      A.   Yes.
6      Q.   Are you with me?
7      A.   Yes.
8      Q.   And this is from Ross McKee,
9  correct?
10     A.   Yes.
11     Q.   And Ross McKee who is initiating the
12  e-mail?
13     A.   Yes.
14     Q.   What did Mr. McKee -- well, you will
15  see that it has been redacted for privilege.
16     A.   Uh-huh.
17     Q.   And for the record I will just ask
18  you what did Mr. McKee say to you in this e-mail?
19          MR. CADIGAN: Objection, instruct
20  you not to answer.
21          THE WITNESS: It says it is redacted
22  for privilege.
23  BY MR. MENDEL:
24     Q.   Right. And, so, Kik's counsel has
25  instructed. I asked you what is in the

                        152

1  privileged section.  And Kik's counsel instructed
2  you not to answer.  And you will follow that
3  instruction?
4      A.   That's correct.  I do.
5      Q.   Was this the e-mail providing you
6  with a draft letter to the OSC, do you know?  Or
7  is it something different?
8      A.   It appears to be, yes.
9      Q.   How do you know?
10     A.   OSC comment.  The subject is OSC
11 comment.
12     Q.   You responded to Mr. McKee, right?
13 On July 7th, 2017?
14     A.   July 6th.
15     Q.   So, I'm looking at page ending
16 in 1218.
17     A.   Okay.
18     Q.   Do you follow?
19     A.   Yes.
20     Q.   And in the bottom there is, it seems
21 like you are responding on July 7th at
22 12:21 a.m.?
23     A.   Okay.
24     Q.   Do you see that?
25     A.   Yes.

153

1      Q.   And on the cc: line are Peter Heinke
2  Nancy Wojtas and Ted Livingston.
3      A.   Okay.
4      Q.   And Mr. Heinke is the CFO from Kik,
5  correct?
6      A.   Yes.
7      Q.   And who is Nancy Wojtas?
8      A.   The counsel at Cooley.
9      Q.   Okay.  And then the substance of
10 what you are responding is redacted for
11 privilege.
12     A.   Yes.
13     Q.   What is it that you wrote back to
14 this group?
15         MR. CADIGAN:  I'm instructing him
16     not to answer.
17         THE WITNESS:  It is privileged, yes.
18     I cannot answer.
19 BY MR. MENDEL:
20     Q.   And you will follow the instruction
21 of Kik's counsel?
22     A.   That's correct.
23     Q.   And then, I'm just going to
24 summarize the exchanges through the rest of the
25 e-mail.  There is a July 7th, 2017 e-mail from

154

1  Mr. McKee back to you, it appears back to you at
2  10:25 a.m., correct?
3      A.   On Page 12 -- what page?
4      Q.   1217.
5      A.   Okay.
6      Q.   And then at 11:27 a.m. on July 7th,
7  there is a response from you to Ross McKee
8  copying Mr. Heinke, Ms. Wojtas and Ted
9  Livingston, right?
10     A.   Yes.
11     Q.   And, then there is a response from
12 Mr. McKee at, on Friday, July 7th, 2017, at
13 1:44 p.m., correct?
14     A.   Uh-huh.
15     Q.   A response from you to that,
16 at 4:42 p.m. on July 7th to Mr. McKee, again
17 Heinke, Wojtas, and Livingston, right?
18     A.   Okay.
19     Q.   And then Mr. Heinke responds, now
20 I'm on the front page of the exhibit, on July 7th
21 at 4:49 p.m., correct?
22     A.   Yes.
23     Q.   And then Mr. McKee responds at
24 4:53 p.m. on July 7th, right?
25     A.   Yes.

155

1      Q.   And all of those communications I
2  just summarized, they are all redacted for
3  privilege, right?
4      A.   Uh-huh, yes.
5      Q.   And, for the record I will ask you
6  what was discussed in these e-mails back and
7  forth?
8          MR. CADIGAN:  And I instruct you not
9      to answer that.
10         THE WITNESS:  Yeah, I cannot answer
11     that.
12 BY MR. MENDEL:
13     Q.   Because it is privileged?
14     A.   Privileged.
15         MR. CADIGAN:  Privileged.
16 BY MR. MENDEL:
17     Q.   On the basis of privilege -- what
18 privilege are you asserting?
19         MR. CADIGAN:  On the grounds that it
20     directly gets at attorney client privilege as
21     reflected in the document itself.
22 BY MR. MENDEL:
23     Q.   And are you going to follow that
24 instruction?
25     A.   I am following that, yes.

156

1    Q.   Then there is actually an additional
2  short exchange from you at 4:57 p.m., correct?
3  Redacted for privilege?  And you are not going to
4  explain what that is either, under instruction?
5    A.   It is the same, yes.
6    Q.   Okay.  And then after that there is
7  a short exchange between you and Mr. Heinke and
8  then you called and talked to Mr. Heinke?
9         Was it just Mr. Heinke on the phone?
10   A.   I don't remember.  That was too far
11 back.
12   Q.   What did you --
13   A.   Probably, because he said call me,
14 so ...
15   Q.   What did you talk to Mr. Heinke
16 about?
17   A.   I truly don't remember going back
18 far back.  It was probably related to this
19 exchange.
20   Q.   You don't have any separate memory
21 of what you discussed with Mr. Heinke?
22   A.   Not specifically.  Specifically not.
23 I'm sure it was related to the OSC to the subject
24 of this communication.
25   Q.   I will take that, thank you.

157

1         MR. MENDEL:  What number are we on?
2         THE WITNESS:  143.
3    Q.   Thank you.
4         (Whereupon, Exhibit 143
5         was marked for identification.)
6    Q.   So, Mr. Mougayar, Deposition
7  Exhibit 143 which I have just given you, it is at
8  the top an e-mail from you to Peter Heinke on
9  August 11th, 2017.  Do you see that?
10   A.   Yes.
11   Q.   And this is responding to an e-mail
12 that Mr. Heinke had sent to you on August 11th,
13 2017, a little bit earlier.
14        Do you see that?
15   A.   Yes.
16   Q.   And he asks you what was the name of
17 the ICO that the OSC looked at and felt
18 comfortable with.  I believe it was a
19 loyalty-based program.
20   A.   Yes.
21   Q.   And you gave him an answer, right?
22   A.   Uh-huh.
23   Q.   And so it says, "So said the
24 founder."
25   A.   Yes.

158

1    Q.   Is it fair to say that you were
2  tracking which ICOs the OSC was approving at this
3  time?
4    A.   No, that is not correct.  I wasn't
5  tracking them.
6    Q.   How did you notice?
7    A.   I just happen.  I know the founder
8  of UCASH, and via conversation with him this came
9  up that he told me he had went, he had gone to
10 see them.  And all I know is that they were okay,
11 they were comfortable with what he was doing.
12 That is it.  That is exactly what I said there.
13 There is nothing really more to it that I knew.
14 I was just relaying the message.  That is it.
15   Q.   Okay.  What other information did
16 you have about the Kik's efforts to approach the
17 OSC in 2017?
18        MR. CADIGAN:  Again, I'm going to
19     instruct you not to answer to the extent that
20     it implicates the attorney/client privilege.
21        But, otherwise you may answer.
22        THE WITNESS:  I mean generally
23     speaking all I knew is that they went to see
24     them.  I wasn't part of the meeting.  And
25     that is the extent of it.

159

1  BY MR. MENDEL:
2    Q.   Do you know what resulted from the
3  meeting?
4    A.   I wasn't privy to that.
5    Q.   Are you aware that Kik decided not
6  to make its token distribution event available in
7  Canada?
8    A.   That's correct.  Subsequently I
9  learned about that.
10   Q.   How did you learn about that?
11   A.   I don't remember how I, I think they
12 made it clear to everybody.  Ted may have written
13 a post, Ted Livingston.
14   Q.   That is how you learned about it?
15   A.   I don't remember if I knew about it
16 before he wrote the post or whether I learned
17 about it when he wrote the post.  But it was
18 around that time frame.
19   Q.   I'll take that one back, thank you.
20        Was there a conference in
21 August 2017 known as the FinTech Canada Bitcoin
22 Ethereum Summit?
23   A.   Yes, it wasn't a conference.  It was
24 an event, I would say.
25   Q.   What do you know about that event?

160

1  Could you describe it?
2      A.  It was a meet up.  It was one of the
3  regular meet ups that was organized in Toronto
4  about blockchain.  And that was one of the dates
5  that the meet up occurred on.
6      Q.  How is a meet up different than a
7  conference there in your view?
8      A.  The length of it.  The length.
9      Q.  What is the length of a meet up
10  versus a conference?
11      A.  I think this was like a 3, or 3-hour
12  event perhaps.  3 or 4-hour event.  So you
13  couldn't call it a conference.  Maybe the
14  organizers called it a conference.
15      Q.  Okay.  How many people attended --
16  can we call this the FinTech Summit for short?
17      A.  Okay.
18      Q.  And do you know when in August of
19  2017 it occurred?
20      A.  When in August, I thought you
21  mentioned the date.
22      Q.  The date.
23      A.  You said 17th.
24      Q.  August 14th?
25      A.  Around that time in August.

161

1  point they were charging $10, 15.
2      So, I don't remember that particular
3  one.  They were very popular, so it may have been
4  over, it was a packed room, I remember that.
5      Q.  So, I'm giving you back what was
6  marked as Deposition Exhibit 132.  Do you see it?
7      A.  Yes.
8      Q.  This is the one where you were
9  talking about in part about your agreement with
10  Kik to be an advisor.
11      A.  Uh-huh.
12      Q.  And, at the very back of this is an
13  e-mail from you to Peter Heinke on August 10th.
14      "By the way I am doing a Fireside
15  Chat with Ted on Monday evening at Mars.  Are you
16  coming, too?"  Is this in anticipation of the
17  FinTech Summit?
18      A.  That was that event you were talking
19  about.
20      Q.  What is Mars?
21      A.  M-A-R-S, it is the name of the
22  building, or of the -- of the location.  It
23  stands for --
24      Q.  That is okay.
25      A.  It is a government, semi-government.

163

1      Q.  Around mid-August?
2      A.  Yes.
3      Q.  Okay.  And did you attend the whole
4  FinTech summit?
5      A.  I don't think I attended the whole
6  thing.  I believe, is this the one where Ted and
7  I were on the stage?
8      Q.  That is what I am getting to?
9      A.  Yes, I was on the stage with Ted.
10      Q.  Yes.
11      A.  It was an after 6 o'clock event, I
12  think.
13      Q.  It was an evening event?
14      A.  I think so.  I recall it was, I
15  think I recall it was an evening event.  I mean
16  it is all documented, the time.  And I think it
17  was an evening event.
18      Q.  Was it open to the public or did you
19  need to buy tickets?
20      A.  It was open to the public to
21  register.
22      Q.  Do you remember if you had to pay
23  anything?
24      A.  I don't remember because at one
25  point the organizers were, it was free at one

162

1      Q.  It is in Toronto?
2      A.  In Toronto, yes.  It is like a
3  complex.
4      Q.  And then he responded on
5  August 10th, "Yes, I will be there.  I'm not sure
6  if I have a ticket for the auditorium or not."
7      Q.  Okay.
8      Q.  You needed like a ticket for the
9  auditorium?
10      A.  I mean to get in, that is what he
11  meant.
12      Q.  And then you responded more about to
13  him about the ticket, obtaining a ticket, right?
14      A.  Yes.
15      Q.  How would you describe the audience
16  there?
17      A.  Mix of entrepreneurs, a lot of
18  entrepreneurs mostly.
19      Q.  Was it a similar mix to the Token
20  Summit that you held in New York City?
21      A.  Maybe.  Maybe.
22      Q.  Would there have been some potential
23  investors or VC types?
24      A.  Some, yes.  Not a lot.  Same with my
25  event, there was not a lot.

164

CONFIDENTIAL

William Mougayar,
12/6/2019

```
 1      Q.   How do you know that?
 2      A.   Because I have the statistics.
 3      Q.   You do?  What statistics do you keep
 4 on that?
 5      A.   You mean on my attendance?
 6      Q.   Well, on the types of people who
 7 attended?
 8      A.   At my Summit.
 9      Q.   Let me start with the FinTech
10 Summit.  Approximately how many people attended,
11 do you know?
12      A.   Ballparking it may be 400, 3, 400.
13      Q.   Okay.  That is your estimation.  You
14 don't have statistics on it, though, right?
15      A.   No.
16      Q.   But you have statistics on your
17 Token Summit who attended in May of 2017?
18      A.   I had them, yes.
19      Q.   Do you have them still?
20      A.   I have to get to them.
21      Q.   How are they kept?
22      A.   I have to go to my records and see
23 if I, what would you, what are you looking for?
24      Q.   Well I guess my question is do you
25 distinguish, do your statistics keep track of
```

165

```
 1      Q.   How do you know that?
 2 what types of attendees there were?
 3      A.   I have to, yeah, I have to see if I
 4 if the job, if the description was in the
 5 database or not.
 6      Q.   Do you have any basis, I mean is
 7 your testimony today that like the investor VC
 8 component was limited?
 9      A.   Yes.
10      Q.   And what are you basing that on?
11      A.   I know by the audience.  I know who
12 was in the audience.
13           The intent of our conference is
14 really the usage of the token, not the, it is not
15 the financial, it is not an investment
16 conference.
17           It is a technology conference
18 usage-wise.
19      Q.   Do you know what each person at the
20 conference wanted to do?
21           Do you know whether or not each
22 person at the conference was interested in buying
23 Kin to, for investment purpose?
24           MR. CADIGAN:  Objection.
25 BY MR. MENDEL:
26      Q.   Do you have any understanding of
```

166

```
 1 what each person's motivation at the conference
 2 was for attending?
 3           MR. CRIMMINS:  Objection.
 4           MR. CADIGAN:  Objection.
 5           MR. CRIMMINS:  You can answer.
 6           THE WITNESS:  I cannot, no, I don't
 7      know what each person is thinking.  But the
 8      focus of the conference is the usage of the
 9      token.
10 BY MR. MENDEL:
11      Q.   And when you say the focus, was that
12 your focus on the conference?
13      A.   I run the program so I know what to
14 put in the program.  It is the innovation
15 potential of the token.
16      Q.   Do your statistics that you keep for
17 the Token Summit, do they reflect a reason for
18 attending?
19      A.   No.
20           (Whereupon, Exhibit 144
21            was marked for identification.)
22 BY MR. MENDEL:
23      Q.   So, I'm providing you with what has
24 been marked Deposition Exhibit 144.
25      A.   Uh-huh.
```

167

```
 1      Q.   And I will just tell you this is a
 2 compilation of different website pages that the
 3 SEC captured or located.
 4      A.   Okay.
 5      Q.   And you will see on the front there
 6 is a, it is, it has the Page Number 274.  Right?
 7 Are you with me on the first page of the exhibit?
 8      A.   Yes.
 9      Q.   And is that a stage of the FinTech
10 Summit?
11      A.   It seems like it.  I can't, it says
12 that, right, FinTech Canada.  What is the-date.
13      Q.   If you go to the next page it should
14 be a little bit clearer.
15      A.   Oh, the color one?
16      Q.   Yes, it is a color one.  It just
17 doesn't have the Bates number on it?
18      A.   It looks like it is the MARS for
19 sure.  Canada.  There is no date, though, oh here
20 it is.  August, okay.
21      Q.   August 14th; is that right?
22      A.   Okay, that is it.
23      Q.   This looks like the stage you were
24 on, right?
25      A.   Yes.
```

168

1     Q.   And then if you flip through
2  Page 302 is the next one and then behind that is
3  a color version of that?
4     A.   Yes.
5     Q.   Do you see that?
6     A.   Yes.
7     Q.   Same stage, different, it says
8  Part 2 of 2 of the FinTech Canada.
9     A.   Okay.
10     Q.   And then finally there is Page 295.
11     A.   Uh-huh.
12     Q.   It is a different website.  This
13  says ABC on it.  Do you know what the ABC website
14  is?
15     A.   Yes.
16     Q.   What is it?
17     A.   It is the blog of Fred Wilson.
18     Q.   Okay.  And on the back there is a
19  picture of you and Mr. Livingston, right?
20     A.   Yes.
21     Q.   Okay.  And then, on the, going back
22  to the first couple of pages, is it your
23  understanding that the discussion was a broadcast
24  on YouTube?  Do you see that insignia on YouTube?
25     A.   I was recorded.  I don't know if it

169

1  was broadcasted at the time.  Is that what you
2  meant?
3     Q.   It was recorded.  Is it your
4  understanding that this was posted on YouTube?
5     A.   Yes, later.
6     Q.   Later.  Do you know when?
7     A.   I don't know.  That was for the
8  organizers, not me.
9         MR. MENDEL:  I think we have to go
10  off the record to change the tape.
11         THE VIDEOGRAPHER:  Please stand by.
12  We are going off the record.  This is the end
13  of Media Unit Number 2.  The time is
14  2:48 p.m.
15         (Whereupon, a discussion off the
16  record took place.)
17         THE VIDEOGRAPHER:  We are back on
18  the record.  This is the beginning of Media
19  Unit Number 3.  The time is 2:50 p.m.
20         (Whereupon, Exhibit 145
21         was marked for identification.)
22  BY MR. MENDEL:
23     Q.   We are back on the record,
24  Mr. Mougayar.
25     A.   Yes.

170

1     Q.   I have just handed you what has been
2  marked as Deposition Exhibit 145.
3     A.   Okay.
4     Q.   Just like for the other transcript I
5  provided you earlier --
6     A.   Yes.
7     Q.   We took the recording that we found
8  on the internet of the event.
9     A.   Yes.
10     Q.   And we transcribed it.  And I just
11  had some questions for you about the transcript.
12         Let's go to, well, this transcript
13  identifies you as Mr. Mougayar, right?  It is not
14  male speaker; you actually have a name in this
15  one.
16     A.   I wasn't part of this.  What page
17  are you --
18     Q.   Okay, well, I'm looking at Page 2.
19     A.   Page 2 of the small, in the squares?
20     Q.   Let me look at your exhibit.
21         So, I have to correct the record.  I
22  did not just hand you a transcript of the
23  August 14th FinTech event.  So, I'm just going to
24  put this aside for now.
25         Okay.  And, counsel can just

171

1  disregard what I handed out.
2     A.   Okay.
3     Q.   Do you recall stating at the FinTech
4  Summit whether you were an investor in Kin or
5  not?
6     A.   I think I did.  I'm not -- I think I
7  did.
8     Q.   Okay.
9         (Whereupon, Exhibit 146
10         was marked for identification.)
11  BY MR. MENDEL:
12     Q.   I'm handing you what has been marked
13  as Deposition Exhibit 146.
14     A.   Yes.
15     Q.   And this is a, an e-mail chain with
16  Mr., an e-mail between Mr. Livingston and
17  Mr. Heinke at the top.
18     A.   Uh-huh.
19     Q.   Dated September 7th, 2017.  Is that
20  what you are seeing?
21     A.   Yes.
22     Q.   Okay.  And directly below that, also
23  on September 7th, there is an e-mail from you.
24  It looks like it is to, you are forwarding it to
25  Mr. Livingston; is that right?

172

CONFIDENTIAL

1    A.   Uh-huh, yes.
2    Q.   And starting at the bottom it looks
3  like on September 7th, 2017, you had received an
4  e-mail from an individual by the name of Vitalik
5  Demin.
6    A.   Okay.
7    Q.   And it says, "Sir, I sent you a
8  message on Telegram.  But I'm not sure how often
9  you check in.
10        "I just wanted to let you know that
11  I was very excited to watch your Fireside Chat
12  with Ted and also to find out that you are an
13  investor.
14        "I was planning to invest in Kin and
15  that video made me even more confident."
16        Do you follow?
17    A.   Yes.
18    Q.   Do you know what Fireside Chat he is
19  talking about?
20    A.   I am assuming it was -- no, it could
21  have been the one in , it could have been the one
22  in August in Toronto.  It is tough to tell.
23    Q.   But, you did the FinTech Summit?
24    A.   It would have been August, because
25  he said I am an investor, yes.  Correct.  It

173

1  would have been the August one.
2    Q.   Does this refresh your memory about
3  whether you said you were an investor?
4    A.   Right, because at that time in May I
5  wasn't an investor.  But, in August I prefaced
6  somewhere there, I disclosed, as a disclaimer,
7  that I was an investor, an advisor, as well.
8  Correct.
9    Q.   Okay.  And you hadn't done any other
10  fireside chats between the August 14th conference
11  and when you received this on September 7th,
12  correct?
13    A.   That's correct.  So, it would have
14  been referencing that one, correct.
15    Q.   Do you know who Mr. Demin is?
16    A.   No, I don't know him.
17    Q.   You hadn't heard from him before?
18    A.   No.
19    Q.   Did you receive Mr. Demin's message
20  on Telegram?
21    A.   No.
22    Q.   You didn't respond?
23    A.   I don't think so.
24    Q.   When Mr. Demin said I was planning
25  to invest in Kin, what did you think he was

174

1  saying?
2    A.   What it says.  I mean, I didn't, I
3  don't believe I responded.  I get lots of e-mails
4  from people I don't know.  So ...
5    Q.   Did you understand him to say that
6  he was planning to buy in Kin's public sale when
7  it went up?
8    A.   Yeah, it says I was planning to
9  invest in Kin.  So, that is, I did not interact
10  with this person further, so I could not clarify
11  this for you.
12    Q.   Oh, I know you are not Mr. Demin.
13  But I'm just asking you what your understanding,
14  did you have any understanding at all about what
15  he was saying when he said I was planning to
16  invest in Kin?
17        Did you think he was going to buy
18  Kin or he was planning on buying Kin?
19    A.   It could be that.  It could be he
20  wanted to develop, be a developer on Kin.  It
21  could be, it could be doing it later.  There is
22  no time element.
23        So, I it is tough to speculate.  I
24  don't know what he was thinking.
25    Q.   Did you receive other e-mails

175

1  similar to this one where somebody was saying
2  that they were planning to buy Kin or invest in
3  Kin?
4    A.   Not like -- no, not necessarily.
5    Q.   You can't, sitting here, you can't
6  remember one way or the other?
7    A.   If there was any I would have
8  provided it to you because we opened the e-mails
9  that were related to Kin.
10        But, I don't think there was
11  anything like this one.
12    Q.   So, it looks like he sent it to you
13  at 9:51 a.m.
14        And at 9:56 a.m. the same day you
15  forwarded it on to Mr. Livingston; is that right?
16    A.   Where is the forward.  I'm not
17  able -- oh, here it is, yes, the forward.  It
18  goes up this way.
19        Yeah, it seems that way, yes.
20    Q.   And you put just sort of a little
21  symbol for a smiley face?
22    A.   Yes.
23    Q.   Why were you sending this to
24  Mr. Livingston?
25    A.   As an FYI, as a spot of the feedback

176

CONFIDENTIAL                                      William Mougayar,
                                                         12/6/2019

1   from the chat.
2       **Q.**   And he responded to you, correct?
3   With a similar, he said great and then with a
4   similar emoticon?
5       **A.**   Yes.  Yeah.
6       **Q.**   Okay.
7       **A.**   Thank you.
8       **Q.**   Is it your recollection that the
9   Kin's token distribution event for Kin took place
10  in September 2017?
11      **A.**   Yes.
12      **Q.**   And, you consulted with Kik about
13  the operation of the event?
14      **A.**   About certain aspects of it.
15      **Q.**   Which aspects?
16      **A.**   At one point we discussed the total
17  amount and I can't remember the rest.  I was
18  mostly responding their inquiries.  If they had
19  something they were asking me about, and I would
20  respond.  But, from memory, one of the points was
21  about the amount.  They were not too sure what
22  the amount was going to be.  And there was a
23  communication about what I responded to limited
24  to a certain amount.
25      **Q.**   What was your recommendation about,

177

1   the amount?
2       **A.**   I think it was about 100 million.  I
3   think at one point in time Ted was asking whether
4   it makes sense to go over 100 million.
5           And my opinion was that it was
6   better to stay at the 100 or less.
7       **Q.**   Okay.
8           (Whereupon, Exhibit 147
9           was marked for identification.)
10  BY MR. MENDEL:
11      **Q.**   I have given you what has been
12  marked Deposition Exhibit 147.
13      **A.**   Yes.
14      **Q.**   And this is an e-mail that you got
15  from Kin by Kik, right, on June 2nd, 2017.  Is
16  this a confirmation of your preregistration?
17      **A.**   It seems that way.  That is what it
18  says.
19      **Q.**   Does this refresh your recollection
20  whether you preregistered for the public
21  offering, for the public sale?
22      **A.**   That is what it says, yes.  That
23  sounds a bit early.  June.
24      **Q.**   Does this --
25      **A.**   I'm not sure what this was for.

178

1       **Q.**   Okay.
2       **A.**   This could have been to register for
3   an e-mail description.
4       **Q.**   Okay.
5       **A.**   But I'm not sure.
6       **Q.**   I will take that.  Thank you.
7       **A.**   Okay.
8           (Whereupon, Exhibit 148
9           was marked for identification.)
10  BY MR. MENDEL:
11      **Q.**   I have given you what has been
12  marked as deposition Exhibit 148.
13      **A.**   Uh-huh.
14      **Q.**   And this is a --
15          This exhibit is a collection of
16  different e-mails that you seem to have received?
17          The Bates numbers aren't
18  consecutive, if you'll notice on the lower
19  corners of the pages.
20      **A.**   Yes.
21      **Q.**   There is an e-mail dated
22  August 22nd, 2017, an e-mail dated August 30th,
23  2017.
24      **A.**   Yes.
25      **Q.**   September 6, 2017.

179

1       **A.**   Okay.
2       **Q.**   Another one dated September 6, 2017.
3       **A.**   Yes.
4       **Q.**   September 7th, 2017.  And
5   September 8, 2017.
6       **A.**   Yes.
7       **Q.**   And these are all e-mails from Kin
8   by Kik?
9       **A.**   Yes.
10      **Q.**   And you received all of these
11  e-mails?
12      **A.**   Yes.  Seems like, yes.
13      **Q.**   Do you know why you are receiving
14  them?
15      **A.**   It seems to be, to have been
16  triggered by the fact that I registered my
17  interest in the Kin presale, in the Kin sale of
18  the tokens.
19      **Q.**   If you look at the one marked
20  Page 871, do you see that one?
21      **A.**   871.  One second.  Yes.
22      **Q.**   And this one on September 6th says,
23  "Thank you for initiating a registration process
24  for the Kin token distribution event."
25      **A.**   Yes.

180

1    Q.   And it seemed like you did that?
2    A.   Yes.
3    Q.   You were in Canada for the event,
4  right?  You lived in Canada at the time of the
5  event?
6    A.   You mean on the exact day that it
7  started?
8    Q.   In September of 2017.
9    A.   Yes.
10   Q.   So, you were ineligible to
11 participate in the event, correct?
12   A.   That's correct, as the public, yes.
13   Q.   Would you have participated if you
14 could?
15        MR. CADIGAN:  Objection.
16 BY MR. MENDEL:
17   Q.   Did you want to participate in the
18 event but couldn't because you were in Canada?
19   A.   But, I participated as an accredited
20 investor.
21   Q.   Did you want to also participate in
22 the token distribution event on top of your
23 initial investment of 100,000?
24   A.   No.  These are automated e-mails.
25   Q.   Correct.  What would you get when

181

1  you receive these?
2    A.   Most, it depends.  In many cases
3  nothing.  It is just thank you.
4    Q.   Okay.
5    A.   This was the result of when Peter
6  told me you have to register, use the same
7  process to register, although you are not doing
8  the public, register so we can get captured a
9  wallet address.
10        So, that is what happened there.
11 This doesn't mean that I had intended on
12 participating in the public sale.
13        (Whereupon, Exhibit 149
14        was marked for identification.)
15 BY MR. MENDEL:
16   Q.   I'm giving you what has been marked
17 as Deposition Exhibit 149.  This is an e-mail
18 from Tanner Philp to you on September 26, 2017.
19 Who is Tanner Philp?
20   A.   He works for Ted.
21   Q.   At Kik?
22   A.   At Kik, yes.
23   Q.   Okay.  And he writes the, "Hey
24 William, the token distribution event closed this
25 morning.  Here is a quick look at the results."

182

1  And there is two bullets.  The first says,
2  "98.76 million total raise inclusive of presale
3  and public sale.  And over 10,000 total
4  participants from 117 countries."
5        Do you know why he is sending this
6  to you?
7    A.   I believe he sent it to everybody
8  who was involved.  So, this was standard to recap
9  the results of that event, those that had
10 participated.
11   Q.   Great.  That is all I have for that.
12 Thank you.
13        Did you continue to consult with Kik
14 after the public sale?
15   A.   Yes.
16   Q.   And what did you do?
17   A.   It was related to the Kin Foundation
18 to organizing the affairs of the Kin Foundation.
19   Q.   What is your understanding of Kik's
20 efforts to develop Kin's functionality after the
21 token distribution event through the rest of
22 2017?
23   A.   Can you be more specific in that
24 question?
25   Q.   Was Kik involved after the -- was --

183

1        Did Kik take any steps to work on
2  the functionality of its Kin token, after the
3  token distribution event in 2017?
4    A.   Yes.
5    Q.   What did it do?
6    A.   It had to develop the SDK.
7    Q.   What is the SDK?
8    A.   The Software Development Kit.
9    Q.   And, that was something that Kik
10 worked on in 2017?
11   A.   I believe so.
12   Q.   After the token distribution event?
13   A.   I'm not sure exactly when they would
14 have started before or during.  It was started
15 before.
16   Q.   And what else did they do?
17   A.   What else did Kik do?
18   Q.   To develop the functionality, what
19 else did Kik do, following the token distribution
20 event in 2017 with respect to the functionality
21 of Kin?
22   A.   I wasn't, I wasn't working for them,
23 so I don't know exactly everything they did.
24 But, I know what they did in relation to the
25 development to the Kin Foundation, Kin Ecosystem,

184

1 and one of the elements was the SDK, and the most
2 of my conversations were about the Kin Rewards
3 Engine and what we were going to do with the
4 Foundation, how we were going to set the
5 Foundation, how we were going to start the
6 Foundation and fulfill our obligations at the
7 Foundation.
8    Q.   When were you approached about
9 becoming a director for the Kin Foundation?
10    A.   Following the KRE event, there were
11 some discussions, following the KRE event, so, in
12 the fall of '17 there were some discussions about
13 my potential involvement in the Kin Foundation.
14    Q.   Did you mean TDE event or KRE event?
15    A.   TDE event.
16    Q.   The token distribution event?
17    A.   Yes.
18    Q.   So, it was after, you were
19 approached after the token distribution event?
20    A.   Yes.
21    Q.   How did that come up?
22    A.   I'm not sure exactly.  I mean it was
23 a series of conversations.  We had regular, we
24 had ongoing conversations with Ted and the
25 others.  And yeah, I mean, I was involved with

185

1 them.
2        So, it was via a natural evolution
3 of progression of my role potentially.
4    Q.   Do you have an understanding of when
5 the Foundation was created?
6    A.   When?
7    Q.   Yes.
8    A.   I'm not sure exactly, but it was in
9 and around the date of the TDE of the token
10 distribution event.  So, it would have been
11 created probably in the August or September time
12 frame of '17.
13    Q.   Do you know which persons initially
14 served as directors of the Foundation?
15    A.   Ted and Peter.
16    Q.   Ted that is Ted Livingston, and
17 Peter Heinke?
18    A.   Correct.
19    Q.   Any others?
20    A.   Not to my knowledge.
21    Q.   Do you know why you were not named a
22 director of the Foundation when it was created?
23        MR. CADIGAN:  Objection.
24 BY MR. MENDEL:
25    Q.   Were you named a director of the

186

1 Foundation when it was created?
2    A.   No.
3    Q.   Do you know why?
4        MR. CADIGAN:  Objection.
5        THE WITNESS:  Can I answer?
6        MR. CADIGAN:  Yes, please answer.
7        MR. CRIMMINS:  Uh-huh.
8        THE WITNESS:  No, I mean, it wasn't,
9 I don't think it is relevant.  I mean, it
10 didn't matter.
11 BY MR. MENDEL:
12    Q.   Okay.  But, so at some point they
13 approached you and said would you be willing to
14 take over as director, as a director of the
15 Foundation?
16    A.   That was the intent, yes, correct.
17    Q.   Okay.  And when is it that you
18 actually became a director?
19    A.   I think officially, officially it
20 happened in May of 2018.  Towards the middle of
21 May.
22    Q.   When you were approached in 2017,
23 what was your response?
24    A.   Positive.
25    Q.   Was it Ted who asked you?

187

1    A.   I don't remember exactly who it was.
2    Q.   You said you would do it?
3    A.   Yes.
4    Q.   So, but there was a lag in time
5 before you actually became a director; is that
6 right?
7    A.   Officially.
8    Q.   Officially?
9    A.   But, we were working towards, I was
10 assuming a lot of, a lot of activities were
11 related to the Kin Foundation.
12        We started to have calls related to
13 the Kin Foundation.  In the early fall of '17.
14    Q.   Do you have any understanding of why
15 you weren't made a director earlier than May or
16 June of 2018?
17    A.   To the best of my knowledge, I think
18 the SEC's investigation slowed things down.  That
19 was my understanding.
20    Q.   And, why was that?
21    A.   Because they were busy with the SEC,
22 answering.  So, that slowed everything down.
23    Q.   Were there any other reasons?
24    A.   As far as I knew that was the main
25 reason.

188

1      Q.   And who told you it was the SEC
2   investigation that slowed things down?
3      A.   They didn't tell me that.  I implied
4   that.
5      Q.   That is just your assumption, right?
6      A.   Yes.
7      Q.   No one at --
8      A.   Let me remember.  It was evident.
9   Let's put it that way.  It was evident, via my
10  conversations with Peter, and Ted, and Tanner
11  that the SEC investigation was slowing everything
12  down.
13     Q.   But, no one ever said, neither Ted
14  nor Peter nor Tanner ever said to you we are
15  holding off making you a director because of the
16  SEC investigation, correct?
17     A.   I wasn't in a hurry.  I was more
18  interested in helping them.  Whether I was a
19  director or not.
20     Q.   But, to go to my question, none of
21  the individuals I just mentioned, Ted, Peter or
22  Tanner said we are not making you a director
23  right now because of the SEC investigation; is
24  that right?
25     A.   They didn't say it that way, no,

189

1   they didn't say it.
2      Q.   You are inferring from it the
3   circumstances?
4      A.   Yes.
5      Q.   Before you became a director, did
6   you attend any board meetings?
7      A.   We had calls.  We had numerous
8   calls.
9      Q.   Were they formal board meetings or
10  were they just calls?
11     A.   They were calls, they were serious
12  calls, meetings, we were discussing a lot of
13  matters relating to the Kin Foundation, the KRE,
14  the development, ecosystem development.
15          So, there were serious and long
16  calls.
17     Q.   A series?
18     A.   Serious and long.
19     Q.   Why do you say they were serious?
20     A.   We were discussing matters relating
21  to the Kin Foundation.
22     Q.   And they were long calls.  How long
23  did they last?
24     A.   It could be one hour, two hours
25  sometimes.

190

1      Q.   Did you at this time, before you
2   were made a director, did you vote on the board?
3      A.   I don't remember.  We would have to
4   go to the minutes.  Technically, I wouldn't
5   because I am not, I wasn't technically a board
6   member.  We were discussing matters more than
7   anything.
8      Q.   Did you make any decisions for the
9   Foundation before you became a director?
10     A.   I don't remember exactly.  I was a
11  very active contributor to a lot of the
12  discussions.  But, I don't remember exactly the
13  decisions specifically.
14     Q.   You don't remember making any
15  decisions, correct?
16     A.   I don't remember specifically.
17     Q.   Did you see yourself as having
18  decision-making responsibility before you became
19  a director?
20     A.   Potentially.  I mean, I was mostly
21  responding to the issues that were put forth and
22  if I saw something that needed attention, I would
23  raise it.
24          And, so, I was not a passive
25  participant.  I was --

191

1      Q.   Did you see yourself as having
2   authority to make a decision for the Foundation?
3      A.   I could if I wanted to.
4      Q.   How is that?
5      A.   I could have influencing.  I could
6   influence Ted, if I wanted to.  If it made sense.
7      Q.   Did you have any kind of formal
8   authority to have Ted vote a certain way for you?
9      A.   When?
10     Q.   Before you became a director?
11     A.   Before --
12          I think before it was more informal,
13  because I was not formally a director.
14     Q.   Who else, before you became, I'm
15  just talking about the time before you became a
16  director.
17          Who else attended the board meetings
18  besides you -- well, who was on the calls, I
19  should just ask.
20     A.   Early on there was another
21  individual, William Raduchel, because he was
22  going to be a potentially a board member as well.
23  And so he was on at least two calls, perhaps more
24  in the fall of '17.
25     Q.   And during Mr. -- how do you say his

192

1  name?
2      **A.**   It is Raduchel, R-A-C-H-U-D-E-L.
3  Bill Rachudl.
4      **Q.**   Or Bill Raduchel?  I think it is
5  Raduchel.
6      **A.**   Sorry.
7      **Q.**   And so he was on, you know of two
8  calls he was on?
9      **A.**   From memory, that is what I
10  remember, yes.
11      **Q.**   Okay.  And then when did those calls
12  with Mr. Raduchel take place?
13      **A.**   In the fall of '17.  Probably
14  October.
15      **Q.**   Did Mr. Raduchel become a director?
16      **A.**   To my knowledge, no.
17      **Q.**   And what is your understanding of
18  why he didn't become a director?
19      **A.**   That I'm not sure.  All I know is
20  that he wasn't proceeding.  That is, I don't know
21  if he backed out or -- I don't know the reason.
22      **Q.**   Who else besides Mr. Raduchel
23  attended the meetings before you -- in the period
24  before you became a director, who else attended?
25      **A.**   Sometimes Tanner would be on the

193

1  calls.  And sometimes Nancy would be on the
2  calls.  Our counsel.
3      **Q.**   Did Tanner have any kind of position
4  at the Foundation?
5      **A.**   No.
6      **Q.**   He worked for Kik, correct?
7      **A.**   Correct.
8      **Q.**   And Mr. Livingston attended the
9  calls?
10      **A.**   Yes.
11      **Q.**   And Mr. Heinke?
12      **A.**   Yes, yes.  Correct.  Peter.
13      **Q.**   Would Eileen Lyon participate in the
14  calls, again in the time before you became a
15  director?
16      **A.**   Yes, later.  I don't think she was,
17  again from memory, I don't think she was involved
18  in the fall.  I think she came along a bit later.
19  In '18.
20          MR. MENDEL:  Okay.  This is probably
21      a good point to take a break.  Off the
22      record.
23          THE WITNESS:  Okay.
24          THE VIDEOGRAPHER:  We are going off
25      the record.  The time is 3:22 p.m.

194

1          (Recess taken -- 3:22 p.m.)
2          (After recess -- 3:37 p.m.)
3          THE VIDEOGRAPHER:  We are back on
4      the record.  The time is 3:37 p.m.
5  BY MR. MENDEL:
6      **Q.**   Mr. Mougayar, let's continue talking
7  about the Foundation, and your role there.
8      **A.**   Okay.
9      **Q.**   So, you recall becoming a formal
10  director in May of 2018; is that right?
11      **A.**   Yes.
12      **Q.**   Or was it June?
13      **A.**   May.
14      **Q.**   May, okay.  Have you received any
15  compensation as a director?
16      **A.**   Yes.
17      **Q.**   What is the compensation that you
18  get?
19      **A.**   About 5,000 a month.
20      **Q.**   So, that is similar to the
21  compensation that you received as a consultant to
22  Kik; is that right?
23      **A.**   Correct.
24      **Q.**   And are you still receiving that
25  today?

195

1      **A.**   Yes, I am.
2      **Q.**   Who pays the $5,000?  Who pays your
3  monthly stipend?
4      **A.**   The Foundation.
5      **Q.**   About what percentage of your time
6  is spent on Foundation responsibilities -- well,
7  let me step back.
8          From the time that you became a
9  director of the Foundation in May of 2018 to the
10  present, has the amount of time that you spent on
11  Foundation activities, has that stayed consistent
12  or has that changed over time?
13      **A.**   I would say fairly consistent.
14      **Q.**   Okay.  And about what percentage of
15  your business time do you spend on Foundation
16  matters?
17      **A.**   Similar to before.  5 to 10 percent.
18      **Q.**   If you had to put a number of hours
19  per month on it, what would you say?
20      **A.**   Per month.
21      **Q.**   Or a week, whatever is easiest.
22      **A.**   Hours.
23          MR. CRIMMINS:  Assuming it is
24      consistent.  If it fluctuates materially,
25      tell counsel that.

196

1      THE WITNESS:  Yes, so, at least ten
2  hours I would say.  Ten hours.
3  BY MR. MENDEL:
4      Q.   Ten hours per month?
5      A.   Yes.
6      Q.   And going back to the time you
7  became a director in May of 2018, what other, who
8  else has been a director at the same time as you?
9      A.   Ted.
10     Q.   Is it just Ted, is that it?
11     A.   Yes.
12     Q.   And when you became a director, did
13 Peter Heinke give up his role?
14     A.   Correct.  Yes.
15     Q.   You replaced him?
16     A.   Correct, yes.
17     Q.   And, so, in the period after you
18 became a director, just focusing on sort of the
19 operation of the board who attended board
20 meetings?
21     A.   Typically it would be Ted and I and
22 Eileen and Tanner in most cases, and there is
23 another law firm in Canada that became the
24 counsel to the Foundation.
25     Q.   Do you know the name of that?

197

1      A.   Borden, Borden Gervais, B-O-R-D-E-N.
2      Q.   Borden?
3      A.   Gervais is the second, and then
4  there is an L.  But I don't remember.
5      Q.   Gervais?
6      A.   Gervais, J-E-R-V-A-I-S [sic].  I
7  think there is B-L-G, there is an L in the middle
8  there that I'm not remembering.
9      Q.   And how did the board make decisions
10 once you became a director?
11     A.   Like any board, decisions are
12 usually discussed and made jointly.  So, nothing
13 unusual there.
14     Q.   You and Mr. Livingston each have a
15 vote?
16     A.   Yes.
17     Q.   And your votes counted equally?
18     A.   Yes.
19     Q.   So, in order for the Foundation to
20 take an action, a particular action, both you and
21 Mr. Livingston have to vote in agreement,
22 correct?
23     A.   Correct, yes.
24     Q.   Okay.  If one of you objects, then
25 nothing can happen?

198

1      A.   That's correct.
2      Q.   In the event that you as a board
3  member have a conflict of interest on a
4  particular decision, can Mr. Livingston just go
5  ahead and make the single vote?
6      A.   Yes, there is a provision there
7  where he would recuse himself if there was a
8  conflict.
9      Q.   Actually my question was, if you
10 have a conflict of interest.  Then how would a
11 board decision be made?
12     A.   I haven't had that situation, I
13 think.  So, I don't remember what the bylaws say
14 in that regard.
15          But, we haven't had that situation.
16     Q.   Has the opposite happened?  Has
17 Mr. Livingston been conflicted?
18     A.   I'm trying to remember.  Maybe once
19 in relation to -- maybe once, but I don't
20 remember the context.  And we resolved it.
21     Q.   You resolved it without him recusing
22 himself?
23     A.   No, with him recusing himself.
24     Q.   Oh.  With him recusing.  When did
25 that occur?

199

1      A.   It would be in the minutes.  I'm
2  thinking it was probably earlier in the summer.
3  The early part of this summer.  Probably in July
4  or August of this year.  That is my vague
5  recollection.
6      Q.   Of 2019?
7      A.   Yes.
8      Q.   And what was the issue concerning?
9      A.   I don't remember.
10     Q.   And you have never had to recuse
11 yourself from any board decisions?
12     A.   That's correct.
13     Q.   Besides this one episode this summer
14 in 2019, you can't recall any other episode in
15 which Mr. Livingston has recused himself?
16     A.   That's correct.
17     Q.   Was there ever a plan to add
18 additional directors to the Foundation board?
19     A.   Yes.
20     Q.   Were they added?
21     A.   No.
22     Q.   Why not?
23     A.   Because of the SEC investigation.
24     Q.   So, from the time that you joined as
25 a director until the present, no additional

200

1  members have been added.  And in each case it was
2  because of the SEC investigation?
3      **A.**   Correct, correct.  I had made
4  overtures to a couple of potential candidates
5  back in the fall of '17.  But, the SEC
6  investigation made it difficult for us to
7  proceed.
8      **Q.**   And, who, did anyone tell you that
9  the SEC investigation was the reason for them not
10  becoming a board member?
11     **A.**   We slowed down the process because
12  of the SEC investigation.
13     **Q.**   Who is we?
14     **A.**   Internally.  I mean Ted and I, and
15  it became apparent that our chances to recruit
16  credible, other potential board members was being
17  jeopardized.
18     **Q.**   So, no one actually told you that
19  they wouldn't join the board because of the SEC
20  investigation or litigation.  Correct?
21     **A.**   That's correct.
22     **Q.**   And did you ever talk to
23  Mr. Raduchel about his not becoming a board
24  member?
25     **A.**   No, I have not.

201

1      **Q.**   So, I want to go back to the period
2  of time, I now want to talk about the Foundation
3  activities.
4      **A.**   Okay.
5      **Q.**   And I want to focus on the time from
6  the token distribution event in September 2017
7  through the time, until the time you were made a
8  director in May of 2018.
9      **A.**   Okay.
10     **Q.**   During that time period what had,
11  what did the Foundation do?
12     **A.**   We were overseeing the development
13  and the evolution of the KRE, the Kin Rewards
14  Engine.  And how it would be distributed to the
15  potential partners, to the partners.  To the
16  remaining instances where we had to approve the,
17  how we incentivize the developers to participate
18  in the ecosystem.
19          That was one of the primary
20  activities.
21     **Q.**   Did, what were some of the other
22  activities?
23     **A.**   That is the primary one.  I mean,
24  that is, I stated in the, in our mission and
25  intent, it is really, it is twofold.  It is to

202

1  promote the development of the ecosystem.  And to
2  manage the KRE, the Kin Rewards Engine in a
3  transparent and in a good way, basically.
4          So, we were the stewards of the Kin
5  Rewards Engine.
6      **Q.**   During this time period, again,
7  before you became a director, did Kik have any
8  employees?
9      **A.**   Did Kik have employees, yes.
10     **Q.**   Who?
11     **A.**   Kik had employees.  Yes.
12     **Q.**   Did it, thank you.
13          Did the Kin Ecosystem Foundation
14  have any employees before you became a director?
15     **A.**   No.
16     **Q.**   So, it didn't have a CEO, correct?
17     **A.**   Correct.
18     **Q.**   Did the Foundation hire McKinsey?
19     **A.**   Yes.
20     **Q.**   What did it hire McKinsey for?
21     **A.**   To do a study relating to the
22  economics of the token and its operation.
23          So, it was an analysis of the
24  implications and the scenarios of the token and
25  its operation.

203

1      **Q.**   When was that study done?
2      **A.**   I think in the fall of '17.  I don't
3  remember the exact dates.
4      **Q.**   Do you know how much the Foundation
5  spent on the McKinsey report or the McKinsey
6  project?
7      **A.**   From memory I recall, I'm not sure
8  if they paid them in Kin or in dollars.
9          But, the number that is in my mind
10  is like 300,000.  But, I may be, it is just, by
11  memory, it is documented.
12          So, you could probably go to the
13  documents.  It says, I think it is 300,000,
14  something like that.
15     **Q.**   During this time period were you
16  aware, again before you became a director, were
17  you aware of any Kik employees performing any
18  functions for the Foundation?
19     **A.**   Well yes, Tanner, yes.
20     **Q.**   What did he do, Mr. Philp do for the
21  Foundation?
22     **A.**   He was doing a lot of
23  operations-types duties.  He was helping Ted.  He
24  has written a documentation and he would
25  summarize the actions sometimes.

204

1        So, he was really more working with
2  whatever needed to be done from the operations
3  perspective.
4        So, I'm not sure I think I can be
5  specific from memory.  But, he had a role in
6  doing the, what we needed to do basically.
7        Q.    So, did Mr. Philp work on the Kin
8  Rewards Engine on behalf of the Foundation?
9        A.    In part he did, yes.
10       Q.    And did he, was he involved in
11 hiring McKinsey to perform that study?
12       A.    I think he was one of them.  One of
13 those that were involved.  I wasn't aware of
14 exactly how they hired them.  I wasn't involved
15 in that decision.
16       Q.    Before you became a director, what
17 were the Foundation's assets?
18       A.    The assets were what we, the Kin, it
19 was the Kin that --
20       Q.    The 6 trillion Kin?
21       A.    Yes.
22       Q.    Anything else?
23       A.    Not to my knowledge.
24       Q.    Did the Foundation receive a loan of
25 $100,000 from Kik?

                        205

1        A.    Oh, yes, yes.  There was a note, I
2  don't remember the date.  There was a loan for
3  operational purposes, I think.
4        Q.    Was it, was it 100,000, is that what
5  you remember?
6        A.    It was close to that number, yes.
7        Q.    How many loans were there?  Do you
8  remember?  Was it more than one?
9        A.    I don't remember.
10       Q.    And once the money was received,
11 what was it used for?
12       A.    I think some of it was used for
13 legal and some of it was the director's fees, and
14 I can't remember the rest, we would have to go
15 back to the minutes to find out.
16       Q.    Was some of it used for insurance?
17       A.    I'm not sure.  I'm not sure.
18       Q.    Did the Foundation pay back the
19 loan?
20       A.    To my knowledge not yet.
21       Q.    When is the loan due?
22       A.    Again my memory, I mean, that
23 information is I think we made it public.  There
24 is a maturity, I recall, it could be due on
25 demand as well if I remember.  Within a number of

                        206

1  days.  It could be due on demand in five days, if
2  I remember.
3        Q.    Before you became a director, had
4  the Foundation actually made any money?
5        A.    Made any money.  Like revenue-wise?
6        Q.    Correct.
7        A.    No, that is not the purpose, no.
8            (Whereupon, Exhibit 150
9            was marked for identification.)
10           (Whereupon, Exhibit 151
11           was marked for identification.)
12       THE WITNESS:  Yes.
13       MR. CRIMMINS:  I just need to know
14   the numbers, which is which.
15       THE WITNESS:  150 and 151.
16 BY MR. MENDEL:
17       Q.    I can read them for the record.  So,
18 Mr. Mougayar, I have given you what has been
19 marked as Deposition Exhibit 150.
20       A.    Yes.
21       Q.    Starting with the Bates Number 2606
22 on the bottom.
23       A.    Yes.
24       Q.    And that is a multi-page document.
25       A.    Okay.

                        207

1        Q.    I have also given you Deposition
2  Exhibit 151.
3        A.    Yes.
4        Q.    With the Bates Number 2604 on the
5  bottom right-hand corner.
6            And so starting with Exhibit 150.
7        A.    Uh-huh.
8        Q.    This is a, it appears to be an
9  e-mail from Peter Heinke dated October 15th,
10 2017, to you.  And there is, it appears to have
11 an attachment called the Foundation Overview?
12       A.    Yes.
13       Q.    Do you see that?
14       A.    Yes.
15       Q.    Okay.  And then in the cover e-mail
16 to 150, Mr. Heinke says, "William Raduchel, as
17 discussed, mentioned that he would be willing to
18 sit on the board.  However, that has not been
19 finalized."
20           You see that, right?
21       A.    Uh-huh.
22       Q.    And that is consistent with your
23 memory, right?
24       A.    Yes.
25       Q.    All right.  And in Exhibit 151,

                        208

1 well, in 150 Mr. Heinke had said, "As per our
2 discussion, this is initial draft, and a basis to
3 provide you an overview from which to work with."
4        And what he is talking about is an
5 overview of the Foundation.  Right?
6    A.    Yes.
7    Q.    Okay.  And you responded in
8 Exhibit 151, "Got it.  I will lead the Kin
9 Foundation Formation Initiative and will apprise
10 you of our progress."
11    A.    Yes.
12    Q.    Did you read the overview document
13 when you received it?
14    A.    Yes.
15    Q.    Did you read it before you responded
16 to Mr. Heinke?
17    A.    It seems that way.  Looking at the
18 time stamps, yes.
19    Q.    And when you say, "I will lead the
20 Kin Foundation Formation Initiative," what were
21 you agreeing to do?
22    A.    To help to recruit some of the other
23 members of the Foundation.  That is what it
24 meant.
25    Q.    The formation initiative.  Just

209

1    A.    Yes.
2    Q.    And those were the objectives,
3 right?
4    A.    Yes.
5    Q.    And also it states down below, "The
6 reward engine -- the rewards engine will only pay
7 out once there is a developer on the platform."
8        Was this your understanding?
9    A.    Yes, which bullet is this again?
10    Q.    This is the second paragraph on
11 Page 2607.
12    A.    Yes.  Yes.  Correct.
13    Q.    Was there a developer on the Kin
14 platform at this point?
15    A.    In October?
16    Q.    Correct.
17    A.    No, not in October.
18    Q.    At this point had the Kin Reward
19 Engine made any payouts?
20    A.    No.
21    Q.    And then under next steps, it
22 states, also on the same page, "One, appoint
23 Board of Directors.  Two, publish the Kin Rewards
24 Engine methodology."
25    A.    Uh-huh.

211

1 getting other board members?
2    A.    Yes.
3    Q.    Had you agreed to become a board
4 member at this time?  Or were you just trying to
5 get other people to join?
6    A.    No, I had agreed in principle, yes,
7 I think so.
8    Q.    Did you agree with the contents of
9 the overview that you had?
10    A.    Yes, I mean it says here Founding
11 Board Member under my name.  And my name is
12 there, so, that was the intent, yes.
13    Q.    Did you at the time you received
14 this entire document, the Foundation Overview --
15    A.    Yes.
16    Q.    -- did you agree with the contents
17 of the overview?
18    A.    Yes.
19    Q.    At Page 2607 it says at the top,
20 "The objective of the Foundation from the outset
21 has two core objectives."
22    A.    Uh-huh.
23    Q.    "Onboard new digital services on to
24 Kin, and 2, build and administer the rewards
25 engine."

210

1    Q.    "Three, build out partner
2 ecosystem."  Correct?
3        Those were the next steps as you
4 understood them?
5    A.    Yes.
6    Q.    And then on the next page, 2608.
7    A.    Yes.
8    Q.    Additional Board Considerations.
9 And there is a list of candidates starting with
10 Olaf Carlson-Wee from Polychain.
11    A.    Yes.
12    Q.    Did you consider these candidates?
13    A.    Yes.
14    Q.    Page 2610?
15    A.    Uh-huh.
16    Q.    I'm at the top under Overview.
17    A.    Yes.
18    Q.    It states, "The Kin Ecosystem will
19 only thrive once there are multiple digital
20 services building experiences for users in
21 capturing the payout from the Kin Rewards Engine,
22 KRE, both within Kik and outside the Kik
23 Messenger environment."
24    A.    Yes.
25    Q.    Is that correct?  Did you agree?

212

1    A.   Yes.  Yes.
2    Q.   And did you agree that there had to
3  be digital services within Kik in order for the
4  Kin Ecosystem to thrive?
5    A.   Within Kik and outside of Kik.  Not
6  just within Kik.
7    Q.   So, at the time you received the
8  overview, were there multiple digital services
9  building experiences for users?
10    A.   Not yet.
11    Q.   Reading down but stay on the same
12  page, on the fourth paragraph it states, "The
13  launch of the rewards engine will need to come
14  with an initial set of launch partners as well as
15  an established funnel of second movers."
16        Do you see that?
17    A.   Yes.
18    Q.   And do you agree with that?
19    A.   Yes.
20    Q.   And had the Foundation identified an
21  initial set of launch partners yet?
22    A.   I think there were early talks or
23  discussions or lists.  Yes.
24    Q.   Nothing final?
25    A.   No.  It was just beginning.

213

1  products that could be bought with Kin?
2    A.   When, today, or --
3    Q.   Well, let's do it in two parts.
4        At the time, were you aware of any
5  real world products that could be bought with
6  Kin?
7    A.   Not at the time.  No.
8    Q.   What about today?  Are you aware of
9  any?
10    A.   Not yet.
11    Q.   Today in 2019, not yet?
12    A.   Correct.
13    Q.   Okay.  You can put those two down.
14        (Whereupon, Exhibit 152
15        was marked for identification.)
16  BY MR. MENDEL:
17    Q.   I have given you what has been
18  marked as Deposition Exhibit 152.
19    A.   Uh-huh.
20    Q.   And, this is an e-mail of Peter
21  Heinke on November 9th, 2017, to you and also
22  copying Ted at Kik and Nancy, correct?
23    A.   Yes.
24    Q.   With the subject Tomorrow
25  Discussion.

215

1    Q.   The next page, 2611.  There is a
2  section marked One, Demonstrate an Appetite For
3  Users to Transact.
4    A.   Uh-huh.
5    Q.   It says uses.  But, it should be
6  users, right?  That is a typo?
7    A.   No, uses, like use cases, think of
8  it as use cases.
9    Q.   Okay.
10    A.   Instead of saying use cases, uses.
11    Q.   Then, on the third paragraph below
12  that header it states, "Tangible real world
13  products are potentially the most impactful.  For
14  a small cost, Kik could purchase items of value,
15  movie tickets, discount coupons, food, drinks, at
16  fast food retailers, and have Kin users spend
17  Kin.
18        "This was proven to success with Kik
19  points where we let users buy Amazon gift cards,
20  sold out extremely fast with each test?"
21    A.   Okay.
22    Q.   Did you agree that real world
23  products were potentially the most impactful?
24    A.   Potentially.
25    Q.   And, are you aware of any real world

214

1        Do you recall this?
2    A.   Now that you put it in front of me,
3  yes.
4    Q.   And it states in the second
5  paragraph this is from Peter, "One of the things
6  we are currently working on is getting an idea as
7  to what the Kin Ecosystem will look like and then
8  determining the various elements that make for
9  sustainable ecosystem."
10    A.   Yes.
11    Q.   Is that true?  Is that what you
12  discussed?
13    A.   Seems that way.
14    Q.   That would have been on the call the
15  next day, right?
16    A.   Yes.
17    Q.   Okay.  That is all for that one.
18  Take your time.
19    A.   One second.
20    Q.   Yep.
21    A.   Okay.  Yes.
22        (Whereupon, Exhibit 153
23        was marked for identification.)
24  BY MR. MENDEL:
25    Q.   I have given you Deposition

216

1  Exhibit 153.  This is another e-mail from
2  Mr. Heinke on November 26, 2017.  This one is to
3  Mr. Raduchel with a cc: to you.
4      **A.**   Right.
5      **Q.**   And a cc: to Nancy Wojtas at Cooley.
6      **A.**   Yes.
7      **Q.**   And the subject line is Economic
8  Model Work Plan.
9          You had written on November 25th, "I
10 think the this McKinsey work plan captures the
11 work pretty well.  However, the real challenge is
12 the initial state.  How do we get buyers and
13 sellers to transact in Kin?  What is that plan?
14 What does it cost?  Who has those resources?  I
15 think this is a major effort."
16          What did you mean by that?
17          MR. CADIGAN:  Wait, that e-mail is
18      from William Raduchel.
19          THE WITNESS:  Yes, it is from me.  I
20      am cc'd there.  I'm not --
21 BY MR. MENDEL:
22      **Q.**   Okay.  Was it your understanding
23 that the initial state as described by
24 Mr. Raduchel had occurred?
25      **A.**   At the time, I mean I was just cc'd,

217

1  so ...
2      **Q.**   He is asking how do we get buyers
3  and sellers to transact in Kin.
4          Was it the case that there were no
5  buyers or sellers yet?
6      **A.**   I wouldn't imply that.  That is,
7  that is his question.  These are his questions.
8  So --
9      **Q.**   What is your memory?  Do you recall
10 any buyers and sellers in Kin at that time?
11     **A.**   We were still early.  He is
12 commenting on the study, I believe, on the
13 economic, on the study.
14     **Q.**   Correct.
15     **A.**   So, William, Bill, let's call him
16 Bill, Raduchel was still getting up to speed on
17 the project.  He was, I was further along than he
18 was from the understanding.
19          So, his questions were more basic
20 maybe.  And these are his questions.  I don't
21 want to comment on his questions.
22          I have no comments, let's say, about
23 this question.
24     **Q.**   Peter, below on November 15th, 2017,
25 there is an invitation to edit a worksheet or a

218

1  spreadsheet.  Do you see that?
2      **A.**   Where is that?  On that same page we
3  have?
4      **Q.**   Yes, it is directly below
5  Mr. Raduchel's e-mail.  Do you see that?
6      **A.**   Okay.  I have invited you to, about,
7  is this to me or to Raduchel?  Raduchel?
8      **Q.**   Well, I'm not sure if it went to you
9  or to Mr. Raduchel, but it is on the e-mail that
10 you eventually received from Mr. Heinke.  Right?
11     **A.**   Yes, but it is not clear whether,
12 maybe it was to Bill Raduchel.  And then I was
13 cc'd, so, I may not have seen it.  I --
14     **Q.**   Well, let me read just the first
15 sentence of that block.
16     **A.**   Yes.
17     **Q.**   Quote below.  It says, "Hi, as per
18 our discussion at the last meeting, we are
19 looking on behalf of the Foundation to engage
20 McKinsey for the purposes outlined in their
21 proposal."
22     **A.**   Okay.
23     **Q.**   So, had McKinsey not been hired yet?
24     **A.**   It doesn't seem that way.  I wasn't
25 directly involved with their hiring, so ...

219

1      **Q.**   Oh, who was?
2      **A.**   It seemed that was Peter and --
3      **Q.**   Did you ever become directly
4  involved with hiring McKinsey?
5      **A.**   No, I was not.
6      **Q.**   That was Peter's responsibility?
7      **A.**   He was one of them it seems like; I
8  don't know who else was involved.
9      **Q.**   Okay.  We can put that one down.
10         By the time you became a director in
11 May 2018 --
12     **A.**   Yes.
13     **Q.**   Was the Kin Rewards Engine, had it
14 come operational?
15     **A.**   Trying to think.  There was a, I'm
16 trying to remember when it became operational.
17         The first payouts were, I can't
18 remember if it was February of '18 or February
19 of '19.  I remember it was February.  We can
20 double-check.  I should know that.
21     **Q.**   You are not sure whether --
22     **A.**   I'm not sure.  I think, I think not
23 yet.
24     **Q.**   You think not yet?
25     **A.**   Yes, I think it came, it became

220

1  operational a bit later on.  We can verify that.
2  I mean the dates are public.
3      Q.   Your best memory is that the first
4  payouts from the Kin Rewards Engine were made in
5  February of 2019?
6      A.   Yes.  I want to say '19.  That would
7  make more sense.  Because we were still
8  recruiting, yes.
9      Q.   Okay.  And so, before the first
10 payouts from the Kin Rewards Engine were made,
11 had the algorithm for the rewards engine been
12 finalized?
13     A.   To a degree.  I mean, there were
14 still some iterations of it.  And I think we were
15 trying to simplify it.
16          Yeah, I think we finalized it after
17 I joined formally.
18     Q.   Were the payouts that you are
19 thinking of in February, were those manual
20 payouts or were those generated by the algorithm?
21     A.   By the algorithm.  It was automated.
22 It was contractual.  There was a contract
23 according to the -- sorry.
24     Q.   What do you mean by contract?
25     A.   I mean, terms.  There were terms

221

1  that, that underlie the agreement with the
2  developers.
3      Q.   Is that what you would describe as a
4  smart contract?
5      A.   No, no.  That is different.  The
6  terms of the engagement with the, each developer
7  had different terms.
8      Q.   I see.
9      A.   Had terms of.
10     Q.   These were developers who joined
11 the --
12     A.   Ecosystem.
13     Q.   The Kin Ecosystem.
14     A.   Yes.
15     Q.   And in order for them to receive
16 rewards they had to enter a contract with the
17 Foundation?
18     A.   Correct.  Correct.
19     Q.   And the Foundation has those
20 contracts?
21     A.   Yes.
22     Q.   Do you know how many payouts the Kin
23 Rewards Engine has made since it has been in
24 operation?
25     A.   I don't know the exact number.  It

222

1  is in the, we will look at those numbers
2  periodically.  But I don't remember them right
3  now.
4      Q.   Could you estimate?
5      A.   No.
6      Q.   Is it --
7      A.   I don't want to give you an
8  uneducated estimate.
9      Q.   Could you give a range?  Are we
10 talking hundreds, thousands, many more than
11 thousands?
12     A.   In dollars?
13     Q.   No, in payouts, in instances of Kin
14 being distributed?
15     A.   To how many developers?
16     Q.   I am talking about each instance of
17 a payout of Kin to a developer, consider that.
18     A.   It is ongoing.  So it is on a
19 monthly basis.  So, that could be a few dozens on
20 a monthly basis.
21     Q.   A few dozens on a monthly basis?
22     A.   Yes.
23     Q.   There could be, but you are not
24 sure?
25     A.   Yes, that is the range.  It is

223

1  related to the number of developers that are in
2  the ecosystem.  And today there are 80 of them or
3  so.
4      Q.   How many?
5      A.   80.
6      Q.   80.
7      A.   About, approximately.
8      Q.   80 today.  And were there any
9  developers at the time that you became a
10 director?
11     A.   There were developers that were
12 developing already, yes, because -- yes.
13     Q.   Were there any developers that had
14 entered a contract with the Foundation at the
15 time you became a director?
16     A.   I think they started to trickle in
17 after.  At least to my knowledge.
18          (Whereupon, Exhibit 154
19          was marked for identification.)
20 BY MR. MENDEL:
21     Q.   So, I have given you what has been
22 marked as Deposition Exhibit 154.
23     A.   Uh-huh.
24     Q.   And this is an e-mail from Chris
25 Cameron dated November 28, 2017, to William

224

1    Raduchel.
2        A.   Yes.
3        Q.   And to you, Mr. Mougayar.
4        And this is an e-mail concerning
5    directors and officer insurance.  Is that right?
6        A.   Yes.
7        Q.   Okay.  And do you know who Chris
8    Cameron is?
9        A.   It seems it says here he is an
10   account executive.
11       Q.   At the, at your insurance broker?
12       A.   At Magnes Group, yes.
13       Q.   Is Magnes Group your insurance
14   broker?
15       A.   I'm not sure who ended up being the
16   insurance.  I'm not sure if they are the ones
17   that ended up.
18       I know we received some quotes.
19   And, but I don't remember who we ended up going
20   with.
21       Q.   Were you involved in obtaining the
22   D&O insurance?
23       A.   No, I was not.
24       Q.   Do you remember receiving this
25   quote?

225

1        Do you see that?
2        A.   Uh-huh.
3        Q.   And then if you flip to the page
4    with the Bates Number 3260 on the bottom, it is
5    the last page.
6        A.   Yes.
7        Q.   You will see that there is a, on the
8    left-hand side there is a rectangular box with
9    different providers listed.
10       A.   Uh-huh.
11       Q.   There is CNA, $5 million, $20,000.
12   And then Trisura $5 million, $10,000.
13       A.   Yes.
14       Q.   And then Berkeley $10 million,
15   $13,000.
16       A.   Okay.
17       Q.   Were these the additional numbers
18   that you were thinking of?
19       A.   Yes, the 20 million, going up to the
20   20 million, that is what I was thinking of.  From
21   the 5 million you showed me in the previous one.
22       Q.   What do you remember about efforts
23   to raise the D&O insurance for the Foundation
24   from 5 million to $20 million?
25       A.   I think Bill Raduchel had suggested

227

1        A.   Not myself, no, I did not.  No.
2        Q.   Okay.  If you go to, well the cover
3    e-mail says, "You will note that the premium for
4    the first 5 million is $20,000."
5        A.   Uh-huh.
6        Q.   Do you recall that being the amount
7    of insurance initially discussed?
8        A.   Vaguely.  I think there were some
9    other numbers that were being proposed.
10       Q.   Okay.  Let's put that one down.
11       A.   Yes.
12           (Whereupon, Exhibit 155
13           was marked for identification.)
14   BY MR. MENDEL:
15       Q.   And here we have as Exhibit 155 an
16   e-mail from Chris Cameron dated December 11th,
17   2017, to Mr. Raduchel and you with a cc: to
18   Mr. Heinke.
19       And, Mr. Cameron states, "Hi
20   everyone, Thanks very much for your patience.
21   Attached is the summary for the D&O quotes we
22   have obtained to build a $20 million tower.  As
23   you will see the current deductible is set at
24   $10,000 but it can be adjusted upwards to
25   capitalize on premium."

226

1    that it goes up to 20.  And I may have agreed to
2    it, I think.
3        Q.   What reasons did Mr. Raduchel
4    provide for increasing the coverage?
5        A.   I'm not sure.  He had more
6    experience than I did probably in sitting on
7    boards.
8        Q.   Do you remember any reasons at all
9    that he discussed with you?
10       A.   No.
11       Q.   Were you both considered potential
12   directors of the Foundation at that time?
13       A.   Yes.
14       Q.   Did you have a view one way or the
15   other about how much insurance to obtain?
16       A.   No, I was going along with Bill's
17   experience and recommendation.
18       Q.   Do you know, it seems at this time
19   by December 11th, Mr. Raduchel still at least
20   under consideration for becoming a director?
21       A.   It seems that way, yes.
22       Q.   And do you know when he finally
23   decided not to become a director?
24       A.   I don't know exactly.  But it was
25   after this communication.

228

**CONFIDENTIAL**                                 **William Mougayar,**
                                                        **12/6/2019**

1      **Q.**   Okay.  You can put that one down.
2           (Whereupon, Exhibit 156
3           was marked for identification.)
4           THE WITNESS:  Yes.
5   BY MR. MENDEL:
6      **Q.**   And then so, Deposition Exhibit 156
7   is an e-mail from Mr. Heinke January 26, 2018,
8   still to you and Mr. Raduchel.  Correct?
9      **A.**   Uh-huh.
10     **Q.**   And he says, well first, you have
11  e-mailed on January 26th, "Is this underway now?"
12     **A.**   Yes.
13     **Q.**   You are talking about the coverage
14  binder, right?
15     **A.**   It seems like subject D&O quote,
16  yes.
17     **Q.**   And, Peter responds, "Yes, it is in
18  place."
19          So, this was the insurance obtained,
20  right?
21     **A.**   Yes.
22     **Q.**   And the underlying e-mail is from,
23  I'm looking at page 3247, it is from Chris
24  Cameron, correct?
25     **A.**   Yes.

                    229

1      **Q.**   So, was the coverage obtained
2   through Magnes?
3      **A.**   Yes.
4      **Q.**   Okay.  You can put that one down,
5   please.
6      **A.**   Okay.
7           (Whereupon, Exhibit 157
8           was marked for identification.)
9   BY MR. MENDEL:
10     **Q.**   And so I'm now giving you what has
11  been marked Deposition Exhibit 157.
12     **A.**   Okay.
13     **Q.**   And this is a, an e-mail from
14  Mr. Heinke June 18th, 2018.  This one is to
15  Mr. Livingston and you.  Correct?
16     **A.**   Okay.  Yes.
17     **Q.**   Are these the final insurance
18  policies that were issued?  And you can take a
19  look at the cover e-mail from Mr. Heinke and then
20  there is starting on Page 3156 in the lower
21  right-hand corner there is a CNA policy.
22     **A.**   Yep.  Yep.
23     **Q.**   And then if you flip forward to
24  Page 3211 there is a Trisura policy.
25     **A.**   3211.  Yep.

                    230

1      **Q.**   Does Exhibit 157, does this consist
2   of the final insurance policies as issued for the
3   Foundation?
4      **A.**   It seems that way, yes.
5      **Q.**   Okay.  And, these reflect the quote
6   that was provided earlier for the tower, right?
7      **A.**   Yes.
8      **Q.**   Up to $20 million in coverage?
9      **A.**   Yes.
10     **Q.**   Was there any additional change to
11  the coverage?
12     **A.**   Not to my knowledge.
13     **Q.**   It stayed the same since this
14  policy?
15     **A.**   Yes.
16     **Q.**   Okay.  Good enough, thank you.
17     **A.**   Sure.
18     **Q.**   So, starting with the period that
19  you became a director.
20     **A.**   Uh-huh.
21     **Q.**   Again, May of 2018.  Is that right
22  or thereabouts?
23     **A.**   Yes, yes, yes.
24     **Q.**   Can you summarize, from that period
25  going forward to the present, what has the

                    231

1   Foundation done?
2      **A.**   Again it is related to two of the
3   priorities that were outlined.  One, the
4   development of the Ecosystem developers.
5           And second the deployment of the
6   KRE, and its evolution.
7           So, we continue to discuss and
8   approve or modify, and make changes to the
9   various agreements of the developers.  We talk
10  about how we are going to communicate what we are
11  doing.  We talk about how the KRE could evolve.
12  And it really focused on the development of the
13  ecosystem.
14          So, that is the main agenda usually
15  of the Kin Foundation.  The achievement is that
16  now we have close to 80 developers in the
17  ecosystem, within a million users that are
18  actively spending or earning Kin, the
19  cryptocurrency, on a monthly basis.
20          And since May that ecosystem has
21  continued to grow.
22          So, we have accomplished what we
23  said we are going to basically, what the
24  Foundation said they would do.
25     **Q.**   Since May of what year?

                    232

1      A.    '18.
2      Q.    Of 2018?
3      A.    Yes.
4      Q.    Since you became a director?
5      A.    That was your question, yes,
6   correct.
7      Q.    Okay.  I just want to make sure.
8   When did the first developer enter a contract
9   with the Foundation?
10     A.    I'm not sure.  I'm not sure.  But it
11  would be in the '18 time frame.
12     Q.    Have there been additional developers
13  in 2019?
14     A.    Yes.  We announced this via
15  Blockpost.  So, there were median Blockposts
16  announcing the first batch, the second batch.
17  And nowadays when there is a significant one we
18  announce it.
19     Q.    And when you say there is a million
20  users, how do you measure that?
21     A.    We have statistics about the number
22  of wallets being created, about the activity of
23  earning activity and the spending activity via
24  the different use cases that exist within the
25  ecosystem.

                      233

1      Q.    And so, is your testimony that there
2   is a million users spending on a monthly basis?
3      A.    Earning or spending, I can't recall
4   if it is necessarily monthly active spenders,
5   spenders.  Spenders.
6      Q.    Those are spenders?
7      A.    Yes.
8      Q.    There is a million spenders?
9      A.    Correct.
10     Q.    And what are the different, and
11  these would be people spending Kin through the
12  developers, correct?
13     A.    Users, inside the apps spending to
14  promote something or it could be earning it and
15  then spending it.
16           So, that is the economy.
17     Q.    Okay.  Does the Foundation today
18  have any employees?
19     A.    No.  Not to my knowledge, I think.
20     Q.    So, who performs functions for the
21  Foundation then?
22     A.    Well, they, there was a group in, in
23  Israel that was the Kin Foundation, the Kin
24  Ecosystem Group.  And they were doing a lot of
25  the work there.

                      234

1      Q.    When you say the group in Israel,
2   who did the group in Israel work for?  Who were
3   they employees of?
4      A.    Of Kik.
5      Q.    Okay.  So the group of Kik employees
6   were the ones doing the work for the Foundation?
7      A.    Uh-huh.
8      Q.    Is that still true today?
9      A.    Since then the group has been wound
10  down.  This was announced and now everything is
11  back in Waterloo.
12     Q.    Was this related to Kik's recent
13  downsizing?
14     A.    Correct.
15     Q.    And that was in 2019, correct?
16     A.    Yes, yes.
17           (Whereupon, Exhibit 158
18           was marked for identification.)
19  BY MR. MENDEL:
20     Q.    I have given you deposition
21  Exhibit 158.
22     A.    Uh-huh.
23     Q.    What is 158?
24     A.    You are asking me?
25     Q.    Well this appears to be an e-mail

                      235

1   chain, correct?
2      A.    Yes.
3      Q.    And at the top it is an e-mail from
4   Katie Tonin.
5      A.    Uh-huh.
6      Q.    Dated July 20th, 2018, to you.
7   Right?
8      A.    Yes.
9      Q.    With a cc: to Eileen Lyon at Kik?
10     A.    Yes.
11     Q.    Who is Katie Tonin?
12     A.    She is Ted's assistant.
13     Q.    And Eileen Lyon, well, she is the
14  general counsel at Kik, correct?
15     A.    Yes.
16     Q.    Okay.  And is Ms. Tonin sending an
17  e-mail about setting up quarterly meetings?
18     A.    Yes.
19     Q.    And are these meetings of the
20  Foundation?
21     A.    Yes.
22     Q.    Why is Mr. Philp attending?
23     A.    He is very helpful.  He is the
24  operations person for Ted.  So, he is very
25  critical.

                      236

1  **Q.**   He is critical to the Foundation's
2  functions?
3  **A.**   Yes, he is.  I would say.
4  **Q.**   And he is a Kik employee, right?
5  **A.**   Yes.
6  **Q.**   And why is Ms. Lyon attending?
7  **A.**   She is the executive counsel, she is
8  the, to take notes and minutes.
9  **Q.**   Was she responsible for doing the
10 minutes of the Foundation meetings?
11 **A.**   That's correct.
12 **Q.**   Do you know why she was performing
13 the function for the Foundation if she was
14 general counsel of Kik?
15 **A.**   Why not?  I mean, I don't
16 understand.
17 **Q.**   Was she serving as the Foundation's
18 in-house counsel?
19       MR. CADIGAN:  Objection.
20       THE WITNESS:  Can I answer --
21       MR. CADIGAN:  Please answer.
22       THE WITNESS:  Her function, she
23   would prepare the board package, the, she
24   would collect feedback to get the agenda
25   done.

237

1       And, later communicate the minutes,
2   the minutes to all of us.
3  BY MR. MENDEL:
4  **Q.**   Did she have a role, did she have a
5  title at the Foundation?
6  **A.**   I'm trying to remember.  I think we
7  probably have her as a secretary.  But I have to
8  remember.
9  **Q.**   It looks like she is performing a
10 secretarial role for the Foundation, correct?
11 **A.**   That's correct, yes, secretary of
12 the Foundation.
13 **Q.**   The Foundation wasn't paying her
14 though, right?
15 **A.**   Not additionally, no.
16 **Q.**   Additionally from what Kik was
17 paying her?
18 **A.**   No.
19 **Q.**   Okay.  I will take that one.
20       (Whereupon, Exhibit 159
21       was marked for identification.)
22 BY MR. MENDEL:
23 **Q.**   I'm giving you what has been marked
24 Deposition Exhibit 159.
25 **A.**   Uh-huh.

238

1  **Q.**   This is an e-mail from you to
2  Mr. Livingston dated July 15th, 2018.
3  **A.**   Yes.
4  **Q.**   And you write in the second
5  paragraph, "Now that the Kin implementation is
6  nearing its operational status, we need to hire a
7  dedicated person to take on the task of managing
8  the relationships with cryptocurrency exchanges
9  so that we can increase the liquidity of the Kin
10 token and widen its true market-making
11 potential."
12 **A.**   Okay.
13 **Q.**   And that was your advice to
14 Mr. Livingston?
15 **A.**   Yes.
16 **Q.**   And he was your co-director of the
17 Foundation at this point, right?
18 **A.**   Yes.
19 **Q.**   What did you mean by operational
20 status for Kin, the Kin implementation.
21 **A.**   I meant that the KRE is now, is now
22 working.  That users can spend and earn the token
23 within the different applications.
24       So, it is that.  That it is working.
25 **Q.**   Your e-mail says it is nearing its

239

1  operational status, right?
2  **A.**   Yes.
3  **Q.**   So, the KRE, Kin Rewards Engine was
4  not operational yet, correct?
5  **A.**   No, nearing it, yes.
6  **Q.**   As of the time of this e-mail?
7  **A.**   Yes.
8  **Q.**   And you wanted to hire a dedicated
9  person to manage relationships with exchanges?
10 **A.**   Yes.
11 **Q.**   Did the Foundation hire a dedicated
12 person?
13 **A.**   We ended up hiring this person that
14 is mentioned here.  Juan Llanos.
15 **Q.**   Was he an employee of the
16 Foundation?
17 **A.**   No, he was a contractor.
18 **Q.**   A contractor.  Who paid, who paid
19 this individual?
20 **A.**   The Foundation paid him.  He was
21 employed by, he was reporting to me partially,
22 mostly I would say.  As it says here.  He
23 reported to me.
24 **Q.**   You knew him previously --
25 **A.**   Correct, yes.

240

1    Q.   -- Mr. Llanos?
2    A.   Yes.
3    Q.   Down below in this e-mail it says,
4  "Budget 15,000 a month for a period of four
5  months plus option to extend by two extra
6  months."
7    A.   Yes.
8    Q.   For a two-thirds FTE, right?
9    A.   Yes.
10   Q.   But he wasn't hired as an employee,
11 right?
12   A.   That's correct.
13   Q.   How did the Foundation get the money
14 to pay him?
15   A.   That was part of the budget that we
16 had.
17   Q.   And my question is, how did, did the
18 Foundation actually make the payment to
19 Mr. Llanos or was it Kik who made the --
20   A.   That I'm not sure.  Because I'm not
21 involved in the operational aspects of it.  We'd
22 have to go back and check.
23   Q.   Who would know the answer to that?
24   A.   Tanner would know, or Peter would
25 know.

                    241

1    Q.   So, you don't know if the cash to
2  pay Mr. Llanos actually came from a Foundation
3  account?
4    A.   No, I wasn't, I don't know.
5    Q.   You don't know.
6    A.   Okay.
7    Q.   Okay.  You can put that one down.
8    A.   Yes.
9         (Whereupon, Exhibit 160
10             was marked for identification.)
11 BY MR. MENDEL:
12   Q.   This is Deposition Exhibit 160.
13   A.   Okay.
14   Q.   An e-mail from you, William
15 Mougayar, to Matthew DiPietro, on July 13th,
16 2018.
17   A.   Yes.
18   Q.   Who is Matthew DiPietro?
19   A.   He is the marketing, the person in
20 charge of Marketing at Kik.
21   Q.   And you write to him, "Sounds good.
22 Talk to you then."  And he had written to you
23 before then that he would call your cell.
24   A.   Okay.
25   Q.   Down further below you write on

                    242

1  July 11th, "At the last meeting yesterday it was
2  agreed that we would keep Kin Kik together from a
3  lot of angles so the separation is not that clear
4  at this point.
5        "The key thing that is definitely in
6  Kin's court is the KRE development.  But that is
7  works in progress and it is further being
8  defined."
9        So this is what you are writing to
10 the, Mr. DiPietro at Kik?
11   A.   Yes.
12   Q.   Okay.  And what did you mean by
13 keeping Kin Kik together from a lot of angles?
14   A.   Let me re-read this --
15   Q.   Take your time.
16   A.   -- so I can refresh my memory on it.
17 I think it was pertaining to the marketing
18 activities.  Is that what the question is?
19   Q.   My question is just what did you
20 mean by it was agreed -- first of all you are
21 referring to a discussion at a meeting.  Right?
22        And since you wrote this on
23 July 11th, you are referring to a meeting the day
24 before on July 11th, 2018.
25   A.   Yes.

                    243

1    Q.   And you are saying, "It was agreed
2  that we would keep Kin Kik together from a lot of
3  angles."
4        And I'm just wondering, first of all
5  who is at this meeting?
6    A.   I'm trying to -- I can't remember
7  that one to be honest.
8    Q.   Okay.  Were you and Mr. DiPietro at
9  the meeting?
10   A.   No, he wasn't at the meeting.  This
11 was a meeting that I was at.
12   Q.   Okay.
13   A.   Perhaps with Ted or Tanner, or
14 others.
15        So, it sounds like I was updating
16 him.
17   Q.   By the word Kin, did you mean the
18 Kin Ecosystem Foundation?  Where you said, "It
19 was agreed that we would keep Kin Kik together
20 from a lot of angles."  The reference to Kin was
21 the Foundation?
22   A.   Yes.  Would be.
23   Q.   And the reference to Kik is the
24 company Kik Interactive, Inc.?
25   A.   Or it would be Kin Ecosystems.  "It

                    244

1  was agreed that we would keep Kin Kik together
2  from a lot of angles."
3          Yeah, it could be either Kin
4  Foundation or Kin Ecosystem.  But, yes.
5      Q.   Was Mr. DiPietro performing
6  marketing functions for the Foundation or the
7  Ecosystem?
8      A.   Not yet.  He was beginning to.  He
9  was going to be doing it.  But not officially,
10 not ...
11     Q.   What marketing efforts were being
12 considered?
13     A.   He was more involved with Kik
14 specifically, not with Kin.
15          There was a plan to make him do more
16 work for Kin.  But these plans did not
17 materialize.  He ended up leaving the company
18 subsequently.
19     Q.   When did he leave?
20     A.   I'm trying to remember when he left.
21 A few months after this memo.  He wasn't doing a
22 very good job.  We were not very pleased with his
23 performance.  So he ended up leaving the company.
24     Q.   Did someone replace him to take on
25 the marketing role for the ecosystem?

245

1      A.   No.
2      Q.   Did someone replace him to take on a
3  marketing role for Kik?
4      A.   No, not that I know of.
5      Q.   Okay.  You can put that one down.
6          (Whereupon, Exhibit 161
7          was marked for identification.)
8  BY MR. MENDEL:
9      Q.   So, I have given you what has been
10 marked Deposition Exhibit 161.
11     A.   Yes.
12     Q.   And this is a group of e-mails that
13 you appear to have received or rather would you
14 describe them as calendar invites?
15     A.   It seems that way, yes.
16     Q.   These are Google calendar invites?
17     A.   Yes.
18     Q.   And, just for the record, these are
19 nonconsecutive Bates Numbers.
20          So, on the lower right-hand corner?
21     A.   Okay.
22     Q.   But, it is a group of invites that
23 you appear to have received.  And these were
24 calendar invitations that were sent between
25 July 23rd 2018 on the front page; is that right?

246

1      A.   Yes.
2      Q.   And I believe the last one was sent
3  on December 20th, 2018.
4      A.   Okay.
5      Q.   And they were for meetings planned
6  between August 3, 2018, and July 25, 2019.
7      A.   Uh-huh.
8      Q.   If you could take just a minute to
9  look through and confirm that these are Google
10 calendar invites that you received.
11     A.   Yes.  Yep.
12     Q.   So, you will see, looking at the
13 first page of Exhibit 161, this is a Google
14 calendar document sent July 23rd, 2018, for a
15 meeting scheduled for October 11th, 2018.  Right?
16     A.   Okay.
17     Q.   And the subject is Kin Foundation
18 Q4.
19     A.   Uh-huh.
20     Q.   So, this was a meeting planned to
21 discuss the Foundation in Q4.
22          Would this be considering the
23 quarter past or the quarter coming up?
24     A.   There was the quarter, this is sent
25 in July.

247

1      Q.   Right.  And the meeting is set for
2  October 11th.
3          So, the October 11th meeting would
4  you -- I guess I'm trying to just --
5      A.   The fourth.
6      Q.   The fourth quarter would be a
7  calendar year?
8      A.   Yes.
9      Q.   Okay.  And it says in terms of who
10 would attend it would be Mr. Livingston, Katie
11 Tonin, his assistant, right?
12     A.   Uh-huh.
13     Q.   Eileen Lyon, you William Mougayar,
14 and Tanner Philp, correct?
15     A.   Katie would not attend.  She was
16 just the organizer.
17     Q.   Just the organizer.  Everyone else
18 would attend?
19     A.   Yes.
20     Q.   And this was a consistent set of
21 people who would attend these meetings?
22     A.   Yes.
23     Q.   Can you look at the invite for, go
24 to the page that says 3240 in the lower right
25 corner.

248

1     **A.**   Yes.
2     **Q.**   This was an invite sent on
3 August 2nd, 2018, and the subject is Kin
4 Foundation.  Call Ed Mondo, Ed Modo, excuse me.
5         Do you see that?
6     **A.**   They are one of the developers.
7     **Q.**   And in terms of who is going to
8 participate, you have Dany Fishel attending as
9 well, correct?
10     **A.**   Yes.
11     **Q.**   And he is a Kik person?
12     **A.**   Yes.
13     **Q.**   He was in Israel, right?
14     **A.**   Correct.
15     **Q.**   He was part of the Israel group?
16     **A.**   Yes.  Correct.
17     **Q.**   What about Matt Hibberd.
18     **A.**   He was part of the U.S. Kik.
19     **Q.**   What was his role?
20     **A.**   Also the developer's relations,
21 getting developers on board in the U.S.
22     **Q.**   Okay.  That is all for that one.
23     **A.**   Okay.
24         (Whereupon, Exhibit 162
25         was marked for identification.)

249

1 BY MR. MENDEL:
2     **Q.**   So, I have given you Deposition
3 Exhibit 162.
4     **A.**   Yes.
5     **Q.**   And this is a September 13th, 2018,
6 e-mail from Matt Hibberd to Juan Llanos.
7     **A.**   Uh-huh.
8     **Q.**   He is the individual that you
9 mentioned that working on the exchange project or
10 the exchange listing project?
11     **A.**   Correct, yes.
12     **Q.**   Dany Fishel is also listed and there
13 is a cc: line that includes you and others.
14         And this is actually Mr. Matt
15 Hibberd had just responded adding Dany Fishel.
16     **A.**   Uh-huh.
17     **Q.**   And presumably everyone else on this
18 e-mail was already notified.
19     **A.**   Yes.
20     **Q.**   Correct?  The e-mail is the list of
21 attendees, or, I'm sorry, recipients and then
22 Mr. Fishel was added.
23     **A.**   Yes.
24     **Q.**   Do I have that right?
25     **A.**   Yes.

250

1     **Q.**   And is this an update on the project
2 run for the exchange listing?
3     **A.**   Yes, that was Juan sending us an
4 update.
5     **Q.**   There is a domain name
6 kinecosystem.com.
7     **A.**   Uh-huh.
8     **Q.**   Where did that domain name come
9 from?
10     **A.**   That was the domain they had before
11 they were able to secure the Kin domain, I
12 believe.  So, Kinecosystem is one of them.  And,
13 you know, that was the one that they had obtained
14 before.
15     **Q.**   Do you know why Mr. Hibberd is using
16 that domain name rather than the Kik domain name?
17     MR. CRIMMINS:  Objection.
18 BY MR. MENDEL:
19     **Q.**   You can answer.
20     **A.**   They were being used
21 interchangeably, I think.  Because he was doing
22 work on behalf of the, to grow the Kin Ecosystem.
23 So that is how the ecosystem is known to the
24 outside, the Kin Ecosystem.
25     **Q.**   Does this reflect, there is a

251

1 section that says 2018-09-13 Update.  This week's
2 progress table.
3     **A.**   Uh-huh.
4     **Q.**   Does this summarize the status of
5 the different exchanges that had been contacted?
6     **A.**   Yes.
7     **Q.**   Or at least considered?
8     **A.**   Yes, that is what it says, yes.
9     **Q.**   Okay.  And so at this point, on
10 September 13th, 2018, there were no exchanges
11 that had been signed up, correct?
12     **A.**   That's correct.  Yes.
13     **Q.**   And none were operational?
14     **A.**   Correct.  Zero.
15     **Q.**   And there were four that were
16 disengaged, correct?
17     **A.**   Yes.
18     **Q.**   That is all I have for that one.
19     **A.**   Okay.
20     MR. MENDEL:  Why don't we go off the
21 record.  We have to change the tape.
22     THE VIDEOGRAPHER:  We are going off
23 the record.  This is the end of Media Unit
24 Number 3.  The time is 4:54 p.m.
25     (Recess taken -- 4:54 p.m.)

252

1    (After recess -- 5:05 p.m.)
2    THE VIDEOGRAPHER:  We are back on
3  the record.  This is the beginning of Media
4  Unit Number 4.  The time is 5:05 p.m.
5    (Whereupon, Exhibit 163
6    was marked for identification.)
7  BY MR. MENDEL:
8    Q.    Mr. Mougayar, I have handed you what
9  has been marked as Deposition Exhibit 163.  It
10  says Draft Kin Ecosystem Foundation Minutes of
11  the Meeting of the Board of Directors,
12  October 11th, 2018.  Right?
13    A.    Yes.
14    Q.    So, this is unsigned.  And then on
15  the back you will see Eileen Lyons, Secretary,
16  right?  Does that refresh your memory of what
17  role she had?  She was a secretary.
18    A.    Yes.
19    Q.    And, Ted Livingston, Chair.
20    A.    Yes.
21    Q.    So, when it says Ted Livingston,
22  Chair.  Did you have another, like title as a
23  director?
24    A.    No.
25    Q.    Is he like perceived as -- by a

253

1  Chair, does he have a lead role as a director?
2    A.    It is more administrative.  I mean
3  he calls the meeting to order.
4    Q.    Okay.  He is the Chair of the Board
5  Of Directors, okay.  And you are just a director?
6    A.    Yes.
7    MR. CADIGAN:  Objection.
8  BY MR. MENDEL:
9    Q.    I'm on the first page now, 2303, in
10  the last paragraph.
11    There was a discussion.  I am
12  reading from the carryover sentence starting
13  "There was a discussion."
14    Do you see that sentence?
15    A.    A brief discussion of the expenses?
16    Q.    Within that paragraph.
17    A.    Okay.
18    Q.    Second to the last line there was a
19  discussion.
20    A.    Yes, yes.  I am on it, yes.  There
21  was a discussion.
22    Q.    "There is a discussion of the extent
23  to which funds raised by Kik in the initial coin
24  offering, ICO, in September 2017 were to be
25  provided to the Foundation to fund the

254

1  development of the Ecosystem as opposed to be
2  used to fund Kik operations."
3    A.    Uh-huh.
4    Q.    "In the discussion that followed, it
5  was recognized that certain expenses should be
6  paid for by the Foundation, for example, legal,
7  audit, rent, partnerships, director fees, and
8  insurance, but that a portion of the funds raised
9  in the ICO were for the establishment and
10  development of the ecosystem and that a suitable
11  mechanism had to be established for those funds
12  to flow to the Foundation."
13    I will stop there.  Were funds
14  raised in ICO provided from Kik to the
15  Foundation?
16    A.    Were funds raised in the ICO made
17  available to the Foundation, that is your
18  question?
19    Q.    Yes.
20    A.    Yes, that is what this says.
21    Q.    Well, this says that there was a,
22  there was a discussion that recognized that a
23  portion of the funds raised in the ICO were for
24  the establishment and development of the
25  ecosystem.  And that a suitable mechanism had to

255

1  be established for those funds to flow to the
2  Foundation.
3    My question is, was that mechanism
4  established?
5    A.    Oh, I see.  Not, I mean, this is,
6  this was reflected in the loan.  So, the, it is a
7  loan.  And it is the loan that funds our
8  operations at this point.
9    Q.    And how much, was this the loan that
10  we just talked about earlier?
11    A.    Yes, yes.  The Foundation does not
12  have -- yes, that was the loan, yes.
13    Q.    Okay.  And we talked about a loan
14  being $100,000?
15    A.    100 and change, I think if I recall.
16    Q.    And you are not aware of any further
17  distribution of funds from Kik to the Foundation
18  besides that loan?
19    A.    That's correct.
20    Q.    Okay.  You can put that one down.
21    (Whereupon, Exhibit 164
22    was marked for identification.)
23  BY MR. MENDEL:
24    Q.    And Mr. Mougayar, I have given you
25  what has been marked as 164.

256

CONFIDENTIAL                              William Mougayar,
                                         12/6/2019

1      A.   Yes.
2      Q.   Deposition Exhibit 164.
3           And it says on the, it is a slide
4    presentation; is that right?
5      A.   Uh-huh.
6      Q.   The first page is 1540.  And it says
7    Legal Separation, January 19th, 2019, correct?
8      A.   Yes.
9      Q.   What is this PowerPoint for?
10     A.   I think this was a proposal.
11     Q.   A proposal by who?
12     A.   I think Brandon had worked on that.
13     Q.   I'm sorry, who?
14     A.   Brandon.
15     Q.   And who is Brandon?
16     A.   He is a finance director at Kik.
17   His name figures in some of those.  He kind of
18   replaced Peter's, he took Peter's job, basically.
19     Q.   Mr. Heinke?
20     A.   Yes.
21     Q.   And who was he proposing to legally
22   separate?
23     A.   Who was he proposing?
24     Q.   It says legal separation.  What is
25   being separated under his proposal?

                        257

1      A.   I'm trying to refresh my memory on
2    this.  Because we discussed it, but we didn't, it
3    was not, it was not initiated.
4           There was a point where we were
5    discussing the, having a Kin business unit that
6    would be separate from Kik.
7           So, this was in relation to that.
8      Q.   Was the Kin Foundation, was the Kin
9    business unit to be part of the Foundation?  Or
10   separate?
11     A.   We had not discussed that.
12     Q.   Was it a business unit to be broken
13   off of Kik?
14     A.   Yes, that was the proposal.  That
15   was an idea.  It was a plan.  It wasn't done yet.
16     Q.   It wasn't executed on?
17     A.   No, it was one of the options at the
18   time.
19     Q.   Because up until this time, the Kin
20   Ecosystem was being worked on by the Israel
21   group, a part of Kik, right?
22     A.   Yes, yes, yes.
23     Q.   Are you familiar with any services
24   contract between the Foundation and Kik under
25   which the work was performed?

                        258

1      A.   Yes, we had entered into an
2    agreement where Kik would perform services for
3    the Kin Foundation, I recall that.
4      Q.   Was this agreement, was it
5    formalized?  Was it signed and executed?
6      A.   I believe so.  If I recall that was
7    done a while back.
8      Q.   Do you know when?
9      A.   A few months ago.  I want to guess
10   in '18.
11     Q.   Okay.
12     A.   In '18.
13     Q.   Did you, were you a director at the
14   time the agreement was entered into?
15     A.   From memory, I would say yes it
16   would have been after May of '18.
17     Q.   Okay.  So you would have signed it
18   or you would have voted on it?
19     A.   Yes, that is my recollection.  That
20   is so far.  I am not positive 100 percent.  But,
21   that is what I remember right now.
22     Q.   So, before this services agreement,
23   was there any other agreement under which Kik
24   employees provided services to the Foundation?
25     A.   I don't think so.  Not under a

                        259

1    formal agreement.  Not under an agreement.  I
2    have to recall, I have to see the agreement again
3    to see what period it covered.  So I don't
4    remember exactly.  I don't want to just, yeah, I
5    just don't remember.
6      Q.   Are you aware of any money being
7    paid from the Foundation to Kik under the
8    services agreement?
9      A.   From the Foundation to Kik?
10     Q.   Correct.
11     A.   I don't remember that.  I would have
12   to look at the agreement to really refresh my
13   memory.
14     Q.   Well.  I'm just asking if you can
15   remember, sitting here today, any -- anything of
16   value being provided from the Foundation to Kik
17   as compensation under the services agreement?
18     A.   No, I don't remember that.
19     Q.   So, how was it that Kik was
20   providing the services?  Was it for free?
21     A.   Some of it was for free, yes.
22     Q.   What was for free?
23     A.   Whatever had to be done on it.
24     Q.   Kik was just doing it for the
25   Foundation for free?

                        260

1     A.   In some cases.  And they were being
2  paid by Kik.  Yes.
3     Q.   And that was under the agreement?
4     A.   I would have to look at the
5  agreement.
6     Q.   You don't know what the agreement
7  says without looking at it, correct?
8     A.   Correct.
9     Q.   But you are not aware of any
10 compensation being provided to Kik?
11    A.   That's correct.
12    Q.   Have you paid any legal bills
13 related to the SEC investigation or this lawsuit?
14    A.   Have I personally?
15    Q.   Correct.
16    A.   No.
17    Q.   Is it, do you have an understanding
18 who is covering your bills?
19    A.   Yes.
20    Q.   Who?
21    A.   The Kik.
22    Q.   Kik is paying the bills?
23    A.   Yes.
24    Q.   It is not covered by the insurance
25 policy that the Foundation took out?

261

1     A.   Yes, that is correct.  It is
2  covered, it is, yeah, correct.  I should correct
3  myself.  It is my understanding.  But, I'm not
4  very, very close to that.
5         I think it was covered by the
6  insurance policy.  But, I'm not 100 percent sure.
7     Q.   You are not -- okay.  You haven't
8  personally paid any out of pocket costs?
9         Like are you paying for any of your
10 travel expenses to D.C.?
11    A.   Yes, so far I don't know who is
12 going to pay me anything back to be honest.  I
13 have paid my way here.  I was under the
14 assumption that I would get reimbursed by the SEC
15 for travel and hotel.
16        But, aside from that, I am not
17 getting reimbursed by Kik or Kin Foundation for
18 any other expenses for this trip.
19    Q.   Has anybody made any payments to you
20 at all for appearing for this deposition?
21    A.   Not at all.
22    Q.   Has anyone made any payments to you
23 for preparing for this deposition?
24    A.   No.
25    Q.   And do you have any understanding

262

1  with anyone for future payments to you for either
2  preparing for the deposition or attending the
3  deposition?
4     A.   No.  There is none of that, no,
5  there is none of that.
6     Q.   And since September 2017 you have
7  received $5,000 a month, correct?
8     A.   Of which year?  September?
9     Q.   Since you, let me rephrase.
10        Since your testimony earlier was
11 since becoming a director, your compensation as a
12 director is $5,000 a month.
13    A.   Yes, there was a period of maybe
14 three months where it was decided that I would
15 get 10,000 instead of five.  There was a
16 transitional period where we were, I think
17 forming, I think it would have been maybe the end
18 of '17, or end of '18 perhaps.  Only three months
19 where I would, I was getting paid 10,000 instead
20 of five because there was extra work being --
21        It reflected the additional amount
22 of time that was, that I was spending.
23    Q.   When was that?
24    A.   I would have to look at the
25 contract.  I think it was in the fall of '18.  It

263

1  would have been in the fall of '18.
2     Q.   Did you meet with any lawyers to
3  prepare for today's deposition?
4     A.   I met with my lawyer.
5     Q.   You met with Mr. Crimmins?
6     A.   Correct.
7     Q.   Did you meet with lawyers from
8  Cooley?
9     A.   We had a call on Monday.  A brief
10 call.
11    Q.   Okay.  Just a brief call?
12    A.   Yes.
13    Q.   How long did you meet with
14 Mr. Crimmins?
15    A.   Yesterday?
16    Q.   Yes.
17    A.   About three and a half hours.
18    Q.   You met in his office?
19    A.   Yes.
20    Q.   Did you review documents?
21    A.   We reviewed the --
22        MR. CRIMMINS:  Not what the
23 documents were.  But you can say whether you
24 reviewed documents.
25        THE WITNESS:  Yes, we reviewed

264

CONFIDENTIAL                                    William Mougayar,
12/6/2019

```
 1   documents, yes.
 2   BY MR. MENDEL:
 3       Q.   Okay.  About how many?
 4       A.   In terms of quantity?
 5       Q.   Quantity, correct.
 6       A.   Is an e-mail a document?
 7       Q.   Yes.
 8       A.   So, one e-mail is one document?
 9       Q.   Yes.  Like what I have been dealing
10   with, giving you today, exhibits, like one
11   exhibit is a document.  So --
12       A.   Yeah, about the same amount.  I
13   would say a binder of --
14       Q.   A binder of documents?
15       A.   Yes.
16       Q.   And did those documents refresh your
17   recollection?
18       A.   Yes.  Yes.
19       Q.   Besides your preparation yesterday,
20   did you do anything else to prepare for the
21   deposition?
22       A.   I re-read a number of the e-mails
23   that --
24           MR. CRIMMINS:  Don't discuss
25       anything that I might have told you to do.
```
                              265

```
 1           THE WITNESS:  Yes.  I re-read the
 2   e-mails that were pertinent to my involvement
 3   with the company.
 4           MR. MENDEL:  I pass the witness.
 5           MR. CADIGAN:  I waive.  I have no
 6   questions.
 7           MR. CRIMMINS:  No questions.
 8           MR. MENDEL:  Thank you,
 9   Mr. Mougayar.
10           THE WITNESS:  Thank you.
11           THE VIDEOGRAPHER:  Please stand by.
12   We are off the record at 5:20 p.m., and this
13   concludes today's testimony of William
14   Mougayar.
15           The total number of media units used
16   was four.
17           (Whereupon, signature not having been
18   waived, the deposition concluded at 5:20 p.m.)
19                    * * *
20
21
22
23
24
25
```
                              266

```
 1           CERTIFICATE OF COURT REPORTER
 2   UNITED STATES OF AMERICA  )
 3   DISTRICT OF COLUMBIA      )
 4        I, LORI J. GOODIN, RPR, CLR, CRR, the
 5   reporter before whom the foregoing deposition was
 6   taken, do hereby certify that the witness whose
 7   testimony appears in the foregoing deposition was
 8   sworn by me; that the testimony of said witness
 9   was taken by me in machine shorthand and
10   thereafter transcribed by computer-aided
11   transcription; that said deposition is a true
12   record of the testimony given by said witness;
13   that I am neither counsel for, related to, nor
14   employed by any of the parties to the action in
15   which this deposition was taken; and, further,
16   that I am not a relative or employee of any
17   attorney or counsel employed by the parties
18   hereto, or financially or otherwise interested in
19   the outcome of this action.
20
21        _____
22        LORI J. GOODIN, RPR, CLR, CRR, RSA
23        Notary Public in and for the
24        District of Columbia
25   My Commission expires:  May 14, 2021
```
                              267

```
 1        DECLARATION UNDER PENALTY OF PERJURY
 2
 3
 4
 5
 6
 7        I declare under penalty of perjury
 8   that I have read the entire transcript of
 9   my Deposition taken in the captioned matter
10   or the same has been read to me, and
11   the same is true and accurate, save and
12   except for changes and/or corrections, if
13   any, as indicated by me on the DEPOSITION
14   ERRATA SHEET hereof, with the understanding
15   that I offer these changes as if still under
16   oath.
17        Signed on the _____ day of
18   _____, 20_____.
19
20   _____
21        William Mougayar
22
23
24
25
```
                              268

**CONFIDENTIAL**

William Mougayar,
12/6/2019

```
 1          ERRATA SHEET
 2  Deposition of: WILLIAM MOUGAYAR
    Date taken: DECEMBER 6, 2019
 3  Case: SEC vs. KIK INTERACTIVE, INC.
    PAGE LINE
 4  _____ _____ CHANGE: _____
            REASON: _____
 5
            CHANGE: _____
 6          REASON: _____
 7  _____ _____ CHANGE: _____
            REASON: _____
 8
            CHANGE: _____
 9          REASON: _____
10  _____ _____ CHANGE: _____
            REASON: _____
11
            CHANGE: _____
12          REASON: _____
13  _____ _____ CHANGE: _____
            REASON: _____
14
            CHANGE: _____
15          REASON: _____
16  _____ _____ CHANGE: _____
            REASON: _____
17
            CHANGE: _____
18          REASON: _____
19  _____ _____ CHANGE: _____
            REASON: _____
20
            CHANGE: _____
21          REASON: _____
22  _____ _____ CHANGE: _____
            REASON: _____
23
24
    Signed _____
25  Dated _____
```

269

```
 1          ERRATA SHEET
 2  Deposition of: WILLIAM MOUGAYAR
    Date taken: DECEMBER 6, 2019
 3  (Errata Page 2)
    PAGE LINE
 4  _____ _____ CHANGE: _____
            REASON: _____
 5
            CHANGE: _____
 6          REASON: _____
 7  _____ _____ CHANGE: _____
            REASON: _____
 8
            CHANGE: _____
 9          REASON: _____
10  _____ _____ CHANGE: _____
            REASON: _____
11
            CHANGE: _____
12          REASON: _____
13  _____ _____ CHANGE: _____
            REASON: _____
14
            CHANGE: _____
15          REASON: _____
16  _____ _____ CHANGE: _____
            REASON: _____
17
            CHANGE: _____
18          REASON: _____
19  _____ _____ CHANGE: _____
            REASON: _____
20
            CHANGE: _____
21          REASON: _____
22  _____ _____ CHANGE: _____
            REASON: _____
23
24
    Signed _____
25  Dated _____
```

270