# SEC42

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )

)

KIK INTERACTIVE, INC. ) File No. HO-13388-A

WITNESS: Michael Hourigan

PAGES: 1 through 66

PLACE: Securities and Exchange Commission

44 Montgomery Street, Suite 2800

San Francisco, California 94104

DATE: Tuesday, July 24, 2018

The above-entitled matter came on for hearing, pursuant to notice, at 9:47 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:
BRENT MITCHELL, ESQ.
STEPHAN SCHLEGELMILCH, ESQ.
JAMES MURTHA, ESQ.
(Via Videoconference)
Securities and Exchange Commission
Division of Enforcement
100 F Street NE, Washington, D.C. 20549

On behalf of the Witness:
MICHAEL COHN, ESQ.
ALEX POPESCU, ESQ.
1345 Avenue of the Americas, Floor 2
New York, New York 10105
(212) 798-6100

Also Present:
Jefree Anderson, Videographer
FernandoBernardo, Paralegal
Kara Krakowar
Tyler Martin

CONTENTS

| WITNESS | EXAMINATION |
|---|---|
| Michael Hourigan | 6 |

| EXHIBIT | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 1 | Formal Order | 7 |
| 72 | Subpoena | 63 |
| 73 | E-mail chain, SEC-PBDigital-E-0000348 to 351 | 28 |
| 74 | E-mail, SEC-PBDigital-E-00086 through 95 | 34 |
| 75 | E-mail chain, SEC-PBDigital-E-0000429 to 430 | 46 |
| 76 | Executed SAFT contract | 55 |

PROCEEDINGS

THE VIDEOGRAPHER: Here begins DVD one in the testimony of Michael Hourigan in the investigation by the U.S. Securities and Exchange Commission in the matter of Kik Interactive, File Number HO-13388-A.

Today's date is July 24th, 2018. The time on the video monitor is 9:47 a.m.

The video operator today is Jefree Anderson, contracted by Behmke Reporting and Video Services, subcontracted by Diversified Reporting Services, Incorporated.

This video investigation is taking place at 44 Montgomery Street, Suite 2800, San Francisco, California.

The court reporter today is Carol Worsdell, certified shorthand reporter, contracted by Diversified Reporting Services, Incorporated.

Counsel, please voice identify yourselves for the record.

MR. COHN: My name is Michael Cohn. I am the chief compliance officer and deputy general counsel at Fortress, Mr. Hourigan's employer.

MR. POPESCU: I am Alex --

MR MITCHELL: Why don't you both -- why don't you both --

MR. COHN: Go ahead.

MR. POPESCU: I am Alex Popescu. I work at Fortress Investment Group as well. I am Michael Hourigan's employer. My title is counsel and director of compliance for Fortress's credit business.

MR MITCHELL: Great. And we are doing this by video conference in Washington, D.C. I am Brent Mitchell. I am an attorney in the enforcement division of the SEC.

I will have my colleagues introduce ourselves, but the three of us are all officers of the Commission for purposes of this investigation.

MR. MURTHA: James Murtha, Division of Enforcement.

MR. SCHLEGELMILCH: Stephan Schlegelmilch. I am in the trial unit in the division of enforcement.

MR MITCHELL: And then we also have two interns who are here, Kara Krakowar, K-R-A-K-O-W-A-R, and Tyler Martin.

Jefree, do you have more -- anything more to your opening?

THE VIDEOGRAPHER: I have no more to my opening, and there's nothing here that asks for the deponent to be sworn in, correct?

MR MITCHELL: Right. I can do that here.

Yeah, I can -- I can do that.

Mr. Hourigan, could you -- if you could raise your right arm, do you swear or affirm to tell the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

Whereupon,

MICHAEL HOURIGAN,

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR MITCHELL:

**Q Can you please state and spell your full name for the record.**

A Michael Hourigan, M-I-C-H-A-E-L. H-O-U-R-I-G-A-N.

MR. MURTHA: Mr. Hourigan, you can put your arm down. Thank you.

THE WITNESS: Just making sure.

BY MR MITCHELL:

**Q Yeah, sorry. Sorry.**

**This is an investigation of the United States Securities and Exchange Commission in the matter of Kik Interactive to determine whether there have been violations of certain provisions of the federal securities laws. However, the facts developed in this**

**investigation might constitute violations of other federal or state, civil or criminal laws.**

**Prior to the opening of the record, Mr. Hourigan, you were provided with a copy of the formal Order of Investigation in this matter as supplemented. It's the two documents up there that say Formal Order and Supplemental Formal Order. Those will be available for your examination during the course of the proceedings.**

**Have you had an opportunity to review the Formal Order?**

A Yes.

(SEC Exhibit No. 1 was identified for the record.)

BY MR. MITCHELL:

**Q Prior to the opening of the record, you were also provided with a copy of the Commission's Supplemental Information form, sometimes called Form 1662. A copy of that notice should be in front of you marked as Exhibit 1. Have you had an opportunity to read Exhibit 1?**

A Yes.

**Q Do you have any questions concerning this exhibit?**

A No.

**Q All right. We have already identified your lawyers, and, sorry, the other person --**

MR. MITCHELL: Fernando, you are still in San Francisco, right?

MR. BERNARDO: Yes.

MR MITCHELL: Great. So Fernando Bernardo, also a staff member in the SEC enforcement division, is actually in the room in San Francisco. All right. Any other preliminaries?

BY MR. MITCHELL:

**Q All right. So, again, we really do appreciate your coming and talking to us. We are going to try to move this along expeditiously, but what we would like to do is sort of start off with your background. If you could just sort of give us your sort of resume level background since high school to walk through your education and the jobs that sort of led you to where you are now.**

A Sure. I grew up in a small town near Scranton, Pennsylvania. I went to college at the University of Notre Dame. After that, I worked in D.C. for a year for Hillary Clinton when she was senator from New York. I then went to Harvard Law School. I worked at Morgan, Stanley doing investment banking in New York for about three years after that, and then I moved out

to the Bay Area to become the COO of a tech hedge fund in 2010. I did that for about five years, and then I joined Fortress Investment Group in 2015 where I have been for the last three years.

**Q What was the name of the tech hedge fund?**

A Thompson P. Capital.

**Q And does it -- I can't track every hedge fund. Are they -- do they still exist?**

A No.

**Q Okay. So did you close down the fund when you -- at roughly the same time you moved over to Fortress?**

A Yes.

**Q When you got to Fortress, what was your job when you got -- what was your role at Fortress when you -- when you got there?**

A I was working in the family office of one of the founders, Peter Briger, helping to manage all of his personal investments.

**Q And is that still the job that you have today?**

A Yes.

**Q So you -- sorry, is the family office part of Fortress or separate from Fortress?**

A It is part of Fortress.

Page 10

MR. COHN: May I interrupt with just one thing? As a technical matter --

MR MITCHELL: Oh, yeah, sure.

MR. COHN: Yeah, sorry. This is Michael Cohn. As a technical matter, there is no such thing -- we use the term "family office" -- sorry, I think we have discussed this previously. We use the term "family office" to mean the group of human beings who are employees of Fortress who help Pete Briger or, in other cases that are so-called family offices within Fortress -- help them manage their personal investments, but there is no separate entity or organization that is literally the family office. I could become part of Pete's family office simply by someone telling me: You are now part of Pete's family office, and I wouldn't change employers or anything like that. So it's more of a function than it is an actual literal family office.

MR MITCHELL: Sounds great.

BY MR. MITCHELL:

**Q So building right from there, what's the function that you do? Sort of describe what your -- what your role is working for Fortress.**

A So my role for the first couple of years was to help manage all of the personal investments that Pete Briger has which range from, you know, investments in

Page 11

Fortress funds, investments in external -- externally managed funds, as well as direct investments in startup companies. For the last year or so, I have been primarily focused on the cryptocurrency markets and the investments that we make and that we have made in that space. So that's been my primary focus for the last year or so.

**Q And who do -- who do you work for?**

A I work directly for Pete.

**Q Who do you report to?**

A To Pete.

**Q And I'm sorry, and Pete Briger is the founder of Fortress that you were discussing before.**

A One of them, yes.

**Q We are going to talk about some other folks during the -- during our conversation today. One of them is named Dan Morehead. Do you know Dan Morehead?**

A Yes.

**Q So who is Dan Morehead?**

A Dan Morehead I believe has been friends with Pete since college, and he was previously I think the CFO of Tiger Management which is a huge, you know, global macro hedge fund. He founded a firm called Pantera Capital like, I don't know, maybe five years ago or so which has focused primarily on, you know, digital

Page 12

assets and cryptocurrency investments, so I know him, you know, in that context.

**Q So he has been at Pantera for the full time you have been at Fortress.**

A Yes, and even more so, yep.

**Q And then there's another person named Drew McKnight. Do you know Drew McKnight?**

A Yes. He is one of the senior, you know, members of Pete's credit fund team and is I think on the management committee of the firm as well, so he's -- you know, a senior partner level guy at Fortress.

**Q So earlier you talked about crypto assets or sort of where you are specialized today. I just want to sort of make sure that you and I are using the same kind of terms. We are going to talk today about the Kin token that Kik Interactive sold or bitcoin or ether or things like that. When you talk about those kinds of things, what do you sort of -- in your daily business, is there a term you use for those kinds of things?**

A I would refer to them as digital assets, but cryptocurrency is just fine, too.

**Q Digital assets.**

A Either one is fine.

**Q Sounds great. So what's your experience with digital assets?**

Page 13

A So, you know, I personally invested in bitcoin, you know, a few years ago, and so I had some interest in the area, and then when I joined in my current role, Pete had a substantial amount of bitcoin in the portfolio and also had some other investments related to that space, so I had a great opportunity to learn a lot about, you know, that new asset class in the last couple of years, and then as these new, you know, forms of digital assets and companies related to them emerged last year, I took a great interest in that and, you know, have developed a little bit of a -- of a specialty in it along the way, although it's a very nascent market so, you know, I think everyone is just kind of learning as they go.

**Q When you say that -- I want to sort of try to focus you on the time when you were considering whether to purchase Kin tokens say in the early summer of last year. At that point of -- in terms of the portfolio you are managing, how much of that was in digital assets?**

A As a percentage of the overall portfolio of Pete or --

**Q Percentage -- yeah, well, both actually. Do you remember what -- how much sort of value you had in digital assets roughly at that time, by that time?**

A You know, the market is so volatile, I don't

recall the percentage. It changes quite a bit on a daily basis so I don't really know.

**Q What about amount? Did you have millions of dollars or hundreds of thousands of dollars or --**

A Millions.

**Q So the office had millions of dollars in digital assets at that point. And was it sort of in a range? Was it more or less -- do you remember whether it was more or less than ten percent of the whole portfolio?**

A Last summer, it would have been less.

**Q And was there a -- was there sort of a reason why the office was investing in these assets? What were -- was there an investment thesis or a reason to invest in these?**

A Yeah. We view it as being on the cutting edge of the intersection of finance and technology, so being a huge global financial firm and then also being here in -- you know, in Silicon Valley in the Bay Area where, you know, it's kind of the center of tech, we saw that convergence, and, you know, we felt like, you know, we could -- we could develop a pretty good expertise in it.

**Q The investments that you had in digital assets, did you have a horizon for them? Were they --**

**you know, generally did you have a feeling for how long you wanted to hold things or what -- how you decide what -- when to sell them?**

A Yeah. I mean we view it as a longer term trend, so I think the intention with any of these is to hold them for longer duration but, you know, the market is very volatile and, you know, it's risky, so when you have opportunities to, you know, recover your cost basis or take profits, you have to be opportunistic about it. So I'd say a longer term view in general but flexible.

**Q We are going to talk at some point about a digital -- I'm sorry, a corporate entity called PB Digital. Do you know PB Digital?**

A Yes.

**Q What is that?**

A That was an LLC that was formed to allow Pete and some other friends of his at the firm and a couple outside the firm to invest in this deal, you know, alongside of him.

**Q So was -- PB Digital was created for the Kik -- for the investment in Kin tokens?**

A Well, I wouldn't say specifically or only for that purpose, but it was -- it was a vehicle -- it was the vehicle that invested in the deal ultimately.

**Q Does that vehicle own things other than Kin**

**tokens?**

A I think along the way it made investments in other digital assets as well, but I don't recall if that was the case or not. I think it may have, though.

**Q And does the office have other legal entities through which it invests other than PB Digital?**

A Yes, many. That's why I'm not totally sure on that, but yes.

**Q And I apologize. I always forget. LLC's have members, is that right?**

A Yes.

**Q LLC's have members.**

A Right.

**Q And the members of -- sorry. Is Pete Briger a member of PB Digital?**

A Yes.

**Q And then there are other members as well --**

A Correct.

**Q -- who are investing alongside of him?**

A Right.

**Q And some of those work at Fortress and some don't?**

A Most do, but yeah, I think there were a couple who don't, uh-huh.

**Q Okay. At this -- again, trying to focus you**

**on early summer of 2017, the time you are considering the Kin token investment, how were you learning about digital assets?**

A Well, there's not any one great resource out there to learn, so it's a combination of, you know, websites, Twitter, ReadIt, blogs, talking to people, conferences, so a variety of informational inputs.

**Q And do you have friends or professional colleagues who talk to you about digital assets as well?**

A Yes.

**Q And when you are considering making possible investments or when you are considering any possible investments for the office, what do -- what do you do? How do you analyze possible investments in digital -- or at that time, how were you going about analyzing possible purchases of digital assets?**

A We'll generally start with the materials provided by the team. So whether that's a whitepaper or a marketing presentation, you know, read about the backgrounds of the founders and the market or application that they are trying to target and then, you know, sort of see who else is familiar with that space or with that team and start to collaborate and form a view.

**Q What kind of factors made offerings**

**attractive back then?**

A Just in general or --

**Q Yeah.**

A I think, you know, essentially creating a digital asset is, as its core, a technological undertaking, so I think having a strong technical team is a critical part of it, and then focusing on a market where, you know, a digital asset would seem to have some real application, at least potential, is another important factor.

**Q All right. What about, were there -- were there factors that sort of when you saw them in offerings that made them not attractive, things that sort of raised red flags or made you less inclined to invest?**

A Yeah. I think when it -- when it looks more like a team is trying to create some type of blotching element to their business model just for the sake of, you know, trying to raise money this way or try to present themselves within that context, that's kind of a red flag; and also not having a strong, you know, technical team or not targeting a market where this seems like it would be suitable would be another red flag.

**Q What do you mean by "technical team"?**

A You know, like talented engineers essentially, you know, software engineers, blockchain engineers, you know, that having the right type of personnel trying to build the product is very important.

**Q Did you weigh whether the token was an ERC20 token? Did the type of token weigh in your decision?**

A A little bit. It's helpful. Ethereum, you know, blockchains and ERC20 tokens on it are by far the leader in the market in terms of, you know, having some kind of user base or network effect. So it makes it easier to put it into that category of being an ERC20 token rather than something different.

**Q Do ERC20 tokens have -- does the fact the token is an ERC20 token have any -- did it have any affect on liquidity?**

A Well, ultimately it did because the exchange that I mentioned ether delta, which is a decentralized like peer-to-peer trading platform, that runs on the Ethereum blockchain as well, so if it had not been an ERC20 token, it would not have been possible to trade it on there, so that was not the intention or something that was even contemplated, but it turned out to be the case.

MR. SCHLEGELMILCH: And the token that you are talking about there, you are talking about the Kin

token, correct?

THE WITNESS: Yes.

BY MR MITCHELL:

**Q I will just close that out. At some point after you received a set of Kin token in 2017, you sold those token on that ether delta platform?**

A That's right.

**Q And we will come back to that.**

**So tell me, what was the market for digital assets like at this point sort of end of the spring, early summer?**

MR. COHN: Hey, Brent, just to interrupt, just to be clear, Mr. Hourigan didn't sell all the tokens. There was a question earlier about whether they liquidated the Kin position, and there was a -- I just want to make sure in your question that you understand they sold part of it, but not all of it.

BY MR MITCHELL:

**Q Great. Let me just clean that up.**

**Mr. Hourigan, well, we are going to talk more later, in more detail, but just at the high level, at some point, PB Digital made an investment; is that right?**

A Yes.

**Q Made an investment with Kik Interactive?**

A Yes.

**Q And as part of that -- as a result of that investment, did -- PB Digital got some Kin tokens in 2017?**

A Yes.

**Q Is that right?**

A Um-hmm.

**Q And am I right that it will also receive some additional tokens in 2018?**

A Yes.

**Q So leaving aside the tokens you have not yet received, do you currently own any of the Kin tokens you received in 2017?**

A No.

**Q Okay. And you sold those -- did you sell those tokens on the ether delta platform?**

A Yes.

**Q Okay. And we will come back --**

MR. COHN: Thank you.

BY MR. MITCHELL:

**Q All right. So what was the market for digital assets like, you know, sort of late spring or early summer 2017? What were -- what were you seeing at that time?**

A The market I would say was brand new and, you

Page 22

know, kind of wild and, you know, emerging, I would say would be the words I would use to describe it.

**Q Did you see -- before Kik, were you aware of any projects where someone sold tokens and then the tokens went up in value?**

A Yes. There was a lot of media attention around those things happening, so that was, you know, one thing that caused a lot of people to get focused on it as you saw these big outcomes in the market.

**Q Okay. So at that point, say, again end of spring or early summer 2017, did the folks connected to PB Digital understand that they could make money by buying digital assets?**

A I think so, yes.

**Q And what about sort of more in general with other people you knew who were watching the market? Did you talk -- did your -- sorry, did your compatriots who were watching the market or who you talked to, did they appear to understand that people could make money by buying digital assets?**

A Yes.

**Q And was there risk in buying digital assets?**

A Absolutely.

**Q And so what kind of risk did you see?**

A There was risk in, you know, the execution of

Page 23

the -- you know, just the development of the business plan or the, you know, creation of the digital asset. There was risk in, you know, liquidity, whether it would ever come or not. There was risk in, you know, the product or service being created, you know, ever getting any real traction or validity in the market. So, yeah, there's -- there's risk all around.

**Q And did you have an investment thesis about digital assets at this time period? Did you have a thesis about what was going to happen or what was good to invest in? What was your overall thesis about the digital asset market?**

A I mean it was early in its development at the time in terms of thesis, but I think the thesis essentially is that, you know, we are all sort of increasingly living in a digital world in terms of how we spend our time and attention. The younger someone is, the more pronounced that effect is and, you know, having assets that exist in a purely digital form could have real value, even though they don't have any representation in the physical world; and so looking for the type of digital assets that could have value within that framework is sort of one of the things that we look to in terms of informing our investment thesis.

**Q And how did you -- what were you weighing**

Page 24

**when you were trying to determine if something had -- some digital asset had the kind of profile that looked attractive to you?**

A Well, I think if -- if the targeted, you know, user base sort of fits the demographic of, you know, what I'm describing where it tends to be younger, it tends to be, you know, digital product or service, you know, sort of native digital application, and if the creation or transfer of value within that digital world, you know, makes sense, which a lot of times it doesn't. In this case I thought it did, but --

**Q Okay. And we will come to Kik.**

**Yeah, go ahead.**

MR. SCHLEGELMILCH: During this same time period, spring, summer 2017, other than Kin -- and I don't need an exhaustive list -- but other than Kin, were there other digital assets that you were investing in?

THE WITNESS: Yes. We did -- we did a few of them.

MR. SCHLEGELMILCH: Can you -- can you tell us what they are or what they were? And again, I don't need an exhaustive list. I'm just sort of looking for sort of the species of digital assets that were interesting to you or worthwhile in investing in.

Page 25

THE WITNESS: And what timeframe are we talking about here, roughly?

MR. SCHLEGELMILCH: Spring, summer 2017.

THE WITNESS: There was another one that we invested in out of the UK which is called FunFair which is a blockchain-based online gaming or casino platform. I'm trying to think what other ones we did in the summer. That was pretty much it. I think I just recall those two.

MR. SCHLEGELMILCH: What about any investment prior to Kin? So Kin was in September 2017?

MR MITCHELL: No, they invested in June.

MR. SCHLEGELMILCH: Okay. So prior to Kin in June of 2017, it was maybe just FunFair.

THE WITNESS: I would say that was roughly concurrent with this, but yeah, they were around the same, those two.

MR. SCHLEGELMILCH: And did you have a holding in Ether or Litecoin --

THE WITNESS: Yes.

MR. SCHLEGELMILCH: -- or Bitcoin at this point?

THE WITNESS: Bitcoin we had a large holding for years. Ether, we bought in 2017 as well. So yes, we had an Ether holding.

Page 26

BY MR MITCHELL:

**Q What about Litecoin or any others like that?**

MR. SCHLEGELMILCH: Doge.

THE WITNESS: We didn't have holdings in those but, you know, we certainly looked at them closely and were aware of them.

BY MR MITCHELL:

**Q Okay. So at some point, you heard about a company called Kik Interactive?**

A Yes.

**Q How?**

A We were introduced to the company by Dan Morehead.

**Q What did -- what did you hear from Mr. Morehead?**

A He said that, you know, this was a well-funded venture-backed startup that had been around for, you know, quite a few years and had a large user base of mostly younger people, but that it was having a tough time competing against, you know, the Facebook's of the world, and that they had this plan to incentivize users and, you know, sort of stimulate their activity on the network by issuing these new digital tokens which would compensate them for their contributions to the platform.

Page 27

**Q All right. So what did you guys -- once you heard about -- once you heard from Mr. Morehead, what did you guys do? I'm sorry, what did the folks you work with do?**

A We said that we would like to learn more about it, and so he put us in touch with them, and then we had a series of, you know, phone calls and a meeting to learn more about it.

**Q Okay. So let's just sort of walk through those. Tell me what you remember. How many phone calls are you thinking about? Eventually there was a meeting; is that right?**

A Eventually there was a meeting. Yeah, the phone calls before the meeting I think were, you know, maybe just a couple. It was sort of we wanted to meet them in person and see -- hear the -- hear the plan from them and make an assessment from there, so....

**Q So in the first -- in the phone calls before the meeting, were you on the phone?**

A Yes.

**Q Who -- who else was on the phone?**

A You know, I don't recall. I had a lot of contact after our initial meeting with Tanner Philp. He was kind of my primary point of contact there, and I had a little bit with Ted Livingston, the CEO, but before

Page 28

our meeting I don't recall who I spoke with or even that much about those conversations. It was just sort of leading up to that meeting.

**Q Okay. Did they also send you any documents?**

A I don't recall if they were sent before or after the initial meeting.

**Q Okay. Do you remember what day the initial meeting was?**

A I don't.

**Q Okay. All right. Well, I'm going to have -- I'm going to have Fernando mark as what I think would be Exhibit 73, a document, and give you a copy of it. I apologize. I had him just make one copy of the documents so if you could look at it and sort of show it to your lawyers, too. You guys can take the time. That's SEC-PBDigital-E-0000348 to 351. So if the court reporter could mark that, and then you can look at it and show it to your lawyer as well. On its face, it appears to be an e-mail chain that starts on June 1st and goes to June the 2nd, 2017.**

**(SEC Exhibit No. 73 was marked for identification.)**

BY MR MITCHELL:

**Q Great. If you guys want to look at that, my first question to you, Mr. Hourigan, is going to be: Do**

Page 29

**you recognize this document?**

A Let me just take one minute here. Sorry.

**Q Yeah. No, absolutely. I apologize. I didn't think through how many copies to make.**

A Okay. I'm looking at this now.

**Q Sounds great. So my first question is: Do you recognize the document?**

A Yes.

**Q Okay. Is this an e-mail that Pete Briger sent a bunch of people at Fortress, including you?**

A Yes.

**Q And was he forwarding an e-mail from Dan Morehead with the term sheet for a potential investment in investment with tokens from Kik Interactive?**

A Yes.

**Q Sitting here today, is this -- do you remember, is this the first time you have seen a term sheet, if you remember?**

A Probably, yes. I don't recall. It's possible that I saw it beforehand, but that -- that would make sense, yeah.

**Q And, again, what did people in your office think of this idea once you got the term sheet?**

A They thought that it was interesting. I mean it -- we have a lot of respect for Dan and his firm and

his expertise in the space and, you know, we were aware of these ICO's or token sales that were taking place in the market, and so, you know, I think the initial reaction was that this looked interesting and we wanted to learn more about it.

**Q What were you aware of with other ICO's that made this seem attractive?**

A Well, there was just a lot of media attention around the ICO phenomenon, and that this was a new way for companies -- you know, tech companies to, you know, issue these digital assets on the blockchain and a way to participate in that and so, you know, we were curious to learn more about it through this -- through this opportunity.

**Q And what did -- I guess what did you do to consider the opportunity?**

A I don't remember how much time elapsed, but at some point relatively soon after this introduction, we met with the team from Kik to learn more about it.

**Q Okay. I will comment on the meeting in a second. On this term sheet, though, this June document, can I have you turn to the page that ends -- the Bates number ends in 350?**

A Um-hmm.

**Q Do you see the page that ends in 350?**

A Yes.

**Q Okay. At the time that you got this term sheet, was Kik telling potential investors that they were aiming to do a -- sort of launch the Kin token by September of 2017?**

A I don't remember that particular aspect or representation that you are referring to on the timing of it.

**Q Was there any discussion at this stage of when people thought that they would launch the Kin token?**

A I remember in our meeting them describing the difficulties of building this, given the scale of their user base and the amount of activity they have on their network relative to the constraints of the Ethereum blockchain, but I don't recall a timeline or, you know, a lot of -- you know, any focus on that.

**Q Before the meeting, did you review any -- any written documents? Any other written documents, I mean obviously other than the term sheet we just saw?**

A I don't think so.

**Q Did you read the whitepaper before the meeting?**

A Yes.

**Q Anything other than the whitepaper?**

A I don't think so. I read around about, you know, Kik and the history of it and the venture funding they got and that sort of thing, but I don't remember any other materials.

**Q What did you take away -- what did you take away from the whitepaper that seemed important?**

A The way that they described that this digital asset would be used in the network among their large user base and how it would incentivize, you know, the people to contribute and participate more actively.

**Q You mean the user base on the -- on Kik's messaging app?**

A Right.

**Q So one of the things that was important to you was that Kik said that it would allow people to use Kin tokens on its messaging app?**

A Right.

**Q Why?**

A Because there was this sort of thesis of like all the social media that everyone spends so much time on. You know, it's free to use, but you are also contributing a lot of content, whether it's like your photos or what you are doing and different comments and likes and emojis and all of this kind of stuff, but you don't actually receive anything for your contributions.

It's sort of just free to use the platform, and so their idea was that given that the users of the network are the ones creating most of the value of the experience, you could create these tokens which would reward them for their contributions to the network.

**Q And you -- and you thought that would -- how did you think that would affect Kin tokens if you could use them in that way? What would happen -- what would be the effect on Kin tokens?**

A We thought that if they could become the currency within that Kik ecosystem, that they -- that those tokens could become very valuable given how big their user base is and how much activity there is on it.

MR. SCHLEGELMILCH: Did you have an expectation that you or Fortress would be participating -- would be a participant in an ecosystem?

THE WITNESS: We played around with Kik just to see how it would work or kind of -- it was not a product any of us had previously used so, you know, we needed to understand that a little bit better to kind of compare it to WhatsApp or Facebook or the other things in the market that we are more familiar with. So having never used a service before, I don't know that I intended to use the token, but I certainly was trying to understand how someone would.

MR. SCHLEGELMILCH: I guess my question is a little bit different. So did you expect that you were going to be -- you or Fortress was going to be creating content for this social network?

THE WITNESS: We weren't planning to, no.

MR. SCHLEGELMILCH: And okay.

BY MR MITCHELL:

**Q Were you planning to buy content or anything else with the Kin tokens?**

A I mean they hadn't created anything yet, so it's hard to say like no, we definitely wouldn't have, but it wasn't -- that wasn't our intention at the time.

MR. SCHLEGELMILCH: Thank you.

BY MR MITCHELL:

**Q Fernando, could you mark a document that ends in 86. This again, I will just say for the record, is a multipage document with the Bates number SEC-PBDigital-E-0000086 through 95, and on its face, the first page has an e-mail that appears to be from you on June 2nd, 2017. So if the court reporter can just mark it and then give it to you, and you and your lawyers can look through it, and tell me when you are ready.**

**My first question is going to be: Do you recognize this document?**

**(SEC Exhibit No. 74 was marked**

**for identification.)**

THE WITNESS: Yes, I recognize this.

BY MR. MITCHELL:

**Q Okay. What is this?**

A This is --

MR. COHN: What's Exhibit 74?

THE WITNESS: This is an e-mail that I sent out to the same group that received the previous communication that we have just discussed where I was trying to explain, you know, a little bit more about what ICO's are, and then I posted a Blog that had been recently published that was getting a lot of attention in the -- in the media.

BY MR MITCHELL:

**Q And did you send this e-mail as part of the -- the discussion about weighing the Kin token offering?**

A Yes.

**Q And is the part on the first page in the first maybe four or five paragraphs that are sort of right underneath the to/from/send/subject line?**

A Um-hmm.

**Q Do you see that? Do you see where it starts last weekend and runs down through the bold thesis?**

A Yes.

**Q Did you write that section?**

A Yes.

**Q And then the rest of it is the Blog post that you were providing everybody a copy of?**

A Correct.

**Q And did the part that you write fairly describe the market as you understood it at the time?**

A Yes.

**Q Looking back on it, is there anything that you look at there that you think boy, that was just wrong, like I got this wrong back then?**

A Not really.

**Q Okay. So at the time you sent this e-mail, you understood that ICO's were a new funding vehicle for tech companies?**

A Um-hmm.

**Q I apologize. The court reporter needs to sort of hear people say words, so you can just answer yes or no for us.**

A Yes.

**Q Okay. So at the time you sent the e-mail, you understood that ICO's were a new funding vehicle for tech companies?**

A Yes.

**Q And then in your e-mail, you described a VC**

**back company called Brave that had done an ICO?**

A Yes.

**Q Is that right?**

A Um-hmm.

**Q And then you note -- you noted the appreciation of the tokens after the initial offering?**

A Yes.

**Q And why did -- why mention that?**

A So that ICO was probably the highest profile one in the market up to that point. The founder of that company is a very well known technologist, and I saw some similarities to Kik in terms of Brave had already raised venture money. It was smaller, but they had raised venture money. They had a user base. They had a, you know, talented technology team, but they were issuing these tokens as a new way to fund the growth of their -- of their business.

**Q And their token had appreciated in value after their offering.**

A It did, and that was what really got, you know, a lot of media attention was that rise in value after the -- well, actually how quick they raised the money in the offering was, you know, really, you know, noteworthy, and then the appreciation afterwards was another thing that was written about.

Page 38

**Q So at the time you sent this e-mail, you understood that tokens could appreciate in value --**

A Yes.

**Q -- after they were initially issued. Did you need Kik to explain that to you?**

A No.

**Q I'm going to put that down.**

**At some point did you receive a PPM, like a private placement memo?**

A I don't recall.

**Q Okay. The meeting -- well, I guess what happened next? You had this June 2nd e-mail. Do you remember whether the next thing was -- well, what do you remember? What happened next? Let me just start with that.**

A The next thing that I remember was that they came out and we met with them, the founders.

**Q Okay. So where did you meet with them?**

A We met with them in our San Francisco office here at One Market.

**Q And who was there?**

A I remember the CEO, Ted Livingston, Tanner Philp who I mentioned before, and then from our group it was Pete, me, Drew McKnight, Brian Nicholson who is another one of our colleagues in the office. I don't

Page 39

remember if there was anyone else, but I remember those guys.

**Q Was there anybody on the phone?**

A I don't think so.

**Q There's a -- there's a -- do you know a person named Akshane Najita? Nahita (phonetic)?**

A Yes.

**Q Okay. Where does he work?**

A He works at SoftBank.

**Q Do you remember whether or not -- do you remember whether or not he participated in this meeting?**

A I just don't remember.

**Q All right. So what happened in the meeting?**

A In the meeting, Kik, which was mainly Ted doing the talking, described, you know, how the company started and the growth that they have had and, you know, the challenges that they have had against the larger competitors in the space, especially Facebook and WhatsApp and that they, you know, felt like they needed to do something new to compete with them more effectively. They had some previous interest in blockchain technology both personally and business-wise, and they saw this as a way to potentially, you know, level the playing field and allow them to compete more effectively against Facebook.

Page 40

**Q Okay. And what was their -- what was the -- sorry, did he have -- did he -- was it just oral or did he have written stuff to share with you as well?**

A I think it was just oral.

**Q Okay. No slides or, you know, or --**

A I don't remember that, no, huh-uh.

**Q Okay. So did he describe to you what Kik was planning to do?**

A Yeah, that they were going to create this token that could be used in their ecosystem to incentivize people to contribute -- to contribute or create content or to engage with the content posted by others, and that it would be a way of rewarding users and kind of aiming to make the service, you know, better than free, where the other -- you know, the Facebooks and the other larger ones are free, but they felt like they could make this so that you could actually get paid for your contributions which we thought was, you know, pretty compelling.

**Q So when you were just saying an ecosystem there, was he describing a Kik app?**

A Yeah, the Kik app and the way that they would layer in this new, you know, token, you know, economy into it to incentivize people.

**Q So he was -- he was describing a way that Kik**

Page 41

**planned to incorporate Kin tokens or transactions with Kin tokens into Kik's existing messaging app.**

A Right.

**Q Okay. Did he -- did anyone talk to you about sort of their planned -- what their plan was in terms of how they would -- how they would do the sale and what -- when they would do the sale?**

A I remember the figure of $100 million, but I don't remember the timing or the -- you know, the structure of the process.

**Q But in that meeting, they said that they were looking to raise $100 million?**

A Yes.

**Q And did they talk to you about a concept or a document called a SAFT, capital S-A-F-T?**

A It was mentioned. I don't remember discussing it much, but it was -- it was mentioned.

**Q Did -- was there a discussion about a -- like how Pete Briger's group would -- how you would invest, like what the terms of the investment would be?**

A Not in great detail. I mean we would be investing alongside everyone else with the same, you know, terms, and we would receive a portion of the tokens whenever they were created, you know, pro rata based on our contribution amount. So it wasn't -- there

wasn't -- we talked mostly about the plan for the -- for the company more so than the details of the deal.

**Q Was the idea that you discussed that you would invest money sort of at that point or at some point in the summer and then receive tokens later in the year?**

A Yes.

**Q And was there discussion then about sort of when -- like how Kik was going to decide when it could sell tokens to the general public?**

A There may have been a little bit of discussion about that, but it wasn't -- it was not a focus of ours.

**Q What do you remember about it?**

A I remember talking about the difficulty or the challenges of integrating this token into their large user base, given the constraints of the Ethereum blockchain. In terms of a timeline for that, I don't -- I don't remember anything being sort of -- sort of promised or even, you know, laid out.

**Q Was that part of your investment sort of analysis, sort of the idea of when you would get tokens?**

A It was, but I don't remember trying to like pin down exactly when -- when that would be.

**Q Was there a discussion about whether the**

**tokens, once they were issued by Kik to the public, would be liquid?**

A No, I don't think we talked about that.

**Q Did you talk about secondary exchanges at all?**

A Subsequent to this initial meeting, I did have quite a few conversation with them about that, but not -- in the initial meeting, I don't -- I don't remember that being part of it.

**Q Okay. Well, let me just move to that for a second. The conversations you are thinking of, are they after the meeting but before you made the investment?**

A No, they were after we made the investment and after we received the tokens. My questions were kind of like: Are you going to get listed on an exchange and when? And it was -- you know, we never really got a clear answer on that, and as far as I know, they still have never been listed on an exchange, so I guess maybe that's why.

**Q Okay. So going back to the meeting, was there -- sorry, was there discussion about sort of the Ethereum blockchain and whether Kik would be able to run the Kin project using the Ethereum blockchain?**

A Yes, there was.

**Q What was that?**

A He just said for the amount of users they have and the amount of activity they have on the network, it would just cripple the Ethereum blockchain to try to process all of that through it, and so they were trying to figure out a way to do like a smaller beta test or find some type of technological work around that would allow them to, you know, use the tokens in the app and then have them sort of port over to the Ethereum blockchain somehow. They were -- they were struggling with how to -- how to do that.

**Q And who did you -- did you have an understanding of who was going to sort of try to address that problem?**

A I think it was -- you know, Ted was the main guy we were speaking with, so I mean it was -- it was mostly him.

**Q And -- sorry, and people at Kik were going to try to solve that problem.**

A Yes.

**Q Did they expect you or other investors to help solve that problem?**

A Only in just maybe talking through it a little bit, but no, not substantively.

**Q Did they talk about what Kik would do after the Kin tokens had been sold to the public?**

A Kik would, you know, try to integrate them into their app was the -- that was the main gist of it.

**Q And also to solve this technological issue about the Ethereum blockchain having limits?**

A Right, which was part of trying to integrate them into the app, you know, figuring out a way to do that or to roll that out.

**Q Did you all raise any specific questions in the meeting?**

A I think we -- you know, we wanted to understand, you know, how this new technology, you know, would potentially sort of reignite the user base of Kik because Kik had raised a lot of money, and they had a lot of users, but they also, you know, were not on a trajectory to be successful given the competition, and so we wanted to understand how this could potentially, you know, reengage a lot of those users that weren't, you know, using the platform much and maybe incentivize some new people to sign up as well.

**Q Well, why did that -- why did that weigh in your decision of whether or not to buy Kin tokens?**

A Well, because ultimately if they, you know, are used in the Kin ecosystem, they presumably would be more valuable than if they were not being used. So the ability to integrate them into that was an important

consideration.

MR. SCHLEGELMILCH: And would it be fair to say sort of in the same vein that if Kik went out of business let's say in October of 2017 or November of 2017, that the Kin tokens would sort of lose all of their value?

THE WITNESS: It would be a big negative for sure. I don't know if they would lose all of their value necessarily, but yeah, based on our investment thesis, that would have been a big negative.

BY MR MITCHELL:

**Q Fernando, can you mark the document that ends in 429 and, again, this is a multipage document with the Bates number SEC-PBDigital-E-0000429 to 430 and then take a look at it with your lawyer. Just tell me when you are ready. On its face, it appears to be an e-mail chain where the top e-mail is an e-mail from you to Drew McKnight and Pete Briger.**

**(SEC Exhibit No. 75 was marked for identification.)**

MR MITCHELL: Sorry, is Michael still reading?

MR. COHN: Yeah, I am almost done. Just one second.

MR MITCHELL: Perfect. Sounds great. No problem.

MR. MURTHA: You are just off camera, so we can't see what you are doing.

MR. MITCHELL: No rush. Take the time you need. My first question is going to be --

MR. COHN: We can move the camera, but it's really boring over here.

MR MITCHELL: Yeah, I know.

MR. COHN: Okay.

BY MR MITCHELL:

**Q So, Mr. Hourigan, take a look at it. My first question is going to be: Do you recognize this document?**

A Yes.

**Q What is it?**

A I'm just reading through the sequence here. So this was -- you know, Dan informed us that the terms had changed a bit and that investors were getting cut back. One of the changes in the terms was that there would be a lockup, and so then that forced us to, you know, think about things over that time horizon which I was trying to provide a view on, you know, kind of the pros and cons of Kik on a one- to two-year horizon.

**Q And so are the three paragraphs at the top of the first page -- is that you writing an e-mail to Mr. McKnight and Mr. Briger --**

A Yes.

**Q -- sharing some of your thoughts?**

A Yes.

**Q And did that -- did that, you know, accurately capture your thinking at the time?**

A Yes, it did.

**Q And so the positive that you saw was that -- I'm sorry, was it a positive that you saw that Kik had a real product/user base/VC investor base?**

A That was a positive, yes.

**Q Can you just say like why? Why was that a positive?**

A Well, because if they could create this digital asset and then sort of integrate it into this user base that had, you know, I think hundreds of millions of users, that's an easier proposition than trying to create a user base from scratch to use a given product or service. So I felt like that was a good sort of foundation to try to integrate this new digital asset into.

**Q And were there negatives that you were weighing?**

A Well, the negative was that they had raised a lot of money, and like I said before, that when you raise that much money and, you know, you're still sort

of burning through cash and not competing successfully against the bigger incumbents, you know, the trajectory on its own is not good, and so there was a solid foundation there that was attractive, but also, they raised, you know, this large amount of money and sort of burned through it and so, you know, this ICO option was, you know, a way to try to raise money that was better than the other alternatives they had at that time.

**Q Did you view the ICO plan as essentially a Hail Mary by Kik?**

A That was certainly one way to look at it.

**Q And what did that mean to you? What were you seeing that made it a Hail Mary?**

A Well, I think at one time they had enough user growth and sort of attraction among a younger demographic that they thought they could compete toe to toe with Facebook, and with the amount of money they raised and burned through, and in talking with Ted and the team, it was obvious that they were on the losing end of that, and so I think they viewed it and we viewed it as, you know, you have got -- I think -- I think it was a couple hundred million users. You have got a tech, you know, platform that works and a community that is engaged to some extent, and so, you know, you need to go deeper in the play book in terms of taking risk and

trying to do something creative rather than just keep sort of keep banging up against Facebook, you know, which, you know, you are just not going to win that -- that battle.

**Q When you were weighing purchasing -- making this deal with Kik, did you have access to Kik's financials?**

A No.

**Q Did you know how much cash Kik had on hand?**

A We didn't.

**Q Did you know how much revenue it was earning?**

A I don't recall that being discussed. Someone may have asked, but that was not my focus, so I don't -- I don't remember that.

**Q Were you aware of what the trends in users were on the Kik app, you know, whether it was overall the numbers of users or the metrics of users were going up or going down?**

A My perception was that it was going down and that it was negative.

MR. SCHLEGELMILCH: Having now had a chance to look at your e-mail again, is it fair to say that your sort of overall view of this was that Kik's prospects as a company weren't great long-term, but that because it had a real product, a user base and a VC investor base,

that it should go up in the near term and that you could exit your position at a profit?

THE WITNESS: I would say that it should go up in the near term based on its potential to actually work. I mean despite the, you know, negatives which we just discussed in terms of their user base and kind of how it was trending, they did have or I think they still do have, you know, hundreds of millions of people on a -- on a chat platform and a lot of activity; and so trying to, you know, create a digital asset to be used in that has a lot of potential compared to creating a digital asset that has no user base to sort of be integrated into.

So it was one part the signalling of this, you know, VC funding they raised and the kind of foundation they have, but the other part of it was that they actually do have that user base and that technology already built out, that, you know, could be an attractive thing to try to integrate this into.

MR. SCHLEGELMILCH: You wrote that it should be fairly ease to flip. What did you mean by that?

THE WITNESS: That there would be a lot of people that would want to buy these assets once they were, you know, created and out there liquid in the market.

MR. SCHLEGELMILCH: So again, so that Fortress or you could be -- you could exit your position at a profit.

THE WITNESS: Correct.

BY MR MITCHELL:

**Q Okay. So was there some point after the meeting that you had in San Francisco when Kik offered you additional offers to raise sort of the amount of money that your group could invest?**

A Towards the end of the process you are referring? In other words, not this e-mail but the --

**Q Yeah. After that e-mail I meant.**

A I'm sorry, the e-mail that we are looking at now or are you saying subsequent to that?

**Q Subsequent to that. I apologize.**

A Subsequent to that I remember kind of at the 11th hour there was this sudden, you know, availability of, you know, more to buy, which we found, you know, somewhat concerning.

**Q How did you hear about the something more?**

A I don't remember if it came directly from Kik.

I think it might have come through Dan, but they -- I think the -- what they told us was that because of KYC issues with some investors in Russia and

maybe China also.

But I seem to remember Russia, that they were sort of cutting out from the sale. There was this extra amount available if we wanted to take it.

**Q And did they -- did you decide to take it?**

A No. We decided not to.

**Q And then do you -- did you talk to -- did you talk to anyone -- any of Kik's outside lawyers at a law firm called Cooley?**

A Yes. I spoke with at least one lawyer there.

**Q Do you remember that person's name?**

A I'm thinking it might have been Nancy, but I don't -- if you said her name, I think I would recognize it, but I don't -- I don't recall.

**Q There's a lawyer at Cooley named Nancy Wojtas.**

A That's her.

MR. MITCHELL: Okay. W-O-J-T-A-S for the court reporter.

THE WITNESS: Yes.

BY MR. MITCHELL:

**Q So tell us about that conver -- sorry, one conversation or multiple conversations?**

A We didn't talk much. I don't remember if it was like once or twice, but that was more I think just

administrative in terms of getting paperwork signed and getting through their process. It wasn't much of a substantive conversation.

**Q Did anybody at Kik talk to you about sort of their legal analysis of the offering or their view of whether the Kin tokens were securities?**

A I don't think that ever came up.

**Q Okay.**

**So I guess I'm going to go with what happened next?**

**You have had these conversations. You had the meeting.**

**You had some subsequent conversations. What did your group do next in terms of the Kik proposal?**

A We decided to make the investment and we proceeded in, you know, going through that process with them to get the docs signed and get the -- the funding processed, and that was pretty much the end of it from what I remember.

MR. MITCHELL: Okay.

Fernando, could you have the court reporter mark the document that doesn't have Bates numbers that I think is the executed SAFT contract?

(SEC Exhibit No. 76 was marked for identification.)

BY MR. MITCHELL:

**Q This is a document that has seven pages and numbered one through seven at the bottom. At the -- on the second page it says Kin, a product of Kik Interactive, Inc., SAFT, S-A-F-T, and then on the back pages -- well, why don't you have your lawyer look at it and you look at it, and my first question is going to be: Do you recognize this document?**

A Yes, I recognize this.

**Q What is it?**

A This is the SAFT that the company provided via Cooley and that we signed I think via, you know, DocuSign or something like that.

**Q If you look on the page that has a seven on the bottom, is that Pete Briger's electronic signature?**

A Electronic, yes.

**Q So then after you make the investment, I guess sort of what happens -- what happened after that in terms of Kik?**

A The next thing that I remember was receiving the tokens once they were created and, you know, distributed, had some back and forth with Tanner on, you know, our, you know, wallet address that he was sending

them to, and then just confirming the receipt and that it was the proper amount.

**Q Okay.**

**And then you got the -- so at some point in 2017 you got tokens?**

A Yes.

**Q And did you receive sort of half the tokens that the SAFT made you eligible for?**

A I think so, yes.

**Q And what did you do with the tokens?**

A We just held them in a -- you know, an Ethereum-based wallet as we typically would do, so we didn't do anything with them. We just held them in the wallet that they were received into.

**Q And was this -- do you still have them in the wallet?**

A Well, we sold -- I'm trying to -- I don't remember if we received all of them and that half of them have some type of cryptographic lock on them for a year or if we only received half of them to begin with, but in either event, half of the them of the total that we purchased, we sold eventually.

**Q And did -- and then did you -- did you sell that half for more than half of your initial investment?**

A Yes.

**Q Roughly, what -- what value did you get for the Kin tokens that you sold compared to your investment?**

A I think it was about 4X.

**Q 4X the full investment or 4X the half?**

A I'm just not sure.

Sorry. I have the data, but I just don't know offhand.

**Q That would be fine. Sitting here today, though, do you think that PB Digital has any basis left in this investment?**

A No.

**Q And do you expect to get more Kin tokens at some point later in 2018?**

A Yes.

**Q Do you have a plan for what you are going to do with those tokens?**

A We would assess, you know, their progress on billing that's out or implementing it and see what the demand looks like in the market, what the price looks like and make an assessment, but we haven't gotten close enough to it yet to start doing that, so it's hard to say.

**Q Whose efforts would you look at? Sorry. In your prior -- in your prior -- in the answer you just**

**gave you talked about "them." Who were you talking about?**

A I'm just thinking of, you know, Ted and Tanner and the team at Kik.

**Q So you will gauge-- your plan is to, when you get the tokens, see how they are doing on the creation of this Kin ecosystem.**

A Yes.

MR MITCHELL: Okay.

So we are going to go off the record.

It is 11:03 I think in San Francisco. Do I have the time right there?

THE VIDEOGRAPHER: One moment. Going off the record, the time is 11:03.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:08.

BY MR MITCHELL:

**Q Great.**

**Mr. Hourigan, during the break, did you have any substantive conversations about the case with the SEC staff?**

A No.

**Q All right.**

**So I just want to sort of do a couple of -- last couple of questions to make sure that we are -- and then we will be done.**

**When -- when you were having conversations with people at Kik or were there any conversations about when Kik intended to sell the tokens or, you know, what would trigger their ability to sell tokens when they would do it?**

A When they would do this sale that we participated in or when they would -- I'm not sure I follow.

**Q Okay.**

**That's okay. When you bought, you purchased using that SAFT contract; is that right?**

A Um-hmm, yeah.

**Q Okay.**

**And as part of that, you received the right to obtain Kin tokens at the time that Kik sold those tokens to the general public. Am I right about that?**

A Yes.

**Q Okay. So was there any discussion between your group and Kik about when that public sale would happen?**

A I don't recall discussing that or that being,

you know, something that we focused on at all.

**Q Was there any --**

THE VIDEOGRAPHER: Can you move your microphone up higher on your tie?

THE WITNESS: Sorry.

THE VIDEOGRAPHER: Thank you.

BY MR MITCHELL:

**Q Was there any discussion about something called an MVP or a minimum viable product?**

A I think they mentioned that as part of their development timeline in terms of trying to roll this out and start integrating it.

Like I think I mentioned earlier, some type of beta test or something like that. So I remember that being mentioned, but I don't -- I don't remember the details of it.

**Q What you are remembering, is that in person or is that on the phone?**

A In person and then subsequently on the phone just in terms of, you know, how is everything going. Are you guys building it out?

You know, I remember them telling me they were working with -- reestimating with other blockchains other than Ethereum, like Stellar. There was one in Israel called Orbs. They were spending

time over there working with different engineers trying to figure out, you know, what's the best way to design this thing.

**Q And did -- the conversations you are describing about Stellar and Orbs, was that after you had obtained Kin tokens?**

A I think so. Yeah, I think that was afterwards. That was somewhat more recent.

**Q Have you spoken to any other people who invested in the Kin offering? Sorry. Obviously you talked to Mr. Morehead.**

A Yeah, other than them, I don't think so.

**Q And have you talked to Mr. Morehead about the investment or his people?**

A Not specifically.

I don't remember having any type of in-depth conversation with them, other than just in passing that it was -- you know, that we had gotten them or where it was trading, but nothing -- nothing specific.

**Q And have you spoken to anyone at Kik about the SEC investigation?**

A No.

**Q Have you spoken to anyone outside Fortress about the SEC investigation?**

A No.

**Q To the best of your knowledge and -- sorry, don't tell me about anything your lawyer told you, but other than conversations with your lawyer, do you know whether Kik or Kik's attorneys have reached out to Fortress or Pete Briger's group?**

A I don't know.

Not to my knowledge, no.

**Q Well, we really do appreciate your talking to us.**

**We are really trying to understand this offering, and it has been -- we know it's a pain for you to have to, you know, go to the office and do all of this stuff, and we really do appreciate your doing it because this has been helpful, and it lets us sort of really understand what happened.**

**As part of our normal process we ask the witness, you know, do you -- is there anything you like want to supplement or anything that you said that you think you need to supplement or correct or anything while we are still on the record?**

A No.

MR. MITCHELL: Okay.

And then just for your counsel, do either of your counsel have any questions,

you know, clarifying questions or anything else you want to ask the witness?

MR. COHN: No. I think we are good. Thank you.

MR MITCHELL: Okay.

So then we would go off the record, if the videographer could take us off the record.

THE VIDEOGRAPHER: All right. This marks the end of the deposition then of Michael --

MR MITCHELL: Oh, actually wait one sec. Sorry.

THE VIDEOGRAPHER: I'm sorry.

BY MR. MITCHELL:

**Q Sorry, I apologize.**

**We had -- during the break we had mentioned one practical issue.**

**Mr. Hourigan, do you have a subpoena in front of you, still sitting in front of you?**

A Yes.

**Q Does it have a label on it with a number?**

A 72.

(SEC Exhibit No. 72 was marked for identification.)

BY MR. MITCHELL:

**Q Okay.**

**So the subpoena with your name on it has been marked as Exhibit 72.**

**Do you see that there?**

A Yes.

**Q Okay. That's it. I'm just literally putting it on the record so that it's clear on the record how that number got there.**

A Okay.

MR. MITCHELL: Okay.

Anything else?

MR. MURTHA: Is that a copy of the subpoena which you are appearing pursuant to today?

THE WITNESS: Yes.

MR MITCHELL: Great.

Okay. Now I apologize for the false alarm earlier. If the videographer could take us off the record, we'd appreciate it.

THE VIDEOGRAPHER: Thank you.

This marks the end of the DVD number one in the deposition of Michael Hourigan. We are going off the record, and the time is 11:14.

(Whereupon, at 11:14 a.m., the examination was concluded.)

* * * * *

PROOFREADER'S CERTIFICATE

In the Matter of: KIK INTERACTIVE, INC.
Witness: Michael Hourigan
File Number: HO-13388-A
Date: Tuesday, July 24, 2018
Location: San Francisco, California

This is to certify that I, Christine Boyce, (the undersigned) do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record, and that this is the original, complete, true and accurate transcript, which has been compared with the reporting or recording accomplished at the hearing.

____________________ ____________

(Proofreader's Name) (Date)