SEC50

# In the Matter of:

*U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.*

---

*Harrison Wang*

*January 09, 2020*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

Page 1

```
1            UNITED STATES DISTRICT COURT
2            SOUTHERN DISTRICT OF NEW YORK
3
4   U S  SECURITIES AND EXCHANGE  )
    COMMISSION,            )
5                     )
            Plaintiff,  )
6                     )
        vs         )No  19-cv-05244
7                     )   (AKH)
                    )
8   KIK INTERACTIVE, INC ,       )
                    )
9        Defendant   )
                    )
10
11
12
13
14       DEPOSITION OF HARRISON WANG
15       THURSDAY, JANUARY 9, 2020
16       SANTA MONICA, CALIFORNIA
17
18
19
20
21
22
23
    REPORTED BY:  JEANINE CURCIONE
24       CSR NO  10223, RPR
25   FILE NO : 459953
```

Page 2

```
1  Deposition of HARRISON WANG, taken on behalf of
2  Plaintiff, at 10:05 A M , Thursday, January 9, 2020,
3  at 1333 2nd Street, Suite 400, Santa Monica,
4  California, before Jeanine Curcione, C S R  No
5  10223, RPR, pursuant to notice
6
7  APPEARANCES OF COUNSEL:
8  FOR THE PLAINTIFF:
9     SECURITIES AND EXCHANGE COMMISSION
    BY:  LAURA K  D'ALLAIRD, ESQ
10    BY:  JAMES MURTHA, ESQ
    105 F Street NE, Mailstop 5971
11    Washington, DC 20549
    Phone (202)551-5475
12    e-mail: DallairdL@SEC gov
13  FOR HARRISON WANG:
14    TAYLOR-COPELAND LAW
    BY:  JAMES TAYLOR-COPELAND
15    501 West Broadway
    Suite 800
16    San Diego, California 92101
    Phone: (619)734-8770
17    e-mail: james@taylorcopelandlaw com
18  FOR THE DEFENDANT:
19    COOLEY, LLP
    BY:  JENNA BAILEY, ESQ
20    BY:  BRETT DE JARNETTE, ESQ
    3175 Hanover Street
21    Palo Alto, California 94304
    Phone (650)849-7005
22    e-mail: jbailey@cooley com
    e-mail: bdjarnette@cooley com
23
24  ALSO PRESENT:
25    John Hank, Videographer
```

Page 3

```
1              I N D E X
2   WITNESS        EXAMINATION      PAGE
3   HARRISON WANG    MR  DE JARNETTE     6, 260
4              MS  D'ALLAIRD     207
5         E X H I B I T S
6   NO    PAGE  DESCRIPTION
7   Exhibit 12  140  Previously Marked
8   Exhibit 108  187  Document Previously Marked
9   Exhibit 220  9  Subpoena
10  Exhibit 221  13  Printout from LinkedIn Account
        for Harrison Wang
11
    Exhibit 222  51  Document Bates Stamped
12       WANG00003-13
13  Exhibit 223  95  Document Bates Stamped
        WANG00014-16
14
    Exhibit 224  102  Document Bates Stamped
15       WANG00019-21
16  Exhibit 225  111  Etherscan Printout of Token
        Transfers
17
    Exhibit 226  150  Document Titled "Announcing Kin,
18       a Cryptocurrency for an Open
        Future
19
    Exhibit 227  157  Document Bates Stamped
20       KIK_00045122-24
21  Exhibit 228  205  Document Titled "Which altcoin
        ICO Has the Most Potential for
22       Use Case and Price Gains?"
23  Exhibit 229  211  Transcript of Harrison Wang
        10/5/18
24
    Exhibit 230  219  Document Bates Stamped
25       KIK_00002665-66
```

Page 4

```
1   NO    PAGE  DESCRIPTION
2   Exhibit 231  227  Document Bates Stamped
        KIK_00008372
3
    Exhibit 232  232  Document Bates Stamped
4       WANG00037-38
5   Exhibit 233  235  Document Bates Stamped
        WANG00039-43
6
    Exhibit 234  239  Document Bates Stamped
7       KIK_00079894-902
8   Exhibit 235  248  Document Bates Stamped
        WANG00033-34
9
10       QUESTIONS NOT ANSWERED
11  PAGE      LINE
12    22        12
      29        15
13    45        17
      49        19
14    110       12
      111       13
15    112       15
      114       18
16    262       18
17
18
19
20
21
22
23
24
25
```

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.
Videotape
Harrison Wang
January 09, 2020

---

Page 5

1     SANTA MONICA, CALIFORNIA;
2     THURSDAY, JANUARY 9, 2020, 10:05 A.M.
3
4        THE VIDEO OPERATOR:  Good morning.  We are
5   going on the record.  This is the start of media
6   unit number 1 of the videotape deposition of
7   Harrison Wang in the matter of US Security and
8   Exchange Commission versus Kik Interactive, Inc.,
9   filed in the United States District Court for the
10  Southern District of New York.  Case number
11  19-CV-05244.
12       This deposition is being held at Cooley,
13  1333 Second Street, Suite 400, Santa Monica,
14  California 90401 on January 9, 2020 at approximately
15  10:06 A.M.  My name is John Hank in association with
16  O'Brien and Levine Court Reporting and I'm the legal
17  video specialist.  The court reporter today is
18  Jeanine Curcione in association with O'Brien and
19  Levine Court Reporting.
20       Will counsel please state their
21  appearances and who they represent for the record
22  after which the court reporter will swear in the
23  witness.
24       MR. DE JARNETTE:  Brett De Jarnette from
25  Cooley on behalf of Kik.

---

Page 6

1        MS. BAILEY:  Jennifer Bailey from Cooley
2   on behalf of Kik.
3        MR. COPELAND:  James Taylor-Copeland on
4   behalf of Harrison Wang.
5        MS. D'ALLAIRD:  Laura D'Allaird on behalf
6   of the plaintiff US Securities and Exchange
7   Commission.
8        MR. MURTHA:  James Murtha, SEC.
9
10         HARRISON WANG,
11       Having been first duly sworn, was
12       Examined and testified as follows:
13
14         EXAMINATION
15  BY MR. DE JARNETTE:
16      Q.  Good morning, Mr. Wang.  Thank you for
17  being here today.  I really appreciate it.  I know
18  this is inconvenient and I'm going to do everything
19  I can to get you out of here as fast as possible.
20  Have you been deposed before?
21      A.  Yes.
22      Q.  How many times have you been deposed?
23      A.  Once.
24      Q.  And is the deposition you're referring to,
25  the testimony that the SEC took from you in 2018?

---

Page 7

1      A.  Yes.
2      Q.  And aside from that testimony, you've sat
3   for no other deposition?
4      A.  No.
5      Q.  Okay.  I know that was a while ago so I'll
6   run through some of the basic ground rules.  The
7   court reporter who's sitting to your right is the
8   most important person in the room.  She is recording
9   everything we say.  She can not transcribe if we're
10  talking at the same time.  So please let me ask my
11  question completely before you respond and I will do
12  the same for your answers so that we're not talking
13  over one another.  Is that okay?
14      A.  Yes.
15      Q.  Also it's important to answer audibly, not
16  with a nod or shake of the head or huh-uh.  Does
17  that make sense?
18      A.  Yes.
19      Q.  If you need to take a break just let me
20  know.  My only request is that we do not take a
21  break while a question is pending.  Do you
22  understand?
23      A.  Yes.
24      Q.  From time to time your attorney or
25  Ms. D'Allaird may object to one of my questions.

---

Page 8

1   Those objections are for the judge to decide later,
2   not to your answers.  In the meantime you need to
3   answer the question unless your attorney instructs
4   you not to answer.  Does that make sense?
5      A.  Yes.
6      Q.  Is there any reason why you can't testify
7   competently and honestly here today?
8      A.  No.
9      Q.  Great.
10      MS. D'ALLAIRD:  Counsel, I apologize for
11  interrupting.  Can we stipulate at the outset that
12  any objections made by Mr. Wang's attorney will also
13  be preserved as to the SEC?
14      MR. DE JARNETTE:  Yes, we agree to that.
15      MS. D'ALLAIRD:  Thank you.
16  BY MR. DE JARNETTE:
17      Q.  Mr. Wang, you're represented by counsel
18  here today; correct?
19      A.  Yes.
20      Q.  Who is your counsel?
21      A.  James Copeland.
22      Q.  Are you represented by any other legal
23  counsel in this matter?
24      A.  Yes.
25      Q.  Who is that?

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                                   January 09, 2020

Page 9

1    A.  Morgan Lewis, Mark Feller.
2    Q.  Anyone else?
3    A.  No.
4    Q.  Are you testifying here today pursuant to
5  a subpoena?
6    A.  Yes.
7    Q.  I'm handing the court reporter a document
8  to be marked as Exhibit 220.
9        (Exhibit 220 was marked for identification
10    by the Reporter.)
11  BY MR. DE JARNETTE:
12    Q.  Do you have Exhibit 220 in front of you?
13    A.  Yes.
14    Q.  Do you recognize this document?
15    A.  Yes.
16    Q.  What is it?
17    A.  Subpoena.
18    Q.  This is the subpoena that you're appearing
19  here pursuant to; correct?
20    A.  Correct.
21    Q.  And you see in the middle of the page it
22  says "testimony" and there's a check box?
23    A.  Yes.
24    Q.  You're appearing here for testimony
25  pursuant to this subpoena; correct?

Page 10

1    A.  Yes.
2    Q.  And you see below that there's a check box
3  for "production"?
4    A.  Yes.
5    Q.  Do you understand that you were subpoenaed
6  to produce documents in this matter?
7    A.  Yes.
8    Q.  Did you produce documents in this matter?
9    A.  I sent them to Mark Feller.
10       MR. COPELAND:  You received the document
11  production; right?
12       MR. DE JARNETTE:  Correct.
13    Q.  And your understanding is that your legal
14  counsel sent that document production to us?
15    A.  Yes.
16    Q.  Talk me through the process of providing
17  Mr. Feller with those documents.  Did you review the
18  documents before you sent them to Mr. Feller?
19    A.  Yes.
20    Q.  Did you -- how did you identify the
21  documents to send to Mr. Feller?
22    A.  He asked me for what I had for Kin/Kik and
23  then I searched my e-mail inbox for anything that
24  had Kin/Kik.
25    Q.  You just ran a search terms Kin or Kik

Page 11

1  through your inbox?
2    A.  Yes.
3    Q.  And you mentioned that you have Gmail?
4    A.  Yes.
5    Q.  Did you run the terms Kin or Kik through
6  your Google Drive?
7    A.  I don't recall.
8    Q.  Did you check any other source aside from
9  e-mails for responsive documents?
10    A.  I don't recall.
11    Q.  You don't recall checking your text
12  messages?
13    A.  No, I don't recall.
14    Q.  Is it possible that you have text messages
15  relating to Kin or Kik?
16    A.  I believe I have what's attorney-client
17  privilege messages with Matt Hibberd which I
18  screen-shotted as well.
19    Q.  Do you have any text messages relating to
20  Kin or Kik?
21    A.  I don't recall.
22    Q.  Did you check?
23    A.  I don't recall.
24    Q.  Is there a way to find out whether or not
25  you checked?

Page 12

1    A.  No.
2    Q.  Do you believe that you fully and
3  completed responded to the document subpoena?
4    A.  Yes.
5    Q.  What's your basis for that?
6    A.  I'm not --
7    Q.  So you testified that you're represented
8  by two law firms; right?
9    A.  Yes.
10    Q.  To the best of your knowledge -- I'm not
11  asking for a specific date.  When did you first
12  become represented by Morgan Lewis?
13    A.  I don't know the exact date.
14    Q.  Within the last six months?  Is that fair?
15    A.  Yes.
16    Q.  Were you represented by Mr. Feller at the
17  time of your testimony in 2018?
18    A.  The one with the SEC?
19    Q.  Right.
20    A.  No, I was not.
21    Q.  Were you represented by any legal counsel
22  at the time of that testimony in 2018?
23    A.  No.
24    Q.  When did Mr. Copeland first begin
25  representing you in this matter?

U.S. Securities and Exchange Commissionv. Videoxpectlve, Inc.                    Harrison Wang
                                                                                January 09, 2020

---

Page 13

1      A.  About a week ago.
2      Q.  But Mr. Feller is still representing you
3   as well; is that right?
4      A.  Yes.
5      Q.  I want to walk through your educational
6   background a little bit.  Can you tell me a little
7   bit about your education since college?
8      A.  Since college?
9      Q.  Since college.  You don't need to go back
10  to high school.
11     A.  So Johns Hopkins and then did a
12  programming boot camp in New York and then Columbia
13  University for a semester or two and then currently
14  USC MBA.
15     Q.  So to unpack that a little bit I take it
16  Johns Hopkins was your undergraduate degree?
17     A.  Correct.
18     Q.  And what was your major?
19     A.  Molecular and cellular biology.
20     Q.  Do you maintain a LinkedIn account?
21     A.  Yes.
22     Q.  I'm handing the court reporter what is
23  being marked as Exhibit 221.
24         (Exhibit 221 was marked for identification
25     by the Reporter.)

---

Page 14

1   BY MR. DE JARNETTE:
2      Q.  Exhibit 221 is a document that says
3   Harrison Wang at the top; is that right?
4      A.  Yes.
5      Q.  Do you recognize this document?
6      A.  Can you rephrase the question?
7      Q.  Is this a printout of your LinkedIn page?
8      A.  Yes.
9      Q.  Does it appear to be a correct and
10  accurate copy of your LinkedIn page?
11     A.  From a very brief glance, yes.
12     Q.  Do you update your LinkedIn profile on a
13  regular basis?
14     A.  No.
15     Q.  When is the last time you'd say that you
16  updated your LinkedIn profile?
17     A.  Couple months ago.
18     Q.  If you go to page 2 and then carrying on
19  to page 3 it looks like you graduated from Johns
20  Hopkins in 2010; is that right?
21     A.  Correct.
22     Q.  And then if you go up to your work
23  experience on page 2 it looks like your first job
24  out of college was working at Johns Hopkins
25  Hospital; is that right?

---

Page 15

1      A.  Correct.
2      Q.  And you were a research assistant?
3      A.  Correct.
4      Q.  What did you do as a research assistant?
5      A.  Just lab work.
6      Q.  So was it fair to say at this time that
7   you wanted to work in the medical field?
8      A.  Yes.
9      Q.  Did you ultimately change career paths?
10     A.  Yes.
11     Q.  Talk me through that.  Why did you change
12  careers?
13     A.  Didn't want to go to med school.
14     Q.  I take it that a major in molecular and
15  cellular biology is a natural feed into medical
16  school?
17     A.  For me, yes.
18     Q.  So you decided that you didn't want to go
19  to medical school and then you left Johns Hopkins
20  Hospital; is that fair?
21     A.  Yes.
22     Q.  And it looks like your next job was at
23  Leibal?
24     A.  Yes.
25     Q.  Talk me through that job.  What was it?

---

Page 16

1      A.  E-commerce business and I was business
2   dev.
3      Q.  What did you do in your role as a business
4   development employee?
5      A.  Find vendors.
6      Q.  Vendors for what?
7      A.  For products to source on the website.
8      Q.  You talked a little bit -- I don't think
9   on your LinkedIn profile but about a computer
10  programming course you took during college; is that
11  right?
12     A.  No.  Not during college.
13     Q.  After college?
14     A.  Yes.
15     Q.  Do you have any sort of degrees or
16  licenses in computer programming?
17     A.  No.
18     Q.  What did you learn in your course in
19  computer programming?
20     A.  It was Ruby on Rails.
21     Q.  Did you learn specific languages?
22     A.  Ruby.
23     Q.  Anything else?
24     A.  I think a very little HTML and Java
25  script.

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 17

1    Q.  Would you consider yourself to be a coder?
2    A.  No.
3    Q.  It looks like your next job was at
4  CliqueMe?
5    A.  Yes.
6    Q.  Tell me about that.
7    A.  I had founded it, cofounded it and it was
8  just -- it was like a tech widget that would sit on
9  websites.
10   Q.  Who was your co-founder?
11   A.  Nicholas Swinson.
12   Q.  Looks like you were there for a year and a
13 half?
14   A.  Yes.
15   Q.  What did you do after CliqueMe?
16   A.  I went to TagKey.
17   Q.  What did you do there?
18   A.  Product manager.
19   Q.  What is TagKey?
20   A.  It was a social media app.
21   Q.  Is it like social messaging?
22   A.  It was like Instagram.
23   Q.  So you could post photos on the app?
24   A.  Yes.
25   Q.  If you go to the first page it looks like

---

Page 18

1  your next job was at Flipagram?
2    A.  Yes.
3    Q.  And you were product and user growth
4  analyst?
5    A.  Yes.
6    Q.  Tell me about Flipagram?
7    A.  It's a slide show social media app.
8    Q.  If you go to the third bullet down this
9  says, "Report on key metrics and product
10 release/change impacts."  Do you see that?
11   A.  Yes.
12   Q.  What key metrics does this refer to?
13   A.  User numbers, engagement levels.
14   Q.  So things like monthly active users, daily
15 active users?
16   A.  Correct.
17   Q.  Is it fair to say that you're familiar
18 with social media user metrics?
19   A.  Yes.
20   Q.  Did you track dash boards while you were
21 at Flipagram regarding user metrics?
22   A.  Yes.
23   Q.  You refer to engagement.  What metrics
24 tracked engagement?
25   A.  Views, likes, shares.

---

Page 19

1    Q.  And you know way more about this than I do
2  but my understanding of Flipagram it allowed you to
3  generate a series of video clips that you could
4  ultimately post to Instagram.  Is that a fair
5  characterization?
6    A.  You can post to more than Instagram, like
7  Facebook.
8    Q.  Any other applications besides Facebook
9  and Instagram?
10   A.  That was the majority of these cases.
11   Q.  How did Flipagram make money?
12   A.  Watermark, selling watermark removal.
13 That was about it.
14   Q.  Did it generate any revenue from
15 advertising?
16   A.  No.  To my knowledge, no.
17   Q.  Flipagram was ultimately acquired; right?
18   A.  Correct.
19   Q.  Did you still work at Flipagram after the
20 acquisition?
21   A.  Well, it became ByteDance which we started
22 TikTok.
23   Q.  Did your role change at
24 Flipagram/ByteDance after the acquisition?
25   A.  I was promoted and yes, role slightly

---

Page 20

1  changed.
2    Q.  How so?
3    A.  I focused more on user growth as opposed
4  to analytics.
5    Q.  User growth meaning expanding the reach
6  and platform?
7    A.  Acquiring users.
8    Q.  And I take it you were focused on
9  retention as well?
10   A.  Correct.
11   Q.  Moving on to Blockfolio, it looks like
12 that was your next job after ByteDance; correct?
13   A.  Correct.
14   Q.  Why did you leave ByteDance?
15   A.  I had vested stock and then I was starting
16 school so Blockfolio was flexible.  I could work
17 just one day a week because MBA we get Fridays off.
18   Q.  Tell me about Blockfolio.  What is that?
19   A.  Cryptocurrency tracking application.
20   Q.  What specifically does Blockfolio track?
21   A.  Crypto prices.
22   Q.  Anything else?
23   A.  It has a news section.
24   Q.  At a general level what is shown in the
25 news section?

---

U.S. Securities and Exchange Commissionv. Vidocptacptve, Inc.                    Harrison Wang
                                                                                January 09, 2020

Page 21

1    A.   Syndicated articles from major crypto
2  publications.
3    Q.   Did you found Blockfolio?
4    A.   No.
5    Q.   What was your role at Blockfolio?
6    A.   Growth and analytics.
7    Q.   What attracted you to Blockfolio?
8    A.   A bunch of my colleagues and friends from
9  Flipagram went over there as well.
10    Q.   You mentioned analytics.  Are you
11  referring to crypto prices?
12    A.   No.
13    Q.   What you are referring to?
14    A.   In-app users, engagement.
15    Q.   The types of things that you tracked while
16  you were at Flipagram?
17    A.   Correct.
18    Q.   So to back up a little bit I know you know
19  all this but just to lay foundation for the record,
20  when you refer to crypto what do you mean?
21    A.   I guess cryptographically secure digital
22  current assets.
23    Q.   And you can correct me if I'm wrong but
24  those crypto assets are also referred to as
25  cryptocurrency; is that right?

Page 22

1    A.   Correct.
2    Q.   And the analytics you were doing, again,
3  you can correct me if I'm wrong, refer to the number
4  of users or types of transactions in those
5  cryptocurrencies; is that right?
6    A.   No.  So it's users checking -- users
7  coming into the application checking prices.
8  There's no transactions happening on Blockfolio.
9    Q.   Got it.  So you were tracking the users of
10  Blockfolio.
11    A.   Correct.
12    Q.   All right.  Do you recall at the time you
13  left Blockfolio how many monthly active users there
14  were?
15    MR. COPELAND:  Objection to the extent it
16  seeks private information that he might not be able
17  to disclose.  I'll instruct him not to answer that.
18  BY MR. DE JARNETTE:
19    Q.   Did Blockfolio publicly disclose its user
20  metrics?
21    A.   Not that I'm aware of.
22    Q.   Why did you leave Blockfolio?
23    A.   I didn't.
24    Q.   You're still at Blockfolio.  Okay.  I
25  apologize.  How much of your time would you say per

Page 23

1  week you spend on Blockfolio?
2    A.   In the last couple of months zero.
3    Q.   I take it because you're busy with school?
4    A.   School and I was working at Fair for a bit
5  for my summer internship.
6    Q.   And you're still working at Fair it looks
7  like?
8    A.   No.  That ended maybe about a month ago.
9    Q.   What were you doing at Fair?
10    A.   Growth and analytics.
11    Q.   Tracking users and things of that nature?
12    A.   Correct.
13    Q.   You testified that you're currently at USC
14  working towards your MBA; is that correct?
15    A.   Correct.
16    Q.   Are you studying anything specific?
17    A.   Just MBA.
18    Q.   After you graduate what career are you
19  hoping to pursue?
20    A.   Growth and analytics.
21    Q.   Any type of company or specific type of
22  company?
23    A.   I currently started working part time
24  while I'm in school for a new tech startup.
25    Q.   What is that new tech startup?

Page 24

1    A.   Flip Fit.
2    Q.   That's not on here; right?
3    A.   Correct.
4    Q.   When did you start?
5    A.   Mid December.  Actually -- sorry.  Mid
6  November.
7    Q.   And what do you do there?
8    A.   Growth and analytics.
9    Q.   What is Flip Fit?
10    A.   It's a social shopping app.
11    Q.   What can people shop for?
12    A.   Clothes.
13    Q.   Is Flip Fit a manufacturer or does it just
14  put you in touch with manufacturers of clothing?
15    A.   We source from brands.
16    Q.   Aside from Flip Fit and your LinkedIn
17  profile is there any other job experience that
18  you've had since college?
19    A.   I am also currently advising another
20  crypto company called Ember Fund.
21    Q.   What does that crypto company do?
22    A.   I guess it has funds in a mobile app that
23  consumers can invest in.
24    Q.   How is the fund related to crypto?
25    A.   The fund only has cryptocurrencies.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

---

Page 25

1    Q.  So the fund goes out and purchases
2  cryptocurrencies?
3    A.  No.  I'm not sure if it actually stores
4  the cryptocurrencies, but it lists funds where the
5  investments are just cryptocurrencies.
6    Q.  So Ember Fund is a website or application?
7    A.  Mobile app.
8    Q.  And it lists funds that hold
9  cryptocurrency?
10    A.  Correct.
11    Q.  And I take it that you work on data
12  analytics of the Ember Fund app?
13    A.  Correct.
14    Q.  Tracking user growth and things of that
15  nature?
16    A.  Correct.
17    Q.  Do you know how Ember Fund makes money?
18    A.  I do.
19    Q.  How does it make money?
20    A.  It takes a percentage fee of the
21  investments.
22    Q.  Are you a user of Ember Fund?
23    A.  I have an account but I have never
24  invested in a fund.
25    Q.  What is your understanding of blockchain

---

Page 26

1  technology?
2    A.  Can you rephrase the question?
3    Q.  Have you heard of the term "blockchain
4  technology"?
5    A.  Yes.
6    Q.  What is your understanding of it?
7      MR. COPELAND:  Objection.  Vague.  You can
8  answer.
9  BY MR. DE JARNETTE:
10    Q.  You can go ahead and answer.
11    A.  Decentralization, security, basically like
12  a protocol for exchange of data and storage.
13    Q.  Do you believe that blockchain technology
14  will facilitate a new age of the Internet?
15    A.  Yes.
16    Q.  Explain that.
17    A.  I think it will facilitate faster
18  transactions, especially financial.
19    Q.  So it's fair to say you would consider the
20  technology to be meaningful; right?
21      MS. D'ALLAIRD:  Objection.
22      THE WITNESS:  Yes.
23  BY MR. DE JARNETTE:
24    Q.  And cryptocurrencies is transacted on top
25  of this blockchain technology; right?

---

Page 27

1      MR. COPELAND:  Objection.  Vague.
2      MS. D'ALLAIRD:  Same objection.
3      MR. COPELAND:  You can answer.
4      THE WITNESS:  Yes.
5  BY MR. DE JARNETTE:
6    Q.  To ask another way, cryptocurrency is
7  transacted using blockchain technology?
8      MR. COPELAND:  Same objection.
9      MS. D'ALLAIRD:  Same objection.
10  BY MR. DE JARNETTE:
11    Q.  Have you heard of the term "utility
12  token"?
13    A.  Yes.
14    Q.  What is your understanding of that term?
15    A.  I guess a token that can be used to
16  transact.
17    Q.  So for example if a token could be used
18  within a digital application you would consider that
19  to be a utility token?
20      MR. COPELAND:  Objection.  Vague.
21  Misstates testimony.
22      MS. D'ALLAIRD:  Same objection.
23      THE WITNESS:  Yes.
24  BY MR. DE JARNETTE:
25    Q.  You purchased a cryptocurrency called Kin

---

Page 28

1  in 2017; right?
2    A.  Yes.
3    Q.  And Kin was sold by a company called Kik
4  Interactive?
5    A.  Yes.
6    Q.  Did you buy that Kin with any other
7  individual?
8    A.  Can you rephrase?
9    Q.  Do you own all of the Kin that you
10  purchased?
11    A.  No.
12    Q.  Explain that.
13    A.  My brother also purchased with me.
14    Q.  When you registered to purchase the token
15  did you include both of your names?
16    A.  No.
17    Q.  Whose name appears on the registration?
18    A.  Mine.
19    Q.  So do you have an agreement with your
20  brother regarding the purchase?
21    A.  No.
22    Q.  You just have an understanding that you
23  both own the Kin?
24    A.  Yes.
25    Q.  Did you pay for all the Kin yourself?

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                Harrison Wang
                                                                                 January 09, 2020

Page 29

1    A.  Yes.
2    Q.  So -- I'm just trying to understand the
3  logistics of you and your brother owning Kin.  Why
4  do you both hold the Kin as opposed to just you?
5    A.  Well, I guess the -- I guess to clarify
6  that point I guess it was under my name but it's our
7  family money.
8    Q.  Got it.  Does any family entity
9  technically hold the Kin like a trust or anything
10  like that?
11    A.  No.
12    Q.  Do you and your brother have any business
13  ventures together?
14    A.  No.
15    Q.  Have you and your brother purchased any
16  other cryptocurrency besides Kin?
17    MR. COPELAND:  Objection.  I'll object on
18  the right to privacy and instruct him not to answer.
19  BY MR. DE JARNETTE:
20    Q.  Are you going to follow your counsel's
21  advice?
22    A.  Yes.
23    Q.  I take it that -- and I know this is from
24  a long time ago, 2017, but I take it you
25  communicated with your brother about the purchase of

Page 30

1  Kin?
2    A.  Yes.
3    Q.  How primarily would you do that?
4    A.  We live together.
5    Q.  Okay.  Do you text with him?
6    A.  Yes.
7    Q.  Do you recall texting with your brother
8  about Kin?
9    A.  I don't recall.
10    Q.  You have no recollection at all about
11  whether or not you texted with your brother about
12  Kin?
13    A.  No, I don't.
14    Q.  Have you checked at any point in the last
15  year?
16    A.  No.
17    Q.  Are you aware the SEC filed a complaint
18  against Kik in June 2019?
19    A.  I wasn't aware of the date but I'm aware
20  of the filing.
21    Q.  Did you read that filing?
22    A.  I skimmed it.
23    Q.  When did you skim it?
24    A.  I don't recall.
25    Q.  Do you recall how you found out about the

Page 31

1  filing of the complaint?
2    A.  I don't recall exactly, but I know it was
3  like CoinDesk had picked it up, some major
4  publications but I don't know exactly which one.
5    Q.  What is your understanding of this case?
6    MS. D'ALLAIRD:  Objection.
7    MR. COPELAND:  Objection.  Vague and calls
8  for a legal conclusion.  You can answer.
9    THE WITNESS:  I can answer?
10    MR. COPELAND:  To the extent it's your own
11  and not based on conversations with your attorney.
12  BY MR. DE JARNETTE:
13    Q.  I'm not asking for any communications with
14  lawyers.  I'm asking for your own personal
15  understanding given that you read the complaint.
16    A.  I am not a legal expert but just from what
17  I understand it was selling an unregistered
18  security.
19    Q.  Is the SEC's claim?
20    A.  Yes.
21    Q.  Did you know that the SEC was going to
22  file a complaint before they filed it?
23    A.  I'm not sure when I knew.  I don't recall.
24    Q.  When you saw the complaint do you recall
25  whether or not that's the first time you learned of

Page 32

1  this case?
2    MS. D'ALLAIRD:  Objection.
3    THE WITNESS:  I mean, I guess I inferred
4  because I was subpoenaed before.
5  BY MR. DE JARNETTE:
6    Q.  During the SEC's investigation; right?
7    A.  Well, subpoenaed in 2018 or whenever,
8  yeah.
9    Q.  And that was before the complaint was
10  filed?
11    A.  I believe so.
12    Q.  After skimming the complaint what was your
13  overall impression of it?
14    A.  I don't recall what I thought at the time.
15    Q.  What about now?
16    MR. COPELAND:  Objection.  Vague.
17    MS. D'ALLAIRD:  Same objection.
18    THE WITNESS:  Answer?
19    MR. COPELAND:  Yes.
20    THE WITNESS:  I agree with a lot of it.
21  BY MR. DE JARNETTE:
22    Q.  What specifically do you agree with?
23    A.  It was -- there was a lot of -- in my
24  opinion deception from Kik and Kin's end.
25    Q.  Do you know whether or not the SEC is

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

---

**Page 33**

1  claiming that Kik deceived anyone?
2      MS. D'ALLAIRD:  Objection.
3      THE WITNESS:  I guess the part about the
4  exchanges and having liquidity.  Again I don't --
5  yeah, and the fact that when it was sold it was a
6  security.  I agree with those points.
7  BY MR. DE JARNETTE:
8      Q.  So you agree that when Kin was sold that
9  that was a securities transaction?
10     MS. D'ALLAIRD:  Objection.  I'll just note
11 for the record he's not an attorney.
12     MR. COPELAND:  Same objection.
13     MR. DE JARNETTE:  I'm just trying to
14 clarify his testimony.
15     THE WITNESS:  I think based on the little
16 I know about securities, yes.
17 BY MR. DE JARNETTE:
18     Q.  At the time that you purchased Kin did you
19 believe that you were purchasing a security?
20     MS. D'ALLAIRD:  Objection.
21     MR. COPELAND:  Same objection.
22     THE WITNESS:  To be honest I didn't know
23 what the difference was when I purchased.
24 BY MR. DE JARNETTE:
25     Q.  But before you purchased did you read

---

**Page 34**

1  anything or hear about the potential of
2  cryptocurrency transactions being deemed securities
3  transactions?
4      MS. D'ALLAIRD:  Objection.
5      THE WITNESS:  I don't recall.
6  BY MR. DE JARNETTE:
7      Q.  You testified I think based on the little
8  I know about securities, yes, about whether or not
9  the Kin sold was part of a securities transaction.
10 What is the basis for that answer?
11     MR. COPELAND:  Objection to the extent it
12 calls for attorney-client communications.  Again,
13 calls for a legal conclusion.  But you can answer.
14     MS. D'ALLAIRD:  Same objection.
15     THE WITNESS:  What was the question?
16 BY MR. DE JARNETTE:
17     Q.  What was the basis for your testimony that
18 based on your limited knowledge you agreed that the
19 sale of Kin could have been a securities
20 transaction?
21     A.  Based on a lot of what I've been reading
22 in the news.  I think there were a couple of
23 articles where lawyers like have written blog posts
24 about it.
25     Q.  Do you recall what those blog posts were?

---

**Page 35**

1      A.  I do not.
2      Q.  Do you recall who those attorneys were?
3      A.  I do not.
4      Q.  Do you recall when you read those blog
5  posts?
6      A.  I do not.
7      Q.  Did you recall how many blog posts there
8  were?
9      A.  I do not.
10     Q.  Did anything aside from the blog posts
11 that you just referenced form the basis of the
12 opinion you just testified about?
13     MS. D'ALLAIRD:  Objection.  Are you asking
14 him for an opinion as to whether or not it was the
15 legal term "securities transaction"?  I want to
16 clarify for the record because I'm confused.
17 BY MR. DE JARNETTE:
18     Q.  My last question was did anything aside
19 from the blog post that you just referenced form the
20 basis of your opinion, what you just testified to.
21 I'm only asking about what you read or referred to.
22     MS. D'ALLAIRD:  What opinion are you
23 referring to?
24     MR. DE JARNETTE:  The opinion he just
25 testified about that he agreed with portions of the

---

**Page 36**

1  complaint.  I'll reask the question.
2      Q.  So aside from the blog post that you just
3  referenced did anything else form -- did you rely on
4  anything else in forming the opinion that you just
5  testified to about?
6      MS. D'ALLAIRD:  Same objections.
7      THE WITNESS:  Can I answer?
8      MR. COPELAND:  Yes.
9      THE WITNESS:  I think conversations with
10 my legal --
11 BY MR. DE JARNETTE:
12     Q.  I'm not asking for you to divulge the
13 conversations with your legal counsel.  Is there
14 anything else aside from conversations with legal
15 counsel or the blog post that you relied on in
16 forming the basis of what you testified to?
17     MR. COPELAND:  Objection.
18     MS. D'ALLAIRD:  Same objection.
19     THE WITNESS:  Not that I can recall right
20 now.
21 BY MR. DE JARNETTE:
22     Q.  And you referred to legal counsel.  Who is
23 that legal counsel?
24     A.  Morgan Lewis and James Copeland.
25     Q.  I don't recall if we discussed this so I

---

Case 1:19-cv-05244-AKH   Document 60-60   Filed 03/20/20   Page 12 of 68

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.    Harrison Wang
January 09, 2020

Page 37

1 apologize if this has already been covered.  How did
2 you first become in contact with Mr. Copeland?
3     A.  I think it was about a year ago or year
4 and a half ago I had reached out because Kin/Kik
5 wasn't delivering a lot of the things they promised
6 and then, you know --
7     Q.  But he only began representing you as of a
8 week ago?
9     A.  Correct.
10     Q.  When you reached out to him -- or after
11 you reached out to him a year ago did you continue
12 to have conversations with Mr. Copeland?
13        MR. COPELAND:  Objection.  Calls for
14 attorney-client communications but you can answer
15 yes or no.
16        THE WITNESS:  No.
17 BY MR. DE JARNETTE:
18     Q.  So aside from that first conversation you
19 didn't have any contact with Mr. Copeland until
20 about a week ago?
21     A.  I think about the year, year and a half
22 ago we may have had two, three either calls or
23 e-mail exchanges and then that was it and then I
24 believe we spoke maybe three, four weeks ago.
25     Q.  When you reached out to Mr. Copeland a

Page 38

1 year, year and a half ago were you thinking about
2 filing a lawsuit?
3        MR. COPELAND:  Objection.  Attorney-client
4 privilege.  You can answer yes or no.
5        THE WITNESS:  Yes.
6 BY MR. DE JARNETTE:
7     Q.  But you haven't -- you haven't; correct?
8     A.  I have not.
9     Q.  Has the SEC's filing of the complaint had
10 an impact on the Kin that you purchased?
11        MS. D'ALLAIRD:  Objection.
12        MR. COPELAND:  Objection.  Calls for
13 speculation.  You can answer.
14        THE WITNESS:  I'm not sure.  I believe so.
15 BY MR. DE JARNETTE:
16     Q.  And how has it had an impact?
17     A.  So this is based on my conversations with
18 Matt Hibberd.  But he had said a lot of partners
19 were coming on board and then once the suit came out
20 he said a lot of those partners were weary as well
21 as exchanges were weary because of the lawsuit.
22     Q.  Who is Matt Hibberd?
23     A.  I believe he's head of US Kin right now
24 and he was head of business development at Kin/Kik
25 before that.

Page 39

1     Q.  Aside from your conversations with Matt
2 Hibberd do you have any other understanding whether
3 or not the SEC's filing of the complaint has
4 impacted your holdings of Kin?
5        MR. COPELAND:  Objection.  Calls for
6 speculation.
7        MS. D'ALLAIRD:  Same objection.
8        THE WITNESS:  I mean the price has gone
9 down since.
10 BY MR. DE JARNETTE:
11     Q.  And I'm not asking you to speculate but
12 based on your understanding do you believe that the
13 price going down is a direct reaction to the SEC
14 filing a complaint?
15        MR. COPELAND:  Objection.
16        MS. D'ALLAIRD:  Objection.
17 BY MR. DE JARNETTE:
18     Q.  Let me reask the question.  Based on your
19 understanding do you believe that the price going
20 down of Kin is a direct reaction to the SEC's filing
21 a complaint?
22        MR. COPELAND:  Same objection.
23        MS. D'ALLAIRD:  Same objection.
24        THE WITNESS:  I can't say for certain.
25 ///

Page 40

1 BY MR. DE JARNETTE:
2     Q.  Do you have any sense one way or the
3 other?
4        MR. COPELAND:  Same objection.
5        MS. D'ALLAIRD:  Same objection.
6        THE WITNESS:  My sense is it's Kin/Kik not
7 delivering what they promised.
8 BY MR. DE JARNETTE:
9     Q.  I appreciate the answer but that doesn't
10 answer my question.  I asked do you have a sense
11 whether or not the SEC's filing of the complaint
12 drove Kin's price down?
13        MR. COPELAND:  Same objection.
14        MS. D'ALLAIRD:  Same objection.
15        THE WITNESS:  I can't say.
16 BY MR. DE JARNETTE:
17     Q.  You testified my sense is it's Kin/Kik not
18 delivering on what they promised.  Can you explain
19 that?
20     A.  Sure.  So before we had invested there
21 were a lot of promises from Ted Livingston of
22 building out the eco system, of integrating Kin
23 within Kik, of being on major exchanges, of a token
24 burn, of -- I had a call with Tanner Philp who's
25 the -- I don't know what position he is now but

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                                  January 09, 2020

Page 41

1 director of corporate development I think back then.
2
3       A couple of days before the ICO where he
4 said there were apps coming on board.  The product
5 was ready.  Ted Livingston made a blog post on
6 medium I believe a week before the ICO where he
7 explained why he told his family and friends to
8 invest and in that blog post it said starting day
9 one Kin would be a partner and it would reach the
10 15,000,000 monthly active users.
11      Yeah.  Matt Hibberd, I had a conversation
12 with him, phone call with him in the summer of 2019
13 where he said apps were coming on board soon.
14 That's why they moved their office to San Francisco
15 because they were going to work with a bunch of app
16 developers.  They said -- I believe they were in
17 touch with 20, 30 major apps and that ten were
18 signed on and I asked how big they were.  He said
19 you would have definitely heard of these apps.
20      Yeah, just a lot of I think things that,
21 you know, either Ted said publicly, Fred Wilson said
22 publicly, Matt or Tanner told me on the phone or
23 written me in e-mails that have still not come to
24 fruition.
25     Q.  So I believe that you talked about a

Page 42

1 pretty broad time frame just now from 2017 to 2019.
2     A.  Sure.
3     Q.  Focusing on prior to the token
4 distribution of September 26, 2017 what specifically
5 do you recall reviewing relating to Kin?
6     A.  The white paper, it talked about the eco
7 system which hadn't been built out, the use cases
8 within Kik that hadn't been built out.  Ted I
9 believe there's a YouTube video and a CoinDesk
10 article where he said we're using Kik to boost the
11 price of Kin.  That the utility of it within Kik and
12 the 15,000,000 monthly active users would boost the
13 price of Kin.
14      The call with Tanner told us about
15 exchanges, working with major exchanges.  The medium
16 post that Ted made about the family, friends where
17 day one it would be in Kik.  That Wilson put a blog
18 post on his AVC website.  Dan Morehead and Joey Krug
19 from Pantera Capital mentioned some things that I
20 believe they talked to Fred about -- Ted Livingston
21 about and then the principal investor at I believe
22 Polychain Capital, Ryan something.  He had mentioned
23 something about Kin, Kik as well.
24     Q.  Was that public?
25     A.  Yeah.

Page 43

1     Q.  Do you recall reading any third party
2 articles such as from Business Insider relating to
3 Kin prior to your purchase?
4     A.  Yes, I believe so.
5     Q.  Aside from the sources that you just
6 talked about, is there anything else you recall
7 reviewing before you purchased Kin?
8     A.  I mean, the YouTube video where Ted gave
9 that talk about driving price up with Kin adoption
10 and Kik.
11     Q.  Do you recall whether or not he was
12 speaking at a conference or what was this video?
13     A.  He was on stage.  So I assume a
14 conference.
15     Q.  Do you know if it was a token summit?
16     A.  I don't know what event.
17     Q.  You used the term "price" a few times.  Do
18 you recall specifically Mr. Livingston ever using
19 the term "price"?
20     A.  In that video I don't know specifically
21 what word but he said --
22     Q.  So I'll stop you right there.  So you
23 can't recall specifically whether or not
24 Mr. Livingston used the term "price" in any of the
25 sources you just talked about?

Page 44

1         MR. COPELAND:  Objection.  Misstates
2 testimony.
3         MS. D'ALLAIRD:  Same objection.
4         THE WITNESS:  I don't recall.
5         MR. DE JARNETTE:  Let's take a break.
6 Let's go off the record.
7         THE VIDEO OPERATOR:  We're off the record
8 at 11:04.
9         (Recess taken.)
10        THE VIDEO OPERATOR:  We're back on the
11 record at 11:23.
12 BY MR. DE JARNETTE:
13     Q.  Mr. Wang, do you understand you're still
14 under oaths?
15     A.  Yes.
16     Q.  I wanted to ask another clarifying
17 question.  You testified that you reached out to
18 Mr. Copeland last year.  Why did you reach out to
19 Mr. Copeland in particular?
20     A.  Someone had I believe posted on Reddit
21 about if anyone was interested that Mr. Copeland --
22 I guess has experience in the space.
23     Q.  If anyone was interested in what?
24     A.  In pursuing legal action.
25     Q.  Generally or with respect to Kik?

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                                   January 09, 2020

---

Page 45

1    A.  It was in the Kik sub-Reddit.
2    Q.  Do you recall who the user was?
3    A.  I do not.
4    Q.  Do you know whether or not it was
5  Mr. Copeland who posted?
6    A.  I don't know who posted it.
7    Q.  And based on your review of that Reddit
8  thread you reached out to Mr. Copeland?
9    A.  After doing my own research, yes.
10   Q.  What did that research entail?
11   A.  Looking on his website.
12   Q.  You testified that when you reached out to
13  Mr. Copeland last year that you were considering
14  filing a lawsuit; right?
15   A.  Correct.
16   Q.  Are you currently considering filing a
17  lawsuit?
18       MR. COPELAND:  Objection.  Calls for
19  attorney-client privilege.  I'll instruct you not to
20  answer.
21       THE WITNESS:  I'm not going to answer.
22       MR. DE JARNETTE:  Are you instructing him
23  not to answer yes or no?
24       MR. COPELAND:  Yes.
25       MR. DE JARNETTE:  You previously allowed

---

Page 46

1  him to answer yes or no to the same question a year
2  and a half ago.
3       MR. COPELAND:  Yes.
4       MR. DE JARNETTE:  Are you still going to
5  instruct him not to answer?
6       MR. COPELAND:  Yes.
7       MR. DE JARNETTE:  Is it your position that
8  that objection isn't waived?
9       MR. COPELAND:  Yes, that is my position.
10  BY MR. DE JARNETTE:
11   Q.  Have you discussed filing a lawsuit with
12  anyone aside from your legal counsel?
13   A.  Yes.
14   Q.  And who did you discuss filing the lawsuit
15  with beside your legal counsel?
16   A.  My brother.
17   Q.  Does your brother have an attorney-client
18  relationship with Mr. Copeland?
19       MR. COPELAND:  Objection.  Calls for a
20  legal conclusion.
21  BY MR. DE JARNETTE:
22   Q.  You can answer.
23   A.  No.
24   Q.  What did you talk to your brother about
25  with respect to potentially filing a lawsuit?

---

Page 47

1    A.  I don't --
2       MR. COPELAND:  Objection to the extent you
3  were just relaying information that came from an
4  attorney.  I'm objecting on attorney-client
5  privilege grounds, but you can answer as to anything
6  else.
7       THE WITNESS:  Yeah, I don't remember the
8  specifics but it was basically looking into the
9  possibility.
10  BY MR. DE JARNETTE:
11   Q.  And how recently have you had these
12  conversations?
13   A.  Within the last month.
14   Q.  What about the last week?
15   A.  Last week?  Yes.
16   Q.  And did you relay to your brother
17  communications that you had with Mr. Copeland?
18   A.  Not specifically, just that I was talking
19  to Mr. Copeland.
20   Q.  Do you recall generally what you conveyed
21  to your brother?
22   A.  I do not.
23   Q.  You can't give me a high level overview of
24  what your conversation with your brother was in the
25  last week?

---

Page 48

1    A.  Basically that Mr. Copeland is
2  representing and coming to the deposition.
3    Q.  Representing you?
4    A.  Representing me.
5    Q.  Anything else about that conversation?
6    A.  Not in the last week, no.
7    Q.  Did you explain to your brother in the
8  last week why Mr. Copeland is representing you?
9    A.  Yes.
10   Q.  What did you tell him?
11       MR. COPELAND:  Objection.  Again.  To the
12  extent it calls for relaying information that I
13  provided to you, you don't have to answer on
14  attorney-client grounds but you can answer
15  otherwise.
16       MR. DE JARNETTE:  Counsel, are you
17  claiming that communications through his brother
18  won't waive the privilege?
19       MR. COPELAND:  I am, yes.  That there
20  would be a common-interest privilege between the two
21  of them.
22       MR. DE JARNETTE:  I'll reask the question.
23   Q.  Did you explain to your brother in the
24  last week why Mr. Copeland is representing you?
25       MR. COPELAND:  Same objection but you can

---

U.S. Securities and Exchange Commissionv. Kidotactive, Inc.                    Harrison Wang
                                                                              January 09, 2020

Page 49

1  answer.
2       THE WITNESS:  For the deposition.
3  BY MR. DE JARNETTE:
4       Q.  Did you tell your brother whether or not
5  Mr. Copeland is representing you for any other
6  reason other than the deposition?
7       MR. COPELAND:  Same objection but you can
8  answer.
9       THE WITNESS:  Yes.
10 BY MR. DE JARNETTE:
11      Q.  And what did you say?
12      MR. COPELAND:  Same objection.  You can
13 answer as long as you can answer without providing
14 attorney-client privileged information.
15      THE WITNESS:  That we were looking into a
16 lawsuit.
17 BY MR. DE JARNETTE:
18      Q.  And as of today are you still looking into
19 that lawsuit?
20      MR. COPELAND:  Objection.  Calls for
21 attorney-client privilege.  Don't answer.
22 BY MR. DE JARNETTE:
23      Q.  Are you aware that the SEC conducted an
24 investigation into Kik before filing its complaint
25 in this matter?

Page 50

1       A.  Can you repeat the question?
2       Q.  Sure.  So you testified that you sat for
3  testimony in 2018 with the SEC; right?
4       A.  Correct, yes.
5       Q.  What is your understanding of why you sat
6  for testimony?
7       A.  That they are looking into Kik/Kin for
8  selling unregistered securities.
9       Q.  And you understand that was part of an
10 investigation?
11      A.  Yes.
12      Q.  Did the SEC contact you -- I mean, when do
13 you first recall the SEC contacting you in
14 connection with the investigation?
15      A.  I don't recall.
16      Q.  Do you remember who first contacted you?
17      A.  I believe it was James Murtha but I'm not
18 a hundred percent sure.
19      Q.  Mr. Murtha who's in the room with us
20 today?
21      A.  Correct.
22      Q.  Do you recognize Mr. Murtha?
23      A.  I do.
24      Q.  Is he the individual that took your
25 testimony?

Page 51

1       A.  Yes.
2       Q.  Did you meet Mr. Murtha in person in any
3  other circumstance aside from your testimony?
4       A.  No.
5       Q.  Have you met with Ms. D'Allaird who's in
6  the room with us today before today?
7       A.  I don't believe so.  I forgot who else was
8  in the initial -- the testimony.
9       Q.  No worries.  I know it's from a long time
10 ago.  I'm handing the court reporter a document to
11 be marked as Exhibit 222.
12      (Exhibit 222 was marked for identification
13      by the Reporter.)
14 BY MR. DE JARNETTE:
15      Q.  Exhibit 222 is Bates stamped Wang 00003
16 through 00013.  At the top the subject line is "Kik
17 Interactive, Inc."  It appears to be a Gmail e-mail.
18 Is that correct, Mr. Wang?
19      A.  Yes.
20      Q.  Do you recognize this document?
21      A.  Yes.
22      Q.  Is this an e-mail thread between you and
23 Mr. Murtha from the SEC?
24      A.  Yes.
25      Q.  Apologies.  We're going to be jumping

Page 52

1  around a little bit because the e-mail thread isn't
2  in chronological order, but I'm going to walk
3  through it in chronological order.  Does that make
4  sense?
5       So let's start on Bates -- and Bates
6  numbers are in the lower right corner to identify
7  the document.  Let's start on Wang 07.  Are you
8  there?  So I want to start at the very bottom of the
9  page where Mr. Murtha writes on January 8, 2018, you
10 see that?
11      A.  Yes.
12      Q.  He says, "Harrison and William, I tried
13 calling both of you.  I'm an enforcement attorney in
14 the SEC's Division of Enforcement along with my
15 colleagues copied on this e-mail, Jeff Leasure and
16 Brent Mitchell.  I'm conducting a nonpublic
17 investigation into Kik's Kin offering that took
18 place in September 2017."  Do you see that?
19      A.  Yes.
20      Q.  To the best of your knowledge is this the
21 first time that anyone from the SEC reached out to
22 you about your purchase of Kin?
23      A.  I don't remember.
24      Q.  Do you recall anyone reaching out to you
25 prior to this January 8, 2018 e-mail?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                                   January 09, 2020

Page 53

1     A.  Again, I don't remember.  I don't believe
2  so.
3     Q.  Do you recall whether or not this is the
4  first time that you heard that the SEC was
5  conducting an investigation into Kik's sale of Kin?
6     A.  I don't remember.
7     Q.  So we can't see from this e-mail who
8  exactly Mr. Murtha e-mailed, however given that he
9  says Harrison and William, is it your understanding
10  that he wrote this e-mail to both you and your
11  brother?
12     A.  I don't remember if my brother was on the
13  e-mail.
14     Q.  Given that your name was the one that
15  appeared on the registration do you have an
16  understanding of why Mr. Murtha reached out to both
17  you and your brother?
18        MR. COPELAND:  Objection.  Calls for
19  speculation.
20        MS. D'ALLAIRD:  Same objection.
21  BY MR. DE JARNETTE:
22     Q.  You can answer.
23     A.  Oh, I don't.
24     Q.  So you respond one above on January 10,
25  2018, "Hi James.  I just trying calling you back.

Page 54

1  Please give me a call at your earliest convenience.
2  Thank you."  Do you see that?
3     A.  Yes.
4     Q.  Do you recall why you called Mr. Murtha
5  back?
6     A.  I don't.
7     Q.  Do you recall whether or not you spoke to
8  Mr. Murtha in January of 2018?
9     A.  I honestly don't remember.
10     Q.  If you flip forward to 05 you see near the
11  bottom of the page you write an e-mail to Mr. Murtha
12  on January 12, 2018 and you write, "Hi James, I
13  apologize for the late response.  Tuesday at
14  2:00 P.M. EST works.  Talk to you then."  You see
15  that?
16     A.  Yes.
17     Q.  Does this refresh your recollection of
18  whether or not you had a call with Mr. Murtha in
19  January of 2018?
20     A.  Yes.
21     Q.  Meaning that you did have a call with
22  Mr. Murtha in January 2018?
23     A.  I guess, I don't know the date or the
24  month, but we did talk before I gave testimony.
25     Q.  Do you recall the first phone conversation

Page 55

1  that you had with Mr. Murtha?
2     A.  I do not.
3     Q.  Do you recall any specific phone
4  conversation with anyone from the SEC regarding your
5  purchase of Kin?
6     A.  I remember there was a conversation, but I
7  remember being asked some questions but I don't
8  recall.
9     Q.  So just to be clear, you do not
10  specifically remember having a phone conversation
11  with Mr. Murtha in January of 2018?
12     A.  I guess I don't recall the month, but
13  there was a conversation before I gave testimony.
14     Q.  Tell me about that conversation.
15     A.  Again, James asked me some questions.  I
16  can't off the top of my head recall what
17  specifically was asked.
18     Q.  What about generally?
19     A.  Sorry?
20     Q.  What about generally?
21     A.  I think it was generally about the sale of
22  the Kin token.
23     Q.  Do you recall Mr. Murtha explaining to you
24  why the SEC was investigating Kik?
25     A.  I don't recall if it was on the call or in

Page 56

1  person in the testimony.
2     Q.  But you recall Mr. Murtha explaining to
3  you why the SEC was investigating Kik?
4        MS. D'ALLAIRD:  Objection.
5        THE WITNESS:  At some point, yes.
6  BY MR. DE JARNETTE:
7     Q.  And what do you recall about that
8  explanation?
9     A.  From what I can recall it was centered
10  around the sale of unregistered security.
11     Q.  Do you recall Mr. Murtha explaining the
12  SEC's basis for that?
13        MS. D'ALLAIRD:  Objection.
14        THE WITNESS:  I don't.
15  BY MR. DE JARNETTE:
16     Q.  In your phone conversations with
17  Mr. Murtha do you recall anyone else being on the
18  line from the SEC?
19     A.  I believe so.
20     Q.  Would you recognize the name if I said it?
21     A.  No.
22     Q.  You mentioned that Mr. Murtha asked you
23  some questions.  Do you remember any question that
24  he asked you?
25     A.  No.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                          January 09, 2020

Page 57

1      Q.   Did you happen to take notes from your
2  call with Mr. Murtha?
3      A.   No.
4      Q.   But it's fair to say that your
5  conversation with Mr. Murtha ultimately led to you
6  sitting for testimony in 2018; correct?
7         MS. D'ALLAIRD:   Objection.
8         MR. COPELAND:   Objection.   Misstates
9  testimony.
10        THE WITNESS:   Do I answer?
11        MR. COPELAND:   Yes, you can answer.
12        THE WITNESS:   What was the question?
13  BY MR. DE JARNETTE:
14     Q.   Is it fair to say that your conversations
15  with Mr. Murtha ultimately led to you sitting for
16  testimony in 2018?
17        MR. COPELAND:   Same objection.
18        MS. D'ALLAIRD:   Same objection.
19        THE WITNESS:   I can't say.
20  BY MR. DE JARNETTE:
21     Q.   What is your understanding of why you sat
22  for testimony in 2018 with the SEC?
23     A.   I was one of the larger purchasers.
24     Q.   Do you recall how much you purchased?
25     A.   I believe close to 1.6 million.

Page 58

1      Q.   US dollars?
2      A.   US dollars.
3      Q.   Did you make that purchase in US dollars?
4      A.   No.
5      Q.   What did you make the purchase in?
6      A.   Ethereum.
7      Q.   And Ethereum is another type of
8  cryptocurrency; right?
9      A.   Yes.
10     Q.   Out of curiosity have you sold any of your
11  Kin?
12     A.   No.
13     Q.   Why not?
14     A.   Nowhere to sell.
15     Q.   Was that the case the entire time that you
16  held Kin?
17     A.   Yes.
18     Q.   What is your basis for that?
19     A.   It's not on any major reputable exchanges.
20     Q.   Did you happen to try to sell on any
21  exchange at any point in time?
22     A.   No.
23     Q.   So if you go to the very bottom of 04 and
24  then going on to 05 Mr. Murtha appears to reach back
25  out to you on June 13, 2018.   You see that?

Page 59

1      A.   Yes.
2      Q.   He says, "I left you a voice mail on
3  Monday.   We're reaching back out to participants in
4  the Kin offering and requesting to speak with them
5  in person.   This is a more formal process that
6  involves a court reporter creating a record of our
7  conversation.   Can you please call me to discuss
8  logistics."   Do you recall seeing that?
9      A.   Yes.
10     Q.   Do you recall receiving this e-mail?
11     A.   I don't recall but I see it, yes.
12     Q.   To the best of your knowledge based on
13  this e-mail isn't it true that Mr. Murtha left you a
14  voice mail?
15     A.   I mean, I don't really check voice mails.
16     Q.   Do you know if he did in fact leave you a
17  voice mail if that would still be on your phone?
18     A.   I don't know.
19     Q.   Did you provide any voice mails to your
20  legal counsel?
21     A.   I did not.
22     Q.   Do you delete voice mails?
23     A.   I -- no.
24     Q.   Do you delete text messages?
25     A.   Yes.

Page 60

1      Q.   How often?
2      A.   I don't know.
3      Q.   Have you deleted text messages in the last
4  month?
5      A.   Not that I can recall.
6      Q.   What about since your testimony in 2018?
7      A.   I don't recall.
8      Q.   Mr. Murtha says, "This is a more formal
9  process that would involve a court reporter."   Did
10  you understand what he meant by that?
11     A.   Yes.
12     Q.   And what was your understanding?
13     A.   That there would be a court reporter.
14     Q.   Do you know what he meant by "more formal
15  process"?
16        MS. D'ALLAIRD:   Objection.
17        THE WITNESS:   I don't remember.
18  BY MR. DE JARNETTE:
19     Q.   Moving on to the next page, 04 near the
20  top of the page it looks like Mr. Murtha e-mails you
21  again on June 22.   You see that?
22     A.   Yes.
23     Q.   And he says, "I'm still trying to reach
24  you and would like to speak to you or with you early
25  next week on the phone to discuss setting up formal

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.      Harrison Wang
January 09, 2020

Page 61

1  testimony which we will compel via federal
2  subpoena."  Do you see that?
3      A.  Yes.
4      Q.  It appears that Mr. Murtha e-mailed you
5  nine days after his June 13 e-mail; correct?
6      A.  Yes.
7      Q.  Is there a reason you didn't respond to
8  him during that time?
9      A.  I don't recall.
10     Q.  Do you recall having a reaction to
11 Mr. Murtha's e-mails that he wanted you to be a part
12 of a more formal process?
13     MS. D'ALLAIRD:  Objection.
14     THE WITNESS:  Yes.
15 BY MR. DE JARNETTE:
16     Q.  What was your reaction?
17     A.  Frustration.
18     Q.  Because of inconvenience and things like
19 that?
20     A.  Yes.
21     Q.  Mr. Murtha continues, "This is nothing to
22 be alarmed about.  It is standard operating
23 procedure for us to serve subpoenas on witnesses for
24 sworn testimony."  Do you see that?
25     A.  No.  Where is that?

Page 62

1      Q.  It's in the same e-mail that I was
2  referring to near the top of 04.
3      A.  Yes.
4      Q.  Mr. Murtha made a reference to there being
5  nothing to be alarmed about.  Were you alarmed in
6  receiving this e-mail?
7      A.  Yes.
8      Q.  Why?
9      A.  I've never been subpoenaed.
10     Q.  At this time were you represented by legal
11 counsel?
12     A.  No.
13     Q.  Did you have any view on whether you
14 wanted the SEC to investigate Kik?
15     MS. D'ALLAIRD:  Objection.
16     THE WITNESS:  I don't recall.
17 BY MR. DE JARNETTE:
18     Q.  So Mr. Murtha continues, "We can talk more
19 on the phone but this would be very short in-person
20 testimony that would take place in our Los Angeles
21 office.  It would cover the same basic topics we
22 discussed over the phone in January."  You see that?
23     A.  Yes.
24     Q.  Does this refresh your recollection on
25 whether or not you had a phone conversation with

Page 63

1  Mr. Murtha in January of 2018?
2      A.  I mean, again, I don't remember exactly
3  when the call happened, but yeah, I guess it was in
4  January.
5      Q.  Based on your review of this e-mail.
6      A.  Correct.
7      Q.  You respond to Mr. Murtha the same day, if
8  you go to 03 and continue on to 04.  You start,
9  "James, I just started a new job so I don't have
10 time to be taking off.  Do you know what the timing
11 of this will be?"  You see that?
12     A.  Yes.
13     Q.  Does that reflect the frustration you were
14 feeling in receiving these e-mails?
15     A.  Yes.
16     Q.  You continue, "What did you want to ask me
17 about?  Since our last talk Kin has started
18 executing the proposed roadmap so I no longer have
19 an issue with the project?  Do you see that?
20     A.  Yes.
21     Q.  I want to take that in parts.  You first
22 said that Kin has started executing the proposed
23 roadmap.  What did you mean by that?
24     A.  I believe at that time they started making
25 public announcements about partnerships.  They

Page 64

1  finally finalized the blockchain after switching
2  twice, and then so I thought they were starting to
3  actually do what they said they were going to do.
4      Q.  By partnerships are you referring to other
5  digital applications integrating Kin within their
6  apps?
7      A.  Correct.  As well as Kik.
8      Q.  As well as Kik integrating Kin/Kik within
9  its app?
10     A.  Correct.
11     Q.  We've been talking about integrating Kin
12 or tokens with digital applications.  Can you
13 explain what a user can do once a token is
14 integrated within a digital application?
15     MS. D'ALLAIRD:  Objection.
16     THE WITNESS:  It would depend on the
17 application.
18 BY MR. DE JARNETTE:
19     Q.  Have you happened to use a digital token
20 within a digital application before?
21     MR. COPELAND:  Objection.  Vague.
22     MS. D'ALLAIRD:  Same objection.
23     THE WITNESS:  Before this point?
24 BY MR. DE JARNETTE:
25     Q.  How about at any point in time?

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                                   January 09, 2020

---

Page 65

1    A.  Yes.
2    Q.  And what token was that?
3    A.  Kin.
4    Q.  What digital application did you use Kin
5    in?
6    A.  So Kin started like a developer program
7    recently in the last couple of months.  And they --
8    basically a bunch of Indeed developers launched a
9    couple of very new small apps that we were unable to
10   use the Kin we purchased in, but you could earn Kin
11   within those apps and then spend it within those
12   apps.
13   Q.  Did you earn Kin within those apps?
14   A.  I did.
15   Q.  Do you recall which apps they were?
16   A.  I think one was KinFit.  That's the only
17   one -- there was like a Kin Wallet one as well.  I
18   forgot what it was called.  I did test a couple of
19   those new apps.
20   Q.  What was the wallet application you were
21   referring to?  KinIt?
22   A.  Yes.
23   Q.  What is your understanding of KinIt?
24   A.  My understanding is that Kik created it.
25   I forgot how they earn within the app but you can I

---

Page 66

1    believe buy gift cards through the app but we
2    weren't allowed to transfer our own Kin in there.
3    Q.  Did you spend Kin within KinIt?
4    A.  Yes.
5    Q.  What did you purchase?
6    A.  Gift cards.
7    Q.  Do you recall what gift cards?
8    A.  I believe there was Starbucks.  I don't
9    remember.
10   Q.  Do you remember when that purchase took
11   place?
12   A.  I don't.
13   Q.  Do you recall if it was within the last
14   six months?
15   A.  I don't.
16   Q.  Do you have any way to find out?
17   A.  You can ask Kik I guess.  They own the
18   app.
19   Q.  Did you happen to have any of these apps
20   currently installed on your phone?
21   A.  Yes.
22   Q.  Which ones?
23   A.  I don't recall.
24   Q.  KinIt would be one of them?
25   A.  I don't recall.  I may have deleted it.

---

Page 67

1    Q.  But to the best of your knowledge you have
2    at least one application on your phone that you can
3    earn or spend Kin in; correct?
4    A.  Yes.
5    Q.  I want to clarify the timing.  You
6    testified about a developer program within the last
7    few months.  What's your basis for the timing being
8    within the last three months?
9    A.  I don't know.  Just --
10   Q.  Are you aware whether there was a
11   developer program earlier than the last few months?
12   MR. COPELAND:  Objection.  Calls for
13   speculation.
14   THE WITNESS:  I don't know the exact time
15   line, but maybe like 10, 11, 12 months.  I don't
16   know.
17   BY MR. DE JARNETTE:
18   Q.  Just to sum up your testimony, you have
19   earned Kin within digital applications; correct?
20   A.  Yes.
21   Q.  So it's fair to say you have also spent
22   Kin within digital applications; correct?
23   A.  Correct.
24   Q.  So it's fair to say you have used Kin as a
25   medium of exchange; correct?

---

Page 68

1    MR. COPELAND:  Objection.  Calls for a
2    legal conclusion.  You can answer.
3    THE WITNESS:  Yes.
4    BY MR. DE JARNETTE:
5    Q.  What does medium of exchange mean to you?
6    MS. D'ALLAIRD:  Objection.
7    MR. COPELAND:  Same objection.
8    THE WITNESS:  I don't know.
9    BY MR. DE JARNETTE:
10   Q.  But you just testified that Kin is a
11   medium of exchange; correct?
12   MR. COPELAND:  Objection.  Misstates
13   testimony.
14   MS. D'ALLAIRD:  Same objection.
15   THE WITNESS:  I -- I don't recall.
16   BY MR. DE JARNETTE:
17   Q.  You testified that you use Kin as a medium
18   of exchange; correct?
19   MS. D'ALLAIRD:  Objection.
20   THE WITNESS:  I don't remember the exact
21   words.
22   BY MR. DE JARNETTE:
23   Q.  I'm just trying to get a general
24   understanding of when you said yes to that question
25   what your understanding -- what your understanding

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Videotape

Harrison Wang
January 09, 2020

Page 69

1  was of medium of exchange?
2      A.  Yes to what question?
3      Q.  That you've used Kin as a medium of
4  exchange.
5      A.  I guess as something you can transact
6  with.
7      Q.  Such as currency like the US dollar?
8      A.  Yes.
9      Q.  And you used that Kin to purchase a
10 Starbucks gift card; right?
11     A.  A gift card.  I don't recall if it was
12 Starbucks.
13     Q.  So it's fair to say that you can use Kin
14 to transact for goods and services; right?
15         MR. COPELAND:  Objection.  Vague.
16         MS. D'ALLAIRD:  Objection.  Are you giving
17 a time frame for this?
18         THE WITNESS:  Do I answer?
19         MR. COPELAND:  You can answer.
20         THE WITNESS:  I can't use my Kin to
21 transact.
22 BY MR. DE JARNETTE:
23     Q.  For goods and services; right?
24     A.  Right.
25     Q.  But you purchased the gift card; right?

Page 70

1      A.  I'm saying the Kin that I purchased in the
2  ICO I cannot use.
3      Q.  I'm asking about Kin generally.  Because
4  you testified that you used Kin to purchase a
5  Starbucks gift card.  You can use Kin as a general
6  matter to purchase goods and services; correct?
7          MR. COPELAND:  Objection.  Vague.
8          MS. D'ALLAIRD:  Same objection.
9          THE WITNESS:  Yes.
10 BY MR. DE JARNETTE:
11     Q.  Are you aware of other individuals aside
12 from yourself that have used Kin to purchase goods
13 and services?
14     A.  Yes.
15     Q.  Who else?
16     A.  My brother.
17     Q.  What has he purchased with Kin?
18     A.  Gift cards.
19     Q.  Through KinIt?
20     A.  Yes.
21     Q.  Anything else?
22     A.  Not that I'm aware of.
23     Q.  Aside from KinIt and KinFit do you recall
24 any other applications that you have either earned
25 or spent Kin in?

Page 71

1      A.  I mean, I do remember using other
2  applications, but I don't recall the names.
3      Q.  Do you have a general sense of how many
4  applications that was?
5      A.  General sense maybe five.
6      Q.  In addition or including KinIt and KinFit?
7      A.  Including.
8      Q.  So you've earned or spent Kin in roughly
9  five digital applications; is that right?
10     A.  Roughly.
11     Q.  What about your brother?  Do you know?
12     A.  I don't know.
13     Q.  But it was at least KinIt?
14     A.  At least KinIt.
15     Q.  What about Kik?
16     A.  No.
17     Q.  Why not?
18     A.  I don't believe it's in there.
19     Q.  What do you mean by that?
20     A.  I don't believe we can use Kin in Kik.
21     Q.  What is the basis for your belief?
22     A.  I mean -- I just don't know of any.
23     Q.  So you just don't know one way or the
24 other whether or not you can use Kin within Kik?
25         MR. COPELAND:  Objection.  Misstates

Page 72

1  testimony.
2          MS. D'ALLAIRD:  Same objection.
3          THE WITNESS:  I have -- so I've heard or
4  read that users have been invited to a beta program
5  within Kik that is not publicly available.  I am not
6  in that private beta, and I believe they were able
7  to buy stickers or something.  I'm not clear.  I
8  don't recall exactly.
9  BY MR. DE JARNETTE:
10     Q.  Have you ever tried to earn or spend Kin
11 within Kik?
12     A.  No.
13     Q.  So is it fair to say that all of the
14 earning and spending in Kin that you've done has
15 been outside of the Kik application; correct?
16     A.  Correct.
17     Q.  Sorry.  We went off on a little bit of a
18 tangent.  Going back to Exhibit 222 at the top of 04
19 you said, "So I no longer have an issue with the
20 project."  Do you see that?
21     A.  Uh-huh.
22     Q.  What did you mean by that?
23     A.  I guess I saw them starting to -- or at
24 least publicly announce they were going to do the
25 things they said they would do in the white paper or

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                                  January 09, 2020

Page 73

1 when I talked to Tanner so I just wanted them -- at
2 that time to just continue what they were doing.
3     Q.  Were you trying to tell Mr. Murtha that
4 you didn't want to be involved because you no longer
5 had an issue with the project?
6         MS. D'ALLAIRD:  Objection.
7         THE WITNESS:  I don't recall my intention.
8 BY MR. DE JARNETTE:
9     Q.  You talked about your brother earning and
10 spending Kin within digital applications.  Are you
11 aware of anyone else besides your brother?
12     A.  I know I -- I do remember telling other
13 people that they could do it, but I don't recall if
14 they actually did it.
15     Q.  Do you remember who you told?
16     A.  I don't remember specifically.
17     Q.  Do you remember when?
18     A.  I mean, no, I don't.
19     Q.  Do you remember how you did that?  Was it
20 in writing?
21     A.  It was in person.
22     Q.  Do you recall if it was within the last
23 six months?
24     A.  I don't recall.
25     Q.  Do you have any way to find out?

Page 74

1     A.  Not that I know of.
2     Q.  Going to 03 do you see that Mr. Murtha
3 responds to your e-mail on June 25, 2018?
4     A.  Yes.
5     Q.  He writes, "We are planning to be in LA
6 July 17 and 18 interviewing public sale investors
7 such as yourself.  The topics we plan to discuss are
8 similar to what we discussed during our last call."
9 Do you see that?
10     A.  Yes.
11     Q.  Does this refresh your recollection on the
12 topics that were discussed on your earlier call?
13     A.  It does not.
14     Q.  Mr. Murtha says, "I anticipate needing
15 three to four hours of your time."  Do you see that?
16     A.  Yes.
17     Q.  I know you didn't recall the specific
18 topics you talked about with Mr. Murtha in January,
19 however, do you recall how long you talked on the
20 phone with him?
21     A.  On the phone?  No, I don't.
22     Q.  Ballpark would you say less than an hour?
23     A.  I don't recall.
24     Q.  Looking at this e-mail and seeing that
25 he's requesting three to four hours to talk to you,

Page 75

1 does it seem like he previously talked to you for
2 three to four hours?
3         MS. D'ALLAIRD:  Objection.
4         THE WITNESS:  No.
5 BY MR. DE JARNETTE:
6     Q.  So you believe that your initial
7 conversation with Mr. Murtha was less than three to
8 four hours.
9     A.  Yes.
10     Q.  Do you have any sense at all how long that
11 conversation was?
12     A.  No.
13     Q.  So it's possible it was two hours?
14         MS. D'ALLAIRD:  Objection.
15         THE WITNESS:  I don't recall.
16 BY MR. DE JARNETTE:
17     Q.  Reading this e-mail did Mr. Murtha respond
18 to your e-mail where you stated, "Since our last
19 talk Kin has starting executing the proposed roadmap
20 so I no longer have an issue with the project?"
21         MS. D'ALLAIRD:  Objection.
22         THE WITNESS:  I don't recall.
23 BY MR. DE JARNETTE:
24     Q.  What about from reading his response in
25 Exhibit 222?

Page 76

1         MS. D'ALLAIRD:  Objection.
2         MR. COPELAND:  Objection.
3         THE WITNESS:  Which response?
4 BY MR. DE JARNETTE:
5     Q.  At the top of 03 where Mr. Murtha responds
6 to your e-mail.
7     A.  I don't recall.
8     Q.  Okay.  That's fine.  We can move on.
9 Let's skip to 08.  So the middle of the page
10 Mr. Murtha e-mails you on June 26, 2018.  Do you see
11 that?
12     A.  Yes.
13     Q.  I know that we jumped forward but based on
14 the timing of this e-mail thread do you believe that
15 this is the next in time e-mail after Mr. Murtha's
16 e-mail on 03?
17         MS. D'ALLAIRD:  Objection.
18         THE WITNESS:  I don't recall.
19 BY MR. DE JARNETTE:
20     Q.  I'm not going to go through each one of
21 these e-mails, however, it appears that you discuss
22 logistics with Mr. Murtha about coordinating your
23 testimony in LA.  Is that fair?
24         MS. D'ALLAIRD:  Objection.
25         THE WITNESS:  Yes.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                                  January 09, 2020

---

Page 77

1  BY MR. DE JARNETTE:
2      Q.  If you go to the bottom of 09 Mr. Murtha
3  e-mails you on June 28, 2018.  Do you see that?
4      A.  Yes.
5      Q.  He says, "Attached is a subpoena I
6  referenced below calling for your testimony on
7  July 17, 2018 at 9:00 A.M."  Do you see that?
8      A.  Yes.
9      Q.  Do you recall receiving a subpoena?
10     A.  Yes.
11     Q.  He goes on to say in the next paragraph,
12 "You will see that the subpoena also calls for the
13 production of documents.  I want to make that
14 process as easy as possible for you so please give
15 me a call at your convenience and I'll explain how
16 to most easily produce responsive documents."  Do
17 you see that?
18     A.  Yes.
19     Q.  Did you produce documents in response to
20 this subpoena?
21     A.  No.
22     Q.  Do you recall why not?
23     A.  I don't recall the specifics.
24     Q.  But you know for sure you did not produce
25 documents at this time to the SEC.

---

Page 78

1      A.  Not that I can remember.
2      Q.  Do you recall having a call with
3  Mr. Murtha to make the process of potentially
4  producing documents as easy as possible for you?
5      A.  I don't recall that.
6      Q.  Please go to 011.  See near the top you
7  e-mail Mr. Murtha on July 12, 2018?
8      A.  Yes.
9      Q.  You write, "James, what is the new
10 schedule?  I need to coordinate with my legal
11 counsel."  You see that?
12     A.  Yes.
13     Q.  You testified earlier at this time that
14 you were not represented by legal counsel during
15 this time.
16     A.  Yes.
17     Q.  Were you represented by legal counsel?
18     A.  It was my friend who was a lawyer and I
19 guess there was nothing formal but he said if I
20 needed him there he could be there.
21     Q.  For the testimony.
22     A.  For the testimony or to prepare for the
23 testimony.
24     Q.  And I'm not asking for any communications
25 with your friend who's a lawyer, however, did you do

---

Page 79

1  anything to prepare with your friend?
2      A.  No.
3      Q.  Did he ultimately attend your testimony
4  with you?
5      A.  No.
6      Q.  So you made a decision that you didn't
7  need him for your testimony?
8      A.  Correct.
9      Q.  Again, without getting into any
10 communications with your friend, why did you make
11 that decision?
12     A.  I believe my friend -- I don't recall the
13 specifics, but I believe my friend just said the
14 SEC -- it's standard for investors sometimes.
15     Q.  To sit for testimony with the SEC?
16     A.  Correct.
17     Q.  Did Mr. Murtha or anyone else from the SEC
18 talk about potentially obtaining legal counsel?
19     A.  I don't recall.
20     Q.  All right.  Please go to 012.  See in the
21 middle of the page Mr. Murtha e-mails you on
22 July 12, 2018?
23     A.  Yes.
24     Q.  He says, "Harrison, thanks for speaking
25 with me again today."  Do you see that?

---

Page 80

1      A.  Yes.
2      Q.  You testified earlier that you recalled
3  talking to Mr. Murtha before your testimony.  Is
4  this the conversation that you had?
5      A.  I don't recall.
6      Q.  Do you recall speaking with Mr. Murtha on
7  the phone in July 2018?
8      A.  I don't recall.
9      Q.  If you go to the last paragraph Mr. Murtha
10 says, "Also, as we discussed the staff has agreed to
11 postpone the request for the production of documents
12 pursuant to the subpoena.  The request that you
13 preserve all responsive documents to the subpoena in
14 the event the staff deems it necessary for you to
15 produce documents at a later date."  Do you see
16 that?
17     A.  Yes.
18     Q.  Did you have an understanding of why the
19 staff agreed to postpone the request for production
20 of documents?
21        MS. D'ALLAIRD:  Objection.
22        MR. COPELAND:  Same objection.
23        THE WITNESS:  I don't recall.
24 BY MR. DE JARNETTE:
25     Q.  Do you recall at this point in time

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 81

1  searching to determine whether or not you had
2  responsive documents?
3      A.  I don't recall.
4      THE VIDEO OPERATOR:  Two-minute warning.
5  BY MR. DE JARNETTE:
6      Q.  What is your understanding of Mr. Murtha's
7  statement that -- or request that you preserve all
8  responsive documents to the subpoena?
9      MS. D'ALLAIRD:  Objection.
10     THE WITNESS:  Just keep everything I have.
11 BY MR. DE JARNETTE:
12     Q.  Do you believe you did that?
13     A.  I believe so.
14     MR. DE JARNETTE:  Let's go off the record.
15     THE VIDEO OPERATOR:  We're off the record
16 at 12:18.  This is the end of media number 1.
17     (At the hour of 12:18 P.M., there was a
18     luncheon recess taken.)
19
20
21
22
23
24
25

---

Page 82

1      (At the hour of 12:57 P.M., the
2      deposition was resumed.)
3
4      EXAMINATION (RESUMED)
5      THE VIDEO OPERATOR:  We're back on the
6  record at 12:57.  This is the start of media number
7  2.
8  BY MR. DE JARNETTE:
9      Q.  Mr. Wang, welcome back from lunch.  Do you
10 understand you're still under oath?
11     A.  Yes.
12     Q.  Would you please go back to the exhibit we
13 were working through, 222, and please turn to Bates
14 12.  In the middle of the page we -- when we went
15 off the record we were talking about this e-mail
16 exchange between you and Mr. Murtha; correct?
17     A.  Yes.
18     Q.  In the last paragraph of the e-mail
19 Mr. Murtha says to you at 2:10 P.M. on July 12, he
20 requests that you preserve all responsive documents
21 to the subpoena; correct?
22     A.  Yes.
23     Q.  You testified that you had -- or you have
24 a practice of deleting text messages; correct?
25     MS. D'ALLAIRD:  Objection.

---

Page 83

1      MR. COPELAND:  Objection.
2      THE WITNESS:  I have done so before, yeah.
3  BY MR. DE JARNETTE:
4      Q.  Did you change that practice after
5  receiving this e-mail from Mr. Murtha?
6      A.  I don't recall.
7      Q.  Do you know whether or not you deleted
8  text messages since July 12, 2018?
9      A.  I don't recall.
10     Q.  Is there any way to find out?
11     A.  I'm not sure.
12     Q.  Mr. Wang, isn't it true that you recall
13 specific statements made to you by Mr. Philp in
14 September 2017?
15     A.  By who?
16     Q.  By Tanner Philp?
17     A.  Yes.
18     Q.  Isn't it true that you remember specific
19 statements made by Fred Wilson on a blog post in
20 2017?
21     A.  I can't quote them.
22     Q.  But you recall that a blog post was made
23 on his ABC blog in 2017; right?
24     A.  Correct.
25     Q.  What was it about?

---

Page 84

1      A.  Something about their investment in Kin,
2  how it would -- like a new way for the Internet or
3  something along those lines.
4      Q.  And you remember a blog post from
5  Mr. Livingston in September 2017 titled "Friends and
6  Family"; correct?
7      A.  That wasn't the exact title but yes.
8      Q.  So you remember all that but you can't
9  tell me within the last year and a half whether or
10 not you deleted a single text message?
11     MS. D'ALLAIRD:  Objection.
12     MR. COPELAND:  Objection.
13     THE WITNESS:  Yes.
14 BY MR. DE JARNETTE:
15     Q.  Yes, you can't tell me whether or not you
16 recall that?
17     MS. D'ALLAIRD:  Same objection.
18     THE WITNESS:  Yes.  So I guess the blog
19 post and everything was stuff that I was searching
20 for when I was asked by -- when I was asked to
21 explain why I had invested.
22 BY MR. DE JARNETTE:
23     Q.  Sorry.  I don't really understand your
24 answer.  What did you mean by searching for when I
25 asked to explain why I had invested.  What does that

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

Page 85

1  mean?
2      A.  So I didn't recall the specifics of the
3  articles or the blog posts, but I knew those were
4  some of the reasons I had invested.  So I looked to
5  find those articles recently.
6      Q.  So it's fair to say you remember reviewing
7  those articles in September 2017 but you only have
8  specific recollection of the contents based on your
9  recent review of them?
10         MS. D'ALLAIRD:  Objection.
11         MR. COPELAND:  Objection.  Misstates
12  testimony.
13         THE WITNESS:  I'm not sure how to respond
14  to that.
15  BY MR. DE JARNETTE:
16      Q.  Is it fair to say that you reviewed these
17  articles because you didn't recall what they said?
18         MS. D'ALLAIRD:  Objection.
19         THE WITNESS:  I recall the, I guess the
20  gist of what they were saying, but I don't remember
21  the specifics of what they were saying.  What they
22  said.
23  BY MR. DE JARNETTE:
24      Q.  And you testified that you remember
25  specific statements that Mr. Philp made in

Page 86

1  September 2017; right?
2      A.  It was -- I can't quote them, but I do
3  remember he hit on certain key points such as
4  liquidity because those are the questions we always
5  consider.
6      Q.  So you remember those key points from
7  September 2017 but you can't tell me any specifics
8  about any conversation you had with the SEC staff
9  about their investigation of Kin?
10         MS. D'ALLAIRD:  Objection.
11         MR. COPELAND:  Objection.
12         THE WITNESS:  Yes.
13  BY MR. DE JARNETTE:
14      Q.  Mr. Wang, I'm entitled to your best
15  recollection.  If you don't recall a specific
16  conversation or specific things I understand that,
17  but I would really appreciate if you could give me
18  your best recollection.  Do you understand?
19      A.  I understand, yeah.  I mean, the
20  difference is there's a lot more specifics that you
21  remember when you put in the amount we put in so we
22  obviously did a lot more preparation for the -- I
23  mean, before we parted with 1.6 million.
24      Q.  Sure.  And I'm not disputing that.
25  However, wasn't it the fact that the SEC reached out

Page 87

1  to you about your purchase a big deal?
2         MR. COPELAND:  Objection.  Vague.
3         MS. D'ALLAIRD:  Objection.
4         THE WITNESS:  I'm not sure what I was
5  thinking about that at that time.
6  BY MR. DE JARNETTE:
7      Q.  You testified earlier that you were
8  alarmed by an e-mail Mr. Murtha sent you; right?
9      A.  Yes.
10      Q.  So did despite being alarmed you can't
11  recall any specific conversation you had with
12  Mr. Murtha?
13         MS. D'ALLAIRD:  Objection.
14         THE WITNESS:  No.
15  BY MR. DE JARNETTE:
16      Q.  Do you have any reason why?
17      A.  No, I don't.  I didn't focus on that.
18      Q.  Yet you were alarmed and it prompted you
19  to contact your friend who was an attorney?
20         MS. D'ALLAIRD:  Objection.
21         THE WITNESS:  Yes.
22  BY MR. DE JARNETTE:
23      Q.  If you go to 013 this is where the e-mail
24  thread ends and the last e-mail from Mr. Murtha he
25  says, "Right building.  Tell security you're going

Page 88

1  to SEC 9th floor."  See that?
2      A.  Yes.
3      Q.  Does this refresh your recollection that
4  you sat for testimony with the SEC on July 19, 2018?
5      A.  I don't know the exact date but yes, I
6  gave testimony to the SEC which I guess was --
7      Q.  Does summer of 2018 sound right to you?
8      A.  Yes.
9      Q.  When you received the e-mail from
10  Mr. Murtha requesting that you preserve documents,
11  did you take any affirmative steps to preserve
12  documents?
13      A.  I don't recall.
14      Q.  After your SEC testimony did the SEC send
15  you a transcript?
16      A.  I don't recall.
17      Q.  Do you remember if you've ever reviewed
18  the transcript from your testimony?
19      A.  Yes.
20      Q.  Do you know when you did that?
21      A.  Within this week.
22      Q.  Do you know how you received that
23  transcript?
24      A.  Yes.  James Murtha sent it to me a month,
25  month and a half ago before the previously scheduled

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 89

1 deposition in December.
2    Q.  Do you know if you produced that e-mail
3 exchange with Mr. Murtha?
4    A.  Did I produce it?
5    Q.  Or provide it to your legal counsel?
6    A.  I don't recall.
7    Q.  Did you know why there's any reason that
8 we haven't received that e-mail?
9    A.  I don't recall.
10    Q.  Do you know if there was any texts that
11 Mr. Murtha wrote in his e-mail aside from attaching
12 the transcript?
13    A.  All I remember was he said that he would
14 be at my deposition and attached the transcript,
15 something along those lines.
16    Q.  Between your testimony and the e-mail that
17 you just referred to from Mr. Murtha, did you have
18 any communications with Mr. Murtha?
19    A.  No.  I didn't respond to the e-mail.
20    Q.  Do you still have that e-mail exchange
21 with Mr. Murtha where he sent you your transcript?
22    A.  It should be in my Gmail.
23    Q.  We're going to ask for that e-mail.  You
24 said that it was sent to you roughly a month ago; is
25 that right?

Page 90

1    A.  I forget when the last deposition was
2 scheduled.  It was about a weekish before the
3 previous deposition.
4    Q.  And you testified that you reviewed your
5 transcript.  Did you review the entire thing?
6    A.  I guess page -- not like -- I think the
7 first page was -- basically what I -- the question
8 and answer part of it.
9    Q.  Where you actually gave testimony.
10    A.  Correct.
11    Q.  Do you recall whether or not you believed
12 that testimony transcript was accurate?
13    A.  Yes.
14    Q.  However, that was over a year ago that you
15 testified; right, since you received the transcript?
16    A.  I don't know if he had sent it to me
17 before but that was the first time I actually paid
18 attention to it.
19    Q.  It was the first time that you reviewed
20 the transcript; right?
21    A.  Correct.
22    Q.  So based on you reviewing your transcript
23 a year after your testimony can you be sure it was
24 accurate?
25    A.  I'm not sure what you're asking.

Page 91

1    Q.  When you read the transcript does your
2 testimony therein reflect your current views?
3    MR. COPELAND:  Objection.  Vague.
4    MS. D'ALLAIRD:  Same objection.
5 BY MR. DE JARNETTE:
6    Q.  Let me reask the question.  Given that
7 over a year has passed since you sat for testimony,
8 after you reviewed the transcript would you have
9 changed any of your answers to the questions had you
10 been asked today?
11    MS. D'ALLAIRD:  Objection.
12    MR. COPELAND:  Objection.  Vague.
13    THE WITNESS:  I mean, I guess at that time
14 I think everything I said was pretty accurate.
15 Obviously a lot has changed in a year, year and a
16 half.  I don't know if that answers your question.
17 BY MR. DE JARNETTE:
18    Q.  It does.  So in terms of a lot changing in
19 the last year or year and a half, would that change
20 any of the responses that you gave during testimony?
21    MR. COPELAND:  Objection.  Vague.
22    MS. D'ALLAIRD:  Objection.
23    THE WITNESS:  I mean, I don't remember the
24 exact -- like all the exact questions.
25 ///

Page 92

1 BY MR. DE JARNETTE:
2    Q.  Sure, but it's fair to say that you stand
3 by your testimony.
4    A.  What I said at that time with everything
5 that happened that time, yes.
6    Q.  I think we established that you're
7 generally aware that a complaint was filed against
8 Kik in the summer of 2019 by the SEC; is that right?
9    A.  I don't know the exact timing but, yes,
10 I'm aware there was a filing.
11    Q.  Did you happen to communicate with anyone
12 from the SEC after the complaint was filed?
13    A.  Yes.
14    Q.  What do you recall about those
15 communications?
16    A.  I believe I reached out to James Murtha
17 for clarity on what the filing or the suit was about
18 and what my options were.
19    Q.  Did you get that clarity from Mr. Murtha?
20    MS. D'ALLAIRD:  Objection.
21    THE WITNESS:  I guess there was nothing
22 like definitive.  But -- I don't recall exactly what
23 he said and I don't want to misquote something legal
24 but, yeah, he laid out kind of what could happen
25 with -- it was -- on the call was James and I

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                                   January 09, 2020

Page 93

1  believe one or two other people who I don't remember
2  the names.
3          But yeah, they were like if basically the
4  process of I guess -- I forgot what it was called --
5  diligence on both sides and, you know, I believe
6  there was something about like if the SEC wins this
7  could potentially happen. If Kik wins this could
8  potentially happen. It was like a conversation
9  around that. I don't recall exactly what was -- the
10 details of that.
11 BY MR. DE JARNETTE:
12     Q.  Kind of like the logistics and procedures?
13     A.  Exactly.
14     Q.  Do you recall if anyone on that call said
15 what would happen if the SEC won?
16     A.  I think it was like, you know, it would --
17 if the SEC wins and Kik has to pay something it
18 would go into a fund that would I believe -- based
19 on the judge says if there's enough money then it
20 would be divvied up to the investors or something
21 like that.
22     Q.  Did they happen to tell you if they won
23 you would get your money back?
24     A.  No.
25     Q.  Did you have that understanding that that

Page 94

1  could happen?
2      A.  Sorry. That I would get my money back?
3  Or would not?
4      Q.  That you would in the event the SEC won?
5          MS. D'ALLAIRD: Objection.
6          THE WITNESS: I don't remember exactly
7  what they said but I basically walked away from that
8  conversation like I didn't anticipate -- that wasn't
9  the guarantee that they made or anything.
10 BY MR. DE JARNETTE:
11     Q.  What else do you recall being discussed on
12 that call?
13     A.  I think it was -- oh, I did have a
14 question. Like how the entity worked like Kik
15 versus Kin. Is Kin housed under Kik. I didn't
16 fully understand that thing. I forget but after the
17 call -- I guess I don't really recall if I
18 understood what the distinction was after.
19     Q.  Do you remember whether or not the SEC
20 staff on the call tried to explain to you the
21 difference?
22     A.  I believe so, yes. But I don't remember
23 what --
24     Q.  Do you remember generally what that
25 distinction was?

Page 95

1      A.  To be honest, no, I don't.
2      Q.  Anything else you recall from that call?
3      A.  No, not that I can remember.
4      Q.  Handing the court reporter a document to
5  be marked as Exhibit 223.
6          (Exhibit 223 was marked for identification
7  by the Reporter.)
8  BY MR. DE JARNETTE:
9      Q.  Exhibit 223 is an e-mail chain with the
10 subject, "Kin versus SEC lawsuit, (we met in person
11 in LA)." It's Bates number Wang 00014 through 16.
12         Mr. Wang, do you know what this document
13 is?
14     A.  Yes.
15     Q.  What is it?
16     A.  This is when I reached out to James about
17 clarifying after the filing.
18     Q.  The filing, you mean the complaint?
19     A.  The complaint, yes.
20     Q.  So you go to the top of the page, this is
21 an e-mail from you to Mr. Murtha on June 7, 2019.
22 If you go to the second paragraph you write, "I saw
23 the recent report of the SEC suing Kik and Kin.
24 Since it's come out the price of Kin has catered" --
25 I assume you meant cratered?

Page 96

1      A.  Yes.
2      Q.  "Cratered further as you probably could
3  imagine." What did you mean by that?
4      A.  What it says, the price dropped.
5      Q.  Why did you say "as you can imagine"?
6      A.  Figure of speech.
7      Q.  And again, correct me if I'm wrong, but my
8  read on the e-mail is -- strike that. Is what you
9  were trying to say here, that the price of Kin has
10 cratered as a result of the SEC filing this lawsuit?
11         MS. D'ALLAIRD: Objection.
12         MR. COPELAND: Objection.
13         THE WITNESS: I'm not sure what I was --
14 what my intention was, but yeah -- well, the price
15 dropped after the filing came out.
16 BY MR. DE JARNETTE:
17     Q.  And in your view the price dropped as a
18 result of the filing of lawsuit?
19         MR. COPELAND: Objection. Misstates
20 testimony.
21         MS. D'ALLAIRD: Objection.
22         THE WITNESS: I'm not sure.
23 BY MR. DE JARNETTE:
24     Q.  Do you believe that's what you were trying
25 to articulate in this e-mail?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                 Harrison Wang
January 09, 2020

Page 97

1        MS. D'ALLAIRD:  Objection.
2        THE WITNESS:  I don't know what my -- what
3    I was intending.
4    BY MR. DE JARNETTE:
5        Q.  Is it fair to say that by -- or the figure
6    of speech "as you can imagine" is equivalent to "you
7    would expect" or "it's obvious"?
8        MR. COPELAND:  Objection.
9        MS. D'ALLAIRD:  Objection.
10        THE WITNESS:  I'm not sure.
11    BY MR. DE JARNETTE:
12        Q.  In reading your own words were you trying
13    to say that as you would expect, the price of Kin
14    has cratered further as a result of the SEC filing
15    this lawsuit?
16        MS. D'ALLAIRD:  Objection.
17        MR. COPELAND:  Objection.
18        THE WITNESS:  I mean, that could be a
19    possibility.
20    BY MR. DE JARNETTE:
21        Q.  You go on to write, "How does suing Kik
22    and Kin protect the investors of Kin?"  Do you see
23    that?
24        A.  Yes.
25        Q.  Why did you ask that question?

Page 98

1        A.  Because I was -- I wanted to know why the
2    SEC was suing.
3        Q.  Did you get an answer of how suing Kik and
4    Kin protects the investors in Kin?
5        MS. D'ALLAIRD:  Objection.
6        THE WITNESS:  I -- I don't remember.
7    BY MR. DE JARNETTE:
8        Q.  This exchange happened less than a year
9    ago; right?
10        A.  Yeah, June 7.
11        Q.  Is it fair to say that the SEC suing Kik
12    was notable?
13        A.  Yes.
14        Q.  Yet you don't remember whether or not you
15    got an answer to your question to the SEC about
16    whether suing Kik and Kin protects investors?
17        MS. D'ALLAIRD:  Objection.
18        MR. COPELAND:  Objection.
19        THE WITNESS:  Like I said, on the call
20    they kind of explained the options.  I -- I mean,
21    there was a lot of -- I mean, I guess I don't know
22    if I asked that specific question during that call.
23    The only question I remember specifically asking
24    was -- and I'm sure I asked other questions but the
25    Kin versus Kik delineation because I just remember

Page 99

1    that was important because we didn't know if the
2    lawsuit was suing Kin or Kik or both.  I remember
3    like that was the important point.
4    BY MR. DE JARNETTE:
5        Q.  You said we.  Who is we?
6        A.  Well, my brother.
7        Q.  So you and William?
8        A.  Yeah.
9        Q.  Anyone else?
10        A.  No.
11        Q.  I take it the fact that you asked the
12    question about how does suing Kik and Kin protect the
13    investors in Kin suggested that you didn't think the
14    lawsuit protected investors?
15        MS. D'ALLAIRD:  Objection.
16        MR. COPELAND:  Objection.
17        THE WITNESS:  I mean, I just don't know,
18    like, you know, how the SEC -- what factors into
19    lawsuits -- like I don't know what goes into that.
20    BY MR. DE JARNETTE:
21        Q.  But at the time of making this statement
22    and reviewing this e-mail, did you believe that the
23    SEC's lawsuit had the effect of protecting Kin's
24    purchasers?
25        MS. D'ALLAIRD:  Objection.

Page 100

1        THE WITNESS:  I mean I think that was why
2    I wanted to talk to them was what were the options
3    or potential results from this lawsuit that may or
4    may not protect the investors.  Like I just didn't
5    know.
6    BY MR. DE JARNETTE:
7        Q.  I totally get that and I appreciate you
8    letting me know what you recall about your
9    conversations with the SEC staff, but my question
10    was at the time of this e-mail thread did you
11    believe that the SEC's filing of the lawsuit
12    protected you as a Kin purchaser?
13        A.  I don't know.  Because I didn't know what
14    the results of a potential SEC lawsuit would result
15    in and that's why I wanted clarity on what the
16    potential options and results were.
17        Q.  Were you happy to learn that the SEC sued
18    Kik?
19        MS. D'ALLAIRD:  Objection.
20        THE WITNESS:  No.
21    BY MR. DE JARNETTE:
22        Q.  Why not?
23        A.  Just legal action against something you
24    invested in by a federal authority is just bad
25    optics.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.  Harrison Wang
January 09, 2020

---

Page 101

1  Q. We talked a little bit about your
2 conversations with the SEC staff about process.  You
3 referred to options a few different times.  What do
4 you mean by options?
5  A. Just like what were the results, potential
6 results, so if the SEC wins what happens.  If Kik
7 wins what happens.
8  Q. Did you happen to ask the SEC about any
9 options that you had personally as opposed to just
10 the results?
11  A. I don't specifically remember.
12  Q. Please go to Bates 16.  The last e-mail in
13 the thread is from you to Mr. Murtha on June 12,
14 2019.  Do you see that?
15  A. Yes.
16  Q. It says, "I didn't see your call.  What's
17 the best number to reach you?"  You testified this
18 call didn't ultimately happen; right?
19  A. Yes.
20  Q. And -- apologies.  I don't remember.  Do
21 you recall who else aside from James Murtha was on
22 that call?
23  A. I don't.
24  Q. Do you remember if Ms. D'Allaird was on
25 that call?

---

Page 102

1  A. I don't.
2  Q. Handing the court reporter a copy of a
3 document marked Exhibit 224.
4  (Exhibit 224 was marked for identification
5 by the Reporter.)
6 BY MR. DE JARNETTE:
7  Q. Exhibit 224 is an e-mail thread with the
8 subject "Kik Interactive," Bates Wang 00019 to 21.
9 Do you recognize this document?
10  A. I do now, yes.
11  Q. Is this an e-mail thread between
12 Ms. D'Allaird from the SEC to you and other SEC
13 staff members?
14  A. Yes.
15  Q. If you look at the top here there's an
16 e-mail from Ms. D'Allaird to you on August 21, 2019
17 copying Steven Sheldelmelch and David Mendel.  Do
18 you see that?
19  A. Yes.
20  Q. Do you know who Mr. Sheldelmelch is?
21  A. I do not.
22  Q. Do you recall having any conversations
23 with him at any point in time?
24  A. I do not.
25  Q. Do you know who Mr. Mendel is?

---

Page 103

1  A. I do not.
2  Q. Do you recognize the name at all?
3  A. I don't remember.  No.
4  Q. Ms. D'Allaird writes, "I'm an attorney in
5 the SEC's Division of Enforcement along with my
6 colleagues Steven Sheldelmelch and David Mendel
7 copied here.  I'm representing the SEC in its
8 lawsuit against Kik Interactive in connection with
9 the September 2017 offering of Kin tokens."  Do you
10 see that?
11  A. Yes.
12  Q. When you spoke to Mr. Murtha in June do
13 you recall him telling you that other individuals
14 from the SEC might reach out to you?
15  A. I can't say for certain.  I don't recall.
16  Q. Do you recall prior to this e-mail whether
17 or not anyone from the SEC asked you whether you
18 would agree to be a trial witness?
19  A. No.
20  Q. No, as in you don't recall or no, you
21 don't believe you were ever asked?
22  A. I don't believe I was ever asked.
23  Q. Do you recall anyone from the SEC prior to
24 this e-mail ever mentioning anything about
25 potentially being a trial witness?

---

Page 104

1  A. No.
2  Q. To this date has the SEC ever brought up
3 the possibility of you being a trial witness?
4  A. Not that I remember, no.
5  Q. Is that something you think you would have
6 remembered?
7  MS. D'ALLAIRD:  Objection.
8  THE WITNESS:  I feel like I would have
9 remembered the words "trial witness" but I honestly
10 can't recall ever remembering those words.
11 BY MR. DE JARNETTE:
12  Q. Were you aware that the SEC identified you
13 as a potential witness to Kik?
14  A. I don't believe so.
15  Q. Do you consider yourself a witness for the
16 SEC?
17  MS. D'ALLAIRD:  Objection.
18  MR. COPELAND:  Objection.
19  THE WITNESS:  No.
20 BY MR. DE JARNETTE:
21  Q. Why not?
22  A. I don't even know what that entails.
23  Q. Going to the next paragraph of Exhibit 224
24 Ms. D'Allaird writes, "I understand that you
25 previously provided testimony during the SEC's

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

Page 105

1 nonpublic investigation of the Kin offering and I'd
2 like to follow up with some additional questions
3 about your purchase of Kin."  See that?
4      A.  Yes.
5      Q.  Do you remember having a call with
6 Ms. D'Allaird?
7      A.  Yes.
8      Q.  She writes here that she has some
9 additional questions about your purchase of Kin.
10 What were those?
11      A.  I don't remember.  I just know there were
12 questions, I guess questions about the testimony I
13 had given.  I believe they asked like how much did I
14 put in.  From what I can recall is mostly like what
15 I had answered in the testimony.
16      Q.  Do you recall Ms. D'Allaird asking you
17 about any subject matter you hadn't already had
18 conversations with SEC staff about?
19      A.  I don't remember.
20      Q.  On that phone call -- actually, do you
21 recall when that phone call happened?
22      A.  I mean, I can't tell you the date and
23 time, but I do remember I was at school, so --
24      Q.  So you respond to Ms. D'Allaird saying,
25 "Sure, does Friday 2:00 P.M. Pacific work?"  Do you

Page 106

1 see that?
2      A.  Yes.
3      Q.  Why did you agree to talk to
4 Ms. D'Allaird?
5      A.  I mean, I don't have a law degree or
6 anything but when the SEC reaches out to you it's,
7 you know -- I guess I respond.
8      Q.  Did you know whether or not you were
9 legally obligated to respond?
10      MS. D'ALLAIRD:  Objection.
11      THE WITNESS:  No, I didn't know.
12 BY MR. DE JARNETTE:
13      Q.  Please go to 21.  On August 28 -- I'm
14 looking at the last e-mail.  On August 28, 2019
15 Ms. D'Allaird e-mails you, "Thank you.  Please call
16 my direct line at that time.  2:02," and she gives
17 her number.  Does this refresh your recollection
18 about roughly when this call happened?
19      A.  I mean, again, I guess the date is stated,
20 but I wouldn't have recollected.  I just know I was
21 on campus at school.
22      Q.  And it's fair to say based on your
23 testimony here today that you do not recall
24 Ms. D'Allaird bringing up the possibility of you
25 serving as a trial witness for the SEC on this call?

Page 107

1      A.  Not that I can recall.  I don't ever
2 recall the words "trial" -- yeah.
3      Q.  Did she talk about you potentially be
4 involved in the litigation in any means?
5      A.  I don't recall.  From what I remember it
6 was mostly just questions from my testimony.
7      Q.  Were you frustrated at that point in time
8 that the SEC was still reaching out to you?
9      MS. D'ALLAIRD:  Objection.
10      THE WITNESS:  Yes.
11 BY MR. DE JARNETTE:
12      Q.  Why?
13      A.  I mean, I'm pretty busy between school.
14 When this started happening we had just sold to
15 TikTok.  I was at another company called Fair which
16 was funded by SoftBank so it was just a lot going on
17 with school and work.
18      Q.  I totally understand.  When do you
19 graduate from USC?
20      A.  I think it's May or June.
21      Q.  Of this year?
22      A.  Of this year.
23      Q.  Congrats.  You're close.  Anything else
24 you remember about that call with Ms. D'Allaird?
25      A.  I just remember there was one or two other

Page 108

1 guys but I don't remember who.  Yeah.
2      Q.  So you remember other individuals from the
3 SEC being on that call aside from Ms. D'Allaird?
4      A.  Correct.
5      Q.  Do you know if one of them was Mr. Murtha?
6      A.  I honestly -- I don't recall.
7      Q.  Did Ms. D'Allaird say anything else about
8 why she wanted to speak with you?
9      A.  Not that I remember.
10      Q.  Do you recall whether or not she referred
11 to your testimony at all?
12      MR. COPELAND:  Objection.  Vague.
13      MS. D'ALLAIRD:  Same objection.
14      THE WITNESS:  I don't remember.  She asked
15 me questions that were also asked during the
16 testimony.
17 BY MR. DE JARNETTE:
18      Q.  Do you remember your name answers to any
19 questions?
20      A.  Not off the top of my head.
21      Q.  Aside from Kin have you purchased other
22 cryptocurrencies?
23      MR. COPELAND:  Objection.  Right to
24 privacy.  Instruct him not to answer.
25      MR. DE JARNETTE:  Counsel, what right to

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                                                                   Harrison Wang
January 09, 2020

Page 109

1  privacy is that?
2      MR. COPELAND:  He has a right to privacy
3  in his financial transactions.
4  BY MR. DE JARNETTE:
5      Q.  I asked have you purchased other
6  cryptocurrencies.
7      MR. COPELAND:  You can answer yes or no.
8      THE WITNESS:  Yes.
9  BY MR. DE JARNETTE:
10     Q.  How many would you say?
11     MR. COPELAND:  Again, I'll let him answer
12 this one but he's not waiving any right to privacy
13 through the answer.
14     THE WITNESS:  I don't know the exact
15 number but probably around ten.
16     MR. DE JARNETTE:  Counsel, what authority
17 do you have that there's a right to privacy of what
18 you say is financial information?
19     MR. COPELAND:  It's protected under the
20 California Constitution and there are a number of
21 federal cases applying that even where the
22 deposition being taken is of a plaintiff, and
23 Harrison here is not even a plaintiff in this case.
24 He's just a third party.
25     MR. DE JARNETTE:  Counsel, what authority

Page 110

1  do you have that supports the position that you can
2  instruct a witness not to answer based on right of
3  privacy?
4      MR. COPELAND:  The California
5  Constitution.
6      MR. DE JARNETTE:  Says you have the right
7  to instruct a witness not to answer during a
8  deposition?
9      MR. COPELAND:  That is correct.
10     MR. DE JARNETTE:  I may ask for that
11 authority.
12     Q.  Mr. Wang, what cryptocurrencies did you
13 purchase besides Kin?
14     MR. COPELAND:  Objection.  Right to
15 privacy and I will instruct you not to answer.
16     MR. DE JARNETTE:  You're taking the
17 position that the types of cryptocurrencies he
18 purchased are protected by right of privacy?
19     MR. COPELAND:  Yes.
20     MR. DE JARNETTE:  And your basis for that
21 is the California Constitution?
22     MR. COPELAND:  That's correct.  And there
23 are a number of federal cases that claim that as
24 well.
25     MR. DE JARNETTE:  But I take it if those

Page 111

1  cryptocurrency transactions were available in the
2  public blockchain and we knew Mr. Wang's wallet
3  address, then there would be no right to privacy;
4  correct?
5      MR. COPELAND:  I would have to see what
6  you're referring to and how you obtained Mr. Wang's
7  transactional information.
8  BY MR. DE JARNETTE:
9      Q.  Mr. Wang, did you provide Kik with your
10 Ethereum wallet address when you registered to
11 purchase Kin?
12     A.  Yes.
13     Q.  Mr. Wang, what cryptocurrencies have you
14 bought aside from Kin?
15     MR. COPELAND:  Same objection and I'll
16 instruct you not to answer.
17     MR. DE JARNETTE:  I'm handing the court
18 reporter an exhibit to be marked as Exhibit 225.
19     (Exhibit 225 was marked for identification
20     by the Reporter.)
21 BY MR. DE JARNETTE:
22     Q.  Mr. Wang, this is a document, at the top
23 it says "Etherscan."  Do you see that?
24     A.  Yes.
25     Q.  Are you familiar with Etherscan?

Page 112

1      A.  Yes.
2      Q.  Are you aware that the Ethereum blockchain
3  is public?
4      A.  Yes.
5      Q.  Looking at this Ethereum address do you
6  have any reason to dispute that this is your
7  address?
8      MR. COPELAND:  Objection.  I'm going to
9  object right to privacy and instruct him not to
10 answer.
11     MR. DE JARNETTE:  Counsel, we have his
12 address.
13     MR. COPELAND:  Okay.
14 BY MR. DE JARNETTE:
15     Q.  With respect to the nine other
16 cryptocurrencies that you purchased aside from Kin,
17 what was the reason for those purchases?
18     MR. COPELAND:  Objection.  It's protected
19 by his right to privacy and it assumes something not
20 in evidence.  I'll instruct you not to answer.
21     MR. DE JARNETTE:  Counsel, how is the
22 reason for purchasing cryptocurrencies without
23 identifying what those cryptocurrencies are invoke
24 the right to privacy?
25     MR. COPELAND:  His reason for engaging in

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.        Harrison Wang
January 09, 2020

Page 113

1   any number of financial transactions is protected by
2   his right to privacy and frankly, I don't see how
3   it's at all relevant to your case what his rationale
4   for any other cryptocurrencies that he may or may
5   not have bought.
6        MR. DE JARNETTE:  Can you cite me a case?
7        MR. COPELAND:  Yeah, I can.  Most of the
8   cases obviously are applying transactions in
9   securities, but there are plenty of them.
10        MR. DE JARNETTE:  With respect to reasons
11   for purchases?
12        MR. COPELAND:  That's correct.
13        MR. DE JARNETTE:  And Counsel, are you
14   aware that relevance is not a grounds to instruct
15   not to answer?
16        MR. COPELAND:  It is not a grounds to
17   instruct not to answer but it is in weighing the
18   balance between privacy and your right to an answer
19   it is a factor.  And when you're searching for
20   people's private financial information with respect
21   to something that's entirely irrelevant it just
22   strengthens the privacy objection.
23        MR. DE JARNETTE:  Counsel, we disagree and
24   we reserve the right to seek court intervention to
25   get answers to this line of questioning.

Page 114

1        MR. COPELAND:  Okay.
2        THE WITNESS:  Am I allowed to clarify
3   something?
4        MR. DE JARNETTE:  Counsel, are you going
5   to allow him to answer?
6        MR. COPELAND:  I've instructed him not to
7   answer these questions.
8   BY MR. DE JARNETTE:
9        Q.  Are you going to follow your counsel's
10   advice?
11        A.  Yes.
12        Q.  Are you familiar with the term "initial
13   coin offering"?
14        A.  Yes.
15        Q.  What is your understanding of that term?
16        A.  When a project raises money by selling a
17   token.
18        Q.  Have you participated in any initial coin
19   offerings?
20        MR. COPELAND:  Objection.  Right to
21   privacy.  I'll instruct him not to answer.
22   BY MR. DE JARNETTE:
23        Q.  Was your purchase of Kin through an
24   initial coin offering?
25        MR. COPELAND:  You can answer that.

Page 115

1        THE WITNESS:  Yes.
2   BY MR. DE JARNETTE:
3        Q.  Is it fair to say that cryptocurrency
4   prices can fluctuate generally?
5        MS. D'ALLAIRD:  Objection.
6        MR. COPELAND:  Objection.
7        THE WITNESS:  Can you repeat the question?
8   BY MR. DE JARNETTE:
9        Q.  To the best of your knowledge do
10   cryptocurrencies prices fluctuate?
11        MS. D'ALLAIRD:  Objection.
12        MR. COPELAND:  Objection.  Vague.
13        THE WITNESS:  Yes.
14   BY MR. DE JARNETTE:
15        Q.  This means that owners of particular
16   tokens can sell those tokens at different prices;
17   right?
18        A.  Yes.
19        Q.  So for example, one purchaser can sell a
20   token for more than they purchased and another can
21   sell for less than they purchased; correct?
22        A.  Yes.
23        Q.  Which means that the fortunes of these two
24   purchases would not rise and fall together; right?
25        MR. COPELAND:  Objection.

Page 116

1        MS. D'ALLAIRD:  Objection.
2        MR. COPELAND:  Calls for a legal
3   conclusion.
4        THE WITNESS:  I'm not sure.
5   BY MR. DE JARNETTE:
6        Q.  If one purchaser made money and one
7   purchaser lost money would you say that their
8   fortunes were different?
9        MS. D'ALLAIRD:  Objection.
10        MR. COPELAND:  Objection.
11        THE WITNESS:  Yes.
12   BY MR. DE JARNETTE:
13        Q.  Which means if one individual sold Kin at
14   a higher price and another sold Kin at a price lower
15   than what they purchased that Kin for, the fortunes
16   of those two people would be different; correct?
17        MS. D'ALLAIRD:  Objection.
18        MR. COPELAND:  Objection.
19        THE WITNESS:  In terms of what?
20   BY MR. DE JARNETTE:
21        Q.  In terms of financial performance?
22        MS. D'ALLAIRD:  Objection.
23        THE WITNESS:  Yes.
24   BY MR. DE JARNETTE:
25        Q.  So to clarify, if two individuals sold Kin

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                                January 09, 2020

---

Page 117

1  at two different prices their fortunes are
2  different; right?
3       MS. D'ALLAIRD:  Objection.
4       MR. COPELAND:  Objection.
5       THE WITNESS:  I mean, that's open for
6  interpretation so I'd say no.
7  BY MR. DE JARNETTE:
8       Q.  Can you explain that?
9       A.  Well, if two people sold at different
10 prices but they bought in at different prices they
11 could have made the same amount or lost the same
12 amount.
13      Q.  If the two individuals who purchased Kin
14 either gained or lost different amounts then it's
15 fair to say that their fortunes would be different?
16      MS. D'ALLAIRD:  Objection.
17      MR. COPELAND:  Objection.
18      THE WITNESS:  Yes.
19 BY MR. DE JARNETTE:
20      Q.  Which means in terms of fortunes rising
21 and falling it also matters when and how purchasers
22 bought Kin; correct?
23      MS. D'ALLAIRD:  Objection.
24      THE WITNESS:  Yes.
25 ///

---

Page 118

1  BY MR. DE JARNETTE:
2       Q.  So at a high level then it's fair to say
3  that the fortunes of Kin purchasers do not all rise
4  and fall together; right?
5       MR. COPELAND:  Objection.
6       MS. D'ALLAIRD:  Objection.
7       THE WITNESS:  Yes.
8  BY MR. DE JARNETTE:
9       Q.  In 2017 around the time that you purchased
10 Kin do you recall whether the prices of
11 cryptocurrencies generally were trending upwards?
12      MS. D'ALLAIRD:  Objection.
13      THE WITNESS:  From what time period?
14 BY MR. DE JARNETTE:
15      Q.  Say around summer to fall of 2017.
16      A.  I don't recall.
17      Q.  Do you recall whether or not the price of
18 Bitcoin and Ether increased in the 2016, 2017 time
19 period?
20      A.  Yes.
21      Q.  And what do you recall about that?
22      A.  I don't know specific months but I
23 remember January-ish Ethereum was I believe around
24 $10 which is when we got a lot of Ethereum and then
25 it rose -- I mean it rose and fell and rose and

---

Page 119

1  fell.  I don't know which exact months it rose and
2  fell.
3       Q.  When you say January do you mean 2016 or
4  2017?
5       A.  I don't remember.  It was when it was
6  about 9 to $10.
7       Q.  Did the price of Bitcoin and Ether around
8  the time that you decided to purchase Kin impact
9  your decision to purchase Kin?
10      A.  Sorry.  Can you repeat that?
11      Q.  Was the trend in the prices of Bitcoin and
12 Ether around the time you decided to purchase Kin
13 impact your decision to purchase Kin?
14      MS. D'ALLAIRD:  Objection.
15      THE WITNESS:  I don't recall.
16 BY MR. DE JARNETTE:
17      Q.  If the price of Bitcoin and Ether were
18 going up do you think that would have influenced
19 your decision of whether or not to purchase Kin?
20      MS. D'ALLAIRD:  Objection.
21      THE WITNESS:  I don't know.
22 BY MR. DE JARNETTE:
23      Q.  What about sitting here today?  Do you
24 think if Bitcoin and Ether were going up that
25 affects your view of the cryptocurrency market as a

---

Page 120

1  whole?
2       MR. COPELAND:  Objection.
3       MS. D'ALLAIRD:  Objection.
4       THE WITNESS:  I don't know.  I haven't
5  thought about it in a long time.
6  BY MR. DE JARNETTE:
7       Q.  Do you have an understanding of what
8  causes the price of cryptocurrencies to move?
9       MR. COPELAND:  Objection.  Vague.
10      MS. D'ALLAIRD:  Same objection.
11      THE WITNESS:  I don't know the specifics
12 of it, but generally, yes.
13 BY MR. DE JARNETTE:
14      Q.  What is your understanding?
15      A.  Can you be more specific?
16      Q.  You said that you generally have an
17 understanding of what causes the price of
18 cryptocurrencies to move.  I'm just asking what that
19 understanding is?
20      MR. COPELAND:  Objection.  Vague.
21      MS. D'ALLAIRD:  Objection.
22      THE WITNESS:  So what factors?
23 BY MR. DE JARNETTE:
24      Q.  Sure.
25      A.  I don't know anymore, but back in 2017

---

Case 1:19-cv-05244-AKH   Document 60-60   Filed 03/20/20   Page 33 of 68

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 121

1  when the big run was happening, so announcements of
2  partnerships, the promise of utility which would
3  drive up demand which would increase the price.
4  Speculation of partnerships, liquidity so being on
5  major exchanges.
6      Q.  Just to clarify, are you talking about Kin
7  or are you talking about cryptocurrency generally?
8      A.  Generally.
9      Q.  Okay.  You mentioned utility.  What did
10  you mean by that?
11      A.  Just usage of the cryptocurrency in real
12  worlds.
13      Q.  You mentioned speculation of partnerships.
14  Is that something that's driven by the seller of the
15  token?
16          MS. D'ALLAIRD:  Objection.
17          MR. COPELAND:  Same objection.
18          THE WITNESS:  I guess by speculation like
19  there would be reports that came out, for example,
20  that IBM was partnering with some cryptocurrency.
21  BY MR. DE JARNETTE:
22      Q.  And could that speculation be drummed up
23  by others than the seller of the token?
24          MR. COPELAND:  Objection.  Vague.
25          MS. D'ALLAIRD:  Same objection.

Page 122

1          THE WITNESS:  I can't speak to what others
2  are doing.
3  BY MR. DE JARNETTE:
4      Q.  How did you first hear about Kin?
5      A.  I mean, it was in the news a lot.  Ted
6  Livingston at the conference that I spoke about
7  before had said they would launch Kin within Kik.
8  It would drive utility which causes demand which
9  causes a pump.  And then -- yeah, there was a lot of
10  news around that.  And then like the -- some
11  prominent VCs invested in Kin, like Pantera,
12  Polychain, Fred Wilson, Union Square Ventures.  So
13  there was a lot of press around that.
14      Q.  You mentioned a video of Ted Livingston.
15  Do you know what that video is from?
16      A.  No.  Like I said before, no.
17      Q.  Do you remember the time period that you
18  watched that video?
19      A.  I do not.
20      Q.  Yet you recall specific statements he made
21  on that video?
22      A.  I didn't recall until I reviewed it like
23  recently.
24      Q.  How recently?
25      A.  Within the week.

Page 123

1      Q.  How can you be sure that you watched that
2  video before you purchased Kin?
3      A.  I mean, that was one of the factors of me
4  purchasing with that amount of money was that he
5  said it would be in Kik.  Like that was the big
6  marketing push was it would be in Kik immediately
7  once Kin launched.  So there would be mass adoption.
8      Q.  My question was how do you know that you
9  watched that video before you purchased Kin?
10          MR. COPELAND:  Objection.
11          MS. D'ALLAIRD:  Objection.
12          THE WITNESS:  I mean, I don't know -- I
13  mean, we can go ask YouTube.
14  BY MR. DE JARNETTE:
15      Q.  So then you don't know whether you watched
16  the video before you purchased Kin?
17          MR. COPELAND:  Objection.
18          MS. D'ALLAIRD:  Objection.
19          THE WITNESS:  I know I did but I don't
20  know how to prove it.
21  BY MR. DE JARNETTE:
22      Q.  Do you know whether you watched the entire
23  video?
24      A.  I did not watch the entire video.
25      Q.  Do you know approximately how long of the

Page 124

1  video you watched?
2      A.  I do not.  There was also a CoinDesk
3  article that I believe pulled quotes.
4      Q.  CoinDesk is not affiliated with Kik;
5  right?
6          MS. D'ALLAIRD:  Objection.
7          MR. COPELAND:  Objection.  Calls for
8  speculation.
9          THE WITNESS:  I would not know.
10  BY MR. DE JARNETTE:
11      Q.  You testified that Mr. Livingston said on
12  the video that you claim you watched that he said
13  utility causes demand which causes a pump.  Do you
14  recall him using that specific language?
15      A.  I don't remember exactly what words were
16  used.
17      Q.  So you can't tell me today the exact
18  language that Mr. Livingston used?
19      A.  I cannot, no.
20      Q.  Then how can you be sure that he
21  purportedly said caused demand which causes a pump?
22      A.  I mean, I can't answer that.
23      Q.  Is that something that you could have
24  deduced yourself that if demand goes up the price
25  will go up?

Page 125

1        MS. D'ALLAIRD:  Objection.
2        MR. COPELAND:  Objection.
3        THE WITNESS:  There were numerous things
4    Ted said.  I don't know what the exact words were
5    but that's what was being put out there.
6    BY MR. DE JARNETTE:
7        Q.  Do you have general familiarity with what
8    the vision of the Kin Ecosystem was?
9        MS. D'ALLAIRD:  Objection.
10        MR. COPELAND:  Objection.
11        THE WITNESS:  I believe so.
12    BY MR. DE JARNETTE:
13        Q.  What is your understanding of that?
14        A.  Basically they wanted to create a
15    crypto -- an asset that could be exchanged across
16    apps.
17        Q.  To be used within the Java applications;
18    right?
19        A.  Correct.
20        Q.  Do you recall the vision also including
21    creating a new way to -- a new way for developers to
22    monetize outside of an advertising model?
23        A.  Yes.
24        MS. D'ALLAIRD:  Objection.  Sorry.  I just
25    wanted to insert an objection there.

Page 126

1    BY MR. DE JARNETTE:
2        Q.  Can you explain your understanding of
3    that?
4        A.  So it was the Kin rewards engine and I
5    don't remember the specifics but it was along the
6    lines of if an app developer implements the Kin SDK
7    and they get users using Kin they would receive a
8    portion of the Kin allotment for that day.
9        Q.  So the vision of Kin included creating
10    this ecosystem where consumers could earn and spend
11    Kin within digital applications; correct?
12        MS. D'ALLAIRD:  Objection.
13        MR. COPELAND:  Objection.
14        THE WITNESS:  Correct.
15    BY MR. DE JARNETTE:
16        Q.  Did you believe in this vision?
17        MS. D'ALLAIRD:  Objection.
18        THE WITNESS:  Yes.
19    BY MR. DE JARNETTE:
20        Q.  Why?
21        A.  My background is in mobile applications at
22    mass consumer scale so I understand the industry
23    very well.
24        Q.  Did you believe that there was a need for
25    this type of technology?

Page 127

1        A.  I don't know if there was a need, but I
2    did believe that this type of application would do
3    very well.
4        Q.  And that was because it centered on
5    utility; right?
6        MS. D'ALLAIRD:  Objection.
7        MR. COPELAND:  Objection.
8        THE WITNESS:  It centered around the
9    ability for developers outside of advertising
10    dollars which were drying up to make money.
11    BY MR. DE JARNETTE:
12        Q.  And you believed in the potential of this
13    new business model?
14        A.  I believed in the ecosystem plus the
15    developers being able to make money from the KRE.
16        Q.  Do you happen to know roughly how many
17    digital applications have integrated Kin within
18    their apps?
19        MS. D'ALLAIRD:  Objection.
20        THE WITNESS:  I do not.
21    BY MR. DE JARNETTE:
22        Q.  Do you know if it's above 50?
23        A.  I do not.
24        Q.  As a Kin purchaser do you see that that
25    would be important to know?

Page 128

1        MS. D'ALLAIRD:  Objection.
2        THE WITNESS:  I think once they stopped
3    delivering on what they said they were going to
4    deliver and there was no liquidity it's worthless.
5    So it doesn't -- it doesn't affect me to know.  It
6    doesn't help me to know.
7    BY MR. DE JARNETTE:
8        Q.  So it wouldn't matter if millions of users
9    were transacting in Kin within the digital
10    applications?
11        MR. COPELAND:  Objection.  Calls for
12    speculation.
13        MS. D'ALLAIRD:  Objection.
14        THE WITNESS:  Presently to me, my opinion?
15    No.
16    BY MR. DE JARNETTE:
17        Q.  But if that were the case, that is
18    evidence of utility; right?
19        MR. COPELAND:  Objection.
20        MS. D'ALLAIRD:  Objection.
21        THE WITNESS:  I don't know.
22    BY MR. DE JARNETTE:
23        Q.  You don't know whether or not millions of
24    users transacting in Kin within digital applications
25    is a sign of utility?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                                       Harrison Wang
January 09, 2020

---

Page 129

1        MR. COPELAND:  Same objection.
2        MS. D'ALLAIRD:  Objection.
3        THE WITNESS:  It wasn't sold as a utility
4   in my opinion.  It could be now.  I don't know.  I'm
5   not a legal expert.  I don't -- yeah.  I don't know
6   what the difference is with certainty.
7   BY MR. DE JARNETTE:
8        Q.  However, million of users transacting in
9   Kin within digital applications you would consider
10  that using Kin as a medium of exchange; right?
11       MS. D'ALLAIRD:  Objection.
12       MR. COPELAND:  Objection.
13       THE WITNESS:  Yes.
14  BY MR. DE JARNETTE:
15       Q.  At the time of -- strike that.  Do you
16  know what the term "token distribution event" means?
17       A.  Yes.
18       Q.  Does that refer to the sale of Kin?
19       A.  I guess I don't know if that refers to the
20  exact sale, but from my understanding it means when
21  they actually gave us the tokens.
22       Q.  Meaning that you registered to purchase
23  Kin before you actually received your tokens.
24       MS. D'ALLAIRD:  Objection.
25       THE WITNESS:  I believe so, yes.

---

Page 130

1   BY MR. DE JARNETTE:
2        Q.  You testified that Kin was not sold as a
3   utility.  What do you mean by that?
4        A.  Well, Ted had said day one it would be Kik
5   would be and, you know, reach 15,000,000 monthly
6   active users but basically nothing really happened
7   for a couple of months after.  There was no utility
8   and then they started switching blockchains, I mean,
9   there was no usage for it.  And even today there's
10  still no usage for the Kin that I've purchased.
11       Q.  What is your basis for that?
12       A.  We are not allowed to my knowledge to
13  transfer any of our Kin into apps to use.
14       Q.  Have you tried?
15       A.  Not in the last couple of months.  When
16  they first launched KinIt and the initial apps we
17  were not allowed to transfer in.
18       Q.  Do you know if that was before the Kin
19  Ecosystem went through a different blockchain?
20       A.  If I recall correctly it was after.  I'm
21  not entirely sure.
22       Q.  You can't say one way or the other?
23       A.  I can't give a hundred percent definitive.
24       Q.  Are you aware of whether or not purchasers
25  of Kin could access sticker packs within the Kik

---

Page 131

1   application after purchasing Kin?
2        A.  I'm not aware.  I've -- I believe I've
3   read on Reddit that some users were invited to beta
4   but I don't exactly know what they were allowed to
5   do in the private beta.
6        Q.  Do you know when if at all TDE
7   participants were able to link their external
8   wallets to the Kik application to see their
9   balances?
10       A.  I do not know.
11       Q.  Is linking one's wallet to a digital
12  application to see your cryptocurrency balance used?
13       MS. D'ALLAIRD:  Objection.
14       MR. COPELAND:  Objection.
15       THE WITNESS:  No.
16  BY MR. DE JARNETTE:
17       Q.  Why not?
18       A.  Because there's no transaction.
19       Q.  So it's your position that use is
20  equivalent to transactions?
21       A.  You have to be able to use it in some way.
22  Just by viewing it is in my opinion is non-usage.
23       Q.  But purchasing Starbucks gift cards is
24  usage; right?
25       A.  Yes.  But to clarify, we can't use the Kin

---

Page 132

1   we purchased to do that.
2        Q.  Do you have a Kik account?
3        A.  I do.
4        Q.  After you received your Kin did you log
5   into Kik?
6        A.  Yes.
7        Q.  Why?
8        A.  I wanted to see if it was actually
9   implemented, if Kin was actually implemented.
10       Q.  But you don't recall whether or not you
11  could link your external wallet; right?
12       A.  I believe you could.  Yeah.  I think I do
13  recall -- it does show how much Kin you had from
14  your wallet.
15       Q.  Do you remember whether or not you had to
16  do something affirmatively for that to happen?
17       A.  I mean, I had to do something.  I don't
18  remember what it was.
19       Q.  So after you received your Kin you think
20  that you took some action and then were able to see
21  your Kin within Kik?
22       MS. D'ALLAIRD:  Objection.
23       MR. COPELAND:  Objection.
24       THE WITNESS:  It was based -- I believe it
25  was basically like logging in or something.  You

---

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

---

Page 133

1 would like somehow log into your wallet through Kik.
2 BY MR. DE JARNETTE:
3    Q.  Do you recall receiving sticker packs as a
4 result of your purchase of Kin?
5    A.  I remember there being sticker packs, but
6 I don't believe you could purchase or interact with
7 them in any way.
8    Q.  You testified that transactions is
9 indicative of use.  Would sending stickers be
10 indicative of use?
11    A.  Sending stickers?  So like I have a
12 sticker and I send to you?
13    Q.  Sure.
14    A.  No.  In my opinion no.
15    Q.  Why not?
16    A.  I don't know.
17    Q.  So you can't explain to me the basis for
18 your answer?
19    A.  Yeah.
20    Q.  Do you recall approximately how much Kin
21 you purchased in the TDE?
22    A.  It was 12 to 13,000,000,000 I believe.
23 Somewhere in that range.
24    Q.  Which equates to around 1.5 million US
25 dollars?

---

Page 134

1    A.  I think it was like -- it was between 1.5
2 and 1.6.
3    Q.  Did you purchase more Kin after the TDE?
4    A.  No, I didn't purchase more Kin.
5    Q.  Do you recall the process of purchasing
6 Kin?
7    A.  Vaguely.
8    Q.  Do you remember that you had to register
9 before you were able to purchase Kin?
10    A.  Yes.  I believe that's why Tanner Philp
11 contacted me.
12    Q.  As a result of your registration?
13    A.  Correct.
14    Q.  And when you registered you expressed how
15 much Kin that you wanted to purchase?
16    A.  Correct.
17    Q.  Which was around 1.6 million?
18    A.  Roughly.  Yes.
19    Q.  And then Mr. Philp reached out to you
20 after you registered?
21    A.  Correct.
22    Q.  Prior to the token distribution event did
23 you talk to anyone at Kik about your potential
24 purchase of Kin?
25    A.  Tanner.

---

Page 135

1    Q.  Anyone else aside from Tanner?
2    A.  I don't recall.
3    Q.  But prior to your registration to purchase
4 Kin, you did didn't talk to anyone from the company;
5 right?
6    A.  No.
7    Q.  And at the time you registered was when
8 you decided that you planned to purchase Kin; right?
9    A.  Yes.
10    Q.  Planned to purchase 1.5 million US dollars
11 of it?
12    A.  That was our upper limit.
13    MR. DE JARNETTE:  Let's go off the record.
14    THE VIDEO OPERATOR:  We're off the record
15 at 2:19.
16    (Recess taken.)
17    THE VIDEO OPERATOR:  We're back on the
18 record at 2:40.  This is the start of media number
19 3.
20 BY MR. DE JARNETTE:
21    Q.  Mr. Wang, do you understand you're still
22 under oath?
23    A.  Yes.
24    Q.  I wanted to clarify something.  You
25 testified that Kin was not sold as a utility; right?

---

Page 136

1    A.  Yes.
2    Q.  You were referring to the use that you
3 believed that Kin did or did not have after tokens
4 were distributed to purchasers; right?
5    MS. D'ALLAIRD:  Objection.
6    THE WITNESS:  Yes.
7 BY MR. DE JARNETTE:
8    Q.  And you testified that Kik marketed its
9 vision of Kin as having use within applications;
10 right?
11    MS. D'ALLAIRD:  Objection.
12    THE WITNESS:  Yes.
13 BY MR. DE JARNETTE:
14    Q.  So is it fair to say then that Kik
15 marketed Kin as a utility?
16    MS. D'ALLAIRD:  Objection.
17    MR. COPELAND:  Objection.
18    THE WITNESS:  I'm not sure what their
19 intent was.
20 BY MR. DE JARNETTE:
21    Q.  But you understood what the vision was
22 from Kik's marketing documents; right?
23    A.  Yes.
24    Q.  And you understood that Kik's vision that
25 it was marketing prior to the TDE was this ecosystem

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

Page 137

1  where Kin would be able to use for goods and
2  services within digital applications; right?
3        MS. D'ALLAIRD:  Objection.
4        THE WITNESS:  Yes.
5  BY MR. DE JARNETTE:
6     Q.  And you would consider that a utility;
7  right?
8        MS. D'ALLAIRD:  Objection.
9        THE WITNESS:  Yes.
10  BY MR. DE JARNETTE:
11     Q.  Which means that objectively speaking in
12  reviewing the marketing materials that you reviewed,
13  Kik marketed Kin as a utility; correct?
14        MR. COPELAND:  Objection.
15        MS. D'ALLAIRD:  Objection.
16        THE WITNESS:  Yes.
17  BY MR. DE JARNETTE:
18     Q.  So earlier today you listed a few
19  different sources that you reviewed prior to your
20  purchase of Kin.  Do you recall that?
21     A.  I -- yes.
22     Q.  You mentioned a Polychain blog post;
23  right?
24     A.  No.  I just mentioned that someone from
25  Polychain said something.

Page 138

1     Q.  Was that public?
2     A.  Yes.
3     Q.  Do you recall what type of media it was?
4     A.  I don't.  It was either like CoinDesk or
5  some publication.
6     Q.  So you mean that someone from Polychain
7  was quoted in a different article?
8     A.  Correct.
9     Q.  And you think that may have been CoinDesk?
10     A.  Correct.  I don't recall the specific
11  publication.
12     Q.  And with respect to the CoinDesk article,
13  Kik didn't publish that; right?
14        MR. COPELAND:  Objection.  Calls for
15  speculation.
16        MS. D'ALLAIRD:  Objection.
17        THE WITNESS:  Not to my knowledge.
18  BY MR. DE JARNETTE:
19     Q.  You also testified Dan Morehead's blog;
20  right?
21     A.  No.
22     Q.  Did you bring up Dan Morehead?
23     A.  Yes.
24     Q.  And in what context did you bring up Dan
25  Morehead?

Page 139

1     A.  He was quoted in the same article.
2     Q.  As the Polychain individual?
3     A.  No.
4     Q.  As the Pantera individual?
5     A.  Yes.
6     Q.  So am I mistaken that you mentioned
7  Polychain at all?
8     A.  No, you're not mistaken.
9     Q.  Do you remember who the individual was
10  from Polychain who was mentioned in this CoinDesk
11  blog post?
12     A.  Ryan something.
13     Q.  And then you mentioned a Business Insider
14  article; right?
15     A.  I don't recall the specifics of it, but I
16  do recall it being on other major publications.
17     Q.  And Kik didn't publish the articles from
18  those major publications; correct?
19        MS. D'ALLAIRD:  Objection.
20        THE WITNESS:  I'm not sure who published
21  it.
22  BY MR. DE JARNETTE:
23     Q.  Do you have any reason to believe that Kik
24  published those articles?
25     A.  Again, I don't know who published it.

Page 140

1     Q.  But aside from this CoinDesk article can
2  you list a specific publication that you reviewed
3  prior to purchasing Kin?
4     A.  Not specifically.
5     Q.  Are you sure that you reviewed any
6  articles aside from this CoinDesk article before you
7  purchased Kin?
8     A.  Yes.
9     Q.  But you can't tell me which ones.
10     A.  No.
11     Q.  You also testified that you reviewed Kik's
12  white paper; right?
13     A.  Correct.
14     Q.  I'm handing the court reporter what has
15  been previously marked as litigation Exhibit 12,
16  investigative Exhibit 2.
17        (Exhibit 12 was marked for identification
18  by the Reporter.)
19  BY MR. DE JARNETTE:
20     Q.  Mr. Wang, you see on the front of this
21  document it says, "Kin, a decentralized ecosystem of
22  digital services for daily life position paper."  Do
23  you see that?
24     A.  Yes.
25     Q.  See under that it says May of 2017?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                Harrison Wang
                                                                                January 09, 2020

Page 141

1    A.  Yes.
2    Q.  This document also has a Bates number Kik
3  000001 through 28.  Do you recognize this document?
4    A.  I do.
5    Q.  Is this Kik's white paper that you
6  referred to?
7    A.  Yes.
8    Q.  Before you purchased Kin do you recall
9  reviewing the entirety of this white paper?
10    A.  I didn't read it line by line but most of
11  it, yes.
12    Q.  Do you recall which portions you did and
13  did not review?
14    A.  I mean, I reviewed everything.  I skimmed
15  over the technical implementation.
16    Q.  Please go to 08.  See at the top it says,
17  "The Kin cryptocurrency" and then "Purchase and
18  characterization"?
19    A.  Yes.
20    Q.  Right under that this says, "Kik is
21  introducing an open source cryptographic token named
22  Kin which is envisioned as a general purpose
23  cryptocurrency for use in everyday digital services
24  such as chat, social media and payments."  Do you
25  see that?

Page 142

1    A.  Yes.
2    Q.  What did you understand that to mean?
3    MS. D'ALLAIRD:  Objection.
4    THE WITNESS:  That it would be used in
5  mobile apps.
6  BY MR. DE JARNETTE:
7    Q.  And you understood that this statement was
8  articulating the vision behind the Kin Ecosystem?
9    MS. D'ALLAIRD:  Objection.
10    THE WITNESS:  I understood it was part of
11  it.
12  BY MR. DE JARNETTE:
13    Q.  What was the other part of the vision?
14    A.  I don't know.  There was a lot of pieces
15  to the vision.  I just don't know if this statement
16  is missing anything.
17    Q.  But at least part of Kik's marketing of
18  the vision behind Kin was that it would be used in
19  mobile apps; right?
20    A.  Yes.
21    Q.  And you understood that from reading this
22  white paper?
23    A.  Yes.
24    Q.  So you understood that the vision behind
25  Kin was that consumers would earn and spend Kin

Page 143

1  within digital applications; right?
2    A.  Yes.
3    Q.  And one of the primary reasons you
4  purchased is because you believed that that
5  functionality would exist within the Kin Ecosystem;
6  right?
7    MS. D'ALLAIRD:  Objection.
8    THE WITNESS:  Yes.
9  BY MR. DE JARNETTE:
10    Q.  And this vision, what was held out to all
11  potential purchasers; right?
12    MS. D'ALLAIRD:  Objection.
13    THE WITNESS:  It was public if that's what
14  you mean.
15  BY MR. DE JARNETTE:
16    Q.  And because it was public this vision was
17  held out to all public purchasers; right?
18    MS. D'ALLAIRD:  Objection.
19    MR. COPELAND:  Objection.
20    THE WITNESS:  If that's what you take
21  public to mean then it was public.
22  BY MR. DE JARNETTE:
23    Q.  Unlike the CoinDesk article we were
24  discussing, this was published by Kik; right?
25    MR. COPELAND:  Objection.  Calls for

Page 144

1  speculation.
2    THE WITNESS:  I can't tell you who
3  published it.
4  BY MR. DE JARNETTE:
5    Q.  But you understood that this white paper
6  was officially affiliated with the Kin project;
7  correct?
8    A.  Correct.
9    Q.  If you could flip to the front page real
10  quick.  See on the front above May 2017 where it
11  says "Kik Interactive, Inc."?
12    A.  Yes.
13    Q.  Does that affect your opinion whether or
14  not Kik Interactive published this paper?
15    A.  No.
16    Q.  Do you have any idea why Kik Interactive
17  is on the front of this white paper?
18    A.  No.
19    Q.  Do you have an understanding that Kik was
20  the entity that sold Kin tokens?
21    A.  Yes.
22    Q.  So if you go on this white paper states,
23  "Kin will be the unit of account for all economic
24  transactions within the Kin Ecosystem and it will
25  serve as the basis of interoperability with other

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                      Harrison Wang
January 09, 2020

Page 145

1  digital services."  Do you see that?
2      A.  No.  Where are we?
3      Q.  Go back to 08.  Apologies.  So under
4  "Purpose and characterization" I read the first
5  sentence.  If you go to the second sentence it says,
6  "Kin will be the unit of account for all economic
7  transactions within the Kin Ecosystem and it will
8  serve as the basis of interoperability with other
9  digital services."  Do you see that?
10     A.  Yes.
11     Q.  What do you understand that to mean?
12     A.  It can be used in a bunch of different
13  digital apps.
14     Q.  So the idea was that Kin would be used in
15  many digital applications aside from Kik; correct?
16     A.  Correct.
17     Q.  And you understood that from reading this
18  white paper?
19     A.  Correct.
20     Q.  Please go to 21.  I know you said you
21  reviewed some articles and a video within the last
22  week or so.  Have you read this white paper within
23  the last week?
24     A.  I have skimmed it.
25     Q.  So you see at the top of 21 it says "Kin

Page 146

1  token issuance"?
2      A.  Yes.
3      Q.  And then "Kin token allocations"?
4      A.  Yes.
5      Q.  So if you go to the second sentence this
6  says, "The proceeds of the token distribution event
7  will be used to fund Kik operations and to deploy
8  the Kin Foundation."  Do you see that?
9      A.  Yes.
10     Q.  What do you understand that to mean?
11     A.  That it would fund Kik operations and be
12  used in Kin Foundation.
13     Q.  Did you understand that aside from the Kin
14  project Kik had a messaging application?
15     A.  Yes.
16     Q.  Is it fair to say that you understood
17  based on this sentence that Kik would use some of
18  the proceeds to fund that messaging business?
19         MR. COPELAND:  Objection.
20         MS. D'ALLAIRD:  Objection.
21         THE WITNESS:  It was to fund the Kik
22  operations to build Kin within Kik.
23  BY MR. DE JARNETTE:
24     Q.  But that's not what this says; right?  It
25  says, "The proceeds of the token distribution event

Page 147

1  will be used to fund Kik operations and to deploy
2  the Kin Foundation."
3         MS. D'ALLAIRD:  Objection.
4         MR. COPELAND:  Objection.
5  BY MR. DE JARNETTE:
6      Q.  Did I read that right?
7      A.  In my opinion it's open for
8  interpretation.
9      Q.  But what you stated was that the proceeds
10  would be used to build the Kin Ecosystem.  That's
11  not stated here; right?
12     A.  That was --
13         MS. D'ALLAIRD:  Objection.
14         MR. COPELAND:  Objection.
15         THE WITNESS:  -- open to interpretation.
16  BY MR. DE JARNETTE:
17     Q.  In this sentence does Kik put any
18  limitations on the proceeds -- or how it would use
19  the proceeds to fund its operations?
20         MS. D'ALLAIRD:  Objection.
21         MR. COPELAND:  Objection.
22         THE WITNESS:  It does not.
23  BY MR. DE JARNETTE:
24     Q.  Please go to 23.  Under "Conclusion" if
25  you go to the second paragraph and the last sentence

Page 148

1  this says, "In this new order Kik plans to be one of
2  many participants rather than a landlord."  Do you
3  see that?
4      A.  No.  Where is it?
5      Q.  So see 7, "Conclusion"?
6      A.  Okay.
7      Q.  And then you go two paragraphs down.  So
8  the paragraph that starts with "Kik will pioneer"?
9      A.  Got it.  Okay.
10     Q.  It states, "In this new order Kik plans to
11  be one of many participants rather than a landlord."
12  Do you see that?
13     A.  Correct.  Yeah.
14     Q.  What do you understand that to mean?
15     A.  That the Kin Ecosystem was supposed to be
16  an ecosystem of many different mobile applications.
17     Q.  Meaning that the success of the ecosystem
18  relied on many digital applications aside from Kik;
19  right?
20         MR. COPELAND:  Objection.
21         MS. D'ALLAIRD:  Objection.
22         THE WITNESS:  Initially, no.
23  BY MR. DE JARNETTE:
24     Q.  What about ultimately?
25         MS. D'ALLAIRD:  Objection.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                                    Harrison Wang
January 09, 2020

---

Page 149

1      THE WITNESS:  We never got to ultimately
2  because initially it wasn't implemented.
3  BY MR. DE JARNETTE:
4      Q.  But you're not aware or you testified
5  you're not aware of how many different applications
6  integrated Kin within their applications; correct?
7      A.  That's correct.
8      Q.  So for all you know it could be over 50?
9      MS. D'ALLAIRD:  Objection.
10     MR. COPELAND:  Objection.
11     THE WITNESS:  The issue is we can't use
12  our Kin that we bought in the ecosystem.
13  BY MR. DE JARNETTE:
14     Q.  But you testified within the last few
15  months you haven't tried to use it within digital
16  applications; right?
17     A.  That's correct.  When they first launched
18  the apps we were not able to.  I cannot speak to the
19  last couple of months.
20     Q.  However, putting aside what you believe
21  Kin could be used for after the distribution of
22  tokens, what is being marketed here is that Kik
23  would be one of many app developers that would be a
24  part of this ecosystem; correct?
25     MS. D'ALLAIRD:  Objection.

---

Page 150

1      MR. COPELAND:  Objection.
2      THE WITNESS:  In that line, yes.
3  BY MR. DE JARNETTE:
4      Q.  And you understood that from reading this
5  sentence of the white paper?
6      A.  Yes.
7      Q.  I'm handing the court reporter a document
8  to be marked 226.
9      (Exhibit 226 was marked for identification
10  by the Reporter.)
11  BY MR. DE JARNETTE:
12     Q.  Do you have Exhibit 226 in front of you?
13     A.  Yes.
14     Q.  See at the top here, it says "Ted
15  Livingston, May 25, 2017"?
16     A.  Yes.
17     Q.  And the title of this is "Announcing Kin,
18  a cryptocurrency for an open future."  Do you see
19  that?
20     A.  Yes.
21     Q.  Do you recognize this document?
22     A.  I can't say I do.
23     Q.  However, it appears that it was published
24  on May 25, 2017 from what you can tell?
25     A.  Yes.

---

Page 151

1      Q.  Do you have any reason to dispute that it
2  was published on that date?
3      A.  Frankly I haven't seen it.
4      Q.  So is it fair to say that you didn't rely
5  on this document when purchasing Kin?
6      A.  Correct.
7      Q.  However, you understand that this was
8  available to any potential Kin purchaser at this
9  time; correct?
10     MS. D'ALLAIRD:  Objection.
11     MR. COPELAND:  Objection.
12     THE WITNESS:  I can't say.  I don't know.
13  BY MR. DE JARNETTE:
14     Q.  If this was publicly available any Kin
15  purchaser could have relied on it; right?
16     MR. COPELAND:  Objection.
17     MS. D'ALLAIRD:  Objection.
18     THE WITNESS:  I believe you can also make
19  medium articles private so I don't know.
20  BY MR. DE JARNETTE:
21     Q.  Do you have any reason to believe that
22  this medium post was private?
23     A.  Like I told you, I don't know.  I've never
24  seen it.
25     Q.  I will represent to you that this was

---

Page 152

1  publicly available.  Please go to the second page.
2  So the first full paragraph Mr. Livingtson writes,
3  "Today we're announcing Kin, a cryptocurrency built
4  on top of the Ethereum blockchain."  Do you see
5  that?
6      A.  Yes.
7      Q.  And then in parentheses it says, "Read our
8  Kin white paper here."
9      A.  Yes.
10     Q.  Do you understand that white paper to
11  refer to Exhibit 225 that we were just going over?
12     A.  I can't say.
13     Q.  Mr. Livingston goes on, "By integrating
14  Kin into our chat app, Kik, we hope to spark the
15  creation of a new ecosystem of digital services that
16  is open, sustainable and compelling."  Do you see
17  that?
18     A.  Yes.
19     Q.  "It will be an ecosystem in which
20  developers link arms to compete with the giants
21  together building a better future for society while
22  also making money."  Do you see that?
23     A.  Yes.
24     Q.  Talking about the new business model that
25  we referred to earlier, did you understand that

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.    Harrison Wang
January 09, 2020

Page 153

1 developers would compete for Kin rewards?
2    A.  Yes.
3    Q.  Meaning that the fortunes of those
4 individuals didn't rise and fall together either;
5 right?
6        MS. D'ALLAIRD:  Objection.
7        THE WITNESS:  I can't say.
8 BY MR. DE JARNETTE:
9    Q.  So if one developer in the Kin ecosystem
10 is competing for a Kin rewards at the expense of
11 another, isn't it true that their fortunes are
12 different?
13        MS. D'ALLAIRD:  Objection.
14        THE WITNESS:  Depends on how you look at
15 it.
16 BY MR. DE JARNETTE:
17    Q.  You can't say one way or the other?
18    A.  No.
19    Q.  So if you go down to the third full
20 paragraph this says, "While Kik will initially be
21 the only service using Kin, our ultimate vision is
22 that our chat app will be just one of thousands of
23 services in the Kin Ecosystem."  Do you see that?
24    A.  Yes.
25    Q.  And you understood that the ultimate

Page 154

1 vision of Kin prior to your purchase is that it
2 would be just one of thousands of services in the
3 Kin Ecosystem?
4        MS. D'ALLAIRD:  Objection.
5        THE WITNESS:  I don't know if it's
6 thousands but it would be in a lot of apps.
7 BY MR. DE JARNETTE:
8    Q.  You wouldn't be surprised if it was
9 hundreds?
10        MS. D'ALLAIRD:  Objection.
11        MR. COPELAND:  Objection.
12        THE WITNESS:  That's fine.
13 BY MR. DE JARNETTE:
14    Q.  Meaning yes?
15    A.  I wouldn't have a problem if it was in
16 like a couple hundred.
17    Q.  Based on your review of Kik's marketing
18 materials prior to purchase, you wouldn't be
19 surprised if hundreds of applications integrated
20 Kin; right?
21        MR. COPELAND:  Objection.
22        MS. D'ALLAIRD:  Objection.
23        THE WITNESS:  I didn't have a number in
24 mind when they marketed.
25 ///

Page 155

1 BY MR. DE JARNETTE:
2    Q.  But would you have been surprised?
3    A.  I don't know.  I don't know if I would
4 have been surprised back then.
5    Q.  The next sentence says, "To maximize the
6 chance of success we're dedicating the majority of
7 Kin to a rewards system that will provide a
8 financial incentive to developers."  Do you see that
9 in the third full paragraph, second sentence?
10    A.  Yes.
11    Q.  You understood that this was part of the
12 alternative business model that we've been
13 discussing?
14        MS. D'ALLAIRD:  Objection.
15        MR. COPELAND:  Objection.  Vague.
16        THE WITNESS:  Repeat the question.
17 BY MR. DE JARNETTE:
18    Q.  Did you understand that the Kin that was
19 dedicated to the Kin rewards engine would support
20 the alternative to the advertising-based model that
21 we've been talking about today?
22        MS. D'ALLAIRD:  Objection.
23        THE WITNESS:  I don't know if it's the
24 alternative to the advertising model but it is
25 supporting developers.

Page 156

1 BY MR. DE JARNETTE:
2    Q.  And that would be developers including but
3 not limited to Kik; right?
4    A.  Correct.
5    Q.  Were you aware of any restrictions --
6 strike that.  Based on your review of Kik's
7 marketing materials before you purchased Kin did you
8 understand that any developer that wanted to
9 participate in the Kin Ecosystem could?
10        MS. D'ALLAIRD:  Objection.
11        THE WITNESS:  That was my understanding.
12 BY MR. DE JARNETTE:
13    Q.  Based on the materials that Kik published?
14        MS. D'ALLAIRD:  Objection.
15        MR. COPELAND:  Objection.
16        THE WITNESS:  I believe so.
17 BY MR. DE JARNETTE:
18    Q.  You also testified that you reviewed a
19 blog post by Mr. Livingston that referred to friends
20 and family.
21    A.  Correct.
22    Q.  Did you review this within the last week?
23 Did you review the blog post in the last week that
24 referred to friends and family?
25    A.  Yes.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 157

1    Q.  I'm handing the court reporter an exhibit
2  to be marked as Exhibit 227.
3        (Exhibit 227 was marked for identification
4     by the Reporter.)
5  BY MR. DE JARNETTE:
6    Q.  Do you have Exhibit 227 in front of you?
7    A.  Yes.
8    Q.  See at the top it says "Ted Livingston,
9  September 6, 2017"?
10    A.  Yes.
11    Q.  You also see where it says, "Why I am
12  telling my friends and family that they should
13  participate in the Kin TDE?"
14    A.  Yes.
15    Q.  Do you recognize this document?
16    A.  Yes.
17    Q.  Is this the blog post referring to friends
18  and family that you talked about today?
19    A.  Yes.
20    Q.  Do you know if this medium post was
21  published before or after you registered to
22  participate in the TDE?
23    A.  I don't recall exactly when I registered.
24    Q.  Please go to the back page which is Bates
25  labeled KIK underscore 00045123.

---

Page 158

1        Are you there?
2    A.  Yes.
3    Q.  Please go to the second to last paragraph.
4  You see where this says, "This is about a movement,
5  a movement to build an ecosystem where people get
6  fairly compensated for the value they provide to
7  digital services"?
8    A.  Yes.
9    Q.  What did you understand that to mean?
10    A.  That people would get fairly compensated
11  for what they did on mobile applications.
12    Q.  Such as developers?
13    A.  Yes.  That's one case.
14    Q.  Other cases would be creating earn and
15  spend opportunities within Kin applications?
16    A.  Can you repeat that?
17    Q.  Your understanding in reading that
18  sentence reflected that developers would get fairly
19  compensated for things such as creating earn and
20  spend opportunities within their applications?
21    A.  You said developers would get compensated?
22  Yes.
23    Q.  And developers would also get compensated
24  for creating use cases?
25        MS. D'ALLAIRD:  Objection.

---

Page 159

1        THE WITNESS:  I guess developers would get
2  compensated based on developing the app.
3  BY MR. DE JARNETTE:
4    Q.  And these would be applications other than
5  Kik messenger; right?
6    A.  Correct.  It includes developers who are
7  developing bots on the Kik application as well.
8    Q.  And to be clear you don't have to work for
9  Kik to develop a bot on Kik Messenger; right?
10        MS. D'ALLAIRD:  Objection.
11        THE WITNESS:  Not that I know of.
12  BY MR. DE JARNETTE:
13    Q.  And you understood that developers -- that
14  the idea behind the Kin Ecosystem was that
15  developers would get fairly compensated for
16  developing these use cases at the time you read this
17  article?
18        MS. D'ALLAIRD:  Objection.
19        THE WITNESS:  Yes.
20  BY MR. DE JARNETTE:
21    Q.  The next sentence says, "A movement to
22  build an ecosystem where smaller developers have a
23  fair shot in making a living when they do what they
24  love and build great things."  Do you see that?
25    A.  Yes.

---

Page 160

1    Q.  Is that the idea we were just talking
2  about?
3        MS. D'ALLAIRD:  Objection.
4        THE WITNESS:  It's part of it.
5  BY MR. DE JARNETTE:
6    Q.  What is your understanding of that
7  sentence?
8    A.  That smaller developers will have a fair
9  shot of making a living.  Making apps.
10    Q.  Within this Kin Ecosystem?
11    A.  Correct.
12    Q.  The next sentence says, "A movement where
13  consumers get immersive and unique experiences
14  catered to their interest and needs."  You see that?
15    A.  Yes.
16    Q.  What did you understand that to mean?
17    A.  Just consumers get a good app experience.
18    Q.  As in they could consume content within
19  applications they enjoy by using Kin?
20        MS. D'ALLAIRD:  Objection.
21        THE WITNESS:  It doesn't necessarily have
22  to be by using Kin but by using apps that have Kin.
23  BY MR. DE JARNETTE:
24    Q.  Where users would be able to transact Kin
25  within those applications.

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.          Harrison Wang
January 09, 2020

Page 161

1      A.  Not necessarily.
2          MR. COPELAND:  Objection.
3          MS. D'ALLAIRD:  Objection.
4   BY MR. DE JARNETTE:
5      Q.  The next paragraph says, "A movement is
6   only as strong as the people behind it and a
7   movement this ambitious needs as many people as
8   possible.  That's why I tell them you should
9   participate."  Do you see that?
10     A.  Yes.
11     Q.  What is your understanding of that
12  paragraph?
13     A.  Strength in numbers.
14     Q.  Meaning that the ecosystem needed as many
15  people as possible?
16         MS. D'ALLAIRD:  Objection.
17         THE WITNESS:  The ecosystem needs users.
18  BY MR. DE JARNETTE:
19     Q.  Who are independent of Kik; right?
20         MR. COPELAND:  Objection.
21         MS. D'ALLAIRD:  Objection.
22         THE WITNESS:  Not necessarily.
23  BY MR. DE JARNETTE:
24     Q.  Explain that.
25     A.  Well, the whole point of Kin is -- and

Page 162

1   with Kik is to launch Kin on day one inside Kik.
2   Those users within Kik would also help boost the
3   utility for Kin.  Whether they use it or not is
4   irrelevant.
5      Q.  But in reading this which you testified
6   that you read this blog post, did you understand
7   that the movement needing as many as possible
8   referred to users both within and outside of Kik?
9          MR. COPELAND:  Objection.
10         MS. D'ALLAIRD:  Objection.
11         THE WITNESS:  I didn't think about that
12  delineation.
13  BY MR. DE JARNETTE:
14     Q.  But you understood that the vision
15  contemplated that users would use Kin in
16  applications outside of Kik; right?
17     A.  The -- say that again.
18     Q.  But you understood that Kik's vision
19  articulated in the marketing materials, that you
20  reviewed prior to your purchase, articulated that
21  users would earn and spend Kin in applications other
22  than Kik; correct?
23     A.  Correct.
24     Q.  In your view prior to your purchase of Kin
25  could the Kin Ecosystem succeed if no third party

Page 163

1   developer integrated Kin within their digital
2   application?
3          MS. D'ALLAIRD:  Objection.
4          THE WITNESS:  I think it could have
5   succeeded within Kik if it was integrated in Kik
6   which is what was marketed.  And the value would
7   have risen with that usage within Kik because as Ted
8   kept saying it was going to get launched to
9   15,000,000 monthly active users, and that would have
10  been enough to increase the price.
11  BY MR. DE JARNETTE:
12     Q.  However, the vision that was marketed
13  through the materials that we're going through,
14  would that vision have been fulfilled if Kin was
15  only available within Kik?
16         MR. COPELAND:  Objection.
17         MS. D'ALLAIRD:  Objection.
18         THE WITNESS:  Yes.
19  BY MR. DE JARNETTE:
20     Q.  How so?
21     A.  The bot developers.
22     Q.  Who we've established aren't necessarily
23  affiliated with Kik; right?
24     A.  Right.  But it's leveraging the Kik
25  platform.  So it is part of Kik.

Page 164

1      Q.  However, you don't know whether or not
2   these bot developers work for Kik or not; right?
3      A.  I do not.
4      Q.  So if you take out bot developers would
5   the vision be realized if Kin was only integrated
6   within Kik?
7      A.  I can't say for certain.
8          MR. COPELAND:  Objection.
9          MR. DE JARNETTE:  Let's go off the record.
10         THE VIDEO OPERATOR:  We're off the record
11  at 3:18.
12         (Recess taken.)
13         THE VIDEO OPERATOR:  We're back on the
14  record at 3:34.
15  BY MR. DE JARNETTE:
16     Q.  Mr. Wang, do you understand you're still
17  under oath?
18     A.  Yes.
19     Q.  You testified earlier that Mr. Livingston
20  said in his friends and family blog post that Kin
21  would reach 15,000,000 users; right?
22     A.  Yes.
23     Q.  And by users you meant monthly active
24  users; right?
25     A.  Correct.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

Page 165

1    Q.   Do you still have Exhibit 227 in front of
2  you?
3    A.   Yes.
4    Q.   And this is the blog post you were
5  referring to?
6    A.   Yes.
7    Q.   Can you point me to where in this blog
8  post Mr. Livingston said that?
9    A.   Page 2.
10    Q.   Where on page 2?
11    A.   The first paragraph.
12    Q.   Sorry.  Which paragraph?
13    A.   First paragraph.
14    Q.   Can you read me exactly what you're
15  referring to.
16    A.   "I told people that Kin has at least one
17  participant who is all in, Kik.  With one strong
18  digital service on board from day one Kin can enjoy
19  a good start regardless of whether or not other
20  digital services adopt it right away.  Kik has
21  15,000,000 monthly active users, many of whom are
22  already accustomed to exchanging digital goods such
23  as stickers and emoji through chat."
24    Q.   And you took that to mean that 15,000,000
25  monthly active Kik users would use Kin on day one?

Page 166

1    A.   Would be exposed to Kin.
2    Q.   Does Mr. Livingston use the term
3  "exposed"?
4       MR. COPELAND:  Objection.
5       MS. D'ALLAIRD:  Objection.
6       THE WITNESS:  No.
7  BY MR. DE JARNETTE:
8    Q.   What do you mean by exposed?
9    A.   They would be aware of Kin.
10    Q.   He doesn't say that Kin will be integrated
11  within Kik on day one, does he?
12       MS. D'ALLAIRD:  Objection.
13       MR. COPELAND:  Objection.
14       THE WITNESS:  With one strong digital
15  service on board from day one.
16  BY MR. DE JARNETTE:
17    Q.   That's not my question.  My question is
18  Mr. Livingston doesn't say that Kin will be
19  integrated within Kik on day one, does he?
20       MR. COPELAND:  Objection.
21       MS. D'ALLAIRD:  Objection.
22       THE WITNESS:  He doesn't say those exact
23  words.
24  BY MR. DE JARNETTE:
25    Q.   Nor does Mr. Livingston say that Kin will

Page 167

1  be accessible to 15,000,000 monthly active Kik users
2  on day one, does he?
3       MS. D'ALLAIRD:  Objection.
4       MR. COPELAND:  Objection.
5       THE WITNESS:  He doesn't explicitly say
6  that.
7  BY MR. DE JARNETTE:
8    Q.   So it's fair to say then Mr. Livingston
9  was not representing that Kin would reach 15,000,000
10  MAU on day one; right?
11       MS. D'ALLAIRD:  Objection.
12       MR. COPELAND:  Objection.
13       THE WITNESS:  Can you repeat that?
14  BY MR. DE JARNETTE:
15    Q.   Based on your testimony just now isn't it
16  true that Mr. Livingston in this Exhibit 227 did not
17  represent that Kin would reach 15,000,000 Kik MAU on
18  day one?
19       MR. COPELAND:  Same objection.
20       MS. D'ALLAIRD:  Same objection.
21       THE WITNESS:  I would argue that saying
22  one strong digital service which they mention who
23  was all in, Kik, on board from day one, I would
24  argue that does represent it will be in Kik day one.
25  ///

Page 168

1  BY MR. DE JARNETTE:
2    Q.   That's your interpretation; right?
3    A.   Yes.
4       MR. COPELAND:  Objection.
5       THE WITNESS:  It's not explicitly stated
6  in the words you said, yes.
7  BY MR. DE JARNETTE:
8    Q.   You have no idea whether or not other Kin
9  purchasers had that same interpretation; right?
10       MR. COPELAND:  Objection.
11       MS. D'ALLAIRD:  Objection.
12       THE WITNESS:  I do not know.
13  BY MR. DE JARNETTE:
14    Q.   And the statement "with one strong digital
15  service on board from day one," that doesn't state
16  that Kin would be integrated within Kik on day one,
17  does it?
18       MR. COPELAND:  Objection.
19       MS. D'ALLAIRD:  Objection.
20       THE WITNESS:  I would argue that it does.
21  BY MR. DE JARNETTE:
22    Q.   How so?
23    A.   Like you said it's open for
24  interpretation.
25    Q.   And that's your interpretation?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                                    Harrison Wang
January 09, 2020

Page 169

1     A.  Yes.
2     Q.  And you have no idea whether or not the
3  way that you interpreted this statement was the way
4  that Kik intended to market the statement; correct?
5        MR. COPELAND:  Objection.
6        MS. D'ALLAIRD:  Objection.
7        THE WITNESS:  I don't know what Ted
8  Livingston was thinking.
9  BY MR. DE JARNETTE:
10    Q.  But based on your current knowledge and
11 understanding today, you cannot say that in Ted
12 Livingston's view he was making a promise that Kin
13 would be integrated within Kik available to
14 15,000,000 MAU on day one?
15       MR. COPELAND:  Objection.
16       MS. D'ALLAIRD:  Objection.
17       THE WITNESS:  Can you restate the
18 question?
19 BY MR. DE JARNETTE:
20    Q.  Sure.  You cannot say that in Ted
21 Livingston's view that he was making a promise that
22 Kin would be integrated within Kik available to
23 15,000,000 MAU on day 1, can you?
24    A.  I believe that his statement represents
25 that, in my opinion.

Page 170

1        MR. COPELAND:  Objection.
2  BY MR. DE JARNETTE:
3     Q.  Which is your interpretation; right?
4     A.  We've established that, yes.
5     Q.  But you have no idea what he intended by
6  that statement; correct?
7        MR. COPELAND:  Objection.
8        MS. D'ALLAIRD:  Objection.
9        THE WITNESS:  If you're asking if I can
10 read his mind, no.
11 BY MR. DE JARNETTE:
12    Q.  To clarify, when you refer to 15,000,000
13 MAU are you talking about Kik users or Kin users?
14       MS. D'ALLAIRD:  Objection.
15       THE WITNESS:  Kik.
16 BY MR. DE JARNETTE:
17    Q.  So users of the Kik messaging platform?
18    A.  Users of the Kik app.
19    Q.  You also testified that before Kin was
20 distributed to you -- strike that.  You testified
21 that before Kin was distributed to you but after you
22 registered you spoke to Tanner Philp; correct?
23    A.  Before I purchased, had put my money
24 actually in, yes.
25    Q.  How many times did you speak to Mr. Philp

Page 171

1  before you purchased?
2     A.  Define speak?
3     Q.  You testified that you had a phone call
4  with Mr. Philp.  How many phone calls did you have?
5     A.  To my recollection one.
6     Q.  Do you recall when that was specifically?
7     A.  Couple of days before the actual putting
8  in of the money.
9     Q.  Do you recall how long that conversation
10 was?
11    A.  I do not.
12    Q.  Even ballpark?
13    A.  I don't remember so I don't want to give a
14 false number.
15    Q.  Do you think it was less than an hour?
16    A.  I don't remember.
17    Q.  But you testified that you remember
18 specific things that Mr. Philp said; right?
19    A.  I remember we had specific questions which
20 he answered.  I can't quote him on those.
21    Q.  What specific questions did you ask
22 Mr. Philp?
23    A.  It was questions about liquidity,
24 exchanges, partnerships, applications coming on
25 board.  I don't recall what else.

Page 172

1     Q.  Do you recall whether or not there was
2  anyone else from Kik on that call?
3     A.  I do not recall.
4     Q.  What did Mr. Philp tell you on that call?
5     A.  That there was liquidity coming soon --
6     Q.  I apologize.  I think it makes sense to
7  take these one by one.  You said liquidity coming
8  soon.  Do you recall him using that precise
9  language?
10    A.  I don't know if it was liquidity or
11 exchanges, but it was something -- I don't know what
12 the precise language was.
13    Q.  Did Mr. Philp use the term "guarantee"?
14    A.  I don't recall.
15    Q.  Did he guarantee that Kin would be
16 available on exchanges on that call?
17    A.  I don't recall if he used the word
18 "guarantee" or not.
19    Q.  Did Mr. Philp promise to you that Kin
20 would be available on exchanges?
21    A.  Are you saying did he say the word
22 "promise"?
23    Q.  We can start with that.  Did he say the
24 word "promise"?
25    A.  I don't recall.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                                     Harrison Wang
January 09, 2020

---

Page 173

1    Q.  But sitting here today you cannot recall
2  the specific language that Mr. Philp used; right?
3    A.  Correct.
4    Q.  What is your best recollection of what he
5  said?
6    A.  I told you.
7    Q.  That there would be liquidity?
8    A.  There would be liquidity/exchanges.  There
9  would be partnerships coming soon.  Everything was
10  built out.  Blockchain was almost ready I believe.
11    Q.  Do you remember whether or not he caveated
12  any of his statements, like we believe liquidity is
13  coming soon?
14    MS. D'ALLAIRD:  Objection.
15    THE WITNESS:  Like I said before, I don't
16  know the exact wording he used.
17  BY MR. DE JARNETTE:
18    Q.  Which means he could have said that?
19    MR. COPELAND:  Objection.
20    MS. D'ALLAIRD:  Objection.
21    THE WITNESS:  I don't know.
22  BY MR. DE JARNETTE:
23    Q.  Which also means that you do not
24  specifically recall whether Mr. Philp said that Kik
25  would be working to get liquidity; right?

---

Page 174

1    MR. COPELAND:  Objection.
2    MS. D'ALLAIRD:  Objection.
3    THE WITNESS:  I don't recall.
4  BY MR. DE JARNETTE:
5    Q.  So based on your current recollection you
6  have no idea whether or not Mr. Philp made any
7  representations that Kik was doing any work to get
8  listed on exchanges; right?
9    MR. COPELAND:  Objection.
10    MS. D'ALLAIRD:  Objection.
11    THE WITNESS:  Can repeat that?
12  BY MR. DE JARNETTE:
13    Q.  Based on your current recollection you
14  can't recall whether Mr. Philp represented whether
15  Kik was doing any work to get Kin listed on
16  exchanges?
17    MR. COPELAND:  Objection.
18    MS. D'ALLAIRD:  Objection.
19    THE WITNESS:  I mean, I don't know what
20  they were doing from behind the scenes.  From what I
21  recall he mentioned they were talking or -- I don't
22  know the wording but they were in contact with
23  exchanges to get listed.  Which is also supported by
24  various tweets that the Kin Foundation put out.
25  ///

---

Page 175

1  BY MR. DE JARNETTE:
2    Q.  You have no specific recollection of
3  Mr. Philp saying that Kik had applied to be on an
4  exchange do you?
5    MR. COPELAND:  Objection.
6    MS. D'ALLAIRD:  Objection.
7    THE WITNESS:  I don't recall.
8  BY MR. DE JARNETTE:
9    Q.  But what you're testifying to here today
10  is that based on that conversation your takeaway was
11  that you believe that there was going to be some
12  sort of liquidity for Kin?
13    A.  Very soon, yes.  And applications where
14  Kin would be partnering with and pretty further --
15  far development of the blockchain.
16    Q.  Do you know whether an exchange can list a
17  token without the company filling out an
18  application?
19    MR. COPELAND:  Objection.
20    MS. D'ALLAIRD:  Objection.
21    THE WITNESS:  That depends.
22  BY MR. DE JARNETTE:
23    Q.  Can some exchanges?
24    MR. COPELAND:  Objection.
25    MS. D'ALLAIRD:  Objection.

---

Page 176

1    THE WITNESS:  I don't know what the
2  process is.  But I believe so.
3  BY MR. DE JARNETTE:
4    Q.  Meaning that you believe some exchanges
5  can list tokens without the company submitting an
6  application; right?
7    MR. COPELAND:  Objection.
8    MS. D'ALLAIRD:  Objection.
9    THE WITNESS:  My only knowledge of that
10  which is very limited because I've never listed
11  anything on an exchange, but decentralized exchanges
12  could.
13  BY MR. DE JARNETTE:
14    Q.  And because Kin was an ERC 20 token any
15  exchange was Kin without Kik filling out an
16  application; right?
17    MR. COPELAND:  Objection.
18    MS. D'ALLAIRD:  Objection.
19    THE WITNESS:  I don't believe that's true
20  but I'm not sure.
21  BY MR. DE JARNETTE:
22    Q.  You can't specifically recall whether
23  Mr. Philp said that exchanges would definitively
24  list Kin, can you?
25    MR. COPELAND:  Objection.

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

Page 177

1        MS. D'ALLAIRD:  Objection.
2        THE WITNESS:  I don't know what wording he
3  used.
4  BY MR. DE JARNETTE:
5        Q.  But he did not represent that it was a
6  hundred percent certain that exchanges would list
7  Kin; right?
8        MR. COPELAND:  Objection.
9        MS. D'ALLAIRD:  Objection.
10       THE WITNESS:  Again, I don't know what
11  wording he used.
12  BY MR. DE JARNETTE:
13       Q.  What about in concept?  He did not
14  represent a hundred percent that Kin would be listed
15  on exchanges, did he?
16       MR. COPELAND:  Objection.
17       MS. D'ALLAIRD:  Objection.
18       THE WITNESS:  In concept I believe he did.
19  When you say -- when someone says it will be listed
20  on exchanges soon, I don't presume that you have to
21  say I promise or I guarantee it will be listed on
22  exchange soon.
23  BY MR. DE JARNETTE:
24       Q.  But Mr. Wang, you just testified and you
25  testified throughout the day that you don't recall

Page 178

1  specifically the words Mr. Philp used on that
2  phone call in 2017; right?
3        MR. COPELAND:  Objection.
4        MS. D'ALLAIRD:  Objection.
5        THE WITNESS:  Correct.  I'm saying in
6  concept, when you asked in concept did you believe
7  he represented, I do, yes.
8  BY MR. DE JARNETTE:
9        Q.  And you took no notes from that call;
10  right?
11       A.  I did not, no.
12       Q.  So you're basing your testimony right now
13  on recollections from September 2017; right?
14       A.  Yes.
15       Q.  Recollections in which you can't even tell
16  me whether or not this call lasted under an hour?
17       MR. COPELAND:  Objection.
18       MS. D'ALLAIRD:  Objection.
19       THE WITNESS:  Yes.
20  BY MR. DE JARNETTE:
21       Q.  Was your brother William in on that call?
22       A.  No.
23       Q.  Why not?
24       A.  I don't know.
25       Q.  But I take it you relayed that

Page 179

1  conversation to William?
2        A.  I don't recall, but I believe so.
3        Q.  Did you tell your brother William about
4  that conversation later in writing?
5        A.  I do not remember.
6        Q.  So we talked about the topic of exchanges
7  or in your words the liquidity.  What else did you
8  and Mr. Philp talk about?
9        A.  It being on -- partnering with different
10  apps.
11       Q.  What did Mr. Philp say about that?
12       A.  That they were working on integrating with
13  a lot of apps, a lot of partners.  My sense were
14  coming on board.
15       Q.  And partners you mean other digital
16  applications?
17       A.  Correct.
18       Q.  Did he give you a time frame for that?
19       A.  I don't recall.
20            Actually this was the first time I
21  physically met Tanner and met Hibberd.  They
22  actually reached out to Flipagram to ask if
23  Flipagram would be a Kin participant.
24       Q.  I want to get the timing straight.  So the
25  conversation you had with Tanner prior to your

Page 180

1  purchase, that was on the phone; right?
2        A.  Correct.
3        Q.  Now, you just testified about an in-person
4  meeting?
5        A.  That was months after the token event.
6        Q.  I'm interested in that but just want to
7  close out the loop on your phone call with Tanner or
8  with Mr. Philp prior to your purchase.  So on that
9  phone call what else did he tell you aside from what
10  you testified on with respect to liquidity and other
11  digital applications?
12       A.  He said that he would be there any time we
13  need, any questions always e-mail him.  He said call
14  him at any time.  He would answer right away or help
15  out any way he can.
16       Q.  And you can't recall specifically what
17  Mr. Philp said about other digital applications
18  integrating Kin; right?
19       MR. COPELAND:  Objection.
20       THE WITNESS:  He did not list any other
21  applications if that's what you're asking.
22  BY MR. DE JARNETTE:
23       Q.  That's helpful but you cannot recall
24  specifically what he said about other digital
25  applications potentially integrating Kin; correct?

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
                                                                                  January 09, 2020

---

Page 181

1       MR. COPELAND:  Objection.
2       MS. D'ALLAIRD:  Objection.
3       THE WITNESS:  I don't remember the
4  wording.
5  BY MR. DE JARNETTE:
6       Q.  Anything else that you and Mr. Philp
7  talked about on that call?
8       A.  Not that I can remember.
9       Q.  Now, moving forward to the in-person
10  meeting that you were just talking about, when did
11  that happen with Mr. Philp and Mr. Hibberd?
12      A.  I don't remember the date.
13      Q.  But it was after your purchase of Kin?
14      A.  A couple of months after.
15      Q.  And one of them reached out about
16  Flipagram potentially integrating Kin within its
17  app?
18      A.  Correct.
19      Q.  Did that happen?
20      A.  No.
21      Q.  Why not?
22      A.  We were purchased by TikTok or by
23  ByteDance.
24      Q.  Is Flipagram the type of app that would be
25  amenable to having earn and spend opportunities

---

Page 182

1  within it?
2       A.  I can't answer that.
3       Q.  Do you remember that there were two days
4  in which you could purchase Kin?
5       A.  I don't.
6       Q.  Did you remember whether or not there were
7  any fee caps?
8       A.  I remember originally there was, but I
9  forget when the caps were lifted.
10      Q.  Do you remember whether or not there was
11  any purchase minimums?
12      A.  I do not remember.
13      Q.  So you don't know whether or not any
14  individual could purchase just one dollar's worth of
15  Kin?
16      A.  I don't know.
17      MS. D'ALLAIRD:  Objection.
18  BY MR. DE JARNETTE:
19      Q.  Do you recall having to wait until the
20  second purchase day to purchase Kin?
21      A.  I don't remember.
22      Q.  Mr. Wang, we've talked about some public
23  statements that you referred to such as blog posts
24  and the white paper; right?
25      A.  Okay.

---

Page 183

1       Q.  In any of the materials that Kik published
2  do you recall Kik referring to the Kin Ecosystem as
3  an investment opportunity?
4       MS. D'ALLAIRD:  Objection.
5       MR. COPELAND:  Objection.
6       THE WITNESS:  I can't state with a hundred
7  percent certainty that the word "investment" was
8  used.
9  BY MR. DE JARNETTE:
10      Q.  Would you have expected it to be used?
11      MS. D'ALLAIRD:  Objection.
12      THE WITNESS:  I don't know what I
13  expected.
14  BY MR. DE JARNETTE:
15      Q.  Do you recall any statement that Kik made
16  before your purchase of Kin telling Kin purchasers
17  that you should expect profits?
18      MR. COPELAND:  Objection.
19      MS. D'ALLAIRD:  Objection.
20      THE WITNESS:  Are you asking if the exact
21  word "profits" was used?
22  BY MR. DE JARNETTE:
23      Q.  Let's start with that.  Do you recall any
24  statement that used the term "profits"?
25      A.  Again, I don't recall specific words.

---

Page 184

1       Q.  But you don't recall the term "profits"
2  being used, do you?
3       A.  No.
4       MS. D'ALLAIRD:  Objection.
5  BY MR. DE JARNETTE:
6       Q.  Nor do you remember the term "investment"
7  being used; correct?
8       A.  I do not.
9       Q.  Nor do you recall the term "price" being
10  used, do you?
11      MR. COPELAND:  Objection.
12      MS. D'ALLAIRD:  Objection.
13      THE WITNESS:  I do not.
14  BY MR. DE JARNETTE:
15      Q.  You testified that you reviewed some
16  public statements that Kik made prior to purchase of
17  Kin this week; right?
18      A.  Correct.
19      Q.  In reviewing those documents do you recall
20  seeing the word "profit"?
21      MR. COPELAND:  Objection.
22      MS. D'ALLAIRD:  Objection.
23      THE WITNESS:  I don't remember.
24  BY MR. DE JARNETTE:
25      Q.  Do you remember seeing the term

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.          Harrison Wang
                                                                           January 09, 2020

Page 185

1  "investment"?
2      MR. COPELAND:  Objection.
3      MS. D'ALLAIRD:  Objection.
4      THE WITNESS:  Again, I don't remember.
5  BY MR. DE JARNETTE:
6      Q.  Do you remember even seeing the term
7  "price"?
8      MR. COPELAND:  Objection.
9      MS. D'ALLAIRD:  Objection.
10     THE WITNESS:  Again, I don't remember.
11 BY MR. DE JARNETTE:
12     Q.  I take it that you've purchased consumer
13 products before; right?
14     MR. COPELAND:  Objection.
15     MS. D'ALLAIRD:  Objection.
16     THE WITNESS:  Yes.
17 BY MR. DE JARNETTE:
18     Q.  I take it that in purchasing those
19 products you've entered into agreements or terms of
20 use?
21     MR. COPELAND:  Objection.
22     MS. D'ALLAIRD:  Objection.
23     THE WITNESS:  I don't know.
24 BY MR. DE JARNETTE:
25     Q.  What about in your professional

Page 186

1  experience?  In any of the jobs you've worked do you
2  have experience entering into agreements or
3  contracts?
4      A.  Employment contracts.
5      Q.  Are you familiar with purchasing something
6  as is?
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  I am not.
9  BY MR. DE JARNETTE:
10     Q.  You don't know what that is?
11     A.  I don't know.
12     Q.  What about purchasing something with no
13 warranties?
14     MR. COPELAND:  Objection.
15     THE WITNESS:  Yes.
16 BY MR. DE JARNETTE:
17     Q.  What does that mean?
18     MR. COPELAND:  Objection.
19     MS. D'ALLAIRD:  Objection.
20     THE WITNESS:  If it breaks you, I guess
21 don't get your money back or something.  You can't
22 return it.
23 BY MR. DE JARNETTE:
24     Q.  Meaning that the seller has no contractual
25 obligation to you after the sale?

Page 187

1      MR. COPELAND:  Objection.
2      MS. D'ALLAIRD:  Objection.
3      THE WITNESS:  I'm not sure.
4  BY MR. DE JARNETTE:
5      Q.  I'm handing the court reporter a document
6  that has been previously marked as Exhibit 108.
7          (Exhibit 108 was marked for identification
8      by the Reporter.)
9  BY MR. DE JARNETTE:
10     Q.  Mr. Wang, Exhibit 108 is a document with
11 the title "Terms of Use Agreement last updated
12 September 11, 2017."  Do you see that?
13     A.  Yes.
14     Q.  It has the Bates label Kik 000079 through
15 97.  Do you recognize this document?
16     A.  I don't recall.
17     Q.  Can you go to the second paragraph.  It
18 says, "By accessing or using the site and/or
19 purchasing Kin tokens you agree to be bound by this
20 agreement and all of the terms incorporated herein
21 by reference."  Do you see that?
22     A.  Yes.
23     Q.  Does this refresh your recollection on
24 what this document is?
25     A.  No.

Page 188

1      Q.  The next sentence says, "If you do not
2  agree to this agreement, you may not access or use
3  the site or purchase the Kin tokens."  Do you see
4  that?
5      A.  Yes.
6      Q.  Does this refresh your recollection on
7  what this document is?
8      A.  No.
9      Q.  The next sentence says, "This agreement
10 governs your access and use of the site and your
11 purchase of the Kin tokens."  Do you see that?
12     A.  Yes.
13     Q.  Do you recall whether or not you agreed to
14 the terms of this agreement?
15     MS. D'ALLAIRD:  Objection.
16     THE WITNESS:  I don't remember.
17 BY MR. DE JARNETTE:
18     Q.  However, to register you accessed the Kin
19 dot Kik.com website; correct?
20     MR. COPELAND:  Objection.
21     MS. D'ALLAIRD:  Objection.
22     THE WITNESS:  I don't remember the
23 website.
24 BY MR. DE JARNETTE:
25     Q.  Do you have reason to dispute you agreed

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                                  January 09, 2020

Page 189

1  to these terms of use?
2        MR. COPELAND:  Objection.
3        MS. D'ALLAIRD:  Objection.
4        THE WITNESS:  I don't remember.
5  BY MR. DE JARNETTE:
6     Q.  Mr. Wang, you did not answer my question.
7  The question was:  Do you have any reason to dispute
8  that you agreed to the terms -- to these terms of
9  use?
10        MR. COPELAND:  Objection.
11        MS. D'ALLAIRD:  Objection.
12        THE WITNESS:  I don't remember.
13  BY MR. DE JARNETTE:
14     Q.  Mr. Wang, it's a yes or no question.  Do
15  you have any reason to dispute that you agreed to
16  these terms of use?
17        MR. COPELAND:  Objection.
18        MS. D'ALLAIRD:  Objection.
19        THE WITNESS:  No.
20  BY MR. DE JARNETTE:
21     Q.  Please go to -- I apologize.  This is a
22  long document.  Bates 88.  Are you there?
23     A.  Yes.
24     Q.  You see the header "Disclaimers"?
25     A.  Yes.

Page 190

1     Q.  Under "Disclaimers" in all caps, this
2  agreement states, "Except as expressly provided to
3  the contrary in a writing by KIK, the site content
4  contained therein in Kin tokens are provided on an
5  as-is and as-available basis without warranties or
6  conditions of any kind either express or implied."
7  Do you see that?
8     A.  Yes.
9     Q.  What is your understanding of that
10  sentence?
11        MR. COPELAND:  Objection.
12        MS. D'ALLAIRD:  Objection, and I'm going
13  to state for the record he's not an attorney.
14        THE WITNESS:  I couldn't tell you.  I
15  don't know.
16  BY MR. DE JARNETTE:
17     Q.  But you testified you have no reason to
18  dispute that you entered into this agreement; right?
19        MR. COPELAND:  Objection.
20        MS. D'ALLAIRD:  Objection.
21        THE WITNESS:  I don't know how you want me
22  to answer that.
23  BY MR. DE JARNETTE:
24     Q.  In reading -- strike that.  You testified
25  that selling something without warranties means that

Page 191

1  you cannot seek a return or any money back from that
2  purchase; correct?
3        MR. COPELAND:  Objection.
4        MS. D'ALLAIRD:  Objection.
5        THE WITNESS:  I don't know.
6  BY MR. DE JARNETTE:
7     Q.  So you cannot tell me what your
8  understanding of the purchase of Kin being without
9  warranties or conditions of any kind means?
10        MR. COPELAND:  Objection.
11        MS. D'ALLAIRD:  Objection.
12        THE WITNESS:  No.
13  BY MR. DE JARNETTE:
14     Q.  However, to the extent you entered into
15  this agreement do you have any reason to dispute
16  that you're bound by it?
17        MR. COPELAND:  Objection.
18        MS. D'ALLAIRD:  Objection.
19        THE WITNESS:  I don't remember.
20  BY MR. DE JARNETTE:
21     Q.  Before today -- strike that.  Is this one
22  of the documents you reviewed within the last week?
23     A.  No.
24     Q.  Are you aware whether or not Kik owed you
25  any continuing contractual duty after the sale of

Page 192

1  Kin?
2        MR. COPELAND:  Objection.
3        MS. D'ALLAIRD:  Objection.  Again, seeking
4  a legal conclusion.
5        THE WITNESS:  I don't know.
6  BY MR. DE JARNETTE:
7     Q.  Do you have any reason to dispute that Kik
8  had no on-going contractual obligation to Kin's
9  purchasers after the distribution of Kin?  It's a
10  yes or no question.
11        MR. COPELAND:  Objection.
12        MS. D'ALLAIRD:  Objection.
13        THE WITNESS:  What was the question?
14  BY MR. DE JARNETTE:
15     Q.  Do you have any reason to dispute that Kik
16  had no on-going contractual obligation to Kin's
17  purchasers after the distribution of Kin.  It's a
18  yes or no question.
19        MR. COPELAND:  Objection.
20        MS. D'ALLAIRD:  Objection.
21        THE WITNESS:  I don't know if they had
22  contractual -- I don't know.  No.
23  BY MR. DE JARNETTE:
24     Q.  But you have no reason to dispute it;
25  correct?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

Page 193

1          MR. COPELAND: Objection.
2          MS. D'ALLAIRD: Objection.
3          THE WITNESS: Not to my knowledge.
4    BY MR. DE JARNETTE:
5        Q.  Do you believe that you owed any other Kin
6    purchaser's contractual duties?
7          MS. D'ALLAIRD: Objection.
8          THE WITNESS: No.
9    BY MR. DE JARNETTE:
10       Q.  Do you believe that you owed other Kin
11   purchaser's obligations of any kind?
12         MR. COPELAND: Objection.
13         MS. D'ALLAIRD: Objection.
14         THE WITNESS: No.
15   BY MR. DE JARNETTE:
16       Q.  At the time that you purchased Kin do you
17   think that you were owed contractual duties?
18         MS. D'ALLAIRD: Objection.
19         MR. COPELAND: Objection.
20         THE WITNESS: I don't know what
21   contractual duties are explicitly but I do know as
22   an investment we are -- like the company needs to do
23   what they said they would do.
24   BY MR. DE JARNETTE:
25       Q.  After you received your Kin, did you have

Page 194

1    an understanding of whether or not Kik owed you
2    further -- strike that.  After you purchased Kin do
3    you believe -- strike that.  After receiving Kin do
4    you believe that Kik owed you any contractual
5    obligations?
6          MR. COPELAND: Objection.
7          MS. D'ALLAIRD: Objection.
8          THE WITNESS: Again, I don't know what
9    contractual obligations are.
10   BY MR. DE JARNETTE:
11       Q.  Once you received Kin did Kik impose any
12   restrictions on what you could do with it?
13       A.  That is --
14         MS. D'ALLAIRD: I'm sorry.  Objection.  I
15   have to interject there.
16         MR. DE JARNETTE: I'll reask the question.
17       Q.  Once you received your Kin, did Kik impose
18   any restrictions on what you could do with it?
19         MS. D'ALLAIRD: Objection.
20         MR. COPELAND: Objection.
21         THE WITNESS: We couldn't use it in any
22   applications.
23   BY MR. DE JARNETTE:
24       Q.  But did you need to seek approval from Kik
25   before transacting in Kin in any way?

Page 195

1          MR. COPELAND: Objection.
2          MS. D'ALLAIRD: Objection.
3          THE WITNESS: I mean -- can you rephrase
4    the question?
5    BY MR. DE JARNETTE:
6        Q.  Sure.  So after you received your Kin it
7    was possible let's say for you to transfer that Kin
8    to your brother; right?
9        A.  Yes.
10       Q.  To make that transfer did you need to seek
11   Kik's approval?
12         MS. D'ALLAIRD: Objection.
13         THE WITNESS: No.
14   BY MR. DE JARNETTE:
15       Q.  So more broadly speaking to transfer Kin
16   you did not need to seek Kik's approval; correct?
17         MS. D'ALLAIRD: Objection.
18         THE WITNESS: Correct.
19   BY MR. DE JARNETTE:
20       Q.  In purchasing Kin you did not receive any
21   equity in Kik; right?
22         MR. COPELAND: Objection.
23         MS. D'ALLAIRD: Objection.
24         THE WITNESS: Not to my knowledge.
25   ///

Page 196

1    BY MR. DE JARNETTE:
2        Q.  You did not receive any voting rights in
3    Kik, did you?
4          MR. COPELAND: Objection.
5          MS. D'ALLAIRD: Objection.
6          THE WITNESS: Not to my knowledge.
7    BY MR. DE JARNETTE:
8        Q.  Which means that if Kik Interactive were
9    to be acquired by another company, you would not be
10   entitled to any dividends or any other type of
11   compensation from that acquisition; right?
12         MR. COPELAND: Objection.
13         MS. D'ALLAIRD: Objection.
14         THE WITNESS: I wouldn't know.
15   BY MR. DE JARNETTE:
16       Q.  If Kik Interactive went out of business
17   you would still own your Kin; right?
18         MR. COPELAND: Objection.
19         MS. D'ALLAIRD: Objection.
20         THE WITNESS: I'm not sure.
21   BY MR. DE JARNETTE:
22       Q.  Why are you not sure?
23       A.  How do I tell you I'm not sure?  I'm not
24   sure.
25       Q.  Once you received your Kin do you believe

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                            January 09, 2020

Page 197

1  that the tokens you held were tied or connected to
2  Kik in any way?
3        MS. D'ALLAIRD:  Objection.
4        THE WITNESS:  Yes.
5  BY MR. DE JARNETTE:
6     Q.  Once you received your Kin do you believe
7  that Kik exerted any control over your tokens?
8        MS. D'ALLAIRD:  Objection.
9        THE WITNESS:  Yes.
10 BY MR. DE JARNETTE:
11    Q.  How so?
12    A.  They controlled liquidity.  They control
13 if we are allowed to use the Kin within the apps
14 which for the record we still are not allowed to use
15 within apps.
16    Q.  My question was a little more simple.  If
17 Kik were to go out of business would your Kin
18 disappear?
19       MR. COPELAND:  Objection.
20       MS. D'ALLAIRD:  Objection.
21       THE WITNESS:  That's up for debate.
22 BY MR. DE JARNETTE:
23    Q.  Why is it up for debate?  Do you just not
24 know?
25       MR. COPELAND:  Objection.

Page 198

1        MS. D'ALLAIRD:  Objection.
2        THE WITNESS:  Well, Kin the digital -- I
3  guess the digital signature is there but there is no
4  value.  There's no -- I mean, it's worthless and the
5  currency is there if it has worth.
6  BY MR. DE JARNETTE:
7     Q.  By digital signature you mean that the
8  token still exists; right?
9     A.  Correct.
10       MR. DE JARNETTE:  Let's go off the record.
11       THE VIDEO OPERATOR:  We're off the record
12 at 4:16.
13       (Recess taken.)
14       THE VIDEO OPERATOR:  We're back on the
15 record at 4:30.
16 BY MR. DE JARNETTE:
17    Q.  Mr. Wang, do you understand that you're
18 still under oath?
19    A.  Yes.
20    Q.  Did you do anything to prepare for your
21 deposition today?
22    A.  Yes.
23    Q.  What did you do?
24    A.  Talked with James Copeland.  Had an e-mail
25 exchange with Morgan Lewis and reviewed some of the

Page 199

1  public blog posts.
2     Q.  You testified that you talked with James
3  Copeland.  How many times did you talk with
4  Mr. Copeland to prepare for your deposition?
5     A.  Two or three times.
6     Q.  Over what time period?
7     A.  The last week.
8     Q.  When was the most recent time that you
9  talked to Mr. Copeland about your deposition?
10    A.  This morning.
11    Q.  I assume that you met with him this
12 morning?
13    A.  Correct.
14    Q.  And the other one to two times that you
15 talked to Mr. Copeland were those in person?
16    A.  No.
17    Q.  Phone call?
18    A.  Yes.
19    Q.  Total how long would you say that you
20 talked to Mr. Copeland about preparing for your
21 deposition over those two to three times?
22    A.  Maybe like two hours, hour and a half, two
23 hours.
24    Q.  Did you review any documents with
25 Mr. Copeland?

Page 200

1     A.  I don't believe so, but he -- he had notes
2  on the testimony.
3     Q.  You mean your 2018 testimony with the SEC?
4     A.  Correct.
5     Q.  You testified that you reviewed some of
6  the public blog posts.  How did you choose which
7  blog posts to review?
8     A.  I have a document of things that we looked
9  at before.
10    Q.  Can you elaborate a little bit more?  What
11 things that you looked at before?
12    A.  Like the public blog posts.
13    Q.  And by "we" do you mean you and your
14 brother?
15    A.  Just me.
16    Q.  So by -- you have a document of things
17 that we looked at before.  You mean that you have a
18 document of materials that you looked at before
19 purchasing Kin?
20    A.  We have a document that has links to
21 articles, some from the purchase of Kin -- some
22 before the purchase, some that might have been
23 after.
24    Q.  Where is that document stored?
25    A.  On my computer.

U.S. Securities and Exchange Commission v. Videotape, Inc.

Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 201

1    Q.  Did you provide that document to your
2  counsel?
3    A.  Yes.
4    Q.  Is there any reason why we didn't receive
5  that document to your knowledge?
6      MR. COPELAND:  Objection.
7      THE WITNESS:  I don't know.
8  BY MR. DE JARNETTE:
9    Q.  How sure are you that you provided it to
10  your legal counsel?
11    A.  I don't recall.
12    Q.  So which means that you're not sure
13  whether or not you sent that document to your legal
14  counsel?
15    A.  I'm not a hundred percent sure.
16    Q.  Did you prepare that document all by
17  yourself?
18    A.  Yes.
19    Q.  When did you prepare that document?
20    A.  A couple of days before the initial
21  deposition date.
22    Q.  In July of 2018?
23    A.  No.  I believe this deposition date.  I
24  don't actually remember.
25    Q.  As in a couple of months ago.

---

Page 202

1    A.  Yes.  I don't recall exactly when.
2    Q.  Does December 2019 sound right to you?
3    A.  I don't recall.
4    Q.  So in putting together a document of
5  materials -- strike that.  This document of
6  materials that you put together, you first started
7  on only a couple of months ago at the earliest;
8  right?
9    A.  Oh, yeah, so I believe I first started
10  thinking about creating it when I was talking with
11  Sussman.
12    Q.  Who's Sussman?
13      MR. COPELAND:  Just to clarify, I think
14  the document he's discussing are notes that he's
15  created to share with an attorney to allow them to
16  evaluate the case.  So the contents are privileged
17  but you can answer the question.
18      THE WITNESS:  Sussman is a law firm.
19  BY MR. DE JARNETTE:
20    Q.  Are you represented by Sussman?
21    A.  I am not.
22    Q.  So you don't have an attorney-client
23  relationship with Sussman?
24      MR. COPELAND:  Objection.
25      MS. D'ALLAIRD:  Objection.

---

Page 203

1      THE WITNESS:  I'm not sure.
2  BY MR. DE JARNETTE:
3    Q.  So it's your testimony here today that you
4  prepared that document based on instructions from
5  Sussman?
6      MR. COPELAND:  Objection.
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  I don't recall exactly why I
9  created it.  But they were asking for information.
10  BY MR. DE JARNETTE:
11    Q.  So you don't know whether or not you
12  created this document in response to any
13  communications you had with Sussman?
14    A.  Correct.
15    Q.  But to the best of your knowledge you
16  solely created this document; correct?
17    A.  Correct.  If I remember correctly.
18    Q.  Aside from blog posts did you review any
19  other documents to prepare for your deposition?
20    A.  I reviewed the SEC testimony I gave.
21    Q.  Did you make notes on that testimony?
22    A.  I don't believe so, no.
23    Q.  Are you a hundred percent sure?
24    A.  I'm not.
25    Q.  You testified that you had an e-mail

---

Page 204

1  exchange with Morgan Lewis.  Aside from that e-mail
2  exchange did you have any communications with Morgan
3  Lewis to prepare for your deposition?
4    A.  We -- I don't remember if it was to
5  prepare for the deposition, but I do remember having
6  a call prior to the previously scheduled deposition.
7    Q.  Did you talk to any SEC attorney to
8  prepare for your deposition?
9    A.  No.  Outside of James Murtha sending me a
10  copy which I did not respond to the e-mail, no.
11    Q.  How many lawyers in addition to Sussman
12  did you interview?
13    A.  One or two others.
14    Q.  Do you recall the names of those law
15  firms?
16    A.  I don't.
17    Q.  Did you send the document that we were
18  just talking about to any of those other law firms?
19    A.  I don't recall.
20    Q.  Did you send that document that we were
21  just referencing to anyone other than attorneys?
22    A.  Not that I can remember, no.
23    Q.  Did you send it to your brother?
24    A.  No.
25    Q.  I'm handing the court reporter a document

Page 205

1  to be marked as Exhibit 228.
2      (Exhibit 228 was marked for identification
3      by the Reporter.)
4  BY MR. DE JARNETTE:
5      Q.  Mr. Wang, Exhibit 228 is a document that
6  is titled, "Which All Coin ICO" -- I'll start again.
7  Exhibit 228 is a document titled, "Which All Coin
8  ICO has the most potential for use, case and price
9  gains."  Do you see that?
10     A.  Yes.
11     Q.  Do you recognize this document?
12     A.  Yes.
13     Q.  What is it?
14     A.  It's a Quora post.
15     Q.  And is this -- and you provided an answer
16 on this Quora post; correct?
17     A.  Correct.
18     Q.  Is this a true and accurate copy of the
19 Quora post?
20     A.  I believe so.
21     Q.  So there is an answer from you that starts
22 with -- on May 26, 2019 that starts with, "Look into
23 All Coins that have real world use cases and a
24 capable development team."  Do you see that?
25     A.  Correct.

Page 206

1      Q.  What did you mean by that?
2      A.  I don't know how I can simplify that
3  anymore.
4      Q.  Is that your understanding sitting here
5  today?
6      MR. COPELAND:  Objection.  Vague.
7  BY MR. DE JARNETTE:
8      Q.  I'll rephrase.  Do you agree with that
9  statement?
10     A.  Yes.
11     Q.  Then you go on skipping a sentence you
12 write, "Use cases can be broken down into both
13 institutional or consumer-based.  Institutional
14 would be tokens that are used by banks while
15 consumer base are tokens that can be implemented in
16 consumer apps such as games or messaging apps."  Do
17 you see that?
18     A.  Yes.
19     Q.  Do you agree with that statement?
20     A.  Yes.
21     Q.  I'm going down, you write, "Without
22 further ado, some great projects in the consumer
23 space with initial traction include."  You see that?
24     A.  Yes.
25     Q.  And the first one is BAT.  Do you see

Page 207

1  that?
2      A.  Yes.
3      Q.  The second is Kin.  Do you see that?
4      A.  Yes.
5      Q.  The third is Enjin.  Do you see that?
6      A.  Yes.
7      Q.  The fourth is OmiseGO.  Do you see that?
8      A.  Yes.
9      Q.  And the fifth is BNB.  Do you see that?
10     A.  Yes.
11     Q.  You wrote that; correct?
12     A.  Correct.
13     MR. DE JARNETTE:  I have no further
14 questions at this time.
15     MS. D'ALLAIRD:  Can we go off the record
16 for a few minutes.
17     THE VIDEO OPERATOR:  We're off the record
18 at 4:45.
19     (Recess taken.)
20     THE VIDEO OPERATOR:  We're back on the
21 record at 5:01.
22         EXAMINATION
23 BY MS. D'ALLAIRD:
24     Q.  Mr. Wang, as I said earlier this morning,
25 my name is Laura D'Allaird and I represent the SEC

Page 208

1  in this litigation.  I want to -- as Mr. De Jarnette
2  said, I want to thank you for being here today.  I
3  know it's a long day and I want to promise you I
4  won't make this longer than it needs to be.
5      I want to start out by asking you, as you
6  testified earlier today you previously met with SEC
7  staff to provide testimony during the investigation
8  that led to this litigation; correct?
9      A.  Yes.
10     Q.  And you testified that was in July of
11 2018?
12     A.  I don't remember the month, but it was
13 summer of 2018.
14     Q.  Summer of 2018.  And where was your
15 testimony taken?
16     A.  Downtown LA.
17     Q.  And was there a court reporter present at
18 your testimony like we have here today?
19     A.  I believe so.
20     Q.  Was someone typing down what was said?
21     A.  I can't remember exactly, but I believe
22 so.
23     Q.  Was someone recording your testimony on
24 video that day?
25     A.  Yes.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Videotaped

Harrison Wang
January 09, 2020

---

Page 209

1      Q.  During your testimony did you swear to
2  tell the truth?
3      A.  Yes.
4      Q.  And did you tell the truth on that date?
5      A.  Yes.
6      Q.  I know you said you can't remember the
7  exact month but you think it was in the summer of
8  2018 that you provided your testimony; correct?
9      A.  Yes.
10     Q.  And you earlier testified that you
11  purchased Kin in September of 2017; correct?
12     A.  Yes.
13     Q.  And today's date is January 9, 2020;
14  correct?
15     A.  Yes.
16     Q.  You'll understand why I ask that in a
17  moment.  So my question is the date on which you
18  provided testimony in the summer of 2018, that was
19  more than a year closer in time to when you actually
20  purchased Kin in 2017 than today; correct?
21     A.  Can you repeat that?
22     Q.  Let me state it another way.  At the time
23  that you provided testimony in July of 2018 that was
24  closer in time to the date on which you purchased
25  Kin in the fall of 2017; correct?

---

Page 210

1      A.  Correct.  Correct.
2      Q.  Earlier you testified about a phone call
3  that you had with Mr. Murtha of the SEC prior to
4  providing testimony to the SEC; correct?
5      A.  Correct.
6      Q.  And I think you testified that you thought
7  there were some other members of SEC on that call as
8  well?
9      A.  Correct.
10     Q.  My question to you is during that call did
11  anyone, either Mr. Murtha or any member of SEC staff
12  on that call tell you what to say in your
13  investigative testimony?
14         MR. DE JARNETTE:  Objection.
15         THE WITNESS:  I can't remember the words
16  but no, I don't believe so.
17  BY MS. D'ALLAIRD:
18     Q.  You also testified about an e-mail that
19  Mr. Murtha sent to you about a month ago attaching
20  your investigative testimony transcript; correct?
21     A.  Yes.
22     Q.  My question to you is in the body of that
23  e-mail did Mr. Murtha tell you what to say at your
24  deposition that you're appearing at today?
25         MR. DE JARNETTE:  Objection.

---

Page 211

1      THE WITNESS:  No.
2  BY MS. D'ALLAIRD:
3      Q.  Mr. Wang, when you provided investigative
4  testimony in the summer of 2018 did SEC staff tell
5  you during testimony that you had a right to have an
6  attorney with you?
7      A.  I believe so.  I can't say with a hundred
8  percent certainty but I believe so.
9      Q.  I'm going to have a document marked
10  Exhibit 229.
11         (Exhibit 229 was marked for identification
12     by the Reporter.)
13  BY MS. D'ALLAIRD:
14     Q.  Mr. Wang, I just handed to you a document
15  that has now been marked Exhibit number 229.  It is
16  a document of multiple pages, several pages.  The
17  first page at the top states HO-13388 underneath
18  Wang underscore Harrison underscore 20180719 and
19  beneath that is the date of 7/19/2018 9:59 A.M.
20         Please take a moment to look through this,
21  Mr. Wang, but my first question to you is going to
22  be do you recognize this document?
23     A.  Yes.
24     Q.  And what is it?
25     A.  It's the document that James Murtha sent

---

Page 212

1  me a copy of my testimony.
2      Q.  Your investigative testimony that you
3  provided to the SEC in the summer of 2018.
4      A.  Correct.
5      Q.  And when was the last time that you read
6  this transcript?
7      A.  In its entirety or just at all?
8      Q.  Well, in its entirety.  Let's start with
9  that.  Strike that.  When's the last time that you
10  looked at this document?
11     A.  This morning.
12     Q.  This morning.  Okay.  And in looking at it
13  what did you do?  Did you read the whole thing or
14  did you look at certain parts of it?
15     A.  I skimmed it but James Copeland had
16  highlighted some notes -- some pieces of it that I
17  focused on.
18     Q.  Don't tell me anything about what was
19  highlighted by your attorney.  When you looked at
20  the transcript this morning, did you notice anything
21  that seemed incorrect?
22     A.  No.  Not to my knowledge.
23     Q.  Have you ever read the transcript in its
24  entirety?
25     A.  No.

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                                   January 09, 2020

---

Page 213

1       Q.  Looking at it now just as you sit here
2   today would this appear to be an accurate transcript
3   of your testimony in the summer of 2018?
4           MR. DE JARNETTE:  Objection.
5           THE WITNESS:  I mean, if it was the one
6   that was provided by James Murtha in his e-mail to
7   me then yes.
8   BY MS. D'ALLAIRD:
9       Q.  And you have no reason to think that the
10  transcript is inaccurate sitting here today?
11      A.  Not that I know of.
12      Q.  Okay.  Mr. Wang, on the day that you
13  received your Kin, when you first received your Kin
14  that you purchased in the TDE, to your knowledge
15  were you able to buy or sell anything with that Kin
16  at that time?
17          MR. DE JARNETTE:  Objection.
18          THE WITNESS:  Not to my knowledge.
19  BY MS. D'ALLAIRD:
20      Q.  To your knowledge on the day that you
21  received Kin were you able to earn and spend Kin?
22          MR. DE JARNETTE:  Objection.
23          THE WITNESS:  No.
24  BY MS. D'ALLAIRD:
25      Q.  You testified earlier I believe that you

---

Page 214

1   have used Kin to purchase Starbucks gift cards;
2   correct?
3       A.  A hundred percent I purchased a few gift
4   cards.  I don't remember which ones.
5       Q.  But you purchased at least one gift card
6   using Kin?
7       A.  Right.
8       Q.  When did you do that?
9       A.  I honestly don't remember.  It was when
10  Kin had launched.
11      Q.  Do you know when Kin had launched roughly
12  speaking?
13      A.  I don't.
14      Q.  In September of 2017 did Kin exist?
15      A.  No.
16      Q.  To your knowledge did Kin exist in October
17  of 2017?
18      A.  No.
19      Q.  To your knowledge did Kin exist at all in
20  the year 2017?
21          MR. DE JARNETTE:  Objection.
22          THE WITNESS:  No.  I remember 2017 they
23  were still trying to figure out the blockchain.
24  BY MS. D'ALLAIRD:
25      Q.  For Kin?

---

Page 215

1       A.  For Kin; correct.
2       Q.  I think you also testified that you have
3   also downloaded an app called KinFit.
4       A.  Correct.
5       Q.  Was KinFit available to you in September
6   of 2017?
7       A.  No.
8       Q.  To your knowledge was KinFit available at
9   any point in the year 2017?
10      A.  No.
11      Q.  Mr. Wang, if you wouldn't mind could you
12  take a look at what was previously provided to you
13  today, Exhibit 12.  It's the white paper, the Kin
14  white paper.
15          I want to just take a look at page 23
16  which also ends in the Bates stamp on the lower
17  right-hand corner in 23.  If you could just turn to
18  that page.  Mr. Wang.  I should back up and ask you
19  I think you testified earlier that you recalled
20  looking at the white paper before you purchased Kin;
21  is that correct?
22      A.  Correct.
23      Q.  And I want to take a look at something on
24  this page, page 23 of the white paper under the
25  heading "Conclusion."  Do you see that?

---

Page 216

1       A.  Yes.
2       Q.  Did you review the conclusion of the white
3   paper?
4       A.  Yes.
5       Q.  I want to look at the third paragraph
6   underneath "Conclusion."  It begins with, "The aim
7   of."  Do you see that?
8       A.  Yes.
9       Q.  I'm going to just read this into the
10  record.  Quote, "With the aim of fostering a vibrant
11  economy based around the Kin cryptocurrency, the
12  company will pledge all its resources to make Kin
13  the primary transaction currency in its chat app and
14  promote services from the Kin Ecosystem to its
15  millions of users."  Did I read that accurately?
16      A.  Yes.
17      Q.  Looking at this sentence now as you sit
18  here who do you understand will pledge all of its
19  resources to make Kin the primary transaction
20  currency in its chat app and promote services within
21  the Kin Ecosystem to its millions of users?
22      A.  Kik.
23      Q.  At the time you purchased Kin was it your
24  understanding that Kik was going to pledge all its
25  resources to make Kin the primary transaction

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                                  January 09, 2020

Page 217

1  currency in its chat app and promote services from
2  the Kin Ecosystem to its millions of users?
3       MR. DE JARNETTE:  Objection.
4       THE WITNESS:  Yes.
5  BY MS. D'ALLAIRD:
6       Q.  Thank you.  You can put that aside.
7       A.  I just want to add to it that Kik had
8  something called Kik Points that was running on it.
9  And again, I can't directly quote but I believe
10 there were articles where Ted stated that Kin will
11 replace Kik Points in all those transactions.
12      Q.  And these articles that you're talking
13 about, are these articles that you saw before you
14 purchased Kin?
15      A.  It's in the white paper.
16      Q.  Do you know where that is?
17      A.  Or it could have been -- the Kik point
18 experiment.  Number 10.
19      Q.  Which page?
20      A.  Page 10.
21      Q.  And are you referring to any specific
22 place in this section where there's reference to the
23 Kik Points experiment?
24      A.  It was in other materials either on
25 CoinDesk -- I can't recall.

Page 218

1       MR. COPELAND:  Page 11.
2  BY MS. D'ALLAIRD:
3       Q.  If you take a look at page 11 at the end
4  of the Kik Points experiment section on the last
5  page, that last sentence, quote, "For Kik the Kin
6  project is an opportunity to integrate chat with
7  true digital commerce within an existing user base."
8  Did I read that accurately?
9       A.  Yes.
10      Q.  And this was your -- you had read this at
11 the time.
12      A.  Yes.
13      Q.  Before you purchased Kin?
14      A.  Yes.
15      Q.  Thank you.  You can put that aside.
16      THE VIDEO OPERATOR:  I need to change the
17 video.
18      MS. D'ALLAIRD:  Let's stop quickly just to
19 change the video.
20      THE VIDEO OPERATOR:  We're off the record
21 at 5:17.  This is end of media number 3.
22      (Recess taken.)
23      THE VIDEO OPERATOR:  We're back on the
24 record at 5:22.  This is the start of media number
25 4.

Page 219

1  BY MS. D'ALLAIRD:
2       Q.  Mr. Wang, I'm going to mark -- hand a
3  document to the court reporter to mark as Exhibit
4  number 230.
5       (Exhibit 230 was marked for identification
6       by the Reporter.)
7  BY MS. D'ALLAIRD:
8       Q.  Mr. Wang, I've just handed to you what has
9  now been marked as Exhibit number 230.  It appears
10 to be an e-mail chain bearing a Bates stamp of Kik
11 underscore 00002665 through 2666.  Feel free to look
12 through the whole thing but I'm going to focus my
13 questions on the first e-mail on the back page of
14 this document.  So the e-mail that kind of starts
15 right at the bottom.  The one dated October 4, 2017
16 at 4:49 P.M.
17      A.  Got it.
18      Q.  So just let me know when you're ready for
19 my questions.
20      A.  I'm ready.
21      Q.  Mr. Wang, do you recognize this exhibit?
22      A.  I don't remember it.
23      Q.  Taking a look at this e-mail that I've
24 directed your attention to that's dated Wednesday,
25 October 4, 2017 at 4:49 P.M., you see next to that

Page 220

1  Harrison Wang and there's an e-mail address.  Is
2  that your e-mail address?
3       A.  That is mine, yes.
4       Q.  Looking at that and looking at the e-mail
5  my question to you is did you send this e-mail?
6       A.  Yeah, if it says my e-mail address then
7  yes.
8       Q.  No reason to think, sitting here today
9  looking at this no reason to think you didn't send
10 this e-mail; right?
11      A.  I don't believe so.
12      Q.  Now, I'll note for the record that we do
13 not see who this e-mail is sent to.  However, if you
14 turn the page to the first page of Exhibit 230 the
15 next e-mail dated Thursday, October 5, 2017 at
16 9:08 P.M.  Do you see that?
17      A.  Yes.
18      Q.  Next to that there's a name Tanner Philp,
19 P-h-i-l-p, and an e-mail Tanner at Kik.com.  And if
20 we go back to your e-mail on October 4, 2017 at
21 4:49 P.M. it's addressed, "Hi Tanner."  Taking a
22 look at that, do you know who you wrote this
23 particular e-mail to?
24      A.  Tanner Philp.
25      Q.  And so my first question to you is looking

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

Page 221

1 at this e-mail just overall, why did you write this
2 e-mail to Mr. Philp?
3     A.  I mean, I don't remember what my intention
4 was back then, but I know back then we were
5 frustrated it wasn't listed on exchanges.  Because
6 this was like a tweet and Tanner had told me on the
7 call that there was indications of exchanges being
8 available ASAP and I guess it hasn't -- there have
9 been no exchanges listed.
10     Q.  And when you say listing on exchanges
11 you're referring to Kin being listed on exchanges?
12     A.  Correct.
13     Q.  I want to read one of your statements in
14 this e-mail into the record.  Quote, "I had read on
15 multiple sources from your team including the Kin
16 Foundation's own Twitter account that," quote, "we
17 have been given indication from multiple occasions
18 this would happen shortly after the sale," end
19 quote.
20        Continuing on with the e-mail.  "When is
21 this expected as it's been almost two weeks since
22 the sale has ended."  End quote there.  My question
23 to you is reading this e-mail had you read on
24 multiple sources -- from multiple sources statements
25 that Kik had been given indication from multiple

Page 222

1 exchanges that Kin would be listed on them?
2        MR. DE JARNETTE:  Objection.
3        THE WITNESS:  I don't remember what the
4 other sources were, but I had read in multiple
5 places, I think on Reddit, probably Telegram maybe.
6 But I can't say for certain.  All I distinctly
7 remember is the tweets.
8 BY MS. D'ALLAIRD:
9     Q.  And to be clear for the record the
10 statements that you read regarding Kin being
11 available on multiple exchanges, you read those
12 statements prior to purchasing Kin; is that correct?
13     A.  Correct.
14        MR. DE JARNETTE:  Objection.
15        THE WITNESS:  I believe.  I don't remember
16 the exact time line but I believe so, yes.
17 BY MS. D'ALLAIRD:
18     Q.  And I'm going to note for the record again
19 that the date of this e-mail is October 4, 2017.
20 And you purchased Kin in September of 2017; correct?
21     A.  Correct.
22     Q.  So this e-mail was written in a matter of
23 weeks after your purchase of Kin.
24     A.  Correct.
25     Q.  And that is far closer in time -- the date

Page 223

1 of this e-mail is far closer in time to the date you
2 purchased Kin than the date of today, January 9,
3 2020; correct?
4     A.  Correct.  I also remember actually now
5 that I'm reading this, so the Kin -- this was the
6 other point was Kin didn't sell out its allotted
7 private investor amount and so they had stated after
8 it didn't sell out that they would do a token burn
9 which would decrease supply which, you know, I won't
10 sit here and pretend to be a finance expert but if
11 you reduce supply and typically there's demand then
12 the price will go up.
13        They had stated that.  I don't know where.
14 But as you can see in the e-mail they did state it
15 somewhere.  And then like a week or two later they
16 decided to redistribute the remaining percentage as
17 opposed to burn it, the tokens which we were not
18 happy about.
19     Q.  And I believe you're referring to the
20 second full paragraph of this e-mail --
21     A.  Correct.
22     Q.  -- beginning with "Also," parentheses, "as
23 per your e-mail with him."
24        Now, let me ask you the statements about
25 burning tokens, you said they said that or made

Page 224

1 statements about that when the token wasn't selling
2 out.
3     A.  Correct.
4     Q.  My first question is who's the "they" in
5 that sentence?
6     A.  Kik/Kin.
7     Q.  And when you say that they made those
8 statements when the token wasn't selling out; am I
9 correct that in understanding they made these
10 statements during the time of the TDE so while
11 people could still purchase Kin tokens?
12        MR. DE JARNETTE:  Objection.
13        THE WITNESS:  I honestly don't know when
14 they said that but I remember it was very soon
15 after.  I don't know exactly but I think they
16 extended the time line that people could purchase, I
17 think.  And then I think it was at that point they
18 stated it, but I can't --
19 BY MS. D'ALLAIRD:
20     Q.  You don't know for sure.
21     A.  Yeah.
22     Q.  And can you explain to me a little bit
23 more about your concern regarding burning the tokens
24 versus minting the tokens?  Why would it be
25 preferable to burn them?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Videotaped

Harrison Wang
January 09, 2020

---

Page 225

1      A.   I guess just basic economics.  If you have
2   less supply then -- essentially like a deflationary
3   asset.  You would essentially restrict supply so it
4   wouldn't be ten trillion tokens, it would be only I
5   think it was -- I forgot how much they said they
6   were going to burn.
7      Q.   And when you restrict supply of something
8   what happens after that?  What does that lead to?
9      MR. DE JARNETTE:  Objection.
10      THE WITNESS:  Usually price increases.
11   Again, I'm not a financial expert, but just the
12   limited knowledge I have of market, you know,
13   markets.
14   BY MS. D'ALLAIRD:
15      Q.   And was that your understanding at the
16   time you wrote this e-mail?
17      A.   Correct.
18      Q.   That limiting supply would mean demand
19   would go up and price would go up?
20      A.   I don't know if demand would go up but
21   limiting supply would cause an increase in price.
22      Q.   Fair enough.  And my question to you is
23   why would you want the price of Kin to go up?
24      A.   I mean ultimately we make these
25   investments to make money.  And as Ted was saying

---

Page 226

1   utility is a way to create demand to cause price
2   increases.
3      Q.   Thank you.  I just want to ask you one
4   more question about this.  The last sentence of your
5   e-mail I'm going to read it into the record, quote,
6   "We really don't appreciate being deceived and kept
7   in the dark considering we have invested so much
8   into this," end quote.  Did I read that accurately?
9      A.   Yes.
10      Q.   And can you tell me what you meant by this
11   sentence?
12      A.   Again, it's from reading the e-mail, not
13   from what I remember at that time, but not being
14   listed on exchanges so no liquidity.  Not being
15   implemented in Kik from day one.  I do remember kept
16   in the dark because he basically stopped responding
17   after we put our money in even though on the call
18   before he said he would always be on call whenever
19   we called or e-mail him and respond immediately.
20      Q.   And he is Tanner?
21      A.   Tanner, correct.  And I just remember he
22   just was not responsive, so yeah.
23      Q.   One other question that I want to ask you
24   is why did you want Kin to be listed on exchanges?
25      A.   The only way we can make money is if

---

Page 227

1   there's liquidity and also I mean, the market at
2   that time was essentially if your token had
3   partnerships/use cases and was on exchanges for
4   liquidity the prices were skyrocketing.
5      Q.   You can set that aside.  I'm going to have
6   the court reporter mark another exhibit, Exhibit
7   number 231.
8      (Exhibit 231 was marked for identification
9      by the Reporter.)
10   BY MS. D'ALLAIRD:
11      Q.   Mr. Wang, we've just handed to you what's
12   been marked as Exhibit number 231.  It appears to be
13   an e-mail chain with a Bates stamp lower right-hand
14   corner of Kik underscore 00008372.  Please take a
15   moment to review and let me know when you're ready
16   for my questions but I'll let you know that I'm
17   going to be focusing my questions on the e-mail that
18   appears at the very bottom of this page, the first
19   e-mail in the chain that's dated Friday,
20   December 15, 2017 at 2:16 P.M.  So just take a look
21   at that and let me know when you're ready for my
22   questions.
23      A.   Yes.
24      Q.   I want to note for the record taking a
25   look at this e-mail -- let me back up.  Mr. Wang, do

---

Page 228

1   you recognize this exhibit?
2      A.   Again, I can't specifically recall sending
3   it but yeah, I do remember that I have -- I had sent
4   him e-mails expressing my frustration.
5      Q.   And him being --
6      A.   Tanner.
7      Q.   Tanner Philp.  And again, we see your
8   e-mail address here; correct?
9      A.   Correct.
10      Q.   And so no reason for you to think that you
11   didn't send this e-mail; right?
12      A.   Correct.
13      Q.   And I just want to read into the record.
14   If you look at the very last paragraph of this
15   e-mail the second sentence that begins with, "We
16   have," I'm going to read this into the record.
17   Quote, "We have put a lot of money into this ICO
18   based on announcements your team made before and
19   during the ICO and answers you gave during our
20   call," end quote.  Did I read that accurately?
21      A.   Correct.
22      Q.   And is this sentence an accurate statement
23   in your view?
24      A.   Yes.
25      Q.   And I'm going to again note for the record

---

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

Page 229

1  that the date on this e-mail is December 15, 2017.
2  And again, December 15, 2017 would you agree is far
3  closer in time to the time that you -- to the date
4  on which you purchased Kin than today, January of
5  2020; correct?
6      A.  Yes.
7      Q.  And just looking at this sentence here as
8  you sit here, are there any particular announcements
9  that come to your memory as you read this?  Any
10  particular announcements that you recall reading
11  that Mr. Philp's team made before and during the
12  ICO?
13      A.  I just know around that time it was
14  announcements about exchanges and being in Kik from
15  day one and all these use cases, but I can't recall
16  like a specific thing.
17      Q.  So am I correct then in assuming in this
18  e-mail you're referring to similar statements that
19  you were referring to in Exhibit -- the e-mail that
20  we saw in Exhibit 230 where you refer to statements
21  on Kin Foundation's Twitter account regarding
22  exchanges?
23      MR. DE JARNETTE:  Objection.
24      THE WITNESS:  I believe yes, that is one
25  of the announcements.

Page 230

1  BY MS. D'ALLAIRD:
2      Q.  And perhaps you may also be referring to
3  additional announcements in that sentence.
4      A.  Correct.
5      Q.  And then you also refer to answers
6  Mr. Philp gave "during our call."  You testified
7  earlier that you had a call with Mr. Philp before
8  you actually purchased Kin.
9      A.  Correct.
10      Q.  Is that the call that you're referring to
11  in this sentence?
12      A.  Correct.
13      Q.  And reading this e-mail, reading this
14  sentence, can you tell us anything about the answers
15  that Mr. Philp gave you during that call that you
16  were referring to in this sentence here?
17      A.  Again, it was based about liquidity
18  exchanges being inside apps, having partnerships
19  lined up. I don't know the specifics.
20      Q.  Mr. Wang, is it accurate to say that at
21  the time that you purchased Kin you expected that
22  Kik would be doing work to make Kin valuable?
23      A.  Yes.
24      MR. DE JARNETTE:  Objection.
25  ///

Page 231

1  BY MS. D'ALLAIRD:
2      Q.  Yes?
3      A.  Yes.
4      Q.  You can set that aside.  Mr. Wang, I want
5  to ask you, before you purchased Kin did you have
6  any discussions with your brother William about
7  purchasing Kin, the reasons why you wanted to
8  purchase Kin?
9      A.  Yes.
10      Q.  And did your brother ever express to you
11  reasons why he wanted you to pool your assets --
12  pool your money together and purchase Kin?
13      MR. DE JARNETTE:  Objection.
14      THE WITNESS:  Can you say the question
15  again?
16  BY MS. D'ALLAIRD:
17      Q.  Did your brother ever express any reasons
18  why he would want to purchase Kin in the TDE?
19      MR. DE JARNETTE:  Objection.
20      THE WITNESS:  Yes.
21  BY MS. D'ALLAIRD:
22      Q.  And do you recall what his views were,
23  what his reasons were why he wanted to purchase Kin?
24      A.  Mainly it would have -- based on the pitch
25  from Ted and the white paper it was going to be the

Page 232

1  first big consumer app adopted cryptocurrency and
2  based on how Ted or the publications were saying
3  from the other VCs who had invested there was -- we
4  felt that with the utility of a mass consumed app
5  and the usage of it, it would drive demand up.
6  BY MS. D'ALLAIRD:
7      Q.  And if demand was driven up --
8      A.  Then price goes up.
9      Q.  I'm going to have the court reporter mark
10  a document as Exhibit 232.
11      (Exhibit 232 was marked for identification
12  by the Reporter.)
13  BY MS. D'ALLAIRD:
14      Q.  So the court reporter has just handed you
15  what's been marked as Exhibit number 232.  It is an
16  e-mail chain bearing a Bates range of WANG00032 --
17  37 -- excuse me, through 38.  Please take a moment
18  to review and let me know when you're ready for my
19  questions.  I will tell you, Mr. Wang, that I'm
20  going to focus on the bottom e-mail on the second
21  page of this exhibit.  The one that's dated Friday,
22  November 17, 2017 at 2:25 P.M.
23      A.  Yes.
24      Q.  Mr. Wang, do you recognize Exhibit 232?
25  Have you ever seen these e-mails before?

Page 233

1    A.  Yes.
2    Q.  I note for the record that on the first
3  page of Exhibit 232 at the very top there's an
4  e-mail address, ███████████████████.
5  Is that your brother's e-mail address?
6    A.  Yes.
7    Q.  And it appears to be forwarding this
8  e-mail chain to your e-mail address?
9    A.  Correct.
10    Q.  And if you take a look at that e-mail I
11  was drawing your attention to, the first e-mail, the
12  e-mail at the bottom on the second page dated
13  Friday, November 17, 2017 at 2:25 p.m.  Do you see
14  that?
15    A.  Yes.
16    Q.  Again, we don't see who that e-mail is
17  being sent to.  We don't see the e-mail address but
18  if you go one e-mail up you see an e-mail being sent
19  to Tanner Philp, Tanner at Kik.com and the e-mail
20  I'm referring to is addressed to Tanner.  Do you see
21  that?
22    A.  Yes.
23    Q.  To your knowledge does this appear to have
24  been sent to Tanner Philp?
25    A.  Yes.

Page 234

1    Q.  And we see that this e-mail is being sent
2  by your brother; correct?
3    A.  Correct.
4    Q.  And I'm just going to read into the record
5  the first few sentences of his e-mail.  Quote, "Why
6  would you guys say on Twitter the day before you
7  raise that you guys were in talks with major
8  exchanges unless it was just to instill confidence
9  in investors?  Why would you request a call with my
10  brother to ask how much we were going to invest?
11  Did you guys really just want to scam all of us of
12  our hard-earned money?"  End quote.
13    I'm going to note for the record that
14  again, the date of this e-mail is November 17, 2017
15  and would you agree with me that November 17, 2017
16  is far closer in time to the date on which you
17  purchased Kin than today's date of January 2020?
18    A.  Yes.
19    Q.  Now, just reading this e-mail does this
20  refresh your recollection as to any discussions that
21  you had with your brother William about reasons why
22  he wanted to purchase Kin?
23    A.  Yeah.  I mean I guess we also thought it
24  would be listed on exchanges right after the sale.
25    Q.  And to your knowledge had your brother

Page 235

1  also seen statements on Twitter about exchanges?
2    A.  Yes.
3    Q.  And had he discussed that with you?
4    A.  I don't recall exactly the wording but --
5  or -- but there were a lot of outlets saying it was
6  being listed on exchanges.  I do know we broadly
7  discussed it would get listed, but we didn't -- like
8  he didn't tell me what source he had read it from
9  specifically.
10    Q.  But again, just for the record, this
11  e-mail chain was forwarded to you; correct?
12    A.  Correct.
13    Q.  You can set that aside.  I'm going to ask
14  the court reporter to mark this document Exhibit
15  number 233.
16    (Exhibit 233 was marked for identification
17    by the Reporter.)
18  BY MS. D'ALLAIRD:
19    Q.  Mr. Wang, the court reporter has just
20  handed to you what has now been marked as Exhibit
21  number 233.  It is an e-mail chain with the Bates
22  range of WANG00039 through 43.  Take a moment to
23  review.  It is a long e-mail chain.  I am going to
24  be focusing my questions on the bottom e-mail on the
25  very first page of Exhibit 233 that's dated Friday,

Page 236

1  September 29, 2017 at 1:26 P.M.
2    A.  Uh-huh.
3    Q.  So just take a look at that and let me
4  know when you're ready for my questions.
5    A.  Yes.
6    Q.  Do you recognize Exhibit 233?
7    A.  I honestly -- I don't remember.  I may
8  have skimmed over it.
9    Q.  We'll see at the very top of Exhibit 233
10  your brother's e-mail address appears to be
11  forwarding to your e-mail address; is that right?
12    A.  Correct.
13    Q.  And so would it appear that then you were
14  forwarded this e-mail chain?
15    A.  Correct.
16    Q.  And no reason to think that you weren't?
17    A.  Correct.
18    Q.  Okay.  And just very quickly looking at
19  that bottom e-mail, again, we don't see who it's
20  sent to.  It's addressed to "Hey, Tanner."  Appears
21  to be from your brother's e-mail address; correct?
22    A.  Correct.
23    Q.  And looking one e-mail up we see an e-mail
24  from Tanner Philp at Tanner at KIK.com; correct?
25    A.  Correct.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Videotape

Harrison Wang
January 09, 2020

Page 237

1    Q.   Would you agree that it would appear that
2  the e-mail I'm referring to, September 29, 2017 at
3  1:26 P.M. appears to be sent to Tanner Philp?
4    A.   Yes.
5    Q.   And I'm going to just read the first few
6  sentences of this e-mail.  Quote, "Can you give me
7  updates on what is going on with Kin?  I'm not going
8  to lie, it seems a money grab to me at this
9  point.  Everything communicated to us turned out was
10  exaggerated.  One, you guys said that you guys were
11  working with big exchanges to get us listed on
12  September 18 but on all your communication channels
13  now are saying that it is up to the exchanges to
14  list Kin.  Two, you said Kin tokens would be burned
15  reducing the total economy and not minted.  Turned
16  out they were minted and not burned," end quote.
17  Did I read that accurately?
18    A.   Yes.
19    Q.   And again, does this refresh your
20  recollection on having conversations -- did your
21  brother have conversations with you about Kin being
22  listed on exchanges?
23    A.   Yes.
24    Q.   Do you know what he's referring to with
25  respect to September 18 in the first point next to

Page 238

1  number 1, "You guys said that you guys were working
2  with big exchanges to get us listed on
3  September 18"?
4    A.   I don't.
5    Q.   And we see that he also has that point 2.
6  "You said that Kin tokens would be burned reducing
7  the total economy and not minted."  That's the
8  burning that you were referring to as well?
9    A.   Correct.
10    Q.   Is it safe to say that your brother had
11  the same -- strike that.  Is it -- would it be fair
12  to say that your brother also wanted to purchase Kin
13  for similar reasons to why you wanted to purchase
14  Kin?
15    MR. DE JARNETTE:  Objection.
16    THE WITNESS:  Which is to make money?
17  Yes.
18  BY MS. D'ALLAIRD:
19    Q.   And I'm going to read one more sentence.
20  Quote, "We invested 5,300-plus Ether into Kin
21  because we believed in the team, vision and trusted
22  what you guys said to be real," parentheses, "token
23  burning exchange listing," end parentheses.  I'm
24  going to stop at the sentence there.  Did I read
25  that accurately?

Page 239

1    A.   Yes.
2    Q.   Do you agree with that statement?
3    A.   Yes.
4    Q.   You can set that aside.  I'm going to have
5  the court reporter mark this Exhibit as 234.
6    (Exhibit 234 was marked for identification
7    by the Reporter.)
8  BY MS. D'ALLAIRD:
9    Q.   Mr. Wang, the court reporter has just
10  handed to you what has now been marked as Exhibit
11  234.  It appears to be an e-mail chain with a Bates
12  range of Kik underscore 00079894 through 79902.
13  Please take a moment to review and let me know when
14  you're ready for my questions but I'm only going to
15  be asking you questions about the first e-mail in
16  this chain, not the redacted portion at the very top
17  but the second one from the top dated Tuesday,
18  October 24, 2017 at 9:48 A.M.  Just take a look at
19  that and let me know when you're ready for my
20  questions.
21    A.   I'm ready.
22    Q.   Mr. Wang, have you ever seen any -- let me
23  stop there.  Have you seen the e-mail that I just
24  drew your attention to at Exhibit 234?  Have you
25  ever seen that?

Page 240

1    A.   No.
2    Q.   No?  I note for the record that you're not
3  on the e-mail.  It's from what appears to be your
4  brother's e-mail address to Tanner Philp; is that
5  correct?
6    A.   Yes.
7    Q.   I'm going to read the third sentence of
8  your brother's e-mail to Mr. Philp.  Quote, "The
9  money we put into this is not," all caps, "a
10  donation.  It is an investment with no way to get it
11  out now with so little volume of Ether delta," end
12  quote.  Did I read that accurately?
13    A.   Yes.
14    Q.   Do you agree with that statement?
15    MR. DE JARNETTE:  Objection.
16    THE WITNESS:  Yes.
17  BY MS. D'ALLAIRD:
18    Q.   And just looking at this does this refresh
19  your recollection -- I know you've given us some
20  detail on your conversations with your brother but I
21  do want to ask if looking at this e-mail refreshes
22  your recollection in any way as to any other
23  conversations you had with your brother, any other
24  details that he gave you as to his views on why he
25  wanted to purchase Kin?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 241

1    A.  I mean, basically it was Kin would be in
2  Kik, utility would drive demand which would drive
3  price so we can make a profit.
4    Q.  Okay.  Thank you.  You can put that aside.
5    Mr. Wang, when's the last time that you
6  ever communicated with anyone from Kik?
7    A.  Kik?  I don't remember when, but I believe
8  it was Matt Hibberd.
9    Q.  Was the communication with Matt Hibberd --
10  do you remember roughly when?
11    A.  I don't.
12    Q.  Was it within the last few months?
13    A.  What's a few months?
14    Q.  Within the fall of 2019?
15    A.  I don't believe so.  I'm not a hundred
16  percent sure.
17    Q.  Do you have any sense of the season?
18    A.  I do remember I had a call with him in the
19  summer of 2019.  And I remember that because I took
20  that call when I was working at Fair which was the
21  summer.
22    Q.  You had a call with Mr. Hibberd in the
23  summer of 2019.
24    A.  Correct.
25    Q.  And I think you did testify to this

Page 242

1  earlier but I don't remember what you said.  So who
2  is Matt Hibberd?
3    A.  To my knowledge he had been the business
4  development guy at Kik and I believe he is now head
5  of Kin US.
6    Q.  And so tell me about that communication in
7  the summer of 2019.  You said it was a phone call.
8  So who called who?
9    A.  I don't remember how it was set up.  It
10  was I believe around the time when some of these new
11  apps were coming out with Kin which was around the
12  time I made the Quora post so -- and then I forgot
13  who contacted who.
14    I may have reached out, but basically I
15  kind of wanted an update on it just because stuff
16  was coming out with the apps and I guess we hadn't
17  really been checking at that point, kind of the
18  keeping up with the updates and stuff just because
19  when you get in our opinion lied to for so long we
20  just didn't really -- I don't know, we just didn't
21  really keep up to date.
22    We were losing faith in the project.  So
23  when these apps were launching we got in touch and I
24  was like, "What are the next steps?  Do you mind
25  updating me?"  And then we hopped on a call and I

Page 243

1  believe at that time he was saying -- I think he was
2  in New York at that time and he was moving to San
3  Francisco to start the Kin US office, and I forgot
4  how we went down kind of that, but he basically said
5  the reason we're moving to San Francisco is because
6  we're talking to all these big name developers.
7    I forgot what the numbers were, but I
8  think it was like 20 or 30 major apps that they were
9  talking to, mostly based in San Francisco.  And he
10  said something along the lines of like ten of those
11  apps would be -- have agreed or are on the finish
12  line or something, whatever the wording was and
13  that -- and I asked like how big are these apps
14  because the existing kind of apps were really small
15  so it was basically useless.
16    And he said they would be apps that you
17  would recognize the name of.  But he couldn't give
18  me the list.  And he did say there was one major app
19  that would use Kin and that it was done.  The
20  integration was done and it just I guess never got
21  released.
22    Q.  Did he say the name of that app?
23    A.  No.
24    Q.  I just want to clarify for the record
25  because you said this was around the time of your

Page 244

1  Quora post.
2    A.  Correct.
3    Q.  Are you referring to the document I think
4  you were shown earlier --
5    A.  Yes.
6    Q.  I believe it was -- I don't have the
7  number in front of me.  Was it 229?  Exhibit number
8  229?
9    MR. DE JARNETTE:  It might have been 228.
10    MS. D'ALLAIRD:  Or 228.
11    THE WITNESS:  228.
12  BY MS. D'ALLAIRD:
13    Q.  228.  Okay.  Is that the Quora post?
14    A.  Yeah.
15    Q.  And did you post that before or after you
16  spoke with Mr. Hibberd?
17    A.  I can't say with a hundred percent
18  certainty but I believe it was after.  I believe I
19  started at Fair in the summer.  So June-ish.
20    Q.  And you said it was around this time that
21  you were getting the news that these apps were
22  coming out?
23    A.  Yes.
24    Q.  And used Kin.
25    A.  Correct.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
January 09, 2020

---

Page 245

1    Q.  Is it fair to say that you were feeling
2 positive about Kin at that point?
3    A.  I mean, from zero -- I mean, from feeling
4 like we basically lost everything to there is now
5 some light at the end of the tunnel.  We also I
6 guess -- I didn't realize we couldn't use the actual
7 Kin we bought in those apps.  I hadn't realized
8 that.
9    Q.  And I believe you testified earlier that
10 as far as you know to this day you can't use the Kin
11 that you actually bought; correct?
12       MR. DE JARNETTE:  Objection.
13       THE WITNESS:  Correct.
14 BY MS. D'ALLAIRD:
15    Q.  Mr. Wang, has either Kik or Kik's
16 attorneys ever reached out to you regarding this
17 litigation?
18    A.  Yes.
19    Q.  Okay.  And when was that?
20    A.  It was -- I was still -- I believe it was
21 around August or -- I'm not sure.
22    Q.  It was sometime in the last few months?
23    A.  Correct.
24    Q.  Within the last six months?
25    A.  I believe so.

---

Page 246

1    Q.  And who reached out to you?
2    A.  I don't remember who the first person was.
3    Q.  Was it someone from the company from Kik?
4    A.  From the legal department I believe it was
5 Cooley.
6    Q.  Someone from Cooley reached out to you?
7    A.  Yes.
8    Q.  And who from Cooley -- and you're
9 referring to Cooley LP the law firm; correct?
10    A.  Correct.  I believe the two here but I
11 don't recall.
12    Q.  You believe it was Ms. Bailey and
13 Mr. De Jarnette who are here today?
14    A.  Correct.
15    Q.  And what form was this communication?  Was
16 it an e-mail?  Was it a phone call?
17    A.  It was e-mail.
18    Q.  It was an e-mail.  And what did the e-mail
19 say?
20    A.  I honestly don't remember.  I just
21 remember he got really aggressive in one of the
22 e-mails.
23    Q.  In one of the e-mails?
24    A.  Yes.
25    Q.  And why do you say that?  When you say

---

Page 247

1 "he" who are you referring to?
2    A.  Brett.
3    Q.  Mr. De Jarnette?
4    A.  Yeah.
5    Q.  And why are you saying -- why are you
6 using the word "aggressive"?
7    A.  I think he -- he just mentioned something
8 about we're going to compel -- I forgot what the
9 language was.  But it started kind of oh, as we just
10 want to talk to you and then it escalated a little.
11    Q.  And was that over e-mail or was that a
12 phone call?
13    A.  It was all e-mail.
14    Q.  It was all e-mail.
15    A.  Correct.  I don't know the exact wording.
16 In my opinion the language got more aggressive.
17    Q.  Try to walk me through to the best you can
18 because I want to exhaust your memory on this to get
19 the details that you have.  Try to walk me through
20 the sort of from the beginning communication from
21 the beginning.  So you said it started out one
22 way --
23    A.  Actually I believe Matt Hibberd had
24 reached out and said, "Would you be open to talking
25 to our attorneys?"  I agreed and then at first I

---

Page 248

1 believe -- I'm not really sure but it was like they
2 made it seem like a casual phone call or something I
3 believe and then I believe I didn't respond and then
4 it kind of escalated.
5    Q.  And you said the initial request was for a
6 phone call?
7    A.  I don't remember exactly.
8    Q.  Let me show you something and see if this
9 helps your memory.  I'm going to mark or have the
10 court reporter mark this document as Exhibit number
11 235.
12       (Exhibit 235 was marked for identification
13    by the Reporter.)
14 BY MS. D'ALLAIRD:
15    Q.  Mr. Wang, the court reporter has just
16 handed to you what's now been marked as Exhibit
17 number 235.  It's an e-mail chain with a Bates range
18 of WANG00033 through 34.  Just take a moment to read
19 through this and review it.  I am going to be asking
20 you about each of these e-mails.  So please review
21 the whole document and let me know when you're ready
22 for my questions.
23    A.  Yes.  I remember.
24    Q.  Mr. Wang, do you recognize Exhibit 235?
25    A.  Yes.

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                                    Harrison Wang
January 09, 2020

Page 249

1    Q.  And what is it?
2    A.  This is I guess the conversation I was
3  referring to when Matt asked if I would talk to the
4  legal team.
5    Q.  And I want to walk through this document a
6  little bit and see as we go through it if it
7  refreshes your recollection on anything.  Okay?
8    A.  Okay.
9    Q.  So I want to start with the first e-mail
10  so at the very top of the page on the first page of
11  Exhibit 235 it's an e-mail appears to be from
12  Matthew Hibberd to you.  It's dated Tuesday,
13  October 1, 2019 at 10:39 A.M.  Do you see that?
14    A.  Yes.
15    Q.  And in this e-mail -- well, let me back
16  up.  Do you have an understanding as to why
17  Mr. Hibberd wrote you this e-mail looking --
18  reviewing this now?
19    A.  Yes.
20    Q.  And what's your understanding?
21    A.  Is they want to build a defense for the
22  SEC lawsuit.
23    Q.  And who's the "they" in your statement?
24    A.  Kin/Kik.
25    Q.  Kin/Kik.  Okay.  I'm going to read into

Page 250

1  the record the first couple of sentences of this
2  e-mail.  Quote, "Hi Harrison, hope you've been doing
3  well.  As you may know the SEC sued Kik earlier this
4  year about its sale of Kin.  We are in the process
5  of building our case and as one of our TDE
6  purchasers we would really love to hear your
7  perspective," end quote.  Did I read that
8  accurately?
9    A.  Yes.
10    Q.  Now, he writes, "We are in the process of
11  building our case."  Do you have an understanding of
12  who the "we" is in that sentence?
13    MR. DE JARNETTE:  Objection.
14    THE WITNESS:  I assumed Kik/Kin.
15  BY MS. D'ALLAIRD:
16    Q.  And he refers to the SEC suing Kik and
17  then "building our case."  Do you know what case
18  he's referring to?
19    A.  I assume the SEC lawsuit.
20    Q.  The lawsuit pursuant to which we're having
21  this deposition today?
22    A.  Correct.
23    Q.  Okay.  And I want to look at the next
24  e-mail in this chain.  It appears to be from you
25  replying to Mr. Hibberd; is that correct?

Page 251

1    A.  Correct.
2    Q.  And it's dated October 2, 2019.  And you
3  write I'm going to read into the record, "Hi Matt,
4  not doing well at all with the news that now Kik is
5  shutting down and still no updates on any other
6  front.  The promise of Kin into Kik was the whole
7  reason I invested in Kin," end quote.  Did I read
8  that accurately?
9    A.  Correct.
10    Q.  Is it an accurate statement that the
11  promise of Kin into Kik was the whole reason that
12  you invested in Kin?
13    MR. DE JARNETTE:  Objection.
14    THE WITNESS:  No.
15  BY MS. D'ALLAIRD:
16    Q.  What's inaccurate about it?
17    A.  Yeah, I guess -- it was the promise of
18  exchanges, other apps using it, using Kin, basically
19  being able to have demand on Kik -- utility and
20  demand on Kik so we could sell for a profit.
21    Q.  So multiple reasons?
22    A.  Correct.
23    Q.  Is one of the reasons that you invested in
24  Kin the promise of Kin being put into Kik Messenger?
25    MR. DE JARNETTE:  Objection.

Page 252

1    THE WITNESS:  Yes.  That was one of the
2  big reasons.
3  BY MS. D'ALLAIRD:
4    Q.  I want to look towards the end of this
5  e-mail.  The next paragraph that begins with
6  "Frankly."
7    A.  Yes.
8    Q.  Quote, "Frankly, I'm not sure if Kin is
9  even still going or has the resources to continue as
10  nothing new has been really announced since you and
11  I talked on the phone months ago when you said
12  several things were in the pipeline and exchanges
13  were a priority."  Did I read that accurately?
14    A.  Correct.
15    Q.  The phone call referred to in this e-mail,
16  is that the phone call that you were describing a
17  few moments ago in the summer of 2019 with
18  Mr. Hibberd?
19    A.  Correct.
20    Q.  And on that phone call with Mr. Hibberd
21  did he say that exchanges were a priority?
22    A.  Yes.
23    Q.  And what did he -- tell me a little bit
24  more about that.  How were exchanges a priority?
25    MR. DE JARNETTE:  Objection.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Harrison Wang
January 09, 2020

---

Page 253

1    THE WITNESS:  Actually Ted also made
2 public announcements about exchanges being a
3 priority.  It was just getting listed on exchanges.
4 BY MS. D'ALLAIRD:
5    Q.  When you say Ted --
6    A.  Livingston.
7    Q.  Ted Livingston.  And the statements you're
8 referring to about exchanges being a priority, when
9 were those -- when did Ted make those statements?
10    A.  I can't recall.
11    Q.  But on your call with Mr. Hibberd in the
12 summer of 2019 Mr. Hibberd referred to making it a
13 priority to list Kin on exchanges?
14    A.  Correct.
15    Q.  And then you write at the end, quote,
16 "Yes, I will talk to your legal team."
17    A.  Correct.
18    Q.  And this is all consistent with your
19 memory that he reached out to you and you agreed to
20 talk to the legal team.
21    A.  Correct.
22    Q.  In the next e-mail, I want to read part of
23 the next e-mail that's dated October 7, 2019 at
24 8:04 P.M.  It appears to be from Mr. Hibberd to you.
25 Did you receive that e-mail just taking a look at

---

Page 254

1 that?  It starts on the first page but then it goes
2 into the second page.
3    A.  Yes.
4    Q.  You received that e-mail?
5    A.  Yes.
6    Q.  And I want to read into the record
7 beginning with the second sentence of that e-mail,
8 quote, "I also wanted to apologize for the lack of
9 updates and movements or things such as exchanges.
10 They have been a top priority and I have personally
11 spoken with every top exchange in the industry," end
12 quote.  Did I read that accurately?
13    A.  Yes.
14    Q.  And his statement that it's been a top
15 priority as to exchanges, is that consistent with
16 your recollection of your conversation with
17 Mr. Hibberd in the summer of 2019?
18    A.  Yes.
19    Q.  And is that consistent with your
20 recollection of your conversation with Mr. Philp
21 prior to purchasing Kin?
22    A.  I can't recall if he said it was top
23 priority.  I don't know the exact words he used, but
24 it seemed like it was a priority.
25    Q.  You came away from your conversation with

---

Page 255

1 Mr. Philp --
2    A.  Correct.
3    Q.  -- prior to purchasing Kin with the
4 understanding that Kik was going to do work to list
5 Kin on exchanges?
6    MR. DE JARNETTE:  Objection.
7    THE WITNESS:  Correct.
8 BY MS. D'ALLAIRD:
9    Q.  Now, having read this does this document
10 help in any way, Exhibit 235 help in any way to
11 refresh your recollection as to what happened after
12 this e-mail chain, after this communication with
13 Mr. Hibberd where he requested having you speak with
14 Kik's legal team?
15    A.  Yes.  I believe that's when Cooley reached
16 out.
17    Q.  And how did Cooley reach out to you?
18    A.  E-mail.
19    Q.  It was e-mail?
20    A.  Yes.
21    Q.  Okay.  Have you -- and you said you had
22 multiple e-mails with Cooley?
23    A.  Yes.
24    Q.  Have you saved those e-mails?
25    A.  Yeah.  I haven't touched anything.

---

Page 256

1    Q.  To your knowledge did you provide those
2 e-mails to your counsel to be produced, the e-mails
3 with Cooley?
4    A.  I'm not sure.  It was -- we had a couple
5 of e-mail exchanges.  I'm not sure how many and then
6 that's when I brought in Mark Feller from Morgan
7 Lewis and they've been coordinating with Mark to my
8 knowledge.
9    Q.  We're going to be requesting those e-mails
10 but for now try to take me through to the best of
11 your recollection what you can remember from those
12 e-mails.
13    So what can you recall about the first
14 e-mail from Cooley to you?  Who at Cooley was it
15 from?
16    A.  I don't recall.
17    Q.  What can you recall about what was said in
18 that e-mail?
19    A.  The gist of it was can we set up some time
20 for a phone call I believe.
21    Q.  In that e-mail did Cooley say anything
22 specific to the litigation?
23    A.  I don't recall.
24    Q.  So the first e-mail is it fair to say was
25 just trying to set up a time to talk?

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Harrison Wang
                                                                                   January 09, 2020

Page 257

1    A.  I don't remember exactly what each e-mail
2  said.
3    Q.  Did you reply to that first e-mail?
4    A.  I believe so.  I don't recall.
5    Q.  Do you recall --
6    A.  Actually all I remember was they I believe
7  reached out, then I responded.  I believe they
8  reached out again and then I don't think I responded
9  for a while and then it was kind of the more
10 aggressive tone, I believe.  I'm not a hundred
11 percent sure.
12   Q.  With respect to the e-mail that you think
13 you didn't respond to, was there any reason why you
14 didn't respond to it?
15   A.  I mean, I'm -- honestly sometimes -- I'm
16 in the middle of school and work.  I don't recall.
17   Q.  Can you tell us anything about that
18 e-mail?
19   A.  I don't remember what that e-mail said.
20   Q.  Do you know who sent that e-mail?
21   A.  I don't.
22   Q.  But you remember that after that point you
23 didn't respond and then you said there was a change
24 in tone.  There was another e-mail sent to you.
25   A.  I'm not sure if it was the e-mail right

Page 258

1  after me responding.  I'm not really sure but there
2  was at some point a change in tone.
3    Q.  And walk me through the e-mail with the
4  change in tone as best you can.  What did it say?
5    A.  I honestly don't remember.  It was just
6  along the lines of we're going to compel you to come
7  in or something.  I don't remember.
8    Q.  Did it say something about compel you to
9  come in for a deposition?
10   A.  I don't know the wording of it and I don't
11 know if the word deposition was used.  I believe it
12 was but I'm not a hundred percent sure.
13   Q.  And you believe that e-mail was written by
14 Mr. De Jarnette?
15   A.  I believe so.
16   Q.  Were there any other people on that
17 e-mail?
18   A.  Yes.
19   Q.  And who else was on that e-mail?
20   A.  I don't recall.  I just remember -- I
21 believe Jenna responded like right after, like more
22 calmer.
23   Q.  You said that Ms. Bailey replied to
24 Mr. De Jarnette's?
25   A.  I believe so.  Someone --

Page 259

1    Q.  Someone responded?
2    A.  Yeah, with a more professional or calming
3  tone.
4    Q.  And what can you tell us about that e-mail
5  with the calming tone?
6    A.  I don't recall.  But it was something
7  about setting up a call.  I think it was like we
8  would prefer not to, you know, do a deposition or
9  something.
10   Q.  Something along those lines?
11   A.  Yeah.
12   Q.  And then after the calming e-mail any
13 other e-mails after that?
14   A.  I don't recall.  I don't recall exactly
15 which e-mail I brought Mark Feller in.
16   Q.  Mark Feller from Morgan --
17   A.  Morgan Lewis, correct.
18   Q.  Let me ask you this.  Did you ever have
19 any phone calls with anyone from Kik's counsel
20 regarding this litigation?
21   A.  I don't believe so.
22       MS. D'ALLAIRD:  Let's go off the record
23 for 60 seconds.
24       THE VIDEO OPERATOR:  We're off the record
25 at 6:22.

Page 260

1       (Recess taken.)
2       THE VIDEO OPERATOR:  We're back on the
3  record at 6:23.
4       MS. D'ALLAIRD:  Thank you, Mr. Wang.  We
5  have no further questions.
6       MR. DE JARNETTE:  I have two more minutes
7  of questioning and unless there's any other
8  questions we should be done.
9
10      EXAMINATION
11 BY MR. DE JARNETTE:
12   Q.  Mr. Wang, you testified earlier today that
13 at the time that you received your Kin you could
14 transfer that Kin to your brother if you wanted;
15 right?
16   A.  Correct.
17   Q.  Which means that at the time that you
18 received your Kin you could do peer to peer
19 transaction with anyone to purchase goods and
20 services; correct?
21       MS. D'ALLAIRD:  Objection.
22       MR. COPELAND:  Objection.
23       THE WITNESS:  That's debatable.
24 BY MR. DE JARNETTE:
25   Q.  So if hypothetically speaking if you

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                                Harrison Wang
                                                                                                January 09, 2020

Page 261

1  wanted to purchase a car from your brother at the
2  time that you received Kin you could pay for that
3  car in Kin by transferring it to him; right?
4       MR. COPELAND:  Objection.
5       MS. D'ALLAIRD:  Objection.
6       THE WITNESS:  In theory, yes.
7  BY MR. DE JARNETTE:
8    Q.  And anyone who owned Kin at the time that
9  they received it after the token distribution event
10 could do those peer to peer transactions; right?
11      MR. COPELAND:  Objection.
12      MS. D'ALLAIRD:  Objection.
13      THE WITNESS:  Yes.
14 BY MR. DE JARNETTE:
15   Q.  Which means that it's fair to say that at
16 the time you received your tokens Kin could be used
17 to purchase goods and services; correct?
18      MR. COPELAND:  Objection.
19      MS. D'ALLAIRD:  Objection.
20      THE WITNESS:  Off line, yes, but the whole
21 point of Kik was to purchase things digitally
22 through Kik through online mediums of exchange.
23 BY MR. DE JARNETTE:
24   Q.  That wasn't my question.  I was just
25 asking whether or not at the time you received your

Page 262

1  Kin, Kin owners had the ability to purchase goods
2  and services by using that Kin?
3       MS. D'ALLAIRD:  Objection.
4       THE WITNESS:  I believe I answered that
5  question.
6  BY MR. DE JARNETTE:
7    Q.  That's a yes?
8    A.  Yes.
9    Q.  You testified earlier about having an
10 in-person meeting with Mr. Philp; is that right?
11   A.  Yes.
12   Q.  Did you remember whether or not you
13 apologized to Mr. Philp at that meeting for any
14 e-mails that you sent to him?
15   A.  I do not recall.
16   Q.  Is it possible that you did?
17   A.  I do not recall.
18   Q.  Are you paying for your counsel's legal
19 fees here today?
20      MR. COPELAND:  Objection.  Calls for
21 attorney-client privilege information.  I'll
22 instruct him not to answer.
23 BY MR. DE JARNETTE:
24   Q.  Are you going to follow your attorney's
25 advice?

Page 263

1    A.  Yes.
2       MR. DE JARNETTE:  We have no further
3  questions.
4       MR. COPELAND:  Nothing from me.
5       THE VIDEO OPERATOR:  We're off the record
6  on January 9, 2020 at 6:27 P.M.  This is the end of
7  media number 4 and today's deposition.
8       (Ending time 6:27 p m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 264

1        REPORTER'S CERTIFICATE
2
3       I, JEANINE CURCIONE, C S R  NO  10223,
4  RPR, in and for the State of California, do hereby
5  certify:
6       That prior to being examined, the witness
7  named in the foregoing deposition was by me duly
8  sworn to testify the truth, the whole truth and
9  nothing but the truth and that the witness reserved
10 the right of signature;
11      That said deposition was taken down by me
12 in shorthand at the time and place therein named,
13 and thereafter reduced to typewriting under my
14 direction, and the same is a true, correct and
15 complete transcript of said proceedings
16      I further certify that I am not interested
17 in the event of the action
18      Witness my hand this_____ day of_____,
19 _____
20
21
22                    _____
                        Certified Shorthand
23                      Reporter for the
                        State of California
24
25