# SEC72

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of: )

) File No. HO-13388-A

KIK INTERACTIVE, INC. )

WITNESS: Alexander Perls Rousmaniere

PAGES: 1 through 29

PLACE: Securities and Exchange Commission

444 South Flower Street, Suite 900

Los Angeles, California 90071

DATE: Wednesday, July 18, 2018

The above-entitled matter came on for hearing, pursuant to notice, at 11:22 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

EXHIBIT 105
WIT: Rousmaniere
DATE: 11-22-19
Jeanine Curcione, CSR, RPR

APPEARANCES:

On behalf of the Securities and Exchange Commission:
JAMES MURTHA, ESQ.
JEFFREY LEASURE, ESQ.
Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.
Washington, D.C. 20549

Also Present:
Keith Farris, Videographer

CONTENTS

| WITNESS | EXAMINATION |
|---|---|
| Alexander Perls Rousmaniere | 5 |

| EXHIBITS | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 70 | Subpoena and Cover Letter | 8 |

PROCEEDINGS

THE VIDEOGRAPHER: Good morning.

Here begins the investigative testimony of Mr. Alexander Rousmaniere in the matter regarding KIK Interactive, Incorporated, File No. HO-13388-A. Today's date is July 18, 2018. The time is 11:22 a.m.

This testimony is being taken at 444 South Flower Street in Los Angeles, California. The videographer and notary is Keith Farris representing Diversified Reporting.

Will all counsel now introduce themselves?

MR. MURTHA: This is James Murtha with the SEC Division of Enforcement out of the Washington, D.C. office.

MR. LEASURE: Jeff Leasure, same division and office.

THE VIDEOGRAPHER: Thank you.

The certified court reporter today is Mr. Marshall Latiner.

MR. MURTHA: Please raise your right hand.

Do you swear to tell the truth, the whole truth and nothing but the truth?

MR. ROUSMANIERE: I do.

Whereupon,

ALEXANDER PERLS ROUSMANIERE

was called as a witness and, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MURTHA:

**Q Could you please state your full name and spell your name for the record?**

A Alexander Perls Rousmaniere; A-L-E-X-A-N-D-E-R, Perls spelled P-E-R-L-S. Rousmaniere is R-O-U-S-M-A-N-I-E-R-E.

**Q What year were you born, Mr. Rousmaniere?**

A 1976.

**Q Thanks.**

**Good morning, Mr. Rousmaniere. I am James Murtha, and to my left is Jeffrey Leasure. We are members of the staff of the Division of Enforcement of the United States Securities and Exchange Commission and officers of the Commission for purposes of this proceeding.**

**There is an investigation by the United States Securities and Exchange Commission in the matter of Kik, K-i-k, Interactive, file No. HO-13388, to determine whether there have been violations of certain provisions of the Federal Securities Laws. However, the facts developed in this investigation might constitute violations of other federal or state civil or criminal**

laws.

Prior to the opening of the record, you were provided with a copy of the Formal Order of Investigation in this matter as supplemented.

It will be available for your examination during the course of this proceeding.

Mr. Rousmaniere, have you had an opportunity to review the Formal Order?

A Yes.

Q Do you have any questions about it?

A No.

Q Also prior to the opening of the record, you were provided with a copy of the Commission Supplemental Information Form 1662.

A copy of that Notice has been previously marked as Exhibit No. 1. I'm handing it to you now.

BY MR. MURTHA:

Q Mr. Rousmaniere, have you had the opportunity to review Exhibit No. 1?

A Yes.

Q Do you have any questions concerning this notice?

A No.

Q You have the right to be accompanied,

represented and advised by counsel.

This means that you may have an attorney present and that your attorney can advise you before, during and after your examination here today.

Do you understand this?

A Yes.

Q Since you are not represented by counsel, there are certain matters discussed in Exhibit No. 1 that I want to highlight for you.

Do you understand upon your request these proceedings will be adjourned so that you may obtain counsel?

A Yes.

Q Do you understand that the statutes set forth in Exhibit No. 1 provide criminal penalties for knowingly providing false testimony or knowingly using false documents in connection with this investigation?

A Yes.

Q Do you understand that you may assert your rights under the Fifth Amendment to the Constitution and refuse to answer any question which may tend to incriminate you?

A Yes.

Q Mr. Rousmaniere, I'm handing you a copy of a

subpoena which has been marked as Exhibit 70.

(SEC Exhibit No. 70 was marked for identification.)

BY MR. MURTHA:

Q Take your time to look at it if you want. My question is is this a copy of the subpoena that you are appearing pursuant to here today?

A Yes.

Q Thank you.

Mr. Rousmaniere, are you currently on or taking any medication that would affect your ability to remember things or recall events or do you suffer from any medical conditions that would similarly affect your ability to recall events or answer questions truthfully?

A No.

Q So sort of in a resume level maybe starting with where you went to college and then after could you at a resume level walk us through your educational and work history?

A I went to Oberlin College in Ohio and I worked briefly for an art dealer in New York City. And then I had a career or have a career as a songwriter for about eight or ten years.

And then since around 2008 I have been some kind of Internet entrepreneur where I have started a few

different businesses, all related to websites, software and video, video software, video websites with some specialities in marketing and advertising and things along those lines.

Q Could you at a high level, and I don't want to get to specifics here, at a high level, could you just tell us what your general investment experience is?

A To my understanding, I'm an accredited investor in that my understanding of this is having over a million dollars either in liquid assets or assets of some kind. But I know I'm an accredited investor because I've been through that before with other things.

And I have invested in equities, in PPOs like LendingClub and Prosper.

I've invested and I have some real estate investments and I have some crypto investments.

Q Could you tell me what your view about the market -- first of all, let me stop.

When you use the word "crypto," what are you referring to?

A Bitcoin, Ethereum and other tokens and coins of various kind.

Q Could you tell me about the market for cryptos from your perspective in 2017?

A There was a big run-up, there was a bubble and the price of all assets went way up. And now it's crashed to some extent and -- I'm not sure what else I could add to that.

**Q Were there not lots of new cryptos being offered and sold?**

A There's lots of new cryptos being offered and sold at varying degrees of fraudulentness, I would say. And I did -- I've had -- over the last year or so, I've tried to make some vague guesses about which ones would be good investments and have invested in a few of them.

**Q How do you go about determining which cryptos would be a good investment?**

A I wouldn't call it science. I barely even call it like -- I mean, it's -- what I've been looking at is is there -- is there some actual technology behind the token that they're offering that seems real and seems different somehow from other things on the market and also is the -- is the -- a lot of the tokens are ICOs, are really just marketing projects which are really just designed to take advantage of confusion.

And one excellent way to do it, you can look at their website.

And if there's a countdown on their website, if it says something will happen in five days,

49 minutes, that is like a well-known thing in Internet marketing.

It's been around for 20 years.

The term for that is moron funneling when you actually -- when you actually -- your entire business is based around finding the confused people and funneling them towards something.

Right? And so certain of these tokens or coins are not moron funnels. There's something real behind them, like Bitcoin and Ethereum, for example, and they're not just pure marketing nonsense.

Right?

**Q Is it fair to say that you were actively buying cryptos in 2017?**

A Yes.

**Q And why were you doing that?**

A Because -- actually it was because I had actively bought cryptos prior to 2017 or early 2017 and before.

And they had gone up so much that it seemed imprudent to not take a smaller portion of that and plant and buy into a few more things that seemed reasonable.

That's actually why, yeah.

**Q Were the cryptos that you purchased -- I'm**

**sorry. Let me rephrase that.**

**Are the cryptos that you purchased tradable on secondary exchanges?**

A Well, yes, because I think with the exception of Kin, which is the subject of this testimony, Kin, which is the currency released by Kik, which I'm sure we'll be talking about, with the exception of that one, all the others I purchased on exchanges, as far as I know, the only ICO, Initial Coin Offering, that I -- that I bought into was this one. And I think every other -- every other token that I have was purchased on exchanges.

**Q So you bought Kin tokens?**

A I bought Kin tokens through their ICO program, yeah.

**Q Do you know how much you purchased in U.S. dollars?**

A I think it was somewhere on the order of -- I don't remember exactly, but if I had to guess -- because I purchased them with Ethereum, which had itself gone way up.

Because I think I made the original purchase in September of 2017.

And I think that I did that because the Ethereum had gone up so much.

I said let me take a chunk of this and put it

into Kin.

And if I had to guess, it would at that time have been valued somewhere between thirty and sixty thousand dollars worth of Ethereum that I used to buy the Kik tokens with, yeah.

**Q If I were to represent to you that it's our understanding that you purchased in U.S. dollars roughly $57,000 in Kin, would that sound about right to you?**

A Yes.

**Q I'm sorry I didn't ask you this earlier, but why did you buy Kin?**

A It was, and still is my belief that there is a possible business model with a chat application that has a means of monetary exchange built in.

And such a system would be impractical with regular U.S. dollars because it really relies on the ability of -- it really relies on micro payments.

That said, you could build one in a centralized way that involved people having credits and -- and those credits being disbursed by a centralized company. But -- but the idea of a chat app that's used in 25 -- chat application that's used in 25 countries in and around the world where people can -- you can make -- you can make money by posting things or by providing content or

whatever.

That it can grow a lot faster and more quickly and be a lot more valuable if the currency was a cryptocurrency, as opposed to a point system, or something like that.

**Q Did you look at the Whitepaper for Kin prior to purchasing?**

A I don't remember, but it's likely that I did look at it, yes.

**Q Is there anything in particular that you remember?**

A Not really.

BY MR. LEASURE:

**Q Did I understand right that Kin was the only ICO you bought into?**

A Yes.

Unless -- unless I'm -- unless I'm missing one, I really do not think that I have bought into any other ICOs.

**Q Do I understand right that compared to other ICOs out there, you thought that the Kin project had a more promising future?**

A Yes.

Because a lot -- even the most successful ICOs that raised the most money, I fundamentally believe that

what they were attempting to do is like nonsense. And just from my understanding of the underlying technology -- for example, there is one called Filecoin that raised a lot of money to have a P-to-P system for people to serve -- to basically replace something like Amazon S3, which is a big storage system.

And I've spent a lot of time working with my websites and software working with S3 and other -- and drop-offs and Google Drive and all these sources. And I think that Filecoin's idea given the state of Internet infrastructure is ridiculous.

And so it's actually -- I would not -- I did not invest -- I don't know if I even had the opportunity to, but I would not have invested in that one for real reasons of my understanding of the technology, whereas with Kik there is -- it seems like the right fit and that there actually is an opportunity and that it might become a huge business.

Whether they're going to be the ones to pull it off, I don't know, you know.

So it's a highly speculative investment, to say the least.

**Q Let me ask you some questions that might sound obvious.**

**You said that other ICOs out there to you**

**looked ridiculous; correct?**

A Uh-huh.

**Q And you wouldn't invest in an ICO you thought looked ridiculous because you would be worried about losing the money that you put in; is that correct?**

A Yes.

Primarily because my -- I'm not a huge fan of the greater fool theory, which is investing in something because you think other people are just going to invest in it and you're going to get out quicker than them. I think that is a -- a lot of money has been made that way, but I think it's a dubious proposition.

**Q Right. Understood.**

A Everything I invested in was because I thought that -- yes, because I thought it could be a real project.

**Q So Kin was something you thought could be a real project; correct?**

A Yes.

**Q And you didn't buy Kin under what you said was the greater fool theory that you could just flip it quickly?**

A That's right.

**Q You thought that the fact that Kik was an existing company with a messaging base meant that they could have, not with certainty, but a chance of building**

**out a project with real value?**

A That's correct.

**Q And then did you then choose to buy in the project, in the ICO because you thought if that worked the coins would be more valuable in the future?**

A That's correct.

**Q So if I were to say you bought Kin because looking at the project you thought you would be able or more likely to make a profit; would that be correct?**

A Yes.

BY MR. MURTHA:

**Q Do you have an account on the Kik app?**

A I do not.

**Q Have you ever heard about digital stickers being available to Kin token owners?**

A Only in our previous conversation.

**Q Our previous conversation referring to when we interviewed you in January of this year?**

A That's correct. Uh-huh.

**Q So you didn't purchase Kin in order to obtain access --**

A I did not.

**Q Have you ever heard the phrase "Kin ecosystem"?**

A The Kin ecosystem; have I heard the phrase? No, but I could probably guess what they're talking about

maybe.

**Q I'll represent to you that you used that phrase before; what's your understanding of what that phrase means?**

A It probably means that they're going to be -- that they're going to be encouraging other developers of other applications to use these Kin tokens and altogether they'd call that their ecosystem. Like these big companies, like these big tech companies like to say they're creating ecosystems where other people can build software and they could all work together.

**Q Was that in place, was a Kin ecosystem in place at the time you purchased the Kin tokens?**

A I don't think so, no.

**Q So that's something that's going to be built in the future?**

A I think -- I would guess they're building it right now.

**Q When you purchased Kin, did you ever review it either way as to whether you intended to participate yourself in that ecosystem in the future?**

A If I would participate myself, it would be possible that I would.

I had no view, but it would be certainly something I would look at, yeah.

**Q Was that your primary purpose at the time --**

A No.

**Q -- to participate in that ecosystem?**

A No.

Because I wouldn't be able to buy tokens to participate in the ecosystem, I don't think. I would just build software that would -- right.

**Q So if you wanted to participate in the ecosystem in the future, you could build software --**

A Right.

**Q -- or buy tokens in the future?**

A I guess so, yeah. Uh-huh.

**Q So there wouldn't be a need to access in September 2017 --**

A No.

**Q -- to buy tokens?**

A No.

**Q Do you know what Kik has done since September 2017 to build out the ecosystem?**

A I did see that they have started offering to finance developers to build projects. I didn't look into that very carefully, but I've seen they've done that. Nothing else comes to mind.

**Q Do you think that's a good idea?**

A Probably, yes.

**Q Are you helping to build a Kik -- sorry. Let me ask that in a better way.**

**Are you helping to build a Kin ecosystem?**

A No.

**Q Other than Kik, are you aware of any other people who are helping to build a Kin ecosystem?**

A I am not.

**Q Let's say, God forbid, that the day after the public sale of Kin tokens Kik went out of business. It stopped. It couldn't afford the ecosystem.**

**Do you think that would put the value of Kin at risk?**

A Yes.

**Q Is that obvious that it would?**

A It seems obvious to me, yes.

**Q Why is that? Spell it out for me.**

A Because -- because it's -- even if other developers were to build applications around using the Kin token and around their chat application, their -- the core of it would be their system and their software. So if that disappears, it's likely the whole thing would disappear.

**Q And is that something you understood at the time?**

A Yes.

**Q Just curious. So is it fair to say that the value of your investment in Kin was tied to Kik's ability to perform future tasks?**

A Yes.

**Q Just curious. Did Kik provide you with financials?**

A What do you mean?

**Q Its own financial statements when you made the offer.**

A They may have provided them. I certainly don't remember looking at them.

**Q Fair enough.**

**When you received your Kin, were you able to purchase anything within the Kik app?**

A No.

**Q Or anywhere else?**

A I didn't try to, no.

**Q The question was different. Was it your understanding whether you were actually able to purchase if you wanted to?**

A At that moment when I got them?

**Q Correct.**

A I'm pretty sure I would -- I was not able to purchase anything at that time. My understanding was that because they hadn't built -- they hadn't built

these tokens, the usage of the tokens into their chat application, as far as I know or knew at the time.

**Q Did you purchase Kin with the belief that it would be listed on secondary exchanges?**

A I wasn't thinking about that very carefully, but yes, it is true that when these -- I mean, true in the last year. Whether it will be true going forward, I'm not sure. But it is true that when these tokens get listed on bigger exchanges, there is a price pump associated with it.

So if I was the typical crypto investor right now, I'd be waiting around for Kin to get listed on such and such an exchange and then maybe I would sell it or something. I tend to not make -- I tend to not believe in timing, market timing very much in general. So it's not something I would think very carefully about.

**Q And on the day you received your Kin, were you able to trade it on any exchanges, to your knowledge?**

A Not that I know of. However, in -- I believe it was January during -- it was either December or January during the huge crypto price pump, I did attempt to sell a little bit of Kin because the price was going up and I looked at the -- and it looked like I had on the order -- I can't remember how much it was.

But I felt like I had so much -- the Kin that

I had had reached a dollar value, which made me think that I was overweight in it. And therefore, I spent a little bit of time trying to sell some of it on a Chinese exchange whose name I think I shared with you in January, but now I forget.

**Q Is it COSS, C-O-S-S?**

A Yes, that sounds about right.

And I found that I kind of messed around with it for a couple of days and found that the market was too liquid to actually sell much at all. And I think what happened was after then the price tanked and I lost interest in selling it.

**Q Did your attempt to sell some of your Kin through COSS actually work; were you successful in it?**

A I think I likely was, but I'm not entirely sure.

I would have to go back and look on the exchange and see what happened.

But -- but if I did sell some, it would have been a very small amount. I would have sold it for Bitcoin or Ethereum. I think, if I had to guess, yes.

I think -- my recollection is maybe I sold five or ten thousand dollars worth or something like that. And then it got to be impossible and then I gave

up.

BY MR. LEASURE:

**Q Do you still hold most of the Kin you purchased?**

A The vast majority of it, yes.

**Q Do you have any plans for it?**

A I do not have any plans for it. However, if it were to -- if it were to -- if it went down, I'd probably do nothing.

If it went up sharply, I would likely sell some because I would feel like it -- was my portfolio was overweight in it.

**Q I don't want to get into the specifics of your portfolio, but in the broad categories you're invested in beyond crypto including stocks and other assets, would you say Kin in that -- within that portfolio is one of more speculative investments you have?**

A Yes.

**Q You're not relying on the Kin to pay the mortgage or rent next year?**

A No.

**Q So if it were to go to zero, it would just be bad, but a speculative investment that went to zero?**

A That's correct.

**Q I assume if it went through the roof and skyrocketed, you'd consider selling it or reaping the**

**gains at some point?**

A Yes.

BY MR. MURTHA:

**Q Did you have any communications with anyone from Kik?**

A No.

**Q Did you ever access their Telegram or Slack or any other messaging app chats?**

A No.

MR. MURTHA: Let's go off the record.

THE VIDEOGRAPHER: Going off the record at 11:52.

(Whereupon, discussion off the record was held.)

THE VIDEOGRAPHER: We're back on the record at 11:56.

MR. MURTHA: Thank you.

BY MR. MURTHA:

**Q After a brief break, Mr. Rousmaniere, did you have any substantive conversations about this matter with the SEC staff?**

A No.

**Q Thank you.**

**So in terms of materials you relied on or things you relied on to purchase Kin, it sounds like**

**the only one was the Whitepaper?**

A I don't -- I really don't think I relied very much on the Whitepaper.

Each one of these ICOs is a Whitepaper that's full of nonsense.

I relied on just the idea that they have a successful chat application and that a monetized, incentivized chat application that uses cryptocurrency is a good idea in my view. And that's pretty much all I relied on.

**Q I think the answer follows from what you just said.**

**But let me just ask the question anyway. Sitting here today, do you have any concerns that Kik lied to you in connection with your investment?**

A Well, my only concern was that they seemed to be investigated by the SEC, so that would suggest to me that there may be things that they did in their ICO which were -- aren't entirely aboveboard.

However, that's the only evidence that I have, and I have no other evidence of that type.

**Q That's fine.**

**At this time we'll offer you an opportunity to clarify anything you said today on the record; is there**

**anything you'd like to clarify?**

A I can't of anything.

**Q At this time we have no further questions for you.**

**If we want to speak to you again in the future, we will reach out to you.**

A Okay.

MR. MURTHA: Thank you.

We're off the record.

THE VIDEOGRAPHER: This concludes the investigative testimony of Mr. Alexander Rousmaniere at 11:57.

(Whereupon, at 11:57 a.m., the examination was concluded.)

* * * * *

PROOFREADER'S CERTIFICATE

In the Matter of: KIK INTERACTIVE, INC.
Witness: Alexander Rousmaniere
File Number: HO-13388-A
Date: Wednesday, July 18, 2018
Location: Los Angeles, CA

This is to certify that I, Christine Boyce, (the undersigned) do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record, and that this is the original, complete, true and accurate transcript, which has been compared with the reporting or recording accomplished at the hearing.

____________________ ______________

(Proofreader's Name) (Date)