# SEC74

**In the Matter of:**

*U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.*

---

*Jack Edward Neil, M.D.*

*January 28, 2020*

---

*68 Commercial Wharf ● Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Page 3

```
1           UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF NEW YORK
2
3  U S  SECURITIES and EXCHANGE )
   COMMISSION,              )
4                          )  No 19-CV-05244
            Plaintiff,     )
5                          )     (AKH)
   vs                      )
6                          )
   KIK INTERACTIVE, INC ,  )
7                          )
            Defendant      )
8  _____/
9
10
11
12
13        VIDEOTAPE DEPOSITION OF
14          JACK EDWARD NEIL, M D
15         (Taken by Defendant)
16        Asheville, North Carolina
17      Tuesday, January 28th, 2020
18
19
20
21
22
23
24      Reported in Stenotype by:
        Judy F  Reins, RMR, CRR
25
```

Page 2

```
1              APPEARANCES
2  ON BEHALF OF THE PLAINTIFF:
3     LAURA K  D'ALLAIRD, Esquire
      DAVID MENDEL, Esquire
4     Securities and Exchange Commission
      105 F Street NE
5     Mailstop 5971
      Washington, DC  20549
6     (202) 551-5475
7  ON BEHALF OF THE DEFENDANT:
8     LUKE T  CADIGAN, Esquire
      MICHAEL E  WELSH, Esquire
9     Cooley, LLP
      500 Boylston Street
10    Boston, Massachusetts  02116
      (617) 937-2300
11
12  ALSO PRESENT:
13    Kristy Skadow, Videographer
14
15      DEPOSITION OF JACK EDWARD NEIL, M D , a
16  witness called on behalf of Defendant, before Judy F
17  Reins, RMR, CRR, and Notary Public, in and for the
18  State of North Carolina, at Regus, Biltmore Park Town
19  Square, 28 Schenck Parkway, Suite 200, Asheville,
20  North Carolina, on Tuesday, the 28th day of January,
21  2020, commencing at 10:09 a m
22
23
24
25
```

Page 3

```
1           INDEX OF EXAMINATIONS
2                              PAGE
3  By Mr  Cadigan            7, 162
4  By Ms  D'Allaird          138, 165
5          INDEX OF EXHIBITS
6  NUMBER      DESCRIPTION        MARKED
7  Exhibit 236 Subpoena to Jack Neil in the    10
               matter of U S  Securities
8              and Exchange Commission vs
               Kik Interactive Inc  dated
9              12/31/19
10 Exhibit 237 Printout of LinkedIn profile    17
               for Jack Neil, M D
11
   Exhibit 238 Email string, top email to      47
12             Jack Neil from Laura
               D'Allaird dated 9/3/19 in re
13             Kik Interactive Inc
14 Exhibit 239 Email string, top email to      54
               Jack Neil, M D  from Laura
15             D'Allaird dated 9/19/19
               regarding Kik Interactive
16             Inc
17 Exhibit 240 Email string, top email to      58
               Jack Neil, M D  from Laura
18             D'Allaird dated 12/30/19
               regarding Kik Interactive
19             Inc
20 Exhibit 241 Spreadsheet entitled Jack       97
               Neil's Kik ICO history
21
   Exhibit 242 Letter to Kik Interactive,     119
22             Inc  Legal Department from
               Joseph J  Peck, attorney,
23             dated 4/10/19
24 Exhibit 243 Email to ▇▇▇▇▇▇▇▇             152
               from Kin by Kik dated 6/1/17
25
```

Page 4

```
1       INDEX OF EXHIBITS (Continued)
2  NUMBER      DESCRIPTION        MARKED
3  Exhibit 244 Email to ▇▇▇▇▇▇▇▇            152
               from Kin by Kik dated
4              6/15/17
5  Exhibit 245 Email to ▇▇▇▇▇▇▇▇            153
               from Kin by Kik dated
6              8/22/17
7  Exhibit 246 Email to ▇▇▇▇▇▇▇▇ dated 9/1/17  155
8
   Exhibit 247 Email to ▇▇▇▇▇▇▇▇            156
9              from Kin by Kik dated
               10/3/17
10
   Exhibit 248 Email to ▇▇▇▇▇▇▇▇            156
11             from Kin by Kik dated
               9/26/17
12
   Exhibit 249 Email to ▇▇▇▇▇▇▇▇            157
13             from Kin by Kik dated
               11/26/19
14
   Exhibit 250 Email to ▇▇▇▇▇▇▇▇            158
15             from Kin by Kik dated
               12/30/19
16
   Exhibit 251 Email to ▇▇▇▇▇▇▇▇            159
17             from Kin by Kik dated
               1/21/20
18
   Exhibit 252 Email to ▇▇▇▇▇▇▇▇            160
19             from Kin by Kik dated
               1/26/20
20
   Exhibit 253 Vox article entitled Kik     162
21             Messenger is no longer
               growing, by Kurt Wagner,
22             9/29/16
23
24
25
```

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

---

Page 5

1       PREVIOUSLY MARKED EXHIBITS REFERENCED
2   NUMBER        DESCRIPTION            PAGE
3   Exhibit 12  Whitepaper entitled Kin: a        93
                decentralized ecosystem of
4               digital services for daily
                life
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 6

1       THE VIDEOGRAPHER:  We are on the record.
2   The time is 10:09 a.m.  Today's date is
3   January 28th, 2020.  This is the video deposition
4   of Dr. Jack Neil in the case of U.S. Securities
5   and Exchange Commission versus Kik Interactive,
6   Incorporated, Case Number 19-CV-05244, in the
7   United States District Court, Southern District
8   of New York.
9       My name is Kristy Skadow, legal
10  videographer.  The court reporter is Judy Reins.
11      Will all counsel please identify yourselves
12  for the record.
13      MR. WELSH:  Michael Welsh, Cooley LLP, on
14  behalf of Kik Interactive.
15      MR. CADIGAN:  Luke Cadigan.  I'm from Cooley
16  LLP for Kik Interactive.
17      MS. D'ALLAIRD:  Laura D'Allaird on behalf of
18  the plaintiff, U.S. Securities and Exchange
19  Commission.
20      MR. MENDEL:  David Mendel, also on behalf of
21  the SEC.
22      THE VIDEOGRAPHER:  This deposition is
23  being -- taking place in Asheville, North
24  Carolina.
25      Madam Court Reporter, please swear in the

---

Page 7

1   witness.
2           JACK EDWARD NEIL, M.D.,
3   being first duly sworn, testified as follows:
4       MS. D'ALLAIRD:  Counsel, I apologize for
5   starting before you begin.  I know that we've
6   stipulated to this before in previous
7   depositions, but I just want to confirm on the
8   record that all objections except to the form of
9   the question are preserved.
10      MR. CADIGAN:  Yes.
11      MS. D'ALLAIRD:  Thank you.
12      MR. CADIGAN:  Yes, absolutely.
13          EXAMINATION
14  BY MR. CADIGAN:
15      Q.  Dr. Neil, thank you for taking the time
16  today.  I just want to go over a few ground rules as
17  we get started.  As you can see, the court reporter is
18  transcribing everything we say today.  It's often
19  said, she's the most important person in the room, so
20  to help her, I'd ask that you let me finish my
21  questions and then you can answer.  If you're
22  responding, please give all your answers verbally
23  rather than a head nod or a -- an uh-huh, so something
24  non-verbal, affirmation or the like.
25          And the attorneys here, when I'm asking

---

Page 8

1   questions, the SEC attorneys may make objections, and
2   when they're asking questions, I may make objections.
3   They're solely for the record.  You may -- you may
4   respond.  If you don't understand a question, please
5   let me know, and I'll do my best to rephrase.
6   Otherwise I'll assume you understand the question.
7           And if you need a break at any time, you
8   know, let me know.  The only thing I'd ask is if a
9   question is pending, if you don't mind, just finish
10  the answer.  Then we'll be glad to take breaks
11  whenever you need it.
12          You understand you're testifying under oath.
13  Any reason today that you can't testify truthfully,
14  completely, honestly?
15      A.  No.
16      Q.  Have you ever testified under oath before?
17      A.  In two healthcare depositions.
18      Q.  Okay.  And when -- when were those
19  depositions?
20      A.  Maybe two years ago and four years ago,
21  something like that.
22      Q.  The one -- the one four years ago, what was
23  the -- the nature of that deposition?
24      A.  Neither one was I named.  Both were --
25  another person was named, and because I was involved

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.      Jack Edward Neil, M.D.
January 28, 2020

Page 9

1  in the case, so it was related to malpractice.
2     Q.  Those were malpractice cases in which you
3  were not --
4     A.  Correct.
5     Q.  -- the named -- the named person.  You
6  were -- you were a witness in those -- I mean, in
7  those matters.
8     A.  Correct.
9     Q.  And where -- in the one that was four years
10  ago, where was -- do you know where that was --
11     A.  They were -- well, they were both in South
12  Carolina -- well, the one four years ago, I think I
13  was living in Michigan at the time, actually.  So it
14  was a -- that was a Georgia case for Medical College
15  of Georgia.  And then the one two years ago was
16  Colleton Healthcare System.
17     Q.  Colleton Healthcare System?
18     A.  Uh-huh, in Walterboro, South Carolina.
19     Q.  And that, too, was in South Carolina?
20     A.  That one was in South Carolina.  The other
21  one, the case was in Georgia, tech -- yeah, it was
22  technically in Georgia, and then I was living in
23  Michigan doing a fellowship.  So I think they came to
24  Michigan for that deposition, but the case was in
25  Georgia for sure.  I can't remember where the

Page 10

1  deposition occurred.
2     Q.  And in either of these cases, was your
3  conduct at issue, I take it?
4     A.  Correct.
5     Q.  And -- and in those -- in those depositions,
6  were you represented by an attorney?
7     A.  Yeah, the malpractice insurance carrier
8  assigned a -- an attorney.
9     Q.  In both cases?
10     A.  Definitely the one two years ago.  The one
11  four -- yes, both.
12     Q.  Okay.  And in both those cases, did you
13  prepare for your depositions?
14     A.  Maybe a 30-minute phone call, but not
15  extensively.
16     Q.  And in both cases that was --
17     A.  Both cases, yeah.
18     Q.  And are you represented by counsel today?
19     A.  No.
20     Q.  I want to show you -- actually, let's have
21  marked as the first exhibit, we're marking this as
22  Exhibit 236.
23       (EXHIBIT 236 WAS MARKED FOR IDENTIFICATION)
24     Q.  You've been handed what's been marked as
25  Exhibit 236.  Do you recognize this document?

Page 11

1     A.  I believe so.  I believe this is the
2  email -- I received this in an email a few weeks ago.
3     Q.  It's the subpoena for your appearance here
4  today.  Correct?
5     A.  Correct.
6     Q.  And you're appearing here today pursuant to
7  the subpoena?
8     A.  Correct.
9     Q.  And it also commands the production of
10  documents.  Is that right?
11     A.  Yes.
12     Q.  And if you go to the -- page 5 of the
13  subpoena, it shows -- on page 5 and page 6, it shows
14  ten categories of documents.  Is that right?
15     A.  Yes.
16     Q.  And they include, amongst other things, All
17  documents and communications concerning Kik.
18       Is that right?
19     A.  Correct.
20     Q.  And All documents and communications
21  concerning Kin?
22     A.  Correct.
23     Q.  Also includes, All documents and
24  communications concerning the investigation or action.
25     A.  Correct.

Page 12

1     Q.  And any communications involving you and
2  the -- the SEC or any other governmental entity.
3       Is that right?
4     A.  Yes.
5     Q.  How did you go about collecting the
6  documents responsive to the subpoena?
7     A.  Mostly from memory and computer searches, so
8  through my email.
9     Q.  And you did produce documents pursuant to
10  the subpoena.  Correct?
11     A.  Correct.
12     Q.  Do you recall how many documents you
13  produced?
14     A.  I do not.  There's -- some were on one hub
15  in a repository, and then I forwarded emails, so there
16  were probably three or four sets of emails I
17  forwarded.
18     Q.  Three or four sets of emails, and about how
19  many documents, just so we have a general -- is it
20  about ten?
21     A.  Sounds about right.
22     Q.  And again, going through -- just as we go
23  about the process of collecting the documents, you
24  indicated that you went through your emails?
25     A.  Uh-huh, yes.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.      Jack Edward Neil, M.D.
January 28, 2020

---

Page 13

1     **Q. And how did you go about searching for your**
2 **emails?**
3     A. I searched for Kin. I searched for Kik. I
4 searched for the people's names I had communicated
5 with, Laura, Jenna, and whatever came back I
6 forwarded.
7     **Q. And -- and then when -- I take it there were**
8 **no emails that -- that hit on Kin or Kik that you did**
9 **not produce?**
10     A. No. The only thing, as I mentioned in an
11 email, is there were a few emails with an attorney a
12 year ago that I thought were privileged, and you
13 know, if -- if it's deemed it's not, I can forward
14 them. There's nothing hidden there, but because it
15 was with an attorney, I didn't produce those.
16     **Q. And with respect to that, how -- how many**
17 **emails were there?**
18     A. Probably 12. Most -- most were one line,
19 and many were not really relevant to this case.
20     **Q. And what -- without getting into the**
21 **communications -- first of all, who was the attorney?**
22     A. Joe -- Joseph Peck.
23     **Q. And who is Joseph Peck?**
24     A. He's an attorney -- he was in Washington,
25 D.C., and then he moved down here for a while to

---

Page 14

1 Asheville, then he moved back to D.C. So I had known
2 him through -- and we'll probably get into this later,
3 but a few years ago with a company that I was working
4 on, we looked into doing an ICO, and he knew
5 cryptocurrency law pretty well. There aren't many
6 people who did, and so I communicated with him back
7 then just around -- around that, and then after this
8 matter, I discussed it with him and what our
9 possible -- what we could possibly look into doing.
10     **Q. Okay. Yeah, I think I'll get in -- we'll**
11 **get into that in more detail later then.**
12        **And then with respect -- and those were the**
13 **only -- well, those are the only emails --**
14     A. Yes.
15     **Q. -- that hit on Kik or Kin that you had --**
16     A. Correct.
17     **Q. -- produced? And then with respect to**
18 **documents, what did you do to go about searching for**
19 **responsive documents?**
20     A. I mean, over the last couple years, or at
21 least last year-and-a-half, I sort of had a folder on
22 my computer that when anything was relevant, I put
23 things -- I put them in, so some of the screenshots
24 and such I had put in that folder, so I produced that
25 folder.

---

Page 15

1     **Q. And was there anything in that -- in that**
2 **folder that you did not produce?**
3     A. No.
4     **Q. And other than that, there were no other**
5 **documents that you had?**
6     A. Correct.
7     **Q. So just -- just to be clear, other than the**
8 **emails with your attorneys, there were no documents**
9 **that you had that were responsive that you did not**
10 **produce?**
11     A. Correct.
12     **Q. Did you have any discussion with the SEC**
13 **about your production?**
14     A. I don't believe so, unless they say -- I
15 don't think so.
16     **Q. So you had no discussions with the SEC about**
17 **how to collect documents?**
18     A. No.
19     **Q. And you had no discussions with the SEC**
20 **about what documents to produce?**
21     A. No.
22     **Q. Did you have any discussions with any**
23 **attorney about how to -- how to collect the documents?**
24     A. No.
25     **Q. Did you have any discussions with an**

---

Page 16

1 **attorney about your -- about the subpoena in any -- in**
2 **any degree; namely, your deposition here today or the**
3 **production of documents?**
4     A. I mean, I -- I spoke for 20 minutes with a
5 guy, Jason Blackwell, I believe his name, about
6 whether I should be represented or not, but I didn't
7 hire him or -- I didn't -- he's not here. I mean,
8 I -- I didn't hire him.
9     **Q. Okay. And, again, without getting into the**
10 **communications with Mr. Blackwell, who is -- who is**
11 **Mr. Blackwell?**
12     A. He's an attorney out of Hendersonville, and
13 it was just a phone call. A friend of mine knew him,
14 and he's not a securities lawyer, so he -- he didn't
15 feel like he could add much value, so.
16     **Q. Okay. But other -- other than -- and,**
17 **again, sounds like you didn't -- you didn't get into**
18 **much discussion with him on it, but other than that,**
19 **you had no discussion with any attorneys regarding**
20 **your production?**
21     A. Correct.
22     **Q. And so you're confident you produced all**
23 **responsive documents?**
24     A. I'm -- yeah, I'm confident that I -- I don't
25 know where else I'd look for documents, or off of

---

U.S. Securities and Exchange Commissionv. Kildare, v. Videotape, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

Page 17

1  memory, I don't have any other documents that would be
2  relevant to this.
3      Q.  I want to turn to the next exhibit, 237.
4          (EXHIBIT 237 WAS MARKED FOR IDENTIFICATION)
5      Q.  I'm handing you what's been marked as
6  Exhibit 237.  This is your LinkedIn profile.  Is that
7  correct?
8      A.  Correct.
9      Q.  And is everything in here accurate?
10     A.  It appears to be, yes.
11     Q.  I want to congratulate you on your man --
12  Man of the Year.
13     A.  That's right.  It was you, too.
14     Q.  Congratulations to us both on that.
15         And so, I mean, I appreciate that it's here,
16  but I'd like to hear from you.
17     A.  Yes.
18     Q.  Where -- where did you go to college?
19     A.  Undergraduate, I did a semester at Clemson
20  and then the rest at University of South Carolina
21  School of -- sorry, University of South Carolina, and
22  then medical school was at the University of South
23  Carolina School of Medicine in Columbia, South
24  Carolina.  Two years were -- the last two years of
25  that were in Greenville for clinical years, and then

Page 18

1  as you can see here, I did residency and fellowship
2  afterwards.
3      Q.  Okay.  And, actually, if you just break that
4  down, so on your LinkedIn page, it -- it references
5  your graduation from the -- for undergrad from the
6  University of South Carolina at Columbia.  Did you say
7  that you attended Clemson?
8      A.  Yeah, for one semester.
9      Q.  Oh, for one semester.  Okay.  And then --
10  and then thereafter, you attended University of South
11  Carolina?
12     A.  Yes.
13     Q.  And got your -- your BS in Computer
14  Information Systems there.  Is that right?
15     A.  Correct.
16     Q.  And then thereafter -- and then that was
17  2004?
18     A.  Yes.
19     Q.  And thereafter you attended medical school
20  with the University of South Carolina School of
21  Medicine?
22     A.  Yes.
23     Q.  And you graduated there in 2009.  Is that
24  right?
25     A.  Yeah, correct.

Page 19

1      Q.  And do you have a specialty in medicine?
2      A.  Pediatric anesthesiology.
3      Q.  And where did you get your residency -- I
4  mean, where did you do your residency?
5      A.  My anesthesia residency was in Augusta,
6  Georgia, and then my pediatric fellowship was in Ann
7  Arbor, Michigan.
8      Q.  And when you say it was Augusta, Georgia,
9  that was at the Medical College of Georgia.  Is that
10  right?
11     A.  I don't know what it's called today.  It
12  keeps changing names, but yes, that's the historical
13  name of that college.
14     Q.  Okay.  And then -- and then thereafter, as
15  indicated here, you were a pediatric anesthesiology
16  fellow at the University of Michigan?
17     A.  Correct.
18     Q.  And you got -- that residency was 2014-2015.
19  Is that right?
20     A.  Yep, yes, sir.
21     Q.  You know, there -- there's a reference here
22  to the general surgeon -- surgery resident in
23  University of Hawaii.
24     A.  Uh-huh.
25     Q.  Could you tell me what -- what that was?

Page 20

1      A.  That's just a filler year because I changed
2  specialties, so when I finished medical school, I
3  started in general pediatrics and then switched to
4  anesthesia, and then there was a filler year, a gap
5  year, so I did surgery in Hawaii, and I got divorced
6  right before that, so I wanted to go somewhere nice.
7      Q.  And now prior to your -- I mean, your --
8  your work as a -- or rather, your education as a
9  doctor, it indicates that you were a chief software
10  architect at Premier Environmental Services.  Is that
11  right?
12     A.  Correct.
13     Q.  What did -- what did that entail?
14     A.  Writing software to interface different
15  computer systems.  Like, we wrote a web portal for
16  tracking trucks and drivers and material and payments.
17  I was the lone programmer, so I made up my own title.
18     Q.  And -- and again, you had come out of the
19  University of South Carolina with a degree in Computer
20  Information Systems.  Is that right?
21     A.  Correct.
22     Q.  And at that time when you graduated, had you
23  known that you wanted to become a doctor?
24     A.  I had done pre -- my last year of that
25  undergraduate degree, I did premed because I had a

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.   Videotape   Jack Edward Neil, M.D.
January 28, 2020

Page 21

1  year -- had finished my degree in three years, so the
2  last year I did premed -- premed, and then I took the
3  MCAT, and then I didn't get into medical school -- I
4  mean, I got into medical school the first time, but it
5  was still a year away, so that's -- that's where that
6  year of work was, the gap in between.
7      Q.  So when you graduated from -- from college,
8  just so I -- out of curiosity, where did you intend to
9  go with your career?
10     A.  I thought I would be writing software and
11  making companies, but it was 2003 and I was 19 years
12  old and nobody would hire a 19-year-old computer guy
13  in the Southeast after the .com, so medicine seemed
14  stable, so.
15     Q.  And I take it and as reflected in your -- in
16  your -- on the first page of -- of your LinkedIn
17  profile, you are rather proficient in software coding.
18  Is that right?
19     A.  Yes.
20     Q.  And you just mentioned that you had thought
21  you would be starting companies.  Did you have an
22  interest in entrepreneurism at the time?
23     A.  A light interest, but yes, an interest.
24     Q.  Had you had any involvement with startups as
25  of the time you graduated from University of South

Page 22

1  Carolina, Columbia?
2      A.  I had programmed a few different website --
3  websites, but never taken outside investment or formed
4  an official company around it.
5      Q.  I'm sorry.  When you say that you had -- had
6  you done that for -- for other companies or?
7      A.  One -- I did one for another company, one
8  was sort of for myself, and I looked at raising
9  capital to do it, but I was 19 and there's no -- it
10  was a different ecosystem, so I never pursued it.
11     Q.  Okay.  So you -- up until that point, you
12  hadn't actually formed any company?
13     A.  Correct.
14     Q.  And during your -- your time in medical
15  school and in -- and your residencies, did you
16  continue your interest in -- in coding?
17     A.  A little bit.  There wasn't much time, but I
18  did -- I wrote some software during medical school and
19  residency.
20     Q.  For -- for what purpose?
21     A.  For the med school or, like, for the entity
22  I was with.  So at the medical school I wrote some
23  software to record lectures and put them on the web
24  page automatically, and then each place I went for
25  residency or for fellowship, I always wrote something

Page 23

1  to make their systems better, paging systems or other
2  things.
3      Q.  Did you have any involvement with startups
4  during your time in -- in medical school or your
5  residency?
6      A.  Unfortunately, no.
7      Q.  And then -- now, when you graduated --
8         MR. CADIGAN:  Actually, can we just go off
9  for a second?  I believe there's an issue with
10  the LiveNote.
11        THE VIDEOGRAPHER:  The time is 10:27 a.m.
12  We're going off the record.
13        (RECESS TAKEN)
14        THE VIDEOGRAPHER:  The time is 10:39 a.m.
15  We are on the record.
16 BY MR. CADIGAN:
17     Q.  Dr. Neil, just places in time, after you
18  graduated from the University -- or rather, you
19  finished your residency at the University of Michigan,
20  what did you do next?
21     A.  I went to work for MedStream Anesthesia
22  practicing anesthesia down in Walterboro, South
23  Carolina.  I was there for one year and then moved up
24  to Hendersonville, North Carolina, and continued
25  practicing anesthesia at Pardee Hospital.

Page 24

1      Q.  Okay.  Just before we get there, so on
2  your -- when you indicated -- wait, where did you say
3  you first went after Michigan?
4      A.  Colleton, South -- Colleton, South
5  Carolina -- Walterboro, South Carolina.  Colleton
6  Hospital in Walterboro, South Carolina.
7      Q.  So it was Colleton Hospital in South
8  Carolina?
9      A.  Yeah, Colleton Regional Medical Center or
10  something.
11     Q.  Okay.  And that's -- is there any reason
12  that's not on your -- on your --
13     A.  Well --
14     Q.  -- profile, or -- or am I missing it, just?
15     A.  Well, I mean, it was a MedStream Hospital,
16  so I think MedStream is on here somewhere.
17     Q.  Oh, yes.
18     A.  So it's a MedStream Hospital.  So I was
19  still with MedStream, just a different location.
20     Q.  Okay.  And you worked as an
21  anesthesiologist --
22     A.  Correct.
23     Q.  -- for that -- for that one-year period?
24     A.  Correct.
25     Q.  And then -- and then there's also a

U.S. Securities and Exchange Commission v. Videtape, Inc.  Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

Page 25

1  reference here to Chief Medical Officer at Blue Nine
2  Systems?
3     A.  Uh-huh, yes.
4     Q.  What is -- what is that?
5     A.  It's the software division of MedStream --
6  or it's the software company owned by MedStream.
7     Q.  What is MedStream?
8     A.  Anesthesia staffing group, so they provide
9  staffing to hospitals and surgery centers.
10    Q.  And you've worked there since 2015?
11    A.  Correct.
12    Q.  And it says that you're the Chief Technology
13  Officer.  Did you start off as the Chief Technology
14  Officer?
15    A.  Not with that title, no.  I started off just
16  anesthesia, just pediatric anesthesiology.
17    Q.  Okay.  And -- and you're saying Blue Nine
18  Systems is an affiliate of MedStream?
19    A.  Correct, wholly owned.
20    Q.  Okay.  And in your role as chief medical
21  officer, what did you do?
22    A.  Helped develop their anesthesia software.
23    Q.  And you did that from November 15th to
24  March 2017?
25    A.  Correct, approximately, yes.

Page 26

1     Q.  Okay.  And then after your time at the
2  Colleton Regional Hospital in South Carolina, where
3  did you go next?
4     A.  Hendersonville, North Carolina to Pardee,
5  P-A-R-D-E-E, Hospital.
6     Q.  And you worked there as an anesthesiologist?
7     A.  Correct.  And I still do.
8     Q.  And so you've been there the entire time, I
9  mean since then?
10    A.  Yes.
11    Q.  And how often are you in the hospital
12  itself?
13    A.  As of last -- for the past year, about six
14  clinical days a month.  Prior to that, it was full
15  time, which is 50 hours a week.
16    Q.  And at what point did you go from 50 hours
17  to six clinical days?
18    A.  Basically January, 2019.
19    Q.  And what prompted that -- that change?
20    A.  Starting -- starting the company, Hank AI.
21    Q.  Okay.  Before -- before we get to that, so
22  you were working, then you were working as an
23  anesthesiologist at Pardee Hospital.  Correct?
24    A.  Correct.
25    Q.  And -- and at some point, you -- or in

Page 27

1  March 2017, it reflects that you founded Udifi.  Am I
2  pronouncing that right?
3     A.  It's fine, but Udifi.
4     Q.  Udifi, Udifi.  Okay.  What is Udifi?
5     A.  It's a Delaware C-Corp, but, you know,
6  I'm -- I'm the only shareholder.  It's -- as I
7  developed and patented just different technologies for
8  healthcare, I put them in that, so it's an
9  intellectual property holding company, basically.
10    Q.  So, but it's a -- it's a Delaware
11  corporation?
12    A.  Correct.
13    Q.  You're the sole shareholder?
14    A.  Correct.
15    Q.  Any employees?
16    A.  No.
17    Q.  Any revenue?
18    A.  No.
19    Q.  Okay.  And I take it that you haven't sought
20  any funding for that?
21    A.  Correct, correct.
22    Q.  And what exactly -- what type of IP does it
23  hold?
24    A.  Somewhere on here, it's probably on this --
25  down in the patent area.  So on the patents, it holds

Page 28

1  the systems and methods for predicting identifiers --
2  sorry, no, it doesn't hold that one.  It holds virtual
3  reality headset adapted to engage in anesthesia
4  mask --
5        THE COURT REPORTER:  I'm sorry, virtual
6     reality headset?
7        THE WITNESS:  Virtual reality headset
8     adapted to engage in anesthesia mask, acoustic
9     and other waveform event detection and correction
10    systems and methods, and blockchain systems and
11    methods for remote monitoring.
12  BY MR. CADIGAN:
13    Q.  And does that mean -- it said that you were
14  the founder there.  Do you -- do you -- how much time
15  do you spend with Udifi?
16    A.  I mean, it's not technic -- it doesn't have
17  a physical presence or a revenue stream, so it's a
18  holding company.  So I'd say on average, none per
19  week.
20    Q.  And then in February 2018, it says that you
21  cofounded Zather --
22    A.  Correct.
23    Q.  -- is that correct?  What is Zather?
24    A.  So it -- we founded it with two guys from
25  London, and it is a -- as it says here, it's a -- it's

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
                                                                                    January 28, 2020

Page 29

1 a way to crowdsource machine learning training data,
2 but we've not raised capital for that yet.
3    Q.  And do you have intentions to raise capital
4 for that at the present time?
5    A.  Not at the present time.  I'm saturated with
6 my other work.
7    Q.  And so you founded it with two other people?
8    A.  Correct.
9    Q.  What are their names?
10   A.  Chet, C-H-E-T, Kaher, K-A-H-E-R, and then
11 Mani Patel, M-A-N-I Patel.
12   Q.  And does the company have any revenue at
13 this time?
14   A.  No, it's -- the actual prototype's not even
15 finished.
16   Q.  And so when you say "the prototype," what
17 exactly are you talking about?
18   A.  The app for data collection.
19   Q.  Is there any -- and when -- how did you come
20 to -- to meet your cofounders?
21   A.  At a conference, the Artificial Intelligence
22 in Medicine conference.
23   Q.  Does this company have any blockchain
24 component to it?
25   A.  No.

Page 30

1    Q.  Are you familiar in the startup world with
2 the concept of a minimum viable product?
3    A.  Yes.
4    Q.  Are you a -- do you have a minimal viable
5 product -- product yet for Zather?
6    A.  No.
7    Q.  Are you working towards one?
8    A.  Not actively.
9    Q.  Actually, so we're on the right -- what is a
10 minimum viable product?
11   A.  Basically a proof-of-concept technology that
12 shows what the use case of the product is so that
13 it's -- yeah.
14   Q.  Okay.  And Zather was founded after you had
15 purchased Kin in the TDE at issue here.  Right?
16   A.  I believe so, yes.  It was founded -- yes.
17   Q.  Okay.  And had you ever contemplated having
18 a -- a blockchain or a cryptocurrency component with
19 Zather?
20   A.  Not -- what's the right word?  Not really,
21 I'd say.
22   Q.  Had you -- had you in any -- any sense?
23   A.  We had -- we -- we thought about it on one
24 conference call, whether it would make sense for
25 compensation, but it would -- we decided it would add

Page 31

1 a technical complexity without a business value.
2    Q.  You had talked earlier about working at --
3 with Mr. Peck to discuss an ICO.
4    A.  Correct.
5    Q.  Was that in connection with Zather?
6    A.  That was with Udifi.
7    Q.  That was with Udifi.  And so with -- with
8 Zather you -- you had not contemplated an ICO?
9    A.  No.
10   Q.  We'll get back to that ICO later.
11       For Udifi, do you have a website?
12   A.  Yeah, just basically a placeholder website,
13 but yes.
14   Q.  What's on the website?
15   A.  Just big picture, you know, leave a legacy,
16 myself, my dad, my cousin, sort of the three people
17 who were sort of building products, maybe a little bit
18 about what we want to do, just hold intellectual
19 property, develop technologies, and license them.
20       THE COURT REPORTER:  Develop technologies
21   and?
22       THE WITNESS:  And license them.
23 BY MR. CADIGAN:
24   Q.  Is there -- is there any hidden substance or
25 materials in there that people can access if they're

Page 32

1 granted access through --
2    A.  No.
3    Q.  -- passwords or the like?  No?
4    A.  No.
5    Q.  What about Zather, does Zather have a
6 website?
7    A.  It does.
8    Q.  Okay.  And what's on that website?
9    A.  Sort of lays out the plan for Zather, that
10 it's a -- marketplace for companies who need to
11 collect training data for their AI systems, and then,
12 another side, to explain to the humans or the data
13 collectors what their value would be.  The log-in
14 doesn't work.  You can't log in and see a dashboard,
15 though.
16   Q.  Have you actively started soliciting
17 participants for Zather?
18   A.  No.
19   Q.  In the -- just as you're working through
20 the -- the concept right now for Zather, what is the
21 incentive you're providing people who are going to be
22 providing data?
23   A.  So the -- the business model would be,
24 that's sort of structured, is that any company who
25 wants to train an AI model and needs diverse, unbiased

U.S. Securities and Exchange Commission v. Videotape, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

Page 33

1  training data can put out a request and put a
2  financial incentive on it to pay the humans to collect
3  it. So if you need rotten oranges and ripe oranges,
4  you can request a thousand pictures of oranges, half
5  rotten, half not rotten, and then pay people out of
6  that 10,000, so if you said you had a thousand and
7  you'll pay a dollar apiece, then a percentage of that
8  goes to the humans collecting it.
9      Q.  And just so I understand, are you actually
10 talking about oranges or is that a -- is that a --
11     A.  And that's an example, yeah. I'm sorry, no,
12 literal oranges, but --
13     Q.  Literal oranges.
14     A.  -- other fruits and, yeah, pictures of audio
15 for car belts, any -- anything you need to train your
16 AI system to collect the training data.
17     Q.  And are you still working on that, that
18 project?
19     A.  Not actively. We've -- we need a CEO. I
20 can't run two companies, so. And that's not my space
21 of passion, so. It's a need, but if we found the
22 right CEO, we would, but.
23     Q.  There's a reference on -- on the website to
24 Zeds. What are -- what are zeds?
25     A.  So they would basically be a reward.

Page 34

1  Instead of paying you in straight dollars, they would
2  be -- and without blockchain, they would be, like, a
3  value -- instead of paying you in dollars, they would
4  be a value. So they wouldn't be backed by blockchain.
5  They'd just be in our database. So it would be you'd
6  get 10,000 Zeds. We probably weren't going to
7  actually do that, but that was something we talked
8  about.
9      Q.  And so you -- you were talking about this as
10 a form of -- of currency?
11     A.  Correct.
12     Q.  But it was -- I mean, at present, I mean, it
13 was not considered to be a digital currency that you
14 were --
15     A.  Correct, we had no desire to build out a
16 blockchain solution for that.
17     Q.  And you're still -- but you're still working
18 on it?
19     A.  We haven't in almost a year.
20     MR. MENDEL:  I just want to make sure you
21 said have not?
22     THE WITNESS:  Have not.
23     MR. MENDEL:  Okay.
24     THE WITNESS:  In almost a year.
25 ///

Page 35

1  BY MR. CADIGAN:
2      Q.  And where are you getting the money for that
3  project?
4      A.  Sort of bootstrapped. I mean, we probably
5  put a total of $10,000 of our -- combined of our own
6  money towards it.
7      Q.  But you have not gotten any funding for
8  that?
9      A.  Correct.
10     Q.  And then you mentioned Hank AI, which you
11 founded in January of 2019. Correct?
12     A.  Correct.
13     Q.  What is Hank AI?
14     A.  It is a -- it's a way to learn how humans
15 think and replace low-level repetitive human
16 decisions. Kind of like what UiPath did for clicks,
17 we do for low-level repetitive decisions.
18     Q.  What does -- what does that mean? What --
19     A.  It means if you're -- if you're seeing the
20 same -- if you're -- if you're sitting behind a
21 computer screen and seeing some inputs, you know, be
22 it Excel spreadsheets, be it in this case -- our first
23 use case is medical coding. You're seeing a medical
24 record and your job is to translate it into codes,
25 automate that process.

Page 36

1      Q.  Okay. When you say a "use case," what's a
2  use case?
3      A.  An example of an application of the product.
4      Q.  And do you have a minimum viable product?
5      A.  Yes.
6      Q.  And what -- what is that minimal viable
7  product?
8      A.  I mean, it's -- it's a combination of
9  back-end APIs to handle all the -- it's RESTful APIs.
10 We have -- without going too much into sort of some of
11 the confidential pieces of proprietary stuff, we've
12 got the APIs, we've got the AI back end, and we've got
13 the user interface for the application that the user
14 installs on their computer.
15     Q.  When you say API," what do you mean?
16     A.  Application programming interface, so it's
17 the way computers talk to each other.
18     Q.  And you have one use case at present.
19 Right?
20     A.  One way -- there's lots of applications
21 built off of that, I -- I guess. I mean, I don't know
22 quite how to answer that. I mean, it -- that use case
23 expands into many, so that particular one is an
24 example of the way we collect and train the system,
25 but a lot of things in healthcare are based off of

Page 37

1  that process, so there are many use cases that come
2  off the top of that.
3      Q.  And I guess what I'm saying, have you --
4  have you executed on any of the other use cases that
5  come off the top of that at this time?
6      A.  No.
7      Q.  And are you still developing the product,
8  the platform?
9      A.  Yes, that one's our -- that one's active.
10     Q.  That one's active?
11     A.  Yes, active, correct.
12     Q.  Meaning that you have customers and people
13  using the platform?
14     A.  Correct.
15     Q.  How many -- how many employees do you have?
16     A.  So we have -- there are seven total people
17  working on the project.  No one's full time, and
18  everyone's 1099 contract right now.
19     Q.  And what do those people do?
20     A.  Six are basically software development, and
21  one is more psychology story marketing.
22     Q.  And do you have any revenue at this time?
23     A.  We were funded with a prepayment from a
24  customer, so that's our revenue.
25     Q.  And how many customers do you have?

Page 38

1      A.  We have two partners signed, two
2  customers/partners signed, and we -- this is
3  confidential, but we're in the process of acquiring
4  a -- a large -- a large group.
5      Q.  A large group?
6      A.  Large coding group.
7      Q.  Coding, coding.
8      A.  Medical coding group, not -- not software
9  development, medical coding group.
10     Q.  When you said that you were funded with
11  prepayment, did the -- the company that provided the
12  prepayment take an ownership interest in the company?
13     A.  Yes.
14     Q.  And how much -- what percentage of the
15  company do you own?
16     A.  Close to 50 percent.
17     Q.  And who are the other owners in the company?
18     A.  The two other co-founders, Sam Hartzog and
19  Sergey Razin, R-A-Z-I-N, and then Ellington
20  Enterprises, which is the entity that prepaid.  They
21  have the other shares.
22     Q.  And are you familiar with the concept of a
23  burn rate?
24     A.  Yes.
25     Q.  And what -- and what is a burn rate?

Page 39

1      A.  For us?
2      Q.  Yes.  I mean, actually, what is a -- what is
3  burn rate in general?
4      A.  Oh, okay.  Just, I don't know if that's
5  relevant here, but.  So --
6      Q.  I'm just wondering if you're familiar with
7  the concept of burn rate.
8      A.  Yeah.  It's -- you're losing money, you
9  know, you're losing more than you're making, and how
10  long will the money you raise last before you're out
11  of money and need to raise more money to keep going.
12  So if you're not profitable, it's -- I think most of
13  the time it's referred to in a non-profitable business
14  or -- so if you're profitable, it would just be your
15  cost of goods sold or your salaries, so.
16     Q.  And what -- and in -- in your case, once
17  you, you know, go through the end of the burn rate,
18  what -- what would be your plans, if any?
19     A.  Yeah, your goal is to convert to a
20  profitable business before you run out of burn --
21  before you burn all your burn or raise more money.
22     Q.  And you could also cut expenses and the
23  like.  Is that right?
24     A.  In theory, yes.
25     Q.  And as a result of -- and so at this -- at

Page 40

1  present, you are involved in Hank AI.  Right?
2      A.  Yes.
3      Q.  You're involved in Zather, although
4  that's -- doesn't sound like that's very active at
5  this point?
6      A.  Correct.
7      Q.  Okay.  You still have your holding company
8  in Udifi.  Correct?
9      A.  Correct.
10     Q.  Okay.  And you still work at MedStream five
11  to six clinical days a month?
12     A.  Correct.
13     Q.  Are there any other companies that you are
14  involved with at this time or -- or contemplating
15  being involved with?
16     A.  I don't have any -- I'd say I have no equity
17  in anything else.  I talk to a lot of companies, so
18  I -- I am not involved in any leadership or decision-
19  making with any other company, no.
20     Q.  Okay.  But are you in the process of forming
21  any other companies?
22     A.  No.
23     Q.  And with respect to -- to Hank AI, what
24  is -- what is your role with the company?
25     A.  To lead it, to define the market fit, define

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
                                                                                          January 28, 2020

Page 41

1  the business model.  We started with sort of a
2  technology and are refining the business model on top
3  of the technology.
4      Q.  And are you doing any coding for the
5  company?
6      A.  Yes.
7      Q.  And about how much time is that taking a
8  week for you?
9      A.  Forty hours.  It's -- mostly my full-time
10  work is Hank AI.
11     Q.  Let's turn to your -- your preparation for
12  your deposition today.  How did you prepare for your
13  deposition today?
14     A.  Not very much.  I mean, I looked back
15  through the documents and the -- what I supplied and
16  talked to Jason, the attorney, to see if I need -- if
17  he thought I needed an attorney, but that's about it.
18     Q.  Did you -- and so you -- you said you talked
19  to Jason, but that was only about whether or not you
20  would need an attorney here.
21     A.  Correct.
22     Q.  Did you speak to anyone else to prepare for
23  your deposition today?
24     A.  Maybe my wife, but she's not -- just wife
25  talk, you know.

Page 42

1      Q.  And about how much time would you say you
2  spent in preparation for your deposition today?
3      A.  Five hours.
4      Q.  And in those five hours, what did you do?
5      A.  Collecting, the documents that
6  I've distributed or, you know -- what's the word?
7      Q.  Produced.
8      A.  Produced, yes, the documents I --
9      Q.  Well, let me put aside the -- the production
10  of the documents itself, but -- well, actually, I take
11  it back.  That -- that goes -- so you had -- you
12  spent -- you spent -- so you're including in the five
13  hours the time you spent collecting documents.  Is
14  that right?
15     A.  Collecting and reviewing, yes.
16     Q.  And reviewing.  Other than the documents
17  that you provided, did you review any other documents?
18     A.  I do not believe so.
19     Q.  Did any of the documents refresh your
20  memory?
21     A.  Yes.
22     Q.  Okay.  Which one -- which -- any in
23  particular?
24     A.  I mean, I -- I -- when I answer that as yes,
25  I mean, they all refresh my memory.  You know, they --

Page 43

1      I -- I remembered all of the documents, but.
2      Q.  When did you go about preparing for this
3  deposition?
4      A.  I suppose I'd count from when I heard about
5  doing it, so whatever the subpoena date is.
6      Q.  And so you -- you collected the documents
7  for -- for production?
8      A.  Correct.
9      Q.  After you produced those documents, did
10  you -- what time did you spend preparing for this
11  deposition?
12     A.  I include that in the five hours.
13     Q.  Yeah, but I'm saying, what -- I mean, so you
14  produced the documents?
15     A.  Oh, you're saying what part of the five
16  hours?
17     Q.  Yeah, I'm trying to figure out whether or
18  not you prepared yesterday --
19     A.  Two-and-a-half.
20     Q.  -- two days -- two days -- two-and-a-half
21  hours?
22     A.  Two-and-a-half hours, yeah.
23     Q.  Okay.  And --
24     A.  I wasn't sure of what to do to prepare, so,
25  yes.

Page 44

1      Q.  Okay.  When did you prepare -- what did you
2  do to prepare after you had produced the documents?
3      A.  Just read them.
4      Q.  And when did you do that?
5      A.  Some point, you know, between January 28th
6  and today, or --
7      Q.  But do you recall when?
8      A.  Sorry, not -- that is today, sorry.
9  Whenever this document was sent in.  I do not recall
10  when.
11     Q.  Had you been following this -- the law --
12  the SEC's lawsuit against Kik?
13     A.  I followed the -- I read the original
14  complaint, and then not much else other than the
15  original complaint.
16     Q.  When did you -- when did you read that?
17     A.  Within days of when it came out, whatever
18  date that record shows.
19     Q.  And did you review Kik's answer to the
20  complaint?
21     A.  I did.
22     Q.  And when did you read that?
23     A.  Again, it must have been relatively soon
24  after it came out.
25     Q.  And have you looked at either of those

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Jack Edward Neil, M.D.
January 28, 2020

---

Page 45

1 documents since you received the subpoena?

2    A.  I did not review those, no.

3    Q.  When did the -- what about the Kik's Wells'
4 notice -- response to Wells' notice in this matter?
5 Are you familiar with what that is?

6    A.  Not particularly.  I -- I think I read it,
7 but I'm not -- I -- if you -- if you have it, it may
8 refresh my memory.

9    Q.  Prior to the SEC bringing its action in this
10 matter in the middle of 2019, and this was back
11 actually in the winter of 2018 or around there, Kik
12 published a response to the SEC's proposed claims, you
13 know, Wells' notice.

14        MS. D'ALLAIRD:  Objection.

15        THE WITNESS:  I believe I read --

16 BY MR. CADIGAN:

17    Q.  And actually, I take that back.  The
18 timing -- the actual timing, winter of 2000 -- was it
19 December 2000 -- December 2018, January 2019, in
20 around there?

21        MS. D'ALLAIRD:  Objection.

22        THE WITNESS:  I -- I -- every now and then,
23 I'll log into CoinDesk, which is sort of the news
24 site, and see the articles, so I'm -- I'm sure I
25 read that when it came out.

---

Page 46

1 BY MR. CADIGAN:

2    Q.  You're sure you read the -- Kik's response
3 to Wells' --

4    A.  I'm -- I'm sure I at least read what showed
5 up on CoinDesk, but I don't completely recall any
6 further than that.

7    Q.  Okay.  So you don't recall whether you read
8 Kik's response --

9    A.  Correct.

10    Q.  -- to the Wells' --

11    A.  If I saw the document, I might -- it might
12 refresh my memory.

13    Q.  Were you aware that -- prior to the
14 complaint being brought by the SEC, were you aware
15 that the SEC was conducting an investigation into Kik?

16        MS. D'ALLAIRD:  Objection.

17        THE WITNESS:  As far as I know, probably mid
18 or late 2018, which maybe is what that Wells'
19 notice, where -- where that comes in.  I just am
20 not familiar with the name "Wells' notice."  At
21 some point there the end of that year or the
22 beginning of 2019, I saw -- saw the action coming
23 about, but as for exact dates or other things,
24 this wasn't a priority in my mind, so I don't
25 recall specifically.

---

Page 47

1 BY MR. CADIGAN:

2    Q.  When did the SEC first contact you regarding
3 Kik?

4    A.  Whenever that first email I supplied was.
5 I -- I imagine it was three months ago, something like
6 that, maybe four, maybe -- it seems like it was August
7 or September.

8    Q.  Okay.  This, the next exhibit marked as
9 Exhibit 238.

10        (EXHIBIT 238 WAS MARKED FOR IDENTIFICATION)

11    Q.  I'm handing you what's been marked as
12 Exhibit 238.  It's an email chain of the last in time,
13 of which is an email from Laura D'Allaird to you dated
14 September 3rd, 2019.  Do you recognize this document?

15    A.  Yes, yes.

16    Q.  And what is this document?

17    A.  The email chain between myself and Laura
18 D'Allaird.

19    Q.  And was the -- the first-in-time email is
20 dated August 29th, 2019, from Ms. D'Allaird to
21 yourself.  And was that the first contact that -- that
22 the SEC had with you?

23    A.  I believe so, yes.

24    Q.  And it references your attempts to have a --
25 to arrange a discussion.  Do you see that?

---

Page 48

1    A.  Yes.

2    Q.  And did you have that discussion?

3    A.  We did.

4    Q.  And when you had that discussion, was -- was
5 that discussion on Friday, September 6th?

6    A.  I'd have to pull out my calendar to make
7 sure, but I believe so.

8    Q.  And who was on -- who was on -- was it a
9 telephone call?

10    A.  It was.

11    Q.  And who was on the telephone call?

12    A.  It was myself, Laura, and I think there was
13 one other attorney, but I don't recall a name.

14    Q.  Okay.  And was that Mr. Mendel?

15    A.  I'd have to look at my calendar probably
16 to --

17    Q.  Okay.

18    A.  -- see the name.

19    Q.  Do you -- do you recall the names --

20    A.  It was a male.

21    Q.  Yeah.  Do you recall the name Steve
22 Schlegelmilch?

23    A.  That doesn't -- doesn't ring a bell for that
24 call, but, again, I'd look -- for truth, I'd just look
25 at my calendar.

---

U.S. Securities and Exchange Commission v. Videotape, Inc.                    Jack Edward Neil, M.D.
                                                                             January 28, 2020

Page 49

1    Q.  Okay.  How about -- you had a calendar in
2  which this was reflected?
3    A.  I mean, just my personal calendar.
4    Q.  Just throw some other names out there.  Was
5  it Jeffrey Leasure?
6    A.  I don't think so.
7    Q.  Okay.  James Murtha?
8    A.  Say that again.
9    Q.  Murtha?
10   A.  I don't think so.
11   Q.  Okay.  The -- and so -- but there was two
12  people from the SEC and you on -- on the phone.  So
13  what was -- when you got on the phone, what did the
14  SEC say to you?
15   A.  It was just a discussion of this matter and
16  what my involvement was and whether I had invested
17  and, you know, general questions around that.
18  Specific questions, I don't recall.
19   Q.  So the question is whether you had invested?
20   A.  I -- I'm sure that was a question, and
21  then -- yeah, I mean, I don't recall the specific
22  questions.
23   Q.  I mean, but generally, I mean, other than
24  whether you invested, was there any other questions
25  that they asked of you?

Page 50

1    A.  I mean, it was probably a 30-minute call, I
2  believe, 20 to 30 minutes, and it would have been
3  around this -- you know, we were talking about this
4  particular action and, you know, why I had invested
5  and just that sort of decision-making.
6    Q.  What -- what, if anything, do you recall
7  them saying about the action?
8    A.  I -- I don't recall anything specific.
9    Q.  Do you recall anything generally about what
10  they said about the action?
11   A.  Not really.
12   Q.  Yeah, and by the way, I'm just -- I mean,
13  I'm trying to --
14   A.  Yeah.
15   Q.  -- you had a 30-minute discussion with the
16  SEC.
17   A.  Right.
18   Q.  I'm trying to find out what you said to the
19  SEC, and I assume --
20   A.  Yeah, it's --
21   Q.  -- there's nothing, I mean, that --
22   A.  Yeah, it would be --
23   Q.  -- sensitive here, I mean.
24   A.  Correct, no, and I'm not protecting
25  anything.  It would be similar to what I discussed

Page 51

1  when I talked to Jenna and, you know, y'all's side.
2  It was the same conversation, it seems like, but it
3  was just about, you know, when I invested, why I
4  invested, whether I'd be willing to participate in
5  this type of action, and then just stuff surrounding
6  that.  As for the exact questions and things, I
7  don't -- I just don't recall.
8    Q.  And let's -- and, again, I appreciate that.
9    A.  Yeah.
10   Q.  That's what I'm trying to get at.  And with
11  regard to whether you'd be willing to participate, do
12  you -- do you recall exactly what the SEC asked in --
13  in connection with that?
14   A.  I mean, I think from my recollection, it was
15  just simply a question like that, like would -- you
16  know, would I be willing to participate in -- you
17  know, in a -- being a witness or a deposition, doing a
18  deposition.
19   Q.  And so it was whether you -- and, again, I
20  apologize.  I'm just trying to get as much detail as I
21  can.
22   A.  Yeah.
23   Q.  Did they ask you whether you'd be willing to
24  be a witness in a deposition?
25   A.  I'm not -- I don't -- I know y'all did.  I

Page 52

1  don't quite recall the two -- the two conversations
2  kind of merged in my head 'cause they were close
3  together.  I -- I don't -- I can't for certain say
4  yes.
5    Q.  Did they ask you whether you -- did they
6  ever mention identifying you as a potential witness in
7  the matter?
8    A.  I believe --
9        MS. D'ALLAIRD:  Objection.
10       THE WITNESS:  I believe so.
11  BY MR. CADIGAN:
12   Q.  And did they ever ask you about whether
13  you'd be willing to testify at trial?
14       MS. D'ALLAIRD:  Objection.
15       THE WITNESS:  I don't think so.
16       MR. CADIGAN:  What's the objection?
17       MS. D'ALLAIRD:  Asked and answered.
18  BY MR. CADIGAN:
19   Q.  And what did -- what, if anything, did the
20  SEC tell you about the action?
21       MS. D'ALLAIRD:  Objection, asked and
22  answered.
23       THE WITNESS:  I mean, I -- again, I don't
24  completely recall.  I have lots of phone calls,
25  and this one was -- I -- I just didn't -- I don't

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.        Jack Edward Neil, M.D.
January 28, 2020

Page 53

1   recall the details.
2  BY MR. CADIGAN:
3    Q.  Yeah.
4    A.  Yeah.
5    Q.  And by the way, I -- again, I'm just trying
6  to get your memory of this.
7    A.  Okay.
8    Q.  So if you don't recall, I -- I really don't
9  want you guessing.
10    A.  Okay, good.
11    Q.  And, I mean, you have a memory of the call,
12  however.
13    A.  Yes.
14    Q.  Correct?  And do you remember telling them
15  why you invested in Kik?
16    A.  Yeah, I -- I discussed that, I'm quite
17  certain, on that call and the call with y'all, 'cause,
18  again, those two calls in my head are just kind of
19  merged, so I'm -- I'm a little timid to say what I'm
20  sure I talked with the SEC about versus what I talked
21  to Jenna about because there were lots of the same
22  questions around the same time, and I'm not sure -- I
23  just don't want to say something that one side said
24  and the other -- 'cause those two calls are kind of
25  merged in my head.

Page 54

1    Q.  Well, and that's why I definitely -- if you
2  don't recall, which is -- which I want -- I want to be
3  very clear about that, and we -- we'll ask you, you
4  know --
5    A.  Okay.
6    Q.  -- your reasons for purchasing Kin.  I just
7  wanted -- and was there a subsequent call on -- that
8  you had with the SEC?
9    A.  I believe we had a short call sometime later
10  that was really just around setting up this
11  deposition.
12    MS. D'ALLAIRD:  Just to clarify -- I'm
13  sorry, Counsel, clarify for the record, are you
14  asking about a subsequent call with the SEC or
15  with --
16    MR. CADIGAN:  Yes, with the SEC.
17    MS. D'ALLAIRD:  -- with Cooley?
18    MR. CADIGAN:  With the SEC.
19    THE WITNESS:  Yeah, I -- I think we had
20  this -- I think I already answered it, yeah.
21    MR. CADIGAN:  I next want to -- actually,
22  can we have this marked as Exhibit 239?
23    (EXHIBIT 239 WAS MARKED FOR IDENTIFICATION)
24  BY MR. CADIGAN:
25    Q.  And I'm putting before you what's been

Page 55

1  marked as Exhibit 239.
2    A.  Uh-huh, yeah.
3    Q.  It's an email, the last-in-time email dated
4  September 19th, 2019, from Ms. D'Allaird to yourself.
5  Is that -- do you recognize this document?
6    A.  Yes.
7    Q.  And this -- the last -- the last email
8  indicates that there was a -- an attempt to set up
9  another call, you know, a couple weeks after your --
10  your first call.
11    A.  Correct.
12    Q.  Did you have this -- this second call that's
13  referenced in the email?
14    A.  I believe we did.  That's what I was
15  referencing a moment ago, but I think it was around
16  finding a time to talk or to do the deposition or
17  to -- that's what the substance of that call was, yes.
18    Q.  Okay.  So, and on this -- this second call,
19  who was on that call?
20    A.  I'm not sure.  I think it was just Laura.
21    Q.  Okay.  And by "Laura," you mean
22  Ms. D'Allaird?
23    A.  Yes.
24    Q.  And how long was that call?
25    A.  A few minutes.

Page 56

1    Q.  And what was the -- the substance of that
2  call?
3    A.  Again, I believe it was just to talk about
4  finding a time to schedule a deposition or a
5  discussion.
6    Q.  By the way, for this call and for the prior
7  call, did you take notes of the call?
8    A.  No.
9    Q.  Did you have any other discussions with
10  the -- the SEC?
11    A.  I do not believe so --
12    Q.  So other --
13    A.  -- other than the emails provided.
14    Q.  Yeah, other than the emails that you've
15  provided and other than the two calls that you
16  mentioned, you've had no other discussions with the
17  SEC?
18    A.  I don't think so.  There may have been
19  another short call, but I don't think so.
20    Q.  Did you have any discussions with the SEC
21  regarding your testimony at the deposition today?
22    A.  No.
23    Q.  Did you have any discussions with the SEC
24  about compensation for your time preparing for your
25  deposition today?

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

Page 57

1    A.  I -- I do not believe so.
2    Q.  Are you on any understanding that the SEC
3    will be compensating you for your time preparing for
4    your deposition today?
5    A.  I don't -- I wish, but I don't think so.
6    Q.  Have you had any discussion with the SEC
7    regarding compensation for the time you're spending at
8    the deposition today?
9    A.  No.
10    Q.  Any discussion regarding reimbursement of
11    any expenses?
12    A.  No.
13    Q.  Okay.  Have you any -- had any discussion
14    with the SEC about appearing as a witness at trial in
15    this matter?
16    A.  I think we -- I think we answered this
17    already, but no.
18    MS. D'ALLAIRD:  Just going to interject
19    objection again, asked and answered.
20    MR. CADIGAN:  I believe I asked him about
21    the first -- the first call, but I haven't asked
22    him about any --
23    THE WITNESS:  Oh, okay.
24    MS. D'ALLAIRD:  Oh, then I didn't understand
25    that.  If you're asking about the next call, then

Page 58

1    go ahead.
2    THE WITNESS:  Sorry, at no point, I don't --
3    at no point during any call has a -- has a
4    discussion about me appearing in trial come up
5    that I recall.
6    MR. CADIGAN:  Can we have marked as the next
7    exhibit 240?
8    (EXHIBIT 240 WAS MARKED FOR IDENTIFICATION)
9    BY MR. CADIGAN:
10    Q.  Okay.  I'm putting before you a document
11    that's been marked as Exhibit 240.  It's an email
12    chain, the last in time which is dated December 30,
13    2019, from Ms. D'Allaird to yourself.  Do you see
14    that?
15    A.  Yes.
16    Q.  Do you recognize this chain?
17    A.  I do, yes.
18    Q.  And before in Exhibit 239, you had
19    indicated -- or rather, this -- this referenced the
20    second discussion with the SEC.  Is that right?
21    A.  Say again.
22    Q.  In Exhibit 239 it referenced a second
23    discussion that you had --
24    A.  Correct.
25    Q.  -- that was scheduled with the SEC.  Right?

Page 59

1    A.  Correct.
2    Q.  And that was the only communications that
3    you recall?
4    A.  Yeah, I -- I think I mentioned that there
5    may have been one more, and this does jog my memory,
6    there was one more.
7    Q.  Now, in this email, you had sent her an
8    email, Ms. D'Allaird an email on December 30th, 2019.
9    Correct?
10    A.  Correct.
11    Q.  And you had indicated that Kik's attorneys
12    had reached out to you.  Is that right?
13    A.  Correct, yes.
14    Q.  And then you ask, Can the SEC provide some
15    legal protection during this deposition as to
16    objections to form and the like since I'm an SEC
17    witness.
18    A.  Correct.
19    Q.  (Reading) Concerned they may attempt to harm
20    my credibility in a case that may end up widely
21    followed.
22    Is that what you asked -- is that what you
23    wrote, rather?
24    A.  Correct.
25    Q.  And then Ms. D'Allaird got back to you and

Page 60

1    sought to schedule a -- a phone call with you.  Is
2    that right?
3    A.  Correct.
4    Q.  Again, did you have that -- that
5    discussion --
6    A.  I think, yeah.
7    Q.  -- with Ms. D'Allaird?
8    A.  Now I remember it, and that one -- that one
9    specifically was around this question, and they
10    provided the confidentiality documents to show that I
11    could -- if there were certain items that needed to be
12    confidential, that I could state that and they'd be
13    maintained confidential, and that's what that
14    conversation was about.  I had forgotten about that.
15    Q.  Did the SEC provide you with -- with
16    something?
17    A.  With the confidentiality agreement that was,
18    I believe, filed in this case.
19    Q.  So actual -- let's just start with the
20    discussion.  When did -- did you have a discussion
21    with Ms. D'Allaird on or about Monday, December 30th?
22    A.  Yes, within a couple days after.
23    Q.  And how -- what's that?
24    A.  I said within a -- with -- around that time,
25    yes.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.      Jack Edward Neil, M.D.
January 28, 2020

---

Page 61

1    Q.  And how long was that discussion?
2    A.  Maybe five minutes.
3    Q.  And -- and what was said on that -- in that
4  discussion?
5    A.  Basically that the SEC couldn't provide --
6  that if I needed counsel, I'd have to provide my own
7  counsel, which is why I called Jason to ask him if I
8  needed counsel, and then that there would, at least,
9  be this confidentiality agreement that was filed, or I
10  don't know what the term is, but something that
11  provided the ability to label certain items
12  confidential if we didn't want them released.
13    Q.  And was it -- when you called Jason, the
14  attorney, was that the -- that was the first time you
15  had reached out to him?
16    A.  After this, correct.
17    Q.  After this discussion?
18    A.  Correct, 'cause I didn't want to spend the
19  money on an attorney.  It's the ...
20    Q.  Yeah.  Okay.  I want to shift gears here for
21  a second and turn to the topic of cryptocurrencies.
22    A.  Okay.
23    Q.  When was -- when did you first become aware
24  of Bitcoin?
25    A.  Maybe 2013 or '12, something like that.

---

Page 62

1    Q.  And how did you come to be aware of Bitcoin?
2    A.  Probably the news, or I think I saw an
3  article on Yahoo way back then.
4    Q.  And did at some point you start -- start
5  mining Bitcoin?
6    A.  Correct.
7    Q.  And when did you do that?
8    A.  After that, at some point after that, so
9  maybe 2013 through '15.
10    Q.  And did you make any investments in -- in
11  computer equipment or the like in order to --
12    A.  Yes.
13    Q.  -- to mine Bitcoin?
14    A.  Yes.
15    Q.  About how much did you spend to invest in
16  equipment to do that?
17    A.  Probably 2,000 to $3,000 to buy GPUs and
18  computer motherboards and that stuff.
19    Q.  And over what time did you mine Bitcoin?
20    A.  2013 to '15, approximately.
21    Q.  And about how much Bitcoin did you mine
22  during that period?
23    A.  Oh, I have no idea 'cause I didn't mine
24  Bitcoin specifically.  I mined Ethereum or other
25  things, and so I --

---

Page 63

1    THE COURT REPORTER:  I mined?
2    THE WITNESS:  Ethereum, E-T-H-E-R-E-U-M, and
3  other tokens, so I don't know what the equivalent
4  in Bitcoin would be, but it -- it may have broken
5  even overall.
6  BY MR. CADIGAN:
7    Q.  You mean that the -- about 2 -- you made
8  about $2,000 in your mining activities to offset
9  the --
10    A.  Probably, yes, 'cause of the electrical
11  cost. I did it in Michigan because it heated my
12  apartment for free.
13    Q.  Did you ever buy -- well, start with Bitcoin
14  for a second.  Did you ever -- did you ever buy any
15  Bitcoin?
16    A.  At some point I probably bought some on
17  Coinbase, but not a significant amount.
18    Q.  Do you recall approximately how much in
19  dollar figures --
20    A.  Maybe --
21    Q.  -- at the time?
22    A.  Maybe a thousand dollars, total, over -- I
23  mean, over forever, maybe a thousand dollars.
24    Q.  And did you ever sell any Bitcoin?
25    A.  Yes.  Approximately how much, mostly it was

---

Page 64

1  to pay taxes.  So, I mean, over the -- do you want sum
2  totals now?
3    Q.  Yeah, sure.
4    A.  Okay.  So, I mean, over -- because I can't
5  separate out by year in my head, but probably over --
6  from 2012 to now, the value of -- had kind of peaked
7  back in 2017 or '18, and it -- I don't know how to
8  define this because I -- if you would -- if you
9  include the Kin token values and stuff, it messes
10  everything up, but I -- I probably cashed out about
11  $250,000 over that whole time, and about 200,000 of
12  that was paid in taxes.
13    Q.  But $250,000 in Bitcoin?
14    A.  Which token was cashed out, I'm not sure,
15  but through Coinbase, so it may have been selling of
16  Ethereum or Bitcoin or some other item on Coinbase.
17    Q.  Okay.  Well, and we can -- so I want to get
18  a sense of the other cryptocurrency so we have a sense
19  of the universe, but before we do that, just so I have
20  a sense of your involvement with blockchain and
21  cryptocurrencies, have you ever spoken on any panels
22  regarding blockchain technology?
23    A.  I did one which was the -- so I guess I've
24  done maybe one panel, which was the one in Atlanta
25  that -- I think it's on the LinkedIn page, the

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.
Videotaped
Jack Edward Neil, M.D.
January 28, 2020

---

Page 65

1 Patientory panel a couple of years ago, speaking about
2 using it for -- for medical device security purposes,
3 so it was more about blockchain than cryptocurrency.
4 I've never spoken on cryptocurrencies, but I have on
5 blockchain.
6      Q.   And where -- where was -- when was this
7 panel?
8      A.   Atlanta -- it's in the LinkedIn reference, I
9 believe.
10     Q.   Okay.
11     A.   Patientory, May 2018 in Atlanta, Georgia, on
12 the front page of that.
13     Q.   But you -- you've never -- you've never
14 spoken on any panels on cryptocurrencies?
15     A.   Correct.
16     Q.   What about blog posts, have you -- have you
17 done any blog posts on cryptocurrencies?
18     A.   I don't think I've ever written a blog post
19 at all, so.
20     Q.   On any topic?
21     A.   On anything, I don't believe.
22     Q.   What about social media?  Have you -- have
23 you made -- put any -- made any social media posts
24 regarding blockchain technology?
25     A.   I probably made some post related to

---

Page 66

1 blockchain or cryptocurrency, but not as an influencer
2 status, just as me sharing a news article or
3 something, but I -- I would not be able to recall what
4 they were.
5      Q.   Have you posted anything -- and, actually,
6 how -- do you have -- do you have any -- do you post
7 regularly on a particular social media site?
8      A.   No, no.  Less than once a week.
9      Q.   Okay.  On what -- on what site?
10     A.   Probably LinkedIn.  Yeah, I don't use
11 Facebook anymore, and then I never use Twitter, so
12 LinkedIn.
13     Q.   And -- and so on -- LinkedIn would be the
14 only social media site that you would post on?
15     A.   Correct.
16     Q.   Do you -- do any of your entities have a
17 Twitter page or, I mean, a Twitter site or --
18     A.   Not really.  Mostly LinkedIn.
19     Q.   -- Twitter account?  Sorry.
20     A.   Yeah, I mean, I have a Twitter account.  I
21 don't think any of the entities have a -- there's
22 definitely not any active Twitter account from --
23     Q.   Yeah.
24     A.   -- from any of them.
25     Q.   Okay.  And have you ever posted anything on

---

Page 67

1 social media regarding blockchain or cryptocurrencies
2 anonymously or through a pseudonym?
3      A.   I do not believe so, no.
4      Q.   And so when we turn to your activity with
5 cryptocurrencies, and you had mentioned Coinbase, when
6 did you -- first of all, what is Coinbase?
7      A.   A way to convert fiat currency into
8 cryptocurrencies.
9      Q.   And when did you first start using Coinbase?
10     A.   Probably within a year of when it started,
11 so maybe 2013.
12     Q.   And have you used any other exchanges?
13     A.   Yes, I've used -- I used Bittrex for a
14 while, B-I-T-T-R-E-X, and then I had an account at
15 Binance.  I don't think I ever traded on Binance.  I
16 used Mint -- MintPal before it got robbed and Cryptsy
17 before the firm ran off with everyone's money --
18 sorry, before Verm ran off with everyone's money -- or
19 Vern.  I think that's all.
20     Q.   Again, how did you come to choose those
21 exchanges?
22     A.   Just, they were trustworthy and pretty
23 widely regarded with some transparency of ownership,
24 too.
25     Q.   Okay.  We've been going a bit.  Can we take

---

Page 68

1 a break?
2      A.   Yes.
3           THE VIDEOGRAPHER:  The time is 11:28 a.m.
4 We're going off the record.
5           (RECESS TAKEN)
6           THE VIDEOGRAPHER:  The time is 11:38, and we
7 are on the record.
8           MR. CADIGAN:  Are we all set?  Okay.
9 BY MR. CADIGAN:
10     Q.   So going back to Bitcoin, what prompted you
11 to be -- to have involvement with Bitcoin?
12     A.   It was a fun -- building the rig was a fun
13 technical challenge, and I always like building, you
14 know, computer stuff, so it's a fun technical
15 challenge that might earn some money.
16     Q.   And did you do any research into Bitcoin
17 before you did it?
18     A.   I'm sure I read plenty, but I don't recall
19 specifically what I read.
20     Q.   Okay.  And then -- and then you mentioned
21 also that you mined Ether.  Right?
22     A.   Correct.
23     Q.   When did you first become aware of Ether?
24     A.   I remember when Vitalik -- when it first
25 came out as -- I believe it was an ICO when it first

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Jack Edward Neil, M.D.
January 28, 2020

Page 69

1  came out, but I didn't participate in that.  I
2  remember when it -- when that came out, but it was
3  just another token at that time.
4      Q.  But at some point you started mining Ether
5  as well.  Right?
6      A.  Right, because you couldn't mine Bitcoin
7  with GPUs, and I made a GPU rig.
8      Q.  And -- and did you ever buy any Ether?
9      A.  Yeah.  I bought -- maybe early 2017 or in
10  20 -- 2016 or '17, I bought probably $15,000 worth of
11  Ether, just direct purchase.
12      Q.  And you did that on Coinbase?
13      A.  I believe so, yes.
14      Q.  And why did you do so?
15      A.  It just seemed like Ethereum was -- they
16  were building the consortium with Microsoft and they
17  were -- looked like the use case for Ether wasn't just
18  as a currency.  It was a -- a platform, and it had a
19  lot of -- great foundation backing it, lots of
20  support, and Vitalik, who is amazing.
21      Q.  And what -- so what research did you do into
22  Ether before you purchased?
23      A.  I mean, I -- I just -- I read every day
24  news, so I just, over time, had read about it.
25  Nothing in particular, specific that I recall.

Page 70

1      Q.  So do you -- you don't recall actually going
2  out to -- to do directed research on Ether before
3  purchasing it?
4      A.  Not specifically.  I had read about it
5  slowly over time, but it had been out for a long time.
6  It had probably been out two years, three years before
7  I purchased any.
8      Q.  And do you still hold Ether?
9      A.  Yes.
10      Q.  And have you sold Ether since you've
11  purchased it, any --
12      A.  Yes.
13      Q.  -- any Ether?
14      A.  I would -- I would include that in that sort
15  of 250 total that I said I sold.  Some of that would
16  have been Ether, yes.
17      Q.  And just to be clear, you mentioned selling
18  approximately 250,000 --
19      A.  Correct.
20      Q.  -- dollars worth of -- of cryptocurrencies,
21  and that includes all the cryptocurrencies that
22  you've --
23      A.  Correct.
24      Q.  -- purchased?  Did you do that in one large
25  sale or over time?

Page 71

1      A.  No, over time.
2      Q.  And what prompted your sales?
3      A.  Paying taxes.
4      Q.  Any -- any other reasons?
5      A.  Not really.
6      Q.  And was it always to coincide with the
7  payment of taxes?
8      A.  Basically.  There may have been 20,000 at
9  some point to pay credit card or something, but
10  basically the -- 90 percent was to pay taxes.
11      Q.  And when you chose which -- which
12  cryptocurrencies to sell to pay taxes, how did you go
13  about choosing which one to sell?
14      A.  At the time, Coinbase -- it was through
15  Coinbase, so it was basically what tokens could you
16  sell on Coinbase, which at the time there weren't many
17  choices, so basically that.
18      Q.  And from the period starting in 2000 -- the
19  start of 2017 to the present, have you -- have you
20  actively followed cryptocurrency market -- actually,
21  let me step back.
22          Have you followed -- have you -- well,
23  first, let me -- let me ask that question.  Have you
24  followed the cryptocurrency market actively since
25  2017?

Page 72

1      A.  I check once a month or so, not -- not as
2  actively as I used to be, but I still check maybe once
3  a month on prices, on -- I read CoinDesk, the top
4  news, but about once a month probably.
5      Q.  So you -- once a month you check your --
6  your CoinDesk account?
7      A.  So I check Coinbase --
8      Q.  I mean Coinbase account, yeah.
9      A.  -- account and then look at some CoinDesk or
10  somewhere sort of for news.
11      Q.  Uh-huh.  And do you still have active
12  accounts at the other exchanges?
13      A.  I don't think my Bittrex one is active or
14  Binance.  The only one I've logged into in a year or a
15  year-and-a-half is Coinbase.
16      Q.  So actually -- and you had mentioned
17  Bittrex.  When did you have a Bittrex account?
18      A.  From probably 2015, maybe, or '14 through --
19  and the last time I logged in was a year-and-a-half or
20  so ago.
21      Q.  But do you still have that account?
22      A.  Maybe.  I -- you can't technically close it,
23  so I guess it's still technically an account.
24      Q.  Do you have -- do you have any crypto-
25  currencies in that account?

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                     Jack Edward Neil, M.D.
January 28, 2020

Page 73

1      A.  I don't think so.  I think I moved
2  everything out.  That's why I haven't logged in.
3      Q.  Okay.  What about Binance?  What -- during
4  what period did you have an account?
5      A.  I don't know.  That would have been for
6  maybe a week when I logged in to try to check it out.
7  I don't -- I -- it was never a very active account,
8  and I don't think I have anything in there.  I hope I
9  don't have anything in there.
10      Q.  And when was that?
11      A.  Maybe 2017.
12      Q.  And what about MintPal?
13      A.  That would have been further back.  Exact
14  dates, I don't know, but I had an account until it
15  got -- like, Mulah or someone bought it and then took
16  all the money, so I had an account at that point.
17      Q.  But, I mean, do you recall what period you
18  started?
19      A.  I'd say I had an account there for probably
20  two years before that event, so whenever that event
21  was, two years -- I had an account for maybe two
22  years.
23      Q.  And then Cryptsy, when did you have that
24  account?
25      A.  Again, about the same timing as MintPal, so

Page 74

1  about two years before Cryptsy, you know, disappeared.
2      Q.  Had you ever -- have you ever tried to sell
3  a token on a -- on an exchange other than Coinbase?
4      A.  For fiat currency, you mean convert it to
5  cash?
6      Q.  Or just -- just to sell it -- I mean,
7  dispose of it in any -- in any --
8      A.  Convert it between cryptocurrencies, yeah,
9  those exchanges we just discussed.
10      Q.  You've -- you've done that on those
11  exchanges?
12      A.  Yes.
13      Q.  During what period?
14      A.  The whole, up until -- yeah, I haven't
15  traded hardly anything in a year or so, but up -- from
16  2013 and through then, throughout that time period.
17      Q.  And so on those exchanges, you would
18  exchange cryptocurrencies you had for other crypto-
19  currencies?
20      A.  Correct, yes.
21      Q.  And I -- just going through some of the
22  other -- the other cryptocurrencies that you
23  purchased, did you own any Ripple?
24      A.  Yes.
25      Q.  Okay.  When did you first become aware of

Page 75

1  Ripple?
2      A.  You're going to get into a lot of generic
3  answers because if -- there's a lot of cryptocurrency
4  that I'm not going to recall, but I would say for most
5  other cryptocurrencies, the alt currencies, I'd call
6  them, from 2014 or '15 through '17, I was paying
7  attention or watching them.
8      Q.  And I -- and I do apologize, but I do -- I
9  do want to ask you about the other cryptocurrencies.
10      A.  Okay.
11      Q.  But in case any of these are different --
12      A.  Okay.
13      Q.  -- what prompted you to buy Ripple?
14      A.  I bought it during the price spike for a
15  short trade back in 2017 or '16.
16      Q.  And what do you mean by that?  I mean,
17  when -- when the Ripple price spiked, you purchased at
18  that time?
19      A.  Just when the whole cryptocurrency space was
20  exploding there for six months to a year, I traded
21  pretty actively between tokens.
22      Q.  And what do -- I mean, just so we have -- we
23  have an understanding, what do you consider that
24  period to be when the cryptocurrency market was most
25  active?

Page 76

1      A.  It was whatever year that it was going up
2  through December.  I think that was '17.
3      Q.  So 2017 is the best of your memory?
4      A.  Yeah, I believe that's -- yeah, and if you
5  look at a graph, you'll -- we can validate.
6      Q.  And just to be clear -- and you may have
7  already answered this -- but to be clear, was there
8  anything about -- did you do any research into Ripple
9  prior to purchasing?
10      A.  Again, those that had been around a long
11  time, I had been reading about, and I've been in the
12  space and reading a lot about many alt currencies.
13  So, you know, I had read about them.  I was very
14  active.  I read CoinDesk twice a day from 2015 through
15  '17 or something.  I just -- nowadays I don't do it
16  much, but yes, I mean, it had been a slow learn over
17  years.
18      Q.  And what was it about Ripple in particular
19  that caused you to buy?
20      A.  Oh, nothing.  I don't like Ripple.  It was
21  just a quick trade.
22      Q.  So you made -- you made that trade
23  without -- I mean, there was nothing about Ripple in
24  particular that caused you to buy that --
25      A.  No, that was a --

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Jack Edward Neil, M.D.
January 28, 2020

Page 77

1    Q.  -- trade -- purchase it?
2    A.  That was a short term.  In the words of Jim
3  Cramer, that was a trade, not an investment.
4    Q.  And what do you mean by that?  I mean, you
5  chose to -- to acquire some Ripple.  Right?
6    A.  Yeah, to get rid of it shortly thereafter at
7  a higher price.
8    Q.  Oh, so you -- you saw it spiking --
9    A.  Yes.
10    Q.  -- at that time?  So you -- it was -- it was
11  more the momentum of Ripple --
12    A.  Correct.
13    Q.  -- than anything else that caused you to
14  purchase?
15    A.  Correct.
16    Q.  Did you do any other research into Ripple
17  prior to making the purchase?
18    A.  Again, other than having kept up with many
19  different currencies, including Ripple, for years,
20  nothing specifically at that time, no.
21    Q.  Okay.  Were there any other cryptocurrencies
22  that you purchased because you saw that the -- the
23  token value was rising and you wanted to make a -- a
24  quick profit?
25    A.  Yeah, during that year, I traded pretty

Page 78

1  actively between different cryptocurrencies,
2  alternative cryptocurrencies, switching between them
3  frequently, but only with ones that I knew that at
4  least there was some foundational -- I didn't trade
5  into what I call junk coins that were -- that had no
6  substance.  Even the trades I made were on somewhat
7  legitimate coins that had been around for a while.
8    Q.  But, I mean, can you identify any others
9  where, I mean, the primary reason you purchased was
10  that its price seemed to be rising and you wanted to
11  make a quick profit?
12    A.  I'm trying to think of specifics.  I mean,
13  there are probably 10 or 20 of them.  If you come
14  back, I'll think about it and try to come back with
15  examples of other ones, but yes, there are -- there
16  would have been other ones similar to Ripple.
17    Q.  You said there were 10 or 20.  You mean you
18  purchased as many as 10 or 20 different crypto-
19  currencies?
20    A.  Trading sort of some of the same money
21  between them, yes.
22    Q.  And I really don't want to make this a
23  memory test, but can you -- can you identify the
24  cryptocurrencies that you recall?
25    A.  I said I'd have to think about it for a few

Page 79

1  minutes.  I probably can recall them, but it's been a
2  while, and I can't recall them off the top of my head.
3    Q.  Okay.  Do any -- do any come to your -- to
4  mind right now?
5    A.  If you listed some and they -- I could
6  probably tell you.
7    Q.  Okay.  How about -- how about Monero?
8    A.  I don't think I ever traded Monero.
9    Q.  What about Litecoin?
10    A.  I did Litecoin, yes.
11    Q.  Okay.  And do you recall -- and you
12  purchased some Litecoin?
13    A.  Correct.
14    Q.  Okay.  Well, do you recall why you purchased
15  Litecoin?
16    A.  Momentum.
17    Q.  Anything -- any other reason?
18    A.  I mean, Dan Lee or, you know -- they had a
19  leader who was pushing hard and getting it attention
20  and, you know, hopefully getting it into more use, but
21  it had been around a long time, so.  And it basically
22  followed Bitcoin.
23    Q.  As a general matter, to what extent did
24  price momentum affect your decisions to purchase
25  cryptocurrencies?

Page 80

1    A.  Well, it depends on if it was an investment,
2  like Ethereum was more of an investment.  I'd hold it
3  for a long time.  These were more trades, so these
4  were more about if it started sinking, I'd get out.
5  Like, I -- I wasn't going to ride the wave down
6  because I didn't believe in the -- these were trades.
7    Q.  But with respect to the -- and by -- by
8  "trades," you're -- when you're making trades, you're
9  exchanging one cryptocurrency --
10    A.  Correct.
11    Q.  -- for another?  It's a form of payment.
12  Right?
13    A.  Correct.
14    Q.  You're acquiring the cryptocurrencies?
15    A.  Right, correct.
16    Q.  And so when you -- other than Ethereum, to
17  what extent did momentum play a role, market momentum
18  play a role in your decisions to purchase crypto-
19  currencies?
20    A.  Again, for the items that I was actively
21  trading, and by "actively trading," I mean, I meant to
22  hold no less -- no more than a week.  They were
23  short-term trades.  In those, it was almost purely
24  momentum except for on the back of some substance to
25  the entities.  So, you know, if it was a brand new ICO

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.      Jack Edward Neil, M.D.
January 28, 2020

Page 81

1  with momentum, I still wouldn't touch it.  It had to
2  have been an entity that had been around for a while
3  that caught some momentum.
4      Q.  What about in the case of Litecoin, had you
5  done any research into Litecoin prior to --
6      A.  Same as Ripple, I've been following it for
7  years, but nothing in particular.
8      Q.  So you knew that it had been around for a
9  while?
10     A.  Correct.
11     Q.  But there was nothing in particular other
12  than that, that it stood out to you?
13     A.  Not really, no.
14     Q.  What about Augur?
15     A.  I don't even remember what -- I don't quite
16  remember Augur, so I don't think I've -- I don't think
17  I've traded that.
18     Q.  Yeah.  What about CloakCoin?
19     A.  Yes.
20     Q.  Why did you purchase or trade for CloakCoin?
21     A.  They've been around a long time, a pretty
22  small market cap, but pretty active development team,
23  doing something that I thought would have some value,
24  which is, you know, untraceable, you know, or -- I
25  guess that's the right word, untraceable transactions.

Page 82

1  So I thought that that was a good use, a good market,
2  a good -- a good use that people would buy it for,
3  but, again, I believed in the development team and
4  the -- and I still hold some of that one.  That one I
5  still have as sort of an investment, even though it's
6  not been the greatest, but, you know, that one was a
7  small tranche of money, yeah.
8      Q.  And so when you say "an investment," what
9  is -- what are you investing in that -- in that
10  context?
11     A.  The development team, the -- you know, the
12  effort being put forth, the, you know -- you know,
13  I've -- I've tested the product.  I've used the
14  product and believe in it.
15     Q.  Okay.  In your opinion, what is the value of
16  the -- of CloakCoin based on?
17     A.  Just how many people want to use it.
18     Q.  How much -- how many want to use the token?
19     A.  Correct, yes.
20     Q.  And did you do any research other than -- I
21  mean, any specific research into CloakCoin prior to
22  acquiring it?
23     A.  I mean, I probably read their whitepaper,
24  but it had been -- this is -- so, I mean, this is five
25  years ago or something when I first started following

Page 83

1  CloakCoin, but, again, they've been around a long
2  time, and, you know, I've used their, you know, wallet
3  and tested it and checked for it, how well it worked,
4  and solved the problem they said they were solving,
5  which was making it untraceable, and so I did all
6  those things, so.
7      Q.  As a general matter, did you -- did you
8  review -- make a point of reviewing the whitepaper
9  before acquiring a token?
10     A.  Not for the trades, not if I was planning on
11  keeping something less than a week, I wouldn't read
12  the whitepaper.  So like Litecoin and stuff, I've
13  never read their whitepaper, but I've followed their
14  progress.  But for something like -- like CloakCoin, I
15  read theirs, and I think I read Ethereum's, but I'm --
16  I don't know.  It would have been eight years ago, so
17  I don't know.
18     Q.  Do you recall any other whitepapers you've
19  read?
20     A.  I mean, other than the Kin one, no.
21     Q.  Other than the Kin one.
22     A.  No.
23     Q.  And what about Tether?
24     A.  That's just -- that's just the U.S. dollar
25  token, I believe.  As long as that's -- I think that's

Page 84

1  just the U.S. dollar token.  That's basically pegged
2  to a dollar, so just a safe spot to sit your money,
3  so.
4      Q.  I'm sorry, just going back to CloakCoin, how
5  much -- how much CloakCoin did you purchase?
6      A.  I think like $30,000 --
7      Q.  And how --
8      A.  -- at the time when I got it, I think.
9      Q.  And how much CloakCoin do you currently own?
10     A.  I still -- I still have whatever the number
11  of tokens I bought back then.
12     Q.  And what about 0x?
13     A.  I think I traded it at some point, but I
14  don't -- not as an investment.  If I got into that, I
15  got -- no, sorry, no, no, 0x is a different one.  I'm
16  thinking of a -- 0x, I did hold 0x for a while.  I
17  don't really know why, honestly.  I think -- I think I
18  bought it 'cause it was one of the first ones to get
19  added to Coinbase, and a lot of things when they get
20  added to Coinbase went up in value, so it was still
21  more of a momentum play than an investment.
22     Q.  Uh-huh.  Now, when you're researching
23  these -- these cryptocurrencies, to the extent you do,
24  do you keep a folder on each of them?
25     A.  No, just ...

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                Jack Edward Neil, M.D.
January 28, 2020

Page 85

1    Q.  You just keep it in your --
2    A.  I don't write anything.
3    Q.  I mean, but do you keep, you know, Twitter
4  or PDFs or anything like that?
5    A.  No.
6    Q.  Okay.  So that would be unusual for you to
7  do so?
8    A.  Correct.
9    Q.  What about Stellar?
10    A.  I traded it.  I don't think I own any of it,
11  and I don't think -- I think I traded it.  It was a --
12  a trade.  That's the Stellar Lumens, I believe.  I
13  think I traded it in and out.  I don't think I own
14  any.
15    Q.  What about the Patientory?
16    A.  Patientory?
17    Q.  Yeah, Patientory.
18    A.  Yeah, that was the only other ICO I ever
19  invested in, but that one was because they were local,
20  they're out of Atlanta, I had known of the girl,
21  Chrissa McFarlane, who was -- and that's -- I ended up
22  doing something on their panel, but -- and it's
23  healthier, so it seemed to fit, so that's why I
24  invested in -- in that one.  I still expected to not
25  hold it more than six months, though.  Like, even when

Page 86

1  I invested in it, it was still more of a -- little bit
2  of a momentum investment, I'd say.
3    Q.  Uh-huh.  And when did -- when did you -- and
4  so you participated in their ICO?
5    A.  Correct.
6    Q.  Okay.  And when was that?
7    A.  It was either 2016 or '17.
8    Q.  And how much did you buy?
9    A.  I believe 20,000 U.S. dollars' worth,
10  something like that, but I don't recall completely.
11    Q.  And what research did you do into the coin
12  before you purchased it?
13    A.  I don't think -- I may have read their
14  whitepaper.  I don't remember if I read their
15  whitepaper.  I looked at sort of -- a lot of that one
16  was based off of where they were located.  They were a
17  U.S.-based company who had proximity local to me,
18  transparency of the ownership was, 'cause most of
19  these things you don't know who the owner is, so
20  knowing who's in charge, which was Chrissa, and she's
21  in Atlanta and she's doing healthcare, and I thought
22  the healthcare blockchain stuff was important.  So
23  I -- I don't think I read their whitepaper.  Just all
24  those pieces made sense to do it.
25    Q.  Did you -- what is -- what is the -- how

Page 87

1  is -- how is the token used in Patientory?
2    A.  I mean, I think they've -- I'm not quite
3  sure anymore.  The point where the time was, the token
4  was going to be -- so if you -- with healthcare
5  interoperability, when you transact your share
6  information, they were going to get paid to sort of
7  store and do the transaction.  So it was basically the
8  token was going to be the value of the
9  interoperability of the piece, and then I think they
10  changed now, so they might be trying to pay patients
11  as well or something.  I'm not sure.  I haven't
12  followed them in a year-and-a-half.
13    Q.  Do you know whether that -- that ICO was
14  registered with the SEC?
15    A.  They were not.  I'm pretty sure they were
16  not.  I don't think any of them were, to my
17  recollection.
18    Q.  What is the value -- in your opinion, going
19  into this -- this -- your decision to purchase -- I
20  mean to participate in the Patientory ICO, what was
21  your understanding of what the -- how the value of the
22  Patientory token was going to be set?
23    A.  I mean, it was based on use.  I mean, all
24  these were, at least in theory, based on use, so if
25  was more people used it, it would be worth more money.

Page 88

1    Q.  Uh-huh.  Okay.
2    MS. D'ALLAIRD:  Counsel, can you just
3    clarify what you mean when you ask him about
4    value, what you mean by value?
5  BY MR. CADIGAN:
6    Q.  Do you understand what I mean by value?
7    A.  I think you mean its value to me in monetary
8  terms.
9    Q.  Thank you.  Overall, have you made or lost
10  money on cryptocurrencies?
11    A.  Most of what I made went to taxes, but made
12  a little.
13    Q.  And so let's turn now to Kik.  Okay.  And
14  let's -- let's start with -- actually, let's start
15  with Kin.  When did you first hear about Kin, the Kin
16  token?
17    A.  I guess early 2017, via -- probably through
18  CoinDesk, some article on CoinDesk.
19    Q.  Do you -- I mean, as best you -- can you
20  recall, what was the first reference to the Kin token
21  that you recall?
22    A.  Just that, the best I could guess it would
23  be, or that I think it was, was around, you know, this
24  messenger company was going to create a token for --
25  to transfer value or to transfer money or currency or

U.S. Securities and Exchange Commissionv. Kivdotactpve, Inc.          Jack Edward Neil, M.D.
January 28, 2020

Page 89

1  whatever between users of the platform and then to
2  expand it and do other pieces with it, but it was tied
3  to the messenger.  The messenger was already in use.
4      Q.  And that -- to the best of your memory, that
5  was your first understanding of the --
6      A.  Yeah.
7      Q.  -- the Kin token?
8      A.  It was basically -- yeah, because what I
9  remember is just, most of the ICOs, they're just no
10  substance.  You know, when they release an ICO,
11  they've got a great idea, and it's like an early
12  startup that's got nothing to show, versus, you know,
13  Kik had a functioning messenger component, and it was
14  the first ICO I had seen that I thought actually had
15  legitimate venture backing in a legit -- like, it was
16  the least risky.  So that's -- I just remember when I
17  read that article, that's why I said, Ooh, I'm going
18  to follow this.
19      Q.  Uh-huh.  And had you been aware of Kik prior
20  to reading that article?
21      A.  Not really.  I mean, I think I had heard the
22  name, but I never used it or anything.
23      Q.  And obviously there -- there was a
24  reference, I mean, in the CoinDesk article you
25  indicated in about early 2017.  What -- what more did

Page 90

1  you do to follow the Kin token thereafter?
2      A.  I don't know if I -- I mean, there's a
3  chance that I registered.  I don't even remember if
4  they had a registration to be kept in the loop or
5  something.  Maybe I did, but I just kept my eyes open
6  on CoinDesk.
7      Q.  Did you have an alert or anything like that
8  or?
9      A.  Not like in a calendar or anything, no.
10  If -- it would have -- I may have, like, gone to the
11  web page and, like, put in my email address to be
12  notified or something.  I just -- I don't remember.
13      Q.  And so to be clear, you don't -- you don't
14  recall whether you did so or not?
15      A.  Correct.
16      Q.  And as we sit here today, you don't recall
17  receiving updates from the company regarding the Kin
18  token?
19      A.  Up and -- not up and to the ICO, no, I don't
20  recall.
21      Q.  So, I mean, at some point we'll get to that.
22  You do participate in the ICO?
23      A.  Correct.
24      Q.  And so as best you can recall, what did you
25  learn about the Kin token prior to the ICO?

Page 91

1      A.  I mean, I read the whitepaper, and I read,
2  you know, the main points that I remember, you know,
3  that just -- you know, what led me to do it is the
4  only part I super remember, but was just, you know,
5  it's a -- it's a token that's pegged or pinned to a
6  legitimate company that's already raised venture
7  capital, like, people have checked them out, like --
8  so you've got some trust there.  They're not going to
9  run off with your money.
10      And then it's deflationary.  They're not
11  going to make more tokens, so it's -- if more people
12  use it, it will be worth more money.  And so then it's
13  just, you know, then they have to build out all the
14  pieces to the platform.  And then there -- of course,
15  I don't think this was stated in the whitepaper or
16  anywhere initially, but the expectation is in the
17  cryptocurrency space, that if you're releasing an ICO
18  or releasing tokens, that you get on some exchange so
19  you're not locked into it for a long period of time.
20      So I don't know if that was in the
21  documentation anywhere.  I mean, later it was in some
22  sort of messaging, but not in the whitepaper, so that
23  expectation was there, but not -- not specifically
24  stated.
25      Q.  And a lot of what -- I mean, when did you --

Page 92

1  when did you review the whitepaper?
2      A.  I read that one before I invested, so I
3  don't know when, but before the date of the ICO.
4      Q.  Do you recall how -- how long before?
5      A.  I do not.  It wasn't the morning of, but I
6  mean, it was -- it was prior, prior.
7      Q.  What prompted you to -- as you indicated,
8  you don't -- you don't always look at the
9  whitepaper -- or rarely look at the whitepapers for --
10      A.  Right.
11      Q.  -- cryptocurrencies.  Right?
12      A.  Right, correct.
13      Q.  So what prompted you to do so here?
14      A.  Because I was going to put more money into
15  it because it was a -- tied to a legitimate company
16  who had raised venture capital.
17      Q.  And, again, you don't recall how long before
18  the ICO you -- or the whitepaper?
19      A.  It would have been within the month prior,
20  but whether it was a week ahead or -- you know,
21  somewhere in there.  I -- I don't recall.
22      Q.  I'm handing you what's been previously
23  marked as Exhibit 12.
24      (PREVIOUSLY MARKED EXHIBIT 12 WAS
25  REFERENCED)

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

---

Page 93

1    Q.   And this is the -- the whitepaper.  Correct?
2    A.   Correct.
3    Q.   And in -- in the whitepaper, I mean -- or
4    rather, you already knew it was -- I mean, Kik was a
5    legitimate operating company.  Correct?
6    A.   Correct.
7    Q.   And you knew that it was backed by venture
8    capital?
9    A.   Correct.
10   Q.   How did you know that?
11   A.   'Cause I had checked it out.  I mean, I -- I
12   looked at who Kik was.  I don't know where I looked,
13   maybe on Yahoo Finance.  I -- I don't remember where I
14   looked, but -- or maybe even CoinDesk listed it.
15   Somewhere I read that they were -- you know, who the
16   venture backers were.
17   Q.   And there's reference in -- in the
18   whitepaper to the ecosystem --
19   A.   Correct.
20   Q.   -- that was contemplated.  Correct?
21   A.   Correct.
22   Q.   And that -- and that was something that you
23   read prior to --
24   A.   Correct.
25   Q.   -- purchasing the Kin?

---

Page 94

1    A.   Correct.
2    Q.   Other than reading the whitepaper, what
3    other research did you do into the Kin token?
4    A.   It's -- I think before the ICO, I'm pretty
5    sure before the ICO, I downloaded the Kik app to play
6    with it because I did not have it.  I think I did that
7    before.  It may have been right after, but we'll just
8    have to check and see, but I'm -- I'm pretty sure I
9    did it before the ICO to check and see that it was a
10   functioning app and everything.  Otherwise, just --
11   again, just reading CoinDesk, going to the website,
12   but nothing in -- nothing else specific other than
13   those things.
14   Q.   Okay.  Did you look for any videos by -- by
15   Kik's CEO, Ted Livingston?
16   A.   I do not believe I did, no.
17   Q.   And you had indicated that there was an
18   expectation that the -- that Kik would be -- Kik token
19   would be on exchange, and I want to just be very
20   clear.  Did -- do you specifically recall any
21   statements by Kik that -- that they would be put on
22   exchanges?
23   A.   I think they were very careful, just like
24   every ICO, to not explicitly state that, but if no one
25   could buy the token, then the platform made no sense.

---

Page 95

1    So, I mean, for the actual platform to work, there has
2    to be an on-and-off ramp, so it's sort of -- even if
3    it's not stated, it -- the whole thing doesn't work
4    unless there's a way to transact, so it's just
5    assumed.
6    Q.   Okay.
7    A.   There's -- later there's something I
8    produced that was from some instant chatting that
9    people had posted on Reddit that I read when it came
10   out around, sort of, that particular item, but at the
11   time of the ICO, nothing specific.
12   Q.   Did you review any of Kik's financial
13   statements before buying Kin?
14   A.   No.
15   Q.   Do you recall how much approximately you --
16   how much Kin you purchased in the TDE?
17   A.   The number of Kin or the amount in dollars?
18   Q.   The amount in dollars.
19   A.   Like 130,000.
20   Q.   Yeah, does $138,408 --
21   A.   Yes.
22   Q.   -- seem about right?
23   A.   Yes, yes.
24   Q.   Just picking a number out there.
25   A.   It's -- it's around that, yes.

---

Page 96

1    Q.   And for that, is it true that you received
2    approximately 945 million Kin?
3    A.   It was a little more 'cause they did a bonus
4    or something.  It -- I think it turned out to be
5    1.1 billion.
6    Q.   Yeah.  I mean, I was thinking that in the
7    TDE or as part of the bonus, yes.  Okay.  You think --
8    you thought it ended up being about a billion Kin?
9    A.   Correct.
10   Q.   And -- and you purchased the -- how did you
11   go about purchasing the Kin?
12   A.   Sending tokens to the address in the ICO.
13   Q.   Okay.  Through the website?
14   A.   Yes.
15   Q.   And did you purchase any more Kin after the
16   TDE?
17   A.   No.
18   Q.   Do you still have your Kin?
19   A.   They never moved.
20   Q.   Okay.
21   A.   Well, they moved between Ethereum addresses,
22   but they've never moved to exchanges or anything.
23   Q.   Do you recall there being any caps on
24   purchases during the TDE?
25   A.   There was an initial cap, I think -- I don't

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.          Jack Edward Neil, M.D.
January 28, 2020

Page 97

1 remember the numbers or anything on this, but there
2 was an initial cap they were trying to let, at least
3 in the messaging, a widespread number of people
4 participate, and then when they didn't reach the
5 amount of money raised they wanted, they opened it up
6 for you to contribute more, so I did.  So initially I
7 had done the cap, and then when they opened it up for
8 more, I contributed more.
9         MR. CADIGAN:  241.
10        (EXHIBIT 241 WAS MARKED FOR IDENTIFICATION)
11        THE WITNESS:  Yeah, and one thing, if I may,
12 I mean, even in this document, there is -- a
13 deflationary statement is in here when it talks
14 about the value goes up as more people use it, so
15 I mean, that's -- it was somewhere in here.  It's
16 highlighted in the version I had, for what it's
17 worth.  The statement in -- the statement that
18 says, The value will go up as more people use it.
19 BY MR. CADIGAN:
20    Q.  Right.
21    A.  Because it's a deflationary currency.  Like,
22 those statements are in here somewhere.
23    Q.  And so, I mean, it was your --
24        MS. D'ALLAIRD:  And just to clarify for the
25 record, you're pointing --

Page 98

1        THE WITNESS:  To the --
2        MS. D'ALLAIRD:  -- to Exhibit 12.
3        THE WITNESS:  -- Exhibit 12, the whitepaper.
4        MS. D'ALLAIRD:  Thank you.
5 BY MR. CADIGAN:
6    Q.  And so it was your understanding that as
7 more people used the token, its value would go up?
8    A.  Right.
9    Q.  And, frankly, that was similar to your
10 understanding of a lot of the other cryptocurrencies
11 that were out there, is they -- the more they were
12 used, the more their value would go up?
13    A.  Tokens like this, yeah, yeah, the ones --
14 ones that are based on a fixed supply and increased
15 usage.  Not all are based that way, but for the tokens
16 set up like that.
17    Q.  Okay.  I'm handing you what's -- or you've
18 been handed what's been marked as Exhibit 241.  This
19 is the -- a document that you prepared.  Is that
20 right?
21    A.  Correct.
22    Q.  And you provided it in response to the
23 subpoena?
24    A.  Correct.
25    Q.  And it lists six different transactions for

Page 99

1 Kik.  Is that right?
2    A.  Correct.
3    Q.  And those -- and as it reflects, you made
4 purchases on September 12th, 2017, September 13th,
5 2017, and three other purchases on September 25th,
6 2017, and received a bonus on September 25th, 2015 --
7 2017.  Is that right?
8    A.  Correct.
9    Q.  Why did you break up these purchases in this
10 manner, rather than making them all at once?
11    A.  I mean, I think the initial -- like, the --
12 some of it was because where I was sending the Ether
13 from was different, so like sometimes the Ether was in
14 different addresses or different wallets 'cause I
15 didn't keep everything in one spot.  Some was because
16 they had locked down -- they had the cap initially and
17 opened it up.  I think that's why that week was -- or
18 that two weeks' difference.
19        The 12th and 13th, I'm not quite sure why
20 those are split.  Maybe I had 15 on one exchange or in
21 one wallet, or maybe I was testing the -- I don't
22 normally send a bunch at once in case you get the
23 address wrong, so that might have been a test send
24 before I sent the rest, but the 25th is when it was
25 opened up 'cause they didn't fill the round -- or they

Page 100

1 didn't fill the amount they wanted to fill.
2    Q.  Did you have an -- at the time you made the
3 purchase, did you have an understanding of why the
4 purchases were capped?
5    A.  You mean the -- the initial cap on, like,
6 how much we could contribute?
7    Q.  Correct.
8    A.  Yeah, the understanding, at least the
9 messaging around it was, it was to more widely
10 distribute the -- the tokens to a wider audience so
11 five people don't own all of them.
12    Q.  And is it fair to say that when you
13 purchased the Kin, you thought that the -- the vision
14 of a decentralized ecosystem that's reflected in the
15 whitepaper made sense to you?
16        MS. D'ALLAIRD:  Objection.
17        THE WITNESS:  Mostly what I trusted was the
18 fact it was tied to a legitimate, growing
19 company, like, and Kik was a --
20        THE COURT REPORTER:  Tied to a legitimate?
21        THE WITNESS:  Growing company, like the Kik
22 had a user base.  I'm trusting that their
23 investors invested in Kik because they knew them
24 and trusted in them, and so then I'm tagging
25 along basically as an investor to them.  That was

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

Page 101

1    mostly it.  Everybody's whitepaper says about the
2    same thing as the Kin's whitepaper.  It wasn't
3    the whitepaper that sold me.  It was that trust
4    in the following the -- following the lead.
5    BY MR. CADIGAN:
6       **Q.  But the whitepaper describes what the**
7    **contemplated use of the token would be.  Right?**
8       A.  Correct.
9          MS. D'ALLAIRD:  Objection.
10   BY MR. CADIGAN:
11      **Q.  And that -- that use of the token was going**
12   **to be use as a currency in a decentralized system.**
13   **Correct?**
14         MS. D'ALLAIRD:  Objection.
15         THE WITNESS:  Correct, but, I mean, that's
16   what every ICO says, and I didn't invest in every
17   ICO.  I invested in this one 'cause it was tied
18   to what I felt was trust.  I -- this whole space,
19   the only time I sent money to anything was around
20   trust.  And this was a trust of, I'm following
21   people who have done due diligence, and that's --
22   that's why I put so much money into this one.  I
23   thought it was my opportunity to invest into a --
24   you know, to something that people who -- you
25   know, a venture believed in, so that -- that's

Page 102

1    the reason why I chose this particular one.
2    BY MR. CADIGAN:
3       **Q.  But if it didn't make sense, you wouldn't**
4    **have invested in it.  Right?**
5          MS. D'ALLAIRD:  Objection.
6          THE WITNESS:  I don't quite know how to
7    answer that.  I mean, if they had come out and
8    said they were going to sell, you know, ponies
9    for lots of money or something, yeah, sure, I
10   mean, that's silly, but anything that fit the
11   mold of ICOs of this type of platform at the
12   time, this is sort of not that different from all
13   the other ICO whitepapers around the time.
14   BY MR. CADIGAN:
15      **Q.  Wait, but are you saying that the -- I mean,**
16   **I -- I mean, you read the whitepaper.  You read that**
17   **with a purpose.  Right?**
18      A.  I mean, I read it, yes, to -- to just -- to
19   see what their goal was, but it was very cookie-cutter
20   to what a lot of other companies are push -- or ICOs
21   were pushing --
22      **Q.  But --**
23      A.  -- which is a platform that people will use,
24   and then it will be worth more money.
25      **Q.  But is it -- I'm sorry.**

Page 103

1       A.  Yeah, that is, you know, a platform that
2    people will use, and then it will be worth more money
3    'cause people are using it.  The difference in this
4    and those is that this one was tied to a legitimate
5    company, domestic company that I felt like I could
6    trust.
7       **Q.  I mean, did you read to see whether or not**
8    **the plan they had for people using the token made**
9    **sense?**
10      A.  I mean, I --
11         MS. D'ALLAIRD:  Objection.
12         THE WITNESS:  -- I read it.  I mean, it
13   makes -- all these things make sense in theory
14   until you execute.  So, I mean, transferring
15   money, I mean, it's the same thing Facebook's
16   doing with Libra, ways to transfer digital money.
17   It's all about how big you can grow your
18   ecosystem.  It makes sense if you do it, but the
19   reason I trusted they could do it is 'cause they
20   were tied to legitimate people who I thought had
21   checked into all those things.
22   BY MR. CADIGAN:
23      **Q.  Yes, but to be clear, at the time you**
24   **purchased, the plans set forth in the whitepaper did**
25   **not, not make sense to you?**

Page 104

1       A.  Correct.
2          MS. D'ALLAIRD:  Objection.
3          THE WITNESS:  Correct.
4    BY MR. CADIGAN:
5       **Q.  Prior to your purchase, did you follow any**
6    **of Kik's social media channels?**
7       A.  I don't think so, no.
8       **Q.  Do you recall anything from any of their**
9    **social media channels that influenced your decision to**
10   **buy Kin?**
11      A.  No.
12      **Q.  Do you have a Reddit account?**
13      A.  I do.  Quite inactive Reddit account, but a
14   Reddit account.
15      **Q.  Did you review -- did you review any Reddit**
16   **posts about Kik before the TDE?**
17      A.  I'm not sure.  I -- I mean, maybe.  I
18   followed them more afterwards than before, but I'm not
19   a hundred percent sure about ahead of time.
20      **Q.  Do you -- did you -- do you recall any posts**
21   **from Kik on Reddit?**
22      A.  Ahead of time, no.
23      **Q.  How did you think Kin would be used once the**
24   **platform was launched?**
25      A.  I don't know.  I mean, things change in

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

Page 105

1  companies.  I figured they'd change from whatever they
2  said and find a way to make it make money.  I -- I
3  don't know.  I mean, it would be used to transfer
4  value between users and different platforms and all
5  these things that everyone says they're going to do.
6  I just trusted they'd execute it, so transferring
7  money around on the Internet.
8      Q.  At the time you -- prior to your purchase,
9  did you have an understanding as to how Kin would be
10 used once it was launched?
11     A.  Prior to my purchase.  I went from -- from
12 this, but this is, again, pretty cookie-cutter
13 explanation of a platform token value model, so, I
14 mean, I -- when I read it, it's not so different.  So,
15 yes, I did understand how it was intended to be
16 valuable.
17     Q.  And you're saying -- and when you're saying
18 based on this, you're -- you're pointing to the
19 whitepaper.  Right?
20     A.  Correct, yes.
21     Q.  Did you have an understanding that -- that
22 Kin -- prior to your purchase, did you have an
23 understanding that Kin was -- planned to be used to
24 buy goods and services?
25     MS. D'ALLAIRD:  Objection.

Page 106

1      THE WITNESS:  Not -- not physical goods and
2  services as that -- virtual goods and services.
3  BY MR. CADIGAN:
4      Q.  But did you have an understanding that at a
5  minimum, Kin could be used to buy virtual goods and
6  services?
7      A.  Yes.
8      MS. D'ALLAIRD:  Objection.
9      Q.  At the time you purchased, did they think --
10 did you think that it was going to be possible that
11 you might use Kin yourself to buy digital goods or
12 services?
13     A.  No.
14     Q.  Was it your understanding when you purchased
15 that other people might be able to use Kin to buy
16 virtual goods and services?
17     A.  Yes.
18     Q.  Are you aware of a concept called "micro-
19 payments"?
20     A.  Vaguely, yes.  I mean, I -- yes.
21     Q.  What -- what's your understanding of what
22 that is?
23     A.  Just small payments that are too expensive
24 to do via traditional payment models.  So, you know,
25 the cost to pay for a piece of gum with a credit card

Page 107

1  is more expensive than the gum, so ways to be able to
2  transact a penny across -- between people without the
3  transaction fee being so high, way to keep that cost
4  down.
5      Q.  And at the time you -- you purchased, did
6  you believe that Kin might one day be used for
7  micropayments?
8      A.  I -- I don't know.  I mean, that wasn't
9  something I thought about.
10     Q.  In -- in your -- I mean, at the time you
11 purchased, what was your understanding of what -- of
12 how Kin would ultimately become successful?
13     A.  That because they were -- you know, again,
14 I'll -- can I reference something that makes an
15 example --
16     Q.  Sure.
17     A.  -- to make it make more sense?  So kind of
18 like what -- again, like the Facebook Libra action has
19 been -- sort of become the way to have a trusted
20 entity who's backing a virtual currency was what I
21 believed in more than anything else.
22     How that ended up being, there's so many
23 pieces here that would change over time.  It wasn't
24 that I thought the whitepaper would be the end-all,
25 be-all executed vision, but that tie to that

Page 108

1  legitimate entity was -- was what I thought.  They'd
2  find a way to make it valuable, and it would probably
3  be just trusted currency transactions through
4  different softwares.  They could maybe build -- help
5  fund that with some of the money.  I don't know.  I
6  figured they'd find a way.  I -- I was investing in
7  the trust of them.
8      Q.  And so as you invested, it was your -- your
9  thought that whatever the company's initial stage was,
10 it would eventually modify and develop?
11     A.  Yeah, I mean, that was -- yes.
12     Q.  And, again, just putting in the -- with
13 reference to what was in the whitepaper, what was your
14 understanding, I mean -- and I understand you say this
15 is cookie-cutter, but what was your understanding of
16 what the Kin ecosystem was proposed to be?
17     A.  That, you know, anyone with a need to handle
18 payments across the Internet would use this payment
19 system to do it, basically, and that they would help
20 develop some of the piece -- you know, they'd have --
21 they'd build the foundation, which is really just the
22 blockchain, and then they would foster and push, you
23 know, development of companies to build and use it or,
24 you know, just have that trust that they -- they were
25 a known entity in a domestic location that would be

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.          Jack Edward Neil, M.D.
January 28, 2020

Page 109

1  the backing behind it, so.
2      Q.  Did you have any understanding as to what
3  role vendors or developers other than Kik would play
4  in the ecosystem?
5      A.  Say that one more time.
6      Q.  Yeah.  Did you have any understanding as to
7  what role vendors or developers other than Kik would
8  supposedly play in the Kin ecosystem?
9      A.  I mean, in the vision, it is that, you know,
10 having that ability to pay would allow other entities
11 building other things to use that for payments.
12 That's, I think, the -- I think that answers the
13 question.
14     Q.  And was it your understanding that those
15 other developers and vendors could participate on the
16 Kin ecosystem?
17     A.  You mean transact using the Kin token?
18     Q.  Yes.
19     A.  Yes.
20     Q.  Have you followed the Kin ecosystem's
21 progress to date?
22     A.  I mean, I quit probably a year ago, I mean,
23 when it comes to following daily other than with this
24 action.
25     Q.  Let's turn to another concept.  What's your

Page 110

1  understanding of the term "blockchain"?
2      A.  Oh, you want my official -- umm, so it's a
3  distributed recordkeeping system that can't be
4  modified or changed once created, and it's verifiable
5  via, you know, cryptographic hashes.  I'll help you
6  with that later.
7      Q.  And what was -- what's your understanding of
8  the concept of decentralized in the context of
9  blockchain technology?
10     A.  That the nodes that are housing the ledger
11 are not all in one location.
12     Q.  And you understood at the time you purchased
13 that the Kin token's function on blockchain
14 technology.  Right?
15     THE COURT REPORTER:  I'm sorry, the Kin?
16     MR. CADIGAN:  Token's function on blockchain
17 technology.
18     MS. D'ALLAIRD:  Objection.
19     THE WITNESS:  Yeah, I don't think Kin knew
20 at the time either.  I mean, they started on a
21 different ecosystem and realized that didn't make
22 any sense, and then they switched to another one,
23 so, I mean, I just figured they'd figure it out.
24 I think they started on Stellar and -- or they
25 started on Ethereum and went to Stellar or

Page 111

1      vice-versa or -- think they didn't quite
2      understand, I don't think, how they were going to
3      use it either.
4  BY MR. CADIGAN:
5      Q.  No, but they -- you understood that they
6  were starting off on a -- a blockchain platform?
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  I understood, yeah, they were
9      on Ethereum.
10 BY MR. CADIGAN:
11     Q.  Do you know what an ERC 20 token is?
12     A.  It's the Ethereum -- it's an Ethereum token.
13 It's a standard for a certain type of Ethereum token.
14     Q.  And was it your understanding that the
15 original Kik tokens were ERC 20 tokens?
16     A.  Correct, as were 95 percent of them during
17 that time period.
18     Q.  Okay.  Are you aware that Kik recently sold
19 its messenger application?
20     A.  Yeah, I saw they first were going to dump
21 it, and then they found a buyer, so, yes.
22     Q.  And do you know what effect, if any, that
23 had on the activity of Kin on the ecosystem?
24     A.  Oh, I don't know.  I've considered the whole
25 thing dead for a year-and-a-half, so I -- I don't

Page 112

1  know.  That's why a lot of these things I don't
2  remember very well because I kind of put it out of my
3  mind.
4      Q.  And so when you first bought your Kin
5  tokens, they were ERC 20 tokens on the Ethereum
6  blockchain.  Correct?
7      A.  Correct.
8      Q.  And who governs the Ethereum blockchain?
9      MS. D'ALLAIRD:  Objection.
10     THE WITNESS:  I mean, it's technically from
11     a cryptographic method, no one, but the
12     foundational team of Ethereum, so I think that's
13     the DAO, or I don't know.  It's a Vitalik and
14     the -- the Ethereum team.
15 BY MR. CADIGAN:
16     Q.  Do you know whether you could have
17 physically transferred your Kin tokens to anyone else
18 immediately after you received them.
19     A.  By "physically," you mean digitally?
20     Q.  Yes.
21     A.  Yes.
22     Q.  Could you?
23     A.  I think so, 'cause they were -- I mean, they
24 were ERC 20 tokens.  You can send those between
25 Ethereum wallets.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                                                                                   Jack Edward Neil, M.D.
January 28, 2020

---

Page 113

1    Q.  When you made your purchase of Kin, did you
2  purchase the Kin with the expectation of making a
3  profit?
4    A.  Yes.
5    Q.  And why did you think that?
6    A.  Same reason the venture people who invested
7  in Kik did.  I mean, I just -- I trusted that.  I
8  mean, that's more than anything the reason why I
9  clicked Send, was -- was following those investors and
10  their belief and their diligence they had done, so
11  that's the primary reason.
12    Q.  Do you recall any specific statements made
13  by Kik itself telling you that you could expect a
14  profit?
15    A.  Well, I mean, in the whitepaper, there's
16  that sentence that I alluded to earlier that said, you
17  know, because it's a finite supply, as more people use
18  it, it will be worth more money, which implies profit.
19    Q.  Okay.  Can you point me to that statement?
20    A.  It was highlighted in the version that I
21  sent over -- well, I might be lying, but I don't know
22  if it's highlighted in the version either.  It's
23  somewhere.  Let's see.
24       (WITNESS REVIEWS DOCUMENT)
25    A.  There's a sentence that says -- yeah, I

---

Page 114

1  still haven't found it in here, but due to the finite
2  supply -- maybe it's back here.  I can probably find
3  it better if I searched in the phone, or I can do that
4  in a little bit on break and then bring it back.
5  There's just -- there's two sentences somewhere in the
6  document.
7    Q.  But your understanding was that the -- that
8  the -- the company had made statements, in effect,
9  that as more people used the token, its value would
10  rise?
11    A.  Correct.
12    Q.  Okay.  And was it your understanding that
13  that -- that use required participation by developers,
14  service providers, and participants in the network?
15       MS. D'ALLAIRD:  Objection.
16       THE WITNESS:  Right, and it wouldn't
17  magically happen.  Kik and Kin would have to push
18  it to make it happen.
19  BY MR. CADIGAN:
20    Q.  But developers and service providers would
21  also have to be involved.  Right?
22       MS. D'ALLAIRD:  Objection.
23       THE WITNESS:  I mean, in a perfect world,
24  yes, but it was Kin and Kik's responsibility to
25  make that happen.

---

Page 115

1  BY MR. CADIGAN:
2    Q.  Wait, I'm sorry.  I don't understand.  To
3  make -- to make what happen?
4    A.  To make -- for other people to care and want
5  to contribute to that ecosystem.  It's -- it's not
6  going to just -- you know, Kin didn't -- Kik wasn't as
7  powerful as Apple and where they can just open a --
8  open an app store and everyone starts making stuff for
9  it.  Like, clearly Kik was going to have to help fund
10  and help --
11    Q.  Foster?
12    A.  -- get that go -- foster, yeah, foster that
13  and get that going.
14    Q.  I'm sorry, I didn't mean to cut you off.
15    A.  No, that's the right word.
16    Q.  Yeah.
17    A.  No, "foster" is the word I was looking for.
18    Q.  But you went in this understanding that Kin
19  would -- would initially foster the ecosystem that
20  would have involved participants, developers --
21    A.  Right.  Well --
22    Q.  -- and app -- and app -- and vendors?
23    A.  Right.
24       MS. D'ALLAIRD:  Objection.  You said, "Kin."
25  Do you mean Kin or Kik?

---

Page 116

1       MR. CADIGAN:  Kik.
2       THE WITNESS:  Kin and Kik.  I mean, yeah, I
3  mean, I kind of -- I kind of lump them together.
4  I mean, they're -- they're probably -- they're
5  legally separate, but virtually the same.
6  BY MR. CADIGAN:
7    Q.  Okay.  But, I mean -- and I apologize to be
8  clear, so.  But it was your understanding that Kik
9  would initially foster the development of the
10  ecosystem that would ultimately involve participation
11  by participants, vendors?
12    A.  Correct.
13    Q.  Developers?
14    A.  Correct.
15    Q.  As a crypto purchaser, cryptocurrency
16  purchaser, just generally, what effect, if any, does
17  the -- the overall crypto market have on the prices of
18  the cryptocurrencies you've purchased?
19       MS. D'ALLAIRD:  Objection.
20       THE WITNESS:  So say that -- can you say
21  that slightly differently?  What effect does it
22  have on the value of the currencies I've
23  purchased?
24  BY MR. CADIGAN:
25    Q.  Yeah.

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                Jack Edward Neil, M.D.
January 28, 2020

Page 117

1    A.  I mean, every -- I mean, they all --
2  everything moves in lockstep to some degree, or has,
3  not anymore, but at the time was moving in lockstep.
4    **Q.  And by that you mean that the prices of the**
5  **cryptocurrencies you had purchased moved in lockstep**
6  **with other cryptocurrencies in the market?**
7        MS. D'ALLAIRD: Objection.
8        THE WITNESS: In general.
9  BY MR. CADIGAN:
10   **Q.  We had talked about the term "minimal viable**
11  **product" previously.  When you purchased -- in the**
12  **TDE, did you have an understanding of what the minimal**
13  **viable product was for the Kin ecosystem?**
14   A.  Not -- I hadn't thought of it that way, no.
15  It was my understanding they had no product at that
16  time.
17   **Q.  And yet you still purchased?**
18   A.  'Cause I believed in Kik, which had a
19  product.
20   **Q.  And you believed in the ultimate development**
21  **of the ecosystem.  Correct?**
22   A.  I believed that a company that could build
23  Kik into a big messenger could build another thing,
24  like, that they could build this.
25   **Q.  Yes, but the "this" we're talking about is**

Page 118

1  **the ecosystem they were talking about?**
2   A.  Correct.
3        MR. CADIGAN: So it's about 12:30 now.  Can
4  we go off the record for a second?
5        THE VIDEOGRAPHER: The time is 12:36 p.m.
6  We're going off the record.
7        (LUNCHEON RECESS TAKEN)
8        THE VIDEOGRAPHER: The time is 1:37 p.m.  We
9  are on the record.
10  BY MR. CADIGAN:
11   **Q.  Dr. Neil, do you own any -- any stocks?**
12   A.  Yes.
13   **Q.  And are those publicly-traded --**
14   A.  Yes.
15   **Q.  -- companies?**
16   A.  Yes.
17   **Q.  And do you -- and you also own stock in your**
18  **own companies.  Correct?**
19   A.  Correct.
20   **Q.  And that's an ownership interest in those**
21  **companies?**
22   A.  Correct.
23   **Q.  And when you bought Kin, you understood that**
24  **that was not an ownership interest in Kin -- Kik.**
25  **Right?**

Page 119

1        MS. D'ALLAIRD: Objection.
2        THE WITNESS: Correct.
3        MR. CADIGAN: Okay.  The next one marked,
4  241.
5        THE COURT REPORTER: 242.
6        MR. CADIGAN: 242.
7        (EXHIBIT 242 WAS MARKED FOR IDENTIFICATION)
8  BY MR. CADIGAN:
9   **Q.  Dr. Neil, I'm showing you what's been marked**
10  **as Exhibit 242.**
11   A.  Yes.
12   **Q.  And this is a letter from Joseph Peck to the**
13  **legal department at Kik dated April 10th, 2019.**
14  **Correct?**
15   A.  Yes.
16   **Q.  Okay.  And I believe you have referenced him**
17  **already, but who is Joe Peck?**
18   A.  He was the attorney, the cryptocurrency
19  attorney -- or I don't know if he'd call himself that,
20  but up in Washington, DC, who I -- who wrote this.
21   **Q.  Okay.  And then he sent this letter -- it**
22  **was your understanding he sent this letter to Kik.**
23  **Right?**
24   A.  Correct.
25   **Q.  And you instructed him to do so?**

Page 120

1   A.  Correct.
2   **Q.  Okay.  When did you retain him?**
3   A.  Probably a month before this.  I had talked
4  to him off and on for a while, but I -- I'm not sure
5  what the definition of retaining an attorney is, but.
6   **Q.  But with respect to this -- this -- the**
7  **issue that became this letter that you sent to Kik,**
8  **when did you first start talking to him about this?**
9   A.  Probably a month before this.
10   **Q.  And you had said that you had worked with**
11  **him previously?**
12   A.  I had talked to him previously, yes.
13   **Q.  And you had talked to him about potentially**
14  **doing an ICO.  Is that right?**
15   A.  Correct.
16   **Q.  And when was -- when was -- when were you**
17  **thinking of doing the ICO?**
18   A.  Either late 2016 or early 2017.
19   **Q.  And why were you contemplating an ICO?**
20   A.  'Cause I thought the traditional methods of
21  raising funding, you know, especially at that time,
22  was kind of a little bit archaic and limiting in scope
23  as to who would -- who was able to participate.  So I
24  was looking specifically, though, to issue a ICO that
25  related ownership interest so that the participants

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Jack Edward Neil, M.D.
January 28, 2020

Page 121

1  had a stake in the company.
2      Q.  And what company was that?
3      A.  Udifi.
4      Q.  And ultimately you decided not to pursue the
5  ICO.
6      A.  Right.
7      Q.  Correct?
8      A.  Correct.
9      Q.  And, actually, have you spoken to Mr. Peck
10  at all in connection with your subpoena here today?
11      A.  I don't think -- I don't think -- I sent him
12  a text message and he didn't respond, so I don't think
13  we've had any conversation.
14      Q.  And in the TDE, isn't it right that you
15  indicated you purchased approximately $138,000 worth
16  of Kin?
17      A.  Correct.
18      Q.  And in this letter you're demanding, oh,
19  approximately $1.5 million from Kik, aren't you?
20      A.  Correct.
21      Q.  And in the letter you threatened to file a
22  lawsuit against Kik, didn't you?
23      A.  Correct.
24      Q.  And amongst other things, the letter
25  threatens fraud claims and breach of fiduciary duty

Page 122

1  claims, doesn't it?
2      A.  Correct.
3      Q.  And you -- you never ultimately brought a
4  lawsuit against Kik.  Right?
5      A.  Correct.
6      Q.  And in taking a look at the -- the complaint
7  in this matter, you understand that the SEC has not
8  charged any fraud or breach of fiduciary duty claims
9  against Kik.  Is that right?
10      MS. D'ALLAIRD:  Objection.
11      THE WITNESS:  Okay.  I said, okay.
12  BY MR. CADIGAN:
13      Q.  No, do you understand that or?
14      MS. D'ALLAIRD:  Objection.
15      THE WITNESS:  I'm not clear on what has been
16  brought exactly or not, so.
17  BY MR. CADIGAN:
18      Q.  Do you have -- do you have an understanding
19  as to whether they've brought any fraud claims here?
20      MS. D'ALLAIRD:  Objection.
21      THE WITNESS:  Not really.
22  BY MR. CADIGAN:
23      Q.  When you -- I mean, what was your basis
24  for -- for claiming fraud in this letter?
25      MS. D'ALLAIRD:  Objection.

Page 123

1      THE WITNESS:  That I believed that they did
2  not disclose relevant information at the time
3  that I basically gave them money.
4  BY MR. CADIGAN:
5      Q.  And what -- what exactly was that
6  information you claimed that Kik failed to disclose?
7      A.  Some of the stuff that came out when the SEC
8  wrote their letter, which were things like, that the
9  user account was decreasing, that they had tried to
10  raise funds, or at least had contemplated and were
11  unsuccessful, and they used this as a method to fund
12  continue -- continuing operations, whereas I -- I --
13  my understanding from everything that was forthcoming
14  was that they were a growing company.  I think I've
15  said before, I trusted Kik, that they were a growing
16  company, and that Kin was on top of that, not that it
17  was going to be helpful to fund Kik from failure.
18      Q.  Now, at the time you wrote this letter, do
19  you know whether the SEC had filed its complaint?
20      MS. D'ALLAIRD:  Objection.  Have we
21  established that he wrote the letter?
22  BY MR. CADIGAN:
23      Q.  Hold on a second.
24      A.  Yes.
25      Q.  Did you instruct your attorney to send this

Page 124

1  letter to --
2      A.  Yes.
3      Q.  -- to Kik?
4      A.  Yes.
5      Q.  Did you read this letter before it was sent?
6      A.  Yes.
7      Q.  Did you authorize this letter?
8      A.  Yes.
9      Q.  Okay.  Now, when this letter was sent,
10  okay -- and by the way, the attorney here is your
11  agent.  Right?
12      MS. D'ALLAIRD:  Objection.
13      THE WITNESS:  At the time he wrote this,
14  yes.  Whether he is now or not is questionable.
15  BY MR. CADIGAN:
16      Q.  Is there any question that this was your --
17  you instructed this letter to be sent to Kik?
18      A.  No, I instructed this letter to be sent to
19  Kik.
20      Q.  Now, at the time that this letter was sent
21  to Kik, did -- do you know whether the SEC had filed
22  its complaint in this matter yet?
23      A.  There was at least some public -- I'm not
24  sure what information was available at the exact time.
25  I know that it had come out that the SEC was --

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                  Jack Edward Neil, M.D.
January 28, 2020

Page 125

1  decided that they owed -- they thought that it was a
2  security violation, and I had been thinking there was
3  a problem for a while.
4       I -- I waited to send the letter because I
5  figured there was nothing to collect, but once that
6  came out, I decided that it was the time to at least
7  put -- the reason we didn't file the action later was
8  we decided to at least place our place in line 'cause
9  we felt like there would be more people filing
10  complaints against Kik.
11  **Q.  And -- but I guess what I'm saying is, were**
12  **you prompted -- I mean, the basis for your -- for your**
13  **claims of fraud and breach of fiduciary duty, when did**
14  **you first come to conceive of those bases?**
15  A.  Oh.  Probably six months after the ICO.
16  It's just from a timing perspective, this timing
17  happened because of the SEC beginning to look.
18  **Q.  Okay.  So as of six months after the ICO,**
19  **okay, you believed that there was a basis for fraud**
20  **claims against Kik?**
21       MS. D'ALLAIRD:  Objection.  Just going to
22       say for the record, we haven't established that
23       he's an attorney or has any kind of legal
24       training.
25       MR. CADIGAN:  He doesn't need to.

Page 126

1       THE WITNESS:  Well --
2       MS. D'ALLAIRD:  Is that your testimony,
3       Counsel?  I'm just saying for the record, he's
4       not an attorney as far as I know.
5       MR. CADIGAN:  Wait.  Please make your
6       objection and move on.
7       MS. D'ALLAIRD:  Well, you've asked me to
8       clarify my objection previously, so I'm --
9       MR. CADIGAN:  I didn't ask you to clarify.
10       I didn't --
11       MS. D'ALLAIRD:  Previously you have, so I'm
12       just trying to be helpful.
13       MR. CADIGAN:  What day?
14       MS. D'ALLAIRD:  I'm just stating -- today.
15       So I'm just saying for the record, as far as we
16       know so far, it hasn't been established that he
17       is an attorney.  And please continue.
18  BY MR. CADIGAN:
19  **Q.  You're not an attorney, are you?**
20  A.  No, and the words, just -- I mean, along
21  those lines, the word "fraud," I don't completely know
22  what legally it means.  I mean, I know in general
23  human sense what "fraud" means, but what is
24  constituted as fraud in a court of law, I don't know.
25  All right.

Page 127

1       So what I mean by the six months after I
2  felt like there was an expectation that there would be
3  a way to transact, to exchange fiat for -- for Kin, so
4  that was one.  We -- we fully -- I fully expected
5  there would be an -- an exchange to -- to transact Kin
6  on, and then that was the primary thing initially,
7  that I'd say six months in as there wasn't an effort
8  to do that, I felt like something wasn't right.
9       And then -- you know, then I start -- I used
10  Kik, and I -- you know, I started to have questions as
11  to whether their platform or model even made sense.
12  And then over that next period of time, I don't know,
13  Kin just -- I don't know, it -- some of it was more of
14  a gut -- some of the -- like, when I say the six
15  months in, some of that was a gut feeling and not like
16  I could have made a legal claim six months in for
17  anything.
18       That was more later, I think.  I'll leave it
19  there.  And I just mean, like, when it seemed clear,
20  especially whenever the number -- like, we wrote this
21  knowing that there were some things probably going
22  to -- not knowing, but expecting some things would
23  come out, that Kik and Kin wasn't working out as
24  intended and that -- and then whenever Kik decide --
25  or Kin decided or whoever decided to shut Kik down and

Page 128

1  then fire sale it or whatever they did, then that sort
2  of sealed the deal that that wasn't what the money was
3  supposed to be used for.
4  **Q.  And as you indicated, this was something of**
5  **a placeholder?**
6  A.  We had no expectation that Kik would respond
7  with anything positive to this, so, yes, basically.
8  **Q.  And -- but what -- I mean, at the time you**
9  **sent this letter -- and you understand a fraud claim's**
10  **a pretty serious claim.  Right?**
11  A.  Uh-huh.
12  **Q.  You didn't make that lightly.  Right?**
13  A.  I believed it to be --
14       MS. D'ALLAIRD:  Objection.
15       THE WITNESS:  I believe it to be true, but I
16       don't have all the facts.  Right?  I mean, it
17       would be something that if we had filed a civil
18       suit and done our subpoenas and investigation, I
19       believe it would have held up that the -- that
20       the Kin sale was a -- a way to raise funding for
21       a company that wasn't growing as expected, which
22       was, you know, Kik.
23  BY MR. CADIGAN:
24  **Q.  And as part of that, can you point to any**
25  **statements or omissions made by Kik, specific**

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.         Jack Edward Neil, M.D.
January 28, 2020

Page 129

1  statements or specific omissions made by Kik that you
2  can recall that form the basis of your suggestion that
3  you were misled?
4          MS. D'ALLAIRD:  Objection, compound.
5          THE WITNESS:  So there is a -- I think Phil
6  Tanner, who is, I believe, a representative of
7  Kik -- I'm not sure his role -- had posted some
8  Medium articles aligning with -- so when I looked
9  back, I found the statement that I was talking
10  about earlier, the statement about the
11  deflationary currency and how it would go up in
12  value with more use.  That was a Medium article
13  by Phil Tanner.  It's one of the things I
14  produced.
15  BY MR. CADIGAN:
16      Q.  Tanner, Phil?
17      A.  Maybe.  Yeah, it was -- it was one I
18  produced.  It's in the documents I produced, stating
19  those facts, that as more people used it, it would go
20  up in value.
21          There were also some -- some back-and-forth
22  communications about getting on exchanges.  That, I
23  think -- combining those two is sort of where the main
24  part of that -- the fraud claim to me comes from, is
25  that I had an understanding and an expectation of

Page 130

1  things that, had we been able to do a full due
2  diligence, would not have panned out to be true, and I
3  would not have invested.
4      Q.  Okay.  But were those -- these statements
5  that you're pointing to, were those things that you
6  recall, again, prior to the TDE that you relied upon
7  in making your decision to purchase Kin?
8      A.  I think the lack of disclosure of them prior
9  would be the problem.
10      Q.  Okay.  So you're not pointing to any
11  affirmative statements that were made by Kik?
12      A.  Not --
13      Q.  Correct?
14          MS. D'ALLAIRD:  Objection.
15          THE WITNESS:  Not prior to the ICO.  Is that
16  the question?
17  BY MR. CADIGAN:
18      Q.  I mean, prior to the TDE, yes.
19      A.  Prior to -- is that the same --
20      Q.  Yeah.  Well, the --
21      A.  The event?
22      Q.  The token distribution event.
23      A.  Yeah, in the September --
24      Q.  Yeah.
25      A.  -- 20 -- yeah, I don't -- I don't recall

Page 131

1  anything prior affirmatively.  It was more of a lack
2  of disclosure.
3      Q.  And when you -- when you instructed that
4  this letter be sent, you were seeking not the
5  approximately $138,000, but $1.5 million.
6      A.  Uh-huh.
7      Q.  What was the basis for you seeking that
8  amount?
9      A.  Yeah, I mean, if you read on that exhibit in
10  Item Number 1, it says that was the peak valuation on
11  January 7th, 2018, on illiquid -- illiquid, untrusted
12  exchanges, which I don't, or no legitimate investor
13  uses, and had there been an opportunity to sell at
14  that point, I would have reduced my exposure to this
15  token.  That's -- that's where that number comes from.
16  My reason was because, ask high instead of lower, I
17  mean, in -- in real estate, but that's where the
18  number comes from.
19      Q.  So it was a negotiating point?
20      A.  Yes.
21      Q.  And you're indicating that had you have
22  known this information, you would have sold earlier?
23      A.  Had I known this information -- by "this
24  information," what are you referencing?
25      Q.  Well, you said there was certain information

Page 132

1  that was -- you were not told --
2      A.  Came out later, yeah.
3      Q.  Came out later?
4      A.  Yeah, had I known that, I wouldn't have
5  invested at all.  Had I -- had I known that they were
6  not having the user counts and things that I don't --
7  that were sort of hinted at prior to this letter but
8  some of it came out in more detail later, I think -- I
9  don't know the timing.  I don't know the timing -- but
10  had I known what I know now, I would never have
11  invested in it.
12      Q.  But -- and by that you're saying the things
13  that you learned as part of the -- the SEC's
14  complaint?
15      A.  Some of the -- yes.
16      Q.  And -- and you know those are the SEC's
17  allegations in this matter.  Right?
18          MS. D'ALLAIRD:  Objection, ambiguous.
19          THE WITNESS:  Yes.
20  BY MR. CADIGAN:
21      Q.  And as of -- as of -- and your -- and had
22  you known that information as of January 2018, could
23  you have sold your Kin at that time?
24          MS. D'ALLAIRD:  Objection.
25          THE WITNESS:  Not on those exchanges, which

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Jack Edward Neil, M.D.
January 28, 2020

---

Page 133

1    is part of what I felt was the lack of -- I
2    know, the breach of fiduciary duty on Kin and Kik
3    was to get on an ex -- a reputable exchange.
4    BY MR. CADIGAN:
5        Q.  Well, Kik was on exchanges as of --
6        A.  Not --
7        Q.  -- January 2018.  Correct?
8            MS. D'ALLAIRD:  Objection.
9            THE WITNESS:  Not know-your-mutton
10   (phonetic), not KYC/AML, not ones that our
11   Government would approve of.
12   BY MR. CADIGAN:
13       Q.  Well, has the -- has the SEC regulated any
14   exchanges --
15           MS. D'ALLAIRD:  Objection.
16       Q.  -- that you know of?
17           MS. D'ALLAIRD:  Objection.
18           THE WITNESS:  There's -- there are -- well,
19   I don't -- I don't know the legal part of this,
20   no.
21   BY MR. CADIGAN:
22       Q.  Okay.  But, I mean, you --
23       A.  I'll say, I don't know.
24       Q.  You just mentioned that, none that the
25   Government would approve of.  Do you know of any --

---

Page 134

1        A.  Right.
2        Q.  -- that the Government had approved of as of
3    January 2018?
4        A.  It's a --
5            MS. D'ALLAIRD:  Objection.
6            THE WITNESS:  It's a gray area, but they
7    were ones that were following the rules better
8    than others, which were things like Coinbase.
9    BY MR. CADIGAN:
10       Q.  How do you know that?
11       A.  Based on their public messaging.
12       Q.  Did you -- do you -- I mean, and you were
13   following this space.  Do you know whether the SEC had
14   ever provided any approval of any of the -- any
15   exchanges?
16           MS. D'ALLAIRD:  Objection.
17           THE WITNESS:  As far as I know, it was a --
18   that's still a gray area, which I think still is.
19   BY MR. CADIGAN:
20       Q.  And -- but there were -- there were other
21   exchanges that you could have sold your Kin tokens on.
22   Right?
23           MS. D'ALLAIRD:  Objection.
24           THE WITNESS:  Let me answer that with -- I
25   can't answer that yes or no.  There are lots of

---

Page 135

1    exchanges.  A lot of them have a fair amount of
2    fraud and theft involved.  There were none that
3    were trusted to not involve theft or fraud at
4    that time.
5    BY MR. CADIGAN:
6        Q.  There were none that you trusted?
7        A.  That I think -- I don't think me as an
8    isolated entity would state this.  I think as a -- as
9    a larger -- the only places were basically EtherDelta
10   and Bankcor at the time.  EtherDelta was a
11   distributed, unregulated, no customer service exchange
12   where if you mess it up, you lose all your money, also
13   very illiquid 'cause no one used it.  And then Bankcor
14   was sort of a trial thing that very few people used.
15   There was no legitimate exchange -- and, again, I
16   don't know how to define "legitimate," other than that
17   I trusted or that most people who knew anything about
18   the space and that still had money and didn't lose it
19   to fraud trusted.
20       Q.  I mean, again, but -- I mean, you can't
21   speak for other people.  Right?
22           MS. D'ALLAIRD:  Objection.
23           THE WITNESS:  I can speak for people like me
24   who have been in this space for a while and know
25   how to not lose their money and, yes.

---

Page 136

1    BY MR. CADIGAN:
2        Q.  But, to be frank, what you're -- what you're
3    providing here is, you didn't trust those exchanges.
4    Right?
5        A.  Myself or I would say other people I know
6    through -- you know, I've been parts of Discord chats
7    and just, I have -- I know other people in the space.
8    It's pretty well-established, and ask -- I don't know
9    how to answer this different, but experienced people
10   in the space would not trust those, including myself.
11       Q.  Is it fair to say that you have a financial
12   interest in the SEC's action against Kik?
13       A.  I don't know.
14           MS. D'ALLAIRD:  Objection.
15           THE WITNESS:  I mean, I think what's lost is
16   lost, so I -- it's not that now, at this point.
17   I mean, we didn't file a suit or anything.  I
18   just -- it's more I just think it was wrong and
19   deceitful, and I'm just doing my part to bring
20   that out.
21   BY MR. CADIGAN:
22       Q.  Do you have any expectation of receiving
23   anything should the SEC be successful in its action
24   against Kik?
25       A.  I have no expectation.  Would I like to?

---

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
                                                                                    January 28, 2020

Page 137

1  Sure, but I have no expectation.
2  **Q.  Is it your hope to?**
3      MS. D'ALLAIRD:  Objection, asked and
4  answered.
5      THE WITNESS:  Sure, we'd all like to not
6  lose the money we've lost, but.
7  BY MR. CADIGAN:
8  **Q.  Okay.  But, I mean, through this action, is**
9  **it your hope to receive money, should the SEC win?**
10     A.  Not through this action.
11     MS. D'ALLAIRD:  Same objection.
12     THE WITNESS:  No.  I don't expect that to --
13  I don't expect that to be true, no.
14  BY MR. CADIGAN:
15 **Q.  So if the SEC wins, you don't expect to**
16 **receive any money?**
17     MS. D'ALLAIRD:  Objection, asked and
18  answered.
19     THE WITNESS:  I think the money is already
20  gone.  I don't think Kin has the money anyhow, so
21  I don't expect there to be anything to collect.
22     MR. CADIGAN:  Can we have five minutes?
23     THE VIDEOGRAPHER:  The time is 1:56 p.m.
24  We're going off the record.
25     (RECESS TAKEN)

Page 138

1      THE VIDEOGRAPHER:  The time is 2:00 p.m.  We
2  are on the record.
3      MR. CADIGAN:  So we have -- we have no
4  further questions for the time being.
5      THE WITNESS:  Okay.
6      MS. D'ALLAIRD:  Okay.  Thank you.
7          EXAMINATION
8  BY MS. D'ALLAIRD:
9  **Q.  Dr. Neil, as I had stated a little earlier**
10 **today, my name is Laura D'Allaird.  I represent the**
11 **SEC in its litigation against Kik Interactive that**
12 **this deposition is the subject of today, and I want to**
13 **just start off by thanking you for being here today**
14 **and giving you so much of our time -- of your time,**
15 **and -- and just to say that, you know, I do have some**
16 **questions and some documents I'm going to show you,**
17 **and I'm going to go through that as quickly and**
18 **efficiently as I can.**
19     **I'd like to start off by going back to**
20 **Exhibit 12.  It's an exhibit that we looked at a**
21 **little earlier today.**
22     A.  This one?
23  **Q.  Yes.  And so to go back to your previous**
24 **testimony, it's -- it's your testimony that you -- you**
25 **did read the Kin whitepaper before you purchased Kin.**

Page 139

1  **Is that correct?**
2      A.  Correct.
3  **Q.  Okay.  I want to turn your attention in**
4  **Exhibit 12 to page 8 of Exhibit 12, and there's a**
5  **section called Point 2, The Kin Cryptocurrency.**
6      **Do you see that?**
7      A.  Yes.
8  **Q.  Okay.  And then looking at this, do you**
9  **recall reading a section in the whitepaper -- or this**
10 **particular section of the whitepaper?**
11     A.  Yes.
12 **Q.  Okay.  If -- I want to draw your attention**
13 **to the second full paragraph under Point 2, The Kin**
14 **Cryptocurrency.  It's a paragraph that begins with, In**
15 **character.**
16     **Do you see that?**
17     A.  Yes.
18 **Q.  Okay.  I'm just going to read into the**
19 **record, "In character, Kin is a pure cryptocurrency of**
20 **fixed supply.  It is fractionally divisible and long-**
21 **term noninflationary.  However, as described below,**
22 **only a small portion of the Kin supply will become**
23 **liquid in the near future, as most of the Kin supply**
24 **is reserved for the Kin rewards engine."**
25     **Did I read that accurately?**

Page 140

1      A.  Yes.
2  **Q.  Okay.  And you testified earlier that you**
3  **recalled seeing statements relating to Kin being not**
4  **inflationary in the whitepaper.  Reading this -- or**
5  **having me read this to you just now, does that refresh**
6  **your recollection as to whether or not this is the**
7  **statement you were referring to?**
8      A.  Yeah, this is one statement.  The -- the
9  specific statement that I was referring to is actually
10  the one from Tanner, Phil, but it -- it matches
11  this --
12 **Q.  Okay, in the Medium post.**
13     A.  -- in -- in intent but is -- the other one
14  is a longer description of this statement.
15 **Q.  Okay.  But is it your testimony that the**
16 **statement I just read to you in this whitepaper**
17 **functionally matches the --**
18     A.  Correct.
19 **Q.  -- the statement you were referring to**
20 **earlier?**
21     A.  It implies deflationary nature.
22 **Q.  Okay.  And then I just want to read into the**
23 **record the next sentence.  "Like other**
24 **cryptocurrencies, units of Kin are fungible and**
25 **transferable and they will be expected to trade on**

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
                                                                                                    January 28, 2020

Page 141

1    cryptocurrency exchanges."
2        Did I read that accurately?
3    A.  Yes.
4        Q.  Okay.  And does that refresh your
5    recollection as to whether or not you had read
6    statements from Kik relating to Kin being available on
7    cryptocurrency exchanges?
8    A.  Yes.
9        Q.  Okay.  And was it your understanding --
10   sitting here today, testifying today, is it -- was it
11   your understanding before you purchased Kin that Kin
12   would eventually be tradeable on cryptocurrency
13   exchanges?
14   A.  Yes.
15       Q.  Okay.  I want to draw your attention back to
16   the last exhibit we left off with with counsel for
17   Kik.  It's Exhibit 242, the letter dated April 10th,
18   2019.
19   A.  Yes.
20       Q.  Okay.  And you testified earlier that you --
21   you had read this letter before it was sent.
22   A.  Correct.
23       Q.  Correct?  Okay.  And you approved of it
24   being sent?
25   A.  Correct.

Page 142

1        Q.  And to the best of your knowledge, were all
2    of the statements in this letter correct?
3    A.  Correct.
4        Q.  Okay.  I want to draw your attention to the
5    second sentence in the third full paragraph of this
6    letter.  It's a paragraph that begins with, From
7    September 12th to September 25th, 2017.
8        Do you see that?
9    A.  Yes.
10       Q.  In that paragraph.  And I'm going to read
11   one sentence in, the second sentence of that paragraph
12   into the record.  "Representatives of the ICO made
13   repeated statements providing assurances that the Kin
14   token would be placed on a regulated exchange to
15   provide the security and liquidity investors required
16   to justify their investment."
17       Did I read that accurately?
18   A.  Yes.
19       Q.  Okay.  Reading that here today, does that
20   refresh your recollection about any statements Kik may
21   have made regarding exchanges prior to your purchase?
22   A.  I mean, they're sort of the sentence that
23   said, Like other cryptocurrencies, and -- you know,
24   and then afterwards, even, there was some -- some
25   people on Reddit were -- posted their interactions

Page 143

1    with Kik that said that they were working on it.
2        Q.  Okay.
3    A.  Which is something I produced --
4        Q.  Okay.
5    A.  -- somewhere.
6        Q.  Okay.  You can put that aside.
7        Now, after you purchased Kin, I believe you
8    testified earlier that you learned some information
9    about Kik Messenger's user base?
10   A.  Yeah.
11       Q.  Is -- that's right?
12   A.  Correct.
13       Q.  Okay.  And what did you learn?
14   A.  Well, the specifics on that, there was
15   nothing public until the SEC's release, so basically
16   that it had been declining.  Their -- I think their
17   daily active users were declining in that they were
18   struggling to find funding, but -- but there was
19   nothing publicly made available prior to because I
20   don't have the ability to check that, so that was the
21   first time I saw it publicly announced.
22       Q.  And so the information you're referring to
23   that you learned after you purchased Kin, you learned
24   that from the SEC's complaint filed in this
25   litigation?

Page 144

1    A.  That -- that particular item for sure, yes.
2        Q.  Okay.  And what was your reaction when you
3    learned of that information?
4    A.  It was -- I don't know.  I guess pissed off.
5    I don't know if that's -- I felt like that was -- when
6    I stated earlier that there were things that weren't
7    disclosed, like that, had that been -- if that's true,
8    right, as in -- to their point, I mean, if that's
9    true, that's, I mean, messed up.
10       Q.  Okay.  And I think you testified earlier
11   that if that's true and if you had known that before
12   you purchased Kin, your testimony is that you would
13   not have purchased Kin?
14       MR. CADIGAN:  Objection.
15       THE WITNESS:  I'd say absolutely not, and
16   the reason I can say it so confidently is the
17   entire reason that I invested in Kin or Kik, or
18   however you want to look at it, was because there
19   was a legitimate venture-backed company growing
20   beside it, and that was the trust that led me to
21   put 138 grand to use.  Had I known that there was
22   a problem there, there's no way I'd have -- you
23   know, that's why I didn't invest in other ICOs,
24   and that's why I still have money and didn't get
25   duped, but.

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.

Jack Edward Neil, M.D.
January 28, 2020

Page 145

1  BY MS. D'ALLAIRD:
2      Q.  And after you purchased Kin, after your
3  purchase, did you obtain any information or learn any
4  information about Kik's finances?
5      A.  Nothing until y'all -- the report from
6  y'all.
7      Q.  The SEC's --
8      A.  Correct.
9      Q.  -- complaint?
10     A.  That report from the SEC --
11     Q.  Okay.
12     A.  -- or that complaint, yes.
13     Q.  And do you recall what the SEC's complaint
14  generally said about Kik's finances?
15     A.  In general, that, you know, it was declining
16  and they were going to need to raise capital or had
17  trouble raising capital as well, and so, you know,
18  this was a way to raise money to keep them from
19  faltering on their primary product, which was the
20  Messenger.
21     Q.  And had you taken a look at Kik's finances
22  before you purchased Kin?
23     A.  I mean, yeah, there's no way to -- there
24  would be no way to see them in a private company side.
25     Q.  Right, that's my next question to you.  To

Page 146

1  your knowledge, would you -- did you have the ability
2  to even see Kik's finances before purchasing it --
3      A.  No.
4      Q.  -- and the TDE?
5      A.  No.
6      Q.  No.  Okay.  And if this were true about what
7  the SEC alleges in its complaint about Kik's finances,
8  if it were true and you knew of that before you
9  purchased Kin, would you have purchased Kin and the
10  TDE?
11         MR. CADIGAN:  Objection, double
12     hypothetical.
13         THE WITNESS:  Again, no.
14  BY MS. D'ALLAIRD:
15     Q.  Dr. Neil, you testified earlier with respect
16  to your history of purchasing cryptocurrency, you've
17  purchased some cryptocurrencies under what you called
18  "the momentum"?
19     A.  Uh-huh, yes.
20     Q.  And you purchased some cryptocurrencies
21  as -- I think what you referred to as an investment?
22     A.  Yes.
23     Q.  Can you tell me what the difference is in
24  your mind between purchasing a cryptocurrency for
25  momentum versus as an investment?

Page 147

1      A.  Yeah, and, again, I'll use Jim Cramer's
2  words, but, you know, it's -- he always says, Don't
3  turn a trade into an investment, which means if you're
4  buying something because you think it has a short-term
5  profit potential, don't get stuck in it, so don't ride
6  it down.  If you see that things aren't going
7  properly, get out, where there -- whereas if it's an
8  investment, you believe in it long term, you stick
9  with the vision, and you ride it, even if it goes
10  down, 'cause you believe in it will go back up, yes.
11     Q.  And with an investment, you -- as you say,
12  you ride it with the belief that even if it goes down,
13  it will go back up?
14     A.  Correct.
15     Q.  And you're referring to the value of --
16     A.  The value, correct.
17     Q.  Okay.  So is it fair to say that with
18  respect to both momentum and investment, they're
19  both -- they're both -- well, let me -- strike that.
20         Is it fair to say that under both momentum
21  and investment, you're looking to ultimately make a
22  profit?
23     A.  Ultimately, yes.
24     Q.  Okay.  You testified earlier about a coin
25  called CloakCoin?

Page 148

1      A.  Yes.
2      Q.  And what was your understanding of what the
3  value of CloakCoin is based on?
4      A.  Just based on usage.
5      Q.  How many people want to use it?
6      A.  Correct.
7      Q.  Okay.  And my question is:  In your view,
8  would the amount that people would be willing to pay
9  for CloakCoin have affected its value?
10         MR. CADIGAN:  Objection.
11         THE WITNESS:  I think what people will pay
12     is what defines the value.
13  BY MS. D'ALLAIRD:
14     Q.  Okay.  Dr. Neil, on the day that you first
15  received your Kin, first time you received Kin after
16  purchasing it, to your understanding, on that day when
17  you first received Kin, could you have bought or
18  purchased anything using Kin?
19     A.  No.
20     Q.  Dr. Neil, at the time that you purchased
21  Kin, what did you plan to do with it long term?
22     A.  Define "long term."  But, I mean, the --
23  within a few months, I expected to exit some of the
24  position 'cause I had put a large percentage of my
25  Ethereum worth into -- to that investment, so I

Page 149

1  intended to liquidate a percentage of it.  And then
2  depending on the progression of the ecosystem, I may
3  have held some long term, but to definitely decrease
4  the exposure.
5      Q.  And when you say exit from it -- some of it
6  in the short term, what do you mean by that?
7      A.  Either trade into a different cryptocurrency
8  or trade it back into U.S. dollars or U.S. dollar
9  equivalents.
10     Q.  And was -- did you do that?
11     A.  No, I could not.
12     Q.  And why could you not?
13     A.  'Cause the -- back to what we were talking
14  about earlier, the only exchanges that picked up the
15  Kin token in the next -- even to this day, really,
16  have been sort of fairly untrusted, non-mainstream
17  exchanges.
18     Q.  Okay.  And your hope to be able to exit out
19  of some of your Kin position in the short term, was
20  that a hope to make a profit when you exited out of
21  it?
22     A.  Of course, yes.
23     Q.  Dr. Neil, have Kik's attorneys ever
24  contacted you about this litigation?
25     A.  We talked -- I talked to Jenna and someone

Page 150

1  else on the phone with Jenna -- Jenna Bailey for maybe
2  an hour maybe one time, maybe three months ago, two months
3  ago.
4      Q.  Okay.  Three months ago.  And you say on the
5  phone it was Jenna Bailey?
6      A.  Yes, and then one other.  I think it was a
7  male person, but I'm not sure --
8      Q.  You don't recall?
9      A.  -- the name.
10     Q.  Okay.  But both attorneys for Kik?
11     A.  My understanding, yes.
12     Q.  Your understanding.  Okay.  How did that
13  call come about?  How were you first contacted?
14     A.  I think there was an email.  I'm not
15  quite -- I guess -- I think Jenna sent me an email and
16  said that I was -- I don't quite know how she got
17  word, but it was an email.
18     Q.  Okay.  It was an email.  And then at some
19  point you had a phone call?
20     A.  Correct.
21     Q.  Okay.  And how long was the phone call
22  approximately?
23     A.  Forty-five minutes, maybe an hour.
24     Q.  Other than Ms. Bailey and then another male
25  on the phone and yourself, was there anyone else on

Page 151

1  the phone?
2      A.  No.
3      Q.  Okay.  And to the best of your recollection,
4  can you just walk me through that conversation?
5      A.  I mean, it was similar, probably, to our
6  call with -- with y'all, which basically was just, you
7  know, about the story of when I invested, why I
8  invested, how I feel about that investment, how I feel
9  about the current situation, would I testify in a
10  deposition, just stuff -- or, you know, things around
11  that, which is sort of similar to -- very similar to
12  the call with the SEC.
13     Q.  Okay.  On that call, did Kik's attorneys
14  state for you their view of the case?
15     A.  I don't think so.
16     Q.  After that phone call, did you have any
17  other discussions with Kik's attorneys regarding this
18  litigation?
19     A.  I don't -- other than a lot of emails around
20  subpoena and this stuff, I don't think we talked
21  again.  I don't -- yeah, I don't think anything else.
22     Q.  I'm now going to show you some documents,
23  and I'm going to go through these as quickly as
24  possible.
25         MS. D'ALLAIRD:  This is going to be 243.  Is

Page 152

1  that right?
2         (EXHIBIT 243 WAS MARKED FOR IDENTIFICATION)
3      Q.  Dr. Neil, I've just handed to you what has
4  now been marked as Exhibit 243.  It's an email, the
5  top of which is dated Thursday, June 1st, 2017, 9:09
6  a.m., from Kin by Kik to email address ███
7  ████████
8      My first question to you, Dr. Neil, is:  Do
9  you recognize Exhibit 243?
10     A.  It looks like my email address.  I don't
11  specifically remember this email, but it looks like an
12  email.
13     Q.  But is ███████ --
14     A.  Yes.
15     Q.  -- .com your email address?  Okay.
16     A.  That is my email.
17     Q.  And you have -- do you have any reason to
18  believe that you did not receive this email?
19     A.  No.
20     Q.  Okay.
21     A.  I believe I did.
22     Q.  Okay.  Great.  You can set that aside.
23         MS. D'ALLAIRD:  This will be 244.
24         (EXHIBIT 244 WAS MARKED FOR IDENTIFICATION)
25     Q.  Dr. Neil, I've just handed to you what has

Page 153

1  now been marked as Exhibit 244.  It's an email dated
2  Thursday, June 15th, 2017, at 4:12 p.m. from Kin by
3  Kik to ████████████.  You can take a minute to look
4  at it, and let me know when you're ready for me to ask
5  you my questions.
6     A.  Okay.
7     Q.  Dr. Neil, do you recognize Exhibit 244?
8     A.  I recognize my email address again, but not
9  the specific email.
10    Q.  Not the specific email.  And do you have any
11 reason to believe that you did not receive this email?
12    A.  No.
13    Q.  Okay.  You can set that aside.
14       MS. D'ALLAIRD:  This will be 245.
15       (EXHIBIT 245 WAS MARKED FOR IDENTIFICATION)
16    Q.  Dr. Neil, I've just handed to you what has
17 now been marked as Exhibit 245.  It's an email dated
18 at the top Tuesday, August 22nd, 2017, at 6:34 p.m.
19 from Kin by Kik to ██████████.  Again, just, you
20 know, take a minute to look over this document and let
21 me know when you're ready for my questions.
22    A.  Okay.
23    Q.  My first question to you is:  Do you
24 recognize Exhibit 245?
25    A.  Yeah, I vaguely remember this one.

Page 154

1     Q.  You do --
2     A.  Yeah.
3     Q.  You remember reading this?
4     A.  Yeah.
5     Q.  Okay.  And, again, no reason to believe you
6  didn't receive this email.
7     A.  Correct.
8     Q.  Right?  I just want to quickly draw your
9  attention to one thing in this email.  The third
10 paragraph down from the top that says, Good news,
11 third paragraph down, it begins, For your reference.
12       Do you see that?
13    A.  I do.
14    Q.  (Reading) For your reference and
15 convenience, here is a link to the complete user
16 registration guide.
17       Then underneath that it says, User
18 Registration Guide.  It's underlined.
19       Did you ever read the user registration
20 guide?
21    A.  I'd -- I'd probably have to see it to
22 remember if I did.  I'm not -- I'm not -- I don't
23 remember.
24    Q.  But you recall reading this email?
25    A.  Again, vaguely.  I remember the

Page 155

1  registration -- I remember the -- that I got it
2  approved.  I remember that part of this, but I don't
3  really remember.
4     Q.  You remember being approved to -- to
5  register --
6     A.  Yeah.
7     Q.  -- for the TDE?
8     A.  Yeah.  I'm not sure if I did that or not.
9     Q.  Okay.  All right.  You can set that aside.
10       MS. D'ALLAIRD:  246.
11       (EXHIBIT 246 WAS MARKED FOR IDENTIFICATION)
12    Q.  Dr. Neil, I've just handed to you what has
13 now been marked as Exhibit 246.  It's an email dated
14 at the top Friday, September 1st, 2017, at 10:04 a.m.
15 from Kin by Kik to ████████████.  Take a minute to
16 look at this, and just let me know when you're ready
17 for my questions.
18    A.  Okay.
19    Q.  Do you recognize Exhibit 246?
20    A.  Again, vaguely, yes.
21    Q.  Vaguely.  No reason to believe that you did
22 not receive this email.
23    A.  Correct.
24    Q.  Right?  Okay.  But you -- you say you
25 vaguely recall reading it?

Page 156

1     A.  Yes.
2     Q.  Okay.  You can set that aside.
3        MS. D'ALLAIRD:  This will be 247.
4        (EXHIBIT 247 WAS MARKED FOR IDENTIFICATION)
5     Q.  Dr. Neil, I've just handed to you what has
6  now been marked as Exhibit 247.  It's an email, the
7  top of which is dated Tuesday, October 3rd, 2017, at
8  11:59 a.m. from Kin by Kik to ██████████.  You
9  know, same thing, take a look at this and let me know
10 when you're ready for my questions.
11    A.  Okay.
12    Q.  Do you recognize Exhibit 247?
13    A.  Not specifically.
14    Q.  Is that your email address that appears in
15 the To line?
16    A.  Yes.
17    Q.  Okay.  Any reason to believe that you did
18 not receive this email?
19    A.  No.
20       MS. D'ALLAIRD:  248.
21       (EXHIBIT 248 WAS MARKED FOR IDENTIFICATION)
22    Q.  And Dr. Neil, I've just handed to you what
23 has now been marked as Exhibit 248.  It's an email,
24 the top of which is dated Tuesday, September 26, 2017,
25 at 9:03 a.m. from Kin by Kik to ████████████.  Take

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.
Jack Edward Neil, M.D.
January 28, 2020

Page 157

1 a moment to look at this exhibit, and let me know when
2 you're ready for my questions.
3    A.  Okay.
4    Q.  Dr. Neil, do you recognize Exhibit 248?
5    A.  Yeah.  Again, vaguely, but yes.
6    Q.  Vaguely.  And what -- what do you recognize
7 it to be?
8    A.  Just what it says, I mean, the -- the
9 results of the -- that the token that had been
10 distributed.  That's the part I remember, is just that
11 I got an email about -- that the tokens were now
12 distributed.
13    Q.  All right.  And in the second paragraph in
14 this email, per our earlier communications, this
15 paragraph sets out the Kin that's been allocated to
16 you.  Is that correct?
17    A.  Correct.
18    Q.  Okay.  You can set that aside.  Okay.  Just
19 a few more.
20    A.  Okay.
21    Q.  And we'll be done soon.
22       MS. D'ALLAIRD:  249.
23       (EXHIBIT 249 WAS MARKED FOR IDENTIFICATION)
24    Q.  Dr. Neil, I've just handed to you what has
25 now been marked as Exhibit 249.  It is an email, top

Page 158

1 of which is dated Tuesday, November 26, 2019, at
2 9:58:08 p.m.  Take a minute to review, and let me know
3 when you're ready for my questions.
4    A.  Okay.
5    Q.  Dr. Neil, do you recognize this exhibit?
6    A.  Yes.
7    Q.  Okay.  And what is it?
8    A.  It's the email from Jenna Bailey asking to
9 set up a phone call.
10    Q.  Okay.  And the date on this is Tuesday,
11 November 26th, 2019.  Correct?
12    A.  Yes.
13    Q.  Okay.  Is this the first time that Kik's
14 attorneys reached out to you regarding this
15 litigation?
16    A.  Yes.
17    Q.  Okay.  All right.  You can set that aside.
18       MS. D'ALLAIRD:  250.
19       (EXHIBIT 250 WAS MARKED FOR IDENTIFICATION)
20    Q.  Dr. Neil --
21       MR. CADIGAN:  That's 251.  Right?
22       THE COURT REPORTER:  250.
23       MS. D'ALLAIRD:  250.
24       MR. CADIGAN:  Oh, I'm sorry.
25 ///

Page 159

1 BY MS. D'ALLAIRD:
2    Q.  Dr. Neil, I've just handed to you what has
3 now been marked as Exhibit 250.  It's an email chain.
4 The top email on the first page is dated Monday,
5 December 30th, 2019, at 2:29:15 p.m., from Jack Neil,
6 MD, to Bailey, Jenna C.  Take a minute to review and
7 let me know when you're ready for my questions.  And
8 you can take your time, but my question, as with the
9 others, is going to be --
10    A.  Oh, okay.
11    Q.  -- do you recognize this exhibit?
12    A.  I was making sure I knew all the pieces that
13 were tagged in here.  Yes, this looks like an email
14 from me.
15    Q.  Okay.  And you recognize this as an exchange
16 between you and Kik's attorneys?
17    A.  Correct.
18    Q.  Okay.  You can set that aside.
19       MS. D'ALLAIRD:  This is going to be 251.
20       (EXHIBIT 251 WAS MARKED FOR IDENTIFICATION)
21    Q.  Dr. Neil, I've just handed to you what has
22 now been marked as Exhibit 251.  Again, it's an email
23 chain.  The top email on the first page is dated
24 Tuesday, January 21st, 2020, at 4:53:31 p.m. from
25 Jenna Bailey to Jack Neil, cc Michael Welsh.  Take a

Page 160

1 minute to review and let me know when you're ready for
2 my questions.
3    A.  Okay.  Yeah, I remember this email.
4    Q.  And Dr. Neil, do you recognize --
5    A.  Yes.
6    Q.  -- this email?  And you said you do remember
7 it.  And what is it?
8    A.  Jenna nudging me to do a better search.
9    Q.  What do you mean by that?
10    A.  To send over the emails in addition to
11 everything else.
12    Q.  The emails that's --
13    A.  Between --
14    Q.  -- that Kik's counsel requested?
15    A.  Subpoenaed, correct.
16    Q.  And subpoenaed.  Okay.  You can set that
17 aside.
18       MS. D'ALLAIRD:  252.
19       (EXHIBIT 252 WAS MARKED FOR IDENTIFICATION)
20    Q.  Okay.  Dr. Neil, I've just handed to you
21 what has now been marked as Exhibit 252.  It's an
22 email chain.  The top email in the first page is dated
23 Sunday, January 26th, 2020, at 4:16:39 p.m. from Jenna
24 Bailey to Jack Neil, CC'd Michael Welsh.  Take a
25 minute to review and let me know were you're ready for

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

Page 161

1  my questions.
2      A.  Okay.
3      Q.  And Dr. Neil, do you recognize Exhibit 252?
4      A.  Yes.
5      Q.  And what is it?
6      A.  A response from Jenna asking for just a
7  little more information, including the emails.
8      Q.  More information regarding your
9  production --
10      A.  The subpoena.
11      Q.  -- under the subpoena from Kik?
12      A.  Correct.
13      Q.  Right.  Okay.  You can set that aside.
14          MS. D'ALLAIRD:  Can we just go off the
15  record for just two minutes, please?
16          THE VIDEOGRAPHER:  The time is 2:29 p.m.
17  We're going off the record.
18          (RECESS TAKEN)
19          THE VIDEOGRAPHER:  The time is 2:34 p.m.  We
20  are on the record.
21          MS. D'ALLAIRD:  All right.  Thank you so
22  much, Dr. Neil.  The SEC has no further questions
23  at this time.
24          THE WITNESS:  Okay.
25          MR. CADIGAN:  We have just a -- just a very,

Page 162

1  very, very minor followup.
2          THE WITNESS:  Okay.
3          MR. CADIGAN:  We're at Exhibit 252?
4          THE COURT REPORTER:  Three.
5          MR. CADIGAN:  253, thanks.
6          (EXHIBIT 253 WAS MARKED FOR IDENTIFICATION)
7              FURTHER EXAMINATION
8  BY MR. CADIGAN:
9      Q.  Dr. Neil, in response to some questions from
10  Ms. D'Allaird about -- or in response to some
11  questions, you mentioned that one of the things that
12  you wish you had known was that Kik's user numbers
13  were declining.  Is that right?
14      A.  Yes.
15      Q.  Okay.  And did you -- had you read this
16  article at Exhibit 253 from Vox dated September 29th,
17  2016?
18      A.  No, I have never seen this.
19      Q.  Okay.  And in the article it says, Kik
20  Messenger is no longer growing.
21          Right?
22      A.  Correct.
23      Q.  And the first line of the article says, Kik
24  Messenger, the six-year-old standalone messaging app
25  primarily used by US teams is no longer growing, says

Page 163

1  CEO Ted Livingston.
2          Correct?
3      A.  That's what it says.
4      Q.  And it goes on to say that, Admitting your
5  customer (sic) -- and further down, there's a
6  paragraph, Admitting your customer (sic) app company
7  isn't growing is not common among startup CEOs.  In
8  fact, it's the kind of information you usually hide
9  deep in the back closet so you don't even have to look
10  at it.
11          Is that right?
12      A.  Yes.
13      Q.  Okay.  It goes on to say, But Livingston is
14  not the common startup CEO.  He's much more open and
15  opinionated than most, and he also isn't too concerned
16  with Kik's user growth plateau.
17          You see that?
18      A.  I do.
19      Q.  And then at the end -- at the end of the
20  article, the article states, last -- second-to-last
21  paragraph, But no matter how you frame it, Kik needs a
22  boost, perhaps not right now, but as we've learned
23  from Twitter, stagnating growth means the vultures
24  start to circle.
25          Is that right?

Page 164

1      A.  Correct.
2      Q.  And had you seen that these -- this article
3  or articles like this out in the press regarding this
4  at the time?
5      A.  I had never seen this.  If I'd have seen
6  this, it would have saved me $138,000 probably.
7      Q.  But this was out there?
8      A.  Yeah, apparently.
9          MS. D'ALLAIRD:  Objection.
10  BY MR. CADIGAN:
11      Q.  And this was --
12          MR. MENDEL:  Objection.
13          MS. D'ALLAIRD:  Objection.
14  BY MR. CADIGAN:
15      Q.  This was just prior to the time you learned
16  of -- of the Kik token.  Correct?
17          MS. D'ALLAIRD:  Objection.
18          THE WITNESS:  The date on this is prior to
19  that, yes.
20          MR. CADIGAN:  Okay.  We have no further
21  questions.
22          MS. D'ALLAIRD:  Thank you.  Did you -- oh,
23  okay.  Can we just go off the record for a
24  minute?
25          THE VIDEOGRAPHER:  The time is 2:37 p.m.  We

U.S. Securities and Exchange Commission v. Kik Interactive, Inc.                    Jack Edward Neil, M.D.
January 28, 2020

---

Page 165

1    are off the record.
2        (RECESS TAKEN)
3        THE VIDEOGRAPHER:  The time is 2:40 p.m.  We
4    are on the record.
5        MS. D'ALLAIRD:  Dr. Neil, we just have a
6    couple questions about what you were just shown.
7            FURTHER EXAMINATION
8    BY MS. D'ALLAIRD:
9    Q.  Taking a look at Exhibit 253, the Vox
10   article titled Kik Messenger Is No Longer Growing.
11   A.  Uh-huh.
12   Q.  Do you see the date there is -- of this
13   article is September 29th, 2016?
14   A.  Yes.
15   Q.  You see that?  Okay.  When did you purchase
16   your Kin?
17   A.  September 2017, like a year later.
18   Q.  I think we saw that in one of the --
19   A.  Yeah.
20   Q.  -- emails?
21   A.  September 2017.
22   Q.  Okay.  And so you purchased Kin roughly a
23   year after this article?
24   A.  Yes.
25   Q.  Okay.  And it's your testimony that you

---

Page 166

1    never saw this article?
2    A.  Correct.
3    Q.  It is your testimony that you read the
4    whitepaper?
5    A.  Yes.
6    Q.  Okay.  If you could just very quickly turn
7    back to Exhibit 12, the Kin whitepaper, and I just
8    want to draw your attention to page 5 of Exhibit 12,
9    the Kin whitepaper.  Towards the bottom of that page,
10   it's a section at the very top titled One Kik's
11   Vision.
12       Do you see that?
13   A.  Yes.
14   Q.  And then there's a few bolded headings, the
15   last one towards the bottom of the page is Building
16   Fundamental Value.
17       Do you see that?
18   A.  Yes.
19   Q.  Okay.  And taking a look at the second
20   paragraph under there -- oh, I should back up.  And so
21   do you recall reading this section of the whitepaper?
22   A.  Vaguely.  It's been a while, but.
23   Q.  Okay.  But your testimony is that you read
24   the whitepaper?
25   A.  I read the whitepaper, yes.

---

Page 167

1    Q.  Okay.  Taking a look at the second full
2    paragraph under that section, Building Fundamental
3    Value, I'm just going to read that into the record.
4        "Today Kik is one of the world's most used
5    chat apps and the fifth most searched term in the IOS
6    app store.  The millions of people who use Kik each
7    month are in a unique position to demonstrate how
8    cryptocurrency economies might form and function in
9    the context of a large mainstream user base."
10       Did I read that accurately?
11   A.  Yes.
12   Q.  Okay.  And was it your understanding at the
13   time that you purchased Kin that Kik was one of the
14   world's most used chat apps?
15   A.  Yes.
16   Q.  Okay.  And was your understanding based on
17   what you read in the whitepaper?
18   A.  Yes, that and other messaging around that
19   time.
20   Q.  Other messaging by Kik?
21   A.  Yeah, on CoinDesk, just different news
22   articles.
23       MS. D'ALLAIRD:  Okay.  Thank you.  That's
24   all I have.
25       MR. CADIGAN:  We have nothing further.

---

Page 168

1        THE VIDEOGRAPHER:  This concludes the video
2    deposition of Dr. Jack Neil.  The time is
3    2:42 p.m.  We are off the record.
4        (SIGNATURE RESERVED)
5        (DEPOSITION CONCLUDED AT 2:42 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

U.S. Securities and Exchange Commissionv. Videotape, Inc.                    Jack Edward Neil, M.D.
                                                                            January 28, 2020

                                        Page 169

1   STATE OF NORTH CAROLINA

    COUNTY OF FORSYTH

2

3           REPORTER'S CERTIFICATE

4       I, JUDY F  REINS, a Notary Public in and for

5   the State of North Carolina, do hereby certify that

6   there came before me on Tuesday, the 28th day of

7   January, 2020, the person hereinbefore named, JACK

8   EDWARD NEIL,M D , who was by me duly sworn or affirmed

9   to testify to the truth and nothing but the truth of

10  his knowledge concerning the matters in controversy in

11  this cause; that the witness was thereupon examined

12  under oath, examination reduced to typewriting under

13  my direction, and the deposition is a true record of

14  the testimony, to the best of my ability and

15  understanding, given by the witness

16      I further certify that I am neither attorney

17  or counsel for, nor related to or employed by, any

18  attorney or counsel employed by the parties hereto or

19  financially interested in the action

20      IN WITNESS WHEREOF, I have hereto set my

21  hand, this the 31st day of January, 2020

22  <%21562,Signature%>

23      _____

            JUDY F  REINS, RMR, CRR

24          Notary Public No  20031970024

25