SEC75

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION


In the Matter of:                )

                                 )  File No. HO-13388-A

KIK INTERACTIVE INC.             )


WITNESS:  Garrette Furo

PAGES:    1 through 31

PLACE:    Securities and Exchange Commission

          200 Vesey Street

          New York, New York 10281

DATE:     Thursday, July 12, 2018


     The above-entitled matter, held pursuant to subpoena

commenced at 10:50 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 2

1    APPEARANCES:
2
3    On behalf of the Securities and Exchange Commission:
4        JAMES MURTHA, ESQ.
5        BRENT MITCHELL, ESQ.
6        JEFFREY LEASURE, ESQ. (Via Telephone)
7        Securities and Exchange Commission
8        Division of Enforcement
9        Brookfield Place, Suite 400
10       200 Vesey Street
11       New York, New York 10281
12
13
14   On behalf of the Witness:
15       JACK YOSKOWITZ, ESQ.
16       Seward & Kissel LLP
17       One Battery Park Plaza
18       New York, New York 10004
19
20
21
22
23
24
25

Page 3

1                    C O N T E N T S
2    WITNESS                    EXAMINATION
3    Garrette Furo                   5
4
5
6    EXHIBITS:      DESCRIPTION         IDENTIFIED
7    69         Subpoena             7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                 P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Okay.  This is tape one.  We
3    are now recording at 10:50 a.m., Thursday, July 12,
4    2018.
5        This is the opening in the deposition of Garrette
6    Furo in the case of Kik Interactive, Case Number
7    HO-13388.
8        This deposition is being held at the offices of
9    the SEC, located at 200 Vesey Street, New York, New
10   York.  The court reporter is Melissa Gilmore with
11   Diversified Reporting.
12       I'm the legal videographer,
13   Adam Venturini, also with Diversified Reporting.
14           Would counsel please introduce themselves and
15   state whom they represent.
16       MR. MURTHA:  James Murtha, SEC, Division of
17   Enforcement.
18       MR. MITCHELL:  Brent Mitchell, same.
19       MR. YOSKOWITZ:  Jack Yoskowitz, Seward & Kissel,
20   for the witness.
21           MR. MURTHA:  Would you please raise your right
22   hand?  Do you swear to tell the truth, the whole truth
23   and nothing, but the truth?
24       MR. FURO:  Yes.
25       MR. MURTHA:  Would you please state your full

Page 5

1    name and spell your name for the record?
2        MR. FURO:  Garrette David Victory Furo.  It's
3    G-A-R-R-E-T-T-E, D-A-V-I-D, V-I-C-T-O-R-Y, F-U-R-O.
4    Whereupon,
5            GARRETTE FURO
6    was called as a witness and, having been first duly sworn,
7    was examined and testified as follows:
8            EXAMINATION
9        BY MR. MURTHA:
10   **Q   Good morning, Mr. Furo.**
11       **I'm James Murtha, and to my left**
12   **is Brent Mitchell, and on phone joining us is Jeff**
13   **Leasure.**
14       **The three of us are members of the staff of the**
15   **Enforcement Division of the United States Securities and**
16   **Exchange Commission and officers of the Commission for**
17   **purposes of this proceeding.**
18       **This is an investigation by the United States**
19   **Securities and Exchange Commission in the matter of Kik**
20   **Interactive, File Number HO-13388, to determine whether**
21   **there have been violations of certain provisions of the**
22   **federal securities laws.**
23       **However, the facts developed in**
24   **this investigation might constitute violations of other**
25   **federal or state, civil or criminal laws.**

Page 6

1    Prior to the opening the record, you were
2    provided with a copy of the Formal Order of Investigation in
3    this matter as supplemented.
4    It will be available for your
5    examination during the course of this proceeding.  If you
6    want to take some time to look at the Formal Order now, you
7    can.
8    If you have any questions, you can discuss them
9    with your counsel.
10   A   (Perusing.)
11   MR. YOSKOWITZ:  Got it?  Okay.
12   Q   Have you had an opportunity to review the Formal
13   Order?
14   A   I have had an opportunity.
15   Q   Do you have any questions?
16   A   I don't know.
17   I mean, I guess I should real the
18   whole thing.
19   Let me just read it, I guess.
20   Q   Sure.  Take your time.
21   MR. YOSKOWITZ:  It's just general statements
22   about the investigation.
23   A   I know nothing about the investigation to be
24   totally honest.  (Perusing.)
25   Okay.  Yeah.  I don't have any questions.

Page 7

1    Q   Also prior to opening the record, you were
2    provided with a copy of the Commission Supplemental
3    Information Form 1662.
4    A copy of that notice has been
5    previously marked as Exhibit 1.
6    Have you had the opportunity to review Exhibit 1,
7    Mr. Furo?
8    A   I have had the opportunity to review Exhibit 1.
9    Q   And do you have any questions about Exhibit 1?
10   A   I do not have any questions.
11   Q   Mr. Furo, are you represented by counsel today?
12   A   Jack, yes.
13   MR. MURTHA:  Would counsel please identify
14   himself?
15   MR. YOSKOWITZ:  Sure.  Jack Yoskowitz, Seward and
16   Kissel, for the witness.
17   BY MR. MURTHA:
18   Q   Mr. Furo, this is a copy of a subpoena, which we
19   have had marked as Exhibit 69.
20   (SEC Exhibit No. 69 was marked for
21   identification.)
22   A   Okay.
23   Q   This is a copy of the subpoena you are appearing
24   pursuant to here today?
25   A   Yes.

Page 8

1    Q   Okay.
2    I will note for the record that the
3    subpoena also calls for the production of certain documents,
4    but after having conversations with counsel, we have agreed
5    to extend the deadline on the production of those documents,
6    and we will speak with your lawyer after this testimony to
7    figure out what we are going to do with regard to that.
8    MR. YOSKOWITZ:  Great.  Thanks.
9    Q   Mr. Furo, are you currently on or taking any
10   medications that would affect your ability to remember
11   things or recall events or do you suffer from any medical
12   conditions that would similarly affect you ability to recall
13   events or answer questions?
14   MR. MITCHELL:  For the record, you're talking too
15   fast for the court reporter.
16   A   I'm waiting for Melissa.  Okay.  I'm just
17   checking.
18   No.
19   Q   Could you walk us through your educational
20   background, maybe starting with after high school?
21   A   After high school, I enrolled at Hampshire
22   College in Amherst, Massachusetts, where I obtained a dual
23   degree in finance and neurobiology.
24   Q   What did you do after college?
25   A   Traded cryptocurrency and did some financial and

Page 9

1    organic chemistry consulting work.
2    Q   What do you do for a living now?
3    A   I trade and do consulting work.
4    MR. MITCHELL:  What year did you graduate?
5    THE WITNESS:  2016.
6    Q   So at some point after graduating you began
7    purchasing cryptocurrencies; is that right?
8    A   Yes.
9    And, technically, before graduation, right.
10   I mean, you know.
11   Q   In the middle of 2017, roughly how much had you
12   invested in crypto assets?
13   Like more than a million
14   dollars?
15   A   Are you asking me how much of my own personal
16   capital I put into the cryptomarket?
17   Q   Yes.
18   A   Zero dollars.
19   Q   Okay.
20   Whose money have you put into the
21   cryptomarkets?
22   A   My money, but money that I got paid for jobs.
23   MR. MITCHELL:  Let me try.
24   Say in the middle of
25   2017, roughly how much of digital assets did you -- did

## Page 10

1  you hold at that point?
2       THE WITNESS:  In the middle of 2017?
3       MR. MITCHELL:  Yep.
4       THE WITNESS:  A few million.
5       MR. MITCHELL:  Okay.
6       And, sorry, I'm just trying
7  to understand your answer from before.
8       Had you -- had you purchased those assets or been
9  sort of -- or gotten them for work that you had done?
10       THE WITNESS:  I had gotten them for work that I
11  had done and mined.
12       MR. MITCHELL:  And mined?
13       THE WITNESS:  Yep.
14       BY MR. MURTHA:
15       Q   Did you participate in purchasing Kin tokens?
16       A   Yes.
17       MR. MITCHELL:  Can I just ask one more?  You said
18  that you traded them.
19       So did you also trade digital assets?
20       THE WITNESS:  Yes.
21       MR. MITCHELL:  And so that means sometimes you
22  would trade one asset for a different asset?
23       THE WITNESS:  No.
24       MR. MITCHELL:  Sorry.
25       What did you mean when you

## Page 11

1  said trading?
2       THE WITNESS:  I prefer to interface with cash.  I
3  don't really like -- there is not a ton of liquidity in
4  the all coin world.
5       It makes much more sense to trade
6  against cash on stuff like GDAX or Gemini or something.
7       MR. MITCHELL:  So sometimes you would sell an
8  asset for cash; is that right?
9       THE WITNESS:  Yes.
10       MR. MITCHELL:  And then sometimes you would
11  buy -- you would use cash to purchase a different
12  asset?
13       THE WITNESS:  That's trade, yes.
14       BY MR. MURTHA:
15       Q   Did you buy Kin tokens in 2017?
16       A   I bought Kin tokens in 2017.
17       Q   What did you do to research Kik Interactive prior
18  to purchasing Kin?
19       A   I read their whitepaper, joined the Slack
20  channel, discussed the offering with developer friends of
21  mine.
22       Q   What did you learn?
23       A   I learned that Kik was a -- what did I learn
24  about the offering?
25       Q   Yes.

## Page 12

1       A   Yeah.
2       So I learned that they were raising money
3  to kind of build out this Kin ecosystem of using like in app
4  currency kind of micropayments.
5       Q   And that was attractive to you?
6       A   I think that it is one of the principal use cases
7  for the technology, so yes.
8       MR. MITCHELL:  The technology being blockchain
9  technology?
10       THE WITNESS:  Yeah.  Yeah.
11       BY MR. MURTHA:
12       Q   What did you weigh in deciding whether to
13  purchase Kin?
14       A   I weighed my liquidity, risk tolerance, time
15  horizon and viability of the product that, you know, was
16  tentatively nebulously being -- being discussed.
17       MR. MITCHELL:  Can we take those one at a time?
18  What do you mean by liquidity?
19       THE WITNESS:  My liquidity.
20       MR. MITCHELL:  What do you mean?
21       THE WITNESS:  I have a pot of money.  How much of
22  it can I, you know, put away for a long time.
23  That's --
24       MR. MITCHELL:  Into the Kin token?
25       THE WITNESS:  Yeah.  Yeah, yeah.

## Page 13

1       MR. MITCHELL:  I think you said liquidity --
2       MR. MURTHA:  Tolerance.
3       MR. MITCHELL:  Risk tolerance.  What did you mean
4  by risk tolerance?
5       THE WITNESS:  If Kin went to zero, could I handle
6  that.  Seems like a pretty good risk tolerance metric,
7  you know.
8       BY MR. MURTHA:
9       Q   And then you had also said the viability of the
10  product was something that you had weighed.
11       What do you mean by the viability of the product?
12       A   Well, in ICO land, you have people raising tens
13  of millions of dollars to make things that don't already
14  exist sometimes in any form.
15       Kik was a different case because it was an
16  existing company that had done successful VC raises and had a
17  large or at least significant and material user base.
18  Therefore, it seems, given their track record of success
19  here, where success means doing anything, they would be able
20  to do more anythings with tens of millions of dollars from
21  the offering.
22       MR. MITCHELL:  They would be able to do those
23  things after the offering?
24       THE WITNESS:  I think that -- yes, they need
25  money to do the things.

Page 14

1    MR. MITCHELL: One follow up. I think I had
2  already asked you the sort of amount of your holdings.
3    In the middle of 2017, roughly how many tokens or
4  digital assets did you own?
5    How many different ones?
6    THE WITNESS: I don't recall, but I mean, you
7  know, more than ten, you know, certainly.
8    MR. MITCHELL: Great.
9    BY MR. MURTHA:
10   **Q  You currently still hold all of your Kin?**
11   A  Yes.
12   **Q  Do you have an account on the Kik app, the Kik**
13  **messaging app?**
14   A  I do. Yep.
15   **Q  When did you open one?**
16   A  I opened it in maybe August of 2017.
17   **Q  And was that in anticipation of participating in**
18  **the Kin ICO?**
19   A  I made the account after I participated in the
20  Kin ICO.
21   **Q  So is it possible that maybe you created the**
22  **account after August because the ICO took place in September**
23  **of 2017?**
24   A  Yeah, then that does sound -- sound likely the --
25  yeah.

Page 15

1    **Q  Do you use the messaging app?**
2    A  I do.
3    **Q  What do you use it for?**
4    A  I use it to send messages.
5    **Q  Have you ever heard about digital stickers being**
6  **available to Kin token owners?**
7    A  I have heard about digital stickers.
8    **Q  What have you heard?**
9    A  That they are available to Kin token holders.
10   MR. MITCHELL: Did you hear about that before the
11  offering?
12   THE WITNESS: I did not hear about that before
13  the offering.
14   And imaginary stickers are the least
15  like -- they are just like -- I could not care less
16  about these stickers.
17   BY MR. MURTHA:
18   **Q  So is it fair to say you did not buy Kin tokens**
19  **to gain access to these Kik imaginary digital stickers?**
20   A  It's one of the truest things I have ever heard.
21   **Q  Did you buy Kin in the hopes of making money?**
22   A  I bought Kin for many reasons, one of them was to
23  make some money.
24   **Q  What were the other reasons?**
25   A  To use them on the platform and to just kind of

Page 16

1  support the adoption of the tech.
2    **Q  And at the time you purchased your Kin tokens,**
3  **were you able to use them for anything?**
4    A  Oh. I guess, yes.
5    **Q  What?**
6    A  Well, can you define "use" for me? You know what
7  I mean?
8    Because you could verify that you held them to do
9  some stuff, which might mean using, like I don't know if
10  you mean use them like spend them or transact with them.
11   **Q  Well, I guess I was using it in the same way**
12  **that -- or hoping to use it in the same way that you had**
13  **used the word "use," and I think, but correct me if I'm**
14  **wrong, I think you were saying that you were hoping to use**
15  **them in --**
16   A  I see.
17   For like stuff on the platform not
18  like -- yeah.
19   No, no, no, no. There wasn't anything
20  available then.
21   They had the whole infrastructure to build
22  out.
23   **Q  And it was Kik who had to build that**
24  **infrastructure?**
25   A  Yes.

Page 17

1    You know, because of my immense urge to
2  cooperate and help you, I just didn't know if maybe it was
3  another sticker question because you -- you know, after you
4  get the app and you can sync the app to like Kik's mainframe
5  or whatever that verifies your holdings, then you get your
6  stickers.
7    MR. MITCHELL: But you didn't buy the Kin tokens
8  to get access to get those stickers?
9    THE WITNESS: I'm going to go on the record and
10  say I don't give a fuck about the stickers. It was
11  kind of a weird thing.
12   It was like I download the
13  thing and they were like, dude, sick, you bought the
14  stuff, here's some stickers, and, you know, I thought
15  it was dumb and didn't even know about it before I --
16  before I purchased --
17   THE COURT REPORTER: "Before I purchased"? I
18  didn't hear what you said.
19   "Before I purchased the"?
20   THE WITNESS: I don't even remember what I said.
21   MR. MURTHA: Let's go off the record.
22   THE VIDEOGRAPHER: We are now off the record at
23  11:08 a.m.
24   (Recess taken.)
25   THE VIDEOGRAPHER: We are now on the record at

Page 18

1    11:13 a.m.
2        MR. MITCHELL:  Mr. Furo, during the break, did
3    you have any substantive conversations with the staff
4    about this case?
5        THE WITNESS:  No.
6        MR. MITCHELL:  Okay.
7        So earlier when we were
8    talking you had -- you had sort of talked about your
9    knowledge about Kik when you -- the company, when you
10   were trying to weigh the purchase of Kin tokens.
11       How did sort of Kik -- Kik's sort of past weigh
12   on -- weight into your decision making?
13       THE WITNESS:  Positively, I guess.  They had an
14   existing product and user base, which seems like, I
15   don't know, just makes more sense to support a company
16   that has a track record of success than one that
17   doesn't.
18       MR. MITCHELL:  Because you were predicting that
19   their track record of success at least suggested they'd
20   have some likelihood of being successful in the future?
21       THE WITNESS:  That's correct.
22       MR. MITCHELL:  And when you were weighing,
23   thereby purchasing Kin tokens, did you understand that
24   Kik would do things after the sale to work on the
25   project that you described earlier?

Page 19

1        THE WITNESS:  Yes.
2        MR. MITCHELL:  What kinds of things did you
3    understand that Kik would do?
4        THE WITNESS:  Just building out the
5    infrastructure to be able to actually use the tokens or
6    currency on the app and build out these kinds of, you
7    know, places where people transact and do stuff.
8        MR. MITCHELL:  So you understood that Kik was
9    going to work on its own app to integrate Kin tokens
10   into it?
11       THE WITNESS:  Yes.
12       MR. MITCHELL:  And did you understand that Kik
13   was going to work to sort of -- about sort of the
14   blockchain architecture for this Kin ecosystem?
15       THE WITNESS:  Yes.
16       MR. MITCHELL:  What did you understand -- what
17   kind of work did you expect Kik to do?
18       THE WITNESS:  Just integration.
19       MR. MITCHELL:  I mean specifically around sort of
20   the architecture of the blockchain.
21       Sorry.  Is that what integration
22   means?
23       THE WITNESS:  I don't -- wait.
24       What?  I just mean they were going
25   to make it so that there were places to use

Page 20

1    the token in the app.
2        MR. MITCHELL:  In the app?
3        THE WITNESS:  Yes.
4        MR. MITCHELL:  And did you also understand that
5    Kik would work to create some kind of system where
6    there could be transactions with Kin token away from
7    Kik's own app?
8        THE WITNESS:  Yes.
9        MR. MITCHELL:  And what did you understand that
10   Kik would do sort of to make those kinds of things
11   happen.
12       THE WITNESS:  Nothing explicit.
13       I mean, I don't think that
14   they published anything saying how they were
15   going to stepwise foster adoption.
16       I think I just assumed that
17   they would be able to because they have
18   existing users and are a relatively successful company.
19       MR. MITCHELL:  Did you think that Kik would work
20   on the architecture, the blockchain architecture for
21   this project that you were -- that you described
22   earlier?
23       THE WITNESS:  Uh-huh.  Yes.
24       MR. MITCHELL:  What kind of work would that
25   entail?  What kind of work did you understand this

Page 21

1    would entail?
2        What kind of architecture?
3        THE WITNESS:  Oh, just -- I don't know what to
4    say except just building it.
5        MR. MITCHELL:  And since the offering, has Kik
6    worked on the blockchain architecture?
7        THE WITNESS:  Yeah.  Yes.
8        MR. MITCHELL:  In what way?
9        THE WITNESS:  Well, the migration of Stellar is
10   the most visible movement, but I don't like work with
11   the dev team or check the updates, so --
12       MR. MITCHELL:  Tell me about -- what is the move
13   to Stellar?
14       THE WITNESS:  The move to Stellar is using the
15   Stellar blockchain instead of the Ethereum chain to
16   have the transactions, right?
17       So initially, at the time of
18   the offering, like people went and said, okay,
19   I'm buying these Kin ERC20 tokens.
20       These are the exact tokens
21   that are going to be used on the Kin app.  Now
22   that's not true.
23       Now the tokens or coins or assets or whatever
24   that are being used on the app are tokens that are --
25   live on the Stellar chain, and you now have to swap

Page 22

```
1    them out on a one-to-one basis.
2          So there's now like a divorce between the
3    original Kin and the Stellar Kin.
4          MR. MITCHELL:  And so people who own the
5    original Kin can exchange them one-for-one for the Stellar
6    Kin?
7          THE WITNESS:  Correct.
8          MR. MITCHELL:  And then the Stellar Kin are
9    actually digital assets that exist on a -- on -- do you
10   know what blockchain?
11         THE WITNESS:  Stellar.
12         MR. MITCHELL:  On the Stellar blockchain?
13         THE WITNESS:  Yeah.
14         MR. MITCHELL:  Okay.
15         And those are the tokens or
16   coins that people are using to conduct transactions
17   inside the Kik app, as far as you understand?
18         THE WITNESS:  Yes.
19         MR. MITCHELL:  Okay.
20         And do you think that
21   the -- that that step or that change has -- is
22   significant to the project?
23         THE WITNESS:  Yes.
24         MR. MITCHELL:  Why?
25         THE WITNESS:  Well, because they are just trying
```

Page 23

```
1    to make it possible, right?
2          I mean, their original --
3    any -- any vision of saying, okay, like we're going to
4    have a lot of small transactions on a single main net
5    is tough.
6          And this was a problem even before I put money
7    into the shit, right?
8          Like it was no secret that
9    scalability and the breadth of transactional volume or
10   whatever that they were hoping to engender was going to
11   be difficult on the Ethereum main net.
12         We all knew it.
13         It was suggested at the time -- and I think they
14   even acknowledged it in the whitepaper, to be
15   completely honest you with you.
16         I think there was a section
17   where they were like, yeah, Ethereum might not
18   be the best thing.
19         And what I think we thought that they were going
20   to do was just kind of do like an accrual accounting
21   thing where they did all the transactions and then they
22   just did true-ups to the main net later.
23         So then they said no, fuck that, like use Stellar
24   now, and that's -- you know, that's it.
25         MR. MITCHELL:  Originally you thought that the
```

Page 24

```
1    transactions might happen sort of off the blockchain
2    entirely inside Kik's system?
3          THE WITNESS:  Yeah, that's exactly right because
4    the Ethereum network isn't expensive to use, but it
5    does cost money to use.
6          And if you are saying, you
7    know, we're going to do a bunch of on-chain Ethereum
8    transactions for like 30 cents or a dollar, like
9    it doesn't -- it doesn't -- you know, we're not at that
10   point in the Ethereum development that that's not going
11   to like destroy the network or not go through.
12         MR. MITCHELL:  Since the offering, has Kik done
13   anything else that you consider significant to sort of
14   making progress on the project you described earlier?
15         THE WITNESS:  So since the SEC stuff has come
16   about, I have been so annoyed by it all that I don't
17   really watch it.
18         So I can't -- I can't say.
19         I mean, I know that there is an active community
20   on the forums who are excited about the project and a
21   lot of partnerships get rolled out, but I don't even
22   know who the partnerships are with.
23         It's, you know --
24         MR. MITCHELL:  What kind of partnerships?
25         THE WITNESS:  Totally, I have no idea.
```

Page 25

```
1          MR. MITCHELL:  I'm just going to give you one
2    document.  I'm going to give you what's previously been
3    marked as Exhibit 2.
4          THE WITNESS:  Thank you.
5          MR. MITCHELL:  Exhibit 2 is a multi-page that has
6    Bates numbers KIK000001 to 28.  Take as long as you
7    want to flip through it.
8          The first question I'm going to ask you is, do
9    you recognize this document?
10         THE WITNESS:  Oh, boy.
11         You know, I don't know
12   because, you know, there were revisions to this
13   document.
14         So do I -- do I know the document?  I guess
15   I know the document.
16         Is this the revision or -- you
17   know, version that I'm familiar with?  I can't -- I
18   can't tell.
19         MR. MITCHELL:  Did you read a whitepaper that Kik
20   published?
21         THE WITNESS:  Yeah, I did.
22         MR. MITCHELL:  And did you use the -- did you
23   read that as part of your considering --
24         THE WITNESS:  Yes.
25         MR. MITCHELL:  That was part of your due
```

Page 26

1   diligence?
2        THE WITNESS:  Yes.
3        MR. MITCHELL:  And sitting here today, does this
4   look like the whitepaper that you reviewed?
5        THE WITNESS:  Yeah.  Yeah, it looks like it, I
6   guess.
7        MR. MITCHELL:  Just flipping through it, when you
8   were doing your due diligence, were there any parts of
9   this that you considered particularly important or
10  particularly unimportant?
11       THE WITNESS:  The inflation rate was important.
12  The inflation rate was stupid, and they should feel bad
13  about it.
14       MR. MITCHELL:  I'm sorry.
15       The inflation rate was
16  the idea that over time -- sorry.
17       The original sale was for
18  a trillion Kin and then over time they would
19  add more Kin to the system?
20       THE WITNESS:  Correct.
21       MR. MITCHELL:  So that was not a feature that you
22  liked?
23       THE WITNESS:  I just think it's stupid behavior.
24       MR. MITCHELL:  I'm sorry.  Why?
25       THE WITNESS:  It's stupid behavior because it's a

Page 27

1   30 percent inflation rate, like what do you want?  Like
2   what?  That's like --
3        MR. MITCHELL:  Were there any other parts in here
4   that you thought were particularly, you know, useful or
5   not relevant?
6        THE WITNESS:  There were some use cases that I
7   just thought were a good idea.
8        I'm just struggling
9   because I don't know if this is the exact same
10  document.
11       I'm used to seeing it in PDF, so it's kind
12  of -- kind of weird.
13       MR. MITCHELL:  Leaving aside the physical
14  document you're holding, you remember that you
15  considered the use cases when you were looking at the
16  whitepaper?
17       THE WITNESS:  Yeah.
18       MR. MITCHELL:  And those use cases, were those --
19  as you remember it, were the use cases that you looked
20  at things that Kin owners could do immediately after
21  the sale?
22       THE WITNESS:  No.
23       MR. MITCHELL:  Were those use cases things that
24  Kik said might happen in the future?
25       THE WITNESS:  Yes.

Page 28

1        MR. MITCHELL:  When you -- when you purchased
2   your Kin tokens, did you go through Kik's Know Your
3   Customer process?
4        THE WITNESS:  That's how you found me.
5        MR. MITCHELL:  Okay.
6        And did you submit, as part of that,
7   your e-mail address as part of your application to
8   purchase?
9        THE WITNESS:  Yes.
10       MR. MITCHELL:  Okay.
11       And when you purchased, did
12  you pay Kik ether to obtain Kin tokens?
13       THE WITNESS:  Yes.
14       MR. MITCHELL:  And is your e-mail address sort of
15  a variation of your name at Gmail?
16       THE WITNESS:  Yes.
17       MR. MITCHELL:  Anything else?
18       Okay.
19       So we really don't have any more questions
20  for you today.
21       What we do always when we end is we
22  offer both the lawyer and the witness an opportunity.
23       Is there anything that you would want to
24  supplement or correct from what we have discussed
25  earlier today?

Page 29

1        THE WITNESS:  No.
2        MR. MITCHELL:  And we always offer the lawyer.
3   Is there anything you would want to ask him, clarifying
4   questions?
5        MR. YOSKOWITZ:  No.
6        MR. MITCHELL:  Can we go off the record?
7        THE VIDEOGRAPHER:  Is this the end of the
8   deposition?
9        MR. MURTHA:  I think so.
10       THE VIDEOGRAPHER:  This concludes today's
11  deposition of Garrette Furo.  We are now off the record
12  at 11:25 a.m.
13       (Whereupon, at 11:25 a.m., the examination was
14  concluded.)
15              * * * * *
16
17
18
19
20
21
22
23
24
25

Page 30

```
 1          PROOFREADER'S CERTIFICATE
 2
 3    In the Matter of:  KIK INTERACTIVE
 4    Witness:        Garrette Furo
 5    File Number:     HO-13388-A
 6    Date:          Thursday, July 12, 2018
 7    Location:       New York, New York
 8
 9        This is to certify that I, Christine Boyce, (the
10    undersigned) do hereby swear and affirm that the attached
11    proceedings before the U.S. Securities and Exchange
12    Commission were held according to the record, and that
13    this is the original, complete, true and accurate
14    transcript, which has been compared with the reporting or
15    recording accomplished at the hearing.
16
17
18    _____   _____
19    (Proofreader's Name)          (Date)
20
21
22
23
24
25
```