SEC89

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


        _____
                                      |
        U.S. SECURITIES AND EXCHANGE  |
        COMMISSION                    |
                                      |
                         Plaintiff,   |   Case No. 19-cv-5244
                                      |
                                      |   Jury Trial Demanded
                 vs.                  |
                                      |
                                      |
        KIK INTERACTIVE INC.          |
                                      |
                         Defendant.   |
                                      |

        _____|
```

        TB/jlk/sr

                         -----------------------


                This is the Deposition of PAT CHAUKOS, in the

        above-noted matter, taken at the offices of VICTORY

        VERBATIM REPORTING SERVICES INC., Toronto-Dominion Centre,

        Suite 900, 222 Bay Street, Toronto, Ontario, on the 5th day

        of December, 2019.


                         -------------------------

```
A P P E A R A N C E S:

STEPHAN J. SCHLEGELMILCH              -- for the Plaintiff
LAURA D'ALLAIRD
U.S. Securities and Exchange Commission
Division of Enforcement
100 F Street, N.E.,
Washington, DC 20549
Tel:    202-551-4935
schlegelmilchs@sec.gov
dallairdl@sec.gov

LUKE CADIGAN                          -- for the Defendant
JULIANNE LANDSVIK
Cooley
500 Boylston Street
Boston, MA 02116-3736
Tel:    617-937-2480
Fax:    617-937-2407
lcadigan@cooley.com
jlandsvik@cooley.com


KEVIN HARNISCH                        -- for Pat Chaukos

Norton Rose Fulbright

799 9th Street NW, Suite 1000

Washington, DC 2001-4501

Tel:    202-662-0200

kevin.harnisch@nortonrosefulbright.com


YVONNE CHISHOLM                       -- for the Ontario
                                         Securities
Ontario Securities Commission
                                         Commission
20 Queen Street, West

Toronto, Ontario M5H 3S8

Tel:    416-593-2363

ychisholm@osc.gov.on.ca
```

Page 166

INDEX OF PROCEEDINGS

PAGE NUMBER

PAT CHAUKOS, affirmed

Examination by Mr. Cadigan                          4

Examination by Mr. Schlegelmilch         166 - 186

Continued Examination by Mr. Cadigan     186 - 187

Index of Exhibits                        188 - 189

Certificate                              190

Errata Sheet                             191

---

Page 5

1  first, if you are in the middle of answering a
2  question, if you wouldn't mind finishing that
3  question, or maybe finishing up a topic, I may ask
4  your indulgence just to finish that topic.
5      A.    Okay.
6      Q.    Just some of the things, just for
7  us, the counsel have already stipulated for the
8  depositions here...we have stipulated that all
9  objections, other than to form, may be reserved.
10     Also, before we get started, have you
11 ever provided testimony before?
12     A.    In a hearing?
13     Q.    No.  In deposition under oath of
14 any kind, in a hearing...
15     A.    I have been a witness in a
16 hearing, yes.
17     Q.    And when was that?
18     A.    That was an OSC matter.
19     Q.    Okay.  And how long ago was that?
20     A.    A few years ago.
21     Q.    Okay.  And what forum was that in?
22     A.    In a commissioner's boardroom,
23 just like a regular hearing room.
24     Q.    Okay.  What was the nature of the
25 matter?

---

Page 4

1  ---  upon convening at 9:30 a.m.
2  ---  upon commencing at 9:30 a.m.
3
4  PAT CHAUKOS, affirmed
5  EXAMINATION BY MR. CADIGAN:
6      MR. CADIGAN:    Before we get started,
7  can we have counsel just identify
8  themselves?
9      MR. HARNISCH:    Norton Rose Fulbright
10 on behalf of the witness.
11     MR. CADIGAN:    Thank you, Ms. Chaukos,
12 am I pronouncing that right?
13     THE WITNESS:    Yes.
14
15 BY MR. CADIGAN:
16     Q.    Thanks for coming today.  Before
17 we get started, I just want to go over some of the
18 ground rules today.  I am going to ask you a
19 series of questions.  If at any time you don't
20 understand any of the questions, please just ask
21 me and I will rephrase it.  We are going to go
22 long.  If you need a break at any time, just let
23 me know and we will take a break.
24     A.    Okay.
25     Q.    I only ask, if you can, just

---

Page 6

1      A.    It was relating to a registrant
2  firm.
3      Q.    And note that you are submitting
4  voluntarily to this deposition under oath, is that
5  right?
6      A.    Yes.
7      Q.    Okay.  Are you appearing pursuant
8  to the memorandum of understanding between
9  Canadian Securities regulators and the SEC?
10     A.    I assume so, yes.
11     Q.    Okay.  Do you know of any reasons
12 that you can't testify truthfully, competently,
13 completely today?
14     A.    No.
15     Q.    I would like to start with your
16 background.  Did you get an undergraduate degree?
17     A.    Yes, I did.
18     Q.    And where did you get that?
19     A.    The University of Toronto.
20     Q.    And when did you graduate?
21     A.    1983.
22     Q.    And then, what did you do after
23 that?
24     A.    I was at Pricewaterhouse until, I
25 believe, 1986.

P. Chaukos

Page 7

1    MR. CADIGAN:    Before we get started,
2    I am going to introduce...what's our next
3    exhibit?
4        MR. SCHLEGELMILCH:    It depends. If
5    you want to pick up after Mr. Heinke, it
6    is 72. If you want to pick up after Mr.
7    Rousmaniere, whose name I cannot
8    pronounce, it's 107, and I have stickers
9    here if you would like to use them.
10       MR. CADIGAN:    Great. Thank you.
11   Yes, we will start with 107 then.
12       MR. SCHLEGELMILCH:    Yes. So 108 is
13   the next.
14       MR. CADIGAN:    108. Thank you.
15       MR. SCHLEGELMILCH:    I don't have
16   those. I'm sorry. I don't have after
17   108. I just have the earlier set.
18       MR. CADIGAN:    Okay. Do you have
19   stickers by any chance? Can we...okay,
20   great.
21       MR. SCHLEGELMILCH:    And Counsel, this
22   is Exhibit 108?
23       MR. CADIGAN:    Yes.
24
25   --- EXHIBIT NO. 108: Pat Chaukos' Background as listed

Page 8

1            on LinkedIn
2
3    BY MR. CADIGAN:
4        Q.    I am handing you what we have
5    marked as Exhibit 108, which was taken from...or
6    actually, this is your background as listed on
7    your LinkedIn account, is that right?
8        A.    Yes.
9        Q.    And as reflected here under your
10   education, and as you indicated, you graduated
11   from the University of Toronto?
12       A.    M'hmm.
13       Q.    And you did so in 1983?
14       A.    Yes.
15       Q.    Okay. And what was your degree
16   in?
17       A.    Bachelor of Commerce.
18       Q.    And you said thereafter you worked
19   at Pricewaterhouse Coopers from 1983 to 1986, is
20   that right?
21       A.    I did.
22       Q.    And what was your role there?
23       A.    I was...well, when you graduate
24   and you are going towards your CPA, at the time it
25   was called a CA, chartered accountant designation,

Page 9

1    you have various roles. But, I was there for
2    three years, so when I left I was a senior at
3    Pricewaterhouse.
4        Q.    And had you taken any accounting
5    courses during your undergraduate time?
6        A.    Yes, it's a requirement. There's
7    a number of courses that have to be done.
8        Q.    Okay. And at some point, you
9    gained your CPA, is that right?
10       A.    I did.
11       Q.    And when was that?
12       A.    I think 1986.
13       Q.    Okay. And where were you
14   authorized as a CPA? In what jurisdictions?
15       A.    Canada.
16       Q.    Canada. And do you still have
17   that CPA?
18       A.    Yes.
19       Q.    After Pricewaterhouse Coopers,
20   what did you do next?
21       A.    After Pricewaterhouse Coopers I
22   was home for a period of time doing consulting
23   work. It was during a time that I had my
24   children.
25       Q.    And were you working for yourself

Page 10

1    during that period?
2        A.    No. I was working for another
3    company.
4        Q.    What was the name of that company?
5        A.    It was like...it was consulting
6    and like, realty-type projects. But, it was part-
7    time. For the most part, I wasn't working.
8        Q.    But, what was the name of the
9    consulting firm that you were working for?
10       A.    I didn't really have a name. It
11   is just I was consulting on various projects.
12       Q.    Okay. I'm sorry. My
13   misunderstanding. I thought you were working for
14   someone else. The consulting...
15       A.    I met clients.
16       Q.    ...that you were doing, were you
17   self-employed as a consultant, or...
18       A.    Self-employed, part-time. Very
19   part-time.
20       Q.    And you said you were working on
21   real estate-type...
22       A.    Projects.
23       Q.    ...projects?
24       A.    Yes.
25       Q.    And what, in particular, were you

P. Chaukos

## Page 11

1  doing on those types of projects?
2      A.    Just providing financial advice.
3      Q.    And how long did you do that?
4      A.    Until I went...I did that only for
5  a period of time.  I went to law school in 1993.
6      Q.    And where did you go to law
7  school?
8      A.    Osgoode Hall in Toronto.
9      Q.    And you graduated from there?
10      A.    I did.
11      Q.    In what year?
12      A.    1996.
13      Q.    And you are still a practising
14  attorney?
15      A.    Yes.
16      Q.    And where are you authorized to
17  practise law?
18      A.    Ontario.
19      Q.    Are you authorized to practise in
20  any other jurisdictions?
21      A.    No.
22      Q.    And so, you are not a member of
23  any Bar in the United States, correct?
24      A.    No.
25      Q.    And you are not authorized to

## Page 12

1  practise there, right?
2      A.    No.
3      Q.    And after law school, what did you
4  do?
5      A.    After law school I went to
6  McCarthy Tetrault as an articling student.
7      Q.    What is an articling student?
8      A.    It's a period of time that you
9  have do as a...in order to become, you know, I
10  guess, barrister and solicitor in Ontario.
11      Q.    And what do you do in that role?
12      A.    Provide legal advice to various
13  clients of the law firm.
14      Q.    And how does that role differ from
15  that of a barrister or solicitor?
16      A.    Well, you are not officially a
17  barrister and solicitor until you have passed the
18  Bar admission course.
19      Q.    Was there a particular focus that
20  you had when you were providing legal advice at
21  McCarthy Tetrault?
22      A.    No.  You had to do certain
23  rotations, so it would have been in various areas.
24      Q.    And what areas?
25      A.    I don't recall.  Corporate, I

## Page 13

1  remember.  Tax.  I did real estate, securities.
2  Various areas.
3      Q.    And after McCarthy Tetrault, your
4  LinkedIn profile reflects that you went to Royal
5  Mutual Funds Inc...
6      A.    Yes.
7      Q.    ...is that right?
8      A.    Yes.
9      Q.    And your role there was what?
10      A.    I had various roles there.  I
11  started off as a manager in compliance.  I became
12  a senior manager.  And by the end of it I was
13  Vice-President of Risk Management and Compliance.
14      Q.    So starting off when you were
15  manager in compliance, what were your
16  responsibilities in that role?
17      A.    So I worked in the Toronto head
18  office.  I would oversee the chief compliance
19  officers in each province, and the teams in each
20  province.  And I would develop compliance systems,
21  or policies, or provide advice around compliance
22  and risk management, as part of that role.
23      Q.    And at this time you were working
24  for a mutual fund dealer, is that right?
25      A.    M'hmm.

## Page 14

1      MR. HARNISCH:    You have to say "Yes"
2  or "No".
3      THE WITNESS:    Yes.  Sorry.
4
5  BY MR. CADIGAN:
6      Q.    And thereafter, you said that you
7  were...so how long were you in that role?  What
8  years?
9      A.    I would have to look back.  I
10  believe I was there for three years, but I would
11  have to look back.
12      Q.    You were there three years...
13      A.    Three...almost three-and-a-half
14  years.
15      Q.    But, you said during that three-
16  and-a-half years you had different titles, right?
17      A.    M'hmm.
18      Q.    Okay.  And so, I am asking about
19  your first title.  Do you recall how long you were
20  in that first role as manager...
21      A.    I don't recall.
22      Q.    Even generally do you recall?  No?
23      A.    Probably a year, year-and-a-half.
24      Q.    Okay.  And then, thereafter, you
25  were in a senior manager role, right?

P. Chaukos

Page 15

1    A.    Yes.
2    Q.    And generally, how long were you
3  in that role?
4    A.    Probably, about a year, a year-
5  and-a-half.
6    Q.    Okay.  And thereafter, you
7  received another promotion, is that right?
8    A.    I did.
9    Q.    And to what position?
10    A.    Vice-President Risk Management and
11  Compliance.
12    Q.    Okay.  And how did that role
13  differ from the roles that you had had previously?
14    A.    Obviously, more responsibility as
15  a result of the work I had done previously.
16    Q.    Okay.  And that role again was
17  overseeing compliance for the mutual fund
18  distributor, correct?
19    A.    Yes.  And the asset manager.
20    Q.    And then, in November 2001, you
21  joined the Ontario Securities Commission, is that
22  right?
23    A.    Yes.
24    Q.    And what prompted that move?
25    A.    What prompted that move?

Page 16

1    Q.    Yes.
2    A.    Actually, trying to, quite
3  frankly, just a better balance in terms of
4  lifestyle.
5    Q.    And so, what role did you take on
6  at the...again, if you don't mind, during the
7  day we are going to call it the OSC, is that okay?
8    A.    Yes.
9    Q.    And what role did you take on at
10  the OSC when you first started?
11    A.    I was actually in a novel role,
12  senior accountant and legal counsel in the
13  compliance area.
14    Q.    Compliance?
15    A.    M'hmm.
16    Q.    And when you say compliance, what
17  entities were you overseeing compliance for?
18    A.    Any firm that would be required to
19  be registered or licensed with the OSC.
20    Q.    And what types of firms are those?
21  Are those broker-dealers, investment advisors?
22    A.    It could be dealers, it could be
23  what we call portfolio managers, and it could be
24  investment fund managers, as well.
25    Q.    Any operating companies that are

Page 17

1  required to be registered under Canadian law?
2    A.    If they are in the business of
3  trading, or dealing, or acting as a fund manager,
4  yes.
5    Q.    Okay.  And what did you do in that
6  role?
7    A.    In the first role?
8    Q.    Yes.
9    A.    I...there was a need for legal
10  advice to the compliance team, because a number of
11  the operational issues that came up in compliance
12  reviews required legal input.
13    Q.    And how long were you in that
14  role, the senior accountant role?
15    A.    I don't recall exactly.
16    Q.    I'm sorry, it was senior
17  accountant and counsel, is that right?
18    A.    Yes.
19    Q.    And, at some point, you received a
20  new title, right?
21    A.    I had multiple titles at the OSC.
22  The next title was senior legal counsel, senior
23  accountant.  Then, it was assistant manager, and
24  then it was manager in the compliance and
25  registrant regulation branch, which was a newly

Page 18

1  formed branch.  And then, I took on the role...
2    Q.    If you don't mind, I want to go
3  through some of these things...
4    A.    Okay.
5    Q.    ...and then we can pick...
6    A.    Sure.
7    Q.    ...it up later.  So before when
8  you were senior legal counsel, and then assistant
9  manager, that was, again, within the compliance
10  branch?
11    A.    The assistant, yes.  Both of those
12  were in the compliance branch.  Capital markets
13  branch actually.  Compliance was a key area of
14  capital markets at the time.
15    Q.    And how did you roles change as
16  you took on these new titles?
17    A.    Well, as assistant manager of the
18  dealer team, we were looking at many registered
19  firms that are registered as what are called
20  exempt market dealers, or scholarship plan
21  dealers.  Pretty much any dealers outside of those
22  regulated by IIROC which is our SRO, similar to
23  FINRA in the States.
24    Q.    And what does IIROC stand for?
25    A.    Investment Industry

## Page 19

1    Regulatory...okay...Investment Industry of Canada,
2    something like that...Regulatory Organization of
3    Canada...Investment Industry Regulatory
4    Organization of Canada.
5        Q.    And you said it was an SRO, so a
6    self-regulatory organization?
7        A.    Yes.
8        Q.    And what was it regulating?
9        A.    Broker-dealers.
10       Q.    So when you had the role as
11   assistant manager, your sole focus was broker-
12   dealers at that time?
13       A.    No.  It would be dealers outside
14   of the ones that are the broker-dealers.  So it
15   would be any dealer.  We are set up a little
16   differently in Canada.  So the broker-dealers, the
17   SRO is IIROC, so they would do primarily the
18   compliance role.  And then, any other type of
19   dealer, my team would go out and do the compliance
20   reviews and look at operations and ensure that
21   firms are compliant with securities regulations.
22       Q.    Okay.  And I guess my question
23   was, you were looking though exclusively at
24   dealers?
25       A.    Not necessarily.  In that role the

## Page 20

1    way we work is, as part of the management team,
2    you are looking across.  But, my team primarily
3    would do compliance reviews of the dealers, yes.
4        Q.    Okay.  And you don't recall how
5    long you had that title until?
6        A.    I think it was probably a couple
7    years before I become manager.
8        Q.    And do you recall when you became
9    manager?
10       A.    No.
11       Q.    Okay.  And then, you said you
12   became manager of the compliance and registration
13   group?
14       A.    Registrant regulation branch.  It
15   was a newly organized branch to the OSC.
16       Q.    And what was your role there?
17       A.    As part of the management team we
18   are responsible for the licensing or registration
19   of all firms, and compliance oversight of all
20   licensed or registered firms.  So that would
21   include fund managers, portfolio managers and
22   dealers.
23       Q.    And your LinkedIn profile says you
24   had that role until October 2016, is that
25   accurate?

## Page 21

1        A.    Yes.
2        Q.    And then, in October 2016, you
3    took on the role as chief of the OSC LaunchPad, is
4    that right?
5        A.    Yes.
6        Q.    I want to talk about that in a
7    second.  But, going back to the OSC, the OSC's
8    authority to regulate comes from the Securities
9    Act of Ontario, and the Commodity Futures Act, is
10   that right?
11       A.    Yes.
12       Q.    Okay.  And its jurisdiction is
13   limited to administering and enforcing securities
14   laws in the province of Ontario in Canada,
15   correct?
16       A.    Yes.
17       Q.    It does not have jurisdiction over
18   securities laws in other provinces, right?
19       A.    No.
20       Q.    And the securities laws that we
21   are talking about are the ones that was authorized
22   under the Securities Act of Ontario, and the
23   Commodity Futures Act of Ontario, correct?
24       A.    Yes.
25       Q.    Okay.  Canada has no federal

## Page 22

1    securities law, right?  No law that governs all of
2    Canada.
3        A.    No.  We work together with our
4    provincial securities counterparts, and that is
5    what is called the Canadian Securities
6    Administrators, or CSA.
7        Q.    And as you just described, Canada
8    has no one national securities regulator, right?
9        A.    No.
10       Q.    And, of course, OSC does not have
11   authority to regulate issues under U.S. law, does
12   it?
13       A.    No.
14       Q.    And the securities laws in the
15   U.S. are obviously different than those in Canada,
16   right?
17       MR. HARNISCH:    Objection.  You can
18   answer.
19       THE WITNESS:    Can you repeat the
20   question?
21
22   BY MR. CADIGAN:
23       Q.    Yes.  The securities laws in
24   Ontario are obviously different than the
25   securities laws in the United States, correct?

P. Chaukos

| Page 23 | Page 25 |
|---|---|

**Page 23**

1   A.   Correct.
2       MR. HARNISCH:   Objection.
3
4   BY MR. CADIGAN:
5       Q.   And the Securities Act of Ontario
6   is not the same as the U.S. Exchange Act, or the
7   Securities Act of the United States, is that
8   right?
9       MR. HARNISCH:   Objection.
10      THE WITNESS:   Yes.
11
12  BY MR. CADIGAN:
13      Q.   Now, are you familiar with what
14  the OSC's public interest jurisdiction is?
15      A.   Yes.  Somewhat, yes.
16      Q.   Okay.  What is that?
17      A.   I mean, we have a public interest
18  mandate under the Act.
19      Q.   And under Section 127 of the
20  Ontario Securities Act, the OSC has power to
21  exercise its public interest jurisdiction to issue
22  sanctions, even where there's been no violation of
23  the Act, regulations thereunder, or policy
24  statements, is that right?
25      MR. HARNISCH:   Objection.  I mean,

**Page 24**

1   obviously, I want to let you go through
2   background and some foundational stuff,
3   but I did mention in our e-mails early on
4   about what we were prepared to have Pat
5   talk about.  One of the things that we
6   are not going to have her do is
7   essentially come in and talk as an expert
8   on securities law.  So, I mean, some of
9   these basic things, you want to say the
10  Ontario regulatory scheme is different
11  from the U.S., that's great, but if we
12  are going to go down a road getting into
13  the, you know, minutiae of, you know,
14  public interest jurisdiction and things
15  like that, I would like to spend our
16  time, kind of, more focused to the issues
17  that Pat can talk about with first-hand
18  knowledge, you know, relevant to the
19  litigation.
20      MR. CADIGAN:   Yes.  And as I think I
21  mentioned to you, I don't think her
22  testimony is relevant for a number of
23  different reasons, and we wouldn't plan
24  to call her for all of those reasons,
25  including the fact that she is, in

**Page 25**

1   essence, testifying on U.S. law.  And so,
2   I appreciate that and you know, if we get
3   into those areas, obviously, you know,
4   you can do what you need to do.  But, I
5   mean, to the extent that her testimony
6   comes up at all, I want to make sure that
7   I have a record that makes it clear that
8   she shouldn't be testifying at all in
9   this matter.
10      MR. HARNISCH:   I mean, obviously, you
11  can ask whatever you want.
12      MR. CADIGAN:   Yes.
13      MR. HARNISCH:   I just want to, kind
14  of..
15      MR. CADIGAN:   No, I appreciate that.
16      MR. HARNISCH:   ...give you a heads-
17  up.  I'm not sure how deep you want to go
18  into those areas, but just, kind of, want
19  to make sure there aren't surprises if we
20  are going to be going much deeper.
21      MR. CADIGAN:   Right.  Okay.  And
22  again, I appreciate that.
23
24  BY MR. CADIGAN:
25      Q.   I'm going to ask the question

**Page 26**

1   again.  Under Section 127 of the Ontario
2   Securities Act, the OSC has the power to exercise
3   its public interest jurisdiction to issue
4   sanctions, even when there's been no violation of
5   the Act, regulations thereunder, or policy
6   statements, is that right?
7       A.   I don't know if those are the
8   exact words, but that sounds accurate.
9       Q.   And there's no constitutional
10  right to a jury in OSC civil litigation, is there?
11      A.   I would have to defer to counsel
12  on that.
13      Q.   But, you're not aware?
14      A.   Not that I'm aware, no.
15      Q.   Do you know whether the insider
16  trading laws are different in the United States
17  than in Ontario?
18      MR. HARNISCH:   Objection.
19      THE WITNESS:   I don't know.
20
21  BY MR. CADIGAN:
22      Q.   You mentioned that in October
23  2016, you took on the position as chief of
24  LaunchPad?  What is LaunchPad?
25      A.   LaunchPad is a dedicated team at

P. Chaukos

## Page 27

1   the OSC that is there to help support Fintech
2   businesses navigate the regulatory requirements.
3   And what that typically means is that a business
4   will come in and talk to us about how securities
5   regulation applies to their business.
6       Q.   And from the outset, did LaunchPad
7   have responsibility for initiatives related to
8   blockchain technology?
9       A.   That's a novel Fintech business,
10  so yes, it would look at blockchain technology-
11  type businesses.
12      Q.   And when you joined LaunchPad as a
13  chief in October 2016, did you understand that
14  LaunchPad had responsibility for initiatives
15  related to blockchain technology?
16      A.   The mandate of the team is to help
17  support novel Fintech businesses.  What we found
18  were a number of blockchain technology businesses
19  were coming in to request support from our team.
20      Q.   M'hmm.  And when did they first
21  start coming to LaunchPad to request assistance?
22      A.   It would have been certainly
23  before March of 2017, so probably late 2016, early
24  2017.
25      Q.   LaunchPad, what branch does that

## Page 28

1   fall under?
2       A.   In the corporate structure?
3       Q.   At OSC, yes.
4       A.   Under compliance and registrant
5   regulation.
6       Q.   When you became its first chief,
7   who did you report to?
8       A.   I reported to Debra Foubert who is
9   the director, but I also reported to our chair,
10  because this was a new initiative.
11      Q.   I'm sorry.  Could you spell that
12  name again?
13      A.   Debra, D-E-B-R-A, Foubert, F-O-U-
14  B-E-R-T.
15      Q.   And what was her title?
16      A.   Director of the compliance and
17  registrant regulation.
18      Q.   And when you say compliance and
19  registrant regulation, what is its role?  What is
20  its scope?
21      A.   Similar to what I described
22  earlier.  It's overseeing all firms and
23  individuals that are licensed or registered with
24  us.
25      Q.   Okay.  As you mentioned, dealers,

## Page 29

1   portfolio managers, investment fund managers, is
2   that right?
3       A.   Right.
4       Q.   How many people reported to you
5   when you became chief of LaunchPad?
6       A.   So the way the team works is we
7   actually have a virtual team.  So we have members
8   that are part of the core team full-time, and then
9   we also have subject matter experts that we draw
10  on from each of the operational branches, to come
11  in, depending on what the business is that we are
12  helping support.  So it could be market
13  regulation, corporate finance, investment funds.
14  There's various members on the team.
15      Q.   Ma'am, when you say that you help
16  Fintech entities navigate the regulatory
17  framework, do you also advise them when they don't
18  need to register?
19      A.   No.  We don't provide legal advice
20  on when they don't need to register.  If we have
21  concerns that they should be registered, we raise
22  those concerns.
23      Q.   When you took on the role as
24  chief, did you have any role in setting policy at
25  the OSC?

## Page 30

1       A.   I mean, throughout all of my
2   roles, there's been roles in setting policy.
3       Q.   So in your role at LaunchPad, you
4   had a role in setting policy?
5       A.   That wasn't the mandate of the
6   team.  The mandate of the team is to help support
7   Fintech innovation in Ontario, and to help
8   Canadian businesses in those types of areas, and
9   to help them navigate regulatory requirements,
10  because a number of these novel Fintech businesses
11  don't understand how regulation applies to them.
12      Q.   Okay.  And based upon that answer,
13  I imagine the answer to this question is no, but I
14  take it then that LaunchPad has no role in helping
15  to structure, or publish guidance to the industry?
16      A.   No.  We did that...we do that.
17      Q.   You do that?  And so, have you
18  released guidance or had a role as release and
19  guidance for the OSC?
20      A.   In this role?
21      Q.   Yes.
22      A.   Yes.
23      Q.   Okay.  Have you done so at all in
24  the blockchain or crypto space?
25      A.   Yes.

P. Chaukos

| Page 31 | Page 33 |
|---|---|

Page 31

1      Q.    And what guidance have you had a
2  role in helping to craft?
3      A.    Well, we first started with a
4  media release in March of 2017, where we raised to
5  businesses that are in this space, they need to be
6  thinking about both registration, prospectus and
7  marketplace requirements.  We issued CSA notice in
8  August of 2017 on cryptocurrency offerings, and we
9  talk about a number of areas.  And then, we also
10  did another notice about a year later.  And most
11  recently, we have done a consultation paper on
12  crypto asset trading platforms.  And those are the
13  key ones.  We have also done investor warnings and
14  other releases related to the crypto asset space
15  and blockchain.
16      Q.    Thank you.  And we will get to
17  those a little bit later.  Prior to taking on the
18  role as chief of the LaunchPad...actually, let me
19  step back.  You mentioned some of the
20  responsibilities with LaunchPad.  In particular,
21  what were your responsibilities as the chief of
22  LaunchPad?
23      A.    To lead the team, to lead the
24  initiative.  Obviously, this was something new
25  that the regulators hadn't done before, so I built

Page 32

1  the team, put it together.  And as part of that we
2  raise awareness in the Fintech community, so that
3  involves speaking events and being at various
4  Fintech community events, as well as providing
5  direct support to businesses.  That's a key part
6  of what we do.  And we do that directly with the
7  firms sitting across the table from the firms and
8  providing...helping them navigate regulatory
9  requirements.
10        And then, our final mandate is to
11  modernize regulation, because, obviously,
12  regulation was built at a time where it was more
13  face to face, and we were seeing a lot more in
14  terms of Fintech innovation, and how financial
15  services are delivered to consumers.
16      Q.    And prior to your role as chief of
17  LaunchPad, had you had any experience with
18  corporate finance?
19      A.    Yes.
20      Q.    What experience was that?
21      A.    Well, throughout our role, any
22  time you are looking at a firm in any of the roles
23  in compliance and registrant regulation, the firms
24  are selling products, so you are looking at the
25  products that they sell.  So you have experience

Page 33

1  with the products that they sell.  But, I also did
2  a secondment in corporate finance for a period of
3  time many years ago.  I think like 2003.
4      Q.    And that was at the OSC?
5      A.    Yes.
6      Q.    And during the secondment, what
7  was your role there?
8      A.    Reviewing prospectuses and
9  providing comment letters to law firms.
10      Q.    How long was that secondment?
11      A.    I don't recall.  It was short.
12  Less than six months.
13      Q.    And prior to taking on the role as
14  chief of LaunchPad, had you had any experience
15  with crypto or blockchain companies?
16      A.    Crypto or blockchain companies?  I
17  don't recall.  I think the first exposure probably
18  would have been as part of LaunchPad.  I did have
19  exposure though to how Fintech innovation was
20  changing the business models for many of the
21  businesses we were dealing with as part of my role
22  as manager in compliance and registrant
23  regulation.
24      Q.    What was your understanding of why
25  you were selected for the role?

Page 34

1      A.    Because my team and I had dealt
2  directly with many of these firms and many of
3  these innovations that we were seeing in the
4  space.  So it was either online advising firms,
5  online trading firms, crowdfunding portals.  You
6  know, there's a variety.  But, we had seen how
7  technology was changing, how financial services
8  were being delivered to investors.
9      Q.    Now, after a year in the role, in
10  October 2017, you were named Deputy Director, is
11  that right?
12      A.    Yes.
13      Q.    And how is that position different
14  than Chief?
15      A.    It's not.  It was just a title
16  change.
17      Q.    Do you know why there was the
18  title change?
19      A.    It was for internal purposes.
20      Q.    And you remain Deputy Director,
21  correct?
22      A.    Yes.
23      Q.    Now, working at the OSC, when do
24  you first come to recognize that cryptocurrencies
25  could be subject to Canadian securities laws?

P. Chaukos

## Page 35

1    A.    Late 2016, early 2017.
2        Q.    And how did you come to recognize
3    that?
4        A.    Because we had a number of firms
5    that had come in, plus we were also seeing a
6    number of firms that were taking the position that
7    they were currencies and not securities.  And as
8    an organization, we didn't agree with that
9    position.
10        Q.    And in those instances, what did
11   you advise them?
12        MR. HARNISCH:    Objection.  Give a
13        very general answer.  Don't get into
14        anything specific about any type of
15        company.
16        THE WITNESS:    Yes.  I mean, we
17        wouldn't talk about specific firms.
18
19   BY MR. CADIGAN:
20        Q.    No.  And I'm not looking for that.
21        A.    Okay.  Repeat the question.
22        Q.    Yes.  And I mean, you talked
23   generally about the fact that crypto companies
24   were coming in and taking the position that their
25   products were currencies and not securities...

## Page 36

1        A.    Right.
2        Q.    ...and you disagreed with that
3    position?
4        A.    Right.
5        Q.    And my question to you is, what
6    did you advise them, given that?
7        A.    Well, in most instances, we would
8    tell them that we believe it's a security and that
9    they would be subject to securities regulation.
10        Q.    And prior to the March 2017
11   release, the OSC had published nothing publicly in
12   that regard, correct?
13        A.    No.
14        Q.    When did you first become aware of
15   Bitcoin?
16        A.    I don't recall.
17        Q.    Was that years ago, decades ago, a
18   decade ago?
19        A.    Well, not decades, but years ago,
20   yes.
21        Q.    Okay.  How many years, generally?
22        A.    I don't know.  Probably 2015,
23   2016.  Around that time.
24        Q.    Okay.  And to your knowledge, has
25   the OSC taken a position regarding whether Bitcoin

## Page 37

1    is a security?
2        MR. HARNISCH:    Objection.
3        THE WITNESS:    Sorry.  Am I responding
4        then?  Yes?
5        MR. HARNISCH:    If you know, yes.  Do
6        you have a "Yes" or "No" answer, or you
7        don't know?
8        THE WITNESS:    I don't know.  Can I
9        ask a question?
10        MR. HARNISCH:    No.
11        THE WITNESS:    Okay.  No.
12
13   BY MR. CADIGAN:
14        Q.    You don't know.  I just want to
15   clarify.
16        A.    I can tell you that we on the OSC
17   LaunchPad team, take the position that Bitcoin
18   itself is a commodity, but what we have seen, and
19   how it's traded, in many instances it is a
20   security or derivative.
21        Q.    Has the OSC taken a unified
22   position regarding whether or not Bitcoin is a
23   security?
24        MR. HARNISCH:    Objection.
25        THE WITNESS:    I would only do it if

## Page 38

1        it's unified, yes.
2
3    BY MR. CADIGAN:
4        Q.    So it's the unified position of
5    the OSC that Bitcoin is a commodity?
6        MR. SCHLEGELMILCH:    Objection.
7        MR. HARNISCH:    Objection.  Asked and
8        answered.  And I don't want to be going
9        down any more Q&A about Bitcoin unless I
10        can become convinced that this is
11        actually relevant...
12        THE WITNESS:    M'hmm.
13        MR. HARNISCH:    ...to the litigation.
14        MR. CADIGAN:    Well, I think as I have
15        indicated, none of this is relevant.  And
16        so...
17        MR. HARNISCH:    Okay.
18        MR. CADIGAN:    ...to the extent that
19        we are getting questions on this, we are
20        going to be asking questions that we can
21        ascertain exactly why this is not
22        relevant here.
23        MR. HARNISCH:    Given your position
24        that this is not relevant, then I'm
25        going...Pat, I would not answer any more

P. Chaukos

## Page 39

1    questions about Bitcoin and the OSC's
2    position on Bitcoin.
3        MR. CADIGAN:     So are you instructing
4    you her not to answer that question...
5        MR. HARNISCH:     Yes.
6        MR. CADIGAN:     ...on relevance
7    grounds?
8        MR. HARNISCH:     In case that wasn't
9    clear, I am instructing her not to answer
10   for any number of reasons...relevant.
11   It's beyond the scope of our agreement to
12   be here voluntarily.  And getting into
13   OSC positions on certain issues, no, I
14   don't want her testifying about things
15   that may be public and non-public and
16   confidential within the OSC.  It's not
17   clear how it all is necessary for what
18   you need.  So for all of those reasons,
19   at a minimum, yes, I am instructing Pat
20   not to answer.
21       MR. CADIGAN:     And again, we don't
22   have to get aggressive on this.  I mean,
23   I am trying to...I'm laying out the
24   position we laid out previously.  We have
25   no agreement regarding the scope of her

## Page 40

1    testimony today.  You have taken the
2    position that you had asked whether we
3    would limit the scope of that testimony
4    and we did not agree to do so.  That
5    said, I said we were going to ask our
6    questions and she can answer them, and
7    you can either object or instruct her not
8    to answer as is the case, depending upon
9    how you choose.  I mean, I would say that
10   to the extent that her testimony in any
11   way might suggest some, sort of,
12   indication regarding whether a statement
13   that might have implications for U.S.
14   securities laws...I mean, we suggest that
15   we would be entitled to probe the basis
16   for that, including the knowledge of
17   Bitcoin, crypto and the relation to the
18   securities laws.
19       MR. HARNISCH:     Okay.  You're free to,
20   obviously, ask whatever you want and we
21   will...
22       MR. CADIGAN:     Yes.
23       MR. HARNISCH:     ...advise Pat
24   accordingly, and then you can, obviously,
25   make your positions known more broadly

## Page 41

1    with the SEC and before the court, and I
2    will leave that all in your various
3    capable hands.  But, I think I was clear
4    on the topics pursuant to which Pat would
5    appear voluntarily today about and you
6    know, we agreed to go forward, and I
7    think we are clear that those were the
8    topics that we would be limiting her
9    testimony to.  Again, ask away, just
10   don't...
11       MR. CADIGAN:     Yes.
12       MR. HARNISCH:     ...be surprised if it
13   goes beyond that, that the instruction is
14   going to be that's beyond the scope of
15   our willingness to appear here
16   voluntarily.  That's all.
17       MR. CADIGAN:     And if I recall, the
18   topic that you indicated was Ms. Chaukos'
19   discussions, communications with Kik, or
20   its counsel and that alone?
21       MR. HARNISCH:     That is correct.
22       MR. CADIGAN:     Okay.  And if you are
23   instructing her not to answer, I just ask
24   that...again, because I would like to
25   know what those grounds are if you are

## Page 42

1    instructing her not to answer.
2        MR. HARNISCH:     I will take it case by
3    case, sure.
4        MR. CADIGAN:     I appreciate that.
5        MR. HARNISCH:     I think I have made it
6    clear on this one, and where we are with
7    going further with the Q&A on Bitcoin
8    that I believe we have reached our limit
9    for the reasons I have articulated.
10       MR. CADIGAN:     And so the record is
11   clear, I heard that you were instructing
12   her not to answer on the ground that it
13   was not relevant and beyond the scope of
14   the terms in which she agreed to appear
15   today?
16       MR. HARNISCH:     Right.  And that
17   potentially a full answer to your
18   question could implicate internal
19   discussions and deliberations within the
20   OSC that are non-public and confidential.
21
22   BY MR. CADIGAN:
23       Q.   Has the OSC ever taken a public
24   position regarding whether Bitcoin is a security?
25       A.   Only more recently in our

P. Chaukos

Page 43

1   consultation paper.
2       Q.    And when was that?  What was that
3   date?
4       A.    I don't recall.  I think we have
5   done it in a couple notices, actually.  I would
6   have to look at the notices.
7       Q.    And what is that public position
8   on whether Bitcoin is a security?
9       A.    We have acknowledged that the
10  Bitcoin itself is a commodity.  However, we have
11  taken the position that on the trading platforms
12  that we have seen, how the Bitcoin was traded,
13  could make it an investment contract, or a
14  security, or a derivative.
15      Q.    And has the OSC taken a public
16  position regarding whether Ether is a security?
17      A.    I don't believe we have.
18      MR. CADIGAN:    Actually, if we could
19      see the next exhibit.  Can I have this
20      marked as Exhibit 109?
21
22  -   EXHIBIT NO. 109:  Release from the OSC, dated March
23              8, 2017
24
25  BY MR. CADIGAN:

Page 44

1       Q.    I am showing you what's been
2   marked as...
3       MR. HARNISCH:    I think the official
4       one is about to come over.
5       MR. CADIGAN:    Right.
6
7   BY MR. CADIGAN:
8       Q.    Okay.  I'm now handing you what
9   has been marked as Exhibit 109.  For the record,
10  this is a March 8th, 2017 release from the OSC.
11  This is the March 2017 release regarding
12  blockchain technologies that you mentioned
13  previously, correct?
14      A.    Yes.
15      Q.    And what was the purpose of this
16  release?
17      A.    As I mentioned earlier, we found
18  that a number of companies were taking the
19  position that because they were using blockchain,
20  or distributed ledger technologies, that
21  securities regulation doesn't apply.  So the
22  purpose of this release was to communicate to the
23  public that in many instances we had seen that
24  actually securities regulations would apply to
25  these businesses.

Page 45

1       Q.    And this release doesn't set forth
2   any guidance regarding specific tests as to what
3   makes distributed ledger technology a security or
4   not, is that right?
5       A.    No.  It was to raise awareness.
6       Q.    Now, in connection with the
7   publication of this guidance, isn't it true that
8   you stated that the OSC was keen to support this
9   type of innovation?
10      A.    Yes.
11      Q.    And you also said that the OSC
12  welcomed the opportunity to work with these
13  businesses and help them understand and navigate
14  potential regulatory requirements, right?
15      A.    Yes.
16      Q.    And what do you mean by work with
17  these businesses?
18      A.    Our support role.  So we provide
19  direct support to businesses, so they have an
20  opportunity to come in and talk to the regulator,
21  and understand what regulatory requirements would
22  apply, and how they might comply with certain
23  requirements.
24      Q.    To your knowledge, has LaunchPad
25  provide guidance to any company about how to

Page 46

1   conduct and ICO in a way that does not require
2   registration and the filing of prospectuses?
3       A.    Yes, we have.
4       Q.    When was that?
5       A.    Well, it would have been around
6   the same time.  2017...sometime in 2017.  We have
7   had a number of businesses, but there are public
8   decisions that are on our website on this topic.
9       Q.    But by public decisions, you mean
10  decisions with respect to companies in which you
11  told them how to conduct an ICO in a way that did
12  not require registration or filing a prospectus?
13      A.    No, no, no.  We provided exemptive
14  relief in those circumstances.  So they were a
15  security, and we provided exemptive relief to
16  companies that were trying to do an ICO.
17      Q.    And in those cases, were they
18  required to register?
19      A.    We provided a registration
20  exemption for a period of time, for them to
21  capital raise, provided they complied with
22  conditions of the decision.
23      Q.    And to your knowledge, has
24  LaunchPad provided any guidance to a company about
25  how to conduct an ICO in a way that the token

Page 47

1    involved would not be treated as a security?
2        A.    No.  That's not our role.
3        Q.    And as you indicated, prior to
4    this release, the OSC had not provided any public
5    releases regarding distributed ledger
6    technologies, is that right?
7        A.    I don't believe so.
8        Q.    And you don't consider this to be
9    guidance, do you?
10       A.    This was a media release intended
11   to communicate our position that securities
12   regulation may apply to anything from initial coin
13   offerings, crypto asset-type funds, or trading
14   platforms that could be a marketplace.  We were
15   just raising awareness that prospectus
16   registration and, I believe, marketplace
17   requirements could apply.
18       Q.    I want to now turn to the
19   discussions with Kik.  When did you first become
20   aware of Kik as a business?
21       A.    It would have been in July of
22   2017.
23       Q.    But, prior to that you had not
24   been aware of its messaging service?
25       A.    No.

Page 48

1        Q.    And is that the same time you
2    first became aware of its plan to offer or sell
3    Kin tokens?
4        A.    I became aware of Kik through a
5    media release, but I don't recall what was
6    involved in the media release.
7        Q.    You say you don't recall the
8    nature of the media release?
9        A.    No.
10       Q.    When did you first become aware of
11   Kik's plan to offer or sell Kin tokens?
12       A.    Through a letter provided by their
13   counsel in July of 2017.
14       MR. HARNISCH:    I know we have come
15   close to an hour, and since you are
16   shifting...I should have said that a
17   question or two ago, but before you get
18   into documents...
19       MR. CADIGAN:    Sure.
20       MR. HARNISCH:    ...do you think we can
21   take a short break?
22       MR. CADIGAN:    Yes, that's fine.
23
24   ---  upon recessing at 10:17 a.m.
25   ---  A BRIEF RECESS

Page 49

1    ---  upon resuming at 10:25 a.m.
2
3    PAT CHAUKOS, resumed
4    CONTINUED EXAMINATION BY MR. CADIGAN:
5
6    ---  EXHIBIT NO. 110:  E-mail from Ross McKee to Pat
7                Chaukos, copied to Monica Kowal
8                and Amy Tsai, dated July 25, 2017,
9                Bates stamped SEC/OSCE 2071-2072
10
11   ---  EXHIBIT NO. 111:  Letter from Ross McKee to Pat
12                Chaukos, Bates stamped KIK 115829-
13                115834
14
15   BY MR. CADIGAN:
16       Q.    Ms. Chaukos, just before we went
17   off the record we were about to talk about the
18   letters you received from counsel for Kik on July
19   25th, 2017.  I am putting in front of you what has
20   been marked exhibits 110 and 111.  And for the
21   record, Exhibit 110 is an e-mail from Ross McKee
22   to you, copying Monica Kowal and Amy Tsai, dated
23   July 25th, 2017 at 3:05 p.m., Bates stamped
24   SEC/OSCE-2071 and 2072.
25       A.    I have 3:08.

Page 50

1        MS. CHISHOLM:    You said 3:05 p.m.
2
3    BY MR. CADIGAN:
4        Q.    Yes, I'm sorry.  Actually, you're
5    right, 3:08 p.m.  Is that right?  Thank you.  For
6    clarification.  And Exhibit 111 is a July 25th,
7    2017 letter to you from Ross McKee, Bates stamped
8    KIK-115829 through 115834.
9        So turning first to Exhibit 110, this is
10   a copy of the e-mail you received from Ross McKee,
11   right?
12       A.    Yes.
13       Q.    At the time you received this e-
14   mail, did you know who Ross McKee was?
15       A.    Yes.
16       Q.    How did you know Ross McKee?
17       A.    He's been involved in many matters
18   at the OSC.
19       Q.    And copied on this is Monica Kowal
20   and Amy Tsai.  Who are they?
21       A.    Monica Kowal was, I believe, vice-
22   chair at the time at the OSC.  She was a previous
23   colleague of Ross McKee.  And Amy Tsai was on my
24   core LaunchPad team.  She was Fintech regulatory
25   advisor.

P. Chaukos

<table>
<tr><td colspan="2">

Page 51

1    Q.   What was Amy Tsai's role?
2    A.   Fintech regulatory advisor.
3    Q.   I'm sorry.  But what does that
4  entail?
5       A.   She's effectively legal counsel on
6  many of these...in terms of part of the team,
7  she's legal counsel on the team, and she would
8  provide direct support, as well, to the
9  businesses.  So she's part of the core team, as I
10  mentioned earlier.
11       Q.   Okay.  And Monica Kowal is vice-
12  chair of what group?
13       A.   Of the OSC.
14       Q.   This was received at around 3:00
15  p.m., is that right?
16       A.   Yes.
17       Q.   Okay.  Do you happen to recall
18  that the SEC published its DAO report later the
19  same day?
20       A.   I would not have been aware of
21  that at that time.  I was on vacation.
22       Q.   So you were not in when this e-
23  mail came in, right?
24       A.   No.
25       Q.   But, you did review this e-mail

</td><td colspan="2">

Page 53

1    Q.   Is there a core team at the time
2  that you would have discussed such matters with?
3       A.   Amy who is copied on the e-mail.
4       Q.   But, you don't recall who else you
5  would have discussed this with?
6       A.   No.
7       Q.   Eventually, you spoke to Ross
8  McKee by phone in response to his letter, isn't
9  that right?
10       A.   I don't recall a phone call.
11       Q.   You don't recall a phone call with
12  Ross McKee between July 31st and August 2nd?
13       A.   I don't recall a phone call at
14  that time, no.
15       Q.   Well, at some point you said you
16  invited Kik to come in and talk, right?
17       A.   Yes.
18       Q.   Okay.  How did you convey that
19  request?
20       A.   Through e-mail.
21       Q.   So you don't recall any
22  discussions with him between July 31st and August
23  2nd?
24       A.   No.
25       Q.   You don't recall describing Kik's

</td></tr>
<tr><td colspan="2">

Page 52

1  when you returned from your vacation?
2       A.   I did.
3       Q.   And attached to the e-mail was the
4  letter that's at Exhibit 111, is that right?
5       A.   Yes.
6       Q.   And did you read this when you
7  returned from your vacation?
8       A.   I did.
9       Q.   And what did you do in response to
10  this letter?
11       A.   I asked to meet with Kik.
12       Q.   Did you have any internal
13  discussions about the Kin offering after receiving
14  the letter?
15       MR. HARNISCH:   Just say "Yes" or
16  "No".
17       THE WITNESS:   Yes.
18
19  BY MR. CADIGAN:
20       Q.   Okay.  With whom?
21       A.   With my team.
22       Q.   And when you say with your team,
23  who was on that team?
24       A.   I don't recall exactly who I would
25  have discussed it with.

</td><td colspan="2">

Page 54

1  letter to him as "refreshing"?  Do you recall
2  anything along those lines at any time?
3       A.   No.
4       Q.   Do you recall telling him that you
5  were consulting internally on the letter?
6       A.   I don't recall that, no.
7       Q.   But you were, in fact, consulting
8  internally on the letter, right?
9       A.   Well, normally when I get a letter
10  and I have asked to meet with them, I would have
11  looked at the letter and consulted with my team,
12  yes.  Normal practice.
13       Q.   But, do you recall doing that in
14  this case?
15       A.   I don't recall it, but I imagine
16  that I did.
17       Q.   Okay.  Do you recall telling him
18  that you were not inclined to give a preliminary
19  indication of acceptance until you had a chance to
20  consult internally?
21       A.   I do not recall that.
22       Q.   And so, you also don't recall
23  telling him that OSC was considering publishing
24  additional notice around the types of factors to
25  consider for blockchain offerings?

</td></tr>
</table>

Page 55

1     A.    We would have done that at the
2  August 4th meeting, yes.
3     Q.    Okay.  But, you don't recall doing
4  that prior to the August 14th meeting?
5     A.    No.
6     Q.    And to the extent that you
7  discussed it during the August 14th meeting, that
8  was a reference to the August 25th CSA notice that
9  later came out, is that right?
10    A.    I don't think it was August 25th,
11 I think it was August 24th.
12    Q.    Okay.  August 24th.
13    A.    But yes, that CSA notice.
14    Q.    Do you recall Mr. McKee telling
15 you verbally that Kin was hoping to get a
16 preliminary indication ASAP?
17    A.    I recall that he said that in an
18 e-mail.
19    Q.    But, you don't recall that in a
20 verbal conversation?
21    MR. HARNISCH:     You need to give a
22 verbal answer.
23    THE WITNESS:    No.
24
25 BY MR. CADIGAN:

Page 56

1     Q.    Do you recall discussing the DAO
2  report with Mr. McKee verbally?
3     A.    Prior to August 14th?
4     Q.    Yes.
5     A.    No.
6     Q.    And you don't recall him
7  discussing with you Kin's relevant utility in
8  light of that, is that right?
9     A.    No.  I don't recall a discussion
10 at all.
11    Q.    You met with Kik on August 14th,
12 right?
13    A.    Yes.
14    Q.    And indeed, on or about August
15 3rd, you contacted Mr. McKee by e-mail, is that
16 right?
17    A.    That sounds correct.  Correct.
18    MR. CADIGAN:    Can I have the next
19 exhibit marked?
20
21 --- EXHIBIT NO. 112: E-mail from Ross McKee to Pat
22              Chaukos, dated August 3, 2017
23
24 BY MR. CADIGAN:
25    Q.    Okay.  I am handing you the next

Page 57

1  exhibit which has been marked Exhibit 112, and
2  it's Bates stamped SEC/OSCE-2097 through 2100.
3  This is an e-mail to you from Ross McKee dated...I
4  mean, it's a chain, the last of which is dated
5  August 3rd, 2017, is that right?
6     A.    Yes.
7     Q.    Okay.  In the e-mail, if you go to
8  the second page of the document in the e-mail
9  chain, Mr. McKee stated:
10          "...I got your message, thanks, and I
11          understand how it works..."
12 Is that right?
13    A.    Yes.
14    Q.    Next, it goes on to say in the
15 next paragraph:
16          "...It would be desirable to have
17          confirmation, even verbal informal, that
18          we are okay, we are on the right track
19          before then..."
20 Is that right?
21    A.    Yes.
22    Q.    And then he went on to say:
23          "...On the other hand, if regulatory
24          indications are unfavourable, Kik would
25          proceed on the token distribution solely

Page 58

1          outside Canada, to exclude Canadian token
2          purchasers pursuant to interpretation
3          note 1..."
4  Is that right?
5     A.    Yes.
6     Q.    And you responded and asked him if
7  it would be possible for Kik to come in for a
8  meeting before August 14th?
9     A.    Yes.
10    Q.    And you said you have questions
11 about the tokens and their future utility, right?
12    A.    Yes.
13    Q.    And the meeting, in fact, take
14 place on October 14th, correct?
15    A.    August 14th.
16    Q.    August 14th.
17    A.    Yes.
18    Q.    And prior to this meeting, did you
19 have any discussions or communications with the
20 SEC about Kik?
21    A.    No.
22    Q.    And internally, what steps did you
23 take to review Kik's proposal?
24    MR. HARNISCH:     Objection.  And I'm
25 going to instruct Pat not to discuss any

P. Chaukos

<table>
<tr><td>

Page 59

1  internal discussions with the OSC.
2
3  BY MR. CADIGAN:
4          Q.    At the meeting on August 14th...on
5  what basis?
6          MR. HARNISCH:    On any number of
7          bases, not the least of which the
8          workings of the OSC and their
9          deliberations.  And work on particular
10         matters similar to the OSC are non-public
11         and confidential.
12
13 BY MR. CADIGAN:
14         Q.    And other than the letter from Mr.
15 McKee, at the meeting on August 14th, what other
16 information did you have about Kin at that time?
17         A.    In the meeting?
18         Q.    Prior to the meeting.  Yes.
19         A.    Prior to the meeting.  No other
20 information other than the letter.
21         Q.    Who attended the meeting?
22         A.    I recall Ted Livingston being
23 there, Ross McKee being there.  I believe there
24 were a couple other Kik representatives, and there
25 were two Cooley LLP lawyers on a conference call,

</td><td>

Page 61

1  Timothy Baikie...
2          A.    Timothy Baikie was not at that
3  meeting.
4          Q.    No?
5          A.    He was sick that day.
6          Q.    Okay.  Who is Timothy Baikie?
7          A.    He's someone on the LaunchPad
8  extended team from the market regulation branch.
9          Q.    But, the others that are listed
10 here, namely, yourself, Amy Tsai, Neeta Varma and
11 Jonathan Yeung were there?
12         A.    Yes.
13         Q.    And you have already discussed Amy
14 Tsai's role.  What about Neeta Varma, what was her
15 role?
16         A.    Neeta Varma, at that time, was in
17 the corporate finance branch, so she would have
18 been our corporate finance person at the time.
19 And Jonathan Yeung, at that time, was in
20 compliance and registrant regulation, so he would
21 have been in registration at that time.
22         Q.    I mean, in addition to being
23 corporate finance and registration, were they also
24 members of the LaunchPad team?
25         A.    The extended team.

</td></tr>
<tr><td>

Page 60

1  Nancy Wojtas and I don't recall the other lawyer's
2  name.
3          Q.    Was that Karen Ubell?
4          A.    I remember Karen, so that's
5  probably right.
6          Q.    Okay.  In addition, Peter Heinke
7  and Tanner Philp were there.  Do you...
8          A.    I don't recall their names.
9          MR. CADIGAN:    And the next exhibit
10         marked is Exhibit 113.
11
12 --- EXHIBIT NO. 113:  E-mail from Amanda Barone to Ross
13         McKee and others, dated August 14,
14         2017, Bates stamped KIK 86618-
15         86621
16
17 BY MR. CADIGAN:
18         Q.    I'm handing what has been marked
19 as Exhibit 113.  For the record, it's an e-mail
20 from Amanda Barone to Ross McKee and others, dated
21 Monday, August 14th, 2017, Bates stamped KIK 86618
22 through 86621.  And I note that you are not on the
23 last in time e-mail setting this up.  And it
24 mentions that the OSC attendees will include Pat
25 Chaukos, Amy Tsai, Neeta Varma, Jonathan Yeung,

</td><td>

Page 62

1          Q.    Do you recall how long the meeting
2  lasted?
3          A.    Typically, they are an hour, but I
4  feel like that one went over a bit, so an hour to
5  an hour-and-a-half.
6          Q.    Did you, or anyone else at the OSC
7  take notes of that meeting?
8          A.    Yes.
9          Q.    Okay.  Who took notes at that
10 meeting?
11         A.    Our normal practice is to take
12 notes during these meetings, so I assume anyone
13 who attended.
14         Q.    Did you take notes at the meeting?
15         A.    I did.
16         Q.    Did you review those notes in
17 preparation for your deposition today?
18         A.    In preparation?  I have reviewed
19 them in the last month, but not in preparation.
20         Q.    What materially did you
21 read...what did you do to prepare for the meeting
22 with Kik?
23         A.    Me, personally?
24         Q.    Yes.
25         A.    I would have reviewed the Ross

</td></tr>
</table>

P. Chaukos

Page 63

1   McKee letter, and I would rely on my team to give
2   me, kind of, the background in terms of Kik
3   itself.  And at the time, there was a white paper,
4   as well.
5           Q.     Were there any memos, or written
6   materials prepared analyzing whether or not Kik's
7   tokens would be securities?
8           A.     At that time?
9           Q.     Yes.
10          A.     No.
11          Q.     Had you had discussions along
12  those lines?
13          A.     Yes.
14          Q.     And would those discussions have
15  been with the members that were present at the
16  meeting for the OSC?
17          A.     Yes.
18          Q.     At the meeting, do you recall
19  telling Kik, or its counsel, that you had not
20  finished reviewing all the material that Kik had
21  submitted?
22          A.     The only thing that I would not
23  have reviewed in its entirety is the white paper,
24  if you're asking about me personally.  My team
25  would have read it though.

Page 64

1           Q.     But, did you tell Kik, or its
2   counsel, at the meeting that you had not completed
3   your review of that material yet?
4           A.     If I made that statement it would
5   be in terms of the review of coming to a
6   conclusion.
7           Q.     Prior to the meeting, had the OSC
8   come to a determination as to whether the proposed
9   sale of Kin constituted an offering of securities
10  under Canadian law?
11          MR. HARNISCH:     Objection, and I'm
12  going to instruct Pat not to answer that
13  question for similar reasons I have given
14  before, that she's not going to be
15  talking about internal discussions at the
16  OSC that have not been publicly
17  pronounced.
18
19  BY MR. CADIGAN:
20          Q.     And just for the record, there are
21  communications in here regarding whether or not
22  the OSC conveyed a determination at that meeting,
23  and I am wondering whether or not actually the OSC
24  had come to a determination prior to that meeting?
25          MR. HARNISCH:     You can ask her what

Page 65

1   was conveyed at the meeting.  As I said
2   before, she's not going to talk about
3   internal discussions that were internal
4   to the OSC.
5           MR. CADIGAN:     And then, that
6   instruction is based on what?  And we can
7   get...I mean, I'm happy to short-phrase
8   it, but I just want to make sure I
9   understand.  You are saying that the
10  internal deliberations of the OSC are
11  privileged?  Is that your...
12          MR. HARNISCH:     Non-public,
13  confidential, depending on the nature may
14  also be privileged.  And, as part of our
15  voluntary appearance today, is not going
16  to be talking about internal confidential
17  non-public information within the OSC,
18  period.
19          MR. CADIGAN:     And I mean, if we were
20  to designate this as confidential under
21  the existing protective order in this
22  matter, I take it, you would still
23  instruct her not to answer?
24          MR. HARNISCH:     Starting with, I
25  haven't seen your protective order, but

Page 66

1   more generally speaking, that does not
2   allay the concerns that the OSC has about
3   disclosing confidential, non-public
4   information, irrespective of whatever
5   protective order may be in place.
6           MR. CADIGAN:     And so, you are
7   instructing her not to answer?
8           MR. HARNISCH:     In case that wasn't
9   clear, yes.
10
11  BY MR. CADIGAN:
12          Q.     And prior to the meeting, in
13  assessing Kik's proposed sale of Kin and whether
14  it constituted an offering of securities, what
15  law, if any, did the OSC look to?
16          MR. HARNISCH:     I don't understand the
17  question, so don't...can you rephrase
18  that?
19          MR. CADIGAN:     Yes.  Right.  And I am
20  assuming we are going to get instruction
21  not to answer, but...
22          MR. HARNISCH:     But, in fairness, I
23  want to make sure I understand...
24          MR. CADIGAN:     Yes.
25          MR. HARNISCH:     ...what you're asking.

P. Chaukos

Page 67

1
2    BY MR. CADIGAN:
3         Q.    Prior to the meeting, in assessing
4    whether the proposed sale of Kin constituted an
5    offering of securities, what law, if any, did the
6    OSC look to?
7              MR. HARNISCH:    For similar reasons, I
8         am going to instruct Pat not to answer.
9         If you want to, you know, perhaps, focus
10        the questioning on what was discussed at
11        the meeting and perhaps probe rationale
12        for what was said and why, you know, we
13        may get to a different place.  Just
14        trying to help.
15             MR. CADIGAN:    Yes, appreciate that.
16        And actually, I am trying to get at that,
17        as well...
18             MR. HARNISCH:    Okay.
19             MR. CADIGAN:    ...to get the rationale
20        for what was discussed, happened prior to
21        the meeting.
22
23    BY MR. CADIGAN:
24        Q.    But, let's turn to the meeting.
25    What do you recall about the meeting, in as much

Page 68

1    detail as you can provide?
2         A.    I recall that we would have had
3    questions about the tokens themselves, and
4    whether...because a number of firms would argue
5    that their tokens are utility tokens, so we would
6    have discussed that.  I recall that...
7         Q.    And I apologize, but I'm not...I
8    just want to be clear what you actually recall
9    versus what...when you say you would have, I want
10   to make sure that we are differentiating what you
11   actually recall from what you believe you may have
12   discussed.
13        A.    No.  We talked about the utility
14   of the tokens.
15        Q.    Okay.  Thank you.
16        A.    Okay?  We discussed why Ross McKee
17   and legal counsel took the position that it was
18   not a security.  We brought up factors that we
19   thought indicated that it was a security and not
20   different than a capital raise by a business to
21   develop a future platform.  I believe someone,
22   whether it was Cooley or Ross McKee, brought up
23   the DAO report and tried to distinguish that.  And
24   I would have communicated that we are close to
25   publishing a notice that would provide a lot more

Page 69

1    guidance on many of the points that were raised in
2    that meeting.
3         Q.    And...
4         A.    And I am going to add one other
5    thing.  They had two offerings, they had the SAFT
6    and the public launch.  The SAFT, they had
7    concluded that that was a security, so the focus
8    of the discussion was on the public launch, or
9    what they called the token distribution event.
10        Q.    Okay.  And again, you indicated
11   that you have reviewed your notes of that meeting
12   prior to today's testimony, right?
13             MR. HARNISCH:    In fairness, she said
14        about a month ago, but not for purposes
15        of preparing for the deposition.
16             THE WITNESS:    Yes.
17
18   BY MR. CADIGAN:
19        Q.    Yes, okay.  And in doing so, is
20   anything that you described here not reflected in
21   your notes?
22        A.    Anything I have described here not
23   reflected in the notes?  I have very sparse notes.
24   I typically only take notes of things that
25   are...that I would not remember, or that I am...or

Page 70

1    next steps, like in terms of at the conclusion of
2    the meeting, or anything unusual.
3         Q.    So a lot of what you described
4    here was not reflected in your notes?
5             MR. HARNISCH:    If you can remember.
6             THE WITNESS:    I don't recall.
7
8    BY MR. CADIGAN:
9         Q.    You don't recall what?
10        A.    I don't recall if everything that
11   I...I know what we discussed.  Whether it's all
12   reflected in my notes, I don't recall.
13        Q.    Prior to today's testimony in
14   preparation for this testimony, did you check to
15   see if others had notes of the meeting that you
16   could look at?
17        A.    No.  You mean for purposes of the
18   prep today?
19        Q.    Yes.
20        A.    No.
21        Q.    What steps did you take to refresh
22   your memory on what was said at that meeting?
23        A.    E-mails, documents.  It was over
24   two years ago.  Those are the primary sources I
25   looked to.

Page 71

1    Q.   And even though you had notes of
2    that meeting, you didn't look at those notes to
3    prepare yourself for today's deposition?
4         A.   I looked at them a month ago.
5         Q.   But, you said that you didn't look
6    at them to prepare for today's deposition.
7         A.   There was nothing in my notes that
8    was surprising to me.
9         Q.   Well, what was in your notes?
10        A.   There were...there was something
11   about the percentages, because I won't remember
12   percentages in terms of how much was the public
13   launch versus what is being held by the Kin
14   Foundation and miners.  I would have, obviously,
15   had something around the public launch, and I
16   recall that there were next steps.
17        Q.   Do you recall that at the outset
18   there was an introduction by Ross McKee?
19        A.   I don't recall exactly what was
20   said, but I do recall that he did start the
21   meeting off.
22        Q.   But, you don't recall what he
23   said?
24        A.   No.
25        Q.   Do you recall that then Ted

Page 72

1    Livingston spoke, the CEO of Kik?
2         A.   I don't recall what Ted...what I
3    recall from Ted Livingston is not the
4    introduction.
5         Q.   But, do you recall Ted Livingston
6    then speaking about Kik?
7         A.   Most likely he may have, yes.
8         Q.   But, do you recall him doing so?
9         A.   No.
10   MR. HARNISCH:   I'm sorry.  Are you
11   talking about Mr. Livingston saying
12   something after Ross' introduction...
13   MR. CADIGAN:   Yes.
14   MR. HARNISCH:   ...or whether he
15   said...okay.  So not just whether he said
16   anything at the meeting, but
17   specifically...
18   MR. CADIGAN:   Right.  Whether he then
19   spoke after Ross McKee.
20   MR. HARNISCH:   Okay.
21   THE WITNESS:   Yes.
22
23   BY MR. CADIGAN:
24        Q.   You don't recall him speaking
25   after Ross McKee?

Page 73

1         A.   Specifically after Ross McKee, no.
2         Q.   Do you recall anything that Mr.
3    Livingston said?
4         A.   I recall that Mr. Livingston did
5    not like the idea that if this was subject to
6    securities law, that he wouldn't be allowed to do
7    secondary trading of the Kin tokens.
8         Q.   And what did he say to convey
9    that?
10        A.   He conveyed that directly, that
11   he...that basically...I don't remember if he used
12   the word "non-starter" or "this is not acceptable
13   to us" but he did not like the idea that if we
14   went the route of prospectus relief, which means
15   you can't do resale or secondary trading, he did
16   not like the idea that Kin tokens could not be
17   sold in a secondary market, or secondary trading
18   of the Kin tokens.
19        Q.   Do you recall anything else about
20   what Mr. Livingston said at the meeting?
21        A.   No.
22        Q.   Okay.  And you indicated that
23   during the meeting Kik discussed the reasons that
24   it believed that it was not a security?
25        A.   Yes.

Page 74

1         Q.   Do you recall what exactly it said
2    in that regard, or to the best of your
3    recollection, what did Kik say in that regard?
4         A.   To the best of my recollection,
5    they were taking the position that the Kin tokens
6    were a cryptocurrency and not a security.
7         Q.   Do you recall anything else?
8         A.   That was the general theme
9    throughout the meeting.
10        Q.   And then, you said that you
11   brought up factors that cut against that analysis,
12   is that right?
13        A.   Yes.
14        Q.   Okay.  And again, focusing solely
15   on the meeting, what factors did you describe?
16        A.   I would have described the fact
17   that the platform had not been developed, that
18   they were capital raising in order to develop
19   their Kin token platform.  And I imagine we
20   probably got into the prongs of the tests.  I know
21   that Cooley was focused on the prongs of the Howey
22   Test.  And in Canada we have a precedent that
23   broadens Howey, which is Pacific Coast Coin.
24        Q.   And when you brought up the
25   factors that you said cut against the suggestion

Page 75

```
 1    that it was not a security, what was the response
 2    from the Kik team?
 3         A.    Generally, their responses were
 4    they didn't agree with our position.
 5         Q.    But, did they provide any basis
 6    for why they didn't agree with your position?
 7         A.    They tried to find what I would
 8    call technical arguments.  So, for example,
 9    because there was no profit sharing, that was
10    distinguishing it from DAO, or from other case
11    law, or the fact that it's a decentralized
12    technology, you're not relying on solely or
13    primarily from the efforts of the management,
14    and we would bring up factors as to why we
15    disagreed with that.
16         Q.    And what were the factors you
17    brought up?  Let's start with the fact that it was
18    not profit sharing?
19         A.    So that goes to the expectation of
20    profit.  So in terms of a lot of the
21    communications we had seen by the Kik team, as
22    well as how the token value would go up, would
23    show that there is an expectation of profit.  The
24    fact that the trading platform was...didn't matter
25    that it was on a blockchain, or distributed ledger
```

Page 76

```
 1    technology.  At the end of the day they were
 2    relying on the Kik management team to build that
 3    platform.  Investors would be relying on the Kik
 4    management team to build that platform.
 5         Q.    And this is something you said to
 6    them at the meeting?
 7         A.    Yes.
 8         Q.    Is that reflected in your notes?
 9         A.    No.
10         Q.    Regarding the point that it was
11    decentralized, what did you say in response to
12    that, if anything?
13         A.    They were pointing to that to say
14    that it had nothing to do with the Kik team
15    developing, so that you are not relying on the
16    efforts of the Kik team.  And at the end of the
17    day, investors that are investing in this are
18    looking to Kik to build this platform.
19         Q.    To come to the conclusions that
20    you conveyed in that meeting, how did you arrive
21    at those conclusions?
22         A.    We had worked with a number of
23    businesses that were taking somewhat similar
24    positions.  We had done the media release in
25    March, and we had finished putting together the
```

Page 77

```
 1    guidance that was going to be published the
 2    following week.  So all of those factors are
 3    factors we have heard from Kik and others and that
 4    we haven't accepted as reasons to say that it's
 5    not a security.
 6         Q.    And had you had a prior internal
 7    meeting to discuss what you were going to convey
 8    to Kik at the meeting?
 9         MR. HARNISCH:    Just say "Yes" or "No"
10    or you don't remember.
11         THE WITNESS:    I don't remember.
12
13    BY MR. CADIGAN:
14         Q.    And during the meeting, was there
15    any discussion as to whether Canadian securities
16    law would apply?
17         A.    Could you repeat the question?
18         Q.    Yes.  Actually, let me step back.
19    During the meeting was there any discussion about
20    U.S. securities laws?
21         A.    Yes, there was, by Cooley.
22         Q.    And it's your position that the
23    governing standard would have been Pacific Coin
24    Exchange, is that right?
25         A.    In Canada, yes.
```

Page 78

```
 1         Q.    During the meeting, did you
 2    express the opinion in sum or substance that the
 3    Howey framework was an old framework?
 4         A.    No.
 5         Q.    You never said that?
 6         A.    No.  What I said is that they were
 7    taking technical arguments and trying to say that
 8    it doesn't apply to the Kin token.  And when you
 9    look at investment contract analysis, you have to
10    look at the facts and circumstances of what you
11    have in front of you.  And the way they were
12    applying it was they were trying to take a
13    technical interpretation and apply it to the Kin
14    token.
15         Q.    But, you say that the fact that
16    they weren't profit sharing was a technical
17    argument, is that right?
18         A.    That's the argument they made.
19         Q.    Yes.  And you...
20         A.    That's how they distinguished DAO.
21         Q.    Yes.  And I think you described
22    that as a technical argument.
23         A.    I said that you can't just look at
24    it.  Just because there's no profit sharing, that
25    it's not an investment contract.  You have to look
```

P. Chaukos

Page 79

1  at expectation of profit, and what does that mean.
2  Q.   You made reference though to
3  technical arguments.  Is that a technical
4  argument, as you are describing it?
5  A.   What I would call that is
6  distinctions without a difference.
7  Q.   Okay.  But, I'm trying...
8  A.   They were making distinctions, but
9  underlying when you look at the test and if you
10  take a purposive interpretation, I don't agree
11  with it, that you can't just say just because
12  there's no profit sharing, it's not an investment
13  contract.
14  Q.   But, that's not a technical
15  argument, is it?
16  MR. HARNISCH:   Objection.  I think
17  she's...
18  THE DEPONENT:   It's legal.
19  MR. HARNISCH:   Hang on.  I think she
20  has given you what she said and why she
21  said it, right?  We are quibbling about
22  whether something is "technical" or not,
23  or what you mean by...
24  THE WITNESS:   Yes.
25  MR. HARNISCH:   ...technical.  I think

Page 80

1  she said, here's what was said, here's
2  the response, and the reason for the
3  response, and why I think in her most
4  recent statements, it may be a
5  distinction without a difference.  So I
6  think it's been asked, and I think it's
7  been answered.
8  MR. CADIGAN:   No.
9  MR. HARNISCH:   And if you want to
10  explain what you mean by a "technical
11  argument" and we will make sure we get a
12  meeting on the minds, that's great.
13
14  BY MR. CADIGAN:
15  Q.   Okay.  What did you mean by a
16  technical argument?
17  A.   Technical, I find lawyers
18  sometimes make technical legal arguments to
19  somehow distinguish the case law.  So he was
20  making a technical argument.  Because there was no
21  profit sharing, it did not fit within the
22  DAO...the...or whatever was released from the SEC
23  on the DAO.
24  Q.   So it's your position that the
25  fact that there was no profit sharing was a

Page 81

1  technical argument?
2  MR. HARNISCH:   That's...
3  THE WITNESS:   Again, it depends what
4  you mean by...
5  MR. HARNISCH:   I think we are
6  going...hang on, Pat.  Hang on.
7  MR. CADIGAN:   I'm wondering...
8  MR. HARNISCH:   Hang on.  I think we
9  are going down a road that is not
10  productive.  You just asked her what she
11  meant by technical argument.  She gave
12  you the answer as to what she meant.
13  MR. CADIGAN:   And I'm asking whether
14  this is, and she's asking me what I
15  think, and I just want to know whether
16  she thinks that's a technical argument?
17  I want it to be clarified.
18  MR. HARNISCH:   She just said and I
19  mean, the record will speak for itself,
20  but I believe she just said, here's an
21  argument that Ross was making that
22  because there was no profit sharing, that
23  means it's not an investment contract.
24  She was characterizing by saying
25  "technical", right, that's what Ross was

Page 82

1  saying, and why she disagreed, period.
2
3  BY MR. CADIGAN:
4  Q.   What were the arguments that you
5  understood to be technical arguments that you
6  heard Kik to be making?
7  MR. SCHLEGELMILCH:   Objection.
8  THE WITNESS:   Technical arguments?  I
9  think I already covered those.  The ones
10  that I recall are the fact that they were
11  distinguishing DAO because of profit
12  sharing, and that because it was
13  distributed ledger technology, they
14  weren't relying on the efforts of others.
15
16  BY MR. CADIGAN:
17  Q.   In this discussion, it's your
18  understanding, wasn't it at the time, that the DAO
19  was not governing law in Canada, right?
20  A.   It's not governing law in Canada.
21  Q.   Was it your understanding that
22  Howey was governing law in Canada?
23  A.   It depends what you mean
24  "governing".  Howey is, obviously, U.S. case law
25  that we would look to, but Pacific Coin Coast is

P. Chaukos

<table>
<tr><td>

Page 83

1   higher precedence in Canada.
2        Q.   I mean, you are not required
3   though to follow Howey, right?
4        MR. SCHLEGELMILCH:   Objection.
5        THE WITNESS:   I don't know.  I don't
6        believe so.  The Pacific Coin Coast case
7        law depends on the prongs that are
8        enumerated in Howey.
9
10  BY MR. CADIGAN:
11       Q.   And isn't it true that when the
12  CSA provided its August 2017 release, it never
13  mentions Howey in that guidance, right?
14       A.   No, I don't believe it does.
15       Q.   It mentions Pacific Coin Exchange
16  and subsequent case law, is that right?
17       A.   We wouldn't enumerate every case
18  law that we would look to.
19       Q.   As of the meeting, and you
20  indicated that you did not express the opinion
21  that the Howey framework was old...as of the
22  meeting, did you hold the opinion that the Howey
23  Test was an old framework?
24       A.   No.
25       Q.   During the meeting, did you
</td><td>

Page 85

1        THE WITNESS:   ...understand that
2        question.
3
4   BY MR. CADIGAN:
5        Q.   You don't understand?  I mean, as
6   of the meeting...
7        A.   Right.
8        Q.   ...did you have an opinion as to
9   whether the Howey framework was applicable to the
10  determination as to whether the offering of Kin
11  was an offering of securities?
12       A.   Howey Test sets out four prongs
13  which are used in Pacific Coin Coast, so both
14  cases which Pacific Coin Coast has precedential
15  value in Canada, includes the four prongs of the
16  Howey Test.  So to say that they are separate and
17  distinct is inaccurate.
18       Q.   Well, I'm asking you just whether
19  you had an opinion?  Either you had an opinion, or
20  you didn't have an opinion.  Did you have an
21  opinion on that topic.
22       A.   No.  The law is the law.
23       Q.   Now, you had gone into the meeting
24  with the intention of listening to what Kik had to
25  say, with an open mind, didn't you?
</td></tr>
<tr><td>

Page 84

1   express the opinion in sum or substance that you
2   did not think that the Howey framework was
3   applicable to the determination as to whether the
4   offering of Kin was an offering of securities?
5        A.   I don't recall if I would have
6   said something like that.
7        Q.   As of the meeting, did you hold
8   the opinion that the Howey Test...
9        A.   The meeting...
10       Q.   ...was not applicable as a
11  framework to determining whether or not the
12  offering of Kin was an offering of security?
13       A.   The prongs of investment contract
14  are set out in Howey.  Pacific Coin Coast relies
15  on those prongs and, in fact, broadens one of the
16  prongs of the test.  So Howey would have come up.
17  It is relevant in that Pacific Coin Coast looked
18  at the prongs of the Howey Test in its analysis.
19       Q.   Again, let me ask the question
20  though.  As of the meeting, did you hold the
21  opinion that the Howey framework was not
22  applicable to the determination as to whether the
23  offering Kin was an offering of securities?
24       A.   I really don't...
25       MR. SCHLEGELMILCH:   Objection.
</td><td>

Page 86

1        A.   Yes.
2        Q.   And you still had materials and
3   Kik's presentation to consider in terms of
4   deciding whether or not that offering was an
5   offering of securities, right?
6        MR. HARNISCH:   I'm sorry.  Could you
7        say that again?
8        MR. CADIGAN:   Yes.
9        MR. HARNISCH:   I'm not sure I
10       understood part of the middle of that.
11
12  BY MR. CADIGAN:
13       Q.   Yes.  You still had materials and
14  Kik's presentation to consider in assessing
15  whether or not the Kin offering was an offering of
16  securities, right?
17       A.   I don't know if we had materials,
18  and I don't recall a presentation.  We had
19  questions that needed...obviously, we needed to
20  understand during that meeting.
21       Q.   I mean, you hadn't looked at all
22  the materials related to the Kin offering at that
23  point?
24       A.   I don't know what you mean by "all
25  the materials".
</td></tr>
</table>

P. Chaukos

Page 87

1    Q.    Well, you hadn't looked, for
2  example, at the...had you looked at the SAFT as of
3  the meeting?
4        A.    Had I looked at the SAFT?  What do
5  you mean by...it was set out in the letter that
6  Ross McKee sent to us, so I had looked at the
7  letter.
8        Q.    Yes, but had you looked at the
9  actual SAFT?
10       A.    No.
11       Q.    Okay.  Had you looked at the terms
12  of use and other agreements between token
13  purchasers and the proposed public sale?
14       A.    I wouldn't have done that.  My
15  team may have done that.
16       Q.    Do you know whether they did?
17       A.    I don't know that.
18       Q.    I mean, were there other materials
19  that you still wanted to look at with respect to
20  the Kin offering as of the meeting?
21       A.    Me, personally?
22       Q.    Yes.
23       A.    No.
24       Q.    At the close of the meeting, you
25  conveyed to Kik that you were still considering

Page 88

1  the matter, isn't that right?
2        A.    I don't know what that would have
3  been in response to.  Me saying I would consider
4  the matter?
5        Q.    You were still considering the
6  matter.
7        A.    That we were still considering the
8  matter?
9        Q.    Yes.
10       A.    I don't recall that.
11       Q.    Do you recall expressing
12  definitively that the OSC's position was that the
13  offering of Kin was a securities offering?
14       A.    I recall that we believed that the
15  Kin offering was a security and that we would be
16  open to prospectus and registration relief because
17  we were working on a similar matter where we had
18  given similar relief, and that I wanted them to
19  think about investment limits and resale
20  restrictions.
21       Q.    And you said all of that at the
22  meeting?
23       A.    Yes, at the end of the meeting as
24  part of next steps.
25       Q.    Was that reflected in your notes?

Page 89

1        A.    Yes.
2        Q.    Okay.  And you told them at that
3  time that you considered this to be a decided
4  issue?
5        A.    I didn't say it was decided.  I
6  said we believed that it is a security.
7        Q.    As of that time, had the OSC come
8  to a decision as to whether or not the offering of
9  Kin was an offering of securities?
10       A.    Can you repeat the question?
11       Q.    Yes.  As of the meeting, had the
12  OSC come to a decision as to whether the proposed
13  offering of Kin was an offering of securities?
14       A.    Yes.  That was the purpose of the
15  meeting.  If we agreed with Ross McKee that this
16  was not a security, there was no purpose in having
17  the meeting.
18       Q.    And you conveyed that expressly
19  and verbally during the meeting?
20       A.    Yes.  As part of next steps, we do
21  that, and we say what are next steps.  And I
22  recall that the reaction was that:
23            "...If this is a security, then we are
24            going to do this.  We are going to
25            exclude Canadian purchasers..."

Page 90

1        Q.    They said that at the meeting?
2        A.    M'hmm.
3        MR. HARNISCH:    Is that a "Yes"?
4        THE WITNESS:    Yes.  Sorry.
5
6  BY MR. CADIGAN:
7        Q.    Because you are being very
8  definitive here in what you said...
9        A.    M'hmm.
10       Q.    ...did you ever express that in
11  writing to Kik?
12       A.    That's not really our role.  Our
13  role with LaunchPad is to help companies navigate
14  regulatory requirements.  We did that in the
15  meeting.  We talked about next steps.  That's what
16  we do.  We provide support.
17       Q.    So you did not provide that
18  position in writing at any time?
19       A.    That's not our role.  We don't
20  give positions in writing to companies.
21       Q.    You did not provide that position
22  in writing at any time, did you?
23       A.    I don't believe so.
24       Q.    And indeed, Ross McKee exchanged
25  e-mails with you over the next several weeks,

P. Chaukos

| Page 91 |
|---|

1 right?
2      A.     Next three weeks about, yes.
3      Q.     Okay.  And in none of those e-
4 mails did you ever tell him that the OSC had
5 already taken the position that the offering of
6 Kin was an offering of securities, right?
7      A.     Ross McKee is a very experienced
8 lawyer, securities lawyer at that.  So when I am
9 talking about resale restrictions and onboarding
10 and investor protections, he knows that we are
11 taking the position that it's a security.
12      Q.     But, you did not ever expressly
13 state in any of those e-mails that you had already
14 told them that OSC had already decided that this
15 was an offering of securities?
16      A.     We don't do that.  I don't believe
17 we would do that in an e-mail.
18      Q.     Did you tell Kik or its lawyers at
19 the meeting, "I am not sure where you are at"?
20      A.     I don't know what that would have
21 been in reference to.  Do I recall saying those
22 words?
23      Q.     Yes.
24      A.     No.
25      Q.     Actually, did you instruct Kik at

| Page 92 |
|---|

1 the meeting not to sell Kin without registration?
2      A.     We talked about registration
3 relief, so the implication is that we talked about
4 registration, yes.
5      Q.     But, did you actually talk about
6 registration?  Did you actually instruct Kik that
7 it should not sell Kin without registration?
8      A.     I would expect that we did, yes.
9      Q.     But, do you recall doing so?
10      A.     Again, if we are talking about
11 registration relief, that means we have told them
12 that we think they need to be registered.
13      Q.     And I'm asking you whether you
14 recall, as you sit here today, telling them they
15 needed to be registered?
16      A.     In those words, no, I don't recall
17 that.  But, we would have discussed registration
18 and prospectus requirements.
19      Q.     During the meeting did you ask for
20 any additional information?
21      A.     I don't recall.
22      Q.     At the meeting, did you, or anyone
23 else from the OSC side, tell Kik that it had to
24 provide certain information to purchasers in the
25 public sale?

| Page 93 |
|---|

1      A.     I'm not sure where you are going
2 with that question, but part of investor
3 protection is disclosure to investors.
4      Q.     I am just asking what was said at
5 the meeting.  So I am asking you, did you, or
6 anyone else from the OSC, tell Kik at the meeting
7 that it had to provide certain information to
8 purchasers in the public sale?
9      A.     That sounds reasonable, but I
10 don't recall those words exactly.
11      Q.     Do you recall saying that in sum
12 or substance?
13      A.     Could you repeat that?
14      Q.     I mean, you're saying you don't
15 recall that exactly, and I'm asking whether or not
16 you recall stating that even generally?
17      A.     Someone on my team probably would
18 have done that, yes.
19      Q.     You're saying probably would have.
20 I am asking whether you recall them doing so?
21      A.     Yes.
22      Q.     Okay.  Who?
23      A.     One of the attendees that was
24 there.  Most likely, Amy Tsai.
25      Q.     Now most likely suggests that it's

| Page 94 |
|---|

1 a prediction.  I am asking whether you recall...
2      A.     No, I don't recall.
3      Q.     Did you, or anyone else from OSC,
4 tell Kik that Kin was subject to resale
5 restrictions?
6      A.     Yes.
7      Q.     Who?  Did you?
8      A.     Yes.
9      Q.     Okay.  And what did you say in
10 that regard?
11      A.     I believe at the time they were
12 looking...we talked about prospectus exemptions.
13 One of the ones that is commonly used by ICOs is
14 the offering memorandum exemption, but it's only
15 allowed for primary distribution.  So there would
16 be no ability to do resale or secondary trading.
17 And I would have communicated that there are
18 resale restrictions if they decide to go that
19 route, and that's where I do recall the reaction
20 from Ted Livingston.
21      Q.     Okay.  Did you have any other face
22 to face meetings with Kik, or its counsel, in
23 August?
24      A.     Face to face meetings, no.
25      Q.     And so, as we close this meeting,

P. Chaukos

Page 95

1   is it fair to say that you believed that you
2   definitively conveyed OSC's position that the
3   proposed offering of Kin was an offering of
4   securities?
5        A.    We definitely communicated the
6   view that we believed that it was a security.
7        Q.    Can we have 23?
8        MR. HARNISCH:    Are you done with the
9        meeting and moving to something else, or
10       are you still on the meeting?  I'm only
11       asking because I could use a couple
12       minutes.
13       MR. CADIGAN:    Yes, we are done with
14       the meeting.
15       MR. HARNISCH:    Do you mind if we take
16       a break?
17       MR. CADIGAN:    No, no.
18
19  --- upon recessing at 11:17 a.m.
20  --- A BRIEF RECESS
21  --- upon resuming at 11:34 a.m.
22
23  PAT CHAUKOS, resumed
24  CONTINUED EXAMINATION BY MR. CADIGAN:
25       Q.    Ms. Chaukos, just before we leave

Page 96

1   the meeting altogether, I just had a few follow-up
2   questions.  So, I take it, given your prior
3   testimony, that you did not convey at the end of
4   the meeting that the OSC was still considering the
5   matter as to whether the offering of Kin might not
6   be an offering of securities?
7        A.    Our role is not to consider
8   whether something is not a security.  Our role is
9   to help businesses understand how securities
10  regulation applies.  So the purpose of the meeting
11  was to convey how we thought securities regulation
12  would apply.
13       Q.    And I'm asking what was said at
14  the meeting?
15       A.    Right.
16       Q.    And I'm saying, at the meeting...
17       A.    Right.
18       Q.    ...do you have a recollection at
19  the meeting as to whether you conveyed that the
20  OSC was still considering the matter as to whether
21  the offering of Kin was an offering of securities?
22  I just want to know whether you remember conveying
23  that at the meeting.
24       A.    I don't recall conveying that
25  exactly, no.

Page 97

1        Q.    Do you recall conveying that
2   generally?
3        A.    I don't recall that.
4        Q.    You said that you looked at your
5   notes, albeit a month ago.  Do your notes reflect
6   that you told Kik that the OSC's position was that
7   the offering of Kin was an offering of securities?
8        A.    My notes reflect next steps, which
9   were to ask...I asked them to think about
10  investment limits for retail investors and resale
11  restrictions, and that the offering, we believed,
12  was a security, and that we were open to
13  prospectus and registration relief.
14       Q.    So your notes reflect that you
15  conveyed that you believed the offering of Kin was
16  an offering of securities?
17       A.    No reason to talk about resale and
18  all the other things unless it was.
19       Q.    I'm asking very pointedly whether
20  your notes reflect your statement that you had
21  told Kik directly that the OSC's position was that
22  the offering of Kin was an offering of securities?
23       A.    No.  Not in those words, no.
24       Q.    And you said that...you did say
25  that you recall next steps being taken.  Now, that

Page 98

1   you have mentioned those.  I want to just go to
2   your memory of the meeting.  What were the next
3   steps that you described to Kik?
4        A.    Next steps were we took the view
5   that we thought it was an offering of securities
6   and that we would like them to think about resale
7   restrictions, because they had talked about
8   wanting resale, and investment limits for retail
9   investors.
10       Q.    And in your mind as you left the
11  meeting, you believe that you had conveyed to them
12  that it was a closed issue as to whether or not
13  the offering of Kin was an offering of securities?
14       A.    I think we conveyed, based on the
15  information we had at the meeting, that we thought
16  it was a security.
17       Q.    And in coming to that conclusion
18  that the offering of Kin was an offering of
19  securities, describe all the steps you took to
20  come to that conclusion.
21       MR. HARNISCH:    Didn't we go over that
22       before?
23       THE WITNESS:    Yes, I feel like we
24       have done this.
25       MR. CADIGAN:    No, I

P. Chaukos

Page 99

1    wasn't...actually, you wouldn't let me
2    get into that, so I just want to make
3    sure I have this for the record.
4
5    BY MR. CADIGAN:
6        Q.    What were all the steps you took
7    into coming to that conclusion?
8        MR. HARNISCH:    In fairness, the
9        record will speak for itself.  I think we
10       did go over that in the context of the
11       meeting and what was said and why.
12
13   BY MR. CADIGAN:
14       Q.    You know, I'm talking about...I
15   mean, you didn't come to that decision on the spot
16   at the meeting, did you?
17       A.    No.
18       Q.    Okay.  So what were the steps you
19   took, we will go prior to the meeting, to come to
20   the conclusion that the offering of Kin was an
21   offering of securities?
22       A.    The material, the letter from Ross
23   McKee.  My team would have reviewed the white
24   paper.  The information we gathered as part of the
25   meeting only helped, in my mind, confirm that we

Page 100

1    thought it was a security.
2        Q.    What you just mentioned discusses
3    reviewing those materials.  And, I guess what I'm
4    saying is, at what point did you do the analysis
5    of the legal principles on those materials to
6    assess whether or not it was a security?
7        A.    So we would have done...
8        Q.    And more to the point, what did
9    you do in that regard in terms of taking the
10   materials reviewed and compare that to the
11   relevant authorities?
12       A.    Again, our role is not to do legal
13   analysis.  Our role is to provide support to novel
14   Fintech businesses.  We had been working on a CSA
15   notice.  We had heard many of the arguments
16   before, and so we had come up with a policy
17   decision which was communicated on August 24th to
18   the industry, to the public in terms of our
19   position.  What I did say to Ross McKee and Kik in
20   the meeting is the notice was coming, because they
21   were making various arguments that others had made
22   to us before, and how we thought that did not mean
23   that it was not a security.
24       Q.    You said it wasn't your role to do
25   legal analysis, or provide legal advice.  What

Page 101

1    legal analysis did you do prior to the meeting to
2    ascertain that the offering of Kin was an offering
3    of securities?
4        A.    Did I do?
5        Q.    You and your team.
6        MR. HARNISCH:    Hang on.  I think, in
7        fairness, you may be having some
8        assumptions that are not necessarily
9        accurate, in reviewing the particular
10       materials that Pat mentioned in the
11       context of all of the other things that
12       she had mentioned that to do "analysis"
13       or to help form a view requires doing
14       something different and distinct.  And
15       reviewing that somehow can't take the
16       knowledge that they have for being
17       familiar with these issues for stuff that
18       they are doing, and form a judgment.  So
19       I just think there's a misunderstanding
20       built into your question.
21       MR. CADIGAN:    And she can answer
22       that, although you did it very eloquently
23       there.
24
25   BY MR. CADIGAN:

Page 102

1        Q.    What legal analysis did you do
2    prior to the meeting on...
3        A.    Specific to Kin?
4        Q.    Specific to the offering of Kin
5    and whether or not it was an offering of
6    securities.  At the meeting you claim that you
7    very definitively said that the offering of Kin
8    was an offering of securities.  And I'm saying,
9    what legal analysis did you do prior to the
10   meeting to come to that decision?
11       A.    And I am going to say, I did not
12   use the word "definitively".  I said we reviewed
13   the letter from Ross McKee.  We did not agree with
14   the analysis in the letter which is why we asked
15   for the meeting.  We needed to understand the
16   utility functions of the Kin tokens during the
17   meeting, and there was nothing that came up in
18   terms of how they described it, that changed our
19   view that we thought the Kin offering was a public
20   sale of securities, full stop.
21       Q.    In coming to that decision, did
22   you review any case law, or any guidance to help
23   you come to that decision?
24       A.    We had already done that in order
25   to publish the guidance that was coming out on

P. Chaukos

## Page 103

1    August 24th.
2        Q.    And did you look at that guidance
3    specifically with respect to Kin?
4        A.    I don't recall, but I imagine we
5    would have.
6        Q.    But, you don't recall doing so?
7        A.    No.
8        Q.    Did you have any internal
9    discussions about what elements or prongs of the
10   Pacific Coin Coast test applied or did not apply
11   in the Kik situation?
12       MR. HARNISCH:    Just say "Yes", "No",
13   or "I don't recall".
14       THE WITNESS:    Yes.
15
16   BY MR. CADIGAN:
17       Q.    In relation to the meeting, when
18   did you have those discussions?
19       A.    I don't recall.
20       Q.    And who did you have those
21   discussions with?
22       A.    My team.
23       Q.    And did you break down each of the
24   prongs of the Pacific Coin Coast test with respect
25   to Kin...

## Page 104

1        MR. HARNISCH:    I will object to that
2    and draw the line there because, again,
3    for all the reasons we have said before,
4    we are not going to have Pat talk about
5    the substance of discussions that were
6    had internally at the OSC.
7        MR. CADIGAN:    Okay.  So you are
8    instructing her not to answer that
9    question?
10       MR. HARNISCH:    Yes.  In case that was
11   not clear, yes.
12
13   BY MR. CADIGAN:
14       Q.    Now, after the meeting did you
15   have any further internal discussions about
16   whether the offering of...the sale of Kin was
17   an offering of securities?
18       MR. HARNISCH:    Same instruction.  "Yes",
19   "No", "Don't recall".
20       THE DEPONENT:    I don't recall.
21       MR. CADIGAN:    I will mark the next
22   exhibit as Exhibit 114.
23
24   --- EXHIBIT NO. 114:  E-mail dated August 15, 2017 from Mr.
25       McKee to Ms. Chaukos and Ms. Tsai

## Page 105

1
2    BY MR. CADIGAN:
3        Q.    For the record, I am handing you what
4    has been marked as Exhibit 114.  It is an e-mail to
5    Amy Tsai and you from Ross McKee dated August 15,
6    2017, Bates stamped SEC 2068 to 2069.  This was an e-
7    mail that Ross McKee sent you the day after the
8    meeting; is that right?
9        A.    Yes.
10       Q.    And in it, he thanks you for
11   arranging the meeting; correct?
12       A.    Yes.
13       Q.    And at the end, he says:
14       "...If you have any other questions, please
15       don't hesitate to contact me..."
16   Right?
17       A.    Yes.
18       MR. CADIGAN:    I next want to hand you
19   what has been marked as Exhibit 115.
20
21   --- EXHIBIT NO. 115:  E-mail dated August 22, 2017 from Mr.
22       McKee to Ms. Chaukos
23
24   BY MR. CADIGAN:
25       Q.    It is an e-mail chain the last of

## Page 106

1    which is an e-mail to you from Ross McKee dated
2    August 22nd, 2017.  And it is Bates stamped SEC OSC
3    2080 to 2083.  And this is an e-mail chain in which
4    you and Ross McKee were on; is that right?
5        A.    Yes.
6        Q.    And in it, you were e-mailing him in
7    response to an article regarding the Kin offering via
8    the SAFT offering; is that right?
9        A.    Yes.
10       Q.    And in it, you said:
11       "...If this is an offering to the public, we
12       would like to discuss what you are providing
13       to investors and how you will comply with
14       resale restrictions and other
15       requirements..."
16   Is that right?
17       A.    Yes.
18       Q.    And he responded to you:
19       "...As we explained in detail when we met,
20       we believe that legally it falls squarely
21       within the virtual currency types, not
22       investment contracts under all the Canadian
23       and U.S. legal tests, and thus in this case
24       and use is not a security..."
25   And it says:

P. Chaukos

| Page 107 | Page 109 |
|---|---|

### Page 107

1    "...Since it is not a security, resale
2    restrictions would not apply, any more than
3    they do to Bitcoin transactions..."
4    Is that right?
5        A.    Yes.
6        Q.    And you didn't respond to this e-mail
7    by telling him "we already told you we believed that
8    this is a security", did you?
9        A.    I don't believe I did, no.
10        MR. CADIGAN:    The next exhibit is marked
11        Exhibit 116.
12
13    --- EXHIBIT NO. 116:  E-mail chain dated August 23, 2017
14            from Mr. McKee to Ms. Chaukos
15
16        THE DEPONENT:    Sorry, can I go back to
17        that?
18        MR. CADIGAN:    Sure.
19        THE DEPONENT:    I did respond to him at
20        11:38, though, and it says:
21        "...What you are providing to investors..."
22        Which was the disclosure to investors that
23        we discussed at the meeting and how you will
24        comply with resale and other requirements.
25        Which was, again, discussed at the...

### Page 108

1
2    BY MR. CADIGAN:
3        Q.    Yes, and thereafter he said, well,
4    this is not a security and thus doesn't need those
5    things.
6        A.    Right.
7        Q.    In response to that, you didn't say,
8    "We already told you we believe this is a security",
9    is that right?
10        A.    Yes.
11        MR. SCHLEGELMILCH:    Counsel, can I just
12        make a note on this exhibit?  It looks like
13        the top e-mail came in before the bottom e-
14        0mail based on the time stamp.  The top e-
15        mail is at 11:02:59 a.m. and the bottom e-
16        mail is 11:38.  So, the chain is flipped...
17        THE DEPONENT:    Yes.
18        MR. SCHLEGELMILCH:    ...than how they
19        normally appear in an e-mail chain when they
20        print out.  I don't know if it is a time
21        zone issue or something like that, but I
22        will note that it does look like the second
23        e-mail is responsive to the first based on
24        the time stamp.
25        MR. CADIGAN:    Based solely on the time

### Page 109

1    stamp.  Based upon the content, it
2    discussed...I mean, there is a question
3    about the article that he responds to in the
4    successive e-mail at the top of the chain.
5        MR. SCHLEGELMILCH:    I am just...
6        MR. CADIGAN:    But, yes...
7        MR. SCHLEGELMILCH:    I am just...because I
8    am not...it is not clear to me...
9        MR. CADIGAN:    ...we will...okay, we will
10    note that for the record.  Thank you.
11
12    BY MR. CADIGAN:
13        Q.    I am handing you what has been marked
14    next as Exhibit 116.  And by the way, for the record,
15    the Bates stamps were cut off on the copy we have
16    made so for now they have been handwritten in.  But
17    it is...it is an e-mail from Ross...or an e-mail
18    chain from Ross McKee the last of which is Ross McKee
19    to Ms. Chaukos dated August 23rd, 2017, Bates stamped
20    SEC-OSC 50 through 54.  And this is an e-mail chain
21    that you received; correct?
22        A.    Yes.
23        Q.    And if you turn over to the prior
24    page, there is the e-mail chain that we just
25    discussed in Exhibit 115; correct?

### Page 110

1        A.    Yes.
2        Q.    And in response to that e-mail chain,
3    you e-mailed Mr. McKee on August 22nd at the bottom
4    of the first page and said:
5        "...We will come back to you on the public
6        sale component..."
7    Is that right?
8        A.    Yes.
9        Q.    And you asked if he had provided any
10    analysis of this aspect other than the initial letter
11    describing Kik's plan; correct?
12        A.    Yes.
13        Q.    And you didn't have any verbal
14    discussions with Mr. McKee on August 21 or 22, did
15    you?
16        A.    I don't recall that.
17        MR. CADIGAN:    The next has been marked as
18        Exhibit 117.
19
20    --- EXHIBIT NO. 117:  E-mail chain ending August 25, 2017
21            between Mr. McKee, Mr. Heinke et al
22
23    BY MR. CADIGAN:
24        Q.    I am handing you what has been marked
25    as Exhibit 117.  I note that you are not on the last

P. Chaukos

Page 111

```
1    two e-mails, but it is true that you are on the e-
2    mail chain starting at the second page; right?  For
3    the record, this is...117 is a chain of e-mails, the
4    last of which is an e-mail from Peter Heinke to Ross
5    McKee and others dated August 25th, 2017, Bates
6    stamped KIK 86881 through 86886.  I want to turn to
7    the last e-mail in this.  This is...
8         A.   Sorry, my e-mail?
9         Q.   Yes.
10        A.   Okay.
11        Q.   I take it back.  Go to the first e-
12   mail, please.  The first in time e-mail Bates stamped
13   86885.  This is an e-mail from Ross McKee...I mean
14   from Amanda Barone to Ross McKee dated August 24,
15   2017; is that right?
16        A.   You are talking about August 24th?
17        Q.   Yes.
18        A.   At 11:44 a.m.?
19        Q.   Yes.
20        A.   Yes.
21        Q.   And who is Amanda Barone?
22        A.   She is our Fintech coordinator.
23        Q.   And in it, she states:
24             "...As a team member on the OSC LaunchPad
25             team, Pat and Amy have asked me to
```

Page 112

```
1    communicate recent media release and CSA
2    staff notice on Cryptocurrency Offerings..."
3         A.   M'hmm.
4         Q.   Did you, in fact, ask her to send
5    this media release and staff notice to Ross McKee?
6         A.   Yes, we told Ross and Kik that we
7    would send it to them once it was published.
8         MR. CADIGAN:     Let's mark this as the next
9         exhibit, 118.
10
11   --- EXHIBIT NO. 118:  CSA Staff Notice dated August 24,
12            2017
13
14   BY MR. CADIGAN:
15        Q.   Ms. Chaukos, I am handing you what
16   has been marked as Exhibit 118.  It is the CSA staff
17   notice dated August 24, 2017 Bates stamped KIK 34311
18   through 34316.  This is, in fact, the CSA staff
19   notice dated August 24th, 2017; right?
20        A.   Yes.
21        Q.   And this was the e-mail that you had
22   asked Ms. Barone to send out; is that right?
23        A.   Yes.  The notice I asked her to send
24   out.
25        Q.   The notice, yes.  And prior to this
```

Page 113

```
1    notice going out, what other, if any, guidance had
2    CSA or OSC provided relating to the factors that were
3    relevant to determining whether a cryptocurrency was
4    subject to securities laws?
5         A.   Well, the Securities Act and the case
6    law stand and apply to all this...the purpose of this
7    notice was to explain to businesses that are doing
8    cryptocurrency offering or trading platforms how
9    securities regulation applies to them.
10        Q.   But this was the first such guidance
11   provided by the CSA or the OSC on this topic;
12   correct?
13        A.   Well, no, the OSC had done a media
14   release too in March of 2017 to say that we thought
15   securities regulation would apply to these
16   businesses.
17        Q.   And, again, that didn't go through
18   the factors that you would consider in determining
19   whether or not a cryptocurrency was subject to
20   securities laws; right?  The March, 2017 one did not?
21        A.   No.  That is what the law firms do.
22        Q.   But that release itself did not do?
23        A.   No.
24        Q.   Okay.  I mean, you say that is what
25   the law firms do.  Are you saying it is not the OSC's
```

Page 114

```
1    responsibility to provide guidance on these topics?
2         A.   To provide guidance in terms of how
3    securities regulation could apply to the business.
4    You are asking about the case law.  The law
5    is...stands.  It is the law and the Securities Act is
6    the Securities Act.  So, you apply those requirements
7    to the businesses.  Our role is just to provide
8    support to the businesses in how some of those
9    regulatory requirements apply to their business.
10        Q.   But do you believe it is the OSC's
11   position to provide guidance as to how the OSC is
12   going to be interpreting those laws?
13        A.   Yes, we do that.
14        Q.   Okay, and had you done that with
15   respect to cryptocurrencies prior to the August 24th,
16   2017 release?  In other words, had you provided
17   guidance as to how the OSC would be looking at the
18   factors in determining whether or not
19   cryptocurrencies were securities?
20        A.   Formal guidance, no.
21        Q.   And this notice was published in all
22   jurisdictions in Canada other than Saskatchewan; is
23   that right?
24        A.   I think it was subsequently in
25   Saskatchewan as well.
```

P. Chaukos

---

Page 115

1     Q.    And it came from the staff of the
2 Canadian Securities Administrators; is that right?
3     A.    Yes.
4     Q.    It did not come from the Canadian
5 Securities Administrators themselves; is that right?
6     A.    That is...that is...it is not really
7 an entity.  It is an umbrella organization of all the
8 provincial securities regulators.
9     Q.    So, the staff of the securities
10 regulators can issue these notices without having to
11 get authority from the administrators themselves; is
12 that right?
13     A.    They get the authority from...so, I
14 would get the authority from the OSC and the Act.
15 B.C. would get it from their Act and their
16 authorities and their executive.  It is representing
17 a harmonized position on how we are going to apply
18 securities regulation to cryptocurrency offerings.
19     Q.    And the purpose of the notice was to
20 help Fintech businesses understand what obligations
21 might apply under securities laws; is that right?
22     A.    Yes.
23     Q.    And did it provide guidance in terms
24 of helping Fintech businesses understand whether the
25 securities laws applied in the first place?

---

Page 116

1     MR. SCHLEGELMILCH:    Objection.  Form.
2     THE DEPONENT:    I am not sure what you are
3 getting at with your question.
4
5 BY MR. CADIGAN:
6     Q.    Well, I think you had indicated that
7 it was the responsibility of the law firms to
8 actually do the analysis under the law.  And what I
9 am asking is whether or not it was the intent of this
10 document to provide that sort of legal guidance to
11 Fintech businesses to understand whether the
12 securities laws and prongs would apply to their
13 particular businesses.
14     MR. HARNISCH:    In fairness, I think she
15 said law firms take steps to do that, not
16 necessarily that it was their, and their
17 alone, responsibility.  But the record will
18 reflect whatever was actually said.
19     THE DEPONENT:    Am I responding?
20     MR. HARNISCH:    Yes, sure.
21     THE DEPONENT:    The purpose of this
22 notice...this was a novel area.  We found
23 that many businesses and their advisors were
24 asking for clarity from the regulators on
25 how securities regulation applies to these

---

Page 117

1 offerings.  This is in response to what we
2 heard from multiple stakeholders.
3
4 BY MR. CADIGAN:
5     Q.    And if you go to what has been marked
6 as...actually, let me step back.  If you go to
7 page...what is Bates stamped 34313.
8     A.    Okay.
9     Q.    If you look at the third paragraph,
10 it says:
11     "...Every ICO/ITO is unique and must be
12 assessed on its own characteristics..."
13 Is that right?
14     A.    Yes.
15     Q.    And you agree with that statement;
16 correct?
17     A.    Yes.
18     Q.    And provided as an example, it says:
19 "...For example, if an individual purchases
20 coins/tokens that allow him/her to play
21 video games on a platform, it is possible
22 that securities might not be involved..."
23 Is that right?
24     A.    Yes.
25     Q.    And there are other use cases, you

---

Page 118

1 would agree, that would make the purchase of a token
2 fall outside securities laws; right?
3     A.    Yes.
4     Q.    Now, the notice provides a four prong
5 test that businesses should apply in determining
6 whether an investment contract exists; correct?
7     A.    Yes.
8     Q.    And that is an investment of money,
9 in a common enterprise, with the expectation of
10 profit, and to come significantly from the efforts of
11 others; is that right?
12     A.    Yes.
13     Q.    There is no further guidance that
14 breaks down how these individual elements should be
15 considered; is that right?
16     A.    No, that is in case law.
17     Q.    And the next two and a half pages of
18 this notice discuss only what a business must do if
19 issuing a coin or token that is a security; is that
20 right?
21     A.    Yes, some of the requirements.  Yes.
22     Q.    Going back to Exhibit 117.  If you go
23 to what has been Bates stamped KIK 86885.  Following
24 the e-mail that Ms. Barone sent attaching the media
25 release, you sent an e-mail to Mr. McKee attaching

---

Page 119

1    the Impak decision; is that right?
2         A.   Yes.
3         Q.   And that decision was from the CSA
4    Regulatory Sandbox granting relief from registration
5    requirements provided the applicant met certain
6    criteria; right?
7         A.   Yes.
8         Q.   What is the CSA Regulatory Sandbox?
9         A.   It is similar to how we have an OSC
10   LaunchPad team.  Each of the other provincial
11   securities regulators have dedicated staff that look
12   at these novel Fintech businesses or these
13   applications, exemptive relief applications that we
14   get.  And we do that in order to allow, let's say, an
15   Ontario business to operate across Canada or a B.C.
16   business to operate in Ontario.  So we want to make
17   sure that we have harmonized decisions to make it
18   easier for Fintech businesses to operate in Canada.
19         MR. CADIGAN:   Can we take a second?
20
21   --- DISCUSSION OFF THE RECORD
22
23         MR. CADIGAN:   For the record, and with
24         counsel and the parties' indulgence, the
25         original Bates stamped document referenced

Page 120

1    was actually a document that had been
2    initially produced and then clawed back.  We
3    are, therefore, producing to replace that as
4    Exhibit 117 the document KIK 86906 through
5    86914.  Again, an e-mail string the last of
6    which is...actually, in this case the last
7    of which is an e-mail from Ross McKee to
8    Peter Heinke dated August 25th, 2017.  And
9    with that actually just to make sure that we
10   have a clear record, let me just ask you
11   some basic questions.
12        If you go to...if you take a look at what
13   replaced Exhibit 117, the first e-mail in this chain
14   is an e-mail from Ms. Barone to you; is that right?
15
16   --- EXHIBIT NO. 117:   E-mail chain dated August 25, 2017
17             between Mr. McKee, Mr. Heinke et al
18
19         MR. HARNISCH:   I don't think she has it.
20         Do you have the...
21         THE DEPONENT:   I don't have it.
22         MR. CADIGAN:   I'm sorry.
23         THE DEPONENT:   I don't see anything from
24         Ms. Barone to me.
25

Page 121

1    BY MR. CADIGAN:
2         Q.   The first e-mail is an e-mail from
3    Ms. Barone to Ross McKee.
4         A.   Yes?
5         Q.   Attaching the August 24 CSA notice;
6    right?
7         A.   And also a Globe & Mail article, yes.
8
9         Q.   And then following up on that e-mail,
10   you sent Mr. McKee the Impak decision; is that right?
11        A.   Yes.
12         MR. CADIGAN:   And as we were discussing,
13         I actually have marked as the next
14         exhibit...is it 119?
15
16   --- EXHIBIT NO. 119:   Impak decision notice dated August
17             16, 2017
18
19         THE DEPONENT:   I don't have it.
20         MR. CADIGAN:   It is being marked.
21         MR. HARNISCH:   I am guessing that is the
22         Impak decision.  Do you have extras?
23
24   BY MR. CADIGAN:
25         Q.   I am handing you what has been marked

Page 122

1    as Exhibit 119.  This is the Impak decision that you
2    sent to him, is that right?
3         A.   Yes.
4         Q.   And in your e-mail to him, you said:
5    "...In light of this decision and the ICO
6    notice, we want to discuss the Kik offering
7    to the public..."
8    Correct?
9         A.   Yes.
10        Q.   And in your e-mail, you didn't
11   explain to Mr. McKee why you thought the Impak
12   decision related to the offer or Kin; do you?
13        A.   Not in the e-mail, no.
14        Q.   And the first page of the Impak
15   decision, if you would go to that, states:
16   "...Relief granted based upon the particular
17   facts and circumstances of the application
18   with the objective of fostering capital
19   raising by innovating startup businesses in
20   Canada..."
21        A.   The head note?
22        Q.   Yes.  It says:
23   "...Decision should not necessarily be
24   viewed as precedent for other filers in the
25   jurisdictions of Canada..."

| | Page 123 |
|---|---|
| 1 | Is that right? |
| 2 | A.   Yes, we do that standard as part of |
| 3 | the CSA Regulatory Sandbox because a lot of what we |
| 4 | are dealing with are novel businesses, so things may |
| 5 | change quickly so we don't want it to be viewed as |
| 6 | our precedent. |
| 7 | Q.   And why did you send this to Mr. |
| 8 | McKee? |
| 9 | A.   It was an example of where we had |
| 10 | provided prospectus and registration relief for a |
| 11 | platform that was developing a platform for users to |
| 12 | use in the future. |
| 13 | Q.   And going back to Exhibit 117 in his |
| 14 | August 25th response to you starting at KIK 86909, |
| 15 | Mr. McKee provided his analysis distinguishing the |
| 16 | Impak decision; is that right? |
| 17 | A.   He does. |
| 18 | Q.   Did you agree with these |
| 19 | distinctions? |
| 20 | A.   When you look at whether a Kin token |
| 21 | is a security, you don't look to the Impak decision. |
| 22 | You have to look at the facts and circumstances of |
| 23 | the Kin token. |
| 24 | Q.   And did you ever convey to Mr. McKee |
| 25 | that point or any response to his...his e-mail here |

| | Page 125 |
|---|---|
| 1 | is providing the analysis.  He is trying to |
| 2 | make distinguishing factors. |
| 3 | |
| 4 | BY MR. CADIGAN: |
| 5 | Q.   And then he says, for example, at |
| 6 | page KIK 86910: |
| 7 | "...CSAN 46307..." |
| 8 | That is the staff notice, is that right? |
| 9 | A.   Yes. |
| 10 | Q.   "...provided only brief investment |
| 11 | contract legal analysis but on the whole I |
| 12 | thought the particular examples chosen were |
| 13 | actually favourable to Kin..." |
| 14 | Right? |
| 15 | A.   Yes. |
| 16 | Q.   And he highlights the video game use |
| 17 | as one of the potential use cases of Kin; right? |
| 18 | A.   I would disagree with that. |
| 19 | Q.   You disagree that...I mean, he does |
| 20 | that. |
| 21 | A.   He does that but I disagree that it |
| 22 | was analogous to Kin. |
| 23 | Q.   Okay, did you ever... |
| 24 | MR. HARNISCH:   He is just asking what he |
| 25 | wrote there. |

| | Page 124 |
|---|---|
| 1 | distinguishing the Impak decision? |
| 2 | A.   I don't recall right now, no. |
| 3 | Q.   And he also provides...Mr. McKee also |
| 4 | provides an analysis of Kin under the August 24th CSA |
| 5 | notice; is that right? |
| 6 | A.   I would have to review it for that. |
| 7 | Give me a minute. |
| 8 | Q.   Yes, take your time. |
| 9 | MR. HARNISCH:   Do you want to point her |
| 10 | to a particular page? |
| 11 | THE DEPONENT:   Yes. |
| 12 | |
| 13 | BY MR. CADIGAN: |
| 14 | Q.   Well, if you look at the second...the |
| 15 | third paragraph of his...the end of the second |
| 16 | paragraph of his e-mail going forward. |
| 17 | A.   Sorry, starting with...what are we |
| 18 | talking about, "It would therefore be appropriate to |
| 19 | treat it as a security"? |
| 20 | Q.   Well, I mean, I am just...he provides |
| 21 | his analysis of Kin under the CSA notice in this e- |
| 22 | mail, doesn't he?  I mean... |
| 23 | MR. HARNISCH:   I think she is reviewing |
| 24 | the document. |
| 25 | THE DEPONENT:   M'hmm.  I don't know if he |

| | Page 126 |
|---|---|
| 1 | THE DEPONENT:   Yes.  Okay. |
| 2 | |
| 3 | BY MR. CADIGAN: |
| 4 | Q.   So, yes, he did state that in this e- |
| 5 | mail, though? |
| 6 | A.   Yes, he did. |
| 7 | Q.   And you disagreed with that position? |
| 8 | A.   Yes. |
| 9 | Q.   Did you convey that your disagreement |
| 10 | with...on that position to him? |
| 11 | A.   I don't believe I did.  I feel like |
| 12 | this was the typical response that we get. |
| 13 | Q.   And if you go to the end of his e- |
| 14 | mail at KIK 86912, and again he has provided analysis |
| 15 | under the...actually, I take it back.  Is it fair to |
| 16 | say that in his e-mails, he has attempted to provide |
| 17 | analysis based upon the Impak decision, the CSA |
| 18 | notice, and Pacific Coin; is that fair to say? |
| 19 | A.   Could you repeat the question? |
| 20 | Q.   Yes.  In his e-mail... |
| 21 | A.   Right? |
| 22 | Q.   ...he is providing his analysis as to |
| 23 | why the offering of Kin should not be considered in |
| 24 | an offering of securities in light of Impak, the |
| 25 | August 24 CSA notice, and Pacific Coast Coin. |

P. Chaukos

1      A.   I think he says at the end of the e-
2  mail, "Those are my preliminary thoughts on the Impak
3  offering and the interpretation of the notice 46307".
4      Q.   But he also provides his analysis
5  under Pacific Coin, doesn't he?  He provides several
6  quotes and analysis based upon Pacific Coin in the e-
7  mail?
8      A.   He does do that.
9      Q.   And at the end of the e-mail, he
10 says:
11         "...These are my preliminary thoughts on
12         Impak offering and interpretation of CSAN
13         46307.  I would appreciate if you and your
14         team could consider these.  If the staff's
15         view is different, I would appreciate if you
16         could please let me have the particulars of
17         how and why the Kin offering does not in
18         particular fit within the spot purchase
19         examples of Pacific Coast Coin Exchange..."
20 That is what he wrote to you, right?
21     A.   Yes.
22     Q.   And you did not take this to be...you
23 did not understand from this e-mail that, at least in
24 his mind, the decision as to whether the offering of
25 Kin was an offering of securities was not yet a

1  closed issue?
2      MR. SCHLEGELMILCH:   Objection.
3      THE DEPONENT:   I didn't take it that way.
4      I took it that Ross McKee was making
5      distinctions with cases and we have very
6      clearly said in the notice that you have to
7      look at the facts and circumstances of the
8      offering.  So, making distinctions with
9      other decisions is not helpful.  Or wasn't
10     helpful, in my mind.
11
12 BY MR. CADIGAN:
13     Q.   And did you...we talked about the
14 Impak decision but did you agree with Mr. McKee's
15 analysis in this e-mail?
16     A.   I agree that he picked facts to
17 distinguish how it was different from Kik but that
18 did not persuade me that that impacted the analysis
19 of the Kin token offering.
20     Q.   Did you discuss Mr. McKee's e-mail
21 with other members of your LaunchPad team?
22     A.   I don't recall.
23     Q.   Did you convey...did you ever respond
24 to Mr. McKee and lay out the reasons why you did not
25 agree with his analysis in this e-mail?

1      A.   Again, that is not our role as
2  LaunchPad team, no.
3      Q.   So you did not do so?
4      A.   I don't believe we did.
5      Q.   Now, on September 5th you had a phone
6  call with Mr. McKee to convey your view that the
7  public sale of Kin should be characterized as an
8  offering of securities; right?
9      A.   I believe e-mails will confirm that
10 but I don't recall the phone call itself.
11     Q.   You don't recall anything about the
12 phone call?
13     A.   No.
14     Q.   You didn't take any notes of the
15 call?
16     A.   I generally don't take notes of
17 calls, no.
18     Q.   Did you prepare notes before making
19 this call?  Prepare notes of the call before making
20 it?
21     A.   No.
22     Q.   You don't recall anything about the
23 call?
24     A.   No.
25     Q.   Do you recall telling Mr. McKee in

1  early September on this call or otherwise that you
2  had been under the impression that the Kin offering
3  was taking place later in the fall and that you had
4  more time to analyze the offering?
5      A.   I don't recall how I communicated
6  that but I do recall having that discussion with
7  Ross, yes.
8      Q.   And what did you say in that regard?
9      A.   I was struck by the fact that
10 this...first of all, the article came out a week
11 after we had a discussion and my impression
12 coming out of the meeting was this was going to be a
13 launch in the fall.  So I was struck by, first, the
14 article, which is why I asked, "What is this about?
15 What is this article about?"  And then when I got
16 the...I think I got an e-mail from Ross saying it was
17 coming up soon.  So, that may have been the prompt
18 for that discussion.
19     Q.   And in that discussion, did you tell
20 him that you had been...you had believed that you had
21 more time to analyze the offering?
22     A.   I don't recall those words.
23     Q.   Did you tell Mr. McKee in that call
24 that the OSC staff was still working on reviewing the
25 submissions that they had made?

P. Chaukos

---

Page 131

1    A.   I don't recall that either.
2    Q.   Do you recall telling Mr. McKee that
3  you felt that the Kik offering was an investment with
4  a risk of loss?
5    A.   I don't recall those words but had,
6  you know...did I hold that view, that it was an
7  investment with a risk of loss?  Yes.  But I don't
8  recall telling Ross McKee on a particular phone call
9  those words.
10   Q.   Do you recall telling him that your
11 focus was on investor protection?
12   A.   Again, I don't recall exactly when
13 that would have been communicated but they likely
14 would have been communicated, yes.
15   Q.   Do you recall acknowledging to Mr.
16 McKee in early August...I take it back, I'm sorry.
17 Do you recall in early September telling Mr.
18 McKee...acknowledging to Mr. McKee that the OSC had
19 been criticized in the press for its little guidance
20 to date?
21   A.   Could you repeat that?
22   Q.   Yes.  In early September...
23   A.   Right?
24   Q.   ...do you recall acknowledging to Mr.
25 McKee that the OSC had been criticized in the press

---

Page 132

1  for its little guidance to date?
2    A.   The only article that I know that we
3  have been criticised for that is actually Kik's
4  articles.
5    Q.   I am asking whether you recall saying
6  that to Mr. McKee.
7    A.   I don't recall saying that.
8    Q.   And as of September 5th, do you
9  believe that you had all the key documents relating
10 to the transaction.
11   A.   I believe that we had adequate
12 documents relating to the transaction.
13   Q.   Had you personally seen the proposed
14 agreements relating to the SAFT or the public sale?
15   A.   I would rely on my team for that.
16   Q.   Do you know whether they saw them?
17   A.   They saw the SAFT agreements.
18   Q.   Did they see the documents related to
19 the public sale?
20   A.   Anything that would have been given
21 to us from Kik for us to review, someone on my team
22 would have reviewed.
23   Q.   And that is what I am asking.  Do you
24 know that those materials had already been provided
25 to you at that point?

---

Page 133

1    A.   Do I know today that they had been
2  provided to me at that point?  No, I don't recall
3  that.
4    Q.   So, you don't recall whether you
5  actually had the...the agreements related to the
6  public sale as of September 5th?
7    A.   I don't recall that, no.
8    Q.   As you sit here today, do you
9  specifically recall that you had the SAFT agreements
10 as of September 5th?
11   A.   The SAFT agreements, I believe we...I
12 believe we had because I believe we asked for it.
13   Q.   Had you asked for the public sale
14 agreement as of September 5th?
15   A.   Again, that is something I rely on my
16 team for.  You are asking me for details that my team
17 would be working on.
18   Q.   No, but I am asking what your
19 understanding was as to whether or not they actually
20 had that.  I mean...
21   A.   Whether they had it or not, I don't
22 know that today, no.  I expect that they would have
23 asked for it.
24   Q.   But had you specifically asked them
25 whether they had?

---

Page 134

1    A.   I don't recall that.
2    Q.   On your call...again, do you recall
3  telling Mr. McKee in the call on September 5th that
4  the OSC would be open to discretionary relief using
5  the Impak precedent?
6        MR. HARNISCH:    Just in fairness, I think
7        she said before she doesn't remember a call
8        on September 5th.
9
10 BY MR. CADIGAN:
11   Q.   Do you recall discussing verbally
12 with Mr. McKee at any time in early September that
13 the OSC would be open to discretionary relief using
14 the Impak precedent?
15   A.   I don't recall those words.  But my
16 asking the Impak decision to be sent to Ross McKee
17 indicated that we were open to discretionary relief.
18   Q.   But that is...and, again, you
19 instructed somebody to send that to him; correct?
20   A.   No, I think I sent that...
21       MR. HARNISCH:    No...
22
23 BY MR. CADIGAN:
24   Q.   I'm sorry, you sent that to him.
25   A.   Yes.

P. Chaukos

Page 135

1        Q.    But do you recall a verbal
2    communication with him later related to, again, the
3    suggestion that they might seek discretionary relief?
4        A.    I don't recall that but that sounds
5    reasonable.
6        Q.    Do you recall telling him that there
7    might be a delay if there were changes to the type of
8    relief along the Impak lines...let me rephrase the
9    question. Do you recall telling Mr. McKee that if
10   Kik sought discretionary relief, there could be a
11   delay if there were changes that had to go back to
12   the CSA Sandbox?
13       A.    I don't recall those...
14   MR. SCHLEGELMILCH:    Objection.
15   THE DEPONENT:    ...words.
16   MR. SCHLEGELMILCH:    Sorry. Just for the
17   record.
18   THE DEPONENT:    I don't recall those words
19   but we do have to go through a CSA process,
20   so that would take time.
21   MR. HARNISCH:    Is there any chance we can
22   eat soon?
23   MR. CADIGAN:    Actually, why don't
24   we...let me finish this line and then we can
25   talk about that. Actually, this is a good

Page 136

1        time. Can we go off the record?
2
3    ---  upon recessing at 12:30 p.m.
4    ---  A LUNCHEON RECESS
5    ---  upon resuming at 1:45 p.m.
6
7    PAT CHAUKOS, resumed
8    CONTINUED EXAMINATION BY MR. CADIGAN:
9        Q.    Ms. Chaukos, when last we were
10   talking, we were talking about the early September,
11   2017 time frame. Eventually, in or around that time
12   frame, Kik informed you it would exclude Canadian
13   purchasers from the public sale of Kin; is that
14   right?
15       A.    Yes.
16       Q.    How did you learn that?
17       A.    I believe there was an e-mail from
18   Ross McKee.
19       Q.    Do you know when that was?
20       A.    It would have been around the same
21   time frame, I think.
22   MR. CADIGAN:    I would like to have this
23   marked the next exhibit, 120.
24
25   --- EXHIBIT NO. 120:  Letter dated October 19, 2017 from

Page 137

1        Huston Loke to Ross McKee
2
3    BY MR. CADIGAN:
4        Q.    I am next handing you what has been
5    marked as Exhibit 120. It is a letter from Huston
6    Loke to Ross McKee dated October 19th, 2017. And it
7    is Bates stamped KIK 101675 through 101676. Have you
8    seen this document?
9        A.    Yes.
10       Q.    And you were aware that the OSC's
11   director of corporate finance had sent Mr. McKee this
12   letter; is that right?
13       A.    Yes.
14       Q.    And had you had any role in helping
15   to prepare this letter?
16       A.    No. To preparing it, no.
17       Q.    And, actually, after early September,
18   did you have any further discussions with Mr. McKee?
19       A.    I did have a discussion with Mr.
20   McKee in early September. There was an article that
21   came to our attention that they were going ahead
22   without...that Kik was going ahead with the offering
23   of the public sale and excluding Canadian purchasers.
24       Q.    And you had a call with him at that
25   time?

Page 138

1        A.    Yes.
2        Q.    What was said on the call?
3        A.    I don't recall exactly but we
4    were...I was quite frankly surprised and disappointed
5    at the same time because we were expecting to work
6    with Kik. They clearly did not come back to us with
7    what alternative they were going ahead with. And the
8    article referenced the fact that there was unclear
9    guidance, even though there was guidance. And the
10   fact that apparently Canadians could be involved in
11   the token offering through secondary markets which,
12   again, is something we had talked to him about that
13   couldn't be done.
14       Q.    And did you express all that to Mr.
15   McKee in this phone call?
16       A.    I expect that I did because I was...I
17   would have picked up the phone at that point when I
18   saw the article and I left him a voicemail message.
19   And I believe he e-mailed me back when I saw the
20   article because we had no advanced notice that this
21   was even coming.
22       Q.    And so you had...so, you don't recall
23   but you believe that is what you told him in your
24   call?
25       A.    I believe that I would have said...I

P. Chaukos

Page 139

1   am going to reiterate.
2       Q.   Well, I am just asking if you
3   recall...
4       A.   An article came out. They hadn't
5   told us how they were going ahead. And then to have
6   an article say there was, first of all, unclear
7   guidance to them and at the same time they were
8   excluding Canadians was disappointing in light of all
9   the work we had done with Kik and counsel.
10      Q.   Yes, and that was what you were
11  dealing with.
12      A.   Yes.
13      Q.   And what I am saying is, did you
14  convey that to Mr. McKee in your call? Do you
15  actually recall doing so?
16      A.   Do I actually recall doing so? I
17  don't recall the exact words but I...I recall picking
18  up the phone and calling Ross McKee, yes, when I saw
19  the article.
20      Q.   And you believe that that is what you
21  conveyed...
22      A.   Yes.
23      Q.   ...the substance of what you just
24  said?
25      A.   Yes.

Page 140

1       Q.   After that discussion with Mr. McKee,
2   did you have any further discussions with him?
3       A.   No.
4       Q.   How did Mr. McKee respond?
5       A.   He actually responded in a way that
6   they decided to go ahead and that it would be
7   announced today but it had already been announced, so
8   I got the e-mail after it had already been announced
9   or published.
10      Q.   And just to be clear, so after that
11  discussion you had no further discussions or
12  communications with Mr. McKee?
13      A.   Once they went ahead...
14      Q.   Yes.
15      A.   ...with the public offering? No, at
16  that point it was referred to corporate finance.
17      Q.   Okay. And I am showing you Exhibit
18  120, which was the letter from...is it pronounced
19  "Loke"?
20      A.   Loke, yes.
21      MR. CADIGAN:   To Mr. McKee. Next exhibit
22  marked, Exhibit 121.
23
24  --- EXHIBIT NO. 121:  Letter dated November 2, 2017 from
25      Mr. McKee to Mr. Loke

Page 141

1
2   BY MR. CADIGAN:
3       Q.   I am handing you what has been marked
4   as Exhibit 121. It is a letter from Mr. McKee to Mr.
5   Loke dated November 2nd, 2017, Bates stamped KIK
6   00128199 through KIK 128223. Have you seen this
7   document?
8       A.   I have seen it, yes.
9       Q.   Did you review it at the time it was
10  sent on or about November 2nd, 2017?
11      A.   I reviewed the letter, not the
12  appendices.
13      Q.   And to date, the OSC has taken no-
14  action against Kik; is that right?
15      A.   No.
16      MR. HARNISCH:   Sorry, just...
17      THE DEPONENT:   No, it has not taken
18  action.
19      MR. CADIGAN:   Okay, thank you.
20
21  BY MR. CADIGAN:
22      Q.   Just to clean up some of this, it is
23  fair to say, isn't it, that the determination of
24  whether the proposed offering of Kin was an offer or
25  sales of securities was a legal decision; right?

Page 142

1       A.   It is a legal analysis, yes.
2       Q.   And the OSC obviously didn't consider
3   whether the proposed offering of Kin was an offer or
4   sales of securities under U.S. law, did it?
5       A.   No, we did not.
6       Q.   In making its analysis, did the OSC
7   make a determination that Kin itself was a security
8   as opposed to whether the proposed offer of Kin was
9   an investment contract?
10      A.   You are going to have to repeat that
11  question.
12      Q.   Yes. What I want to understand is,
13  did you do a separate analysis as to whether Kin
14  itself was a security?
15      A.   The launch...okay, my team...
16      Q.   And, again, I want to be clear about
17  the question. The analysis, as I have understood it,
18  looked at an issue as to whether the offer or sale of
19  Kin was an offer or sale of securities.
20      A.   Right.
21      Q.   And one might look at that in the
22  investment context...investment contract context. My
23  question is whether you analyzed whether Kin itself,
24  the digital token, was itself a security.
25      A.   Well, obviously we had looked at the

P. Chaukos

Page 143

1    materials and come to that view.  Whether it is in a
2    written memo, that is the part I don't know...I don't
3    recall.
4         Q.    And is the token Kin itself an
5    investment contract?
6         A.    Well, there are many prongs but the
7    Pacific Coin test is specific to the investment
8    contract section, yes.
9         Q.    And I guess what I am asking is,
10   again, taking the Kin itself separate and apart from
11   the offer or sale of that, whether that particular
12   token, instrument, vehicle, whatever you want to call
13   it is itself a security.  Did you analyze whether Kin
14   itself in a vacuum is a security?
15        A.    I guess I am not understanding your
16   question.  The offering of the Kin token is what we
17   looked at.
18        Q.    Right.
19        A.    Right?
20        Q.    And that is what I am asking, when
21   you looked at the offering.
22        A.    Right.
23        Q.    When you looked at the offering of
24   Kin...
25        A.    Right.

Page 144

1         Q.    ...did you look at it in the
2    investment contract context?
3         A.    Yes.
4         Q.    Okay.  Did you do a separate analysis
5    as to whether Kin itself is a security?
6         A.    We would be looking at the offering
7    of the Kin tokens, not the...not the Kin itself.  I
8    guess I am not understanding your distinction.  We
9    look at the offering of securities.
10        Q.    The pre-sale was conducted as a
11   securities offering; correct?
12        A.    Yes.
13        Q.    Did the OSC assess whether there were
14   any issues with that offering?
15        A.    We looked at it and we agreed that it
16   was a security.
17        Q.    And I believe we talked about some of
18   the prongs.  One prong I don't believe that we spent
19   much time on, if any, was the common enterprise
20   prong.  What analysis did the OSC do to determine
21   that there was a common enterprise implicated by the
22   offering of Kin?
23        A.    I don't recall.
24        Q.    I next want to turn your attention to
25   another topic.  What was the first communication that

Page 145

1    the OSC had with the SEC about Kik?
2         MR. SCHLEGELMILCH:    Objection.
3         MR. HARNISCH:    Again, I would object as
4    well and direct Pat not to answer questions
5    about communications between the OSC and the
6    SEC.
7         MR. CADIGAN:    Okay, and I am going to ask
8    you to be very specific about what grounds
9    you are instructing her not to answer.
10        MR. HARNISCH:    It is the same basic
11   rationale that I have given you before on
12   the others.  One, first of all, it is
13   outside the scope of our agreement for
14   appearing here voluntarily today, so first
15   and foremost.  But then with respect to work
16   that the OSC does, it is non-public and
17   confidential and that would include its
18   work, communications, deliberations, any of
19   those types of things with its co-regulators
20   including the Securities and Exchange
21   Commission.  So, any of those types of
22   things that are not otherwise public are
23   beyond the scope of what Pat is going to be
24   talking about today.
25        MR. CADIGAN:    And so, I mean, again, we

Page 146

1    are not...we didn't agree to that so I
2    know...
3         MR. HARNISCH:    I'm not...
4         MR. CADIGAN:    I know.  I am just saying I
5    want to be clear for the record when you
6    said "our agreement", I just wanted to be
7    clear that that is not the common "our"
8    meaning your agreement with Kik on this.
9         MR. HARNISCH:    How about this?  Let me
10   say pursuant to the terms to which I said
11   Pat would be willing to appear today and the
12   topics that she would be willing and we
13   would be willing to have her speak about.
14        MR. CADIGAN:    Right, that's fine.  And so
15   with respect to the...and I want to just
16   understand this.  So, you are
17   claiming...what privilege or deliberative
18   privilege?
19        MR. HARNISCH:    It is...
20        MR. CADIGAN:    Because I really want to be
21   very specific so that I understand because,
22   as you understand, the SEC is the other
23   party in this transaction and it is
24   generally fair game to ask about the
25   communications that witnesses have had with

P. Chaukos

## Page 147

1  the parties in this and they are doing that
2  and so be it.  I am asking you what
3  privileges that you are asserting that would
4  prevent us from understanding what
5  communications the witness has had with the
6  adverse party in this matter.
7        MR. HARNISCH:    Sure.  And I will come
8  back to a couple of things, right?  One, I
9  will come back to what we have said the
10 terms are for her appearing today.  So I
11 understand that is not an answer to your
12 question about a privilege.  However, I can
13 say that pursuant to OSC policies, the work
14 that they do is non-public and confidential.
15 And so therefore we are not going to have
16 Pat talk about issues that were internal to
17 the OSC that they were discussing either
18 solely amongst themselves or with other
19 regulators, right, unless that has otherwise
20 been made public.  And my
21 understanding...somebody can correct me if I
22 am wrong...that communications between these
23 two regulators are not otherwise public.  If
24 you have something that is about a...you
25 know, something that has been produced or

## Page 148

1  otherwise public, feel free...feel free to
2  show me.
3        MR. CADIGAN:    We don't need to debate
4  that either.  There are many things that
5  have come up that are not otherwise public
6  between parties that come out in discovery.
7  These are not internal discussions that I am
8  asking about.  They are not.  They are
9  discussions with a third party, a regulator
10 from a separate entity.  And, indeed, you
11 know, we understand that, you know, there
12 have been communications and you saying that
13 were not...
14       MR. HARNISCH:    I am listening to you.  I
15 have just got to close the blind here.
16       MR. CADIGAN:    Yes, okay.
17       MR. HARNISCH:    Or maybe not.
18       MR. CADIGAN:    Okay.
19       MR. HARNISCH:    Anyway, go ahead.
20       MR. CADIGAN:    So, on that basis, you are
21 instructing her not to answer?
22       MR. HARNISCH:    I am still instructing her
23 not to answer.  You can ask the question, as
24 we have done before, did conversations
25 happen or something like that and she will

## Page 149

1  give you a, "Yes", or, "No", or, "I don't
2  recall".
3        MR. CADIGAN:    M'hmm.  Okay, that's fine.
4
5  BY MR. CADIGAN:
6        Q.    Did you have any conversations with
7  the SEC about Kik prior to the August 14th meeting...
8        A.    No.
9        Q.    ...with Kik?
10       A.    No.
11       Q.    Did you have any conversations with
12 the OSC...I mean with the SEC about Kik prior to
13 September 5th, 2017?
14       A.    No.
15       Q.    Did you have any conversations with
16 the SEC prior to its initiation of the investigation
17 in this matter?
18       A.    Yes.
19       Q.    When was that communication?
20       A.    So, I am responding but I am also
21 cognizant of what you...
22       MR. HARNISCH:    No, you can give a...I am
23 okay with the when.
24       THE DEPONENT:    Oh.  So, there was a call
25 with the SEC a few days after the

## Page 150

1  notice...the media article by Kik that they
2  were going public.  So, it would have been
3  around...on or around September 11th.  And
4  then the next communication I don't know the
5  dates but would have been when it had become
6  a potential, I guess, investigation by the
7  SEC.
8
9  BY MR. CADIGAN:
10       Q.    And did you initiate the call to the
11 SEC on September 11th?
12       A.    We would have initiated the call,
13 yes.
14       Q.    What was the reason that you
15 initiated the call?
16       MR. HARNISCH:    I am going to direct you
17 not to answer that.
18
19 BY MR. CADIGAN:
20       Q.    Have you provided any guidance or
21 assistance to the SEC in its investigation of Kik?
22       MR. HARNISCH:    It is a "Yes" or a "No" or
23 an "I don't know".
24       THE DEPONENT:    I don't know.
25

P. Chaukos

Page 151

1    BY MR. CADIGAN:
2         Q.   Did you personally provide an
3    interview to the SEC?
4         A.   An interview?
5         Q.   Yes.  Did you talk to the SEC in
6    connection with this investigation of this matter?
7         A.   As I said, there was a call after
8    once the investigation had started.  That I recall.
9         Q.   And...
10        A.   It wasn't an interview.  I wouldn't
11   call it an interview.
12        Q.   Did they go over the various facts
13   and timeline of your communications with Kin?
14        MR. SCHLEGELMILCH:    Objection.
15        MR. HARNISCH:    Just say "Yes" or "No" or
16   "I don't recall".
17        THE DEPONENT:    I mean, they asked about
18   Kik, yes.  That I recall.
19
20   BY MR. CADIGAN:
21        Q.   But did you provide them with dates,
22   times describing your communications with Kik?
23        MR. HARNISCH:    Okay, I am going to direct
24   her not to answer.
25        MR. SCHLEGELMILCH:    I'll object for the

Page 152

1    record.
2         MR. CADIGAN:    What's that?
3         MR. SCHLEGELMILCH:    I am objecting for
4    the record.
5
6    BY MR. CADIGAN:
7         Q.   Did you keep any notes of your
8    discussions with the SEC?
9         A.   No, I have no notes.
10        Q.   Was anyone else there with you when
11   you were talking with the SEC?
12        A.   Yes.
13        Q.   Who else was there?
14        A.   Which meeting are we talking about,
15   though?
16        Q.   On September 11th.
17        Q.   On September 11th, who was with me?
18        Q.   Yes.  From the OSC.
19        A.   I don't recall from the OSC.
20        Q.   Okay, and then you said there was a
21   subsequent discussion you had with the SEC; is that
22   right?
23        A.   Yes.
24        Q.   Okay.  And who was with you from the
25   OSC on that one?

Page 153

1         A.   I believe there was two people from
2    our enforcement branch.
3         Q.   Do you know whether they took notes
4    of that discussion?
5         A.   I don't know.
6         Q.   Who were those people from the
7    enforcement branch?
8         A.   I would have to go back to my notes.
9    I want to say Noulla Antoniou is one and I don't
10   recall the other person.
11        Q.   When you say notes, did you take
12   notes of that discussion?
13        A.   No.  I think I previously answered
14   that I didn't take notes on that discussion.
15        Q.   You indicate you would have to go
16   back and check your notes.  What notes are you
17   referring to?
18        A.   No, I meant, like, the calendar
19   invite.  I don't know.  I don't recall who was there.
20        Q.   On September 11th, who did you speak
21   with at the SEC?
22        MR. HARNISCH:    You can answer that.
23        THE DEPONENT:    Amy Starr.  Valerie
24   Szczepanik.  There was someone else from
25   Amy's group, I think Amy's corporate

Page 154

1    finance.  And I believe Michael Coco from
2    international.
3
4    BY MR. CADIGAN:
5         Q.   And...
6         A.   I think the other...sorry, in Amy's
7    group it was Cindy.  I don't remember the last name.
8         Q.   And how long did that discussion
9    last?
10        A.   Half an hour to 45.
11        Q.   And what was the topic of that
12   discussion?
13        MR. HARNISCH:    I am going to direct you
14   not to answer beyond Kik.  I am presuming it
15   is Kik.
16        THE DEPONENT:    Oh.  Okay, on that one
17   specifically, I asked whether Kik had
18   approached the SEC.
19
20   BY MR. CADIGAN:
21        Q.   And what were you told?
22        MR. HARNISCH:    No.  I am directing Pat no
23   to answer.
24        MR. SCHLEGELMILCH:    I will also add an
25   objection.

P. Chaukos

Page 155

1
2    BY MR. CADIGAN:
3        Q.    And in your subsequent call with the
4    SEC, who was on the call from the SEC?
5        A.    I don't recall the names.
6        Q.    Do you recall whether they were from
7    the division of enforcement or division of corporate
8    finance or some other division at the SEC?
9        A.    I believe one person was from
10   enforcement.
11       Q.    And how long did that call last?
12       A.    Again, probably half an hour to 45.
13       Q.    And when did that call take place?
14       A.    I don't recall the date.
15       Q.    Was that also in the fall of 2017?
16       A.    I actually think it was closer to
17   winter.
18       Q.    Winter, 2017?  Did you have any other
19   discussions with the SEC staff related to Kik?
20       A.    No.
21       Q.    Did you provide any documents to the
22   SEC?
23       A.    No.  Me personally?
24       Q.    Yes.
25       A.    No.

Page 156

1        Q.    Do you know whether any...if any
2    documents were provided by the OSC to the SEC?
3        MR. HARNISCH:    I am going to direct you
4            not to answer.
5
6    BY MR. CADIGAN:
7        Q.    Do you know whether the notes of your
8    meetings and your communications with Kik were
9    provided to the SEC?
10       MR. HARNISCH:    I will also direct you not
11           to answer.
12
13   BY MR. CADIGAN:
14       Q.    Do you know what, if any, documents
15   were provided to the SEC by the OSC?
16       A.    I don't...
17       MR. HARNISCH:    You can say "Yes" or "No"
18           or "I don't know".
19       THE DEPONENT:    I don't know.
20
21   BY MR. CADIGAN:
22       Q.    Did you have any...did you review any
23   part of the SEC's complaint prior to its filing?
24       A.    Prior to this?
25       Q.    Prior to its filing.

Page 157

1        A.    Prior to the filing?  No.
2        Q.    Okay.  Have you had any discussions
3    with the...did you have any discussions with the SEC
4    regarding the filing of its complaint?
5        A.    I am going to ask you to repeat that
6    again.
7        Q.    Yes, did you have any discussions
8    with the SEC regarding the filing of its complaint?
9        A.    Regarding the filing of its
10   complaint.  No, not on that specific issue, no.
11       Q.    Again, as you said, the only two
12   discussions you have had with the SEC were the two
13   you just mentioned?
14       A.    Right.  One, after the media article
15   to understand whether Kik approached the SEC.
16   And then the following was later once the SEC had
17   started an investigation.
18       Q.    When you reached out to the SEC, how
19   did you decide who to reach out to?
20       A.    For which call?
21       Q.    For the call on September 11th.
22       A.    The call on September 11th?  We
23   typically allow the SEC to determine that.  But I
24   also knew that Amy Starr and Valerie were involved in
25   these issues.

Page 158

1        Q.    And in the subsequent call, did you
2    reach out to the SEC or did the SEC reach out to you?
3        A.    I don't know the answer to that.
4        Q.    You don't know whether you reached
5    out to them?
6        A.    No, no, I didn't.  I don't know who
7    did.
8        Q.    Did you have any...did you ever
9    communicate with the SEC by e-mail?
10       A.    Me personally?
11       Q.    Yes.
12       A.    I don't recall an e-mail to the SEC.
13       Q.    Have you been on any chains with e-
14   mails to the SEC relating to Kik?
15       A.    With the SEC?  I don't recall any e-
16   mails that I would have been involved with the SEC
17   and Kik.
18       Q.    Have you spoken to the SEC since it
19   has filed its complaint in this matter?
20       A.    Since it has filed its complaint?
21   When was the complaint filed?
22       Q.    The complaint was filed in mid...June
23   of last year.  June, 2019.  Sorry.
24       A.    I don't recall.
25       Q.    You don't recall whether you have had

P. Chaukos

Page 159

```
1    any discussions in the last several months?
2         A.   I don't believe I have but I...I
3    mean, I don't...I don't recall.
4         Q.   Did you have any discussions with the
5    SEC related to your testimony today?
6         A.   Discussions with the SEC related to
7    my testimony?  I mean, I am going to ask you to
8    rephrase that question.
9         Yes.  I mean, have you had any
10   discussions with the SEC regarding your providing a
11   deposition in this matter?
12        A.   On the call with the SEC, I was
13   asked...
14        MR. HARNISCH:   No.  No.  I am not going
15        to have you talk about substance and
16        communications with the SEC but I think...
17        THE DEPONENT:   I was asked about Kik as
18        well, I was going to say.
19        MR. HARNISCH:   Oh.  Sorry.
20
21   BY MR. CADIGAN:
22        Q.   And when was that?
23        A.   I have explained, there was one call
24   right after the media article.
25        Q.   Yes?
```

Page 160

```
1         A.   And that was to understand whether
2    Kik had approached the SEC.  That was...we needed to
3    understand whether they had even talked to the SEC.
4    And then many months later, I don't recall the date,
5    there was a discussion around our interaction with
6    Kik and that was it.  That was the...
7         Q.   And I believe you said that was
8    towards the winter of 2017?
9         A.   I believe it was then, yes.
10        Q.   And since the lawsuit has been filed
11   in this matter, in June 2019, I am asking whether you
12   have had any communications with the SEC regarding
13   your deposition, your providing a deposition in this
14   matter.
15        A.   I don't believe so.  I don't recall
16   any calls after that.
17        Q.   Have you been following the lawsuit?
18        A.   No.  I have many more things to do.
19        Q.   Did you have any communications with
20   the SEC when the DAO report was published?
21        A.   No.
22        Q.   Did you have any communications with
23   the SEC regarding the August 24th, 2017 CSA staff
24   notice?
25        A.   No, there would be no reason for
```

Page 161

```
1    that.
2         Q.   So, to your knowledge, did you
3    provide an interview to the SEC regarding Kik?
4         A.   I think I answered that.  I am not
5    sure what you mean by an interview.  We did have a
6    discussion about our interactions with Kik.
7         MR. CADIGAN:   Can we have this marked as
8         Exhibit 122?
9
10   --- EXHIBIT NO. 122:  Letter dated August 28, 2017 to
11             Finance Ministers from Manie Eagar
12
13   BY MR. CADIGAN:
14        Q.   I am handing you what has been marked
15   as Exhibit 122.  For the record, it is an August
16   28th, 2017 letter to Finance Ministers from Manie
17   Eagar, chairman of the Blockchain Association of
18   Canada.  It is Bates stamped KIK 117898 and 117900.
19   Have you seen this document before?
20        A.   Yes.
21        Q.   What is it?
22        A.   It is a letter from Manie Eagar to
23   the Finance Ministers.
24        Q.   And who are the Finance Ministers?
25   What is their role?
```

Page 162

```
1         A.   I don't think I am an expert on that,
2    but effectively they are responsible for the Ministry
3    of Finance in their provinces.  Bill Morneau would be
4    the federal Finance Minister.
5         Q.   And this was a letter written after
6    the August 24th, 2017 CSA notice; is that right?
7         A.   It appears to be.
8         Q.   And in it, if you look at the second
9    page, is a statement:
10        "...To date, the OSC has not published any
11        specific guidance on the characteristics of
12        a digital token sold through a crowd sale
13        that would be considered a security under
14        Ontario securities laws..."
15   Is that right?
16        A.   No, that is not right.
17        Q.   No, I mean, is that what that states?
18        A.   That is what it says.
19        Q.   I mean, you disagree with that
20   position but that is what it states there?
21        A.   Right.
22        Q.   And I think that you had indicated
23   that you understood that the only...rather, let me
24   just say, beyond this letter, were you aware of any
25   other criticism regarding the guidance that had been
```

P. Chaukos

## Page 163

1    provided regarding cryptocurrencies in Ontario?
2          A.    I have heard comments from various
3    parties who are in the crypto asset space that do not
4    like the regulatory framework that would apply.  That
5    they would prefer that either regulation doesn't
6    apply or that securities regulation doesn't apply.
7          Q.    And where have you seen those
8    comments?
9          A.    That is part of our role.  When we do
10   outreach to the Fintech community, we provide direct
11   support to these businesses.  These are just the
12   comments we have heard.
13         Q.    And it is true, isn't it, that when
14   the CSA...when CSA provided its August 24th notice,
15   it did not put out that guidance for public comment
16   before releasing it; right?
17         A.    It is not required to.
18         Q.    But it did not do so, right?
19         A.    Right.
20         MR. CADIGAN:    Could we have this marked
21         as Exhibit 123.
22
23   --- EXHIBIT NO. 123:  Article dated September 18, 2017 by
24              Ross McKee, Chris Hewat and Liam
25              Churchill entitled "Industry Responds

## Page 164

1              to CSA Guidance on Cryptocurrency
2              Offerings"
3
4    BY MR. CADIGAN:
5          Q.    I am handing you what has been marked
6    as Exhibit 123.  This is an article written by Ross
7    McKee and others entitled...dated September 18, 2017
8    entitled "Industry Responds to CSA Guidance on
9    Cryptocurrency Offerings", is that right?
10         A.    That is what it says.
11         Q.    And under "Industry Responds" he
12   writes:
13               "...Fintech organizations and companies are
14               concerned the Staff Notice did not provide
15               specific guidance on the characteristics of
16               a cryptocurrency that would result in it
17               being considered a security..."
18   Is that what he wrote?
19         A.    That is what he wrote.
20         Q.    And isn't it true that this article
21   is linked on the OSC website?
22         A.    This article is linked on the OSC
23   website?
24         Q.    Yes.
25         A.    I am not aware of that.

## Page 165

1          Q.    Are you denying that it is on there?
2          A.    I am not denying, I just am not aware
3    of it.
4          Q.    Okay.  What did you do to prepare for
5    the deposition today?
6          A.    I feel like I answered that question
7    but I reviewed the documents and the e-mails that
8    were the direct communications between me and Kik or
9    its counsel.
10         Q.    And who was there when you prepared?
11         A.    Who was there when I prepared?
12         Q.    Yes.
13         A.    I prepared with my legal counsel.
14         Q.    And who was that?  Mr. Harnisch?
15         A.    Yes, Mr. Harnisch.  And Yvonne
16   Chisholm.
17         Q.    And when did you prepare?
18         A.    Yesterday.
19         Q.    And how long did you meet with them
20   to prepare?
21         A.    A couple hours.
22         Q.    And is the OSC paying for your legal
23   counsel?
24         A.    I don't have...I don't know the
25   answer to that.  I assume so but I don't know the

## Page 166

1    answer to that.
2          Q.    Is it your present intention to
3    testify at the trial in this matter if asked to do
4    so?
5          MR. HARNISCH:    Objection.  I would direct
6          you not to answer that.  Those issues will
7          be handled in consultation with counsel.
8
9    BY MR. CADIGAN:
10         Q.    Have you had any discussions with the
11   SEC regarding whether you would so testify?
12         A.    Have I had discussions?
13         Q.    Yes.
14         A.    No.
15         Q.    Before we just leave that, in terms
16   of the later discussion with the SEC regarding...in
17   winter of 2017, I just want to make sure that I am
18   clear, if I were to ask about the details of that
19   discussion, I take it you would instruct her not to
20   answer?
21         MR. HARNISCH:    That is a fair assumption.
22         MR. CADIGAN:    I have no further
23         questions.
24
25   EXAMINATION BY MR. SCHLEGELMILCH:

P. Chaukos

| Page 167 |
|---|

```
 1          Q.   Good afternoon, Ms. Chaukos.  As you
 2   know by now, my name is Stephan Schlegelmilch and I
 3   am one of the attorneys for the SEC in this action.
 4   I have got just a few questions, actually now very
 5   few questions, but I do apologize because they are
 6   likely going to overlap a little bit with what Kik's
 7   counsel covered with you earlier today.
 8          Just by way of ground rules, I talk quickly.
 9   If I ask a question that doesn't make any sense, I
10   will do my best to rephrase it.  Just let me know.
11   And when thinking about your answers and when
12   answering my questions, I guess my overall caution is
13   that I am not seeking privileged information.  I am
14   not seeking confidential information.  And I am not
15   trying to ask you questions that would cause you to
16   be, like, an expert on the law in any way.  So, I am
17   not seeking that information.
18          A.   Okay.
19          Q.   So, what I would like to do first is
20   to have you look at the press release that the OSC
21   put out in March of 2018.  There it is right there.
22   March of 2017, I'm sorry.  How did the OSC
23   disseminate this press release?  How did it push it
24   out to the market?
25          A.   It was a media release, so it would
```

| Page 168 |
|---|

```
 1   have been done through our communications department.
 2          Q.   So, was it put on the Internet?
 3          A.   Yes.
 4          Q.   And did it receive coverage in the
 5   press?
 6          A.   Yes, I believe so.
 7          Q.   Okay.  And is it fair to say that in
 8   summary the OSC when issuing this media release was
 9   warning would-be issuers of digital tokens that the
10   securities laws may apply to the issuance of the
11   digital tokens?
12          A.   That is fair.
13          Q.   And if you look on the second page of
14   the release, did the OSC invite would-be issuers of
15   digital tokens to contact the OSC regarding the token
16   offering?
17          A.   Yes, that is the mandate of OSC
18   LaunchPad.
19          Q.   And I think you have said earlier,
20   and I am not asking for any specifics, that you
21   actually got a fair number of queries from digital
22   token offerors?
23          A.   Yes.  Media inquiries but also from
24   businesses themselves.
25          Q.   If this is...if your counsel says
```

| Page 169 |
|---|

```
 1   this is out of bounds I will withdraw the question,
 2   but I am looking for, sort of, an order of magnitude.
 3   I am looking for from the time this media release was
 4   released in March of 2017, can you tell me
 5   approximately how many would-be issuers of tokens
 6   contacted you until, let's say, August of 2017?  That
 7   five month period.
 8          A.   I don't know the exact numbers but if
 9   I were to estimate, I would say it is probably less
10   than 20.
11          Q.   But Kik, towards July, was one of
12   those potential offerors of digital tokens?
13          A.   Yes.
14          Q.   That contacted the OSC?
15          A.   Right.
16          MR. SCHLEGELMILCH:   Let's go off the
17   record.
18
19   --- DISCUSSION OFF THE RECORD
20
21   BY MR. SCHLEGELMILCH:
22          Q.   Now, I know that from your prior
23   testimony you met in person with Kik and
24   representatives of Kik and their legal counsel
25   in...on August 14th of 2017; is that correct?
```

| Page 170 |
|---|

```
 1          A.   That is correct.
 2          Q.   I think you said but I want to make
 3   sure that I understood this that Kik had U.S. counsel
 4   present?
 5          A.   Yes.
 6          Q.   Were they in person or were they
 7   telephonic?
 8          A.   They were on a conference call.
 9   There was two U.S. counsel.
10          Q.   Did they speak?
11          A.   They did.
12          Q.   Okay.  What do you...if you can
13   recall the subject matter, what was it that they were
14   speaking about when they spoke?
15          A.   When they spoke, it was about how
16   under U.S. law they thought that the token offering
17   was not a security.
18          Q.   And when they talked about it, were
19   they talking about it in the context of the Howey
20   Test?
21          A.   Yes.
22          Q.   And just so the record is clear, at
23   the highest of high levels, what is the Howey Test?
24          MR. CADIGAN:   Objection.
25          MR. SCHLEGELMILCH:   Just so that we are
```

P. Chaukos

Page 171

1    all on the same page with respect to
2    definitions.
3        MR. CADIGAN:    Objection for the record.
4        THE DEPONENT:    Howey Test is a case in
5    the U.S. that sets out four prongs of a test
6    to determine whether something is an
7    investment contract.
8        MR. SCHLEGELMILCH:    I see.
9
10   BY MR. SCHLEGELMILCH:
11       Q.    And so when Kik's United States
12   counsel spoke during this meeting telephonically,
13   that was the topic that they were talking about, was
14   the Howey Test; is that correct?
15       A.    Yes. They had done, kind of, a legal
16   analysis but Blakes had only issued the letter to us.
17       Q.    What can you tell me about the legal
18   analysis that you just mentioned?
19       A.    Other than what they said on the
20   call, we never saw it.
21       Q.    And so on the call, did they indicate
22   that a legal analysis existed but they weren't
23   willing to share it?
24       A.    That their legal analysis indicated
25   that it wasn't a security based on a couple...at

Page 172

1    least a couple prongs of Howey.
2        Q.    Okay. Do you have in front of you
3    the...I think it is marked previously as 118. It is
4    the CSA notice.
5        A.    Okay.
6        Q.    And I think your testimony was...and
7    I am not trying to misstate it in any way, I am just
8    trying to sort of reorient us to an earlier session
9    of your deposition, I think your testimony was that
10   even though this notice had not been issued, that you
11   talked about the substance of this notice with Kik
12   and its representatives during the August 14th
13   meeting. Is that correct?
14       A.    We talked about the notice that it
15   would be coming out and it would be addressing some
16   of the same arguments that Kik was making in the
17   meeting, yes...
18       Q.    And if you...
19       A.    ...and that we would forward it to
20   them.
21       Q.    All right. I apologize. Would you
22   look at the third page of the notice.
23       A.    The third page? Okay.
24       Q.    Yes. There is four numbered
25   sentences.

Page 173

1        A.    Yes.
2        Q.    Is this the test for an investment
3    contract in Canada?
4        A.    I mean, it is summarizing but it is
5    the four pronged test that we...that is set out in
6    Pacific Coin...Coast Coin.
7        Q.    And I think your testimony is that it
8    is the same test that is set forth in Howey?
9        MR. HARNISCH:    Objection.
10       THE DEPONENT:    It broadens...my
11   understanding is that it broadens Howey...on
12   prong number four, I believe. And there may
13   be elements even in two, but to come
14   significantly from the efforts of others, I
15   believe Howey says to come solely or
16   primarily from the efforts of others.
17       MR. SCHLEGELMILCH:    Okay.
18
19   BY MR. SCHLEGELMILCH:
20       Q.    And if you look on the first page...
21       A.    Of the notice?
22       Q.    ...of the notice. Do you see
23   footnote 4?
24       A.    Yes?
25       Q.    The first URL there, the first

Page 174

1    website.
2        A.    Okay?
3        Q.    Is that the website for the United
4    States Securities and Exchange Commission?
5        A.    I don't know the answer to that.
6        Q.    Okay. Nevertheless, the notice in
7    the footnote encourages would-be registrants to check
8    out one of those URLs; is that correct?
9        A.    Yes.
10       Q.    In your conversation with Kik...if
11   you could turn to the third page, I think it might be
12   helpful. In your conversations with Kik on August
13   14th, did you talk about these four prongs?
14       A.    Some elements of the...not...not
15   necessarily all of them but some of them, yes.
16       Q.    Okay, can you tell me to the best of
17   your memory which prongs you discussed with Kik on
18   August 14th?
19       A.    I remember distinctly the expectation
20   of profit because they were thinking about profit in
21   the way you do with traditional securities, does it
22   provide dividends, you know, any kind of profit
23   sharing and what the expectation of profit means.
24       Q.    And what did you or what did other
25   people from the LaunchPad say in response to that?

P. Chaukos

| Page 175 | Page 177 |
|---|---|

**Page 175**

1    A.   Well, it was actually something that
2  we actually put into our notice. There are ways
3  to...or expectation of profit with these token
4  offerings. You can have an expectation of profit
5  that is broader than what traditional securities have
6  had. So, a lot of them do rewards or there is an
7  increase in value. You know, in terms of promotional
8  type activities.
9    Q.   Do you recall telling Kik during this
10  meeting that it was the OSC's view that an increase
11  in value or an increase in price in the token could
12  lead to an expectation of profits?
13    MR. HARNISCH:   Objection.
14    THE DEPONENT:   Yes.
15
16  BY MR. SCHLEGELMILCH:
17    Q.   Can you provide any additional colour
18  on what you told them during the meeting on that
19  topic?
20    A.   No, I don't recall details. I recall
21  that we had that discussion around that prong of the
22  test.
23    Q.   Okay. Do you recall any discussion
24  regarding the fourth prong of the test, to come
25  significantly from the efforts of others?

**Page 176**

1    A.   That would have been...that
2  discussion...what I do recall on that is the
3  distinguishing Howey to Pacific Coin.
4    Q.   Okay?
5    A.   And at the same time...and I don't
6  know who on the Kik team made the argument. You
7  know, because miners are the ones that are, kind of,
8  building the DLT or the blockchain technology, they
9  are a big part of it, that somehow it is
10  decentralized and so therefore you are not relying on
11  the efforts of the Kik team. So that was the
12  discussion around that.
13    Q.   Do you recall your or anyone else
14  from the OSC LaunchPad's response to that argument
15  that Kik was making?
16    A.   We were making the argument that
17  investors are investing money, relying on the
18  representations by the Kik team and what platform
19  they would deliver. They were relying on the Kik
20  team to be developing that platform.
21    Q.   Okay. Is it fair to say that your
22  read of the white paper and the materials that you
23  reviewed in advance of the meeting suggested to you
24  that investors were looking to Kik to build out the
25  platform, the ecosystem?

**Page 177**

1    MR. CADIGAN:   Objection. I'm sorry.
2    THE DEPONENT:   Yes, I will put a caveat
3  there, though. I find a lot of white papers
4  overly promotional, so I typically rely on
5  what the business tells us in the meeting.
6
7  BY MR. SCHLEGELMILCH:
8    Q.   And did Kik address that point during
9  the meeting?
10    A.   Which point?
11    Q.   The point we were just talking about,
12  that whether or not investors were looking to Kik to
13  build out the ecosystem or to...
14    A.   I don't recall how they addressed it.
15    Q.   Okay, thank you. Do you recall a
16  discussion with Kik regarding an investment of money?
17  The first prong of...that is listed here in the CSA
18  notice?
19    A.   I don't recall that.
20    Q.   Okay. And do you recall...and
21  forgive me if you covered this with Mr. Cadigan, but
22  do you recall a discussion regarding the common
23  enterprise prong?
24    A.   I don't recall the discussion on the
25  common enterprise.

**Page 178**

1    Q.   But you do recall a discussion
2  regarding prongs three and four?
3    A.   Yes.
4    Q.   Okay. During the meeting with Kik on
5  August 14th, do you recall a discussion of the DAO
6  report?
7    A.   I remember, and I think I said this
8  previously, that it came up and they distinguished
9  DAO...the Kik offering with DAO because of the profit
10  sharing element.
11    Q.   And do you recall responding to that
12  argument?
13    A.   I don't recall the detail but we
14  would have responded because that goes to the
15  expectation of profit.
16    Q.   Okay. And we have already covered
17  that.
18    A.   M'hmm.
19    Q.   Okay. So I don't need to...
20    A.   Yes.
21    Q.   ...do it all over again. I have
22  brought exhibits. I should mark them. I brought
23  them all the way here.
24    MR. HARNISCH:   As long as they are here,
25  right?

P. Chaukos

---

Page 179

1      MR. SCHLEGELMILCH:    As long as they are
2   here.  Let me hand you what we will mark as
3   Exhibit 124.
4
5   --- EXHIBIT NO. 124:   E-mail chain ending September 7, 2017
6             between Mr. McKee and Ms. Chaukos
7
8   BY MR. SCHLEGELMILCH:
9      Q.   I am handing you what has now been
10  marked as Exhibit 124.
11     A.   Okay.
12     Q.   And just for the record, it is an e-
13  mail exchange that is from Mr. McKee to you
14  dated...the most recent in time e-mail is September
15  7, 2017 at 7:01 p.m. and the Bates numbers on the
16  exhibit are SEC OSC-E 0000083 through 90.
17     A.   Okay.
18     Q.   And what I'd like to do is to ask you
19  to look at the page that ends in 86.  Specifically,
20  an e-mail from Mr. McKee to you dated September 5,
21  2017.
22     A.   6:41 p.m.?
23     Q.   Yes, ma'am.
24     A.   Okay.
25     Q.   Just take a minute to read this over

---

Page 180

1   but my question will be, is Mr. McKee proposing an
2   exemption from registration?
3      MR. CADIGAN:    Objection.  Leading.
4      THE DEPONENT:    He is proposing a no-
5   action letter.
6      MR. SCHLEGELMILCH:    Okay.
7      THE DEPONENT:    Which Mr. McKee knows we
8   cannot do in Ontario.
9
10  BY MR. SCHLEGELMILCH:
11     Q.   Why do you say that, that you can't
12  do that in Ontario?
13     A.   Because we are not allowed to give
14  blanket type orders or no-action letters.  We
15  normally do this type of relief through an exemptive
16  relief application and a decision.
17     Q.   Okay.  The fact that Mr. McKee is
18  asking for a no-action letter, did that cause you to
19  understand that Mr. McKee understood that the
20  OSC...that the LaunchPad had determined that the Kin
21  that Kik was going to offer in September of 2017 was
22  a security?
23     MR. CADIGAN:    Objection.
24     THE DEPONENT:    I actually think he is
25  conceding that it is a security.

---

Page 181

1   BY MR. SCHLEGELMILCH:
2      Q.   Now, why do you say that?
3      A.   Because he is offering either what he
4   called a no-action or exemptive relief application,
5   which is what we had proposed initially.  Or, he is
6   saying he is going to...I think this is the e-mail
7   where he says he will do no Canadians under what we
8   call the distributions outside Canada.
9      Q.   Okay.  I don't want to interrupt your
10  reading.  I was going to move on to a different
11  topic.
12     A.   No, go ahead.
13     Q.   So, if you could look at...I did not
14  mark the exhibit number down but it is the November
15  2nd, 2017 letter from Mr. McKee to Mr. Loke.
16     A.   Okay.
17     Q.   It is right there.  It was marked
18  previously as Exhibit 58 in a deposition.  I just
19  want to focus on one sentence of Mr. McKee's letter
20  on the first page.  Mr. McKee writes:
21        "...In fact, the first time the OSC staff
22        definitively communicated a position that
23        the ITD..."
24  And I think that is the issue of tokens:

---

Page 182

1        "...constituted an offering of securities
2        was in the telephone call to me from Ms.
3        Chaukos on September 5th, shortly before the
4        scheduled launch date..."
5   Based on your recollection of events, is that
6   accurate?
7      A.   No.
8      Q.   How is it inaccurate?
9      A.   I don't know how he means
10  "definitively".  But we had communicated our position
11  throughout.  That was the reason for meeting with Kik
12  in the first instance, because if we agreed with the
13  legal analysis there was no need to meet with Kik and
14  that is also the reason why we were asking about
15  investor disclosures.  Every time there was a media
16  article, we followed up right away because we did at
17  that time believe and...and to this day believe that
18  it was an offering of securities.
19     Q.   But is it fair to say that no later
20  than September 5th the OSC had definitively
21  communicated to Kik that the token was a security?
22     A.   I am going to ask you to rephrase
23  that.
24     Q.   Yes, it is a lousy question.  Is it
25  fair to say that at least by September 5th, the date

---

## Page 183

```
 1    indicated in Mr. McKee's letter, that at least by
 2    that date the OSC had made it crystal clear to Kik
 3    that the offering of the Kin token was a securities
 4    offering?
 5          MR. CADIGAN:    Objection.
 6          THE DEPONENT:   Okay, when you say "at
 7          least", I am saying there is no way after
 8          September 5th they could have argued that we
 9          hadn't communicated it was a security.  Yes.
10
11    BY MR. SCHLEGELMILCH:
12          Q.    And, in fact, your testimony...I am
13    not trying to misstate it.  Your testimony it was
14    actually much earlier than that; is that correct?
15          A.    Yes.
16          MR. SCHLEGELMILCH:    Let me mark another
17          exhibit.  Thank you.  Let me hand you what
18          has been marked as Exhibit 125.
19
20    --- EXHIBIT NO. 125:  Article dated September 7, 2017 by
21          Ted Livingston entitled "Canadian
22          Residents Excluded from Next Week's
23          Kin TDE"
24
25    BY MR. SCHLEGELMILCH:
```

## Page 184

```
 1          Q.    I just want to ask you one question
 2    or a couple questions about this, I guess.  Have you
 3    ever seen this before?
 4          A.    I don't think I have seen it in this
 5    format.  I think it might be a blog that came from
 6    Ted Livingston, so I probably would have seen it
 7    before, yes, in that format.
 8          Q.    Let me just ask you about one thing
 9    that Mr. Livingston wrote in this Medium post.  Mr.
10    Livingston wrote:
11          "...Despite our best efforts to work with
12          the OSC, they have failed to give us clear
13          direction on when Canadian securities law
14          will or, more importantly, will not
15          apply..."
16    Based on your memory, is that statement accurate?
17          A.    No, it is not accurate.
18          Q.    How so?
19          A.    We met with them from August 14th.
20    Every time there was an article in the paper, we
21    followed up.  We, in fact, understood the public
22    offering was going to happen much later.  But every
23    time we saw an article, I followed up with Ross McKee
24    and I think all of the discussions, whether we are
25    talking about resale, investor disclosure, how they
```

## Page 185

```
 1    were going to satisfy registration and prospectus
 2    requirements indicated that we were very clear that
 3    it was a security and they needed to comply with
 4    regulatory requirements and that we were open to
 5    exemptive relief.  We understood this was a novel
 6    area where, you know, not all the regulations may
 7    make sense for a Fintech type business.  But we were
 8    open to exemptive relief.  And we never heard back on
 9    the exemptive relief.
10          Q.    In all of your conversations with Mr.
11    McKee and with other representatives of Kik, was
12    there ever a conversation about whether Kik had
13    contacted the SEC like they had contacted the OSC
14    LaunchPad?
15          A.    I asked that question, I think, on
16    the August 14th meeting.
17          Q.    And what was their response?
18          A.    That the SEC didn't have a LaunchPad
19    the way we have a LaunchPad.  They didn't have a team
20    or a unit that they could talk to.
21          Q.    And that was the reason Kik gave for
22    not contacting the SEC?
23          A.    That is my recollection.  And I don't
24    know if it was Ross McKee or Cobley that responded to
25    that question.
```

## Page 186

```
 1          MR. SCHLEGELMILCH:    Okay.  Can we go off
 2          the record?
 3
 4    --- DISCUSSION OFF THE RECORD
 5
 6          MR. SCHLEGELMILCH:    Subject to asking
 7          further questions after representatives of
 8          Kik ask more questions, if they do, we have
 9          no further questions at this time.  Thank
10          you very much.
11          MR. CADIGAN:    I just have a very quick
12          follow-up and I hope to be quick.  I can ask
13          them from down here.
14
15    CONTINUED EXAMINATION BY MR. CADIGAN:
16          Q.    You just mentioned that...you
17    indicated that someone at Kik or their counsel made
18    the comment that the SEC didn't have a LaunchPad.  Is
19    that right?
20          A.    Yes.
21          Q.    Okay.  Was that reflected in your
22    notes of the meeting?
23          A.    In my notes?
24          Q.    Yes.
25          A.    No.
```

Page 187

1      MR. CADIGAN:    I have no further

2      questions.

3      MR. SCHLEGELMILCH:    None.

4

5      ---   upon adjourning at 3:00 p.m.

---

1    121    Letter dated November 2, 2017 from
2           Mr. McKee to Mr. Loke              140
3
4    122    Letter dated August 28, 2017 to
5           Finance Ministers from Manie Eagar      161
6
7    123    Article dated September 18, 2017
8           by Ross McKee, Chris Hewat and
9           Liam Churchill entitled
10          "Industry Responds to CSA Guidance on
11          Cryptocurrency Offerings"           163
12
13   124    E-mail chain ending September 7, 2017
14          between Mr. McKee and Ms. Chaukos      179
15
16   125    Article dated September 7, 2017 by
17          Ted Livingston entitled
18          "Canadian Residents Excluded from
19          Next Week's Kin TDE"                183
20
21
22

---

INDEX OF EXHIBITS

EXHIBIT                                    PAGE
NUMBER      DESCRIPTION                    NUMBER

108    Pat Chaukos' Background as listed
       on LinkedIn                            7

109    Release from the OSC, dated
       March 8, 2017                          43

110    E-mail from Ross McKee to Pat Chaukos,
       copied to Monica Kowal and Amy Tsai,
       dated July 25, 2017,
       Bates stamped SEC/OSCE 2071-2072       49

111    Letter from Ross McKee to Pat Chaukos,
       Bates stamped KIK 115829-115834        49

112    E-mail from Ross McKee to Pat Chaukos,
       dated August 3, 2017,
       Bates stamped SEC/OSCE 2097-2100       56

113    E-mail from Amanda Barone to Ross McKee
       and others, dated August 14, 2017,
       Bates stamped KIK 86618-86621          60

114    E-mail dated August 15, 2017 from
       Mr. McKee to Ms. Chaukos and Ms. Tsai  104

115    E-mail dated August 22, 2017 from
       Mr. McKee to Ms. Chaukos               105

116    E-mail chain dated August 23, 2017 from
       Mr. McKee to Ms. Chaukos               107

117    E-mail chain ending August 25, 2017
       between Mr. McKee, Mr. Heinke et al  110 & 120

118    CSA Staff Notice dated August 24, 2017   112

119    Impak decision notice dated
       August 16, 2017                        119

120    Letter dated October 19, 2017 from
       Huston Loke to Ross McKee              136

---

7      I hereby certify the foregoing to be a

8      true and accurate transcription of the above

9      noted proceedings held before me on the 5th

10     DAY OF DECEMBER, 2019, and taken to the best

11     of my skill, ability and understanding.

12

13                   }

14                   }   Certified Correct:

15                   }

16                   }

17                   }

18                   }

19                   }

20                   }   _____

21                   }   Tahleia Bishop

22                   }   Verbatim Reporter

ERRATA SHEET

Page                Line

-------------------------------------------------

.

-------------------------------------------------

-------------------------------------------------

-------------------------------------------------

-------------------------------------------------

-------------------------------------------------

-------------------------------------------------

-------------------------------------------------

    I, Pat Chaukos, have reviewed pages 4 to 186,
and with the exception of the above-noted
corrections, hereby agree to the accuracy of my
statement recorded herein.

Date:

Signature: