# SEC90

**Page 1**

1    UNITED STATES DISTRICT COURT
2    FOR THE SOUTHERN DISTRICT OF NEW YORK
3
4    UNITED STATES SECURITIES    )
     AND EXCHANGE COMMISSION,    ) Case No.
5                                ) 19-cv-5244 (AKH)
             Plaintiff,    )
6                          )
     vs.                   )
7                          )
     KIK INTERACTIVE, INC.,    )
8                          )
             Defendant.    )
9    _____)
10
11
12
13
14    VIDEOTAPED DEPOSITION OF W. ROSS F. MCKEE
15           December 10, 2019
16              9:09 a.m.
17           Washington, D.C.
18
19
20
21
22
23
24    Reported by:
      Bonnie L. Russo
25    JOB No. 191210BOR

**Page 2**

1    Videotaped Deposition of W. Ross F. McKee held
2    at:
3
4
5         United States
6         Securities and Exchange Commission
7         100 F Street, N.E.
8         Washington, D.C.
9
10
11
12    Pursuant to Notice, when were present on behalf
13    of the respective parties:
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1    APPEARANCES:
2    On behalf of the Plaintiff:
3      LAURA D'ALLAIRD, ESQ.
       DAVID MENDEL, ESQ.
4      JEFF LEASURE, ESQ.
       U.S. SECURITIES and EXCHANGE COMMISSION
5      100 F Street, N.E.
       Washington, D.C. 20549
6      202-551-5475
       dallairdl@sec.gov
7
8    On behalf of the Defendant:
9      LUKE T. CADIGAN, ESQ.
       MICHAEL E. WELSH, ESQ.
10     COOLEY LLP
       500 Boylston Street
11     Boston, Massachusetts 02116
       617-937-2480
12     lcadigan@cooley.com
       mwelsh@cooley.com
13
     On behalf of the Witness:
14
       ROBERT H. HOTZ, JR., ESQ.
15     AKIN GUMP STRAUSS HAUER & FELD, LLP
       One Bryant Park
16     New York, New York 10036
       212-872-1000
17     rhotz@akingump.com
18
19
20   Also Present:
21     Glen Fortner, Videographer
22
23
24
25

**Page 4**

1                   INDEX
2    EXAMINATION OF W. ROSS F. McKee        PAGE
3    BY MS. D'ALLAIRD              8
4
5
                  EXHIBITS
6
     Exhibit 165 Subpoena           11
7
     Exhibit 166 Coinlaw Article entitled     31
8          "Blockchain Is a Challenge to
           Fundamental Assumptions -
9          Ross McKee of Blake
           Cassels & Graydon
10
     Exhibit 167 E-Mail Chain dated 7-7-17    49
11         MMLWM-00001215-224
12   Exhibit 168 E-Mail Chain dated 7-25-17   58
           KIK_00115827-834
13
     Exhibit 169 E-Mail Chain dated 8-25-17   233
14         SEC-OSC-E-0000061-65
15   Exhibit 170 E-Mail Chain dated 9-5-17    147
           SEC-OSC-E-0000066-68
16
17
18
19
20
21
22
23
24
25

PREVIOUSLY MARKED EXHIBITS:

1
2  Exhibit 58       Letter dated 11-2-17
3  Exhibit 59       Article entitled "Canadian
                    Residents Excluded From
4                   Next Week's Kin TDE"
5  Exhibit 109      News Release dated 3-8-17
6  Exhibit 112      E-Mail Chain dated 8-3-17
7  Exhibit 113      E-Mail Chain dated 8-14-17
8  Exhibit 115      E-Mail Chain dated 8-22-17
9  Exhibit 118      Notices/New Releases
10 Exhibit 120      Letter dated 10-19-17
11 Exhibit 124      E-Mail Chain dated 9-7-17
12
13
14
15
16
17
18
19
20
21
22
23
24
25

5

1          MR. MENDEL:  David Mendel, here also
2  for the Securities and Exchange Commission.
3          MR. LEASURE:  Jeff Leasure.
4          MR. WELSH:  Michael Welsh on behalf
5  of Kik Interactive.
6          MR. CADIGAN:  Luke Cadigan, Cooley,
7  on behalf of Kik Interactive.
8          MR. HOTZ:  Rob Hotz on behalf of
9  Ross McKee.
10         THE VIDEOGRAPHER:  Will the court
11 reporter please administer the oath.
12
13         W. ROSS F. McKEE,
14 being first duly sworn, to tell the truth, the
15 whole truth and nothing but the truth,
16 testified as follows:
17         MR. CADIGAN:  Actually, before we
18 get started, I'd just like to say one thing
19 just to support the record.
20         Obviously, it's highly irregular,
21 not frowned upon, to take the testimony of the
22 opposing party's counsel.  Rather than moving
23 to quash, we decided to take this on a
24 question-by-question basis with the assumption
25 that you are solely getting into conversations

7

1          P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  This is Video
4  No. 1 of the video deposition of Ross McKee
5  taken by the plaintiff in the matter of the
6  U.S. Securities and Exchange Commission v. Kik
7  Interactive, Inc., pending before the U.S.
8  District Court for the District of New York,
9  Case No. 19-cv-5244.
10         This deposition is being held at the
11 U.S. Securities and Exchange Commission, 100 F
12 Street, Northeast, Washington, D.C., on
13 December 10, 2019.  The time on the video
14 screen is 9:09.
15         My name is Glen Fortner.  I'm the
16 legal video specialist from the firm Gradillas
17 Court Reporting, Inc.  The court reporter today
18 is Bonnie Russo in association with Gradillas
19 Court Reporters, Inc.
20         For the record, will counsel now
21 please introduce themselves and who they
22 represent.
23         MS. D'ALLAIRD:  Laura D'Allaird on
24 behalf of the plaintiff, U.S. Securities and
25 Exchange Commission.

6

1  with third parties, not privileged
2  conversations.
3          To the extent that there is any
4  questions that get into privileged
5  communications or his mental impressions, we're
6  going to be instructing him not to answer.
7  Again, we will take that on a
8  question-by-question basis.
9          Just note that it's for the company,
10 it's the company's privilege.  Mr. McKee has no
11 authority to waive that privilege and no waiver
12 is intended by his testimony today.
13         MS. D'ALLAIRD:  Okay.  Understood.
14 And I will just say for the record, that we are
15 not seeking privileged information.  However, I
16 will be asking questions that perhaps you might
17 think gets at privileged information and of
18 course, you are at liberty to instruct the
19 witness not to answer.
20         With that said, can we get started?
21         MR. CADIGAN:  Yes, thank you.
22         EXAMINATION BY COUNSEL FOR PLAINTIFF
23         BY MS. D'ALLAIRD:
24    Q.    Good morning.  Could you please
25 state your full name and spell your name for

8

1   the record.
2       A.   Sure.  My full name is William Ross
3   Fraser McKee.  William, Ross, R-O-S-S, Fraser,
4   F-R-A-S-E-R, and McKee, M-C-K-E-E.
5       Q.   And, Mr. McKee, as I said a few
6   moments ago, my name is Laura D'Allaird.  I
7   represent the SEC in its lawsuit against Kik
8   Interactive.
9            Today's deposition is being
10  conducted in connection with that lawsuit and
11  it's being conducted under the Federal Rules of
12  Civil Procedure.
13           Could you please state for me your
14  home address?
15      A.   My home address is ▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
17      Q.   Do you have any other personal
18  addresses?
19      A.   No.
20      Q.   And addresses, business addresses or
21  personal addresses in the United States?
22      A.   No.
23      MS. D'ALLAIRD:  If I could just
24  clarify the record, we have counsel here for
25  Kik.  Are you also representing the witness?

9

1       MR. CADIGAN:  No, we are not
2   representing him individually.
3            BY MS. D'ALLAIRD:
4       Q.   Mr. McKee, have you ever been
5   deposed before?
6       A.   No.
7       Q.   So I'm going to go over just a few
8   basic ground rules for this proceeding.
9            So as you can see, we have a court
10  reporter here today who is going to transcribe
11  everything that we say.  Because everything is
12  being written down, we need to try to keep a
13  clear record so to do that, we need to try not
14  to talk over one another.  So please try your
15  best to let me finish my question before you
16  answer.  It can be tempting to jump in, we
17  know.  You think you know where I am going with
18  a question, please just let me finish it first
19  before you answer.
20           Because we are transcribing today's
21  deposition, you need to give verbal responses
22  so not a body gesture or a nod of the head.
23  That won't be picked up by the transcript.
24           If you don't understand a question,
25  by all means let me know and I will try to

10

1   rephrase as appropriate.
2            We will also be taking periodic
3   breaks throughout the day.  However, if you
4   feel you need a break, jest let me know or let
5   your counsel know and we will be happy to take
6   a break.  We just ask that if a question is
7   pending, that you just answer the question
8   before we actually go on break.
9            Mr. McKee, you understand that you
10  are under oath today?
11      A.   I do.
12      Q.   And are you taking any medication
13  today that could affect your memory?
14      A.   No, I'm not.
15      Q.   Is there any reason that you can't
16  give full and complete testimony today?
17      A.   No reason, no.
18           (Deposition Exhibit 165 was marked
19  for identification.)
20           BY MS. D'ALLAIRD:
21      Q.   Mr. McKee, I have just handed to you
22  what has been marked as Exhibit No. 165.
23  Please take a moment to review and let me know
24  when you are ready for questions.
25      A.   Do you want me to read the rules of

11

1   civil procedures first?
2       Q.   No.  I'll just let you know what my
3   question is.
4            My question is going to be:  Have
5   you seen this before?
6       A.   No.
7       Q.   Do you recognize what it is?
8       A.   It's a subpoena, yes.
9       Q.   And you see that your name is under
10  the subpoena to testify at a deposition in a
11  civil action.
12           Do you see that Ross McKee in care
13  of Robert Hotz?
14      A.   I see my name, yes.
15      Q.   And there is a date set for the
16  deposition which is 12-10-2019 at 9 a.m.
17           Do you see that?
18      A.   Yes, I do.
19      Q.   Are you appearing here today
20  pursuant to this subpoena, Exhibit 165?
21      A.   Yes, I guess I am.  I believe my
22  attorney accepted it on my behalf, so that's
23  why I haven't seen it before.
24      Q.   Mr. McKee, what year were you born?
25      A.   1954.

12

1    Q.    And where were you born?
2    A.    Toronto, Canada.
3    Q.    Where did you spend your childhood?
4    A.    Toronto mostly.  I lived in Montreal
5  for a few years as well when I was younger,
6  couple of years, age 5 to 7, but mostly
7  Toronto.
8    Q.    So you've always lived in Canada?
9    A.    Yes.
10   Q.    And you went to college?
11   A.    Yes, a university in Toronto,
12  University of Toronto, Trinity College.
13   Q.    And did you receive any degrees
14  there from the University of Toronto?
15   A.    Yes.  I got a bachelor of arts in
16  geography.
17   Q.    When did you receive that degree?
18   A.    1976.
19   Q.    Do you have any other degrees?
20   A.    I have a bachelor of law, which I
21  obtained in 1991 from Queens University at
22  Kingston also in Canada.
23   Q.    And after you received your law
24  degree, were you ever admitted to practice law
25  anywhere?

13

1    A.    Yes, I was admitted.  I was an
2  articling student and then admitted to practice
3  law, what was then called the Law Society of
4  Upper Canada and it's now called the Law
5  Society of Ontario.  I was called to the bar in
6  1983.
7    Q.    You said that you were -- in between
8  getting your law degree and being admitted to
9  the Ontario Bar, you were an articling student.
10   A.    Yes.
11   Q.    What is that?
12   A.    In Canada -- in Ontario, it varies
13  by province.  When you graduate law school, you
14  have an academic degree but you are not
15  qualified as a lawyer so the process then and
16  -- again, it's varied over the years but at my
17  time, the process was that you would work as an
18  indentured student for a lawyer for a year and
19  work for that lawyer as an apprentice in a
20  sense, but you are not actually entitled to
21  practice law, and then at the end of your
22  article year, you would then go to a bar
23  admission course for six months run by the law
24  society and you would pass a series of exams,
25  and then at the end, having passed those exams

14

1  and assuming you were signed off by your
2  articling principal, then you would be admitted
3  as a solicitor in the court and called to the
4  bar as a barrister, so a barrister and a
5  solicitor in the law society.
6    Q.    When did you become a barrister, was
7  that also in 1983?
8    A.    1983.
9    Q.    Other than the Ontario Bar, are you
10  admitted in any other bars?
11   A.    No, I'm not.
12   Q.    Are you admitted to practice law
13  anywhere in the United States?
14   A.    No.
15   Q.    After you were admitted to the
16  Ontario Bar, Mr. McKee, where did you work
17  after that?
18   A.    I worked in Toronto for a firm
19  called Blakes Cassels & Graydon -- well, Blakes
20  Cassels & Graydon then, now Blakes Cassels &
21  Graydon, LLP, the same firm I'm with now.  I
22  also worked for them as a summer student during
23  law school.
24   Q.    Prior to attaining your --
25   A.    Yes.  And I did my articles with

15

1  Blakes too, colloquially named Blakes.
2    Q.    So you have always worked at Blakes
3  essentially after you received --
4    A.    Yes.  Except, I did a secondment to
5  the Ontario Securities Commission for a year
6  and a half when I was a third-year lawyer.
7    Q.    A third-year lawyer so not a law
8  student?
9    A.    No, 1986, 1985 -- 1985, 1986.
10   Q.    What was your -- what was your
11  secondment?  Can you describe that for me for
12  the OSC?
13   A.    It was -- the OSC regularly took in
14  lawyers from the street to work in the various
15  offices of the OSC so I did six months in the
16  corporate finance branch working as a corporate
17  finance attorney, reviewing prospectuses and
18  exemption applications.
19        I worked six months in the
20  enforcement branch as an enforcement counsel
21  reviewing disciplinary actions with dealers,
22  advisors, I was doing some hearings for the
23  commission and then I did the last three months
24  in the office of legal advisor, which was an
25  office of lawyers who advised the chair of the

16

1   commission on policy matters, focusing
2   principally on beneficial shareholder
3   communications, OBOs and OBOs were the rules
4   that were coming into effect then.
5       Q.   Just to clarify for the record, when
6   you say, "OSC," are you referring to the
7   Ontario Securities Commission?
8       A.   Yes.  Ontario Securities Commission,
9   OSC.
10      Q.   And can you just tell me what is the
11  Ontario Securities Commission?
12      A.   It is a crown agency, a creature of
13  statute under the Securities Act established in
14  Ontario.  It is the statutory administrator of
15  the Ontario Securities Act and the Commodity
16  Futures Act in Ontario.
17      Q.   And so you were on secondment in the
18  '80s at OSC for about -- was it a year and a
19  half --
20      A.   Yes.
21      Q.   -- did you say?
22      A.   Something like that.
23      Q.   During that time when you were in
24  enforcement, did you look at any matters
25  involving securities offerings?

17

1       A.   I don't think so.  I don't recall.
2   I think most of my actions were more on the
3   leader and compliance area which are called
4   broker-dealers here, so more on the
5   registration, regulatory compliance area.
6   There were some investigations going on for
7   matters but none that come to mind at this
8   point.
9       Q.   Other than your secondment at the
10  OSC, have you always worked at -- I'm going to
11  refer to your firm as Blakes for ease of
12  reference.
13          You have always worked there?
14      A.   Yes, that's right.
15      Q.   And you are currently a partner at
16  the firm?
17      A.   Yes, I am.
18      Q.   And when did you become partner?
19      A.   It would have been 1989.
20      Q.   And what kind of law do you
21  practice?
22      A.   I practice securities regulation.  I
23  am part of our securities in capital markets
24  group and so I deal a lot of cross-border
25  matters, explaining Canadian securities laws,

18

1   both offering laws and dealer -- we refer to
2   registration in Canada as dealer registration,
3   advisor registration, not share registration,
4   that we call as prospectus qualification, so I
5   do both of those things.
6           I also advise exchanges,
7   marketplaces, clearing agencies on their
8   compliance side.  I work on some cross-border
9   matters for Canadian issuers who are selling
10  into the United States, for example, or other
11  places, and so we would work with U.S. counsel
12  in satisfying the Canadian side of those
13  offerings, where they handle the U.S. aspect of
14  it.
15      Q.   Are you familiar with the term
16  "cryptocurrency?"
17      A.   Yes, I am.
18      Q.   What does that mean to you?
19      A.   Cryptocurrency is a digital form of
20  ownership of a particular asset that is
21  registered to an address on a blockchain and it
22  can be transferred from one address to another.
23  The address and the transaction is encrypted,
24  so that the ownership and it's replicated over
25  the network so that the ownership of the

19

1   particular asset in question is theoretically
2   immutable, meaning it can't be changed and
3   can't be -- and it could be any sort of asset.
4   Cryptocurrencies in particular are more focused
5   on whether the asset is used to transfer a
6   value of a thing, a value as opposed to
7   transfer of an article.
8       Q.   Just a few more terms here for you.
9           Are you also familiar with the term
10  "digital asset?"
11      A.   Yes, generally.
12      Q.   Does that generally mean the same
13  thing as cryptocurrency to you?
14      A.   Not necessarily, no.  I would say
15  that cryptocurrency is probably a form of
16  digital assets, but not all digital assets are
17  cryptocurrencies.  You could tokenize a share
18  of a company and have that represented on the
19  blockchain, that would be a digital asset, but
20  it wouldn't be a cryptocurrency.
21  Cryptocurrency is meant to be spent.
22      Q.   What about digital tokens, is that
23  similar to cryptocurrency?
24      A.   Well, cryptocurrencies are enabled
25  by digital tokens.  They are a form of it.

20

1    They are more like a digitalized, a more
2  generic term.
3        **Q.**   Have you also heard of the term
4  "cryptoasset?"
5        **A.**   Yes, and again, it's a generic term
6  much like digital assets, in the sense, a
7  digital asset could be anything that is not
8  necessarily linked to the blockchain or
9  conventionally, it usually is.  Cryptoasset is
10  something that is necessarily involved in the
11  blockchain and the encryption involved, but it
12  isn't necessarily a currency aspect.
13        **Q.**   So if I understand you correctly,
14  and please correct me if I'm wrong.
15        When you say cryptocurrency, you are
16  referring to something that is specifically
17  tied to a blockchain or linked to the
18  blockchain?
19        **A.**   Correct, and for payment purposes.
20        **Q.**   And for payment purposes.
21        And digital asset, digital token or
22  cryptoassets to you are broader than
23  cryptocurrency?
24        **A.**   In my thinking, yes.
25        **Q.**   Meaning it can incorporate something

21

1  that is not linked to a blockchain?
2        **A.**   Well, a digital asset could be just
3  a book representation of a share, for example,
4  so one of the clearing agencies, DTC and so on,
5  they take book entry shares and they're all on
6  a digital record and comes off of some
7  spreadsheet somewhere, so that is a form of
8  digital but isn't blockchain necessarily or
9  encrypted.
10        Crypto is one that -- they're using
11  crypto because they are saying it's linked more
12  to encryption and the purpose of the encryption
13  is to enable blockchain certainty, so I'd say
14  in terms of shading, digital asset is the
15  broadest of possible terms.  It could be
16  anything electronic whatsoever, encompassing
17  things that are not necessary blockchain.
18        Crypto is inferring it is involved
19  with blockchain things, cryptocurrency is
20  definitely blockchain.
21        **Q.**   Let's take the broadest term then,
22  digital assets.
23        Have you ever advised clients on the
24  regulation of digital assets?
25        **A.**   Ever?  Yes.

22

1        **Q.**   For how long?
2        **A.**   For how long?  Well, in terms of the
3  more recent form of it, I would say since 2013.
4        **Q.**   And when you say, "the more recent
5  form" of digital assets, what do you mean?
6        **A.**   That was in the context of bitcoins
7  and so it was advice in connection with
8  bitcoins.
9        **Q.**   Are you familiar with the term
10  "initial coin offering?"
11        **A.**   Yes.
12        **Q.**   Is that term also known as ICO?
13        **A.**   Yes.
14        **Q.**   And for ease of reference, I'm just
15  going to refer to it as ICO.
16        **A.**   Sure.
17        **Q.**   What do you understand an ICO to be?
18        **A.**   An offering of tokens of some sort
19  on a blockchain for sale to persons or buyers.
20        **Q.**   When did you first hear about ICOs?
21        **A.**   First?  I can't be certain as to the
22  specific date but it would have been towards
23  the end of 2016, early part of 2017 perhaps.
24        **Q.**   Have you advised any clients on
25  ICOs?

23

1        **A.**   Yes.
2        **Q.**   And roughly, how many clients would
3  you say you have advised on ICOs?
4        **A.**   Roughly, it would be -- a fair
5  qualification because I'm not certain, I
6  haven't done a count.  I think to the best of
7  my recollection now, it would be four.
8        **Q.**   Four clients.  For ICOs?
9        **A.**   For ICOs.
10        **Q.**   How many clients did you advise on
11  ICOs prior to June of 2019?
12        **A.**   Prior to June of 2019?
13        **Q.**   Yes.
14        **A.**   June this year.
15        **Q.**   June this year.
16        **A.**   Four.
17        **Q.**   Four.  Okay.
18        **A.**   Again, to the best of my
19  recollection, there may be some smaller ones
20  that I've asked some questions and didn't
21  proceed.  I don't specifically recall.  Four is
22  the best I can come up with.
23        **Q.**   Are you familiar with something that
24  is called the Howey test?
25        **A.**   I am aware of it.  I'm not saying I

24

1  am familiar.  I know it's a reference to a U.S.
2  legal case and I'm not an expert in U.S. law,
3  but it's used colloquially as a general term in
4  cases that are referred to and in Canadian
5  cases as well.
6      **Q.**   Have you read the case?
7      **A.**   Howey?  Yeah, I think so, yeah.
8      **Q.**   What does -- what does Howey relate
9  to?
10         MR. CADIGAN:  I'm going to object
11  and instruct him not to answer.
12         MS. D'ALLAIRD:  On the basis of
13  what?
14         MR. CADIGAN:  On the basis that
15  you're asking Kik's counsel his mental
16  impression regarding a legal standard that is
17  at issue in this case.  Again, this is not a
18  nonprivileged conversation.  This is not
19  something where he's a percipient witness to
20  discussions with third parties.
21         It's highly improper under -- and
22  you know the case law, Shelton V American
23  Motors.  It is highly improper to take
24  testimony of the opposing party's counsel.  The
25  only way that you can do so, that the

25

1  information that you are seeking is
2  nonprivileged, if it is absolutely relevant to
3  your case and is something that only he could
4  provide.
5         Otherwise, you are simply mining
6  counsel for the opposing party's mental
7  impressions on the case.  It's highly improper
8  and we're instructing him not to answer, and
9  we're going to instruct him not to answer
10  anything that gets into his mental impression.
11         Now, to the extent that you want to
12  get into his discussions with the OSC, that is
13  fair game.
14         MS. D'ALLAIRD:  For the record, I'm
15  not -- to use your term, "mining" the witness
16  for his mental impressions.
17         MR. CADIGAN:  You are asking for his
18  understanding of the Howey test.  You are
19  asking --
20         MS. D'ALLAIRD:  If you could just
21  let me finish, please.  Let me speak and
22  finish.
23         I am asking if he understands what
24  the subject matter of the Howey test relates
25  to.

26

1         MR. CADIGAN:  That's not what the
2  question was.
3         MS. D'ALLAIRD:  Okay.  Well, then,
4  I'm going to ask it that way.
5         MR. CADIGAN:  Okay.
6         BY MS. D'ALLAIRD:
7      **Q.**   Mr. McKee, do you know what the
8  subject matter of the Howey test is?
9      **A.**   I'm not going to say no, because I'm
10  not an expert in the United States law and
11  Howey is a U.S. case.  My understanding is that
12  it includes in it --
13         MR. CADIGAN:  Actually, on this, I'm
14  just going to ask you to answer just generally
15  the topic.
16         THE WITNESS:  Sure.  So securities
17  regulation.
18         One thing -- sorry, can I turn off
19  my phone, it is buzzing in my pocket and I'm
20  just going to shut the -- go to airplane mode.
21         MS. D'ALLAIRD:  Do you want to go
22  off the record.
23         THE WITNESS:  No, if you're
24  wondering what I'm doing, that's what I'm
25  doing, I'm just going to airplane mode so I

27

1  won't get buzzed.
2         BY MS. D'ALLAIRD:
3      **Q.**   Thank you.  We appreciate that.
4         Mr. McKee, I want to clarify for the
5  record, are you litigation counsel at Blakes?
6      **A.**   No, I'm not.
7      **Q.**   Are you a transactional attorney?
8      **A.**   I'd say I'm transactional and
9  advisory.
10      **Q.**   And has -- Kik's counsel said this
11  earlier.
12         You have been counsel to Kik?
13      **A.**   Yes.
14      **Q.**   Are you currently serving as counsel
15  for Kik?
16      **A.**   Yes.
17      **Q.**   In a litigation capacity?
18         MR. CADIGAN:  Objection.
19         BY MS. D'ALLAIRD:
20      **Q.**   You can answer.
21      **A.**   Not in a sense of litigation.  I'm
22  still giving security law advice, so I am not
23  giving advice about their action with the SEC.
24  That's not in my field of expertise.
25      **Q.**   How long has Kik been a client of

28

1  yours?
2      **A.**   Since late May 2017.
3      **Q.**   And you say you were not retained in
4  the litigation capacity?
5      **A.**   For this litigation, no.  Our
6  engagement for Kik started in May 2017 and has
7  continued and they continue to be a client of
8  the firm.
9      **Q.**   And to be clear for the record, is
10  it the case that you are not representing Kik
11  in this litigation?
12      **A.**   Correct, I am not representing Kik
13  in this litigation.
14      **Q.**   Okay.  Thank you.
15          Mr. McKee, have you ever been
16  interviewed about ICOs in any public media?
17      **A.**   I have been interviewed about
18  securities regulation of blockchain and
19  offerings on some of these specialized blogs
20  and agencies.  I don't recall a specific, but
21  ICO focused in particular, but it may have come
22  up during those.
23      **Q.**   Are you familiar with something
24  called "Coinlaw?"
25      **A.**   Yes.

29

1      **Q.**   What is Coinlaw?
2      **A.**   Coinlaw is a blog that specializes
3  on the application of law to cryptocurrency and
4  the use of cryptocurrency.
5      **Q.**   Have you ever been interviewed by
6  Coinlaw?
7      **A.**   Yes, I was.
8      **Q.**   And when were you interviewed?
9      **A.**   I believe earlier this year.  I
10  can't recall when specifically.
11      **Q.**   Was it May 2019?
12      **A.**   That sounds about right.
13      **Q.**   And was your interview with Coinlaw
14  published?
15      **A.**   I believe it was on the Internet,
16  yes.
17      **Q.**   When it was published, did you
18  read --
19      **A.**   Yes.
20      **Q.**   -- the interview?
21      **A.**   Yes.
22      **Q.**   And did you notice any inaccuracies
23  in the transcription of your interview with
24  Coinlaw?
25      **A.**   I don't recall anything at this

30

1  point, no.
2      **Q.**   And at that time, did you reach out
3  to Coinlaw to correct anything in your
4  interview?
5      **A.**   I don't recall.
6      **Q.**   But sitting here today, you don't
7  recall?
8      **A.**   Right.  I don't recall.
9      **Q.**   Okay.
10          (Deposition Exhibit 166 was marked
11  for identification.)
12          BY MS. D'ALLAIRD:
13      **Q.**   Mr. McKee, I have just handed to you
14  what has now been marked as Exhibit 166.  It is
15  an exhibit of seven pages.
16          The first page has a title at the
17  top that reads:  "Blockchain is a Challenge to
18  Fundamental Assumptions-Ross McKee of Blakes
19  Cassels & Graydon."
20          If you turn to the very last page,
21  there is a date at the very top of May 7, 2019.
22          Please take a moment to review this
23  and let me know when you are ready for my
24  questions.
25      **A.**   Sure.

31

1          MR. HOTZ:  I'll note for the record
2  that there are a couple of sentences that
3  appear cut off on my copy.
4          THE WITNESS:  Mine as well.
5          MR. MENDEL:  Counsel, which
6  sentences are you referring to?
7          MR. HOTZ:  I'm referring, on the
8  bottom of Page 3, top of Page 4.
9          MR. MENDEL:  On the bottom of Page
10  3, are you referring to?
11          MR. HOTZ:  Top of 4.
12          MR. MENDEL:  Is it the line on the
13  bottom of Page 3:  "Determined to be securities
14  and therefore they're leaving alone the
15  assets."
16          Is that the one?
17          MR. HOTZ:  I can't read the second
18  -- it is cut off, literally, like, the half of
19  that.  Want to look at my copy?  It's cut off
20  right on the half.
21          And if you look at the next page,
22  it's tough to read the next sentence as well on
23  the top of the next page.
24          MR. MENDEL:  Okay.
25          MS. D'ALLAIRD:  So you can't

32

1  recognize that as:  "Determined to be
2  securities and therefore, they're leaving alone
3  the assets?"
4          MR. HOTZ:  No.
5          MS. D'ALLAIRD:  You cannot.  Okay.
6          MR. HOTZ:  And then on the next
7  page, since you are doing it, you might as well
8  read that one into the record, too.
9          The top of 4, I can't read that one
10 at all.  Is that the same sentence?
11         MS. D'ALLAIRD:  That looks to be the
12 same sentence.
13         MR. HOTZ:  I don't know, I can't --
14         MS. D'ALLAIRD:  "Determined to be
15 securities and therefore, they're leaving alone
16 the assets."
17         Next page:  "That they determined
18 not to be securities or which they can't prove
19 to be securities."
20         MR. HOTZ:  If that's what it says,
21 that's what it says.  Mine is not clear.
22         But go ahead with your examination.
23         THE WITNESS:  Why is the pagination
24 different?  There's a line different.  All
25 right.  Go ahead.

33

1  question, a little -- halfway down on the
2  second page in bold, it states:  "What's your
3  take on the shift from ICOs to STOs.  Do you
4  think this is a positive development."
5          Do you see that question?
6      A.  Yes, I do.
7      Q.  What is your understanding of what
8  an STO is?
9      A.  It's a securities token offering and
10 it is like an ICO except it has rules baked
11 into the blockchain so that the token itself
12 can only be transferred in accordance with the
13 securities laws of a particular jurisdiction
14 that applies to it.
15         So for example, it won't let itself
16 be sold to someone who is not an accredited
17 investor or won't let itself be sold to more
18 than 300 people in the United States, for
19 example, if those were the rules.  And those
20 rules are baked into the transfer system so
21 it's not like an ICO which is transferable to
22 anybody at any time.  It's only transferable if
23 it meets certain requirements.
24     Q.  So is it the case that ICOs may or
25 may not comply with securities laws but STOs

35

1          BY MS. D'ALLAIRD:
2      Q.  Are you ready for questions?
3      A.  Uh-huh.
4      Q.  Mr. McKee, do you recognize this
5  document?
6      A.  Yes, I do.
7      Q.  Is this the May 2019 Coinlaw article
8  that you were discussing a few minutes ago?
9      A.  Yes.  It's actually a transcript of
10 a podcast.  It wasn't published -- it wasn't
11 printed as an article.  It was a podcast
12 interview and this is essentially a transcript.
13     Q.  It was a podcast, meaning it was
14 broadcast live, it was verbal?
15     A.  I don't know.  I just did the
16 interview part.  I didn't do the podcast part.
17     Q.  And this is a transcription of that
18 podcast?
19     A.  Yes, I believe so.
20     Q.  To the best of your knowledge?
21     A.  Yes.  It may have been edited from
22 the transcript.  I didn't see a transcript.
23     Q.  I want to take a look at a couple of
24 your answers.
25         If you turn to Page 2, there is a

34

1  do?
2          MR. HOTZ:  Objection to form.
3          THE WITNESS:  I think that STOs are
4  intended to be designed to comply with
5  securities laws and that's not necessarily the
6  case.  ICOs don't have transfer restrictions
7  built into the ICO mechanism itself.
8          BY MS. D'ALLAIRD:
9      Q.  I'm going to read your answer to
10 this question, part of it into the record.
11         "I think it's a very positive
12 development.  I think ICOs have been
13 problematic for many reasons, not the least of
14 which is that they created an image that it was
15 a bit of a wild west situation in the crypto
16 sphere.  I remember when I first started
17 hearing about ICOs, I was thinking that I was a
18 terrible securities lawyer because I couldn't
19 think of how they were doing these offerings
20 legally.  I thought that there must be some
21 exemption that I'm not smart enough to think of
22 that would apply to these, but gradually, I
23 came to realize that, in fact, there was no
24 exemption at all and that many of these ICOs,
25 if not most of them, were clearly securities,

36

1  and they were entirely unregulated on the basis
2  that some people thought it was a new thing and
3  that the rules didn't apply.  That's like
4  people selling stuff over the Internet and
5  thinking, because I can sell it on the
6  Internet, that means that no rules apply and we
7  all know that is no longer the case."
8      Did I read that accurately, Mr.
9  McKee?
10     A.  Yes, you did.
11     Q.  And is what I just read an accurate
12 transcription of what you said in the Coinlaw
13 interview?
14     A.  Yes, I believe it is.
15     Q.  I would like to look at your answer
16 to the next question in bold towards the bottom
17 of that same second page of Exhibit 166.
18     The question is:  "Is there a
19 difference in the legal approach to crypto
20 assets between Canada and the U.S."
21     Do you see that?
22     A.  Yes, I do.
23     Q.  And I'm going to read part of your
24 response into the record.
25     "There are more similarities than

37

1  differences in the leading case about what is
2  the definition of an investment contract.  The
3  Supreme Court of Canada had adopted many of the
4  U.S. common law tests for investment contracts,
5  the famous Howey case and others.  So the U.S.
6  tests for when an investment contract is
7  considered a security are largely similar to
8  the legal tests used in Canada.  Canada's
9  common law is heavily influenced by the U.S.
10 common law in that regard.  So I would say that
11 in global terms, the U.S. and Canada are very
12 similar in how they interpret whether something
13 is a security or not.  The approach is a little
14 bit different beyond that because we don't have
15 separate commodity trading regulators such as
16 the CFTC in U.S. and Canada.  It tends to be
17 lumped under the same regulator."
18     Did I read that quote accurately?
19     A.  Yes.
20     Q.  Is that an accurate transcription of
21 what you said in your Coinlaw interview?
22     A.  I believe it was, yes.
23     Q.  Does that refresh your recollection
24 as to your familiarity with the Howey case?
25     MR. HOTZ:  Objection.

38

1      MR. CADIGAN:  Object to form.
2      THE WITNESS:  I mean, I said already
3  that I am familiar with the Howey case in the
4  same sense here.  I'm not familiar as an expert
5  in the sense that lots of lay people have heard
6  of the Howey test and oranges and so on, and so
7  I am no more familiar than they are.
8      So I am roughly familiar with what
9  it's about in some case, but the point of what
10 I am saying here is that that case has been
11 adopted in Canadian case law, and so what I am
12 saying is the Canadian case law has referred to
13 the Howey test in Canadian case law where I am
14 an expert so I'm aware of it, it has been
15 referred to and -- they don't -- they can't
16 adopt U.S. law but it has been referred to in
17 Canadian cases.  So that's the aspect of what
18 I'm familiar.
19     BY MS. D'ALLAIRD:
20     Q.  To your knowledge, does the Howey
21 case relate to what is an investment contract
22 in U.S. securities law?
23     A.  Yes.  Do you want that back?
24     Q.  Yes.
25     A.  Do you want the subpoena back as

39

1  well?
2      Q.  Yes.  Thank you.
3      Mr. McKee, you stated earlier that
4  you had been retained by Kik I think back in
5  early 2017; is that right?
6      A.  That's right, May -- late May 2017,
7  yes.
8      Q.  May of 2017.  And what was the
9  subject matter of your retention?
10     A.  We were retained to advise Kik in
11 connection with its pending sale of Kin tokens.
12     Q.  And when you say, "we," who are you
13 referring to?
14     A.  Blakes.
15     Q.  Blakes, the firm?
16     A.  Yes.
17     Q.  And that included you?
18     A.  Yes.
19     Q.  Any other attorneys at Blakes?
20     A.  I wasn't the originating lawyer
21 originally.  I didn't have the original contact
22 with Kik and the staff there.  A different
23 lawyer at Blakes had that connection and was
24 referred to me internally at the firm given my
25 expertise.

40

1    **Q.**  Your expertise being what?
2    **A.**  Securities generally and blockchain
3  matters in particular.  I have taken an
4  interest in that in particular and I was known
5  in the firm as being the securities regulation
6  blockchain person.
7    **Q.**  Is it fair to say that you were
8  retained to provide legal advice to Kik as to
9  securities law, Canadian securities law, in
10  relation to its sale of Kin tokens?
11    **A.**  Yes, that's fair.
12    **Q.**  You referred to being retained in
13  relation to Kik sale of Kin tokens.
14    When did -- did Kik sell Kin tokens
15  at some point in time?
16    **A.**  Yes.  They sold them in a -- they
17  sold Kin tokens themselves in September 2017.
18  They sold some SAFTs, the simple agreements for
19  future tokens relating to the Kin tokens
20  earlier in 2017.
21    **Q.**  You said there were SAFTs and then
22  offerings to other individuals; is that right?
23    **A.**  Yes, as far as I am aware.
24    **Q.**  What are -- you said what SAFT
25  stands for, but what are they to your

41

1  knowledge?
2    **A.**  It's an agreement under which the
3  company entered into with a purchaser where the
4  purchaser pays some funds to the company and
5  the company agrees with them that they will
6  give them the right to acquire the tokens when
7  they are eventually issued at a fixed price.
8    **Q.**  And when did Kik sell SAFTs for Kin
9  tokens?
10    **A.**  I'm aware -- I don't know globally.
11  We were only involved in the particular
12  reporting of transactions that had been done in
13  Canada and they turned out to be only in the
14  Province of Ontario.  And from the records that
15  were given to us by Kik, they were sold during
16  the time period from July, August, September
17  2017.
18    **Q.**  You said that Kik also sold Kin
19  tokens to the public?
20    **A.**  Yes, later in September.
21    **Q.**  Did Kik sell tokens to the public in
22  Canada?
23    **A.**  No, they did not.
24    **Q.**  You were retained to advise on that?
25    **A.**  Well --

42

1    MR. HOTZ:  Yes or no.
2    THE WITNESS:  Yes.
3    BY MS. D'ALLAIRD:
4    **Q.**  When you were retained to provide
5  legal advice to Kik with respect to its sale of
6  Kin tokens, did you anticipate any potential
7  litigation to Kik in relation to that sale?
8    MR. CADIGAN:  Objection.
9    MR. HOTZ:  Objection.
10    MS. D'ALLAIRD:  If I could just
11  finish my question.
12    THE WITNESS:  Anticipate?  No, I
13  didn't anticipate any.  We were seeking to
14  provide regulatory advice so they wouldn't get
15  in trouble.
16    BY MS. D'ALLAIRD:
17    **Q.**  When you say, "regulatory advice,"
18  you mean in relation to Canadian regulators?
19    **A.**  Local regulators.  There is no
20  Canadian securities law.  There is no federal
21  securities law.  It's a series of provincial
22  ones.  Based in Ontario, Kik's headquarters is
23  Ontario, so it's Ontario's securities law that
24  would apply to their offerings.  If they sold
25  tokens to other persons elsewhere in Canada,

43

1  then the particular laws of those particular
2  provinces or territories would apply, so it's
3  all of those.
4    Can I amend an answer?  The
5  anticipation of litigation one has me a little
6  bit -- because I know that's a loaded term.  It
7  wasn't anticipation of a specific lawsuit, you
8  know, it was like a defendant in that.  It's in
9  general, giving legal advice to avoid putting
10  oneself in a situation where there are problems
11  with a regulator or elsewhere, so that you will
12  not be getting in trouble and there won't be
13  litigation eventually brought, so in a sense,
14  it's in contemplation of avoiding litigation.
15    **Q.**  So taking the answer that you just
16  gave, did you anticipate any specific
17  litigation against Kik --
18    **A.**  No.
19    **Q.**  -- in relation to a sale of Kin
20  tokens?
21    MR. CADIGAN:  Objection.  I'm going
22  to instruct him not to answer.
23    MR. MENDEL:  How is that privileged?
24    MR. CADIGAN:  You guys are getting
25  into his mental impressions.

44

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

1    BY MS. D'ALLAIRD:
2    **Q.**   Are you going to not answer on the
3    basis of the instruction?
4    **A.**   Correct.
5         MR. MENDEL:  Isn't that putting the
6    cart before the horse?  I mean, to say you're
7    getting into mental impressions, you need to
8    anticipate a certain litigation.
9         MR. CADIGAN:  No, you don't
10   actually.  Any time you take the testimony of
11   the opposing party's counsel, you have the
12   threshold, the burden of showing that it's
13   absolutely necessary to your case that he is
14   the only person that can provide this
15   information and that this information is -- is
16   not privileged in order to get over that
17   barrier.
18        In this case, you are going into
19   what only can come from discussions that he had
20   with his client over the engagement and the
21   reasons that he was being engaged.  He can't
22   answer that question, which is -- first of all,
23   only his side of the answer as opposed to the
24   client's side of the answer as to what their
25   intention was in retaining him, but you can't

45

1    get into any of that without getting into
2    communications that he had with his client.
3         And the only basis he has for even
4    answering that question is based upon his
5    communications with the client and to the
6    extent there was an answer on the record, we
7    move to strike that.
8         MR. MENDEL:  I think in order to
9    answer whether -- a response of work product,
10   we need to know if there was a litigation
11   anticipated.  That's my only point, Counsel.
12        MR. CADIGAN:  And my only point is,
13   in order to get into that, you need to be able
14   to get into the communications that he had with
15   his client on those topics, and first of all, I
16   have no idea why any of this is relevant given
17   that you have brought a strict liability case
18   under U.S. law, and now you are -- as I said
19   before and I will stick with that, mining the
20   mental impressions of Canadian counsel for the
21   opposing party.
22        MR. MENDEL:  That's your
23   characterization of what we're doing, Counsel.
24   That's your characterization of what is
25   relevant and so rather than clutter up the

46

1    record, I think we should just move on with the
2    deposition.
3         MR. CADIGAN:  Yes, and again, to the
4    extent that you want to ask him about public
5    statements he made or communications he had,
6    other than with Kik, that's fair game.  That
7    was what I thought you were going to be doing
8    today.
9         MR. MENDEL:  We can agree to
10   disagree.
11        MS. D'ALLAIRD:  Are you done?
12        MR. CADIGAN:  Yes.
13        BY MS. D'ALLAIRD:
14   **Q.**   Mr. McKee, was a decision made at
15   one point to approach the OSC regarding Kik's
16   planned offering of Kin tokens?
17   **A.**   Yes.
18   **Q.**   When was that decision made?
19   **A.**   It would have been made in either
20   late June, early July 2017.
21   **Q.**   How did that decision come about?
22        MR. HOTZ:  Objection.
23        THE WITNESS:  I don't think I can
24   answer that question.
25        BY MS. D'ALLAIRD:

47

1    **Q.**   You can't tell me how it came about
2    on the basis of --
3    **A.**   I think that's in connection with my
4    advice to my client, so I have to decline to
5    answer under the professional privilege
6    requirement.
7    **Q.**   Who was involved in making the
8    decision to approach the OSC with respect to
9    Kik's offering of Kin tokens?
10   **A.**   It would have been myself and senior
11   officers of Kik, and I think their U.S. legal
12   counsel was part of it, as part of the general
13   legal advisory group.
14   **Q.**   Which senior officers of Kik were
15   involved in the decision?
16   **A.**   Primarily, Peter Heinke and Tanner
17   Philp.
18   **Q.**   Who is Peter Heinke?
19   **A.**   He's the chief financial officer of
20   Kik, was the chief financial officer of Kik.
21   **Q.**   Who is Tanner Philp?
22   **A.**   He's a program manager for the Kin
23   project.
24   **Q.**   Any other senior officers at Kik
25   involved in the decision to approach the OSC?

48

1     A.   I cannot recall whether the CEO was
2   directly participating in the calls or not at
3   this point.
4     Q.   You mentioned that Kik's U.S. legal
5   counsel is involved in the decision to approach
6   the OSC?
7     A.   They were part of the discussions
8   overall.
9     Q.   Who specifically are you referring
10  to?
11    A.   Nancy Wojtas, counsel from Cooley.
12    Q.   Anyone else among Kik's U.S. legal
13  counsel involved in that decision?
14    A.   I don't recall any other names, no.
15    Q.   Anyone else at Blakes other than
16  yourself?
17    A.   No, I don't think so.
18    Q.   Other than legal counsel and senior
19  officers of Kik, was anyone else involved in
20  the decision to approach the OSC about Kik's
21  offering of Kin?
22    A.   I don't recall any other names, no.
23        (Deposition Exhibit 167 was marked
24  for identification.)
25        BY MS. D'ALLAIRD:

49

1     Q.   Mr. McKee, I've just handed to you
2   what has now been marked as Deposition Exhibit
3   167.  It is an e-mail.
4        The top chain -- the top of the
5   e-mail on the very first page is dated July 7,
6   2017, from an individual named William
7   Mougayar, M-O-U-G-A-Y-A-R, to Peter Heinke,
8   H-E-I-N-K-E.  This document bears a Bates range
9   of MMLWM-00001215 through MMLWM-00001224.
10       Please take a minute to review and
11  let me know when you are ready for my
12  questions.
13    A.   Yep, I'm ready.
14    Q.   Mr. McKee, do you recognize this
15  e-mail chain?
16    A.   Not particularly, no.  There is no
17  subject in any of it at all.  It says:
18  "Redacted for privilege," so the names are
19  familiar to me but I have no idea what the
20  e-mails are about.
21    Q.   I note that there is a subject line
22  that we can see throughout this document.  That
23  is "OSC comment."
24    A.   Yep.
25    Q.   Does that refresh your recollection

50

1   as to what this e-mail chain relates to?
2     A.   It probably relates to --
3        MR. HOTZ:  I will instruct the
4   witness not to reveal the privilege in the
5   context of answering your question.
6        THE WITNESS:  Yeah.  I mean, now
7   that I see William Mougayar was an advisor to
8   Kik, so he may have participated in some of
9   these discussions in the early stages about
10  what the company ought to be doing.  But I
11  can't recall the specifics of these particular
12  e-mails.
13       BY MS. D'ALLAIRD:
14    Q.   You say that William Mougayer was an
15  advisor to Kik?
16    A.   Yes.
17    Q.   What is your understanding that he
18  was advising Kik on at this time?
19    A.   He is a blockchain expert.  He wrote
20  a book called blockchain -- "Business
21  Blockchain," and so he was giving them advice
22  on economics and token economics and so on.
23    Q.   And do you recall if he was giving
24  Kik advice on whether to approach the OSC about
25  his offering of Kin?

51

1     A.   I don't recall.
2     Q.   At this time, in July of 2017, do
3   you know if Mr. Mougayar had a formal agreement
4   in place with Kik?
5     A.   I don't know.
6     Q.   Did you communicate with Mr.
7   Mougayar about potentially approaching the OSC
8   regarding Kik's offering of Kin?
9        MR. HOTZ:  Yes or no.
10       THE WITNESS:  Yes, broadly, yes.
11       MR. CADIGAN:  I'm sorry, what was
12  that answer?
13       THE WITNESS:  Yes.  Sorry.
14       BY MS. D'ALLAIRD:
15    Q.   As you noted earlier, Mr. McKee,
16  throughout this chain, the body of each e-mail
17  has a box around it stating:  "Redacted for
18  privilege," and we cannot see the text or the
19  content of each e-mail.
20       I'm going to ask on the record, what
21  is the substance of these conversations?
22       MR. CADIGAN:  Objection.  Instruct
23  not to answer.  At the outset, you said you
24  were not looking for privileged communication.
25       MS. D'ALLAIRD:  I don't know that

52

1  we've established these communications are
2  privileged.
3          MR. HOTZ:  The ones that we redacted
4  for privilege?  You did not -- okay.  I
5  instruct the witness not to answer.
6          THE WITNESS:  Okay.
7          BY MS. D'ALLAIRD:
8      Q.   You're not going to answer based on
9  that instruction by Kik's counsel?
10     A.   Correct.
11     Q.   Do you specifically recall
12  communicating with Mr. Mougayar in order to
13  provide Kik with legal advice relating to its
14  offering of Kin?
15     A.   In order to provide Kik legal
16  advice?
17     Q.   Yes.
18          MR. CADIGAN:  Objection.
19          BY MS. D'ALLAIRD:
20     Q.   You can answer.
21     A.   I mean, in the overall context of my
22  legal advice generally, Mr. Mougayar was part
23  of numerous conversations.  I wasn't using him
24  as a conduit to get to Kik if that's what your
25  question is inferring.  He was part of the

53

1  project team.
2      Q.   He was part of the project team.
3          Was he essential to your providing
4  legal advice to Kik?
5          MR. CADIGAN:  Objection.
6          BY MS. D'ALLAIRD:
7      Q.   Just yes or no.
8      A.   No.
9      Q.   You can give that back to me.  Thank
10  you.
11         Moving forward, Mr. McKee, did you
12  eventually reach out to the OSC on Kik's behalf
13  relating to Kik's offering of Kin?
14     A.   Yes.
15     Q.   When was that?
16     A.   In July 2017.
17     Q.   And how did you reach out to the
18  OSC?
19     A.   The OSC had formed a project team
20  called OSC LaunchPad with much fanfare and
21  fancy graphics.  They advertised themselves as
22  being a new way of doing business, give
23  guidance, they were flexible, given the new
24  economy and so on, and so we thought we could
25  contact them.

54

1          I telephoned first to find out who
2  was the right person to contact and then I
3  wrote a letter.
4      Q.   And you telephoned the OSC first to
5  find out who would be best to contact relating
6  to Kik's offering of Kin?
7      A.   Yes.
8      Q.   Who did they -- who did you speak
9  with at the OSC?
10     A.   I spoke -- I tried to speak with Pat
11  Chaukos and she was absent and so I spoke with
12  the second team member on the team, Amy Tsai,
13  T-S-A-I.
14     Q.   And Amy Tsai told you then who to
15  reach out to?
16     A.   Who to address, how the process was,
17  to send us the letter.
18     Q.   And you said you tried to talk to
19  Pat Chaukos first.  How did you know to try to
20  talk to Pat Chaukos?
21     A.   She was the director of the OSC
22  LaunchPad project.
23     Q.   Did you know her prior to reaching
24  out to her regarding --
25     A.   Not particularly.  I hadn't come

55

1  across her before in the OSC staff but when the
2  LaunchPad initiative had been announced earlier
3  in the year, I thought it was an interesting
4  idea and I reached out to her by telephone
5  inviting her to lunch so we could chat about it
6  and I never heard back.
7      Q.   So after you spoke with Amy Tsai,
8  she told you to reach out to Ms. Chaukos; is
9  that right?
10     A.   No.  She said the thing was, to send
11  a letter into the OSC LaunchPad and they would
12  -- the OSC has a portal as well, and the
13  question, one of my questions was, do we have
14  to send this through the document portal or I
15  can send an e-mail or what's the --
16  functionally, how do we get things onto your
17  OSC LaunchPad radar.
18     Q.   So you sent a letter in?
19     A.   Yes.
20     Q.   And tell me about that letter.
21          What did you say in that letter to
22  the OSC?
23     A.   It was an explanation of the
24  background.  There had been some media reports
25  about the potential Kik offering, the media

56

1  language had been somewhat vague and broad and
2  somewhat inaccurate, and so there was some
3  concern that maybe the OSC was thinking Kik was
4  doing -- Kin -- or Kik was doing something that
5  they were not actually doing, so the purpose of
6  the letter was to say, here's what they are
7  actually doing, here's accurately setting out
8  what is in here and why we think it is in
9  compliance with securities law and if you have
10  any concerns, do let us know.
11      Q.   Why did you think that the OSC might
12  have some concerns based on what was being
13  reported in the media about Kik's offering of
14  Kin?
15          MR. HOTZ:  Objection.
16          THE WITNESS:  I think that the media
17  reports, and I don't recall the specifics of
18  any particular media report at this point, but
19  they were in the context of these broader ICOs,
20  I think I referred to it like the wild west in
21  my article.  We didn't believe that Kin was
22  that type of offering.  I said many were
23  securities, but doesn't mean all, and we
24  believed this was a different -- fundamentally
25  different type of offering and the newspaper

57

1  articles that -- broadbrushing everything all
2  together, so we were trying to say, look, this
3  is not that type of thing.
4          That type of ICOs that were going
5  and raising money from people to go and build
6  something, that will promise maybe it will
7  happen.  It's a different type of offering and
8  we wanted to -- so far as possible, get
9  confirmation from the OSC that they agreed with
10  our position.
11          BY MS. D'ALLAIRD:
12      Q.   And your position was that -- if you
13  can clarify for me, what was your position that
14  you represented to the OSC?
15      A.   That Kin tokens were not securities.
16  This was not distribution of securities.
17      Q.   And, therefore, would not be subject
18  to Ontario Securities Commission regulations?
19      A.   That's right.
20          (Deposition Exhibit 168 was marked
21  for identification.)
22          BY MS. D'ALLAIRD:
23      Q.   Mr. McKee, I have just handed to you
24  what has now been marked as Deposition Exhibit
25  168.  It is an e-mail.

58

1          The top of which is dated Tuesday,
2  July 25, 2017.  The Bates stamp on the e-mail
3  is Kik_00115827 through 5828.  This exhibit
4  includes its attachments which is a letter
5  dated July 25, 2017, bearing a Bates range of
6  Kik_00115829 through Kik_00115834.
7          Please take a moment to review and
8  let me know when you are ready for my
9  questions.
10      A.   Okay.  Okay.
11      Q.   Mr. McKee, do you recognize the
12  cover e-mail of Exhibit 168?
13      A.   Yes, I do.
14      Q.   Did you forward the e-mail at the
15  very top of the chain that we see here at
16  Exhibit 168?
17      A.   Yes, I did.
18      Q.   And what is this e-mail that you
19  have forwarded?
20          Do you see there is an e-mail at the
21  bottom of the first page.
22      A.   Right.  That is the cover e-mail
23  through which I delivered the letter to Pat
24  Chaukos at the OSC and Amy Tsai who I've
25  mentioned earlier on and also Monica Kowal who

59

1  was the vice-chair of the commission.
2      Q.   And we see their e-mails in that
3  bottom e-mail --
4      A.   Yes.
5      Q.   -- on Exhibit 168; is that right?
6      A.   Yes.
7      Q.   And then you forward that e-mail,
8  the cover e-mail and its attached letter,
9  looking up at the very top of page -- of
10  Exhibit 168 to Nancy Wojtas and then I see
11  Peter Heinke next to that as well.
12      A.   Yes.
13      Q.   And you said earlier that Nancy
14  Wojtas was Kik's U.S. legal counsel?
15      A.   Right.
16      Q.   And Mr. Heinke at that time was
17  Kik's CFO?
18      A.   Yes.
19      Q.   Why were you forwarding your e-mail
20  and letter to the OSC, to Kik's U.S. legal
21  counsel?
22          MR. HOTZ:  Objection and instruction
23  not to answer.
24          MS. D'ALLAIRD:  On the basis of
25  what?

60

1    MR. CADIGAN:  On the basis of
2  attorney-client privilege and his mental
3  impressions.
4    BY MS. D'ALLAIRD:
5    Q.    You are not going to answer based on
6  that instruction?
7    A.    Correct.
8    Q.    Nancy Wojtas, Kik's U.S. legal
9  counsel that's on this e-mail.
10    Was she retained by Kik to advise it
11  on its offering of Kin tokens?
12    A.    I don't know.
13    Q.    You don't know?
14    A.    I have no idea what the arrangements
15  between Cooley and Kik.
16    Q.    So do you not recall why you
17  forwarded this e-mail to Ms. Wojtas?
18    MR. CADIGAN:  Objection, and again,
19  instruction not to answer.
20    BY MS. D'ALLAIRD:
21    Q.    You are not going to answer?
22    A.    No.
23    Q.    Let's take a look at the letter on
24  the next page.
25    For the record, Mr. McKee, if you

61

1  these things may engage securities regulation
2  and we would encourage you to consider
3  securities laws and reach out to us and we have
4  a new OSC LaunchPad project to facilitate
5  communication to give guidance in most
6  circumstances and provide flexible regulation
7  that balances investor protection with the
8  means of a nascent industry.
9    Q.    Okay.  And so in addition to the
10  coverage about Kik in the press, you were also
11  writing the OSC because of this March news
12  release referred to in your letter here at
13  Exhibit 168; is that right?
14    A.    They had encouraged people to
15  approach them and it seemed to be a new
16  approach that the OSC was taking not to be
17  punning, that it would be more interactive and
18  we were interested in getting whatever
19  certainty we could get out of them.
20    Q.    I've just handed to you what we
21  previously marked if you look at the very last
22  page of this document, Exhibit No. 109.
23    Please take a look at this document
24  and let me know when you are ready for my
25  questions.

63

1  turn to the second to last page, Page 5 of your
2  letter.
3    Is that your signature that appears
4  under: "Yours very truly?"
5    A.    Yes, it is.
6    Q.    And did you write this letter?
7    A.    Yes, I did.
8    Q.    To the best of your knowledge, are
9  the statements in this letter accurate?
10    A.    To the best of my knowledge, yes, as
11  it was in July of 2017, yes.
12    Q.    If you take a look at your letter,
13  the second full paragraph on the first page of
14  the letter, last sentence in that paragraph,
15  I'm going read it into the record.
16    "Given the OSC's March news release,
17  Kik asked us to update the OSC about Kik's
18  plans relating to Kin and to describe how Kin
19  will work."
20    What is the March news release that
21  you are referring to there?
22    A.    That was a news release issued by
23  the Ontario Securities Commission in March of
24  2017, saying that there is lots of uncertainty
25  around these blockchain offerings and some of

62

1    A.    Sorry, Exhibit 109?
2    Q.    Exhibit 109.  Yes, you can see on
3  the very last page of the document, there is a
4  stamp.  It looks a little different than the
5  other stickers that we have been using.  But
6  you'll see that this is Exhibit No. 109.
7    A.    Uh-huh.
8    Q.    So take a look at that and just let
9  me know when you are ready for my questions.
10  You can take your time.
11    But my question is going to be:  Is
12  this the March -- the OSC March news release
13  that is referred to in your letter at Exhibit
14  168?
15    A.    Yes, it is.
16    Q.    Now had you reviewed this news
17  release that we see at Exhibit 109 when it came
18  out in March of 2017?
19    A.    Yes, I had.
20    Q.    So you were aware of this news
21  release when you were first retained by Kik in
22  May of 2017?
23    A.    Yes, I was.
24    Q.    And your letter to the OSC is dated
25  July 25, 2017, correct?

64

1    **A.**   Yes, it is.
2    **Q.**   Why the -- why did you not reach out
3  to the OSC until July of 2017, if you were
4  aware of this news release in March of 2017?
5        MR. HOTZ:  Objection.
6        MR. CADIGAN:  I will let you answer
7  that question.
8        THE WITNESS:  Well, first of all,
9  the news release came out in March of 2017.  I
10 was only engaged at the very end of May, so I
11 couldn't have reached out much sooner than
12 that.  I became -- took a while to get aware of
13 what the project was involved and it took a
14 while to write the letter, to make sure we had
15 the facts accurate as well and formulate our
16 views.
17       BY MS. D'ALLAIRD:
18    **Q.**   Okay.  So that's why it took two
19 months to write the OSC?
20       MR. HOTZ:  Objection.
21       MR. CADIGAN:  Objection.
22       BY MS. D'ALLAIRD:
23    **Q.**   Yes or no?
24       MR. CADIGAN:  Objection.  Asked and
25 answered.

65

1        You can answer.
2        THE WITNESS:  I don't think that is
3  an accurate characterization.  It took two
4  months.  The letter came about during the
5  course of our engagement and we decided to
6  prepare it and it took a while to prepare.  I'm
7  not sure the exact date on which we started
8  writing this.
9        BY MS. D'ALLAIRD:
10    **Q.**   Okay.  We can move on.
11    **A.**   Want these back?
12    **Q.**   No.  I would like you -- actually, I
13 will take Exhibit 109, thank you.
14       But stay with me on Exhibit 168.  If
15 you could please turn to Page 3 of the letter.
16 There is a title in bold, halfway down the
17 page, called:  "The launch process."
18       Do you see that?
19    **A.**   Yes, I do.
20    **Q.**   And then underneath that, the letter
21 states:  "Kik is moving forward in a two-phase
22 process," and below that:  "No. 1, presale of
23 rights."
24       The presale of rights, does that
25 refer to the SAFTs that you mentioned earlier

66

1  today?
2        **A.**   Yes, it does.
3        **Q.**   And two sentences in in that
4  paragraph beneath:  "No. 1, presale of rights,"
5  beginning with:  "Since Kin has not yet
6  launched."
7        Do you see that sentence?
8        **A.**   Yes, I do.
9        **Q.**   I'm just going to read it into the
10 record.
11       "Since Kin has not yet launched and
12 therefore has no effective utility at the time
13 of the presale, this presale of rights will be
14 conducted as a conventional securities
15 distribution of such rights in full compliance
16 with the securities laws of Canada, the United
17 States and other applicable foreign
18 jurisdictions."
19       Do you see that sentence?
20    **A.**   Yes, I do.
21    **Q.**   What is the sentence based on?
22       MR. CADIGAN:  Just so we -- just the
23 source of that information.
24       THE WITNESS:  It's based on the
25 company's advice to me that they were selling

67

1  the SAFTs in Canada to accredited investors
2  only and that it would be in compliance with
3  other jurisdictions.  I wasn't expert on those
4  other laws but they advised me it would be in
5  compliance with that.
6        BY MS. D'ALLAIRD:
7     **Q.**   I just want to be clear for the
8  record.
9        The portion of your sentence that
10 states that:  "The presale of rights would be
11 conducted as a conventional securities
12 distribution of service rights in full
13 compliance with" -- reading ahead, "the United
14 States," what is that based on?
15       MR. CADIGAN:  Again, asking only
16 that you name the source and not get into the
17 substance of legal advice.
18       BY MS. D'ALLAIRD:
19    **Q.**   I am not asking -- just for the
20 record, I am not asking for the substance of
21 legal advice.  I am asking for the source of
22 that information.
23    **A.**   It would have been likely Nancy
24 Wojtas from Cooley and Peter Heinke from Kik
25 advising me with respect to the U.S. side of

68

1  the offering.
2     **Q.**  So to your knowledge, had Kik
3  considered U.S. securities laws in relation to
4  Kik's offering of Kin as of the date of this
5  letter, July 25, 2017?
6     MR. CADIGAN:  Objection.  Instruct
7  you not to answer.
8     MS. D'ALLAIRD:  Are you contending
9  that whether or not Kik considered U.S.
10  securities laws is privileged?
11     MR. CADIGAN:  I am asking -- to the
12  extent that you are getting his understanding
13  as to that, that is privileged, yes.
14     BY MS. D'ALLAIRD:
15     **Q.**  Okay.  You are not going to answer
16  that question on the basis of Mr. Cadigan's
17  instruction?
18     **A.**  That's right.
19     **Q.**  Let's turn to Page 4 of the letter
20  of Exhibit 168.  And I am looking at the
21  heading in bold:  "Securities law
22  considerations."
23     Underneath that, there is a
24  sentence:  "Kik has carefully considered
25  Canadian and U.S. legal advice for the launch

69

1  of Kin."
2     And is that an accurate statement to
3  your knowledge?
4     **A.**  Yes.
5     **Q.**  And what is the statement that:
6  "Kik has carefully considered U.S. legal
7  advice" based on in this letter?
8     MR. CADIGAN:  Again, just the source
9  of that information.
10     THE WITNESS:  It's based on my
11  understanding of --
12     MR. CADIGAN:  Actually, again, not
13  your understanding, I am asking you for just
14  the source of that information.
15     THE WITNESS:  Right.
16     MR. HOTZ:  Identify the source.
17     MR. CADIGAN:  And not get into
18  communications or advice.
19     THE WITNESS:  I understand.  Nancy
20  Wojtas and Peter Heinke.
21     BY MS. D'ALLAIRD:
22     **Q.**  Mr. McKee, why are you referring to
23  U.S. law in your letter to the Ontario
24  Securities Commission?
25     MR. CADIGAN:  Objection and instruct

70

1  not to answer.
2     BY MS. D'ALLAIRD:
3     **Q.**  Are you not going to answer based on
4  that instruction?
5     **A.**  Yes.
6     **Q.**  Generally, when you reach out to the
7  Ontario Securities Commission -- or let me ask
8  you this question first, back up.
9     Had you reached out to the Ontario
10  Securities Commission prior to this time
11  relating to cross-border securities
12  transactions?
13     **A.**  Yes, I have.
14     **Q.**  And have you reached out to the
15  Ontario Securities Commission relating to
16  cross-border securities transactions that
17  include the United States?
18     **A.**  Yes, I have.
19     **Q.**  When you have done that, have you
20  referred to U.S. law in addition to Canadian
21  law in connection with reaching out to the OSC
22  relating to those offerings?
23     **A.**  Not specific U.S. laws but overall
24  general compliance, sometimes, yes, not always.
25     **Q.**  When you do, why do you do that?

71

1     MR. HOTZ:  Objection.  It gets into
2  Blakes's privileges with other clients.  He is
3  not here to answer and provide answers about
4  his work for other clients so I instruct him
5  not to answer that.
6     BY MS. D'ALLAIRD:
7     **Q.**  In your communications with the OSC
8  relating to cross-border securities
9  transactions in -- that involved the United
10  States, do members of the OSC typically ask you
11  about U.S. law?
12     **A.**  There is no typical.
13     **Q.**  Do they ever ask you about U.S. law?
14     **A.**  Sometimes.  Especially if it's a
15  cross-border transaction.
16     **Q.**  Do you have an understanding as to
17  why the OSC has occasionally asked you about
18  U.S. law in connection with securities
19  offerings?
20     MR. HOTZ:  Objection.
21     THE WITNESS:  It would be --
22  regulatory capacity for curiosity is infinite.
23     MR. HOTZ:  We have been going about
24  an hour.  Can we take a break when you have a
25  moment.

72

1    MS. D'ALLAIRD:  Sure.  I just have
2    about two more questions and then we can break
3    if that's okay.
4          BY MS. D'ALLAIRD:
5    **Q.**   I just want to look at the bold
6    heading at the bottom of that same page, Page
7    4: "No. 2, token distribution event."
8          The token distribution event, does
9    that relate to Kik's offering of Kin to the
10   public?
11   **A.**   Yes.
12   **Q.**   And the second paragraph underneath
13   that heading, I want to look at the second
14   sentence in the second paragraph.  I'm going to
15   read it into the record.
16         "Kin does not meet the case law
17   legal test for characterization as the
18   investment contract."
19         Mr. McKee, what case law legal test
20   for the characterization as an investment
21   contract were you referring to in this
22   sentence?
23         MR. CADIGAN:  Objection.  I instruct
24   you not to answer.
25         MS. D'ALLAIRD:  On the basis of

73

1    instruction.
2          MS. D'ALLAIRD:  You're going to
3    instruct him not to answer what specific case
4    law legal test he is bringing to the attention
5    of the OSC, a third party in this letter.  I
6    just want to be clear, that's what you are
7    saying.  That's your position.
8          MR. CADIGAN:  Yes.  If he brought
9    that case law to the attention of the OSC in
10   this letter, then you can obviously ask him
11   about it because you know what that case law
12   is.  Otherwise, it only resides in his mind and
13   if it was something that he actually mentioned
14   to OSC, then you have that as well, but if it
15   was not, then it's entirely within his mind,
16   it's his mental impressions on this topic, it
17   goes to work product, it goes to
18   attorney-client privilege and I'm instructing
19   him not to answer.
20         Again, if you want to get what he
21   actually said, what he actually heard, that's
22   fine, but anytime you get into his motivation
23   of what he understand, his understanding of
24   case law, you are shaking your head for the
25   record, and I'm going to say that is completely

75

1    what?
2          MR. CADIGAN:  On the basis that goes
3    directly to his mental impressions.  If you
4    want to ask him about what he actually said or
5    communicated to the OSC, you can do so, but to
6    get underneath that and get to his thoughts and
7    impressions on that, I'm instructing him not to
8    answer.
9          MS. D'ALLAIRD:  I am not asking him
10   for legal advice.  I am asking him to explain
11   to me the meaning of a term that he included in
12   a letter for a third party to the USC.  You're
13   contending that is privileged information?
14         MR. CADIGAN:  Yes.  I'm saying that
15   what is on the page, you can ask him about.
16   You cannot ask him his motivations, his
17   understandings, his strategy or anything else
18   that went into sending that.  That is all
19   caught up in the inviolate mental impressions
20   of legal counsel.  You knew that when you
21   noticed this deposition.
22         MR. HOTZ:  Can I have the question
23   read back please.
24         (The record was read as requested.)
25         MR. CADIGAN:  I stand by that

74

1    inappropriate.
2          You put on in a strict liability
3    case on U.S. law opposing -- I mean, the
4    counsel for the opposing party.  There is no
5    reason for you to do so.
6          MR. MENDEL:  Mr. Cadigan, I don't
7    think we need to -- you can state your position
8    about what is privileged and we can disagree
9    with that position.  I don't think there is a
10   need to delve into our respective -- whatever
11   our motivations for disagreement.
12         We each have our sides that we are
13   respecting so let's just stick to assertions of
14   privilege and agreement or disagreement on
15   that.
16         MR. CADIGAN:  I'd like to, but I
17   keep getting questioned about what I'm doing on
18   this, and I have been very clear from the very
19   beginning.  We are here even though it's
20   completely inappropriate and more so as we go
21   on, because we were under the understanding
22   that you would be asking about statements made
23   to third parties, what he heard and what was
24   said, and we're going to it on a
25   question-by-question basis.

76

1     We are now getting into what he was
2  thinking, what his mindset was, et cetera, and
3  we are not going to allow that.
4     You're right, though.  We move on,
5  but I can't keep getting asked about my basis
6  for this and then told not to provide my basis
7  for this.  We are ready to move on.  I am
8  instructing him not to answer.
9     MS. D'ALLAIRD:  Okay.  Let's take a
10 break.
11     THE VIDEOGRAPHER:  Going off the
12 record.  The time is 10:27.
13     (A short recess was taken.)
14     THE VIDEOGRAPHER:  Going back on the
15 record.  The time is 10:50.
16     BY MS. D'ALLAIRD:
17  Q.   Mr. McKee, we are back on the
18 record, and I have just a couple more questions
19 about Exhibit 168.
20     I'm looking at the last page of the
21 attached letter, Page 5, and looking at the
22 last sentence of that last paragraph.  You ask
23 Ms. Chaukos to get back to you as soon as she
24 could.
25     Why were you asking her to do that?

77

1  A.   All right.  It says:  "If you do
2  have any issues you wish to raise, we would
3  appreciate you getting back to me as soon as
4  you can."
5  Q.   Fair enough.  Why were you asking
6  her to do that?
7  A.   So we could try to achieve
8  regulatory certainty.
9  Q.   What do you mean by "regulatory
10 certainty?"
11  A.   Get assurance from the OSC that they
12 agreed with our positions set out in the
13 letter.
14  Q.   That position is that Kin was not --
15 the offering of Kin was not an offering of
16 securities under Canadian law?
17  A.   Right.
18  Q.   And after you sent this letter to
19 Ms. Chaukos, did anyone from the OSC reach out
20 to you regarding this letter?
21  A.   Yes.  Initially, Amy Tsai, who I see
22 I gave the wrong name in here.  Amy Tan.  It's
23 not a different person, that's just a typo.
24 Contacting me saying Pat was actually away on
25 vacation and would get back to us as soon as

78

1  she got back, and subsequent to that, we -- I
2  followed up with her and suggested a meeting
3  then.
4  Q.   With Ms. Chaukos?
5  A.   Yes.  Well, with the OSC LaunchPad
6  team, yeah.
7  Q.   And so Ms. Chaukos, you followed up
8  with Ms. Chaukos after hearing from Amy Tsai or
9  did Ms. Chaukos then reach out to you?
10  A.   I don't remember who called whom.
11  Q.   And what is the next thing you
12 remember after having communication with Ms.
13 Chaukos?
14  A.   We had a meeting with the OSC staff.
15 There was nothing substantive between this and
16 that meeting.
17  Q.   And the meeting with OSC staff, when
18 did that take place?
19  A.   August 14, 2017.
20  Q.   August 14, 2017?
21  A.   Yes.
22  Q.   Was that an in-person meeting?
23  A.   Yes, it was.
24  Q.   Where did it take place?
25  A.   At the Ontario Securities

79

1  Commission.
2  Q.   In Toronto?
3  A.   Right.
4  Q.   And who was present at that meeting?
5  A.   There was myself representing
6  Blakes.  There was Ted Livingston, Peter
7  Heinke, Tanner Philp from Kik.  There was -- by
8  conference call, Nancy Wojtas and Karen Ubell
9  from Cooley.  From the OSC was Pat Chaukos,
10 Jonathan Yeung, Asad Aktar, and I can't
11 remember who else from the OSC.
12  Q.   Okay.  You mentioned Mr. Livingston.
13 Is that the CEO of Kik?
14  A.   Yes.
15  Q.   Anyone else attend other than those
16 attendees from Kik, yourself, the OSC and then
17 Kik's U.S. counsel on the phone?
18  A.   I don't know -- no.  No one else.
19  Q.   Did you communicate to the OSC why
20 Kik's U.S. counsel would be attending on the
21 phone?
22  A.   I don't think so, no.
23  Q.   Did the OSC request that Kik's U.S.
24 counsel join this meeting?
25  A.   No.

80

1    **Q.**   Why did you -- Kik's U.S. counsel
2  join this meeting?
3        MR. CADIGAN:  Objection.  Instruct
4  you not to answer.
5        MS. D'ALLAIRD:  On the basis of
6  privilege?
7        MR. CADIGAN:  On the basis of
8  privilege and work product.
9        BY MS. D'ALLAIRD:
10   **Q.**   Are you not going to answer based on
11  that instruction, Mr. McKee?
12   **A.**   That's right.
13   **Q.**   How long was this meeting?
14   **A.**   To my recollection, it was about an
15  hour.
16   **Q.**   And did you take notes during this
17  meeting?
18   **A.**   I took some notes.  I did talking
19  and I'm not a very good note taker while talker
20  but I did take some notes, yes.
21   **Q.**   Did anyone else take notes at the
22  meeting?
23   **A.**   I don't know.  I presume so.  People
24  were writing, so probably, I'm not sure.
25   **Q.**   Did you review anyone's notes after

81

1  the meeting?
2   **A.**   No.
3   **Q.**   Okay.  What was the purpose of this
4  meeting?
5   **A.**   It was to provide an opportunity for
6  the OSC to ask questions.  I now recall Ms.
7  Chaukos had sent an e-mail saying -- a thanks
8  letter; we have some questions about the Kin
9  offering so we were going to go and provide
10  more information to the OSC's questions to
11  address them.  We wanted to approach it in a
12  very open way.  We weren't trying to hide
13  anything.  We wanted to say here is everything
14  we are doing.  Here is our analysis, are you
15  cool with this.
16   **Q.**   Did Ms. Chaukos give you any other
17  specific indication of what she wanted to
18  discuss other than just generally the offering
19  of Kin?
20   **A.**   No.  I invited her a couple of times
21  to provide us -- if you give us answers to our
22  questions ahead of time, we could prepare
23  specifically and there was no response.
24   **Q.**   As best as you can, I would like you
25  to walk me through this meeting from beginning

82

1  to end as best as you can recall.
2   **A.**   Okay.
3   **Q.**   So who spoke first?
4   **A.**   I probably spoke first, just to
5  introduce who was who on our side of the table.
6  The OSC staff would have introduced, not would
7  have, the OSC staff did introduce themselves as
8  well initially, so who the parties were.
9        I gave a very general background
10  about the fact that this offering was pending
11  as per the letter and then Ted Livingston
12  spoke.  There was no PowerPoint presentation,
13  it was all just verbal.  He spoke about the
14  background of Kik, what the Kik chat app was,
15  its business role and its place in the Canadian
16  business community as a messaging app.
17        The challenges they faced in an ad
18  revenue-based environment, that Facebook and
19  Google were making their money from ads and
20  giving everything else away for free and this
21  made it difficult for Kik to provide services
22  in the way of making the revenue that they
23  would do and so they were looking -- they had
24  trialed some loyalty points concept in previous
25  time period.  I'm not sure the exact time

83

1  period.  I wasn't -- I don't have -- I never
2  used the Kik app so I don't know how it works
3  in detail.
4        And so they proved the concept that
5  their users of their community were interested
6  in doing things that would allow them to earn
7  these Kik points and earn them and spend them,
8  and so they said it was a -- as a trial for a
9  form of ecosystem, something that the users
10  were interested in.
11        The growth of cryptocurrency and
12  that technology had given them the idea that
13  they would be able to do this in a way that
14  would have actual value as opposed to -- the
15  Kins transferred would have actual value in an
16  ecosystem as opposed to just loyalty points, so
17  that, for example, people could buy, if you
18  like something today on Facebook, you don't get
19  anything for that.  You like it and that's
20  nice.  Facebook earns that information and
21  sells that information.
22        Under the proposal with Kin, if you
23  participated in things and you liked things and
24  you did surveys, you would earn Kin tokens and
25  then you could spend those Kin tokens for

84

1  things like, for example, getting access,
2  special access to a particular chat group with,
3  you know, Selena Gomez or something.  So they
4  sort of said the background of all that.
5        Then we talked about the plan for
6  the particular Kin offering, that there was
7  underway, at that time, the SAFT offering that
8  had been offered looking to raise around $50
9  million for institutional investors and there
10 was a global SAFT offering, and we discussed
11 that it would be conducted on the basis in
12 Canada, selling only to accredited investors,
13 and then that there would be a second phase of
14 the actual Kin offering that would be offered
15 later in September.
16       Once the -- the idea was that the
17 SAFT offering was now, while they were still
18 working on the Kin platform, at the time when
19 the Kin wallet was up and integrated with Kik
20 accounts and they were ready to actually have
21 the Kin network integrated with the Kik
22 network, they would be able to launch the Kin
23 token offering at that time.
24       This is a distinguishing point from
25 other ones where it was just -- as I said in my

85

1  letter, vaporware, things were -- actually
2  didn't exist.  Kik -- it was emphasized that
3  Kik had a platform of like 15,000 users, I
4  mean, 15 million users, I'm not sure the
5  numbers that were used, but they had an
6  established platform of users, all of whom
7  would be able to eventually participate.
8        It would be rolled out over time
9  primarily for scaling concerns.  There was
10 concern whether blockchain technology could
11 handle the numbers involved, whether a theorem
12 which was the original technology could handle
13 the numbers that Kik would bring, it would be
14 by far the largest, you know, new entrant in
15 terms of existing users.
16       And so they thought they would trial
17 it with a small number of users first of all to
18 make sure it worked smoothly and then as
19 scaling would go, they would gradually scale it
20 out and over, making sure the network didn't
21 crash on Day 1 essentially.
22       Then we discussed the --
23   Q.   Let me just stop you there.
24   A.   Okay.
25   Q.   What you were just describing for

86

1  me, the description of the offering and what
2  would happen with the Kin, who was speaking at
3  that time?  Who was giving this information?
4     A.   The information with the rollout and
5  the timing, that would have been either Ted
6  Livingston or Tanner Philp, but the mechanisms
7  of rollout and scaling concerns.
8     Q.   Okay.
9     A.   And a good way -- once they finished
10 describing the system, then, you know, I took
11 over and said here is our -- we think this is
12 fine from a securities viewpoint.  We drew a
13 distinction from other ICOs where there was no
14 vaporware.  This is an existing platform
15 rolling onto it directly, it would be
16 operational from Day 1 and we discussed the
17 leading case.  It was Pacific Coast Coin
18 Exchange.
19       Canada is the leading authority on
20 what is an investment contract, and I pointed
21 in particular to the facts of Pacific Coast
22 Coin Exchange is about people buying bags of
23 silver coins and they can buy them one of two
24 ways, they can buy them either on margin
25 contracts or they could buy them in specie,

87

1  like you buy a bag of coins and you pay for
2  them upfront.  The vast majority -- in that
3  case, the vast majority of purchasers bought
4  them on margin.
5        The case law and the decision is
6  about only the margin contracts, not about
7  people who bought them in specie, and the Chief
8  Justice of Canada in that case said the
9  securities law is not affected by people who
10 are buying coins in specie.
11       And the leader, he was in dissent in
12 that particular case.  The head of the group of
13 the majority also said we are talking here only
14 about the margin contract issues here, because
15 in their case, it was the hedge contract that
16 the company was running, that was the actions
17 of others that was necessary as one of the
18 pillars of an investment contract, and if the
19 company did not manage their hedge contract,
20 there would be no funds with which they could
21 repay people if their profits they had
22 allegedly earned on their margin contracts
23 whereas people who just made profits based
24 solely on the market price of silver, because
25 it is held in specie, that did not inform the

88

1  case here and it wasn't part of the Securities
2  Act.
3       So the distinction I was pointing to
4  the OSC was -- in this case, the people are not
5  buying Kin on margin.  They're going to buy Kin
6  and there is no profit coming from the company,
7  there is no return coming from Kik.  They don't
8  earn, you know, dividends, they don't earn
9  profits.  They have no way of -- if they're
10  going to make any profit at all, it's going to
11  be in the fact that their Kin which they own is
12  going to increase in price or change in price
13  in the market for Kin, which was directly the
14  same as if they had a bag of silver coins and
15  that which the Supreme Court had said, that is
16  not an investment contract.  So that was
17  central to our analysis and it is a point that
18  is frankly overlooked, so we were drawing that
19  to the OSC attention.
20       And then the other aspect of the
21  decentralized nature of Kin isn't writing apps.
22  There's app providers involved, so and so,
23  elements of things that are part of investment
24  contract.  It is not a good deck.  It's not a
25  -- they don't have royalty rates, or the other

89

1  major categories of the definition of security,
2  we went through those briefly and said, look,
3  it's not this, it's not that, because they
4  don't have any entitlement earnings, there is
5  no profit sharing, et cetera, et cetera.
6       And then the last thing we talked
7  about --
8       Q.   Let me just stop you right there,
9  just with a couple quick questions before I
10  forget.
11      A.   Sure.
12      Q.   So you mentioned that you -- in the
13  beginning of this next piece of the meeting,
14  where you described that this was an existing
15  platform that would be operational on Day 1,
16  where had you received that information to
17  present to the OSC?  Who had given you that
18  information?
19      A.   From Kik.
20      Q.   From Kik.  Okay.  And Pacific Coast
21  Coin, that's a case law out of the Supreme
22  Court of Canada?
23      A.   Yes.
24      Q.   And is it --
25      A.   Pacific Coast Coin Exchange.

90

1       Q.   Pacific Coast Coin Exchange.  Okay.
2  Thank you, I always mix it up.
3       And so is that a test of -- I'm
4  sorry.  Let me back up.
5       Is Pacific Coast Coin a case out of
6  the Canadian Supreme Court relating to the
7  definition of investment contract under
8  Canadian law?
9       A.   Ontario law.
10      Q.   Under Ontario law.
11      A.   Ontario securities law, yes.
12      Q.   You mentioned that in going through
13  your analysis of that case in relation to the
14  offering of Kin, you mentioned -- stating that
15  profits off of Kin would not come from the
16  company.
17       Why -- why were you describing that
18  in relation to Pacific Coast Coin?
19       MR. CADIGAN:  Objection.  Instruct
20  you not to answer.
21       If you want to ask what he said in
22  the meeting about that, that's fine.
23       MS. D'ALLAIRD:  Are you objecting on
24  the basis of privilege?
25       MR. CADIGAN:  Yes.

91

1       MS. D'ALLAIRD:  Just to be clear for
2  the record.
3       BY MS. D'ALLAIRD:
4       Q.   You are not going to answer that
5  based on Kik's counsel's instruction?
6       A.   Yes.
7       Q.   What are the -- under Pacific Coast
8  Coin, can you set out for me what that case
9  holds?  How one decides if something is an
10  investment contract under Pacific Coast Coin.
11      A.   Sure.  There are essentially four
12  prongs to the test.  It is an investment of
13  money with an expectation of profit to come
14  primarily from the efforts of others, and I
15  forget the -- I think I blurred two of those
16  together so that is basically it -- in the
17  common enterprise, sorry.
18       Investment of money in a common
19  enterprise with an expectation of profit
20  primarily to come from the efforts of others,
21  and it's primarily, because they said it's not
22  necessarily solely, it's primarily.
23       Q.   And if I understand you correctly,
24  you discussed or presented to the OSC on the
25  prong under Pacific Coast Coin of expectation

92

1  of profits; is that right?
2      A.   Yes.
3      Q.   And can you state for me again what
4  you said with respect to that prong?
5      A.   If there was an expectation of
6  profit, the profit to a holder of Kin tokens
7  would come only from an appreciation of price
8  of the tokens which they held and then the
9  eventual sale of that token for more than you
10  bought it for, and it would not come from
11  earnings from Kik Interactive.
12      Q.   Did you also discuss with the OSC
13  the prong under Pacific Coast Coin of common
14  enterprise?
15      A.   Yes, I believe so, yes.
16      Q.   What did you say about that prong to
17  the OSC in this meeting?
18      A.   I don't recall specifically because
19  that wasn't a major part of that, but in a
20  sense, that the Kin ecosystem as it was devised
21  would have a number of applications, a number
22  of users, it wasn't -- people were not dealing
23  directly exclusively with Kik Interactive.  It
24  would be other participants in the Kin.  People
25  -- what people chose to allow people to do to

1  earn or spend Kin would not be up to Kik.  It
2  would be up to the ecosystem, the users of
3  that, so that's it.
4      Q.   And then did you also discuss with
5  the OSC the prong of efforts of others under
6  Pacific Coast Coin?
7      A.   Yes.
8      Q.   What did you say about that prong?
9      A.   I said in this case, the profits
10  would come from the secondary market generally
11  and that, you know, the price of a commodity
12  like a Kin token in the market would be the
13  market price which is what everyone's view is
14  on the value of that Kin.  It is not fixed by
15  Kik.  It is not set by Kik in any way.  It's a
16  market price and so the value of potential
17  profit is if people generally think it is worth
18  something or not.
19      Q.   So other than what you described
20  just now about what you said about the prongs
21  of the Pacific Coast Coin test, did you say
22  anything else about Pacific Coast Coin to the
23  OSC?
24      A.   I can't recall specifics of anything
25  else.  I just said those are the key things I

1  would have mentioned.
2      Q.   After you discussed Pacific Coast
3  Coin with the OSC, can you keep walking me
4  through this meeting, what happened after that?
5      A.   We talked about the registration
6  side and Canada registration means dealer or
7  advisor registration, not qualification by
8  prospectus, and they said just in case you are
9  curious, our analysis on the registration side
10  is that -- there is a national instrument in
11  Canada, it's a rule called National Instrument
12  31013 which has a long complicated name but
13  basic registration requirements and there is a
14  companion policy, 3103 CP which is the
15  equivalent of -- rough equivalent of an SEC
16  interpretive release so it publishes -- it's a
17  formal policy published by the Securities
18  Commission.
19          In this case, it is published
20  uniformly by all the Securities Commission in
21  Canada which is why it's called a national
22  instrument and a national companion policy, and
23  in the companion policy, they give their
24  interpretation of how they intend to apply and
25  interpret the law, and in their triggers for

1  dealer registration, they discuss issuers and
2  they said that an issuer who is raising capital
3  for their -- or if an issuer is raising capital
4  for their business in accordance with the
5  business plan, and they do this even on success
6  of an asset, but it's just raising capital for
7  a business plan.  They would not interpret that
8  as being in the business of creating securities
9  in those circumstances unless the issuer has
10  specific people who are devoted to nothing but
11  raising money for the issuer.
12          And so that certainly can be said,
13  this was equivalent to Kin to the extent
14  they're selling these SAFT tokens and redoing
15  this raise, it's in accordance with their
16  business plan and if they have another
17  business, are you running a chat message app,
18  so they're not in the business of trading
19  securities and therefore, they don't need to be
20  registered as a dealer.
21      Q.   If I understand you correctly, and
22  I'm not a Canadian lawyer so I just want to
23  understand this.
24      A.   I share your opinion.
25      Q.   With respect to the registration

1  piece of that, your conversation on that, was
2  that only with respect to the SAFTs or did that
3  include also --
4      A.    No, just in general, basically.
5      Q.    General, including the whole SAFTs
6  and then the direct sale?
7      A.    The sale of these tokens was
8  pursuant to a business plan in connection with
9  this business that they had for establishing
10 the Kin ecosystem and so it was not -- they
11 were not in a securities trading business like
12 a broker would be.
13     Q.    And so if I understand you
14 correctly, this -- what you are describing is
15 essentially an exemption from registration?
16     A.    Not an exemption, no.  It's not a
17 trigger.  This discussion is whether the
18 registration requirement has been triggered or
19 not, so it's not that it's has been triggered
20 and you're exempt, like the accredited investor
21 one is different and we're dealing with
22 different things here.
23         So what we were saying here was, if
24 there is no trigger for dealer registration in
25 these facts -- situations, and in the SAFT, we

97

1  are saying prospectus requirement is triggered
2  but there is an exemption and in the case of
3  the sale of the tokens, we are saying that the
4  prospectus requirement is not triggered.
5      Q.    So if I understand you correctly,
6  the -- you are saying that in the SAFT -- with
7  respect to the SAFTs, registration is not
8  triggered because of -- because of what?
9      A.    Because they were raising the money
10 in the SAFT to pursue their business plan, not
11 for the purpose of being in the business of
12 trading securities.
13     Q.    But the SAFTs, if I understand you
14 correctly, were securities or considered to be
15 securities for purposes of this discussion with
16 the OSC?
17     A.    Yes.
18     Q.    And then with respect to the
19 offering of the Kin tokens themselves, what was
20 the argument there as to why it shouldn't be
21 registered?
22     A.    Registered as a dealer you mean or
23 are you talking about U.S. DAO registration?
24     Q.    Registered -- let's take both
25 registered as a dealer.

98

1      A.    On the same basis that the money
2  that's being raised is to fulfill the business
3  plan that they have for the development of this
4  business, and therefore, it's not in the
5  business of trading securities.
6         It's a -- the companion policy talks
7  about startups, and they say in a startup
8  situation, you know, they can be raising money
9  for that, and even if you go back successively,
10 then you are not engaged in the business of
11 trading securities which is the trigger for
12 dealer registration.
13     Q.    So to my understanding, the trigger
14 would have been if the Kin -- if the sale of
15 Kin was a security sale; is that right?
16     A.    No, that's not accurate.  Even if
17 you are selling securities -- so, for example,
18 and this is not part of my advice to the OSC,
19 right, but briefly, just for understanding,
20 people who -- two guys in a garage have come up
21 with this cool idea for a new computer.  They
22 decide to sell shares in a company to raise
23 money for this, to raise the computer, to raise
24 money to build the computer, they sell these
25 shares to people.

99

1         Prospectus requirements aside,
2  because they are raising the money to build up
3  their business dealings in the computer
4  business, they are not in the business of
5  trading securities, so they do not have to
6  register as a dealer in order to be able to
7  sell those shares to other people.
8         The requirement, it's all in the
9  context of whether or not you are selling
10 securities, so if you are not doing securities
11 at all, dealer registration doesn't come into
12 it at all.  I understand that.  But we were
13 talking about both the SAFT and saying, look,
14 and for greater certainty, even if you are
15 concerned about dealer situations, it would not
16 be a dealer registration issue anyway, because
17 they are not involved in some huger policy in
18 saying so.
19     Q.    Thank you.  That's what I was trying
20 to clarify.
21         So my understanding then is that for
22 purposes of the discussion of dealer
23 registration with the OSC during this meeting
24 in August of 2017, the assumption -- just for
25 the purposes of that part of the discussion,

100

1  was that the offering of Kin was a security?
2      A.  No.  I wouldn't say it's an
3  assumption.  What I said was, the SAFT was an
4  offering of securities so if they are curious
5  about that, what we were seeking to do in the
6  meeting was to assuage any regulatory concerns
7  the OSC might conceivably have, any.
8          There were people there from the
9  registration branch who focus on dealer stuff.
10  They don't care about prospectus exemptions and
11  so on, so we were saying in case you are
12  thinking whether Kik should register as a
13  dealer, they don't have to because they're not
14  -- whether what they are offering is a security
15  or not, they don't have to register as a dealer
16  because they are not in the business of trading
17  in securities.
18          It wasn't intended as a concession
19  or even an assumption that it was a security.
20  In the case of a public offering, we had our --
21  we said that in the letter that we were
22  treating the SAFT offering as a distribution of
23  securities, so a registration question would
24  legitimately arise for that and we would
25  address that.

                        101

1          The Kin one, we said we don't think
2  it's an offering of securities at all, because
3  of this, but -- just for purposes in case you
4  are concerned, even if it -- whether it is or
5  not, there is no registration here.
6      Q.   Okay.  I think I understand you.  So
7  for purposes of the registration with respect
8  to the offering of the Kin tokens, whether or
9  not it was a security or not, it didn't have to
10  be registered.
11      A.   The company did not have to register
12  as a dealer, that's right.
13      Q.   Any other registration that could
14  apply?
15      A.   Advisor, investment fund manager,
16  those don't apply.  Advisors or portfolio
17  manager's discretion also are not applicable.
18  This is not an investment fund so there is no
19  investment fund manager issue, so no.
20      Q.   So no discussion of that during the
21  meeting?
22      A.   No.
23      Q.   Then what happened next in the
24  meeting?  Who spoke next?
25      A.   They sort of said thanks very much.

                        102

1  We appreciate.  We were hoping we might get
2  them saying, yeah, you're right, this is great,
3  you know, carry on.  But nothing was said.
4  That's all very well.  They picked up their
5  notes and said, we will think about all the
6  things you've told us, thanks for your time,
7  and the meeting is over.
8      Q.   After you spoke and then folks from
9  Kik and then maybe you spoke again, the OSC
10  didn't say anything substantive?
11      A.   No.  It was an interactive meeting
12  throughout.  There were comments and discussion
13  along, there were questions in forming it.  I
14  think the -- I said, so what do you think and
15  are we there, and the closest we got was Pat
16  Chaukos said, I don't think we are where you
17  are yet.
18      Q.   And that was in the context of what?
19      A.   Of me asking, are you agreeing with
20  our position that we don't have a security
21  offering here.
22      Q.   Did Pat Chaukos say anything else
23  during this meeting?
24      A.   She asked questions about some of
25  the things, what about the development of the

                        103

1  Kin network by Kik, and we responded,
2  explaining the distinction between Kik and the
3  developers who are not Kik people, they are
4  third parties.
5          She asked questions about confirming
6  that there was no profit sharing, there was no
7  revenue -- revenue rights arising, no voting
8  rights arising with the Kin tokens.  We
9  confirmed that was the case.  She talked, you
10  know, we talked about some of the origins.  I
11  think the word Howey was mentioned.  I can't
12  remember exactly by whom in that, and -- but I
13  do recall she was actually somewhat dismissive
14  of Howey as a precedent as being old law and
15  we're dealing with new modern things.  So, you
16  know, we just focused primarily on Pacific
17  Coast Coin Exchange which was trading.
18      Q.   And you don't recall who first
19  raised Howey?
20      A.   I honestly don't recall, no.
21      Q.   But you do recall it being
22  discussed?
23      A.   Yeah, I recall Howey was mentioned.
24  I recall her saying that it was old law and she
25  was dismissive of it.

                        104

1      **Q.**   So all you recall about the
2  discussion with respect to Howey is that
3  someone raised it.  Was it raised by the OSC?
4      **A.**   I can't remember.
5      **Q.**   Can't remember.  Someone raised it
6  and Ms. Chaukos said that it was an old test?
7      **A.**   Yeah.  She said it was an old law
8  from the 1940s and we are dealing with modern
9  things and so we should be bringing modern
10  concepts to review these things in general.  I
11  mean, they talk about how they are flexible and
12  they're looking to adapt to the modern business
13  needs and so on.
14      **Q.**   Did she express a view on Pacific
15  Coast Coin and if that should apply to the
16  offering of Kin?
17      **A.**   I don't think she expressed a view,
18  no.
19      **Q.**   Anything else discussed of Howey in
20  the meeting?
21      **A.**   They said -- about Howey?
22      **Q.**   Uh-huh.
23      **A.**   I don't recall anything further
24  about Howey, no.
25          The only thing they said is that

105

1  they were planning on releasing guidance very
2  soon.  There was brief mention of the fact that
3  the SEC had published its DAO report earlier in
4  July, and we didn't get into it in detail but
5  they said, you know, Canada is planning on
6  publishing guidance and looking through the
7  CSA.  CSA is Canadian Securities
8  Administrators.  It's the body of all the
9  provincial and territorial regulators together,
10  and that the staff would say they would be --
11  that would be very helpful to us to provide
12  more information about that, so we should watch
13  for that.
14      **Q.**   Who brought up the approaching
15  guidance coming from the CSA?
16      **A.**   Pat Chaukos.
17      **Q.**   Pat Chaukos.
18          And you said that someone brought up
19  the DAO report.
20      **A.**   Yeah, it was mentioned that there
21  was -- I said, look in -- there was, I mean,
22  zero guidance in Canada at this point on
23  cryptocurrency, digital things, there was like
24  nothing at all.  There were no exemption
25  orders.  They said, you know, we are looking at

106

1  some, we are working through some and so on,
2  but there had been no exemption orders granted
3  to date.  That there were no decisions of any
4  securities commissions.
5          There was a notice from the Ontario
6  Securities Commission and the Quebec Autorite
7  des Marches Financieres, AMF, in 2014, saying
8  bitcoin is not regulated so be cautious.
9  There was the press release in March saying
10  these digital assets of cryptocurrencies may
11  involve securities law, you should consult and
12  you should consider securities law, and that
13  was it.
14          And so we talked about the fact that
15  there was no guidance and therefore, our
16  interpretation was this based on the situation,
17  the response was that the U.S. has the DAO, we
18  have nothing like that yet.  They said ours is
19  coming soon.  We're looking forward to that.
20      **Q.**   When you talked about the fact that
21  there was no guidance, who said that there was
22  no guidance?
23      **A.**   I would have said that probably
24  three or four times.
25      **Q.**   Did anyone at the OSC agree or

107

1  disagree with that?
2      **A.**   I think they generally acknowledged
3  that there had been no published guidance and
4  that we -- that's why they were working on this
5  guidance and they were looking forward to
6  releasing it and they were quite excited about
7  it.
8      **Q.**   You said they acknowledged -- who
9  acknowledged that there was no formal guidance?
10      **A.**   I think Pat and they all kind of
11  nodded together, but yeah -- we all did.
12      **Q.**   She said there is no formal
13  guidance.
14      **A.**   She wouldn't have -- I'm not sure
15  her specific words, specifically, but --
16      **Q.**   Did she give any --
17      **A.**   -- there was a general
18  acknowledgement there was no guidance, which is
19  why they were going to be publishing guidance.
20      **Q.**   Did Ms. Chaukos say anything about
21  the upcoming guidance, the substance of --
22      **A.**   No.
23      **Q.**   -- the upcoming formal guidance?
24  No?
25      **A.**   No, she did not.

108

1       MR. CADIGAN:  Just for the record,
2  can you just let her finish the questions.
3       THE WITNESS:  Sorry.  I'm jumping
4  in.
5       BY MS. D'ALLAIRD:
6    Q.   With respect to the DAO report, walk
7  me through what was discussed about the DAO
8  report that came out of the SEC?
9    A.   To my recollection, it was just
10 mentioned in passing.  We did not walk through
11 the DAO report.  We didn't go through it in any
12 particular detail as to what it said.
13       It may have been -- briefly, by way
14 of comparison saying, you know, Kin is nothing
15 like the DAO in the sense that it's -- the DAO
16 is like a hedge fund where people would earn --
17 have rights to returns and so on and this was
18 nothing like that, so it may have been briefly
19 mentioned for facts by way of distinguishment,
20 but we didn't get into any detailed analysis.
21    Q.   When you say, "briefly mentioned for
22 facts," that was brought up on Kik side?
23    A.   Yes.  By Kik side.
24    Q.   By you specifically?
25    A.   Yes.

                        109

1    Q.   I just want to understand if you
2  remember specifically what she said.
3    A.   I don't recall specifically --
4    Q.   You don't recall.
5    A.   -- her words, but it was -- her --
6  my recollection of her tone was that she was
7  dismissive in tone and words of substance about
8  the importance of -- the central importance of
9  the Howey case.
10    Q.   Do you remember anything specific
11 that she said?
12    A.   No.
13       MR. CADIGAN:  Again, can we just --
14 both of you actually --
15       THE WITNESS:  Sorry.  Yeah, talking
16 over, sorry.  Yep, yep.
17       BY MS. D'ALLAIRD:
18    Q.   I think you testified earlier that
19 Ms. Chaukos said something along the lines of,
20 I'm not sure that we are at where you're at.
21    A.   Yes.
22    Q.   That was with respect to Kik's
23 position that the offering of Kin was not a
24 securities offering?
25    A.   Correct.

                        111

1    Q.   I want to go back to the discussion
2  of Howey and what you can remember about that,
3  and you said that Ms. Chaukos said something
4  along the lines -- that Ms. Chaukos said that
5  the test, the Howey test was an old test.
6       And did she give you -- did she make
7  any kind of comparison between Howey and
8  Pacific Coast Coin?
9    A.   No, I don't think so.  At the time I
10 wasn't even sure she was a lawyer so...
11    Q.   You were not sure if Ms. Chaukos was
12 a lawyer?
13    A.   Yes, I wasn't that familiar with her
14 professional background.
15    Q.   What was your understanding --
16 sorry.  Hang on a second.
17       So generally, is your testimony that
18 Ms. Chaukos was dismissive of the Howey test?
19    A.   She said that the Howey test was --
20 the Howey case was old law.
21    Q.   Is that exactly what she said?
22    A.   To the best of my recollection, it
23 was definitely old and, you know, I think the
24 implication was that it therefore didn't have
25 -- had limited precedential value.

                        110

1    Q.   Did she give any reasons for -- for
2  what she said for her position that she didn't
3  necessarily agree with Kik's position?
4    A.   No.  She gave no reasons, no
5  feedback.
6    Q.   Did anyone ask her for her reasoning
7  of that position?
8    A.   Not expressly, no.  We were looking
9  for their view and that was -- clearly, they
10 were going to go away and think about it, so it
11 had been conveyed to us that they weren't
12 prepared to tell us anything that day.  They
13 wanted to go away and think about it.  So we
14 let them go away to think about it.  We can't
15 force -- force a regulator.  It's like trying
16 to push rope.
17    Q.   Did Kik's U.S. counsel speak at this
18 meeting?
19    A.   She may have chimed in on the
20 conference call a couple of times.  I don't
21 recall any specific part of the conversation
22 that she had.
23    Q.   When you say, "she," are you
24 referring to Nancy Wojtas?
25    A.   Nancy Wojtas, that's right, yes.

                        112

1    **Q.**   And I think you said Karen Ubell was
2    also present?
3       **A.**   Yes.
4       **Q.**   To your knowledge, were they on the
5    phone during the entire meeting?
6       **A.**   The link was open.  If they were in
7    the room, I have no idea.  They could have got
8    up and walked out.
9       **Q.**   At what point did they speak during
10   the meeting?
11      **A.**   I can't recall any specific
12   interventions.
13      **Q.**   Was it during the beginning, the
14   middle, end?  Do you recall how many times they
15   spoke?
16      **A.**   I don't recall.
17      **Q.**   Do you recall anything that Kik's
18   U.S. counsel said during this meeting?
19      **A.**   No.  I'm not sure they did intervene
20   at any point.  If they were on the call, it may
21   have been listening only -- there is nothing in
22   my recollection or my notes that shows they
23   said anything.
24      **Q.**   During the portion of the meeting
25   where you were discussing with Ms. Chaukos the

113

1    Howey test, did Kik's U.S. counsel say anything
2    at that time?
3       **A.**   As I said, I have no recollection of
4    U.S. counsel saying anything during the call,
5    early, late, during.
6       **Q.**   You have no reason to believe that
7    they were not on the call during that portion
8    of the conversation?
9       **A.**   Correct.  I have no reason to
10   believe they would not have been on the call.
11      **Q.**   Did anyone during this meeting
12   express a view as to whether the offering of
13   Kin was a securities offering under U.S. law?
14      **A.**   No.
15      **Q.**   Did the OSC ever express a view --
16      **A.**   No.
17      **Q.**   -- under U.S. law?
18      **A.**   No.  Sorry.
19      **Q.**   Did anyone on any side during this
20   meeting in August of 2017, bring up potentially
21   -- Kik potentially reaching out to the U.S.
22   Securities and Exchange Commission?
23      **A.**   No.
24      **Q.**   Other than the DAO report, was there
25   any mention of the U.S. Securities and Exchange

114

1    Commission during this meeting?
2       **A.**   No.
3       **Q.**   To your knowledge, did anyone,
4    either yourself or Kik's U.S. counsel or Kik
5    itself, ever reach out to the U.S. Securities
6    and Exchange Commission in relation to Kik's
7    offering of Kin?
8            MR. CADIGAN:  Objection.
9    Foundation.
10           You may answer.
11           THE WITNESS:  I can answer it?  I
12   don't have any knowledge of that.  I don't have
13   any knowledge as to whether they did or did not
14   either way.
15           BY MS. D'ALLAIRD:
16      **Q.**   Is it fair to say that at least one
17   of the purposes of this meeting was to discuss
18   with the OSC their views on whether Kik's
19   offering of Kin was an investment contract
20   under Canadian law?
21      **A.**   Yes, that's fair.
22      **Q.**   How did the meeting conclude?
23      **A.**   Pretty much we will get back to you.
24      **Q.**   We will get back to you.  That was
25   stated?

115

1       **A.**   The OSC will get back to us, thank
2    you very much for your time, they will take it,
3    consider it, and we can expect to hear from
4    them.
5       **Q.**   And what specifically were they
6    going to get back to you on, did they say?
7       **A.**   Our submissions, whether they agreed
8    with them or if they had views of what we ought
9    to be doing instead.
10      **Q.**   The submissions you're referring to,
11   that was your submission that the offering of
12   Kin was not a securities offering under
13   Canadian law, right?
14      **A.**   Yes.
15      **Q.**   And if it was, it was exempt from
16   registration.
17      **A.**   Just again, registration, make sure,
18   translate registration.  If it was, there was
19   no dealer registration requirement for the
20   offering for Kik in respect of either the SAFT
21   offering or the Kin offering.  We were not --
22   frankly, that wasn't really a question at
23   issue, because they have a published policy
24   statement where they've given guidance, very
25   clear, saying, startup issuers can raise money

116

1   on their own as long as they have real business
2   that they are doing a business plan.  And
3   that's not a-- and they have a broad exemption
4   for issuers.
5          Issuers don't have to register
6   themselves as dealers to sell their own shares,
7   so long as they are raising money for their
8   business.  And that was clear.  We were just
9   like checking off that box so we weren't really
10  waiting for feedback.  The feedback was almost
11  exclusively around the Kin offering.
12     **Q.**   Whether it was a securities
13  offering?
14     **A.**   Prospectus -- whether it was a
15  prospectus requirement, yeah.
16     **Q.**   Whether it was a prospectus
17  requirement under Canadian law?
18     **A.**   Right, right.
19     **Q.**   Let me ask you this during that
20  meeting.
21          During the August 2017 meeting with
22  the OSC, was there any discussion about Kik
23  potentially not offering Kin in Canada?
24     **A.**   Yes.
25     **Q.**   And who brought that up?

117

1     **A.**   I would have brought it up.
2     **Q.**   Did you bring it up?
3     **A.**   Yeah, I believe so.
4     **Q.**   And walk me through that discussion,
5   please.
6     **A.**   Well, essentially, it was, you know,
7   that we -- I'm not sure -- we had subsequent
8   discussions about it as well.  It may have been
9   done very much in passing at that time.  We did
10  it in more detail later in our dealings with
11  the OSC, but we said, look, in the event --
12  because we wanted a response from them in a
13  timely way and we wanted a positive response in
14  a timely way, and if they decided that they
15  couldn't give us a timely response in a -- or a
16  positive response in a timely way, then we said
17  to them we always have the option of just
18  distributing outside of Canada alone.
19          That probably was as much as I
20  discussed at that point.  It was more of
21  putting a stake and goading them to get back to
22  us fast.  It was really more a matter of -- I
23  wasn't trying to make a position, it was really
24  more like hurry up and get back to us because
25  we have alternatives.

118

1     **Q.**   When you say -- I want to be clear
2   on this.
3          In raising the possibility of Kik
4   not offering Kin in Canada, you were saying
5   that Kik would do that in the event that the
6   OSC didn't get back to Kik in a timely manner
7   as to whether or not the offering was a
8   securities offering?
9     **A.**   That would have been -- would have
10  been -- if we couldn't get -- if we wouldn't
11  get assurance from them that we were good or we
12  had concerns about it or if they proposed --
13  they came back and said it's not -- it is a
14  security -- we view it as a security and we
15  have to do all these things, then we decided we
16  -- you know, say we might distribute it outside
17  Canada and drop Canada entirely.
18     **Q.**   Did you or anyone else state during
19  the meeting that if the OSC were to get back to
20  you and say that they thought that the offering
21  was a securities offering, that Kik would not
22  offer Kin in Canada?
23     **A.**   I didn't say that during that
24  meeting, no.
25     **Q.**   That wasn't discussed at all?

119

1     **A.**   Not -- we said generically, that we
2   have the possibility of proceeding with the
3   offering outside of Canada alone, dropping
4   Canada, but it would have been a really brief
5   passing, it was more a matter of, you know, you
6   know we have that option.
7     **Q.**   Other than what you've described so
8   far about the meeting in August of 2017 with
9   the OSC, can you recall anything else that was
10  said during that meeting, sitting here today?
11     **A.**   No.  I think there were comments
12  from the OSC in how they were interested in
13  being flexible and supporting innovative
14  business, that the LaunchPad was trying to be
15  receptive to issuers doing things in a new way,
16  the new technology, so that their rules had to
17  be adapted, but yet, they had an objective of
18  investor protection but they were indicating
19  they were open and flexible in considering
20  things that would suit the different aspects of
21  new businesses.  That would have been part of
22  -- probably the early part of the meeting.
23     **Q.**   One more question about the
24  discussion relating to Howey and I understand
25  you don't recall a lot about it.  You said you

120

1  did take notes.
2      In your notes, did you reflect
3  anything about the Howey discussion?
4      **A.**  I think I might have written
5  something like Howey old law or something like
6  that, very brief.  Just wrote a comment.
7      **Q.**  Sitting here today, do you recall
8  specifically writing Howey old law in your
9  notes?
10     **A.**  I don't have my notes in front of me
11 so I don't recall.  That would have been --
12 that part of it jumped out at me.  I'm wishing
13 I said Magna Carta is old law, too, but it
14 still applies.  But I didn't make any comment
15 back at the time.  It was just a comment.  It
16 was a matter of discussion immediately after
17 the meeting her comment among us.
18     MR. HOTZ:  Don't reveal discussions
19 with the client after the meeting.  That is
20 privileged, and we are not waiving that
21 privilege.
22     BY MS. D'ALLAIRD:
23     **Q.**  Mr. McKee, I have just handed to you
24 what was previously marked as Exhibit 113.  You
25 can see that marking in a stamp on the very

121

1  last page of this exhibit.
2      Please take a moment to review.
3  It's an e-mail dated August 14, 2017.
4      Let me know when you are ready for
5  my questions.
6      **A.**  Yep.
7      **Q.**  Mr. McKee, do you recognize Exhibit
8  113?
9      **A.**  Yes.
10     **Q.**  Did you receive the e-mail that we
11 see at the top of the chain here on the first
12 page of Exhibit 113?
13     **A.**  Yes, I did.
14     **Q.**  What does this e-mail relate to?
15     **A.**  This is from the meeting organizer
16 arranging the meeting on August 14.
17     **Q.**  The meeting organizer from the OSC?
18     **A.**  From the OSC, Amanda Barone.
19     **Q.**  Amanda Barone.  I just want to walk
20 through a little bit of this e-mail just to
21 confirm who was there.
22     So the e-mail says:  "Good morning,
23 Ross.  As per your e-mail, here are details
24 confirming today's meeting with the OSC
25 LaunchPad team."

122

1      By teleconference, there is Nancy
2  Wojtas, Cooley, LLP, U.S. counsel for Kik, and
3  you said Nancy Wojtas was in fact on the phone.
4      In addition to that, Karen Ubell was
5  also on the phone from Cooley?
6      MR. HOTZ:  Objection.  Asked and
7  answered.
8      BY MS. D'ALLAIRD:
9      **Q.**  You can answer.
10     THE WITNESS:  Yes.
11     BY MS. D'ALLAIRD:
12     **Q.**  And then further down the e-mail:
13 "OSC attendees will include Pat Chaukos."
14     You said that she was there.  Amy
15 Tsai, she was also there.  Neeti Varma, was she
16 present at the meeting?
17     **A.**  I don't recollect.  Probably.  She
18 is from the investment funds branch of the OSC.
19     **Q.**  Do you recall her saying anything
20 during the meeting?
21     **A.**  No.
22     **Q.**  Jonathan Yeung, I think you said
23 that he was also there?
24     **A.**  Yes.
25     **Q.**  Who is he?

123

1      **A.**  He's from the registration branch,
2  dealer registration branch.
3      **Q.**  Did he say anything during the
4  meeting?
5      **A.**  I don't recall.
6      **Q.**  Timothy Baikie is listed under his
7  name, B-A-I-K-I-E, and who is he?
8      **A.**  He is with marketplace regulation
9  from the OSC.  I don't recall him being --
10 participating in the meeting but he may have
11 been part of that at the far end.  I don't
12 think he spoke.
13     **Q.**  And then on behalf of Kik
14 Interactive, you said all these individuals
15 were present, Mr. Livingston, Mr. Heinke, Mr.
16 Philp?  Is it Philip or Philp?
17     **A.**  Philp.
18     **Q.**  P-H-I-L-P, and then yourself.
19     **A.**  Yes.
20     **Q.**  Okay.  Thank you.  I will take that
21 back.
22     After the August 14 meeting at the
23 OSC, what happened after that?  What was your
24 next contact with the OSC in relation to Kik's
25 offering of Kin?

124

1    A.   There was the publication -- there
2  were e-mails back and forth with the OSC during
3  the latter part of August.  There was the
4  publication of the CSA guidance, 45307, which
5  was frankly a disappointment.  The guidance was
6  very skimpy, basically said Pacific Coast Coin
7  Exchange is the law and there's these four
8  prongs and you should consider whether they
9  apply.  That was kind of it.  I said, that's
10  it.
11    So I wrote back to the OSC after the
12  release.  There also had been an exemption
13  application that the OSC granted for a company
14  called Impak, I-M-P-A-K, and in Canada, the
15  Commission was able to grant exemption orders
16  so they had released this one.
17    The OSC had drawn Impak to my
18  attention and I looked at it and I said, well,
19  it is quite different from ours.  In the Impak
20  situation, the value of the tokens is fixed by
21  the company.  Their tokens are redeemable by
22  investors to get money back at a price fixed by
23  the company, so if there is an expectation of
24  profit, it's directly with the company, they
25  are incumbent, and it's a redeemable security

125

1  essentially, and so it wasn't like the Kin
2  situation at all.
3    I said that the notice, the CSA --
4  in my e-mail, I said the notice the CSA
5  published was actually useful for us because
6  they confirmed Pacific Coast Coin Exchange and
7  I reemphasized the parts of Pacific Coast Coin
8  Exchange drawing a distinction between
9  participant specie versus participant margin
10  and said you were equivalent to specie and
11  therefore, Chief Justice said it is not a
12  Securities Act issue and the rest of them said
13  the margins is what we're focused on here.
14    The example they had given -- they
15  gave two limited examples in the CSA notice
16  about uses, one of them was using tokens to
17  play video games.  I said that is a Kin use
18  case for tokens to use that sort of thing.
19    So overall, it didn't affect my --
20  other than my messages overall were still the
21  view, this is -- this doesn't change anything
22  from our point of view.
23    Q.   Your message was that it didn't
24  change anything from your point of view?
25    A.   Yes.

126

1    Q.   Did the OSC express any opinions
2  during that time about your position?
3    A.   No.  We didn't get any opinions from
4  the OSC.
5    Q.   So I want to go back and walk
6  through in detail.
7    You said the next time that you
8  talked to the OSC was sometime later in August
9  through e-mail, I think you said.
10    A.   It was all e-mail communications
11  pretty much.
12    Q.   All e-mail communications after
13  that?
14    A.   Yes.  Up until September and so on.
15  It may have been very brief ones.  I don't
16  recall the specific order of some of them.
17    Q.   Leading up to the Kin offering?
18    A.   Right.
19    MR. CADIGAN:  Actually, again, just
20  for the record, and if you could let her finish the
21  question, and if you could let him finish his
22  answer.  Thank you.
23    BY MS. D'ALLAIRD:
24    Q.   Mr. McKee, I have just handed to you
25  what was previously marked as Exhibit No. 115.

127

1  You can see that on the stamp at the very last
2  page of this exhibit.
3    It is an e-mail chain.  The top
4  e-mail on the very first page of Exhibit 115 is
5  dated August 22, 2017.
6    Please take a moment to review
7  Exhibit 115 and let me know when you are ready
8  for my questions.
9    A.   Okay.  Okay.
10    Q.   Mr. McKee, do you recognize Exhibit
11  115?
12    A.   Yes, I do.
13    Q.   And looking at the very first page
14  of this exhibit, there is an e-mail at the
15  bottom dated August 22, 2017, at 11:38 a.m.
16    Do you see that?
17    A.   Yes, I do.
18    Q.   It appears to be from Ms. Chaukos to
19  you.
20    You received that e-mail?
21    A.   Yes, I did.
22    Q.   And Ms. Chaukos writes:  "Hi, Ross.
23  Can we discuss the article below.  If this is
24  an offering to the public, we would like to
25  discuss what you are providing to investors and

128

1   how you will comply with resale restrictions
2   and other requirements," and she appears to
3   have cut and pasted an article below that.
4        My question is:  What is your
5   understanding of why Ms. Chaukos wrote this
6   initial e-mail in the chain?
7        A.   Well, the second sentence of the
8   paragraph is:  "At our meeting, we understood
9   that it's institutional investors for the
10  initial capital raising," so she appears to
11  be misunderstanding the phases and was conflating
12  the initial capital raise with the SAFT and
13  the public sale and lumping them all together, so
14  that's -- she wrote this article and she was
15  saying -- she seemed to be under the impression
16  we were doing just an institutional-only sale,
17  whereas we had discussed clearly in the letter
18  and in the meeting, we were doing a SAFT sale
19  to accredited investors and the public sale of
20  Kin tokens later, and she seemed to be lumping
21  these all together by that paragraph, so she
22  was pretty confused about how we were offering
23  what.
24       Q.   Your understanding was she was
25  lumping the SAFT portion of the offering and

129

1   security, it's not a distribution of securities
2   and there are no resource restrictions.
3        Q.   So your understanding of her
4   confusion was that she thought there were
5   potentially no resale restrictions as to the
6   SAFT portion of the Kin token offering; is that
7   right?
8        A.   No.  I think she was asking what --
9   it was clear she was mixing the two together,
10  and so she was taking the concept of resource
11  restriction and saying what are you doing about
12  the offering overall.  We were -- I was
13  reemphasizing there were two different
14  offerings and so that the resource restrictions
15  of one weren't necessarily applicable to the
16  other.
17       Q.   Prior to this e-mail, had anyone at
18  the OSC given you any indication that they
19  agreed with your position that the offering of
20  Kin tokens was not a securities offering under
21  Canadian law?
22       A.   No.
23       Q.   If you look at your e-mail response
24  at the top of the page, the first page of
25  Exhibit 115, I am looking at the last paragraph

131

1   the Kin portion of the offering with -- into
2   one based on the article that she cut and
3   pasted at Exhibit 115 to you?
4        A.   She -- her expression, we understood
5   it's institutional investors for the capital
6   raising indicated some confusion to me in her
7   mind.
8        Q.   With respect to resale restrictions
9   and other requirements, what did you understand
10  her to be referring to there?
11       A.   We know what resale restrictions
12  are.  We were talking about -- she's -- because
13  she is not drawing a distinction between the
14  SAFT sale to accredited investors and the
15  public sale later on, she is pushing the two
16  things together, and so what I was at efforts
17  to do was to say, no, there's two different
18  things going on here.
19       Q.   What was your understanding as to
20  what that confusion would mean?
21       A.   Well, there are resale restrictions
22  on distribution to a accredited investors and
23  so there would be resources applicable to
24  those, but if you are distributing or you're
25  selling Kin tokens to buyers and it's not a

130

1   -- the last full paragraph of your response.
2        And you write, towards the end of
3   the second to last sentence:  "Under all the
4   Canadian and U.S. legal tests" -- "not
5   investment contracts under all the Canadian and
6   U.S. legal tests and thus, in this case and use
7   is not a security."
8        What did you mean to convey to Ms.
9   Chaukos in referring to U.S. legal tests?
10       A.   I received a call at this point, I
11  think it's because Pacific Coast Coin refers to
12  U.S. legal tests and has incorporated some of
13  those into Canadian law, so the origin of them
14  are -- as I said in my article, it's similar
15  although not identical.  I wasn't -- we don't
16  need to persuade the OSC about the status under
17  U.S. law.  Just basically, because the tests
18  are similar.
19       It was just generic reasoning what
20  the -- it was a virtual currency-type and was
21  not an investment contract.  Same way I refer
22  to Canadian legal tests, it's not a material
23  legal test.
24       Q.   Pacific Coast Coin, you said it
25  refers to U.S. legal tests?

132

1    A.   Yes.
2    Q.   What U.S. legal test does Pacific
3  Coast Coin refer to?
4    A.   It refers to the Howey case, I'm not
5  sure the exact citations, Hawaii Market
6  Centers, Glen Turner, and I think some other
7  ones.
8    Q.   You can set that aside.
9        (Deposition Exhibit 169 was marked
10  for identification.)
11  BY MS. D'ALLAIRD:
12    Q.   Mr. McKee, I just handed you what
13  has now been exhibit -- what's now been marked
14  as Exhibit No. 169.
15  The first page and top e-mail of that chain is
16  dated August 25, 2017, and it bears the Bates
17  range of SEC-0SC-E-0000061 through 65.
18        Please take a moment to review and
19  let me know when you are ready for my
20  questions.
21    A.   Okay.
22    Q.   Mr. McKee, do you recognize this
23  e-mail chain?
24    A.   I do.
25    Q.   I want to start at the first e-mail

133

1  on the chain that appears on the page that is
2  Bates-stamped ending in 64.  It's a few pages
3  in.
4    A.   Yes.
5    Q.   Did you receive this e-mail at the
6  bottom of this page from Amanda Barone dated
7  August 24, 2017?
8    A.   I did, yes.
9    Q.   And who do you understand her to be
10  referring to with respect to Pat and Amy in the
11  sentence:  "Pat and Amy had asked me to
12  communicate recent media news release and CSA
13  staff notice on cryptocurrency offerings."
14    A.   I understand that to be Pat Chaukos
15  and Amy Tsai.
16    Q.   Do you have an understanding as to
17  why Pat Chaukos and Amy Tsai would have asked
18  Ms. Barone to send this recent media news
19  release and the CSA staff release to you?
20    A.   I don't know as to why Amanda did
21  anything.  At the meeting, they told us there
22  was guidance coming out and we should look for
23  that.
24    Q.   The CSA staff notice in the subject
25  line I see:  "CSA staff notice 46307,

134

1  cryptocurrency offering."
2        Was that the CSA staff notice that
3  was discussed in the meeting, I think you said
4  that, in August of 2017.
5    A.   I assume so.  They didn't give us
6  the name or numbers on the pending CSA guidance
7  so I am guessing this is what they were talking
8  about.
9    Q.   That's the notice that you referred
10  to just a few moments ago when you said that
11  during the summer at some point that notice
12  came out?
13    A.   Yes.
14    Q.   You said you received this e-mail.
15        Did you review this CSA staff notice
16  when you received it?
17    A.   I did.
18    Q.   You can hold onto both of those for
19  now.
20        Mr. McKee, I have just handed to you
21  what was previously marked -- or stamped on the
22  very last page as Exhibit No. 118.
23        Please take -- take a moment to
24  review and let me know when you are ready for
25  my questions.

135

1    A.   Yep, I'm ready.
2    Q.   This is the CSA staff notice
3  referred to in Ms. Barone's e-mail to you at
4  Exhibit 169; is that correct?
5    A.   Yes, it is.
6    Q.   And you said you -- you read this
7  notice.
8        You will see on the first page there
9  is a series of footnotes.
10        If you take a look at Footnote No.
11  4, there is a link to a website that begins
12  with:  "WWW.Investor.gov."
13        Do you recall if you clicked on that
14  link?
15    A.   I don't think I did, no.  I looked
16  and can tell they are not Canadian so I was not
17  really focused on it.
18    Q.   Could you tell where that was --
19    A.   Well, one, the first one is a U.S.
20  one and the second one I think is Singapore.
21    Q.   The one I just read off to you --
22    A.   Investor.gov.  One is mas.gov is
23  Singapore.
24    MR. CADIGAN:  Again --
25    THE WITNESS:  Talking over.  I'm

136

1    sorry.
2         BY MS. D'ALLAIRD:
3         Q.   If you could please turn to the
4    third page of the notice.
5              Under the heading:  "Trades and
6    securities," five paragraphs down, there is a
7    sentence that begins:  "In determining."
8              Do you see that?
9         A.   Which paragraph?  How many
10   paragraphs down?  Five, yes, "in determining
11   whether."
12        Q.   It's the fifth paragraph.
13        A.   Yes.
14        Q.   "In determining whether or not an
15   investment contract exists, businesses should
16   apply the following four-prong test, namely,
17   does the ICO/ITO involve," and then there is
18   four prongs.
19             Is this the Pacific Coast Coin test?
20        A.   Largely, yes.
21        Q.   You say, "largely, yes."
22        A.   It's a simplification, but yes.
23        Q.   Understood.  And these prongs were
24   discussed during the meeting with the OSC in
25   August 14, 2017?

137

1         A.   Overall, yes.
2         Q.   Going back to Exhibit 169.  I just
3    want to keep moving up the chain, so the next
4    e-mail in the chain on that page with the Bates
5    number ending in 64 is from Pat Chaukos to you.
6              Did you receive that e-mail?
7         A.   Yes, I did.
8         Q.   Okay.  And Ms. Chaukos writes:
9    "Please find attached the Impak decision that
10   was published Thursday."
11        A.   Uh-huh.
12        Q.   What was the Impak decision?
13        A.   This is the exemption order that I
14   mentioned before.  It was for a social Impak
15   token based in Quebec, so it was originally a
16   decision that the Quebec regulated -- Quebec
17   AMF, Ontario had issued a parallel exemption
18   order or something like that.
19        Q.   That was exemption from registration
20   as a dealer?
21        A.   Both, it was -- no, it was just
22   registration as a dealer.  They were complying
23   with the offering memorandum exemption, the
24   statutory offering memorandum exemption, so
25   they had an exemption as a dealer on some

138

1    conditions.
2         Q.   Do you have an understanding as to
3    why Ms. Chaukos was sending you the Impak
4    decision?
5         A.   It was the first exemption order
6    granted to any token-related matter whatsoever
7    in Canada so she thought maybe it would be of
8    interest to me but I don't know for sure.
9         Q.   And she writes -- the second or
10   third sentence actually in her e-mail:  "In
11   light of this decision and the ICO notice, we
12   wanted to discuss the Kik offering to the
13   public."
14             Do you have an understanding of what
15   she meant there?
16        A.   Well, the ICO notice, I believe
17   she's actually referring to their
18   cryptocurrency offering, Staff Notice 46307.
19        Q.   That's at Exhibit 118?
20        A.   Right.  So basically given this
21   exemption and the principles of the notice,
22   they wanted to discuss the offering.
23        Q.   And did you have an understanding of
24   what she wanted to discuss with you?
25        A.   No.  The e-mail is all I got.

139

1         Q.   As of this time, had anyone at the
2    OSC communicated to you a position that Kik's
3    planned offering of Kin tokens was not a
4    securities offering under Canadian law?
5         A.   No.
6         Q.   And then just taking a quick look at
7    your response in the e-mail, it's a few pages
8    long.
9              I think we can go back, it starts at
10   the very first page of Exhibit 169 and you sent
11   this e-mail to Ms. Chaukos; is that right?
12        A.   Uh-huh.
13        Q.   And --
14             MR. CADIGAN:  You have to answer
15   audibly.
16             THE WITNESS:  Yes.  Yes.  Right.
17             BY MS. D'ALLAIRD:
18        Q.   You write on Page 3 of the e-mail,
19   the very end of your e-mail actually, three
20   paragraphs up:  "Those are my preliminary
21   thoughts on the Impak offering and
22   interpretation of CSAN 46307."
23             Did I read that correctly?
24        A.   Yes.
25        Q.   Did Ms. Chaukos have a response to

140

1    -- let me back up.
2         So what were you trying to convey in
3    this e-mail?
4    A.   Exactly what the paragraph says. I
5    said these are my views as to the -- whether
6    the Impak exemption decision equated to our
7    situation or didn't, to distinguish it from our
8    situation, and to go over the CSA notice and
9    emphasize the elements of that that were
10   supportive of our position for Kik -- in Kin,
11   and saying, you know, let me know the
12   particulars of -- if the staff views different,
13   so I still don't know whether they view it
14   differently because they haven't got back to me
15   yet.
16        Let me know what your issue is so we
17   can discuss that, because we have been quite
18   specific with -- and I was -- what this didn't
19   show is I actually sent this with yellow
20   highlighting in some of the paragraphs to make
21   it look really easy.  Look, this is the law.
22   If you have issue with what we are saying and
23   looking for feedback so I am seeking --
24   Q.   I'm sorry.
25   A.   So I was seeking feedback from them

141

on our submission.
2         MR. HOTZ:  When you're -- sorry.
3    When you sent this to Ms. Chaukos, you're
4    saying you highlighted in yellow?  That's
5    what your testimony is?
6         THE WITNESS:  Yes.
7         BY MS. D'ALLAIRD:
8    Q.   We don't see that in Exhibit 169.
9         Do you recall which portions you
10   highlighted in this e-mail to Ms. Chaukos?
11   A.   I can't recall exactly but it would
12   have been the parts, you know, the -- like, for
13   example, the Chief Justice on the top of the
14   second page, the end of the first paragraph:
15   "Spot purchases are clearly outside the
16   Securities Act," I highlighted that one for
17   sure.
18   Q.   Anything else?
19   A.   Part of just the grant period as
20   well.  I think under investment contract:  "If
21   Pacific does not properly invest the pool
22   deposit, the purchaser will obtain no return on
23   the investment regardless of the prevailing
24   value of silver."
25        There may have been other -- a few

142

other sections.  I can't recall.
2    Q.   What position were you trying to
3    convey as to Impak?  What was your position on
4    the Impak decision?
5    A.   That it was not a precedent for us
6    to, you know, say, oh, we should get the same
7    exemption that they have because we were
8    fundamentally different.  Then they said, they
9    were redeemable tokens at a value fixed by the
10   issuer and that there was no other market for
11   them, there's no alternate value.  Things could
12   fluctuate so it was more clearly obviously a
13   security, and quite likely so, but that wasn't
14   our situation.  If you are trying to equate
15   Impak to Kik, it's not the same.
16   Q.   And then what was your position as
17   to the CSA notice?
18   A.   That it was overall helpful to us
19   and that it confirmed Pacific Coast as a
20   leading authority and these statements of
21   Pacific Coast that I thought were helpful for
22   our part of it and that the examples, the two
23   examples they gave were also helpful, one was
24   using it to play video games and at the other
25   end of the stream, they said an individual

143

purchases coins whose value coins, tokens whose
2    value was tied to the future profits or success
3    of the business and in this case, they opined
4    that future gain is not tied to future profits
5    of success of Kin Interactive.  People don't
6    have -- it doesn't have the market fluctuation
7    I guess compared to a national currency and
8    foreign exchange.
9         MS. D'ALLAIRD:  Should we take a
10   break.  We can go off the record now.
11        THE VIDEOGRAPHER:  Going off the
12   record.  The time is 12:04.
13        (A short recess was taken.)
14        THE VIDEOGRAPHER:  Going back on the
15   record.  The time is 13:18.
16        MS. D'ALLAIRD:  Okay.  We are back
17   on the record.
18        BY MS. D'ALLAIRD:
19   Q.   Mr. McKee, I have just handed to you
20   what was previously marked as Exhibit 112 as
21   you can see from the stamp that appears on the
22   very last page of this document.
23        It is an e-mail chain, on the very
24   first page, the top e-mail is dated August 3,
25   2017.

144

1      Please take a moment to review and
2  let me know when you are ready for my
3  questions.
4      **A.**   Yep, okay.
5      **Q.**   Mr. McKee, do you recognize this
6  e-mail chain?
7      **A.**   I do, yes.
8      **Q.**   And taking a look at -- I think it's
9  the first e-mail in the chain on the second
10 page of Exhibit 112, the page with the Bates
11 stamp ending in 2098.
12     There is an e-mail at the top of
13 that page on August 3, 2017, at 10:39 a.m.,
14 Ross McKee wrote.
15     Do you see that?
16     **A.**   Yes.
17     **Q.**   Did you send this e-mail?
18     **A.**   Yes, I did.
19     **Q.**   Did you -- it doesn't show there,
20 but did you send this to Ms. Chaukos?
21     We see the next e-mail in the chain
22 is from Pat Chaukos to Ross McKee.
23     Is it reasonable to infer that you
24 sent this e-mail to Ms. Chaukos?
25     **A.**   I believe I -- yes, I sent it to

145

1  her.
2      **Q.**   I just want to take a look at the
3  last paragraph of this e-mail beginning with
4  the sentence: "On the other hand."
5      You write: "On the other hand, if
6  regulatory indications aren't favorable, Kik
7  would proceed on the token distribution solely
8  outside of Canada to exclude Canadian token
9  purchasers pursuant to Interpretation Note 1."
10     Do you see that?
11     **A.**   Yes, I do.
12     **Q.**   And what did you mean to convey to
13 Ms. Chaukos by this sentence?  What did you
14 mean by "regulatory indications are
15 unfavorable" -- "if regulatory indications are
16 unfavorable?"
17     **A.**   Pretty much what it says.  I mean,
18 this was subsequent to the letter that I had
19 sent to them.  We hadn't had feedback yet from
20 the OSC.  We were seeking feedback.  So I said,
21 you know, if we can't get favorable feedback,
22 then we can proceed with this.
23     **Q.**   Would unfavorable feedback also
24 include the OSC taking the position that Kik's
25 offering of Ken was a securities offering under

146

1  Canadian law?
2      **A.**   Yes, it could have, yes.
3      **Q.**   I will take that back.  Thank you.
4      (Deposition Exhibit 170 was marked
5  for identification.)
6      BY MS. D'ALLAIRD:
7      **Q.**   Mr. McKee, I just handed to you --
8  I've just handed to you what has now been
9  marked Exhibit No. 170.  It's an e-mail chain.
10     On the top e-mail on the first page
11 is dated September 5, 2017, and this e-mail
12 bears a Bates range of SEC-OSC-E-0000066
13 through 68.
14     Please take a moment to review and
15 let me know when you are ready for my
16 questions.
17     **A.**   Yes.
18     **Q.**   Do you recognize this e-mail chain
19 in Exhibit 170, Mr. McKee?
20     **A.**   Yes, I do.
21     **Q.**   Taking a look at the very first
22 e-mail on the chain that appears on the page
23 Bates-stamped 67.
24     At the bottom of that page, there is
25 an e-mail.  It appears to be from you to Ms.

147

1  Chaukos.
2      Do you see that?
3      **A.**   Yes, I see it.
4      **Q.**   Did you send that e-mail?
5      **A.**   Yes, I did.
6      **Q.**   Taking a look at the last sentence
7  in the first paragraph: "We'd like to get a
8  firmer view from the OSC based upon our
9  submissions to date to avoid surprises."
10     What was your understanding of the
11 OSC's view of Kik's planned offering of Ken as
12 of the date of this e-mail?
13     **A.**   I did not have a view from the OSC.
14 I had no response from the OSC about their
15 view.  We sent in submissions and hadn't had my
16 replies from them giving us responses to our
17 submissions, so I was still attempting to get
18 that.
19     **Q.**   So when you wrote:  "Firm review,"
20 you were referring to --
21     **A.**   Well, the review is one thing.
22 We're not sure where we are I think was the
23 last we heard.
24     **Q.**   So I think you've implied it, but
25 you were reaching out --why did you write this

148

1  e-mail to Ms. Chaukos?
2      A.   As the last sentence of the first
3  paragraph says, "to avoid surprises."
4      Q.   Meaning what?
5      A.   What's the OSC's view here.  Are we
6  set to go?  Can we please get some feedback.  I
7  had virtually zero feedback from the OSC, just
8  by attempts, we'd ask questions and we'd send
9  submissions.  They did not receive and did not
10 send.
11     Q.   Looking up at this chain, the next
12 e-mail appears to be from Pat Chaukos to you,
13 Tuesday, September 5, 2017, at 5:10 p.m.
14          Do you see that?
15     A.   Yes.
16     Q.   She writes:  "Hi, Ross.  Just got
17 out of meetings.  Are you available now."
18          Do you see that?
19     A.   Yes, I do.
20     Q.   Did you speak with Ms. Chaukos at
21 that point?
22     A.   Yes.  I telephoned her and -- or she
23 telephoned me, I can't remember specifically,
24 but we had a telephone conversation.
25     Q.   Okay.  And was it just you and Ms.

149

1  Chaukos on the phone?
2      A.   As far as I know, yes.
3      Q.   You didn't include anyone else on
4  the call --
5      A.   I didn't include anyone else.
6      Q.   -- with you?
7      A.   There was no one else included on my
8  call.
9      Q.   About how long was the call?
10     A.   It was brief, maybe five, ten
11 minutes tops.
12     Q.   And what was discussed?
13     A.   She told me then that the OSC felt
14 they did not agree with our submission that it
15 was not a security.  I asked what about my
16 submissions in the Pacific Coast Coin Exchange,
17 the detailed submissions I sent in and the
18 arguments I provided.
19          She said staff had not yet had an
20 opportunity to complete their review of my
21 submissions.  I was somewhat dismayed by that
22 and expressed my dismay that they were coming
23 to this view that they did not agree with our
24 position, without having read our position or
25 completed their analysis of this, so we had

150

1  some discussions.
2          She said that their review, she said
3  -- she felt that there was a potential for
4  someone losing money in this, and that their
5  overwhelming purpose was investor protection,
6  and on that basis that -- they felt that they
7  could not agree with not a security.
8          She said that they would be open to
9  exemptive relief along the lines of Impak.  I
10 asked about timing of that and she said that it
11 would not be available by September the 12th,
12 which is when we told them the launch was
13 planned for.  If it was exactly the same as
14 Impak and the exact same terms, it would be
15 relatively quick through -- what is called the
16 CSA sandbox which is their committee for
17 exemptive reviews across Canada but, even then,
18 not by September 12.  Not a matter of a few
19 days, it would be weeks, and if there was any
20 difference from Impak at all, then it would be
21 treated as a novel application and take that
22 much longer.
23          So I said, you know, and also, she
24 said that -- in the discussion about why they
25 were coming to this view or what they were

151

1  doing, it was sort of a general sense of, well,
2  as you know, we have a general public interest
3  responsibility, so it was sort of a general
4  view from essentially -- she said -- and at
5  that point, I said, well, then I think we may
6  be having to instead, this would be the
7  unfavorable thing we were talking about, and so
8  we may have to proceed outside of Canada and
9  drop Canada, but we'll -- I will discuss it
10 with my client and see what they have to say.
11     Q.   I want to clarify a couple of
12 things.
13          You began by saying that Ms. Chaukos
14 expressed a view that the OSC felt that they
15 did not agree with Kik's position that the
16 offering of Kin was not a security?
17     A.   Correct.
18     Q.   Do you recall specifically what she
19 said in that regard?
20     A.   I think it was exactly that way.  It
21 wasn't expressed as -- it wasn't expressed as,
22 you know, it is a security, and we do not agree
23 with your position that it is not a security.
24     Q.   And then you said that you asked her
25 about the staff's -- OSC's staff's review of

152

1  subsequent submissions and those -- I just have
2  a moment here.
3          Are those the e-mails that we were
4  discussing a little earlier today?
5      A.   Those e-mails, the letters, you
6  know, the whole -- the whole basket of all the
7  submissions we had done.  Well, why.  What's
8  the basis for this, and she said they hadn't
9  completed their analysis and basically weren't
10 engaging.
11     Q.   I'm just going to hand back to you
12 Exhibit 169 and 115.
13         Are those the submissions you were
14 referring to with respect to subsequent
15 submissions to Ms. Chaukos for OSC staff to
16 review?
17     A.   Yes.  The -- my e-mail of August 22
18 to the security, my e-mail of August 25 with
19 more detailed and discussion of case law in
20 particular, and Impak in particular, and then
21 my -- the overall letter as well.
22     Q.   The letter from July 25?
23     A.   The discussion and the meeting as
24 well.
25         MR. HOTZ:  Sorry.  You talked over

153

1  each other.  The letter from July 25?
2          THE WITNESS:  The letter from July
3  25 from me to the OSC and then the submissions
4  we had made during the course of the meeting on
5  August 14 as well, so the whole range of our
6  submissions didn't seem to be addressed at all.
7          BY MS. D'ALLAIRD:
8      Q.   Thank you.  I can take those back.
9          And so with respect to those
10 subsequent submissions in Exhibit 169 and 115,
11 I think you testified that Ms. Chaukos said
12 that the staff, the OSC staff had not completed
13 their review of those submissions?
14     A.   Correct.
15     Q.   Is that correct?
16     A.   Their analysis was the word she'd
17 used.
18     Q.   That was my next question to you.
19         Do you recall specifically what she
20 said in that regard?
21     A.   The OSC staff were -- I can't
22 remember if she said "we" or the "OSC staff,"
23 but I think she said the OSC staff have not
24 completed their analysis of our submissions.
25     Q.   Did she give any indication to you

154

1  if she had read those submissions at Exhibit
2  115 and 169?
3      A.   It was implicit.  She didn't
4  specifically mention whether she did or didn't.
5      Q.   Did she express any view to you
6  about those submissions, any view on her part,
7  on Ms. Chaukos's part?
8      A.   All she said was that she felt there
9  was a risk of loss for investors and their
10 primary focus was investor protection and that
11 they did not need to come to a view for certain
12 on this, because of their public interest
13 powers.  She didn't say powers.  Responsibility
14 was the word she used.
15     Q.   I think you said at some point in
16 the call, she said then on the basis of all
17 that, they just could not agree that the
18 offering of Kin, the planned offering of Kin
19 was not a security?
20     A.   That was a lead-in before the
21 reasons.  She told me that it was not a
22 security.  I said, okay, why.  And then I said
23 what about my submissions for Pacific Coast
24 Coin Exchange in particular, because I rushed
25 it through.  The notice came out in a day and I

155

1  had submissions in within 24 hours.  I would
2  pull submissions together in 24 hours and they
3  couldn't review them and come to a conclusion
4  within -- what's this, like, two weeks later,
5  so I was -- anyway.
6          So -- and then the subsequent reason
7  she gave about risk of loss and investor
8  protection were after she communicated their
9  view.
10     Q.   Did she say anything more specific
11 about her concern about risk of loss to
12 investors?
13     A.   Just that they saw there was a risk
14 of loss.
15     Q.   Do you recall anything else
16 discussed during this phone call?
17     A.   No.  Risk of loss, investor
18 protection, no need to come to a definitive
19 view -- definitive loaded here.
20         And then I said we would consider
21 the alternative of dropping the Canadian
22 offering and seeking it outside of Canada.
23     Q.   Did Ms. Chaukos specifically use the
24 word "definitive" during this phone call?
25     A.   No.

156

1    Q.   How did the phone call end?
2    A.   I said I would convey this to my
3 client and we will see what they are going to
4 do.
5    Q.   Going back to Exhibit No. 170.
6    A.   Yep.
7    Q.   So then moving up to the next e-mail
8 in the chain that begins on the very first page
9 of Exhibit 170, the e-mail appears to be from
10 you to Ms. Chaukos on September 5?
11   A.   Yes.
12   Q.   Is this e-mail subsequent to your
13 phone call with Ms. Chaukos?
14   A.   Yes, it is.
15   Q.   And why did you write this e-mail?
16   A.   Well, I'm not sure the "why" part of
17 it, but what I was getting at, because there
18 had been discussion as I mentioned about the
19 exemption alternative and -- but the timing of
20 that was impractical, so I was trying to strike
21 a middle ground, the Ontario Securities
22 Commission LaunchPad was advertised as being
23 flexible, fast.  They have a rocket ship as
24 their logo.
25        And I have done dozens of exemption

157

1 applications that take months or even years so
2 I knew that wasn't practical and so I was
3 basically saying, you know, how flexible are
4 you going to be.  We have, you know, the facts
5 are that the median purchase registration in
6 Canada is only $2,000 so it's little small
7 amounts going in.
8        In Impak, the -- they had different
9 conditions depending on the level of investment
10 and for people who were going to invest just
11 $22000 but not put in very much money, there
12 was no obligation for them to be accredited
13 investors or even eligible investors which is a
14 defined term in the rules for a lesser amount
15 of accredited investors particularly used in
16 the offering and random exemption.
17        So it says, look, it appears we have
18 a small -- investors investing a small amount
19 of money.  This was primarily outside of
20 Canada.  I said less than 5 percent in Canada.
21 You know, we are not a bad boy.  This is not
22 some vaporware potential thing, and I said,
23 look, I recognize there's a spectrum and I said
24 there is at least a reasonable interpretation
25 as I have been submitting for weeks now that --

158

1    Q.   You are reading from the -- I'm
2 sorry, you're reading from the --
3    A.   I am pointing to the word "echoing,"
4 where I said there is at least a reasonable
5 interpretation as I highlighted the application
6 of securities law may not be entirely clear in
7 this area.
8        MR. CADIGAN:  Can you slow down.
9        THE WITNESS:  Sorry.  I'm just
10 quoting from the --
11        MR. HOTZ:  You just got to slow down
12 for the court reporter.
13        THE WITNESS:  I will read:  "May not
14 be entirely clear in this case and we must
15 admit that guidance has been thin."
16        So what I was making the point here
17 is that this is not a clear-cut case.  We have
18 been making submissions as to lots of reasons
19 why this is not a security at all, and the
20 staff seemed to be well -- one part being on
21 the fence and the other part saying they come
22 to a view that they don't agree with our
23 submissions, saying, look, can we do a
24 compromise which would be -- because the
25 offering is so small in these particular

159

1 circumstances, are you prepared to take an
2 informal no-action position as long as it's,
3 you know, $2,000 max per person, that's okay.
4        BY MS. D'ALLAIRD:
5    Q.   And you are referring to, with no
6 action, the paragraph under proposal --
7    A.   Yes.
8    Q.   -- in your e-mail?
9    A.   Yep.
10   Q.   With the OS -- part of the sentence
11 there:  "Would the OSC consider taking an
12 inform no-action position."
13   A.   Correct.  The idea was, the median
14 purchase registration was $2,000.  If we put a
15 firm cap on that and say -- because median is
16 just, you know, mathematical median, if we
17 limit it to $2,000, no one in Canada can invest
18 no more than $2,000 period, how about letting
19 this one go.
20   Q.   And then you write about the no
21 Canadians alternative?
22   A.   Right.
23   Q.   You write underneath there, the
24 first sentence:  "If this is not acceptable,
25 then as I mentioned, if it faces any

160

1  possibility of a threat of future OSC
2  enforcement action for selling to Ontario
3  investors, Kik would prevent Canadian
4  purchasers (currently 612) from participating
5  in the offering."
6       You wrote that?
7    A.  Yes.
8    Q.  Had Ms. Chaukos described the
9  potential for future OSC enforcement action for
10 selling to Ontario investors during the phone
11 call on the September 5th?
12    A.  It was implicit in a sense because
13 if we were -- if they are saying we think -- we
14 don't agree with your position it's not a
15 security and we say, well, we're going to go
16 ahead anyway, then, you know, I think the
17 reasonable expectation is the OSC might
18 consider to do something.
19       I also said there was a possibility,
20 not probability, but that's my job is to avoid
21 possibility.
22    Q.  Did Ms. Chaukos ever reply to your
23 proposal in Exhibit 170?
24    A.  I recall she replied in a brief
25 e-mail saying we can't do no actions which

161

1  wasn't -- put it this way, so -- I just -- she
2  responded saying we just can't do no actions
3  and that's why I didn't -- that's why used the
4  word informal because I knew we don't do no
5  actions but I was asking what their position
6  might be, but she responded to the negative.
7    Q.  Okay.  And I can take back Exhibit
8  170.  Thank you.
9       Mr. McKee, I've just handed to you
10 what was previously marked as Exhibit No. 124
11 which is shown by a stamp on the last page of
12 this document.  It is an e-mail chain with the
13 top e-mail on the chain on the first page of
14 Exhibit 124 is dated September 7, 2017.
15      Please take a moment to review this
16 document and let me know when you are ready for
17 my questions.
18    A.  Okay.
19    Q.  Mr. McKee, do you recognize the
20 e-mail chain on Exhibit 124?
21    A.  Yes, I do.
22    Q.  If you take a look at the page --
23 about three pages in, the page ending in Bates
24 No. 85, do you see that at the very bottom?
25      There is an e-mail from Pat Chaukos

162

1  to you dated September 6, 2017.  "Good morning,
2  Ross."
3       Do you see that?  Then there is an
4  e-mail following that.  It goes on to the next
5  page.
6    A.  Yes.
7    Q.  Do you see that?
8    A.  Yes, I see it.
9    Q.  Did you receive that e-mail?
10   A.  Yes, I did.
11   Q.  It looks like, if you turn to the
12 next page, this is her e-mail response to your
13 e-mail that we just saw on the previous Exhibit
14 170 where you set out another idea proposal; is
15 that right?
16   A.  Yes.  This is the thing I was
17 referring to which said we can't provide no
18 action letters and shot down the proposal.
19   Q.  Why can't the OSC provide no action
20 letters?
21   A.  Well, it kind of gives my advice as
22 a Canadian lawyer.
23      MR. HOTZ:  Hold on.  We are not
24 asking for the legal advice to the client on
25 this.  I think it's a factual question.

163

1       If you can answer as a factual
2  question why the OSC cannot provide a no action
3  letter, do so without revealing legal advice to
4  the client.
5       THE WITNESS:  Sure.  The Canadian
6  security regulators have in place a system of
7  exemption applications, where even if the law
8  applies, the commission has the ability to
9  waive any aspect of the law or certain aspects
10 depending on particular sections of it, either
11 on conditions or not, but those are specific to
12 the applicant for a particular fact situation
13 and they don't have a formal procedure by which
14 they can say certain -- we do certain things,
15 certain aspects of the law will not apply to
16 you, they can be relied upon others generally.
17      They have administrative discretion
18 at all times, but we don't have any formal no
19 action type of system the way the SEC does, for
20 example, as I understand it.
21      BY MS. D'ALLAIRD:
22   Q.  Then she writes in the next sentence
23 -- Ms. Chaukos:  "To confirm, did you mean
24 exemptive relief."
25      Do you see that?

164

1    A.   Yes.  I see that sentence.
2    Q.   The next e-mail on the chain, also
3  dated September 6, 2017, that is on -- that
4  begins on Page 84, Bates Stamp 84.
5        Do you see that?
6    A.   Yes, I do.
7    Q.   And you write that: "Kik is
8  continuing to consider its alternatives," and
9  then moving up the chain to the first page of
10 Exhibit 124, there is an e-mail from Pat
11 Chaukos to you, very bottom of the page, also
12 dated September 6.
13       She writes in the third sentence of
14 that e-mail: "In light of the tight timeline
15 regarding the public sale, please let us know
16 when you expect to hear back from your client
17 on the alternative they would like to take."
18       The date of this e-mail is September
19 6, 2017.  Is that -- that's about a week before
20 the scheduled September 12, 2017, launch date
21 for the Kin token offering, correct?
22   A.   I don't recall the specific date of
23 the launch but it is about that time, yes.
24   Q.   And then you reply at the very top
25 of the page of Exhibit 124:  "Pat, Kik has

165

1  decided in the circumstances to proceed without
2  Canada, so for launch" purchasers -- "purchases
3  in Canada will be restricted as I outlined, all
4  of 72-503 CP principles."
5        Did I read that accurately?
6    A.   Yes.  Though you said it's a reply.
7  My original reply is earlier on September the
8  6th.  I said much appreciated.  I will let you
9  know as soon as I can," so this was a follow
10 up.
11   Q.   Follow up.  Thank you for
12 clarifying.
13       Did Kik ultimately offer Kin in
14 Canada?
15   A.   They did not.  They sold it to some
16 employees in Canada pursuant to an employee
17 exemption, but not to the general public, no.
18   Q.   And did Kik not offer Kin to the
19 public in Canada on the basis of the OSC's
20 position with respect to the Kin offering?
21       MR. CADIGAN:  Objection.  Instruct
22 you not to answer.
23       MS. D'ALLAIRD:  And that is on the
24 basis of privilege?
25       MR. CADIGAN:  Yes.

166

1        BY MS. D'ALLAIRD:
2    Q.   Are you going to comply with Kik's
3  counsel's instruction?
4    A.   Yes, I am obliged to comply with
5  Kik's counsel's instructions.  It's my
6  professional responsibility as their lawyer.
7    Q.   I can take that back.  Thank you.
8        After this last communication with
9  Ms. Chaukos where you said that Kik was going
10 to proceed without offering Kin in Canada, were
11 there any subsequent communications with the
12 OSC about Kik's offering of Kin?
13   A.   Yes.  There was an e-mail from the
14 -- from Pat Chaukos at the OSC after the launch
15 was announced saying they had heard this in the
16 media or it may have been actually subsequent
17 to my e-mail that you just provided to me where
18 she replied saying, yes, we were already aware
19 of this from media reports and we were
20 disappointed.
21   Q.   She was already aware that Kik had
22 decided not to offer Kin in Canada?
23   A.   Right, yes.
24   Q.   Had you seen media reports showing
25 that?

167

1    A.   Not before I sent that e-mail, no.
2    Q.   How was it announced in the media,
3  do you know?
4    A.   The company published -- or Ted
5  Livingston, the CEO published a post on median.
6    Q.   Did you read that post?
7    A.   Eventually I read it, yes.
8    Q.   When did you first read it?
9    A.   I can't recall.  Would have been in
10 that day or later the next day.  I'm not sure.
11   Q.   Mr. McKee, I've just handed to you
12 what was previously marked as Exhibit No. 120
13 as shown by the stamp on the last page of this
14 document.  It is a letter October 19, 2017.
15       Please take a moment to review and
16 let me know when you are ready for my
17 questions.
18   A.   Okay.
19   Q.   Mr. McKee, do you recognize Exhibit
20 120?
21   A.   I do.
22   Q.   What is it?
23   A.   It's a letter from Huston Loke who
24 is the -- at the time, was director of
25 corporate finance of the OSC to me asking

168

1  questions about the reliance by Kik on the
2  distribution owed to Ontario for the
3  distribution.
4      Q.   The distribution of what?
5      A.   Kin tokens, the public sale.
6      Q.   Taking a look at this letter -- I
7  should ask you.
8          You received this letter?
9      A.   Yes, I did.
10     Q.   You read it?
11     A.   I did.
12     Q.   Taking a look at the first paragraph
13 of the letter about one sentence in, the
14 sentence beginning with:  "I am confirming."
15         Do you see that?
16     A.   Yes.
17     Q.   I'm just going to read it into the
18 record.
19         "I am confirming that OSC staff's
20 position is that the ITD constitutes an
21 offering of securities."
22         I will just stop there a moment.
23         Do you have an understanding of what
24 Mr. Loke meant by ITD?
25     A.   It's a defined term in the letter,

169

1  the paragraph before, the initial token
2  distribution.
3      Q.   And that would be the Kik's offering
4  of Kin to the public?
5      A.   Yes.
6      Q.   And then reading on:  "This position
7  was previously communicated to you in a meeting
8  with OSC staff on August 14, 2017, and in
9  discussions on August 21, 2017, following the
10 public announcement of the offering."
11         Is that an accurate statement?
12         MR. HOTZ:  Object to the form of the
13 question.
14         MR. CADIGAN:  Same.
15         MR. HOTZ:  You mean that the
16 statement is as read -- as you read it is
17 accurate or that the statement -- the fact of
18 the statement is an accurate statement of the
19 facts according to this witness's memory?
20         BY MS. D'ALLAIRD:
21     Q.   I will ask you both questions.  Did
22 I read --
23         MR. HOTZ:  Objection.  Compound.  Do
24 you want to do one at a time?
25         MS. D'ALLAIRD:  I'm going to do one

170

1  at a time.  Thank you.
2          BY MS. D'ALLAIRD:
3      Q.   Did I read that sentence accurately,
4  Mr. McKee?
5      A.   Yes.  That's what it says in the
6  letter.
7      Q.   And is that sentence itself an
8  accurate statement?
9      A.   No.
10     Q.   Okay.  And why not?
11     A.   Because the position -- this letter
12 was the first time the OSC staff confirmed that
13 this distribution constituted offerings of
14 securities writing.  The last period of time
15 was orally on September 5.
16         No such position was communicated in
17 the meeting on August 14.  There was no
18 discussion on August 21 at all.  There was one
19 I believe on August 22 where she said she will
20 get back to you in the public -- Pat Chaukos
21 told me I'll get back to you in the public
22 sale.
23     Q.   Mr. McKee, had OSC staff conveyed a
24 position to you that Kik's planned public
25 offering of Kin was an offering of securities

171

1  prior to Kik initiating the offering?
2      A.   On August 5, by telephone from Pat
3  Chaukos.
4          MR. CADIGAN:  I'm sorry.
5          MR. HOTZ:  Objection.
6          MR. CADIGAN:  Did you say August 5?
7          THE WITNESS:  September, sorry.
8  September 5.  In the telephone call from Pat
9  Chaukos on September the 5th, that's when they
10 communicated that for the first time.  Even
11 then, it was, like, they said that they cannot
12 agree with our position, that it is not a
13 security.
14         BY MS. D'ALLAIRD:
15     Q.   Okay.  I can take that back.  Thank
16 you.
17         Mr. McKee, I have just handed to you
18 what was previously marked as Exhibit 58 in
19 this litigation.  I will note that it was
20 previously marked as Exhibit 186 in the
21 investigation leading to this action.
22         It is a letter dated November 2,
23 2017.
24         Please take a moment to review and
25 let me know when you are ready for my

172

1    questions.
2        A.   I'm familiar with this letter.
3        Q.   You ready?
4        A.   Yes.
5        Q.   Mr. McKee, do you recognize Exhibit
6    58?
7        A.   Yes, I do.
8        Q.   And what is it?
9        A.   It's a letter from me to Huston Loke
10   responding to his letter of October 19
11   providing him with the answers he sought in
12   that letter.
13       Q.   You wrote this letter?
14       A.   I did.
15       Q.   Turning to Page 8 of the letter that
16   ends in Bates Stamp 12.
17       A.   Yes.
18       Q.   Is that your signature that appears
19   at the end of the letter?
20       A.   Yes, it is.
21       Q.   You said this is your response to
22   Mr. Loke's letter to you that we just looked at
23   Exhibit 120.  I can show that to you again.
24       A.   Yes.  October 19, yes.
25       Q.   And, Mr. McKee, when you wrote this

173

1    letter that we see at Exhibit 58, did the
2    letter accurately reflect your personal
3    knowledge at that time as of November 2, 2017?
4        A.   Yes.
5        Q.   And are the statements in your
6    letter accurate?
7        A.   Yes, to the best of my knowledge.
8        Q.   Taking a look at the letter on the
9    first page, in the second paragraph, the first
10   sentence reads:  "We acknowledge your
11   expression of OSC's staff's current position
12   that the IDT constituted an offering of
13   securities."
14            Do you see that?
15       A.   Yes.
16       Q.   You wrote that?
17       A.   Yes, I typed that.
18       Q.   And then in the next paragraph, you
19   write:  "The meeting on August 14 was, in fact,
20   inconclusive.  Notes indicate that the closest
21   the OSC staff president came to expressing a
22   position was for Pat Chaukos to say, 'I am not
23   sure we are where you are.'"
24            Do you see that?
25            And this statement -- was this

174

1    statement based on your notes, you referred to
2    notes, indicate?
3        A.   Based on my recollection and my
4    notes.
5        Q.   Your notes from the August 14, 2017
6    meeting?
7        A.   Yes.
8        Q.   And then you go on to say or to
9    write rather:  "There was no discussion on
10   August 21.  There was an exchange of e-mails
11   between myself and Ms. Chaukos on August 22
12   asking about a National Post article and about
13   money services business registrations."
14            Do you see that?
15            And then the following paragraph
16   that begins:  "In fact."
17            Do you see that?
18       A.   Yes.
19       Q.   I'm just going to read that next
20   sentence into the record.
21            "In fact, the first time that the
22   OSC staff definitively communicated a position
23   that the ITD constituted an offering of
24   securities was in the telephone call to me from
25   Ms. Chaukos on September 5 shortly before the

175

1    scheduled launch date."
2            Did I read that accurately?
3        A.   Yes, you did.
4        Q.   And is that statement accurate?
5        A.   I regret using the word
6    "definitively," which has been quoted I think
7    by the SEC in my original complaint.  I don't
8    think definitive is quite accurate.  What it
9    should have said was "finally told us anything
10   at all," and what I was trying to say is this
11   is the first time they expressed a position
12   that they did not agree with the security.
13            What I was trying to say was that he
14   had told us, that they had told us for sure it
15   was a security on August 14 and August 21st.  I
16   said that is not true, by the way, and it was
17   left vague on the 14th and 22nd.  We will get
18   back to you, we will get back to you, and then
19   finally, it wasn't until the 5th that we
20   finally heard from them that they did not agree
21   it was not a security so that was an accurate
22   statement of -- the first time we heard that
23   position.  The word "definitive" was not
24   accurate.
25       Q.   So your testimony is the word

176

1  "definitively" is not an accurate -- is not
2  accurate?
3      A.   Right.
4      Q.   You shouldn't have used the word
5  "definitively."
6      A.   Right.
7      Q.   If you removed "definitively" from
8  that sentence, is it an accurate statement?
9      A.   Yes.
10     Q.   Mr. McKee, is it accurate to say
11 that the OSC had communicated to you a position
12 that the Kin offering to the public constituted
13 an offering of securities prior to the
14 scheduled launch date of the Kin token
15 offering?
16     A.   Yes.
17     Q.   And, Mr. McKee, is it accurate to
18 state that Ms. Chaukos communicated that to you
19 on September 5, 2017?
20     A.   I'm sorry, "that." Can you refresh
21 me what you mean by "that?"
22     Q.   Is it accurate to say that Mr.
23 Chaukos communicated to you on September 5,
24 2017, that the OSC was taking a position that
25 the Kin offering to the public constituted an

177

1  offering of securities?
2      A.   Yes, overall, she expressed it as
3  saying they did not agree with our submission
4  that it was not a security, but that amounts to
5  the same thing. I am just trying to be
6  accurate in what she said.
7      Q.   So is that intention that with what
8  you do -- with what you wrote here at Exhibit
9  58 in your letter dated September 22, 2017?
10         MR. HOTZ:  Objection.
11         MR. CADIGAN:  Objection. Could you
12 have the question read back. I'm sorry. Can
13 you repeat the question.
14         MS. D'ALLAIRD:  I can rephrase.
15         BY MS. D'ALLAIRD:
16     Q.   So, Mr. McKee, so I asked you the
17 question:  Is it accurate to say that Ms.
18 Chaukos communicated to you on September 5,
19 2017, that the Kin offering to the public
20 constituted an offering of securities, and your
21 answer:  Yes, overall, she expressed it, saying
22 they did not agree with our submission, it was
23 not a security but that's not the same thing.
24 I am trying to be accurate in what she said.
25         So my question is:  Is that answer

178

1  the same as what you wrote here in your letter
2  dated November 2, 2017, Exhibit 58, when you
3  write:  "In fact, the first time that the OSC
4  staff definitively communicated the position
5  that the ITD constituted an offering of
6  securities was in the telephone call from Ms.
7  Chaukos on September 5, shortly before the
8  scheduled launch date?
9          MR. CADIGAN:  Objection.
10         THE WITNESS:  Aside from the word
11 "definitively," as I indicated before, yes.
12 And when I said -- there may be a mistake in
13 your transcript. I said it amounts to the same
14 thing. I didn't say it is not the same thing.
15         BY MS. D'ALLAIRD:
16     Q.   Okay. Your testimony is that,
17 sitting here today, the word "definitively" is
18 not accurate in your November 2, 2017 letter in
19 Exhibit 58; is that correct?
20     A.   Right.
21     Q.   And you wrote this letter on
22 November 2, 2017?
23     A.   Yes.
24     Q.   And the Kik offering of Kin was in
25 September of 2017, correct?

179

1      A.   Yes.
2      Q.   Okay. And so when you wrote this
3  letter, that was about a few weeks to a month
4  after Kik's offering of Kin to the public,
5  correct?
6      A.   Yes.
7      Q.   So that was one month after the
8  offering and today is about two years after the
9  offering, correct?
10         MR. HOTZ:  Objection.
11         MR. CADIGAN:  Objection.
12         THE WITNESS:  This letter was in
13 response to a request from the OSC, the timing
14 of this has to do with the OSC request. If the
15 point of your question is:  Do I remember it
16 better then, do I remember it now, what I am
17 saying now is the word "definitively" was used
18 as a way of saying we had not got any
19 indications -- in the context as we elaborated
20 at depth today, Counsel, we had made numerous
21 submissions and were not getting feedback from
22 the OSC saying what do you think, and, finally,
23 on September the 5th, Pat Chaukos deemed to
24 say, we don't agree with your submissions.
25 They had not said that before at any point.

180

1	And the point of this paragraph was
2	to first of all put on the record and challenge
3	whatever internal communications had been made
4	to Mr. Loke, who I think effectively had been
5	misinformed by his staff about how definitive
6	they had been in their communications with us,
7	so when I said "definitively," what I was
8	trying to convey was, they finally said
9	anything at all that was a position and I used
10	the word "definitive" as a short form.  In
11	hindsight, I would not have chosen that word.
12	But September the 5th was the first
13	time we got any position from the OSC about
14	whether this was a security or not, and that's
15	certain.
16	BY MS. D'ALLAIRD:
17	Q.   Mr. McKee, would it be reasonable to
18	say that your memory was probably better with
19	respect to the September 5, 2017 call with Ms.
20	Chaukos as of the date of your letter, November
21	2, 2017, than it is today, December 10, 2019?
22	MR. CADIGAN:  Objection.
23	Argumentative.
24	THE WITNESS:  Probably.
25	BY MS. D'ALLAIRD:

181

1	Q.   I will take that back.  Thank you.
2	You know what, hold onto it for a second.
3	Mr. McKee, I have just handed to you
4	what was previously marked as Exhibit 58 in
5	this litigation.  I'll note --
6	MR. HOTZ:  59.
7	MR. CADIGAN:  59.
8	BY MS. D'ALLAIRD:
9	Q.   59, thank you.  Exhibit 59 in this
10	litigation.
11	I will note that it was previously
12	marked as Exhibit 187 in the investigation.
13	This is a document, the top of which
14	says Ted Livingston, underneath founder and CEO
15	of Kik and Kin and there is a date underneath
16	that of September 7, 2017.
17	Please take a moment to review and
18	let me know when you are ready for my
19	questions.
20	A.   Okay.
21	Q.   Mr. McKee, do you recognize Exhibit
22	59?
23	A.   I do.
24	Q.   What is it?
25	A.   I believe this is a copy of the

182

1	median post by Ted Livingston announcing
2	they're going to exclude Canada from the
3	offering.
4	Q.   This was the median post you were
5	referring to earlier?
6	A.   Yes, it is.
7	Q.   And taking a look at the second
8	paragraph of this post that begins:  "With this
9	decision."
10	I want to read into the record
11	beginning with the second sentence of that
12	paragraph:  "Despite setting up Kin to have one
13	of the most fair TDEs to date and despite our
14	best efforts to work with the OSC, they have
15	failed to give us clear direction on when
16	Canadian securities law will or more
17	importantly will not apply."
18	Did I read that accurately?
19	A.   You did, yes.
20	Q.   Do you agree with that statement?
21	MR. CADIGAN:  Objection.  And
22	instruction not to answer on the grounds of
23	privilege and work product.
24	BY MS. D'ALLAIRD:
25	Q.   Are you going to comply with that

183

1	instruction?
2	A.   I will comply.
3	MS. D'ALLAIRD:  Let's take a break.
4	THE VIDEOGRAPHER:  Going off the
5	record.  The time is 14:06.
6	(A short recess was taken.)
7	THE VIDEOGRAPHER:  Going back on the
8	record.  The time is 14:23.
9	MS. D'ALLAIRD:  We are back on the
10	record.
11	BY MS. D'ALLAIRD:
12	Q.   Mr. McKee, is it fair to say that
13	under Canadian law, a security includes
14	something that is called investment contract?
15	MR. HOTZ:  Objection.
16	Are you going to permit him to
17	answer this?
18	MR. CADIGAN:  I will let you have
19	that answer.
20	THE WITNESS:  The statutory
21	definition of security in the Ontario
22	Securities Act includes as one of the clauses,
23	investment contract.
24	BY MS. D'ALLAIRD:
25	Q.   And is it accurate to say that back

184

1  in 2017, you thought that as a general matter,
2  ICOs could potentially be considered to be
3  investment contracts under Canadian law?
4         MR. CADIGAN:  Objection.  Instruct
5  not to answer.
6         MS. D'ALLAIRD:  On the basis of
7  privilege?
8         MR. CADIGAN:  On the basis of
9  privilege, yes.
10        BY MS. D'ALLAIRD:
11    Q.   Are you going to comply with that?
12    A.   Yes.
13    Q.   Going back to the August 14, 2017
14 meeting with the OSC, is it fair to say that in
15 that meeting, you were advocating that the
16 planned offering of Kin tokens should not be
17 considered to be an investment contract under
18 Canadian law?
19    A.   The public sale portion of it, not
20 the pre-SAFT sale, yes, it's fair to say that.
21    Q.   And in advocating for that position,
22 you pointed to the OSC to certain precedence
23 under Canadian law; is that correct?
24    A.   Yes, I did.
25    Q.   And you cited to the Canadian

185

1  Supreme Court decision, the Pacific Coast Coin
2  decision, which defined what an investment
3  contract was, right?
4         MR. HOTZ:  Objection.
5         MR. CADIGAN:  Objection.  Are we
6  going to go over all of this again?
7         BY MS. D'ALLAIRD:
8     Q.   Can you answer the question, please?
9     A.   Well, it's two questions.  Yes, I
10 referred to Pacific Coast Coin Exchange in the
11 -- in the conversation, and then you said which
12 -- which seems to be the second question as to
13 what Pacific Coast Coin Exchange stands for.
14    Q.   We will take it in two parts.
15        In advocating for that position that
16 the public offering of Kin tokens was not an
17 investment contract under Canadian law, you
18 cited to the Canadian Supreme Court decision
19 Pacific Coast Coin, correct?
20        MR. CADIGAN:  Objection.  Asked and
21 answered.
22        BY MS. D'ALLAIRD:
23    Q.   You can answer.
24    A.   Yes.
25    Q.   And Pacific Coast Coin defines what

186

1  an investment contract is under Canadian law,
2  correct?
3         MR. CADIGAN:  Objection.  Asked and
4  answered.
5         BY MS. D'ALLAIRD:
6     Q.   You can answer.
7     A.   Pacific -- when you say "define."
8  Pacific Coast Coin Exchange is a judicial case
9  that was in part, one of the factors was an
10 investment contract.
11    Q.   And in advocating for the position
12 that the public offering of Kin tokens was not
13 an investment contract, you also pointed the
14 OSC to other administrative decisions and
15 guidance such as the Impak decision, correct?
16        MR. CADIGAN:  Objection.  Asked and
17 answered.
18        MR. HOTZ:  Objection.
19        THE WITNESS:  Are we still talking
20 about the meeting of August 14 now?
21        BY MS. D'ALLAIRD:
22    Q.   We are talking about the meeting of
23 August 14 and then subsequent conversations or
24 communications with the OSC.
25        MR. CADIGAN:  Objection.

187

1         THE WITNESS:  At the meeting August
2  14, I did not point them to other things
3  because they didn't exist yet.  Impak didn't
4  come out until October or August, sorry,
5  August.
6         There was a subsequent one later on
7  in October, a different case.  There had been
8  no CSA guidance published yet, so I didn't have
9  anything else to point them to.  We briefly
10 distinguished the SEC facts in the DAO so -- as
11 we -- as I said earlier on, we explained that
12 the fact situation of the DAO was not our fact
13 situation, and then we discussed the principles
14 of Pacific Coast Coin Exchange as they applied
15 to Kin.
16        BY MS. D'ALLAIRD:
17    Q.   As of that meeting with the OSC on
18 August 14, 2017, to your knowledge, did Kik
19 have the ability to reach out to the U.S.
20 Securities and Exchange Commission?
21        MR. CADIGAN:  Objection.  Instruct
22 you not to answer.
23        MR. HOTZ:  Objection.
24        THE WITNESS:  I can't answer that
25 question.

188

1     MS. D'ALLAIRD:  On what basis,
2  privilege?
3     MR. CADIGAN:  Privilege.
4     BY MS. D'ALLAIRD:
5  **Q.**   And you're not going to answer?
6  **A.**   I will comply with that direction.
7  **Q.**   Okay.  Mr. McKee, have you paid any
8  legal bills related to the SEC's investigation
9  or lawsuit in this matter?
10  **A.**   Have I paid legal bills?
11  **Q.**   Uh-huh.
12  **A.**   Can you clarify?
13  **Q.**   Any bills for legal representation?
14     MR. HOTZ:  Do you mean him
15  personally, do you mean his firm?
16     BY MS. D'ALLAIRD:
17  **Q.**   Yes, Mr. McKee.  I asked you, Mr.
18  McKee.
19  **A.**   No, I have not.
20  **Q.**   You have not.  Okay.
21     Do you have an understanding of who
22  is covering those bills?
23  **A.**   Bills for my representation here
24  or --
25     MR. HOTZ:  Yes, for your

189

1  representation here.
2     THE WITNESS:  Is that the question?
3     BY MS. D'ALLAIRD:
4  **Q.**   That's right.
5  **A.**   Yes.
6  **Q.**   And who is covering those legal
7  bills?
8  **A.**   Blakes is billing Kik Interactive,
9  our client, for my time and expenses in
10  responding to the deposition.
11     MR. HOTZ:  I think she was asking
12  about your -- I thought you were asking about
13  my fees, so are you asking about his fees or my
14  fees?
15     MS. D'ALLAIRD:  We were going to get
16  to that incidentals as well, so thank you for
17  answering that.
18     THE WITNESS:  It's hardly
19  incidental.
20     BY MS. D'ALLAIRD:
21  **Q.**   I am also asking about your legal
22  bills with --
23  **A.**   Yes, my counsel, my personal counsel
24  legal bills are being reimbursed to Blakes by
25  our client Kik Interactive.

190

1  **Q.**   Other than your legal bills or
2  out-of-pocket costs, such as travel expenses
3  and your hotel, are you receiving any other
4  payments in connection with your appearance
5  here today?
6  **A.**   No.
7  **Q.**   Mr. McKee, what did you do to
8  prepare for today's deposition?
9  **A.**   I reviewed documents associated with
10  the representation, in particular, focusing on
11  my correspondence with Ontario Securities
12  Commission.
13     I looked at the SEC's -- I'm not
14  sure what you call it, the -- where my name
15  appears as someone who might potentially be
16  called.  It was drawn to my attention by Kik to
17  let me know that I was on that list and --
18     MR. HOTZ:  Do not reveal
19  communications with Kik.
20     THE WITNESS:  Sorry.  That document
21  said it would involve my communications with
22  the Ontario Securities Commission so I focused
23  on those and reviewed those documents.
24     BY MS. D'ALLAIRD:
25  **Q.**   Did you meet with your attorney to

191

1  prepare for --
2  **A.**   Yes, I have -- apologize.
3  **Q.**   Let me ask it again.
4     Did you meet with your attorney to
5  prepare for today's deposition?
6  **A.**   Yes, I did.  I had some telephone
7  conversations with my attorney and then I met
8  with him in person as well.
9  **Q.**   And did you meet with him -- when
10  did you meet with your attorney?
11  **A.**   In person, I met with him on Sunday
12  and then on Monday.
13  **Q.**   Sunday and Monday.  For how long on
14  each day did you meet with your attorney?
15  **A.**   On Sunday, we met for a couple of
16  hours, dinner basically, and yesterday, for
17  about -- I'm not sure, maybe five hours.
18  **Q.**   Five hours.  And you said you
19  reviewed some documents in preparation for
20  today's deposition.
21     Did you review documents with your
22  attorney during those meetings?
23  **A.**   Yes.
24  **Q.**   And just roughly, how many documents
25  did you review?

192

1    A.   I'm not sure what you mean by a
2  document, because a lot of it was e-mail and
3  there were various threads and things attached
4  to each other and how much they count and so
5  on, I don't know.  Basically, the documents you
6  have shown me today are pretty much the
7  documents that I reviewed.  There's a few
8  others you haven't shown me that I reviewed
9  also.
10   Q.   Would you say probably like a
11 one-inch binder with the documents in it?
12   A.   About that, maybe.
13   Q.   You said you had a couple of calls
14 with counsel to prepare for today's deposition.
15        About how many calls did you have?
16   A.   Two or three.
17   Q.   Two or three.  When were those
18 calls?
19   A.   During the time between the
20 deposition being arranged and last week, very
21 brief calls.  They were not substantive really.
22   Q.   And in preparing for today's
23 deposition, did you meet with Kik's legal
24 counsel in this litigation?
25   A.   I met with them on Monday.

193

1    Q.   And who from Kik's legal counsel did
2  you meet with?
3    A.   Mr. Cadigan and Mr. Welsh.
4    Q.   Were they present at your meeting
5  with Mr. Hotz?
6    A.   Yes, we met together.
7    Q.   Were they there the entire four or
8  five hours?
9    A.   Yes.  It was at the Cooley office.
10   Q.   Did you do anything else other than
11 what -- other than the meetings and the phone
12 calls, reviewed documents, did you do anything
13 else to prepare for today's deposition?
14   A.   No.  I don't think so.
15   MS. D'ALLAIRD:  I'll pass the
16 witness.
17   MR. CADIGAN:  We have no questions.
18   MR. HOTZ:  I have no questions.
19 Thank you.
20   THE VIDEOGRAPHER:  This marks the
21 end of the deposition of Ross McKee.  We're
22 going off the record at 14:33.
23   (Whereupon, the proceeding was
24 concluded at 2:33 p.m.)
25

194

CERTIFICATE OF NOTARY PUBLIC
     I, Bonnie L. Russo, the officer before
whom the foregoing deposition was taken, do
hereby certify that the witness whose testimony
appears in the foregoing deposition was duly
sworn by me; that the testimony of said witness
was taken by me in shorthand and thereafter
reduced to computerized transcription under my
direction; that said deposition is a true
record of the testimony given by said witness;
that I am neither counsel for, related to, nor
employed by any of the parties to the action in
which this deposition was taken; and further,
that I am not a relative or employee of the
attorney or counsel employed by the parties
hereto, nor financially or otherwise interested
in the outcome of the action.
Dated:  December 17, 2019

_____
     Notary Public in and for
     the District of Columbia

My Commission expires:  June 30, 2020

195

CERTIFICATE OF WITNESS

I, W. ROSS F. McKEE, do hereby declare under
penalty of perjury that I have read the entire
foregoing transcript of my deposition testimony,
or the same has been read to me, and certify that
it is a true, correct and complete transcript of
my testimony given on December 10, 2019, save and
except for changes and/or corrections, if any, as
indicated by me on the attached Errata Sheet, with
the understanding that I offer these changes and/or
corrections as if still under oath.
_____ I have made corrections to my deposition.
_____ I have NOT made any changes to my deposition.

Signed
_____
W. ROSS F. McKEE
Dated this _____ day of _____ of 20____.

Sworn to and Subscribed before me,
this_____day of_____, 20___.
_____
Notary Public     My commission expires:_____

196

**W. Ross McKee**
**12/10/2019**

```
 1              ERRATA SHEET
 2    Deposition of:  W. ROSS F. McKEE
      Date taken:  DECEMBER 10, 2019
 3    Case:  SEC v. KIK INTERACTIVE, INC.
 4    PAGE  LINE
            _____    CHANGE: _____
 5            _____    REASON: _____
 6            _____    CHANGE: _____
              REASON: _____
 7
            _____    CHANGE: _____
 8            _____    REASON: _____
 9            _____    CHANGE: _____
              REASON: _____
10
            _____    CHANGE: _____
11            _____    REASON: _____
12            _____    CHANGE: _____
              REASON: _____
13
            _____    CHANGE: _____
14            _____    REASON: _____
15            _____    CHANGE: _____
              REASON: _____
16
            _____    CHANGE: _____
17            _____    REASON: _____
18            _____    CHANGE: _____
              REASON: _____
19
            _____    CHANGE: _____
20            _____    REASON: _____
21            _____    CHANGE: _____
              REASON: _____
22
            _____    CHANGE: _____
23            _____    REASON: _____
24
25    Signed_____
      Dated_____
```

197