SEC92

# In the Matter of:

*U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.*

---

*Alexander Rousmaniere*

*November 22, 2019*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Case 1:19-cv-05244-AKH   Document 60-104   Filed 03/20/20   Page 3 of 31

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                Alexander Rousmaniere
November 22, 2019

Page 3

1        UNITED STATES DISTRICT COURT
2     SOUTHERN DISTRICT OF NEW YORK
3
4   U S  SECURITIES AND EXCHANGE   )
    COMMISSION,            )
5                      )
           Plaintiff,   )
6                      )
       vs        )No  19-cv-05244
7                  )  (AKH)
                   )
8   KIK INTERACTIVE, INC ,     )
                )
9        Defendant   )
                )
10
11
12
13
14      DEPOSITION OF ALEXANDER ROUSMANIERE
15      FRIDAY, NOVEMBER 22, 2019
16         SANTA MONICA, CALIFORNIA
17
18
19
20
21
22
23
     REPORTED BY:  JEANINE CURCIONE
24         CSR NO  10223, RPR
25   FILE NO : 88574

---

Page 2

1   Deposition of ALEXANDER ROUSMANIERE, taken on behalf
2   of Plaintiff, at 9:02 A M , Friday, November 22,
3   2019, at 1333 2nd Street, Suite 400, Santa Monica,
4   California, before Jeanine Curcione, C S R  No
5   10223, RPR, pursuant to notice
6
7   APPEARANCES OF COUNSEL:
8   FOR THE PLAINTIFF:
9     SECURITIES AND EXCHANGE COMMISSION
       BY: LAURA K  D'ALLAIRD, ESQ
10     BY: JEFF LEASURE, ESQ
       105 F Street NE, Mailstop 5971
11     Washington, DC 20549
       Phone (202)551-5475
12     e-mail: DallairdL@SEC gov
13   FOR THE DEFENDANT:
14     COOLEY, LLP
       BY: JENNA BAILEY, ESQ
15     BY: BRETT DE JARNETTE
       3175 Hanover Street
16     Palo Alto, California 94304
       Phone (650)849-7005
17     e-mail: jbailey@cooley com
       e-mail: bdjarnette@cooley com
18
19   ALSO PRESENT:
20     Albert Salaz, Videographer
21
22
23
24
25

---

Page 3

1                I N D E X
2
3   WITNESS      EXAMINATION        PAGE
4   ALEXANDER ROUSMANIERE
5         BY MS  BAILEY       5
6         BY MS  D'ALLAIRD       111
7
8           E X H I B I T S
9   NO      PAGE  DESCRIPTION
10   Exhibit 101  7  Subpoena
11   Exhibit 102  12  Letter from SEC to Alexander
              Rousmaniere dated 6/28/18
12
      Exhibit 103  15  Document Bates Stamped
13           SEC-KIK-LIT-E-0000990
14   Exhibit 104  21  Document Bates Stamped
              SEC-ROUSMANIERE-E-0000001-12
15
      Exhibit 105  31  Deposition Transcript of
16        Alexander Perls Rousmaniere
          dated 7/18/18
17
      Exhibit 106  45  Screenshot from Kin Kik com
18
      Exhibit 107  98  Screenshot from CoinMarketCap
19        Website
20   Exhibit 108  104  Whitepaper for Kik Interactive,
          Inc
21
22
23
24
25

---

Page 4

1        SANTA MONICA, CALIFORNIA;
2     FRIDAY, NOVEMBER 22, 2019, 9:02 A.M.
3
4     THE VIDEO OPERATOR:  Good morning.  We're
5   on the record.  This is the start of media number
6   one of the video recorded deposition of Alexander
7   Rousmaniere in the matter of US Securities and
8   Exchange Commission versus Kik Interactive,
9   Incorporated, filed in the United States District
10   Court, State of New York.  Case number
11   19-CV-05244AKH.
12     This deposition is being held at 1333
13   Second Street, Suite 400, Santa Monica, California
14   90401 on the date of November 22, 2019 at
15   approximately 9:03 A.M.  My name is Albert Salaz
16   with O'Brien Levine Court Reporting and I'm the
17   legal video specialist.  The court reporter today is
18   Jeanine Curcione with O'Brien and Levine Court
19   Reporting.
20     Will counsel please state their
21   appearances and state whom they represent on the
22   record after which the court reporter will swear in
23   the witness.
24     MS. BAILEY:  Jenna Bailey from Cooley on
25   behalf of Kik Interactive.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Alexander Rousmaniere
                                                                                  November 22, 2019

Page 5

1       MR. DE JARNETTE:  Brett De Jarnette from
2  Cooley on behalf of Kik.
3       MS. D'ALLAIRD:  Laura D'Allaird on behalf
4  of the US Securities and Exchange Commission.
5       MR. LEASURE:  Jeff Leasure, SEC.
6
7       ALEXANDER ROUSMANIERE,
8       having been duly affirmed, was
9       examined and testified as follows:
10
11            EXAMINATION
12  BY MS. BAILEY:
13     Q.  Good morning, Mr. Rousmaniere.  Thank you
14  for being here today.  I know it's an inconvenience
15  but we'll try to get through this as efficiently as
16  possible and get you out of here.  So I'm aware that
17  you already testified last summer but other than
18  that have you ever had your deposition taken before?
19     A.  No.
20     Q.  So to start off I'm going to go over a few
21  basic ground rules.  Could you please state your
22  name for the record.
23     A.  Alexander Rousmaniere.
24     Q.  Do you understand you're under oath as if
25  you were testifying in court with a judge?

Page 6

1     A.  Yes, I do.
2     Q.  So as you can see we have a court reporter
3  present here today.  She's going to be transcribing
4  everything that we say in the room, so to help her
5  do that please just wait for me to get through the
6  end of my question before you start answering me.  I
7  know it's not natural in the course of conversation
8  but bear with me and then make sure to answer all of
9  my questions audibly, vocally and without huh-uh or
10  nods which won't be picked up by the transcript.
11        And you also may recognize the SEC
12  attorneys that are here with us today.  They may
13  from time to time object to my questions.  If they
14  do so they're preserving their objections for the
15  record but you should still feel free to answer my
16  question unless you are told otherwise.  But let
17  them get their objections out before answering the
18  question so we can have a clean record.
19        If you don't understand any of my
20  questions please let me know and I'll rephrase it to
21  make sure you do.  If you don't ask I'll assume that
22  you understood so please let me know.  And if you
23  ever need a break at any time, again, we'll try not
24  to be here too long but let me know and we'll take a
25  break.  The only thing I ask is if there's a

Page 7

1  question I asked and it's pending you answer the
2  question and then we go on the break.  Does that
3  make sense to you?
4     A.  Yes.
5     Q.  Is there any reason why you can't testify
6  competently and honestly here today?
7     A.  No.
8     Q.  So what is your understanding of the
9  reason that you're here today?
10     A.  I think there is a lawsuit that the SEC is
11  suing Kik.
12     Q.  And did you receive a subpoena to appear
13  here today?
14     A.  Yes.
15     Q.  So the court reporter is handing you
16  what's just been marked as Exhibit 101.  Do you
17  recognize this document?
18        (Exhibit 101 was marked for identification
19        by the Reporter.)
20        THE WITNESS:  Yes.
21  BY MS. BAILEY:
22     Q.  Are you appearing here today pursuant to
23  the subpoena?
24     A.  Yes.
25     Q.  We're done with that.  So earlier the

Page 8

1  first question I asked you, you said that you
2  understood because SEC was suing Kik Interactive.
3  Can you explain what you understand the nature of
4  this lawsuit to be about?
5     A.  My understanding is that the SEC is
6  asserting that Kik should have done certain things
7  before or during the issuance of its Kin token to
8  comply with securities law.
9     Q.  Okay.  Do you have a sense or an
10  understanding of what those things would have been?
11        MS. D'ALLAIRD:  Objection.
12        THE WITNESS:  Not specifically.
13  BY MS. BAILEY:
14     Q.  And you mentioned that it was related to
15  securities laws.  How much do you understand about
16  securities laws?
17     A.  Undergraduate level.  Not -- nothing in
18  detail.
19     Q.  Did you ever take a class or anything
20  where it was specifically discussed?
21     A.  Probably -- I took a law and economics
22  class undergraduate level.  That's about it.
23     Q.  So is it fair to say you're generally
24  aware of what securities laws are and how they work?
25        MS. D'ALLAIRD:  Objection.

1      THE WITNESS: I'm not really in a position
2  to judge that.
3  BY MS. BAILEY:
4      Q.  Have you read the complaint that the SEC
5  filed in this case?
6      A.  I may have looked at it briefly but I
7  haven't read the entire thing.
8      Q.  Do you remember about when that was?
9      A.  Maybe near the time of the complaint.  I
10  think I -- it -- I would have looked at least at the
11  front page of it when -- I follow Coin Desk which is
12  the news source so whenever it was, I think it was
13  in the last year at some point.  I can't remember
14  when exactly.
15      Q.  So do you understand though that that
16  complaint was filed about a year and a half after
17  the sale was completed?
18      A.  I can't answer -- if you're telling me
19  that and that is the case then I wouldn't dispute
20  that.
21      Q.  I'm just trying to understand what your
22  level is about the case so far, so if you're not
23  aware of that --
24      A.  I don't know the exact timing of the
25  filing of the suit, no.

1      Q.  By any chance have you read Kik's response
2  to the SEC's complaint?
3      A.  Not that I can recall.
4      Q.  Have you seen any articles or anything
5  else discussing Kik's response in Coin Desk or
6  other --
7      A.  Yes, but I don't remember the details of
8  them.
9      Q.  Stepping back for a minute, how did you
10  prepare for your deposition today?
11      A.  I didn't prepare.
12      Q.  So did you speak with anybody about your
13  deposition?
14      A.  No.
15      Q.  Did you review any documents to prepare
16  for this deposition?
17      A.  No.
18      Q.  So when was the first time you can recall
19  the SEC -- when I say SEC I'm referring to the
20  Securities and Exchange Commission.  I assume you
21  understand that.  When did they first contact you
22  regarding their investigation into Kik?
23      A.  I do know that I had a deposition with the
24  SEC last summer and so they probably contacted me --
25  I don't know exactly but it would have been a month

1  or two prior to that.  So it would have been late
2  spring of 2018.  I think.
3      Q.  Okay.  And I'm going to run through a
4  number of names.  If you could just let me know if
5  you ever remember communicating with these
6  individuals.  How about Brent Mitchell?
7      A.  Yes, sounds familiar.
8      Q.  Do you remember having phone conversations
9  with him?
10      A.  I'm not sure.
11      Q.  How about e-mails?
12      A.  Possibly.
13      Q.  What about James Murtha?
14      A.  Yes.
15      Q.  So did you have phone conversations with
16  him?
17      A.  Either phone or e-mail.  But that sounds
18  very familiar.
19      Q.  Okay.  Could it possibly be both phone --
20      A.  Yes.
21      Q.  How about Jeff Leasure?
22      A.  Yes.
23      Q.  Phone and e-mail?
24      A.  Possibly both.
25      Q.  How about Steven Schlegelmilch?

1      A.  That name does not ring a bell.
2      Q.  What about David Mendel?
3      A.  Name does not ring a bell.
4      Q.  And then Laura D'Allaird?
5      A.  I don't remember.  No.
6      Q.  So I've just handed you what's been marked
7  as Exhibit 102.  It appears to be a PDF with the
8  title "United States Securities and Exchange
9  Commission."  The subject matter is in the matter of
10  Kik Interactive and it says it was sent via e-mail
11  to ███████████.  Does this document look
12  familiar to you?
13      (Exhibit 102 was marked for identification
14  by the Reporter.)
15      THE WITNESS:  Yes, it does.
16  BY MS. BAILEY:
17      Q.  And is ███████████, is that your
18  contact information?
19      A.  Yes, it is.
20      Q.  So what is this document?
21      A.  It seems to be -- it looks like it's the
22  subpoena which preceded my deposition of last
23  summer.
24      Q.  Great.  And if you can remember, was this
25  the first time you spoke with the SEC?

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 13

1    A.  No.
2    Q.  Okay.  If you can turn with me to -- so I
3  forgot to mention this document bears the Bates
4  label.  When I refer to Bates label that's the
5  numbering and lettering in the bottom right-hand
6  corner.  It bears the Bates label
7  SEC-Kik-LIT-E-0000344.  If you can turn with me to
8  Bates number 0000347.
9    A.  Okay.
10    Q.  You'll see on this page there's two boxes
11  that have been checked.  One says "you must produce"
12  and then lists a number of things and one says "you
13  must testify."  Do you see that?
14    A.  Yes.
15    Q.  Did you produce any documents in response
16  to this subpoena?
17    A.  In response to this subpoena.  I can't --
18  I don't know.  However, I did at one point there was
19  a -- it was either this or before this or after this
20  or somewhere around there, there was a request for
21  documents which involved me copying and pasting five
22  or ten, maybe 15 e-mails into a text document and
23  sending it to somebody, possibly James Murtha and I
24  believe that was the full extent of everything I
25  produced.

Page 14

1    Q.  Can you remember any other requests for
2  documents other than this subpoena?
3    A.  No.
4    Q.  Any that were given to you verbally or in
5  other communications?
6    A.  I don't know.  But I can't remember what
7  the -- when the request was made and what the exact
8  nature of the request was, however, I do remember --
9  as I just said about the documents I did provide.
10    Q.  Sure.  Okay.  Thank you.  I know it's been
11  a long time.  If you could flip with me one more
12  time to Bates number 0000351.  You'll see there's a
13  number C, "Documents to be preserved and produced,"
14  and then there's a category of documents listed
15  here.  Does this look familiar to you?
16    A.  It doesn't look familiar but I see it now.
17    Q.  As you read this here today -- and I'll
18  give you a minute if you need time, does this
19  roughly reflect the type of documents that you
20  searched for and produced to the SEC?
21    A.  Yes.
22    Q.  Around the time of June 28 when you
23  received this subpoena, do you remember making any
24  efforts to preserve your e-mails related to Kik?
25    A.  I didn't make special efforts because the

Page 15

1  e-mails were already in my Gmail box and as I
2  remember I just copied and pasted whatever e-mails I
3  had which were -- as I recall only just group --
4  e-mails from Kik that I received.  I don't think I
5  ever sent -- oh, except there may have been part of
6  the either KYC or to prove that I was an accredited
7  investor so that may have been some outgoing e-mail
8  but otherwise that was it.  There was like a few
9  e-mails.
10    Q.  But you don't have any routine practice of
11  deleting certain amounts of e-mails.
12    A.  I do not.
13    Q.  And were all your communications with Kik
14  through your Gmail account if you recall?
15    A.  Yes.
16    Q.  So you've just been handed a document
17  labeled Exhibit 103.  It bears the Bates label
18  SEC-Kik-LIT-E-0000990.  Does this document look
19  familiar to you?
20    A.  It does but mine is labeled 105.
21       (Exhibit 103 was marked for identification
22    by the Reporter.)
23       (Court reporter remarked exhibit.)
24  BY MS. BAILEY:
25    Q.  Does this document look familiar to you?

Page 16

1    A.  Yes.
2    Q.  Can you describe the communications in
3  this document?
4    A.  This is what I was just referring to and
5  this would have been all the e-mails regarding Kik
6  and Kin, in chronological order.
7    Q.  Did you hire an attorney to help you put
8  this production of documents together?
9    A.  I did not.
10    Q.  Did anyone else advise you on how to put
11  this production together?
12    A.  No, they did not.
13    Q.  Does that include anyone from the SEC?
14    A.  Well, since there was nobody then it would
15  disinclude anybody from SEC explicitly; right?
16    Q.  Okay.  So here you refer to a record of
17  correspondence regarding Kik -- Kin and Kik.  Does
18  this roughly reflect to your knowledge all of your
19  communications regarding Kin and Kik?
20    A.  Yes.
21    Q.  So just now I want to have a base level of
22  terminology that we're using.  Just now when you
23  were describing what Kin is you used the word
24  currency.  Can you describe to me what you mean when
25  you say the word currency in this context?

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.          Alexander Rousmaniere
November 22, 2019

Page 17

1      A.  I'm using that only in the most broad
2  descriptive term.  You can also refer to it as a
3  token.  Cryptocurrency.  Yeah, I don't claim to have
4  an exact word for it.
5      Q.  So we're going to obviously talk about
6  cryptocurrency today.  What are you referring to by
7  the term cryptocurrency if you had to describe it?
8      A.  It could be anything from Bitcoin to
9  Ethereum to other tokens to any kind of --
10  anything -- anything that uses the technology that
11  descended from Bitcoin.
12      Q.  So would you categorize Kin as in that
13  same category?
14      A.  Yes.
15      Q.  And you mentioned the technology tracing
16  back to Bitcoin.  Are you referring to blockchain
17  technology?
18      A.  Yes.
19      Q.  What is your level of understanding about
20  how blockchain technology works?
21      A.  I'm not sure how to rate it but I have
22  some technical understanding of it.
23      Q.  Could you try and explain it to me?
24      A.  From scratch?
25      Q.  Just your basic understanding of how

Page 18

1  blockchain technology works.
2      A.  Well, it's -- blockchain technology is a
3  way of cryptographically securing what previously
4  was hard to track, like just virtual dollars or
5  virtual points of some kind.  And the blockchain
6  allows the users of the currency to verify who
7  actually owns it and the ownership is -- the
8  ownership is proven by the possession of a private
9  key which can be verified but not duplicated by a
10  recipient or third party and it requires -- yeah.
11  So keep it there.
12      Q.  That's great.  And cryptocurrency in your
13  knowledge runs on top of blockchain technology?
14      MS. D'ALLAIRD:  Objection.
15      THE WITNESS:  I think most of it does.
16  Yes.  I know that Ethereum and Bitcoin do and I know
17  that most of the cryptocurrencies I know about also
18  run on blockchain technology.
19  BY MS. BAILEY:
20      Q.  How about Kin?
21      A.  I'm actually -- I'm vague on the actual
22  technical underpinnings of Kin.
23      Q.  And cryptocurrency in your experience, is
24  that typically something that's a medium of
25  exchange?

Page 19

1      MS. D'ALLAIRD:  Objection.
2      THE WITNESS:  I guess it can be, yes.
3  BY MS. BAILEY:
4      Q.  Do you know one way or the other whether
5  Kin ran on the Ethereum blockchain at the point of
6  the token sale?
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  I don't remember either way.
9  BY MS. BAILEY:
10      Q.  So at the time you purchased Kin, you
11  didn't know necessarily whether it would run on
12  blockchain technology or which blockchain it would
13  operate on?
14      MS. D'ALLAIRD:  Objection.
15      THE WITNESS:  Now that I remember Kin did
16  run on the Ethereum network at the time and my
17  possession of the Kin that I bought was actually it
18  was inside of an Ethereum wall as an alternative
19  token but -- as far as I remember it was on the
20  Ethereum blockchain.  That's correct.
21  BY MS. BAILEY:
22      Q.  Are you familiar with the term
23  "decentralized" in this case?
24      A.  Yes.
25      Q.  What is your understanding of what that

Page 20

1  means in the context of blockchain technology?
2      A.  That the system can be run unlike for
3  example a database system which requires a central
4  source of truth, there is in the case of
5  cryptocurrency there is a decentralized source of
6  truth that is -- that has to do with a consensus
7  between the nodes that are participating in the --
8  in the -- in the protocol.
9      Q.  Got it.  And I apologize for asking so
10  many basic questions but could you explain to me
11  what a node is?
12      A.  A node in this case usually is actually
13  just a computer that has usually a complete set of
14  all the transactions and is able to broad -- is able
15  to serve client requests for information about the
16  blockchain and is able to communicate with other
17  computers, other nodes in order to -- for all the
18  nodes to keep up with the most recent information
19  about the blockchain.
20      Q.  Got it.  So is it fair to say that your
21  understanding is that the nodes are operating the
22  protocol that is underpinning the blockchain?
23      MS. D'ALLAIRD:  Objection.
24      THE WITNESS:  Yes.
25  ///

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.          Alexander Rousmaniere
November 22, 2019

Page 21

1  BY MS. BAILEY:
2     Q.  Is that a fair characterization of what
3  you just explained to me?
4     A.  Yes.
5     Q.  Okay.  I'd like to go back now that we've
6  sort of set some basic understanding.  I'd like to
7  go back to one more document.
8        So you've just been handed a document
9  marked 104.  It bears the Bates label
10  SEC-Rousmaniere-E-0000001 through 0000012.
11      (Exhibit 104 was marked for identification
12   by the Reporter.)
13  BY MS. BAILEY:
14     Q.  Do you recognize this document?
15     A.  I do.
16     Q.  Could you describe to me what this is?
17     A.  This looks like the compendium of the
18  e-mails I put together.
19     Q.  So this is the set of documents you
20  mentioned earlier that you produced in response to
21  the subpoena we discussed earlier.
22     A.  Yes.
23     Q.  So does this e-mail consist -- or does
24  this document consist of multiple e-mails that you
25  provided to the SEC?

Page 22

1     A.  Yes.
2     Q.  If you go with me to Bates page 0000010,
3  10, at the very bottom of the page there there's an
4  e-mail from Brent S. Mitchell to Perls James and
5  Jeffery on January 8.  Is Perls you?
6     A.  Yes.
7     Q.  Am I saying that correctly?
8     A.  Uh-huh.
9     Q.  And James and Jeffery, do you understand
10  those to be SEC attorneys?
11     A.  Yes.
12     Q.  Was this the first time that somebody from
13  the SEC reached out to you?
14     A.  I mean, this is the end of the documents
15  in reverse chronological order.  Although --
16  possibly, yes.
17     Q.  So if you could just take a minute and
18  read through the e-mail from Brent Mitchell on
19  January 8.  He says, "I'm an enforcement attorney in
20  the SEC's enforcement division along with my
21  colleagues copied on this e-mail, Jeff Leasure and
22  James Murtha.  I'm conducting a nonpublic
23  investigation into Kik Interactive's September 2017
24  offering of Kin tokens."  He says, "We're interested
25  in asking you some questions about your purchase of

Page 23

1  Kin.  We're contacting a group of Kin purchasers to
2  better understand the offering."
3        Does that help refresh your memory on
4  whether this was the first time you ever heard from
5  somebody at the SEC?
6     A.  It seems likely this was.
7     Q.  And it says here, "Can you propose some
8  times when you can speak to us and tell us what
9  known number to call."  Do you recall having an
10  initial call with them sometime around January?
11     A.  Yes.
12     Q.  And below here you say, "Would be happy to
13  help," and then provide your phone number; right?
14     A.  Yes.
15     Q.  So when you spoke in January was that a
16  phone call?
17     A.  Yes.
18     Q.  Do you recall who was on the call?
19     A.  I do not.
20     Q.  Do you remember what you discussed on that
21  call?
22     A.  Not in -- no.  Not in detail.
23     Q.  If you can remember what was the subject
24  matter generally?
25     A.  My discussions with -- there was a few

Page 24

1  discussions with the SEC before my deposition during
2  this time and then during the deposition and then
3  subsequent to the deposition recently and all I can
4  tell you in specific is that each time the
5  conversations kind of covered the same ground.
6  That's what stuck out at me is they kind of had the
7  same questions for me each time.  Beyond that like
8  nothing really stands out as being different during
9  one conversation or another.
10     Q.  Can you recall the subject matter then of
11  maybe one of your more recent conversations with
12  them?
13     A.  I think the most recent phone conversation
14  with them was notable in that it seemed to just go
15  over the existing material that was already in my
16  deposition.  Like they wanted to make sure I was
17  still going to say the same thing that I said in my
18  deposition and the question that they've asked -- I
19  remember they asked I think back then at the
20  deposition, after the deposition had to do with did
21  I have special -- did I have any particular special
22  conversations with Kik and also did I have access to
23  some stickers or some kind of free goods or goodies
24  somehow and my answer to that was no, I didn't.
25     Q.  So then is it fair to say that you

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 25

1  remember discussing digital stickers in this initial
2  January call that you had with the SEC?
3       MS. D'ALLAIRD:  Objection.
4       THE WITNESS:  I don't know.
5  BY MS. BAILEY:
6    Q.  So one of the other things that you
7  mentioned just now was they were wondering if you
8  had any special conversations with Kik.  Could you
9  elaborate on what you mean by that?
10   A.  Well, clearly I provided them with all the
11  e-mails and they had asked me -- they had asked me
12  if I -- oh, yeah, they asked me at times if I was on
13  a telegram group or -- I think they wanted to see if
14  I had any -- what kind of communication I had with
15  Kik around the sale and I had like -- it was easy to
16  answer because I had virtually no communication with
17  them besides these e-mails you've seen.
18   Q.  Okay.  And can you recall whether the SEC
19  represented to you what their investigation was
20  about in this January phone call?
21   A.  Where's their -- let's see.  Where's
22  this -- no.  They didn't -- no, I don't think
23  they've ever described what the investigation is
24  about.
25   Q.  But you did understand it to be about

Page 26

1  Kik's sale of Kin tokens in 2017?
2    A.  Yes.
3    Q.  In the course of any of your discussions
4  with the SEC outside of your investigative testimony
5  which is what you've referred to as your deposition,
6  did they ever show you any documents?
7    A.  Did they ever show me any documents?
8    Q.  Yeah.
9    A.  No.  No, I don't think so.
10   Q.  Do you recall discussing secondary
11  exchanges with the SEC before your testimony?
12       MS. D'ALLAIRD:  Objection.
13       THE WITNESS:  Yes.  Well, I don't know
14  when the discussion was taken place but now that you
15  mention it there has been a question that SEC has
16  asked at various times regarding did I attempt to
17  resell any Kin tokens.
18  BY MS. BAILEY:
19   Q.  Okay.
20   A.  So that would be a question about a
21  secondary exchange.
22   Q.  Can you recall what you told them about
23  that?
24   A.  I would have told them that at some point
25  in I think 2018 I did make a recreational stab at

Page 27

1  selling a small block of Kin tokens and I can't
2  remember the outcome of it.  Whatever the outcome
3  was it didn't encourage me to sell anymore.  That's
4  for sure.
5    Q.  So you can't remember if you were able to
6  actually sell any of your Kin tokens at that time?
7    A.  I can't remember specifically, no.
8    Q.  And you said the words "recreational stab"
9  at it?
10   A.  Just to see if there was a market for it.
11   Q.  Market meaning -- do you remember that it
12  was possible to sell your Kin --
13   A.  To see if there were buyers?
14   Q.  Whether there was demand?
15   A.  Yeah, whether there was enough liquidity
16  in the marketplace that there were actually people
17  buying and selling it.
18   Q.  Did you convey that to the SEC when they
19  asked you about it?
20       MS. D'ALLAIRD:  Objection.
21       THE WITNESS:  I'm not sure.
22  BY MS. BAILEY:
23   Q.  Fair enough.  When the SEC reached out to
24  you, why did you -- why did you talk to them?
25       MS. D'ALLAIRD:  Objection.

Page 28

1       THE WITNESS:  Well, I guess I knew that
2  they could subpoena me, so and I felt like my
3  situation was -- I didn't feel there was any risk of
4  talking to them because my dealings with Kik have
5  been so limited and so clean that if I had some more
6  complex dealings with Kik or I thought I would be in
7  legal jeopardy I probably would have gotten a lawyer
8  involved but I didn't mind to talk to them directly.
9  BY MS. BAILEY:
10   Q.  And you just referred to your dealings
11  with Kik as being clean.  Are you referring to just
12  the fact that you sort of bought this thing from
13  them and now you have the thing and now there's no
14  longer any existing relationship between you and
15  Kik?
16       MS. D'ALLAIRD:  Objection.
17       THE WITNESS:  Yes.
18  BY MS. BAILEY:
19   Q.  And do you still own Kin today?
20   A.  Yes.
21   Q.  And you don't feel that you have any
22  ongoing business relationship with Kik today?
23   A.  Business relationship?
24   Q.  Yeah.
25   A.  I guess that's sort of a complex issue.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.          Alexander Rousmaniere
November 22, 2019

Page 29

1  If you buy a share of Proctor and Gamble do you have
2  a business relationship with Proctor and Gamble?
3  Not really.  You're an investor.  To the same extent
4  I'm an investor in these Kin tokens.
5      Q.  When you use the term investor I want to
6  understand -- I don't want to quibble about
7  terminology but just to understand what you're
8  referring to as an investor.  Are you using that
9  term -- I guess what do you mean by the word
10  "investor"?
11      A.  Well, an investor in a cryptocurrency is
12  someone who purchased some of the cryptocurrency and
13  owns it -- I mean, I don't really see it as an
14  important difference between an investor in real
15  estate or an investor in stocks or an investor in a
16  business or investor in gold, platinum.
17      Q.  Okay.  So the way you're using the term is
18  someone who purchases something --
19      A.  Yeah.
20          MS. D'ALLAIRD:  Objection.  I just have to
21  jump in from time to time before you answer.  Thank
22  you.  You can go ahead.
23  BY MS. BAILEY:
24      Q.  So you're referring to somebody who
25  purchases something?

Page 30

1          MS. D'ALLAIRD:  Objection.
2          THE WITNESS:  I'm using it in a very broad
3  sense, yes.
4  BY MS. BAILEY:
5      Q.  So could buying a house be an investment
6  in your view?
7          MS. D'ALLAIRD:  Objection.
8          THE WITNESS:  Yes.
9  BY MS. BAILEY:
10      Q.  And buying gold is another example of an
11  investment in your view?
12      A.  Yes.
13      Q.  So have you purchased houses -- a house
14  before?
15      A.  Yes.
16      Q.  In your experience did that transaction
17  have to be registered with the Securities and
18  Exchange Commission?
19          MS. D'ALLAIRD:  Objection.
20          THE WITNESS:  No.
21  BY MS. BAILEY:
22      Q.  Have you ever bought gold before?
23      A.  Yes.
24      Q.  Did you register that transaction with the
25  Securities and Exchange Commission?

Page 31

1          MS. D'ALLAIRD:  Objection.
2          THE WITNESS:  No.
3  BY MS. BAILEY:
4      Q.  You testified in the course of the SEC
5  investigation; correct?
6      A.  Yes.
7      Q.  I'm going to hand you another document.
8  You've just been handed a document that's been
9  marked as Exhibit 105.  Do you recognize this
10  document?
11          (Exhibit 105 was marked for identification
12      by the Reporter.)
13          THE WITNESS:  Yes.
14  BY MS. BAILEY:
15      Q.  What is this?
16      A.  This looks like the transcript of my -- is
17  it a deposition or is it -- whatever you're calling
18  it.  Or interview, my interview of 2018.
19      Q.  Either terminology is fine.  When we're
20  saying deposition you're referring to this testimony
21  that you gave on this day.  And this was on July 18,
22  2018.  Okay.  Do you recall if you had a chance to
23  review this transcript after your testimony to
24  approve its contents?
25      A.  I don't recall either way.

Page 32

1      Q.  Have you ever seen this document before?
2      A.  I don't know.
3      Q.  Fair enough.  You can set that down.  So
4  I'd like to talk a little bit about your background
5  and professional -- your professional background and
6  then I think we can go to a break after we're done
7  with this section.  So did you graduate from
8  college?
9      A.  I did.
10      Q.  Where did you go to college?
11      A.  Oberlin College.
12      Q.  What did you major in?
13      A.  I majored in history.
14      Q.  And what did you do after college?
15      A.  I worked for an art dealer and I -- my
16  main career for the ten years following that was as
17  a songwriter and I eventually had my own record
18  label and in 2008 I switched -- I kind of evolved
19  into having a software company which is my main
20  project now, software company and a website, a
21  website that I run.  And so -- and I have my own
22  business.
23      Q.  Okay.  So I'd like to go through sort of
24  all those.  You have a lot of things going on so I'd
25  like to hear about each one of them.  So in 2008 you

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Alexander Rousmaniere
                                                                                   November 22, 2019

Page 33

1  started a software company.  What is the name of
2  that company?
3       A.  Ezvid, E-z-v-i-d.
4       Q.  Can you tell me about what that company
5  does?
6       A.  Ezvid makes video software for Windows and
7  also we have a web based video creation tool called
8  Ezvid Wikimaker and we run -- and our website has
9  both professionally and user generated content of
10 various kinds and we create a video series which
11 we -- which is also posted on YouTube and Amazon.
12      Q.  And do you have a background in web
13 developing?
14      A.  Yes.  Well, I've -- I didn't originally
15 but I've learned a lot of it in the last five or six
16 years.
17      Q.  Did you receive any training or are you
18 completely self-taught?
19      A.  Self-taught.
20      Q.  So what are some of your other projects
21 outside of Ezvid?
22      A.  Nothing particularly notable.
23      Q.  So starting back in 2008 until now?
24      A.  I've done a variety of different marketing
25 projects on YouTube and different kinds of projects

Page 34

1  around affiliate marketing and video and that kind
2  of thing.
3       Q.  So do you have some knowledge about how
4  these marketing advertising industry operates?
5       A.  I have some knowledge.  Yes.
6       Q.  Have you ever -- have any of your
7  companies ever built a mobile application?
8       A.  Yes.
9       Q.  Which one?
10      A.  Briefly in -- around 2010 or so I started
11 a project to build mobile applications for
12 psychotherapists to use and that only lasted a year
13 or two.
14      Q.  Did you ever launch a mobile application?
15      A.  Yes.  That would be those applications.
16      Q.  Was it available for public consumption?
17      A.  Yes.
18      Q.  Could you walk me through what features
19 that application had when you launched it?
20      A.  Is this relevant to the discussion of Kik
21 and Kin?
22      Q.  Yeah, it is.
23      A.  The application -- the mobile applications
24 for psychotherapists involved keeping a diary for
25 those in DBT therapy and also the generation of

Page 35

1  sounds and visual stimulation for EMDR therapy.
2       Q.  And we'll be done with these questions
3  soon, I promise.  But did you anticipate when you
4  launched it that you would continue building out
5  additional functionality as time went on?
6       MS. D'ALLAIRD:  Objection.
7       THE WITNESS:  No.
8  BY MS. BAILEY:
9       Q.  So it was --
10      A.  These particular applications were very
11 simple and were kind of like one off.
12      Q.  And then you didn't pursue it after two
13 years or so?
14      A.  Correct.
15      MS. BAILEY:  I think we should take a
16 break right now.  We're at a good stopping point.
17      THE VIDEO OPERATOR:  We're going off the
18 record.  The time is 9:49 A.M.
19      (Recess taken.)
20      THE VIDEO OPERATOR:  We're back on the
21 record.  The time is 10:02 A.M.
22      MS. D'ALLAIRD:  Counsel, just before you
23 begin I just wanted to note for the record that
24 we've agreed to stipulate that objections other than
25 matters to form are preserved.

Page 36

1       MS. BAILEY:  Yes.
2       MS. D'ALLAIRD:  Thank you.
3  BY MS. BAILEY:
4       Q.  Okay.  So the next thing I want to talk
5  about is just to get an understanding of your
6  knowledge of the cryptocurrency space.  It will be
7  helpful going forward.  What is the first time you
8  remember ever purchasing cryptocurrency?
9       A.  Probably 2013.
10      Q.  Do you remember what the first
11 cryptocurrency you bought was?
12      A.  Bitcoin.
13      Q.  Would you say you're generally familiar
14 with the cryptocurrency market?
15      A.  Generally, yes.
16      Q.  Do you typically follow it -- do you
17 follow the prices as they go up and down?
18      A.  Yes.
19      Q.  And do you look at sort of trends in the
20 industry generally?
21      A.  Generally.
22      Q.  Is that something that you started doing
23 as early as 2013?
24      A.  Yes.
25      Q.  Have you done it pretty much continuously

Page 37

1  up through the present?
2      A.  Yes.
3      Q.  And that would include 2017?
4      A.  Uh-huh.
5      Q.  That's a yes?
6      A.  Yes.
7      Q.  How did you first buy your first Bitcoin?
8      A.  Probably on Coinbase.
9      Q.  And Coinbase is a secondary exchange for
10  cryptocurrencies?
11      A.  Yes.
12      Q.  Can you approximate how many
13  cryptocurrencies you've ever purchased?  And by
14  cryptocurrencies I mean different kinds of
15  cryptocurrency.
16      A.  Maybe 20.  Maybe -- somewhere between 20
17  and 30 probably.
18      Q.  And did you buy -- how many of those did
19  you buy on the secondary market?
20      A.  I guess all of them expect possibly for
21  Kin.
22      Q.  So you said possibly.  Is there a
23  possibility you bought Kin on the secondary market
24  at some point?
25      A.  No.  I didn't buy Kin on the secondary

Page 38

1  market.  The only Kin I bought was during the ICO.
2      Q.  And again, I will probably use the term
3  TDE to refer to Kik's 2017 sale of Kin tokens just
4  because that's what comes naturally but just so I
5  understand when you use the term ICO, are you
6  talking about Kik's 2017 public sale of Kin's
7  tokens?
8      A.  Yes.
9      Q.  Why did you first start buying
10  cryptocurrencies?
11      A.  Because I thought that they could be a
12  good investment.
13      Q.  And that included Bitcoin?
14      A.  Yes.
15      Q.  Could you elaborate what you mean by that?
16      MS. D'ALLAIRD:  Objection.
17      THE WITNESS:  How could I elaborate on
18  that?
19  BY MS. BAILEY:
20      Q.  Fair enough.  Why did you think it would
21  be a good investment?
22      A.  Well, there's a lot of reasons why
23  cryptocurrencies could be and can be useful.  I
24  mean, I could go through them now but I don't have
25  any particular insight on this that anyone doesn't

Page 39

1  have.
2      Q.  It's just helpful for me to understand
3  your background.  I know it seems funny but when you
4  saw -- I guess I should ask this.  Do you recall in
5  2017 when cryptocurrency prices were going up?
6      A.  Yes.
7      Q.  Are you familiar with that time in the
8  market?
9      A.  Yes.
10      Q.  And is that -- when the prices of
11  cryptocurrencies generally are trending upward, does
12  that suggest to you that you should purchase
13  cryptocurrencies?
14      MS. D'ALLAIRD:  Objection.
15      THE WITNESS:  No.  I purchase -- making a
16  purchase decision based on -- because there's a
17  bubble in progress does not seem like the right way
18  to make a purchase decision.
19  BY MS. BAILEY:
20      Q.  Did you ever purchase cryptocurrency with
21  the hope that some day the market would trend
22  upward?
23      A.  Yes.
24      Q.  How did you evaluate the potential of a
25  given token before purchasing it?

Page 40

1      A.  Well, I guess it depends on the token.
2  But in the case of Kin I evaluated it as I said to
3  the SEC based on the seeming fact that the company
4  issuing the token had a user base and an existing
5  application and I thought that their proposed use
6  case of a cryptocurrency that could be traded
7  amongst people in a chat setting was a good use case
8  and was likely or at least possible to find product
9  market fit or whatever they call it.
10      Q.  I promise we're going to talk more about
11  Kin in a second here but typically before Kin was it
12  your practice to research any materials that you
13  could find online based on other cryptocurrencies
14  you were purchasing on the secondary market?
15      MS. D'ALLAIRD:  Objection.
16      THE WITNESS:  That's a pretty vague
17  question.  Yes, I did research and yes, the research
18  was on the Internet.
19  BY MS. BAILEY:
20      Q.  I'll clarify my question.  Did you ever
21  look for materials on the Internet related to a
22  given cryptocurrency before purchasing it?
23      A.  Yes.
24      Q.  What types of materials did you look for?
25      A.  Well, in some cases I looked at the code.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.          Alexander Rousmaniere
November 22, 2019

Page 41

1  If there was a public GitHub repository.  GitHub is
2  a place where open source code is shared with the
3  world and certain cryptocurrencies have publicly
4  available code that can be reviewed.  That's some of
5  the research I might have done.
6      Q.  Did you typically look up the white papers
7  associated with these projects?
8      A.  No.
9      Q.  So how did you first hear about Kik?
10     A.  Well, it looks like from this I got an
11  e-mail from my brother, although I probably -- I
12  probably -- I don't know if I heard about it from
13  him first or I read about it on a website like
14  CoinDesk or another crypto blog.
15     Q.  So before we get to this e-mail from your
16  brother which I want to ask about as well, before
17  even then had you ever heard of Kik, the company?
18     A.  Yes.
19     Q.  Had you ever used Kik before?
20     A.  No.
21     Q.  Did you know at that time who Kik's CEO
22  was?
23     A.  I wouldn't have known that by heart, no.
24     Q.  I should probably clarify my question.
25  Before you bought Kin in the TDE so leading up to

Page 42

1  then did you ever know who Kik's CEO was?
2      A.  I mean, first of all let me go back to a
3  prior question about whether I read the white paper.
4  It is likely that I did skim the Kin white paper.
5      Q.  The Kin white paper?
6      A.  Yes.  I may have looked at other -- looked
7  at, not read in detail -- I've looked at other white
8  papers of other tokens that I may have invested in.
9  Your last question was did I know who the CEO was.
10  Yes, I guess I did -- I mean I knew his name.
11     Q.  You did?
12     A.  Probably, yes.
13     Q.  Was he somebody who you were following in
14  the space?
15     A.  No.
16     Q.  Now, I'd love to talk about this e-mail
17  from Tony Rousmaniere.  Is that your brother?
18     A.  Yes.
19     Q.  I'll direct you to what has been marked as
20  Exhibit 104.  So there's a message at the very top
21  of the page from Tony Rousmaniere that appears to be
22  dated August 23, 2017 to Alexander.  Is that you?
23     A.  Yes.
24     Q.  And all it has in this e-mail appears to
25  be just a link to Kin.Kik.com.  You had already

Page 43

1  alluded to this but if you can remember had you ever
2  discussed Kik or Kin with Tony before he sent this
3  e-mail to you?
4      A.  I don't know.
5      Q.  So what I'm trying to do here is pinpoint
6  when about you first started looking into the Kin
7  project.  Is it fair to say that August 23 would
8  have been around the time you first started looking
9  into Kin?
10     A.  I can't tell you for sure.
11     Q.  Would it be possible that you could have
12  heard about it much, much prior to that?
13     A.  Yes.
14     Q.  And did you start conducting research on
15  Kin before Tony sent you this e-mail?
16     A.  I don't know.
17     Q.  I know it's been a long time and I
18  appreciate you bearing with me.  So outside of this
19  exchange can you specifically remember any
20  discussions with Tony that you had about Kin?
21     A.  No.
22     Q.  And if we go down a little bit on the page
23  there's an e-mail from Alexander Perls, that's you;
24  correct?
25     A.  Uh-huh, yes.  That's me.

Page 44

1      Q.  And then you say I'm going to put
2  50,000 -- 50K into it?
3      A.  Uh-huh.
4      Q.  So is this approximately the time when you
5  decided to put $50,000 into the Kin project?
6         MS. D'ALLAIRD:  Objection.  Go ahead.
7         THE WITNESS:  Yes, likely because as I
8  remember the actual purchase of the Kin happened
9  soon thereafter, like maybe -- I think maybe it was
10  in September -- I know it was September or October.
11  Right around then so that date looks familiar.
12  BY MS. BAILEY:
13     Q.  Just to summarize, you're not sure exactly
14  when you first heard about Kin or first started
15  researching it, but was this around the time you
16  decided to purchase Kin?
17     A.  Yes.
18     Q.  And Tony says, "Yeah, me too."  Do you
19  know if he ever purchased Kin?
20     A.  My understanding is that he did not.
21     Q.  Can you recall specifically any documents
22  that you reviewed before purchasing Kin?
23     A.  I can't remember in specific if I reviewed
24  any.  But it's likely that I did look at the white
25  paper and looked at their website.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.        Alexander Rousmaniere
November 22, 2019

Page 45

1    Q.  So do you recall -- I'll start with this.
2  Do you recall clicking on the link to Kin.Kik.com
3  that Tony sent in this e-mail?
4    A.  I don't recall clicking on that link that
5  day but it's likely that I did visit that website at
6  some point.
7    Q.  So you would expect that you visited
8  Kin.Kik.com at some point?
9    A.  Yes.
10    Q.  Did you review any of Kik's financial
11  statements before buying Kin?
12    MS. D'ALLAIRD:  Objection.
13    THE WITNESS:  No.
14  BY MS. BAILEY:
15    Q.  Did you ever ask for them?
16    A.  No.
17    Q.  So you've been just handed a document
18  that's labeled 106.  Are you familiar with the
19  Wayback Machine?
20    A.  I am.
21    (Exhibit 106 was marked for identification
22    by the Reporter.)
23  BY MS. BAILEY:
24    Q.  So I'll represent to you this is a screen
25  grab from the Wayback Machine as you can see in the

Page 46

1  upper corner from the Kin.Kik.com website.  This
2  screen grab was taken from the date September 1,
3  2017 as you can see in the middle of the top there.
4  So I'm just trying to see if you recall --
5    MS. D'ALLAIRD:  Excuse me.  I'll lodge an
6  objection to this exhibit.  Go ahead.
7  BY MS. BAILEY:
8    Q.  I'm trying to understand whether this is
9  the page that you viewed when you might have clicked
10  on that link around that time?
11    MS. D'ALLAIRD:  Objection.
12    THE WITNESS:  Yes, it seems likely.
13  BY MS. BAILEY:
14    Q.  Does this page look familiar to you?
15    A.  It does look vaguely familiar.
16    Q.  Do you remember now that you're seeing it
17  clicking on any of the links on this page or the
18  following page?
19    MS. D'ALLAIRD:  Objection.
20    THE WITNESS:  I don't remember in specific
21  if I did or not.
22  BY MS. BAILEY:
23    Q.  And how about the last page of this?  It
24  says 3 out of 3.  Do you remember clicking on any of
25  these articles?

Page 47

1    MS. D'ALLAIRD:  Objection.
2    THE WITNESS:  I don't remember.
3  BY MS. BAILEY:
4    Q.  So do you see on the very first page
5  there's a portion at the bottom right that says "Our
6  vision."  Do you see that now?
7    A.  Yes.
8    Q.  If you want to take a minute to read it --
9    A.  Okay.
10    Q.  Do you recall reading this at the time
11  when you went to this website?
12    A.  I do not recall in specific.
13    Q.  Was this consistent with what your
14  understanding was as the vision of Kin tokens as you
15  understood it?
16    MS. D'ALLAIRD:  Objection.
17    THE WITNESS:  Yes.
18  BY MS. BAILEY:
19    Q.  And I would like to hear about what your
20  understanding of the Kin vision was.  So if you have
21  an understanding of what your beliefs were about
22  what the vision for Kin was when you purchased Kin?
23    MS. D'ALLAIRD:  Objection.
24    THE WITNESS:  That this token would be
25  used on their chat application and people would be

Page 48

1  exchanging these tokens and they would serve as an
2  incentive for whatever kind of activity people would
3  be doing on this chat application.
4  BY MS. BAILEY:
5    Q.  So is it your understanding -- I guess
6  I'll rephrase.  Was it your understanding before you
7  purchased Kin that Kin could only be used on the
8  chat application?
9    MS. D'ALLAIRD:  Objection.
10    THE WITNESS:  I didn't consider that
11  issue.  I don't think I had an opinion either way.
12  By nature -- for example, if this was running, which
13  it was at the time, on the Ethereum network it
14  seems, there really isn't a way to restrict the
15  usage of cryptocurrencies to just one application.
16  It's like saying TCP/IP is protocol in which data is
17  transferred over the Internet.  It built into
18  TCP/IP -- there is not -- built into that protocol
19  any method for preventing other people to use --
20  preventing certain applications from using it or not
21  using it, nor to prevent the usage of something like
22  a protocol, that's when you get into the worlds of
23  DRM, digital rights management, which are meant to
24  restrict the usage -- anyway, the Kin token, if I
25  had read this at the time it would make sense

Page 49

1 because I would have thought oh, yes, they're going
2 to use this token on the chat application but it's
3 decentralized so anyone can use it on any
4 application. It all sounds reasonable to me.
5 BY MS. BAILEY:
6    Q.  Can you recall if the Kin token code was
7 open source at the time?
8        MS. D'ALLAIRD:  Objection.
9        THE WITNESS:  I can't recall.
10 BY MS. BAILEY:
11    Q.  So you don't recall reviewing the code for
12 Kin?
13        MS. D'ALLAIRD:  Objection.
14        THE WITNESS:  I don't think I reviewed it.
15 BY MS. BAILEY:
16    Q.  So just to drill down a little bit on what
17 you just said, so you testified earlier that it's
18 your memory that Kin was run on the Ethereum
19 blockchain when it was launched.  Is your
20 understanding of tokens that run on the Ethereum
21 blockchain that they can be integrated into any app
22 that people choose?
23        MS. D'ALLAIRD:  Objection.
24        THE WITNESS:  Yes.
25 ///

Page 50

1 BY MS. BAILEY:
2    Q.  And then when that occurs -- I know you
3 spoke about this a bit ago but walk me through, do
4 the nodes validate that transaction on the Ethereum
5 blockchain?
6    A.  Yes.
7    Q.  And to your understanding that process is
8 decentralized in nature?
9        MS. D'ALLAIRD:  Objection.
10       THE WITNESS:  Well, with Ethereum it's a
11 little tricky because Ethereum is not as
12 decentralized as it should be and the actual -- I
13 haven't looked into this stuff in a few months
14 really, but when I last left Ethereum is that they
15 have these super nodes and there's only certain
16 nodes that can validate everything.  But in general
17 the idea with Bitcoin and the hope with Ethereum is
18 to have a network where yes, a transaction can be
19 independently verified in a decentralized fashion.
20       When I say I didn't -- now that you
21 mention -- now that I'm recalling that it was built
22 on Ethereum I think that they were issuing the token
23 on the Ethereum network so I did know a little bit
24 at that point about the Ethereum network.  Not as
25 much as I learned later but I knew a little bit

Page 51

1 about it and I thought that then they were going to
2 probably -- to migrate Kin to another blockchain,
3 now that I think about it.  And we were investing in
4 this thing that you would then trade in for the real
5 Kin which would come out on a different blockchain.
6 BY MS. BAILEY:
7    Q.  Do you remember learning that information
8 before you bought Kin in the TDE or after?
9    A.  I don't recall when I learned that.
10    Q.  Was that a significant consideration for
11 you before you purchased Kin?
12       MS. D'ALLAIRD:  Objection.
13       THE WITNESS:  Was what --
14 BY MS. BAILEY:
15    Q.  You described this understanding that Kin
16 would ultimately be migrated onto a new blockchain,
17 but you told me you couldn't remember one way or the
18 other whether you had known that information before
19 the TDE.  I'm trying to understand whether that
20 concept of whether Kin would be migrated to a new
21 blockchain was important to you or a substantial
22 consideration for you before you bought Kin in the
23 TDE.
24       MS. D'ALLAIRD:  Objection.
25       THE WITNESS:  Probably it was not

Page 52

1 something I thought about too much.
2 BY MS. BAILEY:
3    Q.  Okay.  When I'm asking questions just make
4 sure you let me get the full question out and let
5 her lodge her objection.
6       Are you familiar with the concept called
7 peer-to-peer transactions?
8    A.  Yes.
9    Q.  Is it your understanding that
10 cryptocurrencies that are available on Ethereum can
11 be transacted or traded peer to peer?
12       MS. D'ALLAIRD:  Objection.
13       THE WITNESS:  Technically I'm a little
14 vague on that because the -- I think it's common to
15 refer to cryptocurrencies as peer to peer.  Yes,
16 they're peer to peer.  They go through nodes that --
17 it's not like you directly transfer any kind of
18 cryptocurrency from person to person.  It all has to
19 go through a node.  But I think it's commonly
20 referred to as peer to peer because it's not like
21 it's going through a trusted authority.
22 BY MS. BAILEY:
23    Q.  That's a good point.  You probably know a
24 lot more than I do about what peer to peer means so
25 can you explain to me what your understanding of

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.
Alexander Rousmaniere
November 22, 2019

---

Page 53

1  that term is?
2       A.  Well, a true peer to peer would be more
3  like file sharing protocols and like say for example
4  torrents where you're just broadcasting the
5  availability of something on a certain protocol and
6  port and you're allowing those ports to be open to
7  the Internet so they can be scanned.  Whereas with
8  cryptocurrency I don't think that it's -- you
9  communicate with a node and that node communicates
10  with other nodes and those other nodes communicate
11  with other users.
12       So it's like you, your nodes and another
13  user, whereas I think true peer to peer would be
14  just me communicating with other users without even
15  centralized nodes at all.  Does that help?
16       Q.  Yeah.  That's helpful.  So I guess let's
17  set aside the definition of peer to peer and I guess
18  my question is really whether on the Ethereum
19  blockchain it's capable for one cryptocurrency owner
20  to transfer that cryptocurrency to the wallet of
21  somebody else or another company?
22       MS. D'ALLAIRD:  Objection.
23       THE WITNESS:  It is possible.  That's the
24  point of -- yes, cryptocurrencies.
25  ///

---

Page 54

1  BY MS. BAILEY:
2       Q.  So was that true of Kin when you received
3  it?
4       MS. D'ALLAIRD:  Objection.
5       THE WITNESS:  It must have been since it
6  went from them to my Ethereum wallet.
7  BY MS. BAILEY:
8       Q.  And at that point could you have sent it
9  to another Ethereum wallet?
10       MS. D'ALLAIRD:  Objection.
11       THE WITNESS:  Yes.
12  BY MS. BAILEY:
13       Q.  So if I for example told you at that time
14  I will sell you a sandwich for 100 Kin if you
15  transfer me 100 Kin to my Ethereum wallet, could
16  that transaction have taken place?
17       MS. D'ALLAIRD:  Objection.
18       THE WITNESS:  Yes.
19  BY MS. BAILEY:
20       Q.  So I mean, sandwich is kind of a silly
21  example but could that have been the case with
22  virtually anything I wanted to sell you at the time?
23       MS. D'ALLAIRD:  Objection.
24       THE WITNESS:  Yes.
25  ///

---

Page 55

1  BY MS. BAILEY:
2       Q.  So the last question on this document
3  Exhibit 106 is -- I know it's not printed very well
4  but at the very bottom of page 1 it says, "The
5  introduction of Kin" in a blue box.  It says,
6  "Envisioned as a general purpose cryptocurrency for
7  use in every day digital services."  And then it
8  continues on.
9       A.  I see that.
10       Q.  What does that mean to you?
11       A.  Not very much.  I mean you can envision
12  anything.
13       Q.  But the terminology general -- general
14  purpose cryptocurrency for use in every day digital
15  services.  What does that mean to you?
16       A.  It means very little because at this time
17  you could have found 10,000 people -- businesses or
18  individuals who were creating cryptocurrencies,
19  especially on the Ethereum network where currency
20  can be made very easily, who would all be saying the
21  same thing.  They're creating a general purpose
22  cryptocurrency that everyone is going to use every
23  day.  So it doesn't mean much I don't think.
24       Q.  Did you perceive Kin to be set apart from
25  those other projects when you purchased it?

---

Page 56

1       MS. D'ALLAIRD:  Objection.
2       THE WITNESS:  Set apart?  Not technically
3  but set apart that there was an existing business
4  and an existing -- hopefully an existing group of
5  people who could start using the thing.
6  BY MS. BAILEY:
7       Q.  Is it fair to say that you thought Kin had
8  a better chance of actually achieving the goal of
9  becoming a cryptocurrency for use in everyday
10  digital services than others?
11       MS. D'ALLAIRD:  Objection.
12       THE WITNESS:  Yes.
13  BY MS. BAILEY:
14       Q.  So if reading this today would you agree
15  that Kin was marketed as a tool to be used for
16  consumptive use?
17       MS. D'ALLAIRD:  Objection.
18       THE WITNESS:  A tool to be used for
19  consumptive -- what does that mean?
20  BY MS. BAILEY:
21       Q.  I should rephrase the question.  Was Kin
22  marketed as a currency to be used consumptively for
23  digital services?
24       MS. D'ALLAIRD:  Objection.
25       THE WITNESS:  Was it marketed as that?

---

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 57

1  BY MS. BAILEY:
2    Q.  Uh-huh.
3    A.  I mean -- I mean yes, I guess so because
4  there would be users in their application and maybe
5  other people would write applications that would use
6  it and then you would be able to buy things.  Like
7  you would be able to trade it over the chat system.
8    Q.  Okay.  Thank you.  I'm not trying to be
9  cute with my words or anything.  I'm just trying to
10  find out if you thought it would be used in digital
11  services?
12      MS. D'ALLAIRD:  Objection.
13      THE WITNESS:  Yes.
14  BY MS. BAILEY:
15    Q.  Was it your understanding then that people
16  would be using Kin after they received it?
17      MS. D'ALLAIRD:  Objection.
18      THE WITNESS:  That's too vague.  Can you
19  narrow that question a bit?
20  BY MS. BAILEY:
21    Q.  Sure.  Were you hoping as somebody who
22  purchased Kin that people would use it after they
23  received it?
24      MS. D'ALLAIRD:  Objection.
25      THE WITNESS:  Depends on what you mean by

Page 58

1  use.
2  BY MS. BAILEY:
3    Q.  So were you hoping that people who
4  received Kin in the token sale, the TDE or ICO,
5  would use it to transact for various digital
6  services within the chat application or anything
7  else?
8      MS. D'ALLAIRD:  Objection.
9      THE WITNESS:  Yes.
10  BY MS. BAILEY:
11    Q.  Did you expect that people would use it
12  for those purposes?
13      MS. D'ALLAIRD:  Objection.
14      THE WITNESS:  Expect is too strong a word
15  for a very -- the word isn't risky.  There's another
16  word that's like risky -- speculative investment.
17  BY MS. BAILEY:
18    Q.  So you can use whatever word is
19  comfortable.  But I'm trying to get at whether you
20  believed at that time when you purchased Kin that it
21  would ultimately be something people used to buy and
22  sell digital services?
23      MS. D'ALLAIRD:  Objection.
24      THE WITNESS:  Because the investment was
25  so speculative at the time I would have thought

Page 59

1  there was a small chance that in the future it would
2  be used widely.
3  BY MS. BAILEY:
4    Q.  We discussed this earlier but it was
5  possible on day one when people received it for
6  people to transact with it; right?
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  I think I interpreted your
9  question as would it be widely used.  When I
10  purchased it I thought it was likely to be used at
11  least once for somebody to do a test transaction
12  with, yes.
13  BY MS. BAILEY:
14    Q.  So what you were testifying to in response
15  to my question earlier was assuming I meant that
16  would this be widely used in large scale fashion.
17  So what I'm actually just trying to get at is a lot
18  more simple than that.  Do you think people would
19  use Kin for transacting for digital services in any
20  capacity when you bought it at some point?
21      MS. D'ALLAIRD:  Objection.
22      THE WITNESS:  Yes.
23  BY MS. BAILEY:
24    Q.  So I'd like to -- actually before I move
25  on can you recall watching any videos before you

Page 60

1  purchased Kin relating to Kin?
2    A.  No.
3    Q.  How about reading any medium posts maybe?
4    A.  I may have skimmed one.
5    Q.  Did anything jump out at you as something
6  you relied on for making your purchase?
7    A.  No.
8    Q.  Can you recall listening to any podcasts
9  about Kin before you purchased it?
10    A.  No.
11    Q.  How about do you follow any social media
12  channels that relate to Kin?
13    A.  No.
14    Q.  And you didn't in 2017 either?
15    A.  Correct.
16    Q.  So you didn't rely on anything you saw in
17  video clips or a podcast interview or medium
18  articles or on social media before you bought Kin.
19    A.  It's possible I might have skimmed a
20  medium article and, as I said, read a few articles
21  in Coinbase and I probably looked at the white
22  paper.  I probably looked at this website, but
23  nothing else comes to mind.
24    Q.  So just to put a finer point on that is it
25  fair to say at least in deciding to purchase Kin you

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 61

1 did not rely on any videos or speeches that you saw
2 involving Kik's CEO?
3        MS. D'ALLAIRD:  Objection.
4        THE WITNESS:  I don't think that I did.
5 BY MS. BAILEY:
6    Q.  Okay.  So now I just want to talk about
7 some of the nuts and bolts of your purchase of Kin.
8 I think you've already been over this but do you
9 recall approximately how much Kin you purchased in
10 the token sale?
11    A.  I keep forgetting how much it was but the
12 SEC at one point reminded me and that seems to be
13 correct.
14    Q.  $50,000 seems to be correct?
15    A.  That seems correct.
16    Q.  Did you ever purchase more Kin after the
17 TDE?
18    A.  I vaguely remember that there was -- I
19 don't think so, but I vaguely remember that like it
20 didn't sell out or something so there was like more
21 left over and then I -- I don't think I did.  I
22 think I -- maybe I was -- I can't remember.  No, I
23 think there was just like this one instance where I
24 sent some Ethereum and that was it.
25    Q.  But you didn't purchase any on secondary

Page 62

1 markets -- or secondary exchanges?  Sorry.
2    A.  No, I did not.
3    Q.  Do you recall there being any caps on the
4 amount that you were allowed to purchase?
5    A.  It seems likely.
6    Q.  So I can direct you to if we go back to
7 Exhibit 104 on page with the Bates label 0000004.
8 It's the second page on the back.  Is this an e-mail
9 you produced to the SEC?
10    A.  Yes.
11    Q.  So if you see about four or five lines
12 down it says, "The TDE will be capped at 75,000,000.
13 In order to enable as many people to participate we
14 will have two phases of the TDE," and then it goes
15 on to describe what the two phases are.
16    A.  Right.
17    Q.  Does that refresh your recollection as to
18 what the purchase caps were?
19    A.  Yes.
20    Q.  So in the line beginning with the word
21 "Tuesday" it says, "For the first 24 hours each
22 registered individual will be able to purchase up to
23 $4,393."
24    A.  Yes.
25    Q.  Were you aware of that cap at the time of

Page 63

1 the sale?
2    A.  I can't remember.  But clearly I invested
3 more than that, didn't I, so I must have waited
4 until the cap was raised.
5    Q.  So where it says "Wednesday, September 13"
6 it says, "The maximum participation cap will be
7 incrementally raised over the first hour and then
8 removed."
9    A.  That seems likely that that's what I did.
10 I mean, I waited until then or something like that.
11    Q.  So going back to the beginning of this
12 section it says, "In order to enable as many people
13 to participate."  Was that something that you
14 remember hearing from Kik about the token sale, that
15 it's goal was to enable people -- as many people as
16 possible to participate in the sale?
17        MS. D'ALLAIRD:  Objection.
18        THE WITNESS:  If I heard it I mean, that
19 statement has no meaning.  It's like Coke makes you
20 happy.  That is what you would say when you were
21 running an ICO obviously.
22 BY MS. BAILEY:
23    Q.  Couldn't one say we want as much money as
24 we can possibly get?
25    A.  That would be poor marketing.

Page 64

1    Q.  That's fair.  With your understanding of
2 how the Kin project would unfold, would it be
3 important to you as a purchaser to know that it was
4 being widely distributed to many, many individuals?
5        MS. D'ALLAIRD:  Objection.
6        THE WITNESS:  Important.  I guess it would
7 be a nice thing.
8 BY MS. BAILEY:
9    Q.  Why would that be nice?
10    A.  Because with some of these ICOs I -- I
11 guess subsequently learned there was a bunch of very
12 sketchy, possibly illegal presales going on where
13 chunks of it were sold off to the big -- to the
14 whales to begin with and then in order to
15 basically -- and then those people would just turn
16 around and sell it again.
17        And I know that some of the -- some
18 various entrepreneurs have gotten in trouble.  I've
19 read they got in trouble for doing that and the
20 SEC -- SEC or someone else said you're not allowed
21 to do that.  So if I had learned or learned now that
22 that was the case with Kin and that there were not
23 that many participating then -- yeah, it would not
24 be -- it would not be great a recommendation of the
25 process as a whole.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Alexander Rousmaniere
                                                                                   November 22, 2019

Page 65

1     Q.  So you're approaching that from the
2  perspective of your understanding that in the past
3  projects in certain -- we've called them whales have
4  gotten in trouble with regulators for that kind of
5  behavior.  Is that the perspective that you're
6  coming to that conclusion from?
7        MS. D'ALLAIRD:  Objection.
8        THE WITNESS:  Yeah, but also that behavior
9  is just -- it's possibly illegal and definitely
10  unethical.
11  BY MS. BAILEY:
12     Q.  So if a token is going to be -- I'll use
13  that language again, general use cryptocurrency for
14  digital services would it be important for many
15  people to have it?
16        MS. D'ALLAIRD:  Objection.
17        THE WITNESS:  Yes.
18  BY MS. BAILEY:
19     Q.  Why is that?
20     A.  Because if -- there has to be a critical
21  mass of users in order to make something useful as a
22  medium of exchange.
23     Q.  So as a purchaser of Kin is it a positive
24  to you that Kik was intending to distribute Kin at
25  least according to this statement here to as many

Page 66

1  people as possible?
2        MS. D'ALLAIRD:  Objection.
3        THE WITNESS:  No, because what they
4  intended was part of their like marketing materials.
5  And that intention didn't differ in any substantial
6  way from any of the other zillions of ICOs that were
7  happening at the same time.
8  BY MS. BAILEY:
9     Q.  I know you said that you haven't
10  participated in any other ICOs but were you aware of
11  other ICOs that had any individual caps on purchases
12  for any amount of time?
13        MS. D'ALLAIRD:  Objection.
14        THE WITNESS:  I don't know.
15  BY MS. BAILEY:
16     Q.  So you can see that Kik put a cap on
17  individual purchases for 24 hours.  Wouldn't that
18  ensure that people who wanted to purchase Kin would
19  have at least the opportunity to within that first
20  24 hours?
21        MS. D'ALLAIRD:  Objection.
22        THE WITNESS:  I guess that's the -- it's
23  the intention to actually allow a broader base of
24  people to buy it or to make it seem like they were
25  intending to allow a broader base of people to buy

Page 67

1  it.  But that doesn't answer the question of what
2  was really going on and it's possible that -- I'm
3  guessing that it's possible that what may have
4  really been going on is that chunks were being sold
5  off to big investors beforehand with the idea they
6  would flip it quickly back to the suckers.
7  Possibly.
8        I know that happened with other ICOs,
9  maybe it happened with Kin.  I don't really know one
10  way or the other but the fact -- what you're
11  pointing out here is like their intention, they're
12  making these noises about it being a broad-based
13  thing literally has no meaning.
14        As I said, it's like marketing materials.
15  It's like Sprite telling you you're going to be
16  active and happy and everyone is going to love you
17  if you drink Sprite.  It's just noise.  It doesn't
18  mean anything necessarily.
19  BY MS. BAILEY:
20     Q.  So what I'm actually trying to get at,
21  setting a cap for the first 24 hours is at least a
22  measure in your view to ensure that there was an
23  opportunity for many people to purchase Kin.
24        MS. D'ALLAIRD:  Objection.
25  ///

Page 68

1  BY MS. BAILEY:
2     Q.  Is that fair to say?
3        MS. D'ALLAIRD:  Objection.
4        THE WITNESS:  No because it could be a
5  marketing measure as opposed to a -- the actual
6  effect of it is unknown.
7  BY MS. BAILEY:
8     Q.  Let me pose a different hypothetical to
9  you.  As somebody who follows the space have you
10  ever heard of these sales that have a cap and then
11  they get bought up instantaneously with a few very,
12  very, very large purchasers?  Are you familiar with
13  that concept?
14        MS. D'ALLAIRD:  Objection.
15        THE WITNESS:  Yes.  I'm familiar.
16  BY MS. BAILEY:
17     Q.  So would that be possible -- I'll
18  rephrase.  Wouldn't it have helped in those
19  situations if purchasers at least within the first
20  24 hours weren't able to buy more than $4,000 worth
21  because it meant more of the smaller purchasers had
22  a chance to buy some of the cryptocurrency?
23        MS. D'ALLAIRD:  Objection.
24        THE WITNESS:  Yes, assuming that such a
25  rule was actually followed by the seller of the

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.          Alexander Rousmaniere
                                                                        November 22, 2019

Page 69

1  token.  And there weren't other deals that had gone
2  on prior to that or in addition to that.  But yes,
3  just as a question of basically economics, if
4  there's a store that's selling some hot new sneaker
5  and they say -- it's kind of like the one per
6  customer thing.  Right?  I guess that enables more
7  people to go and get the sneakers and make sure that
8  the scalpers don't buy it all up and resell it.  As
9  long as that is happening in an honest fashion.
10  BY MS. BAILEY:
11      Q.  Do you have any reason to dispute that the
12  caps in the case of the Kin sale were enforced?
13          MS. D'ALLAIRD:  Objection.
14          THE WITNESS:  I don't have reason to
15  dispute that.
16  BY MS. BAILEY:
17      Q.  And on the flip side of that were you
18  aware when you purchased Kin that there was no
19  minimum purchase amount required?
20          MS. D'ALLAIRD:  Objection.
21          THE WITNESS:  I was not aware.
22  BY MS. BAILEY:
23      Q.  Have you ever heard of another project
24  having that structure before?
25          MS. D'ALLAIRD:  Objection.

Page 70

1          THE WITNESS:  I haven't heard either way.
2  BY MS. BAILEY:
3      Q.  So what is your takeaway from the fact
4  that people -- there was no minimum purchase
5  requirement?
6          MS. D'ALLAIRD:  Objection.
7          THE WITNESS:  Theoretically it was part of
8  their marketing tactic to make it -- I mean, so many
9  of the ICOs are going for this idea of scale and
10  show how decentralized it is so one of the marketing
11  tactics that would come along with that might be to
12  say yeah, we're going to have no minimum so the
13  little players can get in and buy little bits of it.
14  BY MS. BAILEY:
15      Q.  Are you aware of any other projects that
16  had minimum purchase requirements, meaning you had
17  to buy at least a certain amount of cryptocurrency?
18          MS. D'ALLAIRD:  Objection.
19          THE WITNESS:  I'm not aware.
20  BY MS. BAILEY:
21      Q.  Do you know if it was ever marketed to the
22  public these -- that there was no minimum purchase
23  requirement?
24          MS. D'ALLAIRD:  Objection.
25          THE WITNESS:  I'm not aware.

Page 71

1  BY MS. BAILEY:
2      Q.  So in that sense in this case is it your
3  view that that was a marketing ploy?
4          MS. D'ALLAIRD:  Objection.
5          THE WITNESS:  Marketing ploy?
6  BY MS. BAILEY:
7      Q.  I'm not trying to change your terminology.
8  I think earlier you said it was a marketing took so
9  do you think it was a tool that was used by Kik in
10  this case?
11          MS. D'ALLAIRD:  Objection.
12          THE WITNESS:  Yes, I guess.  That was a
13  feature -- that was part of the feature of the sale,
14  it's possible that to some investors they would have
15  said this is great.  There's no floor on it.  Which
16  means a lot of people are going to buy into it or
17  something like that.
18  BY MS. BAILEY:
19      Q.  Okay.  Are you familiar with the term
20  called "micro-transactions"?
21      A.  Yes.
22      Q.  What does that term mean to you?
23      A.  Typically I think it refers to the ability
24  to make purchases for very small amounts of money
25  which when translated into for example US dollars

Page 72

1  might be one penny or tenth of a penny or hundredth
2  of a penny or five cents or ten cents.  All those
3  figures are values of transactions for which the
4  existing credit cards system does not work very well
5  or work at all.
6      Q.  Did you expect that Kin would be used for
7  micro-transactions?
8      A.  I didn't -- well, I mean, if the Kin
9  project was going to be successful, if the project
10  on the whole would be successful, yes, I would
11  expect that it would be used for micro-transactions.
12  I just want to reiterate that my expectation of the
13  Kin project was that it would fail because most of
14  these projects did fail and have failed and will
15  fail.  So I don't want -- I don't have an
16  expectation that any of this would happen, but if it
17  were to succeed, I would expect that one of the
18  features of its use would be its usage for
19  micro-transactions.
20      Q.  I asked two questions.  One, I'd like to
21  understand more about why did you buy Kin if you
22  thought the project would fail?
23          MS. D'ALLAIRD:  Objection.
24          THE WITNESS:  Because I thought that there
25  was -- there was a chance that it would succeed and

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.          Alexander Rousmaniere
November 22, 2019

Page 73

1 the value of Kin would go up exponentially.
2 BY MS. BAILEY:
3     Q.  And you focused on the word expectation,
4 and I'm not trying to necessarily ask you about
5 whether you expected that it would be ultimately
6 used at the scale of micropayments that its
7 potential foretold, but I'm trying to understand
8 whether you think that was part of the messaging
9 that Kik had presented to the public about how Kin
10 was a different option for a currency for digital
11 services?
12     MS. D'ALLAIRD:  Objection.
13 BY MS. BAILEY:
14     Q.  Is that fair to say?
15     MS. D'ALLAIRD:  Objection.
16     THE WITNESS:  You're asking was part of
17 their messaging the proposal that it would enable
18 micro-transactions, and my answer is yes, that was
19 likely part of their messaging.  However, that kind
20 of applies to most cryptocurrency projects.
21 BY MS. BAILEY:
22     Q.  So just to --
23     A.  If not all; right?
24     Q.  Just to circle back, so if people -- there
25 was no minimum requirement, meaning people could buy

Page 74

1 one dollar worth of Kin tokens, would that be
2 consistent with the ultimate use case for the token
3 being micro-transactions?
4     MS. D'ALLAIRD:  Objection.
5     THE WITNESS:  I think that's confusing two
6 different things.  The first thing you're talking
7 about is, is there a broad based set of retail
8 investors, and the broad base set of retail
9 investors could include people who could only put in
10 ten bucks; right?  The second question is in regard
11 to the actual usage, eventual usage of it -- I lost
12 my train of thought here.
13     But no, I don't think that the fact that
14 they had no minimum purchase thing hardly seems
15 related to whether or not it would be used for
16 micro-transactions in the future.
17 BY MS. BAILEY:
18     Q.  So your understanding of that is that
19 those two concepts are not related?
20     A.  They're not related.
21     MS. BAILEY:  We'll take another ten-minute
22 break.
23     THE VIDEO OPERATOR:  We're going off the
24 record.  The time is 10:53 A.M.
25     (Recess taken.)

Page 75

1     THE VIDEO OPERATOR:  We're back on the
2 record.  The time is 11:08 A.M.
3 BY MS. BAILEY:
4     Q.  So in your view when you purchased Kin how
5 could Kin become successful?
6     MS. D'ALLAIRD:  Objection.
7     THE WITNESS:  By a lot of people using the
8 Kin token for transactions.
9 BY MS. BAILEY:
10     Q.  So just to look at the flip side of that,
11 could the project have succeeded if nobody ever
12 transacted in Kin?
13     MS. D'ALLAIRD:  Objection.
14     THE WITNESS:  Well, from an investor
15 standpoint yes, I guess it could of.  Because if
16 you're an investor you want the value of it to go up
17 and there are plenty of examples of cryptocurrencies
18 that virtually no one uses for any real reason which
19 have gone up in value.
20 BY MS. BAILEY:
21     Q.  I want to drill down on that.  I think you
22 just said that Kin specifically could only be
23 successful if it was used --
24     A.  I would want you to define successful.
25     Q.  That's a good point.  Earlier you had said

Page 76

1 you didn't expect the project to be successful.  I
2 think that was the word you used.  If I'm misquoting
3 you tell me.  But that's the concept I'm trying to
4 draw out now.  What would have to happen for the
5 project to be quote, unquote, successful as a
6 business model in your view?
7     MS. D'ALLAIRD:  Objection.
8     THE WITNESS:  A business model for the Kik
9 company you mean?
10 BY MS. BAILEY:
11     Q.  Or any company that used Kin?
12     MS. D'ALLAIRD:  Objection.
13     THE WITNESS:  Well, this gets confusing to
14 talk about because most of the money that's been
15 made through cryptocurrencies the vast majority is
16 speculation on currencies, not usage by humans.  So
17 I want to walk back my previous statement about it
18 could only be successful if people used it.  For an
19 investor and from a company perspective also, I mean
20 the best way to talk about this is by maybe another
21 example in the same space.  If we look at that
22 company in San Francisco that has one of the leading
23 cryptocurrencies, not Stellar -- Ripple.  Ripple.
24     That's very successful.  The people who
25 sold Ripple have made hundreds of millions of

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 77

1  dollars as far as I understand.  A bunch of suckers
2  bought it.  It's gone way down.  It's been very
3  successful for the people on the inside who created
4  the cryptocurrency and sold it and been successful,
5  but it's not like there's really hardly any users of
6  this cryptocurrency.
7  BY MS. BAILEY:
8      Q.  I want to separate this out.  The side
9  that I want to focus on for the time being is the
10  vision for how Kin would be used as Kik had
11  portrayed it to the public before the token sale.
12  So was it your understanding that Kin was a new
13  option for a business model for various applications
14  or developers?
15      MS. D'ALLAIRD:  Objection.
16      THE WITNESS:  Yes, it could be.  The idea
17  was that it could be used by other application
18  developers, yes.
19  BY MS. BAILEY:
20      Q.  So in that sense, just in that sense could
21  it become successful at that goal if it weren't
22  used?
23      MS. D'ALLAIRD:  Objection.
24      THE WITNESS:  No.
25  ///

Page 78

1  BY MS. BAILEY:
2      Q.  I want to ask a few followup questions
3  about the other side of it that you've referenced
4  which is that the price can go up irrespective of
5  use or whether it was being used.  So with a
6  cryptocurrency like Kin where its primary intention
7  is to be used, why would it go up in value even if
8  it weren't being used?
9      MS. D'ALLAIRD:  Objection.
10      THE WITNESS:  You just said its primary
11  intention which is both vague and like -- I don't
12  really -- my guess would be the primary intention of
13  Kin would be for the people who run Kik to make a
14  large pile of money selling it and it going up in
15  price.  To do that they would have to have a lot
16  of -- it would be most likely to go up in price if
17  there were either a lot of real users or there was a
18  perception that there were a lot of real users.
19  BY MS. BAILEY:
20      Q.  That's fair.  I didn't mean to put any
21  words in your mouth or ascribe any meaning to what
22  the purpose was, but what I'm trying to understand
23  is it possible for the market forces of the industry
24  generally to drive the value of cryptocurrencies up
25  and down?

Page 79

1      A.  Yes.
2      Q.  Have you ever seen that happen in your
3  experience?
4      A.  Yes.
5      Q.  So earlier you testified that you
6  generally follow cryptocurrency markets and have
7  been doing so since 2013; is that right?
8      A.  Yes.
9      Q.  So in that time this is something you have
10  observed happening?
11      MS. D'ALLAIRD:  Objection.
12      THE WITNESS:  Yes.
13  BY MS. BAILEY:
14      Q.  Would that be, in your experience would
15  that be irrespective of anything Kik or any other
16  company did to cause the prices of all the
17  cryptocurrencies to inflate?
18      MS. D'ALLAIRD:  Objection.
19      THE WITNESS:  It wouldn't be completely
20  irrespective because clearly for any of the
21  currencies, even those that don't have a company
22  behind them, there are developers, so clearly their
23  success is at least somewhat related to the work the
24  developers have done on the application.
25  ///

Page 80

1  BY MS. BAILEY:
2      Q.  So say Ethereum or another blockchain
3  that's already been launched, is it possible that
4  the price of ether or any other cryptocurrency could
5  go up and down in value based on factors that don't
6  have anything to do with what the Ethereum
7  foundation is doing?
8      MS. D'ALLAIRD:  Objection.
9      THE WITNESS:  You just said don't have
10  anything to do.
11  BY MS. BAILEY:
12      Q.  I'm saying is it possible that it could go
13  up and down based on factors that didn't have
14  anything to do -- I'm not saying that that's
15  exclusively how the price could go up or down, but
16  I'm asking whether that's a possibility that outside
17  factors other than the company could influence the
18  price up or down?
19      MS. D'ALLAIRD:  Objection.
20      THE WITNESS:  The outside factors could
21  influence the price up and down but it's impossible
22  that the company or in the case of Kin or the
23  developers in the case of say Bitcoin don't have any
24  effect on the price.  Because clearly the price is
25  related to the underlying -- to some extent it's

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Alexander Rousmaniere
November 22, 2019

---

Page 81

1  related to the underlying protocol and software
2  which is developed by people.
3  BY MS. BAILEY:
4      Q.  What is your basis for that thought?
5      A.  Because there are no cryptocurrencies that
6  have just appeared on earth out of nowhere without
7  humans developing them.
8      Q.  So what you're saying is somebody created
9  it and built the underlying infrastructure; right?
10         MS. D'ALLAIRD:  Objection.
11  BY MS. BAILEY:
12     Q.  So to some degree that's part of it of
13  course.  But putting that aside, once the project
14  has been launched is it possible for there to be
15  other factors that affect the price up or down?
16         MS. D'ALLAIRD:  Objection.
17         THE WITNESS:  There are -- it is possible
18  for there to be other factors, yes.
19  BY MS. BAILEY:
20     Q.  Is that something you've seen happening
21  over the years of following the industry?
22         MS. D'ALLAIRD:  Objection.
23         THE WITNESS:  Yes, but I mean, that
24  applies to any single thing that's bought and sold
25  on earth by humans.  Like the price of like cobalt

---

Page 82

1  or platinum goes up and down like based on lots of
2  different factors, including like the miners of the
3  thing and the demand for it and the speculation and
4  all those things.
5  BY MS. BAILEY:
6      Q.  So in your view is supply and demand a
7  major determinant of the price of any asset?
8         MS. D'ALLAIRD:  Objection.
9         THE WITNESS:  Yes.
10  BY MS. BAILEY:
11     Q.  And does that apply to Kin as well?
12     A.  Yes.
13     Q.  And could you -- is it your belief that
14  Kin's price could be affected by swings in the
15  market?
16         MS. D'ALLAIRD:  Objection.
17         THE WITNESS:  Yes.
18  BY MS. BAILEY:
19     Q.  Was that something that you personally
20  anticipated when you bought Kin?
21         MS. D'ALLAIRD:  Objection.
22         THE WITNESS:  Yes.  Because it's hard to
23  envision any cryptocurrency that wasn't affected by
24  swings in the market.
25  ///

---

Page 83

1  BY MS. BAILEY:
2      Q.  Fair.  Were you -- this isn't to say -- or
3  this isn't to ask whether this was your sole
4  motivation but were you in some part hoping that
5  market prices would go up and with it the price of
6  Kin would go up?
7         MS. D'ALLAIRD:  Objection.
8         THE WITNESS:  Yes.
9  BY MS. BAILEY:
10     Q.  So in that sense are there certain
11  parallels between Kin tokens and the items you
12  described, like cobalt or platinum I think were the
13  two examples.  Are there some parallels in that
14  sense between those two types of assets?
15     A.  Yes.
16     Q.  What would those parallels be, just to
17  cover it.
18         MS. D'ALLAIRD:  Objection.
19         THE WITNESS:  That they can be bought and
20  sold.
21  BY MS. BAILEY:
22     Q.  How about their price dynamic?  Are there
23  any parallels in how the price evolves over time for
24  something like Kin versus something like cobalt?
25  Earlier you testified that cobalt goes up and down

---

Page 84

1  based on certain factors.  I believe you said like
2  supply and demand.  Correct me if I'm misstating
3  you.  Is that also true for Kin?
4         MS. D'ALLAIRD:  Objection.
5         THE WITNESS:  Yes.
6  BY MS. BAILEY:
7      Q.  So in that sense there's some
8  similarities.
9      A.  Yes.
10     Q.  Have you ever heard the term "Kin
11  Ecosystem"?
12     A.  Yes.
13     Q.  What does that mean to you?
14     A.  It likely refers to the idea that multiple
15  application developers will allow for the usage of
16  Kin in their applications.
17     Q.  Okay.  And what functionality needs to
18  exist in a cryptocurrency in order for another
19  developer to use it within their app?
20         MS. D'ALLAIRD:  Objection.
21         THE WITNESS:  What functionality?  Well,
22  this needs to be a public protocol which the
23  application can use in order to send requests back
24  and forth to a node on -- a node that has access to
25  the blockchain of that currency.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.
Alexander Rousmaniere
November 22, 2019

Page 85

1 BY MS. BAILEY:
2     Q.  And earlier you had testified I believe
3 that any developer could have integrated Kin after
4 the token sale, immediately after the token sale.
5 Am I quoting you correctly?
6         MS. D'ALLAIRD:  Objection.
7         THE WITNESS:  I don't remember saying
8 that.
9 BY MS. BAILEY:
10    Q.  Is it your understanding that companies
11 could have used Kin immediately following the token
12 sale?
13        MS. D'ALLAIRD:  Objection.
14        THE WITNESS:  My recollection is that that
15 had not -- was not ready yet, but there was some
16 idea that in the future there would be a way for
17 other application developers to use Kin.
18 BY MS. BAILEY:
19    Q.  Okay.  So earlier we had talked in some
20 detail about the technical components of a
21 cryptocurrency and sort of how it can be used in
22 various forms and I think you had an acronym that
23 you had used for the type of -- I don't want to try
24 and characterize it because I'll be wrong but is
25 there a way for any company to use a cryptocurrency

Page 86

1 that's on the Ethereum blockchain?
2         MS. D'ALLAIRD:  Objection.
3         THE WITNESS:  Yes.  Anybody could build
4 into an application a way to communicate with the
5 Ethereum blockchain.
6 BY MS. BAILEY:
7     Q.  So that's what I'm trying to get at here.
8 Thank you for bearing with me.  It's hypothetically
9 since Kin was functioning on the Ethereum blockchain
10 was it possible for companies to transact with it on
11 day one after the token sale?
12        MS. D'ALLAIRD:  Objection.
13        THE WITNESS:  Oh, I see what you're
14 saying.  Yes, you're absolutely right that at that
15 point the Kin token was a token on top of the
16 Ethereum blockchain and there were already at that
17 point wallet providers for example where you could
18 store your tokens in your Ethereum wallet.  So yes,
19 you're right that at that point any developer could
20 have added the ability to interact with the -- in a
21 pretty limited fashion with the Kin tokens in an
22 Ethereum wallet.
23 BY MS. BAILEY:
24    Q.  So if -- I'm going to call back to your
25 understanding of the Kin Ecosystem.  I believe you

Page 87

1 mentioned it was a function of various developers
2 using Kin.  Is that accurate to say?
3         MS. D'ALLAIRD:  Objection.
4 BY MS. BAILEY:
5     Q.  And please correct me if you have a
6 different understanding.
7     A.  The Kin Ecosystem sounds like a marketing
8 term to me.  So I'm not really willing to say what
9 is or isn't the Kin Ecosystem.
10    Q.  Earlier I asked you what that term means
11 to you and you had given a description of that it's
12 developers who had integrated Kin into various
13 applications, I believe.  Is that fair to say?
14        MS. D'ALLAIRD:  Objection.
15        THE WITNESS:  It would be the marketing
16 term for the idea that there are applications that
17 have integrated it in one way or the other, yes.
18 Whether such an ecosystem actually exists at this
19 point I'm not -- I can't say.
20 BY MS. BAILEY:
21    Q.  That's fine.  But if Kin had that basic
22 ability to be transferred as a medium of exchange,
23 do you think that's enough for the Kin Ecosystem --
24 I'll just keep using that term -- to exist?
25        MS. D'ALLAIRD:  Objection.

Page 88

1         THE WITNESS:  The question is too vague.
2 BY MS. BAILEY:
3     Q.  Okay.  I'll narrow it down.  So if -- is
4 the functionality of being able to transact in Kin
5 in various applications sufficient in your view to
6 amount to an ecosystem?
7         MS. D'ALLAIRD:  Objection.
8         THE WITNESS:  I think the term ecosystem
9 is too vague and I wouldn't say -- what literally
10 amounts to an ecosystem is like some wetlands or
11 something.  That's an ecosystem.  This whole
12 application of the word ecosystem that was came up
13 with by some Internet companies ten years ago and
14 now everyone uses, and, like, it can mean so many
15 things.  It's not like I could testify about what an
16 ecosystem is when applied to this.
17 BY MS. BAILEY:
18    Q.  Of course.  And I can only ask you as to
19 what you understand that to mean and that's what I'm
20 referring to.  But would a more accurate term maybe
21 like an economy?
22        MS. D'ALLAIRD:  Objection.
23        THE WITNESS:  An economy, the word economy
24 to me suggests that there's a critical mass of
25 buyers and selling.  Like when you say there's a

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 89

1  functioning economy it means there's enough buyers
2  and sellers -- there's a functioning economy of salt
3  in this marketplace because people are buying and
4  selling salt all the time.  But if there's just
5  someone there wanting to sell it or just people that
6  wanted to buy it you'd say well, the economy, it's
7  not really a full economy because it's not moving
8  back and forth; right?
9      Q.  So just to press on that, though, if
10  there's a unique medium of exchange or currency
11  that's unique to a given economy, would that change
12  any of your conclusions about the hypothetical that
13  you just posed?
14      MS. D'ALLAIRD:  Objection.
15      THE WITNESS:  I'm kind of lost here.
16  BY MS. BAILEY:
17      Q.  So there's a fundamental cryptocurrency
18  that's underlying this quote, unquote, economy
19  ecosystem, whatever you want to call it.  And if
20  people could transact in that currency, would that
21  be enough in your view to allow developers to
22  achieve the purpose which you described earlier of
23  using Kin within their applications?
24      MS. D'ALLAIRD:  Objection.
25      THE WITNESS:  I'm still lost.  Try one

Page 90

1  more time.
2  BY MS. BAILEY:
3      Q.  You referred to the term of ecosystem as a
4  marketing term.  Do you recall that Kik marketed the
5  Kin Ecosystem before the TDE?
6      A.  I've definitely heard the term Kin
7  Ecosystem.  I'm not sure at what point they began to
8  use that term.
9      Q.  Was the project marketed as the Kin
10  Ecosystem?
11      MS. D'ALLAIRD:  Objection.
12      THE WITNESS:  I don't know.  Do they have
13  it in this thing?
14  BY MS. BAILEY:
15      Q.  Let's look.  So if you go back to that
16  paragraph that we talked about earlier, this is
17  Exhibit -- what is this?  This is Exhibit 106.  So
18  just to recap, this was the page that we discussed
19  earlier which is a Wayback Machine screen shot of
20  the Kin.Kik.com website.
21      MS. D'ALLAIRD:  Again, we object to the
22  introduction of this exhibit.
23  BY MS. BAILEY:
24      Q.  So at the bottom right there's a part that
25  says "Our vision" which we discussed previously.  Do

Page 91

1  you recall that?
2      A.  Yes.
3      Q.  So in here it describes, "The vision for
4  Kin is rooted in the belief that a broad group of
5  participants can come together to create an open
6  ecosystem of tools for digital communication and
7  commerce," and then I'm not going to read the rest.
8      So in light of this do you believe that
9  Kik marketed Kin as -- or do you believe that Kik
10  marketed the Kin Ecosystem to the public before the
11  TDE?
12      MS. D'ALLAIRD:  Objection.
13      THE WITNESS:  It certainly looks like they
14  did, yes.
15  BY MS. BAILEY:
16      Q.  And that ecosystem would involve
17  developers offering goods and services in exchange
18  for Kin?
19      MS. D'ALLAIRD:  Objection.
20      THE WITNESS:  That would be my guess, yes.
21  BY MS. BAILEY:
22      Q.  I think you mentioned this but have you
23  been following the Kin Ecosystem -- I'll keep using
24  that term and all I mean is this concept we've been
25  talking about.  Have you been following Kin's

Page 92

1  progress to date?
2      A.  I have not.
3      Q.  So you testified earlier that you recall
4  other projects having marketed their projects as
5  quote, unquote, ecosystems.  What do you mean by
6  that?
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  That a -- the dream of a lot
9  of cryptocurrencies is that there will be a lot of
10  users of them and the word ecosystem is like this
11  sound big and exciting and grand, you know.  They're
12  going to be the next Google.  They're going to have
13  an ecosystem.  All these companies will have
14  ecosystem and they're going to be huge I guess.
15  BY MS. BAILEY:
16      Q.  So your view of the term implies that it's
17  some breadth that's part of the word ecosystem
18  agency as you hear it.
19      A.  Yeah.
20      Q.  Understood.  And have you been following
21  any of the developments with the company Kik?
22      A.  Not closely.  I saw a couple of headlines
23  recently where they sold off -- they sold off the
24  chat application.
25      Q.  So you're aware that they sold their chat

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.                    Alexander Rousmaniere
November 22, 2019

Page 93

1  application.
2      A.  Uh-huh.
3      Q.  Did you have any reaction to that?
4      A.  No, not particularly.
5      Q.  It wasn't particularly important to you
6  that they had sold their chat application?
7      A.  I don't really have an opinion about it
8  either way.
9      Q.  And so you testified earlier that you
10  still have your Kin today; right?
11      A.  That's correct.
12      Q.  And it didn't -- the fact that you saw Kik
13  had sold its chat application didn't cause you to
14  want to sell your Kin?
15      MS. D'ALLAIRD:  Objection.
16      THE WITNESS:  Because the idea that the
17  Kin would be less money?  I'm not sure it's worth
18  anything right now.  I'm not sure there's any market
19  for it.
20  BY MS. BAILEY:
21      Q.  I'm just asking if learning that news made
22  you want to sell your Kin tokens?
23      A.  No.  Because that's not how -- that's not
24  like a good line of thought in investing.  It's like
25  panic.  No, it didn't make me want to sell it.

Page 94

1      Q.  So this is going to sound like a silly
2  question so bear with me but despite the fact that
3  Kik sold its chat application your Kin still exists;
4  right?
5      MS. D'ALLAIRD:  Objection.
6      THE WITNESS:  Yes.
7  BY MS. BAILEY:
8      Q.  Did you have the idea when you bought Kin
9  that you might profit from that purchase?
10      A.  Yes.
11      Q.  Why did you think that?
12      A.  I think you already asked that.  But to go
13  over it again, I thought that the value of the Kin
14  could increase because I thought that the usage --
15  that the overall proposal that a cryptocurrency
16  could be used in a chat application successfully was
17  a good idea, a good proposal and I thought that
18  could work at some point and Kin was well positioned
19  to be that application -- Kin was looked to be that
20  currency because Kik already had an application and
21  user base.
22      Q.  So it was your impression that you could
23  profit if Kin were used as intended?
24      MS. D'ALLAIRD:  Objection.
25      THE WITNESS:  Yes.  Well, intended --

Page 95

1  BY MS. BAILEY:
2      Q.  If it were used as intended meaning if it
3  was used as a currency for various digital services?
4      MS. D'ALLAIRD:  Objection.
5      THE WITNESS:  Yes.
6  BY MS. BAILEY:
7      Q.  Make sure to let her get her objection in.
8      A.  Sorry.
9      Q.  Do you recall -- I know that you mentioned
10  you had only -- you remember anything specific about
11  the white paper but you believe it was likely that
12  you had reviewed it.  Do you remember anything in
13  the white people or otherwise where Kik told you to
14  expect that you could profit?
15      A.  No, I don't remember.
16      Q.  Do you have any reason to believe that
17  they did make any such statement?
18      MS. D'ALLAIRD:  Objection.
19      THE WITNESS:  I don't have any reason to
20  believe and that would be a pretty amateur move.  So
21  I doubt they would make such statement.
22  BY MS. BAILEY:
23      Q.  So you say you would doubt that Kik would
24  make a statement that people could expect to profit
25  from purchasing Kin?

Page 96

1      MS. D'ALLAIRD:  Objection.
2      THE WITNESS:  Correct.
3  BY MS. BAILEY:
4      Q.  Were you hoping when you bought Kin that
5  well established companies would integrate it into
6  their projects?
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  No.
9  BY MS. BAILEY:
10      Q.  So if for example Google or Amazon started
11  accepting Kin would that matter to you as someone
12  who has Kin today?
13      MS. D'ALLAIRD:  Objection.
14      THE WITNESS:  It would matter because it
15  would likely be that the demand for Kin would likely
16  increase.
17  BY MS. BAILEY:
18      Q.  Okay.  Understood.  When you bought your
19  Kin could you decide to sell it at any time you
20  wanted to?
21      A.  I could decide to sell it any time I
22  wanted to, but to actually sell it would require an
23  exchange and a willing buyer.
24      Q.  Sure.  So phrased another way, did Kik
25  impose any limitations on when you could sell your

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 97

1 Kin?
2      A.  No.  And I don't think they would have the
3 technical facility to do so.
4      Q.  What do you mean by that?
5      A.  I don't think that there's a way on the
6 Ethereum network to prevent the transfer of
7 Ethereum -- of ether or ether tokens to my
8 knowledge.
9      Q.  Fair.  Okay.  So --
10     A.  That said there are smart contracts --
11 there absolutely can be something on the Ethereum
12 network where there's a smart contract which does
13 allow for restriction of transfer and movement, all
14 that kind of thing.  But my understanding of the Kin
15 token was that there are no such restrictions and I
16 did not rely on a smart contract, beyond the smart
17 contract that was used for the creation of the token
18 itself.
19     Q.  So your understanding of the smart
20 contract that governed the sale of Kin is that it
21 effectively transferred Kin to you and then there
22 were no other restrictions imposed on you as
23 somebody who owned Kin with what you could do with
24 it?
25         MS. D'ALLAIRD:  Objection.

Page 98

1         THE WITNESS:  Correct.
2 BY MS. BAILEY:
3      Q.  So is it the case that anybody who had Kin
4 after the token sale could sell it at any time they
5 wanted to?
6         MS. D'ALLAIRD:  Objection.
7         THE WITNESS:  Technically they could sell
8 it, yes.
9 BY MS. BAILEY:
10     Q.  So cryptocurrency rises and falls in
11 value; right?
12        MS. D'ALLAIRD:  Objection.
13        THE WITNESS:  Yes.
14 BY MS. BAILEY:
15     Q.  I've just handed -- you've just been
16 handed an exhibit marked Exhibit 107.  It is a
17 screen grab of a website called CoinMarketCap.  Are
18 you familiar with this website?
19        (Exhibit 107 was marked for identification
20        by the Reporter.)
21     A.  Yes.
22     Q.  What is your understanding of what
23 CoinMarketCap offers?
24        MS. D'ALLAIRD:  I'm just going to quickly
25 object to the introduction of this exhibit but

Page 99

1 please continue.
2         THE WITNESS:  Supposedly it tracks the
3 market capitalization of the currency.
4 BY MS. BAILEY:
5      Q.  Does it show changes in price?
6      A.  It should show changes in price and the
7 total value of all of the market capitalization,
8 meaning the total value of all the tokens added up.
9      Q.  Right.  So if we're looking at this chart
10 here, you'll see that it says Kin charts in the
11 upper left corner.  Do you see that?
12     A.  Kin charts?  Where are we looking?
13     Q.  Right above the chart in the middle --
14     A.  Yes.
15     Q.  -- to the left.
16     A.  Yes, I see that.
17     Q.  What is your understanding of what this
18 chart represents?
19        MS. D'ALLAIRD:  Objection.
20        THE WITNESS:  My understanding is that it
21 represents the market price of Kin plotted over
22 these two years.
23 BY MS. BAILEY:
24     Q.  So I'm going to ask you a series of
25 hypotheticals.  If you look with me -- I know the

Page 100

1 font is small, I apologize for that but if you go to
2 say -- if you see on the bottom line there's a
3 number of months, it says October '17, January '18.
4 Do you see that?
5      A.  Uh-huh.
6      Q.  If I pinpoint a time right before January
7 '18, so say December, if somebody sold at that point
8 would they make a different amount of money from
9 that sale as opposed to somebody who sold say in
10 January 2018?
11        MS. D'ALLAIRD:  Objection.
12        THE WITNESS:  Yes.
13 BY MS. BAILEY:
14     Q.  Because the price had gone up by the time
15 the next person had hypothetically sold; right?
16        MS. D'ALLAIRD:  Objection.
17        THE WITNESS:  Give me the two time periods
18 you're discussing again?
19 BY MS. BAILEY:
20     Q.  Just for the same of example, we can pick
21 any time period on here but if somebody sold in
22 October even or the first point on this chart and
23 then a different person sold on the point where it
24 says January 2017, those two people would quote,
25 unquote, profit differently.  Is it fair to say?

Case 1:19-cv-05244-AKH   Document 60-104   Filed 03/20/20   Page 28 of 31

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 101

1      MS. D'ALLAIRD:  Objection.
2      THE WITNESS:  Yes, except that with a not
3 so liquid token like this these charts are not
4 accurate and not necessarily real, however, what
5 you're saying is correct.  Yes.
6 BY MS. BAILEY:
7      Q.  So the chart is really just a
8 demonstrative of a more general concept and what I'm
9 asking is if somebody sold on one day when the price
10 was at a certain level and a different person sold
11 on a different day when the price was say higher or
12 much lower, is it possible that one person could
13 profit and one person could lose based on their
14 sales of Kin?
15     MS. D'ALLAIRD:  Objection.
16     THE WITNESS:  Yes.
17 BY MS. BAILEY:
18     Q.  So in your view would that mean that the
19 fortunes of those two people were not necessarily
20 aligned?
21     MS. D'ALLAIRD:  Objection.
22     THE WITNESS:  Yes.
23 BY MS. BAILEY:
24     Q.  Just to put a little tweak on that, would
25 it be fair to say that the fortunes of those two

Page 102

1 people would be different?
2      MS. D'ALLAIRD:  Objection.
3      THE WITNESS:  Yes.
4 BY MS. BAILEY:
5      Q.  Did Kik owe you any continuing contractual
6 duties after the token sale completed?
7      MS. D'ALLAIRD:  Objection.
8      THE WITNESS:  I don't think so, no.
9 BY MS. BAILEY:
10     Q.  So let's walk through it -- through that.
11 Just as a basic matter is it your understanding
12 generally that the terms of a contract govern the
13 parties' duties in any particular transaction?
14     MS. D'ALLAIRD:  Objection.
15     THE WITNESS:  Yes, but isn't the question
16 here of whether Kin is selling a security or not?
17 And if it's selling a security it's up to the SEC to
18 say what the rules are.  There is a contract which
19 is set by Congress I guess if it's a security.
20 BY MS. BAILEY:
21     Q.  What I'm actually asking about are the
22 terms of the contract in a more traditional sense
23 between you and Kik when you bought Kin.  When you
24 enter into any deal to purchase something is it
25 common for there to be a contract that explains the

Page 103

1 terms of that deal?
2      MS. D'ALLAIRD:  Objection.
3      THE WITNESS:  Yes.
4 BY MS. BAILEY:
5      Q.  So are you familiar with the term "as-is"
6 in any context?
7      A.  Yes.
8      MS. D'ALLAIRD:  I'm sorry.  Objection.
9 BY MS. BAILEY:
10     Q.  What does that term mean to you?
11     A.  That when you buy something you get it as
12 it is and you can't request modifications after the
13 fact.
14     Q.  So are you saying that you receive it free
15 and clear?  Is that a way to put it?
16     MS. D'ALLAIRD:  Objection.
17     THE WITNESS:  I don't really know what
18 that means.
19 BY MS. BAILEY:
20     Q.  Fair.  Do you recall there being a
21 contract between you and Kik when you bought Kin?
22     MS. D'ALLAIRD:  Objection.
23     THE WITNESS:  I don't recall it but there
24 likely was one because I possibly went on some
25 website and there was probably some terms I agreed

Page 104

1 to.
2 BY MS. BAILEY:
3      Q.  Are you familiar with a document called
4 the "terms of use agreement"?
5      A.  I know about terms of use agreements and
6 I'm not familiar with this one.
7      Q.  I should clarify.  Are you familiar with
8 the terms of use agreement that related to this
9 particular sale of Kin?
10     A.  No.
11     Q.  You've just been handed an exhibit marked
12 108.  At the top it reads "Terms of Use Agreement"
13 and it bears Bates label Kik 000079.  Does this
14 document look familiar to you?
15     (Exhibit 108 was marked for identification
16     by the Reporter.)
17     THE WITNESS:  No.
18 BY MS. BAILEY:
19     Q.  So do you recall having to acknowledge it
20 or having seen it at any time before you purchased
21 Kin?
22     MS. D'ALLAIRD:  Objection.
23     THE WITNESS:  I don't recall it.  I don't
24 remember seeing it and it's likely that I did agree
25 to it.

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 105

1  BY MS. BAILEY:
2      Q.  So do you have any reason to doubt that
3  you agreed to this?
4          MS. D'ALLAIRD:  Objection.
5          THE WITNESS:  I do not.
6  BY MS. BAILEY:
7      Q.  Okay.  So I'm going to direct you two,
8  three pages.  If you skip to page -- with the Bates
9  label Kik 000088.  I think it's the tenth page in.
10  There's a section called "disclaimers" that have a
11  block of text in all caps.  Do you see that?
12     A.  Yes.
13     Q.  So do you see where it says, "Except as
14  expressly provided to the contrary in a writing by
15  Kik the site content contained therein and Kin
16  tokens are provided on an as-is and as available
17  basis without warranties or conditions of any kind,"
18  and it continues on.  But I will spare all of us
19  from me reading all of it.  Do you see that?
20     A.  I do.
21     Q.  What does that mean to you sitting here
22  today reading it?
23     A.  To me reading this it means that I agreed
24  to -- I likely agreed to these terms whereby the Kin
25  company -- Kik company, Kik Interactive would have

Page 106

1  no obligations, no specific obligations to me as an
2  owner of this thing I was buying from them.  And
3  that seems likely but none of this relates -- just
4  because I agreed to it doesn't mean that Kik wasn't
5  selling a security and that the rules -- that the
6  American securities laws -- I mean, don't apply.
7          So this -- my -- I'm not a lawyer but like
8  this sort of thing can be -- a court could look at
9  this and say this is invalid because they're selling
10  a security and they didn't do X, Y, Z when they're
11  selling a security.
12     Q.  Do you know what those securities laws
13  are?
14     A.  No, I don't in particular.
15     Q.  What would be the basis for that belief
16  that it could still be a security?
17     A.  I know there's something called the Howey
18  Test, Howey whatever.  And I don't know exactly how
19  it works, but I do know that the SEC will say hey,
20  there's lots of people who sell things and then the
21  SEC shows up and say that was a security.  You're
22  not allowed to sell it like that.  So you may have
23  had this agreement with your buyer but it's invalid
24  because what you're doing is selling a security.
25     Q.  I don't necessarily want to draw any

Page 107

1  conclusions based on this with you here today about
2  whether something is or is not a security.
3      A.  Okay.
4          MS. D'ALLAIRD:  I just have to interject
5  here, I'm going to object to this line of
6  questioning.  I'm not a lawyer here.
7          MS. BAILEY:  I'm not questioning him about
8  anything related to securities law.
9          MS. D'ALLAIRD:  You are but you're asking
10  him about contract law and I'm just going to object
11  to this line of questioning, but please continue.  I
12  just want to log that for the record.
13  BY MS. BAILEY:
14     Q.  To be clear, I'm asking you only what your
15  understanding is of what you agreed to or what you
16  likely agreed to by virtue of this contract that
17  we're talking about, the terms of this agreement.
18     A.  So I agreed to this and as long as there
19  isn't another overriding law or policy or something
20  which would make this invalid, then I think that I'm
21  likely bound by this agreement.
22     Q.  And I'm -- I don't need -- I'm not asking
23  you to reach any legal conclusion about whether this
24  agreement is valid or whether it's legally
25  enforceable.  I'm not asking you to reach any of

Page 108

1  those conclusions today.  I'm only asking
2  specifically right now with respect to this clause
3  where it says that the tokens -- the tokens are
4  provided on an as-is and as available basis.
5          I'm just asking what your understanding of
6  what those terms are.  I think that you've already
7  given me an answer on that.  If you have anything
8  else that you want to add then please feel free.
9  I'm not asking you to give me any legal opinions or
10  anything like that just to be clear.
11         MS. D'ALLAIRD:  Objection.
12  BY MS. BAILEY:
13     Q.  Are you aware of any other contract that
14  governed your arrangement with Kik?
15         MS. D'ALLAIRD:  Objection.
16         THE WITNESS:  Am I aware.  There probably
17  are -- of contracts?  No.
18  BY MS. BAILEY:
19     Q.  Are you aware of having agreed to or read
20  or signed any other contracts between you and Kik?
21         MS. D'ALLAIRD:  Objection.
22         THE WITNESS:  No.
23  BY MS. BAILEY:
24     Q.  So just to clear it up and just to
25  summarize what we've gone through, assuming and

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.

Alexander Rousmaniere
November 22, 2019

Page 109

1  putting aside the issue of whether these terms are
2  valid, just assuming that they are, did you
3  understand -- or do you understand from this
4  language that Kik had no contractual obligations to
5  you after delivering the Kin tokens?
6      MS. D'ALLAIRD:  Same objections as before.
7      THE WITNESS:  Assuming that these are
8  valid and there's nothing that overrides them, then
9  yes.  I do understand that.
10 BY MS. BAILEY:
11     Q.  Is that based on your reading of this
12 language here today?
13     MS. D'ALLAIRD:  Objection.
14     THE WITNESS:  Yes.
15 BY MS. BAILEY:
16     Q.  And are you reaching that conclusion based
17 on your personal understanding of these words in the
18 sense that you described them earlier?
19     MS. D'ALLAIRD:  Objection.
20     THE WITNESS:  I mean, that's too
21 complicated for me.  I can't wrap my mind around
22 that.
23 BY MS. BAILEY:
24     Q.  Fair.
25     MS. BAILEY:  Can we take a break?  We're

Page 110

1  nearing the end.  Promise.
2      THE VIDEO OPERATOR:  We're going off the
3  record.  The time is 11:53 A.M.
4      (Recess taken.)
5      THE VIDEO OPERATOR:  We're back on the
6  record.  The time is 12:11 P.M.
7  BY MS. BAILEY:
8      Q.  Okay.  So I'm very close to being done.
9  Thank you for sticking with me.  I appreciate it.  I
10 just have a few more questions.
11     So when you bought Kin, did you receive
12 any ownership interest in Kik Interactive?
13     A.  Not to -- no.
14     Q.  Have you ever received disclosures from
15 Kik regarding its performance, financials or
16 otherwise?
17     A.  No.
18     Q.  Do you have any voting rights in Kik?
19     A.  No.
20     Q.  Are you aware of an entity called the Kin
21 Foundation?
22     A.  Yes.
23     Q.  Do you have any voting rights in the Kin
24 Foundation?
25     A.  No.

Page 111

1      Q.  Does Kik pay you any dividends?
2      A.  No.
3      Q.  Do you know what dividends are?
4      A.  Yes.
5      Q.  How about the Kin Foundation?  Do they pay
6  you any dividends?
7      A.  No.
8      Q.  If Kik makes any revenue by selling
9  services in exchange for Kin tokens, do you receive
10 a distribution from Kik in share in those profits?
11     MS. D'ALLAIRD:  Objection.
12     THE WITNESS:  No.
13 BY MS. BAILEY:
14     Q.  And if Kik went out of business would you
15 still have Kin?
16     MS. D'ALLAIRD:  Objection.
17     THE WITNESS:  Yes.
18     MS. BAILEY:  That's all the questions I
19 have.  Thank you.  I might ask more questions after
20 they're done but that's the all the questions I have
21 for now.  And I'll turn it over.
22     MS. D'ALLAIRD:  Thank you so much.
23         EXAMINATION
24 BY MS. D'ALLAIRD:
25     Q.  Mr. Rousmaniere, I want to also thank you

Page 112

1  for being here today and giving us your time.  I
2  only have a few questions for you so we can move
3  through this quickly.  So you previously testified
4  that you had met with SEC staff and provided
5  testimony in the investigation that led to this
6  lawsuit; correct?
7      A.  Yes.
8      Q.  And during your testimony at that time was
9  there a court reporter present there?
10     A.  Yes.
11     Q.  And was your testimony taken on video?
12     A.  Probably.  I can't remember.
13     Q.  Did you swear to tell the truth at that
14 time?
15     A.  I did.
16     Q.  And did you tell the truth?
17     A.  I did.
18     Q.  I just want to draw your attention back to
19 I believe it was marked as Exhibit 105, the
20 transcript.
21     A.  Yes, I got it.
22     Q.  Now, taking a look at Exhibit 105 it's
23 dated July 18, 2018, witness Alexander Perls
24 Rousmaniere.  Just taking a look at this Exhibit
25 105, Mr. Rousmaniere, would this appear to be an

U.S. Securities and Exchange Commissionv. Kik Interactive, Inc.
Alexander Rousmaniere
November 22, 2019

---

Page  113

1  accurate transcript of the testimony that you
2  provided to the SEC in July of 2018?
3     A.  Yes, it looks like it.
4     Q.  Okay.  No further questions from our end.
5        MS. BAILEY:  We have nothing either.
6        MS. D'ALLAIRD:  I just want to note for
7  the record that the SEC is requesting a copy of
8  Mr. Rousmaniere's deposition.  And I need a rough as
9  well.
10        THE VIDEO OPERATOR:  This is the end of
11   the video deposition of Alexander Rousmaniere.
12   We're going off the record.  The time is 12:14 P.M.
13        (Ending time 12:14 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

Page  115

1        REPORTER'S CERTIFICATE
2
3        I, JEANINE CURCIONE, C S R  NO  10223,
4   RPR, in and for the State of California, do hereby
5   certify:
6        That prior to being examined, the witness
7   named in the foregoing deposition was by me duly
8   sworn to testify the truth, the whole truth and
9   nothing but the truth and that the witness reserved
10   the right of signature;
11        That said deposition was taken down by me
12   in shorthand at the time and place therein named,
13   and thereafter reduced to typewriting under my
14   direction, and the same is a true, correct and
15   complete transcript of said proceedings
16        I further certify that I am not interested
17   in the event of the action
18        Witness my hand this_____day of_____,
19   _____
20
21        _____
22        Certified Shorthand
          Reporter for the
          State of California
23
24
25

---

Page  114

1  STATE OF CALIFORNIA        )
                              )
2  COUNTY OF LOS ANGELES      )
3
4        I, ALEXANDER ROUSMANIERE, hereby certify
5  under penalty of perjury under the laws of the State
6  of California that the foregoing is true and
7  correct
8        Executed this _____day of
9  _____, 2019 at
10  _____, California
11
12
13        _____
14        ALEXANDER ROUSMANIERE
15
16
17
18
19
20
21
22
23
24
25

---