------------------------------------- X

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

      vs.

KIK INTERACTIVE INC.,

              Defendant.

------------------------------------- X

:
:
:
:
:
:

Civil Action No. 19-cv-5244 (AKH)

## KIK INTERACTIVE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................... 1

RELEVANT FACTUAL BACKGROUND.................................................. 3

    A.    Early Development of Kik Messenger and the Vision for Kin............................. 3

    B.    Kik's Announcement of Kin and Product Launch Strategy. ................................ 4

        1.    Kik Conducted a Private Placement of Future Rights to Kin.................. 5

        2.    Kik Sold Kin to the Public to Jumpstart the Kin Economy..................... 7

        3.    Kik Marketed and Sold Kin as a Medium of Exchange For Use in a Diverse and Decentralized Economy of Digital Services. ................... 8

    C.    At the Time of Launch, Kin Tokens Were Functional and Could be Used as a Medium of Exchange................................................................. 10

    D.    Kin Tokens Continue to Serve as the Medium of Exchange for a Flourishing Digital Economy................................................................. 12

    E.    The SEC's Complaint Conflates the Pre-sale and the TDE................................ 13

ARGUMENT ................................................................................. 13

    I.    THE SALES OF KIN TOKENS DURING THE TDE DO NOT CONSTITUTE INVESTMENT CONTRACTS.................................................. 14

        A.    The Howey Test Requires An Objective Analysis of What Kik "Offered and Promised."............................................................... 15

        B.    There Is No Common Enterprise Between Kin Purchasers and/or Kik........................................................................... 17

            1.    There Is No Common Enterprise Because Kik Did Not Owe TDE Purchasers Ongoing Contractual Obligations............. 18

            2.    No Common Enterprise Exists Because Purchasers Assumed Full Control of Their Kin. ........................................... 21

            3.    There Is No "Horizontal Commonality" Between TDE Purchasers. .............................................................. 23

            4.    There Is No Strict Vertical Commonality Between Kik and TDE Purchasers. ......................................................... 25

        C.    Kik Did Not Lead Purchasers Primarily To Expect Profits Based On The Essential Managerial and Entrepreneurial Efforts Of Others. ................................................................................. 27

            1.    Kik Led Purchasers to Expect Use and Consumption of Kin.................................................................. 29

            2.    Any Expectation of Profits Could Not Have Been Based on the Essential Entrepreneurial or Managerial Efforts of Kik. ....... 31

D.    Characterizing Sales of Kin as Investment Contracts Would Be Confusing and Potentially Inconsistent With the Actions of Other Agencies...................................................................................................... 35

II.    THE PRE-SALE WAS CONDUCTED PURSUANT TO A VALID EXEMPTION UNDER RULE 506(C) OF REGULATION D. ......................... 37

A.    Kik's Pre-Sale Complied with Regulation D, and is Therefore Exempt from the Securities Act's Registration Requirements. ............... 38

B.    The Pre-Sale and the TDE Were Separate and Distinct Offerings. ......... 41

CONCLUSION..................................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Albanese v. Fla. Nat'l Bank of Orlando*,
823 F.2d 408 (11th Cir. 1987) ............................................................................ 16, 32

*Aldrich v. McCulloch Props., Inc.*,
627 F.2d 1036 (10th Cir. 1980) .................................................................................. 16

*Alunni v. Dev. Res. Grp., LLC*,
2009 WL 2579319 (M.D. Fla. Aug. 18, 2009)....................................................... 21, 22

*Alunni v. Dev. Res. Grp., LLC*,
445 F. App'x 288 (11th Cir. 2011)....................................................... 17, 19, 28, 29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................... 13

*Bamert v. Pulte Home Corp.*,
445 F. App'x 256 (11th Cir. 2011) ...................................................................... 16, 32

*Bender v. Cont'l Towers Ltd. P'ship*,
32 F. Supp. 497 (S.D.N.Y. 1986) ............................................................................... 31

*Berman v. Bache, Halsey, Stuart, Shields, Inc.*,
467 F. Supp. 311 (S.D. Ohio 1979) .......................................................................... 36

*CFTC v. McDonnell*,
287 F. Supp. 3d 213 (E.D.N.Y. 2018) ................................................................. 35, 37

*CFTC v. My Big Coin Pay, Inc.*,
334 F. Supp. 3d 492 (D. Mass. 2018)......................................................................... 37

*Copeland v. Hill*,
680 F. Supp. 466 (D. Mass. 1988).................................................................... 22, 27

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
2002 WL 31453789 (S.D.N.Y. Oct. 31, 2002)......................................................... 20

*Davis v. Rio Rancho Estates, Inc.*,
401 F. Supp. 1045 (S.D.N.Y. 1975) .................................................... 16, 18, 20, 33

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
608 F.2d 1297 (9th Cir. 1979) .................................................................. 16, 18, 20

Page(s)

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
377 F. Supp. 3d 337 (S.D.N.Y. 2019) .................................................................... 13

*Goldberg v. 401 North Wabash Venture LLC*,
755 F.3d 456 (7th Cir. 2014) ....................................................................... 23, 25

*Goodwin Props., LLC v. Acadia Grp., Inc.*,
2001 WL 800064 (D. Me. July 17, 2001) ............................................................. 41

*Goodwin v. Elkins & Co.*,
F.2d 99 (3d Cir. 1984) .................................................................................... 15

*Gugick v. Melville Capital LLC*,
2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) .......................................................... 26

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
396 F. Supp. 175 (N.D. Cal. 1975) .................................................................... 19

*Hart v. Pulte Homes of Michigan Corp.*,
735 F.2d 1001 (6th Cir. 1984) ................................................................... 18, 28

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2002) ................................................................. 25

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*,
439 U.S. 551 (1979) ................................................................................. 14, 36

*Inter-Mark USA, Inc. v. Intuit, Inc.*,
2008 WL 552482 (N.D. Cal. Feb. 27, 2008) ......................................................... 20

*Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*,
205 F. Supp. 2d 243 (S.D.N.Y. 2002) ................................................................. 25

*Keith v. Black Diamond Advisors, Inc.*,
48 F. Supp. 2d 326 (S.D.N.Y. 1999) .................................................................. 27

*Lavery v. Kearns*,
792 F. Supp. 847 (D. Me. 1992) ................................................................... 22, 23

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
179 F. Supp. 2d 159 (S.D.N.Y. 2001) ................................................................. 34

*Long v. Shultz Cattle Co.*,
881 F.2d 129 (5th Cir. 1989) ........................................................................... 32

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982) .................................................................................... 15

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ............................................. 21, 22, 25, 27

*Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*,
    2019 WL 6311520 (S.D.N.Y. Nov. 25, 2019) ......................................... 21

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ................................................................... 21

*Noa v. Key Futures, Inc.*
    638 F.2d 77 (9th Cir. 1980) ..................................................... 22, 33, 34

*Piambino v. Bailey*,
    610 F.2d 1306 (5th Cir. 1980) .............................................................. 15

*Plazza v. Airbnb, Inc.*,
    289 F. Supp. 3d 537 (S.D.N.Y. 2018) ................................................... 21

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ............................................................. passim

*Rice v. Branigar Org., Inc.*,
    922 F.2d 788 (11th Cir. 1991) .............................................................. 28

*Roberts v. Weight Watchers Int'l, Inc.*,
    217 F. Supp. 3d 742 (S.D.N.Y. 2016) ................................................... 20

*Robinson v. Glynn*,
    349 F.3d 166 (4th Cir. 2003) ................................................................ 35

*Rodriguez v. Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993) ............................................................. passim

*S&S NY Holdings, Inc. v. Able Energy, Inc.*,
    2012 WL 3084112 (S.D.N.Y. July 27, 2012) ......................................... 16

*Savino v. E. F. Hutton & Co.*,
    507 F. Supp. 1225 (S.D.N.Y. 1981) ..................................................... 24

*Scott v. Harris*,
    550 U.S. 372 (2007) .............................................................................. 13

Page(s)

*Sea Pines of Va., Inc. v. PLD, Ltd.*,
399 F. Supp. 708 (M.D. Fla. 1975) ..................................................... 35

*SEC v. Aqua-Sonic Prod. Corp.*,
524 F. Supp. 866 (S.D.N.Y. 1981) ...................................................... 15

*SEC v. Belmont Reid & Co.*,
794 F.2d 1388 (9th Cir. 1986) ............................................................ 33

*SEC v. C.M. Joiner Leasing Corp.*,
320 U.S. 344 (1943) ............................................................................ 15

*SEC v. Edwards*,
540 U.S. 389 (2004) ............................................................................ 35

*SEC v. Glenn W. Turner Enters., Inc.*,
474 F.2d 476 (9th Cir. 1973) ........................................................ 29, 32

*SEC v. Lauer*,
52 F.3d 667 (7th Cir. 1995) ................................................................ 17

*SEC v. Levin*,
849 F.3d 995 (11th Cir. 2017) ............................................................ 38

*SEC v. Mattera*,
2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ..................................... 39

*SEC v. Ralston Purina Co.*,
346 U.S. 119 (1953) ............................................................................ 41

*SEC v. SG Ltd.*,
265 F.3d 42 (1st Cir. 2001) ................................................................ 24

*SEC v. Shavers*,
2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ..................................... 36

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ................................... passim

*Shailja Gandhi Revocable Tr. v. Sitara Capital Mgmt., LLC*,
2012 WL 3580680 (N.D. Ill. Aug. 14, 2012) ..................................... 38

*Teague v. Bakker*,
1998 WL 168876 (4th Cir. Apr. 8, 1998) ........................................... 15

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*United Hous. Found., Inc. v. Forman*,
421 U.S. 837 (1975) ................................................................ 14, 28

*United States v. Leonard*,
529 F.3d 83 (2d Cir. 2008) ............................................................ 29

*United States v. Ulbricht*,
31 F. Supp. 3d 540 (S.D.N.Y. 2014) ................................................ 36

*Wals v. Fox Hills Dev. Corp.*,
24 F.3d 1016 (7th Cir. 1994) .................................................... 14, 25

*Walsh v. Int'l Precious Metals Corp.*,
510 F. Supp. 867 (D. Utah 1981) ............................................... 35, 36

*Walther v. Maricopa Intern. Inv. Corp.*,
1998 WL 186736 (S.D.N.Y. Apr. 17, 1998) ...................................... 25

*Warfield v. Alaniz*,
569 F.3d 1015 (9th Cir. 2009) ................................................... 15, 28

*Woodward v. Terracor*,
574 F.2d 1023, 1023 (10th Cir. 1978) ..................................... passim

*Wright v. Nat'al Warranty Co.*,
953 F.2d 256 (6th Cir. 1992) .......................................................... 37

## **Statutes**

15 U.S.C. § 78c(a)(10) .................................................................... 35

## **Rules**

Fed. R. Civ. P. 56(a) ....................................................................... 13

## **Regulations**

17 C.F.R. § 230.501(a) ................................................................... 38

17 C.F.R. § 230.502 ............................................................ 38, 39, 41

17 C.F.R. § 230.506 ....................................................................... 38

17 C.F.R. § 230.508 ....................................................................... 38

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

**<u>Other Authorities</u>**

*Black's Law Dictionary* ................................................................................................ 35

Defendant Kik Interactive, Inc. ("Kik") respectfully submits this memorandum of law in support of its Motion for Summary Judgment.

## PRELIMINARY STATEMENT

With this case, the Securities and Exchange Commission (the "SEC") seeks to stretch the definition of a "security" under the federal securities laws far beyond the plain language of the Securities Act of 1933 (the "Securities Act"), as well as any prior judicial construction of that statute. In so doing, the SEC asks this Court to bless an unprecedented and dramatic expansion of the SEC's regulatory authority. For the reasons discussed below, this Court should decline the SEC's invitation to ignore well established governing law.

The SEC claims that Kik violated Section 5 of the Securities Act by offering or selling an unregistered "security" when it created and sold a digital currency called Kin in 2017. The public sale of Kin tokens (called the token distribution event or "TDE") was preceded by a private sale of contractual rights to accredited investors (a process called the "Pre-sale"), through which Pre-sale participants got the right to purchase Kin tokens at a discount to the TDE price, if and when Kik successfully launched the Kin token. But the undisputed facts, together with decades of case law interpreting the definition of "security" under the Securities Act, show that Kik is entitled to judgment as a matter of law.

Kik is entitled to summary judgment with respect to the TDE because the public sale of Kin did not give rise to any "investment contracts" as defined by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946) ("*Howey*"). The SEC fails to meet two of *Howey*'s three requirements: common enterprise and expectation of profits based of the essential managerial efforts of others. ***First***, undisputed facts show that there was no "common enterprise" between or among Kik and those who purchased Kin in the TDE. It is undisputed that the terms of sale for the TDE only obligated Kik to deliver Kin tokens, and that TDE purchasers agreed to purchase

Kin "as is," with no express or implied warranties, and without any other ongoing contractual obligations for Kik. It is likewise undisputed that, once purchasers received their Kin, Kik had absolutely no control over the tokens, and no control over whether, when, or how purchasers used their Kin tokens. These undisputed facts preclude any finding of a "common enterprise."

**Second**, the SEC cannot show that Kin purchasers were led to expect profits from the essential managerial and entrepreneurial efforts of Kik or others, as *Howey* requires. The undisputed facts show that Kik promoted Kin as a medium of exchange to be used in a new digital economy, not as an investment opportunity. Kik also made clear that the economy's success was dependent on developers and consumers *other than Kik* transacting in Kin. Similarly, Kik emphasized that it could not guarantee the price of Kin, nor could it guarantee its liquidity on secondary market exchanges. As such, to the extent that any purchasers subjectively expected to profit, those expectations could not have been based on anything Kik led them to believe, nor could they have expected to profit from any managerial or entrepreneurial efforts by Kik.

Kik is also entitled to summary judgment with respect to the Pre-sale. The undisputed facts show that the Pre-sale is exempt from registration under Rule 506(c) of SEC Regulation D under the Securities Act. In the Pre-sale, Kik and each Pre-sale participant entered into a Simple Agreement for Future Tokens ("SAFT"), which gave the participant a contractual right to receive Kin tokens in the future, if and when Kik successfully launched the Kin token, at a discount to the public sale price. As such, Pre-sale participants relied upon Kik to build and launch the Kin tokens; otherwise, they would lose 20% of what they paid under the SAFT. Given those terms, Kik took a conservative approach and treated the rights encompassed in the SAFT agreements as securities, but in so doing, Kik availed itself of an exemption from the registration requirements of the Securities Act under Rule 506(c). In that regard, the undisputed facts show that Kik (1) sold Kin

to accredited investors as defined in Regulation D, (2) conducted extensive diligence to ensure such participants were accredited and not purchasing as underwriters, (3) provided the requisite disclaimers set forth in Regulation D, and (4) filed a Form D with the SEC, memorializing the exemption. These undisputed facts mean that, as a matter of law, the Pre-sale was exempt from the registration requirements of the Securities Act.

For these and other reasons discussed herein, Kik respectfully requests that the Court grant its motion for summary judgment.

## RELEVANT FACTUAL BACKGROUND

### A.  Early Development of Kik Messenger and the Vision for Kin.

Kik was founded in 2009 by Ted Livingston and Christopher Best. Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF") ¶ 1. The following year, Kik launched a messenger application ("Kik Messenger"). *Id.* ¶ 2. Kik Messenger was immediately popular, garnering approximately 1 million users in 15 days and ultimately becoming one of the most widely-used messaging platforms in the world. Declaration of Tanner Philp ("Philp Decl.") ¶ 5. As of 2017, Kik's messenger application had 300 million registered users and 15 million monthly active users, and was ranked in the Top 10 Social Networking Apps in the Apple App store. *Id.* ¶ 6.[1] But despite the success of the Kik Messenger app, Kik faced challenges in monetizing its business. *Id.* ¶ 8. Early on, Kik opted not to sell its users' data. *Id.* This made it difficult for Kik to compete in an industry where the vast majority of advertising dollars go to a small number of very large players who monetize their users' data by providing targeted advertising that can reach millions (or even billions) of users. *Id.*

Eventually, Kik decided to propose a fundamentally different way for people to buy and

---

[1] In October 2019, Kik sold its messenger application to Medialab Inc. SUMF ¶ 122.

sell digital products and services.  SUMF ¶¶ 3-19.  Instead of providing digital products or services for "free," and then monetizing them by selling users' data (either directly or through targeted advertising), Kik would create and sell a digital currency, called "Kin," that people could use to buy and sell digital products and services directly, without advertising.  *Id.*; Philp Decl. ¶¶ 23-31. For example, a gaming application could charge users Kin tokens for acquiring new features or extra lives, and allow users to earn Kin by winning challenges against their friends.  Or, in a messaging application, a user could host an interesting group chat and charge an entry fee of Kin tokens, and therefore be rewarded for their contribution.  *See, e.g.*, SUMF ¶¶ 90-91.  The same Kin tokens could be earned in one application, and then spent in another, creating a thriving ecosystem which would allow developers to earn real revenue for offering desirable content.  *See, e.g.*, *id.* ¶¶ 79.  One key component of this proposed new economy was that, although Kik would create and sell Kin in the first instance, once purchased, Kin would be available for **any** buyers or sellers (not just Kik) to use as a digital currency, and Kik could not make that happen by itself.  *Id.* ¶¶ 17-19.

Having studied the potential applications of blockchain technology since 2011, Kik recognized that a cryptocurrency based on this technology would serve each of these goals.  SUMF ¶ 3.  This is because blockchain technology was "decentralized," meaning that it was not controlled by any one entity, but rather a network of participants.  Philp Decl. ¶¶ 10-14. Kik believed that a cryptocurrency built on decentralized blockchain technology had the potential to galvanize a global community of like-minded developers to participate in a model where users and developers alike were rewarded for their contributions to the ecosystem using a cryptocurrency.  *Id.* ¶¶ 29-30.

B.  **Kik's Announcement of Kin and Product Launch Strategy.**

Kik officially announced Kin to the public and released a whitepaper (the "Whitepaper") setting forth its vision for the Kin economy on May 25, 2017.  SUMF ¶¶ 4-7.  Later, in August

2017, Kik announced its plan to conduct a "Token Distribution Event," or "TDE," in which it would distribute Kin to as many users as possible who signed up to buy Kin. *Id.* ¶ 38. The Whitepaper described the vision for the new Kin economy as:

> [A] global network of digital services that constitutes a new cooperative operating model, focused on the long term. In this model, developers and service providers will enjoy the right and opportunity to innovate and compete for compensation, while users will benefit from a diverse digital experience, freedom of choice, and access to a broad range of commercial services.

*Id.* ¶ 14; Declaration of Michael Welsh, Ex. K.[2]

On the same day, Kik's CEO Ted Livingston also published an article on Medium.com setting forth Kik's proposal for "a new ecosystem of digital services that will be truly open and decentralized, and which starts with a new cryptocurrency." *Id.* ¶ 9; Ex. L, at 1. This article explained that Kik, like many developers, was struggling to "find [a] sustainable business model[]" without advertising revenue, and therefore proposed Kin as a digital currency for a new economy that would "compensate developers and creators without relying on advertising." Ex. L, at 1.

### 1. Kik Conducted a Private Placement of Future Rights to Kin.

To fund its development of the technology and infrastructure underlying the Kin tokens, Kik conducted a private offering between June and September 11, 2017 (the "Pre-sale"). SUMF ¶ 20. In the Pre-sale, Kik entered into separate contracts ("Simple Agreement for Future Tokens" or "SAFTs") with a select group of sophisticated, high-net-worth participants who paid U.S. dollars in exchange for the right to receive a certain number of Kin tokens in the future at a discounted price, subject to a successful product launch of Kin (the "Network Launch"). *Id.* ¶¶ 20-25. In the accompanying Private Placement Memorandum ("PPM"), Kik stated that it would use the majority of the proceeds from the Pre-sale to develop a minimum viable product and

---

[2] All exhibits are attached to the Declaration of Michael E. Welsh which is being filed concurrently.

"progress the development of the Kin Ecosystem—a semi-centralized blockchain-based computer network that enables economic transactions and a reward system for digital service providers[.]" Ex. F, at KIK000051.

Because the Pre-sale participants' potential to profit was expressly contingent on Kik's ability to successfully launch the token, the Pre-sale was conducted in accordance with Rule 506 of Regulation D. SUMF ¶ 25; Philp Decl. ¶¶ 37-39.[3] Kik retained an independent consultant, CoinList, to conduct due diligence and verify each investor's accreditation status under Regulation D. SUMF ¶¶ 30-33; Philp Decl. ¶¶ 42-46. Kik placed express limitations on the ability of participants to transfer the SAFT or their interests in the Kin tokens. SUMF ¶ 35. Specifically, the SAFT and PPM provided that the rights conferred under the SAFT had not been registered under federal securities laws, and each participant expressly certified that it was entering the SAFT "for its own account and not with a view towards, or for resale in connection with, the sale or distribution thereof[.]" *Id.* ¶¶ 35-36. Kik filed a Form D with the SEC on September 11, 2017. SUMF ¶ 37.

Kik raised approximately $50 million during the Pre-sale, which was more than enough to build the technology necessary to launch the token on the Ethereum blockchain, as well as the necessary infrastructure to use Kin within Kik. *Id.* ¶ 24. Kik used the funds to implement a product in Kik Messenger where users could link their cryptocurrency wallet to attain premium content and status within the app. Philp Decl. ¶ 49. To provide developers with one example of potential uses for Kin, Kik developed several tiers of user status that allowed users to unlock different types of sticker content corresponding to the tier. SUMF ¶¶ 76-77. The token also was functional as a

---

[3] While Kik treated the offer and sale of the rights conferred in the SAFT agreements as a securities offering, the underlying assets that were the subject of these agreements (*i.e.*, the Kin tokens themselves) were never contemplated to be securities.

medium of exchange outside of the Kik app if other developers wanted to incorporate it into their apps. *Id.* ¶¶ 68-75.

## 2. Kik Sold Kin to the Public to Jumpstart the Kin Economy.

After creating the necessary infrastructure to launch and use Kin tokens, Kik needed to distribute Kin to a wide base of prospective users who would form the new Kin economy. *See* SUMF ¶¶ 38-44, 57-66. To this end, Kik conducted a public sale of Kin starting on September 12, 2017, in which purchasers paid Ether (another cryptocurrency) in exchange for Kin tokens (the "Token Distribution Event" or "TDE"). *Id.* ¶¶ 39, 55, 61. In line with the Bank Secrecy Act of 1970 and the regulations promulgated thereunder, Kik required purchasers to pre-register for the sale on kin.kik.com, and thereby complete Kik's "Know-Your-Customer" or "KYC" process, as well as Kik's Anti-Money Laundering ("AML") process. *Id.* ¶¶ 40-43. Kik retained an outside contractor to advise on and execute the KYC/AML processes. *Id.* ¶¶ 44; Philp Decl. ¶ 55. Users submitted personal information, including passport photos and addresses, which the contractors then used to crosscheck against various databases. SUMF ¶ 42. Despite some Pre-sale participants cautioning Kik that this robust process would deter people from participating, Kik proceeded with the mandatory KYC/AML.

Unlike the Pre-sale, the TDE was governed by a contract entitled the Terms of Use, which was prominently featured on the website where all purchasers registered to participate in the TDE. SUMF ¶¶ 45-47. In order to purchase Kin, Kik required purchasers to check a box verifying that they agreed to these terms, which were available via hyperlink. *Id.* ¶ 46. By agreeing to the Terms of Use, TDE purchasers acknowledged and accepted that:

- Kin tokens were intended "to be used for all transactions within a Kin ecosystem comprised of digital services that participate in the right to compete for compensation in Kin";

- Kik's only affirmative obligation to purchasers was to deliver the tokens "ON AN

'AS IS' AND 'AS AVAILABLE' BASIS WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED";

- Because purchasers obtained complete control over the tokens as soon as they were delivered to the buyer's wallet, Kik could not guarantee it can cause the transfer of purchased Kin tokens after delivery;

- The price of Kin could be adversely affected by "[f]luctuations in the price of Ether or other digital assets"; and

- The Terms of Use constitute "the entire agreement between you and Kik relating to your … purchase and use of the Kin Tokens."

*Id.* ¶¶ 49-50; Ex. H.

### 3. Kik Marketed and Sold Kin as a Medium of Exchange For Use in a Diverse and Decentralized Economy of Digital Services.

From the time of its public announcement in May 2017 through the TDE, Kik's public statements regarding Kin consistently emphasized two critical facts: (1) that Kin was a currency that was designed to be earned and spent within digital applications, and (2) that Kik would be only one of many participants in this new Kin-incentivized digital economy. SUMF ¶¶ 5-19. To effectuate these goals, Kik also structured the TDE so as to encourage participation by users, rather than passive purchasers. SUMF ¶¶ 57-66.

Because passive purchasers who bought Kin with no intent to use it would hinder the growth of the Kin economy, Kik never advertised Kin as a passive investment. Rather, Kik repeatedly emphasized that Kin would be a medium of exchange in a new economy of digital services. *Id.* ¶ 5-17. For example, in its initial press release, Kik stated that it hoped Kin would be "one of the most adopted and used cryptocurrencies in the world." *Id.* ¶ 8. And in its Whitepaper, Kik described Kin as "an open source cryptographic token, . . . which is envisioned as a general purpose cryptocurrency for use in everyday digital services such as chat, social media, and payments." Ex. K, at KIK000008. The Whitepaper also notified prospective users that they could "earn Kin by providing value to other members of the Kik digital community through

curation, content creation, and commerce," and could "spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants." *Id.* at KIK000005.

Consistent with this purpose, Kik also made it a priority to encourage developers to buy Kin and participate in the economy. SUMF ¶¶ 12-17. As such, many of Kik's public statements specifically targeted developers as potential purchasers of Kin. *Id.* In the Company's announcement, Livingston addressed "all developers out there who are competing in a world increasingly controlled by giants, we invite you to check out Kin." *Id.* ¶ 12. Before the TDE, Kik also promoted Kin on developer-focused social-media channels, and at conferences geared toward developer audiences. *Id.* Even the media reiterated Kik's message that Kin had the potential to break up consolidation of power among a few large developers by giving all developers the opportunity to earn a living from providing value, with one journalist noting, "If you're a developer, and your app generates plenty of users and adds value to the ecosystem, you get rewarded. If you write a story, share it, and others like it, you get paid. In Kin." Ex. X, at 2. Consistent with this purpose, and unlike the Pre-sale, the TDE was not restricted to accredited investors, as it did not involve the sale of a security. ECF No. 1 at ¶¶ 168, 174.

Similarly, Kik's public statements emphasized that Kik would be just one of many developers and participants contributing to the success of the Kin economy. SUMF ¶¶ 17-19. This was important because functioning economies need multiple participants to interact and transact with each other; the Kin economy would not succeed if Kik were the only participant. Philp Decl. ¶¶ 21, 29-30. For example, Kik's Whitepaper stated that it intended to be a "participant rather than a landlord" in the new Kin economy. SUMF ¶¶ 19; Ex. K, at KIK000005. In his article announcing the launch of Kin, Mr. Livingston wrote that Kik "hope[d] to spark the creation of a

new ecosystem of digital services that is open, sustainable, and compelling," and that Kik's "ultimate vision [was] that [Kik Messenger] [would] be *just one of thousands of services in the Kin ecosystem*." SUMF ¶ 18; Ex. L, at 2; (emphasis added). In a blog published shortly before the TDE, Mr. Livingston described how the vision could not succeed with Kik alone, and Kik needed "as many people as possible" to support their "movement to build an ecosystem where people get fairly compensated for the value they provide to digital services. . . . A movement where consumers get immersive and unique experiences catered to their interests and needs." *Id.* ¶ 11; Ex. N, at KIK00045123. That same article also stated that "the success of a new cryptocurrency depends on the number of people who work together to build it. The more people participating, the better." *Id.* at KIK00045122.

Because its goal was to create a wide base of Kin users, Kik structured the TDE to ensure anyone interested in participating would have the opportunity to do so. *See* SUMF ¶¶ 57-61; Philp Decl. ¶¶ 68-70. Unlike many other cryptocurrency sellers at the time, Kik capped how many tokens a purchaser could buy for the first 24 hours, to prevent large purchasers from stock piling excessive amounts of Kin before others could participate. SUMF ¶¶ 58-59. On the other hand, Kik did not require a minimum purchase amount, meaning that someone could purchase as little as $1 worth of Kin. *Id.* ¶ 60. These restrictions had the intended effect; in fact, roughly half of the purchasers in the public sale bought less than $1,000 worth of Kin, and many purchasers bought less than $1 worth of Kin. *Id.* ¶¶ 63-64. Ultimately, approximately 10,000 individuals purchased Kin in the TDE, and Kik received $50 million in revenue from the sale. *Id.* ¶ 65.

### C. At the Time of Launch, Kin Tokens Were Functional and Could be Used as a Medium of Exchange.

In order to ensure that Kin's functionality was immediately demonstrable, Kik sold Kin to the public only after the token was functional and had been integrated within Kik Messenger. *Id.*

¶¶ 23, 70.  In fact, Kik postponed the date of the sale at least three times because the token was not ready to be spent or used.  *Id.* ¶ 70; Philp Decl. ¶ 79.  But at the time of launch, there were already an unlimited number of ways that Kin could be used.  SUMF ¶¶ 72-76.

First, Kin could be used within Kik Messenger at the moment it was launched and distributed to TDE purchasers.  To demonstrate how Kin could be used within digital applications, Kik launched a minimum viable product, or "MVP," in conjunction with the launch of Kin.  *Id.* ¶¶ 76-77. The MVP allowed Kin purchasers to link their cryptocurrency wallets to their Kik accounts, which displayed their Kin balance to other users.  *Id.* ¶ 77.  After doing so, Kin holders could unlock exclusive premium content within the application, including stickers or emojis, which varied based on the amount of Kin the user owned.  *Id.*  Shortly after the TDE, nearly 20% of the TDE purchasers participated in the MVP and linked their wallets to Kik.  *Id.* ¶¶ 78.  Kik soon launched additional functionality within Kik Messenger in December 2017, which allowed TDE purchasers to spend Kin on additional premium stickers, as well as earn Kin by completing polls or surveys, by providing feedback to Kik regarding the experience, or by offering artistic content such as stickers to other Kik users.  *Id.* ¶ 79.  By January 2018, 59% of Kik users with linked wallets had participated in at least one poll and earned Kin, and 19% of wallet users had spent Kin on at least one sticker pack.  *Id.* ¶ 80.

Second, the token was also immediately functional as a medium of exchange outside of the Kik application.  *Id.* ¶¶ 71-75.  Given that the code for Kin was publicly available, any developers that wanted to incorporate it into their applications had the tools and means to do so immediately upon launch without any help or intervention from Kik.  *Id.* ¶¶ 74-75.  And because it was operated on the Ethereum blockchain, an open source platform, anyone who held Kin could freely transfer it on Ethereum or use it as a medium of exchange for any transaction—Kik did not (and could not)

impose limitations on that use. *Id.* ¶ 72, Philp Decl. ¶ 91. That means that anyone wishing to accept Kin as currency was able to do so, and in fact did do so. For example, soon after launch, companies selling sunglasses and cars—neither of which was connected to Kik—announced that they would accept Kin tokens for purchases. SUMF ¶ 73.

**D.** **Kin Tokens Continue to Serve as the Medium of Exchange for a Flourishing Digital Economy.**

Consistent with Kik's vision and with Kik's public statements before the TDE, the Kin economy has flourished through the participation of dozens of developers and applications— independent of Kik—that have generated opportunities to earn and spend Kin. Kin can be spent on a myriad of digital services and can be shared amongst users seamlessly within popular apps such as Reddit or Twitter. *Id.* ¶ 81. Today, there are 57 applications in which Kin is being used monthly to purchase or participate in digital services. *Id.* ¶81. Within those applications, there are *1.9 million* users spending Kin each month. *See id.* ¶ 83. And to date, *over seven million* different users have spent Kin tokens, and *over twenty million* different users have earned Kin from these applications. *Id.* ¶ 84. Kin is also in the top three cryptocurrencies, as measured by use on the blockchain excluding secondary market transactions, showing that Kin is overwhelmingly used as a medium of exchange. *Id.* ¶ 86. In fact, these statistics show that Kin has more activity as a digital currency than Bitcoin or Ether, which the SEC has deemed not to be securities. *Id.* ¶ 86. Tellingly, Kik Messenger is not even the top application within the ecosystem, measured by the amount of Kin tokens being spent; instead it is a third party application that independently integrated Kin. *Id.* ¶ 85. And even more telling: since the TDE, Kik has sold the Kik Messenger application to a third party; who is now operating the messaging application in the ecosystem without Kik's involvement. *Id.* ¶ 88; Philp Decl. ¶ 92. In short, Kik's vision of an open and decentralized economy, with many independent users and developers using Kin as a medium of

12

exchange in a new digital economy, has been validated in the market, and has been highly successful.

### E.     The SEC's Complaint Conflates the Pre-sale and the TDE.

After a lengthy investigation, the SEC filed this action in June 2019, alleging only that Kik violated Sections 5(a) and (c) of the Securities Act when it "offered and sold securities without a registration statement in effect and without an exemption from registration."  ECF 1, at ¶ 194.  The Complaint does not distinguish between the Pre-sale and the post-launch purchases of Kin in the TDE.  Rather, the SEC asserts that the Kin transactions *in aggregate* should be considered an "investment contract" subject to the registration requirement of the Securities Act.  As set forth below, the SEC cannot meet its burden of proof for these claims because the economic realities of Kik's sale of Kin stand in stark contrast to the investment schemes covered by *Howey*.

### ARGUMENT

A party is entitled to summary judgment where it can show that "there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 345 (S.D.N.Y. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In deciding whether to grant summary judgment, there must be more than a "scintilla of evidence" in the non-movant's favor.  *Anderson*, 477 U.S. at 252.  That is, there must be a "genuine" dispute, meaning that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotations and citation omitted).

## I.  THE SALES OF KIN TOKENS DURING THE TDE DO NOT CONSTITUTE INVESTMENT CONTRACTS.

Section 2(a)(1) of the Securities Act defines "security" through a list of examples, including a "note," a "stock," and a "bond," as well as an "investment contract," which is the only type of security the SEC claims is at issue here.  The term "investment contract" was included in this definition for the "limited purpose of identifying unconventional instruments that *have the essential properties of a debt or equity security*," but would otherwise not fall within an enumerated category.  *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994) (emphasis added); *see also Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (1979) (the interest acquired must have "substantially the characteristics of a security"); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993) (the definition should "capture new arrangements comprising the essence of securities, however they may be named"); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 851 (1975) (housing cooperative "stock" not a security in part because the instrument does not possess "characteristics traditionally associated with stock," such as "voting rights" and "dividends contingent upon an apportionment of profits").

The Supreme Court incorporated these qualities in its definition of an investment contract, which is "a contract, transaction, or scheme" that involves (1) an investment of money (2) in a common enterprise (3) with an expectation of profits based on the essential managerial efforts of others.  *Howey*, 328 U.S. at 298–99; *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (applying *Howey*'s three-part test).  The investment contract in *Howey* involved the sale of real estate parcels in an orange grove, coupled with a service contract with the offeror, by which an affiliate would maintain the lots, pick the oranges, and market the harvest.  328 U.S. at 295–96.  Under the terms of the contracts, purchasers had no right of entry to market the crop and had no right to specific fruit.  *Id.* at 296.  Instead, the management company maintained the land as a

single orange grove: it picked all of the fruit, pooled the oranges together for market, and the individual land owners received an allocation of net profits based upon the quantities of fruit picked. *Id.* at 296. In holding the contracts constituted an "investment contract," the Supreme Court emphasized that rather than a traditional land conveyance, purchasers were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by the respondents." *Id.* at 299.

### A. The Howey Test Requires An Objective Analysis of What Kik "Offered and Promised."

The term "investment contract" is not a boundless catch-all; rather, courts have diligently applied *Howey*'s elements because "[e]ach component in the concept matters." *Rodriguez*, 990 F.2d at 10; *Revak.*, 18 F.3d at 87 (all three elements of the *Howey* test must be present). The *Howey* test, then, is a transaction-specific, "objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009); *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 353 (1943) (analysis should focus "the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."); *Marine Bank v. Weaver*, 455 U.S. 551, 561 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purpose intended to be served, and the factual setting as a whole."). The subjective intent of the parties simply does not control. *SEC v. Aqua-Sonic Prod. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) ("The subjective intentions or motivations of the investors are irrelevant."); *Goodwin v. Elkins & Co.*, 730 F.2d 99, 104 (3d Cir. 1984). To hold otherwise would risk instances where some participants "might have purchased securities while others did not." *Teague v. Bakker*, 1998 WL 168876, at *3 (4th Cir. Apr. 8, 1998); *see also Piambino v. Bailey*, 610 F.2d 1306, 1320 (5th Cir. 1980) ("The motivation of particular individuals might vary; the application of the statute

must be objectively based.").

In conducting this objective inquiry, "***the first step in analyzing investment contracts is to look to the contracts themselves***." *Albanese v. Fla. Nat'l Bank of Orlando*, 823 F.2d 408, 410 (11th Cir. 1987) (emphasis added); *see also Bamert v. Pulte Home Corp.*, 445 F. App'x 256, 267– 68 (11th Cir. 2011) (characterizing the underlying purchase agreements as "central to Plaintiffs' securities claims" because multiple elements of *Howey* depended on their terms). If the terms of the governing contract are inconsistent with the required showing under *Howey*, courts routinely hold that there is no investment contract. *See, e.g.*, *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (terms of the contract for real property was not an "investment contract"); *S&S NY Holdings, Inc. v. Able Energy, Inc.*, 2012 WL 3084112, at *5 (S.D.N.Y. July 27, 2012) (no investment contract where the governing agreement was no longer valid); *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1050 (S.D.N.Y. 1975) (no investment contract where promoter was not contractually obligated to manage or "run the development and distribute profits to the plaintiff, as did the operators of the orange groves in *Howey*"); *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300–01 (9th Cir. 1979) (same result despite marketing materials emphasizing promoter's efforts to develop surrounding land).

In addition to the written contract, courts may consider "the representations made by the defendants as the basis of the sale," such as "[p]romotional materials, merchandising approaches, oral assurances and contractual agreements." *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980). However, materials and oral assurances that conflict with the governing contract are not sufficient in and of themselves to establish an investment contract. *See, e.g.*, *Davis*, 401 F. Supp. at 1049–50 (promotional materials emphasizing future development of surrounding lands did not establish an investment contract where purchase agreement contains no

such promises); *Alunni v. Dev. Res. Grp., LLC*, 445 F. App'x 288, 292–93, 298 (11th Cir. 2011) (oral assurances and "representations" made at "workshops or otherwise" insufficient to create investment contract where written contract was entire agreement between the parties).

As set forth below, undisputed facts show that the TDE did not give rise to any "investment contracts," and therefore did not violate Section 5 of the Securities Act. Accordingly, regarding the TDE, Kik is entitled to judgment as a matter of law.

### B.  There Is No Common Enterprise Between Kin Purchasers and/or Kik.

The SEC cannot establish the existence of a "common enterprise," an essential element of the *Howey* test. *Revak*, 18 F.3d at 87. To determine whether a common enterprise exists, the Second Circuit applies the "horizontal commonality" test, which requires "the tying of each individual investor's fortunes to the fortunes of the other investors by a pooling of assets, usually combined with the pro-rata distribution of profits." *Id.* at 87–88 (adopting horizontal commonality and citing approvingly to cases from several other circuits holding to like effect); *accord SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (horizontal commonality exists only where "each investor's interest is pooled with that of the other investors, so that each has an undivided share in a pool of assets rather than an individual asset"). Although the Second Circuit has not addressed the issue, other courts have indicated that common enterprise may be established through "strict vertical commonality," which requires that "the fortunes of investors be tied to the *fortunes* of the promoter." *Revak*, 18 F.3d at 87–88 (citation omitted).[4]

---

[4] In *Revak*, the Second Circuit expressly rejected the "broad vertical commonality" test, which is met when "the fortunes of the investors [are] linked to only to the *efforts* of the promoter." 18 F.3d at 87. Courts consistently criticized this test as inconsistent with *Howey* because it essentially eliminates the common enterprise requirement. *Id.* at 88 (collecting cases); *see also Kaplan v. Shapiro*, 655 F. Supp. 336, 340 (S.D.N.Y.1987) (criticizing broad vertical commonality test).

Here, the undisputed facts preclude a finding of a common enterprise under either test because:

- Kik owed TDE purchasers no ongoing contractual obligations beyond delivering the Kin tokens themselves (*see, infra,* Part I.B.1);

- Upon receipt of their tokens, TDE purchasers had complete control over their tokens (*see, infra,* Part I.B.2); and

- To the extent that any TDE purchasers expected to earn a profit (such as by selling their tokens for more than the TDE price), they would earn those profits individually not (a) collectively with one another (and hence no horizontal commonality) or (b) with Kik (and hence no vertical commonality) (*see, infra,* Part I.B.3-4).

### 1. There Is No Common Enterprise Because Kik Did Not Owe TDE Purchasers Ongoing Contractual Obligations.

As an initial matter, no common enterprise can exist under any formulation absent a continuing contractual obligation between the seller and the purchasers, requiring the seller to perform certain actions to further the enterprise. *Woodward*, 574 F.2d at 1025 (no contractual obligation apart from transferring title to subdivision of development); *De Luz Ranchos*, 608 F.2d at 1301 (same); *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1003 (6th Cir. 1984) (*Howey* test not met where "defendants were under no contractual duty to develop the subdivisions" and "plaintiffs had no right to share in the profits of successful development"); *Davis*, 401 F. Supp. at 1050 (same). In *Howey*, for example, the Supreme Court's decision hinged on the terms of the service contracts between investors and the promoter, which lasted ten years and provided defendants "full discretion and authority over the cultivation of the groves and the harvest and marketing of the crops." *Howey*, 328 U.S. at 295–96 (prospective customers were "offered both a land sales contract and a service contract" and told that the service contract would be critical to their grove investments). Indeed, Kik is not aware of any case where, under principles

consistent with those applied by the Second Circuit, a court held an investment contract existed

even though the promoter made no ongoing, post-purchase commitments.[5]

*Woodward* is instructive. There, the Tenth Circuit determined that there was no "common

enterprise" (and thus no investment contract) between purchasers of undeveloped lots in a planned

residential community. *Woodward*, 574 F.2d at 1025. In so holding, the court emphasized that

the "investment contract" inquiry centers on the terms of the written contract governing the

transaction at issue:

> [T]he mere fact that the plaintiffs bought lots from Terracor does not
> mean that by such acquisition they were thereafter engaged in a
> common venture or enterprise with Terracor. ***The only contractual
> agreement between plaintiffs and Terracor*** was the Uniform Real
> Estate Contract. Terracor was under ***no contractual obligation to
> the plaintiffs other than to deliver title once purchase terms were
> met.*** Unlike *Howey*, Terracor was ***not under any collateral
> management contract with the purchasers of its land***. In short, the
> record in the instant case simply shows the purchase by the plaintiffs
> of lots in a real estate development. Though it is possible that the
> plaintiffs may have a common-law remedy against the defendants
> arising out of the purchase of the lots, such does not mean that the
> transaction itself is an "investment contract," thereby invoking the
> provisions of the federal securities laws.

*Id*. (emphasis added). In other words, because there was no contractual obligation beyond

transferring title to the subdivision of the development, nor were the parties under any collateral

management contract, no common enterprise existed. *Id.* Similarly, in *De Luz Ranchos*, the court

found that there was no common enterprise, even though the developer *explicitly marketed plots*

---

[5] Even where some promises or ongoing obligations by the seller exist outside the contract, they cannot create a common enterprise where there was no contractual obligation to do so. *See Alunni*, 445 F. App'x at 292–93, 298 (oral promises made during promotional efforts insufficient to create investment contract where written contract was entire agreement between the parties); *Rodriguez*, 990 F.2d at 11 (seller's "strong and repeated suggestions" that surrounding land would develop did not create investment contract as there was no contractual obligation to do so); *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975) (no investment contract "when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services").

*of land as a passive investment*, because the governing land sale contracts did not obligate the developer to do anything other than transfer title. 608 F.2d at 1300–01; *see also Davis*, 401 F. Supp. at 1050 (reaching same result).

As in *Woodward*, the undisputed facts show that there were no ongoing contractual obligations between Kik and TDE purchasers, and this precludes the existence of a common enterprise as a matter of law. Indeed, the Terms of Use was the only written contract entered into between Kik and TDE purchasers. Under that agreement, Kik was only required to deliver Kin in exchange for Ether, with no continuing obligations. To reinforce the lack of ongoing obligations, the Terms of Use make clear that TDE purchasers received their Kin tokens "AS IS," meaning that they undertook "the entire risk of the quality of the goods involved."[6] Courts routinely dismiss breach of contract claims where, as here, the operative contract contains an "as is" clause. SUMF ¶ 49; *see also supra*, n.5. TDE purchasers agreed to purchase Kin "WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED." *Id.* Accordingly, both Kik and TDE purchasers agreed that they owed no ongoing obligations to each other. *Roberts v. Weight Watchers Int'l, Inc.*, 217 F. Supp. 3d 742, 753, 755–56 (S.D.N.Y. 2016) (dismissing breach of contract claims because a disclaimer of express and implied warranties dictated that no obligations were owed amongst the parties). And, importantly, the Terms of Use include a merger clause, which memorialized the parties' understanding that the terms "constitute[d] the entire agreement between you and Kik relating to . . . your purchase and use of

---

[6] *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 2002 WL 31453789, at *2–3 (S.D.N.Y. Oct. 31, 2002) (granting motion for summary judgment on breach of contract and fraud claims where written contract to purchase an airplane contained an "as is" clause); *Inter-Mark USA, Inc. v. Intuit, Inc.*, 2008 WL 552482, at *9 (N.D. Cal. Feb. 27, 2008) (finding "as is" language in software license contract was valid and enforceable disclaimer).

the Kin Tokens." SUMF ¶ 51; *see Alunni*, 445 App'x at 298 (citing merger clause in rejecting arguments that alleged promises not set forth in agreement could establish an investment contract).[7] On these undisputed facts, no reasonable trier of fact could find that there was a common enterprise between Kik and TDE purchasers.

### 2. No Common Enterprise Exists Because Purchasers Assumed Full Control of Their Kin.

Further, under either horizontal commonality or strict vertical commonality tests, no common enterprise exists where the purchaser obtains complete control over an asset. *See, e.g.*, *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011) (no common enterprise where purchasers had full control over the purchase of rare coins); *accord Howey*, 328 U.S. at 296 (service contract granted management company "full discretion and authority" over the groves, including the fruit grown on each investor's plot). Kik is aware of no case where a purchase agreement constituted an investment contract even though purchasers assumed full control of the underlying asset. This is because a finding of common enterprise in such circumstances "belies the economic reality of the transaction at issue." *Alunni v. Dev. Res. Grp., LLC*, 2009 WL 2579319, at *8 (M.D. Fla. Aug. 18, 2009) (no investment contract where purchasers where purchasers "retained the right to do whatever they legally pleased with their units"); *see also Revak*, 18 F.3d at 88 (reaching same conclusion); *Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*, 2019 WL 6311520, at *7 (S.D.N.Y. Nov. 25, 2019) (no investment contract where provisions in agreement at issue "afforded members significant control").

---

[7] Given that each purchaser was required to check a box agreeing to the Terms of Use before purchasing Kin, this agreement is binding against all purchasers. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ("Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'"); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 550 (S.D.N.Y. 2018) (collecting cases).

A purchaser's control of the asset is particularly probative where, as here, the purported "profit" derives from the resale of the asset at an appreciated value. In such cases, courts have uniformly held that there is no common enterprise where a purchaser retains complete control over the decision of whether (or when) to sell the underlying asset. For example, in *Lavery v. Kearns*, the court concluded that the mere purchase of condominiums from a management company was not a common enterprise, even where the management company made representations about plans to develop the neighborhood, because purchasers controlled their units upon purchase. 792 F. Supp. 847, 859–60 (D. Me. 1992). The court noted that the "thrust of the investment" was the "appreciation of the value of the property," and, because purchasers had control to "choose to sell" their units and could "set whatever price they wished," the purchasers, not the seller, determined whether they profited or not. *Id.* at 860. Similarly, in *Marini*, the court found no common enterprise for the purchase of rare coins "because plaintiff was free to direct the sale of his coins separate and apart from [defendant's] decision to sell his coins," and therefore "the fortunes of [plaintiff] and [defendant] clearly were not directly linked." 812 F. Supp. 2d at 257–58; *see also Noa v. Key Futures, Inc.* 638 F.2d 77, 79–80 (9th Cir. 1980) (no common enterprise where "the decision to buy or sell was made by the owner of the silver"); *Copeland v. Hill*, 680 F. Supp. 466, 468–69 (D. Mass. 1988) (same, noting the "primary risks and rewards—appreciation or depreciation in market value—rested on the plaintiffs").

As in *Alunni*, *Marini*, and *Lavery*, TDE purchasers "retained the right to do whatever they legally pleased with their [tokens]." *Alunni*, 2009 WL 2579319, at *8. It is undisputed that Kik imposed no restrictions on when or how TDE purchasers used (or sold) their Kin. *See* ECF 1 at ¶ 88 (stating that "[a]ll Kin . . . were unrestricted"). Nor is it disputed that TDE purchasers could use, transact, or sell their Kin without Kik or any other purchaser doing so, or even knowing so.

On this point, the Terms of Use are highly relevant. The Terms of Use agreement—again, the only contract governing the sale of Kin—contained no restriction on purchasers' use, transfer, or sale of Kin tokens, nor does it contain any legal obligation for Kik to control the transfer of Kin tokens. Indeed, because Kin token are maintained on a "decentralized ledger within the Ethereum platform," TDE purchasers acknowledged and accepted that Kik could not "effect the transfer of title or right in any Kin tokens." SUMF ¶ 50. And under this agreement, Kik's only obligation was to distribute Kin to TDE purchasers upon the receipt of Ether. *Id.* ¶¶ 52, 56, 69. Moreover, Kin was distributed to TDE purchasers using a mechanism called a smart contract, which is a self-executing contract built into computer code using blockchain technology (like Kin) and publicly available for anyone to view. *Id.* ¶ 67; Ex. A, Philp Decl. ¶ 80. The TDE smart contract was built **solely to distribute Kin tokens**, and did not allow Kik to retain any control over future use or transfers of Kin. *See id.* Therefore, as in *Lavery*, each Kin purchaser was in complete control over whether, and when, they would sell their Kin. Thus, a purchaser who elected to sell their Kin when the price of Kin was higher would profit, whereas others who elected to sell their Kin when the value was lower would not. Because Kin purchasers' exercise of control over their asset "determine[s] whether they profit or not," there cannot possibly be a common enterprise. *Lavery*, 792 F. Supp. at 859–60.

### 3. There Is No "Horizontal Commonality" Between TDE Purchasers.

Application of the horizontal commonality test reinforces that the common enterprise element cannot be met. Horizontal commonality, as adopted by the Second Circuit, requires "the tying of each individual investor's fortunes **to the fortunes of the other investors** by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87 (emphasis added); *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 465 (7th Cir. 2014) (test requires multiple investors "pool their investments and receive pro rata profits"); *SEC v. SG*

23

*Ltd.*, 265 F.3d 42, 50 (1st Cir. 2001) (horizontal commonality "places easily ascertainable and predictable limits on the types of financial instruments that will qualify as securities"). "Pooling" under *Howey* involves an "arrangement whereby the account constitutes a single unit of a larger investment enterprise in which . . . the profitability of each unit depends on the profitability of the investment enterprise as a whole." *Savino v. E. F. Hutton & Co.*, 507 F. Supp. 1225, 1236 (S.D.N.Y. 1981). For that reason, "pooling" means more than merely commingling of funds in a single account, rather it requires "the inter-dependency of the investors that transforms the transaction substantively into a pooled investment." *SEC v. Life Partners, Inc.*, 87 F.3d 536, 544 (D.C. Cir. 1996); *accord Copeland*, 680 F. Supp. at 468 (no horizontal commonality because the fortunes of each rare coin purchaser was "intertwined with the success of the pool").

Here, horizontal commonality is not present because there was no "pooling" of funds among TDE purchasers, nor a pro rata profit-sharing arrangement. TDE purchasers did not "pool" their funds because Kik did not promise to use the proceeds for any common purpose. Rather, Kik made clear that it would use proceeds from the TDE to fund its own operations, in which TDE purchasers had no interest whatsoever. Ex. K, Whitepaper, at KIK00021. Further, the SEC cannot establish that TDE purchasers had a pro rata right to Kik's profits. After distributing Kin, Kik did not distribute any money, interest, dividend, or anything that could be construed as "profit" to each of the TDE purchasers. Indeed, purchasers would only "profit" to the extent that they chose to sell Kin at a higher price than they paid for it. But other TDE purchasers do not share this "profit" proportionally, as horizontal commonality requires. *See, e.g.*, *Revak*, 18 F.3d at 88 (horizontal commonality not present because "[t]he rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner. Plaintiffs owned individual units, and could make profits or sustain losses independent of the

24

fortunes of other purchasers. There are simply no indicia of horizontal commonality."); *Wals*, 24

F.3d at 1018 (contrasting pro rata distribution of profits in stock ownership with rent generated

from condominium ownership and holding that the latter did not give rise to common enterprise);

*Goldberg*, 755 F.3d at 466 (horizontal commonality not established where instruments are

characterized as "speculative . . . investments, hoping also to earn some rental income," because

purchase is "different from sharing returns common to all the [] owners."). Because TDE

purchasers did not receive pro rata distribution of profits from pooled funds, there can be no

horizontal commonality.

> **4.      There Is No Strict Vertical Commonality Between Kik and TDE
> Purchasers.**

Although the Second Circuit has not expressly adopted strict vertical commonality, this

test also results in a finding of no common enterprise. This test asks whether the "fortunes" of the

investor *and the promoter* are "inextricably linked." *Marini*, 812 F. Supp. 2d at 261; *see also*

*Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 249 (S.D.N.Y.

2002) (plaintiff must establish that "the fortunes of plaintiff and defendants are linked so that they

rise and fall together"). Evidence that an investor's fortunes are tied to the promoter's efforts is

not sufficient. Rather, the promoter's profit must be contingent on the profits of the investors.

*Revak*, 18 F.3d at 88. For example, strict vertical commonality is present where the investment

manager receives a performance fee of 20% of the profits generated by the investment account

because his "financial compensation was linked to the fortunes of the investors." *In re J.P.*

*Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2002); *see also Walther v. Maricopa*

*Int'l. Inv. Corp.*, 1998 WL 186736, at *7 (S.D.N.Y. Apr. 17, 1998) (finding strict vertical

commonality where defendants "were to be paid only if [plaintiff's] funds made substantial gains,"

and "[c]onsequently, if [plaintiff's] funds appreciated in value, the defendants were financially

compensated," whereas "if [plaintiff's] investment did not perform well, the defendants were not paid" (internal quotation marks omitted)). In contrast, there can be no strict vertical commonality where the promoter's profit (or lack thereof) is unaffected by the investors' profits. *Gugick v. Melville Capital LLC*, 2014 WL 349526, at *5 (S.D.N.Y. Jan. 31, 2014) (strict vertical commonality lacking because defendant "was entitled to a commission . . . regardless of whether Plaintiff made a profit").

Kik's profit from its ownership of Kin is entirely detached from that of other Kin holders, as nothing in the Terms of Use dictated that Kik's ability to profit was contingent on the other Kin owners' profits or losses. For example, TDE purchasers who sold Kin in January 2018 (when Kin was selling at a price higher than the TDE price) made a profit from the increased price of Kin. Similarly, if Kik earns Kin by offering goods and services within its application, it would profit, irrespective of whether any other Kin purchasers received a profit (or loss). And anyone, including Kik, could purchase or sell its Kin at any point, and individual purchasers would not share in any profits from that subsequent sale, nor would the parties equally share any loss.

Unable to meaningfully dispute the terms of the operative contract, or to identify any other connection between Kik and Kin holders' profit or losses, the SEC has argued that merely owning the same Kin tokens is sufficient to create a common enterprise between Kik and Kin holders. *See* ECF 1 at ¶ 183 ("If the value of Kin rises or falls, the change in value will affect the value of all of the Kin tokens, whether such tokens are held by Kik, the Foundation, or investors."). But courts have uniformly rejected this argument, finding that separate ownership of identical assets is insufficient to establish a common enterprise, even if those assets rise and fall in value at the same time. For example, in *Marini*, the court expressly rejected the argument that a plaintiff's "purchase of the same coins as defendants would make their fortunes rise and fall together from owning

26

identical property." 812 F. Supp. 2d at 257. There, the court disagreed that the parties' "ownership of the same types of coins necessarily links their fortunes together for purposes of the strict vertical commonality analysis," particularly because the purchasers were "***free to direct the sale of [their] coins separate and apart from [the defendant's] decision to sell his coins***." *Id.* at 258; *Copeland*, 680 F. Supp. at 468. Indeed, such an approach would lead to the absurd result of every commodity, such as Chuck-E-Cheese tokens and Starbucks gift cards (and other fungible assets, such as gold), constituting "securities."

This approach is also unworkable as a practical matter, because Kin are freely transferrable among any members of the public without Kik's knowledge or participation. This approach would also mean that Kik would be involved, at any given moment, in any number of common enterprises involving individuals with whom Kik has absolutely no relationship whatsoever, contractual or otherwise. For example, under the SEC's interpretation, an individual could acquire Kin tokens on a secondary market, not having reviewed *any* of Kik's offering materials, or agreed to *any* of Kik's terms, and would be considered as being in an enterprise with Kik for the mere fact that they are equally affected when the price of Kin changes. *Howey* cannot possibly be read to support that result.

For the foregoing reasons, there is no common enterprise and Kik is entitled to summary judgment.

### C. Kik Did Not Lead Purchasers Primarily To Expect Profits Based On The Essential Managerial and Entrepreneurial Efforts Of Others.

Kik is also entitled to summary judgment because the SEC cannot prove that TDE purchasers were primarily "led to expect profits" from the essential managerial and entrepreneurial efforts of others. *Howey*, 328 U.S. at 298-99; *see Rodriguez*, 990 F.2d at 11; *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 332 (S.D.N.Y. 1999). This question turns on "an

objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *See Warfield*, 569 F.3d at 1021 (quoting *Howey*, 328 U.S. at 298-99).[8]  Courts consider promotional materials associated with the transaction.  *Id.*  And the focus must be on the "overall emphasis in the promotional materials," not on stray references plucked from their context.  *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 (11th Cir. 1991)  (holding that sale of housing-development lots and membership interests were not securities despite reference to "buying the property as an investment" because "overall emphasis in the promotional material" was on use of the property).

When purchasers are primarily led to expect to use or consume an item, even in the future, there is no "expectation of profits" under *Howey* and its progeny.  *See Forman*, 421 U.S. at 852–53; *see also Rice*, 922 F.2d at 790 (explaining that when purchasers buy an asset to "use or consume it, the securities laws do not apply").  There is also no reasonable expectation of profits under *Howey* merely because a promoter mentions that an item could increase in value or that the purchaser could profit.  *See Alunni*, 445 F. App'x at 292 (no investment contract in purchase of condominiums where promotional materials stated that purchasers would receive immediate income and did not have to manage their units); *Revak*, 18 F.3d at 84 (no investment contract where condominiums were marketed for "the income to be derived from rentals, and the prospect of capital appreciation"); *Hart*, 735 F.2d at 1003 (no investment contract for model home purchases where promotional materials touted "the potential for excellent appreciation in value during the holding period").  Rather, the focus must be on what ***Kik led purchasers to expect***; the simple fact that any one individual subjectively intended to profit is irrelevant.  *See Contract*

---

[8] If instead subjective intent controlled, it would lead to the absurd result that some people bought a security while other purchasers of the same asset did not.  *See Rodriguez*, 990 F.2d at 11 (explaining that there was no need to identify buyers with varying purchaser intents because focus was on what "promoter or any other obligated person or entity was promising the buyers").

*Buyers League v. F&F Inv.*, 300 F. Supp. 210, 224 (N.D. Ill. 1969) ("[T]o conclude that the natural desire of any purchaser that his purchase should appreciate in value makes a 'security' of what has been purchased, is obviously to so muddle the term as to make it meaningless."). And in a case involving transactions with nearly 10,000 separate purchasers, the SEC cannot establish there was an investment contract without evidence that "the majority or even a fair number of the buyers bought" Kin "as an investment to derive profits from entrepreneurial efforts of the developer." *Rice*, 922 F.2d at 791.

Moreover, even if purchasers are led to expect profits, such expectations must be based on the "undeniably significant" entrepreneurial or managerial efforts of the promoter. *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973); *United States v. Leonard*, 529 F.3d 83, 88 & n.6 (2d Cir. 2008) (citing *Glenn W. Turner* favorably and listing other circuits which have followed this approach). That is, the expectation must be based on the type of *Howey*-level "commitments and promises" that "cross over the line and make the interest acquired one in an ongoing business enterprise." *Rodriguez*, 990 F.2d at 11. These "commitments" therefore must go beyond mere foundational efforts, such as building infrastructure. *See, e.g.*, *Woodward*, 574 F.2d at 1025 (assurances to build community surrounding real property were insufficient to establish a common enterprise). If the purchaser has complete control over the item or interest purchased, he or she does not expect profits from the requisite "efforts of others." *See Alunni*, 445 F. App'x at 296.

1.  **Kik Led Purchasers to Expect Use and Consumption of Kin.**

Kin purchasers could not have expected to profit based on what Kik offered them because, like the written agreements in *Woodward* and *Hart*, the written contract governing the purchase of Kin in the TDE limited Kik's obligation solely to deliver Kin, not to undertake additional management or other efforts. SUMF ¶ 52. Similarly, the promotional materials Kik released

before and around the time of the TDE primarily emphasized the use and consumption of Kin. *See Woodward*, 574 F.2d at 1026 *Rice*, 922 F.3d at 790–91. Kik emphasized Kin's use as a medium of exchange for digital services, not an investment opportunity, and its marketing materials were directed at potential *users* and *participants* in the Kin ecosystem. In its first announcement of Kin, Kik said it planned to "spark the creation of a new ecosystem of digital services that is open, sustainable, and compelling." SUMF ¶ 17. According to Kik's Whitepaper, Kin would be used in "everyday digital services such as chat, social media, and payments." *Id.* ¶ 6. "Users [would] be able to earn Kin by providing value to other members of the Kik digital community through curation, content creation, and commerce . . . and [would] be able to spend Kin on products, services, and other valuable assets." *Id.* ¶ 16.

Kik's public statements were directed precisely to the group of people most likely to use and consume Kin. In a Medium post, Livingston emphasized the importance of attracting many participants in order to grow this "digital community," specifically noting, the "movement is only as strong as the people behind it, and ***a movement this ambitious needs as many people as possible***." *Id.* ¶ 11 (emphasis added). In that same post, Mr. Livingston also solicited developers, understanding that their participation was just as critical. *Id.* ¶ 12 (inviting "all developers out there who are competing in a world increasingly controlled by giants, we invite you to check out Kin"). Kik also promoted Kin to the developer community through social-media channels and at developer conferences. Developers understood that Kin could be used as to buy games, video streams, and other digital points. *See* Ex. S, Kin.org Apps. And Kik marketed Kin to developers who would create uses for Kin, and not treat the currency as an investment. *See* SUMF ¶ 12.

Kik also specifically structured the TDE in a way that would encourage the widest possible audience to participate because it recognized that the Kin economy would not succeed without a

wide base of *users*. Kik imposed an individual cap on purchases for the first 24 hours of the TDE, during which time purchasers could not purchase more than $4,393 worth of Kin, and did not impose a minimum purchase amount, meaning that a TDE purchaser could buy as low as one cent of Kin. *Id.* ¶¶ 58, 60. This resulted in more than 10,000 purchasers ultimately buying Kin, approximately half of whom bought less than $1,000 worth of Kin. *Id.* ¶¶ 61, 63. Some purchasers bought as little as nine cents' worth of Kin. *Id.* TDE purchasers included developers that implemented Kin into their applications. Ex. A, Philp Decl. ¶ 76. Importantly, around 20% of TDE purchasers used Kin's initial functionality within Kik that was introduced upon the distribution of Kin. SUMF ¶ 78. Based on these undisputed facts, no reasonable trier of fact could find that Kik led TDE purchasers to primarily expect profits from buying Kin.

**2.    Any Expectation of Profits Could Not Have Been Based on the Essential Entrepreneurial or Managerial Efforts of Kik.**

Even if TDE purchasers reasonably expected to profit, the SEC cannot satisfy *Howey* unless those purchasers were led to expect a profit *from the essential managerial and entrepreneurial efforts of others*. *See Howey*, 328 U.S. at 298–99. The sort of "efforts" of a promoter envisioned under *Howey* "are activities such as the organization of a business, the efforts of a promoter in cultivating and marketing citrus, the efforts of a promoter in drilling an exploratory well in connection with the sale of oil leases, or the efforts of the managers of a savings and loan to earn profits to be distributed as dividends." *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986) (internal citations omitted). In other words, the efforts of the promoters must be ***necessary to the success of the venture***, such that without them, the "investments would be virtually worthless." *Id.* Here, Kik's efforts within the Kin ecosystem are not "managerial" or "entrepreneurial" for several reasons.

As an initial matter, there is no investment contract if a buyer's expectation of profit turns on his or her "own decision and on market forces." *Long v. Shultz Cattle Co.*, 881 F.2d 129, 137 n.8 (5th Cir. 1989). This is because of the simple fact that "[a]n investor who has the ability to control the profitability of his investment, either by his own efforts or by majority vote in a group venture, is not dependent upon the managerial skill of others." *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982). As with the other elements of *Howey*, this element often turns on the terms of the governing contract. *See Albanese*, 823 F.2d at 410 (noting that "the crucial inquiry is the amount of control that the investors retain under their written agreements."). For example, in *Bamert*, the court evaluated the purchase agreements governing the real estate transaction at issue, finding that their terms allowed purchasers to "reside in the units or to rent them out," and did not "obligate [the purchasers] to contract with" any particular manager. 445 Fed. App'x. at 263. As a result, the court found that the "expectation of profits" prong had not been met "[g]iven the otherwise extensive control [the purchasers] enjoy[ed] under the agreements." *Id.* As discussed above, TDE purchasers received full, unrestricted control over their Kin tokens, and the decision to use, sell, or buy Kin was in the sole discretion of each individual buyer. This alone precludes a finding that purchasers were relying on the managerial efforts of Kik.

Additionally, the price of Kin, like any other asset, is based on supply and demand. Ex. H, Terms of Use, at KIK000090-91. Where, as here, demand for an asset is driven by any number of independent actors, it cannot be said that Kik's efforts were the "undeniably significant" ones that would determine the success or failure of the economy. *Glenn W. Turner*, 474 F.2d at 482. While Kik's role was to build the initial infrastructure, it was always unequivocal that Kik alone would not support the Kin economy, nor could it. On this point, courts have drawn an important distinction between efforts to develop the infrastructure or ecosystem surrounding the purchased

asset—orange groves, silver bars, or Kin—versus an actual "promise to run the [asset] and distribute the profits to the plaintiff," as in *Howey*. *Woodward*, 574 F.2d at 1026 (finding that defendants' efforts to "buil[d] roads and other improvements" are "not the type of managerial service contemplated in *Howey*"). In *Davis*, the Court held that efforts to build out infrastructure within a development of homes, such as "roads and other improvements, [were] not the type of managerial service contemplated in *Howey*[.]" *Davis*, 401 F. Supp. at 1050. Similarly, any of Kik's efforts to contribute to the Kin economy were purely infrastructural; for example, Kik built the mechanism that would reward participants in the economy and make improvements to the blockchain—the equivalent of a "road" on which the Kin tokens traveled. As a fellow Kin holder, Kik had an incentive to contribute to the economy, like other participants in the ecosystem did. But because Kin's value is a function of demand, the truly significant efforts were the efforts of all of the participants in the economy, all of whom help generate demand for the token. In fact, Kik Messenger does not generate the most Kin spend transactions per month. SUMF ¶ 85.

Additionally, courts have held that where purchasers expect profits based on general market factors, which are untethered to the specific efforts of the promoter, this prong is not satisfied. For example, in *Noa*, a case involving a forward contract for silver bars, the Ninth Circuit found no expectation of profits from the efforts of others because "[o]nce the purchase of silver bars was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [the promoter]." 638 F.2d at 79. Similarly, the Ninth Circuit reached the same conclusion in a case involving a forward contract for gold coins because profits for the coin buyer depended primarily upon the fluctuations of the gold market, not the managerial efforts of others. *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986). Here, any fluctuation

in the value of Kin was undeniably influenced heavily by the cryptocurrency market at the time. Ex. H, Terms of Use, at KIK000091.

An expectation of profit primarily from resale of an asset on the secondary market likewise does not satisfy *Howey*. *See Noa*, 638 F.2d at 79 (*Howey*'s third prong not met where expected profits of the investor depended on market fluctuations, not the managerial efforts of the defendant); *see also Belmont Reid.*, 794 F.2d at 1391 (same); *Life Partners*, 87 F.3d at 546 (seller's "establishing a resale market" did not constitute entrepreneurial efforts of others); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (foreign-exchange transactions did not satisfy *Howey* because "any gain likely would result in large part from market movements, not from capital appreciation due to [promotor's] efforts"). The contract language between the parties is instructive. For example, in *Life Partners*, the parties agreed in the contract that, "[t]here is no established market for the resale" and "there is no guarantee that any policy can be resold, or that resale, if it occurs, will be at any given price." 87 F.3d at 546. Based on this language, the court rejected the claim that the buyer expected profits from the entrepreneurial efforts of others. *Id.*

As in *Life Partners*, *Noa*, and *Belmont Reid*, any expectation of profits that Kik purchasers had was based on potential resale on secondary markets, not from the managerial or entrepreneurial efforts of Kik. Rather, Kik made clear from the beginning that it would be a "participant" rather than a landlord, and that the economy could only succeed if a wide base of users and developers used Kin as intended. SUMF ¶¶ 18-19. Kik further made clear in the Terms of Use that to transact with Kin required doing so on the Ethereum blockchain, which was not operated by Kik. *Id.* ¶ 50. Additionally, purchasers acknowledged that "Kik [could] not guarantee that Kik or any Kik party can effect the transfer of title or right in any Kin tokens." *Id.* Kik did not operate any secondary

exchanges, act as a broker for Kin transactions, offer to buy Kin from purchasers, or make any guarantee that there would be liquidity for the token. Kik did not have the ability to determine whether exchanges would accept Kik and could not affect its price upon a potential resale.

### D. Characterizing Sales of Kin as Investment Contracts Would Be Confusing and Potentially Inconsistent With the Actions of Other Agencies.

A decision by this Court that the sales of Kin during the TDE were not investment contracts under *Howey* does not leave those sales or the tokens subject to a "protective regulatory gap" that would justify expansion of the securities law. *See Walsh v. Int'l Precious Metals Corp.*, 510 F. Supp. 867, 872 (D. Utah 1981). Rather, such a finding is consistent with principles of statutory construction and concurrent jurisdiction that make currencies and commodities subject to other agencies' oversight for the following reasons.

***First***, from the time it was launched until today, Kin has functioned as a medium of exchange, identically to Bitcoin, Ether, and other currencies, which are expressly from the definition of "security." *See* 15 U.S.C. § 78c(a)(10) ("The term 'security' means . . . but ***shall not include currency***[.]" (emphasis added)).[9] Like Bitcoin and Ether, Kin can be used for peer-to-peer transactions, is convertible to other currencies, and is widely accepted by digital applications and retailers. Courts have recognized that these cryptocurrencies share common characteristics with currencies, including their use as a medium of exchange. *See, e.g.*, *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 218 (E.D.N.Y. 2018) (defining cryptocurrencies as "digital assets used as a

---

[9] Although the Securities Act does not include the same express exclusion of "currency," the definitions of "security" under both Section 3(a)(10) of the Exchange Act and Section 2(a)(1) of the Securities Act are nearly identical and courts have treated them as such. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003). Currency is traditionally defined as a store of value or a "medium of exchange." *Currency*, Black's Law Dictionary (10th ed. 2014) (an item that circulates "as a medium of exchange"). It need not be legal tender, or even recognized by the United States or other foreign country in order for the securities laws to be inapplicable. *See Sea Pines of Va., Inc. v. PLD, Ltd.*, 399 F. Supp. 708, 711–12 (M.D. Fla. 1975) (promissory note, as a "cash substitute," was "within the exclusion for currency," and therefore not a security).

medium of exchange"); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) ("[T]he only value for Bitcoin lies in its ability to pay for things—it is digital and has no earthly form…."); *SEC v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) ("Bitcoin is a currency or form of money" in part because the asset can be "exchanged for conventional currencies, such as the U.S. dollar[.]"). Consistent with its marketing materials, Kin may be used to pay for "products, services, and other valuable assets offered by merchants, developers, influencers, and other participants." SUMF ¶ 16; Ex. K, Whitepaper, at KIK00005-6. Not only has Kin been accepted for physical goods, such as sunglasses, but it is now available for use in over 50 digital applications in the Google and Apple stores. SUMF ¶¶ 73, 81. This includes well-established applications such as Perfect 365 (which has 100 million users), as well as new concepts like Kinny, which allows Twitter and Reddit users to give Kin as a tip to other users for posts and comments that they like. *See, e.g.*, Ex. S, Kin.org Apps. Excluding secondary market sales, today Kin earn and spend transactions within digital applications currently reflect a higher blockchain activity that that of Bitcoin and Ethereum. *See* SUMF ¶ 86.

*Second*, there is no need to extend the Securities Act to transactions that it has not previously covered when those transactions are subject to a distinct regulatory scheme. *See, e.g.*, *Daniel*, 439 U.S. at 569–70 (declining to "extend[] the Securities Acts" to pension plans because there was already "comprehensive legislation governing the use and terms" of the plans); *Walsh*, 510 F. Supp. at 872–873 (declining to "stretch the protection of the securities laws" where Commodity Futures Trading Commission ("CFTC") had "filled the protective regulatory gap"); *Berman v. Bache, Halsey, Stuart, Shields, Inc.*, 467 F. Supp. 311, 319 (S.D. Ohio 1979) (noting the court's "reluctance" to find a security when there was a "distinct regulatory scheme" that "significantly undermine[s] arguments that a security exists"). Courts have recognized that

cryptocurrencies are subject to oversight and regulation of other federal bodies. For instance, the CFTC has affirmatively regulated cryptocurrencies as a commodity, subjecting them to anti-fraud and anti-manipulation oversight. *See McDonnell*, 287 F. Supp. 3d at 228 ("Virtual currencies can be regulated by CFTC as a commodity."); *CFTC v. My Big Coin Pay, Inc.*, 334 F. Supp. 3d 492, 498 (D. Mass. 2018) (virtual currency subject to CFTC regulation). Likewise, the Internal Revenue Service considers "virtual currency transactions [to be] taxable by law just like transactions in any other property."[10]

The separate regulatory regimes of the CFTC and IRS already apply to transactions in other cryptocurrency. Extending the Securities Act to cover Kin transactions would stretch the Act beyond where it has previously extended and subject Kik to potentially confusing and duplicative regulation. There is no "regulatory gap" for the SEC to fill in this case, and the Court should decline to find one here.

## II. THE PRE-SALE WAS CONDUCTED PURSUANT TO A VALID EXEMPTION UNDER RULE 506(C) OF REGULATION D.

Kik is also entitled to summary judgment on the SEC's claim that its Pre-sale constituted an unregistered sale of securities because the undisputed facts show that Kik conducted the Pre-sale under Regulation D, and that it is therefore exempt from registration requirements.[11] Courts routinely grant summary judgment in Section 5 cases when the sale at issue complies with the Regulation D requirements. *See, e.g.*, *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 259–61 (6th Cir. 1992) (affirming grant of summary judgment in a Section 5 case for defendants who complied

---

[10] Virtual Currencies, Internal Revenue Service, https://www.irs.gov/businesses/small-businesses-self-employed/virtual-currencies.

[11] Kik structured the Pre-sale as a Regulation D private placement because of the distinct terms of the Pre-sale, including the sale to only accredited investors, discounted prices, the conditional right to receive Kin upon a network launch, the potential to lose one's contribution, and the receipt of 50 percent of one's Kin a year after Kin was launched. As discussed above, Kik never contemplated that Kin itself would be or represent a security once created, but rather a currency.

with Regulation D and Section 4(2)); *Shailja Gandhi Revocable Tr. v. Sitara Capital Mgmt., LLC*, 2012 WL 3580680, at *5–6 (N.D. Ill. Aug. 14, 2012) (same). Here, the record establishes that Kik engaged in the steps required by Rule 506(c) and thus complied with Regulation D as a matter of law and the SEC's claim should be dismissed.

A.    **Kik's Pre-Sale Complied with Regulation D, and is Therefore Exempt from the Securities Act's Registration Requirements.**

Regulation D provides a general exemption from the registration requirements of Section 5 of the Securities Act, accordingly allowing companies to sell securities without registering the offering, by meeting certain requirements. *See* 17 C.F.R. § 230.500(a). Specifically, Rule 506(c) of Regulation D, provides for an exemption from registration for sales to accredited investors, if the issuer takes "reasonable care" to ensure that participants are (1) accredited investors, (2) are not statutory underwriters, and then (3) files a Form D with the SEC. 17 C.F.R. § 230.506; 17 C.F.R. § 230.502. As long as the seller makes a "good faith" and "reasonable" attempt to comply with these requirements, the exemption is not necessarily lost, even if its requirements are not strictly followed. 17 C.F.R. § 230.508; *see also SEC v. Levin*, 849 F.3d 995, 1004–05 (11th Cir. 2017) (explaining that Rule 508(a) "preserves the safe harbor for certain insignificant deviations in private actions"). The undisputed facts here show that Kik's Pre-sale complied with each of the three requirements of Rule 506(c), and therefore Kik is entitled to judgment as a matter of law.

*First*, Kik took more than "reasonable steps" to verify that the 50 Pre-sale purchasers were accredited investors as defined by Regulation D. 17 C.F.R. § 230.506(c). Accredited investors are those "who the issuer reasonably believes come within any" of several enumerated categories about the purchaser's business acumen, net worth, income, or other financial sophistication. 17 C.F.R. § 230.501(a) (defining what types of entities and individuals can qualify as an "Accredited

38

investor"); *see also SEC v. Mattera*, 2013 WL 6485949, at *11 (S.D.N.Y. Dec. 9, 2013). There is no question that Kik complied with this requirement for the following reasons:

- The PPM Kik provided to each Pre-sale participant explicitly said that the sale was "limited ***solely to accredited investors*** as defined in Regulation D…." SUMF ¶ 28.

- Kik engaged an independent vendor, CoinList, who verified that each of the fifty Pre-sale participants were in fact accredited. *Id.* ¶ 30; Ex. A, Philp Dec., ¶ 42.

- Kik required each Pre-sale participant to submit certain documents including an attestation verifying that it was accredited and its submissions were accurate. SUMF ¶ 32; Ex. A, Philp Dec. ¶ 43.

- Participants were required to provide additional supporting documentation demonstrating that they were accredited. Ex. A, Philp Dec. ¶ 43

- CoinList also verified participants' accreditation using AngelList, a well-known platform that is used to verify accreditation status. SUMF ¶ 31; Ex. A, Philp Dec. ¶ 43.

- Kik prohibited any participant from executing a SAFT unless CoinList confirmed that the participant met the SEC's requirements for accreditation. SUMF ¶ 33; Ex. A, Philp Dec. ¶ 45.

Based on these steps, both Kik and its agent, CoinList, reasonably believed that each of the fifty participants were in fact accredited (and the SEC has not disputed that fact).

***Second***, Kik took reasonable care to ensure that Pre-sale participants were investing on their own behalf, and were not "underwriters." The obligation to take "reasonable care" to verify that a purchaser is not an "underwriter" is automatically satisfied where the issuer: (1) conducts a reasonable inquiry into whether the purchasers is buying the securities for himself or for others; (2) provides a written disclosure to each purchaser that the securities are not registered with the SEC and cannot be resold unless they are registered or sold pursuant to an exemption; and (3) places a legend on the certificate or document stating that the securities have not been registered and their transfer is restricted. 17 C.F.R. § 230.502(d). Kik did all three of these things and more. Through its negotiations with potential purchasers, Kik had conversations with each individual

Pre-sale participant, who confirmed that they were not purchasing the SAFT to resell or distribute it. Ex. A, Philp Decl., ¶ 47. Kik additionally provided the following written disclosures and legends on the face of the Pre-sale documents:

- Each SAFT contained "Purchaser Representations" to which the purchaser agreed that they were purchasing the SAFT only for their own accounts, and not as an underwriter. SUMF ¶ 36 ("The Purchaser is purchasing this instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same").

- The SAFTs also contained the following disclosure on the very first page: THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 . . ., OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM." *Id.* ¶ 35. The SAFTs also contained a Purchaser Representation, where the participants all verified that they had been advised of this fact. Ex. E, SAFT, at KIK000069.

- Kik placed unambiguous legends on the SAFT agreements, notifying participants that they were "restricted" securities. Ex. E, SAFT, at KIK000066. In addition to the prominent disclaimer above, the PPMs also stated that "[t]he SAFTs described in this Memorandum are subject to restrictions on transferability and resale and may not be transferred or resold."[12] Ex. F, PPM, at KIK000038.

These undisputed facts demonstrate Kik took reasonable efforts to ensure that participants were not acting as underwriters.

***Finally***, the last requirement of Rule 506(c) is to file a Form D with the SEC, and it is undisputed that Kik did so on September 11, 2017. *See* ECF 1 at ¶ 158; Ex. G, Form D. For the

---

[12] As the SAFT itself was the security, the provisions restricting transfer applied to the SAFT and the rights encompassed therein. Transfer of Kin tokens were not restricted under the SAFT because (a) the tokens did not exist at the time the SAFTs were executed, and (b) pursuant to its terms, the SAFT terminates upon Kik's successful delivery of Kin to the purchaser in an amount set forth in their respective agreement. Ex. E, SAFT, at KIK000068.

foregoing reasons, Kik satisfied the three requirements of Rule 506(c) and it is entitled to a valid exemption to the Security Act's registration requirements.[13]

### B. The Pre-Sale and the TDE Were Separate and Distinct Offerings.

The SEC cannot sidestep Kik's unambiguous compliance with Regulation D by contending that it constituted a "single offering" or an "integrated offering"[14] with the TDE. Kik is entitled to summary judgment for the fundamental reason that the Pre-sale and TDE involved sales of different assets to different groups of purchasers over different time periods. The Pre-sale was limited to fifty "investment funds and other wealthy investors," who were all accredited, all participated in private diligence conducted by a third-party consultant, and all entered agreements entitling them to discounted Kin in the future upon occurrence of certain events, in exchange for U.S. Dollars. *See* ECF 1 at ¶ 157. Pre-sale participants bought a *right* to buy tokens *in the future* and did not themselves purchase Kin tokens. SUMF ¶ 44. Conversely, the TDE involved the later sale of functional Kin tokens in exchange for Ether to 10,000 members of the public who were subject to the Terms of Use. *Id.* ¶¶ 45, 61. Further, the two transactions were conducted for entirely different purposes: the Pre-sale was necessary to fund development of the infrastructure for Kin before it was launched to the public, whereas the TDE was a means to distribute Kin to a wide base of users and earn revenue for Kik. These distinctions are further summarized as follows:

---

[13] The Pre-sale was also exempt from the registration requirements pursuant to Section 4(a)(2) of the Securities Act, which exempts "transactions by an issuer not involving any public offering." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 120 (1953).

[14] To determine whether two offerings must be integrated, courts apply the five factors outlined in 17 C.F.R. § 230.502(a): (a) whether the sales are part of a single plan of financing; (b) whether the sales involve issuance of the same class of securities; (c) whether the sales have been made at or about the same time; (d) whether the same type of consideration is being received; and (e) whether the sales are made for the same general purpose. *See Goodwin Props., LLC v. Acadia Grp., Inc.*, 2001 WL 800064, at *9 (D. Me. July 17, 2001) (requiring proof of all five factors). None of these factors are met.

| Fig. 1.1 | | |
|---|---|---|
| | **Pre-sale** | **TDE** |
| **Asset Received** | Conditional contract right to receive Kin tokens in the future, if launched | Kin tokens, as-is |
| **Time Frame** | July 3 – September 11, 2017 | September 12–26, 2017 |
| **Participants** | 50 accredited investors, contacted individually | 10,000 members of the public that registered through Kik's website. |
| **Governing Contract** | SAFTs | Terms of Use |
| **Consideration** | U.S. Dollars | Ether |
| **Restrictions** | Could not resell or transfer SAFTs | None |
| **Discount** | 30% off of TDE price | None |
| **Loss if Kin Not Launched** | 30% of investment | N/A |
| **Participant Qualification** | Due diligence; conducted through CoinList | KYC and AML; conducted using a two outside consultants: Scott Benson and IdentityMind |
| **Documentation Required** | Proof of accreditation, Due Diligence forms, purchaser representations in SAFT. | Name, address, email, social security or passport number, a passport photo page scan, and, for some people, a photograph for face matching. |
| **Offering Materials** | Private Placement Memorandum, private negotiations | Whitepaper, Terms of Use |

These undisputed facts show that the Pre-sale and TDE were distinct sales of different assets, to different parties, under different contracts and for different consideration. Kik therefore is entitled to summary judgment on the SEC's claim that they were somehow a "single" or "integrated" offering.

### CONCLUSION

For the foregoing reasons, Kik respectfully requests that this Court grant its motion for summary judgment.

Dated: March 20, 2019                    Respectfully submitted,


By: /s/ *Patrick E. Gibbs*
_____

Patrick E. Gibbs (*Pro Hac Vice*)
Brett H. De Jarnette (*Pro Hac Vice*)
Jenna C. Bailey (*Pro Hac Vice*)
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
Phone: (650) 843-5000
Fax:     (650) 849-7400
Email: pgibbs@cooley.com;
bdejarnette@cooley.com

Sarah M. Lightdale (SL7122)
Cooley LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6374
Fax:     (212) 479-6275
Email: slightdale@cooley.com

Luke T. Cadigan (*Pro Hac Vice*)
Julianne M. Landsvik (*Pro Hac Vice*)
Michael E. Welsh (*Pro Hac Vice*)
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA  02116-3736
Phone: (617) 937-2425
Email: lcadigan@cooley.com;

Robert W. Pommer III (RP5328)
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-5950
Email: rpommer@kirkland.com

Attorneys for Defendant
KIK INTERACTIVE INC.

## **CERTIFICATE OF SERVICE**

I, Patrick E. Gibbs, hereby certify that a true and correct copy of the foregoing document was served on counsel of record via ECF on this 20th day of March, 2020.

                                        */s/ Patrick E. Gibbs*
                                         Patrick E. Gibbs