UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

U.S. SECURITIES AND EXCHANGE          :
COMMISSION,
                                      :
             Plaintiff,
                                      :    Civil Action No. 19-cv-5244
        vs.
                                      :
KIK INTERACTIVE INC.,
                                      :
             Defendant.
                                      :
------------------------------------- X


**DEFENDANT'S LOCAL RULE 56.1 STATEMENT
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, Defendant Kik Interactive, Inc. ("Kik") in connection with its Motion for Summary Judgment, sets forth the following statements of material facts as to which there is no genuine issue to be tried:

1.      Kik is a Canadian company founded in 2009 by Ted Livingston and Christopher Best.  Ex. A, Declaration of Tanner Philp ("Philp Decl."), ¶ 3.[1]

2.      Kik launched a messaging application called Kik Messenger in 2010.  Ex. D, Excerpts of Transcript of Investigative Testimony of Ted Livingston dated November 11 and November 12, 2018 ("Livingston Inv. Tr."), at 18:6-8.

3.      In 2011, Mr. Livingston began studying the potential applications of blockchain and cryptocurrency in a consumer application.  Ex. D, Livingston Inv. Tr., at 66:1-68:20.  In late 2016 and early 2017, Kik began discussing how to implement a new business model centered around a decentralized digital currency.  Ex. A, Philp Decl. ¶¶ 17-26.

4.      Kik announced its vision for this digital currency to the public on May 25, 2017 through a Whitepaper ("the Whitepaper"), press release, and Medium blog post.  *See* Ex. K, Whitepaper; Ex. M, Kin Press Release dated May 25, 2017; Ex. L, Ted Livingston, *Announcing Kin, a Cryptocurrency for an Open Future,* Medium (May 25 2017).

5.      In its Whitepaper, Kik explained that "blockchain-based networks offer open source models by which new digital ecosystems may thrive.  Large communities can gather around such networks and encourage the development of customized digital economies.  In such an ecosystem, consumers can trade currency for goods or services provided by creators and

---

[1] Citations to "Ex." refer to the exhibits attached to the Declaration of Michael Welsh in Support of the Defendants' Motion for Summary Judgment, submitted concurrently herewith.

developers that have economic incentives, other than advertising, to make great products."  Ex. K, Whitepaper, at 3.

6.      The Whitepaper described how the proposed digital currency, called Kin, could be used in "everyday digital services such as chat, social media, and payments" and provided example use cases.  Ex. K, Whitepaper, at 13-15.

7.      The Whitepaper also stated: "[d]ecentralization offers the most promising path to realize Kik's vision of a sustainable future in online communication and commerce."  Ex. K, Whitepaper, at 3.

8.      In the press release, Kik stated that it hoped Kin would become "one of the most adopted and used cryptocurrencies in the world."  Ex. M, Press Release dated May 25, 2017.  It also stated that "[d]ecentralization provides a sustainable way forward."  *Id.*

9.      The Medium blog post, which was written by Mr. Livingston, stated that Kin was envisioned as "a new ecosystem of digital services that will be truly open and decentralized, and which starts with a new cryptocurrency."   Ex. L, Ted Livingston, *Announcing Kin, a Cryptocurrency for an Open Future*, Medium (May 25 2017).

10.     Mr. Livingston further stated that the Kin economy would allow, "people to participate in an economy based on buying and selling stickers, hosting and joining group chats, creating and using bots, and much more."   Ex. L, Ted Livingston, *Announcing Kin, a Cryptocurrency for an Open Future*, Medium (May 25 2017).

11.     On September 6, 2017, Ted Livingston posted another article on Medium, which stated:

> [the Kin ecosystem] is about a movement. A movement to build an ecosystem where people get fairly compensated for the value they provide to digital services. . . . A movement where consumers get immersive and unique experiences catered to their interests and needs. A movement is only

> as strong as the people behind it, and a movement this ambitious needs as
> many people as possible.

Ex. N, Ted Livingston, *Why I am Telling my Friends and Family That They Should Participate*

*in the Kin TDE*, Medium (Sept. 6, 2017).

12.    In the same article, Mr. Livingston wrote "all developers out there who are

competing in a world increasingly controlled by giants, we invite you to check out Kin." *Id.*

13.    Mr. Livingston published another article on Medium that same day, which stated:

> We believe there is an opportunity to fundamentally change how digital services
> are built, used and monetized. A way that gives consumers a richer ecosystem of
> digital services while compensating them for the value they contribute to those
> services. A way that empowers developers to follow their passions while still
> ensuring they can make a fair living.  We want as many people as possible to be
> able to participate in this project from the beginning.

Ex. O, Ted Livingston, *Kin TDE: If You Want to Participate, You *Must* Register by September*

*9, 9:00 a.m. ET,* Medium (Sept. 6, 2017), at KIK00045080.

14.    In the Whitepaper, Kik described the new Kin economy as:

> a global network of digital services that constitutes a new cooperative operating
> model, focused on the long term. In this model, developers and service providers
> will enjoy the right and opportunity to innovate and compete for compensation,
> while users will benefit from a diverse digital experience, freedom of choice, and
> access to a broad range of commercial services.

Ex. K, Whitepaper, at KIK000007.

15.    The Whitepaper stated that by providing an open and decentralized network of

digital services, the Kin ecosystem would "foster[] direct economic relationships between

developers, creators, and consumers, with value and governance shared among the participants."

Ex. K, Whitepaper, at KIK000003.

16.    The Whitepaper continued to explain that users could "earn Kin by providing value

to other members of the Kik digital community through curation, content creation, and commerce"

and could "spend Kin on products services, and other valuable assets offered by merchants, developers, influencers, and other participants." Ex. K, Whitepaper, at KIK00005-6.

17.     In the May 25, 2017 press release, Kik stated:

> By integrating Kin into our chat app Kik, we hope to spark the creation of a new ecosystem of digital services that is open, sustainable, and compelling.  It will be an ecosystem in which developers link arms to compete with the giants together, building a better future for society while also making money.

Ex. M, Kik Press Release dated May 25, 2017.

18.     In a May 25, 2017 Medium article, Ted Livingston described Kik's "ultimate vision" that Kik Messenger would be "just one of thousands of services in the Kin ecosystem." Ex.  L, Kik Press Release dated May 25, 2017.

19.     Kik's Whitepaper also explained that Kik's goal was to "encourage the development of a digital services ecosystem that is fair and open" and in which Kik preferred "to be a participant rather than a landlord."  Ex. K, Whitepaper, at KIK000005.

20.     Kik conducted a private offering of futures contracts between June and September 11, 2017 (the "Pre-sale").  Ex. A, Philp Decl. ¶ 32; Ex. E, SAFT.

21.     In the Pre-sale, Kik entered into Simple Agreements for Future Tokens ("SAFTs") with 50 individuals and entities.  Ex. A, Philp Decl. ¶¶ 32–25.  Kik also provided all Pre-sale participants with a Private Placement Memorandum ("PPM"), which set forth the terms of the transactions.  *Id.* ¶ 36; Ex. F, PPM.

22.     Through the SAFTs, the purchasers agreed to pay U.S. dollars in exchange for a contractual right to receive Kin in the future at a discount.  Ex. A, Philp Decl. ¶¶ 33–34, 48; Ex. E, SAFT.  The SAFTs explained that purchasers would have the right to receive Kin at a 30% discount from the maximum price that Kin would later be sold to the public (if and when Kik conducted such a public sale).  Ex. E, SAFT, at KIK000066.

23.     The SAFTs provided Pre-sale participants with the right to receive 50% of their Kin if and when a "Network Launch" (initial functionality of Kin within Kik) occurred and the remaining 50% of their Kin a year later.  Ex. A, Philp Decl. ¶¶ 37–39; Ex. E, SAFT, at KIK000066. If a Network Launch did not occur, the SAFT required Pre-sale participants to forfeit 30% of the amount they contributed.  Ex. A, Philp Decl. at ¶ 40.

24.     In the Pre-sale, Kik received $50 million from 50 purchasers.  Ex. A, Philp Decl. ¶ 48.

25.     Kik decided to structure the Pre-sale as a Regulation D offering under Rule 506(c). *Id.* ¶ 41; Ex. E, SAFT; Ex. F, PPM.

26.     The PPMs stated that individuals and entities could only participate in the Pre-sale to the extent they were "accredited investors," as defined in Regulation D of the Securities Act of 1933.  Ex. F, PPM, at KIK000037; Ex. E, SAFT, at KIK000066.

27.     The PPM stated that it "ha[d] been prepared by Kik Interactive Inc. for use by a limited number of accredited investors to whom Kik Interactive Inc. is offering the opportunity to purchase the right to acquire in the future pursuant to a Simple Agreement for Future Tokens units of Kin tokens to be developed, produced and offered by Kik Interactive Inc."  Ex. F, PPM, at KIK0000037.

28.     The PPM also contained a section on "Investor Qualifications," stating that:

> Only persons of adequate financial means who have no need for present liquidity with respect to this investment should consider purchasing the purchase rights set forth in the SAFT offered hereby" and that "This Offering is limited solely to accredited investors as defined in Regulation D under the Securities Act, meaning only those persons or entities coming within any one or more of the following categories," followed by the categories of what persons and entities qualify as accredited investors.

Ex. F, PPM, at KIK000059-60.

29.     Similarly, the SAFT included a "Purchaser Representation" that "[t]he Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Purchaser's financial condition and is able to bear the economic risk of such investment for an indefinite period of time."  Ex. E, SAFT, at KIK0000066.

30.     Kik engaged an independent consultant, CoinList, to verify that each participant was accredited.  Ex. A, Philp Decl. ¶ 42.

31.     CoinList informed Kik that it collected participants' proof of accreditation through a website, coinlist.co/kin, and a platform called AngelList that provides accreditation-verification services.  Ex. A, Philp Decl. ¶ 43.  CoinList also informed Kik that its own lawyers conducted a secondary review of the documentation to verify whether each participant was accredited.  *Id.*

32.     Based on this review of accreditation materials, such as audited financial statements or attestations from lawyers or accountants, CoinList informed Kik that each of the fifty Pre-sale participants were in fact accredited investors, as defined under Regulation D.  *Id.* ¶¶ 43–44.

33.     Kik did not enter into any SAFT agreements until it received this confirmation from CoinList.  Ex. A, Philp Decl. ¶ 45.

34.     The SAFT contained language cautioning participants that they could not participate in the Pre-sale if they planned to resell tokens immediately upon receipt.  Ex. E, SAFT, at KIK000069.

35.     The SAFT stated:

> THE OFFER AND SALE OF THIS SECURITY INSTRUMNET HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES.  THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER

THE ACT AND APPLCIABLE STATE SECURITIES LAWS PURSAUNT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

Ex. E, SAFT, at KIK0000066.

36.     The SAFT also contained a "Purchaser Representation" that "The Purchaser is purchasing this instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same."  Ex. E, SAFT, at KIK0000069.

37.     After conducting the Pre-sale, Kik filed a Form D with the SEC on September 11, 2017, memorializing the exemption under Rule 506(c) of Regulation D.  Ex. A, Philp Decl. ¶ 50; Ex. G, Form D filed September 11, 2017 ("Form D"), at KIK000073-78.

38.     Kik announced its plan to distribute Kin to the public, in a sale called the "Token Distribution Event" or "TDE," on August 29, 2017.  Ex. A, Philp Decl. ¶ 52.

39.     In the TDE, Kik sold Kin in exchange for another cryptocurrency, called Ether.  Ex. A, Philp Decl. ¶ 71.

40.     Before participating in the TDE, purchasers were required to register for the TDE before September 9, 2017 on the website kin.kik.com ("the Website").  Ex. A, Philp Decl. ¶¶ 53 – 54; Ex. O, Article titled "Kin TDE: If You Want to Participate, You *Must* Register by September 9, 9:00 a.m. ET." Produced at bates KIK00045080, at KIK00045080.

41.     The registration process, included Know-Your-Customer ("KYC") and Anti-Money Laundering ("AML") screening, which among other things, verified the identities of Kin purchasers. Ex. A, Philp Decl. ¶ 55.  Kik retained an outside consultant to advise Kik in conducting that process.  *Id.*

42.     Specifically, Kik required purchasers to submit personal information to comply with KYC/AML requirements.  *Id.* ¶ 58.  Purchasers were required to: (1) input certain basic information, including their name, date of birth, email and address; (2) provide a government identification number, either in the form of a passport or social security number and; (3) provide the address of the Ethereum wallet they planned to utilize in connection with the TDE.  *Id.*; Ex. B, Heinke Inv. Tr., at 417:13-22.

43.     As the final step in the registration process, all purchasers were required to affirmatively verify that, among other things, the information they provided was correct, that they were participating in the TDE on a personal basis, and that they understood they would not be able to participate in the TDE with a different Ethereum wallet.   Ex. A, Philp Decl. ¶¶ 59, 62-63; Ex. J, Kin User Registration Guide, p. 7.  Purchasers also had to indicate the amount of Kin they wished to purchase.  Ex. A, Philp Decl. ¶ 58.

44.     Only 10,000 of the 17,000 people who registered participated in the TDE.  Ex. A, Philp Decl. ¶¶ 66, 73.

45.     As a part of the registration process to purchase Kin, participants were required to enter into a contract with Kik governing that purchase, titled the "Terms of Use" ("Terms of Use").  Ex. A, Philp Decl. ¶¶ 60–63; Ex. H, Terms of Use.

46.     When submitting their registration information through the registration Website, purchasers were required to click a button verifying that they agreed to the Terms of Use.  Ex. A, Philp Decl. ¶¶ 60–63; Ex. J, Kin User Registration Guide, p. 7; Ex. H, Terms of Use, at KIK000079.

47.     The Terms of Use were publicly available in multiple places on the Website, including the screen where users submitted their registration information.  Ex. A, Philp Decl. ¶¶ 62–63; Ex. H, Term of Use; Ex. J, User Registration Guide, at 7.

48.     The Terms of Use notified purchasers that they agreed to the Terms of Use by using the Kin.kik.com website and that such agreement governed their purchase of Kin:

> By accessing or using the Site and/or purchasing Kin Tokens, you agree to be bound by this Agreement and all of the terms incorporated herein by reference. If you do not agree to this Agreement, you may not access or use the Site or purchase the Kin Tokens. This Agreement governs your access and use of the Site and your purchase of the Kin Tokens.

Ex. H, Terms of Use, at KIK000079.

49.     The Terms of Use stated:

> **Disclaimers** EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN A WRITING BY KIK, THE SITE CONTENT CONTAINED THEREIN, AND KIN TOKENS ARE PROVIDED ON AN 'AS IS' AND 'AS AVAILABLE' BASIS WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED. KIK DISCLAIMS ALL OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT AS TO THE SITE, CONTENT CONTAINED THEREIN AND KIN TOKENS.

Ex. H, Terms of Use, at KIK000079.

50.     The agreement also stated:

> KIN IS AN INTANGIBLE DIGITAL ASSET. KIN TOKENS EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE ETHEREUM NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY KIN TOKENS OCCURS ON THE DECENTRALIZED LEDGER WITHIN THE ETHEREUM PLATFORM. KIK DOES NOT GUARANTEE THAT KIK OR ANY KIK PARTY CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY KIN TOKENS.

Ex. H, Terms of Use.

51.     Finally, the Terms of Use stated that they were "the entire agreement between you and Kik relating to your . . . purchase and use of the Kin Tokens."  Ex. H, Terms of Use, at KIK000079.

52.     In the Terms of Use, Kik did not commit to do anything other than deliver Kin tokens in exchange for Ether. Ex. H, Terms of Use.

53.     The Terms of Use did not require TDE purchasers to share, with one another or with Kik any profits or losses resulting from their purchase of Kin.  Ex. H, Terms of Use.

54.     TDE purchasers did not receive, review, or agree to the SAFT or PPM that were distributed to Pre-sale participants.  Ex. A, Philp Decl. ¶ 66.

55.     The TDE began on September 12, 2017 at 9:00am ET.  Ex. A, Philp Decl. ¶ 67.

56.     In the TDE, Kik agreed to deliver tokens to purchasers in exchange for Ether.  Ex. A, Philp Decl. ¶ 71; Ex. H, Terms of Use.

57.     By that date, 17,075 individuals from 139 countries had pre-registered to participate. Ex. A, Philp Decl. ¶ 67; Ex. P, Article titled "Kin token distribution event starts today," dated September 12, 2017, at 1.

58.     For the first 24 hours of the TDE, Kik imposed a cap on individual purchases, so that no one person could buy more than $4,393 worth of Kin.  Ex. A, Philp Decl. ¶ 69, Ex. P, Article titled "Kin token distribution event starts today," dated September 12, 2017, at 1.

59.     The Kin Foundation posted a Tweet stating that these individual caps were designed to ensure all registered participants had a fair chance to purchase.  Ex. W, Tweet from Kin Foundation.

60.     Kik also did not require a minimum purchase amount. Ex. B, Heinke Inv. Tr., at 215:2-5; Ex. A, Philp Decl. ¶ 70.

61.     TDE purchasers paid Ether in exchange for Kin tokens.  Ex. A, Philp Decl. ¶ 71.
In total, Kik received Ether worth approximately $50 million as of the end of the TDE from more
than 10,000 purchasers.  *Id.* at ¶ 73.

62.     Of that $50 million, approximately $16 million came from purchasers who listed
the United States as their place of residence in the United States.  Ex. A, Philp Decl. ¶ 73.  Of the
over 10,000 purchasers, 3,456 purchasers listed their residence as in the United States.  *Id.*

63.     Approximately half of the total TDE purchasers bought less than $1,000 worth of
Kin in the TDE, and over ninety percent of purchasers in the TDE bought less than $5,000 worth
of Kin.  *Id.* ¶ 73.

64.     Some purchasers bought less than $1 worth of Kin, including at least one purchaser
who bought only $0.09 worth of Kin.  *Id*. ¶ 75.

65.     When the TDE ended on September 26, 2017, Kik issued a press release stating:
"[m]ore than 10,000 people from 117 countries participated in the token sale, immediately making
Kin one of the most widely held cryptocurrencies in the world." Ex. Y, Kik Press Release dated
9/26/17.

66.     The same press release quoted Mr. Livingston as saying, "[w]e wanted as many
people as possible to participate in the Kin token distribution event.  Based on the outpouring of
support leading up to and during the event, we clearly achieved that goal . . . . We envision Kin as
the foundation for a decentralized ecosystem of digital services, starting with Kik, and we couldn't
be more thrilled than to build this new future together with you." Ex. Y, Kik Press Release dated
9/26/17.

67.     Kin was launched and distributed to the TDE purchasers on September 26, 2017 via a smart contract.  Ex. A, Philp Decl. ¶ 78.  Pre-sale participants received 50% of the tokens they were allocated according to their SAFT agreements on the same day.  *Id.* ¶ 39, 78.

68.     The Kin token that was distributed operated on the Ethereum blockchain, which is an open source platform that Kik did not create, launch, or control.  Ex. A, Philp Decl. ¶¶ 27, 81.

69.     Once TDE purchasers received their Kin tokens, TDE purchasers had complete control over the tokens – Kik had no control over what they did with the Kin tokens they had purchased.  ECF No. 1 at ¶ 88; Ex. A, Philp Decl. ¶ 91.

70.     Kik stated in its Whitepaper that it would not launch Kin until it was integrated in Kik messenger.  Ex. K, Whitepaper, at KIK000023.  Kik had delayed the date of the TDE at least three times because the token was not then ready to be integrated within Kik Messenger.  Ex. A, Philp Decl. ¶ 79.

71.     On the day Kin was launched, Kin could be immediately transferred between users on the Ethereum blockchain peer to peer or be integrated within an application, and was also integrated within Kik Messenger.  *Id.* ¶¶ 81, 83, 85.

72.     Anyone with an Ethereum wallet address could accept Kin as payment, starting from the second Kin was launched.  *Id.* ¶¶ 81.

73.     By January 2018, Kik had learned that some independent companies had already announced they planned to accept Kin in exchange for sunglasses and vehicles.  *Id.* ¶ 82; Ex. Q, Third Eye Sunglasses, *ThirdEyeSunglasses.com Will Now Accept Kin Coin* (Jan 2, 2018).

74.     App developers could also integrate Kin into their app by using open source Ethereum tools that already existed for Ethereum-based tokens.  Ex. A, Philp Decl. ¶¶ 81, 83.

75.     In or about October 2017, Kik learned that a third party developer independently developed a bot for use within the Kin bot platform called "Kinchat." *Id.* ¶ 84.

76.     Kik also launched a minimum viable product or "MVP" on the day that Kin was launched ("the MVP") that integrated Kin within Kik.  Ex. A, Philp Decl. ¶ 85; Ex. C, Philp Inv. Tr. 274:3-19.

77.     The MVP allowed Kin purchasers to link Ethereum wallets to their Kik accounts that would display their balance of Kin.  Ex. A, Philp Decl. ¶ 86.  Then, Kin purchasers could access different tiers of digital content, such as stickers, based on the amount of Kin owned.  *Id.*; Ex. C, Philp Inv. Tr. 223:11-15.

78.     Shortly after the TDE, approximately 20% of purchasers had participated in this MVP by linking their wallets to Kik Messenger.  Ex. A, Philp Decl. ¶ 88.

79.     In December 2017, Kik launched a second use case within Kik Messenger, in which users could earn Kin by completing polls or surveys, by providing feedback to Kik regarding the experience, or by offering artistic content such as stickers to other Kik users.  Ex. A, Philp Decl. ¶ 89.  Kik users could use their Kin to purchase premium digital stickers, or transfer it for use within another application.  *Id.*

80.     By January 2018, 59% of Kik users with linked wallets had participated in at least one poll and earned Kin, and 19% of wallet users had spent Kin on at least one sticker pack.  *Id.* ¶ 90.

81.     Today, 57 applications have integrated Kin within their applications and provide opportunities for Kin to be earned and/or spent within such applications.  Ex. R, Kin.org Statistics; Ex. S, Kin.org Apps; Ex. A, Philp Decl. ¶ 92.

82.     The statistics showing usage of Kin are all publicly available on the blockchain, and are available to the public on a website maintained by the Kin Foundation, kin.org.  Ex. R, Kin.org Statistics.

83.     As of March 19, 2020, there are approximately 1.9 million users spending Kin within these applications each month.  Ex. R, Kin.org Statistics; Ex. A, Philp Decl. ¶ 97.

84.     As of March 19, 2020, over seven million different wallets have spent Kin tokens, and over twenty million different wallets have earned Kin.  Ex. R, Kin.org Statistics.

85.     As of March 2019, the application with the highest volume of Kin tokens being spent is not Kik Messenger but a third-party application that integrated the Kin token – Kik is third.  Ex. R, Kin.org Statistics; Ex. A, Philp Decl. ¶ 96.

86.     As of March 19, Kin was ranked third of all cryptocurrencies on Blocktivity.info, which measures blockchain activity excluding secondary market transactions.  Ex. V, Block'tivity Blockchain Activity Matrix as of 3/19/2.  Block'tivity describes its mission as "observing which project is actually being used by people."  *Id.*  As of the same date, Bitcoin was ranked tenth, and Ether was ranked sixth.  *Id.*

87.     Kik Interactive does not currently operate any application in the Kin economy. Ex. A, Philp Decl. ¶ 92.

88.     In October 2019, Kik sold the rights to the Kik Messenger application to a third party, Media Lab.  Ex. A, Philp Decl. ¶ 93.  Media Lab currently operates the Kik Messenger application, which still allows users to earn and spend Kin tokens.  *Id.* ¶ 93.

89.     Kik is not operating any of the applications that are currently driving demand for Kin in the Kin economy. *Id.* at ¶ 92.

90.     An application called KinFit describes itself as an "app that pays you digital currency for your daily steps." Ex. T, KinFit Webpage.  KinFit is a "fully integrated platform that connects your phone's pedometer to the Kin Ecosystem.  This allows users to earn Kin cryptocurrency and to enjoy a wide range of spending options for the Kin they earn." *Id.*  KinFit is available on the Apple App store and Google Play app store.  *Id.*

91.     An application called Love & Loud radio claims to be "a hybrid 'Music Discovery App' and 'Music Promotion App' that allows users to consume content submitted by other users who offer Kin for listening.  Ex. U, Love & Loud Webpage.  The Kin can then be spent promoting their own audio or sent to other apps in the Kin ecosystem to be spent elsewhere. From the app, users can also easily connect to artists and share the music they have discovered." *Id.*

Dated: March 20, 2019

Respectfully submitted,


By: /s/ *Patrick E. Gibbs*

Patrick E. Gibbs (*Pro Hac Vice*)
Brett H. De Jarnette (*Pro Hac Vice*)
Jenna C. Bailey (*Pro Hac Vice*)
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
Phone: (650) 843-5000
Fax:     (650) 849-7400
Email: pgibbs@cooley.com;
bdejarnette@cooley.com

Sarah M. Lightdale (SL7122)
Cooley LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6374
Fax:     (212) 479-6275
Email: slightdale@cooley.com

Luke T. Cadigan (*Pro Hac Vice*)
Julianne M. Landsvik (*Pro Hac Vice*)
Michael E. Welsh (*Pro Hac Vice*)
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA  02116-3736
Phone: (617) 937-2425
Email: lcadigan@cooley.com;

Robert W. Pommer III (RP5328)
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.,
Washington, D.C. 20004
Phone: (202) 879-5270
Email: rpommer@kirkland.com


Attorneys for Defendant
KIK INTERACTIVE INC.

## <u>CERTIFICATE OF SERVICE</u>

I, Patrick E. Gibbs, hereby certify that a true and correct copy of the foregoing document was

served on counsel of record via ECF on this 20th day of March, 2020.

*/s/ Patrick E. Gibbs*
Patrick E. Gibbs
