# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
U.S. SECURITIES AND EXCHANGE COMMISSION,   :

      Plaintiff,   :

vs.   :  Civil Action No. 19-cv-5244 (AKH)

KIK INTERACTIVE INC.,   :

      Defendant.   :
------------------------------------- X

# DECLARATION OF TANNER PHILP IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Tanner Philp, declare as follows:

1. I am the Head of Corporate Development and Operations at Kik Interactive, Inc. ("Kik"). I have been employed with Kik since April 2014. Previously, I served as the Technical Advisor to the Chief Executive Officer and the Director of Corporate Development.

2. I submit this declaration in support of Kik's Motion for Summary Judgment. I have personal knowledge of the facts set forth herein, or have obtained personal knowledge of the facts set forth herein based upon my review of pertinent records, and if called to testify, I could and would competently testify thereto.

**I.  Kik Interactive, Inc.**

3. Kik is a private Canadian company, with its principal place of business in Waterloo, Canada. Kik was founded in 2009 by Ted Livingston and Christopher Best.

4. In or around 2010, Kik launched a messaging application called Kik Messenger ("Kik Messenger"). Kik Messenger allowed real-time chat messaging across multiple operating systems, including iPhones, Androids, and Blackberries.

5. Within 15 days after launch, approximately one million users had opened accounts on Kik Messenger, and within one week after that, two million users had opened accounts.

6. By September 2017, Kik had 300 million registered users and 15 million monthly active users. At that time, Kik was also ranked as one of the Top 10 Social Networking Apps in the Apple App Store.

7. Kik garnered substantial investments from venture-capital firms, including a $50 million investment from Chinese conglomerate Tencent in 2015 putting Kik's valuation as of that time at $1 billion.

8. Despite having millions of users, Kik struggled to monetize Kik Messenger. Because one of its core principles is user privacy, Kik refused to sell user data to third-party advertisers to generate revenue. As a result, Kik had difficulty competing with larger companies, like Facebook, that generated revenue from targeted advertising, and could offer similar chat applications to users for free.

**II.    Cryptocurrencies & the Blockchain**

9. As Head of Corporate Development and Operations, my responsibilities and duties include overseeing and supporting the technical aspects of Kik's business operations. I am intimately familiar with Kik's development and launch of the Kin network, including the sales process of Kin. In connection with role, I am also similarly familiar with cryptocurrency and blockchain technology.

10. A cryptocurrency is a digital asset that is stored and transferred on a distributed ledger called a "blockchain" through cryptographic code.

11. Blockchains are decentralized ledgers that record, store, and authenticate transactions and publicly display those transactions.

12. Each transaction on a blockchain is recorded in a "block," and each block is in turn cryptographically linked to the prior block, resulting in a chain of blocks (or transactions) recorded in the decentralized ledger.

13. Blockchains operate using decentralized networks of computers that provide the required computing power to securely process and verify the accuracy of all transactions on the blockchain. These computers that participate in the network are referred to as "nodes."

14. Unlike centralized ledgers, which are administered and maintained by a single entity (*e.g.*, a central bank), the decentralized node network manages and operates the blockchain independently.

15. Cryptocurrencies are stored in digital wallets, which allow users to hold and transfer their cryptocurrencies on a blockchain. These wallets are similar to bank accounts, but they are not maintained by a centralized third party.

16. Wallets are identified by a wallet address, which is a series of letters and numbers. Users can transfer cryptocurrencies to other users if they know the other user's wallet address.

**III.   Kik Points & Kik's Cryptocurrency Vision**

17. In 2014, Kik launched a centralized virtual currency within Kik Messenger, called Kik Points, in order to learn whether (1) its users would be eager to earn and spend a digital currency, and (2) it could monetize Kik Messenger through these transactions to earn revenue.

18. Users could earn Kik Points by completing polls or surveys sponsored by third-party advertisers, and then spend their earned Kik Points on content within Kik Messenger, including digital stickers, emojis, and other forms of expressive content.

19. Kik generated revenue from Kik Points by selling them to third-party advertisers, who then utilized Kik Points to pay users for answering their surveys or polls within Kik Messenger.

20. During the two and a half years that the Kik Points product was active, users earned Kik Points approximately 253 million times, and spent Kik Points on 74 million purchases. In fact, Kik Points generated an average of 300,000 transactions per day and its monthly transactions generated nearly three times the volume of Bitcoin during that time, a well-known cryptocurrency. Kik believed that this usage demonstrated that Kik Messenger could support the use of a virtual currency.

21. However, there was insufficient demand for Kik Points from advertisers because users could only earn and spend Kik Points within Kik Messenger, and they were maintained solely by Kik.

22. As a result of this experience, Kik began exploring an implementation of a decentralized digital currency that would solve these problems.

**IV.    Kin: A New Decentralized Cryptocurrency**

23. In early 2017, Kik's Board and senior management first discussed the formulation of a strategy to develop this new cryptocurrency, which would be called Kin.

24. Kik retained a number of experts and consultants in the cryptocurrency and blockchain field to explore the viability of this new token business model, including CoinFund, CoinTree, and Sylvain Labs.

25. At this time, Kik had other options available to extend its cash runway, including pursuing an acquisition, reducing expenses, or another round of investor financing. However, Kik's management decided to pursue a cryptocurrency-based business model instead, as Kik would be able to earn revenue on an ongoing basis.

26. Kik's Board of Directors ultimately approved Kik's plan to pursue the Kin project on February 16, 2017.

27. Kin was designed as a cryptocurrency that would initially be launched on a decentralized blockchain called Ethereum. Kik has no role in operating the Ethereum blockchain; rather, it is maintained by a network of independent nodes.

28. Kik envisioned that Kin could be used among a network of digital applications, products, and services, rather than just Kik Messenger.

29. Kik chose to create a cryptocurrency using blockchain technology because it was well-suited for micro-transactions, which were otherwise impractical for developers due to high credit card transaction fees. This would allow developers, including Kik, to monetize their applications in new ways and would allow developers to implement Kin independently, without needing to rely on third parties.

30. A cryptocurrency built on blockchain technology would also facilitate a truly decentralized network of participants, wherein Kik would not control the supply or uses of Kin tokens.

31. Kik publicly announced its plan to launch Kin on May 25, 2017. Kik also simultaneously published a whitepaper detailing Kik's vision for Kin and the new Kin economy. A true and correct copy of the whitepaper is attached as Exhibit K to the Declaration of Michael E. Welsh (the "Welsh Declaration").

## V.     The Pre-Sale

32.     In order to facilitate and fund the development of Kin and its underlying infrastructure, Kik conducted a private offering of futures contracts with 50 accredited investors from June through September of 2017 (the "Pre-Sale.").

33.     During the Pre-Sale, Kik sold the conditional right to receive Kin in the future to accredited investors. Kik came into contact with these accredited investors through various contacts in the cryptocurrency and blockchain community.

34.     The parties memorialized this transaction through contractual agreements called Simple Agreements for Future Tokens ("SAFTs"). A true and correct copy of the form SAFT is attached as Exhibit E to the Welsh Declaration.

35.     Kik obtained a signed SAFT from every Pre-sale participant.

36.     Each participant in the Pre-sale also received a Private Placement Memorandum ("PPM"). A true and correct copy of the form PPM is attached as Exhibit F to the Welsh Declaration.

37.     Pre-sale participants only would receive Kin upon the occurrence of a "Network Launch," which the SAFT defined as "a *bona fide* transaction or series of transactions, pursuant to which the Company will sell Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain."

38.     If a Network Launch did not occur, purchasers agreed to forfeit 30% of their investment.

39.     If a Network Launch did occur, purchasers would receive 50% of their allotment of Kin at the time Kin was distributed to the public, with the remaining 50% of their allotment to be received exactly one year from that date.

40. Pre-Sale purchasers received a discount of 30% from the price of Kin tokens offered to the public in recognition of the risk they undertook in contracting prior to any actual launch of Kin.

41. Kik structured its Pre-sale as a private placement, pursuant to an exemption from registration under securities laws.

42. Kik hired an independent consultant, CoinList, to conduct diligence and ensure that each Pre-sale purchaser was an accredited investor.

43. CoinList informed Kik that it took the following steps to confirm that each participant was accredited:

   a. Prospective participants were required to complete the accreditation process through AngelList, a platform that provides accreditation-verification services, which was available online at angel.co/accreditation.

   b. CoinList collected "Participant Due Diligence Forms" that required purchasers to provide certain identifying information and attest to its accuracy.

   c. CoinList collected additional proof of accreditation through a website, coinlist.co/kin, including financial documents and attestations from attorneys or accountants.

   d. CoinList also had its own lawyers conducting a secondary review of this documentation to verify accreditation status.

44. CoinList notified Kik that each prospective participant was accredited on a rolling basis.

45. Kik did not enter a SAFT with any potential purchaser unless CoinList confirmed to Kik that the purchaser met the SEC's requirements for accreditation.

46. As a result of this process, Kik received confirmation from CoinList that each of the fifty Pre-sale participants were accredited.

47. Kik also spoke with each individual Pre-sale participant individually as part of this process.

48. Kik accepted only U.S. dollars from purchasers in connection with the Pre-Sale, and ultimately received approximately $50 million from 50 Pre-Sale purchasers.

49. This amount was sufficient to allow Kik to build the infrastructure necessary to launch Kin on the blockchain, and integrate it within Kik Messenger. Kik even declined additional indications of interest from potential Pre-Sale purchasers in order to ensure that there would be a sufficient volume of Kin to sell to the public.

50. Kik used the funds generated from the Pre-Sale to develop the technology required to successfully launch Kin on the Ethereum blockchain, as well as to create the necessary infrastructure to use Kin within Kik Messenger.

51. Kik concluded the Pre-sale and filed a Form D with the SEC on September 11, 2017. A true and correct copy of the Form D is attached as Exhibit G to the Welsh Declaration.

**VI.    The Token Distribution Event**

52. On August 29, 2017, Kik announced its plan to distribute Kin to the public in a sale called the "Token Distribution Event" or "TDE."

53. Users were required to register for the TDE before September 9, 2017, in order to participate in the TDE.

54. In September 2017, Kik operated a website at https://Kin.kik.com (the "Website") in order to allow participants to register for the TDE. If a participant did not register through the Website, they could not participate in the TDE.

55. Kik required participants to register for the TDE in order to meet Know Your Customer ("KYC"), Anti-Money Laundering ("AML"), and Office of Foreign Asset Control ("OFAC") compliance requirements. Kik retained a third party consultant who verified that each of these screening requirements was met.

56. The registration requirement also was intended to ensure a fair token distribution by preventing users from purchasing Kin under multiple accounts, which could have resulted in a concentration of Kin among a few large individual purchasers.

57. Kik also published a User Registration Guide to provide participants with a step-by-step overview of the Website and the TDE registration process. A true and correct copy of the User Registration Guide is attached as Exhibit J to the Welsh Declaration.

58. As part of the registration process, Kik required all purchasers to: (1) input certain basic information, including their name, date of birth, email and address; (2) provide a government identification number, either in the form of a passport or social security number and; (3) provide the address of the Ethereum wallet they planned to utilize in connection with the TDE. Finally, all purchasers were required to estimate the amount of Kin that they wished to purchase.

59. All purchasers were also required to affirmatively verify that, among other things, the information they provided was correct, that they were participating in the TDE on a personal basis, and that they understood they would not be able to participate in the TDE with a different Ethereum wallet.

60. In addition, all purchasers were required to affirmatively agree to the Terms of Use (the "Terms of Use"), which contained the terms governing the TDE. The Terms of Use were made available for participants' review via a hyperlink at the bottom of the Website, the same website that users were required to visit in order to register for the TDE. While completing the

registration process, purchasers had an additional opportunity to review the Terms of Use online and/or print and review the Terms offline before registering. A true and correct copy of the Terms of Use is attached as Exhibit H to the Welsh Declaration.

61. If the customer did not affirmatively indicate that they agreed to the Terms of Use, they could not register and accordingly could not participate in the TDE.

62. The User Registration Guide displays an image of this verification process. Below is an excerpt of the screenshot, with highlights added to emphasize the relevant portion:



63. The "Terms and Conditions" referenced in the above screenshot are the Terms of Use.

64. After the participant affirmed their assent to the Terms of Use and finalized the registration process, the participant would receive an email to confirm their email address. Once the participant confirmed their email address, Kik's KYC verification process would begin. The KYC process could then take up to three business days, at which point the participant would be notified via email as to whether their registration was accepted or denied.

65. Kik also published a document entitled Frequently Asked Questions to provide additional guidance to purchasers regarding the registration process. A true and correct copy of the Frequently Asked Questions document is attached as Exhibit I to the Welsh Declaration.

66. Kik did not distribute SAFT agreements or PPMs to TDE purchasers, except to the extent any of the Pre-sale participants later independently decided to purchase tokens in the TDE. Kik also did not publish the SAFT agreements or PPMs publicly where TDE purchasers could have accessed them.

67. The TDE began on September 12, 2017 at 9:00am. As of that date, 17,075 individuals from 139 countries had successfully registered to participate in the TDE.

68. Kik's goal in the TDE was to ensure a wide distribution of Kin to a large base of potential users.

69. In order to ensure that all registered participants had a fair chance to participate in the TDE, Kik imposed a hard cap on individual participants' purchases of Kin for the initial 24 hours of the TDE. This cap prevented any one person from purchasing more than $4,393 worth of Kin during this initial time period (the amount calculated by dividing the amount of Kin that was available for purchase, by the number of individuals who had registered to purchase Kin).

70. Moreover, Kik did not require participants to meet a minimum purchase amount, so that a registered participant could purchase and receive Kin even if they wanted to purchase only $1 worth of Kin.

71. TDE purchasers paid Ether in exchange for receiving Kin tokens.

72. Kik collected the information for each Kin purchase in the TDE, including the personal information provided in registration as well as the amount of Kin purchased. I have reviewed these records and other information related to the TDE transactions, and have personal knowledge of the overall participation in the TDE.

73. By the close of the TDE, Kik ultimately received Ether worth approximately $50 million from more than 10,000 individual purchasers. Of the $50 million received by Kik, approximately $16 million came from purchasers residing in United States and, of over 10,000 purchasers, only 3,456 purchasers resided in the United States.

74. Moreover, approximately half of the total TDE purchasers bought less than $1,000 worth of Kin in the TDE, and over ninety percent of purchasers in the TDE bought less than $5,000 worth of Kin.

75. Some purchasers bought less than $1 worth of Kin, including at least one purchaser who bought only $0.09 worth of Kin.

76. Among these purchasers were developers who subsequently integrated Kin into their applications.

77. The TDE was completed on September 26, 2017.

**VII.   Kin's Utility as of its Launch Date**

78.     On September 26, 2017, Kin was launched and distributed to the TDE purchasers via a smart contract, while Pre-Sale purchasers simultaneously received 50% of the Kin they had been allocated in their respective SAFT agreement.

79.     Kik decided not to conduct the TDE or distribute Kin until it was sure that Kin could be immediately used upon launch.  In fact, Kik delayed the TDE three times because the Kin token could not yet be used within Kik.

80.     Kin was launched and distributed via a smart contract that was designed and created by a third-party consulting firm retained by Kik.  The smart contract automatically distributed six trillion Kin to the Kin Foundation, three trillion Kin to Kik, and the remaining one trillion Kin to the TDE purchasers and Pre-Sale participants.

81.     The distributed Kin tokens operated on the Ethereum blockchain.  Because the Ethereum blockchain was an open source, decentralized platform, anyone holding Kin could freely transfer their Kin in peer to peer transactions on the Ethereum blockchain, or utilize Kin within a digital applications or services. Indeed, from the moment Kin was launched, anyone with an Ethereum wallet address could accept Kin as a form of payment.

82.     By January 2018, I became aware that two third parties had announced they would accept Kin as payment: one in exchange for sunglasses, and another in exchange for automobiles.

83.     As of the launch date, independent application developers could also integrate Kin into their applications utilizing pre-existing open source Ethereum tools for tokens operating on the Ethereum blockchain.

84.     For example, in or around October 2017, Kik learned that a third-party application developer had independently developed a bot (a program that functions within other applications)

called "Kinchat" for use within the Kin bot platform. This third party developer did so without help from any Kik employees.

85. At the time of launch, Kik launched a minimum viable product or "MVP" within Kik Messenger that allowed anyone who owned Kin to use it Kik. The MVP was intended to demonstrate to developers how Kin could be utilized within digital applications.

86. In the MVP, users could link their Ethereum-based Kin wallets to their Kik Messenger accounts, which would then display their Kin account balances to other users. Kik also launched tiered sticker packs, and users holding Kin could access the sticker packs within Kik Messenger according to the amount of Kin owned.

87. Kik selected this MVP based on the data it learned from the Kik Points experiment, having learned that its users were eager to interact with expressive content. Kik also knew that status was important for users in the Kik Messenger community to convey.

88. Shortly after the TDE, approximately 20% of TDE participants had affirmatively linked their Ethereum wallets to Kik, demonstrating significant use of Kin tokens from inception.

89. In December 2017, Kik launched a second use case for Kin within Kik Messenger. In this new product, users could earn Kin within the Kik Messenger by completing polls or surveys for third-party advertises, providing feedback to Kik regarding their experiences, or by offering creative content, such as digital stickers, to other Kik Messenger users. Kik Messenger users could then purchase that digital content with Kin.

90. By January 2018, 59% of Kik users with linked wallets had engaged in at least one poll and earned Kin, and 19% of wallet users had spent Kin on at least one sticker pack.

91. After Kik distributed Kin to the wallet addresses provided by purchasers, Kik did not (and still does not) have the ability to transfer, freeze, or otherwise control the tokens.

## VIII. Kin Today

92. I am aware that there are approximately 57 applications, including Kik Messenger, which currently allow users to earn and spend Kin tokens. Kik Interactive does not operate any application that currently participates in this economy.

93. In October 2019, Kik Messenger was acquired by an independent company, Media Lab, which now operates the Kik Messenger application. In this sale, Kik sold Media Lab a nonexclusive license for the intellectual property comprising the Kik Messenger application.

94. Kik is only aware of the volume of transactions in Kin by analyzing data from the blockchain, where Kin is operated. This data is all public, as it is recorded on the blockchain. The volume of transactions is not independently reported to or recorded by Kik.

95. Kik launched a Software Developer Kit, a package of code which is publicly available and provides third parties a convenient method to independently integrate Kin within their respective applications.

96. There are currently more than fifty applications with users actively earning or spending Kin as part of the Kin economy. The application with the highest volume of Kin tokens being spent is a third-party application that integrated the Kin token, not Kik Messenger.

97. The Kin economy further includes approximately 1.9 million active spenders of Kin.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20th day of March 2020.

_____
Tanner Philp