# Exhibit F



# Kik Interactive Inc.

## Confidential Private Placement Offering Memorandum

## Minimum $25.0 Million and Maximum $50.0 Million

### *Purchase Rights for Tokens pursuant to*
### *Simple Agreement for Future Tokens*

**THE OFFERING PERIOD OF THE PLACEMENT WILL EXPIRE ON THE EARLIER TO OCCUR OF: (I) THE DATE ON WHICH THE MAXIMUM PLACEMENT AMOUNT HAS BEEN SUBSCRIBED FOR AND ACCEPTED BY THE COMPANY AND A FINAL CLOSING IS CONDUCTED OR (II) JULY 15, 2017, UNLESS EXTENDED BY UP TO 60 DAYS IN THE DISCRETION OF THE COMPANY.**

This Confidential Private Placement Offering Memorandum (this "***Memorandum***") has been prepared by Kik Interactive Inc. for use by a limited number of accredited investors to whom Kik Interactive Inc. is offering (the "***Offering***") the opportunity to purchase the right to acquire in the future pursuant to a Simple Agreement for Future Tokens (the "***SAFT***") units of Kin tokens to be developed, produced and offered by Kik Interactive Inc. (the "***Tokens***"). Unless the context requires otherwise, in this Memorandum the terms "***Kik***," "***the Company***," "***we***," "***us***" and "***our***" refer to Kik Interactive Inc. and its subsidiaries and all dollar ($) amounts set forth herein refer to United States dollars.

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000037

This confidential Private Offering Memorandum (the "*Memorandum*") has been prepared solely for use by the prospective purchasers of Kin tokens pursuant to a Simple Agreement for Future Tokens ("*SAFT*") to be issued by Kik Interactive Inc. ("*Kik*" or the "*Company*") with respect to certain units of Kin of the Company (the "*Tokens*") and shall be maintained in strict confidence.  Each recipient hereof acknowledges and agrees that (i) the contents of this Memorandum constitute proprietary and confidential information, (ii) Kik and its affiliates, including without limitation the Kin Ecosystem Foundation, derive independent economic value from such confidential information not being generally known, and (iii) such confidential information is the subject of reasonable efforts to maintain its secrecy.  The recipient further agrees that the contents of this Memorandum are a trade secret, the disclosure of which is likely to cause substantial and irreparable competitive harm to the Company.  Any reproduction or distribution of this Memorandum, in whole or in part, or the disclosure of its contents, without the prior written consent of the Company, is prohibited.  Each person who has received this Memorandum is deemed to agree to return this Memorandum to the Company upon request.  The existence and nature of all conversations regarding the Company and this offering must be kept confidential.

This Memorandum has been prepared in connection with a private offering to accredited investors of the SAFT.  Each investor will be required to execute a SAFT (as amended, restated and/or otherwise modified from time to time) and investor questionnaire to effect its future investment in the Tokens.  This Memorandum contains a summary of the SAFT, the Tokens and certain other documents referred to herein.  However, the summaries in this Memorandum do not purport to be complete and are subject to and qualified in their entirety by reference to the actual text of the relevant document, copies of which will be provided to each prospective investor upon request.  Each prospective investor should review the SAFT and such other documents for complete information concerning the rights, privileges and obligations of SAFT investors.  If any of the terms, conditions or other provisions of the SAFT or such other documents are inconsistent with or contrary to the descriptions or terms in this Memorandum, the SAFT or such other documents shall control.  The Company reserves the right to modify the terms of the offering and the SAFTs and the Tokens described in this Memorandum, and the SAFTS are offered subject to the Company's ability to reject any commitment in whole or in part.

The SAFTs and the Tokens have not been and will not be registered under the United States Securities Act of 1933, as amended (the "*Securities Act*"), or any United States state securities laws or the laws of any foreign jurisdiction.  The SAFTs will be offered and sold under the exemption provided by Section 4(A)(2) of the Securities Act and Regulation D promulgated thereunder, or to non-U.S. Persons who are not purchasing for the account or benefit of a U.S. Person as defined under Regulation S under the Securities Act, and other exemptions of similar import in the laws of the states and other jurisdictions where the offering will be made.  The Company will not be registered as an investment company under the United States Investment Company Act of 1940, as amended (the "*Investment Company Act*").  Consequently, investors will not be afforded the protections of the Investment Company Act.

The SAFTs described in this Memorandum are subject to restrictions on transferability and resale and may not be transferred or resold.  Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

An investment in the SAFT and the Tokens involves a high degree of risk, volatility and illiquidity.  A prospective purchaser should thoroughly review the confidential information contained herein and the terms of the SAFT, and carefully consider whether an investment in the SAFT is suitable to the investor's financial situation and goals.

No person has been authorized to make any statement concerning the Company or the sale of the SAFTs discussed herein other than as set forth in this Memorandum, and any such statements, if made, must not be relied upon.

Investors should make their own investigations and evaluations of the SAFT and the Tokens that will be delivered pursuant thereto, including the merits and risks involved in an investment therein.  Prior

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

to any investment, the Company will give investors the opportunity to ask questions of and receive answers and additional information from it concerning the terms and conditions of this offering and other relevant matters to the extent the Company possesses the same or can acquire it without unreasonable effort or expense.  Investors should inform themselves as to the legal requirements applicable to them in respect of the acquisition, holding and disposition of the SAFTs and the Tokens upon their delivery, and as to the income and other tax consequences to them of such acquisition, holding and disposition.

This Memorandum does not constitute an offer to sell, or a solicitation of an offer to buy, an interest in any jurisdiction in which it is unlawful to make such an offer or solicitation.  Neither the United States Securities and Exchange Commission nor any other federal, state or foreign regulatory authority has approved an investment in the SAFT.  Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum, nor is it intended that the foregoing authorities will do so.  Any representation to the contrary is a criminal offense.

Investments in the SAFT are denominated in United States dollars ($) and Investors may tender United States dollars.  Such currencies are subject to any fluctuation in the rate of exchange and, in the case of digital assets, the exchange valuations.  Such fluctuations may have an adverse effect on the value, price or income of an investor's investment.

### Cautionary Statements Regarding Forward-Looking Statements

Certain statements in this Memorandum constitute forward-looking statements.  When used in this Memorandum, the words "may," "will," "should," "project," "anticipate," "believe," "estimate," "intend," "expect," "continue," and similar expressions or the negatives thereof are generally intended to identify forward-looking statements.  Such forward-looking statements, including the intended actions and performance objectives of the Company, involve known and unknown risks, uncertainties, and other important factors that could cause the actual results, performance, or achievements of the Company in its development of the Kin Ecosystem to differ materially from any future results, performance, or achievements expressed or implied by such forward-looking statements.  No representation or warranty is made as to future performance or such forward-looking statements. All forward-looking statements in this Memorandum speak only as of the date hereof.  The Company expressly disclaims any obligation or undertaking to disseminate any updates or revisions to any forward-looking statement contained herein to reflect any change in its expectation with regard thereto or any change in events, conditions, or circumstances on which any such statement is based.

Prospective investors are not to construe this Memorandum as investment, legal, tax, regulatory, financial, accounting or other advice, and this Memorandum is not intended to provide the sole basis for any evaluation of an investment in an interest.  Prior to acquiring an interest, a prospective investor should consult with its own legal, investment, tax, accounting, and other advisors to determine the potential benefits, burdens, and other consequences of such investment.

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

**KIK INTERACTIVE INC**

**SIMPLE AGREEMENT FOR FUTURE TOKENS**

**TABLE OF CONTENTS**

COMPANY OVERVIEW ........................................................................................... 1

DIRECTORS AND MANAGEMENT ....................................................................... 6

TERMS OF THE PURCHASE RIGHTS AND THE SAFTS ...................................... 8

RISK FACTORS ..................................................................................................... 11

USE OF PROCEEDS .............................................................................................. 18

PLAN OF DISTRIBUTION ..................................................................................... 19

TAX CONSIDERATIONS ....................................................................................... 25

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

# COMPANY OVERVIEW

Kik Interactive Inc. is one of the world's most popular messaging platforms. With over a quarter of a billion messages sent daily and 15 million monthly active users, Kik is the fifth most-searched term in the iOS App Store, and ranks #7 in social networking alongside Facebook Messenger and WhatsApp.

Founded by Ted Livingston in 2009, Kik has been a leading innovator in the chat space since the first million people signed up for the chat application in 2010. Kik was the first chat app to become a platform in 2011, and the first Western chat platform to integrate bots in 2014. Today, Kik has 124 full-time, 7 part-time and 11 contract employees located in offices across Waterloo, Toronto, New York City, and Tel Aviv.

Kik's wifi-enabled chat application was initially developed to support real-time messaging across multiple mobile operating systems, including Blackberry, Android and iPhone. With profiles based on user names rather than phone numbers, Kik provided a unique and compelling way for teens to participate in mobile messaging.

Today, Kik positions itself in the marketplace as a community chat platform for the mobile generation. 57 percent of Kik's active user base comprises 13 to 24 year olds. Extending beyond the simple utility of messaging, Kik enables seamless connection with friends and families through innovative chat experiences, offering users the ability to discover and explore a wide variety of interests. As a result, Kik enjoys a high level of engagement from its users. The average Kik user spends 37 minutes and sends 55 messages daily on the platform.

## Kik's core product missions

The Kik product teams are currently working across seven core focus areas -- identity, people, experiences, health, safety, bots and the chat economy.

The first product mission, built around identity, is to ensure that Kik is a place where users can explore and express who they are without being judged by others. In a world where teens and young adults are increasingly reliant on social media, the pressure for acceptance and validation is palpable. Kik aims to provide an alternative space that is free from judgement. Nearly 40% of the U.S. mobile messaging market, believes that Kik promotes and protects the interests of young people, and that Kik provides a private space away from public and social pressure.

Kik's second product mission, built around people, is to ensure Kik is a place where users can meet and connect with all types of friends and communities. Public Groups is an example of a chat feature that allows users to come together to build communities around shared interests. Since the product's launch in early 2017, Kik users have created over 7 million Public Group chats for connecting with people around interests from music to comics, food and gaming.

Experiences, or rather, providing an environment where users can access a diverse set of shared experiences, is Kik's third product mission. Product offerings across this mission range from new ways to communicate, such as our recently added group video chat, to enabling users the ability to consume,  co-create and share content. Over 55 million pieces of expressive content, namely stickers and GIFs, are shared daily on Kik.

Health and safety are foundational product missions focused on maintaining a high level of product quality and user safety within the Kik chat application. Kik seeks to provide a safe community where Kik users have confidence that they can express themselves with little risk of exposure to unwanted negative, adult, or illegal content and tries to improve user safety by combining strategic education, prevention, detection

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

and moderation.  Kik also seeks to identify and continuously monitor the best way to deliver a great experience for Kik's users by maintaining certain standards of a well performing application for Kik users with respect to the application's (1) stability; (2) performance; (3) responsiveness; (4) wifi, and how these standards can be realized using technological solutions.

Kik also maintains an industry-leading bot platform, which works to enhance community building and experiences on Kik. A chatbot is software that is designed to automate tasks or provide a service via a chat interface. Simply put, a chatbot combines services and experiences, many of which are commonly found in mobile apps, with conversational interfaces. Since launching the bot platform in 2014, over 187,000 bots have been created by third-party developers. Today, Kik users engage with bots across many categories including gaming, entertainment, fashion, beauty, and lifestyle.

The seventh product mission at Kik is focused on building a robust chat economy, providing users with new and innovative offerings from developers, content creators and brands, while ensuring proper monetization for these offerings. Kik has been experimenting with forms of in-app currency since 2014, when it launched Kik Points. In launching Kik Points, the company wanted to see if users of its chat app would be eager to earn and spend a centralized digital currency. Key to this innovation was the notion that users would not have to purchase Kik Points but could instead earn them within the app. Millions of Kik users participated, resulting in an average monthly transaction volume nearly three times higher than the global transaction volume of Bitcoin.

This seventh and final product mission will serve as the stepping-stone to realizing the future vision of Kin, which will be outlined further in this memorandum. The size of the user base, demographics, and community interactions and ethos make Kik a unique venue where cryptocurrency may be introduced, adopted, and utilized by a large mainstream audience.

**The Kin vision: a decentralized ecosystem of digital services for daily life**

The past 150 years have brought a series of momentous shifts in the advancement of communication and commerce, each catalyzed by new technologies that have increased the power of media: the telegraph, the telephone, radio, television, the web, and, finally, the mobile internet. In each case, these new modes of communication brought the world fresh commercial opportunities, facilitating the exchange and promotion of goods and services that could reach an ever greater, and increasingly targeted, population.

Kik's management believe that the next step in this process is the assimilation of economic value into communication systems. Digital services such as chat, social media, and online payments have come to play a fundamental role in our daily lives, influencing not only our consumption behaviors, but also our discourse, politics, and methods of value exchange. Digital communications platforms are becoming the most important media in the ongoing development of a global economy.

At the same time, more and more of these services are controlled by a diminishing number of companies. If left unchecked, Kik's management believes that it is possible that a few private entities may in the future exercise significant authority over the digital services everyone uses, with the potential to effectively eliminate consumer choice on a global scale.

Kik believes that decentralization provides a more sustainable way forward. The vision for Kin is rooted in the belief that a broad group of participants can come together to create an open ecosystem of tools for digital communication and commerce that prioritizes consumer experience, bringing a fair and user-oriented model for digital services to the market.

2

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000042

**The development of the Kin Ecosystem**

The Kin Ecosystem will seek to establish a global network of digital services that constitutes a new cooperative operating model that is focused on the long term. In this model, developers and service providers will enjoy the right and opportunity to innovate and compete for compensation, while users will benefit from a diverse digital experience, freedom of choice, and access to a broad range of commercial services. The development of the Kin Ecosystem will follow four key milestone phases.

- ***The introduction of Kin***. Envisioned as a general purpose cryptocurrency for use in everyday digital services, Kin will be used for all transactions within the Kin Ecosystem. Implemented on the public Ethereum blockchain as an ERC20 token, Kin will serve as the basis of interoperability with other digital services in the Kin Ecosystem.

- ***Establishing value for Kin***. Kin will be integrated into the Kik application, making Kik the first digital service to join the Kin Ecosystem. With millions of users, it is expected that Kik will drive mainstream consumer adoption of Kin and establish a fundamental value for the cryptocurrency. By natively integrating the Kin wallet into the app, Kik believes that it will quickly become one of the most adopted and used cryptocurrency wallets in the world.

- ***Deployment of the Kin Rewards Engine***. The Kin Rewards Engine is an innovative cryptoeconomic structure intended to promote the use of Kin as a common currency. Through the Kin Rewards Engine, Kin will be introduced into circulation as a daily reward, to be distributed among stakeholders by an algorithm that reflects each community's contribution to the overall ecosystem. This economic structure is intended to create a natural incentive for owners of other digital services to adopt Kin and become partners in the Kin Ecosystem.

- ***Governance by the Kin Ecosystem Foundation***. The Kin Ecosystem Foundation, a to-be formed not for profit corporation,  will act as the governance body for the Kin Ecosystem. The Kin Ecosystem Foundation's mandate is to grow an open ecosystem of digital services that consumers can easily explore and find value in, while giving developers an open and sustainable platform to build, enhance and monetize those services. Over time, the Kin Ecosystem Foundation will help to manage the transition of the Kin Ecosystem into a fully decentralized and autonomous network.

**Initial Launch of Kin and Kin Ecosystem**

At the time of the public Token distribution event, the Kik messaging application will have the following functionality (the "***Minimum Viable Product***"):  a Kik user who owns Kin will be able to create a "wallet" inside the Kik app.  The wallet will be accessible via the settings menu within the Kik messaging application using a private key. Only by entering the private key, a Kik user will be able to see his or her wallet (including, the Kik user's Kin balance, send/receive premium stickers functionality and Kin status). Each Kik user (who has a Kik wallet) will be categorized into one of five categories of status based on the number of Kin held by that Kik user.

A Kik user (who has a wallet) will be eligible to use premium sticker packs based on his or her status. Premium sticker packs will be created by independent content creators (not brands).  A Kik user (who has a wallet) will be able to send any of his or her premium stickers to any Kik user, however, a Kik user who

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000043

does not have a wallet will only be able to receive premium stickers from a Kik user (who has a wallet).

## Potential Future Competitive Landscape

By launching Kin, the Company will seek to integrate cryptocurrency to the largest potential number of users in one application to-date. While there is no direct competition to Kin currently, the Company could encounter competition from any of the other larger applications, either messengers such as Facebook or Whatsapp or other digital service providers. We believe that the Company has a proven track record of innovation and execution. By introducing a cryptocurrency on one of the larger bot networks and with a highly engaged user base will result in a strong ecosystem. Unlike other potential competitors, Kik does not have established business models that will constraint it from being an innovator in the sector.

## Legal Proceedings

From time to time, Kik may be involved in legal proceedings. The results of such legal proceedings and claims cannot be predicted with certainty, and regardless of the outcome, legal proceedings could have an adverse impact on Kik's business or the development of the Kin Ecosystem because of defense and settlement costs, diversion of resources and other factors.

### *Data Privacy Class Action*

Kik and several other mobile application developers were first sued on March 12, 2012, in a putative class action filed in the United States District Court for the Western District of Texas, alleging that their mobile applications illegally harvested address book data from mobile devices without the device owners' consent.

Based on the named plaintiffs' allegations of address-book harvesting, the Second Amended Complaint asserted causes of action for invasion of privacy, common law misappropriation, conversion, trespass to personal property, misappropriation of trade secrets, negligence, interception of electronic communication under the Electronic Communication Privacy Act, computer fraud, RICO, theft, violation of California Penal Code section 502, violation of the Texas and California Wiretap Acts, unjust enrichment, constructive trust, and declaratory relief. The complaint sought damages in an unspecified amount, statutory damages, punitive damages, injunctive relief, disgorgement of profits, declaratory relief, interest, and attorneys' fees and costs.

Kik, among other defendants, moved to transfer the case to the United States District Court for the Northern District of California, and to dismiss the complaint, on October 12, 2012. The court granted the motion to transfer on January 15, 2013, and denied without prejudice all other pending motions in light of the transfer. On May 6, 2013, the Court ordered that the Opperman case be related to five other actions pending in the Northern District of California, which proceeded in coordinated proceedings before Judge Jon S. Tigar under lead case number 3:13:00453-JST.

Pursuant to court order, plaintiffs in the five related cases filed a Consolidated Amended Class Action Complaint on September 3, 2013, which asserted substantially identical allegations and causes of action, and sought substantially identical damages, against Kik and other defendants as asserted in the Second Amended Complaint in the Opperman case.

On October 18, 2013, Kik, among other defendants, filed motions to dismiss the Consolidated Amended Class Action Complaint. Following a hearing on February 11, 2014, the Court issued an order on May 14,

4

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000044

2014, dismissing without prejudice, all of plaintiffs' claims with the exception of plaintiffs' claim for common law intrusion upon seclusion against Kik and other defendants.

As permitted by the Court's order, the plaintiffs filed a Second Consolidated Amended Complaint on June 27, 2014, in which plaintiffs assert claims against Kik and other app-developer defendants for common law conversion and intrusion upon seclusion, as well as several other claims directed solely to Apple, Inc.

Kik filed a motion to dismiss the remaining claims in plaintiffs' Second Consolidated Amended Complaint on August 22, 2014.  On March 23, 2015, the Court issued an order dismissing with prejudice plaintiffs' claim for conversion, but denying the motion to dismiss as to plaintiffs' common law claim for intrusion upon seclusion.  In August 2015, the parties commenced discovery with respect to the intrusion-upon-seclusion claim.  Written discovery is by and large complete, and Defendants took the depositions of Plaintiffs.  No depositions of Kik or its employees have been noticed.  Both sides have employed source code experts to review Kik's code.

On November 12, 2015, Plaintiffs filed a motion for class certification against Defendants' Path and Apple.  On September 15, 2016, the Court issued an order partially granting the motion for class certification, which Apple appealed to the Ninth Circuit pursuant to Federal Rule of Civil Procedure 23(f).

On August 23, 2016, Plaintiffs filed a motion for class certification against Kik and other app-developer defendants.  On September 12, 2016, the Court granted a stipulation extending the deadlines for Kik and other app-developer defendants to oppose Plaintiffs' motion for class certification pending the outcome of Apple's appeal to the Ninth Circuit and a joint mediation between the parties in an attempt to settle the matter.  On October 20, 2016, the Ninth Circuit denied Apple's appeal.  On November 20 and December 2, 2016, Kik and most defendants, as well as Plaintiffs, participated in mediation and agreed upon terms of classwide settlement.  The parties' executed settlement agreement was submitted to the court with a motion for preliminary approval by Plaintiffs on April 3, 2017.  On May 16, 2017, the court issued an order stating that it would decide the motion without a hearing.  The court has not yet issued an order ruling on the motion.

### Complaints for Patent Infringement

From time to time, the Company is the target of patent infringement suits, typically brought by so-called non-practicing entities (as known as patent trolls).  Although these suits must be taken seriously, and Kik intends to defend itself vigorously in suits alleging patent infringement, suits involving non-practicing entities often involve non-material monetary settlements.  The Company has been the recent target of several patent infringement suits involving what appear to be non-practicing entities.  None of these suits have yet been served.  The plaintiffs in each of these suits have not made any settlement demands.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000045

## DIRECTORS AND MANAGEMENT

**Management Team**

The Company's executive management includes the following individuals.

*Ted Livingston, 30.*  Mr. Livingston has served as Kik's Chief Executive Officer since he founded the Company in 2009.  Mr. Livingston  attended University of Waterloo from 2005 to 2009, and he maintains an active interest in the University of Waterloo's Velocity Fund, a startup accelerator he conceived of and first funded.  Mr. Livingston was named one of Fast Company's Most Creative People In Business in 2017.

*Peter Heinke, 59.*  Mr. Heinke has served as Kik's Chief Financial Officer and Chief Operating Officer since 2010.  From 2006 to 2010, Mr. Heinke served as the Chief Operating Officer of CorCare Inc.  Prior to that, Mr. Heinke led finance, operations and strategy for both established and startup companies in the media, technology and transportation sectors.  Mr. Heinke holds a B.A. in business from Wilfrid Laurier University.

*Eran Ben-Ari, 38.* Mr. Ben-Ari has served as Kik's Chief Product Officer since 2016. From 2015 to 2016, he served as Vice President, Product at Rounds Entertainment Ltd. From 2014 to 2015 he served as Vice President, Growth at Hola Networks Ltd., and from 2012 until 2014, he served as Vice President, Product at Kampyle Ltd. (Acquired by Medallia). Mr. Ben-Ari holds a master's degree in Anthropology (highest honors) from Hebrew University.

*Alim Dhanji, 40.* Mr. Dhanji has served as Kik's Chief People Officer and Chief Compliance Officer since 2015. Prior to that he served as an advisor to Kik's Chief Executive Officer from 2011 to 2015.  Mr. Dhanji has over 15 years of international leadership experience having held senior executive roles in human resources, finance and corporate development at TD Bank Financial Group, Citigroup and KPMG International. Mr. Dhanji holds an MBA from Royal Roads University and is a board member at Golden Key International Honour Society.

*Dany Fishel*, *38.*  Mr. Fishel has served as President of Kik Israel since 2016.  Mr. Fishel co-founded Rounds Entertainment Ltd. and from 2008 to its acquisition by Kik in 2016, served as its Chief Executive Officer. Prior to that, Mr. Fishel co-founded Kwakwa, a strategic web consulting firm and managed both contextual and behavioral advertising for 888 Holdings PLC. Mr. Fishel holds a B.A. in economics and management from Hebrew University.

*Erin Clift*, *43.*  Ms. Clift has served as Kik's Chief Marketing Officer since 2016.  From 2012 to 2015, she served as Vice President, Global Marketing and Partnerships at Spotify.  Prior to Spotify, Ms. Clift held leadership positions at AOL Inc. and Google, Inc.  She holds a B.A. in psychology from Indiana University.

*David Simons*, *50.*   Mr. Simons has served as Kik's Senior Vice President, Engineering since 2016.  From 2009 to 2016, he served as Chief Technology Officer of Points International, Ltd.  Mr. Simons holds a BMath in computer science from University of Waterloo.

**Board of Directors**

The Company's Board of Directors is comprised of the following individuals:

*Samuel Spadafora*, *74.*  Mr. Spadafora has served as Kik's Chair of the Board of Directors since 2011. From November 1999 to November 2006, he served as the chairman of the board of directors of Chordiant

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000046

Software, Inc., a provider of customer relationship management software, where he also served as Chief Strategy Officer from November 2003 to November 2006. Mr. Spadafora served as Chief Executive Officer and as a director of Chordiant from June 1998 to January 2002 and, from June 1998 until October 2000, he was also Chordiant's President. Mr. Spadafora retired from Chordiant Software, Inc. in November 2006. From April 1994 to June 1998, Mr. Spadafora served as Vice President of Worldwide Field Operations for the microelectronic business of Sun Microsystems, Inc., a computer systems and networking company. Mr. Spadafora holds a B.A. degree in Marketing from Eastern Michigan University.

***Jim A. Estill***, *58*.  Mr. Estill has served on the Kik Board of Directors since 2016.  Since 2009, Mr. Estill has served as the Chief Executive Officer of Danby Products Limited and is a Co-Founder, Managing Director and Managing Partner of Canrock Ventures.  He served as Chief Executive Officer of SYNNEX Canada Limited at SC Txlink LLC from 2004 to 2009.  He serves as an investor, advisor and board member to many technology businesses including RIM where he was a founding board member.   Mr. Estill holds a B.Sc. degree in systems design engineering from University of Waterloo. He also hold BA from Woodstock Collegiate Institute.

***Fred Wilson***, *56*.  Mr. Wilson has served on the Kik Board of Directors since 2011.  Mr. Wilson has served a managing partner at Union Square Ventures since 2003.  Prior to that he founded and served as a managing partner at Flatiron Partners.   Mr. Wilson has an MBA from The Wharton School of Business at the University of Pennsylvania and a B.S. in Mechanical Engineering from MIT.

***Paul Holland***, *57*.  Mr. Holland has served on the Kik Board of Directors since 2014.  Mr. Holland has served as a General Partner at Foundation Capital since 2001.  Mr. Holland holds an MBA from University of California, Berkeley, a MA in foreign affairs from University of Virginia, and BS from James Madison University.

Mr. Livingston, Kik's founder and Chief Executive Officer, and Mr. Heinke, Kik's Chief Financial Officer and Chief Operating Officer, are also members of the Board of Directors.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000047

## TERMS OF THE PURCHASE RIGHTS AND THE SAFTS

*The summary below describes the principal terms of the SAFTs and the rights to purchase Tokens contained therein. Certain of the terms and conditions described below are subject to important limitations and exceptions. Prospective investors should review the entirety of form of SAFT, available from the Company. The summary below is qualified in its entirety by reference to the actual text of the form of SAFT.*

| | |
|---|---|
| *Company:* | Kik Interactive Inc. |
| *Securities:* | Right to purchase in the future certain units of Kin of the Company (the "**Token**" or "**Kin**") pursuant to a Simple Agreement for Future Tokens (each a "**SAFT**" and together the "**SAFTs**") issued to investors (each, an "**Investor**").  Each Investor: (a) if in the United States, or a U.S. Person (as defined in Regulation S under U.S. Securities Act of 1933, as amended (the "**Securities Act**")), must be an accredited investor, as defined in Regulation D under the Securities Act or (b) if in Canada, such Investor must be an accredited investor as defined under applicable Canadian securities laws, or (c) if outside of the United States, must be a non-U.S. Person who is not purchasing for the account or benefit of a U.S. Person as defined under Regulation S under the Securities Act |
| *Minimum Net Proceeds:* | $25.0 million |
| *Maximum Net Proceeds:* | $50.0 million |
| *Minimum SAFT Investment:* | $0.5 million |
| *Form of Payment for SAFT:* | U.S. Dollars |
| *Use of Proceeds:* | A significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to build-out a semi-centralized blockchain-based computer network that enables economic transactions and a reward system for digital service providers as well as to develop an application to make the network accessible via the Kik messaging platform (the "**Kin Ecosystem**") See "Use of Proceeds" elsewhere in this Memorandum for additional information. |
| *Automatic Conversion:* | Upon the achievement of the Minimum Viable Product and the occurrence of a *bona fide* transaction or series of transactions, pursuant to which the |

8

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000048

Company will sell Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain (the "***Network Launch***"), the Company will automatically issue to the Investor fifty percent (50%) of such number of units of the Kin equal to the SAFT Purchase Amount divided by the Discount Price (as such price shall be determined and set forth in the SAFT). The remainder of such Tokens shall be issued to Investors on the one year anniversary of the Network Launch.

*Conversion Price:*

The conversion price of the units of Kin shall be at the discount price, which shall be the maximum price a unit of Kin is sold to the public in the Network Launch multiplied by seventy percent (70%).

*Termination:*

The SAFT shall terminate upon the earlier of (i) the Network Launch; (ii) September 30, 2017, if the Network Launch has not occurred by such date, provided that, the Company shall have the right to extend by sixty (60) days, in its sole discretion (iii) the payment or setting aside of payment of amounts due to the Investor upon a Dissolution Event, which shall include (a) a voluntary termination of operations of the Company, (b) a general assignment for the benefit of the Company's creditors or (c) any other liquidation, dissolution or winding up of the Company, whether voluntary or involuntary); and (iv) the failure of this Offering to obtain proceeds from the sale of all rights pursuant to the SAFTS of more than $25.0 million, *provided*, that in the case of (ii) or (iii), the Company shall have the obligation to repay to the Purchasers the amount of their investment multiplied by the discount rate set forth in the SAFT (the "***Discounted Purchase Amount***") and in the case of (iv) the Company shall have the obligation to repay the full amount of the Investors investment amount.

*Priority of Payment:*

If, immediately prior to the consummation of the Dissolution Event, the assets of the Company that remain legally available for distribution to the Investors, as determined in good faith by the Company's Board of Directors, are insufficient to permit the payment to the Investors of their respective Discounted Purchase Amounts, then the remaining assets of the Company legally available for distribution will be distributed with equal priority and pro rata among the Investors in proportion to the

9

FOIA Confidential Treatment Requested
By Kik Interactive Inc.
KIK000049

Discounted Purchase Amounts they would otherwise be entitled to receive.

*Documentation:*

Purchase and sale of the rights shall be on the terms and conditions set forth in the SAFT, which shall be prepared by Company's counsel, and which will contain certain representations, warranties and covenants of the Company and the Investors, closing conditions and other provisions.

*Token Distribution:*

The total supply of Kin that may ever be issued is 10 trillion units. At the time of the Network Launch, an aggregate of ten percent (10%) of the total supply will be issued to the Investors upon conversion of the SAFTs and to the general public; thirty percent (30%) of the total supply will be issued to Kik (the "***Company Allocation***"), and the remaining sixty percent (60%) of the total supply of Kin will be allocated to the Kin Ecosystem Foundation (the "***Reward Allocation***").

Ten percent (10%) of the Company Allocation will vest upon the Network Launch, and an additional ten percent (10%) shall vest at the beginning of each quarter thereafter. Kik currently expects that a portion of the Kin that vests upon the Network Launch will be distributed to Kin employees and possibly Kik's shareholders.

The Kin Ecosystem Foundation will use up to twenty-five percent (25%) of the Reward Allocation for operations and marketing. Every year, in perpetuity, twenty percent (20%) of the remaining Reward Allocation will be issued as periodic incentive payments pursuant to the Kin Rewards Engine.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000050

## RISK FACTORS

*An investment in the SAFT involves a high degree of risk. You should consider carefully the risks described below, together with all of the other information contained in this Memorandum and the SAFT, before making an investment decision. The following risks entail circumstances under which, our business, financial condition, results of operations and prospects could suffer.*

**Risks associated with an investment in the SAFT**

***Kik may not successfully develop, market and launch the Minimum Viable Product and Investors may not receive Tokens.***

The Minimum Viable Product has not yet been developed by Kik and will require significant capital funding, expertise of Kik management, time and effort in order to develop and successfully launch the Minimum Viable Product and further develop the Kin Ecosystem. Although Kik intends for the Minimum Viable Product , Tokens and Kin Ecosystem to follow the specifications described in this Memorandum, and intends to take commercially reasonable steps toward those ends, Kik may have to make changes to the specifications of the Minimum Viable Product ,Tokens or Kin Ecosystem for any number of legitimate reasons or Kik may be unable to develop the Minimum Viable Product and progress the development of the Kin Ecosystem in a way that realizes those specifications or any form of a functioning network. It is possible that the Tokens and the Minimum Viable Product may not ever be released and there may never be an operational Token or Kin Ecosystem or that the Network Launch will not occur. The Minimum Viable Product, Tokens or Kin Ecosystem, if successfully developed and maintained, may not meet Investor expectations at the time of purchase. Furthermore, despite good faith efforts to develop and launch the Minimum Viable Product and subsequently to develop and maintain the Kin Ecosystem, it is still possible that the Minimum Viable Product  or the Kin Ecosystem will experience malfunctions or otherwise fail to be adequately developed or maintained, which may negatively impact the Kin Ecosystem and Tokens. As a result, or if the Network Launch does not occur, Investors may lose all of their investment or may only be repaid the Discounted Purchase Amount.

***Kik may be forced to cease operations or take actions that result in a Dissolution Event.***

It is possible that, due to any number of reasons, including, but not limited to, an unfavorable fluctuation in the value of cryptographic and fiat currencies, the inability by the Company to establish the Minimum Viable Product or the Tokens' utility, the failure of commercial relationships, or intellectual property ownership challenges, the Company may no longer be viable to operate and the Company may dissolve or take actions that result in a Dissolution Event.

***If there is not a Network Launch or if there is a Dissolution Event, Investors will only be entitled to receive the Discounted Purchase Amount, and may lose all of their investment.***

If the Network Launch does not occur or if there is a Dissolution Event, Investors will only be repaid the Discounted Purchase Amount. In addition, if, immediately prior to the consummation of the Dissolution Event, the assets of the Company that remain legally available for distribution to the Investors, as determined in good faith by the Company's Board of Directors, are insufficient to permit the payment to the Investors of their respective Discounted Purchase Amounts, Investors may lose all of their investment.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000051

***The SAFTs may not be transferred.***

The terms of the SAFT prohibit transfer of the SAFT.  As a result, Investors will be required to hold their SAFT until the earlier of the Network Launch and the delivery of all of the Tokens, or the termination of the SAFT pursuant to the provisions set forth therein.   Consequently, Investors must be prepared to bear the risk of an investment in the SAFT until the termination of the SAFT pursuant to the terms set forth therein.

***Investors will not be issued the full number of Tokens that each Investor has the right to purchase under the SAFT until one year following the Network Launch, and will not be able to transfer Tokens until they are issued.***

Upon the Network Launch, each Investor will receive only fifty percent (50%) of the Tokens which it has the right to purchase under the SAFT.  The remainder of the Tokens will be issued to the Investor on the one year anniversary of the Network Launch.  As a result, it will be over a year from the date of the initial investment in the SAFT until the Investor has received all of the Tokens it has the right to purchase under the SAFT.  As a result, Investors may be unable to dispose of their Tokens at a necessary or convenient time for the Investor.

***The tax treatment of the SAFT, the purchase rights contained therein and the Token distribution is uncertain and there may be adverse tax consequences for Investors upon certain future events.***

The tax characterization of the SAFT and the Tokens is uncertain, and each Investor must seek its own tax advice in connection with an investment in the SAFT. An investment pursuant to the SAFT and the purchase of Tokens pursuant thereto may result in adverse tax consequences to Investors, including withholding taxes, income taxes and tax reporting requirements. Each Investor should consult with and must rely upon the advice of its own professional tax advisors with respect to the United States and non-U.S. tax treatment of an investment in the SAFT and the purchase rights contained therein.

***If Kik is unable to successfully consummate the Network Launch, develop the Kin Ecosystem, attract developers and new applications to drive users to the Kin Ecosystem and grow its user base through widespread use and adoption of the Tokens, Investors will not be able to exercise their right to purchase Tokens and may lose all of their investment in the rights acquired pursuant to the SAFT.***

Kik will use the proceeds of this Offering to make significant investments to develop and launch a viable Minimum Viable Product and subsequently to build a fulsome network upon which Kik, other content providers and users can create compelling content and realize utility. Kik may not have or may not be able to obtain the technical skills and expertise needed to successfully develop the Minimum Viable Product and progress it to a successful Network Launch.  If Kik is not successful in its efforts to demonstrate to content providers and potential users the utility and value of the Kin Ecosystem, there may not be sufficient demand for the Tokens for Kik to proceed with the Network Launch.  Further, if Kik is not successful in its efforts to grow the user base or if it is unable to build and maintain good relations with users and other content providers following the Network Launch, the Kin Ecosystem may be seriously harmed or may never be fully adopted by users.

**Risks associated with the Tokens and the Kin Ecosystem**

***The Kin Ecosystem may not be widely adopted and may have limited users.***

It is possible that the Kin Ecosystem will not be used by a large number of individuals, companies and other entities or that there will be limited public interest in the creation and development of distributed ecosystems

12

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000052

(such as the Kin Ecosystem) more generally or distributed applications to be used on the Kin Ecosystem. Kik has experienced a declining usage of its messenger service over the last several years. Such a lack of use or interest could negatively impact the development of the Kin Ecosystem and therefore the potential utility of Tokens.

***Alternative networks may be established that compete with or are more widely used than the Kin Ecosystem.***

It is possible that alternative networks could be established that utilize the same or similar open source code and protocol underlying the Kin Ecosystem and attempt to facilitate services that are materially similar to the Kin Ecosystem services. The Kin Ecosystem may compete with these alternative networks, which could negatively impact the Kin Ecosystem and the Tokens.

***The open-source structure of the Kin Ecosystem protocol means that the Kin Ecosystem may be susceptible to developments by users or contributors could damage the Kin Ecosystem and Kik's reputation and could affect the utilization of the Kin Ecosystem and the Tokens.***

The Kin Ecosystem will operate based on an open-source protocol maintained by Kik and other contributors. As an open source project, the Kin Ecosystem will not be represented, maintained or monitored by an official organization or authority. The open-source nature of the Kin Ecosystem protocol means that it may be difficult for the Company or contributors maintain or develop the Kin Ecosystem and the Company may not have adequate resources to address emerging issues or malicious programs that develop within the Kin Ecosystem adequately or in a timely manner. Third parties not affiliated with the Company may introduce weaknesses or bugs into the core infrastructure elements of the Kin Ecosystem and open-source code which may cause the Kin Ecosystem to lose Tokens stored in user wallets or lose other valued Tokens issued pursuant to the Kin Rewards Engine or held by the Kin Ecosystem Foundation. Such events may result in a loss of trust in the security and operation of the Kin Ecosystem and a decline in user activity and could negatively impact the market price of the Tokens. Further, the Ethereum network also operates based on an open-source protocol and may also be susceptible to developments by users or contributors that could damage the Ethereum network, which could also adversely affect the operation of the Kin Ecosystem.

***The Kin Ecosystem may be the target of malicious cyberattacks or may contain exploitable flaws in its underlying code, which may result in security breaches and the loss or theft of Tokens. If the Kin Ecosystem's security is compromised or if the Kin Ecosystem is subjected to attacks that frustrate or thwart our users' ability to access the Kin Ecosystem, their Tokens or the Kin Ecosystem products and services, users may cut back on or stop using the Kin Ecosystem altogether, which could seriously curtail the utilization of the Tokens and cause a decline in the market price of the Tokens.***

The Company will take steps to build, maintain, and secure the infrastructure of the Kin Ecosystem and user wallets and will work with experts as required in order to develop and employ best practices for network security; however, despite these measures, the Kin Ecosystem structural foundation, the open-source protocol, the software application and other interfaces or applications built upon the Kin Ecosystem are still in an early development stage and are unproven, and there can be no assurances that the Kin Ecosystem and the creating, transfer or storage of the Tokens will be uninterrupted or fully secure which may result in a complete loss of users' Tokens or an unwillingness of users to access, adopt and utilize the Kin Ecosystem. Further, the Kin Ecosystem may also be the target of malicious attacks seeking to identify and exploit weaknesses in the software or the Kin Ecosystem which may result in the loss or theft of Tokens. In any such event, if the Network Launch does not occur or if the Kin Ecosystem is not widely adopted, Investors may lose all of their investment or may only be repaid the Discounted Purchase Amount.

13

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000053

*The Ethereum blockchain network on which Kin operates utilizes code that is subject to change at any time. These changes may have unintended consequences for the Kin Ecosystem and the Tokens.*

Kin is built as an ERC-20 token on top of the Ethereum blockchain. In addition to the aforementioned risks regarding development and acceptance of blockchain networks or the price of blockchain assets that may negatively affect the Ethereum network, other changes such as upgrades to Ethereum's blockchain, a hard fork in Ethereum, or a change in how transactions are confirmed on the Ethereum blockchain may have unintended, adverse effects on all blockchains utilizing using the ERC-20 standard, including the Kin Ecosystem. These changes may occur at any time prior to the development of the Kin Ecosystem and may cause delays development or may completely foreclose the Company's ability to launch the Kin Ecosystem.

*The Kin Ecosystem will rely on third-party platforms such as the Apple App Store and the Google Play Store to distribute the application through which users will access the Kin Ecosystem. If the Kin Ecosystem is unable to maintain a good relationship with such platform providers, if their terms and conditions or pricing change, if we violate or cannot comply with, or if a platform provider believes that we have violated, the terms and conditions of its platform, or if any of these platforms loses market share or falls out of favor or is unavailable for a prolonged period of time, access to and utilization of the Kin Ecosystem and the Tokens will suffer.*

A significant portion of Kik's users access the Kik chat application on the Apple App Store and the Google Play Store, and it is expected that this will also be the case for accessing the Kin Ecosystem. The application through which users access the Kin Ecosystem will be subject to the standard policies and terms of service of third party platforms, which govern the promotion, distribution and operation generally of applications on the platform. Each platform provider has broad discretion to change and interpret its terms of service and other policies with respect to the Kin Ecosystem and other applications, and those changes may be unfavorable. A platform provider may also change its fee structure, add fees associated with access to and use of its platform, change how the personal information of its users is made available to application developers on the platform or restrict how users can share information with other users on its platform or across platforms.

Such changes may decrease the visibility or availability of the Kin Ecosystem, limit distribution capabilities, prevent access to the Kin Ecosystem, increase the costs to operate on these platforms or result in the exclusion or limitation of the Kin Ecosystem application on such platforms which could negatively impact the Kin Ecosystem and the Tokens.

If the Kin Ecosystem application violates, or a platform provider believes it has violated its terms of service (or if there is any change or deterioration in Kik or the Kin Ecosystem's relationship with these platform providers), that platform provider could limit or discontinue Kik or the Kin Ecosystem's access to the platform. Any limit of, or discontinuation to, Kik or the Kin Ecosystem's access to any platform could adversely affect access to and utilization of the Kin Ecosystem and the Tokens.

**Risks related to blockchain technologies and digital assets**

*The regulatory regime governing the blockchain technologies, cryptocurrencies, tokens and token offerings such as Kin Ecosystem and the Tokens is uncertain, and new regulations or policies may materially adversely affect the development of the Kin Ecosystem and the utility of the Tokens.*

Regulation of tokens (including the Kin) and token offerings such as this, cryptocurrencies (including Ethereum), blockchain technologies, and cryptocurrency exchanges currently is undeveloped and likely to rapidly evolve, varies significantly among international, federal, state and local jurisdictions and is subject to significant uncertainty. Various legislative and executive bodies in the United States and in other

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000054

countries may in the future, adopt laws, regulations, guidance, or other actions, which may severely impact the development and growth of the Kin Ecosystem and the adoption and utility of the Tokens.   Failure by the Company, the Kin Ecosystem Foundation or certain users of the Kin Ecosystem to comply with any laws, rules and regulations, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including civil penalties and fines.

As blockchain networks and blockchain assets have grown in popularity and in market size, federal and state agencies have begun to take interest in, and in some cases regulate, their use and operation. In the case of virtual currencies, state regulators like the New York Department of Financial Services have created new regulatory frameworks. Others, as in Texas, have published guidance on how their existing regulatory regimes apply to virtual currencies. Some states, like New Hampshire and North Carolina, have amended their state's statutes to include virtual currencies into existing licensing regimes. Treatment of virtual currencies continues to evolve under federal law as well. Both the Department of the Treasury and the Commodity Futures Trading Commission, for example, have published guidance on the treatment of virtual currencies like Bitcoin. The IRS released guidance treating Ether as property that is not currency for US federal income tax purposes, although there is no indication yet whether other courts or federal or state regulators will follow this classification. Both federal and state agencies have instituted enforcement actions against those violating their interpretation of existing laws.

The regulation of non-currency use of blockchain assets is also uncertain. For example, neither the SEC nor the CFTC has formally asserted regulatory authority over any particular blockchain network. CFTC has publicly taken the position that certain blockchain assets are commodities, but SEC has not taken the position that any particular blockchain asset is a security. To the extent that a domestic government or quasi-governmental agency exerts regulatory authority over a blockchain network or asset, the Kin Ecosystem and the Tokens may be adversely affected.

Blockchain networks also face an uncertain regulatory landscape in many foreign jurisdictions such as the European Union, China and Russia. Various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect the Ethereum Network and its users, particularly Ethereum Exchanges and service providers that fall within such jurisdictions' regulatory scope. Such laws, regulations or directives may conflict with those of the United States or may directly and negatively impact our business. The effect of any future regulatory change is impossible to predict, but such change could be substantial and adverse to development and growth of the Kin Ecosystem and the adoption and utility of the Tokens.

New or changing laws and regulations or interpretations of existing laws and regulations, in the United States and other jurisdictions, may adversely impact the value of the currency in which the Tokens may be exchanged, the value of the distributions that may be made by the Kin Ecosystem Foundation, the liquidity and market price of the Tokens, the ability to access marketplaces or exchanges on which to trade the Tokens, and the structure, rights and transferability of Tokens.

***The further development and acceptance of blockchain networks, including the Kin Ecosystem, which are part of a new and rapidly changing industry, are subject to a variety of factors that are difficult to evaluate. The slowing or stopping of the development or acceptance of blockchain networks and blockchain assets would have an adverse material effect on the successful development and adoption of the Kin Ecosystem and the Tokens.***

The growth of the blockchain industry in general, as well as the blockchain networks with which the Kin Ecosystem will rely and interact, is subject to a high degree of uncertainty. The factors affecting the further development of the cryptocurrency industry, as well as blockchain networks, include, without limitation:

- Worldwide growth in the adoption and use of Bitcoin, Ether and other blockchain technologies;

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000055

- Government and quasi-government regulation of Bitcoin, Ether and other blockchain assets and their use, or restrictions on or regulation of access to and operation of blockchain networks or similar systems;

- The maintenance and development of the open-source software protocol of the Bitcoin or Ethereum networks;

- Changes in consumer demographics and public tastes and preferences;

- The availability and popularity of other forms or methods of buying and selling goods and services, or trading assets including new means of using fiat currencies or existing networks;

- General economic conditions and the regulatory environment relating to cryptocurrencies; or

- A decline in the popularity or acceptance of the Bitcoin or Ethereum networks would adversely affect our results of operations.

The slowing or stopping of the development, general acceptance and adoption and usage of blockchain networks and blockchain assets may deter or delay the acceptance and adoption of the Kin Ecosystem and the Tokens.

***The prices of blockchain assets are extremely volatile. Fluctuations in the price of Ether or other digital assets could materially and adversely affect our business, and the Tokens may also be subject to significant price volatility.***

The prices of blockchain assets such as Bitcoin and Ether have historically been subject to dramatic fluctuations and are highly volatile, and the market price of the Tokens may also be highly volatile. Several factors may influence the market price of the Tokens, including, but not limited to:

- Global blockchain asset supply;

- The remaining supply of Kin following distributions pursuant to the Kin Rewards Engine;

- Global blockchain asset demand, which can be influenced by the growth of retail merchants' and commercial businesses' acceptance of blockchain assets like cryptocurrencies as payment for goods and services, the security of online blockchain asset exchanges and digital wallets that hold blockchain assets, the perception that the use and holding of blockchain assets is safe and secure, and the regulatory restrictions on their use;

- Investors' expectations with respect to the rate of inflation;

- Changes in the software, software requirements or hardware requirements underlying the Kin Ecosystem;

- Changes in the rights, obligations, incentives, or rewards for the various participants in the Kin Ecosystem;

- Interest rates;

- Currency exchange rates, including the rates at which Ether may be exchanged for fiat currencies;

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000056

- Fiat currency withdrawal and deposit policies of blockchain asset exchanges on which the Tokens may be traded and liquidity on such exchanges;

- Interruptions in service from or failures of major blockchain asset exchanges on which the Tokens may be traded;

- Investment and trading activities of large investors, including private and registered funds, that may directly or indirectly invest in the Kin Ecosystem or Tokens or other blockchain assets;

- Monetary policies of governments, trade restrictions, currency devaluations and revaluations;

- Regulatory measures, if any, that affect the use of blockchain assets such as the Tokens;

- The maintenance and development of the open-source software protocol of the Kin Ecosystem or the Ethereum network;

- Global or regional political, economic or financial events and situations; or

- Expectations among Kin Ecosystem or other blockchain assets participants that the value of the Tokens or other blockchain assets will soon change.

A decrease in the price of a single blockchain assets may cause volatility in the entire blockchain asset industry and may affect other blockchain assets including the Tokens.  For example, a security breach that affects investor or user confidence in Ether or Bitcoin may affect the industry as a whole and may also cause the price of the Tokens and other blockchain assets to fluctuate.

17

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000057

**USE OF PROCEEDS**

We expect that the gross proceeds of this offering will be between $25.0 million and $50.0 million before the deduction of offering costs. A significant portion of the proceeds of the Offering will be used by the Company to originate the Minimum Viable Product and subsequently to progress the development of the Kin Ecosystem – a semi-centralized blockchain-based computer network that enables economic transactions and a reward system for digital service providers – as well as to develop an application to make the Kin Ecosystem accessible via the Kik messaging platform.

In the event that the net proceeds of the Offering are less than $25.0 million, we will be unable to proceed with the development of the Kin Ecosystem and we do not expect that we will be able to successfully achieve the Network Launch.  We intend to segregate the proceeds of the Offering until such time as we have received net proceeds of $25.0 million.  If that threshold is achieved, we will release the funds for our use in developing the Kin Ecosystem.  If that threshold is not achieved by July 15, 2017, we will return the proceeds to the Investors in full.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000058

## PLAN OF DISTRIBUTION

### Segregation of Funds

Until we achieve the minimum Offering amount of $25.0 million, the proceeds for the Offering will be kept in a separately established account.  Upon achievement of the minimum Offering amount and the closing on such amount, the proceeds from the minimum Offering amount will be distributed to the Company. Upon each additional closing, if any, the proceeds subject to that additional closing will be distributed to the Company and the associated SAFTs will be issued to the Investors in such SAFTs. If the Offering does not achieve the minimum Offering amount of $25.0 million, the proceeds for the Offering will be promptly returned to Investors, without deduction or interest.

### Investor Qualifications

Only persons of adequate financial means who have no need for present liquidity with respect to this investment should consider purchasing the purchase rights set forth in the SAFT offered hereby because: (i) an investment in the  SAFTs involves a number of significant risks (See "Risk Factors"); and (ii) no market for the SAFTs or the purchase rights contained therein, and none is likely to develop in the reasonably foreseeable future. This Offering  is intended to be a private offering that is exempt from registration under the Securities Act and applicable state securities laws.

This Offering is limited solely to accredited investors as defined in Regulation D under the Securities Act, meaning only those persons or entities coming within any one or more of the following categories:

(i)        Any bank, as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity; any broker-dealer registered pursuant to Section 15 of the Exchange Act; any insurance company, as defined in Section 2(13) of the Securities Act; any investment company registered under the Investment Company Act of 1940 or a business development company, as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; and any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such Act, that is either a bank, savings and loan association, insurance company or registered investment advisor, if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by person(s) that are accredited investor(s);

(ii)       Any private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940;

(iii)      Any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, any corporation, Massachusetts or similar business trust, or company, not formed for the specific purpose of acquiring the Common Stock, with total assets in excess of $5,000,000;

(iv)      Any director or executive officer of the Company;

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000059

(v)     Any natural person whose individual net worth, or joint net worth with that person's spouse, exclusive of the value of the person's primary residence net of any mortgage debt and other liens, at the time of his or her purchase exceeds $1,000,000;

(vi)    Any natural person who had an individual income in excess of $200,000, or joint income with that person's spouse in excess of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year;

(vii)   Any trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Common Stock, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D; or

(viii)  Any entity all of whose equity owners are accredited investors.

The term "net worth" means the excess of total assets over total liabilities, exclusive of the value of your primary residence net of any mortgage debt and other liens. In determining income, you should add to your adjusted gross income any amounts attributable to tax-exempt income received, losses claimed as a limited partner in any limited partnership, deductions claimed for depreciation, contributions to an IRA or Keogh retirement plan, alimony payments and any amount by which income from long-term capital gains had been reduced in arriving at adjusted gross income.

You will be required to represent to the Company in writing that you are an accredited investor under Regulation D, as described above, and may also be required to provide certain documentation in support of such representation. In addition to the foregoing requirement, you must also represent in writing that you are acquiring the SAFT for your own account and not for the account of others and not with a view to resell or distribute such securities.

**Other Requirements**

| The USA PATRIOT Act | What is money laundering? | How big is the problem and why is it important? |
|---|---|---|
| The USA PATRIOT Act is designed to detect, deter and punish terrorists in the United States and abroad. The Act imposes new anti-money laundering requirements on brokerage firms and financial institutions. Since April 24, 2002, all United States brokerage firms have been required to have comprehensive anti-money laundering programs in effect. To help you understand these efforts, the Placement Agent wants to provide you with some information about money laundering and the Placement Agent's efforts to help implement the USA PATRIOT Act. | Money laundering is the process of disguising illegally obtained money so that the funds appear to come from legitimate sources or activities. Money laundering occurs in connection with a wide variety of crimes, including illegal arms sales, drug trafficking, robbery, fraud, racketeering and terrorism. | The use of the United States financial system by criminals to facilitate terrorism or other crimes could taint our financial markets. According to the United States State Department, one recent estimate puts the amount of worldwide money laundering activity at $1 trillion a year. |

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000060

| What the Company is required to do to help eliminate money laundering? | |
|---|---|
| Under new rules required by the USA PATRIOT Act, the Company's anti- money laundering program must designate a special compliance officer, set up employee training, conduct independent audits and establish policies and procedures designed to detect and report suspicious transaction and ensure compliance with the new laws and rules. | As part of the Company's required program, it may ask you to provide various identification documents or other information. Until you provide the information or documents that the Company needs, it may not be able to effect any transactions for you. |

**You should check the Office of Foreign Assets Control (the "*OFAC*") website at http://www.treas.gov/ofac before making the following representations**: You represent that the amounts invested by you in this Offering were not and are not directly or indirectly derived from any activities that contravene Federal, state or international laws and regulations, including anti-money laundering laws and regulations. Federal regulations and Executive Orders administered by the OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of the OFAC-prohibited countries, territories, individuals and entities can be found on the OFAC website at http://www.treas.gov/ofac. In addition, the programs administered by the OFAC (the "OFAC Programs") prohibit dealing with individuals[1] or entities in certain countries, regardless of whether such individuals or entities appear on any OFAC list;

(i)      you represent and warrant that none of: (1) you; (2) any person controlling or controlled by you; (3) if you are a privately-held entity, any person having a beneficial interest in you; or (4) any person for whom you are acting as agent or nominee in connection with this investment is a country, territory, entity or individual named on an OFAC list, or a person or entity prohibited under the OFAC Programs. Please be advised that the Placement Agent may not accept any subscription amounts from a prospective investor if such investors cannot make the representation set forth in the preceding sentence. You agree to promptly notify the Company and the Placement Agent should you become aware of any change in the information set forth in any of these representations. You are advised that, by law, the Placement Agent may be obligated to "freeze the account" of any investor, either by prohibiting additional subscriptions from it, declining any redemption requests and/or segregating the assets in the account in compliance with governmental regulations, and that the Placement Agent may also be required to report such action and to disclose such investor's identity to the OFAC;

(ii)      you represent and warrant that none of: (1) you; (2) any person controlling or controlled by you; (3) if you are a privately-held entity, any person having a beneficial interest in you; or (4) any person for whom you are acting as agent or nominee in connection with this investment is a senior foreign political figure[2], or any immediate family[3] member or close

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branch of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[3] "Immediate family" of a senior foreign political figure typically includes such figure's parents, siblings, spouse, children and in-laws.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000061

associate[4] of a senior foreign political figure, as such terms are defined in the footnotes below; and

(iii)     if you are affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if you receive deposits from, make payments on behalf of, or handle other financial transactions related to a Foreign Bank, you represent and warrant to the Company and the Placement Agent that: (1) the Foreign Bank has a fixed address, and not solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct its banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

The Company is entitled to rely upon the accuracy of your representations to each of them. The Company may, but under no circumstances shall it be obligated to, require additional evidence that a prospective investor meets the standards set forth above at any time prior to its acceptance of a prospective investor's subscription. You are not obligated to supply any information so requested by the Company, but the Company may reject a subscription from you or any person who fails to supply such information.

**How to Subscribe**

To subscribe for the purchase rights set forth in the SAFT, each prospective investor must complete, execute and deliver the following to the Company:

(a)     A signature page evidencing such prospective investor's execution of the SAFT;

(b)     A completed Investor Questionnaire (for a natural person or entity, as applicable);

(c)     For U.S. citizens or residents of the United States, an Internal Revenue Service Form W-9;

(d)     For individual investors, a copy of one form of government issued picture identification (e.g. state issued driver's license or passport); and

(e)     The subscription amount by wire transfer or certified check to the Company, the details of which shall be provided by the Company.

The materials referenced above are available at www.coinlist.co/kin.

All subscription funds will be deposited in the Company's account and shall be segregated by the Company until the earlier of the time at which a Closing is held whereby the Company shall achieve the minimum Offering amount of $25.0 million. No interest will be paid to any potential investors on funds delivered to the Company and later returned to the Investor. Accordingly, Investors will lose the use of their funds for up to the duration of this Offering period.

Subject to applicable state securities laws, you may not revoke any subscription that you deliver to the Company.

---

[4] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with such senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of such senior foreign political figure.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000062

If a subscription is wholly or partially rejected, subscription funds in the amount rejected will be returned to such subscriber, without interest, deduction or offset.

***Notice to Prospective Investors in Canada***

Each Canadian purchaser who purchases securities on a private placement basis pursuant to this offering memorandum will be deemed to have represented to and agreed with the Company that such purchaser: (i) is resident in Canada; (ii) is purchasing the securities with the benefit of the prospectus exemption provided by Section 2.3 of National Instrument 45-106 – *Prospectus Exemptions* (NI 45-106) (that is, such purchaser is an "accredited investor" within the meaning of NI 45-106 and is either purchasing securities as principal for its own account, or is deemed to be purchasing the securities as principal for its own account in accordance with applicable securities laws); (iii) if not an individual, the purchaser was not created or used solely to purchase or hold securities as an accredited investor under NI 45-106; and (iv) if required by applicable securities laws, the purchaser will execute, deliver and file or assist the Company in obtaining and filing such certificates, reports, undertakings and other documents relating to the purchase of the securities by the purchaser as may be required by any securities commission or other regulatory authority.

*Canadian Resale Restrictions*

The distribution of the securities in Canada is being made only on a private placement basis exempt from the requirement that the Company prepare and file a prospectus with the applicable securities regulatory authorities. The Company is not a reporting issuer in any province or territory in Canada and its securities are not listed on any stock exchange in Canada and there is currently no public market for the securities in Canada.  The Company currently has no intention of becoming a reporting issuer in Canada, filing a prospectus with any securities regulatory authority in Canada to qualify the resale of the securities to the public, or listing its securities on any stock exchange in Canada.  Accordingly, to be made in accordance with securities laws, any resale of the securities in Canada must be made under available statutory exemptions from registration and prospectus requirements or under a discretionary exemption granted by the applicable Canadian securities regulatory authority.  **Canadian purchasers are advised to seek legal advice prior to any resale of the securities.**

*Purchasers' Rights - Ontario*

Securities legislation in certain of the provinces of Canada provides purchasers with rights of rescission or damages, or both, where an offering memorandum or any amendment to it contains a misrepresentation. A "misrepresentation" is an untrue statement of a material fact or an omission to state a material fact that is required to be stated or that is necessary to make any statement not misleading in light of the circumstances in which it was made.  These remedies must be commenced by the purchaser within the time limits prescribed and are subject to the defenses contained in the applicable securities legislation.

The following is a summary of the statutory rights of rescission or damages, or both, under securities legislation in Ontario, and as such, is subject to the express provisions of the legislation and the related regulations and rules and reference is made thereto for the complete text of such provisions.  Such provisions may contain limitations and statutory defenses not described here on which the Company and other applicable parties may rely. The rights described below are in addition to, and without derogation from, any other right or remedy available at law to purchasers of the securities. Purchasers should refer to the applicable provisions of the securities legislation of Ontario for the particulars of these rights or consult with a legal adviser.

Ontario securities legislation provides that where an offering memorandum is delivered to a purchaser and contains a misrepresentation, the purchaser will, except as provided below, have a statutory right of action

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000063

for damages or for rescission against the Company, without regard to whether the purchaser relied on the misrepresentation; if the purchaser elects to exercise the right of rescission, the purchaser will have no right of action for damages against the Company. No such action shall be commenced more than, in the case of an action for rescission, 180 days after the date of the transaction that gave rise to the cause of action, or, in the case of any action other than an action for rescission, the earlier of: (i) 180 days after the purchaser first had knowledge of the facts giving rise to the cause of action, or (ii) three years after the date of the transaction that gave rise to the cause of action. The Ontario legislation provides a number of limitations and defenses to such actions, including: (a) the Company is not liable if it proves that the purchaser purchased the securities with knowledge of the misrepresentation; (b) in an action for damages, the Company shall not be liable for all or any portion of the damages that the Company proves do not represent the depreciation in value of the securities as a result of the misrepresentation relied upon; and (c) in no case shall the amount recoverable exceed the price at which the securities were offered.

These rights are not available for a purchaser that is: (a) a Canadian financial institution, meaning either: (i) an association governed by the *Cooperative Credit Associations Act* (Canada) or a central cooperative credit society for which an order has been made under section 473(1) of that Act; or (ii) a bank, loan corporation, trust company, trust corporation, insurance company, treasury branch, credit union, caisse populaire, financial services cooperative, or league that, in each case, is authorized by an enactment of Canada or a province or territory of Canada to carry on business in Canada or a province or territory of Canada; (b) a Schedule III bank, meaning an authorized foreign bank named in Schedule III of the *Bank Act* (Canada); (c) the Business Development Bank of Canada incorporated under the *Business Development Bank of Canada Act* (Canada); or (d) a subsidiary of any person referred to in clauses (a), (b) or (c), if the person owns all of the voting securities of the subsidiary, except the voting securities required by law to be owned by directors of that subsidiary.

### *Notice to Prospective Investors in the United Kingdom*

With respect to offers and sales of our securities that are the subject of this Memorandum:

- offers or sales of any of such securities to persons in the United Kingdom are prohibited in circumstances which have resulted in or will result in such securities being or becoming the subject of an offer of transferable securities to the public as defined in Section 102B of the Financial Services and Markets Act 2000 (as amended) (the "*FSMA*");

- all applicable provisions of the FSMA must be complied with, with respect to anything done in relation to such securities in, from or otherwise involving the United Kingdom; and

- any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received in connection with the issue or sale of such securities shall only be communicated, or be caused to be communicated, in circumstances in which Section 21(1) of the FSMA does not apply to us.

### *Notice to Prospective Investors in China*

The SAFTs are not being offered or sold and may not be offered or sold, directly or indirectly, within the People's Republic of China (for such purposes, not including the Hong Kong and Macau Special Administrative Regions or Taiwan), except as permitted by the securities and other laws and regulations of the People's Republic of China.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000064

## TAX CONSIDERATIONS

EACH INVESTOR SHOULD SEEK, AND MUST DEPEND UPON, THE ADVICE OF HIS OR HER TAX ADVISOR WITH RESPECT TO THEIR INVESTMENT, AND EACH INVESTOR IS RESPONSIBLE FOR THE FEES OF SUCH ADVISOR. NOTHING IN THIS MEMORANDUM IS OR SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE TO AN INVESTOR. INVESTORS SHOULD BE AWARE THAT THE INTERNAL REVENUE SERVICE MAY NOT AGREE WITH ALL TAX POSITIONS TAKEN BY THE COMPANY AND THAT CHANGES TO THE INTERNAL REVENUE CODE OR THE REGULATIONS OR RULINGS THEREUNDER OR COURT DECISIONS AFTER THE DATE OF THIS MEMORANDUM MAY CHANGE THE ANTICIPATED TAX TREATMENT TO AN INVESTOR. THE COMPANY WILL NOT OBTAIN ANY RULING FROM THE INTERNAL REVENUE SERVICE WITH REGARD TO THE TAX CONSEQUENCES OF AN INVESTMENT IN THE NOTES.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, PROSPECTIVE INVESTORS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY INVESTORS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH INVESTORS UNDER THE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF INVESTMENTS IN THE COMPANY; AND (C) PROSPECTIVE INVESTORS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

146528051 v8

FOIA Confidential Treatment Requested
By Kik Interactive Inc.

KIK000065