# EXHIBIT 1

*SEC v. Telegram Group Inc., et al.*, SDNY Case No. 19-cv-9439 (PKC)

Opinion and Order – March 24, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

                          Plaintiff,                              19-cv-9439 (PKC)

              -against-                                          OPINION
                                                                AND ORDER

TELEGRAM GROUP INC. and TON ISSUER
INC.,

                          Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

            The Securities and Exchange Commission ("SEC") seeks to enjoin Telegram

Group Inc. and TON Issuer Inc. (collectively "Telegram") from engaging in a plan to distribute

"Grams," a new cryptocurrency, in what it considers to be an unregistered offering of securities.

In early 2018, Telegram received $1.7 billion from 175 sophisticated entities and high net-worth

individuals in exchange for a promise to deliver 2.9 billion Grams.  Telegram contends that the

agreements to sell the 2.9 billion Grams are lawful private placements of securities covered by an

exemption from the registration requirement.  In Telegram's view, only the agreements with the

individual purchasers are securities.  Currently, the Grams will not be delivered to these purchasers

until the launch of Telegram's new blockchain, the Telegram Open Network ("TON") Blockchain.

Telegram views the anticipated resales of Grams by the 175 purchasers into a secondary public

market via the TON Blockchain as wholly-unrelated transactions and argues they would not be the

offering of securities.

            The SEC sees things differently.  The 175 initial purchasers are, in its view,

"underwriters" who, unless Telegram is enjoined from providing them Grams, will soon engage

in a distribution of Grams in the public market, whose participants would have been deprived of the information that a registration statement would reveal.

Cryptocurrencies (sometimes called tokens or digital assets) are a lawful means of storing or transferring value and may fluctuate in value as any commodity would.  In the abstract, an investment of money in a cryptocurrency utilized by members of a decentralized community connected via blockchain technology, which itself is administered by this community of users rather than by a common enterprise, is not likely to be deemed a security under the familiar test laid out in S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298–99 (1946).  The SEC, for example, does not contend that Bitcoins transferred on the Bitcoin blockchain are securities.  The record developed on the motion for a preliminary injunction presents a very different picture.

The Court finds that the SEC has shown a substantial likelihood of success in proving that the contracts and understandings at issue, including the sale of 2.9 billion Grams to 175 purchasers in exchange for $1.7 billion, are part of a larger scheme to distribute those Grams into a secondary public market, which would be supported by Telegram's ongoing efforts. Considering the economic realities under the Howey test, the Court finds that, in the context of that scheme, the resale of Grams into the secondary public market would be an integral part of the sale of securities without a required registration statement.

Telegram knew and understood that reasonable purchasers would not be willing to pay $1.7 billion to acquire Grams merely as a means of storing or transferring value.  Instead, Telegram developed a scheme to maximize the amount initial purchasers would be willing to pay Telegram by creating a structure to allow these purchasers to maximize the value they receive upon resale in the public markets.

As part of its <u>Howey</u> analysis, the Court finds an implicit (though formally disclaimed) intention on the part of Telegram to remain committed to the success of the TON Blockchain post-launch.  Indeed, Telegram, as a matter of fact rather than legal obligation, will be the guiding force behind the TON Blockchain for the immediate post-launch period while the 175 purchasers unload their Grams into the secondary market.  As such, the initial 175 purchasers possess a reasonable expectation of profit based upon the efforts of Telegram because these purchasers expect to reap whopping gains from the resale of Grams in the immediate post-launch period.  Under the <u>Howey</u> test, the series of contracts and understandings centered on Grams are a security within the meaning of the Securities Act of 1933 (the "Securities Act").

For reasons that will be more fully explained, the Court finds that the SEC has shown a substantial likelihood of success in proving that Telegram's present plan to distribute Grams is an offering of securities under the <u>Howey</u> test to which no exemption applies.  The motion for a preliminary injunction will be granted.

At the preliminary injunction hearing, neither side offered live testimony, despite an opportunity to do so.  (Doc. 58).  The parties presented the Court with a fulsome Joint Stipulation of Facts ("Joint Stip."), (Doc. 72), and each side offered deposition testimony, exhibits, and declarations.  The parties also filed cross-motions for summary judgment and the SEC filed a motion to strike an affirmative defense, motions which the Court finds unnecessary to reach at this juncture.  Set forth below are the Court's findings of fact and conclusions of law on the motion for a preliminary injunction.[1]

---

[1] Citations to evidence are illustrative only and are not intended to indicate that the cited evidence is the only evidence supporting the finding.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

    A. <u>Telegram</u>.

        In 2006, Pavel Durov founded VKontakte, a Russian version of Facebook.  (Joint Stip. ¶ 9).  With the help of Nikolai Durov, his brother and a skilled programmer, Pavel successfully built VKontakte into the largest Russian social media network.  (Joint Stip. ¶¶ 11–13).  Pavel accumulated a sizeable personal fortune before exiting VKontakte and leaving Russia over disputes with the Russian government.  (Plaintiff's Exhibit ("PX") 18 at 2 (Doc. 122-18)); (Defs.' Resp. to Pls.' Counter-Statement at 51 (Doc. 120)).

        In 2013, the Durov brothers founded Telegram and released Telegram Messenger, which remains Telegram's signature product.  (Joint Stip. ¶¶ 16, 23); (Defs.' 56.1 Statement ¶¶ 42, 45 (Doc. 75)).  Telegram is a private company, (Pl.'s 56.1 Statement ¶ 154 (Doc. 80)), and Pavel is its chief executive officer, (Joint Stip. ¶ 3).  Messenger is a messaging app that offers end-to-end encryption and also contains a diverse ecosystem of groups, channels, and in-app commerce. (Joint Stip. ¶¶ 18–19, 22); (Doc. 80 at 1); (PX 18 at 7).  Messenger is globally popular and currently has a monthly user base of approximately 300 million.  (Doc. 75 ¶ 43).  Messenger is also particularly popular among the cryptocurrency community and has been described as the "cryptocurrency world's preferred messaging app."  (Joint Stip. ¶ 23); (Joint Exhibit ("JX") 8 at 12 (Doc. 72-8)).  Telegram was founded with non-profit goals, (JX 8 at 5), and states that Messenger will never charge user fees or introduce advertising on the app, (Joint Stip. ¶ 21).  As such, Messenger has never produced any revenues, (PX 18 at 1, 5), and, excluding the present offering of Grams, the Durov brothers have never received any income from their wildly successful creation.  (Joint Stip. ¶¶ 14–15).

Messenger generates no revenues; nearly all of Messenger's expenses prior to 2018, including salaries and server costs, were paid for by Pavel out of his personal fortune.  (Joint Stip. ¶ 17); (Doc. 80 ¶ 3).  After receiving the $1.7 billion from the private offering of 2.9 billion Grams, Telegram used this newly raised capital to cover "way over 90 percent" of Telegram's expenses, which includes the costs of Messenger.  (PX 12 at 53:2–3 (Doc. 122-12)); (Doc. 80 ¶ 12); (Malloy Decl., Ex. 4 at 1 (Doc. 167-4)).  When describing its projected budgets for 2019 and 2020, which totaled $180 and $220 million respectively, Telegram stated that it still lacked plans to generate revenue from Messenger, so would continue to pay Messenger's way using funds from the offering of Grams and Pavel's personal wealth for the foreseeable future.  (Doc. 80 ¶ 26); (PX 18 at 5, 8).  Telegram subsequently reported that, from January 2018 to January 2020, it spent $405 million, about 24% of the proceeds from the offering of Grams, on the development of the TON Blockchain and the operations of Messenger.  (Joint Stip. ¶¶ 144–45).

B.  The TON Blockchain and Grams.

In 2017, Telegram began development of a proprietary blockchain and digital asset.[2]  (Doc. 75 ¶ 49).  The Durov brothers believed that Telegram could learn from the mistakes of existing blockchains and, by correcting their flaws, enable Telegram's new cryptocurrency to be the first to achieve truly widespread adoption.  (Doc. 75 ¶¶ 46–48).  Telegram's proposed blockchain would be named the "Telegram Open Network" ("TON") Blockchain and its native token would be called the "Gram."[3]  (Doc. 75 ¶¶ 49, 52).

---

[2] A blockchain serves as the means of validating the authenticity of a transfer of a unit of cryptocurrency.  It is a widely distributed but secure ledger or account of transactions.  (Doc. 75 ¶¶ 1–3).  Individual blockchain transactions are grouped together and then recorded in "blocks" that are linked to prior blocks creating a "chain." (Doc. 75 ¶¶ 7–8).  No centralized master copy of the blockchain exists; instead current versions of the blockchain are kept by individual users connected across a network.  (Doc. 75 ¶¶ 9–10); (Waxman Decl. at 1 n.1 (Doc. 16)).

[3] A unit of a cryptocurrency can be used to store and transfer value, provide access to real-world services, offer voting or governance rights within the blockchain, or power applications and smart contracts built into the blockchain.

As part of the offering materials distributed in connection with the 2018 Sales discussed below, Telegram released a White Paper, authored by Nikolai and dated January 18, 2018, that discussed the unique features of the proposed TON Blockchain.  (Joint Stip. ¶ 90); (JX 13 (Doc. 72-13)).  The TON Blockchain would operate as a "Proof of Stake" system, which would rely on validator nodes (computers running full versions of the TON Blockchain software) to authenticate new blocks and to vote on rule changes.  (Joint Stip. ¶¶ 122–23, 125); (JX 13 at 10); (McKeon Report ¶ 86, 190 (Doc. 102-1)).  Validators would earn Grams for their services and would be required to stake at least 100,000 Grams as collateral. (Joint Stip. ¶¶ 125, 127); (JX 13 at 44).  Due to the capital and technical resources required, acting as a validator would be beyond the ability of the hypothetical mass market user of the TON Blockchain.  (Herlihy Report ¶ 19); (JX 13 at 45 ("[O]ne definitely cannot mine new TON coins on a home computer, let alone a smartphone.")).

According to the White Paper, at least initially, the supply of Grams would be limited to five billion, which would be held by Telegram.  (Joint Stip. ¶ 138); (JX 13 at 129).  Each Gram subsequently sold by Telegram would be priced according to a formula that was based on the number of publicly outstanding Grams and priced each Gram slightly higher than the last one sold.  (Joint Stip. ¶¶ 144–46); (JX 13 at 129–31).  The price produced by this formula is called the "Reference Price."  (Joint Stip. ¶ 144); (JX 13 at 129–30).  If the market price of Grams fell below half of the Reference Price, Telegram (or the TON Foundation, discussed below), would have discretion to repurchase Grams and, by reducing the number of Grams in circulation, potentially prevent the market price from falling further.  (Joint Stip. ¶ 122); (JX 13 at 131).

---

(Doc. 16 ¶¶ 4, 5); (Doody Report ¶ 11).  For instance, the native digital asset of the Bitcoin blockchain is Bitcoin and of the Ethereum blockchain is Ether.  (Doc. 75 ¶¶ 22–23); (Doody Report ¶ 10).

C.   The 2018 Sales to Initial Purchasers.

In 2018, Telegram sold "interests in Grams" to 175 entities and high net worth individuals (the "Initial Purchasers") in exchange for dollars or euros.  (Joint Stip. ¶ 40); (Doc. 75 ¶ 100); (JX 11 § 2.3 (Doc. 72-11)).  The agreements (the "Gram Purchase Agreements") entitled the Initial Purchasers to receive an allotment of Grams upon the launch of the TON Blockchain. (Joint Stip. ¶ 140).  Telegram sold to the Initial Purchasers in two rounds:  the "Round One Sales" in January to February 2018 and the "Round Two Sales" in February to March 2018 (collectively, the "2018 Sales").  (Joint Stip. ¶¶ 41, 46, 54).

In the Round One Sales, Telegram sold approximately 2.25 billion Grams to 81 purchasers for $850 million, which included $385.5 million from 34 U.S. purchasers.  (Joint Stip. ¶¶ 48–51); (JX 1 at 5 (Doc. 72-1)); (JX 9 at 17 (Doc. 72-9)).  The Grams are to be delivered when, as, and if the TON Blockchain launches.  The price per Gram was approximately $0.38.  (Joint Stip. ¶ 87).  The Gram Purchase Agreements for Round One Sales included a lockup provision, which bars resale of Grams after their delivery to the Initial Purchaser.  (Joint Stip. ¶ 88).  Three months after receiving the purchased and delivered Grams, the Round One Purchaser would be permitted to resell up to one quarter of its allotment of Grams.  The remaining three quarters of the Grams would be free of restrictions in three equal tranches:  6, 12, and 18 months after the launch of the TON Blockchain.  (Joint Stip. ¶ 88).  By February 2, 2018, the SEC had contacted Telegram regarding the Round One Sales.  (McGrath Decl., Ex. H (Doc. 83-8)); (McGrath Decl., Ex. K at 158:5–159:17 (Doc. 83-11)).  On February 13, 2018, Telegram filed a Form D for the Round One Sales, claiming an exemption under Rule 506(c).  (Joint Stip. ¶¶ 48, 52); (JX 1 at 6).

In the Round Two Sales, Telegram sold approximately 700 million Grams to 94 purchasers for $850 million, which included $39 million from five U.S. purchasers.  (Joint Stip.

¶¶ 55–56); (JX 2 at 5 (Doc. 72-2)).  The price per Gram was approximately $1.33.  (Joint Stip. ¶ 94).  Grams purchased in the Round Two Sales did not carry a lockup provision.  (Joint Stip. ¶ 93).  On March 29, 2018, Telegram filed a Form D for the Round Two Sales, claiming an exemption under Rule 506(c).  (Joint Stip. ¶ 55); (JX 2 at 6).  Because of the claimed exemptions, Telegram did not register or file a registration statement for the Round One Sales or the Round Two Sales.  (Joint Stip. ¶¶ 58–59).  In total, the 2018 Sales raised $1.7 billion in exchange for approximately 2.9 billion Grams, which equates to 58% of all Grams.  (Joint Stip. ¶ 43); (Doc. 75 ¶¶ 102–03); (Doc. 80 ¶ 37).

In advance of the 2018 Sales, Telegram circulated to all Initial Purchasers as well as other prospective purchasers a set of promotional materials, which included, among other things, primers, the Gram Purchase Agreements, the January 18, 2018 White Paper, and an explanation of certain risk factors.  (Joint Stip. ¶¶ 60–64).  These materials detailed the technical specifications of the TON Blockchain and the Gram, the terms of the Gram Purchase Agreements, Telegram's plans for distributing Grams and promoting Grams as a mass market cryptocurrency, as well as the financial opportunity presented by Grams.  (Joint Stip. ¶¶ 60–104).  In particular, the promotional materials specified that 4% of Grams would be reserved for the Telegram developers who were to build the TON Blockchain, including 1% for each Durov brother.  (Joint Stip. ¶¶ 158–59); (JX 9 at 16).  The developers' Grams would be subject to a four-year lockup period post-launch.  (Joint Stip. ¶ 160); (JX 9 at 18).

The 1% of Grams given to each Durov brother is not the full extent of their ability to profit from the 2018 Sales.  Indeed, the offering materials specifically noted that Telegram retained full discretion to allocate the funds raised between the TON Blockchain, Messenger, and Telegram generally.  (JX 15 at 7–8).  While a portion of the $1.7 billion has been used to develop

8

the TON Blockchain, counsel for Telegram made plain at oral argument that Telegram still reserves the right to dividend any unspent portion of the proceeds of the 2018 Sales to Telegram's shareholders, i.e. the Durov brothers. As noted, Messenger charges no user fees and sells no advertising and, thus, the proceeds of the 2018 Sales stand to be a major source of the Durov brothers' profit for their years-long development of Telegram and Messenger.

The offering materials further detailed plans to integrate the TON Blockchain with Messenger in order to "leverag[e] Telegram's massive user base and developed ecosystem." (JX 9 at 11). Specifically, Telegram stated that 10% of Grams would be reserved for use in post-launch incentive programs, which would encourage the widespread adoption of Grams. (Joint Stip. ¶ 163); (JX 9 at 16). Half of this pool, 5% of all Grams, will be "distributed on a first-come, first-served basis to users of Telegram Messenger" who request Grams via a process within Messenger. (Defs.' Resp. Pl.'s 56.1 Statement ¶ 387 (Doc. 95)). Telegram also aimed to ensure that "[t]he Gram will serve as the principal currency for the in-app economy on [Messenger]" and that "Telegram's existing ecosystem will offer simple ways of buying the TON coins (Grams) and a range of services to spend them on, driving demand for the cryptocurrency." (JX 9 at 11, 13). The offering materials described Messenger-integrated applications to further mainstream adoption of the TON Blockchain. In particular, Telegram pitched that "[i]ntegrated into Telegram applications, the TON [W]allet is expected to become the world's most adopted cryptocurrency wallet."[4] (JX 9 at 11). Finally, the offering materials again emphasized that Telegram would use any proceeds raised to fund both the development of the TON Blockchain as well as the ongoing operations and expansion of Messenger. (JX 9 at 19).

---

[4] Digital wallets, pieces of software akin to a bank account for digital assets, store "private keys," which grant control over individual tokens, and permit users to easily send and receive tokens via the blockchain. (Doc. 75 ¶¶ 24–29).

Next, the promotional materials specified that Grams unallocated in the aforementioned plans and unsold in the 2018 Sales, an amount ultimately totaling 28% of Grams, would be allocated to a reserve pool, the TON Reserve.  (Joint Stip. ¶ 162).  Telegram stated its intention to create a non-profit foundation, the TON Foundation, to which it would transfer control of the TON Reserve as well as of governance functions for the TON Blockchain.  (Joint Stip. ¶¶ 147, 151); (JX 15 at 8 (Doc. 72-15)); (JX 9 at 20).  However, Telegram noted that there was no timetable for creating the TON Foundation and stated that it might not be created at all.  (Joint Stip. ¶ 148); (JX 15 at 8).  If the TON Foundation is not formed, then the TON Reserve would purportedly be "locked for perpetuity."  (Doc. 75 ¶ 231).  If created, the TON Foundation would be controlled by a board on which the Durov brothers would sit,[5] (Joint Stip. ¶ 153), and would have discretion to buy and sell Grams as needed to support the market price of Grams.  (Joint Stip. ¶¶ 164–65).  Though Telegram now disclaims the TON Foundation's power to buy Grams on the open market, the offering materials highlighted this power.  (Joint Stip. ¶¶ 167–68); (JX 13 at 131).

Finally, the offering materials stated that participants in the 2018 Sales would receive a substantial discount on the price of Grams as compared to later sales.  (JX 3 at 2 (Doc. 72-3) (describing a "private discount" of between 65.2% and 72% as compared to the price at an eventual public sale)).  Based on the number of Grams sold, the Reference Price of Grams at the launch of the TON Blockchain would be approximately $3.62.  (Joint Stip. ¶ 143).

---

[5] The parties agree that, in its present formulation, the TON Foundation would be overseen by a board consisting of the Durov brothers and three other "independent" members, who would have "no connection to Telegram or its affiliates with experience in blockchain technology and/or TON."  (Joint Stip. ¶ 154).  However, Telegram has not consistently claimed that non-Durov board positions would be held by "independent" directors.  (Drylewski Decl., Ex. 4 at 24 (Doc. 73-4) ("[T]he TON Foundation will have the following associated members or persons: (i) Pavel Durov; (ii) Nikolai Durov; and (iii) any other member or person selected by Pavel Durov and Nikolai Durov prior to the initial issuance of Grams or the incumbent members of the TON Foundation post-initial issuance.")).

D.  Post-2018 Sales Actions.

Following receipt of funds from the 2018 Sales, Telegram began to develop the TON Blockchain and Grams.  As discussed, Telegram also used funds from the 2018 Sales to maintain and expand Messenger.  (Joint Stip. ¶¶ 144–45).  In October 2019, Telegram was prepared to launch the TON Blockchain and distribute Grams to the Initial Purchasers by the end of the month.  (Doc. 75 ¶ 219); (McGrath Decl., Ex. J (Doc. 83-10)).  If Telegram did not deliver Grams to the Initial Purchasers by October 31, 2019, the Gram Purchase Agreements would have obligated Telegram to refund any remaining funds from the 2018 Sales.  (Joint Stip. ¶ 116).  After this litigation commenced, the deadline was extended to April 30, 2020.  (Joint Stip. ¶ 117).  Since then Telegram has also continued efforts to further develop the TON Blockchain.  (Joint Stip. ¶ 210).  On January 6, 2020, Telegram posted a public statement to its website regarding the TON Blockchain, which stated that "Telegram will have no control over TON" and that "Grams won't help you get rich."  (Drylewski Decl., Ex. 3 at 1, 2 (Doc. 73-3)).

E.  Preliminary Injunction Standard in an SEC Action.

Section 20(b) of the Securities Act provides that:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States . . . to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 77t(b) (2018).

The required "proper showing" depends on the nature of the relief sought.  S.E.C. v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 414–15 (S.D.N.Y. 2001).  "A preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to . . . a current violation . . . ."  S.E.C. v. Cavanagh, 155 F.3d 129, 132

(2d Cir. 1998) (quoting <u>S.E.C. v. Unifund SAL</u>, 910 F.2d 1028, 1041 (2d Cir. 1990)).  If the SEC seeks to enjoin an ongoing violation of the securities laws, as is the case here, it must make a proper showing of a risk of future harm, but does not need to show a risk of repetition.  <u>United States v. Or. St. Med. Soc'y</u>, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations. . . . All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur."); <u>S.E.C. v. Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 99 (2d Cir. 1978) ("Except for the case where the SEC steps in to prevent an ongoing violation, this language seems to require a finding of 'likelihood' or 'propensity' to engage in future violations."); <u>see also</u> <u>S.E.C. v. Gentile</u>, 939 F.3d 549, 556 (3d Cir. 2019) ("This principle is a corollary to the most basic rule of preventive injunctive relief—that the plaintiff must show a cognizable risk of future harm." (citing <u>Or. St. Med. Soc'y</u>, 343 U.S. at 333)). The SEC does not need "to show risk of irreparable injury or the unavailability of remedies at law" as required of private litigants.  <u>Unifund SAL</u>, 910 F.2d at 1036.  Therefore, for a preliminary injunction, the SEC must make a substantial showing of the likelihood of success in proving a current violation of the securities law as well as a substantial showing of a risk of future harm in the absence of such an injunction.

     F.  <u>Section 5 Liability and the Howey Test</u>.

        Section 5 of the Securities Act prohibits the offer, sale, or delivery after sale of any security without an effective or filed registration statement.  15 U.S.C. § 77e(a), (c).  As such, a prima facie case of a section 5 violation requires the SEC to show:  (1) that no registration statement was in effect or filed; (2) defendant offered or sold a security; and (3) the offer or sale took place in interstate commerce.  <u>S.E.C. v. Cavanagh</u>, 1 F. Supp. 2d 337, 361 (S.D.N.Y.), <u>aff'd</u>, 155 F.3d 129 (2d Cir. 1998).  In this case, the foundational question is whether Telegram's contract, transaction, or scheme amounts to an offer or sale of a security.

"Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." S.E.C. v. Edwards, 540 U.S. 389, 393 (2004) (quoting Reves v. Ernst & Young, 494 U.S. 56, 61 (1990)).   As such, section 2(a)(1) of the Securities Act defines a "security" to include an "investment contract" as well as investment vehicles such as stocks and bonds.[6]   15 U.S.C. § 77b(a)(1).   Known as the Howey test, the Supreme Court defined an "investment contract" as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298–99 (1946).

"The enterprise and the described materials, by the very nature of the operation of the securities laws, must be examined as of the time that the transaction took place, together with the knowledge and the objective intentions and expectations of the parties at that time." S.E.C. v. Aqua–Sonic Prods. Corp., 524 F. Supp. 866, 876 (S.D.N.Y. 1981) (citing United Hous. Found., Inc. v. Forman, 421 U.S. 837, 852–53 (1975)), aff'd, 687 F.2d 577 (2d Cir. 1982); see also Finkel v. Stratton Corp., 962 F.2d 169, 173 (2d Cir. 1992) ("[A] a sale occurs for [Securities Act] purposes when 'the parties obligate[ ] themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.'" (quoting Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876, 891 (2d Cir. 1972))).

This definition of investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by

---

[6] Section 3(a) of the Securities Exchange Act of 1934 contains a slightly different definition of "security."  15 U.S.C. § 78c(a)(10).  However, "[a]lthough the precise wording of the two definitional sections differs, the Supreme Court has consistently held that the definitions are virtually identical and the coverage of the two Acts may be considered the same.  Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 238 (2d Cir. 1985) (citing United Hous. Found., Inc. v. Forman, 421 U.S. 837, 847 n.12 (1975)).

those who seek the use of the money of others on the promise of profits." Howey, 328 U.S. at 299. In the analysis of purported investment contracts, "form should be disregarded for substance and the emphasis should be on economic reality." Tcherepnin v. Knight, 389 U.S. 332, 336 (1967); see also Forman, 421 U.S. at 849 (stating that "Congress intended the application of [the securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto"); Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1034 (2d Cir. 1974) (asking "whether, in light of the economic reality and the totality of circumstances," an instrument was an investment contract). Disclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive. S.E.C. v. SG Ltd., 265 F.3d 42, 54 (1st Cir. 2001).

The Howey test provides the mode of analysis for an unconventional scheme or contract alleged to fall within the securities laws. Howey itself determined that a "scheme" involving the sale of small tracts of land, evidenced by contracts of sale and warranty deeds, together with service contracts for the growing of oranges on the land amounted to an "investment contract" that was a "security." Howey, 328 U.S. at 299–300. Courts have found other schemes and contracts governing a range of intangible and tangible assets to be securities. Glen-Arden Commodities, 493 F.2d 1027 (whiskey casks); Miller v. Cent. Chinchilla Grp., Inc., 494 F.2d 414 (8th Cir. 1974) (chinchillas); Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) (digital tokens).

G.  Exemptions from the Registration Requirement.

If the relevant instruments are securities and a prima facie case of a section 5 violation is then established, "the burden shifts to the defendant to show that the securities were exempt from the registration requirement." Cavanagh, 155 F.3d at 133 (citing S.E.C. v. Ralston

Purina Co., 346 U.S. 119, 126 (1953)).  "Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public."  S.E.C. v. Cavanagh, 445 F.3d 105, 115 (2d Cir. 2006).  In this case, there are two relevant safe harbors from the registration requirement, section 4(a) of the Securities Act and Rule 506(c) of Regulation D.

Section 4(a)(1) exempts from the registration requirement of section 5 "transactions by any person other than an issuer, underwriter, or dealer," while section 4(a)(2) exempts "transactions by an issuer not involving a public offering."  15 U.S.C. § 77d(a)(1)–(2). Section 2(a)(11) of the Securities Act defines an "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security."  Id. § 77b(a)(11).  A "'distribution,' as used in Section 2[(a)(11),] has been held to mean the equivalent of a 'public offering.'"  Neuwirth Inv. Fund Ltd. v. Swanton, 422 F. Supp. 1187, 1194–95 (S.D.N.Y. 1975); see also Gilligan, Will & Co. v. S.E.C., 267 F.2d 461, 466 (2d Cir. 1959) (stating that a "'distribution' requires a 'public offering'"); Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 215 (3d Cir. 2006) ("[T]hose courts interpreting [section 4(a)(1)] have uniformly concluded that the term 'distribution' is synonymous with 'public offering' as set forth under Section 4[a](2).").

In defining "public offering," the Supreme Court held that "it is essential to examine the circumstances under which the distinction [between public and private] is sought to be established and to consider the purposes sought to be achieved by such distinction."  Ralston Purina Co., 346 U.S. at 124 (quoting S.E.C. v. Sunbeam Gold Mines Co., 95 F.2d 699, 701 (9th Cir. 1938)).  As such, "the applicability of [section 4(a)(2)] should turn on whether the particular class of persons affected need the protection of the [Securities] Act.  An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'"  Id. at 125.  The Second Circuit has also instructed that a "'[d]istribution' comprises

'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'" R. A. Holman & Co. v. S.E.C., 366 F.2d 446, 449 (2d Cir. 1966) (quoting Lewisohn Copper Corp., 38 S.E.C. 226, 234 (1958)), aff'd on reh'g, 377 F.2d 665 (2d Cir. 1967).  In claiming an exemption under section 4(a), the defendant is required to "establish[] that [its] sales do not constitute a disguised public distribution." Cavanagh, 1 F. Supp. 2d at 337.

Rule 506 of Regulation D states that "[o]ffers and sales of securities by an issuer that satisfy the conditions [of this Rule] shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the [Securities] Act."  17 C.F.R. § 230.506(a). To make use of this safe harbor, Rule 506(c) requires that the relevant securities are sold only to accredited investors and that the sales also satisfy Rule 502(d).  Id. § 230.506(c).  Rule 502(d) in turn bars the resale of securities sold under a Regulation D exemption without a registration statement.  Id. § 230.502(d).  Rule 502(d) further requires that the issuer "exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(a)(11) of the [Securities] Act." Id.  Demonstrating reasonable care requires, among other things, "[r]easonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons."  Id.

A defendant, who claims protection of an exemption from registration but fails to meet the requirements of that exemption, will be found to have violated the registration requirements of Securities Act.

H. The Gram Purchase Agreements and Associated Understandings and Undertakings, Including the Expected Resales into the Secondary Market, Are Viewed as One Scheme Under Howey.

Telegram argues that there are two distinct sets of transactions at issue in this case, one subject to the securities laws and one that is not. In Telegram's view, the first set of transactions was the offers and sales of the "interests in Grams," as embodied in the Gram Purchase Agreements, to the Initial Purchasers. While Telegram concedes that the Initial Purchasers' "interest in a Grams" are a security, it claims an exemption from registration under Regulation D. Telegram argues that a second and distinct set of transactions will be the delivery of the newly created Grams to the Initial Purchasers upon the launch of the TON Blockchain. Telegram stresses that, because, upon launch, Grams would have "functional consumptive uses" (i.e. could be used to store or transfer value), Grams would be a commodity and, therefore, not subject to the securities laws. Specifically, Telegram notes that, upon receipt of their Grams, Round Two Purchasers, who are not subject to a contractual lockup period, would then be free to use Grams as a currency to purchase goods or services on the TON Blockchain or to stake their Grams to become validators.

The economic reality of Telegram's course of conduct is straightforward and rather easily understood. Telegram entered into agreements and understandings with the Initial Purchasers who provided upfront capital in exchange for the future delivery of a discounted asset, Grams, which, upon receipt (and the expiration of the lockup periods for Round One Purchasers), would be resold in a public market with the expectation that the Initial Purchasers would earn a profit. A reasonable Initial Purchaser understands and expects that they will only profit if the reputation, skill, and involvement of Telegram and its founders remain behind the enterprise, including through the sale of Grams from the Initial Purchasers into the public market.

The Gram Purchase Agreements and the future delivery and resale of Grams are viewed in their totality for the purpose of the <u>Howey</u> analysis.  In <u>Howey</u>, although the land purchase contracts and the service contracts were separate agreements that took effect at different points in time and a purchaser was not mandated to enter into both, the Court analyzed the entirety of the parties' interaction, finding that the whole scheme comprised a single investment contract and, therefore, a security.  <u>Howey</u>, 328 U.S. at 297–98 (reversing the lower court's decision to "treat[] the contracts and deeds as separate transactions").  This Court finds as a fact that the economic reality is that the Gram Purchase Agreements and the anticipated distribution of Grams by the Initial Purchasers to the public via the TON Blockchain are part of a single scheme.

I.   The Series of Understandings, Transactions, and Undertakings Between Telegram and <u>the Initial Purchasers Is a Security</u>.

As discussed, "a contract, transaction or scheme" is deemed an investment contract if it satisfies the four prongs of the <u>Howey</u> test, namely (1) an investment of money (2) in a common enterprise (3) with the expectation of profit (4) from the essential efforts of another. <u>Howey</u>, 328 U.S. at 298–99.  The Court finds that the SEC has shown a substantial likelihood of success in proving that, at the time of the offers and sales to the Initial Purchasers, a reasonable investor expected to profit from Telegram's continued support for Grams and the underlying TON Blockchain through the distribution of Grams by the Initial Purchasers to the public.  Therefore, the series of understandings, transactions, and undertakings between Telegram and the Initial Purchasers were investment contracts satisfying the <u>Howey</u> test and, therefore, are securities.

i.   The Series of Understandings, Transactions, and Undertakings Should Be <u>Evaluated as of the Time of the 2018 Sales</u>.

Telegram argues that Grams should be evaluated under <u>Howey</u> at the time of their delivery to the Initial Purchasers, i.e. at the launch of the TON Blockchain.  It asserts that it will

not be part of a common enterprise and will not provide essential managerial efforts once the TON Blockchain is launched.  The post-launch distribution of Grams by the Initial Purchasers, Telegram argues, is independent of any Telegram action.  But Howey requires the Court to examine the series of understandings, transactions, and undertakings at the time they were made.  The Court finds that the SEC has shown a substantial probability of success in proving that the series of understandings, transactions, and undertakings are investment contracts, and therefore are securities, under Howey.

Under the Securities Act, "[t]he term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3).  The Second Circuit has held that, for the purposes of the securities laws, a sale occurs when "the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time."  Radiation Dynamics, 464 F.2d at 891; see also Finkel, 962 F.2d at 173.  "[A] contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed."  Yoder v. Orthomolecular Nutrition Inst., 751 F.2d 555, 559 (2d Cir. 1985); Vacold LLC v. Cerami, 545 F.3d 114, 122 (2d Cir. 2008) (stating that a sale occurs "even if the later exchange of money and securities is contingent upon the occurrence of future events, such as the satisfaction of a financing condition, at least when the contingency is not so unlikely that it renders the stock transaction extremely speculative" (citing Yoder, 751 F.2d at 559 & n.4)); Aqua–Sonic Prods. Corp., 524 F. Supp. at 876 (stating that a transaction "by the very nature of the operation of the securities laws, must be examined as of the time that the transaction took place" (citing Forman, 421 U.S. at 852–53)), aff'd, 687 F.2d 577.  Further, there can be little argument that an offer, as a unilateral act, occurs at the time it is made.  15 U.S.C. § 77b(a)(3) ("The term 'offer to sell', 'offer for sale', or

'offer' shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.").

Based on its filed Forms D, Telegram offered and sold Grams to the Initial Purchasers in the Round One and Round Two Sales by, at latest, February 13, 2018 and March 29, 2018, respectively. (JX 1 at 6); (JX 2 at 6). Whether the scheme, viewed as a whole, amounts to a security will be evaluated at this point in time.

    ii.   Investment of Money.

The first prong of Howey examines whether an investment of money was part of the relevant transaction. In this case, the Initial Purchasers invested money by providing dollars or euros in exchange for the future delivery of Grams. (JX 11 § 2.3); (JX 12 § 2.3 (Doc. 72-12)). In total, the Initial Purchasers provided Telegram with approximately $1.7 billion in exchange for the promised delivery of 2.9 billion Grams upon the launch of the TON Blockchain. (Joint Stip. ¶¶ 43, 48, 55); (Doc. 75 ¶¶ 102–03). Telegram does not dispute that there was an investment of money by the Initial Purchasers and the Court finds that this element has been established.

    iii.   Common Enterprise.

The second prong of Howey, the existence of a common enterprise, may be demonstrated through either horizontal commonality or vertical commonality. Horizontal commonality is established when investors' assets are pooled and the fortunes of each investor is tied to the fortunes of other investors as well as to the success of the overall enterprise. Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994); see also SG Ltd., 265 F.3d at 49 (describing "horizontal commonality" as "a type of commonality that involves the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise"); ATBCOIN LLC, 380 F. Supp. 3d at 353. In contrast, strict vertical commonality "requires that the fortunes of investors

be tied to the fortunes of the promoter."[7]  Revak, 18 F.3d at 88 (citing Brodt v. Bache & Co., Inc., 595 F.2d 459, 461 (9th Cir. 1978)); see also In re J.P. Jeanneret Assocs., Inc., 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (stating "that strict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under Howey").

The SEC has shown horizontal commonality.  After the 2018 Sales, Telegram pooled the money received from the Initial Purchasers and used it to develop the TON Blockchain as well as to maintain and expand Messenger.  (Joint Stip. ¶¶ 44–45, 118).  The ability of each Initial Purchaser to profit was entirely dependent on the successful launch of the TON Blockchain.  If the TON Blockchain's development failed prior to launch, all Initial Purchasers would be equally affected as all would lose their opportunity to profit,[8] thereby establishing horizontal commonality at the time of 2018 Sales.

Further, horizontal commonality exists after the launch of the TON Blockchain.  The plain economic reality is that, post-launch, the Grams themselves continue to represent the Initial Purchasers' pooled funds.  ATBCOIN LLC, 380 F. Supp. 3d at 354 (finding a pooling of assets in a post-launch digital asset).  Post-launch, the fortunes of the Initial Purchasers will also remain tied to each other's fortunes as well as to the fortunes of the TON Blockchain.  Upon delivery of the Grams, Round Two Purchasers will possess an identical instrument, the value of which is entirely dependent on the success or failure of the TON Blockchain as well as on Telegram's enforcement of the lockup provisions on Round One Purchasers.  All Initial

---

[7] Strict vertical commonality is distinct from broad vertical commonality that merely requires that "the fortunes of the investors need be linked only to the efforts of the promoter."  Revak, 18 F.3d at 87–88.  In the Second Circuit, broad vertical commonality does not satisfy the common enterprise prong of the Howey test.  Id. at 88.

[8] While schemes with horizontal commonality often include a pro rata distribution of revenues or income, such a pro rata distribution is not a required for horizontal commonality.  ATBCOIN LLC, 380 F. Supp. 3d at 354.

Purchasers, Round One and Round Two, were dependent upon the success of the TON Blockchain software and, if it failed, all Initial Purchasers would suffer a diminution in the value of their Grams.  The investors' fortunes are directly tied to the success of the TON Blockchain as a whole.[9]  Id. (holding that "the value of [a post-launch digital asset] was dictated by the success of the [blockchain] enterprise as a whole, thereby establishing horizontal commonality").  The Court finds that the SEC has made the required showing of horizontal commonality because the record demonstrates that there was a pooling of assets and that the fortunes of investors were tied to the success of the enterprise as well as to the fortunes of other investors both before and after launch.

Alternatively, the SEC has made a substantial showing of strict vertical commonality.  Each Initial Purchaser's anticipated profits were directly dependent on Telegram's success in developing and launching the TON Blockchain.  Telegram's own fortunes were similarly dependent on the successful launch of the TON Blockchain as Telegram would suffer financial and reputational harm if the TON Blockchain failed prior to launch.  Telegram was reliant on funds from the 2018 Sales to meet Messenger's $190 million and $220 million expenses for 2019 and 2020, respectively.  (Doc. 80 ¶ 26); (PX 18 at 5, 8); (Joint Stip. ¶¶ 44–45).  Failure to launch the TON Blockchain by the contractual deadline would require Telegram to return any unspent funds to the Initial Purchaser, depriving Telegram of its primary planned source of funding for Messenger's growing expenses.  This loss of funding could potentially harm Telegram's ability

---

[9] The Initial Purchasers' ability to time their potential sales of Grams or control other aspects of their ownership of Grams are insufficient to negate a finding that a common enterprise exists.  Aqua–Sonic Products Corp., 687 F.2d at 578–79 (finding a common enterprise existed though the relevant investment contract "was optional" and provided investors with control over aspects of the enterprise that affected their profits).  The ability to sell their Grams, and thereby exit the common enterprise, does not mean that the Initial Purchasers are not part of a common enterprise while they continued to possess Grams.

to continue to expand or even maintain its signature product and, thereby, damage the fortunes of the company as a whole.

The offering materials accompanying the 2018 Sales further detail how Telegram's financial fortunes would continue to be inextricably linked to the fortunes of the TON Blockchain and, therefore those of the Initial Purchasers, after launch. After launch, Telegram's most valuable asset would be the TON Reserve, consisting of 28% of all Grams. Telegram states that the TON Reserve would either be transferred to the TON Foundation, (Joint Stip. ¶ 162), or "locked for perpetuity," (Doc. 75 ¶ 231). However, Telegram is under no legal obligation to undertake either course of action and could instead choose to retain control over the TON Reserve.[10] In that case, the TON Reserve would be Telegram's largest asset, thereby linking the company's financial fortunes to the price of Grams and the success of the TON Blockchain.

Telegram would also suffer critical reputational damage if the TON Blockchain failed prior to or after launch. Telegram generated interest in Grams and the to-be-built TON Blockchain based on the reputation of Pavel and his team as the creators of Messenger, a fast growing and well-regarded app. See, e.g., (PX 3 ¶ 12 ("Telegram's founders had already created and launched a successful messenger application, which also gave us confidence that Telegram's ICO would be successful, as compared to unknown teams with no experience bringing a product to market.")). In raising $1.7 billion, Telegram emphasized its technical expertise, promoted its teams of "A-players," (JX 4 at 4 (Doc. 72-4)); (JX 8 at 21–24), and directly affixed its good name to the TON Blockchain (the "Telegram Open Network" Blockchain) and the Gram ("Telegram").

---

[10] Transferring the TON Reserve to the TON Foundation also might not restrict Telegram's control over this pool of Grams as Telegram is under no legal obligation to establish the TON Foundation with an actually independent board. See supra pg. 10 n.5.

As such, the failure of Telegram's new signature cryptocurrency project soon after launch would tarnish the reputations of Telegram and the Durovs.  The impairment of its goodwill, especially in light of its inability to generate revenue from Messenger, would significantly damage Telegram's ability to develop new products, attract needed technical talent, and potentially even to raise the capital needed to sustain Messenger.  Conversely, the successful launch of the TON Blockchain would burnish Telegram's reputation, opening new and potentially financially lucrative doors for its next product idea.  Based on the record presented, Telegram's fortunes are directly tied to the fortunes of the Initial Purchasers, which will rise and fall with the success or failure of the TON Blockchain.  As such, the Court finds that the SEC has made a substantial showing of strict vertical commonality.

       iv.    <u>Expectation of Profit</u>.

       <u>Howey</u>'s third prong examines whether the investor entered the relevant transaction with the expectation of profit.  Telegram disputes that Grams were purchased with an expectation of profit, arguing instead that the Initial Purchasers bought Grams with the expectation to use them as currency.  The Court finds that the SEC has shown a substantial likelihood of success in proving that the Initial Purchasers purchased Grams in the 2018 Sales with an expectation of profit in the resale of those Grams to the public via the TON Blockchain, which would be developed by Telegram and the success of which would be implicitly guaranteed post-launch by Telegram.

       An investor possesses an expectation of profit when their motivation to partake in the relevant "contract, transaction or scheme" was "the prospects of a return on their investment." <u>Howey</u>, 328 U.S. at 301; <u>see also</u> <u>S.E.C. v. Hui Feng</u>, 935 F.3d 721, 730–31 (9th Cir. 2019) (finding the requisite expectation of profit even when this investment intent was secondary to a motive unrelated to profit).  Profit means an "income or return, to include, for example, dividends,

other periodic payments, or the increased value of the investment." Edwards, 540 U.S. at 394; see also Forman, 421 U.S. at 852 (stating that "[b]y profits, the Court has meant either capital appreciation resulting from the development of the initial investment").

In contrast to an investment intent, an individual may acquire an asset with "a desire to use or consume the item purchased." Id. at 852–53. A transaction does not fall within the scope of the securities laws when a reasonable purchaser is motivated to purchase by a consumptive intent. Id. The inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant. Warfield v. Alaniz, 569 F.3d 1015, 1021 (9th Cir. 2009) ("Under Howey, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'").

Based upon the totality of the evidence, the Court finds that, at the time of the 2018 Sales to the Initial Purchasers, a reasonable investor, situated in the position of the Initial Purchasers, would have purchased Grams with investment intent. The Court also finds that, without the expected ability to resell Grams into the secondary market, the $1.7 billion paid to Telegram would not have been raised. Several aspects of the 2018 Sales demonstrate this reasonable expectation of profit.

The sale price of Grams during the Round One and Round Two Sales, approximately $0.38 and $1.33 respectively, (JX 11 at 8); (JX 12 at 2), was set at a significant discount to the expected Reference Price post-launch and the expected market price in a post-launch public market, (JX 13 at 129–31). Upon the launch of the TON Blockchain, the only Grams available for public purchase would either be newly-released Grams from the TON Reserve or

Grams resold by Round Two Purchasers, whose Gram Purchase Agreements did not contain a lockup clause.  Under Telegram's pricing formula, the Reference Price of Grams held in the TON Reserve at launch would be approximately $3.62.  (Joint Stip. ¶ 143).  If the market price reached the Reference Price but no higher, it would offer Round One and Round Two Initial Purchasers an approximate 852% and 172% premium, respectively, over their cost of acquiring Grams.  This would provide a substantial opportunity for the Initial Purchasers to profit on the resale of Grams, even if the market price of Grams fell below the Reference Price as the TON Reserve is not permitted to sell newly floated Grams for less than the Reference Price.  (Joint Stip. ¶ 166); (JX 13 at 131); (Doody Report ¶ 38 (Doc. 122-10)).

Telegram also promoted the TON Foundation's power to support the market price of Grams.  Specifically, the TON Foundation was authorized to repurchase Grams on the open market if their market price fell to half (or less) of the Reference Price, which at launch would equate to approximately $1.81 per Gram.  (Joint Stip. ¶ 167); (JX 13 at 131); (Doody Report ¶ 44).  This provision created the reasonable expectation among Initial Purchasers that, even if the market price of Grams fell, the TON Foundation would support a market price that would enable the Initial Purchasers to sell their Grams at a considerable profit.  (Doody Report ¶ 40).  Further, this price floor mechanism was pitched as a means of arresting and reversing declines in Grams' market price, and thereby protecting the ability of the Initial Purchasers to profit from Gram resales, by reducing the supply of available Grams and presumably increasing the price per Gram.  (Joint Stip. ¶ 122); (JX 13 at 131).

The size and concentration of their Gram purchases indicates that the Initial Purchasers purchased with investment, not consumptive, intent.  The amount of capital raised ($1.7 billion), the large percentage of the total supply of Grams (58%), and the limited number of

Initial Purchasers (175) support the finding that the Initial Purchasers did not intend to use their allotments of Grams as a substitute currency to store and transfer value.

The terms of the Gram Purchase Agreements also point to an investment intent on the part of the Initial Purchasers.  In Round One, Grams were sold at $0.38 per Gram but were subject to a lockup agreement that prevented the Round One Purchasers from reselling their Grams until three months after launch.  (Joint Stip. ¶ 88); (JX 11 § 10.1).  After 3 months, a Round One Purchaser was then permitted to sell up to 25% of its allotment of Grams, with additional tranches of Grams unlocking 6 months, 12 months, and 18 months after launch.  (Joint Stip. ¶ 88); (JX 11 § 10.1).  In contrast, the Grams purchased by the Round Two Purchasers were not subject to such a lockup agreement.  (Joint Stip. ¶ 93).  This differential lockup granted an exclusive window for the Round Two Purchasers—who paid considerably more per Gram—to resell Grams and profit from their investment before Grams owned by Round One Purchasers could be sold into the market and thereby place downward pressure on the price of Grams.  (PX 30 at 11 (Doc. 122-18)).  This exclusive window creates a structural incentive for the Round Two Purchasers to resell their holdings of Grams quickly and indicates that the Round Two Purchasers bought Grams with an investment intent.

Further, the existence of the lockups tend to negate the likelihood that a reasonable Round One Purchaser purchased Grams for consumptive use.  Simply put, a rational economic actor would not agree to freeze millions of dollars for up to 18 months (following a lengthy development period) if the purchaser's intent was to obtain a substitute for fiat currency.  (Doody Report ¶ 5).  The economic reality is that these lockups were part of the bargained-for-exchange with Round One Purchasers, who obtained their Grams at a much lower price than the Round Two Purchasers but with the expectation of a larger profit after the lockup period expired.  The lockups

supported the economic justification for Round Two Purchasers to pay a higher price for Grams because the Round Two Purchasers would have an exclusive window to sell without competition from Round One Purchasers.

The economic realities of the promised integration of Grams and the TON Blockchain with Messenger also support a finding of a reasonable expectation on the part of the Initial Purchasers that Grams would increase in value and return a profit. (Joint Stip. ¶ 9 ("Telegram informed the [I]nitial [P]urchasers that it hoped to integrate the TON Wallet into Telegram Messenger in part to encourage a wide adoption of Grams after launch.")); (JX 8 at 11–14 (primer section entitled "Telegram Messenger-TON Integration")); (JX 13 at 124). Integration of a TON Wallet into Messenger would quickly introduce Grams to Messenger's 300 million monthly user base. This anticipated integration fueled the Initial Purchasers' expectations of a spike in Gram demand upon launch.[11]

Telegram's offering materials targeted buyers who possessed investment intent. Promotional materials emphasizing opportunities for potential profit can demonstrate that purchasers possessed the required expectation of profits. See, e.g., Forman, 421 U.S. at 853–54; Edwards, 540 U.S. at 392. While the offering materials covered some potential consumptive uses, (JX 8 at 14), they also highlighted the opportunity for profit by capital appreciation and resale based on the discounted purchase price.[12] (JX 3 at 2); (JX 8 at 17). Specifically, the promotional materials highlighted the large discount, compared to the Reference Price, (Joint Stip. ¶ 143), as

---

[11] The 2018 Sales also provided the opportunity for the Initial Purchasers to tap into the value created by the growth of Messenger. (Doody Report ¶ 28 ("This integration provides avenues for Gram holders to profit from the growth of Telegram Messenger through their investment in Grams.")); (PX 7 ¶ 7 (Doc. 122-7)).

[12] Information in promotional materials on consumptive uses can still create an expectation of profits if the materials "fuel[] expectations of profit." SG Ltd., 265 F.3d at 54.

well as to the anticipated market price, (JX 3 at 2), at which Initial Purchasers could obtain Grams. The materials also discussed the TON Foundation's ability to provide a price floor for Grams in the case of market turmoil.  (Joint Stip. ¶¶ 164–65); (JX 13 at 131).  In toto, the offering materials fueled the expectation that, after launch, the Initial Purchasers would be able to resell their allotment of Grams for a profit.

Consumptive uses for Grams were not features that could reasonably be expected to appeal to the Initial Purchasers targeted by Telegram.  In seeking participants for the 2018 Sales, Telegram did not focus on cryptocurrency enthusiasts, specialty digital assets firms, or even mass market individuals who had a need for an alternative to fiat currency.  (Doc. 80 ¶ 142); (Doc. 95 ¶ 142).  Instead, Telegram selected sophisticated venture capital firms (and other similar entities) as well as high net worth individuals with an inherent preference (i.e. their business model) toward an investment intent rather than a consumptive use.  (Doc. 80 ¶¶ 139–42); (Doc. 95 ¶¶ 139–42); (PX 18 at 6).

The Court's finding that the Initial Purchasers had a reasonable expectation of profit is buttressed by Initial Purchasers' subjective views, as captured in internal memoranda and emails. The subjective intent of the Initial Purchasers does not necessarily establish the objective intent of a reasonable purchaser.  However, the stated intent of prospective and actual purchasers, though not considered for the truth of their content, may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser.  S.E.C. v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1305 (2d Cir. 1971) (finding that the testimony of individual investors "was relevant to whether [a document] was misleading to the 'reasonable investor'"); Slevin v. Pedersen Assocs., Inc., 540 F. Supp. 437, 441 (S.D.N.Y. 1982).

An actual Initial Purchaser declared that it "purchased Grams with the aim of making a profit when it ultimately sold the Grams" and "did not intend to use Grams for consumptive purposes." (PX 5 ¶¶ 21–22 (Doc. 122-5)). Another Initial Purchaser stated that they "hoped for an increase in the value of Grams and an opportunity to eventually sell Grams if the value increased" and did "not believe that [the investor entity] intended to use Grams as currency or for consumptive purposes." (PX 6 ¶ 6 (Doc. 122-6)). Other Initial Purchasers similarly viewed Grams as an investment, not a consumptive asset. (PX 1 ¶ 14 (Doc. 122-1)); (PX 2 ¶¶ 14, 18 (Doc. 122-2)); (PX 3 ¶¶ 7, 18, 20 (Doc. 122-3)); (PX 4 ¶¶ 6, 13 (Doc. 122-4)); (PX 7 ¶¶ 18, 19, 21); (PX 8 ¶ 11 (Doc. 122-11)); (PX 30 at 11); (PX 31 at 4 (Doc. 122-31)); see also (PX 1 ¶ 15 (stating that "[t]he pricing mechanism described by Telegram indicated that any future token offerings would sell Grams at a higher price")); (PX 7 ¶ 7 (stating that an investor "became interested in investing in the Telegram ICO because [it] did not think it was possible to invest into Telegram, the company, directly")). The subjective views of these Initial Purchasers, taken with the totality of the evidence, support the Court's finding that the SEC has shown a substantial likelihood of success in proving that a reasonable purchaser in the 2018 Sales had an expectation of profit.

Telegram argues that there can be no expectation of profit in light of its disclaimers and public statements emphasizing the consumptive use of Grams and rejecting any expectation of profit. (Drylewski Decl., Ex. 3 at 2 ("Third, you should NOT expect any profits based on your purchase or holding of Grams, and Telegram makes no promises that you will make any profits. Grams are intended to act as a medium of exchange between users in the TON ecosystem. Grams are NOT investment products and there should be NO expectation of future profit or gain from the purchase, sale or holding of Grams.")). However, such statements, including an internet post after

the initiation of this action, are insufficient to negate the substantial evidence that a reasonable purchaser expected to profit from Grams upon their launch.

     v.    <u>Efforts of Another</u>.

The final <u>Howey</u> prong considers whether the expectation of profit stems from the efforts of another.  Though <u>Howey</u> states that the expectation of profits should stem "solely from the efforts of the promoter or a third party," <u>Howey</u>, 328 U.S. at 299, subsequent decisions have focused on whether the "reasonable expectation of profits [were] derived from the entrepreneurial or managerial efforts of others." <u>Forman</u>, 421 U.S. at 852; <u>see also</u> <u>Leonard</u>, 529 F.3d at 88 ("[W]e have held that the word 'solely' should not be construed as a literal limitation; rather, we 'consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'" (quoting <u>S.E.C. v. Aqua–Sonic Prods. Corp.</u>, 687 F.2d 577, 582 (2d Cir. 1982)).  The efforts of promotors, undertaken either before or after gaining control over investor funds, are relevant considerations due to <u>Howey</u>'s focus on economic realities. <u>S.E.C. v. Mut. Benefits Corp.</u>, 408 F.3d 737, 743–44 (11th Cir. 2005) (stating that "[n]either <u>Howey</u> [n]or <u>Edwards</u> require such a clean distinction between a promoter's activities prior to his having use of an investor's money and his activities thereafter" and that "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether <u>Howey</u>'s test is satisfied" (first citing <u>S.E.C. v. Eurobond Exch., Ltd.</u>, 13 F.3d 1334 (9th Cir. 1994); then citing <u>Gary Plastic Packaging Corp.</u>, 756 F.2d 230; and then citing <u>Glen-Arden Commodities</u>, 493 F.2d 1027)).

The Court finds that the SEC has shown a substantial likelihood of success in proving that, at the time of the 2018 Sales, a reasonable Initial Purchaser's expectation of profits

from their purchase of Grams was based upon the essential entrepreneurial and managerial efforts of Telegram.  As Telegram has noted, Grams do not exist and did not exist at the time of the 2018 Sales.  (Doc. 71 at 7, 39).  But the Initial Purchasers provided capital to fund the TON Blockchain's development in exchange for the future delivery of Grams, which they expect to resell for a profit. The offering materials recognize this economic reality and made Telegram's commitment to develop this project explicit.  (JX 8 at 19 (stating that Telegram "intend[s] to use the proceeds raised from the offering for the development of the TON Blockchain")); see also (JX 11 at 7). Thus, to realize a return on their investment, the Initial Purchasers were entirely reliant on Telegram's efforts to develop, launch, and provide ongoing support for the TON Blockchain and Grams.  The Court finds that if, after immediately after launch, Telegram and its team decamped to the British Virgin Islands, where Telegram is incorporated, and ceased all further efforts to support the TON Blockchain, the TON Blockchain and Grams would exist in some form but would likely lack the mass adoption, vibrancy, and utility that would enable the Initial Purchasers to earn their expected huge profits.  See M. Todd Henderson & Max Raskin, A Regulatory Classification of Digital Assets:  Toward an Operational *Howey* Test for Cryptocurrencies, ICOs, and Other Digital Assets, 2 Colum. Bus. L. Rev. 443, 461 (2019) (proposing a "Bahamas Test").  Initial Purchasers' dependence on Telegram to develop, launch, and support the TON Blockchain is sufficient to find that the Initial Purchasers' expectation of profits was reliant on the essential efforts of Telegram.  See ATBCOIN LLC, 380 F. Supp. 3d at 357.

Telegram's advertised promotion of the TON Blockchain and Grams though integration with Messenger created a reasonable expectation in the minds of the Initial Purchasers that their anticipated profits were dependent on Telegram's essential post-launch efforts.  Since announcing the TON Blockchain, Telegram's core message has been that Gram would be the first

digital asset capable of true mass market adoption.  (JX 4 at 1).  Telegram highlighted the value proposition of participating in the launch of the first mainstream cryptocurrency in its offering materials for the 2018 Sales, (JX 8 at 5 (stating that "Telegram is uniquely positioned to establish the mass-market cryptocurrency")); see also (JX 9 at 5); (Joint Stip. ¶ 141), and has continue to emphasize the potential for Gram's mainstream adoption in its more recent public statements, (Drylewski Decl., Ex. 3 at 1 (stating its intention that "Grams will become a true complement to traditional currencies")).  The Initial Purchasers recognized that an investment in Grams was a bet that Telegram could successfully encourage the mass adoption of Grams, thereby enabling a high potential return on the resales of Grams.  See, e.g., (PX 7 at 8 (investment thesis stating that Grams "ha[ve] the potential to be the first truly mass market cryptocurrency")); (PX 31 at 4, 5 (investment thesis highlighting the chance to "ability to participate in what could be a category defining investment" and "[o]pportunity to invest in a token that could prevail as the leading store of value and smart-contract platform")).

At the time of the 2018 Sales, Telegram's stated goal of developing Grams into the first mass market cryptocurrency was plausible, to Telegram, the Initial Purchasers, and the wider market, because of Messenger and its enormous user base.  If the plans for a technically identical blockchain were floated, stripped of Telegram's branding and support, it is unlikely that such an offering would have raised $1.7 billion in less than three months.  Telegram's offering achieved its success because of its stated intention to integrate the TON Blockchain with Messenger in order to encourage the widespread use of Grams.  Telegram knew that Messenger was the critical element for the TON Blockchain to become something more than a new competitor to other cryptocurrencies, bluntly stating that "Telegram will serve as a launch pad for TON, ensuring its technological superiority and widespread adoption at launch."  (JX 9 at 20).  A variety of planned

integrations would introduce Grams to Messenger's 300 million current monthly users as well as to all future Messenger users, a category which appears set to grow quickly.  (PX 17 at 2 (Doc. 122-17) (Pavel writing that he "see[s] both TON and Telegram as integral parts of the success of the project as Telegram provides the necessary userbase and adoption to make the whole idea of mass market crypto-currency work")).

Investors also knew that Messenger represented the key to Grams' mass adoption and therefore expected Telegram to use Messenger to advance this goal.  See, e.g., (PX 32 at 1 ("TON has an effective way to bootstrap the blockchain by leveraging Telegram's 200M active users.")); (PX 2 ¶ 14 ("Telegram already had a captive community of users, which made it less difficult to create a new network.")); (PX 1 ¶ 11 ("I felt that the Telegram Messenger's user base was a factor that was tied to how much demand there would be for Grams in the future.")); (PX 4 ¶¶ 14–15 (investor stating that it "felt that Telegram's Messenger application would continue to drive demand for Grams" and that "Grams would have a good synergy with Telegram's Messenger application")); (PX 5 ¶ 13 ("I viewed the Messenger platform and the to-be-developed TON platform to be connected.")); (PX 7 ¶ 19 ("Our belief was that with 180 million users, Telegram and its applications and uses would grow in popularity, and with increased use and demand the price of Grams would rise over time.")); (PX 33 at 2 ("The Telegram Messenger ecosystem provides a significant go to market advantage for TON.")); see also (PX 1 ¶¶ 11, 15); (PX 2 ¶ 7); (PX 5 ¶ 12); (PX 30 at 5); (PX 31 at 1).  The Initial Purchasers reasonably expected that Telegram would continue to support the TON Blockchain in the post-launch period.

Telegram structured post-launch financial incentives to ensure that the link between Grams and Messenger was unmistakable to users.  As part of its promotion of the 2018 Sales, Telegram stated it planned to reserve 10% of all Grams for post-launch incentive payments to

encourage the growth of the TON ecosystem.  (JX 8 at 18).  Half of this pool, 5% of all Grams or nearly 250 million Grams, would be offered as incentives for Messenger users to try the TON Blockchain for the first time.  (Drylewski Decl., Ex. 5 at 3–4 (Doc. 73-5)).  Grams would be freely "distributed on a first-come, first-served basis to users of Telegram Messenger," who request them via Messenger.  (Doc. 95 ¶ 387); (Drylewski Decl., Ex. 5 at 3–4).  These incentives, which Telegram still plans to employ, are intended to entice Messenger users to interact with the TON Blockchain for a monetary reward, in hopes of generating a host of first time blockchain users.  (Joint Stip. ¶ 163); (Doc. 95 ¶ 387).

The Gram Purchase Agreements anticipate a critical role for Telegram in the post-launch TON Blockchain.  Section 5.2 of both the Round One and Round Two Purchase Agreements oblige Telegram to "use its reasonable endeavours to facilitate the use of [Grams] as the principal currency used on Telegram Messenger by building TON Wallets into Telegram Messenger."  (JX 11 § 5.2); (JX 12 § 5.2).  These still valid provisions created the reasonable expectation in the minds of the Initial Purchasers that, following launch, Telegram would integrate the TON Blockchain with Messenger and, thereby, continue to work to improve and advance the TON Blockchain.  Further, the Gram Purchase Agreements' "Risk Factors" described a pertinent potential risk to the 2018 Sales as the "[r]isks [a]ssociated [w]ith [i]ntegrating the TON Blockchain and Telegram Messenger."  (JX 14 at 5); see also (JX 15 at 5–6).  It continued that "Telegram intends to integrate the TON Blockchain with Telegram Messenger as described in the 'Telegram Messenger-TON Integration' section of the Telegram [Round One] Primer," before warning that, due to any issues with this integration, " adoption of Grams as a form of currency within Telegram Messenger's existing ecosystem may be more limited than anticipated."  (JX 14 at 5); see also (JX 15 at 5–6).  The Gram Purchase Agreements' still enforceable terms set and continue to shape

the Initial Purchasers' expectations and would lead a reasonable purchaser to believe that Telegram would work to integrate Messenger and the TON Blockchain in a manner to advance the TON Blockchain's success.

Indeed, as part of the 2018 Sales, Telegram explicitly promoted multiple ways in which the TON Blockchain and Grams would be directly integrated with Messenger.  In the "Telegram Messenger-TON Integration" section of offering materials, Telegram stated that the official TON Wallet would be integrated into Messenger, thereby allowing Messenger users to control their Grams without leaving the app and permitting Grams to "serve as the principal currency for the in-app economy on Telegram."  (JX 8 at 11, 13 ("Integrated into Telegram applications, the TON [W]allet is expected to become the world's most adopted cryptocurrency wallet.")); (JX 9 at 11); (Joint Stip. ¶ 140); see also (PX 31 at 2 (investor forecast that "[a]t launch, the Telegram TON [W]allet will become the world's most adopted cryptocurrency wallet").  Since the institution of this action, Telegram has purported to abandon of its promise to integrate the TON Wallet into Messenger.  (Drylewski Decl., Ex. 3 at 2 ("At the time of the anticipated launch of the TON Blockchain, Telegram's TON Wallet application is expected to be made available solely on a stand-alone basis and will not be integrated with the Telegram Messenger service.")).  However, such disclaimers are not dispositive and this disclaimer in particular is equivocal on its face.  In the next breath, the disclaimer states that "Telegram may integrate the TON Wallet application with the Telegram Messenger service in the future."  (Id.).

Telegram pledged to give Grams to its development team and the lockup provision governing those Grams fed reasonable expectations that this development team would continue to play an important role in the growth of the TON Blockchain.  Specifically, Telegram has reserved 4% of all Grams for the TON Blockchain development team, including 1% for each Durov brother,

and has stated that these Grams would be distributed subject to a four-year lockup period.  (Joint

Stip. ¶¶ 158–60); (JX 9 at 16, 18).  A lockup period imposed on critical employees aligns their

interests with the success of Grams and the TON Blockchain during the lockup period.  These

lockups have their most plausible and logical economic justification if the employees subject to

the lockup will play a critical role in the ongoing success of the entity.  In fact, one investor

specifically discussed the developer lockup period with Pavel and then told him that, in terms of

Pavel's own allocation of Grams, "more is better!" because it ensured that Pavel's interests were

"fundamental[ly] aligned with the success of TON."  (PX 25 at 2 (Doc. 122-25) (inquiring whether

"the tokens issued to employees and developers pre launch being subject to the same lockup as the

investors [as] [t]his is what typically happens for IPOs to ensure the people needed to deliver the

core intellectual property have incentives to stay engaged through the lockup")); (Doc. 80 ¶ 148).

       The cumulative effective of the advertised integration of the TON Blockchain with

Messenger and the lockups placed on the developer's Grams created a reasonable expectation

among the Initial Purchasers that Telegram would continue to provide essential support for the

TON Blockchain after launch.  See, e.g., (PX 2 ¶ 14 ("Based on Telegram's offering materials, we

also believed that the Telegram team would continue to support and grow the TON network after

launch and make it more useful, and the value of Grams would continue to go up.")); (PX 4 ¶ 14

("Based on the due diligence I did, I expected Telegram to continue to work on the TON

Blockchain platform it was building after launch, which would increase the value of Grams."));

(PX 6 ¶ 3 ("[Initial Purchaser] anticipated that Telegram would remain involved in the

development of the TON network after it was launched.")).  Based on the totality of the evidence,

a reasonable Initial Purchaser would expect Telegram to continue to support and improve the TON

Blockchain post-launch.

The Court finds that the SEC has shown a substantial likelihood of success in proving that the Initial Purchasers' investment was made with a reasonable expectation of Telegram's essential entrepreneurial and managerial efforts to develop and support the TON Blockchain and Grams.

* * *

Examining the totality of the evidence and considering the economic realities, the Court finds that the SEC has shown a substantial likelihood of success in proving that the 2018 Sales were part of a larger scheme, manifested by Telegram's actions, conduct, statements, and understandings, to offer Grams to the Initial Purchasers with the intent and purpose that these Grams be distributed in a secondary public market, which is the offering of securities under Howey.

J.   Grams Are Not Evaluated Upon the Launch of the TON Blockchain.

Telegram argues that Grams, as distinct from the Gram Purchase Agreements, must be evaluated under Howey when the Grams come into existence with the launch of the TON Blockchain.  Telegram then contends that, at launch, Grams would be commodities, not securities, because Grams would be used consumptively, would not be supported by Telegram's essential efforts, and would lack the requisite common enterprise.  Telegram emphasizes that, even if the Court found Grams to be securities at the time of the 2018 Sales, Grams were then covered by a valid Rule 506(c) exemption.  This exemption would extend until the launch of the TON Blockchain, at which point Grams would be commodities not covered by the securities laws.

The Court rejects Telegram's characterization of the purported security in this case. While helpful as a shorthand reference, the security in this case is not simply the Gram, which is

little more than alphanumeric cryptographic sequence.  <u>Howey</u> refers to an investment contract, i.e. a security, as "a contract, transaction or scheme," using the term "scheme" in a descriptive, not pejorative, sense.  <u>Howey</u>, 328 U.S. at 298–99.  This case presents a "scheme" to be evaluated under <u>Howey</u> that consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram.  <u>Howey</u> requires an examination of the entirety of the parties' understandings and expectations.  <u>Howey</u>, 328 U.S. at 297–98 (declining to "treat[] the contracts and deeds as separate transactions").  Further, for the reasons discussed previously, the Court finds that the appropriate point at which to evaluate this scheme to sell and distribute Grams is at the point at which the scheme's participants had a meeting of the minds, i.e. at the time of the 2018 Sales, rather than the date of delivery.[13]

K.  The Grams Sales to the Initial Purchasers Do Not Fall Within an Exemption and so Constitute a Violation of the Securities Laws.

Telegram admits it has filed no registration statements related to any offering of the Gram Purchase Agreements or Grams.  (Joint Stip. ¶ 59).  Instead, Telegram argues that the "offers and sales on interests in Grams" reflected in the Gram Purchase Agreements were made according to valid exemptions to the registration requirement under section 4(a)(2) and Rule 506(c).  (Doc. 71 at 42).  The Court finds that the SEC has shown a substantial likelihood of success in proving that Telegram sold Grams to the Initial Purchasers with the purpose and intent that those Grams then be distributed by the Initial Purchasers into a secondary public market.  Telegram has failed to carry its burden of demonstrating a valid exemption either under section 4(a)(2) or Rule 506(c).  The Court concludes that Telegram's offers and sales of the Grams represent an ongoing violation

---

[13] Even if the Court adopted Telegram's theory and evaluated Grams upon the launch of the TON Blockchain, it does not necessarily follow that Telegram's analysis of the <u>Howey</u> factors at launch is correct and, thereby, that Grams are not a security.

of section 5 and that the final step of this public distribution of a security without a registration statement must be enjoined.

On the evidence presented, the Court finds that the scheme is "a disguised public distribution." Cavanagh, 1 F. Supp. 2d at 337. Telegram's fundamental goal was to establish Grams as "the first mass market cryptocurrency." (JX 4 at 1). Telegram did not intend for Grams to come to rest with the 175 Initial Purchasers but to reach the public at large via post-launch resales by the Initial Purchasers. Therefore, Telegram's sale of Grams to the Initial Purchasers, who will function as statutory underwriters, is the first step in an ongoing public distribution of securities and, as such, Telegram cannot receive the benefit of an exemption from the registration requirement under either section 4(a) or Rule 506(c).

Section 4(a)(2) exempts "transactions by an issuer not involving a public offering" from section 5's registration requirement. 15 U.S.C. § 77d(a)(2). Telegram is the issuer of Grams.[14] A sale of securities is not a public offering when it is made "to those who are shown to be able to fend for themselves." Ralston Purina Co., 346 U.S. at 125. Telegram argues that, because the Grams were offered to the Initial Purchasers, who were undoubtedly sophisticated investors capable of fending of themselves, there was no public offering and the section 4(a)(2) exemption applies to its sales of Grams. However, the ability of the Initial Purchasers to fend for themselves does not end the inquiry if the Grams were not intended to come to rest with the Initial Purchasers.

The Court finds that Telegram did not intend for the Grams to come to rest with the Initial Purchasers. Specifically, Telegram's goal of establishing Grams as "the first mass market

---

[14] "The term 'issuer' means every person who issues or proposes to issue any security; . . . ." 15 U.S.C. § 77b(a)(4).

cryptocurrency" required that the 58% of all Grams sold in the 2018 Sales reach a much wider pool than the 175 Initial Purchasers.  As discussed previously, Telegram built economic incentives into the 2018 Sales, including large discounts and differential lockups, to ensure that the Initial Purchasers resold Grams soon after launch.  Further, Telegram sought out participants for the 2018 Sales, such as major venture capital firms, that would purchase with an investment intent and so would sell their allocation of Grams quickly to earn a profit.

The Second Circuit has held that securities do not come to rest with investors who intend a further distribution.  Gilligan, Will & Co., 267 F.2d at 468 (stating that a security does not come to rest with an investor who purchased "speculatively" and with "a view to distribution"); see also Geiger v. S.E.C., 363 F.3d 481, 487–88 (D.C. Cir. 2004) (stating that one "did not have to be involved in the final step of [a] distribution to have participated in it" and that the purchase of shares at "a substantial discount" followed by their quick resale supported a finding that the shares were not at rest).  The Court finds that Telegram intended that Grams be distributed to the public through the Initial Purchasers.  The Court further finds that the public "need[s] the protection of the [Securities] Act."  Ralston Purina Co., 346 U.S. at 125.  The Court concludes that Telegram's offer and sale of Grams to the Initial Purchasers is a public offering and ineligible for a section 4(a)(2) exemption to the registration requirement.

Rule 506(c) exempts transactions that meet its conditions from section 5's registration requirement.  17 C.F.R. § 230.506(c).  One requirement of Rule 506(c) exemption is that the issuer "exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(a)(11) of the [Securities] Act," which in turns requires a"[r]easonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons."  Id. § 230.502(d).  The Court finds that Telegram failed to use reasonable

care to ensure that the Initial Purchasers were not underwriters, and therefore may not avail itself of a Rule 506(c) exemption.

Section 2(a)(11) defines an "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security."  15 U.S.C. § 77b(a)(11).  And, again, a distribution includes "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'"  R. A. Holman & Co., 366 F.2d at 449.  The Initial Purchasers bought Grams from Telegram, the issuer, with an intent to resell them for profit in the secondary market soon after launch of the TON Blockchain.  The Grams would not and were not intended to come to rest with the Initial Purchasers but instead were intended to move from the Initial Purchasers to the general public.  Therefore, this two-step process represents a public distribution and the Initial Purchasers, who acted as mere conduits to the general public, are underwriters.

Telegram argues that, even if Initial Purchasers are statutory underwriters, it complied with Rule 502(d) by taking reasonable care to ensure that the Initial Purchasers were purchasing for themselves and not to resell to their Grams to others.  Specifically, Telegram points to a representation and warranty in each Gram Purchase Agreement that required the Initial Purchasers to warrant that they were "purchasing the Tokens for [their] own account and not with a view towards, or for resale in connection with, the sale or distribution."  (Doc. 75 ¶ 209); (JX 11 at 20).  However, in evaluating economic reality of this scheme, legal disclaimers do not control.  The representation and warranty that the Initial Purchasers purchased without a view towards resale rings hollow in the face of the economic realities of the 2018 Sales.  From Telegram's perspective, it was critical that the Initial Purchasers could flip their Grams in a post-launch secondary market because this feature would increase the amount of money it could raise.  Based

on these economic realities, Telegram's contrary representations will not be accorded controlling weight.  Telegram did not take reasonable care to ensure that statutory underwriters were not participants in the 2018 Sales.  As the 2018 Sales to the Initial Purchasers were merely a step in a public distribution of Grams and Telegram was aware that Initial Purchasers were statutory underwriters, Telegram's sales of Grams do not qualify for a Rule 506(c) exemption from the registration requirement.

The Court finds that the SEC has shown a substantial likelihood of success in proving that the Gram Purchase Agreements, Telegram's implied undertakings, and its understandings with the Initial Purchasers, including the intended and expected resale of Grams into a public market, amount to the distribution of securities, thereby requiring compliance with section 5.  Telegram has failed to establish an exemption to the registration requirement under either section 4(a)(2) or Rule 506(c).  Further, the Court concludes that the SEC has shown that the sale and imminent delivery of Grams represent a single ongoing violation of section 5.  The Court also finds that the delivery of Grams to the Initial Purchasers, who would resell them into the public market, represents a near certain risk of a future harm, namely the completion of a public distribution of a security without a registration statement.  An injunction, prohibiting the delivery of Grams to the Initial Purchasers and thereby preventing the culmination of this ongoing violation, is appropriate and will be granted.

CONCLUSION

Plaintiff's motion for a preliminary injunction, (Doc. 3), is GRANTED.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 24, 2020