# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>KIK INTERACTIVE INC.,<br><br>     Defendant. | Civil Action No.:<br>19-cv-5244 (AKH) |

## BRIEF OF AMICUS CURIAE THE BLOCKCHAIN ASSOCIATION IN SUPPORT OF DEFENDANT

Keith Bradley
Benjamin Beaton (*pro hac vice* pending)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: 202-457-6000
keith.bradley@squirepb.com
benjamin.beaton@squirepb.com

*Counsel for the Blockchain Association*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ............................................................. 1

SUMMARY OF THE ARGUMENT ......................................................... 1

BACKGROUND ................................................................................... 4

    A.    Digital Assets Are Important to U.S. Economic Growth........................ 4

    B.    Not All Digital Assets Are Alike—and Many Are Not Securities ....................... 5

    C.    The SEC Has Provided Little Regulatory Clarity on the Securities-Law Status of Digital Assets ............................................................. 7

ARGUMENT ......................................................................................... 10

I.    The Pre-Sale Model Is Consistent with SEC Rules and Guidance ................................. 10

    A.    Before these Enforcement Actions, the SEC's Statements Had Encouraged the Exempt Pre-Sale Fundraising Model ............................................ 10

    B.    The *Telegram* Order Contradicted the SEC's Prior Position and the Industry's Reliance ................................................................ 13

    C.    The *Telegram* Order Is Distinguishable Because It Rested on Findings of Fact not Applicable or Appropriate Here on Summary Judgment ...................... 16

II.    The Pre-Sale Model Used By Kik Complies with U.S. Securities Law ......................... 16

    A.    Kik's Pre-Sale Involved a Lawfully Exempt Transaction that Raised Capital to Develop Kin ................................................................ 16

    B.    Kik Used Funds Raised through the Pre-Sale to Develop Kin into a Functional Medium of Exchange that Is Not a Security ............................... 19

CONCLUSION ....................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bildstein v. Mastercard Int'l Inc.*,
    329 F. Supp. 2d 410 (S.D.N.Y. 2004) ...................................................................................13

*Cal. Comms. Against Toxics v. EPA*,
    934 F.3d 627 (D.C. Cir. 2019) ............................................................................................11

*Her Majesty the Queen v. U.S. EPA*,
    912 F.2d 1525 (D.C. Cir. 1990) ..........................................................................................11

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ................................................................................20

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ...................................................................................................20

*SEC v. Sunbeam Gold Mining Co.*,
    95 F.2d 699 (9th Cir. 1938) ................................................................................................17

*SEC v. Telegram Group Inc.*,
    1:19-cv-9439 (S.D.N.Y. Mar. 24, 2020) ....................................................................... *passim*

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ..................................................................................................... *passim*

*Tuccillo v. Geisha NYC, LLC*,
    635 F. Supp. 2d 227 (E.D.N.Y. 2009) ................................................................................16

*United States v. Morrison*,
    529 U.S. 598 (2000) ............................................................................................................15

*United States v. Zaslavskiy*,
    No. 17-cr-647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) .......................................5, 13

**Statutes & Regulations**

15 U.S.C. § 78c .............................................................................................................................5

17 C.F.R. § 200.18 ......................................................................................................................11

17 C.F.R. § 227.100 ......................................................................................................................7

17 C.F.R. § 230.144 ....................................................................................................................15

17 C.F.R. § 230.501 ...................................................................................17

17 C.F.R. § 230.506 .............................................................................13, 17

**Other Authorities**

Bob Pisani, *Bitcoin and Ether are not Securities*, CNBC (June 14, 2018).....................................6

C. Steven Bradford, *Crowdfunding and the Federal Securities Laws* (Oct. 7, 2011) ...............................................................................................7

Hester M. Peirce, *Broken Windows: Remarks before the 51st Annual Institute on Securities Regulation* (Nov. 4, 2019).................................................................8

Hester M. Peirce, *How We Howey* (May 9, 2019)................................................7, 8, 9

Hester M. Peirce, *Running on Empty: A Proposal to Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020) ............................................ passim

Hester M. Peirce, *Secret Garden: Remarks at SEC Speaks* (Apr. 8, 2019)....................................9

Jemayel Khawaja, *Meet the American Legislators Bullish on Blockchain* (Feb. 19, 2019) .................................................................................................5

Joe Mont, *Reps Urge White House to Support Blockchain* (May 29, 2019) ..................................5

Juan Batiz-Benet *et al.*, *The SAFT Project: Toward a Compliant Token Sale Framework* (Oct. 2, 2017) ...........................................................................13

Mark Butler, *SEC Issues Second No-Action Letter for Crypto Sales – This Time for Gamers* (Aug. 8, 2019)........................................................................7

Michael del Castillo, *Blockchain 50: Billion Dollar Babies* (Apr. 16, 2019) ..............................4

Nikhilesh De *et al.*, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (Apr. 6, 2018)............................................................................. passim

Philipp Hacker, *et al.*, *Regulating Blockchain: Techno-Social and Legal Challenges* (1st ed. 2019) .......................................................................11

*Rep. Warren Davidson: You Have to Defend Money to Defend Freedom* (Oct. 22, 2019) .................................................................................................8

SEC, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019) ............................................................................................8, 12

SEC, *Response for Pocketful of Quarters, Inc.* (July 25, 2019) ....................................................8

SEC, *Response for TurnKey Jet, Inc.* (Apr. 3, 2019)....................................................................8

SEC, *The Laws That Govern the Securities Industry, Securities Act of 1933* ...............................17

SEC, *What We Do* ...........................................................................................................................17

Times Talks, *SEC Chairman Jay Clayton & Andrew Ross Sorkin* (Nov. 29, 2018) .....................11

U.S. Congress Joint Economic Committee, *The 2018 Joint Economic Report* ..............................5

William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*,
(June 14, 2018) .................................................................................................. *passim*

Zuluaga, *The SEC Can't Keep Kik-ing the Crypto Can Down the Road*, Coindesk
(June 5, 2019) ...........................................................................................................................8

## INTEREST OF AMICUS CURIAE

The Blockchain Association is a not-for-profit organization that seeks to improve public policy to help blockchain networks develop and prosper in the United States. It seeks to educate policymakers, courts, and the public about how blockchain technology works and how regulatory clarity can bring about a more secure, transparent, and innovative digital marketplace. This future holds immense promise for U.S. consumers, investors, and innovators. Cryptocurrency—only one of many applications of blockchain technology—is by itself at least a $200 billion industry. Many other industries also stand to gain from reduced remittance fees, improved supply chains, and other advantages of the technology. The Blockchain Association comprises 27 member companies, which themselves represent billions of dollars in market capitalization and thousands of employees in the United States. Given the potential impact of this case on our members and the broader industry, the Blockchain Association respectfully submits this brief to aid the Court's consideration and advance the industry's interests in a stable and sensible U.S. legal environment governing their investments and innovation.

## SUMMARY OF THE ARGUMENT

This Court will be among the first to analyze whether, and under what circumstances, blockchain "tokens" or "digital assets" are considered securities. Innovators, investors, users, and regulators will all closely analyze the Court's decision, which will influence decisions in a hundred-billion dollar industry that provides thousands of Americans with jobs. Because of the potential impact of the case and novelty of the issues presented, the Court should decide the case narrowly and based on the established pillars of existing securities law.

The Court must first determine whether the Kik pre-sale to accredited investors and the Kin token sale to public buyers were in fact one integrated sale of securities. The Court must then

apply the familiar test of *Howey v. SEC* to determine whether the Kin tokens were securities: did buyers invest in a common enterprise with the expectation of profits to be derived primarily from the efforts of others? Applying *Howey* to the record evidence in this particular case—rather than issuing a broader ruling that might inadvertently put all cryptocurrency on trial—represents the appropriate and limited approach to the summary judgment motions before the Court. Deciding whether *Howey* applies to the tokens at issue could provide the industry and regulators alike with greater clarity about the applicability of well-established SEC exemptions to newly created digital assets.

The Court should *not* adopt the novel theory advanced in the recent *Telegram* decision: that *complying* with existing securities exemptions by contracting with sophisticated accredited investors amounts to a "scheme" to distribute unregistered securities to the public at some point in the future. The *Telegram* decision treats cryptocurrency as somehow different from every other industry. Following that decision could undermine innovation in an important new field of technology while excluding an industry from the same securities law exemptions that are supposed to apply uniformly.

In this case, the SEC is attempting to leverage the concept of "integration" to sweep under the rug the important differences in Kik's activities. All Kin are "fungible," the SEC says, "and provided their holders with the same rights." SEC's Memorandum of Law in Support of Motion for Summary Judgment at 47 (ECF No. 58) ("SEC MSJ"). This is true, but incomplete. Kik's initial presale, in accordance with Regulation D, raised capital by *promising to deliver* Kin in the future. That enforceable contractual commitment—a genuine "right"—is quite distinct from what an individual buyer of Kin later received: a functional asset to use and consume. The SEC nevertheless contends that the Court should treat these legally and factually distinct sales as a

single distribution or "integrated offerings" in order to manufacture a securities violation. The government's case, therefore, calls into question whether companies may enter into a private placement with sophisticated investors under SEC Rule 506 (Regulation D) to fund a blockchain network, and then later sell (or otherwise distribute) tokens to the public once the network is functional. Improperly conflating Kik's private placement and public sale, however, would defeat the purpose of the SEC's existing rules and contradict its previous position.

Before filing this action, the SEC had provided limited guidance on how to fund and introduce blockchain networks. But what it *had* said differs drastically from its approach to this case. Indeed, the funding model challenged here is one consistent with and encouraged by *the SEC's own statements*, both when Kik launched Kin and even after. The Chairman and the Director of Corporation Finance have acknowledged that a digital asset "can evolve toward or away from a security." De, *infra* n.21. Contrary to the SEC's approach in this case, previously it recognized that "[j]ust because [a particular instrument is] a security today doesn't mean it'll be a security *tomorrow*, and vice-versa." *Id.*; *see also* Hinman, *infra* n.6. The statements came while addressing the "SAFT" ("Simple Agreement for Future Tokens") funding model Kik used in this very case. Accordingly, the agreements at issue promised to deliver tokens to accredited investors only once those tokens provided a functional medium of exchange outside the SEC's own understanding of a security. The investment contract and the underlying asset are distinct. "Conflating the two concepts," as one Commissioner anticipated, "has limited secondary trading and has had disastrous consequences for the ability of token networks to become functional." Peirce, *infra* n.23.

Given these potential implications, the Blockchain Association respectfully requests that this Court follow existing SEC rules and guidance: the sale of digital assets under a statutory exemption, or their circulation to the public once a functional network exists, does not amount to

an improper distribution of unregistered securities. Rather, the fact-specific test under *Howey* continues to govern whether a particular asset amounts to a security.

## BACKGROUND

### A. Digital Assets Are Important to U.S. Economic Growth

A blockchain is a distributed ledger—a database that can accurately, securely, and efficiently record multiple copies of data across many computers in a network. The simplest way to think about a blockchain is as a spreadsheet or database that does not rely on a single party to update entries, but that relies instead on a community or group process for updating and validating data.

Hundreds of innovators—including governments, NGOs, startups, and large public companies like IBM, Microsoft, Amazon, and Walmart—are exploring a wide variety of potential uses for blockchain ranging from election security to drug tracking to identity-fraud prevention.[1] "Digital assets" or "cryptocurrencies" are one important application of this technology. As financial ledgers, blockchains can make financial transactions more programmable and less expensive. Cryptocurrencies allow people to send value across the globe digitally, instantly, and securely, without the need for intermediaries. A digital asset or cryptocurrency consists of tokens—each of which is simply a sequence of letters and numbers. The blockchain records this alphanumeric sequence, and tracks the owners of those tokens and any transfers of that digital asset.

As a result of the benefits of blockchains, policymakers have emphasized the importance of ensuring that blockchain technology can thrive in the United States. A 2018 Joint Economic

---

[1] *See, e.g.*, Michael del Castillo, *Blockchain 50: Billion Dollar Babies*, (Apr. 16, 2019), www.forbes.com/sites/michaeldelcastillo/2019/04/16/blockchain-50-billion-dollar-babies/.

Committee report urged governments "not [to] prejudge and hinder technological developments."[2] A bipartisan group of lawmakers recently recognized that "[b]lockchain is an example of digital innovation that has the potential to transform a myriad of industries through its ability to improve the transparency, efficiency, and security of transactions and information."[3]

## B.  Not All Digital Assets Are Alike—and Many Are Not Securities

The applicability of the securities laws to digital assets is not one-size-fits-all. The definition of "security" under the Exchange Act includes "investment contracts" as well as other familiar instruments such as stocks and bonds, though it excludes commodities and currencies. *See* 15 U.S.C. § 78c(a)(10). The Supreme Court has defined an "investment contract" as (1) the investment of money (2) in a common enterprise (3) with a reasonable expectation of profits (4) to be derived solely from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–300 (1946). The orange-grove interests at issue in *Howey* satisfied these criteria because investors were buying not just land or fruit, but instead the opportunity to receive profits from the efforts of others who promised to use the invested capital to manage the orange grove and sell its fruit. *See id.* The question here is how to apply that WWII-era precedent to a rapidly developing medium of digital exchange.

The fact-specific nature of the *Howey* analysis means some digital assets reflect investment contracts while others do not.[4] Applying *Howey* to novel and varied blockchain projects is not a

[2]U.S. Congress Joint Economic Committee, *The 2018 Joint Economic Report*, at 20–21, 225–26, https://www.congress.gov/115/crpt/hrpt596/CRPT-115hrpt596.pdf.

[3]Joe Mont, *Reps Urge White House to Support Blockchain*, (May 29, 2019), www.complianceweek.com/regulatory-enforcement/reps-urge-white-house-to-support-blockchain/27167.article. "[B]lockchain," lawmakers have recognized, "ha[s] the greatest potential to take us into the fully fledged technological age." Jemayel Khawaja, *Meet the American Legislators Bullish on Blockchain*, (Feb. 19, 2019) (quoting Rep. Tom Emmer), https://media.consensys.net/blockchain-law-congress-house-senate-2019-133e30fd5dd5.

[4]*See, e.g.*, *United States v. Zaslavskiy*, No. 17-cr-647, 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018) ("Whether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry.").

uniform determination; only some will involve common investments in a third party's managerial efforts to turn a profit. The Blockchain Association respectfully urges this Court to recognize that variety and nuance in its review of this case.

To assess whether a token is a security, it is critical to understand the market value and legal significance of a particular asset—a question that varies widely for different digital assets and blockchain systems. So-called "security tokens," for example, entitle their holders to a return on the profits from an investment fund. "Equity tokens" represent ownership of a particular asset, like debt or corporate stock. These are undoubtedly considered securities.

For some digital assets, by contrast, such as the well-known cryptocurrency Bitcoin, a token merely represents ownership of an asset that others are willing to exchange in the marketplace. The token's value comes from other people exchanging that asset for goods and services on the corresponding blockchain network—forming a market for the tokens. In this sense, cryptocurrencies function just like ordinary currencies, the value of which fluctuates based on market participants' demand to use that means of exchange.

Accordingly, the SEC has acknowledged that two of the most notable digital assets—Bitcoin and Ether, accounting for 75% of cryptocurrency market value—are not securities.[5] Holders of these digital assets, the SEC has apparently concluded, have no "expectation of return by a third party," with no central party responsible for the success of the enterprise. According to the SEC's Director of Corporation Finance William Hinman, "the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a

---

[5]Bob Pisani, *Bitcoin and Ether are not Securities*, CNBC (June 14, 2018), www.cnbc.com/2018/06/14/bitcoin-and-ethereum-are-not-securities-but-some-cryptocurrencies-may-be-sec-official-says.html (quoting the SEC's Director of Corporation Finance William Hinman).

security."[6] Thus the SEC has also recognized that purely functional digital assets—offering access to video games or jet travel, for example—are not securities; they merely give holders a stake in the output, rather than equity, of a commercial enterprise.[7]

### C. The SEC Has Provided Little Regulatory Clarity on the Securities-Law Status of Digital Assets

Given the wide range of digital assets, and the importance of their treatment under the securities laws, the SEC might have been expected to provide guidance about their legal status *before* filing an enforcement action. No settled precedent or agency rulemaking addressed whether and when digital assets amounted to securities.[8]

Yet aside from the handful of acknowledgments above, the SEC provided little clarity about its own interpretation of the securities' laws application to digital assets. One SEC Commissioner has likened the SEC's guidance on the question whether digital assets are securities to a Jackson Pollock painting: "splashing lots of factors on the canvas without any clear message."[9] This avant-garde approach has regrettably left policymaking to novel enforcement actions like this one. It exposes blockchain developers and their projects to the threat of ad hoc litigation and enforcement, while depriving the public of any notice or comment. Instead, market participants

---

[6]William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 (citing *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 853 (1975)).

[7]*See, e.g.*, Mark Butler, *SEC Issues Second No-Action Letter for Crypto Sales – This Time for Gamers*, (Aug. 8, 2019), https://www.intelligize.com/sec-issues-second-no-action-letter-for-crypto-sales-this-time-for-gamers/ (reporting on the SEC's no action letters for TurnKey Jet and Pocketful of Quarters).

[8]This ad hoc approach stands in stark contrast to the SEC's approach to the novel regulatory issues concerning crowdfunding ventures like Kickstarter and Indiegogo. There entrepreneurs solicited public investment to develop a project in return for a share of the profits or specific rewards. In response, the SEC (at Congress' direction) engaged in formal rulemaking to promulgate clear exemptions for crowdfunding. *See* 17 C.F.R. § 227.100, *et seq*. That regulatory clarity enabled the flourishing of this powerful tool for small businesses' capital formation. *See, e.g.*, C. Steven Bradford, *Crowdfunding and the Federal Securities Laws* (Oct. 7, 2011), https://www.sec.gov/info/smallbus/acsec/bradford_crowdfunding.pdf.

[9]Hester M. Peirce, *How We Howey* (May 9, 2019), https://www.sec.gov/news/speech/peirce-how-we-howey-050919.

have been forced to hunt for regulatory clues among the SEC's limited grab bag of statements, speeches, no-action letters, closed-door meetings, and settlements.

- **Enforcement:** The SEC has brought a handful of one-off enforcement actions, which have been criticized as "regulation by enforcement rather than by guidance."[10] Even "taken together" with staff guidance, these "offer no clear path for a functioning token network to emerge."[11]

- **Two unhelpful no-action letters:** The industry hoped that the SEC might issue no-action letters indicating parameters for tokens' status as non-securities, but only *two* have issued so far involving tokens that no one ever thought could possibly be considered securities.[12] One addressed what were effectively airline miles (redeemable for flight services at $1 per token),[13] while the other concerned digital arcade tokens developed by a 12-year-old.[14]

- **An open-ended and confusing guidance "framework":** In April 2019, the SEC's Strategic Hub for Innovation and Financial Technology published an informal framework for analyzing whether digital assets are securities.[15] It set forth a laundry list of 38 factors—many with multiple sub-parts—to "consider in assessing whether a digital asset is offered or sold as . . . a security." *Id.* SEC staff defensively cast the Framework as "not a rule, regulation, or statement of the Commission," in an apparent attempt to insulate it from judicial review. *Id.* The Framework was immediately met with external and even internal criticism for its complexity.[16] And the open-ended Framework stands in stark contrast to the statements from Director

---

[10]Kollen Post, *Rep. Warren Davidson: You Have to Defend Money to Defend Freedom* (Oct. 22, 2019), https://cointelegraph.com/news/rep-warren-davidson-you-have-to-defend-money-to-defend-freedom.

[11]*See* Hester M. Peirce, *Broken Windows: Remarks before the 51st Annual Institute on Securities Regulation* (Nov. 4, 2019), www.sec.gov/news/speech/peirce-broken-windows-51st-annual-institute-securities-regulation. In December 2017, the agency settled with Munchee, a food-review app developer. In September 2019, the agency settled civil-penalty charges against Block.one. And the SEC has relied on basic fraud theories to sue RECoin, PlexCoin, and AriseBank.

[12]SEC, *Response for Pocketful of Quarters, Inc.* (July 25, 2019) https://www.sec.gov/corpfin/pocketful-quarters-inc-072519-2a1; SEC, *Response for TurnKey Jet, Inc.* (Apr. 3, 2019), https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1.htm.

[13]TurnKey Jet, Inc., *supra* n.12.

[14]Pocketful of Quarters, Inc., *supra* n.12.

[15]SEC, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019) https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[16]Zuluaga, *The SEC Can't Keep Kik-ing the Crypto Can Down the Road*, Coindesk (June 5, 2019), https://www.coindesk.com/the-sec-cant-keep-kik-ing-the-crypto-can-down-the-road (the framework "turn[ed] the 70-year-old, four-pronged *Howey* test into a 40-point-plus list of potential reasons why the SEC might consider a token offering to be an offering of securities."); Peirce, *supra* n.9 (the framework "could raise more questions and concerns than it answers").

Hinman and others, discussed below, that encouraged the industry's adoption of the exempt pre-sale fundraising model.

- **Closed-door meetings:** The SEC has repeatedly tied up individual projects in extensive pre-launch consultations, creating "a body of secret law" with a "lack of transparency and accountability."[17] Though it "binds market participants *like* law," it remains "immune from judicial—and even Commission—review." Innovators are "literally told if you want to launch a token, whatever you think you want to do with it, come check with the SEC first."

In this case, the SEC has touted its "DAO Report" as providing the industry with notice of potential regulatory enforcement. *See* SEC MSJ at 5, 7–8, 60, 63. This report, the SEC says, gave Kik and the industry all the warning it needed that digital assets could be securities. *See id.* But this single, fact-specific report concerned a particular token that obviously *was* a security. The "Decentralized Autonomous Organization" tokens would entitle token holders to support, vote on, and profit from business ventures—just like a shareholder.[18] Token holders were entitled to vote on projects for the DAO to fund, and the DAO would receive financial returns from the projects and distribute them to token holders. *See id.* The organization's direct-voting structure may have been a novel form of governance, but its tokens plainly were securities. The SEC's report confirming this obvious fact gave innovators and investors little guidance about how to evaluate models different from traditional equity securities. Nor did it provide any warning that the SEC would attempt to prevent those in the blockchain industry from relying on long-standing exemptions like Regulation D.

---

[17]Hester M. Peirce, *Secret Garden: Remarks at SEC Speaks*, (Apr. 8, 2019), https://www.sec.gov/news/speech/peirce-secret-garden-sec-speaks-040819.

[18]*See* SEC Release No. 81207 at 1 (July 25, 2017) ("The holders of DAO Tokens stood to share in the anticipated earnings from these projects as a return on their investment in DAO Tokens."), https://www.sec.gov/litigation/investreport/34-81207.pdf.

**ARGUMENT**

I.    **The Pre-Sale Model Is Consistent with SEC Rules and Guidance**

    A.    **Before these Enforcement Actions, the SEC's Statements Had Encouraged the Exempt Pre-Sale Fundraising Model**

Despite its otherwise hazy regulatory framework, the SEC previously offered consistent guidance on two key points. *First*, the interests or assets embodied in a blockchain token may change over time, such that a token representing a security at one point in time will not necessarily remain a security. A "digital asset can," according to Director Hinman, "over time, become something other than a security." Hinman, *supra* n.6. "[T]he analysis of whether something is a security is *not* static," and an instrument ceases to satisfy *Howey* when "the network on which the token or coin is to function is sufficiently decentralized." *Id*.

*Second*, given this potential for change, the industry could utilize existing exemptions from securities registration and sale requirements to raise capital, particularly through private placements under Regulation D. As Director Hinman has explained, blockchain innovators might "conduct the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and digital assets offer." Hinman, *supra* n.6. "This allows the tokens or coins to be structured and offered in a way where it is evident that purchasers [of the tokens after the network launch] are not making an investment in the development of the enterprise." *Id*. Although the characteristics of the particular offering would always be relevant, Director Hinman made "clear [that] I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction." *Id.*

The Director's remarks reflected existing SEC rules that promulgated after notice and comment, and amounted to an important statement that innovators and investors took seriously.[19] This was entitled to respect as reflecting the agency's views. Director Hinman is "the principal advisor to the [SEC] in matters pertaining to" these provisions of the Securities Act. *Cf. Her Majesty the Queen v. U.S. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (letter from Acting Assistant Administrator of Air and Radiation constituted position of the agency). "[N]othing . . . provides us reason to question his authority to speak for the [agency]." *Cal. Comms. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (reaffirming *Her Majesty the Queen*).[20]

Director Hinman's view finds broad support. It is supported by *Howey* itself, which recognized its test "embodies a flexible rather than a static principle." 328 U.S. at 299. Other SEC Commissioners have also supported Director Hinman's view.

For example, SEC Chairman Jay Clayton has focused on the functionality of the digital asset and explained that: "[t]he ***use*** [of cryptocurrency] can evolve toward or away from a security . . . . Just because it's a security today doesn't mean it'll be a security tomorrow, and vice-versa."[21] Chairman Clayton offered an example of an investor who funds a Broadway play in exchange for presale tickets. The agreement might initially be a security: investors expect profits based on the theatre's ability to produce an attractive show that drives ticket demand and value.[22] But once the

---

[19]*See, e.g.,* Philipp Hacker, *et al.*, *Regulating Blockchain: Techno-Social and Legal Challenges* at 253 (1st ed. 2019) ("Hinman's analysis is broadly consistent with the SAFT white paper's analysis that sales of pre-functional tokens may qualify as securities transactions and, later, when the tokens are functional and sold as useful commodities on a distributed network, no longer qualify as a securities transaction.").

[20]*See also* 17 C.F.R. § 200.18 (duties of Director of Corporation Finance). Director Hinman's speech frequently used the word "we," *cf. Her Majesty the Queen*, 912 F.2d at 1532 (giving weight to similar usage of "we"); and it was posted on the SEC's website.

[21]Nikhilesh De *et al.*, *SEC Chief Touts Benefits of Crypto Regulation*, CoinDesk (Apr. 6, 2018), https://www.coindesk.com/sec-chief-not-icos-bad/.

[22]Times Talks, *SEC Chairman Jay Clayton & Andrew Ross Sorkin* (Nov. 29, 2018), https://www.timestalks.com/talks/timestalksdealbook-andrew-ross-sorkin-and-s-e-c-chairman-jon-clayton/.

show has opened, the tickets would not be securities; they would merely allow the holder to access the show, despite the existence of a secondary ticket marketplace.

Commissioner Hester Peirce likewise has recognized that blockchain projects can "mature into a functional or decentralized network that is not dependent upon a single person or group to carry out the essential managerial or entrepreneurial efforts."[23] Because digital assets can change from securities to non-securities over time, Commissioner Peirce has proposed a three-year "safe harbor" that would allow time for blockchain projects to mature from securities into non-securities through "the development of a functional or decentralized network, exempted from the registration provisions of the federal securities laws." *Id.*

The SEC's Framework for "Investment Contract" Analysis of Digital Contracts expressed a similarly dynamic view of tokens' status. "In evaluating whether a digital asset previously sold as a security should be reevaluated at the time of later offers or sales," the Framework acknowledged, "there would be additional considerations." Framework, *supra* n.15 at 5, 8. The Framework stated explicitly that it was "identif[ying] some of the factors to be considered in determining w*hether and when a digital asset may no longer be a security*." *Id.* at 9 (emphasis added). And all of this is consistent with the SEC's well-known acceptance of Bitcoin and Ether as non-securities, because the digital assets now exist on functional or decentralized blockchain networks.[24]

The exempt pre-sale approach (in this case referred to as a "Simple Agreement for Future Tokens" or "SAFT") that Kik, Telegram, and others have used was designed around this very notion that because the *Howey* analysis can change over time, the analysis is specific to the specific

---

[23]Hester M. Peirce, *Running on Empty: A Proposal to Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020), https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06.

[24]*See* De, *supra* n.21.

instrument or investment contract being sold at a given time. The exempt pre-sale agreement is an investment contract offered by digital asset developers to accredited investors pursuant to Regulation D. 17 C.F.R. § 230.506. Accredited investors fund a token project and receive in return the right to a certain number of the project's tokens. But those tokens would be received in the future, once the network is functional or decentralized. Developers "use the funds to develop genuinely functional network, with genuinely functional utility tokens, and then deliver those tokens to the investors once functional."[25]

### B. The *Telegram* Order Contradicted the SEC's Prior Position and the Industry's Reliance

Despite the SEC's attention to the funding of blockchain projects, only one judicial decision has directly addressed the issue of whether and when digital assets are securities.[26] *See SEC v. Telegram Group Inc.*, 1:19-cv-9439, slip op. (S.D.N.Y. Mar. 24, 2020) (the "*Telegram* Order"). There, the court entered a preliminary injunction halting a cryptocurrency distribution by Telegram Group and TON Issuer ("Telegram"). That interlocutory decision "lacks precedential value because the matter is on appeal." *Bildstein v. Mastercard Int'l Inc*., 329 F. Supp. 2d 410, 415 n. 1 (S.D.N.Y. 2004); Notice of Appeal, *Telegram*, 1:19-cv-09439 (filed Mar. 24, 2020) (ECF No. 228). And the *Telegram* Order is erroneous and distinguishable from this case in important respects.

*Telegram* involved an exempt presale agreement: accredited investors gave money to Telegram to develop a cryptocurrency—"Grams"—in exchange for a future right to receive Grams

[25] Juan Batiz-Benet *et al.*, *The SAFT Project: Toward a Compliant Token Sale Framework*, at 1 (Oct. 2, 2017), https://saftproject.com/static/SAFT-Project-Whitepaper.pdf.

[26] Beyond *Telegram*, the few decisions involving digital assets involved blatant fraud; the securities status of the digital assets themselves was incidental. *See, e.g.*, *Zaslavskiy*, No. 17-cr-647, 2018 WL 4346339 at *1.

after Telegram developed the digital asset and its network. *Telegram* Order at 1. Telegram never distributed Grams to the public or even to the initial investors. *Id.*

It was undisputed that the Grams themselves were ***not*** securities. *See id.* at 38–39. The court, too, correctly recognized that a Gram "is little more than alphanumeric cryptographic sequence, *id.*, and that "an investment of money in a cryptocurrency utilized by members of a decentralized community connected via blockchain technology . . . is not likely to be deemed a security under the familiar test laid out in [*Howey*]." *Id.* at 2. Rather than following an orthodox *Howey* analysis, the *Telegram* court treated the SAFT agreements and "the anticipated distribution of Grams by the Initial Purchasers to the public via the TON Blockchain [as] part of a single scheme." *Id.* at 18. It reached this surprising conclusion because "Initial Purchasers would earn a profit" by reselling the Grams they were to receive according to their SAFT investments. *Id.* at 18.

This holding suffers from at least three critical errors.

*First*, the court conflated distinct securities law concepts: private placements and future distributions. This violates the SEC's own expressed views. Regulation D offerings commonly envision some re-sale by the accredited investors who buy first. But that does not mean that the upstream investor is an underwriter or the downstream sale is a securities offering. Each must be analyzed independently based on the facts at the time. "The 'contract, transaction or scheme' by which the token is sold may constitute an investment contract; but, the object of the investment contract—the token—may not bear the hallmarks of a security. ***Conflating the two concepts has limited secondary trading and has had disastrous consequences for the ability of token networks to become functional***." Peirce, *supra* n.23 (emphasis added).

*Second*, the *Telegram* court never identified the "security" initial purchasers would sell to the public in violation of the securities laws. That security could not have been a Gram, which,

again, the court found "is little more than alphanumeric cryptographic sequence." *Id.* at 38–39; *see also* Hinman, *supra* n. ("the token—or coin or whatever the digital information packet is called—all by itself is not a security, just as the orange groves in *Howey* were not."). The court's silence on this critical issue is deafening in light of the SEC's repeated recognition that a digital asset sale might represent an investment contract at one stage (an exempt pre-sale agreement under Regulation D) but cease to be a security at another point (a decentralized or functional commodity). *See supra* § I.A, p.10. Chairman Clayton, Commissioner Peirce, and Director Hinman have all acknowledged this. It is therefore essential to have clear lines between each regime, as people will not be able to use and trade digital assets if their security-status is perpetually uncertain. The *Telegram* court, regrettably, obscured that distinction by signaling that sales of post-launch Grams by initial investors would involve securities. What that security was or when it would cease to be a security is entirely unclear. This Court should not add to the confusion; the line between security and non-security should remain at the clearest point under existing law.

*Third*, the *Telegram* court ignored that even if Grams would be "securities" when the network is launched, that does not necessarily invalidate Telegram's reliance on Regulation D. There are numerous ways that private investors can sell securities purchased in private placements without violating U.S. securities law. For example, private investors could sell Grams after holding them for more than 12 months under Rule 144 without being "underwriters." *See* 17 C.F.R. § 230.144(b)(1)(i). They could sell Grams to other accredited investors pursuant to Section 4(a)(7) of the Securities Act. Or they could sell Grams in foreign jurisdictions where the tokens would not be treated as a security, regardless of U.S. law. *See United States v. Morrison*, 529 U.S. 598 (2000). By conflating the private placement of investment contracts and future sales of Grams, the

*Telegram* court jumped the gun: it prematurely rejected, or simply ignored, numerous ways that initial investors could comply with U.S. securities law.

### C. The *Telegram* Order Is Distinguishable Because It Rested on Findings of Fact not Applicable or Appropriate Here on Summary Judgment

The *Telegram* court also decided the case on a different standard than the one facing this Court. Although Telegram and the SEC had filed cross-motions for summary judgment, the court specifically avoided ruling on those motions, finding them "unnecessary to reach at this juncture." *Telegram* Order at 3. Instead, the court limited its ruling to the SEC's motion for preliminary injunction motion. *Id.* This left the court free to make factual findings that it could not on summary judgment. *See Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 246 n. 16 (E.D.N.Y. 2009) (summary judgment presents a "completely different procedural posture" from preliminary injunctions where the court "is competent to make findings of fact").

Indeed, the court found "as a fact" what it viewed to be the investors' real expectations. *Telegram* Order at 17–18. That factual finding was central to the *Telegram* court's conclusion that Telegram's exempt pre-sale agreements were "part of a larger scheme." *Id.* at 38; *see also id.* at 25, 30–31, 37. This factual finding was also a necessary predicate before the court could apply the *Howey* analysis to a combination of both the past private placement and expected future Gram sales. This factual finding would not have been appropriate on summary judgment.

## II. The Pre-Sale Model Used By Kik Complies with U.S. Securities Law

### A. Kik's Pre-Sale Involved a Lawfully Exempt Transaction that Raised Capital to Develop Kin

The SEC's prior guidance is correct, while the SEC's position in this litigation is wrong. The SAFT contract model, on which Kik based its pre-sale for Kin, complies with the letter and spirit of the securities laws.

The principal purpose of the federal securities laws is to protect investors.[27] Congress—and, by extension, the SEC—typically seek to protect investors by ensuring they have adequate information upon which to make investment decisions.[28] To that end, the federal securities laws have established a disclosure regime designed to ensure investors receive information that would enable them to weigh the relative merits and risks of an investment. *See SEC v. Sunbeam Gold Mining Co.*, 95 F.2d 699, 701 (9th Cir. 1938). The federal securities laws, however, acknowledge that some sophisticated investors may need less protection. This allows issuers and investors to operate more efficiently by avoiding some of the more burdensome aspects of registration and disclosure. Congress and the SEC have established several different categories of such investors, including "accredited investors." 17 C.F.R. § 230.501(a).

The SAFT pre-sale contracts were indisputably securities. Kik treated them as securities. *See* Kik Interactive, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment at 38–41 (ECF No. 62) ("Kik MSJ"). Kik contracted *only* with accredited investors, relying on Regulation D's Rule 506(c) exemption, and filed a Form D disclosing the sale. *See id.*; *see also* 17 C.F.R. § 230.506(c). Kik then used the proceeds to develop the Kin network into a product that provides genuine utility. *See* Kik MSJ at 6–7. Only once Kin existed as digital tokens tradable on a network did Kik deliver tokens to investors according to their contracts—similar to the way a bond holders receive coupon payments and principal or a futures contract holder takes delivery of the commodity. *See* Kik MSJ at 5, 37 n.11. From a policy perspective, Congress's and the SEC's decision makes sense: the pre-functional investors must be able to bear enterprise risk—which is

---

[27] SEC, *What We Do*, https://www.sec.gov/Article/whatwedo.html ("The mission of the U.S. Securities and Exchange SEC is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.").

[28] SEC, *The Laws That Govern the Securities Industry, Securities Act of 1933*, https://www.sec.gov/answers/about-lawsshtml.html#secact1933 (One of the "basic objectives" of the Securities Act of 1933 is to "require that investors receive financial and other significant information concerning securities being offered for public sale.").

why Kik initially sold Kin to accredited investors—while the eventual token-holders are merely bearing functional-product risk or currency-risk. This tracks how a theatre can provide returns to its investors (Chairman Clayton's analogy) by distributing discounted tickets for the show without the tickets themselves being securities.

The SAFT allows only accredited investors to invest before the network is functional. The SAFT framework seeks to ensure that the appropriate laws apply to the elements of a token sale: when developers agree on the SAFT with investors, they are selling a security subject to the investor-protection laws. And when the tokens are ultimately distributed, the risks that investor-protection laws mitigate are absent. The network is functional, the developers have already expended their efforts, and future purchasers cannot expect profits based on the efforts of others subject to disclosure requirement. This approach to developing a blockchain harmonizes the SEC's mandate of investor protection with the need for capital formation.

Yet this enforcement action bizarrely attacks the decision to use an investment model designed expressly to *comply* with the SEC's own regulations. Nothing in the securities laws or precedent suggests that an issuer cannot enter into an investment contract with accredited investors under Regulation D and deliver the resulting products to those accredited investors in satisfaction of those contracts or sell the product developed through that investment.

Indeed, the entire purpose of the exempt pre-sale model is to provide developers with lawful access to capital from accredited investors to build functional, non-security tokens and networks. This model complies with the securities laws, SEC regulations, and the repeated views of the SEC's Commissioners and Directors. Any particular concerns regarding the implementation or timing of Kik's pre-sale would surely be limited to those specific facts, without implying that

blockchain investments lack access to capital on the same basis as other innovators complying with U.S. securities laws.

## B. Kik Used Funds Raised through the Pre-Sale to Develop Kin into a Functional Medium of Exchange that Is Not a Security

The SEC never argues that Kin tokens constitute securities on their own. Instead, the SEC's *Howey* analysis is premised on conflating the pre-sale SAFT contracts with Kin tokens sold to the public during Kin's "Token Distribution Event" or the "TDE." *See, e.g.*, SEC MSJ at 30 (asserting Kin purchasers expected profits because "SAFT participants had a profit incentive"). Properly analyzing Kin tokens on their own leads to the conclusion that the SEC cannot establish that they are securities, on the current summary judgment record, for multiple reasons.

*First*, Kik used the capital it raised during the pre-sale to develop Kin into an autonomous and operational digital asset. Especially at the summary-judgment stage, it is impossible to ignore the steps reflecting Kik's development of the technology, launch of Kin, and implementation of Kin into Kik Messenger; these undoubtedly allowed users to consume and use Kin in an autonomous manner. *See* Kik MSJ at 6–7, 10–11. Because Kik built Kin on the Ethereum blockchain, which Kik did not control, Kin operated as a medium of exchange that could be used by anyone, for any transaction, outside of Kik's control. *See id.* at 11–12. The SEC cannot dispute that Kin is usable as a medium of exchange, much less establish that undisputed facts show it is *not* a useful medium of exchange. Nor can it deny that Kin is built on an open-source platform, so that any developer can incorporate Kin into its own applications. *See id.*

*Second*, attempts to fit Kin into *Howey*'s "investment contract" similarly fail for lack of commonality. "Horizontal commonality" represents this Court's standard way of assessing the existence of a common enterprise. That requires showing "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the

pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87–88 (2d Cir. 1994). That plainly did not exist for sales of Kin to public purchasers in the TDE, since Kik owed no ongoing contractual obligations to those purchasers. *See* Kik MSJ at 18–21. Instead, those initial public purchasers obtained complete control over their Kin and, of course, could decide to resell the Kin or exchange them for goods of services. *Id.* at 21–23. The money Kik received from the TDE was not "pooled," tying investors' fortunes to one another, either. Proceeds from the sale of Kin through the TDE went to Kik, as occurs when a company sells any product or commodity, with no corresponding equity stake or right to receive interest, dividends, or other pro rata profit sharing. *See id.* at 23–25.

Nor would there be "strict vertical commonality," a mode of common enterprise that the Second Circuit has neither adopted nor foreclosed. This type "requires that the fortunes of investors be tied to the fortunes of the promoter." *Revak*, 18 F.3d at 88. The SEC argues such fortunes are sufficiently tied because "Kin investors understood that their fortunes would rise and fall with those of Kik because of Kik's large stake in Kin." SEC MSJ at 24–25. This makes little sense. Mere ownership of the same asset does not give rise to strict vertical commonality. Returning to Chairman Clayton's example, a theatre company promoting a Broadway play owns the same assets that it sells to the public: tickets to the show. If the show is a hit, both the theatre company and public purchasers can sell tickets to future shows for more money. But that does not place the theatre company in strict vertical commonality with every person who purchased a ticket. *See also* Kik MSJ at 25–27; *Marini v. Adamo*, 812 F. Supp. 2d 243, 257–58 (E.D.N.Y. 2011) (ownership of same coins such that "their fortunes rise and fall together from owning identical property" insufficient for strict vertical commonality where purchasers are "free to direct the sale of [their] coins separate and apart from [the defendant's] decision to sell his coins").

The SEC attempts to shortcut the real meaning of commonality by asserting that "[a]ll of the Kin . . . were fungible and provided their holders with the same rights." SEC MSJ at 47. This is mere rhetoric. The SEC never identifies a single right that a holder of Kin has. To be sure, all holders of Kin have one right in common—the mere right to hold the Kin themselves. The SEC's argument that holders of Kin have pooled investments because Kin all carry the same rights would, if it were correct, also show that holders of dollars, Bitcoin, and baseball cards have also pooled their funds—those holders, too, all have the same rights to hold the same assets.

The SAFTs, of course, gave their holders genuine pooled rights, and claims upon Kik obligating Kik to develop Kin as a product and deliver it. The SEC insists that all Kin carry the same rights, but ignores the fact that a holder of Kin, in itself, has rights quite different from (and far narrower than) a SAFT purchaser had.

*Third*, the SEC cannot point to undisputed facts that TDE purchasers had an "expectation that they would earn a profit solely through the efforts" of others. *Howey*, 328 U.S. at 298. While the SEC asserts that TDE purchasers bought Kin to profit, SEC MSJ at 30–31, Kik has submitted contrary evidence. More than 10,000 purchasers bought Kin, half of whom bought less than $1,000 worth of Kin. Many are actively using and enjoying its features. *See* Kik MSJ at 10–13. This contrasts markedly from the 175 investors in the Telegram SAFT that purchased more than $1 *billion* in Grams.

## CONCLUSION

The Blockchain Association respectfully requests that this Court deny the SEC's motion for summary judgment, and ensure its ruling is narrowly tailored to avoid casting doubt on cryptocurrency projects not before the Court.

Dated: April 17, 2020.

Respectfully submitted,

S/ *Keith Bradley*

Keith Bradley
Benjamin Beaton (*pro hac vice* pending)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
Telephone: 202-457-6000
keith.bradley@squirepb.com
benjamin.beaton@squirepb.com

*Counsel for the Blockchain Association*