**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**U.S. SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

        **vs.**

**KIK INTERACTIVE INC.**

                              **Defendant.**

---

**Case No.  19-cv-5244 (AKH)**

**PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   COUNTER-STATEMENT OF FACTS..................................................................4

    A.  Kik Marketed And Sold Kin As A Way For All Investors To Profit From
        Kik's Managerial and Entrepreneurial Efforts .................................................4

       1.  Kik Promised To Develop An Ecosystem That Would Let Investors
           "Make A Lot Of Money"......................................................................4

       2.  Kik Courted "Whales" Who Would Invest Large Amounts of
           Money In The Public Sale ...................................................................6

    B.  Kik Conducted One Marketing Campaign That Included Both SAFT
        Participants and Public Investors ......................................................................7

    C.  Kik Met Its Aggregate $100 Million Fundraising Goal................................10

    D.  At The Time Investors Received Their Kin, There Was Nothing To Buy.........11

    E.  Kik's Claims About The Kin Ecosystem Today Are Irrelevant To
        Kik's Violation Of Section 5 ............................................................................11

III.  STANDARD OF REVIEW ...................................................................................12

IV.  ARGUMENT.........................................................................................................12

    A.  Kik Offered And Sold Investment Contracts To The Public Investors ...........13

       1.  Public Investors Entered A Common Enterprise Among Themselves
           And With Kik .................................................................................. 18

          a.  Kin Investors Did Not Require "Ongoing Contractual Obligations"
              To Invest In A Common Enterprise ............................................. 20

          b.  Kik's Pooling Of Funds For Use In Launching Kin and Developing
              The Kin Ecosystem Created Horizontal Commonality .......................... 25

          c.  Kin Investors Invested In A Common Enterprise Even Though
              They Could Resell Their Kin ....................................................... 26

          d.  Kik's Ownership Of Trillions Of Kin Created Vertical Commonality ............... 29

       2.  Kin Investors Reasonably Expected Profits Derived From Kik's
           Entrepreneurial And Managerial Efforts ......................................... 31

          a.  Public Investors In Kin Reasonably Expected Profits ....................... 32

          b.  Kin Investors Reasonably Expected Profits Based On Entrepreneurial
             Or Managerial Efforts From Kik ................................................... 37

       3.  Alleged Potential Regulation Of Kin By Other Agencies Does Not Affect
           Whether Kik Offered And Sold Investment Contracts................................44

    B.  Kik Is Not Entitled To An Exemption For The Portion Of Its Public
        Distribution That It Conducted Through SAFT Participants ................................48

i

|     |     |     |     |
| --- | --- | --- | --- |
| | 1. | Kik Engaged In A Single Distribution, Not Two Offerings | 48 |
| | 2. | Even if Kik Engaged in Two Separate Offerings, They Should Be Integrated Into A Single Non-Exempt Offering | 52 |
| | 3. | Kik's Public Distribution of Kin Through SAFT Participants Cannot Qualify For The Rule 506(c) Exemption | 53 |
| | 4. | Kik's Public Distribution of Kin Does Not Qualify For An Exemption Under Section 4(a)(2) of the Act | 57 |
| V. | CONCLUSION | | 58 |

## TABLE OF AUTHORITIES

**Cases**

*Albanese v. Fla. Nat'l Bank of Orlando*,
    823 F.2d 408 (11th Cir. 1987) ........................................................................ 18, 40

*Aldrich v. McCulloch Properties, Inc.*,
    627 F.2d 1036 (10th Cir. 1980) ...................................................................... 15, 41

*Alunni v. Development Resources Group, LLC*,
    445 Fed. Appx 288 (11th Cir. 2011) ......................................................... 23, 24, 29

*Balestra v. ATBCoin LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ........................................................... 20, 25

*Bamert v. Pulte Home Corp.*,
    445 F. App'x 256 (11th Cir. 2011) ...................................................................... 18

*Baroi v. Platinum Condo Dev., LLC*,
    914 F. Supp. 2d 1179 (D. Nev. 2012) .................................................................. 23

*Bender v. Cont'l Towers Ltd. P'ship*,
    32 F. Supp. 497 (S.D.N.Y. 1986) ................................................................... 22, 42

*Berman v. Bache, Halsey, Stuart, Shields, Inc.*,
    467 F. Supp. 311 (S.D. Ohio 1979) ..................................................................... 47

*Cameron v. Outdoor Resorts of America*,
    608 F.2d 187 (5th Cir. 1979) ....................................................................... 34, 36

*CFTC v. McDonnell*,
    287 F. Supp. 3d 213 (E.D.N.Y. 2018) .................................................................. 46

*Continental Marketing Corp. v. SEC*,
    387 F.2d 466 (10th Cir. 1967) ............................................................................ 16

*Copeland v. Hill*,
    680 F. Supp. 466 (D. Mass. 1988) ...................................................................... 29

*Davis v. Rio Rancho Estates, Inc.*,
    401 F. Supp. 1045 (S.D.N.Y. 1975) ..................................................................... 23

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
    608 F.2d 1297 (9th Cir. 1979) ............................................................................ 22

*Finkel v. Stratton Corp.*,
    962 F.2d 169 (2d Cir. 1992) ............................................................................... 55

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ............................................................................... 42

*Glen-Arden Commodities, Inc. v. Costantino,*
   493 F.2d 1027 (2d Cir. 1974) ................................................................................ 14

*Goodwin Props. LLC v. Acadia Grp., Inc.,*
   No. 01-49 (PC), 2001 WL 800064 (D. Me. July 17, 2001) .............................. 53

*Grenader v. Spitz,*
   537 F.2d 612 (2d Cir. 1976) ................................................................................ 34

*Happy Inv. Gp. v. Lakeworld Properties, Inc.,*
   396 F. Supp. 175 (N.D. Cal. 1975) .................................................................... 23

*Hocking v. Dubois,*
   885 F.2d 1449 (9th Cir. 1989) ............................................................................ 15

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel,*
   439 U.S. 551 (1979) .............................................................................................. 47

*Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.,*
   205 F. Supp. 2d 243 (S.D.N.Y. 2002) ............................................................... 30

*Kemmerer v. Weaver,*
   445 F.2d 76 (7th Cir. 1971) ................................................................................ 34

*Lavery v. Kearns,*
   792 F. Supp. 847 (D. Me. 1992) .................................................................. 22, 29

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,*
   179 F. Supp. 2d 159 (S.D.N.Y. 2001) ............................................................... 42

*Long v. Shultz Cattle Co., Inc.,*
   881 F.2d 129 (5th Cir. 1989) ................................................................ 27, 41, 42

*Marini v. Adomo,*
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) ............................................................... 29

*Mautner v. Alvin H. Glick Irrevocable Grantor Tr.,*
   2019 WL 6311520 (S.D.N.Y. Nov. 25, 2019) ............................................. 29, 32

*Noa v. Key Futures, Inc.,*
   638 F.2d 77 (9th Cir. 1980) ............................................................................ 29, 42

*R.A. Holman & Co. v. SEC,*
   366 F.2d 446 (2d Cir. 1966) ................................................................................ 57

*Radiation Dynamics, Inc. v. Goldmuntz,*
   464 F.2d 876 (2d Cir. 1972) ................................................................... 12, 44, 55

*Revak v. SEC Realty Corp.,*
   18 F.3d 81 (2d Cir. 1994) .............................................................................. 19, 25

*Reves v. Ernst & Young*,
 494 U.S. 56 (1990) ............................................................................................. 47

*Rodriguez v. Banco Cent. Corp.*,
 990 F.2d 7 (1st Cir. 1993) ...................................................................... 15, 22, 42

*Savino v. E.F. Hutton & Co., Inc.*,
 507 F. Supp. 1225 (S.D.N.Y. 1981) ............................................................. 26, 30

*SEC v. Aqua–Sonic Prods. Corp.*,
 524 F. Supp. 866 (S.D.N.Y. 1981) .......................................................... 14, 44, 55

*SEC v. Aqua–Sonic Prods. Corp.*,
 687 F.2d 577 (2d Cir. 1982) .......................................................... 14, 27, 32, 41

*SEC v. Battoo*,
 158 F. Supp. 3d 676 (N.D. Ill. 2016) ................................................................. 24

*SEC v. Belmont Reid*,
 794 F.2d 1388 (9th Cir. 1986) ........................................................................... 42

*SEC v. C.M. Joiner Leasing Corp.*,
 133 F.2d 241 (5th Cir. 1943) ............................................................................. 16

*SEC v. C.M. Joiner Leasing Corp.*,
 320 U.S. 344 (1943) ............................................................................ 2, 15, 21, 51

*SEC v. Cavanagh*,
 1 F. Supp. 2d 337 (S.D.N.Y. 1998) .................................................................... 57

*SEC v. Cavanagh*,
 445 F.3d 105 (D.C. Cir. 2006) ..................................................................... 49, 54

*SEC v. Edwards*,
 540 U.S. 389 (2004) ................................................ 2, 13, 27, 32, 38, 41, 45

*SEC v. Galaxy Foods, Inc.*,
 417 F. Supp. 1225 (E.D.N.Y. 1976) ................................................................... 26

*SEC v. Glenn W. Turner Enter.*,
 474 F.2d 476 (9th Cir. 1973) ............................................................................. 26

*SEC v. Hui Feng*,
 935 F.3d 721 (9th Cir. 2019) ............................................................................. 32

*SEC v. Infinity Group Co.*,
 212 F.3d 180 (3d Cir. 2000) ................................................................... 19, 25, 28

*SEC v. Koscot Interplay, Inc.*,
 497 F.2d 473 (5th Cir. 1974) ....................................................................... 28, 41

*SEC v. Life Partners, Inc.,*
    87 F.3d 536 (D.C. Cir. 1996) ........................................................................... 26, 42

*SEC v. Ralston Purina Co.,*
    346 U.S. 119 (1952) ..................................................................................... 48, 57

*SEC v. Schooler,*
    905 F. 3d 1107 (9th Cir. 2018) ........................................................................... 53

*SEC v. SG Ltd.,*
    265 F.3d 42 (1st Cir. 2001) ...................................................................... 17, 33, 37

*SEC v. Shavers,*
    No. 13 Civ. 416, 2013 WL 4028182 (E.D. Tex. Aug. 6, 2013) ......................................... 46

*SEC v. Shields,*
    744 F.3d 633 (10th Cir. 2014) ........................................................................ 14, 17

*SEC v. Telegram Group Inc.,*
    No. 19 Civ. 9439 (PKC), 2020 WL 1430035 (S.D.N.Y. Mar. 24, 2020) .............................. *passim*

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) ....................................................................... 1, 13, 21, 32, 33

*Solis v. Latium Network, Inc., No.*
    18 Civ. 10255 (SDW-SCM), 2018 WL 6445543 (D.N.J. Dec. 10, 2018) ............................. 20, 37

*Tcherepnin v. Knight,*
    389 U.S. 332 (1967) ....................................................................................... 14

*Timmreck v. Munn,*
    433 F. Supp. 396 (N.D. Ill. 1977) ......................................................................... 23

*United Hous. Found., Inc. v. Forman,*
    421 U.S. 837 (1975) ........................................................ 13, 14, 22, 32, 33, 34, 41, 44

*United States v. Leonard,*
    529 F.3d 83 (2d Cir. 2008) ....................................................................... 14, 16, 32

*United States v. Ulbricht,*
    31 F. Supp. 3d 540 (S.D.N.Y. 2014) ...................................................................... 46

*United States v. Zaslavskiy,*
    2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ............................................................ 20

*Wals v. Fox Hills,*
    24 F.3d 1016 (7th Cir. 1994) ............................................................................. 22

*Walsh v. Int'l Precious Metals Corp.,*
    510 F. Supp. 867 (D. Utah 1981) ......................................................................... 47

*Woodward v. Terracor,*
　574 F.2d 1023 (10th Cir. 1978) .......................................................................... 21

**Statutes**

17 C.F.R. § 230.502 ................................................................................................. 52

17 C.F.R. § 230.506 ................................................................................................. 55

31 C.F.R. § 1010.100 ............................................................................................... 45

7 U.S.C. § 2 ............................................................................................................. 47

15 U.S.C. § 77b ......................................................................................... 45, 54, 55

15 U.S.C. § 77d ...................................................................................................... 57

15 U.S.C. § 77n ...................................................................................................... 15

15 U.S.C. § 78c ...................................................................................................... 45

**Other**

Fed. R. Civ. P. 56 .................................................................................................. 12

*In re Bitcoin Inv. Tr.,*
　Release No. 78282, 2016 WL 4363462 (July 11, 2016) .................................... 45

*In re BTC Trading, Corp.,*
　Release No. 9685, 2014 WL 6872955 (Dec. 8, 2014) ....................................... 45

*In re Coinflip Inc.,*
　Release No. 33538, 2015 WL 5535736 (Sept. 17, 2015) ................................... 45

*IRS Notice 2014-21,*
　2014-16 I.R.B. 938, 2014 WL 1224474 (Apr. 14, 2014) ................................... 46

SEC Rule 502 ............................................................................................ 55, 56, 57

SEC Rule 506 ............................................................... 3, 4, 48, 51, 52, 53, 56, 57

SEC Rule 508 .......................................................................................................... 56

*Section 3(a)(11) Exemptions for Local Offerings,*
　26 Fed. Reg. 11896, 1961 WL 61651 (Dec. 6, 1961) ........................................ 53

Plaintiff U.S. Securities and Exchange Commission ("SEC") respectfully submits this memorandum in opposition to the motion of defendant Kik Interactive Inc. ("Kik") for summary judgment.  For the reasons set forth below, the Court should deny Kik's motion.

## I.  PRELIMINARY STATEMENT

Kik's 2017 offer and sale of digital assets called "Kin" – generating proceeds of $100 million for Kik and its failing Messenger business – was a single public distribution of securities.  During a highly publicized, four-month marketing campaign, Kik declared that, in exchange for payment, Kik would deliver Kin to investors on a future date and launch the "Kin Ecosystem."  In a torrent of public statements delivered during the same campaign, Kik promised that, after delivering the Kin, the company would take specific actions to develop the Ecosystem and to drive up demand for Kin, thereby increasing Kin's "value" and enabling investors and Kik to "make a lot of money."  Kik bluntly put its own reputation on the line, announcing that Kik was "all in," and "that Kik has both the experience and the resources, and the user base to really make this happen."  Kik told investors that it was providing them a "covenant" to take these future steps.  Because Kik conducted a public offering of securities, in the form of investment contracts, without filing a registration statement with the SEC or having an exemption from registration available, Kik violated Section 5 of the Securities Act of 1933 ("Securities Act" or "Act").

Kik now asserts, as to about half of its offering, that two of the three elements of an investment contract required by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), are not met.  These arguments – addressing the Kin that Kik sold to investors through its so-called "public sale" in September 2017 (referred to here as the "public investors") – are without merit.  *First*, Kik's argument that public investors did not invest in a "common enterprise," because they "checked a box" indicating that they agreed to certain, on-line, contractual, disclaimers, ignores decades of case law and economic reality.  The Supreme Court and lower courts have long made clear that determining the existence of

1

an investment contract requires "go[ing] outside the [offering] instrument itself" and assessing "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943). The economic reality of the offering, reflected in Kik's statements about how public investors would jointly benefit from the company's promised use of their funds, is that the investors and Kik were in a common enterprise.

**Second,** the record overwhelmingly demonstrates that public investors reasonably expected "profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (internal quotation omitted). Kin, unlike real estate or commodities such as gold and silver, did not have inherent value, and would not even exist if Kik had not created it. Thus, throughout its four-month marketing campaign, Kik repeatedly emphasized that it could and would "establish" and "build" value for Kin through the different actions it promised to take. Among other things, Kik would be the Kin Ecosystem's "champion," and would "pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Kin Ecosystem to its millions of users." Kik also repeatedly stated that public investors could expect to liquidate their Kin holdings on exchanges. In addition to these scores of public statements, Kik strategized on how to attract "cryptoinvestors," targeted audiences that would include "investors," and gave special treatment to "whale" investors who would spend a lot of money in the public sale.

While, at times, Kik characterized Kin as a "medium of exchange" for the Ecosystem, this was not the sole or even the primary focus of Kik's advertising. At no point during its marketing campaign did Kik identify any specific good or service that could be purchased with Kin. The public sale results confirm Kik's overarching message of Kin as an investment:  over 70 percent of the $49 million collected by Kik during the purported public sale portion of the offering came from investors spending *at least $5,000*, while *less than .09 percent* (less than one-tenth of one percent) came from investors

spending $100 or less on Kin.  Thus, for every million dollars raised in the public sale, more than $700,000 came from investors who paid Kik at least $5,000, and less than $900 came from investors who paid $100 or less.  Such disproportionately high investment amounts were not commensurate with buying the token for "use," of which there was none.

Kik's claim as to the other portion of its single offering – directed to wealthy investors who entered contracts called Simple Agreements for Future Tokens ("SAFTs") – also fails.  Kik argues that these transactions constituted a "separate" offering that qualified for an exemption from registration set forth in SEC Rule 506(c) of Regulation D.  But, that rule provides an exemption only for offerings in which sales are limited to accredited investors.  Kik marketed Kin to SAFT participants and public investors simultaneously, using the same promotional statements to meet a single fundraising goal; conducted sales to both of these groups in the same month; and distributed Kin to all investors on the same day.  Because Kik conducted only a *single* public distribution that involved non-accredited public investors – or, alternatively, conducted separate offerings that should be considered "integrated" into a single offering – Kik failed to comply with Rule 506(c).  Additionally, Kik does not qualify for any exemption, because the portion of Kik's offering to SAFT participants (even if "separate" from, and not integrated with, the public sale) was a public distribution of securities with the SAFT participants serving as statutory underwriters.

In its recent decision in *SEC v. Telegram Group Inc.*, No. 19 Civ. 9439 (PKC), 2020 WL 1430035 (S.D.N.Y. Mar. 24, 2020), another court in this district addressed a similar scenario, involving Telegram's planned distribution of digital assets called "Grams" to alleged accredited-investor purchasers, where no registration statement had been filed.  Applying *Howey*, and focusing on the "plain economic reality" of the scheme, the court found that the SEC had shown a substantial likelihood of success in proving that "the series of understandings, transactions, and undertakings between Telegram and the [purchasers] were investment contracts."  *Id.* at *9-10.  And, in granting

the SEC's request for a preliminary injunction against the distribution, the court also found a substantial likelihood that Telegram sold the Grams to the purchasers "with the purpose and intent that those Grams then be distributed by the [purchasers] into a secondary market," and, therefore, no exemption under Rule 506(c) or the Act was available. *Id.* at *18. This court should apply a similar analysis here.

For these and other reasons discussed herein and in the SEC's prior memorandum of law in support of its motion for summary judgment (ECF No. 58) ("prior memorandum" or "Mem."), the SEC respectfully requests that the Court deny Kik's motion for summary judgment and grant the SEC's motion for summary judgment.

## II.   COUNTER-STATEMENT OF FACTS

In response to Kik's statement of factual background, set forth in Kik's memorandum of law in support of its motion for summary judgment (ECF No. 62, pages 3 to 13), the SEC respectfully refers the Court to the SEC's statement of facts, set forth in Section II.C of its prior memorandum (ECF No. 58, pages 8 to 17) as well as to the SEC's statement of material facts on motion for summary judgment under local civil rule 56.1 (ECF No. 59) ("56.1"), and the SEC's response and counter-statement to Kik's local civil rule 56.1 statement ("Opp. 56.1"), submitted herewith. In addition, the SEC states the following.

### A.   Kik Marketed And Sold Kin As A Way For All Investors To Profit From Kik's Managerial and Entrepreneurial Efforts

#### 1.   Kik Promised To Develop An Ecosystem That Would Let Investors "Make A Lot Of Money"

From Kik's initial announcement of Kin on May 25, 2017, through the company's distribution of Kin to all investors on September 26, 2017, Kik conducted an aggressive, multi-city, multi-media marketing campaign for Kin. 56.1 ¶¶ 49-71. Throughout this campaign, Kik highlighted the opportunity for investors to profit from Kin because of Kik's commitment to the "Kin Ecosystem"

and the steps Kik promised to take to boost Kin's "value." *Id.* ¶¶ 94-104, 113-120. The proposed Kin Ecosystem was to be "an entirely new platform" on which, "in the future," people would be able to earn and spend Kin. *Id.* ¶ 54. To develop such an Ecosystem and to establish and build Kin's value, Kik specifically promised that, after it distributed Kin, it would: (1) integrate Kin into Kik's existing product, Kik Messenger, so that the token would be available to Messenger's millions of users; (2) build new products, services, and systems for the Kin Ecosystem, including a Rewards Engine that would incentivize developers to join the Ecosystem; (3) supplement and improve (or replace) the Ethereum blockchain on which Kin would run; and (4) create a new "Kin Foundation" that Kik would direct and control. *Id.* ¶¶ 131-183. Kik assured investors that any Kin purchased could be easily resold on exchanges. *Id.* ¶¶ 121-130. Kik repeatedly emphasized its entrepreneurial experience and management expertise, *Id.* ¶¶ 132-141, and the company's own desire to profit from the three trillion Kin it was creating and "preallocat[ing]" to itself. *Id.* ¶¶ 105-112; SEC31 (ECF No. 60-31) at 21.

Comparing an investment in Kin to venture capital investing, or to an investment during the dot.com era, or using other analogies, Kik repeatedly told potential investors that they and Kik could "make a lot of money." *Id.* ¶¶ 103, 104, 114, 115, 117, 120.

Given this record, Kik's contention that it "never advertised Kin as a passive investment" (Kik Br. 8) is untrue. It was obviously impossible for individual Kin investors to undertake any of the above-summarized steps to develop the Ecosystem, all of which Kik promised to perform. 56.1 ¶ 154 ("Kik alone controlled Kik Messenger."); *id.* ¶ 163 (individual investors could not have decided to replace the blockchain). Kik repeatedly advertised Kin as a way for investors to profit as a result of Kik's managerial and entrepreneurial efforts. And, indeed, Kik's CEO admitted that the potential to profit from the appreciation of the token was obvious to anyone who understood "the fundamentals of crypto economics." Opp. 56.1, Counter-Statement ¶ B.

Kik's promotional material did describe a potential future Ecosystem in which people could earn and spend Kin.  And, it was Kik's business model to achieve a broad distribution of Kin, because more trading by more people could increase Kin's market value and, therefore, benefit investors.  Opp. 56.1 ¶ 60; 56.1 ¶ 300.  However, at no point during its four-month marketing campaign did Kik identify – or was it even possible to identify – any specific good or service that could be bought with Kin.  56.1 ¶¶ 210-211; Opp. 56.1 ¶¶ 10, 14, 71.  Kik's white paper included hypothetical "example" or "prospective use cases" that were possible ways that Kik might change Kik Messenger to incorporate Kin.  56.1 ¶ 51.  But, at least during its marketing of Kin, Kik never committed to implementing any of these use cases, and, in fact, none of them were available when Kik distributed Kin.  *Id.* ¶¶ 199-200; Opp. 56.1 ¶ 6.  In short, Kin had no use upon distribution.

## 2.     Kik Courted "Whales" Who Would Invest Large Amounts of Money In The Offering

Kik's courting of large public investors further demonstrates that people who bought Kin in the public sale portion of the offering would do so for investment purposes, rather than to "spend Kin on products, services, and other valuable assets."  Kik Br. 9.  Before the public sale, Kik executives contacted investors they called "whales" – investors who had indicated an interest in purchasing large amounts of Kin – to offer assistance in completing their transactions and establish a point of contact within Kik.  56.1 ¶ 248.  Kik sought to structure the sale so that whales were able to purchase the amount of Kin they desired.  *Id.* ¶ 248.  Given the larger amounts at issue, Kik employees opted to contact these purchasers to offer themselves "as a resource to ask further questions about the white paper or anything that they had questions about."  *Id.* ¶ 248.

Meanwhile, Kik's claim that it prioritized encouraging developers "to buy Kin and participate in the economy" (Kik Br. 9) is unsupported by the record.  Although Kik quotes statements from Kik's CEO to "all developers out there" (*id.*), these statements appeared in articles generally available to the public.  Kik does not identify any marketing channel that it pursued during the public sale

specifically targeted to developers.[1]  Also, Kik did not make available to developers the software they needed to incorporate Kin in their programs (referred to by Kik as Software Developer Kits or SDKs), until after the September 2017 distribution of Kin.  *Id.* ¶ 214; Opp. 56.1 ¶¶ 12, 15, 17, 18, 71.  At the time of the distribution, a blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications did not exist.  56.1 ¶ 212; Opp. 56.1 ¶¶ 12-13, 15, 17-18, 71.  As of October 15, 2017, there were no developers on the "Kin platform;" the Kin Rewards Engine had not made any payouts; and Kik's asserted vision of "multiple digital services building experiences for users" did not exist.  56.1 ¶ 214.

**B.  Kik Conducted One Marketing Campaign That Included Both SAFT Participants and Public Investors**

Kik's contention that it conducted "a private offering" to SAFT participants, distinct from the public sale, is belied by the record.  The facts show that Kik conducted one marketing campaign – and one offering of Kin – in which Kik advertised the assets (referred to as tokens) to both SAFT participants and public investors at the same time, as follows.

- Kik's public announcement of Kin at the Token Summit on May 25, 2017, and subsequent Roadshow events, were open to and directed at all potential Kin investors, both SAFT participants and public investors alike.

- Kik's main marketing document for the offering – the white paper – was directed at both groups.  56.1 ¶ 47.  The white paper stated that "Kik will conduct a token distribution event that will offer for sale one trillion units" of Kin – a sale that would encompass *all* investors.  *Id.* ¶ 55.

---

[1] Similarly, although Kik quotes from a media article concerning how developers could "get rewarded" in the Ecosystem, the quote does not appear in Kik's Rule 56.1 Statement (ECF No. 63), and, in any event, does not support any assertion by Kik that it "specifically targeted developers" in the public sale.  Kik Br. 9.

- Kik continued to tell investors, in press releases and emails, that it was conducting one "sale." *Id.* ¶¶ 245, 239, 273, 274.

- The Roadshow included private meetings between Kik and potential SAFT participants in the cities where Kik also gave public speeches about Kin. *Id.* ¶¶ 43-46, 57-58, 62.

- Kik publicly touted the purchases by several large SAFT participants as a reason why potential public investors should participate. *Id.* ¶ 257.

- The price at which Kik sold Kin to the SAFT participants – and the delivery of Kin to these participants – were conditioned on the public sale. *Id.* ¶¶ 77-78, 81

- Kik entered into SAFTs until September 11, 2017, after registration for the public sale had closed and one day before the public sale began. *Id.* ¶ 234.

- The sale proceeds from both groups met Kik's announced aggregate fundraising goal of $100 million. *Id.* ¶¶ 37-40, 55, 273, 245, 274.

- Kik distributed Kin to both groups on the same day.

Additionally, Kik told both groups that the company would use sale proceeds from all investors to develop technology for Kin and to otherwise develop the Kin Ecosystem. To be clear, there was little difference in Kik's vague descriptions of how or when the proceeds from both types of investors would be used. The white paper stated:

> In order to finance the Kin roadmap, Kik will conduct a token distribution event that will offer for sale one trillion units out of a 10 trillion unit total supply of Kin. The proceeds of the token distribution event will be used to fund operations and to deploy the Kin Foundation. A portion of the funds raised in the token distribution event will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik.

8

*Id.* ¶ 142; *see also id.* ¶ 155.  Kik thus explained that funds from the *entire* one trillion Kin offering in 2017 – including funds from both SAFT participants and public investors – would be used for common purposes that included future, Kin-related, tasks.

As for funds specifically received from the public sale, Kik's CEO told his audience at the June 2017, San Francisco Meet-Up:

> So, we're going to use the funds to build a new platform.  So, to build a new transaction service, the identity service, the reward engine, to build out all these cases inside of Kik, to get a bunch of developers building use cases outside of Kik basically to, like, launch this whole broader ecosystem.

*Id.* ¶ 143.  Kik had similar plans for the funds received from SAFT participants.  In addition to the white paper, Kik provided SAFT participants with a Private Placement Memorandum ("PPM").  Although the PPM stated that some of the SAFT participants' funds would be used to build what Kik called its Minimum Viable Product ("MVP") [2] – which, presumably, would be ready for Kin's launch – the funds also would be used "***subsequently*** to buildout a semi-centralized blockchain-based computer network that enables economic transactions and a reward system for digital service providers as well as to develop an application to make the network accessible via the Kik messaging platform (the "Kin Ecosystem")."  *Id.* ¶ 144 (emphasis added).  These other, non-MVP, projects were complicated tasks that required significant resources and attention from Kik well after the tokens were distributed.  *See, e.g., id.* ¶ 150 (white paper statement that Kik would integrate Kin into its chat application "[o]ver time" using an "iterative process of research, experimentation, and fine-tuning"); *see also id.* ¶¶ 153, 159-161, 163, 165, 172, 175, 177-179, 213.  Kik could not have used all of the SAFT

---

[2] Kik did not mention the MVP in any public announcements or discuss the MVP in marketing to potential public sale investors.  56.1 ¶ 208.  Kik's MVP – which the company developed for compliance purposes – consisted of honey badger "stickers" that could be "unlocked" by Kin investors inside Kik Messenger.  *Id.* ¶¶ 202, 204-207.  The stickers could not be bought or sold with Kin, and they were unavailable to public investors who did not also have a Kik Messenger account.  *Id.* ¶¶ 202-203.

participants' funds pre-launch, because many SAFTs were not entered into until the weeks – indeed, the day – before the start of the public sale. *Id.* ¶ 238.

And, in fact, the proceeds of Kik's sales of Kin to SAFT purchasers and the general public were subject to a single budgeting process after Kik's distribution of the token. *Id.* ¶¶ 296, 298. Kik has used all sale proceeds as working capital to fund Kik's business operations, and Kik does not distinguish between or among these funds and the funds that the company previously had on hand from venture capital investment or company operations. *Id.* ¶¶ 297, 303.[3]

### C. Kik Met Its Aggregate $100 Million Fundraising Goal

From July 3, 2017, through September 11, 2017, Kik entered into SAFTs with approximately 50 participants through which Kik collected approximately $49 million. Of this amount, over $2 million was collected through SAFTs created on September 11, 2017. 56.1 ¶ 238; Opp. 56.1 ¶ 20. On August 29, 2017 – while Kik was still selling Kin through SAFTs – Kik publicly announced procedures for participation in its public sale of Kin. 56.1 ¶¶ 244-245. Those procedures required that potential investors register with Kik by September 9, 2017. From September 12, 2017, to September 26, 2017, Kik sold Kin to approximately 10,000 of the pre-registered public investors, who paid Ether worth a total of approximately $49.2 million. *Id.* ¶ 260.

The $49.2 million that Kik collected through the public sale portion of the offering was less than the maximum amount of $75 million that Kik had pegged for the sale. *Id.* ¶ 257. Kik set a cap of $4,393 on how much each public investor initially could purchase, but the cap lasted only 24 hours. Kik Rule 56.1 Statement (ECF No. 63) at ¶ 59. After the cap was lifted, public investors could spend as much as they wanted up to the aggregate $75 million limit that Kik set for the sale. 56.1 ¶ 259. No

---

[3] Kik confirmed in an October 2017 letter to the SEC that "Kik intends to use the sale proceeds for operating expenses and to build out the Kik app to further incorporate the use of Kin and further integrate with the Kin ecosystem." Opp. 56.1 ¶ 70.

public investor that bought Kin was limited in how much they could spend, with 56 public investors spending at least $100,000, eight public investors spending over $500,000 and one public investor spending as much as $1.553 million.  *Id.* ¶¶ 259, 265; Opp. 56.1 ¶ 58.  Of the $49.2 million paid by public investors, over $34.4 million (70 percent) was from investors who invested at least $5,000; over $46.8 million (95 percent) was from investors who invested at least $1,000; and *less than $42,000 (.09 percent)* was from investors who invested $100 or less in Kin.  56.1 ¶ 267; Opp. 56.1 ¶¶ 63.[4]

On September 26, 2017, Kik issued a press release stating, "the Kin token distribution (TDE) has successfully ended, raising nearly US$100 million."  56.1 ¶ 270.

### D.    At The Time Investors Received Their Kin, There Was Nothing To Buy

When Kik distributed Kin on September 26, 2017, the token could not be used to buy anything in Kik Messenger.  56.1 ¶ 210.  The token could not even be used to buy the stickers that Kik made available as part of its MVP.  *Id.* ¶ 202.  Nor had Kik identified any specific good or service that could be bought with Kin outside of Kik Messenger.  *Id.* ¶¶ 210-211.  Even as of October 20, 2017, nearly four weeks after the conclusion of the Kin offering, neither Kik nor any third party offered services or products in return for Kin.  Opp. 56.1 ¶ 10.[5]

### E.    Kik's Claims About The Kin Ecosystem Today Are Irrelevant To Kik's Violation Of Section 5

Kik spends a page of its brief discussing the current status of the Ecosystem, now two-and-a-half years after the offering was completed.  Kik Br. 12-13.  Such discussion is irrelevant to a determination of whether Kik offered and sold an investment contract between May and September

---

[4] Furthermore, the funds from investors who spent $100 or less on Kin constituted only about *.04 percent* of the total of $98.3 million raised in the offering.  Thus, the 746 people who paid $100 or less bought about $422 out of every $1,000,000 in Kin sold during the entire sale.  Opp. 56.1, Counter-Statement ¶ C.

[5] As of October 20, 2017, it was also still the case that "Kik users who participated in the pre-sale or public sale [could not] 'hold' Kin in the Kik app."  Opp. 56.1 ¶ 76.  And, as noted, a blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications with Kin did not then exist.  *Id.* ¶ 212; Opp. 56.1 ¶¶ 12-15, 17-18, 71.

2017, the gravamen of the SEC's case against Kik.  *See Telegram*, 2020 WL 1430035, at *9; *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) (a securities "sale" occurs when "the parties obligated themselves to perform what they agreed to perform even if the formal performance of their agreement is to be after a lapse of time"); *infra* Sections IV.A, IV.A.3, and IV.B.3.  Moreover, to the extent Kik asserts there is a functioning Ecosystem today, the record only demonstrates that such a state of affairs resulted from Kik's entrepreneurial and managerial efforts following its distribution of Kin on September 26, 2017, and not from any consumptive use of Kin at the time of the distribution.  For example, Kik has made hundreds of thousands of dollars in payments to developers to compensate them for developing applications that have incorporated Kin, and Kik's own employees have developed such applications.  Opp. 56.1 ¶¶ 87, 90, 91.

## III.   STANDARD OF REVIEW

The standard of review for a motion under Rule 56(a) of the Federal Rules of Civil Procedure is set forth in the SEC's prior memorandum, which the SEC incorporates herein by reference.  As noted in more detail in our prior memorandum, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014).  *See generally Dependable Sales & Service, Inc. v. TruCar, Inc.*, 377 F. Supp. 3d 337, 345-46 (S.D.N.Y. 2019).

## IV.   ARGUMENT

Kik violated Section 5 of the Securities Act by conducting a public offer and sale of securities without filing a registration statement with the SEC or having available an exemption from registration.  Kik's offer and sale of Kin in 2017 was an offer and sale of securities, in the form of

investment contracts, because all persons and entities that bought Kin through the $100 million offering ("Kin investors") (1) made an investment of money (2) in a common venture (3) with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *Howey*, 328 U.S. at 301; *Edwards*, 540 U.S. at 395. Kik's entire 2017 offering of Kin – to SAFT participants and public investors alike – violated Section 5.

Kik admits that it never filed a registration statement for Kin. Kik does not dispute that it conducted the 2017 offering through interstate commerce, or that it offered and sold securities to the SAFT participants. Rather, Kik now seeks summary judgment on the sole grounds that (A) it did not offer and sell investment contracts to the public investors, and (B) the portion of its offering to the SAFT participants qualified for an exemption from registration. Both arguments are without merit, and Kik's motion should be denied.

### A.    Kik Offered And Sold Investment Contracts To The Public Investors

As to the public investors, who paid Kik approximately $49.2 million in what Kik calls the "Token Distribution Event" or "TDE," Kik argues that its distribution event "did not give rise to any 'investment contracts.'" Kik Br. 17. Kik does not contest that public investors in Kin made an investment of money, thereby satisfying *Howey*'s first prong, but Kik contends that *Howey*'s second and third prongs are not met. However, contrary to Kik's arguments, the public investors invested in a common enterprise, and they did so with a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Edwards*, 540 U.S. at 395.

The *Howey* test aims to answer a fundamental question: whether the transaction involves "all the elements of a profit-seeking business venture." *Howey*, 328 U.S. at 300; *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975) (focus is "on the capital market of the enterprise system"); Mem. Section II.A (collecting cases applying *Howey* to various and novel circumstances). The Second Circuit has explained that the *Howey* test is an analysis of "'whether, under all the circumstances, the

scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 583 (2d Cir. 1982)). In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction," *Forman*, 421 U.S. at 849.

"Consistent with *Howey*'s focus on substance over form, [courts] look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) (quoting *SEC v. Merch. Capital*, LLC, 483 F.3d 747, 756-57 (11th Cir. 2007)); *see also Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1029, 1034 (2d Cir. 1974). Additionally, "[t]he enterprise and the described materials, by the very nature of the operation of the securities laws, must be examined as of the time that the transaction took place, together with the knowledge and the objective intentions and expectations of the parties at that time." *SEC v. Aqua–Sonic Prods. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) (citing *Forman*, 421 U.S. at 852–53), *aff'd*, 687 F.2d 577 (2d Cir. 1982); *Telegram*, 2020 WL 1430035, at *6.

Notwithstanding these longstanding principles, Kik argues that the court should determine whether the company offered and sold investment contracts to public investors under a much stingier standard. In Kik's view, no investment contract can exist "[i]f the terms of the governing contract are inconsistent with the required showing under *Howey*," and "materials and oral assurances that conflict with the governing contract are not sufficient in and of themselves to establish an investment contract." Kik Br. 16. Kik argues, in essence, that the court should ignore the tsunami of written and oral promises publicly issued by the company if they were not included in the boilerplate language that investors allegedly agreed to when they pre-registered for the public sale. The law plainly requires rejection of Kik's cramped, "check-the-box" defense.

14

Kik's argument is foreclosed by the well-established rule that courts, in assessing whether an investment contract exists, "must go outside the [offering] instrument itself." *Joiner*, 320 U.S. at 352–53, 355. Focusing on substance and economic reality instead of form, as the Supreme Court mandates, requires not limiting the inquiry to a contract or written instrument, because the "term 'offer' has a different and far broader meaning in securities law than in contract law." *Hocking v. Dubois*, 885 F.2d 1449, 1457–58 (9th Cir. 1989) (*en banc*); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039–40 (10th Cir. 1980). Numerous schemes involve a written contract that is not by itself a security—such as a sale of real property or animals—that, when coupled with a promotor's other representations, amount to an investment contract. *See also Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (court must look to "promises [that] go well beyond the legal terms of the contracts"). To conclude otherwise would create a loophole capable of swallowing all manner of investment schemes for profit, which is plainly inconsistent with the remedial purpose and express terms of the Securities Act. *See* 15 U.S.C. § 77n ("Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.").

The Supreme Court's decision in *Joiner* is a case in point. In *Joiner*, the Court held that the promoter's sale of oil leasehold interests in acreage in Texas to dozens of purchasers throughout the United States gave rise to investment contracts, even though the promoter's promise to drill an exploratory oil well appeared only in sales literature and not in the sale contract itself. *See* 320 U.S. at 346-48. Finding that the contractual language itself was not dispositive, the Court emphasized: "The exploration enterprise was woven into these leaseholds, in both an economic and a legal sense; the undertaking to drill a well runs through the whole transaction as the thread on which everybody's

15

beads were strung." *Id.* at 348.[6]  Furthermore, the Court found that it was "unnecessary to determine" whether the promoter's extra-contractual promise created legal rights under state law, as "acceptance of the offer quoted" created "a form of investment contract in which the purchaser was paying both for a lease and for a development project." *Id.* at 349.  "The test" under the Securities Act, the Court held, "is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.  In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." *Id.* at 352-53.

Similarly, in *Continental Marketing Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967), the court of appeals held that contracts for the sales of beavers, considered alongside arrangements for maintaining the beavers provided by third parties, gave rise to investment contracts.  The court recognized that the seller's "formal contractual documents" provided that its "contracts and services begin and end with the sale and delivery of live, specific and identified animals and that purchasers' reliance on the company extends no further." *Id.* at 468.  Nonetheless, heeding *Howey*'s admonition "to disregard form for substance and place emphasis on economic reality," the court found that "[t]he more critical factor is the nature of the investor's participation in the enterprise." *Id.* at 470.  Thus, the court held that the promoter sold investment contracts despite its own limited contractual obligations.  *See id.*

Furthermore, in evaluating whether partnership or limited liability corporation agreements give rise to investment contracts between managing members and other investors, courts routinely "look beyond the formal terms of a relationship to the reality of the parties' positions." *Leonard*, 529

---

[6] As set forth in the underlying opinion of the court of appeals, the relevant leasehold assignments did not impose any contractual obligations to drill a well.  *See SEC v. C.M. Joiner Leasing Corp.*, 133 F.2d 241, 242-44 (5th Cir. 1943) ("In other words, it is clearly shows [sic] that what Corporation was offering for sale and selling and assigning was a leasehold interest in specific tracts out of the 300 acres, or as defined by Texas courts— an interest in the land of specific tracts out of the 3000 acres.").

F.3d at 85.  In such cases, even if the written operating agreement appears to confer general partner powers on an investor, suggesting requisite investor control, economic realities that are in conflict with written terms nonetheless can give rise to an investment contract.  In *Leonard*, for example, on the "face of the documents" there appeared to be "too much investor control," but investment contracts nevertheless existed where investors "were presented with the subscription agreements on a take-it-or-leave-it basis," and "their number and geographic dispersion left investors particularly dependent on centralized management."  *Id.* at 90 (citing *Williamson v. Tucker*, 645 F.2d 404, 423-24 (5th Cir. 1981)); *see also Shields*, 744 F.3d 633 (reinstating complaint that joint venture agreements were investment contracts).

And, courts have applied these same principles to conclude that digital assets, similar to Kin, are investment contracts.  In *Telegram*, for example, Judge Castel preliminarily enjoined Telegram's distribution of 2.9 billion Grams to purchasers where no registration statement had been filed and no exemption was available.  Applying *Howey*, the Court found:

> [a]n implicit (though formally disclaimed) intention on the part of Telegram to remain committed to the success of the TON Blockchain post-launch. Indeed, Telegram, as a matter of fact rather than legal obligation, will be the guiding force behind the TON Blockchain for the immediate post-launch period while the 175 purchasers unload their Grams into the secondary market.

2020 WL 1430035, at *2.  Telegram argued that it had disavowed future contractual obligations, but the court rejected this argument, stating, "[d]isclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive."  2020 WL 1430035, at *6 (citing *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001)).  Thus, the court concluded, "the series of

17

understandings, transactions, and undertakings between Telegram and the Initial Purchasers were investment contracts satisfying the *Howey* test and, therefore, are securities." *Id.* at *9.[7]

Finally, the cases cited by Kik only confirm the primacy of economic reality over contractual boilerplate. In *Albanese v. Fla. Nat'l Bank of Orlando*, 823 F.2d 408, 412 (11th Cir. 1987), for example, the court rejected the defendant's reliance on "agreements' words" and found that it had sold investment contracts where the buyers "had no realistic alternative" but to rely on the defendant. In *Bamert v. Pulte Home Corp.*, 445 F. App'x 256, 259-260 (11th Cir. 2011), the purchase agreements at issue "expressly stated that the transaction was limited to the terms of the agreements and did not include any promotional representations outside of the agreement." *Id.* at 259. Nonetheless, heeding "*Howey*'s focus on substance over form," the court reaffirmed that it "must instead consider the whole transaction or scheme, including the other representations made by the defendants," and found that the plaintiffs plausibly alleged that sale transactions were investment contracts. *Id.* at 264-65.

Against this legal backdrop, Kik's arguments that the second and third prongs of *Howey* are unsatisfied by the facts of this case are without merit.

        **1.**     **Public Investors Entered A Common Enterprise Among Themselves And With Kik**

By paying more than $49 million worth of Ether to Kik on the heels of Kik's four-month marketing campaign, public investors entered a "common enterprise." Under established case law in

---

[7] As the *Telegram* court explained during a hearing:

> One might be tempted as a lawyer to say, well, let me look at the agreements their four corners and that will answer the question . . . [T]hat's not how the economic realities test works. If I could look at the four corners of the agreements and decided on that and nothing else, you know kind of as the way we think of the Parol Evidence Rule and construction of an unambiguous contract, this case should be very easy . . . But that's not what we're dealing with. So, I have to look beyond those agreements at the full economic reality.

Second Declaration of Laura D'Allaird Decl., submitted herewith ("Second D'Allaird Decl."), SEC108; Transcript of Hearing in *SEC v. Telegram*, No. 19 Civ. 9439 (PKC) (S.D.N.Y.), Jan. Feb. 19, 2020, at 44:2-15.

the Second Circuit and other circuits, the "common enterprise" element can be met through a showing of "horizontal commonality" which "'ties the fortunes of each investor in a pool of investors to the success of the overall venture.'" *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (quoting *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir. 1984)); *Telegram*, 2020 WL 1430035, at *10. Additionally, courts routinely hold that "common enterprise" also can be shown through "strict vertical commonality" which "requires that the fortunes of investors be tied to the fortunes of the promoter." *Revak*, 18 F.3d at 88 (citing *Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir. 1978)); *Telegram*, 2020 WL 1430035, at *10; Mem. 22 (collecting cases).

Here, as the SEC has previously discussed, the public investors invested in a common enterprise that satisfies both horizontal and vertical commonality. Horizontal commonality is met, because investor assets were converted to cash, deposited into a single bank account, and then spent – as Kik said they would be – on projects designed to boost Kin's value, to the benefit of all investors. *See* Mem. 23-24; 56.1 ¶¶ 294-300. Because all Kin are fungible or the same, the "return on investment" for any one Kin holder was "directly proportional to the amount of that investment." *SEC v. Infinity Group Co.*, 212 F.3d 180, 188 (3d Cir. 2000). Vertical commonality also is met, because the fortunes of Kin investors would rise and fall with those of Kik largely as a result of Kik's retention of three trillion Kin (30 percent of all Kin created) – a fact that Kik routinely touted as an inducement to participate in the offering. *See* Mem. 24-25; 56.1 ¶¶ 100, 112.

Numerous, recent cases finding that purchasers of digital assets entered a common enterprise support this conclusion. In *Telegram*, for example, the court found both (1) that horizontal commonality was created when Telegram received the investors' funds, where the funds were then used to develop and launch the new blockchain, *and* (2) that horizontal commonality also would exist *after* Telegram distributed the Grams, because "[t]he plain economic reality is that, post-launch, the Grams themselves continue to represent the Initial Purchasers' pooled funds," and "the fortunes of

19

the Initial Purchasers will also remain tied to each other's fortunes as well as to the fortunes of the TON Blockchain." 2020 WL 1430035, at *10. The court also found vertical commonality, because the 28-percent stake in Grams that Telegram had given itself "would be Telegram's largest asset, thereby linking the company's financial fortunes to the price of Grams and the success of the TON Blockchain." *Id.*, at *11. The same reasoning applies here: Kik's promises of future efforts using pooled investor funds created horizontal commonality; Kik's large (30 percent) stake in Kin created vertical commonality.[8]

Ignoring the plain application of Second Circuit law to the facts of this case, Kik contends that the public investors did not enter a common enterprise. All of Kik's arguments on this element are without merit and fail to demonstrate the lack of a genuine dispute of material fact. To the contrary, the undisputed evidence shows that all Kin investors, including public buyers, did enter into a common enterprise.

### a. Kin Investors Did Not Require "Ongoing Contractual Obligations" To Invest In A Common Enterprise

Kik's contention that "no common enterprise can exist under any formulation absent a continuing contractual obligation between the seller and the purchasers, requiring the seller to perform certain actions to further the enterprise" (Kik Br. 18), is incorrect and should be rejected. There is simply no requirement of "ongoing contractual relations" as part of either the horizontal commonality test or vertical commonality test. In *Joiner*, *Continental Marketing*, and *Leonard*, the courts held that the

---

[8] *See also Balestra v. ATBCoin LLC*, 380 F. Supp. 3d 340, (S.D.N.Y. 2019) (finding horizontal commonality where "the funds raised through the ICO were pooled together to facilitate the launch of the ATB Blockchain, the success of which, in turn, would increase the value of Plaintiff's ATB Coins"); *Solis v. Latium Network, Inc.*, No. 18 Civ. 10255 (SDW-SCM), 2018 WL 6445543, at *2 (D.N.J. Dec. 10, 2018) (horizontal commonality sufficiently pled through allegations "that the funds raised through Latium's ICO were pooled to develop and maintain Latium's tasking platform" and "'an investor's return on a Latium ICO investment is directly proportional to the amount of an investor's financial stake and number of LATX tokens owned.'"); *United States v. Zaslavskiy*, 2018 WL 4346339, at *6 (E.D.N.Y. Sept. 11, 2018) (finding that profits would be distributed pro-rata "given that investors were promised 'tokens' or 'coins' in exchange for, and proportionate to, their investment interests in the schemes").

promoters' representations or other economic realities outside of formal contractual documents gave rise to investment contracts.  The same is true of the numerous, recent court decisions (cited above) finding that buyers of digital assets – similarly situated to the public investors here – entered a common enterprise.

Although Kik points to the existence of a service contract for the cultivation of oranges in *Howey* (Kik Br. 18), that decision did not establish a *requirement* that the promoter undertake formal contractual obligations for the creation of an investment contract.  To the contrary, citing *Joiner*, *Howey* reaffirmed that the term "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits."  328 U.S. at 299.  Moreover, the court in *Howey* concluded that an investment contract existed in that case even though the service contract was optional and 15 percent of investors did not even subscribe to it.  328 U.S. at 295.

Here, the many Kik public statements, written and oral, during its four-month marketing campaign supported a common enterprise for the public investors – and all investors in the offering for that matter – regardless of whether Kik memorialized its promises in a signed contract.  Kik repeatedly vowed that it would use the investors' funds to take specific steps to drive up demand for Kin and boost the token's market value.  These undertakings by Kik "r[an] through the whole transaction as the thread on which everybody's beads were strung."  *Joiner*, 320 U.S. at 348.

The court's decision in *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978), finding that land sale contracts did not create investment contracts on facts dissimilar to those in this case, does not help Kik.  First, the court did not apply either the horizontal or vertical commonality test applicable in the Second Circuit.  Second, the decision is distinguished by wholly different facts involving what a land buyer could realistically expect from the developer-seller.  *See* 574 F.2d at 1026 (stating "the record . . . simply show[ed] the purchase by the plaintiffs of lots in a real estate development").

Notably, the *Woodward* court recognized that a common enterprise could exist in circumstances "whereby it is expressly **or impliedly** understood that the property will be developed or operated by others." *Id.* (internal quotation omitted) (emphasis added).  Here, unlike the facts found in *Woodward*, Kik made clear that it would "develop[]" the public investors' property – Kin – by developing the Kin Ecosystem.

Furthermore, *Woodward* and other real estate cases are generally distinguishable from this case because of the nature of the asset in those cases.  Real property generally is unique, has inherent value, is sold to a discrete group of buyers, and is more easily understood to provide a consumptive use. Kin, by contrast, is fungible, inherently without value, and sold to virtually an unlimited number of buyers, and had *no* consumptive use when distributed.  *See Forman*, 421 U.S. at 837 (concluding based on facts "there can be no doubt that investors were attracted solely by the prospect of acquiring a place to live"); *Wals v. Fox Hills*, 24 F.3d 1016, 1019 (7th Cir. 1994) (finding condominium time-sharing purchase and rental agreement did not create an investment contract where plaintiff's "return was tied to . . . space-time with its own unique characteristics," and noting that court could rule differently if investors were to "regard the lots as fungible"); *Bender v. Cont'l Towers Ltd. P'ship*, 32 F. Supp. 497, 501 (S.D.N.Y. 1986) ("A piece of real estate, such as a condominium, has an inherent worth, a worth not solely dependent on the efforts of a promoter.").  It was precisely because Kin (unlike real property) had no inherent value independent of the seller's efforts that Kik repeatedly promised to "build fundamental value" for the token.  *See, e.g.*, 56.1 ¶ 54; Opp. 56.1 ¶ 5.[9]

---

[9] That said, even in the real estate context, courts recognize that the "promoter properly is held to his representations as to what he is selling even where those promises go well beyond the legal terms of the contracts and the fine print of the disclaimers" because "commitments and promises . . . , and the network of relationships related to the project, can cross over the line and make the interest acquired one in an ongoing business enterprise."  *Rodriguez v. Banco Cen.*, 990 F.2d 7, 11 (11th Cir. 1993); *see also De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1301 (9th Cir. 1979) (recognizing that case "pose[d] a close question of law" and that the courts might have ruled differently on different facts).  Kik's cited cases are not to the contrary. *See Lavery v. Kearns*, 792 F. Supp. 847, 855 (D. Me. 1992) (stating "it [was] necessary to look beyond the four corners of the written documents in determining the existence of an investment contract," and that

Nor can Kik hide behind boilerplate disclaimers in its "Terms of Use," to which public investors allegedly agreed by "check[ing] a box" days before buying Kin.  Kik Br. 20.  Even assuming these terms disavowed all of Kik's written and oral marketing of Kin – which they did not – and investors were aware of the terms at the times they committed funds to Kik – a point on which Kik offers no proof[10] – the terms are "contrary to the apparent economic reality" of the public investors' purchases of Kin.  *Telegram*, 2020 WL 1430035, at *6, 9 (internal quotation omitted) (finding purchasers of digital tokens entered investment contracts despite disclaimers).  Here, the economic reality is that Kik, through scores of public statements, primed public investors' expectations of profits based on future actions that Kik was singularly able to take.  Kik declared that it was providing a "covenant" and "pledg[ing] all its resources" to accomplish these actions.  Opp. 56.1 ¶ 7.  Investors, in turn, were reliant on Kik's honoring these commitments to obtain profits they were led to expect.  Kik cannot now evade the consequences of its many promises through boilerplate disclaimers.  *See Baroi v. Platinum Condo Dev., LLC*, 914 F. Supp. 2d 1179, 1197-98 (D. Nev. 2012) (concluding "boilerplate disclaimers . . . [did] not trump the economic realities of the transaction" and finding condominium transactions created investment contract where investors "lacked the practical ability to control their investment"); *Timmreck v. Munn*, 433 F. Supp. 396, 401 (N.D. Ill. 1977) ("adhesion integration law" could not "eradicate the reality" of promoter's representations and did not warrant summary judgment for

---

"[p]romotional materials, oral assurances, and merchandising approaches are all relevant." (internal quotation omitted)); *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1050 (S.D.N.Y. 1975) (unlike here, promoters' interest "was in recouping their investment, making a profit and moving on," and "[a]ny benefit to plaintiff would be purely incidental"); *Happy Inv. Gp. v. Lakeworld Properties, Inc.*, 396 F. Supp. 175, 180-81 (N.D. Cal. 1975) (unlike here, "nothing was said about defendants' participating in efforts to draw commerce or commercial enterprises"); *Alunni v. Development Resources Group, LLC*, 445 Fed. App'x 288, 297 (11th Cir. 2011) (unlike here, future profit-making activity "[did] not entail the kind of specialized knowledge or equipment present in many cases that have found third-party dependency").

[10] Neither of the public investors who were asked about the Terms of Use during their depositions in this case recalled clicking on the button or reading the document.  Opp. 56.1 ¶ 45.

promoter on *Howey* analysis); *SEC v. Battoo*, 158 F. Supp. 3d 676 (N.D. Ill. 2016) (marketing disclaimers

that defendant was not operating as broker ineffective as shield from liability under the securities laws).

Finally, the Terms of Use did not address – let alone purport to preclude investors' reliance

on – Kik's marketing of Kin.  The terms merely stated (on page 10 of the 19-page document):

> **Disclaimers**
>
> EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN A
> WRITING BY KIK, THE SITE CONTENT CONTAINED THEREIN,
> AND KIN TOKENS ARE PROVIDED ON AN "AS IS" AND "AS
> AVAILABLE" BASIS WITHOUT WARRANTIES OR CONDITIONS OF
> ANY KIND, EITHER EXPRESS OR IMPLIED. . . .

Opp. 56.1 ¶ 49; Kik Ex. H (ECF No. 64) at KIK000088.  And, on page 18:

> **Miscellaneous**
>
> This Agreement constitutes the entire agreement between you and Kik relating
> to your access to and use of the Sites, and Content and your purchase and use
> of the Kin Tokens. . . .

Opp. 56.1 ¶ 51; Kik Ex. H (ECF No. 64) at KIK000096.  Fairly read, these provisions address only

Kik's website content and how Kin would function.  They do not at all speak to Kik's many

representations – including its public presentations – about what *Kik* would do to support Kin or the

Kin Ecosystem.  Furthermore, the disclaimers affirmatively do *not* preclude investors' reliance on any

or all of Kik's "writing[s]" – *e.g.*, Kik's white paper, press releases, tweets, and blog posts regarding the

offering.  Opp. 56.1 ¶ 49.  *Compare Alunni v. Development Resources Group, LLC*, 445 Fed. App'x 288, 297

(11 Cir. 2011) (assessing condominium sale disclaimers that expressly advised against reliance on

developer's "oral representations," or on "any statements, agreements, or representations, either oral

or in writing" that added to contract's terms).  For all of these reasons, the disclaimers in Kik's Terms

of Use do not weigh against the finding of a common enterprise.

> **b. Kik's Pooling Of Funds For Use In Launching Kin and Developing The Kin Ecosystem Created Horizontal Commonality**

Kik's perfunctory attempt to argue that there was no horizontal commonality among Kin investors (Kik Br. 23-25) misstates the law and ignores the factual record. First, "pro-rata distribution of profits" is not a prerequisite to horizontal commonality. To the contrary, courts have routinely declined to make pro rata profits a requirement of the common enterprise prong. *See Telegram*, 2020 WL 1430035, at *10 n.8 ("[A] pro rata distribution is not a required for horizontal commonality."); *Balestra*, 380 F. Supp. 3d at 354 ("formalized profit-sharing mechanism" not "required" for common enterprise); *accord Revak*, 18 F.3d at 87 (stating only that pro-rata distribution of profits is "usually combined" with asset pooling); *Infinity Group*, 212 F.3d at 188 (finding it sufficient for horizontal commonality that "the investor's return was directly proportional to the amount of that investment"). Here, it is sufficient for horizontal commonality that Kin investors' assets were "pooled and the fortunes of each investor [were] tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 2020 WL 1430035, at *10.

Second, Kik's contention that Kin investors "did not 'pool' their funds because Kik did not promise to use the proceeds for any common purpose" is wrong. Kik repeatedly made plain that pooled investor funds would be used for the benefit of the common enterprise. Kik's white paper stated that Kik would sell one trillion Kin to "finance the Kin roadmap" (Mem. 12, 32; 56.1 ¶ 55), and that proceeds from the public sale "will be used" not only "to fund Kik operations" but also "to deploy the Kin Foundation" and "to execute upon the roadmap of additional feature development planned for the Kin integration into Kik" (Mem. 23, 32; 56.1 ¶ 142). Kik reiterated these promises at the San Francisco event in June 2017, and in the written materials delivered to SAFT participants. *See supra* Section II.B; Mem. 23, 32; 56.1 ¶¶ 67, 143, 144. Furthermore, Kik's plan to direct funds to its own operations weighs *in favor of* – not against – a finding of horizontal commonality, given the

company's central importance to the success of the Kin project.  *See* Mem. 34; 56.1 ¶ 4 ("Kik has both the experience and the resources, and the user base to really make this happen.").

The cases cited by Kik are not to the contrary.  Unlike in *Savino v. E.F. Hutton & Co., Inc.*, 507 F. Supp. 1225 (S.D.N.Y. 1981), in which the court found that funds in separate investor accounts were not "pooled," *id.* at 1236, here all public sale proceeds were stored in a digital wallet and then deposited into one bank account and allocated to Kin-focused projects as Kik saw fit.  56.1 ¶¶ 295-300, 302.[11] Because all Kin investors stood to benefit from Kik's efforts in a manner proportionate to the amount Kin they owned, each Kin investor's return "depend[ed] on the profitability of the of the investment enterprise as a whole." *Savino*, 507 F. Supp. at 1236.   And, whereas in *SEC v. Life Partners, Inc.*, 87 F.3d 536, 546 (D.C. Cir. 1996), the court (addressing *Howey*'s third prong) found no "significant non-ministerial service" performed by the promoter after delivering the relevant instruments to investors, the opposite is true in this case.

### c.  Kin Investors Invested In A Common Enterprise Even Though They Could Resell Their Kin

Kik's additional argument, that there was not a common enterprise because Kin investors could resell their tokens after Kik delivered them (Kik Br. 21-23), also fails.  "A common enterprise is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."  *SEC v. Glenn W. Turner Enter.*, 474 F.2d 476, 482 n.7 (9th Cir. 1973).  Thus, the relevant inquiry here is not whether Kin investors received "complete control over an asset" – such as the token itself – but whether the investors were dependent upon the efforts of Kik (or third parties) for the success of their *investment*.  *See SEC v. Galaxy Foods, Inc.*, 417 F. Supp. 1225, 1239 (E.D.N.Y. 1976) ("[T]he existence of a security turns on an analysis of

---

[11] Kik's former CFO expressly testified that the public sale proceeds were "pooled."  *See* Second D'Allaird Decl., SEC10 (ECF No. 60-10) at 478:2-4 ("Q: And would you say that Kik pooled the proceeds from the sale of tokens to the public?  A: Yes.").

the nature and extent of the investors' participation in, and control over, the fate of their investments."), *aff'd*, 556 F.2d 559 (2d Cir. 1977).  The fact that Kin investors could resell their tokens after receiving them does not guide whether they invested in common enterprise.  An individual's ability to exchange or dispose of an investment contract on his or her own – which exists with respect to many forms of investments that are straight-forward examples of investment contracts (*see, e.g., Edwards*, 540 U.S. at 391-92 (purchaser of lease-based investment contract had option to sell back lease to the promoter)) – is not germane to and does not alter this analysis.

Second Circuit and other court of appeals decisions reinforce this conclusion.  In *Aqua–Sonic*, the court found that a common enterprise existed even though the relevant contractual arrangement "was optional" for the investors and provided them with control over aspects of the enterprise that affected their profits.  *See* 687 F.2d at 578–79.  The overriding question was "whether the typical investor who was being solicited would be expected under all the circumstances to accept the option, thus remaining passive and deriving profit from the efforts of others."  *Id.* at 582-583.  Similarly, in *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 137 (5th Cir. 1989), investors could affect the overall "profitability" of their investments in cattle-feeding consulting agreements by deciding whether to hedge those agreements.  Nonetheless, the investors were in a common enterprise because the promoter "provided the entire framework within which an individual investor's efforts would succeed or fail."  *Id.*

Here, there is no genuine dispute that Kin investors similarly relied on Kik to "provide[] the entire framework" – *i.e.*, to create, develop, foster and improve the Kin Ecosystem, and to take the steps necessary to establish and build value for Kin.  Obviously it was impossible for Kin investors to integrate Kin into Kik Messenger, 56.1 ¶¶ 148-155, or to build the Kin Rewards Engine, a "really difficult" task that entailed future distributions from the reserve of six trillion Kin that Kik controlled through the Kin Foundation, *id.* ¶¶ 169-179.  It was also unrealistic to expect that Kin investors would

act to supplement and improve, or replace, the Ethereum blockchain, as Kik had promised to do.  *See id.* ¶¶ 163 ("Would the holders of Kin tokens be able to . . . unilaterally make such a decision?  No."); *id.* ¶¶ 156-165.  In short, Kin investors depended on Kik to make their investments successful, and it was *Kik* – not the investors – that "controlled" the value of these investments as long as the investors held the tokens.  The Kin investors' receipt of their tokens and subsequent ability to transfer them does negate Kik's primacy in this regard.  *See, e.g., Telegram*, 2020 WL 1430035, at *10 (finding a common enterprise where, "[u]pon delivery of the Grams . . . [p]urchasers will possess an identical instrument, the value of which is entirely dependent on the success or failure" of the promoter's future efforts).

Nor does it matter that Kin investors could obtain different returns on their investments by reselling the tokens at different times.  Kik Br. 22.  "The ability to sell their [Kin], and thereby exit the common enterprise, does not mean that the [Kin investors] are not part of a common enterprise while they continued to possess [Kin]."  *Telegram*, 2020 WL 1430035, at *10.  In *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974), in finding a common enterprise among investors in a multi-level marketing scheme, the court concluded that "the fact that an investor's return is independent of that of other investors in the scheme" was "not decisive."  *Id.* at 479.  "[T]he requisite commonality" in that case was "evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter's efforts]."  *Id.*  And in *SEC v. Infinity Group Co.*, 212 F.3d 180, 188-89 (3d Cir. 1999), the court accepted the showing of horizontal commonality even though individual investors entered separate contracts with different repayment dates.  So too here; the ability of public investors to resell their fungible Kin at different times – at market prices uniformly impacted by Kik's efforts to develop the Ecosystem – does not negate their common enterprise manifested by both horizontal and vertical commonality.  The fact remains that the fortunes of all Kin investors and Kik rose and fell together based on Kik's efforts.

Meanwhile, the cases that Kik cites are far afield and do not support its erroneous argument that control of an asset negates a common enterprise. Unlike here, where public investors depended on Kik and their interests were commonly aligned, in the cases on which Kik purports to rely: (1) there was no meaningful dependency by the buyers on the promoters, *see Alunni*, 445 Fed. App'x at 297 (11 Cir. 2011) (no "third-party dependency"); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980) (30-day reliance on promoter's solvency deemed insufficient); (2) there was no pooling of investor funds that the promoter could use to generate profits, *see Lavery v. Kearns*, 792 F. Supp. 847, 858-59 (D. Me. 1992) (funds from sales and rentals of condominium units were "not part of an initial *development* plan" (emphasis in original)); *Marini v. Adomo*, 812 F. Supp. 2d 243, 257-58 (E.D.N.Y. 2011) (no vertical commonality where buyer and seller of rare coins maintained separate, non-identical portfolios with different combinations of coins, and buyer's transaction caused decline in seller's portfolio); (3) the interests of the buyer and seller were not aligned under the contract they entered, *see Copeland v. Hill*, 680 F. Supp. 466, 468 (D. Mass. 1988) (buyer would not "lose anything" if seller's guarantee were invoked, and "the gallery would not gain or lose anything if the coins had appreciated or depreciated in market value"); or (4) the common enterprise prong was not even at issue, *see Mautner v. Alvin H. Glick Irrevocable Grantor Tr.*, 2019 WL 6311520, at *1, 6-7 (S.D.N.Y. Nov. 25, 2019) (involving operation of limited liability company).

In sum, because Kik pooled the funds of all Kin investors who then relied on Kik, the investors' control of their tokens did not negate the common enterprise.

### d. Kik's Ownership Of Trillions Of Kin Created Vertical Commonality

Finally, Kik's contention that there was no vertical commonality between public investors and the company (Kik Br. 25-27) contradicts what Kik repeatedly told the investors before they paid Kik, and, in all events, is without merit. The case law resoundingly confirms that "there is 'vertical commonality' and hence a 'common enterprise' within the meaning of *Howey*, where the financial

arrangement is such that" the promoter's "fortunes rise and fall with those of the investor." *Savino*, 507 F. Supp. at 1237; *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 249 (S.D.N.Y. 2002) (same); *see also Savino*, 507 F. Supp. at 1238 (common enterprise element satisfied by "two or more parties whose profits or losses are interdependent to a certain extent"). The facts here meet that standard. It was one of Kik's main selling points that it would retain three trillion Kin (30 percent of all tokens created) and it was "in our financial best interest" to drive up demand for Kin. 56.1 ¶ 109. As Kik summarized at one conference:

> This – this is the beautiful thing for Kik: it's also fundamentally a new way to monetize. *So, for us, we're setting 30 percent of Kin aside for Kik, as a financial incentive for us basically to put this huge messenger into this ecosystem, and to get this whole ecosystem going.* And so (indiscernible) – you know, we – *our goal now is just to grow the value of Kin.* The more we do that, the more the value of our 30 percent grows. And we're now looking at that as the fundamental way that we monetize this, you know, eight and a half years of work, and $120 million invested.

*Id.* ¶ 110 (emphasis added); *see also id.* ¶¶ 100, 105-112. This alignment of interests created vertical commonality.

Indeed, in *Telegram*, the court found that the mere *possibility* that Telegram would retain 28 percent of all Grams following distribution of the tokens sufficed to create vertical commonality. *Telegram*, 2020 WL 1430035, at *11. Here, the case for vertical commonality is even more compelling, because Kik was guaranteed to receive three trillion Kin under a vesting schedule. 56.1 ¶ 55. Thus, by Kik's own design, Kik's "financial fortunes" would be "link[ed]" to the price of Kin and the success of the Kin Ecosystem generally. *Telegram*, 2020 WL 1430035, at *11.

Kik has no answer to this reality, other than to recycle its earlier, meritless, argument that Kin investors could sell at different times, and to erect a straw man argument that finding investment contracts here would mean that "Chuck-E-Cheese tokens and Starbucks gift cards" are too. (Kik Br. 27). But, Kin are not like video game tokens or coffee gift cards, among other reasons, because those businesses do not seek to entice buyers with an expectation of profits based on the efforts of others

for such items.  In fact, Kik's CEO explained at the New York City conference in September 2017 that the difference between Kin and "Starbuck's points" was "compelling," because the latter simply provides an individual reward for drinking coffee.  By contrast, with a digital asset such as Kin – according to the CEO – creat[ing] demand" would cause "the value of the [asset] overall . . . to go up.  And it goes up for me, and it goes up for you."  Opp. 56.1, Counter-Statement ¶ A.

Kik also complains that Kin's transferability means "that Kik would be involved, at any given moment, in any number of common enterprises involving individuals with whom Kik has absolutely no relationship whatsoever."  Kik Br. 27.  But this is the situation that any issuer faces when it conducts a public distribution of securities (such as unrestricted stocks or bonds), and Kik's argument only underscores the gravity of its violation of Section 5.  Kik voluntarily distributed a security to the public, yet it failed to provide required disclosures to investors about Kin and Kik in the form of a registration statement.  Such disclosures would have benefited not only the investors in the offering, but also the downstream purchasers to whom the investors resold the Kin.  Kik's litigation brief thus highlights the serious public harm that it willingly caused through its unregistered offer and sale of a security, but it does not provide a reason for why it did not create a common enterprise.

### 2. Kin Investors Reasonably Expected Profits Derived From Kik's Entrepreneurial And Managerial Efforts

Kik also contends that it is entitled to summary judgment as to the public investors on *Howey*'s third prong, arguing that "the SEC cannot prove that [public investors] were primarily led to expect profits from the essential managerial and entrepreneurial efforts of others."  Kik Br. 27.  Kik is again wrong.  The SEC, not Kik, is entitled to summary judgment on this prong.

As an initial matter, Kik exaggerates the legal standard.  The Supreme Court has held that "[t]he touchstone" of an "investment contract,"

> is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.  By profits, the Court has meant either capital

> appreciation resulting from the development of the initial investment . . . or a
> participation in earnings resulting from the use of investors' funds . . . .

*Forman*, 421 U.S. at 852; *see also Edwards*, 540 U.S. at 897-98 (repeating *Forman* formulation).  And in

*Leonard*, the Second Circuit reiterated that determining whether an investment contract exists requires

consideration of:

> whether, under all the circumstances, the scheme was being promoted
> primarily as an investment or as a means whereby participants could pool their
> own activities, their money and the promoter's contribution in a meaningful
> way.

529 F.3d at 88 (quoting *Aqua–Sonic*, 687 F.2d at 582 (footnote omitted)); *see also Mautner*, 2019 WL

6311520, at *6 (same).  Thus, proof of an investment contract requires only an "expectation of profit"

when the investor enters the scheme, plus an expectation that these profits will be based on "the

entrepreneurial or managerial efforts of others" – or, alternatively, on the pooling of the investors'

resources with the "promoter's contribution in a meaningful way." *See SEC v. Hui Feng*, 935 F.3d 721,

730-31 (9th Cir. 2019) (finding the requisite expectation of profit even when investment intent was

secondary to a motive unrelated to profit); *Telegram*, 2020 WL 1430035, at *12 ("An investor possesses

an expectation of profit when their motivation to partake in the relevant 'contract, transaction or

scheme' was 'the prospects of a return on their investment.'" (quoting *Howey*, 328 U.S. at 301)).

The undisputed evidence here shows that the public investors bought investment contracts

under these correctly-stated standards.  Indeed, even under Kik's exaggerated version of the standard,

the undisputed evidence shows that Kik's motion should be denied, and the SEC's motion should be

granted.

### a.   Public Investors In Kin Reasonably Expected Profits

Kik argues that public investors in Kin "could not have expected to profit based on what Kik

offered them" because, allegedly, "the promotional materials Kik released before and around the time

of the [public sale] emphasized the use and consumption of Kin."  Kik Br. 29-30.  Kik is mistaken.

Objectively viewed, Kik's marketing campaign overwhelmingly emphasized "the prospects of a return" on the public investors' investment. *Howey*, 328 U.S. at 301; *see also Telegram*, 2020 WL 1430035, at *14 ("[P]romotional materials emphasizing opportunities for potential profit can demonstrate that purchasers possessed the required expectation of profits."). Kik could not have been emphasizing "use" of Kin when marketing the offering, because there was no good or service to buy with Kin, and Kik did not identify any actual use for Kin when it was distributed. Rather, the offering was plainly a capital raising event for which the mere *possibility* that Kin could be used in a future, Kik-sponsored, Ecosystem was of secondary importance to investor profits. Indeed, Kik's CEO has testified that any public sale investor who understood "the fundamentals of crypto economics" purchased with the hope of profiting through appreciation. Opp. 56.1, Counter-Statement ¶ B.

The "use" or "consumption" (as opposed to "profit") concept derives from *Forman*, where the Supreme Court held that shares in a housing co-op, entitling the holder to lease an apartment, were not "investment contracts." 421 U.S. 837, 857-59 (1975). The Court reasoned that this result followed for at least two reasons. First, "[t]he **sole** purpose of acquiring the[] shares [was] to enable the purchaser to occupy an apartment," and the shares "c[ould] not be transferred to a nontenant" and had to be sold back to the co-op at the price originally paid. *Id.* at 842-43 (emphasis added). Second, the purchasers "were attracted **solely** by the prospect of acquiring a place to live, and not by financial returns" because the agreements provided that purchasers would "be unable to resell their apartments at a profit since the apartment must first be offered back" to the co-op. *Id.* at 853-54 (emphasis added).

Thus, courts considering whether an instrument was purchased for use under *Forman* typically consider the following three factors:

> (1) whether the promoter, despite disclaiming that the instruments could only be "used," also made representations that "fueled expectations of profit," *SG Ltd.*, 265 F.3d at 53-54 (statements discussing potential returns "constitute[s] a not-very-subtle form of economic inducement" at odds

with the bulletin in *Forman* that "nowhere" sought "to attract investors by the prospect of profits" (citing *Forman*, 421 U.S. at 854));

(2) whether it is reasonable to expect purchasers to "use" the item, *e.g.*, *Kemmerer v. Weaver*, 445 F.2d 76, 79-80 (7th Cir. 1971) (contract for sale and care of beavers was investment contract because "as a practical matter, it would have been physically impossible for the average purchaser of live breeding beaver to take absolute possession of his animals . . . ."); and

(3) whether the amount sold was indicative of a true consumptive purpose; compare *Grenader v. Spitz*, 537 F.2d 612, 617-618 (2d Cir. 1976) (co-op shares were not investment contracts because "[t]he number of shares [available was] . . . clearly in proportion to the size and location of the apartment . . . .") with *Cameron v. Outdoor Resorts of America*, 608 F.2d 187, 193 (5th Cir. 1979) (since investors were sold many units, they "manifestly could not use" all of them, and the shares were investment contracts).[12]

Here, the facts of what Kik actually told potential investors during its extensive marketing campaign defeat any argument by Kik that investors bought Kin "solely" or even primarily for "use."

*First*, throughout its white paper, press releases, social media posts and tweets, professionally prepared video, CNBC interview, and multiple roadshow presentations that were recorded and made available on the Internet, Kik made numerous statements that "fueled expectations of profit."  These statements repeatedly touted Kin's potential to gain or increase in "value" or become "more valuable" as a result of Kik's efforts to drive up demand for Kin, and conveyed that both investors and Kik "could make a lot of money" from Kin.  *See* Mem. 26-27; 56.1 ¶¶ 54, 97, 98, 100, 103, 110, 114, 115, 117, 120.  In particular, Kik's promise to accelerate demand, by promptly integrating Kin into Kik Messenger – with that application's "millions" of daily users – fostered expectations of an immediate boost in value and price.  *See* 56.1 ¶ 149; *Telegram*, 2020 WL 1430035, at *13 (anticipated integration of Grams into 300-million monthly user base "fueled the Initial Purchasers' expectations of a spike in Gram demand upon launch").  Kik also repeatedly predicted that Kin would be tradable on

---

[12] SEC staff has elsewhere summarized the factors derived from the foregoing cases that may guide the inquiry of whether purchasers of a token have "reasonable expectation of profits." *See* "Framework for 'Investment Contract' Analysis of Digital Assets," https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

"exchanges," thereby priming expectations that investors would be able to easily resell Kin at a profit. *See* Mem. 27-28; 56.1 ¶¶ 121-127, 129.

**Second**, it was not reasonable to expect public investors to be buying Kin to use the tokens. Even if Kik's marketing included general statements that Kin holders would "be able to spend Kin on products, services, and other valuable assets" (Kik Br. 30), nowhere in its summary judgment papers does Kik identify a single, specific use for Kin that it told prospective buyers about *before* the public sale. And, the record demonstrates that Kik never identified such a use. Mem. 28-29; 56.1 ¶¶ 208, 210-211. Kik's "MVP" – which Kik developed to put it "in a better position to defend a regulatory challenge" – consisted of honey-badger stickers that could not be bought or sold for Kin, and indisputably were never marketed to public sale investors. 56.1 ¶¶ 202-204, 207-208.[13] Kik claims that it directed public statements "to the group of people most likely to use and consume Kin" (Kik Br. 30), but Kik offers no proof that it presented to particular audiences or through particular media to accomplish such a goal. To the contrary, Kik cites only statements by its CEO – in publicly available Medium posts – about the importance of selling Kin to "as many people as possible." Kik Decl. Exs. N, O.[14]

In fact, the record shows that Kik deliberately targeted potential public investors who would seek primarily to maximize profits from Kin, not "use" the token. Kik executives viewed the Token

---

[13] Because the MVP stickers could not be bought or sold with Kin, they were essentially an additional feature of Kin for public investors who had a Kik Messenger account, serving as a cartoon display of their individual Kin balance. 56.1 ¶¶ 202, 204.

[14] Kik's assertion that it specifically "marketed Kin to developers" (Kik Br. 9, 30) is similarly unsupported. Kik cites only to the same Medium articles and other materials – such as the white paper – that were generally available to the public. *See id.* at 9 (citing Kik Rule 56.1 Statement (ECF No. 63) at ¶¶ 12-17). In supposed support of its assertion about what "[d]evelopers understood" from its 2017 marketing (Kik Br. 30, citing Ex. S, Kin.org Apps), Kik refers only to several pages of icons of applications that allegedly accept Kin in *2020*. And despite its claim that "TDE purchasers included developers that implemented Kin into their applications" (Kik Br. 31) – a claim that does not appear in Kik's Rule 56.1 statement – nowhere does Kik identify who these developers were. *See supra* Section II.A.2.

Summit as an "ideal" venue at which to announce the Kin offering, because "the primary audience for the initial announcement really is an investor community." Mem. 28; 56.1 ¶ 49. Additionally, Kik gave special treatment to potential "whale" investors that had indicated an interest in purchasing large amounts of Kin, 56.1 ¶ 248. A Kik executive emailed and called whales with plans to buy at least $1 million in Kin to answer questions, offer assistance, and provide a point of contact. *Id.* ¶ 248; Opp. 56.1 ¶ 12; *supra* Section II.A.2.

*Third*, the huge volumes of Kin bought by many public investors are "manifestly" inconsistent with a true consumptive purpose. *Cameron*, 608 F.2d at 193. Of the approximately $49.2 million collected by Kik in the public sale, over $34.4 million (70 percent) was paid by investors who spent at least $5,000, and over $46.8 million (95 percent) was paid by investors who spent at least $1,000. 56.1 ¶¶ 267-268; *supra* Section II.C.[15] There is simply no doubt that most Kin purchased in the public sale was purchased "with investment intent, not consumptive, intent." *See Telegram*, PI Order at 26-27 (concluding "[t]he size and concentration" of token purchases by group of initial purchasers reflected an investment intent).

Kik argues that it attempted to "encourage the widest possible audience to participate" in the public sale by briefly capping the investment amount at $4,393, before then selling Kin on an unlimited basis to these investors. Kik Br. 31. But Kik lifted the cap after 24 hours, and the total fundraising goal of $75 million for the public sale meant that no one investor was limited in how much they could buy. Opp. 56.1 ¶ 58. Furthermore, Kik's seeking a broad distribution of Kin does not show that Kik muted the expectation of profits that it fostered; to the contrary, Kik wanted a broad distribution to more quickly build the "economy" and to stimulate trading "velocity," which would lead to increased

---

[15] Kik's consultant advised the company, before the offering, that investors spending between $5,000 and $50,000 could be described as "serious cryptoinvestors globally as well as small VC funds and family offices that are pushing into the space." Opp. 56.1 ¶ 63.

value for Kin and increased profits for investors.  Opp. 56.1 ¶ 60; 56.1 ¶ 300; Mem. 24.  From an objective perspective – given the content of Kik's marketing and its failure to identify any specific use for Kin – even these relatively smaller investors were motivated by an investment intent.  *See SG Ltd.*, 265 F.3d at 53 (investment contract could exist despite the promoter's contention "that participants paid money not to make money, but, rather, to acquire an entertainment commodity for personal consumption"); *Telegram*, 2020 WL 1430035, at *14 n.12 ("Information in promotional materials on consumptive uses can still create an expectation of profits if the materials 'fuel[] expectations of profit,'" (quoting *SG Ltd.*, 265 F.3d at 54)); *Solis v. Latium Networks, Inc.*, No. 18 Civ. 10255, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (rejecting "use" argument with respect to digital asset that could supposedly unlock in-network uses, given that the platform had "limited functionality" at the time).

In any event, only a limited number of public investors bought small amounts of Kin. According to Kik's CFO at the time, small buyers would include people who "wanted to buy in for $50 or $100."  Opp. 56.1 ¶ 60.  But Kik received less than $42,000 in the public sale – *less than one tenth of one percent of the amount raised in the public sale* – from investors who spent $100 or less on Kin.  Opp. 56.1 ¶ 63.

*Finally*, several public investors have clearly testified that they *did* invest in Kin to make a profit. *See* Mem. 30-31; 56.1 ¶¶ 188-189.  Such testimony "may be properly considered in the Court's evaluation of the motivations of the hypothetical reasonable purchaser," even if it is not independently conclusive of such motivations.  *Telegram*, 2020 WL 1430035, at *14 (citing *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1305 (2d Cir. 1971) (finding that the testimony of individual investors "was relevant to whether [a document] was misleading to the 'reasonable investor'")).

> **b.   Kin Investors Reasonably Expected Profits Based On Entrepreneurial Or Managerial Efforts From Kik**

Additionally, there can be no genuine dispute that Kin investors reasonably expected that profits they gained from Kin's increase in value would be "derived from the entrepreneurial or

managerial efforts of others." *Edwards*, 540 U.S. at 395.  Kik's promotion of Kin clearly communicated that the company's future efforts would be "essential" to Kin's success, thereby also meeting Kik's version of the legal standard.  In *Telegram*, the promotion of Grams "created a reasonable expectation in the minds of the [purchasers] that their anticipated profits were dependent on Telegram's essential post-launch efforts."  *Id.* at *16.  The same is true here for Kik's promotion of Kin.

Throughout its four-month marketing campaign, Kik repeatedly and emphatically stated that it would lead efforts – by undertaking specific and consequential tasks – to drive demand and to grow the value of Kin.  Kik stated that it would (1) integrate Kin into Kik Messenger and, in so doing, "build fundamental value for Kin" and "on day one make Kin the most used cryptocurrency – one of, if not the most used cryptocurrencies in the world," which would "make Kin very valuable" (Mem. 32; 56.1 ¶¶ 146-149, 151-153); (2) build new products, programs and systems, including "additional feature development planned for the Kin integration into Kik" and a "Rewards Engine" and would attract developers and, like integration, make Kin more valuable (Mem. 32-33; 56.1 ¶¶ 54-55, 142-144, 170-171, 174-176, 178); (3) develop and coordinate new technology to supplement, and then to replace, the blockchain on which Kik intended to launch Kin and which was then inoperable for the types of mass transactions that Kik thought essential for the Kin Ecosystem (Mem. 34; 56.1 ¶¶ 156-165); and (4) create and "influence" a new "Foundation" that Kik would, in fact, direct and control, "to oversee the fair and productive growth of the Kin Ecosystem" (Mem. 34-35; 56.1 ¶¶ 180-182, 278-282). Meanwhile, Kik also continually touted its entrepreneurial experience and management expertise and told potential investors that it would remain committed to Kin's success.  Mem. 34; 56.1 ¶¶ 132-134, 137, 139-140.

Starting with the white paper and continuing throughout the entirety of the Roadshow, Kik emphasized that it had every financial incentive to carry through on its promises to take the above-described steps.  Kik was retaining three trillion (30 percent) of all Kin created, and so, the more Kik

got "this whole ecosystem going . . . the more the value of our 30 percent grows.  And we're looking at that as the fundamental way that we monetize this."  56.1 ¶ 110; *see also id.* ¶¶ 105-112; *supra* Section IV.A.1.d.  Furthermore, by creating a 10-quarter (two-and-a-half year) vesting schedule for its receipt of the Kin, Kik assured investors that Kik would remain incentivized and committed to the ecosystem for years to come.  *See* 56.1 ¶ 55; SEC31 (ECF No. 60-31) at 21; 56.1 ¶ 112 (telling New York City audience that Kik was "vesting in at 10 percent a quarter for 10 quarters"); *Telegram*, 2020 WL 1430035, at *17 (finding four-year lockup provision reserving a percentage of Grams for "critical employees" "fed reasonable expectations that this development team would continue to play an important role in the growth of the TON Blockchain").

In the face of this record, Kik's argument that it did not promise "managerial" or "entrepreneurial" efforts, and that its efforts were not the " 'undeniably significant' ones that would determine the success or failure of the economy" (Kik Br. 31-32) cannot be taken seriously.  Although Kik again cites cases from the real estate context, Kin – unlike real property or commodities such as gold or silver – has no inherent value.  Rather, Kin's value depended on whether Kik would succeed in creating a workable and vibrant economy for Kin.  Kik highlighted this very point in the opening pages of its white paper:

> But simply creating a digital currency is not enough. For a cryptocurrency to be viable, it must also be useful and valuable. ***To establish an economy around the new currency, Kik must help to establish Kin's fundamental value***.

56.1 ¶ 54 (emphasis added).  And the white paper went on to say:

> ***Kik will build fundamental value for the new currency by integrating Kin into its chat app.***  Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem.

*Id.* (emphasis added).  Thus, individual Kin investors could not – and did not – exercise "control" over their investment in any sense comparable to syndicate members "vot[ing] in a group venture" or condominium buyers "rent[ing] . . . out" their units.  Kik Br. 32.  Kik's own repeated statements made

clear that Kin investors were "dependent upon the managerial skill of others," namely Kik.  *Id.*  Kin investors could not reasonably have expected to implement any of the steps that Kik said it would take to drive demand for Kin and to increase Kin's value, on their own.  *See supra* Section IV.A.1.c; *e.g.*, *Albanese*, 823 F.2d at 412 (investment contracts created where plaintiffs who "were experienced businessmen" had no "realistic alternative" but to rely on promoter's efforts).

Kik's attempt to downplay the significance of its promised future efforts – equating them to property developers' alleged representations that they would build a "road" or "infrastructure" in other cases (Kik Br. 32-33) – similarly ignores the reality of what Kik repeatedly told potential investors about Kin and the future Ecosystem.  The Rewards Engine was not a "'road' on which the Kin tokens traveled," but, according to the white paper, "*an economic incentive mechanism . . . to further grow the ecosystem.*"  56.1 ¶ 169; SEC31 (ECF No. 60-31) at 5 (emphasis added).   Kik's CEO explained at the Token Summit that, as the Rewards Engine incentivized developers to create more transactions with Kin:

> [T]*he more valuable Kin overall becomes,* the more valuable daily reward becomes.  *And so, we see this daily reward starting at about $100,000 a day, but could quickly grow to half a million, a million dollars a day, if not more.*

56.1 ¶ 174.  Thus, the Rewards Engine that Kik promised to create was integral to its plan to increase Kin's value and boost profits for investors.

Similarly, Kik's promise to address fundamental technological flaws with the Ethereum blockchain, to which Kik devoted a section of its white paper, and which Kik elaborated upon during the Roadshow, did not merely suggest an incidental enhancement for the Ecosystem.  *Id.* ¶¶ 158-161.  The promised project – which Kik later did undertake – was an essential step without which a simple transaction involving Kin users "would take down the whole network."  *Id.* ¶ 161 (Kik CEO's statement at New York City Ethereum event); *see also id.* ¶ 164 (testimony from Kik's CEO that "the blockchain technology was very new and immature"); *id.* ¶ 156; SEC31 (ECF 60-31) at 19 (statement

in white paper that, "[t]o enable highly scalable, low latency, and cost effective decentralized systems . . . significant advances will need to be made in blockchain technology"). Investors in Kik "could not reasonably be believed to be desirous and capable of undertaking" these projects "on their own," and thus had to rely on Kik's managerial expertise. *Aqua-Sonic*, 687 F.2d at 583-84.

What is more, Kik made clear to investors that, at least for some period after distributing Kin, the Ecosystem that Kik envisioned would *not* be decentralized, and Kik would *singlehandedly* support Kin. Opp. 56.1 ¶ 19. It was *Kik* that would "be the ecosystem's champion" and would "build fundamental value for the new currency by integrating Kin into its chat app." Opp. 56.1 ¶¶ 7, 19; *see also id.* ¶ 19 (Kik would become Kin's "first large adopter and sponsor"). Kik drove home this point in its September 6, 2017 Medium post, stating: "**With one strong digital service on board from day one, Kin can enjoy a good start regardless of whether or not other digital services adopt it right away**." 56.1 Opp. ¶ 19 (emphasis added); *see also id.* (Kik CEO's statement during Roadshow that integration into Kik "on day one will make Kin the most used cryptocurrency – one of, if not the most used cryptocurrencies in the world. And that's going to make Kin very valuable.").

Kik's recycled arguments that Kin's value was affected by "general market factors" and that "[a]n expectation of profit primarily from resale of an asset on the secondary market . . . does not satisfy *Howey*" (Kik Br. 33-34) are also unavailing. The Supreme Court has squarely held that "profits" under *Howey* includes "capital appreciation resulting from the development of the initial investment." *Forman*, 421 U.S. at 852; *see also Edwards*, 540 U.S. at 394 ("profits" include "the increased value of the investment."). Just as the ability of Kin investors to resell the tokens does not preclude a "common enterprise," *supra* Section IV.A.1.c, neither does it show that Kin investors did not reasonably rely on Kik's future efforts to increase the tokens' value. *See Long*, 881 F.2d at 137 & n.8 (investment contracts created where promoter "provided the entire framework within which an individual investor's efforts would succeed or fail"); *Koscot*, 497 F.2d at 479, 485 (investors' ability to affect profits did not preclude

finding of investment contracts); *Aldrich*, 627 F.2d at 1039 (land sale contracts could constitute investment contracts despite investors' ability to resell lots); *Rodriguez*, 990 F.2d at 14 (same).

And where, as here, the promoter's efforts are so plainly central to "establish[ing]" and "build[ing]" the market value of the object of the investment, "market fluctuations" (Kik Br. 34) do not obviate the finding of an investment contract.  In *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985), the court found that the bank's sale of certificates of deposit through a special program was a sale of investment contracts where purchasers relied on the bank's "skill and financial stability" to perform additional tasks.  *Id.* at 240.  Specifically, the purchasers relied on the bank to create and maintain a secondary market for the CDs, to maintain its marketing efforts toward new buyers and issuing banks, and to provide ongoing monitoring of the issuing banks. *See id.* at 240-41.  The fact that the CDs could fluctuate in market value with changing interest rates did not mean the bank was not providing additional, valued services for the purchasers, nor did it negate the existence of an investment contract.  The same is true here for Kik's promises to create and develop the Kin Ecosystem after it delivered the tokens.  The cases Kik now cites do not show otherwise.  *See Long*, 881 F.2d at 137 n.8 (market forces not dispositive).[16]

The recent *Telegram* decision further illustrates why the "efforts of others" test is met here. Concluding that the test was satisfied in that case, the court found it important that (1) Telegram told investors that it would integrate Grams with its messaging service and "Grams would be the first

---

[16] None of Kik's other cases support its sweeping assertion that an investment contract is precluded by an impact on profits from market fluctuations or the investor's own actions.  Those cases simply involved fact-driven findings that the degree of involvement by the promoter or third parties was insufficient to create an investment contract.  *See Bender*, 32 F. Supp. 497, 501 (concluding promoter's efforts "would have at most only a marginal effect on the value of the condominium units"); *Life Partners*, 87 F.3d at 546 (finding no "significant non-ministerial service" performed by the promoter after delivering the relevant instruments to investors); *Noa*, 638 F.2d at 80 (promoter's purchase of silver and free storage did not amount to "undeniably significant efforts"); *SEC v. Belmont Reid*, 794 F.2d 1388, 1381 (9th Cir. 1986) (concluding in "close" case that investor's reliance on "managerial skill" of promoter did not exceed that of "an ordinary buyer"); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (rejecting claim that transactions were investment contacts under New York's Martin Act).

digital asset capable of mass market adoption;" (2) the offering was unlikely to succeed absent the promoter's "branding and support;" and (3) Telegram stated that it planned to reserve a percentage of Grams "for post-launch incentive payments to encourage the growth of the TON ecosystem." *Telegram*, 2020 WL 1430035, at *16. This case presents similar facts.  First, Kik stressed the importance of its plans to integrate Kin with Kik Messenger while it also touted Messenger's success, *see, e.g.*, 56.1 ¶ 139 (press release statement that "Kik is by far the largest consumer company to enter the cryptocurrency space, and this is a seminal moment for the industry."); *see also id.* ¶ 54, 132-141, 148-149; Opp. 56.1 ¶ 19.  Second, Kik's "branding and support" were integral to the Kin offering, as Kik's white paper itself proclaimed.  Opp. 56.1 ¶ 19; SEC31 (ECF No. 60-31) at 21 (stating that, "[i]n exchange" for three trillion Kin, "Kik will provide startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand.").  And, third, Kik told potential investors that it planned to reserve 60 percent of all Kin for post-launch incentive payments to developers through the Rewards Engine – which Kik promised investors that it would build – to generate increased transactions in Kin.

Finally, the reality that Kik's role was "undeniably significant" to future investor profits is buttressed by investor testimony.  As one public investor testified, if Kik were to go out of business and Kik Messenger were to "disappear[], it's likely the whole thing would disappear." 56.1 ¶ 188. Another testified that, if Kik did nothing after distributing Kin, "everyone would just jump ship . . . because all the investors would sell off." *Id.* ¶ 189.  *See also* 56.1 ¶ 190 (third investor's testimony that "it wouldn't magically happen.  Kik and Kin would have to push to make it happen"); *id.* ¶ 191 (fourth investor's testimony that, "given [Kik's] track record of success here, where success means doing anything, they would be able to do more anythings with tens of millions of dollars from the offering").

For all of these reasons, Kik's contention that it was only a "participant" in the Ecosystem and not a "landlord" rings hollow.  However Kik labeled itself, the company was the linchpin to Kin's

future success, which is why the company repeatedly assured investors that it was "all in."  There is

no genuine dispute that Kik promised "essential" managerial and entrepreneurial efforts that would

generate profits for public investors, without which the Kin project almost certainly would have failed.

*See Telegram*, 2020 WL 1430035, at *15 (finding that Telegram failed the "Bahamas test," because, "if,

after immediately after launch, Telegram and its team decamped to the British Virgin Islands . . . and

ceased all further efforts to support the TON Blockchain, the TON Blockchain and Grams would

exist in some form but would likely lack the mass adoption, vibrancy, and utility that would enable the

Initial Purchasers to earn their expected huge profits.").

### 3. Alleged Potential Regulation Of Kin By Other Agencies Does Not Affect Whether Kik Offered And Sold Investment Contracts

Congress "sought to define 'the term security in sufficiently broad and general terms so as to

include within that definition the many types of instruments that in our commercial world fall within

the ordinary concept of a security.'" *Forman*, 421 U.S. at 847-48 (quoting H.R. Rep. No. 85, 73d Cong.,

1st Sess., 11 (1933).  Kik's assertions that Kin functions like a "currency," and may be regulated by

other federal agencies, do not alter the conclusion that Kik offered and sold securities to public

investors under Congress's "broad and general" definition of the term.

*First*, Kin's alleged status as a "medium of exchange" "today," or even months after it

distributed the token on September 26, 2017 (Kik Br. 35-36), is irrelevant.  The analysis of whether

Kik offered and sold investment contracts must focus on the underlying contract, transaction, or

scheme at the time of the offer and sale.  *See Telegram*, 2020 WL 1430035 at *9; *Radiation Dynamics*, 464

F.2d at 890-91; *Aqua–Sonic*, 524 F. Supp. at 876; *infra* Section IV.B.3.  For this same reason, Section

D of the background section of Kik's brief (pages 12-13) and paragraphs 73 through 75, and 78

through 91, of Kik's Local Rule 56.1 Statement (ECF No. 63) are also irrelevant.

*Second*, Kik's contention that Kin qualifies as a "currency" under the Securities Act, and is therefore excluded from the Act's definition of "security," is without merit.[17]   Federal regulations define "currency" as "[t]he coin and paper money of the United States or of any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issuance."  31 C.F.R. § 1010.100(m).  Accordingly, the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") has concluded that "[i]n contrast to real currency, 'virtual' currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency.  In particular, virtual currency does not have legal tender status in any jurisdiction."  *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013) (discussing 31 C.F.R. § 1010.100(m)).[18]

Based on FinCEN's guidance, the SEC has repeatedly distinguished virtual currencies like Bitcoin from "real" currency.  *See, e.g.*, *In re Bitcoin Inv. Tr.*, Release No. 78282, 2016 WL 4363462, at *1 n.1 (July 11, 2016); *In re BTC Trading, Corp.*, Release No. 9685, 2014 WL 6872955, at *1 n.1 (Dec. 8, 2014).  The Commodity Futures Trading Commission ("CFTC"), whose authority Kik cites as evidence that the Securities Act should not cover cryptocurrencies, has made the same distinction.  *See In re Coinflip Inc.*, Release No. 33538, 2015 WL 5535736, at *1 n.2 (Sept. 17, 2015).  And the Internal Revenue Service ("IRS"), another agency Kik points to as evidence that the SEC should not regulate transactions in cryptocurrencies, has concluded that "virtual currency is not treated as currency" for

---

[17] Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), provides that the term "'security' . . . shall not include currency."  Section 2(a) of the Securities Act, 15 U.S.C. § 77b(a)(1), does not similarly exclude the term "currency" from "security."  The SEC does not dispute that the two provisions should be interpreted coterminously in this regard.  *See Edwards*, 540 U.S. at 393 (2004).

[18] The cited FinCEN Guidance is available at https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulationspersons-administering

purposes of federal tax laws.  *See* IRS Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Apr. 14, 2014).

Even the authority Kik cites for its assertion that cryptocurrencies share some characteristics of currencies acknowledges that virtual currencies may **also** be securities.  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 218 (E.D.N.Y. 2018).[19]  The fact that an asset may be used – or is used – as a "medium of exchange" does not transform the asset into a "currency" under federal law, and, therefore, a non-security under the federal securities laws.  For all of these of these reasons, Kin is not "currency" under the Securities Act, regardless of the labels that Kik applies to the token, and the Court can and should apply *Howey* to Kik's 2017 offer and sale of Kin.

*Third*, the potential jurisdiction of regulators other than the SEC over Kin does **not** counsel against application of the securities laws to Kin, particularly given Congress's broad definition of "security."  Courts and the staff of other federal agencies have readily acknowledged that cryptocurrencies may be subject to oversight by multiple federal agencies.  As the court in *McDonnell* explained, "[t]he jurisdictional authority of CFTC to regulate virtual currencies as commodities does not preclude other agencies from exercising their regulatory power" under appropriate circumstances. 287 F. Supp. 3d at 228-29 (quoting Jay Clayton [SEC Chair] and Christopher Giancarlo [CFTC Chair], *Regulators are Looking at Cryptocurrency*, WALL ST. J., Jan. 24, 2018 ("[S]ome products that are labeled cryptocurrencies have characteristics that make them securities.")); *see also id.* at 222 (describing "[c]oncurrent [o]versight" from SEC and other agencies).  Similarly, in a letter filed in the *Telegram*

---

[19] Other cases cited by Kik on this point are unrelated to the federal securities laws, or are taken out of context because they do not concern the definition of "currency" under the securities laws.  *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) (digital currency allegedly used by defendant and his coconspirators constituted "funds" within meaning of money laundering statute); *SEC v. Shavers*, No. 13 Civ. 416, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (Bitcoin satisfies the "investment of money" prong of the *Howey* test).

case, CFTC staff stated its view that a virtual currency may in fact been *both* a commodity and a security

under the Securities Act:

> [T]he Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-26, provides that
> many securities are commodities to which the securities laws apply.  Thus, any
> given digital asset may or may not be subject to the securities laws, but that
> does not depend on whether the asset is a commodity.  It depends on whether
> the asset is a 'security' within the meaning of the '33 Act itself.

Second D'Allaird Decl., SEC107, CFTC Letter dated Feb. 18, 2020, at 1-2.[20]  Furthermore, Kik cites

to no authority – and the SEC can find none – holding that the IRS's authority to tax transactions in

virtual currencies as transactions in property means that a virtual currency cannot be an investment

contract under *Howey*.  The *Howey* test was designed to avoid such pigeon-holing.[21]

In any event, Kik is applying the wrong test.  The existence of "another regulatory scheme"

may be relevant when analyzing whether a particular instrument is subject to the securities laws as a

"note" (like a bond or debenture) under the Supreme Court's rubric for "notes" in *Reves v. Ernst &*

*Young*, 494 U.S. 56, 67 (1990).  However, as the Supreme Court explained, the test for determining

whether an instrument is a "note" under *Reves* does not apply to determining whether an instrument

is an "investment contract" under *Howey*, because the *Howey* test is "designed for an entirely different

variety of instrument," and to conclude otherwise would "make the [securities] Acts' enumeration of

many types of instruments superfluous."  *Reves*, 494 U.S. at 64.

---

[20] As the CFTC staff's letter further explains, the CEA has provisions – including, among others, a savings clause in Section 2(a)(1) of the CEA – that preserve the SEC's jurisdiction and confirm that securities laws continue to apply to securities. *See* 7 U.S.C. § 2(a)(1)(A); *see also* 7 U.S.C. § 2(a)(1)(H) (carving out most securities from new authority granted to the CFTC under the Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat.1376, 1641-1802 (2010)).

[21] Notably, Kik does not even contend that Kin is a commodity subject to CFTC jurisdiction.  Furthermore, Kik cites cases that are factually inapposite and do not support its argument of alleged, inappropriate regulatory overlap regarding digital tokens. *See Walsh v. Int'l Precious Metals Corp.*, 510 F. Supp. 867, 871-872 (D. Utah 1981) (nondiscretionary commodities account); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560 (1979) (noncontributory, compulsory pension plan); *Berman v. Bache, Halsey, Stuart, Shields, Inc.*, 467 F. Supp. 311, 319 (S.D. Ohio 1979) (single margin account for commodities futures contracts).

**B.    Kik Is Not Entitled To An Exemption For The Portion Of Its Public Distribution That It Conducted Through SAFT Participants**

Kik violated Section 5 of the Securities Act through its *entire* 2017 offering of Kin, including the portion of the offering that Kik conducted through SAFT participants.  As to the SAFT portion – which Kik calls the "Pre-sale" – Kik does not dispute that Kik sold securities to the SAFT participants without registration.  Rather, Kik argues that the SAFT portion was exempt from registration under SEC Rule 506(c) of Regulation D.  But Kik cannot carry its burden that it qualified for this or any other exemption from registration.  *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1952) (an issuer claiming an exemption from registration carries the burden of proving entitlement to the registration).

Kik does not qualify for the Rule 506(c) exemption, because it did not limit its sales to accredited investors.  Kik did not engage in a "[s]eparate and [d]istinct [o]ffering[]" to the SAFT participants.  Kik Br. 41.  Rather, Kik conducted a single offering that amounted to a public distribution of Kin, part of which involved the SAFT participants.  Furthermore, even if Kik could be considered to have conducted two offerings – one to the SAFT participants and one to the non-accredited public investors – these "separate" offerings should be integrated as one offering under the applicable SEC rule and case law.  In either case, Kik did not limit its offering to accredited investors, as required.  Finally, the SAFT portion did not itself qualify for the Rule 506(c) exemption, because the SAFT participants were but the first step in the public distribution of Kin; Kik took no steps to ensure that the SAFT participants were not underwriters of Kin – that is, persons acquiring with the intent to resell to other investors.  For the same reason, Kik did not qualify for the statutory exemption for "transactions by an issuer not involving any public offering."  Kik Br. 41 n.13.

**1.    Kik Engaged In A Single Distribution, Not Two Offerings**

Although Kik acknowledges that the exemption in Rule 506(c) requires sales to accredited investors only (Kik Br. 38), Kik would limit this requirement to the portion of its offering to SAFT

participants, contending that it constitutes a separate offering that warrants exemption. Such a narrow application of the rule elevates form over substance and is not supported by the law. Kik sold securities to accredited and non-accredited investors alike, and engaged in a single noncompliant offering. *See SEC v. Cavanagh*, 445 F.3d 105, 114 (D.C. Cir. 2006) (concluding exemption from registration did not apply where defendants conducted "a single actual transaction with multiple stages"). Kik ran a single distribution, because, among other reasons:

(1) Kik repeatedly told investors, in public press releases and individual emails, that it was conducting one "sale" and seeking to raise one "total" amount of money. Kik's August 29, 2017 press release, for example, stated that Kik "will look to raise a ***total of US$125 million through its token sale***." 56.1 ¶ 245 (emphasis added); *see also* Mem. 38-40; 56.1 ¶¶ 55, 239, 257, 273, 274.

(2) Kik used the same marketing and logistics for SAFT participants and public investors. For example, it directed the white paper to both groups, gave public presentations that were open to both groups, and coordinated its Roadshow to encompass both groups. *See* Mem. 40-41; 56.1 ¶¶ 43, 46, 47, 240, 287; and

(3) Kik's delivery of Kin to SAFT participants was expressly conditioned on the public phase of the offering. The price at which Kik sold Kin to the SAFT participants was also expressly conditioned on the public phase. Thus, the two phases of the offering were inextricably bound. *See* Mem. 41-42; 56.1 ¶¶ 77-78, 81.

*See also supra* Section II.B. Given these facts and the overriding statutory objective of "full disclosure of information for the protection of the investing public," *Cavanagh*, 445 F.3d at 114-115, Kik engaged in a single distribution that was not limited to accredited investors. Any steps Kik allegedly took to determine that only the *SAFT participants* were accredited (Kik Br. 38-39) are beside the point. All of the Kin investors – the public investors as well the sophisticated SAFT participants – were entitled to

full disclosure.  It is undisputed that Kik did not even give the public investors the same quality of information that it provided to the SAFT participants, which is antithetical to the statutory objectives.

Kik's arguments that it conducted "separate" offerings are without merit.  Kik argues that "the two transactions were conducted for entirely different purposes" – with the SAFT portion allegedly intended to fund development of Kin pre-launch, and the public sale intended "to earn revenue for Kin."  Kik Br. 41.  But this assertion is wholly unsupported by the facts.  First, Kik's white paper described how *all* the proceeds from "the offer for sale of one trillion units" would be used, without distinguishing between "private" or "public" sale proceeds.  *Supra* Section II.B.  Second, Kik intended to use, and did use, proceeds from **both** transactions to advance the Kin project, and, to do so post-launch.  The white paper stated that all proceeds "will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik."

The SAFT and PPM did *not* state that funds from SAFT participants would be *limited* to pre-launch efforts.  Rather, the documents stated that funds would be used for various tasks – including creation of "a reward system" – that Kik intended to perform *after* launch.  56.1 ¶ 144.  Also, on September 11, 2017 – the day before Kik started the public sale – Kik entered into 10 SAFTs generating over $2 million for Kik.  *Id.* ¶¶ 52, 254; Opp. 56.1 ¶ 20.  It was impossible for Kik to use those funds to develop Kin's infrastructure "before it was launched" just two weeks later.[22]  As for funds received through the public sale, Kik similarly advertised that they would be used "to build a new platform," including "a new transaction service, the identity service, the reward engine, to build out all these cases inside of Kik, to get a bunch of developers building use cases outside of Kik basically to, like, launch this whole broader ecosystem."  *Id.* ¶ 143.  In short, Kik did not publicly identify

---

[22] Indeed, as of January 2018 – more than three months after it launched Kin – Kik still had approximately $34.9 million (over 70 percent) of the proceeds of its "private sale" in its TD Bank account.  Opp. 56.1, Counter-Statement ¶ E.  Kik admits in its brief that, through the SAFTs, it raised "more than enough to build the technology necessary to launch the token on the Ethereum blockchain."  Kik Br. 6.

different purposes for the two categories of sale proceeds, nor was there a practical difference in what Kik actually did with the proceeds.  *See supra* Section II.B.

Furthermore, Kik's chart purporting to compare the "Pre-sale" and "TDE" (Kik Br. 42, "Fig. 1.1") contains numerous errors and fails to demonstrate "separate" offerings.  The chart is flawed, because, among other reasons:

- The "**Asset Received**" by *both* SAFT participants and public investors was the same:  Kin.  *See infra* Section IV.B.3; Mem. 52-53.

- The "**Time Frame**" for the offering to *both* SAFT participants and public investors started with Kik's public announcement at the Token Summit on May 25, 2017.  Furthermore, Kik was still entering SAFTs on September 11, 2017, two weeks after Kik publicly announced how to sign up for the public sale, two days after registration for the public sale closed, and only one day before the start of the sale.  *See* 56.1 ¶¶ 234-235, 238, 254-256.[23]

- The fact that only some "**Participants**" were "accredited" does not legitimately distinguish the two portions of the offering.  Rather, the fact serves only to demonstrate that Kik does not qualify for the Rule 506(c) exemption.  Additionally, the comparison is factually incorrect, because Kik "individually" contacted the public investors that it identified as "whales."  56.1 ¶ 248; *supra* Sections II.A.2, IV.A.2.a.

- The contents of the "**Contracts**" do not dictate the nature of the investment contracts entered into by the SAFT participants and the public investors.  *See Joiner*, 320 U.S. at 346-48, 352-53; *supra* Section IV.A.

- The "**Consideration**" paid by public investors (Ether) was easily convertible – and promptly converted by Kik – into U.S. dollars.  Mem. 47; 56.1 ¶ 295.

- There were no "**Restrictions**" on the ability of either SAFT Participants or public investors to resell the Kin both simultaneously received.  56.1 ¶¶ 79, 83; Opp. 56.1 ¶ 34.

- The "**Offering Materials**" for *both* SAFT Participants and public investors included Kik's white paper, and Kik's Roadshow presentations were open to both groups.  *See* 56.1 ¶ 47.

---

[23] Furthermore, the September 11, 2017 SAFTs were created more than *three* weeks after Kik's August 21, 2017, "soft launch" of the registration process for prospective, non-SAFT purchasers who sought to participate in the public sale.  Opp. 56.1 ¶¶ 20, 38.

For all of these reasons, the undisputed facts show that Kik conducted a single offering that included both SAFT participants and non-accredited public investors, thereby precluding any reliance on Rule 506(c).

### 2. Even if Kik Engaged in Two Separate Offerings, They Should Be Integrated Into A Single Non-Exempt Offering

Even if the Court declines to find that Kik conducted a single offering, the evidence easily shows that the offerings to SAFT participants and public investors should be integrated, and therefore considered one offering, under the SEC's five-factor test. *See* Mem. 43-44 (describing factors). This integration test is set forth in Regulation D, the same regulation upon which Kik bases its claim of exemption. *See* 17 C.F.R. § 230.502(a) & Note. Although Kik acknowledges this test (Kik Br. 41 n.14), it declines to address it, and, for this reason alone, its motion should be denied. Additionally, as the SEC explained in its prior memorandum, the undisputed facts show that Kik cannot demonstrate that the sales to both SAFT participants and public investors should not be integrated, because:

(1) The sales were *"part of a single plan of financing."* They were both part of Kik's plan, even before Kik first announced the offering in May 2017, to raise $100 million to fund Kik operations and to launch and to develop Kin and the Kin Ecosystem.

(2) The sales *"involve[d] issuance of the same class of securities,"* namely Kin. All of the Kin issued were identical and fungible and provided their holders with the same rights. A change in the value of Kin affected all Kin tokens.

(3) The sales were *"made at or about the same time."* Kik offered Kin to both groups from May to September 2017; it sold Kin to both groups in September 2017 (after selling Kin to some SAFT participants in July and August of 2017); and it delivered Kin to both groups in September 2017.

(4) Similar *"consideration"* was *"received."* Kik received U.S. dollars or assets that were immediately convertible to U.S. dollars.

(5) The sales were *"for the same general purpose."* The sales to both groups were intended to raise funds that would be used to create and develop Kin and the Kin Ecosystem and to fund Kik's ongoing operations.

Mem. 43-48 and record cites therein (emphasis added).[24] Because Kik's offerings to SAFT participants and non-accredited public investors should be integrated and considered one offering, Kik's sales to non-accredited investors defeats Kik's reliance on the Rule 506(c) exemption.

### 3.   Kik's Public Distribution of Kin Through SAFT Participants Cannot Qualify For The Rule 506(c) Exemption

Even if Kik conducted separate, non-integrated offerings to SAFT participants and public investors, Kik still does not qualify for an exemption under Rule 506(c). That is because Kik took no steps to assure that participants would not immediately distribute the securities, and took no steps to issue securities with resale restrictions. There was no question that SAFT participants that spent millions of dollars on Kin would, once they received the 50 percent of the tokens they were owed during Kik's distribution event (on September 26, 2017), had every incentive to resell the Kin to the broader public, and the evidence shows that some did just that. This was impelled by the very structure of the SAFT, which allowed the participants to buy Kin at a 30 percent discount from the token's public sale price. Kik indisputably sought as SAFT participants various hedge funds or other large investment firms whose objective was to profit on resales. Kik Br. 41. Plus, there was no use for Kin

---

[24] Kik cites an unpublished district court opinion for the assertion that all five of the above factors must be met to find integration (Kik Br. 41 n.14, citing *Goodwin Props. LLC v. Acadia Grp., Inc.*, No. 01-49 (PC), 2001 WL 800064 (D. Me. July 17, 2001)), but this approach is contrary to the weight of case law authority, *see SEC v. Schooler*, 905 F. 3d 1107, 1163-64 (9th Cir. 2018) (Regulation D exemption unavailable where four out of five integration factors satisfied), and SEC guidance that "[a]ny one or more factors may be determinative," *Section 3(a)(11) Exemptions for Local Offerings*, 1933 Act Release No. 33-4434, 26 Fed. Reg. 11896, 1961 WL 61651, at *1 (Dec. 6, 1961); *see also* Mem. 45. In any event, all five of the integration factors are met here, as discussed in the text.

available to the SAFT participants.  *See supra* Section IV.A.2.a.  *See Telegram*, 2020 WL 1430035, at *14.

Two SAFT participants, who paid Kik $2 million and $20 million respectively under the SAFTs,

invested in Kin with hopes that the token would be "fairly easy top flip" so that they "can lock in

gain."  Mem. 55; 56.1 ¶¶ 193-194, 196.  As planned, the participants sold many billions of Kin within

months of their initial receipt of the tokens and earned substantial profits.  Mem. 55-56; 56.1 ¶¶ 195,

197.  Thus, Kik plainly sold Kin to SAFT participants who had "a view to . . . the distribution" of the

token, or who "participate[d] or ha[d] a direct or indirect participation in any such undertaking."  15

U.S.C. § 77b(a)(11); *see Cavanagh*, 445 F.3d at 115-116 (approving district court's conclusion that third

parties that purchased shares from affiliates of issuer with plans to resell them were underwriters).

Kik cannot evade this conclusion through the pretense that it sold only "a right to buy tokens"

– and not Kin – under the SAFTs.  Kik Br. 41.  First, this new argument by Kik, that it only sold

*options* to buy Kik through the SAFTs, contradicts Kik's earlier position that the SAFTs gave

participants "a contractual right to *receive* rights in the future."  Kik Br. 2 (emphasis added); *see also*

Answer ¶ 1 (ECF No. 22).  The SAFT simply does not state that it gave participants a right "to buy"

Kin.  Opp. 56.1 ¶ 22; SEC51 (ECF No. 60-61).  No additional investment decision by the SAFT

participant was necessary, or even possible.  Under the SAFT, in the event of a "Network Launch,"

Kik would deliver to the SAFT participants "the required amount of Kin automatically, without

further action required by the . . . [p]articipants."  Opp. 56.1 ¶ 22.

Second, Kik's other forumulation of its position – that SAFT participants bought only the

"right to receive" Kin in the future – is also contradicted by the SAFT.  The SAFT simply states that

it "hereby issues to the Purchaser the right (the "*Right*") to certain units of Kin, (the "*Token*" or

"*Kin*"), subject to the terms set forth below."  Opp. 56.1 ¶ 22; SEC61 (ECF No. 60-61) at KIK000067.

As Kik told the SEC in October 2017, "*Kin*" was "purchased by the pre-sale and public sale

participants."  Opp. 56.1 ¶ 22; SEC64 (ECF No. 60-76) at No. 7 (emphasis added).

Third, regardless of Kik's shifting characterizations of the SAFT, Kik sold Kin to the participants when the parties entered those agreements between July 3, 2017 and September 11, 2017, because at those moments "the parties to the transaction [became] committed to one another."  The transaction to which they became commited was the sale of Kin at a discounted, per-Kin, sales price. *Radiation Dynamics,* 464 F.2d at 890-91; *see also* 15 U.S.C. § 77b(a)(3) (defining "sale" in Securities Act to include "every contract of sale or disposition of a security or interest in a security, for value"); *Finkel v. Stratton Corp.,* 962 F.2d 169, 173 (2d Cir. 1992) (concluding sale occurs under Act "when the parties obligate themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." (internal quotation omitted)); *Aqua-Sonic,* 524 F. Supp. at 876 (stating that a transaction "by the very nature of the operation of the securities laws, must be examined as of the time that the transaction took place"); Mem. 52-53.

In *Telegram,* the court evaluated a similar arrangement in which the token issuer entered into contracts for future delivery of token, contingent on the launch of the network.  Acknowledging the controlling, above-cited precedent, the court reasoned that the issuer sold "Grams" to the purchasers when the parties entered their respective contracts, even though, at the time of the court's decision (in March 2020), the purchasers had not yet received any Grams.  The court concluded that the tokens were offered and sold "at latest" when the issuer filed Form Ds for the contracts in early 2018.  *See Telegram,* 2020 WL 1430035, at *9.  So too here, Kik sold "Kin" to the SAFT participants when the parties entered those contracts, and "at latest" when Kik filed its Form D for these sales on September 11, 2017.  *See* Kik Ex. G (ECF No. 64-7).

Given that Kik ***designed*** the sales to SAFT participants as part of a public distribution of Kin, Kik can hardly claim that it met the requirement of Rule 502(d) of Regulation D to "exercise reasonable care to assure that the purchasers of the securities are not underwriters" under the Act.  17 C.F.R. §§ 230.506(c)(1); 230.502(d).  Kik was obviously aware of the types of steps it needed to take

to satisfy the "reasonable care to assure" requirement.  *See* Kik Br. 39-40.  Even so, Kik makes no

argument that it took reasonable steps to prevent the resale of *Kin* that it distributed through the

SAFT participants.  And, in fact, it did not.  SAFT participants made no "[r]epresentations" that they

were purchasing Kin only for their own accounts, and not as an underwriter.  Kik Br. 40 (quoting

SAFT's participant representations that applied only to "this instrument" – the SAFT).  Kik did not

tell SAFT participants – in writing or otherwise – that they were prohibited from reselling Kin unless

the offer and sale of Kin were registered under the Act or an exemption from registration was

available.  *See id.*  And, Kik did not create the digital equivalent of a restrictive legend for the tokens

alerting downstream purchasers that resales must be registered or otherwise exempt.  *See id.*; Mem. 54-

55; 56.1 ¶¶ 79, 83.  *See Telegram*, 2020 WL 1430035, at *8 (concluding, even where purchasers

represented that they bought the tokens "for their own account," the issuer failed to comply with Rule

502(d) given "economic reality" of purchasers' incentive to "flip their Grams in a post-launch

secondary market").

　　　Nor can Kik prove that it is entitled to the Rule 506(c) exemption on the alleged ground that

it made a "good faith" and "reasonable" attempt to comply with Rule 506(c).  Kik Br. 38.  Rule 508(a)

provides, in relevant part:

> A failure to comply with a term, condition or requirement of Rule[] . . . 506
> will not result in the loss of the exemption from the requirements of section 5
> of the Act for any offer or sale to a particular individual or entity, if the person
> relying on the exemption shows:
>
> . . . .
>
> (2)  The failure to comply was insignificant with respect to the offering as a
> 　　　whole . . . and
>
> (3)  A good faith and reasonable attempt was made to comply with all
> 　　　applicable terms, conditions, and requirements of Rule[] . . . 506. . . .

Kik's failure to comply with Rule 506(d) resulted in the public distribution of $49 million worth of

securities on an unrestricted basis, without a registration statement – half of the entire offering.  This

cannot be characterized as an insignificant failure since Regulation D is premised on ensuring that the offering is not part of a public distribution. And Kik's total failure to take *any* of the steps for Kin outlined in Rule 502(d) cannot be described as a "good faith and reasonable attempt" to comply with that provision. Particularly in the context of an electronically transferable digital asset, it was not reasonable for Kik to create *no* restrictions on the transfer of Kin from SAFT participants to other persons that would occur directly, or through "exchanges" that Kik was well aware would facilitate further distribution of the asset. Therefore, the Rule 506(c) exemption was not satisfied or applicable.

### 4. Kik's Public Distribution of Kin Does Not Qualify For An Exemption Under Section 4(a)(2) of the Act

Although Kik makes the conclusory assertion that the portion of its offering to SAFT participants was "exempt from the registration requirements pursuant to Section 4(a)(2) of the Securities Act" (Kik Br. 41 n.13), this defense – which Kik did not include in its Answer – also fails. Section 4(a)(2) provides that "[t]he provisions of section 5 shall not apply to . . . transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2). Kik does not qualify for the statutory exemption either, because, as discussed above and in the SEC's prior memorandum, the offer and sale of Kin that Kik conducted via SAFTs "involv[ed] . . . [a] public offering."

As the Supreme Court has explained, "the applicability of [Section 4(a)(2)] should turn on whether the particular class of persons affected need the protection of the [Securities] Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" *Ralston Purina*, 346 U.S. at 125. The Second Circuit has also instructed that a "'[d]istribution' comprises the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (internal quotation omitted); Mem. 50. "In claiming an exemption under section 4(a), the defendant is required to 'establish that its sales do not constitute a disguised public distribution.'" *Telegram*, 2020 WL 1430035, at *7 (quoting *SEC v. Cavanagh*, 1 F.

Supp. 2d 337, 369 (S.D.N.Y. 1998)).  Here, Kin were never intended to come to rest in the hands of

SAFT participants, but to be dispersed to the broader public that was in need of the Act's protections.

Accorindgly, Kik's cannot rely on Section 4(a)(2).  *See Telegram*, 2020 WL 1430035, at *19 (concluding

issuer could not rely on Section 4(a)(2) where it "did not intend for the Grams to come to rest with

the Initial Purchasers.").

## V.    CONCLUSION

For the foregoing reasons and those stated in the SEC's prior memorandum, the Court should

deny defendant Kik's motion for summary judgment and grant plaintiff SEC summary judgment.


Dated:    April 24, 2020

/s/ David Mendel
Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
Division of Enforcement
100 F Street, N.E.
Washington, DC 20549
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on April 24, 2020, I caused the foregoing to be filed using the Court's CM/ECF

system, which will send a notification of such filing to each counsel of record.


*/s/ David Mendel*
David S. Mendel
*One of Plaintiff's Attorneys*