**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Case No.  19-cv-5244 (AKH)** |
| **vs.** | |
| **KIK INTERACTIVE INC.** | |
| **Defendant.** | |

**PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S RESPONSE AND COUNTER-STATEMENT TO DEFENDANT KIK INTERACTIVE INC.'S LOCAL CIVIL RULE 56.1 STATEMENT**

Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Plaintiff U. S. Securities and Exchange Commission ("SEC") submits this Response and Counter-Statement to Defendant Kik Interactive Inc.'s ("Kik") Local Rule 56.1 Statement (ECF No. 63), which Kik submitted in support of its motion for summary judgment.

To the extent the SEC does not controvert particular assertions by Kik, the SEC does not thereby concede that any such uncontroverted assertion constitutes a material fact, or that the cited evidence is relevant, or that it would be admissible at trial.  Nor does the SEC thereby admit the truth of those assertions for purposes other than resolution of Kik's motion.  To the extent that the SEC does not controvert assertions that a witness testified to a particular fact or that a document contains a specific statement, the SEC does not thereby concede that the witness or document is credible on that point, that the substance of the testimony or statement is not disputed, or that the testimony or statement is accurate.

<strong><u>SEC'S RESPONSE TO KIK'S LOCAL RULE 56.1 STATEMENT</u></strong>

1.      Kik is a Canadian company founded in 2009 by Ted Livingston and Christopher Best. Ex. A, Declaration of Tanner Philp ("Philp Decl."), ¶ 3.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 1.


2.      Kik launched a messaging application called Kik Messenger in 2010.  Ex. D, Excerpts of Transcript of Investigative Testimony of Ted Livingston dated November 11 and November 12, 2018 ("Livingston Inv. Tr."), at 18:6-8.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 2.

3.      In 2011, Mr. Livingston began studying the potential applications of blockchain and cryptocurrency in a consumer application.  Ex. D, Livingston Inv. Tr., at 66:1-68:20.  In late 2016 and early 2017, Kik began discussing how to implement a new business model centered around a decentralized digital currency.  Ex. A, Philp Decl. ¶¶ 17-26.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 3, but they are incomplete and, as such, misleading.  Slides distributed to and discussed by Kik's Board in early 2017 described Kik's sale of a "cryptocurrency" as a "new way to raise funds that is in vogue," and as a way to "finance the business" and "extend[ Kik's cash] runway."  (SEC15 (ECF No. 60-15) at KIK_FOUNDATION_CAP_005739, 47, and 52).[1]  At this time, Kik was "in a precarious position, to say the least."  (*Id.* at KIK_FOUNDATION_CAP_005705).

4.      Kik announced its vision for this digital currency to the public on May 25, 2017 through a Whitepaper ("the Whitepaper"), press release, and Medium blog post. *See* Ex. K, Whitepaper; Ex. M, Kin Press Release dated May 25, 2017; Ex. L, Ted Livingston, *Announcing Kin, a Cryptocurrency for an Open Future*, Medium (May 25 2017).

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 4, but they are incomplete and, as such, misleading.  Kik also announced its offer and sale of Kin at an event in New York City called the "Token Summit," by releasing a professionally produced video, and by appearing for an interview on CNBC.  (Answer (ECF No. 22) at ¶¶ 62-63; SEC36-A (ECF No. 60-36); SEC36-B (ECF No. 60-37); SEC58-A (ECF No. 60-68); SEC58-B (ECF No. 60-69); SEC59-A (ECF No. 60-70); SEC59-B (ECF No. 60-71)).  Kik also participated in a multi-city "Roadshow" to

---

[1] Exhibits cited by the SEC herein that are marked SEC1 to SEC103 were filed as attachments to the Declaration of Laura D'Allaird, filed on March 20, 2020 (ECF No. 60).  Consistent with the Court's instruction that "[p]arties shall refer to exhibits already filed and not duplicate them," Individual Rule 2(C)(i)(III), the SEC provides the docket entry number of each previously-filed exhibit cited.

promote the Kin offering, which included speaking events in Shenzhen, China (SEC45-A (ECF No. 60-46); SEC45-B (ECF No. 60-47)), San Francisco (SEC46-A (ECF No. 60-48); SEC46-B (ECF No. 60-49)), Toronto (SEC48-A (ECF No. 60-54); SEC48-B (ECF No. 60-55)), and New York City (SEC49-A (ECF No. 60-57); SEC49-B (ECF No. 60-58)).  Kik's CEO also discussed the Kin offering on a video podcast (SEC47-A (ECF No. 60-51); SEC47-B (ECF No. 60-52)).[2]

5.     In its Whitepaper, Kik explained that "blockchain-based networks offer open source models by which new digital ecosystems may thrive.  Large communities can gather around such networks and encourage the development of customized digital economies.  In such an ecosystem, consumers can trade currency for goods or services provided by creators and developers that have economic incentives, other than advertising, to make great products."  Ex. K, Whitepaper, at 3.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 5, but they are incomplete and, as such, misleading.  Kik's statements regarding the Kin offering were not limited to its white paper (*see* SEC Response to Paragraph 4, above), and Kik's white paper contained other statements beyond those quoted by Kik in Paragraph 5, including statements regarding how Kik would "help to establish Kin's fundamental value," and that "Kik will build fundamental value for the new cryptocurrency by integrating Kin into its chat app."  (SEC31 (ECF No. 60-31) at 5).

6.     The Whitepaper described how the proposed digital currency, called Kin, could be used in "everyday digital services such as chat, social media, and payments" and provided example use cases.  Ex. K, Whitepaper, at 13-15.

---

[2] (*See also* SEC35 (ECF No. 60-35), at ¶¶ 8-41).  Many of Kik's Roadshow events were recorded on video and posted on the Internet.  (Answer (ECF No. 22) at ¶¶ 7, 70).

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 6, but they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were not limited to its white paper (*see* SEC Response to Paragraph 4, above), and Kik's white paper contained other statements beyond those quoted by Kik in Paragraph 6.  (*See, generally*, SEC31 (ECF No. 60-31)).  At the time Kik issued the white paper, Kik's chief product officer did not want the company to "commit[]" to actual implementation of the specific use cases described in the white paper, because Kik "lacked the relevant research to see if these indeed turn out to be something that can create real value for the users."  (SEC41 (ECF No. 60-42) at 105:23-107:19).  And, when Kik distributed Kin on September 26, 2017, none of the "use case" examples suggested by the white paper were available.  (SEC10 (ECF No. 60-10) at 246:14-247:7).

7.     The Whitepaper also stated: "[d]ecentralization offers the most promising path to realize Kik's vision of a sustainable future in online communication and commerce."  Ex. K, Whitepaper, at 3.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 7, but they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were not limited to its white paper (*see* SEC Response to Paragraph 4, above), and Kik's white paper contained other statements beyond those quoted by Kik in Paragraph 7, including statements that "Kik will be the [Kin] ecosystem's champion and will showcase Kin to its millions of users;" "Kik will promote other Kin digital services;" "Kik will work toward creating the first open and sustainable alternative ecosystem of digital services for our daily lives;" "Kik will encourage a network effect for Kin by becoming its first large adopter and sponsor;" "Kik will initially implement a semi-centralized hybrid on-chain and off-chain transaction service for scalable interactions with the Kin cryptocurrency;" "Kik will provide startup resources, technology, and a covenant to integrate with the

4

Kin cryptocurrency and brand;" Kik "will pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Kin Ecosystem to its millions of users;" Kik "will establish the Kin Foundation;" and Kik will "create the Kin Rewards Engine to incentivize developers and creators to make new products and services." (SEC31 (ECF No. 60-31) at 6, 7, 18, 21, and 23).

8.    In the press release, Kik stated that it hoped Kin would become "one of the most adopted and used cryptocurrencies in the world." Ex. M, Press Release dated May 25, 2017.  It also stated that "[d]ecentralization provides a sustainable way forward." *Id.*

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 8, but they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were not limited to its May 25, 2017 press release (*see* SEC Response to Paragraph 4, above), and Kik's press release contained other statements beyond those quoted by Kik in Paragraph 8, including Kik's description of its "four step" plan to "establish[] demand and fundamental value for the cryptocurrency." (SEC38 (ECF No. 60-39)).

9.    The Medium blog post, which was written by Mr. Livingston, stated that Kin was envisioned as "a new ecosystem of digital services that will be truly open and decentralized, and which starts with a new cryptocurrency." Ex. L, Ted Livingston, *Announcing Kin, a Cryptocurrency for an Open Future*, Medium (May 25 2017).

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 9, but they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were not limited to its Medium blog post (*see* SEC Response to Paragraph 4, above), and Kik's Medium blog post contained other statements beyond those quoted by Kik in Paragraph 9, including an

acknowledgement that "Kik will initially be the only service using Kin" and an assurance that Kik "will create demand for [Kin] by encouraging people to earn and spend Kin within Kik, which is used by millions of people every day."  (SEC37 (ECF No. 60-38)).

10.     Mr. Livingston further stated that the Kin economy would allow, "people to participate in an economy based on buying and selling stickers, hosting and joining group chats, creating and using bots, and much more."  Ex. L, Ted Livingston, *Announcing Kin, a Cryptocurrency for an Open Future*, Medium (May 25 2017).

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 10, but they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were not limited to its Medium blog post (*see* SEC Response to Paragraph 4, above), and Kik's Medium blog post contained other statements beyond those quoted by Kik in Paragraph 10, including an acknowledgement that "Kik will initially be the only service using Kin" and an assurance that Kik "will create demand for [Kin] by encouraging people to earn and spend Kin within Kik, which is used by millions of people every day."  (SEC37 (ECF No. 60-38)).  Moreover, the "economy" described by Kik's CEO – "buying and selling stickers, hosting and joining group chats, creating and using bots, and much more" – did not exist at the time of Kik's offer and sale of Kin; no goods or services were offered for sale using Kin tokens at the time of Kik's offer and sale of Kin.  (SEC8 (ECF No. 60-8) at 475:6-22)  As of October 20, 2017, nearly four weeks after the conclusion of the Kin offering, neither Kik nor any third party offered services or products in return for Kin.  (SEC64 (ECF No. 60-76) at Nos. 9-11).

11.     On September 6, 2017, Ted Livingston posted another article on Medium, which stated:

> [the Kin ecosystem] is about a movement. A movement to build an ecosystem where people get fairly compensated for the value they provide to digital services. . . . A movement where consumers get immersive and unique experiences catered to their interests and needs. A movement is only as strong as the people behind it, and a movement this ambitious needs as many people as possible.

Ex. N, Ted Livingston, *Why I am Telling my Friends and Family That They Should Participate in the Kin TDE*, Medium (Sept. 6, 2017).

    **SEC Response:** The SEC does not controvert the assertions contained in Paragraph 11, but they are incomplete and, as such, misleading. Kik's statements regarding its offer and sale of Kin were not limited to its Medium blog post (*see* SEC Response to Paragraph 4, above), and Kik's Medium blog post contained other statements beyond those quoted by Kik in Paragraph 11, including the pledge that "Kin has at least one participant who was all in: Kik." (SEC68 (ECF No. 60-80)).[3] The day following this Medium post, on September 7, 2017, Mr. Livingston explained at a public event in New York City that Kik would use its app to "launch Kin" and "give it its value":

> And that's where we said, okay, it shouldn't be Kik points. It should be something more broad, bigger, and that's where we came up with the name Kin and family. It's, yes, we'll use Kik to launch Kin. That will give it its value. But then we'll use the cryptocurrency as a tool to economically incentivize the creation of hundreds, thousands, tens of thousands of other places where consumers can go to earn and spend Kin.
>
> . . .
>
> Like, the way I think of it is, number one, imagine somebody -- some new project created Kin. Hey, we're going to create this new ecosystem of digital services for consumers so you can go to all these different places, all these great services. But everybody would be like, well, who is going to adopt that? So now we're saying, well, actually we signed up the first digital service, and it's this company called Kik -- this app called Kik. It has 15 million monthly active users. It's a top 100 app in the U.S., and it's actually the number five most-searched for term in the App Store because everybody uses it to connect across communities. Everybody would be like, wow, Kin, that sounds amazing. And

---

[3] Kik published the September 6, 2017 Medium post touting the offering one day after the Ontario Securities Commission "definitively communicated a position that the [sale of Kin to the public] constituted an offering of securities" based on the *Howey* test and Canadian law. (Answer (ECF No. 22) at ¶ 109; SEC89 (ECF No. 60-101) at 169:22-171:16, 181:14-183:15).

you've already signed up Kik -- this top 100 app? Like, that's a really exciting project. And so that we think is like, the killer innovation is not only have we built the platform and the ecosystem with Kin, but we've also found that first killer app. And, you know, if you look at the history of platforms, that's always how they evolve. You know, like, Nintendo had Super Mario Brothers. Windows had Excel.  Even the iPhone had the iPod. So we think we have both the platform and the killer app to start this whole thing.

(SEC49-B (ECF No. 60-58) at 42:15-23, 45:3-46:3).

12.      In the same article, Mr. Livingston wrote "all developers out there who are competing in a world increasingly controlled by giants, we invite you to check out Kin."  *Id.*

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 12, but they are incomplete and, as such, misleading.  (*See* SEC Response to Paragraph 11, above). Throughout Kik's offer and sale of Kin, there was nothing to purchase with Kin.  (SEC8 (ECF No. 60-8) at 475:6-22).  A blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications also did not exist during Kik's offer and sale of Kin.  (*Id.* at 115:15-117:16; SEC14 (ECF No. 60-14) at 564:3-565:9).  And, Kik did not distribute its Software Developer Kit ("SDK") (consisting of public code, written by Kik, that allowed for third-party applications' integration with the blockchain on which Kin was then running) to potential developers until after the distribution of the token on September 26, 2017.  (SEC22 (ECF No. 60-22) at 183:25-184:15; SEC8 (ECF No. 60-8) at 586:6-19; SEC14 (ECF No. 60-14) at 564:21-566:9).  Paragraph 12 also omits that, around the time of the September Medium blog post quoted by Kik, Kik executives were contacting a number of public sale purchasers who had indicated an interest in purchasing large amounts of Kin, to offer assistance in completing their transactions and establish a point of contact within Kik.  (Answer (ECF No. 22) at ¶ 165).  Kik executives referred to these large purchasers as "whales."  (*See, e.g.,* SEC98 (ECF No. 60-110)).  On September 7, 2017, a Kik executive told his colleagues in an internal email: "I emailed all of the participants that indicated $1mm+

(excluding China) and have been doing follow up calls with a bunch.  I've talked to 6 directly so far and all were serious about their amounts.  I just got off the phone with one guy who is a pretty sophisticated ICO investor . . . ."  (*Id.* at KIK_00025988).  Kik's intention was to structure the sale so that whales were able to purchase whatever amount of Kin they desired.  Given the larger amounts at issue, Kik employees opted to contact these purchasers to offer themselves "as a resource to ask further questions about the white paper or anything that they had questions about." (Answer (ECF No. 22) at ¶ 165).

13.     Mr. Livingston published another article on Medium that same day, which stated:

> We believe there is an opportunity to fundamentally change how digital services are built, used and monetized. A way that gives consumers a richer ecosystem of digital services while compensating them for the value they contribute to those services. A way that empowers developers to follow their passions while still ensuring they can make a fair living. We want as many people as possible to be able to participate in this project from the beginning.

Ex. O, Ted Livingston, *Kin TDE: If You Want to Participate, You *Must* Register by September 9, 9:00 a.m. ET*, Medium (Sept. 6, 2017), at KIK00045080.

**SEC Response:**  The assertion that the language quoted by Kik in Paragraph 13 appeared in a September 6, 2017 Medium blog post is false.  Instead, the language quoted by Kik appears in an August 29, 2017 Medium blog post, which contained other statements beyond those quoted by Kik in Paragraph 13, including a description of the offer and sale of Kin as being a single sale of "1 trillion Kin tokens."  Also on August 29, 2017, Kik issued a press release in which it stated, among other things, that "[w]ith millions of users, Kik hopes to drive mainstream consumer adoption of Kin, potentially making it the most adopted and used cryptocurrency in the world." (SEC96 (ECF No. 60-108)).  Moreover, throughout Kik's offer and sale of Kin, there was nothing to purchase with Kin (SEC8 (ECF No. 60-8) at 475:6-22); a blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications did not exist (*id.* at

115:15-117:16; SEC14 (ECF No. 60-14) at 564:3-565:9); and Kik did not distribute a Software

Developer Kit for Kin to potential developers (SEC22 (ECF No. 60-22) at 183:25-184:15; SEC8 (ECF

No. 60-8) at 586:6-19; SEC14 (ECF No. 60-14) at 564:21-566:9).

 

14.     In the Whitepaper, Kik described the new Kin economy as:

> a global network of digital services that constitutes a new cooperative
> operating model, focused on the long term. In this model, developers and
> service providers will enjoy the right and opportunity to innovate and compete
> for compensation, while users will benefit from a diverse digital experience,
> freedom of choice, and access to a broad range of commercial services.

Ex. K, Whitepaper, at KIK000007.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 14, but

they are incomplete and, as such, misleading. Kik's statements regarding its offer and sale of Kin were

not limited to its white paper (*see* SEC Response to Paragraph 4, above), and Kik's white paper

contained other statements beyond those quoted by Kik in Paragraph 14 (*see, e.g.,* SEC Response to

Paragraphs 5-7, above). Throughout the offering and after, the "Kin economy" did not exist; no one,

not even Kik, offered any goods or services in exchange for Kin. (SEC64 (ECF No. 60-76) at Nos.

9-11).

 

15.     The Whitepaper stated that by providing an open and decentralized network of digital

services, the Kin ecosystem would "foster[] direct economic relationships between developers,

creators, and consumers, with value and governance shared among the participants." Ex. K,

Whitepaper, at KIK000003.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 15, but

they are incomplete and, as such, misleading. Kik's statements regarding its offer and sale of Kin were

not limited to its white paper (*see* SEC Response to Paragraph 4, above), and Kik's white paper

contained other statements beyond those quoted by Kik in Paragraph 15 (*see, e.g.*, SEC Response to Paragraphs 5-7, above).  Moreover, throughout Kik's offer and sale of Kin, there was nothing to purchase with Kin (SEC8 (ECF No. 60-8) at 475:6-22); a blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications did not exist (*id.* at 115:15-117:16; SEC14 (ECF No. 60-14) at 564:3-565:9); and Kik did not distribute a Software Developer Kit for Kin to potential developers (SEC22 (ECF No. 60-22) at 183:25-184:15; SEC8 (ECF No. 60-8) at 586:6-19; SEC14 (ECF No. 60-14) at 564:21-566:9).  Kik also stated that, for an unspecified period after the distribution of Kin, Kik would "have a lot of influence over [the] Kin Foundation" (SEC46-B (ECF No. 60-49) at 43:17-44:24; SEC49 (ECF No. 60-58) at 56:17-22), which together with Kik would control 90% of the outstanding supply of Kin (SEC31 (ECF No. 60-31) at 21 ("three trillion kin will be preallocated to Kik" and "six trillion kin will be under the purview of the Kin Foundation")).

16.     The Whitepaper continued to explain that users could "earn Kin by providing value to other members of the Kik digital community through curation, content creation, and commerce" and could "spend Kin on products services, and other valuable assets offered by merchants, developers, influencers, and other participants."  Ex. K, Whitepaper, at KIK00005-6.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 16, but they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were not limited to its white paper (*see* SEC Response to Paragraph 4, above), and Kik's white paper contained other statements beyond those quoted by Kik in Paragraph 16 (*see, e.g.*, SEC Response to Paragraphs 5-7, above).  Moreover, throughout Kik's offer and sale of Kin and after, there was nothing to purchase with Kin.  (SEC8 (ECF No. 60-8) at 475:6-22; SEC64 (ECF No. 60-76) at Nos. 9-11).

11

17.     In the May 25, 2017 press release, Kik stated:

> By integrating Kin into our chat app Kik, we hope to spark the creation of a
> new ecosystem of digital services that is open, sustainable, and compelling. It
> will be an ecosystem in which developers link arms to compete with the giants
> together, building a better future for society while also making money.

Ex. M, Kik Press Release dated May 25, 2017.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 17, but

they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were

not limited to the May 25, 2017 press release (*see* SEC Response to Paragraph 4, above), and Kik's

press release contained other statements beyond those quoted by Kik in Paragraph 17 (*see* SEC

Response to Paragraph 8, above).  Moreover, throughout Kik's offer and sale of Kin, there was

nothing to purchase with Kin (SEC8 (ECF No. 60-8) at 475:6-22); a blockchain capable of processing

transactions between buyers and sellers at the volume and speed necessary for running consumer

applications did not exist (*id.* at 115:15-117:16; SEC14 (ECF No. 60-8) at 564:3-565:9); and Kik did

not distribute a Software Developer Kit for Kin to potential developers (SEC22 (ECF No. 60-22) at

183:25-184:15; SEC8 (ECF No. 60-8) 586:6-19; SEC14 (ECF No. 60-8) at 564:21-566:9).  To the

extent Kik concedes in Paragraph 17 that the "ecosystem" would not be decentralized when Kin was

initially sold, or that it would be up to Kik to "build fundamental value for Kin" (SEC31 (ECF No.

60-31) at 5), the SEC does not controvert those assertions.  (*See* SEC Response to Paragraph 19,

below).


18.     In a May 25, 2017 Medium article, Ted Livingston described Kik's "ultimate vision"

that Kik Messenger would be "just one of thousands of services in the Kin ecosystem."  Ex. L, Kik

Press Release dated May 25, 2017.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 18, but

they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were

not limited to its Medium blog post (*see* SEC Response to Paragraph 4, above), and Kik's Medium blog post contained other statements beyond those quoted by Kik in Paragraph 18 (*see* SEC Response to Paragraph 10, above).  Moreover, throughout Kik's offer and sale of Kin, there was nothing to purchase with Kin (SEC8 (ECF No. 60-8) at 475:6-22); a blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications did not exist (*id.* at 115:15-117:16; SEC14 (ECF No. 60-14) at 564:3-565:9); and Kik did not distribute a Software Developer Kit for Kin to potential developers (SEC22 (ECF No. 60-22) at 183:25-184:15; SEC8 (ECF No. 60-8) at 586:6-19; SEC14 (ECF No. 60-14) at 564:21-566:9).  As of October 20, 2017, Kik was still the "initial user of the Kin ecosystem" and could not identify any other party then offering services or products in exchange for Kin.  (SEC64 (ECF No. 60-76) at No. 11).

19.    Kik's Whitepaper also explained that Kik's goal was to "encourage the development of a digital services ecosystem that is fair and open" and in which Kik preferred "to be a participant rather than a landlord." Ex. K, Whitepaper, at KIK000005.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 19, but they are incomplete and, as such, misleading.  While the white paper contained these statements, Kik also repeatedly emphasized Kik's importance to Kin's future success and detailed the actions it would take to lead the "Kin Project" and increase demand for Kin.  By way of example, Kik's white paper repeatedly touted Kik's plan, Kik's experience and past successes, Kik's intention to use Kik Messenger to "build fundamental value" for the token, and Kik's ability to lead the project:

a.   "Kik has been a leading innovator in the chat space since the first million people signed up for the application in 2010."  (SEC31 (ECF No. 60-31) at 5).

13

b. "The size of the [Kik Messenger] user base, demographics, and community ethos make Kik [Messenger] a unique venue to where cryptocurrency may be introduced, adopted, and utilized by a large mainstream audience."  (*Id.* at 9).

c. The "Kin Project" is "an opportunity to integrate chat with true digital commerce within an existing user base."  (*Id.* at 11).

d. The white paper touted the experience of Kik's management and included a four-page section describing the biographies and professional experience of seven Kik executives. Kik did not provide the biography of any non-Kik personnel.  (*Id.* at 24-27).

e. "In exchange [for its receipt of three trillion Kin], Kik will provide startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand."  (*Id.* at 21).

f. In the white paper's "Conclusion," Kik promised to "pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Ecosystem to its millions of users."  (*Id.* at 23).

g. The white paper does not identify any other participant or potential participant in the Kin ecosystem, other than Kik.  (*Id.*).

Similarly, in the May 25, 2017 video that Kik released when announcing the offering, Kik stated that "Kik has both the experience and the resources, and the user base to really make this happen." (SEC58-B (ECF No. 60-69) at 5:6-15).  Kik also included a description of Kik's management team in its Private Placement Offering Memorandum ("PPM"), because "people that would be investing in this company, Kik, at the presale level would want to know who's managing the company."  (SEC10 (ECF No. 60-10) at 390:13-391:3).  In fact, Kik made clear in the white paper that the "ecosystem" would *not* be decentralized when Kin was initially sold – it would be entirely Kik-based and entirely

up to Kik to "build fundamental value for Kin," which is why Kik repeatedly touted its experience,

past successes, and buy-in:

> To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems. Building a decentralized system is a complex process, and the transition to it must be done in a measured and responsible way over time. The following subsections outline Kik's plan for launching an entirely new platform: the Kin Ecosystem.
>
> . . .
>
> Today, Kik is one of the world's most used chat apps and the fifth most-searched term in the iOS App Store. The millions of people who use Kik each month are in a unique position to demonstrate how cryptocurrency economies might form and function in the context of a large, mainstream user base. Kik will build fundamental value for the new currency by integrating Kin into its chat app. Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem. In the future, users will be able to earn Kin by providing value to other members of the Kik digital community through curation, content creation, and commerce. Kik users will be able to spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants. Kin will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency. Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem.
>
> . . .
>
> Through a series of economic and technological transitions, and based on a new cryptocurrency called Kin, Kik will work toward creating the first open and sustainable alternative ecosystem of digital services for our daily lives.
>
> …
>
> Kik will encourage a network effect for Kin by becoming its first large adopter and sponsor. It will also establish the Kin Foundation as the custodian of the Kin Ecosystem, driving the stability and growth of Kin services.

(SEC31 (ECF No. 60-31) at 5-6, 7).  Kik's September 6, 2017 Medium post explicitly stated that Kik

could and would singlehandedly support Kin when first launched:

> Kin has at least one participant who was all in: Kik.  With one strong digital service on board from day one, Kin can enjoy a good start regardless of whether or not other digital services adopt it right away.  Kik has 15 million

monthly active users, many of whom are already accustomed to exchanging digital goods, such as stickers and emoji, through that.

(SEC68 (ECF No. 60-80); *see also* Answer (ECF No. 22) at ¶ 122).  And, Kik repeated these assurances during its public Roadshow:

> So, there's a couple phases to rolling out Kin, this new cryptocurrency.  So, the first phase is to create the cryptocurrency, and to integrate it into Kik. And that on day one will make Kin the most used cryptocurrency -- one of, if not the most used cryptocurrencies in the world. And that's going to make Kin very valuable.

(SEC45-B (ECF No. 60-47) at 18:3-22:15).

> And that's where we said, okay, it shouldn't be Kik points. It should be something more broad, bigger, and that's where we came up with the name Kin and family. It's, yes, we'll use Kik to launch Kin. That will give it its value. But then we'll use the cryptocurrency as a tool to economically incentivize the creation of hundreds, thousands, tens of thousands of other places where consumers can go to earn and spend Kin.
>
> . . .
>
> Like, the way I think of it is, number one, imagine somebody -- some new project created Kin. Hey, we're going to create this new ecosystem of digital services for consumers so you can go to all these different places, all these great services. But everybody would be like, well, who is going to adopt that? So now we're saying, well, actually we signed up the first digital service, and it's this company called Kik -- this app called Kik. It has 15 million monthly active users. It's a top 100 app in the U.S., and it's actually the number five most searched for term in the App Store because everybody uses it to connect across communities. Everybody would be like, wow, Kin, that sounds amazing. And you've already signed up Kik -- this top 100 app? Like, that's a really exciting project. And so that we think is like, the killer innovation is not only have we built the platform and the ecosystem with Kin, but we've also found that first killer app. And, you know, if you look at the history of platforms, that's always how they evolve. You know, like, Nintendo had Super Mario Brothers. Windows had Excel. Even the iPhone had the iPod. So we think we have both the platform and the killer app to start this whole thing.

(SEC49-B (ECF No. 60-58) at 42:15-23, 45:3-46:3).  And, Kik and the Kin Foundation (which Kik told purchasers it would "have a lot of influence over" (SEC46-B (ECF No. 60-49) at 43:17-44:24; SEC49-B (ECF NO. 60-58) at 56:17-22) collectively owned and controlled 90% of the outstanding

supply of Kin.  (SEC31 (ECF No. 60-31) at 21 ("three trillion Kin will be preallocated to Kik" and "six trillion Kin will be under the purview of the Kin Foundation")).

20.     Kik conducted a private offering of futures contracts between June and September 11, 2017 (the "Pre-sale"). Ex. A, Philp Decl. ¶ 32; Ex. E, SAFT.

**SEC Response:**  The assertions contained in Paragraph 20 are false.  Kik offered and sold one trillion Kin tokens between May 25, 2017 and September 26, 2017.  (SEC31 (ECF No. 60-31) at 21 ("Kik will conduct a token distribution event that will offer for sale one trillion units out of a 10 trillion unit total supply of Kin.")).  The offering was conducted in two phases – one phase involving discounted sales pursuant a contract called a Simple Agreement for Future Tokens ("SAFT") (which Kik sometimes called the "presale"), and one phase that did not involve a SAFT (which Kik sometimes called the "public sale," "Network Launch," "token distribution event," or "TDE").  (*See* Memorandum in Support of the SEC's Motion for Summary Judgment (ECF No. 58) at 38-43).  During Kik's Roadshow, Kik's CEO described these two phases of a single, one trillion token sale:

> So, maybe this is, like – the allocation is, we're selling 10%. So, we're creating 10 trillion Kin tokens. You know, why a trillion? Because consumers, when they post in our group chat, they don't want to earn .0002 Bit coin, they'd rather have two Kin. So you know, we just always look at this group (inaudible) so that's why so many. We're going to take 1 trillion of those tokens and then sell it in a token distribution event, and we're going to do half presale through institutional investors, which is already completely spoken for (inaudible) and then half through a public distribution event, and that distributor event. . . .

(SEC46-B (ECF No. 60-49) at 55:24-56:20; *see also* SEC31 (ECF No. 60-31) at 21 ("Kik will conduct a token distribution event that will offer for sale one trillion units out of a 10 trillion unit total supply of Kin.")).  Both phases of Kik's offering of one trillion Kin commenced on May 25, 2017, when Kik announced Kin, issued its white paper and commenced its multi-city Roadshow.  (*See* SEC Response to Paragraph 4, above).  Kik entered into its first SAFT on July 3, 2017.  (SEC53 (ECF No. 60-63)).  Kik's last ten sales of Kin pursuant to SAFT occurred on September 11, 2017, and garnered for Kik

proceeds of $2.005 million.  (*Id.*; SEC104, Second Declaration of Brent Mitchell ("2nd Mitchell Decl."), at ¶ 4).[4]  These final SAFT sales occurred after Kik's August 21, 2017 "soft launch" of registration for the public phase (SEC105, KIK_00066759), after Kik's August 29, 2017 announcement of registration for the public phase (SEC96 (ECF No. 60-108); Answer (ECF No. 22) at ¶ 160), and after the September 9, 2017 deadline for such registration (SEC96 (ECF No. 60-108); Answer (ECF No. 22) at ¶ 161).  On September 26, 2017, "pre-sale participants who were parties to the SAFTs received Kin at the same time as public sale participants."  (SEC64 (ECF No. 60-76) at No. 1).

21.     In the Pre-sale, Kik entered into Simple Agreements for Future Tokens ("SAFTs") with 50 individuals and entities.  Ex. A, Philp Decl. ¶¶ 32–25.  Kik also provided all Pre-sale participants with a Private Placement Memorandum ("PPM"), which set forth the terms of the transactions.  *Id.* ¶ 36; Ex. F, PPM.

**SEC Response:**  Subject to the SEC's Response to Paragraph 20, above, the SEC does not controvert the assertions contained in Paragraph 21.

22.     Through the SAFTs, the purchasers agreed to pay U.S. dollars in exchange for a contractual right to receive Kin in the future at a discount.  Ex. A, Philp Decl. ¶¶ 33–34, 48; Ex. E, SAFT.  The SAFTs explained that purchasers would have the right to receive Kin at a 30% discount from the maximum price that Kin would later be sold to the public (if and when Kik conducted such a public sale).  Ex. E, SAFT, at KIK000066.

---

[4] Exhibits SEC104 to SEC108 are attached to the Second Declaration of Laura D'Allaird, filed concurrently by Plaintiff.

**SEC Response:**  The assertions contained in Paragraph 22 are false.  Kik's SAFT provided that "in exchange for the payment by the undersigned purchaser," Kik "issue[d] to the Purchaser the right (the "Right") to certain units of Kin."  (SEC51 (ECF No. 60-61) at KIK000067).  The SAFT further provided:

> **(a) Network Launch**. If there is a Network Launch before the expiration or termination of this instrument, the Company will issue to the Purchaser a number of units of the Token equal to the Purchase Amount divided by the Discount Price pursuant to the following schedule:
>
> (i) Fifty percent (50%) shall be issued as soon as practicable after the Network Launch provided that such issuance shall be no later than the date on which such units of Token are distributed to the public; and(ii) Fifty percent (50%) shall be issued on the one-year anniversary of the Network Launch.

(*Id.*).  The SAFT also provided the following definitions:

> "**Discount Price**" means the maximum price per Token sold by the Company to the public during the Network Launch multiplied by the Discount Rate.
>
> "**Discount Rate**" is 70%.
>
> . . .
>
> "**Network Launch**" means a bona fide transaction or series of transactions, pursuant to which the Company will sell Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain.

(*Id.* at KIK000068).  As Kik admitted:

> Under the terms of the SAFT, Kik would issue to Private Sale participants a certain number Kin tokens in the event of a Network Launch (defined in the SAFT) upon the terms set forth in the SAFT. In such an event, Kik would deliver to the Private Sale Participants the required amount of Kin automatically, without further action required by the Private Sale Participants.

(SEC1 (ECF No. 60-1) at No. 26).  And, this admission is consistent with Kik's statement to the SEC that "Kin [was] purchased by the pre-sale and public sale participants."  (SEC64 (ECF No. 60-76) at No. 7).  Additionally, "pre-sale participants who were parties to the SAFTs received Kin at the same time as public sale participants."  (*Id.* at No. 1).

19

23.     The SAFTs provided Pre-sale participants with the right to receive 50% of their Kin if and when a "Network Launch" (initial functionality of Kin within Kik) occurred and the remaining 50% of their Kin a year later.  Ex. A, Philp Decl. ¶¶ 37–39; Ex. E, SAFT, at KIK000066.  If a Network Launch did not occur, the SAFT required Pre-sale participants to forfeit 30% of the amount they contributed.  Ex. A, Philp Decl. at ¶ 40.

**SEC Response:**  Certain of the assertions contained in Paragraph 23 are false.  A "Network Launch" meant Kik's sale of Kin to the public, not the "initial functionality of Kin within Kik" as stated in Paragraph 23.  (SEC51 (ECF No. 60-61) at KIK000068 ("'Network Launch' means a *bona fide* transaction or series of transactions, pursuant to which the Company will sell Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain.")).  The SEC does not controvert Kik's assertion that SAFT participants received 50% of the Kin they purchased via SAFT at the time of the Network Launch and 50% on the one-year anniversary of the Network Launch.  (*Id.* at KIK000067).  Under the SAFT, in the event of a Network Launch, Kik would deliver to the SAFT participants "the required amount of Kin automatically, without further action required by the Private Sale Participants."  (SEC1 (ECF No. 60-1) at No. 26.)  If a Network Launch did not occur by the deadline set forth in the SAFT, Kik had the obligation to repay the participant 70% of the amount paid by the participant.  (SEC51 (ECF No. 60-61) at KIK000068).  Consistent with the SAFT's terms, "[P]re-sale participants who were parties to the SAFTs received Kin at the same time as public sale participants."  (SEC64 (ECF No. 60-76) at No. 1).

24.     In the Pre-sale, Kik received $50 million from 50 purchasers. Ex. A, Philp Decl. ¶ 48.

**SEC Response:**  Subject to the SEC's Response to Paragraph 20, above, the SEC does not controvert the assertions contained in Paragraph 24.

25.     Kik decided to structure the Pre-sale as a Regulation D offering under Rule 506(c).  *Id.* ¶ 41; Ex. E, SAFT; Ex. F, PPM.

**SEC Response:**  The SEC does not controvert the assertion in Paragraph 25 that Kik contends that its sales of Kin pursuant to SAFT are exempt from registration under Rule 506(c) of Regulation D.  As set forth in the SEC's Memorandum in Support of its Motion for Summary Judgment (ECF No. 58), Kik's sales are not entitled to such exemption, and, in fact, Kik did not "structure the Pre-Sale as a Regulation D offering under Rule 506(c)."

26.     The PPMs stated that individuals and entities could only participate in the Pre-sale to the extent they were "accredited investors," as defined in Regulation D of the Securities Act of 1933. Ex. F, PPM, at KIK000037; Ex. E, SAFT, at KIK000066.

**SEC Response:**  Subject to the SEC's Response to Paragraphs 20 and 25, above, the SEC does not controvert the assertions contained in Paragraph 26.

27.     The PPM stated that it "ha[d] been prepared by Kik Interactive Inc. for use by a limited number of accredited investors to whom Kik Interactive Inc. is offering the opportunity to purchase the right to acquire in the future pursuant to a Simple Agreement for Future Tokens units of Kin tokens to be developed, produced and offered by Kik Interactive Inc." Ex. F, PPM, at KIK0000037.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 27.

28.     The PPM also contained a section on "Investor Qualifications," stating that:

Only persons of adequate financial means who have no need for present liquidity with respect to this investment should consider purchasing the purchase rights set forth in the SAFT offered hereby" and that "This Offering is limited solely to accredited investors as defined in Regulation D under the Securities Act, meaning only those persons or entities coming within any one or more of the following categories," followed by the categories of what persons and entities qualify as accredited investors.

Ex. F, PPM, at KIK000059-60.

> **SEC Response:** The SEC does not controvert the assertions contained in Paragraph 28.

29.    Similarly, the SAFT included a "Purchaser Representation" that "[t]he Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Purchaser's financial condition and is able to bear the economic risk of such investment for an indefinite period of time." Ex. E, SAFT, at KIK0000066.

> **SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 29, but they are incomplete and, as such, misleading.  The provision of the SAFT that Kik quotes also provides that "[t]he Purchaser enters into this SAFT with the expectation that he, she or it, as the case may be, will profit upon the successful development and Network Launch [*i.e.*, the sale of Kin to the public][5] arising from the efforts of Kik and its employees to develop and market the Kin Ecosystem and the Token Sale."  (SEC51 (ECF No. 60-61) at KIK000069).

30.    Kik engaged an independent consultant, CoinList, to verify that each participant was accredited.  Ex. A, Philp Decl. ¶ 42.

---

[5] (SEC51 (ECF No. 60-61) at KIK000068 ("**Network Launch**" means a *bona fide* transaction or series of transactions, pursuant to which the Company will sell Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain.")).

**SEC Response:** To the extent the assertions contained in Paragraph 30 refer to purchasers of Kin pursuant to Kik's SAFT, the SEC does not controvert these assertions.  Kik did not attempt to determine whether non-SAFT purchasers of Kin qualified as accredited investors.  (Answer (ECF No. 22) at ¶ 168).

31.     CoinList informed Kik that it collected participants' proof of accreditation through a website, coinlist.co/kin, and a platform called AngelList that provides accreditation-verification services.  Ex. A, Philp Decl. ¶ 43.  CoinList also informed Kik that its own lawyers conducted a secondary review of the documentation to verify whether each participant was accredited. *Id.*

**SEC Response:** To the extent the assertions contained in Paragraph 31 refer to purchasers of Kin pursuant to Kik's SAFT, the SEC does not controvert these assertions.  Kik did not attempt to determine whether non-SAFT purchasers of Kin qualified as accredited investors.  (Answer (ECF No. 22) at ¶ 168).

32.     Based on this review of accreditation materials, such as audited financial statements or attestations from lawyers or accountants, CoinList informed Kik that each of the fifty Pre-sale participants were in fact accredited investors, as defined under Regulation D.  *Id.* ¶¶ 43–44.

**SEC Response:** The SEC does not controvert the assertions made in Paragraph 32.

33.     Kik did not enter into any SAFT agreements until it received this confirmation from CoinList. Ex. A, Philp Decl. ¶ 45.

**SEC Response:** The SEC does not controvert the assertions made in Paragraph 33.

34.     The SAFT contained language cautioning participants that they could not participate in the Pre-sale if they planned to resell tokens immediately upon receipt.  Ex. E, SAFT, at KIK000069.

**SEC Response:**  The assertions contained in Paragraph 34 are false.  The SAFT required the purchaser to represent that the purchaser had no intention of reselling "this instrument" (*i.e.*, the SAFT); it required no representations regarding the resale of the discounted Kin the purchaser would receive.  In fact, the SAFT required the purchaser to represent that the purchaser expected to profit from the rise in price of Kin after the public sale "arising from the efforts of Kik":

> 4.     **Purchaser Representations**
>
> . . . .
>
>          **(b)** The Purchaser has been advised that the Right created by this instrument is a security and that the offers and sales of this Right have not been registered under any country's securities laws and, therefore, cannot be resold except in compliance with the applicable country's laws. **The Purchaser is purchasing this instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.** The Purchaser has such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Purchaser's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.
>
>          **(c) The Purchaser enters into this SAFT with the expectation that he, she or it, as the case may be, will profit upon the successful development and Network Launch arising from the efforts of Kik and its employees to develop and market the Kin Ecosystem and the Token Sale.**

(SEC51 (ECF No. 60-61) at KIK000069 (emphasis added)).   Kik was aware that buyers who purchased Kin pursuant to the SAFT were "investors" and "capitalists" and intended to sell their Kin after the public sale.  (SEC10 (ECF No. 60-10) at 212:25-214:12).

35.     The SAFT stated:

> THE OFFER AND SALE OF THIS SECURITY INSTRUMNET [sic] HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLCIABLE [sic] STATE SECURITIES LAWS PURSAUNT [sic] TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

Ex. E, SAFT, at KIK0000066.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 35, but they are incomplete and, as such, misleading.  The SAFT placed no restrictions on the resale of Kin. Rather, the SAFT required the purchaser to represent that the purchaser expected to profit from the rise in price of Kin.  (*See* SEC Response to Paragraph 34, above).


36.    The SAFT also contained a "Purchaser Representation" that "The Purchaser is purchasing this instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same."  Ex. E, SAFT, at KIK0000069.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 36, but they are incomplete and, as such, misleading.  The SAFT placed no restrictions on the resale of Kin. In fact, the SAFT required the purchaser to represent that the purchaser expected to profit from the rise in price of Kin after the "Network Launch" (*i.e.*, the sale of Kin to the general public).  (*See* SEC Response to Paragraph 34, above).

37.     After conducting the Pre-sale, Kik filed a Form D with the SEC on September 11, 2017, memorializing the exemption under Rule 506(c) of Regulation D.  Ex. A, Philp Decl. ¶ 50; Ex. G, Form D filed September 11, 2017 ("Form D"), at KIK000073-78.

**SEC Response:**  The SEC does not controvert the assertion in Paragraph 37 that Kik filed a Form D on September 11, 2017, but the Form D, by the very terms of Kik's exhibit, "claimed" an exemption, it did not "memorialize" one.

38.     Kik announced its plan to distribute Kin to the public, in a sale called the "Token Distribution Event" or "TDE," on August 29, 2017. Ex. A, Philp Decl. ¶ 52.

**SEC Response:** The assertions contained in Paragraph 38 are false.  Kik announced its plan to distribute Kin to the public on May 25, 2017, when it issued its white paper and commenced its multi-city Roadshow.  (*See* SEC Response to Paragraph 4, above; *see also* SEC31 (ECF No. 60-31) at 21 (Kik's May 25, 2017 white paper announced that "Kik will conduct a token distribution event that will offer for sale one trillion units out of a 10 trillion unit total supply of Kin").  On August 29, 2017, Kik issued a press release describing the specific process by which prospective, non-SAFT purchasers could register to buy Kin.  (SEC96 (ECF No. 60-108)).  The week prior, on August 21, 2017, Kik "soft launched" the registration process for prospective, non-SAFT purchasers. (SEC105, KIK_00066759).

39.     In the TDE, Kik sold Kin in exchange for another cryptocurrency, called Ether.  Ex. A, Philp Decl. ¶ 71.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 39.

40.     Before participating in the TDE, purchasers were required to register for the TDE before September 9, 2017 on the website kin.kik.com ("the Website").  Ex. A, Philp Decl. ¶¶ 53 – 54; Ex. O, Article titled "Kin TDE: If You Want to Participate, You *Must* Register by September 9, 9:00 a.m. ET." Produced at bates KIK00045080, at KIK00045080.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 40 and further states that the deadline for registration – September 9, 2017 – was two days before Kik's last ten sales of Kin pursuant to SAFT, from which Kik received $2.005 million in proceeds.  (SEC104, 2nd Mitchell Decl., at ¶ 4).

41.     The registration process, included Know-Your-Customer ("KYC") and Anti- Money Laundering ("AML") screening, which among other things, verified the identities of Kin purchasers. Ex. A, Philp Decl. ¶ 55.  Kik retained an outside consultant to advise Kik in conducting that process. *Id.*

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 41.

42.     Specifically, Kik required purchasers to submit personal information to comply with KYC/AML requirements.  *Id.* ¶ 58.  Purchasers were required to: (1) input certain basic information, including their name, date of birth, email and address; (2) provide a government identification number, either in the form of a passport or social security number and; (3) provide the address of the Ethereum wallet they planned to utilize in connection with the TDE.  *Id.*; Ex. B, Heinke Inv. Tr., at 417:13-22.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 42, and further states that Kik anticipated that some purchasers would spend more than $100,000 and required such purchasers to complete an additional "passport verification."  (*See* Philp Decl. (ECF No. 64-1) at ¶ 62).

27

43.     As the final step in the registration process, all purchasers were required to affirmatively verify that, among other things, the information they provided was correct, that they were participating in the TDE on a personal basis, and that they understood they would not be able to participate in the TDE with a different Ethereum wallet.  Ex. A, Philp Decl. ¶¶ 59, 62-63; Ex. J, Kin User Registration Guide, p. 7.  Purchasers also had to indicate the amount of Kin they wished to purchase. Ex. A, Philp Decl. ¶ 58.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 43.

44.     Only 10,000 of the 17,000 people who registered participated in the TDE.  Ex. A, Philp Decl. ¶¶ 66, 73.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 44.

45.     As a part of the registration process to purchase Kin, participants were required to enter into a contract with Kik governing that purchase, titled the "Terms of Use" ("Terms of Use"). Ex. A, Philp Decl. ¶¶ 60–63; Ex. H, Terms of Use.

**SEC Response:**  The SEC does not controvert that, at the time of registration, purchasers were required to click a button indicating that they consented to Kik's Terms of Use, but the remainder of Paragraph 45 is a legal conclusion, which the SEC need neither controvert nor accept.  Neither of the public-phase purchasers of Kin who were asked about the Terms of Use during their depositions in this case recalled clicking on the button or reading the document.  (SEC92 (ECF No. 60-104) at 104:3-25; SEC50 (ECF No. 60-60) at 187:5-188:23).  In fact, one of the two public-phase purchasers questioned by Kik about the Terms of Use testified that it was his expectation that Kik's Terms of Use document was irrelevant to a determination of whether Kik was offering or selling securities under

28

U.S. law.  (SEC92 (ECF No. 60-104) at 106:3-6 ("[J]ust because I agreed to it doesn't mean that Kik wasn't selling a security and that the rules -- that the American securities laws -- I mean, don't apply.")).  The SEC is not aware of, nor has Kik identified, any purchaser who actually read the Terms of Use.

46.     When submitting their registration information through the registration Website, purchasers were required to click a button verifying that they agreed to the Terms of Use.  Ex. A, Philp Decl. ¶¶ 60–63; Ex. J, Kin User Registration Guide, p. 7; Ex. H, Terms of Use, at KIK000079.

**SEC Response:**  The assertion contained in Paragraph 46 appears to be duplicative of the assertion contained in Paragraph 45, and so the SEC provides the same response.  (*See* SEC Response to Paragraph 45, above).

47.     The Terms of Use were publicly available in multiple places on the Website, including the screen where users submitted their registration information.  Ex. A, Philp Decl. ¶¶ 62–63; Ex. H, Term of Use; Ex. J, User Registration Guide, at 7.

**SEC Response:**  The assertion contained in Paragraph 47 appears to be duplicative of the assertion contained in Paragraph 45, and so the SEC provides the same response.  (*See* SEC Response to Paragraph 45, above).

48.     The Terms of Use notified purchasers that they agreed to the Terms of Use by using the Kin.kik.com website and that such agreement governed their purchase of Kin:

> By accessing or using the Site and/or purchasing Kin Tokens, you agree to be bound by this Agreement and all of the terms incorporated herein by reference. If you do not agree to this Agreement, you may not access or use the Site or purchase the Kin Tokens. This Agreement governs your access and use of the Site and your purchase of the Kin Tokens.

Ex. H, Terms of Use, at KIK000079.

29

**SEC Response:** The SEC does not controvert that the language quoted in Paragraph 48 appears in Kik's Terms of Use, but the remainder of Paragraph 48 is a legal conclusion, which the SEC need neither controvert nor accept. (*See also* SEC Response to Paragraph 45, above).

49.    The Terms of Use stated:

> **Disclaimers** EXCEPT AS EXPRESSLY PROVIDED TO THE CONTRARY IN A WRITING BY KIK, THE SITE CONTENT CONTAINED THEREIN, AND KIN TOKENS ARE PROVIDED ON AN 'AS IS' AND 'AS AVAILABLE' BASIS WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED. KIK DISCLAIMS ALL OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT AS TO THE SITE, CONTENT CONTAINED THEREIN AND KIN TOKENS.

Ex. H, Terms of Use, at KIK000079.

**SEC Response:** The SEC does not controvert that the language quoted in Paragraph 49 appears in Kik's Terms of Use, though the language does not appear on the first page of the document, as indicated by Kik's citation. Rather, the quoted language appears on page 10 of 19, at KIK000088. Furthermore, Kik "EXPRESSLY PROVIDED TO THE CONTRARY" in numerous writings and public statements. (*See, e.g.,* SEC Response to Paragraph 4, above).

50.    The agreement also stated:

> KIN IS AN INTANGIBLE DIGITAL ASSET. KIN TOKENS EXIST ONLY BY VIRTUE OF THE OWNERSHIP RECORD MAINTAINED IN THE ETHEREUM NETWORK. ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY KIN TOKENS OCCURS ON THE DECENTRALIZED LEDGER WITHIN THE ETHEREUM PLATFORM. KIK DOES NOT GUARANTEE THAT KIK OR ANY KIK PARTY CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY KIN TOKENS.

Ex. H, Terms of Use.

**SEC Response:** The SEC does not controvert that the language quoted in Paragraph 50 appears on page 11 of 19 of Kik's Terms of Use.

51.     Finally, the Terms of Use stated that they were "the entire agreement between you and Kik relating to your . . . purchase and use of the Kin Tokens."  Ex. H, Terms of Use, at KIK000079.

**SEC Response:**  The SEC does not controvert that the language quoted in Paragraph 51 appears in Kik's Terms of Use, but the quotation is incomplete and, as such, misleading; the quoted language also does not appear on the first page of the document, as indicated by Kik's citation, but on pages 18 and 19.  The full paragraph quoted by Kik states:

> **Miscellaneous**
>
> This Agreement constitutes the entire agreement between you and Kik relating to your access to and use of the Sites, and Content and your purchase and use of the Kin Tokens. This Agreement, and any rights and licenses granted hereunder, may not be transferred or assigned by you without the prior written consent of Kik, and Kik's failure to assert any right or provision under this Agreement shall not constitute a waiver of such right or provision. Except as otherwise provided herein, this Agreement is intended solely for the benefit of the parties and are not intended to confer third party beneficiary rights upon any other person or entity.

KIK000096-97.

52.     In the Terms of Use, Kik did not commit to do anything other than deliver Kin tokens in exchange for Ether.  Ex. H, Terms of Use.

**SEC Response:**  The assertions contained in Paragraph 52 appear to be duplicative to those contained in Paragraph 49, above, and so the SEC provides the same response.  (*See* SEC Response to Paragraph 49).

53.     The Terms of Use did not require TDE purchasers to share, with one another or with Kik any profits or losses resulting from their purchase of Kin. Ex. H, Terms of Use.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 53.

54.     TDE purchasers did not receive, review, or agree to the SAFT or PPM that were distributed to Pre-sale participants. Ex. A, Philp Decl. ¶ 66.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 54.

55.     The TDE began on September 12, 2017 at 9:00am ET. Ex. A, Philp Decl. ¶ 67.

**SEC Response:**  The SEC does not controvert Kik's assertion that non-SAFT purchasers who had registered for the Kin sale by the September 9, 2017 deadline began to make specific purchases of Kin (which they and SAFT participants would simultaneously receive on September 26, 2017) on September 12, 2017.  (Answer (ECF No. 22) at ¶ 171).

56.     In the TDE, Kik agreed to deliver tokens to purchasers in exchange for Ether.  Ex. A, Philp Decl. ¶ 71; Ex. H, Terms of Use.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 56.  Kik planned to convert the Ether to US dollars immediately after the conclusion of its sale of Kin. (SEC46-B (ECF No. 60-49) at 55:10-23).  Kik began to convert the Ether to US dollars on September 27, 2017, the day after Kik's distribution of Kin.  (SEC93 (ECF No. 60-105) at ¶ 10).

57.     By that date, 17,075 individuals from 139 countries had pre-registered to participate. Ex. A, Philp Decl. ¶ 67; Ex. P, Article titled "Kin token distribution event starts today," dated September 12, 2017, at 1.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 57, but, in full, the September 12, 2017 press release provided as follows:

> WATERLOO, Ontario - Sept. 12, 2017 - Kik Interactive the creator of the popular chat platform Kik, today announced the Kin token distribution event (TDE) will commence on Sept. 12, 9:00 a.m. ET.  To date, 17,075 individuals from 139 countries have registered to participate in the token sale, in which Kik will look to raise a total of US$125 million.
>
> TDE participants will have 24 hours starting on Sept. 12, 9:00 a.m. ET to participate up to US$4,393.  This individual cap was determined by dividing the available US$75 million by the total number of registrants. In doing this, we are guaranteeing that not all of the US$75 million will be sold – registered participants who later decide not to participate at all or at the or maximum participation cap will result in unsold tokens.  On Sept. 13, 9:00 a.m. ET, these unsold tokens will be sold in a subsequent sale for registered participants who would like to buy more. The maximum participation cap will be incrementally raised over the first hour and then be removed until all tokens are sold.
>
> Kik has already raised US$50 million in a presale round, leaving 512 billion Kin tokens valued at US$75 million available for the public token sale. Notable participants of the pre-sale included Blockchain Capital, Pantera Capital, and Polychain Capital.
>
> Only those who completed registration before Sept. 9 can participate in the TDE, which will only take place on kin.kik.com.
>
> **About Kik:**
>
> Kik Interactive Inc. connects the world through chat. The company is the maker of Kik, a chat platform popular with U.S. teens where people can chat with friends and connect with chat-based services. Founded in 2009, Kik Interactive Inc. is headquartered in Waterloo, Ontario, Canada. For more information, please visit kik.com

(SEC99 (ECF No. 60-111); https://www.kik.com/blog/kin-token-distribution-event-starts-today/ (last visited Apr. 20, 2020)).

58.     For the first 24 hours of the TDE, Kik imposed a cap on individual purchases, so that no one person could buy more than $4,393 worth of Kin.  Ex. A, Philp Decl. ¶ 69, Ex. P, Article titled "Kin token distribution event starts today," dated September 12, 2017, at 1.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 58, but they are incomplete and, as such, misleading.  (*See* SEC Response to Paragraph 57, above).  While Kik imposed a cap for the first 24 hours, it lifted the cap thereafter, and purchasers could spend unlimited amounts of Ether to buy Kin.  (Answer (ECF No. 22) at ¶ 173).  Kik had a goal of raising up to $125 million total, with up to $75 million coming through the public sale portion of its offering.  (SEC67 (ECF No. 60-79) ("Kik will look to raise a total of US$125 million through its token sale"); SEC99 (ECF No. 60-111) (same)).  As a result, no public sale purchaser was limited in how much they could buy.  Within nine hours of removing the cap on September 13, 2017, Kik saw its daily sales volume double.  (SEC106, KIK_00061820).

59.     The Kin Foundation posted a Tweet stating that these individual caps were designed to ensure all registered participants had a fair chance to purchase.  Ex. W, Tweet from Kin Foundation.

**SEC Response:** The SEC does not controvert that a Tweet was sent from a Twitter account called "Kin Foundation" that stated that "We implemented individual caps during the first 24hrs to ensure all registered participants had a fair chance to purchase," but Tweets posted by the "Kin Foundation" Twitter account were written by Kik's Social Media Manager.  (SEC64 (ECF No. 60-76) at No. 17).

60.     Kik also did not require a minimum purchase amount.  Ex. B, Heinke Inv. Tr., at 215:2-5; Ex. A, Philp Decl. ¶ 70.

**SEC Response:**  The SEC does not controvert the assertions made in Paragraph 60, and also states that Kik believed that the Kin project "would only be successful if over the long term the economy took off and did really, really well."  (SEC10 (ECF No. 60-10) at 130:10-12).  Kik's Chief Financial Officer at the time of the offering testified that, "[i]f somebody wanted to buy in for 50 or

$100 and buy currency, they could do that, because they were going to transact in the systems.  So the broader we had in that base, the more successful we're going to be as an economy."  (SEC10 (ECF No. 60-10) at 131:14-18).

61.     TDE purchasers paid Ether in exchange for Kin tokens.  Ex. A, Philp Decl. ¶ 71.  In total, Kik received Ether worth approximately $50 million as of the end of the TDE from more than 10,000 purchasers. *Id.* at ¶ 73.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 61, but adds that Kik planned to convert the Ether to US dollars immediately after the conclusion of its sale of Kin.  (SEC46-B (ECF No. 60-49) at 55:10-23).  Kik began to convert the Ether to US dollars on September 27, 2017, the day after Kik's distribution of Kin.  (SEC93 (ECF No. 60-105) at ¶ 10).

62.     Of that $50 million, approximately $16 million came from purchasers who listed the United States as their place of residence in the United States.  Ex. A, Philp Decl. ¶ 73.  Of the over 10,000 purchasers, 3,456 purchasers listed their residence as in the United States.  *Id.*

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 62.

63.     Approximately half of the total TDE purchasers bought less than $1,000 worth of Kin in the TDE, and over ninety percent of purchasers in the TDE bought less than $5,000 worth of Kin. *Id.* ¶ 73.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 63, but they are incomplete and, as such, misleading.  Of the $49.2 million spent on Kin by all public buyers, a total amount of about $31,369,147 (about 64%) was spent by buyers who paid at least $10,000, a total amount of about $34,429,000 (about 70.6%) was spent by buyers who paid at least $5,000, and a

total amount of about $46,837,457 (about 95%) was spent by buyers who paid at least $1,000. (SEC93 (ECF No. 60-105) at ¶ 6; SEC104, 2nd Mitchell Decl., at ¶ 6(d)). Only $42,000 – or about 0.09% of the public sale total – was spent by buyers who paid $100 or less, and only 746 of the total 10,000 public sale purchasers paid $100 or less. (SEC104, 2nd Mitchell Decl., at ¶ 6(b)-(c)). Those 746 people bought about $852 out of every $1,000,000 in Kin sold. (*Id.* at ¶ 6(c)). In April 2017, Kik's consultant informed Kik that buyers who purchased Kin in amounts of $5,000 and above would be "serious cryptoinvestors globally as well as small VC funds and family offices that are pushing into the space (with larger ones trying to formulate a thesis on the opportunity and set up structures to allow for token based investments.)" (SEC83 (ECF No. 60-95) at COINFUND019869-70).

64.     Some purchasers bought less than $1 worth of Kin, including at least one purchaser who bought only $0.09 worth of Kin. *Id.* ¶ 75.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 64, but they are incomplete and, as such, misleading. (*See* SEC Response to Paragraph 63, above).

65.     When the TDE ended on September 26, 2017, Kik issued a press release stating: "[m]ore than 10,000 people from 117 countries participated in the token sale, immediately making Kin one of the most widely held cryptocurrencies in the world." Ex. Y, Kik Press Release dated 9/26/17.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 65, but they are incomplete and, as such, misleading. In total, the press release provided:

> WATERLOO, Ontario — Sep. 26, 2017- Kik Interactive, the creator of the popular chat platform Kik, has announced the Kin token distribution event (TDE) has successfully ended raising nearly US$100 million. More than 10,000 people from 117 countries participated in the token sale, immediately making Kin one of the most widely held cryptocurrencies in the world.

"We wanted as many people as possible to participate in the Kin token distribution event. Based on the outpouring of support leading up to and during the event, we clearly achieved that goal," said Ted Livingston, founder and CEO of Kik. "We envision Kin as the foundation for a decentralized ecosystem of digital services, starting with Kik, and we couldn't be more thrilled than to build this new future together with you."

Kin is an ERC20 token on the Ethereum blockchain that will be integrated into Kik as the primary transaction currency. By integrating Kin into Kik's chat platform, which has millions of users, to drive mainstream consumer adoption, Kin has the potential to become the most adopted and used cryptocurrency in the world. Eventually, the Kin Rewards Engine, an innovative cryptoeconomic structure intended to promote the use of Kin as a common currency, administered by the Kin Foundation, will foster the creation and development of a worldwide, decentralized ecosystem of digital services.  For more information on Kin, please visit: kin.kik.com.

**About Kik:**

Kik Interactive, Inc., connects the world through chat. The company is the maker of Kik, a chat platform popular with U.S. teens where people can chat with friends and connect with chat-based services. Founded in 2009, Kik Interactive, Inc. is headquartered in Waterloo, Ontario, Canada. For more information, please visit kik.com.

(SEC100 (ECF No. 60-112)).

66.     The same press release quoted Mr. Livingston as saying, "[w]e wanted as many people as possible to participate in the Kin token distribution event. Based on the outpouring of support leading up to and during the event, we clearly achieved that goal . . . .  We envision Kin as the foundation for a decentralized ecosystem of digital services, starting with Kik, and we couldn't be more thrilled than to build this new future together with you." Ex. Y, Kik Press Release dated 9/26/17.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 66, but they are incomplete and, as such, misleading.  (*See* SEC Response to Paragraph 65).

67.     Kin was launched and distributed to the TDE purchasers on September 26, 2017 via a smart contract.  Ex. A, Philp Decl. ¶ 78.  Pre-sale participants received 50% of the tokens they were allocated according to their SAFT agreements on the same day.  *Id.* ¶ 39, 78.

**SEC Response:**  The SEC does not controvert that SAFT and non-SAFT Kin purchasers received their Kin simultaneously (not just "on the same day"), the former subject to the vesting schedule set forth in the SAFT.  (SEC64 (ECF No. 60-76) at No. 1; Answer (ECF No. 22) at ¶¶ 177-178).

68.     The Kin token that was distributed operated on the Ethereum blockchain, which is an open source platform that Kik did not create, launch, or control.  Ex. A, Philp Decl. ¶¶ 27, 81.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 68.

69.     Once TDE purchasers received their Kin tokens, TDE purchasers had complete control over the tokens – Kik had no control over what they did with the Kin tokens they had purchased.  ECF No. 1 at ¶ 88; Ex. A, Philp Decl. ¶ 91.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 69, but they are incomplete and, as such, misleading.  Although public sale purchasers could control the tokens after they received them, the purchasers did not have control over Kik's efforts to "establish Kin's fundamental value," or to "build fundamental value for the new cryptocurrency by integrating Kin into its chat app," or to perform other tasks that Kik said it would do during its marketing of Kin to develop the Kin Ecosystem.  (*See, e.g.*, SEC31 (ECF No. 60-31) at 5).

70.     Kik stated in its Whitepaper that it would not launch Kin until it was integrated in Kik messenger.  Ex. K, Whitepaper, at KIK000023.  Kik had delayed the date of the TDE at least three

times because the token was not then ready to be integrated within Kik Messenger. Ex. A, Philp Decl. ¶ 79.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 70, but they are incomplete and, as such, misleading.  Kik's statements regarding its offer and sale of Kin were not limited to its white paper (*see* SEC Response to Paragraph 4, above), and Kik's white paper contained other statements beyond those quoted by Kik in Paragraph 70. (*See, generally*, SEC31 (ECF No. 60-31)).  In addition, on the day that Kik distributed Kin (September 26, 2017), Kik issued a press release stating that "Kin . . . *will be* integrated into Kik [Messenger] as the primary transaction currency," thereby implying that Kin had not yet been integrated into Kik Messenger (SEC100 (ECF No. 60-112) (emphasis added)).  And, on October 20, 2017, nearly a month after Kik distributed Kin, Kik confirmed "Kik intends to use the sale proceeds for operating expenses and to build out the Kik app to further incorporate the use of Kin and further integrate with the Kin ecosystem."  (SEC64 (ECF No. 60-76) at No. 4).

71.     On the day Kin was launched, Kin could be immediately transferred between users on the Ethereum blockchain peer to peer or be integrated within an application, and was also integrated within Kik Messenger.  *Id.* ¶¶ 81, 83, 85.

**SEC Response:**  The SEC does not controvert the assertions made in Paragraph 71, but they are incomplete and, as such, misleading.  On the day Kin was launched, there was nothing to purchase with Kin (SEC8 (ECF No. 60-8) at 475:6-22); a blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications did not exist (*id.* at 115:15-117:16; SEC14 (ECF No. 60-14) at 564:3-565:9); and Kik had not distributed a Software Developer Kit for Kin to potential developers (SEC22 (ECF No. 60-22) at 183:25-184:15; SEC8 (ECF No. 60-8) at 586:6-19; SEC14 (ECF No. 60-14) at 564:21-566:9).  As of October 20, 2017, Kik was

aware of "secondary trading on exchanges," but Kik could not identify anyone that accepted Kin in exchange for a good or service, including Kik itself.  (SEC64 (ECF No. 60-76) at Nos. 9-11; *see also* SEC Response to Paragraph 70, above).

72.     Anyone with an Ethereum wallet address could accept Kin as payment, starting from the second Kin was launched. *Id.* ¶¶ 81.

**SEC Response:**  The assertions in Paragraph 72 appear to be duplicative of those set forth in Paragraph 71, above, and so the SEC provides the same response.  (*See* SEC Response to Paragraph 71).

73.     By January 2018, Kik had learned that some independent companies had already announced they planned to accept Kin in exchange for sunglasses and vehicles. *Id.* ¶ 82; Ex. Q, Third Eye Sunglasses, *ThirdEyeSunglasses.com Will Now Accept Kin Coin* (Jan 2, 2018).

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 73, but notes that Kik does not identify the supposed seller of "vehicles" and does not state whether any such sunglasses or vehicles were actually purchased using Kin.

74.     App developers could also integrate Kin into their app by using open source Ethereum tools that already existed for Ethereum-based tokens.  Ex. A, Philp Decl. ¶¶ 81, 83.

**SEC Response:**  The assertions contained in Paragraph 74 appear to be duplicative of those set forth in Paragraph 71, above, and so the SEC provides the same response.  (*See* SEC Response to Paragraph 71).

75.     In or about October 2017, Kik learned that a third party developer independently developed a bot for use within the Kin bot platform called "Kinchat." *Id.* ¶ 84.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 75.

76.     Kik also launched a minimum viable product or "MVP" on the day that Kin was launched ("the MVP") that integrated Kin within Kik.  Ex. A, Philp Decl. ¶ 85; Ex. C, Philp Inv. Tr. 274:3-19.

**SEC Response:** The SEC does not controvert the assertions made in Paragraph 76, but they are incomplete and, as such, misleading.  The "MVP" was a series of digital, cartoon "stickers" that would be available to Kik Messenger users who purchased Kin; the stickers were not available to Kin purchasers who did not have a Kik Messenger account.  (SEC40 (ECF No. 60-41) at 107:3-10).  The stickers could not be purchased using Kin.  (SEC14 (ECF No. 60-14) at 228:10-13).  Kik did not mention the stickers in any of its marketing to the general public during the offer and sale of Kin, so the stickers could not have been a motivation for such purchases.  (SEC3 (ECF No. 60-3) at 180:14-18; SEC40 (ECF No. 60-41) at 154:15-155:13).  As of October 20, 2017, "Kik users who participated in the pre-sale or public sale [could not] 'hold' Kin in the Kik app.  Instead, the Kik dashboard display[ed] a user's balance of Kin in his or her external wallet . . . ."  (SEC64 (ECF No. 60-76) at No. 8).

77.     The MVP allowed Kin purchasers to link Ethereum wallets to their Kik accounts that would display their balance of Kin. Ex. A, Philp Decl. ¶ 86.  Then, Kin purchasers could access different tiers of digital content, such as stickers, based on the amount of Kin owned.  *Id*.; Ex. C, Philp Inv. Tr. 223:11-15.

**SEC Response:** The assertions contained in Paragraph 77 appear to be duplicative of those set forth in Paragraph 76, above, and so the SEC provides the same response. (*See* SEC Response to Paragraph 76).

78.     Shortly after the TDE, approximately 20% of purchasers had participated in this MVP by linking their wallets to Kik Messenger. Ex. A, Philp Decl. ¶ 88.

**SEC Response:** The terms "purchasers," "shortly," and "participated in this MVP" are vague and ambiguous as used in this Paragraph, so the SEC cannot meaningfully respond to Kik's assertions, and, on that basis, controverts the assertions contained in Paragraph 78. As of October 20, 2017, only 499 Kik Messenger users, representing about 5% of investors, had downloaded one or more sticker packs. (SEC64 (ECF No. 60-76) at No. 9).

79.     In December 2017, Kik launched a second use case within Kik Messenger, in which users could earn Kin by completing polls or surveys, by providing feedback to Kik regarding the experience, or by offering artistic content such as stickers to other Kik users. Ex. A, Philp Decl. ¶ 89. Kik users could use their Kin to purchase premium digital stickers, or transfer it for use within another application. *Id.*

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 79.

80.     By January 2018, 59% of Kik users with linked wallets had participated in at least one poll and earned Kin, and 19% of wallet users had spent Kin on at least one sticker pack. *Id.* ¶ 90.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 80, though the SEC notes that Kik omits the denominators in the percentages it cites.

81.     Today, 57 applications have integrated Kin within their applications and provide opportunities for Kin to be earned and/or spent within such applications.  Ex. R, Kin.org Statistics; Ex. S, Kin.org Apps; Ex. A, Philp Decl. ¶ 92.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 81.

82.     The statistics showing usage of Kin are all publicly available on the blockchain, and are available to the public on a website maintained by the Kin Foundation, kin.org.  Ex. R, Kin.org Statistics.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 82, but notes that all Kin Foundation expenses, including the kin.org website, are paid for by Kik because the Kin Foundation has no cash (SEC6 (ECF No. 60-6) at 41:22-42:22).

83.     As of March 19, 2020, there are approximately 1.9 million users spending Kin within these applications each month. Ex. R, Kin.org Statistics; Ex. A, Philp Decl. ¶ 97.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 83.

84.     As of March 19, 2020, over seven million different wallets have spent Kin tokens, and over twenty million different wallets have earned Kin. Ex. R, Kin.org Statistics.

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 84.

85.     As of March 2019, the application with the highest volume of Kin tokens being spent is not Kik Messenger but a third-party application that integrated the Kin token – Kik is third. Ex. R, Kin.org Statistics; Ex. A, Philp Decl. ¶ 96.

**SEC Response:**  The exhibit cited by Kik for the assertions contained in Paragraph 85 does not provide data for March 2019, and it does not, therefore, support the assertion made therein.  Data regarding the "volume of Kin tokens being spent" in March 2019 is not available at the website identified by Kik, https://www.kin.org/stats.  On this basis, the SEC denies the assertions contained in Paragraph 85.

86.   As of March 19, Kin was ranked third of all cryptocurrencies on Blocktivity.info, which measures blockchain activity excluding secondary market transactions. Ex. V, Block'tivity Blockchain Activity Matrix as of 3/19/2.  Block'tivity describes its mission as "observing which project is actually being used by people." *Id.*  As of the same date, Bitcoin was ranked tenth, and Ether was ranked sixth.  *Id.*

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 86.

87.   Kik Interactive does not currently operate any application in the Kin economy. Ex. A, Philp Decl. ¶ 92.

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 87, but they are incomplete and, as such, misleading.  While Kik may not presently operate an application that has incorporated Kin, it operated Kik Messenger until October 2019, and Kik has also made hundreds of thousands of dollars in payments to developers to compensate them for developing applications that have incorporated Kin.  (SEC6 (ECF No. 60-6) at 35:20-42:22).  For example, Kik has paid the developer of one app – Perfect365 – approximately $125,000.  (*id.* at 39:15-19; SEC104, 2nd Mitchell Decl., at ¶ 10.).  The agreement memorializing Kik's sale of Kik Messenger to MediaLab also requires MediaLab to purchase on the open market $100,000 worth of Kin every month for 15 months.  (SEC6 (ECF No. 60-6) at 30:14-31:7).

88.     In October 2019, Kik sold the rights to the Kik Messenger application to a third party, Media Lab. Ex. A, Philp Decl. ¶ 93. Media Lab currently operates the Kik Messenger application, which still allows users to earn and spend Kin tokens. *Id.* ¶ 93.

**SEC Response:** The SEC does not controvert the assertions made in Paragraph 88.


89.     Kik is not operating any of the applications that are currently driving demand for Kin in the Kin economy. *Id.* at ¶ 92.

**SEC Response:** The assertion contained in Paragraph 89 appears to be duplicative of the assertion contained in Paragraph 87, and so the SEC provides the same response.  (*See* SEC Response to Paragraph 87, above).


90.     An application called KinFit describes itself as an "app that pays you digital currency for your daily steps." Ex. T, KinFit Webpage. KinFit is a "fully integrated platform that connects your phone's pedometer to the Kin Ecosystem. This allows users to earn Kin cryptocurrency and to enjoy a wide range of spending options for the Kin they earn." *Id.* KinFit is available on the Apple App store and Google Play app store. *Id.*

**SEC Response:** The SEC does not controvert the assertions contained in Paragraph 90, but they are incomplete and, as such, misleading.  Kik paid the developer of KinFit at least $5,000 for creating the application.  (SEC6 (ECF No. 60-6) at 35:20-42:22).


91.     An application called Love & Loud radio claims to be "a hybrid 'Music Discovery App' and 'Music Promotion App' that allows users to consume content submitted by other users who offer Kin for listening. Ex. U, Love & Loud Webpage. The Kin can then be spent promoting their

own audio or sent to other apps in the Kin ecosystem to be spent elsewhere. From the app, users can also easily connect to artists and share the music they have discovered." *Id.*

**SEC Response:**  The SEC does not controvert the assertions contained in Paragraph 91, but they are incomplete and, as such, misleading.  The developer and founder of the Love & Loud Radio application is a Kik employee.  (SEC6 (ECF No. 60-6) at 13:5-14:22; SEC104, 2nd Mitchell Decl., at ¶ 12).

### SEC'S COUNTER-STATEMENT TO KIK'S LOCAL RULE 56.1 STATEMENT

A.     During a September 7, 2017 Roadshow event in New York City, Kik's CEO made the following statement to the audience:

> [I]f you go to Starbuck's and you drink a ton of coffee, and you get a bunch of Starbuck's points, that doesn't help me.  And if I go to Starbuck's, and I drink a bunch of coffee, and I get a bunch of Starbuck's points, that doesn't help you.  But in a cryptocurrency, the opposite is true.  If I come in and I provide a bunch of value, and I create demand for this cryptocurrency, then the value of the cryptocurrency overall is going to go up.  And it goes up for me, and it goes up for you.

(SEC49-B (ECF No. 60-58) at 53:1-53:11).

B.     Kik's CEO testified that he understood that some public-phase purchasers bought Kin to make a profit through appreciation – *i.e.*, based on the increase in the price of Kin:

> [Q.]    Did you think -- do you think people bought Kin tokens in September of 2017 because they thought the value could grow?
>
> [A]    If people didn't understand that the value could grow, then they would not understand cryptocurrencies and the fundamentals of crypto economics.  The fundamental of crypto economics is supply is fixed.  So if demand goes up, then the price goes up.  Like, would Kik have launched Kin if it thought the value of its Kin holdings wouldn't increase?  No.  That's what made it a viable business model for us and everybody else.  Some people bought it knowing only that.  But I think lots of people bought it with the idea that this could be a solution to a major world problem for everybody including themselves.

(SEC8 (ECF No. 60-8) at 125:19-126:9).

C.     When the sales of all one trillion Kin by Kik are included, only 0.04% of all one trillion

Kin sold were purchased by buyers spending $100 or less, for a total of only $42,000 of the $98.3

million in Kik's overall proceeds.  (SEC 104, 2nd Mitchell Decl., at ¶ 6(j)).  Of the 10,000 purchasers

of the one trillion Kin that Kik sold in 2017, only 746 buyers spent less than $100.  (*Id.*).

D.     "Kik [held] the proceeds of the pre-sale of Kin through the SAFTs at TD Bank in

Canada . . . in United States dollars."  (SEC64 (ECF No. 60-76) at No. 3; *see also* Answer (ECF No.

22) at ¶ 186).

E.     Kik reported to the SEC that, as of January 4, 2018, Kik still held $34.9 million in

proceeds from its sales of Kin via SAFT in its TD Bank account.  (SEC104, 2nd Mitchell Decl., at ¶

8(c)).  As of August 8, 2018, Kik reported that it still held $15.97 in proceeds at TD Bank.  (*Id.* at ¶

8(d)).

# # # #


Dated:   April 24, 2020                    Respectfully submitted,


                                            */s/ Stephan J. Schlegelmilch*
                                           Stephan J. Schlegelmilch
                                           David S. Mendel
                                           Laura D'Allaird
                                           U.S. SECURITIES AND EXCHANGE COMMISSION
                                           Division of Enforcement
                                           100 F Street, N.E.
                                           Washington, DC 20549
                                           (202) 551-4935 (Schlegelmilch)
                                           (202) 551-4418 (Mendel)
                                           (202) 551-5475 (D'Allaird)
                                           SchlegelmilchS@SEC.gov
                                           MendelD@SEC.gov
                                           DAllairdL@SEC.gov

                                           *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on April 24, 2020, I caused the foregoing to be filed using the Court's CM/ECF

system, which will send a notification of such filing to each counsel of record.


*/s/ Stephan J. Schlegelmilch*
*Counsel for Plaintiff*