SEC108

1

K2J9SEC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

              v.                            19 CV 9439 (PKC)

TELEGRAM GROUP, INC., et al.,

                    Defendants.

------------------------------x
                                           New York, N.Y.
                                           February 19, 2020
                                           10:01 a.m.

Before:

                    HON. P. KEVIN CASTEL,

                                           District Judge

                              APPEARANCES

SECURITIES AND EXCHANGE COMMISSION
      Attorneys for Plaintiff
BY:   KEVIN McGRATH
      JORGE TENREIRO
      ALISON R. LEVINE
      LADAN F. STEWART


SKADDEN, ARPS, SLATE, MEAGHER & FLOM
      Attorneys for Defendants
BY:   ALEXANDER DRYLEWSKI
      SCOTT MUSOFF
      CHRISTOPHER MALLOY
      THANIA CHARMANI

K2J9SEC1

1          (Case called)

2          MR. TENREIRO:  Good morning, your Honor.

3          Jorge Tenreiro on behalf of the U.S. Securities and

4    Exchange Commission.

5          MR. McGRATH:  Good morning, your Honor.  Kevin

6    McGrath.

7          MS. LEVINE:  Good morning, your Honor.  Alison Levine.

8          MS. STEWART:  Good morning.  Ladan Stewart.

9          THE COURT:  You're all also from the plaintiff, right?

10          MS. STEWART:  Correct.

11          THE COURT:  For the defendant.

12          MR. DRYLEWSKI:  Good morning, your Honor.  Alex

13    Drylewski, Scott Musoff, Christopher Malloy and Thania Charmani

14    from Skadden Arps on behalf of the defendants.

15          THE COURT:  Good to see you all.

16          Mr. Musoff, good to have you back in my courtroom.

17          MR. MUSOFF:  Thank you, your Honor.  My pleasure.

18          THE COURT:  We still have some unfinished business.

19          MR. MUSOFF:  We're getting closer, your Honor.

20          THE COURT:  That's good to hear.

21          First order of business is the evidentiary record on

22    the motion for preliminary injunction.  Does the plaintiff wish

23    to offer any live testimony?

24          MR. TENREIRO:  Not at this time, your Honor.

25          THE COURT:  All right.

1          And you have submitted additional exhibits, documents,

2     I think excerpts from Mr. Hyman's deposition and now you have

3     some materials produced in foreign countries, I understand,

4     that you're offering at this time.

5          MR. TENREIRO:  That is correct, your Honor.  We're

6     offering those and the summary judgment exhibits as well.

7          THE COURT:  Now when you say the "summary judgment

8     exhibits," what specifically do you mean by that?  That which

9     you have referenced in your Rule 56.1 statements?  Is that what

10    you mean?  You're offering all of that in support of your

11    motion for preliminary injunction, right?

12         MR. TENREIRO:  That's correct, your Honor, yes.

13         THE COURT:  And let me hear from Mr. Drylewski.

14         You, I gather, are opposing the Hyman testimony.  I've

15    given you the opportunity to crossdesignate.  Why do you oppose

16    the introduction of the Hyman testimony?

17         MR. DRYLEWSKI:  We don't oppose the introduction of

18    it, your Honor.  Aside from our objections to relevance, once

19    we put in the counterdesignations, we don't object.

20         THE COURT:  That's taken care of.  Thank you.

21         Does the defendant have any live testimony they wish

22    to offer?

23         MR. DRYLEWSKI:  No, your Honor.

24         THE COURT:  And you're relying on the exhibits

25    referenced in your 56.1 statement.  Anything else that I should

1    know you're relying on of an evidentiary nature?

2            MR. DRYLEWSKI:  No, your Honor.

3            THE COURT:  So, the evidentiary record in this case is

4    closed.

5            MR. DRYLEWSKI:  That's correct.

6            THE COURT:  All right.  A few observations.  There

7    are, of course, a number of motions pending.  There is the

8    12(f) motion.  There are the parties' various motions for

9    summary judgment.  And, of course, the plaintiffs' motion for a

10   preliminary injunction.  I'm going to hear argument from each

11   of you this morning.  I wanted to make a couple of preliminary

12   observations because it may help and guide your discussion

13   here.

14            In terms of first principles, the *Howey* Test has been

15   with us for over 70 years, longer than many of the people at

16   the first two tables have been alive, and cryptocurrency has

17   been around for about twelve years.

18            One of the issues that is not presented in this case

19   and that no one has argued that cryptocurrencies are inherently

20   securities.  That's not what this case is about.  In fact,

21   there would be no basis under the *Howey* Test for such an

22   argument.

23            I've read carefully the amicus submissions of our two

24   amicus curiae that I have already approved, or amici I should

25   say, and that is not what this Court will be deciding.

1          *Howey* is easy to state, maybe not always easy to

2     apply, but an investment contract is a security within the

3     meaning of the Securities Act of '33 if it's a contract,

4     transaction or scheme whereby a person:  One, invests money;

5     two, in a common enterprise; three, is led to expect profits;

6     and four -- well *Howey* says solely from the efforts of the

7     promoter or third party but as time has gone on that "solely"

8     language has been modified and it's not a literal limitation.

9     It's a primarily promoted or -- that seems to be the most

10    prevalent matter in which it is utilized.

11          And, of course, *Howey* is a flexible test.  It focuses

12    on economic realities, not on labels.  And, of course, the

13    lawyers in this case are well acquainted that the label point,

14    that labels don't control, actually works in both directions.

15    So you have the Forman case where stock in a corporation was

16    held not to be a security because it was essentially ownership

17    of a cooperative apartment.  So the labels do not get anybody

18    out of this one way or the other.

19          Disclaimers do not control.  And so one can look at a

20    purchase agreement and there could be a

21    helpful-to-the-defendants statement or an unhelpful statement

22    to the defendant in the purchase agreement or elsewhere and

23    it's going to be the economic realities of the transaction that

24    control.

25          The most notable difference in viewpoint as I see it

1    between what the SEC is arguing and what the defendants are

2    arguing is:  What is the offering of a security?  There is no

3    dispute that there is or has been an offering of a security.

4    The plaintiffs contend that.  The defendants admit that.

5            In the plaintiff's view of the world that there is a

6    connected scheme to have the two tranches or rounds of purchase

7    agreements and that the intent and purpose of the purchasers as

8    known to Telegram and as intended by Telegram was to not

9    utilize the Grams received as a utility or for consumptive

10   purposes but rather for the purpose of further distribution in

11   a secondary market and these initial purchasers are either

12   literally underwriters or akin to underwriters into that

13   secondary market; that you look at whether it's a security at

14   the time the purchase agreements are entered into, looking down

15   the road at what the entirety of the scheme or transaction is.

16           The defendants see something very different or notably

17   different in that they see the security which they assert is

18   exempt under Reg D as a private placement.  May also be Reg S

19   also, I'm not sure.  But they see that as a private placement

20   of securities and it comes to rest at the instant of launch.

21   And they maintain that at the instant -- (pause).

22           I have a deliberating jury, ladies and gentlemen.  I

23   have a note from them.  If you could get everyone assembled.

24   It appears to be some sort of a medical issue.  Is the nurse

25   in?

K2J9SEC1

1              THE DEPUTY CLERK:  The nurse?

2              THE COURT:  The nurse.

3              THE DEPUTY CLERK:  Our nurse?  I think they are.

4              THE COURT:  See whether they are.

5              The defendants maintain that at the moment of launch

6      there is a decentralized blockchain that will go into full

7      operation; that it is ready to operate at the instant of

8      launch; and that this will be a decentralized market, there

9      will not be a common enterprise, and certainly it will not be

10     from the efforts of the promoter at the moment of launch.

11             So there's a disagreement as to when does the court

12     look at this transaction, at the moment of launch or at the

13     moment the purchase agreements are entered into.

14             The SEC appears to take a fallback position that if

15     one were to examine this at the moment of launch they maintain

16     that it would still be a security under the *Howey* Test.  And

17     among the things we're going to look at -- Jeff, could you have

18     the marshal come in.  I want to talk to him.

19             One of the things we are going to consider is if, for

20     example, our promoter in this case, Telegram Group and its

21     senior team were to depart the scene and return to the British

22     Virgin Islands at the time the purchase agreements were entered

23     into, could this have survived and, again, even at the moment

24     of launch if they departed the scene and exited and did nothing

25     further, could this survive.

1          Now, ladies and gentlemen if you take one moment.

2          (Pause)

3          (Court and marshal confer)

4          So, those are some of the issues we're going to talk

5   about.  I expect the parties to address what the economic

6   justification was for the lockup in the round one purchase

7   agreements, whether this transaction and the distribution to

8   the initial purchasers was for a consumptive purpose on the

9   part of the initial purchasers, is that even an important

10  question, and what the business justification was on the part

11  of the purchasers for tying up capital for a year or more due

12  to lockups and delays in getting the blockchain up if this was

13  just a currency.  All right.

14          And so with that we'll begin with the government.

15          Mr. Li, I'm tasking you with letting me know when

16  defense counsel arrives, OK.  Thank you.

17          MR. LI:  Yes, your Honor.

18          MR. DRYLEWSKI:  Your Honor if I could before we begin

19  just a small housekeeping matter.

20          THE COURT:  Sure.

21          MR. DRYLEWSKI:  Before we get into the substantive

22  discussions here, given the nature of the discussions, we

23  thought it may be helpful to the court reporter.  We put

24  together a glossary of terms and spellings.  We gave a copy to

25  the SEC with the Court's permission we would hand this to the

K2J9SEC1

1    court reporter.

2              THE COURT:  Thank you.

3              So whenever you're ready, Mr. Tenreiro.

4              MR. TENREIRO:  Thank you.

5              Good morning again, your Honor.  May it please the

6    Court.  As the Court recognized, we are here most importantly

7    to ensure that we stop what is an ongoing violation of Section

8    5 of the Securities Act, the registration requirement which is

9    the critical bedrock component of the United States securities

10   laws.

11             Hundreds of businesses register every year with the

12   SEC.  The core issue in this case is whether Telegram sold

13   securities and, if so, whether it was entitled to an exemption

14   from the registration requirement.

15             The Court is correct to focus under *Howey* on the

16   economic reality.  The economic reality of what occurred here

17   really is beyond dispute, your Honor.  We submit that this was

18   a straightforward capital raise by a startup company.

19             Telegram, as the record shows, needed money to fund

20   the growth of its popular messaging app and projects that it

21   was putting out there into the market.  Now, having raised some

22   of those funds, it seeks to obtain the benefit of the funds

23   that will come indirectly from public investors through the

24   underwriters without the responsibilities and obligations that

25   come with registration.

K2J9SEC1

1          Telegram could have done this many other ways.  But to

2     remain competitive with WhatsApp it does not want to charge

3     user fees and to keep its corporate ethos of privacy and no

4     government regulation it doesn't want to sell a piece of its

5     company as the CEO admitted under oath.

6          So what Telegram did was it hired investment bankers

7     to find venture capitalists and other institutional investors

8     to buy into this offering.

9          And it is also undisputed that Telegram did not even

10     file a Form D as to this -- into the transactions until after

11     it was contacted by the SEC.

12          I'd like to highlight for the Court three undisputed

13     facts that go to the economic reality of what occurred here and

14     that compel the conclusion that Telegram sold securities which

15     included and include the Grams and that it is entitled to no

16     exemption.

17          In addition to the fact that I mentioned, which is

18     that Telegram was seeking to raise funds for its business

19     through the use of investment bankers and venture capitalists,

20     it cannot be disputed that Telegram did not condition delivery

21     of Grams to venture capitalists under existing actual uses for

22     Grams or on the echo system being developed to the point where

23     one could reasonably expect that these sophisticated purchasers

24     would view these as commodities.

25          As the Court alluded to just a moment ago, it's

K2J9SEC1

1    impossible to surmise any business justification for these

2    sophisticated purchasers to tie up $1.7 billion in funds simply

3    because they wanted to convert it into another currency that

4    they were going to use as currency.

5             It is equally --

6             THE COURT:  But you can buy gold and not view it as a

7    means to store value or to pay for something but to, if you

8    will, speculate in gold, right?

9             And you could, in that sense, you could not be a

10   security within the meaning of *Howey* and purchase a

11   cryptocurrency for speculative purposes, correct?

12            MR. TENREIRO:  That is correct, your Honor.

13            There is a number of differences with the gold

14   example.  One is the one the Court alluded to earlier which is

15   that you typically don't tie in your funds for years on a

16   purchase of gold in that nature -- in that fashion.

17            Another difference I think is that if my boss were to

18   come into my office tomorrow and say I want you to sue gold I

19   would say I don't know who to sue, I don't know who to serve

20   the subpoena to.

21            THE COURT:  Go ahead.

22            MR. TENREIRO:  So for gold there is no promoter.

23   There is nobody there that's saying this -- buy gold to

24   speculate because I'm going to be -- I suppose the person who

25   could do that would be God.  God might say I'm going to create

K2J9SEC1

1    more gold and people are going to like it more.  So that is the

2    principal distinction between gold and an asset that requires

3    Telegram -- Telegram's significant efforts, which they touted,

4    to develop, before it achieved the moment where it could be

5    used as quote/unquote gold.

6         The next fact I'd like to highlight for the Court is

7    that Telegram, it is undisputed, that it's so-called investors

8    have already begun their public distribution of Grams.

9    Telegram does not and cannot dispute that from the moment of

10   the presale round purchasers started reselling their right to

11   receive Grams and up until at least the summer of 2019.

12        This demonstrates what the economic reality of this

13   transaction was.  People are already trying to profit from the

14   speculative nature of their interest in --

15        THE COURT:  This is the purported secondary market

16   that's already emerged?  Is that what you're referring to?

17        MR. TENREIRO:  That is correct, your Honor.

18        THE COURT:  One second.

19        MR. TENREIRO:  Yes.

20        (Pause)

21        (Court and marshal confer)

22        THE COURT:  Go ahead.

23        MR. TENREIRO:  Thank you, your Honor.

24        The third undisputed point is another one that the

25   Court alluded to in its introductory remarks.  The economic

K2J9SEC1

justification for the lockups and price differentials -- I've
never heard of somebody selling doughnuts to people and selling
the same doughnuts to somebody for 37 cents and to other people
for a dollar and 33 cents.  What this -- the economic reality
of the transaction, as Telegram structured it, created an
incentive for resales to occur and for people to view this as a
potential profit-making enterprise.

        What will happen, the economic reality of this is that
there's two rounds.  The presale -- the so-called presale
purchasers paid 37 cents per gram and have -- will have no --
will have a relief -- I can call a delayed delivery or slow
release date of how they can sell their Grams.

        But from the beginning Telegram told the market, the
people that it was marketing this offering to, that they were
going to have subsequent rounds at higher prices with no
lockups.  So the so-called Stage A investors ultimately pay a
dollar 33 cents, approximately four times as much.  But they
were told you're not going to have any lockups.

        So what is going to happen?  What is going to happen
if and when these investors receive their Grams?

        They know that waiting in the wings three months later
there is going to be a market, a flood into the market at a
quarter of the price.  This creates a very strong economic
incentive to sell the Grams.  You'd be foolish not to try to
divest yourself before those three months are up because in

three months somebody else can make a profit at a much lower

price.

          These facts, your Honor, establish -- Telegram cannot

dispute any of these facts.  Telegram relies mostly on

disclaimers and, as the Court recognized, disclaimers are not

what the Court looks to in the *Howey* Test.  For every

disclaimer that Telegram points to one can point to another

disclaimer that goes the other way.

          The economic reality of the transaction is that this

was a capital fund raise in the offering sale of securities in

2018.  Telegram could have structured its offering in other

ways that would have complied with the securities laws.  But

Telegram chose to invoke the jurisdiction of the SEC by

claiming a Regulation D exemption and now having failed to

comply Telegram should be enjoined from carrying out the next

unlawful step in that distribution.

          THE COURT:  And the reason they flunk Reg D is because

the initial purchases are, in your view, underwriters.  Is that

the reason they flunk?  Or is there some other reason?

          MR. TENREIRO:  There's a number of reasons, your

Honor.  I think the Court alluded to one of them.  They don't

have to be -- they can be akin to underwriters.  I think the

Second Circuit has recognized a number of times not only that

it's a broad term but that, in fact, anyone taking steps

necessary to effect the distribution are -- can be considered

1  underwriters.

2         But there's a number of other reasons and I'll go

3  through them.

4         The first one is something we've been discussing

5  already which is that Telegram put no restrictions on reselling

6  by the Stage A investors.  So in a private offering, in a

7  private offering done --

8         THE COURT:  When you use the term Stage A, it's

9  synonomous with round two purchasers, correct?

10         MR. TENREIRO:  Yes, your Honor.  That's correct.

11         THE COURT:  And presale is synonomous with round one?

12         MR. TENREIRO:  That's right.

13         THE COURT:  Thank you.

14         MR. TENREIRO:  So the other fact that shows that the

15  Regulation D exemption was not met is that it's undisputed that

16  initial purchasers are already selling the right to receive

17  Grams into an existing secondary market that Telegram

18  encouraged.

19         THE COURT:  I thought -- I may be wrong about this but

20  I thought that purchase agreements prohibited purchasers from

21  selling into a prelaunch market.

22         MR. TENREIRO:  That is correct, your Honor.

23         But the Second Circuit and the SEC have long

24  recognized -- I think one example is the Cavanaugh case from

25  the 1990s -- that sort of just taking the underwriters at their

1   word is not sufficient.  The burden of meeting Regulation D is

2   on the issuer.  And the exemption is construed narrowly to

3   effect the purposes of the securities laws.  So for them to

4   say -- promise us that you're not going to resell is not

5   enough.

6           THE COURT:  Well do you take the position that Reg D

7   is not available because this is an offering to those who will

8   purchase in the postlaunch secondary market and they will be

9   purchasing without the benefit of a registration statement or

10  qualifying under the qualified investor standards and the like?

11          MR. TENREIRO:  That's right.  That is correct, your

12  Honor.  This is a public offering.  The Court should view this

13  as one transaction.

14          We are in the perhaps somewhat unique position of

15  standing here in the middle of it and asking the Court to

16  enjoin the ongoing violation.  But the Court is correct that

17  that is how we view it.

18          Other facts that are undisputed that show that

19  Telegram as a matter of law cannot meet Regulation D is that

20  Telegram paid initial purchasers transaction-based

21  compensation, reselling the right to receive Grams.

22          THE COURT:  Why does that -- how does that factor in

23  and why is that relevant?

24          MR. TENREIRO:  So typically in a Regulation D offering

25  that's done correctly the issuer knows who it's selling the

instrument to because the issuer has an obligation to make sure
that the individuals are accredited investors there's a long
list of requirements including accredited investors, that
they're not certain individuals that are sanctioned and things
of that nature.

In this case Telegram cannot today tell a Court who
the ultimate beneficiaries are of all the sales that it entered
into because what happened and what's undisputed in the record
is that after March 2018 Telegram lost control of its offering.
A number of the market -- perhaps the market for
cryptocurrencies had faced a downturn in early 2018.  Telegram
thought it had $150 million lined up and it didn't.  And it had
to sort of scramble to replace purchase agreements.  And it
hired at least three entities to find other investors for them.
And Telegram did not conduct KYC look-through all the way
through to all of those ultimate beneficiaries.  Telegram knew
that some of these individuals -- some of these entities were,
in fact, marketing Grams and making -- marketing them --
issuing marketing materials.

THE COURT:  For what you would view as the postlaunch
distribution or was it prelaunch distribution?  When you say
marketing materials, as to what?

MR. TENREIRO:  Those were used, as far as I can tell,
for prelaunch.  Now there could be evidentiary question as to
whether those condition -- conditioned the future market.  But

we're saying now that those marketing materials were used to

induce purchases during those initial, well call it the initial

phases of the offering.

          Most importantly, your Honor, as we've been discussing

already, Telegram, as a matter of economic reality, Telegram

told people they wanted to achieve widespread distribution of

these instruments and sought out people who were going to buy

for that purpose.

          The analogy I would point the Court to is the

Aqua-Sonic case from the Second Circuit where the issuer was

selling sort of dental licensing agreements.  And in construing

the *Howey* Test the Second Circuit said the promoter didn't find

people who knew how to use dental licensing agreements, didn't

even hire salesmen that knew what these agreements were about.

They found people to sell investments.

          That's what Telegram did here.

          THE COURT:  What's your evidence that in recruiting

purchasers in round one presale or round two Stage A Telegram

was seeking people who could distribute or would distribute the

Grams postlaunch or prelaunch?

          MR. TENREIRO:  Right.  I think the evidence -- there's

a number of factors that I would point the Court to critically.

The affidavits that we submitted from the Court show -- and I

don't think Telegram disputes -- that nobody asked the venture

capitalists and other sophisticated purchasers:  Do you have

any use for cryptocurrencies?  Are you planning on using Grams

on -- what's one of the apps that they put in the list, a

pregnancy app.  I don't think that that question was asked of

any of the venture capitalists.

THE COURT:  But again going back to the gold analogy,

I got a big pile of gold and people -- I'm seeking out people

to buy gold.  I'm not asking them what they plan to do with it.

Maybe they're going to mint it into coins and sell it.

I don't know.

MR. TENREIRO:  And the gold analogy, your Honor, is

tempting but it fails because labels don't control.  And gold

has intrinsic value today. Grams have -- do not have intrinsic

value; that it's not tied to the efforts and the promises of

efforts that Telegram made.

I think an important -- I would like to point the

Court to the undisputed facts that none of these individuals

were even asked whether they had any interest in

cryptocurrencies.  One could, for example, think of a situation

where who uses cryptocurrencies?  Sometimes you hear that

people who are in countries that maybe don't have as well

developed banking systems, or people that have more restricted

banking systems.  So if Telegram had sold Grams to those

individuals, I suppose it would have a better argument that it

was selling cryptocurrencies to sell.

Telegram is going to talk about theater tickets but

K2J9SEC1

Telegram didn't look for theater fans when it was selling these things.  Telegram was looking to people who are in the business of funding venture capital ventures, of funding businesses.

I think one of the investment memos I think most well crystallizes this point is PX 30, Exhibit 30, one of the exhibits we submitted.  And that investment memorandum captures the economic reality of this transaction from start to finish.  In the very first page the investor talks about the potential for annualized returns of 180 percent to early investors.

At page four of that investment memorandum the investors say, "We firmly believe the Durov brothers will be the guiding force," the Durov brothers, and particularly Pavel, will be the guiding force behind time.

Later in the investment memo the investor notes the economic reality of this transaction, which is that Telegram is free to use and has no way to monetize.  They pride themselves on offering free fast messaging services and currently operate as a nonprofit.  This is from page nine.  The introduction of TON blotching architecture.

THE COURT:  Are you talking about internal page nine or the file page nine?  I guess the internal page nine.

MR. TENREIRO:  Internal page nine would be file page ten.

THE COURT:  And when?  Under what?

MR. TENREIRO:  Under TON Valuation Revenue Capture.

K2J9SEC1

1          THE COURT:  OK.  This is going to not take very long

2     but I have a matter to tend to in my criminal case and then

3     we'll pick up.

4          So I'm estimating about seven minutes, something like

5     that.

6          MR. TENREIRO:  Thank you, your Honor.

7          THE COURT:  And I can see the attorneys and the

8     defendant at sidebar.  So, Flo, if you'll bring them in for

9     sidebar.

10          (Recess)

11          THE COURT:  I'm sorry, Mr. Tenreiro.

12          MR. TENREIRO:  May I proceed, your Honor?

13          THE COURT:  Yes.

14          MR. TENREIRO:  Thank you, your Honor.

15          THE COURT:  So we were looking at PX 30.

16          MR. TENREIRO:  That's right.  And we were focusing on

17     page 9, internal page 9.  And, as I was saying, I think that

18     this investment memorandum captures very well the economic

19     reality as all of these highly sophisticated and experienced

20     investors understood it.  I think Telegram wants to tell the

21     Court that it should not look to the views of the investors

22     because Howey is an objective test.  Howey is of course an

23     objective test.  But the Second Circuit has repeatedly cited

24     with approval in Glen-Arden and in Aqua-Sonic and said we look

25     at what the people actually did to inform that objective

K2J9SEC1

reality.

          If Telegram were to bring in space investments into
the Court tomorrow to say these are oranges, one might question
whether there's an objective -- that feeds into the objective
test and whether the Court should give any weight to that.

          But these were documents created internally by these
investors who have now also, some of them, come to the Court
with sworn declarations explaining some of the points that I've
made, including that none of them -- nobody has asked them what
they wanted to do with these but, more importantly, that they
bought these for profit and not use and that they expect
Telegram to work on this project postlaunch based on the
statements that Telegram made to them.

          One example is PX2.  Paragraph 14.  The investor
explains that to the Court.  PX3, in paragraphs 18 to 22, the
same explanation.

          I don't want to go through all of them necessarily.
They are in our briefs.  But I think that the unifying theme
and the thread that sort of binds these affidavits and that is
consistent with the investment memos at the time is that the
economic reality of this transaction is as we've been
describing it to the Court this morning.

          The important thing, as one can see from all of these
investment memorandums, the investors' expectations of how much
profits they could make.  They talked about 40X, return 10X on

1    our investment, upside is 3 to 4X.  Those are some examples.

2    That's not what people talk about when they're discussing

3    investing in oranges.  This is what people talk about when they

4    are funding a company and they're hoping to profit from the

5    efforts of that company to be successful in the endeavors the

6    company has promised.

7          Telegram would also have the Court look only to the

8    four corners of the purchase agreement.  And I think that it

9    really cannot be disputed that that's simply incorrect as a

10   matter of law.

11         Recently in the case U.S. v. Leonard in the Second

12   Circuit, which is also cited in our papers, the Second Circuit

13   reminded lower courts that it should look beyond just the terms

14   of the agreement.  In fact, there's a line in there that says:

15   Were we to look only at the agreements, and some conclusion

16   follows, but the court explicitly reminds the courts what has

17   been clear since *Howey*, which is that when we're talking about

18   investment contract, we're talking not about the instruments

19   and not about the labels but, as this court has recognized

20   today, the economic reality and all of the representations

21   made.

22         Telegram in the white paper that it admits that it

23   published in March of 2019 to the market at large, but that it

24   also has stipulated it distributed to the initial purchasers

25   during the fundraise that we're discussing, makes statements

1    such as the TON Foundation itself will likely have to provide

2    most of the validators during the first appointment phase of

3    the TON blockchain.  That's at page 130 of the white paper.

4            At page 31 Telegram said that the TON Foundation will

5    be receiving the money or the cryptocurrency or fiat

6    currency -- I'm paraphrasing now -- that it will obtain from

7    selling Grams and that it will use them to further the TON

8    project.  That is what Telegram told people it was going to do.

9    And that is what people understood Telegram to be offering

10   them.

11           THE COURT:  Well, how do you respond to I think it's

12   Exhibit 2, the McKeon, where he has a list of potential

13   validators who will step up to the plate?

14           MR. TENREIRO:  So the fact that there might be other

15   validators that might essentially validate transactions, your

16   Honor, is not -- is neither relevant nor dispositive.

17           The question under *Howey* is:  What can a reasonable

18   purchaser expect Telegram's role to be based on the economic

19   reality of undisputed facts?

20           And one economic factor that's undisputed is that

21   Telegram will have sort of the legal right to control

22   42 percent of the Grams even after the launch.

23           THE COURT:  And what can you tell me about the

24   connection between the named defendants and the TON Foundation

25   which I gather it now exists, right?

1          MR. TENREIRO:  It's -- I don't think so, your Honor.

2     I think the TON Foundation has not yet been established.

3          THE COURT:  OK.

4          MR. TENREIRO:  Part of the difficulty in answering the

5     Court's question is that Telegram has maintained from the very

6     beginning that it has flexibility to do whatever it wants.  And

7     that -- and so that factor really cannot be something that the

8     Court can reasonably and logically consider when it considers

9     the economic reality.

10          THE COURT:  But the evidence you maintain, and you

11     maybe can point me in that, direction is that the two -- one or

12     the other of the two named defendants will establish the

13     foundation that will hold 52 percent or so of the Grams.

14          MR. TENREIRO:  So what Telegram told people at the

15     time that it entered into the purchase agreements is that it

16     will do that and that the TON Foundation, this is page 130 of

17     the white paper, the TON Foundation itself will likely have to

18     provide most of the validators during the first appointment

19     phase of the TON blockchain; and then it says i.e., its

20     creators, the development team.  So that's the evidence of what

21     was said to people at the time.

22          I expect Mr. Drylewski to say well Telegram has sort

23     of disclaimed.  But what's important to note about these

24     disclaimers is -- there's a number of things.  First is, as the

25     Court recognized, as a matter of law, disclaimers don't get you

K2J9SEC1

1    very far.

2             THE COURT:  And some of these disclaimers are after

3    the lawsuit was filed here.

4             MR. TENREIRO:  And they're equivocal.

5             THE COURT:  They were after the lawsuit was filed.

6             MR. TENREIRO:  That's correct, your Honor.

7             THE COURT:  Thank you.

8             MR. TENREIRO:  They were.  And they were equivocal.

9    They are equivocal.  Telegram does not actually commit to not

10   establishing the TON Foundation.  Telegram does not commit to

11   not holding the Grams.  Telegram says:  We may; we may not.

12            But this gets me back to one of the questions that the

13   Court posed to the parties at the beginning which is:  At what

14   time should the Court look at the transaction?

15            The law is clear, your Honor, and under -- and I'll go

16   through it, that the time at issue here is when Telegram was

17   offering and selling the securities.

18            If the Court were to construe Section 5 in any other

19   way, it would create an incentive essentially to violate

20   Section 5 by offering A today and telling you B tomorrow.

21            But the economic reality of the transaction does not

22   really permit that.  The economic reality of the transaction

23   has not changed in the minds of the initial purchasers simply

24   by Telegram's disclaimers.  Telegram has made the efforts and

25   since the filing of the lawsuit has, in fact, continued to make

1    efforts.

2              THE COURT:  Have you been able to establish whether or

3    not 1.7 billion was, in fact, transferred in the two tranches?

4    There's a flavor in the papers that maybe some of it hasn't

5    been paid.  And what is the significance of that, if any?

6              MR. TENREIRO:  Thank you, your Honor.

7              So I think -- I think our understanding of the bank

8    records, to the extent we have some, is that they eventually

9    did get $1.7 billion.  But the timing of that is -- remains

10   unclear to us.

11             I think the significance of that goes back to what I

12   was discussing earlier with respect to the steps that Telegram

13   took to complete its offering and how it conducted the offering

14   which we maintain as a matter of law did not comply with

15   Regulation D because of how it carried it out in addition to

16   the factors about the economic reality of what the incentives

17   were.

18             To go back to the point of the timing at which the

19   point -- at which the Court looks at *Howey*.  I think there's a

20   number of legal doctrines that sort of inform this question.

21   But the most basic one is simply the text of the law.  The law

22   speaks of offers and sales of securities.

23             The offers, indisputably, occurred when Telegram was

24   marketing.  It was offering the -- when offering the

25   transaction.  The sales, Telegram does not really say that the

K2J9SEC1

delivery is the sale.  They don't actually go and say that.
They are just saying that the delivery is the time of analysis
based on no legal principle that I have been able to surmise.

          And the Second Circuit has said in an unbroken line of
cases that the word "sale" means the time the parties entered
into the agreement.  The moment the check was written --

          THE COURT:  And what's your legal support for that
proposition?  What cases are you relying on?

          MR. TENREIRO:  I would point the Court to Radiation
Dynamics in the first place.  But, as I mentioned, there is an
unbroken line of cases.  So we would also point the Court to
Finkel v. Stratton, the 1992 case that extends the holding of
Radiation Dynamics to the Securities Act itself.

          And by the way, your Honor, the SEC has, in 2005, sort
of issued guidance, which we cite in footnote nine of our
motion for summary judgment, that is consistent with this, what
I would argue as the only logical way to interpret Section 5.

          The sale of stock in an IPO, typically there's a
contract for delivery on day T plus 3.  That Telegram decided
to sort of interpose a piece of paper and say we'll deliver it
at T plus 20 cannot change what was sold.  I've sent my money
to buy my bike and it's going to be delivered to me by Amazon
over the mail.  I bought it.  I don't understand the
significance of delivery, at least in the context of sale.

          THE COURT:  Well it might be one of those

K2J9SEC1

1  hold-for-Christmas sales.

2          MR. TENREIRO:  It might be -- they used to call

3  layaway.

4          THE COURT:  Yes.

5          MR. TENREIRO:  But if I pay for it, I bought it.

6          And that's the position, by the way, your Honor, that

7  Telegram took in its Form D where it said we've sold 850

8  million.  They view themselves as having sold even though they

9  haven't received all of the money.

10          That is the -- that is the economic reality that

11  cannot be denied by this moment of delivery.

12          The delivery, your Honor, is a liquidity event.  The

13  launch of the blockchain is a liquidity event.

14          One of the questions the Court raised at the beginning

15  was:  Is there a dispute as to what the blockchain is going to

16  look like.  There is no question.  I don't think we dispute

17  that Telegram could, I think they said, within a five-second or

18  five-minute notice launch this thing, which really suggests to

19  us that a preliminary injunction is urgently required.

20          The question is whether Telegram can be expected to

21  make efforts going forward; not whether it can launch, but

22  whether it's still going to be involved.

23          THE COURT:  Well I think it's your experts who

24  question whether it could be viably launched in five minutes

25  because of securities laws and the absence of security testing

1    and a bunch of other things, the absence of any apps or known

2    validators who are going to take this on, etc.

3         MR. TENREIRO:  That's true, your Honor.  But for

4    purposes of our motion for preliminary injunction and summary

5    judgment the Court may assume that Telegram is ready to launch.

6    The question is what is it ready to launch.

7         But, as I said, that launch is simply a liquidity

8    event.  What is in the mind of the initial purchasers at the

9    time of the agreement is what controls.

10        And if I may -- so we pointed the Court to what was in

11   the mind of the initial purchasers.  We've pointed the Court to

12   the statements Telegram made at the time.  The statements that

13   I've covered from the white paper, some of them were repeated

14   in the other marketing materials such as the primer, the

15   presale primer where Telegram talked about its involvement

16   through 2021 and where Telegram talked about the integration of

17   Messenger into this echo system.  All of these things, again,

18   show up very clearly in the investment memoranda that were

19   prepared at the time and that give the Court, one could say,

20   clues or insight into what we submit is already the obvious

21   economic reality of the transaction.

22        The Court asked at the beginning whether the

23   transaction was for consumptive purpose or at least in part for

24   that.  There is no evidence in the record that that was the

25   case.  The evidence is all to the contrary.  All of the

1   investment memos and all of the affidavits talk about –- at

2   most some say we've considered whether we'd act as validators.

3   That's all that some of the investors have said.  All of them

4   have said, though, that they plan to find the right moment when

5   to sell these things for a profit.

6        And I would like to point the Court back to the

7   Gilligan, Will case from the Second Circuit which we think is

8   critical in this case.  In Gilligan, Will the Second Circuit

9   said that's exactly the situation where we need registration

10  and protection.  These underwriters are going to decide what

11  the right moment is to unload the securities onto members of

12  the public.  That's why we need registration and that's why we

13  need information.

14        Because the underwriters are going to decide that this

15  is no longer a worthwhile endeavor for them and dump the

16  securities into the market.  And that's what is at the core of

17  the registration requirement, the Supreme Court's concerns

18  since Ralston Purina and the cases that talk about a public

19  distribution and how the Court should understand that issue.

20        I could address our motion our or 12(f) motion now or

21  wait until.

22        THE COURT:  No.  I think what would be useful for you

23  to do is –- and I understand the 12(f) motion and the

24  opposition in the 12(f) motion.

25        Most of what I have experienced in terms of SEC

K2J9SEC1

1   enforcement actions are looking in some form of the rearview

2   mirror, looking at likelihood of recurrence, etc.  And there's

3   a flavor of that standard in the defendant's papers.  But what

4   is the standard on irreparable injury in an alleged ongoing

5   violation case?

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. TENREIRO:  Thank you, your Honor.

2          I'll address that.  So, I think again it's important

3     to start with the text of the statute.  The statute Section

4     20(b) if I may bring my statute book.

5          THE COURT:  Sure.

6          MR. TENREIRO:  Section 20(b) of the Securities Act is

7     clear that whenever it shall appear to the commission that any

8     person is engaged or is about to engage in any acts or

9     practices which constitute or will constitute a violation of

10    these provisions, it may bring -- now I'm phrasing -- it may

11    bring essentially an injunctive action and it empowers the

12    courts to enjoin such acts or practices.

13         So, that's sort of the traditionally language that one

14    looks to for what's called a 'prospective injunction'.  And the

15    standard, we submit, the standard is there a violation that's

16    ongoing?  So, to meet that standard we have to prove, as we

17    submit that we have, that the violation occurred and that it's

18    continuing.  I don't think there is any dispute that if this

19    case were to go away Telegram would within five seconds or five

20    minutes is going to press the 'send' button and distribute

21    these securities to the initial purchasers.  We submit that

22    that's the next step within this offering, that's a public

23    offering in violation of Section Five.

24         To the extent that the SEC, as the Court obviously

25    knows, that the SEC doesn't have to prove irreparable injury in

1    the typical forward looking injunction when there's been a

2    completed violation.  Those cases talk typically about a

3    preliminary obey the law injunction, a broad obey the law

4    Section Five or Section 10 injunction.  To the extent that --

5    so, we submit that we do not have to show irreparable injury

6    but I think that in the context of a prospective injunction,

7    that's exactly what we're here to stop which is an injury to

8    the public by having securities distributed without the

9    registration statement being provided by Telegram and the

10   information that's in that registration statement.

11           As the Court knows from its experience, those

12   registration statements have disclosures about risks, about

13   what the issue is planning to do with the funds that its

14   obtained, about what's going on with the company, about its own

15   holdings of those funds.  That is important information.  To

16   the SEC the harm here is that these individuals could be making

17   entry into these transactions without having that information.

18           I think the Second Circuit has characterized this as

19   the essential of the act to protect investors by requiring

20   registration that again is the Giligan Will case.  And there is

21   a number of sort of what I'll describe as -- statements to that

22   effect in the Supreme Court's jurisprudence in this area.  The

23   Joinder case from the very beginning talked about the evils

24   that Congress was trying to address when it passed these laws.

25   It was the caveat emptor regime that existed for the securities

1    laws that were passed.  That's the fundamental harm that the

2    Securities Act was enacted to address.

3            To the extent that there's any question -- and I don't

4    think there is -- but to the extent that there's any question

5    about private versus the public harm that I have just

6    described, I think the Second Circuit in Management Dynamics

7    and in the Culpepper case have been very clear that the public

8    interest is paramount, I don't think it's even a close call.

9    We respectfully submit that the harm here is solely to the

10   public if the Court will permit this to continue.

11           In another case that has at least relevant principles

12   from the Second Circuit called SEC v. Kern, the Second Circuit

13   reminded the courts that it should not construe Section Five to

14   incentivize violations by permitting sort of a public offering

15   to the stopped, by permitting the violation to sort of stop

16   midstream simply because they're making these statements.

17   Nothing has really changed in the economic realities at issue

18   here.

19           So, if I have sufficiently addressed the Court's

20   question about the standard, I'd like to at least in closing

21   and reserve some rebuttal if permitted.  But in closing, we'd

22   ask the Court to start exactly where the Court began this

23   morning which is by looking at the economic reality and really

24   applying common sense to this transaction.  As I mentioned at

25   the beginning, this was a company that wanted to raise funds

K2JAASEC2                         Hearing

1   and didn't want to do it in the traditional way, didn't want to

2   have to sell a piece of its company, didn't want to have to

3   register with the SEC, but it does want and it's asking the

4   Court to give it an opportunity to take $1.7 billion indirectly

5   from members of the investing public without complying with the

6   registration requirements.

7          In this way, Telegram is seeking to pass on its

8   problem, essentially, to the investing public that wants the

9   benefit of that without the responsibilities of disclosure

10  imposed by the act.  Telegram's attempt to do this by this

11  two-step process versus what it calls a two-step process but

12  what is really one transaction were selling to venture

13  capitalists, that Telegram has no use for those things other

14  than to profit does not put its fund rate outside of the rubric

15  of securities laws and that shows why registration is

16  important.

17         When the Court looks at the question that the Court

18  asked us at the beginning, what is the economic justification

19  for the -- purchase agreement?  There isn't any other than to

20  create demand and to sort of incentivize some people to decide

21  I want to be in this trench and some other people to decide I

22  want to be in the trench that I can sell first.  That's what

23  people do in IPOs.  When the Court asks whether the transaction

24  in the initial purchases provide for consumptive use, the

25  evidence in the record at the time of the transaction is

1    essentially undisputed that it was not for consumptive use.  To

2    the extent that Telegram can point to anything, it would not

3    permit a reasonable juror to conclude anything other than these

4    transactions, that these were not consumers of goods.

5              Lastly, the Court asked what the business

6    justification is for time of capital for a year or more if this

7    was just a currency, I have not been able to come up with one.

8    And in our conversation and in the evidence we've submitted

9    from these sophisticated venture capitalist, there isn't any.

10   There is no reason why somebody would do that.  There's no

11   reason why other than in hopes based on Telegram's promises

12   that Telegrams efforts would be successful that the team that

13   they touted that would ten years of experience or 15 member

14   team, that that team could create another successful enterprise

15   from which they would -- a profit.  For those reasons, this is

16   transaction falls squarely under the Howey test.

17             The Court is quite correct in the statement it made at

18   the beginning.  This case is not about all Cryptocurrencies.

19   It's not about another transaction.  It's not about future

20   transactions.  It's about the transaction that Telegram already

21   entered into and in the middle of which Telegram finds itself.

22             The Securities Act has a clear mandate and it clearly

23   empowers the Court as recognized by the Second Circuit to

24   enjoin an ongoing violation and we simply ask that the Court do

25   so today and that pursuant to its October 21 order that it

K2JAASEC2                          Hearing

1   extend the current standstill and issue a preliminary

2   injunction

3            THE COURT:  Thank you.  We'll take a ten-minute recess

4   and then we'll resume with Mr. Drylewski's argument.

5            MR. DRYLEWSKI:  Thank you, your Honor.

6            THE COURT:  Thank you.

7            (Recess)

8            THE COURT:  Please be seated.

9            Whenever you're ready.

10           MR. DRYLEWSKI:  Thank you, your Honor.

11           If it please the Court, we've put together a small

12   side deck that we may refer to through the argument.  With the

13   Court's permission I'd offer some up to you, to the Court's law

14   clerk and to the court reporter.

15           THE COURT:  All right.  That's fine.

16           (Pause)

17           MR. DRYLEWSKI:  Good morning, your Honor.

18           May it please the Court, I'm Alex Drylewski, for the

19   defendants.  It's a little difficult to know where to start but

20   I'll begin with a statement that your Honor made at the outset

21   and that is that a digital asset standing alone is inherently

22   not a security.  We agree, and I believe the SEC agrees too,

23   what would make a digital asset a security is if it is coupled

24   with a promise from the promoter to undertake essential

25   managerial efforts leading to a profit for the purchaser.

1          Now, what that means is there has to be a coupled

2     promise with that asset.  The asset could be sold in one

3     circumstance where it is not a security and it can be sold in

4     another circumstance where it is a security, depending upon

5     what the promoter promised in each of those different

6     circumstances.

7          And to take an example from Howey itself, there were

8     two essentially two agreements that were offered to the

9     purchasers, a land sale agreement for orange groves and a

10    separate service agreement by which the promotor agreed that it

11    would cultivate the orange groves.  It would grow the oranges.

12    It would sell the oranges and then it would remit the profit to

13    the purchaser.

14         Now under those circumstances, the Supreme Court held

15    that an investment contract had been offered because those two

16    offers coupled together created an expectation in the

17    purchasers that they would profit solely from the manager's

18    work and service in generating a profit, the managerial

19    service.

20         THE COURT:  And they weave together two separate

21    potentially standalone agreements to come to that conclusion.

22         MR. DRYLEWSKI:  Precisely, your Honor.

23         And no one would doubt that if it were just the land

24    contract alone and someone were just selling the orange groves

25    alone, that would not be a security.  It must be the weaving

1    together, as you said, of the promise and the asset.

2           Now, taking that to this case, there is an fundamental

3    question at issue that we believe the SEC has conflated here.

4    And that is there was an initial offer that was made to private

5    purchasers whereby Telegram agreed it would take the funds that

6    those private purchasers pooled together and it would take

7    effort to build this ton block chain.  And if successful, it

8    would create the grams and it would distribute those grams to

9    the purchasers as a return on their investment.

10          Significantly, your Honor -- and this is undisputed --

11   defendants treated that transaction as a securities offering.

12   And the reason it did so is because indisputably, the private

13   purchasers pooled their money together in exchange for

14   Telegram's agreement embodied in the purchase agreements that

15   it would undertake those efforts to build a block chain.  But

16   the idea and the intent was that once the block chain is built

17   and launched, it is completely open source code.  It is out

18   there on the Internet.  Telegram will then proceed into the

19   background and be just one of many in the decentralized

20   community of network users that would have the ability but no

21   obligation to continue to undertake any efforts, whatsoever.

22          THE COURT:  Well, the image of the decentralized

23   community after launch, your image of it and the SEC's image of

24   it actually are not necessarily incompatible.  What is the

25   difference is the timeline.  You maintain that that exists on

1   the instant of launch, whatever the moment of launch is, it

2   exists then.  They maintain it will not exist then but may very

3   well exist at some point in the future.  That's where you

4   differ.

5          MR. DRYLEWSKI:  That is exactly right, your Honor.

6   And in fact, that is one of our points is that it is undisputed

7   that the end goal here is a decentralized community.  The

8   question is, when will you get there?  But that is a time

9   limited question and courts and case law says that even a

10  central managerial efforts are managerial efforts that are

11  temporary on transitory may not rise to the level of a Howey

12  promise making an investment contract.

13         And we see it come up in cases involving franchisors

14  and franchisees where a franchisor may give start-up help,

15  advise, marketing, advertising, but the end goal and the

16  intention all along is that the franchisee will eventually

17  takeover and there will be no reliance on essential managerial

18  efforts of others.

19         THE COURT:  What's your case on that?  What's your

20  franchise case?

21         MR. DRYLEWSKI:  We have a couple of cases, your Honor,

22  on this point.  One, the franchisor or franchisee case is

23  called Martin v. Tempest.  Let me just pull it up.

24         THE COURT:  Sure.  We can find the cite, I'm sure.

25         MR. DRYLEWSKI:  I have it here.  The case is called

K2JAASEC2                        Hearing

1   Martin v. Temp.  It's a Fifth Circuit case and the citation is

2   628 F.2d 887 Fifth Circuit 1980.  We also cite for this

3   proposition in our briefs a case called Alunni v. Development

4   Resources.  It's an Eleventh Circuit case from 2011.  And that

5   case involved the promotion of condos in Florida that were

6   marketing as a real estate investment opportunity but some of

7   them came with a one-year existing lease where the promotor

8   would continue to manage those properties and remit the

9   profits.  And because that was a time-limited issue, because it

10  was temporary and transitory, those management promises on the

11  existing leases did not rise to the level of a Howey promise.

12          And if I could refer your Honor to the first slide in

13  the deck, this is the concept that we're talking about here

14  about the difference between the private placement which,

15  again, was treated expressly as a securities offering and post

16  launch grams which are uncoupled from that promise that's in

17  the purchase agreement that Telegram is going to undertake any

18  essential managerial efforts of others.

19          So, the only point here is analytically we have to

20  look at this at two separate points in time.  You look at it on

21  the day one of the private purchase and you say, was this a

22  security and we say it is.  And we agree that it was.  But you

23  also have to look at grams when they will be offered to a new

24  set of public gram purchasers in the market.

25          THE COURT:  Well, again, the definition of 'terms'

K2JAASEC2                          Hearing

1    sounds picky but it turns out as I think both sides agree to be

2    quite critical here.  And I think what the SEC is claiming is

3    not merely that you look at whether it's a security on the day

4    the offer and acceptance is made when it's offered and

5    certainly, when it's accepted and certainly, when the promise

6    to exchange consideration is made, but I think they're saying

7    that it's an offering of securities and then you have to

8    complete the sentence essentially to whom.  And their position

9    seems to be that with the two tranches or rounds of purchase

10   agreements at that moment in time there was an offering of

11   securities that extended to the post launch secondary market.

12           You, as I understand it, I think what you're saying

13   is, yes, there was an offering of securities but the offering

14   of securities was to the initial purchaser's, full stop.

15           MR. DRYLEWSKI:  That's exactly right, your Honor.

16           THE COURT:  It's what this case is here.

17           MR. DRYLEWSKI:  One way to try to illustrate this is

18   take something that I think the parties will agree is not a

19   security, the purchase of a house.  I could buy a house on day

20   one and on day three I may sell that house but sell it with a

21   coupled promise to that purchaser that I'll retain possession

22   of the house.  I'll rent it out and I'll remit the rental

23   proceeds to that purchaser.  Now, it's the same underlying

24   asset but in scenario one it is not a security.  In scenario

25   two it may be a security and I submit that the SEC would not

1    disagree that the second scenario could be.

2            THE COURT:  Right.  And uninitiated into the law in

3    this area and neither side is uninitiated here, so I'm perhaps

4    stating an obvious proposition to both sides.  One might be

5    tempted as a lawyer to say, well, let me look at the agreements

6    their four corners and that will answer the question.  And

7    there really is not a dispute in this case that that's not how

8    the economic realities test works.  If I could look at the four

9    corners of the agreements and decided on that and nothing else,

10   you know kind of as the way we think of the Parole Evidence

11   Rule and construction of an unambiguous contract, this case

12   should be very easy and I'd give you five minutes a side to

13   make your points.  But that's not what we're dealing with.  So,

14   I have to look beyond those agreements at the full economic

15   reality.

16           MR. DRYLEWSKI:  Understood, your Honor.

17           And let's look at the economic realities of this

18   situation.  From the beginning of this transaction from day one

19   Telegram announced that its intention here was to create a new

20   mass market consumer cryptocurrency.  The point was to make

21   something that could be freely traded, bought, sold and used by

22   consumers.  And you can see that going all the way back to the

23   offering materials that went to these private purchasers.  In

24   the problem statement for the primer that was given to those

25   purchasers at ab initio, it said the problem that Telegram

1   identified here is that the technological limitations of

2   existing cryptocurrencies like Bitcoin and Ethereum have

3   prevented their widespread adoption among consumers.  They say

4   that because of those limitations most of the purchasers of

5   those cryptocurrencies are investors and not everyday

6   consumers.  This was the problem that Telegram purported to

7   identify that it was hoping to solve with this new technology.

8              So, they got their development team together -- it's a

9   world renown development team -- and created a platform that is

10  meant to be and has intended from the beginning to be faster,

11  more scalable and more consumer friendly than any existing

12  digital platform out there.

13             THE COURT:  But let's be candid.  Like anybody who

14  makes a product, I'm sure your product is the best.  I'll

15  assume that for the sake of argument.  But essential to the

16  vision -- doesn't make it a bad vision.  It doesn't even answer

17  the questions in this case, necessarily.  But essential to that

18  vision was the existence of the 200 million -- sometimes I read

19  300 million -- user base of Telegram messenger and this is

20  what's going to put this cryptocurrency in everyone's hands is

21  that we're not starting from zero and creating a name and a

22  word that no one's ever heard of.  We're your friendly folks at

23  Telegram Messenger who are going to move you gently into a

24  world of cryptocurrency and there are three hundred million

25  people who will be open to this idea.  Well, I'll try it.  I'll

1    try it for a month.  I'll try it on the small scale basis, see

2    how it goes.  What could go wrong?  And so, it's not the

3    entirety of the story to say oh, no, no, I have better

4    scalability.  I have better functionality.  I am more user

5    friendly.  Everybody claims that about their product.  And I'm

6    sure your clients have come up with something more wiz bang

7    than the last guy who did it.  I'll take that as a given but

8    there's much more to what that vision was.

9            MR. DRYLEWSKI:  So a couple of points there, your

10   Honor.  First of all, no doubt Telegram in its offering

11   materials said to these private purchasers, we've got an

12   existing eco system of users out there that a lot of them tend

13   to be crypto enthusiasts.  We have a built-in audience of

14   people that will be very receptive to this idea and the

15   potential of adopting them quickly.  That was an existing

16   thing.  That was already there.  And that was promised to the

17   private purchasers as part of the value proposition for that

18   private transaction that, again, was treated as a securities

19   offering.  We do not doubt that the private investors there

20   sought to profit here.

21           Now, there's evidence that some of them sought to

22   profit in different ways, including by potentially using their

23   grams and working as validators which is in and of itself a

24   money making opportunity, but --

25           THE COURT:  Yes.  Where is the evidence that any of

1    the initial purchasers were looking to become validators?

2              MR. DRYLEWSKI:  So, one of the e-mails, there was an

3    internal e-mail that the SEC attached recently to one of its

4    letters post closing of briefing is an internal discussion by

5    one of the private purchasers where they talk about,

6    specifically, the idea of staking and making money through

7    their gram holdings.  And that is you can find it at docket

8    number 108-2.  It is Exhibit B to a letter that SEC put in on

9    February 10.

10             But putting that to the side, your Honor, even if we

11   stipulated that every single one of those private purchasers

12   was looking to get financial gain by selling their grams at the

13   end of the private placement, our answer is "so what?"  The

14   point is that grams when you look at them at that point are

15   commodities and not securities because have you to look at the

16   totality of the circumstances at that time.  If the Howey

17   purchasers, who put their money into the growing of oranges,

18   got oranges back as their return on investments and they want

19   to go use those oranges or sell them for profit, that is

20   irrelevant that the subjective intents there.  The point is are

21   the oranges securities at that point in time when you look at

22   the offers and sales to others?

23             And another example is from the Second Circuit, Glen

24   Arden.  That's a case where the plaintiffs bought whiskey

25   warehouse receipts.  And the plaintiffs in that case said --

K2JAASEC2                       Hearing

1      excuse me -- the defendants in that case said, that's just a

2      sale of commodities.  That's not an investment contract under

3      Howey.  The Second Circuit undertook an analysis that we think

4      is critical showing the difference between the sale of a

5      commodity and the sale of an investment contract.  And what the

6      Second Circuit said is, sure, whiskey on its own may be a

7      commodity but what was bought here was additional services from

8      the promotor that was absolutely necessary to the promised

9      profit.

10            But in that scenario if the plaintiff had taken its

11     whiskey receipts and let's say offered them to a liquor

12     wholesaler or offered them to someone else, just the whiskey

13     receipts themselves, without any of those concomitant promises

14     by the promoter to do any of that other stuff, that would be a

15     consumer transaction or a transaction in commodities.  It would

16     not be a transaction selling securities subject to the federal

17     securities laws.  And that's what we're saying is going to be

18     the future transactions of grams postlaunch.  That was the

19     vision and the intention of Telegram all along.  This project

20     would not work if the idea was grams are securities on day one

21     and they're always securities or they're securities at the time

22     of launch when we launch the ton block chain and we're done

23     with any managerial efforts.

24            So, when your Honor posed the question, what happens

25     if Telegram goes to the Bahamas and you can't find them

1    again --

2              THE COURT:  No.  I said the British Virgin Islands.

3    They are incorporated in the British Virgin Islands.  That's

4    what I said.

5              MR. DRYLEWSKI:  Thank you for the correction, your

6    Honor.

7              If they go anywhere and disappear and no one can count

8    on them to lift a finger again, the question has to be asked.

9    It's not one question.  It's two.  The first is, if they did it

10   at the beginning of the private placement, the answer is the

11   private purchasers would not have made a penny because they

12   were relying on Telegram to create that block chain platform.

13   That was the essential managerial efforts promise that was made

14   and that's why that was an investment contract.

15             But if Telegram upon the launch decides to go to the

16   British Virgin Islands, Bahamas or Buffalo, New York and never

17   seen again, that does not change what gram purchasers in the

18   market will expect.  Because what Telegram has said from the

19   beginning and has reiterated and reemphasized to anyone who

20   will listen is that the entire nature of this decentralized

21   block chain platform, and the only reason why it will work is

22   if there is not one person managing this.  The Telegram recedes

23   into the background and because it's an open source code,

24   anyone can come in and can build these applications and smart

25   contracts on it.

K2JAASEC2                          Hearing

And in fact, we have seen based on public reports that there is already strong interest from third parties to build these types of use cases and applications on the platform.  And we submit that is remarkable here, judge, given that there's a cloud of uncertainty based on this very litigation.  There is still strong evidence that the decentralized community out there of independent third parties is looking at this block chain as a chance for them to make money entrepreneurly by building smart contracts and block chains, applications on block chain that gram purchasers in the market can use or not use.  But there won't be these essential managerial efforts by Telegram that are in the words of Glen Arden in the Second Circuit, absolutely, necessary to the promised profits.  Telegram is not promised any profits to gram purchasers in the future in the market coming in after the block chain has been built.  And even if it did, those profits would not be based on any of Telegram's efforts.

Now, the idea that Telegram may want to continue to drive more consumption and more demand for this product postlaunch, that's the same as any manufacturer of a consumer product wanting to create a widely used product.  That, in and of itself, cannot create an expectation of profits of the kind that Howey contemplates.

And to give an analogy, if I were to buy season tickets to the Mets, I may think, rightly or wrongly, that I

1      might profit from those tickets by reselling them in the future

2      at a higher value.  I may also generally expect again, rightly

3      or wrongly, that the Mets will undertake efforts to improve

4      their roster to improve their stadium and to market themselves

5      to a new fan base or expand their following.

6                  THE COURT:  That sounds like a fantasy.

7                  MR. DRYLEWSKI:  My other team is the Buffalo Bills.

8      So, I picked that as the more plausible analogy.

9                  THE COURT:  I guess you've been schooled by Mr --

10                 MR. DRYLEWSKI:  We've has some interesting

11     conversations about Gil Hodges but that's a separate topic.

12                 But the point is, I may have those expectations that

13     the team will undertake those efforts.  And those efforts may

14     all have a very positive effect on the value of my season

15     tickets but that doesn't make my season tickets a security.

16     And the reason why is because the crucial element there is that

17     the Mets have to promise to me, we're selling you those tickets

18     as an opportunity to profit based on our essential efforts.

19     That is the critical piece of any Howey investment contract.

20     And that looking at grams postlaunch, we submit, is the

21     critical piece that's missing here.  And so if a gram purchaser

22     you're looking at it from their perspective coming in

23     postlaunch, what are they looking at at this point?  They're

24     looking at the fact that Telegram has built the block chain.

25     The platform is up and running.  It is open source code and

1   anybody can build on top of it.  In fact, as Telegram has told

2   everyone, anyone can copy the block chain code and launch their

3   own block chain with their own idea and own name for it.

4          So, gram purchasers looking at that situation will

5   come in and they will buy grams for one of three reasons.

6   They'll either do it because they want to use them as a medium

7   of exchange, just like Bitcoin.  People use it as a score of

8   value and to transfer value to others on the block chain.

9   Either that, either to use it in connection with smart

10  contracts and applications that may be built on top of the

11  platform, that's what Ethereum does.  People use the name of

12  Ethereum tokens in order to run smart contracts which give

13  values to those users.

14         Or three, they do it for speculative reasons because

15  they want to profit by buying it low and they think they can

16  sell it high.  None of those are enough to satisfy Howey.

17  Commodities are bought and sold for speculative reason and for

18  gain all the time.  People trade currencies.  People trade gold

19  and silver and sugar and futures relating to all those as well.

20  That doesn't make it a security because what those people were

21  doing is they're relying on force of supply and demand and

22  they're hoping that what they're buying the demand will go up

23  over time or that someone will by it from them at a higher

24  price.  But that is not reliance on the essential managerial

25  efforts of Telegram and it can't be, your Honor, we submit,

1    under the facts here that both sides agree.

2           And just going back again to the economic realities

3    here, if you turn if you could to slide 20.  The SEC in its

4    reply brief put in a summary of its notion of what the economic

5    reality of the value for grams is and I'd like to read it.

6           "The economic reality as investors themselves

7    succinctly explained it, is that the value grams represent

8    could potentially grow based on the efficacy and success of

9    Telegrams or other third parties' efforts to create some demand

10   and value for them in the future so they may be resold at a

11   higher price.  That makes grams securities."

12          Your Honor, we submit that does not make gram

13   securities.  The SEC doesn't cite a case for that proposition.

14   We submit there is none.  What that highlights is that grams in

15   the market following launch at the ton block chain will not

16   carry any of those absolutely necessary essential managerial

17   efforts of others.

18          Now, your Honor, turning just quickly to the words

19   that Telegram used when it describes this, both to the private

20   purchasers and to the public gram consumers in the future, we

21   take your Honor's point that disclaimers are not dispositive.

22   You have to look past the words that are used.  But there are

23   long lines of cases after Howey that say that the words mean

24   something.  They cannot be disregarded.

25          Going all the way back to joiner where the Supreme

1   Court said that offerings "must be judged as being what they

2   were represented to be".  And here what Telegram said from the

3   beginning -- and it's on slide 14, your Honor.  Telegram said:

4            "Grams are intended to act as a medium of exchange

5   between users in the ton ecosystem.  Grams are not investment

6   products.  There should be no expectation of future profit or

7   gain from the purchase or sale of grams."

8            Your Honor, that was made to every private purchaser

9   in the private offering.  They repped and warranted to reading

10  and understanding it.  Those are sophisticated investors.  And

11  then it was re-emphasized and reiterated in a public notice to

12  every member of the public, including any potential gram

13  purchaser in the market if this project is allowed to launch.

14           We submit that we are not aware of a single case where

15  a promotor made that clear a statement, that definitive a

16  statement to potential purchasers and the Court, nevertheless,

17  imposed an investment contract.  And we would direct the Court

18  to the SEC v. Life Partners case.  It's D.C. Circuit.  There

19  the purchasers bought certain viatical contracts and they

20  claimed they were investment contracts because they said the

21  defendants promised that they would make a secondary market for

22  those instruments and they would profit on them.

23           The D.C. Circuit rejected that theory and emphasized

24  that in the written materials the defendants warned plaintiffs

25  specifically that those viatical contracts are not liquid

1    investments and there can be no guaranty that there would be

2    any secondary market that's developed for those contracts.  The

3    D.C. Circuit emphasized that fact.

4            We would also point your Honor to Davis v. Riao

5    Rancho.  It's a case Judge Brieant decided of this court.

6    There the plaintiffs bought land in New Mexico and they claimed

7    they were led to expect profits based on the sole efforts of

8    the developer promotor.  Judge Brieant dismissed that case.  He

9    said even if the defendants in fact built roads or improvements

10   on the property at issue, that is not the type of managerial

11   efforts contemplated under Howey and Forman because the

12   defendants did not make promises that they would run the

13   development and distribute profits to the plaintiffs.  There

14   was no management agreement between the parties, nor were the

15   defendants obligated under the purchase agreement to undertake

16   any of those efforts.  Cases are legion on this point, your

17   Honor.  The Rodriguez case from the First Circuit.  The De Los

18   Ranchos case from the Ninth Circuit.  They all say that there

19   the plaintiffs believed they were led or anticipated or

20   expected that the defendant promoters were going to build up

21   these thriving residential communities and they were going to

22   appreciate, the investments of those plaintiffs were going to

23   appreciate in value based on those efforts.  And in each one of

24   those cases the Court said, no, generalized, even strong and

25   repeated suggestions that something may happen is not enough.

1    When you look at the contracts here, the contract was a

2    conveyance of land and fee simple and there was no obligation

3    to undertake any specific essential managerial effort.

4           We submit that those cases are on all fours here.  And

5    just because a purchaser may anticipate or expect that

6    postlaunch, Telegram may continue to be involved.  Even putting

7    aside whether that's an essential managerial effort that is not

8    enough under Howey.

9           THE COURT:  But I look at it from the perspective of

10   what the offeror is intending to communicate.

11          Is that correct?

12          MR. DRYLEWSKI:  That's exactly right.

13          THE COURT:  Is it what the or what the offeror expects

14   that a reasonable purchaser would understand?  Perhaps, that's

15   better said.

16          MR. DRYLEWSKI:  We don't see that formulation in the

17   case law, your Honor.  But, objectively speaking, what the

18   cases say is you have to look at what was said.  The words of

19   the promoter are paramount.  And what does that convey

20   objectively speaking?  You don't look subjectively at what are

21   the anticipations, the inferences or the expectations.

22          THE COURT:  Right.  You don't look, you cannot look

23   solely at what's in the mind of the purchaser.

24          MR. DRYLEWSKI:  Not only that.  You can't, your Honor,

25   because otherwise something could be a security to you and not

1    a security to me.

2              THE COURT:  I get the point.  I get that point.

3              MR. DRYLEWSKI:  On that point just one other point,

4    your Honor, and we think this is a significant admission if you

5    turn to slide 18 of the deck.  This is from the SEC's

6    opposition brief at page nine.  The SEC says:

7              "The Court should not engage in speculation about what

8    a reasonable purchaser might expect in the future based on

9    Telegram's shifting statements about its intention.  The

10   evidence in the record is insufficient to ground any such

11   speculation.

12             Your Honor, we submit that is a remarkable concession

13   because if the best that the SEC can do here or ask the Court

14   to do here is speculate as to what a reasonable purchaser might

15   expect postlaunch, then we submit it has not met its burden for

16   a preliminary injunction and it has not met its burden to raise

17   a material issue of fact to oppose our motion for summary

18   judgment.

19             Your Honor, I don't want to beat a dead horse but I

20   did want to point out if you turn to slide six here, we're not

21   asking you to take our word for it on this difference between

22   an investment contract where there is a digital asset that is

23   coupled with a promise of essential managerial efforts of

24   others putting that in contradistinction to just the underlying

25   token itself.  SEC Commissioner Hester Peirce, just this month

1    said, put out a speech and a new proposed safe harbor for

2    digital asset developers where she made this point that the SEC

3    has been criticized for enlighting the distinction between the

4    investment contract through which a digital token may be

5    offered or sold and the digital token itself.  And she says the

6    contract transaction or scheme by which the token is sold may

7    constitute an investment contract.  But the object of the

8    investment contract, the token, may not bear the hallmarks of a

9    security.  And conflating those two concepts has had disastrous

10   consequences on the ability for token networks to build up.

11        We submit that that is what the SEC is doing here.

12   They are conflating the two things.  The token itself, the

13   grams upon launch of the ton block chain will not be wrapped in

14   an investment contract.  They will not carry with them any

15   ongoing promises, commitments or agreements by Telegram to do

16   anything.  In fact, Telegram has expressly disavowed that and

17   in fact, Telegram is technologically precluded from doing

18   anything from a government standpoint.  It has represented to

19   the world it will not act as a validator.  The validator's on

20   the system, without getting too technical in terms of

21   technology, the validators are a dispersed community of network

22   users.  And what they do is they reach consensus through the

23   software to validate the transactions and the contracts that

24   exist on the platform.  That, both of the parties expects agree

25   that's the backbone and the heart of the platform going forward

K2JAASEC2                          Hearing

1    once its been built.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. DRYLEWSKI:  (Continuing) And those validators will

2     not include Telegram.  They will be a dispersed community of

3     other network users that will govern and run this platform.  So

4     to the extent --

5          THE COURT:  Although you can't say that that won't be

6     the case for some portion of the life post-March, that Telegram

7     may step in if a community of validators does not emerge

8     immediately but with the distinct desire to exit at the

9     earliest opportunity when there are enough validator nodes up

10    and running.

11         MR. DRYLEWSKI:  So --

12         THE COURT:  Is that right?

13         MR. DRYLEWSKI:  Essentially, your Honor.  But just one

14    note there.  It does bear noting that Telegram has said from

15    the beginning that if there is some flaw in the blockchain, it

16    is very likely and possible that that may never get fixed

17    because what Telegram can do in its role following the launch

18    of the blockchain is it can recommend proposals for fixing the

19    code.  But those proposals to be implemented have to be

20    implemented by the validators.

21         THE COURT:  I understand.

22         MR. DRYLEWSKI:  But putting that aside, assume that

23    Telegram will say:  Oh, oh no, we just launched a faulty

24    product and will want to stand behind it and try and find ways

25    to fix it.  We submit that is no different than a manufacturer

1    putting a product out into the market with a warranty.  It is

2    temporary, transitory and incidental to the essential

3    managerial efforts of building the blockchain to begin with.

4    That commitment is embodied in the purchase agreements that

5    expire by their terms at the launch.

6         THE COURT:  So if there were a flaw in the blockchain

7    technology, Telegram would anticipate doing what it could to

8    put out a fix.  Once it's launched doesn't guarantee that

9    everybody is going to buy into the fix, but that they would put

10   a fix out.

11        MR. DRYLEWSKI:  They would put out a proposal almost

12   undoubtedly, your Honor.  But we don't know.  What their

13   intentions would be to actually go forward with it depends,

14   obviously, on the circumstances and what the nature of the

15   problem and the fix is.

16        But assuming for the sake of these motions that

17   Telegram is incentivized to and would put out a proposed fix,

18   the validators then can say:  Yeah, that seems like a good fix,

19   we'll implement it.  And if two-thirds of them vote it through,

20   it gets implemented in the system.

21        Or they could say:  Telegram, you put out a faulty

22   product, we don't think you know what you're talking about, and

23   may look to other solutions to fix it in order to go forward.

24        THE COURT:  I understand.  But on my other point, if

25   there is not a community of validators that emerges on day one,

K2J9SEC3

1   Telegram stands ready to step into that role for some period of

2   time postlaunch.

3           MR. DRYLEWSKI:  I can't represent that that is the

4   case, your Honor.

5           What Telegram has said is that it does not have any

6   superior rights and it has represented and made clear it will

7   not validate; it will not govern the system.

8           So it could be --

9           THE COURT:  You're not disclaiming however -- whatever

10  those words mean, you're not disclaiming that if in the

11  immediate postlaunch period there is not an emergent community

12  of validators, you're not the disclaiming that Telegram would

13  step in and fill that role for some period of time?

14          MR. DRYLEWSKI:  So it cannot.  So just to draw a

15  distinction.  I think this is part of the --

16          THE COURT:  Why can it not?

17          MR. DRYLEWSKI:  Because, one, it is just -- it cannot

18  be -- it has said it will not be a validator.

19          THE COURT:  Let's pause.  Let's pause.  Words matter

20  here.

21          MR. DRYLEWSKI:  Sure.

22          THE COURT:  And I know you're not your client.  You

23  take what you know from your client.  But there is a world of

24  difference between cannot and will not.  So explain what you

25  mean.

K2J9SEC3

1          Is there a "cannot" or is it a "will not"?

2          MR. DRYLEWSKI:  Thank you, your Honor.

3          I will do my best as probably a poor interlocutor of

4     the technological issues here.  But as I understand it, the

5     validation process is called a consensus mechanism.

6          THE COURT:  Yes.

7          MR. DRYLEWSKI:  And what it requires is that a certain

8     number of nodes, independent nodes all validate a transaction.

9     If two-thirds of them agree, then that is a valid transaction

10    for purposes of the platform.  One party standing alone cannot

11    create consensus by itself.  So what you would be left with is

12    let's assume Telegram would step in and, I don't know, would

13    say these are good transactions, you can trust these

14    transactions.  What our expert would say that is not a

15    successful blockchain.  It sort of loses its very essence as a

16    decentralized ledger because you now have a centralized

17    governing force.

18         THE COURT:  I got it.  And I understand that.  And in

19    that sense I get your point about "cannot."

20         But, if a community of validators does not emerge in

21    the immediate postlaunch period, is Telegram disclaiming that

22    it will endeavor to foster and incentivize the creation of that

23    validator community?

24         MR. DRYLEWSKI:  I do not understand Telegram to be

25    disclaiming those efforts.

1          THE COURT:  That's fine.  You've answered my question.

2          MR. DRYLEWSKI:  Thank you.

3          THE COURT:  My question was imperfectly phrased and

4   thank you for the assistance.

5          MR. DRYLEWSKI:  Not at all, your Honor.

6          But it is -- apropos of this conversation, it is worth

7   noting that the SEC's expert has recognized that on the test

8   net there have been 36 validator nodes that were set up.  That

9   is strong indication that there is that interest on day one for

10  folks to act as validators.

11         And just, again, not to get too much into the

12  technology, but it's not like Telegram has this product behind

13  a curtain and is, on day one of the launch, going to whip it

14  out and say here it is, here's the technology we've been

15  developing.

16         There's been a test net where the code for this

17  blockchain platform has been publicly available.  It began

18  rolling it out in March of last year.  And so the entire

19  public, anyone in the world, can go on, can look at this code,

20  can test it out, can try simple smart contracts, see how they

21  interact with the code base, and can set up validator nodes.

22  And we know 36 parties have set up those nodes to act at

23  validators.  So there is interest in that.

24         THE COURT:  But, there is a real commitment when one

25  actually -- this is not something one does in your gym shorts

K2J9SEC3

1    at night in their spare time.  This is, as I understand it,

2    becoming a validator is a business in and of itself for which

3    there are incentive shares available that Telegram can release

4    to validators, no?

5         MR. DRYLEWSKI:  You are right.  The Court is right in

6    the sense it is a business in and of itself and that it is a

7    moneymaking business and one that people will be highly

8    incentivized to do.

9         A clarification on the way it works mechanically.

10   Telegram does not reward the validators for their validation

11   work.  And this is part of the concept of decentralized

12   platforms that takes -- that takes some people by surprise.

13        It's all built into that protocol.  So it's

14   automatically executed.  If the validators reach consensus on a

15   block and it is appended to the end of this distributed ledger,

16   they're rewarded from the system with newly minted Grams.  It's

17   like Bitcoin mining where people can do the validation work

18   necessary and they get the Bitcoin not from Mr. Bitcoin or some

19   foundation.  They get it from the technology itself.  And so

20   it's self-regulating, self-working, decentralized and Telegram

21   will not play that role going forward.

22        Now, there's been some talk about the TON Foundation.

23   If your Honor would like, I'm happy to address that.

24        THE COURT:  Yes, please.

25        MR. DRYLEWSKI:  First and foremost, Telegram, when it

was looking at the details for this project back in 2017, it
made the specific decision to build a lot of flexibility into
the details of this product for the very reason of making sure
that it complied with not just the U.S. federal securities laws
but all applicable laws and regulations in this very new and
emerging space.

          And so what it thought at the time is it looked at
other successful blockchains in terms of being allowed to
operate, like Bitcoin and Ethereum.  And those platforms had
their own foundations.  They're typically not-for-profit type
companies that have involvement with the blockchain platform.
They may publish nonbinding research reports.  Some of them may
give out small incentives to developers to generate activity on
the blockchain.  The Ethereum Foundation does that everyday, is
doing it right now.

          So that was the thought behind it.  Telegram
determined that we could establish a TON Foundation that would
have similar goals, similar roles and responsibilities.  But it
told every single one of the private purchasers in the purchase
agreements and in the risk factors that went with all of the
offering documents that we may never establish this TON
Foundation.  We intend to.  We think it's a good idea.  But we
may never do it.  And in the public notice that Telegram put
out in January, it said the same thing, that the TON Foundation
will not be established at launch and it may never be

1  established.

2         THE COURT:  So who owns or who has a beneficial

3  interest in the 52 percent of Grams that have not been the

4  subject of the offer, the purchase agreements?

5         Now I know that there's a certain, I think it's two or

6  four percent for developers.  I'm not talking about that.  I'm

7  talking about the reserve.

8         MR. DRYLEWSKI:  Sure.

9         THE COURT:  Who owns the reserve?

10         MR. DRYLEWSKI:  So for the record -- when the Grams

11  are created at launch, assuming the launch were to incur,

12  58 percent of the Grams would go to those private purchasers

13  that bought them through the purchase agreements.

14         THE COURT:  All right.

15         MR. DRYLEWSKI:  That subscribed to them.

16         Then 28 percent of those Grams would go into a wallet

17  designated for the TON Foundation.  And the idea is that they

18  would be held in a smart contract, unable to be used for

19  voting, validating, transferring, buying, selling unless and

20  until the TON Foundation is established in the future.

21         If the TON Foundation is never established, then those

22  Grams will stay in that wallet.  They will be locked up in

23  perpetuity.  If the TON Foundation is establishment, Telegram

24  has represented and committed that it would be done with the

25  following parameters.  It would be a not-for-profit

K2J9SEC3

organization.  It would be governed by a board of directors

that is a majority independent board, meaning three of the five

members at least would have no affiliation with Telegram or any

of its employees.  And that the foundation can do only one of

three things.  And this will be all set out in a publicly

available charter and governance documents.  They can publish

nonbinding research and opinions about, hey, here is what we're

seeing is going on in the TON blockchain, isn't this great or

isn't this not great.  Here's what we think about it.  They can

give out small incentives in Grams to developers and people to

promote the consumptive use of Grams.  And I think the example

we give in our brief is someone spends ten Grams on some

product or service, the Foundation may have a deal where they

give one gram to that person, to try and get this currency

being used by consumers.  And third, they can sell Grams into

the market but only if the free market price for Grams were to

rise above this hypothetical reference price.

            THE COURT:  I'm familiar with that.

            So if the market price rises above this hypothetical

reference point, theoretical reference point, and now hard

currency is generated, who owns the hard currency?

            MR. DRYLEWSKI:  The TON Foundation does.

            THE COURT:  So now you said 58 percent will go to

those who have entered into the purchase agreements?

            MR. DRYLEWSKI:  Correct, your Honor.

1          THE COURT:  Is that what you're saying?

2          28 percent is in the wallet and may be locked up in

3     perpetuity in the wallet for no one to ever have.  And what

4     about the balance?

5          MR. DRYLEWSKI:  So then there is the four percent that

6     your Honor mentioned that is the currency -- the cryptocurrency

7     that Telegram will pay to its employees and founders.  And the

8     last ten percent is Grams that Telegram has reserved to use --

9     to give out itself as incentive payments to consumers in the

10    market or to developers.

11         THE COURT:  OK.  So Telegram has raised 1.7 billion

12    dollars and it does not and has not committed to use that

13    1.7 billion exclusively for development of the TON blockchain,

14    correct?

15         MR. DRYLEWSKI:  That's correct, your Honor.

16         THE COURT:  So as I understand it, net of what they do

17    happen to spend on such activities, including promotional

18    activities and paying your well earned legal fees it can be

19    dividend-ed up to the owners of the business?

20         MR. DRYLEWSKI:  Yes.  The funds that were raised in

21    the private placement were disclosed to everyone that they

22    could be used without -- essentially without limitation.

23         THE COURT:  So I mean when I say "used" they, net of

24    whatever Telegram elects to spend, really and truly is

25    available to go into the pocket of the shareholder owners.

1          MR. DRYLEWSKI:  I think that's right.  Yes.

2          THE COURT:  OK.  Thank you.

3          MR. DRYLEWSKI:  Your Honor, unless you have any other

4     questions on Grams and the *Howey* analysis, there were a few

5     issues that the SEC raised regarding the bona fides of the

6     exemptions and the private placement, I'm happy to address

7     those if your Honor would like.

8          THE COURT:  It's really up to you at this point.  And

9     then I would propose to hear a brief rebuttal from the movant

10    on the preliminary injunction.

11         MR. DRYLEWSKI:  Thank you, your Honor.  Just very,

12    very briefly then.

13         THE COURT:  Sure.

14         MR. DRYLEWSKI:  The SEC's theory of why the private

15    placement exemption was blown is hinged on this notion that it

16    was, in fact, a disguised public distribution.  We submit that

17    is really asking the same question that we've already talked

18    about, because if Grams are not securities at the point that

19    they're created and can be available to be distributed to the

20    public, then by definition there cannot be a public

21    distribution of a security.  So the question again funnels back

22    to that second question, not whether Grams are securities at

23    the time of the private placement but whether Grams are

24    securities at the time that the blockchain is launched and for

25    the first time the public will be able to buy those Grams.

1          Now the SEC made some points that there were some

2     finder's fees agreements.  We struggle and have struggled from

3     the beginning to understand how that makes anyone an

4     underwriter here.  What Telegram did is it entered into certain

5     placement agent agreements with certain foreign entities to

6     find investors to backfill where certain of the private

7     investors in the second round didn't come through with their

8     contractual obligations to pay.

9          But what those agreements said, first they excluded

10    the U.S.  They were all exclusively ex-U.S.  They were only in

11    jurisdictions that the parties agreed to.  And those finders or

12    placement agents were not permitted under the agreement to

13    negotiate, solicit, or do anything with respect to potential

14    investors.  They were only permitted to funnel them to Telegram

15    or Telegram would then negotiate and make the offers.

16         We see nothing wrong with that here, your Honor, in

17    the context of a private placement.  It certainly doesn't

18    create an underwriter.  And they were not reselling Grams,

19    these finders.  In fact, some of them were not even investors

20    in the private placement.

21         But what the record does reflect is that not only did

22    Telegram put in very strong representations and warranties that

23    each of these private purchasers had to agree to, that they

24    would not transfer any interests in Grams prior to the launch,

25    at which point, again, we submit that Grams will not be

K2J9SEC3

1    securities, so that shouldn't be an issue from that point going

2    forward, but not only did they make those reps, but they are

3    required to repeat those reps again at the time of the launch

4    as a precondition to receiving their Grams, that they haven't

5    transferred any interests.

6              Now, we think that the --

7              THE COURT:  Who has to repeat their representations?

8              MR. DRYLEWSKI:  The private purchasers, your Honor.

9              THE COURT:  Both tranches?

10             MR. DRYLEWSKI:  Correct.

11             THE COURT:  Go ahead.

12             MR. DRYLEWSKI:  And although we don't think it's

13   relevant to the reasonable care analysis here, the record

14   shows --

15             THE COURT:  What happens if they're fibbing when they

16   say we haven't made any agreements to sell in a secondary

17   market prelaunch and we haven't done any of that, what happens

18   if they're fibbing?  If they're caught, they're caught.  If

19   they're not caught, I guess they get away with it?

20             MR. DRYLEWSKI:  If they're caught, your Honor, because

21   Telegram had specific information showing that they actually

22   engaged in reselling, Telegram will and has, and the record

23   reflects this, excluded purchasers from the private placement

24   altogether and canceled purchase agreements.  Telegram has done

25   that.

K2J9SEC3

1       But where there is no specific evidence that Telegram

2   can point to to say we know you're fibbing, Telegram sort of

3   has its hands tied and would be opening itself up to a lawsuit

4   if it just canceled a purchase contract from an investment

5   without the ability to prove it.

6       But one of the reasons why Telegram selected these

7   highly reputable, highly sophisticated purchasers in the first

8   instance is so that it could take comfort in the fact that

9   these highly sophisticated investors were making these

10  representations and would stand by them --

11      THE COURT:  Well, let me ask you.  Is there right now,

12  as we speak, an ongoing secondary market in Grams?

13      MR. DRYLEWSKI:  There are rumors that there is some

14  secondary trading of Grams, whether it's Grams or interest in

15  Grams or derivative trading, it's --

16      THE COURT:  It wouldn't be in Grams.  It would be an

17  interest in Grams.  Right.

18      MR. DRYLEWSKI:  It would be akin to like say pre-IPO

19  trading.  There are rumors of that.  But where Telegram has

20  specific evidence that a specific purchaser is violating the

21  terms and the reps in their purchase agreement, it follows up

22  there.  And if there is evidence, it cancels the purchase

23  agreements.  That's what it's agreed to do.  Otherwise, if

24  there was more that was required, it would basically make

25  Telegram the guarantor of all of these private purchasers that

1   they weren't going out and doing their reselling or otherwise

2   it would blow the exemption.  We submit that's not the law.

3          The law is focused on what are the defendant's

4   efforts.  And we submit it's at the time of the transaction

5   when it's entered into.  502(d) says it's reasonable care that

6   the purchaser is acquiring the security for him or herself.  At

7   that time -- the SEC doesn't point to a single red flag that

8   any of these private purchasers had side deals to resell their

9   tokens or had designs to go out and find someone exchange for

10  these Grams.  The only thing that they can argue at that point

11  is that, what everybody understood, Grams would be resold at

12  the launch at a time when everyone expected and intended that

13  Grams would not be securities.  They'd be the or oranges in

14  *Howey*.  They'd be the return on the investment.

15         And the last point is the SEC called that launch the

16  liquidity event.  The liquidity event.  That's right.  What it

17  was was the private purchasers with were getting back currency

18  as a return on their investment.  Now whether they go and they

19  exchange that for another currency, sure.  But the liquidity

20  event is that point in time.  That's the transaction.  And

21  looking past that liquidity event and that transaction, the new

22  transactions in the market with new Gram purchasers coming in,

23  that needs to be assessed at that point in time and that's

24  where we submit, again, running the *Howey* analysis there, Grams

25  do not fit within the definition of investment contract because

1     there is no promise of essential managerial efforts.

2              THE COURT:  Thank you.

3              MR. DRYLEWSKI:  I suppose the last point I would just

4     make, your Honor, and then I promise I'll sit down, is if your

5     Honor is considering the preliminary injunction request, I know

6     that under the terms of the parties' agreement that expires

7     technically today unless it is extended by consent or a request

8     by one of the parties.  We obviously don't believe that the SEC

9     has met its burden of a clear showing of either a past

10    violation or of the likelihood of a future violation given

11    everything we've said.  But we also submit that from the

12    beginning Telegram, these defendants have maintained

13    flexibility with respect to the details of the project and if

14    there's one particular aspect of this project that concerns the

15    Court they are willing and able to have that enjoined, not do

16    that, if it means that the project itself can launch which we

17    believe it should be allowed to do under *Howey*.

18             THE COURT:  Well, let me ask you this.  There are two

19    possibilities.  One is that you consent to the continuation of

20    the existing injunction pending determination of the

21    preliminary injunction motion.  The other is that you don't

22    consent, at which at the conclusion of today's session I will

23    rule.

24             Do you consent?

25             Do you want a moment to consult with your colleagues?

K2J9SEC3

1      MR. DRYLEWSKI:  If I could, your Honor, please.

2      THE COURT:  Sure.

3      (Counsel confer)

4      MR. DRYLEWSKI:  Thank you, your Honor.

5      The one point I just wanted to make on the record, the

6  concern here about the timing, is that under the purchase

7  agreements themselves, if the blockchain doesn't launch, then

8  the investors are entitled to their money back less the amount

9  spent.  And that date right now is April 30.  Now, that's some

10 ways off but that is the only concern is that --

11     THE COURT:  I'm mindful of that.

12     MR. DRYLEWSKI:  Thank you.

13     THE COURT:  I don't anticipate that that will be a

14 problem in terms of a ruling.

15     MR. DRYLEWSKI:  Thank you, your Honor.

16     We consent to that.

17     THE COURT:  Thank you.

18     MR. DRYLEWSKI:  Unless your Honor has any further

19 questions.

20     THE COURT:  Thank you.

21     MR. DRYLEWSKI:  Thank you.

22     THE COURT:  All right.  And I'll hear briefly from the

23 movant.

24     Everybody is a movant here today; movant, crossmovant,

25 cross-crossmovant.

K2J9SEC3

1      MR. TENREIRO:  And amici.

2      THE COURT:  And amici.  We have plenty of amici here

3  too.

4      MR. TENREIRO:  Thank you, your Honor.

5      Your Honor, what I heard from Mr. Drylewski was more

6  labels:  Sugar, apartments, gold.  And what I did not hear was

7  an answer to one of the -- not even one of the Court's three

8  questions at the beginning.

9      What was the economic purpose behind the lockups?

10  What was the economic purpose behind locking in money for a

11  year, $1.7 billion in order to buy other currencies?  And I

12  didn't hear an answer to the question about whether the reality

13  of this transaction at the beginning was for use other than a

14  concession by Mr. Drylewski that, in fact, it was not, that it

15  was for investment.

16      I could end there but I would like to address a couple

17  of the other points that Mister -- that the defendants made

18  with respect to some of the cases that they cited.

19      They cite the Glen-Arden case, your Honor, which we

20  think is a case that is extremely helpful for the SEC where the

21  Second Circuit rejects the notion that you can just come up

22  here and say this is a contract for the delivery of futures.

23  That's exactly what the defendants said and the SEC prevailed

24  in that case.  Simply saying that it's the contract for the

25  future delivery of whiskey was not enough.  The Court said you

1   have to look at the economic reality.

2            To the extent that the defendants rely on franchise

3   cases outside of this circuit, I will direct the Court to the

4   Aqua-Sonic case, which I mentioned in my opening and which,

5   again, looks at economic reality very cleverly and very --

6   looking at a lot of factors.  And I think that's one of the

7   problems that essentially is at the core of the defendant's

8   arguments, is that they try to separate the economic reality

9   that *Howey* instructs us to look at.  They'll look at Mets

10  tickets and they look at gold and they look at certain aspects

11  of other things that surely share characteristics with

12  investment contracts.  And in doing that, they're sort of

13  obfuscating the clear picture that emerges when the Court takes

14  a step back as the Court did at the beginning of today's

15  hearing and looks at the entirety of the economic reality in

16  the transaction.

17            Telegram insists on framing the question as to what's

18  going to happen between future purchasers and has not provided

19  the Court with any legal reason why that should be the case.

20  As I mentioned a moment ago, it refuses to answer the question

21  of what the transaction was at the beginning.  And worse than

22  that, I think what Telegram is doing is they're recasting the

23  promise that they made from:  We're going to make the best

24  blockchain ever, millions times over to:  We're going to launch

25  something.  That's how Telegram is seeking to recast the

1    promise that it made in 2018 in order to say, to plausibly

2    claim that they're about to walk away.

3           But even then Mr. Drylewski discussed a lot of efforts

4    that Telegram is reserving the right to make and is not

5    disclaiming any of those efforts.

6           Excuse me, your Honor, if I may get the slides from my

7    table.

8           THE COURT:  Sure.

9           MR. TENREIRO:  I think the Court, once again, sort of

10   hit the nail on the head when it recognized that it's simply

11   implausible to think that this company that prides itself on

12   its reputation is going to walk away from this project and

13   leave it in shreds if there is nobody there to pick up what the

14   company wants to do.

15          The defendants talked about validators and the Court

16   engaged in a colloquy about that.  The other thing that

17   Telegram promised it would do is that it would use the

18   Foundation to select and to use its expertise to select

19   which -- who are the parties that it might give these Grams to,

20   to incentivize them to develop other apps for the system.

21          It is perfectly reasonable for a purchaser of these

22   instruments to think that Telegram and its smart,

23   world-renowned team hopefully will pick the best ones, sort of

24   like the defendant in Gary Plastic was picking the best banks

25   to get the securities from and creating a market for them.

1    That's what reasonable efforts are.

2           Mr. Drylewski would not on this stand, in front of all

3    the press that's here, Telegram will not disclaim that its

4    reputation is on the line here.  Mr. Durov, in his deposition,

5    was very clear that he prides himself a lot in the reputation

6    of this company.  It's implausible to think that they're going

7    to walkaway and just deliver a dud of a product after they've

8    staked their entire business on it.

9           Now, in terms of disclaimers, I think slide 14 shows

10   exactly why the courts don't look at disclaimers, look at them

11   with suspicion.  The first -- the disclaimer that the

12   defendants pointed us to is a disclaimer that's contained in

13   risk disclosures.  And it says Grams are not investment

14   products.  There should be no expectation of future profit or

15   gain from the purchase or sale of Grams.

16          But the defendants concede that that's exactly what

17   the initial purchasers bought the Grams and entered into these

18   agreements for.  So for them to point -- this is why the courts

19   are smarter than that.  The courts don't focus on these the

20   disclaimers.  They focus, as the Court is, on economic reality.

21          On the distribution point, your Honor, what would

22   Telegram should have done.  Telegram said there's rumors.

23   There's rumors about -- of secondary market.  I will submit to

24   the court that alone disproves that they're entitled to a

25   Regulation D exemption.

1           Telegram has the obligation, and under the Chinese

2    Benevolent Association case, the Second Circuit has instructed

3    the courts to look at the entirety of the process, not just at

4    the moment of the sale.  That's also in the R.A -- I think it's

5    called R.A Hallman test, another case from the Second Circuit.

6           THE COURT:  But you don't decide something based on

7    rumors.  Rumors are rumors.

8           MR. TENREIRO:  No, no, that time true.

9           What I mean to say is the fact that Telegram doesn't

10   know if there's a secondary market shows that it's not taking

11   it's Regulation D obligations seriously.  Telegram has the

12   ability at the very least to ask --

13          THE COURT:  Well, listen if participating in a

14   secondary market is a violation of your purchase agreement and

15   may jeopardize your ability to receive Grams, I would think

16   that a wise but deceptive purchaser would take steps to conceal

17   that secondary market because it's at a minimum a breach of

18   contract.

19          MR. TENREIRO:  And despite that the SEC was able to

20   find out who was behind the liquid sale and Telegram seems to

21   not have been able to do that.  And the SEC has brought forth

22   to this Court --

23          THE COURT:  Well you have slightly better subpoena

24   power than they do.

25          MR. TENREIRO:  But they have the ability to cancel

1    this contract.  And we only found out -- I don't want to get

2    into the process by which we found out about this, which we can

3    get into if the case should proceed.  But the point I think is

4    that Telegram -- I mean the record is undisputed that Telegram

5    received e-mails about this sale and did nothing about it.

6          Now I think -- we submit that's certainly enough to

7    meet our burden for a preliminary injunction and enough for

8    there to be no facts from which a reasonable jury could

9    conclude that Telegram met its exemption.

10          To close, your Honor, I'd like to go back to where we

11   began which is *Howey*.  One of the many favorite lines in *Howey*

12   that I look to is where the Supreme Court explained in that

13   case the land tract agreement embodied the interest that the

14   investor had.  The land sale agreements were incidental, the

15   Supreme Court said, because the land sale agreements

16   permitted the promoter to remember or to figure out what

17   percentage of the interest everybody had so *Howey* would

18   distribute the profits.

19          In this case Grams are that.  Grams embody the

20   interest of the initial purchasers in this enterprise.

21   Technology perhaps has permitted Telegram to give them the

22   Grams rather than distributing the profits by sending them

23   dollars.  But that is the economic reality that the investors

24   entered into in 2018.  And nothing that Telegram has said today

25   changes that economic reality simply because it hasn't given

1     the actual keys to the purchasers to those Grams.

2              When the Court takes a step back and understands that

3     economic reality, there is no conclusion other than the Grams

4     were part of the investment contract that was sold and these

5     sales of these investment contracts are entitled to no

6     exemption.  Therefore, we are entitled to a preliminary

7     injunction.

8              THE COURT:  Thank you.

9              MR. TENREIRO:  Thank you.

10             THE COURT:  On the consent of the parties, the

11    injunctive relief in the stipulation and consent order entered

12    by the Court on October 21, 2019 is extended until the

13    determination of the motion for preliminary injunction and

14    other interim relief.  So it is ordered that defendants shall

15    not offer, sell, deliver, or distribute Grams to any person or

16    entity until the determination of the motion for a preliminary

17    injunction and other interim relief.  And that, of course, is

18    on consent.

19             I want to thank the attorneys and those behind the

20    scenes who have worked with them to put together really a first

21    rate set of papers.  And one thing I'm going to point out is I

22    was particularly pleased at the joint stipulation which makes

23    my life and my understanding of things a lot easier.  You're

24    officers of the court.  You're advocates for a party.  Neither

25    side's clients were prejudiced by agreeing on certain basic

K2J9SEC3

```
 1    facts.  It just tees it up so the judge can do the judge's work
 2    better.  So I hope you remember the lesson of that as you go
 3    forward in other cases, that this is really valuable because
 4    what you want is a decision that is reasoned and informed
 5    unless you really have such a loser of a position that you
 6    don't want that, you want to cloud the mind of the judge so
 7    that it will go off in some orbit and you have a nice shot at
 8    the Circuit.  But I don't believe that was the case here.  So
 9    my compliment is most sincere and the quality of the oral
10    advocacy today is among the best I've had in this courtroom,
11    including, of course, Mr. Musoff, who is right up there and was
12    so patiently quiet today.
13            So the decision is reserved.  I thank you all very
14    much.  We are adjourned.
15            (Adjourned)
16
17
18
19
20
21
22
23
24
25
```