UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

U.S. SECURITIES AND EXCHANGE
COMMISSION,                                          :

                                                    :
                    Plaintiff,
                                                    :
            vs.                                        Civil Action No. 19-cv-5244 (AKH)
                                                    :
KIK INTERACTIVE INC.,
                                                    :
                    Defendant.
                                                    :

-------------------------------------- X

**KIK INTERACTIVE, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT FACTUAL BACKGROUND................................................................. 4

A.    Kik's Launch of Kik Messenger and Launch of Kik Points. ................................. 4

B.    The Vision for Kin: A Decentralized Economy of Digital Services. .................... 5

C.    Kik's Development and Launch of Kin. ................................................................ 6

D.    Kin Tokens Have Functioned as a Medium of Exchange Within Digital Services Since Launch. ...................................................................................... 8

E.    The Kin Foundation Was Created to Foster Growth of the Economy and Is Distinct from Kik. ........................................................................................... 10

F.    Kik Had No Notice That Its Sales of Kin Would Violate U.S. Securities Laws, From SEC Guidance Or Otherwise. ......................................................... 11

G.    The SEC's Guidance Released After the TDE Did Not Provide Additional Clarity. ............................................................................................................ 12

LEGAL STANDARD............................................................................................... 13

ARGUMENT ........................................................................................................... 14

I.    THE SEC CANNOT ESTABLISH THAT THE TDE CONSTITUTES AN "INVESTMENT CONTRACT." ................................................................ 16

A.    The SEC Cannot Demonstrate a Common Enterprise Between Kik and TDE Purchasers............................................................................ 17

1.    There Is No Common Enterprise Because Kik Did Not Owe TDE Purchasers Ongoing Contractual Obligations............. 20

2.    TDE Purchasers Retained Full Control Over Their Use or Sale of Kin, Which Precludes the Existence of a Common Enterprise. ................................................................ 23

3.    The SEC Fails to Establish "Horizontal Commonality." ............. 25

a.    The Proceeds from the TDE and the Pre-sale Were Not "Pooled" For Purposes of *Howey*. ........................... 26

b.    Common Ownership of a Fungible Asset Alone Does Not Create a Common Enterprise......................... 28

4.    There Is No Strict Vertical Commonality Between Kik and TDE Purchasers. ...................................................... 30

B.    The SEC Does Not Meet Its Burden to Show That TDE Purchasers Were Primarily "Led to Expect Profits" From Their Purchase of Kin........................................................................................ 31

**Table of Contents**
(continued)

**Page**

1.     Kik Marketed Kin as a Digital Currency For Consumptive Use, Not an Investment Opportunity. ........................................... 32

      a.     The SEC's Out-of-Context Soundbites Misrepresent the "Emphasis" of Kik's Promotional Materials. ............ 33

      b.     The SEC Presents No Evidence That Any Purchaser Relied on Any Specific Statement Cited in Its Motion. ................................................................................ 36

2.     Kik Did Not Operate Exchanges or Guarantee Liquidity for Kin. ...................................................................................... 37

3.     Internal Documents Regarding the Audience for Kik's Announcement of Kin Are Irrelevant. ......................................... 40

4.     Kin Has Been Functional as a Medium of Exchange from the Day of Its Launch. ................................................................ 41

5.     Kik Structured the TDE to Deter Large Purchases By Passive Investors. ...................................................................... 45

6.     Facts Regarding the Pre-sale Are Irrelevant to Whether Kik Led TDE Purchasers to Expect Profits. ..................................... 46

7.     The SEC's Reliance on Subjective Expectations of A Few Purchasers Is Misguided. .............................................................. 47

C.     The SEC also Cannot Establish That Kik Led Purchasers To Expect Profits Based on the Entrepreneurial or Managerial Efforts of Kik. ....... 49

    1.     Purchasers Expecting Profits from Market Forces, Rather Than the Promoter's Efforts, Do Not Satisfy This Element. ........ 49

    2.     The SEC Does Not Identify Any *Howey*-Level Promises that Create an Expectation of Profits From the Efforts of Others. .................................................................................. 51

      a.     Efforts to Participate in the Kin Economy and Generate Demand Were Not Unique or Limited to Kik. ................................................................................... 52

      b.     Efforts to Build Systems within the Kin Ecosystem Are Merely Infrastructural, Not Managerial. ................... 54

II.     THE PRE-SALE COMPLIED WITH RULE 506(C) OF REGULATION D AND SECTION 4(A)(2) OF THE SECURITIES ACT. ................................ 55

A.     Kik's Pre-sale Complied with Regulation D, and Is Therefore Exempt from The Registration Requirements Set Forth in Section 5. .... 56

B.     The Pre-Sale and TDE are Two Distinct Transactions, Not a Single Offering. .................................................................................. 59

**Table of Contents**
(continued)

**Page**

    C.    The Pre-sale and TDE Were Not "Integrated" Offerings. ....................... 64

            1.    The TDE and Pre-sale Were Not Part of A Single Plan of Financing.................................................................................. 65

            2.    The Pre-sale and TDE Were Done for Different Purposes.......... 66

            3.    The Pre-sale and TDE Did Not Involve the Same "Class" of "Securities."........................................................................... 67

            4.    Kik Accepted Different Consideration in the Pre-sale and TDE.................................................................................... 69

            5.    Because the Pre-sale and TDE Did Not Overlap, Timing Also Cuts Against Integration...................................................... 70

III.    THERE ARE DISPUTED MATERIAL FACTS ABOUT WHETHER THE TERM "INVESTMENT CONTRACT" IS VAGUE AS APPLIED TO KIN TRANSACTIONS.................................................................... 71

    A.    Other Courts' Application of the Term "Investment Contract" to Other Instruments or Transactions Is Irrelevant to Whether the Term Is Vague *As Applied* to Kik. .......................................... 73

    B.    The SEC Has Not Shown That Kik Had Constitutionally Fair Notice That the TDE Would Constitute an Investment Contract. ........... 75

    C.    Prior to the TDE, There Was No Guidance Suggesting That Cryptocurrencies Like Kin Would Be Considered Securities. ................ 76

    D.    The SEC's Approach to Regulating Cryptocurrencies After the TDE Was Contradictory and Ever-Changing. ......................... 78

    E.    Kik Had No "Actual" Awareness That the TDE Would Constitute a Sale of Securities................................................................... 81

CONCLUSION.................................................................................................. 84

## Cases

*Albanese v. Fla. Nat'l Bank of Orlando*,
823 F.2d 408 (11th Cir. 1987) ........................................................................... 20

*Aldrich v. McCulloch Props., Inc.*,
627 F.2d 1036 (10th Cir. 1980) ..................................................................... 36, 41

*Alunni v. Devel. Res. Grp., LLC*,
445 F. App'x 288 (11th Cir. 2011) ................................................................. 21, 34

*Argentinian Recovery Co. LLC v. Board of Directors of Multicanal S.A.*,
331 B.R. 537 (S.D.N.Y. 2005) .......................................................................... 64

*Balestra v. ATBCOIN LLC*,
380 F. Supp. 3d 340 (S.D.N.Y. 2019) ..................................................... 18, 29, 38

*Bender v. Cont'l Towers Ltd. P'ship*,
632 F. Supp. 497 (S.D.N.Y. 1986) ..................................................................... 51

*Beranger v. Harris*,
2019 WL 5485128 (N.D. Ga. Apr. 23, 2019) ...................................................... 42

*Busher v. Barry*,
2019 WL 6895281 (S.D.N.Y. Dec. 18, 2019) ...................................................... 82

*Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986) ................................................................................. 13

*Cifra v. Gen. Elec. Co.*,
252 F.3d 205 (2d Cir.2001 ............................................................................... 13

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014); .......................................................................... 13

*Commonwealth Bank & Tr. Co. v. Spectrum Leasing Corp.*,
719 F. Supp. 346 (M.D. Pa. 1989) ..................................................................... 25

*Contract Buyers League v. F&F Inv.*,
300 F. Supp. 210 (N.D. Ill. 1969) ...................................................................... 47

*Copeland v. Hill*,
680 F. Supp. 466 (D. Mass. 1988) ..................................................................... 26

*Copeland v. Vance*,
893 F.3d 101 (2d Cir. 2018) .............................................................................. 71

*In re Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009 .............................................................................................. 73

*Davis v. Rio Rancho Estates*,
    401 F. Supp. 1045 (S.D.N.Y. 1975) .................................................... 20, 22, 52, 54

*De Luz Ranchos Inv., Ltd. V. Coldwell Banker & Co.*,
    608 F.2d 1297 (9th Cir. 1979) ......................................................................... 21

*De Wit v. Firstar Corp.*,
    879 F. Supp. 947 (N.D. Iowa 1995) ................................................................ 58

*Demarco v. LaPay*,
    2009 WL 3855704 (D. Utah Nov. 17, 2009) ................................................. 21

*Dickerson v. Napolitano*,
    604 F.3d 732 (2d Cir. 2010) ........................................................................... 73

*Donohoe v. Consol. Operating & Prod. Corp.*,
    982 F.2d 1130 (7th Cir. 1992) ................................................................... 62, 70

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185(1976) ....................................................................................... 79

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ................................................................................. 71, 75

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ........................................................................... 38

*Gay Men's Health Crisis v. Sullivan*,
    733 F. Supp. 619 (S.D.N.Y. 1989) ......................................................... 72, 75, 76

*Glen-Arden Commodities, Inc. v. Constantino*,
    493 F.2d 1027 (2d Cir. 197 ............................................................................ 74

*Goodwin Properties, LLC v. Acadia Group, Inc.*,
    2001 WL 800064 (D.Me.,2001) ................................................................. 64, 69

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
    396 F. Supp. 175 (N.D. Cal. 1975) ................................................................. 22

*Hart v. Pulte Homes of Michigan Corp.*,
    735 F.2d 1001 (6th Cir. 1984) .......................................................... 20, 21, 25, 34

*Hayes v. New York Attorney Grievance Comm.*,
    672 F.3d 158 (2d Cir. 2012) ........................................................................... 71

*Hellstron v. U.S. Dep't of Veterans Affairs,*
　　201 F.3d 94, 98 (2d Cir. 1996) ................................................................ 72

*Hill v. Colorado,*
　　530 U.S. 703 (2000) ................................................................................ 75

*Int'l Broth. of Teamsters v. Daniel,*
　　439 U.S. 551 (1979) ................................................................................ 80

*Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.,*
　　205 F. Supp. 2d 243 (S.D.N.Y. 2002) .................................................... 30

*In re J.P. Jeanneret Assocs., Inc.,*
　　769 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................................... 26

*Keith v. Black Diamond Advisors, Inc.,*
　　48 F. Supp. 2d 326 (S.D.N.Y. 1999) ...................................................... 49

*Lavery v. Kearns,*
　　792 F. Supp. 847 (D. Me. 1992) .................................................. 23, 24, 25

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.,*
　　179 F. Supp. 2d 159 (S.D.N.Y. 2001) .................................................... 49

*Marine Bank v. Weaver,*
　　455 U.S. 551 (1982) ................................................................................ 15

*Marini v. Adamo,*
　　812 F. Supp. 2d 243 (E.D.N.Y. 2011) ................................... 23, 24, 30, 31

*Mechigian v. Art Capital Corp.,*
　　612 F. Supp. 1421 (S.D.N.Y. 1985) ...................................................... 18

*Miller v. Cent. Chinchilla Grp., Inc.,*
　　494 F.2d 414 (8th Cir. 1974) .................................................................. 51

*Milnarik v. M-S Commodities, Inc.,*
　　457 F.2d 274 (7th Cir. 1972) .................................................................. 18

Noa v. Key Futures, Inc.,
　　638 F.2d 77 (9th Cir. 1980) .................................................................... 30

*Perez v. Hoblock,*
　　368 F.3d 166 (2d Cir. 2004) .................................................................. 75

*Pinnacle Comm'ns. Int'l, Inc. v. Am. Family Mortgage Corp.,*
　　417 F. Supp. 2d 1073 (D. Minn. 2006) .................................................. 56

*Piper v. Chris-Craft Indus.*,
  431 U.S. 1 (1977) ........................................................................... 80

*Resolution Tr. Corp. v. North Bridge Assocs. Inc.*,
  22 F.3d 1198 (1st Cir. 1994).......................................................... 73

*Revak v. SEC Realty Corp.*,
  18 F.3d 817 (2d Cir. 1994) ...................................................... passim

*Rice v. Branigar Org., Inc.*,
  922 F.2d 788 (11th Cir. 1991) ........................................................ 32

*Rocky Aspen Mgmt 204 LLC v. Hanford Holdings LLC*,
  230 F. Supp. 3d 159 (S.D.N.Y. 2017) ............................................ 28

*Rodriguez v. Banco Cent. Corp.*,
  990 F.2d 7 (1st Cir. 1993)............................................................... 22

*Salameh v. Tarsadia Hotel*,
  726 F.3d 1124 (9th Cir. 2013) .................................................. 36, 52

*SEC v. Aqua-Sonic Prod. Corp.*,
  524 F. Supp. 866 (S.D.N.Y. 1981) ................................................. 16

*SEC v. Aqua-Sonic Prods*,
  687 F.2d 577 (2d Cir. 1982) ........................................................... 51

*SEC v. Belmont Reid & Co.*,
  794 F.2d 1388 (9th Cir. 1986) ........................................................ 49

*SEC v. Blockvest, LLC*,
  2018 WL 6181408 (S.D. Cal. Nov. 27, 2018)............................ 36, 52

*SEC v. Blockvest, LLC*,
  2019 WL 625163 (S.D. Cal. Feb. 14, 2019)................................... 37

*SEC v. Brigadoon Scotch Distributing Co.*,
  480 F.2d 1047 (2d Cir. 1973) ......................................................... 74

*SEC v. Cavanagh*,
  1 F. Supp. 2d 337 (S.D.N.Y. 1998) ................................................ 64

*SEC v. Cavanagh*,
  445 F.3d 105 (2d Cir. 2006) ........................................................... 14

*SEC v. Dunfee*,
  1966 U.S. Dist. LEXIS 10105 (W.D. Mo. Dec. 8, 1966)................ 68

*SEC v. Edwards*,
   540 U.S. 389 (2004) ................................................................................................ 19

*SEC v. Glenn W. Turner Enters., Inc.*,
   474 F.2d 476 (9th Cir. 1973) .......................................................................... 49, 52

*SEC v. Infinity Grp. Co.*,
   212 F.3d 180 (3d Cir. 2000) ........................................................................... 25, 29

*SEC v. Lauer*,
   52 F.3d 667 (7th Cir. 1995) .................................................................................. 25

*SEC v. Life Partners, Inc.*,
   87 F.3d 536 (D.C. Cir. 1996) ........................................................................ 26, 50

*SEC v. Mapp*,
   2017 WL 5177960 (E.D. Tex. Nov. 8, 2017) ...................................................... 68

*SEC v. Mattera*,
   2013 WL 6485949, (S.D.N.Y. Dec. 9, 2013) ................................................ 15, 64

*SEC v. Paro*,
   468 F. Supp. 635 (N.D.N.Y. 1979) ..................................................................... 80

*SEC v. Ralston Purina Co.*,
   346 U.S. 11920 (1953) ........................................................................................ 57

*SEC v. SG Ltd.*,
   265 F.3d 42, 52 (1st Cir. 2001) ........................................................................... 28

*SEC v. Telegram Grp. Inc.*,
   2020 WL 1430035 (S.D.N.Y. Mar. 24, 2020) ............................................. passim

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................................ passim

*Sutera v. Schering Corp.*,
   73 F.3d (2d Cir. 1995) ......................................................................................... 72

*Svets v. Osborne Precious Metals Co.*,
   1992 WL 281413 (N.D. Cal. June 8, 1992) ......................................................... 30

*Teague v. Bakker*,
   1998 WL 168876, (4th Cir. Apr. 8, 1998) ........................................................... 17

*United Housing Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ............................................................................... 32, 43, 61

*United States v. Bowdoin,*
   770 F. Supp. 2d 142 (D.D.C. 2011) ........................................................... 74

*United States v. Coonan,*
   938 F.2d 1553 (2d Cir. 1991) .................................................................... 71

*United States v. DeStafano,*
   429 F.2d 34447 (2d Cir. 1970) .................................................................. 75

*United States v. Farris,*
   614 F.2d 634 (9th Cir. 1979 ...................................................................... 74

*United States v. Rybicki,*
   354 F.3d 124 (2d Cir. 2003) ...................................................................... 72

*United States v. Smith,*
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) ...................................................... 72

*United States v. Turner,*
   842 F.3d 602 (8th Cir. 2016) ..................................................................... 72

*United States v. Zaslavskiy,*
   2018 WL 4346339,(E.D.N.Y. Sept. 11, 2018) ............................. 29, 74, 75

*Upton v. SEC,*
   75 F.3d 92 (2d Cir. 1999) .................................................................... 75, 76

*In re Vecco Instruments, Inc. Sec. Litig.,*
   2007 WL 76030569 (S.D.N.Y. June 28, 2007) ........................................ 82

*VIP of Berlin, LLC v. Town of Berlin,*
   493 F.3d 179 (2d Cir. 2010) ...................................................................... 73

*Wals v. Fox Hills Dev. Corp.,*
   24 F.3d 1016 (7th Cir. 1994) ..................................................................... 16

*Warfield v. Alaniz,*
   569 F.3d 1015 (9th Cir. 2009) .............................................................. 16, 31

*Woodward v. Terracor,*
   574 F.2d 1023 (10th Cir. 1978 ........................................................... passim

## Other Authorities

1 Louis Loss, *et al.,*
   *Fundamentals of Securities Regulation* 3.C.1 (7th Ed. 2020) ............................ 65, 67

6 Cox, Hillman *et al.,*
   *Securities Regulation* 21 (2009) .................................................................. 56

*Agri-Quip*,
  SEC No-Action Letter, 1974 WL 9638 (Sept. 20, 1974) ............................................ 65, 66, 68

*Citicorp.*,
  SEC No-Action Letter, 76-77 CCH Dec., FSLR ¶ 80,778, (Aug. 20, 1976) ............... 65, 66, 68

*DeLorean Motor Co.*, SEC No-Action Letter,
  1977 WL 11174 (Sept. 15, 1977) ............................................................................ 65, 66, 71

*In re Matter of Munchee Inc.*,
  Exchange Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017) ................................... 18

*Pacific Physician Servs., Inc.*,
  SEC No-Action Letter, 1985 WL 55629 (July 22, 1985) ......................................................... 67

*Stratford Employees Cattle Program, Ltd.*,
  S.E.C. No-Action Letter (1973-1974 Transfer Binder) Fed. Sec. L. Rep. (CCH) ¶ 79, 761
  (March 8, 1974) ...................................................................................................................... 68

Wade, *The Integration of Securities Offerings*,
  25 Loy. U. Chi. L.J. ........................................................................................................... 66, 70

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................................... 13

## Regulations

17 C.F.R. § 230.502(a)........................................................................................................... 14, 64

x

Defendant Kik Interactive, Inc. ("Kik") respectfully submits this memorandum of law in support of its opposition to the Securities and Exchange Commission's (the "SEC") Motion for Summary Judgment (ECF No. 57) ("Motion") on its single claim alleging that Kik engaged in an unregistered offering of securities.[1]

## PRELIMINARY STATEMENT

In bringing its motion, the SEC bears a substantial burden: it must put forth undisputed evidence of facts which, taken together, satisfy each and every element of the *Howey* test.  If there is a genuine dispute as to even a single material fact on any element, the SEC's motion must be denied.  Here, the SEC has identified 308 purportedly material facts, and there are factual disputes as to the vast majority of them.[2]  *See* Kik's Response to SEC's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Summary Judgment.  Even before addressing the legal substance of the SEC's assertions, this dooms their motion.

In any other *Howey* case, an attempt to satisfy the high summary judgment burden would involve an analysis of (at least) the contract governing the transaction and the statements made to the parties that induced them to purchase.  But here, tellingly, the SEC asks this Court to grant its motion without a single reference to the governing contract between the parties, and based on a patchwork of stray statements from speeches, documents, and agreements that were never viewed,

---

[1] Perhaps not surprisingly, the SEC's action here does not challenge Kik's assertion that as it exists today, Kin is not a security.  Indeed, Kin is currently one of the most widely used cryptocurrencies in the world, with millions of users (including some of the SEC's own witnesses) earning and spending Kin in digital applications each month.  *See, infra*, at 8–9, 42–43.

[2] The SEC's identification of 308 material facts, knowing there are factual disputes as to most of them, would suggest that the SEC's motion is aimed more at defending itself against Kik's motion for summary judgment than at seeking summary judgment in the SEC's favor.  While the SEC bears the burden in its motion on all elements and must show there is no factual dispute as to any of them, Kik need only show the undisputed absence of a single element to succeed on its own motion.

read, or considered by any of the purchasers in the alleged "investment scheme."  The facts the SEC has put forth cannot possibly carry its burden of proof under *Howey*, which requires a showing that Kik objectively offered and promised terms which reflected an investment contract.

And when these omitted facts are considered, including a review of the governing contract and Kik's marketing materials for the sale, it is all the more clear that the SEC's motion must fail. The undisputed facts show, for example, that: Kik offered and sold Kin as a medium of exchange to be used within an economy of digital applications; Kik never promised or suggested that Kin would be an investment opportunity; that the Kin economy, by design, would depend on the ;participation of many developers and users beyond Kik; that Kin purchasers had complete control over their Kin; and that the governing contract contained no ongoing contractual obligations between the parties once distribution of Kin was complete.  The undisputed facts also show that this vision was not just theoretical: Kin has actually been used as a medium of exchange by *millions* of users within dozens of applications, only one of which is Kik Messenger (and which Kik does not even operate anymore).  As such, the SEC cannot prove, as a matter of law, that Kik's Token Distribution Event ("TDE") constituted an "investment contract," as defined by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946).

The SEC has also premised its case on a fundamental misrepresentation of fact: it characterizes two transactions—taking place at different points in time, with different terms, different parties, and different assets—as a "single offering."  The SEC goes to great lengths to conflate the two transactions, intending to muddle and obfuscate that clear structure to create a false narrative, because without it, the SEC's entire case falls apart.  But the undisputed record, and seventy years of unbroken precedent dictates that the Pre-sale and the TDE should be evaluated separately, and when so evaluated, the SEC's Section 5 claim fails.  Kik conducted two separate

and distinct transactions, involving *different circumstances, different contractual agreements, different terms, different purchasers, different consideration, and different promotional materials*.  In the first transaction (the "Pre-sale"), Kik conducted a private sale to accredited investors of the contractual rights to purchase then-non-existent Kin tokens at a point in the future, if and when Kik successfully launched Kin.  Given the circumstances, Kik consistently treated the involved packet of rights and expectations as a security and conducted the offering pursuant to Regulation D of the Securities Act of 1933.  In the second, separate transaction, Kik conducted a public sale of Kin tokens: the TDE.  This sale was governed by the Terms of Use—the sole contract between Kik and the TDE participants—a document which expressly limited the purchasers' rights and expectations.  The second transaction, having been conducted *after* the infrastructure for Kin already existed, and given that it was merely a sale of goods to the public, was not an offering of securities.  Thus, the sale did not require registration with the SEC.

Finally, even if the SEC could prove its Section 5 claim, the SEC is nonetheless not entitled to summary judgment because the term "investment contract" is unconstitutionally vague "as applied" to Kik's TDE.  It would be fundamentally unfair to expect Kik to know that its sale of Kin would violate the federal securities laws, when both Congressmen and SEC Commissioners have since highlighted the lack of guidance and clarity in the SEC's approach.  In fact, the SEC's own Commissioner has noted that the SEC's framework (which was announced long *after* Kik's sale of Kin) is so broad and far-reaching, that it would lead to absurd results (e.g., items such as Starbucks gift cards and Chuck-E-Cheese tokens could be considered "securities").

For these and other reasons discussed herein, Kik respectfully requests that the Court deny the SEC's motion for summary judgment, and grant its cross-motion.

# RELEVANT FACTUAL BACKGROUND[3]

**A.**   **Kik's Launch of Kik Messenger and Launch of Kik Points.**

Founded in 2009, Kik is a Canadian social media company and the developer of a leading messenger application ("Kik Messenger"). Kik 56.1 ¶¶ 1–2. Upon launch, Kik Messenger was immediately popular and soon became one of the most widely-used messaging platforms in the world. *Id.* ¶ 2; Welsh Ex. A ¶¶ 5, 6 (Philp Decl.). But despite the popularity of the Kik Messenger app, Kik faced challenges in monetizing its business while staying true to its stance against selling users' data. This made it difficult for Kik to compete in an industry where the vast majority of advertising dollars go to a select number of dominant players who monetize their users' data by providing targeted advertising. *Id.* Despite these challenges, Kik continued to explore profitable business models that aligned with its core values, including the usage of digital currencies.[4]

In 2014, Kik first experimented with monetizing its business using a centralized digital currency called Kik Points. Welsh Ex. A ¶¶ 17–22. Kik Points could only be used within Kik Messenger, and Kik retained sole control and discretion over them. *Id.* at ¶ 21. Kik sold Kik Points to advertisers, who could use them to reward users who answered the advertisers' surveys

---

[3] Citations to "Welsh Ex." and "Landsvik Ex." refer to exhibits filed with the Declarations of Michael E. Welsh (ECF No. 64) and Julianne M. Landsvik, which is being filed concurrently with this Opposition. Citations to exhibits filed with the Declaration of Laura D'Allaird (ECF No. 60) are referred to as "SEC" followed by the exhibit number (*e.g.*, "SEC1"). "SEC 56.1" and "Kik 56.1" refer to the parties' statements of undisputed material facts (ECF Nos. 59, 63). "Kik Br." means Kik's Summary Judgment Memorandum (ECF No. 62). "SEC Mot." refers to the SEC's Summary Judgment Memorandum (ECF No. 58).

[4] The SEC goes to great lengths to paint Kik as a company with "dwindling cash" that decided to "reinvent" itself with proceeds from its sale of Kin. SEC Mot. at 1. This narrative is irrelevant, as the SEC's sole claim requires no analysis of Kik's financial condition or internal motivations. Further, it is inaccurate. In "early 2017" (prior to even the Pre-sale), Kik had "ten to 11 months of a runway, which [Kik's CFO] thought was pretty good for a company of our stature where we were in the development cycle." SEC10 at 55:9-17. And Kik was also not backed into a corner: Kik had "numerous options" at the time to extend its runway, including raising additional financing (as it had done in the past). *Id* at 55:18-21. Stripping away the SEC's spin, the same facts are far less sinister: Kik, a company struggling to generate revenue in an industry monopolized by a few dominant players, created a digital currency to fuel a new digital economy that would allow itself, and any application developers facing similar obstacles, to be compensated for offering products and services going forward.

or polls within Kik Messenger.  *Id.* at ¶ 19.  Users could spend the Kik Points they earned on expressive content like digital stickers.  *Id.* at ¶ 18.  This model was successful with users: over a period of two-and-a-half years, Kik Points averaged 300,000 daily transactions.  *Id.* at ¶ 20.  From this usage, Kik learned that its users valued stickers, emojis, and other types of content they could use to express themselves within the app.  SEC14 at 60:11-22.  However, despite their popularity amongst users, Kik Points could not support a thriving economy because they could only be used within Kik Messenger.  Welsh Ex. A ¶¶ 21–22.  Kik realized that, for a digital token to truly function as a real currency, it needed to be interoperable across multiple applications.  *Id.*

**B.   The Vision for Kin: A Decentralized Economy of Digital Services.**

The popularity of Kik Points showed Kik that its platform could benefit from a virtual currency, but revealed the limitations of a centralized currency that was limited to Kik Messenger. Kik's management realized that a decentralized cryptocurrency based on blockchain technology would resolve these limitations, because it would not be controlled by any one entity, but rather a network of participants.  Welsh Ex. A ¶¶ 10–14; Kik Br. at 4.  This would eliminate advertisers' concerns of dilution by guaranteeing a fixed supply, and reduce the risk of devaluation by allowing the token to be used freely within a variety of digital applications, thus ensuring that Kik Messenger was not the sole entity creating demand.  With these lessons in mind, Kik proposed Kin, a decentralized cryptocurrency that would function on blockchain technology.  *See* Kik Br. at 4.  Critically, unlike Kik Points, ***the same Kin tokens could be earned in one application, and then transferred and spent in another***, creating a thriving ecosystem that would allow developers to earn real revenue for offering desirable content.  *E.g.*, Welsh Ex. A ¶ 79.  One key component of this proposed new economy was that, although Kik would create and sell Kin in the first instance, Kin could be used as a digital currency by ***any*** buyers or sellers (not just Kik). Kin's value as a currency would fluctuate as a result of the laws of supply and demand. Most importantly,

Kik could not make that happen by itself. *Id.* ¶¶ 17–19.

Accordingly, Kik marketed Kin as a cryptocurrency that would be earned and spent within a large community of digital services, including (but not limited to) Kik Messenger. *See* Kik Br. at 8–10; Landsvik Ex. Z ¶ 16 (Dowd Decl) ("I understood Kin be marketed as a cryptocurrency that would be used on a wide scale as a medium of exchange within digital applications."); Ex. AA ¶ 20 (Hendriks Decl.) (same). In fact, many TDE purchasers believed that Kin was positioned to be the first ever cryptocurrency that was actually built for widespread use within digital applications and services. *See* Landsvik Ex. AA ¶ 14 (Hendriks Decl.); Ex. Z ¶¶ 9–10 (Dowd Decl.). Kik also consistently emphasized that Kik would be just one of many developers and participants contributing to the success of the Kin economy. *See* Kik Br. at 9–10 (summarizing public statements prior to TDE explaining that Kik would be "just one of thousands of services in the Kin ecosystem"). From reviewing this marketing material, the public (including TDE purchasers), realized that Kik would be just one participant in the Kin economy, and would not ultimately be responsible for managing the Kin economy. *See* Landsvik Ex. Z ¶¶ 18–19 (Dowd Decl.); Ex. AA ¶¶ 38–39 (Hendriks Decl.); Ex. DD at 38:17–39:6 (Weatherman Tr.); Ex. CC ¶¶ 14–16 (Weatherman Decl.). Moreover, it was not solely incumbent upon Kik to encourage others to join the Kin economy; that task could be (and was) done by any participant in the economy. For example, one independent developer wrote a series of articles describing how to integrate Kin within Android applications using publicly available tools and open-source code, as well as a tool demonstrating transactions in Kin in real time. Landsvik Ex. AA ¶¶ 33–35.

## C.   Kik's Development and Launch of Kin.

Kik officially announced Kin to the public and released a whitepaper (the "Whitepaper") setting forth its vision for the Kin economy on May 25, 2017. *See* Kik Br. at 4–5. To fund development of the Kin tokens and the necessary technology for launch, Kik engaged in a Private

Placement to a select group of sophisticated, accredited investors ("the Pre-sale") between May 2017 and September 11, 2017.  *See* Kik Br. at 5–7.  In the Pre-sale, Kik sold the contractual right to receive Kin, if and when it was ever launched in the future, at a discounted rate as compared with the ultimate public sale.  *Id.*  Alternatively, if Kin were never launched, Pre-sale participants would lose thirty percent of their contribution.  *Id.*  This transaction was memorialized by a Simple Agreement for Future Tokens ("SAFT"), as well as a Private Placement Memorandum ("PPM"), both of which were individually distributed to interested participants.  *Id.*; Ex. A ¶¶ 33-36.  Because Pre-sale participants' receipt of Kin was entirely contingent on Kik's successful effort to launch Kin tokens on the blockchain, and given the risk of losing their investment, Kik structured this transaction as an exempt offering pursuant to Regulation D.  Kik Br. at 6.  Accordingly, Pre-sale participants provided diligence information to Kik, including proof of accreditation, using methods that were exclusive to Pre-sale participants.  Landsvik Ex. A ¶¶ 42–43.  Kik filed a Form D with the SEC memorializing the sale on September 11, 2017.

After the Kin tokens were developed, and the infrastructure for the Kin economy existed, Kik conducted a TDE in which it sold one trillion Kin to over 10,000 purchasers in 117 countries.  Welsh Ex. Y at 1; Ex. A ¶ 73.  Kik's goal with the TDE was to distribute Kin tokens to a wide base of potential users in order to jumpstart the Kin economy, and accordingly Kik structured the TDE to prevent large purchasers from buying up Kin to immediately re-sell on the secondary market.  Kik Br. at 10 (describing efforts to deter passive investments); Welsh Ex. A ¶ 68 ("Kik's goal in the TDE was to ensure a wide distribution of Kin to a large base of potential users.").  The TDE was governed by a contract entitled the Terms of Use, which was prominently featured on the website where all purchasers registered to participate in the TDE.  *See* Kik Br. at 7.  The Terms of Use agreement told TDE purchasers that it "govern[ed] [their] access and use of the Site ***and***

*[their] purchase of the Kin Tokens*."  Welsh Ex. H. at KIK000079.  Kik never made any of the materials related to the Pre-sale—including the SAFT, PPM, and due diligence processes for the Pre-sale—available to the public.  ECF No. 1 ¶ 90.

**D.      Kin Tokens Have Functioned as a Medium of Exchange Within Digital Services Since Launch.**

When Kin was first launched and distributed to the public on September 26, 2017, it was already fully functional as a medium of exchange for digital services—and could also be used inside Kik Messenger.  *See* Kik Br. at 10–12 (describing Kin's functionality upon launch); Landsvik Ex. AA ¶¶ 23–25 (same); Ex. Z ¶¶ 20–22 (same).  This meant that Kik had already built the "necessary elements of the Kin ecosystem, and from that point on, it was open for developers and third parties to start using Kin within it."  Landsvik Ex. AA ¶ 31 (Hendriks Decl.).  At the moment of launch, Kin could be accepted as payment for digital services by anyone wishing to do so, because it operated on the Ethereum blockchain.  Kik Br. at 11–12 (describing ability to use Kin outside of Kik upon launch); Welsh Ex. A ¶ 81 (same); Landsvik Ex. AA ¶¶ 21–22 (same).  Further, because the code for Kin was open-source, any developer could (and many did) independently integrate Kin within their app using publicly-available tools that were designed to operate with any Ethereum token.  Landsvik Ex. AA ¶ 23–25 (Hendriks Decl.); Welsh Ex. A ¶¶ 83, 84 (Philp Decl.).

In conjunction with its launch, Kin was integrated within Kik Messenger, in a product referred to as the "Minimum Viable Product" or "MVP," which allowed users to begin using Kin immediately to unlock premium stickers and display their status to others.  Kik Br. at 11; Welsh Ex. A ¶ 85.  The idea for this MVP derived from Kik's experience with Kik Points, in which it learned that its users were eager to spend digital currency to purchase premium stickers and expressive content.  *Id.* ¶¶ 86, 87.  For software and social media companies like Kik, it is common

to launch an initial MVP from which users and the developers can grow to introduce additional functionality.  *See* SEC74, 30:1-13 (Neil Tr.) (describing an MVP as a "proof-of-concept" or use case for a new product or technology); Landsvik Ex. AA ¶¶ 28 (Hendriks Decl.) (stating that "a product's utility on the day of its launch is typically not indicative or determinative of what the product's ultimate utility will be").  Demonstrating Kin's consumptive use, within weeks after the TDE, 20% of TDE participants had already linked their wallets to Kik Messenger in order to unlock stickers and display status to other users.  *See, e.g.*, Landsvik Ex. AA ¶¶ 24–27 (Hendriks Decl.) (explaining that he "personally utilized the MVP by linking my Ethereum wallet to my account on Kik Messenger").

Over time, more and more developers and users capitalized on this infrastructure, and have created a thriving digital economy.  Users can spend Kin to access premium content within apps, donate Kin to worthy charitable causes, and earn Kin, for example, by exercising (*see* Landsvik Ex. AA, Ex. CC), or by taking time away from their screens to focus on tasks.  Landsvik Ex. Z.  Today, Kin can be earned and spent in 57 different applications, ***none of which are operated by Kik Interactive***.[5]  *See* Kik Br. at 12 (describing state of economy today); Welsh Ex. A ¶ 92; *id.* Ex. R, Ex. S.  Within those applications, tens of millions of users have earned or spent Kin tokens to date.  Welsh Ex. R; Landsvik Ex. YY.  This widespread usage and adoption proves that Kik's vision of a decentralized economy was not merely hypothetical or theoretical—it has come to fruition through the efforts of a wide group of users and developers.

---

[5] Kik sold its messenger application in October 2019 and does not currently operate an application within the Kin economy. Kik 56.1 ¶ 88.  As just "one of many participants" within the ecosystem, however, Kik's departure did little to slow the organic growth of Kin. Welsh Ex. K at KIK000023.  In the past month alone, for example, roughly four million new users spent or earned Kin within the 57 Kin-integrated applications. *Compare* Welsh Ex. R (statistics as of March 20, 2020), *with* Landsvik Ex. YY (as of today).

**E.      The Kin Foundation Was Created to Foster Growth of the Economy and Is Distinct from Kik.**

Notably, the SEC conflates *Kik's* "efforts" with work that would be done by the Kin Foundation.  The Kin Foundation was "intended as an independent, nonprofit, and democratic governance body for members of [the Kin economy]."  Welsh Ex. K at KIK000016.  The Kin Foundation's "principal functions" were to include "open governance of its resources together with other ecosystem partners, the support and advancement of the technology related to Kin's implementation, and all matters related to ecosystem membership, including the Kin Rewards Engine."  *Id.*  In other words, the Kin Foundation's role was to support and foster the growth of the economy by allowing for the participation by others—but the Kin Foundation itself did not suggest that it would manage or control the economy, nor would it create demand for the token in and of itself.

But in any event, the Kin Foundation is—and has always been—a legally distinct entity from Kik.  Kik employees formed the Kin Foundation in September 2017, and its CEO, Ted Livingston, has served on the Kin Foundation Board.  In that capacity, however, Mr. Livingston owes duties to the Kin Foundation, and acts on behalf of the Kin Foundation, not Kik.  While Kik employees have conducted work on behalf of the Kin Foundation on the Kin Rewards Engine and other elements of the infrastructure, such work was performed pursuant to an agency agreement and a services agreement between the Kin Foundation and Kik.  Landsvik Ex. WW; Ex. XX.  Pursuant to the Services Agreement, Kik will invoice the Kin Foundation for any work that is performed on behalf the Foundation, which is separate and distinct from Kik's previous work on elements of Kik Messenger or any other business specific to Kik.

**F.**     **Kik Had No Notice That Its Sales of Kin Would Violate U.S. Securities Laws, From SEC Guidance Or Otherwise.**

Cryptocurrencies have existed since Bitcoin was launched in 2009, and have been bought and sold on secondary exchanges ever since.  SEC20 at 1, 5.  But in May 2017, at the time Kik announced its plan to develop Kin, the SEC had still not released any affirmative guidance regarding the application of securities laws to cryptocurrencies.  Nor had any court concluded that a cryptocurrency was an "investment contract" under *Howey*.  The SEC has opted to forego the formal rulemaking process which allows it to set forth clear standards or rules for what type of conduct it regulates.  In fact, SEC officials have indicated that this silence was intentional, to prevent token sellers from creating a "road map to get around" its regulations.  Landsvik Ex. LL at 2.

Finally, in July 2017, the SEC released the DAO Report.  SEC88.  Kik reviewed the DAO Report, and found that the scheme described therein was wholly different from Kik's planned sale of Kin.  In fact, the DAO Report stated "whether or not a ***particular transaction*** involves the offer and sale of a security . . . ***will depend on the facts and circumstances***[.]"  *Id.* at 17 (emphasis added).  In the DAO, investors received DAO tokens in exchange for investing funds which were pooled and used by the DAO to fund projects.  Profits derived from those projects were to be distributed to token holders on a pro rata basis to all of the DAO token holders.  Moreover, there were a number of statements from the creators of the DAO which compared the enterprise to "buying shares in a company" and receiving "dividends."  *Id.* at 4.  And importantly, there was no actual or contemplated use for DAO Tokens, other than as a representation of relative ownership interest in the DAO.

As a result of these distinctions, the DAO Report encouraged Kik that its sale would not fall within the SEC's definition of an "investment contract."  In fact, in the days following the

release of the DAO Report, Kik's CEO Ted Livingston noted publicly, that it made "complete sense" for the SEC to regulate tokens such as DAO tokens, because they functioned like a "classic security." *See* SEC 47B at 8:2–9:2. In an August 1, 2017 podcast interview, when asked about the SEC's recent statement that "some tokens can be qualified as securities," Mr. Livingston replied:

> I think the idea that tokens that are securities will get regulated like securities get – makes complete sense. You know, you look at the [DAO] tokens, which is what the guidance was on, and the [DAO] tokens were basically a fund of funds that were, you know, pooling funds to invest in other projects, and then paying back out dividends to the people who held those tokens. ***That is, like, a classic security. Like, that's almost, like, the definition of a security. And so, for the SEC to come in and say, hey, you know, we looked at what the [DAO] did, and you know, guys, this is like a fund of funds. It's obviously a security, and therefore should be regulated like a security, makes complete sense to us, and it's fully expected. I think, like, when you look at the utility token side, there is no guidance given on that.*** And so, there are no rules in that space. It's an emerging space. And so, we're working with, you know, the top lawyers all over the world to make sure not just that we follow the rules, obviously we do that, but also ***we're trying to anticipate where the rules will land, and provide us sort of the most thoughtful, buttoned up way to not only do a token distribution event, but also to build one of these decentralized networks***.

*Id.* (emphasis added). In other words, the DAO Report actually encouraged Kik that its proposed sale of Kin, which would not involve promises of profits, and would center on the widespread use of Kin tokens, would not fall within the SEC's definition of an investment contract.

## G.   The SEC's Guidance Released After the TDE Did Not Provide Additional Clarity.

The SEC continued making statements after the TDE, but none have clarified its approach to regulating cryptocurrencies. In December 2017, Chairman Jay Clayton confirmed that "there are cryptocurrencies that do not appear to be securities." Landsvik Ex. II at 3. And in the following months, the SEC brought a number of isolated enforcement actions against cryptocurrency sellers that allegedly engaged in securities fraud. Finally, in 2019, almost two years after the TDE, SEC staff released a "Framework for 'Investment Contract' Analysis of Digital Assets" supposedly to

provide guidance about whether and when the sale of a cryptocurrency could constitute the sale of an investment contract.  Landsvik Ex. KK.  Even so, the Framework contained a list of *thirty-eight factors* or "characteristics" relevant to whether a digital asset was offered or sold as an investment contract, but were "not intended to be exhaustive."  *Id.* at 6.  Moreover, the Staff was clear that the Framework was not even "a rule, regulation or statement of the Commission, and the Commission has neither approved nor disapproved its content."  This Framework has been met with criticism, even from the SEC's own Commissioner, who commented that the Framework was only the "first step" toward explaining how *Howey* would apply to digital assets, and that the SEC's "Jackson Pollock approach to splashing lots of factors on the canvas without any clear message leaves something to be desired."[6]  Two months later, the SEC filed this suit against Kik.  ECF No. 1.

## LEGAL STANDARD

A party is only entitled to summary judgment where it can show that "there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The SEC has the burden to prove the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The "court must view the evidence in the light most favorable to [Kik] and draw all reasonable inferences in [Kik's] favor," while reserving "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts'" to be presented at trial.  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir.2001) ("[T]he district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.").

---

[6] Ex. NN, Peirce, *How We Howey* (May 9, 2019); *see also* Ex. PP, Joseph H. Nesler*, When it Comes to Analyzing Utility Tokens, the SEC Staff's "Framework for 'Investment Contract' Analysis of Digital Assets" May Be the Emperor Without Clothes (Or, Sometimes an Orange Is Just an Orange)*, Crypto Law Corner.

**ARGUMENT**

The SEC's motion for summary judgment should be denied because it has not presented facts demonstrating that either transaction (the Pre-sale or TDE) required registration with the SEC. As discussed below, the circumstances of the TDE are inconsistent with the definition of an investment contract under *Howey*. And the Pre-sale, which took place while Kik was still building the necessary technology to launch Kin on the blockchain (and involved an entirely different set of terms and expectations), was conducted pursuant to a valid exemption from registration. On their face, these are two separate offerings, neither of which violated Section 5. To overcome the deficiencies in its case, the SEC repeatedly takes the position that the two transactions were simply a "single distribution." By ascribing the offering materials, terms, and circumstances of the Pre-sale to the TDE, the SEC presents a false impression that Kik offered TDE participants terms that resembled a securities offering. Conversely, by grouping the 10,000 public participants (who did not undergo the Pre-sale diligence process) together with the accredited Pre-sale participants, the SEC argues that the Pre-sale did not comply with the requirements of Regulation D.

The SEC cites no authority which supports its "single offering" theory.[7] This not surprising, as the SEC's own regulations make clear that separate sales of securities can only be treated as one when the sales qualify for treatment as an "integrated offering." *See* 17 C.F.R. § 230.502(a) (noting that "the determination as to whether separate sales of securities are *part of the same offering (i.e., are considered integrated*) depends on the particular facts and circumstances."

---

[7] The SEC's only purported support for this theory, *SEC v. Cavanagh*, 445 F.3d 105, 107–16 (2d Cir. 2006), does not support the conclusion that these separate transactions were "one offering." *Cavanagh* did not address the question of whether two separate sales from the issuer were a single offering for the purpose of a section 5 claim. Rather, the court assessed whether the re-sale of stock, which had previously been registered with the SEC, needed to be registered again upon re-sale. *Id*. In fact, as the SEC conceded, *Cavanagh* reiterates that registration of a security is "*transaction-specific*," which dictates that the Pre-sale and TDE transactions must be evaluated independently for purposes of Section 5. SEC Mot. at 51 (emphasis added).

14

(emphasis added)); *SEC v. Mattera*, 2013 WL 6485949, at *12 (S.D.N.Y. Dec. 9, 2013) (same).[8] As discussed in detail below, each of the five factors set forth by the SEC weighs against integration: (1) the sales were not part of a "single plan of financing," (2) they did not involve the "issuance of the same class of securities," (3) they were not conducted at the same time, (4) they required different consideration, and (5) were not made for the "same general purpose." *See*, *infra*, Part II.C.   The SEC cannot sidestep these requirements by simply recasting its integration arguments under a new name.  Because the two offerings were discrete, and because the SEC fails to prove they should be integrated, they must be evaluated separately for purposes of the SEC's Section 5 claim.  *See Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11(1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes to be served, and the factual setting as a whole.").

When properly framed, the shortcomings of the SEC's case become clear.  On the one hand, the SEC fails to establish that the TDE constituted an investment contract because it has not (and cannot) set forth undisputed facts demonstrating: (1) a "common enterprise" between or among Kik and TDE participants, or (2) that Kik led TDE participants to primarily expect profits based on its essential managerial or entrepreneurial efforts.  Failure to prove either of these prongs, much less both of them, dooms the SEC's motion and case.  On the other hand, with respect to the Pre-sale, as set forth below, that transaction complied with Regulation D and is therefore exempt

---

[8] The Court's recent decision in *Telegram* is inapposite. The investment "scheme" in Telegram concerned a single private pre-sale sale of 2.9 billion tokens to 157 sophisticated investors in two rounds, the stated purpose and intention of which was to distribute those tokens to the public through a secondary market upon launch of the blockchain.  *SEC v. Telegram Grp. Inc.*, 2020 WL 1430035, at *1 (S.D.N.Y. Mar. 24, 2020), *appeal docketed*, No. 20-1026 (2nd Cir. March 24, 2020).  In granting the SEC's motion for preliminary injunction, the Court recognized that the pre-sale purchasers were statutory underwriters, and therefore, the pre-sale rounds constituted a "disguised public distribution."  *Id.* at *19 (internal quotation marks omitted).  *Telegram* did not concern a separate post-launch sale of pursuant to a separate contract, and Pre-sale participants did not receive their tokens before the TDE participants.

from registration.

Finally, although the Court need not reach the issue, the SEC's motion should also be denied because the term "investment contract" is unconstitutionally vague "as applied" to Kik's TDE. The SEC's Motion fails to establish that Kik was provided adequate notice to Kik that the particular facts and circumstances of its sale of Kin would constitute an "investment contract." This factual dispute alone precludes summary judgment in the SEC's favor.

## I. THE SEC CANNOT ESTABLISH THAT THE TDE CONSTITUTES AN "INVESTMENT CONTRACT."

To win its Motion, the SEC must put forth undisputed evidence of a "contract, transaction, or scheme" which involves each of the following elements: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits based on the essential managerial efforts of others. 328 U.S. at 298–99; *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). This definition is intended to identify "unconventional instruments that have the essential properties of a debt or equity security," but would otherwise not fall within an enumerated category of securities. *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994); Kik Br. at 14. But the SEC's motion attempts to stretch this definition far beyond this intent and purpose.

The *Howey* test is a transaction-specific, "objective inquiry into the character of the instrument or transaction offered based on what the purchasers were '***led to expect***.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (emphasis added); Kik Br. at 15–16. The subjective intent of the parties does not control, particularly where such expectations were based on something other than the objective representations of the promoter. *See* Kik Br. at 15; *e.g.*, *SEC v. Aqua-Sonic Prod. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) ("The subjective intentions or motivations of the investors are irrelevant."). This objective focus is particularly critical where, as here, the parties have identified different purchasers who held vastly different subjective

expectations for their use or sale of Kin, and where many of these expectations were not based on anything in Kik's offering materials. *Teague v. Bakker*, 1998 WL 168876, at *3 (4th Cir. Apr. 8, 1998) ("The subjective intention of a given purchaser cannot control whether something is a 'security,' else some might have purchased securities while others did not. The proper focuses of the inquiry are on the transaction itself and the manner in which it is offered.").

As set forth below, given that the SEC's assertions are contradicted by the terms of the sole relevant TDE agreement (the Terms of Use) and Kik's overall representations regarding the TDE, the SEC cannot satisfy its burden that there is no genuine issue of material dispute that the TDE constituted an "investment contract."   Accordingly, regarding the TDE, the SEC's Motion must be denied.

### A.     The SEC Cannot Demonstrate a Common Enterprise Between Kik and TDE Purchasers.

The SEC's Motion should be denied because, among other reasons, the SEC fails to establish the existence of a "common enterprise," an essential element of the *Howey* test.  *Revak*, 18 F.3d at 87.   The Second Circuit follows the majority test, horizontal commonality, which requires the SEC establish that the transaction at issue ties "each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits."  *Id.* (adopting horizontal commonality and citing approvingly to cases from several other circuits holding to like effect).   Although the Second Circuit has not addressed the issue, other courts have indicated that common enterprise may also be established through "strict vertical commonality," which requires that "the fortunes of investors are tied to the fortunes of the *promoter*." *Id.* at 87–88 (citation omitted).

In attempt to skirt the rigor of this requirement, the SEC first suggests that common enterprise is not a "distinct element" of the *Howey* test.  SEC Mot. at 21 n.11.[9]  This argument is baseless.  "Judicial analyses of the question whether particular investment contracts are 'securities' within the statutory definition have repeatedly stressed the significance of finding a common enterprise." *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir. 1972).  Nor can the SEC's contention be squared with the Second Circuit's decision in *Revak*, which held in no uncertain terms that common enterprise is an essential requirement under *Howey*.  18 F.3d at 88 (holding transaction at issue "does not constitute a common enterprise within the meaning of *Howey*" and therefore "cannot be considered the sale of securities for purposes of the federal securities laws").  Indeed, courts in the Second Circuit have repeatedly rejected attempts to minimize the common enterprise requirement in a manner consistent with the SEC's purported view.  *Id.* at 88 (rejecting broad vertical approach to common enterprise as "inconsistent with *Howey*" (citation omitted)); *accord Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1426 (S.D.N.Y. 1985); ("Because, as a practical matter, the broad definition of 'vertical commonality'

---

[9] Notwithstanding precedent to the contrary, the SEC has ignored the common enterprise requirement in other recent matters. *In re Matter of Munchee Inc.*, Exchange Act Release No. 10445, 2017 WL 6374434 (Dec. 11, 2017) (cited in SEC Mot. at 8) (administrative order in connection with settlement, applying Howey to offering of digital assets without any reference to common enterprise).  Given the limited precedent related to digital assets, a few courts have relied on the SEC's approach in *Munchee* on preliminary motions to permit the case to proceed to discovery.  *E.g.*, *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (denying motion to dismiss, relying extensively on *Munchee* for guidance to determine whether common enterprise was present); *Telegram*, 2020 WL 1430035, at *10 (granting preliminary injunction, citing *Balestra* to find common enterprise).  The SEC now cites these cases to suggest that it satisfied it burden to establish a common enterprise was present as a matter of law. SEC Mot. at 8, 24.  The Court should reject the SEC's invitation to expand upon this misapplication of law.

renders the second element of the *Howey* test meaningless, I must reject it as untenable.").[10]  *Revak* remains binding precedent, and the SEC must establish the existence of a common enterprise between and among Kik and Kin purchasers for the TDE to constitute an offering of securities.  It has failed to do so.

The facts set forth by the SEC—even if they were undisputed—do not amount to a common enterprise as a matter of law.  And, there are a number of undisputed facts (many of which the SEC's Motion omits) which necessarily preclude a common enterprise.  ***First***, Kik owed Kin purchasers no ongoing contractual obligations beyond delivering the Kin tokens themselves (*see, infra,* Part I.A).  Rather than address the Terms of Use, which expressly disclaims any ongoing contractual obligations, the SEC's Motion pretends they simply do not exist, and instead patches together irrelevant statements from internal documents, interviews, and deposition transcripts.  But none of these amounts to a commitment to exert ongoing management efforts over the enterprise as a whole.  ***Second***, purchasers had complete control over their Kin (*see, infra,* Part I.B), ensuring that the fortunes of Kik and Kin purchasers were in no way contingent on or bound to one another.  Even where purchasers all own a common, fungible asset, there can be no common enterprise where each individual is at liberty to sell the asset at any time and price of their choosing.  Here, there is no dispute that Kik had no control over when or how Kin purchasers sold their Kin, meaning that purchasers could profit or lose independently of one another.  ***Third,*** Kik did not pool funds into a single account for the express benefit of Kin purchasers.  TDE participants held

---

[10]  The broad vertical commonality test collapses the second and third prongs of *Howey* by merely requiring the success or failure of the investment be dependent on the promoter's efforts or expertise. *Revak*, 18 F.3d at 87.  In recent matters, the SEC has described the broad vertical test as consistent with the dismissive view it asserts here.  Landsvik Ex. KK, SEC, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019) at n.10 (asserting the SEC's view that common enterprise is not a distinct element (citing SEC's Suppl. Br. at 14 in *SEC v. Edwards*, 540 U.S. 389 (2004) (urging adoption of the broad vertical test because it aligns with the SEC's view that common enterprise "does not impose a distinct requirement for an investment contract" (internal quotation marks omitted))).

no ongoing interest in the sale proceeds and were not entitled to a pro rata distribution of profits. ***Finally***, the SEC's argument that a common enterprise exists because "all Kin are fungible or the same," and therefore all generally worth the same amount at any point in time, is without merit. Common ownership of a fungible asset alone—particularly a simple currency—does not sufficiently intertwine each purchaser's fortunes so as to establish the common enterprise requirement.

These undisputed facts preclude the SEC from satisfying either the horizontal commonality test (*see, infra,* Part I.C) or strict vertical commonality test (*see, infra,* Part I.D).

### 1.   There Is No Common Enterprise Because Kik Did Not Owe TDE Purchasers Ongoing Contractual Obligations.

In arguing that a common enterprise exists, the SEC skips the "first step in analyzing investment contracts" and ***ignores the governing and sole agreement*** between Kik and TDE participants.[11] *Albanese v. Fla. Nat'l Bank of Orlando*, 823 F.2d 408, 410 (11th Cir. 1987) . This deficiency, in and of itself, precludes the SEC from meeting its burden of establishing no disputed issue of fact for purposes of summary judgment.  Where, as here, the parties' relationship is governed by a written contract that is devoid of any contractual duty to perform ongoing managerial services, there can be no common enterprise.  *See* Kik Br. at 18–20; *Hart v. Pulte Homes of Michigan Corp*., 735 F.2d 1001, 1003 (6th Cir. 1984); *Davis v. Rio Rancho Estates*, 401 F. Supp. 1045, 1049–50 (S.D.N.Y. 1975).  In *Woodward v. Terracor*, for example, the Tenth Circuit held that there was no "common enterprise" (and thus no investment contract) between purchasers of undeveloped lots in a planned residential community because the defendant "was under ***no contractual obligation to the plaintiffs other than to deliver title*** once purchase terms

---

[11] This oversight is puzzling, particularly since the SEC has previously cited the Terms to describe the relationship between Kik and TDE purchasers.  ECF No. 1 ¶ 27 ("When selling Kin to the general public, Kik required investors to agree" to the Terms—specifically, the arbitration and choice of law provisions).

were met." 574 F.2d 1023, 1025 (10th Cir. 1978) (emphasis added); *accord  De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300–01 (9th Cir. 1979) (same, even though sale was marketed as a passive investment).

Here, Kik and TDE purchasers entered into the Terms of Use, which was the contractual agreement governing the sale of Kin.[12]  And like the written agreements in *Woodward* and *Hart*, the Terms of Use limited Kik's obligation solely to deliver Kin to TDE purchasers, not to undertake additional management or other efforts.  Not only do the Terms lack any affirmative undertaking of duties to manage the purported "enterprise," the Terms of Use make clear that TDE purchasers received their Kin tokens "AS IS," and "WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED."  Welsh Ex. H at 10.[13]  The patchwork of isolated statements from interviews and internal documents cited by the SEC cannot supersede the express terms of a written, integrated agreement.  TDE purchasers also understood this agreement to mean that Kik owed them no continuing obligations after delivering Kin.  Landsvik Ex. Z ¶ 14; Ex. AA ¶ 17; Ex. BB ¶ 16, 17; SEC92 (Rousmaniere Dep Tr.) at 105:23–106:2 ("I likely agreed to these terms whereby . . . Kik Interactive would have no obligations, no specific obligations to me as an owner of this thing I was buying from them.").  The Terms of Use encompassed the entirety of the agreement between Kik and TDE purchasers, and in fact, included a merger clause to that effect. Kik Br. at 20–21; *Alunni v. Devel. Res. Grp., LLC*, 445 F. App'x 288, 298 (11th Cir. 2011); *Demarco v. LaPay*, 2009 WL 3855704, at *9 (D. Utah Nov. 17, 2009) (marketing materials do not

---

[12] No TDE purchasers have disputed that they were subject to this agreement, and some affirmatively agreed they were subject to it.  *See* Landsvik Ex. Z ¶ 13; Ex. AA ¶ 15; Ex. BB ¶ 17; SEC92 at 105:2-5; SEC50 at 189:6-19.  Nor were any TDE purchasers aware of any other agreement governing their purchase of Kin. *See*, *e.g.*, SEC92 at 108:13-22.

[13] In *Telegram*, the court declined to accord certain representations and disclaimers "controlling weight" because, inter alia, the disclaimers were not published until after the SEC initiated the action and were equivocal.  2020 WL 1430035, at *20. Here, however, TDE purchasers acknowledged and accepted the unequivocal disclaimers prior to the sale and some 21 months before the SEC's action.

establish an investment contract where written agreement contains merger clause). The SEC has presented no evidence that this contract is not binding, which alone dictates that there was no common enterprise between Kik and TDE participants.

Even setting aside the Terms of Use, the SEC identifies no instance where Kik obligated itself to do anything to further the enterprise. General assurances in marketing materials of Kik's intent to encourage adoption—something that *anyone* could have done—do not create a common enterprise. *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993) (seller's "strong and repeated suggestions" that surrounding land would develop did not create investment contract as there was no contractual obligation to do so); *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975) (no investment contract "when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services"); *Davis*, 401 F. Supp. at 1050 (statements in promotional materials referencing the community that would be developed after the sale did not establish common enterprise among purchasers of condominiums). Similarly, statements that Kik would integrate Kin in its own application, as part of its own business model, are not obligations owed to purchasers that benefit the "enterprise." *Woodward*, 574 F.2d at 1025.

And, although subjective expectations do not control, TDE purchasers understood at the time of the sale that Kik had no obligations to them other than creating the self-executing smart contract which would deliver Kin. For example, one TDE purchaser said "I recall believing that Kik's only obligation to me was to deliver the Kin tokens that I had purchased…I do not recall believing that Kik owed me any ongoing contractual obligations." Landsvik Ex. BB (Ramsey Decl.) ¶ 16[14]; *see also* Ex. Z ¶ 14 (same); Ex. AA ¶ 17 (Hendriks Decl.) (same). Thus, because

---

[14] Mr. Ramsey, a witness identified on the SEC's initial disclosures, provided two declarations to Kik's counsel. *See* Landsvik Ex. BB; BB-2. Mr. Ramsey first provided Kik with a declaration reflecting his

the SEC fails to cite any specific commitments to perform ongoing managerial services, the SEC fails to establish a common enterprise.

### 2. TDE Purchasers Retained Full Control Over Their Use or Sale of Kin, Which Precludes the Existence of a Common Enterprise.

Further, the SEC fails to satisfy its burden under either horizontal commonality or strict vertical commonality because Kin purchasers obtained complete control over their Kin tokens upon receipt.  Kik Br. at 21–23; *e.g.*, *Marini v. Adamo*, 812 F. Supp. 2d 243, 256–58 (E.D.N.Y. 2011) (no common enterprise where purchasers had full control over the purchase of rare coins). The absence of control is particularly outcome-determinative in cases where the purported "profit" generated by the enterprise, if any, derives from the resale of an asset.  In *Lavery v. Kearns*, for example, no common enterprise existed among purchasers of condominiums, despite evidence indicating that the seller repeatedly discussed future plans to develop the neighborhood (thus increasing the price of the units), because purchasers received full control over their units upon purchase.  792 F. Supp. 847, 859–60 (D. Me. 1992); *Revak*, 18 F.3d at 88 (citing favorably to *Lavery* and reaching same result).  The court noted that the "thrust of the investment" was the "***appreciation of the value of the property***," and, because purchasers had control to "choose to sell" their units and could "set whatever price they wished," the individual purchasers each determined whether they profited or not—not the sellers or promoters.  *Lavery*, 792 F. Supp. at 860 (emphasis added) (internal quotation marks omitted).  This was true even though all of the

---

statements on January 23, 2020, which he reviewed, edited, and signed under pains and penalties of perjury.  Four days after sharing this declaration with counsel for the SEC, Mr. Ramsey emailed Kik's counsel, copying the SEC's counsel, claiming he had been "informed that this document is quite a bit more serious" and wished to make some additions to his declaration.  Landsvik Ex. BB-1.  Mr. Ramsey did not recant the substance of his initial declaration, he merely added his impressions after having ***only recently*** run a "google search of articles about Kik and Kin . . . and read all the ones that come up on the first results page."  *Id.*  Mr. Ramsey had no recollection of reviewing any of these articles prior to the TDE, and Mr. Ramsey's initial declaration accurately reflected his recollections of what he believed at the time of his purchase.  *Id.*; *see also* Landsvik Ex. BB. Mr. Ramsey's impressions deriving from articles which he first reviewed in January 2020, after having spoken with counsel for the SEC, should be afforded no weight.

condominiums would jointly appreciate in value as the neighboring community was improved.  *Id.*  Because each purchaser retained control over their unit, the court concluded that the "***transaction was not one in which the purchasers were invited to or did provide funds that went for a common development. They purchased their own units to rent for a fixed return or to resell.***"  *Id.*; (emphasis added); *accord Marini*, 812 F. Supp. 2d at 257–58 (fortunes of the parties "clearly not directly linked" because coin purchaser "was free to direct the sale of his coins separate and apart from [defendant's] decision to sell his coins").

Here, as in *Lavery* and *Marini*, the thrust of the SEC's purported "enterprise" is the prospect "that investors would be able to easily resell Kin at a profit."  SEC Mot. at 27.  But, as in *Marini* and *Lavery*, TDE purchasers individually could choose when, and at what price, they would sell their Kin.  It is undisputed that Kik imposed no restrictions or controls on when or how TDE purchasers used (or sold) their Kin.  *See* ECF No. 1 at ¶ 88; *see also* SEC92 at 96:24–97:3 (testifying that Kik did not "impose any limitations on when [he] could sell [his] Kin").  The Terms of Use agreement—again, the only contract governing the sale of Kin—contained no restriction on purchasers' use, transfer, or sale of Kin tokens.  And because Kin was launched on the blockchain, "Kik did not (and still does not) have the ability to transfer, freeze, or otherwise control the tokens" after they were launched.  Kik 56.1 ¶ 50; Welsh Ex. A at ¶¶ 80, 91.

Even TDE participants recognized the import of this control, testifying that, as in *Lavery*, their fortunes did not rise and fall together:

- "[W]hat I'm asking is if somebody sold on one day when the price was at a certain level and a different person sold on a different day when the price was say higher or much lower, *is it possible that one person could profit and one person could lose based on their sales of Kin?* . . . THE WITNESS: *Yes*.  BY MS. BAILEY:  So in your view would that mean that *the fortunes of those two people were not necessarily aligned*? . . . THE WITNESS: *Yes*."  SEC92 at 101:8-22 (Rousmaniere Dep. Tr.).

24

- "Q. *This means that owners of particular tokens can sell those tokens at different prices; right*? A. *Yes*. Q. So for example, one purchaser can sell a token for more than they purchased and another can sell for less than they purchased; correct? A. Yes.  Q. Which means that the fortunes of these two purchases would not rise and fall together; right? . . . THE WITNESS: I'm not sure.  BY MR. DE JARNETTE: Q. *If one purchaser made money and one purchaser lost money would you say that their fortunes were different*? . . . THE WITNESS: *Yes*." SEC50 at 115:15–116:11 (Wang Dep. Tr.).

Each Kin purchaser was in complete control over whether, and when, they would sell their Kin, and therefore in control of whether they would profit or not.  *Lavery*, 792 F. Supp. at 859–60.  This means that, even if Kik did have influence over the price of Kin, and even if all Kin owners would, in a theoretical sense, benefit if Kin increased in value, there can be no common enterprise as a matter of law.

### 3.    The SEC Fails to Establish "Horizontal Commonality."

The horizontal commonality test, the only approach to common enterprise that has been expressly adopted by the Second Circuit, requires the "'sharing of pooling of funds'" in such a way that "the fortunes of each investor depend upon the profitability of the enterprise as a whole." *Revak*, 18 F.3d at 87 (citing *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir.1984)); *accord SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (horizontal commonality exists only where "each investor's interest is pooled with that of the other investors, so that each has an undivided share in a pool of assets rather than an individual asset").  Put another way, horizontal commonality exists where a purchaser pools funds into "one big pot" and promises "that each investor would share proportionately in the profits from the common fund." *Commonwealth Bank & Tr. Co. v. Spectrum Leasing Corp.*, 719 F. Supp. 346, 350 (M.D. Pa. 1989) (internal quotation marks and citation omitted).

Here, the SEC does not claim that purchasers received a pro rata distribution of profits, a characteristic the SEC's own cases describe as essential under horizontal commonality.  *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000) (cited in SEC Mot. at 24) (horizontal

commonality requires "a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis"). Instead, the SEC argues that horizontal commonality exists because: (1) the proceeds from the TDE and the Pre-sale were "pooled," and (2) that all Kin purchasers commonly owned Kin, which is fungible, and therefore uniformly benefitted from any increase in value. Neither argument has merit.

a. **The Proceeds from the TDE and the Pre-sale Were Not "Pooled" For Purposes of *Howey*.**

The SEC claims that horizontal commonality is satisfied because "the fortunes of all Kin investors were tied together by Kik's pooling of the funds that the investors paid Kik." SEC Mot. at 23. However, the SEC's primary evidence of "pooling" is that the proceeds, once received, went into Kik's bank account. SEC 56.1 ¶¶ 296–298. However, "pooling" means more than merely commingling funds in a single account;[15] rather it requires "the inter-dependency of the investors that transforms the transaction substantively into a pooled investment." *SEC v. Life Partners, Inc.*, 87 F.3d 536, 544 (D.C. Cir. 1996); *accord Copeland v. Hill*, 680 F. Supp. 466, 468 (D. Mass. 1988) (no horizontal commonality because the fortunes of each rare coin purchaser were not "intertwined with the success of the pool"). Horizontal commonality specifically requires "a sharing or ***pooling of funds*** . . . ***for a common purpose***." *In re J.P. Jeanneret Assocs., Inc*., 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011).

The SEC cites no evidence supporting the notion that TDE purchasers' fortunes depended upon the pooling of their funds for some common purpose that directly resulted in profits for Kin holders.[16] When Kin were distributed to TDE purchasers, the fundamental utility of Kin and the

---

[15] This should be obvious. Otherwise, for example, any retail store might be said to be "pooling" funds simply by depositing proceeds of sales of consumer items into a common bank account to fund its business.

[16] Continuing its effort to manufacture a "single offering," the SEC also now incorrectly claims that funds from both the TDE and Pre-sale were "pooled" in a single bank account. But the SEC concedes that this was not true: the Ether Kik received in the TDE was originally "housed" in its digital wallet, and as it was

Kin economy already existed, so the funds from the TDE were not pooled for purposes of building and launching Kin.  *See*, *supra*, at 8–9; Landsvik Ex. Z ¶¶ 20–25; Ex. AA ¶¶ 21–24, 31 ("In my view, the TDE marked the end of Kik building the necessary elements of the Kin ecosystem, and from that point on, it was open for developers and third parties to start using Kin within it.").

In fact, the SEC concedes that the proceeds from the TDE, unlike the Pre-sale, were merely lumped into Kik's general "budgeting process," and used as "working capital to fund Kik's business operations."  SEC Mot. at 23.  To be clear, after the TDE, Kik's "business operations" comprised of running and operating Kik Messenger—an enterprise in which Kin holders had absolutely no stake.  *See* SEC92, 110:11-13 ("So when you bought Kin, did you receive any ownership interest in Kik Interactive? A. Not to -- no."); *id.* at 111:8-12 ("Q. If Kik makes any revenue by selling services in exchange for Kin tokens, do you receive a distribution from Kik in share in those profits? . . . [A]: No.").  The SEC also concedes that Kik's Whitepaper told purchasers that the proceeds from the TDE would be "used to execute on the roadmap of ***additional feature development planned for the Kin integration into Kik***" and cites a quote from a public speaking engagement where Livingston explained that Kik would use the funds to "build out all these cases inside of Kik."  SEC Mot. at 23.  But Kik's use of funds to improve its own application, in its capacity as one of many participants in the economy, is far too tangential of a connection to the success or failure of the enterprise to constitute "pooling."[17]  At most, these efforts would

---

gradually sold for U.S. dollars, held in a California bank account.  SEC 56.1 ¶ 294.  The U.S. dollars received in the Pre-sale were deposited in a ***different account with a different bank, in a different country***. *Id.* ¶ 295.  The funds were never placed together into a single account.  Even if merely placing funds in a single account were enough, this is simply untrue.

[17] Extending *Howey* this far risks absurd results.  To use an hypothetical provided by Commissioner Peirce, if a purchaser buys sneakers, and the sneaker company uses revenue from its sneaker sales to hire famous athletes to promote its brand—this does not create a common enterprise among any holders of the company's sneakers.  This is true even though the company's use of funds had a tangential effect of this driving up the value of the purchasers' sneakers.  *See* Landsvik Ex. OO.

demonstrate for others the desirability of joining the economy—but this is far short of what *Howey* demands. The SEC attempts to paper over this glaring deficiency by, again, conflating the Pre-sale with the TDE, and citing language from the Pre-sale documents—documents which were prepared solely for sophisticated investors who *did* rely on Kik to use their money to build and launch Kin tokens.  SEC Mot. at 23.  TDE purchasers were in no similar position, and thus this evidence is irrelevant and misleading.  Thus, the SEC has not presented sufficient evidence that TDE funds were "pooled" for purposes of horizontal commonality.

> ### b.       Common Ownership of a Fungible Asset Alone Does Not Create a Common Enterprise.

The SEC's second faulty assertion with respect to horizontal commonality is that, "because all Kin are fungible or the same, the value of any one holder's Kin is proportionate to the number of Kin held," and that this "undisputed fact establishes horizontal commonality under the applicable case law."  SEC Mot. at 24.  Yet the authorities cited by the SEC offer no support for its expansive interpretation of common enterprise.  The SEC primarily relies on cases decided at the motion to dismiss stage,[18] which collectively stand for the unremarkable position that common enterprise is sufficiently pled where purchasers receive an asset that represents a proportionate interest in an enterprise in which their funds were pooled and each purchaser's fortunes were tied to the profitability of the enterprise as a whole.  SEC Mot. at 24.  In each case, purchasers were promised either (a) a pro rata distribution of profits or (b) that the promoter would use the pooled funds for a specific purpose for the benefit of each investor, for example, building the token itself. *See, e.g.*, *SEC v. SG Ltd.*, 265 F.3d 42, 50–52 (1st Cir. 2001) (defendant "unambiguously represented" in its offering materials for an alleged Ponzi scheme "that participants' funds were

---

[18] Since *Howey* analysis "is a fact-intensive inquiry" that is typically "not to be decided on a motion to dismiss," *Rocky Aspen Mgmt 204 LLC v. Hanford Holdings LLC*, 230 F. Supp. 3d 159, 164, 167 (S.D.N.Y. 2017) (cited in SEC Mot at 24), the precedential value of the SEC's cases are of little import.

pooled in a single account" in order "to settle participants' on-line transactions," pay "referral fees to existing participants," and fund the "*10% guaranteed return*" for certain virtual shares) (emphasis added); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (denying motion to dismiss, finding that complaint sufficiently alleged funds "were pooled together" in order to "create and launch" the blockchain and subsequently distribute tokens); *United States v. Zaslavskiy*, 2018 WL 4346339, at *4, *6, *9 (E.D.N.Y. Sept. 11, 2018) (same, where funds pooled to purchase diamonds and real estate and the profits of these investments were to be distributed to investors on a pro rata basis). In each case, as alleged, the asset at issue represented either a right to distribution of profits or a concrete interest in the ongoing use of pooled funds.

Further, the SEC's only common enterprise cases decided after the motion to dismiss stage support Kik, not the SEC. Both *Howey* and *Infinity Group* involved the pooling of assets and a pro rata distribution of profits. *Howey*, 328 U.S. at 296 (management company maintained each investor's land as a single orange grove: it picked all of the fruit, pooled the oranges together for market, and the individual land owners received an allocation of net profits based upon the quantities of fruit picked); *Infinity Grp.*, 212 F.3d at 187–89 (offering materials promised to "pool participant contributions" in a trust "to create highly-leveraged investment power that would yield high rates of return" for investors through "guaranteed dividends"). And unlike the Terms of Use here, the contracts at issue in *Howey* and *Infinity Group* provided the defendant company **complete control** over the investment scheme. *Infinity Grp.*, 212 F.3d at 189 (noting, under the terms of the contract, the defendant "'retained *exclusive control*'" over the investment decisions related to the pooled funds (emphasis added)); *Howey*, 328 U.S. at 296 (management company had "*full discretion and authority*" over the cultivation of the groves and the harvest and marketing of the crops" (emphasis added)). These cases underscore the significance of control and a pro rata

29

distribution in profits under horizontal commonality, neither of which is present here.

### 4.    There Is No Strict Vertical Commonality Between Kik and TDE Purchasers.

Because the Second Circuit has not expressly adopted strict vertical commonality, the discussion above should dispose of the SEC's "common enterprise" argument.  But even if this Court were to apply this alternative test, the SEC's claim still fails because neither Kik's profits nor those of Kin purchasers were contingent upon the other.  Kik Br. at 26–27.  Vertical Commonality requires "the fortunes of plaintiff and defendants are linked so that they rise and fall together."  *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 249 (S.D.N.Y. 2002) (internal quotation marks and citation omitted).  The SEC's sole argument that strict vertical commonality existed is that Kik owned a "large stake in Kin"—rehashing its same argument that common ownership of a fungible asset is sufficient.  *See* SEC Mot. at 24 ("Kik stated in the white paper that it would receive three trillion Kin, amounting to 30 percent of all Kin created.").  But as with horizontal commonality, this argument again fails.

First, courts have rejected application of vertical commonality even where the seller and buyers all own the same, fungible asset.  *Marini*, 812 F. Supp. 2d at 257–58 (rejecting argument that "ownership of the same types of coins necessarily links their fortunes together for purposes of the strict vertical commonality analysis."); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79–80 (9th Cir. 1980) (no common enterprise despite common ownership of silver); *Svets v. Osborne Precious Metals Co.*, 1992 WL 281413, at *1 (N.D. Cal. June 8, 1992) (same, for precious metals).  Thus, Kik's receipt of "three trillion Kin" is insufficient to establish a common enterprise.  Indeed, the SEC has not cited a single case where the mere ownership of common assets, by itself, gave rise to a common enterprise.  *See*, *supra*, at 27–29.

Second, Kik and Kin purchasers each retained full ownership and control of their Kin, meaning that Kik's profit was in no way contingent on the profits of Kin purchasers. *See* Kik Br. at 25–27 (explaining that, to satisfy vertical commonality, the promoter's profits must be contingent on the profits of the investors); *see also Marini*, 812 F. Supp. 2d at 257–58 ("[B]ecause plaintiff was free to direct the sale of his coins separate and apart from [defendant's] decision to sell his coins, the fortunes of [plaintiff and defendant] clearly were not directly linked."); *Copeland*, 680 F. Supp. at 468–69 (no vertical commonality because rare coin transaction "was more akin to a contract for the sale of goods" and "[t]he primary risks and rewards—appreciation or depreciation in market value—rested on the plaintiffs"). And in fact, Kik's own decisions to sell Ether over time yielded $9.8 million in profits—none of which was contingent on, or shared with, TDE purchasers. SEC Mot. at 15 n.6.

The SEC bears the burden of establishing existence of a common enterprise between and among Kik and Kin purchasers for the TDE to constitute an offering of securities. It has failed to do so. The Motion should be denied.

### B.   The SEC Does Not Meet Its Burden to Show That TDE Purchasers Were Primarily "Led to Expect Profits" From Their Purchase of Kin.

Even setting aside the SEC's inability to prove a "common enterprise" between Kik and TDE purchasers, the Court should deny the SEC's motion in any event because the SEC has failed to show that Kin purchasers were primarily "led to expect profits" from their purchase of Kin. *Howey*, 328 U.S. at 298–99. The SEC concedes that evaluating this element requires an objective inquiry, focused "on what the purchasers were offered or promised," as opposed to subjective expectations or external forces in the market. SEC Mot. at 30 (citing *Warfield*). Critically, the focus of this inquiry must be on the "overall emphasis in the promotional materials," not on stray references plucked from their context. *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 (11th Cir.

31

1991) (holding that sale of housing-development lots and membership interests were not securities despite reference to "buying the property as an investment" because the "overall emphasis in the promotional material" was on use of the property).  Moreover, where an asset is sold primarily for consumptive use—for example, use as a medium of exchange—it is well-established that there can be no expectation of profits under *Howey*.  *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975); *Aldrich*, 627 F.2d at 1040 (finding that lots were "clearly" not securities because "the purchasers were induced to obtain them primarily for residential purposes").

### 1.    Kik Marketed Kin as a Digital Currency For Consumptive Use, Not an Investment Opportunity.

First, the overwhelming emphasis of Kik's promotional material for the TDE was on Kin's use as a medium of exchange for digital services, not an investment opportunity.  *See* Kik Br. at 8–10 (summarizing Kik's promotion of Kin as a medium of exchange).  Kik's White Paper explained that Kin would be used in "everyday digital services such as chat, social media, and payments."  Welsh Ex. K at KIK000008.  "Users [would] be able to earn Kin by providing value to other members of the Kik digital community through curation, content creation, and commerce . . . and [would] be able to spend Kin on products, services, and other valuable assets." *Id.* at 5–6.  Mr. Livingston also solicited developers, understanding that their participation was just as critical: "all developers out there who are competing in a world increasingly controlled by giants, we invite you to check out Kin."  Welsh Ex. N; Landsvik Ex. FF.[19]

Tellingly, the public—including journalists and TDE purchasers—were well aware that

---

[19] The SEC notably cites statistics regarding "4,003 executed and planned ICOs" between January 2017 until May 2018 for the proposition that such sales typically result in an appreciation in price after the tokens were listed on secondary exchanges.  SEC Mot. at 28.  It is wholly improper to cite facts relating to *other sales of cryptocurrency*, none of which relate to Kin or its offering materials, to suggest that Kik somehow led purchasers to expect a profit.  The undisputed facts show that Kik did not cite any such statistics or suggest that Kin would have a similar appreciation in value.

Kik marketed Kin as a medium of exchange within a new digital economy, ***not an investment opportunity***. *See, e.g.*, SEC92 at 56:21–57:3 ("Was Kin marketed as a currency to be used consumptively for digital services? . . . I mean, yes."); Landsvik Ex. FF at 2 (article from third party reiterating that Kin could be used as a medium of exchange, for example "to buy games, live video streams and other digital products.").  For example, TDE purchasers have stated that:

- "[I]t was my understanding that Kin was a digital currency to be integrated into Kik, with its 300 million registered users, and be used as a medium of exchange to purchase digital goods and services within digital applications, including digital stickers and similar products." Landsvik Ex. BB-2 ¶ 11 (Ramsey Decl.).

- "**Q**: And you understood that Kik's vision that it was marketing prior to the TDE was this ecosystem. where Kin would be able to use for goods and services within digital applications; right? . . . **A**: Yes . . . **Q**: So the idea was that Kin would be used in many digital applications aside from Kik; correct?  A: Correct . . . **Q**: Which means that objectively speaking in reviewing the marketing materials that you reviewed, Kik marketed Kin as a utility; correct?  **A**: Yes." SEC50 (Wang Tr.) at 136:24–137:4, 137:11-16, 145:14-16.

- "**Q**: Was Kin marketed as a currency to be used consumptively for digital services?  **A**: I mean -- ***I mean yes, I guess so because there would be users in their application and maybe other people would write applications that would use it and then you would be able to buy things*** . . . **Q**: So you say you would doubt that Kik would make a statement that people could expect to profit from purchasing Kin?  **A**: Correct." SEC92 (Rousmaniere) at 56:21–57:6, 95:23–96:2.

This testimony establishes that Kik's overwhelming emphasis was on Kik's functionality as a medium of exchange, rather than an opportunity to profit.  This is fundamentally at odds with *Howey*, and thus the SEC's claim must fail.

### a.    The SEC's Out-of-Context Soundbites Misrepresent the "Emphasis" of Kik's Promotional Materials.

The SEC does not dispute that Kik's marketing and promotional material touted Kin as a medium of exchange to be used within digital applications.  Instead, the SEC claims that Kik "in many public venues promised that investors 'could make a lot of money' from Kin," and cites less than ten stray soundbites where Kik or Mr. Livingston referenced the words "money," "value."

or venture capital fundraising.[20]   Mot. at 26.   However, stray references to these terms cannot

possibly sustain the SEC's motion.   SEC Commissioner Peirce's commentary on this point is

particularly illuminating:

> There are circumstances in which the security label fits, **but**, **in other cases,**
> **promises made about tokens increasing in value are nothing more than**
> **expressions of the hope that a network will succeed and be used by lots of people**.
> **I would argue that the analysis should focus on the objective nature of the thing**
> **offered to the purchasers**.   If the token seller is simply discussing the potential for
> an increase in the value of a token in the same manner that a seller of any number
> of other consumer products might appeal to purchasers' desire to buy a product of
> lasting or even increasing value, it there an investment contract?

Accordingly, *Howey* requires more than mere references to the "*prospect* of capital

appreciation," *see Revak*, 18 F.3d at 84 (emphasis added), or the "'*potential* for excellent

appreciation.'" *See Hart*, 735 F.2d at 1003 (emphasis added); *see also Alunni*, 445 F. App'x at 292

(no investment contract in purchase of condominiums despite promotional materials stating that

purchasers would receive immediate income and did not have to manage their units).   Rather, to

establish this element, the SEC must prove that the predominant message underlying the contract

and offering materials, as a whole, primarily emphasized a passive interment in an ongoing

venture, rather than a consumptive use**.**   Even taken at face value, the stray statements identified

by the SEC are insufficient to meet its burden.

Even worse than its reliance on such stray statements, the SEC affirmatively misrepresents

the content of the statements it cites.   For example, Mr. Livingston's statement that Kin would

allow participants to "make a ton of money" had nothing to do with a passive investment, but

---

[20] The SEC further asserts that the fact that Kik allocated some Kin to itself supports purchasers' expectation
of profits because *Kik* had a desire to increase the value of the tokens (*id.* at 31).   Merely because Kik had
an incentive to contribute to the economy—like any other Kin holder—does not mean that purchasers
expected to profit from Kik's efforts.   This is particularly so where Kik emphasized repeatedly to the public
that it was important that Kik be only a "participant," not a landlord in the economy, and that the economy
could succeed only if a wide base of people used Kin as intended.   *See* Kik 56.1 ¶¶ 18-19.

rather espoused the potential benefits of a new economy where consumers and developers were compensated for their contributions.  For example, Mr. Livingston explained that, today, "if you host a great group chat, today you do that for free. You know, we do everything as consumers for free and we never get paid."  But with Kin, users and developers would be compensated, and possibly make money, from activities such as "host[ing] a great group chat," "creat[ing] a great song," or creating "a great level" for a game.  SEC48-B at 10:10–11:3.  Further, the vast majority of Mr. Livingston's statements the SEC cites, including those relating to the "dot.com" era, refer to cryptocurrencies generally, not Kin, and never referred to profits to be gained from TDE purchasers.  For example, Mr. Livingston's reference to the "dot com era" was merely to illustrate the adoption of new technologies, such as e-commerce.   Like the dot.com era, many cryptocurrencies would fail, but a few projects would be widely adopted, just like "Amazon and Google" during the "dot.com" era.  SEC8 at 429:17-18.  These references were important because Kik's vision for Kin was a departure from other cryptocurrencies—unlike many other tokens, Kik believed that Kin could be the first widely adopted token by consumers and developers to be used within digital applications.  Kik 56.1 ¶ 8.  And finally, the SEC mischaracterizes Mr. Livingston's reference to "VC investing."   In reality, Mr. Livingston was responding to a question from the interviewer about how "the ICO process" differed from a "traditional funding process," and Mr. Livingston responded that the "really interesting thing about crypto is it's just sort of fundamentally new and fundamentally more powerful."   And in the same interview, Mr. Livingston spoke at length about how Kin could allow users to "provide value to each other," for example for "creating and consuming music on a music platform" or "hosting and joining clans in a game."  SEC 47-B at 6:6-11.  These statements, which the SEC cites in a vacuum, do not reflect the overall emphasis of Kik's marketing of Kin.

b.     **The SEC Presents No Evidence That Any Purchaser Relied on Any Specific Statement Cited in Its Motion.**

The SEC's focus on these scattered soundbites is all the more inappropriate because the SEC's motion is devoid of any evidence that TDE purchasers reviewed, let alone relied on them. The *Howey* analysis is properly focused on only documents and representations that form the "basis of the sale." *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980). Courts will discard statements or documents absent evidence that the purchasers "were induced to buy" the asset based on them. *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131–32 (9th Cir. 2013) (affirming dismissal of investment contract claim where there were no allegations that purchasers "were induced to buy" based on statements they did not receive until after the transaction). Therefore, statements or documents from the promoter that are not reviewed or relied on "are irrelevant in assessing whether a security was 'presented' to the [purchasers] at [the] time [of the sale]." *Id*. The SEC's own case, *Blockvest*, is instructive. *SEC v. Blockvest, LLC*, 2018 WL 6181408 (S.D. Cal. Nov. 27, 2018). There, the court denied the SEC's request for a preliminary injunction because "its argument presume[d], without evidentiary support" that the purported investors had actually reviewed or relied on the materials the SEC cited in support of its *Howey* claim. *Id.* at *6. The Court reasoned that the parties "provide starkly different facts as to what the 32 test investors *relied on*, in terms of promotional materials, information, economic inducements or oral representations at the seminars, before they purchased the test BLV tokens," and the Court was therefore unable to find that the sale of tokens was an investment contract under *Howey*. *Id*. at *6–7 (emphasis added). The Court's later ruling on the SEC's motion for reconsideration again held that the SEC failed to show that purchasers actually relied on the materials it was citing to support its *Howey* analysis, and thus denies the SEC's motion for reconsideration as to its alleged Section 5 violation and other claims. *SEC v. Blockvest, LLC*, 2019 WL 625163, at *6 (S.D. Cal.

36

Feb. 14, 2019).[21]

Here, the SEC offers no evidence that any TDE purchaser heard or relied on Mr. Livingston's statements about "money," the dot.com era, or VC investing—all of which were made at conferences, interviews, or speeches, and not distributed *en masse* to prospective TDE purchasers. In fact, the SEC has presented no evidence that even ***a single TDE purchaser***, let alone a majority of them, heard statements from, for example, the "NYC Ethereum event," the June 2017 conference in China, the San Francisco Bitcoin Meetup, or the August 14, 2017 conference in Canada, despite heavily quoting them in its motion. SEC Mot. at 26–27. But there is evidence to the contrary. For example, one TDE purchaser has stated, "I do not recall reviewing any specific materials published by Kik prior to purchasing Kin in the TDE." Ex. BB, ¶ 6. And a number of others testified that they do not believe that they watched, let alone relied on, *any* videos involving Kik or Kik's CEO prior to purchasing Kin. SEC74 at 94:14-16 (Neil Tr.) (testifying that he did not recall watching any videos from Kik or Mr. Livingston before purchasing Kin); Landsvik Ex. BB ¶ 6 (Ramsey Decl.) (same); SEC92 at 59:24–61:4 (Rousmaniere Tr.) (testifying that he did not watch any videos or listen to podcasts regarding Kin prior to the TDE). For this reason, the Court should discard the SEC's cherry-picked statements, which do not have any connection to any Kin purchaser, their expectations, or their decision to buy Kin.

### 2.    Kik Did Not Operate Exchanges or Guarantee Liquidity for Kin.

Second, the SEC misleadingly argues that "Kik repeatedly told investors in its white paper, tweets, and Roadshow, that Kin would be tradable—or that Kik expected Kin to be tradable—on secondary trading platforms (what it called "exchanges"), thereby priming expectations that

---

[21] The Court did allow the SEC to proceed on its previously unaddressed claim under Section 17(a), which requires the mere offering of securities for sale, without attendant reliance by actual purchasers. *Id*. at *7-10. In other words, this claim was allowed to proceed because it does not require actual reliance on the materials by any specific purchaser, thus reaffirming this principle.

investors would be able to easily resell Kin at a profit." SEC Mot. at 27. As an initial matter, *Howey* demands more than "priming expectations"—it requires actual "commitments" to perform tasks that would yield a profit for the enterprise. *See Happy Inv. Group*, 396 F.Supp. at 181 (finding *Howey* test was "not fulfilled when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services that affect plaintiffs' control and management of the [asset]"); *see*, *infra*, at 49–50. Further, the SEC cites no authority to support its claim that the potential for future liquidity of an asset, without more, is sufficient under *Howey*. Instead, the SEC cites *Balestra*, where the defendants promised purchasers that they would "'expand [the token's] presence on large and prospective crypto-exchange platforms, offering its investors ***more opportunities to multiply their investment***s. . . .'" *Balestra*, 380 F. Supp. 3d at 356, n. 14 (emphasis added); *see* SEC Mot. at 26. The SEC also cites *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., in which the Second Circuit found that investors in certificates of deposit (which were established investment vehicles) expected profits from Merrill Lynch's efforts because the bank had expressly promised to create and operate a secondary market for the certificates, and agreed to re-purchase the certificates if interest rates decreased. 756 F.2d 230, 241–42 (2d Cir. 1985). As such, the purchasers bought "an opportunity to participate in the CD Program and its secondary market" and paid "for the security of knowing that they may liquidate at a moment's notice free from concern as to loss of income or capital[.]" *Id.* at 241.

Here, however, the SEC's Motion identifies just two statements from Mr. Livingston that reference secondary exchanges: (1) a statement that Kik would "be able to sell [Kin] on to the exchanges like anybody else" (SEC Mot. at 24); and (2) a statement that Kin would be "immediately tradable" and "on day one, Kin [would] go on to a bunch of exchanges where you

can exchange it for other cryptocurrencies, or even fiat currencies." SEC Mot. at 27. Neither statement shows Kik assuring purchasers that it would provide or guarantee such liquidity (much less a promise to repurchase Kin if the price declined), and neither statement shows Kik suggesting that the purpose of these exchanges was to allow purchasers to profit. In fact, the suggestion that the prospect of Kin being listed on exchanges is somehow a *de facto* promise of profit is based on a flawed understanding of how any economy, not just a cryptocurrency economy, works. Like any functioning economy, currency exchanges serve an important purpose in the Kin economy that is untethered to "profit." It is important, for example, that businesses earning Kin as revenue can utilize those funds to pay other business expenses, which require fiat currency (salaries, rent, or other regular expenses). *See* Landsvik Ex. Z at ¶¶ 50–53; *id.* Ex. CC at ¶¶ 20, 31. Similarly, developers wishing to integrate Kin within an application might require an initial supply of Kin to pay out to users, which they would likely acquire on the secondary market if they had not purchased Kin in the TDE. *See* Landsvik Ex. Z at ¶ 48 (Dowd Decl.) (stating that he purchased Kin on the secondary market to use within his application); i*d.* Ex. CC at ¶ 28 (Weatherman Decl.). In short, the SEC's claim that Kik referenced exchanges (even if it could identify even one purchaser that relied on such statements) does not satisfy its burden of showing that Kik led purchasers to expect that they would profit, or that they could rely on Kik's efforts to ensure that profit.

Not only does the SEC fail to meet its *prima facie* burden, the undisputed facts show that: (1) Kik affirmatively clarified that it could *not* guarantee or promise that Kin would be liquid on exchanges, or that Kin would have any re-sale value, and (2) TDE purchasers understood that Kik did not make any such guarantees. While Kik expected cryptocurrency exchanges to list Kin, as exchanges had done with other ERC-20 tokens, the Kin Foundation repeatedly told the public that

the decision to list Kin was ultimately "***up to the exchanges***," not Kik.  Landsvik Ex. TT; *see also* Landsvik Ex. UU (same); Ex. VV ("[W]e are not actively keeping track of exchanges that have expressed interest"); *see also* SEC62 (exchanges may list Kin "if they choose"); Ex. ZZ (listing Kin "depend[ed] on the exchanges themselves and who lists them").  The Terms of Use reinforced this notion, informing purchasers that "KIK DOES NOT GUARANTEE THAT KIK OR ANY KIK PARTY CAN EFFECT THE TRANSFER OF TITLE OR RIGHT IN ANY KIN TOKENS." Further, at a conference in San Francisco (from which the SEC repeatedly cites) Mr. Livingston told the audience: "***we cannot guarantee value with Kin***…. I think once you create a cryptocurrency, it's on the exchanges, and the price of it is set by the market based on supply and demand."  SEC46B at 35:20-23.  And TDE purchasers have acknowledged that Kik did not guarantee liquidity: for example, one stated that "I do not recall Kik or the Kin Foundation ever promising that Kin would be listed on exchanges, nor do I recall Kik promising that Kik or the Kin Foundation would exert efforts to have Kin listed on exchanges."  Landsvik Ex., BB ¶ 15 (Ramsey Decl.); *see also* Ex. AA ¶ 22 (Hendriks Decl.) ("I also do not believe that Kik made a promise that Kin would be listed on exchanges once it was launched.").  Even if the SEC were correct that the existence of liquidity alone was relevant under *Howey* (it is not), there is at the very least as disputed issue as to whether purchasers were led to expect liquidity for Kin.

### 3.    Internal Documents Regarding the Audience for Kik's Announcement of Kin Are Irrelevant.

Third, the SEC argues that purchasers expected to profit based on Kik's internal discussions about the "ideal" venue and audience for its initial announcement of Kin.  SEC Mot. at 28.  As an initial matter, Kik did in fact make efforts to promote Kin in channels most likely to contain actual developers and users.  Kik consistently promoted Kin to the developer community through social-media channels and at developer conferences like Botness.  SEC99:4-23.  The

internal documents referenced in the SEC's motion—email exchanges shared among "Kik executives"—have no bearing on the question of whether Kik outwardly suggested or promised that Kin would be a passive investment opportunity.  Because *Howey* analysis is limited to those documents or statements that form the "basis of the sale," courts refuse to consider materials that were not "promoted at the time of the sale" or relied on by purchasers when entering the transaction.  *Salameh*, 726 F.3d at 1131 (refusing to consider a separate agreement because potential purchasers were never told about the agreement, nor were they told that the agreement would "result in investment-like profits" (citing *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039–40 (10th Cir. 1980)).  As a result, this argument carries no weight.

### 4.    Kin Has Been Functional as a Medium of Exchange from the Day of Its Launch.

Fourth, the SEC claims that Kik "did not identify any specific use for Kin as a proposed medium of exchange" upon launch, which allegedly emphasized Kin's "attractiveness as an investment."  SEC Mot. at 28.  Importantly, the relevant inquiry is actually whether Kik's promotional material led purchasers to expect profits, or expect that Kin would be used as a medium of exchange.  The SEC's own case law concedes that the expectation to "to use or consume the item purchased" precludes an expectation of profits under *Howey*.  *Id.*

The SEC argues that "Kik did not identify any specific use for Kin as a proposed medium of exchange, hereby further heightening the emphasis on Kin's future 'value' and its attractiveness as an investment."  *Id.*  But as discussed above, Kik marketed Kin as a medium of exchange to be used in digital applications, and identified many potential use cases in advance of the TDE.  The Whitepaper, for example, provided three pages of "possible use cases," representing ways that Kin could be used in the future.  Welsh Ex. K at KIK000013–15.  Given that use cases for Kin would be generated by any number of third parties, Kik could not possibly know about them all at the

time of the TDE.  However, these use cases provided examples for prospective purchasers of how it could be used.  The SEC also claims that Kik "did not market the stickers to public investors, and so they could not have been a reason for any of their Kin purchases anyway."  SEC Mot. at 29.  This is simply untrue.  Kik listed "buying and selling stickers" as a potential use case for Kin in Mr. Livingston's Medium post that was released the day Kin was announced.  Welsh Ex. L, at 2.  And at least one TDE specifically recalled hearing about stickers prior to the TDE.  *See, e.g.*, Landsvik Ex. BB ¶ 9 (Ramsey Decl.) ("I recall hearing about something about stickers being offered within the Kik Messenger application prior to participating in the Kin TDE.").  That functionality was realized through the MVP, which Kik repeatedly indicated would exist at launch.  *See* Welsh Ex. K at KIK000023.

And it is undisputed that Kin could be used as a medium of exchange already ***at the time of the TDE***, demonstrating immediate functionality of the currency.  *See* Kik Br. at 10–12; Welsh Ex. A at ¶¶ 85–91 ("At the time of launch, Kik launched a minimum viable product or 'MVP' within Kik Messenger that allowed anyone who owned Kin to use it [within] Kik.").  As an initial matter, the SEC's motion places undue emphasis on Kin's utility at the moment of launch.[22]  In reality, if a commodity is primarily marketed for use, there can be no reasonable expectation of profits from the efforts of the promoter—even if that use was not to occur until sometime in the future.[23]  *Woodward*, 574 F.2d at 1025 (no investment contract despite purchase of empty "lots as

---

[22] SEC Commissioner Peirce has acknowledged that token sellers hoping to build a "decentralized network in which a token serve as a means of exchange" are in the impossible position of "need[ing] to get the tokens in the hands of other people," while those efforts are "stymied by concerns that such efforts may fall within the ambit of federal securities laws."  Landsvik Ex. OO at 1.  For this reason, Commissioner Peirce proposed a three year safe harbor, which would formally allow decentralized networks to take hold and grow.

[23] The SEC cites *Beranger v. Harris,* for the proposition that the *Howey* test is met where promoter led buyers "to believe they could expect a profit from buying the tokens," even though "tokens had additional functionality."  2019 WL 5485128, at *3-4 (N.D. Ga. Apr. 23, 2019); Mot. at 29.  This may be true—but in *Beranger*, unlike here, the plaintiff was able to "detail[] several ways in which [the promoter] led plaintiffs to believe that they could expect a profit from buying the tokens."  *Id.* at *3.  For example, the

future building sites."); *Forman*, 421 U.S. at 853 (finding no expectation of profits because purchasers intended to "acquir[e] a place to live," despite the fact that the homes were not yet built at the time of purchase).   Nonetheless, Kik did launch functionality for Kin within Kik ***at the moment it was launched***. The SEC acknowledges that Kik launched an "MVP" at the time of the TDE, where purchasers could link their digital wallets, view their balances, and access and send premium content, exclusive to TDE purchasers.[24]

Unable to refute that Kik *did* market Kin as a medium of exchange, the SEC quibbles with the desirability of Kin's initial use upon launch.   SEC Mot. at 28–29.   But the SEC identifies no case holding that a plaintiff's subjective judgment regarding the desirability of a product is relevant—the question is simply whether Kin was marketed as a medium of exchange for consumptive use, not passive investment.   And, from Kik's experience with Kik Points, it had learned that users were interested in purchasing stickers and premium emojis, so this use was far from superficial.   *See*, *supra*, at 4–5.   The SEC also cannot dispute that ***2,000 TDE purchasers***

---

promoter's social media referenced "'TREMENDOUS growth,'" and even told purchasers *specific, increasing dollar amounts* that the tokens would sell for in the future.   *Id.* at \*3-4.   Here, the SEC cannot produce any similar statements from Kik—and in fact, Mr. Livingston said that they **could "not guarantee value with Kin**."   SEC46B at 35:20-23.   Further, in *Beranger*, the "internet platform had not yet been launched, and it was entirely up to the defendants to make that happen."   *Id.* at \*3.   But for TDE purchasers, the platform was already launched and available for anyone to contribute.   *See* Landsvik Ex. AA ¶ 31. Therefore, this case is inapposite.

[24] The SEC claims that the MVP was solely developed for "compliance" purposes.   This is irrelevant— there is nothing wrong with seeking "compliance—but in any event, the author of the cited email has since testified, twice, that the SEC has taken the statement out of context and that he believed that the MVP was valuable both from both a business and user perspective.   *See* SEC40 at100:7-18 (Ben-Ari Tr.) (launching MVP was important so Kik could "generate . . . really important learnings that can speed up the ability to integrate Kin successfully").   The SEC also depicts this use as insignificant, but the SEC has identified no case law which requires the Court to make a judgment as to the desirability of available uses.   And the integration of premium stickers is hardly superficial, and in fact, companies have made hundreds of millions of dollars from selling digital stickers.   For example, another messaging company, Line, earned over \$250 million in a year, solely from digital stickers.   And Kik made its decision to integrate stickers into its MVP based on years of user input and market research.   *See* Welsh Ex. L (noting that Kik Points users spent Kik Points on "digital items, such as stickers or emoji," and that the volume of Kik Points transactions was "three times higher than Bitcoin's").

*used that functionality of Kin within Kik Messenger*.  Welsh Ex. A ¶ 88; Landsvik Ex. AA ¶ 27 ("I personally utilized the MVP").  Prospective and actual TDE purchasers have indicated that Kik did market Kin as a "medium of exchange to purchase digital goods and services within digital applications, including digital stickers and similar products."  Landsvik Ex. BB ¶ 9 (Ramsey Decl.); Ex. Z ¶ 16 (Dowd Decl.); Ex. AA ¶ 20 (Hendriks Decl.); SEC92 (Rousmaniere Tr.), at 56:21–57:7.

Consistent with Kik's vision and with Kik's public statements before the TDE, the Kin economy has flourished through the participation of dozens of developers and applications— independent of Kik—that have generated opportunities to earn and spend Kin.  Kin can be spent on a myriad of digital services and can be shared amongst users seamlessly within popular apps such as Reddit or Twitter.  Welsh Ex. A ¶ 81.  Within the many applications that integrate Kin, there are *4.3 million* users spending Kin each month, *over eleven million* different users have spent Kin tokens, and *over twenty six million* different users have earned Kin from these applications. Landsvik Ex. YY.  Kin is also consistently among the top cryptocurrencies, as measured by use on the blockchain excluding secondary market transactions, showing that Kin is widely used as a medium of exchange.  Welsh Ex. A ¶ 86.  These statistics show that Kin has more activity as a digital currency than Bitcoin or Ether, which the SEC has deemed not to be securities.  *Id.* ¶ 86. Moreover, the SEC's own witness, Harrison Wang, testified that he has earned and spent Kin in five digital applications (none of which was Kik Messenger), has used Kin as a "medium of exchange," and that he is aware of others who have used Kin "to purchase goods and services." SEC50 at 70:3–71:16.  Other TDE purchasers have not only earned and spent Kin within digital applications, but they have developed applications that have integrated and have received compensation in the form of Kin, for their contributions within this new digital economy.  *See*

Landsvik Ex. AA ¶¶ 41–55 (describing KinFit app); Ex. Z ¶¶ 30–55 (describing Pause For app). For example, in Pause For, users earn Kin by pausing their phones and focusing on other tasks, which they can then spend on "power-ups" or donate to charity—to plant trees, vaccinate puppies, or feed hungry families.  Landsvik Ex. Z ¶¶ 30–55.  In KinFit, users can earn Kin for exercising and then transfer that Kin to use in other apps or purchase "doublers" within KinFit. Landsvik Ex. AA ¶¶ 41–55.

## 5. Kik Structured the TDE to Deter Large Purchases By Passive Investors.

Fifth, the SEC argues that purchasers "bought Kin in such large quantities that their purchases only can be logically explained by an expectation of profits, and not by a desire to use or consume."  Mot. at 29.  This so-called "logical" assumption by the SEC (presented without support) has no basis in fact or law.  Most notably, the SEC has again conflated the Pre-sale with the TDE, this time in an attempt to artificially inflate the supposed "large quantities" of Kin that were purchased.  The SEC's claim, for example, that "less than two percent (2%) of the entire amount raised in the Kin offering was spent by investors who paid less than $1,000" is based on calculations that include the Pre-sale, which included primarily large, multi-million dollar contributions.  In reality, roughly ***half*** of the participants in the TDE bought less than $1,000 worth of Kin, and many purchasers bought less than $1 worth of Kin, with one purchaser buying ***just nine cents worth of Kin***.  Welsh Ex. A at ¶¶ 74–75.

Nonetheless, large purchases of Kin do not equate to "investment" intent.  For example, a purchaser who wanted to integrate Kin into a digital application would need a sizeable supply of Kin to begin distributing it to users.  *See* Landsvik Ex. AA ¶¶ 54 (Hendriks Decl.) (explaining that he needed a supply of Kin to begin operating their rewards system); Ex. Z ¶ 48 (Dowd Decl.) (explaining that he used the Kin he bought in the TDE toward the supply of Kin in his application);

Ex. CC ¶ 20 (Weatherman Decl.) (stating that he needed to purchase a "larger amount" of Kin after deciding to build an application utilizing Kin as a business model). There is no support for the SEC's assumption that all large purchases were necessarily for investment purposes.

And, undisputed facts show that Kik took many (successful) steps to deter large purchases from speculative investors in the TDE. *See* Kik Br. at 10; Welsh Ex. A at ¶¶ 68–70. This included a cap on how many tokens a purchaser could buy for the first 24 hours, which prevented large purchasers from stock-piling excessive amounts of Kin before others could participate. Welsh Ex. A ¶¶ 68–69; Ex. P, at 1. Similarly, Kik did not require a minimum purchase amount, meaning that someone could purchase as little a penny's worth of Kin. *Id.* at ¶ 70. This message was communicated to prospective purchasers, who understood that Kik's goal was to ensure a wide base of participants. *See* SEC74 at 100:9-11 ("[T]he messaging around [the initial cap] was, it was to more widely distribute the . . . tokens to a wider audience so five people don't own all of them."). Even though there were a small number of large purchases, it is undisputed that Kik's public materials focused overwhelmingly on achieving a wide distribution of Kin to likely users and developers, not passive investors.

### 6. Facts Regarding the Pre-sale Are Irrelevant to Whether Kik Led TDE Purchasers to Expect Profits.

Sixth, in the absence of evidence that Kik led *TDE purchasers* to expect a profit, the SEC again relies on facts from the Pre-sale to support its claim, arguing that "SAFT participants had a profit incentive" because they bought Kin at a 30 percent discount, yielding an "obvious profit opportunity." SEC Mot. at 30. However, the terms of this separate transaction—which were never offered to or applicable to TDE purchasers—do not suggest that Kik led TDE purchasers to expect a profit. Kik concedes that Pre-sale participants expected such a profit given the nature of that transaction, which is why the Pre-sale was treated as an offering of securities. In making this

argument, the SEC concedes that the TDE had no similar profit incentive, and supports Kik's

position that the sales need to be analyzed independently.

> 7. **The SEC's Reliance on Subjective Expectations of A Few Purchasers Is Misguided.**

Lastly, disregarding the overwhelming emphasis of the sale, the SEC instead highlights the

expectations of a few individuals, who supposedly hoped to profit.  SEC Mot. at 30.  As an initial

matter, the focus must be on what ***Kik led purchasers to expect***—the simple fact that any one

individual subjectively intended to profit is irrelevant.  *See Contract Buyers League v. F&F Inv.*,

300 F. Supp. 210, 224 (N.D. Ill. 1969) ("[T]o conclude that the natural desire of any purchaser that

his purchase should appreciate in value makes a 'security' of what has been purchased, is obviously

to so muddle the term as to make it meaningless."); *see*, *supra*, at 16.  Indeed, many courts have

found no investment contracts despite evidence that a number of purchasers participated solely for

profit or investment purposes.  *See, e.g.*, *Woodward*, 574 F.2d at 1024–25 (finding no investment

contract despite several purchasers indicating they "did not intend to actually build on the land,

and they bought the land as an 'investment.'").  But even assuming such expectations were

relevant, purchasers who actually adhered to Kik's messaging *did* in fact purchase with the

subjective intention to *use* Kin within digital applications, not to sell it for a profit.  For example,

TDE purchasers have stated:

- "I purchased Kin in the TDE because I intended to use it as a developer and a user of digital applications and because I believed in the vision for the Kin ecosystem that was described in the white paper. More specifically, I was excited about the Kin ecosystem and its potential, and hoped to build an application that would run on that ecosystem."  Landsvik Ex. AA ¶ 18 (Hendriks Decl.).

- "When I purchased Kin in the TDE, I believed I might use it as a developer and a user of digital applications. More specifically, I thought it likely I could build an application that would utilize the Kin tokens that I purchased and construct a business model based on Kin."  Landsvik Ex. Z ¶ 15 (Dowd Decl.).

These subjective beliefs at least create a dispute of fact, which undermines the SEC's Motion.  But

tellingly, even the three TDE purchasers (out of 10,000) who the SEC claims subjectively expected to profit did not expect to profit because of Kik's marketing of Kin. Rather, these purchasers held those beliefs because of their own preconceived notions regarding cryptocurrencies generally. For example, TDE purchasers have stated the following:

- "To the extent I hoped the price of Kin would increase when I purchased Kin, that hope was not based on anything that Kik said or published, but rather what I read or heard about other cryptocurrencies. Kik never said specifically that I would make money or that Kin was an investment opportunity." Landsvik Ex. BB ¶ 11 (Ramsey Decl.).

- "I believed that the price of Kin would be tied to the cryptocurrency market, and that the price would change in large part based on market forces that were generally applicable to all cryptocurrencies or outside of Kik's control. For example, I believed the price of Kin and other cryptocurrencies would primarily be tied to the price of Bitcoin. *Id.* ¶ 13.

- "**Q**. Do you remember anything in the white [paper] or otherwise where Kik told you to expect that you could profit? A. No, I don't remember. Q. Do you have any reason to believe that they did make any such statement? . . . [**A**] I don't have any reason to believe and that would be a pretty amateur move[.]" SEC92 (Rousmaniere Dep. Tr.) at 95:15-21.

- "I don't think this was stated in the whitepaper or anywhere initially, but the expectation is in the cryptocurrency space, that if you're releasing an ICO or releasing tokens, that you get on some exchange so you're not locked into it for a long period of time. So I don't know if that was in the documentation anywhere." SEC74 (Neil Dep. Tr.) at 91:14-24.

Thus, even if subjective intentions were relevant, these particular opinions have no basis in anything that Kik offered or promised, and should be discarded. Otherwise, token sellers would be left with no control whatsoever as to the terms and circumstances of the asset they are offering for sale. *See* Landsvik Ex. OO at 2 (Commissioner Peirce: "The subjective intent of any particular purchaser should not be controlling. If it were, then is there any end to the Commission's authority?"). Viewed properly in light of the documents and representations that formed the "basis of the sale" (and ignoring the wide range of subjective intentions), it is clear that Kik did not lead purchasers to expect profits, and it is Kik, not the SEC, that is entitled to judgment as a matter of law. But in any event, to the SEC extent that the SEC's Motion relies upon the subjective intent of these TDE participants, the evidence cited above shows that there is a significant dispute of fact

regarding the subjective intent of the 10,000 separate TDE participants.   As such, the SEC's Motion fails.

### C.   The SEC also Cannot Establish That Kik Led Purchasers To Expect Profits Based on the Entrepreneurial or Managerial Efforts of Kik.

Even if the SEC could produce evidence that purchasers were led to expect a profit (they cannot), that alone is insufficient under *Howey*.   Rather, the SEC must prove that any such expectations were based on the "undeniably significant" managerial and entrepreneurial efforts of others.   *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir. 1973); *Howey*, 328 U.S. at 298–99; *Keith v. Black Diamond Advisors, Inc.*, 48 F. Supp. 2d 326, 332–34 (S.D.N.Y. 1999). The SEC similarly fails to make this showing.

### 1.   Purchasers Expecting Profits from Market Forces, Rather Than the Promoter's Efforts, Do Not Satisfy This Element.

The SEC's claim fails because, to the extent purchasers expected the value of Kin to increase, such expectations were based on general market factors.   Such expectations, which are untethered to the specific efforts of the promoter, are insufficient under *Howey*.   In *Noa*, for example, the Ninth Circuit found no expectation of profits from the efforts of others in a case involving a forward contract for silver bars, because "[o]nce the purchase of silver bars was made, the profits to the investor ***depended upon the fluctuations of the silver market, not the managerial efforts of [the promoter]***."   *Noa*, 638 F.2d at 79 (emphasis added); *see also SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (reaching the same result for sale of a forward contract for gold coins because profits depended primarily upon the fluctuations of the gold market); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (foreign-exchange transactions did not satisfy *Howey* because "any gain likely would result in large part from market movements, not from capital appreciation due to [promotor's] efforts").   This concept is particularly true where the seller does not guarantee

that there will be an available market for re-sale, on which point the contract language between the parties is instructive. For example, in *Life Partners*, the parties agreed in the contract that, "'[t]here is no established market for the resale'" and "'there is no guarantee that any policy can be resold, or that resale, if it occurs, will be at any given price.'" 87 F.3d at 546. Based on this language, the court rejected the claim that the buyer "'predominately'" expected profits from the entrepreneurial efforts of others. *Id*.

As in *Life Partners*, *Noa*, and *Belmont Reid*, any expectation of profits that Kik purchasers had was based on market forces and the potential resale on secondary markets, not from the managerial or entrepreneurial efforts of Kik. Kik made clear from the beginning that it would be a "participant" rather than a landlord, and that the economy could only succeed if a wide base of users and developers used Kin as intended. Kik 56.1 ¶¶ 18–19. Kik further made clear in the Terms of Use that to transact with Kin required doing so on the Ethereum blockchain, which was not operated by Kik. *Id.* ¶ 50. Additionally, purchasers acknowledged that "Kik [could] not guarantee that Kik or any Kik party can effect the transfer of title or right in any Kin tokens." *Id.* Kik did not operate any secondary exchanges, act as a broker for Kin transactions, offer to buy Kin from purchasers, or make any guarantee that there would be liquidity for the token. Kik did not have the ability to determine whether exchanges would accept Kik and could not affect its price upon a potential resale.

Indeed, even the few TDE purchasers who testified that they subjectively intended to profit made clear that their expectations were based on market forces, not on anything that Kik led them to expect. One TDE purchaser stated:

> I believed that the price of Kin would be tied to the cryptocurrency market, and that the price would change in large part based on market forces that were generally applicable to all cryptocurrencies or outside of Kik's control. For example, I

believed the price of Kin and other cryptocurrencies would primarily be tied to the price of Bitcoin.

Landsvik Ex. BB ¶ 13 (Ramsey Decl.).   Another TDE purchaser testified that he "personally anticipated" that the price of Kin would be affected by swings in the market, and that, when purchasing Kin, he was in part "hoping that market prices would go up" and Kin would follow. SEC92 (Rousmaniere Dep. Tr.) at 82:19–83:8.  This same purchaser even compared the value of Kin to "the price of like cobalt or platinum," which "goes up and down like based on lots of different factors, including like the miners of the thing and the demand for it and the speculation and all those things." *Id.* at 81:20–82:4.  *Howey* does not encompass expectations of profit based on such external forces.

### 2. The SEC Does Not Identify Any *Howey*-Level Promises that Create an Expectation of Profits From the Efforts of Others.

Additionally, to find that purchasers expected profits from the efforts of the promoter, courts require that the seller make actual commitments to perform tasks that would yield a profit for the enterprise. *See Happy Inv. Group*, 396 F.Supp. at 181.  These promises must be central to the success or failure of the enterprise: "activities such as the organization of a business . . . cultivating and marketing citrus . . . drilling an exploratory well in connection with the sale of oil leases, or the efforts of the managers of a savings and loan to earn profits to be distributed as dividends." *Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986); *see also SEC v. Aqua-Sonic Prods*, 687 F.2d 577, 579 (2d Cir. 1982) (finding that promises to perform "all significant marketing functions" and retaining unilateral discretion to manage certain aspects of an ongoing business relationship were sufficient under *Howey*.)  Put simply, this element is met only where, "without the efforts of the promoters, the investments would be virtually worthless," (*Bender*, 632 F. Supp. at 501), or where a seller assures purchasers that they could remain passive and still earn a profit.  *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414, 417 (8th Cir. 1974)

(finding element was met where seller encouraged purchasers "to invest by representing that the efforts required of them would be very minimal"). However, suggestions or promises that the promoter would build basic infrastructure or improve the communities surrounding the asset are not the type of managerial services contemplated by *Howey*. *See Woodward*, 574 F.2d at 1026; *Davis*, 401 F. Supp. at 1050; *see also* Kik Br. at 32–33 (summarizing cases holding that mere infrastructure-building is insufficient).

None of the supposed "promises" the SEC identifies rise to the level of the commitments, guarantees, or promises that *Howey* requires.[25] As an initial matter, none of them can even be framed as promises, as the sole contract governing the sale of Kin did not obligate Kik to do *any* work to support the Kin economy. Further, the necessary elements of the Kin economy already existed at the time that Kin tokens were distributed, and from then on, "it was open for developers and third parties to start using Kin within it." Landsvik Ex. AA ¶ 31. Nonetheless, none of the categories the SEC identifies are the type of critical, profit-generating efforts that *Howey* requires.[26]

### a. Efforts to Participate in the Kin Economy and Generate Demand Were Not Unique or Limited to Kik.

Statements that Kik would integrate Kin into the Messenger app, join the Kin Ecosystem, encourage people to earn and spend Kin within the Kik app, and add ways to use the token inside the Kik are not "undeniably significant" managerial-type efforts. *See Glenn W. Turner Enters., Inc.*, 474 F.2d at 482. Importantly, *none* of these tasks were exclusive to Kik—and in fact, the Kin

---

[25] The SEC's argument in this regard also fails because, as discussed above, the SEC fails to provide evidence that any purchaser actually heard or saw many of the statements on which the SEC relies. *Salameh*, 726 F.3d at 1131–32; *Blockvest*, 2018 WL 6181408 *6.

[26] Tellingly, the SEC does not even provide any citation for its first statement that "Kik's four-month marketing campaign overwhelming and repeatedly conveyed not only that 'efforts of others' would be required to grow the value of Kin, but also that Kik would undertake the most important of those efforts." SEC Mot. at 31.

project would have failed if other third parties had not similarly participated. Welsh Ex. A ¶¶ 21, 29, 30; *id.* Ex. K at KIK000005; *id.* Ex. L, at 2; *id.* Ex. N at KIK00045122–23. But even assuming they were, efforts to generate demand (including encouraging others to do so) are insufficient under *Howey*. For example, courts have held that the mere attempt to "induce purchasers to build" homes on vacant lots, thereby causing an appreciation in value of the development, are not sufficiently tied to the interests of other purchasers. *Davis*, 401 F. Supp. at 1050.

It is undisputed that the value of Kin was solely a function of supply and demand, which necessarily depended on the actions of any number of parties. Indeed, the SEC itself effectively concedes that the participation of *other developers* (and the resulting increase in demand) was crucial to any increase in the value of Kin. *See* SEC Mot. at 33 (arguing that the Kin Rewards Engine would "be instrumental in attracting developers to the ecosystem, ***thereby increasing the utility of Kin, which would spur greater numbers of transactions, and make Kin more valuable***"). In any event, the Kin Rewards Engine was designed and launched by the Kin Foundation, not Kik. Welsh Ex. K, at KIK000019. And, Kik was not the only entity involved in "attracting" developers to the economy—other participants could (and did) undertake independent efforts to encourage others to join the economy. *See* Landsvik Ex. AA ¶¶ 31–40.

The SEC's only argument to the contrary is that "[n]o single Kin investor could have been expected to develop the necessary technology or to stimulate the demand that was sufficient to establish and build Kin's 'value.'" SEC Mot. at 35. But the same can be said of Kik: Kik alone could not stimulate the requisite demand for Kin tokens to drive an increase in value. Kik reiterated this message numerous times prior to the TDE. Kik Br. at 9-10. TDE purchasers also have stated that "the Kin economy could never succeed if [Kik Messenger] was the only application to integrate Kin," and that "any third parties could contribute to the ecosystem by building

applications or tools that would utilize Kin." Landsvik Ex. Z ¶¶ 24–28 (Dowd Decl.); Ex. AA ¶¶ 31–40 (Hendriks Decl.) ("I never viewed Kik as being the sole company responsible for making Kin successful. . . For the Kin ecosystem to be successful, I knew that a large number of developers and users would have to earn and spend Kin tokens.").

> ### b. Efforts to Build Systems within the Kin Ecosystem Are Merely Infrastructural, Not Managerial.

The SEC's claims that Kik promised to "build new products, programs, and systems" and "supplement and improve the current blockchain" are similarly deficient, these efforts amount to nothing more than infrastructure-building activities that have been repeatedly rejected by courts. *See* Mot. at 32–33. *Davis* is instructive. There, the Court found that efforts to build infrastructure within a development of homes, including "roads and other improvements, [were] not the type of managerial services contemplated in Howey." *Davis*, 401 F. Supp. at 1050. This was because the promoters "did not promise to run the development and distribute profits to the plaintiff, as did the operators of the orange groves in Howey." *Id.* And, as with Kik, the Court noted that the promoters' "efforts, if any to enhance living conditions in the development" were not related to the purchasers' expectation, as any benefits to the purchasers were "purely incidental." *Id.*

Kik's efforts to develop elements of the Kin economy—including the blockchain and the rewards engine—are no different. When Kin was launched to the public, it was fully functional, and the blockchain was operational. Kik's continuing efforts to "improve" the blockchain, or create the infrastructure for the Kin Rewards Engine merely improved the space and bandwidth for participants in the Kin economy to build projects and generate demand for Kin. These are not efforts that yield a "profit" which Kik redistributes to Kin holders, and are therefore insufficient under *Howey*.

Similarly, Kik's "describ[ing] the backgrounds" of its executives and "declar[ing]" that it

has been a leading innovator in chat applications also do not constitute a promise to purchasers that they will profit.  SEC Mot. at 34.  The most that can be said is Kik touted its *ability to build a functional token*—something it had completed before the TDE even occurred.  None of the statements about building the technology for the token translate into an expectation that someone buying the token will profit from it.  Quite the opposite was true: Kik had no ability to control the use of the token.  Kik 56.1 ¶ 72.  Kik made clear that the code for Kin was publicly available and any developer could incorporate it into his or her app, and because it operated on the open source Ethereum blockchain, any Kin holder could freely transfer it on Ethereum or use it as a medium of exchange.  Kik 56.1 at ¶¶ 71–75.

For the reasons stated above, the SEC's claim that the TDE constituted an investment contract fails.

## II.    THE PRE-SALE COMPLIED WITH RULE 506(C) OF REGULATION D AND SECTION 4(A)(2) OF THE SECURITIES ACT.

The Court should deny summary judgment with respect to the Pre-sale because the undisputed facts show that the Pre-sale was exempt from the registration requirement.  Indeed, even if the SEC could somehow establish that there are no genuine issues of disputed fact that the TDE was an "investment contract," the $50 million of contractual rights sold in the Pre-sale is exempt from the registration requirements of the federal securities laws under Regulation D.[27] Although Kik ultimately has the burden of proving that it complied with the exemption, to survive the SEC's Motion, Kik must only demonstrate that there is a disputed issue of fact as to whether it complied with Regulation D.  *Pinnacle Comm'ns. Int'l, Inc. v. Am. Family Mortgage Corp.*, 417

---

[27] Kik structured the pre-sale as a Regulation D private placement because of the distinct terms of those transactions, including the sale to only accredited investors, discounted prices, the conditional right to receive Kin upon a network launch, the potential to lose one's contribution, and the receipt of 50 percent of one's Kin a year after Kin was launched.  Welsh Ex. E, Ex. F.

F. Supp. 2d 1073, 1086 (D. Minn. 2006) (denying summary judgment on section 5 claim where there was a disputed issue of fact as to whether the non-moving party sold to only accredited investors in accordance with Regulation D); *SEC v. Ishopnomarkup.com, Inc.*, 2007 WL 2782748 at \*9-10 (E.D.N.Y. Sept. 24, 2007) (denying summary judgment on section 5 claim where disputed issues of fact existed as to whether defendant complied with Regulation D).  Even a disputed question as to whether a seller made a "***good faith" effort*** to comply will preclude summary judgment against the seller, as Rule 508 permits "insignificant deviations" from Regulation D's requirements in such cases.  *See* 6 Cox, Hillman et al., Securities Regulation 21 (2009) ("Summary judgment . . . will not be granted on a Regulation D, § 5 claim where there is evidence that a securities offeror has made a good faith attempt to comply with its terms and may be entitled to an exemption under Rule 508 for an insignificant deviation from Regulation D's requirements made in good faith.").

As set forth in Kik's motion for summary judgment, the undisputed facts show that Kik complied with Rule 506(c) on face.  However, at an absolute minimum, there is a disputed issue of fact as to whether Kik complied with the Regulation D exemption, and the SEC's summary judgment motion should therefore be denied.

A.   **Kik's Pre-sale Complied with Regulation D, and Is Therefore Exempt from The Registration Requirements Set Forth in Section 5.**

Rule 506(c), promulgated under Section 4(a)(2) of the Act, provides for an exemption from registration for sales to accredited investors, even where there is "general solicitation," if the issuer takes "reasonable care" to ensure that participants are (1) accredited investors, (2) are not statutory underwriters, and then files a Form D with the SEC. 17 C.F.R. §§ 230.500(a); 230.506; 230.502.

The undisputed facts show that Kik complied with each these obligations.[28] The SEC does not dispute that Kik took "reasonable care" to ensure that the Pre-sale participants were "accredited investors." *See* Kik Br. at 38–39 (summarizing steps taken to ensure that each participant was accredited). Nor does it contest that Kik filed a Form D with the SEC. *Id*. at 40 (summarizing Form D).

Instead, the SEC argues that "Kik did not take any steps to assure SAFT participants were not underwriters." Mot. at 54. The SEC is wrong. The Securities Act defines an "underwriter" as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security . . . ." Section 2(a)(11). As detailed in Kik's Motion, Kik conducted the requisite inquiry into whether each purchaser was participating for himself or others, and provided unambiguous legends on all of the offering documents stating that the securities could not be resold. Kik Br. at 39–40. Here, the "security" that Pre-sale purchasers received was the contractual rights memorialized by the SAFTs. *See* Welsh Ex. F, at 8 (PPM) (describing the "security" being purchased as the *"[r]ight to purchase in the future certain units of Kin"* pursuant to the SAFT); *id.*, Ex. G (Form D, characterizing the security at issue as "the Sale and issuance of rights to receive Kin tokens in the future via a Simple Agreement for Future Tokens (SAFTs)." Pre-sale purchasers *were expressly prohibited from re-selling this security,* something

---

[28] In the alternative, Kik's Pre-sale was separately exempt pursuant to Section 4(a)(2) of the Securities Act, which exempts "'transactions by an issuer not involving any public offering.'" *SEC v. Ralston Purina Co.*, 346 U.S. 119, 120 (1953). This exemption applies where the investors in an offering are "shown to be able to fend for themselves in a transaction 'not involving any public offering.'" *Id.* at 125. All of the Pre-sale participants were sophisticated, wealthy investors—as the SEC's own Complaint admits at least nine times. *See* ECF No. 1 ¶ 12 ("Kik offered and sold tokens to professional investment funds and other select, wealthy investors using purchase agreements that Kik called . . . "SAFTs."); *id.* ¶ 195 ("Kik sold a portion of the one trillion tokens at a discount to investment funds and other wealthy investors pursuant to SAFTs"); *id.* ¶¶ 13, 56, 86, 87, 101, 157. In the SAFTs, participants also represented that they had "such knowledge and experience in financial and business matters that the Purchaser is capable of evaluating the merits and risks of such an investment, is able to incur a complete loss of such investment without impairing the Purchaser's financial condition and is able to bear the economic risk of such investment for an indefinite period of time."

the SEC does not contest.  *See* Welsh Ex. E at 1 (SAFT) (notifying participants that they were

"restricted" securities); *Id.*, Ex. F at 2 (PPM) (stating that the SAFTS are subject to restrictions on

transferability and resale and may not be transferred or resold.")

Instead, the SEC claims that Pre-sale purchasers could be "underwriter[s]" because Kik did

not "restrict the resale of ***Kin*** once delivered to those purchasers."  As an initial matter, Kin did

not even exist at the time that Pre-sale purchasers entered into the SAFTs, and Kik could not

impose restrictions on usage of an asset that would only exist *after* the agreement with purchasers

was already completed.  But more fundamentally, the statutory definition of underwriters require

that they sell a "***security***" to the public.[29]  Therefore, Pre-sale purchasers can only be deemed

"underwriters" if the SEC proves Kin in and of itself is a determined to be a "security."[30]  But as

the SEC's own Director of the Division of Corporation Finance has said (and then posted on the

SEC's website), "the token—or coin or whatever the digital information packet is called—***all by***

***itself is not a security***."  Adding to this confusion, the SEC does not otherwise claim that Kin, in

itself, is a "security."  Instead, the SEC goes to great lengths to argue that the sale of Kin is an

investment contract under *Howey*, not that the underlying token is in and of itself, a security.  The

SEC's inconsistent positions only highlights its lack of a credible basis to argue that Kik did not

comply with Regulation D.

---

[29] When the alleged security is an investment contract, this question is determined based on the facts and circumstance of the purported underwriter's sale ***to the public***.  *See, e.g.*, *De Wit v. Firstar Corp.*, 879 F. Supp. 947, 989 n. 29 (N.D. Iowa 1995).

[30] The SEC has not alleged that future sales of Kin from Pre-sale purchasers would be considered "investment contracts."  Nor can it.  As the SEC makes clear, determining whether an instrument is an "investment contract," is a facts and circumstances test, which must be applied at the time of each sale. This means that to establish the existence of an investment contract sold by Pre-sale purchasers, the SEC would have to conduct a separate *Howey* analysis at the time of each sale.  Not only does the SEC fail to present evidence of when any Pre-sale purchaser purportedly sold Kin, but it also failed to conduct a *Howey* analysis with respect to each such sale of Kin.

Regardless, even if the Pre-sale of Kin were sufficient, there is no evidence that Pre-sale purchasers were Kik's means of distributing Kin to the public. Not only were Pre-sale purchasers required to wait a full year after launch before receiving 50 percent of their Kin, Kik also separately sold Kin to 10,000 public purchasers. In fact, Pantera Capital, the largest Pre-sale purchaser, only sold 10% of its Kin within a year of its purchase of Kin.[31] These facts prove that Pre-sale participants were not underwriters for purposes of Regulation D, and therefore the SEC's Motion is without merit.

### B.      The Pre-Sale and TDE are Two Distinct Transactions, Not a Single Offering.

One theory asserted by the SEC is that the Pre-sale and TDE were a "single offering of one trillion tokens, which included both SAFT participants and non-accredited public investors. As an initial matter, there is no separate framework under which the SEC can simply claim two sales are "a single offering"—it must prove that the transactions can be formally integrated. Nor does *Howey* support such a conclusion: while it is common for courts applying *Howey* to consider multiple agreements governing the relationship between ***the same investors*** as part of a single scheme, this does not extend to ***separate*** offerings involving separate purchasers, consideration, terms, and offering materials. *See, e.g., Howey*, 328 U.S. at 297 (explaining that the issue was whether the "land sales contract, the warranty deed and the service contract" — all entered into by the same group of investors — "together constitute[d] an 'investment contract'"). To link separate offerings, formal integration is the only proper vehicle. *See, e.g., Ishopnomarkup.com, Inc.*, 2007

---

[31] For these reasons, among others, Kik's private offering is clearly distinguishable from that in *Telegram*, where ***there was no contemplated public sale*** and Pre-sale purchasers were incentivized to sell their tokens within "exclusive window[s]" at "an approximate 852% and 172% premium." *Telegram*, 2020 WL 1430035, at *12, 13. Kik, on the other hand, did not provide purchasers with windows in which to sell their tokens at a premium, and in fact did not even *receive* tokens until they were distributed to TDE purchasers.

WL 2782748, at *4 ("Pursuant to principle of integration, multiple transactions are examined to determine whether they should be treated as a single, unitary transaction.").

But even assuming such a theory existed, the glaring differences between the Pre-sale and TDE preclude a finding that they were a single offering:

- ***First***, the transactions were directed toward entirely different groups of purchasers: the Pre-sale involved fifty "investment funds and other wealthy investors," who all qualified as accredited investors, ECF No. 1 at ¶ 157, whereas the TDE was open to the public and was not restricted to accredited investors.  *Id.* at ¶ 174 ("In total, approximately 10,000 public investors sent 168,732 Ether (then worth about $49.2 million) to Kik."); *id.* ¶ 168 ("Kik did not undertake . . . to determine whether these public sale investors qualified as 'accredited investors.'").

- ***Second***, the parties underwent entirely different registration processes: Pre-sale participants participated in the private diligence process described above in order to comply with Regulation D.  TDE purchasers, on the other hand, registered on a website, Kin.kik.com, and participated in a KYC process (run by a different consultant) in which they submitted biographical information, such as social security or passport information. ECF No. 1 at ¶ 161, 166, 171.

- ***Third,*** the sales involved different operative contracts: the Pre-sale was conducted pursuant to SAFT agreements and PPMs, whereas the TDE was governed by the Terms of Use.  ECF No. 1 at ¶ 12, 90, 162 (TDE purchasers "were not provided the PPM that was provided to investors who purchased Kin via Kik's SAFTs"); Welsh Ex. A, Ex. E, Ex. F, and Ex. H; Landsvik Ex. BB ¶ 19 (Ramsey Decl.).

- ***Fourth,*** each set of purchasers received different assets: Pre-sale participants received conditional contractual rights to the future delivery of the Kin, and TDE purchasers merely received the currency Kin.  ECF No. 1, at ¶ 158; Welsh Ex. E; Ex. F; Ex. G; Ex. H.

- ***Fifth***, Pre-sale participants "paid only 70 percent of the maximum price at which the Kin would be sold during the public sale."  ECF No. 1, at ¶ 87 ¶ 90 (referring to TDE as "undiscounted"); Welsh Ex. F at 9; Ex. A at ¶ 40.

- ***Sixth***, Pre-sale participants were entitled to receive Kin (upon the occurrence of all of the preconditions) pursuant to a schedule: half at the time that it delivered tokens to the general public and half on the one-year anniversary of the first delivery, whereas TDE purchasers received all of the Kin they purchased immediately.  ECF No. 1, at ¶ 12; Welsh Ex. F at 9; Ex. A at ¶ 39.

- ***Seventh***, Pre-sale purchasers were subject to provisions restricting the transferability of the contractual rights received, whereas TDE purchasers received full control over their Kin tokens immediately.  Welsh Ex. F at 2.

- **Eighth,** Pre-sale participants assumed the risk of losing 30% of their investment if Kin were never launched at all, whereas TDE purchasers assumed no risk whatsoever. They were unconditionally entitled to the Kin they purchased. ECF No. 1, at ¶ 87; Welsh Ex. A at ¶ 38; *see also* Welsh Ex. E, Ex. F.

- **Ninth**, Kik received different consideration between the two offerings: U.S. Dollars in the Pre-sale, and Ether in the TDE. ECF No. 1 at ¶¶ 12, 13; Welsh Ex. A, at ¶ 48, 71.

- **Finally**, the two sales did not overlap temporally: the Pre-sale was conducted between July 3, 2017 and September 11, 2017 (ECF No. 1 at ¶¶ 157, 158), whereas sales of Kin in the TDE "commence[d] on September 12, 2017, at 9:00 am Eastern Time." *Id.* at ¶ 161.

The SEC's arguments to the contrary ignore these realities, and are therefore without merit. For example, the SEC claims that these transactions were a "single offering . . . because that is what it told investors." SEC Mot. at 37, 38. To get there, the SEC cherry-picks various isolated references to one "token sale," while intentionally ignoring the more predominant references to the separate sales. *Id.* at 39. However, a few informal, media-facing references cannot negate the distinct nature of the two sales as outlined above—and as the SEC has pointed out, "the emphasis should be on economic realities underlying a transaction," rather than the verbiage used in media outlets. *Forman*, 421 U.S. at 849. And in any event, Kik did publicly describe the transactions as separate. In fact, **before the TDE took place**, Kik announced that it had "closed a presale round of US $50 million to select accredited investors[.]" SEC67 at 1. News outlets also reported that Kik "raised $50 million from the private sale" and that Kik would "follow the pre-sale with a public 'token distribution event.'" Landsvik Ex. GG. And, Kik's Form D, filed with the SEC to memorialize the Regulation D exemption for the Pre-sale, makes clear that the "[s]ale of rights to receive Kin tokens in the future via a [SAFT agreement]" was separate and distinct from Kik's sale of Kin to the public. Welsh Ex. G at KIK000076.

The SEC also claims, without authority, that "Kik used the same marketing and logistics for the two stages of the offering." SEC Mot. at 40. But this is indisputably false. The SEC

concedes that the Private Placement Memorandum circulated to all Pre-sale participants was not circulated to TDE participants.  Welsh Ex. A at ¶ 66; ECF No. 1 at ¶ 90.  Nor does the SEC dispute that Kik "met privately with the SAFT participants" through connections in the blockchain industry, whereas Kik did not engage in similar negotiations with TDE participants.  SEC Mot. at 40; Welsh Ex. A at ¶ 33.  The fact that some Pre-sale participants and TDE purchasers could have seen the same public marketing materials for Kin tokens and the Kin economy is not alone a basis to disregard the economic realities of the two distinct transactions.  In fact, any time the same company is involved in two separate transactions, there will be marketing materials pertaining to the company and/or a given product that are seen by participants in both.

Finally, the SEC contends that "Kik ran a single offering, because the delivery of Kin to SAFT participants and the price at which the participants bought the Kin were both conditioned on the public phase of the offering."  Mot. at 41.  This too is not accurate.  As evidenced by the contract governing the Pre-sale, the delivery of Kin to the Pre-sale participants was conditioned on a "Network Launch," which was defined as "a *bona fide* transaction or series of transactions, pursuant to which the Company will sell Kin to the general public in a publicized product launch of Kin ***through the instantiation of Kin via deployment on the Ethereum Blockchain***."  Welsh Ex. A, Philp Decl., at ¶¶ 37–38; Ex. E at 2; Ex. F at 9 (emphasis added).  In any event, even if the Pre-sale had been conditioned on the TDE, one sale conditioned on another does not mean that the two sales are a "single offering."  *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1140 (7th Cir. 1992).

The Court's recent decision in *Telegram* also does not support a finding that the transactions were a single offering.  In *Telegram*, unlike the present case, the Court did not evaluate separate private and public sales by the issuer to determine whether they constituted an integrated

offering.  Indeed, Telegram did not conduct an offering of the tokens to the public, as Kik did, nor did it have a comparable agreement like the Terms of Use which governed the terms of that public sale.  Instead, Telegram held a private sale of 2.9 billion tokens to a select number of sophisticated investors who declared that they intended to distribute the tokens to the public through the secondary market.  *Telegram*, 2020 WL 1430035, at *1.  In granting the motion for preliminary injunction, the Court determined that the single sale of tokens to these 175 wealthy investors (and no public sale) amounted to a "'disguised public distribution'" because Telegram's stated goals required the sophisticated purchasers to resell their tokens to public and Telegram had incentivized these purchasers to resell their tokens within a certain time period.  *Id*. at *19.  As such, the Court held that the private purchasers met the statutory definition of underwriters because they acted as "conduits" to the sale to the general public.  *Id*. at *20.  Here, in contrast, Pre-sale purchasers were not a necessary conduit to the sale of Kin to the public, and Kik took steps (as required by Regulation D) to ensure that they were *not* acting as underwriters.  *See, infra,* Section II.A.  And unlike *Telegram*, Kik sold Kin to 10,000 purchasers directly (rather than relying on distribution through resale).  And rather than providing Pre-sale purchasers an "exclusive window" to resell their tokens to the public (thus incentivizing immediate resale), Pre-sale purchasers did not even receive their full allotment of Kin until long *after* the TDE.[32]  Further, the record establishes through hindsight that Pre-sale purchasers actually did *not* act as a means of public distribution: for example, Pantera Capital, the largest Pre-sale participant, *only sold 10 percent of its Kin* within a year of entering into a SAFT with Kik.

For these reasons, the Pre-sale and the TDE are not a "single offering," and the Pre-sale and TDE should be evaluated as separate transactions for purposes of the SEC's section 5 claim.

---

[32] Pre-sale purchasers did not receive 50% of their Kin until a year after the TDE.

### C.     The Pre-sale and TDE Were Not "Integrated" Offerings.

Recognizing that its "single offering" theory is meritless, the SEC alleges "in the alternative," that the TDE and the Pre-sale were "integrated" offerings.  Integrated securities offerings must aggregately comply with an applicable exemption, such as Regulation D, or otherwise be registered with the SEC.  As such, to destroy Kik's otherwise valid Regulation D exemption, the SEC is claiming that the TDE should be tacked on to Kik's Pre-sale.  *See*, *infra*, at 13–14.  But this theory similarly fails.  To determine whether two offerings must be integrated, courts apply the five factors outlined by the SEC and adopted in 17 C.F.R. § 230.502(a), as well as by the Second Circuit: "'(a) [w]hether the sales are part of a single plan of financing; (b) [w]hether the sales involve issuance of the same class of securities; (c) [w]hether the sales have been made at or about the same time; (d) [w]hether the same type of consideration is being received; and (e) [w]hether the sales are made for the same general purpose.'"  *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 364 (S.D.N.Y. 1998).  Courts have found that the absence of even one factor is sufficient to preclude integration.  *See Goodwin Properties, LLC v. Acadia Group, Inc.*, 2001 WL 800064, at *9 (D. Me. 2001) (requiring proof of all five factors).  This "inquiry is made from the perspective of the issuer of the securities."  *Mattera*, 2013 WL 6485949, at * 13; *Cavanagh*, 1 F. Supp. 2d at 365–66 (finding that two events were "integrated in the minds of their architects").

The SEC's integration argument rests almost entirely on *Argentinian Recovery Co. LLC v. Board of Directors of Multicanal S.A.*, in which the SEC claims the "court emphasized that the later offering 'necessarily followed, and was dependent on,' the earlier offering."  331 B.R. 537, 548 (S.D.N.Y. 2005); SEC Mot. at 45.  But this reference was made in the context of ***only one factor*** (timing of the two sales), which the Court acknowledged was "perhaps the least significant of all five factors."  *Argentinian Recovery Co. LLC v. Board of Directors of Multicanal S.A.*, 331 B.R. 537, 548 (S.D.N.Y. 2005).  And there, ***all of the other factors*** weighed "clearly" in favor

of integration: the two sales at issue involved the exact same class of securities, the exact same consideration, and there was no dispute that the two sales were to finance the same exact debt restructuring. *Id*. at 547–48. Here, not only does Kik contest each and every factor, but in fact the undisputed evidence cuts against integration for each.

### 1.    The TDE and Pre-sale Were Not Part of A Single Plan of Financing.

The SEC argues that this factor cuts in its favor because, "[a]s planned, Kik offered and sold one trillion Kin and raised a total of $100 million, and, in so doing, repeatedly told Kin buyers it was one 'sale' and that Kik raised one 'total.'" Mot. at 45. The SEC is wrong. As discussed above, in Section II.B., the TDE and the Pre-sale were separate and distinct sales, which represent two very different stages of Kik's business, and as such did not represent a single plan of financing. A "plan of financing tends to refer to factors such as the method of offering the security, the timing of plans for raising capital, and whether the offerings are financially interdependent." 1 Louis Loss, *et al*., *Fundamentals of Securities Regulation* 3.C.1 (7th Ed. 2020) at 1.

The SEC has routinely found that this factor precludes integration when one offering is conducted for short-term capital and the other for long-term purposes (such as widespread distribution of an asset or good), even when the two offerings are conducted simultaneously. *E.g.*, *DeLorean Motor Co.*, SEC No-Action Letter, 1977 WL 11174, at *1–2 (Sept. 15, 1977) (stating that a public offering of common stock for the purpose of "establish[ing] a network of dealers" was not integrated with a simultaneous private offering for the purpose of "obtain[ing] additional short-term working capital"); *see also Agri-Quip*, 1974 WL 9638, at *1 (Sept. 20, 1974) (finding no integration where one offering was for the purpose of "increas[ing] working capital and reduction of preset outstanding loans," and the other for "new plant facilities."); *Citicorp.*, SEC No-Action Letter, 76-77 CCH Dec., FSLR ¶ 80,778, at 3 (Aug. 20, 1976) (finding no integration, in part, because one instrument was "sold to finance current transactions and provide a short term

source of cash," and the other was "sold to finance other activities of Citicorp's subsidiaries and with maturities of up to five years."). In *Agri-Quip*, the SEC also found it relevant that the offerings were directed at different markets: "the market is not the same since the bonds are aimed at the tax exempt market, whereas the Reg. A offering involves stock to be sold to the general public." *Agri-Quip*, 1974 WL 9638, at *1.

     Here, Pre-sale and TDE were directed towards different audiences and with different goals. The Pre-sale was conducted first, for the explicit purpose of raising short-term capital to fund Kik's development of the infrastructure necessary to launch Kin tokens on the blockchain and integrate them within Kik Messenger. *See* Welsh Ex. E ("[A] significant portion of the amount raised under the SAFTs will be used to fund the Company's build-out of a semi-centralized blockchain-based computer network (the "***Kin Ecosystem***")); Ex. F ("A significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to build-out a semi-centralized blockchain-based computer network."). After receiving the funds from the Pre-sale, Kik had more than sufficient runway to extend its business operations through at least January 2019. The TDE, on the other hand, was directed at members of the public as a sale of a good, with the purpose of creating a "network" of Kin users. *DeLorean Motor Co.*, 1977 WL 11174, at *1–2; Welsh Ex. A ¶ 68. As in *DeLorean*, *Citicorp*, and *Agri-Quip*, the Pre-sale was conducted for short-term capital, and the TDE was conducted to launch an economy of users. Thus, they were not part of a single plan of financing.

### 2.     The Pre-sale and TDE Were Done for Different Purposes.

     This factor is commonly analyzed in connection with the "single plan of financing," and in fact, "[s]everal cases and no-action letters have suggested that offerings are not part of a single plan of financing when offerings are made for different purposes." Wade, *The Integration of Securities Offerings,* 25 Loy. U. Chi. L.J. 199 at 213 (1994); *see also Pacific Physician Servs.,*

*Inc.*, SEC No-Action Letter, 1985 WL 55629, at *3 (July 22, 1985) (determining that two offerings to two distinct groups, the public and numerous employees, were "not intended for the same purpose and [were] not part of a single plan of financing").  As discussed above, Kik's Pre-sale was conducted for the purpose of funding the development and launch of Kin.  Kik did not make any efforts to identify Pre-sale participants who would be "users" of Kin tokens, but rather targeted a small number of wealthy accredited investors, who were understood to be seeking a profit.  *See, e.g.*, SAFT Agreements at 4 ("The Purchaser enters into this SAFT with the expectation that he, she or it, as the case may be, will profit upon the successful development and Network Launch arising from the efforts of Kik and its employees to develop and market the Kin Ecosystem and the Token Sale.").  The TDE, on the other hand, was not even a "financing" effort, nor was its primary purpose to finance the development of Kin.  Rather, as discussed above, Kik's primary goal in the TDE was to achieve a broad distribution of Kin tokens to as many registered individuals as possible—ultimately, over 10,000—understanding that this wide distribution to users was imperative for the Kin economy to succeed.  *See*, *supra*, at 6-7.  And as discussed above, because the driving motivation for the TDE was ensuring participation and generating revenue, rather than fund-raising, Kik structured the TDE intentionally to ensure a wide distribution of Kin among users wishing to participate.  These facts establish that these two offerings were not conducted for the same purpose.

### 3. The Pre-sale and TDE Did Not Involve the Same "Class" of "Securities."

Even if the Court were to find that Kik's sale of Kin tokens in the TDE constituted an offering of securities, it would defy logic to find that the Pre-sale and the TDE involved the same "class" of securities.  Even "slight differences between two securities have nonetheless been held to justify non-integration."  Loss, *et al.*, *Fundamentals of Securities Regulation*, at 2.  For example,

in *SEC v. Dunfee*, the court refused to integrate percent notes payable in 20 monthly installments with 7 percent notes issued 8 months later and payable in 36 months, finding that the securities were sufficiently differentiated.  1966 U.S. Dist. LEXIS 10105, at *2–4 (W.D. Mo. Dec. 8, 1966); *cf. SEC v. Mapp*, 2017 WL 5177960, at *8 (E.D. Tex. Nov. 8, 2017) ("The sales of Servergy's securities were of the same class because they were all issued as common stock.").  The SEC has repeatedly also found that integration was improper because there were differences in the assets being received.  *See Agri-Quip*, SEC No-Action Letter, 1974 WL 9638, at *1 (Sept. 20, 1974) (finding no integration because "industrial revenue bonds" and common stock involved "entirely different classes of securities, one equity and one debt"); *Citicorp*, SEC No-action Letter, 76-77 CCH Dec., FSLR ¶80,778, at 2 (Aug. 20, 1976) (finding that two securities were different classes because they had "completely distinctive maturity dates," and because one was a "short term, cash equivalent investment with an emphasis on liquidity" while the other would be "purchased for long term investment by institutional lenders for their loan portfolios."). The SEC has also found this factor to cut against integration where the investors in each offering incurred different risks of loss with respect to their investment, or where the offerings are directed at different groups of investors.  *See Stratford Employees Cattle Program, Ltd.*, S.E.C. No-Action Letter (1973-1974 Transfer Binder), (CCH Dec., FSLR) ¶ 79, 761 (March 8, 1974) (finding two classes of securities where one group risked "los[ing] all or a large part of his equity" and the other did not, and where securities were sold to different investors).

In addressing this factor, the SEC does not even claim that Kik failed to create different classes of *securities*—its sole argument is that "Kik did not create different classes of Kin (second factor)." Mot. at 47.  But this is sheer misdirection by the SEC.  The relevant inquiry is whether the seller created separate classes of **securities** (17 C.F.R. § 230.502(a)), and as discussed above,

the SEC does not even claim that Kin in and of itself is a security, nor does it disown the statements of Director Hinman stating that "the token—or coin or whatever the digital information packet is called—all by itself *is not a security*, just as the orange groves in *Howey* were not."  Landsvik Ex. HH (emphasis added).  Therefore, the SEC's argument fails.  The undisputed facts show that the assets received in each offering were entirely different.  The "security" sold in the Pre-sale consisted of the SAFT itself, and the rights encompassed therein.  SEC52.  In contrast, TDE participants did not purchase any of the contractual rights encompassed by the SAFT.  They simply bought Kin tokens—a currency.  This would be true even if the SEC were to succeed in showing that the TDE gave rise to an "investment contract":  Even in that case, the "investment contract" encompassed by the SAFT would be different than whatever "investment contract" allegedly arose from the TDE.  Thus, this factor weighs heavily against integration.

### 4.    Kik Accepted Different Consideration in the Pre-sale and TDE.

The fourth factor also cuts decisively against integration, as the undisputed facts show that Kik accepted entirely different forms of consideration in the two sales.  Courts have found the absence of this factor alone to be sufficient to warrant dismissal.  *Goodwin Properties* is instructive.  There, the Court reviewed the near-identical question of whether two offerings were integrated, and, "if so, whether the result of that integration is that exemption from registration pursuant to Regulation D was unavailable."  *Goodwin Properties*, 2001 WL 800064 at *8.  Despite the fact that many of the other factors favored integration, the court ultimately found that the offerings were not integrated *solely because the seller received two different forms of consideration in the two offerings*.  *Id.* at *9 (noting that the complaint could "only be read to allege that stock and assets . . . were received as consideration for the first sale and cash and loan forgiveness was received for the second sale").  Here, the Complaint concedes that this factor has

not been met: it is undisputed that Kik accepted Ether in exchange for Kin in the TDE, and U.S.

dollars in exchange for the SAFT rights in the Pre-sale.  *See* ECF No. 1 at ¶¶ 12, 13.

On this factor, the SEC does not even dispute that the Pre-sale and TDE required different

consideration.  Instead, it contends that "all of Kik's sales of Kin were for U.S. dollars or assets

that were immediately convertible to U.S. dollars."  Mot. 47.  In other words, Ether and U.S.

dollars are one and the same because Kik could hypothetically *sell* Ether, a digital currency,

for U.S. dollars.  Unsurprisingly, the SEC provides no authority for this argument, which would

effectively eliminate this factor altogether.  Indeed, this position would lead to the absurd result

that *all payments of any kind* that could be sold for U.S. dollars (including nearly anything in the

world: commodities, gold, silver, promissory notes, public company stock, etc.) are the "same

consideration" as U.S. dollars.  This cannot be so.  Thus, this factor also precludes integration.

### 5.    Because the Pre-sale and TDE Did Not Overlap, Timing Also Cuts Against Integration.

The timing of the Pre-sale and TDE also cuts against integration.  While "[t]he timing of

the offerings . . . is perhaps the least significant of all five factors," the Complaint concedes that

the TDE did not commence until after the Pre-sale completed.  Wade, *The Integration of Securities*

*Offerings,* 25 Loy. U. Chi. L.J. 199 at 220 (1994).  Kik began the Pre-sale officially on July 3,

2017, when it entered into the first SAFT, and it officially marked the end of its Pre-sale by filing

its Form D with the SEC on September 11, 2017.  Kik's TDE did not begin until September 12,

2017—a day later—meaning the sales did not overlap.  At worst, this factor is neutral, and does

not affect the analysis.  *See, e.g.*, *Donohoe*, 982 F.2d at 1140 (finding that timing factor was "fairly

neutral" where "the offerings were clearly not made at the same time, but they were still

moderately close together").  Moreover, as discussed above, the SEC itself found that integration

was not even warranted in cases where two sales were conducted simultaneously.  *See, e.g.*, *DeLorean Motor Co.*, SEC No-Action Letter, 1977 WL 11174, at *1–2.

Based on a review of the objective evidence, each of the five factors cuts harshly against integration.  And when analyzed as a distinct offering of securities, there is no meaningful dispute that Kik complied with all of the requirements of Regulation D under Rule 506(c).  As a result, the SEC cannot establish that with respect to its Pre-sale, Kik failed to comply with Regulation D for purposes of summary judgment.

## III.   THERE ARE DISPUTED MATERIAL FACTS ABOUT WHETHER THE TERM "INVESTMENT CONTRACT" IS VAGUE AS APPLIED TO KIN TRANSACTIONS.

A law may be unconstitutionally vague for either of two reasons: first, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, or second, if it lacks clear standards such that it authorizes or encourages arbitrary and discriminatory enforcement.  *See Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018).  The vagueness doctrine addresses two primary due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253.

As-applied vagueness challenges require a fact-specific analysis that courts routinely find cannot be determined at summary judgment.[33]  *See, e.g.*, *Hayes v. New York Attorney Grievance Comm.*, 672 F.3d 158, 161 (2d Cir. 2012) (noting district court's denial of summary judgment on vagueness claim to resolve issues of fact); *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir.

---

[33] Kik has asserted a challenge only that the law is void *as-applied* to the specific circumstances in this case. *See* ECF No. 34 at 4.  This is distinguished from a facial challenge that a law is unconstitutionally vague in all situations.  *See United States v. Coonan*, 938 F.2d 1553, 1562 (2d Cir. 1991) (distinguishing as-applied from facial vagueness challenges).

2003) (noting that as-applied challenges are determined "'in light of the specific facts of the case at hand'"); *United States v. Smith*, 985 F. Supp. 2d 547, 606, n.20–21 (S.D.N.Y. 2014) (declining to dismiss indictment and noting that whether defendant had constitutionally fair notice was a factual question for a jury to decide); *see also Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619, 639 (S.D.N.Y. 1989) (denying motions for summary judgment on facial vagueness claim because a "fuller presentation and analysis" of the documents was needed at trial). When there are factual issues relating to the underlying conduct that the district court cannot rule on at summary judgment, the court must also defer ruling on the affirmative defense until trial. *See United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016).

The SEC's Motion with respect to Kik's affirmative defense fails for several reasons. First, this Court must consider the actual facts and circumstances of Kik's TDE, and thus prior courts' application of the term "investment contracts" to other financial instruments or transactions does not resolve whether the law was unconstitutionally vague *as applied to Kik*. Second, there are disputed, material facts about whether Kik could know that its sale of Kin would constitute an investment contract. And third, this Court must consider the SEC's actual pattern of enforcement (or lack thereof) in determining whether the law authorizes or encourages arbitrary enforcement. Where, as here, the SEC's own Commissioner has criticized its own regulatory framework as being "a regulatory version of an escape room" and has ***directly disagreed with many positions being taken by the enforcement division in this very case***, it cannot possibly be said that there is no disputed fact as to whether the law is vague as applied to Kik. Landsvik Ex. SS.[34]

---

[34] In addition to the factual disputes discussed herein, Kik believes there are many additional facts that, if it had the opportunity, it would use to defend itself in opposing the SEC's Motion. A party opposing summary judgment must have "the opportunity to discover information that is essential to his opposition." *Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995). The Second Circuit has routinely held that summary judgment is not appropriate where the non-movant has been unable to obtain such discovery. *See Hellstron v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 98 (2d Cir. 1996); *Sutera*, 73

A.      **Other Courts' Application of the Term "Investment Contract" to Other Instruments or Transactions Is Irrelevant to Whether the Term Is Vague *As Applied* to Kik.**

When a party raises a defense that a law is vague *as applied*, the proper inquiry is whether the law "failed to provide *them* with notice" that their conduct was prohibited, or whether the law failed to sufficiently limit the discretion of the enforcing agency.  *Dickerson v. Napolitano*, 604 F.3d 732, 745 (2d Cir. 2010) (italics in original).  Courts considering as-applied challenges must analyze the litigant's actual conduct at issue.  *See VIP of Berlin, LLC v. Town of Berlin*, 493 F.3d 179, 189 (2d Cir. 2010).  By asserting that "no federal court has ever accepted Kik's argument," the SEC overlooks this critical requirement.  *See* SEC Mot. at 58.  The fact that other courts have rejected as-applied vagueness challenges in the context of other types of financial instruments or transactions does not address whether the law—including the *specific* guidance provided by the SEC regarding sales of digital tokens—provided *Kik* with notice that its specific conduct (launching a decentralized token for consumptive use) was prohibited.

---

F.3d at 18.  Courts may defer or deny summary judgment if the non-moving party shows that it "cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  Although many cases involving requests to defer summary judgment based on Rule 56(d) involve "premature" summary-judgment motions before the close if discovery, the rule is not so limited.  *See In re Dana Corp.*, 574 F.3d 129, 148-49 (2d Cir. 2009 (finding bankruptcy court abused its discretion in granting summary judgment over request for additional discovery even after bankruptcy court had "rejected" non-movant's request to compel discovery); *Resolution Tr. Corp. v. North Bridge Assocs. Inc.*, 22 F.3d 1198, 1208–09 (1st Cir. 1994) (finding abuse of discretion where district court granted summary judgment and denied motion to compel where "facts needed to oppose summary judgment" were in moving party's exclusive control and where "the government went too far, frustrating appellants' legitimate discovery initiatives by playing keepaway.").  Here, at every turn, the SEC refused to comply with Kik's requests for discovery regarding its affirmative defense, claiming that it was irrelevant.  *See* ECF No. 34-4 at 10–13, 17, 19–20, 21, 23–24.  Now, with discovery safely closed, the SEC seeks summary judgment against Kik on this issue and also attempts to use against Kik facts that were the subject of Kik's discovery requests.  *See* SEC 56.1 Nos. 10–13, 17, 19-20, 21, 23–24.  As set forth more fully in the Declaration of Luke Cadigan, by virtue of the SEC's refusal to produce documents going to the heart of Kik's affirmative defense, Kik has been prevented from obtaining critical information to assist it in opposing the SEC's motion on this issue, namely information as whether the SEC was arbitrarily interpreting, applying, and enforcing the securities laws to cryptocurrencies and Kin and why it did not take further steps to clarify the standard. *See, e.g.*, Landsvik Ex. ¶¶ 216, 218, 230.

The SEC's reliance on three cases from the 1970s rejecting—without any analysis—vagueness challenges to the terms "investment contract" and "security" are unpersuasive. For example, the SEC heavily relies on *SEC v. Brigadoon Scotch Distributing Co.*, in which the Second Circuit rejected the appellants' argument that the term "investment contract" was void for vagueness *in a single sentence in a footnote*, without even acknowledging whether the appellants raised an as-applied or facial challenge. 480 F.2d 1047, 1052 n.6 (2d Cir. 1973) (cited in SEC at Mot. at 58). The remaining two cases, *Glen-Arden* and *Farris*, merely reiterate that *Brigadoon* found a vagueness argument "untenable," without further analysis. *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1029 (2d Cir. 1974); *United States v. Farris*, 614 F.2d 634, 642 (9th Cir. 1979). None of these cases support rejecting Kik's defense.

The two more recent cases cited by the SEC are similarly inapposite, and in fact show that this question requires a fact-specific inquiry at trial. First, the SEC's reliance on *United States v. Bowdoin* is misplaced—if not misleading—because there the court considered and rejected only a *facial* challenge to the term "investment contract," which Kik is not making here. 770 F. Supp. 2d 142, 148 (D.D.C. 2011) (defendant's "attack on the facial vagueness of the term 'investment contract' as a type of security … is without merit"). Second, in *Zaslavskiy*, (the only case involving the sale of digital assets), the court rejected a vagueness challenge in a motion to dismiss an indictment, recognizing that the defense involved a fact-specific inquiry and noting that it was insufficient to warrant dismissal "***at this juncture***" because "[w]hether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry." 2018 WL 4346339, at *4, *9 (E.D.N.Y. Sept. 11, 2018) (emphasis added). Additionally, *Zaslavskiy* involved charges of securities fraud, and the defendant argued that the Exchange Act and Rule 10b-5 were unconstitutionally vague. *Id.* When deciding whether the defendant would have sufficient notice

that his conduct was prohibited, the court concluded that, "*combined*, the Exchange Act, Rule 10b-5, and the definition of 'investment contract' set forth in *Howey*, made it reasonably clear at the relevant time that the charged conduct was criminal." *Id.* at *8 (internal quotations and citations omitted) (emphasis added).  Courts are also far less likely to find a statute constitutionally vague when applying a statute that "contains a scienter requirement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *United States v. DeStafano*, 429 F.2d 344, 347 (2d Cir. 1970) (noting that scienter "relieve[s] the statute of the objection that it punishes without warning an offense of which the accused was unaware.").  As the SEC's claims here do not require a showing of scienter, *Zaslavskiy* also does not support a conclusion that Kik's void for vagueness defense must fail.

### B.     The SEC Has Not Shown That Kik Had Constitutionally Fair Notice That the TDE Would Constitute an Investment Contract.

It is a fundamental principle in our legal system that laws must give the people or entities they regulate fair notice of what conduct is forbidden or required.  *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  Due process requires that people of ordinary intelligence have a reasonable opportunity to understand what conduct a law prohibits.  *See Perez v. Hoblock*, 368 F.3d 166, 175-76 (2d Cir. 2004); *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1999).  In determining whether a person has this reasonable notice, courts consider the specific context in which the regulation is enforced.  *See Perez*, 368 F.3d at 175-76.  Where, as here, a regulator's enforcement policies are at issue, courts will conduct a fact-specific inquiry as to those policies, including whether the policy has been communicated to the public, uncertainty in an agency's interpretation of a rule, and an agency's awareness of other firms' violations of the rule.  *See Upton*, 75 F.3d at 98.  Courts will also consider whether the regulator has taken inconsistent positions, internally and externally.  *Gay Men's Health Crisis*, 733 F. Supp. at 637, 641 (finding vagueness where there was confusion within the enforcing agency "as to the proper interpretation of a regulation").

Moreover, where there is "substantial uncertainty in the Commission's interpretation" of a rule, courts have found that defendants did not receive reasonable notice. *Id.*

For example, in *Upton* the Second Circuit considered whether a defendant had constitutionally sufficient notice that his conduct would violate an SEC rule. *Id.* The court concluded that it could not "defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation." *Id.* The court reasoned that because the SEC had been aware other firms were evading the substantive of the rule for two years, yet issued only "one consent order carrying little, if any, precedential weight," and took no other steps "to advise the public that it believed the practice was questionable," there was "substantial uncertainty in the Commission's interpretation." *Id.* (internal quotations omitted).

C.     **Prior to the TDE, There Was No Guidance Suggesting That Cryptocurrencies Like Kin Would Be Considered Securities.**

At the time Kik announced the Kin project in May of 2017, neither the SEC nor any court had deemed the offer or sale of *any* cryptocurrency to be an "investment contract" under the federal securities laws, despite the SEC's awareness of at least two cryptocurrencies, Bitcoin and Ether, which had already existed for years.  SEC Mot. at 28 n.13.  The SEC opted to forego the formal rulemaking process to set forth clear standards or rules for what type of conduct it regulates, instead choosing to regulate by enforcement—for example by bringing the present action against Kik. Valerie Szczepanik, a "high-ranking official in the SEC's Division of Corporate Finance," ECF No. 27 at 3, publicly acknowledged that the agency's delay in providing prospective guidance in this area was intentional, meant to prevent token sellers from creating a "road map to get around it."  Landsvik Ex. LL at 2.  In other words, meant to prevent sellers from having the tools to apply and comply with the law.

This regulation-by-enforcement approach leaves the industry to extrapolate from a handful

of enforcement actions and contradictory statements from SEC officials what conduct it actually regulates.  This is precisely the case with the DAO Report.  The DAO Report, which the SEC issued two months *after* Kik announced its plan to sell Kin (and two months after it started selling SAFTs), also did not provide constitutionally sufficient notice that Kik's conduct would be prohibited.[35]  Contrary to what the SEC asserts, the DAO Report actually stood for the unremarkable proposition that an arrangement involving cryptocurrency, which bears all of the hallmarks of a security, could constitute an investment contract.  But the Report itself expressly acknowledged that "whether or not a ***particular transaction*** involves the offer and sale of a security . . . ***will depend on the facts and circumstances***[.]"  SEC88 at 7–18 (emphasis added).  In the DAO Report, investors received DAO tokens in exchange for investing funds which were pooled and used by the DAO to fund projects.  *Id.* at 12.  DAO holders shared an ongoing interest in these pooled funds because the profits from the funded projects were distributed to token holders on a pro rata basis.  *Id.*  They also entitled participants to vote and receive "rewards," which the cofounder expressly compared to "buying shares in a company" and "dividends."  *Id.* at 4.  Significantly, there was nothing in the DAO Report that suggested the SEC's regulatory scheme could be applied to a token that was sold *for consumptive use*, like Kin.  For these reasons, the DAO Report actually had the effect of encouraging Kik that the securities laws would *not* apply to its sale of Kin, because of the significant differences between the DAO Report and Kik's vision for Kin.

By the time that Kik distributed tokens in the TDE on September 27, 2017, hundreds (if not thousands) of different tokens had been distributed to the public and ***not one issuer filed a***

---

[35] Notably, when Kik requested documents and communications from the SEC concerning the DAO Report, the SEC refused to produce them on grounds that those documents were "not relevant to any party's claim or defense."  *See* ECF No. 34-3 at 18, Response to Request No. 12.  And yet, the SEC now claims that the DAO Report provided Kik the requisite notice that Kin transactions would be subject to securities laws.

*registration statement with the SEC*, demonstrating that no issuer believed that its token sale was a "security" under existing law.  The SEC's own brief cites a study consisting of "4,003 executed and planned ICOs—nearly all from January 2017 until the completion of the study in May 2018" which, it now claims, all saw meteoric rises in value after being listed on secondary exchanges. SEC Mot. at 28.  Despite now citing these statistics as some sort of evidence that it was well known "ICOs" would spike in value, *id.*, the SEC announced only *one single instance* where it believed one of these sales bore the markings of a security by the time Kik's TDE took place.  SEC88.

D. **The SEC's Approach to Regulating Cryptocurrencies After the TDE Was Contradictory and Ever-Changing.**

In the months after Kik sold Kin, the SEC's conduct continued to muddy the waters about whether the sale of cryptocurrency was subject to the Securities Act.  The SEC vacillated between various positions on whether the securities laws apply to cryptocurrencies, with officials at one point stating, "there are cryptocurrencies that do not appear to be securities," followed by "I believe every ICO I've seen is a security," to even suggesting that a token can evolve from being a security to later not being a security.  Landsvik Ex. HH; ECF No. 22 ¶¶ 123–125.  Director Hinman has acknowledged the multiple positions and has stated that even if a cryptocurrency itself is not a security, it can still be offered as a security depending "how it is being sold and the reasonable expectations of purchasers."  Landsvik Ex. HH.  The SEC has also wavered (and continues to do so in this very case) as to whether the *token* itself is a security, or whether the transaction as a whole is the security, leaving a great deal of uncertainty.[36]  Despite numerous calls to engage in

---

[36] Commissioner Peirce acknowledged this very issue, explaining that "some commentators have pointed out that we have elided the distinction between the token and the investment contract.  The 'contract, transaction or scheme' by which the token is sold may constitute an investment contract; but, the object of the investment contract—the token—may not bear the hallmarks of a security.  Conflating the two concepts has limited secondary trading and has had disastrous consequences for the ability of token networks to become functional."  Landsvik Ex. OO at 1.

rule-making (with the opportunity for public comment) in this area or to provide clear guidance, the SEC has declined to do so.  Nor has the SEC issued any no-action letters providing any helpful guidance.[37]

There is no question that these positions created uncertainty about law's application.  And in fact, several members of Congress wrote to Chairman Clayton explicitly asking the SEC to "clarify the criteria used to determine when offers and sales of digital tokens should properly be considered 'investment contracts'" because the standard was unclear.  Landsvik Ex. JJ at 2.  And in 2019, almost two years after Kik announced its sale of Kin, one of the SEC Commissioners acknowledged that the Commission has *still* not "provide[d] the public with clear guidance as to how people can comply with our law."  Landsvik Ex. NN at 1.  The same Commissioner also described the SEC's approach to cryptocurrency to be the "regulatory version of an escape room" as recently as July 2019.  Landsvik Ex. SS.  This admission alone shows that the people and entities subject to the Securities Act lack fair notice about what conduct is forbidden.  Combined with the agency's silence at the time of the Kin sales, and the multiple contradictory statements since then, it should be a question for the factfinder at trial whether Kik had notice of what conduct was prohibited.

Further adding to the uncertainty, after years of silence about whether and how to apply the Securities Act to cryptocurrencies—and well after the Kin distribution—SEC staff finally released a "framework" of 38 non-"exhaustive" factors relevant to "evaluating whether a digital asset is an investment contract."  Landsvik Ex. KK at 6.[38]  Even the SEC would not agree to be

---

[37] The SEC has issued only two no-action letters addressing tokens, but they addressed tokens (for digital arcades and airline miles) as to which there would have been no question that the assets were not securities.  Landsvik QQ, Response for Pocketful of Quarters, Inc.; Landsvik Ex. RR.

[38] The SEC's interpretation of the *Howey*, in this case, is not entitled to any deference, as it is a novel and sweeping expansion of pre-existing guidance.  The power given to regulatory agencies is "not the power to make law.  Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed

bound to this "framework," indicating that "it is not a rule, regulation, or statement of the Commission, and the Commission has neither approved nor disapproved its content."  Third, SEC Commissioner Peirce has publicly acknowledged the absurdity and ambiguity created by applying some of the agency's public statements, noting in July 2019 that "[i]f you apply the reasoning that some of my colleagues at the SEC have used, there are lots of things that would [qualify as] securities," such as Starbucks gift cards and Chuck E. Cheese tokens as examples.  Landsvik Ex. SS.  This framework includes a litany of factors and considerations which have *never* been determinative in any case applying *Howey.*  For example, the Framework asks whether the seller "raised an amount in excess of what may be needed to establish a functional network or digital asset," whether the seller "owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly," and whether there are "essential tasks or responsibilities" that would be performed by the promoter or a "decentralized network" of users.  If the Court were inclined to bless the SEC's application of this framework as applied to Kik, that would constitute a vast, ex-post-facto expansion of the law.  While hindsight is 20/20, at the time that Kik conducted its TDE, there was *no case in the history* of *Howey* which could have warned that "decentralization" would be relevant or necessary—and to what extent.

The SEC urges this Court to ignore the "substantial uncertainty" surrounding the

---

by the statute.'" *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213 (1976).  It is "commonplace to give some deference to the SEC's administrative interpretation, assuming of course, that this interpretation does not offend the clear meaning of the statute as revealed by its language, purpose, and history."  *SEC v. Paro*, 468 F. Supp. 635, 643 (N.D.N.Y. 1979); *see also Int'l Broth. of Teamsters v. Daniel*, 439 U.S. 551, 566 (1979) ("But there are limits, grounded in the language, purpose, and history of the particular statute, on how far an agency properly may go in its interpretative role.").  This is particularly true for an agency's "consistent, longstanding interpretation of the statute," but less so for novel interpretations.  *Id.* at 566, n. 20.  The Supreme Court has also explained that the SEC's interpretation is less entitled to deference when it adopts inconsistent positions or when "the narrow legal issue is one peculiarly reserved for judicial resolution."  *Piper v. Chris-Craft Indus.*, 431 U.S. 1, 41 n. 27 (1977).  The SEC's current approach is not only a clear expansion of its pre-existing guidance, it is also rife with inconsistent and conflicting positions.  Thus, the SEC is not entitled to deference in this case.

Commission's interpretation of "investment contract" as applied to cryptocurrencies designed for consumptive use, and look only to cases that have applied the *Howey* test "successfully for decades."  SEC Mot. at 59–60.  The Court should decline that invitation.

> ### E.    Kik Had No "Actual" Awareness That the TDE Would Constitute a Sale of Securities.

Realizing that its guidance was objectively insufficient to put Kik, or any other similarly situated party, on notice, the SEC resorts to misquoting and twisting internal documents and communications to suggest that Kik had some "actual," clairvoyant notice that its sale of Kin would violate securities laws.  But there is substantial evidence to the contrary: that Kik did not have any knowledge or belief that its sale of Kin would constitute an offering of securities.  For example, Mr. Livingston publicly explained in detail the reasons why Kik viewed its sale of Kin as wholly distinguishable from the DAO Tokens, which functioned like a "classic security."  *See, supra*, at 11–12; SEC47B at 8:2–9:2.  Kik also demonstrated that it was committed to complying with all applicable laws, including by restricting participants in its home country when there was a risk that the sale could run afoul of Canadian securities laws, and by ensuring compliance with KYC/AML requirements.

The SEC also cites a number of "facts" that purportedly prove that Kik was on notice that its sale of Kin would constitute a sale of securities.  Even if these internal discussions were relevant, the SEC has grossly misrepresented the content of the statements it purports to quote from.

***First***, the SEC claims that, "as early as April 3, 2017, Kik received explicit warnings in a report from its consultant that regulators could find that the offer and sale of Kin would be an offer and sale of securities under *Howey*."  SEC Mot. at 60–61.  This is categorically false.  The report that Kik received from its consultant on April 3, 2017 actually stated: "***The SEC has given no***

***guidance that any particular token offering is a security, and this guidance is not expected in***

***the near future***." SEC83 at COINFND19857. The report actually made the uncontroversial

observation that the "SEC would potentially apply the Howey Test to determine if the sale of such

tokens would constitute an 'investment contract,'" but for the reasons outlined in Kik's Motion,

its position has always been that the TDE does not constitute an investment contract under *Howey*.

*Id*.

    ***Second***, the SEC characterizes Kik's discussion with its insurer regarding the risk that Kik

did not "[c]omply with the *Howey* test" to be some sort of admission that Kik knew its sale was a

violation of securities laws. SEC Mot. at 61. This is not so.[39] The SEC is quoting language from

Kik's insurance broker, not from any Kik employee, describing their opinions on potential loss,

which included "investor issues . . . ***generally***." SEC86. The SEC presents no evidence that this

insurance broker had actually reviewed the terms of the TDE and concluded that it would constitute

an investment contract, or that its insurance broker was qualified to do so. And it is hardly

appropriate or fair to punish Kik for its decision to retain additional insurance coverage when

embarking on a new, unprecedented business strategy, for which the SEC had yet to provide any

guidance.

    ***Third***, the SEC claims that Kik's conversations with the Ontario Securities Commission

("OSC") regarding the application of *Canadian securities laws* to its sale of Kin, and subsequent

decision to exclude Canadian residents form the sale, somehow proves that Kik knew the TDE

---

[39] Not only is this statement irrelevant, it is also inadmissible, as evidence of insurance is generally not admissible to show wrongful conduct, or even to show knowledge that conduct may be wrongful. *See Busher v. Barry*, 2019 WL 6895281, at *18 (S.D.N.Y. Dec. 18, 2019) (rejecting plaintiff's argument that indemnification agreement was admissible to show consciousness of wrongdoing); *In re Vecco Instruments, Inc. Sec. Litig.*, 2007 WL 76030569, at *2 (S.D.N.Y. June 28, 2007) (explaining that FRE 411 prohibits relying on defendants' concern about litigation and communications with liability insurance carrier to show subjective awareness of the wrongfulness of their conduct). Here, the SEC cannot use the fact that Kik obtained insurance as evidence of its knowledge that the Securities Act prohibited the sale of Kin.

would violate U.S. securities laws.  As an initial matter, it is undisputed that *Howey* is not governing law in Canada, that the Securities Act of Ontario is not the same as the Securities Act of 1933, and that the OSC has no authority to regulate issues beyond Ontario, much less under U.S. law.  SEC89 at 23:5-10; 83:2-8; 22:10-13.[40]  It is also undisputed that Canadian securities laws contain a provision which allows the OSC to assert jurisdiction over any transaction in the "public interest," even if no violation of securities laws occurred.  *Re Canadian Tire Corp.* (1987), 10 O.S.C.B 857 (although conduct was not in violation of any provision of Ontario's securities laws, OSC may nonetheless prohibit conduct that is "contrary to the public interest").  In fact, Kik's Canadian counsel testified that Kik opted to exclude Canadian residents from the TDE because it understood that this rule would allow the OSC to bring an action with respect to the TDE, even if it did not satisfy the definition of an investment contract.  SEC90 at 151:23–152:10; 155:8-14.

Kik additionally disputes the extent to which the OSC and Kik discussed whether the sale of Kin would constitute an investment contract under *Howey*.  The SEC asserts that the OSC "raised concerns that the sale of Kin would violate both Ontario and U.S. securities laws, because Kin tokens were investment contracts and, thus, securities," SEC 56.1 ¶ 228, but other facts contradict that version of events.  Prior to the TDE, the OSC *never* definitively informed Kik that it had reached the conclusion that its sale of Kin would constitute an offering of securities under *Howey*, or that *Howey* would even be controlling law.  SEC89, Chaukos Dep. Tr. at 88:11-20; Landsvik Decl., Ex. EE at 1.  In fact, Kik's same Canadian counsel testified that during a meeting prior to the sale, Pat Chaukos (the Chief of the OSC's "LaunchPad" team) told Kik that *Howey*

---

[40] For these and other reasons, any testimony by Ms. Chaukos, a Canadian attorney with no U.S. legal qualifications, on an issue regarding the legal interpretation and application of *Howey*, U.S. legal precedent, in a matter of strict liability is utterly irrelevant.

was "old law" and was "dismissive of it" during a meeting in 2017.  SEC90, McKee Dep. Tr. at

104:18-25.  Specifically, Mr. McKee testified that Ms. Chaukos described *Howey* as "an old law

from the 1940s and we are dealing with modern things and so we should be bringing modern

concepts to review these things in general."  *Id.* at 105:5-13.[41]  In short, the SEC has not produced

any evidence—let alone undisputed facts—that suggest Kik was aware that its sale of Kin would

violate U.S. Securities laws. In fact, Kik's choice to exclude residents from its own home country

from its sale of Kin demonstrates the very opposite: that Kik was committed to complying with all

applicable laws. Accordingly, this Court should deny the SEC's motion for summary judgment.

## **CONCLUSION**

For the foregoing reasons, Kik respectfully requests that the SEC's motion for summary

judgment should be denied.

---

[41] Ms. Chaukos testified that she did not ever make such a statement.  Chaukos Tr. at 78:1-14.  While this claim stretches credibility, this merely proves why the SEC's motion is improper as to Kik's affirmative vagueness defense.  The SEC claims that this meeting with the OSC put Kik on notice that its sale of Kin would constitute a security—but the parties have vastly different characterizations of the events taking place at that meeting.  As a result, the SEC cannot possibly succeed on its motion, as there are at least genuine issues of material fact as to Kik's affirmative vagueness defense.

Dated: April 24, 2020                           Respectfully submitted,


By: /s/ *Patrick E. Gibbs*
                                           _____
        Patrick E. Gibbs (*Pro Hac Vice*)
        Brett H. De Jarnette (*Pro Hac Vice*)
        Jenna C. Bailey (*Pro Hac Vice*)
        Cooley LLP
        3175 Hanover Street
        Palo Alto, CA  94304-1130
        Phone: (650) 843-5000
        Fax:    (650) 849-7400
        Email: pgibbs@cooley.com;
        bdejarnette@cooley.com

        Sarah M. Lightdale (SL7122)
        Cooley LLP
        55 Hudson Yards
        New York, NY 10001-2157
        Phone: (212) 479-6374
        Fax:    (212) 479-6275
        Email: slightdale@cooley.com

        Luke T. Cadigan (*Pro Hac Vice*)
        Julianne M. Landsvik (*Pro Hac Vice*)
        Michael E. Welsh (*Pro Hac Vice*)
        Cooley LLP
        500 Boylston Street, 14th Floor
        Boston, MA  02116-3736
        Phone: (617) 937-2425
        Email: lcadigan@cooley.com;

        Robert W. Pommer III (RP5328)
        Kirkland & Ellis LLP
        1301 Pennsylvania Avenue, N.W.
        Washington, D.C. 20004
        Phone: (202) 389-5950
        Email: rpommer@kirkland.com

        Attorneys for Defendant
        KIK INTERACTIVE INC.

## **CERTIFICATE OF SERVICE**

I, Patrick E. Gibbs, hereby certify that a true and correct copy of the foregoing document was served on counsel of record via ECF on this 24th day of April, 2020.

*/s/ Patrick E. Gibbs*
Patrick E. Gibbs
