**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>     vs.<br><br>KIK INTERACTIVE INC.<br><br>                    Defendant. |

Case No. 19-cv-5244 (AKH)

**DEFENDANT'S RESPONSE TO PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL <u>FACTS IN SUPPORT OF SUMMARY JUDGMENT</u>**

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1, Defendant Kik Interactive, Inc. ("Kik" or "the Company") respectfully submits the following responses to the Securities and Exchange Commission's ("Plaintiff" or "SEC") Statement of Undisputed Material Facts In Support of Summary Judgment ("Statement").

Kik notes at the outset that the SEC's Statement is far from the "short and concise statement" of material facts that this Court's rules require.  *See* Civ. L.R. 56.1(a).  Many of the SEC's purported facts contain multiple, compound statements.  And many of them are wholly immaterial to the discrete issues in the Plaintiff's Motion for Summary Judgment: whether Kik's sales of the token Kin in 2017 constituted an "investment contract."  For example, the SEC references statements of a handful of Kin purchasers about what they planned to do with their Kin. Yet when assessing whether Kik led purchasers to expect profits from the efforts of others, as *Howey* requires, the focus is "on what the purchasers were offered or promised," as opposed to subjective expectations or external forces in the market.  *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009).  Indeed, many courts have found no investment contracts despite evidence that a number of purchasers participated solely for profit or investment purposes.  *See, e.g.*, *Woodward v. Terracor*, 574 F.2d 1023, 1024-25 (10th Cir. 1978) (finding no investment contract despite several purchasers indicating they "did not intend to actually build on the land, and they bought the land as an 'investment.'").  The SEC also repeatedly references documents and statements that were wholly internal to Kik and were indisputably not heard by any potential purchaser.  These statements cannot form the basis for what Kik led purchasers to expect.  *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-32 (9th Cir. 2013); *SEC v. Blockvest, LLC*, 2018 WL 6181408 (S.D. Cal. Nov. 27, 2018).  Thus, they are immaterial to whether the Kin that Kik sold constituted the sale of an "investment contract."

The glaring omission from the SEC's 308 purportedly undisputed material facts is any reference to the single contract governing the relationship between Kik and TDE purchasers.  *See* Kik Opp. at 1-2.  The Terms of Use expressly limited purchasers' rights and set their expectations.  The SEC seeks to ignore this critical agreement by citing irrelevant and immaterial facts that appear only to mischaracterize the record or distract from the single question in this case.  *See* Kik Opp. at 20.

Finally, many of the SEC's statements throughout cite to third-party statements or other evidence that is inadmissible.  Many other paragraphs fail to cite to the record at all.  Both of these shortcomings are improper at summary judgment, and those statements should be ignored.  *See* Fed. R. Civ. P. 56(c)(2); Civ. L.R. 56.1(d).

## PLAINTIFF'S STATEMENT OF ALLEGEDLY UNDISPUTED MATERIAL FACTS AND DEFENDANT'S RESPONSES

1. Defendant Kik Interactive Inc. ("Kik") is a privately-held Canadian corporation founded in 2009. (Kik's Answer to Complaint ("Answer") ¶ 5; SEC1, Kik's September 17, 2018 Response No. the SEC's Investigative Requests for Admission ("Inv. RFA") No. 36; SEC2, Kik's October 7, 2019 Response No. the SEC's Rule 36 Requests for Admission ("Lit. RFA") No. 1).

**In Response to No. 1**: Undisputed.

2. Between February 22, 2017 and September 17, 2018, Kik had its headquarters in Waterloo, Ontario, and offices in New York City and Tel Aviv. (Answer ¶ 28; SEC1, Inv. RFA, at No. 1; SEC2, Lit. RFA, at No. 36).

**In Response to No. 2**: Undisputed.

3. Kik's New York City office was located in Manhattan, on the Lower East Side, and employed ten people, including its chief marketing officer. (SEC3, Investigative Testimony of Erin

Clift ("Clift Inv. Tr."), at 11:19-21, 26:24-27:12; SEC4, Deposition of Peter Heinke ("Heinke Dep. Tr."), at 41:6-25).

> **In Response to No. 3**: Undisputed.

4.     From mid-2017 through the date of this filing, Kik's general counsel lived and worked in California. (SEC5, Investigative Testimony of Eileen Lyon ("Lyon Inv. Tr."), at 14:16-22, 30:17-22; SEC6, Rule 30(b)(6) Deposition of Kik Interactive ("Kik 30(b)(6) Dep. Tr."), at 13:5-14:22).

> **In Response to No. 4**: Undisputed that from mid-2017 through June 4, 2019, Kik's general counsel lived and worked primarily in California. Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

5.     At present, Kik is headquartered in Kitchener, Ontario, and has several employees in the United States, including at least one in Manhattan. (Answer ¶ 28; SEC6, Kik 30(b)(6) Dep. Tr., at 13:5-14:20, 24:8-25:7).

> **In Response to No. 5**: Undisputed.

6.     Before 2017, Kik received at least $120 million in financing from venture capital firms, including an investment in 2015 from technology conglomerate Tencent. (Answer ¶ 35).

> **In Response to No. 6**: Undisputed.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

7.     Until September 2019, Kik operated a chat application called Kik Messenger, which was launched in 2010 and allowed users to communicate with each other using mobile devices. (Answer ¶ 36). Kik sold Kik Messenger in September 2019, and it has since then focused on developing a new product, a digital "wallet," that will "send and receive and store Kin." (SEC6, Kik 30(b)(6) Dep. Tr., at 28:10-31:24; SEC7, Deposition Exhibit ("Dep. Ex.") 264).

> **In Response to No. 7**: Undisputed.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

8.      Kik Messenger has had hundreds of millions of users (Answer ¶ 37), with a significant concentration among "teenagers and 20-somethings" in the United States (SEC8, Investigative Testimony of Edward Livingston ("Livingston Inv. Tr."), at 38:12-20).

> **In Response to No. 8**: Undisputed.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

9.      Kik has had challenges in making money from Kik Messenger. (SEC4, Heinke Dep. Tr., at 43:5-8). Historically, Kik has not been profitable, and its efforts to monetize its platform through other business lines have been largely insufficient to sustain its business. (Answer ¶ 38). In 2017, Kik was struggling to monetize its business without resorting to the sale of user data to advertisers. (Answer ¶¶ 5, 37).

> **In Response to No. 9**: Undisputed.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

10.     Before fiscal year 2018, Kik's costs exceeded its revenue (Answer ¶ 5), and Kik did not generate appreciable revenue. (SEC9, Investigative Testimony of Paul Holland ("Holland Inv. Tr.") 30:14-33:7; SEC10, Investigative Testimony of Peter Heinke ("Heinke Inv. Tr."), 43:24-46:2; 48:16-50:2, 53:15-55:6).

> **In Response to No. 10**: Undisputed.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

11.     From mid-2015 to mid-2016, the company recorded $2.2 million in revenue but had total expenses of $29.2 million, and the company experienced a comprehensive loss, before adjustments for income taxes, of $29 million. From mid-2016 to mid-2017, the company recorded $1.5 million in revenue but had $32.3 million in expenses, and the company experienced a comprehensive loss, before adjustments for income taxes, of $32.9 million. (Answer ¶ 38; SEC11, Dep. Ex. 26; SEC12, Dep. Ex. 27; *see also* SEC2, Lit. RFA, Nos. 48-49; SEC4, Heinke Dep. Tr., at 43:20-45:17; SEC10, Heinke Inv. Tr., 50:7-52:6).

> **In Response to No. 11**: Undisputed.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

12.     In late 2016, Kik hired an investment bank to evaluate a potential sale of the Company. (Answer ¶ 40). On or about February 1, 2017, Kik's CEO sent an email to Kik's Board of Directors attaching an update from the investment bank. The update stated that the investment bank had contacted 35 parties and signed confidentiality agreements with seven of them, and that all seven declined to buy or merge with Kik after attending presentations. (SEC13, KIK_FOUNDATION_CAP_001299). The investment bank did not find a buyer for Kik. (SEC4, Heinke Dep. Tr., at 46:22-47:10; SEC14, Investigative Testimony of Tanner Philp ("Philp Inv. Tr."), at 36:14-40:11).

> **In Response to No. 12**: Undisputed that Kik hired an investment bank to evaluate a potential sale of the Company, and that Kik's CEO sent the email cited.  Disputed that the investment bank did not identify a buyer for Kik.  *See* SEC10, Heinke Inv. Tr. 30:17-31:1 (explaining the bank "felt we had the opportunity to go back to a couple" of potential buyers).  Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract" and because the statements of an investment bank contained in an email from Kik's CEO contain inadmissible hearsay.

13.     "With no bids coming out of the [investment bank's] process, and a continued decline in [Kik Messenger's] metrics, [Kik was] in a precarious position, to say the least." (SEC15, Dep. Ex. 28).

> **In Response to No. 13**: Disputed.  At that time, Kik had options available to extend its cash runway, including by reducing expenses or obtaining another round of investor financing.  Philp Decl. ¶ 25.  As a result, as Kik's former CFO testified, the Company was not in a precarious position.  SEC10, Heinke Inv. Tr. 79:21-80:15.  Tellingly, the SEC does not provide any cite or support for what metrics were supposedly in decline.  Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

14.     At the same time, "the answer of Kik will 'figure out how to make money later' was no longer an option with [Kik's] investors." (SEC8, Livingston Inv. Tr., 42:10-43:4) And, going into 2017, there was "a fear within Kik that Kik could die." (*Id*. at 46:19-22).

**In Response to No. 14**: Disputed.  As to the first sentence, the SEC has provided no evidence from any investor much less all of them regarding what options they would consider.  As to the second sentence, it was not universally held fear within Kik that Kik could die given it had other options to extend its runway, including by reducing expenses or obtaining another round of investor financing.  Philp Decl. ¶ 25. Also, as Kik's former CFO testified, the Company was not in a precarious position.  SEC10, Heinke Inv. Tr. 79:21-80:15.  Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

## B.   BY EARLY 2017, KIK WAS RUNNING OUT OF MONEY

15.     By early 2017, Kik had had roughly $26 million in cash remaining and, at times, spent around $3 million per month. (Answer ¶ 41).

> **In Response to No. 15**: Undisputed.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

16.     On January 27, 2017, Kik's CEO sent an email to Kik's Board that referenced an upcoming meeting and attached a slide deck. The slide deck showed that daily average users dropped from more than 10 million in January 2016 to about 6 million in January 2017, and that monthly average users dropped from more than 28 million in January 2016 to about 20 million in January 2017. (SEC15, Dep. Ex. 28, at KIK_FOUNDATION_CAP_005718-719; SEC4, Heinke Dep. Tr., at 50:16-52:5; *see also* Answer ¶ 37).

> **In Response to No. 16**: Undisputed.  Kik objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

17.     The January 27, 2017 slide deck also stated that the "Current Situation" was "$3.1M current burn" and "Runway to September 5, 2017." (SEC15, Dep. Ex. 28, at KIK_FOUNDATION_CAP_005718-719, 740; SEC4, Heinke Dep. Tr., at 53:22-54:6). "Runway" meant the time by which Kik would run out of money to fund operations under then-current spending levels. (SEC4, Heinke Dep. Tr., at 52:6-20). "Current burn" meant the amount of money Kik spent every month to operate. (*Id.* at 55:3-6).

**In Response to No. 17**: Undisputed that that the cited slide deck contains the quoted language, and that as Mr. Heinke testified, "[r]unway is the length of time a company normally has cash flow to operate," and that "current burn" refers to the "monthly operational expenses."

Disputed that the cited text reflects the only possible calculation of the cash burn rate and runway given that "Kik had. . . options available to extend its cash runway, including pursuing an acquisition, reducing expenses, or another round of investor financing."   Philp Dec. ¶ 25.  Kik's management decided to pursue a cryptocurrency-based business model instead, as Kik would be able to earn revenue on an ongoing basis." *Id.*  As Kik's former CFO, Mr. Heinke, testified, Kik had numerous options to extend its runway, and that "it was not a serious concern to me at that time."  SEC10, Heinke Inv. Tr. at 179:21-180:15.  Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

## C.   KIK PLANNED A SINGLE OFFERING OF ONE TRILLION DIGITAL TOKENS CALLED "KIN"[1]

18.    The January 27, 2017 slide deck included slides stating that a sale of a "cryptocurrency" may be a way for Kik to "finance the business" and thereby "[e]xtend[] [r]unway." (SEC15, Dep. Ex. 28, at KIK_FOUNDATION_CAP_005739, 005747, and 005752). The slides also stated that "launching a new cryptocurrency" was a "new way to raise funds that is in vogue," and they noted that such a launch would be a "[l]arge pivot in business model." (*Id.* at KIK_FOUNDATION_CAP_005752).

**In Response to No. 18**:  Undisputed that the cited slide deck contains the quoted language taken out of context.

Disputed that these statements reflect all the reasons for considering a cryptocurrency or that it reflected a large pivot in the business model.  As Mr. Heinke testified, generating revenue was only one aspect of the cryptocurrency model discussed by the Board and the cryptocurrency model reflected an evolution from Kik's prior experience with Kik Points rather than a large pivot.  SEC4, Heinke Dep. Tr. at 57:23-59:11; *see also* SEC10, Heinke Inv. Tr. at 75:23-76:5.  Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

---

[1] Kik disputes and objects to all headings as unsupported by any citations to the record.

19.     During its meeting on or about February 1, 2017, Kik's Board discussed the slides circulated on January 27. (SEC4, Heinke Dep. Tr., at 57:11-59:1).

> **In Response to No. 19**: Undisputed that Kik's Board discussed, among other things, the January 27 slides at its meeting on or around February 1, 2017.  Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

20.     By early 2017, Kik's senior management had concluded that sale of digital tokens was Kik's "only option." (SEC8, Livingston Inv. Tr., at 79:14-80:5, 158:12-161:10).

> **In Response to No. 20**: Disputed. "Kik had other options available to extend its cash runway, including pursuing an acquisition, reducing expenses, or another round of investor financing. However, Kik's management decided to pursue a cryptocurrency-based business model instead, as Kik would be able to earn revenue on an ongoing basis."  Philp Decl. ¶ 25; *see also* SEC10, Heinke Inv. Tr. at 179:21-180:15 ("Kik had numerous options to extend its runway").  Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

21.     The new cryptocurrency considered by the Board would be issued on a blockchain. A blockchain is a type of distributed ledger or peer-to-peer database that is spread across a network and records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called "blocks." Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, so that the blocks together form a chain. The system relies on cryptographic techniques for securely recording transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Some blockchains can record what are called "smart contracts," which are, essentially, computer programs designed to execute the terms of a contract when certain triggering conditions are met. (Answer ¶ 30).

> **In Response to No. 21**: Undisputed.  Kik objects to each statement to the extent it does not contain a citation to admissible evidence as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

22.     Kik's Board members often referred to the potential issuance of a cryptocurrency as an "ICO," which is shorthand for Initial Coin Offering. (*See, e.g.*, SEC16, Investigative

Testimony Exhibit ("Inv. Ex.") 150; SEC17, Investigative Testimony of Fred Wilson ("Wilson Inv. Tr."), at 132:8-133:3; SEC9, Holland Inv. Tr., at 64:4-65:9).

> **In Response to No. 22**: Disputed. The cited evidence does not support the assertion that Kik's Board members "often" used the term "ICO." Mr. Wilson makes no reference to an "ICO." *See* SEC17, Wilson Inv. Tr. 132:8-133:3. Mr. Holland states only that, "at some point, Kik . . . an ICO was executed upon." SEC9, Holland Inv. Tr. 64:4-65:9. Moreover, Kik executives testified that they did not use the term ICO. *See* SEC4, Heinke Dep. Tr. at 139:22-140:9; SEC14 Philp Inv. Tr. at 163:9-21.
>
> Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

23.     From February through May 2017, Kik's executives continued to provide updates to the company's directors about Kik's financial "runway," and Kik predicted it would run out of cash sometime during the late fall of that year. (*See, e.g.*, SEC18, Dep. Ex. 4 at KIK_00026538; SEC19, Dep. Ex. 36 at KIK_00106791; SEC4, Heinke Dep. Tr., 86:7-18, 87:21-88:8; SEC3, Clift Inv. Tr., 52:16-54:6; SEC9, Holland Inv. Tr., 48:21-51:19; 106:2-107:21; SEC14, Philp Inv. Tr. at 32:16-33:14; SEC17, Wilson Inv. Tr. 37:4-39:4).

> **In Response to No. 23**: Disputed. "Kik had other options available to extend its cash runway, including pursuing an acquisition, reducing expenses, or another round of investor financing. Kik's management decided to pursue a cryptocurrency-based business model instead, as Kik would be able to earn revenue on an ongoing basis." Philp Dec. ¶ 25; *see also* SEC10, Heinke Inv. Tr. at 179:21-180:15 (Kik had numerous options to extend its runway). As Kik's former CFO testified, Kik had been "conservative" in projecting its runway, and Kik had in fact extended its runway previously, including from September to November 2017. SEC8, Heinke Dep. Tr. at 54:19-55:2, 87:3-19. Kik also objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

24.     On February 16, 2017, Kik's CEO emailed the board a PowerPoint slide deck that included "The Potential for an ICO" in the agenda and a section entitled "Kik & the Blockchain" (SEC18, Dep. Ex. 4 at KIK_00026455), which included, *inter alia*, the following statements

regarding the potential interest of "cryptoinvestors" and "crowdfunders" in purchasing a digital

token issued by Kik:

- "Cryptoinvestors" were "largely funding three areas" that included blockchain
  platforms, infrastructure projects, and decentralized applications;

- "We believe that the scale of our network alone will drive strong interest from the
  cryptoinvestor community;" and

- 68% of "Crowdfunders" "[w]ould invest in tradable digital tokens of a blockchain
  company if offered good risk-return potential."

(*Id.* at KIK_00026455, 57-58, 61, and 63; *see also* SEC3, Clift Inv. Tr. at 98:19-99:9, 99:13-

103:13).

> **In Response to No. 24**: Undisputed that the slide deck contained these statements,
> which came from third-party CoinFund. Disputed to the extent the SEC attributes
> these statements to Kik. The slide deck expressly states that the statements are from
> "Source: Coinfund Investor Survey." *See* SEC18. As Kik's former Chief
> Marketing Officer and the person who created the deck specifically explained she
> "was sharing the results of the CoinFund investor survey" on behalf of CoinFund,
> SEC3, Clift Inv. Tr. 100:7-13, the information was "taken from the survey," *id.*
> 101:5, and she did not "even recall going through this in detail." *Id.* 101:1-2.
> CoinFund's statements are not attributable to Kik and are inadmissible hearsay.
> Additionally, disputed as to the term "cryptoinvestor" as it was a term CoinFund
> used; Kik did not understand "cryptoinvestor" to mean participants who were
> buying with a specific intent to profit or anyone who would buy tokens through a
> public sale. SEC4, Heinke Tr. 78:5-79:13; SEC14, Philp Inv. Tr. 124:1-15.

25.     Kik's "pivot" to cryptocurrency coincided with a dramatic increase in both the

number of digital token offerings and the amounts raised therein – "a sort of market frenzy that

typifies a bubble." (SEC20, Dirk A. Zetzsche, Ross P. Buckley, Douglas W. Arner, & Linus Föhr,

*The ICO Gold Rush: It's a Scam, It's a Bubble, It's a Super Challenge for Regulators*, 60 Harv.

Int'l L. J. 267, 288 (2019) (analyzing 1,000 ICO "whitepapers" issued between 2016 and 2019)).

During a February 2017 conference, a market observer – whom Kik later hired as a consultant –

predicted "strong growth of ICO markets in 2017" with 34 ICOs in the first half of the first quarter and, by year end, "300 ICOs raising $600m." (SEC21, Dep. Ex. 133 at MMLWM-00000151; SEC22, Deposition of William Mougayar ("Mougayar Dep. Tr."), at 71:14-72:10). According to an article by CoinDesk, "43 ICOs in 2016 raising an aggregate $256 million; that number jumped to 343 ICOs in 2017." (Answer ¶ 44). And, according to the founder of a hedge fund that would become the top Kin purchaser, "[t]he ICO market [was] white hot" in 2017. (Answer ¶ 72; SEC23, Investigative Testimony of Daniel Morehead ("Morehead Inv. Tr."), at 57:17-25; SEC24, Inv. Ex. 180).

> **In Response to No. 25**: Disputed to the extent the SEC suggests by these statements that Kik intentionally timed its Token Distribution Event ("TDE") at a time of a market "frenzy" or "bubble." The timing "actually worried" Kik because "an overheated market" would be "a big problem" for a volatile cryptocurrency. SEC10, Heinke Tr. 343:15-344:10. Additionally, the timing of the TDE was in part determined based on pressure from Pre-sale purchasers. *Id.* 361:12-19. Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract," and to the extent the third-party statements are offered for their truth because such statements constitute inadmissible hearsay. Otherwise, undisputed that the cited documents contain the quotes referenced by the SEC

26.     At the February 16, 2017 meeting, Kik's Board instructed the executive team to assume that Kik would conduct a token sale, while the company was "finishing [its] evaluation of the viability' of a cryptocurrency project." (Answer ¶ 45).

> **In Response to No. 26**: Undisputed. Kik objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

27.     In an email to Kik's chief marketing officer and another marketing employee dated February 28, 2017, Kik's CEO described Kik's new "crypto story," which would be "a new way" to raise capital. He wrote, *inter alia*, that Kik would "sell some [tokens] to crypto investors to raise money," and that "[m]ore demand" for the token would mean "[v]alue goes up," and, therefore: "Buy today, sell tomorrow, profit." (SEC25, KIK_00026563; Answer ¶ 46).

**In Response to No. 27**: Undisputed that Mr. Livingston sent an email containing the quoted text taken out of context.  Disputed that the select quotes accurately summarize the email cited.  Mr. Livingston described several features of a "Kik coin crypto currency" beyond those cited by the SEC, including that it will "get developers a simply yet powerful monetization tool for their bots," SEC25, KIK_0026563.  The email continues to describe how Kik will give some Kin away to users (thus raising no money).  *Id.* at KIK_0026564.  Additionally, a sale of some tokens to a select group of purchasers to raise money to fund the development of the Kin token is entirely consistent with the Pre-sale Kik conducted pursuant to Regulation D, the purpose of which was disclosed in its Whitepaper and to all participants in the Presale.  Kik Ex. E (SAFT), Ex. K (Whitepaper). Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

28.     Similarly, in a March 24, 2017 email to Kik's Leadership Team, Kik's CEO described his "[v]ision" for an offering of tokens (then called "Kik Points") and the "value proposition to investors." He explained that, "because of all the things [Kik will] do to create demand for [the tokens]," people could buy now at a low price and sell later at a higher price to "creat[e] a return":

> [I]f you buy some Kik Points today when the demand is low, then you will be able to sell them at a higher price tomorrow when the demand is higher, creating a return. This potential return encourages investors to "buy in" at an ICO. An ICO is where Kik takes a portion of its reserves from its Fort Knox (say 100 million of the 1 billion Kik Points that we initially created and put in our Fort Knox) and sells them in an auction. The value proposition to investors is that if they buy in today at the ICO, and then the demand for the currency goes up because of all the things we do to create demand for them, then they will be able to sell their points at a higher price in the future, and make a return. The money taken in from investors for the ICO is used by Kik to fund development to create more and more demand by both growing the community, and by growing the demand for the currency within the community.

(Answer ¶ 47; SEC26, Inv. Ex. 107 at KIK_00026625; SEC8, Livingston Inv. Tr., at 208:19-210:13).

**In Response to No. 28**: Undisputed that Mr. Livingston sent the cited email containing the quoted language, but Kik notes it is taken out of context.  Disputed that the selected quote accurately summarizes the cited email or Kik's intentions as of the Pre-Sale or TDE.  The email was sent internally by Mr. Livingston months before Kik even announced the Kin economy to the public.  Disputed that Kik's

efforts would cause the value of the token to increase.  Mr. Livingston was explaining general crypto economics, and that the value of *any* cryptocurrency would go up "because of all the things everybody does."  SEC8, Livingston Inv. Tr. 218:21-220:15.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

29.    During this same time period, Kik began to work with a consulting firm located in New York City to research the market for tokens and other digital assets and to design Kik's ICO. (SEC10, Heinke Inv. Tr., at 80:22-86:25; SEC9, Holland Inv. Tr. 98:4-9; SEC14, Philp Inv. Tr., at 56:13-19).

> **In Response to No. 29**:  Disputed that Kik hired a consulting firm to design an "ICO" as Kik did not use the term "ICO," but rather referred to a "token distribution event" because Kik's TDE reflected "the importance of the distribution to participants of the network."  SEC14, Philp Inv. Tr. 162:23-163:21; SEC4, Heinke Tr. 139:22-140:8.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  Otherwise undisputed.

30.    The consultant's research confirmed for Kik that "serious cryptoinvestors globally as well as small VC funds and family offices that are pushing into the space" could, in fact, become interested in adding Kik's tokens to their existing portfolios of digital assets. (Answer ¶ 49). The consultant again advised Kik that the "investment space" for digital tokens "[wa]s extremely hot" and reported for recent token sales that "[t]he average return multiple is 15x." (SEC27, Dep. Ex. 6 at COINFUND007697 (emphasis in original); SEC10, Heinke Inv. Tr., at 127:20-128:10).

> **In Response to No. 30**:  Undisputed that the consultant report contained the quoted statements taken out of context.  Disputed that these statements reflect the conclusions of the consultant report or that Kik adopted those statements as its own conclusions.  The consultant conducted a survey to gauge general interest in a generic cryptocurrency in February 2017, well before Kik announced Kin to the public.  SEC8, Livingston Inv. Tr. 200:1-9.  As Mr. Heinke testified, Kik knew that its ecosystem would not survive if the market for Kin was a volatile one and when Kik eventually sought purchasers, it sought to avoid speculative purchasers." *See* SEC10, Heinke Inv. Tr. 128:6-129:3.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract," and because statements of the third-party consultant constitute inadmissible hearsay.

31.     On April 10, 2017, in advance of a meeting of Kik directors later that same week, Kik's CEO sent to the directors his PowerPoint presentation for the meeting, entitled "Kik & Cryptocurrency," together with a report prepared by Kik's consultant. (Answer ¶ 50; SEC28, Dep. Ex. 35). The materials included results from the consultant's "Cryptoinvestor Survey" and "Cryptoinvestor Expert Panel" and contained a "Funding perspectives" slide showing revenues from average historical token sales and predicted a capital raise of "$100 million easily" from the offering. (Answer ¶ 50). The materials set forth a "roadmap" for a token sale later that year and included steps for an "investor marketing plan" and an "exchange outreach." (*Id*.).

> **In Response to No. 31**: Undisputed that Mr. Livingston sent the referenced email containing the referenced materials. Disputed that these statements accurately convey the contents of the overall Kik presentation or the findings of the CoinFund report or that they had any influence on the TDE or Pre-Sale. The results of the "Cryptoinvestor Survey" and "Cryptoinvestor Expert Panel" conducted by the third-party consultant, are referenced on a *single slide* in a 14-page presentation. SEC28 at KIK_00106722. The report itself listed five different "limitations" to " interpreting survey results," including that the survey had a small sample size and demographic biases. SEC28 at KIK_00106675, -677. Mr. Livingston did not even recall "personally reading through the report itself," SEC8, Livingston Inv. Tr. 193:19-194:1, and others in Kik's leadership specifically rejected the nomenclature used in the report, SEC10, Heinke Inv. Tr. 155:19-23. Kik further disputes that the "general roadmap" referenced by the SEC reflects the steps Kik actually took before and during its token sales, which occurred months after this presentation. SEC28 at KIK_00106727.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." The *Howey* analysis involves an "objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009). Thus it is limited to documents or statements that form the "basis of the sale." *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-32 (9th Cir. 2013). In addition, documents and discussions that were wholly internal to Kik are not relevant and inadmissible. *Id.* Kik further objects to the statements from the third-party consultant as inadmissible hearsay. *See* Fed. R. Evid. 802.

32.     Despite the consultant's optimism, in a late April 2017 email, a Kik Board member described Kik's plan to offer and sell a digital token as "a hail Mary pass that involves crypto." (SEC29, USV0015937; Answer ¶ 7).

> **In Response to No. 32**: Undisputed that a Kik Board member sent the cited email stating that Kik is "attempting a hail Mary pass that involves crypto."  SEC29 at USV0015937.  Disputed that Kik or Kik's Board viewed Kik's plan to be "a hail Mary pass" SEC8, Livingston Inv. Tr. 166:6-22.  ("The more I think about it, I think this is a great idea.  People call it a hail Mary but to me that is a longshot and I really do not think it is a long shot.").
>
> Kik further objects to these wholly internal statements as irrelevant and immaterial to any of the issues in the SEC's Motion.  *See, supra,* Response No. 31.

33.     In April 2017, Kik and its New York-based consultants started to draft a "white paper," through which the company would announce the offering of the digital token – by this time called "Kin" – to the public. (Answer ¶ 52).

> **In Response to No. 33**: Disputed insofar as Kik announced the Kin offering not in its white paper but at a live event called Token Summit in New York City in May 2017.  SEC8, Livingston Inv. Tr. 338:11-21.  Otherwise undisputed.

34.     On May 4, 2017, Kik's CEO emailed Kik's Board a PowerPoint slide deck stating that the end of the company's cash runway was six months away – October 9, 2017, if the company made severance payments to fired employees, or November 1, 2017, if it did not. (SEC19, Dep. Ex. 36, at KIK_00106791; SEC4, Heinke Dep. Tr., at 85:22-86:18).

> **In Response to No. 34**: Disputed to the extent the SEC suggests that Kik in fact would run out of cash on October 9, 2017 or November 1, 2017 because those dates were projections only.  SEC4, Heinke Tr. 86:4-87:23.  Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  Otherwise undisputed.

35.     The PowerPoint Slides attached to Kik's CEO's May 4, 2017 email described Kik's intended sale of one trillion tokens, which would be "sold on day 1" to "Investors." (SEC19, Dep. Ex. 36, at KIK_00106802; *see also id.* at KIK_00106815).

**In Response to No. 35**: Disputed that Kik intended to sell one trillion tokens "on day 1." Kik's distribution of Kin involved two distinct transactions: a Simple Agreement for Future Tokens ("SAFT") that took place from June through September 11, 2017, and a Token Distribution Event that took place from September 12 through September 26, 2017. Philp Decl. ¶¶ 33-34, 37, 66-77. Participants in the Presale entered only the SAFT in which they received only the right to receive Kin if and when the Kin network launched. SEC14, Philp Inv. Tr. 248:3-6. Kik further disputes the statement to the extent it suggests Kik sold Kin to "investors" whose intent only was to profit from a passive investment. As Kik's then Manager of Special Initiatives explained, early on Kik used the term "investors" loosely to refer to participants token sales without regard for their intent. *See* SEC14 Philp Inv. Tr. 124:1-125:5.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31. Otherwise undisputed.

36.     On May 22, 2017, in advance of a telephonic Board meeting the next day, Kik's CEO sent the directors a PowerPoint presentation with details about the company's planned offering, which had been fleshed out during the drafting of the white paper. (Answer ¶ 54; SEC30, Dep. Ex. 7).

**In Response to No. 36**: Undisputed.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response 31.

37.     The presentation reiterated that Kik would create a total supply of 10 trillion Kin tokens and offer a "[f]loat" of 10 percent of that supply (*i.e.*, one trillion tokens), with a "Total Raise Target" of $100 million. (Answer ¶ 55; SEC30, Dep. Ex. 7). The "Total Raise" would occur though a "Pre-Sale" phase and a "Token Distribution Event." (SEC 30, Dep. Ex. 7, at KIK_00106892).

**In Response to No. 37**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering." Kik conducted two distinct sets of sales: the Pre-sale, which involved "a private offering of futures contracts with 50 accredited investors from June through September of 2017," and the TDE, which was intended to ensure a wide distribution of Kin to a large base of users, and took place from September 12 to September 26, 2017. Philp Decl. ¶ 32, 67-68, 77. Additionally, the document cited by the SEC confirms that Kik planned two distinct sets of

transactions: the Pre-Sale and the Token Distribution Event."   SEC30 at KIK_00106894.  The fact that one page of the document references a 10% "float" and indicates how tokens will ultimately be allocated from a fixed supply does not suggest that Kik conducted a "single offering."

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response 31. Otherwise undisputed.

38.      The presentation also described the sale of the one trillion tokens in multiple "tranches," with buyers in the earlier tranches – *i.e.*, what Kik called a "Pre-Sale" – committing funds in advance of a sale of Kin to the general public in exchange for discounts from the final offering price. (Answer ¶ 55; SEC30, Dep. Ex. 7).

**In Response to No. 38**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31. Otherwise undisputed.

39.      Kik had also decided to sell Kin in one or more of the early tranches by entering into Simple Agreements for Future Tokens ("SAFTs") with investment funds and other wealthy investors. As of May 22, 2017, Kik planned to raise up to $50 million through SAFTs, during the "Pre-Sale," and between $50 million to $75 million more in what Kik called the "public tranche[s]." (Answer ¶ 56; SEC30, Dep. Ex. 7; SEC10, Heinke Inv. Tr., at 207:10-23).

**In Response to No. 39**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31. Otherwise undisputed.

40.      The May 22, 2017 presentation summarized a single sale of the one trillion Kin "float" as follows:

## Token Sale Structure (Soft Cap)

| | |
|---|---|
| Token Supply | 10T Tokens |
| Float Offered | 10% |
| $ Tranches Based Pricing Discounts | 35%; $0-25M SAFT<br>25%; $25-50M SAFT 2<br>20%; $50-75M (first public tranche)<br>10%; $75-100M (last chance for discounts)<br>0%; $100-125M (post soft cap) |
| Soft Cap | $100M (followed by a 24 hour countdown once reached) |
| Sale Time | 30 days maximum |
| Minimum | TBD |
| Distribution | Fixed 10% sold; Token Allocation calculated at end of sale based on proceeds raised and distributed per the example |
| Vesting | Time and Performance based for Founder and Foundation tokens only |

(Answer ¶ 57; SEC30, Dep. Ex. 7, at KIK_00106893).

> **In Response to No. 40**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31. Otherwise undisputed that this slide is one of several slides contained in the May 22, 2017 Board presentation.

41.     The presentation also explained that 30 percent of the total number of tokens created (*i.e.*, three trillion) would be allocated to Kik under a future vesting schedule, while 60 percent of the total supply (*i.e.*, six trillion) would be allocated to a new "Kin Foundation" that Kik would establish. (Answer ¶ 58).

> **In Response to No. 41**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31. Otherwise undisputed.

42.     By planning to keep three trillion Kin, Kik intended to compensate itself for "provid[ing] start up resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand." (SEC31, Dep. Ex. 12, at KIK000021).[2] And, in so doing, Kik planned to profit from any future appreciation of Kin, so that the more success Kik had with respect to its "goal . . . to grow the value of Kin . . . the more the value of [Kik's] 30 percent grows." (Answer ¶ 115).

> **In Response to No. 42**: Undisputed that Mr. Livingston stated, as set forth in Kik's Answer, that "the more we [grow the value of Kin], the more the value of our 30 percent grows." ECF 22 at ¶ 115. Also undisputed that Kik's Whitepaper states that Kik will "provide start up resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand." Disputed that Kik planned to "profit" or ever stated it would "profit" from the growth of the value of Kin, or that Kik intended to compensate itself. The SEC's citations do not support these statements. Further, the footnote is disputed to the extent the SEC suggests that Kik was conducting a single "one trillion Kin" offering. *See* Response No. 37.

43.     Before the May 2017 public announcement, Kik drafted a single "communications strategy" that would run from the announcement until the "token distribution event" and encompass both the "Pre-sale" and "Public sale" phases. (Answer ¶ 59; SEC32, Inv. Ex. 56) Kik also planned a single "Investor Roadshow" that included events in New York City, San Francisco, and abroad. The plan included the public announcement at which Kik would "[d]rive interest and awareness of Kik token sale," meetings with venture capitalists, and the token sale itself (then scheduled for July 2017), at which Kik would "Drive participation in sale" by the "Crypto community." (Answer ¶ 59; SEC32, Inv. Ex. 56).

> **In Response to No. 43**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Kik's communications strategy focused on two distinct events: the token distribution event, and the Pre-sale. The marketing for these events was focused on different audiences. *See* SEC14, Philp Inv. Tr. 173:16-24; *see also id.* 173:16-25 ("All of the marketing communications for the public sale was very specifically about the business model

---

[2] SEC31, Dep. Ex. 12, is the Kin white paper, which Kik published on May 25, 2017. The white paper was Kik's primary marketing document for the entire, one trillion Kin token sale. (SEC4, Heinke Dep. Tr., at 99:16-25).

that Kin provided for developers and consumers."). Kik further disputes the suggestion that existence of a slide presentation entitled "Communications Strategy" means that Kik made the same statements to potential Pre-sale participants as it did to potential TDE purchasers. Kik further disputes that the "road show," which was targeted to Pre-sale investors, was also aimed at TDE purchasers. SEC8, Livingston Inv. Tr. 400:9-401:13; Inv. Ex. 202 at KIK_00107750. Further, the cited presentation expressly distinguishes between the "crypto community" and the "tech community" as different potential participants. SEC39 at KIK_00107739. Otherwise, undisputed that the cited document (SEC32) was one iteration of a presentation entitled "Communications Strategy" and that it contains the quoted text.

44.     The "communications strategy" summarized how the Investor Roadshow would be

directed at both SAFT participants and public buyers as follows:

## Roadshow

**Media Strategy:** Setup in-person interviews with friendlies and analysts; setup in-person meetings with crypto investors reporters

**Tactics:**
- Media dinner in Toronto
- In-person meetings in SF and NY
- 1-2 Meetups w/ Ted in SF, NY, Toronto, London
- Leverage Fred Wilson and other advisors to validate this strategy with media and analysts
- Speak at TechCrunch Shenzen and Cryptofinancing (London)

**Key Topics:**
- *Kik is converting its network into crypto users*
- *Why chat + crypto makes sense*
- *How chat's ecosystem (bots, expression, etc.) will drive*
- *Potential alliance to trump Facebook's network effects*
- *General industry/Kik decline (if this is part of the narrative, this needs to be addressed head-on)*
- *Why Kik will be the first one to make this successful*




(SEC32, Inv. Ex. 56, at COINFUND006085).

> **In Response to No. 44**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering" on the ground that it had a "communications strategy," even though that strategy involved communications focused on two distinct events: the token distribution event, and the Pre-sale. *See also* Response No. 43.
>
> Kik further objects to this statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31. Otherwise, undisputed that the cited document (SEC32) was one iteration of a

presentation entitled "Communications Strategy" and that it contains the reproduced slide.

45.     Pursuant to its communications strategy, Kik planned to speak to the public about the "Public sale" phase at the same time it would discuss the "Pre-sale" phase with accredited investors. (Answer ¶ 59).

> **In Response to No. 45**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43. The fact that Kik engaged in separate communications with distinct groups over the same time period simply has no bearing on whether the Pre-sale was validly conducted pursuant to Regulation D.
>
> Kik further objects to this statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract," *see* Response No. 31, and to whether the Pre-sale was validly conducted pursuant to Regulation D. Otherwise, undisputed that Kik's communications strategy involved making some statements to potential TDE purchasers at the same time it was making separate communications to potential Pre-sale participants.

46.     The May 22, 2017 Board presentation included the following "Presale Timeline," which illustrates Kik's plan to simultaneously market Kin to both the general public and potential SAFT participants:

# Presale Timeline

|  | June 1 | Mid-June | End of June | Mid-July |
|---|---|---|---|---|
| **Target Raise Amount (Cumulative)** | $5mm | $20mm | $40mm | $50mm |
| **Target Markets** | - Conference Attendees<br>- First Degree Connections | - US - East Coast<br>- Canada | - US - West Coast<br>- Asia | - EU |
| **Key Actions** | - Qualify prospective buyers<br>- Advisor warm intros | - NY & Toronto Roadshow<br>- Media Dinners | - TechCrunch: Shenzen<br>- China & Japan Roadshow<br>- SF Roadshow | - London: Cryptofinancing<br>- EU Roadshow |
| **Materials** | - Executive Summary<br>- Term Sheet | - Management Presentation<br>- SAFT | - Management Presentation<br>- SAFT | - Management Presentation<br>- SAFT |

(SEC, Dep. Ex. 7, at KIK_00106886).

> **In Response to No. 46**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43.  As explained in Mr. Philp's declaration, Pre-sale participants and TDE purchasers received different documents and statements from Kik, and Kik did not distribute SAFT agreements or Private Placement Memoranda to TDE purchasers, unless any of the Pre-sale participants later independently decided to buy Kin in the TDE.  Philp Decl. ¶¶ 32-36, 54-55, 66.  Kik further notes that the SEC incorrectly states the date of the document cited at SEC30, KIK_00106868, which is May 23, 2017, not May 22.

> Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract," *see* Response No. 31, and to whether the Pre-sale was validly conducted pursuant to Regulation D.  Otherwise, undisputed that the slide reproduced above is one of several contained in the presentation at SEC30.

47. Kik's white paper (SEC31, Dep. Ex. 12) was directed to both the general public and accredited, pre-sale investors simultaneously. (SEC10, Heinke Inv. Tr., at 243:24-244:23).

> **In Response to No. 47**:  Undisputed that the target audience for the Whitepaper, which discuseed Kik's general vision for Kin and the new Kin economy, was "a combination of [ ] both the presale investors and then actual users, because it discussed a lot about the applications and what you could do with the token[.]"

SEC10 Heinke Inv. Tr. 243:25-244:18; Philp Decl. ¶ 31; SEC14 Philp Inv. Tr. 210:7-15.

48.     On May 23, 2017, Kik's board voted to approve the timeline, the allocation of the

ten trillion Kin, the split between a "pre-sale and public sale," and the white paper. (Answer ¶ 60).

>  **In Response to No. 48**: Disputed to the extent the SEC suggests the "split between
>  a 'pre-sale and public sale'" somehow constituted a single offering of Kin.  *See*
>  Response No. 37.  Pre-sale participants and TDE purchasers received different
>  documents and statements from Kik, and Kik did not distribute SAFT agreements
>  or Private Placement Memoranda to TDE purchasers, unless any of the Pre-sale
>  participants later independently decided to buy Kin in the TDE.  Philp Decl. ¶¶ 32-
>  36, 54-55, 66.
>
>  Otherwise undisputed that on or about May 23, 2017, Kik's Board voted to approve
>  the timeline, allocation of Kin, and the Whitepaper.

## D.     KIK PUBLICLY ANNOUNCED THE OFFERING OF ONE TRILLION KIN TOKENS

49.     On May 25, 2017, Kik announced a plan to offer and sell one trillion Kin through

publishing a white paper, issuing press releases, and statements by Kik's CEO during a "fireside

chat" at an event in New York City called the "Token Summit." (Answer ¶ 8; SEC22, Mougayar

Dep. Tr., at 96:13-20; SEC31, Dep. Ex. 12) Before the announcement, Kik's chief marketing

officer emailed Kik's CEO that "the primary audience for the initial announcement really is an

investor community" and "the Token Summit is ideal." (Answer ¶ 62; SEC33, Inv. Ex. 84).

>  **In Response to No. 49**: Disputed to the extent the SEC offers it for the proposition
>  that the audience at the Token Summit announcement in fact was made up of an
>  "investor community" and to the extent that the SEC suggests that the makeup of
>  the audience indicates whether Kik lead purchasers to expect profits primarily from
>  the efforts of others.  Kik further disputes this statement because it is incomplete
>  and misleading.  In the email cited at SEC33, Erin Clift, Kik's Chief Marketing
>  Officer, actually said she "believe[d] that the best first announcement is with an
>  audience of people who truly understand the power of crypto – and the nuances
>  around it. This is why I think the Token Summit is ideal." *Id.*  As the creator of the
>  conference testified, the audience was comprised of a "a lot of entrepreneurs
>  mostly" and "some" VC-types, but "not a lot."  SEC33, Mougayar Tr. 164:15-25.
>
>  Kik further objects to this statements as irrelevant and immaterial to whether Kik's
>  sales of Kin constituted an "investment contract." *See* Response No. 31.  Otherwise

undisputed that on May 25, 2017, Kik announced a plan to offer and sell one trillion Kin through publishing a white paper, issuing press releases, and statements by Kik's CEO during a "fireside chat" at an event in New York City called the "Token Summit."

50.     The Token Summit was created and organized by one of Kik's consultants. (SEC22, Mougayar Dep. Tr., at 36:13-38:14). Before the announcement, the consultant emailed Kik's chief marketing officer that "we expect 350-400 attendees, a mix of crypto-token crowd, entrepreneurs, business managers, investors/VCs, wall street types, regulators and media." (SEC34, Dep. Ex. 135; SEC22, Mougayar Dep. Tr., at 88:17-89:5). The actual number of attendees was close to 700, requiring building security to shut a number of people out because of fire regulations. (SEC22, Mougayar Dep. Tr., at 90:15-16; SEC4, Heinke Dep. Tr., at 134:16-135:1).

> **In Response to No. 50**: Undisputed.  Kik objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

51.     At the time he spoke at Token Summit, as well as when he subsequently appeared on CNBC and spoke at other events relating to Kin, Kik's CEO had authority to speak on behalf of Kik regarding the Kin project. (SEC35, November 12, 2019 Stipulation, at ¶¶ 14-41).

> **In Response to No. 51**: Undisputed.

52.     A video of the Token Summit fireside chat was posted on YouTube. (Answer ¶ 62; SEC36-A, May 25, 2017 Token Summit ("Token Summit") (video), SEC36-B, Token Summit (transcript)).

> **In Response to No. 52**: Undisputed that such a video was posted.  Disputed to the extent the SEC suggests that the video was viewed or received by any actual Pre-sale participate or TDE purchaser.

53.     Kik posted the white paper on its website, making the document freely accessible on the Internet. (SEC4, Heinke Dep. Tr., at 127:5-25). The white paper was Kik's primary marketing document for the entire, one trillion Kin token sale. (*Id.* at 99:16-25).

**In Response to No. 53**: Disputed that the Whitepaper "was Kik's primary marketing document for "the entire, one trillion Kin token sale." As Kik's former CFO testified that, it was the "main marketing document" only for the token sale, not the Pre-sale or SAFT. SEC4, Heinke Inv. Tr. 99:21-25. Further disputed that there was a single sale. *See* Response No. 37. Otherwise, undisputed.

54.     The whitepaper described as follows Kik's plan to sell Kin and to "driv[e] demand [for] and fundamental value" of the token:

> 1.     Kik's Vision
>
> As a company, Kik has been searching for a sustainable monetization model that does not compromise user experience or privacy. Rather than opt for mass display advertising or the selling of consumer data, Kik has decided to adopt a decentralized organizational model. Its goal is to encourage the development of a digital services ecosystem that is fair and open. Kik prefers to be a participant rather than a landlord in this user-first economy.
>
> To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems. Building a decentralized system is a complex process, and the transition to it must be done in a measured and responsible way over time. The following subsections outline Kik's plan for launching an entirely new platform: the Kin Ecosystem.
>
> **A new digital currency**
>
> The first step is to create a new cryptocurrency: Kin. Related to the word "kinship," and conveying a feeling of being connected to community, the Kin identity and currency is designed specifically to bring people together in a new shared economy.
>
> But simply creating a digital currency is not enough. For a cryptocurrency to be viable, it must also be useful and valuable. To establish an economy around the new currency, Kik must help to establish Kin's fundamental value.
>
> **Building fundamental value**
>
> Kik has been experimenting with forms of in-app currency since 2014, when it launched Kik Points. In launching Kik Points, the company wanted to see if users of its chat app would be eager to earn and spend a centralized digital currency. Key to this innovation was the notion that users would not have to purchase Kik Points but could instead earn them within the app. Millions of Kik users participated, resulting in an average monthly transaction volume nearly three times higher than the global transaction volume of Bitcoin.

Today, Kik is one of the world's most used chat apps and the fifth most-searched term in the iOS App Store. The millions of people who use Kik each month are in a unique position to demonstrate how cryptocurrency economies might form and function in the context of a large, mainstream user base.

Kik will build fundamental value for the new currency by integrating Kin into its chat app. Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem. In the future, users will be able to earn Kin by providing value to other members of the Kik digital community through curation, content creation, and commerce. Kik users will be able to spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants.

Kin will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency. Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem.

(SEC31, Dep. Ex. 12, at 5-6).

> **In Response to No. 54**: Disputed that the Whitepaper says that *Kik* will "driv[e] demand [for] and fundamental value" of the token. The correct and complete quote actually says that *Kin*'s digital economy will drive value for the cryptocurrency: "*Kin* will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency. Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem." SEC31 at KIK000006. Otherwise, undisputed.

55.     The white paper further stated that, "[i]n order to finance the Kin roadmap, Kik will conduct a token distribution event that will offer for sale one trillion units out of a 10 trillion unit total supply of Kin" (*id.* at 21), and that, "[t]o be notified of updates regarding the token distribution event, participants are invited to provide their email address at http://kin.kin.com" (*id.* at 23; Answer ¶ 64). The white paper did not identify a date on which the token distribution event would occur. Consistent with Kik's prior plans, the white paper also explained that three trillion Kin (30%) would be allocated to Kik under a future vesting schedule, and six trillion Kin (60%) would be allocated to a new "Kin Foundation." (SEC31, Dep. Ex. 12, at 21).

> **In Response to No. 55**: Disputed to the extent the SEC suggests that that Kik was conducting a "single offering" or that it made the same statements and

representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43. Kik knew that Pre-sale participants were a "totally different" user base than those buying in the TDE. SEC10, Heinke Inv. Tr. 142:4-15. Purchasers in the TDE "were buying [Kin] to integrate or primarily buying it for integrating into the ecosystem and having coin to use in the ecosystem." *Id.* As Kik's Board presentation from May 2017 made clear, there were two distinct sales: the Pre-sale involving a SAFT to accredited investors only, and a TDE to the public. SEC30 at KIK_00106892. Otherwise undisputed.

56.     Also on May 25, 2017, Kik's CEO appeared on CNBC; Kik and Kik's CEO posted online on social media and Medium; Kik released a professionally prepared promotional video that was uploaded to YouTube; and Kik issued a press release entitled "Kik to Integrate Kin Tokens as First Mainstream Adoption of Cryptocurrency." (Answer ¶ 63; SEC37, Inv. Ex. 200; SEC38, Inv. Ex. 88).

> **In Response to No. 56**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both saw and relied on the statements. Otherwise undisputed.
>
> Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

## E.   BETWEEN MAY AND SEPTEMBER 2017, KIK PROMOTED THE SALE OF ONE TRILLION KIN THROUGH A "WHITE PAPER," SEVERAL VIDEOS, SOCIAL MEDIA, AND A MULTI-CITY "ROADSHOW"

57.     Following the May 25, 2017 announcement, Kik advertised the "Kin economy," and, in doing so, its employees attended events in San Francisco, China, the United Kingdom and Canada. Kik planned a "Participant Roadshow," as outlined in its Communications Strategy, which included stops in San Francisco, China, London, and Toronto, and included events targeted at developers and other potential participants in the Kin economy, including the "TechCrunch" conference in Shenzhen, China, the "Botness" conference in New York City, the "Bitcoin Meetup" in San Francisco, the "Meetup" at Spotify's office in New York, and a "Meetup" in London. Kik's CEO made public statements during this "roadshow," including by speaking on panels at

conferences and in "fireside chats" with local media (Answer ¶ 69; SEC14, Philp Inv. Tr., at

332:18-23; SEC39, Inv. Ex. 202; SEC35, November 12, 2019 Stipulation, at ¶¶ 14-41).

> **In Response to No. 57**: Disputed to the extent these statements suggest that
> publication of any of those statements alone is sufficient to show that any TDE
> purchaser both saw and relied on them.  Further disputed to the extent the SEC
> suggests that Kik was conducting a "single offering" or that it made the same
> statements and representations to potential Pre-sale participants and potential TDE
> purchasers.  *See* Response No. 43.  Otherwise, undisputed.

> Kik further objects to these statements as irrelevant and immaterial to whether
> Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

58.   The "Participant Roadshow," as outlined in the Communications Strategy, was not

specifically targeted at developers and other potential participants in the Kin economy, but was

instead directed at accredited investors, several of whom would ultimately purchase Kin via SAFT

(*e.g.*, Pantera Capital and Polychain Capital):



(SEC39, Inv. Ex. 202, at KIK_00107750; *see also* SEC8, Livingston Inv. Tr., at 400:9-401:18).

> **In Response to No. 58**: Disputed.  The Participant Roadshow was targeted at
> developers or other potential participants.  As Kik's Director of Corporate
> Development testified, the "target audience for the roadshow" was "largely,

developers of consumer applications." SEC14, Philp Inv. Tr. 334:13-16.  Different events in various cities focused on different groups of people.  *Id.* 335:9-25.

59.    At least one Kik executive expected that persons who would be interested in participating in Kik's public sale would include "speculators" who "are there to make a profit. And that is it. They couldn't care less about anything else." (SEC40, Deposition of Eran Ben-Ari ("Ben-Ari Dep. Tr."), at 69:15-70:3; SEC41, Investigative Testimony of Eran Ben-Ari, ("Ben-Ari Inv. Tr."), at 138:14-20.) He formed this view based on "internal discussions with people within the company" including Kik's CEO and CFO, and based on discussions with Kik's consultants during an "offsite . . . to better understand who usually participates in these TDEs [token distribution events]." (SEC41, Ben-Ari Inv. Tr., at 140:9-22).

> **In Response to No. 59**: Disputed to the extent the SEC suggests these were the only persons the cited Kik executive said would be interested in participating in the public sale.  This individual, Kik's former Chief Product Officer testified that in addition to "some spectators," he believed enthusiasts and Kik users would participate in the TDE. SEC41, Ben-Ari Inv. Tr. 138:14-20. Otherwise undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

60.    Kik personnel attended events in various cities to tell people about the Kin project and the idea of buying Kin tokens (SEC14, Philp Inv. Tr., at 334:7-11), and to raise awareness of the ecosystem as a whole and Kik's planned token distribution event (*Id.* at 394:2-11; *see also* SEC35, November 12, 2019 Stipulation, at ¶¶ 8-13).

> **In Response to No. 60**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43.  Otherwise undisputed.
>
> Kik further objects to this statement on the grounds that it is irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31.

61.     Many of Kik's Roadshow events were videotaped and posted on YouTube. (Answer ¶¶ 7, 70).

> **In Response to No. 61**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser saw or relied on the statements.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers.  *See* Response No. 43.   Otherwise undisputed.
>
> Kik objects on the grounds that it is irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

62.     During the same Roadshow in which Kik made public statements about Kin, Kik also met privately with individuals to discuss Kin. These individuals included accredited investors who were interested in participating in sales of digital tokens. (SEC14, Philp Inv. Tr., at 332:18-23, 336:7-13, 338:12-23). For example, while Kik was in New York City during the week of the Token Summit, Kik met with the investors Pantera Capital and Maple Ventures. (SEC10, Heinke Inv. Tr., at 132:20-12; SEC14, Philp Inv. Tr., at 338:25-339:4; SEC23, Morehead Inv. Tr., at 26:6-28:9). In addition, while in San Francisco, Kik met with representatives of Fortress Investment Group. (SEC14, Philp Inv. Tr., at 337:14-338:3; SEC42, Investigative Testimony of Michael Hourigan ("Hourigan Inv. Tr."), at 38:11-42:12, 43:20-46:1). Kik's written Communications Strategy stated with respect to the Roadshow, "Goal: [Kik's CEO] to meet with top 2-3 crypto participants in each market." (SEC39, Inv. Ex. 202 at KIK_00107750).

> **In Response to No. 62**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers.  *See* Response No. 43.  Otherwise undisputed.
>
> Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

63.     In addition to traveling to multiple cities, Kik posted to on-line social media such as Medium, Twitter, Reddit, and Slack regarding the Kin project. (Answer 1 71).

**In Response to No. 63**:  Disputed to the extent the SEC suggests that publication of any statements on social media alone is sufficient to show that any TDE purchaser saw and relied on the statements.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers.  *See* Response No. 43.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser relied on any of the statements, Kik objects to the statement as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See also* Response 31.

64.     By June 1, 2017, Kik was sending emails to persons who had signed up to receive updates about Kin, stating that Kik would "be back in touch over the coming weeks with more details on the product, the registration process and token event." (*See, e.g.*, SEC43, COINFUND012819; SEC44, PANT-000000051).

**In Response to No. 64**: Disputed to the extent the SEC suggests that publication of any statements on social media alone is sufficient to show that any TDE purchaser saw and relied on the statements.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers.  *See* Response No. 43.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser relied on any of the statements, Kik objects on the grounds as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See also* Response 31.

65.     Between June 14, 2017 and June 16, 2017, Kik's CEO traveled to New York City in connection with Kik's sale of Kin. (SEC35, November 12, 2019 Stipulation, at 1 9).

**In Response to No. 65**: Undisputed.

66.     Between June 18, 2017 and June 22, 2017, Kik's CEO traveled to Shenzhen, China, where, on June 20, 2017, he spoke at an event entitled "TechCrunch Shenzhen." (*Id*. at 1 23). Kik's CEO's statements at TechCrunch Shenzhen were recorded on video. (*Id*. at 1123-26; SEC45-A, June 20, 2017 TechCrunch Shenzhen ("TechCrunch") (video); SEC45-B, TechCrunch (transcript)).

> **In Response to No. 66**:  Disputed to the extent the SEC suggests that publication of the video alone is sufficient to show that any TDE purchaser saw and relied on the statements. Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43.   Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser relied on any of the statements, Kik objects on the grounds that it is irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See also* Response No. 31.

67.      Between June 27, 2017 and June 28, 2017, Kik's CEO traveled to San Francisco, California, where, on June 27, 2017, he spoke at an event entitled "An Evening with Ted Livingston." (SEC35, November 12, 2019 Stipulation, at ¶ 27). Kik's CEO's statements at "An Evening with Ted Livingston" were streamed on-line live and recorded on video. (*Id*. at ¶¶ 27-30; SEC46-A, June 27, 2017 An Evening with Ted Livingston ("An Evening") (video); SEC46-B, An Evening (transcript); SEC46-C, An Evening (screen capture)).

> **In Response to No. 67**: Disputed to the extent the SEC suggests that publication of the video alone is sufficient to show that any TDE purchaser relied on the statements. Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser relied on any of the above-mentioned statements, Kik objects on the grounds as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See also* Response No. 31.

68.      Between July 4, 2017 and July 7, 2017, Kik's CEO traveled to London in connection with Kik's sale of Kin. (SEC35, November 12, 2019 Stipulation, at ¶ 12). And, on August 1, 2017, Kik's CEO appeared on "Finance Magnates' Blockchain Podcast," a video podcast that was and is available on the Internet. (*Id*. at ¶¶ 31-33; SEC47-A, August 1, 2017 Finance Magnates' Blockchain Podcast ("Finance Magnates") (video); SEC47-B, Finance Magnates (transcript); SEC47-C, Finance Magnates (screen capture)).

> **In Response to No. 68**: Disputed to the extent the SEC suggests that publication of the video alone is sufficient to show that any TDE purchaser saw and relied on the statements. Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser relied on any of the statements, Kik objects as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See also* Response No. 31.

69.     On August 14, 2017, Kik's CEO spoke at an event in Toronto, Canada entitled "Fintech Canada: Bitcoin and Ethereum Summit." (SEC35, November 12, 2019 Stipulation, ¶¶ 34-37). Registration for the event was open to the public. (SEC22, Mougayar Dep. Tr. 162:18-21). The talk was recorded on video and posted on the Internet. (SEC35, November 12, 2019 Stipulation, ¶¶ 34-37; SEC48-A, August 14, 2017 Fintech Canada: Bitcoin and Ethereum Summit ("Fintech Canada") (video); SEC48-B, Fintech Canada (transcript); SEC48-C, Fintech Canada (screen capture); SEC22, Mougayar Dep. Tr., at 167:23-170:8).

> **In Response to No. 69**: Disputed to the extent the SEC suggests that publication of the video alone is sufficient to show that any TDE purchaser saw and relied on the statements.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See also* Response No. 31.

70.     Between September 6, 2017 and September 8, 2017, Kik's CEO traveled to New York City (again), where, on September 7, 2017, he spoke at an event entitled "New York City Ethereum." (SEC35, November 12, 2019 Stipulation, ¶¶ 38-41). The talk was recorded on video and posted on the Internet. (*Id*.; SEC49-A, September 7, 2017 New York City Ethereum ("NYC

Ethereum") (video); SEC49-B, NYC Ethereum (transcript); SEC49-C, NYC Ethereum (screen capture)).

> **In Response to No. 70**: Disputed to the extent the SEC suggests that publication of the video alone is sufficient to show that any TDE purchaser saw and relied on the statements.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering" or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response No. 43.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See also* Response No. 31.

71.     At least one purchaser of Kin viewed some or all of these public appearances on YouTube before making his purchases. (*See, e.g.*, SEC50, Deposition of Harrison Wang ("Wang Dep. Tr."), at 43:5-14, 122:4-13).

> **In Response to No. 71**: Disputed.  The SEC cites to only one purchaser, Harrison Wang, who identified generally only two public appearances he supposedly saw (i.e., a "YouTube video where Ted gave that talk about driving price up with Kin adoption and Kik," and "Ted Livingston at [a] conference") without specifically identifying what appearances those were.  SEC50, Wang Tr. at 43:5-14, 122:4-13.  In his testimony more than a year earlier, Mr. Wang said only that he read the Whitepaper and some articles.  SEC73, Wang Inv. Tr. 14:19-23.  He did not recall that he had even seen a video until the week of his deposition more than a year later, after this suit was filed.  SEC50, Wang Tr. 122:14-123:24.  And he did not remember when he watched the video and did not even watch the entire thing. *Id.* Further disputed to the extent the SEC suggests that it reflects what any purchaser other than Harrison Wang saw.
>
> Kik further objects that the subjective view of a single purchaser is irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract," *see* Response No. 31, as are marketing statements in light of the merger clause in the TDE's Terms of use.

F.     **KIK OFFERED AND SOLD THE ONE TRILLION KIN THROUGH CONTRACTS CALLED "SAFTS" AND THROUGH A "PUBLIC SALE"**

   *i.     Kik Conducted One Offering of Kin In Two Phases, One That Included A SAFT And One That Did Not.*

72.    From May 25, 2017 through September 11, 2017, Kik offered and sold the right to receive Kin in the future, conditioned on a "Network Launch," to "accredited investors" as defined in SEC Regulation D. Kik sold such rights to investors pursuant to contracts called Simple Agreements For Future Tokens ("SAFTs"). The SAFT stated that Kik "hereby issues to the Purchaser the right ("***the Right***") to certain units of Kin (the "***Token***" or "***Kin***"), subject to the terms" of the SAFT. If the "Network Launch" occurred, the investors who entered into a SAFT with Kik would receive Kin at a discounted price. These SAFT investors would receive 50 percent of their allotted tokens upon Network Launch, and their remaining tokens the following year (SEC51, Dep. Ex. 52; Answer ¶ 1).[3]

          **In Response to No. 72**: Undisputed.

73.    From May 25, 2017 through September 26, 2017, Kik offered and sold Kin to the general public through a process that culminated in the Network Launch, which Kik also referred to as a "public sale" or "token distribution event." (Answer ¶ 31).

          **In Response to No. 73**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37.   Otherwise undisputed.

74.    As Kik's CEO explained to an audience in San Francisco, Kik sold Kin through SAFTs and to the public as part of a single sale of 10% of the total number of Kin that Kik planned to create:

          So, maybe this is, like – the allocation is, we're selling 10%. So, we're
          creating 10 trillion Kin tokens. You know, why a trillion? Because
          consumers, when they post in our group chat, they don't want to earn .0002
          Bit coin, they'd rather have two Kin. So you know, we just always look at

---

[3] SEC51, Dep. Ex. 52, is a sample of Kik's form SAFT.

> this group (inaudible) so that's why so many. We're going to take 1 trillion of those tokens and then sell it in a token distribution event, and we're going to do half presale through institutional investors, which is already completely spoken for (inaudible) and then half through a public distribution event, and that distributor event. . . .

(SEC44-B, An Evening (transcript), at 55:24-56:20).

> **In Response to No. 74**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering," or that Kik made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response Nos. 37, 46.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

75.     Similarly, Kik's CEO described the structure of the Kin sale to an audience in China as follows:

> There'll be three blocks of Kin. One block will be the 10 percent we're selling this summer, one block will be the 30 percent set aside for Kik, and that will vest 10 percent per quarter for 10 quarters. And then the third block will be the 60 percent set aside for this not-for-profit Kin Foundation. So, for that 30 for Kik, as it vests into the market, we will be able to sell it on to the exchanges like anybody else, to fund operations, to provide a financial exit for employees and investors, really to do with whatever we want.

(SEC43-B, TechCrunch (transcript), at 21:4-14).

> **In Response to No. 75**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering," or that it made the same statements and representations to potential Pre-sale participants and potential TDE purchasers. *See* Response Nos. 37, 46.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

76.     Consistent with Kik's CEO's statements, Kik did not create different classes of Kin.

All of the one trillion Kin that Kik sold were identical and fungible. (Answer ¶ 180).

**In Response to No. 76**: Undisputed that Kik did not create different classes of Kin, and that all Kin were identical and fungible. Disputed that this was "consistent with Kik's CEO's statements" as the SEC does not identify any such statements. Further disputed that Kik conducted a single offering of one trillion Kin. *See* Response No. 31.

### ii.    By Entering Into The SAFTs, Kik Gave Itself A Deadline To Complete The Public Sale.

77.    Kik's SAFT (*see, e.g.*, SEC51, Dep. Ex. 52) provided that purchasers who contracted with Kik would receive half of their allotment of tokens upon the completion of the public portion of the sale, which the SAFT called the "Network Launch", and half the following year:

**1.    Events**

   **(a)    Network Launch**. If there is a Network Launch before the expiration or termination of this instrument, the Company will issue to the Purchaser a number of units of the Token equal to the Purchase Amount divided by the Discount Price pursuant to the following schedule:

   **(i)    Fifty percent (50%)** shall be issued as soon as practicable after the Network Launch provided that such issuance shall be no later than the date on which such units of Token are distributed to the public; and(ii) Fifty percent (50%) shall be issued on the one-year anniversary of the Network Launch.

In connection with and prior to the issuance of Tokens by the Company to the Purchaser pursuant to this Section 1(a):

   **(ii)    The Purchaser** will execute and deliver to the Company any and all other transaction documents related to this SAFT, including verification of accredited investor status or non-U.S. person status under the applicable securities laws; and

   **(iii)    The Purchaser** will provide to the Company a network address for the allocation of Purchaser's Tokens after the Network Launch.

(SEC51, Dep. Ex. 52; Answer ¶ 1). The "Network Launch" was defined as "a *bona fide* transaction or series of transactions, pursuant to which the Company will sell Kin to the general public in a publicized product launch of Kin through the instantiation of Kin via deployment on the Ethereum Blockchain" – *i.e.*, the "tranches" of Kin that Kik planned to sell the general public. (SEC51, Dep. Ex. 52).

**In Response to No. 77**:  Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Although the word "tranche" appears in other internal Kik documents, the SEC does not cite them here, and other

evidence makes clear that Kik did not consider the Pre-sale and TDE to be separate "tranches" of a single offering. Otherwise undisputed.

78.  Purchasers who bought Kin via SAFT (who Kik sometimes referred to as "SAFT participants") paid a sum certain at the time they entered into the SAFTs, but Kin would ultimately be delivered in an amount that reflected the discounted price – that is, they paid only 70 percent of the price at which the Kin would be sold to the public during the public portion of the sale. Thus, the number of Kin received by the SAFT investor and the per-Kin price for the Kin received were contingent on the pricing of Kin during the public portion of the sale. Specifically, the SAFT stated in relevant part, under Section 2:

> "*Discount Price*" means the maximum price per Token sold by the Company to the public during the Network Launch multiplied by the Discount Rate.
>
> "*Discount Rate*" is 70%.

(SEC51, Dep. Ex. 52; *see also* SEC52, Dep. Ex. 16).[4] Stated another way, because SAFT participants paid a discounted price for the Kin based on the public sale price, the number of Kin that SAFT participants would ultimately receive was contingent on the public sale pricing of Kin. (SEC51, Dep. Ex. 52, at KIK000068; SEC4, Heinke Dep. Tr. 170:2-21).

> **In Response to No. 78**: Disputed to the extent that SEC suggests that the Kin would necessarily be delivered to SAFT holders without regarding to the SAFT terms governing such delivery, including the launch of the network.  Otherwise undisputed.

79.  SAFT participants would receive 50% of their Kin upon the completion of the "Network Launch" and 50% a year later, both without further action on the part of the purchaser. The SAFT stated that "the Right created by this instrument . . . cannot be resold except in compliance with the applicable country's laws." (SEC51, Dep. Ex. 52, at KIK000069). The SAFT placed no resell restrictions on Kin once transferred to SAFT participants. Kik also did not place

---

[4] 5 SEC52, Dep. Ex. 16, is an example of Kik's private placement memorandum ("PPM") that Kik provided to accredited SAFT participants but not to general public purchasers. (Answer ¶ 90).

restrictions on the Kin distributed to persons who bought during the public sale. (Answer ¶¶ 1, 12, 88).

> **In Response to No. 79**:  Disputed to the extent that the SEC suggests that the SAFT placed no resell restrictions on SAFT participants.  Resale purchasers were expressly prohibited from reselling the security itself, SEC51 at KIK000066, 69, and the SEC has cited no evidence in supports of its proposition as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Otherwise undisputed.

80.     The SAFTs would expire if the "Network Launch" (*i.e.*, the completion of the sale to the public) did not occur by September 30, 2017. Kik retained the right to extend that time frame by sixty days, until November 30, 2017. (Answer ¶ 92).

> **In Response to No. 80**: Undisputed.

81.     If the Network Launch did not occur by the deadline, Kik's SAFT would "terminate," meaning that SAFT participants would not receive Kin, and Kik would be required to return 70% of the invested cash to each purchaser:

> **(b)      Dissolution Event**. If there is a Dissolution Event before this instrument expires or terminates, the Company will pay an amount equal to the Purchase Amount multiplied by the Discount Rate (the "*Discounted Purchase Amount*"), due and payable to the Purchaser immediately prior to, or concurrent with, the consummation of the Dissolution Event. If immediately prior to the consummation of the Dissolution Event, the assets of the Company that remain legally available for distribution to the Purchaser and all holders of all other SAFTs (the "*Dissolving Purchasers*"), as determined in good faith by the Company's board of directors, are insufficient to permit the payment to the Dissolving Purchasers of their respective Discounted Purchase Amounts, then the remaining assets of the Company legally available for
>
> distribution, will be distributed with equal priority and pro rata among the Dissolving Purchasers in proportion to the Discounted Purchase Amounts they would otherwise be entitled to receive pursuant to this Section 1(b).  Any distributed amounts shall be in U.S. Dollars.
>
> **(c)      Termination**.  This instrument will expire and terminate upon the earlier of (i) upon the Network Launch; (ii) the payment, or setting aside for payment, of amounts due the Purchaser pursuant to Section 1(b); (iii) September 30, 2017 (the "*Deadline Date*"), if the Network Launch has not occurred as of such date; provided that, the Company shall have the right to extend the Deadline Date by sixty (60) days, in its sole discretion; and (iv) the failure to obtain net proceeds of more than $25,000,000 from the sale of all rights pursuant to the SAFTs; *provided*, that in the case of (iv), the Company shall have the obligation to repay to the Purchasers the aggregate amount of all Purchase Amounts.

(SEC51, Dep. Ex. 52; *see also* Answer ¶ 1; SEC10, Heinke Inv. Tr., at 392:20-295:19).

> **In Response to No. 81**: Undisputed.

82.     The SAFT made no provision for a purchaser to cancel the agreement and obtain a refund, absent a condition set forth in the SAFT. (SEC51, Dep. Ex. 52).

**In Response to No. 82**: Undisputed.

83.     Kik provided potential SAFT participants with a private placement memorandum ("PPM") (SEC52, Dep. Ex. 16), but it did not provide this information to general public purchasers. (Answer ¶ 90). The PPM included a "Company Overview" about Kik, biographies of Kik's "Directors and Management," and a description of the Kin project, but did not contain information about Kik's financial history. (SEC52, Dep. Ex. 16). The PPM provided that "[t]he SAFTs described in this Memorandum are subject to restrictions on transferability and resale and may not be transferred or resold" (*id*. at KIK000038), but it did not place any restrictions on the resale or transferability of the Kin purchased pursuant to the SAFT. (Answer ¶ 88).

> **In Response to No. 83**: Disputed.  The PPM contained pages of information about the Company's history, its users and ranking in the Apple App Store, competition with Facebook Messenger and WhatsApp, its core product missions and what each was building, among other information.  SEC52 at KIK000041-47. Otherwise undisputed.

84.     On May 24, 2017, the day before Kik publicly announced about Kin, Kik executives met in New York City with the founder of a hedge fund, Pantera Capital, and discussed the hedge fund's potential interest in signing a SAFT. (Answer ¶ 89).

**In Response to No. 84**: Undisputed.

85.     At its May 24, 2017 meeting with Pantera's founder, Kik described how it would use Kik Messenger to create interest in the tokens. (SEC23, Morehead Inv. Tr., at 26:4-31:5). That hedge fund later entered a SAFT and paid Kik $15 million, the highest amount by any Kin buyer in 2017. (SEC53, Dep. Ex. 40; SEC10, Heinke Inv. Tr., at 362:4-7).

> **In Response to No. 85**: Disputed. Kik explained to Pantera's founder, Mr. Morehead, how "the messenger app would be the first service provided on this new Kin Ecosystem," and Mr. Morehead "thought that by starting with a community of

20 million active users they would have a better chance of building a decentralized social network than just two guys in a garage." SEC23, Morehead Tr. 30:8-31:4. Otherwise undisputed.

86.    During the same New York City trip, Kik executives also met with representatives of another potential SAFT participant, which later entered into a SAFT with Kik. (SEC4, Heinke Dep. Tr., at 132:20-133:12).

**In Response to No. 86**: Undisputed.

87.    Following its May 2017 public announcement of Kin, Kik sent select potential SAFT participants term sheets that described Kik's plan to raise $50 million through SAFTs. (*See, e.g.*, SEC54, KIK_00017702; SEC55, KIK_00017698).

**In Response to No. 87**:  Disputed that Kik described a plan to "raise" $50 million. The attached term sheets identify the "amount of rights offering," and state that purchasers will be entitled to receive certain numbers of Kin based on the amounts paid for the rights to purchase units of Kin.  SEC55 at KIK_0017699.  Otherwise undisputed.

88.    Kik advised Kin purchasers who purchased pursuant to the SAFT that the SAFT was a security:

THE OFFER AND SALE OF THIS SECURITY INSTRUMENT HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THIS SECURITY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED, OR HYPOTECATED EXCEPT AS PERMITTED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

(Answer ¶ 91; SEC51, Dep. Ex. 52).

**In Response to No. 88**: Undisputed.

89.    On June 14, 2017, Kik's outside counsel sent an email to Kik's CFO with the subject line "Draft email," and which stated in the body of the email:

At the last Board meeting, before Fred and Jim had to drop off the call, the proposed course of action suggested, to ensure minimum risk to the Company and the Board (in recognition of the frothiness of the cryptocurrency markets generally at this time), was to conduct a $100MM pre-sale and eliminate the "public" token distribution event (TDE). The conversion of the SAFT rights into Kin would occur at the time the Kin ecosystem was fully functional versus at the time there was a minimal viable product.

During the remainder of the Board call (after Fred and Jim's departure), the discussion centered on an option whereby the Company would conduct a $75MM pre-sale, and a $25MM public TDE at the time the Kin ecosystem was fully functional (which would be beyond the anticipated summer 2017 event).

After the Board meeting, management had an opportunity to consider 2 things – whether a TDE at $25MM (total raise of $100MM including the pre-sales) would maintain the integrity of the discounts communicated to pre-sale investors and whether investors contacted already for the pre-sale would view negatively a delay in the TDE to allow the Company to develop a fully functional Kin ecosystem.

. . . .

We reached out to the lead investor on the pre-sale [Pantera Capital] and talked about extending the time before the Company would conduct the [token distribution event] and offered the reason why and much to our surprise, the proposed delay was viewed adversely and would impact the lead investor's decision to participate in the pre-sale.

(SEC56, Inv. Ex. 181).

> **In Response to No. 89**: Undisputed that Kik's outside counsel sent the cited email. Disputed as to the substance of the email.  Mr. Heinke, Kik's then CFO, did not recall Pantera saying that the TDE "would adversely affect his decision to invest." SEC10, Heinke Inv. Tr. 361:12-24.  Pantera's founder, Mr. Morehead, further testified that any delay in the TDE would not have impacted his decision to invest. SEC23 Morehead Inv. Tr. at 116:1-12.
>
> Kik further objects to these statements as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract."  *See* Response No. 31.  Kik further objects to these statements as inadmissible hearsay that is inappropriate for summary judgment.

90.    Kik wanted to be the first digital services application to launch a cryptocurrency.

(Answer ¶ 95).

> **In Response to No. 90**: Undisputed.

91.     Kik executives were worried that the market for digital tokens might cool, or that other social media companies could offer digital assets before Kik and deprive it of significant first-mover advantages. (SEC9, Holland Inv. Tr., at 231:5-233:11; SEC10, Heinke Inv. Tr., at 406:1-411:7).

> **In Response to No. 91**: Disputed.  Mr. Livingston was *not* concerned with pressure about being first to market.  SEC10, Heinke Inv. Tr. 406:1-9.  The only support cited by the SEC to the contrary is the statement of a Kik Board member that he believed the "feeling among the company" was to be ready to go to market with its idea, and that there was general discussion within the company about "trying to make this happen while the market was still open."  SEC9, Holland Inv. Tr. 231:5-233:11.  Kik further objects to statements of a third-party as inadmissible hearsay.

92.     Kik entered into SAFTs with various participants from July 2017 until September 11, 2017, when it entered into the final 10 SAFT agreements. (SEC57, Inv. Ex. 133).

> **In Response to No. 92**: Undisputed.

93.     In total, Kik received approximately $49 million from approximately 50 participants pursuant to the SAFTs. (Answer ¶¶ 1, 12, 93). As a result of the deadline contained in the SAFT, if the Network Launch did not occur by November 30, 2017, Kik would have been obligated to return around $35 million to Kin purchasers who bought pursuant to a SAFT purchasers. (Answer ¶ 93).

> **In Response to No. 93**: Disputed.  Kik always had the option to negotiate a further extension with Pre-sale participants, if necessary.  SEC10, Heinke Inv. Tr. 394:23-395:5. Otherwise undisputed.

## G.   KIK MARKETED THE KIN OFFERING BY EMPHASIZING THE OPPORTUNITY TO PROFIT.

### i.   *Kik's Publicly Described How Kin's Price Could Increase.*

94.   Kik could control what it led purchasers of Kin to expect. (Answer ¶ 72). And in its public statements about Kin between May 25, 2017 and September 26, 2017, Kik described how the value and prices of Kin could increase in the future.

> **In Response to No. 94**: Disputed.  Kik's marketing materials did not describe the value or price of Kin rising.  Starting with the publication of it Whitepaper, Kik emphasized its "goal [] to encourage the development of a digital services ecosystem that is fair and open," and that "Kik prefers to be a participant rather than a landlord."  SEC31 at KIK000005.  Kik planned to help "build fundamental value for the new currency by integrating Kin into its chat app," and by being the "first service to join the Kin Ecosystem."  *Id.*  Otherwise, undisputed as Kik's Answer ¶ 72 states, that Kik could "only control what it led purchasers to expect, *not what purchasers may or may not have known*."  *Id.* (emphasis added).
>
> Kik further objects to this statement because it lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

95.   For example, Kik's white paper made clear that the Kin that Kik planned to both sell to the public and retain in its treasury was at the core of Kik's "monetization model" as a for-profit entity, and it included the following discussion:

> Kin will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency. Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem.
>
> The Kin Rewards Engine will use economic incentives to bring other digital services and applications into the decentralized Kin Ecosystem. Inspired by previous systems like Bitcoin's block rewards and Steemit's posting rewards, the Rewards Engine will create natural incentives for digital service providers to adopt Kin and become partners in the ecosystem. The ecosystem will not impose any unnecessary restrictions or tolls on monetization strategies, beyond ensuring common ethics and legality of content and transactions. As more partners join, the network effect of the Kin Ecosystem will grow, building the value of the currency, and in turn encouraging new partners to join this initiative.
>
> . . .

> Through a series of economic and technological transitions, and based on a new cryptocurrency called Kin, Kik will work toward creating the first open and sustainable alternative ecosystem of digital services for our daily lives. Economic incentives at the core of this ecosystem will ensure that all participants – users, founders, and digital service partners – will ultimately benefit from this work.

(SEC31, Dep. Ex. 12, at 5, 6, 7).

> **In Response to No. 95**:   Disputed.   Kik was "searching for a sustainable monetization model that does not compromise user experience or privacy."  SEC31 at KIK000004.  The Whitepaper does not refer to Kik's status as a "for-profit" entity or suggest that Kin was at its "core," and the SEC provides no cite suggesting otherwise.  Otherwise undisputed that the document contains the quoted text.

96.     As one Kik witness testified, the "entire vision is that as the ecosystem evolves and more demand, the value of the underlying token would increase." (SEC14, Philp Inv. Tr., at 408:5-408:7).

> **In Response to No. 96**: Undisputed.  Kik's "goal [] to encourage the development of a digital services ecosystem that is fair and open," and that "Kik prefers to be a participant rather than a landlord."  SEC31 at KIK000005.  Kik planned to help "build fundamental value for the new currency by integrating Kin into its chat app," and by being the "first service to join the Kin Ecosystem."  *Id.*  Kik further objects to this statement to the extent suggests it reflects the views of Kik as a whole or other executives.

97.     Similarly, at the May 25, 2017 Token Summit in New York City, Kik's CEO stressed Kin's role in "monetization":

> So that's step number two is taking Kin, integrating into one of the largest consumer apps in the world to really give it value and to make Kik better and monetize Kik in a new way. But we didn't stop there. We said, wait a second, if we give Kin value, could we use some of that value to spark the creation of a new ecosystem of digital services? There's all these developers out there who have built these amazing things, but they can't make any money. They don't have the scale to monetize through advertising. And these huge companies who do have the scale are giving everything else away for free. So you have all these developers who are trying to build these amazing things but they're just they're going broke.

(Answer ¶ 66; SEC36-B, Token Summit (transcript), at 5:13-6:2).

45.

**In Response to No. 97**: Disputed.  To the extent the SEC refers to Kin's role in monetizing Kik, the statement refers to the ability of all free apps to monetize by adopting and using Kin.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

98.   In its May 25, 2017 press release, Kik stated that it "will drive mainstream consumer adoption of Kin, establishing demand and fundamental value for the cryptocurrency." (SEC38, Inv. Ex. 88).

**In Response to No. 98**: Undisputed.

99.   And, in its May 25, 2017 Medium post, Kik described a future "system" under which "Kin itself will become more valuable":

> To maximize the chance of success, we're dedicated the majority of Kin to a rewards system that will provide a financial incentive for developers. Each day, using an algorithm that reflects each service's contribution, the Kin Rewards Engine will divvy up a set amount of Kin among all the services in the ecosystem. . . . In time, it can create a network effect: as the daily reward increases in value, more developers will join, there will be more Kin transactions, Kin itself will become more valuable, and in turn the daily reward will be worth even more...

(Answer ¶ 66; SEC37, Inv. Ex. 200).

**In Response to No. 99**: Undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

100.   Kik repeatedly discussed the potential to profit from a purchase of Kin by citing the concepts of "supply and demand" and reminding potential purchasers that the supply of Kin was fixed (e.g., SEC31, Dep. Ex. 12, at 8), and Kik was "all in" on creating demand for the token. For

example, at the June 27, 2017 conference in San Francisco, Kik's CEO put it as follows during a question-and-answer session with the audience:

> [KIK'S CEO]: So, that's the beautiful thing with the blockchain, right? We know with Bitcoin for example, there's only going to ever be 22 million Bitcoins, or whatever it is --
>
> AUDIENCE MEMBER: 21 million.
>
> [KIK'S CEO]: 21 million, thank you, I appreciate that. (Laughter.)
>
> [KIK'S CEO]: Sorry, I was off by so much. (Laughter.)
>
> [KIK'S CEO]: And with that -- so, that's the beautiful thing, is like, as a developer, as anybody in the US, you can look at Bitcoin and say, so, there's only going to ever be 21 million Bitcoins. So, the supply is fixed, so the demand for Bitcoin goes up, economics 101, supply stays the same, demand goes up, price is going to go up. And therefore, if I buy some today, if I think the demand is low, because I think tomorrow the demand will be higher, I will be able to sell at a higher price, and that's the thing that was just never possible. . . .
>
> AUDIENCE MEMBER: All right, that's all well and good. My second question for you is, what will Kik do in order to guarantee the value of Kin going forward?
>
> [KIK'S CEO]: So, we cannot guarantee the value of Kin. You know, I think once you create a cryptocurrency, it's on the exchanges, and the price of it is set by market based on supply and demand. And so, you know, even though the supply is fixed, as the demand goes down, the price is going to go down, but I think what we can guarantee is we are all in on this. You know, this is -- this is something we've been working to -- towards for a long time, but this is something that is in our financial best interest, because of the 30%, but actually, like, just to be honest, like, this is something we have to do. We cannot compete with Facebook.

(SEC46-B, An Evening (transcript), at 34:11-35:6, 35:17-36:7; Answer ¶ 9).

> **In Response to No. 100**: Disputed.  The SEC cites only one instance of this so-called "repeated" representation, and that reference to the Whitepaper does not support the SEC's statement.  It states only that "Kin is a pure cryptocurrency of fixed supply," and does not reference a potential to profit whatsoever.  SEC31 at KIK000008.  Moreover, referencing "concepts of supply and demand" generally does not equate to the "potential to profit" and the SEC provides no cite otherwise. Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

101.   In the professionally produced video that Kik released around the time of the Token Summit, Kik's CEO described how Kik would recruit developers to join the Kin Ecosystem and the benefits that would follow: "So you get all these developers coming in, and that creates more transactions. The more transactions, the more demand for the currency. The more demand for the currency, the more valuable the currency." (SEC58-A, May 25, 2017 Promotional Video ("Promo Video") (video); SEC58-B, Promo Video (transcript), at 4:10-13; *see also* SEC35, November 12, 2019 Stipulation, at ¶20-22).

> **In Response to No. 101**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

102.   Kik's white paper, meanwhile, stated, "In character, Kin is a pure cryptocurrency of fixed supply." (SEC31, Dep. Ex. 12, at 8).

> **In Response to No. 102**:  Undisputed.

103.   And, at the August 14, 2017 conference in Canada, Kik's CEO described how increased demand for Kin could lead to "everybody . . . mak[ing] a ton of money":

> But, now, with the cryptocurrency, it's in Kik's best interest to get people paid because that's what we're trying to do. We're trying to build this economy, whether it's around chat – you know, I host a great group chat that I join your great group chat; whether it's music – I create a great song, I listen to your great song; a game – I create at great level, I play your level; where consumers are coming together and providing value to each other and facilitating that with a cryptocurrency. The more you do that, the more valuable the - the more demand for the cryptocurrency there will be. And with sort of a, you know, cryptocurrency, you can guarantee a fixed supply,

guaranteed scarcity. So supply stays the same. Demand goes up, the price goes up. Such that if you set some aside for yourselves and you give other people the opportunity to participate and contribute, everybody can not only build this amazing new ecosystem and platform, but also make a ton of money.

(Answer ¶¶ 10, 117; SEC48-B, Fintech Canada (transcript), at 10:10-11:3).

> **In Response to No. 103**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31.   Kik further objects that this statement is irrelevant and immaterial because Kik did not sell Kin to any Canadian residents.

104.   Kik's CEO made similar statements at an early September event in New York City:

> And this is where we really got excited about bitcoin back in 2011 where it was like, bitcoin for the first time ever could provide a solution to this problem; where now for the first time ever with blockchain, you could actually guarantee the scarcity of a digital asset. So once you create a cryptocurrency on the blockchain, you can guarantee for the first time ever that there will never be more. So, you know, there's going to be 21 million bitcoins. For the first time ever we can say, there will never be more. You know, whereas before with airline miles, or any other sort of digital asset, somebody could always print more. And so what that meant is guaranteed scarcity -- if you could create a new cryptocurrency, there's only ever going to be so much of it, guaranteed scarcity, guaranteed supply. If you could grow the demand for it, then the price -- the value of that cryptocurrency would go up, such that if you set some aside for yourself at the beginning, you could make a lot of money. And so this was the exciting insight for us. It was like, for the first time ever, you could have open and valuable.
>
> . . .
>
> And so that's what you're doing. You're building an economy around some way that consumers can provide value to other consumers where there's sort of like, built-in scarcity. You know, I can only have so many people in my fan club. I'd love to give it to you all for free, but I can't. So who will pay me the most, and let's facilitate that with a cryptocurrency. The really cool thing about this is now as a digital service provider as Twitter, your number one metric is how well can you get consumers compensated, okay? Before it was how well can we extract value from consumers. Now, it's how well

can we give value to consumers. And the more you do that, the more valuable the cryptocurrency will be.

(SEC49-B, NYC Ethereum (transcript), at 35:15-36:13, 73:23-74:14).

> **In Response to No. 104**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31.

### ii.     When Pitching Kin, Kik Emphasized That Kik's Ownership of Three Trillion Kin Gave Kik a Financial Incentive to Increase the Value of Kin.

105.    In its public statements about Kin between May 25, 2017 and September 26, 2017, Kik said it intended to profit from its own stake in Kin. Kik also stated that, because of its desire to profit, Kik was committed to trying to grow the demand for the token.

> **In Response to No. 105**: Disputed.  Kik's goal was not to profit, but was to "encourage the development of a digital services ecosystem that is fair and open." SEC31 at KIK000005.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.
>
> Kik further disputes on the ground that the SEC does not offer any citation to evidence in the record suggesting otherwise as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

106.    Kik retained 30% of the Kin created. (Answer ¶ 10).

> **In Response to No. 106**: Undisputed.

107.    On May 25, 2017, Kik's CEO stated on CNBC that Kik could make a "great financial return" if "more and more people" transact using Kin:

> KIK CEO: Digital currency allows us to create a fundamentally new way to monetize. I think, historically, you build a community and use it to then sell people's attention to advertisers or try to sell them stuff that they either don't want or don't need. So now with the cryptocurrency, it unlocks a fundamentally new way to monetize the community. So instead you're just bringing people together, creating a place where they can create value for

each other transacting in a new cryptocurrency, and that alone is enough to make a great financial return.

INTERVIEWER: What exactly are they transacting? And how do you make money by people using Kin.

KIK CEO: So this is something we've been experimenting with, actually, since 2014 when we launched Kik Points. And so there's a bunch of ways to earn it. You could watch ads, you could host a great group chat, create a great sticker, build a great bot. And so there's all these different ways as a consumer you can come in and build spend value. And how that makes money for Kik is we create (inaudible) set some of that aside for us such that if more and more people transact in this cryptocurrency, the value of it grows such that the value of our holdings grow as well.

(Answer ¶ 65; SEC59-A, May 25, 2017 CNBC Interview ("CNBC") (video); SEC59-B, CNBC

(transcript), at 2:1-3:1).

**In Response to No. 107**: Disputed.  The quoted language refers to other users using Kin to monetize their apps, not Kik, and explains that Kin was a way for other users and developers to "compete with huge, centralized companies" that are large enough to be able to monetize through advertising.  SEC59B at 3:12-23.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

108.  At the May 25, 2017 Token Summit announcement, Kik's CEO reiterated that Kin

presented a "fundamentally new way to monetize a community":

So, historically, you build a community. Kik has 15 million people that show up every month -- over 15 million people. And so, historically, what you want to do is you sell their attention to advertisers, or you try to sell them stuff that maybe they don't need or don't want.

But now with the block chain, and with a cryptocurrency, you could change that, and instead what you could do is, hey, what if we just brought people together? Brought people together in this community, and created an economy where people are providing value to the community, and taking value from the community on this -- on a cryptocurrency? If you could do

that, and do that alone, and by owning a chunk of that cryptocurrency, if could be a fundamentally new way to monetize a community.

(SEC36-B, Token Summit (transcript), at 3:15-4:5).

> **In Response to No. 108**: Disputed. Mr. Livingston's statements referred to how members of the Kin community could use Kin to "monetize." Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31.

109.    At the June 27, 2017 presentation in San Francisco, Kik's CEO explained that, because Kik set aside Kin for the itself at the beginning, Kik was committed to working to increase Kin's value:

> So, like, the coolest thing about it is like we would become completely aligned with everybody in our ecosystem. They'd be like -- users would be, like, hey, the more places I can earn value, the better it is for me. The more places I can spend value, the better it is for me. The developers would say, hey, the more places (inaudible) can spend -- (inaudible) that I have -- cryptocurrency that I have becomes more valuable. And for Kik, you know, we're setting, again, 30% aside for ourselves. The beginning, hey, the more valuable this becomes, the more it gets used -- even if it's not even in Kik over time.
>
> . . .
>
> So, we cannot guarantee value with Kin. I think once you create a cryptocurrency, it sits on exchanges and the price of it is set by the market based on supply and demand. So you know supply is fixed and demand goes down the price is going to go down. But I think what we can guarantee is we are all in on this. You know, this is – this is something we've been working to – towards for a long time, but this is something that is in our financial best interest, because of the 30%, but actually, like, just to be honest, like, this is something we have to do. We cannot compete with Facebook.

(Answer ¶ 116; SEC46-B, An Evening (transcript), at 15:3-14, 35:20-36:7).

**In Response to No. 109**: Disputed.  Mr. Livingston discussed the ways in which *all* users and Kin holders would benefit from an increase in the value of Kin.  As he stated, "Now, it was just letting people—more and more people earning and spending in more and more places in more and more ways, and the more we did that, the better it would be for users, the better it would be for developers, and the better it would be for us."  SEC46B, 14:23-15:2.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

110.    At the June 2017 conference in China, Kik's CEO described the plan to award Kik 30% of the outstanding supply of Kin, and he explained that, as a result, the company's "goal now is just to grow the value of Kin":

This – this is the beautiful thing for Kik: it's also fundamentally a new way to monetize. So, for us, we're setting 30 percent of Kin aside for Kik, as a financial incentive for us basically to put this huge messenger into this ecosystem, and to get this whole ecosystem going. And so (indiscernible) – you know, we – our goal now is just to grow the value of Kin. The more we do that, the more the value of our 30 percent grows. And we're now looking at that as the fundamental way that we monetize this, you know, eight and a half years of work, and $120 million invested.

(Answer ¶ 115; SEC45-B, TechCrunch (transcript), at 20:1-12).

**In Response to No. 110**: Disputed.  Kik's primary plan was to build an economy "so all these developers out there" for whom "it's very hard [] to find a sustainable business model" could monetize their apps.  45B, 19:9-16.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

111.    At the August 14, 2017 conference in Canada (quoted above at ¶ 103), Kik stated that "its's in Kik's best interest to get people paid." (Answer ¶ 117).

**In Response to No. 111**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

112.   And Kik's CEO repeated these sentiments at the early September 2017 conference

in New York City:

We're putting aside 3 trillion for Kik, vesting in at 10 percent a quarter for 10 quarters. So over two and a half years – that's Kik's incentive for being the first killer app on this platform, how we convinced our investors to do this.

. . .

This is the thing I love about cryptocurrencies, it's so many times, like, why would we open source Kik for the users? Because we'll make more money. Because the more we grow the usage of this asset, the ecosystem around it, the more valuable the currency, the more valuable our 30 percent. If people perceive that, hey, this Kin foundation, they're favoring Kik as one of these participants in the system, nobody will adopt it, and Kin won't be worth anything. And so it's just in our economic best interest, which is always the best test. If it's in somebody's economic best interest, they're probably going to do it. And so that's how we tried to set it up here.

(SEC49-B, NYC Ethereum (transcript), at 56:3-8, 57:7-21).

**In Response to No. 112**:  Disputed.  Kik's CEO did not "repeat[] these sentiments" as the statements at the September 2017 conference in New York City were distinct from Mr. Livingston's other communications.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

### iii. *Kik Promoted Kin Against A Backdrop Of Rapidly Increasing Prices For Digital Assets.*

113.    During this same time period, the overall demand for other digital tokens and assets significantly increased, and potential Kin investors were well aware that older digital assets (such as Bitcoin) had dramatically risen in value, generating large returns for early investors. Again, as the Kin offering's lead investor observed, "[t]he ICO market [was] white hot." (Answer ¶ 72).

> **In Response to No. 113**: Disputed.  The quote of a third-party suggesting that the "ICO market" was "white hot" or "increasing" is inadmissible hearsay. Further disputed to the extent this statement lacks a citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

114.    Kik repeatedly reminded potential Kin investors of the recent performance of older digital assets when pitching Kin. For example, at the June 2017 conference in San Francisco, Kik's CEO invoked the increase in price of Ether when explaining why Tencent and Kik's other venture capital investors made the economic decision to permit Kik to pivot to Kin:

> So, one thing -- but in terms of, like, funding, you know, we have raised $120 million from traditional investors, and the most recent investment we took is from [Tencent], you know, one of the most advanced messengers in the world. They invested $50 million to privately fund the company. Those guys want a return, you know? We invested all this money, so you're just going to give this all away? And so, I think this is what is cool about cryptocurrency is like, you can say, no, no, no, we're not -- yes, we want to give it all away, we want to open everything up. We want to give up control, and build this open, decentralized ecosystem, but in doing so, we give Kin a better shot at succeeding, and by setting 30% aside for ourselves, like, you know, if Kin were as popular as Ether is today, that 30% would be worth $9 billion. That'd be pretty awesome. You know, we'd give some back to you guys [Tencent]. You know, you invest 50 million, we'll give you 500 million out of that $9 billion. So, that's why it took some time -- it took some time, but you know, we said, listen, we need a new way to compete, we need a new way to monetize, and this is the best way, and we can make some money too if it works.

(SEC46-B, An Evening (transcript), at 37:24-38:22).

> **In Response to No. 114**: Disputed.   Mr. Livingston compared Kin to other cryptocurrencies like Bitcoin because "Bitcoin was the first cryptocurrency that was able to guarantee the scarcity of a digital asset" and if a user understood

Bitcoin, he would understand Kin.  SEC8, Livingston Inv. Tr. 417:21-25.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Further disputed that Kik used the term "investors" as it was a "nebulous" term that was used "relatively loosely looking at people that are participating in token sales" not focusing on their intent for purchasing.  SEC14 Philp Inv. Tr. 124:1-125:5.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31.

115.    Similarly, at the June 2017 conference in China, Kik's CEO participated in the

following on-stage dialogue with the moderator:

> KIK CEO: You know, the thing about a cryptocurrency is, once it's created, there will never be more. And so Kik will never have more than that 3 trillion tokens of Kin. And as we sell them into the market, we will -- the only way to get them back is to buy them back. And that's what makes cryptocurrencies really special. But the – the value of these cryptocurrencies can grow very quickly. And so our bet is, the more -- you know, we sell a little bit into the market, that gives us funding. We can build some more around that – we can create value faster than we're selling the Kin into the market. So, for example, if, you know, we owned 30 percent of Ethereum today, that would be worth $10 billion.

> INTERVIEWER: That's quite a lot of money.

> KIK CEO: That's quite a lot of money. That would be a good exit.

(SEC45-B, TechCrunch (transcript), at 21:23-22:15).

**In Response to No. 115**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

### iv.    *Kik Compared Market Conditions To The "Dot Com" Era.*

116.    During its Roadshow, Kik invoked the "dot com" era as a prior example of the

opportunity to make money in a quickly developing market.

**In Response to No. 116**: Disputed.   Mr. Livingston compared cryptocurrencies generally to the "dot-com" era to compare his belief that many cryptocurrencies other than Kik will be failures, but "some of them will change the world."  SEC8, Livingston Inv. Tr. 426:2-20.  He compared various token projects *other than Kik* to companies in that era and how they had made money quickly, and some failed. *Id.* 119:4-11.  Further disputed to the extent this statement lacks a citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

117.    For example, at the June 28, 2017 conference in San Francisco, Kik's CEO specifically cited the "dot com" era, predicting that "people are going to make a lot of money" with tokens and ICOs and directly comparing investors who would buy in Kik's token "crowd sale" to the venture capitalists who had earlier invested in Kik:

> So, I think – like, for me, I think is like the dot com, for better and for worse. So, you know, there is a lot of hype right now, and people are going to make a lot of money -- people have made a lot of money. People are going to lose a lot of money here. This is coming, right? It's going to happen multiple times as we move through this innovation, but at the end of the day, Amazon and Google came out of the dot com.

> And so, this is how I view, like, tokens and ICOs. I think 90% of them probably are going to go to zero, and people are going to lose a lot of money, and you know, the regulators are going to come in. They're going to say, how do we make this (inaudible) for innovation, but still make it safe for consumers, and everybody's going to be trying to figure this out, and it's going to be crazy.

> It's going to be – I was in like, high school at the time, but I think like 2001 -- in 2000 or 2001, whatever year it was, it's going to be that all over again, and I think for us, it's – we believe that, you know, a few huge economic entities are going to come out of this space, and I think that actually a few huge economic entities have already come into this space.

> And so, I think, you know, like everything, it's risk and reward, but I think, you know, we have a good story, and I think we're trying to do it in a fair, way, and I think our heart's in the right place, and we're going to do everything we can.

> You know, what really scares me at the end of the day is disappointing people, and I think what scares me about doing a crowd sale is before, if Kik failed, I would disappoint a bunch of rich people. But now if Kik fails, I will disappoint a bunch of regular people, and that, like, really weighs on me. (Inaudible) we need – so, we're going to do everything we can to make it a win for everybody.

(Answer ¶ 74; SEC46-B, An Evening (transcript), at 61:9-62:15).

> **In Response to No. 117**: Disputed.   Mr. Livingston did not lead purchasers to expect to make a lot of money; he described the ability to make money and failure of many companies after the "dot-com" era as compared to various token projects *other than Kik*.   SEC8, Livingston Inv. Tr. 119:4-11.   Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.   Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."   *See* Response No. 31.

118.     Similarly, at the September 7, 2017 conference in New York City, Kik's CEO

stated:

> I think like, the right analogy for this, too, is just like, this is the dot.com. Right, when the Internet came out, it was this new innovation, very disruptive at the time, and on one side it created all these opportunities, but on the other side, it created all these challenges. And you know, regulators have a choice, like, oh, look at all the sex on the Internet. Like, shut it down. But if they did that, they would miss out on this decade's biggest opportunity of innovation and economic wealth generation. And so just like with the dot.com, I think, you know, crypto today is very similar. There's a lot of excitement. There's going to be a lot of money made. There's going to be a lot of money lost. But that the end of the day, something the size of Amazon and Google will come out of it.

(SEC49-B, NYC Ethereum (transcript), at 69:24-70:17).

> **In Response to No. 118**: Disputed.   Mr. Livingston did not lead purchasers to expect to make a lot of money; he described the ability to make money and failure of many companies after the "dot-com" era as compared to various token projects other than Kik.   *See* Response Nos. 117-18.   Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.   Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."   *See* Response No. 31.

119.    Kik's CEO later explained that he used the "dot com" analogy because he wanted

to express to potential purchasers his belief that Kin would be "massive":

> Q.     In promoting or discussing Kin prior to the public sale, did
>        you ever compare the crypto space in 2017 to the dot-com
>        area?
>
> A.     I did.
>
> Q.     Why did you do that?
>
> A.     I think I wanted to -- I don't recall specifically, let me say
>        that. But if I were to speculate, I wanted to make it clear
>        that what I was trying to do, I believe, is -- dot-com, there
>        was a lot of -- a lot of excitement at the time. Ultimately, a
>        lot of the things that people were excited about turned out
>        to be failures. And yet, a few of the things that people were
>        excited about or even not excited about at the time turned
>        out to be massive. And I think I was just simply drawing
>        the comparison that I felt the same way and do feel the
>        same way about cryptocurrencies today, that most of them
>        will be failures, but some of them will change the world.
>
> Q.     And you think Kin could be one that becomes massive and
>        changes the world?
>
> A.     I absolutely believe that, yes.
>
> Q.     Okay. And was that part of how you described or
>        encouraged people to participate in the Kin sale?
>
> A.     I think that's how I described my belief in the vision.
>
> Q.     In advance of the Kin sale?
>
> A.     Yes. Absolutely.

(SEC8, Livingston Inv. Tr., at 426:2-427:5).

> **In Response to No. 119**: Disputed in that Mr. Livingston did not recall why he
> made the "dot com" comparison.  At the time he made the comparison, he
> specifically described the ability to make money and failure of many companies
> after the "dot-com" era as compared to various token projects *other than Kik*.
> SEC8, Livingston Inv. Tr. 119:4-11.  Undisputed that Mr. Livingston provided the
> cited testimony.

###### v.     *Kik Compared Buying Kin to Venture Capital Investing*

120.     Kik's CEO marketed Kin by noting the similarities between it and venture capital

investing, and touting the advantages of buying tokens. For example, speaking on the "Finance

Magnates" video podcast on August 1, 2017, Kik's CEO stated:

> You know, I think compared to VC investing, for example, one, you can get
> in at basically any stage and in any amount, and two, you can get out at any
> stage, and in any amount, and I think that's really compelling, you know,
> this idea that I can get in early, identify something that could be big.
>
> If I'm right, it can go up in value. I can sell maybe half of the crypto I hold
> and let the rest keep going. On the other side, I think that's also the challenge
> of crypto fundraising, which is, how do you sort of figure out which are the
> good ones, and which are not, and then how do you keep these teams sort
> of honest and executing on the vision that they laid out?
>
> Because I think that's the hard thing now. There's a lot of projects right
> now. They're all raising lots of money. It's hard to know which are the good
> ones and which are not, and then once those projects get that money, it's
> hard – it's hard to see, you know, if when we were five people eight years
> ago, somebody had given us $100 million.
>
> Like, that would've been runway forever, and there would've been no sense
> of urgency to figure out the next phase of the vision so that you could create
> the next version of the story so you could go out and raise more money, and
> keep the company alive.
>
> Now, it's like, hey guys, like, you know, we could spend a million dollars
> a year for the next 100 years, and we still wouldn't have run out of money.
> So, I think that's going to be the challenge of crypto, is picking out which
> ones are the good ones versus the bad ones, and then creating that sense of
> urgency and accountability behind the teams.

(Answer ¶ 75; SEC47-13, Finance Magnates (transcript), at 14:8-15:14).

> **In Response to No. 120**: Disputed.   "VC investing" where "you can get in
> basically at any stage and at any amount" was not a comparison to the TDE because
> Kik imposed a hard cap on individual participants' purchase of Kin in the TDE.
> Philp Decl. ¶ 69.  Disputed to the extent the SEC suggests that publication of any
> of those statements alone is sufficient to show that any TDE purchaser both heard
> and relied on the statements.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of
> the statements, Kik objects to the SEC's statements as irrelevant and immaterial to

whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.  Kik further objects to this statement to the extent it lacks citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

### vi.    *Kik Told Buyers That There Would Be Platforms For Reselling Kin*

121.    After the initial sale by an issuer, digital tokens are sometimes transferred between users or listed on online trading platforms, which are sometimes colloquially referred to as "exchanges," whereon the tokens trade for other digital assets or fiat currencies. (Answer ¶ 33).

**In Response to No. 121**: Undisputed.

122.    In the initial announcements of the Kin project and throughout the Kin offering, Kik told potential purchasers that they would be able to liquidate their Kin holdings and that Kin would trade on online trading platforms, which Kik referred to as "exchanges," soon after issuance.

> **In Response to No. 122**: Disputed.  Mr. Livingston only *hoped* Kin would be listed on exchanges "at some point."  SEC8, Livingston Inv. Tr. 555:23-556:3.  And he expected that "exchanges would just start listing and allowing trading in Kin."  *Id.* 560:24-561:2.  Additionally, "there was an effort in the token sale to have it as broad a participation as possible, and there was not an immediate focus on exchanges immediately after the sale, given that there was an opportunity for everyone to participate at the token sale."  SEC14, Philp Inv. Tr. 194:17-24.  Kik further disputes this statement because it lacks any citation to evidence in the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

123.    Kik's white paper stated: "[l]ike other cryptocurrencies, units of kin are fungible and transferable, and they will be expected to trade on cryptocurrency exchanges." (Answer ¶ 80; SEC31, Dep. Ex. 12, at 8).

**In Response to No. 123**: Undisputed.

124.    Kik's white paper stated that Kin would be implemented on the "public Ethereum blockchain as an ERC20 token." (Answer ¶ 80; SEC31, Dep. Ex. 12, at 8). Kik's choice of the ERC-20 token protocol, a specific technical standard on the Ethereum blockchain, would make Kin easy to trade on trading venues operating on the Ethereum blockchain. In February 2017, regarding the ERC-20 standard, a Kik board member observed in an email to Kik's CEO that a

particular platform operator "is going to support all tokens built on this standard in their exchange and consumer product," and predicted, "if we build on that it will make it easier for all of the exchanges to support our token." (SEC60, KIK_00024739).

> **In Response to No. 124**: Disputed.  Using an ERC20 token would not necessarily make Kin easier to "trade," and none of the cited documents make such a reference. Further disputed as to the second sentence that lacks any citation to evidence in the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Further disputed that the statement of a third-party board member constitutes inadmissible hearsay that is inadmissible at summary judgment.  Otherwise undisputed.

125.    During the June 2017 conference in China, Kik's CEO stated that "the beautiful thing with these cryptocurrencies, is, you know, they're immediately tradable. So on day one, Kin will go on to a bunch of exchanges where you can exchange it for other cryptocurrencies, or even other fiat currencies." (Answer ¶ 81; SEC45-13, TechCrunch (transcript), at 20:18-22). Indeed, during the same talk, Kik's CEO stated that Kik intended to utilize such exchanges for its own holdings: "So, for that 30[%] for Kik, as it vests into the market, we will be able to sell it on to the exchanges like anybody else, to fund operations, to provide a financial exit for employees and investors, really to do with whatever we want." (SEC45-B, TechCrunch (transcript), at 21:10-14).

> **In Response to No. 125**:  Disputed.    Mr. Livingston was referring to cryptocurrencies *in general* as being immediately tradeable.   SEC45-13, TechCrunch (transcript), at 20:18-22.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

126.    On July 6, 2017, in Response No. an investor's inquiry about future tradability, a Kik executive responded that "once the token goes live (looking at end of summer). It will be traded on a number of exchanges," and provided the name of "one of the more popular ones." (Answer ¶ 82; SEC61, DBP-SEC-KIN_0000070).

**In Response to No. 126**: Disputed.  Mr. Livingston *hoped* Kin would be listed on exchanges "at some point."  SEC8, Livingston Inv. Tr. 555:23-556:3.  But he expected that "exchanges would just start listing and allowing trading in Kin," not that Kik would cause them to be listed.  *Id.* 560:24-561:2.  Kik further expected Kin would trade on exchanges because it was "an ERC-20 token, and both fungible and transferable," and "any cryptocurrency exchange can list an ERC-20 token.  It doesn't require any specific permissible from anyone.  It's a permissionless blockchain, which is an Ethereum, and ERC-20 tokens can be implemented on an exchange if an exchange operator chose to."  SEC14, Philp Inv. Tr. 7-15.  Further disputed to the extent the SEC suggests this email was sent to a potential public sale purchaser.  The recipient was a potential participant in the Pre-sale.  SEC61 at DBP-SEC-KIN_0000071.  Otherwise undisputed that a Kik executive sent an email containing the quoted text.

127.    Kik also tweeted statements regarding the future tradability of Kin, often using a Twitter account in the name of the Kin Foundation, which Kik had not yet created. (Answer ¶ 83).  For example, on August 29, 2017, Kik wrote that "many" "exchanges" had indicated that they would list Kin:



And, similarly, on September 17, 2017, Kik stated:



(Answer ¶ 83; SEC62, KIK_00006919; SEC63, KIK_00004467; SEC64, October 20, 2017 Letter, at page 6).

> **In Response to No. 127**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

128.    Kik contacted at least one trading platform to inquire about listing Kin. (Answer ¶ 84).

> **In Response to No. 128**: Undisputed.
>
> Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

129.    Following the distribution of Kin in September 2017, Kik communicated with purchasers who wanted to know when the token would be listed on trading platforms. (*See, e.g.*, SEC65, Dep. Ex. 230; SEC50, Wang. Dep. Tr., at 220:12-222:4). At least one purchaser, based on

Kik's tweets and other communication, understood Kik to have represented that Kik would cause

Kin to be listed on trading platforms. (SEC50, Wang Dep. Tr., at 21:13-22:7, 174:13-24, 177:13-

22, 220:25-221:9). This purchaser believed that such listing was critical to making a profit from

the appreciation of Kin:

> Q.    One other question that I want to ask you is why did you
> want Kin to be listed on exchanges?
>
> A.    The only way we can make money is if there's liquidity
> and also I mean, the market at that time was essentially if
> your token had partnerships/use cases and was on
> exchanges for liquidity the prices were skyrocketing.

(*Id*. at 226:23-227:4). SAFT participants similarly planned or hoped to realize profits by selling on

secondary exchanges. (*See, e.g.*, SEC23, Morehead Inv. Tr., 68:20-69:11; SEC42, Hourigan Inv.

Tr., at 42:21-43:19).

> **In Response to No. 129**: Disputed.  The TDE purchaser did not believe that listing
> on an exchange was "critical to making a profit."  The purchaser did not even recall
> Kik telling potential purchasers that they could expect to profit.  SEC50, Wang Tr.
> 183:15-184:13.  Mr. Wang believed that the potential for him to profit was based
> on simply that Kin's "utility would drive demand which would drive price."  *Id.*
> 241:1-5; 251:16-20.  Kik further disputes that SAFT participants planned or hoped
> to profit by selling on secondary exchanges.  SAFT participants recognized that
> they could later sell their Kin *either* on a secondary exchange or "potentially in a
> single party transaction."  SEC23, Morehead Tr. 69:5-11.  Kik objects to this
> statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an
> "investment contract."  Otherwise undisputed.

130.    On or about December 17, 2017, in a post on the social media platform Reddit, a

Kik employee wrote: "1. Liquidity. We are fully aware there needs to be liquidity for Kin on major

exchanges, and this is essential for the token and the Kin ecosystem to work: This is absolutely

understood by the company, and most importantly - its management. We were aware of this since

the project was conceived." (SEC66, KIK_00045074).

> **In Response to No. 130**: Undisputed that the document contains the quoted text.
> Kik objects to this statement as irrelevant and immaterial to whether Kik's sales of
> Kin constituted an "investment contract."  The statement was made more than *three*

*months* after Kik conducted the public sale and Pre-sale and thus could not have affected *any* potential purchaser's expectations.    SEC66 at KIK_0045074. Additionally, the references to exchanges in the post were specifically in Response No. the community asking "a lot of questions" about exchanges.  *Id.*  And Kik specifically cautioned Kin holders that, with respect to getting listed on exchanges, "We have to act responsibly when approaching this topic.  We cannot act the same way as other companies in the field have done." *Id.*

## H.    THROUGHOUT THE KIN OFFERING, KIK EMPHASIZED ITS OWN IMPORTANCE TO KIN'S FUTURE SUCCESS AND THE ACTIONS IT WOULD TAKE TO SUPPORT KIN AND INCREASE DEMAND FOR KIN

131.    In the initial public announcements of Kin and at numerous other times during the Kin offering, Kik described actions it was then taking, and actions it would take in the future, to make the project successful. Kik stated that the actions it was taking, and intended to take in the future, were intended to drive up demand for Kin and, hence, Kin's value. Many of the actions that Kik said it would take had no reasonable prospect for completion, and, in fact, were not completed, in advance of the planned 2017 public sale.

> **In Response to No. 131**: Disputed.  Kik said the TDE will not take place until "Kik has completed the technology upgrade to integrate with Kin and the cryptocurrency can be used functionally within Kik."  Id. at KIK000023.  At the time a user received Kin at the token distribution event in September 2017, the user had the ability to transfer Kin to others and to integrate it into another app.  SEC40, Ben-Ari Tri. 177:9-25.

> Kik further objects that this statement contains no citation to evidence in the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

### i.    *Kik Touted Its Experience, Its Expertise, And The Value Of Kik Messenger.*

132.    Kik touted its previous accomplishments and the popularity of Kik Messenger. Kik's May 2017 white paper stated that "Kik has been a leading innovator in the chat space since the first million people signed up for the chat application in 2010." (SEC31, Dep. Ex. 12, at 5). The white paper provided performance data for Kik Messenger, including the number of monthly average users and age of the active user base, and noted that 64% of the application's users live in the United States. Kik asserted that "[t]he size of the [Kik Messenger] user base, demographics,

and community ethos make Kik a unique venue where cryptocurrency may be introduced, adopted, and utilized by a large mainstream audience." (Answer ¶ 119; SEC31, Dep. Ex. 12, at 9). The "Kin project," Kik said, was "an opportunity to integrate chat with true digital commerce within an existing user base." (Answer ¶ 119; SEC31, Dep. Ex. 12, at 11).

> **In Response to No. 132**: Disputed that Kik "touted its previous accomplishments and the popularity of Kik messenger." Otherwise undisputed.

133.    As Kik's then-chief marketing officer testified, Kik included information about the performance of Kik Messenger in the white paper because "[i]t was about our ability to grow an audience and maintain an ecosystem." (SEC3, Clift Inv. Tr., at 148:23-149:15). Kik's white paper stated: "Kik's team has a proven track record of developing products for the mass market, and Kik looks forward to introducing cryptocurrency into the product process." (SEC31, Dep. Ex. 12, at 11).

> **In Response to No. 133**: Disputed. Kik included information about Messenger's metrics because Kik was building a digital economy, and "for an economy to exist, you have to have people to participate in it . . . [s]o it was about our ability to grow an audience and maintain an ecosystem." SEC3, Clift Inv. Tr. 149:2-15. Otherwise undisputed.

134.    Kik's white paper touted Kik's management and included a four-page section describing the biographies, professional experience, and skills of seven Kik executives and identifying the names and titles of 13 other "Kin Core Team" members. (*Id*. at 24-27). For example, Kik's white paper touted that the company's CFO had previously "spent more than 20 years leading finance, operations, and strategy for both established and startup companies" in various sectors. And Kik's chief product officer, "br[ought] startup and academic research experience to Kik" and was "in the final stages of completing his PhD." (*Id*. at 24-25).

> **In Response to No. 134**: Disputed that Kik's Whitepaper "touted Kik"s management" or "touted" the CFO's experience as those are characterizations not contained within the cited document. Otherwise undisputed.

135.    Kik did not provide a biography of any non-Kik personnel, and, in the white paper's "Conclusion" section, Kik assured potential buyers that it would "pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Ecosystem to its millions of users." (*Id*. at 23-27; Answer ¶ 120).

> **In Response to No. 135**: Undisputed.

136.    Kik's former CFO explained that a similar description of Kik's leadership team was included in the PPM because "people that would be investing in this company, Kik, at the presale level would want to know who's managing the company." (SEC10, Heinke Inv. Tr. 390:13-391:3).

> **In Response to No. 136**: Disputed. Mr. Heinke believed potential Pre-sale participants were "investing in the company" and he understood that they "were buying a share and a security under a presale context." SEC10, Heinke Inv. Tr. 142:4-15. He did not refer to TDE purchasers or discuss whether they were provided with similar information.

137.    In the May 25, 2017 video that Kik issued when announcing the Kin project, the company stated:

> [B]y banding together, and using this cryptocurrency, Kin, as a way to align us all together, I think we can make a better experience for consumers but also a better future for society in general. Kik has both the experience and the resources, and the user base to really make this happen. The success of this project really comes down to how many other people can we get excited to compete with us, to join us, to work with us and to build this together.

(SEC58-B, Promo Video (transcript), at 5:6-15).

> **In Response to No. 137**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31.

138.    Kik's public statements reflected the CEO's belief that the role of Kik, as an established company with a long history of market achievements, distinguished the Kin token from other projects being sold at the time:

> Every cryptocurrency to date had been launched by small groups of people who were working together but were new and unestablished, and yet, here was an established company creating a cryptocurrency. . .
>
> [And] I would say we have a long history of Kik being first. So maybe -- like, we're the first chat app to go viral, the first chat app to launch platforms, the first chat app in the western world to launch bots, and the first VC-backed company, to my knowledge, in the world to launch cryptocurrency. So I guess that's what distinguishes us broadly.

(SEC8, Livingston Inv. Tr., at 420:18-21, 421:6-12).

> **In Response to No. 138**: Disputed.   Mr. Livingston did not describe Kik's background as important to potential purchasers, but only replied to a question why "a centralized company with its own CEO and management structure be entering the crypto space?"  SEC8, Livingston Inv. Tr. 420:15-17.  Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

139.    Kik re-emphasized its experience and expertise at other times during its marketing of the offering. In an August 2017 press release relating to the then-upcoming public portion of the sale, Kik quoted a hedge fund partner's statement that:

> Kik is by far the largest consumer company to enter the cryptocurrency space, and this is a seminal moment for the industry...We have been impressed with Kik's thoughtful approach to the creation and distribution of Kin, and have confidence that the team will execute their vision of creating a decentralized ecosystem of digital services through Kin."

(SEC67, Inv. Ex. 93).

> **In Response to No. 139**: Disputed that Kik conducted a "single offering."  *See* Response No. 36.  Further disputed to the extent the SEC suggests that publication

of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.

Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

140.    In a Medium post on September 6, 2017, Kik's CEO stated he was promoting Kin

to his "friends and family" in part because:

> Kin has at least one participant who was all in: Kik. With one strong digital service on board from day one, Kin can enjoy a good start regardless of whether or not other digital services adopt it right away. Kik has 15 million monthly active users, many of whom are already accustomed to exchanging digital goods, such as stickers and emoji, through that.

(SEC68, Dep. Ex. 227; Answer ¶ 122).

> **In Response to No. 140**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

141.    And Kik's CEO repeated these sentiments at the conference in New York City in

early September 2017:

> And that's where we said, okay, it shouldn't be Kik points. It should be something more broad, bigger, and that's where we came up with the name Kin and family. It's, yes, we'll use Kik to launch Kin. That will give it its value. But then we'll use the cryptocurrency as a tool to economically incentivize the creation of hundreds, thousands, tens of thousands of other places where consumers can go to earn and spend Kin.
>
> . . .
>
> Like, the way I think of it is, number one, imagine somebody -- some new project created Kin. Hey, we're going to create this new ecosystem of digital services for consumers so you can go to all these different places, all these great services. But everybody would be like, well, who is going to adopt that? So now we're saying, well, actually we signed up the first digital

service, and it's this company called Kik -- this app called Kik. It has 15 million monthly active users. It's a top 100 app in the U.S., and it's actually the number five most-searched for term in the App Store because everybody uses it to connect across communities. Everybody would be like, wow, Kin, that sounds amazing. And you've already signed up Kik -- this top 100 app? Like, that's a really exciting project. And so that we think is like, the killer innovation is not only have we built the platform and the ecosystem with Kin, but we've also found that first killer app. And, you know, if you look at the history of platforms, that's always how they evolve. You know, like, Nintendo had Super Mario Brothers. Windows had Excel. Even the iPhone had the iPod. So we think we have both the platform and the killer app to start this whole thing.

(SEC49-B, NYC Ethereum (transcript), at 42:15-2345:3-46:3).

> **In Response to No. 141**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31.

### ii.   *Kik Stated That It Would Spend Proceeds From Kin Sales On Tasks To Increase Demand For Kin.*

142.   Kik's white paper stated:

> In order to finance the Kin roadmap, Kik will conduct a token distribution event that will offer one trillion out of a 10 trillion unit total supply of Kin. The proceeds of the token distribution event will be used to fund Kik operations and to deploy the Kin Foundation. A portion of the funds raised in the token distribution will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik.
>
> . . . .
>
> [And i]n exchange [for its receipt of three trillion Kin], Kik will provide startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand.

(SEC31, Dep. Ex. 12, at 21; Answer ¶ 125).

> **In Response to No. 142**: Undisputed.

143.     Kik's CEO stated at the San Francisco conference in June 2017 that Kik would use

sale proceeds to build systems "to . . . launch this whole broader ecosystem":

> AUDIENCE MEMBER: So, my question is regarding the ICO. Let's say
> it's successful as some of these recent ICOs, and you raise $50 million
> worth of Ether. What will you guys do with that Ether?
>
> [KIK'S CEO]: So, we will convert it to US dollars. So -- is that what your
> question is?
>
> AUDIENCE MEMBER: Or how are you going to use the funds? Well, how
> are you going to use the funds? Because, like, most other ICOs are using
> those funds to build another platform.
>
> [KIK'S CEO]: Yeah.
>
> AUDIENCE MEMBER: You guys already have a platform.
>
> [KIK'S CEO]: So, we're going to use the funds to build a new platform. So,
> to build a new transaction service, the identity service, the reward engine,
> to build out all these cases inside of Kik, to get a bunch of developers
> building use cases outside of Kik basically to, like, launch this whole
> broader ecosystem.

(SEC46-B, An Evening (transcript), at 55:10-23; Answer ¶ 125).

> **In Response to No. 143**: Disputed to the extent the SEC suggests that publication
> of any of those statements alone is sufficient to show that any TDE purchaser both
> heard and relied on the statements.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of
> the statements, Kik objects to the SEC's statements as irrelevant and immaterial to
> whether Kik's offer or sale of Kin constituted an "investment contract."
> *See* Response No. 31.

144.     The SAFT stated:

> A significant portion of the amount raised under the SAFTs will be used to
> fund the Company's build-out of a semi-centralized blockchain-based
> computer network (the "***Kin Ecosystem***") that enables economic
> transactions and a reward system for digital service providers as well as to
> develop an application to make the network accessible via the Kik
> messaging platform.

(SEC51, Dep. Ex. 52, at KIK000068 (emphasis in original)). Similarly, the PPM stated:

A significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to buildout a semi-centralized blockchain-based computer network that enables economic transactions and a reward system for digital service providers as well as to develop an application to make the network accessible via the Kik messaging platform (the "Kin Ecosystem")

(SEC52, Dep. Ex. 16, at KIK000048).

**In Response to No. 144**: Undisputed.

### iii. *Kik Promised It Would Create Demand For Kin By Building New Products, Services, And Systems For The "Kin Ecosystem."*

145.    Kik's white paper stated:

To foster an ecosystem that is not only open and decentralized but also more compelling than its traditional counterpart, Kik must create a series of new products, services, and systems. Building a decentralized system is a complex process, and the transition to it must be done in a measured and responsible way over time.

(SEC31, Dep. Ex. 12, at 5; Answer ¶ 123).

**In Response to No. 145**: Undisputed.

146.    Kik's white paper also stated that Kik would be 'the ecosystem's champion and will showcase Kin to its millions of users," and, "[o]ver time, Kik will also promote other Kin digital services." Kik made clear that "Kik must help to establish Kin's fundamental value" and that "Kik will build fundamental value." (SEC31, Dep. Ex. 12, at 5, 6; Answer ¶ 124).

**In Response to No. 146**: Disputed.  Kik explained it would "build fundamental value for the new currency" is "by integrating kin into its chat app," making Kin the "primary transaction currency, and Kik" the first service to join the Kin Ecosystem.  SEC31 at KIK000005.  Otherwise undisputed.

147.    Kik's May 25, 2017 Medium post said, "[o]nce we have established the new cryptocurrency, we will create demand for [Kin] by encouraging people to earn and spend Kin within Kik." (Answer ¶ 124).

**In Response to No. 147**: Disputed.  The complete sentence states, "Once we have established the new cryptocurrency, we will create demand for it by encouraging

people to earn and spend Kin within Kik, which is used by millions of people every day."  Welsh Decl. Ex. L, at 2/5.  *Id.*  Otherwise undisputed.

*iv.*       ***Kik Promised It Would Create Demand For Kin By Integrating Kin Into Kik's Messaging App.***

148.    Kik told potential investors that the company would revise Kik Messenger to permit users to buy and sell goods and services using Kin. Kik's white paper stated that Kik would "leverage its large existing user base to drive mass adoption" of Kin, and that "Kik will build fundamental value for the new currency by integrating Kin into its chat app. Indeed, Kin will be Kik's primary transaction currency, and Kik will be the first service to join the Kin Ecosystem." (SEC31, Dep. Ex. 12, at 5; Answer ¶ 128). The white paper also stated, "Kik users will be able to spend Kin on products, services, and other valuable assets offered by merchants, developers, influencers, and other participants." (SEC31, Dep. Ex. 12, at 6).

   **In Response to No. 148**: Undisputed.

   Kik objects to this statement to the extent it does not include citations to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

149.    Kik's May 25, 2017 Medium post stated: "Once we have established the new cryptocurrency, we will create demand for it by encouraging people to earn and spend Kin within Kik which is used by millions of people every day." (SEC37, Inv. Ex. 200; *see also* SEC8, Livingston Inv. Tr., at 350:21-351:7).

   **In Response to No. 149**: Disputed.  *See* Response No. 147.  Undisputed that the above sentence appears in Kik's May 25, 2017 Medium post.

150.    Specifically, to achieve such integration, the white paper stated that, first, Kik would integrate digital wallets for each Kik Messenger user account so that users could engage in "common wallet interactions;" and that, thereafter, "[o]ver time, Kik will work to integrate Kin into Kik's chat ecosystem for the benefit of users, platform developers and partners . . . by

employing the same iterative process of research, experimentation, and fine-tuning that has made Kik successful." (SEC31, Dep. Ex. 12, at 11; Answer ¶ 128).

> **In Response to No. 150**: Disputed.  The quote is incomplete and misleading.  The complete text of the Whitepaper states, "The primary feature required to enable a digital community to use cryptocurrency is a wallet.  As a first step, Kik will integrate wallets for each user account.  The associated user interface will allow for the most common wallet transactions."  SEC31 at KIK000012.  Kik Points further "demonstrated that there is demand for an economy built around chat.  Over time, Kik will work to integrate Kin into Kik's chat ecosystem for the benefit of users, platform developers, and partners.  Kik will do so by employing the same iterative process of research, experimentation, and fine-tuning that has made Kik successful." *Id.* at KIK000011.  Otherwise undisputed.

151.    Kik's white paper identified "example" or "prospective use cases" that were possible ways that Kik might change Kik Messenger so that users could buy and sell goods and services using Kin. One such use case, for example, consisted of charging a fee (paid in Kin) to app users wanting to attend chats with celebrities. (SEC31, Dep. Ex. 12, at 12-15; Answer ¶ 129).

> **In Response to No. 151**: Disputed.  The paraphrased statements do not accurately summarize the quoted text, which states in full about "Kik economy and prospective use cases," that "Kik will introduce a number of marketplace use cases that will prompt consumers and brands to transact with Kin.  SEC31 at KIK000012.  One of the several examples in the Whitepaper showed how users could "monetize their popularity within Kik" by creating "VIP groups" or "premium, exclusive groups that require a paid entrance fee" and which "celebrities and thought leaders could use [] as a platform for engaging their communities, while generating tangible value for their time and attention." *Id.* at KIK000013.  Otherwise undisputed.

152.    At the June 2017 conference in China, Kik's CEO stated that Kik would "integrate" Kin into Kik Messenger:

> So, there's a couple phases to rolling out Kin, this new cryptocurrency. So, the first phase is to create the cryptocurrency, and to integrate it into Kik. And that on day one will make Kin the most used cryptocurrency -- one of, if not the most used cryptocurrencies in the world. And that's going to make Kin very valuable.

(SEC45-B, TechCrunch (transcript), at 18:3-22:15).

> **In Response to No. 152**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements.  Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.

153.    Kik provided no date by which it would complete Kin's integration into Kik Messenger. However, Kik made clear that its integration efforts would continue beyond any public sale of Kin. (SEC31, Dep. Ex. 12 at 11 ("Over time, Kik will work to integrate. . .")). A June 2017 online news article that Kik promoted on the Kin Foundation's Twitter feed, for example, quoted a statement by Kik's CEO that the company would "add more and more ways to use [Kin] inside Kik . . . in the latter part of this year [2017] and into next year [2018]." (Answer ¶ 131; SEC69, KIK_00007074, at KIK_00007090).

> **In Response to No. 153**: Disputed.  Kik said it would integrate "Kin into Kik's chat ecosystem for the benefit of users, platform developers, and partners," and it did so at the time of the TDE.  SEC31 at KIK000011.  Otherwise undisputed.

154.    Kik alone controlled Kik Messenger, and only Kik could modify Kik Messenger to incorporate Kin transactions. (Answer ¶ 131).

> **In Response to No. 154**: Undisputed.

155.    Kik further communicated to potential Kin investors that Kik would not complete its work on integrating Kin with Kik Messenger before the public sale, because, as its white paper explained, "[a] portion of the funds raised in the token distribution will be used to execute upon the roadmap of additional feature development planned for the Kin integration into Kik." (Complaint ¶ 132;[5] SEC31, Dep. Ex. 12, at 21).

---

[5] ECF No. 1. Kik's Answer did not address this paragraph of the Complaint, so it is admitted. Each paragraph of Kik's Answer after ¶ 131 is mis-numbered by one paragraph – *e.g.*, Answer ¶ 132 responds to Complaint ¶ 133, and so on.

**In Response to No. 155**: Disputed.  The fact that Kik would continue to build and add "additional features" of Kin for use within the Kik app, does not mean it was not integrated at the time of the TDE.  SEC31 at KIK000021.  Consistent with its statement in the Whitepaper that the TDE will not take place until "Kik has completed the technology upgrade to integrate with Kin and the cryptocurrency can be used functionally within Kik," *Id.* at KIK000023, TDE purchasers had the ability to transfer Kin to others over Ethereum and to integrate it into another app.  SEC40, Ben-Ari Tri. 177:9-25; Philp Decl. ¶ 81.  Otherwise undisputed.

    *v.*     ***Kik Promised It Would Create Demand For Kin By Implementing New Technology To Allow For Scalable, Fast, And Cost-Effective Transactions – i.e., Kik Stated That It Would Develop A Blockchain For The Future Kin Network.***

156.    Kik's white paper stated that Kin would initially operate on the pre-existing Ethereum blockchain, but Kik acknowledged that this approach created known "[p]latform limitations" that were expected to impede the actual use of Kin to buy or sell goods or services. Kik said that the Ethereum blockchain could handle only relatively small numbers of transactions, was too slow, and imposed a fee for each transaction. Kik therefore recognized that the Ethereum blockchain was incapable of running consumer applications at sufficient volumes, or "scale," to make Kin successful. Kik's white paper acknowledged a need for future "significant advances... in blockchain technology" to enable a "highly scalable, low latency, and cost effective decentralized systems." (SEC31, Dep. Ex. 12, at 18-19; Answer ¶ 135). Kik realized that Ethereum contained technological limitations that could potentially cause issues with a digital token used for a high volume of transactions. (Answer ¶ 136).

**In Response to No. 156**: Disputed that Kik "promised" anything according to the heading preceding this statement because it is not a specifically numbered statement with a citation to the record.  Further disputed.  Kik recognized that the Ethereum network operated with certain limitations and accordingly proposed a "hybrid solution" using a "semi-centralized system" with the ultimate goal of moving to a "fully decentralized system."  *Id.* at KIK000018-19.

Kik objects as to the first and second sentences of this paragraph because they lack any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

157.    Accordingly, even though Kik chose the Ethereum blockchain as Kin's platform, Kik could not use this blockchain for Kin transactions within Kik Messenger, let alone by numerous other companies, which Kik hoped to attract to the Kin Ecosystem, because of Ethereum's technological limitations. At the June 2017 presentation in San Francisco, Kik's CEO told the audience that giving only five Kin tokens to each Kik Messenger user would absorb 23 days of the computing capability of the entire Ethereum network. (SEC46-B, An Evening (transcript), at 21:2-23:3).

> **In Response to No. 157**: Disputed.  Kik considered various "scaling solutions" and alternatives to keeping Kin on the Ethereum blockchain.  SEC14, Philp Inv. Tr. 231:17-24.  Additionally, Kik explained publicly that Ethereum was "the best blockchain to build for right now," and that it could "create a new cryptocurrency, new token very quickly and easily.  And then we set it up such that as new blockchains emerge, if they have higher scalability, we can move between blockchains."  SEC49B 52:7-17.  Further disputed as to the first sentence of this paragraph because it lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Otherwise undisputed.

158.    Kik's white paper informed potential purchasers that Kik would address these issues, and do so in at least two different ways. First, Kik would implement its own "transaction service" that would allow Kin users to temporarily bypass the Ethereum blockchain – and avoid its logjams and expense – by conducting Kin transactions within Kik Messenger on a "centralized" ledger to be operated by Kik (or by an entity established by Kik). Kik described this new service as "a semi-centralized hybrid on-chain and off-chain Transaction Service for scalable interactions with the Kin cryptocurrency." Second, Kik stated that it would seek a "long term" solution by establishing a new entity, the "Kin Foundation," which would in turn "move to migrate [Kin's] transactional infrastructure to a fully decentralized system while retaining a low friction user experience." (SEC31, Dep. Ex. 12, at 19; Answer ¶ 137).

> **In Response to No. 158**: Disputed.  The Whitepaper states that, "Kik will initially implement a semi-centralized hybrid on-chain and off-chain Transaction Service for scalable interactions with the Kin cryptocurrency.  At the core, the transactions

in Kin will be settled on the Ethereum blockchain." SEC31 at KIK000018. To reach its goals of improving user experience, avoiding network fees for transactions between users, and avoiding stress on the public network, Kik proposed a centralized off-chain ledger with an API available to all digital service partners. *Id.* In the long term, the Kin Foundation would "migrate the transaction infrastructure to a fully decentralized system while retaining a low friction user experience." *Id.* at KIK000019. Otherwise undisputed.

159.    Kik promised to publish a "Kin Technical Whitepaper" that described Kik's proposed "managed solution for Kin tokens." (SEC31, Dep. Ex. 12, at 19; Answer ¶ 138).

> **In Response to No. 159**: Disputed that Kik "promised" to publish a technical whitepaper. The Whitepaper contained a reference that Kik would publish a technical white paper. SEC31 at KIK000019. Otherwise undisputed.
>
> Kik further objects to this statement as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract." *See* Response No. 31.

160.    Following its initial announcements, Kik continued to tell potential investors that it would seek long-term technological improvements that enabled Kin transactions on the blockchain. For example, during the June 2017 San Francisco conference, Kik's CEO said Kik was "looking for" a new "blockchain 3.0," which Kik itself might create by partnering with another blockchain or building its own bespoke blockchain. (SEC46-B, An Evening (transcript), at 22:11-23:3; Answer ¶ 138). Regardless, Kik promised to "spend a lot of time on that as well." (*Id.* at 23:2-3).

> **In Response to No. 160**: Disputed. The first sentence lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d). And Mr. Livingston's reference to blockchain 3.0 was a desire to improve upon Bitcoin and Ethereum, noting that they made it possible to "guarantee scarcity of an individual asset" and "add logic to that, and now we're looking for blockchain 3.0. You can have those two things, plus scale, and that may be Ethereum, you know, if that might be a new blockchain that we partner with, or we actually might take a crack at building our own blockchain." SEC46B 22:11-23.

161.    Similarly, at the September 7 New York City event, Kik's CEO stated:

> Scalability is a real issue. You know, if we wanted to go in and just give one Kin to each of our users, we'd tie up the Ethereum network for something like 30 days. Take 30 days, like, you get one Kin. You get one

Kin. Come back 30 days later, and you get one Kin. And it would take down the whole network. And so I think, you know, getting that scalability, it's a big challenge. How we're going to do it is we want everything to be on chain from day one because we're going to do sort of like, a Gmail-style rollout inside of Kik. So we're going to start with just a thousand users. And then from there, as we figure out the scalability, we increase the scalability of the blockchain -- whether it's on Ethereum, whether it's on our own sort of blockchain 3.0 project, or somebody else's blockchain 3.0, I call it, as we can increase the scalability, we'll increase the size of the consumer bases again.

(SEC49-B, NYC Ethereum (transcript), at 48:7-49:1).

> **In Response to No. 161**: Undisputed.

162.    By September 2017, it would have been impractical for Kik or any other commercial developer to engage in Kin transactions on the Ethereum blockchain, because of the slow speeds at which the blockchain would have processed those transactions, among other limitations. As a Kik executive testified in August 2018, almost a year after Kik's token distribution event:

> Q.    Can a commercial developer like Kik just run on the -- run transactions on the Ethereum app? On the Ethereum blockchain?
>
> A.    They could. It would be slow.
>
> Q.    I mean, do you think it's actually, like, that it's a practical way to run a business?
>
> A.    Today?
>
> Q.    Yeah.
>
> A.    I do not think it's practical for a consumer application to run all their products on Ethereum. I think over time Ethereum will become more scalable and that is up to all the people contributing to the Ethereum blockchain.

(SEC14, Philp Inv. Tr., at 575:12-575:24).

> **In Response to No. 162**: Disputed.  The first sentence lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Further disputed that Kik's solution was "impractical."  Kik chose to build on Ethereum because "it's a

really easy way into get into the market.  It's the best blockchain to build for right now" and it could create a new token "very quickly and easily" that could be moved to another blockchain.  SEC49B 52:5-17.  Otherwise undisputed.

163.    As the issues were described by Kik, a coordinated, centralized effort was required to implement solutions to the existing blockchain's "scalability" and speed issues. A decentralized group of Kin investors could not perform these functions. Indeed, Kik stated that it intended to use the proceeds of the token sale to finance this work by Kik employees and contractors, many of whom it identified by name in its white paper. As Kik's New York City-based consultant testified:

> Q.     . . . [S]o when Kin was offered to the public, again, I'll represent to you was September of 2017, what blockchain was it on?
>
> A.     So I believe Kin was anticipating being an ERC20 token on the Ethereum blockchain.
>
> Q.     Got it. . . .
>
> [Q].    Could the decentralized community have gotten together and just moved Kik -- the Kin tokens off the Ethereum blockchain?
>
> [A].    That has never happened -- well, it kind of depends on what you mean, I suppose. Would the holders of Kin tokens be able to, you know -- you know, as a group, unilaterally make such a decision? No.

(SEC70, Investigative Testimony of Jake Bruhkman ("Brukhman Inv. Tr."), at 90:10-91:1).

> **In Response to No. 163**: Disputed.  Kik had a team "specifically dedicated to a scaling solution for Kin" that would allow Kin to transact on another blockchain. SEC14, Phil Inv. Tr. 564:2-17; 565:10-12.  Additionally, Mr. Bruhkman explained that "scalability is a concern for every application in the blockchain space today," but that as of summer 2017, he believed Kin could be implemented on the Ethereum blockchain.  SEC70, Bruhkman Inv. Tr. at 158:4-17.
>
> Kik objects to this statement as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract."  *See* Response No. 31.  Otherwise undisputed.  Kik further objects that the first three sentences lack any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

164.    By the time Kik sold Kin to the general public in September 2017, Kik had not

enabled Kin transactions among users of Kik Messenger that would have relied on Kin's chosen

platform – the Ethereum blockchain – because doing so would have risked crashing the Ethereum

network:

> Q.    Could -- again, I bought Kik – let's say I bought Kin on day
>        one of the public sale. Could I engage in peer-to-peer
>        transactions inside the Kik messaging app with my Kin?
>
> A.    You could not. Not to my knowledge.
>
> Q.    Why not?
>
> A.    Why not? The reason for that was the blockchain
>        technology was very new and immature. And so I think our
>        concern was with the current state of blockchain
>        technology, if we enabled that, there's a potential that we
>        could crash the Ethereum network, which would not just
>        hurt all Kin users inside of Kik, obviously, but would hurt
>        all users of Ethereum broadly. And we didn't want to do
>        that.

(SEC8, Livingston Inv. Tr., at 470:2-470:15).

> **In Response to No. 164**: Disputed to the extent the SEC suggests the token was
> not functional at the time Kik sold Kin to the public in September 2017.  At the
> time Kik sold Kin in the TDE, Kik had launched a product within Messenger that
> allowed anyone who owned Kin to use it within Kik.  Philp Decl. ¶¶ 85-86.  They
> could link their digital wallets to Kik Messenger and access different tiers of
> premium content with different amounts of Kin.  *Id.*  Otherwise undisputed.

165.    Ultimately, such work to improve the scalability of the blockchain was undertaken

by Kik. (SEC14, Philp Inv. Tr., at 563:12-565:9).

> **In Response to No. 165**: Disputed that this work was undertaken by Kik alone as
> there were "a lot of people that contribute to the Ethereum blockchain" other than
> Kik.  SEC14, Philp Inv. Tr. 564:2-10.  Otherwise undisputed.

*vi.*    ***Kik Told Investors It Would Work To Attract People To The Kin Network,***
        ***Which Would Increase The Price Of Kin In The Future.***

166.    Kik publicly stated that it would wait until after the planned token distribution event

to invite developers to join the ecosystem. At the May 25, 2017 Token Summit, Kik's CEO stated:

> So, the timeline for this is we're publishing our white paper today. We'll
> start integrating Kin into Kik in a way very similar to what we did with Kik
> coins, and then we'll announce a token distribution event later this summer,
> and from there, later this year or early next year, that's where we'll -- where
> we will start to open up the platform for other developers to join the
> ecosystem.

(SEC36-B, Token Summit (transcript), at 11:9-11:16).

> **In Response to No. 166**: Disputed.  Kik did not say it would "wait until after the
> planned token distribution event to invite developers," but only that the platform
> was in fact open or available for developers to join after the TDE.  SEC36B at 11:9-
> 16.  Otherwise undisputed.

167.    Similarly, the white paper promised that "Kik will be the [Kin] ecosystem's

champion and will showcase Kin to its millions of users." (SEC31, Dep. Ex. 12, at 6).

> **In Response to No. 167**: Disputed. The white paper did not include any promise
> but simply said that, "As the founding member of the Kin Foundation, Kik will be
> the ecosystem's champion and will showcase Kin to its millions of users." SEC31
> at KIK000006.  Otherwise undisputed.

168.    And, Kik previewed for investors its post-launch pitch at the September 7

conference in New York City:

> And so the question everybody is going to ask themselves is, why would I
> adopt Kin when I could launch my own cryptocurrency and do my own
> token distribution event? And so the answer we want to give to that is
> because you will make more money. And so that's really how we thought
> about Kin is how can we set it up such that as a developer, who has a digital
> service like, I could do my own cryptocurrency, but if I adopt Kin, I'll just
> make more money.

(SEC49-B, NYC Ethereum (transcript), at 62:19-63:3).

> **In Response to No. 168**: Disputed.  The SEC provides no support that there were
> "investors" present at the September 7 conference in New York City.  Further
> disputed to the extent the SEC suggests that publication of Mr. Livingston's

83.

statements shows that any TDE purchaser relied on the statements.  *See* Response No. 108.  Otherwise undisputed.

### vii.    Kik Said That It Would Create A "Kin Rewards Engine" That Would "Further Grow The Ecosystem."

169.    Kik also promoted the creation of "the Kin Rewards Engine," an automated system that would identify companies or individuals who helped to boost demand for Kin, and reward them with additional Kin. Thus, the Rewards Engine would further develop the Ecosystem. Kik's white paper stated:

> Kin will sit at the center of a new digital economy inside Kik, driving demand and fundamental value for the cryptocurrency. Its resulting value will enable the launch of an economic incentive mechanism, the Kin Rewards Engine, to further grow the ecosystem.

(SEC31, Dep. Ex. 12, at 5).

> **In Response to No. 169**: Disputed. The Rewards Engine would "use economic incentives to bring other digital services and applications into the decentralized Kin Ecosystem."  SEC31 at KIK000006.  Otherwise undisputed.
>
> Kik further objects that the first sentence of this statement lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

170.    Kik's white paper explained that "60 percent of the total supply of Kin will be secured in a smart contract, allocated to the Kin Rewards Engine, and introduced into circulation as periodic rewards." (*Id*. at 19; Answer ¶ 144)

> **In Response to No. 170**: Undisputed.

171.    Kik's white paper stated that "the company [*i.e.*, Kik] . . . will create the Kin Rewards Engine to incentivize developers and creators to make new products and services." (SEC31, Dep. Ex. 12, at 23).

> **In Response to No. 171**: Undisputed.

172.    Kik employees worked on the Kin Rewards Engine. (Answer ¶ 95).

> **In Response to No. 172**: Undisputed.

173.    Kik's white paper included a high-level overview of the Kin Rewards Engine's

operations:

> Periodically, the Engine will unlock and distribute a specific amount of Kin
> to be shared among digital service providers in the Kin Ecosystem. The
> rewards that each partner receives will be proportional to a measure of the
> utilization of Kin within that digital service. Such value will be assessed by
> a well-defined process that ensures the rewards are distributed fairly using
> an objective, performance-based methodology.

(SEC31, Dep. Ex. 12, at 6). But Kik's white paper did not provide additional details about this

process – *e.g.*, how the Rewards Engine would "measure" the use of Kin in digital services, how

it would "assess" the value of those uses, or how the "objective performance-based methodology"

would be employed – it necessarily required further work by Kik. As Kik's Answer confirms, the

white paper "would not necessarily set forth every input of the algorithm that the Kin Rewards

Engine would use." (Answer ¶ 145).

> **In Response to No. 173**:  Disputed.  The Whitepaper explained in detail that "the
> Kin Foundation will administer the Kin rewards Engine" in order "to create
> incentives for digital services and applications that create vibrant services within
> the Kin Ecosystem."  SEC31 at KIK000017.  It further explained that it would
> accomplish this by "periodically unlocking a specific amount of Kin and
> distributing it among ecosystem partners, favoring digital services in which the Kin
> cryptocurrency is highly utilized,"  and included the precise percentage of Kin to
> be released over time.  SEC31 at KIK000017, 21.  Further disputed that the
> Rewards Engine or the Whitepaper "necessarily required further work by Kik"
> because this statement lacks any citation to evidence in the record.  Otherwise
> undisputed.

174.    At the May 25 Token Summit, Kik's CEO was asked a series of questions by the

organizer of the summit who at that time also served as a paid Kik consultant. The two discussed

on stage the Kin Rewards Engine as follows:

> CONSULTANT: It's almost like a profit sharing kind of coop type model?
>
> KIK'S CEO: Yeah. It economically incentivizes everybody to work
> together, and the really nice thing about it is, it creates this great network
> effect, where the more developers that come into this ecosystem, the more
> transactions they create -- the more transactions they create, the more

> valuable Kin overall becomes, the more valuable Kin overall becomes, the more valuable the daily reward becomes. And so, we see this daily reward starting at about $100,000 a day, but could quickly grow to half a million, million dollars a day, if not more.

(SEC36-B, Token Summit (transcript), at 6:22-7:9; *see also* SEC22, Mougayar Dep. Tr., at 107:18-19).

> **In Response to No. 174**: Disputed. As of July 7, 2017, Mr. Mougayar's advisor agreement with Kik had not been formalized. SEC22, Mougayar Tr. 50:21-51:5. Further disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.
>
> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract." *See* Response No. 31. Kik further objects that the first sentence lacks any citation to the record r as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

175.    Kik publicly stated that the Rewards Engine would not be created until after the public sale. In a June 2017 interview, Kik's CEO stated that setting up the Rewards Engine "will be later this year [2017], or sometime next year [2018]." (Answer ¶ 147).

> **In Response to No. 175**: Undisputed.
>
> Kik objects to the first sentence of this paragraph because it lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

176.    Kik communicated to potential Kin buyers that Kik would "use the funds" from the public sale to build the Rewards Engine, among other tasks:

> So we're going to use the funds to join the platform and essentially build it, the transaction service, the identity service, the reward engine. To build it in all use cases inside of Kik, to get a bunch of developers building use cases outside of Kik. Basically to like launch this whole broader ecosystem

(SEC46-B, An Evening (transcript), at 55:10-23; Answer ¶ 148).

> **In Response to No. 176**: Disputed to the extent the SEC suggests that publication of any of those statements alone is sufficient to show that any TDE purchaser both heard and relied on the statements. Otherwise undisputed.

> Particularly in the absence of evidence that any purchaser saw or relied on any of the statements, Kik objects to the SEC's statements as irrelevant and immaterial to whether Kik's offer or sale of Kin constituted an "investment contract."  *See* Response No. 31.  Kik further objects that the first sentence lacks any citation to the record r as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

177.    At the time of the May 25, 2017 announcement and throughout the rest of the offering, Kik did not intend to complete the Kin Rewards Engine before the planned token distribution event. (SEC4, Heinke Dep. Tr., at 94:5-12, 96:20-97:18, 104:19-106:20). By July 2017, Kik executives understood that creating a Rewards Engine "would be really difficult" and could take a significant amount of time. (SEC10, Heinke Inv. Tr., at 406:18-409:9; SEC71, Inv. Ex. 184). Before distributing Kin, Kik hired an additional consultant to work with Kik employees to design the Rewards Engine. (SEC10, Heinke Inv. Tr., at 410:12-411:7).

> **In Response to No. 177**: Disputed that Kik conducted a "single offering."  *See* Response No. 36.  The details of the Kin Rewards Engine were not intended to be complete at the time of the TDE, but other iterations of a program that would reward users with Kin had been considered.  *See* SEC4, Heinke Dep. Tr. 106:18-108:9. Otherwise undisputed.

178.    At the September 2017 New York City event, Kik's CEO stated that Kik was not ready to release the algorithm for the Kin Rewards Engine, and that the company was still trying to develop an algorithm that could not be "gamed":

> Now, the thing we haven't released yet – and we will but not yet -- is -- the obvious question is, but isn't that really gameable?

> Like, what if, you know, Jesse at Spotify is a little bit evil, and he says, instead of like, creating real transactions, what if I just great a bunch of bots to send Kin back and forth with each other, and I'll drive up this transaction volume, and, you know, who is real? Who is a bot? You can't know.

> I think the secret sauce to the algorithm is how we solve for that problem, how we solve for game ability. We're not releasing that yet. We're very excited about that, but that's really how the Kin – that wasn't 60 seconds, but that's how the Kin rewards engine works is if the Kin economy like, is worth this much without you, and this much with you, we're going to find a way -- a fair, programmable, and ultimately decentralized way to get that

value to you, such that it's in your best economic interest to adopt Kin versus build your own cryptocurrency.

(SEC49-B, NYC Ethereum (transcript), at 64:2-64:21).

> **In Response to No. 178**: Disputed.  With respect to the algorithm for the Kin Rewards Engine, the purpose of this delay was to make sure Kik was providing what was in the purchasers' "best economic interest" and make sure the ecosystem was "fair."  SEC49B 64:2-21.  Otherwise undisputed.

179.    On September 26, 2017, the automated functions of the Rewards Engine were not operational. The Kin Rewards Engine was being worked on at the time of the September 2017 distribution. (Answer ¶ 149).

> **In Response to No. 179**: Undisputed.

> Kik objects to the first sentence of this paragraph because it lacks any citation to the record whatsoever as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

### viii.    Kik Promised It Would Create And Control A "Kin Foundation" To Manage And Promote Demand For Kin.

180.    Kik's white paper stated that Kik would "establish the Kin Foundation to manage and encourage growth of the Kin Ecosystem," and that, "[o]ver time, Kik will work to structure and form the Kin Foundation, a nonprofit organization to oversee the fair and productive growth of the Kin Ecosystem." The Foundation would "administer the Kin supply and the Kin Rewards Engine" and "provide support and tools for digital services to operate more easily within the ecosystem," and, "[u]ltimately . . . [would] facilitate the entire ecosystem's transition to a fully decentralized and autonomous network." And, Kik explained that the Foundation would receive six of the ten trillion Kin that Kik created. (SEC31, Dep. Ex. 12, at 6, 21; Answer ¶ 98).

> **In Response to No. 180**: Undisputed.

181.    Despite statements about the eventual transfer of Kin Ecosystem responsibilities to the Foundation, Kik provided no concrete timetable for this transfer, and Kik's CEO told audiences

that, for an unspecified period, Kik would "have a lot of influence over that Kin Foundation" and

that the Foundation would not be "totally independent" from Kik:

> [Y]es, Kik is a centralized app run by a centralized company, but we are
> using Kik to boost up the value of Kin, and you know, we're giving a bunch
> of that Kin to this independent not-for-profit foundation, the Kin
> Foundation. Now, we're going to have a lot of influence over that Kin
> Foundation, at least initially, right? We're not going to sit there and oh like
> no, no, no, it's totally independent. Like obviously it's like Kik created Kin,
> Kik created the Kin Foundation, you know they put ten on the board because
> you know we thought it was really smart or whatever. Obviously we're
> going to have influence there. But our goal is to yes, we're going to start
> with employees to try to get this whole thing running. But . . . what we're
> going to do with the Kin Foundation is move to decentralize it and to make
> it completely autonomous as quickly as we can. Not right away because we
> don't want the DAO all over again. But over time we'll move it to be - okay
> it works, the reward engine is working, it's not gameable, everything is
> running and it's working, no one's hacked it yet or it's not being hacked.
> Everybody agrees, like, now is the time for the autonomous use, we'll
> decentralize[.]

(SEC46-B, An Evening (transcript), at 43:17-44:24; Answer ¶ 152).

> **In Response to No. 181**: Disputed.  Kik would have some influence over the
> Foundation "*at least initially*," with the ultimate goal of the Kin Foundation
> overseeing a fully decentralized economy.  *See* Response No. 177; SEC46B 43:22-
> 23.  Otherwise undisputed.

182.    At the September 2017 New York City event, Kik's CEO stated that Kik "has

influence" on both the company and the foundation:

> So in terms of separating, like, the private entity of Kik and the foundation,
> the Kin rewards engine, today, you know, obviously Kik has influence on
> both. And that's what we need to do to get it going. But over time, the idea
> is Kik becomes just another participant in this much broader ecosystem.

(SEC49-B, NYC Ethereum (transcript), at 56:17-22).

> **In Response to No. 182**: Undisputed.

183.    According to Kik's public statements throughout the offering, Kik and the Kin

Foundation (which, again, Kik planned to "have a lot of influence over") would collectively own

and control nine trillion Kin – 90% of all the Kin that would ever exist. (SEC45-B, TechCrunch

(transcript), at 12:4-14).

> **In Response to No. 183**: Disputed.  The document cited by the SEC references only a *single* statement on June 20, 2017 to an audience in China, not that Kik and the Kin Foundation made multiple "statements throughout the offering" about its ownership of Kin.  SEC45B.  The Foundation was "meant to be this not-for-profit independent group, overseeing the growth of this ecosystem" and only "initially" would Kik "play a large part in getting that foundation going."  SEC45B:6-19.  Further disputed as nothing in the portion of the transcript cited references Kik or the Foundation's ownership of Kin.

## I.   THE MARKET UNDERSTOOD FROM KIK'S MARKETING OF THE OFFERING THAT THEY COULD PROFIT FROM KIK'S ANTICIPATED FUTURE EFFORTS TO PROMOTE AND SUPPORT KIN.

184.   Various observers, including financial and technology news sources, that reported

or publicly commented on Kik's offering of Kin either repeated the company's statements that Kin

could appreciate or stated that they understood Kik to be offering an investment vehicle. For

example, a writer reporting on the June 2017 conference in China reported as follows:

> While some people have made significant money off of bitcoin, others are skeptical as to whether volatile cryptocurrencies are a good investment. [Kik's CEO] can see it going either way. "The way I think about ICOs is it's very similar to the dot-com era. There was a bunch of excitement, people made a bunch of money, people lost a bunch of money but Amazon and Google came out of it. "

(Answer ¶ 76).

> **In Response to No. 184**: Disputed.  Disputed that Mr. Livingston's reference to the "dot com" era refers to Kik.  *See* Response Nos. 116, 119.  Further disputed as to the first sentence because it lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d), and states that "various observers" commented on Kik, but mentions only a single reporter in China, where Kik did not sell Kin.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31. Otherwise undisputed.

185.   In a July 11, 2017 article by a CNBC columnist titled "Why a messaging start-up

is making its own digital currency instead of going public," the reporter summarized an interview

with Kik's CEO as follows: "he thought, if Kik could develop a cryptocurrency that became a self-sustaining economy – and Kik owned a big chunk of that supply limited currency – the value of that stake in Kin could end up being more valuable than the potential exit valuation for Kik as an ad-based business in an IPO or through an acquisition." The article also calculated Kik's potential profit if Kin increased in value like other digital assets had done. (Answer ¶ 77).

> **In Response to No. 185**: Disputed.  This paragraph contains a supposed quote from a columnist who summarized the statement of Mr. Livingston.  It contains multiple levels of hearsay and lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d); *see* Fed. R. Evid. 802.  Kik further objects to these statements as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract."  *See* Response No. 31.  Otherwise undisputed a third-party made the quoted statement.

186.   A September 4, 2017 article on an online blockchain news service described Kik's plan to use the proceeds from Kin sales to create the Kin Ecosystem, and analyzed the merits of buying Kin both "for flipping" and for its "long-term potential" as an investment, opining on the project's implied valuation and the risk that investors could sell rapidly on secondary trading markets. (Answer ¶ 78).

> **In Response to No. 186**: Disputed.  The SEC provides no cite to the record or identification of the article's author or location to verify its contents.  Moreover, the opinions and statements of a third-party "news service" are inadmissible hearsay.  Kik objects to these statements as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract."

187.   Similarly, investors who purchased Kin understood from Kik's marketing of the token that investing in Kin provided an opportunity to profit, and that Kik would take steps to increase demand for the token, thereby increasing its price.

> **In Response to No. 187**: Disputed.  Purchasers understood Kin was a medium of exchange with consumptive use.  *See* Landsvik Ex. Z, ¶¶ 16-18, 25-27 (Dowd Decl.) ("I understood Kin to have been marketed as a cryptocurrency that would be used on a wide scale as a medium of exchange within digital applications. Kik did not market Kin as a passive investment opportunity."); *id.* Ex. AA (Hendriks Decl.), ¶¶ 20-21, 30 (same); Ex. BB-1 (Ramsey Decl.), ¶¶ 11, 14. 16 ("Kik never said specifically that I would make money or that Kin was an investment opportunity").

Kik further disputes this statement as lacking any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

188.    For example, one investor who purchased Kin during the portion of the sale open to the public stated that, after reading Kik's whitepaper, he purchased Kin in order to make a profit on the token's appreciation, and he understood that Kin's appreciation, if any, was tied to Kik's ability to execute on the assurances it had made when marketing the token:

Q.    You thought that the fact that Kik was an existing company with a messaging base meant that they could have, not with certainty, but a chance of building out a project with real value?

A.    That's correct.

Q.    And then did you then choose to buy in the project, in the ICO because you thought if that worked the coins would be more valuable in the future?

A.    That's correct.

Q.    So if I were to say you bought Kin because looking at the project you thought you would be able or more likely to make a profit; would that be correct?

A.    Yes.

. . . .

Q.    Let's say, God forbid, that the day after the public sale of Kin tokens Kik went out of business. It stopped. It couldn't afford the ecosystem. Do you think that would put the value of Kin at risk?

A.    Yes.

Q.    Is that obvious that it would?

A.    It seems obvious to me, yes.

Q.    Why is that? Spell it out for me.

A.    Because -- because it's -- even if other developers were to build applications around using the Kin token and around their chat application, their -- the core of it would be their

92.

system and their software. So if that disappears, it's likely
the whole thing would disappear.

Q.     And is that something you understood at the time?

A.     Yes.

Q.     Just curious. So is it fair to say that the value of your
investment in Kin was tied to Kik's ability to perform
future tasks?

A.     Yes.

(SEC72, Investigative Testimony of Alexander Rousmaniere ("Rousmaniere Inv. Tr."), at 16:23-

17:10, 20:8-21:4).

> **In Response to No. 188**: Disputed that Mr. Rousmaniere bought Kin to profit.
> Mr. Rousmaniere bought Kin based on "his belief that there is a possible business
> model with a chat application that has a means of monetary exchange built in."
> SEC72, Rousmaniere Inv. Tr. 13:10-14:5.  He would not buy something "because
> you think other people are just going to invest in it and you're going to get out
> quicker than them." *Id.* 16:3-12.
>
> Kik further objects to these statements as irrelevant and immaterial to whether the
> sales of Kin constituted an "investment contract." *See* Response No. 31.  Otherwise
> undisputed that Mr. Rousmaniere provided the cited testimony.

189.    Likewise, another investor, after reading the white paper, purchased Kin in the

hopes that it would rise in value, and that he could thereby make a profit (SEC73, Investigative

Testimony of Harrison Wang ("Wang Inv. Tr."), at 18:11-13, 19:3-9 ("Q. Did you invest in Kin

because you wanted to make a profit? A. Yes.")); he also understood from Kik's statements that

such appreciation was tied to the fortunes of Kik:

Q.     What if Kik conducted the ICO and then did nothing;
would Kin appreciate in value, in your opinion?

A.     No.

Q.     What would happen to it?

A.     I mean, it would just -- everyone would jump ship, I think,
because all the investors would sell off.

> Q.      It's fair to say that the value of your Kin would
>         dramatically decrease?
>
> A.      Yes.

(*Id*. at 20:15-23; *see also* SEC50, Wang Dep. Tr., at 42:3-25).

> **In Response to No. 189**: Disputed.  Mr. Wang thought that Kin's "utility would
> drive demand which would drive price." *Id.* 241:1-5; 251:16-20.   Otherwise
> undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether the
> sales of Kin constituted an "investment contract." *See* Response No. 31.

190.    Another investor who purchased Kin during the sale to the public testified that

Kik's touting of Kik's receipt of funding from well-known venture capital firms was evidence that

Kik would cause Kin to increase the price of Kin and that he would, as a result, make a profit:

> Q.      When you made your purchase of Kin, did you purchase
>         the Kin with the expectation of making a profit?
>
> A.      Yes.
>
> Q.      And why did you think that?
>
> A.      Same reason the venture people who invested in Kik did. I
>         mean, I just -- I trusted that. I mean, that's more than
>         anything the reason why I clicked Send, was -- was
>         following those investors and their belief and their
>         diligence they had done, so that's the primary reason.
>
> Q.      Do you recall any specific statements made by Kik itself
>         telling you that you could expect a profit?
>
> A.      Well, I mean, in the whitepaper, there's that sentence that I
>         alluded to earlier that said, you know, because it's a finite
>         supply, as more people use it, it will be worth more money,
>         which implies profit.
>
> . . .
>
> Q.      But your understanding was that the – that the -- the
>         company had made statements, in effect, that as more
>         people used the token, its value would rise?
>
> A.      Correct.

Q.     Okay. And was it your understanding that that -- that use required participation by developers, service providers, and participants in the network?

[A].    Right, and it wouldn't magically happen. Kik and Kin would have to push it to make it happen.

(SEC74, Deposition of Jack Neil ("Neil Dep. Tr."), at 113:1-114:18 (objection omitted)).

**In Response to No. 190**: Disputed.   Dr. Neil understood that Kin's ultimate success depended on the participation of participants, vendors, and developers.  SEC74, Neil Dep. Tr. at 116:7-14.   He also understood that any increase in Kin's value was dependent on such participants, vendors, and developers' actual use of Kin.  *Id.* at 114:7-18.  Otherwise undisputed.

Kik further objects to these statements as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract."  *See* Response No. 31.

191.    Another public sale investor explained that in making his purchase decision he considered:

[A].    Well, in ICO land, you have people raising tens of millions of dollars to make things that don't already exist sometimes in any form. Kik was a different case because it was an existing company that had done successful VC raises and had a large or at least significant and material user base. Therefore, it seems, given their track record of success here, where success means doing anything, they would be able to do more anythings with tens of millions of dollars from the offering.

[Q].    They would be able to do those things after the offering?

[A].    I think that -- yes, they need money to do the things.

(SEC75, Investigative Testimony of Garrette Furo ("Furo Inv. Tr."), at 13:12-13:25).

**In Response to No. 191**: Disputed.  Mr. Furo "weighed his liquidity, risk tolerance, time horizon, and viability of the product" when deciding whether to purchase Kin.  SEC75, Furo Tr. 12:12-16.  Otherwise undisputed.

Kik further objects to these statements as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract."  *See* Response No. 31.

192.    After the August 14, 2017 conference in Canada, a prospective Kin buyer sent an email to the Kik consultant who conducted the live interview of Kik's CEO at the conference,

stating: "I just wanted to let you know that I was very excited to watch your fireside chat with Ted and also to find out that you're an investor. I was planning to invest in Kin and that video made me even more confident!" The consultant forwarded the email to Kik's CEO, who responded "Great :)" (SEC76, Dep. Ex. 146; SEC22, Mougayar Dep. Tr. 173:2-14).

> **In Response to No. 192**: Disputed that this was a "prospective buyer" in the TDE. The SEC provides no support whether this person was a potential SAFT participant, TDE purchaser, or whether he ultimately bought Kin.  Otherwise undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract."  *See* Response No. 31.

193.    The accredited investors who purchased Kin through the SAFT included managers of large investment funds with hundreds of millions or billions of dollars under management, and whose business purpose was to make investment returns not develop or use software applications or digital asset ecosystems or accumulate stickers. (*See, e.g.*, SEC23, Morehead Inv. Tr., at 9:24-12:1; 24:12-15 (re Pantera Capital); SEC42, Hourigan Inv. Tr., at 8:11-14:23, 34:1-12 (re PB Digital/Fortress Investment Group). They also understood that Kik was selling an investment, and they purchased Kin with the intent to make a profit, specifically through Kin's appreciation resulting from Kik's promised efforts. For instance, a representative for a SAFT participant which paid $2 million for approximately 19.5 billion Kin (*see* SEC53, Dep. Ex. 40), explained in a June 2017 email that "[c]ompared to other ICOs, Kik has a real product/user base/VC investor base etc., which should generate hype around the ICO and make it fairly easy to flip." (SEC77, Inv. Ex. 75).

> **In Response to No. 193**: Disputed.  Pre-sale participants bought a futures contract containing a conditional right to receive Kin in the future.  Philp Decl. ¶¶ 32-33. Further disputed that they "purchased Kin with the intent to make a profit, specifically through Kin's appreciation resulting from Kik's promised efforts" as this statement lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Otherwise undisputed.

194.    The representative later testified:

Q.    Having now had a chance to look at your e-mail again, is it fair to say that your sort of overall view of this was that Kik's prospects as a company weren't great long-term, but that because it had a real product, a user base and a VC investor base, that it should go up in the near term and that you could exit your [Kin] position at a profit?

A.    I would say that it should go up in the near term based on its potential to actually work. I mean despite the, you know, negatives which we just discussed in terms of their user base and kind of how it was trending, they did have or I think they still do have, you know, hundreds of millions of people on a -- on a chat platform and a lot of activity; and so trying to, you know, create a digital asset to be used in that has a lot of potential compared to creating a digital asset that has no user base to sort of be integrated into. So it was one part the signaling of this, you know, VC funding they raised and the kind of foundation they have, but the other part of it was that they actually do have that user base and that technology already built out, that, you know, could be an attractive thing to try to integrate this into.

Q.    You wrote that it should be fairly ease to flip. What did you mean by that?

A.    That there would be a lot of people that would want to buy these assets once they were, you know, created and out there liquid in the market.

Q.    So again, so that Fortress or you could be -- you could exit your position at a profit.

A.    Correct.

(SEC42, Hourigan Inv. Tr., at 50:21-52:4). This investor also confirmed that he understood that if Kik were to stop its involvement with Kin following the tokens' distribution, it "would have been a big negative" based on the investor's "investment thesis." (*Id*. at 46:2-10).

> **In Response to No. 194**: Disputed.  Mr. Hourigan specifically said he "didn't know if [the tokens] would lose all of their value" if Kik went out of business. SEC42, Hourigan Tr. 46:2-10.  Otherwise undisputed.

195.    Within 10 months of the September 2017 distribution of Kin, this SAFT participant had sold all of the approximately 9.75 billion Kin that it had received by that point, and for which

it obtained proceeds substantially exceeding its entire $2 million investment. (*Id*. at 20:4-21:17; 56:4-8).

> **In Response to No. 195**: Disputed. The cited text does not support the statement because it does not reference when the participant sold, how many Kin he sold, and how much it received for those Kin. *See* SEC42, Hourigan Inv. Tr. at 20:4-21:17; 56:4-8. Further, the investor's counsel clarified that the investor sold only part, but not all, of its holdings of Kin. *Id.* at 20:12-17.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

196.  Another SAFT participant, Pantera Capital, paid Kik $20 million – nearly one fifth of the entire amount Kik received – for an allocation of approximately 146 billion Kin. (SEC53, Dep. Ex. 40). In a June 2017 email, this participant's founder noted the 30% discount that it would receive under the SAFT and wrote, "I think it is likely to [sic] up more than 2x so can lock in gain." (SEC77, Inv. Ex. 75).

> **In Response to No. 196**: Disputed. SAFT participants bought a futures contract with a right to receive Kin in the future. Philp Decl. ¶¶ 32-34. Otherwise undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

197.  Pantera Capital also began selling its Kin within six months of the September 2017 distribution and sold approximately 10 percent of its allocated Kin within a year of the distribution, obtaining proceeds that represented approximately 25 percent (or $5 million) of the participant's original investment. (SEC23, Morehead Inv. Tr., at 133:7-135:24; 148:21-149:5). The founder of this purchaser later testified:

> Q.   Did you buy Kin tokens to use them, to spend them within the Kik app or within any ecosystem they might create?
>
> A.   I imagine that we would have used a small percentage of them, but we principally bought it for capital appreciation.
>
> Q.   So is all the Kin that you bought in the ICO fund?

A.      Yes.

Q.      And so you would have used the Kin tokens that reside in
         the ICO fund to purchase things within the Kin Ecosystem?

A.      I -- only for kind of experimental reasons to decide if it's a
         good investment. It would be an immaterial amount.

Q.      Is that something you would have to clear with the fund
         investors before doing or you can just unilaterally do that?

A.      We do have the ability to use tokens for staking and other
         purposes to test systems, but it would -- again, it would be a
         very immaterial amount.

Q.      So, I mean, the primary purpose for your investing in Kin
         was to profit, to make money for your investors?

A.      Yes. We were principally seeking capital. Appreciation on
         the tokens.

(*Id*. at 73:9-74:9).

**In Response to No. 197**: Undisputed.

Kik objects to these statements as irrelevant and immaterial to whether Kik's sales
of Kin constituted an "investment contract." *See* Response No. 31.

198.    Another investor who purchased $100,000 in Kin using a SAFT (and who was

compensated as a Kik consultant and later became a director of the Foundation), believed during

the offering that Kik would be responsible for opening up Kin to developers after the token

distribution event, because Kik "had the resources." (SEC22, Mougayar Dep. Tr., at 122:25-

123:14). At the time of the offering, the investor expected Kik to be involved in developing Kin at

least through 2017 and likely into 2018 because "that was the only way." (*Id*. at 125:10-16:17).

One of the reasons the investor bought Kin was to profit from an appreciation in the value of Kin

"if they are successful." (*Id*. at 133:1-7).

         **In Response to No. 198**:  Disputed.  As of "May of 2017" Mr. Mougayar believed
         Kik would be involved in adding functionality for Kin.  SEC22 Mougayar Tr.
         123:5-14.  The TDE was not announced until later in August 2017.  Philp Decl.
         ¶ 52.  Further disputed that Mr. Mougayar bought Kin to profit, which was

"potentially" one of the reasons he entered the SAFT. SEC22, Mougayar Tr. 133:1-7. Otherwise undisputed.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

## J. AT THE TIME OF THE KIN OFFERING, KIN HAD NO UTILITY

### i. *Kik Did Not Market Any Specific Use For Kin To Public Buyers*

199. In marketing the Kin offering, Kik's white paper had described a number of "example[s]" or "prospective use cases . . . demonstrating how Kin may be integrated into the Kik application." (SEC31, Dep. Ex. 12, at 12-15).

> **In Response to No. 199**: Disputed that Kik conducted a "single offering." *See* Response No. 36. Otherwise undisputed.

200. When Kik distributed Kin on September 26, 2017, none of the "use case" examples suggested by the white paper were available:

> Q.    At the time of the token distribution event, could people go into the Kik app and use their Kin tokens to do any of the things that are described here [in the white paper]?
>
> A.    No.

(SEC10, Heinke Test. Tr., at 246:14-247:7; *see also* SEC4, Heinke Dep. Tr., at 130:7-131:25; SEC14, Philp Test. Tr. 404:19-405:4).

> **In Response to No. 200**: Disputed to the extent that, at the time Kik sold Kin to the public in September 2017, Kik had launched a product within Messenger that allowed anyone who owned Kin to use it within Kik. Philp Decl. ¶¶ 85-86. On the day of the token distribution event, Kin was fully integrated into the Kik app and there was a functioning product that anyone who owned Kin could use within Kin. SEC 14, Philp Inv. Tr. 225: 14-24. Otherwise undisputed.

### ii. *Kik Rushed To Create A "Minimum Viable Product" That Kik Described Only To SAFT Participants*

201. By June 2017, Kik decided to hold the public Kin sale as soon as the company had created what it called a "Minimum Viable Product" or "MVP" for the token. (SEC78, Inv. Ex. 49).

**In Response to No. 201**: Disputed. The cited document does not state that the TDE would occur "as soon as" the MVP was functional. *See* SEC78 at page KIK_00117729. Mr. Heinke testified only that Kik's plan around May 2017 was to sell tokens to the public sometime after Kik had created an MVP. *See* SEC4, Heinke Inv. Tr. 110:3-23; SEC10, Heinke Dep. Tr. 191:1-19.

202. The Minimum Viable Product that Kik pursued was a series of digital, cartoon "stickers" that would be available to Kik Messenger users who purchased Kin. The stickers would appear inside Kik Messenger and would not be available to Kin buyers who did not have a Kik Messenger account. (SEC40, Ben-Ari Dep. Tr., at 107:3-10 ("You had to have a Kik Messenger in order to access the stickers.")). Upon buying Kin, an investor with a Kik Messenger account could access the cartoon stickers by opening a digital "wallet" inside Kik Messenger, unlocking digital stickers that were accessible in the wallet, and then sharing the stickers with other users within the application. The more Kin owned by a Kik Messenger user, the higher the user's "status" level and the more stickers the user could access. (SEC10, Heinke Inv. Tr., at 193:10-14).

**In Response to No. 202**: Disputed to the extent the SEC suggests that this was the MVP's sole functionality. The MVP also included the ability to link an Ethereum wallet to a person's Kik Messenger account. Philp Decl. ¶ 86; SEC40, Ben-Ari Tr. 170:4-11. Additionally, at the time a user received Kin at the token distribution event in September 2017, the user had the ability to transfer Kin to others and to integrate it into another app. SEC40, Ben-Ari Tri. 177:9-25. Otherwise undisputed.

Kik further objects that this statement lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

203. The stickers could not be purchased using Kin. (SEC14, Philp Inv. Tr., at 228:10-13; SEC64, October 20, 2017 Letter).

**In Response to No. 203**: Disputed to the extent that different types of stickers could be unlocked in tiers corresponding with how much Kin a user owned. SEC40, Ben-Ari 104:14-23; 105:9-21. Otherwise undisputed that stickers could not be "purchased" with Kin.

204. The stickers that Kik created for its purported Minimum Viable Product were small, emoji-like images, predominately a cartoon honey badger, such as the below:



(Answer ¶ 103).

> **In Response to No. 204**: Disputed.  The honey badger sticker referenced by the SEC is only one example of a sticker that was included in Kik's MVP.  SEC40, Ben-Ari 108:18-109:5. Otherwise undisputed.

205.   Kik developed the stickers based on its belief that they were relevant to whether Kik's sales of Kin were securities transactions under the securities laws. (SEC14, Philp Inv. Tr.,. 265:19-266:5, 272:23-273:12; SEC41, Ben-Ari Inv. Tr., at 71:20-74:13). As one Kik executive wrote in a June 2017 email to other company executives about how the company had defined Minimum Viable Product:

> The definition was written with one purpose only: **COMPLIANCE**. This is NOT an MVP [Minimum Viable Product] for product purposes, nor to satisfy any good user experience for crypto participants. We discussed that once we integrate Kin into Kik we will rebuild the entire product bottom up and the MVP will not be used in any way.

(SEC79, Inv. Ex. 194; SEC41, Ben-Ari Inv. Tr., 71:20-74:13).

> **In Response to No. 205**: Disputed.  Satisfying compliance concerns was only one of multiple reasons for developing the MVP, andKik disputes that compliance is necessarily synonymous with "securities laws."  SEC4, Heinke Dep. Tr. 112:24-113:14.  Mr. Ben-Ari, the author of the email in question, also testified that he had changed his mind after having conversations with other Kik executives and that "there was a lot of merit" in the MVP aside from compliance, including from the product perspective. SEC40 Ben-Ari Dep. Tr. at 99:24-100:18.   Otherwise undisputed that the document contains the cited text.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

206.    Similarly, in June 2017, a Kik employee described the "crypto stickers" as follows:

> Basically it doesn't really matter. The whole point is to make our legal department happy, not the users (who are actually investors and probably could care less that they got a sticker pack for their $10K investment into KIN).

(SEC80, Dep. Ex. 76).

**In Response to No. 206**: Disputed.  The email in question was in response to a request for feedback regarding a specific sticker pack design that a Kik employee viewed as sexist and, moreover, the Kik employee was not otherwise involved in the design or creation of the MVP.  Landsvik Decl. Ex. MM, Leibovich Tr. 92:11-98:10.  Kik further disputes that the MVP definition was written for compliance only.  *See* Response No. 205.  Otherwise undisputed that the document contains the cited text.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

207.    Minutes from a Kik Board meeting on August 3, 2017 reported that Kik's CEO discussed with the board "the proposed cap on the [Token Distribution Event] . . . indicating that since the TDE has been delayed to further develop the minimum viable product (or initial product) so it should be in a better position to defend a regulatory challenge than others which have raised far greater amounts with either no or little utility." (SEC81, Inv. Ex. 29).

**In Response to No. 207**: Disputed that there were several reasons Kik opted to launch the public token when it did, including that Kik wanted to prove that the technology was integrated, as well as ensure it had an MVP.  SEC10, Heinke Inv. Tr. 195:9-196:19.  Another reason Kik needed the token to have utility before launching to the public was a business reason so that there was value to the product they were offering.  SEC10, Heinke Inv. Tr. 199:14-16.  Undisputed that the board minutes contained the cited text.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

208.    Kik did not mention the status-based stickers in any public announcements or otherwise discuss these cartoon stickers in marketing to potential public sale investors, before the public sale. (SEC3, Clift Inv. Tr., at 180:14-18; SEC40, Ben-Ari Dep. Tr., at 154:15-155:13).

Because public sale investors could not have known about the stickers before buying Kin, the stickers could not have been a motivation for these purchases.

> **In Response to No. 208**: Undisputed that Kik's public announcements did not specifically discuss stickers. Disputed to the extent this statement lacks any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

209. Some of the largest Kin purchasers during the portion of the sale open to the public have testified that they did not purchase Kin in order to access the stickers. (SEC72, Rousmaniere Inv. Tr., at 17:12-22; SEC73, Wang Inv. Tr., at 17:7-18:10 ("Q. Did you buy Kin in order to gain access to digital stickers? A. No."); SEC75, Furo Inv. Tr., at 15:5-20 ("I could not care less about these stickers."); SEC74, Neil Dep. Tr., at 117:10-118:2 ("It was my understanding they had no product at the time.")).

> **In Response to No. 209**: Undisputed that four of the approximately 10,0000 TDE participants made these statements. Kik objects to these statements to the extent the SEC suggests the statements of a select group of purchasers is representative of purchaser expectations as a whole.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

### *iii.* *Up To And Including The Time Of Kik's Distribution Of Kin On September 26, 2017, There Was No Good Or Service To Purchase With Kin.*

210. At no time prior to September 26, 2017 did Kik identify any specific good or service that could be purchased with Kin. (SEC14, Philp Inv. Tr., at 233:22-235:7, 241:11-21; SEC8, Livingston Inv. Tr., at 457:24-458:6). And, throughout the period in which Kik offered and sold Kin, up to and including September 26, 2017, there was nothing to purchase using Kin:

> Q.  Okay. Rolling back the clock. It's September of 2017. Which developers or apps accepted Kin?
>
> A.  Just Kik.

Q.    That's it? You were unaware of any others?

A.    Correct.

Q.    Okay.

[Q].  What did Kik accept them for?

[A].  Kik allowed you to unlock stickers based on your balance.

[Q].  So did Kik -- did Kik provide any goods and services to people in return for Kin tokens?

[A].  If you're saying in terms of actually spending them where Kik would take your tokens in return for something, no.

(SEC8, Livingston Inv. Tr., at 475:6-22; *see also* SEC41, Ben-Ari Inv. Tr., at 132:1-22 ("If you're referring to spend Kin within Kik, that was, at that point in time, at the point of the TDE, was not possible."); SEC64, October 20, 2017 Letter).

> **In Response to No. 210**: Disputed that Kin tokens were not functional at the time of the TDE.  At the time a user received Kin at the token distribution event in September 2017, the user had the ability to transfer Kin to others and to integrate it into another app.  SEC40, Ben-Ari Tri. 177:9-25. Otherwise undisputed that the documents contain the cited text.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

211.   One investor who bought Kin in the public sale confirmed that, at the time he received his Kin, "[t]here wasn't anything available then. They had the whole infrastructure to build out." And the investor confirmed that he understood that it was Kik who would build that "infrastructure." (SEC75, Furo Inv. Tr., at 16:19-25). Another public sale purchaser testified similarly:

Q.    On the day you purchased or received your Kin, were you able to purchase anything?

A.    No, I don't think so.

Q.    Were you relying on Kik to build the ecosystem in order for you to be able to access the ecosystem you referenced?

A.      Yeah.

(SEC73, Wang Inv. Tr., at 16:17-23).

> **In Response to No. 211**: Disputed that Kin tokens were not functional at the time of the TDE.  *See* Response No. 211.  Otherwise undisputed that the documents contain the cited text.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

212.    A blockchain capable of processing transactions between buyers and sellers at the volume and speed necessary for running consumer applications, and a functioning rewards engine also did not exist on September 26, 2017. (SEC8, Livingston Inv. Tr., at 115:15-117:16; SEC14, Philp Inv. Tr., at 564:3-565:9 ("The transaction throughput on Ethereum is too slow and too expensive to run consumer applications at scale.")).

> **In Response to No. 212**: Disputed.  The Kin token functioned on the Ethereum blockchain at the time of the TDE.  SEC8, Livingston Inv. Tr. 115:15-116:3.  Kik simply wanted to grow Kin's use to a scale larger than Ethereum would support.  *Id.*  116:16-117:16. Further disputed that while the algorithmic Kin Rewards Engine envisioned in the white paper did not exist as of September 26, 2017, the Kin rewards could be manually distributed to developers.  *See* SEC14, Philp Inv. Testimony at 358:11-359:12; 542:1-23; Heinke Dep. Tr. at 106: 22-25.  Otherwise undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

213.    As of late 2018, a functional Rewards Engine did not exist:

> Q.      Okay. And, again, we're on day one. I bought -- say I bought in the Kin sale in September 2017. Could I, at that time, earn Kin via the Kin Rewards Engine?
>
> A.      As a developer?
>
> Q.      As anyone?
>
> A.      So the Reward Engine is for developers.
>
> Q.      Okay.

> A.    The Reward Engine was not running then and is not
>        running today.
>
> Q.    That's what I was going to ask you. It's not running today
>        [in 2018]?
>
> A.    Correct.

(SEC8, Livingston Inv. Tr., at 471:10-471:22).

> **In Response to No. 213**: Disputed.  While the algorithmic Kin Rewards Engine
> envisioned in the whitepaper did not exist as of 2018, Kin rewards could be
> manually distributed Kin to developers.  *See* SEC14, Philp Inv. Testimony at
> 358:11-359:12; 542:1-23; Heinke Dep. Tr. at 106: 22-25.  Otherwise undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether
> Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

214.    Kik did not distribute the blockchain's public code in the form of a Software

Developer Kit (called a "SDK") to developers until after the distribution of the token. (SEC8,

Livingston Inv. Tr., at 586:6-586:19; SEC22, Mougayar Dep. Tr., at 233:7-18; SEC14, Philp Inv.

Tr., at 564:21-566:9). Indeed, as of October 15, 2017, several weeks after Kik distributed Kin,

there were no developers on the "Kin platform;" the Kin Rewards Engine had not made any

payouts; and it was the case that "multiple digital services building experiences for users" did not

then exist. (SEC22, Mougayar Dep. Tr., at 211:5-20, 212:18-213:25; SEC82, Dep. Ex. 150;

SEC64, October 20, 2017 Letter).

> **In Response to No. 214**: Disputed. Kin functioned as a currency.  Shortly after the
> TDE approximately 20% of the participants had linked their Ethereum wallets to
> Kik.  Philp Decl. ¶ 88.  In December 2017, users had the ability to earn Kin within
> Kik messenger by completing polls or surveys for third-party advertisers, providing
> feedback to Kik, or by offering creative content to other Kik users.  *Id.* ¶ 89.  By
> January of 2018, 59% of Kik users were linked wallets had engaged in at least one
> poll to earn Kin, and 19% of wallet users had spent Kin on at least one set of digital
> stickers.  *Id.* ¶ 90.
>
> Kik further objects to these statements as irrelevant and immaterial to whether
> Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

215.    As of late 2019, there were (and had been) no "tangible real world products that could be purchased with Kin." (SEC22, Mougayar Dep. Tr., at 214:11-215:12).

> **In Response to No. 215**:  Disputed.  As of August 2018, a sunglasses company began accepting Kin in exchange for its products.  SEC14, Philp Inv. Tr. 227:15-21.

216.    Kin is not "currency" as that term is defined in the federal regulations, and it has never had legal tender status in any jurisdiction. Federal regulations define "currency" as "[t]he coin and paper money of the United States or of any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issuance." 31 C.F.R. § 1010.100(m). The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") has noted that virtual currency is not legal tender: "In contrast to real currency, 'virtual' currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency. In particular, virtual currency does not have legal tender status in any jurisdiction." *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (March 18, 2013) (discussing 31 C.F.R. § 1010.100(m)).[6] The CFTC and IRS have reached the same conclusion. *See In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736, *1 n.2 (Sept. 17, 2015); *IRS Virtual Currency Guidance*, I.R.S. Notice 2014-21, 2014-16 I.R.B. 938, 2014 WL 1224474 (Apr. 14, 2014).

> **In Response to No. 216**: Disputed that "currency" is defined as legal tender under federal regulations, including federal securities regulations.  *See Sea Pines of Va., Inc. v. PLD, Ltd.*, 399 F. Supp. 708, 711–12 (M.D. Fla. 1975).  Kik further objects to these statements to the extent they lack cites to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Kik further objects as these statements are legal conclusions and not statements of fact.
>
> Kik further objects to the SEC's position that these statements are material for purposes of summary judgment, as the SEC previously took the position that these

---

[6] Available at https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf (last visited March 17, 2020).

topics are "not relevant to any party's claim or defense." *See* ECF 34-4, at page 21 of 32; Response No. Request No. 34.  Indeed, the SEC relied on that position to deny Kik any discovery whatsoever into Kik's affirmative defense that application of the securities laws in this case is constitutionally void.  *See* ECF 34; ECF No. 27.

### K.   KIK KNEW THAT ITS OFFERING AND SALE OF KIN COULD BE CONSIDERED AN OFFERING AND SALE OF SECURITIES

217.   Starting at least as early as February 2017, Kik was aware that regulators could decide that the offering and sale of Kin was an offering and sale of securities under *Howey*. On multiple occasions between February 2017 and Kik's distribution of Kin in September 2017, Kik executives and board members specifically discussed the risk that United States and Canadian securities regulators would conclude that the offer and sale of Kin should be regulated as a security – specifically, as an "investment contract" under the United States Supreme Court's decision in *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946), or analogous Canadian law.

> **In Response to No. 217**: Disputed.  None of these statements contain a citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

218.   For example, before Kik's public announcement of Kin, on or about April 3, 2017, the New York-based consultant that had been advising Kik specifically warned Kik about the SEC's potential regulation of the Kin offering:

> 2. **SEC**
>
> > a.  The SEC has yet given no guidance that any particular token offering is a security, and this guidance is not expected in the near future.
> >
> > b.  The SEC would potentially apply the Howey Test[3] to determine if the sale of such tokens would constitute an "investment contract".

(SEC83, Dep. Ex. 33, at COINFUND019857; Answer ¶ 97).

> **In Response to No. 218**: Disputed as to the characterization that this statement was a "warning" because the cited documents do not contain that language, and because Mr. Livingston did not remember reading the CoinFund report.  SEC8, Livingston Inv. Tr. 237:6-10.  Otherwise undisputed that the document contains the cited text.

Kik further objects to these statements as irrelevant and immaterial to whether

Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

219.    In an email the next day, on April 4, 2017, the same consultant told a Kik executive,
"You don't want your offering to be a securities offering, as that comes with a huge regulatory
burden and expense (it's essentially like taking your company public). On the other hand,
unregistered public securities offerings are not legal in the U.S." (Answer ¶ 97; SEC84,
COINFUND000369). The consultant further suggested that Kik consider blocking sales in the
United States to mitigate the risk of SEC enforcement. (SEC84, COINFUND000369). By the time
Kik received these communications, Kik personnel were aware that the *Honey* test could be used
to determine that the sale of a digital token constituted the sale of an investment contract. (SEC14,
Philp Inv. Tr., at 197:9-198:19; SEC10, Heinke Inv. Tr., 94:24-95:6).

> **In Response to No. 219**: Undisputed.  Kik further objects to these statements as
> irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment
> contract."  *See* Response No. 31.

220.    On April 10, 2017, a series of PowerPoint slides provided to Kik's Board included
the statement that a Kin offering that raised "millions" and "was highly marketed to users and the
public at large . . . risk[ed] becoming a security in the eyes of the SEC very quickly." (Answer
¶ 97).

> **In Response to No. 220**: Disputed.  This statement is incomplete and misleading.
> The entire quote in the consultant's report notes that the "SEC has yet given no
> guidance that any particular token offering is a security, and this guidance is not
> expected in the near future."  SEC83 at COINFUND019857.  The SEC further
> omits that this statement was made by a CoinFund survey participant, not Kik,
> about a hypothetical token, not Kin.  Landsvik Decl. Ex. BBB at KIK00106273.
>
> Kik further objects to these statements as irrelevant and immaterial to whether
> Kik's sales of Kin constituted an "investment contract," *see* Response No. 31, and
> to the extent this statement lacks a citation to the record as required by Fed. R. Civ.
> P. 56(c) and L.R. 56.1(d).

221.    On or about May 5, 2017, Kik's CEO also sent the board of directors a series of PowerPoint slides that warned that "Securities law" was the first-listed "[r]isk" associated with the company's sale of Kin:







(SEC19, Dep. Ex. 36 at KIK_00106806; Answer ¶ 98).

> **In Response to No. 221**: Undisputed that the document contains the cited text.
>
> Kik objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

222.    During the summer of 2017, as Kik's officers and directors reassessed Kik's insurance, they specifically discussed obtaining $10 million in additional insurance for "defense costs" associated with, *inter alia*, disputes regarding whether Kik had "compl[ied] with the Howey test" or "if the SEC determines that Kin is, in fact, a security and not a product." (SEC4, Heinke Dep. Tr., at 146:7-155:10; SEC85, Dep. Ex. 53; SEC86, Dep. Ex. 67).

> **In Response to No. 222**: Undisputed that the documents contain the cited text.
>
> Kik objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.  Kik further objects to this statement as inadmissible.  Fed. R. Evid. 411; *Busher v. Barry*, No. 14-cv-4322, 2019 WL 6895281, at *18 (S.D.N.Y. Dec. 18, 2019).

223.     On July 18, 2017 Kik's CFO received an email from Kik's insurance broker which

stated:

> Investor issues will generally come from two areas:
>
> - Any failure of Kik to perform as the investors expect. As you march towards commercialization and greater success these issues will continue to grow with the increased investor expectations.
> - With the advent of Kin we now have the potential for regulatory issues to develop if the SEC determines that Kin is in fact a security and not a product. An SEC investigation would trigger defense costs, fines and penalties as well as a likely investor suit should there be any direct impact on the value of their investment.

(SEC86, Dep. Ex. 67; SEC4, Heinke Dep. Tr., at 152:20-153:5).

> **In Response to No. 223**: Undisputed that the email contains the cited text, but disputed that it is complete or accurately reflects the content of the email, which advised Kik on many areas that could result in "a potential claim" or "the potential for a loss," including non-securities regulatory, cyber, and professional-liability issues, and that "insurance policies can only indemnify for the investigation costs of a regulatory issue not the fines themselves."  SEC86 at KIK_00115681
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.  Kik further objects to this statement as inadmissible. *See* Response No. 222.

224.     Kik ultimately obtained $10 million in additional insurance coverage (SEC4, Heike

Dep. Tr., at 160:19-162:8), and this insurance is presently financing Kik's defense in this litigation.

(SEC87, Kik's Second Amended Initial Disclosures).

> **In Response to No. 224**: Undisputed that Kik obtained $10 million in additional insurance coverage.  Disputed to the extent the cited document supports the SEC's contention that insurance is financing Kik's defense in this litigation.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.  Kik further objects to this statement as inadmissible. *See* Response No. 222.  Otherwise undisputed.

225.     On July 25, 2017, the SEC issued a Report of Investigation pursuant to Section

21(a) of the Exchange Act (the "DAO Report"). The DAO Report specifically discussed the so-

called "*Howey* test" and stated, *inter alia*, as follows:

> Whether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and

circumstances, including the economic realities of the transaction. Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission or to qualify for an exemption from the registration requirements of the federal securities laws. The registration requirements are designed to provide investors with procedural protections and material information necessary to make informed investment decisions. These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology.

(SEC88, The DAO Report at 17-18; Answer ¶ 106).

> **In Response to No. 225**: Undisputed.  Kik objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

226.    Kik's CEO was aware of and reviewed the DAO Report within days of its issuance.

(SEC2, Lit. RFA, No. 130).

> **In Response to No. 226**: Undisputed.  Kik objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

227.    On the same day the SEC issued the DAO Report, Kik contacted the Ontario Securities Commission ("OSC") regarding the legality of the Kin offering. The OSC is a regulatory agency which administers and enforces securities legislation in the Canadian province of Ontario, where Kik is headquartered. (Answer ¶ 107; SEC89, Deposition of Pat Chaukos ("Chaukos Dep. Tr."), at 47:18-50:12).

> **In Response to No. 227**: Disputed that Kik contacted the OSC "regarding the legality of the Kin offering," as that statement lacks any citation to evidence in the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d). Otherwise undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

228.    From August to September 2017, including during a face-to-face meeting on August 14, 2017, Kik executives and Kik's Canadian and American counsel discussed the Kin offering with the OSC. In the discussions, OSC staff members raised concerns that the sale of Kin would violate both Ontario and U.S. securities laws, because Kin tokens were investment contracts and, thus, securities. During these discussions, the company, its Canadian and American lawyers, and regulators specifically discussed the United States Supreme Court's decision in *Howey*, to which the Canadian regulator looked for guidance as to whether the offering of Kin was, in fact, a securities offering. (SEC89, Chaukos Dep. Tr. 73:22-75:4, 77:18-21, 82:21-83:8, 85:8-17, 169:22-171:16).

> **In Response to No. 228**: Disputed.  The OSC staff "was somewhat dismissive of *Howey* as a precedent as being old law[.]"  SEC Ex. 90, McKee Tr. 104:11-15; 23-25. Prior to the TDE, the OSC *never* definitively informed Kik that it had reached the conclusion that its sale of Kin would constitute an offering of securities under *Howey*, or that *Howey* would even be controlling law.  SEC89, Chaukos Tr., 88:11-20; Landsvik Decl., Ex. EE, McKee Ltr., Chaukos Ex. 121, at KIK_00128199.  Kik further disputes these statements to the extent they lack any citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

229.    By at least September 5, 2017, the OSC informed Kik that the "OSC staff definitively communicated a position that the [sale to the public of Kin] constituted an offering of securities" based on the *Howey* test and other Canadian law. (Answer ¶ 109; SEC89, Chaukos Dep. Tr., at 169:22-171:16, 181:14-183:15; SEC90, Deposition of Ross McKee ("McKee Dep. Tr."), at 171:23-172:13, 177:22-178:6).

> **In Response to No. 229**: Disputed.  The OSC *never* definitively informed Kik that it had reached the conclusion that its sale of Kin would constitute an offering of securities under *Howey*, or that *Howey* would even be controlling law.  *See* SEC89, Chaukos Tr., Landsvik Decl., Ex. EE, McKee Ltr., Chaukos Ex. 121, at KIK_00128199.

Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

230.    After learning of the OSC's position, Kik barred Canadians from purchasing Kin in the public sale. (Answer ¶ 110). Kik did not contact the SEC regarding the legality of the Kin offering, even though the OSC questioned whether Kik should do so in light of the OSC's conclusions on the subject. (SEC89, Chaukos Dep. Tr., at 185:10-185:20; Answer ¶ 111).

> **In Response to No. 230**:  Disputed.  Kik chose to exclude Canadian residents from the TDE because Kik understood that the OSC's public-interest exception would allow the OSC to bring an action with respect to the TDE, even if it did not satisfy the definition of an investment contract.  SEC90, McKee Tr. 151:23-152:10; 155:8-14.  Further disputed because the OSC asked only whether Kik had already contacted the SEC, and did not question whether Kik should do so.  SEC89, Chaukos Dep Tr. at 185:10-20.  Otherwise undisputed.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.  Kik further object's to the SEC's position that these statements are material for purposes of summary judgment, as the SEC previously took the position that these topics are "not relevant to any party's claim or defense."  See ECF 34-4; *Id.* at page 24-25 of 32.

## L.    KIK ATTEMPTED TO TAILOR ITS MESSAGING TO MITIGATE LEGAL RISK

231.    Kik personnel tasked with speaking publicly about Kik's offering of Kin were provided with guidance about "not talking about Kin publicly as an investment . . . [f]or compliance reasons." (SEC14, Philp. Inv. Tr., at 399:9-400:8; SEC91, Inv. Ex. 120; *see also, e.g.*, SEC14, Philp Inv. Tr., at 368:19-371-17).

> **In Response to No. 231**: Disputed.  Kik personnel did not talk about Kin publicly as an investment because that "was not really the vision for Kik."  SEC14 Philp Inv. Tr. 399:9-400:4.
>
> Kik further objects to these statements as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

232.    Kin purchasers, however, understood that Kik's avoidance of certain buzz-words did not impact the value proposition of the investment Kik offered:

Q.      Did you have the idea when you bought Kin that you might profit from that purchase?

A.      Yes.

Q.      Why did you think that?

A.      I think you already asked that. But to go over it again, I thought that the value of the Kik could increase because I thought that the usage -- that the overall proposal that a cryptocurrency could be used in a chat application successfully was a good idea, a good proposal and I thought that could work at some point and Kin was well positioned to be that application -- Kin was looked to be that currency because Kik already had an application and user base.

. . . .

Q.      Do you recall -- I know that you mentioned you had only -- you remember anything specific about the white paper but you believe it was likely that you had reviewed it. Do you remember anything in the white p[aper] or otherwise where Kik told you to expect that you could profit?

A.      No, I don't remember.

Q.      Do you have any reason to believe that they did make any such statement?

[A].    I don't have any reason to believe and that would be a pretty amateur move. So I doubt they would make such statement.

(SEC92, Deposition of Alexander Rousmaniere ("Rousmaniere Dep. Tr."), at 94:8-21, 95:9-21 (objection omitted)).

**In Response to No. 232**: Disputed.  The cited transcript does not support the statement that "purchasers understood that Kik's avoidance of certain buzz-words did not impact the value proposition of the investment Kik offered."  Kik further disputes this statement to the extent the SEC suggests the testimony of an individual purchaser represents what purchasers as a whole understood.

Kik additionally objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

## M.   KIK RAISED APPROXIMATELY $100 MILLION FROM KIN INVESTORS WITHOUT FILING A REGISTRATION STATEMENT

233.   Kik offered and sold one trillion Kin in 2017. (Answer ¶ 1). From mid-July through September 2017, Kik raised a total of approximately $100 million in U.S. dollars and Ether through sales of Kin. (SEC1, Inv. RFA, No. 32). Over $55 million of this sum was raised from United States-based purchasers. (Answer ¶ 15).

> **In Response to No. 233**: Disputed that Kik conducted a "single offering." *See* Response No. 37.  Kik received approximately $50 million from Pre-sale participants in exchange for the right to receive Kin in the future,  Philp Decl. ¶¶ 32-33, 48, and approximately $50 million worth of Ether in exchange for Kin it sold to 10,000 purchasers in the TDE.  Philp Decl. ¶ 73.  Otherwise undisputed.

### i.   *From July To September 11, 2017, Kik Sold Discounted Kin To Wealthy Investors Through SAFTS.*

234.   From early July 2017 to September 11, 2017, Kik sold Kin by entering into SAFTs with investment funds and other wealthy investors. Kik received approximately $49.05 million from approximately 50 investors, including 21 located in the United States who paid Kik more than $39.3 million. (Answer ¶ 157).

> **In Response to No. 234**: Disputed that the SAFTs sold Kin.  The SAFT was sold a futures contract with the right to receive Kin in the future.  Philp Decl. ¶¶ 32-34.  Further disputed to the extent the statement lacks a citation to evidence in the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Otherwise undisputed.

235.   Pursuant to the SAFTs Kik entered into between July 2017 and September 11, 2017, purchasers bought Kin in amounts that ranged from $10,000 to $15 million. (SEC93, Declaration of Brent Mitchell ("Mitchell Dec."), at ¶ 4(b)).

> **In Response to No. 235**: Disputed. SAFT participants entered into SAFTs in exchange for the right to receive Kin in the future in the specified amounts.  Philp Decl. ¶¶ 32-33, 48.  Otherwise undisputed.

236.    The six largest SAFT purchasers all have postal addresses suggesting that they reside in the United States, and two of the largest SAFT participants have addresses in New York City. (*Id*. at ¶ 4(c)).

**In Response to No. 236**: Undisputed.

237.    In addition, the SAFT participants included: (i) 11 purchasers who purchased Kin for amounts ranging from $501,000 to $1.999 million, (ii) 21 purchasers who purchased Kin for amounts ranging from $100,000 to $500,000, and (iii) 13 purchasers who purchased Kin for amounts ranging from $10,000 to $99,999. (*Id*. at ¶ 4(d)).

**In Response to No. 237**: Disputed. SAFT participants entered into SAFTs in exchange for the right to receive Kin in the future in the specified amounts. Philp Decl. ¶¶ 32-33, 48. Otherwise undisputed.

238.    On September 11, 2017, Kik entered into SAFT agreements with the last 10 purchasers, including a $1.2 million agreement with a purchaser located in Illinois. (*Id*. at ¶ 4(e)).

**In Response to No. 238**: Undisputed.

239.    Kik provided email updates to SAFT participants that included plans for the token distribution event and "Sale Metrics" for all the Kin that Kik hoped to sell in both portions of the offering. For example, on or about August 30, 2017, Kik sent SAFT participants an email stating:

## Sale Metrics

- Total cap: $125mm
    - Pre-sale: $50mm (30% discount)
    - Public: $75mm

(SEC94, Dep. Ex. 141; SEC22, Mougayar Dep. Tr., at 141:2-8; SEC95, KIK_00019210 - KIK_00019475).

**In Response to No. 239**: Disputed that Kik conducted a "single offering." *See* Response No. 37. Otherwise undisputed.

240.    In order to collect Ether addresses and know-your-customer information from certain Kin purchasers who bought via SAFT, Kik asked those investors to use the same internet portal that the general public used. (SEC94, Dep. Ex. 141; SEC22, Mougayar Dep. Tr., at 142:2-14).

> **In Response to No. 240**: Undisputed that SAFT purchasers used the same internet portal as TDE participants.  Disputed that Kik conducted a "single offering." *See* Response No. 37.

241.    On or about September 11, 2017, Kik filed a Form D with the SEC indicating that Kik had sold securities. Under "Type(s) of Securities Offered," the Form D stated: "Sale and issuance of rights to receive Kin tokens in the future via a Simple Agreement for Future Tokens (SAFTs)." (Answer ¶ 158).

> **In Response to No. 241**: Undisputed.

242.    Kik's Form D claimed that its offering using SAFTs was exempt from the requirement to be registered under the federal securities laws, pursuant to the exemption for sales to accredited investors under SEC Rule 506(c). (Answer ¶ 159).

> **In Response to No. 242**: Undisputed.

243.    The Kin that were ultimately delivered to the wealthy investors who purchased through Kik's SAFT were identical to those delivered to investors who purchased during the public sale portion of the offering. (Answer ¶ 180).

> **In Response to No. 243**: Disputed to the extent the SEC suggests that purchasers in the public sale were "investors" in that they did not buy Kin with an intention to use it.  Otherwise undisputed.

ii.     *Starting In August 2017, Kik Publicly Announced The Public Sale Process And Allowed Investors To Sign Up.*

244.     On or about August 29, 2017, Kik issued a press release announcing the dates for its "token distribution event" and the process by which the general public could purchase Kin. (Answer ¶ 160; SEC96, Dep. Ex. 55).

**In Response to No. 244**: Undisputed.

245.     In its August 29 press release, Kik informed the public that "[a]ll who want to participate in the TDE [public sale] must register by Sept. 9, 9:00 ET." This same press release announced that Kik "ha[d] successfully closed a presale round of US $50 million to select accredited investors." And that "Kik will look to raise a total of US$125 million through its token sale." (Answer ¶ 161; SEC96, Dep. Ex. 55). The August 29 press release also stated that "[w]ith millions of users, Kik hopes to drive mainstream consumer adoption of Kin, potentially making it the most adopted and used cryptocurrency in the world." (Answer ¶ 161; SEC96, Dep. Ex. 55).

**In Response to No. 245**: Disputed that Kik conducted a "single offering." *See* Response No. 37.  Otherwise undisputed.

246.     Kik's August 29 press release also included the following quote attributed to one of the "select accredited investors" identified earlier in the press release:

> "Kik is by far the largest consumer company to enter the cryptocurrency space, and this is a seminal moment for the industry," said Ryan Zurrer, principal and venture partner at leading cryptocurrency hedge fund Polychain Capital. "We have been impressed with Kik's thoughtful approach to the creation and distribution of Kin, and have confidence that the team will execute their vision of creating a decentralized ecosystem of digital services through Kin."

(SEC96, Dep. Ex. 55).

**In Response to No. 246**: Undisputed.

247.     General public investors were not provided the PPM that was provided to the wealthy investors who purchased Kin at a discount pursuant to via Kik's SAFT. (Answer ¶ 162).

The PPM contained detailed descriptions of certain "Risk Factors" concerning Kik, Kin, and the Ecosystem. For example, it warned investors who purchased Kin via SAFT that "Kik has experienced a declining usage of its messenger service over the last several years. Such a lack of use or interest could negatively impact the development of the Kin Ecosystem and therefore the potential utility of Tokens." (Answer ¶ 163; SEC52, Dep. Ex. 16).

> **In Response to No. 247**: Disputed that Kik referred to anyone was "investors." *See* Response No. 114.  Otherwise undisputed.

248.    Kik's User Registration Guide, dated August 2017 and published to the public on Kik's website, stated: "We are excited to take the next steps in bringing Kin to life. The Kin token offering presents a unique opportunity for crypto investors, as Kin will offer mainstream audiences a chance to instantly interact with a cryptocurrency." (SEC97, Inv. Ex. 9; Answer ¶ 164). Kik executives contacted a number of public sale purchasers who had indicated an interest in purchasing large amounts of Kin, to offer assistance in completing their transactions and establish a point of contact within Kik. (Answer ¶ 165). Kik executives referred to these large purchasers as "whales." (*See, e.g.*, SEC98, Inv. Ex. 185). Kik's intention was to structure the sale so that whales were able to purchase the amount of Kin they desired. Given the larger amounts at issue, Kik employees opted to contact these purchasers to offer themselves "as a resource to ask further questions about the white paper or anything that they had questions about." (Answer ¶ 165).

> **In Response to No. 248**: Disputed that the term "whales" refers to all potential purchasers or includes TDE purchasers.  "Whale" was only a large buyer that Kik contacted in connection with the presale.  SEC10, Heinke Inv. Tr. 426:6-21.
>
> Further disputed to the extent this statement lacks citations to evidence in the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).  Kik objects to this statement as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract" because they pre-date the TDE. *See* Response No. 31.  Otherwise undisputed.

249.    In mid-September, Kik's chief marketing officer wrote an email suggesting that Mr. Livingston attend two conferences in Kiev and Hong Kong, with the goal being "for Ted to network with and generate interest from high value crypto investors to participate in the Kin token sale." (Answer ¶ 165).

> **In Response to No. 249**: Disputed.   Ms. Clift was not suggesting that Mr. Livingston attend the conferences, but providing justification for the potential trip as Kik executives were "considering" whether to send Mr. Livingston. Landsvik Decl. Ex. CCC at KIK_00125522.  Kik decided not to and Mr. Livingston did not attend the trip.  *Id.*
>
> Kik further objects to this statement as irrelevant and immaterial to whether the sales of Kin constituted an "investment contract" because the email occurred after Kik opened registration for the TDE. *See* Response No. 31.

250.    Would-be purchasers who registered for the public sale were required to complete a "know-your-customer" or "KYC" process, which required users to submit their name, address, email, and social security or passport number. Purchasers indicating an interest in purchasing over $100,000 of Kin would be required to submit a passport photo page scan and a photograph for face matching. (Answer ¶ 166).

> **In Response to No. 250**: Undisputed that Kik required potential purchasers to complete a KYC process, including, among other things, submitting the information and documentation described.  *See* Philp Decl. ¶¶ 58-59.

251.    Kik relied on its KYC process to identify the citizenship, country of residence, and, where applicable, the state of residence of each public sale purchaser, and to decide which persons could purchase Kin and which could not. Kik declined to sell Kin to purchasers from certain countries, including Canada, China, Cuba, and North Korea. Kik also declined to sell Kin to general public purchasers from certain U.S. states, including New York and Washington State. (Answer ¶ 167).

> **In Response to No. 251**: Undisputed that Kik relied on the KYC process and that Kik declined to sell to purchasers from the listed countries.  Disputed to the extent

the SEC suggests this constituted the entire KYC or registration process.  *See* Philp Decl. ¶¶ 58-59

252.    Kik did not undertake, through its KYC process or otherwise, to determine whether these public sale investors qualified as "accredited investors," as that term is defined by federal securities regulations. (Answer ¶ 168).

> **In Response to No. 252**: Disputed to the extent the SEC suggests that purchasers in the public sale were "investors" in that they did not buy Kin with an intention to use it.  Kik did not use the term "investors."  *See* Response No. 114. Otherwise undisputed.

253.    Kik did not undertake to determine whether investors bought Kin with the intent to profit from their purchase or to immediately resell and distribute Kin. (Answer ¶ 169).

> **In Response to No. 253**: Disputed.  Kik specifically sought out developers and potential purchasers who would be interested in Kin's consumptive use. *See* Welsh Ex. O at KIK00045080; Welsh Ex. L; SEC31 at KIK000013-15.  Further disputed Disputed to the extent the SEC suggests that purchasers in the public sale were "investors" in that they did not buy Kin with an intention to use it.  Kik did not use the term "investors."  *See* Response No. 114.

254.    Kik continued private discussions with accredited investors after the public portion of the sale was officially announced, and it entered into 10 SAFTs, including one in the amount of $1.2 million, on September 11, 2017, two days after the registration deadline for potential purchasers in the public sale. (Answer ¶ 170; SEC93, Mitchell Decl., at ¶ 4(e)).

> **In Response to No. 254**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Otherwise undisputed.

*iii.*    *From September 12 To 26, 2017, Kik Sold Kin To The General Public.*

255.    From September 12 to 26, 2017, Kik sold Kin to investors who were approved by Kik's KYC process. (Answer ¶ 171).

> **In Response to No. 255**: Disputed to the extent the SEC suggests that purchasers in the public sale were "investors" in that they did not buy Kin with an intention to use it.  Kik did not use the term "investors."  *See* Response No. 114.  Otherwise undisputed.

256.    On September 12, 2017, Kik issued a press release entitled "Kin token distribution event starts today," which explained the process for registered purchasers to buy Kin. (Answer ¶ 172)

> **In Response to No. 256**: Undisputed.

257.    The September 12 press release provided:

**WATERLOO, Ontario** – Sept. 12, 2017 – <u>Kik Interactive</u>, the creator of the popular chat platform Kik, today announced the <u>Kin token distribution event</u> (TDE) will commence on Sept. 12, 9:00 a.m. ET. To date, 17,075 individuals from 139 countries have registered to participate in the token sale, in which Kik will look to raise a total of US$125 million.

TDE participants will have 24 hours starting on Sept. 12, 9:00 a.m. ET to participate up to US$4,393. This individual cap was determined by dividing the available US$75 million by the total number of registrants. In doing this, we are guaranteeing that not all of the US$75 million will be sold – registered participants who later decide not to participate at all or at the or maximum participation cap will result in unsold tokens. On Sept. 13, 9:00 a.m. ET, these unsold tokens will be sold in a subsequent sale for registered participants who would like to buy more. The maximum participation cap will be incrementally raised over the first hour and then be removed until all tokens are sold.

Kik has already raised <u>US$50 million in a presale round</u>, leaving 512 billion Kin tokens valued at US$75 million available for the public token sale. Notable participants of the pre-sale included Blockchain Capital, P Polychain Capital.

Only those who completed registration before Sept. 9 can which will only take place on <u>kin.kik.com</u>.

(SEC99, Inv. Ex. 94). A large public sale purchaser found Kik's touting of venture capital participants important to his decision to invest. (SEC73, Wang Inv. Tr., at 14:19-16:3).

> **In Response to No. 257**: Undisputed that Mr. Wang testified that VC participation was subjectively important to him.  SEC73, Wang Tr. 14:19-15:21.  Disputed that Kik was "touting" venture capital participants or that this was a statement that influenced Mr. Wang's decision as it was published on the day of the TDE, by which time purchasers already had registered for the TDE.  Philp Decl. ¶ 53.

258.    Kik's September 2017 sale of Kin to the general public was denominated in Ether, which Kik planned to quickly convert to dollars. (SEC46-B, An Evening (transcript), at 55:10-23).

> **In Response to No. 258**: Undisputed that Kik converted Ether to dollars.  Disputed

that Kik planned to do so "quickly." Indeed, Kik still holds Ether received during the TDE. *See* SEC6, 30(b)(6) Dep. Tr. at 32:19-25.

259. The sale included multiple rounds. In each round, purchasers sent Ether to Kik to buy a proportional number of Kin. In the first round, conducted over the first 24 hours starting on September 12, 2017, purchasers could send Kik Ether worth up to $4,393 to buy a proportional number of Kin. In the second round, which started on or about September 13, 2017, Kik removed the cap on purchase amounts, and purchasers could send unlimited amounts of Ether to buy Kin. (Answer ¶ 173).

> **In Response to No. 259**: Undisputed, but subject to clarification that this refers to the multiple rounds of the TDE.

260. Approximately 10,000 total purchasers bought Kin in the public sale in exchange for a total of 168,732 Ether, which was then worth approximately $49.2 million. Approximately 3,456 of these purchasers were from the United States, and these purchases accounted for approximately $16.8 million in Ether. (Answer ¶ 174).

> **In Response to No. 260**: Undisputed.

261. In addition, the United States public sale buyers included: (i) 15 purchasers who paid for Kin in amounts ranging from $100,000 to $500,000, (ii) 207 purchasers who paid for Kin in amounts ranging from $10,000 to $99,999, and (iii) 1664 purchasers who paid for Kin in amounts ranging from $1,000 to $9,999. (SEC93, Mitchell Decl., at ¶ 6(i)).

> **In Response to No. 261**: Disputed as to the definition of "United States public sale buyers" to the extent that includes purchasers with a U.S. passport but who are not residents in the United States. The SEC defines "U.S. Public Buyers" to be "purchasers [who] provided Kik with postal addresses located in the United States, social security numbers, and/or U.S. passports." *See* SEC93, Mitchell Decl. ¶ 6(g). However, it is unclear if the SEC's calculations include purchasers who provided all of those things, or at least one, and the SEC does not use the same defined term in its Statement. Further disputed that the all of these as defined are U.S. residents as it appears the SEC included some purchasers who had U.S. passports but residences abroad. Disputed as to part (ii) and (iii). Using U.S. residents, 205 purchasers paid for Kin in amounts ranging from $10,000 to $99,999, and 1644

purchasers paid for Kin in amounts ranging from $1,000 to $9,999. Further disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Otherwise undisputed that the TDE included approximately 15 purchasers who paid for Kin in amounts ranging from $100,000 to $500,000.

262. Of the money spent on Kin by United States buyers in the public sale, a total amount of about $2,254,097 was spent by buyers who paid at least $500,000; a total amount of about $5,168,031 was spent by buyers who paid at least $100,000; a total amount of about $10,525,772 was spent by buyers who paid at least $10,000; and a total amount of about $16,219,917 was spent by buyers who paid at least $1,000. (*Id*. at ¶ 6(j)).

> **In Response to No. 262**: Disputed as to the reference to "United States buyers." *See* Response No. 261. Further disputed as to the total amounts above. A total amount of about $10,494,602 was spent by TDE participants who paid at least $10,000, inclusive of the above; and a total amount of about $16,100,542 was spent by TDE participants who paid at least $1,000, inclusive of the above. Further disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Otherwise undisputed that a total amount of about $2,254,097 was spent by two TDE participants who paid at least $500,000; a total amount of about $5,168,031 was spent by TDE participants who paid at least $100,000, inclusive of the above.

263. Of the money spent on Kin in the public sale by United States-based buyers, a total amount of about $677,612 – or about 4.01% of all purchases made by United States-based buyers – was spent by United States-based buyers who paid less than $1,000. (*Id*. at ¶ 6(k)).

> **In Response to No. 263**: Disputed as to the reference to "United States-based buyers." *See* Response No. 261. Further disputed as to the total from United States-based purchasers. The total who purchased less than $1,000 worth of Kin was $669,990. Further disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Otherwise undisputed.

264. Of the money spent on Kin by buyers from the United States, more than 50% of the Kin was purchased by buyers who paid more than $24,000. (*Id*. at ¶ 6(l)).

> **In Response to No. 264**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Otherwise undisputed.

265.    The eight largest public sale purchasers paid about $1.553 million, $1.462 million, $1.160 million, $970,231, $871,393, $686,144, $640,424 and $593,705, respectively. (*Id*. at ¶ 6(b)).

> **In Response to No. 265**: Undisputed.

266.    The purchasers in the public portion of the sale also included (i) 48 purchasers who paid for Kin in amounts ranging from $100,000 to $500,000, (ii) 544 purchasers who paid for Kin in amounts ranging from $10,000 to $99,999, and (iii) 4584 purchasers who paid for Kin in amounts ranging from $1,000 to $9,999. (*Id*. at ¶ 6(c)).

> **In Response to No. 266**: Disputed as to part (iii).  4590 participants paid for Kin in amounts ranging from $1,000 to $9,999.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Otherwise undisputed that the TDE included (i) 48 participants who paid for Kin in amounts ranging from $100,000 to $500,000, (ii) 544 participants who paid for Kin in amounts ranging from $10,000 to $99,999.  *Id*. at ¶ 6(c).

267.    Of the money spent on Kin by all buyers in the public portion of the sale, a total amount of about $7,938,264 was spent by buyers who paid at least $500,000; a total amount of about $16,298,405 was spent by buyers who paid at least $100,000; a total amount of about $31,369,147 was spent by buyers who paid at least $10,000; and a total amount of about $46,837,457 was spent by buyers who paid at least $1,000. (*Id*. at ¶ 6(d)).

> **In Response to No. 267**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Otherwise undisputed.

268.    Of the money spent on Kin by all buyers in the public portion of the sale, a total amount of about $1,926,056 – or about 3.95% of the total sum raised during the public portion of the sale – was spent by buyers who paid less than $1,000. (*Id*. at ¶ 6(e)).

> **In Response to No. 268**: Disputed.   The total amount the SEC references is apparently by buyers who purchased $1,000 *or* less, inclusive.  The total amount spent by the 4,942 purchasers who spent less than $1,000 is $1,920,057.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37.

269.     Of the Kin bought by all buyers in the public portion of the sale, more than 50% of the Kin was purchased by buyers who paid more than $32,000. (*Id*. at ¶ 6(f)).

> **In Response to No. 269**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Otherwise undisputed.

270.     Of the money spent on Kin by all buyers, including both those who purchased pursuant to SAFT and those who did not, a total amount of about $54,403,264 was spent by buyers who paid at least $500,000; a total amount of about $65,413,405 was spent by buyers who paid at least $100,000; a total amount of about $80,960,647 was spent by buyers who paid at least $10,000; and a total amount of about $96,428,957 was spent by buyers who paid at least $1,000. (*Id*. at ¶ 8(b)).

> **In Response to No. 270**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Otherwise undisputed.

271.     Of the money spent on Kin by all buyers, including both those who purchased pursuant to SAFT and those who did not, a total amount of about $1,926,056 – or about 1.96% of the entire amount raised in Kin offering – was spent by buyers who paid less than $1,000. (*Id*. at ¶ 8(c)).

> **In Response to No. 271**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Otherwise undisputed.

272.     Of the money spent on Kin by all buyers, including both those who purchased pursuant to SAFT and those who did not, more than 50% of the Kin was purchased by buyers who paid more than $500,000. (*Id*. at ¶ 8(d)).

> **In Response to No. 272**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Otherwise undisputed.

273.     On or about September 26, 2017, Kik issued a press release announcing that "the Kin token distribution event (TDE) has successfully ended raising nearly US$100 million":

> WATERLOO, Ontario – Sep. 26, 2017- Kik Interactive, the creator of the popular chat platform Kik, has announced the Kin token distribution event (TDE) has successfully ended raising nearly US$100 million. More than 10,000 people from 117 countries participated in the token sale, immediately making Kin one of the most widely held cryptocurrencies in the world.

(Answer ¶ 176; SEC100, Inv. Ex. 95).

> **In Response to No. 273**: Undisputed that Kik issued a press release containing the cited text.  Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.

274.    Following its distribution of Kin, Kik sent external communications regarding its sales of Kin and referring to the transactions as one "sale." For example, on September 26, 2017, a Kik executive sent the following email to a purchaser who bought via SAFT:

> The token distribution event closed this morning. Here's a quick look at the results:
>
> - $98.76M total raise (inclusive of pre-sale and public sale)
> - Over 10,000 total participants from 117 countries
>
> The hard cap for the sale was $125M. In order to maintain the 1T supply, the remaining allocation in the sale is being redistributed proportionally to all sale participants, while also maintaining the 30% discount to pre-sale participants. As such, the split of the 1trillion tokens netted out to:
>
> - **59.43%** pre-sale
> - **40.57%** public sale
>
> The distribution of tokens is coming through in two instalments. The first, which you should see in your wallet now, is your proportional allocation of tokens of the initial 488B tokens allocated to the pre-sale cohort under the assumption of a full $125M sale. The second instalment is the redistribution of unsold tokens and you will see that in the next 48-72 hours.

(SEC101, Dep. Ex. 149; SEC22, Mougayar Dep. Tr., at 182:16-183:10). Similar emails were sent to other SAFT participants. (SEC102, KIK_00020141 - KIK_00020150).

> **In Response to No. 274**: Undisputed that the document contains the cited text and that Kik sent emails to Pre-sale participants.  Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.

275.    The following timeline illustrates Kik's offering and sale of Kin:

| Kik's Offer and Sale of Kin |
|---|

| MAY 2017 | **MAY 25** | Sale of 1 Trillion Kin announced (a), and white paper issued (b) |
|---|---|---|
| JULY 2017 | **JULY 3** | First sale via SAFT (c) |
| | **JULY 25** | SEC issues DAO Report (d) |
| AUG 2017 | **AUG 29** | Kik publishes Instructions for public portion of sale (e) |
| SEPT 2017 | **SEPT 5** | OSC "definitively communicate[s]" that sale of Kin is securities offering (f) |
| | **SEPT 9** | Deadline for buyers to register for public portion of sale (g) |
| | **SEPT 11** | Last sales via SAFT (h) |
| | **SEPT 12** | Purchasers who timely registered pay Ether to buy Kin (i) |
| | **SEPT 26** | Sale concludes and Kik announces that it has raised "US$100 million" (j) |
| | | 1 Trillion Kin distributed (k) |

((a) SEC38, Inv. Ex. 88; (b) Answer ¶ 8; SEC31, Dep. Ex. 12; (c) SEC53, Dep. Ex. 40; (d) Answer ¶ 17; (e) Answer ¶ 160; SEC96, Dep. Ex. 55; (f) Answer ¶ 109; SEC89, Chaukos Dep. Tr., at 169:22-171:16, 181:14-183:15; (g) Answer ¶ 161; (h) SEC53, Dep. Ex. 40; (i) Answer ¶¶ 171, 173; (j) Answer ¶ 176; (k) Answer ¶ 177).

> **In Response to No. 275**: Disputed.  This is not a document in the record.  The SEC created this chart that is misleading to the extent it suggests that Kik was conducting a "single offering."  *See* Response No. 37.  Kik further disputes this statement to the extent it implies Kik knew that its sale of Kin would constitute the sale of a security.  *See* Response Nos. 227-29; *see also* SEC89, Chaukos Tr., 88:11-20; Landsvik Decl., Ex. EE, McKee Ltr., Chaukos Ex. 121, at KIK_00128199.  The OSC did not "definitively" communicated that "the sale of Kin is securities offering" on September 5, 2017, and regardless, that statement is irrelevantSEC Ex. 90 at 179:10-20.  Kik further objects to this statement as containing inadmissible hearsay evidence and an improper use of Fed. R. Evid. 1006.

### iv.    *Kik Never Filed A Registration Statement.*

276.    Kik has never filed with the SEC a registration statement for its offer and sale of Kin. (Answer ¶ 111; SEC1, Inv. RFA, No. 40).

**In Response to No. 276**:  Undisputed that Kik did not file a registration statement with the SEC.  Disputed to the extent this statement suggests that Kik was conducting a "single offering.  *See* Response No. 37.

277.   Kik did not otherwise publicly disclose its financial statements. (Answer ¶ 68).

**In Response to No. 277**: Undisputed.

## N.   AS PROMISED, KIK CREATED THE KIN FOUNDATION ON SEPTEMBER 12, 2017

278.   The Kin Foundation was officially established on September 12, 2017, after registration for the public sale of Kin had closed and on the day public sale buyers started to pay Ether for the tokens. Initially the Foundation had two directors, Kik's CEO and Kik's then-CFO. (Answer ¶ 153; SEC1, Inv. RFA, No. 38; SEC103, Dep. Ex. 62; SEC4, Heinke Dep. Tr., at 186:21-187:11).

**In Response to No. 278**: Undisputed that the Kin Foundation was established on September 12, 2017 and initially had two directors, Kik's CEO and Kik's then-CFO.  Disputed to the extent the statement implies that Kik and the Kin Foundation are not independent entities.  The Kin Foundation is "an independent nonprofit, and democratic governance body for the members of this [Kin] ecosystem," SEC31 at 6, and Kik has repeatedly denied that, "[f]rom its founding through the present, the Kin Ecosystem Foundation has not been independent of Kik Interactive."  SEC1 RFA Nos. 48-50.

Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract," *see* Response No. 31, and to the extent it lacks any citation to evidence in the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1(d).

279.   Upon creation of the Foundation and through distribution of the Kin on September 26, 2017, the Foundation had no operations independent of Kik, no employees, and no cash or other assets (except for the Kin it received on September 26, 2017) to fund operations. (SEC4, Heinke Dep. Tr., at 189:9-20; SEC1, Inv. RFA, No. 44; SEC10, Heinke Inv. Tr., at 462:11-469:4).

**In Response to No. 279**: Disputed to the extent the SEC implies that Kik and the Kin Foundation were not independent entities.  *See* Response No. 278.  Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.  Otherwise undisputed.

280.    At the time of the public sale, the Foundation was not independent from Kik, and Kik had not made any specific decisions about how the Foundation would operate in the future. (SEC10, Heinke Inv. Tr., at 456:2-22).

> **In Response to No. 280**: Disputed. The Kin Foundation is independent of Kik. *See* Response No. 278. Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

281.    Kik's CEO and CFO served as the Foundation's sole directors until May 2018. (SEC1, Inv. RFA, No. 42). Since May 2018, the Foundation's directors have been Kik's CEO and a longtime Kik consultant, William Mougayar. (SEC22, Mougayar Dep. Tr., at 197:6-15). From approximately April 2017 through May 2018, Mr. Mougayar served as a compensated consultant to Kik. (Answer ¶ 34; SEC22, Mougayar Dep. Tr., at 53:4-18; 56:18-57:9; 187:17-21).

> **In Response to No. 281**: Undisputed, but subject to clarification. As of July 7, 2017, Mr. Mougayar's advisor agreement with Kik had not been formalized. SEC22, Mougayar Tr. 50:21-51:5. Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31.

282.    Because Kik's CEO has always been one of two board members, the Foundation has always needed the CEO's approval to conduct any business. Kik's CEO cannot unilaterally approve any Foundation action, unless Mr. Mougayar has a conflict of interest in the matter being voted on. (Answer ¶ 34; SEC8, Livingston Inv. Tr., at 424:24-425:21; SEC22, Mougayar Dep. Tr., at 198:9-199:1).

> **In Response to No. 282**: Disputed. The Kin Foundation is independent of Kik. *See* Response No. 278. In general, both Mr. Livingston and Mr. Mougayar must vote to approve any action on behalf of the Kin Foundation. *See* SEC22 Mougayar Dep. Tr. at 198:11-191:1. If there is a conflict of interest, Mr. Livingston can and has recused himself. *Id.* 199:2-23. Further disputed to the extent the SEC suggests "Kik's CEO" has a seat on the Foundation's Board. Mr. Livingston is a board member in his individual capacity, not as CEO of Kik. *See* SEC6, Philp Tr. 65:1-6. Otherwise undisputed.

> Kik further objects to this statement as irrelevant and immaterial to whether Kik's

sales of Kin constituted an "investment contract."  *See* Response No. 31.

283.    The Foundation was created so that it could receive six trillion Kin to distribute in such a way as to compensate – through the Rewards Engine – companies that promote Kin transactions and, therefore, boost demand for Kin. (SEC31, Dep. Ex. 12 at 21).

> **In Response to No. 283**: Disputed.   The Kin Foundation was created to "administer the Kin Rewards Engine" with the eventual goal of creating a "fully decentralized" and "autonomous reward mechanism."  SEC31 at 16-17.

284.    At present, all Foundation activities are conducted by Kik employees at Kik's cost. (SEC6, Kik 30(b)(6) Dep. Tr., at 75:3-78:3). The Foundation continues to have no employees and no assets of its own, other than the Kin it received on September 26, 2017. (*Id*. at 41:22-42:22; SEC22, Mougayar Dep. Tr., 234:17-235:16). Certain Kik employees are "very critical" to the Foundation's functions. (SEC22, Mougayar Dep. Tr., at 236:3-238:19).

> **In Response to No. 284**: Disputed to the extent the SEC suggests that the Kin Foundation is not independent of Kik.  *See* Response No. 278.  Kik employees provide services on the Kin Foundation's behalf pursuant to a Services Agreement and for which the Kin Foundation agreed to compensate Kik.  SEC6 at 76:24-80:14. Kik further disputes this statement to the extent the SEC mischaracterizes Mr. Mougayar's testimony that Mr. Philp is a critical operations employee for Mr. Livingston.  *See* SEC22 at Mougayar Dep. Tr. at 236:19-25.
>
> Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

285.    Kik's general counsel serves as the Foundation's secretary, although the Foundation does not pay her. (*Id*. at 237:6-238:20).

> **In Response to No. 285**: Disputed that Ms. Lyon was designated as the Foundation's secretary, but undisputed that she attends Foundation board meetings as secretary.  SEC6, Philp Tr. 65:13-17.  Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

286.    The Foundation did not enter into any contracts with developers who agreed to integrate Kin into their applications until 2018. (*Id*. at 233:7-11).

**In Response to No. 286**: Disputed.  The SEC mischaracterizes Mr. Mougayar's testimony that he could not recall precisely when the Foundation contracted with developers, but surmised it would be in 2018.  *See* SEC22, Mougyarar Dep. Tr. at 233:7-11.

Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."

## O.   ON SEPTEMBER 26, 2017, KIK DELIVERED THREE TRILLION KIN TO ITSELF, ONE TRILLION KIN TO INVESTORS, AND SIX TRILLION KIN THE FOUNDATION

287.    On or about September 26, 2017, a third-party contractor hired by Kik created a smart contract that generated 10 trillion Kin. (Answer ¶ 177).

**In Response to No. 287**: Undisputed.

288.    Kik received four trillion Kin, of which Kik kept three trillion. Kik then transferred the other one trillion Kin to the approximately 10,000 general public purchasers and the approximately 50 purchasers who bought Kin using Kik's SAFT. Pursuant to the terms of the SAFTs, however, only half of the Kin purchased via SAFTs were delivered; the other half were to be delivered on the one-year anniversary of the distribution. (Answer ¶ 178).

**In Response to No. 288**: Disputed.  The smart contract (as referenced in ¶ 289), not Kik, distributed Kin to the purchasers.  *See* Philp Decl. ¶¶ 78-80.  Further disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37.  Otherwise undisputed.

Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract."  *See* Response No. 31.

289.    The smart contract also distributed six trillion Kin to the Kin Foundation. (Answer ¶ 179).

**In Response to No. 289**: Undisputed.

290.    The Kin that Kik kept and caused the Kin Foundation to receive are all identical and fungible with the tokens that Kik sold and distributed (via SAFT or public sale). (Answer ¶ 180).

> **In Response to No. 290**: Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Otherwise undisputed.
>
> Kik further objects to this statement as irrelevant and immaterial to whether Kik's sales of Kin constituted an "investment contract." *See* Response No. 31. Otherwise undisputed.

291. Kik imposed no resale or use restriction on any of the Kin distributed on September 26, 2017. (Answer ¶ 181).

> **In Response to No. 291**: Undisputed.

292. Within months after the token distribution event, investors who had purchased Kin at a discount through SAFTs began to liquidate their Kin holdings for a profit, sending billions of Kin into the secondary market. (SEC23, Morehead Inv. Tr., at 133:2-135:25; SEC42, Hourigan Inv. Tr., at 20:4-21:17; 56:4-8; Answer ¶ 182).

> **In Response to No. 292**: Undisputed that SAFT participants have sold portions of their Kin tokens for a profit. Disputed that SAFT participants "liquidated" their investments. Mr. Morehead testified that Pantera retains 90% of the Kin tokens it purchased in the Pre-sale, and Mr. Hourigan testified that PB Digital sold only "some" of its Kin tokens. *See* SEC23, Morehead Inv. Tr. at 133:7-14; SEC42, Hourigan Inv. Tr. at 20:9-17. Further disputed as to the term "investors" as Kik did not use that term. *See* Response No. 114.

293. Because all Kin tokens are the same, all Kin tokens are valued at the same price on any given day. (Answer ¶ 183). If the value of Kin rises or falls, the change in value will affect the value of all Kin, whether such tokens are held by Kik, the Foundation, or investors. (*Id*.).

> **In Response to No. 293**: Undisputed that all Kin tokens are the same, and that because Kin is valued by principles of supply and demand in the market, presumably all Kin tokens are valued at the same price on any given day. SEC14, Philp Inv. Tr. 407:8-15. Disputed that all Kin tokens are necessarily valued at the same price on any given day.

P.     **KIK POOLED THE PROCEEDS OF THE SALE OF KIN AND USED THE PROCEEDS TO FUND ITS OPERATIONS AND "INCREASE THE VELOCITY" OF KIN**

294.    Kik deposited funds received from the SAFT participants in U.S. dollars in a single account owned by Kik at a Canadian bank. (Answer ¶ 186; SEC2, Lit. RFA, No. 70; SEC10, Heinke Inv. Tr., at 473:6-474:11).

>    **In Response to No. 294**: Undisputed that Kik deposited funds received from Pre-sale purchasers in U.S. dollars in a single account owned by Kik at a Canadian bank.  Disputed to the extent the SEC suggests that Kik was conducting a "single offering," *see* Response No. 37, or that Kik "pooled" proceeds from the Pre-sale and TDE.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011).

295.    Kik stored in a "digital wallet" the Ether it had received during the public portion of the sale. Between September 27, 2017 and March 28, 2018, Kik exchanged Ether it had received during the public portion of the sale for U.S. dollars and put those dollars into a single account owned by Kik at a California bank. (SEC10, Heinke Inv. Tr., at 474:22-475:14, 477:7-478:4; SEC6, Kik 30(b)(6) Dep. Tr., at 33:19-34:24; SEC93, Mitchell Decl., at ¶¶ 10(b)-(e)). Because of an increase in the price of Ether after September 26, 2017, Kik ultimately realized approximately $59 million from its exchange of Ether to U.S. dollars. (SEC93, Mitchell Decl., at ¶ 10(e)).

>    **In Response to No. 295**: Undisputed that Kik received and stored Ether received from TDE participants in its digital wallet, that Kik exchanged Ether for U.S. dollars and deposited the dollar proceeds into an account owed by Kik at a California Bank, and that Kik ultimately realized approximately $59 million from its exchange of Ether into dollars.  Disputed to the extent the SEC suggests that Kik was conducting a "single offering," or that Kik "pooled" proceeds from the Pre-sale and TDE.  *See* Response Nos. 37, 294.

296.    Kik thus owned all the proceeds from the sales and controlled the proceeds through the company's budgeting process. (SEC10, Heinke Inv. Tr., at 473:24-474:4; 474:12-21; 477:7-478:4; SEC6, Kik 30(b)(6) Dep. Tr., at 33:19-34:24).

>    **In Response to No. 296**: Undisputed that Kik owned and controlled the proceeds from the Pre-sale and the TDE.  Disputed that Kik was conducting a "single

offering," or that Kik "pooled" proceeds from the Pre-sale and TDE.  *See* Response Nos. 37, 294.

297.    Kik has used proceeds received from both portions of its sale of Kin as working capital to fund Kik's business operations. (SEC6, Kik 30(b)(6) Dep. Tr., at 33:19-34:24; SEC2, Lit. RFA, No. 71; SEC64, October 20, 2017 Letter).

> **In Response to No. 297**:  Undisputed that Kik used proceeds from the Pre-sale and the TDE as working capital to find Kik's business operations.  Disputed that Kik was conducting a "single offering," or that Kik "pooled" proceeds from the Pre-sale and TDE.  *See* Response Nos. 37, 294.

298.    Funds received from both portions of the sale were "pooled" and transferred to and from various Kik-controlled accounts to finance Kik's operations, and Kik controlled the transfer of all such funds. (SEC10, Heinke Inv. Tr., at 477:24-479:24; SEC14, Philp Inv. Tr., at 448:16-451:19; SEC6, Kik 30(b)(6) Dep. Tr., at 33:1-34:14).

> **In Response to No. 298**:  Undisputed that Kik utilized proceeds from the Pre-sale and the TDE to finance Kik's operations, and that Kik controlled the transfer of such funds.  Disputed that Kik was conducting a "single offering," or that Kik "pooled" proceeds from the Pre-sale and TDE.  *See* Response Nos. 37, 294.

299.    Kik has also spent the proceeds "to develop the Kin Ecosystem" and to try to "execute on the plan that we produced in the white paper." (SEC10, Heinke Inv. Tr., at 479:25-480:18; *see also* SEC64, October 20, 2017 Letter).

> **In Response to No. 299**:  Disputed to the extent the SEC contends that Kik "pooled" proceeds from the Pre-sale and the TDE.  *See* Response No. 294.  Otherwise undisputed.

300.    After the public sale, Kik "tr[ied] to attract people to use Kin tokens," including by "get[ting] brands to build and developers to build on the ecosystem." (SEC10, Heinke Inv. Tr., at 480:22-481:4). Specifically, Kik tried to "increase the velocity" in Kin, which meant "the amount that the currency trades." Causing an increase in the "velocity" of Kin would "[e]ffectively over time . . . increase the value of the token." (Id. at 481:7-20).

> **In Response to No. 300**: Disputed.  Kik wanted to "build the ecosystem" in order to "increase the velocity" of Kin as a "transactional currency."  SEC10, Heinke Inv. Tr. at 481:5-482:13.  Otherwise undisputed.

301.    Kik used funds from Kik's Canadian bank account "to further its efforts as a participant in the Kin Ecosystem." (SEC2, Lit. RFA, No. 75).

> **In Response to No. 301**: Disputed to the extent the SEC contends that Kik "pooled" proceeds from the Pre-sale and the TDE.  *See* Response No. 294. Otherwise undisputed.

302.    Kik used funds that were first deposited in Kik's California bank account "to further its efforts as a participant in the Kin Ecosystem." (*Id.* at No. 72).

> **In Response to No. 302**: Disputed to the extent the SEC contends that Kik "pooled" proceeds from the Pre-sale and the TDE.  *See* Response No. 294. Otherwise undisputed.

303.    Kik does not distinguish between funds received through SAFTs, funds received from the general public, or funds the company previously had on hand from venture capital investment or company operations. (SEC6, Kik 30(b)(6) Dep. Tr., at 32:1-35:15).

> **In Response to No. 303**: Disputed.  This statement mischaracterizes Mr. Philp's testimony, which was only that Kik's current cash reserves are retained at two bank accounts.  SEC6, Philp 30(b)(6) Tr. at 35:9-15.

304.    Neither the Kin Foundation nor Kin investors had control over how the proceeds of the Kin sale were spent. Kik possessed sole discretion. (Answer ¶ 188).

> **In Response to No. 304**: Undisputed that neither the Kin Foundation, SAFT purchasers, nor TDE participants, had control over proceeds generated by the Pre-sale and the TDE.  Disputed to the extent the SEC suggests that Kik was conducting a "single offering."  *See* Response No. 37.

**Q.    WHEN OFFERING AND SELLING KIN, KIK MADE USE OF THE MEANS AND INSTRUMENTS OF INTERSTATE COMMERCE.**

305.    Kik used the Internet, including websites and email, to provide offering materials to potential purchasers of the Kin token. Specifically, Kik posted the white paper on its website, making the document freely accessible on the Internet. (SEC4, Heinke Dep. Tr., at 127:5-25). Kik

also emailed the white paper and URL addresses for the white paper to potential and actual Kin

investors in the United States. (*See, e.g.*, SEC74, Neil Dep. Tr., at 25:23-26:10, 152:24-153:12).

> **In Response to No. 305**: Undisputed that Kik used the Internet to provide materials to potential purchasers, and that Kik posted the whitepaper on its website, making the document freely accessible on the internet. Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Kik further disputes this statement because it mischaracterizes Dr. Neil's testimony that he did not recall the email in question. *See* Neil Dep. Tr. at 152:3-153:13.

306.    Kik also sent emails to potential and actual investors in the United States to

communicate regarding Kik's offer and sale of Kin. (*See, e.g.,* SEC74, Neil Dep. Tr., at 152:3-19,

153:16-155:6, 155:12-156:1, 156:22-157:12; SEC2, Lit. RFA, Nos. 64, 67; SEC44, PANT-

000000051).

> **In Response to No. 306**: Undisputed that Kik sent emails to potential and actual SAFT purchasers and TDE participants. Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See See* Response No. 37. Further disputed to the term "investors" as Kik did not use that term. *See* Response No. 114.

307.    Kik also spoke by telephone with prospective and actual investors in the United

States to discuss and promote Kik's offering of Kin. (SEC14, Philp Inv. Tr., at 426:4-19, 429:6-

11; SEC73, Wang Inv. Tr., at 24:19-25:4; SEC50, Wang Dep. Tr., at 40:17-41:4).

> **In Response to No. 307**: Undisputed that Mr. Philp spoke with Mr. Wang by telephone. Disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37.

308.    Kik also used multiple United States-based social media outlets on the Internet,

including Medium, Twitter, Reddit, and Slack, to post about the Kin project. (Answer ¶ 71). And

at least one investor viewed on-line the video recordings of Kik's CEO's various public talks

before making his investment decision. (*See, e.g.*, SEC50, Wang Dep. Tr., at 43:5-14, 122:4-13).

> **In Response to No. 308**: Disputed that Mr. Wang viewed any video recordings of Kik's CEO before deciding to purchase Kin. *See* Response 71. Further disputed to the extent the SEC suggests that Kik was conducting a "single offering." *See* Response No. 37. Otherwise undisputed that Kik posted to the various listed social

media outlets regarding the Kin project, and that Mr. Wang testified that he viewed part of a YouTube video in which Mr. Livingston spoke about the Kin Project.


* * * *


Dated:  April 24, 2020                               Respectfully submitted,


By: /s/ *Patrick E. Gibbs*
_____

  Patrick E. Gibbs (*Pro Hac Vice*)
  Brett H. De Jarnette (*Pro Hac Vice*)
  Jenna C. Bailey (*Pro Hac Vice*)
  Cooley LLP
  3175 Hanover Street
  Palo Alto, CA  94304-1130
  Phone: (650) 843-5000
  Fax:     (650) 849-7400
  Email: pgibbs@cooley.com;
  bdejarnette@cooley.com

  Sarah M. Lightdale (SL7122)
  Cooley LLP
  55 Hudson Yards
  New York, NY 10001-2157
  Phone: (212) 479-6374
  Fax:     (212) 479-6275
  Email: slightdale@cooley.com

  Luke T. Cadigan (*Pro Hac Vice*)
  Julianne M. Landsvik (*Pro Hac Vice*)
  Michael E. Welsh (*Pro Hac Vice*)
  Cooley LLP
  500 Boylston Street, 14th Floor
  Boston, MA  02116-3736
  Phone: (617) 937-2425
  Email: lcadigan@cooley.com;

Robert W. Pommer III (RP5328)
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-5950
Email: rpommer@kirkland.com

Attorneys for Defendant
KIK INTERACTIVE INC.

## CERTIFICATE OF SERVICE

I, Patrick E. Gibbs, hereby certify that a true and correct copy of the foregoing document was served on counsel of record via ECF on this 24th day of April, 2020.

*/s/ Patrick E. Gibbs*
Patrick E. Gibbs
