# Exhibit BB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X
U.S. SECURITIES AND EXCHANGE COMMISSION, :
: Civil Action No. 19-cv-5244
      Plaintiff, :
: **DECLARATION OF RYAN RAMSEY**
  vs. :
:
KIK INTERACTIVE INC., :
:
      Defendant. :
------------------------------------- X

I, Ryan Ramsey, declare as follows:

1. I currently reside in Arcata, California, and have resided here since August 19th, 2019. I have personal knowledge of the statements made herein. If called to testify, I could competently and truthfully testify to these facts.

2. I purchased 780,173,779.30 Kin in Kik's 2017 Token Distribution Event (the "TDE") in exchange for 395.31 ETH, and ultimately received 950,491,488.03 Kin.

3. At the time I purchased Kin, I was located in Peru, where I resided at the time.

4. I do not recall reviewing any specific materials published by Kik prior to purchasing Kin in the TDE. Prior to purchasing Kin, I can only recall reading articles about Kin that were published by third parties, such as Coin Desk.

5. I do not recall ever reviewing or reading the Kin white paper prior to purchasing Kin in the TDE, nor do I recall relying on any statements in the Kin white paper when deciding to purchase Kin.

6. I do not recall viewing any videos of Kik's CEO, Ted Livingston, speaking about Kin prior to purchasing Kin in the TDE, nor do I recall relying on any statements from any videos of Mr. Livingston when deciding to purchase Kin.

7. I do not recall viewing any Tweets from Kik or the Kin Foundation prior to purchasing Kin in the TDE, nor do I recall relying on any statements contained in any Tweets from Kik or the Kin Foundation when deciding to purchase Kin.

8. I bought Kin primarily because, in 2017, I had seen many Initial Coin Offerings ("ICOs") in which the token sold rose in value after the sale had completed, and I assumed that Kin might behave similarly. However, this assumption was not based on anything that Kik said or published, but rather how I believed the cryptocurrency market functioned generally.

9. When purchasing Kin, my understanding was that Kin was a digital currency to be used as a medium of exchange to purchase digital goods and services within digital applications, including digital stickers and similar products. I recall hearing about something about stickers being offered within the Kik Messenger application prior to participating in the Kin TDE.

10. When I purchased Kin, I understood that other applications besides Kik could integrate Kin into their applications.

11. To the extent I hoped the price of Kin would increase when I purchased Kin, that hope was not based on anything that Kik said or published, but rather what I read or heard about other cryptocurrencies. Kik never said specifically that I would make money or that Kin was an investment opportunity.

12. One of the reasons I decided to purchase Kin was that the cryptocurrency market at the time in 2017 was generally trending upwards. If the market had been trending downward, I would not have purchased Kin.

13. I believed that the price of Kin would be tied to the cryptocurrency market, and that the price would change in large part based on market forces that were generally applicable to all cryptocurrencies or outside of Kik's control. For example, I believed the price of Kin and other cryptocurrencies would primarily be tied to the price of Bitcoin.

14. When purchasing Kin, while I did expect Kin to be integrated within Kik Messenger, I do not recall Kik making any promises to integrate Kin into Kik Messenger in any particular manner, or within any specific timeframe.

15. Prior to my purchase of Kin, I do not recall Kik or the Kin Foundation ever promising that Kin would be listed on exchanges, nor do I recall Kik promising that Kik or the Kin Foundation would exert efforts to have Kin listed on exchanges.

16. When purchasing Kin, I recall believing that Kik's only obligation to me was to deliver the Kin tokens that I had purchased. While I expected that Kik would further the vision for Kin, I do not believe those expectations were based on anything specific that Kik published or said, and I do not recall believing that Kik owed me any ongoing contractual obligations after purchasing Kin.

17. I do not have any reason to dispute that I agreed to Kik's Terms of Use when making my purchase of Kin, and believe I likely agreed to it.

18. As a consumer, my understanding of the term "as is" and the term "no warranties" is that there are no strings attached or future obligations.

19. When purchasing Kin, I was not aware of a separate pre-sale being conducted pursuant to SAFT Agreements, nor have I ever reviewed or been provided the SAFT Agreement or Private Placement Memorandum that were provided to pre-sale participants.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed in Arcata, California, on January 23rd, 2020.

_____
    Ryan Ramsey