# Exhibit PP

Case 1:19-cv-05244-AKH   Document 79-10   Filed 04/24/20   Page 2 of 14



# When it Comes to Analyzing Utility Tokens, the SEC Staff's "Framework for 'Investment Contract' Analysis of Digital Assets" May Be the Emperor Without Clothes (Or, Sometimes an Orange Is Just an Orange) (Part I)

**Oct 28, 2019**

---

*This is the first in a series of posts critical of the SEC's approach to analyzing so-called "utility tokens" under the federal securities laws.*

For purposes of these posts:

- A "utility token" is a blockchain-based coin or token that

    - has no rights associated with it other than the right to use the coin or token to purchase goods or services from the token issuer;
    - does not carry any claim on the assets of the token issuer (whether on liquidation of the token issuer or otherwise); and
    - does not entitle the token holder to any voting or similar rights or any rights to receive income, dividends or other distributions.[i]

Case 1:19-cv-05244-AKH   Document 79-10   Filed 04/24/20   Page 3 of 14

- An "investment contract" is a *contract, transaction* or *scheme* whereby:

  - (1) a person invests money
  - (2) in a common enterprise and
  - (3) is led to expect profits solely from the efforts of the promoter or a third party.

Section 2(a)(1) of the Securities Act of 1933 (the "Securities Act"), and Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange Act" and, together with the Securities Act, the "Securities Acts"), define the term "security" in slightly different terms, but the Supreme Court has concluded that they should be treated as "essentially identical in meaning."[ii] Each section defines the term "security" to include an "investment contract." Neither section defines the term "investment contract." In *SEC v. W. J. Howey Co.,* 328 U.S. 293 (1946) ("*Howey"),* the Supreme Court articulated the three-prong test set forth above for determining whether a particular instrument is an "investment contract," and the courts have essentially followed that test ever since.[iii]

## Part I: The Problem

Recent enforcement actions brought by the Securities and Exchange Commission ("SEC"),[iv] as well as recent guidance provided by the SEC staff[v] and certain high-ranking SEC officials:[vi]

- fail to distinguish the "investment contracts" pursuant to which utility tokens are offered and sold to purchasers, on the one hand, from the utility tokens sold to purchasers pursuant to such "investment contracts," on the other hand; and/or
- take the position that, under the *Howey* test, a utility token can be an "investment contract," and therefore a "security," in its own right.

The SEC's[vii] position that, under *Howey,* a utility token can be an "investment contract," and therefore a "security," in its own right confuses or conflates (1) the *contract, transaction* or *scheme* pursuant to which the utility token is offered and sold to purchasers (which, depending on the types of marketing and promotional efforts involved, may or may not be an "investment contract") with (2) the utility token sold to a purchaser pursuant to such a *contract, transaction* or *scheme* (which in essence represents a consumptive item in the form of a right to acquire goods and services and therefore, in and of itself, is never an "investment contract").[viii] Unfortunately, but not surprisingly, this error has hindered, not advanced, the development of a sound and clear conceptual framework for analyzing the status of offers and sales of utility tokens under the federal securities laws.

The SEC's conflation of (1) *contracts, transactions* or *schemes* pursuant to which utility tokens are offered and sold to purchasers with (2) the utility tokens sold to purchasers pursuant to such *contracts, transactions* or *schemes,* finds its highest expression in the *Gary Plastic Remarks*. While at one point in those remarks, Director Hinman appears to endorse the idea that there is a clear distinction between an "investment contract" pursuant to which a utility token is offered and sold, on the one hand, and the utility token itself, on the other hand, he ultimately conflates the two:

Case 1:19-cv-05244-AKH   Document 79-10   Filed 04/24/20   Page 4 of 14

> "…[in] the ICOs I am seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not. Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. When someone buys a housing unit to live in, it is probably not a security...But under certain circumstances, the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others. For example, if the housing unit is offered with a management contract or other services, it can be a security…Similarly, when a CD, exempt from being treated as a security under Section 3 of the Securities Act, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and the potential to profit from changes in interest rates, the *Gary Plastic* case teaches us that the instrument can be part of an investment contract that is a security. The same reasoning applies to digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop the enterprise – can be, and, in that context, most often is, a security – because it evidences an investment contract."

Insofar as Director Hinman was addressing the status of utility tokens under the Securities Acts, case law suggests that he got it right when he reasoned that a utility token, which is not itself a security, can be **part of an investment contract that is a security**, and got it wrong when he suggested that a utility token can "evidence an investment contract." To say that a utility token "evidences an investment contract" is to conflate a consumptive item, on the one hand, with the "investment contract" pursuant to which it was offered and sold, on the other hand.[ix]  Director Hinman also got it right when he asserted that "[c]entral to determining whether a security is being sold is how it is being sold."  Unfortunately, as discussed below (and as will be discussed in greater detail in a subsequent post), later pronouncements of the SEC staff unduly de-emphasize the manner in which a utility token is sold and unduly emphasize factors – such as the subjective motivations of token purchasers, the free transferability of tokens and the existence of vibrant secondary markets for tokens – that should have little or no relevance to determining whether an "investment contract" exists.

I do not disagree with the proposition that where (1) an issuer of utility tokens offers, sells and issues utility tokens that are not fully functional at the time of issuance to raise funds for the purpose of developing the platform on which such tokens can be used in the future ("Non-Functional Tokens"), and (2) in connection with making such offers and sales, makes promises or representations that, analyzed from an objective standpoint, would lead prospective purchasers to expect profits resulting from an increase in value of the tokens attributable to the managerial or entrepreneurial efforts of the issuer or others, those promises and representations, considered together with the agreement relating to the sale of the tokens to a purchaser, constitute a *contract, transaction* or *scheme* that bears all of the hallmarks of an "investment contract" (and thus a "security") within the meaning of the Securities Acts. In that case, offers and sales of the "investment contract" (as opposed to the utility tokens offered and sold thereunder) must be registered under the Securities Act, unless an exemption from the registration requirements of the Securities Act is available.

Nor do I disagree with the view that, where an issuer of utility tokens makes the types of promises or representations described above in connection with offering and selling Non-Functional Utility Tokens, uses the proceeds of the offering to develop the platform on which such tokens can be used and then issues such tokens to investors only when the platform is functional ("Fully Functional Tokens"), those promises and representations, considered together with the agreement relating to the sale of the tokens to a purchaser, constitute a *contract, transaction* or *scheme* that bears all of the hallmarks of an "investment contract."

At the same time, I do not believe that it can credibly be argued that a utility token is an "investment contract" in its own right.  A utility token is, **by nature and design**, a consumptive item, not a security.[x]  It entitles the holder of the token to purchase goods and/or services on the related platform.  In the case of a Non-Functional Token, the token represents a future right to purchase goods and/or services on the platform, once the platform becomes functional.  In the case of a Functional Token, the token represents a present right to purchase goods and/or services on the platform.  In either case, that right, in and of itself, does not constitute an "investment contract" or any other type of "security," because the right, in and of itself, does not contain, and is incapable of making, any promise or representation that would lead prospective purchasers to expect profits resulting from an increase in value of the token attributable to the managerial or entrepreneurial efforts of the issuer or others.  In that regard, a utility token is fundamentally and qualitatively different from a digital asset (or a non-digital asset such as stock or bond) that, by its very nature and design, carries with it a promise to pay dividends, income or other distributions.[xi]  There is, in short, nothing inherent in a utility token that would induce a prospective purchaser to buy it as an investment.  Such an inducement must necessarily be voiced by a person "outside" the token – that is, as part of and in connection with a *contract, transaction* or *scheme* under which the token is offered and sold.

Thus, even if one concludes that a particular *contract, transaction* or *scheme* involving the offer and sale of a utility token is an "investment contract," that "investment contract" is distinct from the utility token offered and sold pursuant to it.  One could, of course, argue that a utility token is a contract in that it confers a right on the holder of the token to acquire goods or services, and obligates the issuer of the token to redeem such token for such goods or services.  But that does mean that it is an **investment contract**.  The "investment contract" (if one is to be found through application of the *Howey* test) is the *contract, transaction* or *scheme* in which: (i) the token issuer offers tokens to the purchaser, (ii) makes certain promises or representations to the token purchaser in connection therewith, (iii) enters into agreement with the token purchaser to sell and issue (or agree to issue) tokens to the purchaser and (iv) the purchaser pays the agreed-on consideration to the issuer in exchange for such tokens.  That "investment contract" is separate and distinct from the contractual rights represented by the token issued pursuant to the "investment contract."  Although the *contract, transaction* or *scheme* under which a utility token is offered and sold may, under certain facts and circumstances, be an "investment contract," the utility token issued pursuant to that *contract, transaction* or *scheme* is, by its very nature, a consumptive item and is no more an "investment contract" than any other right to acquire goods and services, such as a gift card.

As will be discussed in greater detail in a subsequent post, even a Non-Functional Token must be considered a consumptive item, no less than any consumptive product that is pre-ordered by a consumer but not yet useful because it is not yet produced or manufactured.  To say that a Non-Functional Token is an "investment contract" is tantamount to saying that a cow embryo sold in connection with a cattle-breeding scheme is an "investment contract." There is no inherent characteristic or attribute of a utility token, Non-Functional or Functional – just as there is no inherent characteristic or attribute of a cow embryo or a mature cow – that suggests that it is an "investment contract."  I have been asked:  how can a Non-Functional Token not be an investment, since it has nowhere to go but up? My answer takes the form of a question:  up to what?  Up to the point where it can be sold at a profit?  Or up to the point where it can be used on the related platform?  My point is that the only thing one can conclude with certainty after examining a Non-Functional Token in its own right is that it is, by nature and design, a consumptive item. Any conclusion that a Non-Functional Token is an investment as opposed to a consumptive opportunity can only be based on an objective examination of the nature of the inducements made to attract purchasers to purchase it – inducements that, as stated above, necessarily must be made "outside" the token itself.

Nor, as we shall see in a later post, does a consumptive item such as a utility token somehow become mystically transformed into an "investment contract" simply because it: (i) is offered and sold pursuant to one and/or (ii) may increase in value over time as a result of the entrepreneurial or managerial efforts of others.

Even if we indulge the SEC's error that a consumptive item involved in an "investment contract" is an "investment contract" in its own right, the SEC compounds its error by failing to follow well-established principles, prescribed by case law, for determining whether a particular *contract, transaction* or *scheme* involving the sale of a consumptive item is an "investment contract."  Under that case law, a *contract, transaction* or *scheme* involving the sale of a consumptive item will be considered an "investment contract" only if, among other things, the promoter has made promises or representations in connection with marketing and promoting the item that, analyzed objectively, would lead potential purchasers to: (i) expect an increase in the value of such item as a result of the managerial or entrepreneurial efforts of others and (ii) view such profit, as opposed to the actual use and enjoyment of the item, as the primary, principal or predominant inducement for purchasing the item.  In short, if an objective analysis shows that a promoter has conducted an offering of tokens in which it made promises or representations to the effect that it (or another party or parties) intends to employ its managerial or entrepreneurial efforts in a manner designed to increase the value of the token, thereby making the token a good investment opportunity, the offering may well constitute an "investment contract."  If, however, an objective analysis shows that a promoter has conducted an offering of tokens in which it markets the tokens primarily as a consumptive item, the offering should not constitute an "investment contract," even if, as a result of subsequent managerial or entrepreneurial efforts on the part of the promoter (or another party or parties), the token increases in value over time. The SEC, however, downplays the necessity to undertake an objective analysis of the type demanded by the courts, and even goes so far as to suggest that the subjective motivations of token purchasers are an important factor to be considered in determining whether the tokens they purchase are "investment contracts."[xii] This suggests that the

Case 1:19-cv-05244-AKH   Document 70-10   Filed 04/24/20   Page 7 of 14

SEC takes the position that if a purchaser of tokens subjectively believes that the tokens are a "good investment," that belief militates in favor of finding that the tokens are an "investment contract." Along the same lines, the SEC appears to believe that if a token purchaser purchases more tokens than he can possibly consume, or that if the token is traded in the secondary market, either fact also militates in favor of such a finding.

Finally (again, indulging the SEC's error for the sake of argument), the SEC fails to explain how a secondary market transaction in a utility token that it considers to be an "investment contract" is itself an "investment contract." If, for example, a secondary market sale is made on an anonymous basis with the seller making no promises or representations to the purchaser regarding the potential future value of the token, how is the third prong of the *Howey* test satisfied? How can the "common enterprise" prong of the *Howey* test be satisfied in the context of a secondary market sale? In that case, where is the "common enterprise" between the seller and the buyer?

Or is the SEC suggesting that once an instrument is characterized as an "investment contract," it is forever an "investment contract" (at least until such time as it can be said that any increase in the value of the instrument is not attributable to the managerial or entrepreneurial efforts of others), regardless of the number of times it is sold in secondary market transactions? In this connection, is the SEC suggesting that the promises and representations made by the token issuer in the original "investment contract" somehow attach themselves to subsequent resales, thereby satisfying the third prong of the *Howey* test with respect to such resales? If that is the case, how long does the SEC believe such promises and representations continue to linger? Forever?[xiii] And, more importantly, what if a subsequent purchaser is not aware of those promises and representations at the time of his or her purchase?[xiv] The SEC cites no case law or other authority to support the proposition (principally, I believe, because there doesn't appear to be any[xv]) – nor does it supply any grounds or analysis to support the proposition[xvi] – that a secondary market sale of an "investment contract" is, necessarily and forever, an "investment contract" in its own right. [xvii]

In my next post, I will discuss the consequences of the SEC's error for market participants that wish to sell, resell, invest in, broker, provide exchange facilities for the trading of, and provide advice with respect to, utility tokens.

In subsequent posts, I will further discuss the SEC's approach, suggest an alternative approach and discuss the legal basis, grounded in case law,[xviii] for adopting that alternative approach.

[i]This discussion assumes that the goods and services that can be purchased with a utility token do not include "securities." Further, this discussion is not meant to imply that tokens that meet the definition of "utility token" used in this discussion should automatically be viewed as "investment contracts" if they carry voting rights of any kind. Rather, any such voting rights would need to be considered on a case-by-case basis to determine whether they constitute the type of voting rights that mark a "security."

[ii]*SEC v. Edwards*, 540 U.S. 389, 393 (2004). *See also Tcherepnin v. Knight*, 389 U.S. 332, 335-336 (1967).

[iii]Later in its opinion, the *Howey* court restated the three-prong test as follows: "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."  328 U.S. at 301.  This second formulation of the test omits the "is led to expect" language relating to profits contained in the court's initial formulation.  As we shall see, however, the courts – by focusing on an "objective" analysis of the types of inducements offered by promoters – have either explicitly or implicitly found the "is led to expect" language to be a core component of the *Howey* test.

[iv]*See, e.g., SEC v. Telegram Group Inc.*, 19. Civ. 9439 (PKC) (S.D.N.Y. October 11, 2019) ("*Gram Complaint*"); *In the Matter of Block.one*, Securities Act Release No. 10714 (September 30, 2019) ("*Block.one*"); *SEC v. ICObox,* 2:19-cv-08066 (C.D. Cal. September 18, 2019); ("*ICObox Complaint*"); *SEC v. Kik Interactive Inc.*, 19-cv-5244 (S.D.N.Y. June 4, 2019) ("*Kik*");  *In the Matter of Gladius Network LLC*, Securities Act Release No. 10608 (February 20, 2019) ("*Gladius*"); *In the Matter of Paragon Coin, Inc.,* Securities Act Release No. 10574 (November 16, 2018) *("Paragon"); In the Matter of Carriereq, Inc., d/b/a Airfox,* Securities Act Release No. 10575 (November 16, 2018) *("Airfox"); In the Matter of Munchee, Inc.,* Securities Act Release No. 10445 (December 11, 2017) *("Munchee"*).

[v]*See,* "*Framework for 'Investment Contract' Analysis of Digital Assets*," issued by the staff of the SEC's Strategic Hub for Innovation and Financial Technology on April 3, 2019 (the "Framework"); *TurnKey Jet, Inc.* (April 3, 2019); *Pocketful of Quarters, Inc.* (July 25, 2019).

[vi]*See, e.g.,* William Hinman, Director of the SEC's Division of Corporation Finance, Remarks at the Yahoo Finance All Markets Summit: Crypto (entitled "*Digital Asset Transactions:  When Howey Met Gary (Plastic)*," June 14, 2018 (the "*Gary Plastic Remarks*").

[vii]A distinction must be made, of course, between the views of the SEC, on the one hand, and the view of its staff and high-ranking officials, on the other hand.  As SEC Chairman Jay Clayton pointed out in his "*Statement Regarding SEC Staff Views*" (September 13, 2018), "[s]taff of the SEC frequently make their views known through a variety of communications, including written statements, compliance guides, letters, speeches, responses to frequently asked questions and responses to specific requests for assistance.  The staff often addresses specific questions from particular SEC-regulated institutions or other stakeholders about [SEC] rules or regulations and how those rules or regulations may apply to a particular entity's specific facts and circumstances. The [SEC's] longstanding position is that all staff statements are nonbinding and create no enforceable legal rights or obligations of the [SEC] or other parties."  The SEC staff, in other words, does not necessarily speak for the SEC.  For purposes of convenience, however, the views and positions of the SEC staff and high-ranking SEC officials are sometimes referred to as the views and positions of the SEC.

Case 1:19-cv-05244-AKH   Document 79-10   Filed 04/24/20   Page 9 of 14

[viii]This discussion focuses exclusively on utility tokens and is not necessarily critical of the SEC's analytical approach to the treatment of other forms of digital assets under the federal securities laws. Depending on the facts and circumstances, it is likely in many cases, and possible in others, that digital assets other than utility tokens could constitute securities in their own right.

[ix]To be fair, later in his remarks, Director Hinman appears to return to his original contention that a digital asset is distinct from the contract, arrangement or scheme pursuant to which it is sold: "I would like to emphasize that the analysis of whether something is a security is not static and does not strictly inhere to the instrument…Even digital assets with utility that function solely as a means of exchange in a decentralized network could be packaged and sold as an investment strategy that can be a security. If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security. Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts." The SEC's enforcement actions cited in note x below, however, remove any doubt that the SEC has concluded that utility tokens can be "investment contracts" in their own right.

[x]In several enforcement actions, the SEC unequivocally took the position that the utility tokens in question were "investment contracts" or "securities." *See*, *Block.one* (note iv, *supra*) ("…the ERC-20 Tokens were securities under the federal securities laws pursuant to *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), and its progeny…."); *ICOBox Complaint* (note iv, *supra*) ("ICOBox…offered and sold securities, in the form of ICOBox's ICOS tokens…"); *Gladius* (note iv, *supra*) ("…GLA Tokens were securities pursuant to *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946), and its progeny…"); *Paragon* (note iv, *supra*) ("…PRG tokens were securities pursuant to *SEC v. W. J. Howey Co.,* 328 U.S. 293 (1946), and its progeny…."); *Airfox* (note iv, *supra*) ("…AirTokens were 'securities' pursuant to *SEC v. W. J. Howey Co.,* 328 U.S. 293 (1946) and its progeny…."); *Munchee* (note iv, *supra*) ("…MUN tokens were securities as defined by Section 2(a)(1) of the Securities Act because they were investment contracts…."); *Kik* (note iv, *supra*) ("Although Kik's SAFT specifically stated that the SAFT was itself a security, it failed to state that the Kin to be delivered under the SAFT were securities sold pursuant to the SAFTs. And although Kik's PPM claimed that the offer and sale of the SAFTs were subject to an exemption from registration under Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, among other United States laws, Kik did not claim any exemption for the offer and sale of Kin through the SAFT. As such, Kik's offer and sale of the SAFTs and Kik's offer and sale of the Kin purchased under the SAFTs were not registered.") It is not clear from the *Grams Complaint* (note iv, *supra*) whether the utility tokens in questions were utility tokens of the type defined in this discussion.

In one recent enforcement action relating to utility tokens (*In the Matter of SimplyVital Health, Inc.*, Securities Act Release No. 10671 (August 12, 2019) ("*SimplyVital*")), the SEC discusses the fact that token purchasers were offered the opportunity to enter into purchase agreements with the issuer, called "Simple Agreements for Future Tokens" or SAFTs, under which the issuer promised to deliver tokens to investors if and when the issuer created them. But nowhere in *SimplyVital* does the SEC specify the instruments that it considers to be "securities" for purposes of its order. Was it the SAFTs? The tokens? Both?  It is simply impossible to draw any firm conclusion in that regard from the order.  The press

release accompanying the order (*see* SEC Press Release dated August 12, 2019 (Administrative Proceeding File No. 3-19332)) further muddies the waters by stating that "[t]he [SEC] today announced settled charges against a New England-based blockchain company for offering and selling approximately $6.3 million of securities to the public in unregistered transactions…The order finds that [SVH] did not file a registration statement with the [SEC] or qualify for an exemption from registration before offering and selling HLTH to the public through the SAFTs."

In any event, in none of its enforcement actions (except *Kik*) does the SEC distinguish the *contracts, transactions* or *schemes* pursuant to which the tokens were offered and sold, on the one hand, from the tokens themselves, on the other hand, and, at least in the case of *Kik, Block.one*, *Gladius, Paragon, Airfox and Munchee*, the tokens in question appeared to be utility tokens.  (In *Airfox*, the SEC stated that "[t]he Airtoken offering was an offer and sale of 'securities' as defined by Section 2(a)(1) of the Securities Act because it constituted the offer and sale of investment contracts."  That statement seems unassailable, because the contracts, transactions or schemes pursuant to which the Airtokens were sold were indeed "investment contracts."  Unfortunately, based on its prior statement in *Airfox* that Airtokens themselves are securities, it is evident that the SEC's reference to "investment contracts" was to the Airtokens themselves, not to the *contracts, transactions* or *schemes* pursuant to which Airtokens were sold. The SEC took the same approach in *Paragon*. In the *ICObox Complaint*, the tokens at issue were sold as an opportunity to obtain tokens issued by other issuers at a discount, but it is not clear whether the tokens issued by such other issuers were exclusively utility tokens.

In all of the actions, the SEC discussed the promises and representations made by the issuers in offering and selling their tokens.  But in all of the actions (other than *Kik*) the SEC failed to distinguish those promises and representations (and related agreements) – which clearly constituted the "investment contracts" pursuant to which the tokens were offered and sold – from the tokens sold pursuant to such "investment contracts."  And in *Kik*, although the SEC distinguished the SAFTs from the tokens issued pursuant to the SAFTs, it took the position that the tokens were "investment contracts" in their own right.

At least one court appears to have concluded that utility tokens can be "investment contracts" in their own right.  *See Balestra v. Atbcoin LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) ("…Plaintiff's Complaint plausibly alleges facts demonstrating that the ATB Coin qualifies as an 'investment contract' under the *Howey* test.").  Another court appears to have implicitly recognized the difference between an "investment contract" pursuant to which a utility token is sold and the utility token itself. *See Hodges v. Harrison,* 372 F. Supp. 3d 1342, 1349 (S.D. Fla. 2019) ("The transactions at issue here are investment contracts and are therefore subject to federal securities laws, including the registration requirements promulgated thereunder.")

[xi]Utility tokens of the type discussed in this post differ from the types of tokens that appear to be described in the SEC's *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (Exchange Act Rel. No. 81207) (July 25, 2017) (the "DAO Report").  The tokens described in the DAO Report appear to have been designed to provide purchasers earnings in the form of dividends or other distributions from projects funded by token purchasers.

[xii]In the Framework, the SEC staff appears to acknowledge that the inquiry into whether a particular instrument constitutes an "investment contract" is "an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold…The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales)."  The Framework then immediately loses that focus in favor of a multi-factor balancing approach (not employed by any court in any case of which I am aware) that:

- relegates "manner of sale" to just one of many factors that need to be considered when conducting an "investment contract" analysis (Section II.C.2 of the Framework, which is dedicated to a discussion of the "reasonable expectation of profits" prong of the *Howey* test, relegates marketing efforts to the bottom of the list of factors to be taken into account in determining whether the initial sale of a digital asset involves an "investment contract;" Section II.C.3 of the Framework, which discusses "other relevant considerations," places marketing efforts toward the bottom of the list); and
- more importantly, indicates that the motivation of a token purchaser is an important factor in determining whether the token is a security: "Situations where the digital asset is exchangeable or redeemable solely for goods or services within the network or on a platform, and may not otherwise be transferred or sold, may more likely be a payment for a good or service in which the purchaser is motivated to use or consume the digital asset."

As we shall see, this focus on subjective motivations runs contrary to case law.  *See, e.g., Teague v. Bakker*, 139 F. 3d 892 (4th Cir. 1998) (unpublished opinion) ("The subjective intention of a given purchaser cannot control whether something is a 'security,' else some might have purchased securities while others did not. The proper focuses of the inquiry are on the transaction itself and the manner in which it is offered. On the other hand, where most intended purchasers share a common understanding of, and have similar motives stoked by, an offering, the 'subjective' understanding and motives are powerful evidence of the objective intent and effect of the offering.  In other words, the subjective feeling of the vast majority of purchasers is very likely the feeling the seller objectively intended to produce.")

It also happens to run contrary to the position the SEC took a few months prior to the issuance of the Framework in its ongoing litigation against Blockvest, LLC. *See SEC v. Blockvest, LLC*, Case No.: 18CV2287-GPB(BLM)  (S.D. Cal. February 14, 2019) ("*Blockvest*").  In *Blockvest*, the SEC filed a motion for partial reconsideration of an earlier decision in the case, arguing that the court had committed clear error in the earlier decision by (among other things) requiring the "the SEC to prove that an investment is a security based solely on the beliefs of some individual investors, rather than the objective nature of the investment being offered to the public."  While the court disagreed with the SEC's characterization of what the court had done in the earlier decision, it reversed that decision based on a thorough "objective" analysis of the promotional efforts surrounding the offer of the digital assets in question.  Citing *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) (an important case that I will consider in a future post, but which is not mentioned in the Framework), the court concluded (at page 10 of its opinion) that "[t]he <u>Howey</u> test is an 'objective inquiry into the character of the instrument or transaction offered based

on what the purchasers were 'led to expect,'" and stated that Court "agrees with the SEC that the <u>Howey</u> test is unquestionably an objective one."  In determining what purchasers were "led to expect," the court concluded (at page 13 of its opinion) as follows:

"This requires an inquiry into what the purchasers were offered or promised… (courts frequently examine promotional material associated with the transaction); <u>see</u> <u>SEC v. C.M. Joiner Leasing Corp.</u>, 320 U.S. 344, 352-53 (1943) ("The test [for determining whether an instrument is a security] ... is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.").

"As explained in <u>Hocking</u>, before applying the <u>Howey</u> test, 'we must determine what exactly [the defendant] offered to [the plaintiff]. <u>Hocking v. Dubois</u>, 885 F. 2d 1449, 1457 (9th Cir. 1989) (concerning sale of real estate). The Ninth Circuit in <u>Hocking</u> explained, '[c]haracterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances, and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case." <u>Id.</u> (quoting <u>Aldrich v. McCulloch Props., Inc.</u>, 627 F. 2d 1036, 1039-40 (10th Cir. 1980))."

[xiii]The SEC appears to come close to this position in the *Grams Complaint* (note iv, *supra*) when it states in its conclusion to the complaint that "[t]he Initial Purchasers' purchases of Grams, and any subsequent purchases of Grams, were and will be an investment of money, in a common enterprise, with an expectation of profits, derived primarily from the current and future entrepreneurial and managerial efforts of Defendants and their agents to build the TON Blockchain and drive demand for Grams."  As we shall see in a later post, this position is as untenable as the position that a utility token can be an "investment contract" in its own right.

[xiv]*See Salameh v. Tarsadia Hotel*, 726 F. 3d 1124, 1131 (9th Cir. 2013), *cert. denied*, 571 U.S. 1202 (2014).

[xv]The scant case law that exists appears to cut against the notion that once an instrument is an "investment contract," is must forever thereafter be characterized as an "investment contract."  In *Hocking v. Dubois*, 863 F. 2d 654 (9th Cir. 1988), the Ninth Circuit withdrew an opinion it had entered earlier in that case published at 839 F.2d 560 (1988) ("*Hocking I*") in which the court effectively embraced the "once a security, always a security" doctrine. 839 F.2d at 570.  Upon reconsideration of *Hocking I*, the Ninth Circuit concluded that "[w]e agree with defendants and amici that the three-judge panel may have written too broadly its conclusion that so long as a rental pool 'option' exists, all secondary market sales necessarily involve a security. Such a per se rule would be ill-suited **to the examination of the economic reality of each transaction** required by *Howey.* In the context of isolated resales, each case requires an analysis of how the condominium was promoted to the investor, including any representations made to the investor, and the nature of the investment and the collateral agreements.

The investor's intentions and expectations as communicated to the broker would be relevant in determining what investment package was actually offered." [emphasis added] *Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989), *cert. denied*, 494 U.S. 1078 (1990).

[xvi]In any event, in my opinion, the argument that the "once a security, always a security" doctrine does not appropriately apply to instruments such an "investment contracts" is ultimately more persuasive than the argument that it does. *See* Robert C. Art, *Sell a Condominium, Buy a Securities Lawsuit: Unwarranted Liabilities in the Secondary Market,* 53 Ohio St.L.J. 414, 435-8.

In fairness, the court in *Blockvest* (following *Warfield)* noted "**the subjective intent of the purchasers may have some bearing** but *Howey* is an objective inquiry into the character of the instrument or transaction based on what the purchasers were 'led to expect.'" [emphasis added] I will discuss in a later post how the courts have dealt with the subjective intent of purchasers in the context of analyzing whether a particular instrument is an "investment contract."

[xvii]I note, however, that in both the *Gary Plastic Remarks* and the *Framework*, the SEC concedes that an instrument that starts its life as an "investment contract" may morph over time into an instrument that is not, which clearly calls into question the validity of the "once a security, always a security" doctrine, at least in the context of digital assets. In the *Gary Plastic Remarks*, Director Hinman observes that, under the following circumstances, "a digital asset transaction may no longer represent a security offering:"

> "If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult and less meaningful."

The *Framework* adopts a similar approach: "In evaluating whether a digital asset previously sold as a security should be reevaluated at the time of later offers or sales, there would be additional considerations as they relate to the 'efforts of others,' including but not limited to: · Whether or not the efforts of an AP, including any successor AP, continue to be important to the value of an investment in the digital asset. · Whether the network on which the digital asset is to function operates in such a manner that purchasers would no longer reasonably expect an AP to carry out essential managerial or entrepreneurial efforts. · Whether the efforts of an AP are no longer affecting the enterprise's success."

Thus, both the *Gary Plastic Remarks* and the *Framework* implicitly reject the "once a security, always a security" doctrine.  Yet they fail to explore the potential inapplicability of that doctrine to sales, in the secondary markets, of utility tokens they consider to be "investment contracts" when first issued.

Case 1:19-cv-05244-AKH   Document 79-19   Filed 04/24/20   Page 14 of 14

[xviii]*See, e.g., Salameh v. Tarsadia Hotel*, 726 F. 3d 1124 (9th Cir. 2013), *cert. denied*, 571 U.S. 1202 (2014); *Warfield v. Alaniz*, 569 F. 3d 1015 (9th Cir. 2009); *Teague v. Bakker*, 139 F. 3d 892 (4th Cir. 1998) (unpublished opinion), *cert. denied*, 525 U.S. 929 (1998) and 35 F. 3d 978 (4th Cir. 1994), *cert. denied*, 513 U.S. 1153 (1995); *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989), *cert. denied*, 494 U.S. 1078 (1990); *Aldrich v. McCulloch Props., Inc.*, 627 F. 2d 1036 (10th Cir. 1980); *Woodward v. Terracor*, 574 F. 2d 1023 (10th Cir. 1978); *Timmreck v. Munn,* 433 F. Supp. 396 (N.D. Ill. 1977); *McCown v. Heidler,* 527 F. 2d 204 (10th Cir. 1975); *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045 (S.D.N.Y. 1975).

# AUTHOR

JOSEPH H. NESLER
Of Counsel


+1 312-558-6478

# RELATED PROFESSIONALS



**Joseph H. Nesler**
Of Counsel Chicago
+1 312-558-6478



**Basil V. Godellas** Partner
Chicago +1 312-558-7237

*This entry has been created for information and planning purposes. It is not intended to be, nor should it be substituted for, legal advice, which turns on specific facts.*