# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

**U.S. SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

        **vs.**

**KIK INTERACTIVE INC.**

                         **Defendant.**

**Case No.  19-cv-5244 (AKH)**

---

# PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Stephan J. Schlegelmilch
David S. Mendel
Laura D'Allaird
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549-5971
(202) 551-4935 (Schlegelmilch)
(202) 551-4418 (Mendel)
(202) 551-5475 (D'Allaird)
SchlegelmilchS@SEC.gov
MendelD@SEC.gov
DAllairdL@SEC.gov

*Counsel for Plaintiff*

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................1

II.  BACKGROUND ................................................................................................6

    A. Kik's "Relevant Factual Background" is a Misstatement of Facts.............................7

        1.   Kik Makes Unsupported Claims About Public Investor "Beliefs" ...............7

        2.   Kik Actively Sought Out "Large Purchasers" .......................................11

        3.   Kin was not "Fully Functional As A Medium Of Exchange"
            Upon Distribution..........................................................................11

        4.   The Kin Foundation is Functionally Indistinct From Kik .........................14

III. ARGUMENT....................................................................................................15

    A. Kik Made An Unregistered Offer And Sale Of Securities Directly To
      Public Investors ..............................................................................................16

        1.   Public Investors In The Offering Invested In A Common Enterprise.................18

            a.   Public Investors Did Not Require "Ongoing Contractual
               Obligations" To   Invest In A Common Enterprise.............................20

            b.   Public Investors' Ability To Resell Their Kin Does Not Preclude
               The Existence Of A Common Enterprise.......................................22

            c.   There Was Horizontal Commonality Among Public Investors
               Because Kik Pooled  Their Funds To Develop The Ecosystem.................24

            d.   Kik Alleges No Facts Contesting Strict Vertical Commonality ............. 28

        2.   Kik's Argument That Kin Buyers Were Not Led To Expect Profits
            Depends Upon The Court Ignoring How Kik Actually Marketed Kin .................29

            a.   The Legal Standard For Expectation Of Profits....................................30

            b.   Kik's Creation Of A New *Howey* Element – Reliance –
               Should Be Rejected .....................................................................31

         3.   The Record Supports The SEC's Motion ............................................36

            a.   At The Time Of The Offering, Kin Had No Consumptive Use .................36

            b.   Kik Repeatedly Marketed Kin As An Opportunity To Profit.....................39

            c.   Kik's Success In Attracting "Whales" Is Indicative Of An
               Expectation of Profit....................................................................43

            d.   Kin Investors Reasonably Expected Profits Based On Kik's
               Entrepreneurial And Managerial Efforts .........................................44

    B. Kik Engaged In A Public Distribution In Violation Of Section 5 .........................46

        1.   Kik Engaged In A Single Distribution, Not Two Offerings........................46

        2.   Even if Kik Engaged in Two Separate Offerings, They Should Be
            Integrated Into A Single Non-Exempt Offering.....................................51

a.   All Kin Sales Were Part Of A Single Plan Of Financing .................................... 51

b.   All Kin Sales Involved Issuance Of The Same Class Of Securities.....................54

c.   All Kin Sales Were Made At Or About The Same Time......................................55

d.   Kik Received Functionally Similar Consideration In All Kin sales ...................56

e.   All Kin Sales Were For The Same General Purpose..........................................56

3.   Kik's Public Distribution Of Kin Through SAFT Participants
Cannot Qualify For The Rule 506(c) Exemption..........................................................57

C.   Kik Presents No Genuine Issue Of Material Fact To Support Its
Affirmative Defense Of Unconstitutional Vagueness ........................................... 59

1.   Kik Identifies No Disputed Fact To Support Its Claim
That It Was Denied Constitutionally Fair Notice ...................................................61

2.   The DAO Report Provided Kik Additional Notice
Of "What Conduct Is Forbidden Or Required" ..........................................................62

3.   Kik Demonstrated That It Had "Notice" By Actively
Planning For The Regulatory Risk That It Was Selling Securities..............................64

4.   Statements By Individual SEC Officials And Members
Of Congress After Kik's Violation Do Not Make The Act
Vague "As Applied" To Kik...................................................................................................66

IV.  CONCLUSION ...................................................................................................................................69

## TABLE OF AUTHORITIES

### Cases

*Albanese v. Fla. Nat'l Bank of Orlando,*
    823 F.2d 408 (11th Cir. 1987) ................................................................................. 20

*Aldrich v. McCulloch Props., Inc.,*
    627 F.2d 1036 (10th Cir. 1980) ................................................................. 24, 31, 32

*Alunni v. Dev. Res. Group, L.L.C.,*
    No. 6:08 Civ. 1349 (DAB), 2009 WL 2579319 (M.D. Fl. Aug. 18, 2009) ........................ 22

*Argentinian Recovery Co. L.L.C. v. Board of Directors of Multicanal S.A.,*
    331 B.R. 537 (S.D.N.Y. 2005) ................................................................................. 55

*Balestra v. ATBCOIN L.L.C.,*
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ...................................................................... 12

*Baroi v. Platinum Condo Dev., L.L.C.,*
    914 F. Supp. 2d 1179 (D. Nev. 2012) ...................................................................... 21

*Beranger v. Harris,*
    No. 18 Civ. 05054 (CAP), 2019 WL 5485128 (N.D. Ga. Apr. 24, 2019) ........................ 12

*Berko v. SEC,*
    316 F.2d 137 (2d Cir. 1963) ................................................................................... 33

*Brady v. Town of Colchester,*
    863 F.2d 205 (2d Cir. 1988) ................................................................................... 16

*Continental Mktg. Corp. v. SEC,*
    387 F.2d 466 (10th Cir. 1967) ................................................................................ 20

*Copeland v. Vance,*
    893 F.3d 101 (2d Cir. 2018) ........................................................................ 59, 60, 62

*Demarco v. LaPay ,*
    No. 2:09 Civ. 190 (TS), 2009 WL 3855704 (D. Utah Nov. 17, 2009) ........................... 22

*Dickerson v. Napolitano,*
    604 F.3d 732 (2d Cir. 2010) ............................................................................ 60, 67

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    756 F.2d 230 (2d Cir. 1985) ................................................................................... 23

*Glen-Arden Commodities, Inc. v. Costantino,*
    493 F.2d 1027 (2d Cir. 1974) ................................................................................. 28

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) .............................................................................................. 33

*Hill v. Colorado,*
    530 U.S. 703 (2000) .............................................................................................. 59

*Hocking v. Dubois,*
    885 F.2d 1449 (9th Cir. 1989) ................................................................................ 20

*Hughes v. SEC,*
   174 F.2d 969 (D.C. Cir. 1949) ................................................................................................33

*In re Jeanneret Assocs., Inc.,*
   769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................................................................................25

*Lavery v. Kearns,*
   792 F. Supp. 847 (D. Me. 1992) ......................................................................................23, 24

*Long v. Shultz Cattle Co., Inc.,*
   881 F.2d 129 (5th Cir. 1989) ..................................................................................................22

*Lorenzo v. SEC,*
   139 S. Ct. 1094 (2019) .............................................................................................................32

*Marini v. Adamo,*
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) ....................................................................................28

*McGill v. American Land & Exploration Co.,*
   776 F.2d 923 (10th Cir. 1985) ................................................................................................20

*Mutual Shares Corp. v. Genesco, Inc.,*
   384 F.2d 540 (2d Cir. 1967) ...................................................................................................33

*N. Sims Organ & Co. v. SEC,*
   293 F.2d 78 (2d Cir. 1961) .....................................................................................................33

*Noa v. Key Futures, Inc.,*
   638 F.2d 77 (9th Cir. 1980) ....................................................................................................29

*Ortiz v. N.Y.S. Parole in Bronx, N.Y.,*
   586 F.3d 149 (2d Cir. 2009) ...................................................................................................60

*Perma Research & Dev. Co. v. Singer Co.,*
   410 F.2d 572 (2d Cir. 1969) ...................................................................................................10

*R.A. Holman & Co. v. SEC,*
   366 F.2d 446 (2d Cir. 1966) ...................................................................................................58

*Radiation Dynamics, Inc. v. Goldmuntz,*
   464 F.2d 876 (2d Cir. 1972) ..............................................................................39, 54, 57

*Revak v. SEC Realty Corp.,*
   18 F.3d 81 (2d Cir. 1994) ..............................................................................18, 19, 25

*Rodriguez v. Banco Cent. Corp.,*
   990 F.2d 7 (1st Cir. 1993) ................................................................................................20, 21

*Salameh v. Tarsadia Hotel,*
   726 F.3d 1124 (9th Cir. 2013) ................................................................................................35

*SEC v. Alternate Energy Holdings, Inc.,*
   No. 1:10 Civ. 00621 (EJL-REB), 2014 WL 2515710 (D. Idaho May 13, 2014) ...................54

*SEC v. Aqua-Sonic Prods. Corp.,*
   687 F.2d 577 (2d Cir. 1982) ..............................................................................23, 29, 32

*SEC v. Battoo,*
  158 F. Supp. 3d 676 (N.D. Ill. 2016) ....................................................................21

*SEC v. Blockvest, L.L.C.,*
  No. 18 Civ. 2287 (GPB-BLM), 2018 WL 6181408 (S.D. Cal. Nov. 27, 2018).................34

*SEC v. Blockvest, L.L.C.,*
  No. 18 Civ. 2287 (GPB-BLM), 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ............ 32, 34

*SEC v. Brigadoon Scotch Distributing Co.,*
  480 U.S. 1047 (2d Cir. 1973) ............................................................................61

*SEC v. C.M. Joiner Leasing Corp.,*
  320 U.S. 344 (1943) ...........................................................................20, 29, 61

*SEC v. Cavanagh,*
  155 F.3d 129 (2d Cir. 1998) ...............................................................................46

*SEC v. Dunfee,*
  No. 16114-2, 1966 U.S. Dist. LEXIS 10105 (W.D. Mo. Dec. 8, 1966).........................55

*SEC v. Edwards,*
  540 U.S. 389 (2004) ................................................................................passim

*SEC v. Everest Mgmt. Corp.,*
  475 F.2d 1236 (2d Cir. 1972) ........................................................................ 33, 34

*SEC v. Galaxy Foods, Inc.,*
  417 F. Supp. 1225 (E.D.N.Y. 1976) ....................................................................23

*SEC v. Glenn W. Turner Enter.,*
  474 F.2d 476 (9th Cir. 1973) .............................................................................23

*SEC v. Hui Feng,*
  935 F.3d 721 (9th Cir. 2019) .............................................................................31

*SEC v. Infinity Group Co.,*
  212 F.3d 180 (3d Cir. 2000) .....................................................................23, 25, 27

*SEC v. Ishopnomarkup.com, Inc.,*
  No. 04 Civ. 4057 (DRH-ARL), 2007 WL 2782748 (E.D.N.Y. Sept. 24, 2007) ........ 16, 51

*SEC v. Koracorp Industries,*
  575 F.2d 692 (9th Cir. 1978) .............................................................................33

*SEC v. Koscot Interplanetary, Inc.,*
  497 F.2d 473 (5th Cir. 1974) .............................................................................22

*SEC v. Mapp,*
  No. 4:16 Civ. 00246 (ALM), 2017 WL 5177960 (E.D. Tex. Nov. 8, 2017)....................53

*SEC v. Morgan Keegan & Co.,*
  678 F.3d 1233 (11th Cir. 2012)...........................................................................32

*SEC v. Nat'l Student Mktg. Corp.,*
  68 F.R.D. 157 (D.D.C. 1975)..............................................................................67

*SEC v. Ralston Purina Co.*,
   346 U.S. 119 (1953) ................................................................................................16

*SEC v. Rana Research, Inc.*,
   8 F.3d 1358 (9th Cir. 1993) ...................................................................................33

*SEC v. SG Ltd.*,
   265 F.3d 42 (1st Cir. 2001) .............................................................................. 23, 25

*SEC v. Softpoint, Inc.*,
   958 F. Supp. 846 (S.D.N.Y. 1997)........................................................................51

*SEC v. Telegram Group, Inc.*,
   --- F. Supp.3d ---, 2020 WL 1430035 (S.D.N.Y. March 24, 2020)............................passim

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................................passim

*Sidell v. Commissioner of Internal Revenue*,
   225 F.3d 103 (1st Cir. 2000)..................................................................................67

*Solis v. Latium Network, Inc.*,
   No. 18 Civ. 10255 (SDW-SCM), 2018 WL 6445543 (D.N.J. Dec. 10, 2018)............................ 13, 36

*Sprint Nextel Corp. v. FCC*,
   508 F.3d 1129 (D.C. Cir. 2007) ............................................................................67

*Svets v. Osborne Precious Metals Co., Inc.*,
   No. 92 Civ. 0357 (BAC), 1992 WL 281413 (N.D. Cal. Jun. 8, 1992) .................................29

*Timmreck v. Munn*,
   433 F. Supp. 396 (N.D. Ill. 1977).........................................................................21

*United Housing Foun., Inc. v. Forman*,
   421 U.S. 837 (1975) ...............................................................................24, 31, 61

*United States v. Farris*,
   614 F.2d 634 (9th Cir. 1979) ................................................................................61

*United States v. Key*,
   513 F.3d 432 (5th Cir. 2007) ................................................................................66

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008).......................................................................20, 23, 31

*United States v. Smith*,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) ...................................................................60

*United States v. Washam*,
   312 F.3d 926 (8th Cir. 2002) ................................................................................66

*United States v. Zaslavskiy*,
   No. 17 CR 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018)................................27, 62, 64

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ............................................................................................60

*Walker v. Carter*,
  210 F. Supp. 3d 487 (S.D.N.Y 2016) ................................................................... 10

*Warfield v. Alaniz*,
  569 F.3d 1015 (9th Cir. 2009) ............................................................................. 16

*Woodward v. Terracor*,
  574 F.2d 1023 (10th Cir. 1978) ....................................................................... 20, 21

**Statutes**

Securities Act Amendments of 1975,
  S. Rep. 94-75, 1975 U.S.C.A.A.N. 179, 1975 WL 12347 (April 14, 1975) ....................................... 33

**Rules**

Securities Act of 1933, 17 CFR § 230.502(d) (Rule 502(d)) ................................................ 4, 58

Securities Act of 1933, 17 CFR § 230.506(c) (Rule 506(c)) ........................................ 4, 6, 46, 57, 58, 59

Plaintiff U.S. Securities and Exchange Commission ("SEC") respectfully submits this reply memorandum in further support of its motion for summary judgment against defendant Kik Interactive Inc. ("Kik") (ECF No. 57).

## I.   PRELIMINARY STATEMENT

**A.**       Although Kik opposes the SEC's motion for summary judgment by claiming that its digital assets, Kin, were not sold as investments, and, therefore, not securities, the undisputed record of Kik's own public statements during its promotion of Kin demonstrates just the opposite.  From its May 25, 2017 public announcement of Kin to an over-capacity audience at the New York City "Token Summit," through its September 26, 2017 distribution of the tokens to thousands of investors who collectively paid Kik $100 million, Kik conducted a highly publicized, multi-media, marketing campaign for Kin.  In addition to releasing a 28-page white paper, Kik promoted Kin by issuing no fewer than four press releases and six social media or blog posts, releasing a pre-produced video, appearing in a CNBC interview and then on a podcast, and delivering live presentations in different cities on at least five different occasions, all of which were videotaped and circulated on the Internet. All of the approximately 215 transcript pages generated from those Kik appearances are in the record in this case.  *Kik does not dispute a single word spoken by Kik's CEO in any of these recordings, nor does it dispute the content of any of its written statements about Kin issued to the public or directed to individual investors.*[1]

---

[1] The exhibits that include Kik's public statements about its offering are:  (1) the white paper, SEC31 (ECF No. 60-31); (2) press releases, SEC38 (ECF No. 60-38), SEC67 (ECF No. 60-79), SEC99 (ECF No. 60-111), and SEC100 (ECF No. 60-112); (3) social media posts, SEC62 (ECF No. 60-74), SEC63 (ECF No. 60-75), and SEC66 (ECF No. 60-78); (4) blog posts, SEC7 (ECF No. 60-7), SEC37 (ECF No. 60-38), and SEC68 (ECF No. 60-80); and (5) transcripts of Kik's prepared video, podcast, CNBC interview, and presentations at conferences, SEC58-B (ECF No. 60-69), SEC47-B (ECF No. 60-52), SEC59-B (ECF No. 60-71), SEC36-B (ECF No. 60-37), SEC45-B (ECF No. 60-47), SEC46-B (ECF No. 60-49), SEC48-B (ECF No. 60-55); and SEC49-B (ECF No. 60-49).

This vast and undisputed record of Kik's own statements conclusively demonstrates that Kik's 2017 offer and sale of Kin was an offer and sale of investment contracts, and, therefore, securities. As shown in these statements, Kik repeatedly promised that, after delivering Kin to investors, the company would take specific actions to develop the "Kin Ecosystem" and to drive up demand for Kin. Through these actions, Kik would "establish" and "build" Kin's "value" and enable investors and Kik "to make a lot of money." Kik promised to be Kin's "champion" and staked its reputation on, and "pledg[ed] all its resources" to, the project. Kik told investors that it would use their funds to "launch this whole broader ecosystem," and then indisputably deposited funds from "public investors" into one bank account. These undisputed facts show that Kin investors entered a common enterprise, and that, under the *Howey* test, they had a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (internal quotation omitted) (discussing *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)).

None of Kik's arguments alters the SEC's conclusive showing that Kik offered and sold investment contracts. As Kik recognizes, the breadth and intensity of its marketing campaign resulted in a large number of material facts about the company's many statements to investors. But, none of these voluminous facts about the content of Kik's statements, or the forums in which they were made or the media through which they were transmitted to the public, are genuinely disputed. While Kik announces in a footnote that it disputes "most of" the SEC's "308 material facts," Kik Opp. Br. 1 n. 2, the text of Kik's filings demonstrates that the opposite is true. And these facts amply show that all of the *Howey* elements have been met.

Recognizing the overwhelming case against it, Kik tries to dismiss the record as a "patchwork of stray statements" (Kik Opp. Br. 1), and protests that "Kik never promised or suggested that Kin would be an investment opportunity" (*id.* at 2). The undisputed record plainly refutes these contentions. Kik also argues that application of the *Howey* test depends on contents of the Terms of

Use that investors allegedly agreed to when they registered for the September 2017 "public sale" of Kin. As the SEC has already comprehensively explained, however, legions of judicial decisions have long rejected Kik's position. *See* SEC Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment (ECF No. 74) at 13-24 ("SEC Opposition Brief" or "SEC Opp. Br").

Kik also tries to divert attention from its campaign's focus on Kin's "value" and the company's promises of future efforts to boost that value, by contending that it envisioned Kin "as a medium of exchange" and an Ecosystem joined by developers other than Kik. Even if true, these asserted facts create no genuine dispute that Kik's statements to investors fueled an expectation of profits based on Kik's efforts and that Kik would play an undeniably significant role in the Ecosystem. Furthermore, Kik does not – and cannot – dispute that, when it distributed Kin in September 2017, there was no good or service to buy with Kin, and that technology did not allow the processing of Kin transactions at the volume and speed needed for consumer applications. Nor can Kik dispute the very large volumes of Kin bought by many investors. While over 70 percent of the $49 million collected by Kik during the purported "public sale" came from investors paying at least $5,000, less than .09 percent (less than one-tenth of one percent) came from investors spending $100 or less on Kin. Nor does Kik genuinely dispute its own vital role to the future of Kin and the Ecosystem in September 2017. While Kik may have sought other "participants" to join the Ecosystem, ***nowhere does Kik contend that Kin could have "established" or "built" its value – or that the token could have succeeded by any other practical measure – without Kik***. What Kik offered and sold to the public in 2017 were investment contracts, and, in so doing without filing a registration statement with the SEC or having available an exemption from registration, Kik violated Section 5 of the Securities Act of 1933 (the "Securities Act" or the "Act").

    **B.** The undisputed record also demonstrates that Kik conducted a single public distribution of securities, and that the portion of this distribution that occurred through investors who

entered Simple Agreements for Future Tokens ("SAFTs") does not qualify for an exemption from registration under Rule 506(c) of Regulation D or any other provision. Kik cannot meet its burden of showing that any exemption applies. Kik planned and conducted its offering of "one trillion units" of Kin to SAFT participants and public investors in tandem as one distribution; the two portions of the distribution were inter-dependent; there was no significant difference in how Kik described it would use the proceeds – or, in fact, how and when it did use the proceeds; the two "rounds" of the sale met a single fundraising goal of $100 million; and Kin was distributed to all investors at the same time using the same "smart contract." Because Kik conducted only a *single* unregistered public distribution that included non-accredited public investors – or, alternatively, conducted separate offerings that should be considered "integrated" into a single offering – Kik failed to comply with Rule 506(c). Kik separately does not qualify for any exemption, because Kik conducted an unregistered, public distribution of securities with the SAFT participants serving as statutory underwriters, and failed to exercise reasonable care to prevent resale of such securities under SEC Rule 502(d) of Regulation D. Kik proffers no disputed fact precluding summary judgment on the portion of its offering via SAFT participants.

The Court can and should conclude that: (1) as discussed under "A" above, the public-investor portion of the offering violated Section 5 of the Act; and (2) the SAFT portion of the offering also violated Section 5. However, while the SEC contends that Kik's *entire* offering violates the Act, it is not true that, without a finding of one offering or integration, "the SEC's entire case falls apart." Kik Opp. Br. 2. Kik committed a violation of Section 5 as to the public-investor portion of the offering that is wholly independent of how the Court rules on Kik's claim of an exemption for the SAFT portion. In any event, the Court can and should grant summary judgment to the SEC on the SAFT portion also.

**C.**      Furthermore, Kik proffers no disputed fact that precludes summary judgment on its affirmative defense that the term "investment contract" is unconstitutionally vague as applied to the public-investor portion of Kik's offering.  Kik bears the burden of proof on this defense.  However, Kik cannot show that 70 years of judicial precedent and the SEC's July 2017 DAO Report "fail[ed] to provide people of ordinary intelligence a reasonable opportunity to understand" that Kik was offering and selling investment contracts.  The undisputed fact that Kik weighed its regulatory risk under the Act, before and throughout its offering, further confirms the constitutional sufficiency of this notice. There is simply no reason why this Court should not apply longstanding Supreme Court precedent governing investment contracts to Kik's offer and sale of its digital assets, as Judge Castel recently did for another promoter's digital assets in *SEC v. Telegram Group, Inc.*, --- F. Supp.3d ---, 2020 WL 1430035, *14 (S.D.N.Y. March 24, 2020).

* * *

In the *Telegram* decision, issued after the parties filed their dispositive motions in this case, the court addressed and rejected almost all of the arguments that Kik now raises in opposition to the SEC's motion, and concluded on analogous facts that the promoter violated Section 5 of the Act. Applying *Howey*, and focusing on the "plain economic reality" of the scheme, the *Telegram* court found that the SEC had shown a substantial likelihood of success in proving that "the series of understandings, transactions, and undertakings between Telegram and the [purchasers] were investment contracts."  *Id.* at *9-10.  In so holding, the court found a likelihood that the buyers of Grams had entered into a common enterprise, *id.* at *10-11; and that the buyers purchased the Grams in 2018 – at the time they entered purchase agreements with the promoter – "with an expectation of profit in the resale of those Grams to the public via the TON Blockchain, which would be developed by Telegram and the success of which would be implicitly guaranteed post-launch by Telegram," *id.* at *11.  The court also found a substantial likelihood that Telegram sold the Grams to the purchasers

"with the purpose and intent that those Grams then be distributed by the [purchasers] into a secondary market," and, therefore, no exemption under Rule 506(c) or the Act was available.  *Id.* at *18.  Despite the obvious implications of the *Telegram* decision for this case, Kik does not squarely address them. This is not surprising, as the reasoning of that decision is devastating to Kik's position here.

For these and other reasons discussed herein, in the SEC's prior memorandum of law in support of its motion for summary judgment (ECF No. 58) ("prior memorandum" or "Mem."), and in the SEC Opposition Brief, the SEC respectfully requests that the Court grant the SEC's motion for summary judgment.[2]

## II.    BACKGROUND

The undisputed factual record in this case clearly establishes that Kik (1) conducted an extensive, public, four-month marketing campaign for Kin; (2) said it would take specific steps after it launched Kin to increase demand for the digital asset; (3) said that it would "establish" and "build" Kin's "fundamental value;" (4) staked its reputation on Kin's success; (5) kept a three trillion (30 percent) stake in Kin; (5) funneled the proceeds from all Kin sales to public investors into one bank account; and (6) planned and conducted its offering to all investors during the same four-month period, to achieve a single fund-raising goal of $100 million.  These undisputed facts require summary judgment in favor of the SEC's claim that Kik violated Section 5 of the Act.

Kik's "Relevant Factual Background" section in its opposition brief mischaracterizes the largely undisputed facts in this case.  It also makes factual assertions that are unsupported by any reference to Kik's Local Rule 56.1 statements.  While, as set forth below, Kik's factual arguments are flawed and unreliable, the important point is that, even if true, Kik's asserted facts do not undermine

---

[2] Now that the record on summary judgment has been further developed, including through Kik's response to the SEC's local rule 56.1 statement of material facts (ECF No. 78) ("Kik Opp. 56.1"), the SEC submits with this reply memorandum an updated, proposed order granting the SEC's motion.

any of the basic, undisputed, facts set forth directly above, nor do they alter the core fact that Kik marketed Kin as an investment opportunity.  The Court can and should grant summary judgment to the SEC on this discrete set of undisputed facts alone.  Nevertheless, the SEC responds as follows to some of Kik's erroneous assertions and demonstrates that, to the extent Kik disputes certain SEC facts, they are not genuinely disputed material facts.  None of Kik's presentation of its asserted factual background justifies withholding summary judgment against Kik.[3]

### A.    Kik's "Relevant Factual Background" Is A Misstatement of Facts[4]

#### 1.    Kik Makes Unsupported Claims About Public Investor "Beliefs"

As the SEC has demonstrated previously, Kik conducted a comprehensive public marketing campaign through which Kik emphasized the opportunity for investors to profit from Kin because of Kik's commitment to developing the "Kin Ecosystem" and the steps Kik promised to take to boost Kin's "value."  SEC Opp. Br. 4-5.  Kik specifically promised that, after it distributed Kin, it would, among other things:  (1) integrate Kin into Kik Messenger; (2) build new products, services, and systems, including a Rewards Engine; (3) supplement and improve (or replace) the Ethereum blockchain; and (4) create a new "Kin Foundation" to increase demand for Kin.  *Id.*  Kik touted its commitment, resources, and ability to achieve these tasks; assured investors that Kin would be tradable on exchanges; and explained that the company had a huge incentive to grow Kin's value because of

---

[3] For additional factual background, *see* SEC Mem. 8-17; SEC Opp. Br. 4-12.

[4] This memorandum has the following terminology:  "SEC Mem" and "SEC Opp. Br." refer to the SEC's opening memorandum of law in support of summary judgment (ECF No. 58) and memorandum of law in opposition to Kik's motion for summary judgment (ECF No. 74), respectively.  "SEC 56.1" and "SEC Opp. 56.1" refer to the SEC's statement of material facts on motion for summary judgment (ECF No. 59) and the SEC's response and counter-statement to Kik's local rule 56.1 statement (ECF No. 75), respectively.  "Kik Opp. Br." and "Kik Opp. 56.1" refer to Kik's memorandum of law in opposition to the SEC's motion for summary judgment (ECF No. 77) and Kik's response to the SEC's local rule 56.1 statement (ECF No. 78). "SEC__" and "Kik Ex. __" refer to an SEC exhibit and a Kik exhibit, respectively.

the three trillion Kin it was creating for itself.  *See id.*  Kik made numerous explicit, or highly suggestive,

comments about both investors and Kik making money from Kin.  *See id.*

In response to this record, Kik makes sweeping, unsupported claims about what public

investors "believed."  Kik Opp. Br. 6.  In particular, with respect to Kik's "public sale" of Kin – what

it also calls the "Token Distribution Event" or "TDE" – Kik claims that "the public (including TDE

purchasers), realized that Kik would be just one participant in the Kin economy, and would not

ultimately be responsible for managing the Kin economy."  Kik Opp. Br. 6.  But, Kik's "evidence"

for this claim consists of only citations to the same conclusory and skeletal description of its public

offering that appears in its earlier brief, and declarations from three witnesses, one of whom did not

even invest in the Kin offering.

First, Kik relies on the declaration of James Weatherman, but he **did not purchase Kin in**

**the offering**.  Kik Opp. at 6; Kik Ex. DD (ECF No. 79-7) at 11:13-12:3.  In fact, Mr. Weatherman

first purchased Kin on the secondary market in December 2017, months after Kik concluded its

offering of Kin.  Kik Ex. CC (ECF No. 79-6) ¶ 3.  Mr. Weatherman's declaration and testimony are,

therefore, irrelevant as to what "TDE purchasers" "recognized" based on Kik's marketing.[5]

Second, Kik cites the declaration of Samuel Dowd (Kik Opp. Br. 4), but Kik failed to provide

for the record Mr. Dowd's deposition transcript, which shows his declaration to be woefully

incomplete.  For example, although Mr. Dowd's declaration represents that he did not "purchase Kin

with the intention of reselling it for a profit on the secondary market," Kik Ex. Z (ECF 79-1) ¶ 17,

during his deposition, he testified that he bought Kin because "there's the chance that it will increase

in value, and so then I can profit off of it."  SEC109, Dowd Tr. at 30:19-26.[6]  Furthermore, during his

---

[5] Neither Mr. Weatherman's declaration (Ex. CC) nor his deposition (Ex. DD) is cited in Kik's Response to the
SEC's 56.1 Statement (ECF No. 78), so neither is properly part of the record for the pending motions.

[6] This exhibit is attached to the Third Declaration of Laura D'Allaird, filed concurrently by Plaintiff.

deposition, Mr. Dowd acknowledged reading certain sections of the Kin white paper before purchasing Kin and testified that he understood at the time, among other things, that Kik had "pledge[d] all of its resources" to integrating Kin into Kik Messenger:

> Q.   All right.   Let's turn to page 23 of this document, ending in Bates Number 23.   And I want to look at Number 7, "Conclusion."   Do you recall reading this section of this document, Mr. Dowd?
>
> A.   I believe I read this section, yeah.
>
> Q.   And the third paragraph under "Conclusion," I want to read into the record the first sentence of that paragraph.   It begins with "With" Quote: "With the aim of fostering a vibrant economy based around the Kin cryptocurrency, the company will pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Kin Ecosystem to its millions of users."   Did I read that accurately?
>
> A.   Yes.
>
> Q.   And based on this sentence, who did you understand to "pledge all [of] its resources to make Kin the primary transaction currency in its chat app"?
>
> MR. SMITH:  Objection.
>
> MS. D'ALLAIRD:  You can answer.
>
> A.   My understanding was that Kik would be the one that it's talking about right here.
>
> Q.   Was that your answer at the time -- or was that your -- sorry, was that your understanding at the time?
>
> A.   Yeah.  To the best of my memory, I did understand that Kik was going to be the one that was implementing Kin into Kik, into its chat app.

SEC109, Dowd Tr. at 80:10-81:16.  Mr. Dowd's declaration also states that he is "not an employee or contractor for Kik," Kik Ex. Z (ECF No. 79-1) ¶ 5, but Mr. Dowd admitted during his deposition that Kik paid him $15,000 for developing his application and $75 per hour for serving as Kik's witness.

SEC109, Dowd Tr. at 46:4-12, 96:2-97:22.[7]   Accordingly, Mr. Dowd's declaration cannot be relied upon for the proposition that "the public . . . realized that Kik would be just one more participant in the economy" (Kik Opp. Br. 6).   *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."); *Walker v. Carter*, 210 F. Supp. 3d 487, 502 (S.D.N.Y 2016) (citing *Perma Research* in disregarding contradictory evidence from non-party witness on motion for summary judgment).

Third, Kik cites the declaration of Luk Hendriks (Kik Opp. Br. 6), whom the SEC understands lives in the Netherlands and was not deposed in this case.   Critically, Mr. Hendriks' declaration does ***not*** state that the Kin Ecosystem could have succeeded without Kik, or that Kik was somehow unessential to the Kin project.   The paragraphs relied upon by Kik state only that Mr. Hendriks "never viewed Kik as being the sole company responsible for making Kin successful."   Kik Ex. AA (ECF No. 79-2) at ¶¶ 38, 39; *see also id.* at ¶ 32 ("I did not expect Kik to be *solely* responsible for building the ecosystem" (emphasis added)).   Furthermore, Mr. Hendriks states that he depends on "the Kin Rewards Engine" – one of Kik's future projects highlighted during its marketing campaign – for the "supply of Kin" he uses for the program he developed.   *Id.* at ¶¶ 54, 55.   And, Mr. Hendriks acknowledges that he bought Kin as a public investor to profit.   *Id.* at ¶ 19 ("I did not purchase Kin with the *sole* intention of reselling it for a profit on the secondary market." (emphasis in original)).   These statements also do not support the notion that Kik was "just one more participant" in the Ecosystem.

---

[7] Mr. Dowd testified that he understood the $15,000 came from the Kin Foundation, SEC109, Dowd Tr. 46:4-12, but his understanding was mistaken, as Kik well knows.  Kik has admitted that it paid Dowd (and numerous other app developers) with the proceeds of the public sale, SEC6 (ECF No. 60-6) at 40:9-15; SEC Opp. 56.1 ¶ 87.

While the declarations discuss the purported roles of these three individuals as developers of applications that adopt Kin, the record, indisputably, establishes that they did not start these applications until the summer of 2018 at the earliest – *more than half a year after Kin's launch*. Kik Ex. DD (ECF No. 79-7) at 23:6-20 (Mr. Weatherman and Mr. Hendriks began developing app in "late fall, early winter of 2018" and launched the app in April 2019); SEC109 Dowd Tr. at 15:14-16 (testifying that app "went live on the app store in August of 2018."). These three declarations should not be accepted as evidence of Kik's blanket assertions as to what all public investors "believed" or "recognized."

### 2.    Kik Actively Sought Out "Large Purchasers"

Kik also contends that it "structured the TDE to prevent large purchasers from buying up Kin to immediately re-sell on the secondary market." Kik. Opp. Br. 7. The facts, however, flatly contradict this contention. Kik executives purposefully targeted and contacted investors they called "whales" – investors who had indicated an interest in purchasing large amounts of Kin – to offer assistance in completing their transactions and establish a point of contact within Kik. SEC 56.1 ¶ 248. Kik sought to structure the sale so that these "whales" were able to purchase any amount of Kin they desired. *Id.* Most of the Kin made available to the public (70 percent) was purchased by investors who paid more than $5,000, an amount higher than the "cap" on which Kik now relies. SEC Opp. 56.1 ¶¶ 58, 63.

### 3.    Kin Was Not "Fully Functional As A Medium Of Exchange" Upon Distribution

Kik claims that "[w]hen Kin was first launched and distributed to the public on September 26, 2017, it was already fully functional as a medium of exchange for digital services – and could also be used inside Kik Messenger." Kik Opp. Br. 8. This is incorrect; Kin was far from "fully functional as a medium of exchange," as Kik's own CEO has conceded on the record. At the time of distribution, there was simply no good or service that could be purchased using Kin. SEC 56.1 ¶ 210; SEC Opp.

11

56.1 ¶ 12.  Even *a month after the offering* there was nothing to buy with Kin.  SEC Opp. 56.1 ¶ 10.
Throughout the offering, Kik did not identify to prospective investors any specific good or service
that could be bought with Kin upon distribution of the token.  SEC 56.1 ¶¶ 210-211.

Kik's representation that Kin could be used inside of Kik Messenger at the time that Kin
"launched" is also misleading.  When Kik distributed Kin on September 26, 2017, the token could not
be used to buy anything in Kik Messenger.  SEC 56.1 ¶ 210.  As its sole example of how Kin operated
as a so-called "medium of exchange" within Kik Messenger, Kik points to its "Minimum Viable
Product" or "MVP."  Kik Opp. Br. 8.  But, aside from the fact that Kik never marketed the MVP to
public investors, *id.* at ¶ 208, the MVP did not involve "buying or selling" anything with Kin.  In
reality, the Kik Messenger app simply "unlocked" certain digital stickers if a user linked the app to a
digital wallet holding Kin.  *Id.* at ¶ 202, 204-207.  The honey-badger stickers were also unavailable to
public investors who did not also have a Kik Messenger account.  *Id.* at ¶¶ 202-203.

Kik also contends that Kin must be considered a "medium of exchange" as of the time of its
launch simply because the Kin token existed on the Ethereum blockchain, meaning that it could be
transferred between individuals with Ethereum wallets.  Kik Opp. Br. 8; Kik Ex. A (ECF No. 64-1)
¶ 81.  Naked transferability of an asset, however, cannot be equated with consumptive use.  Kik
essentially argues that, because it created and distributed a token to purchasers that could then be re-
transferred, *ipso facto*, Kin could not have been a security.  But the fact that traditional securities such
as stocks and bonds can be transferred does not demonstrate that they are used for consumption."
And, by Kik's logic, every token ever made and distributed as part of any ICO would be a "medium
of exchange" and not a security under the federal securities laws, a conclusion which courts have
routinely rejected.[8]

---

[8] *See, e.g., Balestra v. ATBCOIN L.L.C.*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (denying motion to dismiss
complaint alleging illegal unregistered offering of digital tokens); *Beranger v. Harris*, No. 18 Civ. 05054 (CAP),
2019 WL 5485128, at *4 (N.D. Ga. Apr. 24, 2019) (denying motion to dismiss claim that digital tokens were

Notwithstanding all of its previous admissions to the SEC in this matter that that the Kin Ecosystem was essentially non-existent for months after the September 2017 launch of Kin, Kik again tries to spin a new narrative. Kik unblushingly contends that, "because the code for Kin was open-source, any developer could (and many did) independently integrate Kin within their app using publicly-available tools that were designed to operate with any Ethereum token." Kik Opp. Br. 8. With respect to the time of Kin's launch, however, this statement is false and directly contradicts what Kik stated in writing to the SEC. As Kik previously stated, as of November 2017, two months after Kin's launch, "Kik's software developers" were then "creating software development tools ("SDKs") that will facilitate the creation of experience and use cases of spending and earning on the Kin platform by third party developers." SEC110, Cooley letter dated November 17, 2017 at No. 11.1 (page 7). At the same time, Kik further told the SEC that "Kik engineers will be the first to use the SDKs to integrate Kin into Kik. *However, at the time Kin were issued and, at the present time, there are no other platforms or third-party creators or developers using Kin.*" *Id.* (emphasis added).[9] Kik's statement in its brief that "many" third party developers independently integrated Kin is simply untrue regarding the months after the launch.

---

securities); *Solis v. Latium Network, Inc.*, No. 18 Civ. 10255 (SDW-SCM), 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (denying motion to dismiss complaint alleging illegal unregistered offer of digital tokens).

[9] Kik further disclosed to the SEC that, after the September 26, 2017 distribution of Kin, a "bot developer" had approached Kik with a new "bot" that would permit Kin holders to transmit the token within the Kik app, but Kik "*rejected*" the for use inside its app "as this bot did not apparently comply with licensing regimes for money transmission." SEC110, Cooley letter dated Nov. 17, 2017, at No. 11.1 n.5 (page 7) (emphasis added). It should further be noted that the two declarations upon which Kik purports to rely for its assertion that "many" developers independently integrated Kin within their app (Kik Opp. Br. 8), do not actually identify any developers who did so, with the exception of the "Kinchat" bot. Kik Ex. A (ECF No. 64-1) at ¶ 84. In sum, the record at most shows that only one developer independently devised a way to integrate Kin within applications before Kik released its SDKs at some point in 2018, and it appears that even this one developer's effort was rejected for use within Kik Messenger. *See also* SEC22 (ECF No. 60-22) at 233:7-11 (testimony from Foundation director and former Kik consultant that the first developer entered a contract with the Foundation "in the '18 time frame").

Further undermining Kik's position was the primitive state of blockchain technology at the time of Kin's launch.  Kin did not operate on a blockchain that could handle the volume and speed of the consumer transactions described by Kik in the white paper and elsewhere, a technological reality that Kik acknowledged during the offering.  SEC Opp. 56.1 ¶ 12; SEC 56.1 ¶ 156.  During the Roadshow, Kik's CEO confirmed that Kik was "looking for" a new "blockchain 3.0," which Kik itself might create by partnering with another blockchain or building its own bespoke blockchain.  SEC 56.1 ¶ 160.

Finally, Kik repeats its claim that, today, there is a "thriving digital economy" surrounding Kin.  Kik Opp. Br. 9.  As the SEC has explained, even assuming that this representation is accurate, Kin's status today has no bearing on whether offers and sales of Kin were investment contracts at the time of the ICO.  *See* SEC Opp. Br. 11-12.  Kik's contentions about Kin's supposed "widespread use" as of today are simply irrelevant.

### 4.     The Kin Foundation Is Functionally Indistinct From Kik

Kik asks the court to view Kik and the Kin Foundation as separate and independent of one another because the Kin Foundation is "legally distinct" from Kik.  Kik Opp. Br. 10.  Kik's position cannot be squared with the undisputed facts and should be rejected.  For one thing, Kik did not market the Foundation as separate from Kik.  During the Roadshow, for example, Kik's CEO told audiences that, for an unspecified period, Kik would "have a lot of influence over that Kin Foundation" and that the Foundation would not be "totally independent" from Kik.  SEC 56.1 ¶ 181.  Nor has the Foundation ever operated independently of Kik.  The Foundation has always needed the Kik CEO's approval to conduct any business, because Kik's CEO has always been *one of two* board members of

14

the Foundation.  *Id.* at ¶ 282.[10]  At present, all Foundation activities are conducted by Kik employees at Kik's cost.  *Id.* at ¶ 284.  The Foundation continues to have no employees and no assets of its own, other than the Kin it received on September 26, 2017.  *Id.*  Thus, as a functional matter, any supposed "distinction" between Kik and the Kin Foundation is in name only.

### III.   ARGUMENT

Kik's 2017 offer and sale of Kin was a single public distribution of securities.  Because Kik conducted this public distribution in interstate commerce without filing a registration statement with the SEC, and without having available any exemption from registration, Kik violated Section 5 of the Securities Act.  Kik attempts to evade liability by characterizing its single distribution as "two separate offerings" (Kik Opp. Br. 14), and by asserting different arguments as to why it was allegedly not required to file a registration statement for each such allegedly different offering, but its arguments fail.

As to the portion of Kik's single distribution involving sales of Kin to approximately 10,000 investors during the September 2017 "public sale," Kik argues that it did not offer and sell investment contracts under the test set forth in *Howey*.  Kik is mistaken.  The investors who bought Kin through the public sale (the "public investors") invested in a common enterprise, and they reasonably expected profits derived from entrepreneurial or managerial efforts of others.  Even if viewed in isolation from the rest of Kik's offering, the portion of the offering to public investors satisfies all of the *Howey* elements.

As to the portion of Kik's single distribution involving sales of Kin to approximately 50 SAFT participants from July through September 2017 – a process that Kik calls the "private sale" – Kik

---

[10] The Foundation's other board member was, until May 2018, Kik's CFO.  SEC 56.1 ¶ 281.  At present, the other board member is a long-time Kik consultant, and Kik's general counsel serves as the Foundation's secretary.  *Id.* at ¶¶ 281, 285.

admits that it sold securities to these investors but argues that the SEC "has not presented facts demonstrating" that the sales "required registration." Kik Opp. Br. 14.  Kik, however, has it exactly backwards.  Under well-established precedent, *Kik* bears the burden of proving an entitlement to an exemption from registration under the Act.  *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); SEC Mem. 37.  Thus, in response to the SEC's motion for summary judgment, *Kik* must offer "'persuasive evidence that [its] claim [of an exemption] is not 'implausible.'"  *SEC v. Ishopnomarkup.com, Inc.*, No. 04 Civ. 4057 (DRH-ARL), 2007 WL 2782748, at *7 (E.D.N.Y. Sept. 24, 2007) (quoting *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  Kik, however, provides no such evidence.

## A.   Kik Made An Unregistered Offer And Sale Of Securities Directly To Public Investors

Kik agrees that the analysis of whether it offered and sold investment contracts involves an "'objective inquiry'" into what Kik told investors about the offering and what these investors were "'***led to expect***.'"  Kik Opp. Br. 16 (emphasis in original) (quoting *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009)); *see also Telegram*, 2020 WL 1430035 at *14 (assessing whether *Howey* test was satisfied by "evaluat[ing] . . . the motivations of the hypothetical reasonable purchaser").  Despite paying lip service to this basic principle, though, Kik spends most of its brief trying to divert attention from what Kik actually said during the offering.

The SEC has presented a mountain of evidence of Kik's public statements during its four-month marketing campaign of Kin.  *See supra* Section I.  Altogether, in its Local Civil Rule 56.1 Statement (ECF No. 59), the SEC has proffered over 60 material facts comprised of Kik's own public statements that it made during its campaign, as to which there is no genuine dispute.[11]  The Court can

---

[11] Although, in its responding statement (ECF No. 78), Kik improperly makes legal objections to many of these facts, or argues that Kik also made other statements besides those quoted, or contests the SEC's characterizations of these statements, Kik does not contest the ***accuracy*** of any of its statements quoted by the SEC, or that the statements were made by Kik or its employees.  Accordingly, Kik does not create any genuine dispute of material fact about ***what Kik and its executives actually said*** to potential investors.  *See* SEC 56.1, and corresponding Kik Opp. 56.1, at ¶¶ 110, 111, 112, 114, 115, 117, 118, 120, 123, 125, 126, 127,

and should grant summary judgment to the SEC on this evidence alone.  Kik's claims about the content of boilerplate disclaimers that public investors allegedly agreed to, the status of Kin as a "medium of exchange," the ability of some public investors to "unlock" digital stickers that depicted honey badgers, and the "beliefs" of two investors who, in 2018, developed new computer applications with the assistance of Kik subsidies, need not be resolved to grant the SEC's motion.  None of Kik's claimed facts, even if true, can alter the undisputed record of Kik's own public statements, which conclusively show that Kik marketed Kin as an investment.  And, as explained below, correction of Kik's facts further strengthens the SEC's already-conclusive record.

Kik's many public statements, standing alone, easily demonstrate that all of *Howey*'s elements for an investment contract are met in this case.  These statements by Kik repeatedly and exhaustively describe how Kik would use investor funds for the investors' benefit, including by taking multiple, specific steps to create and build Kin's value and, therefore, generate profits for the investors.  Kik's public statements also touted Kik's resources, experience, technical capability, commitment to the Kin project, and gigantic financial incentive to achieve an increase in Kin's value.  ***Kik does not dispute that it made the public statements cited by the SEC in support of its motion for summary judgment***.  Additional facts as to which there is no genuine dispute – that Kik could not make a profit and was burning through cash when it decided to conduct the offering in the first place; that Kik targeted individual "whale" investors who would spend a lot of money on Kin; the obviously inflating bubble of digital asset prices that Kik dog-whistled to investors throughout the offering; and Kik's pooling of ***all*** funds received from public investors into a ***single*** United States bank account – further buttress the SEC's claim that Kik offered and sold securities to the public investors.

---

130, 132, 134, 135, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 155, 157, 158, 159, 160, 161, 166, 167, 168, 169, 170, 171, 173, 174, 175, 176, 178, 180, 181, 182, 199, 244, 245, 246, 248, 256, 257, and 273.

17

Faced with this insurmountable record, Kik resorts to mischaracterizing the record by calling it a "patchwork of isolated statements from interviews and internal documents." Kik Opp. Br. 19, 21. And, Kik replays its legally erroneous argument that the company was free to ignore its scores of public statements about how it would "establish" and "build" Kin's "value" – and allegedly absolve itself of responsibility under the Act – by having investors "click a box" during their online registration for the public sale.[12]  The Court should reject Kik's obfuscation and grant summary judgment to the SEC on its claim that Kik violated Section 5 as to the public investors.

### 1.      Public Investors In The Offering Invested In A Common Enterprise

The public investors in Kin entered a common enterprise as required for an investment contract under *Howey*.  The public investors entered a common enterprise irrespective of whether they were joined in that enterprise by the SAFT participants (which they were, because Kik conducted a single, integrated offering, *see infra* Sections III.B.1, III.B.2).

As the SEC explained in its opening brief, both the "horizontal commonality" and "strict vertical commonality" tests for common enterprise are met in this case.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994) (describing both tests); SEC Mem. 21-25.  Horizontal commonality is met because the Ether that Kik received from public investors in payment for Kin was pooled in a digital wallet and then converted to cash, deposited into a single bank account in California, and spent on projects designed to boost Kin's value, to the benefit of all investors.  *See* SEC Mem. 23-24; SEC 56.1 ¶¶ 294-300.[13]  Kik repeatedly told investors that it would use their funds to advance the Ecosystem and boost demand for Kin.  Both in the white paper and during the Roadshow, Kik stated

---

[12] Kik also fills pages of its opposition brief responding to arguments that the SEC did not make – *e.g.*, concerning the "broad vertical approach to common enterprise" that some courts outside the Second Circuit have adopted.  Kik Opp. Br. 18.

[13] By way of example, Kik used public sale proceeds to compensate app developers (including Messrs. Dowd, Weatherman, and Hendriks) for integrating Kin into their apps.  SEC Opp. 56.1 ¶ 87.

that it would use investor funds for future, specific, Kin-related projects. SEC 56.1 ¶¶ 135, 142, 143; SEC Mem. 23; SEC Opp. Br. 8-9, 25-26, 50-51. Kik also stated that it would use investor funds "to fund Kik's operations," SEC 56.1 ¶ 142, which likewise would benefit Kin investors. That was because, among other reasons, Kik "pledge[d] all its resources to make Kin the primary transaction currency in its chat app and promote services from the Ecosystem to its millions of users." *Id.* at 56.1 ¶ 135. As Kik's CEO explained to his Shenzhen audience, this would "on day one . . . make Kin the most used cryptocurrency – one of, if not the most used cryptocurrencies in the world. And that's going to make Kin very valuable." *Id.* at 56.1 ¶ 152. If the price of Kin rose as a result of Kik's promised efforts, all investors holding Kin would profit in proportion to their holdings. Thus, the "fortunes" of each public investor was "tied" to the "fortunes of the other investors by the pooling of assets." *Revak*, 18 F.3d at 87.

Strict vertical commonality, requiring "that the fortunes of investors be tied to the fortunes of the promoter" (*id.* at 88), is also is met here. The fortunes of Kin investors would rise and fall with the fortunes of Kik largely as a result of Kik's retention of three trillion Kin (30 percent of all Kin created). Kik routinely touted this inducement to participate in the offering, emphasizing to investors that "***our goal now is to just grow the value of Kin***." SEC56.1 ¶ 110 (emphasis added); *see also* Mem. 24-25; 56.1 ¶ 112; *Telegram*, 2020 WL 1430035, at *11 (finding strict vertical commonality where, "[a]fter launch, Telegram's most valuable asset would be the TON Reserve, consisting of 28% of all Grams").

Without any real basis to challenge this straightforward application of precedent, Kik tries to invent additional legal requirements for *Howey*'s common enterprise prong that totally ignore the horizontal and strict vertical commonality tests – and, conveniently for Kik, its own marketing statements for Kin. As the SEC has explained previously (SEC Opp. Br. 18-31), Kik's arguments are contrary to law and must be rejected.

19

### a.   Public Investors Did Not Require "Ongoing Contractual Obligations" To Invest In A Common Enterprise

Kik argues "there can be no common enterprise" because, allegedly, "the parties' relationship is governed by a written contract that is devoid of any contractual duty to perform ongoing managerial services." Kik Opp. Br. 20. Kik is wrong. The online agreement that public investors "clicked" when they registered for the public sale – the "Terms of Use" – did not erase Kik's prior four months of repeated public promises to take specific steps to increase Kin's value after it distributed the token. As the SEC previously explained, the Supreme Court and numerous lower courts have squarely rejected Kik's argument. *See* SEC Opp. Br. 14-18, 20-24. In *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943), the Supreme Court held that, in assessing whether an investment contract exists, courts "must go outside the [offering] instrument itself." *Id.* at 352-53, 355. Other courts have since steadfastly adhered to this principle. *See, e.g.*, *United States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993); *Hocking v. Dubois*, 885 F.2d 1449, 1457–58 (9th Cir. 1989) (*en banc*); *Albanese v. Fla. Nat'l Bank of Orlando*, 823 F.2d 408, 412 (11th Cir. 1987); *Continental Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967). This Court should do the same.

Kik seeks to equate its four months of promises to "[g]eneral assurances in marketing materials." Kik Opp. Br. 22. The dismissive characterization plainly defies the record, which the SEC has already described in detail in its prior memoranda. *See* SEC Mem. 13-14, 31-35; SEC Opp. Br. 4-6, 37-44.

Kik does not help itself by renewing citations to cases involving contracts for the sale of land or condominiums, involving factual scenarios far afield from this case. First, the case upon which Kik principally seeks to rely, *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978), is from a circuit that does even not apply the horizontal commonality test, as the Second Circuit does. *See McGill v. American Land & Exploration Co.*, 776 F.2d 923, 925 (10th Cir. 1985). Second, while, in some of the cases that

Kik cites, the courts made fact-findings that investment contracts were not created, those cases nevertheless reaffirmed that promoters' commitments to "develop[] or operate[]" the "property" at issue could create such contracts. *Woodward*, 574 F.2d at 1026. Here, unlike the facts found in *Woodward*, Kik made clear that it would "develop[]" the assets conveyed to investors – Kin – by developing the Kin Ecosystem. *See also, e.g.*, *Rodriguez*, 990 F.2d at 11 (recognizing that the "promoter properly is held to his representations as to what he is selling even where those promises go well beyond the legal terms of the contracts and the fine print of the disclaimers" because "commitments and promises . . . , and the network of relationships related to the project, can cross over the line and make the interest acquired one in an ongoing business enterprise."); SEC Mem. 22-23 & n.9 (distinguishing real estate cases cited by Kik). There is, simply, no helpful comparison to be made between, on the one hand, the sale of unique properties with inherent value and utility to discrete groups of buyers, and, on the other, an Internet company's capital raise of tens of millions of dollars achieved through the sale of fungible assets with no inherent value to an essentially unlimited number of buyers. This is particularly the case where, as here, the promoter promised future efforts, following conveyance of the asset, "to establish . . . fundamental value" and to "build fundamental value" the otherwise valueless asset. SEC 56.1 ¶ 54.

Kik again highlights the boilerplate "disclaimer" language inserted into the provisions that appear on pages 10 and 18 of its online Terms of Use. These provisions, however, cannot trump the economic reality, created through Kik's extensive marketing, that Kik was selling its own future efforts alongside the tokens themselves. *See Telegram*, 2020 WL 1430035, at *6; *Baroi v. Platinum Condo Dev., L.L.C.*, 914 F. Supp. 2d 1179, 1197-98 (D. Nev. 2012); *Timmreck v. Munn*, 433 F. Supp. 396, 401 (N.D. Ill. 1977); *SEC v. Battoo*, 158 F. Supp. 3d 676 (N.D. Ill. 2016); SEC Opp. Br. 14-18, 20-24.

In any event, the supposed "disclaimers" themselves do not even address Kik's prior statements during its marketing campaign about its future, post-distribution actions to develop the

Ecosystem.  The Terms state, on the first page, "This Agreement governs *your access and use of the Site and your purchase of the Kin Tokens*."  Kik Ex. H (ECF No. 64-8) at KIK000079 (emphasis added).  The cryptic and murky disclaimer language that Kik now seeks to rely upon, buried many pages later in the document, is similarly devoid of any apparent retraction by Kik of its previously stated commitments as part of its extensive marketing campaign or its many statements vowing to build Kik's future "value."  If anything, the disclaimers suggest that public investors could rely on Kik's prior "writing[s]."  *Id.* at KIK000088; SEC Opp. Br. 23-24 (providing full quotations of asserted disclaimer language).  Kik's disclaimers are thus wholly unlike the disclaimers in the real estate contract cases cited by Kik.  *Compare Demarco v. LaPay* , No. 2:09 Civ. 190 (TS), 2009 WL 3855704, at *8 (D. Utah Nov. 17, 2009) (no warranties or representations about "the investment value" or "the possibility or probability of profit or loss resulting from ownership" of the property); *Alunni v. Dev. Res. Group, L.L.C.*, No. 6:08 Civ. 1349 (DAB), 2009 WL 2579319, at *4 (M.D. Fl. Aug. 18, 2009) (noting very first sentence of purchase contract stated "ORAL REPRESENTATIONS CANNOT BE RELIED UPON").  To the extent this court even considers Kik's vague and cryptic disclaimers, they should be given no weight.

> **b.    Public Investors' Ability To Resell Their Kin Does Not Preclude The Existence Of A Common Enterprise**

Kik further argues that there is no common enterprise, because investors allegedly "obtained complete control over their Kin tokens upon receipt."  Kik Opp. Br. 23.  This argument by Kik – which, like its first, seeks to avoid scrutiny of what Kik actually told investors and is untethered to the horizontal and strict vertical commonality tests followed in this circuit – should similarly be rejected.

As the case law makes clear, a common enterprise is characterized by the investor's passivity or dependence on others for the success of the investment, not by the investor's ability to affect the timing or profitability of the investment.  *See Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 137 (5th Cir. 1989); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974); *SEC v. Glenn W. Turner Enter.*,

474 F.2d 476, 482 n.7 (9th Cir. 1973).  In the Second Circuit, the question is "whether, under all the circumstances, the scheme was being promoted primarily . . . as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way."  *Leonard*, 529 F.3d at 88; *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982); *SEC v. Galaxy Foods, Inc.*, 417 F. Supp. 1225, 1239 (E.D.N.Y. 1976).  Kik's novel argument cannot be reconciled with these precedents.

Kik's argument also runs headlong into the established rule that "profits" under *Howey* include "the increased value of the investment."  *Edwards*, 540 U.S. at 394.  Kik's argument, if accepted, would implausibly limit an investment contract based on capital appreciation to scenarios in which investors bought and sold their investments at exactly the same times.  The case law refutes such a limitation. *See, e.g.*, *Edwards*, 540 U.S. at 391-92 (purchaser of lease-based investment had option to sell back lease to the promoter); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985) (investors had option of selling investments, "thereby realizing profits from capital appreciation"); *Telegram*, 2020 WL 1430035, at *10 n.9 ("The ability to sell their Grams, and thereby exit the common enterprise, does not mean that the Initial Purchasers are not part of a common enterprise while they continued to possess Grams.").  Furthermore, courts have found a myriad of other schemes to be investment contracts even though investors could exit their investments at different times.  *See SEC v. SG Ltd.*, 265 F.3d 42, 51 (1st Cir. 2001) (common enterprise existed where investors were told they would be repaid in full upon demand); *SEC v. Infinity Group Co.*, 212 F.3d 180, 185 (3d Cir. 2000) (common enterprise existed where investors entered separate contracts with different repayment dates).  Likewise, traditional stocks and bonds are "securities" even though investors can decide when to resell them into liquid secondary markets.

Finally, Kik's purported reliance on *Lavery v. Kearns*, 792 F. Supp. 847 (D. Me. 1992) is misplaced.  In that case, the court concluded that buyers of condominium units with an optional

23

lease/buyback program were not in horizontal commonality, because, the court found, by entering into separate agreements with the promoter, the buyers "had not subscribed to any plan making themselves dependent on the success of their fellow owners' investment, or on the success of [the promoter.]"   *Id.* at 859.   Furthermore, the buyers were "not a part of" any plan by the promoter to "use the capital from the . . . sales for other projects," and there was no pooling of investor funds that was "part of an initial *development* plan that included Plaintiffs and the other purchasers."   *Id.* at 858-59.   The opposite is true here, where all of the public investors' funds were pooled for Kik's use to develop the Ecosystem and build Kin's value, to the benefit of all investors and Kik.

The SEC respectfully refers the Court to its prior memorandam, which further demonstrates the legal and practical implausibility of Kik's argument.   *See* SEC Opp. Br. 26-29.

**c.**      **There Was Horizontal Commonality Among Public Investors Because Kik Pooled Their Funds To Develop The Ecosystem**

Kik created horizontal commonality among the public investors by pooling their funds and using those funds to take its promised steps to develop the Ecosystem and "make Kin very valuable." 56.1 ¶ 152.   Trying to dodge an application of the horizontal commonality test grounded in law or fact, Kik mischaracterizes the case law, the record in this case, and the SEC's position.

*First*, although Kik contends that "pro rata distribution of profits" is "essential under horizontal commonality" (Kik Opp. Br. 25), this is not so.   "[A] pro rata distribution is not required for horizontal commonality."   *Telegram*, 2020 WL 1430035, at *10 n.8; *see also* SEC Opp. Br. 25 (collecting cases).   Kik's erroneous argument is inconsistent with the accepted principle that "profits" from an investment contract include "the increased value of the investment" – *i.e.*, capital appreciation. *Edwards*, 540 U.S. at 394; *see also United Housing Foun., Inc. v. Forman*, 421 U.S. 837, 852 (1975); *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980).   Capital appreciation obviously can –

and frequently does – occur without any "distribution" from the promoter.  Shares of Berkshire Hathaway are securities even though the company famously pays no dividends.

Despite Kik's claim that the court in *Infinity Group* described a "pro rata distribution" as "essential" and "require[d]" for horizontal commonality (Kik Opp. 25-26), the court did no such thing. There, investors entered into individual contracts providing for fixed returns and repayment of principal on demand.  212 F.3d at 185, 188.  Based on these facts, the defendant denied the existence of horizontal commonality, emphasizing that the investors had no "direct interest" in the promoter and their funds "were not earmarked for any particular purpose." *Id.* at 188.  The court squarely rejected this argument, however, finding it sufficient for horizontal commonality that "the investor's return was directly proportional to the amount of that investment." *Id.* at 188.  Similarly here, Kik's public investors stood to profit in "direct proportion" to the number of Kin they purchased, and there was no requirement of a promoter distribution that was "pro rata." *See also SG Ltd.*, 265 F.3d at 50-51 (following *Infinity* approach).

**Second,** the record in this case easily demonstrates that public investors in Kin formed a "pool of investors" whose fortunes were tied "to the success of the overall venture," *Revak*, 18 F.3d at 359. Further, there was "'a sharing or pooling of funds . . .  for a common purpose.'"  Kik Opp. Br. 26 (quoting *In re Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011)).[14]

---

[14] The "common purpose" language quoted by Kik from *Jeanneret* is dicta, as the court found that the complaint in that case sufficiently alleged strict vertical commonality, and the parties did not even allege horizontal commonality.  *See Jeanneret*, 769 F. Supp. 2d at 359.  Regardless, the facts here easily show such a "common purpose" among public investors in Kin.  Separately, Kik faults the SEC for stating that funds received from public investors and SAFT participants were deposited into "a single bank account," without providing any citation to the SEC's papers.  Kik Opp. 26 n.16.  But the SEC's Memorandum (ECF No. 58) correctly states on page 23 that Kik deposited the funds that it received from SAFT participants into a Canadian bank account, and the funds that it received from public investors into a California bank account.  In any event, given that the sale proceeds deposited into both accounts were controlled through Kik's budgeting process; used for the same general purposes, including purposes related to the "Ecosystem;" and used generally during the same, post-launch, time period, funds from the two investor groups were also "pooled" together for common enterprise purposes, and these facts further support the conclusion that Kik conducted a single distribution of securities.  *See infra* Sections III.B.1, III.B.2.

The fortunes of public investors were plainly tied to the "success of the overall venture," which – as Kik repeatedly explained in its marketing – was the future development of a vibrant Kin Ecosystem that would result in the elevated demand for, and value of, Kin. Similarly, the achievement of such an Ecosystem was the public investors' "common purpose." Such an Ecosystem, however, plainly did not exist at the time Kin was distributed to the investors, nor would investors reasonably have expected it to exist. Upon distribution, there was nothing to buy with Kin either inside or outside of Kik Messenger, nor was there a functioning Reward Engine or a blockchain that could sustain consumer applications that incorporated Kin. SEC 56.1 ¶¶ 210-212. Through their respective Kin purchases, the public investors pooled their funds to enable Kik to act on its marketing promises and to build the Ecosystem that would yield profits to investors.

Kik regards as significant that it told investors the company would use their funds "as working capital to fund Kik's business operations." Kik Opp. Br. 27. But, Kik's selective emphasis ignores its statements that investor funds *also* would be used "to deploy the Kin Foundation" and for many other Ecosystem-specific purposes. SEC 56.1 ¶¶ 142, 143; SEC Mem. 23. Furthermore, even as a stand-alone statement, Kik's declaration that it would use investor funds for its own operations supports a finding of horizontal commonality. That is because Kik's operations – far from being "tangential" to the Ecosystem's success (Kik Opp. Br. 27) – were at the very heart of the "overall venture" and "common purpose" in which public investors were investing. As Kik explained in the opening pages of its white paper:

> But simply creating a digital currency is not enough. *For a cryptocurrency to be viable, it must also be useful and valuable. To establish an economy around the new currency, Kik must help to establish Kin's fundamental value.*

56.1 ¶ 54 (emphasis added). Kik would accomplish this objective by "leverag[ing] its large existing user base to drive mass adoption" of Kin, and "integrating Kin into its chat app" so that "Kin will be Kik's primary transaction currency." *Id.* at ¶ 148. Kik reiterated this point throughout its marketing

campaign. *See, e.g.*, *id.* at ¶¶ 149, 152, 153. Because the integration of Kin into Kik Messenger was such an essential step in establishing Kin's value, and because Kik openly "pledge[d] all its resources" to make this happen, SEC 56.1 ¶ 135, Kik's bizarre contention that that "Kin holders had absolutely no stake" in Kik's business operations must be rejected. *See Telegram*, 2020 WL 1430035, at *13 (anticipated integration of Grams into 300-million monthly user base "fueled the Initial Purchasers' expectations of a spike in Gram demand upon launch").

**Third,** Kik makes an additional, muddled, argument that there was no horizontal commonality unless it "use[d] the pooled funds for a specific purpose for the benefit of each investor" and Kin "represent[ed] . . . a concrete interest in the ongoing use of pooled funds." Kik Opp. Br. 28-29. But, Kik does not explain how these contentions affect the result in this case. Furthermore, the case law rejects any requirement that investor funds be pegged to a particular, discrete, task of the promoter – for example, here, Kik's work to develop a scalable blockchain. Investor funds do not have to be "earmarked for [a] particular purpose." *Infinity*, 212 F.3d at 188. It is sufficient that investors bought Kin in exchange for, and "proportionate" to, their investment interests. *United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *6 (E.D.N.Y. Sept. 11, 2018) (citing *Infinity* and *SG Ltd.*). A particular investors' amount of Kin merely "serve[s] as a convenient method of determining the investors' allocable shares of the profits." *Howey*, 328 U.S. at 300.

Regardless, Kik clearly said that the investors' pooled funds would be used – and the funds, in fact, were used – for the specific purpose of executing upon the promises that Kik made during its marketing campaign. Such use of the funds would "benefit" the investors by boosting the value of their Kin. And, because the investors reasonably would have understood Kin's value to depend on whether Kik successfully used the investors' funds to implement its plans, Kin represented a "concrete interest" for the investors. *See id.* To the extent Kik suggests that horizontal commonality requires that the public investors receive some "thing" from Kik in the future beyond the Kin and profits in

the form of capital appreciation from Kik's efforts, Kik fails to explain why this is or should be the law, and the court should reject such an argument.  *See Telegram*, 2020 WL 1430035, at *10 (finding a common enterprise where, "[u]pon delivery of the Grams . . . [p]urchasers will possess an identical instrument, the value of which is entirely dependent on the success or failure" of the promoter's future efforts); *accord Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1032-33, 1035 (2d Cir. 1974) (concluding that SEC met burden in showing that sales of "transfer certificates" signifying ownership of barrels of whiskey were investment contracts in light of promoter's representations that it would provide other, future services, and noting the "long line of cases where purported sales of tangible property, service contracts, or both were held to be investment contracts.").

### d.    Kik Alleges No Facts Contesting Strict Vertical Commonality

Finally, Kik can point to no legal authority or facts that undermine the SEC's showing that there was strict vertical commonality between the public investors and Kik.  Kik ***told*** public investors that their fortunes and the company's fortunes were aligned, stating, just days before the start of the September 2017 public sale, "the more we grow the usage of this asset, the ecosystem around it, ***the more valuable the currency, the more valuable our 30 percent***."  SEC 56.1 ¶ 112 (emphasis added).  Thus, *Howey*'s common enterprise prong is met regardless of whether the public investors also had horizontal commonality.

The cases cited by Kik do not show otherwise.  In *Marini v. Adamo*, 812 F. Supp. 2d 243, 257-58 (E.D.N.Y. 2011), the court declined to find a common enterprise between a buyer and seller of rare coins where the two individuals maintained separate, non-identical portfolios with different combinations of coins, and, during a large liquidation, the buyer's "fortunes rose" while the seller's "fortune's fell." *Id.* at 258.  Those facts are plainly distinguishable from this case, in which the fortunes of the public investors and Kik were wholly aligned by an increase in Kin's value.  This case is also

obviously different from *Marini* in that Kik promised to use investor funds to develop an Ecosystem and "establish" and "build" value for an asset that otherwise had no inherent value.  And, contrary to Kik's descriptions of cases involving precious metals (Kik Opp. Br. 30), the question in those cases was not whether the fortunes of the promoter and investors were aligned by the ownership of the same types of assets, but whether the promoter's efforts were "undeniably significant," *Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980), or whether the "success or failure" of the promoter and investor were "correlate[d]" at all, *Svets v. Osborne Precious Metals Co., Inc.*, No. 92 Civ. 0357 (BAC), 1992 WL 281413, at *1 (N.D. Cal. Jun. 8, 1992).  The courts' respective determinations of those factual issues have no relevance here.

### 2.   Kik's Argument That Kin Buyers Were Not Led To Expect Profits Requires The Court To Ignore How Kik Actually Marketed Kin

As set forth in the SEC's opening brief, the Court must determine whether Kin purchasers had "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others," *Edwards*, 540 U.S. at 395, based upon an objective review of the "terms of the offer, the plan of distribution, and the economic inducements held out to the prospect," *Joiner*, 320 U.S. at 352-53, which includes the "promotional material" for the offering, *Aqua-Sonic*, 687 F.2d at 583.  *See also Telegram*, 2020 WL 1430035, *18 ("*Howey* requires an examination of the entirety of the parties' understandings and expectations.").[15]  In demonstrating that Kik's "promotional material" for the Kin offering objectively gave rise to a reasonable expectation of profits derived from the entrepreneurial

---

[15] Specifically, the *Telegram* Court explained:

> *Howey* refers to an investment contract, *i.e.* a security, as "a contract, transaction or scheme," using the term "scheme" in a descriptive, not pejorative, sense.  *Howey*, 328 U.S. at 298–99. This case presents a "scheme" to be evaluated under *Howey* that consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the [digital asset]. *Howey* requires an examination of the entirety of the parties' understandings and expectations.

2020 WL 1430035 at *18.

and managerial efforts of others, namely Kik, the SEC laid out page after page of "economic inducements" disseminated by Kik during its four-month-long multimedia blitz, which Kik internally referred to as the "Roadshow" and "Rolling thunder."[16]  SEC 56.1 ¶¶ 49-71, 94-183.

Faced with well-settled law and an unequivocal and voluminous record, Kik dissembles.  Even though a Kik executive testified that Kik engaged in a coordinated Roadshow to "rais[e] awareness for the ecosystem as a whole as well as the token distribution event," and that the Roadshow included numerous "speaking engagements," postings on Reddit and Twitter, "medium and blog posts," and "interviews with media outlets" (SEC14 (ECF No. 60-14) at 394:1-395:6), Kik now says the Court must ignore it, dismissing as a few "stray soundbites" the damning record the SEC has assembled. Kik Opp. Br. 33-35.  Per Kik, the Court should instead consider *only* Kik's statements that Kin would, at some point, have consumptive use.  *Id.* at 32-33, 41-45.  But, Kik's highly selective approach to the record depends upon a newly-minted element of the SEC's claim: "reliance" – *i.e.*, Kik contends that it can only be responsible for the promotional statements it admits disseminating if the SEC can identify a specific buyer who specifically relied on a specific statement.  *Id.* at 36-37.  *Howey* has no such element, and Kik's argument is precluded by the statutory scheme and judicial precedents stating that the SEC need not prove reliance in its cases.  Kik's efforts in this regard are telling, for they contain an implicit admission that neither the record nor existing law support Kik's opposition to the SEC's motion.

### a.      The Legal Standard For Expectation Of Profits

As set forth in the SEC's prior briefs, proof of an investment contract requires only an "expectation of profit" at the time an investor enters the scheme, plus an expectation that these profits will be based on "the entrepreneurial or managerial efforts of others" – or, alternatively, on the pooling

---

[16] SEC32 (ECF No. 60-32) at COINFUND006073.

of the investors' resources with the "promoter's contribution in a meaningful way. *See* SEC Opp. Br. 31-32 (quoting *Forman*, 421 U.S. at 852; *Leonard*, 529 F.3d at 88).

Citing *Forman* and *Aldrich*, Kik argues that Kin's (entirely hypothetical) "use as a medium of exchange" means, *ipso facto*, that it was "sold primarily for consumptive use." Kik Opp. Br. 32. But Kik is wrong. *Forman* dealt with shares in a housing co-op that could not be re-sold or transferred for a profit, 421 U.S. at 842-43, 853-54, which is obviously not the case with Kin. And in *Aldrich*, the Tenth Circuit reversed a district court's finding that an investment contract did not exist and remanded with instructions to consider evidence of defendants' "[p]romotional materials, merchandising approaches, oral assurances and contractual agreements" – *i.e.*, precisely the evidentiary examination that Kik herein seeks to avoid. *See* 627 F.2d at 1040. Accordingly, Kik's authority does not undermine the SEC's motion; it bolsters it. Moreover, as the Ninth Circuit recently held, an expectation of profit need not be the only, or even the primary, expectation found in an offering. *See SEC v. Hui Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019) (finding sufficient expectation of profit even when "investors' primary reason to participate in the EB-5 program was to gain U.S. visas"); *see also Telegram*, 2020 WL 1430035, at *12 (citing with approval *Feng*'s holding). So, even if some purchasers bought with the hope that the token might also one day be usable, the relevant analysis does not end there.

> **b.    Kik's Creation Of A New *Howey* Element – Reliance – Should Be Rejected**

Over the course of seven decades since *Howey*, courts have continuously re-confirmed that an "investment contract" is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See Howey*, 328 U.S. at 301; *Edwards*, 540 U.S. at 393. Against this backdrop of well-settled law, Kik now seeks to interpose a new hurdle for the SEC, claiming that, to establish that the offer and sale of Kin was an investment contract, the SEC must *also* conclusively demonstrate that "TDE purchasers reviewed" and "relied on" the portions of the Roadshow discussed at length in the SEC's motion. Kik

Opp. Br. 36-37.[17]   The SEC, however, is not a private litigant seeking damages, and the *Howey* analysis does not require any analysis of investor reliance or injury.

     ***First,*** "in determining whether the offering is an investment contract courts are to examine the offering from an objective perspective…." *Aqua-Sonic*, 687 F.2d at 584.   The case law Kik cites does not hold otherwise.   *See, e.g.*, *SEC v. Blockvest, L.L.C.*, No. 18 Civ. 2287 (GPB-BLM), 2019 WL 625163, at *5 (S.D. Cal. Feb. 14, 2019) ("the *Howey* test is unquestionably an objective one," requiring inquiry into the terms of "promotional materials, information, economic inducements or oral representations at the seminars"); *Aldrich*, 627 F.2d at 1039 ("Central to [the *Howey* test] is the promotional emphasis of the developer . . . .   Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale . . . .   Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case.").   Kik's "reliance" argument cannot be reconciled with this principle.

     ***Second,*** equally fatal to Kik's argument, including a reliance element in the *Howey* analysis would also manifestly defeat the objectives of the statutory scheme.   It is well-established that the SEC need not prove reliance when it seeks injunctive relief under the securities laws.   *Lorenzo v. SEC*, 139 S. Ct. 1094, 1104 (2019) ("[T]he Commission, unlike private parties, need not show reliance in its enforcement actions."); *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244 (11th Cir. 2012) ("Congress designated the SEC as the primary enforcer of the securities laws, and a private plaintiff's 'reliance' does not bear on the determination of whether the securities laws were violated.") (collecting authorities).   This is so because "restrictions on who may invoke the power of the federal judiciary to enforce the securities laws by collecting damages do not bear on the determination of whether a

---

[17] *See also generally* Kik Opp. 56.1 (ECF NO. 78).

violation of the securities laws has been committed," and the SEC brings civil actions to enforce the law, not to collect damages. *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363-64 (9th Cir. 1993).

Thus, unlike private litigants, the SEC does not have to prove whether individual investors actually relied on or were harmed by a defendant's misrepresentations to enforce the securities laws. *See, e.g., SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236 (2d Cir. 1972) (denying private party intervention in SEC enforcement action noting that their claim for damages would require proof of "scienter and causation, elements of proof not required in an SEC injunction action.") (*citing Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 547 (2d Cir. 1967)); *Hughes v. SEC*, 174 F.2d 969, 974 (D.C. Cir. 1949) (affirming SEC's revocation order based on violations of Securities Act Sections 17(a)(1-3) and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), stating that "revocation is proper even if one, or none, of the particular clients here involved has been misled or has suffered injury."); *N. Sims Organ & Co. v. SEC*, 293 F.2d 78 (2d Cir. 1961) (affirming revocation for violations of Securities Act Sections 17(a)(1-3) and Exchange Act Section 10(b), finding that reliance is not an element of either provision even where the purchaser cancelled the sale and testified that he did not rely on defendant's statement); *Berko v. SEC*, 316 F.2d 137 (2d Cir. 1963) ("The Commission's duty is to enforce the remedial and preventive terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury."). Indeed, the SEC's chief remedy – injunction — is not designed to compensate for past harm, but to act prophylactically against future violations. *SEC v. Koracorp Industries*, 575 F.2d 692, 697 (9th Cir. 1978) (*citing Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

Congress has likewise noted that SEC injunctive actions do not require proof of damages or causation. *See* Securities Act Amendments of 1975, S. Rep. 94-75, 1975 U.S.C.A.A.N. 179, 1975 WL 12347, at *76 (April 14, 1975) (enactment of Section 21(g) to preclude consolidation of private securities fraud cases with SEC equitable enforcement actions necessary to prevent unduly prolonging

or adding complexity when causation and damages are not required in an SEC injunctive action) (*citing Everest Mgmt. Corp.*, 475 F.2d at 1240).  Congress vested the SEC to seek injunctions whenever a person is engaged or about to engage in a securities law violation.  Past violations are evidence that the defendant is likely to violate the securities laws in the future and should be restrained. Yet restraints are equally appropriate against one who has taken all the necessary steps to commit a violation, but has fortuitously caused no harm.[18]

**Third,** Kik provides no persuasive legal authority to overcome these longstanding principles, or any practical reason why the SEC should be required to show "reliance" in this case.  Citing a partially reversed opinion, *SEC v. Blockvest, L.L.C.*, No. 18 Civ. 2287 (GPB-BLM), 2018 WL 6181408 (S.D. Cal. Nov. 27, 2018), Kik asserts that the SEC must establish that investors actually reviewed or subjectively relied on the materials the SEC cites in support of its *Howey* claim.  Kik Opp. Br. 36.  In a subsequent opinion partially granting the SEC's motion for reconsideration, however, the *Blockvest* court clarified that it had ***not*** applied "a subjective test so as to require the SEC . . . to show what specific investors relied on before they purchased the [tokens]."  *Blockvest*, 2019 WL 625163, at *5. The court's focus was not whether investors in fact relied on the offering materials, but rather on "disputed factual issues as to the nature of the investment being offered."  *Id.*  For example, the court identified as disputed facts whether Blockvest had received funds from friends and family as loans or investments, and whether those people were investors or simply testing Blockvest's platform.  *Id.* at 12-14.  There is no such factual dispute here about whether there were in fact offers and sales; Kik made an offer, and Kik sold Kin to investors based on promotional statements that would lead investors to expect profits.

---

[18] It is critically important that elements required for private litigant damage claims are not imported into the baseline assessment of whether the offering involves securities.  Section 5 prohibits the unregistered offer of a security even before any investor is shown to have relied on the offering statements, and Congress has appointed the SEC to pursue injunctive relief to prevent harm to public investors.

Kik also cites *Salameh v. Tarsadia Hotel*, 726 F.3d 1124 (9th Cir. 2013) for its contention that the SEC must definitively prove that Kin purchasers reviewed and relied on specific statements cited in the SEC's motion.  In *Salameh*, the court found that the transaction at issue was not an investment contract because the materials that might have established certain prongs under *Howey* were not made available to the investors until several months *after* they had invested.  The plaintiffs in *Salameh* alleged that the sale of certain hotel condominiums coupled with a rental management agreement constituted an investment contract.  726 F.3d at 1128.  In affirming the dismissal of the plaintiffs' complaint, the *Salameh* court noted that, although the rental management agreement could make the condominium sales an investment contract under *Howey*, the plaintiffs did not allege that they received any materials relating to the rental management agreements before they purchased the condominiums.  *Id.* at 1130-1132.  In fact, the plaintiffs executed the rental management agreements between eight and 15 months *after* they signed the hotel condominium purchase agreements.  *Id.*  Due to the significant time gap between the two underlying transactions, the court held that the agreements together did not constitute an investment contract.  *Id.* at 1132.  The factual issue there revolved over what was offered at the time of sale.  Again, here, there is no such dispute.

Obviously, the underlying facts in *Blockvest* and *Salameh* stand in stark contrast to the Kin offering.  This is not a situation where the SEC has cited isolated, one-off statements to individual investors, the content of which Kik disputes.  Rather, the SEC bases its evidentiary showing on Kik's white paper supplemented by a tsunami of coordinated Tweets, blog posts, a podcast, a pre-prepared marketing video, and recordings of scheduled presentations by Kik's CEO to auditoriums full of potential Kin investors that were then published on the Internet to further promote the offering.  SEC 56.1 ¶¶ 49-71.  Kik does not dispute the content of the statements, it does not dispute that it made the statements available to the public, and it does not dispute that it made the statements during and in connection with the offering.  Kik Opp. 56.1 ¶¶ 49-71.  Kik invited investors to rely on its

statements, and it hoped they would do so.  And, Kik's efforts to market Kin were wildly successful, yielding $100 million in proceeds from 10,000 unrelated individuals all over the world, many of whom could *only* have learned of the offering from Kik's numerous presentations and the tightly-messaged, multi-media marketing materials pumped out by Kik between May and September 2017.  On these facts, Kik's reliance argument simply makes no sense.

### 3.  The Record Supports The SEC's Motion

Before going further, it bears noting that Kik concedes that SAFT purchasers possessed a reasonable expectation to profit from the re-sale of the Kin they received on September 26, 2017.  Kik Opp. Br. 46 ("Kik concedes that Pre-sale participants expected such a profit").  Given the evidence, no other conclusion is possible for these investors.

As to the Kin made available to the general public, the record demonstrates that Kik aggressively pitched Kin as an opportunity to profit from the entrepreneurial or managerial efforts of others.  Before the offering, Kik's CEO summarized the company's messaging to the executive who would design the promotional campaign: "Buy today, sell tomorrow, profit."  SEC 56.1 ¶ 27.  And this is precisely what Kik marketed when selling Kin.

### a.  At The Time Of The Offering, Kin Had No Consumptive Use

Like the phony "wizard" in *The Wizard of Oz*, Kik says the Court should "pay no attention to that man behind the curtain," asking the Court to look only at the statements Kik made about the hoped-for opportunities to spend Kin that might exist after Kik got the Ecosystem off the ground.  Kik Opp. Br. 32-35.  But, Kik's incantation of the words "consumptive use" has no talismanic power; "[i]nformation in promotional materials on consumptive uses can still create an expectation of profits if the materials 'fuel[] expectations of profit,'" *Telegram*, 2020 WL 1430035, at *14, n. 12, and even Kik cannot contest that the consumptive use of Kin was entirely hypothetical throughout the four-month offering, and when it was issued.  *See Solis*, 2018 WL 6445543, at *3 (evidence that blockchain

"platform had only limited functionality" when launched supports finding of "expectation of profit").

Kik never identified anything that could *actually* be purchased with Kin, only things that might be some

day.   SEC 56.1 ¶ 210[19]   And, indeed, there was nothing to buy with the Kin that Kik issued in

September 2017; not even Kik sold anything in exchange for Kin:

> Q.   Okay. Rolling back the clock. It's September of 2017. Which developers
> or apps accepted Kin?
>
> A.   Just Kik.
>
> Q.   That's it? You were unaware of any others?
>
> A.   Correct.
>
> Q.   Okay.
>
> Q.   What did Kik accept them for?
>
> A.   Kik allowed you to unlock stickers based on your balance.
>
> Q.   So did Kik -- did Kik provide any goods and services to people in return
> for Kin tokens?
>
> A.   If you're saying in terms of actually spending them where Kik would take
> your tokens in return for something, no.

*Id.*  Even a month after the offering, there was nothing to buy with Kin, SEC Opp. 56.1 ¶¶ 10, 18,

and Kin did not then operate on a blockchain that could handle the volume and speed of the consumer

transactions described by Kik in the white paper and elsewhere, *Id.*; SEC 56.1 ¶ 212.[20]

While Kik attempts to point to its "MVP" as evidence of Kin's consumptive use, Kik did not

tell would-be purchasers about the MVP in advance of their purchase, so it could not have formed a

---

[19] Although Kik's white paper included hypothetical "example" or "prospective use cases" for Kin, Kik did not commit to implementing any of these use cases, and, in fact, none of them were available when Kik distributed Kin.  56.1 ¶¶ 199-200; SEC Opp. 56.1 ¶ 6.  At best, the declarations on which Kik relies suggest only that these purchasers were aware of the hypothetical "use cases."

[20] Kik trumpets the unremarkable fact that Kin, as a digital asset issued on the Ethereum blockchain, was transferable.  The SEC does not dispute this fact.  But, due to known "scalability issues" with that blockchain, Kin could not be transferred in amounts and at the speed that would be required to operate consumer-style applications Kik advertised.  *See supra* Section II.A.3; SEC 56.1 ¶¶ 156, 212.

basis for their investment decisions.  SEC 56.1 ¶ 208.  While Kik tries to rebut this fact by citing a

declaration of a single Kin purchaser (Kik Opp. Br. 44), Kik fails to mention that the purchaser

submitted a new, substitute declaration a week after the one on which Kik relies, because, after further

review, he was not "comfortable with the truthfulness" of the declaration Kik's lawyers wrote for him

to sign.  *See* Ex. BB-1 (ECF No. 79-4).[21]  And, regardless, even the MVP did not involve "buying or

selling" anything with Kin; the Kik Messenger app simply "unlocked" certain digital stickers of honey

badgers if a user linked the app to a digital wallet holding Kin.  SEC 56.1 ¶¶ 202-203.  Accordingly,

the Court need not decide whether a token with consumptive use could be a security – because, ***when***

***offered and sold by Kik, Kin had no consumptive use whatsoever***.

Unable to deny these facts, Kik attempts to change the subject, spending multiple pages of its

brief touting the *present* status of the Ecosystem.  Kik Opp. Br. 41-45.  While such representations of

activity may or not be true given Kik's hundreds of thousands of dollars' in subsidies to Ecosystem

---

[21] The witness's replacement declaration made clear that he understood the Kin offering to be an opportunity to profit based upon the managerial and entrepreneurial efforts of Kik:

> 10. I bought Kin primarily for three reasons. The first and biggest reason was because, in 2017, I had seen many Initial Coin Offerings ("ICOs"), and participated in a previous one, in which the token sold rose in value after the sale had completed, and I assumed that Kin might behave similarly. It was my plan to hold onto the token for a year for tax purposes and then sell at a profit. I never had any intention of using Kin to purchase digital items and have only ever sold Kin for other cryptocurrencies.

> 11. Secondly, I remember reading that Kik had already successfully implemented a similar idea called Kik Points. I remember reading about Kik and the Kin sale from online news articles and it was my understanding that Kin was a digital currency to be integrated into Kik, with its 300 million registered users, and be used as a medium of exchange to purchase digital goods and services within digital applications, including digital stickers and similar products. I remember it was supposed to be based off Kik Points and that Kik had previously had a lot of success with it and the amount of daily transactions of Kik Points was much higher than that of Bitcoin or Ethereum.

> 12. And thirdly, I chose to buy Kin because Kik was the first major tech company to get into cryptocurrency that already had a lot of clout and investors behind them along with a working product and believed because of this they would succeed and the price of Kin would go up.

Kik Ex. BB-2 (ECF No. 79-5) at ¶¶ 10-12.

participants, SEC Opp. 56.1 ¶¶ 87, 89-91, the present status of the token is irrelevant.  The Court

must examine the economic reality of the offering *at the time of the offering*.  And, while Kik

complains that the SEC "places undue emphasis Kin's utility at the moment of launch," it offers no

legal rationale for the Court's consideration of the token's supposed utility at any other moment in

time, and there is none.  *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972);

*Telegram*, 2020 WL 1430035, at *6, *9 ("*Howey* requires the Court to examine the series of

understandings, transactions, and undertakings at the time they were made.").

> **b.      Kik Repeatedly Marketed Kin As An Opportunity To Profit**

Turning now to the evidence of Kik's promotional campaign, the "stray soundbites" Kik

implores this Court to ignore, the record is clear that Kik marketed Kin as an opportunity to profit.

As a starting point, and as Kik's CEO admitted when asked whether Kin buyers purchased

with an expectation that the value of their holdings would appreciate, the investment thesis of the Kin

offering was obvious to anyone that understood "the fundamentals of crypto economics":

> If people didn't understand that the value could grow, then they would not
> understand cryptocurrencies and the fundamentals of crypto economics. The
> fundamental of crypto economics is supply is fixed.  So if demand goes up,
> then the price goes up. Like, would Kik have launched Kin if it thought the
> value of its Kin holdings wouldn't increase? No. That's what made it a viable
> business model for us and everybody else. Some people bought it knowing
> only that.

SEC Opp. 56.1, Counter-Statement ¶ B.  Based upon these self-evident "fundamentals," Kik created

and executed upon a marketing scheme that hammered the following themes: (1) Kin was a limited-

supply token, the price of which would rise or fall based on demand that Kik would encourage; (2)

Kik, with its millions-strong user base, was "all in" on boosting demand for (and, thus, the price of)

Kin; (3) Kik and its savvy venture capital investors had determined that, if it allocated Kin to itself,

the company expected to profit through the appreciation of Kin; and (4) successful third-party hedge

funds and investors had reviewed Kik's plan and concluded that they, too, were likely to profit through the appreciation of Kin.

As to Kik's *first theme*, Kik's CEO's September 2017 presentation to an auditorium of potential investors in New York City is illustrative that Kik touted that increased demand would drive up value:

> And this is where we really got excited about bitcoin back in 2011 where it was like, bitcoin for the first time ever could provide a solution to this problem; where now for the first time ever with blockchain, you could actually guarantee the scarcity of a digital asset. So once you create a cryptocurrency on the blockchain, you can guarantee for the first time ever that there will never be more. So, you know, there's going to be 21 million bitcoins. For the first time ever we can say, there will never be more. You know, whereas before with airline miles, or any other sort of digital asset, somebody could always print more. And so what that meant is guaranteed scarcity -- if you could create a new cryptocurrency, there's only ever going to be so much of it, guaranteed scarcity, guaranteed supply. If you could grow the demand for it, then the price -- the value of that cryptocurrency would go up, such that if you set some aside for yourself at the beginning, you could make a lot of money. And so this was the exciting insight for us. It was like, for the first time ever, you could have open and valuable.

*Id.* at ¶ 104. Kik repeated this portion of the Kin stump speech in presentations to audiences in San Francisco, SEC46-B (ECF No. 60-49) at 34:11-35:16, China (SEC45-B (ECF No. 60-47) at 21:23-22:15), and Canada, SEC48-B (ECF No. 60-55) at 5:6-6:2, 10:20-11:3. This point was also made in Kik's white paper. SEC31 (ECF No. 60-31) at 21 ("the distributed [10 trillion] kin will constitute the entirety of the available liquid supply"). And, when making this point, Kik frequently added a dog-whistle reminding audiences of the outsized profits made from the meteoric rise in the prices of Bitcoin and Ether. *See, e.g.*, SEC45-B (ECF No. 60-47) at 21:23-22:15; SEC46-B (ECF No. 60-49) at 34:11-35:16.[22]

---

[22] Kik spends three pages of its brief trying to deny that it told investors that they should expect Kin to trade on exchanges. (Kik Opp. Br. 37-40). Given the white paper's unambiguous assurance that, "units of kin are fungible and transferable, and they will be expected to trade on cryptocurrency exchanges," SEC 56.1 ¶ 123, and Kik's other similar statements, *id.* at ¶¶ 121-130, Kik's protestations need no additional response.

Next, when pushing its ***second theme***, Kik repeatedly stated that it would act as Kin's "champion." SEC31 (ECF No. 60-31) at 6. Kik's white paper repetitively assured would-be buyers that Kik would take steps to "build fundamental value," *see, e.g., id.* at 5-6, and Kik's May 25, 2017 promotional video assured potential buyers that "Kik has both the experience and resources, and the user base to really make this happen." SEC 56.1 ¶ 137. Further driving this point home, in a Medium post on September 6 (during the registration period for the sale to the public), Kik assured potential buyers that Kik was "all in":

> Kin has at least one participant who was all in: Kik. With one strong digital service on board from day one, Kin can enjoy a good start regardless of whether or not other digital services adopt it right away. Kik has 15 million monthly active users, many of whom are already accustomed to exchanging digital goods, such as stickers and emoji, through chat.

*Id.* at ¶ 140. And, Kik repeated this sentiment the next day when speaking to an audience in New York City. *Id.* at ¶ 141 ("[Y]es, we'll use Kik to launch Kin. That will give it its value."); *see also id.* at ¶¶ 135, 146 (Kik would "pledge all its resources to make Kin the primary transaction currency in its chat app and promote services from the Ecosystem to its millions of users.").

With respect to its ***third theme***, Kik made clear that Kik viewed its own planned ownership of Kin as an opportunity to profit through capital appreciation:

> So, for us, we're setting 30 percent of Kin aside for Kik, as a financial incentive for us basically to put this huge messenger into this ecosystem, and to get this whole ecosystem going. And so (indiscernible) – you know, we – ***our goal now is just to grow the value of Kin. The more we do that, the more the value of our 30 percent grows***. And we're now looking at that as the fundamental way that we monetize this, you know, eight and a half years of work, and $120 million invested.

*Id.* at ¶ 110 (emphasis added). Similarly, speaking to an audience in San Francisco, Kik's CEO explained why Kik's well-known venture capital owners had made the profit-motivated decision to allow Kik to sell Kin:

> So, one thing -- but in terms of, like, funding, you know, we have raised $120 million from traditional investors, and the most recent investment we took is

> from [Tencent], you know, one of the most advanced messengers in the world.
> They invested $50 million to privately fund the company. Those guys want a
> return, you know? We invested all this money, so you're just going to give this
> all away? And so, I think this is what is cool about cryptocurrency is like, you
> can say, no, no, no, we're not -- yes, we want to give it all away, we want to
> open everything up. We want to give up control, and build this open,
> decentralized ecosystem, but in doing so, we give Kin a better shot at
> succeeding, and by setting 30% aside for ourselves, like, you know, if Kin were
> as popular as Ether is today, that 30% would be worth $9 billion. That'd be
> pretty awesome. You know, we'd give some back to you guys [Tencent]. You
> know, you invest 50 million, we'll give you 500 million out of that $9 billion.
> So, that's why it took some time -- it took some time, but you know, we said,
> listen, we need a new way to compete, we need a new way to monetize, and
> this is the best way, and we can make some money too if it works.

*Id.* at ¶ 114.[23]   Kik made clear that the Kin it would hold would be identical to that which it was

offering for sale to investors.  *See* SEC31 (ECF No. 60-31) at 8, 21 (Kik would "offer for sale one

trillion units out of a 10 trillion total supply of kin" and "three trillion kin [of the 10 trillion total] will

be preallocated to Kik"; all "units of kin are fungible").

And, Kik's numerous press releases, particularly those at the end of the offering, contained

assurances as to its *fourth theme* – that numerous hedge funds and venture capitalists believed that

they could make money on Kin:

> WATERLOO, Ontario – Aug. 29, 2017- Kik Interactive, the creator of the
> popular chat platform Kik, today announced Kin's upcoming token
> distribution event (TDE) will commence on Tuesday, Sept. 12, 2017 at 9:00
> a.m. ET. Kik also announced it has successfully closed a presale round of
> US$50 million to select accredited investors, including Blockchain Capital,
> Pantera Capital, and Polychain Capital.  Kik will look to raise a total of US$125
> million through its token sale. . . .
>
> "Kik is by far the largest consumer company to enter the cryptocurrency space,
> and this is a seminal moment for the industry," said Ryan Zurrer, principal and
> venture partner at leading cryptocurrency hedge fund Polychain Capital. "We
> have been impressed with Kik's thoughtful approach to the creation and

---

[23] This aspect of Kik's marketing highlights the importance of Kik's failure to register the offering.  Had a
registration statement been filed and disseminated, investors would have been provided information about
Kik's declining user base, inability to generate revenue, years of eight-figure losses, and declining cash "runway."
SEC 56.1 ¶¶ 9-11, 15-17.

> distribution of Kin, and have confidence that the team will execute their vision
> of creating a decentralized ecosystem of digital services through Kin."

*Id.* at ¶ 245-46.  Kik reiterated this point on September 12, the first day on which the general public

was permitted to buy tokens:

> Kik has already raised US$50 million in a presale round, leaving 512 billion
> Kin tokens valued at US$75 million available for the public token sale. Notable
> participants of the pre-sale included Blockchain Capital, Pantera Capital, and
> Polychain Capital.

*Id.* at ¶ 257.  Kik invited would-be purchasers to join these savvy investors.

Viewed holistically, the implication of Kik's four tightly-woven themes was clear: a reasonable

investor would have purchased Kin with investment intent.  And indeed, the evidence demonstrates

that actual Kin investors, in fact, understood Kik's offering to provide an opportunity to profit.  *Id.* at

¶¶ 188-191.  Even several of Kik's witnesses purchased with investment intent, albeit in evidence Kik

neglects to highlight.  Kik Ex. BB-2 (ECF No. 79-5) at ¶ 10 ("It was my plan to hold onto the token

for a year for tax purposes and then sell at a profit."); Kik Ex. DD (ECF No. 79-7) at 37:11-15 ("Q. .

. . [D]id you buy Kin with the hope that it would go up in value as a result of all those benefits that

you were talking about?   A. Well, of course.   We're capitalists.").   The "stated intent" of these

purchasers, "though not considered for the truth of their content, may be properly considered in the

Court's evaluation of the motivations of the hypothetical reasonable purchaser."  *Telegram*, 2020 WL

1430035, at *14 (citation omitted).

### c.  Kik's Success In Attracting "Whales" Is Indicative Of An Expectation of Profit

Furthermore, as the *Telegram* court recently held, the "size and concentration" of purchases

can indicate that buyers "purchased with investment, not consumptive, intent."  *Telegram*, 2020 WL

1430035, at *13.  While Kik's brief makes much of the fact that "Kik did not require a minimum

purchase amount," Kik Opp. Br. 46, Kik also did not cap purchasers after the first 24 hours, SEC 56.1

¶ 259.  Kik sold unlimited amounts of Kin to anyone who wanted it, and Kik actively courted large investors, which Kik called "whales."  *Id.* at ¶ 248.[24]

Kik's targeting of large investors was highly successful.  Seventy percent of all the Kin available for sale to the public was purchased by buyers who spent at least $5,000, *id.*, an amount above the "first day cap" that Kik cites as evidence for its argument that "large purchasers" were "prevented . . . from stock-piling excessive amounts of Kin."  Kik Opp. Br. 46.  And, the eight largest public sale purchasers – the "whales" Kik wooed – paid about $1.553 million, $1.462 million, $1.160 million, $970,231, $871,393, $686,144, $640,424 and $593,705, respectively.  SEC 56.1 at ¶ 265.  The largest of these purchasers testified, unequivocally, that he purchased Kin to make a profit.  *See id.* at ¶ 189 ("Q. Did you invest in Kin because you wanted to make a profit?  A. Yes.").

> ### d.   Kin Investors Reasonably Expected Profits Based On Kik's Entrepreneurial And Managerial Efforts

The evidence is also clear and uncontested that Kik promised to "be the ecosystem's champion," and promised to take many specific entrepreneurial and managerial steps to "build fundamental value" for Kin – including, *inter alia*, that Kik would (a) "provide startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand," SEC 56.1 ¶ 142; (b) "build a new transaction service, the identity service, the reward engine, to build out all these cases inside of Kik, to get a bunch of developers building use cases outside of Kik basically to, like, launch this whole broader ecosystem, *id.* at ¶ 143; (c) "create a series of new products, services, and systems, *id.* at ¶ 145; (d) "showcase Kin to its millions of users," *id.* at ¶ 146, (e) integrate Kin into the Kik Messenger app to "leverage its large existing user base to drive mass adoption," *id.* at ¶ 148; (f) "figure out the scalability" limitations of the Ethereum blockchain by creating a "Transaction Service" or a

---

[24] Kik contends that the term "whale" referred "only" to SAFT purchasers of Kin.  Kik Opp. 56.1 at ¶ 248.  Kik's explanation cannot be squared with the evidence.  *See* SEC98 (ECF No. 60-110) (discussing the whales' reaction to the public sale's first-24-hour cap); *see also* Answer (ECF No. 22) at ¶ 165.

new, bespoke blockchain, *id.* at ¶¶ 158, 161; (g) create the "Kin Rewards Engine" to "further grow the ecosystem," *id.* at ¶ 169; and (h) create and "have a lot of influence over" the Kin Foundation, *id.* at ¶¶ 180-82.  Kik tries to diminish this evidence by calling it mere "infrastructure," but Kik cannot transmogrify the evidence by re-labeling it.

While Kik argues that its vision for Kin was a decentralized network, there is no question that the ecosystem was not decentralized when Kin was issued.  As Kik's own promotional material concedes, when launched, the "ecosystem" would be entirely Kik-based, and it would be entirely up to Kik to "build fundamental value for Kin," which is why Kik repeatedly touted its experience, past successes, and buy-in.  Kik's white paper stated that Kik would become Kin's "first large adopter and sponsor."  SEC Opp. 56.1 ¶ 19.  Kik repeated this sentiment throughout the Roadshow.  *Id.*  And Kik's September 6, 2017 Medium post reassured potential buyers that Kik could and would singlehandedly support Kin when first launched:  because of Kik's total commitment to the project, and promise to integrate Kin into Messenger immediately upon launch, "Kin can enjoy a good start regardless of whether or not other digital services adopt it right away."  *Id.*  Meanwhile, Kik made clear that the company and the Kin Foundation that it controlled collectively owned and controlled 90 percent of the outstanding supply of Kin.  *Id.*  In sum, when Kin was distributed on September 26, 2017, Kin was entirely centered around and dependent upon Kik.

In *Telegram,* the Court articulated the following test that helps to illustrate Kik's promises in this regard:  what would have happened to the project if, immediately after launch, the token issuer "decamped to the British Virgin Islands . . . and ceased all further efforts to support the [blockchain]."  *Telegram*, 2020 WL 1430035, at 15.  Here, the answer is obvious:  had Kik disappeared immediately after the offering, Kin would have had no "champion," the asset-less Kin Foundation would cease to operate, and the Ecosystem that Kik now touts would never have developed.

**B.      Kik Engaged In A Public Distribution In Violation Of Section 5**

Not only did Kik violate Section 5 by selling unregistered securities to the public investors, the portion of Kik's public distribution of securities that it conducted via SAFT participants also violated that provision.   Kik conducted a single offering of Kin that encompassed both SAFT participants and public investors, or, alternatively, separate offerings to these two groups that were integrated into a single offering.   Under either theory, the offering was not limited to accredited investors, and, therefore, it fails to qualify for the exemption from registration under Rule 506(c) of Regulation D.   *See* 17 C.F.R. § 230.506(c).   The SAFT portion of the offering fails to qualify for any exemption for the *additional* reason that was relied upon by the *Telegram* court, on analogous facts, to enjoin preliminarily the distribution of digital assets in that case:  the issuer of the assets (here, Kik) failed reasonably to assure that the investors to whom it sold the assets (here, the SAFT participants) would not immediately resell to uninformed public buyers.   Under any of these theories, Kik presents no genuine dispute as to any material fact.

**1.      Kik Engaged In A Single Distribution, Not Two Offerings**

The court should follow the practical approach of the Second Circuit in *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998), and conclude that Kik's purportedly separate "rounds" of sales to SAFT participants and public investors was "a *single* transaction with multiple stages."   *Id.* at 114 (emphasis in original).   This result is certainly consistent with Kik's internal planning of the offering.   As Kik's management conveyed to the company's board of directors before the start of the offering, Kik regarded the two stages as "tranches" within the same "sale structure," which was designed to raise an aggregate total of $100 to $125 million.   SEC Mem. 10-11; SEC 56.1 ¶¶ 37-40.   In fact, on May 22, 2017, three days before its public announcement of Kin, Kik contemplated as many as five such tranches:  two "tranches" of sales involving SAFTs and three "public tranche[s]" of sales.   SEC Mem. 11; SEC 56.1 ¶ 40.   Kik subsequently settled on only one tranche of each.   For Kik to now argue that

it conducted two "separate" offerings ignores the plain fact that the sales that it conducted were two stages of a single fundraising plan.

Kik also clearly conveyed to the outside world that it was conducting only one offering. Kik's white paper, which was directed to both SAFT participants and public investors, SEC 56.1 ¶ 47, stated that the company would "offer for sale one trillion units" of Kin, *id.* at ¶ 55. Thereafter, Kik issued press releases and sent mass emails to investors confirming that it was conducting one "sale." SEC Mem. 38-39; SEC 56.1 ¶¶ 245, 239, 257, 273, 274. Even now, Kik admits that the two phases of its offering should be described as "round[s]" of financing, suggesting they were part of a larger whole. Kik Opp. 61 (quoting Kik's August 29, 2017 press release, SEC67 (ECF No. 60-79) at 1). Kik tries to dismiss this consistent, one-sale, messaging as "a few informal, media-facing references," but this argument is misleading. Kik put this information into its ***main marketing document*** for the offering – the white paper – and then into crafted, pre-written press releases and statements sent ***directly to investors.***

As the SEC has previously explained, numerous other undisputed facts establish that Kik conducted only one offering. *See* SEC Mem. 38-43, 7-10, 48-52. Kik conducted the offering to both groups over the same four-month time frame, with some of the actual sales to both groups occurring only one day apart. Mem. 46-47; SEC 56.1 ¶¶ 234-235, 238, 254. Kik also coordinated its Roadshow under a single communications strategy to accommodate both groups, SEC 56.1 ¶¶ 43-46, 57-58, 62, 84-85;[25] touted the purchases by the SAFT participants to the public investors, *id.* at 56.1 ¶ 257; and

---

[25] Kik disputes that the term "Roadshow," "which was targeted to Pre-sale investors, was also aimed at TDE purchasers." Kik Opp. 56.1 ¶ 43. This dispute cannot be genuine, because, as a Kik executive testified, the Roadshow "was about raising awareness for the ecosystem as a whole as well as the token distribution event." SEC14 (60-14) at 394:1-6. In any event, Kik does not dispute any of the dates or locations of the presentations delivered at conferences by Kik's CEO, and it is "undisputed that Kik's communications strategy involved making some statements to potential TDE purchasers at the same time it was making separate communications to potential Pre-sale participants." Kik Opp. 56.1 ¶ 45.

created only one class of Kin that it distributed (at least in part) to both groups on the same day using the same "smart contract," *id.* at ¶¶ 76, 123, 290, 293.  The price at which Kik sold Kin to the SAFT participants was pegged, at a discount, to the price paid by public investors, and Kik would not have distributed Kin to the SAFT participants if it did not also distribute Kin to the public investors.  SEC Mem. 41-42; SEC 56.1 ¶¶ 77-78, 81.

Consistent with Kik's public statements and the additional disclosures it provided only to the SAFT participants, Kik spent most or all the funds that it raised from the two groups for the same purposes, and over the same post-launch time frame.  SEC Opp. Br. 8-9, 50-51.  Kik spent at least 70 percent of the proceeds from its "private sale" more than three months *after* it received the proceeds from the "public sale."  SEC Opp. 56.1, Counter-Statement ¶ E.

The asserted differences between the two stages of its distribution, highlighted by Kik, are hardly "glaring."  Kik Opp. Br. 60-61.  Kik's description is both inaccurate and incomplete.  Both SAFT participants and public investors bought the same "asset" – Kin.  All investors were free to resell Kin immediately upon receiving it.  SEC 56.1 ¶ 291.  The Ether that Kik received from the public investors was immediately convertible – and, in fact, promptly converted by Kik – to cash.  *Id.* at ¶ 295; SEC93 (60-105) at ¶ 10.  In all other respects the differences asserted by Kik are either beside the point – *e.g.*, the two stages involved "different groups" – or are minor in comparison to the similar, inter-dependent nature of the two stages.  The fact remains that the distribution had one unitary purpose:  fund Kin's development while keeping Kik in business.

Kik gives the pretense of disagreeing with a number of the SEC's asserted facts about the offering, but these are not genuine disputes, and Kik raises no issue that saves it from summary judgment.  For example, Kik purports to disagree with the claim that "Kik used the same marketing and logistics for the two stages of the offering."  Kik Opp. Br. 61 (purporting to dispute SEC Mem.

40).  However, each of the facts underlying the SEC's claim is amply supported by the record or Kik's own admissions:

- **SEC Fact:**  Kik directed its white paper at both SAFT participants and public investors.  SEC Mem. 40; SEC 56.1 ¶ 47.

  - ✓ **Record Support:**  Testimony of Kik's former CFO (SEC10 (ECF No. 60-10) at 244:12-23):

    Q    And what did you consider [the white paper's] target audience to be?

    A    I think it was basically -- well, it was a combination of, I think, both the presale investors and then actual users, because it discussed a lot about the applications and what you could do with the token and what we were looking at going forward.

    Q   So in your mind, it was both sort of the accredited investors –

    A   Yes.

    Q   -- and also to the general public?

    A   Yes.

- **SEC Fact:**  Kik created a "communications strategy" with a slide entitled "Roadshow" that was directed at both SAFT participants and public buyers.  SEC Mem. 40; SEC 56.1 ¶ 44.

  - ✓ **Kik Admission:**  "[U]ndisputed that the cited document (SEC32) was one iteration of a presentation entitled 'Communications Strategy' and that it contains the reproduced slide."  Kik Opp. 56.1 ¶ 44.

- **SEC Fact:**  The "Presale Timeline" that Kik's management provided the board for its May 23, 2017 meeting also demonstrates that Kik would conduct its public marketing of Kin in tandem with meetings with potential SAFT participants.  SEC Mem. 40-41; SEC 56.1 ¶ 46.

49

✓ **Kik Admission:** "[U]ndisputed that the slide reproduced above is one of several contained in the presentation at SEC30." Kik Opp. 56.1 ¶ 46.

- **SEC Fact:** Some SAFT participants used the same Internet portal that public investors used to provide their Ether addresses and requested know-your-customer information to Kik. SEC Mem. 41; SEC 56.1 ¶ 240.

  ✓ **Kik Admission:** "Undisputed that SAFT participants used the same internet portal as TDE participants." Kik Opp. 56.1 ¶ 240.

- **SEC Fact:** The same "smart contract" delivered the same, fungible tokens to both sets of purchasers at precisely the same time. SEC Mem. 41; SEC 56.1 ¶¶ 287, 290.

  ✓ **Kik Admission:** "Undisputed" that "On or about September 26, 2017, a third-party contractor hired by Kik created a smart contract that generated 10 trillion Kin." Kik Opp. Br. 56.1 ¶ 287.

  ✓ **Kik Admission:** "[U]ndisputed" that "The Kin that Kik kept and caused the Kin Foundation to receive are all identical and fungible with the tokens that Kik sold and distributed (via SAFT or public sale)." Kik Opp. Br. 56.1 ¶ 290.

Thus, Kik's claimed "dispute" of facts is unsupported by the evidence and its own response to the SEC's Rule 56.1 statement.

Kik tries to distance itself from the white paper by obliquely referring to the document as "marketing materials pertaining to the company and/or a given product." Kik Opp. Br. 62. But the white paper was indisputably Kik's **_main_** marketing document for the entire "one trillion" token sale.[26]

---

[26] SEC 56.1 ¶ 55; *see also id.* at ¶ 42 & note 3. A PowerPoint presentation from Kik's management to the board of directors on May 23, 2017, stated, "Next Thursday, after we announce, we will be propping up a landing page which will house the main marketing document for our fundraise, the whitepaper." SEC30 (ECF No. 60-30) at KIK_00106872. Kik's former CFO confirmed this fact in his deposition. *See also* SEC 4 (ECF No. 60-4) at 99:16-25 ("Q. "And the white paper was Kik's main marketing document for the offering; is that right? A. Correct. Well, you say offer. Yes, for the token sale.").

Also, confusingly, Kik says it disagrees that "the delivery of Kin to SAFT participants and the price at which the participants bought the Kin were both conditioned on the public phase of the offering." Kik Opp. Br. 62. But the sentence from the SAFT that Kik quotes in support of its dubious position only confirms the accuracy of the SEC's fact. Any supposed dispute of fact can be resolved in the SEC's favor by simply reading the second and third pages of the SAFT. *See* SEC Mem. 41; 56.1 ¶ 77; SEC51 (ECF No. 60-61) at KIK000067-68.

### 2.   Even if Kik Engaged in Two Separate Offerings, They Should Be Integrated Into A Single Non-Exempt Offering

Even if the Court declines to find that Kik conducted a single offering, the offerings to SAFT participants and public investors should be integrated, and therefore considered one offering, under the relevant five-factor test. Critically, Kik does not dispute that a finding of integration means that Kik has violated Section 5. Furthermore, Kik does not dispute that the integration standards from Rule 502(a) of Regulation D can and should be applied to its conduct. *See* Mem. 43-44 (describing factors). However, Kik again misstates which party has the burden of proof. As the party claiming an exemption from registration under the Act, *Kik* bears the burden of proving that its two "separate" offerings should *not* be integrated. *SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859 (S.D.N.Y. 1997) ("If a registration exemption is claimed, the claimant bears the burden of proving the exemption."). Because Kik offers no "persuasive evidence" that the five-factor test even plausibly weighs in Kik's favor, the court should conclude that offerings are integrated and grant summary judgment to the SEC. *Ishopnomarkup*, 2007 WL 2782748, at *7.

### a.   All Kin Sales Were Part Of A Single Plan Of Financing

Kik had only one "plan of financing." Undisputed facts concerning both Kik's internal board presentations and external communications about the offering demonstrate this reality. *See supra* Section III.B.1; SEC Mem. 45-47 (discussing first factor). The circumstances that Kik says merit attention under this factor – including "the timing of plans for raising capital" and "whether the

offerings are financially interdependent" (Kik Opp. Br. 65) – further demonstrate that Kik had only a single financing plan. Kik devised its plan for the sales at the exact same time, in the exact same board presentation. SEC Mem. 11; SEC 56.1 ¶ 40. The price at which Kik sold Kin to the SAFT participants was expressly conditioned on the "public sale" price of Kin – indeed, the former was a 30 percent discount off the latter. SEC Mem. 41-42; 56.1 ¶¶ 77-78, 81. Additionally, Kik would not have delivered Kin to the SAFT participants if it did not also deliver Kin to the public investors. *Id.* The two offerings were in every sense "financially interdependent" based on these undisputed facts.

Kik tries to obscure its total lack of evidence under this first factor by instead arguing the *fifth* integration factor – *i.e.*, whether the "two" offerings had different purposes. But the undisputed record weighs strongly in the SEC's favor on this issue, too. Purporting to rely on prior SEC no-action letters, which involve inapposite facts, Kik argues that it sold Kin to SAFT participants for "short-term capital" while its public sale allegedly was "a sale of a good, with the purpose of creating a 'network' of Kin users." Kik Opp. Br. 65-66. But this is only a make-believe difference, because the substance of all of these transactions was the same: *investors paid valuable consideration for Kin tokens and Kik's promises.* Furthermore, Kik offers not a shred of proof of how its use of investor funds reflected different "purposes" for the two groups of sales. Kik's "evidence," rather, is limited to wholly conclusory assertions about its allegedly different "goals" for the sales. *Id.* For this reason alone, Kik fails to carry its burden on this factor.

In any event, the undisputed evidence shows that Kik did *not* have different "purposes" for the funds that it raised from the SAFT participants and public investors. Kik waited until *after* the public sale to use all or almost all of the money that it raised from both groups. By Kik's own telling, the company had enough money to continue operating at least through October or November of 2017, even without any Kin sales. Kik Opp. Br. 4 n.4. Kik did not receive money from many SAFT participants sufficiently in advance of the launch of Kin in September 2017 to make much of a

practical difference for that event.  In particular, Kik waited until September 11, 2017, approximately two weeks before the launch, to enter into 10 of the SAFTs.  SEC 56.1 ¶ 238; SEC Opp. 56.1 ¶ 20. Kik's bank account balances bear this out.  As of January 4, 2018 – more than three months *after* the launch – Kik still held $34.9 million in proceeds from its sales to SAFT participants – ***more than 70 percent of its "private sale" proceeds*** – in its Canadian bank account.  SEC Opp. 56.1, Counter-Statement ¶ E.  Thus, Kik's claim that it intended these proceeds for pre-launch "development" of Kin's "infrastructure" (Kik Opp. Br. 66) is contradicted by what Kik actually did with the proceeds.

What Kik actually told investors about how it intended to use the various sale proceeds similarly undermines Kik's position.  In *SEC v. Mapp*, No. 4:16 Civ. 00246 (ALM), 2017 WL 5177960 (E.D. Tex. Nov. 8, 2017), the court found that four consecutive offerings of securities, each purportedly designed to fund a different stage of development of a computer server, were integrated. *Id.* at *4.  Rejecting the issuer's argument that each offering "had unique purposes tied to a distinct phase of the development" of the server, the court found that all of the sales "were made for the same purpose: financing [the company's] operations for the development and manufacture of the [server.]" *Id.*  Here, Kik's argument of "different purposes" for the Kin sales proceeds is even less compelling than that of the losing *Mapp* defendant.  As the SEC has previously discussed, Kik did not publicly identify different purposes for the two categories of sale proceeds or different time frames in which the proceeds would be spent.  SEC Opp. Br. 8-10, 50-51.  Furthermore, Kik's Private Placement Memorandum ("PPM"), which Kik disclosed only to SAFT participants, does not show that Kik would limit its use of "pre-sale" funds to "short-term," pre-launch, initiatives for Kin.  SEC Opp. Br. 50; SEC 56.1 ¶ 144.  Rather, the PPM states that funds would be used to create "a reward system for digital service providers" – a task that Kik had always planned to implement *after* launching Kin.  SEC 56.1 ¶¶ 144, 175-179; SEC52 (ECF No. 60-62) at KIK000048.  Accordingly, Kik's claim of different "purposes" for the funds should be rejected.  *See SEC v. Alternate Energy Holdings, Inc.*, No. 1:10 Civ.

00621 (EJL-REB), 2014 WL 2515710, at *7 (D. Idaho May 13, 2014) ("Although the PPMs vary in some respects as to the projects listed on each, the purpose of the PPMs was not limited to those particular listed projects.  Instead, the listed projects were examples of the projects AEHI was pursuing in furtherance of its general business purpose ... Thus, the fact that the PPMs listed different projects pursued by AEHI does not make the offerings distinct.").

And, finally, Kik *admits* that funds from SAFT participants and public investors were used for the same purposes.  Kik Opp. 56.1 ¶¶ 296-297, 299, 301-302 (admitting, *inter alia*, that Kik owned and controlled all of the sales proceeds, used proceeds from both sets of sales as working capital to fund Kik's business operations, spent the proceeds "to develop the Kin Ecosystem" and to try to "execute on the plan that we produced in the white paper").  In sum, the "two" offerings were planned at the same time, had a single fundraising goal, were financially interdependent, and raised money for similar purposes and to be spent during roughly the same time periods.  Kik had only a single plan of financing.

### b.    All Kin Sales Involved Issuance Of The Same Class Of Securities

SAFT participants and public investors received the same "class of securities."  They all received Kin, which indisputably was identical and fungible and provided their holders with the same rights.  SEC Mem. 47; SEC 56.1 ¶¶ 76, 123, 290.  Furthermore, the Kin received by all investors was bound up with Kik's repeated, public promises to take specific steps that would develop the Ecosystem and "make Kin very valuable."  SEC 56.1 ¶ 152.  As the SEC has explained, SAFT participants bought "Kin" (not just "rights" to Kin) at the time they entered into the SAFTs.  *See* Mem. 52-53; *Telegram*, 2020 WL 1430035, at *9; *Radiation Dynamics*, 464 F.2d at 891 (a securities "sale" occurs when "the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time").  Because the SAFT itself was nontransferable, SAFT participants could only profit when they received the tokens and then sold

them. SEC Opp. 56.1 ¶ 34.  To the extent Kik succeeded in driving up demand for Kin, and, hence, the token's post-launch value, this benefitted SAFT participants and public investors alike in proportion to the amount of Kin that they held.  Kik does not respond to this argument, other than with the inconsequential observation that SAFT participants also received copies of SAFTs when they bought Kin.  Kik may have made an *additional* commitment to the SAFT participants that accompanied the company's sale of the token to them – that is, to complete preparations for the launch of Kin. But, this additional commitment did not alter the common "covenant" that Kik provided to all investors, which revolved around Kik's promised efforts *after* the launch.[27]  This factor, too, weighs in the SEC's favor.

### c.      All Kin Sales Were Made At Or About The Same Time

Kik offered Kin to both SAFT participants and public investors from May to September 2017; it sold Kin to both groups in September 2017 (after selling Kin to some SAFT participants in July and August of 2017); and it simultaneously delivered Kin to both groups in September 2017 using the same "smart contract."  Kik did more than just conduct the "two" sets of sales "at about the same time;" it carefully synchronized the "two" offers and sales.  Mem. 46-47.  And, indisputably – as Kik even acknowledges (Kik Opp. Br. 64) – the sale to SAFT participants "was dependent on" the sale to the public investors, further cementing the intertwined timing and nature of all of the sales.  *See Argentinian Recovery Co. L.L.C. v. Board of Directors of Multicanal S.A.*, 331 B.R. 537, 540-41, 543-48 (S.D.N.Y. 2005) (Hellerstein, J.).  Kik's overtly coordinated timing of the sales factor heavily favors integration.

---

[27] Kik's purported reliance on *SEC v. Dunfee*, No. 16114-2, 1966 U.S. Dist. LEXIS 10105 (W.D. Mo. Dec. 8, 1966) does not help it.  In that case, which did not involve application of the SEC's five-factor integration test, the court concluded that a second sale of notes that started at least eight months after the first sale of notes, with different terms, was not the same "issue" of securities.  The case has no relevance to Kik's near-simultaneous offerings of fungible Kin in this case.

        **d.**        **Kik Received Functionally Similar Consideration In All Kin sales**

Kik received U.S. dollars from the SAFT participants and, from the public investors, digital assets (Ether) that were immediately convertible to dollars. Kik fails to highlight any practical difference between these two forms of consideration. By September 29, 2017, *three days after distributing Kin*, Kik had already exchanged some of the Ether that it received from public investors for $11 million. SEC 56.1 ¶ 295; SEC93 (ECF No. 60-105) at ¶ 10(c). By December 29, 2017, Kik had exchanged additional Ether, putting the total exchange amount over $50 million. SEC93 (ECF No. 60-105) at ¶ 10(d). The highly liquid nature of all of the consideration that Kik received in the sales weighs in favor of integration.

        **e.**        **All Kin Sales Were For The Same General Purpose**

As explained above under factor one and in prior briefing, Kik raised funds from SAFT participants and public investors for the same general purpose: Kik would use the funds to create and develop Kin and the Kin Ecosystem and to fund Kik's ongoing operations. SEC Mem. 22-23, 45-46; SEC Opp. Br. 50-51; *supra* Section III.B.2.a. Kik argues that its sale to public investors "was not even a 'financing' effort, nor was its primary purpose to finance the development of Kin." Kik Opp. Br. 67. But Kik cites no persuasive evidence to support this argument, which is contradicted by the contents of its own marketing campaign. *Supra* Section III.B.2.a. This fifth factor also heavily supports integration.

* * *

Because Kik's offerings to SAFT participants and non-accredited public investors should be integrated and considered one offering, Kik's sales to non-accredited investors defeats Kik's reliance on the Rule 506(c) exemption.

56

### 3. Kik's Public Distribution Of Kin Through SAFT Participants Cannot Qualify For The Rule 506(c) Exemption

Even if Kik conducted separate, non-integrated offerings to SAFT participants and public investors, Kik still does not qualify for an exemption under Rule 506(c). That is because Kik took no steps to assure that the SAFT participants would not immediately distribute the securities, and took no steps to issue securities with resale restrictions. Under the Act's definition of "sale" and the reasoning of the Second Circuit in *Radiation Dynamics,* 464 F.2d at 890-91, and cases following that precedent, the SAFT participants bought Kin – and not just "rights" to Kin – at the times they entered into the SAFTs. SEC Mem. 52-53; *see also Telegram,* 2020 WL 1430035, at *9. Kik has no response to this argument. Kik Opp. Br. 56-57. Kik also does not dispute that the SAFT's discount for Kin incentivized the participants to resell the tokens for profit (SEC Mem. 51), or that SAFT participants, in fact, resold their Kin within the first year (Kik Opp. Br. 59, 63).[28] Kik indisputably made *no* attempt – let alone a "good faith" attempt – to preclude the resale of Kin that Kik sold to the SAFT participants. Indeed, Kik's SAFT agreement required purchasers to represent that they had an "expectation" of realizing a "profit" after the public sale (SEC51 (ECF No. 60-61) at KIK000069),

---

[28] Kik does not dispute that the largest SAFT participant (which invested $15 million) sold 10 percent of its total allocation of Kin within a year of its purchase. Kik Opp. Br. 59. (This volume of Kin sold represented 20 percent of what the participant then held, because it had not yet received its second installment of Kin that was due at the one-year mark.) Kik claims to dispute the SEC's fact that a second participant (which invested $2 million) sold all of the approximately 9.75 billion Kin that it had received (before the second installment) within 10 months of the September 2017 distribution. Kik Opp. 56.1 ¶ 195. This is not a genuine dispute, however, because Kik misreads the transcript of the participant's testimony. This testimony was taken on July 24, 2018, approximately 10 months after the distribution. The participant clearly testified that he had sold all of the Kin he had received at that point. *See* SEC 42 (ECF No. 60-43), Hourigan Inv. Tr. at 21:11-17 ("Q. So leaving aside the tokens you have not yet received, do you currently own any of the Kin tokens you received in 2017? A. No. Q. Okay. And you sold those -- did you sell those tokens on the ether delta platform? A. Yes."); *id.* at 56:15-25 ("Q. And was this -- do you still have them in the wallet? A. Well, we sold -- I'm trying to -- I don't remember if we received all of them and that half of them have some type of cryptographic lock on them for a year or if we only received half of them to begin with, but in either event, half of the them of the total that we purchased, we sold eventually. Q. And did -- and then did you -- did you sell that half for more than half of your initial investment? A. Yes."). In any event, the SAFT's discount structure plainly incentivized SAFT participants to resell their Kin, and some indisputably did so promptly.

which could only happen if SAFT participants sold their Kin into the public market.  Here, as in *Telegram*, Kik's "fundamental goal was to establish [Kin] as the first mass market cryptocurrency," and, therefore, Kik "did not intend for [Kin] to come to rest with the [SAFT participants] but to reach the public at large via post-launch resales by the [SAFT participants]."  *Telegram*, 2020 WL 1430035, at *19 (internal quotations omitted).

Kik's sole response to the claim that it ignored the requirements of Rule 502(d) with respect to Kin is to suggest that the participants' resale of Kin did not amount to a resale of "securities."  Kik Opp. Br. 58; *see* 17 C.F.R. § 230.502(d).  But this argument fails for at least two, related reasons.  First, it ignores the unitary nature of a public "distribution," which "comprises the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public."  *R.A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (internal quotation omitted); SEC Mem. 50.  Kik sold Kin through investment contracts to the SAFT participants without regard to the requirements of Rule 502(d).  These investment contracts included the Kin bound together with Kik's promises of future efforts after it launched the token.  The Kin maintained their status as investment contracts during the course of their dispersal to the public.  Second, Kik ignores the breadth and duration of its many public promises, during its four-month marketing campaign, to develop the Kin Ecosystem and support Kin.  These promises, which Kik made broadly available to the investing public, were not abrogated by SAFT participants' roles as conduits for the distribution.  Rather, Kik's promises flowed with the Kin to the investing public, all without a registration statement from Kik in violation of Section 5.  *See Telegram*, 2020 WL 1430035, at *18 (finding substantial likelihood that Telegram failed to carry its burden under Rule 506(c) or

Section 4(a)(2) of the Act where it "sold Grams to the Initial Purchasers with the purpose and intent that those Grams then be distributed by the Initial Purchasers into a secondary public market.").[29]

Furthermore, contrary to Kik's argument, the absence of a "public sale" in *Telegram* does not limit the application of the reasoning in that case to this one. Kik Opp. Br. 63. In *Telegram*, the court addressed an analagous situation involving the issuer's planned distribution of digital assets to alleged accredited-investor purchasers, where no registration had been filed. The court's conclusion that exemptions under Rule 506(c) and Section 4(a)(2) were unavailable under those circumstances is highly germane to – and should be followed in – this case. Kik's conduct of a larger offering that also included direct sales of Kin to unaccredited public investors does not distinguish *Telegram*; rather, it provides *additional* reasons for why Kik cannot qualify for any exemption.

### C.   Kik Presents No Genuine Issue Of Material Fact To Support Its Affirmative Defense Of Unconstitutional Vagueness

The statutory term "investment contract" is not "unconstitutionally vague" as applied to Kik's 2017 offer and sale of Kin, and Kik presents no genuine issue of material fact that precludes summary judgment against it on this defense. Kik carries the burden of showing that the term "investment contract," as applied to its offering, (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Kik makes neither showing, and, moreover, offers no "'persuasive evidence'" that its vagueness defense "is not 'implausible'" under this standard. Nor can it, as the Securities Act, 70 years of precedent under *Howey*, and the SEC's DAO Report provided more than sufficient constitutional notice of what constitutes a "security." And, while not required for the Act

---

[29] For these same reasons and those discussed in its memorandum in opposition to Kik's motion for summary judgment, the SAFT portion of Kik's offering is not exempt from registration under Section 4(a)(2) of the Securities Act. *See* SEC Opp. Br. 57-58.

to pass constitutional muster, Kik's contemporaneous knowledge of the regulatory risk that it took reinforces the conclusion that it had sufficient notice.

As this court already has correctly ruled in this case, Kik's vagueness defense "raises an issue of law, not of fact," and, if the Securities Act "is vague, or confusing, or arbitrary . . . that can be argued objectively." ECF Nos. 30, 36. The Second Circuit instructed in *Copeland* that:

> Whether a statute is unconstitutionally vague is an "objective" inquiry in which we must determine "whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular plaintiff actually received a warning that alerted him or her to the danger of being held to account for the behavior in question."

893 F.3d at 114 (quoting *Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010)). Notwithstanding this instruction, even in response to the SEC's motion, Kik still does not identify why the standard for an "investment contract," set forth in *Howey* over 70 years ago and applied by federal courts to innumerable factual contexts since then, is unconstitutionally vague as applied to *Kik*'s particular circumstances. If it is the "common enterprise" prong, or the "expectation of profits" prong, or the "future efforts of others" prong that Kik takes issue with, Kik provides utterly no explanation as to how it was unconstitutionally burdened by any of these well-worn tests. The reason for Kik's stark silence is that no such burden existed. "[T]he unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement." *United States v. Smith*, 985 F. Supp. 2d 547, 587-88 (S.D.N.Y. 2014) (quoting *Ortiz v. N.Y.S. Parole in Bronx, N.Y.*, 586 F.3d 149, 159 (2d Cir. 2009). And, although Kik could have "clarif[ied] the meaning of the regulation by its own inquiry" with the SEC, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982), indisputably it did not.

Furthermore, the Supreme Court expressly designed the *Howey* test to be "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299. Kik's purported defense,

which challenges the breadth of the *Howey* test, runs counter to this admonition.  It also disregards Congress's intention to define "the term security in . . . broad and general terms." *Forman*, 421 U.S. at 847-48.  On this point, it is highly relevant that numerous court decisions have rejected constitutional vagueness challenges to the term "investment contract" and the *Howey* test.  In *United States v. Farris*, 614 F.2d 634 (9th Cir. 1979), for example, the court upheld criminal convictions based on the charge that mortgage notes sold "in a large offering to many unsophisticated purchasers" were securities.  *Id.* at 641.  Although one defendant argued that "definition of a 'security'" was unconstitutionally vague "because the SEC had not labeled the contracts 'securities' during the time of the acts in the indictment," the court rejected this argument.  *Id.* at 641-642.  Citing the Second Circuit's decision rejecting the vagueness challenge in *SEC v. Brigadoon Scotch Distributing Co.*, 480 U.S. 1047 (2d Cir. 1973), the *Farris* court reasoned:  "It is too late in the day more than 32 years after the Supreme Court's decision in *SEC v. Howey Co.*, 328 U.S. 293 (1946) to say that the term "security" is impermissibly vague."  614 F.2d at 642.  Similarly here, now another 41 years after *Farris*, the court should reject Kik's constitutional challenge to the application of  an established doctrine that other courts have applied for decades, in a countless variety of contexts, to "[n]ovel, uncommon, or irregular devices, whatever they appear to be," that are "prov[en] as a matter of fact" to be "'investment contracts.'" *Joiner*, 320 U.S. at 351.

### 1.     Kik Identifies No Disputed Fact To Support Its Claim That It Was Denied Constitutionally Fair Notice

For the reasons set forth above, Kik's constitutional vagueness defense should be rejected as a matter of law.  First, Kik cannot show objectively that it was "denied fair notice of what conduct is forbidden or required" "as-applied" to its circumstances (Kik Opp. Br. 75), because the Act and decades of judicial precedents supplied that notice.  Nowhere in its opposition brief does Kik provide any "persuasive evidence" of an alleged disputed fact that is relevant to this vagueness prong.  Indeed, Kik does not identify any disputed facts at all.

While Kik also appears to suggest that the Court should determine "whether the law authorizes or encourages arbitrary enforcement" under the second vagueness prong (Kik Opp. Br. 72), Kik provides no supporting argument on this point.  In any event, (1) neither the Securities Act nor the *Howey* test invites such arbitrary enforcement, *see Zaslavskiy*, 2018 WL 4346339, at *9; and (2) Kik's clearly admitted conduct of raising $100 million through a broadly targeted, well-publicized, offering of digital assets to the public, without filing a registration statement, "falls within the core of the statute's prohibition," *Copeland*, 893 F.3d at 119; *Zaslavskiy*, 2018 WL 4346339, at *3.  The court should not consider "the SEC's actual pattern of enforcement" with respect to the *Howey* test (Kik Opp. Br. 72), because Kik asserts only a vagueness defense; thus, the relevant question is only whether "the statute, as drafted by the legislature and interpreted by the courts, *invites* arbitrary enforcement." *Copeland,* 893 F.3d at 120 (emphasis added) (declining to assess government's "enforcement priorities" under a vagueness claim).  As this Court has already correctly ruled, the focus in this case should be "on what defendant [Kik] did, and not why the agency decided to bring the case." ECF No. 36.  No asserted fact by Kik precludes summary judgement against it.[30]

2.   **The DAO Report Provided Kik Additional Notice Of "What Conduct Is Forbidden Or Required"**

For the foregoing reasons, even had the SEC not provided any regulatory guidance that was tailored to digital assets, Kik's vagueness defense would be without merit.  The SEC's issuance of the

---

[30] In a footnote, Kik contends that the Court should not enter summary judgment against Kik on its vagueness defense, because it was denied discovery against the SEC, which, in Kik's view, would inform its claim under the arbitrary enforcement prong of the vagueness test.  Kik Opp. Br. 72-73 n.34.  For the reasons provided by the Court in its rulings rejecting Kik's discovery requests (ECF Nos. 30 and 36), and by the SEC in opposing those requests (ECF No. 27), all of the discovery that Kik now complains about was properly denied, and Kik's argument that the Court should refrain from granting summary judgment should be rejected.  Kik's claim that the SEC is now "attempting to use against Kik facts that were the subject of Kik's discovery requests" is incorrect.  As the SEC discusses in the text, Kik's awareness of its regulatory risk – shown through internal Kik documents, testimony, and admissions – confirms that Kik had sufficient constitutional notice of the definition of the term "investment contract."  The issue of constitutionally sufficient notice *to Kik* has nothing to do with the subject of Kik's improper discovery requests, which pertained to the internal, privileged deliberations of the SEC and/or its officials concerning the applicability of the securities laws to digital assets.

DAO Report on July 25, 2017 – a full two months before Kik's "public sale" of Kin – removes any doubt that Kik had sufficient constitutional notice and that its defense should be rejected.  The DAO Report provided a plain warning to the digital asset industry that companies conducting the very type of fundraising activity in which Kik was engaged could be subject to scrutiny by the SEC for compliance with Section 5.  The first page of the Report stated:

> The Commission deems it appropriate and in the public interest . . . to advise those who would use a . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws. All securities offered and sold in the United States must be registered with the Commission or must qualify for an exemption from the registration requirements. . . .
>
> *This Report reiterates these fundamental principles of the U.S. federal securities laws and describes their applicability to a new paradigm—* virtual organizations or *capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment and the related offer and sale of securities.* The automation of certain functions through this technology, "smart contracts," or computer code, does not remove conduct from the purview of the U.S. federal securities laws.

SEC88 (ECF No. 60-100) at 1-2 (footnotes omitted) (emphasis added).  Again, at the beginning of its "Discussion" section, the Report stated:

> [T]he Commission deems it appropriate and in the public interest to issue this Report in order to stress that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale. . . .
>
> . . . .
>
> The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors.

*Id.* at 10 (internal quotations omitted).  And again, in the conclusion section, the Report stated:

> Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission or to qualify for an exemption from the registration requirements of the federal securities laws. The registration requirements are designed to provide investors with procedural protections and material information

necessary to make informed investment decisions. ***These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization, regardless whether those securities are purchased using U.S. dollars or virtual currencies, and regardless whether they are distributed in certificated form or through distributed ledger technology***.

*Id.* at 18 (emphasis added). Oddly, Kik complains that the Report "acknowledged that 'whether or not a particular transaction involves the offer and sale of security . . . will depend on the facts and circumstances.'" Kik Opp. Br. 77. But, this is exactly the approach that *Howey* prescribed and on which the SEC premises its claim. Whatever Kik's CEO may have believed about the facts and circumstances of DAO Tokens compared to Kin (*id.* at 81), this subjective belief does not alter – or, in any way minimize the importance of – the SEC's broad message in the Report that it believed that the "fundamental principles of the U.S. federal securities laws" applied to digital assets. Notably, the court in *Telegram* did not hesitate to apply the same statute to a similar investment scheme based on a virtually identical digital asset. *See Telegram*, 2020 WL 1430035, at *9 (concluding *Howey* test was satisfied). Kik objectively, and indisputably, was on notice. *See Zaslavskiy*, 2018 WL 4346339, at *9 (finding DAO Report constitutes relevant regulatory guidance).

### 3. Kik Demonstrated That It Had "Notice" By Actively Planning For The Regulatory Risk That It Was Selling Securities

Objectively viewed, the statute, case law, and DAO Report, by themselves, provided more than sufficient constitutional notice to Kik and require summary judgment for the SEC. Nonetheless, the voluminous record of the many ways in which Kik considered – and planned for – the regulatory risk that it was offering and selling securities further confirms that there is no constitutional error in applying the Act to its conduct. Kik indisputably was ***aware*** that *Howey* could apply to its offering. For example:

- A report dated April 3, 2017, which Kik received from its consultant, stated: "The SEC would potentially apply the Howey Test to determine if the sale of such tokens

64

would constitute an 'investment contract."   Kik Opp. 56.1 ¶ 218 ("Otherwise undisputed that the document contains the cited text").

- In an email the next day, on April 4, 2017, the same consultant told a Kik executive, "You don't want your offering to be a securities offering, as that comes with a huge regulatory burden and expense (it's essentially like taking your company public).  On the other hand, unregistered public securities offerings are not legal in the U.S."  The consultant further suggested that Kik consider blocking sales in the United States to mitigate the risk of SEC enforcement.   By the time Kik received these communications, Kik personnel were aware that the *Howey* test could be used to determine that the sale of a digital token constituted the sale of an investment contract. Kik Opp. 56.1 ¶ 219 ("Undisputed.")

- On or about May 5, 2017, Kik's CEO also sent the board of directors a series of PowerPoint slides that warned that "Securities law" was the first-listed "[r]isk" associated with the company's sale of Kin.  Kik Opp. 56.1 ¶ 221 ("Undisputed that the document contains the cited text.")

- Minutes from a Kik Board meeting on August 3, 2017 reported that Kik's CEO discussed with the board "the proposed cap on the [Token Distribution Event] . . . indicating that since the TDE has been delayed to further develop the minimum viable product (or initial product) so it should be in a better position to defend a regulatory challenge than others which have raised far greater amounts with either no or little utility."  Kik Opp. 56.1 ¶ 207 (following Kik's contention "that there were several reasons Kik opted to launch the token when it did . . . . Undisputed that the board minutes contained the cited text.").

Despite repeatedly considering the risk, Kik made the business decision to proceed anyway.  This fulsome and specific awareness demonstrates that Kik had sufficient constitutional notice.  *Cf. United States v. Washam*, 312 F.3d 926, 930 (8th Cir. 2002) (finding "appeal" in the government's argument that "actual notice" by the defendant of the illegality of his actions defeated the argument about the statute's vagueness).   Kik's exact motivations for proceeding with the offering despite the known risk – *e.g.*, that the company was simply wrong about the degree of risk, or wanted to try litigation with the SEC – need not be resolved for the court to reject its defense.  Having "deliberately go[ne] perilously close to an area of prescribed conduct," Kik must bear the consequences of that decision.  *United States v. Key*, 513 F.3d 432, 442 (5th Cir. 2007).  That Kik gambled wrongly does not create a constitutional violation.[31]

    **4.      Statements By Individual SEC Officials And Members Of Congress After Kik's Violation Do Not Make The Act Vague "As Applied" To Kik**

Despite taking pains to characterize its constitutional challenge as "*as applied*" (Kik Opp. Br. 73) (emphasis added), Kik purports to support its challenge by describing certain events that occurred *after* it violated Section 5.  Kik Opp. Br. 78 (criticizing "The SEC's Approach . . . *After* the TDE") (emphasis added).   Specifically, Kik recites out-of-context excerpts of public statements by various SEC officials speaking in their individual capacities, and Members of Congress, reflecting a variety of

---

[31] As for other evidence of Kik's awareness of regulatory risk, Kik makes evidentiary objections to certain emails and argues that there are "disputes" as to the scope of certain discussions about its offering that it had with Canadian regulators.  Kik Opp. Br. 81-83.  For example, Kik disputes the meaning of an email from Kik's outside counsel to the Ontario Securities Commission which stated that, on September 5, 2017, "the OSC staff definitively communicated a position that [Kik's sale to the public of Kin] constituted an offering of securities."  Kik Ex. EE (ECF No. 79-8) at 2.  *See* Kik Opp. 56.1 ¶ 229.  In addition, Kik objects to the admissibility of July 2017 email from its insurance broker which states, in part:  "With the advent of Kin we now have the potential for regulatory issues to develop if the SEC determines that Kin is in fact a security and not a product.  An SEC investigation would trigger defense costs, fines and penalties as well as a likely investor suit should there be any direct impact on the value of their investment."  Kik Opp. 56.1 ¶ 223.  The SEC does not concede that such objections are valid, or that that Kik's averred factual disputes are genuine; nevertheless, the court need not resolve them to grant summary judgment to the SEC on Kik's constitutional defense.

views about how digital assets ought to be regulated under the federal securities laws generally. *Id.* at 78-80. None of the cited statements concern Kik or Kin specifically, and all the statements indisputably occurred after Kik's conduct that forms the basis of the SEC's claims in this case. Thus, the statements have nothing to do with whether Kik was given sufficient "notice" when it engaged in this conduct. Kik Opp. Br. 73 (contending that, under as-applied standard, "the proper inquiry is whether the law 'failed to provide *them* with notice' that their conduct was prohibited" (quoting *Dickerson*, 604 F.3d at 745)). Kik cites no case – and the SEC is aware of none – holding that regulators' statements *after* proscribed conduct occurs demonstrated insufficient notice to the wrongdoer *before* such conduct.

In any event, the statements of Members of Congress obviously cannot be evidence that the *Howey* standard is vague. The excerpted statements of SEC officials also cannot be evidence, because (among other reasons) these statements were made in the officials' individual capacities and, therefore, cannot bind the Commission.[32] And, even assuming that the excerpts of the identified SEC officials hypothetically had evidentiary value, they still do not help Kik. Rather, they uniformly confirm *Howey*'s broad reach with respect to digital assets. For example, Kik cites the June 2018 speech of Director of Corporation Finance William Hinman. Kik Opp. Br. 78; Kik Ex. HH (ECF No. 79-11). In that speech, Director Hinman observed that, in "many cases" in which promoters sell tokens instead of shares "in order to raise money to develop networks on which digital assets will operate . . . the economic substance is the same as a conventional securities offering. . . . [I]t is easy to apply the

---

[32] *See Sidell v. Commissioner of Internal Revenue*, 225 F.3d 103, 111 (1st Cir. 2000) ("statements by individual IRS employees cannot bind the Secretary [of Treasury]"); *SEC v. Nat'l Student Mktg. Corp.*, 68 F.R.D. 157, 160 (D.D.C. 1975) (SEC staff views and "the views of an individual Commissioner will not invariably reflect the position of the agency as a whole"). If the individual votes of Commissioners cannot bind an agency, neither can their public statements in which they affirmatively disclaim that they are speaking for the Commission. *See Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131 (D.C. Cir. 2007). Each of the speeches of an SEC official cited by Kik included a disclaimer that that the official spoke only for her or himself and not for the full Commission.

Supreme Court's 'investment contract' test first announced in *SEC v. Howey*."  Kik also cites the May

2019 speech of Commissioner Hester Peirce.  Kik Opp. Br. 79; Kik Ex. NN (ECF No. 79-17).   In

that speech, Commissioner Pierce, while expressing her view that "[f]orbearance on the part of a

regulator is often appropriate," nevertheless pointed out the continuing applicability of legal standards:

"The problem is that the securities laws do not cease to operate as a new industry develops.

Consequently, individuals and companies in the industry must comply with our securities laws or risk

becoming the subject of an enforcement action."[33]

In sum, Kik cannot show that that the Securities Act and *Howey* are constitutionally defective

as applied to its circumstances, nor can it show a genuine issue of material fact precluding summary

judgment against it on this defense.  The court should reject the defense.

---

[33] Similarly, in the December 2017 speech of Chairman Jay Clayton cited by Kik (Kik Ex. II (ECF No. 79-12)), Chairman Clayton noted concerns that "cryptocurrency and ICO markets" brought "greater opportunities for fraud and manipulation," warned that "no initial coin offerings have been registered with the SEC," directed readers to investor alerts and bulletins on the subject published starting in July 2013, and stated that "activity that involves an offering of securities must be accompanied by the important disclosures, processes, and other investor protections that our securities law require."  Chairman Clayton also stated that he had "asked the SEC's Division of Enforcement to continue to police this area vigorously and recommend enforcement actions against those that conduct initial coin offerings in violation of the federal securities law."  Kik also complains about the breadth of the factors set forth in the informal guidance released by the staff of the SEC's Division of Corporation Finance in April 2019, entitled *Framework for "Investment Contract" Analysis of Digital Assets*, Kik Ex. KK (ECF No. 79-14).  But, Kik points to nothing in the Framework that is inconsistent with the SEC's allegations against Kik in this case.  Furthermore, all of the Framework's guidance was based on decades-old Supreme Court jurisprudence and other case law that existed *before* Kik's offering of Kin.  Issuance of the guidance in 2019 did not deprive Kik of constitutionally sufficient notice in 2017 that its conduct violated the Act.

## IV.   CONCLUSION

For the foregoing reasons, those set forth in the SEC's prior memorandum of law in support of summary judgment (ECF No. 58), and those set forth in the SEC's memorandum of law in opposition to Kik's motion for summary judgment (ECF No. 74), the Court should grant plaintiff SEC summary judgment.

Dated:   May 8, 2020                       */s/ David Mendel*
                                            Stephan J. Schlegelmilch
                                            David S. Mendel
                                            Laura D'Allaird
                                            U.S. SECURITIES AND EXCHANGE COMMISSION
                                            Division of Enforcement
                                            100 F Street, N.E.
                                            Washington, DC 20549
                                            (202) 551-4935 (Schlegelmilch)
                                            (202) 551-4418 (Mendel)
                                            (202) 551-5475 (D'Allaird)
                                            SchlegelmilchS@SEC.gov
                                            MendelD@SEC.gov
                                            DAllairdL@SEC.gov

                                            *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on May 8, 2020, I caused the foregoing to be filed using the Court's CM/ECF

system, which will send a notification of such filing to each counsel of record.


*/s/ David Mendel*
David S. Mendel
*One of Plaintiff's Attorneys*