# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    **Plaintiff,**<br><br>    **vs.**<br><br>**KIK INTERACTIVE INC.**<br><br>                    **Defendant.** | **Case No.  19-cv-5244 (AKH)** |

## [PROPOSED] ORDER

The Court, having reviewed and considered the motions for summary judgment filed by Plaintiff U.S. Securities and Exchange Commission ("SEC") and Defendant Kik Interactive Inc. ("Kik"), all memoranda and evidence submitted in support and opposition thereof, and the other pleadings in the record, hereby GRANTS the motion for summary judgment filed by the SEC (ECF No. 57) and DENIES the motion for summary judgment filed by Kik (ECF No. 61).  In so ruling, the Court makes the following findings of fact and conclusions of law.

## I.    THE SEC'S SECTION 5 CLAIM

The SEC contends that Kik violated Section 5 of the Securities Act of 1933 when Kik offered and sold a digital asset called "Kin" in 2017.  To prove its claim, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly sold or offered to sell the securities (3) through interstate commerce. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13. (2d Cir. 2006).  Kik concedes that the first and third elements have been satisfied by the SEC.  However, with respect to Kik's sales of Kin directly to the general public, Kik argues that it did not sell securities.  In contrast, with respect to its sales to accredited investors, Kik concedes that it sold securities but contends that its sales were subject to an exemption from Section 5's registration requirement.

1

A.      **Kik Offered And Sold Investment Contracts**

As to Kik's direct sales of Kin to the general public, the remaining element of the SEC's claim turns on whether Kin was an "investment contract," which is an "investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (discussing *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)).  Because the Court is required to consider the "terms of the offer, the plan of distribution, and the economic inducements held out to the prospect," *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53, 355 (1943), Kik's "Terms of Use" document cannot limit the Court's review of the record in this regard.

Based on the facts admitted by Kik in response to the SEC's Local Rule 56.1 Statement ("Kik Opp. 56.1," ECF No. 78), the Court finds that Kik's offer and sale of Kin to the general public was an offer and sale of an investment contract, and summary judgment in the SEC's favor is appropriate.

1.      *An Investment of Money*

Kin purchasers paid Kik dollars and Ether, the latter of which Kik converted to dollars.  *See* Kik Opp. 56.1 ¶¶ 233, 258.  Accordingly, an "investment of money" is present here.  *See Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564 (10th Cir. 1991).

2.      *Common Enterprise*

The Court finds a "common enterprise" based on both "horizontal" and "strict vertical" commonality.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994) ("common enterprise" when the "the fortunes of each investor depend[ed] upon the profitability of the enterprise as a whole," or "the fortunes of investors [were] tied to the fortunes of the promoter").  With regard to horizontal commonality, Kik concedes that Kin purchasers received the same digital asset held by all other purchasers, in proportion to the amount of their investment, which was pooled.  *Id.* at 87. Additionally, the success or failure of each purchaser's investment depended upon the profitability of

2

the entire endeavor (*id.* at 87) – the "Ecosystem" that Kik described in its marketing campaign. *See* Kik Opp. 56.1 ¶¶ 54, 95-104, 259. With regard to strict vertical commonality, Kik's promotional materials also made clear that purchasers' fortunes were tied to Kik's fortunes (*Revak*, 18 F.3d at 88) by virtue of the three trillion Kin that Kik awarded itself "[i]n exchange" for Kik's provision of "startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand." Kik Opp. 56.1 ¶¶ 42, 109-112, 142.

### 3.    Reasonable Expectation of Profit Derived From The Entrepreneurial Efforts of Others

Viewed objectively, Kik's promotional campaign, the content and distribution of which Kik does not contest, touted Kin's potential to increase in value as a result of Kik's managerial and entrepreneurial efforts to drive demand for Kin. *See, e.g.,* Kik Opp. 56.1 ¶¶ 96-104, 109-110, 112-115; Kik Ex. K (ECF No. 64-11) at 5-6. While Kik contends that it advertised that Kin would be a "medium of exchange," Kik concedes that, during its marketing campaign, it identified no good or service that could be purchased with Kin and that when launched there was nothing to purchase with Kin. *See* Kik Opp. 56.1 ¶¶ 210-211. Kik also concedes that there were significant technological shortcomings with the blockchain on which Kin ran when launched, making it difficult if not impossible to use for consumer transactions. *See id.* at ¶ 156. In any event, "[i]nformation in promotional materials on consumptive uses can still create an expectation of profits if the materials 'fuel[] expectations of profit.'" *SEC v. Telegram Group, Inc.*, --- F. Supp. 3d ---, 2020 WL 1430035, at *14, n. 12 (S.D.N.Y. Mar. 24, 2020). Given the record of Kik's public statements, there is no genuine dispute that such an expectation was created among Kin buyers in this case.

# # #

Kik does not claim an exemption for the portion of its offering directed to the general public. Accordingly, the Court finds that Kik's offer and sale of Kin to the general public constituted an unregistered offering of securities and a violation of Section 5.

### B.    Kik's Sales To Accredited Investors Were Not Exempt

"[T]he defendant bears the burden of proving the applicability of an exemption," and "registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public." *Cavanaugh*, 445 F.3d at 111, 115.  By contending that its sales to accredited investors were subject to an exemption from registration under Rule 506(c) of Regulation D, Kik concedes that it offered and sold securities with respect to these purchasers.

#### 1.    One Offering of One Trillion Kin

Kik's public statements describe its offer and sale of "one trillion units . . . of Kin" as a single sale with a single fundraising goal.  *See* Kik Ex. K (ECF No. 64-11) at 21; Kik Opp. 56.1 at ¶¶ 55, 239, 245, 257, 273, 274.  The economic reality of the offering is consistent with Kik's statements in this regard.  Kik used the same core marketing document – the white paper – for both portions of the sale, organized a "Roadshow" during which it both gave public presentations about Kin and met with accredited investors, and delivered Kin to both sets of purchasers at the same time using the same "smart contract," and, moreover, the terms of the sale to accredited investors were expressly conditioned on the occurrence and pricing of the general public sale.  *See* Kik Opp. 56.1 ¶¶ 47, 43-46, 57-58, 62, 76, 84-85, 287-288, 290-293; Kik Ex. E (ECF No. 64-5) at KIK000067-68.  Accordingly, as in *Cavanaugh*, the Court finds that Kik engaged in "a *single* transaction with multiple stages."  445 F.3d at 114 (emphasis in original).  And, because this "single transaction" included unaccredited investors, Kik cannot avail itself of the exemption set forth in Rule 506(c).

#### 2.    Kik's Offerings Were Integrated

Alternatively, the same undisputed evidence establishes that Kik's offering of Kin to the general public and its offering of Kin to accredited investors were "integrated" under Rule 502(a)'s five-factor test.  Here, as Kik's preparations for the offerings and public statements show, the offerings were part of a single plan of financing.  *See* Kik Opp. 56.1 ¶¶ 40, 142-43.  Both sales involved the

issuance of the same class of securities (Kin), and both occurred at or about the same time – Kik sold Kin to accredited investors between July and September 11, 2017; Kik sold Kin to the general public between September 12, 2017 and September 26, 2017; and Kik delivered Kin to both on the same day. *See id.* at ¶¶ 72, 76, 92, 123, 290. Both sets of sales were made for functionally identical consideration; Kik sold to accredited investors for dollars and to the general public for Ether, which it converted to dollars. *See id.* at ¶ 233, 295. And, the offerings were for the same purpose – Kik announced that it would use the proceeds of both "to fund Kik operations" and to "launch this whole broader ecosystem." *Id.* at ¶¶ 142-43. Accordingly, even if Kik's sales of Kin are considered two offerings, those offerings were integrated, and Kik is not entitled to exemption from registration because, again, the combined offering included non-accredited, general public investors.

### 3.   *Even If Not Integrated, No Exemption Is Available*

Finally, even if the Court were to treat Kik's sales of Kin as two distinct offerings, Kik is not entitled to an exemption from registration because Kik did not take steps to assure that its accredited investors were not statutory underwriters, purchasing Kin with an eye toward resale. In fact, the terms of Kik's "SAFT" agreement with accredited investors required purchasers to represent that they intended to "profit" from the Kin they received, which could only happen through their re-sale of Kin. Kik Ex. E (ECF No. 64-5) at KIK000069. Here, as in *Telegram*, Kik's stated "fundamental goal was to establish [Kin] as the first mass market cryptocurrency," and, therefore, Kik "did not intend for [Kin] to come to rest with the [SAFT participants] but to reach the public at large via post-launch resales by the [SAFT participants]." *Telegram,* 2020 WL 1430035, at *19 (internal quotations omitted). Kik's argument that it did not sell Kin to these accredited investors – it only sold the right to receive Kin in the future, which right the SAFT contract made unsellable – cannot be reconciled with *Radiation Dynamics, Inc. v. Goldmuntz,* or the economic reality of the transaction. 464 F.2d 876, 890-91 (2d Cir. 1972) ("sale" occurs "when the parties to the transaction are committed to one another"); *see also*

*Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) ("the point at which the parties become irrevocably bound is used to determine the timing of a purchase and sale"). Because Kik did not take steps to assure that the accredited investors were not underwriters, it cannot avail itself of an exemption, regardless of whether the transactions were one or multiple, integrated or not.

## II.    KIK'S AFFIRMATIVE DEFENSE OF UNCONSTITUTIONALITY

As to Kik's affirmative defense that Section 5's application to "investment contracts" is unconstitutionally vague "as applied" to its sale of Kin, the Court also grants the SEC's motion for summary judgment. "[I]n light of the many Supreme Court decisions defining and applying the term," any such claim is "untenable." *SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973). Moreover, as the defendant concedes, Kik had actual notice of and planned for the potential applicability of *Howey* to its offer and sale of Kin. *See* Kik Opp. 56.1 ¶¶ 218-226.

## III.   KIK'S AFFIRMATIVE DEFENSE OF PERSONAL JURISDICTION

Finally, Kik has abandoned its third affirmative defense that "Kik is not subject to general or specific personal jurisdiction in this Court," and the Court finds, therefore, that summary judgment is warranted.

## CONCLUSION

Accordingly, for the foregoing reasons, it is ORDERED, ADJUDGED and DECREED that Plaintiff's motion for summary judgment (ECF No. 57) is GRANTED, and Defendant's motion for summary judgment is DENIED (ECF No. 61).


Dated: _____          _____

                               UNITED STATES DISTRICT JUDGE