SEC109

Samuel Dowd
12/13/2019

1            UNITED STATES DISTRICT COURT
2      FOR THE SOUTHERN DISTRICT OF NEW YORK
3
4   U.S. SECURITIES AND   )
     EXCHANGE COMMISSION,  )
5                         )
         Plaintiff,  )
6                  ) Case No.
     vs.          ) 19-cv-5244(AKH)
7                         )
     KIK INTERACTIVE INC.,  )
8                         )
         Defendant.  )
9   _____)
10
11
12
13
14         Deposition of SAMUEL DOWD, taken
15   on behalf of Plaintiff, at 1961 Stout
16   Street, Suite 1700, Denver, Colorado,
17   beginning at 11:03 a.m. and ending
18   at 2:42 p.m. on Friday, December 13,
19   2019, before K. Michelle Dittmer,
20   Registered Professional Reporter.
21
22
23
24
25   JOB No. 191213SDM

                          1

---

1   APPEARANCES:
2   For the Plaintiff:
3      U.S. SECURITIES AND EXCHANGE COMMISSION
          BY:  LAURA D'ALLAIRD, ESQ.
4      BY: DAVID S. MENDEL, ESQ.
          Attorneys at Law
5      100 F Street N.E.
       Washington, D.C. 20549
6      (202)551-5475
       dallairdl@sec.gov
7      mendeld@sec.gov
8   For the Defendant:
9      COOLEY LLP
          BY: JENNA BAILEY, ESQ.
10     Attorney at Law
       3175 Hanover Street
11     Palo Alto, California 94304-1130
       (650)843-5002
12     jbailey@cooley.com
13
14  For the Deponent:
15     K&L GATES
          BY: NEIL T. SMITH, ESQ.
16     Attorney at Law
       State Street Financial Center
17     One Lincoln Street
       Boston, Massachusetts 02111-2950
18     (617)261-3100
       neil.smith@klgates.com
19
20
     Videographer:  MS. SARA HOWARD
21        GRADILLAS COURT REPORTERS
          400 North Brand Boulevard, Suite 950
22        Glendale, California 91203
          (424)239-2800
23
24
25
                          2

---

1                  INDEX
2   WITNESS:               EXAMINATION
3   SAMUEL DOWD
4      BY MS. D'ALLAIRD              4
5      BY MS. BAILEY              121
6      BY MR. SMITH              122
7
                EXHIBITS
8
    EXHIBIT NO.   PAGE   DESCRIPTION
9
    Exhibit 171   5   Subpoena to Testify in a
10  Civil Action
11  Exhibit 172   11   11/27/19 Letter to Stephan
                  Schlegelmilch from Neil
12                Smith
13  Exhibit 173   27   9/26/17 Email to ▐▐▐▐▐▐▐
                  from Kin by K k
14  SD_KIK_0000721 - 722
15  Exhibit 174   49   8/13/18 Email to Samuel Dowd
                  from Natasha Shine-Zirkel
16  SD_KIK_0000028
17  Exhibit 175   56   Reddit comments for Pause For
18  Exhibit 176   59   Pause For FAQs and Recent Posts
19  Exhibit 177   72   9/27/19 Email to Samuel Dowd
                  from Chase Barker
20  SD_KIK_0000618 - 619
21  Exhibit 178   99   Email chain, top email 10/17/19
                  to Samuel Dowd from Jenna Bailey
22  SD_KIK_0000671 - 675
23
24         PRIOR MARKED EXHIBITS:
25  Exhibit 12   76

                          3

---

1      Denver, Colorado, Friday, December 13, 2019
2          11:03 a.m. - 2:42 p.m.
3
4         (Deposition Exhibit 171 was marked.)
5         THE VIDEOGRAPHER:  This is Video Number 1
6   of the video deposition of Samuel Dowd in the matter of
7   United States Securities & Exchange Commission,
8   plaintiff, versus Kik Interactive Incorporated,
9   defendant, pending before the United States District
10  Court for the Southern District of New York, Case
11  Number 1:19-CV-05244 [sic].
12        This deposition is being held at
13  1961 Stout Street, Suite 1700, Denver, Colorado, on
14  December 13, 2019.  The time on the video screen is
15  11:03 a.m.
16        My name is Sara Howard, and I am the legal
17  video specialist from the firm of Gradillas Court
18  Reporters.  The court reporter today is Shelly Dittmer in
19  association with Gradillas Court Reporters, located at
20  400 North Brand Boulevard, Suite 950, Glendale,
21  California.
22        For the record, will counsel now please
23  introduce themselves and whom they represent.
24        MS. D'ALLAIRD:  Laura D'Allaird on behalf
25  of the plaintiff, U.S. Securities & Exchange Commission.

                          4

**Page 5**

1    MR. MENDEL:  David Mendel for the SEC.
2    MS. BAILEY:  Jenna Bailey on behalf of Kik
3  Interactive.
4    MR. SMITH:  Hi.  Neil Smith from K&L Gates
5  on behalf of Mr. Dowd.
6    THE VIDEOGRAPHER:  Will the court reporter
7  now please administer the oath.
8    SAMUEL DOWD,
9  having been first duly sworn, was examined and
10 testified as follows:
11    EXAMINATION
12 BY MS. D'ALLAIRD:
13    Q.  Good morning, Mr. Dowd.
14    A.  Good morning.
15    Q.  Could you please state your full name and
16 spell it for the record.
17    A.  Samuel Dowd, S-a-m-u-e-l, D-o-w-d.
18    Q.  Thank you.
19    MS. BAILEY:  Sorry to interrupt.  I just
20 have a really quick thing that we could hopefully address
21 off the bat.
22    I would like to avoid having to object
23 over top of him at any point to try and keep this
24 efficient, so are you willing to agree that if he's
25 objecting to a question, that objection is preserved on

**Page 6**

1  behalf of Kik, as well, for later on?  Or -- I just don't
2  want to have to be in a position where we're both
3  objecting to the same questions.  Is that okay with you?
4    MS. D'ALLAIRD:  That's fine.
5    MS. BAILEY:  Okay.  Thank you.
6    MS. D'ALLAIRD:  We can agree to that.
7    Q.  (By Ms. D'Allaird)  Okay.  Mr. Dowd, as I
8  said a few moments ago, my name is Laura D'Allaird and I
9  represent the SEC in its lawsuit against Kik Interactive,
10 Inc.  Today's deposition is in connection with that
11 lawsuit, and it's being conducted under the Federal Rules
12 of Civil Procedure.
13    Could you please state your home address
14 for us.
15    A.  Yeah. ████████████████████████████████
16 ████████████████████████████████.
17    Q.  Do you have any other personal addresses?
18    A.  I sometimes use -- still use my parents'
19 address on some things, so I could state that if I need
20 to.
21    Q.  Okay.  Where do they live?
22    A.  In Missouri. ████████████████████████
23 ██████████████████████████.
24    Q.  Do you have any business addresses?
25    A.  That's the same one.

**Page 7**

1    Q.  Same one as the Colorado Springs address?
2    A.  I'm sorry.  As my parents' address in
3  Lee's Summit, Missouri.
4    Q.  Okay.  And I want to clarify for the
5  record, Mr. Dow -- Dowd, we have Kik's counsel here
6  today.
7    Is Kik's counsel also representing you?
8    A.  Not that I'm aware of, no.
9    Q.  No?
10    MS. D'ALLAIRD:  Is that right?
11    MS. BAILEY:  That's right.
12    MS. D'ALLAIRD:  Okay.  All right.  Thank
13 you.
14    Q.  (By Ms. D'Allaird)  Mr. Dowd, have you been
15 deposed before?
16    A.  Never.
17    Q.  Okay.  There are some ground rules that we
18 have to go over before we get started, so I'm just going
19 to go over those now.
20    As you can see, we have a court reporter
21 here today who is taking down everything that we say.
22 And because the record is going to be transcribed, we
23 need to try to make it as clear as possible, and so that
24 means that we have to try our best not to talk over one
25 another.

**Page 8**

1    So please just be patient and let me
2  finish my question before you answer.  It can be tempting
3  to, you know, jump in if you -- you know, you may think
4  you know where I'm going with a question, but just try
5  to -- try to hold off on answering until I finish my
6  question.
7    Because we are transcribing today's
8  deposition, you need to give verbal answers.  So, you
9  know, a nod of the head or a body gesture is not going to
10 make it into the transcript, so please try to give verbal
11 answers to all of my questions.
12    If you don't understand a question, by all
13 means tell me and I'll rephrase as appropriate.  We're
14 also going to take periodic breaks during the deposition;
15 but if you feel like you need a break for whatever
16 reason, just tell me, tell your counsel, and we will
17 break.  I only ask that if a question is pending, that
18 you answer it before we actually go on break.
19    Okay?
20    A.  Okay.
21    Q.  Okay.  Mr. Dowd, you understand that
22 you're under oath today?
23    A.  Yes.
24    Q.  Okay.  And are you taking any medication
25 today that could affect your memory?

1     A.  No.
2     Q.  And is there any reason you can't give
3  full and complete testimony today?
4     A.  No.
5     Q.  Okay.
6        MR. SMITH:  Thank you.
7        MS. BAILEY:  Thank you.
8     Q.  (By Ms. D'Allaird)  Mr. Dowd, I've just
9  handed to you what has now been marked Exhibit
10  Number 171.  Please take a moment to review this and let
11  me know when you're ready for my questions.
12        MR. SMITH:  While he's reading that,
13  Laura, can I -- or as a process question, again, this
14  isn't investigative testimony, so I assume I can keep a
15  copy of the exhibits?
16        MS. D'ALLAIRD:  That's right.
17        MR. SMITH:  Okay.  Thank you.
18     A.  Do I need to read all of this?
19     Q.  (By Ms. D'Allaird)  No.  My questions are
20  just going to pertain to the first page of the documents.
21     A.  Okay.
22        MR. SMITH:  So here and here.
23        THE WITNESS:  Uh-huh.
24     Q.  (By Ms. D'Allaird)  And my question is
25  going to be, have you ever seen this document before?

9

1     A.  Okay.  I'm ready.  Is that -- is that the
2  question?
3     Q.  Yes.
4     A.  Yes, I have seen this document before.
5     Q.  Okay.  And is this a Subpoena for your
6  deposition today?
7     A.  Yes.
8     Q.  Okay.  And are you appearing today
9  pursuant to this Subpoena at Exhibit 171?
10     A.  Yes.
11     Q.  Okay.  You'll also see on Exhibit 171
12  there is a box checkmarked for "Production."
13        Do you see that, towards the middle of the
14  page?
15     A.  I do.
16     Q.  And it lists out some documents and other
17  information that the SEC requested in this Subpoena.
18        You see that?
19     A.  I do.
20     Q.  And my question to you is, to the best of
21  your knowledge, did you provide those documents and other
22  information to your counsel for production to the SEC?
23     A.  I did, yes.
24     Q.  Okay.  Okay.  I can take that back.  Thank
25  you.

10

1        (Deposition Exhibit 172 was marked.)
2        MR. SMITH:  Thank you.
3     Q.  (By Ms. D'Allaird)  Mr. Dowd, I've just
4  handed to you what has now been marked Exhibit
5  Number 172.  It is a letter dated November 27, 2019, from
6  Neil T. Smith to Stephan J. Schlegelmilch, I'll spell
7  that, S-c-h-l-e-g-e-l-m-i-l-c-h.
8        Please take a moment to look at this
9  document and let me know when you're ready for my
10  questions.
11        (A pause occurred in the proceedings.)
12     A.  I'm ready.
13     Q.  Mr. Dowd, have you ever seen this document
14  before?
15     A.  Not to my knowledge, no.
16     Q.  Okay.  Do you recognize what it is?
17     A.  Yes.
18     Q.  Okay.  And what is it?
19     A.  From what I'm understanding here, it is an
20  email, probably, or some kind of letter from my attorney
21  to, I guess, this Stefan --
22        MR. SMITH:  Stephan.
23     A.  Stephan?  Stephan, who I do not know,
24  giving my -- I believe the documents that we were just
25  talking about in that Subpoena, as well as the -- my

11

1  social media handles.
2     Q.  (By Ms. D'Allaird)  Okay.  Thank you.
3        And as you noted, it also lists out -- the
4  letter lists out some social media and social media
5  handles, and I think we see that in the bullets on the
6  very first page of Exhibit 172.
7        Do you see those?
8     A.  I do.
9     Q.  And my question to you is, is this list of
10  social media a complete list of all the social media
11  where you may have made public comments related to Kin or
12  Kik?
13     A.  To the best of my knowledge, yes.
14     Q.  Okay.  And then in parentheses next to
15  each social media, there's the -- what I believe are the
16  corresponding social media handles or online profiles as
17  applicable.
18        And my question is, are these all of
19  the -- are these accurate, are these the correct social
20  media handles or online profiles for each of those
21  corresponding social media?
22     A.  Yes.  These all are correct, yeah.
23     Q.  Okay.  Thank you.  I can take that back.
24        Mr. Dowd, what year were you born?
25     A.  1995.

12

1    **Q.**  And where were you born?
2    **A.**  Texas.  That's as specific as I know.
3    **Q.**  You don't know the city or town?
4    **A.**  I think I was -- I was -- I lived in
5  Irving.  Whether or not the hospital was in Irving, I
6  don't know.
7    **Q.**  Okay.  My next question to you is, where
8  did you spend your childhood?  Where did you grow up?
9    **A.**  Lee's Summit, Missouri, primarily.
10    **Q.**  That's where your parents live now?
11    **A.**  That's correct.
12    **Q.**  Okay.  And did you go to college?
13    **A.**  Yes.
14    **Q.**  And where did you go to college?
15    **A.**  Louisiana State University in Baton Rouge.
16    **Q.**  Okay.  And did you earn a degree from
17  Louisiana State University?
18    **A.**  Yes.
19    **Q.**  Okay.  And was it a bachelor's degree?
20    **A.**  Bachelor's of science in computer science.
21    **Q.**  Computer science.  Okay.
22    And what year did you graduate?
23    **A.**  2018.
24    **Q.**  Okay.  Do you have any other degrees?
25    **A.**  No.

13

1    **Q.**  Okay.  After you graduated in 2018 -- was
2  it May of 2018?
3    **A.**  May of 2018.
4    **Q.**  Okay.  What did you do after that, where
5  did you work?
6    **A.**  I work for myself as a software consultant
7  and I guess entrepreneur would be the word.
8    **Q.**  Software consultant and entrepreneur.
9    And you say you're an entrepreneur.  Do
10  you have a business?
11    **A.**  Yes.
12    **Q.**  Okay.  What's the name of that business?
13    **A.**  Oroboros.  I'll spell that:
14  O-r-o-b-o-r-o-s, LLC.
15    **Q.**  Okay.  And what is the nature of
16  Oroboros's business?
17    **A.**  So it includes both the software
18  consulting contract work, really, as well as the Pause
19  For mobile app.
20    **Q.**  And where is Oroboros located?
21    **A.**  I believe the business address is the ███
22  ████████████ address.
23    **Q.**  Okay.  And how many employees are at
24  Oroboros?
25    **A.**  I'm the only employee.

14

1    **Q.**  You're the only one?
2    And you said that Oroboros has the Pause
3  For app?
4    **A.**  That's correct.
5    **Q.**  And what is the Pause For app?
6    **A.**  Pause For app is an iOS mobile app which
7  rewards users for spending time off of their phone by
8  donating to charitable organizations within the app.
9    **Q.**  And what is iOS?
10    **A.**  IOS is Apple's mobile operating system for
11  the iPhone.
12    **Q.**  Okay.
13    **A.**  And iPad.
14    **Q.**  When did you first create Pause For?
15    **A.**  I believe, if I'm remembering correctly,
16  we went live on the app store in August of 2018.
17    **Q.**  On the app store, that was on Apple?
18    **A.**  The Apple's app store, yes.
19    **Q.**  Now, you said in -- with Oroboros that
20  your independent consult -- your consulting is also part
21  of Oroboros; is that right?
22    **A.**  Yes.
23    **Q.**  And what kind of consulting work do you
24  do?
25    **A.**  I do websites and mobile apps for small

15

1  businesses.
2    **Q.**  And you've done that since summer of 2018
3  to the present?
4    **A.**  I started doing that prior to creating an
5  LLC and creating Oroboros.
6    **Q.**  Okay.
7    **A.**  So I've been doing that, in some fashion,
8  for about seven years probably.
9    **Q.**  Seven years.  So prior to even being in
10  college?
11    **A.**  Yes.
12    **Q.**  So since you were in high school; is
13  that --
14    **A.**  Yes.
15    **Q.**  -- right?
16    So how many companies have you provided
17  consulting services to?
18    **A.**  I wouldn't be able to give you an exact
19  number right now, but it -- around ten, most likely.
20    **Q.**  And how many have you provided consulting
21  services to since you graduated from college?
22    **A.**  To the best of my memory, four.
23    **Q.**  Four.
24    Now, just focusing on those four, what
25  kinds of businesses were those four?

16

1    **A.**   A variety.  So one is a plumber.  One is a
2  cigar retail store.  One is actually a charity for foster
3  children.  I can't remember what the fourth one is right
4  now.
5    **Q.**   And you said that you provide website
6  consulting services?  Are those -- can you give me some
7  more detail on the types of consulting that you provided
8  to those particular four businesses?
9    **A.**   Yeah.  So for the plumber, for example,
10  I've developed a WordPress website for him where his, I
11  guess, customers can find him and call him and submit
12  requests for service for plumbing services.
13        And then for the charity, I've also
14  designed a website for them.  That one is in Django.  And
15  I kind of manage, you know, if they have some -- someone
16  join the company, I add that to their staff page or
17  things like that.
18    **Q.**   Okay.  What's Django?
19    **A.**   Django is -- oh, a web framework, I think
20  is the technical term, but basically it's a technology
21  that you can use to both design websites and kind of
22  maintain and update those websites.
23    **Q.**   Okay.  Other than Pause For, have you ever
24  created an app -- or, I'm sorry.  I should rephrase my
25  question.

                              17

1        Prior to launching Pause For, had you ever
2  created or launched another app?
3        MR. SMITH:  And do you mean like on the
4  app store or something --
5    **A.**   Correct.
6        MR. SMITH:  -- like, available, I mean, I
7  think --
8        MS. D'ALLAIRD:  Something that would be
9  available to the public.
10        MR. SMITH:  Okay.
11    **A.**   Publicly available, no.  No.
12    **Q.**   (By Ms. D'Allaird) Okay.  And privately
13  available?
14    **A.**   Privately available, yes.  Yeah.
15    **Q.**   Okay.  Describe those apps for me.
16    **A.**   So I think all of them were school
17  projects, so there were various little things that --
18  yeah.  Like, one was -- I believe it was called Grow 2,
19  that the idea was -- it was a habit tracker.  So, you
20  know, if you brushed your teeth every day, you could go
21  into this app and mark that you had done that, and it
22  would -- I think it made a tree grow, if I remember
23  correctly, like a little -- a little digital tree or
24  garden or some -- some kind, yeah.
25    **Q.**   Okay.  And that, you said, was in school,

                              18

1  in college?
2    **A.**   Yeah.
3    **Q.**   Okay.
4    **A.**   Yeah, at LSU.
5    **Q.**   Prior to developing Pause For, have you
6  ever developed any -- any other kind of software?
7    **A.**   I mean, yes, in that websites are
8  software.
9    **Q.**   Okay.
10    **A.**   But probably not in the way that you --
11  you're asking.
12    **Q.**   Thank you.
13        Mr. Dowd, do you have any investment
14  experience?
15    **A.**   Yes.
16    **Q.**   Okay.  Can you describe that experience
17  for me.
18    **A.**   Which aspect of the experience do you want
19  me to describe?
20    **Q.**   So what types of investments have you
21  made?
22    **A.**   Okay.  I've purchased stocks, bonds,
23  mutual funds.  I have a silver bar, it's a bullion.
24        I think that's a pretty complete list from
25  what I remember.

                              19

1    **Q.**   And for how long have you been doing that,
2  investing in these specific investments?
3    **A.**   2006 roughly, 2007.
4    **Q.**   So since you were in high school or middle
5  school?
6    **A.**   Middle school.
7    **Q.**   Middle school?
8    **A.**   Yeah.  I was 12 or 13, yeah.
9    **Q.**   Okay.  Are you familiar with the term
10  "cryptocurrency"?
11    **A.**   I am.
12    **Q.**   And what does that term mean to you?
13    **A.**   Cryptocurrency is a type of digital
14  currency that exists using blockchain technology to
15  secure transactions on its network.
16    **Q.**   Okay.  Now, so that we can keep our
17  terminology straight today --
18    **A.**   Uh-huh.
19    **Q.**   -- so if I say "cryptocurrency," "digital
20  currency," do those mean the same thing to you?
21    **A.**   No, but I'm -- I'm willing to use them
22  interchangeably --
23    **Q.**   Okay.  How --
24    **A.**   -- today.
25    **Q.**   -- do you see them as being different?

                              20

1    **A.**  Yeah.  Yeah.  I almost want to say yeah so
2  I wouldn't have to explain that.
3          But, I mean, I guess the difference, to my
4  understanding, is that cryptocurrency includes a little
5  bit extra on top of digital currency, in that there's
6  that level of encryption that provides the security.  So,
7  technically, a digital currency could be, you know, some
8  tokens in some game in -- on an iPhone app, right, that's
9  just like kind of made up, right?
10         But cryptocurrency has that extra step
11 above that with the encryption.
12    **Q.**  So if I understand you correctly, you're
13 saying that cryptocurrency has an added layer of
14 protection --
15    **A.**  Correct.
16    **Q.**  -- added --
17    **A.**  Yes.
18    **Q.**  -- security?
19         Okay.  What about "digital token," does
20 that mean the same thing to you as "digital currency"?
21    **A.**  Yes.
22    **Q.**  Okay.  Are you familiar with the term
23 "Initial Coin Offering"?
24    **A.**  Yes.
25    **Q.**  Is that also sometimes referred to as

21

1  "ICO"?
2    **A.**  Yes.
3    **Q.**  And for the sake of reference, I'm going
4  to refer to Initial Coin Offerings as "ICOs"; is that
5  okay?
6    **A.**  Totally fine.
7    **Q.**  Okay.  Now, what do you understand an ICO
8  to be?
9    **A.**  My understanding is that an ICO is the
10 first time that -- or at least the way I've seen it used,
11 is the first time that a new cryptocurrency is offered
12 to, I guess, the public or to people outside of, you
13 know, their internal team.
14    **Q.**  Mr. Dowd, do you -- strike that.
15         Have you ever purchased a cryptocurrency?
16    **A.**  Yes.
17    **Q.**  Okay.  Which ones?
18    **A.**  I've purchased Ethereum, Kin, Basic
19 Attention Token.
20    **Q.**  Basic Attention?
21    **A.**  Token, yes.  BAT, it's shortened to.
22         And then XLM, which is Stellar's token.
23    **Q.**  Okay.
24    **A.**  I think that's all of them.
25    **Q.**  Okay.  When did you first purchase

22

1  Ethereum?
2    **A.**  Honestly, I have no -- no idea off the top
3  of my head.  Sorry.
4    **Q.**  How much Ethereum do you -- or strike
5  that.
6          How much Ethereum have you purchased in
7  all the time that you've purchased Ethereum, total?
8    **A.**  If I had to give an estimate, probably
9  around 12 Ethereum.
10    **Q.**  12 Ethereum, okay.  We'll get to Kin.
11         But with respect to BAT --
12    **A.**  Uh-huh.
13    **Q.**  -- how much have you purchased in that
14 cryptocurrency?
15    **A.**  I know that the amount I purchased at one
16 point was worth around 1 Ether, one ETH, but the actual
17 amount, I couldn't tell you.  It's some number, large
18 number.
19    **Q.**  Okay.  And what about XLM, how much have
20 you purchased in that?
21    **A.**  That was purchased in the same way, where
22 I just kind of converted one ETH, Ether token, to however
23 much XLM it was.
24    **Q.**  Do you recall when you first purchased
25 BAT?

23

1    **A.**  I do not.
2    **Q.**  Do you recall when you first purchased
3  XLM?
4    **A.**  It was at the same time as the BAT, but I
5  don't remember what time that was.
6    **Q.**  Okay.  Have you ever purchased
7  cryptocurrency or digital token in an ICO?
8    **A.**  Yes.
9    **Q.**  Okay.  And which tokens?
10    **A.**  Kin.
11    **Q.**  Kin.  Only Kin?
12    **A.**  I believe so, yes.
13    **Q.**  Okay.  How did you first learn about the
14 Kin ICO?
15    **A.**  To my memory, I was subscribed to some
16 subreddits on the site Reddit, some cryptocurrency,
17 subreddits.  And I believe there was a post there where I
18 first heard about it.
19    **Q.**  Do you remember approximately when you
20 first heard about it --
21    **A.**  I do not.
22    **Q.**  -- or saw that, subreddit?
23    **A.**  No.
24    **Q.**  Going back to the other cryptocurrencies
25 that you purchased -- so set aside Kin for a minute --

24

1  taking them one at a time, why did you purchase them?
2        So why did you purchase Ethereum?
3        A.  I believe I first heard about Ethereum
4  from one of my friends, and he kind of explained the idea
5  of cryptocurrency.  And then I went and did some of my
6  own research online, learned more about the blockchain
7  and kind of the technology there.  And I'm, you know, a
8  software developer, so kind of an enthusiast about these
9  types of things.  So I was very interested in it.
10        And then it seemed like something I wanted
11  to be a part of, and it's -- at the time, it was growing
12  pretty rapidly, so there was also a potential for
13  financial gain by getting into it earlier.  So that
14  factored in as well.
15        Q.  "Financial gain," meaning that you could
16  potentially make a profit off of holding Ethereum and
17  selling it?
18        A.  Correct.
19        Q.  Okay.  What about BAT, why did you
20  purchase that currency, cryptocurrency?
21        A.  A lot of the same reasons as -- as
22  Ethereum.  BAT had kind of a different vision from
23  Ethereum, where they were -- as the name suggests, Basic
24  Attention Token -- they were going to pay people for
25  their attention with this token, and it seemed like a

25

1  good alternative to kind of the ad model that most
2  software is going down right now.
3        And so I wanted to be a part of that, and
4  so you could buy Basic Attention Token and use it in
5  their browser, which I believe is called Brave, to kind
6  of reward the creators that you support with that token
7  instead of watching ads for them.
8        And again, there was a possibility of
9  financial gain if I were to hold it and they were to
10  increase in value.
11        Q.  And with respect to XLM, why did you
12  purchase that cryptocurrency?
13        A.  So XLM, they had a different -- a
14  different method of kind of verifying their blockchain.
15  And one of the problems that had started to see with
16  Ethereum was that the blockchain couldn't scale to what
17  seemed to be usable on a wide -- wide scale, you know,
18  use case.  And XLM's blockchain could do something like,
19  you know, ten times more transactions every -- every
20  second.
21        And so, again, the technology seemed good,
22  and I wanted to be a part of it.  And there was a
23  potential, if the price increased, that I would profit
24  off of that.
25        Q.  So you said that you -- one of the

26

1  cryptocurrencies you purchased was Kin?
2        A.  Uh-huh.
3        Q.  What did you use to purchase Kin?
4        A.  If I remember correctly, I used Ether
5  tokens to buy Kin.
6        Q.  And how much Ether did you pay for Kin?
7        A.  I don't remember.
8        Q.  Do you remember, roughly, the U.S. dollar
9  value at the time that you purchased Kin?
10        MR. SMITH:  U.S. dollar value of what?
11        MS. D'ALLAIRD:  Of the Ether.
12        A.  Of the Ether?
13        Q.  (By Ms. D'Allaird)  Of the Ether that
14  you --
15        A.  That I used --
16        Q.  -- used to purchase Kin.
17        A.  -- to purchase the Kin?
18        Q.  Yes, correct.
19        A.  I believe it was around $2,000.
20        Q.  Okay.
21        (Deposition Exhibit 173 was marked.)
22        Q.  (By Ms. D'Allaird)  Mr. Dowd, I've just
23  handed to you what has now been marked Exhibit 173.  It
24  is an email dated September 26, 2017, and it bears a
25  Bates range of SD underscore KIK underscore 0000721

27

1  through 22.
2        Please take a moment to review and let me
3  know when you're ready for my questions.
4        (A pause occurred in the proceedings.)
5        A.  I'm ready.
6        Q.  Mr. Dowd, do you recognize this exhibit?
7        A.  I do.
8        Q.  And what is it?
9        A.  It's an email from Kin talking about a
10  redistribution -- redistribution of tokens that weren't
11  sold in the initial token distribution event.
12        Q.  And I see in the "To:" line, under
13  "Subject:" and "From,"
14        Is that you?
15        A.  That is me.
16        Q.  Okay.  And did you receive this email?
17        A.  I did receive this email.
18        Q.  Okay.  And if you look in that paragraph
19  that's talking about the redistribution, the sentence
20  beginning, "This was done at the original exchange rate,"
21  do you see that paragraph?
22        A.  Yes.
23        Q.  And then the next sentence says, "Your
24  portion of this redistribution is," and it gives Kin, and
25  "making your total Kin balance:"

28

1       To the best of my knowledge, is this
2   accurate in terms of how much you purchased in Kin?
3       **A.**   Yes.
4       **Q.**   Okay.  All right.  You can give that back.
5   Thank you.
6       Mr. Dowd, why did you buy Kin?
7       **A.**   So I initially heard about Kin through, I
8   believe, like I said, that Reddit post.  I then did some
9   more research.  They had released a white paper -- which
10  I think is a term used in a lot of technical
11  industries -- but in cryptocurrency, basically, these are
12  released to kind of explain the idea of the project and
13  how -- how it's envisioned that it will work and the
14  technology behind it.
15      And so Kin's white paper talked about how,
16  with a lot of cryptocurrencies what they were doing was
17  called proof of work, where all of these computers around
18  the world are solving math problems, basically, to
19  generate more of the currency in question.  And they kind
20  of fought against that idea, which a lot of people in the
21  community were doing at the time.  And it was an idea
22  that I didn't like particularly, either.
23      And their idea to replace proof of work
24  was to distribute their tokens, instead of based on
25  computing power, based on, kind of, developer effort.

29

1   And so their idea was, they would fund this Kin Rewards
2   Engine and basically -- you know, simplifying it quite a
3   bit -- but every time a -- someone used the
4   cryptocurrency -- whoops -- used the cryptocurrency in
5   the app or the website, or whatever, of a developer, that
6   developer would get some of the cryptocurrency.  So the
7   idea was that the cryptocurrency would achieve this
8   widespread adoption through incentivizing developers to
9   use it.
10      And so I was very interested in the
11  project, and then when I got -- I think I got an email
12  about signing up for the token distribution event and
13  went ahead and did that.
14      **Q.**   So you said you were -- you were
15  interested in the idea of -- that was behind the token as
16  you read in the white paper?
17      **A.**   Correct.
18      **Q.**   Any other reason why you purchased?
19      **A.**   Yeah.  I mean, I -- I couldn't tell you
20  every reason.  I'm sure there were others I'm not
21  thinking of now.
22      But there's also, you know, with anything,
23  there's the chance that it will increase in value, and so
24  then I can profit off of it.
25      There's also the fact that I am a

30

1   developer and so, you know, maybe reading a white paper
2   talking about rewarding developers maybe got me excited
3   to -- being one of those and potentially being a part of
4   the ecosystem down the road.
5       I think those are the main reasons.
6       **Q.**   So as I understand it, the reasons that
7   you're listing off are:  You thought it was an
8   interesting idea; you thought there was a potential that
9   it could increase in value and you could make a profit;
10  and you also were interested in potentially participating
11  in being a developer?
12      MS. BAILEY:  Objection.
13      MR. SMITH:  I'm going to object to that as
14  well.  I think that -- I think his answers are what they
15  are.  If you wanted to sort of summarize some of the
16  reasons, that's fine.
17      But I think his answers otherwise stand
18  for themselves as to what his full reasons were.
19      **Q.**   (By Ms. D'Allaird) Is there anything
20  inaccurate in what I said?
21      MR. SMITH:  Yeah, if you can answer.  I
22  objected, but you can still answer if you understand her
23  question.
24      **A.**   From what I understood of what you said,
25  no, I didn't hear anything that was inaccurate.

31

1       **Q.**   (By Ms. D'Allaird)  Okay.  Going back to
2   the Rewards Engine, you mentioned -- I think you
3   mentioned, and correct me if you're wrong -- you said
4   something, they -- they will create a Rewards Engine.
5       And who did you understand would create a
6   Rewards Engine?
7       **A.**   My understanding was that an entity called
8   the Kin Foundation either had been or was being created,
9   which was a -- my understanding, a nonprofit, whose goal
10  was widespread adoption of this cryptocurrency Kin.  And
11  they were the ones that were going to -- I'm sorry, I
12  forgot the phrasing of your question.
13      MR. SMITH:  Reward Engine, I think is what
14  she said.
15      **A.**   Oh, yes.  There -- yeah.
16      MS. D'ALLAIRD:  Thank you.
17      **A.**   They were the ones that were going to kind
18  of define -- the white paper already had kind of a
19  definition in place of what the Reward Engine would look
20  like, but they were going to kind of help it along and
21  figure out the specifics.
22      **Q.**   (By Ms. D'Allaird)  "They" being the Kin
23  Foundation?
24      **A.**   The Kin Foundation, yes.
25      **Q.**   And you said your understanding was, it

32

Samuel Dowd
12/13/2019

1  may or may not have existed at the time that you read the
2  white paper?
3          MR. SMITH:  I'm sorry.  I think the
4  question -- do you mean, did the Foundation exist or did
5  the Rewards Engine?  I guess, I -- I'm not sure what your
6  question is.
7          MS. D'ALLAIRD:  The Foundation.
8          Q.  (By Ms. D'Allaird)  To your understanding,
9  did the Foundation exist at the time that you read the
10  white paper?
11         A.  I honestly don't remember.
12         Q.  Okay.  Did you have any understanding of
13  who would be working at the Kin Foundation at the time
14  that you read the white paper?
15         A.  No, I don't think I had any kind of
16  knowledge of specific people.  No.
17         Q.  At the time that you were considering
18  buying Kin, did you have any understanding, one way or
19  the other, if Kik would be involved in the Kin
20  Foundation?
21         MS. BAILEY:  Objection.
22         MS. D'ALLAIRD:  You can answer.
23         THE WITNESS:  Okay.
24         MR. SMITH:  Yeah.
25

33

1          MS. D'ALLAIRD:  Sometimes they will
2  object --
3          THE WITNESS:  They just say the word and
4  then stop.
5          MS. D'ALLAIRD:  Yeah.  Just to explain --
6          THE WITNESS:  Okay.
7          MS. D'ALLAIRD:  -- sometimes they will
8  object to preserve a question.
9          MR. SMITH:  Unless I instruct you not to
10  answer based on privilege, you should answer if you
11  understand the question.
12         THE WITNESS:  Okay.
13         MR. MENDEL:  Do you want to read it back
14  to him just to make sure --
15         THE WITNESS:  Yes, please.  Yeah.
16         MS. D'ALLAIRD:  Can you read back the
17  question.
18         (The following question was read:
19         "QUESTION:  At the time that you were
20  considering buying Kin, did you have any understanding,
21  one way or the other, if Kik would be involved in the Kin
22  Foundation?")
23         A.  My understanding of the relationship
24  between the Kin Foundation and Kik, I was aware of -- I
25  was aware that members of the Kin Foundation, to my

34

1  understanding, were involved with Kik.  But when the Kin
2  Foundation was founded, Kik would be an app that was in
3  the ecosystem, just like, you know, all the other apps in
4  the ecosystem, and wouldn't be, I guess, you know, part
5  of the Kin Foundation in any special way.
6          Q.  (By Ms. D'Allaird)  Do you have an
7  understanding of when the Kik Foundation was created?
8          A.  The Kin Foundation?
9          Q.  The Kin Foundation.
10         A.  No.
11         Q.  Okay.
12         A.  Honestly, I don't.  I don't know.
13         Q.  Mr. Dowd, when you bought Kin, did you buy
14  with the expectation that you would one day sell some or
15  all of your Kin?
16         A.  What do you mean by "expectation"?
17         Q.  Did you hope to be able to sell your Kin
18  at some point?
19         A.  I think, when I bought Kin, there -- I
20  mean, there was an understanding that, as a currency, it
21  could be, you know, exchanged at a later date.  It wasn't
22  bought for the express purpose of selling, but I -- yeah,
23  the -- having the ability was always something that
24  was -- my understanding was that was going to be part of
25  it, yes.

35

1          Q.  Other than the subreddit that you saw
2  relating to the Kin ICO and the white paper, did you take
3  a look at anything else in deciding whether or not to
4  purchase Kin?
5          A.  I'm not remembering any -- any other
6  sources that I consulted, no.
7          Q.  Do you recall looking at any social media
8  relating to Kin, other than Reddit?
9          A.  And this is -- to clarify, in all of the
10  times leading up to the token distribution event?
11         Q.  Leading up to your purchase.
12         A.  Purchase.
13         Q.  Okay.
14         A.  Right.
15         Q.  The time that you purchased.
16         A.  I know that I had -- I had put in my, like
17  I said earlier, my email so I was getting emails from, I
18  believe, the Kin Foundation.
19         So anything that they linked to, I may
20  have looked at, but I -- there's -- nothing's coming to
21  mind of what else I would have looked at, no.
22         Q.  Other than the emails that you received
23  relating to Kin, did you talk to anyone at Kik before you
24  purchased Kin?
25         MR. SMITH:  Do you mean verbally spoke to

36

Samuel Dowd
12/13/2019

1  or communicated over some other form?
2      Q.  (By Ms. D'Allaird)  Whether you emailed
3  with them or spoke with them in person or over the phone,
4  did you communicate with anyone at Kik prior to
5  purchasing Kin?
6      A.  To my knowledge, no.
7      Q.  Okay.  Mr. Dowd, at the time that you
8  purchased Kin, did you have any understanding of what was
9  going to happen to Kin after you purchased it?
10     A.  When you say "understanding," do you mean
11 like hypothetical, like, guesses as to what was going to
12 happen or -- or actual concrete --
13     Q.  I mean based on anything that you looked
14 at prior to buying Kin.
15     A.  I don't -- I don't know if I understand
16 the question.
17     Q.  Are you familiar with something called the
18 Kin Ecosystem?
19     A.  Yes.
20     Q.  Okay.  And had you heard of that before
21 you purchased Kin?
22     A.  Yes.
23     Q.  And --
24     A.  I believe so.
25     Q.  -- what's your understanding of the Kin

37

1  Ecosystem?
2      A.  Kin Ecosystem is a collection of apps or
3  developers who make apps that all use Kin inside of their
4  app, is my understanding.
5      Q.  And at the time that you purchased Kin,
6  did you have any understanding of what would happen with
7  the Kin Ecosystem after you purchased Kin?
8      A.  So I, like I said earlier, had read the
9  white paper, and the white paper talks about kind of at
10 least the -- the hypothetical, what the Kin Ecosystem
11 would look like.
12     But as far as knowing exactly what it was
13 going to look like, no.
14     Q.  At the time that you purchased Kin, did
15 you have any understanding of what would happen with the
16 Kin ICO proceeds?
17     A.  To my knowledge, I don't think -- I don't
18 think I -- I don't think I knew anything about it, no.
19     Q.  Do you have an account on the Kik
20 Messenger app?
21     A.  I believe I do.  And it was created soon
22 after the token distribution event, but I -- I don't know
23 that I've ever really used it.
24     Q.  Okay.  I want to just take you back very
25 quickly to Exhibit 173, and the date on this email is

38

1  September 26, 2017.
2      Do you see that?
3      A.  I do.
4      Q.  Is this the date on which you received
5  your Kin?
6      A.  I couldn't tell you.  I don't remember.
7      Q.  Was it around this time?
8      A.  I would imagine so, yes.
9      Q.  So late September of 2017?
10     A.  That sounds right.
11     Q.  Okay.  Okay.  You can give that back to
12 me.
13     Prior to purchasing Kin, had you heard
14 anything about digital stickers being available to Kin
15 token holders?
16     A.  I want -- I believe that it had been
17 talked about as something that was coming to the Kik app.
18 I know that they had been testing, I believe they called
19 them like Kik coins or Kik tokens or something in the app
20 prior to all of this as kind of a proof concept, and
21 those were used to buy stickers.
22     So I could say I was vaguely aware of
23 stickers as a -- as an idea, yes.
24     Q.  And where did you hear about this?
25     A.  I mean, I don't know.  But if -- I would

39

1  imagine it was on the -- either on -- it was most likely
2  on the Kin Foundation subreddit.
3      Q.  Do you recall specifically if you saw it
4  on the Kin Foundation --
5      A.  I do not specifically recall, no.
6      Q.  You said you recalled Kik tokens or coins
7  and having stickers available through Kik tokens or
8  coins; is that right?
9      A.  Yes.
10     Q.  The Kik tokens or coins were not Kin,
11 though, right?
12     A.  Correct.  So the -- my understanding was
13 that Kik had kind of experimented with a digital currency
14 inside their app.  And again, the name that I made up
15 there might not be perfectly accurate.  But -- but it was
16 a kind of a precursor to what Kin would be as kind of a
17 test to see how people would use it.
18     Q.  And you specifically remember reading
19 something about digital stickers being available to the
20 holders of the precursor to Kin?
21     MR. SMITH:  Object.  I'm going to object.
22 I don't think he specifically said he remembered that,
23 but . . .
24     A.  I was about to say, I don't specifically
25 remember, no.

40

1    Q.  (By Ms. D'Allaird)  So is it correct that
2  you don't specifically remember hearing about digital
3  stickers being available to Kin token holders prior to
4  the time that you purchased Kin?
5    MR. SMITH:  Sorry.
6    I think -- object.  I don't want to object
7  too much, Laura, I'm sorry.  But I think what he said was
8  he's not sure how he heard of it, and he thinks it was
9  through the subreddit, but -- but he's not exactly sure.
10  So that's why the word "specific" is what's tripping me
11  up, so . . .
12    MS. D'ALLAIRD:  Okay.  I'm sorry you're
13  tripped up.
14    Q.  (By Ms. D'Allaird)  I want to know if you
15  specifically remember hearing about digital stickers
16  being available to Kin token purchasers?
17    A.  When you say "specifically remember," what
18  does that mean exactly?  Do I have to remember the
19  specifics of where and when and how?
20    Q.  Did you hear that?  Did you read it?  Did
21  you hear that?  Did anyone tell you that --
22    A.  That stickers --
23    Q.  -- specifically?
24    A.  -- would be available to Kin holders?
25    Q.  Yes.

41

1    A.  I -- I don't think I can say I
2  specifically remember that, no.
3    Q.  Did you buy Kin tokens to get access to
4  digital stickers?
5    A.  No, not -- not primarily, no.
6    Q.  Okay.  When you received your Kin on or
7  about sometime in September of 2017, were you able to
8  purchase anything within the Kik Messenger app at that
9  time?
10    A.  At that time, I didn't use the Kik
11  Messenger app, so I don't know.
12    Q.  So you don't know one way or the other?
13    A.  No.
14    Q.  Okay.  On the day that you received your
15  Kin, were you able to trade Kin on any exchanges?
16    A.  I don't recall.
17    Q.  Are you able to trade Kin on exchanges
18  today?
19    A.  Yes.
20    Q.  And have you traded Kin on exchanges?
21    A.  I have traded for Kin on exchanges.
22    Q.  Just four Kin?
23    A.  No, sorry.
24    Q.  Or for --
25    A.  F-o-r Kin.  Like I have traded Ether for

42

1  Kin tokens.
2    Q.  So since the time you purchased Kin, you
3  have purchased more Kin on exchanges; is that correct?
4    A.  That's correct.
5    Q.  Okay.  And about how much more Kin have
6  you purchased since your original purchase of Kin in the
7  Kin ICO?
8    A.  Not a lot, but I don't remember the
9  specific amount.
10    Q.  Just roughly?
11    A.  Can I say it in terms of U.S. dollars?
12    Q.  Yes.
13    A.  That work?  I want to say -- it's in the
14  hundreds, somewhere in the hundreds, not a thousand.
15    Q.  Hundreds of dollars?
16    A.  Of dollars, correct.
17    Q.  Okay.  Which exchanges did you use to
18  purchase more Kin?
19    A.  I know I used Mercatox, M-e-r-c-a-t-o-x.
20  I may have used others in the past, but I don't remember
21  those.
22    Q.  Do you have any understanding of where
23  Mercatox is based?
24    A.  No.
25    Q.  Going back to Pause For, does Pause For

43

1  have any relation to Kin?
2    A.  As far as the token Kin?
3    Q.  Uh-huh.
4    A.  Yes.  You use Kin inside of Pause For.
5    Q.  Okay.  And how -- how did it come about
6  that Kin is used in Pause For?
7    A.  So I was developing Pause For and actually
8  trying to use ads as a way of kind of funding the
9  donation aspect of the app.
10    And I received an email from, I believe,
11  the Kin Foundation, talking about something they called
12  the Kin Developer Program, which was -- I don't know what
13  the actual correct term for this is -- but basically
14  giving out some kind of grants or money to developers to
15  use Kin in their apps.  And so I explored that as an idea
16  of a way to kind of fund the donations of Pause For.
17    And so I applied to the Kin Developer
18  Program, was accepted, and then integrated Kin into the
19  app.
20    Q.  Do you recall about when you first heard
21  from the Kin Foundation about the Kin Developer Program?
22    A.  Not off the top of my head, no.
23    Q.  Not even generally, like the season?
24    A.  I know there's an email somewhere, but --
25    Q.  Okay.

44

1    **A.** -- I don't know.
2    **Q.** Okay. Fair enough.
3          And you said that you were accepted into
4    the Kin Developer Program at some point?
5    **A.** Yes.
6    **Q.** And can you give me more detail on the Kin
7    Developer Program itself?
8    **A.** So my understanding of the Kin Developer
9    Program at the time is, they had a limited number of
10   spots available for developers -- developers who wanted
11   to use Kin in their apps.
12         And the idea was, if you went live on
13   either Apple's App Store or the Google Play Store, they
14   would then check that your app was using Kin, and then
15   they gave a reward: part in U.S. dollars, part in Kin.
16         And then they had another structure of
17   rewards on top of that for when you hit certain
18   milestones, which I believe were based on monthly active
19   users; they would give out more U.S. dollars and Kin.
20   **Q.** Do you know how developers were selected?
21   **A.** To my memory, I believe I filled out a
22   form, kind of describing what Pause For was and how it
23   would use Kin, and then some sort of selection was made.
24   But I don't know anything about their process.
25   **Q.** Okay. And you said as -- as part of the

45

1    program, the selected developers would receive funding in
2    U.S. dollars and Kin?
3    **A.** Correct.
4    **Q.** Okay. And did you receive some funding
5    through the Kin Developer Program?
6    **A.** I did, yeah.
7    **Q.** You did? And how much did you receive in
8    U.S. dollars?
9    **A.** I believe it was 15,000 U.S. dollars.
10   **Q.** And where did you understand that funding
11   to come from?
12   **A.** The Kin Foundation.
13   **Q.** At the time that you received your funding
14   as part of the Kin Developer Program, did you have any
15   understanding of who was working at the Kin Foundation?
16   **A.** I had -- at the time I received my
17   funding, I had some knowledge, because we had done a
18   videoconference kind of -- where we presented the apps,
19   me and some of the other developers.
20         And so I -- in a way, I had met some of
21   them through videoconference, but that was -- that was
22   kind of the extent of my knowledge.
23   **Q.** This was a videoconference that took place
24   after you were selected into the program?
25   **A.** Correct.

46

1    **Q.** And it was a videoconference with other
2    app developers?
3    **A.** Yes.
4    **Q.** And it included some folks from the Kin
5    Foundation?
6    **A.** Yeah. If I remember correctly, it was
7    kind of the setup where they were all sitting around the
8    table, and they were one of the people.
9    **Q.** Do you remember any specific names of the
10   people from the Kin Foundation?
11   **A.** I do not.
12   **Q.** At the time that you received your funding
13   as part of the Kin Developer Program, did you have any
14   understanding, one way or the other, if anyone from Kik
15   was working at the Kin Foundation?
16   **A.** No.
17         MS. BAILEY: Objection.
18   **A.** No.
19   **Q.** (By Ms. D'Allaird) No?
20         In addition to funding in U.S. dollars,
21   did you also receive some Kin as part of the Kin
22   Developer Program?
23   **A.** Yes.
24   **Q.** And approximately how much Kin did you
25   receive?

47

1    **A.** I believe it was 25 million.
2    **Q.** Do you recall how much that was worth in
3    U.S. dollars at the time that you received that funding?
4    **A.** I do not.
5    **Q.** As part of the Kin Developer Program, did
6    Pause For also receive any kind of tech support from the
7    Kin Foundation or anyone else?
8    **A.** How do you define "tech support"?
9    **Q.** Any assistance with setting up the app,
10   any technical aspects about the app, anything like that.
11   **A.** There was a channel we could go through to
12   raise questions and -- and problems with the Kin SDK,
13   software development kit, that we used to integrate Kin
14   into the app. So if we had problems with their SDK, then
15   we could reach out for support with that.
16   **Q.** When did you first receive the software
17   developer kit?
18   **A.** To my memory, it was around the same time
19   that I got accepted into the developer program, though I
20   believe it's publicly available.
21   **Q.** It's publicly available today?
22   **A.** It is publicly available today. I believe
23   it was publicly available then, too; you just needed to
24   kind of talk to someone at the Foundation to get your
25   wallet set up, but the developer kit itself is

48

1 publicly -- or was publicly available.
2     Q.   At the time that you were accepted into
3 the Kin Developer Program, did you have any understanding
4 of who was making the software developer kit?
5     A.   My understanding was that it was the --
6 the Kin Foundation was developing that.
7     Q.   Did you have any understanding of who
8 specifically at the Kin Foundation was developing the
9 software developer kit?
10     A.   I mean, it -- like I said, it was -- it
11 was public. It's on a website called GitHub, where you
12 can see who's developing it. I didn't look, though, so I
13 don't know.
14     MR. SMITH:  You all right?  Do you want a
15 break?
16     THE WITNESS:  Doing good.
17     MR. SMITH:  Do you need a break?
18     THE WITNESS:  No, I'm good.
19     MS. D'ALLAIRD:  Sure.  Do you want --
20 we've been going for an hour.  Do you want to take a
21 break or --
22     MR. SMITH:  He's good.
23     MS. D'ALLAIRD:  Okay.
24     (Deposition Exhibit 174 was marked.)
25     THE COURT REPORTER:  174.

49

1     MR. SMITH:  Thank you.
2     MS. BAILEY:  Thank you.
3     Q.   (By Ms. D'Allaird) Mr. Dowd, I've just
4 handed to you what has now been marked as Exhibit 174.
5 It is an email that appears to be dated August 13, 2018,
6 and it bears a Bates number of SD underscore KIK
7 underscore 0000028.
8     Please take a moment to review this
9 exhibit, and let me know when you're ready for my
10 questions.
11     (A pause occurred in the proceedings.)
12     A.   I'm ready.
13     Q.   Mr. Dowd, do you recognize Exhibit 174?
14     A.   I do.
15     Q.   And what is it?
16     A.   It is an email from someone at, I believe,
17 the Kin Ecosystem telling me that I was accepted into the
18 Kin Developer Program.
19     Q.   Okay.  And you received this email?
20     A.   Yes.
21     Q.   And I see it's from Natasha Shine-Zirkel,
22 natasha@kinecosystem.com, sent to you, Samuel Dowd.
23     There's a cc line with Caroline Edwards.
24     Do you see that?
25     A.   I do.

50

1     Q.   And her email address is
2 caroline.edwards@kik.com.
3     Do you have any understanding, one way or
4 the other, if Caroline Edwards was at Kik at this time?
5     A.   No.
6     Q.   And does this refresh your recollection if
7 at the time you were accepted into the Kin Developer
8 Program, if you had any understanding, one way or the
9 other, if Kik was involved in that program?
10     MR. SMITH:  Do you understand what
11 "refresh your recollection" means in this context?
12     THE WITNESS:  No.
13     MR. SMITH:  Okay.
14     Q.   (By Ms. D'Allaird)  Looking at this
15 document --
16     A.   Uh-huh.
17     Q.   -- does that bring up in your memory
18 whether or not you knew at the time of this document, one
19 way or the other, if Kik was involved in the Kin
20 Developer Program?
21     MR. SMITH:  So it's a just -- I think what
22 she's saying is that, different than reading the email,
23 which you can see here the words on paper, that if you
24 now have an independent memory which is refreshed by
25 looking at this as to her question.

51

1     Do you understand that?
2     THE WITNESS:  As to -- yes.
3     MR. SMITH:  Okay.  So answer that, please.
4     A.   So no. I still -- no.
5     Q.   (By Ms. D'Allaird)  Looking down at this
6 email, it's the third paragraph, the paragraph that
7 begins with, "The Kickoff session."
8     Do you see that?
9     A.   I do.
10     Q.   And the second sentence in that paragraph
11 reads, quote:  "Please review the documentation hub and
12 fill out this form with any product or technical
13 questions you would like us to answer during the Kickoff
14 session."
15     Did I read that accurately?
16     A.   Yes.
17     Q.   Okay.  Did you fill out the form that
18 appears to be linked in that sentence?
19     A.   I don't remember, but I think that I did.
20     Q.   Would you have kept a copy of that form
21 anywhere?
22     A.   No.
23     Q.   Do you recall anything about the form?
24     A.   I believe it was a Google form.  And it
25 really was kind of what it talks about in this email,

52

1 where it's basically, "Do you have questions," because
2 they were going to do the Kickoff session that it
3 mentions there, which, if I remember right, was another
4 kind of videoconference with a bunch of developers and
5 them.  And they -- if we had any questions, they wanted
6 to go over that in the session.
7       Q.   And do you recall any questions that you
8 may have included on that form?
9       A.   I don't, no.
10      Q.   Okay.
11           MS. D'ALLAIRD:  I think I have a few more
12 questions, and then we can take a break, if that works.
13           MR. SMITH:  Sure.  Are you done with this
14 one?
15           MS. D'ALLAIRD:  Yes, I am.  You can give
16 that back.  Thank you.
17           MR. SMITH:  Uh-huh.
18           Do you want a break, or are you good to
19 keep going?
20           THE WITNESS:  I'm okay.
21           MR. SMITH:  Yeah, we can keep going.
22           THE WITNESS:  I'm good with anything.
23           MS. D'ALLAIRD:  Just a few more questions,
24 and we can --
25           THE WITNESS:  Okay.

53

1       MS. D'ALLAIRD:  -- break in a few minutes.
2       Q.   (By Ms. D'Allaird)  So as I understand you,
3 Pause For is an app that rewards users with Kin for
4 turning off their phones for a period of time; do I have
5 that right?
6       A.   That's mostly correct.  It's -- so it's
7 not turning off the phone as much as staying off the
8 phone.  So it starts a timer, and the app detects if a
9 user opens any other app during that time.  So you kind
10 of are locked into only using Pause For.
11      Q.   And if you successfully lock your phone or
12 aren't using your phone in any other way, or successfully
13 pause it, I should say --
14      A.   Correct.
15      Q.   -- what happens after that?
16      A.   So currently what happens is, the user is
17 rewarded with a certain amount of Kin tokens -- and the
18 words to describe this are always hard -- but basically
19 at the end of your pause, you get taken to the screen and
20 you can see your minutes add up.  And when they get to a
21 certain amount, then that tally is recorded in our system
22 as like:  Okay, a meal just got donated.
23           And then at the end of the quarter, we
24 tally all those up and make a donation to Feeding
25 America, in this example, for the cost of all those

54

1 meals.
2       Q.   Okay.  So if you pause correctly, there's
3 a donation that gets made to the -- to the charity?
4       A.   Yes, when you pause for the appropriate
5 amount of minutes.
6       Q.   And the donation is made in Kin?
7       A.   No.  The donation is made in U.S. dollars.
8       Q.   And so where does Kin factor into this?
9       A.   So currently in the app, the Kin that the
10 users earn can then be used on, we call them power-ups,
11 and basically what the power-ups do is they add
12 effectiveness to the pauses.  So if you pause for
13 40 minutes but you have this -- one of the power-ups
14 enabled, we would give credit for 44 minutes, right, so
15 the donations happen more quickly if you're using the Kin
16 to buy the power-ups.
17      Q.   Where does Pause For get the Kin that
18 users can earn in the app?
19      A.   So I think the primary source right now is
20 still that -- like I said, I think 25 million that got
21 from the Kin Developer Program.  In addition to that, we
22 receive weekly -- from the Kin Foundation, we receive our
23 Kin Rewards Engine payout.  And then I've purchased some
24 Kin separately, like I mentioned before.
25           So those sources all combined to go toward

55

1 the user.
2       Q.   The Kin that you, as a developer, and
3 Pause For earn out of the rewards engine, you donate to
4 the -- to the Pause For app?
5       A.   So it's hard to say where any one piece of
6 currency comes from or goes, but -- I think I have, you
7 know, two or three wallets.  So I don't know where
8 exactly -- like, it's kind of impossible to say which --
9 which token is going where, if that makes sense.
10           MS. D'ALLAIRD:  Let's take a quick break
11 right now, I think.
12           MR. SMITH:  Okay.
13           THE WITNESS:  Okay.
14           THE VIDEOGRAPHER:  The time is 12:12 and
15 we're going off record.
16           (Recess taken from 12:12 p.m. until
17 12:36 p.m.)
18           THE VIDEOGRAPHER:  The time is 12:36 p.m.
19 and we're back on the record.
20           MR. SMITH:  Thank you.
21           MS. BAILEY:  Thank you.
22           (Deposition Exhibit 175 was marked.)
23           THE COURT REPORTER:  175.
24      Q.   (By Ms. D'Allaird)  Mr. Dowd, I have handed
25 to you what has now been marked as Exhibit 175.  The

56

1  top -- it is a double-sided document.  The top upper
2  left-hand corner says:  Reddit r/KinFoundation.
3           Please take a moment to review Exhibit 175
4  and let me know when you're ready for my questions.  I
5  will tell you that I'm going to be asking you about the
6  back side of this document.
7           MR. SMITH:  Okay.  So do you want him to
8  read the whole thing now, or do you want to just have him
9  focus on a certain section?
10         Q.  (By Ms. D'Allaird)  Yeah.  I mean, if you
11 can just focus on the back of the document.
12         MR. SMITH:  Okay.
13         A.  Okay.
14         (A pause occurred in the proceedings.)
15         A.  Okay.
16         Q.  (By Ms. D'Allaird)  Mr. Dowd, do you
17 recognize this document?
18         A.  I recognize the posts here, yes.
19         Q.  And what are these posts?
20         A.  This is the post that a member of the Kin
21 community made on the Kin Foundation subreddit when Pause
22 For went live, and then there's comments from me and
23 others of the community.
24         Q.  Okay.  And Pause For went live, I think
25 you said, in -- when?

57

1          A.  I believe I said August of 2018, but --
2          Q.  Okay.
3          A.  -- I guess whenever this was.
4          Q.  Okay.
5          A.  I don't know if it says on here.
6          Q.  Okay.  If you take a look at the -- the
7  second side of this document, a little more than halfway
8  down the page, there's a question from j-h-i-n-s-i 274.
9           Do you see that?
10         A.  I do.
11         Q.  Okay.  And then there's -- it looks like
12 an answer underneath that from s-a-d-m-o-w-d.
13          Is -- is that you?
14         A.  That is me and that is an answer, yes.
15         Q.  Okay.  I'm just going to read the question
16 first.
17          "What is the business model?  Who funds
18 the KIN to pay people to do nothing on their phones?"
19          Did I read that accurately?
20         A.  You did.
21         Q.  Okay.  And I'm just going to read a little
22 bit of your answer.
23          Quote:  "Hi, founder here.  Great
24 question.  Short answer:  it's complicated.  Better
25 answer:  right now we're using investor money and the

58

1  money from the Kin Developer Program to subsidize these
2  Kin earns and subsequent donations."
3           Did I read that accurately?
4          A.  You did.
5          Q.  And my question is just, what did you mean
6  when you wrote "investor money"?
7          A.  To my recollection of what I was talking
8  about here, I believe I was talking about my own money.
9          Q.  Your own money?
10         A.  Correct, yeah.
11         Q.  Meaning -- oh, your own money --
12         A.  Like my --
13         Q.  -- that you're --
14         A.  -- savings --
15         Q.  -- investing?
16         A.  -- account.  Yes.
17         Q.  Okay.
18         A.  Yeah.
19         Q.  You -- okay.  Okay.  I can take that back.
20 Thank you.
21         (Deposition Exhibit 176 was marked.)
22         MR. SMITH:  Thanks.
23         MS. BAILEY:  Thank you.
24         Q.  (By Ms. D'Allaird)  Mr. Dowd, I have just
25 handed to you what has now been marked as Exhibit 176.

59

1  This is a four-sided document.  The top upper left-hand
2  corner reads, "Pause For (../default.htm)."
3           Please take a moment to review this
4  exhibit, and let me know when you're ready for my
5  questions.
6           MR. SMITH:  And for this one, Laura, do
7  you want him to read the whole thing?
8           MS. D'ALLAIRD:  I am going to focus on the
9  first bolded portion here under the -- the capital "FAQ."
10         MR. SMITH:  Okay.
11         Q.  (By Ms. D'Allaird)  I'm going to focus on
12 that, and then if you turn to the second page, the
13 response under the first bolded question on that page.
14          So you can just focus on --
15         MR. SMITH:  Sorry --
16         Q.  (By Ms. D'Allaird) -- those two things.
17         MR. SMITH:  -- "Do the charities get the
18 Kin . . ." is that the one?
19         MS. D'ALLAIRD:  Yes, that's correct.
20         MR. SMITH:  Okay.  Thank you.
21         (A pause occurred in the proceedings.)
22         A.  Okay.
23         Q.  (By Ms. D'Allaird)  Okay.  Mr. Dowd, do you
24 recognize this exhibit?
25         A.  I do.

60

1      Q.   And what is it?
2      A.   It is the Frequently Asked Questions page
3 on the Pause For website.
4      Q.   Okay.  And did you draft this Frequently
5 Asked Questions page?
6      A.   I definitely contributed to it, but
7 primarily, it was Hannah, mentioned there, Hannah Kidder.
8      Q.   Who's Hannah?
9      A.   She --
10      Q.   And, I'm sorry, you said -- what's her
11 last name?
12      A.   Kidder.
13      Q.   Kidder?
14      A.   K-i-d-d-e-r.
15      Q.   Okay.  And who is she?
16      A.   She was working with us as kind of a head
17 of marketing at the time.
18      Q.   Did you review this FAQ before it was made
19 available on the Pause For website?
20      A.   Yes.
21      Q.   Okay.  I want to take a look at the answer
22 under the first FAQ.
23           The first FAQ reads, "Where does the money
24 come from?"
25           Did I read that accurately?

61

1      A.   Yes.
2      Q.   Okay.  And the answer is, "Donations are
3 funded from investor capital, rewards from the Kin
4 Developer Program, and our partners."
5           Did I read that accurately?
6      A.   Yes.
7      Q.   Okay.  And my question is, what does
8 "investor capital" refer to there?
9      A.   Again, I think I was referring to my money
10 that I had invested in the company.  And as I understand
11 what I'm reading here, we're also talking about kind of
12 the plans as well, not exactly only what has happened so
13 far, so potentially in-the-future investors as well.
14      Q.   How much money had you invested in Pause
15 For when it first launched?
16      A.   When you say "invested," I had put some
17 money into an account.  Do you want to know how much
18 money I had put in or how much had been spent?
19      Q.   I guess what I mean is, if we go back to
20 Exhibit 175, the answer that we took --
21      A.   Uh-huh.
22      Q.   -- a look at, "investor money."
23           I'm just wondering -- and you said that
24 was your money that you invested.
25      A.   Okay.

62

1      Q.   I'm just wondering, how much of your
2 personal money did you invest in the app?
3      A.   If I remember correctly, I put $5,000 in.
4      Q.   Okay.  Thank you.
5           If you could just then turn -- stay with
6 me on Exhibit 176 and turn to the second page, and I want
7 to look at the answer to the FAQ at the very top.  I'll
8 read that one into the record.
9           "Do the charities get the Kin I spend?
10 Does the Pause For team go out and plant trees?  How does
11 that process work?"
12           Did I read that correctly?
13      A.   You did.
14      Q.   Okay.  And then I'm just going to read
15 the -- the answer in the first paragraph underneath that.
16           Quote:  "Ideally, each charity in the app
17 will have a Kin wallet, gifts given in the marketplace
18 immediately translate on the blockchain from our wallet
19 to the chosen charity's wallet.  Full transparency, zero
20 delay.  We're still waiting for the Kin technology to
21 catch up on this one though."
22           Did I read that accurately?
23      A.   Yes.
24      Q.   Okay.  And my question is, what does
25 "We're still waiting for the Kin technology to catch up

63

1 on this one though" refer to?
2      A.   I think concisely, what that refers to is
3 kind of this idea that we've -- we've always had that we
4 don't want to put extra work on charities that we work
5 with; we don't want them to have to figure out all the
6 terms that we've discussed today and all of the different
7 technologies at play.
8           So the hope was, eventually the Kin
9 blockchain would get to a point where it was easy and
10 accessible for people without any technical knowledge to
11 use it to basically turn whatever Kin that we were giving
12 these organizations, in this example, into the trees or
13 the meals that they're providing.
14      Q.   And do you have any understanding as to
15 who would be developing the Kin blockchain?
16      A.   So the Kin blockchain was -- was and is
17 already developed.  More -- maybe I wasn't clear, but
18 more so what I mean is kind of the things built on top of
19 the blockchain, the tools that make it simpler for
20 someone with no technical knowledge to use.
21      Q.   Okay.  And do you have an understanding of
22 who would be building those tools on top of the
23 blockchain?
24      A.   My understanding was that, really, I mean,
25 anyone could do it.  The technology was there.  It was

64

1  just a matter of kind of making -- making things more
2  accessible to a layperson. So, yeah, apps in the
3  ecosystem, Foundation, any of those. Kin Foundation, I
4  mean.
5      Q.  Okay. I can take that back. Thank you.
6          Mr. Dowd, how many users does Pause For
7  currently have?
8      A.  When you say "users," do you mean active
9  users or users that have downloaded the app?
10     Q.  Let's start with active users.
11     A.  Active users. Off the top of my
12 head, what -- the last number I remember reading was
13 somewhere around 200 monthly active users.
14     Q.  Do you recall when you last saw that?
15     A.  It was probably two or three months ago.
16     Q.  And where -- where did you see that there
17 were 200 monthly active users?
18     A.  We use a technology called Firebase that
19 Google develops, and they give us information like that
20 on -- you know, when people are logging in and how many.
21     Q.  You said there are also inactive users?
22     A.  Correct.
23     Q.  And how many inactive users does Pause For
24 have currently?
25     A.  So I -- I only know the monthly active

65

1  user number as -- basically what that means is, users
2  that have logged in in that month. So theoretically,
3  those 200 users could be a different 200 users the next
4  month, so I can't really say how many inactive users we
5  have.
6          What I can say confidently is that
7  somewhere between, I believe, last time I looked, 1,500
8  and 2,000 people have downloaded the app.
9      Q.  Does Firebase keep any metrics of what the
10 active users earn?
11     A.  No. I think maybe it has the capability
12 to, but the way we have it set up, no.
13     Q.  Do you keep track of what users earn in
14 any other way?
15     A.  I mean, so there's the wallet on the
16 blockchain where all of the, we call them earns, in the
17 app are funded from. And so in a way, I keep track just
18 by checking in on that every once in a while and making
19 sure it still has Kin in it. But I don't actively track
20 that, no.
21     Q.  Do you have an understanding of how much
22 Kin Pause For users have earned to date?
23     A.  This is a very rough estimate, but
24 somewhere around, I want to say, 20 to 30 million Kin.
25     Q.  And is your understanding based on looking

66

1  at the wallet that you just referred to?
2      A.  Correct, yes.
3      Q.  Okay. And do you know how much in U.S.
4  dollars that 20 to 30 million Kin is worth?
5      A.  Off the top of my head, no, and it would
6  be different depending on when they -- when they earned
7  it.
8      Q.  Do you receive any income from the Pause
9  For app?
10     A.  We receive the rewards from the Kin
11 Rewards Engine weekly, like I mentioned. But right now,
12 that -- that just sits in the wallet as well, so it's not
13 being converted to U.S. dollars, anything like that.
14     Q.  It's always sat in the wallet --
15     A.  Yeah. Or been then re- -- redistributed
16 to the users again.
17     Q.  Okay. So no other income from -- no -- no
18 income from Pause For --
19     A.  Correct.
20     Q.  -- for you?
21         Okay. Do you receive income from your
22 consulting practice?
23     A.  I do.
24     Q.  Okay. Income -- do you receive income
25 from anywhere else?

67

1      A.  Yes. I am -- technically, I'm employed by
2  two companies, one of which is one of my clients, but
3  they're -- I guess I can't say that's income to the
4  consulting company because it's actually a W-2, you know,
5  employee relationship.
6      Q.  Okay. What are the two companies?
7      A.  The Drumm Farm Center for Children, which
8  is D-r-u-m-m Farm, which is the charity I mentioned
9  earlier.
10         And then a company called Test Geek, which
11 is an ACT and SAT tutoring, in Colorado Springs, company.
12     Q.  What do you expect your annual income to
13 be in 2019?
14     A.  I don't know.
15     Q.  Just roughly?
16     A.  Yeah. I still don't know. Because a lot
17 of my work is contract based so it's -- if I finish a
18 contract, it's going to change by $10,000.
19         But somewhere between 30- and 60,000, I
20 would imagine.
21     Q.  Do you know how that breaks down in terms
22 of hourly income?
23     A.  I know that I -- I know what my hourly
24 rate is for the consulting work. But then I have
25 different hourly rates for different things as well,

68

1  so --
2      **Q.**  Okay.
3      **A.**  -- it's hard to say.
4      **Q.**  Okay.  I want to ask you a few more
5  questions about your investment experience.
6          How many different stocks have you
7  purchased --
8          MS. D'ALLAIRD:  Oh, I'm sorry.
9          MR. SMITH:  Are you all right?
10         THE WITNESS:  I'm so sorry.
11         MS. D'ALLAIRD:  Do you need some --
12         MR. SMITH:  Do you want a sec?
13         THE WITNESS:  No, I'm okay.
14         MS. D'ALLAIRD:  Do you want to take --
15         THE WITNESS:  I just --
16         MS. D'ALLAIRD:  -- a break?
17         THE WITNESS:  No, I'm okay.
18         MS. D'ALLAIRD:  Okay.
19         THE WITNESS:  I just was trying not to
20  cough into the mike.
21         MS. D'ALLAIRD:  Do you need some water?
22         THE WITNESS:  That's what made me cough.
23         MS. D'ALLAIRD:  Okay.
24         MR. SMITH:  Happens to me all the time.
25         THE WITNESS:  Yeah.  Don't know how I

69

1  still haven't figured out how to drink.
2      **A.**  Can you repeat your question?  I'm sorry.
3      **Q.**  (By Ms. D'Allaird)  How many different
4  stocks have you purchased over the years?
5      **A.**  Obviously this is going to be a rough
6  estimate, but somewhere around 20 to 30 different stocks.
7      **Q.**  Okay.  You mentioned mutual funds?
8      **A.**  (Witness nodded head up and down.)
9      **Q.**  How many --
10     **A.**  Correct.
11     **Q.**  -- different mutual funds have you
12  invested in?
13     **A.**  I think my Roth IRA is invested in a
14  Vanguard fund of some kind; I believe that's a mutual
15  fund.  And then aside from that, I believe two, to my
16  memory.  Two.
17     **Q.**  Have you invested in any bonds?
18     **A.**  Not directly that I can remember.
19     **Q.**  Do you know the approximate value, current
20  value of your portfolio?
21     **A.**  Does that include my retirement portfolio
22  as well?
23     **Q.**  Yes.
24     **A.**  Okay.  I would estimate somewhere around
25  40,000.

70

1      **Q.**  Okay.  Now, you said you -- you started
2  investing in -- set aside cryptocurrency -- stocks,
3  mutual funds while you were a student or you were
4  younger?
5      **A.**  Correct.
6      **Q.**  Did anyone teach you about investing?
7      **A.**  Google, if that counts, and my mom helped
8  me sign up for an E-Trade account.
9      **Q.**  Does your mom work in the financial
10  industry?
11     **A.**  No.
12     **Q.**  No?
13         Okay.  You said that you knew your hourly
14  rate for consulting.  You may have told me what it was.
15  Can you tell me again what it is?
16     **A.**  75 --
17     **Q.**  75 --
18     **A.**  -- dollars an hour.
19     **Q.**  -- an hour.
20         And what percentage would you say that you
21  spend on -- percentage of your working time that you
22  spend on Pause For?
23         MR. SMITH:  Sorry, do you mean, like,
24  today?  Do you mean on average over the course of a year?
25  That's kind of a broad question.

71

1      **Q.**  (By Ms. D'Allaird) Let's take 2019.
2      **A.**  2019?
3         MR. SMITH:  Thank you.
4      **A.**  I would say roughly 80 percent.
5      **Q.**  (By Ms. D'Allaird)  80 percent.
6         Okay.  And so in 2019, did you spend
7  20 percent of your time on consulting work?
8      **A.**  Yes, yeah.
9      **Q.**  Okay.  So looking at that 80 percent that
10  you spend on Pause For -- approximately 80 percent that
11  you spend on Pause For, am I correct in saying that
12  you're not receiving income for that 80 percent?
13     **A.**  Correct.  I'm not receiving income, no,
14  for that.
15     **Q.**  Okay.
16         (Deposition Exhibit 177 was marked.)
17         MR. SMITH:  Thanks.
18         MS. BAILEY:  Thanks.
19         THE COURT REPORTER:  177.
20     **Q.**  (By Ms. D'Allaird)  Mr. Dowd, I've just
21  handed to you what has now been marked as Exhibit 177.
22  It's an email, dated September 27, 2019, that bears a
23  Bates range of SD underscore KIK underscore 0000618
24  through 619.
25         Please take a moment to review, and let me

72

1  know when you are ready for my questions.
2         (A pause occurred in the proceedings.)
3      A.  Okay.
4      Q.  Do you recognize Exhibit 177?
5      A.  I do.
6      Q.  And what is it?
7      A.  It is an email from Chase Barker with Kin.
8      Q.  And did you receive this email?
9      A.  I did.
10     Q.  Okay.  Who's Chase Barker?
11     A.  Chase is someone who works with the Kin
12  Foundation.  I believe he started as a developer for one
13  of the teams on one of the apps in the ecosystem, and
14  then to my knowledge, I guess he was hired by the Kin
15  Foundation as kind of a -- I can't remember the word that
16  they use.  I guess it's on here, right?  Well, now he's
17  called technical program director.
18         Originally, he was kind of our main
19  technical contact for any support we needed with their
20  SDK, I think I mentioned earlier.
21     Q.  To your knowledge, does Mr. Barker have
22  any affiliation with Kik?
23     A.  Not that I know of, no.
24     Q.  Just reading this email, looking at this
25  exhibit right now, do you know what this email relates

73

1  to?
2      A.  From what I'm seeing, it's talking about
3  the shutting down of the Kik Messenger app and, I guess,
4  kind of a restructuring and what it's going to look like.
5      Q.  Do you recall reading this email at the
6  time?
7      A.  I do, yeah.
8      Q.  Okay.  Looking at this email, do you have
9  an understanding of who will be shutting down Kik
10  Messenger?
11     A.  From what I'm reading here, it says that
12  Kik will be shutting down Kik Messenger.
13     Q.  Looking at the sentence, quote, "By doing
14  so, we are able to allocate our resources to double down
15  on Kin moving forward."
16         Did I read that sentence accurately?
17     A.  Yes.
18     Q.  Okay.  Do you have an understanding of who
19  the "we" is in that sentence?
20         MS. BAILEY:  Objection.
21         MR. SMITH:  You're asking what his
22  understanding is, or are you asking him what Chase meant
23  when he wrote it?
24         MS. D'ALLAIRD:  I'm asking what his
25  understanding is.

74

1         MR. SMITH:  Okay.
2      A.  So looking over this again, it -- it does
3  seem kind of confusing, but my understanding is that
4  Chase and whoever he's -- he's working with is allocating
5  their resources to double down on Kin, yeah.  So whoever
6  Chase is -- is working with at this time.
7      Q.  (By Ms. D'Allaird)  Okay.  You can give
8  that back to me.
9      A.  Okay.
10         MS. D'ALLAIRD:  Let's take a break now,
11  and then we can come back and have -- I think we can
12  finish up.
13         MR. SMITH:  Oh, really?  Okay.
14         MS. D'ALLAIRD:  Yeah.  So let's --
15         MR. SMITH:  Okay.  How much longer --
16         MS. D'ALLAIRD:  -- go off the record.
17         MR. SMITH:  -- do you think you have?
18         MS. D'ALLAIRD:  I'm sorry?
19         MR. SMITH:  We can go off the record, I'm
20  sorry.
21         MS. D'ALLAIRD:  We can go off the record.
22         THE VIDEOGRAPHER:  The time is 1:03 p.m.
23  and we're going off the record.
24         (Recess taken from 1:03 p.m. until
25  1:36 p.m.)

75

1         THE VIDEOGRAPHER:  The time is 1336 and
2  we're back on the record.
3      Q.  (By Ms. D'Allaird)  Mr. Dowd, I've just
4  handed to you what was previously marked as Exhibit 12 in
5  this litigation.  I'll note for the record that it was
6  marked as Exhibit 2 in the investigation leading to this
7  action.
8         Take a moment to review this document, let
9  me know when you're ready for my questions.  I'm going to
10  be asking you about a few things throughout it, so I
11  don't want to point you to anything in particular.
12     A.  Okay.
13     Q.  But just take a look, and let me know when
14  you're ready.
15         (A pause occurred in the proceedings.)
16     A.  I'm ready.
17     Q.  Mr. Dowd, do you recognize Exhibit 12?
18     A.  Not specifically, no, but I believe that
19  I've read this.
20     Q.  The title is:  "Kin:" -- I'm reading on
21  the first page -- "a decentralized ecosystem of digital
22  services for daily life."  Underneath that, in all caps:
23  "POSITION PAPER."
24         Does that sound familiar to you at all?
25     A.  I mean, not -- not specifically, no.  I

76

Samuel Dowd
12/13/2019

1  think this is the paper that I read before investing, but
2  that was quite a few years ago now so I'm not entirely
3  sure.
4        Q.   When you say the paper you read before,
5  are you referring to the white paper for Kin?
6        A.   Correct.
7        Q.   Can we turn to page 11 of Exhibit 12, and
8  it's a Bates number that ends in 11.
9        Do you see it?
10       Do you see the title in bold:  "Kin
11  integration [into] Kik" -- or I'm sorry.  Let me read
12  that again.  I read that incorrectly.
13       "Kin integration in Kik."
14       A.   Yes.
15       Q.   Do you see that?
16       Did you read this section of this
17  document?
18       A.   I believe that I did, yes.
19       Q.   Okay.  I'm going to read the second
20  sentence underneath that heading.  It begins with, "Over
21  time."
22       Quote:  "Over time, Kik will work to
23  integrate Kin into Kik's chat ecosystem for the benefit
24  of users, platform developers, and partners."
25       Did I read that accurately?

77

1        A.   Yes.
2        Q.   Okay.  Based on this sentence, who do you
3  understand will integrate Kin into the Kik chat
4  ecosystem?
5        A.   Based on this sentence, Kik.
6        Q.   Did you understand that at the time that
7  you were considering purchasing Kin?
8        A.   Yes.
9        Q.   Did you have any understanding as to
10  whether Kik would be working to integrate Kin into Kik's
11  chat ecosystem after the Kin ICO ended?
12       A.   Are you asking if I was understanding
13  specifically when they were going to do it?
14       Q.   Yes, that is what I'm getting at.  Yes.
15       A.   I mean, I don't -- I don't know as far as
16  kind of specific times or anything.  I know what this --
17  I understood what this was saying, which is that they
18  will work to integrate it, but as far as the timing, I
19  don't know.
20       Q.   Okay.  Can you turn to page 18, also
21  ending in Bates Number 18.
22       At the very top, there's a Number 5 and
23  then, "Technical considerations."
24       Do you see that?
25       A.   Yes.

78

1        Q.   And then underneath that, a bolded heading
2  of, "Platform limitations and off-chain solution."
3        Do you see that?
4        A.   Yes.
5        Q.   And I want to just read the first sentence
6  of the very last paragraph on that page.  It begins with
7  the word "Given."
8        Quote:  "Given these barriers, Kik will
9  initially implement a semi-centralized hybrid on-chain
10  and off-chain Transaction Service for scalable
11  interactions with the Kin cryptocurrency."
12       Did I read that accurately?
13       A.   Yes.
14       Q.   And did you read this section of this
15  document before you purchased Kin?
16       A.   I don't remember specifically, but I
17  believe I at least skimmed it, yes.
18       Q.   Okay.  Based on this sentence, who do you
19  understand will "initially implement semi-centralized
20  hybrid on-chain and off-chain transaction service for
21  scalable interactions" --
22       MS. BAILEY:  Object --
23       Q.   (By Ms. D'Allaird)  -- "with the Kin
24  cryptocurrency"?
25       MS. BAILEY:  Sorry.  Objection.

79

1        A.   Based on this sentence, I see that Kik
2  will initially implement it.
3        Q.   (By Ms. D'Allaird)  Did you have an
4  understanding that Kik would do that work at the time
5  that you were considering purchasing Kin?
6        MS. BAILEY:  Objection.
7        A.   I don't -- I don't know that I was really
8  looking at specifically who was going to create the
9  initial blockchain when I purchased Kin, but -- yeah.
10       Q.   (By Ms. D'Allaird)  All right.  Let's turn
11  to page 23 of this document, ending in Bates Number 23.
12       And I want to look at Number 7:
13  "Conclusion."
14       Do you recall reading this section of this
15  document, Mr. Dowd?
16       A.   I believe I read this section, yeah.
17       Q.   And the third paragraph under
18  "Conclusion," I want to read into the record the first
19  sentence of that paragraph.  It begins with "With."
20       Quote:  "With the aim of fostering a
21  vibrant economy based around the Kin cryptocurrency, the
22  company will pledge all its resources to make Kin the
23  primary transaction currency in its chat app and promote
24  services from the Kin Ecosystem to its millions of
25  users."

80

1        Did I read that accurately?
2        A.   Yes.
3        Q.   And based on this sentence, who did you
4   understand to "pledge all [of] its resources to make Kin
5   the primary transaction currency in its chat app"?
6        MR. SMITH:  Objection.
7        MS. D'ALLAIRD:  You can answer.
8        A.   My understanding was that Kik would be the
9   one that it's talking about right here.
10        Q.   (By Ms. D'Allaird)  Was that your answer at
11   the time -- or was that your -- sorry, was that your
12   understanding at the time?
13        A.   Yeah.  To the best of my memory, I did
14   understand that Kik was going to be the one that was
15   implementing Kin into Kik, into its chat app.
16        Q.   Okay.  You said earlier about this
17   document that you may have read it, but it was quite a
18   few years ago.  Approximately -- approximately when are
19   you referring to, like what year?
20        A.   Am I allowed to look at this, the date
21   here and use that?
22        Q.   You can use that if you want --
23        A.   Okay.
24        Q.   -- but I was hoping to get your memory.
25        A.   Yeah.  I mean, yeah, all of this stuff was

81

1   happening in -- in the time that it was -- these things
2   were all going down, so it was between this being
3   released and the token distribution event, is when I read
4   the white paper.
5        Q.   Okay.
6        A.   So --
7        Q.   I think you -- earlier, we established
8   that you received Kin at some point in September of 2017?
9        A.   Yeah.  That's what we established, yeah.
10        Q.   And you read this at some point prior to
11   that?
12        A.   Correct, yeah.
13        Q.   Did you read this in -- in 2017?
14        A.   Yes.
15        Q.   So that was a couple years ago --
16        A.   Yeah.
17        Q.   -- roughly speaking?
18        A.   Roughly speaking, yeah.
19        Q.   Okay.  All right.  You can give that back
20   to me.  Thank you.
21        A.   Uh-huh.
22        Q.   Mr. Dowd, has counsel for Kik ever reached
23   out to you regarding this litigation?
24        A.   Yes.
25        Q.   And when, when did they first reach out to

82

1   you regarding this litigation?
2        A.   I don't recall.  It would -- it would have
3   been in 2019, though.
4        Q.   Do you recall, roughly, the season?
5        A.   Let's see.  I was living in Colorado, so
6   after April.
7        Q.   After April.
8        Okay.  And who from Kik's counsel first
9   reached out to you regarding this litigation?
10        A.   I honestly don't remember who.
11        Q.   How did they reach out to you?
12        A.   I believe it was email.
13        Q.   Okay.  And do you recall what was said?
14        A.   My recollection is that before they had
15   reached out, I had been reached out to by a member of the
16   Kin Foundation.  And they had kind of explained that they
17   were -- I don't know if they were looking for witnesses
18   or whatever it was, but they were asking if they could
19   give my name to Cooley as a potential witness.
20        And so then the email from Cooley was
21   following up on that and, I believe, just asking to set
22   up a meeting to kind of talk more about what they were
23   looking for.
24        Q.   So just unpacking that a little bit, you
25   said that you first heard from someone from the Kin

83

1   Foundation.  Do you recall who from the Kin Foundation?
2        A.   Chase Barker.
3        Q.   Chase Barker.  And that's the individual
4   who we saw on an email earlier today?
5        A.   Correct.
6        Q.   And he reached out to you how?
7        A.   I believe he used Slack, but that's -- I
8   don't remember.
9        Q.   You don't remember?  Okay.
10        A.   Yeah.  Some digital written communication.
11        Q.   And what did he tell you?
12        A.   I don't recall the exact conversation, but
13   he mentioned the lawsuit and that -- I think maybe he
14   said that I would be a good witness or -- or something
15   like that.
16        Q.   Okay.
17        A.   And that he wanted to give my information
18   to Kin or Kik or whatever's attorneys so that they could
19   reach out and talk to me more.
20        Q.   And -- and you said that was Cooley; is
21   that Cooley the law firm?
22        A.   That was my understanding, yeah.
23        Q.   Okay.  And then someone from Cooley
24   reached out to you to set up a meeting?
25        A.   Yeah.  To my memory, that's how it

84

1  happened.
2      Q.   And did that meeting take place?
3      A.   Yes.
4      Q.   Okay.  And approximately when was the
5  meeting?
6      A.   I mean, probably within a couple weeks
7  after those emails, but I don't remember specifically.
8      Q.   Okay.  Was it an in-person meeting?
9      A.   No.  It was a -- I had -- they sent me a
10 dial-in and I called in.
11     Q.   It was a phone call?
12     A.   Yeah.
13     Q.   Okay.  How long was the phone call?
14     A.   I don't remember.
15     Q.   Okay.  Who was on the phone call?
16     A.   I believe that you (indicating) were on
17 it, that she was on it.
18     Q.   And you're -- for the record, you're --
19         MS. BAILEY:  Jenna.
20     Q.   (By Ms. D'Allaird)  -- nodding towards
21 Ms. Bailey.
22     A.   Nodding toward Ms. Bailey.  There were, I
23 think, around four different people that I had never met
24 before.
25     Q.   Okay.

85

1      A.   And I do not remember their names.
2      Q.   Okay.  Was anyone on the phone with you?
3  So other than members of Kik's counsel, was there anyone
4  else on the phone?
5      A.   Not to my knowledge, no.
6      Q.   Was anyone from Kik, the company, on the
7  phone?
8      A.   I don't think so, unless -- I mean, no, I
9  don't think so.
10     Q.   Okay.  And what was discussed during this
11 phone call?
12     A.   I don't remember everything, but I
13 remember they kind of laid out the lawsuit that's taking
14 place, and we talked about -- I believe in this phone
15 call, we talked about my involvement with the
16 cryptocurrency Kin and Pause For and how it uses Kin.
17 Yeah.
18         And then I think -- I think toward the end
19 of the call, they -- they asked if they could put my name
20 forward to, I guess, to the SEC.  And I don't think I
21 gave them an answer on the call, but it was brought up as
22 an idea.
23     Q.   What did they tell you about this lawsuit?
24     A.   I don't remember exactly, but it wasn't a
25 lot.  I mean, just kind of the basic facts of, you know,

86

1  SEC on one side, Kik on the other, and that they
2  represent Kik.  And I think they may have introduced me a
3  little bit to the arguments of each side, but I don't
4  know that that's -- I don't know how far they went into
5  that.
6      Q.   What can you tell me about what they said
7  about the arguments?  What can you remember about that?
8      A.   I mean, I can't say anything with
9  certainty.  Do you want me to kind of guess or -- I --
10     Q.   No.
11     A.   No?  Okay.
12     Q.   I want to know what you -- I'm trying --
13     A.   Yeah.
14     Q.   -- right now to just know what you
15 remember.
16     A.   Yeah.  I mean, so I don't remember
17 anything they specifically said on that phone call.  I
18 have recollections of, like, what the arguments are just
19 from general knowledge.  But from that phone call, I
20 don't remember what they said, no.
21     Q.   When you refer to your knowledge of the
22 general arguments, is that -- is that based on things
23 that you've read on the Internet?
24     A.   Primarily, yes.  Yeah.
25     Q.   At the end of the call, they asked if they

87

1  could put your name forward, I think you said?
2      A.   That's what I remember, yeah.
3      Q.   Did you have any understanding of what
4  that meant?
5      A.   I think I actually asked them kind of what
6  that meant, like what my responsibilities would be if
7  they -- if they were to do that.  And so they kind of
8  explained that most likely -- and I believe that was in
9  this call -- that they explained that, most likely, I
10 would get deposed by the SEC.  Here we are today.
11         And then most likely, if the case goes to
12 trial, that I would have to appear in court in New York,
13 I believe.
14     Q.   Okay.  Anything else that you remember
15 about this phone call?
16     A.   No, not specifically.  No.
17     Q.   Okay.  What happened after the phone call?
18     A.   I went back to work.
19         MR. SMITH:  Yeah.
20     Q.   (By Ms. D'Allaird)  Did you hear from --
21 let me clarify my question.
22         After the phone call, did you ever hear
23 again from Kik's counsel?
24     A.   I did, yes.  I was sent an email following
25 up, and I do not remember the contents of the email, but

88

1    I was emailed after the call.
2        Q.   About how long after the call was the
3    email?
4        A.   I would say within the week.
5        Q.   Okay.  Do you remember anything generally
6    about the contents of the email?
7        A.   I don't.
8        Q.   Okay.  What happened after that email?
9    Did you reply?
10       A.   I imagine I must have, but I don't
11   remember specifically what happened next.
12       Q.   Do you remember if there were any other
13   meetings or calls with Kik's counsel?
14       A.   I know we had at least one other call, and
15   probably just one other call.
16       Q.   Okay.
17       A.   Yeah, to kind of talk about some more
18   specifics of -- of how this was all going to work.
19       Q.   Okay.  Approximately when was that other
20   call?
21       A.   I -- I don't remember.
22       Q.   Who was on the call?
23       A.   Probably the same people that were on
24   before.
25       Q.   So that would be Ms. Bailey --

89

1    A.   Ms. Bailey.
2        Q.   -- and some other attorneys from Cooley?
3        A.   Yeah.  I think there was a guy named Luke.
4        Q.   Luke?
5        A.   Yeah.  That's all I remember.
6        Q.   Does Luke Cadigan sound familiar?
7        A.   That does sound familiar.
8        Q.   Okay.  You believe he was on that call?
9        A.   I believe he was.  If he wasn't, he was
10   cc'd on the emails or something, but that name sounds
11   familiar from Cooley.
12       Q.   Do you recall if he was on the first call
13   as well?
14       A.   I believe he was.
15       Q.   Okay.
16       A.   I'm not 100 percent sure.
17       Q.   Okay.  Do you recall any other names --
18       A.   No.
19       Q.   -- of folks on this call?
20            Do you recall if anyone from Kik, the
21   company, was on this call, the second call?
22       A.   I believe the understanding I had at the
23   time is that most everyone on the call was from Cooley
24   and then one may have been the counsel, like a general
25   counsel at Kik.  It all sounded like lawyer words, and I

90

1    don't remember specifically.
2        Q.   And you're not a lawyer?
3        A.   I am not a lawyer.
4        Q.   Tell me what was discussed on this second
5    call.
6        A.   As I remember, we talked about -- we
7    talked a little more about what it would look like if I
8    were to be called as a witness or, I guess, put forth as
9    a witness, and then they talked about Neil Smith.
10       Q.   And Neil Smith is your counsel --
11       A.   My counsel.
12       Q.   -- who is present today?
13       A.   Yes.  And how they wanted Neil to
14   represent me so I had some kind of representation in the
15   case.
16       Q.   Okay.  A couple questions.
17            What did they tell you about what would
18   happen if you were named or called as a witness?
19       A.   I mean, similar to what I mentioned
20   before.  You know, we talked about the deposition, and I
21   believe I specifically asked, you know, "Am I going to
22   have to go to New York twice to -- to do this?"  And they
23   mentioned that, most likely, the SEC would come to me for
24   the deposition.
25            And then I asked about dates, and they --

91

1    at the time, I believe they told me that discovery --
2    which I think is a word -- was ending in November and so
3    I would be deposed by November.  That's my remember --
4    memory.
5            That apparently is not the case anymore.
6    And that the trial would happen sometime in 2020, but
7    they couldn't give me too many specifics on when, but
8    that was their -- their estimate for when the trial would
9    happen.
10       Q.   What did they tell you about Mr. Smith?
11       A.   They told me that he, I guess, is an
12   attorney that is separate from Kik and from Cooley and
13   from Kin and from everyone else and that he -- he could
14   represent me as a witness.
15       Q.   Okay.  Do you have any understanding as to
16   why they were recommending a lawyer to represent you?
17            MS. BAILEY:  Objection.
18       A.   So my understanding, which was based off
19   what they said, is that they wanted a clear division
20   between me and them, I guess, and they can't -- I think
21   the way it works is that they can't represent me because
22   they're part of the case, so they needed a third party to
23   represent me.
24            They did also give me the option of
25   finding my own counsel, I believe, but they -- they did

92

1  mention -- I forgot this earlier -- that Neil Smith was
2  familiar with the SEC, and so they recommended him as
3  counsel.
4       Q.  (By Ms. D'Allaird)  Okay.  Just -- I just
5  want a yes-or-no answer to this question.  I don't want
6  to get into any kind of substance.
7            Did you ever reach out to a lawyer, not
8  Mr. Smith, to another lawyer about potentially
9  representing you in relation to being a witness in this
10  litigation?
11      A.  No.
12      Q.  Okay.  Anything else that you can remember
13  about this second call?
14      A.  No.
15      Q.  Okay.  And after the call, did you have
16  any further communications with counsel for Kik?
17      A.  Yes.  There were emails after the call.
18      Q.  Okay.  And the emails, do you remember who
19  from Kik's counsel sent those emails?
20      A.  I don't, no.
21      Q.  Okay.  And what did those emails relate
22  to?
23      A.  Again, the -- you know, me being provided
24  as a witness for this case, yeah, and more logistic
25  questions and things of that nature.  I'm really trying

93

1  to remember more specifics and I've got nothing.
2       Q.  Okay.  If that's all you can remember --
3       A.  That's all I remember.
4       Q.  -- then we'll stop at that.  Okay.
5            Mr. Dowd, have you paid any legal bills in
6  relation to this lawsuit?
7       A.  No.
8            MR. SMITH:  Objection.
9       A.  No.
10      Q.  (By Ms. D'Allaird)  Okay.  Do you have an
11  understanding of who is covering those bills?
12           MR. SMITH:  Objection.  Sorry.  I -- if --
13  it's -- I think he can get to the point of it, your
14  question.
15           But if your understanding is based on
16  conversations you and I have had, I don't -- you can just
17  answer yes or no to that.  If you have an understanding
18  from other conversations --
19           THE WITNESS:  Uh-huh.
20           MR. SMITH:  -- that you and I did not have
21  directly, then that's a different answer.
22      A.  Remembering.  I remember that when, I
23  guess, the representatives with Cooley talked to me
24  originally about me getting counsel, they mentioned that
25  I would not have to pay for that, that that would be

94

1  something that -- I don't know specifically who's paying
2  for it, but that I'm not paying for it.
3       Q.  (By Ms. D'Allaird)  Okay.  They mentioned
4  that it would be paid --
5       A.  It would be paid.
6       Q.  -- by someone not you?
7       A.  Right.
8       Q.  Okay.  Have you paid any out-of-pocket
9  costs in relation to this deposition today?
10      A.  Not yet, I guess.  I mean, I've, you know,
11  used gas to get here and I had to park in a garage, but
12  technically, I haven't paid for either of those things
13  yet.
14      Q.  Will anyone be reimbursing you for those
15  out of -- those costs that you just mentioned?
16           MR. SMITH:  Objection.
17      A.  It's my understanding that I can get
18  reimbursed for those things.  I don't know exactly who or
19  how that happens, but when we -- when I originally talked
20  to Cooley about the deposition, they did -- or and about
21  the trial as well, they mentioned that I could have -- I
22  could be reimbursed for, like, my costs associated with
23  it.
24      Q.  (By Ms. D'Allaird)  Did they specify who
25  would be reimbursing you?

95

1       A.  I don't think so, no.
2       Q.  Okay.  Has anybody made any payments to
3  you for appearing today at this deposition?
4       A.  No.
5       Q.  Do you have an understanding of any
6  payments that may come to you in the future for appearing
7  here today at this deposition?
8            MR. SMITH:  So same objection as before.
9            If your understanding is based on
10  conversations we've had, you can answer just yes or no;
11  but if it's based on other conversations, you can talk
12  about that.  But I think that's a yes-or-no question,
13  so . . .
14      Q.  (By Ms. D'Allaird)  Well --
15      A.  Can --
16      Q.  -- it --
17           MR. SMITH:  Do you have an understanding,
18  yes or no.
19      A.  Can you repeat the question?  Sorry.
20           MS. D'ALLAIRD:  Can we read back the
21  question.
22           (The following question was read:
23           "QUESTION:  Do you have an understanding
24  of any payments that may come to you in the future for
25  appearing here today at this deposition?")

96

```
 1        A.  Yes.
 2        Q.  (By Ms. D'Allaird)  Okay.  And who do you
 3  understand will be making those payments?
 4        A.  I don't know.  I don't know.
 5        Q.  Okay.  What is your understanding based
 6  on?
 7        A.  Conversations with representatives of
 8  Cooley.
 9        Q.  Okay.  And what did they tell you about
10  future payments that you may receive for appearing at
11  this deposition today?
12        A.  To my memory, I mentioned to them that
13  owning a business and being, you know, the person that
14  does all the development, I'd -- it was difficult for me
15  to set aside time during workdays to come out here, and
16  so I mentioned to them that my hourly rate was the $75.
17        And from my understanding of their
18  response, then I could be reimbursed for the time that I
19  spent on being deposed or the trial or whatever.
20        Q.  Okay.  The $75-per-hour amount, that
21  refers to your consulting hourly rate?
22        A.  Correct.
23        Q.  Okay.  And did anyone at Cooley give you
24  an indication as to who would be paying you that hourly
25  rate?
```

97

```
 1        MS. BAILEY:  Objection.
 2        A.  Not to my knowledge, no.
 3        Q.  (By Ms. D'Allaird)  Okay.  And do you have
 4  an understanding of the amount that you might receive for
 5  appearing here today?
 6        MR. SMITH:  Objection.  I don't know what
 7  you mean.  I guess it's a confusing question.  Do you
 8  mean how many hours it's going to take?  I mean, he's
 9  told you it's sort of an hourly billing rate, so . . .
10        Q.  (By Ms. D'Allaird)  Do you have an
11  understanding of how much you're going to be paid --
12        A.  I mean --
13        Q.  -- for being here today?
14        A.  The --
15        MR. SMITH:  The day's not over.
16        Q.  (By Ms. D'Allaird)  The amount?
17        MR. SMITH:  It's hard to say.  The day's
18  not over.
19        MS. D'ALLAIRD:  Okay.
20        MR. MENDEL:  You can answer.  Go ahead.
21        MR. SMITH:  You can answer, if you
22  understand.
23        MS. D'ALLAIRD:  You can answer.
24        A.  Yeah, my -- my understanding is limited to
25  my hourly rate.  That's all I -- all I've been told.
```

98

```
 1        (Deposition Exhibit 178 was marked.)
 2        THE COURT REPORTER:  178.
 3        MR. SMITH:  Thanks.
 4        Q.  (By Ms. D'Allaird)  Mr. Dowd, I've just
 5  handed to you what has now been marked as
 6  Exhibit Number 178.  It is an email chain.
 7        The first email at the very top of the
 8  first page of this exhibit is dated October 17, 2019.  It
 9  bears a Bates range of SD underscore KIK
10  underscore 0000671 through 675.
11        Please take a look at this exhibit, and
12  let me know when you're ready for my questions.
13        MR. SMITH:  Would you like him to read the
14  whole chain?
15        MS. D'ALLAIRD:  Yes, please.
16        MR. SMITH:  Okay.
17        So why don't you start at the back because
18  it goes historically.
19        (A pause occurred in the proceedings.)
20        A.  Okay.
21        Q.  (By Ms. D'Allaird)  Mr. Dowd, do you
22  recognize the email chain at Exhibit 178?
23        A.  I do.
24        Q.  I want to start at the beginning on,
25  historically, the first email of the chain, and that
```

99

```
 1  appears at the page ending in Bates Number 674.
 2        There's an email at the top dated Friday,
 3  September 27, 2019, at 2:12 p.m.
 4        Do you see that?
 5        A.  Yes.
 6        Q.  Okay.  It's hard to see who this is sent
 7  to because it just says, "Bailey, Jenna . . . wrote:" and
 8  then, "Hi Samuel."
 9        But if you look at the email, the next
10  email there, there's a reply.  And if you turn back to
11  the Bates page of 673, there's a "Samuel Dowd"
12  responding.
13        Do you see that?
14        A.  Yes.
15        Q.  Yeah.
16        Based on that, do you know if you received
17  this first email that I'm just referring to on the page
18  with Bates Number 674?
19        A.  Yes.  Yeah.
20        Q.  Okay.  And do you recall reading this
21  email?
22        A.  I do.
23        Q.  Okay.  Is this the email you were
24  referring to a few moments ago, the first email from
25  Kik's counsel to you?
```

100

1    A.  Yeah, the first email.  Yes.
2    Q.  Okay.  I see in here, there's a reference
3 to, quote, "I believe you already touched base with
4 Chase . . ."
5         That's Chase Barker?
6    A.  That's Chase Barker --
7    Q.  Okay.
8    A.  -- is my understanding.
9    Q.  And then I want to read the last sentence
10 in that -- in the full -- the large paragraph there.
11         Quote:  "As a TDE purchaser and a
12 developer who is involved in the Kin community, we would
13 very much appreciate a 30 minute call to provide some
14 context about the case and how you could potentially help
15 in our defense."
16         Did I read that accurately?
17    A.  Yes.
18    Q.  Okay.  And then I see that there's a reply
19 from you:  "Hi Jenna,"
20         "I'm available Tuesday from 1:30 to 5 p.m.
21 MDT."
22         Did I read that accurately?
23    A.  Yes.
24    Q.  And that's setting up the call, the first
25 call that you had?

101

1    A.  That's correct.
2    Q.  Okay.  Reading this email, does that bring
3 to mind anything else about that phone call, that first
4 phone call that you had?
5    A.  Yeah.  I mean, so the part about me being
6 a TDE purchaser and a developer, that reminds me more
7 specifically of why they were talking about me being
8 someone that they would potentially want to call as a
9 witness, because of my multiple ways that I'm involved in
10 the ecosystem.
11    Q.  Okay.  Do you recall anything else about
12 Kik's counsel providing context about the case to you?
13    A.  No.
14    Q.  No?
15         What about any other discussion of how you
16 could potentially help in Kik's defense?
17    A.  Other than the -- the -- what I just
18 mentioned, no, nothing new.
19    Q.  Other than being a witness?
20    A.  Correct, yeah.
21    Q.  And then just moving up the chain, so I'm
22 on the page with the Bates stamp ending in 673, there's
23 an email from Ms. Bailey to you, dated Tuesday,
24 October 1, 2019 at 6:07 p.m.
25         Do you see that?

102

1    A.  Yes.
2    Q.  Okay.  And did you receive that email?
3    A.  Yes.
4    Q.  Okay.  And in the cc line, there's someone
5 named Eileen Lyon, L-y-o-n.
6         Do you know who that is?
7    A.  I believe that's the -- the person I
8 mentioned earlier who was the counsel at Kik, but I don't
9 know specifically.
10    Q.  Okay.  And looking at this now, does that
11 bring to your mind whether or not Ms. Lyon was on that
12 first call?
13    A.  I'm pretty sure she was, but I don't know
14 for sure.
15    Q.  Okay.  And then on the cc line, if we keep
16 moving over, there's Luke Cadigan.
17         I believe you mentioned Luke Cadigan
18 earlier.  He's one of Cooley's attorneys, right?
19    A.  That's my understanding, yes.
20    Q.  And then there's someone called -- or
21 named Brett De Jarnette, D-e space J-a-r-n-e-t-t-e.
22         Do you know who that is?
23    A.  I don't --
24    Q.  Okay.
25    A.  -- no.

103

1    Q.  And you don't have any recollection if he
2 was on that first call?
3    A.  I don't remember if he was or not, no.
4    Q.  Okay.  Okay.  I want to read part of this
5 second sentence in this email, beginning with, "please
6 do."
7         Quote:  ". . . please do let us know if
8 you have any additional questions about the process and
9 what it would involve."
10         Did I read that portion of that sentence
11 correctly?
12    A.  Yes.
13    Q.  Okay.  There's a reference to "additional
14 questions."
15         Did you have questions during that first
16 call?
17    A.  I mean, I would imagine that I asked some
18 questions about, as I mentioned earlier, the process of
19 being a witness in a -- in a court case.
20    Q.  Okay.  Okay.  Then moving up the chain,
21 there's another email on Tuesday, October 8, 2019, from
22 Ms. Bailey.
23         Again, it doesn't show who it's being sent
24 to, but looking at this email, do you know if you
25 received this email?

104

1    A.  Yes, I did receive this email.
2    Q.  Okay.  Ms. Bailey writes in the second
3  sentence, quote:  "I just wanted to check in with you and
4  see if you had any additional thoughts or questions about
5  our discussion last week," end quote.
6        Did I read that correctly?
7    A.  Yes.
8    Q.  Okay.  Now, that email is dated October 8.
9  The email prior to that from Ms. Bailey to you is dated
10  October 1.  There's about a week in between.
11        Is there any reason in particular why --
12  well, I should ask this:  Had you emailed them in between
13  that time?
14    A.  Not to my knowledge, no.
15    Q.  Okay.  Or otherwise reached out to anyone
16  at Cooley?
17    A.  Not to my knowledge.
18    Q.  Is there any reason why you had not in
19  those seven days?
20        MR. SMITH:  Objection.
21    A.  I mean, I imagine there's a variety of
22  reasons.  I don't know exactly what I was doing that
23  week, but I'm sure I was doing a lot.  So, yeah, I mean,
24  that's not a -- that's not above the standard amount of
25  time it takes me to respond to an email.

105

1    Q.  (By Ms. D'Allaird)  Okay.  Okay.  Now let's
2  move -- let's continue to move up the chain.
3        The next email on the same page, on
4  Thursday, October 10, 2019.  It appears to be from you.
5  We don't see who it's to.  But the first sentence is:
6  "[Hi] Jenna and all."
7        Just looking at this email, did you write
8  and send this email?
9    A.  I did.
10    Q.  Okay.  Did you send it to Ms. Bailey and
11  the others, individuals who were listed on the email that
12  we saw earlier on October 1 --
13    A.  Yeah --
14    Q.  -- 2018?
15    A.  -- to my memory, I just pressed "Reply
16  All," so it was probably to all of those --
17    Q.  Okay.
18    A.  -- cc's.
19    Q.  Okay.  I want to read the first sentence
20  of your email.  Quote:  "I have put a good bit of thought
21  into it, and I just don't" know -- I just -- excuse me.
22  Let me start over because I want to read that accurately.
23        Quote:  "I have put a good bit of thought
24  into it, and I just don't think I can justify taking the
25  time off to go to New York right now," end quote.

106

1        Did I read that accurately?
2    A.  Yes.
3    Q.  Okay.  What did you mean?
4    A.  So basically what I said.  It's -- it was
5  difficult for me to justify taking time off of work to
6  get involved in this case.
7    Q.  And "New York" refers to, I think you
8  mentioned the trial being in New York?
9    A.  Yeah, that was my understanding, is the
10  trial would be in New York.
11    Q.  Okay.  And then the last sentence of your
12  email, quote, "I hope you have luck finding witnesses,"
13  end quote.
14        Did I read that accurately?
15    A.  Yes.
16    Q.  Okay.  And "finding witnesses," does that
17  refer to finding witnesses for Kik's defense?
18    A.  Yeah.  Yeah.
19    Q.  And so at this point in time, you are not
20  inclined to be a witness for Kik?
21    A.  When I sent this email, correct, yeah.
22    Q.  Let's move on to the next email on the
23  previous page ending in Bates Number 672.
24        It's an email dated October 11, 2019, at
25  10:49 a.m.  It appears to be from you and then Ms. Bailey

107

1  and the other individuals that we -- we saw on the
2  previous email on October 1 in this chain.
3        Looking at this email, did you send this
4  email?
5    A.  I did.
6    Q.  Okay.  And I should ask:  In between the
7  email that you sent on October 10, 2019 and the one we're
8  looking at right now, October 11, had you had any
9  communication with anyone at Cooley?
10    A.  No.
11    Q.  Okay.  Anyone at Kik?
12    A.  Not to my knowledge, no.
13    Q.  Okay.  Why did you send this email?
14    A.  Well, I don't remember the specific
15  reason, but to my memory, I had looked at my previous
16  email and kind of thought about it a little bit more.
17        And I wanted to -- I wanted to be a
18  witness.  I wanted to be a part of this; I just didn't
19  have the time.  And so I wanted to send one more email
20  just to clarify that if there was a way that we could
21  make it work where I wasn't, you know, basically losing
22  money by participating, then I could participate.
23    Q.  Okay.  I -- I want to read the first two
24  sentences of your email.
25        Quote:  "I guess I should clarify.  I

108

1 really do want to help."
2          Now I'm going to write -- read the
3 third -- did I read those two accurately?
4          A.   Yes.
5          Q.   Now I'm going to read the third sentence.
6          Quote:  "I would just need to be
7 compensated to justify it to the business owner part of
8 myself."
9          What did you mean by this statement?
10          A.   Similar to what I was just saying, is that
11 as someone who works hourly, every hour that I'm not
12 working is money that I'm no longer going to get, which
13 means, you know, rent that I can't pay.
14          So in order to take on a new project with
15 an unknown amount of hourly commitment, I just need to
16 make sure that I wasn't going to lose money while doing
17 that.
18          Q.   And were you asking to be compensated to
19 be a witness for Kik?
20          MR. SMITH:  Objection.
21          MS. D'ALLAIRD:  You can answer.
22          A.   So -- I mean, the email does say that, you
23 know, "need to be compensated."  So yeah, I was -- I was
24 asking to have my time, basically, reimbursed, yeah.
25          Q.   (By Ms. D'Allaird)  At this point in time,

109

1 you are not inclined to serve as a witness for Kik
2 without compensation, correct?
3          MR. SMITH:  Objection.  Do you mean when
4 he wrote the email, or do you mean today?
5          MS. D'ALLAIRD:  When he wrote the email.
6 I'll --
7          MR. SMITH:  Sorry.  Thank you.
8          Q.   (By Ms. D'Allaird)  Let me look back at the
9 question here.
10          All right.  At the time that you wrote
11 this email on October 11, 2019, you were not inclined to
12 serve as a witness for Kik without compensation, correct?
13          MR. SMITH:  Objection.
14          A.   Can -- can you --
15          MS. D'ALLAIRD:  You can answer.
16          A.   -- clarify what you mean by "not
17 inclined"?
18          Q.   (By Ms. D'Allaird)  You weren't agreeing at
19 that time to be a witness without compensation?
20          A.   I had not yet agreed to be a witness, but
21 I did want to be a witness, as the email says that
22 "I . . . do want to help."  But no, I had not agreed to
23 be a witness.
24          Q.   The last sentence of this email, quote:
25 "I've never even argued a traffic ticket let alone the

110

1 SEC."
2          Did I read that accurately?
3          A.   You did.
4          Q.   What did you mean by that statement?
5          A.   Well, I was telling a joke, first of all.
6          But what I meant was that I've never been
7 involved in any kind of legal proceeding; I've never been
8 to court; I've never been a witness; I've never been
9 deposed, none of those things.
10          Q.   Did you understand -- did you have an
11 understanding that Kik's attorneys were asking you to
12 argue against the SEC?
13          MR. SMITH:  Objection.
14          A.   That was not my understanding.  My
15 understanding was that I would be a third-party witness,
16 I guess third party to anyone involved in the case.
17          Q.   (By Ms. D'Allaird)  All right.  Moving up
18 the chain, looks like there's a reply at 5:41 p.m. on
19 October 11, 2019 from Ms. Bailey.  Again, we don't see
20 the email addresses of who is on this email.  It's
21 addressed "Hi Sam."
22          Looking at this email, do you recall if
23 you received this email?
24          A.   I did receive this email.
25          Q.   Okay.  A few sentences in, I want to read,

111

1 quote:  "Generally, I am optimistic that we could figure
2 something out that works for you and doesn't
3 inconvenience you too much.  To that point, I think it
4 makes sense to set up a call early next week to talk
5 through our options."
6          Did I read that accurately?
7          A.   Yes.
8          Q.   Okay.  And does that refer to setting up
9 that second call that you had?
10          A.   I believe it does, yeah.
11          Q.   Okay.  Looking at this email, okay, not --
12 not looking at the others just yet, but looking at this
13 email, does that bring to mind anything else about that
14 second call that you had with Kik's counsel?
15          A.   Yes.  Yeah.  I had forgotten that during
16 that call, we had discussed the reimbursement options.  I
17 had forgotten that that was part of what we discussed on
18 the second call.
19          Q.   All right.  Anything else?
20          A.   No.
21          Q.   Okay.  Then moving up the chain, there's a
22 reply from you.
23          A.   Uh-huh.
24          Q.   October 11, 2019 at 5:06 p.m.  You suggest
25 a couple days.

112

Samuel Dowd
12/13/2019

1    Then if we flip the page, there's an email
2    dated October 15, 2019 at 10:47 p.m. from Ms. Bailey,
3    addressed "Hi Sam." Doesn't have any email addresses on
4    it.
5        But do you recall receiving this email?
6    A.  I do.
7    Q.  Okay.  And Ms. Bailey includes a link to
8    what appears to be Mr. Gates' profile at his law firm --
9        MR. SMITH:  Mr. Smith.
10   Q.  (By Ms. D'Allaird)  Mr. Smith.  Not
11   Mr. Gates --
12       MR. SMITH:  I wish I was Mr. Gates.
13   Q.  (By Ms. D'Allaird) -- that's --
14       MR. SMITH:  That would be much better.
15   Q.  (By Ms. D'Allaird) -- Mr. Smith's profile
16   on K&L Gates?
17   A.  Yeah -- yes.
18   Q.  Okay.  All right.  And then the next
19   email, Thursday, October 17, 2019 at 11:13 a.m., there's
20   a reply from you to everybody who we see on these earlier
21   emails: Ms. Lyon, Mr. Cadigan, Mr. De Jarnette, and
22   Ms. Bailey.
23       You write, quote, "If you still think it's
24   best to hire" -- oh, let me ask, did you send this email?
25   A.  I did.

113

1    Q.  Okay.  And second sentence, quote: "If
2    you still think it's best to hire Neil, that works for
3    me."
4        Did I read that accurately?
5    A.  Yes.
6    Q.  Does that bring to mind anything else
7    about the conversation as to potentially retaining
8    Mr. Smith as your counsel in relation to this litigation?
9    A.  No.
10   Q.  Okay.  The next sentence in this email,
11   quote:  "As far as the per diem calculations go, my
12   hourly rate for my consulting work is $75/hour."
13       Quote:  "On average, I work 10 hours a
14   day.  Depending on the day, I do different amounts of
15   consulting work and Pause For work, and the Pause For
16   work is obviously harder to calculate an hourly rate for.
17   But seeing as I'm consulting as a mobile developer, and
18   I'm working on Pause For as a mobile developer, using the
19   same rate for both makes the most sense to me.  So per
20   hour: $75.  Per diem: $750.  Let me know if that all
21   makes sense."
22       Did I read that accurately?
23   A.  Yes.
24   Q.  Okay.  What were you referring to with
25   respect to "As far as the per diem calculations go"?

114

1    A.  I believe in the second phone call with
2    the Cooley representatives, when we were talking about
3    reimbursing for time, they mentioned a per diem, I guess,
4    idea of reimbursing.  And I believe that was more so for
5    the trial itself since I would have to travel to,
6    theoretically, New York.
7        But yes, I was referring to, in the call,
8    them mentioning that they -- they could reimburse me.  I
9    just need to have justification for what I normally would
10   be making.
11   Q.  Okay.  Prior to this call, had you heard
12   of per diem rates?
13   A.  Yes.
14   Q.  Okay.  So you were familiar with that.
15       You said you thought the conversation was
16   about a per diem for participating in the trial?
17       MR. SMITH:  Objection.
18   A.  I mentioned that the -- that the per diem
19   was more -- more aimed at the trial since that was going
20   to be the time that I was traveling a full day.  But not
21   that -- not anything more than that.
22   Q.  (By Ms. D'Allaird)  Okay.  Did you have any
23   understanding as to whether or not the per diem would
24   apply to your appearance in the deposition?
25   A.  I don't know if it was stated whether or

115

1    not I would be paid per diem for the -- in fact, I know
2    it wasn't stated whether or not I would be paid per diem
3    for the deposition.  I was under the impression that I
4    would get some form of reimbursement for the deposition.
5    Q.  Okay.  That we discussed earlier?  Okay.
6    A.  Correct.
7    Q.  And then going up to the very top email in
8    this chain, from Ms. Bailey to you, cc'ing the
9    individuals that are also cc'd in the October 17 email,
10   dated October 17, 2019.
11       Did you receive that email?
12   A.  I did.
13   Q.  Okay.  And the first sentence in that
14   email after "Hi Sam," quote:  "This all makes sense,
15   thanks!"  End quote.
16       Did I read that accurately?
17   A.  Yes.
18   Q.  Okay.  And what did you understand
19   Ms. Bailey to mean by that statement?
20   A.  My understanding was that she was
21   referring to what I said in my last email, asking her to
22   let me know if it all made sense, and I was referring to
23   my calculations for a per diem and per hour rate.
24   Q.  Okay.  Mr. Dowd, have you worked as a
25   consultant this week prior to today, so Monday through

116

1  Thursday of this week?
2      **A.**  Yes.
3      **Q.**  Okay.  And what did you bill per hour for
4  that consulting work?
5      **A.**  $75 an hour.
6      **Q.**  Okay.  And about how many hours did you
7  work this week at that rate?
8      **A.**  I can't say I know off the top of my head.
9      **Q.**  Okay.  Just approximately?
10     **A.**  What's today's day, Friday?
11         MR. SMITH:  Correct.
12     **Q.**  (By Ms. D'Allaird) Today's Friday, so I'm
13  talking about Monday through Thursday.
14     **A.**  For Monday through Thursday of this week,
15  I would estimate that I worked around 30 hours at that
16  rate.
17     **Q.**  Did you do any other work this week at any
18  other hourly rate?
19     **A.**  Yes.
20     **Q.**  Okay.  And what work was that?
21     **A.**  I believe I worked one or two hours for
22  Drumm Farm, the charity I mentioned earlier, and they pay
23  me at a $50 rate, but that's the W-2 employee situation.
24     **Q.**  Okay.  And just roughly, how many hours
25  did you work for Drumm Farm?

117

1          MR. SMITH:  Don't talk about anything we
2  talked about in the call.
3      **A.**  And then also met with my deposition this
4  morning.
5          MR. SMITH:  Say you met with counsel this
6  morning.
7      **A.**  Oh, deposition -- counsel.
8          THE WITNESS:  Thank you.
9      **Q.**  (By Ms. D'Allaird)  Okay.  So you had a
10  couple calls with your counsel to prepare for today's
11  deposition.
12          Don't tell me anything that was said, but
13  when did the phone calls take place?
14     **A.**  I believe one was on -- one was yesterday
15  and one, I believe, was on Tuesday.
16     **Q.**  Okay.  And the call on Tuesday, about how
17  long was that call?
18          MR. SMITH:  Objection.
19          You can answer.
20     **A.**  I believe it was about one hour.
21     **Q.**  (By Ms. D'Allaird)  And approximately how
22  long was the call with your counsel yesterday?
23          MR. SMITH:  Objection.
24     **A.**  I don't remember.
25     **Q.**  (By Ms. D'Allaird)  These were phone calls.

119

1      **A.**  One or two.
2      **Q.**  One or two?  Okay.
3          MS. D'ALLAIRD:  Okay.  Can we take just a
4  two-minute break right now?
5          MR. SMITH:  Sure.
6          MS. D'ALLAIRD:  Go off the record.
7          THE VIDEOGRAPHER:  The time is 1433 and
8  we're going off the record.
9          (Recess taken from 2:33 p.m. until
10  2:38 p.m.)
11          THE VIDEOGRAPHER:  The time is 1438 and
12  we're back on the record.
13     **Q.**  (By Ms. D'Allaird)  We're back on the
14  record.
15          Mr. Dowd, what did you do to prepare for
16  today's deposition?
17     **A.**  Well, I had to -- I don't know if this
18  counts as to "prepare," but I had to produce those
19  documents that we've gone over some of them, and I had a
20  couple phone calls with my counsel, just kind of talking
21  about what a deposition looks like --
22          MR. SMITH:  Just -- stop.
23          MS. D'ALLAIRD:  Oh.
24          MR. SMITH:  Sorry.
25          MS. D'ALLAIRD:  Don't --

118

1          Did your counsel provide you with any
2  documents to review in preparation for today's
3  deposition?
4          MR. SMITH:  Objection.
5          So just say --
6          THE WITNESS:  Is that something --
7          MR. SMITH:  -- say yes or no.
8          THE WITNESS:  -- I'm allowed to talk
9  about?
10     **A.**  Yes.
11     **Q.**  (By Ms. D'Allaird)  Yes?
12          Okay.  About how many documents?
13          MR. SMITH:  Objection.
14     **A.**  About five.
15     **Q.**  (By Ms. D'Allaird)  And did those documents
16  refresh your memory as to the events that we discussed
17  here today --
18          MR. SMITH:  Objection.
19     **Q.**  (By Ms. D'Allaird)  -- in your deposition?
20     **A.**  Yes, some of them.
21     **Q.**  In preparing for today's deposition, did
22  you do anything else?
23     **A.**  I read those documents.  That's it.
24     **Q.**  Okay.  In preparing for today's
25  deposition, did you meet with Kik's attorneys?

120

**Page 121**

```
 1        A.  No.
 2        Q.  Okay.  Did you speak with Kik's attorneys
 3  in preparation for this deposition?
 4            MR. SMITH:  Objection.
 5        A.  No.
 6        Q.  (By Ms. D'Allaird)  No?
 7        A.  (Witness shook head from side to side.)
 8        Q.  Okay.
 9            MS. D'ALLAIRD:  Pass the witness.
10            MS. BAILEY:  Oh, sorry.  So I only have, I
11  think, two questions.  I promise I won't drag it out.
12            EXAMINATION
13  BY MS. BAILEY:
14        Q.  But I just -- does the fact that you're
15  being reimbursed for your expenses for testifying in this
16  case impact your testimony in any way?
17        A.  No.
18        Q.  Is -- is the reimbursement that you're
19  receiving in any way contingent on the content of the
20  testimony that you're providing either here or at trial?
21        A.  No.
22        Q.  Okay.
23            MS. BAILEY:  That's it.
24            MR. SMITH:  I just have two quick
25  questions.
```

**Page 122**

```
 1            EXAMINATION
 2  BY MR. SMITH:
 3        Q.  One is, without getting into the substance
 4  of our discussion, Mr. Dowd, the documents that we sent
 5  you, those were all documents that you had first sent to
 6  us, right?
 7        A.  Yes.
 8        Q.  Okay.  And counsel for the SEC had asked
 9  you about your time this week.
10            Did you spend any other time working on
11  any other projects this week, apart from your consulting
12  work and the work for Drumm Farm?
13        A.  Yes.
14        Q.  And what --
15        A.  Yeah.  I --
16        Q.  What was that working on?
17        A.  For Pause For.
18        Q.  And about how many hours did you work this
19  week for the Pause For app?
20        A.  Roughly 10 to 20.
21            MR. SMITH:  Okay.  No other questions.
22            THE VIDEOGRAPHER:  This concludes today's
23  recorded video session of Samuel Dowd.  The time is 1442
24  and we are going off the record.
25            (WHEREUPON, the within proceedings were
```

**Page 123**

```
 1  concluded at 2:42 p.m. on the 13th day of December,
 2  2019.)
 3            *   *   *   *   *
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 124**

```
 1        I, SAMUEL DOWD, hereby certify that I have read
    the foregoing transcript and that the same and
 2  accompanying correction sheets, if any, constitute a true
    and complete record of my testimony.
 3
 4  PAGE  LINE        NOW READS          SHOULD READ
 5  ____  ____  _____  _____
 6  ____  ____  _____  _____
 7  ____  ____  _____  _____
 8  ____  ____  _____  _____
 9  ____  ____  _____  _____
10  ____  ____  _____  _____
11  ____  ____  _____  _____
12  ____  ____  _____  _____
13  ____  ____  _____  _____
14  ____  ____  _____  _____
15  ____  ____  _____  _____
16  ____  ____  _____  _____
17                   _____
18                   SAMUEL DOWD
19        Subscr bed and sworn to before me this _____
20  day of _____, 20____.
21
22        My Commission expires: _____
23        Notary Public
24        Address: _____
25                 _____
```

Samuel Dowd
12/13/2019

1        REPORTER'S CERTIFICATE
2
3        I, K. MICHELLE DITTMER, Registered Professional
4   Reporter and Notary Public, State of Colorado, do hereby
5   certify that previous to the commencement of the
6   examination, the deponent was duly sworn by me to testify
7   to the truth in relation to the matters in controversy
8   between the parties hereto; that the said deposition was
9   taken in machine shorthand by me at the time and place
10  aforesaid and was thereafter reduced to typewritten form;
11  that the foregoing is a true transcript of the questions
12  asked, testimony given, and proceedings had.  I further
13  certify that I am not employed by, related to, nor
14  counsel for any of the parties herein, nor otherwise
15  interested in the outcome of this litigation.
16       IN WITNESS WHEREOF, I have affixed my signature
17  this 20th day of December, 2019.
18       My commission expires April 13, 2020.
19
    _____
20       K. MICHELLE DITTMER
         Registered Professional Reporter
21
22
23
24
25

                    125

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**