SEC110



Patrick E. Gibbs
+1 650 843 5535
pgibbs@cooley.com

FOIA CONFIDENTIAL TREATMENT REQUEST
BY EMAIL: MITCHELLB@SEC.GOV

November 17, 2017

Brent Mitchell
Senior Counsel – Division of Enforcement
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20759

RE:   *In re Kik Interactive* (HO 13388)

Dear Brent:

I write in response to the supplemental questions set forth in your October 25, 2017 letter (the "Request") concerning Kik Interactive Inc. ("Kik" or the "Company"). Kik is producing certain documents responsive to the Request through a secured filed transfer site.

**Question 1.1 - Please identify the dates of the individual sales of SAFTs. That should include, but not be limited to, the date of the sale, the purchasing Person, the size of the sale, and the consideration paid for the sale.**

KIK001187 is a chart containing the dates of the individual execution dates of SAFTs, the pre-sale participants, and the amount purchased in United States Dollars.[1]

**Question 4.1 - How did Kik use the proceeds of the SAFT sales prior to or on September 26? What proceeds were used in connection with incorporating the use of Kin and creating the Kin Ecosystem, and how did Kik use those proceeds? What proceeds were used for other purposes, and how did Kik use those proceeds?**

Prior to September 26, Kik spent significant time, money, and resources developing the Kin Project and Ecosystem with the ultimate goal of developing Kin as a true medium of exchange, whereby users could both earn and spend Kin within the Ecosystem. Kik spent approximately $7.5 million to fund the Kin project. Of this amount, $1.6 million in expenses were pre-funded by Kik through excess cash on hand raised during prior financing rounds and from operations and $5.9 million in expenses were funded through SAFT proceeds.

Consistent with Kik's view of Kin as a currency, Kik expended time, money and resources on researching and coordinating with its internal and outside legal teams to ensure compliance with

---

[1] Please note that after further investigation, Bonseph Holdings Limited, Brad Riddoch, Larry Innanen, Marc Heinke, and Ash Mukherjee have been added to the list of pre-sale participants.

Cooley LLP   3175 Hanover Street   Palo Alto, CA   94304-1130
t: (650) 843-5000   f: (650) 849-7400   cooley.com

153842390



applicable laws and regulations and to maximize safety within the Kin Ecosystem. Kik worked extensively on researching and coordinating with its internal and outside legal teams to ensure compliance with applicable laws and regulations in the United States and Canada. This included but is not limited to, developing risk assessment, analyzing KYC and AML obligations, structuring the terms of the pre-sale agreements (SAFTs), Kin Terms of Service and Privacy Policy, incorporating and registering a Money Services Business (MSB), incorporating the Kin Foundation, identifying advisors and directors, developing a strategic collaboration agreement with CoinTree and beginning negotiating contracts with the board designees. Total external legal expenditures prior to September 26 were approximately $698,000, which does not include internal legal and executive management time spent on the project.

Kik also retained consultants, including CoinFund and CoinTree, who conducted research with respect to product development, technological architecture, product implementation, initial product launch, and regulatory compliance. Fees incurred to CoinFund and CoinTree prior to September 26 totaled approximately $4,300,000.

Kik obtained KYC/AML software from IdentityMind to collect data on more than 17,000 public sale registrants (including the over 10,000 public sale participants provided to the SEC) and to run various sanctions screenings on the registrants to ensure regulatory compliance. Total software costs, including $65,000 paid to IdentityMind, were approximately $74,000.

From a resourcing perspective, Kik redeployed 41 Kik employees (20 operations and 21 engineering), to the Kin Project. Although Kik did not maintain time records for its engineers, the Kin Project team devoted extensive time to the project. Time allocations were determined through discussions with key management and leadership. Kik's Engineering Team worked on technically integrating Kin into the Kik platform, including developing security measures, such as enabling a multi-signature wallet to mitigate against security breaches. Similarly, Kik's software engineers introduced encryption and safety features for linking an external wallet to Kik accounts. The engineers also programmed the self-execution of the smart contract with numerous inputs, which included automatic refunds for participants who did not pass the KYC or AML screenings and for other individuals who were not allowed to participate. This team also worked on enabling the exclusive content for Kin Holders within Kik, such as the availability of sticker packs and status levels, and automating communications with Kin Holders through chat bots.

In accordance with the strategic collaboration agreement with CoinTree (effective August 30, 2017), Kik acquired four key engineers with specific knowledge and experience in block-chain technology. During the month of September (1st – 26th inclusive) these engineers were employed by Kik. As a result, $51,000 in salaries, benefits, perks and travel was allocated to the Kin project. Prior to August 30, 2017, CoinTree was engaged on a consultancy basis.

In addition to the above, Kik spent significant resources on marketing, research, crypto related hardware and equipment, internal employee training and development to ensure that all employees



were familiar with cryptocurrency in general as well as exchanges, token distribution, and blockchain technology, and other project expenses for a total of approximately $711,000.

**Question 4.2 - How did Kik use the proceeds of the SAFT or Kin sales on or after September 26? What proceeds were used in connection with incorporating the use of Kin and creating the Kin Ecosystem, and how did Kik use those proceeds? What proceeds were used for other purposes, and how did Kik use those proceeds?**

Between September 26 and October 31, 2017, Kik has used roughly $560,000 in SAFT and public sale proceeds to fund operations and further develop the Kin Project and Ecosystem. Costs during the period were primarily determined using a cash based approach as October month-end has yet to be completed (amounts are subject to change). Expenditures during this period were primarily related to internal costs. For example, Kik devoted 9 more employees to the Kin Project following the public sale, for a total of 50 (23 operational, 27 engineering). These efforts have focused on the implementation of new iterations of the Kik App that further integrates Kin into the platform. For example, Kik plans to submit a new version of the Kik App to the Apple store by December 5, 2017, which is discussed in more detail below.

**Question 5.1 - What emails in the spreadsheet at KIK000109 are also emails for Kik App users? Please produce a revised version of the spreadsheet with a field for Kik membership and, where available, the data that Kik maintains for that Kik App user.**

As we have previously discussed, KIK000109 contains information from certain participants who intended to participate in the public sale before the KYC and AML process took place, so it does not necessarily reflect the actual individuals who participated and the amounts contributed. Specifically, the inputs of the public sale smart contract did not allow people to participate if they did not pass the KYC or AML process. Further, the smart contract inputs did not allow certain people to contribute over certain amounts. Please see KIK001188 for a revised spreadsheet containing information post-public sale that reflects data from the individuals who actually participated in the public sale. The spreadsheet contains Ether address, Kin, amount of Ether, amount in U.S. dollars, IP address, age, postal country, and passport country of those individuals that participated in the public sale.[2]

---

[2] The spreadsheet does not contain first and last names as that is a manual process that would be burdensome to collect for all public sale participants. However, Kik has provided that information for certain participants, such as in KIK001186. Please also note that Kik's October 20, 2017 Letter stated that 1,712 public sale participants have linked an external wallet that holds Kin to their Kik account. After further investigation, 1,712 total individuals (including Kik employees) have linked an external wallet that holds Kin to their Kik account. Based on Kik's records, 1,685 public sale participants, have linked external wallets holding Kin to their Kik accounts.



November 17, 2017
Page Four

FOIA CONFIDENTIAL TREATMENT REQUEST

**Question 7.1 - Why did Kik award Kin to 1,000 of its most active users?**

Kik awarded Kin to 1,000 of Kik's most active users to encourage the integration of Kin on the Kik platform and further establish Kik as a user of the Kin Ecosystem. Specifically, Kik intended for these users to proliferate the use of Kin within the Ecosystem, such as through the current use of sticker packs. Engaging Kik's most active users to proliferate uses and features has been a common practice of Kik to gain key insights and expand the network. For example, in connection with Kik Points (which Kik considers to be a beta for Kin), Kik awarded all users an initial balance which encouraged participation within the application.

**Question 8.1 - Did any of the Largest TDE Purchasers or Largest US TDE Purchasers link their wallet to the Kik App? If so, which ones?**

Yes. The Largest TDE and US TDE purchasers who have linked their external wallets to the Kik App are:



- ▇
- ▇
- Garrette David Furo
- ▇
- ▇
- ▇
- ▇
- ▇
- Harrison Wang
- ▇

**Question 8.2 - Among the public sale participants who have linked a wallet to the Kik App, please identify the 50 Persons with the largest balance of Kin. For each Person, please provide the data identified in response to Question 6 and the amount of Kin purchased in the TDE.**

Please see Bates Range KIK001186 for a spreadsheet containing this information.[3]

**Question 9.1 - At the time that Kin were first issued, could Kin Holders buy any goods or services with Kin? If so, what and how?**

At the time Kin was first issued, Kin Holders could use Kin to buy goods or services in peer-to-peer transactions. That is, if a public sale participant wanted to purchase an item from a particular

---

[3] Please note that the amount of Kin held in the spreadsheet reflects the amount held in the wallet that is linked to the Kik account. There may be other wallets that hold Kin that are not linked.



November 17, 2017
Page Five

FOIA CONFIDENTIAL TREATMENT REQUEST

individual, he or she could transfer Kin to that individual on the blockchain in exchange for the item. However, as previously discussed with Staff, as of the date Kin was first issued, Kin Holders could not buy any goods or services through Kik. Rather, as discussed in Kik's October 20, 2017 Letter, Kin Holders were granted certain sticker status levels within Kik based on the amount of Kin they hold. Specifically, the current version of Kik allows Kin Holders to link external wallets holding their Kin to their Kik account. Depending on how much Kin a user has, each Kin Holder can unlock a sticker status that corresponds to his or her Kin balance. These incremental statuses give the user access to exclusive content, primarily stickers, that are valuable within a chat community. Not only can users insert stickers within specific chats, but other Kik users can evaluate other users based on their status levels.

Further, as discussed in Kik's October 20, 2017 Letter, Kik has developed plans to implement four major additions to its initial product platform by December 5, 2017, which is the unofficial deadline to submit new app versions to the Apple Store and Google Play store before the holidays, although no assurances can be given that Kik will accomplish its goals by that time.

Specifically, Kik intends to gift Kin to 9,000 more Kik users, who are active in the Kik community. The goals of this next effort are to introduce a larger group of Kik users to using Kin and to encourage them, as well as artists/content providers, to experiment with a simplified example use-case of a two-sided economy.

Kik plans to introduce an on-chain solution for transactions on the Ethereum network. Kik users will be given two different ways to earn Kin, through brand interactions (polls) and providing feedback to Kik regarding the experience. Thus, artists and other content providers will have an opportunity to earn Kin by providing exclusive content, such as stickers. Kik users will be able to spend their Kin on that exclusive premium content.

Also, in the next 12 months, it is anticipated that the Kin Ecosystem Foundation will continue to expand the use of Kin in four stages. First, assuming that Kik demonstrates success with the additions to the product platform mentioned above, it is intended to significantly expand the reach of Kin within the Kik userbase and add more users to experience Kin. Second, Kin Ecosystem Foundation will work towards having three to five independent digital services with a community that use Kin as a currency. Third, based on the accumulated knowledge of working with these partners beyond Kik, the Kin Ecosystem Foundation, with the help of Kik, will begin to work toward developing independent marketplaces that can serve all digital services that have integrated Kin (including Kik). Fourth, the Kin Ecosystem Foundation intends to work on establishing a decentralized Ecosystem of digital services that are competing for the Kin Rewards Engine. [4]

---

[4] Kik has no agreement with the Kin Ecosystem Foundation to provide such assistance, and the Kin Ecosystem Foundation could engage others (in addition to or instead of Kik) with whom to work on development of the Kin Ecosystem.



November 17, 2017  
Page Six

FOIA CONFIDENTIAL TREATMENT REQUEST

**Question 9.2 - What is a "sticker pack?" How do Kik users use them? How many different "sticker packs" were provided to Kin Holders?**

A sticker pack is a collection of shareable digital stickers. Stickers are frequently used in the chat community, which are similar to using "emoticons" or "emojis" in text message conversations. The stickers can be used both for one-on-one and group chats.

There are numerous different sticker packs, which have been produced to the Staff in Bates Range KIK1080 - KIK001184. A list of the stickers and the number of shares has also been produced at KIK001185.

For reference, the sticker industry is prevalent, and a company called LINE has generated over $250 million a year in sticker revenue. *See* https://techcrunch.com/2016/06/13/chat-app-line-makes-over-270-million-a-year-from-selling-stickers/.

**Question 9.3 -- What "exclusive content within Kik" was provided to Kin Holders other than sticker packs?**

The sticker packs are the exclusive content within the Kik App for Kin Holders at this time.

**Question 9.4 -- You wrote that Kin Holders were "granted certain sticker status levels." Was the granting of those sticker levels automatic, or did Kin Holders need to affirmatively do something to be granted that access? If so, what did Kin Holders need to do?**

Kin Holders were not automatically granted sticker levels. Pre-sale and public sale participants received an email with a unique code that they could use to link their external wallet that held Kin to their Kik account.

Further, Kin Holders using Kik were required to opt-in to the Kik terms of use. Once a Kin Holder had accepted the terms of use, Kik provided the Kin Holder access to sticker packs that corresponded to their status relative to the amount of Kin they held.

**Question 9.5 - Did any of the Largest TDE Purchasers or Largest US TDE Purchasers access the exclusive content, including but not limited to downloading sticker packs? If so, what did they access?**

Yes. The Largest TDE and U.S. TDE Purchasers who downloaded sticker packs include:

- Garrette David Furo
- ███████████
- ███████████
- ███████████

Cooley LLP  3175 Hanover Street  Palo Alto, CA  94304-1130  
t: (650) 843-5000 f: (650) 849-7400 cooley.com

153842390



November 17, 2017  FOIA Confidential Treatment Request
Page Seven

**Question 11.1** - You wrote that "Kik is the initial user of the Kin Ecosystem." At the time that Kin were first issued, was there any other user of the Kin Ecosystem? At the present time, are there any other users? If so, when did they become users and what are they doing in the Kin Ecosystem?

Kik is the first digital service in the Kin Ecosystem. The introduction of Kin into the Kik platform follows the same product development process that has been used and refined over years at Kik with respect to new iterations of the Kik App and the introduction of new features, including Kik Points. Kik's product development process begins with product conceptualization with the Product Team. Then the Engineering Team works on implementing the concept to create an initial product experience for a small number of users. This allows Kik to effectively introduce new features, measure the impact, create different iterations of the product, while slowly growing the user base. This process is common practice in the industry.

Kik's software developers are currently creating software development tools ("SDKs") that will facilitate the creation of experiences and use cases of spending and earning on the Kik platform by third party developers. The SDKs will enable engineers to integrate Kin (*i.e.*, to use the functionality provided by the SDK to do interesting things with Kin) in any application. The SDK will contain functionality such as creating a wallet, sending Kin to another party and checking a wallet's balance. Kik engineers will be the first to use the SDKs to integrate Kin into Kik. However, at the time Kin were first issued and, at the present time, there are no other platforms or third-party creators or developers using Kin.[5]

**Questions 11.2** - Who are the 20 artists and content creators? What are the digital services outside of Kik? For each, please describe the content being created and the project being planned, including but not limited to the expected or target date for completion, whether the feature or project would be in the Kik App or some other forum, who will implement the feature or project, a description of any agreement or contract related to that Person, and contact information, including the name of the person(s) dealing with Kik or the Kin Ecosystem.

KIK001189 is a list of artists and content creators that Kik has contacted to create sticker packs for the next iteration of the Kik App, which Kik plans to submit to the Apple store by December 5, 2017, which is discussed in more detail above. The list contains the artist or company contacted, business address, whether they have worked with Kik in the past, whether an NDA is in in place yet, and any notes regarding the status of the contact.

---

[5] Soon after the TDE, Kik was approached by a bot developer with a bot that would permit Kik Users to send Kin to other Kik Users within the Kik App. However, as this bot did not apparently comply with licensing regimes for money transmission, the bot was rejected by Kik for use inside the Kik App. However, this is an instance of an independent developer attempting to use Kin. See https://gist.github.com/charleyhine/c87b91904f38322ec7e67bcddd929986/.



November 17, 2017
Page Eight

FOIA CONFIDENTIAL TREATMENT REQUEST

Please note that in its effort to respond by October 20th to the requests sent by the Staff on October 11th, Kik mistakenly stated that it was currently working with 20 artists and content creators. At an internal Kik planning session, an individual coordinating the outreach to the content creators had expressed his intention to do so and others at Kik who helped prepare the response had misinterpreted his statement to mean that he was already doing so.

**Question 14.1 - Who are the third-party content developers and digital services? For each, please describe the feature or project being discussed, including but not limited to the expected or target date for completion, whether the feature or project would be in the Kik App or some other forum, who will implement the feature or project, a description of any agreement or contract related to that Person, and contact information, including the name of the person(s) dealing with Kik or the Kin Ecosystem.**

Kik's strategic partnership team on behalf of the Kin Ecosystem Foundation is in discussions with many well-known brands and digital services regarding their potential adoption of Kin both within Kik and through their own platforms. The discussions are ongoing and fluid. These brands and developers include: Whisper, Tango, Fancy.com, NBC Universal, Pepsi, Agora.io, Fanko, Fandango, and Starfire. Such brands have indicated an interest in learning more and experimenting with Kin, but no formal agreements are yet in place. Kik will update the Staff with more details once it has entered into definitive agreements with third-party content developers or digital service providers.

**Question 15.1 - What do you mean that "Kik plans to introduce a full chain solution for transactions based on the Ethereum network?"**

"Full chain" was intended to say "on chain" for purposes of Kik's October 20, 2017 Letter. This refers to the blockchain infrastructure that processes and confirms transactions. To be "on chain" means all transactions will happen directly on the public Ethereum network where the decentralized network of codes will confirm and process the transactions. This carries some scalability challenges as transaction times are slow (30 sec. - 30 min.) and transaction fees are high (~$0.35-$0.40). In short, it is anticipated that the Kin Ecosystem Foundation will introduce a way that Kin can be spent through the Ethereum blockchain that is both technologically and practically viable.

**Question 16.1 - You identified two people. The answer does not identify any Kin employee or attorney, although the staff understands from the answers and the presentation by Kik's counsel that the foundation is working with Kik and that Kik attorneys created the foundation. Who created the foundation and at whose direction? Who currently controls the foundation? Are there people other than William Mougayar and William Raduchel acting for, representing or affiliated with the foundation? If so, who, what are their roles, what have they done, and what do they plan to do? Are there any other people creating the Kin**



November 17, 2017
Page Nine

Foundation? What have they done and what do they plan to do? Are there any other people acting for the foundation? What have they done and what do they plan to do?

The Kin Ecosystem Foundation was organized by Kik through one of its Canadian legal counsels, LaBarge Weinstein LLP, immediately prior to the TDE so that the Kin Ecosystem Foundation could take receipt of the 6 trillion Kin allocated to it. LaBarge Weinstein LLP continues to provide assistance to the Kin Ecosystem Foundation on both organizational and ministerial matters, such as preparation of the by-laws. Further, Cooley is assisting the Kin Ecosystem Foundation on organizational matters.

The Kin Ecosystem Foundation will be managed by the Board of Directors and its members, which shall be elected by its members. Ted Livingston and Peter Heinke were the initial directors of the Kin Ecosystem Foundation for purposes of completing the organization process on a timely basis immediately before the TDE. Messrs. Livingston and Heinke will be formally appointed upon completion of the necessary paperwork and immediately resign as soon as the paperwork relating to Messrs. Mougayar and Raduchel is completed. As we previously explained, William Mougayar and William Raduchel have agreed to serve on the Board of Directors and as we disclosed previously, Mr. Mougayar has been involved since April 2017 in the evolution of the Kin Ecosystem Foundation. The Kin Ecosystem Foundation may have up to 10 directors per the Articles of Incorporation. The Foundation Board of Directors will determine the criteria membership in accordance with the Kin Ecosystem Foundation's by-laws. Messrs. Mougayar and Raduchel, while not officially appointed to the Kin Ecosystem Foundation, have been active on behalf of the Kin Ecosystem Foundation on organizational matters as well as in discussions with Kik on the development side. Some of the organizational issues Messrs. Mougayar and Raduchel are grappling with are what the conditions of membership should be, who should (and would) become members, and whether there should be a cost to becoming a member so that the Kin Ecosystem Foundation has a source of fiat for its operations. Others matters include who might be candidates for the Board of Directors, whether an advisory board should be established immediately or deferred, what activities should the Kin Ecosystem Foundation contract with Kik to perform in the near term (if at all) and upon what terms, and should independent or separate counsel to the Kin Ecosystem Foundation be retained? Other than the two law firms identified above assisting on the organizational matters, Kin Ecosystem Foundation has no employees or independent contractors at the present time but that will change in the near term. For example, McKinsey and Company has presented a proposal to develop Kin's monetary policy model (*e.g.*, demand and supply drivers, integrated with strategy) and define resulting strategic and operational strategy (*e.g.*, daily transaction goal, distribution algorithm, Kin Reward Engine launch date).

Question 16.2 -- What contracts or agreements exist concerning the Kin Foundation? The answer does not identify any such documents. Please identify them or confirm that none exist.

The Kin Ecosystem Foundation is insured under Kik's directors' and officers' insurance policy, although when the organization is complete, Kin Ecosystem Foundation will obtain its own

Cooley LLP   3175 Hanover Street   Palo Alto, CA   94304-1130
t: (650) 843-5000   f: (650) 849-7400   cooley.com

153842390



November 17, 2017  
Page Ten

FOIA CONFIDENTIAL TREATMENT REQUEST

coverage. Except as noted, we confirm that no written contracts or agreements exist at the present time. The Kin Ecosystem Foundation, however, anticipates that directors' agreements, engagement letters with professional service providers, and McKinsey and Company will be entered into in the near term.

**Question 18.1 - Please confirm that you have listed all email addresses, phone numbers and social media handles used for any purpose by the people identified in the question.**

Ted Livingston has the following additional accounts and phone numbers:

- Email: ▮
- Home Phone: none
- Instagram: ▮

Mr. Livingston also has a LinkedIn page listed under his name.

Peter Heinke has the following additional accounts and phone numbers:

- Email: ▮@▮
- Home Phone: ▮

Mr. Heinke also has Facebook and LinkedIn pages listed under his name. Mr. Heinke believes that he at one point also joined Instagram and Snap. However, he does not use those pages and does not recall his username or passwords for those applications.

Rod McLeod has the following additional accounts:

- Email: ▮
- FB: ▮
- Snapchat: ▮
- Instagram: ▮

Mr. McLeod also has a LinkedIn page listed under his name.

Shannon Gallico has the following additional accounts and phone numbers:

- Email: ▮
- Instagram: ▮
- Snapchat: ▮



November 17, 2017  
Page Eleven

FOIA CONFIDENTIAL TREATMENT REQUEST

Ms. Gallico also has Facebook and LinkedIn pages listed under her name.

Kik is not aware of any other email addresses, phone numbers and social media handles used for any purpose by the individuals identified in response to Question 18.

**Question 19 - Did Kik have any Communications Concerning SAFTs or TDEs with the Largest TDE Purchasers or Largest US TDE Purchasers? If so, please describe those communications, including but not limited to the participants, the date, the form of communication, the substance, and the location.**

Kik contacted TDE participants who had registered and indicated they were planning on purchasing more than $1 million worth of Kin. Kik had asked to set up short calls with some of those participants for diligence purposes, to understand who these people were, and to offer a resource to answer any questions about the project, high-level product roadmap within Kik, as well as the sale process.

Please see the list below, which includes the email addresses of each participant and the date the call was held.

- September 6: ███████
- September 7: ███████
- September 7: ███████
- September 7: ███████
- September 7: ███████
- September 7: ███████

In addition, Kik will do a reasonable search of its documents to identify if any such communications took place, and if so, Kik will produce those documents to the SEC.

**Question 20 —Did Kik have any Communications with any Kin purchasers or potential Kin purchaser Concerning what Kin could be used for at the time of the TDE, including but not limited to the use of Kin to obtain sticker packs? If so, please describe those communications, including but not limited to the participants, the date, the form of communication, the substance, and the location.**

Kik will do a reasonable search of its documents to identify if any such communications took place, and if so, Kik will produce those documents to the SEC.

\* \* \*

The information contained in this response is provided subject to, and without waiver of: (1) any objections to the SEC's Requests; (2) any applicable privilege governed by federal or state law including the attorney-client privilege; and (3) any and all other legal rights pertaining to Kik under



November 17, 2017  
Page Twelve

FOIA CONFIDENTIAL TREATMENT REQUEST

federal or state law. To the extent any information properly subject to attorney-client or work-product privileges are provided, such disclosure is inadvertent and not intended to constitute a waiver. In the event of such inadvertent disclosure, Kik requests that the privileged material be immediately deleted or otherwise withdrawn from your consideration. Further, this response is based on information that is accurate to the best of the knowledge, information, and belief of Kik, and Kik reserves the right to amend or supplement this response and this production if new or different information becomes known or discovered.

Pursuant to 17 C.F.R. § 200.83 and all other applicable statutes and regulations, Kik requests that any information submitted in connection with this inquiry (including without limitation this letter and the information contained therein) be accorded confidential treatment under the Freedom of Information Act. Kik further requests that the information contained therein not be released to any other persons except as may be necessary to assist in conducting this investigation. In the event that a Freedom of Information Act request is received by the SEC seeking disclosure of this letter or the enclosed information, Kik requests that they be notified through their undersigned counsel, so that they can provide additional information substantiating their request for confidential treatment.

Sincerely,

*Patrick Gibbs /BDJ*

Patrick E. Gibbs

PEG:cg

cc: FOIA Office (By Fax)