UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------- X

U.S. SECURITIES AND EXCHANGE
COMMISSION,                                :

                                           :

            Plaintiff,

                                           :

    vs.                                         Civil Action No. 19-cv-5244 (AKH)

                                           :

KIK INTERACTIVE INC.,

                                           :

            Defendant.

                                           :

-------------------------------------- X

**KIK INTERACTIVE, INC.'S REPLY MEMORANDUM OF LAW IN FURTHER**
**<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.     THE SEC'S EXTENSIVE RELIANCE ON TELEGRAM IS MISPLACED. ..................................................................................... 2

II.    THE SEC HAS FAILED TO IDENTIFY ANY MATERIAL FACTUAL DISPUTE THAT THERE IS NO COMMON ENTERPRISE. ........................... 5

    A.    Kik Owed No Ongoing Contractual Obligations to Kin Purchasers. ........ 6

    B.    The SEC Fails to Raise a Material Dispute as to the Absence of Horizontal Commonality. ........................................................ 10

        1.    Kik Did Not Pool TDE Funds for the Common Benefit of Any "Enterprise." ......................................................... 11

        2.    TDE Purchasers Were Not Entitled to a Pro Rata Distribution of Profits. ...................................................... 12

        3.    TDE Purchasers' Fortunes Were Not Bound to One Another Because They Retained Full Control Over Their Kin. .................................................................................. 14

    C.    Kik's Ownership of Kin Does Not Create Strict Vertical Commonality. ............................................................................... 20

III.   THE SEC CANNOT ESTABLISH THAT KIK LED PURCHASERS TO EXPECT PROFITS FROM KIK'S FROM ESSENTIAL MANAGERIAL EFFORTS. ................................................................................................. 24

    A.    The SEC Continues to Ignore the Primary Document Binding Kik and Kin Purchasers: the Terms of Use. .................................... 25

    B.    Kik Offered and Sold Kin as a Medium of Exchange and Did Not Guarantee Profits or Returns. ...................................................... 26

    C.    The SEC's Emphasis on Kin's Utility on Day One Is Misplaced. ......... 28

    D.    The SEC Also Fails to Dispute That Kik Did Not Market Kin as an Opportunity for TDE Purchasers to Profit. ............................... 30

    E.    Kik's Efforts Could Not Cause Kin Purchasers to Profit. ..................... 36

IV.   KIK ENGAGED IN TWO SEPARATE OFFERINGS. ................................... 39

    A.    Kik's Pre-sale and TDE Were Not a "Single Distribution." ................... 40

    B.    The Pre-sale and TDE Do Not Qualify for Integration. ........................... 44

V.    KIK'S PRE-SALE WAS EXEMPT FROM THE REGISTRATION REQUIREMENT AND COMPLIED WITH REGULATION D. ...................... 46

    A.    Kik Complied with Each and Every Requirement of Rule 506(c) and Therefore Is Exempt from Registration. ........................................... 46

B.      Kik Made a Good Faith and Reasonable Attempt to Comply with Rule 506(c) and Therefore the Pre-Sale Is Exempt from Registration. .......................................................................................... 49

C.      The Pre-Sale Qualifies for an Exemption Under Section 4(a)(2). ........... 50

CONCLUSION ....................................................................................................................... 51

## Cases

*Aldrich v. McCulloch Props., Inc.*,
   627 F.2d 1036 (10th Cir. 1980) ............................................................... 27

*Alunni v. Devel. Res. Grp., LLC*,
   445 F. App'x 288 (11th Cir. Oct. 27, 2011) .............................. 6, 8, 24, 32

*Balestra v. ATBCoin LLC*,
   380 F. Supp. 3d 340 (S.D.N.Y. 2019) ...................................................... 12

*Bender v. Cont'l Towers Ltd. P'ship*,
   632 F. Supp. 497 (S.D.N.Y. 1986) ........................................................... 37

*Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*,
   2011 WL 744732 (S.D.N.Y. Mar. 1, 2011) ................................................. 9

*Commonwealth Bank & Tr. Co. v. Spectrum Leasing Corp.*,
   719 F. Supp. 346 (M.D. Pa. 1989) ........................................................... 11

*Cont'l Mktg Corp. v. SEC*,
   387 F.2d 466 (10th Cir. 1967) ....................................................... 7, 9, 10

*Contract Buyers League v. F&F Inv.*,
   300 F. Supp. 210 (N.D. Ill. 1969) ........................................................... 25

*Copeland v. Hill*,
   680 F. Supp. 466 (D. Mass. 1988) ........................................................... 16

*Davis v. Rio Rancho Estates*,
   401 F. Supp. 1045 (S.D.N.Y. 1975) ............................................... 6, 36, 38

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
   608 F.2d 1297 (9th Cir. 1979) .................................................................. 6

*Feldman v. Google, Inc.*,
   513 F. Supp. 2d 229 (E.D. Pa. 2007) ......................................................... 9

*Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.*,
   962 F.2d 268 (2d Cir. 1992) ..................................................................... 2

*Goodwin Props., LLC v. Acadia Grp., Inc.*,
   2001 WL 800064 (D. Me. 2001) ............................................................... 45

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
   396 F. Supp. 175 (N.D. Cal. 1975) ....................................................... 6, 8

*Hart v. Pulte Homes of Michigan Corp.*,
   735 F.2d 1001 (6th Cir. 1984) ........................................................... 6, 32

*Jamaica Ash & Rubbish Removal Co., Inc. v. Ferguson*,
   85 F. Supp. 2d 174 (E.D.N.Y. 2000) ................................................................ 34

*Jordan Inv. Co., LTD, v. Hunter Green Invs.* LTD,
   205 F. Supp. 2d 243 (S.D.N.Y. 2002) ............................................................... 20

*Kemmerer v. Weaver*,
   445 F.2d 76 (7th Cir. 1971) .............................................................................. 31

*Lavery v. Kearns*,
   792 F. Supp. 847 (D. Me. 1992) ................................................................. 16, 33

*Long v. Shultz Cattle Co.*,
   881 F.2d 129 (5th Cir. 1989) ................................................................. 14, 18, 19

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982) ......................................................................................... 26

*Marini v. Adamo*,
   812 F. Supp. 2d 243 (E.D.N.Y. 2011) ...................................................... passim

*Meyer v. Uber Techs., Inc.*,
   868 F.3d 66 (2d Cir. 2017) ................................................................................ 9

*Noa v. Key Futures, Inc.*
   638 F.2d 77 (9th Cir. 1980) ........................................................................ 16, 33

*Revak v. SEC Realty Corp*,
   18 F.3d 81 (2d Cir. 1994) ........................................................................ passim

*Rice v. Branigar Org., Inc.*,
   922 F.2d 788 (11th Cir. 1991) .......................................................................... 27

*Roberts v. Obelisk, Inc.*,
   2019 WL 1902605 (S.D. Cal. Apr. 29, 2019) .................................................... 9

*Rodriguez v. Banco Cent. Corp.*,
   990 F.2d 7 (1st Cir. 1993) ........................................................................ 6, 8, 37

*Savino v. E.F. Hutton & Co., Inc.*,
   507 F. Supp. 1225 (S.D.N.Y. 1981) .................................................................. 20

*SEC v. Aqua-Sonic Prods. Corp.*,
   524 F. Supp. 866 (S.D.N.Y. 1981) .................................................................... 18

*SEC v. Aqua-Sonic Prods. Corp.*,
   687 F.2d 577 (2d Cir. 1982) .................................................................. 18, 24, 26

*SEC v. Battoo*,
   158 F. Supp. 3d 676 (N.D. Ill. 2016) ................................................................. 8

*SEC v. C.M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943) ......................................................................... 5, 7

*SEC v. Cavanagh*,
   1 F. Supp. 2d 337 (S.D.N.Y. 1998) ................................................................. 41

*SEC v. Cavanagh*,
   445 F.3d 110 (2d Cir. 2006) ....................................................................... 40, 41

*SEC v. Edwards*,
   540 U.S. 389 (2004) ........................................................................ 15, 17

*SEC v. ETS Payphones, Inc.*,
   300 F.3d 1281 (11th Cir. 2002) ................................................................... 17

*SEC v. Galaxy Foods, Inc.*
   417 F. Supp. 1225 (E.D.N.Y. 1976) ............................................................... 14

*SEC v. Hui Feng*,
   935 F.3d 721 (9th Cir. 2019) ...................................................................... 31

*SEC v. Infinity Grp. Co.*,
   212 F.3d 180 (3d Cir. 2000) ............................................................. 12, 14, 18

*SEC v. Koscot Interplanetary, Inc.*,
   497 F.2d 473 (5th Cir. 1974) .................................................................. 14, 19

*SEC v. Life Partners, Inc.*,
   87 F.3d 536 (D.C. Cir. 1996) ...................................................................... 11

*SEC v. Mattera*,
   2013 WL 6485949 (S.D.N.Y. Dec. 9, 2013) ...................................................... 41

*SEC v. Ralston Purina Co.*,
   346 U.S. 119 (1953) ..................................................................... 46, 50, 51

*SEC v. SG Ltd.*,
   265 F.3d 42 (1st Cir. 2001) ....................................................................... 31

*SEC v. Telegram Grp., Inc.*,
   2020 WL 1430035 (S.D.N.Y. Mar. 24, 2020) ............................................. passim

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ...................................................................... passim

*Solis v. Latium Network, Inc.*,
   2018 WL 64455433 (D.N.J. Dec. 10, 2018) ........................................................ 12

*United Housing Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ...................................................................................... 25, 28

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2011) ............................................................................ 26, 36

*Univ. of Texas v. Camenisch*,
   451 U.S. 390 (1981) ................................................................................................ 2

*Warfield v. Alaniz*,
   569 F.3d 1015 (9th Cir. 2009) ..................................................................... 26, 34

*Weinstock v. Columbia Univ.*,
   224 F.3d 33 (2d Cir. 2000) .................................................................................. 36

*Woodward v. Terracor*,
   574 F.2d 1023 (10th Cir. 1978) ........................................................... 6, 7, 10, 28

## Other Authorities

*Agri-Quip*,
   SEC No-Action Letter, 1974 WL 9638 (Sept. 20, 1974) ...................................... 44

Loss, *et. al.*, Fundamentals of Securities Regulation 3.C.1 (7th Ed. 2020) ................................. 39

## Regulations

17 C.F.R. § 230.502 ............................................................................... 40, 45, 47

17 C.F.R. § 230.506 ..................................................................................... passim

17 C.F.R. § 230.508 ............................................................................... 46, 49, 50

## INTRODUCTION

As demonstrated in its opening brief, Kik is entitled to summary judgment for two primary reasons.  First, the TDE[1] did not constitute an "investment contract" because the SEC cannot establish two of the three requirements of the *Howey* test: a common enterprise and expectation of profits from the essential managerial efforts of others.   Second, Kik's separate Pre-sale of contractual rights to accredited investors complied with an exemption from registration.  The SEC cannot establish that the TDE and Pre-sale constituted a "single integrated offering" because the transactions were conducted at different stages of development (pre and post-launch), involved different rights, different contractual agreements, different purchasers, and different consideration.

Far from undermining any of these arguments, the SEC's Opposition actually confirms that Kik is entitled to summary judgment on these grounds.  As evidenced by the SEC's Response to Kik's Rule 56.1 Statement, the key material facts supporting Kik's Motion are undisputed. Nonetheless hoping to avoid judgment as a matter of law, the SEC rests its Opposition on a number of faulty legal propositions and inapposite cases.  Rather than address the controlling precedent in Kik's Opening Brief, the SEC repeatedly cites to nonbinding authorities, decided at preliminary stages, or premised on legal principles expressly rejected by the Second Circuit.  In addition, the SEC ignores critical facts, such as the provisions of the Terms of Use, the only contract between Kik and TDE purchasers, in favor of inconsequential facts, such as isolated statements made by Kik employees taken out of context.  Because the SEC cannot establish either the required elements of an investment contract or that the TDE and Kik's pre-sale to accredited investors constituted a "single integrated offering," Kik's Motion for Summary Judgment should be granted.

---

[1] Unless otherwise indicated, all capitalized terms shall have the same meanings as they do in Kik's Motion for Summary Judgment.

**ARGUMENT**[2]

### I.   THE SEC'S EXTENSIVE RELIANCE ON TELEGRAM IS MISPLACED.

The SEC's central argument is that the recent preliminary injunction ordered in *SEC v. Telegram Grp., Inc.* mandates denial of Kik's Motion.  *See* SEC Opp. at *passim* (citing 2020 WL 1430035, at *2 (S.D.N.Y. Mar. 24, 2020), *appeal docketed*, No. 20-1026 (2nd Cir. March 24, 2020) (granting preliminary injunction, halting future distribution of cryptocurrency to pre-sale purchasers)).  In so doing, the SEC "[i]mproperly equates 'likelihood of success' with 'success'" on the merits.  *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 394 (1981).  Unlike summary judgment, rulings at the preliminary-injunction stage are not final judgments on the merits, but rather tentative rulings based on an incomplete record.[3]  *Camenisch*, 451 U.S. at 395; *Goodheart Clothing Co., Inc. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 274 (2d Cir. 1992) ("A preliminary determination of likelihood of success on the merits in a ruling on a motion for preliminary injunction is ordinarily tentative, pending a trial or motion for summary judgment.").

In any event, *Telegram* involved an entirely different set of facts and circumstances, and so even the tentative conclusions reached at the preliminary injunction stage are irrelevant to this case.  Telegram sold interests in future digital tokens *only* to accredited investors in two groups of private-placement transactions.  *Telegram*, 2020 WL 1430035, at *3.  The tokens it sold were discounted by roughly 60-75% from the price Telegram expected them to trade when they were

---

[2] Citations to "Welsh Ex." and "Landsvik Ex." refer to exhibits filed with the Declarations of Michael E. Welsh (ECF No. 64) and Julianne M. Landsvik (ECF No. 79).  Citations to exhibits filed with the Declaration of Laura D'Allaird (ECF No. 60) are referred to as "SEC" followed by the exhibit number (*e.g.*, "SEC1").  "SEC 56.1" and "Kik 56.1" refer to the parties' statements of undisputed material facts (ECF Nos. 59, 63).  "Kik Br." means Kik's Summary Judgment Memorandum (ECF No. 62). "SEC Mot." refers to the SEC's Summary Judgment Memorandum (ECF No. 58).  "SEC Opp." and Kik Opp." refer to the parties' respective opposition briefs.  (ECF Nos. 74, 77).  "SEC 56.1 Response" and "Kik 56.1 Response" refer to the responses to the parties' statements of undisputed material facts (ECF Nos. 75, 78).

[3] Notably, the court in *Telegram* declined to rule on the parties' cross-motions for summary judgment "at this juncture."  *Telegram*, 2020 WL 1430035, at *2.

launched. *Id.* at *5.  From those sales (to only 175 purchasers), Telegram raised $1.7 billion.  *Id.* at *4.  Telegram planned to use those funds to build and develop its cryptocurrency called "Grams," which would operate on an entirely new blockchain, also to be developed by Telegram with proceeds from the sales, called the "TON Blockchain."  *Id.* at *3.  The sales to those accredited investors made up 58% of all Grams that were ever going to exist.  *Id.* at *4.  And because Telegram had no plans to sell Grams directly to the public in the near future, anyone interested in acquiring Grams until then *would have to purchase them from one of the accredited investors.  Id.* at *13.  To ensure those investors would be motivated to flip their tokens (and "reap whopping gains from the resale," *id.* at *2), Telegram created "exclusive windows" for them to resell their tokens, approximating the premium they would make to be "852% and 172%," respectively, for the two groups of purchasers.  *Id.* at *12–13.  Telegram also promised to repurchase Grams in circulation if the market price fell below a specified formula, which it assured the accredited investors was a means of "increasing the price per Gram."  *Id.* at *12.

In *Telegram*, there was no dispute that the initial purchase agreements were securities.  SEC108 at 6:2-4.  Instead, the SEC argued that the pending distribution of 58% of Grams to the 175 accredited investors was an extension of that initial securities offering.  *Telegram*, 2020 WL 1430035, at *1, 8.  In granting the preliminary injunction, the court concluded that the SEC established that "Telegram's present plan to distribute Grams [to accredited investors] is an offering of securities under" *Howey.  Id.* at *2 (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  The *Telegram* court further determined that by providing the "exclusive windows" for resale, Telegram created a substantial likelihood that the interests of the accredited investors were tied to pooled funds and Telegram's effort to help the investors profit from the resale.  *Id.* at *10, 13.  Importantly, the court did not conclude that the Grams themselves were securities, *see id.* at *18,

but rather that the purchase agreements were part of an ongoing scheme "to distribute those Grams into a secondary public market, which would be supported by Telegram's ongoing efforts," making the purchasers "function as statutory underwriters." *Id.* at *1, 19.

Telegram has already appealed the district court's preliminary injunction ruling, *see* Notice of Appeal, *Telegram*, 1:19-cv-09439 (filed Mar. 24, 2020) (ECF No. 228), and observers have noted very serious flaws in the district court's analysis in that decision.  ECF No. 69.  As such, the SEC's heavy reliance on this preliminary ruling is questionable, at best.  But in any event, the transactions at issue in this case—Kik's Pre-sale of contractual rights from July 3 to September 11 of 2017, and then Kik's public TDE from September 12 to September 26 of 2017—are completely different from the "scheme" that the court considered in *Telegram* and the court's analysis therefore has no application here.  The key differences include the following:

- Unlike Telegram, Kik conducted a public sale of Kin tokens that allowed the public to purchase Kin directly from Kik, and thus Pre-sale participants were not a means of distributing Kin to the public.

- Rather than selling 58% of tokens to private investors as Telegram did, Kik allocated the rights to roughly 5–6% of Kin to accredited private investors.

- Kik also allocated 60% of the Kin in circulation to the Kin Foundation, which would distribute Kin *for free* through the Kin Rewards Engine to Kin economy participants over time based contributions to the Kin economy that would develop.

- Rather than promising to take actions to maintain a price floor (as Telegram did), Kik consistently stated that it had no control over the price of Kin, which would be determined by supply and demand.  For example, it alerted Pre-sale purchasers that currencies like Kin "are subject to any fluctuation in the rate of exchange and, in the case of digital assets, the exchange valuations" which "may have an adverse effect on the value, price or income of an investor's investment."  Welsh Ex. F at KIK000039.  Kik *never* indicated that it would (or could) provide liquidity for Kin on secondary markets, nor did it offer to maintain a price floor.  To the contrary: Kik stated it could not guarantee *any* value for Kin.  *See* SEC46B at 35:20–23.

- Rather than promising "exclusive" windows for immediate resale at substantial premiums (as Telegram did), Pre-sale purchasers did not receive any Kin until Kik distributed it to the public, and even then, did not receive *half* of their Kin until one full year later.

4

Despite all of these key factual differences, the SEC places heavy reliance on this decision, evidently because both cases involves cryptocurrencies.   But *Howey* is a fact-intensive, transaction-specific inquiry, and "the courts ***have not been guided by the nature of the assets*** back [*sic*] of a particular document or offering.   The test rather is ***what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect***."   *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943) (emphasis added) (rejecting argument that sales of real estate were not regulated by the Act solely because they involved real estate).   The court in *Telegram* even made clear during the preliminary injunction hearing that there is "no basis under the *Howey* test" for the position "that cryptocurrencies are inherently securities."   SEC108 at 4:18-22.   At bottom, the "facts and circumstances" currently before this Court are dramatically different from those considered by the court in *Telegram*.   As such, the *Telegram* court's analysis has no bearing on Kik's Motion.

## II.   THE SEC HAS FAILED TO IDENTIFY ANY MATERIAL FACTUAL DISPUTE THAT THERE IS NO COMMON ENTERPRISE.

As demonstrated in Kik's Motion, there was no ongoing relationship or commonality between or among Kik and TDE purchasers to establish a common enterprise as required by *Howey*.   In its Opposition, the SEC does not dispute the key material facts on which this argument is based.   Specifically, the SEC does not dispute that: (1) the Terms of Use constituted the "entire agreement" between Kin and TDE participants relating to the purchase of Kin (SEC 56.1 Response at ¶ 48); (2) Kin tokens were provided "as is" and "without warranties or conditions of any kind" (*id.* at ¶ 49); (3) Kik "did not commit to do anything other than deliver Kin tokens in exchange for Ether." (*id.* at ¶ 52); (4) TDE purchasers had complete control over their Kin tokens when they received them (*id.* at ¶¶ 68–69); (5) TDE purchasers were not required to share any profits or losses resulting from their resale of Kin (if any) with other Kin holders (*id.* ¶ 53); or (6) that on the day

TDE purchasers received Kin, it could be "immediately transferred between users on the Ethereum blockchain peer to peer or be integrated within an application." *Id.* ¶ 71.

As a matter of law, these undisputed facts preclude a finding of common enterprise here, for at least three reasons: ***First***, the lack of ongoing contractual obligations between Kik and TDE purchasers negates the existence of a common enterprise under any formulation. ***Second***, there is no horizontal commonality between TDE purchasers because their funds were not "pooled" for their common benefit, nor were they entitled to a pro rata distribution of profits. ***Third***, the fortunes of Kik and TDE purchasers were not linked because each party had exclusive control over their Kin, meaning some could profit while others did not. Because the SEC cannot establish a common enterprise, Kik is entitled to judgment as a matter of law.

### A.      Kik Owed No Ongoing Contractual Obligations to Kin Purchasers.

The SEC admits that, once Kik distributed Kin tokens to TDE purchasers, Kik owed those TDE purchasers no ongoing obligations at all. *See* SEC 56.1 Response at ¶ 52. The SEC argues, however, that a common enterprise does not require that the promoter owe binding obligations to purchasers. SEC Opp. at 20–21. Kik's Motion cited decades of cases finding no common enterprise precisely because there were no ongoing obligations between buyer and seller. *See* Kik Br. at 18–22, citing *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978); *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300–01 (9th Cir. 1979); *Davis v. Rio Rancho Estates*, 401 F. Supp. 1045, 1049–50 (S.D.N.Y. 1975); *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1003 (6th Cir. 1984); *Alunni v. Devel. Res. Grp., LLC*, 445 F. App'x 288, 292–93, 298 (11th Cir. Oct. 27, 2011); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993); *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975). The SEC's Opposition does not call any of this authority into question. The SEC attempts to distinguish only *Woodward*, but its arguments are unpersuasive. First, the SEC claims (without support) that real

estate "is more easily understood to provide a consumptive use." SEC Opp. at 22. Setting aside

that consumptive use has no bearing on common enterprise, Kin tokens were marketed as "a

general purpose cryptocurrency for use in everyday digital services such as chat, social media, and

payments." Ex. K at KIK000008. Given the prevalence of apps and smart phones, it is hard to

imagine how this use would not be "easily understood." Second, the SEC claims that *Woodward*

"recognized" that a common enterprise could exist "whereby it is expressly or ***impliedly***

understood that the property will be developed or operated by others." SEC Opp. at 22 (emphasis

in original). But this grossly misrepresents the *Woodward* court's ruling: the language is actually

a quote from a secondary source that had been cited by the plaintiffs, which the court ***expressly***

***rejected***, as it went on to confirm the significance of ongoing contractual obligations:

> In the instant case there is no suggestion that Terracor is under any contractual
> obligation to do anything more than deliver title upon payment of the purchase
> price. That, to us, is a significant difference."

*Id.* at 1026–27. Simply put, nothing in *Woodward* suggests that there can be a common enterprise

where, as here, there are no ongoing obligations between buyer and seller.

The same is true of the SEC's authorities: none of them found a common enterprise in the

absence of some obligation by the seller (whether a "formal" contract or not) to perform ongoing,

profit-generating tasks. *See, e.g.*, *Joiner*, 320 U.S. at 346–48 (finding that the seller "promised"

to drill an exploration well, which was the "thread on which everybody's beads were strung");

*Cont'l Mktg Corp. v. SEC*, 387 F.2d 466, 470 (10th Cir. 1967) (seller represented that "a

representative of the domestic beaver industry . . . would bring profit to investors," who were

"encouraged to leave their beavers" with the sellers where they would be "'expertly housed, fed

and otherwise cared for.'"). Kik has never claimed that a "formal contractual document" was

required, or that this Court must *solely* examine the contract in evaluating a transaction. It is well-

established that the transaction must be considered in light of "economic realities." *See Howey*,

328 U.S. at 298.  But where, as here, a written contract is designated as the *sole* agreement governing a transaction, the authority is clear that extraneous oral statements or explanations do not supersede it.  *See* Kik Br. at 18–20, citing *Alunni*, 445 F. App'x at 292–93, 298 (oral promises made during promotional efforts insufficient to create investment contract where written contract was entire agreement between the parties); *Rodriguez*, 990 F.2d at 11 (seller's "strong and repeated suggestions" that surrounding land would develop did not create investment contract as there was no contractual obligation to do so); *Happy Inv. Grp.*, 396 F. Supp. at 181 (no investment contract "when there are promises of the general nature made by defendants in their literature and handouts, but no actual commitments to perform specific services").

Under this standard, Kik's Motion should be granted.  The SEC does not dispute that the Terms of Use precluded the existence of any ongoing obligations, and the SEC has not identified any extra-contractual promise or obligation by Kik to conduct work for the "enterprise."  To start, the SEC does not dispute that TDE purchasers were bound by these Terms of Use.  It offers no evidence that purchasers did not acknowledge and accept the Terms of Use before purchasing Kin. Rather, the SEC mischaracterizes the contract as "click-the-box" "boilerplate" and asks this Court to simply ignore the terms of the underlying agreement on that basis.  But unlike the cases cited by the SEC, the Terms of Use were not isolated disclaimers within investment brochures (*SEC v. Battoo*, 158 F. Supp. 3d 676, 696 (N.D. Ill. 2016)), nor could they be characterized as self-serving public statements first published months after the transaction (*Telegram*, 2020 WL 1430035, at *5).  Rather, the undisputed facts show that Terms of Use were presented to each and every potential TDE participant *before* they finalized their purchase of Kin, and that those purchasers could not complete their purchases without affirmatively agreeing to be bound by them:



Welsh Ex. A at ¶ 62–63.[4]  By clicking their agreement to the Terms of Use, purchasers entered an

enforceable contract with Kik that "govern[ed] . . . [their] purchase of the Kin Tokens."  Welsh

Ex. H at KIK000079; *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 79 (2d Cir. 2017) ("Courts around

the country have recognized that an electronic click can suffice to signify the acceptance of a

contract[.]"); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (collecting cases).

And given that these Terms were binding on TDE purchasers, the SEC fails to identify any

provision therein which would bind Kik to ongoing obligations.

Even if the Court looks beyond the Terms of Use, the SEC still has not identified an

actionable promise by Kik to perform any tasks that pertain to TDE purchasers or its alleged

"enterprise."  This is not a case like *Continental Marketing*, where "all [the purchasers] needed to

do was buy the beavers, pay ranching fees," and the ranchers promised to do the rest of the work

to generate "geometric profits."  387 F.2d at 470.  Here, the SEC claims there were "scores of

public statements," but does not even *argue* that Kik obligated itself to do anything in these

statements—it merely claims that they "primed public investors' expectations of profits."  SEC

Opp. at 23.  But the SEC cites no authority for the proposition that a common enterprise can arise

from statements that "prime[]" someone else's expectation of profits (whatever that means).

---

[4] The SEC's reliance on the limited recollection of two TDE participants is not sufficient to create a disputed fact.  Nor would this dispute be material in any event: purchasers' memory of checking a box is not relevant to the enforceability of a contract.  *See Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011) ("Failure to read a contract before agreeing to its terms does not relieve a party of its obligations under the contract."); *accord Roberts v. Obelisk, Inc.*, 2019 WL 1902605, at *6 (S.D. Cal. Apr. 29, 2019) (testimony that plaintiffs "do not recall" agreeing to the terms is "immaterial").

Moreover, the SEC only puts forth one alleged "covenant" to "pledge all [Kik's] resources," but omits that in this quote, Kik said only that it was going to make Kin available to use ***within Kik Messenger*** and would put its resources toward ensuring it met that goal. *See* Welsh Ex. K at KIK000021, KIK000023. TDE purchasers had no stake in Kik Messenger, nor did they share in any benefit from Kik Messenger's success or failure. *See* SEC92, 110:11-13; *id.* at 111:8-12. Put in the terms of *Continental Marketing*, this would be akin to the beaver ranchers expending efforts toward raising ***their own beavers***, generating no profits whatsoever for the other purchasers, but having an incidental effect on the industry. The same is true for Kik Messenger: any success it had in integrating Kin would have only incidental effects on Kin purchasers. *Woodward*, 574 F.2d at 1026 (finding no common enterprise where the defendant's efforts to "enhance" the development would have "purely incidental" effects on the other purchasers). Thus, even if the Terms of Use did not control, the SEC has not identified a genuine issue of material fact as to whether an extra-contractual obligation could have existed.

> **B.    The SEC Fails to Raise a Material Dispute as to the Absence of Horizontal Commonality.**

As set forth in Kik's Motion, the SEC cannot establish common enterprise under the Second Circuit's horizontal commonality test because TDE purchasers neither pooled their funds nor shared any profits or losses on a pro rata basis. *Revak v. SEC Realty Corp*, 18 F.3d 81, 87 (2d Cir. 1994). In its Opposition, the SEC strains to reinterpret the horizontal commonality test (including in ways the Second Circuit specifically rejected in *Revak*), and tries to distort the factual record. But despite the SEC's hand waving, the undisputed factual record shows that: (1) Kik did not "pool" assets for the common benefit of TDE purchasers, (2) TDE purchasers did not receive a pro rata distribution of profits, and (3) the fortunes of TDE purchasers were not tied together. Any one of these undisputed facts is enough to require judgment in Kik's favor.

1.     **Kik Did Not Pool TDE Funds for the Common Benefit of Any "Enterprise."**

The SEC's contention that Kik "pooled" the funds from the TDE by depositing them into one bank account misstates the law and contradicts its own pleadings.  First of all, even if the funds were deposited into one account (which they were not), that would not amount to "pooling" for this purpose.  Instead, the SEC must also show that Kik used the funds for a common purpose to fulfill on-going obligations to the purchasers.  *SEC v. Life Partners, Inc.*, 87 F.3d 536, 544 (D.C. Cir. 1996) (rejecting SEC's contention that commingling of funds is sufficient to establish "pooling"); *Commonwealth Bank & Tr. Co. v. Spectrum Leasing Corp.*, 719 F. Supp. 346, 349–50 (M.D. Pa. 1989) (no horizontal commonality despite placing funds in company's operating account).  Otherwise, any retailer that sells a product and deposits the proceeds in a company bank account could be said to be pooling the funds, even if it uses those proceeds to fund its own operations.  Further, in its own Statement of Undisputed Material Facts, the SEC acknowledges that the funds from the TDE were never placed together into a single bank account.  SEC 56.1 ¶¶ 294–95.  On the contrary, to this date, proceeds from the TDE remain in two forms of currency (Ether and U.S. dollars), and are located in two separate accounts (a digital wallet and a Canadian bank account).  SEC 56.1 ¶ 294.  Further, nothing on the record suggests that Kik used these funds for a common purpose so that each purchaser shares in fortunes and risks of the use of those funds on an ongoing basis.

Kik also did not use these funds for the common purpose of fulfilling any ongoing obligations to TDE purchasers, and the SEC does not say otherwise.  To confuse this analysis, the SEC cites two cases in which funds were "pooled" for the purpose of developing and launching other blockchain projects.  *See* SEC Opp. at 20, n.8.  But neither case involved funds placed in a bank account *after* the project was already launched and functional.  *E.g.*, *Balestra v. ATBCoin*

11

*LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (plaintiff sufficiently plead "the existence of 'horizontal commonality'" in claims "the funds raised through the ICO were pooled together ***to facilitate the launch of the ATB Blockchain***, the success of which, in turn, would increase the value of Plaintiff's ATB Coins" (emphasis added)); *Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *2, 3 (D.N.J. Dec. 10, 2018) (same, noting that "[d]efendants' arguments to the contrary are better suited to support a motion for summary judgment").   In contrast, TDE participants could not reasonably believe Kik would use the TDE proceeds to build and launch Kin on the blockchain, because by the time they received Kin, the token had already been launched on the Ethereum blockchain, and the Terms of Use made clear that Kik had no obligations to the TDE purchasers other than to deliver the token.  SEC 56.1 at ¶ 295; SEC6 at 31:15-25.  Kik used the funds from the TDE to fund its own, privately-held business, not a profit-generating enterprise involving token holders.  This is clear from the evidence cited by the SEC on this point, which is that the money would be used to "fund ***Kik operations***" and "execute upon the roadmap of additional feature development planned for the Kin integration ***into Kik***."  SEC Opp. at 25 (emphasis added).  It is undisputed that Kin purchasers had no stake in Kik, and did not profit or lose along with Kik.  Simply put, the undisputed facts show that the TDE purchasers' funds were not "pooled" for purposes of horizontal commonality.

### 2.  TDE Purchasers Were Not Entitled to a Pro Rata Distribution of Profits.

The SEC likewise concedes there was no pro rata distribution of profits (SEC Opp. at 25), which the SEC's own case law describes as an essential element of horizontal commonality.  *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000) (cited in SEC Mot. at 24) (horizontal commonality requires "a pooling of investors' contributions and distribution of profits and losses on a pro-rata basis").  Ignoring its own authorities, the SEC argues that horizontal commonality is

established because (according to the SEC) the proceeds from the TDE were spent "on projects designed to boost Kin's value, to the benefit of all investors." SEC Opp. at 19. But the SEC cites no case holding that the use of funds on "projects" that are "designed" to boost the value of an asset is enough to establish horizontal commonality in the absence of pro rata profit sharing. This is hardly surprising, as the "benefit" to TDE purchasers from such activity is tangential at best, and there was no apportionment of any benefit allegedly created by Kik. In the Second Circuit, horizontal commonality requires a "pro-rata sharing of profits and losses." *Revak*, 18 F.3d at 87. The alternative standard set forth in the SEC's Opposition was simply made up out of whole cloth, and bears no resemblance to the standard set by the Second Circuit in *Revak*.

The SEC also argues that horizontal commonality exists because the "'return on investment' for any Kin holder was 'directly proportional to the amount of that investment.'" SEC Opp. at 19 (citing *Infinity Grp*., 212 F.3d at 188). But the SEC's only authority for this argument is completely inapposite. In that case, the seller sold "property transfer contracts" in which investors contributed to a Trust that promised to invest in certain ventures and return a "guaranteed . . . annual rate of return ranging from 138% to 181% depending on the amount of the participant's principal." *Id.* at 184–85. Under the applicable contract, the investors' "dividends" would be apportioned ***"according to the amounts committed by the investor*.*" Id.* at 188 (emphasis added). And the asset received actually ***represented the investors' right to receive "dividends"*** that were paid out on a pro rata basis—the very definition of a pro rata distribution of profits. *Id.* at 184–85.

The undisputed facts show that the circumstances of the Kin TDE are completely different. Unlike *Infinity Group*, where investors made their purchase and then passively received profits based solely on the amount of money they contributed, no TDE purchaser earned a profit simply by virtue of owning Kin tokens. The success or failure of Kik Messenger did not translate into

more or less value in each Kin token.  Rather, the value of tokens would depend on market-level forces of supply and demand—which could fluctuate as more people transacted in Kin or adopted it for use in their apps.  Even when the economy grew, however, TDE purchasers could still profit only by re-selling Kin tokens at a price above the TDE price.  As such, their profit or loss depended on market forces (*i.e.*, changes in the market price of Kin), plus their own decisions about whether and when to sell.  The SEC's reliance on *Infinity Group* is thus misplaced.  If anything, the facts of the *Infinity Group* case only highlight why the SEC's case here falls short.

> ### 3.    TDE Purchasers' Fortunes Were Not Bound to One Another Because They Retained Full Control Over Their Kin.

Unable to dispute that TDE purchasers received complete control over the Kin they bought (which precludes a common enterprise), the SEC urges this Court to consider "whether the investors were dependent upon the efforts of Kik (or third parties) for the success of their investment."  SEC Opp. at 26.  Although the SEC does not give it a name, it is asking this Court to apply a test known as the "broad vertical commonality" test, which requires a "showing that the fortunes of investors are tied to the efforts of the promoter."  *Revak*, 18 F.3d at 88 (criticizing and rejecting this broad vertical commonality test).  Each case cited by the SEC here analyzes common enterprise under this "broad vertical" framework that is not the standard in the Second Circuit.  *See* SEC Opp. at 27-28 (citing *Long v. Shultz Cattle Co.*, 881 F.2d 129, 141 (5th Cir. 1989) (applying broad vertical commonality), *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) (same); *SEC v. Galaxy Foods, Inc.* 417 F. Supp. 1225, 1239 (E.D.N.Y. 1976) (same, citing *Koscot*)).  But as the SEC knows, *see* SEC Mot. at 19, 22, in *Revak*, the Second Circuit **specifically rejected** this very test because it effectively collapses two elements of the *Howey* test into one:

> We do not interpret the *Howey* test to be so easily satisfied. If a common enterprise can be established by the mere showing that the fortunes of investors are tied to the

14

efforts of the promoter, two separate questions posed by *Howey*—whether a
common enterprise exists and whether the investors' profits are to be derived solely
from the efforts of others—are effectively merged into a single inquiry: "whether
the fortuity of the investments collectively is essentially dependent upon promoter
expertise."

*Revak*, 18 F.3d at 88 (citation omitted); *Marini v. Adamo*, 812 F. Supp. 2d 243, 259 n.13 (E.D.N.Y.

2011) (rejecting same argument).  The SEC does not explain why it urges this Court to adopt a

standard that the Second Circuit has expressly rejected in *Revak*, but the reason is clear enough:

the SEC knows it cannot prevail under the standard set forth in *Revak*.  In *Revak*, the Second Circuit

held that there was no common enterprise primarily because purchasers had full control over their

units, and thus the "rents and expenses attributable to each unit were not shared or pooled in any

manner."  *Id.* at 88.  Further, purchasers "could make profits or sustain losses independent of the

fortunes of other purchasers."  *Id.*  This was true even though promoters touted "the prospect of

capital appreciation upon resale" of their units, and offered investors "on-site management"

services through a common agent.  *Id.* at 84.  The Second Circuit's opinion in *Revak* is binding,

and on the undisputed facts in this case, it requires judgment for Kik as a matter of law.

Ignoring *Revak*, as well as the many other cases cited on this point in Kik's Motion, the

SEC argues that the "ability to exchange or dispose of an investment contract on his or her own—

which exists to many forms of investments that are straight-forward examples of investment

contracts . . . is not germane to and does not alter this analysis."  SEC Opp. at 27 (citing *Edwards*,

540 U.S. at 391–92).  But this is just more misdirection, and it ignores the SEC's own theory of

"profit" in this case.  As noted above, under the SEC's theory, TDE purchasers could only "profit"

by selling Kin tokens for a price higher than the TDE price.  *See* Part II.B.2, *supra*.  In such a case,

the purchaser's right to control the asset (in other words, the right to decide whether and when to

sell) means that the purchaser's fortunes are not tied to the fortunes of any other purchaser, and so

there can be no common enterprise.  The authorities cited in Kik's motion are directly on point,

and they confirm that there can be no common enterprise here.  *See, e.g., Lavery v. Kearns*, 792 F. Supp. 847, 859–60 (D. Me. 1992); *Marini* 12 F. Supp. 2d at 257–58; *see also Noa v. Key Futures, Inc.* 638 F.2d 77, 79 (9th Cir. 1980) (no common enterprise where "the decision to buy or sell was made by the owner of the silver"); *Copeland v. Hill*, 680 F. Supp. 466, 468–69 (D. Mass. 1988) (same, noting the "primary risks and rewards—appreciation or depreciation in market value—rested on the plaintiffs").

The SEC argues that these authorities are too "far afield," but fails to meaningfully address the positions advanced in Kik's Motion.  Instead, the SEC's Opposition cites a patchwork of irrelevant factual distinctions that have no bearing whatsoever on the matter at hand.  SEC Opp. at 29.  For example, as stated in Kik's Motion, *Lavery* involved no common enterprise where the "'thrust of the investment'" was the "'appreciation of the value of the property,'" because the purchasers had control to sell on any terms they wished.  Kik Br. at 22.  The SEC attempts to distinguish this case by pointing out that the sales were "not part of an initial *development* plan," but does not explain what that is or how the TDE was different.  SEC Opp. at 29 (emphasis in original).

Similarly, there was no common enterprise in *Marini* (which involved the purchase of rare coins) "because plaintiff was free to direct the sale of his coins separate and apart from [defendant's] decision to sell his coins," and therefore "the fortunes of [plaintiff] and [defendant] clearly were not directly linked."  812 F. Supp. 2d at 257–58.  The court's ruling was unambiguous:

> ***Most important***, Adamo was under no obligation to sell his coins at the same time that Marini sold his; in other words, Adamo was free either to sell his coins before Marini, if an opportunity arose, or to hold onto his coins longer to capitalize on any long-term appreciations in value. ***Accordingly, while the valuation of their portfolios may have paralleled one another given their similar contents, and any deal that Adamo found could have affected the prices of the coins that Adamo and Marini each owned, the portfolios were not intertwined such that Marini's and Adamo's fortunes had to rise and fall together.*** Stated otherwise,

16

> because plaintiff was free to direct the sale of his coins separate and apart from
> Adamo's decision to sell his coins, the fortunes of Marini and Adamo clearly were
> not directly linked.

*Id.* at 258–59 (emphasis added).  In its opposition, the SEC argues that *Marini* did not involve

pooling and the "buyer and seller" of the asset "maintained separate, non-identical portfolios with

different combinations of coins[.]"  SEC Opp. at 29.  But the *Marini* court did not base its decision

on those facts.  It explicitly found that the "[m]ost important" factor for a finding of no common

enterprise was the purchaser's ability to control the decision and timing of the sale of his coins,

not the fact that the portfolios were "similar" enough to rise and fall together while the parties

owned them.  812 F. Supp. 2d at 257.

In sharp contrast, the SEC's only authority on this point, *SEC v. Edwards*, is inapposite

because it did not involve a "profit" from the resale of an asset.  540 U.S. 389, 391–92 (2004).  In

*Edwards*, the purchasers' ownership of payphone packages entitled them to receive monthly

payments from the operator of a pay phone business for a 14% "annual return" on their investment.

*Id.* at 389, 391. As an initial matter, the Supreme Court in *Edwards* did not even discuss common

enterprise,[5] but rather addressed only the question of whether a fixed rate of return (rather than a

variable return) qualifies as "profit" under the *Howey* test.  *Id.* at 397.  In any event, it is true that

the purchasers' ability to resell the payphone packages was irrelevant to the profit analysis, but

that is because the purchasers' "profit" in that case did not come from reselling the packages to

other buyers.  It came, instead, from the defendant's management of a payphone business, and all

of the owners' fortunes were aligned because they all received a monthly payment from the

defendant for as long as they owned the packages.  *Edwards*, 540 U.S. at 394–95; *see also Infinity*

---

[5] Notably, however, the lower court **applied the broad vertical commonality test** to establish common
enterprise, a test which has been rejected by the Second Circuit.  *See SEC v. ETS Payphones, Inc.*, 300 F.3d
1281, 1284 (11th Cir. 2002); *Revak*, 18 F.3d at 88 (rejecting broad vertical test).

*Grp.*, 212 F.3d at 188–89 (same, purchasers all received dividends from their purchase depending on the profits of the enterprise up until they sold the asset). Frankly, it is nothing short of ridiculous for the SEC to cite *Edwards* for the proposition that control over resale is "not germane" to this issue, when *Revak* and a host of other authorities confirm that where (as here) profit derives from resale, control over the asset (and the circumstances of any resale) is actually outcome determinative on this issue.

The SEC's position that "Second Circuit and other court of appeals decisions reinforce this conclusion" is disingenuous. SEC Opp. at 27. The SEC cites *Aqua-Sonic* and *Long*. *See* SEC Opp. at 27. But in *Aqua-Sonic*, the common-enterprise element was not contested. 687 F.2d at 581-82; *see also SEC v. Aqua-Sonic Prods. Corp.*, 524 F. Supp. 866, 877 (S.D.N.Y. 1981) (district court decision noting "the input of money and the common enterprise are conceded").[6] And *Long* applied the broad vertical commonality test that has been rejected by the Second Circuit. *Long*, 881 F.2d at 141 ("We recognize that under our standard the second and third prongs of the *Howey* test may in some cases overlap to a significant degree and that our standard has been criticized for that reason" including by courts in the Southern District of New York).

Citing *Long*, the SEC continues to argue that "Kin investors . . . relied on Kik to 'provide[] the entire framework—*i.e.*, to create, develop, foster and improve the Kin Ecosystem, and to take the steps necessary to establish and build value for Kin." SEC Opp. at 27 (citing *Long*, 881 F.2d

---

[6] As in the district court, the Second Circuit's analysis in *Aqua-Sonic* was limited to whether the uncontested expectation of profits derived from the efforts of others. 687 F.2d at 582; *see also Long*, 881 F.2d at 134 (finding that while plaintiffs "could, theoretically" make decisions about how to operate the enterprise, it was "undisputed that at each juncture plaintiffs relied solely on the advice of" the promoter, ***including the decision of when to sell***). In contrast, the SEC admits that TDE purchasers had *complete*, unfettered, control over whether they would profit or lose, by determining whether and when to re-sell. Thus, these cases are inapposite.

at 127).[7]  But the "framework" in *Long* involved a cattle-feeding venture where the promoter effectively controlled all aspects of the venture, include "the decision when to sell, and the decision to whom to sell" the cattle.  881 F.2d at 133, 137.  Additionally, the *Long* court considered those factors as part of its discussion of whether the purchasers expected profits from the efforts of others—not whether there was a "common enterprise."  *Id.*  Simply put, it does not involve application of the test this Court must follow.

Even looking beyond the SEC's use of precedent that has been specifically rejected by *Revak*, its factual argument also falls flat.  *See Revak*, 18 F.3d at 87-88 (discussing *Long* and *Koscot*, and holding that broad vertical commonality does not satisfy *Howey*).  According to the SEC, it was "unrealistic" and "impossible" for Kin purchasers to undertake certain discrete actions, such as causing Kin to function in the Kik Messenger app, or build the program that would automatically distribute Kin to participants in the economy.  SEC Mot. at 27.  First, even if all these statements were true, they are immaterial because they do not mean that TDE purchasers could just sit back and earn a profit based on their ownership of Kin.  Every single purchaser could direct the use, application, and sale of their own Kin regardless of what Kik did.  Similar to the transactions in *Marini*, while the value of the Kin owned by Kik and by TDE purchasers "may have paralleled one another," and a "deal" that Kik found may have affected the price of Kin that purchasers owned, TDE purchasers were "free to direct the sale of [their Kin] separate and apart from" Kik's decision to sell or distribute its Kin.  *See Marini*, 812 F. Supp. at 257.  Under the binding precedent cited in Kik's Motion at 21 – 23, there cannot be a common enterprise.

---

[7] The discussion of a "framework" in *Long* actually references the *Koscot* case, 497 F.2d 473, 478-79 (5th Cir. 1974), that involved a pyramid scheme where where investors' returns were "inextricably tied to the efficacy" of the scheme.  881 F.2d at 137. *Koscot*, however, is another inapplicable Fifth Circuit case applying the broad commonality test.  *Id.* at 478-79.

**C.      Kik's Ownership of Kin Does Not Create Strict Vertical Commonality.**

Unable to prevail on horizontal commonality, the SEC invokes a separate test (called "strict vertical commonality"), and rests its argument on a single undisputed fact: that Kik did not sell *all* of the Kin created but retained three trillion tokens.  SEC Opp. at 29–30.  But separate ownership of the same asset or commodity does not mean necessarily that the "promoter's 'fortunes rise and fall with those of the investor,'" as the SEC suggests, and neither of the cases cited by the SEC supports this argument.  In *Savino v. E.F. Hutton & Co*, the plaintiffs survived a motion to dismiss by alleging that the defendant/seller was paid "brokerage commissions" and bonuses that were tied to a percentage of the profits that the defendant/seller earned for plaintiffs by investing plaintiffs' money.  507 F. Supp. 1225, 1229–30 (S.D.N.Y. 1981).  As such, commonality between the promoter and the buyers did not turn simply on their separate ownership of a common asset.  The same is true of *Jordan*: in that case, the investor thought it was buying a special series of shares in an emerging markets fund, which would subject the investor to the claims and liens of the fund's creditors.  *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 205 F. Supp. 2d 243, 245–46 (S.D.N.Y. 2002).  There was strict vertical commonality, the court found, because the investment manager, fund administrators, and directors, all received "performance fees" equal to a percentage of trading profits.  *Id.* at 249.  Neither case, in other words, found a common enterprise based merely on separate ownership of the same asset, and neither case involved facts remotely analogous to Kik's TDE.  Indeed, the SEC's position here—that separate ownership of the same asset can create a common enterprise—has been expressly rejected by other courts in this circuit.  *See Marini*, 812 F. Supp. 2d at 257–58 (rejecting the argument that plaintiff's and defendant's "ownership of the same coins establishes the existence of strict vertical commonality").

The SEC's reliance on the recent preliminary injunction decision in *Telegram* also does not save its argument.  In *Telegram*, the court's finding that the SEC had "made a substantial

20

showing of strict vertical commonality" was based on dramatically different facts and circumstances. *Telegram*, 2020 WL 1430035, at *11. As noted above, Telegram sold interests in Grams to the Initial Purchasers before it had developed either the Gram token or the TON Blockchain, *id.* at *13-14, and the court analyzed the transactions from the perspective of the Initial Purchasers, at the time they first entered into their purchase agreements. *Id.* at *9. In that context, the *Telegram* court found that there was a "substantial showing" of strict vertical commonality between Telegram and the Initial Purchasers because they all stood to profit from their future ownership of Grams, but the potential profit for all of them depended on Telegram's ability to develop and launch both the TON Blockchain and the Gram token. *Id.* at *11. In other words, in *Telegram*, the court's conclusions about strict vertical commonality were not based on the "mere possibility" that Telegram would own some percentage of Grams (as the SEC argues). It was also based on the specific factual setting of that case, where neither the Grams nor the underlying TON Blockchain had been developed, and the Initial Purchasers were entirely dependent upon Telegram's development efforts. *Id.*

The *Telegram* court's analysis does not apply to the Kin TDE because, at the time of the TDE, the Kin token had already been developed on the existing Ethereum blockchain, so neither Kik nor the TDE purchasers were relying on Kik's efforts to develop or launch either the token or the underlying blockchain.[8] The SEC has argued that, in this case, Kik and the TDE purchasers were similarly dependent upon Kik's efforts to "sponsor" the Kin economy. SEC Opp. at 33. But that analogy does not hold. At the time of the initial purchase transactions in *Telegram* (the point

---

[8] The court also noted that Telegram would "suffer financial and reputational harm if the TON Blockchain failed prior to launch." *Telegram*, 2020 WL 1430035 at *11. Again, this fact is not applicable to Kik at the time it entered into the TDE—the blockchain and tokens were already functional and prepared to launch, and Kik was obligated to provide them.

in time at which the court focused its analysis), the Initial Purchasers did not have control over anything: the Grams had not even been created, much less transferred to the Initial Purchasers, and so any profit or loss for both Telegram and the Initial Purchasers was entirely dependent upon Telegram's development efforts. *Telegram*, 2020 WL 1430035, at *15. Neither Telegram nor the Initial Purchaser had the ability to earn a profit or lose money independently of one another. Here, in contrast, once the Kin tokens were distributed to TDE purchasers, they had complete control over their tokens and their profits (or losses) depended on market forces (supply and demand for Kin), plus their own decisions about whether and when to sell their Kin.[9]

Indeed, to the extent that the *Telegram* court's reasoning applies to Kin at all, it would suggest, at most, that the *Pre-sale* Kin purchasers would satisfy the test for vertical commonality with Kik because the purchasers depended on Kik to launch Kin tokens successfully. But it is undisputed that Kik's relationship to *TDE purchasers* was different: Kik had already created the Kin tokens, was obligated to provide them, and upon distribution, TDE purchasers and Kik each independently owned and controlled their own Kin. Thus, for the same reason that common ownership of Kin is insufficient to create a horizontal commonality among TDE purchasers, Kik's ownership of Kin tokens is similarly insufficient to create vertical commonality between Kik and TDE purchasers.

---

[9] The *Telegram* court went on to say that commonality would exist after the launch of the TON Blockchain and Gram tokens, based on the fact that the court evaluated the circumstances of the sale solely from the time of the Initial Purchase agreements *looking forward*, when the tokens were not yet developed. Further, Telegram had made a number of specific contractual commitments to take steps to support or increase the value of Grams. 2020 WL 1430035, at *17 (noting that the "Gram Purchase Agreements anticipate a critical role for Telegram in the post-launch TON Blockchain," and that Telegram was obligated to "continue to work to improve and advance the TON Blockchain"). As discussed above, there were no similar contractual commitments here (in fact, Kik expressly *disclaimed* any such obligations), and Kin tokens actually existed and were functional at the time of the TDE. In any event, the court's ruling in *Telegram* was not based— as the SEC misleadingly suggests—on the "mere *possibility* that Telegram would retain 28 percent of all Grams." SEC Opp. at 30 (emphasis in original).

At bottom, the SEC does not dispute the facts showing that the fortunes of Kik and the TDE purchasers were not linked. It does not dispute that purchasers agreed to the Terms of Use, that those Terms notified purchasers that Kin was provided "as is," that Kik expressly told purchasers it could "not guarantee that Kik or any Kik party can effect the transfer of title or right in any Kin tokens," or that Kik committed to nothing more than delivering Kin tokens. SEC 56.1 Response at ¶¶ 45, 49–52. And critically—the SEC does not dispute that "once TDE purchasers received their Kin tokens, TDE purchasers had complete control over the tokens—Kik had no control over what they did with the Kin tokens they had purchased." *Id.* at ¶ 69.

For the reasons discussed above, the SEC is wrong that merely owning the same asset creates a common enterprise between Kik and Kin purchasers, particularly where, as here, any party can sell or buy Kin at any time. In its Motion, Kik points out that this flawed approach would mean Kik could be involved in any number of "common enterprises" with individuals who bought Kin on the secondary market for example, based on the simple fact that they now own Kin. Kik Br. at 27. The SEC simply deflects this point, pointing to situations where an issuer distributes "unrestricted stocks or bonds" and then lacks control over who owns them. SEC Opp. at 31. But stocks and bonds are specific, enumerated categories of "securities" under the Securities Act (15 U.S.C. § 77b) that are not analyzed as "investment contracts" under the *Howey* test. It goes without saying that parties who purchase *stock* in a company—which represents a statutorily-defined relationship between the company and its shareholders—are treated as investors. Tellingly, the SEC references no situation in which sellers of "*investment contracts*" are determined to have a contractual arrangement with parties with whom they have no ongoing obligations, and thus this analogy has no merit.

III.   **THE SEC CANNOT ESTABLISH THAT KIK LED PURCHASERS TO EXPECT PROFITS FROM KIK'S FROM ESSENTIAL MANAGERIAL EFFORTS.**

Kik is entitled to summary judgment on the additional grounds that the SEC cannot meet its burden to prove that Kin purchasers were primarily led to expect profits from the managerial efforts of others.  Rather than identifying a factual dispute that is truly material to this question, the SEC urges the Court to disregard both the letter and intent of *Howey*.  Specifically, the SEC claims that *Howey* does not require that Kik actually *led purchasers to expect a profit*, but only that purchasers themselves expected to profit, regardless of whether Kik led them to expect it. *See* SEC Opp. at 32 (arguing that "proof of an investment contract requires only an 'expectation of profit' when the investor enters the scheme").  Remarkably, referring to a passage in Kik's brief that quotes the Supreme Court's *Howey* opinion, which unambiguously requires proof that purchasers were "led to expect profits"  Kik Br. at 27 (citing *Howey*, 328 U.S. at 298–99), the SEC claims that Kik "exaggerates" the applicable legal standard.  SEC Opp. at 31. It is unclear what part of the legal standard the SEC contends Kik "exaggerates," but at all events, the SEC's own authorities recognize that proof of an investment contract requires analysis of "whether the scheme was being promoted *primarily as an investment*" versus one where users were led to expect use or consumption of an item.  *Leonard*, 529 F.3d at 88; *see Forman*, 421 U.S. at 852–53; *Aqua-Sonic Prods. Corp.*, 687 F.2d at 582.  Here, the undisputed facts show it was the latter.

Setting aside the absurdity of arguing that Kik misstated the relevant test by accurately quoting the *Howey* opinion, many cases specifically reject the SEC's proposition that the mere "prospect" or "potential" for capital appreciation creates an investment contract.  *See Revak*, 18 F.3d at 84; *Alunni*, 445 F. App'x at 292.  Indeed, one of the SEC's own Commissioners criticized this approach, stating that the "potential for an increase in the value of a token" cannot alone satisfy *Howey*, and arguing that the analysis instead "should focus on the objective nature of the thing

24

offered to the purchasers."  Landsvik Ex. OO at 2. The SEC's interpretation would also lead to the absurd result that whether something is an investment contract turns on a "the natural desire of any purchaser that his purchase should appreciate in value," rather than what he was actually "led to expect" by the seller.  *See Contract Buyers League v. F&F Inv.*, 300 F. Supp. 210, 224 (N.D. Ill. 1969) (to conclude that a purchaser's natural desire to profit "makes a 'security' of what has been purchased, is obviously to so muddle the term as to make it meaningless").

Here, an objective analysis of what purchasers were actually offered shows that Kik led purchasers to expect Kin would be a medium of exchange, not a passive investment that would generate profits for them.  If some of those purchasers hoped—or even expected—they could profit from buying Kin, that expectation was not based on what Kik offered.  Indeed, where an asset is sold primarily for use or consumption, there is no expectation of profits under *Howey*.  *See United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975).  The SEC concedes this legal point (as it must), and it also concedes (as it must) that Kik repeatedly characterized Kin as a medium of exchange that would have no value outside of its use as such.  In an effort to avoid summary judgment against it, the SEC again ignores the key agreement between Kik and the TDE purchasers, mischaracterizes the factual record, and stretches the case law beyond any reasonable interpretation.  For the reasons set forth below and in Kik's opening brief, Kik is entitled to judgment as a matter of law on this ground.

**A.    The SEC Continues to Ignore the Primary Document Binding Kik and Kin Purchasers: the Terms of Use.**

As it did in its own Motion for Summary Judgment, the SEC again ignores the only written agreement between Kik and the TDE purchasers—the Terms of Use—which must be the starting point for evaluating what purchasers were led to expect.  *See* Kik Br. at 7–8.  To be sure, in deciding whether a transaction involves an "investment contract," courts have sometimes considered extra-

contractual terms, but even in that context, the "expectation of profits" element of the *Howey* test involves "an objective inquiry into the character of the instrument or transaction offered." *See Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009). It requires review of the instrument as a whole and the entirety of the "factual setting." *See Marine Bank v. Weaver*, 455 U.S. 551, 561 n.11 (1982). Thus, none of the SEC's authorities suggest that a court can faithfully apply *Howey* while completely ignoring the only written agreement between the parties (as the SEC does), and none of them suggests that the SEC can simply pluck a handful of statements out of context while ignoring statements that are inconsistent with its theory. *Cf. Aqua-Sonic Prods. Corp.*, 687 F.2d at 584 (explaining that the *Howey* analysis involves looking at "terms of the offer" as well as other factors); *United States v. Leonard*, 529 F.3d 83, 89–90 (2d Cir. 2011) (court's analysis starts with transaction documents). It is undisputed what the Terms of Use said and that TDE purchasers agreed to them, and based on those terms, purchasers could not have expected that their purchase would generate returns or profits. *See* Kik Br. at 20; Kik 56.1 at ¶¶ 47–53.

## B. Kik Offered and Sold Kin as a Medium of Exchange and Did Not Guarantee Profits or Returns.

The SEC does not dispute the material facts that show Kik consistently marketed Kin as a medium of exchange that purchasers could use, not as a passive investment. *See* Kik Br. at 29–30. It does not dispute that: (1) Kik's marketing material explained how Kin could be used as a medium of exchange; (2) Kik targeted potential purchasers most likely to be interested in Kin for the ability to use it; (3) Kik structured the TDE in a way that was most likely to ensure those who bought it were doing so to become actual Kin users;[10] (4) Kik imposed a limit on how much Kin

---

[10] The SEC makes a cursory claim that Kik "offer[ed] no proof that it presented to particular audiences or through particular media to accomplish such a goal." SEC Opp. at 35. This is untrue: almost all of Kik's public statements directly address "all developers out there" and repeatedly call on developers to buy Kin and participate in the new Kin economy. *See* Kik Br. at 9. Kik also promoted Kin on social media channels and at developer conferences targeted at the developer community. SEC14 at 394:13–395:2. This emphasis

any one purchaser could buy; and (5) Kik expressly stated it could "not guarantee value with Kik." SEC46B at 35:20–23; *see* SEC 56.1 Response at ¶¶ 57–60, 63–66.  The SEC's argument that Kik "courted 'whales,'" SEC Opp. at 6, 36, does not contradict any of these undisputed facts, particularly since large purchasers could buy Kin to use or consume it.  *See* Section III.D, *infra*.  Also, the fact that certain buyers made larger purchases than others does not change the fact that Kik intended for the TDE to ensure wide distribution of Kin, Kik structured the sale to achieve that result, and Kik ultimately achieved that goal.

Unable to dispute the material facts showing that Kik marketed Kin for consumptive purposes, the SEC argues that *Forman* and similar cases do not apply unless consumption or use of Kin was the TDE purchasers' "sole" purpose for buying Kin.  *See* SEC Opp. at 33.  This is wrong for two reasons.  First, even if that were the correct test, it is undisputed that the SEC has no evidence for "the majority *or even a fair number* of the buyers."  *Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 (11th Cir. 1991) (emphasis added).  In its Opposition, the SEC says only that "several public investors have clearly testified that they did invest in Kin to make a profit."  SEC Opp. at 37. The "several investors" it refers to are *four* of the 10,000 TDE purchasers.  *Id.*  Their subjective motive for purchasing—even if relevant—could not substitute for the subjective intents of nearly 10,000 other purchasers.  And further, the test is not that consumption or use of Kin be purchasers' "sole" reason for buying.  The real question is whether "purchasers were induced to obtain [the tokens] ***primarily*** for [consumption]."  *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1040 (10th Cir. 1980) (emphasis added); *see also* Kik Br. at 27–28, Kik Opp. at 31–32.

---

is underscored even by the types of events Kik attended when marketing Kin tokens: "Token Summit," TechCrunch Shenzhen," the "Bitcoin and Ethereum Summit," or "New York City Ethereum" (to name a few).  The SEC merely claims that *videos* of these conferences, which were reproduced and posted by *other entities—not Kik*—made these statements available to any prospective TDE purchasers.  However, it is apparent that Kik directed its attention toward audiences consisting of highly sophisticated developers and blockchain enthusiasts.

Even if a purchaser bought Kin and did "expect" to profit, that was a subjective expectation that is inconsistent with the product that Kik sold and marketed. The undisputed facts instead lead inevitably to the conclusion that Kik offered Kin as a medium of exchange that could be used and consumed within Kik and other apps. *See* Kik Br. at 29–31.

> **C.      The SEC's Emphasis on Kin's Utility on Day One Is Misplaced.**

The SEC skims over the slew of instances where Kik's offering material explained that Kin could be used as a medium of exchange, and concludes nevertheless that Kik could not have marketed Kin for consumptive use because "there was no good or service to buy with Kin, and Kik did not identify any actual use for Kin when it was distributed." SEC Mot. at 33. The SEC cites no case to support its position that the "expectation of profits" analysis turns on *when* the use or consumption will occur. And it has no answer to the cases cited in Kik's opening brief stating that the expectation to use or consume an item, ***even in the future***, precludes an "expectation of profits." *See* Kik Br. at 28; Kik Opp. at 42. Accepting the SEC's interpretation would mean that the people in *Forman* who purchased co-op shares to obtain a place to live, could not have "expected" to use or consume the living quarters if they were not built at the time of the purchases. *See Forman*, 421 U.S. at 853 (finding no expectation of profits because purchasers intended to "acquir[e] a place to live," despite the fact that the homes were not yet built at the time of purchase). That interpretation would also conflict with *Woodward*. *See* 574 F.2d at 1025 (no investment contract despite purchase of empty "lots as ***future*** building sites" (emphasis added)). Simply put, the SEC's position in this case—that marketing for consumptive use matters only if the consumptive use will happen immediately—cannot be squared with either *Forman* or later cases applying its holding. Here, it is undisputed that after the TDE, dozens of independent mobile apps joined the Kin economy offering goods and services in exchange for Kin tokens. No authority requires Kik to identify every use case *prior* to the sale, as the SEC would require, and *Woodward*

and *Forman* recognize that purchasers may be "induced" to buy for consumptive use, even when that consumptive use may occur in the future (and, indeed, even when the product to be used does not even exist at the time of the purchase).

Kik's marketing material repeatedly described Kin as a general use token that could be used within digital applications to buy and sell digital services. Ex. K at KIK000008 (describing Kin as "an open source cryptographic token, . . . which is envisioned as a general purpose cryptocurrency for use in everyday digital services such as chat, social media, and payments"). And as previously discussed, Kik's marketing material *did* identify a number of potential use cases for Kin even before the TDE, including in the Kin White paper. *See* Kik Opp. at 41–42. However, because the Kin economy would be comprised of many independent applications, Kik would have no way of knowing all of the ways it would be used in the future. Indeed, the fact that many new and even unforeseeable use cases would develop over time was built into the very concept of the Kin economy, and this was one of the reasons Kik believed it would be attractive to developers and users alike. That does not change the fact that Kik marketed Kin "primarily" for use as a medium of exchange.

Even assuming Kin's use cases on the day of launch were determinative, the SEC cannot dispute that Kin *was* a functional medium of exchange the instant it was launched.[11] ***First***, Kik had integrated Kin within Kik as a store of value, which allowed users to link their wallets, display their status to other users, and unlock premium stickers according to the amount of Kin owned.

---

[11] The SEC claims that "Kin had no use upon distribution," but this argument is belied by the undisputed facts. The SEC does not dispute that "[a]nyone with an Ethereum wallet address could accept Kin as payment, starting from the second Kin was launched," (SEC 56.1 Response at ¶ 72), nor does it dispute that Kin purchasers could "link Ethereum wallets to their Kik accounts [and] would display their balance of Kin," as well as "access different tiers of digital content, such as stickers, based on the amount of Kin owned." *Id.* at ¶¶ 76–77. As such, this unfounded statement should be disregarded.

SEC 56.1 Response at ¶¶ 76–77.[12]  The SEC identifies no authority holding that the ability to purchase a good by transferring Kin is a prerequisite—the question is whether the asset was designed for use or consumption.  **Second**, that "there was no good or service to buy with Kin" does not mean that Kin was not functional at the time of the TDE to be used to buy a good or service if one were available.  It simply means that no other developer had yet created a product or service for which it had already started accepting Kin as currency.  Kin in fact *was* functional at the time the tokens were distributed to the public, and Kik postponed the launch of Kin several times to ensure as much.  Kik 56.1 at ¶ 70; Welsh Ex. A at ¶ 79.  Because Kin launched on an open-source blockchain, anyone who held Kin could freely transfer it on Ethereum, which was an open source platform available to the public, or use it as a medium of exchange in transactions.  Kik 56.1 at ¶ 72; Welsh Ex. A at 91.  The SEC does not dispute this.  *See* SEC 56.1 Response at ¶ 71.  Indeed, that is exactly what started happening shortly after the public received their Kin.  *See* Kik Br. at 12-13.

### D.   The SEC Also Fails to Dispute That Kik Did Not Market Kin as an Opportunity for TDE Purchasers to Profit.

The SEC knows it cannot prove that Kik "induced" TDE purchasers with offers or promises of an investment opportunity, so it tries to hide behind fuzzy accusations that Kik's public statements "fueled expectations of profit."  SEC Opp. at 34.  No case has ever held that a seller creates an investment contract merely by "fuel[ing]" someone else's "expectations" of a profit.  This includes the cases cited by the SEC, which all involve written promises or guarantees of

---

[12] The SEC suggests that these stickers were "unavailable to [TDE purchasers] who did not also have a Kik Messenger account."  SEC Opp. at 9 n.2. This is incorrect.  Kik Messenger, like almost any other digital application, allows any member of the public to create an account, meaning literally any TDE purchaser could have accessed stickers within Kik Messenger.  And in fact, many purchasers did—within weeks after the TDE, over 20% of TDE participants had linked their wallets to Kik's MVP.  *See* Kik 56.1 at ¶ 78; *see also* Landsvik Ex. AA ¶¶ 24–27 (Hendriks Decl.) (explaining that he "personally utilized the MVP by linking my Ethereum wallet to my account on Kik Messenger").

profits.  The court in *SG Ltd.*, for example, determined that a seller's representations "played upon greed and fueled expectations of profit" because the seller "***flatly guaranteed that investments . . . would be profitable, yielding monthly returns of 10% and annual returns of 215%***."  *SEC v. SG Ltd.*, 265 F.3d 42, 54 (1st Cir. 2001).[13]  So too in the SEC's other authority.  *See Kemmerer v. Weaver*, 445 F.2d 76, 78 (7th Cir. 1971) ("[A] 100% Return within one year was guaranteed[.]");  *SEC v. Hui Feng*, 935 F.3d 721, 729 – 30 (9th Cir. 2019)) (seller made written "promise of a fixed rate of return").  *Howey*, which requires a showing that purchasers were "led to expect profits" requires far more than vague characterizations that the defendant "fueled" or "primed . . . expectations of profits."  *See* SEC Opp. at 23, 34; *Howey*, 328 U.S. at 299.

In this case, the SEC has not produced evidence of anything resembling a promise or guarantee of profits.  Its Opposition cites only the following "facts" in support of this element: (1) one or two-word quotations where Kik employees mentioned the words "value" or "valuable," or the prospect that Kin could increase in value (SEC Opp. at 34); (2) the notion that Kik and other economy participants could generate "demand" for the Kin token (*id.*); (3) references to the *possibility* (not even a guarantee) that Kin could be listed on secondary exchanges (*id.* at 34 – 35); and (4) a cursory reference to "several" purchasers who allegedly *did* purchase Kin hoping to profit, without any allegation whatsoever that these expectations were "fueled" by anything Kik actually said.  *Id.* at 36-37.  As discussed below, even if the Court adopts the SEC's skewed portrayal of them, these statements are a far cry from the "guarantees" of profitability or returns that sellers of other instruments promised in *SG Ltd.*, 265 F.3d at 54, *Kemmerer*, 445 F.2d at 78, and *Hui Feng*, 935 F.3d at 729-30.

---

[13] And even this was not conclusive that there was an expectation of profits as a matter of law because the court in *SG* was deciding a motion to dismiss and noted that SG "has a plausible argument . . . that no participant in his or her right mind should have expected guaranteed profits from purchases" of these shares.  *Id.* at 54.

*First*, mere references to "value," or the potential that the value of an asset might increase, do not suffice under *Howey*, which requires more than mere references to the "***prospect*** of capital appreciation." *Revak*, 18 F.3d at 84 (emphasis added); *see also Hart*, 735 F.2d at 1003); *Alunni*, 445 F. App'x at 292.  Moreover, the SEC provides these quotes out of context, and reframes them inaccurately.  For example, the SEC claims that Kik "conveyed that both investors and Kik 'could make a lot of money' from Kin."  This is untrue.  In this interview, Mr. Livingston stated that participants who joined the economy as intended, by "provid[ing] value to each other," for example by "selling them both physical and virtual goods," could "make a lot of money" from those ***services***—not from their purchase of Kin.  SEC46-B at 11:19-24.  He also analogized the cryptocurrency industry ***generally*** to the "dot com" era because "there is a lot of hype right now, and people are going to make a lot of money"—but he was not even speaking about Kin.  *Id.* at 61:4-12.  Thus, even viewing these statements in isolation (as the SEC does), they do not come close to showing that Kik "offered or promised" an investment opportunity to prospective TDE purchasers.  *See Warfield*, 569 F.3d at 1021.  This is even more true when those statements are viewed in the broader context of Kik's marketing and promotion of Kin, as required under *Howey*.  That broader set of statements further undermines any suggestions that Kik was offering TDE participants an investment opportunity.  For example, the Terms of Use stated that Kin tokens were offered with no conditions, warranties, or other restrictions by Kik.  *See* Kik Br. at 21-22.  Mr. Livingston was explicit that Kik "cannot guarantee value with Kin," Kik Opp. at 40, and purchasers acknowledged that Kik could not cause the transfer of title or right to any Kin.  *Id.*; *see also* Kik 56.1 ¶¶ 10, 11, 14, 16, 18, 50.

*Second*, the SEC claims that Kik "promise[d] to accelerate demand, by promptly integrating Kin into Kik Messenger."  SEC Opp. at 34.  There was no such "promise," nor does an

attempt to create demand for an asset amount to a promise of *profits*.  *See Noa v. Key Futures, Inc.*, 638 F.2d at 79-80 (finding that "no investment contract was created" despite the fact that the purchasers knew silver bars could increase in value "depend[ing] on the fluctuations of the silver market."); *Lavery v. Kearns*, 792 F. Supp. 847, 859-60 (D. Me. 1992) (promises to develop amenities within a community were not enough to create investment contract).  The SEC further claims that "any public sale investor who understood 'the fundamentals of crypto economics' purchased with the hope of profiting through appreciation."  SEC Opp. at 33.  But this was a statement from Mr. Livingston's testimony.  It is unfathomable that a statement made *one year after the TDE* to SEC staff during testimony, and not heard by any purchaser could have somehow "fueled" purchasers' expectations.  SEC 56.1 Response at ¶ B.  And anyway, Mr. Livingston simply agreed with the SEC's hypothetical that someone who understood "the fundamentals of crypto economics" *could* understand that Kin *might* increase in value due to supply and demand; he did not offer an opinion about what any TDE purchasers "hope[d]" to get from their purchase of Kin.  He certainly was not testifying about anything that Kik actually "offered or promised" to prospective TDE purchasers.

**Third,** the SEC claims that Kik "**predicted** that Kin would be tradable on 'exchanges,' thereby priming expectations that investors would be able to easily resell Kin at a profit."  SEC Opp. at 34 – 35 (emphasis added).  As an initial matter, the fact that exchanges would potentially allow Kin to be traded does not equate to generating a *profit*.  *See* Kik Opp. at 39 (explaining how exchanges are necessary for a functioning economy to operate).[14]  And there is no evidence in the

---

[14] Similarly, the SEC's reference to the "velocity" of Kin had nothing to do with "trading" Kin or generating profits; it was only meant to mean "**how much earn and spend you have in the ecosystem**," or the amount that Kin is used as a medium of exchange within applications.  SEC10 at 484:6-13; 210:11-15; *see also id.* at 89:7-12 (explaining that "proper velocity" on the blockchain (i.e., transaction speed) was important to allow "spending . . . and the exchange of value, which is what [the Kin economy is] built on").

record that Kik ever guaranteed purchasers that Kin would be tradable on exchanges.  Rather, it is undisputed that while Kik may have "hoped" that Kin would trade on exchanges, it did not and could not promise that to be the case, and expressly stated it was up to the exchanges whether they would list the token.  Kik 56.1 Response at ¶ 122; *see also* Kik Opp. at 37–40; Landsvik Ex. TT ("decision to list Kin was ultimately "up to the exchanges,"); *see also* Landsvik Ex. UU (same); Ex. VV ("[W]e are not actively keeping track of exchanges that have expressed interest"); *see also* SEC62 (exchanges may list Kin "if they choose"); Ex. ZZ (listing Kin "depend[ed] on the exchanges themselves and who lists them").  Simply put, expressing hope that exchanges would decide to list Kin does not come close to an "offer or promise" of an investment opportunity.

>    ***Finally***, the SEC argues that "several" purchasers had an "investment intent."  SEC Opp. at 36 to 37.  Again, this position lacks support in fact and law.  The SEC does not cite anything in the record to support its statement that "[t]here is simply no doubt that most Kin purchased in the [TDE] was purchased 'with investment intent.'"  SEC Opp. at 36.  This is just a lawyer's argument, not evidence.  *See Jamaica Ash & Rubbish Removal Co. v. Ferguson*, 85 F. Supp. 2d 174, 182 (E.D.N.Y. 2000).  Moreover, the "expectation of profits" element requires "an objective inquiry into the character of the instrument or transaction offered."  *See Warfield*, 569 F.3d at 1021.  The subjective intentions of purchasers are irrelevant to what Kik objectively led purchasers to expect.  *See* Kik Opp. at 16–17.[15]

---

[15] Because the SEC must prove its case from an objective assessment of what Kik offered, in its own Motion, Kik does not rely on any such statements of purchasers' subjective intent or motive.  The SEC's Motion, on the other hand, relies on the subjective views of purchasers, which are disputed by evidence to the contrary.  *See* Kik Opp. at 16–17; Kik 56.1 Response at ¶¶ 187–191.  As a result, a dispute of fact as to the amount of Kin purchasers who subjectively intended to profit is fatal to the SEC's Motion, and immaterial to Kik's Motion.

Rather than providing actual evidence that Kik "led" these purchasers to expect profit, the SEC's argument turns on its assumption that any purchaser who bought some (arbitrary)[16] large quantity, must have had an "investment intent." The undisputed facts show otherwise.[17] Developers planning to incorporate Kin into their own apps would require a large initial quantity of Kin to use as a reward to their app users. *See* Kik Opp. at 39. Several developers in fact said that is exactly what they did. *See* Landsvik Ex. Z at ¶ 15 (explaining that he purchased more than 13 million tokens because he "thought it likely [he] could build an application that would utilize the Kin tokens that [he] purchased"); Landsvik Ex. AA at ¶¶ 16, 50 (explaining that he purchased more than 25 million Kin with the intention of building an application that would use Kin); Landsvik Ex. CC at ¶ 28 (explaining that he needed a large supply of Kin to begin operating his application, which paid out Kin rewards to users to reward physical activity). But this is, again, a misdirection: the size of the purchase (and the SEC's evolving views on how to interpret that size) is wholly irrelevant—the question is whether Kik led purchasers to expect profits. The undisputed facts show that it did not.

At bottom, the SEC's speculation about the intent of several thousand TDE purchasers who purchased widely varying amounts for any number of potential reasons is not enough to avoid summary judgment, which is the "put up or shut up" moment where the non-moving party must identify those "specific facts showing that there is a *genuine issue for trial*." *Weinstock v.*

---

[16] The SEC also presents heavily biased statistics on the amounts of Kin purchased in the TDE, drawing an arbitrary line at purchases of $100. *See* SEC Opp. at 37. Kik's CFO never testified that purchases *over* $100 were automatically profit-seeking, nor is there any basis to draw such a distinction. As discussed in Kik's Motion and Opposition, roughly half of the purchasers in the public sale bought less than $1,000 worth of Kin, and many purchasers bought less than $1 worth of Kin.

[17] The SEC attempts to distinguish Kin from the sales of condominiums or co-ops where a single purchaser who bought large quantities "obviously could not himself use twenty-five" lots of land. *Cameron*, 608 F.2d at 193; *see* SEC Opp. at 36. The analogy does not hold here. Unlike an individual who could not physically occupy 25 campsites, a purchaser buying large quantities of Kin *could* use or consume the tokens, and thus the quantity any one buyer purchased should not be determinative.

*Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (emphasis added).  Simply put, this SEC has not done so.  No reasonable trier of fact could find on this record that Kik offered Kin "*primarily as an investment*" rather than one where users were led to expect use or consumption of their Kin. *See Leonard*, 529 F.3d at 88.

      **E.**      **Kik's Efforts Could Not Cause Kin Purchasers to Profit.**

The SEC does not dispute (or even address) Kik's argument that Kin's value was solely a function of supply and demand, which necessarily depends on the actions of multiple parties, nor does the SEC dispute that the value of Kin depended on market forces outside of Kik's control. Kik Opp. at 52; SEC Response to Kik 56.1 at ¶¶ 89, A, B.  These undisputed facts preclude a finding that TDE purchasers were led to expect profits from Kik's efforts.  *See* Kik Br. at 32–35; *see also Davis*, 401 F.Supp. at 1050 ("[N]o 'investment contract' is involved when a person invests in real estate, with the hope perhaps of earning a profit as the result of a general increase in values concurrent with the development of the neighborhood.")  An "economy" requires transactions, and Kik could not single-handedly create the Kin economy.  It could not force other developers to create apps that would integrate Kin tokens or accept them as payment, and it could not force users to transact in Kin.  The growth of the Kin economy—and thus the value of the currency that would be used in that economy—turned entirely on general principles of supply and demand over which Kik had no control.  Perhaps most importantly, Kik routinely told potential purchasers that the success of the Kin economy (the only thing that would increase demand for Kin) depended on the participation of many independent third parties, Kik Mot. at 9, 34-35, and the SEC does not dispute this, either.  *See* SEC Response to Kik 56.1 at ¶¶ 14, 19, 60.

Instead, the SEC attempts to manufacture another dispute that is neither genuine nor material.  According to the SEC, it was "obviously impossible" for individual purchasers to "undertake any of the . . . steps to develop the Ecosystem."  SEC Opp. at 5.  But the undisputed

facts show that this was not impossible at all, much less obviously so: any developer or user with a smart phone could easily help develop the Kin economy, and in fact, the SEC does not contest that to date, *millions have done so*.  *See* Kik 56.1 at ¶ 83 (admitting that, as of March 19, 2020, 1.9 million users were spending Kin tokens within applications per month); *see also* Welsh Ex. R (showing that approximately one month later roughly 4 million new users were spending Kin per month).  Kik was always clear that the work of developing the Kin economy needed to be done by any number of independent participants who integrated or used Kin within digital applications. *See* Kik Br. at 9–10 (summarizing pre-TDE public statements expressing that Kik would be "just one of thousands of services in the Kin ecosystem" and that its success would depend "on the number of people who work together to build it").  For example, Mr. Livingston announced in a public blog post that to succeed, the Kin economy "needs as many people as possible."  *See* Kik Br. at 30.   Individual developers and users would be integral to the process of building the economy, and the SEC cannot dispute that over time, dozens of independent developers have in fact done so.

While Kik does not dispute that it built some of the infrastructure that allowed the economy to function by launching Kin tokens on the blockchain, the SEC does not identify any of the type of *Howey*-level "commitments and promises" that "cross over the line and make the interest acquired one in an ongoing business enterprise."  *Rodriguez*, 990 F.2d at 11.  The sort of "efforts" that qualify "are activities such as the organization of a business, the efforts of a promoter in cultivating and marketing citrus, the efforts of a promoter in drilling an exploratory well in connection with the sale of oil leases, or the efforts of the managers of a savings and loan to earn profits to be distributed as dividends."  *Bender*, 632 F. Supp. at 501 (internal citations omitted). The mere act of helping build demand is insufficient under any standard, as dozens of other

applications have done the same. Thus, Kik's statements or promises to build functionality for Kin within Kik Messenger, including its statements that it was "incentivized" to do so, do not "cross over the line and make the interest acquired one in an ongoing business enterprise." Many of the SEC's arguments fall into this category, and are without merit. *See* SEC Opp. at 22, 39.

Indeed, the only other efforts that the SEC identifies are (1) developing and launching the Kin Rewards Engine, (2) replacing the blockchain on which Kin would function, and (3) creating the Kin Foundation. But courts have routinely held that this type of activity – building infrastructure – is not enough under *Howey*. *See Davis*, 401 F. Supp. at 1050; *see also* Kik Opp. at 54–55. Rather, *Howey* requires the promise to exert efforts, without which "the investments would be virtually worthless." *Bender*, 632 F. Supp. at 501. None of these activities meet this standard. The Rewards Engine is simply an algorithmic means by which Kin is periodically distributed to Kin economy participants based on transaction volume, rewarding contributions to the ecosystem. Welsh Ex. K at KIK000006.[18] The calculation of these rewards is not even up to Kik's discretion, rather, the standards are pre-determined and applied formulaically based on the data on the blockchain. Executing this menial function hardly qualifies as an "entrepreneurial" effort. Similarly, Kik's statements in 2017 that a new version of Ethereum "might be a new blockchain that we partner with" or that it "might take a crack at building our own" are not promises of "managerial" conduct for the reasons set forth in Kik's Opposition. *See* Kik Opp. 54–55; Kik 56.1 Response at ¶¶ 159–160.[19]

---

[18] To the extent Kik employees have conducted work to execute the Rewards Engine, such work was all done on behalf of the Kin Foundation (not Kik) pursuant to the Services Contract between Kik and the Kin Foundation.

[19] The SEC appears to suggest that Kin did not already function on a blockchain when it was distributed to TDE purchasers. To be clear: when the TDE occurred, Kik had already developed Kin on the Ethereum blockchain and it already functioned as intended. SEC 56.1 Response at ¶¶ 68–71. No further actions from Kik were required to allow Kin to function as a medium of exchange.

The SEC also claims, without record support, that "Kik did not make available to developers the software they needed to incorporate Kin in their programs . . . until after the September 2017 distribution of Kin." SEC Opp. at 7. As the SEC well knows, the tools that allowed any developer to integrate Kin within their application immediately upon launch were already available to the public; purchasers did not require any software from Kik to do so. SEC 56.1 Response at ¶ 74 (conceding that "[a]pp developers could also integrate Kin into their app by using open source Ethereum tools that already existed for Ethereum-based tokens").

*Telegram* is distinguishable on this point as well. Telegram did not only promise to integrate Grams within its application—it was obligated to *build and launch the TON Blockchain*, without which the Initial Purchasers would receive nothing. *Telegram*, 2020 WL 1430035, at *16. Initial purchasers in *Telegram* were wholly reliant on Telegram's efforts to build this blockchain, which immediately sets *Telegram* apart from the Kin TDE, where the blockchain and tokens had already been created. *See id.* at *3 ("The [purchase agreements] entitled the Initial Purchasers to receive an allotment of Grams upon the launch of the TON Blockchain."). Additionally, the initial purchasers were also reliant on Telegram to enforce the exclusive resale windows and take various steps to maintain a price floor for Grams sold on the secondary market. *Id.* at *14. Thus, *Telegram* does not support a finding that TDE purchasers were reliant on Kik's efforts, because here, the economy was already functional and depended on the participation of many parties.

## IV.   KIK ENGAGED IN TWO SEPARATE OFFERINGS.

The SEC cannot dispute that Kik's Pre-sale was exempt from the securities laws. This part of its case rests on an unfounded theory that Kik engaged in a "single noncompliant offering." SEC Mot. At 49. Exemptions from registration are applied "on a transaction by transaction basis." Loss, *et. al.*, Fundamentals of Securities Regulation 3.C.1 (7th Ed. 2020). Where, as here, a plaintiff asserts that two ostensibly separate transactions must be analyzed together, courts evaluate

whether the offerings are "integrated," (i.e., treated as the "same offering") by applying the five-factor integration analysis set forth in 17 C.F.R. § 230.502(a).  Here, undisputed facts (including Kik's filing of a Form D which formalized the separate Pre-sale transaction) establish that Kik conducted two separate transactions.

The SEC seeks to avoid the analysis altogether (presumably because it cannot meet any of the five factors to show integration), arguing that the integration inquiry does not apply on the ground that the two transactions were a single "distribution."  But the SEC provides no support for its theory that the Court should simply ignore the five-factor test required by the regulations in § 230.502(a).  The only case it cites, *SEC v. Cavanagh*, actually confirms that the "doctrine of integration" is the proper means by which "seemingly separate transactions are treated as one when a court or the SEC analyzes whether those transactions are covered by an exemption from Section 5's registration requirements."  445 F.3d 105, 112-13 (2d Cir. 2006) (cited in SEC Opp. at 49).[20] The Court should reject the SEC's attempt to circumvent this framework in favor of an unsupported and incorrect test.

**A.**     **Kik's Pre-sale and TDE Were Not a "Single Distribution."**

Tellingly, the SEC identifies no framework, guidance, or standard for applying its "single offering" theory.  Under any standard, though, none of SEC's arguments have merit.  ***First***, the SEC claims that "Kik did not even give the public investors the same quality of information that it provided to the SAFT participants."  SEC Opp. at 50.  In doing so, the SEC concedes that Kik provided TDE purchasers different documentation and information; this negates integration. Given the vast differences between the transactions, providing the Pre-sale documentation to TDE

---

[20] *Cavanagh* noted (in dicta) that two individual defendants were considered "affiliates" for purposes of Section 4(1) because they remained so "during the negotiation of and agreement to" a single agreement which would take place in multiple stages.  445 F.3d at 113.

purchasers would have been affirmatively *misleading* to them, as none of the terms, conditions, or content applied to them.  For example, the SAFT contained disclaimers and restrictions pertaining to the sale of a security pursuant to Regulation D, but TDE purchasers did not purchase a security, nor was the asset they received (Kin) subject to any similar restrictions.  *See*, *e.g.*, Welsh Ex. E at KIK000066.  More fundamentally, at the time participants entered SAFTs, Kin had yet to be launched, and thus Kik advised Pre-sale purchasers of various risks and conditions related to its ability to build and launch Kin.  *See* Welsh Ex. E at KIK000066–68; Welsh Ex. F at KIK000044–45 (describing status of Kik's ongoing legal proceedings), KIK000048–52 (describing terms of SAFT agreements and the "risks associated with an investment in the SAFT").  Kik's operations and financial condition were relevant because under the SAFT terms, they would terminate if (among other reasons) Kik failed to launch Kin, or if Kik were to cease operations or dissolve for any reason.  *See* Welsh Ex. F at 9.  TDE purchasers were not subject to these risks or conditions because after Kin's launch its progression depended almost entirely on facts outside of Kik's control, and thus the Terms of Use did not contain similar terms. *See* Welsh Ex. H.  A policy of "full disclosure of information" thus supports treating the Pre-sale and TDE separately.

**Second**, the SEC claims that Kik did not outwardly identify different purposes for the Pre-sale and the TDE.  The SEC cites no case (nor is Kik aware of any) that supports the relevance of this assertion.  Integration is evaluated "from the perspective of the issuer of the [alleged] securities," not by reviewing marketing materials.  *SEC v. Mattera*, 2013 WL 6485949, at *13 (S.D.N.Y. Dec. 9, 2013); *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 365 (S.D.N.Y. 1998) (finding that two sales were "integrated in the minds of their architects").  Here, it is undisputed that Kik conducted the Pre-sale to fund development of Kin on the blockchain, and conducted the later TDE to launch the network of users for the Kin economy.  Welsh Ex. A, Philp Decl., ¶¶ 32, 68 (Kik

conducted the Pre-sale "[i]n order to facilitate and fund the development of Kin and its underlying infrastructure," whereas "Kik's goal in the TDE was to ensure a wide distribution of Kin to a large base of potential users."). The SEC claims that the White paper described how Kik would use the combined funds from both the Pre-sale and TDE to "advance the Kin project." SEC Opp. at 50.[21] This is false. The sentence the SEC cites discusses Kik's intended use of the "*[t]he proceeds of the token distribution event*." Welsh Ex. K at KIK000021 (emphasis added). Nowhere does the White paper reference using the proceeds of the TDE to develop and launch Kin. Rather, it states a portion of the proceeds from the TDE will be used "to fund Kik operations" and to "execute upon the roadmap of additional feature development planned for Kin integration into Kik." *Id.*

**Third**, the SEC also claims that nothing *limited* Kik's use of Pre-sale funds to "pre-launch efforts," and that Kik in fact used Pre-sale funds for purposes other than the development of Kin. SEC Opp. at 50. Again, there is no authority for this claim—nothing requires Kik to use every dollar from its Pre-sale toward development of Kin. It is undisputed that: (1) the Pre-sale and TDE had different purposes, as demonstrated by internal and public documents, and (2) the funds *were in fact* used for different purposes. *See* Welsh Ex. A ¶ 50 ("Kik used the funds generated from the Pre-Sale to develop the technology required to successfully launch Kin on the Ethereum blockchain, as well as to create the necessary infrastructure to use Kin within Kik Messenger.").

**Fourth and finally**, the SEC makes a superficial effort to discredit the facts set forth in the chart provided in Kik's Motion (Fig. 1.1). But the SEC fails to meaningfully dispute any of them.

- The "Asset Received" is simply not the same: Pre-sale participants received a specific package of rights and conditions which, upon the occurrence of a number of conditions, entitled them to receive an allocation of Kin. The PPM and SAFT unambiguously describe the "asset received" as "the [r]ight to purchase in the future certain units of Kin

---

[21] The SEC's vague reference to the "Kin project" is imprecise and disregards undisputed facts. After Kin was launched, Kik was clear that the proceeds from the TDE would be dedicated to activities that were exclusive to Kik Messenger. See Kik Opp. at 27 (explaining that TDE funds were subject to Kik's "general 'budgeting process'"). From that point, the work of building the economy was open for any participant.

. . . pursuant to a Simple Agreement for Future Tokens."  TDE purchasers received a good: Kin tokens.

- Similarly, it remains undisputed that the "Time Frame" for the TDE did not commence until (at the earliest) registration opened on September 12, 2017.  The TDE was not even announced to the public until August 30, 2017.  The SEC's conclusory reference to Kik's announcement of Kin in May 2017 raises no meaningful dispute.

- The SEC does not dispute that the "Consideration" received was different, nor does it cite any case holding that the ability to convert one form of consideration into another is relevant.

- There is objective evidence that Kik imposed restrictions on the asset received by Pre-sale purchasers (*e.g.*, Welsh Ex. E); whereas the SEC concedes that the Kin received in the TDE were "unrestricted."

- As discussed above, the SEC also concedes that the "Offering Materials" received by SAFT participants are distinct from the TDE.  Further, the SEC's claim that Kik's "Roadshow" presentations were open to both groups is misleading.  Kik conducted private negotiations with prospective Pre-sale participants that were not open to the public. *See* Welsh Ex. A, Philp Decl., at ¶ 47 (stating that Kik employees "spoke with each individual Pre-sale participant individually as part of [the Pre-sale registration] process").

Rather than dispute that the Pre-sale and TDE were governed by separate contracts, with separate terms and circumstances, the SEC claims that the "contents of the 'Contracts' do not dictate the nature of the investment contracts" at issue.  Opp. at 51.  In other words, the SEC is expressly asking the Court to disregard the contents of the governing ***contracts***, directly in contrast with decades of case law requiring the very opposite. There is no dispute about what these contracts say, and no dispute that their contents are highly relevant to the investment contract inquiry. *See Howey*, 328 U.S. at 299–300 (evaluating the contents of the land and service contracts in question).

**B.      The Pre-sale and TDE Do Not Qualify for Integration.**

It is not surprising that the SEC argues that the integration framework should not apply: none of the five factors supports a finding of integration.[22]  *See* Kik Opp. at 64–71 (discussing each of the factors).  *First*, the Pre-sale and TDE were not part of a "single plan of financing."  The Pre-sale was conducted for short-term capital in order to build and launch Kin, and the TDE was conducted to generate revenue and leverage a new network of Kin users.  *See* Kik Opp. at 64–71; *see also, e.g.*, *Agri-Quip*, SEC No-Action Letter, 1974 WL 9638, at *1 (Sept. 20, 1974).

*Second*, the SEC's sole argument that Kik issued the "same class of securities" depends on the faulty conclusion that Kin itself is a security.  Consistent with positions taken by the SEC and by courts addressing this issue, Kik never treated Kin tokens themselves as a security.  *See* Landsvik Ex. HH ("[T]he token—or coin or whatever the digital information packet is called—all by itself **is not a security**, just as the orange groves in *Howey* were not").  Even if the SEC succeeded in its claim that the TDE was a securities offering, the "security" would not be the same as the security sold in the Pre-sale.  The security sold in the Pre-sale consisted of the conditional right to receive Kin, as memorialized in the SAFTs, whereas the alleged "security" sold in the TDE consisted of the purchase of Kin tokens from Kik, as memorialized in the Terms of Use.  Thus, this factor also cuts against integration.

*Third*, the SEC again misstates the relevant offering periods for the Pre-sale and TDE.  The timing of the offerings for purposes of the integration analysis does not begin at an arbitrary point in time, selected by the SEC; it depends on the timing of the "[o]ffers and sales."  *See* 17 C.F.R. §

---

[22] In its Opposition, the SEC claims that Kik "acknowledges this test" but "declines to address it."  This is untrue—Kik's Motion addresses each of the five factors.  Kik Br. at 41.  Kik further addressed each of these factors in further detail in its Opposition.  Kik Opp. at 64–71.  And, Kik again addresses these factors in the instant brief.  To the extent Kik bears the burden of proving that its two offerings are not integrated, that burden has been satisfied.

230.502(a) (defining six-month safe harbor for "[o]ffers and sales that are made more than six months" apart).  The SEC cannot dispute that SAFT agreements were entered into beginning in June, and that Kik "concluded the Pre-sale and filed a Form D with the SEC on September 11, 2017 (Welsh Ex. A, ¶ 32; *see also* Ex. G), and that Kik "start[ed] the TDE" on September 12, 2017.  *See* Welsh Ex. O.  Thus, there was no overlap between the two transactions.

*Fourth*, there is no dispute that Kik accepted different forms of consideration in the TDE and the Pre-sale.  This factor does not ask whether the consideration received was "similar" (as the SEC claims), but rather whether the consideration was the "***same***."  17 C.F.R. § 230.502.  The SEC again concedes they are not the same, instead proposing that the Ether received from the Pre-sale could be "convert[ed] to U.S. dollars" and were therefore "similar."  SEC Opp. at 53.  This is true of almost any asset or instrument that exists, and if accepted, this theory would eliminate this factor altogether. Courts have found that the absence of this factor alone is sufficient to preclude integration of two offerings, even where one type of consideration could be converted into the other.  *See Goodwin Props., LLC v. Acadia Grp., Inc.*, 2001 WL 800064, at *8–9 (D. Me. 2001) (finding that two offerings were not integrated because the seller received stock and assets in first sale, and cash and loan forgiveness in the second sale).

*Fifth*, the TDE and Pre-sale were conducted for two different purposes.  The SEC's vague references to goals such as "develop[ing] Kin and the Kin Ecosystem" are inaccurate and misleading.  For example, Kik had already "develop[ed] Kin" before the TDE began.  *See* Welsh Ex. A, ¶ 79.  In the Pre-sale, Kik needed funding to build the Kin tokens and basic infrastructure for the Kin economy to function.  The TDE, however, was conducted after that functionality existed, and the revenue was used for Kik's business operations (including building functionality within Kik Messenger).

Given that each of the five factors weighs against integration, Kik's Pre-sale must be evaluated independently for purposes of Regulation D.

## V.   KIK'S PRE-SALE WAS EXEMPT FROM THE REGISTRATION REQUIREMENT AND COMPLIED WITH REGULATION D.

When properly viewed as a standalone transaction, there is no dispute that the Pre-sale is exempt from the registration requirement as a matter of law.  Kik conducted its Pre-sale as a private placement in accordance with Rule 506(c) under Regulation D, and is entitled to judgment in its favor for at least three reasons.  First, the undisputed facts show that Kik complied with each and every requirement of Regulation D.  Second, even assuming there was a deviation from the strict requirements of Rule 506(c), at the very least Kik has demonstrated that it made a good faith effort to comply, and that there were no significant deviations from the rule.  Thus, Kik is also entitled to judgment pursuant to Rule 508.  And finally, in the alternative, the Pre-sale is qualified to an exemption under Rule 4(a)(2), which exempts "transactions by an issuer not involving any public offering." *SEC v. Ralston Purina Co.*, 346 U.S. 119, 122 (1953).

### A.   Kik Complied with Each and Every Requirement of Rule 506(c) and Therefore Is Exempt from Registration.

When confronted with analyzing the Pre-sale on its own merits, separate and apart from the TDE, the SEC's sole claim that Kik failed to comply with Regulation D is that Pre-sale participants were "underwriters."[23]  The SEC's Opposition entirely ignores every step Kik took to comply with Regulation D and fails to meaningfully respond to Kik's Motion, instead raising a sideshow based entirely on the improper assumption that Kin tokens themselves are securities. They do not refute or call into question any of Kik's efforts to verify that each purchaser was not

---

[23] The SEC concedes that the Pre-sale participants were all accredited for purposes of 506(c).  *See*, *e.g.*, Kik 56.1 at ¶¶ 26, 28, 30, 32.

an underwriter, efforts which are automatically deemed to be sufficient under 17 C.F.R. § 230.502(d).  Undisputed facts prove that Kik took all three steps:

- ***First,*** Kik had conversations with each individual Pre-sale participant, who confirmed that they were not purchasing the SAFT to resell or distribute it.  Welsh Ex. A at ¶ 47.  Kik also required them to represent that they were "purchasing this instrument for [their] own account . . . and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has ***no present intention of selling, granting any participation in, or otherwise distributing the same.***" Welsh Ex. E at KIK000069 (emphasis added).

- ***Second***, the SAFTs all had conspicuous disclaimers on the very first page stating that the security had not been registered and would be subject to securities laws for any transfer or resales.  Purchasers were required to verify they had been advised of this fact. *Id.*

- ***Third***, Kik placed unambiguous legends on the SAFT agreements, notifying participants that they were "restricted" securities.  Ex. E, SAFT, at KIK000066.  In addition to the prominent disclaimer above, the PPMs also stated that "[t]he SAFTs described in this Memorandum are subject to restrictions on transferability and resale and may not be transferred or resold." Ex. F at KIK000038.

*See* Kik Br. at 39–40.

Further, the SEC claims that "Kik took no steps to assure that [Pre-sale] participants would not immediately distribute the securities."  SEC Opp. at 53.  This is demonstrably false.  In the Pre-sale, Kik sold an investment contract comprising of the rights and obligations packaged together in the SAFT agreements.  Pre-sale purchasers were expressly restricted from reselling these rights (the "securities") to others.  *See* Welsh Ex. F at KIK000052 ("***The SAFTs may not be transferred***." (emphasis in original)).[24]   The SEC cites no evidence to suggest that Pre-sale

---

[24] Even if the Kin that Pre-sale participants ultimately received were considered "securities" (contrary to SEC guidance and decades of case law), this assertion is still untrue: Pre-sale participants did not even receive 50% of the Kin they were allocated until one full year after Kin was launched.  See Welsh Ex. A at ¶ 39.  Because Kin functioned on a blockchain, and thus entirely outside of Kik's control, Kik did not even have the ability to restrict transfers of Kin after they were received.  *See* Welsh Ex. A at ¶ 91 ("Kik did not (and still does not) have the ability to transfer, freeze, or otherwise control the tokens.").  By delaying the distribution of that Kin, Kik prevented Pre-sale participants from re-selling it for at least one year.

purchasers even attempted to resell their SAFTs, as was the case in *Telegram*.  *See* SEC108 at 12:6-17.  Instead, the SEC claims Kik should have placed restrictions on the Kin delivered to Pre-sale participants post-launch.  This argument rests on the baseless assumption that Kin itself is a security.  Regardless, the SEC provides no support for the notion that Pre-sale participants were motivated to resell their Kin simply because they received it at a discount.  The SEC rests its speculation on the fact that two SAFT participants eventually sold less than 15% of their combined Kin in 2018.  *See* Opp.at 54 (citing SEC 56.1 ¶¶ 193–194, 196).  Neither of these purchasers immediately resold its Kin in the secondary market.  Pantera Capital, the largest Pre-sale purchaser, ***did not sell any*** of its Kin for six months and still owned approximately 90% of its Kin as of September 2018.  SEC 56.1 ¶ 197.  The other referenced Pre-sale purchaser, PB Digital, merely testified that it had sold a portion of its Kin by July 2018, over a year after the date of the alleged "sale" of securities at issue here.[25]  The record simply does not support the SEC's characterization of the Pre-sale participants' motivations.

The SEC also claims that Kik did not take "reasonable care to assure" that the Pre-sale purchasers were not underwriters.  SEC Opp. at 55–56.  This is objectively false, as demonstrated above.  The SEC pretends these facts do not exist, and instead cites a number of actions Kik could have taken to restrict future sales of *Kin* tokens—which were not securities any more than the oranges were securities in *Howey*—and did not even *exist* at the time the SEC claims the parties "[became] committed to one another."  SEC Opp. at 55.  For example, the SEC claims that Kik could have asked Pre-sale participants to represent they were not going to resell Kin, or "creat[ed] the digital equivalent of a restrictive legend for the tokens alerting downstream purchasers that

---

[25] *See* Opp. at 57 (contending that the "sale" of securities occurred once the parties signed the SAFT and became committed to one another); SEC57 (PG Digital signed SAFT on July 3, 2017).

resales must be registered or otherwise exempt." SEC Opp. at 56. The suggestion that Kik should have added a "digital equivalent of a restrictive legend" to a piece of code that exists on a blockchain—something that has ***never been done***, and is logistically impossible—reveals the absurdity of the SEC's position. It is undisputed that Kik had no control over the transfers of Kin after it was distributed. *See* Welsh Ex. A, ¶ 91. Because the SAFT agreements terminated upon the distribution of Kin, Kik could not exercise control over the SAFT participants' Kin.

Finally, the SEC claims that Kik "designed the sales to SAFT participants as part of a public distribution of Kin," citing the preliminary injunction decision in *Telegram*. SEC Opp. at 55–56. This is false. As explained above, facts in *Telegram* are highly distinguishable: there, the first transaction was *explicitly* conducted for the purpose of distributing Grams to the public. Here, there was no such purpose, and Kik *sold* Kin directly to the public in a separate sale. Unlike *Telegram*, the Pre-sale was not a necessary vehicle for distributing Kin to the public.

**B.      Kik Made a Good Faith and Reasonable Attempt to Comply with Rule 506(c) and Therefore the Pre-Sale Is Exempt from Registration.**

Even if Kik failed to comply with a component of Rule 506(c) (it did not), at minimum it is entitled to summary judgment on the grounds that it satisfied Rule 508(a) by making a "good faith" and "reasonable" effort to comply with Rule 506(c). In its Opposition, the SEC fails to substantively address any of Kik's efforts to comply with Regulation D. Instead, the SEC claims (without authority) that the size of the offering makes the alleged failure to comply significant under Rule 508. SEC Opp. at 56–57. Yet "significance" under Rule 508 is not judged by the *amount* of the offering, but rather by the severity of the failure to comply. *See* 17 C.F.R. § 230.508(a)(2) (a failure to comply with a "term, condition or requirement" of Rule 506 will not result in the loss of an exemption if the failure "was insignificant with respect to the offering as a

whole").  Because there is no cap on the amount that can be raised in a Rule 506(c) offering, the amount Kik raised does not factor into the determination of whether Kik satisfied Rule 508(a).

Recasting its "single offering" arguments, the SEC claims the Kik did not satisfy Rule 508(a) on the ground that it was not reasonable for Kik to "create *no* restrictions on the transfer of Kin."  Kik *did* restrict the resale of 50% of their Kin by withholding it for one year.  And regardless, Kin tokens themselves are not securities and there was no need for them to be restricted.  Finally, the SEC repeats its claim that Kik did not take "*any* of the steps" outlined in Rule 502(d).  SEC Opp. at 57 (emphasis in original).  As discussed above, Kik indisputably complied with each and every step outlined by Rule 502(d) (*see* Part V.A, *supra*).  This is more than sufficient to satisfy the reasonableness requirement of Rule 508(a).

### C.    The Pre-Sale Qualifies for an Exemption Under Section 4(a)(2).

As the SEC concedes, "the applicability of [Section 4(a)(2)] should turn on whether the particular class of persons affected need the protection of the [Securities] Act.  An offering to those who are shown to be able to fend for themselves is a transaction "'not involving any public offering.'" *Ralston Purina*, 346 U.S. at 125 (emphasis added). Here, it is undisputed that the Pre-sale participants were sophisticated, high-net-worth individuals that were not in need of the protections outlined in the SEC's Opposition.  *See* ECF No. 1 at ¶ 12 (describing Pre-sale participants as "professional investment funds and other select, wealthy investors"). The SEC also does not dispute the fact that Pre-sale purchasers were "accredited investors" as defined in Regulation D of the Act.  Kik 56.1 at ¶ 26.  The SEC's sole opposition to Kik's claim of exemption under Section 4(a)(2) of the Act is that "Kin were never intended to come rest in the hands of SAFT participants, but to be dispersed to the broader public that was in need of the Act's protections."  SEC Opp. at 58.  The SEC cites no authority suggesting that 4(a)(2) turns on whether the asset could ultimately be transferred to "the broader public," instead, it exempts "***offering[s]***

*to those* who are shown to be able to fend for themselves." *Ralston Purina*, 346 U.S. at 125.  Here,

the "offering" was made to the Pre-sale purchasers.  But for the reasons discussed above, the SEC

has put forth no evidence that SAFT participants were simply a means of distributing Kin to the

public.  As a result, the Pre-sale qualifies for the 4(a)(2) exemption.

## <u>CONCLUSION</u>

For the reasons stated above and in its moving papers, Kik respectfully requests that the

Court grant its Motion for Summary Judgment.

Dated: May 8, 2019                                    Respectfully submitted,


By: /s/ *Patrick E. Gibbs*
_____
   Patrick E. Gibbs (*Pro Hac Vice*)
   Brett H. De Jarnette (*Pro Hac Vice*)
   Jenna C. Bailey (*Pro Hac Vice*)
   Cooley LLP
   3175 Hanover Street
   Palo Alto, CA  94304-1130
   Phone: (650) 843-5000
   Fax:     (650) 849-7400
   Email: pgibbs@cooley.com;
   bdejarnette@cooley.com

   Sarah M. Lightdale (SL7122)
   Cooley LLP
   55 Hudson Yards
   New York, NY 10001-2157
   Phone: (212) 479-6374
   Fax:     (212) 479-6275
   Email: slightdale@cooley.com

   Luke T. Cadigan (*Pro Hac Vice*)
   Julianne M. Landsvik (*Pro Hac Vice*)
   Michael E. Welsh (*Pro Hac Vice*)
   Cooley LLP
   500 Boylston Street, 14th Floor
   Boston, MA  02116-3736
   Phone: (617) 937-2425
   Email: lcadigan@cooley.com;

51

Robert W. Pommer III (RP5328)
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 389-5950
Email: rpommer@kirkland.com

Attorneys for Defendant
KIK INTERACTIVE INC.

## **CERTIFICATE OF SERVICE**

I, Patrick E. Gibbs, hereby certify that a true and correct copy of the foregoing document was served on counsel of record via ECF on this 8th day of May, 2020.

*/s/ Patrick E. Gibbs*
Patrick E. Gibbs

53