USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/30/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                      Plaintiff,

    -against-

KIK INTERACTIVE INC.,

                      Defendant.

------------------------------------------------------------ x

**OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

19 Civ. 5244 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        The U.S. Securities and Exchange Commission ("SEC" or "Plaintiff") filed this action against Kik Interactive Inc. ("Kik" or "Defendant"), alleging that Kik's unregistered offering of digital tokens violated Section 5 of the Securities Act. The parties cross-moved for summary judgment. As detailed further herein, I hold that undisputed facts show Kik offered and sold securities without a registration statement or exemption from registration, in violation of Section 5. Therefore, the SEC's motion for summary judgment is granted, and Kik's motion for summary judgment is denied.

**RELEVANT FACTS**

**I.   The Advent of Kik and Kin**

    **A.  Background**

        Kik was founded in 2009 and launched its messaging application, Kik Messenger, in 2010. Pl. 56.1 Resp.[1] ¶¶ 1-2. Kik Messenger allowed users to communicate in real-time through their mobile devices, much like a text message or other chat application. Def. 56.1

---

[1] "Pl. 56.1 Resp." refers to Plaintiff U.S. Securities and Exchange Commission's Response and Counter-Statement to Defendant Kik Interactive Inc.'s Local Civil Rule 56.1 Statement, ECF No. 75. Paragraph references incorporate both Kik's numbered statements and the SEC's responses.

1

Resp.[2] ¶ 7. Though Kik Messenger was popular, it was not profitable, because Kik did not sell user data to third-party advertisers. Kik Ex.[3] A, ECF No. 64-1 ¶¶ 5-8; Def. 56.1 Resp. ¶¶ 8-9. In search of a profitable business model, Kik created and sold a digital currency, which it called "Kin." Kik Ex. A, ECF No. 64-1 ¶¶ 23-27; Def. 56.1 Resp. ¶¶ 18-32; *see also* SEC Ex.[4] 30, ECF No. 60-30 (Board presentation laying out plan for Kin).

As planned by Kik, Kin was to be a cryptocurrency stored, transferred, and recorded on a digital ledger called a blockchain. Kik Ex. A, ECF No. 64-1 ¶¶ 10-11. On a blockchain, each transaction is recorded in a block, which is linked to a prior block through cryptographic code. Kik Ex. A, ECF No. 64-1 ¶ 12. This results in the chain of blocks making up the ledger, or blockchain. *Id.* Blockchains are decentralized because they rely on the combined computing power of different networks of computers to process and verify transactions. Kik Ex. A, ECF No. 64-1 ¶ 13. Users have access to their own digital wallets to store Kin, and to buy and sell Kin. Kik Ex. A, ECF No. 64-1 ¶ 15. Kik planned to issue Kin using an already existing blockchain, the Ethereum blockchain. Pl. 56.1 Resp. ¶ 68; Kik Ex. K, ECF No. 64-11, at 8. The Ethereum blockchain is an open source, decentralized platform that has been used to issue other custom digital assets. Kik Ex. A, ECF No. 64-1 ¶ 81; Kik Ex. K, ECF No. 64-11, at 8

Kik envisioned Kin as a means of buying and selling digital products and services across different applications, including applications not run by Kik. For example, in this "digital ecosystem," a user might create a song and charge other users Kin to listen to that song. Kik Ex. K, ECF No. 64-11, at 12-15 (Kik white paper listing "prospective use cases" for Kin). That user

---

[2] "Def. 56.1 Resp." refers to Defendant's Response to Plaintiff U.S. Securities and Exchange Commission's Local Rule 56.1 Statement of Undisputed Material Facts in Support of Summary Judgment, ECF No. 78. Paragraph references incorporate both the SEC's numbered statements and Kik's responses.
[3] "Kik Ex." refers to an exhibit annexed to the Declaration of Michael E. Welsh in Support of Defendant's Motion for Summary Judgment, ECF No. 64.
[4] "SEC Ex." refers to an exhibit annexed to the Declaration of Laura D'Allaird in Support of Plaintiff U.S. Securities and Exchange Commission's Motion for Summary Judgment, ECF No. 60.

might then take part of the Kin she earned and spend it on premium features in a gaming application. A user would be able to earn Kin in one application and spend the Kin in another.

Internally, Kik set a goal of raising $100 million total through private and public sales of Kin. Def. 56.1 Resp. ¶ 37. Kik publicly announced its plans for Kin on May 25, 2017 through various media, including a white paper (Kik Ex. K, ECF No. 64-11), press release (Kik Ex. M, ECF No. 64-13), blog post (Kik Ex. L, ECF No. 64-12), live announcement (SEC Ex. 36-B, ECF No. 60-37), and promotional video (SEC Ex. 58-B, ECF No. 60-69).

Kik also embarked on a multi-city tour (the "Roadshow") to promote Kin and discussed Kin at other public events. Def. 56.1 Resp. ¶¶ 57-71. In addition to describing how Kin would operate, Kik's CEO explained how people could make money from early purchases of Kin. For example, at an event five days before the beginning of the public sale of Kin, he said, "if you set some aside for yourself at the beginning, you could make a lot of money." SEC Ex. 49-B, ECF No. 60-58, at 36:7-10; *see also* SEC Ex. 48-B, ECF No. 60-55, at 10:20-11:3. This was possible because Kik "guaranteed scarcity" of Kin by offering a fixed supply. SEC Ex. 48-B, ECF No. 60-55, at 10:20-11:3. It hoped that as the supply stayed fixed, demand, and thus price, would go up. *Id.*

### B. The Private Sale of Kin

The launch of Kin took place in two phases: a private offering between June 2017 and September 11, 2017 (labeled by Kik as the "Pre-Sale") and a public offering beginning on September 12, 2017, the next day (labeled by Kik as the "Token Distribution Event" or "TDE"). In the Pre-Sale, Kik entered into agreements called Simple Agreements for Future Tokens ("SAFTs") with 50 sophisticated participants, verified by Kik's independent consultant to be accredited investors. Pl. 56.1 Resp. ¶¶ 21, 30-33; *see also* Kik Ex. E, ECF No. 64-5 (SAFT). The SAFTs provided that Pre-Sale participants paid U.S. dollars for the right to receive Kin at a

30% discount: 50% of their acquisition when the public offering (described in the SAFT as the "Network Launch") became effective, and 50% a year after. Pl. 56.1 Resp. ¶¶ 22-23; *see also* SAFT § 1(a). Pursuant to the SAFT, purchasers acknowledged that their right to acquire Kin was a security and unregistered with the SEC, and that the right was being acquired for investment and not for resale:

> The Purchaser has been advised that the Right created by this instrument is a security and that the offers and sales of this Right have not been registered under any country's securities laws and, therefore, cannot be resold except in compliance with the applicable country's laws. The Purchaser is purchasing this instrument for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.

SAFT § 4(b). A Private Placement Memorandum also said, "[Y]ou must also represent in writing that you are acquiring the SAFT for your own account and not for the account of others and not with a view to resell or distribute such securities." Kik Ex. F, ECF No. 64-6 (Private Placement Memorandum), at 20.

The Private Placement Memorandum further explained to Pre-Sale participants that money they paid would be used to create a "Minimum Viable Product," advance the development of a "Kin Ecosystem," and build an application to make the Kin Ecosystem available via Kik Messenger. Private Placement Memorandum at 18. The Minimum Viable Product, discussed in more detail below, was a "wallet" within the application that allowed holders of Kin to view their balances, send and receive premium stickers, and view their Kin status (*i.e.*, one of five tiers based on number of Kin held). Private Placement Memorandum at 3.

Kik received $50 million through the Pre-Sale. Pl. 56.1 Resp. ¶ 24. On September 11, 2017, the last day of the Pre-Sale period, Kik filed a Form D with the SEC,

claiming the Pre-Sale was exempt under Rule 506(c). Pl. 56.1 Resp. ¶ 37; *see also* Kik Ex. G, ECF No. 64-7 (Form D).

## II. The Public Sale (The Token Distribution Event)

Kik began its public sale of Kin, or as Kik called it, the Token Distribution Event, or TDE, on September 12, 2017, the day after the private sale ended. TDE participants purchased Kin using Ether, another type of cryptocurrency. Pl. 56.1 Resp. ¶ 39. A Terms of Use Agreement, constituting the entire agreement between the purchaser and Kik, provided that "KIN TOKENS ARE PROVIDED ON AN 'AS IS' AND 'AS AVAILABLE' BASIS WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED." Kik Ex. H, ECF No. 64-8, at KIK000088, 096. It also explained that "Kin Tokens are intended to be used for all transactions within a Kin ecosystem comprised of digital services that participate in the right and opportunity to innovate and compete for compensation in the form of Kin Tokens." *Id.* at KIK000081.

During the TDE, approximately 10,000 purchasers bought Kin in exchange for a total of 168,732 Ether, worth approximately $49.2 million. Def. 56.1 Resp. ¶ 260. For the first 24 hours, purchasers were permitted to buy only $4,393 worth of Kin. Pl. 56.1 Resp. ¶ 58. After that, they could buy unlimited amounts. Def. 56.1 Resp. ¶ 259. In the distribution that followed, on September 26, 2017, one trillion Kin were distributed to purchasers in the private and public sales, unrestricted, with the right to make further sales in the secondary markets. Def. 56.1 Resp. ¶¶ 287-88, 291-92. Kik retained an additional three trillion Kin, or 30% of issued and outstanding tokens. Def. 56.1 Resp. ¶¶ 106, 288. Six trillion additional tokens were distributed to the Kin Foundation, a not-for-profit entity created by Kik. Def. 56.1 Resp. ¶¶ 41, 289. Thus, Kik remained in control, directly and through the Kin Foundation, of 90% percent of all issued and outstanding tokens. As of that date, September 26, 2017, no goods or services were available for sale to holders of Kin. Def. 56.1 Resp. ¶¶ 210-11. They had only Kik's "Minimum

5

Viable Product," that is, a digital wallet showing the holder's balance, and digital stickers of undefined use or purpose. Pl. 56.1 Resp. ¶¶ 76-77.

As for Kik, it had received the payments in Ether and in dollars made by purchasers at the private and public sales. Kik converted the Ether into dollars, and deposited the dollars into two bank accounts. Def. 56.1 Resp. ¶¶ 294-95. Kik announced that it raised nearly $100 million from the distribution of Kin. SEC Ex. 100, ECF No. 60-112. The money from the sales funded Kik's business operations, including the development of the Kin Ecosystem and other projects to "execute on the plan that [Kik] produced in the white paper." Def. 56.1 Resp. ¶¶ 296-99; SEC Ex. 10, ECF No. 60-10, at 480:10-18.

In the years that followed, 57 applications have offered opportunities to earn and/or spend Kin within their applications. Pl. 56.1 Resp. ¶ 81. Based on blockchain activity excluding secondary market transactions, Kin currently ranks third among all cryptocurrencies. Pl. 56.1 Resp. ¶ 86.

### III.   The Absence of SEC Regulations for Cryptocurrencies

Prior to Kik's distribution of Kin, the SEC had not promulgated any rules to regulate issuances of cryptocurrencies. On July 25, 2017, after Kik had announced its plan to issue Kin but before it made its distribution, the SEC issued its *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"). Release No. 81207, 117 S.E.C. Docket 745, 2017 WL 7184670 (July 25, 2017); *see also* SEC Ex. 88, ECF No. 60-100. In the DAO Report, the SEC described its investigation into a German corporation's sale of tokens to investors. The SEC determined that the tokens were securities, but no enforcement proceedings were initiated. 2017 WL 7184670, at *1, 8-12. It "advise[d] those who would use . . . distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws." *Id.* at *1.

6

## IV. Procedural History

The SEC filed the present suit on June 4, 2019. The SEC alleges violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c), based on Kik's alleged offering and sale of securities without a registration statement or exemption from registration. *See* Complaint, ECF No. 1. The SEC seeks relief in the form of an injunction barring Kik from violating Section 5(a) and 5(c) Securities Act, disgorgement of ill-gotten gains, and monetary penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d). Kik denied the allegations, asserting as an affirmative defense that the definition of "investment contract" is void for vagueness as applied to Kik. I denied without prejudice the SEC's motion for judgment on the pleadings based on that issue, holding that a substantive ruling must be deferred until summary judgment. Order (Oct. 29, 2019), ECF No. 29. Now, fact discovery has been completed, and the parties have cross-moved for summary judgment on all claims.

## DISCUSSION

### I. Legal Standard

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). Where, as here, both parties move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under

7

consideration." *Schwabenbauer v. Bd. of Ed. of City School Dist. of City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981).

## II. The Sale of Kin to the Public (the TDE) Was a Sale of a Security and Required a Registration Statement

"Section 5 [of the Securities Act] provides that it is unlawful for any person to use the channels of interstate commerce to sell a security unless a registration statement is in effect as to such security." *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011); *see also* 15 U.S.C. § 77e. "To prove a violation of Section 5 requires establishing three prima facie elements: (1) That the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007); *see also SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006). With respect to the sale of Kin to the public (the TDE), the only disputed legal issue is whether the was the sale of a "security"; the parties agree that all other elements under Section 5 are met.

Under Section 2(a)(1) of the Securities Act, the definition of "security" includes an "investment contract." 15 U.S.C. § 77b(a)(1). In determining what constitutes an investment contract, courts rely on the test set forth in *SEC v. W.J. Howey Co.*: "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298-99 (1946); *see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) ("three elements of the *Howey* test" are "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others"). In this analysis, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

8

Few courts in this Circuit have had the opportunity to apply *Howey* in the context of cryptocurrency. The Second Circuit has not yet spoken on the issue, and two district court decisions, while instructive, present important distinctions in their facts. *See SEC v. Telegram Group Inc.*, No. 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (granting preliminary injunction to prevent planned distribution of digital tokens because there was a substantial likelihood that SEC would succeed in proving that plan constituted unregistered securities offering); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) (denying motion to dismiss in putative class action alleging that company sold unregistered securities through offering of digital tokens). I have to decide this case without benefit of direct precedent in relation to cryptocurrencies. I do so, understanding that the definition of investment contract is "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

Kik concedes that its issuance of Kin through the TDE involved an investment of money by which participants purchased or acquired Ether and exchanged Ether for Kin. Thus, the parties agree that the first element of the *Howey* test is satisfied. The parties dispute whether the second and third elements are satisfied. I hold that that they are.

### A. Common Enterprise

"A common enterprise within the meaning of *Howey* can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak*, 18 F.3d at 87.[5] Where horizontal commonality is present, "the fortunes of each investor depend upon the profitability of the enterprise as a whole." *Id.*

---

[5] "Some circuits hold that a common enterprise can also exist by virtue of 'vertical commonality', which focuses on the relationship between the promoter and the body of investors." *Revak*, 18 F.3d at 87. The Second Circuit has

9

Kik established a common enterprise. Kik deposited the funds into a single bank account. Def. 56.1 Resp. ¶ 295. Kik used the funds for its operations, including the construction of the digital ecosystem it promoted. *See infra* Part II.B; Def. 56.1 Resp. ¶¶ 296-99. This ecosystem was crucial. The success of the ecosystem drove demand for Kin and thus dictated investors' profits. Kik recognized and repeatedly emphasized this. Rather than receiving a pro-rata distribution of profits, which is not required for a finding of horizontal commonality, investors reaped their profits in the form of the increased value of Kin. *See Balestra*, 380 F. Supp. 3d at 354 ("[F]ormalized profit-sharing mechanism" in the form of pro-rate distribution "is not required for a finding of horizontal commonality.").

Kik, relying primarily on out-of-circuit authority, seeks to create additional requirements for a common enterprise. It is true, as Kik asserts, that in the Terms of Use Agreement, Kik expressly disclaimed any ongoing obligation to TDE purchasers after the distribution of their Kin. However, an ongoing contractual obligation is not a necessary requirement for a finding of a common enterprise. *See Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1049-50 (S.D.N.Y. 1975) (considering contractual obligations among other representations, or lack thereof, in assessing common enterprise prong). For example, in *Hart v. Pulte Homes of Michigan Corp.*, one of the cases on which Kik relies, the Sixth Circuit examined the economic realities of the transaction to determine if plaintiffs had alleged "a close relationship between the sale of model homes and the financing of common development" to establish a common enterprise. 735 F.2d 1001, 1005 (6th Cir. 1984). The contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly

---

expressly rejected broad vertical commonality, which only requires the fortunes of the investors to be linked to the *efforts* of the promoter. *Id.* at 87-88. The Second Circuit has not yet decided whether strict vertical commonality, which requires that the *fortunes* of the investor be tied to the fortunes of the promoter, can satisfy the "common enterprise" element of the *Howey* test. *Id.* Because I find that horizontal commonality is present here, I need not address whether vertical commonality is sufficient for a finding of a common enterprise, nor whether vertical commonality is present here.

10

consider representations and behavior outside the contract. *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-55 (1943) (courts consider the "character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect," and may look "outside the instrument itself"). This is in line with the *Howey* test's "emphasis . . . on economic reality." *Tcherepnin*, 389 U.S. at 336.

Similarly, the fact that TDE purchasers could sell their Kin whenever they pleased is not dispositive. With respect to horizontal commonality, the key feature is not that investors must reap their profits at the same time; it is that investors' profits at any given time are tied to the success of the enterprise. This is not a scenario where the funds of each investor were segregated and separately managed, allowing for profits to remain independent. *See Savino v. E. F. Hutton & Co., Inc.*, 507 F. Supp. 1225, 2136-37 (S.D.N.Y. 1981) (rejecting theory of horizontal commonality where "[t]he money invested in each . . . account was not merged into a single investment fund," but instead, "[t]he profitability of each plaintiff's account was purely a function of the transactions executed on behalf of that account, and was not causally related to the profitability of the . . . accounts as a whole").

The economic reality is that Kik, as it said it would, pooled proceeds from its sales of Kin in an effort to create an infrastructure for Kin, and thus boost the value of the investment. This is the nature of a common enterprise, to pool invested proceeds to increase the range of goods and services from which income and profits could be earned or, in the case of Kin, to increase the range of goods and services that holders of Kin would find beneficial to buy and sell with Kin. *See Balestra*, 380 F. Supp. 3d at 354 ("[T]he value of [the digital asset] was dictated by the success of the . . . enterprise as a whole, thereby establishing horizontal commonality."). The stronger the ecosystem that Kik built, the greater the demand for Kin, and thus the greater the value of each purchaser's investment.

## B. Expectation of Profits Based on the Efforts of Others

To qualify as an investment contract, the investment must come with "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975). Profits can take the form of "capital appreciation resulting from the development of the initial investment." *Id. Howey* contemplates that an investor is "led to expect profits *solely* from the efforts of the promoter or a third party." 328 U.S at 298-99 (emphasis added). However, the Second Circuit "ha[s] held that the word 'solely' should not be construed as a literal limitation; rather, we 'consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'" *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir.1982)). I hold that TDE satisfies this element of the *Howey* test.

In public statements and at public events promoting Kin, Kik extolled Kin's profit-making potential. Kik's CEO explained the role of supply and demand in driving the value of Kin: Kik was offering only a limited supply of Kin, so as demand increased, the value of Kin would increase, and early purchasers would have the opportunity to earn a profit. *See* SEC Ex. 48-B, ECF No. 60-55, at 10:20-11:3. He explained, "If you could grow the demand for it, then the price -- the value of that cryptocurrency would go up, such that if you set some aside for yourself at the beginning, you could make a lot of money." SEC Ex. 49-B, ECF No. 60-58, at 36:7-10. In its white paper, Kik explained how Kin would be tradable on the secondary market through cryptocurrency exchanges. Kik Ex. K, ECF No. 64-11, at 8. Furthermore, after the first 24 hours of the TDE, Kik removed the cap on the amount of Kin investors could purchase, thereby allowing purchasers to buy more Kin to speculate on any increase in its value. Def. 56.1 Resp. ¶¶ 259, 261-62.

Kik characterized Kin also as a medium for consumptive use, "a general purpose cryptocurrency for use in everyday digital services such as chat, social media, and payments." Kik Ex. K, ECF No. 64-11, at 8; *see also* Kik Ex. H, ECF No. 64-8, at KIK000081. Kik argues that this consumptive use shows that its sale of Kin does not constitute an investment contract. *See Forman*, 421 U.S. at 852-53 ("[W]hen a purchaser is motivated by a desire to use or consume the item purchased[,] . . . the securities laws do not apply."). However, none of this "consumptive use" was available at the time of the distribution. It would materialize only if the enterprise advertised by Kik turned out to be successful. By contrast, in *Forman*, cited by Kik, "there [could] be no doubt that investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments." 320 U.S. at 344.

The demand for Kin, and thus the value of the investment, would not grow on its own. Growth would rely heavily on Kik's entrepreneurial and managerial efforts. In its white paper, Kik promised to "provide startup resources, technology, and a covenant to integrate with the Kin cryptocurrency and brand." Kik Ex. K, ECF No. 64-11, at 21. In the white paper and elsewhere, Kik further described efforts it would take to integrate Kin into Kik Messenger, create incentives to attract developers who would establish new uses for Kin, and generally "foster an ecosystem" rooted in Kin by "creat[ing] a series of new products, services, and systems." *Id.* at 5-6, 21. Kik's insistence in its briefs that "market forces" would drive the value of Kin ignores the essential role of Kik in establishing the market. Moreover, as Kik's CEO explained, Kik had a unique incentive to increase demand for Kin because it retained for itself 30% of the tokens created. *See* SEC Ex. 46-B, ECF No. 60-49, at 35:17-36:7 ("I think what we can guarantee is we are all in on this . . . . [T]his is something that is in our financial best interest, because of the 30%, but actually, like, just to be honest, like, this is something we have to do.").

These efforts by Kik were crucial because without the promised digital ecosystem, Kin would be worthless. This point draws attention to why Kik's reliance on case

13

law from the real estate context is misplaced. *See, e.g., Forman*, 421 U.S. at 852-53 (holding that homebuyers in a cooperative housing project were not parties to an investment contract where buyers "were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments"); *Davis*, 401 F. Supp. at 1049-51 (holding there was not an investment contract where plaintiff purchased land in a residential subdivision with the mere hope of increase in value based on development of the neighborhood). Unlike real estate, Kin have no inherent value and will generate no profit absent an ecosystem that drives demand. *See Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986) (contrasting sale of condominiums with contexts where, "without the efforts of the promoters, the investments would be virtually worthless"). It is undisputed that Kik had to be the primary driver of that ecosystem.

### III. The Pre-Sale Was Part of an Integrated Offering

"Section 5 provides that it is unlawful for any person to use the channels of interstate commerce to sell a security '[u]nless a registration statement is in effect as to [such] security,' or to offer to sell or offer to buy a security 'unless a registration statement has been filed as to such security.'" *SEC v. Cavanagh*, 155 F.3d 129, 132-33 (2d Cir. 1998) (quoting 15 U.S.C. § 77e(a), (c)). "Once the SEC has made a prima facie case, the burden shifts to the defendant to show that the securities were exempt from the registration requirement." *Id.* at 133. With respect to the Pre-Sale, the private sale of Kin, Kik concedes that it sold securities, but claims that the securities were exempt from registration under Rule 506(c) of Regulation D and that the Court can grant it summary judgment on that basis. Under Rule 506(c) of Regulation D, securities are exempt from the registration requirement where the issuer takes reasonable care to ensure that investors are accredited investors and that they are not underwriters, and the issuer files Form D with the SEC. 17 C.F.R. §§ 230.502, 230.506.

14

"All sales that are part of the same Regulation D offering must meet all of the terms and conditions of Regulation D." 17 C.F.R. § 230.502(a). It is undisputed that the TDE offering, the public sale that began one day after the private sale closed, did not comply with Regulation D. Therefore, if the Pre-Sale and TDE sales are considered part of the same offering, the Pre-Sale does not qualify for an exemption under Regulation D. In determining whether the Pre-Sale and TDE should be considered integrated for purposes of Regulation D, the Court considers:

    (a) Whether the sales are part of a single plan of financing;
    (b) Whether the sales involve issuance of the same class of securities;
    (c) Whether the sales have been made at or about the same time;
    (d) Whether the same type of consideration is being received; and
    (e) Whether the sales are made for the same general purpose.

17 C.F.R. § 230.502(a) note. "Not all of these factors need be established to justify a finding that transactions claimed to be separate were in fact one integrated transaction." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 364 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). "Neither the SEC, nor any court, has provided guidance as to how to weigh the factors, though, in general, the first and fifth factors are often given greater weight." *SEC v. Mattera*, No. 11 Civ. 8323(PKC), 2013 WL 6485949, at *13 (S.D.N.Y. Dec. 9, 2013).

Here, most notably, the Pre-Sale and TDE sale were part of a single plan of financing and made for the same general purpose. Proceeds from both sales went toward funding Kik's operations and building the ecosystem for Kin. Kik Ex. F, ECF No. 64-6, at 18; Kik Ex. K, ECF No. 64-11, at 21. Even where Pre-Sale proceeds were spent separately, they supported the TDE. For example, Pre-Sale proceeds were used to establish the Minimum Viable Product and other infrastructural elements necessary in advance of the TDE. Both internally and in statements to the public, Kik discussed its efforts to raise $100 million collectively, failing to differentiate between the $50 million raised in one sale and the $50 million raised in the other.

The two sales were intertwined in ways that went beyond the use of funds. For example, under the SAFTs made with 50 sophisticated participants, Pre-Sale participants could not receive their Kin unless there was a successful launch through the TDE. SAFT § 1(c). All of Kik's behavior suggests that this was a single effort to raise capital to deploy Kin and keep Kik alive.

Purchasers in the two sales received the same class of securities, fungible Kin that were equal in value. It is true that they received them via different instruments with different rights. However, the ultimate result was distribution of identical assets.

The sales also took place at about the same time. The Pre-Sale ended the day before the TDE sale began, and Kin were distributed to Pre-Sale and TDE purchasers at the same time. Furthermore, as discussed, the sales were staged in this manner because they were interdependent. I have previously held that the timing factor favors a finding of integration where one offering "necessarily followed, and was dependent on" another. *Argentinian Recovery Co. LLC v. Bd. of Dirs. of Multicanal S.A.*, 331 B.R. 537, 547-48 (S.D.N.Y. 2005) (Hellerstein, J.).

The only factor weighing against a finding of integration is that Kik received different forms of consideration from the two sales. For the Pre-Sale, Kik received consideration in the form of U.S. dollars. For the TDE, Kik received consideration in the form of Ether. The SEC argues that these qualify as the same type of consideration because Ether could be easily converted into U.S. dollars. That could be said for many types of consideration though. The SEC does not cite any authority for the proposition that convertibility into U.S. dollars renders consideration "the same" as U.S. dollars.

Taking these considerations together, I hold that the Pre-Sale was integrated with the TDE sales. One would not have happened without the other, and both were integral to the successful launch of Kin. Four of five prescribed factors, including the two most important ones,

16

favor a finding of integration. The two consecutive sales were part of a single plan to introduce Kin and jumpstart the Kin economy.

Thus, I hold that the Pre-Sale, and the TDE sale to the general public, constituted an unregistered offering of securities that did not qualify for exemption under Rule 506(c).

## IV. "Investment Contract" Is Not Unconstitutionally Vague as Applied to Kik

Finally, Kik asserts as an affirmative defense that the term "investment contract" is unconstitutionally vague as applied. The SEC moves for summary judgment that this assertion, Kik's last remaining affirmative defense,[6] fails. I agree and hold that the term "investment contract" is not unconstitutionally vague as applied to Kik's offering of Kin.

A law "'can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) ("[A]ll vagueness challenges—whether facial or as-applied—require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement."). As to the latter issue, the court may hold that a law does not authorize arbitrary and discriminatory enforcement based on a conclusion "(1) that a statute as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement or (2) that, even in the absence of such standards, the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of

---

[6] Kik confirmed at oral argument that it has abandoned its defense of lack of personal jurisdiction.

the statute." *Farrell*, 449 F.3d at 494. Whether a law is impermissibly vague is an objective inquiry. *Copeland*, 893 F.3d at 114.

First, the law regarding the definition of investment contract gives a reasonable opportunity to understand what conduct and devices it covers. *Howey* provides a clearly expressed test for determining what constitutes an investment contract, and an extensive body of case law provides guidance on how to apply that test to a variety of factual scenarios. *See United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) ("[I]t is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well."). That is constitutionally sufficient. *See United States v. Zaslavskiy*, No. 17 CR 647 (RJD), 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018) ("[T]he abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required.").

Second, for similar reasons, the law provides sufficiently clear standards to eliminate the risk of arbitrary enforcement. *Howey* is an objective test that provides the flexibility necessary for the assessment of a wide range of investment vehicles. Kik focuses much of its argument on the SEC's failure to issue guidance on securities enforcement related specifically to cryptocurrencies, SEC officials' inconsistent public statements on the issue, and the SEC's failure to bring enforcement actions against other issuers of digital tokens. However, the law does not require the Government to reach out and warn all potential violators on an individual or industry level. *See Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010) ("Courts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular [party] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." (internal quotation marks and citations omitted)). Kik cites one

case where the Second Circuit, in assessing an as-applied vagueness challenged, took account of uncertainty in the SEC's interpretation of a provision. *See Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996). In *Upton*, the SEC had been inconsistent in its enforcement of a rule as applied to the same practice occurring consistently across the industry for years. *Id.* at 98. By contrast, as Kik acknowledges, every cryptocurrency, along with the issuance thereof, is different and requires a fact-specific analysis. Furthermore, the vagueness inquiry does not call for a factual investigation into whether a statute has led to arbitrary enforcement; it asks, objectively, whether the statute "authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland*, 893 F.3d at 114. The statute at issue here does not.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied. The Clerk is directed to close the open motions (ECF Nos. 57, 61). By October 20, 2020, the parties shall jointly submit a proposed judgment for injunctive and monetary relief. If they cannot agree on a proposed judgment, they should note their differences in a single document, supported by separate statements in a single letter, to be submitted by the same date, October 20, 2020.

SO ORDERED.

Dated: September 30, 2020
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge